Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN MERRITT, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, JAMES E STALEY, TUSHAR MORZARIA, C.S. VENKATAKRISHNAN, and ANNA CROSS<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Plaintiff Stephen Merritt ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Barclays PLC ("Barclays" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Barclays securities between July 22, 2019 and October 12, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

1

misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.      Plaintiff Stephen Merritt, as set forth in the accompanying certification, incorporated by reference herein, purchased Barclays securities during the Class Period and was economically damaged thereby.

7.      Defendant Barclays is a British universal bank.

8.      Barclays is incorporated in England and its head office is located at 1 Churchill Place, London, E14 5 HP, England. Barclays American Depositary Receipts ("ADRs" or "ADR") trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BCS". Barclays maintains an address at 10250 Constellation Boulevard, 7th Floor, Ste. 750, Los Angeles, CA 90067.

9.      Defendant James E. "Jes" Staley ("Staley") served as the Company's Group Chief Executive ("CEO") from December 1, 2015 to October 31, 2021.

10.     Prior to joining Barclays, Defendant Staley was a J.P. Morgan employee. In 1999, he became head J.P. Morgan's Private Banking division, during which time he met Jeffrey Epstein. In 2001, he was promoted to CEO of JP Morgan Asset Management and ran that division until 2009. In 2013, he left J.P. Morgan, and, on October 28, 2015, it was announced that he would become the CEO of Barclays effective December 1, 2015.

11.     Defendant Tushar Morzaria ("Morzaria") has served as a Company Group Finance Director since October 2013.

2

12.     Defendant C.S. Venkatakrishnan ("Venkatakrishnan") has served as the Company's CEO since November 1, 2021.

13.     Defendant Anna Cross ("Cross") has served as a Company Group Finance Director since April 2022.

14.     Defendants Staley, Morzaria, Venkatakrishnan, and Cross are collectively referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (g)     approved or ratified these statements in violation of the federal securities laws.

16.     Barclays is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

17.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18.     Barclays and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     This complaint relates to Jeffrey Epstein ("Epstein"). Epstein was an American financier and a sex offender. He worked at Bear Sterns before opening a consulting firm called Intercontinental Assets Group Inc. ("IAG") in 1981. IAG focused on helping wealthy clients recover embezzled funds. Epstein then worked at Towers Financial Corporation, which was eventually exposed as a Ponzi scheme. He then founded J. Epstein & Company (which became Financial Trust Company), which managed assets for ultra-high net worth individuals.

20.     Through these roles, Epstein accrued significant wealth and became an acquaintance of wealthy and powerful figures, including Defendant Staley.

21.     Epstein was also a sexual predator. He was the subject of multiple criminal prosecutions and civil lawsuits relating to his misconduct and extensive criminal activity. On July 8, 2019, prosecutors in the Southern District of New York charged Epstein with sex trafficking and conspiracy to commit sex trafficking of minors. On August 10, 2019, Epstein was found dead in his cell at the Metropolitan Correctional Center in New York City of an apparent suicide.

22.     Epstein has received significant media attention and infamy due to the egregiousness of his crimes and his association with the wealthy and powerful. In addition to extensive media coverage of Epstein during his life and after his death, he was the subject of a Netflix documentary series called *Jeffrey Epstein: Filthy*

*Rich*, which premiered in May 2020, and a Lifetime series called *Surviving Jeffrey Epstein*, which premiered in August 2020.

**Materially False and Misleading Statements**

**Issued During the Class Period**

23.    On July 22, 2022, in response to Epstein's July 8, 2019 indictment, The New York Times ran an article entitled "Jeffrey Epstein's Deep Ties to Wall Street Figures." (the "July 22 NYT Article"). The July 22 NYT Article highlighted Epstein's ties to various Wall Street figures, including Defendant Staley. Specifically, the July 22 NYT Article discussed how Defendant Staley had visited Epstein at his Palm Beach office, where Epstein spent time on work release while serving a prison sentence.  It stated, in pertinent part:

> When Jeffrey Epstein was serving time in Florida for soliciting prostitution from a minor, he got a surprising visitor: ***James E. Staley, a top JPMorgan Chase executive and one of the highest-ranking figures on Wall Street***.
>
> Mr. Staley had good reason to maintain his relationship with Mr. Epstein, ***who received him at his Palm Beach office, where he had been permitted to serve some of his 13-month sentence in 2008 and 2009***. Over the years, Mr. Epstein had funneled dozens of wealthy clients to Mr. Staley and his bank.
>
> \*       \*       \*
>
> Mr. Epstein nonetheless managed to affix himself to a handful of prominent Wall Street veterans, including Mr. Staley, who is now chief executive of the British bank Barclays.
>
> \*       \*       \*
>
> In the clubby world of Wall Street, one connection often begets another, and Mr. Epstein around 1999 connected with Mr. Staley — one of Mr. Black's good friends. Mr. Staley at the time was running JPMorgan's private bank, which caters to wealthy individuals and where Mr. Epstein was a client.
>
> ***Mr. Epstein and Mr. Staley soon became friends, and Mr. Epstein began***

5

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

*referring rich individuals to Mr. Staley, who over the next decade converted dozens of those referrals into clients of JPMorgan's private bank, according to a person with knowledge of the relationship*.

One introduction proved especially valuable: Mr. Epstein connected Mr. Staley with Mr. Dubin, who at the time was running Highbridge, one of the country's largest hedge funds, according to people familiar with the relationship. Mr. Epstein knew Mr. Dubin because he had once dated Eva Andersson, before she married Mr. Dubin.

A few years later, in 2004, Mr. Staley orchestrated a deal in which JPMorgan bought a majority stake in Highbridge. Mr. Dubin, and the Highbridge co-founder Henry Swieca, became JPMorgan employees. It is not clear whether or how Mr. Epstein was compensated for helping broker that deal.

\*       \*       \*

The Highbridge deal helped elevate JPMorgan's asset-management division — which at the time was under Mr. Staley's leadership — into a major player in the fast-growing hedge fund world, and it cemented Mr. Staley's role in the bank as an up-and-comer. (Mr. Swieca left the bank in 2009, and Mr. Dubin left in 2013.)

\*       \*       \*

*Mr. Staley and JPMorgan, too, stuck with Mr. Epstein for years after his guilty plea* — a period in which, according to prosecutors, Mr. Epstein engaged in an extensive sex-trafficking operation. It wasn't until around 2013, when Mr. Staley left JPMorgan, that Mr. Epstein ceased being a JPMorgan client.

(Emphasis added).

24.    In direct response to the July 22 NYT Article, Stephen Doherty, a Barclays spokesman was quoted in the July 22 NYT Article as saying "***Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally***[.]"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(Emphasis added).

25.     This statement was materially misleading because, while it may have been literally true that Mr. Staley never engaged Mr. Epstein in a business deal, whether in his capacity as a J.P. Morgan employee or personally, it gave the impression that Barclays was denying that Staley had a personal relationship with Epstein.

26.     On February 13, 2020, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2019 (the "2019 Annual Report"). Attached to the 2019 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Staley and Morzaria attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

27.     In the 2019 Annual Report, Barclays disclosed a regulatory investigation by the British Financial Conduct Authority (the "FCA") regarding Defendant Staley's relationship with Jeffrey Epstein. It stated, in pertinent part:

> In deciding whether to recommend Jes Staley for re-election, the Board has carried out its usual formal and rigorous performance assessment, which it does in respect of the effectiveness of each of the Directors. As part of its determination in respect of Mr. Staley, the Board has had regard to media reports in the past 6 months that have highlighted historical links between Mr. Staley and Jeffrey Epstein.
>
> As has been widely reported, earlier in his career Mr. Staley developed *a professional relationship* with Mr. Epstein. *In the summer of 2019, in light of the renewed media interest in the relationship, Mr. Staley volunteered and gave to certain executives, and the Chairman, an explanation of his relationship with Mr. Epstein*. Mr. Staley also confirmed to the Board that he has had no contact whatsoever with Mr. Epstein at any time since taking up his role as Barclays Group CEO in December 2015.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

The relationship between Mr. Staley and Mr. Epstein was the subject of an enquiry from the Financial Conduct Authority (FCA), *to which the Company responded*. The FCA and the Prudential Regulation Authority subsequently commenced an investigation, which is ongoing, into Mr. Staley's characterisation to the Company of his relationship with Mr. Epstein and the subsequent description of that relationship in the Company's response to the FCA.

*Based on a review, conducted with the support of external counsel, of the information available to us and representations made by Mr. Staley, the Board (the Executive Directors having been recused) believes that Mr. Staley has been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein.* Accordingly, Mr. Staley retains the full confidence of the Board, and is being unanimously recommended for re-election at the 2020 AGM.

The Board will continue to cooperate fully with the regulatory investigation, and will provide a further update as and when it is appropriate to do so.

(Emphasis added).

28.     This statement was materially false and misleading because, by the time the 2019 Annual Report was filed with the SEC, Barclays had come into possession of emails between Epstein and Staley which showed that their relationship went well beyond "professional".

29.     The 2019 Annual Report contained the following risk disclosure on employee misconduct:

The Group's businesses are exposed to risk from *potential* non-compliance with its policies and instances of wilful and negligent misconduct by employees, all of which could result in enforcement action or reputational harm. It is not always possible to deter employee misconduct, and the precautions we take to prevent and detect this activity may not always be effective. Employee misconduct could have a material adverse effect on the Group's customers, clients, market integrity as well as reputation, financial condition and prospects.

(Emphasis added).

8

30.     This statement was materially false and misleading because, by the time it was issued, Barclays knew or should have known, based on its possession and review of certain of Defendant Staley's email correspondence with Epstein, that Staley's relationship with Epstein was much deeper than Barclays publicly represented, including to the Financial Conduct Authority.

31.     The 2019 Annual Report contained the following disclosure on reputational risk:

> Reputation risk is the risk that an action, transaction, investment, event, decision or business relationship will reduce trust in the Group's integrity and/or competence.
>
> ***Any material lapse in standards of integrity, compliance, customer service or operating efficiency may represent a potential reputation risk***. Stakeholder expectations constantly evolve, and so reputation risk is dynamic and varies between geographical regions, groups and individuals. A risk arising in one business area can have an adverse effect upon the Group's overall reputation and any one transaction, investment or event (in the perception of key stakeholders) can reduce trust in the Group's integrity and competence. ***The Group's association with sensitive topics and sectors has been, and in some instances continues to be, an area of concern for stakeholders***, including (i) the financing of, and investments in, businesses which operate in sectors that are sensitive because of their relative carbon intensity or local environmental impact; (ii) ***potential association with human rights violations (including combating modern slavery) in the Group's operations or supply chain and by clients and customers***; and (iii) the financing of businesses which manufacture and export military and riot control goods and services.
>
> Reputation risk could also arise from negative public opinion about the actual, or perceived, manner in which the Group conducts its business activities, or the Group's financial performance, as well as actual or perceived practices in banking and the financial services industry generally. ***Modern technologies, in particular online social media channels and other broadcast tools that facilitate communication with large audiences in short time frames and with minimal costs, may significantly enhance and accelerate the distribution and effect of damaging information and***

9

*allegations*. Negative public opinion may adversely affect the Group's ability to retain and attract customers, in particular, corporate and retail depositors, and to retain and motivate staff, and could have a material adverse effect on the Group's business, results of operations, financial condition and prospects.

In addition to the above, reputation risk has the potential to arise from operational issues or conduct matters which cause detriment to customers, clients, market integrity, effective competition or the Group [. . .]

(Emphasis added).

32.     This statement was materially false and misleading because Barclays omitted any discussion of reputational risk relating to Defendant Staley's friendship with Epstein, who it knew or should have known had more than a professional relationship with Defendant Staley.

33.     The statement was materially false and misleading insofar as it discussed potential association with human rights violations (including modern slavery), while failing to disclose Defendant Staley's close association with Epstein, who had engaged in, among other crimes, human trafficking. Epstein had also subjected minors to sexual slavery.

34.     Finally, the statement was materially false and misleading insofar as it discussed the risks of modern technology and the speed with which communications can be broadcasted, which Barclays admitted might serve to enhance and accelerate the effect of damaging information, while failing to disclose that it was at a heightened risk of significant reputational risk due to how much media attention Epstein had received due to the heinousness of his crimes as well as his associations with the rich and powerful.

35.     The 2019 Annual Report contained the following disclosure about legal risk:

The Group conducts activities in a highly regulated global market which exposes it and its employees to legal risks arising from (i) the multitude of

laws and regulations that apply to the businesses it operates, which are highly dynamic, may vary between jurisdictions, and are often unclear in their application to particular circumstances especially in new and emerging areas; and (ii) the diversified and evolving nature of the Group's businesses and business practices. In each case, this exposes the Group and its employees to the risk of loss or the imposition of penalties, damages or fines from the failure of members of the Group to meet their respective legal obligations, including legal or contractual requirements. [. . .]

***A breach of applicable legislation and/or regulations by the Group or its employees could result in criminal prosecution, regulatory censure, potentially significant fines and other sanctions in the jurisdictions in which the Group operates***. Where clients, customers or other third parties are harmed by the Group's conduct, this may also give rise to civil legal proceedings, including class actions. Other legal disputes may also arise between the Group and third parties relating to matters such as breaches or enforcement of legal rights or obligations arising under contracts, statutes or common law. Adverse findings in any such matters may result in the Group being liable to third parties or may result in the Group's rights not being enforced as intended.

(Emphasis added).

36.      This statement was materially false and misleading because, by the time it was issued, Barclays had received emails between Defendant Staley and Epstein which it knew or should have known contradicted the response it had given to the FCA's inquiry on the true nature of the relationship between Epstein and Defendant Staley. Accordingly, this presented legal risk to the Company.

37.      On the same day the 2019 Annual Report was filed with the SEC, Defendant Staley appeared on Bloomberg Television to discuss the Company's annual results. This interview was posted on YouTube in a video titled "Barclays CEO Says He Was 'Very Transparent' About Jeffrey Epstein Relationship."

38.      In this interview, Defendant Staley acknowledged that it was "well known" that he had had a "longstanding professional relationship with Jeffrey Epstein." He also acknowledged that the relationship with Epstein had began in

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

2000, when Staley was tapped to lead J.P. Morgan Chase's private bank, of which Epstein was already a client. He then said the inquiry focused on his transparency with Barclays regarding his relationship with Jeffrey Epstein. He then said that he had been "very transparent" about the relationship, and that Barclays had concluded the same.

39.     This statement was materially false and misleading because Defendant Staley had a much closer relationship with Jeffrey Epstein than he or Barclays had publicly admitted, which Barclays knew at the time of the interview.

40.     On February 18, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Staley and Morzaria attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

41.     The 2020 Annual Report contained the following risk disclosure on employee misconduct:

> ***The Group's businesses are exposed to risk from potential non-compliance with its policies and standards and instances of wilful and negligent misconduct by employees, all of which could result in potential customer and client detriment, enforcement action (including regulatory fines and/or sanctions), increased operation and compliance costs, redress or remediation or reputational damage which in turn could have a material adverse effect on the Group's business, results of operations, financial condition and prospects***. Examples of employee misconduct which could have a material adverse effect on the Group's business include (i) employees improperly selling or marketing the Group's products and services; (ii) employees engaging in insider trading, market manipulation or unauthorised trading; or (iii) employees misappropriating confidential or proprietary information belonging to the Group, its customers or third parties. These risks may be exacerbated in circumstances where the Group is unable to rely on physical oversight and supervision of employees (such as during the COVID-19 pandemic where employees have worked remotely)

(Emphasis added).

42.     This statement was materially false and misleading because, by the time it was issued, Barclays knew or should have known, based on its possession and review of certain of Defendant Staley's correspondence with Epstein, that Staley's relationship with Epstein was much deeper than Barclays publicly represented, including to the FCA.

43.     The 2020 Annual Report contained a substantially similar risk disclosure regarding reputational risk to the 2019 Annual Report's risk disclosure on reputational risk, as discussed in paragraph 31.

44.     Similarly, the 2020 Annual Report's risk disclosure on reputational risk was materially false and misleading for the same reasons as the equivalent disclosure from the 2019 Annual Report, as discussed in paragraphs 32, 33, and 34.

45.     The 2020 Annual Report contained a substantially similar risk disclosure regarding regulatory and legal risk to the 2019 Annual Report's risk disclosure on regulatory and legal risk, as discussed in paragraph 35.

46.     Similarly, the 2020 Annual Report's risk disclosure on legal risk was materially false and misleading for the same reasons as the equivalent disclosure from the 2019 Annual Report, as discussed in paragraph 36.

47.     In response to the November 12, 2021 FT Article (defined below), Barclays pointed to an earlier statement that said, "***the investigation makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes***". (Emphasis added).

48.     This statement was materially false and misleading because Barclays was aware or should have been aware of Defendant Staley's close involvement with Epstein by that time, including Staley's awareness of Epstein's crimes and his possibly witnessing or participating in sex crimes.

13

49.     On May 23, 2022, the Company filed with the SEC its amended Annual Report on Form 20-F/A for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Venkatakrishnan and Cross attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

50.     The 2021 Annual Report contained a substantially similar risk disclosure regarding employee misconduct to the 2020 Annual Report's risk disclosure on potential employee misconduct, as discussed in paragraph 41.

51.     Similarly, the 2021 Annual Report's risk disclosure on employee misconduct was materially false and misleading for the same reasons as the equivalent disclosure from the 2020 Annual Report, as discussed in paragraph 42.

52.     The 2021 Annual Report contained a substantially similar risk disclosure regarding reputational risk to the 2019 and 2020 Annual Report's risk disclosure on reputational risk, as discussed in paragraphs  31 and 43.

53.     Similarly, the 2021 Annual Report's disclosure on reputational risk was materially false and misleading for the same reasons as the equivalent disclosures from the 2019 and 2020 Annual Reports, as discussed in paragraphs 32, 33, 34, and 44.

54.     The 2021 Annual Report contained a substantially similar risk disclosure regarding regulatory and legal risk to the 2019 and 2020 Annual Reports' risk disclosure on regulatory and legal risk, as discussed in paragraphs 35 and 45.

55.     Similarly, the 2021 Annual Report's risk disclosure on legal risk was materially false and misleading for the same reasons as the equivalent disclosure from the 2019 Annual Report, as discussed in paragraph 36.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

56.     On February 15, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Venkatakrishnan and Cross attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

57.     The 2022 Annual Report contained a substantially similar risk disclosure regarding employee misconduct to the 2021 Annual Report's risk disclosure on potential employee misconduct, as discussed in paragraph 50.

58.     Similarly, the 2021 Annual Report's risk disclosure on employee misconduct was materially false and misleading for the same reasons as the equivalent disclosure from the 2020 Annual Report, as discussed in paragraph 51.

59.     The 2022 Annual Report contained a substantially similar risk disclosure regarding reputational risk to the 2019, 2020, and 2021 Annual Reports' risk disclosure on reputational risk, as discussed in paragraphs  31, 43, and 52.

60.     Similarly, the 2022 Annual Report's disclosure on reputational risk was materially false and misleading for the same reasons as the equivalent disclosures from the 2019, 2020, and 2021 Annual Reports, as discussed in paragraphs 32-34, 44, and 53.

61.     The 2022 Annual Report contained a substantially similar risk disclosure regarding regulatory and legal risk to the 2019, 2020, and 2021 Annual Reports' risk disclosure on regulatory and legal risk, as discussed in paragraphs 35, 45, and 54.

62.     Similarly, the 2022 Annual Report's risk disclosure on legal risk was materially false and misleading for the same reasons as the equivalent disclosures from the 2019, 2020, and 2021 Annual Reports, as discussed in paragraphs 36, 46, and 55.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

63.     The statements contained in ¶¶ 24, 26-27, 29, 31, 35, 37-38, 40-41, 43, 45, 47, 49, 50, 52, 54, 56-57, 59, 61 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Contrary to his false public assertions, Jes Staley had a close relationship with Jeffrey Epstein; (2) Staley was reportedly aware of Jeffrey Epstein's criminal activities and may have even sexually assaulted a victim who had previously been trafficked by Jeffrey Epstein; (3) Staley's close, personal relationship with Jeffrey Epstein, and potential criminal activity, if discovered, could bring reputational, legal, and financial harm to Barclays; (4) as a result, Barclays response to the FCA's inquiry regarding Staley's relationship with Epstein was materially false; (5) Barclays, having become aware of information contradicting its response to the FCA's inquiry, then failed to update the response so that it would be accurate, or otherwise take any meaningful action; and (6) that as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

**THE TRUTH BEGINS TO EMERGE**

64.     On November 1, 2021, after market hours, Barclays filed a current report on Form 6-K with the SEC, announcing Defendant Staley's departure from Barclays. It stated, in pertinent part:

Barclays and [Jes Staley], Group Chief Executive, were made aware on Friday evening of ***the preliminary conclusions from the FCA and the PRA of their investigation into Mr[.] Staley's characterisation to Barclays of his relationship with the late Mr[.] Jeffrey Epstein and the subsequent description of that relationship in Barclays' response to the FCA***. In view of those conclusions, and Mr[.] Staley's intention to contest them, the Board and Mr[.] Staley have agreed that he will step down from his role as Group

Chief Executive and as a director of Barclays. ***It should be noted that the investigation makes no findings that Mr[.] Staley saw, or was aware of, any of Mr[.] Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr[.] Staley following the arrest of Mr[.] Epstein in the summer of 2019***.

***The Board is disappointed at this outcome. Mr[.] Staley has run the Barclays Group successfully since December 2015 with real commitment and skill***. Supported by the senior team which he largely helped build and on whom the Barclays Group will be relying for the future, Mr[.] Staley clarified the Barclays Group's strategy, transformed its operations and materially improved its results. The regulatory process still has to run its full course and it is not appropriate for Barclays to comment further on the preliminary conclusions.

(Emphasis added).

65.     On this news, the price of Barclays ADRs fell by $0.25 per ADR, or 2.23%, to close at $10.93 per ADR on November 2, 2021.

66.     On November 12, 2021, before the domestic market closed, the *Financial Times* published an article entitled "Jes Staley exchanged 1,200 emails with Epstein that included unexplained phrases" (the "November 12, 2021 FT Article"). It stated, in pertinent part:

Jes Staley exchanged 1,200 emails with Jeffrey Epstein over a four-year period with content that included unexplained terms such as "snow white", according to people familiar with the correspondence between the former Barclays chief executive and the convicted sex offender.

\*         \*         \*

Central to the probe was a cache of emails first provided to US regulators by JPMorgan [. . .]

***Neither the extent of the email traffic between the two men nor any of its content has been made public until now.***

\*         \*         \*

17

Staley's ties to Epstein began in the early 2000s when Epstein, who managed money for billionaires, was a client of JPMorgan's private bank. They became sufficiently close that Staley visited Epstein while he was serving a prison sentence in Florida in 2009 for procuring a child for prostitution and soliciting a prostitute.

Staley has said their relationship began to "taper off" after he left the US bank in 2013. ***However, just a few months before joining Barclays in 2015, Staley sailed his yacht to Epstein's private Caribbean island. [. . .]***

While aware of Staley's connection to Epstein when he joined Barclays, ***the FCA and PRA opened a formal probe after receiving the email cache from US regulators in 2019***, people familiar with the matter told the FT.

***Barclays was first notified about the emails in early December 2019***, when chair Nigel Higgins was summoned to see Mark Carney, the then governor of the Bank of England, the people said.

Regulators were concerned that the emails contradicted an earlier letter sent by the bank, which described the relationship as professional. ***They urged the board to review the new information and check if the CEO had played down his links with the disgraced financier***.

***The bank spent the next two months scrutinising the large amount of documents with the assistance of law firm Clifford Chance***. At one point Staley considered resigning but was persuaded to stay, two people familiar with the decision said.

Barclays resolved to stand by Staley, deeming him to have been truthful about the relationship and deciding that no conclusions could be drawn about the unexplained language.

\*          \*          \*

Regulators focused on whether Staley was "full and frank" with them in his initial disclosures and subsequent interviews. Regulations require a firm to engage with the FCA in an "open and co-operative way" and disclose anything of which regulators "would reasonably expect notice".

(Emphasis added).

67.     On this news, the price of Barclays ADRs went down by $0.05 per ADR, or 0.469%, to close at 10.62 on November 12, 2021.

68.     After hours on March 8, 2023, relating to the litigation *Jane Doe 1 v. JPMorgan Chase Bank, N.A*., 22-v-10019-JSR (S.D.N.Y.), JPMorgan Chase Bank ("J.P. Morgan") filed a third-party complaint against Defendant Staley for indemnity, contribution, breach of fiduciary duty, and breach of the faithless servant doctrine in the event that it is found liable.

69.     In this matter, plaintiff Doe alleged that "Staley knew without any doubt that Epstein was trafficking and abusing girls." Doe also alleged that Staley "personally observed Doe as a sex trafficking and abuse victims at times including through his departure from JP Morgan in 2013."

70.     Staley was also alleged to have "personally spent time with young girls whom he met through Epstein on several occasions"; "personally visited young girls at Epstein's apartments located at 301 East 66th Street"; "personally observed Epstein around young girls"; and personally observed "Epstein sexually grab young women in front of him."

71.     Plaintiff Doe alleged that "***one of Epstein's friends used aggressive force in his sexual assault of her and informed Jane Doe 1 that he had Epstein's permission to do what he wanted to her.***" (Emphasis added). In her operative complaint, she did not identify who this person was by name. In the third-party complaint, JP Morgan stated "***[u]pon information and belief, Staley is this person***, who she described as a 'powerful financial executive' she had historically been afraid to identify." (Emphasis added).

72.     On this news, the price of Barclays ADRs went down by $0.29, or 3.59%, to close at $7.77 on March 9, 2023. The price of Barclays ADRs then

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

declined by an additional $0.24 per ADR, or 3.08%, to close at $7.53 on March 10, 2023.

73.     On October 12, 2023, the Financial Conduct Authority published an announcement on its website entitled "FCA decides to fine and ban James Staley". It stated, in pertinent part:

> The FCA has decided to fine former CEO of Barclays, James Staley, £1.8 million and ban him from holding a senior management or significant influence function in the financial services industry.

> The FCA has found that *Mr[.] Staley recklessly approved a letter sent by Barclays to the FCA, which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact*.

> Therese Chambers, joint Executive Director of Enforcement and Market Oversight at the FCA said: 'A CEO needs to exercise sound judgement and set an example to staff at their firm. Mr[.] Staley failed to do this. *We consider that he misled both the FCA and the Barclays Board about the nature of his relationship with Mr[.] Epstein*.

> 'Mr[.] Staley is an experienced industry professional and held a prominent position within financial services. *It is right to prevent him from holding a senior position in the financial services industry if we cannot rely on him to act with integrity by disclosing uncomfortable truths about his close personal relationship with Mr[.] Epstein*.'

> In August 2019, the FCA asked Barclays to explain what it had done to satisfy itself that there was no impropriety in the relationship between Mr[.] Staley and Mr[.] Epstein. In its response, Barclays relied on information supplied by Mr[.] Staley. Mr[.] Staley confirmed the letter was fair and accurate.

> *The letter claimed that Mr[.] Staley did not have a close relationship with Mr[.] Epstein*. In reality, in emails between the two *Mr[.] Staley described Mr[.] Epstein as one of his 'deepest' and 'most cherished' friends*.

The letter from Barclays to the FCA also claimed Mr[.] Staley ceased contact with Mr[.] Epstein well before he joined Barclays. ***However, Mr[.] Staley was in fact in contact with Mr[.] Epstein in the days leading up to his appointment as CEO being announced on 28 October 2015. Mr[.] Staley joined Barclays in December 2015***.

While Mr[.] Staley did not draft the letter there was no excuse for his failure to correct the misleading statements when he was the only person at Barclays who knew the full extent of his personal relationship with Mr[.] Epstein and the specific timings of his contact with him. The FCA has found that Mr[.] Staley was aware of the risk that his association with Mr[.] Epstein posed to his career.

***The FCA considers that, in failing to correct the misleading statements in the letter, Mr[.] Staley recklessly misled the FCA and acted with a lack of integrity.***

(Emphasis added).

74.     On this news, Barclays' ADRs fell $0.39 per ADR, or 4.98% to close at $7.43 per ADR on October 12, 2023, damaging investors.

75.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Barclays securities publicly traded on the NYSE or OTC markets during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE and OTC markets. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE and OTC markets, both efficient markets;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

83. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**<u>COUNT I</u>**
**<u>For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder</u>**
**<u>Against All Defendants</u>**

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

88.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

89.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true

facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

91.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

92.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

93.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

94.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

26

of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

97.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

98.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

99.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: November 1, 2023                **THE ROSEN LAW FIRM, P.A.**

                                       /s/ Laurence M. Rosen
                                       Laurence M. Rosen (SBN 219683)
                                       355 South Grand Avenue, Suite 2450
                                       Los Angeles, CA 90071
                                       Telephone: (213) 785-2610
                                       Facsimile: (213) 226-4684
                                       Email: lrosen@rosenlegal.com

                                       *Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS