O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, et al.,<br><br>Defendants. | Case No.: 2:23-cv-09217-MEMF-KS<br><br>**ORDER GRANTING MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL [ECF NO. 17]** |

Before the Court is the Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel filed by Movants Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees. ECF No. 17. For the reasons stated herein, the Court hereby GRANTS the Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel.

/ / /

I. **Background**

A. **Factual Background**[1]

The present case concerns statements made by Defendant Barclays PLC ("Barclays") in its filings to the Securities and Exchange Commission (the "SEC") that were allegedly false and misleading, which lead to the purported class purchasing Barclays securities at inflated prices and sustaining losses therefrom.

From 2015 to 2021, Barclays employed Defendant James "Jes" Staley ("Staley"), who served as its Group Chief Executive. Compl. ¶ 9. Prior to working with Barclays, Staley worked for J.P. Morgan, and in 1999, served as the head of J.P. Morgan's Private Banking division. *Id.* ¶ 10.[2] During this time, Staley met Jeffrey Epstein. *Id.* Epstein was an American financier, who became infamous after his sexual misconduct and criminal activity was brought to light. *See id.* ¶¶ 19–21. Epstein was charged with sex trafficking and conspiracy to commit sex trafficking of minors in July 2019, and in August 2019, was found dead in his cell at a correctional facility. *Id.* at ¶ 21. Due to the egregiousness of his crimes, and his association with many wealthy and powerful figures, Epstein has received significant media attention, both during life and postmortem. *Id.*

On July 22, 2022, the New York Times ran an article entitled "Jeffrey Epstein's Deep Ties to Wall Street Figures" (the "July 22 NYT Article"), which highlighted Epstein's ties to various Wall Street figures, including Staley. *Id.* ¶ 23. The July 22 NYT Article discussed Staley's "friendship" with Epstein, including the commencement of their relationship in 1999, which resulted in Epstein referring many rich individuals as clients to Staley while Staley worked at J.P. Morgan. *Id.* pp. 5–6. The July 22 NYT Article mentioned that Staley and J.P. Morgan stuck with Epstein "for years after his guilty plea – a period in which, according to prosecutors, Mr. Epstein engaged in an extensive

---

[1] The following factual background is derived from the allegations in Plaintiff's Complaint, ECF No. 1 ("Compl."), except where otherwise indicated. The Court makes no finding on the truth of these allegations and includes them only as background.

[2] In 2001, Staley was promoted to CEO of J.P. Morgan's Asset Management division, a position he held until 2009. Compl. ¶ 10. Staley left J.P. Morgan in 2013. *Id.*

sex-trafficking operation." *Id.* p. 6. The July 22 NYT Article also mentioned that Staley was, at the time the article was published, the chief executive of Barclays. *Id.* at p. 5.

In response to the July 22 NYT Article, Stephen Doherty, a spokesman for Barclays, was quoted as saying "'Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally[.]'" *Id.* ¶ 24. Plaintiffs allege that this statement was materially misleading because it gave the impression that Barclays denied any personal relationship between Staley and Epstein. *Id.* ¶ 25.

On February 13, 2020, Barclays filed its Annual Report on Form 20-F for the year ending on December 31, 2019 ("2019 Report") with the Securities and Exchange Commission ("SEC"). *Id.* ¶ 26. The 2019 Report included certifications signed by Staley and another Barclays executive attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. *Id.* The 2019 Report also included the disclosure of a regulatory investigation by the British Financial Conduct Authority ("FCA") regarding Staley's relationship with Epstein. *Id.* ¶ 27. The disclosure, in important part, stated that Staley had developed a professional relationship with Epstein, and in the summer of 2019, in light of "renewed media interest in the relationship," Staley voluntarily gave an explanation of his relationship with Epstein to certain executives at Barclays. *Id.* The disclosure concluded that an FCA investigation was ongoing, but based on the information available to Barclays, Barclays believed that Staley had been fully transparent concerning his relationship with Epstein. *Id.* Plaintiffs allege that this statement was materially misleading because, at the time 2019 Report was filed, Barclays was in possession of emails between Epstein and Staley which showed that their relationship was not merely a professional one. *Id.* ¶ 28.

On the same day the 2019 Report was filed with the SEC, Staley appeared on Bloomberg Television to discuss Barclays's annual results. *Id.* ¶ 37. During the television appearance, Staley acknowledged that he had a longstanding professional relationship with Epstein and indicated that Staley had been transparent about the nature of this relationship with Barclays. *Id.* ¶ 38.

Barclays filed Annual Reports on Form 20-F for the years ending on December 31, 2020 (*id.* ¶ 40), December 31, 2021 (*see id.* ¶ 49), and December 31, 2022 (*id.* ¶ 56). All these annual reports

contained substantially similar disclosures as the 2019 Report that Plaintiffs contend were false and misleading. *See id.* ¶¶ 43–46, 50–55, 57–62, 63.

On November 1, 2021, Barclays announced Staley's departure, stating that Barclays was made aware of the preliminary conclusions from the FCA of its investigation into Staley and Epstein's relationship, and that in view of the conclusions and Staley's intention to contest them, Staley had agreed to step down from his role. *Id.* ¶ 64. The price of Barclays stock fell the next day. *Id.* ¶ 65. On November 12, 2021, the Financial Times published an article titled "Jes Staley exchanged 1,200 emails with Epstein that included unexplained phrases" (the "FT Article"). *Id.* ¶ 66. The FT Article noted that Barclays had been notified about a cache of emails between Staley and Epstein in early December 2019. *Id.* That same day, the price of Barclays stock fell. *Id.* ¶ 67.

### B. Procedural History

On November 1, 2023, Merritt filed this securities fraud class action on behalf of himself and any other person or entity who purchased or otherwise acquired publicly traded Barclays securities during the Class Period. *See* Compl. The Complaint alleges the following causes of action: (1) Violations of Section 10(b) and rule 10b-5; and (2) Violations of Section 20(a) of the Securities Exchange Act (the "Exchange Act"). *See id.*

On January 2, 2024, David Samuel ("Samuel") filed a motion for appointment as lead plaintiff and approval of choice of counsel. ECF No. 12. That same day, Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees (collectively, the "Teamsters") filed the instant dueling motion for appointment as lead plaintiff and approval of choice of counsel. ECF Nos. 17 (Notice of Motion), 18 ("Motion" or "Mot."). On January 23, 2024, Samuel withdrew his motion. ECF No. 25. On January 23, 2024, the Teamsters filed a reply in support of their Motion. ECF No. 26 ("Reply"). The Teamsters Motion is unopposed. Reply at 1.

On May 1, 2024, the Teamsters filed a waiver of oral argument concerning their Motion. ECF No. 29.

///

## II. Applicable Law

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which established the procedures for the filing of class action suits under the Securities and Exchange Act of 1934. *See* 15 U.S.C. § 78u-4. In *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002), the Ninth Circuit outlined the "simple three-step process for identifying the lead plaintiff pursuant" to the PSLRA. *Id.* at 729. First, the plaintiff that files an action under the PSLRA must provide notice of the "pendency of the action, the claims made and the purported class period" in a "widely circulated national business-oriented publication or wire service." 15 U.S.C. § 78u-4(a)(3)(A); *In re Cavanaugh*, 306 F.3d at 729. The notice must also inform purported class members that they may move the court to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A). Next, the court must determine which plaintiff "has the largest financial interest in the relief sought by the class" who "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii); *see In re Cavanaugh*, 306 F.3d at 730. The third step "is to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements. *In re Cavanaugh*, 306 F.3d at 730 (citing 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

## III. Discussion

As the Court explains in more detail below, the Court finds that the Teamsters have met the requirements of the PSLRA, and as such, appoints the Teamsters as the lead plaintiff and their law firm, Robbins Geller Rudman and Dowd LLP, as lead counsel.

### A. The Teamsters Can Serve as Lead Plaintiffs

A principal issue here is whether the Teamsters—which constitute two separate entity plaintiffs—can together serve as lead plaintiff. The Ninth Circuit has not squarely considered this question,[3] however, other courts to consider the question have allowed for a group to serve as the

---

[3] In *Cohen v. United States District Court for Northern District of California*, 586 F.3d 703, 711 n.4 (9th Cir. 2009), the Ninth Circuit noted, in a footnote, that although the issue was not before the court, "the district court may have erred in appointing 'co-lead plaintiffs[.]'" However, this assertion does not appear to stand for the fact that a few members of the purported class cannot form a group that is labeled as *the* lead plaintiff, as the Ninth Circuit acknowledged, stating that "the PSLRA allows a group to serve as lead plaintiff." *Id.* (citing *In re Cendant Corp. Litigation*, 264 F.3d 201, 223 n.3 (3d. Cir. 2001) (Third Circuit stated that the a group (CalPERS) can serve as lead plaintiff).

lead plaintiff where there was some relation between the members of the group or some other compelling circumstance justified appointing more than one class member as the lead plaintiff. *See In re Advanced Tissue Scis. Sec. Litig.*, 184 F.R.D. 346, 352–53 (S.D. Cal. 1998) (appointing McKitty Group's six designated group members as lead plaintiffs); *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 45 (S.D.N.Y. 1998) (appointing three entities as co-lead plaintiffs would fulfill the purpose of the PSLRA).

  The Court finds that allowing a small group of related members to serve as the lead plaintiff is consistent with the PSLRA. First, the language of the PSLRA specifically states that a court may appoint "as lead plaintiff the . . . *members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." 15 U.S.C. § 78u–4(a)(3)(B)(i). Thus, from the language of the PSLRA, it appears that Congress contemplated that members could "band together" and serve as the lead plaintiff in a securities class action.

  Additionally, the SEC has stated that while a court "should not appoint competing applicants for the lead plaintiff position as 'co-lead plaintiffs'" a court may "appoint a single lead plaintiff, which may consist of a group of cooperating persons . . . ." October 30, 1998 Commission Announcement, 1998 WL 755118. In fact, where courts have refused to appoint a group as the "lead plaintiff," the group has generally consisted of unrelated investors "brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff." *In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.*, 209 F.R.D. 447, 451 (C.D. Cal. Aug. 9, 2002) (collecting cases). This limitation is in line with the purpose of the PSLRA, which "'was to prevent lawyer driven litigation' . . . . [T]he goal of the statute is to reduce the 'collective action' problems that widely dispersed clients face in supervising their attorneys." *Aronson v. McKesson HBOC, Inc.*, 79 F. Supp. 2d 1146, 1152 (N.D. Cal. 1999).

  Here, the two Teamsters entities are funds belonging to the same chapter—Teamsters Local 237. Thus, the Teamsters are not a large group, nor are they unrelated and brought together solely for the purpose of aggregating their claims. Thus, the Court does not find that there is a danger of this turning into a "lawyer driven litigation." *See id.* As such, the Court finds that the Teamsters can serve as the lead plaintiff.

### B. The Teamsters Satisfy PSLRA's Requirements

The Court finds that, under 15 U.S.C. § 78u-4, the Teamsters are presumed the most adequate plaintiff because the Teamsters (1) made their motion in response to the issued notice, (2) have the largest financial interest in the relief sought by the class, and (3) otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii).[4]

First, on November 1, 2023, the Rosen Firm (counsel for Merritt) published a notice pursuant to 15 U.S.C. § 78u-4(a)(3)(A) in *Business Wire*.[5] The notice included information concerning the claims at stake, the purported class period, and how to join the class action, as well as a statement that if a party wishes to serve as lead plaintiff, the lead plaintiff must move the court by a certain deadline. The notice satisfied the requirements of the PSLRA. 15 U.S.C. § 78u-4(a)(3)(A). The Teamsters filed their Motion within the time allowed by the notice. Mot. at 3.

Second, the Teamsters have a combined 38,392 shares of Barclays stock and have suffered at least $112,383 in losses allegedly resulting from Defendants' purported misconduct. Based on the record before the Court, the Teamsters have the largest financial interest in relief sought by class.[6]

Third, the Teamsters have satisfied the requirements of Rule 23(a) of the Federal Rules of Civil Procedure. Under Rule 23(a), a party may serve as a class representative if the following requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

---

[4] The Court also notes that the Teamsters filed certifications pursuant to 15 U.S.C. § 78u-4(a)(2)(A), which is not discussed as a requirement by the Ninth Circuit in *In re Cavanaugh*. *See* ECF No. 19-2. The certifications show that the Teamsters have not served as the lead plaintiff in more than 5 securities class actions during any three-year period, as required by 15 U.S.C. § 78u-4(a)(3)(B).

[5] On its website, *Business Wire* states that it has "[f]ull-service newsrooms in North America, Europe and Asia," and that it is "a trusted source for news organizations, journalists, investment professionals and regulatory authorities, delivering news directly into editorial systems and leading online news sources via its multi-patented NX network." About Business Wire, Business Wire, https://services.businesswire.com/about-us?_gl=1*7nr6wd*_ga*MTAxMzQ4NzY1Mi4xNzE0NTk0MDU2*_ga_ZQWF70T3FK*MTcxNDU5NDA1NS4xLjEuMTcxNDU5NDI2NC42MC4wLjA. As such, it appears that *Business Wire* is a "widely circulated national business-oriented publication[.]" *See* 15 U.S.C. § 78u-4(a)(3)(A)(i).

[6] The only other purported class member for whom the Court has financial information for is Samuel, who lost about $10,573 in connection with his purchase of Barclays securities. ECF No. 13 at 5.

Fed. R. Civ. P. 23(a).

First, the Court analyzes typicality and commonality together, as these requirements "tend to merge." *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.3 (1982). Typicality examines whether the claims and defenses of the class representative are typical of the claims and defenses of the class—that is, whether the class representatives "possess the same interest and suffer the same injury as the class members." *Id.* at 156 (internal quotation marks omitted). Commonality requires "a plaintiff to show that 'there are questions of law or fact common to the class,' such that the issues are "capable of classwide resolution . . . ." *Wal-mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011). Here, the claims of the purported class, including the Teamsters, all stem from the same allegedly false and misleading statements Defendants disseminated—mainly, that Staley's relationship with Epstein was strictly professional—which resulted in the purported class members purchasing Barclays stock at inflated prices. Mot. at 6. Whether the statements were false and misleading and violated the Exchange Act are questions that will be resolved uniformly across the entire class—that is, a finding concerning the false or misleading nature of the statements at issue will resolve a central issue for each purported class member's claim.

Although the Teamsters do not address the numerosity requirement, the Court finds that this requirement is met.[7] As the Complaint states, Barclays's securities are actively traded on the NYSE and OTC markets, and as such, there are likely hundreds, if not thousands of members in the proposed class. Compl. ¶ 77; *see In re Cavanaugh*, 306 F.3d at 730 ("It must then focus its attention on *that* plaintiff and determine, *based on the information he has provided in his pleadings* and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'") (second emphasis added)

---

[7] Courts have found, based on the Ninth Circuit's analysis in *in re Cavanaugh*, that an in-depth analysis of Rule 23's requirements is unnecessary at this stage, as the focus of the district court's inquiry is on the typicality and adequacy prongs. *See Lloyd v. CVB Fin. Corp.*, CV 10-06256 MMM, 2011 WL 13128303, at *5 (C.D. Cal. Jan. 21, 2011) (stating that the Rule 23 inquiry focuses on typicality and adequacy at the appointment stage; *Richardson v. TVIA, Inc.*, C 06 06304 RMW, 2007 WL 1129344, at *4 (N.D. Cal. Apr. 16, 2007) ("The typicality and adequacy requirements of Rule 23 are the main focus of this determination."). As such, it is not necessary for the Court to address numerosity and commonality.

Finally, a moving party seeking class certification must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A named plaintiff satisfies the adequacy test if he or she has no conflicts of interest with other class members and if the named plaintiff will prosecute the action vigorously on behalf of the class. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Adequacy also turns on the qualifications of counsel for the representatives. *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Here, there is nothing before the Court to suggest that the Teamsters have a conflict of interest with other purported class members or will not vigorously prosecute the action on behalf of the class. Moreover, the Teamsters have retained Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). Robbins Geller specializes in complex litigation, including securities class actions. *See* The Right Choice, Robbins Geller Rudman & Dowd LLP, https://www.rgrdlaw.com/firm.html (describing Robbins Geller as a firm specializing in, among other areas, securities class action suits). Robbins Geller has 200 lawyers in 10 offices nationwide and served as class counsel in the securities litigation involving Enron (*In re Enron Corp. Sec. Litig.* No. H-01-3624 (S.D. Tex.), securing a $7.2 billion settlement. In re Enron Corp. Sec. Litig., Robbins Geller Rudman & Dowd LLP , https://www.rgrdlaw.com/cases-notable-cases-Enron.html (providing information concerning the *Enron* case and the recovery amount).

## IV.     Conclusion

For the foregoing reasons, the Court GRANTS the Motion. The Court hereby appoints the Teamsters as lead plaintiff in this action and Robbins Geller as lead plaintiff's lead counsel.

IT IS SO ORDERED.

Dated: June 11, 2024

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge