UMHOFER, MITCHELL & KING LLP
MATTHEW DONALD UMHOFER (SBN 206607)
ELIZABETH MITCHELL (SBN 251139)
767 S. Alameda Street, Suite 270
Los Angeles, CA 90021
Telephone:  213/394-7979
matthew@umklaw.com
elizabeth@umklaw.com

– and –

WILLIAMS & CONNOLLY LLP
BRENDAN V. SULLIVAN, JR. (admitted *pro hac vice*)
JOHN M. MCNICHOLS (admitted *pro hac vice*)
STEPHEN L. WOHLGEMUTH (admitted *pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone:  202/434-5800
bsullivan@wc.com
jmcnichols@wc.com
swohlgemuth@wc.com

Counsel for Defendant James E. Staley

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BARCLAYS BANK PLC, et al., <br><br> Defendants. | CASE NO.: 2:23-cv-09217-MEMF-KS <br><br> **DEFENDANT JAMES E. STALEY'S NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> **FILED SEPARATELY:** <br> **(1) REQUEST FOR JUDICIAL NOTICE; and** <br><br> **(2) [PROPOSED] ORDER.** <br><br> Date: March 20, 2025 <br> Time: 10:00 A.M. <br> Courtroom: 8B <br> Hon. Maame Ewusi-Mensah Frimpong |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 20, 2025, at 10:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 8B of the Honorable Maame Ewusi-Mensah Frimpong, located at 350 West First Street, Los Angeles, California 90012, Defendant James E. Staley will, and hereby does, move for dismissal of Plaintiff's Amended Class Action Complaint in this matter.

The Motion seeks dismissal with prejudice of the Amended Class Action Complaint brought by Lead Plaintiff Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees ("Teamsters") and plaintiff The Firemen's Retirement System of St. Louis ("St. Louis Firemen"), for failure to state a claim upon which relief may be granted.

This Motion is filed pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, and is based on the accompanying Memorandum of Points and Authorities, all pleadings and papers filed in this action, all matters of which this Court may take judicial notice, including those set forth in the contemporaneously filed Request for Judicial Notice, and such additional papers and arguments as may be presented at or in connection with the hearing.

This Motion is made following the conference of counsel pursuant to Civil Local Rule 7-3, which took place on October 23, 2024.

DATE: October 30, 2024                    UMHOFER, MITCHELL & KING LLP

s/ Elizabeth A. Mitchell
Matthew Donald Umhofer
Elizabeth A. Mitchell

WILLIAMS & CONNOLLY LLP

Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
John M. McNichols (admitted *pro hac vice*)
Stephen L. Wohlgemuth (admitted *pro hac vice*)

Counsel for Defendant James E. Staley

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 2

      A.     FCA Investigates the Staley-Epstein Connection. ................................................ 3

      B.     Staley Resigns from Barclays After Learning of FCA's "Preliminary Conclusions." ......................................................................................................... 5

      C.     Lawsuits Against JPMorgan Reveal the Staley-Epstein Emails. ........................... 6

      D.     The FCA's Decision. .............................................................................................. 6

ARGUMENT ................................................................................................................................ 7

I.     PLAINTIFFS FAIL TO PLEAD A MATERIAL MISSTATEMENT. ............................. 8

      A.     Plaintiffs Fail To Plead That the Statements Were Misleading. ........................... 9

      B.     Plaintiffs Fail To Plead That the Statements Were Material. ............................... 12

II.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION. ................................................ 15

III.   PLAINTIFFS FAIL TO STATE A CONTROL-PERSON CLAIM AGAINST STALEY. ................................................................................................................... 17

CONCLUSION .......................................................................................................................... 18

CERTIFICATE OF COMPLIANCE ......................................................................................... 19

## TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................................... 7

*Brown v. Assentato*,
2024 WL 4341716 (C.D. Cal. Sept. 27, 2024).................................................................. 8

*Carey Camp v. Qualcomm Inc.*,
2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) .................................................................. 17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)............................................................................................. 11

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)............................................................................... 12

*Cunningham v. Identiv, Inc.*,
716 F. App'x 663 (9th Cir. 2018) ..................................................................................... 10

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010)............................................................................................. 10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................................................... 15

*Eng v. Edison Int'l*,
2017 WL 1857243 (S.D. Cal. May 5, 2017)..................................................................... 17

*Greenhouse v. MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004)....................................................................................... 12, 13

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989)...................................................................................... 12, 14

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010)............................................................................................. 9

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th. Cir. 2024)........................................................................................... 16

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008)............................................................................................. 7

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022)......................................................................................... 15, 16

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

*In re Ramp Networks, Inc. Sec. Litig.*,
    201 F. Supp. 2d 1051 (N.D. Cal. 2002) .......................................................................... 17

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)............................................................................................ 9

*Irving Firemen's Relief & Ret. Fund v. Uber Technologies, Inc.*,
    998 F.3d 397 (9th Cir. 2021)............................................................................................ 8

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011)...................................................................................... 15, 16

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005)........................................................................................... 12

*Lopes v. Fitbit, Inc.*,
    2020 WL 1465932 (N.D. Cal. Mar. 23, 2020)................................................................ 16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)............................................................................ 2, 8, 15, 17

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013)....................................................................................... 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................................ 11

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First
    Solar Inc.*,
    2023 WL 4161355 (D. Ariz. June 23, 2023).................................................................... 16

*Pardi v. Tricida, Inc.*,
    2024 WL 1056013 (N.D. Cal. Mar. 11, 2024).................................................................. 11

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999)........................................................................................... 13

*Ramos v. Comerica Inc.*,
    2024 WL 2104398 (C.D. Cal. Apr. 12, 2024) ............................................................ 15, 17

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017)................................................................................ 8, 9, 11

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ....................................................................... 10

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ............................................................................ 11

*White v. H&R Block, Inc.*,
    2004 WL 1698628 (S.D.N.Y. July 28, 2004) .................................................................. 14

iv

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ............................................................................................ 17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .............................................................................................. 17

**STATUTES**

15 U.S.C. § 78j(b) ................................................................................................................... 8

15 U.S.C. § 78t(a) ................................................................................................................... 8

15 U.S.C. § 78u-4 ............................................................................................................ 7, 15

**RULES**

Fed. R. Civ. P. 9(b) ................................................................................................................ 7

**REGULATIONS**

17 C.F.R. § 240.10b-5 (2014) ................................................................................................ 8

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## PRELIMINARY STATEMENT

In his previous career at JPMorgan, Defendant Jes Staley developed a relationship with celebrity financier Jeffrey Epstein, a JPMorgan client.  The details of their relationship became common knowledge years ago, after Epstein's 2008 conviction for soliciting a minor for prostitution made him a household name and brought scrutiny on his many friends and associates.  To date, no entity has ever found that Staley witnessed or was otherwise aware of Epstein's criminal activity, but the fact of that regrettable relationship has followed Staley through every subsequent turn of his career.

In July 2019, four years into Staley's tenure as CEO of British bank Barclays, his prior relationship received renewed media attention when Epstein was arrested on sex trafficking charges and then killed himself a few weeks later.  Unsettled by these developments, the U.K. Financial Conduct Authority (FCA) asked the Chairman of Barclays what the bank had done to diligence that relationship.  In response, Barclays sent the FCA a letter stating, in pertinent part, that (i) the two men were "not [] close," and (ii) Staley's last contact with Epstein was "well before" Staley became CEO.  In October 2023, four years later, the FCA declared those two statements "misleading."

None of these events had any effect on Barclays' publicly traded shares.  By October 2023, Staley had long since departed the bank, so the FCA's decision had zero repercussions on Barclays as a going concern.  But more importantly, Barclays' 2019 letter containing the allegedly misleading statements was sent *privately* to the FCA, and thus its comments about the nature and duration of the Staley-Epstein relationship were *never communicated to the market*.  Because this is fatal to a fraud-on-the-market claim, Plaintiffs have scoured Defendants' public statements over the same four years (from 2019 to 2023) for any and all statements that sound like, or relate to, the 2019 letter.  In this vein, Plaintiffs have seized on statements (i) that the Epstein relationship was "professional," (ii) that Staley had "no contact" with Epstein while at Barclays; and (iii) that Barclays' board had found Staley "transparent" about the relationship, alleging that such statements, too, were materially misleading in light of the FCA's subsequent decision.  They were not, and Plaintiffs' allegations do not otherwise give rise to a claim.

1

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

In the first place, the statements that Plaintiffs have sued upon are *not* contradicted by the FCA's 2023 decision.  This is unsurprising, as the FCA did not even consider those statements, much less pass judgment on them.  Without that factual predicate, Plaintiffs have no basis to claim that any alleged misstatement was false or misleading, nor can they show that the FCA's decision amounted to a "corrective disclosure" for purposes of the loss causation requirement.  Nor can Plaintiffs establish that any alleged misstatement was "material."  As noted at the outset, the Staley-Epstein relationship was a vestige of Staley's *previous* job at JPMorgan, and thus Defendants' statements about that relationship had nothing to do with his tenure at Barclays or any metric relevant to the bank's stock price.  Moreover, details of the Epstein relationship suggesting that it was more than "professional"—and, therefore, that Staley had *not* been "transparent" about it—had been in the public domain long before the FCA's decision.  For all of these reasons, Plaintiffs' claims fail.

## FACTUAL BACKGROUND[1]

Barclays is a multinational bank and publicly held company headquartered in London.  ECF No. 52 ("Am. Compl.") ¶ 5.  Its ordinary shares trade on the London Stock Exchange under the ticker symbol "BARC."  The bank also has a secondary listing on the New York Stock Exchange where it trades American Depositary Receipts under the ticker symbol "BCS."  *Id.* ¶ 1.

In July 2015, upon the departure of its old CEO, Barclays began its search for a new chief executive.  James Staley, an American banker formerly with JPMorgan, was a top choice for the position.  *See id.* ¶ 11.  At the time, however, Staley shared a well-known connection to Jeffrey Epstein, the Wall Street financier and convicted sex offender.  *See id.* ¶ 56(f).  The two men had met more than fifteen years before through JPMorgan, where Epstein was a client.  *Id.* ¶ 14.  Staley's relationship to Epstein raised concerns in some quarters, *id.* ¶ 56(f), but despite those concerns, Staley became CEO and an Executive Director at Barclays that December, *id.* ¶ 11.

---

[1]  The facts set forth below are taken from the Amended Complaint, documents cited in the Amended Complaint, or documents of which the Court may take judicial notice.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  References to "Ex. __" refer to exhibits to the Declaration of Elizabeth A. Mitchell, filed in support of Mr. Staley's accompanying request for judicial notice.

2

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### A.    FCA Investigates the Staley-Epstein Connection.

Four years later, Staley's tenure at Barclays had been largely successful.  *Id.* ¶ 12. But his prior relationship took on renewed notoriety in July 2019 when Epstein was arrested on sex trafficking charges and then died by suicide a few weeks later.  *Id.* ¶¶ 13, 18.  Commenting on Staley's connection, *The New York Times* observed that Epstein had provided Staley with valuable client referrals during his time at JPMorgan, and—on a more personal note—that while the two men had met through work, their relationship "did not remain purely professional for long" and the pair "soon became friends."  Ex. 01, N.Y. Times at 5; Am. Compl. ¶ 15.  In this vein, the *Times* noted that Staley appeared to have "stuck with" Epstein after his 2008 conviction, even visiting him in Palm Beach while Epstein was serving his sentence.  Ex. 01, N.Y. Times at 7; Am. Compl. ¶¶ 15, 52.  In response to the claims about Epstein's referrals furthering Staley's career, the same article quoted a Barclays spokesman as saying that Staley had "never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally."  Am. Compl. ¶¶ 16, 53.

Concerned by the notoriety, the U.K. Financial Conduct Authority—the chief regulator of Britain's financial markets—contacted Barclays in August 2019 to inquire what the bank had done before hiring Staley to satisfy itself that there was no impropriety in Staley's relationship with Epstein.  *Id.* ¶¶ 19, 60.  In a written response sent in October 2019, Barclays explained that, after conversations with Staley, Staley was "resolute that at no time did he see anything that would have suggested or revealed any aspect of [Epstein's] conduct that has been the subject of recent allegations," with Barclays further noting (i) that the two men "did not have a close relationship" and (ii) that Staley's last contact with Epstein had occurred "well before" he joined Barclays in 2015.  *Id.* ¶¶ 19-20, 62.

A few weeks later, the FCA received from U.S. investigators a collection of Staley-Epstein emails from 2015 and prior years (i.e., pre-dating Staley's time at Barclays).  *Id.* ¶¶ 21, 64.  After reviewing them, the FCA alerted Barclays to the emails, complaining that they belied the claims in Barclays' letter.  *Id.*  Thereafter, the FCA commenced an investigation into whether Barclays—and Staley—had been forthcoming about Epstein.  *Id.* ¶ 64.

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Barclays disclosed the investigation on February 13, 2020, *id.* ¶ 68, noting both (i) the FCA's August 2019 "enquiry" about the Epstein relationship, and (ii) its follow-on investigation into Staley's "characterization" of the relationship in Barclays' October 2019 letter.  Ex. 02, Barclays PLC, Annual Report (Form 20-F) at 13 (February 13, 2020).  Barclays further noted, however, that Staley had already given an account of events to the Barclays board, which the board had found "transparent," and thus that he still enjoyed the board's "full confidence:"

> [E]arlier in his career Mr. Staley developed a professional relationship with Mr. Epstein.  In the summer of 2019, in light of the renewed media interest in the relationship, Mr. Staley volunteered . . . an explanation of his relationship with Mr. Epstein . . . [H]e has had no contact whatsoever with Mr. Epstein at any time since taking up his role as Barclays Group CEO in December 2015.  Based on . . . the information available to us and representations made by Mr. Staley, the Board . . . believes that Mr. Staley has been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein.  Accordingly, Mr. Staley retains the full confidence of the Board . . . .
>
> [Barclays] is cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate in relation to these matters . . . .

Am. Compl. ¶¶ 69-70.

Staley himself made similar comments later that day during an earnings call and other media appearances, stating that he had had a "professional relationship" with Epstein during his time at JPMorgan, but that the relationship "began to taper off quite significantly" after he left, and that there had been "no contact" with Epstein since he joined Barclays.  *Id.* ¶¶ 23, 71.  Staley also noted that the Barclays board had reviewed the situation and found him "transparent."  *Id.*[2]  Barclays Chairman Nigel Higgins reiterated some of these points a few weeks later in a letter to shareholders, stating,

---

[2] *See also* Am. Compl. ¶ 72 (Staley stated he had "a long-standing professional relationship with Jeffrey Epstein" and that he "was transparent with and open with the bank and with the board."); *id.* ¶¶ 73-74 (Staley: "I have been fully transparent and open. I worked with the guy professionally."); *id.* ¶ 75 (Staley: "[I] had no contact with Mr. Epstein after becoming Barclays' CEO.").

4

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

"The Board's governance processes were rigorously followed in relation to this matter," and "Jes [Staley] retains the full confidence of the Board." *Id.* ¶ 77.

Contemporaneous media coverage of these announcements, however, noted the suspicion underlying the FCA's investigation. As the *Evening Standard* reported on February 13, 2020—the same day that Barclays announced the investigation—the FCA "launched an inquiry into what Staley told the bank, and what the bank disclosed in its submission to them," because it was "unsatisfied with the [bank's] response." *Id.* ¶ 73.

**B.      Staley Resigns from Barclays After Learning of FCA's "Preliminary Conclusions."**

On November 1, 2021, Barclays announced that it had been informed of the FCA's "preliminary conclusions" about its 2019 letter, and that Staley intended to contest them and had stepped down as both CEO and director. *See id.* ¶¶ 83-84. In doing so, Barclays observed that the FCA made "no findings that Mr. Staley saw, or was aware of, any of Mr. Epstein's alleged crimes," but reiterated that the investigation that had led to Staley's departure concerned "Mr. Staley's characterization to Barclays of his relationship . . . and the subsequent description of that relationship in Barclays' response to the FCA." *Id.* ¶ 83; *see also id.* ¶ 84 (market analysts noting FCA investigation into Staley's "characterisation" of the Epstein relationship).

Two weeks later, the Staley-Epstein emails that had spawned the FCA investigation became public news. The *Financial Times* reported that the two men had "exchanged 1,200 emails," *id.* ¶ 85, which "showed a close relationship," Ex. 03, Fin. Times at 2-3. As the article observed, Staley and Epstein were "sufficiently close" that Staley had (i) "visited Epstein while he was serving a prison sentence in Florida," (ii) "sailed his yacht to Epstein's private Caribbean island" in 2015, and even (iii) "allowed Epstein to mentor one of his daughters during her college application." *Id.* That same month, the *Financial Mail on Sunday* (Am. Compl. ¶ 87) reported that the FCA's forthcoming report could be an "embarrassment" for Barclays, and that "[t]he concern is that the excerpts [from the emails] will suggest that Staley was closer to Epstein than he had originally stated." Ex. 04, Fin. Mail on Sunday at 2.

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### C.     Lawsuits Against JPMorgan Reveal the Staley-Epstein Emails.

In January 2022, just two months after Staley's resignation, an anonymous plaintiff filed a class action lawsuit against JPMorgan in New York federal court, alleging that the bank had enabled Epstein's sex trafficking and was therefore liable to his victims. Am. Compl. ¶ 92. A year later, the U.S. Virgin Islands filed a similar suit making essentially identical allegations. *Id.* ¶ 93. Both lawsuits mentioned Staley by name, alleging that he and Epstein had "a close personal relationship," and that while at JPMorgan, Staley had shielded Epstein from scrutiny and thereby caused the client relationship to continue. *Id.* ¶¶ 92, 95.

Although many of these details were initially hidden from public view—the pleadings were extensively redacted—that changed in February 2023 when portions of the Virgin Islands' complaint were unsealed. *Id.* ¶ 95. Because the complaint quoted several of the Staley-Epstein emails verbatim, readers could see that Staley had written to Epstein some years earlier that he "deeply appreciated [their] friendship," and had "few so profound," *id.*, and that "it was great to be able, today, to give you . . . a long, heartfelt hug." Ex. 05, USVI Compl. ¶¶ 53, 55, 57-59. These emails attracted significant media attention, with the *Financial Times* commenting the very next month (March 2023) that they "did not tally with a merely professional relationship, close or not." Am. Compl. ¶ 96.

### D.     The FCA's Decision.

On October 12, 2023, the FCA published a "Decision Notice" announcing its conclusions concerning Barclays' 2019 letter. Am. Compl. ¶¶ 4, 29-30, 104, 112-113. In the Decision Notice and an accompanying statement, the FCA asserted that the letter contained "two misleading statements," and that Staley was responsible for them because although he did not draft the letter, he had "recklessly" approved it. *Id.* ¶ 104. On that basis, the FCA fined Staley and barred him from holding a senior position in the U.K. financial services industry. *Id.* That same day, Barclays' NYSE and LSE stock prices dropped $0.39 per share (4.99%) and £4.90 per share (3.12%) respectively. *Id.* ¶¶ 30, 113.

As to the specific statements at issue, the FCA stated:

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

The letter claimed that Mr Staley did not have a close relationship with Mr Epstein. In reality, in emails between the two Mr Staley described Mr Epstein as one of his 'deepest' and 'most cherished' friends.

The letter . . . also claimed Mr Staley ceased contact with Mr Epstein well before he joined Barclays.  However, Mr Staley was in fact in contact with Mr Epstein in the days leading up to his appointment as CEO being announced on 28 October 2015.

*Id.* ¶ 104.  Explaining the basis for these findings, the FCA pointed to (i) "email communications that . . . refer to the strength of the[] friendship," (ii) Staley's visits "to Epstein in Florida 'during his prison sentence,'" and "to various of Epstein's residences," (iii) "Epstein's advice to Staley's daughter on her graduate work," (iv) their "discussion on significant matters," including becoming Barclays CEO, and (v) the two men's interaction in 2015 via email and Staley's personal visit to the Virgin Islands.  *Id.* ¶¶ 106-07.

Three weeks later, Plaintiffs filed this lawsuit, alleging that over the four years between Epstein's arrest and the FCA decision, Defendants violated U.S. and U.K. securities laws by making misleading statements about the Staley-Epstein relationship and the FCA investigation.  Because of Defendants' misstatements, Plaintiffs allege, Barclays shares traded at inflated prices from July 22, 2019—the date of the earliest misrepresentation—until October 12, 2023, when the FCA's Decision revealed the true facts to the market, and, in doing so, caused Plaintiffs to suffer economic losses as their holdings lost value.  *Id.* ¶¶ 1, 113-14.

**ARGUMENT**

To survive a motion to dismiss, a complaint cannot rest on mere "labels and conclusions," and must instead "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citations omitted).  In a securities fraud case, moreover, a complaint must describe the fraud "with particularity," Fed. R. Civ. P. 9(b), and "specify each statement alleged to have been misleading [and] the reason . . . why," 15 U.S.C. § 78u-4; *see also Irving Firemen's Relief & Ret. Fund v. Uber*

7

*Technologies, Inc.*, 998 F.3d 397, 403 (9th Cir. 2021). When weighing whether a complaint meets these "formidable" and "exacting" requirements, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055, 1070 (9th Cir. 2008), a court may look beyond the pleadings and consider extraneous documents if (1) the complaint refers to the documents; (2) the documents are central to the plaintiff's claim; and (3) no party questions their authenticity. *Brown v. Assentato*, 2024 WL 4341716, at * 4 (C.D. Cal. Sept. 27, 2024).

Here, of the Amended Complaint's three claims, only two are directed against Staley. In Count I, Plaintiffs allege that Staley violated Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5 thereunder by making misleading statements that inflated the price of Barclays' NYSE-traded ADRs during the class period. Am. Compl. ¶¶ 132-43 (first citing 15 U.S.C. § 78j(b); and then citing 17 C.F.R. § 240.10b-5 (2014)). In Count II, Plaintiffs allege that Staley is liable for the misleading statements he did not personally make because he was a "control person" under Section 20(a) of the same Act. *Id.* ¶¶ 144-50 (citing 15 U.S.C. § 78t(a)).

For both Counts, the statements potentially at issue for Staley are those made before November 1, 2021, which could (at least in theory) be attributed to Staley either because he made them personally or because he was Barclays' CEO at the time. As to the later-in-time alleged misstatements—set forth at Paragraphs 83 through 98 of the Amended Complaint[3]—Plaintiffs allege no factual basis by which Staley could be liable for them under either Section 10(b) or Section 20(a).

## I.   PLAINTIFFS FAIL TO PLEAD A MATERIAL MISSTATEMENT.

To state a claim for securities fraud under Section 10(b), a plaintiff must allege, among other things, a misrepresentation or omission of material fact. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017). Although usually expressed as one element, the "material misrepresentation[]" requirement actually has two

---

[3] *See* Am. Compl. ¶¶ 83 ("investigation makes no findings that Staley was aware of . . . any of Mr Epstein's alleged crimes "), 86 (same), 88 ("not appropriate . . . to comment . . . on the circumstances of [Staley's] departure"), 89 ("cooperating" with FCA), 94 (same), 98 ("Barclays' "original review, conducted in February 2020, was based on information it had at the time"). Although the Amended Complaint mentions a statement by Staley's U.K. lawyer in November 2021, after Staley's departure from Barclays, *see* Am. Compl. ¶ 85 ("our client had no involvement in any of the alleged crimes committed by Mr. Epstein"), that statement is not among those claimed as actionable, *see* Am. Compl. ¶ 135 (itemizing alleged misrepresentations), presumably because it was not a comment on the FCA's findings, which appears to be Plaintiffs' theory as to why similar statements by Barclays and Higgins were misleading, *see id.* ¶¶ 83, 86.

8

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

components: first, that the sued-upon statement be either false or misleading, and, second, that the information it conveys be material to an investor's decision.  *Id.* at 1275; *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) ("The materiality of information is different from the issue of whether a statement is false or misleading.").

### A.      Plaintiffs Fail To Plead That the Statements Were Misleading.

As to the first component, a statement is "misleading" if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Retail Wholesale,* 845 F.3d at 1275 (citations omitted).  This is a key concept, as a statement is *not* misleading simply because it is incomplete or less than fully forthcoming.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (statement may "not mislead even if it is incomplete or does not include all relevant facts").  Under Rule 9(b) and the PSLRA, Plaintiffs bear the burden to plead facts showing the misleading nature of *each* alleged misrepresentation at issue.  *In re Rigel Pharms.*, 697 F.3d at 877.  As to the misstatements alleged against Staley, Plaintiffs cannot carry this burden.

***Staley "Never Engaged or Paid Fees" to Epstein.***  The earliest alleged misstatement is Barclays' July 2019 statement that Staley "never engaged or paid fees" to Epstein, either at JPMorgan or personally.  Plaintiffs do not allege that this statement was false, but rather that it "omits an accurate description of [Staley and Epstein's] continued close business dealings even after Staley left JPMorgan."  Am. Compl. ¶ 56(d).  But the fact that Barclays denied a formal or paid engagement with Epstein did not create a misimpression of the extent of the men's dealings.  Read in context, in fact, the statement did the opposite: As Plaintiffs allege, Barclays made the statement in response to comments in *The New York Times* about how greatly Epstein's "rich contacts" had furthered Staley's career in the "clubby world of Wall Street."  *Id.* ¶¶ 52-53.  With that background, a limited denial of only a *compensated* relationship would leave no one with the misimpression that Staley and Epstein did not actually work together.

***The Relationship Was "Professional."***  Plaintiffs also challenge Barclays' and Staley's statements from February 2020 describing the Epstein relationship as "professional."  *Id.* ¶¶ 69-72.  Here again, Plaintiffs do not deny the literal truth of the statements—as they acknowledge, the relationship began as a client engagement at JPMorgan, *id.* ¶ 52—but they allege that statements

9

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

were misleading because the relationship was actually "intimately close," as shown by the men's email correspondence, *id.* ¶ 81(a). "Professional," however, is not in conflict with "close," nor does it deny the existence of a personal relationship.  Plaintiffs attempt to surmount this problem by claiming that Defendants said that the relationship was "*only* professional," *see id.* ¶¶ 30, 81(a) (emphasis added), but that is *not* what Barclays and Staley actually said.  *See, e.g.*, *Rok v. Identiv, Inc.*, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017) ("the statements did not say 'only material weakness,'" and thus were not misleading), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("We are not, however, required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice . . . .").

*The Relationship "Taper[ed] Off," with "No Contact" at Barclays.*  As to the alleged misrepresentations on the duration of the Epstein relationship, Plaintiffs focus on (i) Staley's statement in February 2020 that the relationship "began to taper off quite significantly" after he left JPMorgan, and (ii) Barclay's and Staley's statements that he had "no contact" with Epstein once he began at Barclays.  *Id.* ¶¶ 69, 71, 75.  But Plaintiffs plead no facts suggesting that the statements were false—the latest contact they allege was in October 2015, before Staley became CEO, *id.* ¶ 56—nor do they provide any explanation of how the statements could mislead anyone about how long the relationship lasted.  Certainly, neither statement suggests that Staley was *not* in contact with Epstein *up until* he became CEO, and thus they are a far cry from the statement that the FCA found misleading in its October 2023 decision.  *Id.* ¶ 104 (contact ceased "well before" Staley became CEO).

*The Board Found Staley "Transparent" and Had "Full Confidence."*  Plaintiffs also allege that Barclays and Staley made misleading statements concerning the board's subjective views about Staley, challenging their statements in February 2020 that the board had found Staley "transparent," and, consequently, that it had "full confidence" in him.  *Id.* ¶¶ 69, 71, 72, 74.[4]  According to

---

[4]  In Plaintiffs' view, the same applies to Barclays' and Higgins' later statements that their views on Staley "remained unchanged."  Am. Compl. ¶¶ 77 (April 2020), 78 (February 2021).

10

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Plaintiffs, these statements were misleading because, at the time they were made, the board possessed the emails showing the Epstein relationship to be closer than Staley had described.  *Id.* ¶ 81(b).

But the board's assessments of Staley and his candor are inherently opinions.  *Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *7 (N.D. Cal. Mar. 11, 2024) (Opinions "reflect [a] judgment about the underlying circumstances.").  As such, they are *not* misleading without factual allegations showing that the board actually—and contemporaneously—held a different view.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 188 (2015) ("[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect."); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare* to claims under Section 10(b) and Rule 10b-5).  Plaintiffs, however, have pleaded no such allegations.  Moreover, the question whether Staley had met Barclays' *subjective* standards for transparency and confidence—particularly when expressed as "sufficiently transparent," Am. Compl. ¶ 69—is not susceptible of any objective answer, and thus statements about it are non-actionable.  *See Retail Wholesale*, 845 F.3d at 1275 ("To be misleading, a statement must be capable of objective verification."); *cf. Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (statement about company's "transparent . . . approach to credit" was "too generalized to be actionable" (citation omitted)).

***Statements About Staley's and Barclays' Response to the FCA.***  The last category of alleged misrepresentation concerns Barclays' and Higgins' statements concerning Staley's and the bank's compliance with the FCA's investigation.  In this vein, Plaintiffs allege that Barclays misrepresented the situation when it said that Staley "volunteered" information about Epstein because his explanation was actually given in response to the FCA's inquiry.  Am. Compl. ¶¶ 69, 81(f).  But in no way does the statement suggest that Staley's explanation was *unsolicited*, and, indeed, the fact that it was motivated by the FCA's inquiry was disclosed in the same breath.  *Id.* ¶ 69 ("Defendants disclosed the FCA was conducting a regulatory investigation into Staley's relationship with Epstein in light of the media reports . . . linking the two men.").

Plaintiffs fare no better with their allegations based on Barclays' and Higgins' respective statements (i) that Barclays was "cooperating" with the FCA, and (ii) that the board had "rigorously

11

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

followed" its "governance processes" in connection with the FCA's investigation. *Id.* ¶¶ 70, 77, 79, 89, 94. On both points, Plaintiffs' sole ground to claim that the statements were misleading is the fact that the bank possessed "evidence . . . regarding [Staley's] relationship with Epstein," either in the form of emails or Staley's personal knowledge, which supposedly "undermined" its claims. *Id.* ¶ 81(d). But Barclays' only interaction with the FCA about Staley's relationship was its *initial* response in October 2019. That occurred *before*, and indeed was the *cause of*, the investigation that ensued. *Id.* ¶¶ 60-65. Plaintiffs plead no facts suggesting that, once the FCA informed the bank of the emails and actually began the investigation, Barclays did anything other than comply and cooperate. Nor was anyone misled about the fact that the FCA was suspicious of the initial response, as Barclays affirmatively disclosed that it was the impetus for the investigation from the very outset. *See* Ex. 02, Barclays PLC, Annual Report (Form 20-F) at 13 (February 13, 2020).

### B.      Plaintiffs Fail To Plead That the Statements Were Material.

Plaintiffs also fail to establish that any of these alleged misstatements was material. A misrepresentation is "material" if an investor would "consider it important in deciding whether to buy or sell shares of stock." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 531 (S.D.N.Y. 2020) (citation omitted); *accord Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Typically, material matters are those bearing on the business prospects of the company, *not* the personal matters of the company's officers, even if they happen to reflect on an officer's integrity. *E.g.*, *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 660 (4th Cir. 2004) (CEO's lie about college degree immaterial as matter of law). In addition, in a fraud-on-the-market case, a misrepresented fact is *not* material if the true information is already in the public domain and thus presumably factored into the price of the stock. *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("[F]ailure to disclose material information may be excused where that information has been made credibly available to the market by other sources.").

Here, none of the alleged misrepresentations had anything to do with quarterly revenue figures, product offerings, or any other factor bearing on Barclays' bottom line. To the contrary, the Epstein relationship was a matter particular to *Staley* that Plaintiffs do not allege continued into his time at Barclays. Am. Compl. ¶ 56 (October 2015 is latest alleged contact). Plaintiffs' only attempt

12

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

to satisfy their pleading burden and explain why a prior relationship *unrelated* to Barclays would matter to investors is the idea that "the depth and scope of that relationship, if discovered, could bring reputational, legal, and financial harm to Barclays." *Id.* ¶ 81(c). Plaintiffs offer no factual support for this conclusory claim, but even taking it at face value, investors were already well aware of Staley's longtime relationship with Epstein. *Id.* ¶ 76 (quoting February 2020 analyst reports discussing relationship). The question on materiality, therefore, is not whether investors would be moved by knowledge of a CEO's relationship with a convicted sex offender, but rather whether they would be *further* moved by the additional knowledge that the relationship was not only "professional" but also friendly. *See Greenhouse*, 392 F.3d at 657 (materiality turns on whether "disclosure of the untrue *fact*(s) (and nothing *but* the disclosure of the untrue fact(s)) would alter the 'total mix' of information"). The likelihood that such marginal and incremental information would tip the scale on an investment decision four years after the relationship ended is effectively nil.

The same analysis applies to the alleged misrepresentations about Staley's and Barclays' candor and compliance with the FCA's investigation   Like the alleged misstatements about the Epstein relationship, Defendants' statements about "transparency," "cooperating," "governance processes," and the like have nothing to do with Barclays as a going concern, and their would-be materiality appears to be entirely derivative of the Epstein relationship. Certainly, Plaintiffs plead no independent basis to establish their import to investors. Such alleged misstatements do not become material by casting them as reflections on personal or corporate integrity. As courts have recognized, the integrity and credibility of an entity or its officers do not raise materiality issues separate from the underlying subject matter to which the alleged misstatements relate. *See Greenhouse*, 392 F.3d at 659 ("'integrity concerns' . . . are merely derivative of the misrepresentation that was the basis for the suit"). Indeed, a contrary rule would render any misstatement material simply by virtue of being a misstatement, which would dispense with the materiality requirement altogether. *Id.* at 660 (rejecting materiality of "*any* misrepresentation by a CEO—including, perhaps, one about his or her marital fidelity, political persuasion, or golf handicap—that might cause investors to question management's integrity"); *see also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999) ("even lies are not actionable" unless they alter "'total mix' of information." (citations omitted)).

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

But even more fundamentally, throughout the proposed class period, there was more than sufficient information in the public domain for investors to come to their own conclusions about Staley's relationship with Epstein and the FCA investigation. The same July 2019 *New York Times* article that (according to Plaintiffs) initiated the class period also described Staley and Epstein as "*friends*," further noting that their relationship was "*not . . .* purely professional," and that Staley had visited Epstein at his home post-conviction. Am. Compl. ¶ 15; Ex. 01, N.Y. Times at 5, 7 (emphases added). The thousand-plus emails that Staley exchanged with Epstein became public knowledge in November 2021, when the *Financial Times* reported that they "showed a *close* relationship between the two men," adding the detail that Epstein had mentored Staley's daughter about her college application. Ex. 03, Fin. Times at 2-3 (emphasis added). And even the emails themselves were partially unveiled in February 2023—eight months before the class period ended—when pleadings quoting the most endearing language were filed in unredacted form. Am. Compl. ¶¶ 85, 95; Ex. 05, USVI Compl. ¶ 57 (quoting Staley's email that "it was great . . . to give [Epstein] . . . a long, heartfelt hug").

Moreover, this extensive public discussion was not limited to the Epstein relationship itself, and indeed it expressly covered the question whether Barclays and Staley had been candid about the relationship in connection with the FCA investigation. In February 2020, for example, the *Evening Standard* reported that the FCA had initiated its investigation precisely because it "had been unsatisfied" with Barclays's response in the October 2019 letter. Am. Compl. ¶ 73. The *Financial Mail on Sunday* was even more direct, commenting in November 2021 about "concerns" that "the excerpts [from the emails] will suggest that Staley was closer to Epstein than he had originally stated." Ex. 04, Fin. Mail on Sunday at 2. And following the unsealing of the emails in February 2023, the *Financial Times* observed that they "did not tally with a merely professional relationship, close or not." Am. Compl. ¶ 96. All of this information was both accessible and readily comprehensible to any reasonable investor, and thus presumably factored in to the stock price. *See In re Apple Comput. Sec. Litig.*, 886 F.2d at 1115; *cf. White v. H&R Block, Inc.*, 2004 WL 1698628, at *6 (S.D.N.Y. July 28, 2004) ("This is not a case involving private information held internally by the company . . . and available only to officers or directors.").

14

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## II.	PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.

To bring a securities fraud claim under Section 10(b), a plaintiff must also show "loss causation."  15 U.S.C. § 78u-4(b)(4).  In a fraud-on-the-market case, this usually entails a "corrective disclosure," a public statement that reveals the falsity of a prior misrepresentation and, in doing so, causes the company's stock price to drop.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 345 (2005).  Because "not every bit of bad news" is corrective of a prior falsity, *Meyer v. Greene*, 710 F.3d 1189, 1202 (11th Cir. 2013), a plaintiff must show how the would-be disclosure "relate[s] back" to the misrepresentation that is actually at issue, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (emphasis and citation omitted).  This requires "tracing the loss back to the very facts about which the defendant lied."  *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (citation omitted).  In addition, a corrective disclosure "must by definition reveal new information to the market," because it cannot be "corrective" when its content is already known.  *In re Nektar Therapeutics*, 34 F.4th at 839.  And even when a corrective disclosure both "relate[s] back" *and* conveys new information, it must cause the share price to fall "significantly."  *See Metzler*, 540 F.3d at 1062 (quoting *Dura*, 544 U.S. at 347).  A "modest" drop will not give rise to a claim.  *See Ramos v. Comerica Inc.*, 2024 WL 2104398, at *4 (C.D. Cal. Apr. 12, 2024) (citations omitted).

To satisfy this element here, Plaintiffs point to a single event: the release of the FCA Decision Notice on October 12, 2023.  Am. Compl. ¶ 104.  According to Plaintiffs, the Decision Notice was a corrective disclosure because it (i) informed the market that two statements in Barclays' 2019 letter were "misleading," and (ii) was followed shortly thereafter by price drops of 4.99% (NYSE) and 3.12% (London).  *Id.* ¶¶ 30, 113.  But the two statements that the FCA found misleading—i.e., that Staley and Epstein were "not [] close," and that their relationship ended "well before" Staley became CEO, *id.* ¶ 104—were *not* public and are *not* among those that Plaintiffs have sued upon this case.  Plaintiffs nowhere explain how it is that a Decision Notice relating to *other* statements proved the falsity of the *actual* statements they have placed at issue.  Indeed, the "Loss Causation" section of the Amended Complaint does not even mention the alleged misrepresentations in this case, and instead generically refers to "false and misleading statements . . . concerning Staley's relationship with Epstein and Barclays' knowledge thereof," *id.* ¶ 104, as though this meets the specificity

15

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

requirements of the PSLRA.  It plainly does not, as the statute's "exacting" pleading standards apply to *all* elements of a Section 10(b) claim, including loss causation.  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1181 (9th. Cir. 2024).  This is a fatal failing here, as a statement "cannot serve as a corrective disclosure" when it "fail[s] to connect" to the misrepresentation.  *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023); *Katyle*, 637 F.3d at 475.

Moreover, none of the FCA's comments was in any way "revelat[ory]" as of October 2023. *In re Nektar Therapeutics*, 34 F.4th at 839.  The fact that the FCA was "unsatisfied" with Barclays' account of the Epstein relationship in its 2019 letter was a matter of public awareness not later than February 2020.  Am. Compl. ¶ 73.  These concerns were confirmed in November 2021 upon the announcement (in Plaintiffs' words) of "FCA's Preliminary Findings that Staley Lied About His Ties to Epstein."  *Id.* at 30, pt. VII.D.  That was nearly *two years* before the Decision Notice said essentially the same thing.  And the FCA's conclusions in the Decision Notice were expressly premised on the same relationship details that newspapers and other lawsuits had published months and (in some cases) *years* earlier.  *Id.* ¶¶ 106-107 (alleging FCA's reliance on, *inter alia*, (i) "email communications that . . . refer to the strength of the[] friendship," (ii) Staley's visits "to Epstein in Florida 'during his prison sentence,'" and (iii) "Epstein's advice to Staley's daughter on her graduate work").  Indeed, the FCA Decision Notice catalogued instances of "press articles" from July to October 2019 that revealed certain of the relationship details that the FCA itself later cited.  Ex. 06, FCA Decision ¶ 4.34(1) (Press articles "included details of . . . Mr. Staley's visit in January 2009 to Mr. Epstein whilst Mr. Epstein was on work release.").  Where, as here, the very *basis* for the FCA's ultimate conclusions was already known, the fact of the conclusions themselves "added no new information to the market."  *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021).

Unsurprisingly, therefore, the stock drop that coincided with the FCA's decision was in no way "significant" as the law requires.  As noted above, on the day at issue, Barclays shares fell just below 5% on the U.S. exchange and just above 3% in the U.K.  Am. Compl. ¶ 113.  Although "significant" is not a bright-line standard, courts in the Ninth Circuit have observed that "securities

16

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

complaints tend to be predicated on double digit declines," *Carey Camp v. Qualcomm Inc.*, 2020 WL 1157192, at \*6 (S.D. Cal. Mar. 10, 2020), and, thus, they have repeatedly held drops of similar magnitude insufficient as a matter of law, *see id.* at \*6 (finding 4.02% drop insufficient); *Ramos*, 2024 WL 2104398 at \*4 (7.4% drop); *Metzler*, 540 F.3d at 1064 (10% drop); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (4% drop). Furthermore, the closing Barclays share prices on October 12—$7.43 (U.S.) and £152.28 (U.K.)—were nearly *identical* to the average share prices for September and October 2023 of $7.44 and £150.86, respectively. Ex. 07, Barclays' historical stock information. And the drop on October 12 was not a stand-alone event: from October 18 to 27, Barclays shares had eight straight days of drops of about 2.25% per day. *Id.* On these facts, the inference of a causal connection between the price drop and the Decision Notice evaporates. *See Eng v. Edison Int'l*, 2017 WL 1857243, at \*4-5 (S.D. Cal. May 5, 2017) (no loss causation where stock drops were "typical movements for [the] stock in the days prior and subsequent to the alleged corrective disclosures").

## III. PLAINTIFFS FAIL TO STATE A CONTROL-PERSON CLAIM AGAINST STALEY.

To state a claim for control-person liability under Section 20(a) of the Exchange Act, a plaintiff must allege: (1) a primary violation of the federal securities laws; and (2) that the defendant had the ability to "control" the primary violator. *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). As noted above, Count I of the Amended Complaint fails to plead necessary elements of a primary violation of Section 10(b). For that reason, Plaintiffs' control-person claim in Count II also fails. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (dismissing Section 20(a) claim where plaintiff failed to plead primary 10(b) violation). But even if a primary violation were apparent from the facts alleged, the control-person claim against Staley would still require dismissal to the extent based on the alleged misrepresentations made on November 1, 2021 or later—after Staley stepped down as CEO and director—as Staley is not alleged to have any affiliation with the other Defendants after that time, or, hence, any ability to control either of them.

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## CONCLUSION

For the foregoing reasons, the Consolidated Amended Class Action Complaint should be dismissed.

DATE: October 30, 2024                     UMHOFER, MITCHELL & KING LLP


                                           s/ Elizabeth A. Mitchell
                                           Matthew Donald Umhofer
                                           Elizabeth A. Mitchell

                                           WILLIAMS & CONNOLLY LLP

                                           Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
                                           John M. McNichols (admitted *pro hac vice*)
                                           Stephen L. Wohlgemuth (admitted *pro hac vice*)

                                           Counsel for Defendant James E. Staley

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for defendant James E. Staley, certifies that this brief is prepared in Times New Roman font with text no less than twelve (12) point font (with footnotes no less than ten (10) point font) and is 25 pages, which complies with the limits set in Section VIII.C of the Court's Civil Standing Order of May 2024, which is the current version available on the Court's website.

DATE: October 30, 2024                    UMHOFER, MITCHELL & KING LLP


                                          s/ Elizabeth A. Mitchell
                                          Matthew Donald Umhofer
                                          Elizabeth A. Mitchell

                                          WILLIAMS & CONNOLLY LLP

                                          Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
                                          John M. McNichols (admitted *pro hac vice*)
                                          Stephen L. Wohlgemuth (admitted *pro hac vice*)

                                          Counsel for Defendant James E. Staley

STALEY'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS