PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:    (213) 687-5000
Facsimile:    (213) 687-5600

SCOTT D. MUSOFF (admitted *pro hac vice*)
scott.musoff@skadden.com
BORIS BERSHTEYN (admitted *pro hac vice*)
boris.bershteyn@skadden.com
LARA A. FLATH (admitted *pro hac vice*)
lara.flath@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000

Attorneys for Defendants Barclays PLC and Nigel Higgins

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>          v.<br><br>BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS,<br><br>                          Defendants. | CASE NO.: 2:23-cv-09217-MEMF-KS<br><br>**DEFENDANTS BARCLAYS PLC'S AND NIGEL HIGGINS' NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**<br><br>**FILED SEPARATELY:**<br>**(1)  REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE; and**<br><br>**(2) [PROPOSED] ORDER.**<br><br>Date: March 20, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8B<br>Judge: Hon. Maame Ewusi-Mensah Frimpong<br><br>Complaint Filed: November 1, 2023<br>Amended Complaint Filed: August 12, 2024 |

---

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 20, 2025, at 10:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 8B, located at 350 West First Street, Los Angeles, California 90012, defendants Barclays PLC and Nigel Higgins will, and hereby do, present for hearing by the Court, the Honorable Maame Ewusi-Mensah Frimpong presiding, this Motion to Dismiss the Amended Class Action Complaint ("Motion").

The Motion seeks dismissal with prejudice of the Amended Class Action Complaint brought by Lead Plaintiff Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees ("Teamsters") and plaintiff The Firemen's Retirement System of St. Louis ("St. Louis Firemen"), for failure to state a claim upon which relief may be granted.

This Motion is filed pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, and is based on the accompanying Memorandum of Points and Authorities, all pleadings and papers filed in this action, all matters of which this Court may take judicial notice, including those set forth in the contemporaneously filed Request for Incorporation by Reference and Judicial Notice, and such additional papers and arguments as may be presented at or in connection with the hearing.

This Motion is made following the conference of counsel pursuant to Civil Local Rule 7-3, which took place on October 23, 2024.

DATED: October 30, 2024

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/ Lara A. Flath*_____
Lara A. Flath
Scott D. Musoff
Boris Bershteyn

Attorneys for Defendants
Barclays PLC and Nigel Higgins

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS          NO.: 2:23-cv-09217-MEMF-KS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

I.    PRELIMINARY STATEMENT ....................................................................... 1

II.   FACTUAL BACKGROUND ............................................................................ 4

    A.    Barclays Responds to an August 2019 FCA Request for Information About Its Knowledge of the Staley-Epstein Relationship ......................... 4

    B.    As Regulators Begin Investigating Staley's Characterization of His Relationship with Epstein, Barclays Cooperates with and Discloses that Investigation in February 2020 ....................................................... 5

    C.    In Late 2021, the FCA Makes Its Preliminary Findings, and Barclays Immediately Announces Staley's Departure ........................................... 6

    D.    As the FCA Continues Its Investigation, More Details About the Staley-Epstein Relationship Continue to Publicly Emerge ...................... 6

    E.    The Alleged October 12, 2023 "Corrective" Disclosure Confirms the FCA's 2021 Preliminary Conclusions and, Weeks Later, this Action Follows ................................................................................................. 7

III.  ARGUMENT .................................................................................................. 8

    A.    Lead Plaintiff Teamsters Fails to State a Claim Under Section 10(b) of the Exchange Act .............................................................................. 8

        1.    The Complaint's Own Allegations Foreclose Loss Causation ....... 8

        2.    The Complaint Fails to Allege Any Actionable False or Misleading Statements ............................................................... 10

            (a)    Statement that Staley Never Professionally Engaged or Paid Fees to Epstein for Advice or Professional Services ...................................................................... 11

            (b)    Statements About When the Relationship Ended ............. 11

            (c)    Statements that Staley and Epstein Had a Professional Relationship .................................................................. 12

            (d)    Statements of Opinion About Staley's Transparency with Barclays ................................................................ 13

            (e)    Statement of Opinion that Staley Retained the Board's Confidence .................................................................... 15

            (f)    Statements that Barclays Cooperated with Regulators ..... 15

            (g)    Statement that Staley Volunteered an Explanation of His Relationship with Epstein ....................................... 16

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

(h)     Statements About the FCA's Initial Findings .................. 16

(i)     Statements About the Board's Internal Deliberations and Processes ....................................................... 17

(j)     Higgins' Declination to Comment on Staley's Departure ....................................................... 17

(k)     Barclays' Reaction to Certain Third-Party Lawsuits ........ 18

3.     Higgins Is Not Liable Under Section 10(b) for Statements He Did Not Make ....................................................... 18

4.     The Complaint Fails to Allege Scienter .................................... 19

(a)     The Complaint Fails to Allege that Higgins Acted with Scienter ....................................................... 19

(b)     Staley's Knowledge of His Relationship with Epstein Cannot be Imputed to Barclays ....................................... 20

B.     The Section 20(a) Claim Under the Exchange Act Fails ......................... 21

C.     Plaintiff St. Louis Firemen's Section 90A Claim Should Be Dismissed ....................................................... 21

1.     The Court Should Decline to Exercise Supplemental Jurisdiction ....................................................... 21

2.     St. Louis Firemen Fails to State a Claim Under Section 90A on the Merits ....................................................... 24

IV.     CONCLUSION ....................................................... 25

CERTIFICATE OF COMPLIANCE ....................................................... 27

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

# TABLE OF AUTHORITIES

## CASES

*In re Air Cargo Shipping Services Antitrust Litigation*,
No. MD 06-1775(JG)(VVP), 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008)................. 23

*Anderson v. Clow*,
No. 92-1120-R, 1993 WL 497212 (S.D. Cal. Sept. 17, 1993) ...................................... 17

*In re Apple Computer Securities Litigation*,
886 F.2d 1109 (9th Cir. 1989) ...............................................................................12-13

*Applied Materials, Inc. v. Advanced Micro-Fabrication Equipment (Shanghai) Co., LTD*,
No. C 07-05248 JW, 2009 WL 10692715 (N.D. Cal. Nov. 30, 2009)...................... 20, 21

*In re Blue Earth, Inc. Securities Class Action Litigation*,
No. CV 14-08263-DSF (JEMx), 2015 WL 12001274 (C.D. Cal. Nov. 3, 2015) .............. 9

*Bruce v. Suntech Power Holdings Co.*,
 No. CV 12-04061 RS, 2013 WL 6843610 (N.D. Cal. Dec. 26, 2013).......................... 19

*Carey Camp v. Qualcomm Inc.*,
No. 18-cv-1208-AJB-BLM, 2020 WL 1157192 (S.D. Cal. Mar. 10, 2020)................ 9, 10

*Chateau des Charmes Wines Ltd. v. Sabaté USA, Inc.*,
No. C-01-4203 MMC, 2003 WL 22682483 (N.D. Cal. Nov. 10, 2003)........................ 24

*In re ChinaCast Education Corp. Securities Litigation*,
809 F.3d 471 (9th Cir. 2015)............................................................................... 20, 21

*Cooper v. Tokyo Electric Power Co. Holdings, Inc.*,
960 F.3d 549 (9th Cir. 2020)..................................................................................... 25

*In re Cutera Securities Litigation*,
610 F.3d 1103 (9th Cir. 2010)................................................................................... 11

*Dibdin v. S. Tyneside NHS Healthcare Trust*,
No. CV 12-00206 DDP (PLAx), 2013 WL 327324 (C.D. Cal. Jan. 29, 2013) .............. 23

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................. 1, 8

*Espy v. J2 Global, Inc.*,
99 F.4th 527 (9th Cir. 2024).................................................................................... 1

*Evanston Police Pension Fund v. McKesson Corp.*,
No. 18-cv-06525-CRB, 2021 WL 4902420 (N.D. Cal. Oct. 21, 2021) ......................... 10

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                NO.: 2:23-cv-09217-MEMF-KS

*Gini v. Las Vegas Metropolitan Police Department*,
   40 F.3d 1041 (9th Cir. 1994)................................................................................22

*In re Herbalife, Ltd. Securities Litigation*,
   No. CV 14-2850 DSF (JCGx), 2015 WL 1245191 (C.D. Cal. Mar. 16, 2015)...............10

*Holbrook v. Trivago N.V.*,
   No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago NV*, ....................................................................................16

*In re Immersion Corp. Securities Litigation*,
   No. C-09 4073 MMC, 2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ...........................19

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) .........................................................................................19

*Lomingkit v. Apollo Education Group Inc.*,
   No. CV-16-00689-PHX-JAT, 2017 WL 633148 (D. Ariz. Feb. 16, 2017)...............11, 12

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014)...............................................................................8

*Lopes v. Fitbit, Inc.*,
   No. 18-cv-06665-JST, 2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021)..................................................................................10

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
   583 F.3d 656 (9th Cir. 2009).............................................................................23

*Lueck v. Sundstrand Corp.*,
   236 F.3d 1137 (9th Cir. 2001).............................................................................23

*Macomb County Employees' Retirement System v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022).............................................................................8

*Mangold v. Cal. Public Utilities Commission*,
   67 F.3d 1470 (9th Cir. 1995).............................................................................24

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008).............................................................................10

*Neborsky v. Valley Forge Composite Techs., Inc.*,
   No. 13-CV-2307-MMA (BGS), 2014 WL 1705522 (S.D. Cal. Apr. 28, 2014)...............10

*In re Nektar Therapeutics Securities Litigation*,
   34 F.4th 828 (9th Cir. 2022)......................................................................1, 9, 10, 14

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020).............................................................................19

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................ 13

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
    774 F.3d 598 (9th Cir. 2014)......................................................................... 8-9

*Palm Harbor Special Fire Control & Rescue District Firefighters Pension Plan v. First
    Solar Inc.*,
    No. CV-22-00036-PHX-MTL, 2023 WL 4161355 (D. Ariz. June 23, 2023)............. 9, 10

*Police Retirement System of Street Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)......................................................................... 13

*Prodanova v. H.C. Wainwright & Co.*,
    No. LA CV17-07926 JAK (ASx), 2019 WL 4143301 (C.D. Cal. July 2, 2019), *aff'd*,
    993 F.3d 1097 (9th Cir. 2021)......................................................................... 19

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021).............................................................. 3, 19, 20

*Retail Wholesale & Department Store v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017)......................................................................... 14

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
    697 F.3d 869 (S.D. Cal. 2024)......................................................... 10-12, 17, 20

*Rok v. Identiv, Inc.*,
    No. 15-cv-5775-CRB, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ................................ 11

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)........................................................................... 13

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) .......................................................................................... 2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................................... 3

*Tongfang Global Ltd. v. Element Television Co.*,
    No. CV 20-876-JFW(AFMx), 2020 WL 4354173 (C.D. Cal. June 22, 2020) ................ 24

*In re Toyota Motor Corp. Sec. Litigation*,
    No. CV 10-922 DSF (AJWx), 2011 WL 2675395 (C.D. Cal. July 7, 2011)............. 22, 23

*Tuazon v. R.J. Reynolds Tobacco Co.*,
    433 F.3d 1163 (9th Cir. 2006)........................................................................... 23

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................... 13, 14

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

*Waswick v. Torrid Holdings, Inc.*,
   No. 2:22-cv-08375-JLS-AS, 2024 WL 3740052 (C.D. Cal. July 23, 2024) ..................... 4

*Welgus v. TriNet Group, Inc.*,
   No. 15-cv-03625-BLF, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F.
   App'x 239 (9th Cir. 2019).................................................................................... 20

*Wessel v. Buhler*,
   437 F.2d 279 (9th Cir. 1971)................................................................................... 18

*Weston Family Partnership LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022)............................................................................... 10, 11

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000)..................................................................................... 23

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021).................................................................................. 12

*In re WRT Energy Securities Litigation*,
   Nos. 96 CIV. 3610(JFK), 96 CIV. 3611(JFK), 1999 WL 178749 (S.D.N.Y. Mar. 31,
   1999) ................................................................................................................ 21

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)......................................................................... 3, 20, 21

### STATUTES

15 U.S.C. § 78u-4(b).............................................................................................. 8

15 U.S.C. § 78u-4(b)(1) ......................................................................................... 2

15 U.S.C. § 78u–4(b)(2)........................................................................................ 19

28 U.S.C. § 1367(c)......................................................................................... 3, 22

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

## I.   **PRELIMINARY STATEMENT**

Plaintiffs' claim of securities fraud is, on its face, illogical and inactionable. They say that, as purchasers of Barclays ADRs or ordinary stock, they suffered injury on October 12, 2023. On that day, the U.K.'s Financial Conduct Authority ("FCA") announced the conclusion of its investigation into the way Barclays' former CEO James Staley had characterized to the FCA his relationship with disgraced financier Jeffrey Epstein—a relationship that entirely pre-dated Staley's tenure at Barclays. (ECF 52 ("Complaint" or "AC") ¶ 111.) According to plaintiffs, this announcement caused the price of Barclays' securities to fall because it revealed, for the first time, the falsehood of past statements by defendants Barclays, Nigel Higgins (its Chairman of the Board), and Staley. But in pleading such a theory, plaintiffs face a "demanding" burden, *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024)[1] and they fail at every step: they do not adequately plead that any defendant said anything false, much less the requisite intent. And the October 2023 announcement of the FCA's final decision—the sole alleged "corrective" disclosure—did not reveal to the market new, let alone unlawfully withheld, information. Indeed, Barclays had disclosed that the FCA had reached its preliminary findings two years earlier—and promptly parted ways with Staley. (*Id.* ¶ 83.) Thus, Plaintiffs' claims fail for several, independent reasons.

**The Complaint Cannot Plead Loss Causation.** Plaintiffs cannot plead loss causation—"a causal connection between the [alleged] material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). They posit that the alleged misstatements—related to Staley's characterization of his relationship with Epstein, the FCA's subsequent investigation, and the opinion of the Board as to whether Staley had been sufficiently transparent at the time— artificially inflated the price of Barclays' securities from July 2019 until the "corrective disclosure" in October 12, 2023 of the FCA's final decision that "revealed to investors and the market" the true nature of the Staley-Epstein relationship. (AC ¶ 114.) But "a corrective disclosure must by definition reveal new information to the market," *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022), and the AC makes clear that the October 2023 announcement was old news. More than

---

[1] Unless otherwise specified, all emphasis is added and internal citations, quotation marks, and alterations are omitted.

1

three years earlier, Barclays disclosed the existence of an FCA investigation concerning Staley's relationship with Epstein. And nearly two years prior, Barclays disclosed that—as a result of the FCA's preliminary findings—Staley was stepping down as CEO. (AC ¶ 83.) Subsequent news reports and other public disclosures revealed even more information about the relationship—including about the existence, volume, and content of emails between Staley and Epstein dating back to 2008-2012, when Staley was employed by JPMorgan and Epstein was a JPMorgan client (the "JPM emails"). (*Id.* ¶¶ 85, 87.) All this information was known to investors and incorporated into the price of Barclays' securities <u>before</u> October 2023. Plaintiffs do not plead—much less with particularity—how the announcement of the FCA's final decision, two years after Staley left Barclays, caused them loss. (*See* § III(A).)

**The Complaint Fails to Plead Any Actionable Misstatement or Omission.** Plaintiffs do not allege with particularity any false or misleading statement by defendants. To survive a motion to dismiss, the complaint must specify <u>each</u> statement alleged to have been false or misleading and the reason or reasons why <u>each</u> statement is so. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78u-4(b)(1). Plaintiffs do not. Take for instance, their challenge to statements that Staley did not have contact with Epstein after joining Barclays in 2015. (AC ¶¶ 69, 71, 75.) The AC makes no allegation contradicting this straightforward statement—that is, <u>no</u> allegation that Staley <u>had</u> contact with Epstein after he joined Barclays in 2015. And numerous statements relate to the Board's "belie[f] that Mr. Staley ha[d] been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein." (*Id.* ¶ 69.) Yet plaintiffs plead no facts that would support a challenge to this statement of opinion and no facts supporting a plausible inference that the Board did <u>not</u> actually hold that subjective belief at the time. Plaintiffs thus fail to allege falsity of any statement. (*See* § III(A)(2).)

Plaintiffs spill much ink on the JPM emails—and whether, after the FCA shared them with certain individuals at Barclays in 2019, Barclays should have inferred that Staley and Epstein used to have an inappropriately "close" relationship. (*See, e.g., id.* ¶¶ 24, 67, 81.) Their speculation is a distraction: This case is not about the propriety of Staley's relationship with Epstein while he was employed at JPMorgan, years before he joined Barclays. It is about whether plaintiffs plausibly allege

2

that defendants made any actionable and material false or misleading statements. They do not.

**The Complaint Fails to Plead a Strong Inference of Scienter.** Plaintiffs also fail to allege facts giving rise to a "strong inference" of scienter—*i.e.*, an inference that is "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs bear the heavy burden of alleging particularized facts demonstrating that each defendant acted with "no less than a degree of recklessness that strongly suggests actual intent." *Prodanova v. H.C. Wainwright & Co.,* 993 F.3d 1097, 1108 (9th Cir. 2021). By plaintiffs' own allegations, Barclays and its Board responded promptly to a regulator's request that it investigate, disclosed the subsequent regulatory investigation, and told the world that, as result of the FCA's findings, Staley was departing as CEO. With respect to Higgins, plaintiffs rely solely on his purported access to and review of the JPM emails. (AC ¶¶ 21-22, 65-66, 81, 102.) But the vast majority of these emails are not described in the AC at all. And those that are share a common trait: they are vague, fragmentary, and stripped of context—and thus incapable of raising a plausible (let alone compelling) inference that Higgins acted to defraud anyone. (*See* § III(A)(3)(a).) Finally, plaintiffs attempt to plead corporate scienter by imputing to Barclays the knowledge of Staley. But Staley's knowledge of his relationship with Epstein—which entirely pre-dated his tenure at Barclays—should not be imputed to Barclays under general agency principles. (*See* § III(A)(3)(b).)[2]

**The Complaint Does Not State a Claim Under U.K. Law.** The claim under Section 90A of the United Kingdom's Financial Services and Markets Act ("FSMA") should be dismissed on multiple grounds. To start, the Court should decline to exercise supplemental jurisdiction over it under either 28 U.S.C. § 1367(c) or *forum non conveniens*. Even were the Court to reach the merits, the claim should be dismissed. Like the U.S. claim, Section 90A requires a plaintiff to allege, among other things, an untrue or misleading statement or omission that caused its losses. (Declaration of Martin Moore ("Moore") ¶ 10(b)-(c), (e).) As detailed above, the AC includes no such allegations. The Section 90A claim also fails for two other reasons. First, unlike U.S. securities law, Section 90A requires each plaintiff to allege that they actually read or heard an alleged misstatement when it was

---

[2] Because the AC fails to state a claim under Section 10(b), the claim for control person liability under Section 20(a) should be dismissed. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990, 1008 (9th Cir. 2009).

3

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

made. (*Id.* ¶ 10(d), The AC makes no such allegation. (AC ¶¶ 122-25.) Second, a Section 90A claim can only rely on misstatements Barclays published by certain "recognised means," such as the Regulatory News Service (RNS) on the London Stock Exchange. (Moore ¶ 10(a).) Numerous of the alleged misstatements were not published there. (AC ¶¶ 53, 71-72, 74-75, 87.)

## II.    FACTUAL BACKGROUND

### A.    Barclays Responds to an August 2019 FCA Request for Information About Its Knowledge of the Staley-Epstein Relationship

In summer 2019, in the wake of Epstein's highly publicized arrest, the media began reporting on his connections with various well-known persons, including Staley, who had become Barclays' CEO in December 2015. (AC ¶¶ 14-15, 46.) For instance, in July 2019, the *New York Times*, reported that the two men met in 1999 when Staley was running JPMorgan's private bank, that they "soon became friends," and that Epstein had referred potential JPMorgan clients to Staley (*Id.* ¶ 15.) The *Times* article also quoted a Barclays spokesperson's statement that "Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally." (*Id.* ¶ 53; Ex. 1 at 4.) Plaintiffs assert this alleged misstatement started the class period.[3]

In August, the FCA contacted Barclays through Higgins, its recently appointed Chairman of the Board (AC ¶ 47), requesting a written explanation of what Barclays "had done to satisfy itself that there was no impropriety with respect to the relationship between Mr Staley and Mr Epstein." (*Id.* ¶ 60.) Based on information provided by Staley, Barclays prepared a letter (which Staley reviewed and approved) that it sent to the FCA in October 2019. (*Id.* ¶¶ 61-62.)[4] This letter explained that the Company was "comfortable in regard to any association of [Staley] or Barclays with [Epstein]" and that Staley "confirmed to us that he did not have a close relationship with Mr Epstein,

---

[3] For purposes of this motion, defendants assume (as they must) the truth of all well-pleaded allegations in the AC. The facts here are drawn from those allegations, documents incorporated by reference, and matters subject to judicial notice. *See Waswick v. Torrid Holdings, Inc.*, 2024 WL 3740052, at *4–5 (C.D. Cal. July 23, 2024). References to "Ex." refer to exhibits to the Declaration of Lara A. Flath, filed in support of Moving Defendants' request for incorporation by reference and judicial notice.

[4] Plaintiffs do not allege that any of statements in this October 2019 letter are actionable. (AC ¶ 135 (identifying 17 paragraphs containing the allegedly false or misleading statements at issue).)

and he is resolute that at no time did he see anything that would have suggested or revealed any aspect of the conduct that has been the subject of recent allegations." (*Id.* ¶ 62). The letter also noted that Staley told Barclays his "last contact with Epstein was well before he joined Barclays in 2015." (*Id.* (emphasis omitted).) Finally, the letter noted that "Barclays' financial Crime team has conducted a thorough review of our records, which did not reveal any client or customer relationship with Mr Epstein" and concluded that "neither our discussions with [Staley] nor our review of the bank's records have revealed any cause to suspect that Barclays or [Staley] have played any role in the activities of Mr Epstein that have been under investigation." (*Id.*)

**B.    As Regulators Begin Investigating Staley's Characterization of His Relationship with Epstein, Barclays Cooperates with and Discloses that Investigation in February 2020**

In December 2019, the FCA and the Prudential Regulation Authority, a U.K. regulatory body that supervises financial institutions, asked Barclays to review the JPM emails (shared by U.S. regulators with the FCA) to determine whether Staley had "played down his ties to Epstein." (*Id.* ¶¶ 64-65.) Barclays complied and the Board commissioned an investigation by an outside law firm, which performed interviews, reviewed emails, and delivered a confidential report. (*Id.* ¶ 66.)

On February 13, 2020, Barclays disclosed the FCA's investigation "into Mr. Staley's characterisation to the Company of his relationship with Mr. Epstein and the subsequent description of that relationship in the Company's response to the FCA." (Ex. 2 at 7; *see also* AC ¶ 69.) Barclays also stated that, "as has been widely reported, earlier in his career Mr. Staley developed a professional relationship with Mr. Epstein" and "in light of the renewed media interest in the relationship, Mr. Staley volunteered and gave to certain executives, and the Chairman, an explanation of his relationship with Mr. Epstein. Mr. Staley also confirmed to the Board that he has had no contact whatsoever with Mr. Epstein at any time since taking up his role as Barclays Group CEO in December 2015." (*Id.* (emphasis omitted); *see also id.* ¶¶ 71-72, 74-75.) Barclays concluded by stating that:

Based on a review, conducted with the support of external counsel, of the information available to us and representations made by Mr. Staley, the Board (the Executive Directors having been recused) believes that Mr. Staley has been sufficiently

5

transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein.

(*Id.* ¶ 69 (emphasis omitted); *see also id.* ¶¶ 71-72, 74.) As Higgins noted in an April 3, 2020 letter, the "Board's governance processes were rigorously followed in relation to" the FCA's request, and, at that time, Staley "retain[ed] the full confidence of the Board." (*Id.* ¶ 77.)[5] Statements in Barclays' annual reports for 2019 to 2022 confirmed that the Company was subject to regulatory inquiries and investigations and that it was "cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate." (*See, e.g.*, ¶ 70.)

**C.     In Late 2021, the FCA Makes Its Preliminary Findings, and Barclays Immediately Announces Staley's Departure**

Over 18 months later, on October 29, 2021, the FCA made Barclays and Staley aware of its investigation's preliminary conclusions. (*Id.* ¶ 26.) The next business day, Barclays issued a release announcing that these conclusions focused on "Mr. Staley's characterisation to Barclays of his relationship with [Epstein] and the subsequent description of that relationship in Barclays' response to the FCA." (*Id.* ¶ 83.) Barclays also disclosed that: "In view of those conclusions, and Mr. Staley's intention to contest them, the Board and Mr. Staley have agreed that he will step down." (Ex. 3 at 11.) Barclays noted that the FCA had made "no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr Staley." (AC ¶ 83; *id.* ¶ 86.) Analysts understood the circumstances of Staley's departure— directly linking it to the FCA's preliminary findings regarding his portrayal of his relationship with Epstein. (*Id.* ¶ 84.)

**D.     As the FCA Continues Its Investigation, More Details About the Staley-Epstein Relationship Continue to Publicly Emerge**

In the wake of Staley's departure, further information about the Staley-Epstein relationship was quickly publicized. Days later, the *Financial Times* published an article titled "Jes Staley

---

[5] According to the AC, the Board ultimately determined that the JPM emails, "while concerning, were inconclusive and not direct evidence of impropriety." (Ex. 6 at 30 (quoted in AC ¶ 96); *see also* Ex. 4 at 15 (quoted in AC ¶ 85) (stating that "Barclays resolved to stand by Staley" in part because "no conclusions could be drawn about" certain emails with "unexplained language").) A statement in Barclays' 2020 annual report also confirmed that, "[a]s part of its decision [to recommend Staley for re-election to the Board], the Board has had regard to the conclusions it reached last year, which conclusions remain unchanged, in relation to the [regulatory] investigation." (*Id.* ¶ 78.)

6

exchanged 1,200 emails with Epstein that included unexplained phrases," stating, that "Staley's ties to Epstein began in the early 2000s," the emails between the two men sent between 2008 and 2012 "showed a close relationship," the two men "became sufficiently close that Staley visited Epstein while he was serving a prison sentence in Florida," and "just a few months before joining Barclays in 2015, Staley sailed his yacht to Epstein's private Caribbean island"; and Staley "allowed Epstein to mentor one of his daughters during her college application." (Ex. 4 at 15.)

Public discussion of and revelations about the relationship continued unabated for years:

- On November 28, 2021, *The Mail on Sunday* reported that emails between Staley and Epstein would be "uncomfortable to see because of Staley's effusive language." (Ex. 5 at 20; AC ¶ 87.)[6]

- On November 24, 2022, public allegations in a civil lawsuit brought by an Epstein victim described "a symbiotic relationship between Epstein and Staley" while Staley worked for JPMorgan. (AC ¶ 92.)

- On February 15, 2023, excerpts of the JPM emails were publicly released in litigation filed by the Attorney General for the United States Virgin Islands ("USVI Litigation"). (*Id.* ¶ 95.) That complaint alleged the emails expressed "pronouncements of 'profound' friendship" and "demonstrated the 'close personal relationship' between the men." (*Id.* ¶¶ 28, 95.) Two weeks later, on March 4, 2023, the *Financial Times* continued to report on these emails. (*Id.* ¶ 96; Ex. 6 at 25.)[7]

**E.   The Alleged October 12, 2023 "Corrective" Disclosure Confirms the FCA's 2021 Preliminary Conclusions and, Weeks Later, this Action Follows**

On October 12, 2023, the FCA announced what, by this time, the market already knew to be its preliminary conclusion: Staley had, in the FCA's judgment, mischaracterized the nature of his relationship with Epstein to the FCA and Barclays. (AC ¶ 104.) The FCA emphasized that Barclays

---

[6] Barclays did not comment on the FCA's pending investigation. As a February 13, 2022 letter signed by Higgins noted "[i]t is obviously not appropriate for me to comment at the moment, further than has been done already, on the circumstances of [Staley's] departure." (AC ¶ 88.)

[7] Barclays publicly acknowledged these allegations, noting that "[t]he Board's original review, conducted in February 2020, was based on the information it had at the time and representations made by Mr. Staley." (AC ¶ 98.)

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

had "relied on information supplied by Mr Staley" and that Staley "was the only person at Barclays who knew the full extent of his personal relationship with Mr Epstein and the specific timings of his contact with him." (*Id.*) Barclays reported these developments in a press release the same day. (*Id.*)

Weeks later, this action was filed. Plaintiffs seek damages stemming from the alleged decline in the price of Barclays' securities on the day of the October 12, 2023 press release confirming the FCA's final decision. (*Id.* ¶¶ 103-14.) Lead plaintiff Teamsters, which allegedly bought Barclays ADRs on the New York Stock Exchange in June, August, and September 2021, asserts a claim under Section 10(b) of the Securities Exchange Act of 1934 against Barclays, Staley, and Higgins and a corresponding Section 20(a) claim against Staley and Higgins. (AC ¶¶ 132-50.) Plaintiff St. Louis Firemen, which allegedly bought Barclays ordinary shares on the London Stock Exchange in August and September 2022 (AC, Sch. A) asserts a claim under Section 90A against Barclays. (*Id.* ¶¶ 151-62.)

## III.    ARGUMENT

### A.    Lead Plaintiff Teamsters Fails to State a Claim Under Section 10(b) of the Exchange Act

Plaintiff fails to state a claim because it cannot allege (as it must) a material misrepresentation, scienter, or loss causation. *Dura*, 544 U.S. at 341. Each of these elements is subject to the heightened pleading requirements of both Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), which "present no small hurdle for the securities fraud plaintiff." *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022).

#### 1.    The Complaint's Own Allegations Foreclose Loss Causation

Plaintiff cannot plausibly plead that the price of Barclays' securities declined as a result of the alleged corrective disclosure on October 12, 2023. The securities laws protect investors only "against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 34. Thus, to plead loss causation based on a "corrective disclosure," a plaintiff must allege with particularity "that the defendant's fraud was '*revealed* to the market and *caused* the resulting losses.'" *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (emphasis in

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

original); *see also Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). "The inquiry begins with whether the court can plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price." *In re Nektar*, 34 F.4th at 839. This is because "confirmatory information (i.e., information already known by the market) is generally reflected in the price of a security in an efficient market." *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc*., 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023); *see also In re Blue Earth, Inc. Sec. Class Action Litig.*, 2015 WL 12001274, at *2 (C.D. Cal. Nov. 3, 2015). To "plausibly plead loss causation, a complaint must allege that a 'company's share price fell <u>significantly</u>.'" *Carey Camp v. Qualcomm Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020).

Here, plaintiff claims that the purported fraud was "revealed to investors and the market" on October 12, 2023, when Barclays announced that the FCA had made its final determination that Staley had mischaracterized his relationship with Epstein to the FCA and to Barclays. (AC ¶¶ 103-04, 114.) But that information was not new to the market. Forty-five months earlier, Barclays disclosed that investigation. Nearly two years earlier, in an announcement extensively covered by analysts (*see id.* ¶ 84) and the media, Barclays disclosed that Staley was leaving Barclays because of the FCA's preliminary conclusions regarding "Staley's characterisation to Barclays of his relationship with [Epstein] and the subsequent description of that relationship in Barclays' response to the FCA." (Ex. 3 at 11; AC ¶ 83.) In other words, in 2021, almost two years ***before*** the "corrective" disclosure, the market was informed that Staley had (in the FCA's view) mischaracterized the relationship, causing him to depart from his job as Barclays' CEO.

Investors also already knew extensive details of the Staley-Epstein relationship. Within days of Staley's departure, the *Financial Times* reported that he and Epstein had ties dating back to the early 2000s and had exchanged nearly 1,200 emails between 2008 and 2012 "show[ing] a close relationship." (Ex. 4 at 14; *see also* AC ¶¶ 85-86.) This same article further revealed that the men "became sufficiently close . . . [for] Staley [to] visit[] Epstein while he was serving a prison sentence in Florida," and that, "just a few months before joining Barclays in 2015," the men remained in contact, with Staley at one point "sail[ing] his yacht to Epstein's private Caribbean island." (*Id.*) And

9

by February 2023, portions of the JPM emails themselves—including excerpts on which plaintiffs so heavily rely on now—were public through the USVI Litigation. (AC ¶¶ 28, 95.) As the AC alleges that Barclays' securities trade in an efficient market (*id.* ¶ 118(h)), this public information was "reflected in the[ir] price" before the alleged October 2023 "corrective disclosure." *Palm Harbor*, 2023 WL 4161355, at *7; *see also In re Nektar*, 34 F.4th at 839; *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020) (disclosure of revised guidance was not corrective because defendants previously disclosed "the basis for these results" and the disclosure "added no new information to the market which was publicly revealed for the first time"), *aff'd*, 848 F. App'x 278 (9th Cir. 2021).[8]

Not surprisingly, Barclays's stock price did not decline to a degree typically necessary to plead loss causation. On October 12, 2023, Barclays' ADR price fell 4.99% and its ordinary stock price fell 3.12%. (AC ¶ 113.) But to plead loss causation, "securities complaints tend to be predicated on double digit declines." *Qualcomm*, 2020 WL 1157192, at *6 (finding 4.02% drop insufficient for loss causation); *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("modest" 10% drop insufficient to support loss causation). Plaintiff therefore fail to plausibly plead loss causation, and its Section 10(b) claim should be dismissed.

**2.    The Complaint Fails to Allege Any Actionable False or Misleading Statements**

The Section 10(b) claim should also be dismissed because the AC does not meet the PSLRA's "exacting requirements for pleading falsity." *Id.* at 1070. A plaintiff must specify with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (S.D. Cal. 2024). Moreover, federal securities law creates no "affirmative duty to disclose any and all material information."

---

[8] Even if one accepts the implausible inference that the FCA decision had a negative effect on the price of Barclays' securities, that is still not enough to allege loss causation. A disclosure may have a "negative" effect on the price of a security without being "corrective" for purposes of loss causation. *Neborsky v. Valley Forge Composite Techs., Inc.*, 2014 WL 1705522, at *7 (S.D. Cal. Apr. 28, 2014); *accord In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *7 (C.D. Cal. Mar. 16, 2015) (disclosures were not corrective even though associated with stock price declines in part because "Plaintiffs do not explain what new information concerning [the company's] business practices the [disclosures] revealed"); *see also Evanston Police Pension Fund v. McKesson Corp.*, 2021 WL 4902420, at *6 (N.D. Cal. Oct. 21, 2021) ("[B]ecause the information was already in the market, it does not matter that other newspapers, analysts, or McKesson employees thought the . . . articles were important.").

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

*Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022). Rather, "[d]isclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id.* It follows that a statement may "not mislead even if it is incomplete or does not include all relevant facts," *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010), and "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose . . . by controlling what they say to the market," *In re Rigel Pharms.*, 697 F.3d at 880 n.8. These principles doom the Section 10(b) claim.

### (a)    Statement that Staley Never Professionally Engaged or Paid Fees to Epstein for Advice or Professional Services

The AC wrongly contends that Barclays misled investors by allegedly directing a spokesperson to state, through a July 22, 2019 *New York Times* article, that "Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally." (AC ¶ 53.) Plaintiff does not challenge the truth of this statement: there is no allegation, for instance, that Staley in fact paid fees to or engaged Epstein to provide advice or other professional services. Instead, it posits that this statement, although factually accurate, was nonetheless misleading because it purportedly signaled that the relationship was less substantial in depth and duration than it really was. (*See, e.g.*, *id.* ¶ 56(d) (claiming that statement "omit[ted] an accurate description of [the] continued close business dealings" between the two men).) But plaintiff cannot meet the pleading requirements of the PSLRA and Rule 9(b) by infusing a statement with an implied meaning that its words do not support. *See, e.g.*, *Rok v. Identiv, Inc.*, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017) (statements about material weakness in internal controls were not misleading as to the absence of other weaknesses in part because "the statements did not say 'only material weakness'"); *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *14 (D. Ariz. Feb. 16, 2017) (statement that company was upgrading online classroom's IT systems was not misleading in part because it "implies nothing about the online classroom's functionality").

### (b)    Statements About When the Relationship Ended

Barclays' February 13, 2020 statement that Staley confirmed that he had "no contact" with

11

Epstein after becoming CEO and Staley's representation on the same date that his relationship with Epstein "stopped before [he] joined Barclays" and that he had "no contact" with Epstein after becoming Barclays' CEO (AC ¶¶ 69, 71, 75) are similarly nonactionable. Tellingly, the AC does not even attempt to plead—as it must—why these statements were allegedly false or misleading. *See In re Rigel Pharms.*, 697 F.3d at 877 (a securities fraud complaint must "'specify . . . the reason or reasons why the statement is misleading'"). To the contrary, the AC admits that the last contact between Staley and Epstein was in October 2015, before Staley started as Barclays' CEO. (AC ¶ 56(f)(ii).)[9] This admission aligns with—and does not controvert—the challenged statements, dooming any claim of falsity. *See Lomingkit*, 2017 WL 633148, at \*14 (falsity not pled because challenged statements "are not inconsistent with the alleged facts that purport to make them false").

### (c)    Statements that Staley and Epstein Had a Professional Relationship

The AC also wrongly contends that in February 2020, when Barclays disclosed the FCA's investigation, it deceived investors by stating that "earlier in his career[,] Mr. Staley [had] developed a professional relationship with Mr. Epstein." (AC ¶ 69; *id.* ¶¶ 71-72, 74 (challenging three similar statements made by Staley the same date).) Again, there is no allegation this statement is false—*i.e.*, that Staley had <u>not</u> formed a professional relationship with Epstein in the years preceding his tenure at Barclays. Instead, the AC posits that this representation, although true, conveyed a misleading impression—that the relationship was "only" professional. (*See id.* ¶ 81(a).) But "that is not what the statement[s] say[]." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021) (rejecting mischaracterization of allegedly misleading statement).

To the extent plaintiff claims Barclays' statement was misleading because it failed to disclose material information about the Staley-Epstein relationship that investors otherwise could not have known, the AC again belies that argument: It admits that Staley's ties to Epstein were widely reported by such major publications as the *New York Times*, which opined in a July 22, 2019 article that the two men had become "'friends.'" (AC ¶ 15; *see also id.* ¶¶ 17, 54, 55 (citing Wall Street Journal and Bloomberg articles).) Investors had more than enough information at their disposal to make an

---

[9] This reasoning applies with equal force to Staley's statement that, after he left JPMorgan, his relationship with Epstein "began to taper off quite significantly." (AC ¶ 71.)

12

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

informed judgment about how to view the (by then, ended) relationship. *See In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("Provided that they have credibly entered the market through other means, the facts allegedly omitted by the defendant would already be reflected in the stock's price; the mechanism through which the market discovered the facts in question is not crucial").

Fundamentally, plaintiff seeks to impose an obligation on Barclays that does not exist under the securities laws, claiming securities fraud based on the premise that by (accurately) describing the historical relationship as "professional," Barclays was obligated to provide extensive detail about it. No such obligation exists. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (the securities laws prohibit "only misleading and untrue statements, not statements that are incomplete" because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not"). Nor does the fact of a pending investigation (which Barclays disclosed) change this fundamental principle. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019) (a pending investigation does not impose a "rite of confession" under the securities laws).

### (d)     Statements of Opinion About Staley's Transparency With Barclays

Barclays' statement expressing its Board's "belie[f] that Mr. Staley ha[d] been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein" (AC ¶ 69) is on its face a nonactionable statement of opinion. To plead that this statement of opinion was false or misleading, a plaintiff must allege facts showing that (1) "the speaker did not hold the belief [it] professed"; (2) "the supporting fact[s] supplied were untrue"; or (3) the speaker omitted "particular (and material) facts going to the basis for the [speaker's] opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015); *see also Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) (to be actionable, a statement must be false "at [the] time by the people who made them"). This is "no small task," *Omnicare* at 194, and the AC falls well short. It pleads no facts demonstrating that the Board <u>did not believe</u> Staley was being sufficiently transparent with them at the time of Barclays' statement. At most, plaintiff points to emails between Staley and Epstein with banal expressions of flattery and gratitude, as well as

13

references so cryptic and stripped of context that they cannot shed any definitive light on the relationship—much less support a plausible inference that the Board did not actually believe what it represented to the public after its investigation. (*See, e.g.*, AC ¶ 81(a)(i)-(viii).) Such speculation and innuendo fall well short of what is necessary to meet the high bar imposed by Rule 9(b) and the PSLRA. *See In re Nektar*, 34 F.4th at 835 ("By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception . . . .").[10] Indeed, the FCA ultimately found that Barclays was in the dark. (*See* Ex. 7 at 37 ("No individual at Barclays was aware that Mr Staley and Mr Epstein had discussed press enquiries regarding their relationship, in connection with Mr Staley's likely appointment as CEO of Barclays, up until 25 October 2015, or had any knowledge of the fact that Mr Staley had shared confidential information with Mr Epstein about negotiations relating to his impending appointment as CEO in October 2015. . . . In fact, Mr Staley consistently did not accurately set out the nature and extent of his relationship with Mr Epstein to Barclays."); *see also* AC ¶ 104 ("[Staley] was the only person at Barclays who knew the full extent of his personal relationship with Mr Epstein and the specific timings of his contact with him.").

Moreover, "sufficiently transparent" is inherently subjective such that it is incapable of "objective verification" and thus inactionable as a matter of law. *Retail Wholesale & Dep't Store v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) ("To be misleading, a statement must be capable of objective verification."). This further forecloses plaintiff from pleading an actionable misstatement. *Cf. LendingClub Corp.*, 423 F. Supp. 3d at 804 (statement about company's "transparent . . . approach to credit" was "too generalized to be actionable").[11]

---

[10] The AC alleges that FCA concluded that certain emails contradicted Staley's characterization of his relationship with Epstein (*see* AC ¶ 104), but ignores that Staley has contested the FCA's findings. And even though plaintiff effectively contends that Barclays should have disclosed that Staley mischaracterized his relationship with Epstein—the very issue the FCA was investigating—before the FCA made any findings on that issue, "[c]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations." *Veal*, 423 F. Supp. 3d at 806.

[11] Plaintiff challenges certain statements by Staley about transparency. (AC ¶¶ 71-72, 74.) Viewed in context, these statements describe the Board's <u>determination</u> about Staley's transparency—and thus are not false or misleading for the same reasons. (*Id.* ¶ 71 ("[T]he Board has done a review of that issue. And they have confirmed that they're also comfortable that I was transparent and open with them with respect to that relationship."); *id.* ¶ 72 ("[T]he Board has done its own review and they've looked back at my transparency and they concluded indeed that I have been transparent and open with the bank.").

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

**(e)      Statement of Opinion that Staley Retained the Board's Confidence**

Nor are there any allegations undermining or making actionable Higgins' April 3, 2020 statement that Staley "retain[ed] the full confidence of the Board." (AC ¶ 77.) Again, there is no allegation that this statement was false (i.e., that he did not actually retain the full confidence of the Board at that time). Instead, plaintiff claims only that "[t]he evidence in the Board's possession seriously undermined the Board's stated confidence in Staley's leadership of the Company." (*Id.* ¶ 81(b).) This conclusory assertion cannot satisfy Rule 9(b) or the PSLRA. For the reasons described above, the emails on which the AC so heavily relies do not show that the Board could not have remained—or did not remain—confident in Staley in April 2020. Indeed, as Barclays disclosed two months prior, the "central question underpinning [its] support for Mr. Staley" was whether he was aware of any of Epstein's crimes. (*Id.* ¶ 83.) Plaintiff does not plead that the Board was in possession of information that indicates Staley had that awareness and, even in 2023, the FCA made no findings on that question (Ex. 7 at 43), such that the Board's support was unwarranted, much less not a true statement at the time.[12]

**(f)      Statements that Barclays Cooperated with Regulators**

Plaintiff fails to adequately allege that Barclays misrepresented its cooperation with regulators. The AC challenges the following disclosure from Barclays' Annual Reports for the years 2019-2022: "The [Barclays] Group is cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate in relation to these matters and others described in this note on an ongoing basis." (AC ¶¶ 70, 79, 88, 94.) But plaintiff does not allege that anything in this statement is inaccurate. It does not plead (nor could it) that Barclays was not actually cooperating with the relevant authorities or keeping all relevant agencies informed. Instead, plaintiff first contends that this disclosure was "undermined" by the supposed "evidence in Barclays' possession." (*Id.* ¶81(d).) Assuming the "evidence" to which plaintiff refers are the JPM emails (*id.* ¶ 21), those emails (as the AC acknowledges) were <u>shared with Barclays by the FCA itself</u>. (*Id.* ¶ 65.) There could be no plausible allegation that Barclays withheld this information from the FCA, and the AC

---

[12] Even the FCA's final decision never reached such a conclusion. (Ex. 7 at 43 ("The Authority makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes.").)

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

also acknowledges that Barclays <u>did</u> investigate when asked by the FCA. (*Supra* § II.A.-B.) Second, to the extent that plaintiff alleges that Staley's "own knowledge regarding his relationship with Epstein" made this disclosure false, that conclusion is not plausible because Staley's knowledge has nothing to do with whether Barclays was cooperating with and briefing the relevant authorities and agencies. Moreover, the AC acknowledges that the FCA determined that Barclays was "misled" by its former CEO "about the nature of his relationship with Mr. Epstein," and that Staley was "the only person at Barclays who knew the full extent" of that relationship. (*Id.* ¶104). The AC alleges no facts (much less particularized facts) suggesting Barclays did not cooperate with the FCA's investigation.

**(g)      Statement that Staley Volunteered an Explanation of His Relationship with Epstein**

Drawing on the February 2020 disclosures, plaintiff also accuses Barclays of misleadingly portraying Staley's statements to the Company about Epstein during the summer of 2019 as having been "volunteered," when in fact they were supposedly provided in response "to an inquiry from the FCA." (*Id.* ¶ 81(f); *see also id.* ¶ 69.) This is a non-sequitur: the AC nowhere explains why information cannot be "volunteered" in response to what the AC itself frames as a "request" rather than compulsory process. Likewise, there is no merit to the suggestion, implicit in this allegation, that Barclays' word choice was designed to conceal or obscure the FCA's investigation. Indeed, Barclays disclosed the FCA's investigation in the very same paragraph. (Ex. 2 at 7.) This disclosure (which the AC conspicuously omits) destroys any inference of falsity or fraud, and exposes plaintiff's allegation as "nothing more than improper quibbl[ing] with . . . [Barclays'] wording." *Holbrook v. Trivago N.V.*, 2019 WL 948809, at \*19 (S.D.N.Y. Feb. 26, 2019) *aff'd sub nom.*, *Shetty v. Trivago NV*, 796 F. App'x 31 (2d Cir. 2019).

**(h)      Statements About the FCA's Initial Findings**

The AC incorrectly contends that Barclays' November 1, 2021 press release misled investors by describing the FCA's preliminary conclusions as having "ma[de] no findings that Mr. Staley saw, or was aware of, any of Mr. Epstein's alleged crimes," and noting that this "was the central question underpinning Barclays' support for Mr. Staley." (AC ¶ 83; *see also id.* ¶ 86 (challenging a similar statement from a *Financial Times* article dated November 12, 2021).) Yet again, there is no allegation

16

that disputes the accuracy of this statement. There is no allegation, for instance, that the FCA had determined Staley was aware of Epstein's supposed crimes; or that this issue was not the "central question underpinning" the Company's support for Staley.

Instead, plaintiff accuses Barclays of misleadingly implying that the "sole issue under investigation by the FCA" concerned Staley's alleged awareness of criminal activity. (*Id.* ¶ 91(a) (emphasis added).) But "if the material containing the alleged omissions actually discloses the facts that Plaintiffs claim [sic] are absent, there is obviously no omission," much less a material one. *See Anderson v. Clow*, 1993 WL 497212, at *4 (S.D. Cal. Sept. 17, 1993). Here, the first sentence of the disclosure (which the AC omits) expressly states that the investigation concerned Staley's" characterisation" of his relationship with Epstein to regulators and the Company. (*See* (Ex. 2 at 7 (noting that investigation focused on "Staley's characterisation to the Company of his relationship with Mr. Epstein and the subsequent description of that relationship in the Company's response to the FCA"); Ex. 3 at 11 (same).) Moreover, in the same press release, Barclays announced that—in light of the FCA's preliminary conclusions—Staley was departing immediately. This disclosure renders implausible any suggestion that Barclays was trying to minimize the investigation.

#### (i)    Statements About the Board's Internal Deliberations and Processes

The challenges to statements made about the Board's internal deliberations also fail. For instance, one statement at issue, on April 3, 2020, refers to the ongoing investigation and notes that "[t]he Board's governance processes were rigorously followed in relation to this matter." (AC ¶ 77.) Plaintiff does not allege how this was false. Indeed, it does not allege what the relevant "governance processes" were, let alone how they were supposedly disregarded. The AC contests the February 18, 2021 statement by Barclays that "[a]s part of its decision [to recommend Staley for re-election to the Board], the Board has had regard to the conclusions it reached last year, which conclusions remain unchanged, in relation to the investigation by the PRA and the FCA." (*Id.* ¶78), but the AC does not even try to explain why this statement was false or misleading, as the PSLRA requires. *See In re Rigel Pharms.*, 697 F.3d at 877. And there are no allegations that the Board did not do what it said— consider its conclusions from 2020 and decline to change them.

#### (j)    Higgins' Declination to Comment on Staley's Departure

17

Plaintiff cannot plead that a February 23, 2022 statement by Higgins that "[i]t is obviously not appropriate for me to comment at the moment, further than has been done already, on the circumstances of [Staley's] departure [from Barclays]" was false or misleading. (AC ¶ 88.) This anodyne remark does not comment on the underlying investigation done by Barclays, the FCA's investigation, or anything at all. (*Id.* ¶ 91(e).) Instead, Higgins was explicitly <u>declining</u> to comment on Staley's departure, which was the result of the FCA's ongoing inquiry—a point that he reiterated in the next sentence when he emphasized that it was "important to let the regulatory and related processes take their course." (*Id.* ¶ 88.). There is nothing false or misleading about this.[13]

### (k)     Barclays' Reaction to Certain Third-Party Lawsuits

The AC disputes a March 24, 2023 statement made in a letter signed by Higgins that "[t]he Board's original review [of how Staley characterized his relationship with Epstein], conducted in February 2020, was based on the information it had at the time and representations made by Mr. Staley" (AC ¶ 98), but fails to allege anything false about that statement. Not only is it literally true, but the context makes clear that Barclays was reacting to allegations made about Staley and Epstein in third-party lawsuits that were commenced in 2022 and early 2023. (*Id.* ¶¶ 92-98.) Plaintiff complains that Barclays' response, which characterized the lawsuits as raising "'serious and new'" allegations (*id.* ¶ 98), "failed to make a full disclosure of what Barclays learned in the course of conducting its internal investigation," including that it had reviewed emails referenced in these lawsuits (*id.* ¶¶ 101(a)-(b)). But this is a distortion of the actual disclosure, which simply states that, as of February 2020, Barclays had not had access to certain of the "'serious and new'" accusations levied in these <u>subsequently filed</u> civil actions. Nothing in the AC suggests otherwise.

### 3.     Higgins Is Not Liable Under Section 10(b) for Statements He Did Not Make

Any primary liability claim under Section 10(b) asserted against Higgins for allegedly misleading statements he did not make should be dismissed. *See Janus Cap. Grp., Inc. v. First*

---

[13] Plaintiff challenges another statement that, according to a press article, Higgins purportedly made on a <u>private</u> call with a Barclays investor that "once you read the [FCA's] final report you will have questions for us because it makes for uncomfortable reading." (AC ¶ 87.) Even if assumed to be true, such a statement is not actionable. *See Wessel v. Buhler*, 437 F.2d 279, 282 (9th Cir. 1971) (statements must be "reasonably calculated to influence the investing public" to be actionable). It also does not render any other statement false.

18

*Derivative Traders*, 564 U.S. 135, 142 (2011) (only the person who "made" an alleged misstatement can be liable under Section 10(b)). Plaintiff summarily contends that Higgins is liable for Barclays' statements because of his "position[ ] of control and authority" as a director and because he was "provided with copies of the documents alleged . . . to be misleading before or shortly after their issuance." (AC ¶ 50). But these conclusory allegations are insufficient. *See, e.g.*, *Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013) (rejecting similar allegations because they "lack[ed] the requisite specificity"); *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *3 (N.D. Cal. Mar. 11, 2011) (similar).

### 4.      The Complaint Fails to Allege Scienter

The Section 10(b) claim also fails because it inadequately alleges scienter—a "mental state embracing intent to deceive, manipulate, or defraud" as to either Higgins or Barclays. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). On a statement-by-statement basis, *see* 15 U.S.C. § 78u-4(b)(2), "a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021). In applying this standard, courts examine whether plaintiffs have pleaded "a plausible motive for the allegedly fraudulent action" by each defendant. *Id.* at 1103. For example, plaintiffs often allege that "someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Id.* at 1107. Conversely, "the lack of a plausible motive . . . makes it much less likely that a plaintiff can show a strong inference of scienter." *Id.* at 1108; *see also id.* at 1102 (absent motive, "plaintiff will face a substantial hurdle in establishing scienter"). Thus, "[o]nly where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will [the Court] overlook the failure to allege a plausible motive." *Id.* at 1108. Finally, "a corporation can only act through its employees and agents and can likewise only have scienter through them." *Prodanova v. H.C. Wainwright & Co.*, 2019 WL 4143301, at *8 (C.D. Cal. July 2, 2019).

### (a)      The Complaint Fails to Allege that Higgins Acted with Scienter

Nowhere does the AC make any particularized allegation sufficient to plead that Higgins acted with the requisite intent. Generalized assertions about "routine business objectives" or a

19

defendant's desire to increase his compensation are not enough. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009), *as amended* (Feb. 10, 2009); *see also id.* at 1005 ("If simple allegations of pecuniary motive were enough to establish scienter, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *In re Rigel Pharms.*, 697 F.3d at 884 (no fraudulent intent "merely because a defendant's compensation" was based in part on "the success of "routine corporate objectives"). Without allegations that would support a specific motive or intent to engage in securities fraud—for instance, seeking to profit from the Company's purportedly inflated stock price through inappropriate trading, the allegations of scienter must be especially "compelling and particularized." *Prodanova*, 993 F.3d at 1103, 1108. They are not.

Instead, the AC relies solely on Higgins' purported access to and review of the JPM emails that pre-dated Staley's tenure at Barclays. (AC ¶¶ 21-22, 65-66, 81, 102.)[14] As explained above (§ III(A)(2)), these emails—to the extent they are described at all—are too opaque to raise a plausible inference that Higgins had "actual access to information contradicting [Barclays' statements] at the time the statements were made." *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *20 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019). Thus, the AC fails to plead Higgins' scienter.

**(b)     Staley's Knowledge of His Relationship with Epstein Cannot be Imputed to Barclays**

Plaintiff misconstrues imputation by claiming that—because Staley knew all the details of his relationship with Epstein—this knowledge must be imputed to Barclays (AC ¶¶ 81(d), 138). Under general agency principles, only "knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority" may be imputed to the corporation. *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co., LTD*, 2009 WL 10692715, at *9 n.53 (N.D. Cal. Nov. 30, 2009); *see also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) ("Because the Exchange Act and accompanying regulations do not contain any explicit instructions on when an employee's acts

[14] Plaintiff's allegation that the Board "conducted interviews with Staley" (AC ¶ 102) is of no help either because plaintiff does not allege what Staley said in those interviews, much less with particularity.

20

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

and intent are to be imputed as those of the company, courts have looked to agency principles for guidance."). Those principles make clear that imputation to Barclays is not proper.

Certainly, Staley's knowledge cannot be imputed to Barclays with respect to the alleged misstatements after his departure, when he was no longer an employee or agent of Barclays (AC ¶¶ 83, 86, 88, 98). But even more fundamentally, Staley's knowledge of his relationship with Epstein was not obtained in this course of his employment at Barclays and the relationship entirely pre-dated Staley's tenure at Barclays. Accordingly, Staley's knowledge is not imputed to Barclays. *See Applied Materials*, 2009 WL 10692715, at *9 (declining to impute employee's knowledge to corporation in connection with misappropriation of trade secrets claim because employee acquired that knowledge while working for a different company); *In re WRT Energy Sec. Litig.*, 1999 WL 178749, at *11 (S.D.N.Y. Mar. 31, 1999) (declining to impute employee's knowledge for scienter purposes where plaintiff failed to allege that knowledge was acquired in relation to his role at the corporation).[15]

**B.    The Section 20(a) Claim Under the Exchange Act Fails**

Because plaintiff fails to state a claim under Section 10(b), the Section 20(a) claim also fails. *See Zucco*, 552 F.3d at 990, 1008 (To state a claim for control person liability under Section 20(a) of the Exchange Act, a plaintiff must allege an underlying violation of Section 10(b).)

**C.    Plaintiff St. Louis Firemen's Section 90A Claim Should Be Dismissed**

**1.    The Court Should Decline to Exercise Supplemental Jurisdiction**

This Court should decline St. Louis Firemen's invitation (AC ¶ 34) to exercise supplemental jurisdiction over their U.K.-law Section 90A claim. A court may decline to exercise jurisdiction for

---

[15] *ChinaCast* does not compel a contrary result. There, the Ninth Circuit imputed to the company the scienter of a CEO who allegedly embezzled millions while emphasizing the company's financial health and "reassure[ing] investors that 'no questions or concern[s] have ever been raised by the company's auditors or audit committee about our cash balances.'" *In re ChinaCast*, 809 F.3d at 472. The CEO's statements were "made with the imprimatur of the corporation that selected him to speak on its behalf and sign SEC filings." *Id.* at 472, 477. Staley's alleged misstatements could not be more different. They centered on the nature of his relationship with Epstein—a relationship that pre-dated his tenure at Barclays and was immaterial to his duties as Barclays' CEO. Unlike attestations of an executive to a company's financial health in an SEC filing, for example, Staley's alleged misstatements were made in response to questions directed to his individual relationship—not about his responsibilities at Barclays. And the policy considerations that concerned the Ninth Circuit are not implicated here. Far from showing that Barclays "turned a blind eye" to alleged misconduct such that imputation would "encourage[ ] appropriate corporate oversight," *id.* at 478, the AC notes that, according to regulators, Barclays was misled by Staley, who "was the only person at Barclays who knew the full extent of his personal relationship with Mr. Epstein." (AC ¶ 104.)

21

a number of reasons, including where the claim raises a novel or complex issue of foreign law, the claim substantially predominates over the claim over which the district court has original jurisdiction, or in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).[16] Here, each factor supports declining jurisdiction.

To start, the Section 90A claim presents novel and complex questions of UK law. To date, "there have been hearings on a relatively small number of Section 90A claims" in UK courts and only one trial, "which is thought to have been one of the longest and most complex trials in English history." (Moore ¶ 27.) "The resulting judgment on liability alone is the leading, and in many respects the only, authority" on Section 90A. (*Id.*) What is more, the "statutory regime under s. 90A sits alongside public enforcement of the relevant disclosure rules"—meaning that the FCA plays a significant role in enforcing the disclosure rules applicable to LSE-listed corporations. (*Id.* ¶ 26.)

On the other § 1367(c) factors, *In re Toyota Motor Corporation Securities Litigation* is instructive. 2011 WL 2675395, at *6 (C.D. Cal. July 7, 2011). There, the court declined to exercise supplemental jurisdiction over Japanese law claims "that form[ed] part of the same case or controversy as American securities fraud claims" for two reasons. *Id.* First, the Japanese law claims substantially predominated because the "vast majority of the members of the currently pleaded class are common stock holders who purchased their stock on foreign exchanges and, therefore, have only a Japanese law claim. It follows that the damages analysis would focus overwhelmingly on these claims." *Id.* The same conclusion follows here as the volume of Barclays' ordinary stock traded on the LSE (and thus covered by St. Louis Firemen's U.K.-law claim) far exceeds the volume of its ADRs traded on the NYSE (covered by Teamsters' U.S.-law claim). (Ex. 8 at 122.)

Second, *Toyota* held that the "exceptional circumstance of comity" to the foreign court "also strongly argues against the exercise of supplemental jurisdiction." 2011 WL 2675395, at *7. As the court noted, the "clear underlying rationale of the Supreme Court's decision in *Morrison v. Nat'l Australia Bk., Ltd.* . . . is that foreign governments have the right to decide how to regulate their own

---

[16] Courts regularly decline to exercise supplemental jurisdiction upon dismissing the claim over which the court has original jurisdiction—as the Court should do with respect to the Exchange Act claims. *See Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994) ("[I]n the *usual* case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state law claims.").

22

securities markets. This respect for foreign law would be completely subverted if foreign claims were allowed to be piggybacked into virtually every American securities fraud case." *Id.* That logic applies here—and is particularly compelling because the plaintiff asserting the U.K.-law claim is not (and indeed cannot be) a party to the U.S.-securities claim.

Alternatively, the Court can dismiss the Section 90A claim in favor of the UK courts under the doctrine of *forum non conveniens*. *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2008 WL 5958061, at *24–30, 37 (E.D.N.Y. Sept. 26, 2008) (citing doctrine of *forum non conveniens* as an exceptional circumstance providing substantial reason for declining supplemental jurisdiction). In considering *forum non conveniens* dismissals, courts ask whether the moving party can show that (1) there is an adequate alternative forum and (2) the balance of private and public interest factors favors dismissal. *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009).[17] Here, Barclays can do both.

First, whether an alternative forum is available is an "easy to pass" test that will give Barclays no trouble. *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1178 (9th Cir. 2006). UK courts provide a more than adequate forum to adjudicate plaintiff's claim against a UK company under UK securities laws—and indeed would be a far more appropriate forum for that claim. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000) ("We regard the British courts as exemplary in their fairness and commitment to the rule of law."); *Dibdin v. S. Tyneside NHS Healthcare Tr.*, 2013 WL 327324, at *3 (C.D. Cal. Jan. 29, 2013) ("There is no reason to think England would be unsuitable. . . . This court is not aware of any Ninth Circuit case that has found England inadequate, but there are a number finding England adequate.").

Second, both private and public interest factors favor dismissal. Barclays is headquartered in London (AC ¶ 5), so most of the evidence and witnesses relating to its board's conduct and its interactions with its U.K. regulators would be located there. *See Chateau des Charmes Wines Ltd. v.*

---

[17] Public interest factors include: local interest in the lawsuit, the court's familiarity with the governing law, the burden on local courts and juries, congestion in the court, and the costs of resolving a dispute unrelated to a particular forum. *See Lueck*, 236 F.3d at 1147. Private interest factors include: the residence of the parties and the witnesses; the forum's convenience to the litigants, access to evidence, whether unwilling witnesses can be compelled to testify, the cost of bringing witnesses to trial, the enforceability of the judgment, and all other practical problems that make trial of a case easy, expeditious and inexpensive. *Id.* at 1145.

23

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

*Sabate USA, Inc.,* 2003 WL 22682483, at *16 (N.D. Cal. Nov. 12, 2003) (finding local interest in the lawsuit minimal when the "essence of [the] lawsuit" took place abroad). Thus, discovery and compulsory process relating to these claims also would be more available and less costly if the claim was litigated there. Likewise, UK courts have a greater interest in adjudicating a cause of action under the UK securities laws. *See Tongfang Glob. Ltd. v. Element Television Co., LLC*, 2020 WL 4354173, at *5 (C.D. Cal. June 22, 2020) (dismissing on *forum non conveniens* grounds in part because "U.S. courts have minimal interest in adjudicating foreign antitrust claims"). And non-California resident St. Louis Firemen can claim no refuge in this Court, as it seeks to bring the Section 90A claim on behalf of <u>any</u> purchaser of Barclays' ordinary shares—not just residents of the U.S., much less this district. The Section 90A claim should be dismissed.

### 2. St. Louis Firemen Fails to State a Claim Under Section 90A on the Merits

In any event, the Section 90A claim is untenable. Under Section 90A, issuers like Barclays may be liable where a plaintiff pleads with particularity that it acquires or holds securities in reasonable reliance on published information and suffers loss as a result of an untrue or misleading statement or omission in that published information. (Moore §§ V, VII, VIII); s. 90A.[18] But the AC does not sufficiently allege that Barclays made an untrue or misleading statement or omission (§ III(A)(2); Moore ¶¶ 48-51, 55, 63) or that plaintiff suffered a loss "as a result of" an alleged misstatement (§ III(A)(1) (Moore ¶¶ 95, 98).[19]

Section 90A is also more restrictive than U.S. securities laws in two respects. First, Section 90A imposes a higher hurdle with respect to reliance. Contrary to the assertion that English law permits "a presumption that they relied on an actionable misrepresentation by which it was intended they should be deceived" (AC ¶ 122), "no such presumption exists as a matter of English law." (Moore ¶ 90; *see also id.* ¶¶ 80-82, 89.) Instead—and fatally for plaintiff—Section 90A

---

[18] Rule 9(b) also applies to the Section 90A claim. *See Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 557 (9th Cir. 2020) (federal procedural rules apply to foreign law claims premised on diversity jurisdiction); *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) (applying same in the context of supplemental jurisdiction).

[19] *See also* Moore ¶¶ 55, 56, 63 (opining that with respect to omission and dishonest delay, plaintiff has failed to make allegations that would be likely to survive scrutiny in an English court, as plaintiff "fails to identify the source of any obligation to disclose" or "any identified legal obligation to publish information within a particular timeframe, and a plea that the required information was not published until a later date").

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS      NO.: 2:23-cv-09217-MEMF-KS

imposes a stringent, individualized reasonable reliance requirement: A plaintiff must plead (and ultimately prove) that a challenged statement was actually present on the claimant's mind when transacting, and that this actual, individual reliance was reasonable under the circumstances. (*Id.* ¶¶ 84-86.) St. Louis Firemen does not even try to allege, as it must, that it read or heard any of the purported misstatements. Rather, it summarily avers that (i) it "reasonably made a decision, including an automated decision to acquire, continue to hold, or dispose of Barclays ordinary shares at the inflated price at which they were in fact acquired and held" and (ii) it was aware of "the price of the shares" and "the published information being true, complete, and accurate." (AC ¶¶ 123-24.) These generalized allegations are insufficient to plead reliance. (Moore ¶¶ 91-92.) Indeed, the admission that St. Louis Firemen transacted based on "automated decision[s]" undercuts any pleading of reliance. (*Id.* ¶ 91.)

The specific timing of St. Louis Firemen's alleged purchases also makes it even less likely that it could allege facts showing that it reasonably relied on the alleged misstatements. St. Louis Firemen purportedly bought Barclays shares on August 4, 2022, and September 28, 2022 (AC, Sch. A)—after Staley departed Barclays and after the market was aware that he (in the FCA's judgment) had mischaracterized the nature of his relationship with Epstein. Not only does this timing further doom any allegation of loss causation but it also makes any attempt by St. Louis Firemen to plead reasonable reliance on any alleged misstatements published before Staley's departure even more implausible. (Moore ¶ 93.)

Second, Section 90A is even more restrictive than U.S. securities laws in that it only imposes liability based on information the issuer "published" "by recognised means," such as the RNS feed used on the LSE. (*Id.* ¶¶ 32-37.) Thus, St. Louis Firemen cannot base a claim on statements that were not so published. (*Id.* ¶ 36 (opining that statements in ¶ 53 (New York Times); ¶ 74 (Evening Standard); ¶ 75 (Wall Street Journal); and ¶ 87 (Mail on Sunday), were not made by "'*recognised means*'" and that the statements in ¶¶ 71, 72, and 86 are also outside the scope of Section 90A).)

## IV.   CONCLUSION

For these reasons, the Court should dismiss the Complaint with prejudice.

DATED: October 30, 2024

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/ Lara A. Flath*_____
Lara A. Flath
Scott D. Musoff
Boris Bershteyn

Attorneys for Defendants
Barclays PLC and Nigel Higgins

BARCLAYS PLC'S AND HIGGINS' MOTION TO DISMISS                    NO.: 2:23-cv-09217-MEMF-KS

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for defendants Barclays PLC and Nigel Higgins, certifies that this brief is prepared in Times New Roman font with text no less than twelve (12) point font (with footnotes no less than ten (10) point font) and is 25 pages, which complies with the limits set in Section VIII.C of the Court's Civil Standing Order published as of May 3, 2024, which is the current version available on the Court's website.

DATED: October 30, 2024

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/ Lara A. Flath*_____
Lara A. Flath
Scott D. Musoff
Boris Bershteyn

Attorneys for Defendants
Barclays PLC and Nigel Higgins

27