PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:    (213) 687-5000
Facsimile:    (213) 687-5600

SCOTT D. MUSOFF (admitted *pro hac vice*)
scott.musoff@skadden.com
BORIS BERSHTEYN (admitted *pro hac vice*)
boris.bershteyn@skadden.com
LARA A. FLATH (admitted *pro hac vice*)
lara.flath@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000

Attorneys for Defendants Barclays PLC and Nigel Higgins

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS, <br><br> Defendants. | CASE NO.: 2:23-cv-09217-MEMF-KS <br><br> **DECLARATION OF MARTIN MOORE K.C. IN SUPPORT OF DEFENDANTS BARCLAYS PLC'S AND NIGEL HIGGINS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** <br><br> Date: March 20, 2025 <br> Time: 10:00 a.m. <br> Courtroom: 8B <br> Judge: Hon. Maame Ewusi-Mensah Frimpong <br><br> Complaint Filed: November 1, 2023 <br> Amended Complaint Filed: August 12, 2024 |

## I. **Introduction**

1. I am a barrister in private practice in London. I was called to the Bar of England and Wales in 1982 and, on completion of my pupillage, became a member of Erskine Chambers in 1983. Erskine Chambers, a set of Barristers Chambers, is widely regarded as the foremost company law Chambers in England and Wales. I was appointed Queens Counsel (now Kings Counsel) in 2002.

2. During the course of my practice as a barrister, I have focused on company law litigation and advice, corporate finance, mergers and acquisitions, financial services, insolvency and corporate reorganisations. I have extensive experience advising companies ranging in size from major multinational public companies to small family companies. As I have become more senior, however, the focus of my practice has moved firmly toward acting for public limited companies, more often than not companies whose securities are publicly traded. I am competent to make this Declaration, and I make this Declaration based on my personal knowledge of the matters recited herein.

3. Exhibit 1 hereto includes a true copy of my profile maintained on Erskine Chambers' website and extracts from Chambers UK Bar Guide 2025 published by Chambers & Partners and The Legal 500 2025 published by Legalease. Exhibit 2 comprises copies of the statutory materials and cases referred to in this Declaration.

4. I have been asked by Skadden, Arps, Slate, Meagher & Flom LLP, attorneys acting for Barclays plc (**Barclays**) and Nigel Higgins (**Mr Higgins**) to provide this Declaration on aspects of English securities law in so far as it applies to the Amended Class Action Complaint filed against Barclays, James E. Staley (**Mr Staley**) and Mr Higgins. Whilst I do not understand it to be necessary or appropriate for me to analyse or evaluate in detail the allegations in the Complaint, I have read the Complaint and I am familiar with its contents. I summarise my understanding of the allegations which are salient to this Declaration in Section II below.

5. It is an important requirement of the Court in England and Wales that persons giving expert evidence owe their duties to the Court to which their evidence is to be tendered and not to

1

the party appointing them. Regardless of whether such a requirement exists in the United States District Court, I have made this Declaration on the same basis as I would were it made in English proceedings.

6.    Given my practice it is inevitable that I would have acted in a professional capacity for entities within the Barclays Group on discrete points of company law, and over the years I have done so. Most recently, I have advised Barclays (and another bank) on issues relating to the removal of the bankers' bonus cap and I was recently jointly instructed by Tesco Personal Finance plc and Barclays Bank UK plc (**Barclays Bank**) in relation to a banking business transfer under Part VII of the Financial Services and Markets Act 2000 which was sanctioned by the High Court on 17 October 2024. Besides producing this Declaration, I have no current engagements for Barclays or Barclays Bank.

7.    Prior to that, in 2018-2019 I acted for Barclays Bank in relation to a banking business transfer under Part VII of the Financial Services and Markets Act 2000 which was sanctioned by the High Court on 29 January 2019. In 2016-2018 I acted for four major British banks, including Barclays Bank, in relation to their ring-fencing transfers under Part VII of the Financial Services and Markets Act 2000 which in the case of Barclays Bank was sanctioned by the High Court on 9 March 2018. None of these matters relate (or related) to the subject matter of these proceedings nor the issues on which I express my views in this Declaration.

8.    I have previously given expert evidence for Barclays in proceedings in the Supreme Court of New York, New York County in the case of *Ezrasons, Inc v Rudd et al.*, Index No. 656400/2020.

9.    I would respectfully suggest that these engagements do not prevent me from complying with my obligations of independence of which, as I have said at para 5 above, I am very mindful.

10.   My conclusions on the key points are as follows:

(a)    Section 90A applies only to information published by recognised means, or by other means where the availability of the information has been announced by the issuer by

DECLARATION OF MARTIN MOORE K.C.                                    CASE NO.: 2:23-cv-09217-MEMF-KS

recognised means. Ten of the seventeen statements relied upon were undoubtedly published by recognised means: see Section IV below.

(b)    Liability may arise only in relation to untrue or misleading statements, omissions or delay in publishing information. In order to establish liability for an omission or delay, a claimant must identify an independent legal duty which entails disclosure of the material in question. No such legal duty is identified in the Complaint. Rather, the gist of the Complaint appears to be that the various statements were untrue or misleading, though I have also been unable to ascertain from the Complaint the grounds on which that is said to have been the case: see Section V below.

(c)    Schedule 10A imposes liability for fraud only, requiring that a person discharging material responsibilities within the issuer knew (or was reckless) as to whether the statement was untrue or misleading; knew an omission to be a dishonest concealment of fact; or acted dishonestly in delaying the publication of the information: see Section VI below.

(d)    A claimant must show that in acquiring, holding or disposing of the securities, he[1] (actually and individually) relied on the untrue or misleading statement or the omission. This is a significant limitation in the application of the statutory scheme. I have been unable to ascertain from the Complaint whether it is alleged that reliance in the required sense was indeed present, though that strikes me as unlikely from the references to an alleged "*presumption*" of reliance and to an "*automated decision*" to acquire, continue or hold securities: see Section VII below.

(e)    In determining what if any loss has arisen as a result of the false or misleading statement, an English court considers what would have happened but for the false or misleading statement, omission or delay. The starting point, in most cases, will be

---

[1] In this Declaration where I refer to the requirement that a claimant must rely on a statement, I include a claimant's authorised agents and advisers. I note that the Complaint in this case simply refers to reliance by the Plaintiffs.

DECLARATION OF MARTIN MOORE K.C.                                CASE NO.: 2:23-cv-09217-MEMF-KS

the difference between the price paid for the securities on the basis of the statement(s) and their true value at that time: see Section VIII below.

## II.    The Complaint

11.    The reading of the Complaint is of course ultimately a matter for the Court. However, in order to frame the matters of law to which I refer below, I should briefly explain my understanding of the case advanced.

12.    As I understand it, the Complaint includes three claims. I am not asked to comment upon the first and second claims, which are made under US securities laws and concern Barclays American Depositary Receipts (**ADRs**) traded on the New York Stock Exchange.

13.    The third claim, to which this Declaration relates, concerns Barclays ordinary shares traded on the London Stock Exchange (the **LSE**) and is brought under s. 90A and Schedule 10A of the UK Financial Services and Markets Act 2000 (**FSMA**) (the **S. 90A Claim**). The S. 90A Claim is made only in respect of ordinary shares, and not in respect of ADRs.[2]

14.    The plaintiff for the S. 90A Claim is the Firemen's Retirement System of St. Louis (**St Louis Firemen**). The Complaint alleges that St Louis Firemen, and a class of persons or entitles who acquired ordinary shares in Barclays or continued to hold them during the period from 22 July 2019 to 12 October 2023, suffered loss as a result of their purchase and retention of Barclays ordinary shares, and that Barclays is liable to compensate them pursuant to s. 90A and Sch 10A of FSMA.

15.    The central allegation is that Barclays made "*a misleading statement or dishonest omission and/or dishonestly delayed the publication of information*", certain of which was published by recognised means, or the availability of which was published by such means.[3]

16.    According to para 135 of the Complaint, the claim appears to be based upon the 17 statements which appear at paras 53, 69, 70, 71, 72, 74, 75, 77, 78, 79, 83, 86, 87, 88, 89,

---

[2] Complaint, paras 1, 44, 152.

[3] Complaint, paras 153.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

94 and 98 of the Complaint. However, as noted in Section IV below, several of those statements are outside the scope of s. 90A.

17.    It is alleged that "*[o]ne or more of the Individual Defendants*", in discharging their managerial responsibilities on behalf of Barclays, acted fraudulently (i.e. in the knowledge that the statements were untrue or misleading, or recklessly to whether they were) and dishonestly.[4]

18.    As noted below in Section VII, the basis on which it said that the St Louis Firemen acted in reliance on the alleged statements[5] is not clear to me. At any rate, they are said to have made a decision to acquire ordinary shares in Barclays at an inflated price. According to Schedule A to the St Louis Firemen's Certification, they acquired shares in August and September 2022, after Mr Staley had resigned.

**III.    The Statutory Regime**

    **A.    History, background and context**

19.    Section 90A and Sch 10A of FSMA make provision for the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of an untrue or misleading statement or dishonest omission in certain published information relating to the securities, or a dishonest delay in publishing information.

20.    They put on a statutory footing, and in some respects modify, the common law of deceit (or fraudulent misrepresentation, as it is also known) as it applies to issuer publications. Amongst the features of the common law it retains is the requirement for reliance on the publication, to which I refer in Section VII below.[6]

21.    Historically, English law provided no remedy for inaccurate statements in information simply by reason of its disclosure to the market by issuers. Section 90A was introduced in 2006 in order to ensure that English law met the requirements of the 2004 Transparency

---

[4] Complaint, paras 155-159.

[5] Complaint, paras 122-14.

[6] Davies Discussion Paper, paras 54-55.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

Directive of the European Union.[7] The Explanatory Note to the legislation which introduced it explained that no issuer had at that time been found liable for damages under English law in respect of statements made in narrative reports or financial statements.[8] That stood in contrast to liability for misstatements and omissions in prospectuses, which was first introduced in 1890 and now appears in s. 90 FSMA.

22.  When s. 90A was introduced in 2006 it was what has been described as a "*stop-gap solution*"[9] in order to ensure that UK law met the requirements of the Transparency Directive. Following its introduction in 2006, there was time for further enquiry and consideration of whether a more extensive regime was appropriate.

23.  A review of s. 90A was then commissioned by the government and undertaken by Professor Paul Davies KC, a pre-eminent company law academic. Professor Davies produced a discussion paper in March 2007 (the **Davies Discussion Paper**), followed by a final report in June 2007 (the **Davies Final Report**). Thereafter, in line with Professor Davies' recommendations, a number of (fairly modest) extensions to s. 90A were proposed and ultimately enacted by the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010. The substantive provisions now appear in Schedule 10A of FSMA. Section 90A simply cross-refers to those provisions in Sch 10A.

24.  As the Explanatory Notes made clear at [1643], s. 90A was designed to ensure that the scope of potential liability was kept within reasonable bounds. Those comments were

---

[7] Council Directive 2004/1209/EC.

[8] Explanatory Note to the Companies Act 2006, s. 1270, [1637]. Explanatory notes do not form part of the legislation and are not considered by Parliament. Explanatory notes are therefore not legally binding, though they may sometimes be regarded as an aid to construction of the legislation: *R (on the application of Westminster City Council) v National Asylum Support Service* [2002] 1 WLR 2956.

[9] *Autonomy v Lynch* [2022] EWHC 1178 at [441]

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

directed to s. 90A in its original form in 2006 but are equally apposite to the regime as amended in 2010. It was noted that:

> *"In particular, the Government was anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties, in order to protect the interests of company members, employees and creditors."*

25.   As will be seen below, the requirements to establish fraud and reliance significantly curtail the range of circumstances in which s. 90A and Sch 10A give rise to liability. The restrictive nature of the regime is inextricably linked to two factors, in particular. First, as regards the interests of company members generally, Professor Davies explained:[10]

> *"It can also be argued that, for long-term only investors, the financial benefits of being able to sue for damages may be small, if their position is looked at over time. They are as likely, it might be said, to be among the shareholders in the issuer which has made the misleading statement as among the investors who were misled. They benefit in the latter capacity but lose out in the first. Over time, their financial position may not be significantly different if they could not sue at all, except that they will have borne the transaction costs of the litigation. Thus, on both the compensation and deterrence fronts, the achievements of private litigation are limited."*

26.   Second, the statutory regime under s. 90A sits alongside public enforcement of the relevant disclosure rules. This is conducted largely by the Financial Conduct Authority (**FCA**),[11] which has a range of enforcement mechanisms available to it, including, for example, powers to impose fines, to seek civil remedies from the High Court and to bring criminal prosecutions. The importance of those powers to the landscape of civil liability in the UK should not be understated. As Professor Davies noted when explaining his recommendation not to extend the legislation so as to cover negligence as well as fraud:[12]

> *"...If private litigation were the only means of enforcing the negligence or due care standard, then one might want to accept these disadvantages of civil litigation in order to have effective enforcement in meritorious cases. The strategy I recommend thus relies on the continuing availability of public enforcement by the FSA. The primary role in securing the exercise of due care on the part of issuers in meeting their continuous disclosure obligations will continue to fall on the FSA..."*

---

[10] Davies Discussion Paper, para 121.

[11] The FCA was established in 2013 and took over financial regulation from the Financial Services Authority (**FSA**), alongside another financial regulator, the Prudential Regulation Authority.

[12] Davies Final Report, para 19.

27. To date, there have been interlocutory hearings on a relatively small number of s. 90A claims. Only one such claim has reached a trial judgment: *Autonomy Corporation v Lynch* [2022] EWHC 1178. *Autonomy* concerned Hewlett-Packard's acquisition of Autonomy Corporation Plc in 2011, and is thought to have been one of the longest and most complex trials in English legal history.[13] The resulting judgment of 1315 pages on liability alone is the leading, and in many respects the only, authority on s. 90A.[14] Accordingly I refer to it to on a number of occasions below.

28. Shortly before this declaration was due to be filed, on 25 October 2024, Leech J handed down judgment in *Allianz Funds Multi-Strategy Trust and others v Barclays* [2024] EWHC 2710. Although this was not a judgment following a trial, it was a judgment on the merits, because Barclays applied, successfully, for the summary disposal of the s. 90A claims brought by a number of claimants (the 'Category C Claimants[15]'), as well as the dishonest delay claims brought by all claimants. The judgment in *Allianz* deals in considerable detail with the legislative background to s.90A claims and with questions concerning reliance, as well as dishonest delay.

**B.      The statutory provisions**

29. Section 90A and Sch 10A are included in full in Exhibit 2. So far as material, Schedule 10A provides as follows:

> *Securities to which this Schedule applies*
> *1(1)      This Schedule applies to securities that are, with the consent of the issuer,*
> *admitted to trading on a securities market, where—*
> *(a)    the market is situated or operating in the United Kingdom, or*
> *(b)    the United Kingdom is the issuer's home State.*

---

[13] *Autonomy* at [7].

[14] It is not yet known whether the *Autonomy* judgment will be the subject of an appeal. My understanding from public statements reported in the press is that any appeal of the liability judgment will follow a separate judgment on quantum, which has not yet been delivered but is expected in the relatively near future.

[15] Being Claimants who (a) knew of the price of Barclays shares and (b) believed that the prevailing market price reflected the value of the shares based on the disclosed information being true and complete and appear to have invested in more or less, active and passive tracker funds of which, it seems, Barclays' shares were a constituent.

...

*Published information to which this Schedule applies*

2(1)    *This Schedule applies to information published by the issuer of securities
to which this Schedule applies—*

    (a)    *by recognised means, or*

    (b)    *by other means where the availability of the information has been
announced by the issuer by recognised means.*

(2)    *It is immaterial whether the information is required to be published (by
recognised means or otherwise).*

(3)    *The following are "recognised means"—*

    (a)    *a recognised information service;*

    (b)    *other means required or authorised to be used to communicate
information to the market in question, or to the public, when a
recognised information service is unavailable.*

(4)    *A "recognised information service" means—*

    (a)    *in relation to a securities market situated or operating in the United
Kingdom, a service used for the dissemination of information in
accordance with transparency rules…;*

...

    (c)    *in relation to any securities market, any other service used by issuers
of securities for the dissemination of information required to be
disclosed by the rules of the market.*

*Liability of issuer for misleading statement or dishonest opinion*

3(1)    *An issuer of securities to which this Schedule applies is liable to pay
compensation to a person who—*

    (a)    *acquires, continues to hold or disposes of the securities in reliance on
published information to which this Schedule applies, and*

    (b)    *suffers loss in respect of the securities as a result of—*

        (i)    *any untrue or misleading statement in that published
information, or*

        (ii)    *the omission from that published information of any matter
required to be included in it.*

(2)    *The issuer is liable in respect of an untrue or misleading statement only if a
person discharging managerial responsibilities within the issuer knew the
statement to be untrue or misleading or was reckless as to whether it was
untrue or misleading.*

(3)    *The issuer is liable in respect of the omission of any matter required to be
included in published information only if a person discharging managerial
responsibilities within the issuer knew the omission to be a dishonest
concealment of a material fact.*

(4)    *A loss is not regarded as suffered as a result of the statement or omission
unless the person suffering it acquired, continued to hold or disposed of the
relevant securities—*

9

(a)  *in reliance on the information in question, and*

(b)  *at a time when, and in circumstances in which, it was reasonable for him to rely on it.*

...

*Liability of issuer for dishonest delay in publishing information*

*5(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—*

(a)  *acquires, continues to hold or disposes of the securities, and*

(b)  *suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.*

(2)  *The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.*

*Meaning of dishonesty*

6    *For the purposes of paragraphs 3(3) and 5(2) a person's conduct is regarded as dishonest if (and only if)—*

(a)  *it is regarded as dishonest by persons who regularly trade on the securities market in question, and*

(b)  *the person was aware (or must be taken to have been aware) that it was so regarded.*

...

30.  As will be seen from the provisions to which I have just referred, in order to establish liability under Schedule 10A, a claimant must prove that:

(a)  the information in question was "*published...by recognised means*" (para 2);

(b)  a statement in the publication **(i)** was "*untrue or misleading*" or **(ii)** omitted "*any matter required to be included it*" (para 3(1)) or alternatively **(iii)** the issuer delayed publication of the information (para 5(1));

(c)  the requisite degree of fault, being:

(i)    in relation to **(i)**, that a person discharging managerial responsibilities within the issuer (a **PDMR**) knew the statement to be untrue or misleading or was reckless as to whether that was so (para 3(2));

(ii)   in relation to **(ii)**, that a PDMR knew the omission to be a dishonest concealment of a material fact (paras 3(3) and 6); and

(iii)    in relation to **(iii)**, that a PDMR acted dishonestly in delaying the publication of the information (paras 5(2) and 6);

(d)    in relation to **(i)** and **(ii)** the claimant acquired, continued to hold or disposed of the relevant securities "in reliance on the information in question" and "at a time when, and in circumstances in which, it was reasonable for him to rely on it" (para 3(4)); and

(e)    in acquiring, continuing to hold or disposing of securities, the claimant suffered loss in respect of those securities as a result of the untrue or misleading statement, omission or delay (para 3(1) and 5(1)).

31.    In the sections that follow, I address certain of those requirements in turn.

## IV.   Information published by recognised means

32.    Liability under Schedule 10A can arise only in relation to information "*published*" by the issuer by "*recognised means*" (para 2(1)(a)) or "*by other means where the availability of the information has been announced by the issuer by recognised means*": para 2(1)(b).

33.    The term "*recognised means*" is defined by paras 2(3) and 2(4). It is a "*service used for the dissemination of information in accordance with transparency rules*". Under rule 6 of the FCA's Disclosure Guidance and Transparency Rules (**DTR**), issuers are required to release regulated information to a regulatory information service (**RIS**) so that the information is disseminated to the market. An RIS is subject to regulatory approval by the FCA. The leading provider, which I understand was the provider used by Barclays, is Regulatory News Service (**RNS**).

34.    Publication by RNS constitutes publication by "*recognised means*" (within the meaning of para 2(1)(a)). A statement quoted in a newspaper or made during an earnings call or television interview does not, unless a publication by RNS has announced the availability of that statement (in which case, the statement would fall within para 2(1)(b)). [16] I have not

---

[16] In *Autonomy*, Hildyard J was clear that transcripts of earnings calls are not publications by recognised means: see [452].

DECLARATION OF MARTIN MOORE K.C.            CASE NO.: 2:23-cv-09217-MEMF-KS

identified any allegation that the "*availability*" of those statements was announced by RNS within the meaning of para 2(1)(b).[17]

35. It is possible, of course, that an investor may *learn* of something which has been independently published by RNS (and therefore by recognized means). To be clear: in that situation, the information to which s. 90A applies is the original publication by RNS, and not the subsequent quotation, reference or comment in the newspaper article.

36. I understand it to be acknowledged by para 154 of the Complaint that some of the statements identified in the Complaint do not fall within the scope of Schedule 10A. Although the Complaint does not identify these statements, in my view

(a) On the basis of the pleaded allegations, the statements referred to in para 53 (New York Times); para 71 (earnings call); para 72 (television interview); para 74 (Evening Standard); para 75 (Wall Street Journal); para 86 (Financial Times) and para 87 (Mail on Sunday) were not made by "*recognised means*" and so do not fall within Sch 10, para 2(1)(a).

(b) The extracts quoted in three of those statements (at para 71 (earnings call), para 72 (television interview) and para 86 (Financial Times)) make some reference to prior RNSs. However, as I have indicated, the information to which s. 90A would apply in those circumstances is the information which was published by recognised means, not the subsequent reference to that information.

37. In the remainder of this Declaration I proceed on the basis that the statements which are on the face of the pleading and in principle within the scope of s. 90A are those appearing in paras 69, 70, 77, 78, 79, 83, 88, 89, 94 and 98 of the Complaint (the **Relevant Statements**).[18]

---

[17] There is a blanket assertion at para 154 that "[c]ertain of the untrue or misleading published information…was either published via the LSE's RNS, or the <u>availability of the information had been announced by Barclays via the RNS</u>" but the Complaint does not identify which information was so announced, or the means by which it was so announced.

[18] To the extent that the Court determines that the seven statements referenced in para. 36(a) are within the scope of s. 90A, my views expressed in the remainder of this Affirmation would also apply to those statements.

**V.**    **Untrue or misleading statements, omissions and delay**

38.    There are three distinct sources of liability under s. 90A: **(i)** untrue or misleading statements; **(ii)** omissions; and **(iii)** delay.

**A.**    **Untrue or misleading statements**

39.    The first is in relation to "*any untrue or misleading statement*" in the published information. As I note below, this appears to be the focus of the Complaint.

40.    In asking whether a statement is "*untrue or misleading*", the first task is to ascertain the "*objective meaning*" of the impugned statement, i.e. the meaning which would be ascribed to it by the intended readership, having regard to the circumstances at the time: *Autonomy* at [460].

41.    The objective meaning of the statement may depend, amongst other things, on its nature and content and the context in which it was made: *Autonomy* at [461].[19] (Ultimately, the claimant must also prove not just that this was its objective meaning, but also that, in relying on the statement, it understood the statement in the sense ascribed to it by the court: *Autonomy* at [466]. This is a reliance point, addressed below).

42.    As a matter of language, "*untrue*" is the opposite of "*true*". At the risk of stating the obvious, if a representation is literally true, it is not untrue.

43.    I am not aware of any authority in which the precise meaning of the word "*misleading*" in the context of Schedule 10A has been overtly discussed. However, it seems to me that the court will take the same approach as it has in the tort of deceit (fraudulent misrepresentation) so that the word "*misleading*" captures statements which are not literally untrue but which, when set in context or reading between the lines, in substance communicate a falsehood or misrepresent the position. Indeed, as I read the *Autonomy* judgment, that was the approach the judge took in that case: see, for example, at [506]).

44.    In ascertaining the limits of the word "misleading", an English court would in my view have regard to the contours of the tort of deceit (fraudulent misrepresentation). It is

---

[19] Citing *Raiffeisen Zentralbank Osterreich AG v The Royal Bank of Scotland Plc* [2010] EWHC 1392 at [82]

concerned with "*false*" representations.[20] Whilst various exceptions have emerged over time, the basic rule is that liability may arise only in relation to representations of 'existing fact':

(a)    A statement of belief may give rise to liability only where it misstates the representor's state of mind as a matter of fact. As Bowen LJ explained in *Edgington v Fitzmaurice* (1885) Ch. D. 549 at 483: "*the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else*".

(b)    Non-disclosure cannot ordinarily give rise to claim for misrepresentation because there is no duty on the parties to a contract to disclose material facts to each other.[21] There are various exceptions or limitations to that general rule. For example, there may be a duty to speak founded upon a particular relationship (as in a proposal for insurance) or rule of law. Alternatively, there may be a representation by conduct: an example is *Gordon v Selico* (1986) 18 HLR 219, where the defendant made no verbal representation but instead covered up dry rot in a flat which was for sale. Finally, there may be implicit in what is said a misrepresentation as to a matter which omitted. In such a case, the court must ascertain what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context.[22]

45.    The critical point, which applies both to the tort of deceit and in my view clearly to s. 90A, is that the statement must be read in the sense which it was intended to convey. In many

---

[20] See, for example, *Hayward v Zurich Insurance Co Plc* [2016] [2017] AC 142 at [62].

[21] *Chitty on Contracts* (35th ed) ed at 10-022.

[22] *Mellor v Partridge* [2013] EWCA Civ 477 at [17]. See also the discussion on implied representations in *Allianz* at [78]-[89]

14

cases that will be the same as its literal meaning, but not inevitably so.[23] If the statement was intended to convey, and did in fact convey, a meaning which was different from its literal meaning, but which was false, it would perhaps better be described as *"misleading"* rather than *"untrue"*, but both are covered by Schedule 10A.

46.    As a matter of English law, it is incumbent upon the claimant to plead with specificity the meaning which he claims the representation in fact conveyed, and on which he claims to have relied. That is true in all cases but especially so where the meaning alleged by the claimant departs from the literal meaning of the words used. It is necessary to plead, amongst other things the "*precise representations made…(and whether they were express or implied)*", as well as the "*precise respects in which the representations made…were factually false*".[24]

47.    The reading of the Complaint is of course a matter for the Court, and it would be going beyond the scope of my function to comment on the falsity or otherwise of the Relevant Statements.

48.    However, it is important to explain that, whereas I can see that it is said in general terms that the Relevant Statements were "*materially false and misleading*" (paras 81 and 101) or "*materially misleading*" (para 91) and that Barclays "*made a misleading statement or dishonest omission*" (para 153), the Complaint does not appear to explain <u>why</u> it is said each statement was untrue or misleading.

49.    Whether a statement was untrue or misleading is not something which speaks for itself. To give one example, one of the Relevant Representations (para 77) is as follows (emphasis in original):

> "…***The Board's governance processes were rigorously followed in relation to this matter***, and I will simply repeat here what we said at the time: ***Jes retains the full confidence of the Board***, and is being unanimously recommended for re-election."

---

[23] See, for example, *Gluckstein v Barnes* [1900] AC 240 at 250-251.

[24] *Kasem v University College London Hospitals NHS Foundation Trust* [2021] EWHC 136 (QB) at [42].

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

50.     If the allegation is that the statement was untrue, it would be incumbent upon the plaintiffs to establish, and an English court hearing a s. 90A claim would require a claimant to plead, why it said that the Board's governance processes were <u>not</u> rigorously followed or the basis for the assertion that the Board did <u>not</u> retain full confidence in Mr Staley. An English court would not, in my view, allow such an allegation to proceed without a clearly pleaded statement **(i)** that the Relevant Statement was untrue or misleading and **(ii)** why that was so.

51.     If it is alleged the Relevant Statements (or any of them) were not literally untrue but were nevertheless misleading, an English court hearing a s. 90A claim would require a claimant to plead with specificity the meaning which it claims the representation conveyed, and on which it claims to have relied.

### B.    Omissions

52.     The second source of liability is in respect of an "*omission*" from that published information "*of any matter required to be included in it*". What information is "*required*" to be included in a publication is to be determined by reference to the disclosure obligations pursuant to which the publication is, or ought to have been, made.

53.     The onus is on the claimant to establish that disclosure of the allegedly omitted matter was "*required to be included*". As Hildyard J explained in *Autonomy*, this means "*mandated by applicable legislation or accounting standards*" in the relevant published information.[25] In *Autonomy*, the question was whether the omitted disclosure was required by the relevant accounting standards to be disclosed: see, for example, the discussion of the disclosures required by IAS 18.35 at [1672] and following.

54.     Beyond the accounting standards, there are various sources of disclosure obligations which may, on the facts of a particular case, mandate the publication of information. Those include, for example, the Listing Rules, the DTRs and the UK Market Abuse Regulation. In

---

[25] *Autonomy* at [1668]. See further *Class Actions in England & Wales* (2nd ed) at 12-046: "*the starting point will likely be the content of the relevant disclosure obligations pursuant to which the relevant publication is (or ought to have been) made …*".

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

each case, it would be incumbent upon the claimant to identify the legislation or rules in question and the information which it required to be included in a publication.

55.  Turning to the Complaint, I note that it is asserted at para 153 that Barclays made a "*dishonest omission*". Reference is also made at para 156 to the "*omission of a matter required to be included in the published information*". The Complaint does not identify the source of any obligation to disclose. Indeed, the gist of the Complaint, it seems to me, is not of omission (or delay) but that the various statements were "*materially false and misleading*" (paras 56, 81 and 101) or "*materially misleading*" (para 91), not that they contained omissions in the sense meant by Schedule 10A.

56.  In the absence of any identified legal obligation giving rise to a requirement to disclose information, an English Court would not in my view allow any allegation of omission to proceed.

**C.    Delay**

57.  The third source of liability is for "delay" by the issuer "in publishing information to which this Schedule applies".

58.  Prior to *Allianz*,  I was not aware of any authoritative guidance on the meaning or application of the delay provision. It is clear from the Davies Discussion Paper which gave rise to the provision that it was intended to capture "*statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules*".[26] The separate provision dealing with omissions was thought not to be apt to cover such situations because **(i)** it contemplates liability only for omissions "*from the statements which is made…rather than liability for failure to make any statement at all*" and **(ii)** it is difficult to see how reliance (a critical component of liability for omissions) could be established in the period when no statement had been made.[27]

---

[26] Davies Discussion Paper, para 83.

[27] Davies Discussion Paper, para 85.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

59. The delay provision was therefore intended to capture a situation where the issuer "*deliberately withholds information in order to mislead the market and to create a false market in its securities*".[28] The "*core case*" is one in which "*the information when published is true, but it is late in arriving*".[29]

60. As Leech J found in *Allianz* at [141], the delay provision must be read so that it does not overlap with para 3 to such a degree that it would render it almost redundant in allowing claimants to advance 'omission' cases under para 5 without the need to establish reliance.

61. Whereas liability for omissions arises where disclosure is required by applicable legislation but omitted from a publication, in my view liability for delay will be engaged where: **(i)** the issuer was subject to an obligation to publish information by a particular date or within a particular timeframe, possibly a very short one but **(ii)** that required information was not in fact published until a later date: see *Allianz* at [138], [138(3)] and [138(6)]. Accordingly, in *Allianz*, the claimants' dishonest delay claims were struck out on the basis that the claimants did not plead that the allegedly delayed material was later published. (As indicated below, a claimant would also need to establish that the PDMR acted dishonestly in delaying the publication, which would carry with it a requirement to establish that the PDMR <u>knew</u> of the requirement to publish by the earlier date, and would also need to show that the loss flowed from the delay in publication.)

62. Schedule 10A, para 5 would therefore capture a situation where an issuer deliberately withholds publication of its annual report beyond the date which by law it must be published (four months after the end of each financial year: DTR r. 4.1), and in doing so creates a false market for the shares. As the editors of Class Actions note at 12-047, it might for example also apply where an issuer delays in notifying the markets of significant transactions (Listing Rules r.10); related party transactions (Listing Rules r. 11); an issuer's

---

[28] Davies Discussion Paper, para 86

[29] Davies Discussion Paper, para 87.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

purchase of its own shares (Listing Rules r. 12); and (iv) dealings in relevant securities transactions by major shareholders (pursuant to DTR r.5.8.12R).

63. Again, although it is asserted that Barclays "*dishonestly delayed the publication of information*" (para 153) and that the one or more of the Individual Defendants "*acted dishonestly in delaying the publication of information*" (para 156), I have not been able to identify the basis for those allegations. In the absence of any identified legal obligation to publish information within a particular timeframe, and a plea that the required information was not published until a later date, an English court would not in my view allow any allegation of delay to proceed. As noted above, in *Allianz* Leech J struck out the claimants' dishonest delay for failing to plead to the elements requirements to establish such a claim.

## VI. **Fault**

### A. **Untrue or misleading statements**

64. An issuer will be liable in respect of an untrue or misleading statement only if a PDMR "*knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading*": para 3(2).

65. Section 90A imposes liability for fraud, but nothing short of fraud. As Professor Davies explained[30] by reference to the seminal case of *Derry v Peek* (1889) 14 App. Cas 337, it has been established since 1889 than an honest, even if unreasonable, belief in the truth of a statement prevents a finding of fraud in English law. Recklessness in English law extends only to not caring about the truth of a statement, such as to lack an honest belief in its truth.[31] I am not in a position to comment on questions of US law but I note that Professor Davies explained his understanding that the English definition of fraud is narrower than the definition of fraud imposed under s. 10b of the Securities Act 1934.

---

[30] Davies Discussion Paper, para 111.

[31] *Autonomy* at [470].

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

66. The Davies Final Report at para 9 rejected an extension of the deceit standard, noting that imposing liability on a wider basis would be likely to cause issuers to become more cautious, pushing them "*towards the less helpful and forthcoming end of the spectrum*". Any overall gain to the market in terms of the accuracy of material released would be "*likely to be outweighed by the loss in terms of the content of what would be disclosed*".

67. As Hildyard J explained in *Autonomy* at [469], it is not sufficient to show that a person knows the facts which *render* a statement untrue. Liability can arise only "*if those facts were present to his mind at the moment the statement is made, such that he appreciates the statement is untrue*". The PDMR must be shown to have the relevant guilty knowledge in respect of each false statement or omission alleged to give rise to liability: *Autonomy* at [477].

68. Both individual defendants were PDMRs of Barclays for the period in which they were directors: para 8(5). Some of the Relevant Statements post-date the period in which Mr Staley was a director, and clearly he would not be considered a PDMR in relation to those statements.

69. Whilst the reading of the Complaint is a matter for the Court, and the relevant rules of pleading will be the procedural rules of the Court and not English law, any s. 90A claim contains various elements which, as a matter of English law, would need to be clearly and distinctly pleaded. This is especially the case where an allegation of dishonesty is made – the courts often emphasise that fraud has to be pleaded clearly and with particularity and that inferences are to be drawn from the pleaded facts, not generalities translated or culled from pleaded facts.[32]

70. A useful summary of the relevant rules in England and Wales is contained in the Davies Discussion Paper at para 113:

> "*In spite of some relaxation in the strike out rules in English law in recent years, it remains the case that in the case of fraud the statement of case must allege fraud clearly and that allegation must be supported with particulars, which are capable of*

---

[32] *Re Augustus Barnett Ltd* [1986] BCLC 170 at 174i to 178c per Hoffmann J.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

*supporting the allegation of fraud. Fraud cannot be 'averred generally'. In addition, under the Bar Council's Code of Conduct a barrister may not draft a statement of case making 'any allegation of fraud unless he has clear instructions to make such allegation and has before him reasonably credible material which as it stands establishes a prima facie case of fraud.'*

71. Clearly it is not my place to comment on the merits or otherwise of factual allegations as to whether the individual defendants acted fraudulently or dishonestly. However, I should stress that an English Court would insist on the provision of proper particulars supporting the allegations of fraud and dishonesty made against them.

**B.    Omissions**

72. An issuer will be liable in respect of an omission only if a PDMR "*knew the omission to be a dishonest concealment of a material fact*": para 3(3).

73. It follows that, in order for liability in respect of an omission to arise, the PDMR "*must have applied his mind to the omission at the time the information was published, and appreciated that a material fact was being concealed (i.e. That it was required to be included, but was being deliberately left out).*"[33]

74. Put another way, the PDMR, must have had actual knowledge, at the time of the omission of the published information of **(i)** a material fact which **(ii)** he also knew was required (in the sense explained in paras V.B.52-5V.B.56 above) to be disclosed but which instead **(iii)** was being "*concealed*".[34]

75. A person's conduct will be dishonest for the purposes if (and only if) **(i)** it is regarded as dishonest by persons who regularly trade on the securities market in question <u>and</u> **(ii)** the person was aware (or must be taken to have been aware) that it was so regarded: para 6. It is worth noting that this is a more exacting standard than that which English law applies generally in assessing dishonesty which, following *Ivey v Genting Casinos (UK) Ltd* [2018] AC 391, does not require the defendant to have been aware that his conduct was dishonest. Although Hildyard J referred to *Ivey v Genting Casinos* in *Autonomy* at [472], I do not read

---

[33] *Autonomy*, [469].

[34] *Autonomy*, [1668].

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

him to have been suggesting that the *Ivey v Genting Casinos* standard applies to FSMA s. 90A and Sch 10A, or that the standard under s. 90A and Sch 10A deviates from the twin requirements to which I have referred, and which are clearly spelled out in the legislation.

76. So far as the Complaint is concerned, as noted above, I have not been able to identify any allegation as to the basis on which the information was "*required*". Nor have I been able to identify any basis for an assertion that the PDMR knew that the information was "*required*" but was instead "*concealed*".

**C.    Delay**

77. An issuer will be liable in respect of delay only if a PDMR "*acted dishonestly in delaying the publication of the information*".

78. The fault element of the dishonest delay limb of s. 90A was not addressed in *Allianz*. However, it seems to me that, in establishing that the PDRM acted dishonestly in delaying the publication of the information, a claimant would be required to show that the PDMR:

    (a)    knew that the issuer was obliged to publish the information by a particular date or within a particular timeframe (possibly a very short one);

    (b)    nevertheless caused the issuer to publish the information at a later date; and

    (c)    did so deliberately and dishonestly.

79. Dishonesty for these purposes has the same meaning as set out in para B.75 above and, in this context, will generally require a claimant to show that the PDMR deliberately delayed publication for the purpose of inducing investors to acquire, or possibly dispose of, securities. Delay in order to obtain the full facts or even to permit the company to deal more easily with the situation which had arisen would not give rise to liability.[35]

---

[35] Davies Final Report, para 49.

## VII.  Reliance

### A.  Untrue or misleading statements and omissions

80.  Reliance is concerned with the causal link between a statement and the representee's actions which gives rise to the relevant harm: *Allianz* at [64]. The need for reliance upon the statement in question is central to Schedule 10A. It provides, in para 3 (emphasis supplied):

> *(1)    An issuer of securities to which this Schedule applies is liable to pay compensation to a person who -*
> *(a)    acquires, continues to hold or disposes of the securities <u>in reliance on published information to which this Schedule applies</u>…*

> *(4)    A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities –*
> *(a)    <u>in reliance on</u> the information in question, and*
> *(b)    at a time when, and in circumstances in which, it was <u>reasonable for him to rely on it</u>.*"

81.  This is a significant limitation in the application of the statutory scheme. The term is used in paras 3(1) and 3(4) to limit the class of persons to whom an issuer is liable to those who have relied on published information.[36]

82.  A claimant must show that he relied on the relevant information and that he did so at a time when it was reasonable to do so; he cannot claim merely on the basis that the market was distorted in some way by a misleading statement or improper omission. As is apparent from the language of the statute, he must show actual, individual reliance (and that such reliance was reasonable). The reliance requirement stands in contrast to the prospectus liability regime in s. 90 FSMA, which contains no such requirement, reflecting the looser parameters of liability for misstatements and omissions in prospectuses.

83.  Four points are worthy of emphasis.

84.  <u>First</u>, as paras 3(1) and 3(4)(a) make clear, the reliance must be on the part of the person who acquired the relevant securities. It is not enough that some other person, who is not the

---

[36] *Allianz* at [102]-[103].

claimant, applied his mind to the representation.[37] A claimant "*cannot have relied on documents they never read or calls they never heard*".[38] Rather, the claimant must prove that they read or heard the representation, understood it in the sense alleged to have been false, and that it caused them to act in a way which caused them loss: *Allianz* at [109].

85.    In an interlocutory hearing of a s. 90A claim in respect of Tesco plc, Hildyard J explained that reliance is "*absolutely central to the statutory form of action*". As a result, the court is required to be "*properly astute to ensure that sufficient particularity*" of reliance is supplied. It was necessary to "*focus the mind of the individual claimants, who have brought very serious allegations, as to precisely the basis on which individually they have proceeded*".[39] The claimants were later ordered to provide disclosure of documents addressing the question of reliance.[40] In *Allianz Global Investors GmbH v RSA Insurance Group Ltd* [2021] EWHC 3091, the claimants were required to submit answers to questionnaires in relation to the issue of reliance. The claimants in *Allianz* were similarly required to submit answers to questionnaires: those answers gave rise to the application for summary dismissal of the claims of the Category C Claimants on the grounds that they had not pleaded adequate reliance. In the result Leech J concluded at 130: " I agree with Hildyard J in *Autonomy* that the Claimants in Category C cannot satisfy this test unless their representatives read and considered that published information or third parties who directed or influenced their investments decisions read and considered that published information".

86.    <u>Second</u>, Hildyard J in *Autonomy* held that it is not enough for a claimant to show that it relied in some generalised sense on a piece of published information, for example the company's annual report (as a whole) for a given year. Liability could arise only where the

---

[37] *Autonomy* at [481] – [482].

[38] *Autonomy* at [458].

[39] *SL Claimants/MLB Claimants v Tesco Plc* [2017] EWHC 3296 at [29], cited in Class Actions in England & Wales (2nd ed) at 12-057.

[40] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315.

claimant "*applied his mind to the statement in question, and where that statement induced the acquisition or…induced the acquirer to transact on the terms he did.*" Certainly, the requirement for reliance "*cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all.*"[41] In *Allianz*, Leech J considered how reliance in this sense applied to omissions, concluding that what a claimant must provide is that it relied on the published information from which the omission was made (rather than on the facts or matters alleged to have been omitted): *Allianz* at [113(3)] and [130].[42]

87. <u>Third</u>, as to the requisite degree of reliance, it is sufficient that the representation "*has had an impact on the mind*" or an "*influence on the judgement of the claimant*". Whether it did so is a question of fact. In seeking to prove that issue of fact, a claimant may in principle avail itself of a presumption.[43] More particularly:

    (a)    Once the claimant establishes that **(i)** the representator fraudulently intended his words to be taken in a certain sense; **(ii)** the claimant understood them in that sense; **(iii)** the representation was material; and **(iv)** the claimant entered into the contract, it is natural to suppose (and it is therefore presumed, unless rebutted by evidence on the facts) that the claimant was induced to make his investment decision on the faith

---

[41] *Autonomy* at [501] – [506]. Cf *Allianz* at [130], where this question did not arise, and Leech J left over to trial the question of whether a claimant must prove that it applied its mind to a particular misleading or untrue statement (as distinct from an omission).

[42] Leech J also left open the question of the extent to which a claimant must have been aware of an implied (as opposed to an express) representation, which did not arise for determination. However, as Leech J noted at 128(6), relying upon *Farol Holdings Ltd v Clydesdale Bank plc* [2024] EWHC 593 (Ch), the fundamental question in any case is whether the claimant's decision to take the action (or refrain from taking the action) which caused it loss was caused by the representation made by the defendant. In the majority of cases, it is difficult to see how a claimant could establish that as a matter of fact unless it was aware of the representation and the representation was actively present on their minds when acting.

[43] *Autonomy* at [515].

DECLARATION OF MARTIN MOORE K.C.        CASE NO.: 2:23-cv-09217-MEMF-KS

of the statement.[44] It is a presumption of fact (that a claimant has in fact been induced to act), not a presumption of law.[45]

(b)    Importantly, as Hildyard J said at [515(7)], the presumption can only arise if the statement has indeed been heard and understood by the representee:

> *"It is also important to keep in mind that the propensity of a statement to influence the mind only gives rise to the presumption (if applicable) if it shown to have been read or heard and understood by the representee in its deceptive sense...if it did not influence the mind...the presumption does not arise".*

It follows that, in *Allianz*, the presumption could not assist the Category C Claimants because they did not allege that they read the relevant statements.[46] The same point has been emphasised in the deceit cases from which the presumption is derived. For example, in *Leni Gas & Oil Investments v Malta Oil Pty* [2014] EWHC 893, Males J explained at [15]:

> *"...a claimant must show that it understood that the representation alleged was being made to it. Without such an understanding, there can be no question of any reliance on the representation."*

(c)    The additional requirement (present under s. 90A of FSMA but not the deceit cases from which the presumption is derived) that the reliance be <u>reasonable</u> substantially undermines the practical effect of the presumption in any event. The requirement for reasonable reliance requires a claimant to show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it.[47]

88.    <u>Fourth</u>, as just noted, it must also be shown that the securities were acquired, held or disposed of "*at a time when, and in circumstances in which, it was reasonable for [the claimant] to rely on [the statement or omission]*". This "*relates to the form and timing of the misrepresentation and what it is reasonable for the representee to make of what he is*

---

[44] *Autonomy* at [515(2)]. Condition (iii) is omitted from the summary at [515(2)] but appears at [509].

[45] *Allianz* at [105(2)].

[46] *Allianz* at [117]-[118].

[47] *Autonomy* at [515(6)].

DECLARATION OF MARTIN MOORE K.C.                                    CASE NO.: 2:23-cv-09217-MEMF-KS

*told*".[48] Reasonableness is assessed at the time claimant relied on the statement. Circumstances, caveats or conditions which qualify the apparent reliability of the statement are all taken into account.[49]

89.    So far as the Complaint is concerned, I note that it is said that, in relation to the US law claims, the plaintiffs will rely on a "*fraud-on-the-market presumption of reliance*" (para 117). I do not understand it to be suggested that such a presumption applies to the s. 90A Claim. To be clear, English law does not recognise such a doctrine, at least for the purposes of founding a private law cause of action.[50] In the UK the protection of the integrity of the market (as opposed to individual investors) is in the hands of public bodies, largely the FCA. The FCA has been given various enforcement powers to do so and can, for example, apply to Court for restitution orders where there has been a contravention of the DTRs or market abuse.

90.    Instead, in relation to the s. 90A Claim, the plaintiffs rely on what is said to be "*a presumption that they relied on an actionable misrepresentation by which it was intended they should be deceived*" (para 122). To be clear: no such presumption exists as a matter of English law. The only relevant presumption is that to which I have referred in para 87 above. The implication of para 122 of the Complaint appears to be that a claimant does not need to establish that it actually read or understood the alleged misstatements. That is not how the presumption operates, as set out above.

91.    At para 123, the plaintiffs say that they "*made a decision, including an automated decision to acquire, continue to hold, or dispose of Barclays ordinary share at the inflated price at which they were in fact acquired and held*". There are two points I would make in relation to this:

_____

[48] *Autonomy* at [519].

[49] *Autonomy* at [520].

[50] *Allianz* at [121]; Davies Discussion paper, para 55, dealing with the common law position. There is no case law to suggest that the position is any different in relation to statutory liability, and as I explain below I would expect the Courts to refer to the common law in interpreting the statute.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

(a)    First, I do not follow what is meant by "*a decision, including an automated decision*". It appears to reflect the case advanced unsuccessfully by the Category C Claimants in *Allianz*, who claimed to have suffered losses "*as a consequence of movements in the share price of the bank*", for example because their investment processes took account of share prices and movements.[51] That was not reliance for the purposes of s. 90A. Indeed, the implication of the plaintiff's allegation in the Complaint appears to be that the decision was not made by a human actor. If that was indeed the position, it is hard to see how the Relevant Statements can have been relied upon at all. If there was no conscious decision to acquire the securities, I do not see that there could have been conscious reliance on the Relevant Statements.

(b)    Second, it appears to be averred that the shares were disposed of "*at the inflated price*". To the extent that the plaintiffs disposed of their shares at the same inflated price, they would thereby have mitigated any loss which would otherwise have been suffered. Put another way, if a claimant acquires a share for £1 and later sells it for £1, he will not be to held to have suffered an actionable loss, even if the share was in reality worth 80 pence on both occasions.

92.    I find the allegation at para 124 that the plaintiffs "*were also aware of (i) the price of the shares and (ii) the published information being true, complete, and accurate*" obscure. An English court would not in my view regard this as an allegation of reliance capable of sustaining a claim under s. 90A. If and insofar as it is really an allegation intended to support the fraud on the market theory, as I have said, that is not a theory known to English private law.

93.    At any rate, I note that the shares were acquired in August and September 2022, some 9-10 months after Mr Staley stepped down as CEO of Barclays. If the St Louis Fireman contend that they did in fact rely (and reasonably relied) on the Relevant Statements, that would require some explanation. In particular it would require explanation as to why a market

---

[51] *Allianz* at [21].

participant acquiring shares some considerable time *after* Mr Staley stepped down as CEO in circumstances where it was clear that the FCA were not satisfied with "*Mr Staley's characterization to Barclays of his relationship with the late Mr Jeffrey Epstein and the subsequent description of that relationship in Barclays' response to the FCA*" would rely, and reasonably rely, on statements concerning Mr Staley published *before* his departure as CEO.

**B.    Delay**

94.    The legislation does not stipulate whether reliance is a necessary element in respect of dishonest delay, and it seems to me that it is not. That is presumably because the notion of reliance assumes the existence of published information (as is the case in relation to misleading statements or omissions) whereas delayed publication assumes no publication at all.[52] This is supported by the Davies Discussion Paper, which noted at para 85:

> "*...it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point.*"

**VIII.    Loss and damage**

95.    I am asked to comment on the question of loss and damage only at a relatively high level at this stage.

96.    Schedule 10A provides that an issuer is liable to pay compensation to a person who acquired securities in reliance on published information, and who has suffered loss in respect of the securities "*as a result of*" any untrue or misleading statement, or the omission or delay. In common with English private law generally, Schedule 10A therefore imposes a causation requirement: a defendant will only be liable for loss suffered "*as a result of*" the statement. The burden of proving damage lies on a claimant, who must show that he has suffered compensable loss.

---

[52] *Class Actions*, 12-055.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

97.    The English courts have not yet had to grapple in any detail with either the scope of recoverable losses under s. 90A or the correct approach when assessing those losses. Professor Davies avoided expressing a view on the appropriate measure of damages, suggesting that it should be left to the courts to decide.[53]  However, what can in my view be said with a degree of certainty is that:

(a)    The objective is to identify "*the sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been if he had not sustained the wrong for which he is now getting his compensation or reparation*".[54]

(b)    A claimant is compensated for the inclusion of the false or misleading statement, or the omission or delay. In assessing the loss flowing from that wrong, one has to consider the relevant counterfactual: what would have happened but for the false or misleading statement, or the omission or delay?[55]

(c)    That is a question of fact.[56] A claimant asserting that, on that counterfactual, he would not have acquired the securities at all will need to prove that as a matter of fact. In many, if not most, cases (as in *Autonomy*, on the judge's preliminary view) the securities would still have been acquired, but at a lower price.

(d)    In either case, the starting point is that damages will be equivalent to the difference between the price paid and the value received, in each case at the time of the acquisition. A claimant will need to establish the delta between the two as at the acquisition date, and that the delta arose as a result of the statement. Whether a claimant is permitted to move beyond that starting point to seek to recover further

---

[53] Davies Final Report, para 60.

[54] *Livingstone v The Rawyards Coal Company* (1880) 5 App Cas 25, cited in Autonomy at [526].

[55] *Autonomy* at [524]-[528].

[56] *Autonomy* at [536]-[537].

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

losses will depend on the particular facts of the case, as well as a number of "*novel and difficult*" legal issues which remain to be worked out in the context of s. 90A.[57]

98.    I note that it is alleged at para 43 of the Complaint that the St Louis Firemen that they acquired shares at "*artificially inflated prices*". That is a question of fact or valuation on which I am not qualified to opine. Conceptually it is a little difficult to understand why, when those shares were acquired in 2022, almost a year after Mr Staley stepped down as CEO, Barclay's share price would be underpinned by anything relating to Mr Staley, or would continue to be so in 2023.

## IX.    Conclusions

99.    A summary of my conclusions is set out at para I.10 above. I am, of course, happy to assist the Court should further questions arise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in London, United Kingdom on October 30, 2024.



_____

Martin Moore K.C.

---

[57] *Autonomy* at [539].

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS