# Exhibit 2

# Financial Services and Markets Act 2000 c. 8
## s. 90 Compensation for statements in listing particulars or prospectus

 **Law In Force With Amendments Pending**

**Version 5 of 6**

21 July 2019 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; False statements; Listing particulars; Loss; Misleading statements; Non-compliance; Omissions; Prospectuses; Securities

**90.— [Compensation for statements in listing particulars or prospectus]** [1]

(1)  Any person responsible for listing particulars is liable to pay compensation to a person who has–

  (a)  acquired securities to which the particulars apply; and

  (b)  suffered loss in respect of them as a result of–

    (i)  any untrue or misleading statement in the particulars; or

    (ii)  the omission from the particulars of any matter required to be included by section 80 or 81.

(2)  Subsection (1) is subject to exemptions provided by Schedule 10.

(3)  If listing particulars are required to include information about the absence of a particular matter, the omission from the particulars of that information is to be treated as a statement in the listing particulars that there is no such matter.

(4)  Any person who fails to comply with section 81 is liable to pay compensation to any person who has–

  (a)  acquired securities of the kind in question; and

  (b)  suffered loss in respect of them as a result of the failure.

(5)  Subsection (4) is subject to exemptions provided by Schedule 10.

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 3 of 522   Page
ID #:617
Financial Services and Markets Act 2000 c. 8

(6)  This section does not affect any liability which may be incurred apart from this section.

(7)  References in this section to the acquisition by a person of securities include references to his contracting to acquire them or any interest in them.

(8)  No person shall, by reason of being a promoter of a company or otherwise, incur any liability for failing to disclose information which he would not be required to disclose in listing particulars in respect of a company's securities–

(a)  if he were responsible for those particulars; or

(b)  if he is responsible for them, which he is entitled to omit by virtue of section 82.

(9)  The reference in subsection (8) to a person incurring liability includes a reference to any other person being entitled as against that person to be granted any civil remedy or to rescind or repudiate an agreement.

(10)  *"Listing particulars"* , in subsection (1) and Schedule 10, includes supplementary listing particulars.

[

(11)  This section applies in relation to a prospectus as it applies to listing particulars, with the following modifications—

(a)  references in this section or in Schedule 10 to listing particulars, supplementary listing particulars or sections 80, 81 or 82 are to be read, respectively, as references to a prospectus, supplementary prospectus and [Articles 6 and 14(2), Article 23 and Article 18 of the prospectus regulation] [3] ;

(b)  references in Schedule 10 to admission to the official list are to be read as references to admission to trading on a regulated market;

(c)  in relation to a prospectus, *"securities"* means "transferable securities".

[

(11A)  In subsection (11)(a) *"supplementary prospectus"* includes, where final terms (see Article 8 of the prospectus regulation) are contained in a separate document that is neither a prospectus nor a supplementary prospectus, that separate document.

] [4] [

(12)  A person is not to be subject to civil liability solely on the basis of a summary in a prospectus unless the summary, when read with the rest of the prospectus—

© 2024 Thomson Reuters.

Exhibit 2
Page 39
2

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 4 of 522    Page
ID #:618
Financial Services and Markets Act 2000 c. 8

(a)  is misleading, inaccurate or inconsistent; or

(b)  does not provide key information [specified by Article 7 of the prospectus regulation][6] ,

and in this subsection a summary includes any translation of it.

][5]][2]

## Notes

1    Heading substituted by Companies Act 2006 c. 46 Sch.15(1) para.5 (November 8, 2006)

2    Added by Prospectus Regulations 2005/1433 Sch.1 para.6(2) (July 1, 2005)

3    Words substituted by Financial Services and Markets Act 2000 (Prospectus) Regulations 2019/1043 Pt 2 reg.25(2) (July 21, 2019: substitution has effect subject to transitional provisions specified in SI 2019/1043 reg.40)

4    Added by Financial Services and Markets Act 2000 (Prospectus) Regulations 2019/1043 Pt 2 reg.25(3) (July 21, 2019: insertion has effect subject to transitional provisions specified in SI 2019/1043 reg.40)

5    Substituted by Prospectus Regulations 2012/1538 reg.7 (July 1, 2012)

6    Words substituted by Financial Services and Markets Act 2000 (Prospectus) Regulations 2019/1043 Pt 2 reg.25(4) (July 21, 2019: substitution has effect subject to transitional provisions specified in SI 2019/1043 reg.40)

*Part VI OFFICIAL LISTING > Compensation for false or misleading statements etc > s. 90 Compensation for statements in listing particulars or prospectus*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 40
3

# s. 90A Liability of issuers in connection with published information

 **Law In Force**

**Version 2 of 2**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Liabilities; Loss; Misleading statements; Omissions; Securities

[

**90A. Liability of issuers in connection with published information**

Schedule 10A makes provision about the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of—

(a)  a misleading statement or dishonest omission in certain published information relating to the securities, or

(b)  a dishonest delay in publishing such information.

]¹

---

## Notes

1    Substituted by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 reg.2(2) (October 1, 2010: substitution has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Part VI OFFICIAL LISTING > Compensation for false or misleading statements etc > s. 90A Liability of issuers in connection with published information*

---

Contains public sector information licensed under the Open Government Licence v3.0.

---

# Schedule 10 COMPENSATION: EXEMPTIONS para. 1 Statements believed to be true

 **Law In Force**

**Version 2 of 2**

24 January 2013 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; False statements; Listing particulars; Misleading statements; Non-disclosure; Prospectuses; Reasonable belief

**1.— Statements believed to be true**

(1)  In this paragraph *"statement"* means–

(a)  any untrue or misleading statement in listing particulars; or

(b)  the omission from listing particulars of any matter required to be included by section 80 or 81.

(2)  A person does not incur any liability under section 90(1) for loss caused by a statement if he satisfies the court that, at the time when the listing particulars were submitted to the [FCA] [1] , he reasonably believed (having made such enquiries, if any, as were reasonable) that–

(a)  the statement was true and not misleading, or

(b)  the matter whose omission caused the loss was properly omitted,

 and that one or more of the conditions set out in sub-paragraph (3) are satisfied.

(3)  The conditions are that–

(a)  he continued in his belief until the time when the securities in question were acquired;

(b)   they were acquired before it was reasonably practicable to bring a correction to the attention of persons likely to acquire them;

(c)  before the securities were acquired, he had taken all such steps as it was reasonable for him to have taken to secure that a correction was brought to the attention of those persons;

© 2024 Thomson Reuters.

(d)  he continued in his belief until after the commencement of dealings in the securities following their admission to the official list and they were acquired after such a lapse of time that he ought in the circumstances to be reasonably excused.

---

## Notes

1    Words substituted by Financial Services Act 2012 c. 21 Pt 2 s.16(13) (January 24, 2013 for the purpose of making rules as specified in SI 2013/113 art.2 and Sch.1 Pt 3; April 1, 2013 otherwise)

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 1 Statements believed to be true*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 43
2

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 8 of 522    Page
ID #:622
Financial Services and Markets Act 2000 c. 8

# Schedule 10 COMPENSATION: EXEMPTIONS para. 2 Statements by experts

 **Law In Force**

**Version 2 of 2**

24 January 2013 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; Experts; False statements; Listing particulars; Misleading statements; Prospectuses; Reasonable belief

**2.— Statements by experts**

(1)  In this paragraph *"statement"* means a statement included in listing particulars which–

(a)  purports to be made by, or on the authority of, another person as an expert; and

(b)  is stated to be included in the listing particulars with that other person's consent.

(2)  A person does not incur any liability under section 90(1) for loss in respect of any securities caused by a statement if he satisfies the court that, at the time when the listing particulars were submitted to the [FCA] [1] , he reasonably believed that the other person–

(a)  was competent to make or authorise the statement, and

(b)  had consented to its inclusion in the form and context in which it was included,

and that one or more of the conditions set out in sub-paragraph (3) are satisfied.

(3)  The conditions are that–

(a)  he continued in his belief until the time when the securities were acquired;

(b)  they were acquired before it was reasonably practicable to bring the fact that the expert was not competent, or had not consented, to the attention of persons likely to acquire the securities in question;

(c)  before the securities were acquired he had taken all such steps as it was reasonable for him to have taken to secure that that fact was brought to the attention of those persons;

© 2024 Thomson Reuters.

Exhibit 2
Page 44

1

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 9 of 522   Page
ID #:623
Financial Services and Markets Act 2000 c. 8

(d)  he continued in his belief until after the commencement of dealings in the securities following their admission to the official list and they were acquired after such a lapse of time that he ought in the circumstances to be reasonably excused.

## Notes

1    Words substituted by Financial Services Act 2012 c. 21 Pt 2 s.16(13) (January 24, 2013 for the purpose of making rules as specified in SI 2013/113 art.2 and Sch.1 Pt 3; April 1, 2013 otherwise)

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 2 Statements by experts*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 45
2

# Schedule 10 COMPENSATION: EXEMPTIONS
# para. 3 Corrections of statements

 **Law In Force**

**Version 1 of 1**

1 December 2001 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; False statements; Listing particulars; Misleading statements; Non-disclosure;
Prospectuses; Rectification

## 3.— Corrections of statements

(1)  In this paragraph *"statement"* has the same meaning as in paragraph 1.

(2)  A person does not incur liability under section 90(1) for loss caused by a statement if he satisfies the court–

(a)  that before the securities in question were acquired, a correction had been published in a manner calculated to bring it to the attention of persons likely to acquire the securities; or

(b)  that he took all such steps as it was reasonable for him to take to secure such publication and reasonably believed that it had taken place before the securities were acquired.

(3)  Nothing in this paragraph is to be taken as affecting paragraph 1.

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 3 Corrections of statements*

---

Contains public sector information licensed under the Open Government Licence v3.0.

---

© 2024 Thomson Reuters.

# Schedule 10 COMPENSATION: EXEMPTIONS para. 4 Corrections of statements by experts

 **Law In Force**

**Version 1 of 1**

1 December 2001 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; Experts; False statements; Listing particulars; Misleading statements; Prospectuses; Rectification

## 4.— Corrections of statements by experts

(1)  In this paragraph *"statement"* has the same meaning as in paragraph 2.

(2)  A person does not incur liability under section 90(1) for loss caused by a statement if he satisfies the court–

(a)  that before the securities in question were acquired, the fact that the expert was not competent or had not consented had been published in a manner calculated to bring it to the attention of persons likely to acquire the securities; or

(b)  that he took all such steps as it was reasonable for him to take to secure such publication and reasonably believed that it had taken place before the securities were acquired.

(3)  Nothing in this paragraph is to be taken as affecting paragraph 2.

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 4 Corrections of statements by experts*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

# Schedule 10 COMPENSATION: EXEMPTIONS para. 5 Official statements

 **Law In Force**

**Version 1 of 1**

1 December 2001 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; False statements; Listing particulars; Misleading statements; Official publications; Prospectuses

## 5. Official statements

A person does not incur any liability under section 90(1) for loss resulting from–

    (a)  a statement made by an official person which is included in the listing particulars, or

    (b)  a statement contained in a public official document which is included in the listing particulars,

if he satisfies the court that the statement is accurately and fairly reproduced.

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 5 Official statements*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS     Document 58-3     Filed 10/30/24     Page 13 of 522     Page
ID #:627
Financial Services and Markets Act 2000 c. 8

# Schedule 10 COMPENSATION: EXEMPTIONS
# para. 6 False or misleading information known about

 **Law In Force**

**Version 1 of 1**

1 December 2001 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; False statements; Knowledge; Listing particulars; Misleading statements; Non-disclosure; Prospectuses

## 6. False or misleading information known about

A person does not incur any liability under section 90(1) or (4) if he satisfies the court that the person suffering the loss acquired the securities in question with knowledge–

    (a)  that the statement was false or misleading,

    (b)  of the omitted matter, or

    (c)  of the change or new matter,

as the case may be.

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 6 False or misleading information known about*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 49

1

# Schedule 10 COMPENSATION: EXEMPTIONS
# para. 7 Belief that supplementary listing particulars not called for

 **Law In Force**

**Version 1 of 1**

1 December 2001 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; Listing particulars; Non-disclosure; Reasonable belief

**7. Belief that supplementary listing particulars not called for**

A person does not incur any liability under section 90(4) if he satisfies the court that he reasonably believed that the change or new matter in question was not such as to call for supplementary listing particulars.

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 7 Belief that supplementary listing particulars not called for*

---

Contains public sector information licensed under the Open Government Licence v3.0.

# Schedule 10 COMPENSATION: EXEMPTIONS para. 8 Meaning of "expert"

 **Law In Force**

**Version 1 of 1**

1 December 2001 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Exemptions; Experts; False statements; Interpretation; Listing particulars; Misleading statements; Prospectuses

## 8. Meaning of "expert"

*"Expert"* includes any engineer, valuer, accountant or other person whose profession, qualifications or experience give authority to a statement made by him.

---

*Schedule 10 COMPENSATION: EXEMPTIONS > para. 8 Meaning of "expert"*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 51

1

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 1 Securities to which this Schedule applies

 **Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Misleading statements; Non-disclosure; Securities

[

## 1.— Securities to which this Schedule applies

(1)  This Schedule applies to securities that are, with the consent of the issuer, admitted to trading on a securities market, where—

(a)  the market is situated or operating in the United Kingdom, or

(b)  the United Kingdom is the issuer's home State.

(2)  For the purposes of this Schedule—

(a)  an issuer of securities is not taken to have consented to the securities being admitted to trading on a securities market by reason only of having consented to their admission to trading on another market as a result of which they are admitted to trading on the first-mentioned market;

(b)  an issuer who has accepted responsibility (to any extent) for any document prepared for the purposes of the admission of the securities to trading on a securities market (such as a prospectus or listing particulars) is taken to have consented to their admission to trading on that market.

[

(3)  For the purposes of this Schedule the United Kingdom is the home State of an issuer if—

(a)  the transparency rules impose requirements on the issuer in relation to the securities, or

© 2024 Thomson Reuters.

Exhibit 2    1
Page 52

(b)  the issuer has its registered office (or, if it does not have a registered office, its head office) in the United Kingdom.

]²]¹

---

# Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

2    Added by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(2) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION*
*> Part 1 SCOPE OF THIS SCHEDULE > para. 1 Securities to which this Schedule applies*

---

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 18 of 522   Page
ID #:632
Financial Services and Markets Act 2000 c. 8

## Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
## para. 2 Published information to which this Schedule applies

 **Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Information services; Issuers; Misleading statements; Non-disclosure; Securities
[

**2.— Published information to which this Schedule applies**

(1)  This Schedule applies to information published by the issuer of securities to which this Schedule applies—

(a)  by recognised means, or

(b) by other means where the availability of the information has been announced by the issuer by recognised means.

(2)  It is immaterial whether the information is required to be published (by recognised means or otherwise).

(3)  The following are "recognised means"—

(a)  a recognised information service;

(b)  other means required or authorised to be used to communicate information to the market in question, or to the public, when a recognised information service is unavailable.

(4)  A *"recognised information service"* means—

(a)   in relation to a securities market situated or operating in the [United Kingdom]$^2$ , a service used for the dissemination of information in accordance with [transparency rules]$^3$ ;

(b)   in relation to a securities market situated or operating outside the [United Kingdom] [4] , a service used for the dissemination of information corresponding to that required to be disclosed under [transparency rules] [5] ; or

(c)   in relation to any securities market, any other service used by issuers of securities for the dissemination of information required to be disclosed by the rules of the market.

] [1]

# Notes

1       Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)
2       Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(a)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))
3       Words substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(a)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))
4       Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(b)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))
5       Words substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(b)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION >*
*Part 1 SCOPE OF THIS SCHEDULE > para. 2 Published information to which this Schedule applies*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 55

2

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION para. 3

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Misleading statements; Non-disclosure; Securities

[

**3.**—

(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

(a)  acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and

(b)  suffers loss in respect of the securities as a result of—

(i)  any untrue or misleading statement in that published information, or

(ii)  the omission from that published information of any matter required to be included in it.

(2)  The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

(3)  The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4)  A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—

(a)  in reliance on the information in question, and

(b)  at a time when, and in circumstances in which, it was reasonable for him to rely on it.

© 2024 Thomson Reuters.

Exhibit 2
Page 56

1

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 21 of 522    Page
ID #:635
Financial Services and Markets Act 2000 c. 8

]¹

---

## Notes

1  Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for misleading statement or dishonest omission > para. 3*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 57

2

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 22 of 522    Page
ID #:636
Financial Services and Markets Act 2000 c. 8

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
## para. 4

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Listing particulars; Misleading statements; Non-disclosure; Prospectuses; Securities

[

**4.**

An issuer of securities to which this Schedule applies is not liable under paragraph 3 to pay compensation to a person for loss suffered as a result of an untrue or misleading statement in, or omission from, published information to which this Schedule applies if—

(a)   the published information is contained in listing particulars or a prospectus (or supplementary listing particulars or a supplementary prospectus), and

(b)   the issuer is liable under section 90 (compensation for statements in listing particulars or prospectus) to pay compensation to the person in respect of the statement or omission.

]¹

---

## Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

© 2024 Thomson Reuters.

Exhibit 2
Page 58
1

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 23 of 522   Page
ID #:637
Financial Services and Markets Act 2000 c. 8

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED
INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION
> Liability of issuer for misleading statement or dishonest omission > para. 4*

Contains public sector information licensed under the Open Government Licence v3.0.

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 5

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Issuers; Securities

[

**5.—**

(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

(a)  acquires, continues to hold or disposes of the securities, and

(b)  suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.

(2)  The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.

]¹

---

## Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

© 2024 Thomson Reuters.

Exhibit 2
Page 60

1

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 25 of 522    Page
ID #:639
Financial Services and Markets Act 2000 c. 8

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for dishonest delay in publishing information > para. 5*

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 26 of 522    Page
ID #:640
Financial Services and Markets Act 2000 c. 8

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION para. 6

 **Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Interpretation; Issuers; Misleading statements; Securities

[

**6.**

For the purposes of paragraphs 3(3) and 5(2) a person's conduct is regarded as dishonest if (and only if)—

(a)  it is regarded as dishonest by persons who regularly trade on the securities market in question, and

(b)  the person was aware (or must be taken to have been aware) that it was so regarded.

]¹

---

## Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Meaning of dishonesty > para. 6*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION para. 7

 **Partially In Force With Amendments Pending**

**Version 1 of 2**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Exemptions; Issuers; Misleading statements; Securities

[

**7.**—

(1)  The issuer is not subject—

(a)  to any liability other than that provided for by paragraph 3 in respect of loss suffered as a result of reliance by any person on—

(i)  an untrue or misleading statement in published information to which this Schedule applies, or

(ii)  the omission from any such published information of any matter required to be included in it;

(b)  to any liability other than that provided for by paragraph 5 in respect of loss suffered as a result of delay in the publication of information to which this Schedule applies.

(2)  A person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(3)  This paragraph does not affect—

(a)  civil liability—

(i)  under section 90 (compensation for statements in listing particulars or prospectus),

(ii)  under rules made by virtue of section 954 of the Companies Act 2006 (compensation),

(iii)  for breach of contract,

© 2024 Thomson Reuters.

Exhibit 2
Page 63

1

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 28 of 522    Page
ID #:642
Financial Services and Markets Act 2000 c. 8

    (iv)  under the Misrepresentation Act 1967, or

    (v)  arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned;

  (b)  liability to a civil penalty; or

  (c)  criminal liability.

(4)  This paragraph does not affect the powers conferred by sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution).

(5) References in this paragraph to liability, in relation to a person, include a reference to another person being entitled as against that person to be granted any civil remedy or to rescind or repudiate an agreement.

]¹

## Notes

1     Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Exclusion of certain other liabilities > para. 7*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 64
2

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 29 of 522    Page
ID #:643
Financial Services and Markets Act 2000 c. 8

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 8 Interpretation

 **Law In Force**

**Version 3 of 3**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Interpretation; Issuers; Misleading statements; Securities
[

**8.— Interpretation**

(1)  In this Schedule—[

(a)  *"securities"* means transferable securities as defined in Article 2(1)(24) of the markets in financial instruments regulation, other than money market instruments as defined in Article 2(1)(25A) of that regulation that have a maturity of less than 12 months (and includes instruments outside the United Kingdom); [3]

] [2]

(b)  *"securities market"* means—[

(i)  a regulated market as defined in Article 2(1)(13) of the markets in financial instruments regulation, or

(ii)  a multilateral trading facility as defined in Article 2(1)(14) of that regulation.

] [4]

(2)  References in this Schedule to the issuer of securities are—

(a)  in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading as mentioned in paragraph 1(1), to the issuer of the securities represented;

© 2024 Thomson Reuters.

Exhibit 2
Page 65

1

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 30 of 522   Page
ID #:644
Financial Services and Markets Act 2000 c. 8

(b)  in any other case, to the person who issued the securities.

(3)  References in this Schedule to the acquisition or disposal of securities include—

(a)  acquisition or disposal of any interest in securities, or

(b)  contracting to acquire or dispose of securities or of any interest in securities,

except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.

(4)  References to continuing to hold securities have a corresponding meaning.

(5)  For the purposes of this Schedule the following are persons "discharging managerial responsibilities" within an issuer—

(a) any director of the issuer (or person occupying the position of director, by whatever name called);

(b)  in the case of an issuer whose affairs are managed by its members, any member of the issuer;

(c) in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication.

(6)  The following definitions (which apply generally for the purposes of Part 6 of this Act) do not apply for the purposes of this Schedule:

(a)  section 102A(1), (2) and (6) (meaning of "securities" and "issuer") [5] [.] [6]

[...] [7]

] [1]

---

# Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

2      Substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(a)(i) (December 31, 2020: shall

© 2024 Thomson Reuters.

Exhibit 2
Page 66
2

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 31 of 522    Page
ID #:645
Financial Services and Markets Act 2000 c. 8

# Notes

come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

3    Articles 1(1)(24) and (25A) are substituted by S.I. 2018/****.

4    Para.8(1)(b)(i)-(ii) substituted for para.8(1)(b)(I)-(iii) by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(a)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

5    Sections 102A to 102C and 103 were substituted for section 103 as originally enacted by regulation 2(1) of and paragraph 1 of Schedule 11 to the Prospectus Regulations 2005(S.I. 2005/1433).

6    Repealed by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(b) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

7    Repealed by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(b) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 3 SUPPLEMENTARY PROVISIONS > para. 8 Interpretation*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2024 Thomson Reuters.

Exhibit 2
Page 67
3

# PUBLIC GENERAL ACTS – EXPLANATORY NOTES

## 2006 c.46-55

Explanatory Notes are published for most but not all Public General Acts.
Where a title is omitted from the list below,  no Explanatory Notes were published for the Act.

46.      **Companies Act**
47.      **Safeguarding Vulnerable Groups Act**
48.      **Police and Justice Act**
49.      **Road Safety Act**
50.      **Charities Act**
51.      **Legislative and Regulatory Reform Act**
52.      **Armed Forces Act**
53.      **Northern Ireland (St. Andrews Agreement) Act**
54.      **.**
55.      **Investment Exchanges and Clearing Houses Act**

Exhibit 2
Page 68

*These Notes refer to the Companies Act 2006 (c.46)*
*which received Royal Assent on 8 November 2006*

market operator to suspend or prohibit such trading. The powers are to be used where the Authority suspects (*subsections (2)* and *(3)*) or finds (*subsection 4*) applicable breaches of transparency obligations. The Authority's powers to request a market operator to prohibit trading could be used where and issuer whose home member State is the UK is listed in another EEA State.

1630.  *Section 89M* sets out the procedures relating to the suspension and prohibition powers of the Authority set out in *section 89L*.

1631.  New *section 89N* sets out the right for those who receive a decision notice or a notice under *section 89M* to refer matters to the Tribunal.

## Section 1269: Corporate governance rules

1632.  Section 1269 inserts new *section 89O* into FSMA which gives the Authority a power (under Part 6 of FSMA) to make rules implementing, enabling the implementation of or dealing with matters arising out of Community obligations on corporate governance of issuers on a regulated market.

1633.  This rule-making power will enable the Authority to make corporate governance rules to cover issuers for whom the UK is the home member State, and whose securities are traded on a regulated market in the UK or elsewhere in the EEA.

1634.  *Subsection (2)* sets out the type of corporate governance provision covered by this rule making power. These include:

- the nature, constitution or functions of the organs of issuers;
- the manner in which organs of the issuer conduct themselves;
- the requirements imposed on organs of the issuer;
- the relationship between the different organs of the issuer;
- the relationship between the organs of the issuer and the members of the issuer (or holders of the issuer's securities).

1635.  *Subsection (3)* provides that greater burdens must not be imposed by corporate governance rules on issuers whose securities are traded outside the UK than those imposed by corporate governance rules or listing rules on issuers with securities on UK markets.

## Section 1270: Liability for false or misleading statements in certain publications

1636.  Section 1270 inserts *sections 90A and 90B* into FSMA and establishes a regime for civil liability to third parties by issuers admitted to trading on a regulated market in respect of disclosures made public in response to provisions implementing obligations imposed by the Transparency Directive.

1637.  Although no issuer has been found liable in damages under English law in respect of statements made in narrative reports or financial statements, the law relating to financial markets and to the obligations of issuers to investors on those markets has been developing in the light of increased regulation of both domestic and European origin. The Transparency Directive has continued that process and increased the level of uncertainty as to whether any actionable duty is owed by an issuer and its directors to investors.

Exhibit 3
Page 69

*These Notes refer to the Companies Act 2006 (c.46)*
*which received Royal Assent on 8 November 2006*

1638.  The Transparency Directive sets out the periodic financial disclosures that must be made by issuers admitted to trading on a regulated market. Articles 4 and 5 of the Transparency Directive provide for annual and half-yearly reports, including management statements, to be made public, and requires statements made by persons responsible within the issuer for these disclosures (the directors in the case of a public company) that these give a true and fair view, and that the management report includes a fair review of certain matters. Article 6 requires the disclosure of interim management statements.

1639.  The Transparency Directive also sets out the minimum requirements for a liability regime that must be adopted by the UK at Article 7, and recital (17) states "Member States should remain free to determine the extent of the liability".

1640.  These provisions give considerable flexibility to Member States in the liability regime they choose to adopt in respect of disclosures under the Directive. The Government has established an exhaustive regime in relation to ensuring the delivery and accuracy of these reports including criminal offences, administrative penalties and actions for civil damages. The provisions in this section relate only to the position in respect of the civil liability of issuers on regulated markets to investors in their securities. The liability regime does not cover issuers on exchange-regulated markets. Their position remains unchanged by implementation of the Transparency Directive.

1641.  While it is intended that there be no additional liability under the Directive in respect of the disclosures to which it relates, the regime leaves undisturbed any other liability owed by directors to the issuer and to members of the company under UK and other national law, and any liability under other FSA rules. It also leaves undisturbed any liability of the issuer in respect of any loss or damage arising otherwise than as a result of acquiring securities in reliance on the relevant statement or report.

1642.  The primary liability of directors and issuers for the accuracy of the required disclosures comprises criminal offences and administrative penalties under the provisions of Part 15 of this Act and Part 6 of FSMA. The provisions in Part 6 require compliance with FSA rules giving effect to the obligations in the Directive and provide for penalties in respect of failure to comply with the rules. In addition, restitution can potentially be ordered by the court, on application of the Authority or Secretary of State, under section 382 of FSMA or by the Authority directly under section 384 of FSMA.

1643.  The Government's intention in developing a civil liability regime has been to provide certainty in an uncertain area and to ensure that the potential scope of liability is reasonable, in relation both to expectations and the likely state of the law after the implementation of the Transparency Directive. In particular, the Government was anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties, in order to protect the interests of company members, employees and creditors. However, as the state of the law after the implementation of the Transparency Directive is not certain, the Government has taken a power, at new *section 90B,* that will enable the provision introduced by section 1270 to be added to or amended if a wider or narrower civil liability regime is deemed appropriate.

**New section 90A: Compensation for statements in certain publications**

1644.  *Subsection (1)(a)* of new *section 90A* provides that the civil liability regime set out in that section applies to those reports and statements required by provisions implementing

Exhibit 2
Page 70

*These Notes refer to the Companies Act 2006 (c.46)*
*which received Royal Assent on 8 November 2006*

Articles 4 to 6 of the Transparency Directive. Depending on transparency rules, we would expect this to include annual and half yearly financial statements and management reports, the sign-off by directors or other responsible parties, as well as interim management statements.

1645. *Subsection (1)(b)* adds to the scope of the regime the information included in preliminary announcements of results made in advance of the reports and statements required by provision implementing Article 4 of the Transparency Directive, but only to the extent that it is intended that the information will appear in the final report or statement and be presented in substantially the same form as that in which it is presented in the preliminary announcement.

1646. *Subsection (2)* sets the scope of the civil liability regime to cover securities of all issuers for which the UK is the home Member State (whether the regulated market on which they are traded is situated in or outside the UK), as well as to cover those issuers whose securities are traded on a regulated market situated in the UK and for whom the UK is the host Member State. UK holders of securities of other issuers (i.e. those for whom the UK is neither a host nor a home State) will not be able to rely on the rights of action set out.

1647. *Subsection (3)* provides that issuers of such securities are liable to pay compensation to a person who has acquired those securities and has suffered loss in respect of them as a result of any untrue or misleading statement in a publication to which this section applies, or an omission of a required statement from such a statement. *Subsection (4)* however limits the liability of the issuer to circumstances where a "person discharging managerial responsibilities" in relation to the publication within the issuer (see *subsection (9)*) knows the statement to be untrue or misleading, or is reckless as to whether the statement is untrue or misleading, or, in the case of omissions, where it is known to be a dishonest concealment of a material fact.

1648. *Subsection (5)* provides that loss will not be regarded as having been suffered for the purposes of *subsection (3)* unless the person suffering it acquired the relevant securities in reliance on the information in the publication and at a time when and in circumstances where it was reasonable to rely on that publication.

1649. *Subsection (6)* limits the liability with regard to untrue or misleading statements, or omissions, in documents to which the section applies. It sets out that issuers are not liable for any liability other than that provided for by the section and that any person who is not the issuer is not liable, other than to the issuer.

1650. *Subsection (8)* clarifies that the section does not affect Part 6 of FSMA conferring liability for a civil penalty, liability for a criminal offence or the right to seek restitution.

1651. *Subsection (9)* sets out the persons who are to be considered as discharging managerial responsibilities for the purposes of the section. This is any director of the issuer, or where the issuer's affairs are managed by the members, a member of the issuer. In the case where the issuer does not have directors, or members, any senior executive with responsibilities in relation to the publication is considered as discharging managerial responsibilities.

**New section 90B: Power to make further provision about liability for published information**

Exhibit 2
Page 71

*These Notes refer to the Companies Act 2006 (c.46)*
*which received Royal Assent on 8 November 2006*

1652. *Subsection (1)* of new *section 90B* establishes a power to make further provision about liability for published information. The new section allows the Treasury by regulations to amend any primary or subordinate legislation relating to the liability of issuers and others in respect of information, including the regime set out in new *section 90A* of FSMA. The exercise of the proposed power could, for example, result in that regime or some other appropriate regime applying to other classes of information, such as information that is required to be disclosed by issuers to shareholders or markets under the Market Abuse Directive (MAD).

1653.   Regulations made under the section would be made using the affirmative procedure (see the amendment to section 429(2) of FSMA made by paragraph 12 of Schedule 15).

### Section 1271: exercise of powers where UK is host member State

1654.   Section 1271 inserts a new section into Part 6 of FSMA: section 100A.

1655.   New *section 100A* sets out the Authority's ability to exercise powers in relation to infringements of prospectus rules and transparency rules or related provisions where issuers' home State is not the UK. *Subsection (2)* clarifies that the enforcement powers extend only to cover infringements required by the relevant directive. *Subsection (3)* sets out the process by which the Authority must engage with the home State competent authority when it finds there has been an infringement. *Subsection (4)* sets out limitations on the Authority's ability to act in those circumstances, but *subsection (5)* provides that, in the appropriate circumstances, it must take all appropriate measures to protect investors.

1656.   *Subsection (6)* imposes an obligation on the Authority to inform the Commission where it takes action to protect investors.

### Section 1272 and Schedule 15: Transparency obligations and related matters: minor and consequential amendments

1657.   Section 1272 introduces Schedule 15, which makes minor and consequential amendments to FSMA related to the provision in sections 1265 to 1271. The Schedule also makes amendments to the C(AICE)Act 2004.

### Part 1: Amendments of the Financial Services and Markets Act 2000

1658.   Part 1 of Schedule 15 makes minor and consequential amendments to FSMA.

1659.   *Paragraph 2* amends section 73 of FSMA to extend, for the purposes of the transparency rules (which can apply to non-regulated UK markets), the factors to which the Authority must have regard when making rules under Part 6 of FSMA, so that these extend to effects on markets other than regulated markets.

1660.   *Paragraph 3* amends section 73A of FSMA to provide that transparency rules and corporate governance rules are "Part 6 rules" for the purposes of Part 6 of FSMA. But paragraph 3 also makes clear that these rules are distinct and separate from other Part 6 rules, such as the listing rules, disclosure rules, and prospectus rules. These different kinds of rules impose different, and sometimes overlapping, obligations on different groups of issuers.

1661.   *Paragraph 6* amends the penalty regime for breaches of Part 6 rules in section 91 of FSMA, so that it applies also to non-compliance with transparency rules, provisions made under the Transparency Directive, and corporate governance rules.

# Davies Review of Issuer Liability

## Liability for misstatements to the market:

## A discussion paper by Professor Paul Davies QC

March 2007

Exhibit 2
Page 73

Exhibit 2
Page 74

# Davies Review of Issuer Liability

## Liability for misstatements to the market:

## A discussion paper by Professor Paul Davies QC

March 2007

Exhibit 2
Page 75

© Crown copyright 2007

The text in this document (excluding the Royal Coat of Arms and departmental logos) may be reproduced free of charge in any format or medium providing that it is reproduced accurately and not used in a misleading context. The material must be acknowledged as Crown copyright and the title of the document specified.

Any enquiries relating to the copyright in this document should be sent to:

Office of Public Sector Information
Information Policy Team
St Clements House
2-16 Colegate
Norwich
NR3 1BQ

Fax:  01603 723000
E-mail:  HMSOlicensing@opsi.x.gsi.gov.uk

**Contacts**

This document can be found on the Treasury website at:

**hm-treasury.gov.uk/davies**

For general enquiries about the review, contact:

Davies Review of Issuer Liability
Room 4 / 20
HM Treasury
1 Horse Guards Road
London
SW1A 2HQ

Email:  davies.review@hm-treasury.gov.uk

ISBN:  978-1-84532-299-1

Printed on at least 75% recycled paper.
When you have finished with it please recycle it again.

PU189

Exhibit 2
Page 76

# Contents

**Page**

Letter from Professor Paul Davies QC: Invitation to comment…………………….....   3

Background: How to respond………………………………………………………..   5

Executive summary………………………………………………………………….…   6

Liability for misstatements to the market: A discussion paper

    I.
        Introduction……………………………………………………………….….   8
- The main disclosure obligations on issuers
- Civil sanctions for breaches of the disclosure obligations
- Sanctions for misstatements in the hands of public bodies

    II.
        The nature of the problem…………………………….…………………..   30
- Negligence or fraud?
- The range of disclosures to be covered
- Particular issues about liability for fraudulent ad hoc statements
- Application of the statutory regime to non-regulated markets
- Defining the scope of liability for fraudulent misstatements

    III.
        Some overarching issues……………………………………………....…   44
- Can optimal levels of fraud-based litigation be avoided?
- The benefits and limitations of private actions to enforce securities law

    IV.
        Appendices……………………………………………………..………   50
- Table 1: FSA cases
- Annex A: Sections 90A and 90B of FSMA 2000 (section 1270 of the Companies Act 2006)
- Annex B: Sections 37b and 37c of the WpHG

List of questions for response...…………………………………………..…….   55

Terms of reference………………………………………………………..………   56

Exhibit 2
Page 77

Exhibit 2
Page 78

**Davies Review of Issuer Liability**

HM Treasury
1 Horse Guards Road
London SW1A 2HQ
Tel: 020 7270 6426
davies.review@hm-treasury.gov.uk
www.hm-treasury.gov.uk/davies

<u>**Invitation to comment**</u>

March 2007

Dear Colleague

The Government has asked me to carry out an independent review of liability in respect of damage or loss suffered as a consequence of inaccurate, false or misleading information disclosed by issuers or their managements to the market (including to their own shareholders) or of failure to disclose relevant information promptly or at all.

Efficient markets depend on the efficient flow of timely, accurate information from companies to market participants. So what incentives are needed to encourage issuers and their managements to disclose meaningful, accurate and timely statements? To what degree should they be liable for losses suffered as a result of investment decisions taken on the basis of inaccurate, false or misleading information? To whom should they be liable? What rights of claim should those who have suffered such damage or loss have? A sensible liability regime must balance the interests of issuers and investors, providing appropriate incentives to make timely and accurate disclosures in compliance with statutory rules, as well as an appropriate right to recover losses.

The Review is examining the law relating to liability for corporate misstatements and considering whether the statutory liability regime currently in place should apply equally to periodic and ad-hoc disclosures, whether it should apply only to issuers on a regulated market or also to those on alternative markets, what the standard of liability should be, against whom should a right be enforceable, who should be able to sue for damages and how should such damages be measured.

Having reviewed in more depth the issues raised by respondents to the Government's consultation last year (on extending the scope of the statutory damages regime for disclosures required under the Transparency Directive) and having had the benefit of informal discussions with a number of interested parties, this discussion paper sets out my analysis of the problem and further issues arising. I invite you or your organisation to submit comments and views on the questions raised. Please also comment on other related issues if you wish.

I want to ensure that the Review is an open process that takes full account of the views of a wide range of stakeholders. The paper is therefore being sent out to broad cross-section of interested parties – main market and alternative market listed issuers, the legal and accountancy professions, financial advisers and intermediaries, relevant industry associations, investor groups, regulatory bodies and economic and academic experts in the field. Your input will be of great value in helping to shape the direction of my final report and recommendations to the Government.

I would be grateful if you could send your submission to the Review Secretariat by Friday 27 April 2007. I look forward to hearing from you and thank you in advance for your input into this important work.

Yours faithfully

**Professor Paul Davies QC**

Exhibit 2
Page 79

Exhibit 2
Page 80

## BACKGROUND

In October 2006, the Economic Secretary to the Treasury invited Professor Paul Davies QC, the Cassel Professor of Commercial Law at the London School of Economics to carry out a review of the liability of issuers in respect of damage or loss suffered as a consequence of inaccurate, false or misleading information disclosed by issuers or their managements to the market or of failure to disclosure relevant information promptly or at all.

The Davies Review follows a Government consultation last year on extending the scope of the statutory damages regime for disclosures required under the FSA disclosure rules implementing the Transparency Directive (2004/109/EC). Responses to that consultation confirmed that this was a complex area in which it is vital to get the policy right, but were not conclusive. The Government therefore decided to include a power to amend, limit or extend the scope of the new liability regime introduced by Section 1270 of the Companies Act 2006 (as new Sections 90A and 90B to the Financial Services & Markets Act 2000). The aim of the Davies Review is to make recommendations to the Government on whether to exercise this power and, if so how.

If the Review recommends that the Government should introduce further provisions about liability for published information or that changes should be made to the existing statutory regime, the Government will, when it publishes its response to the Review:

- consult fully on the Government's response to the review's proposals;
- publish a full regulatory impact assessment of these proposals; and, subsequently
- bring forward legislation for the new regime.

The Government's previous consultation documents, together with current information on the Davies Review can be found at the following web address: **www.hm-treasury.gov.uk/davies**

## How to respond

The deadline for responses to the Review is <u>Friday 27 April 2007</u>.

We would prefer <u>electronic submissions</u> where possible. Please state clearly on the covering note in the body of your submission if you do not want your response to be posted on the Davies Review website.

Responses should be sent by email to: **davies.review@hm-treasury.gov.uk**

Davies Review of Issuer Liability
Savings and Investment Team (SAVI)
HM Treasury
1 Horse Guards Road
London SW1A 2HQ

Contact: Anthea Heffernan, Secretary to the Davies Review, tel: 020 7270 6426

Exhibit 2
Page 81

# EXECUTIVE SUMMARY

▪ The central questions this discussion paper seeks to address are: What incentives are appropriate to encourage issuers to disclose meaningful, accurate and timely statements? Should companies, managers or advisers be liable to investors for losses suffered as a result of investment decisions taken on the basis of inaccurate information? To whom should they be liable? If there is to be liability, should the basis of that liability be negligence (carelessness) or deceit (making a statement without an honest belief in its truth)? Are statutory provisions needed to bring about the appropriate liability regime or can that task be left to the common law by way of judicial development of the relevant rules? What is an appropriate balance between public and private enforcement of companies' disclosure obligations?

▪ It is clear that neither the current state of the law in relation to liability nor its policy rationale are easy to state simply. The paper therefore first sets out the background to the problem: outlining main types of disclosure obligations to which issuers are subject (paras 9-22); evaluating the civil sanctions for breaches of those disclosure obligations (paras 23-57); before turning to public enforcement of the disclosure rules and the role of the FSA (paras 58-67).

▪ Until 2006, there was no statutory regime for inaccurate statements other than those contained in prospectuses, where liability was imposed on the basis of negligence. Nor did the common law routinely provide liability for misstatements in periodic or ad hoc statements, though the possibility of liability for deceit (fraudulent misstatements) existed. The Caparo case of 1990 excluded common law negligence liability except where the defendant knows that someone is likely to use the statement for a particular class of transaction. The adoption of the Transparency Directive in 2004, which imposes requirements for periodic disclosures specifically for the purpose of investor protection, raised concerns as to whether the Caparo principle would be undermined. Similar concerns exist in relation to ad hoc disclosures, now regulated by the Market Abuse Directive 2003.

▪ The Government responded by introducing a statutory liability regime (via a new section 90A to FSMA 2000) for disclosures required by the Transparency Directive and prelim announcements (and via section 463 of the Companies Act 2006 for reporting required under Part 15 of that Act). Section 90A first confirms the prior common law situation of no negligence liability to investors, and second, adopts and adapts the prior common law on deceit applying it only to issuers and in favour of purchasers of shares – in effect changing the law marginally in favour of investors. Section 90A does not deprive investors of previously held common law rights to sue.

▪ Public enforcement of the disclosure rules is largely in the hands of the FSA, who may exercise various powers of sanction under FSMA 2000. FSA powers under the Disclosure and Transparency Rules in relation to periodic and ad hoc reporting apply only to main market issuers. But FSA powers in relation to market abuse apply also to AIM and Plus Market companies. The main responsibility for supervision of disclosures made by AIM companies lies with a "Nominated Adviser" (nomad), which all AIM companies are required to have.

▪ The second half of the paper (from para 68) discusses two distinct approaches to solving the problem and the issues arising: the first looks at section 90A as a legal

Exhibit 2
Page 82

mechanism to preserve the common law position on liability; the other considers what would be an appropriate liability regime in principle. Possible reforms to section 90A cannot be evaluated in the absence of a sense of the appropriate policy balance in this area.

- Key questions on which views are sought include:
    i. Should the trigger for liability be <u>fraud (ie. recklessness or intention) or negligence</u>? Should there be liability for misstatements even if those making the statements honestly (but carelessly) believed them to be true? What is the right standard of liability to incentivise disclosure of timely, accurate and meaningful disclosures without imposing undue cost burdens on issuers? (paras 71-78).

    ii. Should the statutory liability regime currently in place under section 90A be <u>extended to ad hoc disclosures</u>? What is the current position in relation to Market Abuse Directive disclosures? Should there be liability for fraudulent misstatements in ad hoc reports? (paras 79-83).

    iii. Should there be <u>liability for statements that are accurate but late</u>? Or are the FSA's rules sufficient, given that much of their enforcement action has focused on delayed disclosure? What about deliberate delays in withholding information in order to mislead the market? (paras 84-88)

    iv. What <u>counts as an ad hoc statement</u>? Just disclosures of inside information required under MAD? Or also ad hoc disclosures required under the DTR? Other announcements or statements? (paras 89-94)

    v. Should section 90A apply also to <u>non-regulated markets</u>? How would it affect the regimes operated by AIM and Plus markets'? How might the courts apply the principles of the common law to non-regulated market liability anyway? Should there be a level playing field between regulated and non-regulated markets? (paras 95-99)

- If section 90A were to be extended, this raises a number of further issues:
    vi. Should investors' claims be subordinated to those of the other unsecured creditors? (para 100)
    vii. Does section 90A serve as sufficient deterrent on those making fraudulent misstatements? Would imposing liability on directors serve a deterrent purpose? What about other advisers? (paras 101-104)
    viii. Should statutory protection as in section 90A also be extended to sellers and holders of shares? (paras 105-107)
    ix. What should be the measure of damages? Should this be left to courts? Should the deceit or negligence measure of damages be adopted? (paras 108-110)

- Finally, paras 111-123 address some overarching issues about: (i) whether development of fraud-based investor action in the UK would encourage a private securities litigation culture similar to that of the US – concluding probably not; and (ii) the benefits and limitations of private actions to enforce securities – concluding that the arguments for facilitating private litigation outweigh those for excluding it where fraud is involved.

Exhibit 2
Page 83

# LIABILITY FOR MISSTATEMENTS TO THE MARKET: A DISCUSSION PAPER

## I. Introduction

1.  It is a widely accepted proposition that the efficiency of the price formation process in a securities market depends in large part upon the mechanisms whereby information is produced, verified and analysed to or in that market.[1] Effective price formation operates so as both to protect investors and, more generally, to promote the efficient allocation of financial resources in the economy as between competing projects. To put the matter another way, a securities market in which the supply of information is slow, inaccurate and poorly analysed is not likely to attract investors, especially where competing markets are available which do not suffer from these defects. Markets which do not attract investors will not attract issuers either.

2.  This Discussion Paper is concerned with only one part – albeit an important part – of the mechanism whereby information is produced to the market and, to some degree, by which it is verified. It is concerned with the sanctions for non-compliance with the growing list of requirements on companies to release publicly information which is of use to market participants in the evaluation of securities and in making decisions whether to trade in those securities. Clearly, these rules do not provide a complete machinery for the effective formation of prices in securities markets, even in relation to company-specific information. The information, once released, needs analysis before investment decisions can be taken. Analysis is a process which is left largely to market participants, subject to some controls dealing, for example, with analysts' conflicts of interest. However, the release of information by companies constitutes a crucial initial step in the process of price formation, and so it is important that there should be an appropriate set of inducements for compliance with the disclosure rules.

3.  In many cases companies might wish to release the information in question in any event,[2] but the rules which constitute the background of this Discussion Paper require them to make the disclosures, whether they wish to or not. The rules thus operate to reduce the asymmetry of information as between companies and market participants. The imposition of a potentially costly burden on companies to produce information, sometimes to have it verified by persons paid for by the company, and to make it public is an implicit subsidy by companies to analysts working in the securities markets. It can be justified as a more efficient way of making company-specific information available to the market than leaving analysts with the whole burden of information acquisition. That would be likely to result in fewer companies being followed by analysts and thus to a less

---

[1] Ronald J Gilson and Reinier Kraakman, *The Mechanisms of Market Efficiency Twenty Years Later: the Hindsight Bias* (2003) 28 *Journal of Corporation Law* 715, reprinted in John Armour and Joseph A McCahery (eds), *After Enron* (Oxford: Hart Publishing, 2006). This proposition remains robust despite the recent developments in behavioural finance which focus on the role of 'noise' or irrational traders.

[2] The paper also looks to some extent at the practice of companies of making statements to the market, even when they are not required to do so.

Exhibit 2
Page 84

efficient price formation process, especially outside the area of the largest companies.[3]

4.    However, the 'subsidy' approach does not tell one how big the subsidy should be: should companies bear only the cost of producing and, to some degree, verifying the information, or should they also be liable to investors for the losses suffered as a result of investment decisions taken on the basis of inaccurate information? This is the central question which the Discussion Paper will address.

5.    Many of the disclosure obligations in question derive today from European Community law, as a result of the development and implementation at Community level of the Financial Services Action Plan. This is not to say that Community law has introduced entirely novel disclosure obligations into the laws of the United Kingdom: in most cases the Community rules replace (and sometimes extend) what were previously purely domestic disclosure rules. With regard to sanctions for non-compliance, moreover, the relevant Directives, as is common with Community law, give the Member States considerable freedom of action, though that freedom is not completely unconstrained by Community-level rules. Enforcement of the disclosure obligations by private parties, through litigation in the courts, to secure compensation for disappointed investors is one possible enforcement mechanism. However, since the creation of the Financial Services Authority and the steady expansion of its powers, public enforcement by the Authority has become an important element in securing compliance with companies' disclosure obligations. Those powers include now not only the imposition of financial penalties but also the initiation of criminal proceedings and other regulatory action. An important question for this Discussion Paper is, therefore, how to find an appropriate balance between public and private enforcement of companies' disclosure obligations, and to examine possible linkages between the two.

6.    Non-legal market sanctions also play an important role in enforcing disclosure obligations, as was emphasised to me by a number of respondents. A company which is discovered to have put out inaccurate information is likely to suffer, not simply a drop in its share price when the truth comes out, but a continuing scepticism on the part of market participants about the information it discloses in future. If, after the truth is revealed, the company's securities continue to trade at a lower level than would otherwise have been the case, the company's cost of capital will be higher and this will be a penalty on the company, possibly of a significant amount. Equally, the directors' reputations may well suffer and this will reduce their value in the executive job market. Thus, as is common in most walks of life, legal sanctions do not have to carry the full burden of securing compliance with the law.

7.    However, as is also common in other areas of social activity, adequate levels of compliance with the disclosure obligations cannot be expected to be secured solely through social sanctions. The future cost to the company (ie the shareholders) or to the directors themselves of the publication of information later discovered to be inaccurate may be outweighed in their minds by the immediate benefits of non- or inaccurate disclosure. It is difficult, perhaps

---

[3] John C Coffee, 'Market Failure and the Economic Case for a Mandatory Disclosure System' (1984) 70 *Virginia Law Review* 717.

Exhibit 2
Page 85

impossible, to quantify the extent to which adequate enforcement fails to be secured by social (or market) sanctions, but clear examples of priority being given to short-term considerations over the need for accurate disclosure can readily be found. Thus, in a prosecution brought by the FSA under section 397 of the Financial Services and Markets Act 2000 ('FSMA 2000'), the defendants were found by the trial court recklessly to have made a statement to the effect that the company had binding contracts for the supply of software programs, even though the contracts had not been concluded, at a time when the revenue from the contracts was needed if the accounts were to show that the company had met its expected turnover and profit. The court later commented that 'the putative contracts were illusory'.[4] Again, in a case involving civil liability for the payment of unlawful dividends, Robert Walker L J stated: 'The judge made a specific finding that the former directors were dishonest in the preparation of the 1991 accounts, in order to deceive the market into the belief that the group was much more profitable than it actually was.'[5]

8.   Thus, it seems reasonable to conclude that legal sanctions, of one sort or another, are needed to supplement social sanctions in this area. This brings us back to the central question of the balance between private sanctions through litigation and public sanctions, mainly in the hands of the FSA. There is some international and comparative research which associates the presence of deep and liquid securities markets above all with the presence in those jurisdictions of a vigorous system of private enforcement of obligations under securities law.[6] This thesis would suggest that the present, somewhat restricted, possibilities for civil litigation in the UK for breaches of the disclosure obligations of companies (see below) are in need of substantial expansion. However, later work by Jackson and Roe argues that 'measures of public enforcement are more strongly associated with robust financial markets.'[7] However, the latter authors do not claim that public enforcement can be used to replace private enforcement but rather that 'both play a role in promoting strong capital markets.' Nor do those authors claim to have identified which type of public enforcement activity is most likely to be effective. Perhaps the only safe conclusion to be drawn from this evidence is that it would be unwise for any country to put all its enforcement eggs in either the public or the private basket, but that the balance between the two forms of enforcement remains an open question for discussion.

**The main disclosure obligations on issuers**

9.   As a preliminary to a discussion of the sanctions for non- or inaccurate disclosure, it is perhaps useful to set out at this stage a short description of the main types of disclosure obligation to which issuers are subject. For the purpose of analysis, it is useful to see the rules as requiring disclosure through three main categories of document: prospectuses and other fund-raising documents; periodic corporate reports, whether produced annually, half-yearly or quarterly; and ad hoc corporate announcements. Although those I talked to did not press for

---

[4] *Rigby and Bailey v R* [2006] 1 W L R 2067 at [5].
[5] *Bairstow v Queens Moat Houses* [2001] 2 BCLC 531 at [63], CA.
[6] La Porta, Lopez-de-Silanes and Schleifer, 'What Works in Securities Laws?' (2006) 61 *Journal of Finance* 1.
[7] Howell E Jackson and Mark J Roe, 'Public Enforcement of Securities Laws: Preliminary Evidence' (Draft of March 2007, forthcoming on ssrn.com).

Exhibit 2
Page 86

change to the civil liability rules in relation to prospectuses, which are in any event outside my terms of reference, the prospectus liability rules provide a useful check on reform proposals for the other classes of document, precisely because the prospectus rules are uncontroversial and, indeed, long-standing. Thus some description of the prospectus rules is required. In light of the tough legal regime applying to prospectuses, however, it should be borne in mind that the prospectus is a 'selling document', produced by the issuer to promote its securities to investors, whereas periodic and ad hoc reports are expressions of routine reporting requirements which do not typically coincide with a selling effort on the part of the company.

### (a) Prospectus disclosure rules

10.    Subject to certain exceptions, section 85 of FSMA 2000 requires a prospectus to be produced whenever (a) transferable securities are to be offered to the public in the United Kingdom *or* (b) transferable securities are to be admitted to trading on a regulated market situated or operating in the United Kingdom. A 'regulated market' is a concept of European Community law,[8] but it is important to note that the operator of a public market in securities is not obliged to obtain the status of a 'regulated' market in order to operate in the United Kingdom. It may choose to forego the benefits and burdens of regulated status, as both the Alternative Investment Market and the Plus Market have.[9] However, the statutory prospectus requirements will bite if there is a public offering of shares,[10] even if the shares are to be admitted to trading on a non-regulated market, such as AIM. In other words, to avoid the statutory prospectus regime for AIM-listed securities, the fund-raising process must involve a placing which does not amount to a public offer.[11]

11.    The detailed requirements of what has to be set out in a prospectus are now to be found in Commission Regulation 809/2004/EC. This is a very extensive and lengthy document made by the European Commission, after consulting the Committee of European Securities Regulators. It is made by the Commission under authority given it by Directive 2003/71/EC of the European Parliament and the Council (the 'Prospectus Directive' or PD). The Commission Regulation (because it is a Regulation rather than a Directive) has become part of the law of the United Kingdom without any need for national legislation to transpose it into domestic law. It is also a maximum harmonisation instrument, ie Member States may not add to its requirements (except where the opportunity to do so is specifically provided within the Regulation).

12.    In addition to what is said in the Commission Regulation, the PD contains some supplementary provisions on the content of prospectuses, which, because the PD

---

[8] The relevant rules are now to be found in Title III of Directive 2004/39/EC on markets in financial instruments.

[9] However, a non-regulated securities market will need to obtain the authorisation of the FSA to operate in the United Kingdom: see FSMA 2000, Part XVIII.

[10] Defined in s. 86.

[11] In the rare case where, without a public offer, securities are introduced to the main market of the LSE and a prospectus is not required (usually because the securities do not fall within the definition of 'transferable securities' – see FSMA 2000, Schedule 11A), the FSA requires the production of listing particulars, which require disclosure of some of the information required for a prospectus. See the FSA's Listing Rules, LR 4.

Exhibit 2
Page 87

is a Directive, have required transposing into national legislation. Following the PD, section 87A of FSMA contains a sweeping up provision. Even if the specific requirements of the Commission Regulation have been met, further information may have to be disclosed in the prospectus if it is 'necessary to enable investors to make an informed assessment of' the position of the issuer or the rights attaching to the securities on offer. Further, again following the PD, section 87G requires the production of a supplementary prospectus if significant new information appears or an error is discovered after the initial prospectus was issued. Finally, the FSA has made 'Prospectus Rules' under the powers conferred on it by section 84 of FSMA 2000. The FSA plays an important role in relation to prospectuses, for example, in checking that information is presented under all the headings required by the Commission Regulation and FSMA.

13.   Even if an issuer avoids a public offer and secures the admission of its securities to trading on a non-regulated market, this does not mean it escapes prospectus-type disclosure obligations. These obligations are to be found, however, not in statute but in the rules of the relevant exchange and are binding on the issuer by way of contract, as part of the process by which the issuer seeks to have its securities admitted to that market and the operator of the market agrees to accept the issuer. Thus, an issuer seeking admission of its securities to AIM needs to produce an 'admission document' which must disclose significant information of the type required under the statutory regime, but in some respects to a less demanding level.[12]

### (b) Periodic disclosure requirements

14.   The reports and accounts provisions of British company law are of long standing, dating back to the nineteenth century, though more recently Community law has shaped those requirements.[13] As now formulated, the directors of companies[14] must produce reports and accounts annually, have the financial statements and parts of the reports audited, circulate them to the shareholders and lay them before the shareholders in general meeting, and file them at Companies House, so that they are available to the public. For quoted companies the rules of public securities markets have also long supplemented these Companies Act requirements, notably by requiring the production of more frequent reports and accounts. By virtue of Directive 2004/109/EC on transparency requirements in relation to issuers (the 'Transparency Directive' or 'TD') Community law now lays down the basic reporting requirements (both annual and more frequent) for companies whose securities are traded on *regulated* markets. The TD thus does not apply to issuers whose securities are traded on AIM or Plus, nor is there in the TD an equivalent to the public offer trigger in the PD, which might have an indirect impact on non-regulated markets. Once again, however, the absence of statutory regulation beyond the requirements in the Companies Acts does not mean that companies listed on non-regulated markets are subject to reporting

---

[12] London Stock Exchange, *AIM Rules for Companies*, February 2007, para. 3 and Schedule 2. See also Plus Market, *Rules for Issuers*, paras. 4-5 and Appendix 1.
[13] Notably the Fourth and Seventh Directives on companies accounts in the company law series of directives, the revised Eighth Directive on auditing, and Commission Regulation 1725/2003/EC adopting international accounting standards.
[14] The requirements are set out in Part VII of the Companies Act 1985 and will be replaced in due course by Parts 15 and 16 of the Companies Act 2006. Small or private companies are exempt from some of these obligations, but the exemptions are not relevant to this Discussion Paper.

Exhibit 2
Page 88

requirements only on an annual basis. AIM- and Plus-listed companies are required to produce non-audited half-yearly reports.[15]

15.  For issuers on regulated markets, notably the main market of the London Stock Exchange, the TD requires annual financial reports (Article 4), half-yearly reports (Article 5) and interim management statements (Article 6). The annual report is in essence that required by the companies legislation, though now termed an 'annual financial report'. The half-yearly report (which is not required to be audited) must contain a condensed set of financial statements and an interim management report. The interim management report must indicate the important events that have occurred during the first six months of the financial year and their impact on the financial statements and the principal risks and uncertainties for the remaining six months. Article 6 requires the publication of quarterly interim management statements by issuers of shares (but not quarterly financial statements). The issuer is required by Article 21 to disseminate the required information 'in a manner ensuring fast access to such information on a non-discriminatory basis' and to do so 'throughout the Community'. In fact, this requirement is applied not only to information required to be disclosed by the TD, but also to any additional information requirements imposed on issuers by Member States beyond the TD (see para 17 below) and to information required by Article 6 of MAD (see para 19 below). Such information is referred to collectively as 'regulated information'.[16]

16.  The TD requires transposition into UK law and this has been done via amendments to FSMA 2000.[17] These amendments confer new rule-making powers on the FSA, which the FSA has exercised so as to produce 'Disclosure and Transparency Rules' (DTR) in place of the previous 'Disclosure Rules' (DR). The TD's periodic reporting requirements are transposed in DTR 4 and (for dissemination) DTR 6. In particular, where the UK is the home state of the issuer, the periodic reports are to be distributed through a Regulated Information Service (RIS)[18] and are to be made available on a website. Again, the RIS is an established feature of the markets and is also the required dissemination channel for the information required to be reported periodically by AIM companies.[19]

17.  Because, unlike the PD, the TD is a 'minimum harmonisation' directive, it is open to the Member States to add to its disclosure requirements. The FSA has done so, through what it calls 'super-equivalent requirements'. These are set out in the Listing Rules. LR 9.8 requires certain information relating to the company's financial position to be included in the annual financial report beyond that required by the DTR; certain non-financial items, such as the requirement to comply, or explain non-compliance, with the Combined Code on Corporate Governance; and the provision of a directors' remuneration report.[20] However, the Listing Rules no longer require the publication of a preliminary statement of annual results, though they do regulate how such a preliminary statement is to be

---

[15] *AIM Rules for Companies*, para. 18 and Plus Market, *Rules for Issuers*, para. 30.

[16] TD, art 2(1)(k).

[17] The changes are set out in Part 43 of the Companies Act 2006 and were brought into force on the date that Act was passed.

[18] A RIS requires the approval of the FSA according to criteria developed by the regulator. The term includes equivalent service providers established in other EEA states, which do not need FSA approval.

[19] *AIM Rules for Companies*, para. 10.

[20] See LR 9.8.4, 9.8.6 and 9.8.8 respectively.

made if the issuer chooses to make one; and a public statement of a board's dividend or other distribution decisions is still required as soon as possible after it has been made.[21] For companies listed on the main market of the LSE, therefore, the periodic disclosure requirements are now mainly in the DTR but still in part in the LR.

### (c) Ad hoc disclosure requirements

18.    Companies whose securities are traded on public markets are now subject to a range of ad hoc disclosure requirements. Some are relatively routine, such as reporting to the market information which has been provided to the company by others. Examples are notifications which the company has received from its directors or major shareholders as to their acquisition or disposal of voting rights in the company.[22] Some disclosures are not aimed at the market principally, but the company's shareholders, such as disclosure of significant or related-party transactions. In the case of significant transactions of the largest size (Class 1 transactions) a circular to shareholders and shareholder approval is required before the transaction becomes binding on the company.[23] Similar provisions apply to related-party transactions, except for small or routine transactions, and in addition the related party may not vote on the resolution for approval.[24] However, such transactions, including class 2 or 3 transactions, which do not require shareholder approval, must be notified through the RIS as soon as the transaction has been agreed. To this extent, the division between notifications to shareholders and notifications to the market is blurred.

19.    The most important of the market-regarding ad hoc disclosure rules is that contained in Article 6 of Directive 2003/6/EC on insider dealing and market manipulation (the 'market abuse directive' or MAD). Article 6(1) requires issuers of financial instruments on *regulated* markets to inform 'the public' as soon as possible of inside information 'which directly concerns' the issuer and to post on their internet sites the publicly disclosed inside information. This is not a new requirement in principle. It can be traced back to Directive 82/121/EEC, though article 6 implements[25] the principle in a particularly rigorous way. Article 6 is transposed into UK law by conferring power on the FSA to make rules (originally the DR, now the DTR). DTR 2 lays down the disclosure obligation and requires that the information be disseminated through a RIS.

20.    Again, although Article 6 of MAD applies only to regulated markets and it has not been applied more widely on transposition into domestic law, requirements similar to Article 6(1) are imposed on AIM and Plus companies.[26] The provisions say, in rather similar terms, that (to take the Plus Market version): "An issuer must announce as soon as possible any change in its sphere of activity, financial position, the performance of its business, or its expectation of its performance,

---

[21] LR 9.7A.
[22] These provisions were previously in the Companies Act 1985 but have been or will shortly be repealed and be replaced by DTR 3 and 5.
[23] LR 10.5.
[24] LR 11.
[25] Supplemented by Commission Directives 2003/124/EC and 2004/72/EC.
[26] *AIM Rules for Companies*, para 11; Plus Markets, *Rules for Issuers*, para. 20.

14    Davies Review of Issuer Liability: A discussion paper

Exhibit 2
Page 90

which, if made public, would be likely to have a significant effect on the price of its securities."

21. The MAD, of course, is centrally concerned not only with disclosure of inside information but also with penalizing market abuse, including insider dealing. Here, it should be noted that the Directive's provisions sanctioning market abuse, although also confined to regulated markets by the Directive, have been applied more widely in the United Kingdom, so as to cover any prescribed market.[27] Both AIM and Plus are prescribed markets.[28] Cases of inaccurate or non-disclosure of inside information can quite easily become cases of market abuse. This is important because the FSA has regulatory functions in relation to market abuse[29] and these functions are thus exercisable in relation to AIM and Plus companies, even though the DTR rules apply only to regulated markets.

### (d) Linking the periodic and ad hoc disclosures

22. Over the course of a year a company might issue a large number of ad hoc statements, of which it might be difficult for investors to keep track. Article 10 of the PD requires companies whose securities are admitted to trading on a regulated market to publish and file with the competent authority of its home Member State an annual statement containing or referring to all the information made public over the previous year, including that made available in other countries. This is translated into domestic law by PR 5.2, which requires only a list of the required statements to be filed with the FSA, rather than their text. Moreover, some matters mentioned in ad hoc statements to the market might be sufficiently important to require repetition in a subsequent periodic report. Both provisions blur the line between periodic and ad hoc disclosure.

### Civil sanctions for breaches of the disclosure obligations

23. Having set out the bare bones of the current disclosure obligations, it is now possible to turn to the central issue of this Discussion Paper, ie the sanctions for non- or inadequate disclosure. Here again, however, the question of possible reforms of the current law cannot properly be evaluated without setting out the current law. This will be done in relation to both private and public enforcement of the disclosure rules. Unfortunately, on the civil side at least, a full understanding of the current situation requires a substantial explanation of how we got to where we are. It was clear from my conversations with respondents that neither they nor I found the current state of the law or its policy rationale easy to state simply. In consequence, we found the assessment of reform proposals equally challenging. Since, however, rationale debate of the future requires an understanding of the present, I set out, briefly, my understanding of the development of the law.

---

[27] FSMA 2000, s. 118.
[28] Prescribed markets include 'all markets which are established under the rules of a UK recognised investment exchange': Financial Services and Markets Act 2000 (Prescribed Markets and Qualifying Investments) Order 2000, art. 4.
[29] See Part VIII of FSMA 2000.

Exhibit 2
Page 91

24.   The civil liability rules for misstatements in the different classes of document discussed above have a rather uneven history. By the end of the nineteenth century the position in relation to prospectuses had become clear, partly as a result of developments in the common law and partly because of the introduction of a statutory liability regime. In relation to liability to investors for misstatements in periodic and ad hoc reports, however, the law remained undeveloped and is still subject to substantial uncertainties – hence the need for this Discussion Paper.

### (a) The position up to the decision in Caparo v Dickman (1990)

25.   By the third quarter of the nineteenth century the courts had established civil liability in relation to fraudulent prospectuses through development of the common law tort of deceit. In 1889, however, the House of Lords blocked further development of the tort of deceit in the case of *Derry v Peek*.[30] It held that that tort was committed only if the defendant had made a statement which the defendant knew to be untrue or if the defendant had acted recklessly as to its truth, ie had made the statement not caring if the statement were true or false. The tort of deceit could not be committed by a defendant who believed the statement to be true, and this would be so no matter how unreasonable the defendant's belief was. In other words, an honest belief in the truth of the statement would protect the defendant, even if the defendant had acted carelessly in the way that belief had been arrived at (for example, where there had been a failure to take proper steps to check the accuracy of the statement). It is true that showing the belief to be wholly unreasonable might persuade the court that the belief was not genuinely held by the defendant. However, that would be a matter of evidence, not of the substantive test to be met. A wholly unreasonable belief, if honestly held, would not amount to deceit.

26.   The tort of deceit required proof of various other elements, beyond the lack of a belief in the truth of the statement made. First, there must actually be a statement. There was no liability at common law for non-disclosure, though the law was sufficiently robust to impose liability for half-truths (ie statements which were true as far as they went but implied something false as a result of what was omitted). However, there could be no liability if the defendant said nothing and merely stood by and let the claimant deceive him or herself, even if such conduct on the part of the defendant were intentional. Second, the defendant must intend the claimant to rely on the untrue statement, or at least intend a class of persons, of whom the claimant was a member, to rely on it. Hence, a company could be said to intend a subscriber for shares to rely on the prospectus, even if it did not know the identity of the subscriber when it issued the prospectus. Third, the claimant must in fact rely on the statement, as part of which requirement the claimant would have to be aware of the statement. This requirement is taken to rule out the theory of 'fraud on the market,' whereby a misstatement which has an effect on the market price can be said to cause an investor loss, even though that particular investor was not aware of the misstatement. And, of course, the claimant must suffer loss. Provided these and the other elements of the tort of deceit are satisfied, the common law regards the defendant as having acted fraudulently. There is no need to show that the defendant had any particular

---

[30] (1889) 14 App Cas 337.

Exhibit 2
Page 92

dishonest intention: even a 'white lie' intended to be and in fact acted on which causes the claimant loss constitutes the tort of deceit. Normally, of course, the maker of a fraudulent statement is also dishonest.

27. Parliament did not think the result in *Derry v Peek* an acceptable one in relation to prospectuses, and so it passed the Directors' Liability Act the following year.[31] That imposed liability for negligent misstatements in prospectuses, ie the defendant would be liable even if belief in the truth of the statement were honestly held, if that belief had been arrived at carelessly (negligently). The present version of the liability imposed by the 1890 Act is to be found in section 90 of FSMA 2000. It is now a very wide-ranging provision. Any person may sue who 'acquires' securities to which the prospectus applies and suffers loss as a result of any untrue or misleading statement in the prospectus or of any omission from the prospectus of a matter which ought to have been included. The use of the verb 'acquires' indicates that the possible range of claimants includes those who buy shares in the after-market as well as those who subscribe for shares from the company. The absence of a requirement that the claimant should have 'relied' on the misstatement (the section requires simply that the claimant should have suffered loss as a result of it) indicates that, provided the misstatement affects the market price of the security, it does not matter that the claimant was unaware of it. And the section covers omissions.

28. The range of defendants is any person responsible for the prospectus or a part of it. Those persons are identified in the FSA's Prospectus Rule 5.5, so as to include the issuer, its directors, and any person who is stated in the prospectus as accepting responsibility for any part of it or who, whether this is stated or not, has authorised its contents. Consequently, the principal advisers will often be within the range of defendants. Finally, the standard for liability is negligence and in fact a strong version of negligence liability. Schedule 10 to FSMA 2000 requires the defendant to prove that he or she was not negligent rather than the claimant to prove that he or she was.[32]

29. The Directors' Liability Act 1890 on prospectus liability was a remarkable development of its day. It influenced the US reforms of the 1930s, when sections 11 and 12 of the Securities Act 1933 were modelled upon it. However, in the Securities Exchange Act 1934 the Congress moved further to introduce a full-scale legislative scheme for the regulation of securities markets of a type not seen in the United Kingdom until the passing of the Financial Services Act 1986. Included in the 1934 Act were continuing disclosure obligations for issuers, both periodical and ad hoc (section 13), the latter by way of a requirement to up-date the company's initial registration statement. Section 18 of the 1934 Act imposed civil liability for misstatements in the continuing disclosure documents to any person 'who, in reliance on such a statement, shall have purchased or sold a security at a price which was affected by such statement.' Unlike in the 1933 Act,

---

[31] The title reveals that directors were the most common targets of liability suits at this time. The accounting profession had not yet developed so as to make itself the target of choice that it now is; and the decision in *Houldsworth v City of Glasgow Bank* (1880) 5 App Cas 317 prevented shareholders from suing their own company (but see now Companies Act 1985 s 111A (Companies Act 2006, s 655) apparently reversing this decision).

[32] There are some complex provisions dealing with the interrelationship of experts and non-experts as far as liability is concerned.

Exhibit 2
Page 93

liability was imposed only if the person making the statement knew the statement was false or misleading (the burden of disproving this being on the defendant). Thus, when moving beyond the prospectus, Congress adopted a standard for liability which was modelled on the tort of deceit. In fact, however, much more important for civil liability in the United States has turned out to be section 10b of the 1934 Act (and Rule 10b-5 made by the Securities Exchange Commission) which prohibits 'any manipulative or deceptive device or contrivance' in connection with the purchase or sale of any security. Although not on their face providing for a civil remedy, the US courts have interpreted them as so doing. I shall look at these provisions further below.

30.   In the United Kingdom, by contrast, the question of the liability of issuers (and others) to those who traded on the basis of misstatements in the company's continuing disclosures was not addressed at this time. This was despite the fact that there has long existed a statutory obligation upon companies to produce annual reports and accounts. However, perhaps because that obligation was located in the Companies Acts in the UK, rather than in securities laws, as in the US, that statutory regime did not address the question of liability to investors for misstatements.

31.   It might have been thought that, even if statute ignored the issue of liability for misstatements in periodic and ad hoc corporate disclosures, that question could arise by way of common law. If a company made inaccurate statements in its continuing disclosure documents, could not the rules the courts had developed for prospectuses be applied? However, the tort of deceit did not give rise to liability for misstatements in companies' periodic reports as easily as it did for those in prospectuses, because of the requirement for liability that the maker of the statement should have intended that the recipient of the statement rely on it. This was a requirement easy enough to satisfy in the case of a prospectus (which was after all a selling document), but more difficult in the case of an annual report, which was primarily a report to shareholders on the directors' stewardship and not obviously intended to induce reliance by way of securities trading.

32.   Alternatively, the common law might have approached the issue via the tort of negligence. This is the most wide-ranging of the torts and covers many types of conduct which fall below the standard set by the law and cause harm to others. The tort was already under development in the nineteenth century, initially to provide compensation for those suffering physical harm as a result of negligent acts, for example in factories or on railways. However, about the time of *Derry v Peek*, the courts decided that the tort of negligence did not apply in principle to negligent statements causing purely economic loss.[33] Not until the 1960s did the common law move away from this 'in principle' denial of liability based on negligence in this class of case.[34] Only at this point was it possible for the common law to confront the question of whether a company, its directors or advisers were liable in negligence for statements in the company's periodic or ad hoc reports upon which investors relied and suffered loss in consequence. An understanding of the answer which was given to this question by the House of

---

[33] *Le Lievre v Gould* [1893] 1 Q B 491,
[34] In *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] A C 465.

Exhibit 2
Page 94

Lords in *Caparo Industries plc v Dickman*[35] is absolutely central to understanding the issues at the heart of this Discussion Paper.

> 33.  <u>By way of summary</u>, therefore, it can be said that before the 1960s the common law imposed liability for intentionally or recklessly inaccurate statements in prospectuses and the statute for negligently inaccurate statements in them,[36] whilst neither statute nor common law routinely provided liability for misstatements in periodic or ad hoc statements.

### (b) Caparo

34.  Once the courts had accepted that there might be liability for purely economic loss resulting from misstatements, they had to go further and define the circumstances in which such liability would be imposed. This was the question raised in the *Caparo* case. Like many of the cases decided around this period, the factual background of *Caparo* involved the purchase of a company whose economic prospects were discovered after the purchase to be less promising than the purchaser had thought beforehand. Such purchasers then looked around for someone to sue in respect of what was alleged to be the misleading information about the company which had been made available. In *Caparo* the purchase was of a target company listed on the London Stock Exchange by another such company through a takeover offer preceded by share purchases in the market. The action was brought initially against both the directors and the auditors of the purchased company,[37] but proceeded only against the auditors. The target company had issued a profit-warning in March 1984, which caused its share price to halve. In May 1984 the directors of the target made a preliminary announcement in its annual results for the year to March 1984, which confirmed that profits were well short of expectations. This caused a further, though less dramatic, fall in the share price. In June the annual accounts were issued to the shareholders. Shortly before that, Caparo, which had previously owned no shares in the target, began acquiring shares in tranches until it reached a shareholding of 29.9%, at which point it made a general offer for the remaining shares, as the City Code required it to do if it was to acquire any more of the target's shares. Caparo asserted that the 1984 accounts, although gloomy, in fact overvalued the company and that the auditors had been negligent in not detecting the irregularities or fraud which had led to the overstatements in the accounts and in certifying the accounts as representing a true and fair view of the company's financial position.

35.  The trial judge held that the auditors owed Caparo no duty of care in negligence, ie that liability did not arise even if the auditors had been negligent.[38] The Court

---

[35] [1990] 1 All E R 568, HL.

[36] In the normal case, the statutory liability would trump the common law one, for why would a claimant assume the burden of proving intention where the statute required the defendant to show that he or she believed on reasonable grounds in the truth of the statement? However, where the statute did not reach, the common law might still fulfil a useful gap-filling role: *Possfund Custodian Trustees Ltd v Diamond* [1996] 1 W L R 1351.

[37] Suing the purchased company itself would obviously be irrational, since it was now owned by the claimant.

[38] It was assumed for the purposes of the decision that the auditors had been negligent; whether they had been or not was never determined. It was unnecessary to do so, since they were not liable even if they had been negligent.

Exhibit 2
Page 95

of Appeal by a majority held that no duty was owed to Caparo in respect of the purchases made before Caparo was registered as a shareholder in the target but was owed thereafter. The House of Lords unanimously upheld the trial judge. Three points can be made about the House of Lords' ruling. First, the court was prepared to accept that the events described above were foreseeable, ie, if the target's auditors had thought about it, they would have realised that the accounts might be used by a bidder as in fact they were used by Caparo. However, in this area of the tort of negligence, the court rejected foreseeability as the touchstone for liability, in spite of its importance in other areas of that tort.

36. Second, the court rejected the narrower version of the claimants' argument which had been accepted by the Court of Appeal, namely, that the provisions in the Companies Acts relating to the accounts and their audit formed the basis for the creation at common law of a duty of care owed by the auditors to the existing shareholders of the company in relation to their purchase of further shares - but not in relation to purchases by non-shareholders. The effect of accepting this argument would probably have been to give Caparo substantially what it sought by way of damages, since only the shares purchased when it was not a shareholder in the target would fall out of consideration in calculating the damages, assuming it could make out the other elements of the tort of negligence.[39] Whilst accepting that the statutory provisions on accounts and audit did form the basis for the recognition of a duty of care owed by the auditors to the shareholders, it was still necessary, the House of Lords said, to ask what was the nature of the duty thus to be recognised at common law. There was no such thing as 'a duty to take care in the abstract but [only] a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained.'[40] It is at this point that the judges needed to embark on their famous analysis of the purpose of the statutory accounts provisions, in order to establish the appropriate scope of the duty of care at common law which could be based on the statute. The view of the House of Lords was that the purpose of the statutory accounts provisions, as far as the shareholders were concerned,[41] was to put them in a position where they could effectively exercise their governance rights over the board (for example, by replacing ineffective management)[42] not to enable them to take investment decisions. Accordingly, a duty of care did not exist in relation to purchases of shares in the company, whether by existing shareholders or non-shareholders.[43]

---

[39] There is some unclarity in the judgment of the Court of Appeal ([1989] 1 All E R 798) as to the time at which the claimant would have to be registered as a shareholder to be able to assert a claim, an unclarity perhaps linked to the question of whether the relevant document for the claim was the annual accounts as circulated to the shareholders or the preliminary announcement of the results.

[40] Lord Oliver at p 599.

[41] Another purpose of the accounts and their audit was also to protect the company itself, for example, by enabling its management to take timely action to stamp out fraud (Lord Oliver at p 583). For this reason, the duty to shareholders would rarely expose the auditors to substantial damages actions by the shareholders, because their loss would normally be reflective of the loss suffered by the company and the company's recovery would take priority. However, if, for example, the accounts negligently undervalued the company, shareholders might be able to recover from the auditors monies expended in convening a meeting of the company and securing the passing of a resolution to remove the existing board.

[42] Lord Bridge at p 580; Lord Oliver at p 583; Lord Jauncey at p 607.

[43] The judges left open the question of whether sales of shares (for example, where the accounts negligently undervalued the company) were within the scope of the duty, on the grounds that only shareholders could sell shares so that sales were necessarily a shareholder activity. However, the judges

Exhibit 2
Page 96

37. Third, however, the House of Lords confirmed earlier cases holding auditors liable when they had assumed responsibility for the accuracy of the accounts in relation to a particular person and in the context of a known transaction. Where the auditor makes a statement knowing that it is going to be made available to a particular person who is likely to rely on it for the purpose of a particular type transaction which is also known or ought to be known to the maker of the statement, a duty of care will normally be found by the court.[44] Most of the post-*Caparo* litigation has been about applying this test to the varying circumstances in which the claimant has sought to get the auditors to stand by or to confirm their audit for the purposes of the particular transaction in respect of which the claimant now wants to sue. Thus, in *Galoo v Bright Grahame Murray*[45], Hillsdown Holdings plc intended to buy a controlling shareholding in companies whose annual statements had overvalued them. Hillsdown sued the companies' auditors and the Court of Appeal held that auditors owed Hillsdown a duty of care. This was because, unlike in *Caparo*, the auditors had sent the accounts to Hillsdown in the knowledge that Hillsdown and the auditors' clients intended to use the financial statements to calculate the purchase price of the shares. On the other hand, no duty of care was owed in respect of loans later made by Hillsdown to the companies, because the auditors did not know Hillsdown intended to use the reports for that purpose[46].

38. The decision in *Caparo* was reasonably controversial at the time, but more among specialists in the law of torts (because of the court's downgrading of foreseeability as a test for the duty of care) than among company lawyers. It does not seem to have produced pressure at that time from the investment community for a change in the law. This may have been because the effect of the decision was to confirm the existing understanding of the law that auditors (and, by extension, directors and the company itself) were not liable to investors at large (including investors who were existing shareholders in the company) in respect of negligent misstatements in companies' annual reports. On the other hand, the court also made it clear that liability could arise for auditors (and presumably others) where the financial statements were given to a known recipient for a specific purpose of which the auditors were aware and upon which the recipient had relied and acted to his detriment. The decision thus distinguished between liability to the market at large and liability in the context of a particular transaction to a particular claimant. In the former case the imposition of liability ran the risk, as was said by a US court many years ago, of 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'[47] In the latter case, where the auditors were asked to stand by the accounts in the context of a particular, known transaction, they could refuse to do so, negotiate terms for so doing, give the undertaking but disclaim any legal liability for it or

---

showed little enthusiasm for this argument; and a thorough-going governance analysis would seem to exclude sales as well as purchases on the grounds that both are investment, not governance, decisions.
[44] This proposition is set out more fully in the judgment of Lord Oliver in *Caparo* (above) at p. 589.
[45] [1994] 2 BCLC 492, CA.
[46] The outer limits of this type of argument are represented by the decision in *Morgan Crucible Co plc v Hill Samuel Bank & Co Ltd* [1991] Ch 295, CA, where the Court of Appeal refused to strike out a claim by a bidder, where the misstatement was alleged to be contained in a defence document issued by the target company in a hostile takeover, which, the court found, was intended to induce the bidder to raise its offer. The defendants were the target's then directors, auditors and investment bank advisers.
[47] *Per* Cardozo C J in *Ultramares Corp v Touch* (1931) 255 N Y 170, 179.

Exhibit 2
Page 97

accept liability. It is also to be noted that the *Caparo* decision has been followed, though not its precise reasoning, by both the High Court of Australia[48] and the Supreme Court of Canada[49].

39. <u>Summary</u>: the effect of the decision in *Caparo* was to leave undisturbed the law as summarised in paragraph 33 above, except where the defendant knew that a particular person was likely to use the statement in the context of a particular class of transaction of which the defendant was aware or ought to have been.

### (c) The Impact of the Transparency Directive

40. In 2004 the European Community adopted Directive 2004/109/EC, the Transparency Directive, whose provisions we outlined in paragraphs 14ff. The periodic disclosures required were annual financial reports, half-yearly reports and interim management statements. Despite the fact that these reports were not selling documents, a concern was raised by some corporate lawyers in major law firms that the Directive would undermine the principle laid down in the *Caparo* case. This fear was not based on any explicit provision in the Directive which required Member States to make issuers or directors or advisers liable to investors in respect of losses suffered as a result of trading decisions taken on the basis of negligent misstatements in periodical reports, because the Directive contains no such explicit requirement. On liability, Article 7 of the Directive requires Member States to apply their existing liability regimes to misstatements in the disclosures required by it, rather than to create new ones. The fear was that the British courts (influenced, perhaps, by the European Court of Justice) would interpret the common law in the future differently from the way it had been interpreted in *Caparo* because of the rationale which appeared to underlie the Directive's mandatory disclosure requirements.

41. More precisely, it was said that the Directive's disclosure requirements seemed to be animated by a theory of investor protection, not a theory of directors giving a stewardship report to their shareholders. This was deduced from the broad statements in the Directive's recitals about its animating purpose. If the courts did come to accept that the purpose of periodical disclosures was investor protection, the narrower version of the claimants' argument, set out in paragraph 36 above, might be accepted by the courts, thus ushering in issuer and director liability to shareholders in respect of their investment decisions.[50] Indeed, by the same token, the wider version of the claimants' argument might be accepted, ie that the periodic disclosure documents created a link between issuer and investors, whether they were shareholders or not.

42. It is difficult to estimate the size of the risk to the *Caparo* decision which the Transparency Directive represented. The drafting of the Directive, especially of its Article 7, was altered to some extent as a result of British representations during the Community legislative process, but the broad language in the recitals remained. Thus, recital 1 says that 'the disclosure of accurate, comprehensive and timely information about security issuers builds sustained investor confidence

---

[48] *Esanda Finance Corp Ltd v Peat Marwick Hungerfords* (1997) 188 CLR 241.
[49] *Hercules Managements Ltd v Ernst & Young* (1997) 146 DLR (4th) 577.
[50] The arguments are set out in House of Lords, European Union Committee, 15th Report of Session 2003-04, *Directors' and Auditors' Liability*, HL Paper 89, May 2004.

Exhibit 2
Page 98

and allows an informed assessment of their business performance and assets. This enhances both investor protection and market efficiency.'[51] Those who feared for the future of *Caparo* argued in essence that the common law had so firmly tied itself to the notion that the purpose of the disclosures determines the availability of a civil action that a change in the purpose of the disclosures (by the Directive) would enlarge the scope of liability at common law, even though the Directive did not intend to bring this change about.[52]

43.   The contrary argument would be that the policy arguments against imposing liability in negligence to investors at large (for example, the indeterminate liability point) would remain as strong as they had previously been regarded, despite the change in the purpose of the disclosures. The purpose of the disclosure may be to inform investors but it is a separate question whether that purpose is to be sanctioned by private actions in damages in addition to public enforcement. Mr Justice Hoffmann (Lord Hoffman as he now is) – a distinguished company law judge - has expressed the view that discussing whether a duty of care exists 'solely in terms of the knowledge, intentions and purposes of the parties' constitutes recourse to 'an impoverished set of concepts.'[53] The Canadian Supreme Court in *Hercules Managements*,[54] whilst coming to the same result as in the *Caparo* case, put most of its emphasis on the policy arguments against imposing liability and only lightly referred to the 'purpose' argument.

44.   On the other hand, it is arguably unfair to present the arguments of those who see a risk to *Caparo* as based on a narrow and technical interpretation of the word 'purpose'. One effect, it can be said, of the Financial Services Action Plan is to place company disclosures in an entirely new context, ie a securities market in addition to a corporate governance context. This involves a strategic shift in the role of corporate disclosures to which, over time, the courts are likely to respond. The force of this argument can be seen particularly in relation to those ad hoc disclosures where there is no internal corporate equivalent, for example, disclosures of inside information. The immediate release of inside information by the company seems to be based wholly on a market-protecting rationale rather than one linked to the company's corporate governance. It can also be argued that the requirement for periodic reporting more frequently than annually – and especially the requirement for quarterly interim statements – makes less sense from a governance perspective, because there is no necessary link to a shareholder meeting, than from a market-protecting perspective.

45.   <u>The best conclusion</u> about the danger to the common law rule from the Directive is probably that arrived at by the House of Lords' European Committee: that the arguments of those worried about the impact of the Directive on the common law were not 'without foundation.'[55]

---

[51] See also recitals 2, 5, 6 and 7. The argument is set out persuasively by Lachlan Burn, 'Only connect--the importance of considering disclosure requirements in the light of their legal consequences' (2007) 2 *Capital Markets Law Journal* 41.

[52] On the use of recitals to interpret a Directive see the Opinion of Advocate General Mazak in Case C-411/05, *Félix Palacios de la Villa v Cortefiel Servicios SA* (not yet reported) and R *(Amicus) v Secretary of State for Trade and Industry* [2004] IRLR 430 at [158] (Richards J).

[53] *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1991] 1 BCLC 18 at 21. His actual decision in the case was overruled by the Court of Appeal.

[54] Above n 49.

[55] Above n 50 at para. 22.

Exhibit 2
Page 99

### (d) The Government's response: section 90A of FSMA 2000

46.    The Government took the opportunity of using the Companies Act 2006, Part 43 which transposes the Directive into domestic law, to address the fears that had arisen about the common law. This was done in what is now section 90A of FSMA 2000, inserted by section 1270 of the Companies Act 2006 – see Annex A. This section introduces a statutory regime for liability in respect of 'any reports and statements published in response to a requirement imposed by a provision implementing Articles 4, 5 or 6 of the transparency obligations directive and any preliminary statement made in advance of' the annual report, in so far as the preliminary announcement contains information intended to appear in substantially the same form in the annual report.[56] Since the section is bounded by the scope of the Transparency Directive, it applies only to securities traded on a regulated market (and so not to AIM companies). Within its scope, this statutory liability regime replaces common law liability. However, the concepts it uses to define liability are clearly drawn from the common law.

47.    It is crucial to note that that the section has two objectives, one of which relates to the prior common law of negligence and the other to the prior common law of deceit. As far as negligence liability is concerned, the statute confirms the prior common law situation of no liability. As far as deceit is concerned, the approach of the statute is also essentially confirmatory, but it makes some adjustments to the prior law so as to make it effective in the context of periodic disclosures.

<u>(i) Negligent statements</u>

48.    The section imposes liability on the issuer for fraudulent misstatements but then provides that, apart from this, no one is liable for loss resulting from reliance by any person (including therefore investors, whether shareholders or not) on an untrue or misleading statement in or the omission of information from the documents to which the section applies.[57] Amongst other things, this excludes liability for negligence on the part of the issuer, its directors or advisers. In this way, the section can be said to confirm the *Caparo* decision and so, as far as the law of negligence is concerned, it does not seek to alter the prior law.

49.    Three limitations on this exclusion of negligence liability should be noted. First, despite views apparently held in some circles to the contrary, I do not read the section as intended to take away liability where statements accepting responsibility for the accuracy of a document are made outside the company's reporting processes. In the case discussed in paragraph 37 it is suggested that Hillsdown would be able to rely under the statutory regime on the explicit or implicit statement made to it by the auditors that the financial statements were accurate. This would be a statement outside the scope of the section which applies only to misstatements or omissions in the reports required to be produced by the Transparency Directive or in the prelims. Since the risk to which the section is addressed is that investors at large could sue in negligence and that none of the policy issues against such liability apply where the defendant assumes responsibility for the accuracy of the statements to the particular claimant in

---

[56] S.90A(1).
[57] S.90A(6).

Exhibit 2
Page 100

respect of a particular transaction, it would be surprising if the courts accepted that the section had a broader effect.

50.    If this view is correct, common law liability in negligence might have some marginal relevance for discussions between company representatives and analysts in the wake of annual reports. However, it should be made clear that merely repeating what is said in the annual reports, even with some gloss, to a group of people is far from accepting legal responsibility for what those people may subsequently do with the information. There are many cases in which auditors have talked to particular parties about proposed transactions without being found by the court to have accepted responsibility for the accuracy of the financial reports for the purpose of the transactions which are subsequently effected.[58]

51.    Second, the section preserves liability at common law *to* the issuer.[59] So, advisers will continue to be liable in contract or tort to the issuer for the negligent performance of their duties, subject, however, to the terms of their contract, including whatever limits on liability auditors may negotiate under the new provisions of the Companies Act 2006. However, the liability of directors in negligence to their companies in respect of the directors' report and the directors' remuneration report (and any summary financial statement derived from them) is excluded by section 463 of the 2006 Act, in order to encourage more open, meaningful and forward-looking narrative reporting. Unlike section 90A of FSMA, section 463 of the CA 2006 does represent a change in the law, so far as the negligence liability of directors to their companies is concerned.[60]

52.    Third, section 90A applies only to civil liability under the general law, but not to liability to penalties imposed by the FSA, to criminal liability or liability under a restitution order made under sections 382 and 384 of FSMA. In short, the public enforcement regime is left untouched by the section.[61]

(ii) Intentional or reckless statements

53.    The major exception to the principle of non-liability stated in section 90A(6) is that the issuer can be liable if it makes a statement in the documents to which the section applies which it knows to be untrue or misleading or is reckless whether that is the case or, in the case of an omission of a required matter, if it knew the omission was 'a dishonest concealment of a material fact.'[62] Only the issuer can be liable to investors under this provision, not directors or advisers. However, a company can only know things if the knowledge of human beings is attributed to it, and the section treats those 'discharging managerial responsibilities' as the relevant persons. Normally, this will be the directors.[63] Thus, the section will normally focus on the knowledge, recklessness or dishonesty of the directors, but

---

[58] See, for example, *Peach Publishing Ltd v Slater & Co* [1998] BCC 139, CA.; *James McNaughton Papers Group Ltd v Hicks, Anderson & Co* [1991] BCLC 163, CA.

[59] S.90A(6)(b).

[60] For an account of the development of the Directive's liability provisions during the Community legislative process see E Ferran, *Building an EU Securities Market* (Cambridge: CUP, 2004) pp. 188-193.

[61] See Case C-97/96, *Daihatsu Deutschland* ([1998] E C R I-6843), holding that the purpose of the requirement in the First Company Law Directive that companies' accounts be publicly available was broader than the protection of members' and creditors' interests and was to enable any 'interested person' to inform themselves about the company's financial information.

[62] S. 90A(4).

[63] S. 90A(9).

Exhibit 2
Page 101

for the purposes of making the issuer liable to investors, not the directors. Directors, however, will be liable to the company. Section 463 of the Companies Act 2006 does not protect the director from this liability where the director knows of the untruth of the statement or is reckless with regard to its truth or acts dishonestly in relation to an omission. Thus, the director might have to reimburse the company for the loss suffered by the company in compensating the investor, but the decision to seek recovery from the director would be a decision to be taken by or on behalf of the company.

54.   The liability on the part of the issuer is to anyone (so, to any investor, whether already a shareholder or not) who acquires securities and suffers loss as a result of the misstatement or omission, where that person relied on the information at a time when it was reasonable for him to do so. This statutory liability is clearly modelled on the common law tort of deceit. In two ways it goes beyond the common law, however. First, although the claimant will recover only if he in fact relied on the publication and that reliance must be reasonable, it is not required that the issuer should have intended the claimant to rely on the publication. The requirement of intention on the part of the issuer as to the reliance by the claimant on the publication made the common law tort of deceit of only marginal relevance to misstatements in periodic reports, as contrasted with prospectuses, where such intention was easy to show. Second, the liability of the issuer is applied to pure omissions from the publication, whereas the common law applied only to omissions which rendered what was said misleading. However, it is to be noted that in the case of omissions, it is not enough that the omission was intentional or reckless, it must amount to a 'dishonest concealment.' Without these two changes from the common law of deceit, it is arguable that the liability for intentional misstatements created by the section would have been meaningless in practice. For that reason, it can be argued that, without these changes, the United Kingdom would have been in breach of its obligation under Article 7 of the Directive and under the general requirements of Community law to have an effective civil liability regime in place for Transparency Directive disclosures. Although Article 7 merely requires Member States to extend their civil liability regimes to the disclosures required by the Directive, it is strongly arguable that this does require the Member State to have some liability regime to be extended. On this basis, it would not constitute compliance with Community law for a Member State to say that it had no liability regime or a liability regime which in practice was wholly ineffective.[64]

55.   On the other hand, the statutory regime retains two features of the common law of deceit which restrict its impact. First, and most important, the claimant can succeed only if it relied on the publication. As we have seen above in para 27, the statutory prospectus liability regime does not require reliance. It adopts a 'fraud on the market' theory. If the misstatement in the prospectus affected the market price of the securities, that is enough, even though the claimant may not have known of the misstatement. Section 90A by contrast, by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken. Second, the defendant's reliance on the publication is required to have been reasonable. Thus, a claimant might not

---

[64] *Cf* Cases C-382/92 and C-383/92, *Commission v United Kingdom* [1994] ICR 664.

Exhibit 2
Page 102

succeed under the section if it had some available way of checking the publication but chose not to use it.

56.    Finally, it should be noted that the regime based on intentional or reckless misstatements operates only in respect of those who acquire securities, and not in favour of those who sell or hold securities.[65] This restriction was criticised by many to whom I talked.

---

57.    <u>Summary</u>: Within its scope of operation, the statutory regime introduced by section 90A of FSMA adopted the prior common law by excluding liability in negligence to investors at large. It also adopted the prior common law on deceit and applied it to issuers (but only them) and in favour of acquirers of securities (but only them). The deceit rules are adopted under the statutory regime with two extensions: to bring in pure omissions and to remove the need to prove the issuer intended the claimant to rely on the publication. Overall, the new statutory regime confirms the prior law and, where it does change it, does so in favour of investors (though the changes can be argued to be marginal). What appears clearly to be the case is that section 90A did not deprive investors of rights to sue on grounds of negligence which they previously held at common law.

---

**Sanctions for misstatements in the hands of public bodies**

58.    Public enforcement of the disclosure rules is largely, though not wholly, in the hands of the FSA.[66] It is probably not necessary to deal specifically with the FSA's sanctions for breach of the prospectus rules and so attention will focus on the periodic and ad hoc disclosure rules.

59.    As we have seen, the FSA has been given the power under Part VI of the FSMA 2000 (as amended) to make rules – the Disclosure and Transparency Rules (DTR) – to implement the MAD and TD, and the rules so made constitute an important element in the FSA's 'Part 6 rules.' As far as both the Disclosure and the Transparency Rules are concerned, 'an issuer must take all reasonable care to ensure that any information it notifies to a RIS is not misleading, false or deceptive and does not omit anything likely to affect the import of the information.'[67] Thus, the DTR adopt a negligence standard for compliance with their requirements. An issuer which fails to comply with any obligation imposed on it by the DTR (including the due care requirements) is liable to a penalty to be imposed by the FSA.[68] Although the due care obligation is imposed only on the issuer, section 91(2) of FSMA 2000 also makes liable to a penalty a director of the issuer 'who was knowingly concerned in the contravention' of the DTR. This appears to mean that if a director knows that the issuer has failed to take due care to establish the accuracy of the statement, he or she will be liable to a penalty as well. Instead of a penalty, the FSA may issue a statement of censure. Action for breach of the DTR is subject to a limitation period of two years.

---

[65] S 90A(3).
[66] The Financial Reporting Review Panel plays an important and recently expanded role in monitoring companies' compliance with reporting standards.
[67] See DTR 1.3.4 for the Disclosure Rules and DTR 1A.3.2 for the Transparency Rules.
[68] FSMA 2000, s. 91(1ZA) for the disclosure rules and s. 91(1B) for the Transparency Rules.

Exhibit 2
Page 103

60. In addition to the civil penalty regime, the FSA possesses powers to apply to the High Court (or Court of Session in Scotland) for an order in respect of a person who has infringed the Part VI rules and has made a profit as a result of the contravention or where the contravention has caused other persons' loss. The court order will require an amount it considers just (having regard to the profit made or loss suffered) to be paid to the FSA, for distribution to persons who appear to the court to have suffered loss or to whom the profits are attributable.[69] The FSA also has the power to apply to the court for an injunction to restrain anticipated or repeated breaches of the requirements.[70]

61. Finally, it should be noted that disclosure of misleading information or non-disclosure of information may constitute market abuse under section 118 of FSMA 2000, notably market abuse in the shape of behaviour 'likely to be regarded by a regular user of the market as a failure on the part of the person concerned to observe the standard of behaviour reasonably expected of a person in his position in relation to the market.' Conduct constituting market abuse triggers independent penalty-imposing powers,[71] but a penalty may not be imposed by the FSA on a person who believed on reasonable grounds that his behaviour did not constitute market abuse or who took 'all reasonable precautions and exercised all due diligence' to avoid acting in a way which constituted market abuse. Since the market abuse prohibition applies to 'any person', it is not confined to issuers. It also carries with it restitution and injunctive relief powers.[72]

62. Finally, the FSA has the power to bring criminal prosecutions for some offences, of which the most important for our purposes is that contained in section 387(1) and (2) of FSMA 2000. Under this section an offence is committed by a person who makes a statement (broadly defined) which he knows to be misleading, false or deceptive in a material particular or is reckless as to whether it is so, and does so for the purpose of inducing another to take an investment decision (broadly put) or is reckless whether it has that effect. The section also applies to dishonest concealment of material facts.[73]

63. Turning to the FSA's exercise of its powers, it is clearly reluctant to use its restitution seeking powers other than in relation to consumers. In its enforcement Handbook the FSA states: 'The number of instances in which the FSA might consider using its powers to obtain restitution for market counterparties are likely to be limited.'[74] I could find no case in which the FSA had used its restitution powers in the class of case being considered in the Review. This may well represent an appropriate allocation by the FSA of its limited resources. However, this policy on the part of the FSA does have significance for the view put forward by some respondents, namely, that compensatory actions brought at the initiative of the public authority might (a) solve the funding problems of private litigation and (b) provide a filter, so that

---

[69] S. 382 of FSMA. Under s. 384 the FSA may make such an order itself in relation to authorised persons, but that is not likely to be relevant in the situations we are discussing.
[70] S. 380.
[71] FSMA 2000, s. 123.
[72] Ss. 381 and 383.
[73] S 397(3) creates a criminal liability for market abuse.
[74] ENF 9.3.2.

28    Davies Review of Issuer Liability: A discussion paper

Exhibit 2
Page 104

unmeritorious claims were not brought. This is not a realistic possibility on the FSA's current view of how best to deploy its efforts.

64.   As for the FSA's use of its penalty and censure powers, as far as I could establish the recent history of their use is as set out in Table 1 (see Appendices) in respect of the disclosures with which I am concerned. It should be remembered that the TD powers were acquired by the FSA only at the beginning of 2007 and so were not available in the period covered by the table, but, of course, there were periodic disclosure requirements in the Listing Rules before they were transferred to the Transparency Rules.

65.   *Table 1:* Two points perhaps emerge from the table. First, the focus of the FSA has been on delayed announcements. Six of the nine cases were based on this complaint alone or together with some other complaint. Under the then applicable version of the FSA's rules the requirements for disclosure 'without delay' of developments or information relating to the company which were likely to have a substantial impact on the price of its securities were contained in LR 9.1 and 9.2. The equivalent today is to be found in DTR 2.2.[75] Second, this is a relatively modest level of public enforcement activity. That the FSA should have made little use of its criminal enforcement powers is not surprising, given the difficulty of proving the elements of intention or recklessness to the required criminal standard of proof.[76] Even so, eight sets of penalties or censures imposed over a period of four years might not seem a high level of enforcement, even though the penalty imposed in the case of Shell was very large in absolute terms – though perhaps less so in comparison with the turnover of that issuer.

66.   The FSA's powers under the DTR in relation to periodic and ad hoc reporting apply only to issuers whose shares are admitted to trading on a *regulated* market. Thus, they do not apply to AIM or Plus-listed companies. However, the FSA's powers in relation to market abuse apply to securities admitted to trading on a *prescribed* market,[77] thus including AIM and Plus, whilst the criminal prohibitions in section 397 of FSMA 2000 also apply beyond regulated markets.[78] Through its market abuse powers in particular, the FSA has some supervisory jurisdiction over misleading ad hoc statements issued by AIM-listed companies. However, the main responsibility for supervision in relation to all types of statement made to the market by AIM companies lies with the London Stock Exchange, which has delegated that responsibility on a day-to-day basis to the 'Nominated Adviser'

---

[75] LR 9.3A required reasonable care to avoid misleading, false or deceptive statements being put out through a RIS. For the current requirements to take care as at present see n. 65.

[76] However, its one prosecution under s 397 of FSMA 2000 was reasonably successful. In the prosecutions of Rigby and Bailey, directors of AIT, the FSA secured custodial sentences and also compensation orders against the defendants, the compensation orders apparently being made under the Powers of the Criminal Courts Act 1973. About £340,000 was ordered to be paid by way of compensation to investors who had bought shares on the basis of the misleading statements, about £120,000 being payable to Standard Life and £200,000 to Morley Fund Management. The Court of Appeal took some of the shine off the FSA's initial success, first by reducing the length of the directors' sentences – though it did uphold custodial sentences (*R v Bailey and Rigby* [2006] 2 Cr App Rep (S) 36) - and, second, by defeating the FSA's attempted use of the confiscation powers under Part VI of Criminal Justice Act 1988 (*Rigby and Bailey v R* [2006] 1 W L R 3067) to deprive the directors of the gains they had made from the misleading statements as well as requiring them to pay compensation those investors who had been harmed. For the FSA's summary of this case see: http://www.fsa.gov.uk/pages/Library/Communication/PR/2005/120.shtml.

[77] FSMA 2000, s 118(1).

[78] Financial Services and Markets Act 2000 (Misleading Statements and Practices) Order 2001/3645.

Exhibit 2
Page 105

(Nomad), which all AIM-listed companies are required to have at all times. Indeed, if an AIM-listed company ceases for whatever reason any longer to have a Nomad, its shares will suspended; and if a fresh Nomad is not appointed within a further month, its AIM listing is cancelled.[79] The LSE supervision system clearly places considerable weight on the proper discharge of their functions by the Nomad; and Nomads translate the obligations laid upon them into their contracts with their companies. During the course of the review there was some public discussion of the overall quality of the supervision provided by Nomads, which was triggered by the LSE's proposal, now implemented, to produce for the first time a rulebook for Nomads, as a way of setting out best practice.[80] Rule 17 of that rulebook states in general terms: 'The nominated adviser is responsible to the Exchange for advising and guiding an AIM company on its responsibilities under the AIM Rules for Companies both in respect of its admission and its continuing obligations on an ongoing basis. A nominated adviser must be available to advise and guide AIM companies for which it acts at all times.'

## II. The nature of the problem

67.  As will be clear from the lengthy discussion above, one very substantial difficulty in discussing the possible extension of section 90A of FSMA is that it is not a section which can be understood as a free-standing provision. Its significance can be evaluated only in the context of the prior common law, whose future development is itself the subject of uncertainty and debate. Very few incontrovertible statements can be made about it. However, among the people to whom I talked, there were two distinct approaches to the issues which could be identified.

68.  One approach was to start from the axiom that the prior common law expressed an appropriate policy stance – essentially one of very limited liability in damages to investors – and that the objective should be to preserve that position. The majority of people taking this stance were of the view (a) that section 90A was necessary to preserve the common law position but (b) that it did not do enough to secure that result and ought to be extended so as to cover misstatements made in other classes of document. Some, however, were sceptical as to whether the common law was at risk from developments in Community law and so thought section 90A unnecessary or opposed its further extension.

69.  A second set of respondents (which included some from the first set) were more at ease in discussing an appropriate liability regime in principle rather than the intricacies of section 90A or the common law. For them, the legal mechanism whereby the appropriate result was to be achieved was less important than defining that result. They accepted that the substantial extension of corporate disclosure requirements to the market had given rise to a serious issue which needed to be addressed. However, a range of views was expressed as to what the balance should be. Whilst it would be far beyond my terms of reference to devise a comprehensive liability regime for market disclosures, I agree with these

---

[79] London Stock Exchange, *AIM Rules for Companies*, February 2007, Rule 1.
[80] London Stock Exchange, *AIM Rules for Nominated Advisers*, February 2007.

Exhibit 2
Page 106

respondents that possible reforms to section 90A cannot be evaluated in the absence of a sense of the appropriate policy balance in this area.

**Negligence or fraud?**

70.   Irrespective of the range of documents covered by any statutory liability regime, a central question is whether the trigger for liability should be negligence or fraud (meaning intention or recklessness). Should there be liability for misstatements in corporate disclosures even if those making the statements honestly (but carelessly) believed them to be true? As we have seen, historically this has been the central question for the common law, and section 90A confirms the current common law position of no liability to investors for honestly held, even if negligent, statements.

71.   There was a widespread (but not unanimous) agreement amongst those I talked to about the desirability of excluding liability for negligence. Even investor groups were generally cautious about the wisdom of imposing liability for negligence, though they were naturally amongst those who were more open to persuasion as to the potential advantages of such liability. An argument in favour of negligence liability for periodic and ad hoc statements can be made from the fact that, for over a century, such a rule has operated for prospectuses, in an apparently acceptable way. The overwhelming response of respondents to the notion that the prospectus standard should be applied to other disclosures, however, was that it would be very costly and in some cases impracticable. It was accepted that the standard of accuracy in prospectuses was high and that this could be attributed in part to the imposition of a negligence standard. However, it was pointed out that the verification process to which prospectuses are subject is both costly and time-consuming. It was not thought that the benefits of imposing this standard for civil liability beyond prospectuses would outweigh the costs. As for annual statements PwC, which was already investigating this issue, provided me with an estimate that a prospectus-type verification approach to annual statements would increase the audit costs by a fifth and that a similar further increase would be generated by additional legal work which would be involved.

72.   However, respondents did not view the costs of a negligence regime solely or even mainly in terms of financial costs to the issuer of providing a higher degree of verification. They were concerned that a negligence standard might reduce the incentives to timely and full disclosure of information to the market, even if the level of accuracy of the information actually disclosed improved. In the case of ad hoc disclosures, it was thought that there would be a cost in slowing down information release (contrary to the thrust of the MAD), even if the negligence standard (of *reasonable* care) might be expected to be less demanding for an ad hoc disclosure than a prospectus or periodic disclosure, which could be planned for in advance to some extent. Whilst some theories might hold that a reasonable care standard would cause the maker of a statement to spend resources on checking the statement up to the point where the cost of the checking exceeded the expected benefits from reduced liability resulting from the checks, this assumes that the maker of the statement has no control over what is said, only over the amount of checking which occurs before the statement is made. Whilst this might be true of some corporate disclosures, in respect of many corporate

disclosures the law can require that a statement be made but not determine how detailed it should be. Respondents, including investor groups, were concerned that liability to the market for negligent misstatement might induce less useful disclosures, so that the overall benefit to investors of such a rule might be slight or negative. Investors in some circumstances would be able to recover losses suffered as a result of relying on inaccurate disclosures, but investors as a whole would suffer from having less information in the market.

73.    On the other hand, when faced explicitly with the question whether they thought the reputation of public securities markets in the United Kingdom would be enhanced if there were no realistic possibility for investors who had been misled by intentionally or recklessly misleading corporate statements to obtain recovery for their losses, no respondent was prepared to give a positive answer. To permit fraudulent statements, it was generally agreed, would have a particularly corrosive effect on market confidence. Moreover, many of the costs of negligence liability do not arise in relation to statements not honestly believed to be true. A person does not have to engage in extensive verification to know whether he or she honestly believes something to be true (as opposed to checking whether it is actually true), whilst it is easy to avoid saying things not believed to be true, without this caution spilling over into statements honestly believed to be true. Some respondents were concerned that the meaning of 'reckless' should be tightly defined, as it is in the current tort of deceit, but all those with whom I discussed the proposition accepted, hardly surprisingly, that a market in which losses caused by fraud could not be recovered would not be attractive to investors or, in turn, to issuers.

74.    It is also worth noting the experience of other countries. In both the United States and Germany legislators have refrained from introducing liability to investors based on the simple negligence of issuers and others. It is particularly important to note this feature of the US federal law, given the prominence which that law has achieved in recent public debates about securities markets. As we noted in para 29, when it imposed civil liabilities for disclosures outside the area of prospectuses, the US legislator retreated to a test of intention: the maker of the statement would escape liability if he could show that he had no knowledge that the statement was false or misleading – usually referred to as the 'scienter' requirement.[81] In fact, private civil actions tend to be brought in the US under section 10(b) of the 1934 Act and Rule 10(b)(5) made under it, although this section appears to give rise to no private right of action. When the courts interpreted the section so as to provide this right, they too adopted a scienter standard.[82] In fact, the standard adopted was more than the making of a knowingly false statement with intention that it be relied upon: there was required to be an intention to 'deceive, manipulate or defraud.' However, later cases have relaxed this standard so as to embrace 'recklessness'; and have then given recklessness a broader meaning than in the United Kingdom, so as to embrace 'an extreme departure from the standards of ordinary care.'[83]

---

[81] Securities Exchange Act 1934, sec. 18(a).

[82] *Ernst & Ernst v Hochfelder* 425 US 185 (1976).

[83] L. Loss and J. Seligman, *Fundamentals of Securities Regulation* (New York, NY: Aspen Publishers, 5th ed, 2004) at p. 1025.

Exhibit 2
Page 108

75.    In 2002 Germany reformed its Securities Trading Act (Wertpapierhandelsgesetz – WpHG) in the light of the collapse of companies quoted on the Neuer Markt, Germany's secondary market, launched in 1997 but closed in 2002. The aim was to introduce civil liability for ad hoc statements, the publication of inaccurate ad hoc reports by companies being perceived as having been a significant contributing factor to the collapse and investor losses. Section 37c (see WpHG in Annex B), which applies to all domestic German stock exchanges, imposes such civil liability (though only on issuers) but provides that: 'Those issuers who can prove that they were not aware of the inaccuracy of the inside information and that such lack of awareness does not constitute an act of gross negligence shall not be liable for damages pursuant to subsection (1).'[84] The recent German law thus tracks the modern understanding of the scienter requirement in US law.

76.    It might thus be concluded that to introduce liability to investors for ordinary negligence would be a step further than either the US legislator and courts or the German legislator have been prepared to contemplate. On the other hand, both systems are prepared to contemplate a meaning for 'recklessness' which includes some cases of negligence, ie where the belief is honestly held but on very unreasonable grounds. By contrast, in the English law of deceit an honest belief in the truth of a statement defeats a claim of recklessness, no matter how unreasonable the belief.[85] Consequently, a half-way house between liability for fraud and liability for negligence might be liabilty for gross negligence. However, it is difficult to know what legislating for such a standard in the UK would involve, since 'gross negligence' is not an established term in English civil law, though it is used in some parts of the criminal law.

77.    Despite the general caution about introducing liability to investors for negligent misstatement – a view which is supportive of this aspect of section 90A – there was one view put to me which went in the other direction. This was that uncertainty as to what impact the TD had on the *Caparo* decision was actually desirable. On the one hand, because issuers and directors thought they might be liable, they would take care over announcements. On the other, because it was not clear that they were, there would be a disincentive to investors to litigate. This situation represented the best of all possible worlds. Consequently, the common law operated satisfactorily and section 90A should not have been adopted and should certainly not be extended. This is a particularly sophisticated analysis. Two points can be made about it. First, it is far from clear that it is sustainable in the long run or even the medium term, since at some point the legal position at common law would be tested in the courts and the beneficial consequences of uncertainty, if such they are, destroyed. Second, it is not clear that the costs of negligence liability referred to above depend heavily on the level of litigation. The costs referred to by respondents were the costs of the steps needed to be taken to avoid litigation, whether by way of extra verification or less useful disclosure. Either issuers and directors believe that such liability is a significant risk, in which case those costs will be incurred, or they do not, in which case the possibility of liability in negligence has no purchase on their actions. My impression is that the advice being tendered by the leading

---

[84] Articles 37b and c are set out in the Annex.
[85] John Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (London: Sweet & Maxwell, 2nd ed., 2007) para. 5.14.

Exhibit 2
Page 109

commercial firms is that the risk exists and so the costs of negligence liability are being incurred.

**Question 1:**
What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liaiblity in the British context? Is fraud an appropriate basis for liability?

**The range of disclosures to be covered**

78. The current statutory regime in section 90A of FSMA 2000 applies only to 'statements published in response to requirement imposed by' Articles 4 to 6 of the TD or to material in prelims which will appear in the annual financial report in substantially the same form. Thus, it does not apply to ad hoc disclosures, in particular to disclosures of inside information required by Article 6 of MAD. A central issue for the Review is whether the statutory regime should be extended to ad hoc disclosures.

79. A number of respondents were of the view that there should be no extension. However, those who took this view were generally sceptical of the need for having section 90A in any event and who therefore thought that there was no need to extend it and some disadvantage in doing so, since a new statutory provision inevitably created some uncertainty as people worked out its implications for them.

80. The contrary argument was that it was impossible in practice to draw a firm line between ad hoc and periodic disclosures, since some ad hoc disclosures will have to be repeated in periodic statements. To remove the risk of negligence-based liability only for periodic statements whiles leaving open the possibility that the courts might impose negligence liability at common law for ad hoc statements did not constitute a rational way of proceeding.[86] Moreover, it could be argued that the risk to the common law regime as it applies to MAD disclosures is at least as great as that from the TD, because MAD, like the TD, adopts in its recitals a market protecting rationale for its provisions, including the requirement for the disclosure of inside information by issuers. In fact, it can be argued that the risk to the common law regime is somewhat greater for MAD disclosures, since there is no company law equivalent to the MAD requirement that inside information be disclosed. Whereas the periodic reporting requirements have their historical origins in the companies' legislation requirements for reporting to shareholders and are still partly regulated in that legislation, the requirement for ad hoc disclosure of inside information is unrelated to governance by shareholders but rather is linked to informing investors.[87] A court applying the common law of negligent misstatement might still be convinced by policy arguments against imposing liability in damages (especially the point about the indeterminacy of the liability) but it would not have at its disposal the comforting rationale for non-

---

[86] See in particular Financial Markets Law Committee, *Legal assessment of the proposed statutory liability regime in the Companies Bill in relation to Transparency Obligations Directive disclosure*, September 2006.

[87] As the DTR implementing the MAD requirement put it, 'the purpose of this chapter is to promote prompt and fair disclosure of relevant information to the market.' (DTR 2.1.3)

Exhibit 2
Page 110

liability that the purpose of the disclosure requirement was to promote shareholder governance.

81.　Looking at the matter more broadly, it can be said that it would be undesirable to have a liability regime for ad hoc statements (permitting negligence actions) which was more expansive than that for periodic statements (excluding negligence). This is because periodic statements can be planned for to some degree, whereas the triggers for ad hoc statements are often (though not always) events of which the company has little notice. Given the emphasis in the FSA's rules and practice on immediate disclosure of the information to the market (with only limited reasons for delay being acceptable), the risk of an issuer falling below the required standard of care in relation to an ad hoc statement is higher than in relation to a periodic statement. Whilst it is true that the standard of *reasonable* care would adjust to a degree to take account of the pressures on the issuer to communicate quickly to the market, the risk of a court holding ex post that the issuer should have picked up an inaccuracy in the statement remains greater in relation to ad hoc statements than in relation to periodic statements.

82.　The extension of the statutory regime to ad hoc disclosures also needs to be viewed from the standpoint, not only of the protection it would afford against negligence liability, but also of the liability it would impose for fraudulent misstatements. None of the respondents I reported above as being in favour of, or at least not opposed to, the imposition of liability for fraud sought to draw an 'in principle' distinction between fraudulent statements in periodic and ad hoc reports. The anti-fraud argument thus constitutes a reason for extending section 90A to ad hoc statements. If it is bad for the reputation of a share market for investors to be left without compensation for fraudulent misstatements in periodic reports, that must equally be the case for ad hoc statements. Indeed, as the German experience suggests, the risk of misleading statements is greater in the latter case, since the issuer may put out an ad hoc statement at any time.

**Question 2:**
Should the statutory regime should be extended in principle to ad hoc statements?

**Particular issues about liability for fraudulent ad hoc statements**

*(i) Delay*

83.　However, respondents, who were in favour of the extension of section 90A, raised a couple of very important issues about the scope of such an extension. One was the question of how section 90A would operate in relation to ad hoc statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules. This was a significant problem because the FSA's rules were thought to be very demanding about the promptness of the required disclosure and to provide few reasons for non-disclosure.[88] We have also noted that the FSA's public enforcement action has focussed heavily on delayed disclosure. It should be noted, however, that the

---

[88] See DTR 2.2.9 (inside information to be disclosed as soon as possible) and 2.5 (especially 2.5.5) – unlikely to be circumstances in which delay justified other than in relation to negotiations whose outcome would be jeopardised by public disclosure.

German reforms do impose liability for delay in parallel terms to those used for inaccuracies. See WpHG section 37b in Annex B.

84.    Where a disclosure was delayed, it was pointed out, to impose liability only on the basis of intention would be no protection for issuers, because the decision to make the announcement at time $t_2$ rather than earlier time $t_1$ would often have been a deliberate one. Moreover, it would always be possible for claimants to argue that the disclosure should have been made somewhat earlier and, in the case of a heavily traded stock, the range of potential claimants could be quite large.

85.    Although section 90A goes beyond the common law by imposing liability for omissions, and late disclosure could be analysed as an omission (ie during the period between $t_1$ and $t_2$), it seems clear that the section does not cover this type of omission. The section contemplates liability only for omissions from the statement which is made ('omission from any such publication of any matter to be included in it')[89] rather than liability for failure to make any statement at all. Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication'[90] could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point.

86.    Most of those who raised this issue wanted to maintain the regime of no civil liability for late disclosure. It has to be said, however, that it is unattractive not to impose liability where an issuer deliberately withholds information in order to mislead the market and to create a false market in its securities. It is suggested that an appropriately narrow liability could be crafted in such a case. First, it is already the case under section 90A that, in relation to omissions, that a deliberate omission is not enough to lead to liability. There must be 'a dishonest concealment' of a material fact. There must be dishonesty as well as deliberateness, so that this test, applied to late disclosures, would not mean an issuer was liable simply because it decided to delay publication for a short period in order to check the accuracy of its proposed statement. Second, however, there is the issue of reliance. It is difficult to see how that requirement could be retained in the case of liability for late publication. An investor can hardly be said to rely on something of which he or she is not aware. However, a substitute for the reliance requirement in the case of late disclosure could perhaps be found by focussing on the purpose of the delay, ie that the purpose of the delay should be to mislead the market. This approach is adopted by section 397 of FSMA 2000 which imposes criminal liability for dishonest concealment of material facts 'whether in connection with a statement . . . or otherwise' but only where the purpose of the concealment is (under that section) the inducement of, broadly put, an investment decision.

87.    However, the criminal law does not have to answer an important question which a civil liability section would have to address: what losses would be subject to compensation in the case of dishonest delay? The core case is one in which the information when published is true, but it is late in arriving. When published, the

---

[89] S. 90A(3).
[90] S. 90A(5)(a).

Exhibit 2
Page 112

information may contain good news or bad news about the company. The absence of a reliance requirement would suggest that anyone who, in the case of good news, sold securities in the period between the point at which the information should have been disclosed and when it was disclosed should be compensated for the difference between the sale price and price that would have been paid, had the information been in the market. Similarly for purchases in the case of bad news. This rule would yield a large number of potential claimants. However, the frequency with which the rule would apply would be constrained by the requirement of dishonesty rather than just intention to delay.

**Question 3:**
Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?

*(ii) What is an ad hoc statement?*

88. Irrespective of whether civil liability is imposed for delay or only for inaccurate ad hoc statements, there is the question of what counts as an 'ad hoc statement'. This apparently innocuous question is in fact a very difficult one to answer precisely. The narrowest approach would be to focus only on the disclosures required by Article 6(1) of MAD, ie the disclosures of inside information. The rationale for this approach would be that it is in relation to this Article that the threat to the common law exclusion of negligence is at its strongest. One objection is that it is often difficult for companies to judge whether a particular piece of information is in fact inside information (normally because of unclarity about whether it price sensitive) and so companies may put out disclosures through a RIS which strictly they are not required to make. However, section 90A, it is suggested, already deals with this point, since it imposes the statutory regime in relation to 'reports and statements published in response to a requirement' imposed by Articles 4 to 6 of the TD. The formulation 'in response to a requirement' does not confine the statutory regime to statements required by the TD but extends it to statements put out where the issuer thinks it is arguable that disclosure is required. The same approach could be applied to disclosures under Article 6 of MAD.

89. However, nearly all non-lawyers and many lawyers did not think it attractive to confine any extended regime to disclosures of inside information under Article 6 of MAD. As is made clear in para 18ff above, there are many types of ad hoc disclosure which companies are now required to make. Article 6 itself is not confined to disclosure of inside information by the issuer. Article 6(4) requires those 'discharging managerial responsibilities' to notify their transactions in the shares (and other related financial instruments) of the issuer. As implemented in the DTR, the notification must be to the issuer which has to inform the market through the RIS of the information received.[91] Following Chapter III, Section 1 of the TD, a similar regime now applies to disclosures of major shareholdings in companies.[92] Both sets of provisions were previously in the companies legislation. There are additional ad hoc disclosure requirements in the Listing Rules, notably in relation to significant or related-party transactions.

---

[91] DTR 3.1.
[92] DTR 5.

Exhibit 2
Page 113

90.    Most respondents thought that it would be unattractive for issuers and their advisers to have different liability regimes applying to different classes of ad hoc disclosures. One popular suggestion, if there was to be an extension of the statutory regime, was to apply it to all announcements put out through a RIS. However, there are two objections to this approach. First, the Listing Rules (LR 10 and 11) require RIS announcements of significant and related-party transactions, but it is clear that the purpose of these announcements is as much to inform shareholders (whose prior consent to the transaction is often needed) as the market. In *Caparo* the court was concerned to preserve the negligence-based rights of shareholders in relation to the governance of the company. The scope of these rights may be unclear and their financial significance not large (in most, though not all, cases, losses to the shareholders will be indistinguishable from the losses to the company and the latter will take precedence) but it seems wrong in principle to reduce these rights. The extension of section 90A, in its present form, to this class of RIS announcement would exclude the liability of directors or the company itself to shareholders in respect of misstatements made to the shareholders in circulars seeking their approval. A slightly more restrictive approach might be to confine the definition of ad hoc statements to statements put out in response to requirements contained in the DTR, thus excluding the shareholder-oriented disclosures required by the LR.

91.    Second, it was argued by some people that the content of RIS announcements might be repeated in briefings and that liability might be based on the briefing rather than the RIS announcement. However, it is not clear that this is a good argument. Section 90A(6) imposes its principle of non-liability where there has been reliance on an untrue or misleading statement in a publication etc. Although it is clear that this principle applies where the claimant reads the document in question and relies on it, it would seem also to apply where the claimant obtains knowledge of the statement in some other way, ie where the information is repeated to him or her by someone else.

92.    Third, it was pointed out that companies release some types of information through press releases rather than a RIS. In principle, this was not thought to be a problem at present, because where the information is thought likely to be price sensitive, a RIS will be used. However, if a more favourable liability regime (from the issuer's point of view) is established for RIS announcements, there might be thought to be an incentive for issuers to use a RIS where it was inappropriate to do so.

93.    There is also a question about whether statements made in the course of takeover bids should be covered by the definition of an ad hoc disclosure. I am inclined to the view that they should not. They are essentially shareholder-regarding rather than market-regarding statements, and the common law, post *Caparo*, has already been applied to them.[93] There is also a hands-on public regulatory system in place in the shape of the Panel on Takeovers and Mergers.

**Question 4:**
If the statutory regime were to be extended to ad hoc announcements, should it be (a) confined to disclosures of inside information (the most pressing case), (b) applied to all

---

[93] See *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1991] 1 BCLC 18, CA and *Partco Group Ltd v Wragg* [2002] 2 BCLC 323, CA.

Exhibit 2
Page 114

RIS announcements or (c) confined to announcements made under the FSA's Disclosure and Transparency Rules (ie excluding ad hoc announcements made under the Listing Rules)?

**Application of the statutory regime to non-regulated markets**

94. Both the TD and the MAD apply only to securities admitted to trading on regulated markets. And section 90A is confined to regulated markets because it applies only to statements made in response to the TD requirements. It might seem, therefore, that the questions discussed in this paper have no relevance to non-regulated markets, such as AIM or Plus. However, as we have seen in paras 14 and 20, the rules of both markets require similar, if less demanding, periodic and ad hoc disclosures. Therefore, on both regulated and non-regulated markets, periodic and ad hoc statements will be made and so the question of the appropriate civil liability regime arises in both cases.

95. Both AIM and Plus pride themselves on their 'light touch' approach to regulation. In their view this has been an important element of the success of both markets, especially of AIM. However, the question of whether section 90A promotes or hinders a 'light touch' regulatory regime remains to be answered and the answer is not obvious. In order to address the question it is important to recall once again the twin effects of section 90A, relating to negligence, on the one hand, and fraud, on the other.

96. As far as negligence is concerned, the section applies the principle of non-liability. One might think that this principle is consistent with the 'light touch' approach. If section 90A continues not to apply to non-regulated markets, then those markets will continue to be regulated by the common law. It might be said that the *Caparo* decision shows that the common law principle is one of non-liability to investors and that the Directives constitute no threat to the common law in relation to non-regulated markets, because they do not apply to them. Consequently, non-regulated markets can continue to rely on the common law to exclude negligence liability in appropriate cases. However, the potential effect of section 90A (whether extended or not) upon the courts' perception of the appropriate liability at common law needs to be considered. A court might take the view that the legislature was prepared to confirm non-liability in negligence for the main market, because of the greater public controls to which it is subject, whilst not being prepared to do that for the non-regulated markets, so that it would be appropriate to modify *Caparo* in its application to the non-regulated markets. It is difficult to assess the weight of this argument about the 'spill over' effect of section 90A on the liability regime for the non-regulated market, but the extension of the statutory regime to non-regulated markets would bring clarity to the liability position.

97. The other effect of the application of section 90A to non-regulated markets is that it would make it clear that there could be civil liability for fraudulent statements. As stated above, no respondent claimed that the absence of liability for fraudulent misstatements would be reputation-enhancing for any securities market, and so it is not apparent that there is any inconsistency between a 'light touch' approach and making liability for fraudulent statements effective. In fact,

Exhibit 2
Page 115

making clear that such liability was effective might support steps currently being taken by the London Stock Exchange to increase the effectiveness of its regulation, for example, the introduction of a rulebook for Nomads and the devotion of greater resources on the part of the Exchange to monitoring the quality of Nomads' discharge of their functions.[94] A clear fraud-based liability might be thought to be supportive of the Nomads' work. A number of respondents also made the point that, in relation to deliberate and reckless misstatements, there should be a level playing field as between regulated and non-regulated markets, especially in the light of the movement of issuers between the two markets.

**Question 5:**
Should section 90A apply to non-regulated markets? Does your answer differ according to whether section 90A is extended to cover ad hoc statements?

### Defining the scope of liability for fraudulent misstatements

98. The thrust of this paper has been to propose the extension of the statutory regime in section 90A of FSMA 2000 for the twin purposes of (a) clarifying the absence of liability in damages for negligent statements and (b) modifying the common law liability for fraudulent misstatements so that it applies effectively to periodic and ad hoc disclosures. In respect of the second aim, a number of detailed issues arise, which are now discussed. In fact, those issues can be said to arise in relation to the existing section and so need consideration whether section 90A is extended or not.

### *(i) Priority as between investors and other unsecured creditors*

99. Section 90A imposes liability for fraudulent misstatements only on the issuer. If the company is insolvent, an issue arises as to whether the defrauded investors should be allowed to compete with the other unsecured creditors of the company for a share of the assets or whether the claims of the shareholders as creditors should be subordinated to the claims of the other unsecured creditors (mainly trade creditors). The English position would seem to be that the investors' claims are not subordinated to those of the other creditors. This is the implication of *Soden v British & Commonwealth Holdings plc* (1997),[95] where the court considered the provisions of section 75(2)(f) of the Insolvency Act 1986, which subordinates claims for 'any sum due to a member of the company (in his character of a member) by way of dividend, profits or otherwise' to the claims of the other unsecured creditors. The House of Lords held that this section did not apply to a claim by a shareholder for damages against the company on the basis of a negligent misstatement made to the shareholder by the company, on the faith of which it had acquired shares in the company. Consequently, the investors' claims ranked equally with those of the other unsecured creditors. The same decision was arrived at recently by the High Court of Australia in the *Sons of Gwalia* case,[96] on the basis of similar Australian legislation. The claim in the Australian case

---

[94] See London Stock Exchange, *AIM Rules for Nominated Advisers*, February 2007.
[95] [1998] A C 298. The question of whether B&C had a good claim against the insolvent company was never determined.
[96] [2007] HCA 1.

40     Davies Review of Issuer Liability: A discussion paper

Exhibit 2
Page 116

arose out of an allegation that the company, in breach of the relevant Australian ad hoc disclosure rules, had failed to notify the Australian Stock Exchange that its gold reserves were insufficient to meet its gold delivery contracts and that it could not continue as a going concern. Although the Australian High Court came to the same conclusion as the House of Lords as to the meaning of the statutory provision, some of the judges expressed regret at the policy outcome. By contrast, the US Bankruptcy Code subordinates securities-based claims to those of other general creditors.

**Question 6:**
Should the claims of investors for damages under section 90A or any extension of it be subordinate to the claims of other unsecured creditors?

### (ii) Liability of those who make statements on behalf of the company

100.  Tort law has not only a compensatory but also a deterrent purpose. Where, as under section 90A, liability is confined to the issuer, it is far from clear that any deterrent purpose of tort law is achieved. This is because the liability, falling on the company, is borne by its shareholders, whereas the makers of the fraudulent statements, normally the directors, carry no liability to the investors (though they may have a liability to the company, as explained in para 53). The shareholders may put pressure on the directors as a consequence of the liability imposed on the company, but such deterrence would operate only indirectly. The question thus arises as to whether, in relation to fraudulent misstatements, there should be liability on those who make the fraudulent misstatement on behalf of the company. Where they meet the requirements of the tort of deceit, for example, where they themselves know that the statement they are making on behalf of the company is false, directors and senior managers are liable at common law. At present, this is the rule that applies to ad hoc disclosures, but section 90A applies a different rule to periodic disclosures.

101.  It might be said that imposing liability on the directors would not in fact secure any deterrent purpose, because D&O insurance is likely to transfer the costs of the liability back to the company, even if the law apparently provides otherwise. Even if D&O insurance is generally unavailable to cover fraudulent behaviour, it may be that such cover would extend to directors' liabilities under settlements of claims brought by investors in which the directors do not admit liability. If this is the case, imposing liability on directors might simply add to the incentives for defendants to settle investors' claims out of court. It is also the case that the cost of the misstatements will be transferred back to the company if the company undertakes to provide to the directors an indemnity against liability to third parties, as is now permitted by section 309B of the Companies Act 1985.

102.  As to foreign experience on this point, in the United States section 10b of the Securities Act 1934 is not confined to issuers, though in practice the system of D&O insurance operates so that little liability remains with the directors.[97] In Germany the reform of the WpHG in 2002 imposed liability only on issuers. In 2004 there was a further reform proposal which would have extended liability to those who acted on behalf of the company, but this reform was not proceeded

---

[97] John C Coffee Jr, *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*, Columbia Law School, Center for Law and Economic Studies, Working Paper No. 293, March 2006.

Exhibit 2
Page 117

with after lobbying by German business.[98] In France, there is the general doctrine of the separate legal personality of the company which protects directors from liability whilst they are acting on behalf of the company, at least before the French civil courts, though the criminal courts are more sceptical of this doctrine.

103.   This question arises not only in relation to directors and senior managers, but also in relation to advisers. Again, the requirements of the fraud action would have to be satisfied by the adviser in question, ie the adviser would have to know that the statement was false or be reckless as to its truth and reliance by the investor would have to be reasonable in the circumstances. There may be a particular worry about imposing this liability on auditors, because of the particular structure of the international audit market, though that worry exists, I believe, more in relation to negligence-based liability than fraud-based liability. The provisions of Chapter 6 of Part 16 of the Companies Act 2006 would not seem to benefit the auditor in this situation because they apparently deal with the auditor's liability to the company, not to third parties.

**Question 7:**
Should statutory liability for fraudulent misstatements be extended to those who make the statement on behalf of the company?

*(iii) Compensation for sellers and holders?*

104.   Section 90A provides compensation only to those who acquired securities on the basis of misleading statements and who suffered loss in consequence.[99] Those who sell securities or hold securities on the basis of false misstatements are not entitled to claim. The exclusion of sellers of securities was criticised by all those respondents who commented on the issue. Some respondents also thought holders of securities should be able to claim. I am inclined to view these two classes of potential claimants as raising rather different questions, which their common feature of being excluded from the current version of section 90A rather obscures.

105.   The problem with giving a right to compensation to a person who simply continues to hold securities (let alone a person who decides to continue as a non-holder of securities in the issuer) is the difficulty of establishing that, in the absence of the misstatement, they would have sold the securities in question or bought (more of) them, as the case may be. This is a counter-factual which may be very difficult to prove. On the other hand, without proof of the counter-factual it will not be possible to say that the claimant relied on the misstatement, reliance being a pre-requisite of liability under section 90A. It is tempting to say that questions of proof can be left to the courts and only those claimants who can show reliance will succeed in their claims. Thus, if I can prove that I telephoned my broker to instruct him to sell my shares in a company but that he drew my attention to an optimistic statement the company had just put out and I told him not to proceed with the sale, I might succeed in my claim. However, in general such cases will be difficult to prove and there might be thought to be a public interest in not giving to the courts the task of making factual

---

[98] See for a critical account of this:
 http://www.jura.uni-augsburg.de/prof/moellers/aktuelles/kapinhag_gestoppt.html.
[99] Section 90A(3).

Exhibit 2
Page 118

determinations for which there will normally be little reliable information. It is interesting to observe that neither the US nor Germany (two countries having statutory liability for misleading disclosures) confers protection on those who simply hold securities or remain as non-investors in the company. In the case of Germany it was an explicit decision to require a market transaction before there could be liability.[100]

106. In the case of a seller of securities, acting in reliance on a false statement put out by the company, the issues of identifying and proving loss might be thought to be the same as with an acquirer of securities. It may be in the nature of things that companies more often put out misleading optimistic statements and so generate purchases of securities than misleadingly pessimistic ones which generate sales. However, in principle it is not clear why reliant sellers should not recover if reliant purchasers do.

**Question 8:**
Should statutory protection be extended to sellers and holders of securities as well as to buyers?

### (iv) The measure of damages

107. Section 90A of FSMA 2000 does not deal with the measure of damages to be awarded if an investor's claim is successful. It seems likely that the courts would apply the same approach as is followed in the case of common law claims for deceit, since the section is closely modelled on the common law tort. In *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* (1996)[101] the House of Lords used a test which was generous to claimants. In particular, the court held, damages in deceit were not limited to that part of the loss which flowed from the fact that the misrepresentation was false. In this case a vendor of shares (Citibank, through one of its employees) made directly to the claimant (Smith New Court) a fraudulent misstatement in connection with a block of shares in Ferranti which the claimant was proposing to purchase as a long-term holding. The effect of the fraudulent misstatement was that there were other bidders for the shares held by Citibank. After the claimant had purchased the shares, it appeared that an entirely unconnected fraud within Ferranti meant that the price of the shares in the market was overvalued. The claimant eventually sold its holding at a considerable loss and recovered the whole of the difference between the purchase and the sale prices, even though much of that loss represented the effect of the unconnected fraud.

108. The approach in the tort of deceit is in contrast to the measure of damages in negligence, where the recoverable loss is defined by reference to the scope of the duty broken. Thus, in *South Australia Asset Management Corpn v York Montague Ltd* (1996)[102] the same court as in the *Smith New Court* case applied a different test where a surveyor had negligently valued properties for a lender proposing to take security over the properties. In this case, the surveyor's liability was limited to the loss caused to the lender from having a security worth less than it had expected,

---

[100] See Ulrike Ehricke 'Deutschland' in Klaus J Hopt and Hans-Christoph Voigt (eds), *Prospekt- und Kapitalmarktinformationshaftung* (Mohr Siebeck, Tübingen, 2005) pp 280-282.
[101] [1997] A C 254, HL.
[102] [1997] A C 191, HL.

but the surveyor was not liable for the loss caused by the subsequent drop of values in the property market generally.

109. As was explained to me by NERA Economic Consulting the focus in private securities litigation in the United States is on identifying the loss caused to the investors by the misstatement, ie the approach is much closer to that for the tort of negligence in the UK than that for the tort of deceit, despite the fraud basis of the US substantive law. NERA, who provide expert evidence to defendants in class actions in the US, have developed a sophisticated methodology for distinguishing the adverse impact on the stock price when the truth emerges from adverse impacts arising from other causes, such as a fall in the overall market which occurs at the same time; and for predicting what the course of the share price would have been if the misstatement had not been made. In the new German rules dealing with misstatements in ad hoc disclosures, it is disputed whether the measure of damages is the loss caused by the misstatement ('Kursdifferenzschaden') or whether the investor can claim to be put in the position he was in before the transaction was entered into ('Vertragsabschlussschaden'), which is in effect the deceit measure in English law. The better view is that it is only the former which can be recovered.[103]

**Question 9:**
Should the deceit or the negligence measure of damages be adopted in the statutory regime?

## III. Some overarching issues

### Can super-optimal levels of fraud-based litigation be avoided?

110. During the course of this Review there has been a considerable body of criticism emanating from the United States about the way that private securities litigation, especially private securities class actions, operate in that country. In particular, in December 2006 the Committee on Capital Markets Regulation, directed by Prof Hal S Scott of Harvard Law School, delivered its Interim Report.[104] Although its views are not universally accepted in the US legal and business communities, there is no doubt that the Report reflects a substantial degree of dissatisfaction with private securities class actions in the US, despite the reforms which had been made in that area as recently as 1995 in the Private Securities Litigation Reform Act. The report makes proposals for various reforms of private securities litigation in the United States, though it should be noted that it falls very far short of proposing that the right to bring such litigation should be removed. The question is thus raised as to whether similar problems would occur in the UK if fraud-based actions by investors became generally available.

111. There are strong reasons for thinking that a fraud-based investor action would operate very differently in the UK from the way in which private securities litigation operates in the US. First, as has been pointed out in para 74 above, the

---

[103] Klaus J Hopt and Hans-Christoph Voigt, 'Grundsatz- und Reformprobleme der Prospekt- und Kapitalmarktinformationshaftung' in Hopt and Voigt (eds), above n 98. pp. 130-133.
[104] Available on: http://www.capmktsreg.org/pdfs/11.30Committee_Interim_ReportREV2.pdf.

Exhibit 2
Page 120

definition of 'fraud' in section 90A and, indeed, in the tort of deceit upon which it is modelled, is narrower than that used by the US courts in 10b litigation. 'Fraud' for the purposes of section 10b of the Securities Act 1934 has been interpreted by the courts as including cases of gross negligence, whereas an honest, even if unreasonable, belief in the truth of the statement prevents a finding of fraud in English law. This point was settled for good by the House of Lords as long ago as 1889 in *Derry v Peek*.[105] As a leading authority has put it: 'The core of the action of deceit is *fraud* on the part of the representor, by which the claimant was *deceived*: this has been clear since the late eighteenth century. During the course of the nineteenth century there was some debate about the exact meaning of "fraud" for the purposes of this tort, but in 1889 this debate was definitively settled by the House of Lords in *Derry v Peek* , and since then the tort has remained in substance unchanged.'[106]

112. Besides this very important difference in the definition of fraud, there are substantial differences in the operation of the civil litigation systems in the two countries, which are probably as important as the differences in the substantive law. These differences in procedural law tend to reinforce the differences in the substantive law, ie to discourage private securities litigation in England[107] and to encourage it in the US.

113. An important procedural issue is how easy it is for a defendant to have the claim against it struck out at an early stage of the litigation, ie at the point when the claimant has simply formulated its claim but there has been no (expensive) pre-trial disclosure, let alone a trial. It is relatively costless (both financially and in terms of management time) to defend an action up to strike-out. If, however, a strike-out is not available, the costs of the litigation begin to mount and so do the pressures on the defendant to settle the claim (and thus avoid the costs and distractions of the litigation), even if the defendant thinks the claim lacks merit. In *BCCI v Price Waterhouse*[108] Laddie J put the significance of the courts taking a robust view of the strike-out as follows:

> "However it is common knowledge that in many cases like this in which enormous sums of damages are sought, the dispute does not reach the stage of a judgment. The sums claimed, the sheer cost of the litigation which in a case like this will be in many tens of millions of pounds, the enormous time which will be needed for the trial and the dislocation that will impose on the parties means that there will be very great pressure on them to settle. That pressure may be felt particularly acutely by the defendants. In fact during another application before me in this action some little while ago, counsel for the plaintiffs (but not the counsel appearing before me on this application) suggested that, no matter how weak the Plaintiffs' claim might appear in a case of this type, the defendants or their insurers would normally succumb to the pressure to offer a settlement. He appeared to suggest that such proceedings therefore justified themselves. I wish to make it clear that I am not suggesting that that is the motive behind these proceedings or that that was being suggested by counsel. But I have little doubt that it reflects what happens in some cases. In a legal system where even success in the litigation leaves the winning party bearing a substantial costs burden, the incentive to do a deal must be significant. Soldiering on as a matter of principle frequently is not a commercially sensible course to adopt. The result is that a significant part of the case law consists of cases concerning applications to strike out."

---

[105] (1889) 14 App. Cas. 337.
[106] Cartwright, above n 83 at para. 5.01.
[107] These remarks are confined to English civil procedure, though it is not believed that the overall position is significantly different in Scotland. Comments from those familiar with Scottish procedure are invited.
[108] [1999] BCC 351.

Exhibit 2
Page 121

In spite of some relaxation in the strike out rules in English law in recent years, it remains the case that in the case of fraud the statement of case must allege fraud clearly and that allegation must be supported with particulars, which are capable of supporting the allegation of fraud.[109] Fraud cannot be 'averred generally'. In addition, under the Bar Council's Code of Conduct a barrister may not draft a statement of case making 'any allegation of fraud unless he has clear instructions to make such allegation and has before him reasonably credible material which as it stands establishes a prima facie case of fraud.'[110] Thus, the stricter definition of fraud in the UK combines with the rules on formulating statements of case to make it more difficult for a claimant who does not have evidence of fraud to get past the strike-out stage, in the hope that pre-trial disclosure by the defendant will produce the evidence that was previously lacking – or that the costs of the disclosure process will pressurise the defendant into a settlement. Although the 1995 reforms attempted to move the US system of civil procedure away from general averments of states of mind and towards greater particularity, it appears that this reform has not been uniformly interpreted across the various Circuits of the federal court system.[111] In the US a very small proportion of private securities actions which are commenced actually reach trial, whilst the percentage of claimed losses (which may well be over-inflated) which is actually met in settlements is very low (about 3 per cent currently).[112]

114. In the United States securities class actions are routinely tried by juries, who determine both liability and damages. This is regarded by potential defendants as substantially increasing the chances of claimants obtaining a large damages award and by claimants as adding significantly to the pressures on defendants to settle. A significant recommendation of the Scott committee is that companies should be able to opt for judge trials (not only in relation to securities litigation).[113] Although fraud actions remain one of the areas where jury trials are still in principle to be used in civil actions in England, this requirement does not apply if 'the court is of opinion that the trial requires any prolonged examination of documents or accounts';[114] and it appears that jury trials are rare in the class of case with which this Review is concerned.

115. However, the factor which was mentioned most often by respondents as promoting securities litigation in the United States were the financial incentives for law firms to initiate litigation. These incentives seem to depend on two matters, neither of which is replicated in the United Kingdom. First, class actions in the US operate on an 'opt out' basis, whereas the closest analogy here under the Civil Procedure Rules is the 'group litigation order' which operates on an 'opt in' basis. Under the US system a court will award recovery for all the members of the class (for example, investors who bought securities after the false statement was made and before the truth emerged) unless they choose to take themselves out of the class action at an early stage. The burden is on the investor to do so, not on the claimant's lawyer to seek their consent to be included in the class.

---

[109] *Three Rivers District Council v Bank of England (No. 3)* [2001] 2 All E R 513, HL.

[110] Bar Council, *Code of Conduct*, para. 704(c).

[111] Though the Supreme Court this term will address this issue in the case of *Tellabs Inc v Makor Issues & Rights Ltd.*

[112] NERA, *Recent Trends in Shareholder Class Action Litigation*, April 2006, pp. 7- 8. The dollar amounts recovered, however, are often substantial.

[113] Above n. 102 at p. 11.

[114] Supreme Court Act 1981, s. 69.

Exhibit 2
Page 122

Under a Group Litigation Order under the CPR[115] the court's judgement will benefit only identified claimants, either those who are on the 'group register' when the judgment is handed down or, if the court so directs, claimants who bring claims in the future. Consequently, to maximise the size of the recovery under the British system, the lawyers must identify the full range of class claimants and seek to obtain the permission of as many of them as possible to join in the litigation and have their claims entered on the register.

116. In connection with the formation of the class, it is also important to revert again to the reliance requirement in section 90A (see para 55 above). In the United States a typical class is constituted by those who bought shares after the misleading statement was made and still held the shares at the point the truth emerged. Under the 'fraud on the market' theory, adopted in the US for misleading continuing disclosures as well as for misstatements in prospectuses, it is not necessary for the claimant to show knowledge of and reliance on the misstatement in question. Thus, class formation is easier and classes are larger than where reliance has to be shown.

117. Second, *contingent* fee arrangements in the United States permit lawyers to enter into agreements whereby they take in a successful case a significant proportion of the recovery awarded to the claimants (thus reinforcing the 'opt out' rule from the point of view of the lawyers) but are not remunerated at all if the case is unsuccessful. In the UK section 58 of the Courts and Legal Services Act 1990[116] permits *conditional* fee arrangements, by which lawyers can agree to no payment if the case is unsuccessful and an increase of their normal fee (but *not* a share of the recoveries) if the case is successful. Such agreements may lead to a doubling (but no more) of the fees otherwise payable.[117] The overall effect of the UK provisions is, it would seem, to give law firms a much less powerful incentive to promote private securities litigation than in the US.[118] There seem to be no law firms in the UK, as there are in the US, whose business model is based wholly or mainly on the promotion of private securities litigation, though the arrival in Europe from the US of such a firm was often mentioned as a possibility by respondents. However, it is clear that the issue of the funding of civil litigation in the United Kingdom is still the subject of debate and that the current rules cannot be assumed to represent the situation which will continue in the future.[119]

118. A particular issue about funding of securities litigation which came to the fore during the Review was that of funding by third parties (as opposed to the law firm representing the claimants). Section 58B of the Courts and Legal Services Act 1990[120] permits third-party funding of litigation, on a similar basis to that for conditional fees. Section 58B is not in force and I understand there are no immediate plans to bring it into force. In the area of insolvency litigation, however, recent changes appear to permit a liquidator to assign a cause of action to a third party in exchange for a share of proceeds, if the litigation is

---

[115] CPR 19.10 ff.
[116] As amended by the Access to Justice Act 1999, s. 27.
[117] The Conditional Fee Arrangements Order 2000/823.
[118] The UK costs shifting rule in the case of unsuccessful litigation is a further factor in discouraging litigation.
[119] See, for example, Civil Justice Council, *Improved Access to Justice – Funding Options and Proportionate Costs*, August 2005.
[120] Also introduced by the Access to Justice Act 1999 (s 28).

Exhibit 2
Page 123

successful,[121] and that third party funders have emerged to take advantage of this possibility.[122] This is a basis for funding litigation which is clearly closer to the US contingent fee model than to the British conditional fee one. However, this facility appears to apply only to claims by companies (brought through the insolvency practitioner), not to claims against them by investors.[123]

**The benefits and limitations of private actions to enforce securities law**

119.  It is traditionally said that the law of tort (of which the law of deceit is part) has two, sometimes conflicting, goals. These are compensating those who have suffered from the wrongful act and deterring the commission of such acts in the future. On deterrence, we have already noted that section 90A of FSMA does not impose liability on the makers of misleading statements on behalf of the company. This does not mean that the private litigation has no deterrent effect on those who make the statements, because they may suffer reputational and other losses as a result of being involved in the litigation. Nevertheless, it does mean that at present direct sanctions on the makers of misleading statements lie in the area of public enforcement of the disclosure rules, notably by the FSA.

120.  As for compensation, we have seen that there are two issues here. On the one hand, the measure of damages rule might seem over-generous to claimants. On the other, the US evidence suggests that most private litigation to enforce securities litigation is settled for a relatively small amount of the damage suffered. The former problem could be fixed by altering the measure of damages rules. The latter is more difficult because it may be very near impossible, and probably undesirable, to change the incentives of issuers, and their directors, to settle litigation rather than to go to trial.

121.  It can also be argued that, for long-term only investors, the financial benefits of being able to sue for damages may be small, if their position is looked at over time. They are as likely, it might be said, to be among the shareholders in the issuer which has made the misleading statement as among the investors who were misled. They benefit in the latter capacity but lose out in the first. Over time, their financial position may not be significantly different than if they could not sue at all, except that they will have borne the transaction costs of the litigation. Thus, on both the compensation and deterrence fronts, the achievements of private litigation are limited.

122.  However, none of the above arguments is a good reason for excluding private litigation entirely where fraud is involved. First, to do so would be exclude almost any possibility of compensation being provided to investors misled by fraud, given the FSA's decision not to allocate its scarce resources to routine use of its restitution powers under FSMA in the case of non-retail investors. Although some investors may appear as often on one side of the litigation equation as on the other, this cannot be guaranteed to be the case for all investors. Those whose

---

[121] See J Armour and A Walters, 'Funding Liquidation: A Functional View' (2006) 122 *Law Quarterly Review* 303.

[122] Notably IM Litigation Funding. See http://www.insolvencymanagement.co.uk/default.htm.

[123] In Australia, where third-party funding is more generally available, there are a number of such providers and the largest, IMF, is quoted on the Australian Stock Exchange. See http://www.imf.com.au/.

Exhibit 2
Page 124

position is asymmetrically on the investor side, will be out of pocket if they have no possibility of suing for fraud. Second, given the adverse effect on market confidence of fraud, it can be said to be unwise from a broader public policy standpoint to rely entirely on public sanctions to combat it. The FSA has a wide range of statutory objectives to fulfil and needs to harbour its resources with care. Private litigation both relieves some of the pressure on those resources and provides an alternative forum within which decisions can be taken about devoting resources to combating fraudulent disclosures by issuers. Third, in the areas covered by EU Directives, it can be argued that making fraud-based liability effectively available would help promote an 'equity culture' which is a subsidiary aim of the EU-level reforms.

Exhibit 2
Page 125

# IV. Appendices

*Table 1:* **FSA cases**[124]

| Company | Date | Breach | Sanction |
|---------|------|--------|----------|
| Eurodis | 12/09/2005 | Delayed announcement LR9.2 | Censure |
| My Travel | 14/07/2005 | Delayed announcement LR9.2 | Fine 240k |
| Pace Micro | 26/01/2005 | Omission from interim results and failure to announce: LR9.2 and 9.3A | Fine 450k |
| Shell | 24/08/2004 | Market abuse | Fine 17m |
| Universal Salvage | 19/05/2004 | Delayed announcement LR9.1 | Fine 90k company 10k director |
| Sportsworld | 29/03/2004 | Delayed announcement LR9.2 | Public censure and 45k on directors |
| SFI | 11/12/2003 | Misleading preliminary results LR9.3A | Censure |
| Marconi | 11/04/2003 | Delayed announcement LR9.2 | Public statement |
| AIT | 2002 onwards | Reckless statement in trading statement FSMA s397 – criminal prosecution | Custodial sentences, disqualification from being a company director, compensation order, confiscation order quashed |

---

[124] Source: www.fsa.gov.uk

Exhibit 2
Page 126

*Annex A:* **Sections 90A and 90B of FSMA 2000 (section 1270 of Companies Act 2006)**[125]

**1270   Liability for false or misleading statements in certain publications**

In Part 6 of the Financial Services and Markets Act 2000 (c. 8), after section 90 insert —

**"90A   Compensation for statements in certain publications**

(1)   The publications to which this section applies are —

(a)   any reports and statements published in response to a requirement imposed by a provision implementing Article 4, 5 or 6 of the transparency obligations directive, and

(b)   any preliminary statement made in advance of a report or statement to be published in response to a requirement imposed by a provision implementing Article 4 of that directive, to the extent that it contains information that it is intended —

(i)   will appear in the report or statement, and

(ii)   will be presented in the report or statement in substantially the same form as that in which it is presented in the preliminary statement.

(2)   The securities to which this section applies are —

(a)   securities that are traded on a regulated market situated or operating in the United Kingdom, and

(b)   securities that —

(i)   are traded on a regulated market situated or operating outside the United Kingdom, and

(ii)   are issued by an issuer for which the United Kingdom is the home Member State within the meaning of Article 2.1(i) of the transparency obligations directive.

(3)   The issuer of securities to which this section applies is liable to pay compensation to a person who has —

(a)   acquired such securities issued by it, and

(b)   suffered loss in respect of them as a result of —

(i)   any untrue or misleading statement in a publication to which this section applies, or

(ii)   the omission from any such publication of any matter required to be included in it.

(4)   The issuer is so liable only if a person discharging managerial responsibilities within the issuer in relation to the publication —

(a)   knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or

(b)   knew the omission to be dishonest concealment of a material fact.

---

[125] See www.opsi.gov.uk/ACTS/acts2006/ukpga_20060046_en.pdf

Exhibit 2
Page 127

(5) A loss is not regarded as suffered as a result of the statement or omission in the publication unless the person suffering it acquired the relevant securities —

    (a) in reliance on the information in the publication, and

    (b) at a time when, and in circumstances in which, it was reasonable for him to rely on that information.

(6) Except as mentioned in subsection (8) —

    (a) the issuer is not subject to any other liability than that provided for by this section in respect of loss suffered as a result of reliance by any person on —

        (i) an untrue or misleading statement in a publication to which this section applies, or

        (ii) the omission from any such publication of any matter required to be included in it, and

    (b) a person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(7) Any reference in subsection (6) to a person being subject to a liability includes a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.

(8) This section does not affect —

    (a) the powers conferred by section 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution);

    (b) liability for a civil penalty;

    (c) liability for a criminal offence.

(9) For the purposes of this section —

    (a) the following are persons "discharging managerial responsibilities" in relation to a publication —

        (i) any director of the issuer (or person occupying the position of director, by whatever name called),

        (ii) in the case of an issuer whose affairs are managed by its members, any member of the issuer,

        (iii) in the case of an issuer that has no persons within sub-paragraph (i) or (ii), any senior executive of the issuer having responsibilities in relation to the publication;

    (b) references to the acquisition by a person of securities include his contracting to acquire them or any interest in them.

## 90B Power to make further provision about liability for published information

(1) The Treasury may by regulations make provision about the liability of issuers of securities traded on a regulated market, and other persons, in respect of information published to holders of securities, to the market or to the public generally.

(2) Regulations under this section may amend any primary or subordinate legislation, including any provision of, or made under, this Act.".

Exhibit 2
Page 128

**Annex B: Sections 37b and 37c of the German Securities Trading Act (Wertpapierhandelsgesetz – WpHG)**[126]

Section 37b
Liability for damages due to failure to immediately publish inside information

(1) If an issuer of financial instruments that are admitted to trading on a German stock exchange fails to immediately publish inside information that directly affects that issuer, it shall be liable to compensate a third party for the damage resulting from the omission if the third party

1. has bought the financial instruments after the omission and still owns the financial instruments upon disclosure of the information or

2. has bought the financial instruments before the existence of the relevant insider fact and sells them after the omission

(2) Those issuers who can prove that the omission was made neither deliberately nor in an act of gross negligence shall not be liable for damages pursuant to subsection (1).

(3) Damage claims pursuant to subsection (1) shall not exist if, in the case of subsection (1) no. 1, the third party knew about the undisclosed fact at the time of purchase and, in the case of subsection (1) no. 2, the third party knew about the undisclosed fact at the time of sale.

(4) Damage claims pursuant to subsection (1) are subject to a limitation period of one year from the date on which the third party learned of the omission, but not more than three years after the omission.

(5) This is without prejudice to further contractual claims or claims in intentional tort which may be raised under the provisions of civil law.

(6) Any agreement which reduces the claims to be brought by an issuer against the members of the board of management based on damage claims against the issuer pursuant to subsection (1) or which relieves the members of the board of management of such claims shall be deemed invalid.

Section 37c
Liability for damages based on the publication of false inside information

(1) If an issuer of financial instruments that are admitted to trading on a domestic stock exchange publishes false inside information that directly affects that issuer in a notification pursuant to section 15, he shall be liable to compensate a third party for the damage resulting from the fact that the third party relied on the accuracy of the inside information, if the third party

---

[126] Source: www.bafin.de

1. has bought the financial instruments after publication and still owns the financial instruments at the point in time at which it becomes publicly known that the information was inaccurate or

2. has bought the financial instruments before publication and sells them before it becomes clear that the information was inaccurate.

(2) Those issuers who can prove that they were not aware of the inaccuracy of the inside information and that such lack of awareness does not constitute an act of gross negligence shall not be liable for damages pursuant to subsection (1).

(3) Damage claims pursuant to subsection (1) shall not exist if, in the case of subsection (1) no. 1, the third party knew that the inside information was inaccurate at the time of purchase and, in the case of subsection (1) no. 2, the third party knew that the information was incorrect at the time of sale.

(4) Damage claims pursuant to subsection (1) are subject to a limitation period of one year from the date on which the third party learns of the inaccuracy, but no more than three years after publication.

(5) This is without prejudice to further contractual claims or claims in intentional tort which may be raised under the provisions of civil law.

(6) Any agreement which reduces the claims to be brought by an issuer against the members of the board of management on grounds of damage claims pursuant to subsection (1) or which relieves the members of the board of management of such claims shall be deemed invalid.

Exhibit 2
Page 130

## LIST OF QUESTIONS FOR RESPONSE

**Question 1:**
What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liaiblity in the British context? Is fraud an appropriate basis for liability?

**Question 2:**
Should the statutory regime should be extended in principle to ad hoc statements?

**Question 3:**
Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?

**Question 4:**
If the statutory regime were to be extended to ad hoc announcements, should it be (a) confined to disclosures of inside information (the most pressing case), (b) applied to all RIS announcements or (c) confined to announcements made under the FSA's Disclosure and Transparency Rules (ie excluding ad hoc announcements made under the Listing Rules)?

**Question 5:**
Should section 90A apply to non-regulated markets? Does your answer differ according to whether section 90A is extended to cover ad hoc statements?

**Question 6:**
Should the claims of investors for damages under section 90A or any extension of it be subordinate to the claims of other unsecured creditors?

**Question 7:**
Should statutory liability for fraudulent misstatements be extended to those who make the statement on behalf of the company?

**Question 8:**
Should statutory protection be extended to sellers and holders of securities as well as to buyers?

**Question 9:**
Should the deceit or the negligence measure of damages be adopted in the statutory regime?

## TERMS OF REFERENCE

Section 1270 of the Companies Act 2006 establishes a new statutory regime for liability in damages to third parties in respect of disclosures under the Transparency Directive (2004/109/EC). The Government consulted last year on whether the statutory regime should be extended. Responses to the consultation confirmed that this was a complex area in which it is vital to get the policy right, but were not conclusive.

The Government want to strike the right balance between the interests of investors and issuers, providing appropriate incentives to make timely and accurate disclosures in compliance with statutory rules, and an appropriate – but limited – right to recover losses. Section 1270 of the Companies Act amends the Financial Services and Markets Act 2000, inserting a new section 90B that provides for a power to amend the statutory regime.

The Government appointed Professor Paul Davies, the Cassel Professor of Commercial Law at the London School of Economics in October 2006 to undertake a review of issuer liability. The Davies Review will:

- Consider the law relating to liability in damages of issuers of securities traded on a regulated market or alternative markets (such as AIM or Plus Markets) in respect of statements and publications made to the market and which are incorrect, false or misleading or have not been made promptly;

- Consider how any such liability may be affected by regulatory obligations attaching to issuers and directors;

- Consider the case for providing for a specific right to damages by those relying on such statements and publications in the context of securities market activities, in particular: the circumstances that might give rise to a right, against whom a right might be enforceable and the consistency with the effect of corporate governance and conventions, standards or rules affecting the information that issuers publish to shareholders and others and how they publish it;

- Consider the impacts on:
  - issuers, markets, investors and others;
  - the quantity and quality of information disclosed;
  - the competitiveness of the UK as a good place to do business;

- Take into account the liability of issuers and their managements in other centres of financial services in Europe or more widely including the USA;

- Make recommendations to the Treasury on whether to exercise the section 1270 power and, if so, how.

In making recommendations to the Treasury, the Review will advise on:
- options for a new regime if recommended;
- who might bring actions to sue for damages;
- the kinds of damages that might be awarded and potential effects of paying those damages on issuers, including effects on their business and employees, directors or senior executives, and on the supply of qualified individuals willing to take on director and non-executive director roles in consequence;
- and other related matters.

Exhibit 2
Page 132

Exhibit 2
Page 133

ISBN 978-1-84532-299-1

9 781845 322991 >

Exhibit 2
Page 134

# Davies Review of Issuer Liability:
## Final Report

by Professor Paul Davies QC

June 2007

Exhibit 2
Page 135

Exhibit 2
Page 136

# Davies Review of Issuer Liability:
## Final Report

by Professor Paul Davies QC

June 2007

Exhibit 2
Page 137

© Crown copyright 2007

Published with the permission of HM Treasury on behalf of
the Controller of Her Majesty's Stationery Office.

The text in this document (excluding the Royal Coat of
Arms and departmental logos) may be reproduced free
of charge in any format or medium providing that it is
reproduced accurately and not used in a misleading context.
The material must be acknowledged as Crown copyright
and the title of the document specified.

Any enquiries relating to the copyright in this document
should be sent to:

Office of Public Sector Information
Information Policy Team
St Clements House
2-16 Colegate
Norwich
NR3 1BQ

Fax:  01603 723000
E-mail:  HMSOlicensing@opsi.x.gsi.gov.uk

**Contacts**

This document can be found on the Treasury website at:

**hm-treasury.gov.uk/davies**

For general enquiries about the review, contact:

Davies Review of Issuer Liability
Room 4 / 20
HM Treasury
1 Horse Guards Road
London
SW1A 2HQ

Email:  davies.review@hm-treasury.gov.uk

ISBN:  978-1-84532-306-6

Printed on at least 75% recycled paper.
When you have finished with it please recycle it again.

PU246

Exhibit 2
Page 138

# Contents

                                                                    **Page**

Foreword by the Economic Secretary to the Treasury………..…………………….    2

Preface by Professor Paul Davies QC………………………………………………    3

Executive summary……………………………………………………………………    4

Davies Review: Final Report……………………………………………………..    7

- *Question 1*: Fraud, negligence and gross negligence…………………………    9
  - o    Fraud or simple negligence
  - o    Fraud or gross negligence
  - o    The definition of fraud

- *Question 2:* Extension of the statutory regime to ad hoc statements………..    19

- *Question 5:* Extension to exchange-regulated markets……………………..    20

- *Question 4:* How are relevant disclosures to be identified?…………………    21

- *Question 3:* Liability for dishonest delay…………………………………………    23

- *Question 8:* Should liability extend to sellers and holders of securities?………24

- *Question 7:* Should liability be confined to issuers or be extended to directors
  and advisers?…………….………………………………………………………    25

- *Question 9:* Assessment of damages……………………………………………26

- *Question 6:* Subordination of investors' claims………………………………27

- Applicable law……………………………………………………………………27

Summary of recommendations.………………………………………………………    29

Terms of reference………………………………………………………………………    31

List of contributors.……………………………………………………………………    32

Further information & next steps……..………………………………………………    33

# Foreword by the Economic Secretary to the Treasury

Last summer, in the course of implementing the Transparency Directive through the Companies Bill, I was presented with compelling arguments from a wide range of companies, accountancy firms and from the legal profession, asking that I take action to set out in law the liability of listed companies for the financial statements that they were required to publish by the Transparency Directive.

Accepting these arguments, and taking this policy forward, it became clear that everybody agreed that this was a complex area, in which it is vital that we get the policy right. However, there was no clear agreement on what the right policy was.

Following consultation, I presented to Parliament a framework of legislation that sought to achieve the correct balance between ensuring that investors had the right to take action against companies in respect of financial statements that turned out to be fraudulent, and enabling companies to release accurate, timely and meaningful statements to investors. However, many of those who commented on the proposals argued that they should cover a wider range of financial statements. In recognition of this, and the enormous challenge of striking the balance correctly, I also asked for the power to be able to make amendments to the legislation.

The appointment of Professor Paul Davies QC to conduct this independent review is the crucial component to make sure that in this vital area we get the policy right. When I first met Paul we discussed the effects that his work could have on the efficiency and international competitiveness of the UK's capital markets. The UK's statutory and legal framework is rightly seen across the world as a key competitive advantage.

The thorough analysis and clear explanation that Paul presents in his final report allow the reader to gain a remarkable insight into this difficult policy area, as well as to understand clearly the rationale behind his conclusions.

**Ed Balls MP**

Exhibit 2
Page 140

# Preface by Professor Paul Davies QC

Ed Balls MP
Economic Secretary
HM Treasury
1 Horse Guards Road
London SW1A 2HQ

Dear Economic Secretary

You asked me in October last year to carry out a review of issuer liability to investors in respect of misstatements to the market and, in particular, to consider the exercise the powers conferred by the new section 90B of the Financial Services and Markets Act 2000 (inserted by the Companies Act 2006). My appointment followed an earlier consultation carried out in the summer of 2006 by the Treasury, whose results confirmed that this was a complex area in which it is vital to get the policy right but were inconclusive. I issued a Discussion Paper in March 2007 and I now submit my Final Report. The Executive Summary which follows sets out the main conclusions and recommendations of my Report.

I am grateful to all those who gave of their time to discuss the issues with me. They came from a wide range of backgrounds within the securities markets and their users, and I learned something from all of them. I am grateful also to those (often, but not always, the same people) who responded in writing to the Discussion Paper and did so, more or less, within the short time limit set by me for responses. Taken as a whole, the responses were thoughtful and reflective. I refer to some of those responses in this Report. However, reading them through sparked for me trains of thought, whose inspiration I cannot no longer precisely identify. So, I apologise to those unacknowledged respondents, especially where they think my views bear an uncanny resemblance to their own.

I am grateful to four LSE graduate students for research assistance on this project which was provided quickly and flexibly, and with serious detriment to their Christmas vacations: Florian Burnat, Joanna Hemingway, Stefan Papst and Alisa Valderrama.

Above all my thanks go to Anthea Heffernan, Secretary to the Review, without whose organisational and distilling skills this Review would not have been completed in such short order.

Yours sincerely,

**Paul Davies**

# Executive Summary

- Section 90A of the Financial Services and Markets Act 2000 (introduced by section 1270 of the Companies Act 2006) establishes a new statutory liability regime under which issuers will be liable for fraudulent misstatements in periodic disclosures to the market as required under the Transparency Directive (2004/109/EC). However, in response to industry concerns raised last summer about the limited scope of the new statutory liability regime and whether common law rights of shareholders were at risk, the Government appointed Professor Paul Davies QC, the Cassel Professor of Commercial Law at the London School of Economics, to carry out an independent review of liability for corporate misstatements to the market and to recommend whether or not changes should be made to the existing statutory regime.

- Key to the independent Davies Review's inquiry has been striking the right balance between incentives needed to encourage companies to disclose accurate, timely and meaningful information and the rights of investors who rely on misleading statements to make investment decisions to claim damages for losses suffered. The Review has considered both existing regulatory obligations and penalties, including criminal penalties, and the potential for liability in damages under existing common law jurisprudence. It has also looked at the position in other EU member states and more widely in the jurisdictions of other substantial financial services markets.

- The Review's Discussion Paper published in March 2007 invited comments on nine questions relating to liability for corporate misstatements to the market. This Final Report, which takes account of the views of a broad cross-section of over 40 respondents, presents the Review's conclusions and recommendations to the Government, making the case for exercising the powers conferred by the new section 90B of FSMA 2000 to extend the existing statutory liability regime in section 90A in certain ways.

- The first and most difficult question raised by the Review was what should be the basis of liability: fraud or the less demanding standard of negligence? Or is gross negligence a viable middle way? The Review recommends that fraud be maintained as the standard of liability for misstatements to the market, on the grounds that: (a) negligence is a fact dependant standard of liability, with very limited guidance as to how the courts might apply it case by case, and which therefore would encourage defensive and bland reporting; (b) careless reporting will not go unsanctioned because negligence is the standard adopted for FSA penalties and censures; (c) creating a civil liability based on a negligence standard risks generating unmeritorious claims for large sums in a way that fraud-based liability does not; and (d) gross negligence, as a new and untested standard, would create legal uncertainties and risk the same problems of defensive reporting and speculative litigation as simple negligence.

- In response to those concerned that fraud is too restrictive a standard of liability, the final report notes that fraud-based liability does not take away existing investor rights, since negligence will remain open as a basis for investor claims in respect of their rights *as shareholders* in the company. Further, the existing statutory regime makes fraud claims easier to bring than at present at common law, because the claimant need only show that his own reliance on the misstatement was reasonable and not

Exhibit 2
Page 142

also that the issuer intended that he should rely on it.  The Review recommends that this should continue to be a feature of the extended statutory regime.

- On the basis of maintaining fraud as the standard of liability, the Review recommends the following changes:

  o extend the statutory regime to cover ad hoc disclosures, on the basis that: (a) some ad hoc statements will later appear in periodic disclosures required by the Transparency Directive; (b) it is confusing to have different liability regimes according to whether a disclosure is required under the Transparency or Market Abuse Directives; and (c) issuers and investors alike saw no principled distinction between ad hoc and periodic disclosures in terms of liability;

  o extend the statutory regime to apply to disclosures by issuers with securities traded on exchange-regulated markets, including AIM and Plus Market, and to all 'multilateral trading facilities' and other trading platforms for securities, on the grounds that while investors in these markets should accept the risk of different levels of disclosure than on the main market, they should still be protected from dishonest disclosure;

  o apply the statutory regime to all RIS announcements, on the grounds that this is the easiest rule for companies and investors alike to understand, but draft the provisions in such a way so as not to affect the rights of shareholders and others arising out of company circulars addressed to them;

  o extend the statutory regime to encompass liability for dishonest delay in making RIS statements, on the basis that where the purpose of the delay is fraudulent, this should be subject to claims for damages; and

  o extend the statutory regime to confer rights on both buyers and sellers of shares, on the basis that sellers in principle should not be excluded from claiming for losses suffered, but exclude those who continue to hold (or not to buy) shares from suing in respect of misstatements in RIS announcements.

- The areas where the Review recommends no change to the statutory liability regime under section 90A at present are:

  o confine statutory liability to issuers only and not impose statutory liability on directors or other advisers or third parties in respect of misstatements in RIS announcements, on the basis that this is not necessary for deterrent purposes. This is so because: (a) the sanctions and censure of the FSA and market operators themselves provide an alternative source of deterrence on directors; (b) exposing a director personally to large compensation claims will likely induce extreme and undesirable caution in order to avoid liability; (c) D&O insurance may shift the loss from director back to the company; (d) the company has the ability to seek compensation from the director for breach of duty or from advisers or others; and (e) shareholders may bring an action against the director under the new derivative action procedures in the Companies Act 2006;

o   leave the assessment of damages to the courts, on the grounds that it is too difficult to formulate effective rules in statute which would not tie the courts' hands in an undesirable way in handling particular cases; and

o   the Government to consider further the issue of subordination of investors' claims to those of unsecured creditors, in part because of the ramifications outside the area of securities litigation.

- Finally, the Review considered the potential for companies to be subject to claims by investors resident in different jurisdictions. The Final Report concludes that it would be best if a single legal regime applied to investor claims, possibly the law of the jurisdiction where the issuer is incorporated or has a primary listing, but this issue cannot be solved through the exercise of the section 90B power and is outside the Review's terms of reference.

# FINAL REPORT

1. The Discussion Paper (DP) issued in March 2007 set out the regulatory framework for continuing disclosure by issuers (both periodic and episodic or ad hoc); analysed the development of the common law and the extreme reluctance of common law to impose liability for negligent misstatements where this would result in 'liability in an indeterminate amount for an indeterminate time to an indeterminate class';[1] and discussed the circumstances which led to the insertion of section 90A into the Financial Services and Markets Act 2000 by the Companies Act 2006. I shall not repeat that material in this Report, though I refer to specific parts of the DP from time to time and it constitutes the background to this Report. I begin with two responses which raised issues not falling within the specific question I asked in the DP, though the issues were considered towards the end of the DP under 'overarching issues' (paras. 110ff of the DP).

2. The law firm, Clifford Chance, argued in its response that there should be no civil liability on the part of companies to investors even for fraudulent misstatements.[2] One of its points was put on the following basis: "Unlike many fraudulent misstatements, therefore, the benefit of the misstatement [to the market] does not accrue to the issuer. Instead, investors who have not sold their securities are penalised twice - through the fraud and through the subsequent payment of compensation." This is an important argument of principle which is worth dealing with at the outset. I do not find it persuasive. First, I am not clear how it can be said that investors in the company who do not rely on the fraudulent statement can be said to be 'penalised'. Their loss appears only to be a result of the company subsequently paying compensation to those who did rely on the statement. Second, I think that fraudulent statements are often made in what the directors conceive (or misconceive) to be the interests of the issuer, for example, deceiving the market so as to keep the company's business alive for a while longer, in the hope that things will turn around.[3] This may be a foolish policy which ultimately inflicts harm on the company and thus on its shareholders, except those who are fortunate enough to sell out before the mistake emerges. However, in this respect it is no different from any other ill-advised or illegal policy adopted on behalf of the company by its directors, the company (ie the shareholders) being required, by law or for reputational reasons, to compensate those harmed by it. The nub of the objection, I suspect, is rather to the compensation of one group of investors, who have suffered from the fraud, by the company (ie the other investors). That, however, is not a novel proposition: the law has provided for such liability for more than a century in relation to fraudulent and even negligent prospectuses,[4] and clearly does so in the case of investors dealing directly with the company to whom the management makes fraudulent statements. I also take the view that it would not be good for the reputation of the British capital

---

[1] Per Cardozo C J in Ultramares Corp v Touche (1931) 255 NY 170, 179, an American decision but much cited in the relevant British cases.

[2] The implication, presumably, though it was not expressly drawn, is that section 90A of FSMA, discussed below, should be repealed.

[3] See the case of R v Bailey and Rigby [2006] 2 Cr. App. Rep. (S) 36, discussed in the DP at para. 65.

[4] A liability which, on the better view, extends to purchasers in the after market and not just to those who take the securities directly from the company: see J Cartwright, Misrepresentation, Mistake and Non-Disclosure (London: Sweet and Maxwell, 2007) para. 7.52.

Exhibit 2
Page 145

markets to have them operate under a regime in which investors were not entitled to compensation for fraudulent statements made by issuers.[5]

3. A similar argument was put in the Minority Response of the Law Society's Company Law Committee, but with the conclusion, in this case, that there should be no liability on the issuer but there should be liability on the directors (in the case of fraudulent misstatements). They say: "it would be more appropriate for the liability to fall exclusively on those persons discharging managerial responsibilities who are responsible for the statement or omission which gives rise to the loss."[6] It is unclear to me why it would be appropriate to exclude corporate liability. The proposition seems to fly in the face of the principles underlying the general law of vicarious liability, ie the liability of companies and other principals for wrongs committed by their agents (including directors) or employees. Here it is established that there will be liability on the principal if what the agent does, even if dishonest, is sufficiently closely connected with the class of acts the agent has been appointed to perform, and this will be so even if what the agent has done can be characterised as performing his or her duties in an improper manner, for an improper purpose or by improper means.[7] Thus, I think the exemption of the company from liability for the actions of its agent would be contrary to the general principles of our civil law. In the absence of much fuller argument as to why it would be 'appropriate' to disapply the principal in this area, I cannot recommend it. However, there clearly is an important and in some ways analogous issue as to whether directors' liability should be retained in addition to the liability of the company, which I address below when dealing with the responses to Question 7.

4. I am thus less troubled than these respondents by the principle of requiring the company to compensate investors whom it has misled. Indeed, specifically to enact that there should be no liability on the part of issuers to investors in the case of fraudulent misstatements would be to remove rights which investors have at common law, even if the precise scope of those rights is unclear. However, this does not mean that I think that liability for misstatements to the capital markets should be freely and extensively imposed. There seem to me to be strong reasons for proceeding cautiously (but not good reasons for not proceeding at all). As indicated in the DP (Introduction), it is important that any liability regime should not provide incentives for companies to become more cautious in their disclosures to the market. The compensation regime for investors should not be at the expense of a free flow of accurate, timely and helpful information to them from issuers. Rather, if possible, the liability regime should contribute to the incentives for accurate disclosure by issuers. Thus, I share the reservations expressed by a number of respondents about the possible disutility of increased securities litigation.[8] I set out below a set of

---

[5] Clifford Chance acknowledged in their response that it was difficult to identify a principled reason for not imposing liability for fraudulent misstatements.

[6] Although they put the point as a response to Question 2 (see below at para 31), it is clear that theirs is a more fundamental objection than just to the extension of section 90A of FSMA to ad hoc statements, for they say that they 'question the logic of section 90A'.

[7] *Dubai Aluminium Co Ltd. v Salaam* [2003] 2 A C 366, HL – solicitors' firm liable to a third party when one of its partners had dishonestly participated in a scheme to defraud the third party, even though neither the partner nor the firm received any of the proceeds of the fraud.

[8] Clifford Chance say and I agree: "We do not believe that it would be beneficial for the UK financial markets for private securities litigation in the UK to follow the course that has been followed in the US, with extensive private securities actions." I also use a slightly different version of their argument about one

Exhibit 2
Page 146

proposals, which build on the existing but partial statutory regime imposing liability on issuers for fraudulent misstatements and which, I believe, will meet the legitimate interests of investors but not hamper the flow of information to the market.

5.  Section 90A imposes liability (i) for fraudulent misstatements (ii) upon issuers (only) (iii) in favour of acquirers of securities (only) (iv) in respect of statements made in response to the requirements of the Transparency Directive (TD) or in preliminary announcements of results, and thus (v) the section applies only to issuers with securities traded on a regulated market (notably, the Main Market of the London Stock Exchange but not AIM or Plus Markets) and (vi) it does not impose liability for delay in making announcements.  Each of these limits on the scope of section 90A can be seen as raising an issue of principle which needs to be addressed in considering a more general statutory regime. However, it is clear that one cannot take a 'pick and mix' approach in discussing these issues. In particular, the answer to the first question (fraud or some version of negligence as the basis for liability) raises the fundamental question in this area, and many respondents made it clear, explicitly or implicitly, that their answers to at least some of the further questions were dependent upon this initial issue having been settled in the way they favoured. I therefore begin with this question, then proceed to the others indicated above, and finally consider a couple of further issues which are not expressly dealt with in section 90A but which emerged from my discussions and researches in this area.

## *Question 1:* Fraud, negligence and gross negligence

### (a) Fraud or 'simple' negligence

6.  The first issue was presented in the DP (at paras. 70–77) principally as a choice between a fraud basis of liability and a negligence basis. There were thirty responses to the Question 1, which posed this issue, and since only one respondent, the UK Shareholders Association, was in favour of negligence as the standard of liability, it might be thought that this issue needs no further elaboration in this Report. However, the matter does deserve detailed consideration because of the need to be clear about the meaning of 'fraud' and because of the positive responses on the part of two further experienced investor groups (Association of British Insurers (ABI) and the Investment Management Association (IMA))[9] to the question also posed in the DP as to whether a 'gross' negligence standard constituted an available half-way house between fraud and 'simple' negligence. The arguments for and against the gross negligence standard cannot be fully understood before one has seen how they play out in relation to the 'simple' negligence standard.

7.  In order to present the issue as sharply as possible, the DP based the competing approaches on the existing concepts elaborated by the common law in the torts of negligence, on the one hand, and deceit, on the other. My understanding is that section 90A adopts the fraud definition from the common law of deceit. In negligence, the standard of conduct required is that of the reasonable person in the position of the defendant. This is a highly flexible standard of liability. The tort of

---

investor group compensating another below in discussing the advantages and disadvantages of liability based on negligence.

[9] The Investor Relations Society was in favour of gross negligence but only if the problems of definition, which I think are insuperable (see para 25 below) could be overcome.

Exhibit 2
Page 147

negligence needs such flexibility because it applies across a very wide range of activities in society, many of which are far removed from making statements to the capital markets, for example, driving a motor vehicle, operating a railway or factory, carrying out a medical procedure. As with all standards, the degree of guidance as to what the law requires, which can be obtained from the wording of the standard itself by those contemplating undertaking an activity to which the standard applies, is very limited. It is the application of the standard by the courts to the facts of particular cases which reveals its requirements, but that is a revelation which comes only after the event. Of course, examining a run of prior court decisions in a particular area enables the reader to deduce some prior guidance about the law's requirements. Nevertheless the application of the standard is always a fact-specific exercise, since what a reasonable person would do in the circumstances in which the defendant was placed can often not be determined without detailed examination of the facts of the case and debate about how the hypothetical reasonable person would have reacted in those circumstances. Thus, the scope for arguing that any particular set of facts giving rise to a potential claim is different is some significant respect from those of the previously decided cases is always large (though not unlimited).

8. By contrast, the tort of deceit is a form of wrongdoing developed by the common law specifically to deal with misstatements. It is formulated in much more precise terms. As laid down by the House of Lords over a century ago in the case of *Derry v Peek*,[10] a person is liable in this tort only if he or she knew the statement being made was false or did not care whether it was true or false (and it was in fact false). A genuine belief in the truth of the statement will protect one from liability, no matter how easily the falsity of the statement might have been discovered. The tort of deceit contains something much closer to a rule than a standard:[11] do not make a statement unless you believe it to be true. It is therefore much easier for someone contemplating speech to know in advance what the tort of deceit requires than in the case of a negligence standard. In addition, since the enquiry in a deceit case is only as to what the defendant knew or believed (rather than what a reasonable person would have done in the same situation), the range of facts upon which liability is dependent is much narrower.

9. The main reason put forward for rejecting a simple negligence standard (by both the majority who wanted fraud only as the basis of liability and those few who would add gross negligence as a basis of liability) was that a negligence standard would not promote comprehensive and timely disclosure but would rather encourage defensive and bland reporting. Alternatively, issuers might report more slowly (taking more time, and incurring more expense, to check the accuracy of what was said). However, given the insistence in the FSA's rules (see below) on speedy reporting, less informative rather than less speedy information disclosures is, in my view, the more likely response to the imposition of negligence liability in respect of episodic reporting requirements. Even though most of the disclosures with which this Review is concerned are mandatory, nevertheless the rules cannot specify comprehensively the content of announcements which issuers are required to make. A negligence standard for civil liability would push issuers towards the less helpful and less forthcoming end of the spectrum of possible approaches to the discharge of the disclosure obligations. In other words, there was agreement, at least as far as simple

---

[10] (1889) 14 App. Cas. 337. For a detailed analysis see J Cartwright, above n. 4, para. 5.13ff.
[11] On the distinction between rules and standards see L Kaplow, 'Rules vs Standards: an Economic Analysis' (1992) 42 *Duke Law Review* 557.

Exhibit 2
Page 148

negligence was concerned, that the gain in terms of accuracy from the imposition of negligence liability was likely to be outweighed by the loss in terms of the content of what would be disclosed.

10. A number of respondents favouring the fraud rule acknowledged that it would constitute a narrow basis for liability, and, seeking to reduce the force of this argument, pointed out the that standard for liability under FSA's rules is negligence: 'an issuer must take all reasonable care to ensure that any information it notifies to a RIS is not misleading, false or deceptive and does not omit anything likely to affect the import of the information.'[12] Thus, there was, it was said, sufficient incentive, in the shape of the FSA's rules and enforcement powers, to ensure that issuers did take proper care over disclosures to the market. However, this argument generates something of a conundrum: if the FSA's rules do not generate an adverse impact on the quality of disclosures to the market, even if they are based on a simple negligence standard, why should one expect civil liability rules based on the same standard to do so? And if the FSA's rules do have this adverse impact, what is the point of confining civil liability to the fraud standard, since this pass has been sold already?

11. These points lead me to the view that it is better to reformulate the question slightly differently and more broadly. The question is not whether there should be a negligence standard of liability for disclosures to the market but whether that negligence standard should be enforced solely by the FSA, primarily through its penalty-imposing powers, or whether civil litigation by investors seeking damages should also play a role in enforcing the negligence standard. The virtually unanimous response in favour of excluding civil liability based on simple negligence in this field reflected in my view three considerations. One was that the extent of the liability in civil litigation is measured by the loss suffered by the claimants, which in the case of a heavily traded stock could be very substantial. In principle, it is the loss caused to those who acquired securities during the period between the making of the false statement and the emergence of the truth (known in the US as the 'class period'), provided the securities were still held at the end of the period. Such losses would not necessarily be related (perhaps typically would not be) to the degree of fault on the part of the issuer in making the inaccurate misstatement. The prospect of a very large liability for only a very minor deviation from the standard of conduct of the reasonable person is likely to induce potential defendants to stay well on the non-liability side of the line, and, as part of that, to engage in 'defensive' and unhelpful disclosure. By contrast, the FSA is required by statute to have regard to the seriousness of the contravention in fixing its penalty,[13] so that a minor departure from the required standard will not necessarily trigger a large penalty. The FSA is thus in a position to relate its penalties to the degree of fault involved and thus not trigger excessively defensive reporting.

12. The second concern was a fear that private litigation would lead to over-enforcement of a negligence standard, coupled with the view that enforcement of the negligence standard by the FSA did not and would not suffer from the same defects. Third, at least in terms of issuer liability, where the costs of litigation fall on the current shareholders in the company, there was scepticism about the overall social utility of a

---

[12] DTR 1.3.4 and 1A.3.2.
[13] FSMA 2000, s. 93(2)(a). ENF 13.3.3(3) makes it clear that the FSA will take into account, among other things, the financial resources of the firm, when fixing the amount of the penalty. To like effect is LSE, *AIM Disciplinary Procedures and Appeals Handbook*, February 1007, p. 2.

mechanism which shifted investment losses from one group of investors to another. I now look at each the second and third arguments in a little more detail.

13. The fear that private litigation, especially collective private litigation, will lead to over-enforcement of the negligence standard results from an analysis which concludes that the civil litigation process permits the bringing of unmeritorious or speculative litigation (ie litigation based upon only weak arguments that the negligence standard has been breached) but which the defendant will prefer to settle rather than litigate to trial. The problem would be exacerbated if lawyers or other third party funders of litigation had an incentive to bring such litigation because, for example, a substantial proportion of such settlements would go to them. Respondents were influenced by the system of securities class actions in the United States and by analyses of that system to the effect that private enforcement of securities laws operates in that country so as to distort the securities markets and to make them less attractive to issuers.[14] If, it was said, the civil litigation system could develop in this way in a country where the basis of liability was 'fraud' (albeit fraud interpreted so as to mean 'gross negligence' – see below), the risk would be even greater for a system where liability was based on 'simple' negligence. How realistic are such fears in the United Kingdom?

14. It should not be thought that speculative litigation is in some way a cultural phenomenon of the United States, rather than one associated with the structure of the civil litigation process. Where the structure of the civil procedure rules permits such litigation in the United Kingdom, it certainly does occur. In the DP I quoted a description of such speculative litigation by Laddie J., to be found in his decision in *BCCI v Price Waterhouse*,[15] which was a case brought *by* a company (through its liquidator) against its auditors. It is perhaps worth repeating it here.

> "However it is common knowledge that in many cases like this in which enormous sums of damages are sought, the dispute does not reach the stage of a judgment. The sums claimed, the sheer cost of the litigation which in a case like this will be in many tens of millions of pounds, the enormous time which will be needed for the trial and the dislocation that will impose on the parties means that there will be very great pressure on them to settle. That pressure may be felt particularly acutely by the defendants. In fact during another application before me in this action some little while ago, counsel for the plaintiffs (but not the counsel appearing before me on this application) suggested that, no matter how weak the Plaintiffs' claim might appear in a case of this type, the defendants or their insurers would normally succumb to the pressure to offer a settlement. He appeared to suggest that such proceedings therefore justified themselves. I wish to make it clear that I am not suggesting that that is the motive behind these proceedings or that that was being suggested by counsel. But I have little doubt that it reflects what happens in some cases. In a legal system where even success in the litigation leaves the winning party bearing a substantial costs burden, the incentive to do a deal must be significant. Soldiering on as a matter of principle frequently is not a commercially sensible course to adopt. The result is that a significant part of the case law consists of cases concerning applications to strike out."

Thus, the question is not whether speculative litigation can occur in this country – it clearly can – but whether the civil procedure rules would encourage or discourage it in respect of the enforcement of securities laws by investors against issuers.

---

[14] See Committee on Capital Markets Regulation, Interim Report, December 2006 (available on: http://www.capmktsreg.org/index.html).
[15] [1999] BCC 351.

15. I discussed this issue in relation to fraud-based litigation in the DP (at paras. 110 – 118) and remain convinced of the conclusion there arrived at that fraud-based liability does not give rise to a serious threat of speculative litigation. However, there are certainly grounds for thinking otherwise in relation to negligence-based liability. In relation to fraud-based liability I pointed to three contrasts with the United States. The first was the absence of jury trials in this area in the United Kingdom.[16] That point applies equally to negligence actions. Second, I pointed to the relative ease with which a defendant could obtain an early dismissal (strike out) of a fraud case if the claimant had no evidence of fraud; and difficulties in the way of the claimant simply alleging fraud in order to get past the strike-out stage.[17] Third, I pointed to the lesser incentives to law firms and others to finance speculative litigation in this country, both because funding in exchange for a share of the recoveries was not clearly permitted outside the area of the enforcement of claims by (rather than against) companies in insolvency and because of the British costs rule under which the loser normally pays at least a proportion of the winner's legal costs.[18]

16. In relation to this last point on financial incentives to litigation the DP stated at para. 117: 'it is clear that the funding of civil litigation in the United Kingdom is still the subject of debate and that the current rules cannot be assumed to represent the situation which will continue in the future.' Subsequent events have served to underline this reservation, at least as far as England is concerned. The Office of Fair Trading has produced a consultation document on the subject of collective private actions to enforce the competition laws which envisages a raising of the cap on the additional fees which lawyers can charge if the litigation is successful (currently set at 100% of the normal fee) and some capping of the liability for the other party's costs if the action is unsuccessful.[19] More significant, the Civil Justice Council, whose earlier work was referred to in the DP, is about to produce a report on the funding of civil litigation generally, which, I understand, is likely to recommend that third party funding should be recognised as an acceptable option for mainstream litigation;[20] that research should be undertaken into the acceptability of contingent fee arrangements whereby lawyers' rewards are expressed as a percentage of the recoveries in a particular case (rather than, as at present, as a multiple of the fee normally charged); and some modification in appropriate cases of the rule that the loser pays the

---

[16] The English rules are dealt with in the DP. The view there expressed that the position was for these purposes similar in Scotland still obtains but I add some more detail on the Scottish provisions. For the use of juries in Scotland see Court of Session Act 1988, s. 11.

[17] On allegations of fraud in Scotland see *Drummond's Trustees v Melville* (1861) 23 D 450 at 462, per Lord President McNeil and *Leslie v Lumsden* (1856) 18 D 1046 at 1070, per Lord Ardmillan. As regards the Code of Conduct applying to advocates in Scotland, there does not seem to be an equivalent rule of conduct in relation to the drafting of pleadings in cases of fraud. There is, however, a rule which provides that "an advocate may not put to a witness any question suggesting that the witness has been guilty of a crime, fraud or other illegal or improper conduct unless he has personally satisfied himself that there is evidence which could, if necessary, be led in support of the suggestion".  As such a line of questioning in a case alleging fraud would already be outlined in the written pleadings, this rule appears to achieve largely the same result as the rule for barristers in England.

[18] The distinction between conditional and contingent fees obtains in Scotland: section 61A(3) and (4) of the Solicitors (Scotland) Act 1980 and the Act of Sederunt (Fees of Solicitors in Speculative Actions) 1992 SI 1992/1879). The Courts and Legal Services Act 1990 does not apply in Scotland, in particular its s 58B contemplating third-party funding.

[19] OFT, *Private Actions in Competition Law: Effective Redress for Consumers and Business* (Discussion Paper, April 2007, OFT 916).

[20] At the moment it is restricted. See para 118 of the DP.

Exhibit 2
Page 151

winner's costs. At the time of writing the precise nature of the recommendations which will emerge from the CJC is unclear as is, of course, the Government's ultimate response to them.[21]

17. I am grateful to Dr Christopher Hodges, of the Centre for Socio-Legal Studies of the University of Oxford, for his response dealing with this issue and for a highly useful subsequent discussion of the likely trends in the funding of civil litigation under these and analogous proposals. If one assumes that the financial incentives to law firms and others to fund litigation are likely to change significantly in the UK, then more weight falls on the other two factors mentioned above to discourage speculative litigation in the securities field. In particular, basing liability on fraud gives defendants scope to secure the strike out of unmeritorious cases at an early stage, in a way which is not likely to be possible in negligence cases because of their fact-specific nature.[22] Disputes over facts can be resolved only at trial but before that the incentives to settle, as described by Laddie J, will have begun to operate.

18. I share the view that there is a real risk, even without changes in the system of funding litigation in this country, that creating a liability to investors based on a negligence standard could generate unmeritorious claims for large sums of money which, for the reasons given by Laddie J, issuers would be under pressure to settle, no doubt for much less than their face value, but nevertheless for significant sums. Future developments in the funding of large-scale commercial litigation, if difficult to identify precisely at this point, seem likely only to exacerbate this problem. By contrast, FSA enforcement of the negligence standard through its penalty-imposing powers is likely to be more measured. It will not be distorted by the financial incentives noted above, which do not apply to it. Moreover, given its statutory obligation to promote 'market confidence' and to have regard to 'the desirability of maintaining the competitive position of the United Kingdom', it can be expected that the FSA will be guided in its enforcement of the negligence standard by the objective of promoting the efficient operation of the capital markets through prompt and informative reporting on the part of issuers. Overall, I am persuaded by the arguments which put the weight of the enforcement burden on public rather than private actors and confine private enforcement to the area of fraudulent claims.[23]

19. My assessment of how best to deal with the frequent lack of fit in civil litigation between the damages payable and the degree of fault involved and with the risk of unmeritorious litigation might well be different if FSA enforcement were not available. If private litigation were the only means for enforcing the negligence or due care standard, then one might want to accept these disadvantages of civil litigation in order to have effective enforcement in meritorious cases. The strategy I recommend thus relies on the continuing availability of public enforcement by the FSA. The primary role in securing the exercise of due care on the part of issuers in meeting their continuous disclosure obligations will continue to fall on the FSA. Those I discussed the issue with took the view that FSA enforcement was currently effective; certainly, no specific proposals for a different approach to its penalty-imposing

---

[21] Some reference to this work is to be found in CJC, *Annual Report 2006*, p. 12.

[22] It is not normally proper for the judge to try to resolve disputes of fact at this stage: *Electra Private Equity Partners v KPMG Peat Marwick* [2001] 1 BCLC 589, CA.

[23] In discussion Dr Hodges confirmed his view that the threat of speculative litigation arose principally in relation to negligence liability and that it was not a significant worry in cases of liability based on fraud, provided, of course, that the deceit definition of fraud was adopted.

powers emerged. Nevertheless, discussants were clearly assuming that the FSA would not reduce its enforcement effort in this area in the future. Further, if there were to be a deterioration in the quality of company disclosure, for example, in a market down-turn, the immediate pressures for a response in that situation would be felt by the regulator, which would not be able to respond that a remedy lay in investors' own hands.

20. One or two discussants wondered whether the FSA could make greater use of its restitution powers to obtain recompense for investors in appropriate cases where they have suffered losses as a result of negligent misstatements to the market.[24] This is an issue upon which the FSA itself has recently consulted. In its Consultation Paper 07/02 (*Review of the Enforcement and Decision-making Manuals*) it said:

> 5.31 We are not proposing to make any substantive changes to our current policy on the use of the powers given to us by the Act to apply to court for restitution and to make an administrative order for restitution, as set out in ENF 9. However, this proposed chapter includes a sentence that does not appear in ENF 9 which confirms that we expect to exercise these formal restitution powers on rare occasions only. This reflects the fact that when deciding whether to use the powers, we will consider other ways that persons might obtain redress, and any proposals by the person concerned to offer redress to any consumers or other persons who have suffered loss. We have also added text which clarifies that in deciding whether to use the powers, we will consider whether this would be the best use of the FSA's limited resources taking into account, for example, the likely amount of any recovery and the costs of achieving and distributing any sums.

This statement reaffirms the FSA's cautious approach to its use of the restitution power, though the absence of an alternative remedy for investors in the case of negligent misstatements to the market would be a factor in favour of its use. Nevertheless, the factors referred to in the final sentence of paragraph 5.31 would continue to operate in favour of a cautious approach. Indeed, to take the opposite extreme, routine use by the FSA of its powers to recover on behalf of investors full negligently-inflicted losses would be open to the same objection, in terms of the impact upon the free flow of information to the market, as would private litigation.

21. The third general consideration supporting excluding liability for simple negligence was the disutility of shifting losses between groups of investors. In a crude form this argument has been around since the emergence of the modern company. In some nineteenth century cases it was said that shareholders should not be able to sue the company because they would be suing themselves. Doctrinally, this makes no sense since the company is a separate legal entity and so shareholders do not sue themselves by suing the company. However, the argument is more persuasive when put in functional terms. A widely dispersed, long-term investor may find that it holds similar proportions of the shares whose acquisition was affected by the misstatement and of the shares which were not traded at the time. If so, there is little reason for it to want to move the loss from where it lies. This situation is particularly likely to obtain if one considers, not a single piece of litigation, but securities litigation over a period of time. As pointed out in para. 121 of the DP, unless an investor thinks that

---

[24] FSMA 2000, ss. 382 and 383; DP paras. 60-63.

there is some reason it will systematically be on one side rather than the other in the litigation, then it may be rational for that investor to support a system of letting the losses lie where they fall, thus saving the transaction costs (lawyers' and court fees) required to shift the loss. It may thus be the case that securities litigation is less attractive to long-term investors than to short-term ones. Hermes put the point in this way in their response to the Discussion Paper: "From a simple public policy perspective, it is hard to see why short-term traders of stock should be advantaged by a liability regime to the detriment of long-term shareowners. If this were to take place, it would seem to run counter to the government's intent to encourage a longer-term outlook on the part of the UK investment industry."

22. Of course, it could be said that the argument put forward in the preceding paragraph amounts to an argument against fraud as a basis for liability as well. However, it can be said that fraud is so corrosive of the basic trust on which the market operates that civil liability for such statements performs a valuable public function in deterring fraud; and that the absence of liability in damages for fraudulent misstatements would fail to meet the legitimate expectations of investors, as the current common law recognises. Moreover, fraud being less prevalent than negligence, even long-term investors may not think that, over a reasonable period of time, their gains from fraudulent statements will outweigh their losses.

23. My conclusion is, along with most respondents, that simple negligence should not be adopted as the basis for private litigation in this area. This is because I think respondents are right to fear that a negligence standard would generate defensive reporting, especially defensive ad hoc reporting, even where such reporting was mandatory. This is not so much because negligence is not an appropriate standard for liability in this area as because it is an inappropriate standard for civil liability in damages, in the light of the three considerations analysed above.

(b) Fraud or 'gross' negligence

24. The definition of 'fraud' adopted in the DP was a restrictive one: the maker of the statement must either know it was untrue or not care whether it was true or not. The latter form of misstatement is usually referred to as 'reckless misstatement'. Belief in the truth of the statement made would mean that there was no liability, even under the heading of recklessness. Whilst no respondent proposed liability based on 'simple' negligence, a minority of respondents (three out of thirty) wished to have a basis for liability in damages which went beyond fraud as defined above. The DP raised the possibility of a gross negligence standard as a half-way house. It is explicitly used in the German legislation (see Annex B to the DP) and in practice the term 'fraud' is interpreted in this way in US securities legislation (see para. 74 of the DP). Not surprisingly the respondents in favour of a gross negligence standard were investor groups. However, the investor groups were not unanimously in favour of a gross negligence standard: both the National Association of Pension Funds (NAPF) and Hermes supported a fraud-only standard.

25. The question is whether 'gross negligence' is a viable middle way. After much thought, I have concluded that it is not. In the common law of negligence (unlike the German civil law) the term 'gross negligence' has no clearly defined meaning because it has not been developed by the courts as a concept distinct from negligence. As

Exhibit 2
Page 154

Millett L J said in *Armitage v Nurse*,[25] speaking of the difference between common law and civil law systems: "While we regard the difference between fraud on the one hand and mere negligence, however gross, on the other as a difference in kind, we regard the difference between negligence and gross negligence as merely one of degree. English lawyers have always had a healthy disrespect for the latter distinction." More than one respondent quoted the famous quip of Willes J that 'gross negligence is ordinary negligence with a vituperative epithet.'[26] There is therefore a serious problem about adopting in legislation[27] a term whose meaning is so unclear. The first danger is that cautious lawyers would advise clients to act as if the term used were simple negligence, and thus trigger the defensive reporting which it is the aim of the law to avoid. Further, issuers would have a strong incentive to accept this advice because of the potential size of the damages award. Although the standard of care required by the law would now be set at a higher level than under simple negligence, every potential defendant would have a strong incentive not to contribute to the litigation in which the height of the gross negligence hurdle was considered by the courts. It might be said that the legislation could give the concept a firm meaning rather than simply adopt the term and leave the courts to make of it what they will. However, I am unconvinced that this could be done. Negligence, whether gross or simple, is a standard designed to apply flexibly in a wide range of situations. It is difficult to see what further specification could be given in the statute which would not involve the use of general phrases, to which the interpretative problem would simply be transferred.

26. Further, the danger of speculative litigation would remain. The gross negligence standard, just like the simple negligence standard, requires the courts to establish the facts of the particular case and then to apply the standard to those facts. The striking out of negligence claims is notoriously difficult where the issue is compliance with the standard of care, and that would remain the case no matter where the standard of care was pitched. The risk is therefore that the strike-out would not act as an effective filter of unmeritorious claims and that the incentives to settlement of even unmeritorious claims, noted above, would operate.

(c) The definition of fraud

27. The argument developed above has been that liability should be based on 'fraud' as defined in the tort of deceit. The maker of the statement must either know that the statement is false or not care whether it is true or false; and a genuine belief in the truth of the statement would be a defence to liability. It would be important that this definition should be clearly embodied within an extended statutory regime. 'Recklessness' in particular is a potentially slippery concept. It would be important that it should be clear that a genuine belief in the truth of the statement made did not amount to recklessness. In other words, and contrary to developments in the United States, the proposed regime would make a firm distinction between recklessness (potentially leading to liability in damages) and gross negligence (which would not); and the dividing line between them would be the presence or absence of a genuine belief in the truth of what was said.

---

[25] [1998] Ch. 241, CA.

[26] *Grill v General Iron Screw Collier Co* (1866) 35 LJCP 321, 330.

[27] It is clear that the imposition of liability for gross negligence would require legislative action, given that it is not a concept the common law has deployed in this area.

28. However, it is important not to exaggerate the limitations of the fraud basis of liability. In particular, the maker of a statement would not necessarily escape liability by stating in the witness box that he or she believed the statement to have been true at the time the statement was made. This is because the court might not believe the witness. In other words, the statement of belief in the truth of the statement must be a credible one. A person who could very easily have checked the truth of a statement which he or she had a strong interest in making may not subsequently be believed when asserting a belief in the truth of what was said. Given the ability of human beings to delude themselves about what they did think in the past, the court may well be right to take a sceptical approach. Although this is only a matter of evidence (if the person did genuinely hold the belief, no matter how irrational it was, there should be no liability), this point does dispose of the argument that a fraud basis of liability permits persons to escape liability where belief in the truth of the statement was not genuinely held. The risk of being disbelieved also means that, at the margin, fraud liability generates some incentive to check the facts before speaking.

29. Some of those arguing in favour of a gross negligence standard were fearful that the explicit adoption of a fraud standard could, in the words of the IMA, 'result in a lessening of the standards of care currently exercised and weaken a key link in the chain of accountability.' I am less concerned by this point than the IMA. As explained in the DP (at paras. 34-39), the current (common) law is liability to investors only on the basis of fraud. There is no case in the UK of which I am aware, outside the area of prospectuses, in which investors have succeeded against an issuer on the basis of negligence. Since this is an area where the central players seem to be well advised legally, it is difficult to see why the transference of such a rule from common law to statute should have if itself a significant impact upon standards of behaviour, assuming current levels of public enforcement.

30. In fact, there is one limited, but significant, way in which the current partial statutory liability scheme (set out in section 90A of FSMA), whose extension I recommend, makes the bringing of a fraud claim easier than it is at common law. At common law, besides knowing that the statement is false or being reckless in this regard, the maker of the statement is liable only if he or she intended the recipient for the statement (or a class of person of whom the recipient was one) to rely on it.[28] This requirement creates a potential obstacle to liability in the case of statements to the market, even if the maker of the statement knew it was false. Section 90A(5) substitutes for 'intended reliance' a requirement that the recipient's reliance should be reasonable in the circumstances. This change facilitates the bringing of fraud actions. If an issuer makes a statement which it knows to be false, liability can follow under the section if the investor's reliance on the statement is reasonable in circumstances, without investigation of the issuer's intentions in making the statement. I recommend that this relaxation of the common law's requirements continue to be part of any extended statutory liability regime.

---

[28] See Cartwright, above n 4, at para. 5.19.

*Question 2:* **Extension of the statutory regime to ad hoc statements**

31. At present the statutory regime in section 90A of FSMA applies only to disclosures made by companies in response to the requirements of the Transparency Directive (TD) and to prelims. The TD applies only to companies with securities traded on regulated markets. Thus, two questions arise: should the statutory regime apply to ad hoc or episodic statements, required by the Market Abuse Directive (MAD) and should it apply to statements, periodic or ad hoc, made by companies whose securities are traded on exchange-regulated markets. I deal with the first issue here and the second issue in the next section.

32. Overwhelmingly, respondents thought the statutory regime should be extended to ad hoc statements made by companies with securities traded on regulated markets. Only two out of 30 respondents were against this extension, plus the two respondents not in favour of imposing statutory liability even for periodic reporting. The reasons in support of the extension were three-fold. First, some ad hoc statements would later appear in disclosures required by the TD, and it was thought to be odd to have a different disclosure regime according to which disclosure the investor relied on. Second, and more broadly, it was thought that those subject to the rules would find it confusing to have different liability regimes according to whether the disclosure was required by the TD or MAD, whether there was overlap or not. Third, it was thought that there was no principled distinction between ad hoc and periodic disclosures as far as the appropriate liability regime was concerned.

33. In some cases those in support of the extension of the statutory regime to ad hoc statements made their support conditional on the their preferred answer to the first question (fraud or gross negligence as the basis for liability) being adopted in the statute. In the case of those in favour of fraud as the only basis of liability this makes sense. Not extending the statute would leave the common law rules in operation in relation to ad hoc statements, and, as explained in the DP and mentioned above, the common law imposes liability only for fraud. For those preferring gross negligence as the basis for liability, this argument for not extending the statute seems less compelling, since the common law does not adopt their preferred basis of liability either. In fact, as explained in para 30, the effect of not extending the statutory regime would be to make the fraud claim less easy to bring.

34. Those opposed to the extension as such, rather than to the principle of statutory liability, were Grant Thornton and Price Waterhouse Coopers (both accountants). The objection of both sets of accountants seemed on a fair reading to be to having a statutory liability based on negligence extended to ad hoc statements and to the undermining of the decision in *Caparo*.[29] Since the recommendation above is for liability based on fraud alone, thus confirming the absence of negligence liability, this objection falls by the way.

35. I therefore recommend that the statutory regime be extended to ad hoc statements made by companies with securities traded on regulated markets.

---

[29] [1990] 2 A C 605, CA.

*Question 5:* **Extension to exchange-regulated markets**

36. There was widespread support for the extension of the statutory regime to exchange-regulated markets. In fact, only two respondents rejected the idea, though many respondents made it clear that their support for the proposition was on the basis that the liability regime should be based on fraud alone. No principled reasons were put forward for not making this extension. It needs to be borne in mind that this is a proposal for a common liability regime across regulated and exchange-regulated markets, not a proposal for common disclosure standards across both types of market. As the Institute of Chartered Secretaries and Administrators (ICSA) said in their response: "The investors in these markets know that companies do not have to disclose the level of detail of those in the main market and they expect a higher level of risk. However, we believe that these investors should still be protected from dishonest disclosure."

37. Significantly, those most closely connected with the exchange-regulated markets supported the extension of the statutory regime: AIM, Plus Market and the Quoted Companies Alliance (QCA). AIM thought that different liability regimes would create confusion for both issuers and investors; QCA thought such a move would protect exchange-regulated markets from uninformed criticism; and Plus Market were concerned simply that the extension of the statutory regime should not impede the market authorities themselves from taking disciplinary action (though they did not suggest any reason why it should). I myself am aware of no basis upon which extension of the civil liability regime would have the effect feared by Plus Market.

38. I therefore recommend the extension of the statutory regime to exchange-regulated markets. In fact, I think it is necessary to go further than the inclusion of exchange-regulated markets. In terms of the concepts used in the Markets in Financial Instruments Directive (2004/39/EC), from November 1 2007 markets will be either regulated or 'multilateral trading facilities'. Although many of the latter will be exchange-regulated markets, as we currently understand them, this may not always be the case. I therefore recommend that all trading platforms for securities be brought within the extended statutory regime.

39. However, it needs to be recognised that in the case of exchange-regulated markets the burden of 'public' enforcement lies on the market operator, not the FSA. Thus, the AIM rules require companies (with the help of the their nominated advisers) to take reasonable care to ensure that information required to be put out on a RIS is accurate and complete, but disciplinary action against the issuer or nomad is a matter for the LSE.[30] The Disclosure and Transparency Rules of the FSA do not apply to exchange-regulated markets. However, the market abuse provisions of FSMA[31] do extend beyond regulated markets to embrace 'prescribed' markets (including any market operated by a Recognised Investment Exchange, such as the LSE). The market abuse rules do catch some types of inaccurate disclosure. Thus, in the Shell case, the penalty of £17 million was imposed for market abuse, although breaches of what are now the DTR were found as well. The FSA found that Shell's failure to correct the false or misleading information it had given to the market about the size

---

[30] AIM Rules for Companies10, 42 and 43. To similar effect are the Plus Rules for Issuers 22 and 56.
[31] S 118ff.

Exhibit 2
Page 158

of its reserves, despite warnings from a number of sources that the information was false, amounted to market abuse.[32]

### Question 4: How are the relevant disclosures to be identified?

40. Once the decision is taken to extend the statutory regime to ad hoc announcements and exchange-regulated markets, a crucial issue arises about the precise definition of the disclosures to which the statutory regime should apply. The overwhelming majority of respondents (twenty-two out of twenty-five)[33] favoured all RIS announcements, on the grounds that it would be the easiest rule for companies to apply and for investors to follow. In particular, it would be problematic to have different regimes for announcements required to be put out through a RIS and those which were not so required but which companies had chosen so to disseminate because it was not clear to them whether the RIS route was needed. This situation might arise where there were doubts about whether a particular piece of information was inside information or not. More broadly, it was thought it would be confusing for investors and companies to have different liability regimes for different categories of RIS statements, according to the legal basis of the disclosure requirement. This would have been the consequence of adopting either of the alternatives put forward, ie only disclosures required by MAD or disclosures required by the FSA's Disclosure and Transparency Rules (DTR) but not those required by the Listing Rules (LR).

41. Those favouring a narrower approach (Hermes, Association of Corporate Treasurers (ACT)) were concerned that the broader approach would or could reduce the rights which shareholders have as shareholders as against their companies. This is because the RIS system is required to be used to disclose to the market certain circulars which the companies are required to send to their shareholders, for example, in relation to significant transactions (LR 10) or related-party transactions (LR 11). I think it vital that the statutory regime for investors should not reduce shareholder rights. On the other hand, I think the arguments in favour of extending the statutory regime to all RIS announcements is compelling. Thus, the question becomes whether an 'all RIS' rule is compatible with the preservation of shareholder rights.

42. I have concluded that it is. I think the way forward was indicated by some of the law firms and lawyers groups which addressed the issue. They were in favour of the 'all RIS' rule but equally concerned, as I am, to preserve shareholder rights. Their argument was that the statutory regime could be applied to the RIS announcement without prejudice to rights which shareholders might have as shareholders arising out of the (virtually identical) circular sent to them. As the City of London Law Society put it: "We do not agree that the purpose of [RIS] announcements is to inform shareholders for *Caparo*[34] purposes. Shareholders are informed for the purpose of exercising their governance rights through direct communications addressed to them as shareholders (circular letters prepared in accordance with Chapter 13 of the Listing

---

[32] FSA, Final Notice, 24 August 2004, *The "Shell" Transport and Trading Company plc and The Royal Dutch Petroleum Company N V*. Section 118 has been rewritten subsequently to this FSA action in the light of the transposition of MAD, but not in such a way as to affect the point in the text.

[33] Those not favouring an extension of the statutory regime to ad hoc disclosures (see para 34) said 'none' in answer to question 4 and these responses are not included in the figures given in the text.

[34] The *Caparo* case (above n 29), whilst denying liability on the part of the auditors to investors (including shareholders who decided to acquire shares on the basis of the inaccurate information) nevertheless reaffirmed the auditor's liability to the company and to shareholders collectively. See DP para. 36.

Exhibit 2
Page 159

Rules). We think it is important that shareholders' *Caparo* rights in respect of these communications should not be restricted but we do not see why applying the statutory liability regime to the RIS announcements relating to the same transaction would have that effect."[35]  Herbert Smith made the further point that it is probably not even necessary to confine the preserved shareholders' rights to governance rights, thus giving rise to the need to define governance rights in the statutory regime. Whatever rights the shareholders have vis-à-vis the company as a result of inaccuracies in the circulars distributed to them by the company should remain untouched by the statutory regime and be left to development by the courts applying the common law.[36]

43. I thus agree with the view put forward by the ABI: "We consider that real time disclosures made under RIS announcements are quintessentially disclosures to the market and not to shareholders though shareholders may subsequently make use of these announcements for governance purposes. What is important, in point of principle (and as per one of the intentions within the Caparo judgment), is that accountability through liability by directors to shareholders for governance purposes should not be prejudiced. We see no need or justification for a carve-out of certain RIS announcements because they are thought to be primarily governance related. However, liability in respect of contents of circulars sent to shareholders in their capacity as such for governance purposes must be maintained." I believe the way to implement this principle is that indicated in the previous paragraph.

44. The same solution can be applied to circulars issued in the course of a take-over bid. These circulars are different from those considered in the previous paragraph, because they may be issued by the offeror to the shareholders of the target company or, when issued by the target to its own shareholders, have sometimes been considered by the courts as addressed also to the bidder company. Such circulars are also issued as announcements via the RIS. However, the policy reasons for preserving shareholder rights in this case seems to me as strong as the cases discussed in paragraph above. I agree with the IMA who, whilst supporting an 'all RIS' rule, wished to preserve the possibility of negligence liability in relation to takeover circulars.

45. I therefore recommend that the statutory regime should apply to all RIS announcements but that the statutory regime should be drafted so as not to affect the rights of shareholders and others arising out of company circulars addressed to them.

46. Finally, I stated in paragraph 49 of the DP that I did not believe that section 90A affected the negligence liability arising where, for example, an auditor undertook responsibility for the accuracy of the accounts in the context of a specific, known transaction. This principle should apply to any acceptance of responsibility on the part of any person (for example, the issuer) for any statement in such a specific context. As I explained in the DP, it is easy for the potential defendant in such a case to protect itself either by not accepting the relevant responsibility or by accepting it

---

[35] The Law Society's (majority) response was to the same effect: "Shareholders should in any event have more extensive rights than market participants in the case of Class 1 transactions by virtue of the shareholder circular required, notwithstanding that the circular would have to be published to the market in full text format and/or via a summary and link to a website."

[36] This is not an area which is dealt with in any detail in the Companies Act 2006.

on terms which are satisfactory to it. I do not think it will be difficult in drafting terms to achieve this result.

*Question 3:* **Liability for dishonest delay**

47. The DP asked whether there should be liability for dishonest delay. At common law there is in principle no liability for not speaking (unless it makes something already said misleading) and so delayed speaking would in principle be covered by this rule. However, the statutory regime in section 90A of FSMA, following the long-standing policy in relation to prospectuses, does not accept the principle of no liability for not speaking. It does impose liability for the deliberate or reckless omission in a statement of anything required to be included in it, whether or not it renders anything said misleading (s. 90A(3)(b)(ii)). The question, therefore, is whether the common law principle should be eroded further by imposing liability, not only for failing to disclose fully, but for delay in disclosure. The DP accepted that liability could not be imposed simply for deliberate delay. In most cases the delay will be deliberate and often for good reasons, for example, in order to be able to make a fuller and more helpful disclosure when disclosure is made. There is no public policy reason in my view to create legal pressure on companies to make quick but inadequate disclosure. The DP therefore put forward for discussion the suggestion that *dishonest* delay should be the basis for liability. In relation to inaccurate statements intention or recklessness would be enough; in relation to delay, there would be the additional requirement of dishonesty.

48. The majority of respondents were against this proposal. Nevertheless, a significant minority (seven out of twenty-nine), coming from a spread of relationships with the capital markets, supported it: ABI, ACT, Association of Investment Companies, ICSA, Investor Relations Society, KPMG, QCA. In discussions it became clear that some of those opposing liability for dishonest delay using it as a proxy for opposition to the FSA's rules on the timing of ad hoc disclosures, which they viewed as impractically demanding.[37] However, the proposal put forward in the DP was not to attach civil liability whenever there was an unjustifiable delay according to the FSA's rules, but to do so only in the case of dishonest delay. Those supporting the proposal were aware that it was very much in the nature of a back-stop (and so not open to the flood-gates argument); and no one identified a principled reason why dishonest delay should not be the subject of civil litigation. Indeed, many of those opposing the reform recognised that there was a good case in principle for imposing liability but were opposed for pragmatic reasons, which I found unconvincing, or because of uncertainty about the meaning of dishonesty.

49. The need to define dishonesty appropriately is indeed a key requirement of this proposal. In my view the solution to this problem is to focus on the purpose of the delay and to impose civil liability only if the purpose (or predominant purpose) for the delay falls within the prohibited category. One could take an analogy from section 397 of FSMA, imposing criminal liability for dishonest concealment of material facts, whether in connection with a statement of not. Under that section, criminal liability is imposed only if the concealment is for the purpose of inducing someone to take or not to take a certain course of action (broadly to take or not take an investment

---

[37] See DTR 2.2.1 and 2.5. The FSA's decision in the Marconi case seems to have been particularly influential in forming attitudes: FSA, Final Notice, Marconi plc, 11 April 2003.

decision). Translated into the context of this Report, there would be liability only if the person deliberately delayed publication for the purpose of inducing investors to acquire (or possibly dispose of) securities. More narrowly, the prohibited purpose could be defined as making a profit on the part of the defendant or inflicting a loss on the person who acquired the securities during the period of delay.[38] In either case, delay in order to obtain the full facts of the situation or even delay in order to permit the company to deal more easily with the situation which had arisen, would not fall within the scope of the civil liability regime, though such delay might constitute a breach of the FSA's rules.[39] On the other hand, delayed disclosure of bad news on the part of the issuer in order to enable the directors of the company to exercise their options and sell the shares at a more attractive price would fall within the civil liability regime, at least on the second of the two approaches to dishonesty.

50. I therefore recommend that the statutory regime should encompass liability for dishonest delay in making RIS announcements.

*Question 8:* **Should liability extend to sellers and holders of securities?**

51. Only six out of twenty-nine respondents favoured the policy adopted in section 90A of FSMA of giving a right of action to acquirers of securities only. Fifteen would extend the right of action to those who disposed of securities and eight to buyers, sellers and holders. I think it is impossible to draw a principled distinction between acquirers and disposers. Although corporate statements are, no doubt, much more often misleadingly optimistic than misleadingly pessimistic, so that acquirers have in fact more cause to complain than disposers, in principle their complaint is the same. In either case the price paid for the security would have been different if the truth had been known, and so the loss in question is the same, even if its incidence is not. I suspect that the exclusion of sellers from section 90A was due to the fact that the House of Lords in *Caparo* did not have to deal with the position of sellers and left the point open to some degree.[40] In any event, I can see no reason to exclude disposers of securities from a developed statutory regime.

52. I have found the question of holders a very difficult one. In most cases they will not be able to show that their decision to hold was taken as a result of reliance on the statement made. However, this will not always be the case: paragraph 105 of the DP gave an example of a situation where there seemed to be no problems of proof and the Appendix to Herbert Smith's response provided some more. However, if holders of securities are given a cause of action, it is unclear why non-acquirers should not be given one as well, ie a person who, on the basis of a fraudulent statement by the company, decides not to become invested in it. I am influenced by the fact that neither US nor German law gives rights of action to holders but require a securities transaction as a condition for liability. I think there is a risk of the courts being asked to make very difficult findings of fact in cases where there is no transaction and of their getting it wrong (or not clearly getting it right), thus bringing this new legislation into disrepute. As the CBI suggested, in many cases holders will be protected by their rights as shareholders, for example, in respect of misstatements made in shareholder

---

[38] This is the approach taken in section 3 of the Fraud Act 2006.
[39] See DTR 2.5.4G on delay in order to make the handling of the crisis easier.
[40] See para. 36, n. 43 of the DP.

circulars, which rights, it has been recommended above, should continue have effect outside the statutory regime.

53. I therefore recommend that the statutory regime should confer rights on both acquirers and disposers of shares. In respect of holders (and non-acquirers) I recommend that the statutory regime exclude them from suing in respect of statements contained in RIS announcements. However, the common law rights of holders arising out of misstatements in circulars should, as recommended above, remain in existence for development by the courts.

### *Question 7:* **Should liability be confined to issuers or be extended to directors and advisers?**

54. Section 90A imposes liability on the issuer. The DP raised the question whether liability should be extended to directors and advisers, on the ground that this would be a deterrent aimed directly at those making the statement on behalf of the issuer. A number of respondents made the point that it is in fact rare, though not unknown, for advisers to make statements on behalf of the company, as opposed to providing reports upon which the directors rely. Accordingly, the discussion will focus on the position of directors.

55. The majority of respondents (twenty-three out of thirty) were opposed to the extension of liability to directors. Those in favour were mainly, though not entirely, investor groups: ABI, AIC, Investor Relations Society (though very cautiously), NAPF, UK Shareholders Association, KPMG. In addition, the Minority View of the Law Society's Company Law Committee was in favour of liability being imposed on directors alone (see paragraph 3 above). Certainly, on normal principles of vicarious liability, the director or other agent remains liable whilst the company or other principal is made vicariously liable for the agent's wrongdoing. The purpose of imposing vicarious liability on the principal is to increase the chances that the claimant will have a financially viable defendant to sue and to give the principal an incentive to control the actions of the agent. In practice, the agent is rarely sued. The issue is thus whether the threat of suit, although in practice not very large, unless the director is insured, is a useful addition to the armoury of weapons available to deter directors from making fraudulent statements.

56. I am convinced by the arguments of those who say that the imposition of liability upon directors is unnecessary for deterrent purposes. The main alternative source of deterrence are the FSA's sanctions (public censure and penalties), which can be deployed against directors of companies on regulated markets where the company acts in breach of the DTR, requiring accurate disclosures according to a negligence standard, provided the director was 'knowingly concerned' in the contravention on the part of the issuer.[41] The DTR do not apply to companies with securities traded on an exchange-regulated market, but inaccurate disclosures may amount to market abuse, which again triggers the FSA's censure and penalty powers, even in relation to companies on AIM or Plus.[42] However, the main burden of policing the accuracy of disclosures on AIM and Plus and imposing sanctions on offenders lies with the market operators themselves (LSE and Plus). The AIM rules make directors

---

[41] FSMA s. 91(2).
[42] FSMA ss. 118 and 123.

responsible for compliance by their companies with the disclosure obligations contained in the AIM rules, but seem to contemplate the imposition of disciplinary sanctions only against the company or its nominated adviser. The Plus Market rules are similarly constructed.

57. There is also reason to be concerned about how targeted damages are from a deterrence point of view. If the director is in fact personally exposed to large securities losses (enough to bankrupt him or her), then the threat of liability is likely to be over-deterring, ie it will induce extreme and undesirable caution on the part of the director in order to avoid liability. On the other hand, if D&O insurance,[43] or some other mechanism, shifts the loss from director to company, it is unlikely that the threat of liability in damages will add the deterrence mechanisms already in place. Whether making the director wholly or partly liable for the loss suffered by investors is a sensible course of action is thus likely to vary from case to case, according to the insurance and indemnity arrangements in place in any particular company and according the company's view of the utility to the company of proceeding against the director or, on the contrary, protecting him or her from liability. This is not a judgement which investors are well-placed to make or, necessarily, interested in making. The company is better placed to do so and, indeed, can do so as the law stands. If the director's negligent discharge of his or her duties, including the issuance of misleading statements to the market,[44] has caused loss to the company, the company may in principle seek compensation from the director for breach of duty. Directors may be unwilling to sue one of their number, but may do so under shareholder pressure, and no such inhibitions will apply to a liquidator or a new board, appointed after a take-over, for example. Finally, an individual shareholder may make use of the new derivative action procedure contained in the Companies Act 2006 in order to bring an action on behalf of the company against the director.

58. Furthermore, the company is not restricted to waiting until the director has inflicted harm on investors before it takes action. Over the past fifteen years or so, the internal control structures of large companies, especially listed companies but not only them, have improved enormously. Creating an internal control structure which reduces significantly the opportunities for directors to make fraudulent statements, where such structures do not already exist, is feasible. Overall, the above approach is consonant with the theory of vicarious liability which generates incentives for the principal made liable for the harm to exert control over the actions of its agents, either in advance of the harm being inflicted on the third party or afterwards.

59. I therefore conclude that liability under the statutory regime should continue to be confined to the issuer.

*Question 9:* **Assessment of damages**

60. This question asked whether respondents preferred a negligence or a fraud measure of damages. On reflection, I am convinced that this question was posed too sharply in the DP and that it would be difficult to formulate effective rules in the statute which would not tie the courts' hands in an undesirable way in handling of particular

---

[43] D&O insurance could operate in this way, even in the case of fraud. See DP para. 101.
[44] Section 463 of the CA 2006 restricts the director's liability to the company to a fraud basis in the case of misstatements in the directors' report or directors' remuneration report.

Exhibit 2
Page 164

cases. I agree with most of the legal respondents that the matter is best left for decision-making by the courts. However, it should be made clear that the effect of this recommendation is that damages are likely to be assessed by reference to the loss caused by reliance on the statement, not the loss caused by its falsity.

*Question 6:* **Subordination of investors' claims**

61. The question here was whether investors' claims should be subordinated to the claims of the other unsecured creditors in the case of the issuer's insolvency, an insolvency possibly brought about by the need to meet the investors' claims. If subordinated, they would rank, presumably, with the claims of the shareholders as shareholders, though they could conceivably rank ahead of pure shareholder claims. If not subordinated, they would compete with the claims of the other unsecured creditors and have priority of the claims of the shareholders as shareholders. There was an almost even split of responses on this issue: fourteen for subordination and thirteen against. I am convinced that this is an important issue. It raises important general issues about the nature of equity investment in companies and about the role of legal capital. A number of those favouring subordination nevertheless put the point very cautiously. As Herbert Smith said: "This issue is however a complex one which would need careful thought. It raises some fundamental questions in relation to insolvency law which would need to be considered further. Also, caution is needed because in some situations subordination would lead to an inequitable result. The wrongdoer, for example the director guilty of deception, could be a substantial creditor of the company. A subordination of the claims of investors would then favour his position as fraudster over theirs as innocent victim."

62. I conclude that this issue needs further work. The issue has potential ramifications outside the area of securities litigation. However, I also agree with the CBI that the point is not so central that the implementation of the above recommendations should await its resolution. I note that in Australia the issue, arising out of the decision of the High Court in the *Sons of Gwalia*[45] case, has been referred to the (Australian) Corporations and Markets Advisory Committee.[46] I recommend that the Government should consider its resulting report as part of any future policy developments.

**Applicable law**

63. Many companies quoted on the British capital markets will have investors resident in a number of different jurisdictions. Which law governs claims brought by such investors is a complex subject, partly because the British rules determining the answer are not entirely clear and partly because courts in other jurisdictions may use different (but equally complex) rules to determine the answer. It is thus not impossible that such companies may be subject to investor claims under as many differing legal regimes as it has investors in different jurisdictions. This seems to me undesirable. A better result would be one in which a single legal regime applied to investor claims, possibly the law of the jurisdiction where the issuer is incorporated or possibly the law of the jurisdiction where the issuer has its primary listing. I have

---

[45] [2007] HCA 1. See DP para. 99.
[46] The terms of reference to the Corporations and Markets Advisory Committee can be found at:
http://www.camac.gov.au/camac/camac.nsf/byHeadline/PDFReference/$file/Ref_Sons_of_Gwalia.pdf.

not explored this question in any detail because it is clear that it cannot be solved through an exercise of the powers contained in section 90B of FSMA, and so is outside my terms of reference. My understanding is that the Government did advance precisely this point in the discussions on the (now agreed) 'Rome II' Regulation on the law applicable to non-contractual obligations, but without success.

# Summary of Recommendations

*Following the Discussion Paper questions*

**Question 1:**
What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liaiblity in the British context? Is fraud an appropriate basis for liability?

*Recommendation:* That fraud should be maintained as the basis of liability for the statutory regime and that the relaxation of the common law's requirements – whereby the claimant need only show that his own reliance on the misstatement was reasonable and not also that the issuer intended that he should rely on it – should continue as part of any extended statutory liability regime.

**Question 2:**
Should the statutory regime should be extended in principle to ad hoc statements?

*Recommendation:* Yes, the statutory regime should be extended to ad hoc statements.

**Question 3:**
Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?

*Recommendation:* That the statutory regime should encompass liability for dishonest delay in making RIS statements.

**Question 4:**
If the statutory regime were to be extended to ad hoc announcements, should it be (a) confined to disclosures of inside information (the most pressing case), (b) applied to all RIS announcements or (c) confined to announcements made under the FSA's Disclosure and Transparency Rules (ie excluding ad hoc announcements made under the Listing Rules)?

*Recommendation:* That the statutory regime should apply to all RIS announcements but that the statutory regime should be drafted so as not to affect the rights of shareholders and others arising out of company circulars.

**Question 5:**
Should section 90A apply to non-regulated markets? Does your answer differ according to whether section 90A is extended to cover ad hoc statements?

*Recommendation:* That the statutory regime be extended to exchange-regulated markets and that 'multilateral trading facilities' and all trading platforms for securities be brought within the extended statutory regime

**Question 6:**
Should the claims of investors for damages under section 90A or any extension of it be subordinate to the claims of other unsecured creditors?

*Recommendation:*  That this issue needs further work and that the Government should consider the outcome of the report of the Australian Corporations and Markets Advisory Committee on the [Australian] High Courts decision in the *Sons of Gwalia* case as part of any future policy developments in this area.

**Question 7:**
Should statutory liability for fraudulent misstatements be extended to those who make the statement on behalf of the company?

*Recommendation:*  That liability under the statutory regime should continue to be confined to the issuer.

**Question 8:**
Should statutory protection be extended to sellers and holders of securities as well as to buyers?

*Recommendation:*  That the statutory regime should confer rights on both acquirers and disposers of shares but exclude holders (and non-acquirers) from suing in respect of statements contained in RIS announcements.  The common law rights of holders arising from misstatements in company circulars should remain in existence for development by the courts.

**Question 9:**
Should the deceit or the negligence measure of damages be adopted in the statutory regime?

*Recommendation:*  That this matter is best left for decision-making by the courts.  The effect of this recommendation is that damages are likely to be assessed by reference to the loss caused by reliance on the statement, not the loss caused by the falsity.

Exhibit 2
Page 168

# Terms of Reference

Section 1270 of the Companies Act 2006 establishes a new statutory regime for liability in damages to third parties in respect of disclosures under the Transparency Directive (2004/109/EC). The Government consulted last year on whether the statutory regime should be extended. Responses to the consultation confirmed that this was a complex area in which it is vital to get the policy right, but were not conclusive.

The Government want to strike the right balance between the interests of investors and issuers, providing appropriate incentives to make timely and accurate disclosures in compliance with statutory rules, and an appropriate – but limited – right to recover losses. Section 1270 of the Companies Act amends the Financial Services and Markets Act 2000, inserting a new section 90B that provides for a power to amend the statutory regime.

The Government appointed Professor Paul Davies, the Cassel Professor of Commercial Law at the London School of Economics in October 2006 to undertake a review of issuer liability. The Davies Review will:

- Consider the law relating to liability in damages of issuers of securities traded on a regulated market or alternative markets (such as AIM or Plus Markets) in respect of statements and publications made to the market and which are incorrect, false or misleading or have not been made promptly;

- Consider how any such liability may be affected by regulatory obligations attaching to issuers and directors;

- Consider the case for providing for a specific right to damages by those relying on such statements and publications in the context of securities market activities, in particular: the circumstances that might give rise to a right, against whom a right might be enforceable and the consistency with the effect of corporate governance and conventions, standards or rules affecting the information that issuers publish to shareholders and others and how they publish it;

- Consider the impacts on:
  - issuers, markets, investors and others;
  - the quantity and quality of information disclosed;
  - the competitiveness of the UK as a good place to do business;

- Take into account the liability of issuers and their managements in other centres of financial services in Europe or more widely including the USA;

- Make recommendations to the Treasury on whether to exercise the section 1270 power and, if so, how.

In making recommendations to the Treasury, the Review will advise on:
- options for a new regime if recommended;
- who might bring actions to sue for damages;
- the kinds of damages that might be awarded and potential effects of paying those damages on issuers, including effects on their business and employees, directors or senior executives, and on the supply of qualified individuals willing to take on director and non-executive director roles in consequence;
- and other related matters.

Exhibit 2
Page 169

# List of contributors

The Davies Review is grateful to the numerous organisations and individuals that provided invaluable input throughout the course of its inquiry through informal discussions and supporting information. The following organisations and individuals contributed written responses to the Discussion Paper:

100 Group of Finance Directors
Allen & Overy
Association of British Insurers (ABI)
Association of Corporate Treasurers (ACT)
Association of Investment Companies (AIC)
Professor Paul Barnes (member, Fraud Advisory Panel)
BT Group plc
Chartered Institute of Management Accountants (CIMA Global)
City of London Law Society Company Law Sub Committee
Clifford Chance LLP
Confederation of British Industry (CBI)
Deloitte & Touche LLP
Environment Agency
General Counsel 100 Group
Grant Thornton UK LLP
Herbert Smith LLP
Hermes Pension Management Ltd.
Dr Christopher Hodges (University of Oxford)
Insolvency Service
Institute of Chartered Accountants in England & Wales (ICAEW)
Institute of Chartered Accountants of Scotland (ICAS)
Institute of Chartered Secretaries & Administrators (ICSA International)
Institute of Directors
International Capital Market Association
Investment Management Association (IMA)
Investor Relations Society
KPMG LLP
Law Society Company Law Committee
Law Society of Scotland
London Investment Banking Association
London Stock Exchange AIM
National Association of Pension Funds
NERA Economic Consulting
Ogilvy Renault LLP
PLUS Markets Group
PriceWaterhouseCoopers LLP
Quoted Companies Alliance
Slaughter and May
Jeffrey Sultoon (Ashurst)
The Takeover Panel
UK Shareholders Association
Robin Woodall (member, LSE Primary Markets Group)

Unless respondents requested otherwise, their responses may be viewed on the Davies Review website at www.hm-treasury.gov.uk/davies.

# Further information & next steps

### Further information

Further information on the background to the Davies Review and links to research commissioned by the Review on the liability regimes in France, Germany, the US and Australia can be found at www.hm-treasury.gov.uk/davies.

### Next steps

The Economic Secretary has committed to consulting fully on the Government's response to the Davies Review's proposals and to publishing a full regulatory impact assessment of these proposals.  For further information contact Jack Middleton at:

Savings and Investment Team (SAVI)
HM Treasury
1 Horse Guards Road
London SW1A 2HQ

Tel: 020 7270 5272
email: Jack.Middleton@hm-treasury.gov.uk

Exhibit 2
Page 172

Exhibit 2
Page 173

ISBN 978-1-84532-306-6

Exhibit 2
Page 174

[HOUSE OF LORDS.]

LIVINGSTONE . . . . . . . . APPELLANT;          H. L. (SC.)

THE RAWYARDS COAL COMPANY . . RESPONDENTS.        1880
                                                   Feb. 13.

*Coal Mine worked by Mistake beyond Boundary—Compensation—Evidence of
the Measure of Damage—Royalty—Surface Damage—Way-leave.*

*A.* was the owner of a small feu of about an acre and a half in extent.
The surface of the ground was occupied by miners' cottages, and underneath
was coal. When *A.* purchased the feu, he was under the impression that
all the minerals under the feu, as under all the ground surrounding it, had
been reserved to the superior; but that was a mistake, for in the deed grant-
ing the feu there was no reservation of coal. The superior granted the
whole property in the coals in all the surrounding land to *R.* and *C.* They,
under the impression that they had the whole of the coal, including the coal
under the acre and a half, worked out and disposed of the coal under *A.*'s
acre and a half; and in doing so damaged the surface.

*A.* could not have worked the coal to a profit himself; there was no person
to whom he could dispose of it but to *R.* and *C.* ; and the element of wilful
trespass, and the element of special and exceptional need of support to the
surface, were absent.

In a claim by *A.* for (1) the value of the coal; (2) a sum for " way-leave"
and the advantage obtained by working through instead of round the feu;
and (3) for damages done to the houses on the surface :—

*Held,* affirming the decision of the Court below, that the value of the coal
taken must be the value of the coal to the person from whom it is taken,
at the time it is taken, and that the best evidence in the peculiar circum-
stances of this case of that value was the royalty paid by *R.* and *C.* for the
surrounding coal field; therefore *A.* was entitled to the lordship on the coal
excavated, calculated at that rate; together with the payment of a sum for
damage done to the houses on the surface.

*Held,* also, that as the question of " way-leave " was not argued before the
First Division of the Court of Session, it could not be entertained in this
House.

The principle of *Jegon* v. *Vivian* (Law Rep. 6 Ch. 742) sustained.

APPEAL from the First Division of the Court of Session in
*Scotland.*

In 1837 Mr. *Gavin Black,* then proprietor of the lands of *Raw-
yards,* near *Airdrie, Lanarkshire,* feued out a small portion of land,
namely, 1 acre 30 falls and 21 ells, to the *Monkland Iron and
Steel Company.* By the feu disposition the grantor specially

Exhibit 2
Page 175

26                    HOUSE OF LORDS                    [VOL. V.

H. L. (Sc.)
1880
LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

reserved to himself, his heirs and successors, the whole ironstone in the ground feued; but the deed contained no reservation of coal.

In 1869 the Appellant, Mr. *James Livingstone*, purchased the feu, and some thirty miners' cottages, which covered the surface, for £80, from the *Monkland Iron and Steel Company*. The Appellant appears to have been under the impression that all the minerals under the feu, as under all the ground surrounding it, had been reserved by the superior.

In 1871 Mr. *Gavin Black* died, and was succeeded by Mr. *John Motherwell*, the present proprietor of the lands of *Rawyards*. He, in the belief that all the coal on the estate had been reserved, granted in 1872 a lease of the whole property in the coal—as far as this appeal is concerned—to the Respondents, the *Rawyards Coal Company*, at a royalty of 6*d.* per ton. They, just as the Appellant was ignorant of his rights, were ignorant of theirs; for they believed they were the owners of all the coal, including the coal under the Appellant's feu. Accordingly, in the ordinary course of their working, and between May, 1871, and May, 1876, they wrought out and removed the coal under the Appellant's acre and a half, to the amount of 5895 tons. When this was done, and the coal disposed of, it was discovered what the real titles were, through the Appellant examining his titles for the prosecution of a claim for surface damage; for the Respondents in working under the acre and a half had, by letting down the ground, caused damage to the miners' cottages. The question under these circumstances came to be, what was the measure of damages the Appellant was entitled to. It was admitted that what was done, was done in perfect ignorance, and that there was no bad faith, nor sinister intention on the part of the Respondents. The Appellant in his action claimed (1) the value of the coal, under the deduction of proper allowances for raising the same; (2) a sum for way-leave, in respect that large quantities of coal had been carried from the adjacent coal field through the Appellant's feu; (3) damages done to the miners' cottages. The Respondents, admitting they had taken the Appellant's coal, tendered in discharge of the action £450 10*s.* This offer being

Exhibit 2
Page 176

refused by the Appellant, the Lord Ordinary (1), after a proof, found, June 10, 1878, *inter alia*,

"That the coal removed from the Pursuer's (Appellant's) feu by the Defenders (Respondents) consisted of 4300 tons or thereby of free (or common) coal, 1275 or thereby of dross, and 320 tons or thereby of gas coal, in all 5895 tons or thereby; and the value of these at the pithead, according to a reasonable calculation of the market value, was as follows: common coal, at 6s. per ton, £1290; dross, at 1s. 6d. per ton, £95 12s. 6d.; and gas coal, at £1 3s. 11d. per ton, £382 13s. 4d.; thus amounting in all to  .    .    .    .    .    .    .    £1768  5 10

"(5) That a fair price for working the said coal may reasonably be fixed at 4s. 3d. per ton over head, this sum including everything except lordship and capital charges, the amount at this rate being in the aggregate .    .    .    .    .    1252 13  9

"And leaving as free profit or value in the hands of the Defenders, derived from coal belonging to the Pursuer, the sum of .    .    .    .    .    .    .    .    £515 12  1

"In the second place that the Pursuer is entitled to recover the said sum of £515 12s. 1d. from the Defenders: finds Pursuer entitled to the expenses of process, &c."

<div align="right">

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

</div>

The Lord Ordinary disallowed the Appellant's claim for damage to his houses by subsidence of the surface, holding that was a loss which the Appellant must necessarily have incurred had he himself worked out the coal. The Lord Ordinary also rejected the claim by the Appellant for "way-leave," amounting to £33 6s. 8d., calculated at the rate of about 2d. per ton; and the Appellant's claim for £110 9s. 8d., as the amount alleged to have been saved to the Respondents by working through, instead of round the Appellant's feu. And these claims were not mentioned by the Appellant's counsel when the case was argued before the First Division. The Respondents being of opinion that the Lord Ordinary had misapprehended the nature of their contention, and had greatly underrated the expense of working the coal, presented a reclaiming note against his decision. The First Division, on the 20th of May, 1879, reversing the Lord Ordinary's interlocutor, found that the Appellant was entitled to £171 7s. 6d., being the amount of lordship on the coal excavated, calculated at the rate paid by the Respondents to the superior for the surrounding coal field, with, in addition, a further sum of £200 as

<div align="center">(1) Lord *Craighill*,</div>

Exhibit 2
Page 177

H. L. (Sc.)
1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

compensation for damage done to the houses on the surface.    In respect of the tender their Lordships gave the Respondents their costs from the date of the said tender (1).

Mr. *Davey*, Q.C., and Mr. *Guthrie Smith*, for the Appellant, contended that he was entitled to the value of the coal after deduction of the cost of severance and bringing it to the surface.    Here the value of the coal was the free profit made by the Respondents. The Appellant was content with the Lord Ordinary's finding; but the judgment of the First Division was in effect to compel the real owner of the coal to receive a royalty, giving the whole profit made to the trespassers.    That finding was not consistent with the principle of *Jegon* v. *Vivian* (2) and the earlier cases. Where the coal is taken by fraud or negligence, the proper estimate of damage is the value of the coal when gotten, without deducting the expense of getting it: *Martin* v. *Porter* (3), *Wild* v. *Holt* (4), and *Phillips* v. *Homfray* (5).    But where taken by mistake, and an encroachment under title, a milder rule prevails, though in *Morgan* v. *Powell* (6) the Defendant was not allowed the cost of the severance of the coal.    So in *Wood* v. *Morewood* (7), a case at *Nisi Prius, Parke*, B., told the jury that if they thought the defendant was not guilty of fraud or negligence, but acted fairly and honestly, in the full belief that he had a right to do what he had, they might give the fair value of the coals as if the coal field had been purchased from the Plaintiff. The jury found that there was no fraud, and estimated the damages accordingly.    That case was the precedent for the principle on which *Jegon* v. *Vivian* (2) was decided: see also *Hilton* v. *Woods* (8), remarks of *Malins*, V.C. (9); *In re United Merthyr Collieries Company* (10).

The value of the coal taken was the profit admittedly gained by the Respondents, but the Court below thought the question of

(1) Court of Sess. Cas. 4th Series, vol. vi. p. 922; Scotch Law Rep. vol. xvi. p. 530.
(2) Law Rep. 6 Ch. 742.
(3) 5 M. & W. 351.
(4) 9 M. & W. 672.

(5) Law Rep. 6 Ch. 770.
(6) 3 Q. B. 278.
(7) Ibid. 440, n.
(8) Law Rep. 4 Eq. 432.
(9) Ibid. at p. 440.
(10) Ibid. 15 Eq. 46.

Exhibit 2
Page 178

the profit realized by the trespasser not of the least relevancy.
If that judgment is right then the real owner would be wrong in
claiming his own coal lying at the pit's mouth, for it would be a
sufficient answer for the trespasser to tender the lordship. The
fact ought to weigh that the Appellant did not want the coal
removed, on the contrary it was of great value to him having a
firm foundation in a county so honeycombed as *Lanarkshire*.

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

[LORD BLACKBURN:—The Court below decided this case on the
peculiar circumstances that no one could work this coal at a profit
unless he had the facilities of the Respondents.]

It was no answer that the Appellant could not have worked the
coal himself. He was entitled to have the chattel taken, restored,
or, if that was impossible, then the profit made out of it must be
handed over to him.

The Appellant was satisfied with the amount awarded by the
Court below for surface damage, but submitted he was also entitled
to the clear profit made out of the coal.

They further maintained that a sum should be allowed the
Appellant for "way-leave," or for the advantage reaped by the
Respondents by working their tramways through, instead of round
the feu.

[EARL CAIRNS:—That question was not argued before the
Inner House, and it is not usual to argue points in this House
that have not been argued before the Court below.]

On the whole matter they submitted that the Appellant was
entitled to the profit made, and to costs.

Mr. *E. E. Kay*, Q.C., and Mr. *Gloag*, maintained for the Re-
spondents—putting aside the compensation for surface damage—
that all the Appellant was entitled to was the value of the coal
*in situ;* that principle was laid down in both *Wood* v. *More-
wood* (1) and *Jegon* v. *Vivian* (2). The question was not what
the trespasser made of the coal, but what the owner *could* have
made of it. The Appellant had no right to follow the coal; nor
was the profit made on it by the Respondents any test of its value

(1) 3 Q. B. 440, n.            (2) Law Rep. 6 Ch. 742.

Exhibit 2
Page 179

30                  ,            HOUSE OF LORDS            [VOL. V.

H. L. (Sc.)      *in situ.*  The circumstances here were most peculiar,—the Appel-
1880         lant could not sink a shaft and work the coal himself at a profit;
LIVINGSTONE     nor was there a single person he could sell the right of working
*v.*        it to, except the Respondents; and the Appellant's own surveyor
RAWYARDS       advised him to take the ordinary royalty given for the coal in the
COAL         neighbourhood.  Therefore the value of the coal to the Appellant
COMPANY.       was accurately given by the Court of Session, and the principle of
——         the cases cited had been applied.

    Mr. *Guthrie Smith*, in reply.

EARL CAIRNS, L.C.:—

    My Lords, there are two minor points in this appeal which I
may mention in the first place, for the purpose of putting them
on one side.  I mean the question of an allowance for way-leave,
and the question of an allowance for what is termed the ad-
vantage obtained by working through, instead of round, the feu
of the Appellant.  Both those points were insisted upon before
the Lord Ordinary; but when the matter came before the First
Division, the contest of the Appellant with regard to those points
does not appear to have been renewed; and, therefore, to enter
upon them now would be in substance to entertain in this
House an appeal from the Lord Ordinary, and not from the First
Division.

    Upon the main question which has been argued the case is one
of some peculiarity.  The Appellant is the owner of a small feu
of about an acre and a half in extent near *Airdrie.*  The surface
of the ground is occupied by miners' cottages or houses, and
underneath there was coal.  When the Appellant bought the feu
some time ago he appears to have been under the impression that
the minerals under this feu, as under all the ground which sur-
rounded it, had been reserved by the superior.  In point of fact
that was a mistake.  The superior kept in his hand the minerals
under all the ground around, but under this acre and a half the
coal had not been reserved in the grant of the feu now owned by
the Appellant.  The Appellant, therefore, although he did not know
it, was the owner of the coal under this acre and a half of ground.
The superior granted the whole property in all the surrounding

Exhibit 2
Page 180

land to the company who are the Respondents, and they, just as the
Appellant was ignorant of his rights, appear to have been ignorant
of theirs.   They appear to have been under the impression that they
had the whole of the coal, including the coal under the acre and
a half.   They had the coal which surrounded the acre and a half,
but they had not the coal which was underneath the acre and a
half.   In the process of their working they worked out the coal
under the acre and a half, and when that was done it was ascer-
tained (it is unnecessary to observe how the discovery came to be
made) what the real titles were, and that this coal really belonged
to the Appellant, and did not belong to the Respondents, who had
got it and disposed of it.   I ought to add that in working under
the acre and a half of ground they had, by letting down or cracking
the ground, caused some damage to the miners' cottages which
stood upon the surface of the acre and a half.

Now, my Lords, under these circumstances the question arises,
what is the measure of damage to which the Appellant is entitled ?
We may put aside some elements which might occur in some cases,
but which do not occur in the present case.   There is absent here
the element of any wilful trespass or wilful taking of coal, which
the person taking it knew did not belong to him.   What was done
was done in perfect ignorance, and there was no bad faith or sinister
intention in that which was done.   We may put aside another
element which might have occurred.   It might have been the case
that the support of the coal under this acre and a half of ground
had been of some peculiar advantage or benefit to the Appellant, for
which no money would compensate him.   Either by some use
made of the surface, or by some specific use intended to be made
of the surface, there might have been a peculiar need for the
support of the minerals underneath, which might either have
made it impossible to estimate the damage, or might have made
the estimate of the damage exceptionally high.   Neither of these
elements occurring—neither the element of what I will call wilful
trespass, nor the element of special and exceptional need of
support—the case is one in which your Lordships have simply to
ascertain what is the ordinary measure of damage for the coal
taken, or what, in other words, is the value of the coal that was
taken.

H. L. (SC.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Earl Cairns, L.C.

Exhibit 2
Page 181

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Earl Cairns, L.C.

Of course the value of the coal taken must be the value to the person from whom it was taken, because I do not understand that there is any rule in this country, or in *Scotland*, that you have a right to follow the article which is taken away, the coal which is severed from the inheritance, into whatever place it may be carried or under whatever circumstances it may come to be disposed of, and to fasten upon any increment of value which from exceptional circumstances may be found to attach to that coal. The question is, what may fairly be said to have been the value of the coal to the person from whose property it was taken at the time it was taken.

I own that it appears to me that the Court of Session have adopted a principle which is not unsatisfactory for the purpose of ascertaining that value. They have said, The value to this Appellant is not the value which he could have derived from himself working the coal and taking it into the market, because he could not have worked it; the area is so small that it would have been impossible for himself to have worked and used the coal, and earned a profit, or put an additional value upon the coal by so working it; he must have gone to some person, or waited till some person came to him who had the power of working the coal from adjacent working; therefore (say they) the value is that which he could have obtained from somebody else who would have come and taken the coal as it stood *in situ,* and who would have worked it and turned it to account. Then they go to the witnesses of the Appellant, and they must take Mr. *Rankine,* his principal witness; and I observe that another witness of the same stamp and character as Mr. *Rankine* immediately follows, who wishes his testimony to be taken as repeating Mr. *Rankine's in omnibus.* Therefore those two witnesses must be taken to say this. Mr. *Rankine* is asked this question: "Suppose you had been asked by Pursuer whether it would be advisable for him to sell the whole of these minerals to Defenders for £100, the Defenders paying compensation for the damage to the houses, would you have advised him to take it?" And his reply is: "The advice I have invariably given—I have done it in two instances within the last two years—is, 'Don't let your coal for a less lordship than that obtained by the adjoining proprietor;' and in that case I should have said to the Pursuer,

Exhibit 2
Page 182

VOL. V.]          AND PRIVY COUNCIL.                    33

'Do not take less than £171 7s. 6d. for the coal, plus the damage to the houses.'" He says that the advice which he would have given to his client would have been not to sell for less than (which implies, of course, to sell for) £171 7s. 6d., plus the damage done to the surface; that is to say, that if there had come to him some person who, from possession of the adjoining property, had been able to work this coal, and had asked the Appellant to sell the coal to him, the Appellant would have been advised to reply, " I will sell you the coal for a royalty, that is· to say, a sum per ton which will produce to me £171 7s. 6d.; but in addition, you must undertake to pay me whatever damage is done to my houses which are upon the surface of the land ;" and, for the purpose of the present argument the amount of damage as ascertained and not objected to is a sum of £200.

H. L. (Sc.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Earl Cairns, L.C.

Upon that evidence the Court of Session say, " We are of opinion that the value to this Appellant of this coal was the money that would have been produced if he had sold the coal, and the money that he would have got if he had sold the coal would have been £171 7s. 6d.; but that would have been accompanied and guarded by a further payment which would have indemnified him for the damage done to the houses upon the surface in getting the coal, and that further sum he must have, in addition to the £171 7s. 6d."

My Lords, I own that under the very peculiar circumstances of this case, there being only the element to consider to which I have referred, namely, the element of value to the Appellant, I think he has received in the judgment of the Court of Session that which is the proper value, and I see no reason for differing from the judgment of the learned Judges. I therefore advise your Lordships, and move your Lordships, that the appeal be dismissed with costs.

LORD HATHERLEY :—

My Lords, after carefully considering the case I have come to the same conclusion, though at one time I was under the impression that there was more in the question of the sale by royalty being as it were enforced than I at present think.

The case is certainly a very peculiar case, and, without with-

VOL. V.                         3      D

Exhibit 2
Page 183

34                              HOUSE OF LORDS :                    [VOL. V.

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.
—
Lord Hatherley.
drawing from any of the principles which I found in the case of *Jegon* v. *Vivian* (1) to be established by the prior authorities, I think this case may be disposed of, and will be disposed of, by your Lordships in entire consistency with those principles. There is no doubt that if a man furtively and in bad faith robs his neighbour of property, and, because it is underground, is probably not for some time detected, the Court of Equity in this country will struggle, or I would rather say will assert its authority, to punish fraud by fixing the person with the value of the whole of the property which he has so furtively taken, and making him no allowance in respect of what he has so done as would have been justly made to him if the parties had been working by agreement, or if, as in the present case, they had been the one working and the other permitting the working through a mistake.

The Courts have already made a wide distinction between that which is done by the common error of both parties, and that which is done by fraud. In the present case, it is clear on both sides that each party was ignorant of the rights of the Pursuer, and consequently the matter is not to be treated as a case of forced sale, but as a case of sale which has taken place by inadvertence; and what we, as a Court of Justice, have to do is to see that under these untoward circumstances that which never ought to have been done at all, but which has been done either through want of watchfulness or through want of knowledge, as the case may be, and which has occasioned in the doing an injury to either of the parties, is remedied and set right, so far as it can be, upon equitable principles. Those principles are no doubt settled by the authorities, many of which have been cited in the course of this argument; those principles are that the owner shall be re-possessed as far as possible of that which was his property, and that, in respect of that which has been destroyed, or removed, or sold, or disposed of, and which cannot therefore be restored in specie, there shall be such compensation made to him as will in fairness between both parties give to the one party the whole of that which was his, or the whole value of that which was his, and will at the same time give to the other, in calculating that value, just allowances for all those outlays which he would have been obliged to make if he had been entering into a contract for that

(1) Law Rep. 6 Ch. 742.

Exhibit 2
Page 184

being done which has, by misfortune and inadvertence on both
sides, and through no fault, been done. Perhaps the law may
have even gone a step further than in some cases might be
necessary. Each case must stand upon its own particular founda-
tion in that respect; but, regard being had to the rule *vigilantibus
non dormientibus*, it requires to be carefully considered in each par-
ticular case how far the principle is just which deals with property
under such circumstances as property which has been acquired
by one person from another without payment, and by inadvertence.
But when we once arrive at the fact that an inadvertence has been
the cause of the misfortune, then the simple course is to make every
just allowance for outlay on the part of the person who has so
acquired the property, and to give back to the owner, so far as is
possible under the circumstances of the case, the full value of that
which cannot be restored to him in specie.

In this case we are singularly free from any difficulty upon the
point, and the parties seem to have carried on the litigation on a
principle which does them credit, and on which one wishes to see
all litigation carried on. They say, "The misfortune has taken
place: we neither of us knew anything about this at the time, and
now that it has taken place let us see what can best be done to
remedy the misfortune which has so occurred." We find the
position of the case to be a very singular one indeed, and one
which is not likely to recur in many instances, though it may in
some instances—it is this. A small piece of ground, an acre and
half in extent, being the property of the Pursuer, is surrounded by
the property of the Defenders; and the Defenders thought (and
the Pursuer thought so too) that it was included in their property,
instead of being a separate portion surrounded by their property.
That being the case, one thing was perfectly clear (and I shall
make it clearer presently by reading the Pursuer's own evidence),
that nothing could be made by the Pursuer of this acre and a half
of ground by working it himself. He would not sink a shaft or
put up a steam-engine, or use any of the ordinary modes of
working a mine, in respect of this acre and a half of ground; and
indeed, that is what he tells us himself, because, in words which
were read by the learned counsel who last addressed your Lord-
ships, the Pursuer says, in his own appendix of proofs, on re-cross-

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Hatherley.

3      D 2

Exhibit 2
Page 185

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Hatherley.

examination: "If the Defenders had not taken away this coal, I might have arranged with them to take it away through their pit, but I don't think it would have been profitable to have done so; I would rather have it standing. I don't think there was any way in which I could have turned this coal into money;" and then he goes to another subject. Several houses were built upon this property; they were apparently small cottages, not of a very heavy description in themselves, and he complains that if he were minded (though it does not appear that he ever was so minded) to build a manufactory or some large building upon the ground, he would not, in consequence of its being so worked by the Defenders, be in a position to find a foundation for his building. Whether he refers to that when he says that he would rather have it remain as it was I do not know, because in his evidence he touches upon it very lightly; but he says that he could not work it himself, and that there were no people to whom he could dispose of it but the Defenders themselves.

My Lords, that being so I do not know what better mode there could have been for ascertaining what the value of the property in this case was, than by doing what the Pursuer himself says he should have been obliged to do in order to turn it into money, and what his own agent, Mr. *Rankine,* said he always advised him to do. Mr. *Rankine,* his agent, said: "It is not workable by yourself in consequence of its small size, and of its so being surrounded by other property—so make the best you can of it, only do not let yourself be driven into a corner. You may perhaps find yourself put to a disadvantage by having only one purchaser; nevertheless, do not part with it for a less royalty than you could get from anybody else, and whatever others are willing to pay I should stand upon, and if you cannot get that I should insist upon retaining the property in its present shape." That being so, the Pursuer says in his evidence, "I don't think that there was any way in which I could have turned this coal into money. It was about the middle of 1875, when the houses began to crack, that I first knew the Defenders were in the course of working out coal under my feu. I spoke about the matter to Mr. John *Motherwell.* I did not ask that the working should be stopped. I suggested that it should have been wrought stoop-and-room for the sake of

Exhibit 2
Page 186

protecting the property as much as possible.  I made no objection
to their going on with the working out of the coal below the feu ;
I was quite content that they should go on with the working."
That was before he knew that the coal under the property was his
own.  Up to that time he could not of course know very well
what rights he had to stop this working ; but when you put the
two sentences together,—one, that he could not have disposed of
the property to any other persons, and the other, that he did not
think of taking any steps to stop the working, I think he cannot
complain that he has got from the gentlemen the very same terms
that he would have got from the adjoining proprietors with whom
he has to deal.

The learned Judges in the Court below seem to have proceeded
upon that footing.  The Lord President says, " In addition to the
consideration above mentioned, it must be kept in view that the
coal in question was surrounded on all sides by the coalfield of
the superior, which is leased to the Defenders.  As the Pursuer's
estate is only one and a half acres in extent it is evident that the
coal under it could not have been worked to profit by himself
working independently.  Nobody but the superior or his lessees
could have worked the coal to any profit.  Now, let us consider
the position of the Pursuer before the Defenders commenced to
work his coal.  He was then in possession of a certain piece of
coal, and his object must be assumed to be to make the most of
it.  It cannot be assumed that he could contemplate keeping the
coal as a support for his cottages, instead of working it out.  It
was situated in a part of the country where every available bit of
mineral is in use to be wrought.  Now, at that point of time, had
the parties come together the coal would in all probability have
been disposed of to the Defenders on terms mutually advan-
tageous.  The Pursuer says indeed, that he could have made
exceptionally good terms for himself, as his coal stood in the way
of the Defenders' working.  But I think when Mr. *Smith* spoke
of the Defenders' necessity being the Pursuer's opportunity he
went too far.  I do not think that the purchase of the Pursuer's
coal was a matter of necessity to the Defenders, but only a matter
of convenience.  There was nothing to prevent their working
round his coal.  But, on the other hand, if the Pursuer wished to

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.
——
Lord Hatherley.

Exhibit 2
Page 187

H. L. (Sc.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

Lord Hatherley.

make the most of his coal he must have taken what the Defenders would give him, or let it stand." In that state of things, and finding that the coal has so been worked out, the learned Judges say, " We find that the best mode, in this particular case, of ascertaining the proper measure of damages is to give the Pursuer what the books and cases tell us we are to give him, that is to say :—As far as possible, the value of his coal, and that we will do by saying that he shall be compensated to the same extent as others have been compensated in adjoining properties ; besides that he shall be compensated, and he has been by the decree compensated, for any damage done to the buildings upon the surface." That has been estimated at £200, and acquiesced in by both parties. He is paid for the royalty £171 ; he is paid for the value of the coal which has been disposed of; and therefore it seems to me that all he can possibly ask for has been given.

The question of way-leave does not seem to have been argued in the Court below, but if it had been argued I should have been prepared to say that I acquiesce in this particular case, and under all the circumstances of this case—which I think are extremely different in many remarkable particulars from those of *Jegon* v. *Vivian* (1)—in the interlocutor pronounced by the Lord Ordinary. But, looking at the form in which this case has been brought before us, no question of this kind arises. Nothing could have been properly estimated and given as the value of the right exercised by the Defenders of taking their waggons and coals from time to time through the ground of the Pursuer, they assuming it to be their own ground. What profit can be said to have been derived from that ? The profit is this : that you save distance; you save other payments which you might have had to make, and therefore, inasmuch as the Pursuer cannot make out that the slightest damage has accrued to him in respect of that user, what you have to pay to him is only the value of his coal plus the damages to the surface. It appears to me to be quite consistent, and that the Pursuer rightly has not pressed that case of the way-leave, because he would have done so with very little effect.

Therefore, under all these circumstances, I am prepared to acquiesce entirely in the judgment of the Court below.

(1) Law Rep. 6 Ch. 742.

Exhibit 2
Page 188

LORD BLACKBURN :—

H. L. (Sc.)
1880
LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.

I also think that the judgment of the Court below should be affirmed, and that consequently the appeal should be dismissed with costs.

The point may be reduced to a small compass when you come to look at it.  I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages you should as nearly as possible get at that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation.  That must be qualified by a great many things which may arise—such, for instance, as by the consideration whether the damage has been maliciously done, or whether it has been done with full knowledge that the person doing it was doing wrong.  There could be no doubt that there you would say that everything would be taken into view that would go most against the wilful wrongdoer—many things which you would properly allow in favour of an innocent mistaken trespasser would be disallowed as against a wilful and intentional trespasser on the ground that he must not qualify his own wrong, and various things of that sort.  But in such a case as the present, where it is agreed that the Defenders, without any fault whatever on their part, have innocently, and, being ignorant, with as little negligence or carelessness as possible, taken this coal, believing it to be their own, when in fact it belonged to the Pursuer, then comes the question,—how are we to get at the sum of money which will compensate them ?

Now, my Lords, there was a technical rule in the English Courts in these matters.  When something that was part of the realty (we are talking of coal in this particular case) is severed from the realty and converted into a chattel, then instantly on its becoming a chattel, it becomes the property of the person who had been the owner of the fee in the land whilst it remained a portion of the land ; and then in estimating the damages against a person who had carried away that chattel, it was considered and decided that the owners of the fee was to be paid the value of the chattel at

Exhibit 2
Page 189

40                          HOUSE OF LORDS                    [VOL. V.

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
·COMPANY.

Lord Blackburn.

the time when it was converted, and it would in fact have been improper, as qualifying his own wrong, to allow the wrongdoer anything for that mischief which he had done, or for that expense which he had incurred in converting the piece of rock into a chattel, which he had no business to do.

Such was the rule of the Common Law. Whether or not that was a judicious rule at any time I do not take upon myself to say; but a long while ago (and when I say a long while I mean twenty-five years ago) Mr. Baron *Parke* put this qualification on it, as far as I am aware for the first time. He said, If however the wrong-doer has taken it perfectly innocently and ignorantly, without any negligence and so forth, and if the jury, in estimating the damages, are convinced of that, then you should consider the mischief that has been really done to the Plaintiff who lost it whilst it was part of the rock, and therefore you should not consider its value when it had been turned into a piece of coal after it had been severed from the rock, but you should treat it at what would have been a fair price if the wrongdoer had bought it whilst it was yet a por-tion of the land as you would buy a coal-field (1). That was the rule to be applied where it was an innocent person that did the wrong; that rule was followed in the case of *Jegon* v. *Vivian* (2), which has been so much mentioned; it was followed in the Court of Chancery, and, so far as I know, it has never been questioned since, that where there is an innocent wrongdoing the point that is to be made out for the damages is, as was expressed in the minutes of the decree:—" The Defendants to be charged with the fair value of such coal and other minerals at the same rate as if the mines had been purchased by the Defendants at the fair market value of the district;" that I understand to mean as if the mines had been purchased while the minerals were yet part of the soil. That, I apprehend, is what is to be done here, and that is what both the Lord Ordinary and the First Division of the Court of Session have endeavoured to do. They have come to different pecuniary results, and the question really comes to be which is correct.

Upon that the Lord Ordinary, as I understand, has gone upon this position. He said, "I have taken evidence, and the result of

(1) *Wood* v. *Morewood*, 3 Q. B. n. 440.        (2) Law Rep. 6 Ch. 742.

Exhibit 2
Page 190

that is, that it is agreed on all hands that this coal, when it was
brought to the surface, actually did sell for £1768 5s. 10d. I
look at the evidence, and I take the evidence to be that the actual
amount expended by the Defendants (there is contradictory evi-
dence on such points as might have been expected, and it is not
all very clear), was 4s. 3d. per ton"—and, deducting that from the
£1768 5s. 10d., he makes it £515 12s. 1d., which is what he says
is the sum that the Pursuer ought to recover taking off all the
expenses that the Defenders have incurred. But then, as it would
necessarily follow, when you took away the coals that were below
the land, that the surface of the land would come down, you must
not take the sum which would be given as compensation for the
injury to the surface twice over. You must not take that sum as
being a matter which you are to be paid for, and also take the
coals as if they had been got out without damage. On the Lord
Ordinary's figures, as it seems to me, the £515 12s. 1d. would be
right, and if there was no other way of getting at the figures, if
you could not get evidence of the value of the coal *in situ* in a
more correct way, I suppose it would be right to take them in
that way. It is always a difficult thing to ascertain the actual
expenses, and you may go wrong, but you must come as near to it
as you can.

But then the Lord Ordinary himself observes that, taking that
way of getting it, and giving the Pursuer £515 12s. 1d., "The
truth of the matter is, that the removal of the Pursuer's coal by
the Defenders, in place of being a misfortune, has been to the
Pursuer a singular stroke of luck. The size of his feu is less than
an acre and a half, and the coal which it contained could not have
been wrought to profit by itself. The expense of sinking a pit and
providing machinery would many times over have exceeded the
value of the minerals. Possibly, no doubt, the Pursuer might
have endeavoured to make with the Defenders terms upon which
his coal might have been raised along with the coal of which they
were the tenants. But the return which would have been rendered
to him under such an arrangement must have fallen far short of
what has been awarded by the Lord Ordinary. The lordship, in
the circumstances, could not be expected to be higher than that
paid by the Defenders for the adjoining portions of the seam ;

H. L. (Sc.)

1880

LIVINGSTONE
v.
RAWYARDS
COAL
COMPANY.
——
Lord Blackburn.
——

Exhibit 2
Page 191

42                          HOUSE OF LORDS                    [VOL. V.

H. L. (Sc.)
1880
LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.

Lord Blackburn.

and this, upon the quantity taken out, even if increased by reasonable damages for injury through subsidence to the houses on the surface, would certainly have fallen considerably short of £500." Now, when you find that the Lord Ordinary himself, who is professing to ascertain what is the money value of the damage that the Pursuer has received, says: "I have got at it in this particular way, but that money value is very considerably above the damage that you have received: it has been a singular stroke of good luck to you that you should get it," it occurs to one at once, *primá facie*, that there must have been something wrong in the way in which that money value was got at, and I think that there was an error in it, and that error was that the Lord Ordinary thought he was bound by decisions (which I do not think he was) to take that mode, and that mode only, of getting at the value of the coal *in situ*, namely, the price which the coal fetched when it was sold, deducting from that the cost of hewing and drawing and so forth, and so to ignore totally the fact this was an isolated small patch of land from which the Pursuer, as he himself admits, could not possibly have got coal by any practical means whatever, except by bargaining with the Defenders. I think there the Lord Ordinary was under a mistake. The Lord President points out very clearly to my mind that the Pursuer could not have made any use of his coal at all as long as he did not let it to the Defenders, who were the only people who could take it. He cannot do more than ask for his damage to the surface. That he is of course entitled to, as the Defenders have taken his coal without his leave and against his will. If they had taken it with full knowledge *scienter* there would have been very much more damage given; but they have innocently and ignorantly taken away his coal. "And then" (says the Lord Ordinary), "we must see what was the value of the coal *in situ* as it stood there to the Pursuer at the time when the Defenders by mistake took it away, and for that we must give compensation." Then he takes the evidence of Mr. *Rankine*, and says, "That is the best evidence that we could have of the value of the coal," and that sum is what the Court of Session has given.

My Lords, I only wish to say one word to guard against any misapprehension on a point which I at first a little misappre-

Exhibit 2
Page 192

hended.  I do not think that this decision of the Court of Session is that the royalty is the measure of the damages.  It is only that it is evidence of the value which is the measure of the damages.  As to the other matters, about the way-leave and so forth, I quite agree with what has been said by my noble and learned friend on the woolsack, that inasmuch as in the Court of Session on appeal from the Lord Ordinary those questions were not raised again they are not before this House at all.  If they were, I should be inclined to agree with what has been said by my noble and learned friend opposite (1), and the Pursuer would gain very little benefit from that contention.

H. L. (Sc.)

1880

LIVINGSTONE
*v.*
RAWYARDS
COAL
COMPANY.
——
Lord Blackburn.

*Interlocutor appealed against affirmed ; and appeal dismissed with costs.*

*Lords' Journals, Feb.* 13, 1880.

Agent for Appellant: *Andrew Beveridge.*
Agents for Respondents : *Simson & Wakeford.*

(1) Lord *Hatherley*, see p. 38.

Exhibit 2
Page 193

# EDGINGTON *v.* FITZMAURICE.

[1882 E. 920.]

*False Representation—Company—Issue of Debentures—Misstatement of Object of Loan—Contributory Mistake of Plaintiff.*

C. A.
1884
DENMAN, J.
May 7, 8,
9, 12.

C. A.
1885
Feb. 27, 28;
March 2, 7.

A misstatement of the intention of the defendant in doing a particular act may be a misstatement of fact, and if the plaintiff was misled by it, an action of deceit may be founded on it.

Where a plaintiff has been induced both by his own mistake and by a material misstatement by the defendant to do an act by which he receives injury, the defendant may be made liable in an action for deceit.

The directors of a company issued a prospectus inviting subscriptions for debentures, and stating that the objects of the issue of debentures were to complete alterations in the buildings of the company, to purchase horses and vans, and to develop the trade of the company. The real object of the loan was to enable the directors to pay off pressing liabilities. The Plaintiff advanced money on some of the debentures under the erroneous belief that the prospectus offered a charge upon the property of the company, and stated in his evidence that he would not have advanced his money but for such belief, but that he also relied upon the statements contained in the prospectus. The company became insolvent:—

*Held* (affirming the decree of *Denman*, J.), that the misstatement of the objects for which the debentures were issued was a material misstatement of fact, influencing the conduct of the Plaintiff, and rendered the directors liable to an action for deceit, although the Plaintiff was also influenced by his own mistake.

THIS action was brought by the Rev. *Charles Nattali Edgington* against the Hon. *J. T. Fitzmaurice*, Colonel *Rich*, Colonel *Snow*, General *Taylor*, and Major *Clench*, directors of the *Army and Navy Provision Market* (*Limited*), and against Mr. *Hunt*, the secretary, and Mr. *Hanley*, the manager, asking for the repayment by them of a sum of £1500 advanced by the Plaintiff on debentures of the company, on the ground that he was induced to advance the money by the fraudulent misrepresentations of the Defendants.

Early in November, 1880, the Plaintiff, who was a shareholder of the company, received a prospectus or circular which had been issued by order of the directors inviting subscriptions for debenture bonds to the amount of £25,000 with interest at 6 per cent., which contained the following statements :—

"The society purchased for their market, at the price of

Exhibit 2
Page 194

CHANCERY DIVISION.

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

£44,500, the valuable property known as *Newman's Yard,* comprising more than a quarter of an acre, situate in and with a frontage to *Regent Street.* This property is held direct from the Crown under a lease from the Commissioners of Woods and Forests for a term of ninety-nine years from the 5th of April, 1824, at a ground rent of £196 11s. 1d. and £15 6s. 9d. yearly in lieu of land tax, and subject to the half yearly payment of £500 in redemption of a mortgage of which £21,500 is outstanding."

The circular further stated that the company had expended on the property £20,679, and in fittings £2943. The objects for which the issue of debentures was made were thus stated :—

"1. To enable the society to complete the present alterations and additions to the buildings and to purchase their own horses and vans, whereby a large saving will be effected in the cost of transport.

"2. To further develop the arrangements at present existing for the direct supply of cheap fish from the coast, which are still in their infancy.

"The changes contemplated in the transport service of the society are the results of past experience, which proves that dealing with contractors is not only expensive but unsatisfactory, for the society being often at their mercy they may almost with impunity horse the vans in such an inefficient manner as to render faulty deliveries unavoidable. With sound horses at the command of the transport department the many evils at present inseparable from employing horses under contract will be prevented.

"The society now consists of upwards of 13,000 members, and since the altered management the numbers have been daily increasing."

The statements in the prospectus were impeached on the following grounds :—

1. That the prospectus was so framed as to lead to the belief that the debentures would be a charge on the property of the company.

2. That the prospectus omitted to refer to a second mortgage for £5000 to Messrs. *Hores & Pattisson* which had been made on the 10th of August, 1880.

Exhibit 2
Page 195

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 160 of 522
Page ID #:774

C. A.
1885
EDGINGTON
v.
FITZMAURICE.

3. That the prospectus stated that the property was subject to the half-yearly payment of £500 in redemption of the mortgage for £21,500, but omitted to state that on the 5th of April, 1884, the whole balance of the mortgage which would be then due, namely, £18,000, might be at once called in.

4. That the real object of the issue of debentures was to pay off pressing liabilities of the company, and not to complete the buildings or to purchase horses and vans or to develope the business of the company.

On the 8th of November, 1880, the Plaintiff, supposing that the debentures would be a charge upon the property mentioned in the prospectus, wrote to Mr. *Hunt*, the secretary of the company, asking him whether they would be a first charge on the property.

Mr. *Hunt* replied on the 10th of November, 1880, in a letter in which he said: "The debentures will be a first charge on this property after providing for the interest payable in respect of the existing mortgage for £21,000, the redemption of which is spread over a period of twenty-one years, and it cannot be called in except at the rate of £1000 a year."

The Plaintiff was also informed verbally by Mr. *Hanley*, the general manager, that the debenture holders would have the security of the company's property.

The Plaintiff accordingly took debenture bonds to the amount of £1500. The debentures were delivered to him on the 19th of February, 1881, and were in the form of a covenant by the company to pay to the bearer the amount advanced with interest, and contained no charge on the property of the company.

The company was wound up by an order dated the 22nd of July, 1881, and the assets were not sufficient to pay the debenture holders more than a small dividend.

The Plaintiff claimed repayment of the sum advanced by him with interest, on the ground that it had been obtained from him by the fraudulent misstatements and omissions in the prospectus and the fraudulent misrepresentations of *Hunt* and *Hanley*; or, in the alternative, £2000 damages for non-fulfilment of the agreement to give the Plaintiff a charge on the property; or, in the alternative, repayment of £1500 advanced by the Plaintiff on the promise and representation that it would be secured by deben-

Exhibit 2
Page 196

462    CHANCERY DIVISION.    [VOL. XXIX.

tures specifically charging it on the property of the company, subject only to a mortgage then existing; whereas the debentures did not specifically charge it on any property, and were made subject to various other charges which were fraudulently concealed from the Plaintiff by the Defendants.

The Defendants appeared separately, but the defences put in by them were substantially the same, namely, that the mortgage for £5000 was a temporary charge only, and was intended to be paid off before the issue of the debentures, and therefore it was not considered necessary to mention it in the prospectus; that they were not aware that the mortgage for £21,500 could be called in in 1884; that they believed, and had fair grounds for believing, that the money raised by the debentures would be expended in the objects stated in the prospectus, and that some part of it was so expended. They also denied that they had given any authority to Messrs. *Hunt* and *Hanley* to represent that the debenture holders would have any charge on the property of the company. Major *Clench* also relied upon the fact that he resigned his office of director on the 12th of August, 1880, although he was present by special invitation at some of the board meetings at which the prospectus was discussed and assisted in drawing it up.

The Plaintiff in his evidence swore that he understood the prospectus as holding out that he would have a charge on the property, and that he would not have taken the debentures unless he had understood that he was to have a charge upon it. He also said that he relied on the fact that the company wanted the money for the objects stated in the prospectus. And he stated that he did not read the bonds when he received them, but only looked at the amounts, and that he did not ascertain their nature till after the company was wound up.

It appeared from the minutes of the board of directors that the company was in financial difficulties at the time when the debentures were issued; their banking account with Messrs. *Ransom, Bouverie, & Co.* being overdrawn to the extent of £5000; that the advance by Messrs. *Hores & Pattisson* had been expended in altering and improving the building in which the company's business was carried on; that a small part of the money raised by the debentures was expended in improving the premises and in the

Exhibit 2
Page 197

VOL. XXIX.]    CHANCERY DIVISION.    463

C. A.
1885
EDGINGTON
*v.*
FITZMAURICE.

purchase of horses and vans; but the rest was applied in payment of pressing liabilities, including the mortgage debt of £5000 due to Messrs. *Hores & Pattisson.* Many facts shewing the company to have been in difficulties are stated in the judgment of Mr. Justice *Denman.*

The action came on for hearing before Mr. Justice *Denman* on the 7th of May, 1884.

Sir *F. Herschell,* S.G., *Rigby,* Q.C., and *Willis Bund,* for the Plaintiff.

*Davey,* Q.C., *W. W. Karslake,* Q.C., and *J. Kaye,* for *Fitzmaurice* :—

A gloss is put upon these documents which they will not bear. The directors did not at the time know that the concern was going to fail, and believed in it, and advanced their own money. Even if the representations in the circular were not true, the Plaintiff must shew that they were deliberately and fraudulently made. But there was no deceit or misrepresentation, and the only ground of complaint is that the Plaintiff has not got what he expected. He says he expected a specific charge on the property, but he must have seen that he got a mere debenture. There was no misrepresentation of any fact, and the directors merely stated their intention as to the money, which of course they might alter. There is every difference between the two: *Maddison* v. *Alderson* (1). Unless it amounts to a contract, a mere statement that you will do something is of no effect: *Jorden* v. *Money* (2); and if it was a contract then it was with the company, and the directors cannot be sued: *Ferguson* v. *Wilson* (3). The circular in no way pledged the directors as to the employment of the money. As to the mortgage, there was no representation that the £21,500 was the only charge, and every one must know that a company owes some debts, and this was merely a temporary loan. The statement as to the mortgage is no doubt inaccurate, but could mislead no one, as every one must know that a mortgage can be called in if default is made in the payments stipulated: *Peek* v. *Gurney* (4). The Plaintiff must prove

(1) 8 App. Cas. 467.    (3) Law Rep. 2 Ch. 77.
(2) 5 H. L. C. 185.    (4) Ibid. 6 H. L. 377.

Exhibit 2
Page 198

464                    CHANCERY DIVISION.                [VOL. XXIX.

C. A.

1885

EDGINGTON
v.
FITZMAURICE.

an intention to deceive. Mere negligence is not enough: *Cargill* v. *Bower* (1). As to the statements by the secretary and manager, they had no authority to make them, and the directors cannot be held liable: *Weir* v. *Bell* (2).

*Crossley*, Q.C., *J. Cutler*, *S. Hall*, *A. Young*, *S. Brice*, and *F. A. Lewin*, for other Defendants, cited *Smith* v. *Chadwick* (3); *Arkwright* v. *Newbold* (4); *Eaglesfield* v. *Marquis of Londonderry* (5); *Kennedy* v. *Panama, New Zealand, and Australian Royal Mail Company* (6).

*Sir F. Herschell*, in reply:—

An allegation of intention may be fraudulent: *Ex parte Whittaker* (7). The test is whether the Plaintiff would have taken these debentures unless he had relied on these statements: *Clarke* v. *Dickson* (8); *Kerr* on Fraud (9).

May 12. DENMAN, J. (After referring shortly to the facts of the case and expressing his opinion that no case of contract between the Plaintiff and the company had been shewn, if indeed it was alleged, proceeded):—

I therefore agree with those learned counsel for the several Defendants who have said that this case is substantially, as indeed the Solicitor-General admitted, reduced to, if it ever was more than, an action of, I am sorry to say not a very unusual character. The ground is that the Defendants did make affirmative statements of non-existing facts as facts which statements they knew not to be true, or recklessly stated without knowing or caring to inquire whether they were true or not, by which statements (and this would of course be necessary), or by them materially, the Plaintiff was induced to part with his money, and has sustained damage by parting with his money on securities which turned out to be worthless. Unless all these things are made out the

(1) 10 Ch. D. 502.
(2) 3 Ex. D. 238.
(3) 20 Ch. D. 27.
(4) 17 Ch. D. 301.
(5) 4 Ch. D. 693.
(6) Law Rep. 2 Q. B. 580.
(7) Ibid. 10 Ch. 446.
(8) 6 C. B. (N.S.) 453.
(9) 2nd Ed. p. 35.

Exhibit 2
Page 199

action must fail against all or against any of the Defendants
against whom they are not made out.

Unfortunately for me, perhaps, I have lately had to look into
this part of the law more than once in cases which are not very
far from analogous to the present case, and inasmuch as this is
really a common law action when put in the way in which it is
now put, it is right to formulate as well as I can before dealing
with such a case the way in which the questions would have to
be put before a jury in order that they might decide whether the
cause of action is made out, taking the ruling of points of law
from the Judge.  Now, in such a case several things would be
told to the jury.  They would be told that the only way in which
persons could be made responsible for fraudulent misstatements
in a prospectus would be first that the prospectus contained not a
mere statement of a possibility, or of a contingency, or of an in-
tention as to what might occur according to the opinion of the
person who is making the statement, but there must be something
which amounts in the opinion of the Judge or jury (sometimes it
may be for the Judge, and sometimes for the jury ;  but generally
I apprehend this would be for the Judge where it is upon a
written document) to a statement of a fact as existing which is
not in truth existing.  It will not be enough that the Defendants
gave a mere loose opinion, because that might be an erroneous
opinion, but there must be something which, solidly looked at, is
a positive statement of fact.  I am putting this, according to my
own view of the matter, as a *sine quâ non.*  Next it must be
proved that that statement was made fraudulently.  Then a jury
would have the legal meaning of the word " fraudulently " ex-
plained to them, and I take it to be now established beyond all
question that a statement is in the eye of the law made fraudu-
lently not only if the person who makes it is stating something
as the fact which is not the fact—absolutely telling a lie—but
less than that suffices in the eye of the law.  If persons who have
the full means of acquiring knowledge about a particular thing,
yet with the intention of inducing other people to spend their
money upon that thing, especially on such a venture as a limited
company, recklessly, and so to speak, in a gambling spirit, with-
out properly inquiring into the truth or falsehood of the thing,

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

Exhibit 2
Page 200

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

without caring sufficiently whether it is true or false, and will or will not mislead people—if such persons wilfully abstain from making inquiries, and make an incorrect statement about the thing without which the money would not have been advanced, then that is in the eye of the law a fraudulent statement as much as if the persons making it had known it to be false. There is, I think, no doubt of the correctness of this doctrine, which was stated in the case of *Peek* v. *Gurney* (1), and has ever since been acted upon by the common law Judges in summing-up to juries. If the statement is one which is false in this sense, that it is so fragmentary and so imperfect as that it must necessarily lead a person to think that to be the case which is not the case, that statement does amount sometimes, and may amount—it would be for the jury, and possibly for the Judge, in particular cases to say whether it does or does not—to a statement fraudulently made within the meaning of those two heads of the definition. Thirdly, a jury would be told that in these cases it must be affirmatively made out that the Plaintiff was materially—not solely, but materially—influenced in the purchase of the thing which turns out to be useless, or in doing the act which turns out to be disastrous by one or more of the statements so made. All those things should be carefully laid down to any jury before they can be left to hold persons liable upon charges such as these. It is an affirmative case for the Plaintiff to make out, and any Court, whether it be a Court of Law or Equity, in deciding cases of this sort ought to give to itself the same cautions and the same directions as to matters of this kind, and as to all that is necessary for the foundations of the actions.

Now with all those conditions before me I have to approach the evidence in this particular case, and except as far as the action is against *Hunt* I think it clear that the Plaintiff's case must stand or fall upon the question whether any or all of these statements in the circular were false, and were made either with knowledge that they were false, or so recklessly as to fall within the rule of fraud arising from that kind of recklessness. As to the Defendants, I may say at once that it is hard to see any reason why any distinction should be drawn between them, saving the cases of

(1) Law Rep. 6 H. L. 377.

Exhibit 2
Page 201

VOL. XXIX.]          CHANCERY DIVISION.

467

C. A.
1885
EDGINGTON
v.
FITZMAURICE.
Denman, J.

*Clench* and *Hunt*, with whose cases I will deal hereafter. I mean to deal with it as a case in which the question is whether any one of three particular statements, alleged to have been relied on by the Plaintiff, was false, and whether it was false either to the knowledge of the Defendants, or made so recklessly, without care whether it was true or false, as to amount to the same thing. Further, whether it was made in order to induce people to subscribe, and whether in consequence of those statements, or any of them (because one if it did materially induce would be enough), the Plaintiff subscribed his money to the company and whether he did lose his money thereby.

[His Lordship then expressed his opinion that the Plaintiff had not been guilty of laches, and proceeded:—]

Now upon the statements of the circular, I do not think that in cases such as this it is incumbent upon the Court or upon the jury necessarily to look at each statement by itself without regard to the other statements. I think one can easily suggest cases, and that this may be such a case, in which taking one statement separately you might say there is nothing in it, or that there is very little in it, or much less than there is if you couple it with the other two. In all such cases, in considering the animus with which the statement was made, I think it is only common sense that, whether jury or Judge, you should look at the whole of the document together, and consider every statement in it with a view of forming a judgment as to the intention, and that it is not a fair way of dealing with these cases to say, I take statement A., there is nothing in it; I take statement B. there is nothing in it; and I take statement C., there is nothing in it—there is nothing in them if they stood alone, and therefore as you cannot make three nothings into something the whole thing falls to the ground. I think you must take the whole, together with its history, and then, it may be that there is just reason for holding statement A., statement B., and statement C. to be all inaccurate, and all falling within the definition of an actionable false statement. There may be cases in which that is so, though, if you had only one, the decision might be quite the other way as regards that one statement. It is quite certain that you must always take into consideration the surrounding facts of

Exhibit 2
Page 202

468                CHANCERY DIVISION.              [VOL. XXIX.

C. A.
1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

the case in construing every document, and not only so, but in considering the animus of the parties who issue that particular document.

I think it is right to run through the history of this company so far as it appears from the documents which were put in evidence in the case, especially the minutes of the meetings of the directors.

[His Lordship then read passages from the minutes of the meetings of the directors, referring to them in many cases on the question whether *Clench,* one of the Defendants was liable. His Lordship was of opinion that in July, 1880, the state of the finances of the company was a matter of considerable anxiety, and that the company was not prosperous. There were frequent meetings, and they owed money to their bankers. In August of that year the mortgage for £5000 was made. In August, 1880, resolutions were passed for spending £110 in repairs, and £150 on horses, and £350 for fish. In September, 1880, a proof of the circular was read at a meeting, so that in his Lordship's opinion this circular was discussed at the same time when there were considerable difficulties as to money. The Defendants certainly advanced their own money, and it was said that this shewed *bona fides* on their part. On the 14th of October the circular was again discussed, and again on the 19th and 28th, in all which time the company was in great difficulties for ready money. The minutes of the subsequent meetings were only important on the question of *bona fides.* At a meeting on the 25th of November there was a resolution to lay out £150 in the purchase of horses, as to which his Lordship rather took the view of the Plaintiff, that it was absurd to suppose that for that sum they would get horses of their own. His Lordship feared that when the circular was issued the intention was to apply the money raised by the debentures in payment of pressing debts. No evidence had been given of the expenditure of the money in any purchase of horses. It appeared that £6575 had been offered, and £5500 had been received by the 1st of December, nearly the whole of which was applied in payment of then existing debts. His Lordship then expressed his regret that the directors had not paid sufficient attention to the advice of their solicitors as to the form of the bond.]

Exhibit 2
Page 203

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 168 of 522
Page ID #:782

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

I have been perhaps unnecessarily minute in going through the salient points as they appeared to me, but I have done so because it appears to me that both upon the question of the construction of the document which is impeached, and also upon the question of the conduct of the directors, and whether it can be looked upon as *bonâ fide* in all senses, or as impeachable on the grounds on which it is impeached, it is desirable to look at the surrounding circumstances and at the whole of their conduct. It is impossible to leave out any matter bearing upon the true condition of the company, or bearing upon this circular, without leaving out something which ought legitimately to be taken into account in considering the questions which are before the Court.

Now, having done that, I must look at the document itself. As I have already said, I consider that the action is one founded on this, and this only, as it now stands : it is an allegation by the Plaintiff that the directors were parties to this circular ; that they published it ; that it contains three specific statements which amount to statements of fact which were inaccurate and misleading and not substantially true ; that they at least were most reckless in publishing this document with those statements, looking at either the knowledge they possessed or the knowledge which they did not care to possess ; and that the Plaintiff was misled by those statements and was induced thereby, or by one or some of them, to part with his money, and that so he has lost his £1500.

The document is headed " Six per cent. debenture bonds." When I first read these bonds I was myself under the impression, an erroneous impression I find, that there had been in the opinion of Courts something to the effect that there was in the mere word " debenture " something indicating to people that the document was more than a mere promise to pay, and that it amounted to something like a charge upon the property, or the takings, or the profits of the concern. That does not appear to be so, though it is said that through certain expressions of *James*, L.J., in the case of *In re Florence Land and Public Works Company* (1), there had been an impression that the mere use of the word " debenture " did imply something more than in point of law it does imply. I think, however, that it was not a very unlikely thing that the

(1) 10 Ch. D. 530.

Exhibit 2
Page 204

470                          CHANCERY DIVISION.                    [VOL. XXIX.

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

mere title of these bonds might, however erroneously, be supposed by persons in the position of the Plaintiff to be a more important thing than a covenant on the part of the company to pay him principal and interest, with no power on his part, whatever might happen, to seize the property of the company at any intermediate time. But that was an erroneous view, and it is clear that in point of law this is nothing more than a promise to pay under the seal of the company. The document contains, however, certain statements which no doubt must be held to be made for the purpose of inducing people to take these bonds, and they are statements relating at least to the advantages of the company, and if they are not, they are idle and unnecessary and irrelevant statements. If one were to speculate upon the kind of way in which such statements would be discussed at a meeting (and they certainly were discussed at many meetings by the directors, though the directors remember nothing about it), one feels as certain as if one were present at one of these deliberations, that they must have considered what they should insert and what they should not insert in this circular, with reference to how the public or the invited subscribers would look at it. That I think is made more certain by the minutes, which shew how often the matter did come before the board, and how all the Defendants must have had it before them from time to time, and how very important it was at the time at which those discussions took place that they should get the money.

[His Lordship then read the first paragraph of the circular, as to which there was no complaint. But as to the statements with respect to the mortgages, his Lordship held that this would be of great importance, and that as the circular stated what the charges were, that amounted to a statement that there were no other charges, whereas there was the mortgage for £5000.]

If so, then the case seems to fall expressly within the language which was used in *Peek* v. *Gurney* (1), and which was referred to by the late Master of the Rolls in *Smith* v. *Chadwick* (2). It is said in answer that they contemplated that the £5000 would be soon paid off. Suppose they had said, "subject also to a mortgage to Messrs. *Hores & Pattisson*, of which so many thousand pounds

(1) Law Rep. 6 H. L. 377.            (2) 20 Ch. D. 58.

Exhibit 2
Page 205

are still due and which we intend to be paid immediately out of these debenture bonds." How can one for a moment say that that is not a matter which might most seriously have entered into the consideration of a person who was subscribing money upon such bonds as these? If so, is not that statement, put in that way, fragmentary, misleading and imperfect, condescending to a particular which makes it all the more misleading? Is it not a reckless and a gambling statement in the mere hope that at some time, if they get sufficient money for these debentures, they may clear this debt away? Is it not a matter which in all frankness and truthfulness ought to have been stated, and which was deliberately not stated with a view of making the prospects more taking to those who would be thinking of advancing money to the company? My view is that it is an important omission amounting to a misstatement, and therefore if the Plaintiff was materially induced by that non-statement to take the debenture bonds, I think he would have a right to complain, and if he suffered by it, to recover his money back against any person who had recklessly led him astray by that kind of statement.

Then, was the Plaintiff induced by that statement to take the bonds? He does not expressly say he was induced partly by that statement. I do not think his words amount exactly to that. But upon examination, and upon cross-examination, though he does say that if he had thought that this document did not give a charge upon the property he should not have had anything to do with it, he said, "If it had been stated to me that there was a second mortgage on this property beyond the £21,500 which had not been paid, and the object of the debenture was at once to be urgently gathering up the money for the purpose of paying that particular mortgage, then I should have had nothing to do with the concern." Now, it is for a jury, or any tribunal that has to draw inferences of fact, to say whether with that evidence, and looking at the materiality of the thing, that is a matter which did tend materially to induce the Plaintiff to take the debentures in question, by which he has lost money. He says that he thought sufficiently of the importance of the thing to go to the secretary and ask the secretary whether this would be a first charge, and the secretary solemnly assured him it would. It shews that he

C. A.
1885
EDGINGTON
v.
FITZMAURICE.
Denman, J.

Exhibit 2
Page 206

CHANCERY DIVISION.                [VOL. XXIX.

C. A.
1885

EDGINGTON
*v.*
FITZMAURICE.

De man, J.

felt it of importance, and he does say that if he had the least notion that there was this second mortgage, he should not have taken the property. I think, therefore, it was a thing which did go materially to induce him to take the debenture bonds, and in that sense also I think it was a statement of fact. That being so, I think that on that ground alone he would be entitled to relief. But, as I said before, I do not think it necessary to say what, supposing that had been the only misstatement, the Court might have done, because I think that each of the statements and the whole of the documents are to be looked upon together. But I do hold that even if it stood upon this alone, looking at the opinion of the Lord Chancellor in *Peek* v. *Gurney* (1) and the opinion of the Master of the Rolls in *Smith* v. *Chadwick* (2), where he comments on the Lord Chancellor's judgment, there was a partial and fragmentary statement, calculated to deceive, and that it was a thoroughly misleading statement, though in the shape of a non-statement, and that the parties are responsible.

[His Lordship then expressed his opinion that the statements as to the half-yearly payments of £500, and as to the power of calling in the balance of the mortgage for £21,500, did not shew that it might be called in at the end of four years.] I think that this is so important a matter that it clearly is most material; that it ought to have been stated; and that, not being stated, it is a matter which makes this prospectus substantially incorrect.

But mere inaccuracy will not affect the matter. This is a case in which the action is brought for fraud. Fraud, however, as I have said, may be committed by reckless representations made without knowing how the matter stands one way or the other. Then, does this fall within that doctrine. Upon the whole, though not so confidently as I hold upon the other matter, I think it does. I think that where five or six directors are constantly attending at meetings, constantly discussing how they can obtain advances, what mortgages they can get, who will deal with them, and whether they shall raise debentures in a particular form from persons, shareholders or otherwise of the company, it is their bounden duty, before they send out a document such as this, to inquire and to know for certain what is the effect of the

(1) Law Rep. 6 H. L. 377.          (2) 20 Ch. D. 58.

Exhibit 2
Page 207

VOL. XXIX.]　　　　　CHANCERY DIVISION.

473

C. A.

1885

EDGINGTON
v.
FITZMAURICE.

Denman, J.

document as to a matter so plain and important. The Plaintiff says that if he had known that the mortgage was liable to be called in in four years, and that in the last year such a sum as £18,000 was to be at once called in, he would not have thought of lending his money to the society. And, though I think that this is not quite so clear a point as the other, I do think it is sufficiently clear, and on that ground also the Plaintiff has a right to say that he has been taken in and misled, and that he has been deceived by reckless statements of a gambling character made by persons who had no right to be so sanguine as they were, with such difficulties about them as at that time were existing, and that on that ground also he is entitled to maintain this action.

Then there is a third point. [His Lordship then read the statement as to the objects of the issue, and expressed his opinion that the intention was to tell people that the purchase of horses and carts was very important to the company, whereas there was no real expectation or intention of so laying out the money, though if all had gone on well it might at some future time have been done.] This, therefore, was illusory and misleading. Nor did it appear that anything was done as to the supply of fish. With regard to the alterations in the buildings the only evidence we have is of very slight and trifling alterations. It would have been easy of proof if there was anything serious expended, or likely to be expended. It does strike me, therefore, that these objects were inserted merely in this way. "The persons who are about to subscribe will require us to say why we want this enormous issue of debenture capital. If we have this valuable property, if we are going on so prosperously, if we have 13,000 members, and the numbers are daily increasing; if we have no other mortgage than the mortgage mentioned in the circular, which is not to be paid off for twenty-one and a half years, people will say why are you coming to us to ask for £25,000 additional capital?" And it being seen that this would be asked, the directors felt that unless they put in some statement which would make people comfortable and satisfied as to the objects of the issue of the debentures, they would not get subscribers."

Does that amount to a false statement? Is it a statement

Exhibit 2
Page 208

474                     CHANCERY DIVISION.              [VOL. XXIX.

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

calculated to mislead to such an extent, and is it within the law a statement of a kind, liable to be considered a fraudulent statement in an action for fraud against an individual. Here many points are made. One point is that it does not state facts, but that it states intentions of the mind, and on that ground it is said, it is not sufficient. Another is, that it is a mere statement of intention which does not amount to any guarantee or contract to do it, and that it might be altered at any time; that it is not a matter with which the persons lending the money would have any concern; and it is also seriously argued that it was solidly and substantially true. I think myself that there is some doubt about what might be the law applicable to this kind of statement. I had to consider it very recently with my Brother *Manisty* in a case in the Queen's Bench Division of *Bellairs* v. *Tucker* (1). It was a different case in many respects, but there was a statement in the prospectus which was issued by the defendants in the case that it was believed that a certain French company would be successful in substance because of the success of an English company. The English company had only very recently been established, and I think both my Brother *Manisty* and myself had considerable doubt whether there was any dishonesty, and whether the statement of success was not a statement of a mere matter of opinion. But then the prospectus went on to say " which English company having only been started eighteen months has already entered into a contract which will have a certain effect." We had the whole matter before us, and we thought that looking to the history of the matter, and looking at the evidence in the case, this was not a statement of a fact as existing which was nonexistent. But whether we were right or not, that case appears to me to be very different from the present, because the decision in that case went on the particular facts of the case and the circumstances of those particular companies. I think that in every one of these cases it will be found that it is a very dangerous rule to take a decision in one case as a precedent, on account of the great variety of facts with regard to the conduct of directors in different companies.

But looking at the facts of the present case and at the sur-

(1) 13 Q. B. D. 562.

Exhibit 2
Page 209

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 174 of 522
Page ID #:788

C. A.

1885

EDGINGTON
v.
FITZMAURICE.

Denman, J.

rounding circumstances, is this statement: "The objects of the present issue are" a false statement of a fact existing which did not exist? If it is not, then I should say the Plaintiff would have no right to rely on it. But upon the whole I think it is. It has not been directly held in any of the cases cited that if the thing stated to exist is an intention of the mind that may not be a statement of fact which is obviously and certainly false.

It was said that it is idle and absurd to suppose that so small a sum as £7000 or £8000 would have had that effect, and that if they had got the whole £25,000 then they might set to work to perform these objects. But I think that cannot be said towards any individual subscriber of the bonds. When you tell me that the objects of this issue are to enable you to complete present alterations, to purchase horses and vans, and to further develope the supply of cheap fish from the coast, that is telling me in so many words, not only that such objects are in your mind, but that if I give you so much money towards that, or if 100 other subscribers give you the whole or part of the £25,000, you are able with reasonable certainty to employ any money subscribed on the faith of your words in doing the things which you tell me it is your object by this issue to obtain. The Lord Justice *Mellish*, in *Ex parte Whittaker* (1) says, that if it were clearly made out that at the time there was no intention to pay he should consider that a case of fraudulent misrepresentation had been shewn. I think that this statement, if not substantially false, is, looking at the whole of the case, a most reckless statement, one shewing an amount of sanguineness which, if really entertained, was under the circumstances, as against people who are asked to advance their money, of the most gambling and speculative character, and on that ground also the Plaintiff is entitled to recover.

I have already stated that I think Major *Clench* who played a leading part in very many of these transactions is quite as liable as the other directors. I feel very sorry for Colonel *Snow*, because at one period he seems to have protested against that which I think was very wrong as regards some of the statements they were making to the subscribers. Still, with his eyes open, he was a party to the prospectus, and the Plaintiff ought not to be

(1) Law Rep. 10 Ch. 446.

Exhibit 2
Page 210

476                    CHANCERY DIVISION.         [VOL. XXIX.

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Denman, J.

deprived of such security as he may get from a judgment against Colonel *Snow* as well as against the others. [His Lordship then considered the case against *Hunt*, coming to the conclusion that he was merely a servant of the company and was not liable, nor was *Hanley*. His Lordship gave judgment against the five directors for £1500 less £45 received as interest on the debentures. As against *Hunt* and *Hanley* he dismissed the action, but without costs, as they ought to have been mere cautious.]

C. M.

C. A.

From this judgment the Defendants *Fitzmaurice, Rich, Snow, Taylor,* and *Clench* appealed. The appeal came on for hearing on the 27th of February, 1885.

*Davey,* Q.C., *Crossley,* Q.C., and *A. Young,* for the Appellants :—

The first ground of complaint put forth in the pleadings, namely, that the prospectus was so framed as to lead the public to believe that the holders of debentures would have a charge upon the property of the company, has been virtually given up. The Plaintiff's expectation of having such a charge was simply his own mistake, assisted, it may be, by the unauthorized statements of the secretary and manager, for which the company are not responsible. And if there had been anything in the circular to lead to that expectation, the Plaintiff's remedy would have been an action for specific performance of the contract for a charge, not an action for deceit.

In order to maintain this action the Plaintiff must shew not only that the statements made by the Defendants were false, but that they were false to their knowledge, and that he was induced by those statements to advance his money.

With respect to the omission of the mortgage to *Hores & Pattison* for £5000, our answer is, that the circular did not profess to state all the liabilities to which the company's property was liable. It was only intended to shew the condition and value of the property when they bought it. As the directors were not offering a charge on the property, there was no reason for them to set out all the incumbrances on it. The £5000 advance was only a temporary loan, which was expended on the improvement

Exhibit 2
Page 211

VOL. XXIX.]        CHANCERY DIVISION.                    477

of the property, and was to be paid off in a few months.  The
mere omission of a fact in a statement will not sustain an action
for deceit: *Arkwright* v. *Newbold* (1).

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

With respect to the statement as to the first mortgage, the
directors have sworn that they were themselves ignorant of the
exact terms of it, and supposed that the whole was to be paid off
by instalments.  The property was bought subject to the mort-
gage, and the mortgage deed was not in their possession.  There
is no evidence of any intention to deceive the public, nor could
the misstatement have any effect on those who were willing to
advance money.  The Plaintiff says that he relied upon the
debentures giving him a charge.  If so, the alleged misstatement
was immaterial to him; he knew that he took subject to the first
mortgage, and it made no difference in what way it was to be
paid off.

The last point relied on by the Plaintiff is the misstatement as
to the object for which the loan was required.  In the first place,
the directors had a *bonâ fide* intention at the time of expending
the money, or a substantial part of it, in the way proposed.  The
evidence clearly shews that they were sanguine as to the ultimate
success of the concern.  And they did in fact apply some of it in
this way.  Moreover, the loan from *Hores & Pattisson* had been
expended in the improvement of the property, and therefore pay-
ing off that loan was practically an employment of the money in
the way proposed.

But, secondly, the Plaintiff was not misled by this statement,
whether it was inaccurate or not.  He says himself that he was
induced to lend his money by the belief that he would have a
charge on the property, and this is admitted to be a mistake.
So that it was his own mistake that misled him, and therefore
the statements of the circular as to the objects in which the
money was to be employed were immaterial: *Smith* v. *Chad-
wick* (2).  There was nothing more than an expression of intention
on the directors' part as to the application of the money.  That
is not such a representation as can be a ground for an action of
deceit: *Jorden* v. *Money* (3); *Maddison* v. *Alderson* (4).

(1) 17 Ch. D. 301.                    (3) 5 H. L. C. 185.
(2) 9 App. Cas. 187.                  (4) 8 App. Cas. 467.

Exhibit 2
Page 212

478

C. A.
1885

EDGINGTON
*v.*
FITZMAURICE.

Sir *F. Herschell*, S.G., *Rigby*, Q.C., and *Willis Bund*, for the Plaintiff:—

The statement, which is now admitted to be untrue, as to the first mortgage, and the omission of mention of the second mortgage were not immaterial. The Plaintiff expected to have not only a charge, but a first charge, subject only to the payment of the £500 instalments of the first mortgage. He would not have advanced his money if he had known that the property was so heavily charged. It is contended that the objects for which the money was required were immaterial. This is a fallacy. Whether the Plaintiff expected to have a charge or not, it made a great difference whether the company was in a position to expend the money raised in improving its premises and developing its business, or would have to spend the greatest part in paying off pressing liabilities. In fact, as the directors well knew, the company was in financial difficulties, and the money was really wanted to relieve them from pressing liabilities. The intention with which the directors raised the loan is a matter of fact, which can be ascertained by evidence ; and it is clear from the evidence, and was so found by the Judge at the trial, that they did not really issue the debentures for the purpose of improving their buildings—that in fact a very small part, under £150, was spent in this manner. Then it is said that if it was a misstatement it did not affect the Plaintiff, because he was deceived by his own mistake. But if a man is influenced in his conduct by the misstatement of the defendant the defendant is not relieved from liability because the plaintiff may have also himself made a mistake. If the defendant's misrepresentation contributed to his conduct the defendant is liable for it.

*Davey*, in reply.

COTTON, L.J.:—

This case has been very fully and ably argued. It is what is called an action of deceit, the Plaintiff alleging that statements were made by the Defendants which were untrue, and that he had acted on the faith of those statements so as to incur damage for which the Defendants are liable. In order to sustain such an

Exhibit 2
Page 213

action the Plaintiff must shew that the Defendants intended that
people should act on the statements, that the statements are
untrue in fact, and that the Defendants knew them to be untrue,
or made them under such circumstances that the Court must
conclude that they were careless whether they were true or not.
The statements in question were made in a prospectus or circular
issued by the Defendants for the purpose of getting subscribers
to a loan, and the Plaintiff alleges that he understood from them
that the advances were to be secured by a mortgage on leasehold
property of the company. In my opinion there was no good
ground for his so believing. There was nothing in the prospectus
to lead him to such a conclusion. The debentures were merely
bonds, and the Plaintiff made no objection to their form at the
time when he received them. Therefore if the question had
rested on that alone there could be no difficulty. But it does
not end there. The Plaintiff also complains that the circular
referred to one mortgage, and stated that it was to be paid off by
half-yearly instalments of £500, but did not state that the mort-
gage money could be demanded in a lump sum in a few years; and
further, that it omitted to state another mortgage for £5000, which
was not to be paid off by instalments, but was payable in two
months. I do not think it necessary to go into the consideration
of these statements. As regards the first mortgage the Defendants
say that they had reasonable grounds for making the statement
which they made, and as to the second mortgage they say that
they did not mean to imply that there was no other mortgage
affecting the company's property. But it is not necessary to give
any decision respecting these statements, because, giving credit
to the Defendants for having made them fairly, there are other
statements which follow, which, in my opinion, cannot be justified.
I allude to statements respecting the objects for which the loan
was effected :—[His Lordship read the passage from the prospectus
in which the objects of the issue of the debentures were stated,
and proceeded :—] It was argued that this was only the statement
of an intention, and that the mere fact that an intention was not
carried into effect could not make the Defendants liable to the
Plaintiff. I agree that it was a statement of intention, but it is
nevertheless a statement of fact, and if it could not be fairly said

C. A.

1885

EDGINGTON
v.
FITZMAURICE.

Cotton, L.J.

2 K 2                                                      1

Exhibit 2
Page 214

480

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Cotton, L.J.

that the objects of the issue of the debentures were those which were stated in the prospectus the Defendants were stating a fact which was not true; and if they knew that it was not true, or made it recklessly, not caring whether it was true or not, they would be liable. Did the Defendants know or believe that the company was in a flourishing condition? I think they must have thought that it would turn out well and that the loan could be paid back, for they had shewn their confidence in the company by advancing money of their own. But the question is whether they did not make a statement of a fact which was not correct, and which they knew to be not correct when they stated the objects for which the loan was asked. I do not say that it was necessary to shew that they intended that all the money raised should be applied in carrying out those particular objects, but certainly they ought to shew that it was to be spent in improving the property and business of the company. What is the fact? The financial state of the company was openly discussed at the board meetings, at which the Defendants were all present, and it is clear that they were in great financial difficulties at the time. Although I should not, as I have said, have held the Defendants liable merely for not referring to the second mortgage in the prospectus, yet the existence of that mortgage was strong evidence of their financial difficulties; and, considering all the other evidence, and the admissions of the Defendants in their cross-examination, I cannot doubt that the real object of the issue of debentures was to meet the pressing liabilities of the company and not to improve the property or develope the business of the company. I cannot but come to the conclusion that however hopeful the directors may have been of the ultimate success of the company, this statement was such as ought not to have been made. It was said, How could those who advanced the money have relied on this statement as material? I think it was material. A man who lends money reasonably wishes to know for what purpose it is borrowed, and he is more willing to advance it if he knows that it is not wanted to pay off liabilities already incurred.

But it was urged by the counsel for the Appellants that the Plaintiff himself stated that he would not have taken the debentures unless he had thought they were a charge upon the property,

Exhibit 2
Page 215

C. A.
1885
~~~~
EDGINGTON
v.
FITZMAURICE.

Cotton, L.J.

and that it was this mistaken notion which really induced the Plaintiff to advance his money. In my opinion this argument does not assist the Defendants if the Plaintiff really acted on the statement in the prospectus. It is true that if he had not supposed he would have a charge he would not have taken the debentures; but if he also relied on the misstatement in the prospectus, his loss none the less resulted from that misstatement. It is not necessary to shew that the misstatement was the sole cause of his acting as he did. If he acted on that misstatement, though he was also influenced by an erroneous supposition, the Defendants will be still liable. Did he act upon that misstatement? He states distinctly in his evidence that he did rely on the Defendants' statements, and the learned Judge found, as a fact, that he did, and it would be wrong for this Court, without seeing or hearing the witness, to reverse that finding of the Judge. We must therefore come to the conclusion that the statements in the prospectus as to the objects of the issue of the debentures were false in fact, and were relied upon by the Plaintiff.

With respect to the Defendant *Clench*, we are not called on to express an opinion on the points in which his case differs from that of the other directors. I am not influenced by the misstatement as to the mortgage. The point on which I rely is the misstatement as to the objects of the loan, in which the Defendants all joined, and for which they are all equally responsible.

The judgment must be affirmed.

BOWEN, L.J.:—

This is an action for deceit, in which the Plaintiff complains that he was induced to take certain debentures by the misrepresentations of the Defendants, and that he sustained damage thereby. The loss which the Plaintiff sustained is not disputed. In order to sustain his action he must first prove that there was a statement as to facts which was false; and secondly, that it was false to the knowledge of the Defendants, or that they made it not caring whether it was true or false. For it is immaterial whether they made the statement knowing it to be untrue, or recklessly, without caring whether it was true or not, because to

Exhibit 2
Page 216

C. A.

1885

EDGINGTON
v.
FITZMAURICE.

Bowen, L.J.

make a statement recklessly for the purpose of influencing another person is dishonest. It is also clear that it is wholly immaterial with what object the lie is told. That is laid down in Lord *Blackburn's* judgment in *Smith* v. *Chadwick* (1), but it is material that the defendant should intend that it should be relied on by the person to whom he makes it. But, lastly, when you have proved that the statement was false, you must further shew that the plaintiff has acted upon it and has sustained damage by so doing: you must shew that the statement was either the sole cause of the plaintiff's act, or materially contributed to his so acting. So the law is laid down in *Clarke* v. *Dickson* (2), and that is the law which we have now to apply.

The alleged misrepresentations were three. First, it was said that the prospectus contained an implied allegation that the mortgage for £21,500 could not be called in at once, but was payable by instalments. I think that upon a fair construction of the prospectus it does so allege; and therefore that the prospectus must be taken to have contained an untrue statement on that point; but it does not appear to me clear that the statement was fraudulently made by the Defendants. It is therefore immaterial to consider whether the Plaintiff was induced to act as he did by that statement.

Secondly, it is said that the prospectus contains an implied allegation that there was no other mortgage affecting the property except the mortgage stated therein. I think there was such an implied allegation, but I think it is not brought home to the Defendants that it was made dishonestly; accordingly, although the Plaintiff may have been damnified by the weight which he gave to the allegation, he cannot rely on it in this action: for in an action of deceit the Plaintiff must prove dishonesty. Therefore if the case had rested on these two allegations alone, I think it would be too uncertain to entitle the Plaintiff to succeed.

But when we come to the third alleged misstatement I feel that the Plaintiff's case is made out. I mean the statement of the objects for which the money was to be raised. These were stated to be to complete the alterations and additions to the buildings, to purchase horses and vans, and to develope the supply of fish.

(1) 9 App. Cas. 201.                    (2) 6 C. B. (N.S.) 453.

Exhibit 2
Page 217

C. A.
1885
EDGINGTON
v.
FITZMAURICE.

Bowen, L.J.

A mere suggestion of possible purposes to which a portion of the money might be applied would not have formed a basis for an action of deceit. There must be a misstatement of an existing fact: but the state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is, therefore, a misstatement of fact. Having applied as careful consideration to the evidence as I could, I have reluctantly come to the conclusion that the true objects of the Defendants in raising the money were not those stated in the circular. I will not go through the evidence, but looking only to the cross-examination of the Defendants, I am satisfied that the objects for which the loan was wanted were misstated by the Defendants, I will not say knowingly, but so recklessly as to be fraudulent in the eye of the law.

Then the question remains—Did this misstatement contribute to induce the Plaintiff to advance his money. Mr. *Davey's* argument has not convinced me that they did not. He contended that the Plaintiff admits that he would not have taken the debentures unless he had thought they would give him a charge on the property, and therefore he was induced to take them by his own mistake, and the misstatement in the circular was not material. But such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference. It resolves itself into a mere question of fact. I have felt some difficulty about the pleadings, because in the statement of claim this point is not clearly put forward, and I had some doubt whether this contention as to the third misstatement was not an afterthought. But the balance of my judgment is weighed down by the probability of the case. What is the first question which a man asks when he advances money? It is, what is it wanted for? Therefore I think that the statement is material, and that the Plaintiff would be unlike the rest of his race if he was not

Exhibit 2
Page 218

Case 2:23-cv-09217-MEMF-KS   Document 58-3   Filed 10/30/24   Page 183 of 522
Page ID #:797

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

influenced by the statement of the objects for which the loan was required. The learned Judge in the Court below came to the conclusion that the misstatement did influence him, and I think he came to a right conclusion.

FRY, L.J.:—

I am of the same opinion. I do not think it necessary to refer to the two alleged misstatements as to the mortgages, because I do not rely on that portion of the case. But with respect to the statement of the objects for which the debentures were issued, I have come to the conclusion that there was a misstatement of fact, that the statement contained in the circular was false in fact and false to the knowledge of the Defendants. Was the statement true in fact? The circular was adopted at a meeting of the board when all the Defendants were present. The financial state of the company was considered. They owed £5000 to their bankers, and £5000 to *Hores & Pattisson.* They owed large sums to tradesmen and other persons. They were under an obligation to pay £3500 in instalments on the mortgage for £21,500 before April, 1884, and they knew that if they did not pay the instalments, the whole would be called in. The necessity of raising money must have been discussed at the meeting. It is clear that their object in raising the money was to meet their pressing liabilities. But the Defendants say that the mortgage for £5000 to *Hores & Pattisson* was only a temporary loan, and that the greater part of it was expended in alterations and additions to the buildings, and therefore the mortgage was merely an anticipation of the loan for the objects stated in the prospectus. But the statement in the prospectus was that a large sum of money had been already expended in improving the building (and that included the greater part of the advance by *Hores & Pattisson*), and that the directors intended to apply the money raised by the debentures in further improving the buildings. This statement was therefore false.

It is not necessary to call attention to the evidence, that the Defendants knew at the time that a large proportion of the loan would have to be expended in paying pressing liabilities. It is hardly denied by the Defendants. I come, therefore, to the

Exhibit 2
Page 219

conclusion, with regret, that this false statement was not only false in fact, but was false to the knowledge of the Defendants.

The next inquiry is whether this statement materially affected the conduct of the Plaintiff in advancing his money. He has sworn that it did, and the learned Judge who tried the action has believed him. On such a point I should not like to differ from the Judge who tried the action, even though I were not myself convinced, but in this case the natural inference from the facts is in accordance with the Judge's conclusion. The prospectus was intended to influence the mind of the reader. Then this question has been raised : the Plaintiff admits that he was induced to make the advance not merely by this false statement, but by the belief that the debentures would give him a charge on the company's property, and it is admitted that this was a mistake of the Plaintiff. Therefore it is said that the Plaintiff was the author of his own injury. It is quite true that the Plaintiff was influenced by his own mistake, but that does not benefit the Defendants' case. The Plaintiff says : I had two inducements, one my own mistake, the other the false statement of the Defendants. The two together induced me to advance the money. But in my opinion if the false statement of fact actually influenced the Plaintiff, the Defendants are liable, even though the Plaintiff may have been also influenced by other motives. I think, therefore, the Defendants must be held liable. The appeal must therefore be dismissed.

Solicitors: *Markby, Stewart & Co.; Crowdy, Son, & Tarry; Last & Sons; J. Holmes; Lewin & Co.; A. E. Copp.*

M. W.

C. A.

1885

EDGINGTON
*v.*
FITZMAURICE.

Fry, L.J.

Exhibit 2
Page 220

240                         HOUSE OF LORDS                    **[1900]**

H. L. (E.)  that this judgment be reversed, and that the respondents do
1900      pay to the appellants the costs both here and below.

OWNERS OF
STEAMSHIP
"GANNET"          LORDS MACNAGHTEN, MORRIS, DAVEY, BRAMPTON, and
v.
OWNERS OF   ROBERTSON concurred.
STEAMSHIP
"ALGOA."
                    *Order appealed from reversed so far as it held the*
THE
"GANNET."            *Gannet to be in fault; decree of Bucknill J.*
                    *restored with costs here and below. Cross-*
                    *appeal dismissed; cause remitted to the*
                    *Admiralty Division.*

                              *Lords' Journals, April* 3, 1900.


        Solicitors: *W. Batham; Pritchard & Sons, for Batesons,*
*Warr & Wimshurst, Liverpool.*

                         ————

                    [HOUSE OF LORDS.]

H. L. (E.)  GLUCKSTEIN . . . . . . . . . APPELLANT;
1900
                              AND
April 5.
———     BARNES (OFFICIAL RECEIVER AND OFFICIAL⎫
          LIQUIDATOR OF OLYMPIA, LIMITED) .⎭ RESPONDENT.

*Company—Promoters—Secret Profit by Promoters—Duty of Disclosure.*

    A syndicate was formed to raise a fund, buy a property and resell it to
a company or some other purchaser; the fund to be in the names of
trustees who were to promote and register a company to which they
should resell the property, and who if a company should be formed were
to be directors. The trustees bought up some of the charges upon the
property for sums below the amount which the charges afterwards realized,
and thereby made a profit for the syndicate of 20,000*l.* They bought the
property for 140,000*l.*, formed a limited company and resold the property
for 180,000*l.* to the company, of which they were the first and at that
time the only directors. They issued a prospectus inviting applications
for shares and disclosing the two prices of 140,000*l.* and 180,000*l.* but not
the profit of 20,000*l.* That some profit had been made by buying up the
charges might have been discovered by a close examination of a contract

Exhibit 2
Page 221

A. C.                  AND PRIVY COUNCIL.                  241

which was referred to in the company's memorandum and articles of
association and in the prospectus. Shares were issued and the company
afterwards went into liquidation :—

   *Held*, that the trustees ought to have disclosed to the company the
profit of 20,000*l.*; that they had not disclosed it; that the fact that the
company could not now rescind was no bar to relief; and that the appel-
lant as one of the trustees was bound to replace that portion of the
20,000*l.* which had been paid to the trustees as their share.

   The decision of the Court of Appeal, *In re Olympia, Limited*, [1898]
2 Ch. 153, affirmed.

IN 1893 the National Agricultural Hall Company, Limited,
owning the place of entertainment called Olympia, was being
wound up. A syndicate was formed to buy and resell Olympia.
The facts and documents by which this scheme was carried
out are fully set forth in the report below. (1) Briefly they
were as follows. By an agreement of January 19, 1893, between
the secretary to the syndicate and the appellant, reciting
that the syndicate proposed to purchase Olympia with a view
to the resale either to a company to be registered under the
Companies Acts or to some other purchaser, it was stated (inter
alia) that a fund was to be raised, and that if the company was
formed the appellant and three other persons named Lyons,
Hart and Hartley, who were members of the syndicate, had
consented to become directors of the proposed company, and
that those four persons should be trustees for the syndicate,
with powers to buy and resell Olympia, to promote and register
the intended company and to purchase (as an interim invest-
ment) any first mortgage bonds of the company then in liquida-
tion. Several persons subscribed for various sums and a fund
was raised. The four syndicate trustees bought up some of
the debenture bonds at a discount, and also a mortgage for
10,000*l.* at the price of 500*l.* They afterwards bought in
February the property called Olympia for 140,000*l.* by auction
before the chief clerk.

   By an agreement of March 20, 1893, between the syndicate
trustees (called the vendors) and one Close, a trustee for the
intended company, it was agreed (inter alia) that the company
should buy Olympia for 180,000*l.* Clause 7 contained the

        (1) [1898] 2 Ch. 153–160.

Exhibit 2
Page 222

H. L. (E.)
1900
GLUCKSTEIN
v.
BARNES.
———

following paragraph: The validity of this agreement shall not be impeached on the ground that the vendors parties hereto as promoters or otherwise stand in a fiduciary relation to the company, nor shall the vendors parties hereto be required to account for any profit made or to be made by them by the purchase of any debentures or of any other charge upon any of the property of the National Agricultural Hall Company, Limited, which are to be satisfied wholly or in part out of the fund paid or to be paid into court.

On the same day the company was registered as Olympia, Limited. The memorandum of association stated its objects, one of which was to carry out the above agreement with Close, and the articles of association provided that that agreement should be binding and carried into effect by the directors. Clause 7 was not specifically referred to. Soon after a prospectus inviting applications for debentures and shares was issued stating (inter alia) that "the promoters of the company hereinafter called the vendors who constitute the entire board of the company" (namely, the appellant, Lyons, Hart and Hartley) had bought the property for 140,000*l.* and would be the vendors to the company for 180,000*l.* The only reference to their dealings with the debentures and mortgage of the old company was as follows: "Any other profits made by the syndicate from interim investments are excluded from the sale to the company." The prospectus referred to the agreement with Close but not to clause 7.

As a matter of fact in addition to the 40,000*l.* profit which the prospectus stated, the syndicate realized more than 20,000*l.* profit, being the difference between the sum they gave for the debentures and mortgage and the sum they received, as holders of the charges, from the liquidator of the National Agricultural Hall Company. Of this profit the appellant, Lyons, Hart and Hartley received 6341*l.* Debentures and shares were issued, and in 1897, Olympia Limited having gone into liquidation, the respondent took out a summons against the appellant under s. 10 of the Companies (Winding-up) Act 1890. The summons was dismissed by Wright J., but the Court of Appeal (Lindley, Rigby and Collins L.JJ.) reversed his decision and

Exhibit 2
Page 223

A. C.          AND PRIVY COUNCIL.                    243

ordered the appellant to pay 6341*l.* with interest to the official    H. L. (E.)
receiver. (1)

1900

GLUCKSTEIN
v.
BARNES.

1899. Nov. 30; Dec. 1, 4, 5.   *Swinfen Eady Q.C.* and *Muir
Mackenzie* (*Cassel* with them) for the appellant.   There was
no evidence of fraud in the sale, and at the time when the
mortgage securities were purchased the appellant was not a
promoter or otherwise in a fiduciary position to the company.
The purchase of the charges was a separate and collateral
transaction, and the trustees were not bound to disclose it.   If
they were under such a duty they discharged it, as sufficient
disclosure was made to satisfy the statute.   Even if the appel-
lant is wrong in these contentions, the company are not
entitled to recover.   Their proper remedy (if any) was rescis-
sion of the contract; but as that is now not possible they can
only ask for damages, and no loss having been sustained the
damages are nominal.   The agreement of March 20, 1893, was
a special bargain and binding on the company.   The company
was incorporated for the express object of carrying out that
agreement.   The articles of association expressly provided that
the appellant and his co-directors should adopt it and carry it
into effect and the directors did so.   The company is therefore
absolutely bound by it: see ss. 11 and 16 of the Companies
Act 1862.   A promoter is one who in fact forms a company.
At the date of the impugned transaction there was no definite
purpose of forming a company; it was only one of two
alternatives.   To use the language of James L.J. in *Gover's
Case* (2) "at the date of the contract there was no company, no
promoter, trustee, or director."   This appeal is governed by
*Erlanger* v. *New Sombrero Phosphate Co.* (3), which was twice
argued in this House: see Lord Hatherley (4); and Lord
Blackburn. (5)   To adopt Lord Hatherley's words the syndi-
cate was entitled to deal with these charges " as they thought
proper."   Lord Cairns used similar language.   See also *Lady-
well Mining Co.* v. *Brookes.* (6)   Secondly, there was in fact

(1) [1898] 2 Ch. 153.          (4) 3 App. Cas. at p. 1242.
(2) (1875) 1 Ch. D. 182.       (5) 3 App. Cas. at p. 1267.
(3) (1878) 3 App. Cas. 1218.   (6) (1887) 35 Ch. D. 400.

Exhibit 2
Page 224

244                     HOUSE OF LORDS                [1900]

H. L. (E.)    disclosure.   In the prospectus, memorandum and articles there
1900    was sufficient notice both of the existence and nature of the
GLUCKSTEIN    profit.   It is true the amount was not stated; but that is not
*v.*    necessary.   The language was perfectly clear, and the words
BARNES.    " interim investments " must have been understood by share-
———    holders.   There is at all events no evidence that any one was
misled into taking shares who would have been deterred if he
had known the precise facts.   Further, assume the disclosure
to have been insufficient, rescission is out of the question, the
company cannot repudiate, damages are the only remedy, and
the Court will not award damages without evidence of loss.
On this point see *Bentinck* v. *Fenn* (1), which affirmed the
decision of the Court of Appeal (2) and of Pearson J. (3)   It is
there distinctly laid down by Lord Herschell that if a person in
a fiduciary position omits to disclose a profit, but no more than
a fair price has been given by the company, rescission or
nominal damages are all that can be claimed.

[They also referred to *Emma Silver Mining Co.* v. *Lewis* (4)
and *Peel's Case.* (5)]

*A. T. Lawrence Q.C.* and *A. R. Kirby* for the respondent.
At the date of the purchase of the debentures the appellant
and the three gentlemen who acted with him were joint pro-
moters and at the date of receipt of the 6341*l.* were also
directors.   There was one scheme throughout to which every
step taken was subsidiary; there was in reality no such
alternative as has been suggested.   From the beginning the
purpose was to form the company and the appellant was in a
fiduciary relation to the shareholders.   This being so the syndi-
cate was under a joint and several liability under the summons :
*Flitcroft's Case* (6) ; and all the authorities which in such cases
have enforced such liability are applicable.   The disclosure of
the profit of 40,000*l.* was misleading.   The net profit was
60,000*l.*; and mere disclosure by reference will not satisfy
statutory requirements.   It is too late in the day to contend

(1) (1887) 12 App. Cas. 652.          (3) (1884) 26 Ch. D. 221.
(2) (1885) 29 Ch. D. 795 (sub nom.     (4) (1879) 4 C. P. D. 396.
*In re Cape Breton Co.*).                (5) (1867) L. R. 2 Ch. 674.
(6) (1882) 21 Ch. D. 519.

Exhibit 2
Page 225

A. C.              AND PRIVY COUNCIL.                    245

that a man only becomes a promoter on the eve of registration
of the company; he becomes so on the first step taken towards
that end.  The appellant and his associates were bound by the
representation made by their prospectus that they were only
making a profit of 40,000*l.* less expenses, and that statement
they must make good.

   *Swinfen Eady Q.C.* in reply.


   The House took time for consideration.


April 5.  EARL OF HALSBURY L.C.  My Lords, in this case
the simple question is whether four persons, of whom the
appellant is one, can be permitted to retain the sums which
they have obtained from the company of which they were
directors by the fraudulent pretence that they had paid 20,000*l.*
more than in truth they had paid for property which they, as
a syndicate, had bought by subscription among themselves,
and then sold to themselves as directors of the company.  If
this is an accurate account of what has been done by these
four persons, of course so gross a transaction cannot be per-
mitted to stand.  That that is the real nature of it I now
proceed to shew.

   In the year 1892 the freehold grounds and buildings known
as " Olympia " were the property of a company which in that
year was being wound up.  That company had issued deben-
tures to the extent of 100,000*l.* as a first charge and a mortgage
as a second charge for 10,000*l.*  The four persons in question
knew that the property would have to be sold, and they com-
bined to buy it in order that they might resell it to a company
to be formed by themselves.  The combination, which called
itself the Freehold Syndicate, but which, perhaps, the common
law would have described by a less high-sounding title, pro-
ceeded to buy up so far as they could the incumbrances on
the property called " Olympia."  They expended 27,000*l.* in
buying debentures.  These, of course, were very much depre-
ciated in value, and they gave 500*l.* for the mortgage of 10,000*l.*
As soon as this transaction had been completed they, partners
in it, proceeded to form a company, and it was of course

Exhibit 2
Page 226

H. L. (E.)
1900
GLUCKSTEIN
*v.*
BARNES.

Earl of Halsbury
L.C.

necessary that the company should be willing to help, and accordingly the four persons in question were made by the articles of association the first directors.

The property was sold on February 8 by the chief clerk of North J. for 140,000*l.*, and the syndicate purchased nominally for that sum, but, by reason of the arrangement to which I have referred, that sum was less by 20,734*l.* 6*s.* 1*d.* than what they appeared to give. On March 29 they completed as directors the purchase of the property for 180,000*l.*, and they as directors paid to themselves as members of the syndicate 171,000*l.* in cash and 9000*l.* in fully paid-up shares—in all 180,000*l.*

The prospectus by which money was to be obtained from the public disclosed the supposed profit which the vendors were making of 40,000*l.*, while in truth their profit was 60,734*l.* 6*s.* 1*d.*, and it is this undisclosed profit of 20,000*l.*, and the right to retain it, which is now in question.

My Lords, I am wholly unable to understand any claim that these directors, vendors, syndicate, associates, have to retain this money. I entirely agree with the Master of the Rolls that the essence of this scheme was to form a company. It was essential that this should be done, and that they should be directors of it, who would purchase. The company should have been informed of what was being done and consulted whether they would have allowed this profit. I think the Master of the Rolls is absolutely right in saying that the duty to disclose is imposed by the plainest dictates of common honesty as well as by well-settled principles of common law.

Of the facts there cannot be the least doubt; they are proved by the agreement, now that we know the subject-matter with which that agreement is intended to deal, although the agreement would not disclose what the nature of the transaction was to those who were not acquainted with the ingenious arrangements which were prepared for the entrapping the intended victim of these arrangements.

In order to protect themselves, as they supposed, they inserted in the prospectus, qualifying the statement that they had bought the property for 140,000*l.*, payable in cash, that

Exhibit 2
Page 227

they did not sell to the company, and did not intend to
sell, any other profits made by the syndicate from interim
investments.

Then it is said there is the alternative suggested upon the
agreement that the syndicate might sell to a company or to some
other purchaser.  In the first place, I do not believe they ever
intended to sell to anybody else than a company.  An individual
purchaser might ask inconvenient questions, and if they or any
one of them had stated as an inducement to an individual
purchaser that 140,000*l.* was given for the property, when in
fact 20,000*l.* less had been given, it is a great error to suppose
that the law is not strong enough to reach such a statement;
but as I say, I do not believe it was ever intended to get an
individual purchaser, even if such an intention would have had
any operation.  When they did afterwards sell to a company,
they took very good care there should be no one who could ask
questions.  They were to be sellers to themselves as buyers,
and it was a necessary provision to the plan that they were
to be both sellers and buyers, and as buyers to get the
money to pay for the purchase from the pockets of deluded
shareholders.

My Lords, I decline to discuss the question of disclosure to
the company.  It is too absurd to suggest that a disclosure to
the parties to this transaction is a disclosure to the company of
which these directors were the proper guardians and trustees.
They were there by the terms of the agreement to do the work
of the syndicate, that is to say, to cheat the shareholders; and
this, forsooth, is to be treated as a disclosure to the company,
when they were really there to hoodwink the shareholders, and
so far from protecting them, were to obtain from them the
money, the produce of their nefarious plans.

I do not discuss either the sum sued for, or why Gluckstein
alone is sued.  The whole sum has been obtained by a very
gross fraud, and all who were parties to it are responsible to
make good what they have obtained and withheld from the
shareholders.

I move your Lordships that the appeal be dismissed with
costs.

H. L. (E.)

1900

GLUCKSTEIN
*v.*
BARNES.

Earl of Halsbury
L.C.

Exhibit 2
Page 228

248                    HOUSE OF LORDS              [1900]

H. L. (E.)    LORD MACNAGHTEN.   My Lords, Mr. Swinfen Eady argued

1900    this appeal with his usual ability, but the case is far too clear

GLUCKSTEIN    for argument.   The learned counsel for the appellant did not,

*v.*    I am sure, raise the slightest doubt in the mind of any of your

BARNES.    Lordships as to the propriety of the judgment under appeal; the only fault to be found with the learned judges of the Court of Appeal, if I may venture to criticise their judgment at all, is that they have treated the defences put forward on Mr. Gluckstein's behalf with too much ceremony.   For my part, I cannot see any ingenuity or any novelty in the trick which Mr. Gluckstein and his associates practised on the persons whom they invited to take shares in Olympia, Limited.   It is the old story.   It has been done over and over again.

These gentlemen set about forming a company to pay them a handsome sum for taking off their hands a property which they had contracted to buy with that end in view.   They bring the company into existence by means of the usual machinery. They appoint themselves sole guardians and protectors of this creature of theirs, half-fledged and just struggling into life, bound hand and foot while yet unborn by contracts tending to their private advantage, and so fashioned by its makers that it could only act by their hands and only see through their eyes. They issue a prospectus representing that they had agreed to purchase the property for a sum largely in excess of the amount which they had, in fact, to pay.   On the faith of this prospectus they collect subscriptions from a confiding and credulous public. And then comes the last act.   Secretly, and therefore dishonestly, they put into their own pockets the difference between the real and the pretended price.   After a brief career the company is ordered to be wound up.   In the course of the liquidation the trick is discovered.   Mr. Gluckstein is called upon to make good a portion of the sum which he and his associates had misappropriated.   Why Mr. Gluckstein alone was selected for attack I do not know any more than I know why he was only asked to pay back a fraction of the money improperly withdrawn from the coffers of the company.

However that may be, Mr. Gluckstein defends his conduct, or, rather I should say, resists the demand, on four grounds,

Exhibit 2
Page 229

A. C.                AND PRIVY COUNCIL.                    249

which have been gravely argued at the bar. In the first place, H. L. (E.)
he says that he was not in a fiduciary position towards 1900
Olympia, Limited, before the company was formed. Well, for GLUCKSTEIN
some purposes he was not. For others he was. A good deal v.
BARNES.
might be said on the point. But to my mind the point is
immaterial, for it is not necessary to go back beyond the Lord
Macnaghten.
formation of the company.

In the second place, he says, that if he was in a fiduciary
position he did in fact make a proper disclosure. With all
deference to the learned counsel for the appellant, that seems to
me to be absurd. "Disclosure" is not the most appropriate
word to use when a person who plays many parts announces
to himself in one character what he has done and is doing in
another. To talk of disclosure to the thing called the company,
when as yet there were no shareholders, is a mere farce. To
the intended shareholders there was no disclosure at all. On
them was practised an elaborate system of deception.

The third ground of defence was that the only remedy was
rescission. That defence, in the circumstances of the present
case, seems to me to be as contrary to common sense as it is to
authority. The point was settled more than sixty years ago
by the decision in *Hichens* v. *Congreve* (1), and, so far as I know,
that case has never been questioned.

The last defence of all was that, however much the share-
holders may have been wronged, they have bound themselves
by a special bargain, sacred under the provisions of the Com-
panies Act, 1862, to bear their wrongs in silence. In other
words, Mr. Gluckstein boldly asserts that he is entitled to use
the provisions of an Act of Parliament, which are directed to
a very different purpose, as a shield and shelter against the
just consequences of his fraud.

My Lords, I am afraid I must call your Lordships' attention
for a moment to the prospectus of Olympia, Limited. In my
opinion it is the cardinal point of the case, and I do not think
full justice has been done to it. The prospectus, I am sorry to
find, was prepared in the office of a well-known solicitor. I
wish I could say that it displays the simplicity and candour

(1) (1831) 4 Sim. 420.

Exhibit 2
Page 230

250                    HOUSE OF LORDS                [1900]

H. L. (E.)
1900

GLUCKSTEIN
*v.*
BARNES.

Lord
Macnaghten.

which some persons perhaps might expect from such an origin. Now this is what the self-constituted guardians of Olympia, Limited, and its shareholders tell those whom they invite to join with them in their enterprise: "The promoters of this company, hereinafter called the vendors, who constitute the entire board of the company which lately produced 'Venice in London,' recently entered into a contract on behalf of a syndicate of which they themselves are members, for the purchase of the entire Olympia property. The vendors effected this purchase on the 8th February, 1893, at competition before the chief clerk of Mr. Justice North in the Chancery Division of the High Court of Justice for the sum of 140,000*l.* payable in cash, and they will, acting on behalf of such syndicate, be the vendors of that property to this company. . . . Any other profits made by the syndicate from interim investments are excluded from the sale to the company. A printed form of the memorandum of agreement which was signed by each member of that syndicate may be inspected by intending applicants for shares or debentures at the offices of the solicitors of the company. The vendors have agreed to resell to the company the whole of the property purchased by them on the 8th February, 1893, for the sum of 180,000*l.* (being nearly 18,000*l.* less than the amount of Messrs. Driver & Co.'s valuation) payable as to 155,000*l.* in cash, and the balance in cash or shares of the company. . . . Out of the profit to be made by the vendors on behalf of the syndicate the vendors have agreed to pay interest at the rate of 5 per cent. per annum upon the amount for the time being paid up on the shares and debentures until the opening of the first entertainment. They will also provide all the preliminary expenses of the formation and bringing out of the company, and the issue of its capital up to and including allotment, and all costs including stamp duty in connection with the completion of the purchase of the property and the mortgage to secure debentures. The conveyance will be made direct to the company by direction of the vendors."

My Lords, it is a trite observation that every document as against its author must be read in the sense which it was intended to convey. And everybody knows that sometimes

Exhibit 2
Page 231

A. C.                    AND PRIVY COUNCIL.                    251

half a truth is no better than a downright falsehood. Is the
statement in the prospectus which I have just read as to the
price which the vendors had to pay for the property true or
false? In the letter it is true. The vendors had bid 140,000*l.*
for the property, and had formally agreed to pay that sum for
it. But for all that, the sum of 140,000*l.* was not the sum
they were going to pay, and they knew that well enough.
They had provided themselves with counters, obtained at little
cost, which in reckoning the price would be taken, as they
knew, at their face value, so that the price of the property to
them would be only about 120,000*l.* Is that what Mr. Gluck-
stein and his associates meant the public to understand?
Surely ordinary persons reading the prospectus, and attracted
by the hopes of profit held out by it, would say to themselves,
" Here is a scheme which promises well. The gentlemen who
are putting the property on the market know something about
it, for they were the sole directors and managers of ' Venice
in London,' which was a very profitable speculation. They
have had the whole property valued by well-known auctioneers,
who say that it is worth more than is asked for it. True, they
secure a profit of 40,000*l.* for themselves, but then they disclose
it frankly, and it is not all clear profit. There is interest to be
paid, and all the expense of forming the company. And they
have actually agreed to pay 140,000*l.* down. That sum, they
tell us, is ' payable in cash.'" You will observe those last
words, " payable in cash." Their introduction is almost a
stroke of genius. That slight touch seems to give an air of
reality and bona fides to the story. Would anybody after that
suppose that the directors were only going to pay 120,000*l.* for
the property, and pocket the difference without saying anything
to the shareholders? " But then," says Mr. Gluckstein, " there
is something in the prospectus about ' interim investments,' and
if you had only distrusted us properly and read the prospectus
with the caution with which all prospectuses ought to be read,
and sifted the matter to the bottom, you might have found a
clue to our meaning. You might have discovered that what
we call ' interim investments' was really the abatement in
price effected by purchasing charges on the property at a

H. L. (E.)

1900

GLUCKSTEIN
*v.*
BARNES.

Lord
Macnaghten.

3       U 2

Exhibit 2
Page 232

H. L. (E.)
1900
GLUCKSTEIN
*v.*
BARNES.

Lord
Macnaghten.

discount." My Lords, I decline altogether to take any notice of such an argument. I think the statement in the prospectus as to the price of the property was deliberately intended to mislead the shareholders and to conceal the truth from them.

My Lords, on so plain a case as this I am very reluctant to quote any authority; but I think I ought to call your Lordships' attention to the case of *Hichens* v. *Congreve* (1), to which I have already alluded, and that for two reasons: first, because it seems to have been lost sight of in the argument of this case; and, secondly, because the facts there have a singular resemblance to the facts of the present case. The defences in the two cases are, for the most part, identical.

*Hichens* v. *Congreve* (1) was decided by Shadwell V.-C. in 1831. There had been a demurrer to the bill, which was overruled by the Vice-Chancellor and by Lyndhurst L.C. on appeal, a motion for payment of money into court, which was successful, and then the case came on for hearing. The facts were these: A Mr. Flattery was the fortunate possessor of a property in Ireland containing treasures of coal and iron, rarely met with on the other side of the channel, and he was anxious to dispose of it. One Sir William Congreve entered into negotiations with him, and found that he was willing to sell for the modest sum of 10,000*l*. Then Sir William associated with himself two gentlemen of the name of Clarke, and the three proposed to themselves to buy the property, and work it by means of a company. But they thought that the company could well afford to pay 25,000*l*. for it, and they supposed that they might honestly, or, at any rate, without being found out, put the extra 15,000*l*. into their own pockets, concealing from the proposed shareholders the difference in price. Mr. Flattery seems to have been not unwilling to lend himself to the scheme. So a contract was drawn up for the sale of the property from Mr. Flattery to the trustees of the company for the price of 25,000*l*., out of which, of course, Mr. Flattery was only to keep 10,000*l*. Sir William Congreve and the two Clarkes got up the company, issued a prospectus, and prepared a deed of settlement stating that the 'property had been bought from Mr.

(1) (1828) 4 Russ. 562; (1829) 1 R. & M. 150; (1831) 4 Sim. 420.

Exhibit 2
Page 233

A. C.                    AND PRIVY COUNCIL.                    253

H. L. (E.)

1900

GLUCKSTEIN
v.
BARNES.

Lord
Macnaghten.

Flattery for 25,000*l.*; and they appointed themselves and other persons directors of the company. A large sum of money was collected, a large body of subscribers executed the deed of settlement, and later on a private Act of Parliament was obtained establishing and regulating, but not incorporating, the company. Some years afterwards the proceedings of Sir William Congreve and his associates were discovered, and a bill was filed by certain shareholders on behalf of themselves and the rest of the shareholders other than the defendants to compel them to refund the 15,000*l.* As the Vice-Chancellor pointed out, if Sir William Congreve and the Messrs. Clarke had agreed among themselves that they would form a partnership or a company for the purpose of working the mines, and had held out to the persons who should form the company that it should be formed on the basis that they should pay 15,000*l.* to Sir William Congreve and the Messrs. Clarke as the consideration for their having the mines, no objection whatever could have been made to the transaction. But the objection was that the real transaction was not disclosed, and "that the persons who became members of the company could not possibly know that it was the intention of Sir William Congreve and the Messrs. Clarke that the 15,000*l.* should be paid out of the funds of the company for the benefit of Sir William Congreve, the Messrs. Clarke, and those gentlemen whom they permitted to participate in it."

Then the Vice-Chancellor, after stating the facts and relevant documents, proceeds as follows: "It is useless for the Messrs. Clarke and Sir William Congreve to state, as they have done, in their answers that they apprehended that the sums which so came to their hands were profits which they were entitled to; for it is impossible that they could, if they fairly exercised their judgments which as directors they were bound to exercise, form any such opinion; and it is perfectly plain to my mind that it was not competent to those who were forming a company thus to deal with the funds of the company, making at the same time the representations which they did make. If they had been dealing with one individual only, no doubt could be entertained upon the matter. Two objections were made to the relief that is asked in this case. First it was said that the

Exhibit 2
Page 234

254                          HOUSE OF LORDS                    [1900]

H. L. (E.)     property was worth 25,000*l.*  So it might have been; but in
1900         my opinion the value of the property is quite immaterial, for
GLUCKSTEIN   the question here is what was held out to the company to have
*v.*          been the sum actually paid for it, and I conceive that if there
BARNES.       was a misrepresentation in that respect, the parties who made
Lord         that representation must be answerable for it.  The other
Macnaghten.   objection that was made was that the mines were not, and
could not have been, purchased for the company; for that at
the time when the agreement was entered into there was no
company in existence.  Strictly speaking it is true that there
was no company in existence; but these gentlemen were
endeavouring to form a company, and they had taken upon
themselves the character of directors for the benefit of all
persons who had agreed to be, or might afterwards become,
members of the company.  The 25,000*l.* was to be paid out of
the funds which should be subscribed by persons who might
thereafter become members of the company, and my opinion,
therefore, is that all those persons who might thereafter
become members of the company through the instrumentality
and representations of those directors are entitled to the pro-
tection of this Court.  Then it was said that there can be no
relief except in the way of restitution of the mines; but that
appears to me to be a fallacy.  On the 22nd of June 1825 an
Act of Parliament was passed which establishes this company
and directs that its capital shall be 300,000*l.*; and I apprehend
that in no other way can there be any relief in this case than
by making those who have subtracted the 15,000*l.* from the
funds of this company repay that sum, for it would be no relief
to make Flattery take back the mines: that would destroy the
company altogether.  When these directors represented that
25,000*l.* was to be paid for the purchase of the mines it must be
considered that they intended that the company should have the
mines, and that they meant it to be understood that that was
the lowest price at which they could be purchased.  What is
complained of is that by improper representation 15,000*l.* has
been withdrawn from the funds of the company and paid into
the pocket of private individuals.  Is it not obvious, therefore,
that the relief to be given is the restitution of the 15,000*l.* ?"

Exhibit 2
Page 235

A. C.                    AND PRIVY COUNCIL.                         255

H. L. (E.)

1900

GLUCKSTEIN
v.
BARNES.

Lord
Macnaghten.

My Lords, I need not comment on the Vice-Chancellor's judgment. It seems to me to cover the whole of the present case except the defence founded on the provisions of the Companies Act, 1862, and with that I have already dealt.

There are two things in this case which puzzle me much, and I do not suppose that I shall ever understand them. I mention them merely because I should be very sorry if it were thought that in those two matters the House unanimously approved of what has been done. I do not understand why Mr. Gluckstein and his associates were not called upon to refund the whole of the money which they misappropriated. What they did with it, whether they put it in their own pockets or distributed it among their confederates, or spent it in charity, seems to me absolutely immaterial. In the next place, I do not understand why Mr. Gluckstein was only charged with interest at the rate of 3 per cent. I should have thought it was a case for penal interest.

In these two matters Mr. Gluckstein has been in my opinion extremely fortunate. But he complains that he may have a difficulty in recovering from his co-directors their share of the spoil, and he asks that the official liquidator may proceed against his associates before calling upon him to make good the whole amount with which he has been charged. My Lords, there may be occasions in which that would be a proper course to take. But I cannot think that this is a case in which any indulgence ought to be shewn to Mr. Gluckstein. He may or may not be able to recover a contribution from those who joined with him in defrauding the company. He can bring an action at law if he likes. If he hesitates to take that course or takes it and fails, then his only remedy lies in an appeal to that sense of honour which is popularly supposed to exist among robbers of a humbler type.

I agree that the appeal must be dismissed with costs.

LORD ROBERTSON. My Lords, I am satisfied of the liability of the appellant. Once the facts are analyzed (and this has been done thoroughly in the Court of Appeal) they are seen to be of no ambiguous import. The appearance of complexity which

Exhibit 2
Page 236

256                    HOUSE OF LORDS                [1900]

H. L. (E.)     the case presents arises from the matters in hand having been
1900           dressed up artificially, so that things have been separated in
GLUCKSTEIN     language and treatment which in their nature are inseparable
v.             and correlative.
BARNES.
               To my thinking, the central fact in the history is, that while
Lord           the object of the syndicate was to make profit out of the resale
Robertson.     of Olympia, it was an essential part of the enterprise, as
               originally designed and as actually carried out, that the same
               individuals who sold as syndicate should buy as directors.
               This was provided by the third head of the agreement which
               set up the syndicate, and it has a far-reaching effect at all the
               stages of the argument.

               First of all, it seems to me to conclude the question whether
               these gentlemen were promoters when they bought the mort-
               gages.  I do not lay out of account the refreshment contract
               and the advertising contract, for the entering into contracts for
               the company is a clear assumption of agency and, therefore, of
               a fiduciary relation to it.  But apart from those contracts,
               where speculators have formed, exclusively of themselves, the
               directorate of a company, to be immediately floated for the
               purpose of buying the property which those same individuals
               are associated to acquire and resell, they have brought them-
               selves directly within Lord Cairns's statement of the law in
               *Erlanger's Case.* (1)   They have taken a decisive step in
               shaping and limiting the company.  It may well be asked, if
               this be not an act of promotion what is ?  The hypothesis of
               all the law which we are considering is that the company is
               not yet formed ; and unless these gentlemen had registered the
               company (and thus passed out of this stage altogether) it is
               difficult to see what more overt acts of promoting and forming
               the company they could have done.

               The only available argument against this conclusion was
               that the gentlemen forming the syndicate might have changed
               their minds and sold to an individual.  This is true, but true
               only in the sense that, till registration of the company and a
               bargain with the company, they were free to change their
               minds—true in the sense in which every enterprise not actually

                          (1) 3 App. Cas. 1218.

Exhibit 2
Page 237

consummated may be abandoned. But as matter of fact, these
men intended, when they bought the mortgages, to sell to a
company constituted in the mode and form described; and they
did sell to that company. The appellant in his evidence avows
it; and the other facts are indicative, to the point of conclu-
siveness, that nothing but a company would have served the
ends of the syndicate. The mere expression in a deed of the
truism that the adventurers could sell to an individual if they
did not sell to a company can never avail against the
ascertainment of the true facts of the scheme.

The facts here are that the company had been so far
organised that its executive was provisionally appointed. The
directors of a company are its executive organ; to them its
interests are confided; and in the present instance the com-
pany, even in this, its inchoate stage, was identifiable through
its executive. I hold that from the moment this step was
taken the coming directors stood in a fiduciary relation to the
company whose interests were to be in their sole hands. This
conclusion rests not on technical rules of law, but on the dictates
of fair play embodied in law. The people for whom these
gentlemen were bound to act were their coming constituents,
the persons out of whose money they proposed to make their
gain.

And now I pass to the next stage of the case. Assuming the
members of the syndicate to have been promoters at the date
of the purchase of the mortgages, did they properly disclose it?
In the skilful argument for the appellant the duty of disclosure
on this hypothesis was conceded. But this concession must
not disarm the criticism which, in considering the adequacy of
the disclosure, first ascertains the relevancy of the transaction
to the question what sum ought to be paid by the directors for
the mortgaged property.

The theory of the appellant is that the purchase of the mort-
gages was a collateral and independent transaction. It seems
to me, on the contrary, to be an essential and inseparable part
of one and the same transaction, and for this plain reason that
the syndicate's gain on the mortgages had to be paid by the
company. The relevancy of the mortgage transaction to the

H. L. (E.)

1900

GLUCKSTEIN
v.
BARNES.

Lord
Robertson.

Exhibit 2
Page 238

H. L. (E.)
1900
GLUCKSTEIN
v.
BARNES.

Lord
Robertson.

question solved by the syndicate sitting as directors is this—a company, or any one else, considering what price shall be paid draws inferences as to the true value from the price paid by the seller and the proposed advance on that price. In short, what the possible buyer wants to know is the profit to be made by his seller. He may be entitled to know this, or he may not, according as his seller is bound or is not bound to disclose it, but the materiality of the knowledge is indisputable. Again, this transaction had another importance. The inference of value drawn from a competitive sale by auction is founded on the assumption that the sum paid was the least that the property could have been got for. In the present case, that inference would have been unsound. I do not know whether it was necessary, in order to secure the property, that the syndicate in their last bid should advance by 8000*l.*, whereas all previous advances had been only of 1000*l.* But I do know that the appellant had no interest to bid 133,000*l.* rather than 140,000*l.*, for by the time the biddings had run thus high it was certain that the mortgages would be paid in full, and, as the syndicate knew that the directors would pay their price, it was indifferent to them, to the matter of a few thousands, whether the price which they nominally, and the shareholders really, paid to the vendor was more or less.

On these grounds I consider that the transaction in mortgages was so relevant to the question what price should the company pay for the property that it was necessary that it should be disclosed to the company completely and in detail, and the question is whether this was done. There are several overwhelming reasons for a negative answer.

In the normal case, where the directors are truly and not merely in name the executive of the company, it may be assumed that they will be vigilant and critical of the particulars of a bargain of such paramount importance as the purchase of the property to be traded with, and that, dealing at arm's length, they will examine into anything bearing on that matter that does not tell its own story in its face. But, in the present case, the company was paralyzed so far as vigilance and criticism were concerned; for the board-room was occupied by the enemy.

Exhibit 2
Page 239

A. C.                 AND PRIVY COUNCIL.                           259

Now, the question whether adequate disclosure has been made
to a company by a vendor bound to do so must necessarily
depend upon the intelligence brought to bear on the informa-
tion.   And if, by his own act, the promoter has weakened, or,
as here, has annulled the directorate, his case on disclosure
becomes extremely arduous—for he has to make out such dis-
closure to shareholders as makes directors unnecessary.   How
this could be done we have no occasion to consider, for the
appellant is not within sight of doing it.   Indeed, the case is so
clear that I do not think it is a case of inadequate disclosure,
but of direct misrepresentation.   Two statements were made
which are clearly of that character.   The one is the assertion
that the purchase of the mortgages was a temporary invest-
ment.   If this means anything, it means that the syndicate
having money on hand awaiting investment in one thing had
temporarily put it to another.   The contrary is the fact : part
of the price of the mortgages was subscribed by the syndicate
for its purposes of which this was, in terms, one ; and much
the greater part was borrowed from their bankers ad hoc.   The
second overt misrepresentation is that the syndicate had paid
140,000*l.* for the property, whereas the truth is that they were
paying only 119,265*l.* 13*s.* 11*d.*, the excuse for the former sum
having been stated coming to no more than this—that they
had to pay the vendor before their own accounts were closed.

I have only to add that I consider the liability of the appel-
lant for the whole sum in the order appealed against to be the
necessary result of the ground of judgment which I adopt.

H. L. (E.)

1900

GLUCKSTEIN
*v.*
BARNES.

Lord
Robertson.

*Order appealed from affirmed and appeal
dismissed with costs.*

*Lords' Journals,* April 5, 1900.

Solicitors : *Lewis & Lewis ; Roderic Oliver.*

Exhibit 2
Page 240

# Re Augustus Barnett & Son Ltd

CHANCERY DIVISION
HOFFMANN J
27 NOVEMBER, 2 DECEMBER 1985

*Fraudulent trading – Parent company providing letters of comfort to subsidiary – Whether parent company liable for fraudulent trading – Companies Act 1948, s 332 (Companies Act 1985, s 630).*

Augustus Barnett Ltd (the company) was a subsidiary of Rumasa SA (Rumasa). The company for a number of years had traded at a loss and its auditors had only been willing to certify its accounts on a going concern basis because Rumasa provided a 'letter of comfort' whereby it agreed to provide the company with financial support and permitted such letters to be noted in the accounts. The last of these letters, dated 1 June 1982, stated that Rumasa undertook 'to provide such additional working capital as is necessary to enable [the company] to trade at its current level of activity for a period of not less than 12 months from this date and also provide such long-term finance as is necessary'. Rumasa during the period of 1977–81 paid the company £4,000,000 by way of subsidy. In March 1983 the board of directors of the company were informed that they were at personal risk of fraudulent trading unless they could obtain funds to pay the company's current debts. The company borrowed money from another subsidiary of Rumasa and suppliers who were reluctant to extend credit to the company were reassured by statements of Rumasa that it would continue to support the company. The company's financial fortunes did not improve and it went into a creditors' voluntary winding up in September 1983. The liquidators commenced proceedings against Rumasa under s 332 of the Companies Act 1948 alleging that by giving the letters of comfort and allowing them to be noted in the accounts, and providing subsidies and making statements of continued support, Rumasa had induced the board of the company to continue to trade and incur debts and therefore Rumasa was liable under s 332. Rumasa applied under RSC Ord 18, r 19, to strike out the claim on the grounds that it disclosed no reasonable cause of action.

**Held** – Application granted. A necessary condition for liability under s 332 of the Companies Act 1948 was that someone had done an act which could be described as carrying on the business of the company and that this act was done with intent to defraud creditors or for a fraudulent purpose. On the facts, as there was no allegation that the board of the company had carried on the company's business with intent to defraud creditors there was no basis therefore on which it could be asserted that Rumasa was a party to the carrying on of the company's affairs for a fraudulent purpose. Even if it were sufficient to show that Rumasa, with intent to defraud, was party to the carrying on of the business of the company, there was nothing in the pleaded facts which supported the allegation of fraud on the part of Rumasa or from which fraud might be inferred. Accordingly the claim against Rumasa would be struck out as showing no reasonable cause of action.

Exhibit 2
Page 241

### Cases referred to in judgment

Cooper (Gerald) Chemicals Ltd, Re [1978] 2 All ER 49, [1978] Ch 262, [1978] 2 WLR 866.

DPP v Ray [1973] 3 All ER 131, [1974] AC 370, [1973] 3 WLR 359, HL.

R v Grantham [1984] 3 All ER 166, [1984] BCLC 270, [1984] QB 675, [1984] 2 WLR 815, CA.

### Application

The applicant, Rumasa SA, applied pursuant to RSC Ord 18, r 19, to strike out a claim by Michael Anthony Jordan and Gerhard Adolf Weiss, the joint liquidators of the company, Augustus Barnett & Son Ltd, for a declaration under s 332 of the Companies Act 1948 on the ground that no reasonable cause of action was disclosed. The hearing took place in chambers but judgment was given in open court.

*Peter Millett QC* and *Alan Steinfeld* for the applicant.
*John Lindsay QC* and *Nigel Davis* for the joint liquidators.

**HOFFMANN J:** There is before the court a summons by the joint liquidators of Augustus Barnett & Son Ltd (which I shall call 'the company') for relief which includes a declaration pursuant to s 332 of the Companies Act 1948 (now s 630 of the Companies Act 1985) that Rumasa SA (which I shall call 'Rumasa') was knowingly party to the carrying on of the business of the company with intent to defraud creditors. The liquidators have served points of claim. Rumasa has applied pursuant to RSC Ord 18, r 19, to strike out the claim to a declaration under s 332 and the relevant parts of the points of claim on the ground that they disclose no reasonable cause of action. I heard the application in chambers but since it raises a point on which I am told there is no authority, I am with the consent of the parties giving my judgment in open court.

I shall summarise the facts alleged in the points of claim, which for the purposes of the application to strike out I must assume to be true. The company was the owner of a well-known chain of shops selling wines and spirits. In 1977 it became a subsidiary of Rumasa, a Spanish company with substantial interests in the production and marketing of wines and sherry. Thereafter the company was the principal UK retail outlet for Rumasa's wine and sherry exports.

Throughout the period of Rumasa's control of the company there was a substantial deficiency of current assets. The auditors would not certify accounts prepared on a going concern basis without a letter from Rumasa confirming that it would continue to support the company. Such letters, often known as 'letters of comfort', were provided by Rumasa on various occasions between 1978 and 1982. They were noted in the published accounts for the years ended 31 December 1979, 1980 and 1981. The last comfort letter dated 1 June 1982 stated that 'Rumasa ... undertakes to provide such additional working capital as is necessary to enable [the company] to trade at its current level of activity for a period of not less than 12 months from this date and also to provide such long term finance as is necessary'. During the period from 1977 until the end of 1981, Rumasa actually paid the company nearly £4m by way of subsidy.

Exhibit 2
Page 242

On 23 February 1983 Rumasa was nationalised by Spanish royal decree. The company at that date was in serious financial difficulties. There was a £4·5 m deficiency in working capital. In March 1983 the company was advised by its auditors and lawyers that the members of its board were at risk of personal liability for fraudulent trading and that unless it could obtain additional funds to pay its current debts it should cease trading and invite its bankers, National Westminster Bank plc, to appoint a receiver. The board notified Rumasa that unless assurances of financial support were received by 21 March it would ask the bank to appoint a receiver.

On 21 March the company obtained an offer of a substantial borrowing facility from Banco de Jerez SA, another subsidiary of Rumasa, secured by a debenture which was executed on 5 April. On the strength of this facility, which was regarded by the board as a temporary measure pending what is described without particularity as a 'long term solution' to the company's financial problems to be provided by Rumasa, the company continued to trade. Important suppliers were reluctant to extend credit but were reassured by statements on behalf of Rumasa that it would continue to support the company. These included an assurance of support to the chairman of the company and statements made at a press conference held on 29 April 1983 in London by the senior administrator of Rumasa appointed by the Spanish government, which were given wide publicity.

The company's financial position continued to deteriorate and on 6 June Ernst & Whinney reported to the board that the company had no prospect of trading out of its financial difficulties as an independent company. The board asked Banco de Jerez and Rumasa for additional financial support. This was not forthcoming and on 11 July 1983 the National Westminster Bank plc, at the invitation of the board, appointed receivers. On 31 August Rumasa appointed the same persons as receivers under the debenture granted to Banco de Jerez in April, which had been assigned to Rumasa. On 2 September the company entered into creditors' voluntary liquidation. There is estimated to be a deficiency of £4·5m for unsecured creditors.

These are in summary the facts alleged in the points of claim. I must also draw attention to certain matters which are not alleged. First, it is not alleged that anyone other than the board actually carried on the business of the company. In particular, it is not alleged that Rumasa carried on any business of the company. The way in which the matter is summed up by the liquidators in para 48 of the points of claim is that by (i) giving the auditors letters of comfort and allowing those letters to be noted in the accounts (ii) providing subsidies (iii) making statements of intention to continue support after nationalisation, both to the board and in public, Rumasa –

> 'indicated an intention financially to support the company and to enable the company to trade as a viable concern; and by so doing induced, and intended to induce, the board of the company to cause the company to carry on trading and to incur debts (which the board would not otherwise have done) and induced, and intended to induce, suppliers and the creditors of the company to continue to supply or grant credit to the company.'

The allegation is therefore that Rumasa induced the board to continue actively to carry on the company's business and induced suppliers and credi-

Exhibit 2
Page 243

tors to do business with the company but not that Rumasa itself in any way carried on the company's business.

Second, it is not alleged that in carrying on the company's business the board had any intent to defraud creditors or anyone else. On the contrary, as may be inferred from the passage which I have quoted from the points of claim, it is accepted that the board honestly believed that Rumasa would continue to support the company and it is alleged that without such belief the board would not have caused the company to continue to trade.

Section 332(1) of the Companies Act 1948 reads as follows:

'If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper so to do, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct ...'

It is a necessary condition of the court's power to make an order under this section that it appears that 'any business of the company has been carried on with intent to defraud'. Transferring the passive to the active voice, this in my judgment involves a finding that someone has done an act which can be described as carrying on some business of the company and that in doing so he had an intent to defraud. Equally, the words 'any business of the company has been carried on ... for any fraudulent purpose' must mean that someone carrying on the business had a fraudulent purpose in doing so. Once this condition has been satisfied, the court may impose personal liability on any persons who were knowingly 'parties to' carrying on of the business 'in manner aforesaid'. The words 'persons ... parties to' may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts. For an example, see *Re Gerald Cooper Chemicals Ltd* [1978] 2 All ER 49, [1978] Ch 262. But I cannot see how the requirements of the section can be satisfied if no fraudulent intent is alleged against any person who actually carried on the business. In such a case, there are no fraudulent acts to which the outsider can have been a party and his own state of mind seems to me for present purposes irrelevant. It may give rise to liability in deceit or some other cause of action but not under s 332 of the 1948 Act.

Counsel for the joint liquidators (Mr Lindsay QC) said that I should not adopt this construction of s 332 unless driven to do so. The effect, he said, would be to make comfort letters legally worthless. The circumstances in which parent companies should be liable for the debts of their subsidiaries is a matter of considerable public importance and debate. It may be that the law on this subject is inadequate. To form a view would require a much wider investigation of the issues of public policy than is open to a judge hearing an interlocutory application to strike out a pleading. The only point

Exhibit 2
Page 244

from facts already pleaded. The allegations about Rumasa's alternative states of mind are also said to be inferences from the pleaded facts. The question is therefore whether the facts alleged constitute adequate particulars of fraud. What those facts amount to is that Rumasa on several occasions declared an intention to support the company but in the end did not provide enough to pay the company's debts.

Counsel for the joint liquidators says that Rumasa's change of mind shows that its previous intention to provide funds to pay the company's debts, if it existed at all, was not settled but subject to an element of contingency. An intention thus qualified is not an adequate basis for a belief that there is good reason for thinking that funds will become available to pay the company's debts as they fall due and can therefore give rise to an inference that there was an intent to defraud – see *R v Grantham* [1984] 3 All ER 166, [1984] BCLC 270, [1984] QB 675. I do not accept this form of reasoning, which involves translating the actual facts pleaded into generalities and then drawing inferences from those generalities rather than the facts themselves.

In my judgment, these facts, if proved, would be entirely inadequate to sustain an allegation of intention to defraud. They are quite consistent with a genuine and honest intention on the part of Rumasa, at the time of each of the statements relied upon, to support the company until it was able to stand upon its own feet. There is no allegation that Rumasa refused any support requested by the board before the Ernst & Whinney report on 6 June. The 1982 comfort letter, so far as it promised support for current trading, expired on 1 June 1983. The promise to provide 'such long term finance as is necessary' had become meaningless in the light of the knowledge that the company could not survive. The statements to the chairman and at the press conference after nationalisation are, as pleaded, plainly no more than statements of current intent and descriptions of what the new controllers of Rumasa had just done, which was to inject a further £2m into the company. Rumasa is entitled to say that even if it admitted every fact alleged by the liquidators, the conclusions alleged in the statement of claim could not be drawn. The pleaded facts show only that Rumasa decided to stop pouring money into the company after it learned that the company's condition was hopeless.

Counsel for the joint liquidators also submitted that an intent to defraud could be inferred from the fact that Rumasa had made continuing representations that it was supporting the company and then decided no longer to do so without informing the company or its suppliers. In those circumstances, the continuing representation would become fraudulent. See *DPP v Ray* [1973] 3 All ER 131, [1974] AC 370. I do not doubt a case of fraud along these lines is conceptually possible. But there is no trace of such a case in the existing points of claim. Counsel for the joint liquidators said that it could be introduced by amendment and the points of claim were therefore not so incurably bad as to merit striking out under RSC Ord 18, r 19. Over an adjournment he produced a draft amendment which alleged that upon a date which could not yet be particularised between 1 June 1982 (when the last comfort letter was given) and 8 July 1983 (when the receivers were appointed) Rumasa ceased to have the intention to support the company but deliberately and fraudulently failed to communicate this to the company and its creditors.

Counsel for the applicant opposed the application for leave to amend on the ground that there was no material on which such an allegation could be

Exhibit 2
Page 245

based. He referred me without objection to certain additional documents which showed that in March 1983 it was a condition of the borrowing facilities provided by the Banco de Jerez that the board of the company should minute its belief that those and its other borrowing facilities would enable the company to meet its debts as they fell due for the foreseeable future. There was nothing to show any retraction of that statement until the Ernst & Whinney report on 6 June. Counsel for the applicant also referred me to a letter from the company to the Banco de Jerez on 9 June, which recognised that the Ernst & Whinney report had transformed the company's expectations and, while appealing for further support from Rumasa, accepted that one option would be to allow the company to fail. There is no suggestion in the letter that Rumasa's comfort letters or other declarations had given rise to a moral obligation to provide continued support in the new circumstances. Therefore, says counsel for the applicant, there is no material on which it can be alleged either that Rumasa had abandoned its intention to support the company before the Ernst & Whinney report or misled the company afterwards. I agree. It seems to me that the allegations in the proposed amendment are wholly speculative and that I should not allow an amendment to plead fraud on such a basis.

I also think that the introduction of an allegation of fraud of this kind would be something quite different from the case presently pleaded. It is one thing not to strike out a pleading which contains an arguable case merely because it has been inadequately or inartistically pleaded. It is quite another, particularly where the allegation is fraud, to refrain from striking out an unarguable case merely because it is claimed that a different arguable case could be formulated instead.

For these reasons I order the prayer for a declaration under s 332 and the supporting paragraphs of the points of claim to be struck out.

*Order accordingly.*

Solicitors: *Herbert Smith & Co* (for the applicant); *DJ Freeman & Co* (for the joint liquidators).

Evelyn M C Budd   Barrister.

Exhibit 2
Page 246

House of Lords    *A*

## *Regina (Westminster City Council) v National Asylum Support Service*

### [2002] UKHL 38

2002  July 8, 9;                Lord Steyn, Lord Slynn of Hadley, Lord Hoffmann,    *B*
      Oct 17                       Lord Millett and Lord Rodger of Earlsferry

*Local government — Powers — Asylum seekers — Accommodation — Asylum claimed after entering United Kingdom — Applicant in ill health, destitute and in need of residential accommodation — Whether local authority under duty to provide accommodation — Whether applicant entitled to asylum support from central Government — National Assistance Act 1948 (11 & 12 Geo 6, c 29), s 21(1A) (as inserted by Immigration and Asylum Act 1999 (c 33), s 116)[1] — Immigration and Asylum Act 1999, s 95(1)[2] — Asylum Support Regulations 2000 (SI 2000/704), reg 6(4)[3]*    *C*

A Kurdish woman who had been suffering from spinal myeloma came to the United Kingdom with her daughter. She suffered a relapse and was admitted to hospital as an inpatient. Upon her discharge she claimed political asylum. Being homeless and without funds she claimed assistance from the local authority. The    *D* authority's social services department carried out a care management assessment and decided that she needed accommodation of at least two rooms which had wheelchair access and was located near to the hospital. The local authority took the view that it was not obliged to pay for such accommodation under section 21(1)(a) of the National Assistance Act 1948 because section 21(1A), as inserted by section 116 of the Immigration and Asylum Act 1999, excluded destitute asylum seekers from entitlement to accommodation under that provision and the National Asylum    *E* Support Service ("NASS") was obliged to pay for the accommodation pursuant to its powers under section 95(1) of the 1999 Act to provide support for destitute asylum seekers. NASS refused to pay on the grounds that the local authority was obliged to provide the accommodation under section 21(1)(a). The local authority paid for the woman to be accommodated in two rooms at a local hotel and commenced proceedings for judicial review of the decision by NASS. The judge dismissed the local authority's application and the Court of Appeal upheld his decision.    *F*
    On appeal by the local authority—
    *Held,* dismissing the appeal, that section 21(1A) of the 1948 Act excluded from a local authority's obligation to provide accommodation under section 21(1)(a) only asylum seekers whose need for care and attention arose solely because they were destitute and did not exclude those who needed care and attention because they were infirm as well as destitute; that, by regulation 6(4) of the Asylum Support Regulations 2000 the Secretary of State was required to take into account any support available    *G* under section 21(1)(a) in determining whether an asylum seeker was destitute and so entitled to support under section 95(1) the 1999 Act; that, consequently, infirm and destitute asylum seekers could not be considered destitute for the purposes of section 95(1) and were excluded from support under that section; and that, accordingly, the obligation to provide accommodation for the woman fell on the local authority (*post*, paras 1, 15, 17–18, 41, 49, 51–53).
    Decision of the Court of Appeal [2001] EWCA Civ 512; 4 CCLR 143 affirmed.    *H*

---

[1] National Assistance Act 1948, as amended, s 21(1)(a)(1A): see post, paras 23, 31.
[2] Immigration and Asylum Act 1999, s 95(1)(3): see post, paras 33, 34.
[3] Asylum Support Regulations 2000, reg 6(4): "[The Secretary of State] must take into account . . . (b) any other support which is available to the principal or any dependant of his, or might reasonably be expected to be so available in that period . . ."

Exhibit 2
Page 247

A    The following cases are referred to in the opinions of their Lordships:

*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]
     1 WLR 896; [1998] 1 All ER 98, HL(E)
*Pepper v Hart* [1993] AC 593; [1992] 3 WLR 1032; [1993] 1 All ER 42, HL(E)
*Prenn v Simmonds* [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)
*R v Hammersmith and Fulham London Borough Council, Ex p M* (1997) 30 HLR 10,
     CA
B    *R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath
     Holme Ltd* [2001] 2 AC 349; [2001] 2 WLR 15; [2001] 1 All ER 195, HL(E)
*R v Wandworth London Borough Council, Ex p O* [2000] 1 WLR 2539; [2000] 4 All
     ER 590, CA
*R (Mani) v Lambeth London Borough Council* [2002] EWHC Admin 735; The
     Times, 8 May 2002
*Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as H E Hansen-Tangen)*
C    [1976] 1 WLR 989; [1976] 3 All ER 570, HL(E)
*River Wear Comrs v Adamson* (1877) 2 App Cas 743, HL(E)
*Robinson v Secretary of State for Northern Ireland* [2002] UKHL 32; The Times,
     26 July 2002, HL(NI)
*Wahid v Tower Hamlets London Borough Council* [2002] EWCA Civ 287, CA

     The following additional case was cited in argument:
D    *Khana v Southwark London Borough Council* [2001] EWCA Civ 999, CA


     **APPEAL** from the Court of Appeal
         This was an appeal by Westminster City Council, with leave of the House
     (Lord Nicholls of Birkenhead, Lord Clyde and Lord Scott of Foscote) given
     on 11 June 2001, from a decision of the Court of Appeal (Simon Brown,
     Brooke and Mance LJJ) dated 10 April 2001 dismissing its appeal from a
E    decision of Stanley Burnton J who, sitting in the Administrative Court of the
     Queen's Bench Division on 27 February 2001, had refused the local
     authority's application for judicial review by way of an order quashing a
     decision of the National Asylum Support Service ("NASS") not to provide
     accommodation and support for Mrs Sabiha Mirza Y-Ahmed, a destitute
     asylum seeker suffering from spinal myeloma.
F        The facts are stated in the opinion of Lord Hoffmann.

         *Nigel Pleming QC* and *Bryan McGuire* for the local authority.
         *John Howell QC* and *Pushpinder Saini* for NASS.

         Their Lordships took time for consideration.

G    17 October. **LORD STEYN**
         1    My Lords, I have had the advantage of reading the opinion of Lord
     Hoffmann.  I share his view that this case should be decided on narrow
     grounds.  I confine myself to expressing agreement with the views expressed
     by Lord Hoffmann in paragraph 49 of his opinion.  I therefore agree that the
     appeal should be dismissed.
         2    There is, however, a point on which I want to comment.  It relates to
H    the status of Explanatory Notes which now accompany most public bills in
     their progress towards enactment by Parliament.  The Explanatory Notes to
     the Immigration and Asylum Act 1999 were placed before the House and
     relied on as arguably assisting in the interpretation of sections of the Act.
     Lord Hoffmann has not relied on this material.  I would also not do so in this

Exhibit 2
Page 248

R (Westminster City Council) v National Asylum Service (HL(E))    [2002] 1 WLR
Lord Steyn

case.  On the other hand, since Explanatory Notes are now sometimes    A
placed before the House, it would be sensible to clarify their status.

3    The background is as follows.  Brief explanatory memoranda used to
be printed at the front of a Bill.  Such a document was a précis and did not
provide background.  In addition ministers were provided with Notes on
Clauses, which did by and large explain what a clause in a Bill was meant to
do.  Later, in an era of greater transparency, Notes on Clauses were made    B
available to backbenchers.

4    In 1999 a new system was introduced.  It involves publishing
Explanatory Notes alongside the majority of public Bills introduced in
either House of Parliament by a Government minister: see Christopher
Jenkins QC, First Parliamentary Counsel, "Helping the Reader of Bills and
Acts" (1999) 149 NLJ 798.  The texts of such notes are prepared by the
Government department responsible for the legislation.  The Explanatory    C
Notes do not form part of the Bill, are not endorsed by Parliament and
cannot be amended by Parliament.  The notes are intended to be neutral in
political tone: they aim to explain the effect of the text and not to justify it.
The purpose is to help the reader to get its bearings and to ease the task of
assimilating the law.  This new procedure has the imprimatur of the House
of Commons Select Committee on Modernization and the House of Lords
Procedure Committee.  The Explanatory Notes accompany the Bill on    D
introduction and are updated in the light of changes to the Bill made in
the parliamentary process.  Explanatory Notes are usually published by
the time the legislation comes into force.  Unlike Hansard material there
are no costly researches involved.  Explanatory Notes for both Bills and Acts
are published by Her Majesty's Stationery Office.  The notes are also
available on the Internet at: http://www.parliament.uk for Bills and    E
http://www.legislation.hmso.gov.uk for Acts.

5    The question is whether in aid of the interpretation of a statute the
court may take into account the Explanatory Notes and, if so, to what
extent.  The starting point is that language in all legal texts conveys meaning
according to the circumstances in which it was used.  It follows that the
context must always be identified and considered before the process of    F
construction or during it.  It is therefore wrong to say that the court may only
resort to evidence of the contextual scene when an ambiguity has arisen.  In
regard to contractual interpretation this was made clear by Lord Wilberforce
in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384–1386, and in *Reardon
Smith Line Ltd v Yngvar Hansen-Tangen (trading as H E Hansen-Tangen)*
[1976] 1 WLR 989, 995–996.  Moreover, in his important judgment in
*Investors Compensation Scheme Ltd v West Bromwich Building Society*    G
[1998] 1 WLR 896, 912–913 Lord Hoffmann made crystal clear that an
ambiguity need not be established before the surrounding circumstances
may be taken into account.  The same applies to statutory construction.  In
*River Wear Comrs v Adamson* (1877) 2 App Cas 743, 763, Lord Blackburn
explained the position as follows:

> "I shall . . . state, as precisely as I can, what I understand from the    H
> decided cases to be the principles on which the courts of law act in
> construing instruments in writing; and a statute is an instrument in
> writing.  In all cases the object is to see what is the intention expressed by
> the words used.  But, from the imperfection of language, it is impossible

Exhibit 2
Page 249

A    to know what that intention is without inquiring farther, and seeing what the circumstances were with reference to which the words were used, and what was the object, appearing from those circumstances, which the person using them had in view; for the meaning of words varies according to the circumstances with respect to which they were used."

Again, there is no need to establish an ambiguity before taking into account
B    the objective circumstances to which the language relates. Applied to the subject under consideration the result is as follows. In so far as the Explanatory Notes cast light on the objective setting or contextual scene of the statute, and the mischief at which it is aimed, such materials are therefore always admissible aids to construction. They may be admitted for what logical value they have. Used for this purpose Explanatory Notes will
C    sometimes be more informative and valuable than reports of the Law Commission or advisory committees, Government green or white papers, and the like. After all, the connection of Explanatory Notes with the shape of the proposed legislation is closer than pre-parliamentary aids which in principle are already treated as admissible: see *Cross, Statutory Interpretation,* 3rd ed (1995), pp 160–161. If used for this purpose the recent reservations in dicta in the House of Lords about the use of Hansard
D    materials in aid of construction are not engaged: see *R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath Holme Ltd* [2001] 2 AC 349, 407; *Robinson v Secretary of State for Northern Ireland* The Times, 26 July 2002, in particular per Lord Hoffmann, at para 40. On this basis the constitutional arguments which I put forward extra-judicially are also not engaged: "Pepper v Hart: A Re-examination" (2001) 21 Oxford
E    Journal of Legal Studies 59.

    6    If exceptionally there is found in Explanatory Notes a clear assurance by the executive to Parliament about the meaning of a clause, or the circumstances in which a power will or will not be used, that assurance may in principle be admitted against the executive in proceedings in which the executive places a contrary contention before a court. This reflects the
F    actual decision in *Pepper v Hart* [1993] AC 593. What is impermissible is to treat the wishes and desires of the Government about the scope of the statutory language as reflecting the will of Parliament. The aims of the Government in respect of the meaning of clauses as revealed in Explanatory Notes cannot be attributed to Parliament. The object is to see what is the intention expressed by the words enacted.

G    **LORD SLYNN OF HADLEY**
    7    My Lords, the unchallenged facts of this case and the legislative provisions are fully set out in the judgment of Stanley Burnton J.

    8    Mrs Y-Ahmed and her daughter came to the United Kingdom on a visit to her son. Following initial treatment in St Mary's Hospital, Paddington, she made a claim for political asylum as a Kurdish/Iraqi living in Kuwait. The case has proceeded on the basis that that was a genuine claim
H    and the Home Office on 22 March 2002 gave her and her daughter indefinite leave so that since then she has not been subject to immigration control or seeking asylum here. It is, however, plain that when she first sought asylum the cancer from which she suffered made medical attention and other care necessary. She did not have accommodation or the means for providing

Exhibit 2
Page 250

herself and her daughter with accommodation and she needed    A
accommodation of two rooms near to St Mary's Hospital with wheelchair
access and room for a carer to look after her physical needs.

9   Which public authority, if any, should provide or pay for this
accommodation was a matter of dispute. The respondent, National Asylum
Support Service, as a part of the Home Office said that this was Westminster
City Council's liability.  Westminster City Council said that National    B
Asylum Support Service must pay. The authorities recognised that this was
an important case partly because of the difficulty of reading together
provisions of the National Assistance Act 1948 and the Immigration and
Asylum Act 1999 and regulations made thereunder, partly because of the
potential impact of the decision on this question on a large number of other
persons subject to immigration control and in particularly asylum seekers.
Westminster City Council assessed Mrs Y-Ahmed's needs and is to be    C
commended for having arranged and paid for her and her daughter's
accommodation pending the resolution of this question. Stanley Burnton J
and the Court of Appeal recognised that the question was not an easy one
and in view of earlier decisions from the Court of Appeal and of first instance
judges to which they referred, it was important that the matter should have
come before your Lordships' House.

10   Section 21(1) of the 1948 Act provided that a local authority    D

"with the approval of the Secretary of State, and to such extent as he
may direct shall, make arrangements for providing—(a) residential
accommodation for persons aged 18 or over who by reason of age, illness,
disability or any other circumstances are in need of care and attention
which is not otherwise available to them."    E

The Secretary of State gave a general direction that local authorities should
make arrangements for persons ordinarily resident in their areas or in urgent
need to be provided with care and attention. The Asylum and Immigration
Act 1996, section 9, provided that housing accommodation under the
Housing Act 1985 should not be provided for persons subject to
immigration control unless they were of a class specified in an order of the
Secretary of State and the orders made did not include asylum seekers who    F
claimed asylum after entry into the United Kingdom. By the Housing Act
1996 a person subject to immigration control is also declared to be ineligible
for housing assistance unless otherwise provided in regulations made by the
Secretary of State.

11   The Court of Appeal in R v Hammersmith and Fulham London
Borough Council, Ex p M (1997) 30 HLR 10 held that destitute asylum    G
seekers not entitled to welfare benefits could be in need of care and attention
within the meaning of section 21 of the 1948 Act although they were no
longer entitled to housing assistance or other social security benefits such as
income support.

12   If this applied across the board to all asylum seekers, it meant that
local authorities in particular areas to which asylum seekers regularly went,
would have to bear the cost of a large number of asylum seekers whereas the    H
large majority of local authorities would have no or little liability.

13   This on the face of it imposed a heavy burden on a few local
authorities for what should have been a national problem. The Government
accepted that the burden, or some of it, should be taken over nationally. The

Exhibit 2
Page 251

A     question in this appeal is how much of the burden has been transferred to the state. Mr Pleming for Westminster has argued forcefully that for all asylum seekers the cost of accommodation should be a national responsibility and that is what Parliament and the Secretary of State have done.

B     14   Whether he is right depends on the construction of the Immigration and Asylum Act 1999. Under section 95 of that Act the Secretary of State may provide or arrange for the provision of support for asylum seekers who appear to the Secretary of State to be destitute. A person is destitute if "he does not have adequate accommodation or any means of obtaining it (whether or not his other essential living needs are met)" or "he has adequate accommodation or the means of obtaining it, but cannot meet his other essential living needs". Under section 96 of the Act support may be provided for the purposes of section 95 "by providing accommodation appearing to the Secretary of State to be adequate for the needs of the supported person and his dependants" or by providing his essential living needs. It is to be noted here that the accommodation is to be "adequate for the needs" of the individual and if these provisions were all, it seems to me that the Secretary of State is given power to provide accommodation adequate for the needs which flow from a requirement of access or proximity to a particular hospital or which requires space for a carer to do his work.

C

D     15   But these provisions are not all. Section 115 of the 1999 Act provides that persons subject to immigration control are, subject to those falling within categories prescribed by regulation, not entitled to certain social security benefits including housing benefit. By section 116 of the Act, section 21 of the 1948 Act is amended to add after subsection 21(1) the following:

E     "(1A) A person to whom section 115 of the Immigration and Asylum Act 1999 (exclusion from benefits) applies may not be provided with residential accommodation under subsection 1(a) if his need for care and attention has arisen solely—(a) because he is destitute; or (b) because of the physical effects, or anticipated effects, of his being destitute."

F     Despite the arguments that Parliament must, in the interests of fairness to local authorities, have wished to lay down that all provision of accommodation should be for the national authorities and despite the terms of section 95 it seems to me that the present question is concluded by this provision. However difficult it may be in particular cases to decide whether the need for care and attention has arisen "solely" because the person is destitute or because of the physical effects or anticipated physical effects of destitution, it seems that it has to be accepted that Parliament intended this distinction. The word "solely" can lead to no other conclusion.

G

    16   In relation to the argument that Parliament must have intended for political or sociological reasons to place the whole burden of looking after asylum seekers on the national authorities it is to be noted that the White Paper on the creation of the National Asylum Support Services, "Fairer, Faster and Firmer—A Modern Approach to Immigration and Asylum" (1998) (Cm 4018), stated in paragraph 8.23 that:

H

    "The 1948 Act will be amended to make clear that social services departments should not carry the burden of looking after healthy and able

Exhibit 2
Page 252

bodied asylum seekers.  This role will fall to the new national support    *A*
machinery"

thereby apparently, even if not intentionally, drawing the distinction which
I feel obliged to accept as flowing from section 21(1A).

17    Accordingly, it follows that the only limitation of a local authority's
liability to provide accommodation is where the need is "solely" due to
destitution or its effects.  Section 95 can therefore not be relied on to give a    *B*
separate right against the Secretary of State where there is destitution plus
disability.  Even if that were a possible construction the Secretary of State,
under section 95, must take into account, by virtue of regulation 6(4) of the
Asylum Support Regulations 2000 (SI 2000/704): "any other support which
is available to the principal or any dependant of his, or might reasonably be
expected to be so available in that period."  Accordingly, the Secretary of    *C*
State, even under section 95, would be obliged to have regard to the liability
of the local authority under section 21 of the 1948 Act as amended for any
asylum seeker whose need for care and attention had not arisen solely
because of his destitution.

18    I would, therefore, dismiss the appeal.

**LORD HOFFMANN**    *D*

19    My Lords, there was a time when the welfare state did not look at
your passport or ask why you were here.  The state paid contributory
benefits on the basis of contribution and means-tested benefits on the basis of
need.  Some flat-rate non-contributory benefits like family allowances
required residence in the UK for a minimum period of time.  But
immigration status was a matter between you and the Home Office, not the    *E*
concern of the social security system.

20    As immigration became a political issue, this changed.  Need is
relative, not absolute.  Benefits which in prosperous Britain are regarded as
sufficient only to sustain the bare necessities of life would provide many
migrants with a standard of living enjoyed by few in the misery of their home
countries.  Voters became concerned that the welfare state should not be a
honey pot which attracted the wretched of the earth.  They acknowledged a    *F*
social duty to fellow citizens in need but not a duty on the same scale to the
world at large.

21    The first to be denied income support (formerly national assistance)
were people who clearly had no right to be here: illegal entrants and
overstayers: see regulation 21(3) of and Schedule 7 to the Income Support
(General) Regulations 1987 (SI 1987/1967).  Those whose immigration    *G*
status remained to be determined were also excluded from ordinary
entitlement to benefit but could be treated as "urgent cases" and paid 90% of
benefit.  Asylum seekers were so treated while their applications were under
consideration.

22    The Asylum and Immigration Act 1996 removed altogether the right
to income support and to housing under the homelessness legislation from
asylum seekers who did not claim asylum at the port or airport of entry.  The    *H*
view was that bona fide asylum seekers could be expected to declare
themselves as such when they arrived.  Not being willing to do so was the
badge of an economic migrant who should be discouraged from coming and,
if here, encouraged to go home.  For similar reasons, benefits were denied to

Exhibit 2
Page 253

A  asylum seekers whose applications had been refused and were pursuing an appeal. Whether on account of this change in the law or some other reason, the number of persons claiming asylum after entry did in fact fall from 29,555 in 1995 to 17,205 in 1996 and 15,915 in 1997: see the 1998 White Paper "Fairer, Faster and Firmer—A Modern Approach to Immigration and Asylum" (1998) (Cm 4018) at para 1.9. But that still left a lot of people who were in the United Kingdom without any entitlement to a home or income.

B  23  Some of these people were no doubt able to subsist on their own resources or the charity of relatives, friends or institutions. But others sought assistance from the social services departments of local authorities. They claimed that they were entitled to accommodation under Part III of the National Assistance Act 1948 (a benefit from which they had not been excluded) by virtue of the provisions of section 21(1):

C     "subject to and in accordance with the provisions of this Part of this Act, a local authority may with the approval of the Secretary of State, and to such extent as he may direct shall, make arrangements for providing— (a) residential accommodation for persons aged 18 or over who by reason of age, illness, disability or any other circumstances are in need of care and attention which is not otherwise available to them . . ."

D  24  The Secretary of State has given a general direction imposing upon local authorities a duty to make arrangements under section 21(1)(a) in relation to persons ordinarily resident in their area and others in urgent need: see Department of Health Circular No LAC (93)10, Appendix 1, paragraph 2(1)(b).

25  The provision of accommodation under this section (generally called "Part III accommodation") had previously been a relatively quiet backwater of the social welfare system, consisting principally of residential homes for the elderly and to a much lesser extent the sensorily disabled and mentally ill. Since the early 90s the provision of such accommodation has been largely contracted out to the private sector and the number of persons in homes staffed by local authorities has fallen from over 100,000 in 1990 to about 50,000 in 2001.

E

F  26  It is apparent from the language of section 21(1)(a) that the power or duty to provide accommodation is dependent upon three conditions being satisfied: first, the person must be in need of care and attention; secondly, the need must arise by reason of age, illness, disability or "other circumstances" and, thirdly, the care and attention which is needed must not be available otherwise than by the provision of accommodation under section 21. (I take these conditions from the valuable analysis by Hale LJ in *Wahid v Tower Hamlets London Borough Council* [2002] EWCA Civ 287 at [30].) The effect of the third condition is that, normally, a person needing care and attention which could be provided in his own home, or in a home provided by a local authority under the housing legislation, is not entitled to accommodation under section 21. That is why the use of the section had previously been for the most part limited to the provision of accommodation in specialist institutions like homes for the aged, in which the necessary care and attention could be provided more conveniently than in separate dwellings.

G

H

27  The first test case to come before the Court of Appeal on whether local authorities were obliged to provide accommodation for asylum seekers

Exhibit 2
Page 254

under section 21 was *R v Hammersmith and Fulham London Borough Council, Ex p M* (1997) 30 HLR 10. This concerned four asylum seekers who were perfectly healthy and not in need of care and attention, but because they were destitute, without accommodation or subsistence, would soon become in need of care and attention unless something was done about it. The Court of Appeal decided that the local authority had an obligation under section 21 to provide them with accommodation.

28    The stark facts of that case—able bodied asylum seekers having to be accommodated by the social services department of the local authority—caused consternation. Before the 1996 Act the local authorities would have had to provide them with accommodation under the homelessness legislation. But the rent would have been paid out of housing benefit from central funds. Now the entire burden was shifted onto the administrative resources and budget of the social services department. And the burden fell particularly heavily upon those local authorities where asylum seekers tended to congregate—Kent, for those landing at the Channel ports, Hillingdon and East Sussex for those landing at Heathrow and Gatwick and the inner London boroughs. As the new Government said later in paragraph 8.14 of the White Paper "Fairer, Faster and Firmer" to which I have already referred:

> "The Court of Appeal judgment . . . meant that, without warning or preparation, local authority social services departments were presented with a burden which is quite inappropriate, which has become increasingly intolerable and which is unsustainable in the long term, especially in London, where the pressure on accommodation and disruption to other services has been particularly acute."

29    What may have escaped notice in the aftermath of *Ex p M* was that the 1996 Act had brought into the scope of section 21 of the 1948 Act *two* distinct classes of asylum seekers who would not have been entitled to Part III accommodation if the 1996 Act had not excluded them from the normal social security system. The first class were the able bodied asylum seekers who qualified solely because, being destitute, they were already or were likely to become in need of care and attention. This was the class highlighted in *Ex p M*. I shall call them "the able bodied destitute", who came within section 21 solely because they were destitute. The second class were asylum seekers who had some infirmity which required the local social services to provide them with care and attention, but who would not ordinarily have needed to be provided with accommodation under section 21 because it was available in other ways, for example, under the homelessness legislation. They would not have come within the section 21 duty because they would not have satisfied the third condition which I have quoted from the judgment of Hale LJ in *Wahid's* case [2002] EWCA Civ 287 at [30]: the care and attention which is needed must not be available otherwise than by the provision of accommodation under section 21. I shall call this class "the infirm destitute".

30    The White Paper, which proposed to solve the crisis created by the 1996 Act and *Ex p M* by creating a National Asylum Support Service ("NASS") as a division of the Home Office, with power to provide accommodation for asylum seekers, focused entirely on the able bodied destitute. It said in para 8.23:

Exhibit 2
Page 255

*A*

"The 1948 Act will be amended to make clear that social services departments should not carry the burden of looking after healthy and able bodied asylum seekers. This role will fall to the new national support machinery."

31   Nothing was said about the infirm destitute and, as I have said, I am not sure it was appreciated that their accommodation was also a new burden

*B*  upon local authorities which had been created by the 1996 Act. However, the terms in which the 1948 Act was amended were in my opinion perfectly clear. Section 116 of the Immigration and Asylum Act 1999 introduced into section 21 a new subsection (1A):

"A person [subject to immigration control, including asylum seekers] may not be provided with residential accommodation under

*C*   subsection (1)(a) if his need for care and attention has arisen solely— (a) because he is destitute; or (b) because of the physical effects, or anticipated physical effects, of his being destitute."

32   The use of the word "solely" makes it clear that only the able bodied destitute are excluded from the powers and duties of section 21(1)(a). The infirm destitute remain within. Their need for care and attention arises

*D*  because they are infirm as well as because they are destitute. They would need care and attention even if they were wealthy. They would not of course need accommodation, but that is not where section 21(1A) draws the line.

33   In parallel with the amendment of section 21, section 95(1) of the 1999 Act gave the Secretary of State power to

"provide, or arrange for the provision of, support for—(a) asylum-
*E*   seekers, or (b) dependants of asylum-seekers, who appear to the Secretary of State to be destitute or to be likely to become destitute within such period as may be prescribed."

34   This power is exercised through NASS. Section 95(3) provides that a person is destitute if

*F*   "(a) he does not have adequate accommodation or any means of obtaining it (whether or not his other essential living needs are met); or (b) he has adequate accommodation or the means of obtaining it, but cannot meet his other essential living needs."

35   It will be seen that while section 21(1A) removes only the able bodied destitute from the duty of the local social service departments,

*G*  section 95(1) appears prima facie to give NASS power to accommodate all destitute asylum seekers, whether able bodied or infirm. It is this apparent overlap between the powers of NASS and the duties of the local authority which has given rise to this appeal.

36   Mrs Y-Ahmed, over whom the dispute has arisen, was at the relevant time an infirm destitute asylum seeker. She is of Iraqi Kurdish origin but comes from Kuwait, where she had lived for 40 years, latterly with her

*H*  husband and children. In 1996 she was diagnosed as having spinal cancer and although treatment in Kuwait initially produced a remission, she had a relapse in 1999. In July 2000 she and her 13-year-old daughter came to London on a visit to her eldest son, who was living here with his wife and child. She was given leave to enter on condition that she should not have

Exhibit 2
Page 256

recourse to public funds. But she soon sought treatment at St Mary's  A
Hospital, Paddington and upon being discharged in November 2000 made a
claim for political asylum. She also said that she was unable to return to her
son's flat and was entirely without funds.

37 Westminster City Council ("Westminster"), within whose area she
had until then been resident, assessed her community care needs pursuant to
section 47 of the National Heath Service and Community Care Act 1990. In  B
conjunction with the hospital they assessed her and her daughter as
requiring self-contained accommodation of at least two rooms near the
hospital, accessible by wheel chair and to community care services. This was
found at an hotel. Westminster considered that NASS should pay for the
accommodation pursuant to its powers under section 95(1) and NASS said
that Westminster should provide it under section 21. When NASS refused to
pay, Westminster commenced proceedings for judicial review, seeking orders  C
quashing its decision and requiring NASS to accommodate Mrs Y-Ahmed.
Stanley Burnton J dismissed the application and his order was unanimously
upheld by the Court of Appeal. On 11 June 2001 an Appeal Committee gave
leave to appeal to your Lordships' House. On 22 March 2002 the Secretary of
State gave Mrs Y-Ahmed indefinite leave to remain. So she is no longer an
asylum seeker or subject to immigration control. But the appeal has been  D
pursued in respect of the time when she was, because it raises an important
point of principle.

38 The ground upon which Stanley Burnton J and the Court of Appeal
found for the Secretary of State was that although section 95(1) prima facie
confers a power to accommodate all destitute asylum seekers, other
provisions of Part VI of the 1999 Act and regulations made under it make it  E
clear that the power is *residual* and cannot be exercised if the asylum seeker
is entitled to accommodation under some other provision. In such a case, he
or she is deemed not to be destitute. If Mrs Y-Ahmed had been able bodied
destitute, she would have been excluded from section 21 and therefore
qualified for accommodation under section 95(1). But as she was infirm
destitute, her first port of call should be the local authority.

39 The provisions relied upon by the Secretary of State are, first,  F
section 95(12), which enacts Schedule 8, giving the Secretary of State power
to "make regulations supplementing this section". Paragraph 1 of the
Schedule says in general terms that the Secretary of State may make "such
further provision with respect to the powers conferred on him by section 95
as he considers appropriate". More particularly, paragraph 2(1)(b) says that
the regulations may provide that in connection with determining whether a
person is destitute, the Secretary of State should take into account "support  G
which is, . . . or might reasonably be expected to be, available to him or any
dependant of his".

40 The next step is to look at the regulations made under these powers,
the Asylum Support Regulations 2000. Regulation 6(4) says that when it
falls to the Secretary of State to determine for the purposes of section 95(1)
whether a person applying for asylum support is destitute, he *must* take into  H
account "any other support" which is available to him. As an infirm
destitute asylum seeker, support was available to Mrs Y-Ahmed under
section 21. Therefore she could not be deemed destitute for the purposes of
section 95(1).

Exhibit 2
Page 257

Case 2:23-cv-09217-MEMF-KS    Document 58-3    Filed 10/30/24    Page 222 of 522
Page ID #:836

A    41    My Lords, like Stanley Burnton J and the Court of Appeal, I find this
argument compelling. The clear purpose of the 1999 Act was to take away
an area of responsibility from the local authorities and give it to the
Secretary of State. It did not intend to create overlapping responsibilities.
Westminster complains that Parliament should have taken away the whole
of the additional burden which fell upon local authorities as a result of the
1996 Act. It should not have confined itself to the able bodied destitute. But
B    it seems to me inescapable that this is what the new section 21(1A) of the
1948 Act has done. As Simon Brown LJ said in the Court of Appeal 4 CCLR
143, 151, para 29, what was the point of section 21(1A) if not to draw the
line between the responsibilities of local authorities and those of the
Secretary of State?

    42    Mr Pleming, who appeared for Westminster, submitted that even if
C    Mrs Y-Ahmed was not excluded by section 21(1A), she did not come within
section 21(1)(a) in the first place. This was because her need for care and
attention did not entail a need to be provided with accommodation. It was
care and attention which could be provided in her own accommodation. If
she had been an ordinary UK resident, she would never have been assessed as
requiring Part III accommodation.

    43    The difficulty about this argument is that it seems to me to run
D    counter to the reasoning in *R v Hammersmith and Fulham London Borough
Council, Ex p M* 30 HLR 10. The able bodied destitute asylum seekers in
that case would never have been given Part III accommodation if they had
not been subject to immigration control. They would have been given
income support and Housing Act accommodation. They had to be given
accommodation because otherwise there was nowhere else they could
E    receive care and attention. Mr Pleming did not challenge the correctness of
*Ex p M* and I do not think it would be open to him to do so, because the
whole of Part VI of the 1999 Act proceeds on the assumption that it is
correct. But the present seems to me an a fortiori case.

    44    Mr Pleming also argued that "support" in regulation 6(4) was
limited to support from private sources. But this seems to me an impossible
contention. "Support" is the word which the 1999 Act uses to describe the
F    benefits which the Secretary of State is empowered to provide. When the
Regulations want to distinguish it from other forms of support, it calls it
"asylum support". "Income support" is an example of another statutory
form of support which immediately comes to mind. Mr Pleming referred to
the application forms prescribed by the Regulations, which ask questions
about private support and various state cash benefits but not
G    accommodation under section 21. He also drew attention to questions in
the form about the medical needs or disabilities of the applicant, which did
not suggest an assumption that the infirm destitute would be excluded.
These points are indeed suggestive, but what they suggest is that the Home
Office may not fully have appreciated, either when the legislation was
promoted or afterwards, the limited relief which the new section 21(1A) gave
the local authorities. But the application forms cannot be used to alter the
H    meaning of the statute.

    45    Mr Pleming said that the Court of Appeal in the present case did not
appreciate the full enormity of what they were doing by leaving local
authorities fully responsible for the infirm destitute. *R v Wandworth
London Borough Council, Ex p O* [2000] 1 WLR 2539 concerned an

Exhibit 2
Page 258

overstayer who was not an asylum seeker. She applied for accommodation    A
under section 21 on the ground that she had mental and physical health
problems which made it necessary for her to have care and attention which
she could not receive unless accommodation was also provided. The Court
of Appeal had to consider the scope of the new section 21(1A). The local
authorities argued that it excluded their duty if the applicant would have
been able, if not destitute, to provide her own accommodation in which to    B
receive whatever care and attention was needed. That is the argument which
Mr Pleming now advances. But the Court of Appeal rejected it. Simon
Brown LJ said, at p 2548, that if the applicant's need for more care and
attention was "to any extent made more acute by some circumstance other
than the mere lack of accommodation and funds" e g because she is old, ill or
disabled, then she is not excluded by section 21(1A).

46    As Simon Brown LJ confessed in his judgment in the Court of Appeal    C
in this case 4 CCLR 143, 153, para 42, he had assumed in *Ex p O* that his
construction of section 21(1A) would have a limited impact on asylum
seekers because destitute asylum seekers would be entitled to section 95
support "irrespective of whether they were particularly vulnerable through
age, ill health or disablement". Having reconsidered the matter in the
present case, he was not so sure. A person subject to immigration control,    D
whether or not an asylum seeker, was either excluded from local authority
responsibility by section 21(1A) or he was not. If he was not, then he was
not entitled to asylum support under section 95(1). But Simon Brown LJ,
at p 154, para 45, expressed the hope that NASS

"will continue to accept responsibility for supporting the great
majority of asylum seekers and that local authorities will only be expected
to assist those comparatively few whose need for care and assistance    E
would qualify them for 1948 Act assistance even were they not subject to
immigration control . . ."

47    Mr Pleming pointed out that this was an invitation to NASS to act
upon the very construction of section 21(1A) which the Court of Appeal had
rejected in *Ex p O* [2000] 1 WLR 2539, namely that it excluded those who
would not need accommodation if they were not subject to immigration    F
control (and therefore entitled to be accommodated under the homelessness
legislation). Whether this would be lawful is somewhat doubtful. In more
recent cases, judges in the Administrative Court have taken the reasoning in
*Ex p O* and of the Court of Appeal in this case to its logical conclusion. In
*R (Mani) v Lambeth London Borough Council* The Times, 8 May 2002 for
example, Wilson J decided that a destitute asylum seeker who, on account of    G
a leg abnormality, sometimes needed help with bedmaking, hoovering and
heavy shopping, was in need of care and attention which, as he had no
accommodation, could not be given to him otherwise than in
accommodation provided under section 21.

48    Mr Pleming said that this case demonstrated the absurd
consequences of the decision of the Court of Appeal. If Mr Mani had been an    H
ordinary resident, his disability would never have entitled him to
accommodation under a statute intended to provide institutions for the old
and retreats for the mentally handicapped. His entitlement as found by
Wilson J arises simply from the fact that he is an asylum seeker. Such a
conclusion is inconsistent with the policy of having a national support system

Exhibit 2
Page 259

A    specifically for asylum seekers.  Furthermore, the decision undermines the policy of dispersal followed by NASS, which is intended to prevent asylum seekers from gravitating to London boroughs or other local authority areas of their choice.  An asylum seeker who can produce a disability, physical or mental, which makes his need for care and attention "to any extent more acute" than that which arises merely from his destitution, can play the system and secure accommodation from the local authority of his choice.

B    49   My Lords, I record these concerns, which seem to me, as they did to the Court of Appeal, not without substance.  But the issues before your Lordships are narrow.  The present case has been argued throughout on the footing that Mrs Y-Ahmed has a need for care and attention which has not arisen solely because she is destitute but also (and largely) because she is ill. It is also common ground that she has no access to any accommodation in

C    which she can receive care and attention other than by virtue of section 21 or under Part VI of the 1999 Act.  The first question for your Lordships is whether in those circumstances she comes prima facie within section 21(1)(a) and, if so, the second is whether she is excluded by section 21(1A).  In my opinion, the answers to these questions are Yes and No respectively.  The third question is whether the existence of a duty under section 21 excludes Mrs Y-Ahmed from consideration for asylum support.  Again, in agreement

D    with the Court of Appeal, I think that the answer is Yes.

50   Your Lordships are not however concerned to decide whether the test laid down by the Court of Appeal in *R v Wandsworth London Borough Council, Ex p O* [2000] 1 WLR 2539 (and applied by Wilson J in *Mani's* case The Times, 8 May 2002) for determining whether the need for care and attention has arisen "solely because he is destitute" was correct.  It would not

E    be right to express any view on this point because it affects the rights of everyone subject to immigration control, whether an asylum seeker or not, and they were not represented before your Lordships.

51   I would therefore dismiss the appeal.

**LORD MILLETT**

F    52   My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Hoffmann.  I agree with it, and for the reasons he gives I too would dismiss the appeal.

**LORD RODGER OF EARLSFERRY**

53   My Lords, I have had the privilege of reading the speech of my noble and learned friend Lord Hoffmann in draft.  I agree with it and for the reasons that he gives I too would dismiss the appeal.

G
*Appeal dismissed with costs.*

*Solicitors: Creighton & Partners; Treasury Solicitor.*

B L S

H

_____

Exhibit 2
Page 260



Neutral Citation Number: [2013] EWCA civ 477

Case No: A2/2012/1893

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE QUEEN'S BENCH DIVISION**
**MR JUSTICE BEATSON**
**HQ0X05544/HQ12X0369**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 3<sup>RD</sup> May 2013

Before :

**LORD JUSTICE LEWISON**
**LORD JUSTICE McCOMBE**
and
**SIR STEPHEN SEDLEY**
- - - - - - - - - - - - - - - - - - - -
Between :

|  |  |
|---|---|
| **(1) The Rt Hon David Mellor PC QC** | **Appellants** |
| **(2) Christopher Jemmett** | |
| **(3\|) Mark Law** | |
| **- and -** | |
| **(1) John Arthur Partridge** | **Respondents** |
| **(2) Frank David Peregrine Partridge** | |

- - - - - - - - - - - - - - - - - - - -
(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - -

**MR R TAGER QC** (instructed by **Jeffrey Green Russell**) for the **Appellants**
**MR J BRISBY QC & MR P GREENWOOD** (instructed by **Streathers LLP**) for the
**Respondents**

Hearing dates : 16 and 17 April 2013
- - - - - - - - - - - - - - - - - - - -
Judgment
As Approved by the Court

Crown copyright©

Exhibit 2
Page 261

**Lord Justice Lewison:**

1. Partridge Fine Arts plc ("PFA"), established in 1900, was an old established and very well-known New Bond Street dealer in antiques and fine art which by 2005 had fallen on hard times. In that year, after previous unsuccessful attempts to sell it, Amor Holdings Ltd ("Amor") made a bid for the majority of its share capital on the terms of an offer letter ("the Offer Letter"). Amor was a newly incorporated company set up for the purposes of the acquisition by Messrs Mellor, Jemmett and Law. They guaranteed a number of obligations undertaken by Amor towards the shareholders in PFA. Despite the efforts of the buyers, and in particular of Mr Law, PFA did not prosper. On 20 July 2009, PFA entered administration; and on 12 July 2011 it went into liquidation.

2. Messrs Mellor, Jemmett and Law now make claims against Messrs John Partridge ("John") and his son Frank Partridge ("Frank"). After various procedural vicissitudes (which I need not recount) the relevant claim form was issued on 31 January 2012. Their claims are of three different kinds:

    i)    Claims which they advance in their personal capacity;

    ii)   Claims which they advance as assignees of claims that were claims vested in Amor; and

    iii)  Claims which they advance as assignees of claims that were claims vested in PFA.

3. John and Frank applied for summary judgment on all the claims made against them. That application came before Beatson J (as he was then) who summarily dismissed some of the claims, but refused to dismiss others on the summary basis. Both sides now appeal. Our task is not to decide whether the claimants are right. Our task is to decide which parts of the case (if any) are fit to go to trial. If I may repeat something I have said before (*Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch), approved by this court in *AC Ward & Son v Catlin (Five) Ltd* [2009] EWCA Civ 1098):

   > "The correct approach on applications by defendants is, in my judgment, as follows:
   >
   > i) The court must consider whether the claimant has a "realistic" as opposed to a "fanciful" prospect of success: *Swain v Hillman* [2001] 1 All ER 91 ;
   >
   > ii) A "realistic" claim is one that carries some degree of conviction. This means a claim that is more than merely arguable: *ED & F Man Liquid Products v Patel* [2003] EWCA Civ 472 at [8]
   >
   > iii) In reaching its conclusion the court must not conduct a "mini-trial": *Swain v Hillman*
   >
   > iv) This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that

Exhibit 2
Page 262

there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: *ED & F Man Liquid Products v Patel* at [10]

v) However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond (No 5)* [2001] EWCA Civ 550;

vi) Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 63;

vii) On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd* [2007] EWCA Civ 725."

4.    Stripped to its bare essentials the claimants' personal claim against John is that:

i)    In the course of negotiations John:

a)    Dishonestly told them that PFA had a long-standing and ongoing relationship with the Getty Museum when in fact that relationship had

Exhibit 2
Page 263

terminated on bad terms some twenty years earlier ("the Getty representation");

b)  Repeatedly told them of PFA's high standing and reputation in the specialist market, thereby implicitly representing that that reputation was justified, without revealing that it was liable to be undermined or destroyed if certain alleged systematic fraudulent trading practices of both John and Frank were to come to light ("the reputation representation");

c)  Encouraged them to rely on financial information provided by PFA (including balance sheets and stock valuations) when that financial information did not enable the discovery of the financial effect of the alleged fraudulent trading practices, and in particular did not enable them to discover that PFA might be vulnerable to claims from dissatisfied customers alleging that PFA had sold them fakes ("the balance sheet representation");

d)  Stated in the Offer Letter that the "only contracts, not being contracts entered into in the ordinary course of business", that had been entered into between 18 November 2003 and 12 December 2006 and that "are or may be material" were two particular agreements. In fact there are two other highly material agreements, namely an agreement with a dissatisfied customer to compromise a claim over the authenticity of two commodes known as the *Bantry House Commodes*, and an agreement under which Frank resigned as a director of PFA.

ii)  These misrepresentations were fraudulently made;

iii)  These misrepresentations caused the individual claimants to guarantee Amor's obligations to shareholders, which they would not have done if they had known the truth.

5.  The claim that the claimants pursue as Amor's assignees is essentially the same, except that the inducement alleged is that Amor was induced by the misrepresentations to make its offer for the majority shareholding, which it would not have done if it had known the truth.

6.  The losses claimed under this head fall into two broad categories. First, there is the amount paid to shareholders for the acquisition of the shares. Part of this was paid by Amor and part by Messrs Mellor and Jemmett when their guarantee was called on. The second broad category is losses arising out of further payments made for the benefit of PFA and, in Mr Law's case, the lost opportunity to develop an alternative business. I will return in more detail to the categories of loss in due course.

7.  The claim that the claimants pursue as assignees of PFA is that the alleged systematic fraudulent trading practices amounted to breaches by John and Frank of their contractual and fiduciary duties to PFA. The pleaded claim is that the consequence of these breaches was that PFA was (or became) worthless as a going concern.

Exhibit 2
Page 264

8.      I need hardly add that both John and Frank vigorously deny the accusations levelled against them. Nothing in this judgment should be taken as a finding that these allegations are true.

9.      At root these allegations are based on a series of transactions which are alleged to support the conclusion that John and Frank conducted a systematically fraudulent business. It is important to stress that the pleaded transactions are said to be examples only. In his witness statement Mr Law says:

> "[27] … Reputation is everything. Had we known of any one serious historic claim against [PFA], we would never have been able to quantify what else might be out there, and would never have taken the risk of acquiring this liability."

> "[37] The relevant complaint that we make in these proceedings is that the Claimants (through Amor) purchased a company with poor liquidity, but the one asset that we did believe we were buying and which we believed and had been led to believe was of such great worth that we were prepared to borrow money and provide personal guarantees so as to acquire it – was the company's impeccable worldwide reputation."

> "[38] Our complaint is that the reputation was in fact undeserved; it was all a lie and done with smoke and mirrors. The company had been systematically defrauding its customers for a great many years, and on the rare occasions that a customer realised that he had been mis-sold … the Partridge modus operandi was to say that differences of opinion amongst such lofty experts were not uncommon, and to take back the denounced item, and sell it to another victim, who himself purchased in reliance upon the undeserved reputation, thus both perpetuating and concealing the fraud. John and Frank had been churning counterfeits for years."

> [39] Had I, as a bona fide antique dealer been aware of the fact that any single one of these three claims could be legitimately made I would not have proceeded with the purchase, and I believe (because they have told me) the same goes for Mr Mellor and Mr Jemmett."

10.     The pleaded transactions are as follows (for the most part taken verbatim from the judge's judgment):

i)      It is alleged that in the 1980s, John sold a pair of counterfeit chairs to the Getty Museum for £175,000; that the Museum made a complaint shortly after delivery but John refused to refund the price. The result was that what had been a long-standing relationship between the Getty Museum and PFA came to an end. It is not pleaded that John knew or suspected that the chairs were counterfeit; only that he had been procured to act by a Mr Hobbs, who it is alleged was a notorious dealer in counterfeit furniture. Frank is not involved in this allegation.

Exhibit 2
Page 265

ii)     In 1991 PFA sold to a Mr Relyea a painting entitled *A View of Cannes* as by Sir Winston Churchill. It is alleged that the painting was a known fake obtained from a Mr Sellin, now deceased, who the claimants allege was a known source of works of art of dubious origin. It is alleged that when John sold the painting to Mr Relyea, he dishonestly redacted all reference to the painting's provenance and catalogue. It is alleged that Mr Henderson, at that time a director of PFA, informed John that the painting was a fake. The judge found that the claim that PFA or John had redacted the painting's provenance was inconsistent with documents showing that the contents of the invoice to Mr Relyea were the same as the catalogue entry for the La Gallais auction house's October 1989 auction in Jersey, where the painting was sold. That was the provenance provided to John Partridge by Mr Sellin. There is no appeal against that finding which is a rejection of the claimants' case in that respect. Mr Relyea raised a question about the painting's provenance in October 1998. By mid-1999 inquiries made by PFA of Lady Soames and Mr David Coombs, an expert on Churchill paintings, revealed doubts about its authenticity. By then PFA could not provide a better provenance than the one on the invoice. Despite all this Mr Relyea has made no claim against PFA. The judge held that any claim would be statute barred; and there is no appeal against that conclusion. Although Frank features on the periphery of this transaction there is no specific allegation of wrongdoing against him. The allegation against John is that by his actions he acted in breach of his fiduciary and contractual duties to PFA.

iii)    The third transaction concerns what are known as the *Cave armchairs*. PFA purchased these from Christies' in 1992. The first allegation is that, after they had not sold for a considerable time, in order to make them more saleable Frank and John arranged for a cherub design on them to be replaced with a floral design, and at the same time altered the designs of the legs. This is said to be contrary to the British Antique Dealers Association's by-laws. The second allegation is that the chairs were sold at some time in about 2004 to Lord Kalms without disclosing the alterations. It is alleged that by their actions both John and Frank acted in breach of their fiduciary and contractual duties to PFA. The judge referred to an interview with Lord Kalms in which the latter indicated that he was not interested in taking proceedings even if the chairs were fake. There is no appeal against the judge's inference of fact.

iv)     The fourth transaction concerns three tables sold to a very good customer of PFA: Mr Mavromatis. They are referred to in the pleadings as the *First* and *Third Gueridon Tables* and the *Red Japanned Table*. The first table was bought by Frank for PFA at a Christies' auction for about £13,500. The allegation is that, in order to lend credibility to an intended deception, Frank had the table restored at a cost of some £11,000 so as to be able to pass it off as a genuine 18th century Gueridon; and then in September 1999 sold it to Dartmouth, a company controlled by Mr Mavromatis. The allegation is that Frank either knew the table to be counterfeit or took insufficient steps to establish whether it could be described in the way that it was. It is also alleged that John knew that the table was not a genuine 18th century Gueridon.  It is alleged that by their actions both John and Frank acted in breach of their fiduciary and contractual duties to PFA. The second of the three tables was

Exhibit 2
Page 266

genuine and nothing turns on that. However, it is alleged that the third table was a counterfeit reproduction of the second (genuine) table which Frank procured to be made. It is alleged that John must have known of the counterfeiting no later than the date of the sale of the third table to Mr Mavromatis. It is alleged that by their actions both John and Frank acted in breach of their fiduciary and contractual duties to PFA. The *Red Japanned Table* was sold in January 1999 to Dartmouth, a company owned by Mr Mavromatis, for £135,000. It was sold as made by Bernard II van Risamburgh. It is alleged that Frank knew the table to be counterfeit or alternatively took insufficient steps to establish whether it could be sold as described. The allegation against Frank is that by his actions he acted in breach of his fiduciary and contractual duties to PFA. There is no specific allegation against John in relation to this transaction. The judge continued at [30]:

> "In 2008 Mr Mavromatis instructed Sotheby's to sell items from his London house and Sotheby's had expressed doubts about the three items. As a result Mr Mavromatis complained to PFA. His complaint about these items was not made public until these proceedings were started. On 5 April 2010 Frank Partridge bought the *Third Gueridon Table* from Mr Mavromatis for £250,000 in settlement of any claim Mr Mavromatis might have had against the company or otherwise in respect of the three items that Sotheby's had doubted."

v)   It is alleged that in December 1999, John Partridge sold a number of items including two pairs of Boulle pedestals and a pair of Boulle commodes to a Mr Greenberg, representing them to be authentic Boulle items from the period of Louis XIV and Louis XVI, rather than reconstructions incorporating 18th century elements. In October 2000, John Partridge sold Mr Greenberg a marriage coffre, which it is alleged he wrongly described as being Louis XIV *circa* 1700 rather than Regency, *circa* early 19th century. The pleaded allegation is that John Partridge knew these items were counterfeit and not from the period as described, or alternatively dishonestly elected to take no or insufficient steps to establish whether they could be so described. When, in about February 2003, Mr Greenberg raised the issue of the age of these items with PFA, Frank Partridge was involved in negotiations with him. During these he offered to deal with the matter by buying back the items for approximately £800,000.

vi)  The sixth transaction concerns the *Bantry House Commodes*. In 1989, s S Franses Ltd, which had acquired the two commodes in Ireland, sold a half interest in them to PFA for £32,800. The commodes were restored that year. S Franses Ltd and PFA shared the cost. It is alleged that this restoration involved the removal of a fruitwood veneer and its replacement with ebony. The commodes did not sell, and in 2001 Frank Partridge told Mr Franses's son that the previous restoration was unsatisfactory and that further work was needed. He proposed that they be sent to Paris and decorated with Boulle at a cost of about £100,000, which he said should have been done originally. Mr Franses did not believe that there had been original Boulle on the commodes, and suggested that consideration be given to less drastic restoration work. The

Exhibit 2
Page 267

disagreement about what work was needed and what had been authorised led to the purchase by PFA of S Franses Ltd's half interest in the commodes. The work was then done and the commodes were offered for sale as "a very rare pair of Louis XIV Boulle and tortoiseshell commodes…*circa* 1710". They were sold in 2002 to a Mr Wexner for £600,000. Mr Wexner's agent, Alex di Carcaci, negotiated the price with John. Frank informed Mr di Carcaci, that existing Boulle decoration had been "re-laid" and "re-engraved", and that the items had been bought from a private collection in Paris. Subsequently, Mr Wexner complained about these items. PFA settled his claim in February 2009 on terms that Mr Wexner kept the items and was permitted to select stock from PFA's shop floor to the value of £420,000, which he duly did.

11.    The judge's first mention of the misrepresentation claims was as follows:

> "[61] I turn to the misrepresentation claims brought against John Partridge by the claimants personally and as the assignees of Amor. … I have referred to the difficulties of establishing systematic fraudulent trading practices on the basis of the seven pleaded transactions and their consequences. Notwithstanding those, and the undoubted force of Mr Brisby's submission that the reputation representation claim is an unsustainable case of pure non-disclosure, I have concluded that it would not be right to strike out this part of the claim on that ground."

12.    However, although this passage is expressed in general terms, it is clear from later passages in his judgment that the judge was confining himself at this point to the Getty representation and the reputation representation. Moreover, the judge also held that part of the claim was unsustainable because of the principle that a shareholder is unable to recover for reflective loss. I shall return to this principle when I have considered the remaining alleged misrepresentations.

13.    So far as the balance sheet representation was concerned the judge held that the claim was unsustainable. He expressed his conclusion thus:

> "[65] I also accept Mr Brisby's submissions about the balance sheet misrepresentation claim. It relies on the 2004 balance sheet, but since, by the time of the offer, the 2005 balance sheet and Sotheby's write-down were available, it is not sustainable. As far as the complaint that provision was not made for contingent liabilities, given the absence of any real possibility of such liabilities and no evidence that PFA considered that claims in respect of the specified transactions would materialise, there was no obligation to make such provision. Where there was a dispute which led to activity, this was reflected. The three Greenberg items were specifically written down, and provision was made for items bought back. Moreover, the company's stock had been independently re-valued by Sotheby's before the negotiations."

> "[78] … in the case of the balance-sheet representation I refer to (and accept) Mr Brisby's submission that, because the 2005

Exhibit 2
Page 268

balance-sheets and Sotheby's write-down were available at the time of the offer, the claim is not sustainable, and becomes no more sustainable if reformulated as a claim based on the 2004 balance-sheet. For the reasons given in [58], there is no real possibility of claims in respect of contingent losses to the third parties who dealt with PFA, and thus there was no obligation to make provision for them in the balance-sheet."

14.    The cross-reference to [58] is an explanation of what the judge meant in [65] by his statement: "given the absence of any real possibility of such liabilities." So one must look to see what he said in [58]. In that paragraph he said:

"As for the *Cave armchairs*, unless Lord Kalms makes a claim there is no loss to PFA. On the evidence a claim by Lord Kalms is "fanciful". If, however, he should decide to bring a claim against the liquidators, as a result of section 10 of the Limitation Act 1980, it will be possible for them to seek contribution from Frank Partridge pursuant to the Civil Liability (Contribution) Act 1978 provided they do so within two years of any judgment. Mr Brisby relied on this possibility in respect of all the claims brought as assignees of PFA in respect of contingent losses to the third parties who dealt with it in the transactions relied on by the claimants. In no case is there any evidence that there is a possibility of such claims. In the case of a number, including Messrs Relyea, Mavromatis, Greenberg and Wexner, the evidence (in the case of the last three, the settlements) strongly suggests there is no such possibility."

15.    The last of the alleged misrepresentations was the material contracts representation. The judge said this:

"[66] Finally, since the claimants accept that they were given access to the company's records, including Board minutes and the compromise agreement, the material contracts representation claim is entirely unsustainable. The claimants' advisers may not have sought to examine all the records that they were given, but they were available for them to examine."

16.    Mr Brisby argues that the judge should have struck out the claim based on the Getty representation and the reputation representation. He had an overarching point on causation, which I will deal with in due course. But in addition he said:

i)    The reputation representation was literally true. PFA did enjoy an impeccable reputation;

ii)    That reputation remained intact until PFA entered administration; and even during the course of the administration the administrators were able to sell PFA's goodwill (which was in effect its reputation) for a six figure sum;

Exhibit 2
Page 269

iii)     Mr Law knew about PFA's reputation independently because he was in the trade, and thus did not rely on John's representation. It was his own evidence that the fact of PFA's reputation was the very reason he was interested in buying the company;

iv)     What the claim amounted to was an attempt to impose on the seller of shares a duty of disclosure, which offended the basic principle: buyer beware.

17.     I do not think that it is quite so simple. First, a representation which is literally true may nevertheless be a misrepresentation if relevant facts are concealed. Second, allied to this proposition is the proposition that a representation may be implicit. Often the two will overlap. A half truth may amount to deceit if it is suggestive of a falsehood and intended so to be. Thus in *Nottingham Patent Brick & Tile Co v Butler* (1866) 16 QBD 778 a statement by a solicitor that he did not know of any restrictive covenants (but who did not reveal that he had not looked at the deeds) was held to have been a misrepresentation. In *Spice Girls Ltd v Aprilia World Service BV* [2002] EWCA Civ 15 [2002] EMLR 27 an express representation that the Spice Girls were "committed" to a contract carried with it the implied representation that the representor did not know of any matter which might falsify the assurance. What the court must consider is what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context. These are fact sensitive questions which, in my judgment, can only be fairly determined at trial. Third, in *Gordon v Selico Co Ltd* [1986] 1 EGLR 71, 77H Slade LJ, giving the judgment of the Court of Appeal, said that the principle "buyer beware" "has no application where a purchaser has been induced to enter the contract of purchase by fraud". Accordingly I agree with the judge that the allegations based on the Getty representation and the reputation representation should be allowed to go to trial.

18.     The main thrust of the claim based on the balance sheet representation is that the company's accounts (and in particular its balance sheets both in 2004 and in 2005) failed to reflect its contingent liability to compensate customers to whom it had mis-sold goods. However, there is an additional plea which merits separate consideration. This comes from paragraph 56 (4) of the Particulars of Claim which reads:

> "John knew that the 2004 Balance Sheet had not included a provision for the contingent liability to Mr Greenberg in respect of the damages which Partridges were liable to him in respect of the boulle pedestals. Had the 2004 Balance Sheet been honestly prepared it would have made a provision of the order of £800,000 against such contingent liability."

19.     There is evidence in the shape of minutes recording board meetings of 17 December 2003 and 28 January 2004 that where the board were aware of potential claims from dissatisfied customers (in this case Mr Greenberg) they actively considered the making of provision in the company's accounts. No such provisions were made in either the 2004 or the 2005 balance sheets. The judge's first reason for rejecting the claim was that the 2005 balance sheet was available. But that does not answer the point that the 2005 balance sheet (like the 2004 balance sheet) did not show any contingent liability for such claims, apart from that of Mr Greenberg which had been settled by the date of the 2005 balance sheet. In my judgment the judge's first reason can apply only to the specific plea relating to Mr Greenberg, which I have quoted.

Exhibit 2
Page 270

The judge's second reason was that a stock valuation by Sotheby's was available by the time of the offer. But the complaint is not that the stock was overvalued. The complaint is that PFA had contingent liabilities to pay compensation to defrauded customers, which would not be reflected in any valuation of stock in the company's possession, because by definition the allegedly counterfeit stock had already been sold. Again, the judge's second reason can apply only to the items repurchased from Mr Greenberg, which were in fact written down in the stock valuation. The judge's third reason was that "given the absence of any real possibility of such liabilities" there was no need to make such provision. Here I think the judge has not fully reflected the chronology. In the amplification of his reasoning in [78] he cross-referred to [58]. The latter paragraph considers whether at the date of the claim form in 2012 there was a real prospect of claims by dissatisfied customers. But the balance sheet representation relates to the period 2004 and 2005, many years earlier. In fact both Mr Wexner and Mr Mavromatis made complaints after the date of the balance sheets; although in neither case did they lead to litigation. So the question is: should the balance sheets have made provision for such potential claims in 2004 or 2005? I do not consider that we can confidently answer that question: no. In my judgment there is a real prospect that the general claim based on the balance sheet representation will succeed. However, as regards the specific claim pleaded in paragraph 56 (4) of the Particulars of Claim I consider that the judge was right in his conclusion that that claim has no real prospect of success. I would therefore strike out that sub-paragraph of the Particulars of Claim.

20.     So far as the material contracts representation is concerned the starting point is the written representation listing the contracts which were said to be the "only" material contracts. The judge did not hold that the Greenberg settlement was not a material contract. His reason for rejecting the claim was that the means of discovering the existence of the Greenberg settlement was available; and that if the buyers did not avail themselves of the opportunity that was, in effect, their problem. However, I do not consider that that is the right approach. Mr Tager QC relied on the principle stated in Clerk & Lindsell on Torts (20th ed) para 18-34:

> "A person to whom a misrepresentation is made is not deceived if he actually knows the truth. But it is no answer to an action for deceit that the claimant might have discovered the falsity by the exercise of ordinary care: it does not lie in the mouth of a liar to argue that the claimant was foolish to take him at his word. Thus, where a vendor of a public house was pursued in deceit for misrepresenting the takings of the business, it was held to be no defence that the vendor's books were it the house at the time and would have disclosed the truth had the plaintiff chosen to look at them."

21.     In my judgment that passage accurately states the law. It follows, in my judgment, that the judge's reason for striking out the claim based on the material contracts representation cannot be sustained; and Mr Brisby QC did not attempt to sustain it on that ground. Instead he argued that the judge's decision should be upheld for other reasons, namely:

i)      The Greenberg settlement was a contract entered into in the ordinary course of business; and

Exhibit 2
Page 271

ii)     In any event it was not a material contract.

22.     In support of the first of these propositions Mr Brisby submitted that the contract was simply one for the purchase of furniture by PFA. Since buying and selling furniture was PFA's ordinary business, the contract was one that was entered into in the ordinary course of business. Alternatively, the compromise of a claim by a disgruntled customer was likewise to be regarded as a contract made in the ordinary course of business. In my judgment these propositions can only be made good (if at all) at trial. We have seen some (but by no means all) of the documentation relating to Mr Greenberg's complaint. It is clear from his e-mail of 20 February 2003 that he was alleging the possibility of counterfeiting; and from his e-mail of 15 April 2003 that he was questioning PFA's probity. We have also seen the board minutes of 17 December 2003 and 28 January 2004 which suggest (to put it no higher) that what was described as "the Greenberg problem" was the cause of Frank's resignation as a director. Had the Greenberg problem simply been part of the ordinary course of business, there would have been no reason for him to resign. This seems to me to be a case where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case. So far as Mr Brisby's second argument is concerned, he concentrated on the quantum of the settlement, compared with the turnover of PFA at the relevant time. However, the evidence of Mr Henderson (a former director of PFA) is that in the light of PFA's turnover and profitability at the time a settlement of the magnitude of that given to Mr Greenberg would have made the difference between a small profit and a large loss. In addition materiality may have a broader meaning than the mere significance of the quantum. It would surely be material to know that a recent allegation of deliberate counterfeiting had been compromised. Mr Greenberg's allegation in the present case may not quite reach that point; but it cannot simply be dismissed. In his written argument Mr Brisby submitted that the Greenberg compromise could not have been material from the perspective of the prospective sellers of the shares to whom the offer was addressed. I do not regard this as self-evident. A shareholder in a company recently accused of counterfeiting whose reputation might be at risk might well regard that as an additional reason to accept an offer for his shares. Finally the representation does not merely encompass contracts that *are* material: it also extends to contracts that *may be* material.

23.     I provisionally conclude, therefore, that all the claims in misrepresentation should, in principle, be allowed to go to trial. However, Mr Brisby had additional points which, he said, should alter this provisional conclusion.

24.     First, Mr Brisby argues that the judge was wrong not to strike out the claims based on all the alleged misrepresentations on the ground that the losses claimed were not caused by the misrepresentations but by the insolvency of PFA which, in turn, came about because of factors unrelated to the misrepresentations. He emphasised the distinction between the occasion of a loss on the one hand, and the cause of a loss on the other. On which side of the line any particular case fell was, ultimately, a question to be decided according to common sense: *Galoo Ltd v Bright Grahame Murray* [1994] 1 WLR 1360, 1375A. That was a case in which the buyer of shares in a company sued the company's auditors for negligence. The losses claimed were trading losses incurred after the share purchase. This court held that those losses were not losses caused by the negligence but by the continuation of trading. It is also

Exhibit 2
Page 272

important to note the cross-appeal in that case. It was alleged that as a result of the auditors' negligence in overstating the company's profits the buyer had paid more for the shares than it would have done in the absence of negligence. The judge had refused to strike out that part of the claim; and his decision was upheld by this court. Clearly the court considered that there was no causation problem in relation to that head of damage: the issue was whether the auditors owed a duty of care to the buyers; and on the facts it was held that they did.

25.    Second, Mr Brisby argued that where a loss came about as a result of a series of causes then the legally potent cause was the first in time if all causes were tortious. But if later causes in the series were not tortious (and not other wrongs) then a subsequent cause is the legally potent cause. He relied in this respect on the decision of the House of Lords in *Carslogie SS Co Ltd v Royal Norwegian Government* [1952] AC 292 which is adequately summarised for present purposes in Clerk & Lindsell on Torts (20th ed) para 2-97:

> "Where the subsequent supervening event is non-tortious the courts apply a different test. If the supervening event is a sufficient cause, i.e. it would have been sufficient in itself to cause the loss, the causative effect of the initial tort is treated as spent or obliterated. In *Carslogie S.S. Co Ltd v Royal Norwegian Government* the defendant's vessel negligently inflicted substantial damage on the claimant's ship. Temporary repairs restored the ship to seaworthiness and she set sail for the United States. The voyage to the United States would not have taken place "but for" the original collision. Crossing the Atlantic, a heavy storm inflicted further damage to the ship. On reaching the United States the damage caused by the collision was repaired at the same time as the storm damage. The total time for the repairs was 51 days. The collision damage alone would have taken 10 days. The House of Lords held that the claimant could not claim for the loss of use of the vessel for the 10 days attributable to the collision damage because the ship was in any event out of use at that time for the storm damage repairs. The defendants were not liable for the storm damage either, because this damage "was not in any sense a consequence of the collision, and must be treated as a supervening event occurring in the course of a normal voyage". The original collision was clearly a "but for" cause of the storm damage, in the sense that had the collision not occurred, the ship would not have been on the particular voyage in which the storm damage occurred. But the tort was merely part of the history of events that placed the ship in that place at that time, and this in itself is not a "cause" of harm that arises from some independent mechanism. The storm damage was not within the risk created by the defendants' negligence."

26.    Third, as mentioned, the judge held that part of the claim based on the Getty representation and the reputation representation was unsustainable because of the principle that a shareholder is unable to recover for reflective loss. The first problem

Exhibit 2
Page 273

is to ascertain which parts of the claim the judge struck out on this ground. The relevant part of the judge's order (settled by counsel) states:

> "insofar as they are made in respect of reflective losses, summary judgment is given against the Claimants on the misrepresentation claims made against John Partridge and based on the "*reputation representation*" or on the "*balance sheet representation*" or the "*material contracts representation*" and/or those claims against John Partridge are hereby struck out."

27. However, it is difficult to identify from the terms of the order precisely which parts of the pleaded case have been struck out on this ground. Indeed Mr Brisby and Mr Tager were unable to agree on what the effect of this part of the order was. The existence of the principle that a shareholder cannot recover personally in respect of loss suffered by the company whose shares he holds is not in doubt. The question is whether it applies in this case and if so to which losses claimed. An order which simply recites the principle is of no practical help to the trial judge. Mr Brisby asserted (or conceded) that this principle could have no application to the personal claims brought by Mr Mellor and Mr Jemmett, despite the fact that the order refers indiscriminately to "the Claimants", and I am content to proceed on that basis.

28. The judge directed himself by reference to the summary of principle in *Gardner v Parker* [2004] EWCA Civ 781 [2005] BCC 46 at [33]. In that case Neuberger LJ said:

> "(1) a loss claimed by a shareholder which is merely reflective of a loss suffered by the company –i.e. a loss which would be made good if the company had enforced in full its rights against the defendant wrongdoer–is not recoverable by the shareholder; *save in a case where, by reason of the wrong done to it, the company is unable to pursue its claim against the wrongdoer* ;
>
> (2) where there is no reasonable doubt that that is the case, the court can properly act, in advance of trial, to strike out the offending heads of claim;
>
> (3) the irrecoverable loss (being merely reflective of the company's loss) is not confined to the individual claimant's loss of dividends on his shares or diminution in the value of his shareholding in the company but extends … to 'all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds' and also (again in the words of Lord Millett) 'to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder' *save that this does not apply to the loss of future benefits to which the claimant had an expectation but no contractual entitlement* ;
>
> (4) the principle is not rooted simply in the avoidance of double recovery in fact; it extends to heads of loss which the company

Exhibit 2
Page 274

could have claimed but has chosen not to and therefore includes the case where the company has settled for less than it might …;

(5) provided the loss claimed by the shareholder is merely reflective of the company's loss and provided the defendant wrongdoer owed duties both to the company and to the shareholder, it is irrelevant that the duties so owed may be different in content."

29.    In *Johnson v Gore Wood & Co* [2002] 2 AC 1, 35 Lord Bingham extracted three propositions from the authorities. Mr Brisby had reservations about the third of them, but otherwise accepted that they were correct. I need only quote the first.

> "Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing *in that capacity and no other* to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss." (emphasis added)

30.    I begin by considering the more straightforward heads of loss claimed: namely the amount that Messrs Mellor and Jemmett paid under the guarantee and the amount that Amor in fact paid for the shares. As far as Mr Brisby's first argument is concerned, the disposal of the cross-appeal in *Galoo* is binding authority against him. But in any event, assuming that I have common sense, it seems to me to be common sense to say that if I am tricked into buying an asset, my laying out of the purchase price has been caused by the trickery. I may well have to give credit for the true value of the asset I have bought, but that is a different principle. As Cockburn CJ put it in *Twycross v Grant* (1877) 2 CPD 469:

> "His grievance is not that he has paid too high a price, but that he has been induced to take shares which, but for the fraud, he would not have taken at all."

31.    So far as the second argument is concerned, it focuses on events subsequent to the purchase. To take the analogy of the ship that sinks, the complaint in this case is that the buyers were tricked into buying the ship in the first place. I do not think that this carries the argument any further.

32.    So far as the argument based on reflective loss is concerned my difficulty is to see how this principle applies to the facts. Messrs Mellor and Jemmett never became shareholders in PFA. Mr Law did, but much later on as part of a damage limitation exercise. So their claims are not claims made as shareholders, and no part of their claim relates to the value of any shares. Their claim is that they were induced by misrepresentation to enter into a guarantee and that their loss is what they paid out

Exhibit 2
Page 275

under it. Moreover the money they paid was paid to shareholders in PFA: it was nothing to do with the company itself.

33.    So far as Amor is concerned, it is true that it acquired shares. But Amor's complaint is not that it suffered loss in its capacity as a shareholder; but that it was induced to become a shareholder by misrepresentation. At the time when the misrepresentations were made it was not a shareholder. Consequently any duty owed to it by John Partridge was not a duty owed to a shareholder, but a duty owed to a prospective buyer of shares. It is true that the damage alleged consists of the payment of the purchase price for the shares. But that is simply the consequence of a previous breach of duty committed at a time when it was not a shareholder. As in the case of the personal claimants the money it paid was paid to shareholders in PFA: it was nothing to do with the company itself.

34.    At the very least this is not a case in which "there is no reasonable doubt". I would allow all the claims against John for misrepresentation to proceed to trial, to the extent that the loss claimed consists of the purchase price paid by Amor and the amounts paid out under their guarantees by the personal claimants.

35.    The personal claimants make an additional claim in paragraph 57 (4) of the Particulars of Claim. This alleges that complaints of various disgruntled shareholders have caused the Takeover Panel to investigate the manner of the purchase of PFA's shares. The very fact that the Particulars of Claim themselves plead that the investigation was caused by complaints by shareholders demonstrates that there is no legally potent causal link between the misrepresentations and the investigation. There is no real prospect of success in recovering this head of loss. I would therefore strike out paragraph 57 (4). Paragraph 58 claims an indemnity against further liabilities under the guarantee. But no such liability has been identified (apart from whatever may emerge from the Takeover Panel's investigation). I would strike out this paragraph too.

36.    Paragraph 58A advances a series of further losses incurred by Mr Law. Part A gives details of a number of loans which were routed through Amor and were used to finance PFA. These loans are said to have been guaranteed by Mr Law or to have been made by Mr Law to Amor. The loans in question are pleaded in paragraphs 58A Part A (1), (2), (4), (5) and (7). There are at least two reasons why in my judgment these claims are unsustainable.

37.    In order to explain this I must recount a few more of the facts. When Amor acquired the shares in PFA it did not have the ready cash to do so. Instead what was agreed was that PFA would sell some of its stock and would lend the proceeds of sale to Amor in order to enable it to make the purchase. This had the consequence that at the date of the administration Amor owed PFA nearly £5.5 million. Mr Law subsequently signed a statement of affairs listing PFA's creditors. Amor was not among them. This fact is a serious evidential problem in the way of establishing that the loans were ever made. In his written submissions in reply Mr Tager said that John and Frank should not be entitled to rely on this allegation because it was raised for the first time very shortly before the hearing below. I will assume that this point is well-made and that the evidential problem can be overcome. However, assuming that this serious evidential problem can be overcome, now that PFA is in liquidation rule 4.90 of the Insolvency Rules 1986 means that there is an automatic set-off of mutual debts. Since the loans

Exhibit 2
Page 276

pleaded in these paragraphs come nowhere near the amount owed by Amor to PFA it follows that Amor has in effect been repaid what it was owed. Second, the making of loans to PFA after the share purchase in order to finance its continued trading falls within the category of trading losses which are ruled out by the decision in *Galoo*. The purchase of the shares was the occasion of the loan but the alleged misrepresentations did not cause the loans to be made.

38.    Paragraph 58A Part A (3) alleges that Mr Law's parents lent money to PFA and that Mr Law promised to repay them. Again there is no trace of any such loan in the statement of affairs signed by Mr Law, but again I will assume that this evidential problem can be overcome. However, Mr Law has not in fact repaid his parents, so that he has not yet suffered any loss. Moreover, in my judgment this loan (and Mr Law's consequential liability) is also barred by the principle in *Galoo*. The misrepresentations were the occasion of the loans, but not the cause of them. Paragraph 58A Part A (6) alleges a loan by Seaturn Holdings Ltd partly to Amor and partly direct to PFA, both loans having been guaranteed by Mr Law. The loan routed through Amor is covered by what I have already said. As far as the direct loan to PFA is concerned, once again there is no trace of it in the statement of affairs signed by Mr Law. But in any event there is no evidence that Seaturn has called on Mr Law to honour his guarantee. And again any loan by Seaturn (and Mr Law's consequential liability) is also barred by the principle in *Galoo*.

39.    Paragraph 58A Part A (8) alleges that AIB lent PFA the sum of £600,000 guaranteed by Mr Law, and that Mr Law is liable to AIB under that guarantee. The loan was made to enable PFA to continue to trade. This head of loss is also ruled out by the decision in *Galoo*.

40.    Paragraph 58 Part B pleads that Mr Law lost the opportunity to spend his time and money running his own companies instead of attempting to rescue PFA. He claims the income he would have made for the period between 2006 and 2015. In this connection Mr Tager relied on the decision of David Richards J in *4 Eng Ltd v Harper* [2009] Ch 91. In that case 4 Eng had been induced to buy a company called Excel as a result of fraudulent misrepresentation. The company had been looking at an alternative acquisition, namely Tarvail. Having considered a number of cases the judge held that in principle such a head of loss was recoverable. He quoted in particular an observation of Lord Steyn that:

"… an award based on the hypothetical profitable business in which the plaintiff would have engaged but for deceit is permissible: it is classic consequential loss."

41.    In the cases that David Richards J considered the claim was made by a buyer of the shares (or business) and the loss claimed was the profit that the buyer would have made in an alternative business. But in our case Mr Law was not the buyer of the shares in PFA. There is no claim that but for the deceit *Amor* would have made profits elsewhere. There is no claim that Mr Law was in any way legally bound to attempt to rescue PFA, which was known to be loss-making at the date of the share sale. Whether he did so was his own choice. I do not consider that Mr Law can bring himself within the scope of the principle. I would therefore hold that the claims in paragraph 58A Part B have no real prospect of success.

Exhibit 2
Page 277

42.     Paragraph 58A Part C makes claims in relation to a series of liabilities incurred by Mr
        Law. For the most part they fall foul of the ruling in *Galoo*, for the reasons I have
        already given. There is, however, one possible exception. In sub-paragraph (11) it is
        pleaded that Mr Law paid the legal costs incurred by Amor in its initial purchase of
        the shares. That seems to me to be recoverable in principle (or at least arguably so).
        Mr Brisby drew our attention to the rubric at the beginning of paragraph 58A which
        describes Part C as being "liabilities that Mr Law incurred and defrayed on behalf of
        Partridges." This is clearly an inappropriate description of the expenditure described
        in sub-paragraph (11). The cost incurred by Amor in buying shares from other
        shareholders is nothing to do with PFA itself. But I would give the claimants the
        opportunity to formulate an appropriate amendment relating to that head of loss.

43.     Subject to that I would strike out paragraph 58A of the Particulars of Claim.

44.     Paragraph 58B of the Particulars of Claim sets out Amor's losses. Sub-paragraph (1)
        claims the price it paid for the shares, which I have already dealt with. Thus paragraph
        58B (1) stands. Sub-paragraph (2) pleads a loan that was made to Amor which in turn
        it lent to PFA. For the reasons I have given this head of loss is irrecoverable. Sub-
        paragraphs (3) to (8) plead alternative claims which are (in effect) the mirror of Mr
        Law's claims in paragraph 58A Part A. For the reasons I have given these heads of
        loss are not sustainable.

45.     Paragraph 58B (9) pleads:

        "In reliance on the fraudulent misrepresentations in or about
        October 2005 Amor engaged Rawlinson & Hunter to provide
        accountancy and related services at a cost of £185,471. Of that
        sum £134,471 has been paid and £51,000 remains outstanding.
        Amor will not seek to recover any such sums as were incurred
        before the fraudulent misrepresentations were made."

46.     Although it is not entirely clear what these services were, I infer from the chronology
        that these were costs incurred in the due diligence carried out before the purchase of
        the shares. If so, then they are in principle recoverable.

47.     Accordingly I would strike out sub-paragraphs (2) to (8) inclusive of paragraph 58B,
        but otherwise allow the claims made in that paragraph to go to trial.

48.     That leaves the claims assigned to the claimants by PFA itself. The judge allowed
        some of the claims against John to go to trial, but struck out all the claims against
        Frank. This produced a rare measure of agreement between Mr Tager and Mr Brisby.
        Both agreed that the claims against John and Frank should be treated in the same way.
        But the agreement ended. Mr Tager said that all of them should be allowed to go to
        trial. Mr Brisby said that all of them should be struck out.

49.     Mr Brisby's principal argument was that these claims were statute barred. Frank
        ceased to be a director of PFA in February 2004. John ceased to be a director on 9
        January 2006 (when the whole of the then existing board resigned). The claim form
        was not issued until 31 January 2012, more than six years later. The Particulars of
        Claim allege that Frank and John were in breach of their contractual and fiduciary

Exhibit 2
Page 278

duties to PFA; but those duties must have been broken (in Frank's case) no later than February 2004 and (in John's case) no later than 9 January 2006.

50. The relevant limitation periods in play are:

"An action founded on simple contract shall not be brought after the expiration of six years from the date on which the cause of action accrued." (Limitation Act 1980 s. 5)

"(1)    No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action—

(a)    in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or

(b)    to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to his use.

…

(3)    Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued." (Limitation Act 1980 s. 21)

51. It is also necessary to refer to section 32 which provides so far as relevant:

"(1)    … where in the case of any action for which a period of limitation is prescribed by this Act, either—

(a)    the action is based upon the fraud of the defendant; or

(b)    any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

(c)    …;

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

References in this subsection to the defendant include references to the defendant's agent and to any person through whom the defendant claims and his agent.

(2)    For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is

Exhibit 2
Page 279

> unlikely to be discovered for some time amounts to deliberate
> concealment of the facts involved in that breach of duty."

52.     If a claim falls within section 21 (1) it may still be defeated by the equitable defence of laches.

53.     The first question is: what is the nature of the pleaded claim? In particular does it allege a *fraudulent* breach of trust? It is, in my judgment, clear from the decision of this court in *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400 that a mere allegation of breach of fiduciary duty is not an allegation of a *fraudulent* breach of that duty. It is equally clear from that decision that the introduction of an allegation of intentional wrongdoing is the introduction of a new cause of action. In my judgment the current Particulars of Claim do not allege a fraudulent breach of fiduciary duty *vis-à-vis PFA itself*. For example paragraph 31B of the Particulars of Claim alleges that John failed to inform the board of various matters; but it does not allege that the failure to inform the board was dishonest. Likewise paragraph 31C alleges that Frank failed to inform the board of various matters but it, too, does not allege that the failure was dishonest. These allegations are equally consistent with an inadvertent breach of duty. The same observations apply to paragraphs 35D, 38C, 38D, 41D, 41E, 44B, 48C, 51B and 54A of the Particulars of Claim. Allegations that Frank and John acted in excess of their authority are likewise allegations that are consistent with inadvertence or negligence.

54.     Prima facie therefore, in so far as the claims are claims of breach of contract they are caught by section 5; and in so far as they are claims for breach of fiduciary duty they are caught by section 21 (3). To this there is one exception. In relation to the third Gueridon table (which had been sold to Mr Mavromatis) paragraph 40 (4) of the Particulars of Claim alleges that the money paid by Mr Mavromatis was misappropriated by Frank and John. Mr Brisby accepted that this was a claim to the recovery of trust property which fell within section 21 (1) (b); but he submitted that it was unsustainable on the facts.

55.     There has been no application to amend the Particulars of Claim to plead any alternative formulation of the claims. Any such application would have to be made, in the first instance, to the Queen's Bench Division and not to this court. It would also have to confront the decision of this court in *Cia de Seguros Imperio v Heath (REBX) Ltd* [2001] 1 WLR 112, the possibility of a defence of laches and the principle that amendments will not be allowed if they would prejudice a limitation defence.

56.     The question, then, is whether section 32 comes to PFA's rescue.

57.     The claimants have adduced the evidence of Mr Henderson, who was a senior director of PFA between May 1988 and 31 March 2001. Mr Henderson gave evidence of the general practice of both John and Frank. He said:

> " [12] … My criticism of John was that he would buy damaged articles cheaply and then restore them and offer them for sale as genuine articles that had not undergone restoration, or that he would simply make spurious additions or alterations to make articles appeal more to modern tastes. If an article didn't sell, he would change it into something he thought would be more

Exhibit 2
Page 280

saleable, and the customer was all too often not informed of the changes.

[13] As many reputable English dealers would not countenance carrying out the alterations John and Frank required, considering them improper, John and Frank had some of the less ethical alterations carried out in Paris by Jean Bourdette, who appeared to be unprincipled.

[16] I was not the only one at Partridges who told John that what he was doing was most improper. Lucy Morton, another director, was extremely concerned at what John and later Frank were up to; but it was most frustrating as John would shout you down and brook no disagreement on the basis that John was an expert who could do no wrong. Frank inherited this arrogance and attitude. So after a while, after one had bashed one's head against a brick wall trying to tell John and Frank that what they were doing was wrong, one almost became inured to it, so that it was embarrassing to make the same point again, knowing that it would make no impact and probably result in abuse.

[21] As the years went by, I sought to encourage a greater level of integrity within the business. I tried in vain to get John and Frank to behave more responsibly, and to eliminate the kind of behaviour that might damage the company's reputation. My pleas fell on deaf ears and John's name became synonymous with altering various pieces as a matter of practice. It is not for nothing that I remember his sister-in-law … call him by the name "bodge" or "bodge of Bond Street"."

58.   Mr Henderson also gave evidence about two candelabra which he thought were two elements fused together but which John was selling as eighteenth century. Mr Henderson's evidence is that Mrs Morton came to see him about that. He reported this to John "who was furious and shouted me down". He goes on to say:

"[56] Lucy Morton my co-director also told John that some of them could not possibly be authentic and he shouted her down also."

59.   According to Mr Henderson, Mr Tollemache, the managing director of PFA, also confronted John, but was sent away with "a flea in the ear".

60.   Mr Henderson also gave evidence about two of the specific transactions pleaded in the Particulars of Claim. Mr Henderson saw the painting "A View of Cannes" which was hanging in PFA's dining room. He remarked generally to members of the board and to John in particular that he had reservations about its authenticity. When he heard that it was on consignment from Mr Sellin (whom Mr Henderson said was known to have counterfeited goods on several occasions) he said to John "I rest my case". He also says that, having consulted a leading expert at Sotheby's, he reported to John that the picture was a fake.

Exhibit 2
Page 281

61.    So far as the first Gueridon table is concerned, Mr Henderson gives evidence of the extensive alterations that were carried out to it in Paris. He goes on to say:

> "[60] It was the arrival of this gueridon back from Paris, altered, that precipitated the biggest row I ever had with Frank. I think he didn't think I would recognise the gueridon, but I did. I told him that what he had done was absolutely disgraceful. This was the last straw for me, and after considering my options, some months later, I handed in my resignation."

62.    Although it is true to say that Mr Henderson does not give evidence about all the pleaded transactions, the pleaded transactions are relied on as examples of what are alleged to be "systematic fraudulent trading practices". It is plain on the basis of Mr Henderson's evidence that at least two members of the board (himself and Mrs Morton) and probably a third (Mr Tollemache) knew of the systematic practices. Mrs Morton remained a director of PFA until 9 January 2006.

63.    In those circumstances it is unnecessary to embark upon the debate whether the knowledge of Frank or John should be imputed to PFA. PFA knew at the time of the breaches of duty now relied on; or at the very least could with reasonable diligence have discovered them. I would therefore uphold the judge's conclusion that, subject to one exception, the claims made by PFA are statute barred.

64.    In addition many of the heads of loss claimed relate to allegations that PFA is potentially liable for contingent claims by dissatisfied customers. The judge held that the prospect of such claims were remote; and that even if such claims were brought, it would be open to PFA to claim indemnity from Frank and or John under section 10 of the Limitation Act 1980 and the Civil Liability (Contribution) Act 1978. I agree with the judge on this point. There is no point in the court having to try hypothetical disputes which may never materialise. Moreover since PFA is in insolvent liquidation it is highly unlikely that anyone will sue it.

65.    I have said that there is one exception: namely the allegation that Frank or John misappropriated the price paid by Mr Mavromatis for the third Gueridon table. It is conceded that this claim is not statute barred. The judge decided that it had no real prospect of succeeding on the facts. Was he right?

66.    The allegation that the price must have been misappropriated has a number of strands. The item had been given a stock number in PFA's records. The number given to it signified that it had been consigned by a third party; in other words that it did not belong to PFA. But PFA often sold consigned items. When a sale of such an item took place, the stock number should have been changed. But there is no record of any change of number. There is no invoice issued by PFA. Nor is there any record of the sale price going through PFA's books. All this might suggest that there was no sale at all. Yet it is common ground that the table was sold to Mr Mavromatis. How can this be? In his evidence Frank suggests that the sale must have been effected by PFA's Swiss subsidiary. But as yet there is no evidence of that. No bank records have been produced which show the payment having reached the Swiss subsidiary; and there is no accounting evidence that shows any inter-company accounting. Perhaps more to the point Frank says that when Mr Mavromatis complained about the authenticity of the table he (Frank) settled Mr Mavromatis' claim by buying it back. If that is true

Exhibit 2
Page 282

one would have expected Mr Mavromatis to have produced the invoice from the Swiss subsidiary (if there was one). But rather surprisingly Frank says that there is not a single piece of paper relating to the alleged compromise. I also find it odd that Frank (who had left PFA in 2004) would have bought back the table in 2010 in order to settle a claim that might be made against PFA. Even odder is that fact that despite repeated requests Frank has not allowed the table to be inspected, on the ground that it is in Moscow and might be sold. In my judgment there is a sufficient mystery surrounding this transaction and the whereabouts of the sale price to warrant further investigation at trial.

67.    The upshot is that I would strike out paragraph 58C (1) of the Particulars of Claim. I would also strike out paragraph 58C (2) of the Particulars of Claim with the exception of the allegation that Frank misappropriated the entire sale proceeds of the third Gueridon table.

68.    Finally I should record that Mr Tager asked for permission to amend the Particulars of Claim to claim certain indemnities. But there was no formulated draft. I think that these potential amendments are already covered by what I have said; but in any event permission to amend should not be given (especially on appeal) without a formulated draft.

69.    For the reasons I have given I would allow both the appeal and cross-appeal in part; to the extent that I have indicated. If my Lords agree with my conclusions, Counsel should try to agree the precise form of a pleading that reflects the reasoning in this judgment. That will enable the trial judge to know exactly what issues remain to be tried. My provisional view is that, in addition to the paragraphs of the Particulars of Claim that I have already said should be struck out, the following paragraphs should also be excised: 7D, 8C(ii) to (iv) and (vi); 8D, 8E, 24A (which has been abandoned), 27 (4B) (which the judge found was unsustainable on the facts), 27 (7) (which seems to be consequential on paragraph 27 (4B)), 28A, 28B, 28C, 31A, 31B, 31C, 35A, 35B, 35C, 35D, 38A, 38B, 38C, 38D, 41A, 41B, 41D, 41E, 44A, 44B, 48A, 48B, 48C, 51A, 51B and 54A.

**Lord Justice McCombe**:

70.    I agree.

**Sir Stephen Sedley**:

71.    I also agree.

Exhibit 2
Page 283

Supreme Court                                                                    *A*

# Zurich Insurance Co plc *v* Hayward

## [2016] UKSC 48

2016  June 16;                        Lord Neuberger of Abbotsbury PSC,
      July 27                              Baroness Hale of Richmond DPSC,    *B*
                                           Lord Clarke of Stone-cum-Ebony,
                                           Lord Reed, Lord Toulson  JJSC

*Contract — Rescission — Settlement of action — Employee claiming damages against employer for injury at work — Employer's insurers suspecting that employee exaggerating effect of his injury but entering into settlement agreement on basis of inability to prove their suspicions in court — Insurers subsequently receiving proof that employee exaggerated claim so that settlement excessive — Insurers bringing action for rescission of settlement agreement — Whether sufficient to prove materially false misrepresentation intended to induce and inducing representee to act to his detriment — Relevance of representee's belief as to truth of representation — Whether employee's material false representation inducing insurers to enter into settlement — Whether insurers estopped from retrieving amount overpaid under settlement agreement*    *C*

                                                                                *D*

The defendant was injured in an accident at work and claimed very substantial damages against his employer.  The employer's insurers, despite suspecting that the defendant had exaggerated the extent of his injuries, were unable to find evidence sufficient to prove their suspicions in court.  They reached an agreement with the defendant to pay him less than one third of the amount he had claimed, in full and final settlement of the claim, and a Tomlin order was made to that effect.  The insurers, having subsequently received proof that the defendant had recovered from his injuries a year before the settlement had been reached, brought an action against him in deceit claiming, inter alia, to be entitled to rescind the settlement agreement and to repayment of the sums paid under it.  The judge, having found that the defendant had exaggerated the effects of his injury, held that the insurers were entitled to rescind the settlement agreement.  He proceeded to assess the quantum of damages due to the defendant in his claim against his employer at less than one ninth of the sum which he had received under the settlement agreement, and ordered the defendant to repay that sum less the amount of the damages assessed.  The Court of Appeal allowed the defendant's appeal on the grounds, inter alia, that, although the defendant had misrepresented the extent of his injuries, the insurers had not relied on that misrepresentation when they had reached the settlement agreement.    *E*    *F*

On the insurers' appeal—

*Held*, allowing the appeal, that in a claim for deceit based upon alleged    *G*
misrepresentation it had to be shown that the defendant had made a materially false misrepresentation which had been intended to induce, and had induced, the claimant to act to his detriment; that, although the claimant's state of mind might be relevant to the issue of inducement, it was not necessary as a matter of law for the claimant to prove that he had believed the misrepresentation to be true, and his reasonable belief as to whether the misrepresentation was true was not a necessary ingredient of the test of whether inducement had been proved; that, since a representee might settle a    *H*
claim on the basis that he thought that the judge would believe the misrepresentation, the fact that the insurers had not wholly believed the defendant did not preclude them from having been induced to reach the settlement by the defendant's misrepresentations; that it was sufficient for the defrauded representee to establish that the fact of the misrepresentation had been a material cause of his entering into

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 284

143
**[2017] AC**                    Zurich Insurance Co plc v Hayward (SC(E))

A  the settlement; and that, accordingly, since the questions whether the insurers had in fact been induced by the misrepresentation to enter into the settlement agreement and whether doing so had caused them loss were questions of fact which the judge had been entitled to decide in the insurers' favour, his order would be restored (post, paras 18, 23, 25–26, 32, 36, 37, 40, 44, 47–49, 50, 57, 58, 67, 70–72).

*Redgrave v Hurd* (1881) 20 Ch D 1, CA and *Smith v Chadwick* (1884) 9 App Cas 187, HL(E) considered.

B  Decision of the Court of Appeal [2015] EWCA Civ 327; [2015] CP Rep 30 reversed.

The following cases are referred to in the judgments:

*Arkwright v Newbold* (1881) 17 Ch D 301, Fry J and CA
*Australian Steel & Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202
C  *BP Exploration Operating Co Ltd v Chevron Shipping Co* [2001] UKHL 50; [2003] 1 AC 197; [2001] 3 WLR 949; [2002] 1 All ER (Comm) 1; [2002] 1 Lloyd's Rep 77, HL(Sc)
*Barton v Armstrong* [1976] AC 104; [1975] 2 WLR 1050; [1975] 2 All ER 465, PC
*Betjemann v Betjemann* [1895] 2 Ch 474, CA
*Briess v Woolley* [1954] AC 333; [1954] 2 WLR 832; [1953] 1 All ER 909, HL(E)
*Downs v Chappell* [1997] 1 WLR 426; [1996] 3 All ER 344, CA
*Edgington v Fitzmaurice* (1885) 29 Ch D 459, Denman J and CA
D  *Gipps v Gipps* [1978] 1 NSWLR 454
*Gould v Vaggelas* (1984) 157 CLR 215
*HIH Casualty and General Insurance Ltd v Chase* [2003] UKHL 6; [2003] 1 All ER (Comm) 349; [2003] 2 Lloyd's Rep 61, HL(E)
*Kyle Bay Ltd (trading as Astons Nightclub) v Underwriters subscribing under Policy No 019057/08/01* [2007] EWCA Civ 57; [2007] 1 CLC 164, CA
E  *Ladd v Marshall* [1954] 1 WLR 1489; [1954] 3 All ER 745, CA
*Lazarus Estates Ltd v Beasley* [1956] 1 QB 702; [1956] 2 WLR 502; [1956] 1 All ER 341, CA
*Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501; [1994] 3 WLR 677; [1994] 3 All ER 581; [1994] 2 Lloyd's Rep 427, HL(E)
*Redgrave v Hurd* (1881) 20 Ch D 1, Fry J and CA
*Ross River Ltd v Cambridge City Football Club Ltd* [2007] EWHC 2115 (Ch); [2008] 1 All ER 1004; [2008] 1 All ER (Comm) 1028
F  *Sharland v Sharland* [2015] UKSC 60; [2016] AC 871; [2015] 3 WLR 1070; [2016] 1 All ER 671, SC(E)
*Smith v Chadwick* (1884) 9 App Cas 187, HL(E)
*Smith v Kay* (1859) 7 HL Cas 750, HL(E)
*Sprecher Grier Halberstam LLP v Walsh* [2008] EWCA Civ 1324; [2009] CP Rep 16, CA
G  *Standard Chartered Bank Ltd v Pakistan National Shipping Corpn Ltd (Nos 2 and 4)* [2002] UKHL 43; [2003] 1 AC 959; [2002] 3 WLR 1547; [2003] 1 All ER 173; [2002] 2 All ER (Comm) 931; [2003] 1 Lloyd's Rep 227; [2003] 1 BCLC 244, HL(E)
*Strover v Harrington* [1988] Ch 390; [1988] 2 WLR 572; [1988] 1 All ER 769
*Summers v Fairclough Homes Ltd* [2012] UKSC 26; [2012] 1 WLR 2004; [2012] 4 All ER 317, SC(E)
*Toubia v Schwenke* [2002] NSWCA 34; 54 NSWLR 46
H  *Zurich Insurance Co plc v Hayward* [2011] EWCA Civ 641; [2011] CP Rep 39, CA

The following additional cases were cited in argument:

*Arnison v Smith* (1889) 41 Ch D 348, Kekewich J and CA
*Attwood v Small* (1838) 6 Cl & Fin 232, HL(E)

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 285

144
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Argument

*Binder v Alachouzos* [1972] 2 QB 151; [1972] 2 WLR 947; [1972] 2 All ER 189;    A
  [1978] 1 Lloyd's Rep 524, CA
*Law v Law* [1905] 1 Ch 140, Kekewich J and CA

**APPEAL** from the Court of Appeal

By a claim form and particulars of claim issued in February 2009 the
claimant insurers, Zurich Insurance Co plc, claimed damages in deceit
against the defendant, Colin Hayward. By amendment the insurers claimed    B
in the alternative to be entitled to rescind a settlement agreement which they
had reached with the defendant on 3 October 2003, whereby the insurers
had agreed to pay the defendant £134,973 in full and final settlement of a
claim for damages for personal injuries sustained in an accident at his work
place on 9 June 1998, and the repayment of the sums paid under it.

The defendant applied to strike out the claim or for summary judgment in
his favour. On 17 March 2010 Deputy District Judge Bosman sitting in    C
Cambridge County Court refused the application. The defendant appealed.
On 19 July 2010 Judge Yelton, sitting in Cambridge County Court, allowed
the appeal and granted the application. The insurers appealed. On 27 May
2011 the Court of Appeal (Maurice Kay, Smith and Moore-Bick LJJ) [2011]
EWCA Civ 641; [2011] CP Rep 39 allowed the appeal and restored the
district judge's decision.    D

Following trial of the claim in November 2012 Judge Maloney QC sitting
in the Cambridge County Court allowed the claim and the settlement
agreement was rescinded. On 6 September 2013 the judge assessed the
quantum of damages due in the defendant's action against his employer at
£14,720 and, in the insurer's action, ordered the defendant to repay the
amount received under the settlement agreement, less £14,720.    E

By an appellant's notice the defendant appealed against the decision to
allow the insurers' claim and the order for repayment. On 31 March
2015 the Court of Appeal (Underhill, King and Briggs LJJ) [2015] EWCA
Civ 327; [2015] CP Rep 30 allowed the appeal and restored the settlement
agreement.

On 28 July 2015 the Supreme Court (Lord Mance, Lord Clarke of Stone-    F
cum-Ebony and Lord Hodge JJSC) granted the insurers permission to
appeal, pursuant to which they appealed.

The facts are stated in the judgment of Lord Clarke of Stone-cum-
Ebony JSC.

*Patrick Limb QC* and *Jayne Adams QC* (instructed by *DAC Beachcroft
Claims Ltd*) for the insurers.    G

The defendant claims that he was fraudulent but not a deceiver and that
the insurers were at fault for failing to discover his dishonesty. However the
tort of deceit does not necessarily require proof that the representee believed
the dishonest representation. Whilst proof of knowledge on the part of the
representee is a defence, nothing short of knowledge of the falsity will do
since a representee who does not know a representation to be false has
been deceived. It is sufficient that the misrepresentation influenced the    H
representee to the extent that it was a material cause of entering into the
settlement.

Inducement is concerned with causation and not with the representee's
credulity. Although it may be inferred that a representee who believes a

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 286

A  misrepresentation has been induced to rely on it, an absence of belief does not mean there was no inducement because what is required for there to be inducement is a causal connection between the misrepresentation and the representee making a decision or undertaking a course of action on the basis of that misrepresentation. Inducement refers to the causative effect of the misrepresentation on the mind of the representee. The focus is on the

B  causative effect of the misrepresentation in terms of what, in the light of the misrepresentation, the representee does or does not do, and not on whether he believed the misrepresentation. The misrepresentation was material if it was actively present in the mind of the representee when he made the settlement.

    Had the insurers known the truth they would not have offered the defendant such a large amount in settlement. That amount was almost ten

C  times the true value of the claim. The defendant's misrepresentations operated on the minds of the insurers and made them decide to make the offer which they made.

    The onus of proof is on the defendant representor to prove actual knowledge of the true position, rather than on the representee bringing a claim for deceit to disprove knowledge. Mere suspicion does not suffice;

D  knowledge, or at least blind-eye knowledge, of truth needs to be established.

    It cannot be said that the insurers had knowledge of facts from which they ought to have realised that the defendant's representations were false, nor did the trial judge so find. Since the insurers did not have knowledge of facts from which they ought to have realised that the defendant's representations were false, they were deceived. As a result of the fraud the insurers were put in a position where they had no choice but to make a settlement.

E    The insurers' suspicions during the original personal injury action, as shown by their having put the defendant under surveillance, does not in law defeat a subsequent claim for deceit. There was fresh evidence which led to fresh allegations and showed the defendant to have been fraudulent. The fact that it subsequently turned out that the insurers' original concerns had been right is not a basis for saying that they were not deceived. There is a

F  substantial difference between suspicion and knowledge. The Tomlin order does not mean that the current proceedings should be stopped.

    [Reference was made to *Gould v Vaggelas* (1984) 157 CLR 215; *Edgington v Fitzmaurice* (1885) 29 Ch D 459; *Australian Steel & Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202; *Attwood v Small* (1838) 6 Cl & Fin 232; *Redgrave v Hurd* (1881) 20 Ch D 1; *Gipps v Gipps* [1978] 1 NSWLR 454 and *Law v Law* [1905] 1 Ch 140.]

G    *Guy Sims* (instructed by *Hewitsons LLP*) for the defendant.

    In a case where fraud is alleged the representee must have been deceived. Successful deception is an essential part of the tort. In order to set aside a compromise on the basis of fraudulent misrepresentation the representee must show that he was deceived and that he was induced into the settlement because he believed that the misrepresentations were true.

H    The insurers were aware that the defendant was not honest and are therefore in no worse a position than they were at the time of the misrepresentation. The insurers went a long way beyond mere suspicion that the representations made by the defendant were untrue. They not only did not believe those representations but actively disbelieved them,

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 287

146
**Zurich Insurance Co plc v Hayward (SC(E))**                    **[2017] AC**
Argument

considered them fraudulent, believed the correct position and analysed it.   A
They decided to investigate the defendant's representations and having
investigated they decided to settle, taking into account all the risks of doing
so, because they did not know if the court would accept the true position was
what they believed it to be. They were not surprised at the finding of fact
eventually made since they had considered that to be the true position well
before the compromise was made.

   In the tort of deceit there is a requirement that the representee both   B
believes and relies on the misrepresentations, so that there is a successful
deception which was only later unmasked. Where the representee conducts
investigations sufficient to uncover facts from which he ought to have
realised that he was being deceived, he does not place the necessary reliance
on the representations.

   [Reference was made to *Edgington v Fitzmaurice* (1885) 29 Ch D 459;   C
*Arnison v Smith* (1889) 41 Ch D 348; *Sprecher Grier Halberstam LLP v
Walsh* [2009] CP Rep 16; *Kyle Bay Ltd (trading as Astons Nightclub) v
Underwriters subscribing under Policy No 019057/08/01* [2007] 1 CLC
164; *Gipps v Gipps* [1978] 1 NSWLR 454; *BP Exploration Operating Co
Ltd v Chevron Shipping Co* [2003] 1 AC 197; *Toubia v Schwenke* (2002) 54
NSWLR 46 and *Binder v Alachouzos* [1972] 2 QB 151.]   D

   *Limb QC* in reply.

   Mistrust on the part of the insurers is not enough to defeat their claim.
*Toubia v Schwenke* (2002) 54 NSWLR 46 does not assist the defendant's
case.

   The court took time for consideration.   E

   27 July 2016. The following judgments were handed down.

**LORD CLARKE OF STONE-CUM-EBONY JSC** (with whom **LORD
NEUBERGER OF ABBOTSBURY PSC, BARONESS HALE OF
RICHMOND DPSC** and **LORD REED JSC** agreed)

*Introduction*   F

   1 In April 2012 the Supreme Court considered a case called *Summers v
Fairclough Homes Ltd* [2012] 1 WLR 2004, where the facts were strikingly
similar to those here. In that case, as in this one, the claimant suffered an
injury at work which was caused by the negligence or breach of duty of his
employer. In each case the employer was either held liable (in the *Summers*   G
case) or admitted liability (here) as to 80%, the claimant accepting that he was
20% to blame. In each case the claimant dishonestly exaggerated the extent
of the consequences of the injury. In the *Summers* case the claimant originally
claimed damages of over £800,000 but was awarded a total of just over
£88,000 on the basis of the true facts, which came to light after undercover
surveillance evidence showed that his account of the consequences of his
injuries had been grossly and dishonestly exaggerated. In the instant case, the   H
claimant, Mr Colin Hayward, claimed £419,316·59 (exclusive of promotion
prospects but discounted for loss of ill health pension). He was ultimately
awarded £14,720 after a trial before Judge Moloney QC ("the judge").
The reason for the reduction was again partly as a result of undercover

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 288

147
[2017] AC                    Zurich Insurance Co plc v Hayward (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A  surveillance and other evidence that showed that Mr Hayward's claim had been grossly and dishonestly exaggerated.

2   In the *Summers* case the issue was what remedies were available to the employer and its insurers, whereas in the instant case the issue arises out of a settlement agreement reached between the parties on 3 October 2003, the accident having occurred on 9 June 1998.  The agreement was made shortly before the issue of quantum was due to be tried and was incorporated in

B  a Tomlin order.  The employer's case was conducted on its behalf by its liability insurer, Zurich Insurance Co plc ("Zurich"), which is the appellant in this appeal.  The employer (in practice Zurich) agreed to pay £134,973·11, inclusive of CRU of £22,473·11, in full and final settlement of Mr Hayward's claim.

3   The Tomlin order was in familiar terms as follows:

C      "BY CONSENT
"IT IS ORDERED THAT
"All further proceedings in this action be stayed, except for the purpose of carrying such terms into effect.  Liberty to apply as to carrying such terms into effect."
"THE SCHEDULE

D      "The claimant accepts in settlement of his cause of action herein the sum of £134,973·11."
"4.  Upon payment by the defendant of the several sums and costs before mentioned, they be discharged from any further liability to the claimant in relation to the claim herein."

E  4   In 2005, Mr Hayward's neighbours, Mr and Mrs Cox, who had lived next door to him since June 2002, approached the employer to say that they believed that his claim to have suffered a serious back injury was dishonest.  From their observation of his conduct and activities, they believed that he had recovered in full from his injury at least a year before the settlement.  They were referred to Zurich and made full witness statements to that effect.

F  5   In February 2009 Zurich commenced the present proceedings against Mr Hayward claiming damages for deceit.  Zurich pleaded that both written statements made by Mr Hayward or on his behalf, and his statements of case in the particulars of claim and the schedule(s) of loss as to the extent of his injury, as well as his accounts given to the medical experts, constituted fraudulent misrepresentations.  Damages were claimed equivalent to the difference between the amount of the settlement and the damages he

G  should have been awarded if he had told the truth.  The claim was subsequently amended to claim in the alternative rescission of the settlement agreement and the repayment of the sums paid under it.

6   No point has been taken in reliance upon the fact that the action was brought in the name of Zurich rather than the employer.  Mr Hayward applied to strike out the proceedings, or for summary judgment in his favour.  He contended that the Tomlin order created an estoppel per rem

H  judicatam and/or by record, alternatively that the action was an abuse of the process because the issue of fraud had been compromised by the settlement.  Deputy District Judge Bosman refused to strike out the claim, although he directed Zurich to amend the claim to seek an order that the compromise be set aside rather than an order for damages.  Although it was pleaded in the

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 289

148
Zurich Insurance Co plc v Hayward (SC(E))                                   [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

original defence to Zurich's claim that Zurich must satisfy the test in *Ladd v*   A
*Marshall* [1954] 1 WLR 1489, that contention was not ultimately pursued
following the hearing before the deputy district judge.  His decision was
reversed on appeal by Judge Yelton.

7   Zurich appealed to the Court of Appeal (Maurice Kay, Smith and
Moore-Bick LJJ) and the decision of the deputy district judge was
unanimously restored [2011] CP Rep 39.  It was held that the settlement   B
gave rise to no estoppel of any kind and that the action was not an abuse of
process.  It was further held that the fact that Zurich had alleged deliberate
exaggeration prior to the settlement did not preclude them from relying on it
subsequently as a ground for rescission.  In the result, the claim proceeded.
I note in passing that Moore-Bick LJ said, at para 58:

> "If it is to succeed in its action Zurich will have to persuade the court   C
> that it was induced to agree to the settlement by fraud on the part of
> Mr Hayward, a task that may not prove easy, given the fact that it already
> knew enough to justify the service of a defence in the terms indicated
> earlier."

*The trial*
                                                                            D
8   The trial came before the judge in the Cambridge County Court in
November 2012.  He heard evidence for Zurich from Zurich's solicitor
(Ms Winterbottom) and its claims manager (Mr Birkenshaw), who were
responsible for the conduct of the litigation, from Mr and Mrs Cox and from
Mr Sharp, who was the orthopaedic expert instructed on behalf of Zurich.
Mr Hayward gave evidence together with three members of his family and
also called evidence from Mr Varley, who was the orthopaedic surgeon   E
instructed on his behalf.

9   Mr Hayward denied any suggestion that his condition was anything
other than genuine or that there was any element of exaggeration.  He
maintained throughout that he was a seriously disabled individual whose
disability arose from the original accident and was such that, ever since, he
had not been able to work or carry out normal activities of daily   F
living without assistance.  As with the first series of witness statements,
Mr Hayward signed the appropriate statements of truth setting out in detail
the extent of his disability and presented himself to the medical experts on
that basis.

10   Following a four-day trial, the judge found that Mr Hayward had
deliberately and dishonestly exaggerated the effects of his injury throughout   G
the court process.  Of Ms Winterbottom and Mr Birkenshaw, the judge said
(at para 2.6 of his judgment quoted in full below) both that: "[neither] can be
said to have believed the representations complained of to be true" and that

> "[they] may not themselves have believed the representations to be
> true; but they did believe that they would be put before the court as true,
> and that there was a real risk that the court would accept them in whole   H
> or part and consequently make a larger award than Zurich would
> otherwise have considered appropriate".

The judge further found that, although Zurich was aware at the time of the
settlement of the real possibility of fraud, Mr Hayward had continued his

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 290

149
[2017] AC                    Zurich Insurance Co plc v Hayward (SC(E))
                             Lord Clarke of Stone-cum-Ebony JSC

A   deliberate misrepresentations even after the disclosure of the 1999 video,
    and that those continuing misrepresentations influenced Zurich into
    agreeing a higher level of settlement than it would otherwise have done. The
    judge therefore set aside the compromise.

    11   It followed that the issue of quantum in the original action remained
    to be tried.  That issue was heard on 6 September 2013 and, having found
B   that Mr Hayward had made a full recovery from any continuing physical
    disability by October 1999, the judge thereafter handed down a judgment
    awarding Mr Hayward damages in the modest sum of £14,720, which was
    about 10% of the settlement figure.  An order was made in the later action
    directing him to repay the sum paid under the settlement less that amount,
    namely £97,780, interest of £34,379.45 and £3,951 adjustment for CRU.

C   *The appeal to the Court of Appeal*

    12   Mr Hayward appealed to the Court of Appeal against the decision
    that the settlement should be set aside but did not appeal against the judge's
    assessment of quantum or (contingent on whether the settlement was set
    aside) against the order for re-payment.  Moreover, the judge's findings of
    fact were not challenged.  To my mind, as appears below, this is a critical
D   factor in this appeal.
    13   The appeal was heard by Underhill, Briggs and King LJJ.  They
    agreed that the appeal should be allowed [2015] CP Rep 30.  Substantive
    judgments were given by Underhill and Briggs LJJ.  Although King LJ agreed
    with both judgments, I do not read their reasoning as quite the same.
    14   In his para 9 Underhill LJ set out para 2.5 of the judge's judgment,
E   where he said the judge addressed the issue of reliance and dealt with the
    law.  Para 2.5 is in these terms:

        "Lastly, of course, it is necessary that the employer/Zurich should *rely*
        on the representations and suffer loss as a result.  Here an interesting (and
        apparently unresolved) question of principle arises.  In the ordinary case,
        sale of goods for example, reliance by the purchaser is effectively
F       equivalent to his *belief in the truth* of the statement; if he believes the
        goods are as represented, he will be relying on the representation (and
        acting on it by his purchase) and if not, not.  In the litigation context
        the position is different.  In such a situation, the party to whom the
        representation is made is by no means likely to believe it to be true at the
        pretrials stage.  At the very least, statements made in the course of
G       litigation will be viewed with healthy scepticism and weighed against the
        other material available.  Often the other party will not be sure, even
        then, whether the statement is in fact true, and will mainly concern
        himself with how likely it is to be accepted by the court.  Sometimes (a
        staged road traffic 'accident' for example) the other party may actually be
        certain from his own direct knowledge that the statement is a deliberate
        lie.  But even then he and his advisers cannot choose to ignore it; they
H       must still take into account the risk that it will be believed by the judge at
        trial.  This situation is quite different from a proposed purchase, where if
        in doubt one can simply walk away.  For these reasons, it appears to me
        that the many dicta relied on by CH, to the effect that liability requires
        that the representation must be believed by the other party, are not

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 291

150
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

applicable to a case like the present.  The formulation adopted by the   A
editors of *Clerk & Lindsell*, 20th ed (2010), para 18-34 fits the case
better; 'The claimant must have been *influenced* by the misrepresentation'
(my emphasis)."

15  After noting that "CH" was shorthand for Mr Hayward,
Underhill LJ set out (also in his para 9), para 2.6 of the judge's judgment as
follows:                                                                   B

"I heard the evidence of Ms Winterbottom and Mr Birkinshaw
respectively in 2003 Zurich's litigation solicitor and claims handler.  Each
was aware of the 1999 video and of the real possibility that this was a
fraudulent claim.  Each was frustrated by the reluctance of 'their' expert,
Mr Sharp, to produce a clear supplemental report saying that he now
believed CH to have been shamming and to have sustained far less harm   C
than was being claimed.  Neither can be said to have believed the
representations complained of to be true.  But, if the law is as stated at 2.5
above, this does not matter provided the representations *influenced* them
in their decision how much to pay CH in settlement.  I am in no doubt
that they did.  They may not themselves have believed the representations
to be true; but they did believe that they would be put before the court as   D
true, and that there was a real risk that the court would accept them in
whole or part and consequently make a larger award than Zurich would
otherwise have considered appropriate.  Acting in reliance on *that* belief
(which, whether or not CH was truthful or honest, was the belief he and
his advisers must have wanted them to form on the basis of the
statements) they made the payment into court which led to the Tomlin   E
order settlement."

Underhill LJ then set out the substance of the judge's ultimate conclusions
from para 6.6 in these terms:

"although Zurich was aware at the time of the settlement of the
real possibility of fraud here, CH had continued his deliberate
misrepresentations even after the disclosure of the 1999 video, and those   F
continuing misrepresentations did influence Zurich into agreeing a higher
level of settlement than it would otherwise have made."

The judge added:

"The conditions required for setting aside the settlement are therefore
made out and I so order."                                                  G

16  Para 6.6 must be put in its context, which includes paras 6.4 and 6.5.
Between paras 6.1 and 6.3 the judge explained why he accepted the evidence
of Mr and Mrs Cox as credible.  He then said, at paras 6.4–6.5:

"6.4.  The choice before me is not the stark one between 'no pain at all'
and 'complete disability'.  What I have to decide is whether CH's actual
level of pain and disability at the time of the representations was          H
materially less than he was representing, and if so whether that
misrepresentation was deliberate and dishonest.  It is accepted that there
was here an injury leading to a measure of pain and disability, at least up
to 2002; and Mr Sharp and Mr Varley do not exclude some continuing

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 292

151

[2017] AC                                   Zurich Insurance Co plc v Hayward (SC(E))
                                                        Lord Clarke of Stone-cum-Ebony JSC

A    pain (as opposed to disability) in the period after the settlement. That
being so, the records of pain management and analgesic drug treatment
which gave me concern are not irreconcilable with Zurich's case.
     "6.5 There is no special standard of proof for fraud in civil
proceedings; the normal test of balance of probability applies, though of
course in assessing the probabilities one bears in mind that fraud is an
B    unusual matter. In this case, the evidence, summarised above, that CH
was not in fact suffering from the level of pain and disability that he
claimed is so strong that it prevails over his innocent explanations. The
probability is, and I so find, that CH was experiencing some pain both
before and after the settlement, and did want it treated and managed; but
at the same time, he also wanted the maximum compensation he could
obtain, and to get it he was dishonestly willing to exaggerate his
C    symptoms to the doctors, and to conceal his real level of ability from them
and from the world, so as to give the false impression that he was not
capable of heavy work when in fact he was. He must have been aware by
the time of the 14 October 1999 surveillance video (at the latest) that his
physical abilities were considerably greater than he thereafter represented
to the doctors and his employers' representatives, and I find that
D    his representations made after that date were knowingly false and
misleading."

     17    Underhill and Briggs LJJ allowed Mr Hayward's appeal for similar
but not identical reasons. They did so essentially because of the state of
mind of Zurich (and the employer) when the settlement was made. They
rejected the conclusions of principle expressed in para 2.5 of the judge's
E    judgment set out above. The parties to this appeal agreed that the appeal
raised two issues. The first was this.

     "In order to set aside a compromise on the basis of fraudulent
misrepresentation, to show the requisite influence by or reliance on the
misrepresentation: a) must the defrauded representee prove that it was
induced into settlement because it believed that the misrepresentations
F    were true; or b) does it suffice to establish influence that the fact of the
misrepresentations was a material cause of the defrauded representee
entering into the settlement?"

The second was this.

     "Under what circumstances, if any, does the suspicion by the defendant
of exaggeration for financial gain on the part of the claimant preclude
G    unravelling the settlement of that disputed claim when fraud is
subsequently established?"

*Discussion*

*Issue 1*

H    18    Subject to one point, the ingredients of a claim for deceit based upon
an alleged fraudulent misrepresentation are not in dispute. It must be shown
that the defendant made a materially false representation which was
intended to, and did, induce the representee to act to its detriment. To my
mind it is not necessary, as a matter of law, to prove that the representee
believed that the representation was true. In my opinion there is no clear

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 293

152
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

authority to the contrary.  However, that is not to say that the representee's    A
state of mind may not be relevant to the issue of inducement.  Indeed, it may
be very relevant.  For example, if the representee does not believe that the
representation is true, he may have serious difficulty in establishing that he
was induced to enter into the contract or that he has suffered loss as a result.
The judge makes this point clearly and accurately in the third sentence of
para 2.5 of his admirable judgment.                                              B

19   He makes a further point in the same paragraph which is of
importance in the context of this somewhat unusual case.  It is this.  A person
in the position of the employer or its insurer may have suspicions as to
whether the representation is true.  It may even be strongly of the view that it
is not true.  However, the question in a case like this is not what view the
employer or its insurer takes but what view the court may take in due course.
This is just such a case, as the judge correctly perceived.  As he put it, the    C
employer and its advisers must take into account the possibility that
Mr Hayward would be believed by the judge at the trial.  That is because the
views of the judge will determine the amount of damages awarded.

20   In any event this is not a case in which Zurich or the employer knew
that Mr Hayward was deliberately exaggerating the seriousness and long
term effects of his injuries.  We now know that he was thoroughly dishonest    D
from October 1999 and that he continued to make false claims in the witness
box at the trial even when the evidence against him was overwhelming.  Each
case of course depends upon its own facts but it seems to me to be
putting the case too high to say, as Briggs LJ does at para 30, that Zurich
went so far as to plead that Mr Hayward was fraudulent and to support it by
a statement of truth.  He says, at para 31:                                       E

   "In my opinion the true principle is that the equitable remedy of
   rescission answers the affront to conscience occasioned by holding to a
   contract a party who has been influenced into making it by being misled
   or, worse still, defrauded by his counterparty.  Thus, once he discovers the
   truth, he must elect whether to rescind or to proceed with the contract.  It
   must follow that, if he already knows or perceives the truth by the time of
   the contract, he elects to proceed by entering into it, and cannot later seek    F
   rescission merely because he later obtains better evidence of that which he
   already believed, still less if he merely repents of it.  This seems to me to be
   a fortiori a case where, as here, the misrepresentation consists of a
   disputed claim in litigation, and the contract settles that claim."

21   To my mind that is to put the position too high in favour of
fraudsters in general and Mr Hayward in particular.  It is true that in its       G
defence dated 30 October 2001 the employer (no doubt through Zurich) stated
that the facts stated in the defence were true.  The relevant facts were
pleaded in paras 6–7 as follows:

   "6. It is admitted that the claimant suffered an injury to his back as a
   result of the accident.  The defendant relies on the medical reports of
   Mr Sharp dated 11 June 2000, 20 August 2000 and 26 November 2000.    H
   The view of the claimant's ongoing physical condition from Mr Bracegirdle
   relied on by the claimant is not accepted by the defendant.  As a result of
   video surveillance obtained Mr Sharp formed the view that the claimant's
   disability was not as great as he had described and he was capable of

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 294

153

[2017] AC                    Zurich Insurance Co plc v Hayward (SC(E))
                             Lord Clarke of Stone-cum-Ebony JSC

A   working full time even if not with heavy lifting. In view of the claimant's
    lack of candour in relation to his physical condition it is not possible to
    accept that his depressive state, as described, has been consistent, is
    continuing or will continue into the future.

        "7. The claimant has exaggerated his difficulties in recovery and
    current physical condition for financial gain."

B   22   These pleas show that Zurich was suspicious of Mr Hayward but no
    very clear allegations were, or could be, made. However, it is not in dispute
    that Zurich did as much as it reasonably could to investigate the position
    before the settlement. The evidence was not as good from its point of view
    as it might have hoped but the fact is that Zurich did not know the extent of
    Mr Hayward's misrepresentations. The case was settled at a time when the
C   only difference between the experts was the likely duration of future loss.
    The figure agreed was about half way between the respective opinions of the
    experts. It was not until the advent of Mr and Mrs Cox that Zurich realised
    the true position. Hence, as the judge expressly found, the amount of the
    settlement was very much greater than it would have been but for the
    fraudulent misrepresentations made by Mr Hayward. The small amount
D   ultimately awarded by the judge, which is not challenged, shows the extent
    of the dishonest nature of the claim. I am not persuaded that the importance
    of encouraging settlement, which I entirely agree is considerable, is sufficient
    to allow Mr Hayward to retain moneys which he only obtained by fraud.

        *The authorities*

E   23   I am not persuaded that the authorities lead to any other conclusion.
    As stated above, the ingredients of the tort of deceit are not in dispute subject
    to one question, which is whether a claimant alleging deceit must show that
    he believed the misrepresentation. In my opinion the answer is no.
        24   There are many formulations of the relevant principles in the
    authorities. I take two examples. In *Briess v Woolley* [1954] AC 333, 353
    Lord Tucker said:

F       "The tort of fraudulent misrepresentation is not complete when the
    representation is made. It becomes complete when the misrepresentation—
    not having been corrected in the meantime—is acted upon by the
    representee. Damage giving rise to a claim for damages may not follow or
    may not result until a later date, but once the misrepresentation is acted
    upon by the representee the tortious act is complete provided that the
G   representation is false at that date."

    To like effect, Lord Mustill said in *Pan Atlantic Insurance Co Ltd v Pine Top
    Insurance Co Ltd (No 2)* [1995] 1 AC 501, 542:

        "In the general law it is beyond doubt that even a fraudulent
    misrepresentation must be shown to have induced the contract before the
H   promisor has a right to avoid, although the task of proof may be made
    more easy by a presumption of inducement."

        25   The authorities show that questions of inducement and causation are
    questions of fact. I would accept the submissions made on behalf of Zurich
    in support of the proposition that belief is not required as an independent

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 295

154
**Zurich Insurance Co plc v Hayward (SC(E))**                                    **[2017] AC**
Lord Clarke of Stone-cum-Ebony JSC

ingredient of the tort. It may however be relevant as part of the court's          A
consideration of the questions whether there was inducement and, if so,
whether causation has been established.

26  In this regard I agree with the judge when he said at the end of
para 2.5 that the statement in *Clerk & Lindsell on Torts*, 20th ed (2010) fits
the case better. It simply said "The claimant must have been influenced by
the misrepresentation". That is a sub-heading to para 18-34 in the 21st ed     B
(2015). In para 18-35 the editors say that, although the claimant must show
that he was induced to act as he did by the misrepresentation, it need not
have been the sole cause. It is submitted on behalf of Mr Hayward that the
claimant's mind must be at least partly influenced by the defendant's
misstatements. In *Edgington v Fitzmaurice* (1885) 29 Ch D 459, 483
Bowen LJ said:                                                                      C

"The real question is, what was the state of the plaintiff's mind, and if
his mind was disturbed by the misstatement of the defendants, and such
disturbance was in part the cause of what he did, the mere fact of his also
making a mistake himself could make no difference."

I see no conflict between the judge's approach and those conclusions.

27  Mr Hayward relies upon the references in the textbooks and, indeed,          D
in cases like *Edgington v Fitzmaurice* to the requirement that the
representation must have impacted upon the representee's mind. To my
mind that simply means that the representee must have been induced to act
as he did in reliance upon the representation.

28  In Zurich's written case its argument in support of the position that
belief in the truth of the representation is not required is summarised as         E
follows:

"(i) Inducement is concerned with causation—not the representee's
credulity. Although one may infer that a representee who believes a
misrepresentation has been induced to rely on it, an absence of belief
does not mean there was no inducement. This is because what is
required for there to be inducement is a causal connection between the      F
misrepresentation and the representee making a decision or undertaking a
course of action on the basis of that representation. That does not require
belief in the misrepresentation itself.

"(ii) Just as belief in the misrepresentation is not required, so also belief
in other inducing causes is irrelevant.

"(iii) There is a '*presumption of inducement*', particularly where there      G
is an intention to induce by means of fraud. If the defrauded representee
first had to show he *believed* the misrepresentation, there would be little
(or no) utility in having the presumption.

"(iv) That presumption should not be rebutted merely because the
representee is sceptical. Otherwise, the doubting representee would be
placed in a worse position than the gullible or trusting one. Given that
misgivings and suspicion might be more likely to arise where there is       H
fraud, it would be perverse for the prospects of redress to be extinguished
on account of those very doubts. Of all representees, it may be thought
the defrauded representee (whether believing or not) should be the most
deserving of protection.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 296

155

A       "(v) There is no duty upon the defrauded representee to exercise 'due
diligence' to determine whether there are reasonable grounds to believe
the representations made.   Conversely, the fact that the representee
does not in fact wholly credit the fraudster and carries out its own
investigations does not preclude it from having been induced by those
representations.  Qualified belief or disbelief does not rule out inducement,
particularly where those investigations were never going to find out the
B       evidence that subsequently came to light.

        "(vi) Whereas proof that the representee had knowledge (or 'blind eye
knowledge') of the falsity suffices, nothing short of that avails the
misrepresentor."

        29    As to sub-para (i), inducement, I would accept the submission on
C       behalf of Zurich that materiality is evidence of inducement because what is
material tends to induce.  As Hutley JA put it in the Court of Appeal of New
South Wales, *Gipps v Gipps* [1978] 1 NSWLR 454, 460, "To state that a
person is induced by a statement is to affirm a causal relation which is a
question of fact, not of law".  See also *Downs v Chappell* [1997] 1 WLR
426, per Hobhouse LJ at p 433.   Moreover, albeit by reference to
section 18(2) of the Marine Insurance Act 1905 (6 Edw 7, c 41), in the *Pan
D       Atlantic* case Lord Goff of Chieveley, accepted at p 517C and p 517E
respectively that in gauging materiality it suffices if the misrepresentation (or
non-disclosure) had "an impact on the mind" or an "influence on the
judgment".  In the same case Lord Mustill adopted references to inducement
not being established where the misrepresentation (at p 545) "did not
influence the judgment", (at p 546) "did not influence the mind" or (at p 551)
E       "had no effect on the decision".

        30    In para 6.6 of his judgment (quoted at para 15 above) the judge held
that the continuing representations influenced Zurich into agreeing to a
higher level of settlement that it would otherwise have done.  The judge was
entitled to adopt the proposition in *Clerk & Lindsell* that "the claimant must
have been influenced by the misrepresentation".

        31    In para 28 of his judgment Briggs LJ said:
F
        "In my judgment the authorities on rescission for misrepresentation
speak with one voice.  For a misstatement to be the basis for a claim to
rescind a contract, the claimant must have given some credit to its truth,
and been induced into making the contract by a perception that it was
true rather than false.  Where judges and text-book writers have used the
word 'influenced' as the touchstone for reliance they have done so in
G       order to allow for belief in the truth of the misrepresentation to be a
contributory rather than sole cause of the representee's entry into the
contract: see for example *Clerk & Lindsell on Torts*, 21st ed, para 18-35.
They have not thereby intended to allow in any case where the
representee can show that he was influenced into making the contract by
the mere making of a representation which he did not believe was true."

H       32    I would not accept this analysis.  As I see it, the representee's
reasonable belief as to whether the misrepresentation is true cannot be a
necessary ingredient of the test, because the representee may well settle on
the basis that, at any rate in a context such as the present, he thinks that the
representation will be believed by the judge.  But it is centrally relevant to the

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 297

156
Zurich Insurance Co plc v Hayward (SC(E))                                      [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

question of inducement and causation.  Logically, the representee is more      A
likely to settle for a different reason other than the representation, if his
reasonable belief is that it is false.  One of the extraneous factors in this case,
for example, was the fact that the insurers' expert Mr Sharp had failed to
produce, in their view, a report which set out the extent of the
misrepresentations with sufficient clarity—see para 15 above.

33  As to sub-para (ii), multiple causes, the text books strongly support       B
the proposition that it is sufficient for the misrepresentation to be an
inducing cause and that it is not necessary for it to be the sole cause: see
e g *Chitty on Contracts*, 32nd ed (2015), vol 1, para 7-37.  See also, for
example, *Barton v Armstrong* [1976] AC 104, where Lord Cross, delivering
the majority advice of the Privy Council in a case involving duress by threats
of physical violence, invoked, as an appropriate analogy, the treatment of
contributing causes in fraud cases.  He said, at p 118:                         C

   "If it were established that Barton did not allow the representation to
   affect his judgment then he could not make it a ground for relief . . .  If on
   the other hand Barton relied on the misrepresentation Armstrong could
   not have defeated his claim to relief by showing that there were other
   more weighty causes which contributed to his decision . . . for in this field
   the court does not allow an examination into the relative importance of    D
   contributing causes . . ."

Lord Hoffmann made much the same point in *Standard Chartered Bank Ltd
v Pakistan National Shipping Corpn Ltd (Nos 2 and 4)* [2003] 1 AC 959,
para 15:

   "if a fraudulent representation is relied upon, in the sense that the        E
   claimant would not have parted with his money if he had known that it
   was false, it does not matter that he also had some other negligent or
   irrational belief about another matter and, but for that belief, would not
   have parted with his money either.  The law simply ignores the other
   reasons why he paid."

Lord Hoffmann then quoted with approval the part of the advice of Lord        F
Cross quoted above and added, at para 16: "This rule seems to me to be
based upon sound policy."  Finally, reliance is placed upon the decision of
the High Court of Australia in *Gould v Vaggelas* (1984) 157 CLR 215,
which was a case of deceit, where Wilson J said, at p 236:

   "The representation need not be the sole inducement in sustaining the
   loss.  If it plays some part, even if only a minor part, in contributing to the  G
   course of action taken a causal connection will exist."

34  As to sub-para (iii), the "presumption" of inducement, it is not a
presumption of law but an inference of fact.  For example, *Chitty on
Contracts*, 32nd ed, vol 1, put it thus at para 7-040:

   "Once it is proved that a false statement was made which is 'material'
   in the sense that it was likely to induce the contract, and that the        H
   representee entered the contract, it is a fair inference of fact (though not
   an inference of law) that he was influenced by the statement, and the
   inference is particularly strong where the misrepresentation was
   fraudulent."

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 298

157
**[2017] AC**                    Zurich Insurance Co plc v Hayward (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    35    Lord Mustill put it in this way in the *Pan Atlantic* case [1995] 1 AC
501, 551. He said that the representor

> "will have an uphill task in persuading the court that the . . .
> misstatement . . . has made no difference . . . there is a presumption in
> favour of a causative effect."

B    We were further referred to the decision of Briggs J in a case about
fraudulent misrepresentations, namely *Ross River Ltd v Cambridge City
Football Club Ltd* [2008] 1 All ER 1004, para 241, where he said:

> "First and foremost, in a case where fraudulent material
> misrepresentations have been deliberately made with a view (as I find)
> improperly to influence the outcome of the negotiation of the cont[r]act in
> C    favour of the maker and his principal, by an experienced player in the
> relevant market, there is the most powerful inference that the fraudsman
> achieved his objective, at least to the limited extent required by the law,
> namely that his fraud was actively in the mind of the recipient when the
> contract came to be made."

See also *Australian Steel & Mining Corpn Pty Ltd v Corben* [1974]
D    2 NSWLR 202, 208–209, per Hutley JA.

36    As to sub-para (iv), rebutting the presumption of inducement, the
authorities are not entirely consistent as to what is required to rebut the
presumption. However, it is not strictly necessary to address those differences
in this case because, however precisely the test is worded—whether what
must be proved is that the misrepresentation played "no part at all" or that it
did not play a "determinative part", or that it did not play a "real and
E    substantial part" —I would accept the submission made on behalf of Zurich
that the presumption is not rebutted on the facts as found in this case. There
can be no doubt on the judge's findings of fact that, if Zurich had known the
true position as to Mr Hayward's state of recovery, it would not have offered
anything like as much as it in fact offered and settled for in October 2003.

37    Since the issue was touched on in argument, I would simply say that
F    the authorities seem to me to support the conclusion that it is very difficult to
rebut the presumption.  As it seems to me, the orthodox view is contained in
*Sharland v Sharland* [2016] AC 871.  In *Smith v Kay* (1859) 7 HL Cas 750,
759 Lord Chelmsford LC asked this question in a rescission case based on an
allegation of fraudulent misrepresentation:

> "can it be permitted to a party who has practised a deception, with a
> G    view to a particular end, which has been attained by it, to speculate upon
> what might have been the result if there had been a full communication of
> the truth?"

In *Sharland v Sharland* Baroness Hale of Richmond DPSC observed of *Smith
v Kay* that it indeed held that a party who has practised deception with a
view to a particular end, which has been attained by it, cannot be allowed to
H    deny its materiality or that it actually played a causative part in inducement.

38    This view is supported by *Downs v Chappell* [1997] 1 WLR 426,
433 where Hobhouse LJ said:

> "The judge was wrong to ask how they [the representees] would have
> acted if they had been told the truth.  They were never told the truth.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 299

158
Zurich Insurance Co plc v Hayward (SC(E))                                          [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

They were told lies in order to induce them to enter into the contract. The
lies were material and successful . . . The judge should have concluded
that the plaintiffs had proved their case on causation . . ."

See also *BP Exploration Operating Co Ltd v Chevron Shipping Co* [2003]
1 AC 197, 244–245, per Lord Millett. The Hon K R Handley wrote an
impressive article entitled "Causation in Misrepresentation" (2015) 131
LQR 277, where he expressed this view, at p 284:

"The representor must have decided to make the misrepresentation
because he or she judged that the truth or silence would not, or might not,
serve their purposes or serve them so well. In doing so they fashioned an
evidentiary weapon against themselves, and the court should not subject
the victim to 'what if' inquiries which the representor was not prepared to
risk at the time."

39   As to sub-para (v), I would accept the submissions made on behalf of
Zurich. In particular I agree that the representee has no duty to be careful,
suspicious or diligent in research. As Rigby LJ put it in *Betjemann v
Betjemann* [1895] 2 Ch 474, 482: "What is the duty of a man to inquire? To
whom does he owe that duty? Certainly not to the person who had
committed the concealed fraud." Here Zurich did as much as it reasonably
could to investigate the accuracy and ramifications of Mr Hayward's
representations before entering into any settlement.

40   As explained above, the questions whether Zurich was induced to
enter into the settlement agreement and whether doing so caused it loss are
questions of fact, which were correctly decided in its favour by the judge.
I accept the submission that the fact that the representee (Zurich) does not
wholly credit the fraudster (Mr Hayward) and carries out its own
investigations does not preclude it from having been induced by those
representations. Qualified belief or disbelief does not rule out inducement,
particularly where those investigations were never going to find out the
evidence that subsequently came to light. That depended only on the fact
that Mr and Mrs Cox subsequently came forward. Only then did Zurich
find out the true position. As Mr Hayward knew, Zurich was settling on a
false basis.

41   I do not think that any of the cases relied upon on behalf of
Mr Hayward, or by the Court of Appeal in his favour justifies its decision.
They include *Kyle Bay Ltd (trading as Astons Nightclub) v Underwriters
Subscribing under Policy No 019057/08/01* [2007] 1 CLC 164. Underhill LJ
stressed, in his analysis in para 24, that Kyle Bay "was not on all fours with
the present case", but that it was illustrative of a similar principle. To my
mind it is of no real assistance because it was a case which, as Neuberger LJ
observed in *Kyle Bay* at para 42, involved unusual facts and in which the
approach of the claimant appeared mystifying. That is not the position here.

42   As to further cases that were said to establish a requirement of belief,
in the Court of Appeal Underhill LJ referred at para 12 to *Sprecher Grier
Halberstam LLP v Walsh* [2009] CP Rep 16, para 17, *Arkwright v Newbold*
(1881) 17 Ch D 301, 324, and *Strover v Harrington* [1988] Ch 390, 407.
However, as Underhill LJ said, none of those cases contains any relevant
discussion of a principle to the effect that belief in the representation is
required before a settlement such as this can be set aside.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 300

159

[2017] AC                    Zurich Insurance Co plc v Hayward (SC(E))
                                  Lord Clarke of Stone-cum-Ebony JSC

A    43    As to sub-para (vi), knowledge of falsity, as I understand it, it is
accepted on behalf of Zurich that, where the representee knows that the
representation is false, he cannot succeed.  There is some support in the
authorities for this view.  So, for example *Chitty on Contracts*, 32nd ed,
vol 1, para 7-036 says,

B        "The burden of proving that the claimant had actual knowledge of the
     truth, and therefore was not deceived by the misrepresentation, lies on the
     defendant; if established, knowledge on the part of the representee is of
     course a complete defence, because he is then unable to show that he was
     misled by the misrepresentation."

*Spencer Bower & Handley on Actionable Misrepresentation*, 5th ed (2014),
p 122, para 11.07 says:

C        "A representee cannot be misled by a statement which he knew to be
     false . . .  The representee's knowledge of the truth must normally be full
     and complete. Partial and fragmentary information, or mere suspicion, will
     not do, 'suspicion, doubt and mistrust do not have the same consequence as
     knowledge'.  A representee who knows that the representation was false to
     some extent, but acts on it, may establish inducement if the departure
D    from the truth was significantly greater than expected."

See also *Gipps v Gipps* [1978] 1 NSWLR 454, 460, per Hutley JA.
     44    As I said earlier, it cannot fairly be said that Zurich had full
knowledge of the facts here.  It follows that it is not necessary to express a
final view on the question whether it always follows from the fact that the
representee knows that the representation is false that he cannot succeed.  As
E    explained earlier, questions of inducement and causation are questions of
fact.  It seems to me that there may be circumstances in which a representee
may know that the representation is false but nevertheless may be held to
rely upon the misrepresentation as a matter of fact.
     45    This very case could have been such a case.  The judge considered
this possibility in para 2.5 of his judgment (quoted at para 14 above), where
F    he said:

         "At the very least, statements made in the course of litigation will be
     viewed with healthy scepticism and weighed against the other material
     available.  Often the other party will not be sure, even then, whether the
     statement is in fact true and will mainly concern himself with how likely it
     is to be accepted by the court. *Sometimes (a staged road traffic 'accident'*
G    *for example) the other party may actually be certain from his own direct*
     *knowledge that the statement is a deliberate lie.  But even then he and his*
     *advisers cannot choose to ignore it; they must still take into account the*
     *risk that it will be believed by the judge at trial.*  This situation is quite
     different from a proposed purchase, where if in doubt one can simply
     walk away." (Emphasis added.)

H    It seems to me that in the kind of case which I have put in italics the claimant
may well establish inducement on the facts.  This was not however a case in
which the judge found that Zurich was certain from its own direct
knowledge that Mr Hayward's representations contained deliberate lies.
     46    Quantum is not in issue.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 301

160
Zurich Insurance Co plc v Hayward (SC(E))                    [2017] AC
Lord Clarke of Stone-cum-Ebony JSC

47   It follows that I would answer the questions posed by the first issue   A
(and set out in para 17 above) in this way.  I would answer (a) no and (b) yes
and would allow the appeal.

*Issue 2*

48   The second issue (also set out in para 17 above) is in these terms:   B

"Under what circumstances, if any, does the suspicion by the defendant
of exaggeration for financial gain on the part of the claimant preclude
unravelling the settlement of that disputed claim when fraud is
subsequently established?"

The answer seems to me to follow from the answer to the first question.  As
I see it, it is difficult to envisage any circumstances in which mere suspicion   C
that a claim was fraudulent would preclude unravelling a settlement when
fraud is subsequently established.

*Conclusion*

49   For these reasons I would allow the appeal.

LORD TOULSON JSC   (with whom   LORD NEUBERGER OF   D
ABBOTSBURY PSC, BARONESS HALE OF RICHMOND DPSC   and
LORD REED JSC agreed)

50   I agree with the judgment of Lord Clarke of Stone-cum-Ebony JSC.
I add this judgment because of the importance of the matter, about which we
are differing from the judgment of the Court of Appeal, based on what   E
I respectfully consider to have been an erroneous conclusion drawn from
earlier case law.  The issue raised by this appeal is important both as a matter
of law and for its practical consequences for insurers and dishonest
claimants.  I gratefully adopt Lord Clarke JSC's account of the facts.

51   Bogus or fraudulently inflated personal injury claims are not new.
One of the great advocates of the 20th century, Sir Patrick Hastings,   F
recounted vividly in his memoirs, "Cases in Court" (William Heinemann Ltd
(1949), pp 4–20), how as a young barrister before World War 1 he built up a
practice defending insurance companies against such claims.  Now as then,
they present a serious problem.  Personal injury claims usually fall to be met
by insurers and the ultimate cost is borne by other policy holders through
increased premiums.

52   Insurers may often have grounds for suspicion about a claim but lack   G
the hard evidence necessary to prove fraud.  To pursue an allegation of fraud
without strong evidence is risky.  If in such circumstances insurers settle a
claim, not in the belief that it is bona fide but in the belief that it is likely to
succeed, and if afterwards they discover evidence which proves that the
claim was fraudulent, can they bring proceedings to set aside the agreement
and recover damages for deceit?  In this case the judge at first instance said   H
yes, but the Court of Appeal said no, because in such circumstances the
insurers were not deceived.  The question which court gave the right answer
is important, both for insurers and for those who advise personal injury
claimants.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 302

161
**[2017] AC**                    Zurich Insurance Co plc v Hayward (SC(E))
Lord Toulson JSC

A  *Strike out application*

53   The Court of Appeal [2011] CP Rep 39 rightly rejected
Mr Hayward's application to strike out the action on the ground that the
issue was res judicata or that the action was an abuse of the process of the
court. The claim had been compromised by an agreement but, as Lord
Bingham of Cornhill emphasised in *HIH Casualty and General Insurance*
B  *Ltd v Chase* [2003] 2 Lloyd's Rep 61, paras 15–16, "fraud is a thing apart"
and "unravels all". Once proved, "it vitiates judgments, contracts and all
transactions whatsoever": per Denning LJ in *Lazarus Estates Ltd v Beasley*
[1956] 1 QB 702, 712, cited by Lord Bingham. I refer to this matter because
in his judgment now under review Underhill LJ called into question the
correctness of the Court of Appeal's earlier judgment, and Mr Hayward's
C  arguments on this appeal were similarly flavoured with criticism of it,
although it was not open to him to attack it directly.

*Judgment of the county court*

54   I would like to pay testimony to the judgment of Judge Moloney QC
as a model of clarity and cogency. Lord Clarke JSC has set out at, paras 14
and 15, the judge's self-direction as to the law (para 2.5) and his application
D  of it to the facts: para 2.6.

*Judgment of the Court of Appeal*

55   Briggs LJ's reasoning was short and direct. He held that for a
misstatement to be the basis for a claim to rescind a contract, the claimant
must have given some credit to its truth and have been induced into making
E  the contract by a perception that it was true rather than false. He said that
when judges and textbook writers used the word "influenced" as the
touchstone for reliance, they did so in order to accommodate cases where
belief in the truth of the statement was a contributory rather than the sole
cause of the representee's entry into the contract.

56   Underhill LJ's reasoning was somewhat different but led him to the
F  same place. His starting point was that when a person enters into a contract
to settle a dispute he knowingly takes the risk of making a payment for a
claim which may be ill-founded, and he pays a sum commensurate with his
assessment of that risk. But he said that the risk which a settlor must be
taken to have accepted will depend on the circumstances of the case.
A settlor will not normally be taken to have accepted the risk that the
G  claimant's case is not just ill-founded but dishonest. However, if it is
sufficiently apparent that the settlor intended to settle notwithstanding the
possibility that the claim was fraudulent, he will be held to the settlement.
The fact that the insurers had pleaded that the claim was exaggerated for
financial gain proved their awareness of the possibility of fraud, but they
chose to settle the claim with that awareness, and it was contrary to the
public interest in the settlement of disputes for them to be allowed to set
H  aside the settlement.

57   Underhill LJ was conscious that the logic of this reasoning was that
Mr Hayward's application to strike out the insurers' action ought to have
succeeded, contrary to the Court of Appeal's earlier decision. He described
it as a "debatable point" whether that decision precluded him from deciding

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 303

162
**Zurich Insurance Co plc v Hayward (SC(E))**                                    [2017] AC
Lord Toulson JSC

the case on the reasoning which he thought should apply, but he considered    A
that it was possible to re-cast his reasoning in a form which was perhaps less
satisfactory, but which avoided conflict with the earlier decision.  He held
that although in one sense the misrepresentations operated on the mind of
the insurers, that did not constitute reliance in the relevant sense.  In deciding
whether to settle, the insurers formed their own independent judgment
whether the claim was likely to succeed, and there was no "relationship of    B
reliance" of the kind which was required for the insurers' action to succeed.
Ultimately, therefore, he allowed the appeal on substantially the same
ground as Briggs LJ.

*Analysis*

58    To establish the tort of deceit it must be shown that the defendant    C
dishonestly made a material false representation which was intended to, and
did, induce the representee to act to its detriment.  The elements essential for
liability can be broken down under three headings: (a) the making of a
materially false representation (the defendant's conduct element); (b) the
defendant's accompanying state of mind (the fault element); and (c) the
impact on the representee (the causation element).  Where liability is
established, it remains for the claimant to establish (d) the amount of any    D
resulting loss (the quantum element).

59    In this case there is now no issue as to elements (a), (b) and (d).
Mr Hayward made false and material representations to the insurers as well
as to the court, both directly and through what he told the doctors and his
own legal advisers with a view to it being communicated to insurers and to
the court.  He did so dishonestly, with the intention of inducing the insurers    E
to pay compensation to him on a false basis.  The judge's assessment of
quantum is not challenged.  The issue concerns element (c).

60    In the statement of facts and issues, the parties have identified the
critical issue in these terms: In order to set aside a compromise on the basis of
fraudulent misrepresentation, to show the requisite influence by or reliance
on the misrepresentation, (a) must the defrauded representee prove that it    F
was induced into settlement because it believed that the misrepresentations
were true; or (b) does it suffice to establish influence that the fact of the
misrepresentations was a material cause of the defrauded representee
entering into the settlement?

61    The parties have raised an additional question as to the
circumstances, if any, in which suspicion by a settlor of exaggeration of the
claim precludes unravelling the settlement when fraud is subsequently    G
established; but in so far as the question involves any point of law, it is
enveloped by the first issue.

62    Some torts do not require the claimant to have suffered any
detriment.  Trespass is an example.  Deceit is not in that category.  It is
essential to show that the defendant's false representation caused the
claimant to act to its detriment.  It stands to reason that this should be so.    H
The vice of the defendant's conduct consists in dishonestly making a false
representation with the intention of influencing the representee to act on it to
its detriment.  If it does not cause the representee to do so, the mischief
against which the tort provides protection will not have occurred.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 304

*A*  A misrepresentation which has no impact on the mind of the representee is no more harmful than an arrow which misses the target.

    **63**  Inducement is a question of fact. In a typical case the only way in which a dishonest representation is likely to influence the representee to act to its detriment will be if the representee is led to believe in its truth. It is therefore not surprising to find statements by judges in such cases *B*  that the misrepresentee must show that he believed or "relied on" the misrepresentation.

    **64**  *Redgrave v Hurd* (1881) 20 Ch D 1, to which Underhill LJ referred, is an example. The plaintiff, an elderly solicitor wishing to retire, advertised for someone to enter into partnership with him and to buy his house. The defendant responded to the advertisement and negotiations followed, in *C*  which the plaintiff stated that the practice brought him in about £300 a year. In fact it did not bring in anything like that amount. The parties entered into partnership and into a separate contract for the sale of the house, which made no reference to the business. The defendant paid a deposit and was let into possession. On discovering that the practice was not worth what the plaintiff had said, the defendant gave up possession and refused to complete the purchase. It was therefore a classic case of a purchaser who claimed to *D*  have entered into the contract in reliance on the truth of a misrepresentation by the seller. The plaintiff sued for specific performance; the defendant counterclaimed for rescission of the contract and damages for deceit. The plaintiff succeeded at first instance before Fry J, who was not satisfied that the defendant had proved that he relied on the misrepresentation. The Court of Appeal upheld the dismissal of the defendant's counterclaim in deceit on *E*  the ground that he had not sufficiently pleaded or proved dishonesty, but it allowed his appeal on the issue of rescission on the ground that the facts gave rise to an inference that he was induced to enter into the contract by the plaintiff's misrepresentation. Jessel MR said, at p 21:

*F*      "If it is a material misrepresentation calculated to induce him to enter into the contract, it is an inference of law that he was induced by the representation to enter into it, and in order to take away his title to be relieved from the contract on the ground that the representation was untrue, it must be shown either that he had knowledge of the facts contrary to the representation, or that he stated in terms, or shewed clearly by his conduct, that he did not rely on the representation."

*G*    **65**  *Smith v Chadwick* (1884) 9 App Cas 187 was another case of a purchaser who claimed to have entered into the contract in reliance on the truth of a misrepresentation by the seller. The plaintiff claimed damages for deceit through having been induced to buy shares in an iron company by false representations in a prospectus as to the output of the iron works. The House of Lords held that his claim failed because the critical words of the prospectus were ambiguous, and the plaintiff had failed to show that he *H*  understood them in a sense which was false. Lord Blackburn surmised, at p 200, that the plaintiff's counsel refrained from asking the plaintiff in examination-in-chief how he understood the wording for fear of receiving a damaging answer. The case was cited in the present case for the opening passage in the speech of Lord Selborne LC, at p 190:

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 305

164
Zurich Insurance Co plc v Hayward (SC(E))                                    [2017] AC
Lord Toulson JSC

"My Lords, I conceive that in an action of deceit, *like the present*, it is    A
the duty of the plaintiff to establish two things; first, actual fraud, which is
to be judged by the nature and character of the representations made,
considered with reference to the object for which they were made, the
knowledge or means of knowledge of the person making them, and the
intention which the law justly imputes to every man to produce those
consequences which are the natural result of his acts: and, secondly, he    B
must establish that this fraud was an inducing cause to the contract; for
which purpose it must be material, and it must have produced in his mind
an erroneous belief, influencing his conduct." (Emphasis added.)

66    In the same case Lord Blackburn had pertinent things to say about
the fundamental link between fraud and damage in an action for deceit,
at p 195:                                                                     C

"In *Pasley v Freeman* (1789) 2 Sm LC 66, 73, 86 (8th ed), Buller J says:
'The foundation of this action is fraud and deceit in the defendant and
damage to the plaintiffs.  And the question is whether an action thus
founded can be sustained in a Court of law.  Fraud without damage, or
damage without fraud, gives no cause of action, but where these two
concur an action lies, per Croke J, 3 Bulst 95.'                             D
"Whatever difficulties there may be as to defining what is fraud and
deceit, I think no one will venture to dispute that the plaintiff cannot
recover unless he proves damage.  In an ordinary action of deceit the
plaintiff alleges that false and fraudulent representations were made by
the defendant to the plaintiff in order to induce him, the plaintiff, to act
upon them.  I think that if he did act upon these representations, he shews
damage; if he did not, he shews none."                                       E

67    So far I have been considering the typical case.  But it is possible for a
representor to make a false and fraudulent misrepresentation, with the
intention of influencing the representee to act on it to its detriment, without
the representee necessarily believing it to be true.  If the representor succeeds
in his object of influencing the representee to act on the representation to its
detriment, there will be the concurrence of fraud and deceit in the representor    F
and resulting damage to the representee.  In principle, the representee should
therefore be entitled to a remedy in deceit.

68    That inducement is a question of fact, necessary to establish
causation in all cases but not necessarily in the same way, was recognised
and well expressed in the decision of the Court of Appeal of New South
Wales in *Gipps v Gipps* [1978] 1 NSWLR 454.  A woman sued her former    G
husband for deceit in relation to a property settlement which they had
entered into at the time of their divorce.  They were joint shareholders in a
private company and as part of the settlement the wife transferred her shares
to the husband.  The shares were valued by an independent accountant, but
the husband dishonestly contrived to see that the valuation was a substantial
undervaluation.  The wife did not trust the husband and suspected that the
shares were worth more than the valuation, but she did not know the extent    H
of the undervaluation.  It was submitted on the husband's behalf that if a
representee knows that a representation is false in a material particular, as a
matter of law he or she cannot sue in respect of it.  The court rejected that
argument.

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 306

165

[2017] AC                     Zurich Insurance Co plc v Hayward (SC(E))
                                                        Lord Toulson JSC

A   69  After referring to various authorities, including particularly the
passage from the judgment of Jessel MR in *Redgrave v Hurd* set out at
para 64 above, Hutley JA said, at p 460:

"The question whether a person has been induced by a statement made
to him to enter into an agreement is, in my opinion, a single issue of fact.
No doubt pre-contractual knowledge that the statement made is not
B   wholly true has a very direct bearing on the resolution of this question of
fact but it does not of itself necessarily provide the answer.  To say that it
does is to formulate a different question.

"To state that a person is induced by a statement is to affirm a causal
relation which is a question of fact, not of law.  That being so, it is
impossible to apply to any situation a rule which produces a final result.
C   The trial judge or jury have to answer the question: Did the
misrepresentation cause the representee to enter into the contract, it being
understood that the representation, as was stated in *Australian Steel and
Mining Corpn Pty Ltd v Corben* [1974] 2 NSWLR 202, 207, 'was among
the factors which induced the contract.' "

70   Some assistance may also be had from the judgment of Hobhouse LJ
D   in *Downs v Chappell* [1997] 1 WLR 426, 433, where he said that for a
plaintiff to succeed in the tort of deceit of deceit it is necessary for him to
prove that (1) the representation was fraudulent, (2) it was material and
(3) it induced the plaintiff to act to his detriment.  He added that "As regards
inducement, this is a question of fact" and that "The word "reliance" used by
the judge has a similar meaning but is not the correct criterion."

71   I agree with Judge Moloney QC's analysis in para 2.5 of his
E   judgment.  The question whether there has been inducement is a question of
fact which goes to the issue of causation.  The way in which a fraudulent
misrepresentation may cause the representee to act to his detriment will
depend on the circumstances.   He rightly focused on the particular
circumstances of the present case.  Mr Hayward's deceitful conduct was
intended to influence the mind of the insurers, not necessarily by causing
F   them to believe him, but by causing them to value his litigation claim more
highly than it was worth if the true facts had been disclosed, because the
value of a claim for insurers' purposes is that which the court is likely put on
it.  He achieved his dishonest purpose and thereby induced them to act to
their detriment by paying almost ten times more than they would have paid
but for his dishonesty.  It does not lie in his mouth in those circumstances to
G   say that they should have taken the case to trial, and it would not accord
with justice or public policy for the law to put the insurers in a worse
position as regards setting aside the settlement than they would have been in,
if the case had proceeded to trial and had been decided in accordance with
the corrupted medical evidence as it then was.

72   For those reasons, which accord to all intents and purposes with the
judgment of Lord Clarke JSC, I too would allow the insurers' appeal and
H   restore the order of Judge Moloney.

*Postscript*

73   It was expressly conceded on behalf of the insurers for the purposes
of the present appeal that whenever and however a legal claim is settled, a

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 307

166
**Zurich Insurance Co plc v Hayward (SC(E))**                    **[2017] AC**
Lord Toulson JSC

party seeking to set aside the settlement for fraud must prove the fraud by          A
evidence which it could not have obtained by due diligence at the time of the
settlement.  It makes no difference to the outcome of the present case and the
court heard no argument about whether the concession was correct.  Any
opinion on the subject would therefore be obiter, and since the court has not
considered the relevant authorities (including Commonwealth authorities
such as *Toubia v Schwenke* (2002) 54 NSWLR 46) or academic writing, it is          B
better to say nothing about it.

*Appeal allowed.*

Shiranikha Herbert, Barrister

C

D

E

F

G

H

© 2017 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 308

A                              Supreme Court

## Ivey *v* Genting Casinos (UK) Ltd (trading as Crockfords Club)

### [2017] UKSC 67

2017  July 13;                          Baroness Hale of Richmond PSC,
B       Oct 25                 Lord Kerr of Tonaghmore, Lord Hughes JJSC,
                        Lord Neuberger of Abbotsbury, Lord Thomas of Cwmgiedd

*Gaming — Gambling — Cheating — Card game player adopting edge-sorting
strategy unbeknown to casino — Implied term in contract not to cheat —
Whether "cheat" connoting dishonest state of mind — Whether "cheating"
including interference by player with process by which game played so as to gain
C       unfair advantage without other player's knowledge — Whether claimant in
breach of implied term so that not entitled to recover winnings — Gambling Act
2005 (c 19), s 42(3)*

The claimant, a professional gambler, played the card game Punto Banco
Baccarat, which was a game of pure chance, at the defendant's casino, winning over
£7·7m. Following an investigation due to the large win the defendant determined
that the claimant had compromised the game by using a method of play called edge-
D       sorting, which involved exploiting the design irregularities on the backs of the
playing cards and then persuading the croupier to rotate the cards so that those of
high value could be distinguished from the others before any card was dealt and bet
placed, without anyone else appreciating the purpose of rotating the cards. The
defendant, which had not known about edge-sorting, refused to pay the claimant his
winnings on the ground that such play altered the odds against it unfairly. The
claimant brought an action for recovery of the sums which he had won. The
E       defendant contended, inter alia, that (i) the gaming contract between the parties had
an implied term that the claimant would not cheat or otherwise act to defeat the
essential premise of the game and if he did so the contract would be void and he
would recover no winnings under it, which term he had broken, and (ii) he had
committed the offence of cheating, contrary to section 42 of the Gambling Act
2005[1] by interfering with the game or deceiving the defendant's staff and so was not
entitled to found his claim on his own criminal conduct. The claimant admitted the
F       implied term but denied cheating or committing a criminal offence, asserting that it
was lawful for "advantage players", such as him, to use such a method of play
because they were in an adversarial position towards the casino, and that edge-
sorting ought to have been known to the defendant which could have protected
itself against it. The judge dismissed the claim on the ground that, although neither
dishonesty nor deception was involved, the claimant's play amounted to cheating
for the purposes of the implied term. The Court of Appeal, by a majority, upheld his
G       decision.
On the claimant's appeal—
*Held*, dismissing the appeal, that, although there was a difference in standard of
proof as between civil and criminal proceedings, cheating carried the same meaning
when considering an implied term not to cheat and when applying section 42 of the
Gambling Act 2005; that, the expression "cheating" in the context of games and
gambling carried its own inherent stamp of wrongfulness; that the issue whether
H       what had been done amounted to cheating, given the nature and rules of the game
concerned, was a jury question to be determined objectively; that consideration
of the concept of dishonesty would unnecessarily complicate the question; that,
consequently, there was no occasion to add to the value judgment whether conduct

[1] Gambling Act 2005, s 42: see post, para 34.

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 309

392
**Ivey v Genting Casinos (UK) Ltd (SC(E))**　　　　　　　　　　　　[2018] AC

A　was cheating a similar value judgment as to whether it was also dishonest; and that, in the present case, the claimant's actions in taking positive steps to fix the deck in a game which depended on random delivery of unknown cards was, inevitably, cheating, and the judge's conclusion to that effect was, accordingly, unassailable (post, paras 38, 43, 48–50, 76).

*Per curiam.* When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to B　the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has C　done is, by those standards, dishonest. If, therefore, there were in cheating at gambling an additional legal element of dishonesty, it would be satisfied in the present case by the application of that test (post, paras 74–75).

Dictum of Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust International Ltd* [2006] 1 WLR 1476, para 10, PC applied.

*R v Ghosh* [1982] QB 1053, CA disapproved.

Decision of the Court of Appeal [2016] EWCA Civ 1093; [2017] 1 WLR 679 affirmed.

D

The following cases are referred to in the judgment of Lord Hughes JSC:

*Abou-Rahmah v Abacha* [2006] EWCA Civ 1492; [2007] Bus LR 220; [2007] 1 All ER (Comm) 827; [2007] 1 Lloyd's Rep 115, CA
*Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37; [2006] 1 WLR 1476; [2006] 1 All ER 333; [2006] 1 All ER (Comm) 478; [2006] E　1 Lloyd's Rep 225, PC
*Boggeln v Williams* [1978] 1 WLR 873; [1978] 2 All ER 1061; 67 Cr App R 50, DC
*R v Cornelius* [2012] EWCA Crim 500; [2012] Lloyd's Rep FC 435, CA
*R v Feely* [1973] QB 530; [1973] 2 WLR 201; [1973] 1 All ER 341; 57 Cr App R 312, CA
*R v Ghosh* [1982] QB 1053; [1982] 3 WLR 110; [1982] 2 All ER 689; 75 Cr App R F　154, CA
*R v Gilks* [1972] 1 WLR 1341; [1972] 3 All ER 280; 56 Cr App R 734, CA
*R v Governor of Brixton Prison, Ex p Sjoland and Metzler* [1912] 3 KB 568, DC
*R v Greenstein* [1975] 1 WLR 1353; [1976] 1 All ER 1; 61 Cr App R 296, CA
*R v Hayes* [2015] EWCA Crim 1944; [2018] 1 Cr App R 10, CA
*R v Landy* [1981] 1 WLR 355; [1981] 1 All ER 1172; 72 Cr App R 237, CA
*R v McIvor* [1982] 1 WLR 409; [1982] 1 All ER 491; 74 Cr App R 74, CA
*R v Rostron* [2003] EWCA Crim 2206, CA
G
*R v Royle* [1971] 1 WLR 1764; [1971] 3 All ER 1359; 56 Cr App R 131, CA
*R v Scott* [1975] AC 819; [1974] 3 WLR 741; [1974] 3 All ER 1032; 60 Cr App R 124, HL(E)
*R v Waterfall* [1970] 1 QB 148; [1969] 3 WLR 947; [1969] 3 All ER 1048; 53 Cr App R 596, CA
*R v Williams* [1953] 1 QB 660; [1953] 2 WLR 937; [1953] 1 All ER 1068; 37 Cr App R 71, CCA
H
*R v Williams (Gladstone)* [1987] 3 All ER 411; 78 Cr App R 276, CA
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC
*Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314; [2011] Lloyd's Rep FC 102, CA

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2

Page 310

393
**[2018] AC**                                        Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                                        Argument

A   *Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802;
        [2002] 2 All ER 377, HL(E)
    *Welham v Director of Public Prosecutions* [1961] AC 103; [1960] 2 WLR 669;
        [1960] 1 All ER 805; 44 Cr App R 124, HL(E)

    The following additional cases were cited in argument:

    *Cooper v Slade* (1858) 6 HL Cas 746, HL(E)
B   *R v Harvey* (unreported) 8 May 1998, CA
    *R v Moore* (1914) 10 Cr App R 54, CCA
    *Sweet v Parsley* [1970] AC 132; [1969] 2 WLR 470; [1969] 1 All ER 347;
        53 Cr App R 221, HL(E)

    **APPEAL** from the Court of Appeal
        By a claim form the claimant, Phillip Ivey, sought recovery against the
C   defendant, Genting Casinos UK Ltd, trading as Crockfords Club, of moneys
    which he had won while playing Punto Banco at the defendant's casino. The
    defendant denied liability on the grounds that (1) no game of Punto Banco
    had been played since the premise on which the game proceeded, that the
    cards would be dealt at random, had been defeated because the claimant had
    known what the first card of any coup dealt was likely to be before it was
D   turned face up; (2) there was an implied term that the claimant would not
    cheat, and that term had been broken; and (3) the claimant had committed
    the criminal offence of cheating under section 42 of the Gambling Act 2005
    by interfering with the game or deceiving the defendant's staff and so was
    not entitled to found his claim on his own criminal conduct. The claimant
    admitted the implied term but denied cheating or committing a criminal
    offence and asserted that he had acted lawfully throughout. By his judgment
E   dated 8 October 2014 Mitting J [2014] EWHC 3394 (QB); [2015] LLR 98
    determined that the claimant had given himself an advantage by using the
    croupier as his innocent agent or tool in circumstances in which he had
    known that neither she nor her superiors had realised the consequences of
    what she had done at his instigation, thereby converting a game in which the
    knowledge of both sides as to the likelihood of the player or banker winning
F   was equal to one in which the claimant's knowledge was greater, which
    amounted to cheating for the purposes of civil law.
        By an appellant's notice the claimant appealed. On 3 November 2016 the
    Court of Appeal (Arden and Tomlinson LJJ; Sharp LJ dissenting) [2016]
    EWCA Civ 1093; [2017] 1 WLR 679 dismissed the appeal.
        On 16 February 2017 the Supreme Court (Baroness Hale of
    Richmond DPSC, Lord Wilson and Lord Hughes JJSC) granted the claimant
G   permission to appeal, pursuant to which he appealed.
        The facts are stated in the judgment of Lord Hughes JSC, post,
    paras 2–27.

        *Richard Spearman QC* and *Max Mallin QC* (instructed by *Archerfield
    Partners llp* ) for the claimant.
        The behaviour described in the judgments of Mitting J [2015] LLR 98 and
H   the Court of Appeal [2017] 1 WLR 679 does not amount to cheating for the
    purposes of the implied term of the gaming contract between the parties or
    section 42 of the Gambling Act 2005 since, whether viewed from the
    perspective of its ordinary meaning or for the purposes of the common law
    or of section 42, "cheating" connotes dishonesty. Prior to the present case

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 311

394
Ivey v Genting Casinos (UK) Ltd (SC(E))                                    [2018] AC
Argument

the word had not been considered in any reported decision outside the      A
criminal context. Offences of and relating to cheating have a long history in
criminal law and proof of guilt in relation to those offences has always
required proof of a dishonest state of mind. The leading case, and the only
case which is relevant today, is *R v Scott* [1975] AC 819 which shows that
the terms "fraud" and "cheating" were frequently used interchangeably at
common law and that dishonesty was plainly a requirement of both those
offences.   Consequently, cheating at common law inescapably involves      B
dishonesty.

The common law offence of cheating was abolished, except regarding
offences concerning the public revenue, by section 32(1)(a) of the Theft Act
1968.  However, section 25 of the 1968 Act included the offence of going
equipped to cheat which remained in force until January 2007.   The
reference to "cheat" was to an offence under section 15 of the 1968 Act, and  C
this required dishonesty. Those were therefore extant offences when the
2005 Act was enacted and, consequently, that meaning of cheating must
have been understood when the 2005 Act was enacted. Further, section 42
of the 2005 Act does not provide a definition of cheating but the
Explanatory Notes prepared by the Department for Culture,
Media and Sport state, in para 163, that cheating has its ordinary meaning:  D
see also Gambling Bill: Hansard (HC Debates) Standing Committee B,
30 November 2004.   Consequently, the concept of cheating within
section 42 of the 2005 Act connotes dishonesty as defined in *R v Ghosh*
[1982] QB 1053. The same test for dishonesty is applicable in civil cases
where liability depends upon an activity which connotes a dishonest state of
mind: see *Twinsectra Ltd v Yardley* [2002] 2 AC 164, paras 115–116, per  E
Lord Millett. It follows that cheating requires dishonesty in a subjective
sense. The judge found as a fact that the claimant had not been subjectively
dishonest: he had believed that what he was doing was not cheating.

If dishonesty were not an element of cheating the concept would, the
defendant suggests, have to connote unfairness. That is too vague a criterion
to be workable. Applying that test, there are many things which would be
accepted as fair in a casino, in the context of the commercial relationship  F
between customer and business, which would not be acceptable in a purely
social environment, and the claimant's conduct would not be unfair in the
context. So even if it is not necessary to show dishonesty the claimant was
still not cheating.

Consequently, the appeal should be allowed because the Court of Appeal
erred in holding that dishonesty is not a necessary element of "cheating"
either under the implied term or under section 42 of the 2005 Act and      G
because (as all three members of the Court of Appeal accepted) the judge
found neither that the claimant had been dishonest nor that he had
perpetrated a material deception, and it is not open to an appellate court to
disturb those findings.

*Christopher Pymont QC* and *Siward Atkins* (instructed by *Kingsley
Napley llp* ) for the defendant.                                            H
There are two limbs to the implied term of the contract: cheating or
otherwise acting to defeat the essential premise of the game. Should there be
anything difficult about applying the first limb, the second limb is crystal clear
and easy to apply. Punto Banco Baccarat is a pure game of chance. All the

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 312

395

[2018] AC                              Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                              Argument

A  odds are fixed and the player bets before a card is played. It is common ground
   that (i) the essential premise of Punto Banco is that the player does not know
   what the cards are before he places his bet and (ii) the claimant's edge-sorting
   was designed to and did give him a good idea of what the cards were before he
   placed his bet. The claimant thus plainly acted to defeat the essential premise
   of the game and dishonesty is irrelevant to any breach of contract.

B      Further, "cheating" in its normal meaning does not necessarily involve
   dishonesty and, even if it does, the test for dishonesty is objective not
   subjective: see *Twinsectra Ltd v Yardley* [2002] 2 AC 164 and *Starglade
   Properties Ltd v Nash* [2011] Lloyd's Rep FC 102. The key test for cheating
   is not whether the player acted dishonesty but whether he acted deliberately
   to gain an unfair advantage in the game. The test suggested by the claimant
   would lead to inconsistent results applying to the same kind of activity,
C  depending on the subjective state of mind of the player concerned.

       As to section 42 of the Gambling Act 2005, the Explanatory Notes make
   clear that cheating "has its normal everyday meaning". Accordingly, the
   actus reus of the offence is any sort of unfair activity which a jury believes to
   be cheating. A jury is perfectly able to decide whether the gambler cheated
   or not, once the nature and rules of the game are understood and the activity
   has been explained. The appropriate mens rea for section 42 is that the
D  defendant intended the actus reus: see *Sweet v Parsley* [1970] AC 132. That
   is consistent with the earlier statutory offences of cheating at cards which do
   not contain any requirement that the accused be guilty of dishonesty.
   Section 17 of the Gaming Act 1845 (8 & 9 Vict c 109) provided for "fraud or
   unlawful device or ill practice in playing at or with cards". It was held in *R v
   Moore* (1914) 10 Cr App R 54 that "ill practice" was a question for the jury,
E  who would determine simply whether the game had been played fairly: see
   also *Baker, The Oxford History of the Laws of England* (2003), vol VI
   (1483–1558), Part IX, Chapter 42 "Deceit", pp 769–773.

       There is also a large number of offences at English law criminalising
   conduct which most people would regard as dishonest but which do not have
   dishonesty as a requirement for the offence to be committed, such as
   (i) corruption (see *Cooper v Slade* (1858) 6 HL Cas 746; *R v Harvey*
F  (unreported) 8 May 1998); (ii) forgery under sections 36 and 37 of the
   Forgery Act 1861 1861 (24 & 25 Vict c 98); and (iii) forgery under section 1 of
   the Forgery and Counterfeiting Act 1981. Therefore, for a person to be guilty
   of those offences there is no requirement to prove dishonesty as defined in *R v
   Ghosh* [1982] QB 1053. Further the Hansard materials show that dishonesty
   was not to be a factor in the offence but fairness was: see Gambling Bill:
G  Hansard (HC Debates), Standing Committee B, 30 November 2004.

       The test of cheating applied by Mitting J [2015] LLR 98 and by the
   majority in the Court of Appeal [2017] 1 WLR 679 is correct and supported.
   In any event, if dishonesty is required, the claimant acted dishonestly. As
   Tomlinson LJ concluded, the claimant's actions were a clear case of
   intentional deception.

H      *Spearman QC* in reply.
       It would be impossible to make a positive finding of dishonesty on the
   facts of the present case. Cheating is acting with deliberate dishonesty: see
   *R v Scott* [1975] AC 819.

       The court took time for consideration.

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 313

25 October 2017.  **LORD HUGHES JSC** (with whom **BARONESS HALE**    A
**OF RICHMOND PSC, LORD KERR OF TONAGHMORE JSC, LORD**
**NEUBERGER OF ABBOTSBURY** and **LORD THOMAS OF CWMGIEDD**
agreed)

1    This case, in which a professional gambler sues a casino for winnings
at Punto Banco Baccarat, raises questions about (1) the meaning of the
concept of cheating at gambling, (2) the relevance to it of dishonesty, and    B
(3) the proper test for dishonesty if such is an essential element of cheating.

*The facts*

2    Over two days in August 2012 Mr Ivey, the claimant in this case,
deployed a highly specialist technique called edge-sorting which had the
effect of greatly improving his chances of winning.  He had the help of    C
another professional gambler, Cheung Yin Sun ("Ms Sun").  First they set up
the conditions which enabled him to win.  Then, later that evening and the
following day, over the course of some hours, he won approximately £7·7m.
The casino declined to pay, taking the view that what he had done amounted
to cheating.  His case is that it was not cheating, but deployment of a
perfectly legitimate advantage.

3    What happened is not in dispute.  It was set out with admirable clarity    D
by Mitting J [2015] LLR 98 and very little is necessary by way of addition or
subtraction.  What follows in this section is almost entirely in his words.

4    Punto Banco is a variant of Baccarat.  It is not normally, to any extent,
a game of skill.  Six or eight decks or, in English nomenclature, packs of 52
cards are dealt from a shoe, face down by a croupier.  Because the cards are
delivered one by one from the shoe, she has only to extract them; no deviation    E
is permitted in their sequence.  She places them face down in two positions on
the table in front of her, marked "player", the "Punto" in the name, and
"Banker", "Banco".  Those descriptions label the positions marked on the
table; there need be no person as "player" and ordinarily there is not.  She
slides the cards from the shoe, face down, one card to player, one to banker; a
second to player and a second to banker.  In prescribed circumstances she
must deal one further card, either to player or to banker or to both, but this    F
possibility is irrelevant to what occurred.

5    The basic object of the game is to achieve, on one of the two positions,
a combination of two or three cards which, when added together, is nearer
to nine in total than the combination on the other position.  Aces to nine
count at face value, ten to King inclusive count as nothing.  Any pair or trio
of cards adding up to more than ten requires ten to be deducted before    G
arriving at the counting total.  Thus four plus five equals nine, but six plus
five (which equals 11) counts as only one.

6    Punters (of whom there need only be one) play the house.  They bet
before any card is dealt and can bet on either the player or banker position.
The cards are revealed by the croupier after a full hand (or "coup"), usually
of four cards, two to each position, has been dealt.  Winning bets are paid at
evens on player, and at 19 to 20 on banker.  It is possible to bet on a tie.  In    H
the event of a tie, all bets on player or banker are annulled; in other words,
the punter keeps his stake and the only bet paid out on is the tie at odds set
by the casino of either eight to one or, at Crockfords, nine to one.  It is
possible to place other types of bet, but this case does not concern them and

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 314

397
[2018] AC                          Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                          Lord Hughes JSC

A  they need not be described. The different odds mean that the casino, or house, enjoys a small advantage, taken over all the play. That is standard and well known to all; casinos publish the percentage "house edge" which they operate. In Punto Banco at Crockfords it was 1·24% if player wins and 1·06% if banker wins.

B  7 A pack of 52 playing cards is manufactured so as to present a uniform appearance on the back and a unique appearance on the face. The backs of some cards are, however, not exactly uniform. The backs of many packs of cards for social use have an obvious top and bottom: for example the manufacturer's name may be printed once only, or the pattern may have an obviously right way up and an upside down. In casino games in which the orientation of the back of the card may matter, cards are used which are in principle indistinguishable whichever way round they are when presented in a shoe.

C  8 Cards with no pattern and no margin at the edge present no problem; they are indistinguishable. However, many cards used in casinos are patterned. If the pattern is precisely symmetrical the effect is the same as if the card is plain; the back of one card is indistinguishable from any other. But if the pattern is not precisely symmetrical it may be possible to distinguish between cards by examining the backs.

D  9 "Edge-sorting" becomes possible when the manufacturing process causes tiny differences to appear on the edges of the cards so that, for example, the edge of one long side is marginally different from the edge of the other. Some cards printed by Angel Co Ltd for the Genting Group (which owns Crockfords) have this characteristic, apparently within the narrow tolerances specified for manufacture. The pattern is not precisely symmetrical on the back of the cards. The machine which cuts the card leaves very slightly more of the pattern, a white circle broken by two curved lines, visible on one long edge than on the other. The difference is sub-millimetric, but the pattern is, to that very limited extent, closer to one long edge of the card than it is to the other. Before a card is dealt from a shoe, it sits face down at the bottom of the shoe, displaying one of its two long edges. It is possible for a sharp-eyed person sitting close to the shoe to see which long edge it is.

E

F  10 Being able thus to see which long edge is displayed is by itself of no help to the gambler. All the cards have the same tiny difference between their right and left long edges, so knowing which edge is displayed tells the gambler nothing about the value of the next card in the shoe. The information becomes significant only if things can be so arranged that the cards which the gambler is most interested in are all presented with long edge type A facing the table, whilst all the less interesting cards present long edge type B. Then the gambler knows which kind of card is next out of the shoe.

G

H  11 In Punto Banco cards with a face value of seven, eight and nine are high value cards. If one such card is dealt to player or to banker, it will give that position a better chance of winning than the other. Thus a punter who knows that when the first card dealt (always to the "player" position) is a seven, eight or nine, he will know that it is more likely than not that player will win. If he knows that the card is not a seven, eight or nine, he will know that it is more likely than not that banker will win. Such knowledge, it is

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 315

agreed, will give the punter a long term edge of about 6·5% over the house if    A
played perfectly accurately.

12    What is therefore necessary for edge-sorting to work is for the cards
in the shoe to be sorted so that all the sevens, eights and nines display edge
type A, whilst the rest display edge type B. That means rotating the high
value cards so that they display edge type A. If the punter were to touch the
cards, the invariable practice at most casinos, including at Crockfords,    B
would be that those cards would not be used again. The only person who
touches the cards is the croupier. So what had to happen was to get the cards
sorted (i e differentially rotated) by type A and type B by the croupier and
then to get them re-used in the next shoe, now distinctively sorted.

13    For edge-sorting to work at Crockfords it is therefore essential that
the croupier is persuaded to rotate the relevant cards without her realising
why she is being asked to do so. Casinos routinely play on quirky and    C
superstitious behaviour by punters. It is in the casino's interests that punters
should believe, erroneously, that a lucky charm or practice will improve
their chance of winning and so modify or defeat the house edge.
Consequently a wide variety of requests by punters, particularly those
willing to wager large sums on games which they must, if they play long
enough, lose in the long run, are accommodated by casinos without demur    D
or surprise.

14    All of the games of Punto Banco played by the claimant and Ms Sun
on 20 and 21 August 2012 were captured on CCTV, mostly with
contemporaneous audio recording as well. The moment at which they
persuaded the croupier, Kathy Yau, to rotate the cards was at 9 p m on
20 August. The video shows it and the words spoken have been transcribed.
Before then, the claimant and Ms Sun had played part of four shoes, the first    E
two plain backed, and the second two Angel cards but with no asymmetry
on the back.

15    The claimant is a high stakes gambler. He began, by his standards,
modestly: bets placed on those four shoes ranged from £4,000 to £75,000
per coup. He was losing. At 8.56 p m he requested a new shoe of cards.
A new shoe was produced. The cards were blue Angel cards with the
rounded pattern described on the back. At 8.57 the claimant asked Jeremy    F
Hillier, the senior croupier overseeing the game: "If I win, can I say I want
the same cards again?" to which Mr Hillier replied he could, "because [he
was] not bending them". The claimant had in fact avoided touching the
cards from either the first or second shoe onwards.

16    The croupier, Kathy Yau, then put the cards face down in blocks on
the table to make the cut, as is conventional. She cut the cards so as to    G
exclude about one deck from play. The claimant asked about the cut: "Why
so big?" Ms Sun said: "They don't cut the seven cards", a reference to the
traditional cut of seven cards from the end. Ms Yau asked if he wanted her
to cut seven cards, to which he replied "yes", he wanted to play 90 hands,
slightly more than the maximum likely to be possible with an eight-deck
shoe with a seven-card cut. She complied, after checking with the supervisor
on duty in the room. That had the effect of maximising the number of coups    H
which would be possible with those packs, and of exposing the maximum
number of cards to the sorting (rotation) process.

17    Ms Yau then dealt the first coup. After the bet was made, and all the
cards then dealt, the next stage was for the croupier to turn the cards face up

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 316

399
[2018] AC                                Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

A    to reveal whether Player or Banker had won.  Ms Sun then asked Ms Yau in
Cantonese to do it, in other words to turn the cards over so that the face
showed, slowly.  Ms Yau said "yes".  Ms Sun then asked her again in
Cantonese to turn the cards in a particular and differential way as they were
being exposed and before they were put on the pile of used cards.  "If I say it
is good, you turn it this way, good, yes?  Um, no good."  (A slightly different
sounding um.)  Ms Yau did not immediately understand what was required.
B    She asked, "so you want me to leave it?"  To which Ms Sun replied, "change,
yeah, yeah, change luck".  Ms Yau: "what do you mean?"  Ms Sun gestured
how to turn it.  "Turn it this way".  Ms Yau: "what, just open it?  Yeah".
Ms Sun: "um", signifying good in Cantonese.

18    The claimant then chipped in, "yeah, change the luck, that's good.
Anything to change the luck, it is okay with me."  Ms Sun reiterated her
C    request in Cantonese, "If I say it is not good, you turn it this way.  If it is
good, turn it this way, okay?"  To which Ms Yau said "okay".  When she
turned over the cards of the second coup, Ms Sun said of four of them,
"good", and of one, "not good", in Cantonese.  Ms Yau did as requested.
What she was being asked to do, and did, was to turn the cards which
Ms Sun called as "good" end to end, and the "not good" cards side to side.  In
consequence, the long edge of the "not good" card was oriented in a different
D    way from the long edge of the "good" cards.  The judge found that she had
been "wholly ignorant" of the significance of what she was doing, card by
card, at the call of Ms Sun.

19    This procedure was followed for each of the next 79 coups dealt
from this shoe.  The maximum amount staked by the claimant on the coups
towards the end of the shoe reached £100,000.  Self-evidently, at no time
E    during the play of this shoe did he derive any advantage from the rotation of
the cards requested by Ms Sun because that rotation occurred at the end, not
at the beginning, of each coup.  This was all preparation.

20    At 10.03 p m, when the shoe was exhausted, the claimant said that
he had won with that deck (i e shoe), and that he would keep it.  The senior
croupier, who had brought in a new collection of cards, was told by the
claimant he did not want them, as he "had won £40,000 with that deck";
F    that was agreed to.  The original cards were reused.  The defendant has not
been able to calculate retrospectively whether that assertion of winnings to
point was true.

21    Before the shoe was reused it had to be reshuffled.  The claimant had
earlier asked Ms Yau's predecessor as croupier for a shuffling machine to
shuffle the cards.  The cards were reshuffled by a machine.  For a punter using
G    the edge-sorting technique this ensured that the shuffle would be effected
without rotating any of the cards unless the croupier did so before they were
put into the machine.  Ms Yau did not do so.  Manual shuffling would have
carried a much higher risk of re-rotation as it was done.

22    Play with the reshuffled shoe recommenced at 10.12 p m and
continued until Ms Yau went for a half hour break at 10.31 p m.  The
claimant did not play during her break but resumed when she returned until
H    3.57 a m on 21 August.  Ms Yau was the croupier throughout.  The
claimant's stake increased to £95,000 and then to £149,000 per coup.  He
won approximately £2m.

23    The accuracy of his bets on player increased sharply.  In the first two
shoes in which Angel cards were used, those without an asymmetric pattern

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 317

400
**Ivey v Genting Casinos (UK) Ltd (SC(E))**                    **[2018] AC**
Lord Hughes JSC

on the back, he placed respectively 11 bets and then 1 bet on player and a    A
seven, eight or nine only occurred once in that 12 times.  On the shoe in
which the edge-sorting was done in the manner described, he placed 23 bets
on player of which eight were sevens, eights or nines.  On the succeeding
shoes, those at least that were completed on that night, shoes four to eight,
the record was as follows.  Shoe four, 23 accurate bets out of 27; shoe five,
22 accurate bets out of 25; shoe six, 20 accurate bets out of 26; shoe seven,    B
23 accurate bets out of 30; shoe eight, 17 accurate bets out of 19.  A similar
but slightly less pronounced pattern occurred on the following day.

24    At the end of play on the early morning of the 21st the claimant
asked if he could keep the same shoe, which he referred to as a deck, if he
returned on the following day.  He was told he could.  Ms Yau returned to
duty at 2 pm on 21 August.  The claimant resumed play with the same cards
at 3 pm and played until 6.41 pm.  His average stake was never less than    C
£149,000.  For the last three shoes it was £150,000, the maximum that he
was allowed to bet each time.  In the middle of play of the last shoe, the
senior croupier told the claimant that the shoe would be replaced when it
was exhausted.  When it was, the claimant and Ms Sun left.  By then he had
won just over £7·7m.

25    Crockfords' practice after a large win such as this is to conduct an    D
ex post facto investigation to work out how it occurred.  After quite lengthy
review of the CCTV footage and examination of the cards, the investigators
succeeded in spotting what had been done.  Nobody at Crockfords had
heard of edge-sorting before.

26    Nine days after the play, on 30 August, the claimant spoke to
Mr Pearce, Managing Director of the London casinos of Genting UK, who
told him that Crockfords would not be paying his winnings because the    E
game had been compromised.  The claimant said he had not touched the
cards, but did not state that which at the trial he freely admitted, that he had
used edge-sorting.  Arrangements were made to refund his deposited stake,
£1m, on 31 August.

27    The judge found that Mr Ivey gave factually frank and truthful
evidence of what he had done.  The finding was that he was a professional    F
gambler who described himself as an "advantage player", that is one who, by
a variety of techniques, sets out to reverse the house edge and to play at odds
which favour him.  The judge found that he does so by means that are, in his
opinion, lawful.  He is jealous of his reputation and is adamant that what he
does is not cheating.  He described what he did, with Ms Sun, as legitimate
gamesmanship.  The judge accepted that he was genuinely convinced that
what he did was not cheating.  But the question which matters is not whether    G
Mr Ivey thought of it as cheating but whether in fact and in law it was.  The
judge concluded that it was, and so did the majority of the Court of Appeal.
Were they right or wrong?

*Gaming and the law*

28    Gaming has been the subject of statutory rules since at least the time    H
of the Restoration.  They have addressed, inter alia, both (1) unfair play
and (2) the recoverability of winnings by civil action.  Very recently, the
Gambling Act 2005 has comprehensively revised the statutory framework
for gaming.  In outline, it makes it lawful but subject to detailed licensing.

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 318

**[2018] AC**  
*Ivey v Genting Casinos (UK) Ltd (SC(E))*  
Lord Hughes JSC

A    29    The Gaming Act of 1664 (16 Car 2, c 7) addressed what it identified as the social ill of excessive gambling, when conducted not for "innocent and moderate recreation" but as a means of trade or making a living. Even in times of relative debauchery, the Act castigated the effect of such gaming on the youth of the day, whether of "the nobility and gentry" or otherwise. By section 3 it made irrecoverable at law any winnings over the then enormous sum of £100. And by section 2 it imposed a forfeit of three times the winnings on anyone who won by (in effect) wrongful means. The forfeit was recoverable by civil action at the suit either of the loser or, if he did not sue, by anyone else. Half the forfeit went to the loser, and half to the Crown. The misbehaviours which gave rise to such forfeit were defined as "any fraud, shift, cousenage, circumvention, deceit or unlawful device, or ill practice whatsoever", and the activities covered included not only cards and dice, but also tennis and foot races, as well as horse-racing, skittles, bowls and many other games. The forfeit was incurred not only by winnings by wagering, but also by prize winning, if the ill practice was demonstrated.

30    By the time of Queen Anne, the attitude to gambling had hardened. The Gaming Act 1710 (9 Ann c 19) repeated in section 5 the list of misbehaviour attracting a forfeit (now five times the winnings), and such was now recognised as a criminal offence attracting corporal punishment. The same Act, by section 2, enabled anyone who lost more than £10 at games, however fair, to recover it by civil action, together with a forfeit of three times the loss, half for the loser and half for the poor of the parish. By section 1 it made void any security given for payment of gaming debts.

31    The Gaming Act 1845 (8 & 9 Vict c 109) abolished the forfeits, but (by section 18) made general the rule that gaming or wagering contracts were unenforceable in law. Section 17 dealt with malpractice. It referred to "fraud or unlawful device or ill practice" and made winning by such means a criminal offence, by way of deeming it to be the recognised offence of obtaining by false pretences with intent to cheat or defraud: see section 53 of the Larceny Act 1827 (7 & 8 Geo 4, c 29). Section 17 was headed "cheating at play to be punished as obtaining money by false pretences".

32    This history is of limited importance, given the enactment of an entirely new regime by the Gambling Act 2005, but it does demonstrate that the law concerned itself from very early times with malpractice at gaming, and that by 1845 a general expression used for it was "cheating". It is also of note that the malpractice thus dealt with was not confined to deception or fraud, but extended to "ill practice". Given the origins of that expression in the 1664 Act, relating to foot races, tennis and the like, as well as to gambling, it is not possible to treat "ill practice" as having been limited by the principle of ejusdem generis to deception or fraud.

33    The Gambling Act 2005 reversed, by sections 334 and 335, the rule that gaming contracts are unenforceable. The new Gambling Commission is, however, given by section 336 a new power to declare void a bet taken by a licensee if satisfied that the bet was "substantially unfair". Amongst the factors (not exhaustively defined) which are to be considered when deciding whether a bet was substantially unfair is included the circumstance that either party to the bet either did believe or ought to have believed that an offence of cheating had been or was likely to have been committed in connection with it, although that is by no means the only consideration. Supply of insufficient information and the belief of either party that the

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 319

underlying contest is conducted in contravention of industry rules are two of **A**
the other specified relevant circumstances. The offence contrary to section 17
of the 1845 Act is replaced by a new offence of cheating at gambling created
by section 42.

34    Section 42 is in the following terms:

"*Cheating*

"(1) A person commits an offence if he— (a) cheats at gambling, or **B**
(b) does anything for the purpose of enabling or assisting another person
to cheat at gambling.

"(2) For the purposes of subsection (1) it is immaterial whether a
person who cheats— (a) improves his chances of winning anything, or
(b) wins anything.

"(3) Without prejudice to the generality of subsection (1) cheating at **C**
gambling may, in particular, consist of actual or attempted deception or
interference in connection with— (a) the process by which gambling is
conducted, or (b) a real or virtual game, race or other event or process to
which gambling relates."

By subsection (4) this offence carries a penalty of up to two years
imprisonment on indictment, or 51 weeks on summary conviction.

**D**

*Cheating*

35    It has been common ground throughout this litigation that the (now
in principle enforceable) contract for betting into which these parties entered
is subject to an implied term that neither of them will cheat.

36    It follows that, if what Mr Ivey did was cheating, he is in breach of this
implied term and cannot as a result recover his "winnings". As well as **E**
advancing this defence, the casino pleaded that what he did amounted to the
offence under section 42, and that in consequence he could not recover the
proceeds of his criminal offence. Mitting J held that the implied term had been
broken, and that it was therefore unnecessary to decide whether or not the
statutory offence had been committed. The majority of the Court of Appeal
dismissed Mr Ivey's appeal. The reasoning of Arden and Tomlinson LJJ was
not identical, but both upheld the judge's conclusion that what had been done **F**
amounted to cheating. Sharp LJ would have allowed the appeal, taking the
view that there could not be cheating unless the statutory offence had been
committed and that a necessary ingredient of it was dishonesty as defined in
*R v Ghosh* [1982] QB 1053.

37    The core submission of Mr Spearman QC for Mr Ivey runs as
follows: (a) the test of what is cheating must be the same for the implied term **G**
as for section 42; (b) cheating necessarily involves dishonesty; (c) the judge
found that Mr Ivey was truthful when he said that he did not consider what
he did to be cheating; therefore dishonesty and in particular the second leg of
the test established by *R v Ghosh* had not been demonstrated; (d) it follows
that what was done was not cheating, and Mr Ivey ought to have recovered
the £7·7m.

38    The concept of cheating long pre-dates section 42 of the Gambling **H**
Act 2005. It clearly embraces the kind of malpractice described in the
statutes of 1664, 1710 and 1845. Section 42 thus adopted a longstanding
concept. However, there is no reason to doubt that cheating carries the same
meaning when considering an implied term not to cheat and when applying

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 320

403

A   section 42 of the Act.  There will be a difference in standard of proof as
between civil and criminal proceedings, but that does not affect the meaning
of cheating.  Section 42 expressly does not exhaustively define cheating, and
the elaboration in section 42(3) is explanatory rather than definitive.  The
section leaves open what is and what is not cheating, as is inevitable given
the extraordinary range of activities to which the concept may apply.
Plainly, what is cheating in one form of game may be legitimate competition
B   in another.

39   For his second and crucial proposition Mr Spearman relied, as a
matter of authority, substantially on *R v Scott* [1975] AC 819.  Viscount
Dilhorne, with whom the other law lords agreed, referred in the course of his
speech to the ancient common law offence of cheating.  He cited, at p 840,
*East's Pleas of the Crown* (1803) vol II, pp 816–818 for that author's
C   opinion that that offence consisted in

"the fraudulent obtaining [of] the property of another by any deceitful
and illegal practice or token (short of felony) which affects or may affect
the public.  It is not, however, every species of fraud or dishonesty in
transactions between individuals which is the subject matter of a criminal
charge at common law . . . it must be such as affects the public . . .
D   calculated to defraud numbers, to deceive the people in general."

Says Mr Spearman, this demonstrates that fraud, and thus dishonesty, was
an essential element of the common law offence of cheating.  The same, he
contends, must follow for cheating at gambling.

40   Mr Scott and his co-defendants were in the business of film piracy.
They bribed employees of commercial cinemas, such as projectionists, to
E   abstract the reels of film overnight so that infringing copies could be made
and in due course distributed commercially for profit.  The charge was not
cheating at common law but conspiracy to defraud.  The substantial issue
before the House of Lords was whether conspiracy to defraud required as an
essential element that there had been deception, which had not been any part
of the strategy employed by the defendants.  The answer was that deception
was one very common form of defrauding, but not the only one.  Whilst no
F   exhaustive definition of defrauding was attempted, the House held that
defrauding also included depriving another, by dishonest means, of
something which is his or to which he would or might be entitled but for the
fraud.  In so holding, the House followed its own decision in *Welham v
Director of Public Prosecutions* [1961] AC 103, where it had emphasised
that the essence of defrauding was the effect on the victim.

G   41   To the extent that defrauding someone may take the form of
depriving him of something which is his, or to which he might otherwise be
entitled, it is plain, and wholly unsurprising, that a criminal offence of
defrauding must contain in addition an element which demonstrates that
the means adopted are illegitimate and wrong.  Otherwise much perfectly
proper business competition would be at risk of being labelled fraud, since
such competition frequently involves strategies to divert business from A to
H   B.  Hence it is entirely unsurprising that conspiracy to defraud was held to
require in addition the proof of dishonest means.  Dishonesty, in this
context, supplies the essential element of illegitimacy and wrongfulness.

42   As the citation from *East* shows, the ancient common law offence of
cheating consisted of a particular subset of fraudulently depriving another of

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 321

property, where the fraud affected the public as a whole.  This offence was    A
abolished by section 32(1) of the Theft Act 1968, except in so far as it
consisted of cheating the revenue.  There is no discussion of this abolition in
the *Eighth Report of the Criminal Law Revision Committee on Theft and
Related Offences* (1966) (Cmnd 2977), which preceded the Act and
recommended most of the terms of the statute including section 32(1), but it
is clear that the Committee took the view that whatever was previously    B
covered by other forms of common law cheating would be caught by its
newly recommended offences, particularly that of obtaining property by
deception under what became section 15 of the Act.  The Theft Act 1968
used the expression "cheat" only in one place, in relation to the offence of
going equipped created by section 25.  There, in section 25(1)(5), it was used
in a restrictive sense limited to the offences contrary to section 15.  (The    C
references to cheat have since been removed from that section.)

43    The common law offence of cheating was referred to in *R v Scott*
[1975] AC 819 only because a supplementary argument for the defendants
was that section 32(1) had impliedly abolished also the offence of conspiracy
to defraud, which argument unsurprisingly failed.  There is no occasion to
investigate the accuracy of East's opinion on the scope of the common law
offence of cheating.  It may well be that it necessarily involved dishonesty,    D
although that expression was not in general use in criminal statutes until the
Theft Act 1968 adopted it in preference to "fraudulently".  But to say that
dishonesty was a necessary element in an offence of which the gist was
obtaining the property of others who may well be strangers, and where the
offence would otherwise be likely to be impossibly wide, is of no help in
construing the meaning of cheating in the quite separate context of
gambling.  Still less is there any reason to suppose that the framers of the    E
Gambling Act adopted in 2005 an analogy with a common law offence
which had largely been abolished nearly 40 years earlier, and when "cheat"
had been used in a different sense in the Theft Act 1968.  Whilst it makes
perfect sense to interpret the concept of cheating in section 42 of the
Gambling Act in the light of the meaning given to cheating over many years,
it makes none to interpret cheating, as used over those many years, by
reference to an expression—dishonesty—introduced into the criminal law    F
for different purposes long afterwards in 1968.  In gambling, there is an
existing close relationship between the parties, governed by rules and
conventions applicable to whichever game is undertaken, and which are
crucial to what is cheating and what is not.  Cheating at gambling need not
result in obtaining the property of the other party, as section 42(2) explicitly
says.  Most importantly, whilst the additional element of dishonesty was    G
necessary to the common law offence of cheating, and no doubt still is to the
surviving offences of cheating the Revenue and conspiracy to defraud, in
order to mark out the illegitimate and wrongful from the legitimate, the
expression "cheating" in the context of games and gambling carries its own
inherent stamp of wrongfulness.

44    Authority apart, Mr Spearman contended that as a matter of    H
ordinary English, cheating necessarily imports dishonesty.  This argument is
most neatly encapsulated by inversion: "honest cheating" is indeed, as has
been sensibly recognised by those who have addressed the phrase in this
litigation, an improbable concept.  But that is because to speak of honest
cheating would be to suggest that some cheating is right, rather than wrong.

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 322

405

**[2018] AC**                    Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

A    That would indeed be contrary to the natural meaning of the word cheating. It does not, however, follow, either (1) that all cheating would ordinarily attract the description "dishonest" or (2) that anything is added to the legal concept of cheating by an additional legal element of dishonesty.

45    Although the great majority of cheating will involve something which the ordinary person (or juror) would describe as dishonest, this is not invariably so. When, as it often will, the cheating involves deception of the

B    other party, it will usually be easy to describe what was done as dishonest. It is, however, perfectly clear that in ordinary language cheating need not involve deception, and section 42(3) recognises this. Section 42(3) does not exhaustively define cheating, but it puts beyond doubt that both deception and interference with the game may amount to it. The runner who trips up one of his opponents is unquestionably cheating, but it is doubtful that such

C    misbehaviour would ordinarily attract the epithet "dishonest". The stable lad who starves the favourite of water for a day and then gives him two buckets of water to drink just before the race, so that he is much slower than normal, is also cheating, but there is no deception unless one manufactures an altogether artificial representation to the world at large that the horse has been prepared to run at his fastest, and by themselves it is by no means clear that these actions would be termed dishonest. Similar questions could no

D    doubt be asked about the taking of performance-enhancing drugs, about the overt application of a magnet to a fruit machine, deliberate time-wasting in many forms of game, or about upsetting the card table to force a re-deal when loss seems unavoidable, never mind sneaking a look at one's opponent's cards.

46    Conversely, there may be situations in which there is deception of the

E    other player but what is done does not amount to cheating. The so-called "three card trick", much practised upon travellers on Victorian and Edwardian trains especially to and from racecourses, commonly involved a deception of the target traveller by a group of associates pretending to be unconnected to one another. The idea was to lure the target into playing the game. But once he was ensnared, the game was often played genuinely; the target lost not because of any cheating but because the shuffler of the cards

F    had sufficient speed of hand to deceive the eye: see for example *R v Governor of Brixton Prison, Ex p Sjoland and Metzler* [1912] 3 KB 568. No doubt other exponents of the three card trick had less genuine methods, such as a fourth (concealed) card, which would indeed be cheating. Sometimes the game admits of a level of legitimate deception. The unorthodox lead or discard at bridge is designed to give the opponent a misleading impression of

G    one's hand, but it is part of the game and not cheating. Pretending to be stupid at the poker table, so that one's opponent does not take one seriously, and takes risks which he otherwise might not, may or may not be another example.

47    These far from sophisticated examples demonstrate the inevitable truth that there will be room for debate at the fringes as to what does and does not constitute cheating. To label an activity "advantage play", as

H    Mr Ivey and others did, is of no help at all. It asks, rather than answers, the question whether it is legitimate or cheating. It would be very unwise to attempt to define cheating. No doubt its essentials normally involve a deliberate (and not an accidental) act designed to gain an advantage in the play which is objectively improper, given the nature, parameters and rules

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 323

(formal or informal) of the game under examination.  The question in the    A
present case, however, does not depend on the near impossible task of
formulating a definition of cheating, but on whether cheating necessarily
requires dishonesty as one of its legal elements.

48   Where it applies as an element of a criminal charge, dishonesty is by
no means a defined concept.  On the contrary, like the elephant, it is
characterised more by recognition when encountered than by definition.
Dishonesty is not a matter of law, but a jury question of fact and standards.    B
Except to the limited extent that section 2 of the Theft Act 1968 requires
otherwise, judges do not, and must not, attempt to define it: *R v Feely* [1973]
QB 530.  In this it differs strikingly from the expression "fraudulently",
which it largely replaced, for the judge did define whether a state of mind,
once ascertained as a matter of fact, was or was not fraudulent: *R v Williams*
[1953] 1 QB 660.  Accordingly, dishonesty cannot be regarded as a concept    C
which would bring to the assessment of behaviour a clarity or certainty
which would be lacking if the jury were left to say whether the behaviour
under examination amounted to cheating or did not.  The issue whether
what was done amounts to cheating, given the nature and rules of the game
concerned, is likewise itself a jury question.  The judge in the present case
applied himself to the question whether there was cheating in exactly this
jury manner.  He directed himself that it is ultimately for the court to decide    D
whether conduct amounted to cheating and that the standard is objective.  In
so directing himself he was right.

49   There is no occasion to add to the value judgment whether conduct
was cheating a similar, but perhaps not identical, value judgment whether it
was dishonest.  Some might say that all cheating is by definition dishonest.
In that event, the addition of a legal element of dishonesty would add    E
nothing.  Others might say that some forms of cheating, such as deliberate
interference with the game without deception, are wrong and cheating, but
not dishonest.  In that event, the addition of the legal element of dishonesty
would subtract from the essentials of cheating, and legitimise the
illegitimate.  Either way, the addition would unnecessarily complicate the
question whether what is proved amounts to cheating.

50   The judge's conclusion, that Mr Ivey's actions amounted to    F
cheating, is unassailable.  It is an essential element of Punto Banco that the
game is one of pure chance, with cards delivered entirely at random and
unknowable by the punters or the house.  What Mr Ivey did was to stage a
carefully planned and executed sting.  The key factor was the arranging of
the several packs of cards in the shoe, differentially sorted so that this
particular punter did know whether the next card was a high value or low    G
value one.  If he had surreptitiously gained access to the shoe and
re-arranged the cards physically himself, no one would begin to doubt that
he was cheating.  He accomplished exactly the same result through the
unwitting but directed actions of the croupier, tricking her into thinking that
what she did was irrelevant.  As soon as the decision to change the cards was
announced, thus restoring the game to the matter of chance which it is
supposed to be, he first covered his tracks by asking for cards to be rotated at    H
random, and then abandoned play.  It may be that it would not be cheating if
a player spotted that some cards had a detectably different back from others,
and took advantage of that observation, but Mr Ivey did much more than
observe; he took positive steps to fix the deck.  That, in a game which

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 324

407

A    depends on random delivery of unknown cards, is inevitably cheating. That it was clever and skilful, and must have involved remarkably sharp eyes, cannot alter that truth.

**51**    Although the judge did not think it necessary to make a finding on the topic, and it is unnecessary to the resolution of this appeal, it would also seem that the facts which he found amounted in any event to a deception of the croupier. Certainly, the judge found [2015] LLR 98, para 40, that

B    pretending to be superstitious did not *by itself* cross the line from legitimate play to cheating, comparing it to the skilled poker player who pretends to be a fool. He also found, contrary to one of Crockfords' submissions, that what occurred did not amount to such deception as altogether to negate the existence of any contract for the game. But that was not a finding that there was no deception at all, and on the facts found there clearly was deception of

C    the croupier into doing something which appeared innocuous or irrelevant, but was in fact highly significant and enabled Mr Ivey to win when he should not have done. If, therefore, there were indeed (and contrary to the conclusion reached above) a necessary legal element of dishonesty in cheating, such a deception would be prima facie dishonest, unless it is prevented from being so by necessity to satisfy the second leg of the test in *R v Ghosh* [1982] QB 1053.

D

*Dishonesty*

**52**    Dishonesty has been adopted since the Theft Act 1968 in the definition of some, but not all, acquisitive criminal offences. Forgery, for example, is defined without reference to dishonesty, but rather by the yardstick of the intention of the forger that his false document should be

E    accepted and acted upon to the prejudice of someone else (Forgery and Counterfeiting Act 1981, section 1), whilst the Fraud Act 2006 retains dishonesty as an element of several forms of fraud: see sections 2, 3, 4 and 11.

**53**    As recorded at para 48 above, dishonesty is itself primarily a jury concept, characterised by recognition rather than by definition. Most of the Theft Act 1968 offences required dishonesty without any elaboration of its

F    meaning: section 15 (dishonestly obtaining property by deception) was a prime example and the Fraud Act 2006, which replaces this and other Theft Act offences, adopts the same form. There are in section 2 of the Theft Act 1968 limited rules relating to when appropriation is *not* to be regarded as dishonest (claim of right, belief in consent of owner, belief that owner cannot be found) and a specific provision that it may be dishonest despite a

G    willingness to pay for the goods, but these were designed to reflect existing rules of law, they apply only to appropriation, and they do not alter the underlying principle that dishonesty is not defined. This reflects the view of the Criminal Law Revision Committee that dishonesty was a matter to be left to a jury; it said in its Eighth Report, at para 39, that " 'Dishonesty' is something which laymen can easily recognise when they see it". That is not

H    to suggest that there is not room for debate at the fringes whether particular conduct is dishonest or not, but the perils of advance definition would no doubt have been greater than those associated with leaving the matter to the jury. Over the succeeding half century, whilst there have undoubtedly (and inevitably) been examples of uncertainty or debate in identifying whether some conduct is dishonest or not, juries appear generally to have coped well

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 325

408
Ivey v Genting Casinos (UK) Ltd (SC(E))                                        [2018] AC
Lord Hughes JSC

with applying an uncomplicated lay objective standard of honesty to          A
activities as disparate as sophisticated banking practices (for example *R v
Hayes* [2018] 1 Cr App R 10) and the removal of golf balls at night from the
bottom of a lake on a private golf course: *R v Rostron* [2003] EWCA Crim
2206.

54   A significant refinement to the test for dishonesty was introduced by
*R v Ghosh* [1982] QB 1053. Since then, in criminal cases, the judge has been          B
required to direct the jury, if the point arises, to apply a two-stage test.
Firstly, it must ask whether in its judgment the conduct complained of was
dishonest by the lay objective standards of ordinary reasonable and honest
people.  If the answer is no, that disposes of the case in favour of the
defendant.  But if the answer is yes, it must ask, secondly, whether the
defendant must have realised that ordinary honest people would so regard
his behaviour, and he is to be convicted only if the answer to that second          C
question is yes.

55   The occasion for this ruling owed nothing to the facts of *R v Ghosh*.
The defendant locum surgeon had claimed payment for operations which
either he had not performed, or which had been carried out under the
National Health scheme so that no fees were due.  The court summarily
dismissed his appeal on the basis that no jury could have concluded, by any
test, otherwise than that he was dishonest.          D

56   The occasion for the analysis of dishonesty in *R v Ghosh* was a
tangle of what were perceived to be inconsistent decisions, some of which
were said to apply a "subjective" test, and others of which were said to apply
an "objective" one.  Those terms are not always as plain to jurors as they
have become to lawyers, but it is convenient to adopt them here when
examining the reasoning in *R v Ghosh*.  That case arrived, as has been seen,          E
at a compromise rule which is partly objective and partly subjective.

57   Thirty years on, however, it can be seen that there are a number of
serious problems about the second leg of the rule adopted in *R v Ghosh*.

(1) It has the unintended effect that the more warped the defendant's
standards of honesty are, the less likely it is that he will be convicted of
dishonest behaviour.          F

(2) It was based on the premise that it was necessary in order to give
proper effect to the principle that dishonesty, and especially criminal
responsibility for it, must depend on the actual state of mind of the
defendant, whereas the rule is not necessary to preserve this principle.

(3) It sets a test which jurors and others often find puzzling and difficult to
apply.

(4) It has led to an unprincipled divergence between the test for          G
dishonesty in criminal proceedings and the test of the same concept when it
arises in the context of a civil action.

(5) It represented a significant departure from the pre-Theft Act 1968 law,
when there is no indication that such a change had been intended.

(6) Moreover, it was not compelled by authority.  Although the
pre-*Ghosh* cases were in a state of some entanglement, the better view is that
the preponderance of authority favoured the simpler rule that, once the          H
defendant's state of knowledge and belief has been established, whether that
state of mind was dishonest or not is to be determined by the application of
the standards of the ordinary honest person, represented in a criminal case
by the collective judgment of jurors or justices.

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 326

409

[2018] AC                                      *Ivey v Genting Casinos (UK) Ltd (SC(E))*
                                                                  Lord Hughes JSC

A    58    The principal objection to the second leg of the *Ghosh* test is that the
less the defendant's standards conform to what society in general expects,
the less likely he is to be held criminally responsible for his behaviour.  It is
true that *R v Ghosh* attempted to reconcile what it regarded as the
dichotomy between a "subjective" and an "objective" approach by a mixed
test.  The court addressed the present objection in this way, [1982] QB 1053,
B    1064:

     "There remains the objection that to adopt a subjective test is to
     abandon all standards but that of the accused himself, and to bring about
     a state of affairs in which 'Robin Hood would be no robber': *R v
     Greenstein* [1975] 1 WLR 1353.  This objection misunderstands the
     nature of the subjective test.  It is no defence for a man to say 'I knew that
     what I was doing is generally regarded as dishonest; but I do not regard it
C    as dishonest myself.  Therefore I am not guilty'.  What he is however
     entitled to say is 'I did not know that anybody would regard what I was
     doing as dishonest'.  He may not be believed; just as he may not be
     believed if he sets up 'a claim of right' under section 2(1) of the Theft Act
     1968, or asserts that he believed in the truth of a misrepresentation under
     section 15 of the 1968 Act.  But if he *is* believed, or raises a real doubt
D    about the matter, the jury cannot be sure that he was dishonest."

And a little later the court added that upon the test which it was setting:

     "In most cases, where the actions are obviously dishonest by ordinary
     standards, there will be no doubt about it.  It will be obvious that the
     defendant himself knew that he was acting dishonestly.  It is dishonest for
     a defendant to act in a way which he knows ordinary people consider to
E    be dishonest, even if he asserts or genuinely believes that he is morally
     justified in acting as he did.  For example, Robin Hood or those ardent
     anti-vivisectionists who remove animals from vivisection laboratories are
     acting dishonestly, even though they may consider themselves to be
     morally justified in doing what they do, because they know that ordinary
     people would consider these actions to be dishonest."

F    59    Even if this were correct, it would still mean that the defendant who
thinks that stealing from a bookmaker is not dishonest (as in *R v Gilks*
[1972] 1 WLR 1341—see para 73 below) is entitled to be acquitted.  It is no
answer to say that he will be convicted if he realised that ordinary honest
people would think that stealing from a bookmaker is dishonest, for by
definition he does not realise this.  Moreover, the court's proposition was
G    not correct, because it is not in the least unusual for the accused not to share
the standards which ordinary honest people set for society as a whole.  The
acquisitive offender may, it is true, be the cheerful character who frankly
acknowledges that he is a crook, but very often he is not, but, rather, justifies
his behaviour to himself.  Just as convincing himself is frequently the stock in
trade of the confidence trickster, so the capacity of all of us to persuade
ourselves that what we do is excusable knows few bounds.  It cannot by any
H    means be assumed that the appropriators of animals from laboratories, to
whom the court referred in *R v Ghosh* [1982] QB 1053, 1064 know that
ordinary people would consider their actions to be dishonest; it is just as
likely that they are so convinced, however perversely, of the justification for
what they do that they persuade themselves that no one could call it

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 327

410
Ivey v Genting Casinos (UK) Ltd (SC(E))                    [2018] AC
Lord Hughes JSC

dishonest.  There is no reason why the law should excuse those who make a A
mistake about what contemporary standards of honesty are, whether in the
context of insurance claims, high finance, market manipulation or tax
evasion.  The law does not, in principle, excuse those whose standards are
criminal by the benchmarks set by society, nor ought it to do so.  On the
contrary, it is an important, even crucial, function of the criminal law to
determine what is criminal and what is not; its purpose is to set the standards B
of behaviour which are acceptable.  As it was put in *Smith's Law of Theft*,
9th ed (2007), para 2.296:

> "the second limb allows the accused to escape liability where he has
> made a mistake of fact as to the contemporary standards of honesty.  But
> why should that be an excuse?"

60   It is plain that in *R v Ghosh* [1982] QB 1053 the court concluded C
that its compromise second leg test was necessary in order to preserve the
principle that criminal responsibility for dishonesty must depend on the
actual state of mind of the defendant.  It asked the question whether
"dishonestly", where that word appears in the Theft Act, was intended to
characterise a course of conduct or to describe a state of mind.  The court
gave the following example, at p 1063, which was clearly central to its
reasoning: D

> "Take for example a man who comes from a country where public
> transport is free.  On his first day here he travels on a bus.  He gets off
> without paying.  He never had any intention of paying.  His mind is
> clearly honest; but his conduct, judged objectively by what he has done, is
> dishonest.  It seems to us that in using the word 'dishonestly' in the Theft
> Act 1968, Parliament cannot have intended to catch dishonest conduct in E
> that sense, that is to say conduct to which no moral obloquy could
> possibly attach."

But the man in this example would inevitably escape conviction by the
application of the (objective) first leg of the *Ghosh* test.  That is because, in
order to determine the honesty or otherwise of a person's conduct, one must
ask what he knew or believed about the facts affecting the area of activity in F
which he was engaging.  In order to decide whether this visitor was dishonest
by the standards of ordinary people, it would be necessary to establish his
own actual state of knowledge of how public transport works.  Because he
genuinely believes that public transport is free, there is nothing objectively
dishonest about his not paying on the bus.  The same would be true of a child
who did not know the rules, or of a person who had innocently misread the G
bus pass sent to him and did not realise that it did not operate until
after 10.00 in the morning.  The answer to the court's question is that
"dishonestly", where it appears, is indeed intended to characterise what the
defendant did, but in characterising it one must first ascertain his actual state
of mind as to the facts in which he did it.  It was not correct to postulate that
the conventional objective test of dishonesty involves judging only the
actions and not the state of knowledge or belief as to the facts in which they H
were performed.  What is objectively judged is the standard of behaviour,
given any known actual state of mind of the actor as to the facts.

61   Although there have been relatively few appeals based upon *R v
Ghosh*, that is because judges have dutifully given the two-leg direction

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 328

411
[2018] AC                     Ivey v Genting Casinos (UK) Ltd (SC(E))
                                                  Lord Hughes JSC

A   where there has been any occasion for it.  But the existence of the second leg
    has frequently led to trials being conducted on the basis that even if the
    defendant's actions, in his actual state of knowledge or belief about
    the relevant facts, would be characterised by most people as dishonest, the
    defendant himself thought that what he was doing was not wrong, and it
    was for that reason honest.  Juries are then required first to ask the so-called
    objective question, that is to say to apply their own standards of honesty, but
B   then to depart from them in order to ask what the defendant himself
    thought.  The idea that something which is dishonest by ordinary standards
    can become honest just because the defendant thinks it is may often not be
    an easy one for jurors to grasp.

    62   Dishonesty is by no means confined to the criminal law.  Civil
    actions may also frequently raise the question whether an action was honest
C   or dishonest.  The liability of an accessory to a breach of trust is, for
    example, not strict, as the liability of the trustee is, but (absent an
    exoneration clause) is fault-based.  Negligence is not sufficient.  Nothing less
    than dishonest assistance will suffice.  Successive cases at the highest level
    have decided that the test of dishonesty is objective.  After some hesitation in
    *Twinsectra Ltd v Yardley* [2002] 2 AC 164, the law is settled on the objective
    test set out by Lord Nicholls of Birkenhead in *Royal Brunei Airlines Sdn Bhd*
D   *v Tan* [1995] 2 AC 378: see *Barlow Clowes International Ltd v Eurotrust*
    *International Ltd* [2006] 1 WLR 1476, *Abou-Rahmah v Abacha* [2007]
    Bus LR 220 and *Starglade Properties Ltd v Nash* [2011] Lloyd's Rep FC
    102.  The test now clearly established was explained thus in the *Barlow*
    *Clowes* case [2006] 1 WLR 1476, para 10 by Lord Hoffmann, who had been
    a party also to the *Twinsectra* case:

E       "Although a dishonest state of mind is a subjective mental state, the
        standard by which the law determines whether it is dishonest is objective.
        If by ordinary standards a defendant's mental state would be
        characterised as dishonest, it is irrelevant that the defendant judges by
        different standards.  The Court of Appeal held this to be a correct state of
        the law and their Lordships agree."

F   63   Although the House of Lords and Privy Council were careful in these
    cases to confine their decisions to civil cases, there can be no logical or
    principled basis for the meaning of dishonesty (as distinct from the standards
    of proof by which it must be established) to differ according to whether it
    arises in a civil action or a criminal prosecution.  Dishonesty is a simple, if
    occasionally imprecise, English word.  It would be an affront to the law if its
G   meaning differed according to the kind of proceedings in which it arose.  It is
    easy enough to envisage cases where precisely the same behaviour, by the
    same person, falls to be examined in both kinds of proceeding.  In *Starglade*
    *Properties Ltd v Nash* [2011] Lloyd's Rep FC 102 Leveson LJ drew attention
    to the difference of test as between civil cases and criminal cases, and rightly
    held that it demanded consideration when the opportunity arose.  Such an
    opportunity is unlikely to occur in a criminal case whilst *R v Ghosh* [1982]
H   QB 1053 remains binding on trial judges throughout the country.  Although
    in *R v Cornelius* [2012] Lloyd's Rep FC 435 the opportunity might have
    arisen before the Court of Appeal, Criminal Division, it did not do so
    because there had been in that case no false representation of which the
    honesty needed to be examined; moreover, there is some doubt about the

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 329

412
**Ivey v Genting Casinos (UK) Ltd (SC(E))**                                    **[2018] AC**
Lord Hughes JSC

freedom of that court to depart from *R v Ghosh* [1982] QB 1053 in     A
the absence of a decision from this court.

64   Prior to the Theft Act 1968, the expression "dishonestly" had not
appeared in the legal definition of acquisitive offences.  The mental element
was usually marked by the expression "fraudulently".  There is no doubt that
that latter expression involved an objective evaluation of the defendant's
conduct, given his actual state of knowledge and belief as to the facts.  The
Criminal Law Revision Committee, in its Eighth Report, advised the     B
substitution of the word "dishonestly", on the grounds that "fraudulently"
had become technical and its meaning had departed somewhat from the
ordinary understanding of lay people.  It recommended that "dishonestly"
would be more easily understood by lay fact-finders and the public generally.
At para 39 the Committee advised that

C
"'Dishonestly' seems to us a better word than 'fraudulently'.  The
question 'Was this dishonest?'  is easier for a jury to answer than the
question 'Was this fraudulent?'.  'Dishonesty' is something which laymen
can easily recognise when they see it, whereas 'fraud' may seem to involve
technicalities which have to be explained by a lawyer."

It was in accordance with this substitution that in *R v Feely* [1973] QB 530 a     D
five-judge Court of Appeal, Criminal Division, held that the question
whether a defendant had behaved dishonestly was to be left to the jury and
should not, as had been the case with "fraudulently", be the subject of
judicial ruling.  But there is no hint in the Committee's report of any
contemplation that whether a man was or was not dishonest should
henceforth depend on his own view of his behaviour.  On the contrary, the
report clearly assumed that the prior objective approach would continue,     E
save that the question would be a jury matter rather than one of law.

65   Prior to *R v Ghosh* [1982] QB 1053 the post-Theft Act authorities
on the meaning of dishonesty were in something of a tangle.  The court in
that case seems to have thought, however, that there were more or less equal
strands of authority supporting the "subjective" and the "objective"
approach.  It identified *R v Feely* [1973] QB 530 and *R v Greenstein* [1975]     F
1 WLR 1353 as tending to support an objective approach, and *R v Landy*
[1981] 1 WLR 355, *R v Waterfall* [1970] 1 QB 148, *R v Royle* [1971] 1 WLR
1764 and *R v Gilks* [1972] 1 WLR 1341 as tending to favour a subjective
one.  It treated *R v McIvor* [1982] 1 WLR 409 as an unsustainable attempt
to reconcile the two lines.  This apparently binary dichotomy is not entirely
borne out on analysis.

66   Chronologically the first two cases, *R v Waterfall* [1970] 1 QB 148     G
and *R v Royle* [1971] 1 WLR 1764, decided in July 1969 and November
1971, did not concern the characterisation of behaviour as dishonest.
Rather, they held that where a false representation is alleged, it must be
shown that the defendant knew that it was false, or at least was reckless in
making it without caring whether or not it was true.  Until there is a false
representation, deliberately or recklessly made, the jury does not get to
whether it was dishonest or not. Plainly, the defendant's actual state of mind     H
as to the truth of the representation is a matter for subjective determination.
If he genuinely believes that what he said was true, he is entitled to be
acquitted, unless of course there is some other behaviour independent of the
false representation which can be said to be dishonest.  It does not at all

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 330

413

A  follow that, when once an absence of belief in the truth of his representation is established, dishonesty is likewise an entirely subjective matter, nor that it is so in cases which do not depend on allegations of false representation(s). This important distinction was subsequently identified in both *R v Landy* [1981] 1 WLR 355 and *R v Ghosh* [1982] QB 1053 itself, but the court in the latter case regarded it as unsatisfactory that the jury should have to apply successive tests, firstly of the defendant's actual knowledge or belief, and,

B  only if he deliberately made a false representation, secondly of the character of his conduct, given his actual state of mind. *R v Waterfall* [1970] 1 QB 148 and *R v Royle* [1971] 1 WLR 1764 were treated as examples of a subjective test of dishonesty, although they are not. There should in fact be no difficulty in the jury making this distinction, as cases such as *R v Greenstein* [1975] 1 WLR 1353 show. It has to be done in every case where there was a

C  false representation but there is a question whether there is any possible moral obloquy attaching to it. And it falls to be done, easily enough, in non-representation cases such as that of the bus travelling foreign visitor. A not dissimilar two-stage test is routinely applied by juries where self defence is in issue. The first stage is to ask what the facts were, as the defendant "subjectively" believed them to be. The second stage is, assuming such facts, to judge whether the response of the defendant was "objectively"

D  reasonable. See *R v Williams (Gladstone)* [1987] 3 All ER 411 and section 76 of the Criminal Justice and Immigration Act 2008.

67  In December 1972 a five-judge Court of Appeal decided *R v Feely* [1973] QB 530. Like some others, the case concerned a defendant employee who had helped himself to money from the till knowing that such a thing was forbidden, but contended by way of defence that he had intended to

E  repay it, and that his employers owed him money anyway. The decision of the court was that it is for the jury, not the judge, to say whether the conduct established was dishonest or not. The court said plainly that employees who take money from the till without permission are usually thieves, but that if the circumstances were such that no possible moral obloquy could attach to what was done, they might not be. It gave as an example the defendant who took the money only because he had no change in his pocket to pay a taxi

F  which had just delivered his wife to the shop, and who meant to and did replace it within minutes. Because the question whether that kind of analysis applied in that case had not been left open by the direction to the jury, the appeal against conviction was allowed. It is therefore inherent in that case that what the jury has to do is to apply its own (objective) standards to whether the conduct was dishonest.

G  68  *R v Greenstein* [1975] 1 WLR 1353, decided in July 1975, concerned a large-scale operation of a method of the discouraged but not illegal practice of "stagging" new issue shares by applying for vastly more than the defendants could pay for, in the hope that a smaller affordable number would be allocated, but more than would have been allotted if the application had been confined to what they could afford. The charges, of obtaining property by deception, depended on the representation made

H  when a cheque is issued, that it is good for the money on due presentation. The defendants, who applied in multiple aliases, did not have the money to meet the cheques they signed for the full number of shares applied for, which were required by the issuers, but they hoped that the return cheques which could be expected to be sent after partial allocation would feed their

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 331

414
**Ivey v Genting Casinos (UK) Ltd (SC(E))**                                    **[2018] AC**
Lord Hughes JSC

A
accounts in time to enable their original cheques to be met. The court upheld
the judge's two-part direction. First, he told the jury that when it came to
asking whether the defendants genuinely believed that their cheques would
be met on due presentation (as many were and several were not) the answer
should depend on their actual state of belief. Secondly, he told them that
when the question was whether the defendants had acted honestly overall
(that is if there was a false representation), they must apply their own
B
standards. It was, the judge had said, no good applying the standards of
anyone accused of dishonesty, for in that event everyone would
automatically be acquitted. That case accordingly supports the principle
that the test of dishonesty (but not of belief in a representation) is objective.
*R v Feely* [1973] QB 530 was applied.

69    *R v Feely* was also applied in *Boggeln v Williams* [1978] 1 WLR 873,
decided in January 1978. The defendant had been acquitted of dishonestly     C
abstracting electricity by re-connecting his supply after the Board had cut
him off for late payment. The acquittal was by the Crown Court on appeal
and specific findings of fact were accordingly available. They were that he
knew how to bypass the meter, but had not done so, that he gave notice to
the Board of what he was doing, that he genuinely believed that he would be
able to pay when the time came, that that belief was not shown to be         D
unreasonable and that in the judgment of the Crown Court he had not acted
dishonestly. The Divisional Court applied *R v Feely* [1973] QB 530 in
holding that the decision upon honesty was for the fact-finding tribunal and
that there was material entitling it to find as it did. That case did not address
the nature of the test of dishonesty beyond saying that the defendant's view
of his conduct was, on those findings, crucial. The reality is that the Crown
Court did not think the conduct dishonest, given what the defendant did and  E
intended. In *R v Ghosh* [1982] QB 1053, this case was rightly treated as
inconclusive upon the perceived binary dichotomy.

70    *R v Landy* [1981] 1 WLR 355, decided in January 1981, was a case
of complex fraudulent trading via a bank, which re-affirmed that dishonesty
was a necessary element of conspiracy to defraud. It also, and more
crucially, insisted on an indictment for conspiracy to defraud giving proper  F
particulars of the conduct complained of, the absence of which had, in that
case, led to a confused and diffuse summing up which did not properly
identify the issues for the jury. The case was important for laying the early
ground for modern case management of fraud trials. In the course of its
judgment, given by Lawton LJ, the court said this, at p 365:

"There is always a danger that a jury may think that proof of an         G
irregularity followed by loss is proof of dishonesty. The dishonesty to be
proved must be in the minds and intentions of the defendants. It is to their
states of mind that the jury must direct their attention. What the
reasonable man or the jurors themselves would have believed or intended
in the circumstances in which the defendants found themselves is not
what the jury have to decide, but what a reasonable man or they
themselves would have believed or intended in similar circumstances may  H
help them to decide what in fact individual defendants believed or
intended. An assertion by a defendant that throughout a transaction he
acted honestly does not have to be accepted but has to be weighed like any
other piece of evidence. If that was the defendant's state of mind, or may

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 332

415

**[2018] AC**                   Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

A   have been, he is entitled to be acquitted.  But if the jury, applying their own notions of what is honest and what is not, conclude that he could not have believed that he was acting honestly, then the element of dishonesty will have been established.  What a jury must not do is to say to themselves: 'If we had been in his place we would have known we were acting dishonestly so he must have known he was.'  What they can say is:

B   'We are sure he was acting dishonestly because we can see no reason why a man of his intelligence and experience would not have appreciated, as right-minded people would have done, that what he was doing was dishonest.' "

71   This passage was treated in *R v Ghosh* [1982] QB 1053 as supportive of a subjective test of dishonesty.  However, its context was an

C   alleged banking fraud consisting of dealing with money of lenders and depositors in ways which were likely to, and did, lead them to lose their money.  The ways included reckless and unsecured speculation, preferential payments to connected companies, the preparation of false accounts, the lodging of false Bank of England returns, and the creation of false discount bills when there was no underlying commercial transaction.  The critical fact is that the defence was that the defendants did not know enough of what was

D   going on to be responsible, and/or that they trusted others to manage the bank.  Since that was the issue, it is plain that the actual state of mind of the defendants was indeed the critical question for the jury, and that the jury had to approach it in the way explained by Lawton LJ.  The issue in the case was not principally whether a state of knowledge, if once established, meant that the defendant's conduct fell to be characterised as dishonest.  Indeed, a

E   defendant who knew about the means allegedly adopted would be hard pressed to suggest that he thought them honest.

72   The position became more complicated in *R v McIvor* [1982] 1 WLR 409, decided in November 1981.  This was, like *R v Feely* [1973] QB 530, a case of unauthorised taking from the till by an employee.  The defendant had asked to borrow money and, having been refused, helped himself nevertheless.  He asserted by way of defence that he had always

F   intended to put the money back, as indeed he had done ten days later.  The judge had told the jury that it must apply the standards of ordinary honest people to whether what the defendant had done was dishonest, and that what he himself thought about that issue was neither here nor there.  The appeal came before a Court of Appeal presided over by Lawton LJ, who had delivered the judgments in both *R v Feely* and *R v Landy* [1981] 1 WLR 355.

G   The court held that the passage cited above in *R v Landy* applied only to the offence of conspiracy to defraud and not to the offence of theft (or, therefore, to the other Theft Act offences in which dishonesty was an essential element).  For the latter, the "objective" lay standard of honesty was to be applied.  In *R v Ghosh* [1982] QB 1053 the court treated this decision as suggesting a "subjective" test for conspiracy to defraud and an "objective" one for other offences, and understandably held that such a distinction could

H   not be sustained in logic or fairness.  It is, however, at least possible, if not likely, that all that Lawton LJ was saying in *R v McIvor* [1982] 1 WLR 409 was that the passage in *R v Landy* [1981] 1 WLR 355 referred to the issue of the defendant's actual state of knowledge of what was happening, and to his actual belief in the truthfulness of any representation which he had made,

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 333

416
Ivey v Genting Casinos (UK) Ltd (SC(E))                                    [2018] AC
Lord Hughes JSC

A

rather than to the issue of whether an established state of mind is or is not
dishonest. With hindsight it can be seen that the court perceived clearly that
if a wholly "subjective" test of when an established actual state of knowledge
or belief is and is not dishonest were to be applied, the consequences would
be that any defendant whose subjective standards were sufficiently warped
would be entitled to be acquitted. It might be noted that in *R v McIvor*
[1982] 1 WLR 409 the court held that the judge's remarks about what the
defendant himself thought being neither here nor there might have been
taken by the jury as requiring them to disregard what he had said about his
actual state of knowledge or belief. There had thus been a misdirection, but
just as in *R v Ghosh* [1982] QB 1053 the court held that the only possible
conclusion was that the defendant had been dishonest.

73    There was in fact only one pre-*Ghosh* case which frankly raised the
relevance of the defendant's own view as to the honesty of what he had done.
*R v Gilks* [1972] 1 WLR 1341 had been decided as long ago as June 1972.
The defendant had been handed, by mistake, as much as £100 too much by a
bookmaker. He realised the mistake but kept the money anyway. Asked to
account for doing so, he offered the view that whereas it would clearly be
wrong to keep such an overpayment if made by the grocer, bookmakers
were fair game. He was convicted notwithstanding the judge's direction that
the jury should put itself in his shoes and ask itself whether *he* had thought
he was acting honestly or dishonestly. Amongst other grounds of appeal
which the Court of Appeal rejected, he contended that the judge ought to
have made it yet clearer that even if he did not believe he had any claim of
right in law to keep the money, he would still not be guilty unless he did not
have the belief he asserted that bookmakers were fair game. The Court of
Appeal rejected that contention also, saying that the judge's direction was a
proper and sufficient one. Thus the case can be said to have endorsed the
(subjective) direction as to dishonesty given by the judge. It did so, of course,
only to the extent that it rejected the defendant's argument that the judge's
direction was wrongly adverse to him. The question whether the direction
was too favourable to him did not arise and was not addressed. *R v Gilks*
preceded *R v Feely* [1973] QB 530, *R v Greenstein* [1975] 1 WLR 1353, *R v
Landy* [1981] 1 WLR 355, *Boggeln v Williams* [1978] 1 WLR 873 and *R v
McIvor* [1982] 1 WLR 409 but was not cited to any of those later courts,
which therefore did not analyse what if anything it had decided. It might,
however, be thought that the facts of *R v Gilks* [1972] 1 WLR 1341 are a
powerful demonstration of the perils of the second leg of the *Ghosh* test, for
it means that if the likes of Mr Gilks are once truthful about their
idiosyncratic view of bookmakers, they are bound to be acquitted.

74    These several considerations provide convincing grounds for holding
that the second leg of the test propounded in *R v Ghosh* [1982] QB 1053
does not correctly represent the law and that directions based upon it ought
no longer to be given. The test of dishonesty is as set out by Lord Nicholls in
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 and by Lord
Hoffmann in *Barlow Clowes International Ltd v Eurotrust International
Ltd* [2006] 1 WLR 1476, para 10: see para 62 above. When dishonesty is in
question the fact-finding tribunal must first ascertain (subjectively) the
actual state of the individual's knowledge or belief as to the facts. The
reasonableness or otherwise of his belief is a matter of evidence (often in
practice determinative) going to whether he held the belief, but it is not an

Exhibit 2
Page 334

417

**[2018] AC**                   Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

*A*   additional requirement that his belief must be reasonable; the question is
whether it is genuinely held. When once his actual state of mind as to
knowledge or belief as to facts is established, the question whether his
conduct was honest or dishonest is to be determined by the fact-finder by
applying the (objective) standards of ordinary decent people. There is no
requirement that the defendant must appreciate that what he has done is, by
those standards, dishonest.

*B*    75   Therefore in the present case, if, contrary to the conclusions arrived
at above, there were in cheating at gambling an additional legal element of
dishonesty, it would be satisfied by the application of the test as set out
above. The judge did not get to the question of dishonesty and did not need
to do so. But it is a fallacy to suggest that his finding that Mr Ivey was
truthful when he said that *he* did not regard what he did as cheating

*C*   amounted to a finding that his behaviour was honest. It was not. It was a
finding that he was, in that respect, truthful. Truthfulness is indeed one
characteristic of honesty, and untruthfulness is often a powerful indicator of
dishonesty, but a dishonest person may sometimes be truthful about his
dishonest opinions, as indeed was the defendant in *R v Gilks* [1972] 1 WLR
1341. For the same reasons which show that Mr Ivey's conduct was,
contrary to his own opinion, cheating, the better view would be, if the

*D*   question arose, that his conduct was, contrary to his own opinion, also
dishonest.

   76   For these several reasons, this appeal must be dismissed.

*Appeal dismissed.*

Ms B L SCULLY, Barrister

*E*

———

*F*

*G*

*H*

© 2018 The Incorporated Council of Law Reporting for England and Wales

Exhibit 2
Page 335

THE HONOURABLE MR JUSTICE HILDYARD
Approved Judgment

FL-2017-000001 & FL-2016-000019



Neutral Citation Number: [2019] EWHC 3315 (Ch)

Claim No. FL-2017-000001
Claim No. FL-2016-000019

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND**
**AND WALES**
**FINANCIAL LIST (Ch D)**

Rolls Building
7 Rolls Buildings
Fetter Lane
London
EC4A 1NL

Date: 3$^{rd}$ December 2019

**Before**:

**THE HONOURABLE MR JUSTICE HILDYARD**
- - - - - - - - - - - - - - - - - - - -
**Between**:

| | |
|---|---|
| **THE PERSONS IDENTIFIED IN SCHEDULE 1 OF THE CLAIM FORM** (the "SL Claimants") | **Claimants** |

**- and –**

| | |
|---|---|
| **TESCO PLC** | **Defendant** |

**And Between:**

| | |
|---|---|
| **(1) MANNING & NAPIER FUND, INC.** (a company incorporated in the United States of America) **(2) EXETER TRUST COMPANY** (a company incorporated in the United States of America) (the "MLB Claimants") | **Claimants** |

Exhibit 2
Page 336

**-and-**

**TESCO PLC**                                        <u>**Defendant**</u>

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**RICHARD MOTT and SIMON GILSON** (instructed by **Stewarts**) appeared on behalf of the
SL Claimants

**PETER DE VERNEUIL SMITH QC and DOMINIC KENNELLY** (instructed by **Morgan
Lewis & Bockius UK LLP**) appeared on behalf of the MLB Claimants

**DAVID MUMFORD QC, MICHAEL WATKINS and NIRANJAN VENKATESAN**
(instructed by **Freshfields Bruckhaus Deringer LLP**) appeared on behalf of the Defendant.

Hearing dates: 5th November 2019 – 7th November 2019
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

Exhibit 2
Page 337

**MR JUSTICE HILDYARD:**

*Scope of this judgment and my rulings*

1. In these two actions, the Claimants in FL-2017-000001 ("the SL Claimants") and the Claimants in FL-2016-000019 ("the MLB Claimants") claim against the Defendant company ("Tesco") under section 90A and Schedule 10A of the Financial Services and Markets Act ("section 90A", "Schedule 10A" and "FSMA" respectively) to recover substantial losses in respect of their investment decisions in relation to shares in Tesco which they made in alleged reliance on information published by Tesco and falling within Schedule 10A.

2. These are my rulings on the matters in dispute at the fourth CMC ("CMC4") in these proceedings, which are fixed to come on for trial commencing in June 2020.

3. I do not address any of the numerous matters which were to be debated but which were sensibly agreed by the parties, either before the hearing of CMC4 or in some cases during it; but I record my thanks for the co-operative manner in which these issues were addressed. Even with that assistance, CMC4 occupied the Court for three sitting days and one reading day. The 24 bundles prepared for the hearing amounted to well over 7,000 pages; and two files of authorities were also provided. This is indeed litigation on a grand scale. But even in such a context, proportionality and an appreciation of finite resource, and what is possible at this stage in the proceedings without dislocating preparations for trial and indeed the trial itself, must temper the natural wish of the parties not to leave any stone unturned; and those considerations have informed my approach, as will be apparent.

*Issues in dispute at CMC4*

4. In broad terms, the issues in dispute at CMC4 can be described as follows:
   (1) the SL Claimants' specific disclosure applications so far as have not been agreed;
   (2) Tesco's specific disclosure application so far as it has not been agreed;
   (3) Tesco's application to strike out part of the SL Claimants' pleadings;
   (4) the case management of the Rathbones claimants' claim in the SL Proceedings;
   (5) Tesco's two applications for Letters of Request;
   (6) the adequacy of the current trial time estimate; and
   (7) other matters.

*Preliminary observations as regards applications for specific disclosure*

5. I would make four preliminary points in relation to the applications for specific disclosure. First, and most fundamentally, a new pilot scheme for disclosure in the Business and Property Courts has been introduced (as CPR PD51U), and (having commenced as and from 1 January 2019) is applicable in the Financial List and to these proceedings (except that pre-existing orders for disclosure are left undisturbed unless varied or set aside). It is not disputed that wide search-based disclosure under Model E of PD51U, rather than any other model, is appropriate now as it has been in the past in a case of this magnitude and complexity. But it is of importance to note that the pilot provides that extended disclosure can only be justified if it is necessary for the

Exhibit 2
Page 338

fair resolution of an "Issue for Disclosure" as set out in a Disclosure Review Document or identified by the court, and will only be given if it is reasonable and proportionate having regard to the Overriding Objective and its specific factors adumbrated in paragraph 6.4 of the PD.

6.  Secondly, and as emphasised by Mr David Mumford QC on behalf of Tesco, it is relevant and complementary to both the above points that the disclosure exercise thus far undertaken by Tesco has been in intended compliance with a basic scheme and architecture set out in a document entitled "Defendant's Proposals for Defendant's Disclosure" to which all the parties contributed and in effect agreed. Mr Laurence Rabinowitz QC on behalf of Tesco described this as a "top down" approach, the central objective being disclosure of documents which in the *RBS* case I described as going to the "real stuff of the case", rather than disclosure of every document relating to the myriad accounting transactions whatever the degree of granularity. Whatever else, the pilot does not introduce or encourage a more generous or less focused disclosure regime than previously; and at this stage of proceedings departure from the agreed architecture is liable for obvious reasons to be disruptive and thereby disproportionate and inefficient.

7.  Thirdly, in accordance with the scheme or architecture described in the preceding paragraph, Tesco has already carried out a very substantial disclosure exercise in these proceedings. As at September 2019, it had searched over a total population of some 7,500,000 documents (before the application of search terms and date ranges) involving 86 custodians, reviewed over 1,000,000 documents and produced some 30,000 documents to the Claimants across 22 tranches over 20 months. Any further disclosure needs to be justified taking into account the detail already provided.

8.  Fourthly, the only issues as to disclosure arise between the SL Claimants and Tesco. No such issues arise between the MLB Claimants and Tesco. Whilst there are differences between the two proceedings, there is much more that is common to them than separates them, especially as regards the need for the Claimants in both to prove (a) the nature and extent of the overstatements of profit and expected profit on which the Claimants rely and (b) that the alleged PDMRs had knowledge of them, which is the focus of almost all the disclosure issues. Whilst I must and do consider necessity and proportionality by reference to the particular proceedings, the fact that in one set no further specific disclosure has been considered necessary is of some relevance in the general consideration of necessity and proportionality.

*SL's applications for specific disclosure*

*Application for documents held other than by custodians*

9.  Turning then, with those factors in mind, to the particular areas of dispute, I shall deal first with the SL Claimants' application for documents for the period 19 September 2014 to 22 April 2015 "relevant to the knowledge of…individuals at the level of Category Director or above in the UK Commercial Function" (disclosure already having been given or agreed to be given in respect of the knowledge of some 33 persons nominated as disclosure custodians by reason of their pleaded involvement in the accounting practices said to have resulted in overstatements of trading profit).

Exhibit 2
Page 339

10.  On behalf of the SL Claimants, Mr Richard Mott's essential justification for seeking disclosure of documents going to the knowledge of individuals beyond the existing custodians and lower (as it were) in the hierarchy was that they would or might demonstrate what he described as the "endemic" knowledge "throughout the UK commercial and commercial finance functions within Tesco'' and/or a "corporate culture" of practices alleged to constitute wrongful accounting. If, for example, even the "large number of the members of buying teams beneath the category directors" had such knowledge, that would demonstrate it to be such common knowledge as must have been shared by those higher in the hierarchy, and especially the pleaded PDMRs.

11.  Mr Mott referred also to a report dated 15 March 2017 (referred to as "the Remediation Report") prepared by Tesco's new management to provide a better understanding of what had gone wrong in Tesco and to assist a "process of renewal and change" and the strengthening of Tesco's compliance framework to ensure that the overstatement revealed "can never happen again". The Remediation Report does record that one of the matters that had become apparent was "that there was evidence of involvement in the practices that led to the overstatement at a more junior level within the Company" which Mr Mott prayed in aid as supporting enquiry at a lower level in the corporate structure than the scheme of disclosure previously agreed had envisaged.

12.  Mr Mumford on behalf of Tesco objected to this extension of the ambit of disclosure. He characterised the plea of "endemic" practices and knowledge as "inherently vague" and disclosure of documents going to the knowledge or involvement of buyers or more junior employees as an enormous task which could not be justified: the documentation would be insufficiently relevant; the search would be disproportionate; "endemic" practices or knowledge is not of itself a central issue; and the proposed laborious exercise would be a departure from the basis scheme of agreed disclosure referred to above. Such a departure was not justified by the Remediation Report: the same report stated that others more senior had "driven the conduct" and it was documentation relating to their knowledge which had been disclosed.

13.  I can see that proof of pervasive knowledge of improper practice could have an evidential bearing and purpose in terms of the fundamental allegations. But otherwise I agree with Mr Mumford. In my judgment, the disclosure sought would be very likely to require a huge and disproportionate search of transactions and their circumstances at a granular level which cannot be justified. The disclosure already agreed should be well sufficient to enable the issue of PDMR knowledge to be fairly tried; or at any rate, this additional layer of disclosure cannot be said to be necessary for the fair disposal of the real issues. I consider that the departure from the scheme previously agreed is unwarranted, especially at this stage before the trial.

14.  I am not persuaded that the Remediation Report justifies the SL Claimants' application in this regard either; the fact that junior persons might have participated at the direction of those more senior is not sufficiently likely to tell one anything more about the knowledge of the PDMRs to warrant the exercise.

*Application for documents referred to in the Remediation Report*

Exhibit 2
Page 340

15. That leads on to the second category of documents of which the SL Claimants sought specific disclosure: documents referred to in the Remediation Report constituting or evidencing Tesco's reviews of "the emails of specific Commercial and Finance employees from the period 1 June 2014 to 19 September 2014… [to determine] … whether any further disciplinary steps were required."

16. Tesco's position in this regard moved closer to that of the SL Claimants in the course of CMC4, and it agreed to disclose the outcomes and to identify and search the files of the "specific Commercial and Finance employees" recorded in paragraph 14 of the Remediation Report as having been investigated in determining possible disciplinary proceedings, but subject to a disputed restriction that this should apply only "insofar as they relate to any of the individuals identified in Schedule 1" (the list of custodians). Similarly, Tesco agreed to disclose documents constituting or evidencing Tesco's consideration of and/or the outcome of reviews to that end undertaken by Tesco, but again subject to the above restriction.

17. The SL Claimants sought the removal of that restriction in each case. Their argument was that the searches, reviews and disclosures should extend beyond documents relating to those named in Schedule 1 to "individuals at the level of Category Director or above in the Commercial Function" and also to "documents constituting or evidencing Tesco's consideration of, and decision on the "evidence of involvement in the practices that led to the overstatement at a more junior level within [Tesco]" referred to at paragraph 15 of the report." Thus, the SL Claimants sought in this context also to move further down the hierarchy to the Category Directors and possibly beyond.

18. Again, I do not consider the broader search and disclosure sought by the SL Claimants to be proportionate in the circumstances I have described. I would adopt the limiting words proposed by Tesco. Whilst there is some real prospect of documents relating to the individuals identified in Schedule 1 throwing evidential light on the persons to whom they reported and above, if that light does not reveal knowledge at their level or such a "culture" as the SL Claimants assert, I am not persuaded that illumination of those further down will be likely materially to assist.

*Application for search of the Shared File Store*

19. Thirdly, the SL Claimants sought an order requiring Tesco to image an electronic repository or shared network drive referred to as the "Shared File Store" and to carry out what they described (somewhat ominously perhaps in terms of the ultimate extent of the process thus sought to be commenced) as "preliminary word searches".

20. The background to this part of the application is a complaint by the SL Claimants that until they sought specific disclosure Tesco had not searched any central repository of electronic documents: its searches were confined to email accounts and other custodian-specific locations. Then, in correspondence in July 2019, Tesco agreed to search parts of another document sharing platform known as SharePoint, which was in use in various divisions and teams within Tesco during the relevant period. Tesco had made it plain in its original disclosure proposal that it considered it unlikely to be a source of relevant material since none of the alleged PDMRs used it; but acceded to search a sub-set of over 900 SharePoints, and in particular those relating to

Exhibit 2
Page 341

departments which it thought might be most relevant, namely Corporate Secretariat, Group Commercial Finance – Insight, Internal Audit, UK Balance Sheet Governance, UK Central Finance, UK Finance Balance Sheet Control, Group Food HR, Group Food Finance, UK & Group Food Legal and Grocery, amounting to some 27GB of data. Tesco continued, however, to take the view that it would not be likely to be productive, and was not reasonable or proportionate, to process and search data from Shared File Store, which contained some 60TB of data.

21.   The SL Claimants have dismissed as inherently unreliable the alleged PDMR's assurance that they did not use the Shared Drive Store, and made the point that others beneath them in the corporate hierarchy, including commercial directors, and their personal assistants (as well as those of the alleged PDMRs) would have done so. They have pressed for at least some review of Shared File and seek an order that Tesco:

    (1)    index the shared file store;

    (2)    run 8 keyword searches; and

    (3)    provide the number of responsive hits to the SL Claimants for each directory and sub-directory / folder.

22.   Tesco in turn have continued to resist this, on the same grounds as before, being that the Shared Filed Store was used predominantly if not exclusively by junior employees to store documents whilst they created and worked on them, and would be unlikely to throw up final documents not available from another searched source, even if a search was feasible without disproportionate time and expense (given the enormous size of the resource).

23.   In the course of the hearing the SL Claimants further restricted their request; and in his reply Mr Mott suggested that what he presented as a much confined search be undertaken using only eight key words over just the selected file areas (out of a total of 1,276). He supported this course as "hopefully" focusing on "the real stuff of the case" and in particular "the plea that these wrongful practices were common knowledge at the layers of Tesco that we identify." However, Tesco rejected this too, essentially on the ground that this was not in reality a targeted search aimed at a defined category of documents but a fishing expedition with the hope of catching a sprat whereby to lead to bigger fish.

24.   Of course, the fact that such a large repository remains unsearched might be thought to be a source of general concern. Against that, however, the extensive disclosure exercise already undertaken and the searches of other files identified to be, and inherently likely to provide, a better source, substantially attenuate any such concern. Further, I do not think I should assume that Tesco's considered evidence as to the use made of the resource and the unlikelihood of it being a repository of documents not found elsewhere in the email record and on personal laptops is inaccurate or to be discounted. Nor do I think it is impermissible to take into account that the existence of the Shared File Store and Tesco's reasoning why it should not be searched were made clear in its original disclosure proposal and not challenged for 18 months. I accept also that the search proposed has characteristics of a fishing expedition with all the danger that an apparently confined request will lead to an attritional and ultimately expensive but misplaced series of distractive enquiries in the now relatively short period before trial.

Exhibit 2
Page 342

25. Accordingly, I do not propose to order searches of the Shared File Drive. In my view, the parties' efforts would not be likely to be productively focused on such an activity: the effort would in the end not be likely to be proportionate or worthwhile.

*Application for documents evidencing briefing to Tesco's new CEO and CFO*

26. A further area of disclosure sought by the SL Claimants concerned documents constituting or evidencing the accounts and/or briefings provided to Mr David Lewis ("Mr Lewis", Tesco's new CEO) and Mr Alan Stewart ("Mr Stewart", Tesco's new CFO) in respect of Tesco's wrongdoing prior to their assumption of office.

27. At CMC1, Tesco resisted both the inclusion of Mr Lewis and Mr Stewart as custodians, and the extension of the disclosure date range to 22 April 2015. I ruled against Tesco on both issues. Amongst other things, I accepted the MLB Claimants' arguments that "it is reasonably to be inferred that the new management will have investigated what the old management did, including the question of who knew about the overstatements" and "Messrs Lewis and Stewart were given ex post facto accounts of the profit overstatements and how they came about, and that this material is relevant to the issue of PDMR knowledge": Redfern Schedule Ruling items 12(i) and (g), and also item 41(g).

28. The SL Claimants' particular focus now is on documents which may reveal the understanding of these two directors, and the basis for it, when making public statements about Tesco's manipulation of its reporting in respect of commercial income at the end of annual accounting periods. They contend that such documents may reveal knowledge on the part of alleged PDMRs or persons reporting to them, and thus be highly relevant. Although Tesco had indicated such documents would be disclosed as part of its original disclosure proposals, none apparently has been.

29. Mr Lewis is not to be a witness at trial, and though Mr Stewart is, I am told that his witness statement does not address the market statements pleaded by the SL Claimants referred to above, or how he acquired the understanding which he expressed to the market. The SL Claimants contend that it is unsatisfactory for him to be cross-examined about his market statements without the Court having proper documentary evidence of what he was told.

30. Tesco, on the other hand, contends that none of the public statements made by Mr Lewis and Mr Stewart "suggests that Mr Lewis or Mr Alan Stewart were privy to some documents that descended to the knowledge of any particular individual or group of individuals"; and that in point of fact Tesco has already undertaken a search of documents in their possession and their custodian data, albeit only within narrow date ranges suggested by Mr Upson on behalf of the SL Claimants and anything relevant to the issue of knowledge has already been disclosed.

31. I do not see any or any sufficient basis for requiring any further search.

*Application for production of the Majid Note despite Tesco's claim to privilege*

32. I must next consider the SL Claimants' application for an order that Tesco produce a note of an interview between Kay Majid (a senior Tesco lawyer who reported directly to Mr Adrian Morris, Tesco's Group General Counsel) and Freshfields dated 23

Exhibit 2
Page 343

September 2014 (which was referred to as "the Majid Note"), notwithstanding Tesco's assertion of privilege in that document.

33. The Majid Note records a "first account" given to Freshfields by Ms Majid of what she knew of the commercial income overstatements prior to 19 September 2014. It seems that Mr Morris also gave such an account which was also noted. The SL Claimants rely on the knowledge of them both in relation to their case on PDMR knowledge, on the basis that (a) Ms Majid explains her detailed involvement in commercial income issues, and she reported to Mr Morris whilst (b) Mr Morris spoke regularly with Mr Clarke and regularly attended Executive Committee Meetings, and that (c) Tesco's disclosure shows that for a significant period prior to the August Trading Update Mr Morris and Ms Majid knew, as a matter of fact, of the existence of the practices that caused the commercial income overstatements. The SL Claimants plead that Mr Morris either discussed those practices with Mr Clarke (who would have known they were wrongful as a matter of accounting), or refrained from doing so because he understood Mr Clarke already knew of them. The MLB Claimants advance a similar case.

34. The SL Claimants do not any longer dispute (at least for present purposes) that the Majid Note was originally privileged. However, they contend that confidentiality in the document has been lost because of its deployment in open court during the second criminal proceedings, and that as the document is no longer confidential, privilege in it cannot be maintained and the Majid Note must be disclosed.

35. The circumstances in which the Majid Note but no record of the note of Mr Morris's first account came to be referred to in open court can be summarised as follows:
   (1) Tesco provided the Majid note to the SFO pursuant to a limited waiver of privilege, but declined to waive privilege in the note of Mr Morris' first account ("the Morris note"). On 18 July 2018, the SFO issued an application for a witness summons against Mr Ian Taylor of Freshfields to compel production of the Morris note. That application was heard (and refused) by Sir John Royce (as the judge at the second criminal trial) on 30 July 2018.
   (2) In the course of argument, Mr Doble, counsel for Mr Bush and Mr Scouler as defendants to the witness summons for the Morris note, referred Sir John Royce to the Majid note, quoted paragraph 1 of it and invited Sir John to read the first three pages of the document to himself, which the judge did.
   (3) Mr Doble then described or summarised, without quoting, what the note records Ms Majid as having said about certain matters, drawing the judge's attention to what he described as "the first three pages of the document and (for example) to paragraph 20 (again without indicating its content in court).
   (4) Counsel attending for Tesco also referred to and read small extracts from the first three pages of the Majid Note describing Ms Majid's first reactions to the revelation by a whistleblower of the wrongful practices subsequently investigated by Tesco and set out in what has come to be referred to as "the Legacy Paper".

36. The SL Claimants contend that the Majid Note has lost confidentiality and is no longer privileged because in the circumstances described above it was 'summarised, partly read out and discussed extensively in legal argument' at the procedural hearing before Sir John Royce. Tesco submits that this contention is erroneous and that the

Exhibit 2
Page 344

FL-2017-000001 & FL-2016-000019

Majid Note remains confidential and privileged notwithstanding the reference to it in
open court and the judge's expressed consideration of part of it. It is necessary to
consider the dispute in more detail since it raises an issue of some importance.

37.  The SL Claimants submit that reference to a document can destroy its confidentiality
in two ways, relying on the analysis made by Leggatt J (as he then was) in *Serdar
Mohammed v Ministry of Defence* [2013] EWHC 4478 (QB). First, sufficient publicity
may be given as to its contents and the information in it that it can no longer be
regarded as confidential: for example, if a document is read out on the television news
or in open court: see *Gotha City v Sotheby's and Another* [1998] 1 WLR 114 at 118F-
H. That is a matter of fact and degree: again, see *Mohammed* at [19]. Secondly,
confidentiality may be lost because references made in public, though not of
themselves sufficient to destroy confidentiality, engage the principle of open justice
which gives right of access to the evidence placed before the court and referred to
during the hearing so that the way and basis on which the matter has been decided can
properly be understood: and see *SmithKline Beecham Biologicals SA v Connaught
Laboratories Inc* [1999] 4 All ER 498 at 512e- f; also *Lilly Icos Ltd v Pfizer Ltd (No 2)*
[2002] 1 WLR 2253. The SL Claimants submitted that both tests were satisfied in this
case. They accepted that the Court had power (pursuant to CPR r.31.22) to make an
order restricting or prohibiting the use of a document thus disclosed, even where it had
been read to or by the court, or referred to at a hearing in public: but that required an
application and none had been made.

38.  Tesco, on the other hand, drew a distinction between information contained in a
document and the document itself: public reference to such information might cause
the loss of confidentiality in the information but not, or not necessarily, in the
document in which it was contained. Here, the reference to, and the judge's reading to
himself of, three pages of what Mr Mumford (on instructions) informed me was a total
of nine pages of the Majid Note should not cause a loss of confidentiality in the
document itself: only in the information conveyed, or at most, the three pages, and not
the remaining parts of the document (the Majid Note).

39.  Mr Mumford especially relied in this context on *Rawlinson and Hunter Trustees SA
and others v Akers and another* [2014] 4 All ER 627, particularly at [71] to [73] in the
judgment at first instance (Eder J, which was upheld on appeal), where (albeit in a part
of the judgment which is strictly obiter) the distinction is drawn and a suggestion that
it is too fine and lacking in merit is rejected, and where the point is made that the loss
of confidentiality in information is not the same as deployment of a document such as
to amount to waiver of privilege in that document. Mr Mumford relied also on a ruling
made on 31 March 2010 by the Right Hon. Sir William Gage in relation to *HM's
Attorney-General's advice of 2003* on the application of the ECHR to the British
Army's operations in Iraq, drawing the same distinction.

40.  Noting that of course CPR 31.22 does not apply to criminal proceedings, Mr
Mumford drew my attention to the provisions applicable in that context, and in
particular to The Criminal Procedure Rules [October 2015], and the Criminal Practice
Directions ancillary to those rules. 5B.14 of the latter provides that "open justice
requires only access to the part of the document that has been read aloud" though in
the event that a member of the public requests a copy the court may order production
of "a suitably redacted version".

Exhibit 2
Page 345

41. Mr Mumford accepted that such rules are not determinative: the matter is ultimately within the discretion of the court, as emphasised recently by the UK Supreme Court in *Dring (on behalf of the Asbestos Victims Support Group) v Cape Intermediate Holdings Ltd* [2019] 3 WLR 429 at 442C. The court may have to balance the principle of open justice and the entitlement of the public "to know what is going on" at a public trial against the protection of private interests including confidentiality: see *Dring* at [45] to [47]; and "also relevant must be the practicalities and the proportionality of granting the request" (*Dring* at [47]). In short, the rule should not be applied mechanistically; but the notion of unqualified right of access to a document which has been referred to subject only to a saving power under CPR 31.22 (in civil proceedings) is misplaced, especially where the references have been sparing and unspecific, and/or where no specific or material reference has actually been made, though the court has considered the contents. In the latter context, it is important to distinguish the two bases on which confidentiality may be lost and not to confuse what has actually happened with the right to see documents to understand what has been going on even if they have not in fact been read; and see per Lord Bingham CJ in the *Smith Kline* case at 512.

42. In my judgment, in this case:
    (1) It is not contended that the Majid Note was deployed in such a way as to constitute waiver: only loss of confidentiality is in issue.
    (2) There is a distinction between the information in a document and the document itself. Whether references (whether by the court or counsel) are such as in fact to constitute such an exposure of the document to the public that confidentiality in it is lost is a matter of degree. In this case, the references did not, either in terms of their detail or their extent, amount to a loss of confidentiality in the document itself.
    (3) Noting that in fact no such application was made, I do not think it likely that an application under the Criminal Rules would have led to disclosure of the Majid Note as being necessary in order to understand what was going on. I do not think that the civil rules require any different approach.
    (4) The references to and the judge's reading of the document do not require its disclosure to enable the public to understand the approach of the court to the procedural decision before it (whether to issue a witness summons in respect of another document, the Morris Note).
    (5) Confidentiality in the document was not lost.

43. I shall not, therefore, require disclosure of the Majid Note. Of course, if in the course of the trial the Majid Note is deployed or referred to the matter will have to be re-assessed at that time. As the Trial Judge, I will be assisted by the background knowledge obtained in consequence of the application now.

*Application for documents relating to Tesco's Republic of Ireland business*

44. The next issue concerns documentation relating to Tesco's Republic of Ireland business.

45. The SL Claimants rely on the extent of knowledge within Tesco's Republic of Ireland business ("Tesco ROI") in support of their case on PDMR knowledge. They contend,

Exhibit 2
Page 346

in summary, that the documentary evidence shows that Ms Easterbrook (Managing Director of Tesco's Developing Businesses division, which included Tesco ROI) and Ms Hodges (Developing Businesses Finance Director) were aware of commercial income overstatements in Tesco ROI, and they communicated with the alleged PDMR (including Mr Clarke and Mr McIlwee) on this topic. The MLB Claimants advance a materially identical case.

46. Much of this part of the SL Claimants' application has been agreed. Thus:

    (1) the SL Claimants sought three categories of documents that are referred to in a document known as "the Emerald Report" (dated 14 April 2015, which was prepared by Deloitte): Tesco did not consider these to be relevant to PDMR's knowledge and initially declined to disclose them; but in the fifth witness statement of Mr Nicholas Williams (dated 30 October 2019) Tesco agreed "in the interests of concluding matters" to searches and disclosure as set out in paragraph 1(6)(a) and (b) of the revised draft Order in relation to Tesco's Republic of Ireland business;

    (2) the SL Claimants accepted Tesco's assurance that it had done all reasonable searches for documents relating to an "amnesty" as referred to in the Project Emerald Report.

47. There remained, before the hearing, a dispute in relation to a report produced by Mr Davies as Head of Tesco Internal Audit called *"Irish Commercial Income review"* and in particular to any documents relating to a passage in it entitled "Next Steps to be considered" detailing in six bullet points various matters to be followed up. The SL Claimants contend that the documents are relevant because they are likely to evidence Tesco's contemporaneous acceptance of the serious conclusions reached by Mr Davies as to the likely knowledge of Tesco ROI and Group individuals, in circumstances where Tesco now refuses to accept (or even plead to) the accuracy of those conclusions: see Responses 14-17 to the SL Claimants' Third RFI. However, on detailed analysis, only one of the bullet points raises a real dispute.

48. The first bullet points reads "Finalisation and write-up of timelines; review of meeting notes for completeness". The SL Claimants have accepted Tesco's evidence that no such timelines were written up; and they have on that basis not pursued the request.

49. Tesco maintains that the second and third bullet points (relating respectively to (i) "Discussions with PwC Ireland to finalise the FY14 financial statements" and (ii) "Discussions with PwC Group team and Group finance to consider implications for the Group Financial Statements") can only be relevant to the quantum of the overstatement. However, the SL Claimants maintain that if (as appears) none has yet been made, a search should nevertheless be undertaken, and if any relevant documents are identified they should be disclosed. For the reasons given by Tesco, I consider it unlikely that a search will reveal any relevant documents; even if the documents can be collated relatively easily I do not think a search is proportionate at this stage and I do not propose to require it.

50. As to the fourth bullet point (relating to "Consideration of the regulatory implications in Ireland and the UK''), Tesco has claimed privilege; the SL Claimants require only that the claim be formally certified, and Tesco has agreed to do that.

Exhibit 2
Page 347

51.  The sixth bullet point referred to "Timing of board briefing". Tesco confirmed (in Mr
     Williams's fifth witness statement) that searches have been made and no documents
     found for which there is not a proper claim for privilege. The SL Claimants agreed on
     that basis not to press that request.

52.  That leaves only the fifth bullet point, which reads "Consideration of internal follow
     up – to include discussions with TK, JE, others tbc". Tesco's position on this was that
     in the event there were no such discussions, and that what in fact happened was that
     the matter was passed to Deloitte to undertake the exercise that culminated in the
     Project Emerald report. The SL Claimants, however, drew my attention to a witness
     statement of Mr Alan Stewart (Tesco's CFO) dated 24 July 2019 which refers to a
     "preliminary assessment" undertaken by Mr Jason Davies before the matter was
     referred to Deloitte and to some consideration being given to it; and they wish to see
     any documents relating to the assessment and the subsequent consideration of it. There
     is, as it seems to me, a possibility of documentation relevant to the question of
     knowledge; and I think that Tesco should make a proportionate search accordingly,
     and disclose any relevant and unprivileged material found.

*Application for production of unredacted versions of documents for expert's review*

53.  Having (as I understand it) agreed not to pursue a further category sought by the SL
     Claimants relating to documents generated by a series of internal investigations at
     Tesco relating to the profit overstatement, the last remaining disclosure sought by the
     SL Claimants and disputed by Tesco is of unredacted copies of 18 specific accounting
     documents described in Schedule 2 to the draft Order as originally sought by the SL
     Claimants.

54.  The SL Claimants have sought unredacted copies of these documents (which were
     disclosed some time ago) at the instance of their expert, Mr Luke Steadman of Alvarez
     & Marsal Disputes and Investigations LLP. He has indicated in correspondence (and in
     particular in a letter to Stewarts Law LLP dated 11 October 2019) that (a) "it may be
     important to review" unredacted versions of Tesco internal accounting
     policies/manuals, where sections of the TGAP (Tesco Group Accounting Policy) have
     been redacted; that (b) unredacted versions of Tesco Audit Committee documents
     "may provide useful, relevant insight in relation to commercial income accounting at
     Tesco"; and that (c) unredacted versions of PwC documents dealing with the extent to
     which commercial income was tested and discussed in the audit process "should be
     reviewed to understand considerations of both materiality and accounting but are not
     available to me." Mr Steadman has also sought an unredacted version of the February
     2015 PwC Audit Plan, even though it post-dates the relevant period, on the basis that
     the document "is likely to contain items of significant interest in relation to historic
     commercial income practices at Tesco, as the February 2015 audit was the first
     external audit after the commencement of the commercial income misstatements and
     their correction".

55.  The SL Claimants submitted that such a request from their expert was reasonable; that
     the documentation was easily collated and its disclosure would not involve
     disproportionate effort or expense; that there were no reasons such as confidentiality
     which might deter disclosure, or at least one that could not be met by use of the

Exhibit 2
Page 348

Confidentiality Club if necessary; and that it would be unusual to refuse such a request from a respectable accounting expert like Mr Steadman. However, the SL Claimants very properly conceded that Mr Steadman did not assert nor could they properly contend that the requested documents are critical or necessary in the sense that Mr Steadman would not be able to reach a conclusion on the expert issues without sight of them.

56.   Although it has provided unredacted versions of those sections of TAPM and TGAP that concern impairment, Tesco objected to the disclosure requested on behalf of Mr Steadman. Its position was that it had already disclosed parts of these documents which are relevant to trading profit or trading margin, which are the only items in Tesco's published information that the SL Claimants allege were untrue or misleading by reason of the commercial income overstatements, and there was no reason why Tesco should disclose (for example) chapters of TGAP that concern some other category (eg debtors or stock) which is not said by the Claimants to be untrue or misleading. Mr Steadman had not said the further disclosure was critical, nor even explained properly his reason for thinking they "may" or "could" be useful.

57.   In the course of argument, I invited Mr Mott to consider whether the standard required by paragraph 18 of the Disclosure Pilot for making an order for disclosure of specific documents (see especially paragraph 18.2) had been met. Paragraph 18.2 specifies that the court must be satisfied that the further disclosure is "necessary for the just disposal of the proceedings" as well as "reasonable and proportionate". After due consideration, Mr Mott very properly did not press the application further. For my part, I do not think the court can be so satisfied. I do not propose to order further disclosure under this heading.

*Application to amend/strike out and for documents relating to the "Impairment Issue"*

58.   The (now) final part of the SL Claimants' application for specific disclosure raises a more convoluted issue which has given rise to three inter-connected applications and some toing and froing between the parties which has not been altogether easy to follow. As I understand it, however, the upshot is that:

(1)   the SL Claimants seek to run a case not previously pleaded except in replies to Tesco's reliance defences alleging errors in Tesco's impairment charges and stock write-downs in relation to their stores, and also alleging that the impairment losses would have been even greater but for overstatements of commercial income for each of FY 2012/13 and FY 2013/14;

(2)   they contend that these issues ("the impairment case") impact on and support their existing case as to the materiality of the overstatement of commercial income (which Tesco has denied);

(3)   they also seek to contend that the materiality of the overstatement of commercial income is further demonstrated by PwC's so-called "Summaries of Unadjusted Misstatements" or "SUMs", recording items which (they say) were not included as accounting items because that have reduced the attractiveness of Tesco's financial reports; and they further contend that the

Exhibit 2
Page 349

decision not to include the items in the SUMs must have been taken by management, and thus that the allegation goes also to PDMR knowledge;

(4) they seek disclosure of all documents relating to the impairment case, including not only unredacted copies of the SUMs (which Tesco agreed before the hearing it would provide) but also of any documents showing the individuals who received and/or were aware of the SUMs.

59. Tesco has objected to the introduction of these matters at this stage. It contends that it is simply far too late. Hitherto, Tesco contends, the SL Claimants' case has focused only on trading profit misstatement, and they have never pleaded any case that Tesco's published information was untrue or misleading by reason of inaccurate impairment charges or stock valuation. Tesco originally pressed but now has reserved to trial an argument that the impairment case is not relevant to any pleaded issue, based on the point (which seems to be accepted by the SL Claimants) that additional impairment charges would not have affected the extent of trading profit or trading profit margin overstatement during the relevant period since Tesco recognised impairments in operating profit, not trading profit. Tesco's contention now is that it is far too late to be raising the impairment case, whatever may be its merits, since it would require a disruptive and disproportionate disclosure and evidential exercise that would obstruct the just disposal of the proceedings and indeed give rise to a real risk that the trial date would be lost.

60. Tesco stressed the SL Claimants' delay in making their applications. They provided the following summary of preceding events:

(1) The SL Claimants first made disclosure requests about stock and impairment in correspondence in April 2018, but did not then make any application for disclosure or for leave to amend their pleadings to introduce these allegations, although Freshfields had said in terms that the reason why disclosure would not be provided was that the requests were not relevant to any pleaded issue.

(2) In May 2019, some nine months after the correspondence referred to above and without identifying any reason for such delay,[1] the SL Claimants sought to advance a case about stock-write down and impairment in draft amendments purporting to particularise their case about PDMR knowledge: see paragraphs 8.5.14A-8.5.14C, which made certain allegations about the link between the commercial income misstatements and impairment and about the allegedly 'aggressive application of accounting standards' (of which stock write-down and impairment were cited as instances).

(3) On 13 June 2019, Tesco indicated that it would not consent to these draft amendments. The SL Claimants did not then issue an application for leave

---

[1] The Claimants reserved their right in correspondence to pursue the specific disclosure requests '*in due course*', and Mr Upson also says that the CMC1 Directions Order envisaged that specific disclosure applications would be made after general disclosure had been given, but Tesco maintains that this did not preclude the Claimants from doing so earlier, and that they ought to have done consistently with PD23A, para 2.7, given that Mr Upson does not suggest that the Claimants were not in a position to make the application until after they had reviewed Tesco's disclosure.

Exhibit 2
Page 350

to amend their RAPOC. Instead, they sought to plead the same allegations at paragraphs 6(3)(c) and 6(3)(d) of their Reliance Replies, on the footing that they are relevant to the materiality of the overstatements. Paragraph 6(3)(c) alleged that the impairment charge would have been higher but for the commercial income overstatements. Paragraph 6(3)(d) alleged that (unidentified) 'Tesco personnel' engaged in 'other practices' that involved 'an aggressive application of accounting standards' and gave three instances of such practices, namely the calculation of impairment charges (paragraph 6(3)(d)(i)), stock write-down (paragraph 6(3)(d)(ii)) and 'the summaries of uncorrected misstatements' (paragraph 6(3)(d)(iii)).

(4) Tesco issued an application on 16 September 2019 to strike out paragraphs 6(3)(c) and 6(3)(d) of the Reliance Replies.

(5) Not until 17 October 2019 did the SL Claimants apply for leave to amend the RAPOC.

(6) Subsequently, the SL Claimants have chosen to delete paragraph 6(3)(d) virtually in its entirety, though some of these allegations still remain in the draft RAPOC (including the allegation of the adoption of aggressive accounting practices), because the SL Claimants apparently wish to contend that they are relevant to the issue PDMR knowledge (paragraph 8.5.14C).

61.  Tesco initially sought on this basis not only to object to disclosure but to have the averments, whether in the form of amendments to their pleading or in the form of particulars of reliance, refused and struck out.

62.  Thus, the disputes about disclosure and the pleadings go hand in hand, and the three applications they have spawned are:
(1) An application by Tesco to strike out certain passages in the SL Claimants' Reliance Replies;
(2) An application by the SL Claimants for leave to amend their particulars of claim to introduce (among other things) the allegations concerning impairment;
(3) An application by the SL Claimants for disclosure concerning impairment.

63.  Since the various applications were first issued, matters have moved on and some confinement of each has been achieved. In particular:
(1) the SL Claimants have sought disclosure of unredacted copies of PwC's so-called "Summaries of Unadjusted Misstatements" or "SUMs" which record all errors above the so-called "clearly trivial" threshold identified by the auditors which the audited company has declined to correct. They contend that they need such disclosure to quantify the extent and materiality of the adjustments set out in the SUMs and especially to test Tesco's case that they were immaterial. Tesco has agreed to such disclosure and it has also agreed not to pursue its attempt to strike out the relevant parts of the draft pleading which relate to those SUMs; and
(2) Tesco no longer pursued for the purpose of this hearing its argument that an increase in fixed asset impairment is irrelevant to the materiality of the

Exhibit 2
Page 351

overstatements of commercial income, accepting that the court could not fairly make such a finding now and such a question is best left to trial.

(3)  However, Tesco continued to contend that the introduction of the plea, necessitating investigation of the impairment case, would be disproportionately disruptive and the exercise of disclosure and the need for expert evidence might even result in the loss of the trial date. That is because:

(a)  introduction of the impairment case would mean that the Court would have to make findings about what the correct impairment charge would have been absent the commercial income overstatements: for that purpose, expert evidence would be required and the experts would need to consider the relevance of that, if any, to the materiality analysis;

(b)  ascertaining the correct impairment charge would require a substantial exercise consisting of two stages: first, whether, but for the commercial income overstatements, there would have been an *'indication of impairment'* or a *'trigger event'*, and if so, secondly, whether the carrying amount of Tesco's fixed assets would have been found to be higher than (i) the value in use of those assets or (if greater) (ii) their fair value less costs of sale;

(c)  that exercise would be both judgmental (and involve a detailed exploration as to why Tesco was wrong to conclude that there was no trigger event) and difficult to replicate after such a long passage of time since it would be difficult to identify the relevant documents after a plethora of staff departures; and even if it were possible, an expert would need retrospectively to analyse such documents from the relevant period as are still available, form views about the mindset of management at the time, and assess whether there would have been an impairment trigger but for the commercial income misstatements;

(d)  even more problematic would be the second stage (establishing value in use): Tesco has not been able to identify any individuals who are still employed by it who could explain how the value-in-use models (assuming Tesco performed these calculations contemporaneously) work, what the key inputs and assumptions were, and what adjustments management would have made to the model absent the commercial income misstatements;

(e)  yet more difficult would be the other aspect of the second stage: establishing fair value less costs of sales ("FVLCS"). There is no indication that a store-by-store fair value assessment was performed either for FY 2012/13 or FY 2013/14. On that assumption (or even on the assumption that some limited exercise was performed), it would, as Mr Williams says, *'be very challenging, and potentially impossible'* to recreate them now for the relevant period without the use of hindsight: Williams 3, para 13. That would, at the very least, require an additional expert in retail property valuation.

Exhibit 2
Page 352

64.  At the outset of his oral submissions, Mr Mott for the SL Claimants suggested that
there was a clear way or short-cut through all this. Noting that Tesco has not so far
addressed and contradicted the indicative figures put forward by Mr Upson in his ninth
witness statement (dated 8 August 2019) suggesting an impairment of over £400
million, he floated the prospect of the experts agreeing on the level of impairment
being such as (even though not exactly quantified) not only to give rise to a trigger
event, but also to be material in amount. Mr Mott offered the further attractive prospect
of this being a way of in effect making unnecessary hundreds of pages of expert
evidence on materiality and other matters: he suggested it to be "a very easy path
through the thicket of expert issues on materiality".

65.  However, the path depends upon consensus: and the exchanges in correspondence
between the experts to which I was taken do not appear to me to suggest any likelihood
of consensus of that kind. Furthermore, as Mr Mumford submitted, the SL Claimants'
need to establish PDMR knowledge of the falsity of the relevant statements in the
published information would make it very likely both that they would have to pursue,
as well as other aspects of the materiality case, a more qualitative estimate of
impairment, since it seems likely that they would wish to rely on that as supporting an
inference of PDMR knowledge of such falsity. Mr Mott did not really demur from this.

66.  Mr Mott's alternative argument was that Tesco had greatly exaggerated the
difficulties, and that in reality (1) Tesco had a Group Accounting Policy ("TGAP")
which stipulated impairment indicators (including, in particular, (a) where IRR was
lower than WACC or (b) an individual store's performance deviated from plan) across
the stores, making unnecessary an assessment of individual judgment in assessing
whether there had been a trigger event; (2) Tesco's financial statements indicated
[C3/1477] that during the relevant period Tesco used a standard stores impairment
model designed to test the 'Value in Use' of each store; and that if and when Tesco's
model could be found, it should be possible (in the view of the SL Claimants' expert,
Mr Luke Steadman) to use it to assess a range of impairment impacts across the stores
relatively easily.

67.  In the latter context, Mr Mott drew my attention especially to letters from Mr
Steadman referring to the use by Tesco's auditors (PwC) in the relevant period of what
he called "the UK Store Impairment Model" which apparently took as its starting point
a five-year cashflow forecast for each UK store and which, during the 2014/15
financial year had been "sensitized" by PwC to assess impairment across the Tesco
stores. Mr Mott contended that if the "UK Store Impairment Model" and Tesco's
accounting policy manual or other internal documents explaining Tesco's
methodology of impairment assessments could be made available it should be
relatively straightforward to recreate appropriate impairment analyses which would in
effect reflect Tesco's approach at the time.

68.  The evidence given on behalf of Tesco in response was somewhat equivocal, or as Mr
Mott put it, "carefully hedged". In his third witness statement (made on 23 October
2019) Mr Nicholas Williams of Freshfields did not suggest that such models and
documents did not exist, only that none had been seen; though he added that Tesco had
"not been able to identify any employees remaining in Tesco who were sufficiently
closely involved in considering the property impairments at the time" and "it is likely

Exhibit 2
Page 353

that there is nobody who could explain how any models worked and what the inputs and assumptions were, and so that would be dependent on documents being available."

69. To seek to allay any impression to the contrary, Mr Mumford, in his oral submissions, stressed that "since Mr Steadman produced his 11th October letter" searches and enquiries had been undertaken but no "relevant impairment model" had been located. But Mr Mumford put forward, as "the real point on which we rest", that even if "a relevant full impairment model" were to be found, the process of establishing the appropriate impairment would not "be anything like as simple as Mr Steadman suggests to generate the sort of counterfactual answer to whether there would have been a relevant trigger in the relevant years and whether, if there was a relevant trigger, there would have been an impairment charge booked." He stressed that the relevant years are 12/13 and 13/14, and contended that it would be far from straightforward to establish reliable counterfactual impairment store figures for the relevant half years in those periods by an exercise of backward extrapolation from the 14/15 assessment relied on by Mr Steadman. That would especially be so because there was a deterioration in the UK trading profit in the first half of 14/15, before discovery of the commercial income misstatements, so that there would have been materially different assumptions made in the modelling at H1/14/15. Furthermore, he explained,

> "it is not simply an exercise of plugging numbers into models and producing outputs. You've got to work out what judgments were exercised or would, counterfactually, have been exercised by management at the relevant time in making the appropriate forecasts, because, of course, these impairment models are all based upon valuations that are derived from forecasts. They are not retrospective…So what one's actually got to do is identify [what alteration] a change in historical commercial income figures or current commercial income figures would require to your forecast going forward… KPMG are saying that it's not a matter they can decide in isolation on their own, it's going to require input from management…[and]…a disclosure exercise to see if we can identify what the relevant forecasting assumptions were…[and]…who could speak to what was happening and see if they're prepare to give evidence because there may be disputed factual points that need to be resolved before the experts could opine."

70. As a final salvo, Mr Mumford submitted that Mr Steadman was "understating the importance of being able to do an FVLCS valuation" and wrong to suggest that a VIU (Value in Use) analysis was an adequate substitute: both were required. There would have to be a property valuation exercise to establish value as at the relevant time: that would require the appointment of a valuer or valuers to establish a historic value for all of Tesco's store portfolio, and that might well be contested.

71. Turning to my assessment of these competing contentions, I confirm the views that I provisionally expressed in the course of argument, which I can summarise as follows:

(1)    Tesco should continue their searches and enquiries with a view to finding any useful "UK Store Impairment Model" and the further documents revealing the forecast and valuation methodology adopted by Tesco, and/or constituting or evidencing the assessment by members of the Audit

Exhibit 2
Page 354

Committee and/or pleaded PDMRs of whether a trigger event had occurred and/or the reporting to or discussions with PwC and the Audit Committee in respect of the process of impairment testing. These searches and the disclosure exercise required are described more fully in paragraph 1(8) of the draft Order drafted for my consideration.

(2)    The parties are to agree a time certain for such searches and enquiries: although there is a continuing obligation to review disclosure, the exercise I am directing should be time limited so that the question as to whether the matters are to go forward to trial may be assessed in the relatively near future.

(3)    Unless the searches and disclosure reveal a way on which the experts can agree to undertake an impairment exercise for the years 12/13 and 13/14 without a store valuation exercise and without an extended subjective enquiry in creating a counterfactual, the dislocation of the trial involved in permitting the SL Claimants to open this additional front is prohibitive, all sides being in agreement that the trial date must be preserved. Subject to paragraph [72] below, I shall therefore adjourn the Reliance Strike-Out and the Amendment Application until after that exercise is completed.

(4)    A suitable date for my review and (in the absence of agreement) final determination of these applications will have to be found; in the meantime, it may well be sensible for the parties to have liberty to apply, though my availability is very limited until mid-January 2020.

72.    There is one final issue relating to the SL Claimants' Amendment Application which I have already mentioned but which is of a different nature and which I should address. This is the draft pleading (at paragraph 8.5.15C (1)) [B12/38] of an allegation that:

(1)    Tesco's Audit Committee "knew, prior to the publication of the Preliminary Results 2013/14 and the Annual Report 2014, that Tesco's fixed asset impairment in respect of FY 2012/13 and FY2013/14 was being calculated using both a discount rate and a long term growth rate which were outside what PwC considered an acceptable range'' and that

(2)    "In the circumstances it is to be inferred that (a) Mr Clarke and/or Mr McIlwee also knew this and/or (b) the Audit Committee's decision to continue to use this discount rate and long term growth rate, notwithstanding the view of Tesco's own auditors, was attributable to a direction by Mr Clarke and/or Mr McIlwee that aggressive accounting practices and assumptions should be adopted wherever possible in order to improve Tesco's financial reporting to the market in respect of FY 2101/13 and FY 2013/14."

73.    Tesco applied to strike this plea out on the basis that (i) the allegation of "aggressive accounting practices" is meaningless given that it is not asserted that there was anything unlawful in that regard, and has no bearing on the pleaded case; (ii) the width and lack of definition of the concept makes it nigh on impossible to establish who knew that the practices were "aggressive" in the intended sense; (iii) such an allegation if left to stand would also prompt an examination and presentation of contrasting prudent accounting judgments to counterbalance the suggestion that there was some general "aggressive" approach that Tesco took; and (iv) the inference pleaded at (b) in paragraph 72(2) above is unsustainable.

Exhibit 2
Page 355

74. Sensing my sceptical reaction to that last plea of a general inference, Mr Mott in reply sought to preserve the rest of the draft pleading quoted at (1) and at (2) (a) in paragraph [72] above by agreeing the deletion of (b). Mr Mumford did not accept the suggested deletion was a cure, and suggested that it was simply a deletion of the express whilst not foreclosing the later introduction of the asserted inference.

75. I propose to permit the plea in the amended form as suggested by Mr Mott and delete (b). I should say that I consider the inference as pleaded at (b) to be unsustainable. I also think there is real doubt about the plea of "aggressive accounting practices". But the plea of a departure from PwC's "acceptable range" seems to me to be unobjectionable at this stage, and the more limited inference of Mr Clarke and Mr McIlwee's knowledge to be permissible, leaving both those matters on the record to be adjudicated at trial. The parties have agreed that any question of further disclosure should be addressed after Tesco have pleaded in response; and that the parties should have permission to apply failing consensus at that stage.

### Tesco's application for disclosure

76. I turn to Tesco's application for further disclosure, most of which has been resolved to the parties' mutual satisfaction by agreement. Two specific disclosure topics remain: both relate to the issue of reliance. One concerns Tesco's request for disclosure of the underlying formulae contained in the quantitative investment model, called BMR+, used by the investment manager for Claimant 33 ("Frankfurt Trust"). The other concerns Tesco's request for disclosure of "*the individual risk profiles of the clients for whom Rathbones* [Claimant 9] *traded shares during the Relevant Period.*" This relates to approximately 8,000 individual clients.

### Frankfurt Trust

77. Part of the hearing of the issue relating to Frankfurt Trust was held in private. This was because the model used was said to be highly confidential. I do not think anything in this judgment will require redaction: but that is a matter that can be addressed when it is circulated in draft.

78. The issue is a narrow one. The SL Claimants do not dispute the entitlement of Tesco to disclosure of the model which guided Frankfurt Trust's investment decision. The issue is whether the proposal they have put forward, to protect its confidentiality, suffices. Tesco contend that it does not, because it needs the full, unredacted and native version of the model in order to test the counterfactual case, and whether when inputted the result would be a recommendation to buy, sell or hold.

79. In essence, the proposal (set out in a letter from Stewarts Law LLP to Freshfields dated 25 October 2019) would require (1) Tesco, instead of running its own tests, to notify Stewarts Law LLP of the experiments it wishes to run on each of the BMR+ models disclosed, specifying which input metrics it wishes to change and the altered values/figures for these metrics that it wishes to be inputted and how; (2) for the SL Claimants then to review Tesco's proposed experiments for relevance with a view then to agreeing them; and then (3) for a video conference to be convened at which Frankfurt Trust would run the experiments, with members of Stewarts Law LLP and representatives of Tesco (excluding Ms Rosie Bichard who may be regarded as running a competing investment business) attending remotely by video link (or in

Exhibit 2
Page 356

person if required, and feasible); (4) for that video conference to be recorded; and finally (5) for the results of the experiments thus undertaken and recorded to be the subject of witness evidence or an agreed statement of facts. The SL Claimants stress the justification of such an approach is that (a) it should accommodate Tesco's legitimate desire to test the system through inputting counterfactuals but (b) protect Frankfurt Trusts' proprietary and highly confidential formulae.

80.   Tesco's main objection to the proposal is that it deprives it of the flexibility it should be entitled to have to test with its own expert various counterfactual inputs and outputs, and (since it is understood that the model works off consensus estimates) different market consensus views, and without the intrusive supervision of the SL Claimants as the opposing party. Such supervision would amount to peering into Tesco's preparations which would otherwise be privileged. Tesco has no wish to exploit the model for any other purpose, nor any objection to the experiments being within the Confidentiality Club arrangements (from which it entirely accepts Ms Bichard should, for these purposes, be excluded). Tesco stresses that no other Claimant which has used a computer model has objected to its disclosure. Lastly, Mr Mumford made the point that confidentiality is not of itself an answer to disclosure; and whilst the court will seek ways of protecting it, the burden is on the party resisting disclosure to persuade the court that this can be done without eroding the rights of the other party (and see *Science Research Council v Nasse* [1980] AC 1028). Mr Mumford disparaged the apparent insistence on the part of Frankfurt Trust that "it's not prepared to disclose the working formulae": as a claimant it is bound to abide by the rules of the court whose process it has engaged.

81.   The balance between the legitimate commercial desire to protect highly confidential information, processes and material and the right (subject to the discretion of the court) of a party to receive proper disclosure in a way that enables it to test the other side's case can be, and in this case in my view is, a difficult one. I am not persuaded that the proposal put forward is sufficient to discharge the burden that (in agreement with Mr Mumford) I accept is on the SL Claimants (and, in particular in this regard, Frankfurt Trust). However, I am impressed by the particular confidentiality and sensitivity of the formulae and other workings of the model, which the evidence I was shown does indeed suggest is of a very high order. Parties should not be required as the price of vindicating their rights to prejudice their proprietary rights (described by Mr Mott as "the life's work, essentially, of the gentleman behind this"); and I approach Frankfurt Trust's reluctance to reveal this in that light. In my view, some better balance must, if at all possible, be achieved.

82.   It seems to me that this must be tailored to affording greater flexibility to Tesco and its expert, and reducing the intrusion; and this may only be possible by the instruction of a highly trusted third party nominated by Frankfurt Trust and approved by the court to supervise the process, which might be recorded by a video which would be kept in case of the necessity for the court to determine any dispute, but sealed. For the present, I leave it to the parties, with such benefit that this thought provides, to try to find some better proposal than is presently put forward. Otherwise I shall have to adopt the rather blunt and binary approach left to the court. I would invite formulation of an appropriate revised proposal within 14 days (or such other period as the parties may agree).

Exhibit 2
Page 357

FL-2017-000001 & FL-2016-000019

*Rathbones*

83.  I turn to the issue concerning Rathbones. The problem arises principally in the context of Rathbones' particular investment decision processes. In this regard, Rathbones operates differently from the other SL Claimants in that decisions were made by in excess of a hundred investment managers over the relevant period who, in turn, acted on behalf of their underlying clients. It would appear from this that the requirements of those individual clients were an important factor that drove the relevant investment decisions. This has two broad consequences: first, since each investor may have different outlooks (not for example, fashioned by a model or investment formula common to all as in the case of Frankfurt Trust and others) reliance will ultimately have to be established in the case of each investor, though 'sample' investors have been chosen in the first instance to seek to establish parameters which may assist in the determination of the case on reliance more generally. Secondly, it is especially important to test the 'sample' cases by reference to information about the clients' individual circumstances, risk appetite, investment objectives and requirements available and current at the date of the relevant investment decision.

84.  Although Stewarts Law LLP (by letter to Freshfields dated 5 November 2019) have agreed to provide (subject to certain conditions apparently designed to protect confidentiality to which Tesco has not objected) client agreements and profiles for the clients represented by the investment managers to be tried as 'sample' cases, Tesco has ascertained that the information provided may not be up to date, or reflect more detailed and contemporaneous information obtained in informal discussions rather than in the course of a formal updating process which I am told occurred only every three years. Tesco seeks an order requiring a search and disclosure of such information, making the point that it must have been sought and kept by Rathbones or the relevant manager for regulatory purposes. The SL Claimants have objected on the basis that a search of all five 'sample' investment managers' communications with their clients (I was told some 216 clients) and records of informal updating of their objectives, risk appetite and the like would be very difficult, time-consuming and expensive and that the exercise would thus be both too granular and disproportionate.

85.  As I mentioned in the course of the hearing, I must admit to finding it surprising that there should be such difficulty in collating the detailed information sought given what I assume are regulatory requirements in that regard. I asked to be informed more precisely what these requirements (if any) are (or were at the relevant time). Further to this intervention Rathbones agreed to investigate again the viability of providing Tesco with more detailed information, and the upshot has been an exchange of correspondence in the course of which I apprehend that a reasonable resolution has been reached, subject to Tesco's reservation of its right to request further documentation from Rathbones in relation to individual client circumstances should the documents to be provided in accordance with the proposal turn out to be inadequate. I am content with that course.

***Tesco's applications for Letters of Request***

86.  The dispute on the issue of reliance spawned a further agenda item for determination at CMC4. Tesco seeks disclosure of the models used by investment managers and other analyses of Tesco shares in order fairly to be able to test the SL Claimants'

Exhibit 2
Page 358

FL-2017-000001 & FL-2016-000019

reliance case. In some instances, however, the SL Claimants have taken the position that the models and other documents are in the control of investment managers, not the relevant SL Claimant. Some investment managers are outside the jurisdiction. Tesco has accordingly issued two applications, supported by witness statements of Mr Ian Taylor of Freshfields in each case, for a letter of request to be issued by the English court to the relevant foreign court with a view to obtaining these documents from the investment managers.

87. The SL Claimants have not consented to these applications but do not oppose them, though they have expressed concern about the width of the request, potential issues of confidentiality and the likely time frame for the working through of the procedure and its potential to impact the trial timetable.

88. One preliminary point seems to me to be worth making, although I confess it has occurred to me after considering the basis of the requests. It is this: in one sense, at least, the apparent reluctance of those who in fact made or directed the decision to provide the documentation on which it was based is somewhat surprising. Tesco's requests do not seem to me to involve a broad trawl; and I would expect the documentation to be fairly easily collatable. Just as Tesco seek the documents to test the relevant SL Claimants' reliance case, so it might be thought those Claimants might need the documents to establish it. Although I cannot usefully or appropriately speculate any further as to the thought-processes guiding those concerned, it may be that reflection on the matter, may encourage a more constructive approach. In the meantime, I can only base my approach on the assumption that a letter of request is the only way of obtaining the documents.

*Jurisdiction*

89. Turning to my jurisdiction, it was pointed out to me at the outset by Mr Mumford that although Mr Taylor states in his 15th witness statement in support of the first application and in his 17th witness statement (in support of the second) that the application is made pursuant to CPR 34.13, that provision of the rules relates to applications for examination of witnesses out of the jurisdiction and not in a Regulation State. However, the court does have inherent jurisdiction to issue a letter of request for the production of particular documents (though not for more general discovery): see *Panayiotou v Sony Music Ltd* [1994] Ch 142 at 149H, 151B-C and (as to the need for the request to be confined to particular documents, though these may be described compendiously) 153F-G. Mr Taylor's 18th witness statement (in further support of the first application) invokes that inherent jurisdiction expressly. I take both applications to be intended to invoke that jurisdiction.

90. The test for the exercise of the jurisdiction, which is discretionary, is that the letter of request must be limited to documents that exist, are capable readily of being identified by the recipient and which would be admissible as evidence in the English action: *ibid.* at 153G.

*Application re Dimensional*

91. The first request concerns documents held by DFA Australia Ltd ("Dimensional"), the investment manager for the QIC Claimants (SL Claimants 69 and 86). The QIC Claimants have explained (some time ago, in May/June 2019) that relevant documents

Exhibit 2
Page 359

requested by Tesco and falling within agreed categories are not within its control, but rather in the control of Dimensional. Dimensional is incorporated in New South Wales, Australia. As to this request to the Supreme Court of New South Wales ("the NSW Supreme Court"):

(1)  It is clear from the QIC Claimants' evidence that Dimensional's portfolio managers used proprietary tools in making investment decisions, the output of which was recorded in spreadsheet form, showing how the stock under evaluation compared to other candidates in the investment universe.

(2)  As Mr Taylor accepts in his 15th witness statement Dimensional has cooperated to some extent; and some issues have been resolved consensually (for example, Dimensional has queried its trading records databases for all trades in Tesco in the QIC portfolios in the relevant period and searched associated Excel files containing information supporting the generation of the orders on which the trades were based, and it agreed (in July/August 2019) to conduct keyword searches of its Excel files, archived email and instant messages). However, the documentation as to the basis on which the investment decision was made remains materially incomplete.

(3)  The QIC Claimants have not disclosed any working native models of these spreadsheets, nor any documents evidencing the underlying data and calculations used in those models. Nor has there been any disclosure of documents that explain the quantitative metrics, calculations and ranking systems used by Dimensional.

92.  I am satisfied that these documents exist (as is apparent from the QIC Claimants' own evidence). Although the SL Claimants have queried the width of the disclosure sought, I note that the documents sought in section 12(1) of the proposed Letter of Request are referred to in a witness statement made by Dimensional's Head of Asia-Pacific Portfolio Manager on behalf of Dimensional and the QIC Claimants; and the documents described in section 12(2), though admittedly fairly broad in potential scope, have been described with as much specificity as possible and should be readily identifiable by Dimensional. I am also satisfied that the documents would be admissible as evidence in this action and are important to Tesco's ability to test the QIC Claimants' reliance case and bring forward a counterfactual case.

93.  The concerns expressed by Dimensional about confidentiality are material and need to be taken into account. Dimensional has expressed particular concern lest Ms Bichard, who works as an equity analyst, gain access to proprietary and confidential material belonging to a competitor. However, in my view, if the documents and any model are kept confidential in the same way as other models provided within the Confidentiality Club, and provided (for reasons previously summarised) Ms Bichard is not shown or given access to any of them, it seems to me that should suffice at this stage of the process. Of course, it will be a matter for the requested Court (the NSW Supreme Court) to determine any further restrictions it considers necessary in response to any claim to preserve confidentiality in, or proprietary rights governed by, its jurisdiction.

94.  The other issue raised by the SL Claimants, as to the potential timing of the process and any possible impact on the Trial or its preparation, has also caused me some concern. However, I am reassured in that regard by the view of Counsel and Attorneys in the firm of Clayton Utz in Sydney, Australia, whom Freshfields have instructed on behalf of Tesco, that it is reasonably to be expected that the NSW Supreme Court

Exhibit 2
Page 360

would deal with the matter within weeks rather than months; that if not opposed by Dimensional the documentation may reasonably be expected to be provided by 10 January 2020; and that if Dimensional oppose and the matter went on appeal, it would be likely to be expedited and concluded in February or March 2020. Whilst the latter date is perilously close to the trial commencement date in June 2020, I do regard the prospect of an appeal as presently unlikely: as I elaborate also in the context of the second application, the documents in question may be as useful to the relevant Claimants as to Tesco, and excessive reluctance to provide them may tell against the Claimants.

95.  I am satisfied in these circumstances that a letter of request for production of the specified documents and models by Dimensional should be issued. I am content with the form now proposed. By analogy with CPR 34.13(6)(b) and PD34A, para. 5.3 (5), I require and would accept the undertaking usually offered to be responsible for the Secretary of State's expenses incurred in relation to the Letter of Request.

*Application re TGAL*

96.  The second request concerns documents held by Templeton Global Advisors Ltd ("TGAL") which acted as the investment sub-advisor or sub-sub-advisor for the John Hancock Templeton Claimants (that is to say, SL Claimants 8, 15 and 92). It appears from Reliance Particulars served by the SL Claimants that it was TGAL which made, directed or at least advised the decisions to purchase, hold and sell Tesco shares on behalf of the John Hancock Templeton Claimants in alleged reliance on Tesco's Published Information. TGAL is incorporated in the Commonwealth of the Bahamas ("the Bahamas"). The SL Claimants have taken broadly the same position on this application as on the first.

97.  As to the background and basis of this request:

    (1)   Stewarts Law LLP have explained (by letter to Freshfields dated 12 July 2019) that the majority of documents that would fall within the agreed disclosure categories are, so far as they relate to the John Hancock Templeton Claimants, held not by them but by investment managers, and in particular TGAL.

    *(2)*   In witness statements provided on behalf of those Claimants, Mr Edgerton Tucker Scott (an Executive Vice-President of TGAL who was the lead portfolio manager for Claimants 8 and 15) and Mr Norman Boersma (Chairman and CEO of TGAL who was the lead portfolio manager for Claimant 92), have stated that TGAL evaluates stocks by a *"rigorous fundamental analysis of a company's business to determine what we consider its economic worth"*.

    (3)   These witness statements refer to internal analysts' reports on which it is said reliance was placed; and these have been disclosed. However, the disclosure provided to date includes no working native versions of the underlying models used by TGAL, nor any documents evidencing the data or calculations used in those models nor any documents evidencing analysis or consideration of the Tesco stock by the individuals said to have been the

Exhibit 2
Page 361

decision-makers at TGAL. Mr Taylor notes that the internal analyst reports or "Food Retail Reports" already disclosed refer to six metrics to forecast Tesco's performance: trough margin, peak margin, 7yr, 8yr and 9yr average margin, FY6 margin, 7 or 9 year CAGR and 2014-2019 CAGR, and there must be documents containing or evidencing these and the other underlying data, assumptions, calculations and third party data used by the analysts to populate the models: but none has been produced. Nor has there been produced any documentation evidencing the consideration of the investment decision by the key decision makers. The disclosure so far is, to my mind, notably thin.

(4)    Tesco has sought disclosure of these documents from the John Hancock Templeton Claimants; but they have responded saying that the documents were not in their control but rather in the control of TGAL, and that TGAL's searches *"were circumscribed by their concerns regarding confidentiality and/or the disproportionate amount of management time which would be taken by disclosure"* and that identifying further relevant documents would be *"unduly burdensome and disproportionate"*, especially in light of the departure of the relevant analyst from the organisation. According to Stewarts Law LLP's letter to Freshfields dated 12 July 2019 conveying these points, TGAL has also put forward confidentiality concerns as a reason for declining to undertake a further voluntary search and disclosure: it is said that *"this confidential information forms the basis of…[its]…point of differentiation and competitive advantage in its market and it is not willing to risk this information becoming available to competitors"*, and that it does not believe that the Confidentiality Club provides sufficient comfort because Ms Bichard (an equity analyst for a competitor) is a member of it.

(5)    In the light of this response, Tesco has further reduced to what it regards as a minimum the number of documents sought by its proposed letter of request; but the documents now sought are said to be plainly necessary in order to enable the proper testing of the reliance claim and the exercise of identifying and producing them would be proportionate. Without these documents and the ability to analyse the financial models and the investment decision making process that TGAL followed to determine or direct whether to purchase, hold or sell Tesco shares, Tesco contends that it would not be able properly to test the John Hancock Templeton Claimants' reliance case, or in particular, the allegation that the investment decision made would have been different had Tesco published the correct trading profit figures.

98.    I am satisfied that these documents are likely to exist. Although the SL Claimants have queried the width of the disclosure sought, I am also satisfied that the documents sought are capable of being identified, collated and produced, would be admissible as evidence in this action and are important to Tesco's ability to test the John Hancock Templeton Claimants' reliance case. I consider that I am entitled to assume that TGAL maintains a proper filing system for each of its clients and properly collated and files records of the advice it has given about investments such as that in Tesco. Very little substance has been provided to substantiate the conclusory statement that the search and production requested would be disproportionately burdensome: the relevant analyst's departure may make the task marginally more difficult but (in a well-ordered

Exhibit 2
Page 362

office) not markedly so; and the proposition that confidentiality concerns would circumscribe or impede the process is not further explained and is not easy to accept.

99. Once again, the SL Claimants' concerns about confidentiality need to be taken into account. However, in my view, and as in the case of the first application, if the documents and any model are kept confidential in the same way as other models provided within the Confidentiality Club, and provided (for reasons previously summarised) Ms Bichard is not shown or given access to any of them, it seems to me that disclosure at this stage of the process. It is Ms Bichard's inclusion in the Confidentiality Club which has been singled out as the concern: and that can, as it seems to me, thereby be addressed. Of course, it will be a matter for the requested Court (the Bahamas Supreme Court) to determine any further restrictions it considers necessary in response to any claim to preserve confidentiality in, or proprietary rights governed by, its jurisdiction; but for my part, I do not think the safeguards are inadequate.

100. In the course of the hearing, I pointed out that (in contrast to the position in the first application) there was no estimate provided by Bahamian Counsel as to the likely timescale, and I asked whether such information might be made available. After the hearing I was provided (by email from Freshfields to my clerk dated 8 November 2019) with the following information based on the advice of Bahamian Counsel, namely Lennox Paton:

> "Once it has been approved by the English Court, the position is that the Letter of Request is sent to the Registrar of the Supreme Court of the Bahamas; the Registrar then passes the Letter of Request to the Attorney-General who makes an application to the Supreme Court for an order giving effect to the Letter of Request. Without waiver of privilege Tesco confirms, in the light of discussions with Lennox Paton, the local counsel firm it has retained in the Bahamas, that the likely timescale from receipt of the Letter of Request by the Registrar of the Supreme Court of the Bahamas to the making of an order that documents be produced would be three months."

101. This timescale, which does not cater for the possibility of an appeal (albeit I would hope an unlikely one, since the documents seem to be as necessary for the purposes of establishing as they are for rebutting the reliance case), is a little unsettling. Anything that might be done to accelerate it would be beneficial; and if on reflection, and given the issue of a letter of request, TGAL consider that voluntary production would, after all, be in the interests of their clients, that would be a very helpful solution. However, even on the basis that the documents may not be produced until February or so, I have concluded that the delay is not of itself a sufficient basis for denying the request.

102. Otherwise, I am satisfied in these circumstances that a Letter of Request for production of the specified documents and models by TGAL should be issued. I am content with the form now proposed. By analogy with CPR 34.13(6)(b) and PD34A, para. 5.3 (5), I require and would accept the undertaking usually offered to be responsible for the Secretary of State's expenses incurred in relation to the Letter of Request.

Exhibit 2
Page 363

THE HONOURABLE MR JUSTICE HILDYARD                                          FL-2017-000001 & FL-2016-000019
Approved Judgment

*Adequacy of the current trial estimate*

103. Welcome co-operation between the parties has resulted in a fresh estimate for trial and
     agreement in principle between them as to what Mr Mumford described as "the broad
     contours of the trial timetable".

104. The original trial estimate was some 40 to 50 days. The trial is currently listed for 44
     hearing days, commencing on Tuesday, 2 June 2020. It is now considered that this is
     inadequate and that a realistic time estimate would be 56 days. I am content with that.

105. Tesco's main concern is that its lead Leading Counsel, Mr Rabinowitz, is presently not
     available after Friday, 11 September 2020. Tesco would have preferred to conclude the
     case by then and has advocated that the court should depart from the usual practice in
     the Commercial Court and in the Financial List of sitting on four days a week, and direct
     that the court will sit on 5 days a week, at least for part of the time. Tesco also invited
     me to direct much shorter oral openings than the Claimants had signalled they wanted.

106. In the course of the hearing, I indicated that I did not think that it would ultimately be
     beneficial for there to be a departure from the usual rule of four hearing days per week.
     My experience has been that the break on the fifth day is salutary. I indicated that I
     would not, save exceptionally, wish to depart from it.

107. I also indicated that in a document-heavy case, while longer oral openings than usual
     might be helpful to the court in preparing it to understand the evidence and the process
     of cross-examination, the Claimants' proposal of 13 days for oral openings was
     excessive.

108. In the light of my indications, and my expression of a willingness to sit for part of
     September to assist the parties, the upshot has been a revised proposal reducing the time
     for oral openings to seven days and providing for there usually to be four hearing days a
     week. The price is that the evidence will spread over until September, but factual
     witnesses should almost all be completed by the end of July with the first two weeks in
     September allocated to expert evidence. There will then be time during the latter part of
     September for the preparation of written Closing Submissions before the trial
     recommences for oral closings on 5 October 2020, with a view to the completion of the
     process on Friday 16 October. Although no doubt disappointed that they may not have
     Mr Rabinowitz for the oral closings, Tesco has confirmed that it is content with this
     course.

109. I too am broadly content with these proposals, though they may require refinement as
     matters develop.

*Conclusion*

110. I would ask Counsel to agree a draft order to reflect these rulings. Any points of
     remaining disagreement can be submitted to me in writing in the first instance.

Exhibit 2
Page 364



Neutral Citation Number: [2021] EWHC 136 (QB)

Appeal No: QA-2020-000071
Claim No: E03CL370

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**ON APPEAL FROM THE COUNTY COURT AT CENTRAL LONDON**
**ORDER OF CIRCUIT JUDGE HH JUDGE BAUCHER DATED 28 JANUARY 2020**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 28/01/2021

Before :

**THE HONOURABLE MR JUSTICE SAINI**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

**KHALID KASEM**                                          **Appellant**

**- and –**

**UNIVERSITY COLLEGE LONDON HOSPITALS**
**NHS FOUNDATION TRUST**                    **Respondent**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Iain Daniels** (instructed by **Saunders Law LLP**) for the **Appellant**
**Mark Roberts** (instructed by **Hempsons LLP**) for the **Respondent**

Hearing date: 20 January 2021
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Covid-19 Protocol: This judgment was handed down by release to Bailli. The date and time for hand-down was deemed to be 10:30am on Thursday 28 January 2021.

.............................

THE HONOURABLE MR JUSTICE SAINI

Exhibit 2
Page 365

## MR JUSTICE SAINI :

This judgment is in 5 parts as follows:

I.      Overview:                         paras. [1]-[14]

II.     The Facts:                        paras. [15]-[20]

III.    The Particularisation Issue:      paras. [21]-[54]

IV.     Additional Grounds of Appeal:     paras. [55]-[67]

V.      Conclusion:                       para. [68]

### I.    Overview

1.    This is an interlocutory appeal in a claim brought by the Respondent NHS Trust ("the Trust") against the Appellant, Khalid Kasem ("Mr Kasem"). By that claim, the Trust alleges that it was induced by Mr Kasem's fraudulent representations to offer him a CPR Part 36 settlement in the sum £75,000.00 in compromise of his clinical negligence claim against the Trust. That original claim was a damages claim against the Trust for what was alleged by Mr Kasem to have been negligently performed shoulder surgery, which caused him long term and debilitating problems. That offer was accepted by Mr Kasem by Notice of Acceptance in accordance with the CPR Part 36 procedural regime.

2.    Basing itself on information it says it acquired post-compromise, the Trust claims that Mr Kasem fabricated and/or exaggerated the impact of the allegedly negligent surgical procedure on him. In short, the Trust argues that Mr Kasem made a dishonest claim and obtained financial settlement of his claim vastly in excess of any true or legitimate claim. It has not paid the £75,000.00 and seeks damages for fraud against Mr Kasem.

3.    In support of its claim the Trust relies upon photographic evidence from social media which it says shows that Mr Kasem must have lied in his claim as regards quantum. That evidence is said to identify him undertaking a number of activities which are inconsistent with his claimed disability. This is said to be at odds with the claimed serious and continuing shoulder problems asserted by Mr Kasem to have been caused by the allegedly negligent surgical procedure.

4.    The legal nature of the Trust's claim, and the relief sought, are at the heart of this appeal. The claim is a common law deceit claim but an averment at the start of its Particulars of Claim has caused part of the controversy in issue on appeal.

5.    At paragraph 4 of its original Particulars of Claim the Trust pleaded:

> "For the avoidance of doubt the [Trust] does not seek, by way of remedy, to have the Notice of Acceptance set aside and/or to withdraw its Part 36 Offer. The [Trust] seeks damages in the tort of deceit, including on an exemplary basis, on account of the fraudulent misrepresentation."

Exhibit 2
Page 366

6.    On behalf of Mr Kasem it was denied that he had lied in making the original claim but more specifically he responded that the Trust's fraud claim fell to be struck out because the above plea at paragraph 4 of the Particulars of Claim relied upon the Part 36 compromise remaining in place (and thereby the Trust sought to maintain its protection and avoid the need to litigate the underlying claim). It was said that this was an abuse of process. Mr Kasem also argued that the original pleading was not properly particularised, and the claim should be struck out for that distinct reason.

7.    Both of these complaints led to Mr Kasem issuing an Application Notice dated 28 June 2019 seeking orders striking out the Trust's claim, alternatively for summary judgment under CPR Part 24.

8.    That application came before Her Honour Judge Baucher ('the Judge') sitting in the Central London County Court on 17 October 2019. The Judge accepted the complaint made by Mr Kasem as regards the abuse in relying on the Part 36 compromise and struck out the claim. However, she also directed that the Trust have liberty to seek to amend its claim and apply for reinstatement of it. The Judge did not at this stage address the fraud particularisation complaints. There is no note or transcript before me of what seems to have been an ex tempore judgment.

9.    An Application Notice dated 15 November 2019, accompanied by a draft amended Particulars of Claim, was in due course served by the Trust. The amendment removed paragraph 4 of the Particulars of Claim and replaced it with a plea which expressly sought a setting aside of the Part 36 compromise. The Trust did not however amend or further particularise the fraud claim which, as indicated above, was the subject of a separate complaint in Mr Kasem's Application Notice of 28 June 2019.

10.    The Judge's detailed judgment of 28 January 2020 on the Trust's amendment application is the subject of this appeal. In summary, the Judge held that amendments were to be allowed on the basis that the Trust was not barred by the doctrine of affirmation from resiling from its original pleaded adoption of the compromise, and also that the pleas in fraud were sufficiently particularised to pursue a deceit claim. The Judge accordingly made an Order on 28 January 2020 granting the Trust permission to amend and she dismissed Mr Kasem's application to strike out the Trust's claim.

11.    Mr Kasem sought permission from the High Court to appeal against this Order. He argued that the Judge was in error on four grounds, which I summarise as follows:

    i)    error in finding that the principle of affirmation did not apply to Part 36 settlements having found that the test for affirmation was satisfied;

    ii)    error in finding that the Part 36 settlement could not be affirmed in a claim which contended fraud, on the basis that fraud "unravels all";

    iii)    having found that there was an abuse of process, error in holding the Trust should be permitted, in the absence of any explanation, to amend its claim. Further, the decision to permit the claim to continue having determined it as an abuse of process sufficient to strike it out was irrational and/or one which no reasonable judge could have made; and

    iv)    error in concluding that the claim in deceit was properly particularised.

Exhibit 2
Page 367

12.     On 8 October 2020, Freedman J granted Mr Kasem permission to appeal on the papers
        solely on Ground 4 (to which I will refer as "The Particularisation Issue"). He refused
        permission to appeal in each of Grounds 1-3 but directed that Mr Kasem could orally
        renew his application on those grounds at the hearing of the appeal on Ground 4, with
        the appeal to follow, if permission was granted.

13.     Having heard oral argument on all the Grounds at the hearing of the appeal, I indicated
        that I would not grant permission to appeal in relation to Grounds 1-3, and would give
        my reasons for refusal together in my judgment on Ground 4. I do that in **Section IV** of
        this judgment.

14.     I will begin by setting out the facts and procedural background in more detail.


## II.     **The Facts**

15.     The original claim arose out of an alleged negligently performed Latarjet procedure
        undertaken on 22 May 2013 by Mr Carlos Cobiella on behalf of the Trust. Mr Kasem
        had a history of problems to the right shoulder following sporting trauma and required
        surgical intervention. The Latarjet procedure is a surgical procedure performed to treat
        shoulder instability by relocating a piece of bone with an attached tendon to the shoulder
        joint.

16.     In summary, Mr Kasem's position in the original action was as follows. He said that
        the initial Latarjet procedure undertaken on 22 May 2013 was carried out negligently
        in that a coracoid bone graft was not positioned or fixed in place correctly, giving rise,
        inter alia, to a requirement for further surgery. In any event, he argued that he had
        wrongly not been given the option of a Bankart repair, a procedure that did not involve
        the requirement for a bone graft or for screw fixation.

17.     By reason of the alleged negligence, Mr Kasem said he had been left with permanent
        ongoing symptoms and serious problems with his right shoulder. In addition to damages
        for pain, suffering and loss and amenity he sought to recover future lost earnings of
        £466,023.29. The claim originally had a pleaded value in excess of £600,000.00. The
        Trust put both liability and quantum in issue.

18.     The material procedural steps which followed issue of the original claim were as
        follows:

        24 November 2017 Trust's Part 36 offer of £75,000.00.

        26 March 2018 Mr. Kasem's Solicitors confirmed, with
                            service of their client's updated Schedule of
                            Special Damages, that their client's
                            '…condition has not altered from that
                            which was set out in the report served with
                            his Particulars of Claim'.

        3 April 2018          Mr. Kasem's Part 36 offer of £250,000.00.

Exhibit 2
Page 368

| | |
|---|---|
| 11 May 2018 | The Trust requested release of DWP records, together with personnel papers from Dial A Flight (Mr. Kasem's employer). |
| 14 May 2018 | The Trust requested that Mr. Kasem disclose full and un-redacted bank statements, only partial disclosure having been provided. |
| 16 May 2018 | The Trust's Solicitors repeated its request for disclosure of bank statements, with the comment that – 'on the basis of the evidence as it currently stands, my client is unable to properly consider its position on the issue of quantum or indeed, the Claimant's recent Part 36 offer of £250,000.00. Please provide all items sought within 28 days hence – i.e. by 13 June 2018. In the event that you have not complied with the Defendant's request by that date I will take instructions on an application for specific disclosure'. |
| 24 May 2018 | Mr. Kasem provided authority for release of Dial A Flight records. |
| 30 May 2018 | The Trust learned for the first time of a successful claim against his former employers by Mr. Kasem. This was in light of clarification being sought from Dial A Flight as to whether the papers for disclosure should include those relating to a claim against them. |
| 20 June 2018 | The Trust's Counter Schedule of Loss and condition and prognosis evidence was served. |
| 28 June 2018 | Mr. Kasem's Solicitors confirmed that their client, would provide a form of authority for release of papers relating to the claim against Dial A Flight. |
| 28 June 2018 | Partial disclosure of bank statements was provided by Mr Kasem. |
| 4 July 2018 | The Trust confirmed that it would pursue an application for specific disclosure in the absence of full disclosure. |

Exhibit 2
Page 369

| 4 July 2018 | Mr. Kasem's Solicitors requested further time in relation to disclosure, his solicitors confirming that they were reviewing PDF documents from their client. |
| 4 July 2018 | Mr. Kasem accepted Part 36 offer of £75,000.00 out of time, no further disclosure having been effected. |
| 20 November 2018 | The present fraud claim was issued by the Trust, it having not paid settlement sum. |
| 21 January 2019 | The original claim was stayed until further order pending resolution of the fraud claim. |
| 21 March 2019 | Defence. |
| 23 May 2019 | Reply to Defence. |

19.    The procedural steps which led to the Order under appeal are described by the Judge in the Judgment:

"3. In paragraph 4 of the particulars of claim in these proceedings, the claimant pleaded that it was not seeking to set aside the Part 36 offer in the Original Action. On 17 October 2019, I heard the defendant's application to strike-out the claimant's claim on the basis that the particulars of claim disclosed no reasonable grounds for bringing the claim and/or that the particulars of claim were an abuse. Without rehearsing the arguments advanced by Mr Roberts for the claimant and Mr Daniels, who appeared for the defendant on that date, I was satisfied that, on the pleaded case, the case should be struck-out pending any further application by the claimant. I, accordingly, ordered: (1) the claim is struck-out subject to any application by the claimant to amend its claim, such application to be made no later than 4.00pm on 15 November 2019, with a copy of the proposed amended particulars of claim, and be reserved for Her Honour Judge Baucher; (2) any consequential application made in claim C74YJ879 is also to be made no later than 4.00pm on 15 November 2019; (3) the defendant has liberty to file and serve a draft amended defence by 4.00pm on 29 November 2019.

4. Pursuant to that order, the claimant issued its application dated 15 November 2019 which reads: 'What order are you seeking? An order in the attached form to reinstate the claim, amend the particulars of claim and for the proceedings to be case managed together with claim C74YJ879.' and in the C74YJ879 action; 'An application that an order for these proceedings to be case managed together with claim E03CL370 and preventing the

Exhibit 2
Page 370

claimant from entering judgment against the defendant pending the outcome of claim E03CL370.'.

5. The claimant now seeks to amend its particulars of claim and within the embodiment of the revised pleading, seeks to set aside the Part 36 compromise; to have the original action case managed and tried thereafter; and seeks damages in the tort of deceit."

20.    As explained above, the Judge permitted this amendment and directed the claims be managed together. She also held that the fraud claim was sufficiently particularised which is the first issue before me.

## III.    The Particularisation Issue

21.    This is the sole ground on which Freedman J granted Mr Kasem permission to appeal. Freedman J explained that although one might consider this a case management issue (where an appeal court would defer to a first instance judge), there was a case with a real prospect of success that, as pleaded, the case in deceit was lacking in particularity.

22.    Before considering the Judge's reasons for allowing the claim to proceed, I need to set out the precise pleaded case.

23.    Having first pleaded the nature of the claims made by Mr Kasem and some of evidence he had relied upon by way of quantum (which I assume was intended to be the case as to "representatations" for the tort ), the draft amended Particulars of Claim (which remained in this respect in the same form as the original) continued as follows in the material paragraphs:

"16. It is the position of the Claimant [the Trust] that:

a.    Substantively the Defendant [Mr Kasem] contrived to present fabricated and/or exaggerated heads of damage and accordingly fraudulently misrepresented the true level of his claim. Specifically it is alleged that the Defendant has fundamentally sought to mislead the Claimant and/or the Court in relation to his claim for personal injury and/or associated special damages in particular alleged lost income, credit card interest and loss of rental income; and

b.    Procedurally the Defendant has:

i.    Failed to effect disclosure and/or deliberately effected misleading and/or incomplete disclosure of relevant documentation which he must have known was harmful to his case;"

Exhibit 2
Page 371

    ii.    Endorsed his statement with a Statement of Truth seeking to support claims which he knew were fabricated and/or exaggerated.

Particulars of the Claimant's position

17. The Claimant is now in receipt of evidence which confirms:

    a.    The Defendant is not in truth suffering from physical symptoms to the extent alleged, for example:

        i.    On one occasion, whilst working at Virgin Gyms, social media confirms he assisted in the lifting of an individual into a swimming pool.

        ii.    It has also been confirmed that the Defendant has, on at least one occasion, participated in boxing sparring, featuring on Youtube as part of, it seems, a promotional campaign.

    b.    The Defendant has misled the Court about his social life. In addition to enjoying nine foreign holidays over a four year period from 2013, he also attended the Coachella Music Festival in July 2016.

    c.    The Defendant is not impecunious. In addition to his foreign holidays, it is equally clear from the partial disclosure of bank statements that there are other accounts in the name of the Defendant. Specifically, they make reference to a transfer of £120,000.00 on 30 September 2014 to a separate account which remains undisclosed. The Defendant's accounts also reveal that between February 2015 and February 2017 he paid £650 per month for rent on a property at WA11 1AR. It is inconceivable that this rent was for the sofa at his friend's residence as he has alleged".

24. Before the Judge, it was argued on behalf of Mr Kasem that this was a deficient fraud pleading. Having directed herself to the relevant authorities on amendment and fraud pleadings, including CIP Properties (AIPT) Limited v Galliford Try Infrastructure Limited and others [2015] EWHC 1345, and Lipkin Gorman v Karpnale Ltd [1998] 1 WLR 1340, the Judge rejected this submission and gave the Trust permission to amend (but in reality to pursue this original pleaded case which had not been amended).

25. The Judge's reasons were as follows:

"50. This then leaves the outstanding aspect of the pleadings. The central thrust of Mr Daniels' attack related to the inadequacy of the pleadings. He submitted that there are only two

Exhibit 2
Page 372

particularised allegations which, on their face, were insufficient to establish fraud and the other paragraphs were of a generic nature. Indeed, he went so far as to invite me to strike-out the proceedings, presumably under CPR 3.4, or to give summary judgment.

51. In contrast, Mr Roberts submitted that the pleadings set out a clear case that the defendant fabricated or exaggerated the nature and extent of his claim for damages. He submitted the examples cited provide strong evidence to support the claimant's case that it was induced to make the Part 36 offer.

52. I have given careful consideration to the respective arguments and in so doing, I have considered the statements of Mr Navsaria, Ms Bagnall and, in fairness to Mr Daniels, given the absence of any further oral submissions, the proposed draft amended defence. Mr Navsaria attacks the focus of the pleadings on paragraph 22 onwards of his statement. In the main, the perceived deficiencies are maintained in the proposed amended pleading. Whilst there is a robust assault on the particulars of claim, I do not consider the claimant is required to set out each and every aspect, but such particulars so that the defendant knows the case it is expected to meet.

53. I am satisfied that, in the words of May LJ in Lipkin Gorman v Karpnale Ltd [1998] 1 WLR 1340, that, 'Where fraud or dishonesty is material, this must be clearly pleaded, if not explicitly, then in such terms that the reader of the pleadings can be left in no reasonable doubt that this is being alleged.'.

54. I am satisfied that, standing back and considering the pleading as a whole, the defendant can be in no doubt as to the substance of the allegations as per paragraphs 3 and 16-18. I, accordingly, decline to strike-out the pleadings and/or grant summary judgment."

26.    Counsel for Mr Kasem forcefully argued on appeal that the Judge failed to deal with his essential complaints (which I have summarised in para. [27] below). He relied upon Three Rivers District Council v Governor and Company of the Bank of England (No 3) [2003] 2 AC 1(HL), and Lipkin Gorman v Karpnale Ltd [1989] 1 WLR 1340 (CA), where May LJ observed at 1351H-1352A:

"... where fraud or dishonesty is material this must be clearly pleaded, if not explicitly, then in such terms that the reader of the pleading can be left in no reasonable doubt that this is being alleged.    where an element in the alleged fraud or dishonesty relied on is the other party's knowledge of a given fact or state of affairs, this must be explicitly pleaded. It is ambiguous and thus demurrable, if fraud is relied on, to use the common "rolled

Exhibit 2
Page 373

up plea" that a defendant knew or ought to have known a given fact."

27.    In terms of specific problems with the pleaded case, the following points of complaint were the focus of submissions on behalf of Mr Kasem before me (by reference to the paragraphs of the pleading I have set out above):

   i)    Paragraph 16a, whilst suggesting that it is setting out specifics, is in fact generic in terms. Paragraph 16b is not an allegation of fraud, but a complaint about the manner in which the clinical negligence case was progressed.

   ii)   Paragraph 17a refers to two minor incidents which it is suggested contradict the evidence in Mr Kasem's witness statement but it does not particularise why this means he was fraudulent.

   iii)  Paragraph 17b suggests Mr Kasem misled the Trust as to his social life in that he took a number of holidays. It is impossible to understand this in the absence of any explanation as to why this led to the Part 36 offer being made.

   iv)   Paragraph 17c is an assertion that Mr Kasem was untruthful about his impecuniosity but again fails to set out how this led to the Part 36 offer being made or made in the sum that was accepted.

   v)    Of particular concern is the use of the phrase *"for example"* in paragraph 17b which suggests the Trust intends to rely on further allegations which it has not particularised. That this is the intention is confirmed in paragraph 7b of the Trust's skeleton argument below on the amendment application which stated:

         "Further, it is inappropriate, within a Particulars of Claim, to recite each and every piece of evidence upon which the Claimant intends to rely. This would fly in the face of common sense. A pleading is there to set out the framework of the case, not provide a checklist which forewarns the Defendant for cross examination. It is worthy of note that in the substantive action, there would be no obligation on the Defendant NHS to plead fraud at all, per Howlett v Davies [2017] EWCA 1696."

28.    In response, Counsel for the Trust supported the Judge's reasons for permitting the case to proceed as pleaded. He argued that the issue of amendment was essentially a case management matter and relied upon the well-known principles set out in Wallbrook Trustee (Jersey) Limited v Fattal [2008] EWCA Civ 427. He also took me to Howlett v Davies and Anor [2017] EWCA Civ 1696, and Pinkus v Direct Line [2018] EWHC 1671. Counsel argued that these cases demonstrated a more flexible approach to allegations of fraud which did not require the type of particularity which was the subject of the complaints made on behalf of Mr Kasem. Both of these cases concerned qualified one way costs shifting ("QOCS").

Exhibit 2
Page 374

29.     Relying on the principles he drew from <u>Howlett,</u> in particular, Counsel for the Trust persuasively argued that the Particulars of Claim set out a clear case against Mr Kasem, namely that he has fabricated and/or exaggerated the nature and extent of his claim for damages. He said that the pleaded examples provide strong evidence to support the Trust's contentions and this is despite the fact that Mr Kasem, in the original action, was in default of his disclosure obligations and as such, there will, almost certainly, be other evidence to support the Trust's position. He also relied on the fact that the acceptance of the Part 36 Offer was out of time and when Mr Kasem was under considerable disclosure pressure. I refer to the procedural chronology in **Section II** above.

30.     In relation to <u>Lipkin</u>, Counsel for the Trust argued that Mr Kasem could be in no doubt or ambiguity as to what is being alleged. He submitted that the Judge in "standing back and considering the pleading as a whole" (Judgment, para. 54) not only adopted the correct test for assessment of the pleading (specific reference being made by the Judge to <u>Lipkin</u>), but then exercised her case management powers/discretion, to reach the conclusion that Mr Kasem could be in no doubt as to the substance of the allegations.

31.     These were attractively presented submissions but, in my judgment, the Judge was in error in permitting the fraud pleading to go forward. Even bearing in mind that one might call this a form of case management issue, I consider that the Particulars of Claim fail properly to comply with basic pleading requirements for a dishonesty and deceit case.

32.     In short, there is substantial force in the submissions made on behalf of Mr Kasem in relation to the nature of the case set out in paragraphs 15 and 16 of the draft amended Particulars of Claim, summarised above at para. [27].

33.     My more detailed reasons for this conclusion are below but I must begin with some basic principles.

34.     The starting point is to underline that in any common law deceit claim a claimant must plead and prove at least the following five matters with sufficient particularity:

i)      A representation of fact made by words or by conduct and mere silence is not enough;

ii)     The representation was made with knowledge that it was false, i.e. it was wilfully false or at least made in the absence of any genuine belief that it was true or made recklessly, i.e. without caring whether the representation was true or false;

iii)    The representation was made with the intention that it should be acted upon by the claimant, or by a class of persons which will include the claimant, in the manner which resulted in damage to him;

iv)     The claimant acted upon the false statements; and

v)      The claimant has sustained damage by so doing.

Exhibit 2
Page 375

35.    See <u>Bradford Third Equitable Benefit Building Society v Borders</u> [1941] 2 All ER 205 at 211 and the helpful summary in <u>Ludsin Overseas Limited v Eco3 Capital Limited</u> [2013] EWCA Civ 413 at [77]. Equally helpful is the summary of the law and example of model deceit pleadings in <u>Bullen, Leake and Jacob, Precedents of Pleadings</u> (Nineteenth Edition 2020) at Section 58, pages 47-56. These cases and text were not cited to me but contain what I regard as uncontroversial principles.

36.    It is not enough to make a bare assertion of fraud when seeking to comply with these requirements. It is well-established that any allegation of fraud must be clearly, unequivocally and with sufficient particularity so that the defendant understands the case made against him. It is of particular importance to underline in the context of the present appeal that the representation which is said to have been made fraudulently must be identified with precision.

37.    As explained by Lord Millett in <u>Three Rivers District Council v Governor and Company of the Bank of England (No 3)</u> [2003] 2 AC 1(HL) at [186]:

>    "It is well established that fraud or dishonesty...must be distinctly proved; that it must be sufficiently particularised... The function of pleadings is to give the party opposite sufficient notice of the case which is being made against him... this involves knowing not only that he is alleged to have acted dishonestly but also <u>the primary facts which will be relied on at trial to justify the inference</u>...this is only partly a matter of pleading. It is also a matter of substance".

>    (My underlined emphasis)

38.    Those principles are not only well-established in case law but are also reflected in the CPR. See CPR PD 16, para.8.2(1) (requiring specific details of fraud and misrepresentations relied upon); the Admiralty and Commercial Courts Guide at C1.2, which provides that "full and specific details should be given of any allegation of fraud, dishonesty, malice or illegality" and that "where an inference of fraud or dishonesty is alleged, the facts on the basis of which the inference is alleged must be fully set out"; and the Chancery Guide at 2.8(1) to like effect.

39.    It is equally well-established that if a case alleging fraud or deceit (or other intention) rests upon the drawing of inferences about a defendant's state of mind from other facts, those other facts must be clearly pleaded and must be such as could support the finding for which the claimant contends. In any event, if a case alleging fraud or deceit (or other intention) rests upon the drawing of inferences about a defendant's state of mind from other facts, those other facts must be clearly pleaded and must be such as could support the finding for which the claimant contends. Useful guidance to this effect appears in <u>Portland Stone Firms Limited v Barclays Bank plc</u> [2018] EWHC 2341 at [25-32] and <u>JSC Bank of Moscow v Kekhman</u> [2015] EWHC 3073 (Comm) at [20].

40.    I do not accept that the cases <u>Howlett v Davies and Anor</u> [2017] EWCA Civ 1696, and <u>Pinkus v Direct Line</u> [2018] EWHC 1671 are relevant to the issues before me. The cause of action pursued before me is common law deceit. These two decisions are concerned with a very different issue. So, in <u>Howlett</u>, as explained by Newey LJ at [29-31], the issue was whether a trial judge can find that the QOCS regime had been displaced because of "fundamental dishonesty" without fraud having been alleged in terms in the insurer's defence. He explained that the classic fraud authorities were of

Exhibit 2
Page 376

limited assistance on this issue. That was because, as Newey LJ observed, those authorities arose in situations where a claimant wished to maintain a claim that depended on a fraud. Such a person was required to clearly both allege it and prove it. The focus was not, as it was in the <u>Howlett</u> appeal, on what a defendant must plead and prove.

41.    By contrast, the appeal before me is concerned with what the Trust must plead and prove. The Trust's entire claim depends on proving fraud. Nothing in <u>Howlett</u> seeks to undermine the well-established principles about pleading fraud which I have summarised above.

42.    Applying these principles, the Trust's Particulars of Claim should in my judgment have contained at least the following:

   i)    The precise representations made by Mr Kasem in the course of his civil claim (and whether they were express or implied);

   ii)   The precise respects in which representations made by Mr Kasem were factually false;

   iii)  The state of knowledge of the Trust at the point of making the Part 36 offer and how the Trust relied upon the representations;

   iv)   The material received by the Trust subsequent to the acceptance of the Part 36 offer which showed that Mr Kasem had provided false information, identifying when such information was received and the precise respects in which the information subsequently received showed the falsity of the representations; and

   v)    The facts relied upon to the effect that Mr Kasem made the representations knowing the same to be false and/or reckless as to the truth of the same.

43.    When one compares the contents of the crucial paragraphs 16 and 17 of the draft Amended Particulars of Claim (which I have set out above at para. [23]) to these basic requirements (and even taking the pleading as a whole), the amended pleading falls far short. I emphasise that the Trust was not required to plead evidence but rather the "primary facts" (adopting Lord Millett's language in <u>Three Rivers</u>) under each of the heads I have identified in para. [42] above.

44.    The pleading suffers from a number of problems. I will identify five main problems. First, there is no obvious connection for example between the fact that Mr Kasem has been on holiday on a number of occasions (or that he attended a specific music festival at Coachella) with any false representation on his behalf. The pleader clearly has in mind some fact or inference which he will ask the Court to take into account or draw but has not explained what it is.

45.    Second, the reader of the draft pleading would be left puzzled by the suggestion that there had been some necessarily false earlier (unpleaded) representation given the fact that Mr Kasem had been seen on social media assisting in lifting someone into a swimming pool at Virgin Gyms.

Exhibit 2
Page 377

46.     Third, the same goes for the fraud claim based on the fact that Mr Kasem has a "social life". How this is said to establish relevant falsity of some earlier representation relied upon by the Trust in deciding to settle the claim with a Part 36 payment remains a mystery.

47.     Fourth, the Trust cannot use the language of "for example" (as it does) when alleging particulars of why a representation is false. That would be to drive a coach and horses through the pleading requirements and allow ambush in the course of trial. That is never permissible as a basis to allege fraud as part of a deceit claim.

48.     Fifth, in relation to reliance on representations, the pleaded case is also defective. All that is said is: "…in consequence of the foregoing the Claimant's position is that it relied upon the foregoing misrepresentations to its detriment and suffered loss in consequence. Accordingly, the Claimant claims against the Defendant in the tort of deceit". An explanation of the way in which the Trust relied upon the representations is making the specific Part 36 Offer is missing. Like other parts of the case, the reader is left guessing. It is clear that the Trust made an offer far below the claimed quantum of the claim. How did it then rely on what was said to have been represented as to the nature and scale of injury? One might consider that settling a £470,000.00 claim for just £75,000.00 suggests the Trust had not relied upon the truth and accuracy of the evidence of Mr Kasem as to his losses.

49.     In oral argument, Counsel for the Trust sought to defend the pleading by arguing that the position as to the more precise nature of the fraud claim made would "crystallise" in the course of disclosure and following witness statements. That is not satisfactory. A clear and sustainable fraud case, if it is to be made at all, must be made at the time the Particulars of Claim seeking relief in deceit is settled. It is not an answer to say the case might become clearer or sustainable at a later stage.

50.     Insofar as the Trust says (as it did in evidence and argument before the Judge) that it is not necessary for it to set out every allegation of fabrication and exaggeration in its pleading, I would reject the breadth of that submission. If the Trust is to argue that the fabrication or exaggeration of any specific matter establishes the falsity of a pleaded representation for the purposes of its common law claim, it is incumbent on it to plead that matter so that Mr Kasem knows the case he is to meet.

51.     I emphasise that this must be done in the pleading and not in evidence. Counsel for the Trust sought to explain in argument (using the boxing/sparring plea) how the fraud case in relation to that issue worked. But that is a case which needs to be set out in the pleading supported by a statement of truth.

52.     Finally, even applying the broad assessment invoked by the Trust as to whether Mr Kasem knows overall the case he is to meet, I do not consider that is established. The case is vague in the extreme. The case has been pleaded in the form of a complaint within section 57 of The Courts and Criminal Justice Act 2015 (which provides no cause of action in itself), as opposed to a deceit claim.

53.     For these reasons, which reflect to some extent the initial observations of Freedman J when granting permission to appeal on this ground, the Particularisation complaint under Ground 4 succeeds and the appeal is allowed.

Exhibit 2
Page 378

54.     The Judge should have struck out the claim as pleaded and maintained in the draft amended Particulars of Claim.


## IV.    Additional Grounds of Appeal

55.     As indicated above, I refused permission to appeal in relation to Grounds 1-3 at the hearing following oral submissions made by Counsel on behalf of Mr Kasem. My reasons for concluding that these grounds do not have a real prospect of success within CPR 52.5(1)(a) are, in brief, as follows. I have set out the Grounds at para. [11] above.

56.     The first two grounds turn on the issue whether the principles of affirmation in contract law apply to Part 36 settlements. The Judge decided that they did not. Freedman J, in refusing permission on these grounds, observed:

> "As regards the matters relating to affirmation, if that were the only issue, the Court would refuse permission to appeal on the basis that the originally pleaded case appeared to be saying that sufficient relief could be obtained through damages. The Judge understandably said that the appropriate relief was a setting aside, and permitted that to be done. As the case appears presently, the detailed jurisprudence about whether there is an analogy with affirmation does not advance the matter. If a claim in deceit is to proceed, the only question was the form of the relief. It is doubtful that the analysis or analogy of affirmation is probative: if it is, there may be no reason why it could not be withdrawn absent injustice, as an admission can be withdrawn and similarly a court of equity can in an appropriate case in the exercise of its discretion overlook 'discretionary' bars to rescission."

57.     I respectfully endorse these observations but add some additional reasons addressing certain points made to me orally by Counsel for Mr Kasem.

58.     In my judgment, whether or not an affirmation at common law had been established on the facts was irrelevant. The Judge was right to conclude that common law principles had no application to the self-contained regime under Part 36. See Gibbon v Manchester City Council [2010] EWCA Civ 726 at [5]-6]. The principles of affirmation/election have been developed by the courts of common law and equity for specific purposes and there is no obvious lacuna in the law concerning Part 36 which requires one to transport these historically developed principles to a new area.

59.     Counsel for Mr Kasem argued, as he had before the Judge, that if the principles did not apply this would "create uncertainty and allow either party to resile from their position" (Judgment, paragraph 15). As I observed during the hearing, the point that seemed to be being made was that some form of mechanism was necessary to deal with such injustice and affirmation was being selected as the candidate, based on analogy with the operation of that principle in contract law.

Exhibit 2
Page 379

60.    In my judgment, the Court has a ready-made mechanism to deal with the position where a party seeks to resile from a pleaded position. That is the law relating to amendment and admissions. Civil procedural law has no need to resort to common law principles of affirmation because it has its own mechanism.

61.    The correct procedural analysis of the situation was that the Court had to consider whether the Trust should be permitted to withdraw what was, as Freedman J explained, effectively an admission in paragraph 4 of the original Particulars of Claim. The Court's powers to supervise and control if and when an admission may be withdrawn, or an amendment made, provide an effective mechanism for dealing with claimed abuse and injustice. The considerations which would apply would focus principally upon the injustice of withdrawal or amendment.

62.    On the facts, there was no injustice or prejudice identified if the plea was withdrawn and Counsel for Mr Kasem fairly conceded when I asked him that he could identify no specific prejudice from the amendment (other than costs).

63.    For completeness, I saw force in the argument that the fact that this was a fraud case made no real difference if the doctrine of affirmation applied (see para.11(ii) above). Here there was a form of affirmation after knowledge of a claimed fraud (indeed, the very pleading claiming fraud also contained a form of affirmation). But the Judge's decision was in my view correct independently of what she said in relation to fraud "unravelling all".

64.    I accordingly refuse permission to appeal on Grounds 1 and 2 but would add a further observation. Given the flexible procedural powers of Court to deal with the situation which arose in this case (where permission was being sought by amendment to withdraw a plea), unless compelled by authority I would have been most reluctant to import a concept such as common law affirmation into the CPR Part 36 regime. That is because, even in its own area of application, that doctrine has over time become encrusted with extensive barnacles of intricacy which one would not readily import into civil procedure concerning amendments. See for example the extensive learning and jurisprudence governing the principles of affirmation described over many pages with nearly 100 footnoted cases in Chitty on Contracts, Vol. 1 (33rd Edition) at para. 24-003, and following.

65.    As to Ground 3, the fact the original plea in paragraph 4 of the Particulars amounted to an abuse did not establish that amending the pleading to remove that plea had to be barred, whatever the circumstances. It was a case management decision for the Judge as to whether, applying the principles on amendment, this plea could be withdrawn. No error of principle was identified in the Judge's approach such as to support the plea that her decision was irrational.

66.    Specifically, I repeat the point that no prejudice to Mr Kasem was identified if the Trust was to be permitted to merely alter the relief it would seek if the fraud claim was made out.

67.    The Judge's conclusions were expressed as follows and I detect no arguable error in them:

Exhibit 2
Page 380

"42. The instant case is not one where a judgment has been obtained, nor yet where fraud has been established. However, based on the principles expounded by the higher courts in both Hayward and Takhar, I consider that to find that the claimant was not entitled to amend its proceedings and seek to set aside the Part 36 settlement, would be an affront to the administration of justice.

43. I do not consider that the proceedings should remain struck-out as per paragraph 1 of my order of 17 October 2019. I am satisfied that the proceedings are not an abuse of process, as the proceedings no longer maintain that the Part 36 settlement remain and that the settlement was improperly induced, which was clearly inconsistent. I am not persuaded by Mr Daniels' submission: ' that the claimant should not simply be permitted to alter its pleaded case, having wrongly and deliberately chosen to previously plead its claim in an abusive way, for its own advantage and to the defendant's prejudice.'

…"

## V.    <u>Conclusion</u>

68.    In the result, I allow the appeal on the Particularisation Issue (Ground 4) and refuse permission to appeal in relation to Grounds 1-3. A hearing to consider consequential relief will be arranged, if the parties cannot agree an order.

Exhibit 2
Page 381

Neutral Citation Number: **[2021] EWHC 3091 (Ch)**

Case No: **FL-2019-000017, FL-2021-000004, FL-2021-000006**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**FINANCIAL LIST (CH)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: **25 October 2021**

Before :

**Mr Justice Miles**
- - - - - - - - - - - - - - - - - - - -
Between :

**Allianz Global Investors GmbH and Ors.**

**Claimants**

- and -
**RSA Insurance Group Limited**
**(formerly RSA Insurance Group plc)**

**Defendant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Peter de Verneuil Smith QC, Shail Patel and William Harman** (instructed by **Brown Rudnick LLP**) for the **Claimants**
**Tom Adam QC, Simon Hattan and Jacob Rabinowitz** (instructed by Herbert Smith Freehills) for the **Defendant**

Hearing date: **25 October 2021**
- - - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

Exhibit 2
Page 382

**Mr Justice Miles:**

1.  This case involves a very large number of claimants. At the first CMC in March 2021 it was ordered that there should be a process whereby the claimants and each of them are required to provide answers to questionnaires in relation to the issue of reliance. The claimants have been ordered, essentially, to explain their case on the issue. For convenience, the claimants have divided themselves into different categories called, "Reliance categories 1-3". In broad terms, RC-1 consists of claimants who are said to have read and relied upon the published information itself when deciding whether to acquire or continue the RSA shares, RC-2 consists of claimants who did not, themselves, read published information, but say that they relied on the published information indirectly by means of other sources of information that acted as a conduit for the published information, and RC-3 consists of claimants who say that they relied on the price of RSA shares from time to time and/or its accuracy, and include those who relied upon RSA being the constituent of an index or benchmark by reason of its market capitalisation within that index.

2.  One of the reasons for ordering the provision of answers to the questionnaires was to enable an orderly sampling process to take place so that claimants within each of the three categories could be selected to go forward as sample claimants for the first trial, and the court's determination in relation to them would then operate by way of guidance in respect of the other claimants within the same respective categories.

3.  There is also a case being run by the claimants which they have called, "presumed reliance", where they say the claimant who does not fall within one of RCs 1 to 3 is entitled to rely on a presumption of inducement. They say that in this case the published information was material in that it was of such a nature that it would be likely to play a part in the decision of a reasonable investor and market participant to acquire, continue to hold, or dispose of shares in RSA and/or to do so at a particular price.

4.  The claimants all contend that they are able to rely on presumed reliance whether or not they fall within one of the reliance categories. I am informed that some of the claimants who have provided answers to the questionnaires have said that they do not fall within RCs categories 1 to 3, and, therefore, by necessary implication, base their claim in relation to misleading or untrue statements solely on the theory of presumed reliance.

5.  Separately the claimants rely on allegations of dishonest delay in relation to the provision of information and in that regard they say do not need to advance a positive case in relation to reliance.

6.  As I have said, I ordered the responses to questionnaires to be provided at the first CMC in March 2021. They were required to be provided by 6 July 2021. That deadline was not met by a fairly large number of funds, who are effectively claimants in the case. At the second CMC that deadline was varied to 17 September 2021. As at that date there were still a large number of funds which had not provided answers to the questionnaires. Since 17 September some more questionnaires have been supplied, and I am told that there are still 18 remaining outstanding answers relating to 39 funds.

Exhibit 2
Page 383

7.    The reason for the orders that are being made was, as I have said, in order to enable an orderly process to take place for the selection of sample claimants to go forward. It seems to me that all claimants are required to provide the information in order that a proper sampling process can take place which is for the benefit of all parties, including all of the claimants.  Moreover, the orders I have made are not to be treated as optional or merely directional; they were orders requiring the provision of this information by each of the claimants separately. The defendant cited Hildyard J's comment in a similar case that where a claimant becomes party to an action of this kind it is not a mere question of subscription in the sense of just signing up to the proceedings and sitting back; every claimant who becomes a party is bound to comply with the rules governing the litigation. I agree.

8.    In my judgment the claimants have already had ample time to meet the  various deadlines and provide the questionnaires. I am not satisfied by the evidence that they have had any real difficulties in answering the questions, or if they have had such difficulties, that they could not have done so by now. These are serious Financial List proceedings where proper engagement with the rules of the court is required,  and it is for the claimants - all of the claimants - to comply.

9.    The defendants seek an order that unless the remaining questionnaires are provided by a deadline of 29 October 2021, any claimant who has not served a response by that date shall have its claim struck out. They submit that the claimants have had more than enough time to comply, that they are already in breach of the order, and if they cannot be bothered to respond, they should not be permitted to press forward with the case.

10.    The claimants oppose the imposition of an unless order. They say that the sanction of a strike out of the whole claim is unjust and disproportionate. They say that the purpose of the questionnaires is to enable the reliance issue to be tried at trial 1, and that has nothing to do with the case based on presumed reliance or dishonest delay, and they say it would be unfair to strike out their claims in full when what they have failed to do is provide information about which reliance categories they fall under.

11.    They also say that there have been some difficulties in the provision of information for some of the funds. They ask until 5 November 2021 as a final deadline. They say that if there is a sanction it should be that the relevant claimants should not be allowed to pursue a claim under RCs 1 to 3.

12.    I prefer the approach proposed by the defendant. It seems to me that, so much time already having passed, it is necessary to impose a proper sanction with real teeth. The claimants have had, as I have said, a good deal of time to provide these answers.  I do not agree with the submission that an unless order is unduly draconian. If the answer of the remaining claimants is that they do not rely on RCs 1 to 3, then they can say so in an answer to be provided within a deadline. If they cannot even be bothered to provide an answer by the deadline, then I do not think it is appropriate that they should be allowed to continue as a claimant in the proceedings. Such an order is not burdensome or disproportionate.

Exhibit 2
Page 384

3

13.   I repeat that the court's order was intended to allow an orderly process for the selection of claimants, and that is something that each and every claimant has to participate in.

14.   So I agree with the defendants' submission that the order should be that unless the relevant responses are provided by a certain date, the claims of that claimant will be struck out. I also consider that the claimants' proposed deadline of 5 November 2021 is too late because the defendants are required to select sample categories by 10 November 2021. I will order the remaining questionnaires to be served by 4.00 p.m. on 2 November 2021. That will give the defendants a little over a week thereafter to finalise their selections. I take into account that the defendants must already have done some work on selecting their proposed sample claimants based on the information they have already received. They will be able from 2 November to decide whether to make any changes to their proposals.

15.   I also order that the claimants shall be entitled to rely on all questionnaires  served by that date, including those which had been served since 17 September 2021.

Exhibit 2
Page 385



<u>Neutral Citation Number: [2022] EWHC 1178 (Ch)</u>

<div align="right"><u>Case No: HC-2015-001324</u></div>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>
<u>BUSINESS LIST (ChD)</u>

<div align="right">

<u>Rolls Building,</u>
<u>7 Rolls Buildings,</u>
<u>Fetter Lane, London</u>
<u>EC4A 1NL</u>

<u>Date: 17 May 2022</u>

</div>

**Before**:

**THE HONOURABLE MR JUSTICE HILDYARD**

- - - - - - - - - - - - - - - - - - - -

**Between:**

|  |  |
|---|---|
| **(1) ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)** | <u>Claimants</u> |
| **(2) HEWLETT-PACKARD THE HAGUE BV (AS SUCCESSOR TO HEWLETT-PACKARD VISION BV)** | |
| **(3) AUTONOMY SYSTEMS LIMITED** | |
| **(4) HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC** | |

**- and –**

|  |  |
|---|---|
| **(1) MICHAEL RICHARD LYNCH** | <u>Defendants</u> |
| **(2) SUSHOVAN TAREQUE HUSSAIN** | |

- - - - - - - - - - - - - - - - - - - -

Exhibit 2
Page 386

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

## LEGAL ISSUES AND TESTS OF LIABILITY UNDER FSMA

### (a) Overview and background to the provisions of FSMA

432.   Autonomy's liability to Bidco is said to arise under s. 90A FSMA ("s. 90A"), and its successor Schedule 10A FSMA ("Sch 10A"). S. 90A, introduced into FSMA by the Companies Act 2006, was in force from 8 November 2006 to 30 September 2010. Sch 10A came into force on 1 October 2010, but s. 90A continues to apply to information first published before that date.[67]

433.   S. 90A and Sch 10A share the same broad scheme. They impose liability on the issuers of securities for misleading statements or omissions in certain publications, but only in circumstances where a person discharging managerial responsibilities at the issuer (a "PDMR") knew that or was reckless as to whether the statement was untrue or misleading, or knew the omission to be a dishonest concealment of a material fact. The issuer is liable to pay compensation to anyone who has acquired[68] securities in reliance on the information contained in the publication, for any losses suffered as a result of the untrue or misleading statement or omission, but only where the reliance was reasonable.

434.   In the present case, the alleged liability of Autonomy under s. 90A/Sch 10A is used as a stepping-stone to a claim against Dr Lynch and Mr Hussain: it is something of a 'dog leg claim' in which, having accepted full liability to Bidco, Autonomy now seeks to recover in turn from the Defendants. There is no conceptual impediment to this. However, it is right to bear in mind that in interpreting the provisions and conditions of liability, the relevant question is whether the issuer itself should be liable, bearing in mind that in the usual course, the issuer's liability will fall on the general body of its shareholders, rather than on the director or other individual primarily responsible for any misstatement.

435.   FSMA was the first UK statute to provide a statutory scheme of liability to investors for misstatements made to the market by issuers, other than through prospectuses; and this case is believed to be the first s. 90A or Sch 10A case to come to trial in these Courts.

436.   This statutory scheme for issuer liability for misstatements or deliberate omissions in published information has been some time in the making. English law had historically not provided a remedy for investors acquiring shares on the basis of inaccuracies in a company's financial statements. Until the introduction of s. 90A in 2006, there was no statutory regime imposing civil liability for inaccurate statements in information disclosed by issuers to the market. This stands in contrast to the long-established statutory scheme of liability for

---

[67]Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192, regulation 3 (Transitional provision).
[68]Or, under Sch 10A, acquired, continued to hold or sold.

Exhibit 2
Page 387

misstatements contained in prospectuses, first set out in the Directors Liability Act 1890, and now contained in the widely drawn provisions of s. 90 FSMA.[69]

437.　The rationale for the different treatment of liability for misstatements in prospectuses and those in other disclosures – with a tougher regime for prospectuses – is easy to understand. "*[T]he prospectus is a 'selling document', produced by the issuer to promote its securities to investors, whereas periodic and ad hoc reports are expressions of routine reporting requirements which do not typically coincide with a selling effort on the part of the company*".[70] An untrue statement in a prospectus can lead to payments being made to the company on a false basis, but the same cannot be said of an untrue statement contained in, say, an annual report.

438.　Nor did the common law provide an easy route to recovery for an investor who had acquired shares in reliance on a misstatement in a company's periodic or *ad hoc* disclosures:

(1) Claims in deceit did not readily give rise to liability for such misstatements, because of the requirement in *Derry v Peek* (1889) 14 App Cas 337 that the maker of the statement should have intended that the recipient of the statement rely on it: as noted in the Davies Review[71], although that requirement might easily be satisfied in the case of a prospectus, which is a selling document, it is difficult to satisfy in the case of an annual or quarterly report, which is primarily a report to shareholders on the directors' stewardship and not obviously intended to induce reliance by securities trading.

(2) Claims in negligence were in general precluded by the House of Lords' decision in *Caparo v Dickman* [1990] 2 AC 605 that liability for economic loss due to negligent misstatement was confined to cases where the statement or advice had been given to a known recipient for a specific purpose of which the maker was aware. Since statutory accounts are prepared for the purposes of assisting shareholders to exercise their governance rights, rather than enabling them to take investment decisions, an investor who acquired shares in reliance on a company's published accounts would not normally have a cause of action.

(3) Furthermore, the 'safe harbour' provisions of s. 463 Companies Act 2006 entirely preclude liability to third parties in respect of 'narrative' reports, subject only to s.90A/Sch 10A FSMA.

439.　Accordingly, until the enactment of s. 90A, there was no scope for a claim of the present type. The explanatory note to the legislation by which s. 90A was introduced in 2006 stated that as at that time, no issuer had been found liable in

---

[69]For an overview of the liability of issuers prior to the enactment of s. 90A, see Professor Paul Davies QC, Davies Review of Issuer Liability: Discussion Paper (HMSO, March 2007) *("the Davies Review").*

[70]Davies Review of Issuer Liability: Discussion Paper.

[71] See *Davies Review of Issuer Liability - Discussion Paper* para 44.

Exhibit 2
Page 388

damages under English law in respect of statements made in narrative reports or financial statements.[72]

440.    The ultimate catalyst for the introduction of a scheme of liability was the Transparency Directive ("TD")[73] in 2004. This required Member States to apply their national liability regimes to the disclosures required by that Directive and to apply them to *"at least…the issuer or its administrative…bodies."* The TD's insistence on enhanced disclosure obligations and the requirement for a responsibility statement gave rise to concerns that the English law's restrictive approach to issuer liability would be disturbed, and that issuers (and directors and auditors) might be made liable for merely negligent errors contained in narrative reports or financial statements.[74]

441.    In light of these concerns, and in recognition of the historical tendency against liability, the regime for issuer liability was introduced in this jurisdiction piece-meal, starting with a stop-gap solution introduced into FSMA by the Companies Act 2006 in the original form of s.90A. This approach allowed for further enquiry and consideration whether any more extensive regime was appropriate.

442.    Any such scheme inevitably involves a balance, especially between the desirability of encouraging proper disclosure and affording recourse to a defrauded investor in its absence, and the need to protect existing and longer term investors who, subject to any claim against relevant directors (who may not be good for the money), may indirectly bear the brunt of any award. The explanatory note referred to the uncertainty which the TD had created, and stated that the government was *"anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties, in order to protect the interests of company members, employees and creditors".*[75] In the debates on the introduction of this provision, a government minister referred to *"the Government's desire to avoid radical change to the law in this area, to respect the preferences of stakeholders and, especially, to ensure that company resources are not inappropriately diverted from shareholders, employees and creditors to the benefit of a much wider group of actual and potential investors".*[76]

443.    Amongst the matters for particular consideration were (a) whether negligence or (as in the USA) gross negligence should suffice or whether liability should continue to depend on proof of fraud; (b) what should count as published information; and (c) who apart from the issuer should be prospectively liable.

444.    After the Davies Review, and a process of consultation and subsequent Final Report by Professor Davies ("the Final Report"), the original s. 90A provisions were extended (a) to issuers with securities admitted to trading on a greater variety of trading facilities (b) to relevant information disclosed by an issuer through a UK recognised information service (c) to permit sellers, as well as

---

[72]Explanatory note to Companies Act 2006, s. 1270, paragraph 1637.
[73] Council Directive 2004/1209/EC.
[74]Davies Review of Issuer Liability: Discussion Paper (above).
[75]Explanatory note to the Companies Act 2006, paragraphs 1637 and 1643.
[76]Margaret Hodge MP, Hansard, HC, Standing Committee D, Col, 482 (6 July 2006):
https://publications.parliament.uk/pa/cm200506/cmstand/d/st060706/am/60706s02.htm

Exhibit 2
Page 389

buyers, of securities to recover losses incurred through reliance on fraudulent misstatements or omissions and (d) to permit recovery for losses resulting from dishonest delay in disclosure. However, Professor Davies recommended that liability should continue to be based on fraud, and his recommendation was accepted. Further, no change was suggested or made to the limitation to PDMRs of the persons other than the issuer who could be made liable, and no specific provisions to determine the basis for the assessment of damages was introduced.

445.    As emphasised by the Defendants, this history is not merely of antiquarian interest. It is relevant when considering the scope of the section, and in particular the matters left open by the draftsman such as the nature of the reliance that must be shown, and the measure of damages. I accept the Defendants' general admonition that the Court should not interpret and apply the section in a way which exposes public companies and their shareholders to unreasonably wide liability.

(b)    *Conditions for liability under s.90A and Sch 10A FSMA*

446.    S. 90A(3), in the form that applied until 30 September 2010, read as follows, so far as material:

> *"(3)    The    of securities to which this section applies is issuer liable to pay compensation to a person who has–*
>
>> *(a) acquired such securities issued by it, and*
>>
>> *(b) suffered loss in respect of them as a result of–*
>>
>>> *(i) any untrue or misleading statement in a publication to which this section applies[77], or*
>>>
>>> *(ii) the omission from any such publication of any matter required to be included in it.*
>>
>> *(4) The issuer is so liable only if a person discharging managerial responsibilities within the issuer in relation to the publication–*
>>
>>> *(a) knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or*
>>>
>>> *(b) knew the omission to be a dishonest concealment of a material fact.*
>>
>> *(5) A loss is not regarded as suffered as a result of the statement or omission in the publication unless the person suffering it acquired the relevant securities–*

---

[77] That is, any reports and statements published in response to a requirement imposed by a provision implementing Article 4, 5 or 6 of the Transparency Directive, and any preliminary announcement of information to be included in such a report or statement: s. 90A(1).

Exhibit 2
Page 390

> *(a) in reliance on the information in the publication, and*
>
> *(b) at a time when, and in circumstances in which, it was reasonable for him to rely on that information. …"*

447.   The equivalent provision of Sch 10A is paragraph 3:

> *"(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—*
>
> > *(a) acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and*
> >
> > *(b) suffers loss in respect of the securities as a result of—*
> >
> > > *(i) any untrue or misleading statement in that published information, or*
> > >
> > > *(ii) the omission from that published information of any matter required to be included in it.*
>
> *(2) The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.*
>
> *(3) The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.*
>
> *(4) A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—*
>
> > *(a) in reliance on the information in question, and*
> >
> > *(b) at a time when, and in circumstances in which, it was reasonable for him to rely on it."*

448.   It is to be noted that the provisions make clear that there is both an objective test (the relevant information must be demonstrated to be "untrue or misleading" or the omissions a matter "required to be included") and a subjective test (a PDMR must know that the statement was untrue or misleading, or know such omission to be a "dishonest concealment of a material fact", which I refer to here as "guilty knowledge"). To establish guilty knowledge, it must be proven that (i) the relevant information was objectively false, (ii) the defendant knew that, in the sense it was likely to be understood, it was false and that (iii) the claimant himself understood it in its false sense and relied on that false sense in making his investment decision. Also, whether a

Exhibit 2
Page 391

claimant's reliance was "reasonable" is to be tested at the time of the investment decision according to the circumstances applicable to him. I elaborate on these ingredients below.

*(c) Published information*

449.　Whether under s. 90A of FSMA or under its successor, Schedule 10A of FSMA, liability can only be established against an issuer by a claimant proving reliance on (a) "*untrue or misleading statements*" in a "*publication*" (the expression used in s. 90A) or "*published information*" (the expression used in Schedule 10A) to which the provisions apply and which a PDMR within the issuer knew to be "*untrue or misleading*" (or was "*reckless*" in that regard), or (b) the omission of a matter required to be included in that publication or published information in circumstances where a PDMR knew the omission to be a "*dishonest concealment of a material fact*".

450.　As regards the information to which the provisions apply, it is common ground that Autonomy's Annual and Quarterly Reports for the Relevant Period (that is, the Quarterly Reports for Q1 2009 to Q2 2011 and the Annual Reports for FY 2009 and FY 2010) were publications to which s. 90A applied or, in the case of those published after 1 October 2010, published information to which Sch 10A applied. It is also common ground that the earnings calls and transcripts of earnings calls from before 1 October 2010 were <u>not</u> covered by s. 90A.[78]

451.　There is a dispute over whether earnings calls or transcripts of earnings calls for quarters after that date (Q3 2010 onwards) constituted published information for the purposes of Sch 10A. The Claimants said they did; the Defendants said they did not.

452.　It is important first to clarify that:

(1) there was no evidence that anyone at HP ever listened to any of the earnings calls; and

(2) the transcripts were not themselves published by recognised means.

So the only live question is whether the <u>availability</u> of the transcripts was announced by Autonomy by recognised means within the meaning of paragraph 2(1)(b) of Sch 10A FSMA.

453.　Paragraph 2(1) of Sch 10A of FSMA states:

*(1) This Schedule applies to information published by the issuer of securities to which this Schedule applies:*

*(a) by recognised means, or*

---

[78]The relevant paragraph in the RRAPoC is confined to earnings calls in respect of Quarterly Reports published <u>after</u> 1 October 2010.

Exhibit 2
Page 392

*(b)  by other means where the availability of the information has
been announced by the issuer by recognised means."*

454.  The Claimants submitted that the effect of paragraph 2(1)(b) was that the
transcripts (and thus the information recorded as having been broadcast on those
calls) after 1 October 2010 constituted published information because their
availability was announced by Autonomy (the issuer) by recognised means.
They relied on the following:

(1) It is common ground that Autonomy's Quarterly Reports were published
by recognised means (which include a "recognised information service"
such as the RNS service); and these provided details of the time, date
and website for the forthcoming earnings call;

(2) This constituted an announcement by recognised means of the
information that would end up being broadcast on that call; and

(3) Accordingly, that information is subject to Sch 10A regardless of the
fact that the transcripts of the earnings calls themselves were not
published by recognised means.

455.  The Defendants submitted that the Claimants are wrong:

(1)  Paragraph 2(1)(b) is intended to address the situation where, rather than
transmitting a document directly by recognised means, the document is
announced by recognised means but made available by other means, for
instance where a company publishes its annual report on its website and
puts out an announcement through a regulatory news service that it is so
available.

(2) That is to be distinguished from the case where (as in this case) the
document in question is never itself published: and simply because a
website address or telephone number is referenced by recognised means
does not render all information on that website or given in the call
"published information".

(3) Thus, the provision of details needed to join the earnings call did not
make the information communicated on the call itself published
information.

(4) Further, even if the above is wrong, the transcripts themselves do not
amount to published information: it was not said that Autonomy
announced the availability of the transcripts by recognised means, and
it did not.  If HP relied on a transcript of a call to which it did not dial in
at the time, it would not be relying on published information.

(5) In any event, there is no evidence that anyone at HP ever read any of the
transcripts other than those for Q1 and Q2 2011: the Claimants cannot
have relied on documents they never read, nor on calls they never heard.

Exhibit 2
Page 393

456.    In my view, the question as to whether paragraph 2(1)(b) applied depends upon whether the provision by recognised means of details needed to join an earnings call should be taken to include the announcement by recognised means of the availability of any transcript made of the call even though the latter is not specifically announced.

457.    In my judgment, the answer is that it does not. The announcement by recognised means made no mention of any transcript. All that was announced by recognised means was the information necessary to enable participation in the call itself. A transcript might be introduced as evidence of what had been said at an earnings call, but only to support a participant's primary evidence of what he or she had heard.   Further, there may be various transcripts, sometimes in different form (as indeed there were in respect of at least one of the earnings calls in this case) sometimes produced by Bloomberg and/or Thomson Reuters and thus someone other than the issuer: it cannot have been intended that all versions should be treated as information published by the issuer, and there is no basis in the language for restricting the published information to a version approved by the issuer, nor in fact any evidence that Autonomy ever itself issued/published an approved version.

458.    I also    pt the view expressed in Dr Lynch's written closing submissions that, on the facts of this case, the point itself is largely academic since the Claimants cannot have relied on documents they never read or calls they never heard, and (as previously noted) there is no evidence that anyone from HP listened to any of the earnings calls, or read any of the transcripts other than the transcripts for Q1 and Q2 2011 which Mr Sarin said he had read. I develop this point at greater length later.

459.    However, my conclusion that the transcripts do not constitute published information for the purposes of FSMA does not mean that they are inadmissible and/or irrelevant. For example, they may be relevant in the context of the OEM claim (see in this regard paragraphs 3162 and 3163 below); and also more to the question of what analysts and the investment community knew, or were told, though of course individual conversations should not be taken to import knowledge across a broader constituency.

*(d)  Untrue or misleading statement or omission*

460.    Unless a statement in published information (or a *"relevant publication"*) contains a *"false or misleading statement"* or omits any *"matter required to be included in it"*, there can be no question of liability under s. 90A of Sch 10A of FSMA. At this first stage, the question is as to the objective meaning of the impugned statement, that is the meaning which would be ascribed to it by the intended readership, having regard to the circumstances at that time.

461.    As to the objective meaning of a statement, Christopher Clarke J (as he then was) provided the following further guidance as to what is required to be

Exhibit 2
Page 394

shown[79] in *Raiffeisen Zentralbank Osterreich AG v The Royal Bank of Scotland Plc* [2010] EWHC 1392 (Comm) at [81] to [82] and [86] to [87][80]:

> 81. Whether any and if so what representation was made has to be judged objectively according to the impact that whatever is said may be expected to have on a reasonable representee in the position and with the known characteristics of the actual representee". *MCI WorldCom International Inc v Primus Telecommunications plc* [2004] *EWCA Civ 957*, per Mance LJ, para 30. The reference to the characteristics of the representee is important…
>
> 82. In the case of an express statement,  the court has to consider what a reasonable person would have understood from the words used in the context in which they were used": *IFE Fund SA v Goldman Sachs International* [2007] 1 Lloyd's Rep 264, per Toulson J at [50] (upheld by the Court of Appeal at [2007] 2 Lloyd's Rep 449). The answer to that question may depend on the nature and content of the statement, the context in which it was made, the characteristics of the maker and of the person to whom it was made, and the relationship between them. …
>
> 86. It is also necessary for the statement relied on to have the character of a statement upon which the representee was intended, and was entitled, to rely. In some cases the statement in question may have been accompanied by other statements by way of qualification or explanation which would indicate to a reasonable person that the putative representor was not assuming a responsibility for the accuracy or completeness of the statement or was saying that no reliance can be placed upon it. Thus the representor may qualify what might otherwise have been an outright statement of fact by saying that it is only a statement of belief, that it may not be accurate, that he has not verified its accuracy or completeness, or that it is not to be relied on.
>
> 87. Lastly the claimant must show that he in fact understood the statement in the sense (so far as material) which the court ascribed to it: *Arkwright v Newbold* (1881) 17 Ch D 301; *Smith v Chadwick* (1884) 9 App Cas 187; and that, having that understanding, he relied on it. This may be of particular importance in the case of implied statements."

---

[79] Albeit in the context of the Misrepresentation Act 1967, rather than FSMA.

[80] See also *Barley v Muir* [2018] EWHC 619 (QB) at [177] per Soole J, contrasted with implied misrepresentation at [178]. See also *Primus Telecommunications Plc v MCI WorldCom International Inc* [2004] EWCA Civ 957 per Mance LJ at [30] (a case of implied misrepresentation but not in terms confined to that, Mance LJ also left the door open to a different approach in fraud). See also *Kyle Bay Ltd v Underwriters Subscribing under Policy No. 01957/08/01* [2007] 1 CLC 164, at [30]-[33], per Neuberger LJ.

Exhibit 2
Page 395

462. Establishing, for these purposes, what was the context of the statement when made, and the characteristics of the representee, is not always straightforward, even in the context of a negotiation between parties in direct communication. In this case, at least as regards the FSMA claim, the difficulty is the greater because statements were addressed in publications issued generally over a period of time to diverse addressees, and in parallel at various different times further information and/or explanations were given to various persons within the market (but not issued generally to the market), which might or might not have informed the view and understanding of the market as a whole.

463. Further, the content of the published information covered by s. 90A and Sch 10A will often[81] be governed by accounting standards, by the companies legislation and especially the Companies Act 2006, and by the Disclosure and Transparency Rules. Compliance with those standards, provisions and rules will frequently involve the exercise of accounting judgement on points where there may be a range of permissible views. A statement is not to be regarded as false or misleading where it can be justified by reference to that range of views.

464. Where the meaning of a given statement is unambiguous, and the only question is whether the defendants nevertheless believed it conveyed a different meaning, the genuineness of the defendant's belief in a different meaning may be usefully tested according to the obviousness or extravagance of its departure from the settled objective meaning, though even then mere implausibility is not capable of amounting to fraud and the test is always as to the genuineness of the defendant's state of mind. As Males J (as he then was) noted in *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm):

> *"In practice, however, the objective meaning of the statement is not irrelevant. As the Privy Council went on to say [in Akerhielm]:*
>
> *"This general proposition is no doubt subject to limitations. For instance, the meaning placed by the defendant on the representation may be so far removed from the sense in which it would be understood by any reasonable person as to make it impossible to hold that the defendant honestly understood the representation to bear the meaning claimed by him and honestly believed it in that sense to be true.""*

465. Sometimes, two or more possible interpretations appear legitimate: that is a case of genuine ambiguity. In such a case, it is not the function of the court to determine which is the more likely meaning, as it would be in a case concerning contractual interpretation. Where the implicated statement is genuinely ambiguous an election between two (or more) reasonable available meanings may well be unnecessary and even unwise. The claim may fail at the first hurdle, unless it is shown that the ambiguity was artful or contrived by the defendant,

---

[81] Invariably for a claim under s. 90A (which, broadly speaking, applies only to information in quarterly, interim or annual reports); but not invariably for a claim under Sch. 10A, given the broader range of "published information" that such a claim may cover.

Exhibit 2
Page 396

in which case that will be evidence (it may well be determinative evidence) of dishonesty at the second subjective stage.

466.    Further, the claimant must prove also that he understood the statement in the sense ascribed to it by the court: as Cotton LJ explained in *Arkwright v Newbold* (1881) 17 Ch D 301:

> *"In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement, according to the construction put on it by the Court, is false, when the plaintiff does not venture to swear that he understood the statement in the same sense which the Court puts on it. If he did not, then, even if the construction may have been falsified by the facts, he was not deceived."*

*(e)  Guilty knowledge*

467.    The basis for the issuer's liability for a misstatement in published information being fraud on the part of at least one PDMR,[82] the ascertainment of objective meaning, even if the statement is unambiguous, is only the beginning of the enquiry. As the Privy Council held in *Akerhielm v de Mare* [1959] AC 789:

> *"The question is not whether the defendants in any given case honestly believed the representation to be true in the sense assigned to it by the court on an objective consideration of its truth or falsity, but whether he honestly believed the representation to be true in the sense in which he understood it albeit erroneously when it was made."*

468.    As in the common law of deceit, it must be proven that a PDMR (as it is accepted each Defendant was) *"knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading"*; or alternatively, that he knew that the omission of matters required to be included was the dishonest concealment of a material fact. For both s. 90A and Sch 10A, the language used shows that there is a requirement for actual knowledge.

469.    *Derry v Peek* also sheds light on what it means to know a statement to be true or misleading.  In the case of a statement, it is not sufficient that a person knows the facts which render a statement untrue: he will only be liable if those facts were present to his mind at the moment when the statement is made, such that he appreciates that the statement is untrue.[83] In the case of an omission, the PDMR must have applied his mind to the omission at the time the information was published, and appreciated that a material fact was being concealed (i.e. that it was required to be included, but was being deliberately left out). Otherwise, it could not be said that he "*knew the omission to be a dishonest concealment of a material fact*".  In the context of this case, the Defendants submitted that means that the Claimants would need to prove in respect of any

---

[82]Sch 10A §3(2) and 3(3).  S. 90A contained a similar concept: see s. 90A(4) ("*person discharging managerial responsibilities within the issuer in relation to a publication*").
[83]See the discussion of *Derry v Peek* and *Armstrong v Strain* at paragraphs 549 and 550 below, in the context of the claim in deceit.

Exhibit 2
Page 397

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

alleged omission that Dr Lynch knew there was a <u>requirement</u> to include the relevant fact.[84]  Unless he knew there was such a requirement, there can be no liability for dishonest concealment.

470.  Liability also extends to recklessness: but it is common ground that recklessness bears the meaning laid down in *Derry v Peek* (1889) 14 App. Cas. 337, that is, not caring about the truth of the statement, such as to lack an honest belief in its truth.  Honest belief in the truth of a statement defeats a claim of recklessness, no matter how unreasonable the belief (though of course the more unreasonable the belief asserted the less likely the finder of fact is to accept that it was genuinely held).[85]

471.  For the purposes of paragraph 3(3) and deliberate concealment by omission, but not, it would seem, paragraph 3(2) and overt misrepresentation, dishonesty has a special definition under Sch 10A, (though s. 90A contained no such special definition).  Paragraph 6 provides that for the purposes of paragraphs 3(3) and 5(2) (re dishonest delay in publishing information) a person's conduct is regarded as dishonest only if:

> *"(a)   it is regarded as dishonest by persons who regularly trade on the securities market in question, and*
>
> *(b)     the person was aware (or must be taken to have been aware) that it was so regarded."*

472.  As is apparent from the Government's July 2008 consultation paper on what would become Sch 10A, this was intended to be a statutory codification of the common law test for dishonesty laid down in *R v Ghosh* [1982] 1 QB 1053.  As the Claimants noted, however, the Defendants have never relied on an argument based on the difference between that test and the revised and now applicable test in *Ivey v Genting Casinos (UK) Ltd* [2018] AC 391 which no longer requires that it be established that the defendant appreciated that his conduct was dishonest by the standards of ordinary decent people. As explained in *Ivey* (at [74]):

> *"When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the*

---

[84] On that basis it would not be enough that Deloitte considered further disclosure might be preferable on a particular point.
[85] And see paragraph 472 below and the decision in *Ivey.*

Exhibit 2
Page 398

> *defendant must appreciate that what he has done is, by those standards, dishonest."*

473. Cogent evidence is required to justify a finding of fraud or discreditable conduct, and the courts recognise that it is generally unlikely that people engage in such conduct. Where a claimant seeks to prove a case of dishonesty, its inherent improbability means that, even on the civil burden of proof, the evidence must be strong enough to overcome the general presumption that innocent incompetence is more frequent and more likely than dishonest design and fraud. The more serious the allegation the more cogent the evidence required to overcome the unlikelihood of what is alleged and thus to prove it. The more serious the consequences for the individual involved, the less likely he would be to run the risk of those consequences. See *In re D* [2008] UKHL 33, at §§23-28 (Lord Carswell) and §§40-42 (Lord Brown); and *Fiona Trust & Holding Corp v Privalov* [2010] EWHC 3199 (Comm) at §§1438-1439 (Andrew Smith J). See also *Jafari-Fini v Skillglass Ltd* [2007] EWCA Civ 261, where Carnwath LJ said this (at §40):

> *"Thus in civil proceedings, the "presumption of innocence" is not so much a legal rule, as a common sense guide to the assessment of evidence. It is relevant not only where the cause of action requires proof of dishonesty, but, wherever the court is faced with a choice between two rival explanations of any particular incident, one innocent and the other not. Unless it is dealing with known fraudsters, the court should start from a strong presumption that the innocent explanation is more likely to be correct."*

474. For both allegedly misleading statements and omissions, it is relevant to consider any advice given to the company and its directors from professionals. The relevance of that advice to a determination of dishonesty is likely to depend on (a) whether the issue to which the statement or omission related was one which fell within the professional expertise and remit of the person providing the advice; (b) whether and to what extent the form or content of the relevant statement was necessarily based on the advice given; and (c) whether by contrast, the person providing the advice would not be in a position to assess how the readership would construe what was said and/or what its true likely import and impact would be.

475. Thus, where a director understands, on the basis of guidance from the company's auditors on an issue as to the intended scope of an accountancy statement, that such accountancy statement and practice do not require the disclosure of a particular fact in the company's published information, the omission of that fact on the basis of that advice is unlikely to amount to a dishonest concealment of a material fact. Even if the Court takes the view that disclosure of the fact was required, the requirement for dishonesty is unlikely to be satisfied where the director was acting in accordance with the advice of reputable professionals in such a context. Similarly, if a PDMR has been advised by auditors that a particular statement included in the accounts was a

Exhibit 2
Page 399

fair description of some aspect of the company's business required to be disclosed under the acts or accountancy standards or statements of practice, it may be unlikely that he knew the statement to be untrue or misleading, or that he was reckless as to its truth, unless the auditors did not have the full picture or were misled.

476.    Particular care is necessary in this context in the present case. In respect of every one of the allegations made against him, Dr Lynch (in particular) relied on the fact that Deloitte, who it was largely common ground had detailed knowledge of Autonomy's business and the specific transactions giving rise to the claim, had approved not only the accounts but also the narrative 'front-end' reports and presentations of Autonomy's business activities. He relied on their approval, or at least their lack of objection, as the demonstration of the integrity and honesty of those reports and presentations. However, there are good reasons, both theoretical and practical, why auditors have an attenuated role in respect of such reports. As a theoretical matter, the purpose and objective of these 'front-end' reports are to reflect the directors' view of the business rather than the auditors', and to require directors to provide an accurate account according to their own conscience and understanding, neither of which can properly be delegated. As a practical matter, directors are likely to be, and should be, in a better position than an auditor to assess the likely impact on their shareholders of what is reported, and (for example) to assess what shareholders will make of possibly ambiguous statements. In short, on matters within the directors' proper province, the view of the company's auditors cannot be regarded as a litmus test nor a 'safe harbour': auditors may prompt but they cannot keep the directors' conscience.

477.    Another issue which arose is as to the necessary nexus between an allegedly false statement, knowledge of its falsity, and the investment decision made by the claimant said to have given rise to loss. The Claimants referred in their written opening to "*the relatively limited scope of the knowledge that must be proved in order for a Schedule 10A claim to arise,*" arguing that "*It is sufficient if the Defendants knew enough to appreciate that there was at least one statement in the published information that was false.*" I do not accept that. I agree with the Defendants that it is clear from the language of the Schedule that a PDMR must have the relevant guilty knowledge in respect of each false statement or omission alleged to give rise to liability. Paragraph 3(2) states that "*The issuer is liable <u>in respect of an untrue or misleading statement</u> only if a person discharging managerial responsibilities within the issuer <u>knew the statement to be untrue</u> or misleading or was reckless as to whether it was untrue or misleading.*" Liability is only engaged in respect of statements known to be untrue.[86] If a company's annual report contains ten misstatements, each of them relied on by a person acquiring the company, but it can only be shown that a PDMR knew about one of those misstatements, the company will only be liable in respect of that one, not the other nine.

---

[86]The same argument applies in relation to omissions: Sch 10A §3(3).

Exhibit 2
Page 400

*(f)  Reliance*

478.   It will already be apparent that reasonable reliance is another necessary
precondition to liability under s. 90A and Sch 10A.  It is expressly provided that
the reliance must be reasonable at the time of the investment decision and in the
circumstances as they were then; and that a loss is not to be regarded as suffered
as a result of the statement or omission unless the person suffering loss acquired
securities "*in reliance on the information in question, and … at a time when,
and in circumstances in which, it was reasonable for him to rely on it.*"[87]

479.   As the Claimants noted in their written closing, Sch 10A does not define the
requirement of reliance on published information.  They submitted that the
concept of reliance is therefore to be informed by the position at common law.
The Defendants accepted this, but only insofar as the language of Sch 10A is
unclear: and they submitted that the language of the section provides an answer
on several of the points in issue.

480.   The Defendants identified four questions: (i) reliance by whom? (ii) reliance on
what? (iii) what degree of reliance? and (iv) when is reliance reasonable?  I
address each in turn, and in doing so (within question (i)) I address a particular
issue which arose as to the position of Bidco ("the Bidco point") which is
relevant not only in the context of the FSMA claim but also in the context of the
Claimants' other 'direct' claims for deceit and/or misrepresentation.

*Reliance by whom?*

481.   As to the question of "reliance by whom?", s. 90A and Sch 10A both require
reliance by the person who acquired the relevant securities, not some other
person.  This is clear from the way the provisions are drafted: see in particular
s. 90A(5) and Sch 10A §3(1)(a).[88]  The latter provides a remedy to "*a person
who…acquires, continues to hold or disposes of the securities in reliance on
published information*".

482.   The Defendants also submitted that this point is consistent with and made clear
in the cases on misrepresentation and deceit.  In order to succeed on a claim in
misrepresentation or deceit, the claimant must have relied on the
misrepresentation.  This means that it must have been present to the claimant's
mind at the time when it took the action on which the claim is founded; or put
another way, the claimant must give some contemporaneous, conscious thought
to the representation.  It is not enough that somebody else (not the claimant)
applies his mind to the representation.  As to this, the Defendants relied
especially on:

---

[87]Sch 10A §3(4) and, in similar but not identical terms, S. 90A(5).
[88]S. 90A(5): "*A loss is not regarded as suffered as a result of the statement or omission in the
publication unless <u>the person suffering it acquired the relevant securities</u>– (a) <u>in reliance on the
information</u> in the publication…*"; Sch 10A §3(1): "*An issuer of securities to which this Schedule
applies is liable to pay compensation to <u>a person who</u>—(a) <u>acquires, continues to hold or disposes of
the securities in reliance on published information</u> to which this Schedule applies…*".

Exhibit 2
Page 401

(a) Cartwright, Misrepresentation, Mistake and Non-Disclosure (4th Ed., 2017) at §3-50:

> *The requirement of a causal link between statement and loss. Whichever remedy is sought for misrepresentation, it will be necessary to establish an adequate link between the statement and the consequence from which the representee claims to be relieved. If the claim is for damages, the question is whether the statement caused the loss. If the claim is for rescission of a contract, the inquiry is as to the causal link between the statement and the claimant s entry into the contract. The language used in the different remedies, and the legal tests employed for them, will vary, but generally the issue is similar: it is an issue of the claimant s reliance on the statement, and whether the statement caused the harm in issue. A false statement, even one made fraudulently, will not be actionable as a misrepresentation by the person to whom it was addressed if it had no impact on his actions, nor otherwise caused him loss. This means that the statement must have been present to the claimant s mind at the time when he took the action on which he bases his claim, but the claimant need not prove that he believed that the statement was true: it is sufficient that, as a matter of fact, he was influenced by the misrepresentation."*

(b) Chitty on Contracts (33rd Ed, 2018) at §7-036:

> *Inducement*
>
> *It is essential if the misrepresentation is to have legal effect that it should have operated on the mind of the representee. It follows that if the misrepresentation did not affect the representee s mind, because he was unaware that it had been made or because he was not influenced by it, he has no remedy."*

(c) *Marme v Natwest Markets Plc* [2019] EWHC 366, at §§281-288 (Picken J). This was a case dealing with an alleged implied representation, to which the claimant had not addressed its mind when entering into a contract. At §286, the judge said:

> *In the circumstances, I agree with Mr Howe QC when he submitted that these authorities support the proposition that a claimant in the position of Marme in the present case should have given some*

Exhibit 2
Page 402

> *contemporaneous conscious thought to the fact that some representations were being impliedly made, even if the precise formulation of those representations may not correspond with what the Court subsequently decides that those representations comprised. If the position were otherwise, then, I agree with Mr Howe QC that the consequence would be that there would be a substantial watering down of the reliance requirement."*

> (d) *Chagos Islanders v Attorney General* [2003] EWHC 2222, at §364.  In that case, Ouseley J held that a person cannot sue in deceit

> *in respect of representations which were not made to them directly or to an agent and in reliance upon which they did not act, being unaware of them.  I regard that as obvious."*[89]

483.    This gives rise to a point which only surfaced in its full form in the Defendants' written closing submissions: the *'Bidco point'*.

*The Bidco Point*

484.    The acquirer in the present case was Bidco, not HP. It was only Bidco that acquired an *"interest in securities"* within the meaning of Sch 10A §8(3).[90] Bidco is the only party that claims to be entitled to damages from Autonomy under FSMA.[91] HP is not a party to these proceedings. Accordingly, in order to establish liability under s. 90A / Sch 10A, the Claimants must establish that <u>Bidco</u> relied on the published information in deciding whether to acquire the share capital of Autonomy.  This is common ground: in their written closing the Claimants accepted that one of the components of the FSMA claim is that *"Bidco must have relied on the information in question when deciding to buy Autonomy shares, at a time when, and in circumstances in which, it was reasonable for Bidco so to rely."*

485.    The Claimants relied on two arguments in respect of the *'Bidco point'*. The first was that this was plainly an *"ambush"*, and that the point (a) should have been properly pleaded to alert the Claimants to it, and since it was not, (b) should not

---

[89]See also the Court of Appeal's comments on that conclusion: *"The judge may very well be right in his conclusion that, as a matter of law, no such cause of action exists as a matter of principle. But it is conceivable that in certain exceptional circumstances, for instance where the defendant, by the very making of the deceitful statement or for some other reason, had assumed liability to the claimant, a cause of action could exist." Chagos Islanders v Attorney General* [2004] EWCA Civ 997, at §36.
[90]Sch 10A §8(3): *"References in this Schedule to the acquisition or disposal of securities include— (a) acquisition or disposal of any interest in securities, or (b) contracting to acquire or dispose of securities or of any interest in securities, except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities."*
[91]See RRAPoC §§97-201, under the heading *"Liability of Autonomy to Bidco under Sch 10A FSMA"*.

Exhibit 2
Page 403

now be available to the Defendants. The second was that in any event the point was a contrived and bad one, since the reality was that HP was the controlling mind of Bidco, and Bidco simply did as it was directed by HP. The Defendants, and in particular Dr Lynch, did not accept either of the Claimants' points. I address each in turn below.

486.    As to the pleading point and the "ambush", the Claimants had asserted in their RRAPoC that:

> *"Bidco acquired the share capital of Autonomy, including the shares held by Lynch and Hussain, in reliance on (i) the information contained in the Annual Reports and the Quarterly Reports (and as repeated and explained during earnings calls) and (ii) the misrepresentations made by Lynch and Hussain directly to HP (and thus to Bidco) as set out below."*

487.    The Defendants had (in each case) denied this. But they had not pleaded any positive case that only proof of Bidco's reliance would suffice, that reliance by HP would not constitute reliance by Bidco and that since no separate reliance by Bidco was demonstrated the claim must fail. They had asked questions as to the identity of those alleged to have relied on the representations but made nothing ostensibly of it: they had not explained or relied on the point in their opening submissions, and had it now seemed, carefully tucked them away for later deployment after the conclusion of evidence, in their written closing submissions. The Claimants denounced this, and submitted that the Defendants should be precluded from pursuing the *Bidco point* as insufficiently pleaded.

488.    In answer, Mr Miles took me through the relevant parts of Dr Lynch's defence to show that there was *"a flat denial, clear denial of reliance by Bidco"*, and that Dr Lynch had (a) made clear that the Defendants were unaware of Bidco's existence, and (b) expressly put the Claimants to strict proof and required them to provide information as to which individuals had relied on Autonomy's published information and the alleged misrepresentations, and (c) received the answer that they were Messrs Apotheker, Robison and Johnson, who had advised the HP Board whether to proceed. The Defendants denied having taken the Claimants by surprise. They contended that they had thus made clear and express their focus on the identity of the individuals who had allegedly relied on the information. Put shortly, the Defendants submitted that there was a clear issue on the pleadings and that in any event it was ultimately an issue of law.

489.    They added that any deficiency in the pleadings, if relevant, was on the Claimants' side: the Claimants had simply failed to plead or prove how it was that a representation made to HP and its bid team could be regarded as one made to and relied on by the Claimants (and in particular, Bidco). The answer contained in the Claimants' Reply did not identify anyone within the management of Bidco who was said to have relied on the published information. Bidco's directors at the time of the acquisition were Ms Lesjak, Paul Porrini and Sergio Letelier. The persons whom the Claimants had identified in answer were the bid team within HP itself:

Exhibit 2
Page 404

> *"201.1. Mr Apotheker, Mr Robison and Mr Johnson relied on Autonomy's published information (or on the review by their subordinates or by HP's advisers of Autonomy's published information, who also so relied) when making recommendations to the board of directors of HP as to whether to proceed with the Autonomy Acquisition and at what price.*
>
> *201.2. The board of HP relied on those recommendations (and on the views of HP's advisers derived from Autonomy's published information) when determining whether Bidco should proceed with the Autonomy Acquisition and what price it should pay for Autonomy. Further, the board was given certain information taken directly from or derived from Autonomy's published information, and the board relied on the same."*

490.    There is, to my mind, some substance in the submissions of both sides. The Defendants did keep their point, as it were, "under wraps", pleading at best the bare minimum. The Claimants did not plead out, as they should I think have pleaded out, their case that although Bidco had its own directors, none of whom was a director of HP, nevertheless its investment decision was made by HP's bid team and directors in alleged reliance on the relevant information. But the question to be determined is whether these points are such as on grounds of pleading deficiencies either (a) to preclude the Defendants pursuing the Bidco point or, more drastically, (b) to result in the total failure of the Claimants' case in all its aspects.

491.    Neither is an inviting result; and inevitably perhaps, I have felt a great reluctance to countenance that these entire proceedings should be determined by a pleading point. I have concluded that:

(1)    The Defendants' pleadings were sparse but sufficient, and their tactic of keeping the point and its powder dry was forensically unyielding but not impermissible in the context of a hard-fought fraud case with the best of legal representation and so much at stake.

(2)    The Claimants' pleading was imperfect and technically incomplete, but the reality is that there has been no material prejudice to the Defendants, who were well aware of the point, had every opportunity to and did cross-examine the individuals said in fact to have relied on the relevant information (being the HP bid team and directors, rather than the *de jure* directors of Bidco, namely, Mr Porrini and Mr Letelier).

(3)    Ultimately, as Mr Miles himself submitted, the issue is really one of law.

492.    As to the issue which substantively arises, the question is whether reliance can be demonstrated in the absence of (a) any evidence to show that Bidco itself, which was not incorporated until 15 August 2011, almost at the end of the due diligence process, six days after KPMG's draft due diligence report, and a day

Exhibit 2
Page 405

before the HP board meeting at which HP decided to carry out the acquisition[92] relied on, considered, or was even aware of the alleged misstatements contained in the published information; and (b) any evidence from any of the directors of Bidco, apart from Ms Lesjak, who gave no evidence about what she did or thought in her capacity as a director of Bidco, gave no evidence of having relied on any of the published information, and as the CFO of HP, was actually opposed to the transaction.

493.    The Defendants submitted that the answer was "No". The Claimants had not adduced the required evidence: the statutory provision plainly required, and the Claimants had simply not sufficiently provided, proof that Bidco had itself considered and acted on the relevant information. Mr Miles also rejected the ancillary suggestion by the Claimants that the Defendants were applying an excessively restrictive interpretation of the statutory provision not required by the wording, and went on to submit:

> "...they say it would be construing the issuer liability regime under FSMA in an unduly restrictive way so as to exclude a remedy simply because of the quite standard way in which HP decided to structure its investment. And they say our interpretation isn t required by the language of the statute.  They seem to be suggesting that our interpretation would thwart the statutory purpose.

> Now we don t agree with that, about the language of the statute. They have not put forward any real argument as to how the statute allows a separation between the person who relies on the information and the person who suffers the loss, or the separation between the acquirer and the decision-maker, perhaps more precisely…

> But we also don t agree with the idea that it s thwarting the purpose of the statute. The purpose of the statute is to protect investors who rely on financial statements and decide to purchase shares. This isn t, we would suggest, an ordinary situation. Investors don t normally incorporate SPVs for the purpose of acquiring shares…"

494.    The Defendants' forthright conclusion was that HP chose to buy Autonomy through Bidco for its own commercial reasons: if the benefits of doing so came at the cost of depriving HP of a claim under FSMA, that is the consequence of HP's choice, and that reliance by HP cannot be equated to reliance by Bidco.

495.     The answer the Claimants offered was that (quoting from Mr Rabinowitz's oral closing speech):

> "...Bidco was an acquisition vehicle created to acquire Autonomy on HP s behalf with HP s money. The decision that Bidco would make an offer for Autonomy and on what terms was made by HP s board based

---

[92] As to Bidco's incorporation, it is pleaded in the RRAPoC that: "*Hewlett-Packard Vision BV ("Bidco") was incorporated in the Netherlands on 15 August 2011*". For the draft due diligence report, and HP's board meeting, see paragraphs 265 and 294 above.

Exhibit 2
Page 406

> *on recommendations by HP s management…The board members of Bidco, on whom so much focus is now placed, merely implemented the HP s board decision that Bidco should make the offer as the Board directed them to."*

Mr Rabinowitz added in his oral reply that:

> *We say that the people who took the decision that Bidco should purchase Autonomy were HP s board on the advice of HP s management and their reliance constitutes Bidco s reliance."*

496.    The Claimants sought to support their arguments:

(1) By reference to an observation of my own in *SL Claimants v Tesco plc* [2019] EWHC 2858 (Ch) at [117] that in the context of FSMA:

> *"Unless the wording was without any semantic doubt entirely deficient to apply in such circumstances, ordinary principles of statutory construction require the court to ensure that the statutory purpose is not thwarted."*

(2) By relying on the decision of the Court of Appeal in *Abu Dhabi Investment Co v H Clarkson and Co* [2008] EWCA Civ 699 in which it was held that the claimants (ADIC and two of its subsidiary companies, ASH and ASMIC), each of whom had different claims, could successfully claim against the defendants (the Norasia defendants) in respect of dishonest misrepresentations made by the Norasia defendants to ADIC. In paragraph 38 of the judgment, May LJ explained:

> *Certainly by the date of the Memorandum of Agreement…, the Norasia defendants knew quite well that the role of the special purpose vehicle was to be subscribed to the shares with money largely derived from a Paribas bridging loan. The underlying commercial thinking which led ADIC to adopt this structure is unimportant. What mattered was that the Norasia defendants knew that this was to be the structure, and that they plainly intended, by their dishonest misrepresentations, to deceive the controlling minds of the special purpose vehicle to induce them to give effect to the proposed investment by means of the proposed structure. It is not necessary, for ASH and ASMIC to succeed, to conclude that the Norasia defendants intended their representation to be passed on to any person whom ADIC might wish to interest in the investment. It is only necessary to conclude, as I do, that the Norasia defendants, knowing as they did the structure by means of which ADIC intended to, and did in fact, effect the investment, plainly intended that their representations should be passed on to those parts of the structure, that is ASH and ASMIC, which effected the investment. In fact, of course, those who controlled the special purpose vehicles were the same people who controlled ADIC, so*

Exhibit 2
Page 407

*that in reality the passing on of the representations is a lawyers construct.""*

Mr Rabinowitz submitted that this was effectively the same as their case on reliance, substituting (as it were) HP in place of ADIC and Bidco in place of ASH and ASMIC.

497.    I turn to the Claimants' second point that it was sufficient for the purpose of the statute for them to demonstrate that Bidco was simply implementing the HP Board's decision made on the basis of the information provided to them that Bidco should make the offer as the Board of HP directed them to do.

498.    Mr Miles sought to side-line the *Abu Dhabi* case as concerned only with whether the Norasia defendants had the necessary intention to deceive for a deceit claim, and whether the second and third claimants (ASH and ASMIC, the two special vehicles) were within the contemplation of the Norasia defendants as likely, and therefore to have been intended to be deceived by the defendants, which Mr Miles stated *"wasn't an issue of reliance"*.

499.    Given the fundamental effect of the point raised by the Defendants it is convenient to explain now the basis on which I have determined that the *Bidco point* has not the conclusive effect which, late in the day, the Defendants contended it had. I accept the Claimants' argument that the fact that it was HP which claims to have been influenced by Autonomy's published information (and specific representations) and it was HP which undertook due diligence does not mean that Bidco cannot satisfy this part of the reliance test.

500.    In a little more detail:

(1)    The *Abu Dhabi* case, though relating to common law deceit and not a statutory provision, does support the conclusion urged by the Claimants that for the purpose of the acquisition, HP can be treated as the controlling mind of Bidco, and that HP's reliance is to be treated as Bidco's reliance.

(2)    There is no such separation on that basis between the person who relies on the information and the person who suffers the loss, nor between the acquirer and the decision-maker.

(3)    Such a conclusion is consistent with the intent of the statutory provisions and avoids what to my mind would be the counter-intuitive conclusion, that the use of an SPV which had no purpose or business nor any real part in the process except as a pocket in HP's trousers, should invalidate the claim.

*Reliance on what?*

501.    Sch 10A paragraph (1)(a) refers to the payment of compensation to a person who acquires, continues to hold or disposes of securities *"in reliance on published information to which this Schedule applies"*. (Its predecessor, s. 90A,

Exhibit 2
Page 408

related only to acquisitions of shares and referred to compensation to a person who acquired shares *"in reliance on the information in the publication"*). The loss claimed must be caused by reliance on that statement or omission.

502. The focus is on statements or omissions in published information on which reliance is demonstrated to have been placed. Paragraph 3(2) refers to the issuer being *"liable in respect of an untrue or misleading statement"*. Further, paragraph 3(1) states that compensation is only to be paid where the acquirer "*suffers loss in respect of the securities as a result of—(i) any untrue or misleading statement in that published information, or (ii) the omission from that published information of any matter required to be included in it.*"

503. As Dr Lynch submitted in his written closing, it would not be enough for Bidco to show that it relied in some generalised sense on a piece of published information (e.g. the annual report for a given year): I accept the Defendants' submission that it cannot have been intended to give an acquirer of shares a cause of action based on a misstatement that he never even looked at, merely because it is contained in (say) an annual report, some other part of which he relied on. The requirement that loss be suffered as a result of the untrue or misleading statement can only be satisfied where the person acquiring securities applied his mind to the statement in question, and where that statement induced the acquisition or (more relevantly for this case) induced the acquirer to transact on the terms he did.

504. This view gains support from the Davies Review on Issuer Liability. Discussing s. 90A, Professor Davies QC said this:[93]

> *"Section 90A ..., by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken."*

The same reasoning would apply in relation to Sch 10A.

505. Similarly, the requirement for reliance cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all: again, see *Marme v Natwest Markets Plc* at §§281-288. The statement must *"have been present to the claimant's mind at the time when he took the action on which he bases his claim."*[94] Unless a document was reviewed, it cannot have been relied on. In this case, the Claimants have referred to alleged misstatements or omissions in a number of documents (for instance transcripts of earnings calls, and Quarterly Reports from long before the acquisition) which were not reviewed by or on behalf of any of the Claimants. These cannot found a claim, though they may be relevant evidence of intention.

---

[93] Davies Review of Issuer Liability: Discussion Paper (above).
[94] See *J Cartwright, 'Misrepresentation and Non-Disclosure'* (4th Ed.) at [3-50].

Exhibit 2
Page 409

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

506.    That said, statements (or omissions) may in combination create an impression which no single one imparts. In my view, if the overall impression thus created is false it may found a claim, if the other conditions of liability are also met.

*What degree of reliance?*

507.    The Claimants argued, by analogy with the common law relevant to claims in deceit, that only a weak causal connection is required between the false statement and the acquisition: they contended that:

> *Although the claimant must have been induced to change his position (here, by buying the Autonomy shares), the representation need not have been the sole or dominant cause. If necessary, the Claimants will contend that, but for the representation, the claimant might" have acted otherwise".*

508.    They referred to *Reynell v Sprye* (1852) 42 EF 710 at 728 (where it was said that *"Once make out that there has been anything like deception…no contract resting in any degree on that foundation can stand"*); to *Barton v Armstrong* [1976] AC 104 at 118[F-H] (in the Privy Council, where it was stated that *"…in this field the court does not allow an examination into the relative importance of contributory causes"*); and to *Raiffeisen Zentralbank Osterreich AG v Royal Bank of Scotland Plc* [2011] 1 Lloyd's Rep 123 at [198]-[199] (where Christopher Clarke J stated *"There are sound reasons of policy why…those who set out to deceive should bear a liability even if it might well have been the case that, but for such behaviour, the contract might still have been made…"*). On this basis, inducement is made out if the representation had *"an impact on the mind"* or an *"influence on the judgement"* though the Claimants accepted that inducement is negated where the representation had *"no effect on the decision"* (*per* Lord Clarke in *Zurich Insurance Co plc v Hayward* [2017] AC 142 at [29]).

509.    The Claimants further contended, again citing *Zurich Insurance Co plc v Hayward* [*supra*], that if a representation was material, that is, of such a nature as to be likely to induce a person in the claimant's position to enter into the contract, it is a fair inference of fact (though not an inference of law) that he was influenced by the statement; and the inference is particularly strong where the misrepresentation was fraudulent. Lord Clarke cited at [35] Lord Mustill's statement in the *Pan Atlantic* case [1995] 1 AC 501, 551 that the representor

> *"will have an uphill task in persuading the court that the…misstatement…has made no difference…there is a presumption in favour of a causative effect."*

510.    The Defendants, however, did not accept that these cases applied in the context of a s. 90A or Schedule 10A FSMA claim. They pointed out that FSMA does not require that the issuer should have intended the claimant to rely on the relevant published information, whereas that is a requirement of the tort of deceit, and it is that requirement and proof of its fulfilment which informs the presumption of causative effect. Accordingly, they did not accept that there was any such presumption in the context of a claim under s. 90A/ Sch 10A. In any

Exhibit 2
Page 410

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

event, they submitted, in its application to claims for misrepresentation/deceit such a presumption is one of fact, not law, and does not affect the burden of proof: see *per* Longmore LJ's analysis in *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc,* and his conclusion at [25] that:

> *The tribunal of fact has to make up its mind on the question whether the representee was induced by the representation on the basis of all the evidence available to it."*

511.  Further, they contended that it was not sufficient for the Claimants to show that HP/Bidco might have been induced; they had to show that they were induced, and that although the misrepresentation in question need not be the sole inducement, it must play a real and substantial part in inducing the representee to act.  They relied again on the analysis and conclusions in *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc.*

512.  Their analysis based on the wording of the statutory provisions was as follows:

(1)  A claimant under these provisions must, in the normal way, establish that the ingredients of the statutory cause of action are made out.

(2)  The burden of proof lies on the claimant.

(3)  The claimant must therefore establish (i) that he has "*acquire[d] ... the securities in reliance on published information ...*" and (ii) "*suffer[ed] loss in respect of the securities as a result of*" the untrue or misleading statement or omission.[95]

(4)  That requires proof that he would not have suffered loss but for the misleading statement.  For this purpose, he must therefore show that he would have acted differently but for the statement (thereby suffering a loss), not that he might have acted differently.  If he can only prove that he might have acted differently, all that can be said is that he might have suffered loss as a result of the statement – in which case the burden of proof has not been satisfied.

(5)  If the evidence shows that the acquirer would have acted in the same way had the published information not contained the false statement or omission, it cannot be said that any loss is suffered as a result of the false statement or omission.

513.  The Defendants submitted that given that the language of the section is clear, there is no need to look to the cases on misrepresentation or deceit in the context of the FSMA claims; but they went on to submit that in any event, those cases do not assist the Claimants, as follows:

(1)  The burden is on the claimant in a deceit claim to prove reliance.  See Clerk & Lindsell on Torts (22nd Ed, 2017) at §18-34:

---

[95]Sch 10A §3(1); and see to similar effect s. 90A(3).

Exhibit 2
Page 411

> *"To entitle a claimant to succeed in an action in deceit, he must show that he acted (or in a suitable case refrained from acting) in reliance on the defendant's misrepresentation. If he would have done the same thing even in the absence of it, he will fail. What is relevant here is what the claimant would have done had no representation at all been made. In particular, if the making of the representation in fact influenced the claimant, it is not open to the defendant to argue that the claimant might have acted in the same way had the representation been true."[96]*

(2) It is not sufficient for a claimant to show that he <u>might</u> have been induced: he must show that he <u>was</u> induced: see *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc* [2019] 1 Lloyds Rep 491 (CA) at §34.

(3) The test for inducement has been expressed in different ways in claims for different types of misrepresentation. It is sufficient in a claim for fraudulent misrepresentation to show that the representation "was actively present to [the claimant's] mind", and whether "his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did".[97] While the misrepresentation need not be the sole inducement, it must play a "real and substantial part" in inducing the representee to act.[98]

514. The Defendants also submitted that in asking whether a claimant under the statutory provisions has relied on a false or misleading statement or omission, in the sense of being induced by that statement or omission to change his position, it is legitimate to ask whether the claimant would have acted differently had he known the truth. If he would have acted in the same way, even if he had known the truth, it cannot be said that he relied on or suffered loss as a result of the false or misleading statement or omission. The Defendants cited *Raiffeisen Zentralbank v RBS* [2010] EWHC 1392 (Comm) at §185 (Christopher Clarke J):

> *"... a claimant who says that even if he had been told the whole truth it would have made no difference to his readiness to enter into the contract will be likely to fail to establish that he was induced to enter into the contract by the misrepresentation in question. There is an inherent contradiction in someone saying that a representation was an inducing cause and accepting that,*

---

[96]The above passage shows that, once inducement has been established as a fact it is irrelevant to ask whether the Claimants would have acted in the same way had the statements made in the published information been true. However, as discussed below, it is relevant to ask the different question, whether the Claimants would have acted differently if accurate information had been published (assuming *arguendo* that the Claimants succeed in their case that there were inaccuracies in it).

[97]*Edgington v Fitzmaurice* (1885) 29 Ch. D. 459, at 483, followed in *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc* [2019] 1 Lloyds Rep 491, at §§28, 32 and 43 (Longmore LJ).

[98]*Dadourian v Simms* [2009] EWCA Civ 169 at §§99 and 101 (Arden LJ).

Exhibit 2
Page 412

> *if the truth had been told, he would have contracted on the same
> terms anyway."*

The Defendants referred also, to similar effect, to *Dadourian v Simms* at §107,
and *JEB Fasteners* [1983] 1 All ER 583 (CA), at 588.

515.     As to these competing submissions on the question of what degree of reliance
is required and whether the presumption of inducement applies in the context
of the FSMA claims, in my judgment:

(1)     It is enough that a fraudulent representation has had *"an impact on the
mind"* or an *"influence on the judgement"* of the claimant (see *per* Lord
Goff of Chieveley in *Pan Atlantic Insurance Co Ltd v Pine Top
Insurance Co Ltd* [1995] 1 AC 501, as quoted by Lord Clarke of Stone-
cum-Ebony JSC in *Zurich Insurance Co plc v Hayward*). There is no
"but for standard" in that context; and the fact that other considerations
may have been predominant does not negate the deception if it did have
some impact or influence, for (as Lord Cross of Chelsea said in *Barton
v Armstrong* [1976] AC 104, 118-119) *"in this field the court does not
allow an examination into the relative importance of contributory
causes."*

(2)     I was          originally minded to agree with the Defendants that the so-called
'presumption of inducement' should not be read into the FSMA test; and
that it would be difficult to integrate with the test of reasonable reliance
which is expressly introduced by FSMA. On reflection, I think this
would be to treat the *"presumption of inducement"* as, in effect, one of
law: and as Lord Clarke explained in the *Zurich Insurance* case, it is
simply an inference of fact. I have ultimately concluded that the
presumption applies in the context of a FSMA claim no less than in other
cases of deceit. The reason is simple: it aphoristically expresses the
reality that once it has been established that a representor fraudulently
intended his words to be taken in a certain sense and that the representee
understood them in that sense and entered into the contract, it is natural
to suppose, unless the presumption is rebutted on the facts, that the
representee was induced to make his investment decision on the faith of
the representor's statement.[99]

(3)     It remains a question of fact to be determined on the balance of
probabilities whether having regard to all the circumstances it did in fact
have *"an impact on the mind"* or an *"influence on the judgment"* (as
Lord Goff put it in the *Pan Atlantic* case) of the representee in making
that investment decision.  But the presumption is difficult to shift.

(4)     In *Hayward v Zurich Insurance Co plc*, Lord Clarke noted (at [36]) that
the authorities are not entirely   consistent as to what is required to rebut
the presumption of inducement: and in particular, *"whether what must*

---

[99] Lord Mustill put it this way in the *Pan Atlantic* case (at [551]): the representor
   *"will have an uphill task in persuading the court that the…misstatement…has made no
   difference…there is a presumption in favour of causative effect."*

Exhibit 2
Page 413

be proved is that the misrepresentation played *"no part at all"* or that it did not play a *"determinative part"*, or that it did not play a *"real and substantial part".* It was not necessary to decide how the test should be worded in that case since it was found that the presumption was not rebutted in that case on any of the formulations; but Lord Clarke did go on to say that *"the authorities…support the conclusion that it is very difficult to rebut the presumption"*, citing Baroness Hale of Richmond DPSC's observation in *Sharland v Sharland* [2015] UKSC 60; [2016] AC 871 that a party who has practiced deception with a view to a particular end, which has been attained by it, cannot be allowed to deny its materiality or that it actually played a causative part in inducement.

(5) It seems to me that, it would be in accordance with the approach in the authorities cited above to avoid semantic debate and leave the issue to be determined according to a value judgment whether in all the circumstances the misrepresentation(s) should be taken as having influenced the decision, without entering into an assessment of its relevant importance amongst any other influences.

(6) Further, the additional requirement of FSMA that the reliance, if established, must also be shown by the claimant to have been reasonable does not remove, but does, in my view, mitigate the effect of the presumption. In my judgment, it introduces an additional test requiring consideration of whether it was reasonable for the representation so to have impacted on the mind and judgment of the representee; put another way, it seems to me that the claimant must show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it: and see further paragraphs [517*ff*] below.

(7) It is also important to keep in mind that the propensity of a statement to influence the mind only gives rise to the presumption (if applicable) if it is shown to have been read or heard and understood by the representee in its deceptive sense and/or the claimant would have entered into the contract even if the misrepresentation had not been made: see *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm) (Males J, at §§18, 19 and 171-172): if it did not influence the mind, or if the representee understood it in some different sense and it was by reference to that different meaning that he acted, the presumption does not arise: and see the discussion about ambivalent or ambiguous statements in the recent decision of Cockerill J in *Leeds City Council and others v Barclays Bank plc and another* [2021] 2 WLR 1180.

(8) I agree, therefore, with Mr Miles that the Court should not assume reliance by Bidco on every statement alleged by the Claimants to be potentially false or misleading, drawn from hundreds of pages of financial statements and transcripts going back months or years before the acquisition of Autonomy, merely because the Claimants allege that these statements were deliberately false or misleading.

Exhibit 2
Page 414

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

516.   Once reliance/inducement has been established as a fact, it is (subject to the exception noted in *Raiffeisen Zentralbank v RBS*, where the representee accepts that he would have acted in the same way, even if he had known the truth) not legitimate or relevant for the defendant to enquire or suggest what the representee would have done had he been told the truth: for, as Hobhouse LJ said in *Downs v Chappell* [1997] 1 WLR 426 at 433, in fact the truth was never told. The question is whether the representee was induced by the false statement; not what the effect would have been if he had been told what he was not told.

*When is reliance reasonable?*

517.   As explained above, and in a departure from the common law, FSMA s. 90A / Sch 10A stipulate also that to establish liability the acquirer of securities must have acted reasonably in relying on the information at a time when, and in circumstances in which, it was reasonable for him to rely on it.  See Sch 10A §3(4):[100]

> *"A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities —*
>
> *(a)    in reliance on the information in question, and*
>
> *(b)    at a time when, and in circumstances in which, it was reasonable for him to rely on it."*

[Emphasis added]

518.   The Claimants relied on *Redgrave v Hurd* (1881) 20 Ch D 1, 13 in which Sir George Jessel MR said:

> *If a man is induced to enter into a contract by a false representation it is not a sufficient answer for him to say,  If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity, and did not choose to avail yourself of them."*

519.   I did not understand this proposition, or its applicability in the context of FSMA as well as common law claims in deceit, to be contested: and although the Defendants pointed to various substantial deficiencies in due diligence they did not argue that on that account the Claimants could not complain they had been deceived. In any event, in my judgment, it is no defence to a FSMA or a fraud claim that the claimants had the means of discovering the truth; and no defence of contributory negligence or *"caveat emptor"* is available. The test of reasonableness relates to the form and timing of the misrepresentation and what

---

[100] S.90A(5) is in materially the same terms.

Exhibit 2
Page 415

it is reasonable for the representee to make of what he is told: it is not addressed to hypothetical matters such as what else the representee might have done to assess the reliability of the statement.

520.    As mentioned above, the statutory provision requiring the claimant to show that at the time when and in the circumstances in which the relevant fraudulent misrepresentation was made his reliance on it was reasonable was regarded by Prof. Davies as a substitute for the common law requirement to show that the representor "intended reliance".[101] The test of reasonableness is not further defined, but it is plainly to be applied by reference to conditions at the time when the representee claimant relied on it. Circumstances, caveats or conditions which qualify the apparent reliability of the statement relied on by the claimant are all to be taken into account. The question of when reliance is reasonable is fact-sensitive.

521.    In the present case, the Defendants instanced the following considerations, amongst others:

(1)    The status and purpose of the particular statement being relied on: thus, the Defendants contended that it is more likely to be reasonable to rely on an IFRS figure stated in the accounts than to rely on a general statement contained in the directors report (for instance, a statement such as "*we believe that our products are the best in the market*"), or a comment made in passing in the course of an earnings call;[102]

(2)    Whether the statement is qualified: the Defendants suggested that where a piece of information is qualified by a statement that it is "*provided for background information and may include qualitative estimates*" (as with the supplementary non-IFRS metrics given by Autonomy), reliance will be reasonable for narrower purposes than where there is no such qualification.

(3)    The time at which the statement is relied on: the Defendants suggested that it is more likely to be reasonable to rely on up-to-date information than to rely on a quarterly report that is several years out of date.

(4)    The purpose for which the information is relied on: the Defendants submitted that it will be unreasonable to rely on information for a purpose for which it is not suited. Thus, they suggested, in the case of a non-IFRS metric expressly stated to involve qualitative estimates, it is unlikely to be reasonable to rely on it by plugging it into a valuation model whose output is highly sensitive to small variations in input.

522.    I agree that the test is fact sensitive and that these factual matters do require consideration in assessing reasonableness. I address these matters at greater length after determining whether the Claimants have established the

---

[101] See *Davies Review of Issuer Liability: Final Report para.30 p18.*
[102] Assuming (*arguendo*) that the call in question constitutes published information.

Exhibit 2
Page 416

misrepresentations alleged: see chapter titled Reliance and Loss Revisited. But
I would summarise my conclusions in this regard as follows:

(1) Although HP/Bidco undoubtedly saw Autonomy as a *"transformational
opportunity"* and Mr Apotheker envisaged that a combination of HP and
Autonomy would realise synergy values in excess of Autonomy's
stand-alone value, the basic building bricks which informed HP's
approach, negotiation, bid and the eventual Acquisition were the historic
revenue figures and description of Autonomy's five revenue streams as
represented in Autonomy's published information.

(2) It was entirely reasonable for HP/Bidco to rely, as it did, on the accuracy
and completeness of the figures and description thus given, unless and
to the extent that through persons acting on its behalf, and having
responsibility to pass on to HP/Bidco what they had found out,
HP/Bidco actually became aware (whether in the context of due
diligence or otherwise) of some particular inaccuracy or material
qualification.

(3) HP/Bidco did not, prior to the Acquisition, and whether in the course of
due diligence or otherwise, actually become aware of anything in the
course of due diligence to warn it of some inaccuracy or material
qualification such as to invalidate or cause it not reasonably to be
entitled to place reliance on Autonomy's figures and representations in
its published information.   None of the matters relied on by the
Defendants made HP/Bidco's reliance unreasonable.

(4) The           reasonableness of HP's reliance at least in material part on
Autonomy's published information was reinforced, and such reliance
was further encouraged, by representations made by Mr Hussain and
others and by presentations made in the January, February and March
Slides described and assessed in the chapter on Deceit and
Misrepresentation later in this judgment below.

(5) HP/Bidco have established reasonable reliance on what was stated in the
published information in respect of all the aspects of Autonomy's
business now said to have been misrepresented; and more particularly,
HP/Bidco reasonably relied on that published information as having
conveyed expressly or by necessary implication that:

(a)    Autonomy was a *"pure software company"* and its
revenue and revenue growth were generated almost
exclusively from its software licence sales, demonstrating
also the success and penetration of its signature product,
IDOL;

(b)    Autonomy's OEM business revenue was a particularly
valuable source of recurring revenue derived at least
predominantly from development licence sales and
recurring revenue from royalties;

Exhibit 2
Page 417

(c)     Autonomy's hosting business, which was accounted for as part of its IDOL Cloud business, was growing as a result of increased hosting revenue streams which by their nature were recurrent;

(d)     Sales by Autonomy from which revenue was recognized were genuine transactions of commercial substance, and properly accounted for accordingly.

523.    I turn to issues of principle which arise in respect of the measure of damages in the context of the Claimants' FSMA claims.

*(g) Loss in the context of FSMA claims*

524.    Neither s. 90A nor Sch 10A specifies the measure of damages that applies to a claim brought under them.  Sch 10A §3(1) simply provides that an issuer *"is liable to pay compensation"* to a person who has acquired securities in reliance on published information, and who has *"suffer[ed] loss in respect of the securities as a result of"* any untrue or misleading statement, or the omission of any matter required to be included. It was not in dispute that damage is a separate component of the cause of action under s. 90A / Sch 10A; and must be proved separately from questions of inducement and reliance.[103] The burden of proving damage lies on the claimant, who must show on the balance of probabilities that he has suffered compensable loss.

525.    One of the questions raised by Professor Davies at the consultation stage was which measure of damages was appropriate, that for fraud (deceit) or that for negligence. He concluded that it would be difficult to formulate effective rules that would not tie the court's hands in an unsatisfactory way, and he recommended that the issue should be left to the courts to decide. In doing so, however, he thought it likely that the courts would apply the same course as it followed in the case of common law claims for deceit *"since the section is closely modelled on the common law tort"*. He noted also that the damages would be likely to be assessed by reference to the loss caused by reliance on the statement, and not the loss caused by its falsity.

526.    It was common ground that the starting point for the assessment of damages is the statement of Lord Blackburn in *Livingstone v The Rawyards Coal Company* (1880) 5 App. Cas. 25:

> *"I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages <u>you should as nearly as possible get at that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his</u>*

---

[103]As explained below, to the extent that analogies with the common law are relevant, loss and causation of loss is a separate element from inducement, and requires 'but for' causation.

Exhibit 2
Page 418

> *compensation or reparation.* *That must be qualified by a great
> many things which may arise—such, for instance, as by the
> consideration whether the damage has been maliciously done,
> or whether it has been done with full knowledge that the person
> doing it was doing wrong. There could be no doubt that there
> you would say that everything would be taken into view that
> would go most against the wilful wrongdoer—many things which
> you would properly allow in favour of an innocent mistaken
> trespasser would be disallowed as against a wilful and
> intentional trespasser on the ground that he must not qualify his
> own wrong, and various things of that sort."* [Emphasis added]

527. This is, as for all tort damages, a "but for" test of causation.[104] In a claim under
these provisions of FSMA, the wrong for which the claimant is getting his
compensation or reparation is the inclusion of a false or misleading statement
in, or the omission of required information from, published information.

528. In assessing the losses flowing from that wrong, it is necessary to ask what
would have happened had the false statements or omissions not been made (i.e.
to identify the right counterfactual). The answer which I also took to be common
ground is that if the published information had not contained false statements
or omitted matters required to be included, the published information would
have contained true statements and included all matters required to be included.
Autonomy was under an obligation to produce annual, half yearly and quarterly
reports covering everything it was required by the Companies Act and
Disclosure and Transparency Rules to cover, having regard also to all applicable
accounting standards. But for the alleged wrong, it would have complied with
its obligations properly. It is not therefore a case where, but for the false
statement, there would have been nothing said on the topic covered by the
statement.[105]

529. It is indeed common ground that in assessing the FSMA Loss, the relevant
counterfactual is that accurate information would have been published
historically. Thus, I also take it not to be in dispute that in determining whether
HP would have proceeded with the transaction, it is to be (and, for the purpose
of calculating any loss, has been) assumed that accurate information would have
informed the market and thus Autonomy's share price and its shareholders'
expectations. This is the basis on which Mr Bezant was instructed: see §1.67 of
his First Report:

---

[104]Again to the extent common law analogies are relevant, see the discussion of loss in relation to
deceit below.
[105]Contrast the hypothetical example given by Christopher Clarke J in *RZB v RBS* where "*P buys a
house from V. He had been considering several houses. He is minded to buy the one which he
eventually buys because of its size, shape and character. Shortly before he makes his final decision V's
agent tells him that a particular celebrity has the house next door, a circumstance which he regards as
advantageous. ... In fact, as it turns out, there is no celebrity next door.*" In that example, if the agent
had not chosen to tell a lie, nothing would have been said about whether there was a celebrity next
door. There was no obligation on V or his agent to volunteer information about whether the
neighbours were celebrities.

Exhibit 2
Page 419

> *"In assessing the FSMA Loss, I am instructed to assume that,*
> *but for the breaches of duty alleged by the Claimants:*
>
> *(1) Autonomy's published financial information would not have*
> *been subject to the false accounting of which the Claimants*
> *complain; but*
>
> *(2) the impugned transactions would still have been entered*
> *into."*

530.   The next step in the counterfactual analysis is to ask what would have happened
       in those circumstances. At §196A.1 of the RRAPoC, the Claimants state that:[106]

> *"But for the matters complained of, Bidco would have acquired*
> *Autonomy at a lower price. The Loss is therefore the difference*
> *between the price that Bidco actually paid for Autonomy (i.e.*
> *approximately US$11.1 billion) and the lower price that Bidco*
> *would have offered for Autonomy, had it known the true position*
> *(this being a price which the selling shareholders in Autonomy*
> *would certainly have accepted or which they would have been*
> *likely to accept had they, too, known the true position)."*

531.   Despite this being their primary pleaded case, the Claimants took a different
       approach in their written opening. They argued that the prima facie measure of
       loss is that set out in *Smith New Court Securities v Scrimgeour Vickers* [1997]
       AC 254 – that is, the price paid by Bidco for Autonomy, less Autonomy's true
       value at the time of the acquisition. As they note, this measure of loss "*may be*
       *conceived of as applying an assumption that absent the fraud the transaction*
       *would not have taken place.*"

532.   The Claimants also submitted that the primary pleaded measure discussed
       above, that is, the difference between the price paid and the lower price that
       would have been paid but for the wrong – should only apply to the extent that
       it gives them larger damages than the *Smith New Court* measure. Thus, they
       said that "*while it is open to a victim of fraud to increase damages above the*
       *prima facie measure by claiming losses from not entering into an alternative*
       *transaction, it is not open to the fraudster to eliminate (or reduce) damages on*
       *that basis."*

533.   The Claimants sought to justify this on the basis of the Court of Appeal's
       decision in *Downs v Chappell* [1997] 1 WLR 426. They contended that this
       precludes the Defendants from arguing that Bidco would have paid the same
       price even if it had known the truth. Further, they say that their position is
       consistent with the policy considerations that apply to fraud claims, referring to

---

[106]Thus, the Claimants averred as their primary case that the bid would have proceeded, albeit at a
lower price. By amendment the Claimants pleaded an alternative case that the bid would not have
proceeded (see further below), in which case their loss would be the difference between the price that
Bidco paid for Autonomy and Autonomy's true market value on the date that Bidco's offer became
unconditional.

Exhibit 2
Page 420

the following dictum of May J in *Slough Estates plc v Welwyn Hatfield DC*
[1996] 2 PLR 50, at 124:

> "*If, as I conceive, the policy of the law is to transfer the whole
> foreseeable risk of a transaction induced by fraud to the
> fraudulent defendant, and if, as I conceive, the court does not
> speculate what, if any, different transaction the plaintiff might
> have done if the fraudulent representation had not been made,
> damages on this basis are not to be regarded as a windfall, but
> the proper application of the policy of the law.*"

534.    The Defendants rejected this on the basis that:

(1) First, whatever the position in relation to the tort of deceit, the
Claimants' argument has no application in a claim under s. 90A / Sch
10A FSMA.  The language of the statute contains no suggestion that
the law on damages in deceit should be imported wholesale to claims under
these provisions. [107]  Different policy considerations apply to claims
under FSMA.  In a claim in fraud or deceit, "*the policy of the law is to
transfer the whole foreseeable risk of a transaction induced by fraud to
the fraudulent defendant*" (Slough Estates, above).[108]  But in a claim
under s. 90A / Sch 10A, there is no "*fraudulent defendant*" since the
fraudster (i.e. the PDMR) and the defendant (i.e. the issuer) are different
persons.[109] Unlike a successful fraudster, an issuer does not in general
benefit from the PDMR's wrong in putting out misleading annual or
quarterly reports because, as already discussed, these are not "selling"
documents. [110]  Transferring risks to the issuer penalises the general
body of its shareholders, not the individual responsible for the
misleading statement.  Far from seeking to transfer risk to the issuer, the
policy underlying s. 90A and Sch 10A was to avoid an inappropriate
transfer of risk to, and diversion of resources from, defendant companies
and their shareholders, employees and creditors.

(2) Secondly, and in any case, even in a claim in deceit or misrepresentation,
the dice are not loaded in the way that the Claimants suggested.  When
it comes to questions of damages it is for a claimant to prove his loss on
a "but for" basis (see further below) and this requires the Court to
examine what would have happened in the counterfactual world.  As
explained above, the first element of the counterfactual is that accurate
accounts would have been prepared; the second step is to ask what
would have happened had that occurred? The Defendants submitted that
the Court has to decide these questions and, as with all factual questions,
there can in principle only be one answer.  The question is one of fact;

---

[107]Contrast the language used in s. 2(1) of the Misrepresentation Act 1967, discussed at paragraph 570
ff below.
[108]See also *Smith New Court* at 279-280
[109]As argued at paragraphs 17 and 18 above, in the present claim, the FSMA claim against the issuer is
being used as a stepping stone to the claim against the PDMRs; but that should not affect the court's
interpretation of s. 90A and Sch 10A.
[110]See paragraph 437 above – and contrast the position with a prospectus.

Exhibit 2
Page 421

and it is not open to the claimant to elect or opt for an outcome which would happen to give it the larger recovery.

(3) Thirdly, the passage from *Downs v Chappell* which the Claimants cited was not dealing with the assessment of damages. As already discussed, it was dealing with an unnecessary (indeed illogical) intermediate question posed by the judge at first instance, after inducement had been established, but before turning to the question of damages.[111] *Downs v Chappell* does not assist on this point.

535. The Defendants went on to contend on the basis set out above that the "no transaction" method of assessing loss discussed in *Smith New Court* will therefore be appropriate only if it is accepted or the Court concludes on the evidence that, absent the alleged misleading statements and omissions in the published information, Bidco would not have purchased Autonomy at all.

536. I agree with the Claimants that the basis of what was termed the *Smith New Court* measure is the *"assumption that absent the fraud the transaction would not have taken place."* That assumption is likely to reflect the reality in many cases of a transaction induced by fraud. But not invariably so: and in particular, in other cases, although the transaction would not have gone ahead at the agreed price, it might have proceeded at a lower price. In *Smith New Court* itself, it had been found as a fact that the sale and purchase would not have taken place because the seller would not have agreed to sell at the best price which the purchaser would have considered paying: see [260F-H]. Likewise in *Downs v Chappell* the judge had decided on the facts that no transaction would have eventuated. However:

(1) In this case, the Claimants averred that *"But for the matters complained of, Bidco would have acquired Autonomy at a lower price"* and pleaded the *"no transaction"* case only as an alternative. Dr Lynch admitted that *"as a matter of fact irrespective of the matters complained of, Bidco would have proceeded with its acquisition of Autonomy".* In such circumstances it seems to me that the *Smith New Court "assumption"* is displaced.

(2) It is to be noted that Mr Hussain denied the averment; but it still seems to me to be a question of fact whether or not an agreement at a lower price would have been agreed. In my judgment, this is a question of fact to be determined by the tribunal of fact, not an

---

[111]There is another passage in the judgment of Hobhouse LJ, in the section dealing with damages, which states that "*In general, it is irrelevant to inquire what the representee would have done if some different representation had been made to him or what other transactions he might have entered into if he had not entered into the transaction in question*": p 441 at B-C . However, the words need to be read in context: on the facts the judge had decided that it was a no transaction case; and in such cases it is indeed irrelevant to go on to ask whether other hypothetical deals might have occurred. That has no application in a case where the court concludes that in the counterfactual world the same transaction would have occurred in any event; the question then is whether the claimant can show that it would have occurred on the same or different terms. Furthermore, as Leggatt J noted at §217(1) of *Yam Seng*, the dictum of Hobhouse LJ cannot have been intended to state a proposition of law.

Exhibit 2
Page 422

election to be made by the defrauded party; and see *Vald Nielsen Holdings A/S and anr v Baldorino and others* [2019] EWHC 1926 (Comm).

(3)     I shall review and finally determine the issue in a subsequent judgment on quantum of loss; but my provisional conclusion is that HP would have purchased Autonomy notwithstanding the diminished historical performance which would have on the Claimants' case been revealed had its transactions been fully and properly described and accounted for, but at a lower price and reduced premium reflecting what would have been its lower share price in the market. The fact is, as I see it, that (a) the value (both actual and prospective) of Autonomy's main product and business, IDOL, was substantially unimpaired (b) Autonomy still offered HP the prospect of transformational change and the creation of a data stack which had been the strategic purpose of the acquisition and (c) the synergy values expected would have been little affected. In my provisional view, this is not a 'No transaction' case.

537.    As I see the matter, I am further fortified in that view by the conceptual difficulties which would arise in adopting a 'No transaction' approach at the election of the Claimants but in circumstances such as these which do not justify it. For all the reasons given above, Autonomy was of special value to HP even in its deemed diminished state; to ignore that special value is to ignore the fact. The Claimants insistence that in a 'No transaction' context, no credit would be allowed for that special value would result in a windfall to HP. Though in a fraud case, the court is tender to the defrauded party, the calculation of loss remains an exercise of assessing proper compensation, not meting out punishment or conferring windfalls. If there is a doubt whether credit should be given for that windfall in a 'No transaction' context, that is another reason for adopting the 'transaction' approach which I have found to be appropriate and for denying the Claimants an opportunistic right of election.

538.    However, and in case I am wrong, and contrary to my view the Claimants are entitled to elect, I should address the issue raised as to the approach to be adopted in a 'No transaction' case, especially in relation to synergy value. If damages did fall to be assessed on that basis, the Defendants submitted that:

(1) As Lord Browne-Wilkinson said in *Smith New Court*, in assessing damages in such a case "*the plaintiff is entitled to recover by way of damages the full price paid by him, but he must give credit for any benefits which he has received as a* result of the transaction."[112]

(2) The aim in valuing the benefit received by Bidco must be to arrive at the figure "*that truly reflects the value of what the plaintiff has obtained.*"[113]

---

[112]*Smith New Court* at 266 C-D.
[113]*Smith New Court* at 267.

Exhibit 2
Page 423

(3) There is no dispute about the date of valuation: the Claimants accept that it is appropriate in this case to value the property acquired as at the date of acquisition.

(4) It is ordinarily appropriate, in giving credit for the benefits received, to assess the market value of the asset to the claimant, which usually is determined by evidence of the price at which the stake could have been bought and sold between willing parties.

(5) The Claimants in this case submitted that this hypothetical purchase should not include special purchasers and (in accordance with the *IVS Framework of the International Valuation Standards Committee*) should not take into account synergies or any element of value available only to a specific buyer (and, in particular, any synergy value to HP).

(6) The Defendants accepted that market value is the measure of the credit to be given in a standard case, that is because that market value is a satisfactory measure of the benefits received; but where there are benefits to the purchaser of the thing acquired and then retained voluntarily it would be punitive and not compensatory to permit the purchaser to retain the value of what it has disavowed. That would not, echoing Lord Browne-Wilkinson's words, truly reflect the value of what the plaintiff has obtained. In a case such as this, the value to be ascertained for which credit is to be given is the value of the stake (the shares in Autonomy and the benefits to which they provide access, actual and potential) in the hands of the acquirer: and that must reflect the synergy values to the acquirer as well as any standalone value. A valuation ignoring synergies would not properly reflect the value of the asset obtained, and would result in a windfall to the Claimants.

(7) The Defendants also submitted that whereas in a deceit claim *"the policy of the law is to transfer the whole foreseeable risk of a transaction induced by fraud to the fraudulent defendant"*, in claims under FSMA against the issuer there is no *"fraudulent defendant"* since the fraudster (the PDMR) and the defendant (the issuer) are different persons. Unlike a successful fraudster, an issuer does not in general benefit from the PDMR's wrong in putting out misleading annual or quarterly reports because they are not "selling" documents. Transferring risks to the issuer penalises the general body of its shareholders, not the individuals responsible for the misleading statement: and that is not consistent with the policy underlying s.90A/Sch 10A which was to avoid an inappropriate transfer of risk to, and diversion of resources from, defendant companies, and their shareholders, employees and creditors: and see paragraph 534(1) above. The fact that the issuer may then have a stepping-stone for a claim against the PDMR should not affect the interpretation of s.90A and Sch 10A of FSMA.

539. These are novel and difficult issues, which so far as I am aware have not previously been tested. I shall return to them when addressing issues of quantum. For the present suffice it to say that my provisional view is that credit

Exhibit 2
Page 424

should be given for synergy value where that was the strategic purpose of the acquisition and the asset has been voluntarily retained.

## Knowledge of the Defendants

540. If the Court concludes that Autonomy is liable to Bidco under s. 90A and/or Sch 10A, separate questions arise as to the Defendants' liability. Are the Defendants liable for breach of duty owed to Autonomy for exposing Autonomy to the FSMA Loss? And if so, for what parts of the FSMA Loss are they liable to pay damages?

541. In opening the case for the Claimants, Mr Rabinowitz appeared to accept that each of the Defendants would only be liable to pay damages to Autonomy to the extent that (i) he was legally responsible (i.e. in breach of duty to Autonomy) for any relevant wrongful statements in or omissions from the published information and (ii) those statements or omissions caused loss to Autonomy by becoming liable to Bidco. He expressly stated:

> "*I don't think there is anything between us because I certainly wasn't suggesting, and certainly wasn't intending to suggest, that if, for example, the accounts -- there were false and misleading statements and -- I'm using this as an example -- Mr Hussain was involved and knew and in breach of his duty but Dr Lynch didn't know, that because Mr Hussain knows, Autonomy has a claim against Dr Lynch. It seems to me plain that we wouldn't.*"

No correction or refinement was suggested in the Claimants' written closing submissions.

542. The Defendants took this to mean that it was common ground that it is necessary to consider the position of the two Defendants separately: Dr Lynch would not be liable save in respect of losses caused by his own breach of duty: he could only be liable for the consequences of the particular wrongful statements or omissions in respect of which he had the requisite guilty knowledge – not for the consequences of any other wrongful statements there may have been of which he was unaware, even if those statements give rise to a liability from Autonomy to Bidco (e.g. because another PDMR had the requisite guilty knowledge in relation to those other statements). However, I have been reminded by the Claimants[114] that in his oral closing, Mr Rabinowitz sought to revisit this, and he explained that all he had intended to convey by his submission in opening was that the Claimants accepted that they *"could not rely against Lynch on Hussain's knowledge that the financial statements were untrue or misleading if Dr Lynch did not know about this and vice-versa...[they] could not rely on the knowledge of defendant 1 to bring a claim against defendant 2 if defendant 2 understood the financial statement to be true and not misleading and vice-versa."* He submitted further that the way the Defendants had apparently interpreted what he had said would result in an inappropriate *"narrowing of the basis of the claim"*. He suggested that the point was simple:

---

[114] After circulation of an earlier version of my judgment in draft.

Exhibit 2
Page 425

chose not to say. The question now is whether the Defendants not only sought to avoid disclosure, but also included in Autonomy's published information statements designed, or which the Defendants knew would or might be taken, to signify that no material part of its business comprised the sale or reselling of hardware to third-party customers.

1661. For the reasons I have given in respect of each of the positive statements relied on by the Claimants, on the hypothesis that (contrary to my primary conclusions) the purpose of the hardware reselling and the reasons for not separately disclosing it are taken to be as the Defendants asserted they were, I would have not been persuaded that the Claimants had established their claims that the statements made were untrue or misleading and that the Defendants appreciated this so as to render them liable under FSMA.

1662. I confirm that I have also considered the statements in the round as well as individually. Although in the context of my actual conclusions, the picture is then darker still, on the hypothesis I have been implicitly directed to take, my conclusion would be no different than in relation to the representations singly. I have concluded that even together the statements cannot be aggregated to produce a false and intentionally misleading positive representation that Autonomy was not reselling hardware.

1663. However, the overall presentation certainly did not disclose hardware reselling: and I turn to the second way in which the Claimants put their case on the hypothesis that the purpose of the hardware reselling was as asserted by the Defendants.

*Did the Annual Reports/ Autonomy's published information omit information about hardware sales which was required to be disclosed?*

1664. With the reservation that if their case on what Autonomy had positively stated in its published information succeeded, their case that there were also omissions might be unnecessary, the Claimants also contended that Autonomy's published information *"was defective because it did not disclose the fact, nature and extent of its hardware sales in its Annual Reports for 2009 and 2010."*[239]

1665. They submitted that:

> "*the relevant accounting standards and other rules required fair disclosure and explanation of the nature and extent of Autonomy's hardware sales, including sales of pure hardware and other hardware in the Annual Reports*."

---

[239] Originally, the Claimants contended that Autonomy also had a duty of disclosure in its Quarterly Reports; but in its written closing submissions it was clarified that, in light of Mr Holgate's evidence that *"the case for disclosure of hardware sales in quarterly reports is not as strong as in interim reports"*, they were no longer pursuing that contention, although Mr Holgate's view was that it would have been *"good practice"* for Autonomy to have disclosed its hardware sales in these reports.

Exhibit 2
Page 426

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

1666.  Their pleaded case in this regard as set out in the RRAPoC is summarised there as follows:

> *"In short, the absence of any disclosure in the Annual Reports…of the existence or extent of hardware sales (other than the unquantified reference to appliance sales being a small part of Autonomy's business) meant that the statements* [identified above] *were untrue and/or misleading , those reports gave a misleading impression of the revenue and revenue growth of Autonomy's software business and/or the Annual Reports omitted a material fact (namely that Autonomy was engaged in the business of selling significant amounts of pure hardware at a substantial loss) that was required to have been included in Autonomy's published information."*

1667.  Leaving aside positive misstatements, only the omission of *"any matter required to be included"* can be relied on as the basis for liability under FSMA Schedule 10A. Further, an issuer is liable only if the PDMR (here, each Defendant) *"knew the omission to be a dishonest concealment of a material fact."*

1668.  Thus, to establish liability for an omission, the onus is on the Claimants to demonstrate on the balance of probabilities that:

> (1) Disclosure of the omitted matter was *"required to be included"* (that is, mandated by applicable legislation or accounting standards)[240] in the relevant published information;

> (2) The relevant Defendant, being a PDMR, had actual knowledge, at the time of the omission of the published information in question, of (a) a material fact which (b) he also knew was required (in the sense explained above) to be disclosed but which instead (c) was being *"concealed"* (that is, deliberately being left out).

1669.  The issues as to the materiality of a fact which had not been disclosed and as to whether disclosure was *"required"* turn on Accounting Standards and Practice, on which there was detailed opposing expert evidence. The issues of what might be termed *"guilty knowledge"* and dishonest concealment are issues of fact. I address first the accountancy issues and thereafter the factual issues.

*Did Autonomy s published information omit a material fact required to be disclosed?*

1670.  In arguing that such disclosure was *"required"* the Claimants relied in particular on IAS 18, §35; IAS 1 §29; and IFRS 8, §32. Alternatively, even if disclosure was not required under specific IFRSs, they contended that additional disclosures were necessary under IAS 1, §17(c) in order to achieve a fair

---

[240] which is not the same as commercially sensible or advisable.

Exhibit 2
Page 427

presentation in the Annual Reports.[241] I shall address those provisions in turn by reference to the expert evidence as to the application of these provisions and in the order that Mr Holgate dealt with them in his expert report.

1671. Before doing so, however, the confines of the issue seem to me best observed by recording that the following matters were and remain common ground:

(1) As previously noted, the revenues from hardware sales were properly included within the overall revenues of Autonomy in compliance with IFRS;

(2) There was no requirement on Autonomy to disclose hardware revenues in its quarterly or interim reports;

(3) None of the Companies Act 2006, the Combined Code or the Disclosure and Transparency Rules required disclosure;

(4) Autonomy properly reported that it had a single operating segment for the purposes of IFRS 8 and this was not gainsaid by the Claimants;

(5) The accounts were prepared or scrutinised by the finance department (made up of a number of experienced accountants), Deloitte and the Audit Committee, and all three groups considered and decided on the appropriate accounting treatment.

*IAS 18.35*

1672. Mr Holgate cited the requirement in IAS 18.35 to disclose:

*"the amount of each significant category of revenue recognised during the period, including revenue arising from: (i) the sale of goods; (ii) the rendering of services ..."*

1673. There is no dispute between the experts that IAS 18.35 was mandatory (*"An entity shall disclose…"*). The issue is whether the requirement to disclose *"each significant category of revenue"* extends to providing a further breakdown of the goods sold or services rendered within those categories.

1674. Mr Holgate's opinion, as given in his evidence, was that hardware sales (a) were very different in their nature and economic effect from the (disclosed) software sales, with radically different profit margins, so as to comprise a *"category of revenue"* and (b) the quantum of the hardware sales was such as to render them *"significant"*.

1675. When cross-examined, Mr Holgate elaborated on his view as follows:

---

[241] In the RRAPoC, the Claimants also relied on various provisions of the Companies Act 2006, the Combined Code on Corporate Governance and the Disclosure and Transparency Rules, but as explained below, it appears that these points are no longer pursued.

Exhibit 2
Page 428

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *"... in many circumstances which are straightforward, then this disclosure requirement [in IAS 18 §35] would be met by saying sale of goods X, rendering of services Y, interest separately and so on. But the circumstances here, as I've outlined, are very unusual in terms of the growth of hardware, the impact on growth percentages and the vastly different gross profit percentages involved. So we're not in a normal situation, I don't believe. So it is important to read the requirements which is the amount of each significant category of revenue recognised in the period and then including this and that. But, to me, the hardware revenue is a significant category of revenue because, if you don't know about it as a separate component, then you are easily misled about the growth, where the growth has come from, where the profitability has come from, the effect on gross margins and the overall picture of what is described as a pure software company, if there's hardware within there with very different characteristics, economic characteristics from the main software business. To not disclose that, I think has various problems including true and fair view and fair presentation and, more specifically here, it is in my view a significant category of revenue for the reasons I've given."*

1676. However, Mr Holgate accepted that there was no definition of what counted as a "category". There is nothing in the wording of the rule that requires a further breakdown into sub-categories. Nor was Mr Holgate able to point to any literature which suggested that a breakdown within the listed categories was required.

1677. Mr Holgate appeared at one point to argue that the interpretation of the rule should be conditioned by such matters as growth rates, margins, and the scale of the relevant sales; in other words that these things should affect the interpretation of the rule in some way. However, he did not explain how these factors could affect the interpretation of the mandatory rule.

1678. Mr Holgate also raised the spectre of an argument, echoing that of the Claimants, that the reference to Autonomy as a "*pure software company*" was somehow relevant to this rule. But he then accepted that, in context, that was used to point out the differences between Autonomy's business and that of a service provider. Again, he did not offer any real explanation as to how that could affect the interpretation of IAS 18.35 or cause it to be read as requiring a further breakdown below the level of "categories" of revenue.

1679. Mr MacGregor accepted that the hardware sales were indeed *"significant"* and that they were different in nature from sales of software. However, he took a different view about the application of IAS 18.35, focused on the words *"category of revenue"*.

1680. Mr MacGregor's view was that the categories of revenue described in this standard are general categories of sale of goods, rendering of services, royalties, *et cetera*. Mr MacGregor relied upon IAS 18.1, which sets out the scope of the standard and explains that it covers revenue in five categories. These are then replicated in IAS 18.35. He explained that the purpose of IAS 18.35 is to require the separate statement and disclosure of revenue in these categories, if it is

Exhibit 2
Page 429

significant. In his view, no further sub-categorisation or breakdown of the revenues within these categories is required.

1681. Accordingly, Mr MacGregor's evidence supported the approach in fact taken by Autonomy, which was audited by Deloitte. The accounts divide the revenues into the categories of (i) sales of goods and (ii) rendering of services but do not provide a further breakdown of those categories.

1682. Furthermore, and although sometimes rather didactic in his approach, Mr Holgate accepted that in relation to this specific issue the view taken by Deloitte, that no sub-categorisation was required by the rule, was not outside the range of a reasonable accountant's views.

1683. Mr Rabinowitz pressed Mr MacGregor in cross-examination on what meaning he thus gave to the words *"including revenue arising…"* [my emphasis] which might appear to suggest that the list which followed was not exhaustive; but Mr MacGregor at least three times repeated his view that in its context the list was indeed intended to be exhaustive.

1684. Further, Mr MacGregor rejected Mr Holgate's suggestion that the rule may depend on variable metrics of performance of the kind he ventilated.  He depicted that approach as importing a sort of segmental analysis: and he was adamant that *"This is not an attempt by the standard setters to come up with a segmental analysis"*.

1685. Mr MacGregor considered that Mr Holgate's approach would inject excessive uncertainty and subjectivity into what is stated as a simple and straightforward rule. Further, the Defendants argued that IAS 18.35 is only one of many applicable provisions: it is not the only means of bringing home the objective of IFRS. The suggestion that the Claimants' interpretation was necessary to safeguard the objectives of IFRS ignored this.

1686. To test his view, I suggested to Mr MacGregor in the course of his cross-examination an extreme example, of a company (I gave Siemens purely as an illustrative example) which made and sold both (say) mobile telephones and fridges, products with vastly different profit margins: I asked him whether he would nevertheless contend that they should be lumped together in one category as both being sales of goods. He said he would. Mr Rabinowitz took this up with him as follows:

> *"Q. And         just to be clear, Mr MacGregor, …you take the view that you don't have to disclose those separate categories, however different they may be, however important they may be to understanding how the company is working, you don't have to disclose them separately, however material they may be for the ability of the investor to understand the financial position of the company; is that your view?*
>
> *A. This is what the Standard requires…this is not the role of the Standard, to sort out segmental disclosures. If in Siemens, the mobile phone department is organised as a separate segment from the…white goods department, and…they're managed separately and*

Exhibit 2
Page 430

*they're reported on separately, then in the segmental information, which is required under IFRS 8, if that's the way Siemens organises itself, then that information would be disclosed there.*

*On the other hand, if there was just one department dealing with all electrical goods, which includes mobile telephones and fridges, it wouldn't. It comes down to the way management has organized itself, certainly under IFRS 8.*

Q. *So doesn't that in your view, however material it would be for investors to know about it, they wouldn't have to be disclosed under this Standard, the fact that the company was doing that?*

A. *This is the disclosure requirement…*

*…what was in the conceptual Standard doesn't mean you disclose whatever somebody out there might think is interesting, material or significant. The disclosure requirements are set out in the IFRSs…*

*…*

*You're trying to read into [IAS 18] something which seems to me to be along the lines of, because there is information someone out there might find reasonably useful, you need to disclose it. That is not the requirement."*

1687.    In his oral reply, Mr Rabinowitz disparaged this interpretation of *"including"* and the application of IAS 18.35 as *"confused"* and *"plainly wrong"*. In the Claimants' written closing, it was submitted that the difficulty and flaw in Mr MacGregor's approach was that it:

*"produces an outcome that is entirely inconsistent with the general objective of IFRS, namely to ensure a fair presentation of a company's financial position and its financial performance in a way that enables readers of its financial information to make economic decisions."*

1688.    The Claimants also cited in support two letters written to Autonomy by the Financial Reporting Review Panel ("FRRP") on 9 September 2009 and 30 November 2009, in the latter of which the FRRP stated:

*"The Panel further notes that it regards the categories listed in paragraph 35(b) of IAS 18 as a minimum disclosure only and would generally expect more disclosure from all but companies with relatively simple operations"*.[242]

---

[242] It should be noted that the FRRP's comments were in relation to a company's general disclosure requirements.  They were not directed at the hardware issue, which was not on their radar at the dates of those letters.

Exhibit 2
Page 431

1689.   As to the Defendants' interpretation, they submitted that whether the word "including" before a list is intended to be exemplary or exhaustive is a matter of interpretation having regard to the context. Further, the Defendants submitted, while there is room for debate about whether there could, in principle, be further categories of revenue, the question here is not whether the hardware sales should have been disclosed as another category. The Defendants' position was that the hardware revenues represent revenues from the sale of goods, which is one of the express categories contained in the rule.  The issue is whether the rule required further breakdown within that category; not whether there might be some other category of revenue beyond those listed. Hence, they submitted, the contention whether the rule is non-exhaustive is nothing to the point.

1690.   In such circumstances, it is necessary to consider the other provisions on which Mr Holgate relied: for it was the Claimants' case that it is not just IAS 18.35 that would have compelled disclosure. The starting point is IAS 1.

*IAS 1*

1691.   IAS 1 is a general standard about the presentation of financial statements. It is not concerned specifically with revenue reporting, there being (as already apparent) specific standards prescribed in IAS 18 (revenue) and IFRS 8 (segmental reporting).

*IAS 1.1*

1692.   IAS 1.1 explains that the standard prescribes the basis for presentation of general purpose financial statements to ensure comparability both with the entity's financial statements of previous periods and with the financial statements of other entities. It sets out overall requirements for the presentation of financial statements, guidelines for their structure, and minimum requirements for their content.  For present purposes, the provisions specifically relied on (as well as IAS 1.1) are 1.15, 1.17, 1.29, and 1.30. Mr MacGregor also relied on IFRS 8.

*IAS 1.15*

1693.   IAS 1.15 is concerned with the general requirement that financial statements "*shall present fairly the financial position, financial performance and cash flows of an entity.*" It makes clear that:

> "*Fair presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework.*"

1694.   The final sentence of IAS 1.15 states that "*the application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.*" It continues that "*in virtually all circumstances, an entity achieves a fair presentation by compliance with*

Exhibit 2
Page 432

*applicable IFRSs*" [my underlining] although the paragraph then states that there may be some circumstances where fair presentation requires further disclosures (see IAS 1.17(C)).

*IAS 1.17*

1695.  IAS 1.17 similarly states that *"In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs"*. But it too, in sub-paragraph (c) repeated that a *"fair presentation"* also requires an entity:

> *"to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance."*

1696.  The real dispute between the experts was, in the end, as to when *"additional disclosures"* would become necessary, and whether they did so in the circumstances of the hardware sales in this case.

1697.  Mr Holgate considered the *"fair presentation"* requirement in IAS 1 to be analogous to the *"true and fair view"* standard in the Companies Act.  I would interpolate that this appears to me to be consistent with the approach of the FRC, and with the view expressed in an Opinion of Mr Martin Moore QC that the two are *"synonymous"* and *"simply different articulations of the same concept."* [243]

1698.  In that regard, Mr MacGregor's opinion was that where all applicable IFRSs have been complied with, the threshold for further disclosure is a very high one and further disclosure will only be required rarely.

1699.  Mr Holgate accepted that the question whether further disclosure is needed under that rule notwithstanding compliance with the detailed specific provisions of IFRS is a matter of accounting judgement.

*IAS 1.29*

1700.  Mr Holgate placed special reliance on IAS 1.29, which provides as follows:

> *"An entity shall present separately each material class of similar items. An entity shall present separately items of a dissimilar nature or function unless they are immaterial."*

1701.  In Mr Holgate's view, IAS 1.29 was a further standard that applied so as to require Autonomy separately to disclose its hardware sales because, both in relation to 2009 and 2010, those hardware sales were material and, further, those hardware sales were of a dissimilar nature to the other sales Autonomy was making (i.e. software sales). The test for materiality, in this context, is whether

---

[243] See Opinion of Martin Moore QC, *'The True and Fair Requirement Revisited'* dated 21 April 2008 and published by the FRC on its website.

Exhibit 2
Page 433

the information could influence the economic decisions that users make on the basis of the financial statements.

1702. The Claimants contended that there are any number of factors that would highlight the dissimilar nature of hardware and software sales by Autonomy, including the very different profit margins that each type of sale would attract; software involves the sale of a licence, whereas hardware is a tangible product; software was created by Autonomy, but hardware was bought and resold with no added value. They also suggested that it is clear that Autonomy itself regarded selling hardware as wholly dissimilar to selling software, and indeed that Mr MacGregor did not in fact dispute that the products and their sale were dissimilar.

1703. In terms of materiality, Mr Holgate in his report developed in some detail his reasons for concluding that hardware sales could not be considered immaterial. Thus:

(1) Mr Holgate identified, in this context, the volume of sales of hardware compared with total reported sales. His Table A was put forward as illustrating the fact that, for FY 2009, total hardware revenue constituted 7.3% of total reported revenue, and that, for FY 2010 total hardware revenue constituted 12.1% of total reported revenue. Mr MacGregor did not suggest that the revenue from hardware, for example in FY 2010 when it was over 12.1%, was immaterial in the context of the overall revenue reported by Autonomy for those periods.

(2) Mr Holgate further referred, in this context, to the effect of "*pure hardware sales*" on Autonomy's revenue growth from 2008 to 2009 and also from 2009 to 2010. His Table B was put forward to show that, if the contribution made to revenue by hardware in each of those years was stripped out, so as to identify what growth there had been in Autonomy's revenue from its software sales (across the board, including hosting):

i. rather than growth of 47% from 2008 to 2009, the figure would be 36.5% – a reduction in growth of some 22%;

ii. rather than growth of 17.7% from 2009 to 2010, the figure would be 11.5% – a reduction in growth of 35%.

1704. Mr Holgate was not challenged on this analysis in cross-examination. Nor was he challenged on his evidence that "*growth in revenue is a major performance indicator for listed companies and one that Autonomy frequently cited*" and that such a difference in these growth figures of software was "*highly significant*". Mr MacGregor accepted that it was material, though he caveated that "*It's a smaller part than played by other parts of revenue*".

1705. Mr Holgate further set out figures intended to illustrate both the very different gross margins that applied to sales of hardware and sales of software and the extent to which the gross margin applicable to sales of hardware affected the overall gross profit margin. Mr Holgate, in this context, also noted that it would have been important, in "*seeking to interpret an overall gross profit of 79%, …*

Exhibit 2
Page 434

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*to know that the majority of sales are at a 90% margin and that a minority of sales are at a gross loss"*. Mr Holgate was not challenged on this in cross-examination.

1706. Again, Mr MacGregor did not express disagreement about this, nor did he deny that being able to identify what gross margin applies to what products that an entity is selling was information that could be important for investors. Rather, and as foreshadowed in paragraph 1698 above, Mr MacGregor's position was that on the basis of his understanding of Autonomy's business, IAS 1.29 (indeed the whole of IAS 1) could not add anything to any disclosure obligation on the part of Autonomy in relation to hardware.

1707. Mr MacGregor made the following principal points:

(1) First, in his view, disclosure of revenue was expressly covered by IAS 18.35 and no further disclosure obligation could, or perhaps should, be added by IAS 1 or IAS 1.29, which were more general in application, rather than being applicable specifically to revenue. Except in very unusual circumstances, compliance with the specific provision qualified as compliance with the general guidance as regards the specific accounting item.

(2) Secondly, Mr Holgate appeared to assume, but did not explain the basis for the assumption, that (in relation to the requirement of IAS 1.29 that *"An entity shall present separately items of a dissimilar nature or function unless they are immaterial"*) hardware sales were to be treated as a separate and material *"class"* of *"items"* from software sales. The Defendants added to this that Mr Holgate had accepted in cross-examination that there was no definition of what is meant by *"similar"* or *"dissimilar"*, nor of *"nature"* or *"function"*; nor is there anything in the wording of the provision (at least nothing specific) that required a breakdown of revenue into sub-categories. Further, he had not suggested or provided any support in the literature for the view that the rule requires a breakdown of revenues into sub-categories and (the Defendants submitted) the wording of the rule does not support it.

(3) Thirdly, and as a further matter relevant to the interpretation of IAS 1.29 and (the Defendants submitted) supportive of Mr MacGregor's view, IAS 1.30 appears to show that the reference to *"items"* in a set of financial statements is a reference to a *"line item"*. Hence revenue for sales of goods could be such a line item, revenue from services another line item, etc. Similarly, costs of goods sold are a different line item from administrative expenses. The rule says that each class of similar line items must be presented separately. It also says that if a line item (say sales and marketing expenses) is not material it need not be separately disclosed. These rules say nothing about the need to present a breakdown within a line item.

(4) Fourthly, and in any event, IAS 1, as a general presentation standard, had to be read together with IFRS 8.

Exhibit 2
Page 435

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

1708. Mr MacGregor made clear, however, at least when cross-examined, that his approach was informed by his understanding (on the basis of his instructions) that (as he put it):

> *Autonomy considered it was essentially selling one overall product, and everything connected with the sale of that product was considered to be [the same] revenue."*

1709. Mr MacGregor appeared to accept in cross-examination that if the sale of hardware had no connection with or relationship to the sale of software, *"nothing to do with the sale of software"*, then IAS 1.29 could apply and require disclosure:

> *"Q.    So you accept that IAS 1.29 could apply? You're just saying you don't think it does if Autonomy – if Dr Lynch's version of the facts is right and hardware was simply sold as a way of selling software?*
>
> *A.    That's correct. I mean, if the reason for selling the hardware was not to sell the software but was for another reason, for example to pump up revenues, then clearly that is something which is material to an understanding of the business.  In those circumstances. But in the circumstances where it's incidental, connected with the sale of the software, then no. I appreciate there is a dispute over that.*
>
> *Q.    So just to be clear, I think you're accepting that if the primary reason was actually to drive revenue rather than to drive software sales, there would have had to have been disclosure, including under IAS 1.29 –*
>
> *A.    That's correct.  Just to be clear, if what's being suggested is that they are implying that what was in fact the sale of IDOL was in fact the sale not of that at all but it was basically being used to pump up revenues, then I would agree, that is something which the accounts should have disclosed.  Those are the two – that seems to me the boundary or the bounds of the dispute and the effect on the presentation."*

1710. That leads on to a further issue as to the application and effect of IFRS 8, and in particular IFRS 8.32.

*IFRS 8*

Exhibit 2
Page 436

1711. IFRS 8 is generally concerned with segmental reporting. The standard applied to Autonomy for the first time in respect of the full year accounts for 2009. It was then a new standard, adopted as part of an attempt to converge IFRS and US GAAP, and (although Mr Holgate disagreed) Mr MacGregor considered that there were uncertainties about its application.

1712. Mr MacGregor gave as an example a debate as to the extent to which it replicated or overlapped with the requirements of IAS 18.35; and he also referred to a paper (*"Post-Implementation Review of IFRS 8 Operating Segments"* dated July 2013) which the International Accounting Standards Board (the "IASB") had issued to consider and report on various uncertainties which had caused debate and difficulty. These difficulties and uncertainties included the issue as to the meaning of *"similar economic characteristics"* and when operating segments fell to be aggregated[244].

1713. As explained in Dr Lynch's closing submissions, and put broadly, whether an entity should be accounted for as having one or more *"Operating Segments"* so as to distinguish the performance of each depends on the way the entity is managed, on the information flows within the company, and on identifying the "chief operating decision maker". Speaking generally, where there is more than one line of business, it will be expected that there is more than one operating segment.

1714. In the case of Autonomy, the finance department and Deloitte concluded in both 2009 and 2010 that there was a single operating segment and (as already explained) that conclusion has not been questioned in these proceedings.

*IFRS 8.1*

1715. IFRS 8.1 identifies the "*core*" principle of IFRS 8 as follows:

> *"An entity shall disclose information to enable users of its financial statements to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates."*

1716. One of the curiosities of IFRS 8 is that although at first blush it might be taken that it applies only to determine whether an entity should adopt segmental accounting, and if it does, to provide for its more detailed application, it is common ground that at least one of its provisions can also apply to an entity with a single Operating Segment, such as Autonomy. The particular provision in issue is IFRS 8.32.

*IFRS 8.32*

1717. IFRS 8.32 provides as follows:

> *"An entity shall report the revenues from external customers for each product and service, or each group of similar products and services,*

---

[244] The IASB noted that *"the empirical evidence identified in the academic review shows that the number of reported segments has increased and the number of single-segment entities has decreased."*

Exhibit 2
Page 437

> *unless the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed. The amounts of revenues reported shall be based on the financial information used to produce the entity's financial statements."*

1718. It is not in dispute that IFRS 8.32 in effect obliges an entity to report the revenues for *"each product or service"* that it provides to customers – or each *"group of similar products or services"* – unless the information is not available and cannot be made available without excessive expense. It is not suggested that this information was not available within Autonomy.

1719. As already noted above, Mr Holgate saw no difficulty or uncertainty in the application of the standard in the case of Autonomy. He was of the view that the sale of hardware was indeed dissimilar to Autonomy's software sales: hardware and software had to be regarded as different products or different groups of products; and that, since the volume of hardware sales was material, IFRS 8.32 clearly obliged Autonomy to make separate disclosure of its hardware sales.

1720. Against that, and as in relation to the other potentially applicable standards, Mr MacGregor noted that the standard did not define *"similar products"*, which was therefore something in relation to which judgement was required.  He also noted that materiality was, again, a matter in relation to which judgement was required. In each case the judgement would be fact-sensitive and nuanced. In his opinion, the question turned on the nature of the business being carried on by Autonomy; and I took Mr MacGregor to justify this approach in part by reference to the need to give some different content to IAS 8.32, ascribing to IAS 8 overall the objective of requiring proper disclosure of substantially separate and independently run businesses. Mr MacGregor stressed also that in his opinion, *"judgment was (and is) the foundation when considering the application of IFRS 8.32"*; and he emphasised that when stating his overall view in respect of IAS 8.32:

> *"...judgement is required when determining whether an entity's sales of products and services require separate disclosure. On the basis that Autonomy's hardware sales were incidental to the sales of the core software product, I agree with the conclusions reached by Deloitte that separate disclosure was not required."*

1721. Mr MacGregor told me that this was consistent with the way that other accountants and other companies (including those which, like Autonomy, had a single operating segment for the purposes of IAS 8) had looked at the matter, as had Deloitte in this case after careful consideration of IAS 8.32 and review also by its National Accounting and Auditing Team ("NAA").

1722. Applying that approach, and as in relation to IAS 1.29, Mr MacGregor explained his view that Autonomy was not required to make separate disclosure under IFRS 8.32 of its hardware revenues, on the basis that Autonomy undertook no separate or segregated business of hardware selling: the hardware sales were 'incidental' to Autonomy's IDOL software sales.

Exhibit 2
Page 438

1723.  Mr MacGregor's view was that on the basis that Autonomy had only one overall product (IDOL) and the sales of such product were supported by the hardware sales no disclosure was necessary: on that basis, Autonomy was a seller of software and the other sales were, like everything else the company did, made in order to sell IDOL.  As Mr MacGregor put it in cross-examination:

> "...there is one overall product and that product is supported by essentially the hardware sales. That is the important thing. That is their business model.
>
> ...
>
> My understanding is that Autonomy isn't interested in hardware, it doesn't consider itself to be a seller of hardware per se. What it considers itself to be is a seller of certain types of software and everything else it does is designed to support those sales."[245]

1724.  Mr MacGregor's general position was encapsulated as follows:

> "Q.    That [i.e growth figures] is plainly information of the sort that could affect the decision of users of the financial accounts, correct?
>
> A.    Well, it may do but if you're not required to disclose it, then you're not required to disclose it. I mean, Autonomy could have taken the view they would disclose it elsewhere but you're not required to disclose it in a set of financial statements...
>
> ...
>
> Q.    ...you do not dispute, do you, Mr MacGregor, that being able to identify what gross margin applied to what products an entity was selling is indeed something that could influence the economic decisions of users of accounts?
>
> A.    But it's not – the breakdown of the gross margin is not something that is required by accounting standards. If you're going to do it, then it's done on a...voluntary basis.
>
> Q.    What's the answer to my question? Do you accept that it is something that could affect the economic decisions of users of the accounts?

---

[245] Mr MacGregor accepted that if the hardware sales were a separate sale of a different product to the sale of Autonomy's core IDOL product, then they would have to be disclosed unless hardware sales could reasonably be considered by management to be 'incidental' to the sales of the core product, with their principal purpose being to 'drive' or 'facilitate' software sales. Mr MacGregor appeared to accept, therefore, that if Dr Lynch's case that Autonomy entered into the hardware sales to drive software sales is not accepted, the hardware sales should have been disclosed.

Exhibit 2
Page 439

> A. *It might do. It might do…it might do but there's all sorts of things that companies do that could affect the economic decisions of people out there who might invest or who might not. They're not required to disclose them in the annual financial statements if it's not required by the accounting standards.*
>
> Q. *Just in terms of whether hardware and software sales were dissimilar in nature or indeed function to other items that Autonomy was selling, just standing back, there's a fairly obvious distinction between the nature of hardware and the nature of software?*
>
> A. *Yes, there is. If you step back and look at those two things, but my understanding is within the context of the business that Autonomy considered it was essentially selling one overall product, and that everything connected with the sale of that product was considered to be the sale of revenue.*
>
> *The way I think about this when I think about one-segment companies of which there are some, you're allowed to have one-segment companies, IFRS 8 allows you to do that, is this: the principal thing you're selling, the other things which are sold you wouldn't sell but for the principal thing you are selling. That is the distinction which I make in terms of trying to understand why you have a one-segment company."*

1725.  This was consistent with the approach in Deloitte's report in relation to IFRS 8.32 in 2009 (which was approved and signed off by the NAA, as was their report in 2010) which read as follows:

> *"All of the software solutions provided by Autonomy to its clients are underpinned by the single core IDOL technology. On that basis, management has provided the following analysis of the revenue balance for the group's single operating segment (Note 4):*
>
> (1)  *Sale of goods*
>
> (2)  *Rendering of services; and*
>
> (3)  *Interest Receivable*
>
> *We note that sale of goods included all items of software and strategic hardware sold during the year. Rendering of services is the release of the support and maintenance revenue and the provision of professional services to clients.*
>
> *As outlined above, management tracks all licence and strategic hardware sales as a single body of sales, being the sale of goods. This is consistent with the financial information presented to Mike Lynch and it is the basis on which he makes his resource allocation decisions. Likewise, the deferred revenue release and the professional services rendered are also reported to Mike as a single line item.*

Exhibit 2
Page 440

*On that basis, we deem that management has appropriately disclosed a breakdown of revenue that is consistent with the information presented to the Chief Operating Decision Maker and is that used to produce the group's financial statements.*

*It is worth noting that in their Q4 2010 press release, management did provide some representative revenue figures for the following virtual product categories:*

> *-IDOL Product;*
> *-IDOL Cloud;*
> *-IDOL OEM;*
> *-Deferred revenue release; and*
> *-Services.*

*We note that whilst this information was able to be produced following some detailed analysis performed by management, these are not amounts extracted from the financial information that underpins the preparation of the financial statements. It was derived from a separate analysis purely* [performed] *for providing some information to analysts on the performance of each virtual product category. It does not represent the way that revenues are analysed out on a regular basis for presentation to Mike Lynch.*

*We also note that this is just one of several virtual buckets that management use to badge their different product offering to analysts, another being the Protect, Promote and Power families. Again, no separate financial information is maintained on a regular basis to evidence the results for any of those virtual brands.*

*On that basis we note that the disclosure provided by management is in line with the requirements of IFRS 8."*

1726.  Mr Holgate considered that IAS 8 clearly required separate disclosure of revenues from hardware sales (assuming the information was available and material). He accepted that it was a new standard at the time and there had been *"some uncertainty as regards the disclosure of operating segments because it was based on a new idea of what was reported internally to the chief operating decision-maker"* but he disagreed that IAS 8.32 was a source of difficulty, and described it as *"quite straightforward."* He countered the suggestion put to him in cross-examination that the provision lacked a definition of *"the idea of products or groups of similar products and services"* by the response that *"they just have their natural meaning".*

1727.  He disagreed with Mr MacGregor's approach (and thus also with that of Deloitte and the NAA), and considered it (a) to rely on a gloss which was not justified by the words of IAS 8.32, (b) to be extreme and implausible in treating hardware and software as similar products, and (c) to be a view and approach which would

Exhibit 2
Page 441

not have been taken either by him and his firm or *"the vast majority of auditors and the ones I've come across and worked with"*.

1728. However, Mr Holgate was nevertheless reluctant, when cross-examined directly whether nevertheless a range of views might encompass the decision made by Autonomy and Deloitte, to say that he considered it to be *"completely outside the range of what a reasonable accountant could think."* As in the context of IAS 1, his response was that clearly that is not the way he would have accounted for hardware, and he thought that not only his own firm, but many other firms also, would have considered that disclosure was required; but he could not say that it was *"outside the range of what a reasonable accountant could think."* That was the same answer as he had given in relation to IAS 1.

*Materiality*

1729. The two experts had different views as to the materiality test, which seem to me also to reflect their different approaches to the provisions discussed above. These differences can be summarised as being:

(1) In Mr MacGregor's view, *"if you're not required to disclose it, then you're not required to disclose it"*. Materiality is only a consideration in determining whether what would otherwise be a requirement of disclosure is material or not sufficiently material to warrant it. To sever materiality from the anchor of the specific disclosure requirements would lead to what Mr MacGregor called a "*free for all*": what is in fact required is to comply with the standards.

(2) In Mr Holgate's view, this was a surprising and extreme position, which could not be consistent with IAS 1, which is directed towards a fair presentation of the company's financial position, and could not be right. Material information as to the company's performance and financial position should be disclosed, if not under specific IFRS provisions then under IAS 1, to achieve fair presentation.

(3) The essential question is the relationship between the general requirement of IAS 1 (which expressly *"sets out overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content"*) and the specific provisions presumed in *"virtually all circumstances"* (quoting IAS 1.17) to implement those general requirements (albeit with the override that in what Mr MacGregor called *"the very, very rarest cases"* "*additional disclosure*" might remain necessary (despite the presumption) to *"result in financial statements that achieve a fair presentation."*)

(4) Mr Holgate considered that this is a *"rarest case".* Mr MacGregor did not, at least if (as he put it in cross-examination) *"all the sales...are being designed to do one thing which is to sell IDOL software."*

*My assessment*

1730. I agree that the essential dispute requires review of the relationship between the general requirement of IAS 1 and the specific provisions presumed in *"virtually*

Exhibit 2
Page 442

*all circumstances"* (quoting IAS 1.17) to implement those general requirements, and the application of the "override".

1731. I agree with Mr MacGregor that the starting point, and in ordinary circumstances, also the end-point, is what is specifically mandated by the Accounting Standards. Full compliance, mitigated by exception for immateriality, should ordinarily ensure fairness. I agree also with the Defendants that it does not follow from the fact that something might be considered *"reasonably useful"* that it must be disclosed. There are many aspects of a company's financial position and financial performance which some investors might wish to know about but of which disclosure is not mandated. The Accounting Standards are intended to determine what is to be disclosed and how disclosure is to be effected: and the ordinary presumption will be that if the information is not required to be disclosed under specific Standards, then even if *"reasonably useful"* it need not be disclosed.

1732. On the other hand, I agree that there are rare circumstances where the materiality of the matter in question is such that disclosure is required notwithstanding that there are no specific Standards unequivocally mandating it. If the Standards do not appear to require disclosure of a matter which, measured by its likely effect on their assessment of the company if readers of the published information were to be made aware of it, is of plain and obvious materiality, the "override" may apply. In my judgment, information may just as much be *"required"* to be disclosed for the purposes of s. 90A(3)(b) and (when it came into force in October 2010) Schedule 10A paragraph 3(1) of FSMA to give, overall, a true and fair view of a company's position and performance as when specific accounting principles or statements of practice expressly require it.

1733. It is, in other words, ultimately a question of degree, to be answered taking into account (a) any judgement as to why specific requirements, which are themselves a useful litmus test of materiality, do not apply, (b) any reasons why disclosure is thought to be unnecessary or commercially unwise, and (c) whether having regard to (a) and (b), disclosure is nonetheless required in order to provide, in the round, a true and fair view.

1734. Sometimes, I would surmise often, there will be a nice balance; in those cases it would to my mind be surprising to conclude that nevertheless disclosure was *"required".* I agree with the Defendants' submission that where there is a range of permissible views on whether a matter is *"required to be included",* an issuer will not be held liable for the omission of that matter: and in any event, if there was doubt that would be fatal to a fraud case. In my view, that is especially so where the Standards do not appear specifically to be applicable and the question of any exceptional "override" is being considered.

1735. In the limited category of cases, where the real reason for non-disclosure is a dishonest intention to conceal, the two limbs of this analysis come together. Consciousness of a high degree of materiality in combination with a conscious determination to conceal the relevant facts and matters from published information precisely because of their materiality from the point of view of the

Exhibit 2
Page 443

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

reader will likely result in there being (a) a *"requirement"* by virtue of the "override" and (b) dishonest concealment such as to establish liability.

1736. As to the first hurdle for the Claimants of establishing a disclosure "requirement" under the Standards, Mr Holgate tended initially to give the impression of a rather black and white approach. In the end, however, notwithstanding his own unequivocal views as to the correct interpretation of the Standards, he accepted that neither in the context of IAS 8 nor in the context of IAS 1 was he willing to say that the judgement made was *"outside the range of what a reasonable accountant could think"* (see paragraph 1728 above). I have considered whether this simply reflects polite unwillingness to express views entailing the conclusion that a respected firm had unanswerably been negligent. I have concluded that although that may have been part of it, his reluctance was primarily based on a realistic appreciation that the points made were arguable.

1737. The lesson suggested by the expert evidence is that there was a range of permissible views on the application of the specific provisions in the Accounting Standards; that would suffice for the Defendants since a statement is not to be regarded as false or misleading where it can be justified by reference to that range of views.

1738. In those circumstances, and in light of Mr Holgate's concession that the case that no disclosure was required by the Standards was arguable, I agree with the Defendants that this is not the occasion to determine which of the competing views on the application of the various Standards is best as if it were a binary matter and then conclusive; for it must always be borne in mind that this is a case based on the alleged dishonesty of the Defendants. No claim is made in these proceedings against Deloitte, and there is no suggestion that Deloitte were aware of, still less colluded in, any dishonesty. In such a context, even a conclusion that in each case the applicable Accounting Standards were not properly applied, and that correctly construed the separate disclosure of hardware sales was mandated, would not be enough for the Claimants. They still have to prove that (a) the Defendants knew that disclosure of the hardware sales was required and (b) the non-disclosure was the dishonest concealment of a material fact, notwithstanding that in every case Deloitte did approve the accounting treatment and did not advise that disclosure was required.

1739. In other words, the ultimate question in determining whether there has been a failure to disclose a matter required to be disclosed by the Standards is not the meaning of the specific provisions but whether the Defendants knew there was a requirement to include the relevant fact and determined to and did conceal it. If they honestly believed that the views taken and judgements made in relation to each relevant bit of published information was one within the range of acceptable views, having regard to the facts as known at the time, and that therefore disclosure was not required, that establishes a good defence so far as the "requirements" of the Standards are concerned. That is so even if the relevant but undisclosed fact was highly material, though the greater the materiality, the more likely it is that its non-disclosure was deliberate. However, that is not the end of the matter: the question remains whether the non-disclosure (or the form of any disclosure made) amounts to dishonest concealment because the directors

Exhibit 2
Page 444

knew that disclosure (or a different form of disclosure) was required in order, in the round, to present a true and fair view.

*Did the Defendants determine dishonestly to conceal matters they knew to be material?*

1740. I turn to address the issue whether, if the Claimants were able to prove one or more omissions of a *"matter required to be included"* in the published information, the Defendants *"knew the omission to be dishonest concealment of a material fact"*. I do so on the premise (contrary to my finding) that the purpose given for the hardware reselling was as it was stated to have been by the Defendants. I am aware (and wary) of piling hypothesis on hypothesis.

1741. The Defendants relied in this context on Deloitte's advice to the effect that there was no *"requirement"* mandating disclosure, so that disclosure was a commercial judgement for the board of Autonomy, and contended that in such circumstances they honestly believed that there was no relevant concealment. It was stressed on their behalf that:

(1) As noted previously, only proof of actual 'guilty' knowledge at the time of a requirement to include the relevant fact would suffice: absent actual knowledge of such a requirement there can be no liability for dishonest concealment.

(2) Dishonesty is the gist of the claim against the Defendants and must be proved, and although in civil proceedings the standard of proof always is that of a balance of probabilities, the seriousness of the allegation means that in the ordinary course, cogent evidence is required in order to overcome the inherent unlikelihood of what is alleged and thus to prove it. Experience shows that in the ordinary course, a benign though curious explanation is often more reliable than a malign though initially plausible one; and furthermore, the seriousness of the consequences of a finding of dishonesty militates against the likelihood that the person implicated took the risk of it.[246]

(3) It is relevant to consider the advice given to the company and its directors: and where, on the basis of advice, a director is given to understand that it is not requisite to disclose a particular fact in the company's published information, the omission of that fact is unlikely to amount to a dishonest concealment of it, unless the giver of the advice was materially misled by or to the knowledge of the recipient of it or that recipient knows full well in some way that the advice is wrong.

---

[246] Against this, I have reason to recall that the Court of Appeal has stated recently that *"...in commercial cases, there will be a wide spectrum of probabilities as to the occurrence of reprehensible conduct"*, and once a propensity for dishonesty in and around the same matter has been demonstrated *it is faintly absurd to elevate the principle that it is inherently improbable that a party would do something dishonest into a relevant benchmark for the determination of the issues"*: see *Bank St Petersburg PJSC & Anor v Arkhangelsky & Anor* [2020] EWCA Civ 408 at [47].

Exhibit 2
Page 445



Neutral Citation Number: [2024] EWHC 2710 (Ch)

FL-2020-000051

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**FINANCIAL LIST (CH D)**

**25 October 2024**

**Before**:

**MR JUSTICE LEECH**
- - - - - - - - - - - - - - - - - - - -

**B E T W E E N:**

|  |  |
|---|---|
| **ALLIANZ FUNDS MULTI-STRATEGY TRUST**<br>**(on behalf of ALLIANZGI BEST STYLES**<br>**GLOBAL EQUITY FUND) AND OTHERS** | **Claimants** |

**- and –**

|  |  |
|---|---|
| **BARCLAYS PLC** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -

**MS HELEN DAVIES KC, MR MICHAEL WATKINS** and **MR TOM FOXTON** (instructed by **Latham & Watkins (London) LLP**) appeared on behalf of the Defendant.

**MR JONATHAN NASH KC, MR ALEX BARDEN** and **MS CAROLA BINNEY** (instructed by **Signature Litigation LLP**) appeared on behalf of the Claimants.

**Hearing dates: 22-23 July 2024**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**This judgment was handed down remotely at 10.30am on 25th October 2024 by circulation to the parties or their representatives by email and by release to the National Archives.**

Exhibit 2
Page 446

Approved Judgment: Leech J          Various Claimants v Barclays Bank PLC FL 2020 000051

**Mr Justice Leech:**

## I.    The Applications

1.    By Application Notice dated 28 March 2024 (the "**Strike Out Application**") the Defendant, Barclays plc (the "**Bank**"), applied to strike out 241 of the Claimants' claims under section 90A ("**S.90A**") and Schedule 10A ("**Schedule 10A**") of the Financial Services and Markets 2000 ("**FSMA**") on the basis that the Claim Form and Particulars of Claim disclosed no reasonable cause of action in relation to those individual claims or, alternatively, for summary judgment under CPR Part 24.2 because those claims have no real prospect of success. The Strike Out Application was supported by the fourth witness statement of Mr Oliver Middleton also dated 28 March 2024 ("**Middleton 4**"). Mr Middleton is a partner in Latham & Watkins LLP ("**Latham & Watkins**"), the Bank's solicitors.

2.    The Bank's case was (and is) that the Claimants do not allege and cannot prove that the relevant funds or sub-funds acquired, continued to hold or disposed of the Bank's shares in reliance on published information within the meaning of Schedule 10A, paragraph 3 ("**Paragraph 3**"). It was also the Bank's case (and remains its case) that the Claimants have not alleged and cannot prove that they suffered loss as a result of a delay by the Bank in publishing information within the meaning of Schedule 10A, paragraph 5 ("**Paragraph 5**"). The Bank does not apply to strike out any of the Claimants' claims under section 90 ("**S.90**").

3.    On 30 May 2024 the Claimants filed the fifth witness statement of Ms Rebecca Hogan in answer to the Strike Out Application and on 26 June 2024 they filed an amended version of that witness statement ("**Hogan 5**"). Ms Hogan is a partner in Signature Litigation LLP ("**Signature**"), the Claimants' solicitors, and she exhibited the expert's report of Mr Riccardo Curcio dated 17 December 2021 and the expert's report of Dr Andrew Hildreth also dated 17 December 2021 which had been filed or exchanged in the *RSA Litigation*. The Bank pointed out that the Court had not granted permission to the Claimants to rely on expert evidence but did not object to the Court considering it.

4.    By Application Notice dated 26 June 2024 the Claimants applied for permission to amend their Particulars of Claim and their Particulars of Quantum (the "**Amendment**

Exhibit 2
Page 447

Application"). The Claimants did not apply to amend their case in relation to Paragraph 3 but to amend their case in relation to Paragraph 5 and the parties were agreed that the Court could deal with this application at the hearing of the Strike Out Application. Ms Helen Davies KC, who appeared with Mr Michael Watkins and Mr Tom Foxton on behalf of the Bank, approached the Strike Out Application on the assumption that the Court could consider the proposed amendments in deciding whether to strike out the relevant claims or to grant reverse summary judgment and I do the same. When I refer to the "**Particulars of Claim**" and the "**Particulars of Quantum**" or "**POQ**", therefore, I intend to refer to the draft Amended Particulars of Claim and the draft amended Particulars of Quantum for which the Claimants applied for permission to amend.

## II.    Background

5.    I set out the detailed background to this action and its procedural history in my judgment on the Claimants' applications to amend the names of individual Claimants in the Claim Form and the Particulars of Claim and to substitute a number of additional Claimants: see [2023] EWHC 2015 (Ch) at [1] to [44]. I also set out the procedural developments between that judgment and the first Case Management Conference ("**CMC1**") in my judgment dated 12 January 2024 following that hearing: see [2024] EWHC 235 (Ch) at [1] to [7]. In relation to the issue of reliance I ordered 20 Claimants to complete the Reliance Questionnaire and 80 Claimants to complete the Reliance Questionnaire Lite: see [8] to [18]. I brought the procedural developments up to date in my judgment dated 2 July 2024 following the second case management conference ("**CMC2**"): see [2024] EWHC 2124 (Ch).

6.    In this judgment, I adopt the defined terms and abbreviations which I have used in each of the three earlier judgments. It should be obvious from the context what those terms mean without the need to repeat those definitions here. Further, the issues which I have to decide on the two applications before me and my reasoning ought to be intelligible to any reader without the need to repeat the detailed background and procedural history again. However, if there is any doubt about the meaning of the terms which I use or the background to the present applications, I refer the reader to the passages which I have identified above.

7.    In considering the case management issues raised by the parties, I will also have to refer

Exhibit 2
Page 448

to the terms of the Order dated 11 and 12 January 2024 which I made after CMC1 (the "**CMC1 Order**") and the terms of the Order dated 1 and 2 July 2024 which I made after CMC2 (the "**CMC2 Order**"). But, again, if there is any doubt about the effect of those Orders or the context in which I made them, I refer to the judgments which I gave following each hearing.

## III.    The Statements of Case

### A.    The Claimants' Case

#### (1)    The Particulars of Claim

8.    In section A of the Particulars of Claim the Claimants set out the factual basis for the claims. On 26 June 2014 the Bank issued an RNS to the London Stock Exchange disclosing that the Attorney General of the State of New York had made the Complaint against the Bank. By close of trading on 1 February 2016 the price of the Bank's ordinary shares had fallen from £1.86 a share to £1.828 a share.  On 31 January 2016 the Bank entered into a settlement agreement with the NYAG and submitted to the SEC Order under which the Bank agreed to pay US $35 million to the State of New York and US $35 million to the SEC. In relation to themselves the Claimants allege as follows:

> "3. The Claimants are investors who acquired, continued to hold and/or disposed of ordinary shares issued by Barclays Plc and admitted to trading on the London Stock Exchange during the Relevant Period, and/or interests therein. For the purposes of these Amended Particulars, references to such shares include references to interests therein. The details of the Claimants are set out in Appendix A.
>
> 4. Some of the Claimants acquired shares pursuant to a rights issue carried out in September 2013 by which Barclays Plc raised approximately £5.8 billion by way of additional share capital ("**the Rights Issue**"). The Rights Issue proceeded by way of prospectus dated 16 September 2013 ("**the Prospectus**")."

9.    Section B sets out the relevant legal regime. The Claimants allege that the Bank's shares were relevant securities for the purposes of section 90 of FSMA ("**S.90**") and S.90A and that the Prospectus was a prospectus in respect of relevant securities for the purposes of S.90. They also allege that the Bank was under an obligation to disclose inside information on a recognised information service without delay under the Disclosure, Guidance and Transparency Rules (the "**DTR**").

Exhibit 2
Page 449

10.    In section C the Claimants allege that the Bank operated a "dark pool" trading system known as "Barclays LX" or "LX Liquidity Cross" ("**LX**") which formed part of its Equities Electronic Trading Division ("**EETD**"). They allege that the Bank made false representations to the public, clients and market participants about the extent of the high frequency trading in its dark pool and its safety as a trading environment and that the Bank promoted its "Liquidity Profiling" service as providing protection from predatory trading whereas in fact it did not apply Liquidity Profiling to certain categories of trading or overrode it altogether. They also allege that the Bank made false representations about the algorithms which it used and its smart order router system whereas, in truth, it directed orders into its dark pool where they were executed by high frequency traders or routed to other trading venues which favour the Bank.

11.    The Claimants make a number of specific allegations about the operation of the dark pool. They go on to allege that the Bank claimed to have "End to End Client Protection" in place which protected client orders and minimised information leakage whereas in truth it was operating its algorithms, smart order router and dark pool to favour high frequency trading, that it did not subscribe to a direct market data feed in breach of a US financial regulation imposed by the SEC, that it did not monitor credit and capital thresholds, that it failed to restrict access to confidential trading information to the appropriate employees, that it failed to provide required information to the SEC and that this conduct amounted to violations of US state and federal laws. I consider some of the specific allegations in the more detailed analysis below.

12.    In section D the Claimants set out the detailed reasons why the Bank was under an obligation to disclose the true facts about the LX trading system pleaded in section C in published information to which Schedule 10A applied. In particular, they allege that those facts gave rise to a principal risk or uncertainty which required a fair review of the Bank's business for the purposes of the DTR, Rules 4.1.8 and 4.2.7: see paragraph 55. They then continue:

"57. Accordingly, for the reasons set out in this Section D:

a. Barclays was at all material times during the Relevant Period under an obligation to announce to the market via an RIS the matters set out in Section C above.

b. Barclays was under an obligation to include the matters set out in Section C above in the Prospectus.

Exhibit 2
Page 450

c. Barclays was at all material times during the Relevant Period under an obligation to include the matters set out in Section C above in its management reports and interim management reports.

58. For the avoidance of doubt, Barclays' announcement on 26 June 2014 did not amount to an announcement to the market of the matters set out in Section C above. To the contrary, that announcement did not set out those matters, and did not accept that any of them were true, as it should have done. Barclays subsequently maintained the public position, as recorded in Mr King's speech referred to at paragraph 9 above, that following internal investigation the allegations were not justified."

13.    In section E the Claimants set out particulars of the false and misleading statements which they allege that the Bank made in its 2011, 2012, 2013 and 2014 annual reports, its 2011, 2012, 2013 and 2014 interim results announcements and in the Prospectus. They then continue as follows (and in the passage below they propose to amend to add the word "dishonestly" in paragraph 69):

"67. The matters set out in Section E1 amounted to the inclusion of untrue and/or misleading statements in Barclays Plc's published information within the meaning of paragraph 3(1)(b)(i) of Schedule 10A.

68. Further or alternatively, the omission to include within Barclays Plc's published information during the Relevant Period the matters set out in Section C above amounted to an omission from that published information of any matter required to be included in it, within the meaning of paragraph 3(1)(b)(ii) of Schedule 10A.

69. Further or alternatively, Barclays Plc dishonestly delayed throughout the relevant period the inclusion in its published information of the matters set out in Section C above, within the meaning of paragraph 5(1)(b) of Schedule 10A."

14.    The Claimants allege that Mr William White, who was the head of the EETD, the Managing Director and Global Head of Product Development and Platforms for Markets and also a member of the Bank's Markets Executive Committee, was a person discharging managerial responsibility (a "**PDMR**"), that he acted dishonestly in causing or permitting the Bank not to disclose the true facts about LX in its published information during the relevant period and that this also amounted to dishonest concealment of material facts. The Claimants also propose to amend to allege that this "amounted to dishonest delay in the publication of such information". Finally, they also allege that he made the untrue and misleading statements set out in section E. They make very similar allegations against Mr Thomas King from 8 September 2014 (at the latest) and allege that it is likely that other PDMRs were guilty of the same misconduct.

Exhibit 2
Page 451

15.   Section F is headed "Loss and Damage" and in this section the Claimants allege that they

relied upon the Bank's published information:

> "82. The Claimants purchased and/or continued to hold shares in reliance
> on Barclays Plc's published information. In support of this averment the
> Claimants are entitled to rely on a presumption of reliance, namely that it
> is to be inferred that they were induced or influenced in their investment
> decisions by Barclays Plc's misstatements and omissions, in circumstances
> where those misstatements and omissions were, for the reasons set out
> above, matters which were likely to play a part in the decision-making of
> a reasonable investor. Further and in any event, it was reasonable for them
> to rely on that published information in circumstances where Barclays Plc
> did not issue any correction or disclose the matters set out in Section C
> above.
>
> 83. Had Barclays Plc not delayed and/or omitted to publish to the market
> the matters set out in Section C above, and/or had Barclays not made the
> misstatements set out in Section E1 above:
>
> a. The Claimants would not have purchased Barclays Plc ordinary shares
> in the Relevant Period. Further or alternatively, any Barclays Plc ordinary
> shares they did acquire would have been acquired at a lower price.
>
> b. The Claimants would have disposed of their Barclays Plc shares at a
> higher price. In particular, had prompt disclosure been made of the position
> at the earliest possible opportunity, although it is likely that there would
> have been some fall in the share price, that fall would not have been as
> great as it was following the NYAG's 25 June 2014 announcement or its
> 1 February 2016 announcement."

16.   Finally, the Claimants allege that they suffered loss and damage as a result of the untrue

or misleading statements made by the Bank in its published information. In particular,

they allege that from (at least) 2011 the market price for the Bank's ordinary shares was

artificially inflated and in excess of their true value and rely on the falls in the market

value of those shares following the publication or disclosure of the Complaint and the

SEC Order.

*(2)    The Particulars of Reliance*

17.   On 24 November 2023 the Claimants served a document headed "Claimants' Particulars

of Reliance Categories" (the "**POR**") and in paragraph 1 they stated that the purpose of

these particulars was to set out three categories into which the respective cases on reliance

of the different Claimants and sub-funds could be divided together with a brief

description of the nature of the reliance falling within each sub-category. In paragraph 3

they set out a number of reservations including the statement that the categories were

Exhibit 2
Page 452

without prejudice to the Claimants' case that it was unnecessary to show reliance in relation to claims under Paragraph 5 and S.90. They also defined "**Published Information**" for the purpose of their pleaded case as "all of Barclays Plc's published information referred to in the Particulars of Claim, including the Prospectus where relevant". Under the heading "The Claimants' Reliance – General" the Claimants then pleaded as follows:

> "4. As set out at paragraph 82 of the Particulars of Claim:
>
> a. Each of the Claimants purchased and/or continued to hold ordinary shares in Barclays Plc in reliance on Barclays Plc's Published Information.
>
> b. The Claimants are entitled to rely on a presumption of reliance, namely that where Barclays Plc's misstatements in, and omissions from, its Published Information were such as likely to induce or influence the making and/or holding of investments by a reasonable investor in Barclays shares, it is to be inferred that any such investor was in fact induced or influenced by such matters. In this respect:
>
> i. The Published Information in this case was (both generally and in relation to the specific matters of complaint), and/or the relevant statements in, omissions from, and/or delays in the production of, the Published Information were, of a nature which was likely to play a part in the making and/or holding of investments by a reasonable investor, given the seriousness and potential consequences of the relevant matters.
>
> ii. In light of the presumption, service of these Particulars of Reliance Categories is without prejudice to the question of what facts, if any, a Claimant is required to prove in relation to reliance.
>
> c. It was in any event reasonable for each of the Claimants to rely on the Published Information during the whole of the Relevant Period, in circumstances where Barclays Plc did not disclose the relevant matters, and did not issue any relevant correction or clarification."

18.   The Claimants allege that they were all professionally managed institutional investors with different investment processes and that a particular Claimant or sub-fund might fall into more than one category. They also allege that as a matter of statutory construction S.90 and S.90A were intended to grant a remedy to investors whose investment processes are wholly or partially "passive", "index-linked or "tracking" in nature for a number of reasons including the fact that at all relevant times a substantial proportion of investors fell within those categories.

(i)    Category A

19.   The POR then go on to identify three categories of Claimants. The first category

Exhibit 2
Page 453

("**Category A**") consists of those Claimants who read and relied on the relevant Published Information directly "in that they read and considered Barclays Plc's relevant Published Information".

(ii)    Category B

20.    The second category ("**Category B**") consists of those Claimants who relied on the relevant Published Information indirectly through other sources which acted as a conduit for the substantive contents of the Published Information. The Claimants provide the following, non-exhaustive particulars of the sources which provided the conduit through which they relied on the Published Information and the activities which they allege amounted to reliance:

> "a. Reviewing transcripts of investor relations calls between Barclays Plc (or its agents or advisers) and financial professionals such as investment analysts, in which the contents of Published Information were the subject of discussion and questions.
>
> b. Meetings and/or discussions with Barclays Plc (or its agents or advisers) which covered matters contained in the Published Information and in which Barclays Plc itself relied on or referred to the Published Information.
>
> c. Reviewing the reports of brokers or financial analysts in relation to Barclays Plc (including "buy", "hold" and "sell" recommendations) which themselves relied upon or referred to the Published Information.
>
> d. Meetings with brokers or financial analysts to discuss Barclays Plc where such brokers or analysts relied upon or referred to the Published Information.
>
> e. Reviewing news reports and/or financial data and/or analysis from news or investment information outlets which themselves relied on or referred to the Published Information."

(iii)    Category C

21.    The third category ("**Category C**"), which is the most important for present purposes, consists of Claimants who are alleged to have suffered losses as a consequence of movements in the share price of the Bank. The POR describe Category C as exhibiting "**Price/Market Reliance**" and they plead that Category C Claimants relied on the Published Information in the following sense:

> "12. Claimants or Sub-Funds in Category C relied on the relevant Published Information in that:

Exhibit 2
Page 454

a. Their investment processes proceeded on the basis that:

i. Barclays Plc was a FTSE listed entity required to produce Published Information compliant with the relevant requirements. As set out in paragraph 5 above, such Published Information would therefore include all relevant negative information and would be correct, complete, timely, true and fair; and/or

ii. Barclays Plc's share price (and/or the movement therein) on the London Stock Exchange would reflect the contents of the Published Information, and would thus take account of all information included in the Published Information, including any negative information.

b. In their investment processes, they took account of Barclays Plc's share price (and/or any movements therein) and/or its status as a listed issuer with relevant obligations as set out in paragraph 5 above, including:

i. By making judgments and/or including Barclays Plc within its investment processes on the basis that Barclays Plc was a listed issuer with relevant obligations as set out at paragraph 5 above; and/or

ii. By making judgments taking into account the price and any relevant movements; and/or

iii. By including and/or by taking account of such matters within an algorithm or other numerically-driven system or decision-making process; and/or

iv. By taking account of such matters and/or their effect on Barclays Plc's market capitalisation as the constituent of an index or benchmark (such as the FTSE 100 or FTSE 250) – for example by adjusting its holding in Barclays Plc shares to "track" the value of Barclays Plc shares as a proportion of the total value of the FTSE 100 or FTSE 250.

13. In this regard, and so far as necessary, it will be the Claimants' case that:

a. The LSE is (alternatively, that the Claimants proceeded on the basis that it is) an efficient market in which the price of Barclays Plc's shares was determined and/or influenced by the contents of its Published Information including the omission of relevant matters from Published Information).

b. By behaving in the manner set out above, they relied indirectly on Barclays Plc's Published Information.

c. It was reasonable for an investor to rely on the share price of Barclays Plc in the manner set out above, as reflecting the contents of Barclays Plc's Published Information."

22.    In their Skeleton Argument dated 17 July 2024 Ms Davies, Mr Watkins and Mr Foxton stated that on the face of the pleadings 241 of the funds or sub-funds whom the Claimants represent or constitute fall within Category C and that their claims were alleged to be worth £330 million. In their Skeleton Argument dated 18 July 2024 Mr Nash, Mr Barden and Ms Binney accepted these figures and also stated that there are 219 funds or sub-

Exhibit 2
Page 455

funds which fall within Categories A and B and that their claims are worth £210 million. Hogan 5 (below) provides further information about the claims.

*(3)    The Particulars of Quantum*

23.    The Claimants allege that the fraud measure of loss is applicable to their claims under S.90A and that they are entitled to be put in the position in which they would have been had they not purchased or continued to hold shares in the Bank in reliance on the Published Information during the "**Relevant Period**" (defined as 1 January 2011 to 1 February 2016) or if the Bank had not delayed in publishing information regarding the relevant misconduct. They plead that damages should be assessed by two alternative measures:

> "5. The Claimants therefore claim (in summary) the difference between (i) the price paid for the Barclays Plc shares or (depending on when acquired) the value of the shares when the relevant Claimant continued to hold such shares in reliance on the Published Information (as the case may be); and (ii) the price of the Barclays Plc shares when sold or (depending on when sold) the value of the shares following the disclosure of at least part of the misconduct identified in the Amended Particulars of Claim to the market ("**Measure 1**") (Section D below).
>
> 6. With respect to the dates on which at least part of the misconduct became known to the market, the Claimants rely on the following dates ("**the Relevant Dates**"):
>
> a. 26 June 2014 (the date the filing of the NYAG Complaint was announced by RNS) ("**Relevant Date 1**"); and
>
> b. 1 February 2016 (the date the NYAG Settlement Agreement was announced by RNS) ("**Relevant Date 2**").
>
> 7. Each Claimant also relies on an alternative measure of loss, calculated by reference to the amount of the inflation in the market price of Barclays Plc shares associated with the misrepresentations and omissions alleged in the Amended Particulars of Claim (the "**Misleading Information**") and/or with Barclays Plc's delay in disclosing the true position. On this alternative measure, the Claimants' loss is calculated as the product of the amount of the inflation in the share price arising from the matters revealed on 25 June 2014 and/or 1 February 2016 and the number of Barclays Plc shares held on the associated Relevant Date (Section E below)."

24.    It is unnecessary to set out the detailed way in which both measures are developed in the POQ and, for present purposes, it is sufficient to note that the Claimants accept that the assessment and calculation of their losses requires them to persuade the Court to accept a particular methodology and to make a number of assumptions in their favour:

Exhibit 2
Page 456

Approved Judgment: Leech J          **Various Claimants v Barclays Bank PLC FL 2020 000051**

"8. In order to compare sale and purchase prices for Barclays Plc shares, it is necessary to match sale and purchase pairs. Because Barclays Plc shares are fungible, this requires the application of a matching methodology. Each Claimant relies on a 'last in, first out' ("**LIFO**") method for matching share sales with prior purchases so as to identify 'purchase-sale pairs' ("**PSPs**"). The case for each Claimant is also set out by reference to two further, alternative matching methodologies: (i) weighted average ("**WA**") and (ii) 'first in, first out' ("**FIFO**").

9. In summary, these methodologies operate as follows:

a. <u>LIFO matching</u> – sales of Barclays Plc shares are matched to the most recent shares purchased prior to the sale in question. The LIFO matching process is repeated until the sold shares are fully allocated to a previous purchase or purchases. Once purchased shares are matched to sold shares, they are removed from the holding inventory when matching to subsequent share sales.

b. <u>WA matching</u> – it is assumed that Barclays Plc shares sold are sold in proportion to the relative percentages of shares in a Claimant's portfolio up until the date of the sale in question. By way of an example:

i. On a given date, a Claimant holds 500 shares in total: (i) 200 shares purchased on a given date ("**Day One**"); (ii) 100 shares purchased on a day following Day One ("**Day Two**"); and (iii) a further 200 shares purchased on a date following Day Two ("**Day Three**").

ii. On the given date after Day Three, the Claimant sells 50 shares.

iii. Applying WA matching: (i) 20 of the 50 shares sold are assumed to be shares that were purchased on Day One; and (ii) 10 and 20, respectively, of the remaining 30 shares sold are assumed to be shares that were purchased on Day Two and Day Three.

c. <u>FIFO matching</u> – sales of Barclays Plc shares are matched to the oldest shares purchased prior to the date in question. The FIFO matching process is repeated until the sold shares are fully allocated to a previous purchase or purchases. Once purchased shares are matched to sold shares, they are removed from the holding inventory when matching to subsequent share sales."

*(4)    Reliance Questionnaires*

25.    In the CMC1 Order, I ordered the Claimants to answer 20 Full Reliance Questionnaires and 80 Reliance Lite Questionnaires to be selected equally by the parties. Five of the Claimants who completed Full Reliance Questionnaires advanced a case based on Price/ Market Reliance only. C68, the DBX ETF Trust, answered the following questions in the questionnaire with the following answers (and the answers given are set out in bold):

"1. Does the Claimant or Sub-Fund advance a case that, in acquiring, holding or disposing of shares in Barclays plc ("Barclays Shares"), it relied

Exhibit 2
Page 457

on specific statements in Published Information alleged to be untrue or misleading, or on the impression created by specific statements read together? **No.**

2. Does the Claimant or Sub-Fund advance a case that, in acquiring, holding or disposing of Barclays Shares, it relied on documents comprising Published Information as a whole?  **No.**"

"4. Does the Claimant or Sub-Fund advance a case that it relied indirectly by means of other sources of information that acted as a conduit for the substantive contents of the Published Information? **No. Not applicable.**"

"5. Does the Claimant or Sub-Fund advance a case that: (i) it knew of and relied on the price of Barclays Shares in acquiring, holding or disposing of Barclays Shares; and (ii) it believed that the prevailing market price of Barclays Shares reflected the value of those shares based on the information disclosed by Barclays being true and complete? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**Yes. The fund tracked an index in the period 1 January 2011 – 1 February 2016 -XTRKR MSCI ALL COUNTRY WORLD US Dollar Hedged Index. XTRKR MSCI ALL COUNTRY WORLD US Dollar Hedged Index hedges to USD the current exposures of its parent index, the ALL COUNTRY WORLD. The ALL COUNTRY WORLD Index is weighted by market capitalization.  Tracking was carried out by an adviser DBX Advisers LLC. The fund's portfolio was re-balanced quarterly during the Relevant Period.**

6. Does the Claimant or Sub-Fund advance a case that it relied on Barclays' status as a listed issuer with relevant obligations as pleaded in paragraph 5 of the PORC? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**Which Individual: an adviser DBX Advisers LLC.**

**When: Reliance occurred each time an investment decision was taken in respect of Barclays Shares, including decisions to initiate the transactions identified in the Trading Data.**"

"7. Does the Claimant or Sub-Fund advance a case of reliance based on a general or invariable practice of reviewing information of a similar nature to the Published Information before making an investment decision? **No.**

If yes, when and by which individual did the Claimant so rely? **Not applicable.**

8. Does the Claimant or Sub-Fund advance a case based only on reliance on alleged material omissions from the Published Information? **No.**

If yes, when and by which individual did the Claimant so rely?

**The Claimant does not advance a case based only on reliance on**

Exhibit 2
Page 458

alleged material omissions from the Published Information (an "Omissions Case"). The Claimant advances an Omissions Case in addition to the other reliance cases identified in these. As to the Claimant's Omissions Case, the information provided in the Answers to Questions 5 to 6 is repeated.

9. Does the Claimant or Sub-Fund rely on specific communications with the Defendant (including in meetings)?

**No.**

If yes, when and between whom (and where in the case of meetings) did the communications and meetings take place? **N/A.**

10. On the basis of what (if any) facts and matters which do not necessarily apply to all Claimants does the Claimant or Sub-Fund say that its reliance was reasonable? **None.**

11. If the Claimant or Sub-Fund has answered yes to any of Questions 1 to 9 above, will it be able to give disclosure in relation to the case it advances?

**No. It is unlikely that this Claimant would have any relevant documents**."

26.    C95, the Folksam Ömsesidig Livförsäkring Livak, also completed a Full Reliance Questionnaire. It answered Questions 1, 2 and 4 in the same way as C68 and answered Questions 7 to 10 either "No" or "Not applicable". It answered Questions 5, 6 and 11 in the following way (and, again, the answers are in bold):

"5. Does the Claimant or Sub-Fund advance a case that: (i) it knew of and relied on the price of Barclays Shares in acquiring, holding or disposing of Barclays Shares; and (ii) it believed that the prevailing market price of Barclays Shares reflected the value of those shares based on the information disclosed by Barclays being true and complete? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**Folksam ömsesidig livförsäkring LIVAK was a tracker fund during the Relevant Period (1 January 2011 – 1 February 2016). It tracked the MSCI World Ex Sweden Index. However, the index has been slightly customized for Folksam ömsesidig livförsäkring due to its ESG criteria. The index was weighted by market capitalization. Tracking was carried out by fund managers employed by a third-party asset manager (Swedbank Robur). Tracking was carried out quarterly. Re-balancing of the fund's portfolio would have depended on factors related to risk and return in relation to the above index. By factors related to risk and return in relation to the above index this means changes in risk and return character in the index composition, the portfolio composition or company specific risk and return factors. Inflows and outflows from the portfolio and changes in ESG-data are**

Exhibit 2
Page 459

also factors that can cause a sell or buy decision. For example, the fund uses a "best in class" ESG approach, changes in ESG scores may cause a buy or sell in the portfolio. The fund permitted a 0.5% deviation from the index for equities and fixed income.

6. Does the Claimant or Sub-Fund advance a case that it relied on Barclays' status as a listed issuer with relevant obligations as pleaded in paragraph 5 of the PORC? **Yes**.

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

Which Individual: **the fund manager, third party agent**.

When: **Reliance occurred each time an investment decision was taken in respect of Barclays Shares, including decisions to initiate the transactions identified in the Trading Data.**"

"11. If the Claimant or Sub-Fund has answered yes to any of Questions 1 to 9 above, will it be able to give disclosure in relation to the case it advances?

**No. The portfolio management is conducted based on a quantitative portfolio analysis where the share's market cap, risk and return characteristics are taken into account (rather than in a fundamental analysis, where analyst's reports or interim reports can be used to a greater extent).**"

27. C132, the Verdipapirfondet KLP AksjeGlobal Indeks I, also answered Questions 1, 2 and 4 in the same way as C68. In answer to Questions 5, 6 and 11 it did not allege that it relied on the price of the Bank's shares in making investment decisions but on the prices of the constituent companies in the Index. It answered Questions 5, 6 and 11 in the following way (and, again, the answers are in bold):

"5. Does the Claimant or Sub-Fund advance a case that: (i) it knew of and relied on the price of Barclays Shares in acquiring, holding or disposing of Barclays Shares; and (ii) it believed that the prevailing market price of Barclays Shares reflected the value of those shares based on the information disclosed by Barclays being true and complete? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**The Verdipapirfondet KLP AksjeGlobal Indeks I Claimant relies on holding the relevant knowledge and belief with respect to the prices of shares of the constituent companies of the Index (as opposed to the specific price of Barclays Shares on a given date). In addition, Verdipapirfondet KLP AksjeGlobal Indeks I Claimant intends to demonstrate that the tracker fund industry, and the creation of tracker funds by market participants (including the Verdipapirfondet**

Exhibit 2
Page 460

**KLP AksjeGlobal Indeks I Claimant and the Manager), operates among other things on the basis that issuers (such as the issuers who were constituents of the Index) disclose true and accurate information to the market at all relevant times. The Verdipapirfondet KLP AksjeGlobal Indeks I Claimant was set up to operate, and did operate, on this basis.**

Which Individual: **On the basis of the above, the Verdipapirfondet KLP AksjeGlobal Indeks I Claimant contends that it is not necessary for it to identify specific individuals who held the relevant knowledge and belief (and therefore who relied in the manner described).**

When: **Reliance occurred each time an investment decision was taken in respect of Barclays Shares, including decisions to initiate the transactions identified in the Trading Data.**

6. Does the Claimant or Sub-Fund advance a case that it relied on Barclays' status as a listed issuer with relevant obligations as pleaded in paragraph 5 of the PORC? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares? **Yes. Please refer to Answer 5.**"

"11. If the Claimant or Sub-Fund has answered yes to any of Questions 1 to 9 above, will it be able to give disclosure in relation to the case it advances?

**The Verdipapirfondet KLP Verdipapirfondet KLP AksjeGlobal Indeks I Claimant does not operate a document deletion or destruction process. The Verdipapirfondet KLP Verdipapirfondet KLP AksjeGlobal Indeks I Claimant has not conducted a search for disclosure in relation to the case it advances, so it does not know if it will be able to identify and disclose relevant documents.**"

B.    The Bank's Case

28.    The Bank denies liability. Again, it is unnecessary to set out the detailed defence which it advances in relation to the Claimants' allegations about the operation of LX. For present purposes it is enough to note that although the Bank admits that the Complaint was made (and subsequently amended) but denies its contents. It also admits the SEC Order and the settlement agreement, it denies that the limited admissions which it made in answer gave rise to any liability under S.90A. I set out below the summary of the Bank's defence (footnotes omitted):

"7. For the reasons pleaded in more detail below, Barclays Plc denies that the Claimants are entitled to the relief claimed or to any relief. The claim is fundamentally flawed on a number of levels:

7.1 As noted, the foundation of the Claimants' claim is a repetition of the

Exhibit 2
Page 461

allegations contained in the NYAG Amended Complaint as set out in Section C of the Particulars of Claim.

7.2 Barclays Plc denies the allegations in Section C save insofar as Barclays has admitted certain limited facts and matters, including relating to a small number of the allegations that were made in the NYAG Amended Complaint, as set out in a settlement agreement dated 31 January 2016 entered into between Barclays and the New York Attorney General (the "**NYAG Settlement Agreement**") and a settlement between Barclays Capital Inc. and the SEC contained in an order of the SEC (the "**SEC Order**") of the same date, and save insofar as expressly admitted or not admitted below. The admitted facts and matters as set out in the NYAG Settlement Agreement and the SEC Order are referred to herein as the "**Admitted Conduct**". To the extent that Section C of the Particulars of Claim is consistent with the Admitted Conduct, it is admitted.

7.3 The balance of the Claimants' allegations in Section C which adopt allegations of wrongdoing in the NYAG Amended Complaint are referred to herein as the "**Alleged Conduct**", and are denied.

7.4 Further and in any event, it is denied (insofar as it is alleged) that the Admitted Conduct or the Alleged Conduct (which is in any event denied) would have caused any prejudice to users of the dark pool.

7.5 It is denied that the Prospectus and/or any of the published information referred to in the Particulars of Claim contained any material omissions as alleged or otherwise.

7.6 Further, it is denied that the Prospectus and/or the other relevant published information contained any statements which were false or misleading (at all, or alternatively to a material extent) as alleged or otherwise.

7.7 Further and in any event:

7.7.1 As to the claim under s.90 FSMA, (a) the Claimants have failed to identify and allege that any individual employees or officers of Barclays Plc who were involved in or responsible for the preparation of the Prospectus had any knowledge of either the Admitted Conduct or the Alleged Conduct (which is in any event denied); (b) in any event, Barclays Plc is not liable because it reasonably believed at the time the Prospectus was submitted for approval that the statements in the Prospectus referred to by the Claimants were true and were not misleading and/or did not contain any material omissions.

7.7.2 As to the claim under s.90A FSMA, of the two individuals identified by the Claimants as persons discharging managerial responsibility on behalf of Barclays Plc, one was not a relevant person discharging managerial responsibility, but in any event neither knew or were reckless as to whether any statements made were untrue or misleading and/or knew any omissions to be a dishonest concealment of a material fact.

7.8 In the premises and in any event, it is denied that the conditions for liability under s.90 and/or s.90A FSMA are satisfied.

7.9 Further and in any event, no admissions are made as to whether any of

Exhibit 2
Page 462

the Claimants reasonably relied on any alleged misstatements and/or omissions (and it is specifically denied that the Claimants are entitled to rely on any presumption of reliance). The Claimants are required to plead and prove these allegations on a Claimant-by-Claimant basis. At present, the Particulars of Claim do not contain a properly particularised case in these respects and Barclays Plc reserves the right to strike out and/or seek summary dismissal of the Claim.

7.10 In any event, it is denied that the Claimants suffered any loss and damage."

29.    The Bank accepts in these proceedings that it admitted a number of limited facts and matters and a small number of the allegations set out in the Complaint but denies that it had any duty to disclose the Alleged Misconduct (as it defines the misconduct which it denies) in its published information or that any statements which it made in its published information were misleading or untrue. In relation to reliance and loss, the Bank made its position clear (original emphasis):

"54. As to paragraph 81, no admissions are made. Each of the Claimants is put to strict proof as to the nature and extent of its alleged dealings in Barclays Plc's ordinary shares during the Relevant Period. Paragraphs 3 and 4 above are repeated.

55. As to paragraph 82:

55.1 No admissions are made as to whether, or the extent to which, any of the Claimants purchased and/or continued to hold shares in Barclays Plc during the Relevant Period. Paragraph 4 above is repeated.

55.2 Save as aforesaid, paragraph 81 is denied. Without prejudice to the generality of the foregoing denial:

55.2.1 It is denied that the Claimants are entitled to rely upon a presumption of reliance as alleged in the second sentence: on the contrary, it is averred that each of the Claimants is required to plead and prove actual reliance in support of its claim under sections 90 and 90A FSMA. In particular, each of the Claimants is required to identify the specific allegedly untrue or misleading statements and/or omissions in Barclays Plc's published information upon which it claims to have relied, to particularise the nature of its alleged reliance on each such statement or omission, and to plead the basis on which it alleges that its reliance was reasonable. The Particulars of Claim do not contain a properly particularised case in these respects and, unless this fundamental deficiency is rectified, Barclays Plc reserves the right to apply to strike out and/or seek summary dismissal of the Claimants' claims under section 90 and/or 90A FSMA.

55.2.2 In any event, if and insofar as the Claimants are held to be entitled to rely upon a presumption as to reliance in support of their claims under section 90 and/or 90A FSMA, Barclays Plc will contend that the

Exhibit 2
Page 463

presumption is at most a rebuttable evidential presumption and, accordingly, Barclays Plc will reserve the right to plead, following disclosure from each of the Claimants, that the presumption falls to be rebutted in respect of all or some of them.

56. As to paragraphs 83-84:

56.1 The share price movements (and other figures) pleaded in paragraphs 84(c)(i) and (ii) are admitted. (For the avoidance of doubt, the reference to 26 June 2013 in paragraph 84(c)(ii) is understood to be intended as a reference to 26 June 2014.)

56.2 Save as aforesaid, paragraphs 83-84 are so vague and inadequately particularised that it is not possible to plead a full response. For the avoidance of doubt, the Claimants are required to plead and prove their allegations as to causation and loss on an individual Claimant-by-Claimant basis. The Particulars of Claim do not contain a properly particularised case in these respects and, unless this fundamental deficiency is rectified, Barclays Plc reserves the right to apply to strike out and/or seek summary dismissal of the Claimants' claims under section 90 and/or 90A FSMA. Without prejudice to the generality of the aforesaid, Barclays Plc will say (without limitation) as follows:

56.2.1 Certain of the pleaded causal chains are mutually exclusive, for example, the allegation that in the counterfactual the Claimants would not have purchased Barclays Plc shares and the allegation that they would have acquired the shares at a lower price. It is denied that any individual Claimant can simultaneously advance both cases.

56.2.2 In any event, as regards all of the Claimants the pleaded case on loss is internally inconsistent. In particular, paragraph 83(b) (which alleges that if earlier disclosure had been made, there would have been some fall in the share price but such fall "*would not have been as great as it was following the NYAG's 25 June 2014 announcement or its 1 February 2016 announcement*") is inconsistent with paragraph 84(c)(iii) (which alleges that the combined fall following the NYAG's 25 June 2014 or 1 February 2016 announcements is likely to reflect the "*difference between the price the Claimants in fact paid and the price they would have paid had the true position been known*").

56.2.3 Further and in any event, if and insofar as there was any inflation in the share price of Barclays Plc during the Relevant Period as alleged (which is denied), each of the Claimants must give credit for any gains received as against the loss which it is claiming."

30.  The Bank also denies that the Claimants are entitled to rely on the fraud measure of damage or that any fall in the share price of the shares which the Claimants held were the result of any statements which were alleged to be untrue or misleading. Given the Claimants' allegation that the London Stock Exchange was an efficient market in which the price of the Bank's shares was determined or influenced by the contents of the Published Information (upon which they rely), it is also important to set out the Bank's

Exhibit 2
Page 464

case in relation to the perception of the market:

> "(a) It is specifically denied that the share price fall which occurred on 26 June 2014 (pleaded at paragraph 84(c)(i)) represents a loss incurred by any of the Claimants as a result of any of the allegedly untrue or misleading statements and/or alleged omissions pleaded in the Particulars of Claim; on the contrary, it is averred that the share price fall was caused (or, alternatively, was predominantly or at least in part caused) by other factors, including prevailing market conditions on that date, and the manner in which the New York Attorney General presented the allegations that were made against Barclays in the NYAG Complaint at his press conference on 25 June 2014, and in particular a perception amongst market commentators that, given the tone and content of the Attorney General's presentation, the allegations might ultimately lead to Barclays Plc's licence to carry out banking business in the US being suspended or withdrawn if the allegations in the NYAG Complaint were proved. Accordingly, it is specifically denied that the share price fall which occurred on 26 June 2014 is a reliable proxy for the impact which prior disclosure by Barclays Plc of the Admitted Conduct and/or the Alleged Conduct (which is in any event denied) would have had on the price of Barclays Plc's shares. This will be a matter for evidence in due course.

> (b) Save as aforesaid, no admissions are made as to whether prior disclosure by Barclays Plc of the Admitted Conduct would have caused any or any significant impact on the price of Barclays Plc's shares. Without prejudice to the generality of the foregoing denial, it is specifically denied that the share price fall which occurred on 1 February 2016 (pleaded at paragraph 83(c)(ii)) represents a loss incurred by any of the Claimants as a result of any of the allegedly untrue or misleading statements and/or alleged omissions pleaded in the Particulars of Claim or is a reliable proxy for the impact which prior disclosure by Barclays Plc of the Admitted Conduct would have had on the price of Barclays Plc's shares. This will be a matter for evidence in due course."

31. Finally, the Bank pleads that the Claimants are required to prove on a Claimant by Claimant basis that they would not have bought its shares or would have acquired them at a lower price or sold them at a higher price as a result of the Bank's conduct. It also pleads that they must give credit for any gains which they received as a result of purchasing or holding or disposing of its shares.

C.    The Evidence

*(1)    Middleton 4*

32. Mr Middleton gave evidence in support of the Strike Out Application. He summarised the Claimants' case as the Bank and its team understood it and set out the relevant

Exhibit 2
Page 465

Approved Judgment: Leech J          Various Claimants v Barclays Bank PLC FL 2020 000051

procedural history. As might have been expected, Ms Hogan did not accept the accuracy of Middleton 4 in her evidence but in my judgment nothing turns on this disagreement. Mr Middleton did not, however, have any relevant evidence to give on the substantive issues in support of the reverse summary judgment element of the Strike Out Application and I need not consider Middleton 4 further.

*(2)    Hogan 5*

33.    Ms Hogan provided helpful evidence which put the Claimants' case on reliance in context. She began by dealing with the number and value of the claims (which the Bank did not dispute). There are currently 135 Claimants who represent or constitute 465 individual funds or sub-funds. All but one of these Claimants advance claims under S.90A with a total claim value of £560 million. 98 funds also advance claims under S.90 with a total claim value of £12 million. 38% of the claims fall within Category A amounting to £194 million, 10% of the claims fall within Category B with a total claim value of £18.5 million and 52% of the claims fall within Category C with a total claim value of £332 million. However, there are 241 funds making claims within Category C and 229 or 95% of those funds are also making claims under S.90 and all of them make claims for dishonest delay.

34.    Ms Hogan did not suggest that any of the 241 funds within Category C claims to have read or considered any of the Published Information pleaded in the Particulars of Claim when deciding to acquire, hold or sell the Bank's shares which are the subject matter of the claim. In a letter dated 18 April 2024 Latham & Watkins contended that it was necessary for an investor to apply their mind to a statement in the pleaded Published Information (or the absence of such a statement) and that the relevant statement (or omission) must have induced the investor to transact on the terms which they did. Ms Hogan's response to this contention was as follows:

> "The Claimants disagree. In very short summary, the Claimants' case at trial will be that, on a proper construction of the legislation, having regard to its wider purposes and the operation of the securities markets, it is sufficient for an investor to have "relied" on Published Information containing misstatements and/or omissions by relying on the fact that the Issuer is a listed company with relevant disclosure obligations, including to disclose full and accurate information, and/or on the price of the shares which is affected by the information published by an issuer."

Exhibit 2
Page 466

Approved Judgment: Leech J          Various Claimants v Barclays Bank PLC FL 2020 000051

35.   Ms Hogan also gave evidence about index or tracker funds which do not make an "active"
      judgment to invest in securities transaction by transaction but invest in a basket of shares
      based on tracking an index such as the FTSE 100 or the FTSE 250. She described these
      funds as "passive" but used the term "**Tracker Funds**" to refer to such funds collectively
      (as do I). Her evidence about those funds was as follows (footnotes omitted):

> "38. Tracker Funds were well established when s.90A was introduced in
> 2006: it is estimated by the Investment Management Association that in
> 2006 between 20% and 25% of total assets in the UK were managed
> according to indexing strategies. By 2010, "Tracker funds under
> management [had] reached £29.5 billion, the highest on record and 59%
> up on the 1st Quarter last year." By the end of 2020, such funds accounted
> for 34% of the total UK investment market (or around £3 trillion) and that
> percentage appears to be growing year on year.
>
> 39. A finding that Tracker Funds are not entitled to rely on the protections
> against the fraudulent preparation of published information contained in
> s.90A FSMA would render that section entirely ineffective in respect of
> around a third of the investment market, by reason of characteristics of the
> potential claimants themselves (rather than the degree of wrongdoing on
> the part of the defendant issuer). Nothing in the wording of FSMA
> indicates that Parliament intended that s.90A would be so severely fettered
> in its operation."

36.   Ms Hogan also stated that it was very likely that the Claimants would wish to rely on
      expert evidence in support of their case in relation to Category C claims at trial and she
      exhibited the reports of Mr Curcio and Dr Hildreth as examples of the kind of evidence
      which they would wish to call. It is not necessary for me to set out or analyse those reports
      in detail and sufficient to set out the relevant parts of Hogan 5 and the points which Ms
      Hogan invited the Court to draw from them (again footnotes omitted):

> "41. Mr Curcio's evidence relates to the fund management market and the
> role of Tracker Funds. He also covers the general process of rebalancing
> of those funds and how the funds track indices that are typically weighted
> by reference to the market capitalisation of its constituent issuers. The
> market capitalisation is a product of the share price of an issuer and the
> number of outstanding shares at any given time. As Mr Curcio sets out,
> Tracker Funds are not homogenous in their approach. He explains, for
> example, that: "*...although index-tracking funds are generally believed to
> be operated in a mechanistic way (with the funds replicating exactly what
> the index does), in practice, fund managers employ some discretion in the
> day-to-day management of index-tracking funds. Some of this discretion
> can result in a management of the fund that is akin to being selective, such
> as with enhanced indexing strategies*." (paragraph 2.3.8)
>
> 42. As Mr Curcio further explains: "*There isn't a clear demarcation*

Exhibit 2
Page 467

*between index-tracking funds and selected portfolio funds, with many funds adopting strategies that combine aspects of both index-tracking and selective portfolio management*" (paragraph 2.5.2).

43. Dr Hildreth's evidence covers (i) whether the market in RSA shares was efficient during the relevant period and, (ii) whether the published information and/or the alleged untrue or misleading statements and omissions affected the price of RSA's shares. As is clear from Dr Hildreth's evidence, market efficiency is a question of degree: a market can be strongly or weakly efficient. The Claimants anticipate that they will likely wish to adduce similar evidence with respect to the market for Barclays shares in advance of the trial at which reliance will be considered, to the extent that this remains a disputed issue. In this context, it is likely that the Claimants will seek to establish at trial that the price of Barclays shares reflected an aggregation of lots of pieces of information including the Published Information, such that the Claimants can be presumed to have relied on the Published Information as reflected in the share price.

44. It is clear from the reports of Mr Curcio and Dr Hildreth that reliance is a factually complex issue, occurring across a spectrum. At this early stage and prior to the provision of witness evidence by individual Claimants, that spectrum has been divided into 3 broad categories, of which Price/Market Reliance is one. That division is necessarily broad-brush, and the Claimants' position is that the Court will be in a far better position to determine where the reliance threshold lies for the purposes of s.90A once it has factual evidence (documentary and/or witness evidence) before it from the individual sample Claimants as to how the relevant sub-funds operated, in addition (as necessary) to expert evidence."

37.   For the purposes of the Strike Out Application I assume that the Claimants will be able to demonstrate these facts at trial. Dr Hildreth also gave evidence in the *RSA Litigation* that economists distinguished between three levels of market efficiency according to the information available. A market is "weak form" efficient if prices fully reflect all historical prices. A market is "semi-strong form" efficient where market prices reflect all information publicly available and a market is "strong form" efficient where all information (both public and private) is known to all. His evidence was that RSA's shares were traded in a strong or semi-strong form efficient market on the LSE between 2009 and 2013 as one of the largest listed stocks and included in the FTSE 100. He also gave evidence that the published information upon which the claims group relied was material to RSA's share price. For the purposes of the Strike Out Application I assume that Dr Hildreth (or another expert) would give the same evidence in relation to the Bank's shares.

## IV.   The Law

Exhibit 2
Page 468

**Approved Judgment: Leech J**          **Various Claimants v Barclays Bank PLC FL 2020 000051**

D.  The Statutory Regime

*(1)  S.90*

38.  Liability for untrue or misleading statements in a company prospectus has a long history. Although S.90 was introduced by FSMA, it is the statutory successor to section 3 of the Directors Liability Act 1890 which imposed liability to pay compensation for untrue statements in a prospectus to all persons subscribing for securities "on the faith of such prospectus". In its current form S.90(1) to (7) provide as follows:

> "(1) Any person responsible for listing particulars is liable to pay compensation to a person who has— (a) acquired securities to which the particulars apply; and (b) suffered loss in respect of them as a result of— (i) any untrue or misleading statement in the particulars; or (ii) the omission from the particulars of any matter required to be included by section 80 or 81.
>
> (2) Subsection (1) is subject to exemptions provided by Schedule 10.
>
> (3) If listing particulars are required to include information about the absence of a particular matter, the omission from the particulars of that information is to be treated as a statement in the listing particulars that there is no such matter.
>
> (4) Any person who fails to comply with section 81 is liable to pay compensation to any person who has— (a) acquired securities of the kind in question; and (b) suffered loss in respect of them as a result of the failure.
>
> (5) Subsection (4) is subject to exemptions provided by Schedule 10.
>
> (6) This section does not affect any liability which may be incurred apart from this section.
>
> (7) References in this section to the acquisition by a person of securities include references to his contracting to acquire them or any interest in them."

*(2)  The Transparency Directive*

39.  On 15 December 2004 the European Parliament and the Council of the European Union issued Directive 2004/109/EC on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market (the "**Transparency Directive**" or "**TD**"). The recitals to the directive included the following:

> "(1) Efficient, transparent and integrated securities markets contribute to a

Exhibit 2
Page 469

genuine single market in the Community and foster growth and job creation by better allocation of capital and by reducing costs. The disclosure of accurate, comprehensive and timely information about security issuers builds sustained investor confidence and allows an informed assessment of their business performance and assets. This enhances both investor protection and market efficiency.

(2) To that end, security issuers should ensure appropriate transparency for investors through a regular flow of information. To the same end, shareholders, or natural persons or legal entities holding voting rights or financial instruments that result in an entitlement to acquire existing shares with voting rights, should also inform issuers of the acquisition of or other changes in major holdings in companies so that the latter are in a position to keep the public informed."

"(7) A high level of investor protection throughout the Community would enable barriers to the admission of securities to regulated markets situated or operating within a Member State to be removed. Member States other than the home Member State should no longer be allowed to restrict admission of securities to their regulated markets by imposing more stringent requirements on periodic and ongoing information about issuers whose securities are admitted to trading on a regulated market."

"(17) Appropriate liability rules, as laid down by each Member State under its national law or regulations, should be applicable to the issuer, its administrative, management or supervisory bodies, or persons responsible within the issuer. Member States should remain free to determine the extent of the liability."

40.    Chapter II was headed "Periodic Information" and Articles 4 to 8 provided for an issuer to make public its annual reports, half-yearly annual reports and interim management statements and the chapter specified in general terms the contents of those documents (subject to certain exemptions). Article 7 provided as follows:

> "**Responsibility and liability**
>
> Member States shall ensure that responsibility for the information to be drawn up and made public in accordance with Articles 4, 5, 6 and 16 lies at least with the issuer or its administrative, management or supervisory bodies and shall ensure that their laws, regulations and administrative provisions on liability apply to the issuers, the bodies referred to in this Article or the persons responsible within the issuers."

41.    Chapter III contained a number of provisions dealing with the provision of ongoing information and Chapters IV and V dealt with general obligations and also competent authorities and their powers. Chapter VI was headed "Implementing Measures" and it included Article 28 which provided as follows:

Exhibit 2
Page 470

"**Penalties**

1. Without prejudice to the right of Member States to impose criminal penalties, Member States shall ensure, in conformity with their national law, that at least the appropriate administrative measures may be taken or civil and/or administrative penalties imposed in respect of the persons responsible, where the provisions adopted in accordance with this Directive have not been complied with. Member States shall ensure that those measures are effective, proportionate and dissuasive.

2. Member States shall provide that the competent authority may disclose to the public every measure taken or penalty imposed for infringement of the provisions adopted in accordance with this Directive, save where such disclosure would seriously jeopardise the financial markets or cause disproportionate damage to the parties involved."

*(3)    S.90A*

42.    Section 1270 of the Companies Act 2006 introduced S.90A to give effect to these provisions and it took effect on 8 November 2006. The Explanatory Note to the section explained that it established a regime for civil liability to third parties by issuers admitted to trading on a regulated market in respect of disclosures made public in response to provisions implementing obligations imposed by the Transparency Directive. In its original form it provided as follows (so far as relevant):

"**90A Compensation for statements in certain publications**

(1) The publications to which this section applies are– (a) any reports and statements published in response to a requirement imposed by a provision implementing Article 4, 5 or 6 of the transparency obligations directive, and (b) any preliminary statement made in advance of a report or statement to be published in response to a requirement imposed by a provision implementing Article 4 of that directive, to the extent that it contains information that it is intended– (i) will appear in the report or statement, and (ii) will be presented in the report or statement in substantially the same form as that in which it is presented in the preliminary statement.

(2) The securities to which this section applies are– (a) securities that are traded on a regulated market situated or operating in the United Kingdom, and (b) securities that– (i) are traded on a regulated market situated or operating outside the United Kingdom, and (ii) are issued by an issuer for which the United Kingdom is the home Member State within the meaning of Article 2.1(i) of the transparency obligations directive.

(3) The issuer of securities to which this section applies is liable to pay compensation to a person who has– (a) acquired such securities issued by it, and (b) suffered loss in respect of them as a result of– (i) any untrue or misleading statement in a publication to which this section applies, or (ii) the omission from any such publication of any matter required to be

Exhibit 2
Page 471

included in it.

(4) The issuer is so liable only if a person discharging managerial responsibilities within the issuer in relation to the publication– (a)knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or (b) knew the omission to be dishonest concealment of a material fact.

(5) A loss is not regarded as suffered as a result of the statement or omission in the publication unless the person suffering it acquired the relevant securities– (a) in reliance on the information in the publication, and (b) at a time when, and in circumstances in which, it was reasonable for him to rely on that information.

(6) Except as mentioned in subsection (8)– (a) the issuer is not subject to any other liability than that provided for by this section in respect of loss suffered as a result of reliance by any person on– (i) an untrue or misleading statement in a publication to which this section applies, or (ii) the omission from any such publication of any matter required to be included in it, and (b) a person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(7) Any reference in subsection (6) to a person being subject to a liability includes a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.”

*(4)    The Davies Review*

43.    Section 1270 of the Companies Act 2006 also inserted a new section 90B into FSMA which gave HM Treasury power to make further provision about liability for published information and to do so by amending any primary or subordinate legislation. In October 2006 the Economic Secretary to the Treasury invited Professor Paul Davies QC, who was then the Cassel Professor of Commercial Law at the London School of Economics, to carry out a review of issuer liability (the “**Davies Review**”). In March 2007 Professor Davies circulated a discussion paper for comment to a wide range of recipients (“**Davies 1**”). He sought views on the following key questions:

“i. Should the trigger for liability be fraud (ie. recklessness or intention) or negligence? Should there be liability for misstatements even if those making the statements honestly (but carelessly) believed them to be true? What is the right standard of liability to incentivise disclosure of timely, accurate and meaningful disclosures without imposing undue cost burdens on issuers? (paras 71-78).

ii. Should the statutory liability regime currently in place under section 90A be extended to ad hoc disclosures? What is the current position in relation to Market Abuse Directive disclosures? Should there be liability for fraudulent misstatements in ad hoc reports? (paras 79-83).

Exhibit 2
Page 472

iii. Should there be liability for statements that are accurate but late? Or are the FSA's rules sufficient, given that much of their enforcement action has focused on delayed disclosure? What about deliberate delays in withholding information in order to mislead the market? (paras 84-88)

iv. What counts as an ad hoc statement? Just disclosures of inside information required under MAD? Or also ad hoc disclosures required under the DTR? Other announcements or statements? (paras 89-94)

v. Should section 90A apply also to non-regulated markets? How would it affect the regimes operated by AIM and Plus markets'? How might the courts apply the principles of the common law to non-regulated market liability anyway? Should there be a level playing field between regulated and non-regulated markets? (paras 95-99)"

44.   In Davies 1, Professor Davies summarised the existing law. He pointed out that the reports and accounts provisions were of long standing and pre-dated EU law. He also pointed out that the Transparency Directive did not apply to securities traded on AIM or PLUS. He then set out the following background which applied to issuers on regulated markets (footnotes omitted):

"15. For issuers on regulated markets, notably the main market of the London Stock Exchange, the TD requires annual financial reports (Article 4), half-yearly reports (Article 5) and interim management statements (Article 6). The annual report is in essence that required by the companies legislation, though now termed an 'annual financial report'. The half-yearly report (which is not required to be audited) must contain a condensed set of financial statements and an interim management report. The interim management report must indicate the important events that have occurred during the first six months of the financial year and their impact on the financial statements and the principal risks and uncertainties for the remaining six months. Article 6 requires the publication of quarterly interim management statements by issuers of shares (but not quarterly financial statements). The issuer is required by Article 21 to disseminate the required information 'in a manner ensuring fast access to such information on a non-discriminatory basis' and to do so 'throughout the Community'. In fact, this requirement is applied not only to information required to be disclosed by the TD, but also to any additional information requirements imposed on issuers by Member States beyond the TD (see para 17 below) and to information required by Article 6 of MAD (see para 19 below). Such information is referred to collectively as 'regulated information'.

16. The TD requires transposition into UK law and this has been done via amendments to FSMA 2000. These amendments confer new rule-making powers on the FSA, which the FSA has exercised so as to produce 'Disclosure and Transparency Rules' (DTR) in place of the previous 'Disclosure Rules' (DR). The TD's periodic reporting requirements are transposed in DTR 4 and (for dissemination) DTR 6. In particular, where

Exhibit 2
Page 473

the UK is the home state of the issuer, the periodic reports are to be distributed through a Regulated Information Service (RIS) and are to be made available on a website. Again, the RIS is an established feature of the markets and is also the required dissemination channel for the information required to be reported periodically by AIM companies.

17. Because, unlike the PD, the TD is a 'minimum harmonisation' directive, it is open to the Member States to add to its disclosure requirements. The FSA has done so, through what it calls 'super-equivalent requirements'. These are set out in the Listing Rules. LR 9.8 requires certain information relating to the company's financial position to be included in the annual financial report beyond that required by the DTR; certain non-financial items, such as the requirement to comply, or explain non-compliance, with the Combined Code on Corporate Governance; and the provision of a directors' remuneration report. However, the Listing Rules no longer require the publication of a preliminary statement of annual results, though they do regulate how such a preliminary statement is to be made if the issuer chooses to make one; and a public statement of a board's dividend or other distribution decisions is still required as soon as possible after it has been made. For companies listed on the main market of the LSE, therefore, the periodic disclosure requirements are now mainly in the DTR but still in part in the LR."

45. Professor Davies then dealt with ad hoc disclosure requirements and, in particular, Article 6 of Directive 2003/6/EC (which he described as the "**Market Abuse Directive**" or "**MAD**"). He then turned to civil sanctions for breaches of disclosure obligations and began with the tort of deceit:

"26. The tort of deceit required proof of various other elements, beyond the lack of a belief in the truth of the statement made. First, there must actually be a statement. There was no liability at common law for non-disclosure, though the law was sufficiently robust to impose liability for half-truths (ie statements which were true as far as they went but implied something false as a result of what was omitted). However, there could be no liability if the defendant said nothing and merely stood by and let the claimant deceive him or herself, even if such conduct on the part of the defendant were intentional. Second, the defendant must intend the claimant to rely on the untrue statement, or at least intend a class of persons, of whom the claimant was a member, to rely on it. Hence, a company could be said to intend a subscriber for shares to rely on the prospectus, even if it did not know the identity of the subscriber when it issued the prospectus. Third, the claimant must in fact rely on the statement, as part of which requirement the claimant would have to be aware of the statement. This requirement is taken to rule out the theory of 'fraud on the market,' whereby a misstatement which has an effect on the market price can be said to cause an investor loss, even though that particular investor was not aware of the misstatement. And, of course, the claimant must suffer loss. Provided these and the other elements of the tort

Exhibit 2
Page 474

of deceit are satisfied, the common law regards the defendant as having acted fraudulently. There is no need to show that the defendant had any particular dishonest intention: even a 'white lie' intended to be and in fact acted on which causes the claimant loss constitutes the tort of deceit. Normally, of course, the maker of a fraudulent statement is also dishonest.

27. Parliament did not think the result in *Derry v Peek* an acceptable one in relation to prospectuses, and so it passed the Directors' Liability Act the following year. That imposed liability for negligent misstatements in prospectuses, ie the defendant would be liable even if belief in the truth of the statement were honestly held, if that belief had been arrived at carelessly (negligently). The present version of the liability imposed by the 1890 Act is to be found in section 90 of FSMA 2000. It is now a very wide-ranging provision. Any person may sue who 'acquires' securities to which the prospectus applies and suffers loss as a result of any untrue or misleading statement in the prospectus or of any omission from the prospectus of a matter which ought to have been included. The use of the verb 'acquires' indicates that the possible range of claimants includes those who buy shares in the after-market as well as those who subscribe for shares from the company. The absence of a requirement that the claimant should have 'relied' on the misstatement (the section requires simply that the claimant should have suffered loss as a result of it) indicates that, provided the misstatement affects the market price of the security, it does not matter that the claimant was unaware of it. And the section covers omissions."

46.    Professor Davies then turned to discuss S.90A in its original form. He stated that the section had two objectives: one relating to the common law of negligence and the other relating to the tort of deceit. He stated that as far as negligence was concerned, it confirmed the existing law that there was no liability and so far as deceit was concerned, the approach was "essentially confirmatory" but made some adjustments for periodic disclosures: see Davies 1, §47. He discussed the way in which the section was modelled on the common law in the following passage and summary upon which Ms Davies and her team placed considerable reliance:

"54. The liability on the part of the issuer is to anyone (so, to any investor, whether already a shareholder or not) who acquires securities and suffers loss as a result of the misstatement or omission, where that person relied on the information at a time when it was reasonable for him to do so. This statutory liability is clearly modelled on the common law tort of deceit. In two ways it goes beyond the common law, however. First, although the claimant will recover only if he in fact relied on the publication and that reliance must be reasonable, it is not required that the issuer should have intended the claimant to rely on the publication. The requirement of intention on the part of the issuer as to the reliance by the claimant on the publication made the common law tort of deceit of only marginal relevance

Exhibit 2
Page 475

to misstatements in periodic reports, as contrasted with prospectuses, where such intention was easy to show. Second, the liability of the issuer is applied to pure omissions from the publication, whereas the common law applied only to omissions which rendered what was said misleading. However, it is to be noted that in the case of omissions, it is not enough that the omission was intentional or reckless, it must amount to a 'dishonest concealment.' Without these two changes from the common law of deceit, it is arguable that the liability for intentional misstatements created by the section would have been meaningless in practice. For that reason, it can be argued that, without these changes, the United Kingdom would have been in breach of its obligation under Article 7 of the Directive and under the general requirements of Community law to have an effective civil liability regime in place for Transparency Directive disclosures. Although Article 7 merely requires Member States to extend their civil liability regimes to the disclosures required by the Directive, it is strongly arguable that this does require the Member State to have some liability regime to be extended. On this basis, it would not constitute compliance with Community law for a Member State to say that it had no liability regime or a liability regime which in practice was wholly ineffective.

55. On the other hand, the statutory regime retains two features of the common law of deceit which restrict its impact. First, and most important, the claimant can succeed only if it relied on the publication. As we have seen above in para 27, the statutory prospectus liability regime does not require reliance. It adopts a 'fraud on the market' theory. If the misstatement in the prospectus affected the market price of the securities, that is enough, even though the claimant may not have known of the misstatement. Section 90A by contrast, by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken. Second, the defendant's reliance on the publication is required to have been reasonable. Thus, a claimant might not succeed under the section if it had some available way of checking the publication but chose not to use it.

56. Finally, it should be noted that the regime based on intentional or reckless misstatements operates only in respect of those who acquire securities, and not in favour of those who sell or hold securities. This restriction was criticised by many to whom I talked.

57. Summary: Within its scope of operation, the statutory regime introduced by section 90A of FSMA adopted the prior common law by excluding liability in negligence to investors at large. It also adopted the prior common law on deceit and applied it to issuers (but only them) and in favour of acquirers of securities (but only them). The deceit rules are adopted under the statutory regime with two extensions: to bring in pure omissions and to remove the need to prove the issuer intended the claimant to rely on the publication. Overall, the new statutory regime confirms the prior law and, where it does change it, does so in favour of investors (though the changes can be argued to be marginal). What appears clearly to be the case is that section 90A did not deprive investors of rights to sue on grounds of negligence which they previously held at common law."

Exhibit 2
Page 476

Approved Judgment: Leech J          Various Claimants v Barclays Bank PLC FL 2020 000051

47. In Davies 1, section II Professor Davies framed the key questions. He addressed first the range of disclosures to be covered and whether they should be extended to either negligent statements or ad hoc statements. He then moved to particular issues which arose in relation to liability for fraudulent ad hoc statements and the first of those was the issue of delay:

> "83. However, respondents, who were in favour of the extension of section 90A, raised a couple of very important issues about the scope of such an extension. One was the question of how section 90A would operate in relation to ad hoc statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules. This was a significant problem because the FSA's rules were thought to be very demanding about the promptness of the required disclosure and to provide few reasons for non-disclosure. We have also noted that the FSA's public enforcement action has focussed heavily on delayed disclosure. It should be noted, however, that the German reforms do impose liability for delay in parallel terms to those used for inaccuracies. See WpHG section 37b in Annex B.
>
> 84. Where a disclosure was delayed, it was pointed out, to impose liability only on the basis of intention would be no protection for issuers, because the decision to make the announcement at time $t_2$ rather than earlier time $t_1$ would often have been a deliberate one. Moreover, it would always be possible for claimants to argue that the disclosure should have been made somewhat earlier and, in the case of a heavily traded stock, the range of potential claimants could be quite large.
>
> 85. Although section 90A goes beyond the common law by imposing liability for omissions, and late disclosure could be analysed as an omission (ie during the period between $t_1$ and $t_2$), it seems clear that the section does not cover this type of omission. The section contemplates liability only for omissions from the statement which is made ('omission from any such publication of any matter to be included in it') rather than liability for failure to make any statement at all. Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point.
>
> 86. Most of those who raised this issue wanted to maintain the regime of no civil liability for late disclosure. It has to be said, however, that it is unattractive not to impose liability where an issuer deliberately withholds information in order to mislead the market and to create a false market in its securities. It is suggested that an appropriately narrow liability could be crafted in such a case. First, it is already the case under section 90A that, in relation to omissions, a deliberate omission is not enough to lead to liability. There must be 'a dishonest concealment' of a material fact. There must be dishonesty as well as deliberateness, so that this test, applied to

Exhibit 2
Page 477

late disclosures, would not mean an issuer was liable simply because it decided to delay publication for a short period in order to check the accuracy of its proposed statement. Second, however, there is the issue of reliance. It is difficult to see how that requirement could be retained in the case of liability for late publication. An investor can hardly be said to rely on something of which he or she is not aware. However, a substitute for the reliance requirement in the case of late disclosure could perhaps be found by focussing on the purpose of the delay, ie that the purpose of the delay should be to mislead the market. This approach is adopted by section 397 of FSMA 2000 which imposes criminal liability for dishonest concealment of material facts 'whether in connection with a statement… or otherwise' but only where the purpose of the concealment is (under that section) the inducement of, broadly put, an investment decision."

48.    In Davies 1, section III Professor Davies dealt with some over-arching issues the first of which was whether "super-optimal levels of fraud-based litigation" could be avoided. He addressed concerns raised about the US experience of private securities class actions and identified a number of differences between the two jurisdictions. He drew particular attention to the absence of any reliance requirement under US law:

"116. In connection with the formation of the class, it is also important to revert again to the reliance requirement in section 90A (see para 55 above). In the United States a typical class is constituted by those who bought shares after the misleading statement was made and still held the shares at the point the truth emerged. Under the 'fraud on the market' theory, adopted in the US for misleading continuing disclosures as well as for misstatements in prospectuses, it is not necessary for the claimant to show knowledge of and reliance on the misstatement in question. Thus, class formation is easier and classes are larger than where reliance has to be shown."

49.    In June 2007 Professor Davies published his final report ("**Davies 2**"). In the first few paragraphs he addressed the argument which had been put to him that there should be no liability to investors even for fraudulent misstatements. He met that argument in the following way:

"4. I am thus less troubled than these respondents by the principle of requiring the company to compensate investors whom it has misled. Indeed, specifically to enact that there should be no liability on the part of issuers to investors in the case of fraudulent misstatements would be to remove rights which investors have at common law, even if the precise scope of those rights is unclear. However, this does not mean that I think that liability for misstatements to the capital markets should be freely and extensively imposed. There seem to me to be strong reasons for proceeding cautiously (but not good reasons for not proceeding at all). As indicated in

Exhibit 2
Page 478

Approved Judgment: Leech J            Various Claimants v Barclays Bank PLC FL 2020 000051

the DP (Introduction), it is important that any liability regime should not provide incentives for companies to become more cautious in their disclosures to the market. The compensation regime for investors should not be at the expense of a free flow of accurate, timely and helpful information to them from issuers. Rather, if possible, the liability regime should contribute to the incentives for accurate disclosure by issuers. Thus, I share the reservations expressed by a number of respondents about the possible disutility of increased securities litigation. I set out below a set of proposals, which build on the existing but partial statutory regime imposing liability on issuers for fraudulent misstatements and which, I believe, will meet the legitimate interests of investors but not hamper the flow of information to the market."

50.    Although a majority of respondents were against the proposal, Professor Davies recommended the introduction of liability for dishonest delay. He accepted that deliberate delay should not be sufficient to impose liability (because there might be good commercial reasons for delay in publication of financial information) but met this as follows:

"49. The need to define dishonesty appropriately is indeed a key requirement of this proposal. In my view the solution to this problem is to focus on the purpose of the delay and to impose civil liability only if the purpose (or predominant purpose) for the delay falls within the prohibited category. One could take an analogy from section 397 of FSMA, imposing criminal liability for dishonest concealment of material facts, whether in connection with a statement of not. Under that section, criminal liability is imposed only if the concealment is for the purpose of inducing someone to take or not to take a certain course of action (broadly to take or not take an investment decision). Translated into the context of this Report, there would be liability only if the person deliberately delayed publication for the purpose of inducing investors to acquire (or possibly dispose of) securities. More narrowly, the prohibited purpose could be defined as making a profit on the part of the defendant or inflicting a loss on the person who acquired the securities during the period of delay. In either case, delay in order to obtain the full facts of the situation or even delay in order to permit the company to deal more easily with the situation which had arisen, would not fall within the scope of the civil liability regime, though such delay might constitute a breach of the FSA's rules. On the other hand, delayed disclosure of bad news on the part of the issuer in order to enable the directors of the company to exercise their options and sell the shares at a more attractive price would fall within the civil liability regime, at least on the second of the two approaches to dishonesty."

51.    Professor Davies dealt with a wide range of issues and made a number of different recommendations in the Davies Review which go wider than the issues which I have to consider. I therefore set out only the first three questions and first three recommendations

Exhibit 2
Page 479

at the end of Davies 2:

> "**Question 1**:
>
> What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liability in the British context? Is fraud an appropriate basis for liability?
>
> *Recommendation*:  That fraud should be maintained as the basis of liability for the statutory regime and that the relaxation of the common law's requirements – whereby the claimant need only show that his own reliance on the misstatement was reasonable and not also that the issuer intended that he should rely on it – should continue as part of any extended statutory liability regime.
>
> **Question 2**:
>
> Should the statutory regime should be extended in principle to ad hoc statements?
>
> *Recommendation*:  Yes, the statutory regime should be extended to ad hoc statements.
>
> **Question 3**:
>
> Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?
>
> *Recommendation*:  That the statutory regime should encompass liability for dishonest delay in making RIS statements."

*(5)*    *The Treasury Consultation*

52.    In July 2008 HM Treasury began an extended consultation in relation to S.90A (the "**Treasury Consultation**"). It began by publishing a consultation paper ("**Treasury 1**") proposing to implement Professor Davies' recommendations and, in particular, to extend S.90A to "multi-lateral trading facilities" such as AIM and PLUS and ad hoc disclosures and also to permit recovery for dishonest delay. The Treasury also published draft regulations under S.90B to introduce a new Schedule 10A which would give effect to these proposals. They framed the policy issue in the introduction to Treasury 1:

> "The question of whether and how far companies (issuers of securities) should be liable in damages for inaccurate statements made to the market upon which investors rely to their detriment is an important one but the answer is not obvious. On the one hand, timely, comprehensive and complete reporting by companies is a crucial element to promote the allocative efficiency of capital markets. Appropriate incentives for such disclosure are thus important. Public enforcement through FSA investigation and sanctions and private litigation by investors have the

Exhibit 2
Page 480

potential to reinforce each other, providing effective incentives for prompt and accurate disclosures. On the other hand, private litigation to enforce investors' rights, particularly if there is uncertainty about the scope of liability, can operate perversely by encouraging speculative litigation and settlements by issuers based on a desire to terminate litigation rather than on the harm done to shareholders."

53. In Treasury 1, section 5 the authors stated that the Government agreed with Professor Davies' recommendation and proposed that the scope of disclosure to which the statutory regime applied should be extended to all information published by an issuer using a recognised information service, and also other information where its availability had been announced using such a service. They also proposed to accept the recommendation that S.90A should be extended to investors who sold securities but not to the holders of shares: see paragraph 7.7. The authors also addressed the question of information acquired from a secondary source:

> "5.16 A question arises as to liability where the information relied on is acquired from a secondary source (e.g., its republication in a news item), rather than directly from a recognised information service (the primary source). Under the statutory regime, liability will arise where the investor has relied on the relevant information, irrespective of its precise source. While the Government proposes to define the relevant information by reference to its primary source, this is simply the most convenient way of defining scope. It would be unfair to deny a remedy simply because the plaintiff could not show that the information was obtained directly from a recognised information service. Indeed it could impose an unnecessary evidential hurdle to valid claims. Accordingly, provided that an investor can prove that the information in question was published on a recognised information service, he will not have to prove that he obtained the information himself from the recognised information service.
>
> 5.17 The Government proposes that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service."

54. The authors of Treasury 1 considered the question whether to introduce liability for dishonest delay to be a finely balanced issue but agreed with Professor Davies' recommendation that the statutory regime should be extended in this way. They accepted that the more restrictive the definition of delay, the greater the certainty for issuers:

> "6.3 The Government recognises the concerns of issuers and their advisers about the risks involved in creating a liability for dishonest delay. Assessing the truth or falsity of a statement is a question of fact. Delay is

Exhibit 2
Page 481

qualitatively different to misstatement, in that it requires a greater element of judgement as to what delay may be permissible. Thus it is more difficult to infer honesty or dishonesty from the circumstances of any delay. This uncertainty could increase the vulnerability of issuers to litigation and increase defensive behaviour. The uncertainty is increased by the potentially wider scope and less predictable application of private law remedies, compared to the public law remedies available through the FSA tribunal process.

6.4 Equally, the Government understands investors' concern that dishonest delay in making disclosures can be just as effective as a direct misstatement in creating a false market and harming the interests of buyers and sellers of securities. Indeed, Davies noted that no one identified a principled (as opposed to a practical) reason why dishonest delay should not be the subject of civil litigation.

6.5 This is a finely balanced issue. The Government's view is that it is appropriate to create a liability for dishonest delay to reinforce the incentives for prompt disclosure, provided that the scope of liability can be precisely drawn to ensure that legitimate delay is not penalised and defensive behaviour on the part of issuers is not promoted.

6.6 The more restrictive the definition of delay that attracts liability, the greater the certainty for issuers and the greater the difficulty for investors in securing redress. Davies considered whether requiring that delay should be deliberate would be sufficient but concluded that it would provide too broad a scope for liability. The basis for delay must be more than intention, since most delays will be intentional and often for good reasons (to check the facts before publication, for example). Issuers would face great pressures in approaching any decision to delay release if it could be challenged afterwards on this basis. A requirement for recklessness would also be insufficient. There would be considerable uncertainty as to what delay would be considered to be "reckless" for these purposes, and though this might be a more difficult standard to meet, there would justifiable fear that some forms of negligent delay would be drawn into the net.

6.7 Hence, Davies has recommended that liability should only attach to dishonest delay. He further suggests that the definition of dishonesty should focus on the purpose of the delay, and that civil liability should only be imposed if the purpose, or the predominant purpose, fell within a prohibited category. Drawing on the test for criminal behaviour under section 397 of FSMA, he suggested that such a purpose could be inducing investors to acquire (or possibly dispose of) securities, or, more narrowly in his view, to enable a gain to be made or to inflict a loss on a person who acquired or sold the issuer's securities during the period of delay.

6.8 The Government agrees that such a test is appropriate. This would ensure liability in those cases where directors, for example, deliberately delayed disclosures in order to buy or sell securities on non-public information. It would ensure that some important cases where disclosure was deliberately delayed, for example, to give the board time to consider the implications of disclosure, to conclude contractual negotiations or to check the accuracy of a disclosure before publication, would not incur

Exhibit 2
Page 482

liability for dishonest delay."

55.     There were a number of differences between the draft Schedule 10A which the Treasury produced for the consultation and Schedule 10A in its final form. However, the principal difference between paragraphs 4 and 5 of the draft and Paragraphs 3 and 5 in their final form was that S.90A was ultimately extended to include liability not only to buyers and sellers of securities but also to holders. (Schedule 10A involved some re-ordering of the provisions in the draft which explains why paragraph 4 of the draft ultimately became Paragraph 3.)

56.     On 17 July 2008 Ms Kitty Ussher, the Economic Secretary to the Treasury, also published an impact assessment which accompanied Treasury 1. It stated that approximately 3,500 issuers of securities were affected by the proposals and it contained an analysis of the costs and benefits. Under the heading "Litigation Costs" it anticipated that any increase in costs would be small and for the following reasons:

> "However, clarifying the liability for misstatement, albeit subject to a demanding test of issuer fraud, is likely to increase the incidence of litigation in cases of fraudulent misstatement.  The increase is likely to be small.  But the potential costs of such cases are significant, even when settled before trial.  It is reasonable to envisage perhaps 2–3 cases over the next ten years, with costs in the region of £1-2 million for each side.  It is reasonable to expect that a similar number of cases would be settled before trial with costs of £0.25–0.5 million for each side. This gives a ten year cost range of £5–15 million, or an annual average transaction cost range of £0.5-£1.5 million. Note that the costs of damages or settlement are excluded from the IA. These are not a transaction cost, but a sanctioned transfer of wealth between parties, and as such do not represent an economic cost. The statutory regime has deliberately been shaped, principally by selecting a demanding fraud test for liability, to minimise the potential for speculative litigation and the corresponding pressure on issuers to settle in order to terminate litigation, rather than compensate for harm done to shareholders.   Accordingly, we do not anticipate incremental costs from speculative litigation."

57.     In March 2010 the Treasury published its response to the consultation ("**Treasury 2**"). The authors reported that the Government had made no change to most of the proposals although some of the wording in the draft regulations had been clarified. They stated in terms that they proposed "to make no change to the current basis of liability (i.e. fraud)". For present purposes, the most significant change to the proposals was to extend the statutory regime to holders as well as sellers of securities. The authors of Treasury 2

Exhibit 2
Page 483

justified the extension on the basis that all of the relevant investors would have to prove reliance:

> "5.7 The Government, having weighed up all the points of view carefully, has decided to extend the statutory regime to include holders of securities as well as sellers. The potential to have two divergent regimes, one for sellers and purchases but another for holders would not be conducive to investor and issuer certainty. Furthermore, there is very little principled reason for seeking to bring sellers within the regime but to leave holders out.
>
> 5.8 However, as the Regulations make clear, there must be reliance on information published by the issuer in deciding to continue holding securities. There is a clear difference between an active holder and a passive holder – the latter will not be entitled to bring an action as they would not be able to show reliance upon the statement in making their investment decision.
>
> 5.9 To be able to bring an action a claimant would, for example, have to demonstrate that as a result of reliance on a fraudulent misstatement he instructed his broker to cancel a sell order and instead retained the holding of securities. A holder of securities who continued to hold without giving the matter any thought would be considered to have held those securities passively and thus not able to demonstrate the necessary reliance on the information to bring a claim."

58.    The authors of Treasury 2 recorded that there had been a debate about "out of hours" disclosures which issuers of securities were required to make under the DTR if a recognised information service was closed but maintained the view that liability should be imposed for information derived from secondary sources:

> "**Source of information**
>
> 6.16 The Government proposed that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service.
>
> **Respondents' views**
>
> 6.17 There was majority support for this proposal – it was seen as a non-contentious issue.
>
> 6.18 Some respondents queried how the liability regime would apply when there was not verbatim reporting of primary material through a secondary source.
>
> **The Government's response**
>
> 6.19 The Government remains of this view and therefore liability will attach to statements put out on a recognised information service, even if a claimant does not obtain the information directly from the recognised

Exhibit 2
Page 484

information service.

6.20 The rationale for liability arising even where an investor relies on information acquired from a secondary source was it was felt to not do so would impose too high an evidential burden on valid claims. Any statement put out through a recognised information service will be within the scope of the liability regime if that statement contains a fraudulent misstatement."

59.    Finally, the authors recorded that there were a range of views in relation to the extension of liability for dishonest delay including a concern that the Court would apply a civil test of dishonesty rather than the criminal test (as it was then understood). They also recorded that the Government's response was as follows:

"7.11 The Government acknowledges that the argument that liability for dishonest delay should only attach to statements that are required to be made has some merit in terms of reducing the risk of opportunistic litigation. However, in order to be successful a claimant would have to demonstrate that a particular statement should have been made at a previous point in time and in fact wasn't, and the act of so doing, was as a result of dishonest behaviour intended to enable a gain to be made or to cause loss to another or expose another to the risk of loss. This is a very high evidential hurdle that claimants will have to satisfy and thus reduces the possibility of opportunistic litigation."

"7.13 The Government acknowledges that there is a risk that the courts would adopt the civil, as opposed to criminal, test for dishonesty. Therefore to prevent this, the Regulations expressly define dishonesty using the criminal test so that a person will be "dishonest" in respect of a delay where that person's conduct would be regarded as dishonest by those who regularly trade in the markets in question, and, in addition, the person concerned was aware that their conduct would be regarded as dishonest."

60.    In October 2009 and between Treasury 1 and Treasury 2, Professor Eilis Ferran of Cambridge University published an article in the Journal of Corporate Law Studies discussing the Treasury proposals and called "Are US style investor suits coming to the UK?": see (2009) 9 JCLS 315. She pointed out that to establish misrepresentation at common law it is sufficient that a misstatement was an inducement to enter into a transaction and not the sole cause. She also pointed out that an inference of reliance may in certain circumstances be drawn from the facts. She continued as follows:

"An inference drawn from the facts is to be distinguished from a legal presumption of reliance. The classic "fraud on the market" theory developed in US securities law, which affords investors trading in efficient markets a rebuttable legal presumption of reliance, has not been adopted

Exhibit 2
Page 485

in section 90A/schedule 10A. However, the thinking that underlies the fraud on market theory, which is that in an informationally efficient capital market the price of securities reflects all publicly available information, could potentially be of some relevance so far as the UK remedy is concerned because it is possible that it could influence determinations on the facts as to reliance/materiality. In many cases it should be relatively straightforward for an investor to show on the facts that the pre-trade price of the securities was material to its investment decisions, on the basis that the price served as a reference point for its trading strategy. From there, arguably it is not a large step to seek to use the efficient capital markets hypothesis to form the basis of an argument that (inferred) reliance on market prices was tantamount to (inferred) reliance on the information itself. If that argument were to succeed, the claimant could have done enough to transfer the burden of proof to the defendant.

This would be a novel argument so far as the English courts are concerned and the likely judicial reaction is hard to predict. Looking to jurisprudence elsewhere in the common law world, *Mondor v Fisherman*, a decision of the Ontario Superior Court of Justice, suggests that there may be some life in an argument based on inferred reliance. However, this was merely a preliminary ruling in which the court refused to strike out a class action by secondary market purchasers and it could be unwise therefore to attach too much significance to it. The counterview—that the inferred reliance argument is really fraud on the market by the back door and, as such, it would be inconsistent with the legislative intent to apply it in the context of section 90A/schedule 10A seems likely to carry considerable weight. Furthermore, in view of developments in financial economics that have undermined the once seemingly unassailable position of the efficient capital markets hypothesis as an accurate explanation of how capital markets actually work, any attempt to use that hypothesis in the interpretation of the section 90A/schedule 10A remedy would certainly merit a cautious reception from the judiciary."

*(6)    Schedule 10A*

61.    On 1 October 2010 the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010 substituted a new S.90A for the provision which I have set out above. It provided for Schedule 10A to make provision for the liability of issuers of securities to pay compensation to persons suffering loss as a result of a misleading statement, dishonest omission or a dishonest delay in publishing information. In its current form Schedule 10A provides as follows:

"1.(1) This Schedule applies to securities that are, with the consent of the issuer, admitted to trading on a securities market, where— (a) the market is situated or operating in the United Kingdom, or (b) the United Kingdom is the issuer's home State.

(2) For the purposes of this Schedule— (a) an issuer of securities is not

Exhibit 2
Page 486

taken to have consented to the securities being admitted to trading on a securities market by reason only of having consented to their admission to trading on another market as a result of which they are admitted to trading on the first-mentioned market; (b) an issuer who has accepted responsibility (to any extent) for any document prepared for the purposes of the admission of the securities to trading on a securities market (such as a prospectus or listing particulars) is taken to have consented to their admission to trading on that market.

(3) For the purposes of this Schedule the United Kingdom is the home State of an issuer if— (a) the transparency rules impose requirements on the issuer in relation to the securities, or (b) the issuer has its registered office (or, if it does not have a registered office, its head office) in the United Kingdom.

2.(1) This Schedule applies to information published by the issuer of securities to which this Schedule applies— (a) by recognised means, or (b) by other means where the availability of the information has been announced by the issuer by recognised means.

(2) It is immaterial whether the information is required to be published (by recognised means or otherwise).

(3) The following are "recognised means"— (a) a recognised information service; (b) other means required or authorised to be used to communicate information to the market in question, or to the public, when a recognised information service is unavailable.

(4) A "recognised information service"  means— (a) in relation to a securities market situated or operating in the United Kingdom, a service used for the dissemination of information in accordance with transparency rules; (b) in relation to a securities market situated or operating outside the United Kingdom, a service used for the dissemination of information corresponding to that required to be disclosed under transparency rules; or (c) in relation to any securities market, any other service used by issuers of securities for the dissemination of information required to be disclosed by the rules of the market.

3. (1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who— (a) acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and (b) suffers loss in respect of the securities as a result of— (i) any untrue or misleading statement in that published information, or (ii) the omission from that published information of any matter required to be included in it.

(2) The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

(3) The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

Exhibit 2
Page 487

(4) A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities— (a) in reliance on the information in question, and (b) at a time when, and in circumstances in which, it was reasonable for him to rely on it.

4. An issuer of securities to which this Schedule applies is not liable under paragraph 3 to pay compensation to a person for loss suffered as a result of an untrue or misleading statement in, or omission from, published information to which this Schedule applies if— (a) the published information is contained in listing particulars or a prospectus (or supplementary listing particulars or a supplementary prospectus), and (b) the issuer is liable under section 90 (compensation for statements in listing particulars or prospectus) to pay compensation to the person in respect of the statement or omission.

5.(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who— (a) acquires, continues to hold or disposes of the securities, and (b) suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies. (2) The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.

6. For the purposes of paragraphs 3(3) and 5(2) a person's conduct is regarded as dishonest if (and only if)— (a) it is regarded as dishonest by persons who regularly trade on the securities market in question, and (b) the person was aware (or must be taken to have been aware) that it was so regarded.

7. (1) The issuer is not subject— (a) to any liability other than that provided for by paragraph 3 in respect of loss suffered as a result of reliance by any person on— (i) an untrue or misleading statement in published information to which this Schedule applies, or (ii) the omission from any such published information of any matter required to be included in it; (b) to any liability other than that provided for by paragraph 5 in respect of loss suffered as a result of delay in the publication of information to which this Schedule applies.

(2) A person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(3) This paragraph does not affect— (a) civil liability— (i) under section 90 (compensation for statements in listing particulars or prospectus), (ii) under rules made by virtue of section 954 of the Companies Act 2006 (compensation), (iii) for breach of contract, (iv) under the Misrepresentation Act 1967, or (v) arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned; (b) liability to a civil penalty; or (c) criminal liability.

(4) This paragraph does not affect the powers conferred by sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution).

Exhibit 2
Page 488

8.(1) In this Schedule— (a) "securities" means transferable securities as defined in Article 2(1)(24) of the markets in financial instruments regulation, other than money market instruments as defined in Article 2(1)(25A) of that regulation that have a maturity of less than 12 months (and includes instruments outside the United Kingdom); (b) "securities market" means— (i) a regulated market as defined in Article 2(1)(13) of the markets in financial instruments regulation, or (ii) a multilateral trading facility as defined in Article 2(1)(14) of that regulation.

(2) References in this Schedule to the issuer of securities are— (a) in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading as mentioned in paragraph 1(1), to the issuer of the securities represented; (b) in any other case, to the person who issued the securities.

(3) References in this Schedule to the acquisition or disposal of securities include— (a) acquisition or disposal of any interest in securities, or (b) contracting to acquire or dispose of securities or of any interest in securities, except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.

(4) References to continuing to hold securities have a corresponding meaning.

(5) For the purposes of this Schedule the following are persons discharging managerial responsibilities" within an issuer— (a) any director of the issuer (or person occupying the position of director, by whatever name called); (b) in the case of an issuer whose affairs are managed by its members, any member of the issuer; (c) in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication.

(6) The following definitions (which apply generally for the purposes of Part 6 of this Act) do not apply for the purposes of this Schedule: (a) section 102A(1), (2) and (6) (meaning of "securities" and "issuer")."

62.    In *Bennion, Bailey and Norbury on Statutory Interpretation* 8th ed (2020) the editors state that where an Act uses a concept that has an established legal meaning it will generally be interpreted as having the same meaning: see section 25.2 (p.829). They also state as follows at p.830 under the heading "Incorporation by reliance on similar concepts":

"An Act sometimes uses language which describes a concept in terms that are similar but not identical to an existing legal concept. The question then is whether the legislative intention was to incorporate or attract the common law rules, wholly or in part, or to start afresh. External aids to construction may help to shed light on the legislative intent.

EXAMPLE

Exhibit 2
Page 489

In *Milne v Express Newspapers Ltd* the Court of Appeal held that the words 'had reason to believe' in the Defamation Act 1996, s 4(3), imported the legal concept of recklessness as discussed in earlier case law. In doing so they relied on the fact that this interpretation was consistent with recommendations made in the report of the Supreme Court Procedure Committee on Practice and Procedure in Defamation (the Neil committee, 1991), which the Act implemented.

EXAMPLE

In *Jones v Tower Boot Co Ltd* the question was whether the words 'in the course of his employment' in the Race Relations Act 1976, s 32(1), incorporated the common law rules relating to vicarious liability. The claimant had been subjected to racial abuse by two fellow employees. The employer denied liability on the basis that it was only responsible under s 32 for things done by an employee 'in the course of his employment' and, drawing on the common law doctrine of vicarious liability, this excluded the acts complained of. It was held that, having regard to the purpose of the Act, the words were to be given their natural everyday meaning and not to be construed restrictively by reference to the principles governing vicarious liability at common law.

EXAMPLE

The Suicide Act 1961, s 1, abolishes the crime of suicide. Section 2(1) as originally enacted went on to state that a person who 'aids, abets, counsels or procures' the actual or attempted suicide of another commits an offence. Despite using the normal language of secondary liability, the aided party commits no crime so the defendant must in fact commit the offence as a principal rather than a secondary party. It is unclear whether the wording was intended, impliedly, to bring in the usual ancillary rules governing aiding, abetting etc (for example as to the need for and nature of mens rea)."

63.    One of the issues which I have to decide is whether the legislative intention was to incorporate the common law concept of reliance or whether Parliament intended to "start afresh". I also have to decide how much weight to attach to the Davies Review and the Treasury Consultation. Lord Hodge DPSC gave guidance in relation to that issue in *R(O) v Secretary of State for the Home Department* [2022] UKSC 3, [2023] AC 255 at [30]:

"External aids to interpretation therefore must play a secondary role. Explanatory Notes, prepared under the authority of Parliament, may cast light on the meaning of particular statutory provisions. Other sources, such as Law Commission reports, reports of Royal Commissions and advisory committees, and Government White Papers may disclose the background to a statute and assist the court to identify not only the mischief which it addresses but also the purpose of the legislation, thereby assisting a purposive interpretation of a particular statutory provision. The context disclosed by such materials is relevant to assist the court to ascertain the meaning of the statute, whether or not there is ambiguity and uncertainty,

Exhibit 2
Page 490

and indeed may reveal ambiguity or uncertainty: Bennion, Bailey and Norbury on Statutory Interpretation, 8th ed (2020), para 11.2. But none of these external aids displace the meanings conveyed by the words of a statute that, after consideration of that context, are clear and unambiguous and which do not produce absurdity."

E.    Reliance

*(1)    A textbook definition*

64.    I turn next, therefore, to reliance in the law of deceit. Ms Davies relied upon Cartwright Misrepresentation, Mistake and Non-Disclosure 6th ed (2019) for a textbook definition or description of reliance in the law of misrepresentation. Professor Cartwright described what we mean by reliance in this context at 3—54:

> ""**Reliance" as the core requirement** It is often misleading to talk in terms of a statement having caused loss; at least, a statement "causes" loss in a different way from an act. A badly built wall may fall over and injure a passer-by. It is not difficult to see that the defective workmanship caused the injury. But if I advise you that a wall is safe, and you walk past it and it falls over, your injury is "caused" in a different way: you took my words, trusted them and yourself took an action which put you in a position in which you suffered damage. A statement affects the decision-making processes of the person who reads or hears it, and that person then takes his own action in the light of the statement. For many of the remedies, therefore, rather than using the language of "causation", it is more usual to speak of the representee's reliance on the statement; by "reliance" we are focusing on this causal link between the statement and the representee's own actions which then gave rise to the harm of which he complains, whether it is entering into the contract or doing some other act which resulted in his suffering loss."

65.    Professor Cartwright distinguished between actual reliance and reasonable reliance (e.g. in the tort of negligence) and also between materiality and reliance. He pointed out that materiality is neither necessary nor sufficient to establish liability. Materiality may establish an inference that the representee relied upon the representation but the strength of that inference will depend on the context and may transfer the burden to the representor of adducing evidence to rebut the inference: see 3—55 and 3—56. But he also stated that the presumption of reliance or inducement cannot "trump" the requirement that the representee was aware of the statement (citing *Leeds City Council v Barclays Bank plc* below): see footnote 267. He then continued at 3—57:

Exhibit 2
Page 491

"**The difficulty of proving reliance; multiple causes** The courts' willingness to infer reliance from the materiality of a statement is a consequence of the difficulty faced by a representee in proving why he entered into a contract. "It is impossible so to analyse the operations of the human mind as to be able to say how far any particular representation may have led to the formation of any particular resolution, or the adoption of any particular line of conduct. No one can do this with certainty, even as to himself, still less as to another." Using as the paradigm case the pre-contractual misrepresentation, the starting-point is clear: look for evidence that the statement caused the representee to enter into the contract—or, at least, was one of the causes. The decision to enter into a contract is generally based on a range of motives and as long as any one of those motives is vitiated by the misinformation given by the other party, it is enough to undermine the whole transaction: the misrepresentation need not be the sole cause of the representee's decision to enter into the contract."

*(2)    The prospectus cases*

66.    Ms Davies also relied on three well-known 19th century cases which made a major contribution to the development of the law of deceit. As it happens, all three involved claims by investors that statements in a prospectus were untrue and were decided in the decade immediately preceding *Derry v Peek* (1889) 14 App Cas 337 and the enactment of the Directors Liability Act 1890. In *Arkwright v Newbold* (1881) 17 Ch D 301 the plaintiff alleged that the promoters of a company had falsely represented in the prospectus that they agreed to pay £32,500 and that this was untrue because the true price was £28,500 and the balance had been misappropriated by the directors personally. Fry J held that the claim was made out but the Court of Appeal overruled his decision on the basis that although there had been misconduct by the directors, the prospectus did not contain a false representation. Cotton LJ also considered that there was no evidence that the claimant had been deceived. He stated this at 324-5:

"I have dealt with that point in order to shew that, in my opinion, there is no ground for reliance on that part of the prospectus as maintaining this action; but I ought to add that in an action of deceit the Plaintiff cannot establish a title to relief simply by shewing that the Defendants have made a fraudulent statement: he must also shew that he was deceived by the statement, and acted upon it to his prejudice. But in this case, although the Plaintiff knew from the defence how the Defendants put their case, and probably knew it from what had taken place previously, he does not in his pleading allege that, even according to the Defendant's own case, the statement of the prospectus as to the remuneration of the directors was false. I should be reluctant to decide the case on the ground of pleading, but the Plaintiff does not carry the case further in his evidence. All he says

Exhibit 2
Page 492

is this: "I saw that there was no promotion money to be paid, and I saw Mr. Grimes' name, whom I knew as a retired paper-maker, and I thought he would know if it was a profitable concern." Therefore he does not allege that he relied on the prospectus as saying, "The directors shall get nothing from anybody except what they get from the shareholders, and that shall be a commission only on the profits." In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement, according to the construction put on it by the Court, is false, when the plaintiff does not venture to swear that he understood the statement in the sense which the Court puts on it. If he did not, then, even if that construction may have been falsified by the facts, he was not deceived."

67.    In *Smith v Chadwick* (1884) 9 App Cas the House of Lords held that a statement in a prospectus was ambiguous and capable of two interpretations and that the plaintiff had failed to prove that he had understood the words in the sense in which they were false. In *Crossley v Volkswagen AG* [2021] EWHC 3444 (QB), [2023] 1 All ER (Comm) 107, a case which I will have to consider in greater detail below, Waksman J provided the following summary of the decision at [51] to [57] (which I gratefully adopt):

> "51. *Smith v Chadwick* (1884) 9 App Cas 187, [1881–5] All ER Rep 242 was a decision of the House of Lords. The claimant alleged that he had been induced to buy shares by a statement contained in the defendant's Prospectus which stated that: '… the present value of the turnover or output of the entire works is over £1,000,000 sterling per annum.'
>
> 52. That statement admitted of two interpretations. It could have meant that the actual turnover for the year exceeded £1m in which case it was plainly false. Or it could have meant that the works were capable of producing that output, in which case it was true.
>
> 53. Prior to trial, the claimant was served with interrogatories asking him to say what his understanding of the words was. Somewhat unhelpfully, he said that he understood the words to mean 'that which they obviously convey' and added that he could not express in any other words what he understood to be their meaning. At trial, the claimant was neither examined nor cross-examined about his understanding. He succeeded at first instance and recovered £5,000 damages for fraudulent misrepresentation. The Court of Appeal reversed that judgment and dismissed the action.
>
> 54. In the House of Lords, Lord Bramwell upheld the decision of the Court of Appeal, even though he thought that the representation could only mean a reference to actual output and was therefore false. However, he was not satisfied that the statement had been made fraudulently.
>
> 55. The lead judgment, with which the Earl of Selborne LC and Lord Watson agreed, was given by Lord Blackburn. He stated ((1884) 9 App Cas 187 at 195, [1881–5] All ER Rep 242 at 246) that whatever the statement meant, the claimant had not sufficiently proved that it did

Exhibit 2
Page 493

influence him. Later, he said that the claimant must prove damage and if he did not act upon the representations he showed no damage. He went on to refer to the fact that it was not always necessary to call the claimant as a witness to prove that he acted upon the inducement. If it could be proved that the defendant, with a view to inducing a person to enter the contract, had made a statement to the representee which was such as would be likely to induce a person to enter into a contract and it was proved that the claimant did enter into the contract, it was a fair inference of fact that he was induced to do so by the statement.

56. Lord Blackburn thought that the words used here could plausibly have had the sense contended for by the defendant (and indeed Cotton LJ in the Court of Appeal thought they bore that meaning). However, he went on to say that he could not see why the claimant did not give evidence as to whether he understood the words to mean what his case alleged, rather than as the defendant alleged. He thought that the claimant's own counsel did not wish to examine him in case he gave the wrong answer and vice-versa for the defendant's counsel wishing not to cross-examine him. But the burden was on the claimant to show that he had been induced by the representation to buy the shares.

57. Here, the point was not that the claimant had not seen the words in question. It was rather that they bore two possible meanings and he had put forward no positive evidence to establish the sense in which he understood them, which was critical to the question of reliance. Accordingly, awareness as such was not the key issue but rather it was his understanding. That said, I take the point made by VW here that it is hard to see how the relevant understanding (whatever it was) did not involve awareness of the words in question."

68.   Because of the nature of the argument in the present case, it is necessary to analyse *Smith v Chadwick* in a little more detail. At first instance, Fry J held that the prospectus contained a number of false statements and that they led the plaintiff to subscribe for shares. The Court of Appeal allowed the appeal see (1882) 20 Ch D 27. Sir George Jessel MR held that Fry J had made a number of errors in his judgment and that the turnover statement was ambiguous and not untrue: see 63. He described the prospectus at 67 as in some respects careless but a fair, honest and bona fide attempt to state the truth. In the early part of his judgment he articulated the following test at 44:

"Again, on the question of the materiality of the statement, if the Court sees on the face of it that it is of such a nature as would induce a person to enter into the contract, or would tend to induce him to do so, or that it would be a part of the inducement, to enter into the contract, the inference is, if he entered into the contract, that he acted on the inducement so held out, and you want no evidence that he did so act; but even then you may shew that in fact he did not so act in one of two ways, either by shewing that he knew the truth before he #:tered into the contract, and therefore,

Exhibit 2
Page 494

could not rely on the mis-statements; or else by shewing that he avowedly did not rely upon them, whether he knew the facts or not. He may by contract have bound himself not to rely upon them, that is to take the matter at his own risk whether they were true or false (which was the conclusion to which the House of Lords came in the recent case of *Brownlie v. Campbell*, or he may state that he did not rely upon them in the witness-box, which I think is so in one instance here. But unless it is shewn in one way or the other that he did not rely on the statement the inference follows."

69.    Sir George Jessel found that this test was not satisfied and that even if the statement bore the meaning found by Fry J it was not a material inducement: see 66. Cotton LJ disagreed with him on the question whether the statement in the prospectus was untrue but he concurred in the result. He stated (at 68) that it must be shown that: "the Plaintiff was deceived, and induced by the deceit that was practised upon him to do something to his prejudice, in respect of which prejudice he claims damages." He then stated his conclusion at 74-5:

> "Now, under these circumstances, in my opinion, even although the construction may be that which Mr. Justice Fry put upon it; yet how can we come to the conclusion in that state of the evidence that the Plaintiff was induced to act to his prejudice by any false statements made by the Defendants in that respect? Of course it may be that where there is a positive statement in clear terms, it is unnecessary for a man to come forward and say how he understood it; where there is a precise statement of a fact about which statement there can be no mistake, then, if that is shewn to be false, it may be assumed that the Plaintiff understood it in the meaning which alone it can have; but here where there is a statement at least of doubtful interpretation, I adhere to what I said in *Arkwright v. Newbold*, that the Plaintiff, coming as he does here, cannot call upon the Court to grant him relief, even if the statement is shewn to be incorrect, and made by the Defendants under such circumstances as to render them subject to liability in consequence of the misstatement so made. Those I think are all the grounds on which the Plaintiff here relies for relief. In my opinion he has not established that there were statements incorrect in fact made by the Defendants by which he was induced to act to his prejudice; or if there is any statement which is incorrect that it was made by the Defendants knowingly or recklessly so as to render them liable."

70.    Lindley LJ also found that the turnover statement in the prospectus was ambiguous. But he also held that the plaintiff had not been induced to acquire shares in reliance on any of the statements in the prospectus. He set out his conclusion at 80:

> "Now I come to the last question, whether the Plaintiff has proved that he took his shares in this company on the faith of any of the statements in the

Exhibit 2
Page 495

prospectus which are alleged to be untrue. I have read his evidence with the greatest possible care, and I cannot come to that conclusion as a matter of fact. The conclusion at which I have arrived, after carefully studying his evidence, is that he knew something about Messrs. Hannay —I think nothing very much—but he knew them to be an old-established firm; he knew something in the same way of Messrs. Chadwick; he had confidence in them that they would not pass off rubbish or be guilty of issuing a fraudulent prospectus; and his knowledge of the two firms induced him to take the shares, but there was no particular expression in the prospectus which he relied on. He relied on the prospectus as a whole; and as a whole I have not the slightest hesitation in saying I think it is an honest prospectus. We have prospectuses varying in point of fraud in every conceivable degree; many of them are tissues of lies from beginning to end. Here is an extreme case in the other direction. I believe it is a thoroughly honest prospectus; and but for one single awkward expression it appears to me the Plaintiff would have no ground of complaint whatever."

71.  The House of Lords upheld the decision. Lord Blackburn gave the principal speech and the Earl of Selborne LC and Lord Watson both agreed with him (as Waksman J pointed out in *Crossley*). It is clear from his speech that he considered it necessary for the plaintiff to prove that the relevant representation had influenced him to act and that he had acted upon it. He stated this at 195-196:

> "I have come to the conclusion that whatever be the meaning of that statement the plaintiff has not sufficiently proved that it did influence him. I do not say that there is no evidence on which a verdict for the plaintiff might be found. I certainly think that, if trying this cause with a jury, I should not be justified in withdrawing it from the jury. I do not even say that a verdict for the plaintiff if found by a jury would be so unsatisfactory that there should be a new trial. But I should have accompanied my direction to the jury with the same observations which I shall hereafter submit to your Lordships as justifying the conclusion to which the Court of Appeal have come and to which I myself come, and to which I ask your Lordships to come; and I think that the jury would, on hearing them, have probably found for the defendants.

> Before going further I wish to make some observations; for though I very nearly agree in what is said by the late Master of the Rolls, he does not quite state what I conceive to be the law. I do not mean to go through the numerous decisions on the subject of an action of deceit. All those which were decided before the date of the last edition of Smith's Leading Cases are to be found collected in the notes to *Chandelor v Lopus* and *Pasley v Freeman*. In *Pasley v Freeman* (3) Buller J. says: "The foundation of this action is fraud and deceit in the defendant and damage to the plaintiffs. And the question is whether an action thus founded can be sustained in a court of law. Fraud without damage, or damage without fraud, gives no cause of action, but where these two concur an action lies, per Croke J."

Exhibit 2
Page 496

Whatever difficulties there may be as to defining what is fraud and deceit, I think no one will venture to dispute that the plaintiff cannot recover unless he proves damage. In an ordinary action of deceit the plaintiff alleges that false and fraudulent representations were made by the defendant to the plaintiff in order to induce him, the plaintiff, to act upon them. I think that if he did act upon these representations, he shews damage; if he did not, he shews none. And I think the plaintiff in such a case must not only allege but prove this damage. It is as to what is sufficient proof of this damage that I wish to make my remarks. I do not think it is necessary, in order to prove this, that the plaintiff always should be called as a witness to swear that he acted upon the inducement. At the time when *Pasley v Freeman* was decided, and for many years afterwards, he could not be so called. I think that if it is proved that the defendants with a view to induce the plaintiff to enter into a contract made a statement to the plaintiff of such a nature as would be likely to induce a person to enter into a contract, and it is proved that the plaintiff did enter into the contract, it is a fair inference of fact that he was induced to do so by the statement. In *Redgrave v Hurd*[1] the late Master of the Rolls is reported to have said it was an inference of law. If he really meant this he retracts it in his observations in the present case. I think it not possible to maintain that it is an inference of law. Its weight as evidence must greatly depend upon the degree to which the action of the plaintiff was likely, and on the absence of all other grounds on which the plaintiff might act. I quite agree that being a fair inference of fact it forms evidence proper to be left to a jury as proof that he was so induced. But I do not think that it would be a proper direction to tell a jury that if convinced that there was such a material representation they ought to find that the plaintiff was induced by it, unless one of the things which the late Master of the Rolls specified was proved; nor do I think he meant to say so. I think there are a great many other things which might make it a fair question for the jury whether the evidence on which they might draw the inference was of such weight that they would draw the inference. And whenever that is a matter of doubt I think the tribunal which has to decide the fact should remember that now, and for some years past, the plaintiff can be called as a witness on his own behalf, and that if he is not so called, or being so called does not swear that he was induced, it adds much weight to the doubts that the inference was a true one. I do not say it is conclusive."

72.   In *Edgington v Fitzmaurice* (1889) 29 Ch D 459 the directors of a company issued a prospectus inviting shareholders to subscribe for debentures. They stated in the prospectus that the purpose of the issue was to enable the company to carry out alterations to their premises, to buy horses and vans and to develop a supply of cheap fish. In

---

[1] *Redgrave v Hurd* was decided the previous year but is reported in the law reports immediately before the decision of the Court of Appeal in *Smith v Chadwick*: see (1881) 20 Ch D 1. The passage to which Lord Blackburn was referring (above) is on p.21 of the law report in which Sir George Jessel MR stated the presumption of inducement was "an inference of law" which could be rebutted by proof that the claimant knew the truth or clear evidence that he or she did not rely on the representation.

Exhibit 2
Page 497

substance, these statements gave the impression that the company was looking to expand rather than being in dire financial trouble. The plaintiff subscribed for £1,500 mistakenly believing that the debentures would be secured by a mortgage over the company's property and that a second charge would be paid off. Denman J held that the statements in the prospectus were false and gave judgment for the plaintiff.

73.    The Court of Appeal dismissed the appeal on the basis that the statements of intention were actionable and that the plaintiff had relied on them. On appeal the defendant's counsel, Mr Horace Davey QC (later Lord Davey), squarely argued that the plaintiff had not been misled by the statements of purpose in the prospectus because he gave evidence that he was induced to subscribe for debentures in the belief that he would have a charge on the company's property and now admitted that this was a mistake: see 477. Cotton LJ dealt with this argument at 480-1:

> "But it was urged by the counsel for the Appellants that the Plaintiff himself stated that he would not have taken the debentures unless he had thought they were a charge upon the property, and that it was this mistaken notion which really induced the Plaintiff to advance his money. In my opinion this argument does not assist the Defendants if the Plaintiff really acted on the statement in the prospectus. It is true that if he had not supposed he would have a charge he would not have taken the debentures; but if he also relied on the misstatement in the prospectus, his loss none the less resulted from that misstatement. It is not necessary to shew that the misstatement was the sole cause of his acting as he did. If he acted on that misstatement, though he was also influenced by an erroneous supposition, the Defendants will be still liable. Did he act upon that misstatement? He states distinctly in his evidence that he did rely on the Defendants' statements, and the learned Judge found, as a fact, that he did, and it would be wrong for this Court, without seeing or hearing the witness, to reverse that finding of the Judge. We must therefore come to the conclusion that the statements in the prospectus as to the objects of the issue of the debentures were false in fact, and were relied upon by the Plaintiff."

74.    Bowen LJ agreed with Cotton LJ that the statements had been made fraudulently and that the plaintiff had relied upon them. He began his judgment by identifying the ingredients of the tort of deceit at 481-2:

> "This is an action for deceit, in which the Plaintiff complains that he was induced to take certain debentures by the misrepresentations of the Defendants, and that he sustained damage thereby. The loss which the Plaintiff sustained is not disputed. In order to sustain his action he must first prove that there was a statement as to facts which was false; and

Exhibit 2
Page 498

secondly, that it was false to the knowledge of the Defendants, or that they made it not caring whether it was true or false. For it is immaterial whether they made the statement knowing it to be untrue, or recklessly, without caring whether it was true or not, because to make a statement recklessly for the purpose of influencing another person is dishonest. It is also clear that it is wholly immaterial with what object the lie is told. That is laid down in Lord Blackburn's judgment in *Smith v. Chadwick*, but it is material that the defendant should intend that it should be relied on by the person to whom he makes it. But, lastly, when you have proved that the statement was false, you must further shew that the plaintiff has acted upon it and has sustained damage by so doing: you must shew that the statement was either the sole cause of the plaintiff's act, or materially contributed to his so acting."

75.     After making the famous observation that "the state of a man's mind is as much a fact as the state of his digestion" he dealt with the argument that the plaintiff did not rely on the statement in the prospectus because he only subscribed for the issue in the belief that the debt would be secured on the company's property (at 483-4):

> "Then the question remains - Did this misstatement contribute to induce the Plaintiff to advance his money. Mr Davey's argument has not convinced me that they did not. He contended that the Plaintiff admits that he would not have taken the debentures unless he had thought they would give him a charge on the property, and therefore he was induced to take them by his own mistake, and the misstatement in the circular was not material. But such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference. It resolves itself into a mere question of fact."

76.     Finally, Fry LJ (who had tried both *Arkwright v Newbold* and *Smith v Chadwick* at first instance) upheld the judge's decision that the plaintiff had relied on the false statements in the prospectus. He stated as follows at 484-5:

> "The next inquiry is whether this statement materially affected the conduct of the Plaintiff in advancing his money. He has sworn that it did, and the learned Judge who tried the action has believed him. On such a point I should not like to differ from the Judge who tried the action, even though I were not myself convinced, but in this case the natural inference from the facts is in accordance with the Judge's conclusion. The prospectus was intended to influence the mind of the reader. Then this question has been raised: the Plaintiff admits that he was induced to make the advance not merely by this false statement, but by the belief that the debentures would

Exhibit 2
Page 499

give him a charge on the company's property, and it is admitted that this was a mistake of the Plaintiff. Therefore it is said that the Plaintiff was the author of his own injury. It is quite true that the Plaintiff was influenced by his own mistake, but that does not benefit the Defendants' case. The Plaintiff says: I had two inducements, one my own mistake, the other the false statement of the Defendants. The two together induced me to advance the money. But in my opinion if the false statement of fact actually influenced the Plaintiff, the Defendants are liable, even though the Plaintiff may have been also influenced by other motives. I think, therefore, the Defendants must be held liable. The appeal must therefore be dismissed."

77.    These authorities have been consistently applied in a modern context. For example, in *Marme Inversiones 2007 SL v NatWest Markets plc* [2019] EWHC 366 (Comm) Picken J cited the passages in Cartwright (above) and *Arkwright v Newbold* and traced their modern application at [281] to [286]. Indeed, he cited both *Arkwright v Newbold* and *Smith v Chadwick* at [285]:

> "As Mr Howe QC observed, this passage was cited with approval by Asplin J in another express representation case, *Bonham-Carter v SITU* [2012] EWHC 3589 (Ch), at [131], as supporting the proposition that "the representee must establish that he subjectively interpreted the representation in the sense in which the court has found it to be false". It was also, previously, cited by Rix LJ in *The Kriti Palm* [2007] 2 CLC 223 at [253] and, again, at [278] when dealing with the absence of evidence from a Mr Whitaker as to what his understanding was in relation to a particular conversation where the representation was said to have been made (see [274]). It was, indeed, the absence of similar evidence in a claim for misrepresentation where the critical words in a company prospectus ("the present value of the turnover or output of the entire works") were ambiguous which led the House of Lords in *Smith  v Chadwick* (1884) 9 App Cas 187 (Lord Bramwell dissenting on this point on the facts) to decide that the claim could not succeed. In that case, the claimant gave evidence merely that he understood the words to mean "that which the words obviously conveyed" without explaining the meaning he understood them to convey."

*(3)    The implied representation cases*

78.    In *Edgington v Fitzmaurice* the directors were found to have lied about the purpose for which they needed to raise capital. By contrast, *Marme* was a case in which the defendants were alleged to have made implied representations. Financial institutions may make factual statements about their operations or their systems and controls which are alleged by borrowers or investors to carry a degree of assurance about their integrity or that their officers and employees have conducted themselves honestly. The borrowers or

Exhibit 2
Page 500

investors may contend that factual statements were obviously designed or intended to reassure them but may be unable to persuade the Court that the individual decision-maker actively considered this issue or was consciously re-assured by the context in which the express statements were made. Further, the more detailed or complex the implied representations are said to be, the more difficult it is to prove that a decision-maker relied on them and the harder it is to resist the conclusion that they are no more than a lawyer's construct.

79.   In *Marme*, for example, a borrower alleged that a number of banks had impliedly represented that they and other banks had not manipulated EURIBOR rates and had acted honestly in relation to setting those rates. Picken J held that the relevant representations had not been made. But he also held that reliance had not been established because the decision-maker did not understand that any of the implied representations had been made to him and that those representations (or something approximating to them) were not and could not be "actively present to his mind": see [288].

80.   In *Property Alliance Group Ltd v The Royal Bank of Scotland plc* [2016] EWHC 3342 (Ch) Asplin J (as she then was) held that a term was to be implied into the relevant swaps contracts that the parties would conduct themselves honestly when performing the contract. But she dismissed the claim on the basis that the banks had not made the specific representations alleged and the borrower had not relied on them. The Court of Appeal disagreed with the judge about the scope of the representations but affirmed her decision on reliance: see [2018] EWCA Civ 355, [2018] 1 WLR 3529.

81.   A third case in which the Court had to consider reliance on implied representations in the context of interest rate swaps was *Leeds City Council v Barclays Bank plc* [2021] EWHC 363 (Comm), [2021] QB 1027. This important decision was also an application to strike out the claim and Cockerill J conducted an extensive review of the authorities on reliance before concluding that awareness of the implied representation was a requirement of liability: see [144]. She also held that the borrowers had no real prospect of success in establishing liability on the basis of their pleaded cases: see [154] to [162].

82.   Cockerill J was asked to revisit her decision in *Leeds* at the trial of the subsequent claim in *Loreley Financing (Jersey) No 30 Ltd v Credit Suisse Securities (Europe) Ltd*: see [2023] EWHC 2759 (Comm). That case did not involve interest rate swaps but a credit

Exhibit 2
Page 501

default swap backed by residential mortgage-backed securities. The investors purchased US $100 million of notes through a private placement and alleged that the issuer had made implied representations in relation to both the honesty of its past and future conduct and the credit-rating of the notes (together with certain other representations). These allegations all failed: see [321] to [373].

83.    Cockerill J also held that the investors' case on reliance failed: see [374] to [436]. In *Loreley* the question whether it is an ingredient of the tort of deceit that the representation must be actively present to the mind of the claimant was critical because the claimants had adduced no evidence that they had read the relevant term sheets or understood the issuer to be giving the implied assurances which they alleged: see [426] to [435]. Moreover, in reaching her decision Cockerill J also had to consider not only whether her own decision in *Leeds* was correct but also whether it could stand in the light of Waksman J's decision in *Crossley v Volkswagen AG* (above).

84.    *Crossley* was also a decision on an application to strike out and for reverse summary judgment (as in *Leeds* and as in the present case). In that case Waksman J refused to strike out claims for deceit brought by a claims group of purchasers of VW cars based on the implied representation that the vehicles which they had purchased complied with all statutory and regulatory requirements including emissions limit. The judge began his analysis of the law with *Smith v Chadwick* and I have set out the relevant passage above when dealing with the prospectus cases. He dealt with *Edgington v Fitzmaurice* at [58]:

> "58. *Edgington v Fitzmaurice* (1885) 29 Ch D 459, [1881–5] All ER Rep 856, was another prospectus case, decided by the Court of Appeal. The key question was whether the claimant could maintain the claim where he was partly influenced by his own mistake but also partly by the defendant's material misstatement of fact. Again, therefore, awareness of the relevant representation was not itself in issue. Cotton LJ stated ((1885) 29 Ch D 459 at 481, [1881–5] All ER Rep 856 at 860) that: 'It is not necessary to shew that the misstatement was the sole cause of his acting as he did. If he acted on that misstatement, though he was also influenced by an erroneous supposition, the Defendants will still be liable.'
>
> 59. Bowen LJ stated ((1885) 29 Ch D 459 at 483, [1881–5] All ER Rep 856 at 861–862) that: '… Such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a statement himself could make no difference.'"

Exhibit 2
Page 502

85.    Waksman J reached his decision principally for pragmatic, case management reasons. But it is right to say that he was not prepared to accept that the members of the claims group had no real prospect of succeeding at trial even if they were unable to demonstrate that they had each been aware of the implied representation. He distinguished *Leeds* on the basis that the factual basis for the claims was very different and he set out his detailed conclusions at [94] to [98]:

> "94. The case before me is very different from *Leeds* (and indeed *PAG* and *Marme*). The conduct, and the representations to be implied therefrom, as pleaded at para 63 of the GPOC (albeit at some length) are both in fact relatively simple. They are not to be spelled out from a complex web of communications. And while in *Leeds* it was to be assumed that the implied representations have been made out, it cannot be denied that the whole context was one where the implied representations might have been difficult to establish and indeed were positively rejected in *PAG* and *Marme*.

> 95. In my judgment, at the end of the day, and for present purposes, it is the approach to summary judgment taken by Cockerill J that is as important as her analysis of the law. Absent *PAG* and *Marme*, if *Leeds* had to be considered in a vacuum, it seems likely that she would have found that this was an unsuitable case for determining the relevant issue at the summary judgment stage as opposed to at trial. In that sense, this case is being dealt with in a vacuum.

> 96. One then has to remember that *Leeds* will be heard by the Court of Appeal on 22 February 2022. Cockerill J must have taken the view that there was a real prospect of a successful appeal on the point of law and/or that there was a compelling reason for an appeal because she granted permission.

> 97. In addition, I do think there are real questions arising from what is to be drawn from the fact that an implied representation from conduct is established which means that the reasonable representee would assume or infer the content of the representation from the conduct observed. It was put to me in argument by the Claimants that it would be odd if a reasonable representee was found to have made that assumption or inference, and yet such an assumption or inference was not sufficient on the part of the actual representee. I appreciate that the former question is an objective one whereas the latter is subjective, depending on the state of mind (or direction of thought) of the actual representee. Nonetheless, I think that there are particular issues raised where implied representations by conduct are alleged and which have yet to be fully worked out. Given also the decisions of the Court of Appeal in *Spice Girls* and *Gordon* and the House of Lords in *Ray*, and notwithstanding *Smith v Chadwick* and the other cases referred to above where the question of awareness was not directly for decision, there is in my view a real prospect of success for the Deceit Claim

Exhibit 2
Page 503

here. This is in circumstances where a relevant assumption or CFOT[2] must be taken to exist or at any rate is likely to be established or at least there is a real prospect of it being established. Further, I do not consider that the whole issue of the Awareness Condition could seriously be described as a 'short point of law' which I should grapple with now. Accordingly, I do not determine that issue at this stage.

98. There are other points, too. First, I understand why VW says that there is an underlying utility in disposing of the Deceit Claim if there were nothing in it, even if there remains a substantial trial. However, the trial here is likely to remain very extensive and involved. It is not as if one would be able by this course to reduce a trial listed for a week or two down to a day or two or at least narrow it substantially. Second, and this is allied to the first point, VW's conduct in relation to the defeat device and its alleged dishonesty (assumed before me for the purpose of these applications) will still be relevant at trial. Apart from anything else, there is a claim here for exemplary damages. Yet further, the whole issue of reasonable consumer expectations will figure prominently in respect of the contractual, CPUT and unfair relationship claims, or at least it is plausible to think that they will. Indeed, on the Claimants' SQ Application (to which I will refer shortly) VW's own position is that this sort of evidence will be highly important. It is indeed why there is a sense in which the two applications before me are both somewhat double-edged. It is impossible in my view, and at this stage of the process, to draw a clear differentiation between the evidence that will be relevant and admissible on the Deceit Claim on the one hand, and on the Satisfactory Quality and further claims on the other. Yet further, in my judgment, the law in this area cannot be said to be complete or fully developed. This is a classic case where I should on any view avoid determining it ahead of trial and in the absence of all relevant findings of fact. For all of those reasons, even if there were no real prospect of success on the Deceit Claim, these are all compelling reasons for a trial.

99. It therefore follows that the principal part of the Deceit Claim Application must be dismissed."

86.    In *Loreley* Cockerill J analysed *Crossley* closely but reached the same conclusion as she had done in *Leeds,* namely, that it was necessary to prove awareness of the statement or statements: see [388]. She also pointed out that *Leeds* had settled just prior to the hearing of the appeal: see [374]. She expressed her overall conclusions in the following passage at [421] to [425]:

"421. I conclude that the law does require that a representation (however made) is received by the representee and that to satisfy the requirements of reliance the representee must be aware of it/have it actively present to their mind when they act on it.

---

[2] The counterfactual of truth.

Exhibit 2
Page 504

422. Mr Lord endeavoured to persuade me that in this context a test of "present to the mind" would suffice. This I regard as a dangerous step away from where the authorities stand, essentially because such a test too easily elides into assumption. "Actively present to the mind", becomes "present to the mind", from which it is but a short distance to "at the back of my mind" - which was exactly where L30 wanted to go because that was what Dr Bauknecht said. But where something is at the back of the mind is it because of assumption or representation? Very often it will be only because of an assumption unconnected to what has been said or done. Accordingly I consider that this approach merely provides another route to dissolve the distinction between representation and assumption – which is also the division between representation and non-disclosure. This is a problem which is particularly acute when (as here) one is dealing with implied representations as to honesty, because it turns every contract into a contract of utmost good faith.

423. I return finally to the fault line which plainly exists in the cases. The authorities above show that there are cases where on the particular facts in play reliance/inducement is found without any distinct evidence of understanding or awareness being identified. It is fair to say that when placed under the analytical microscope those cases do offer a different flavour to those which I have decided establish the orthodoxy which applies where a question arises as to reliance based on an issue as to the operativeness of a representation. But it can be seen that these cases where no evidence of understanding/awareness is separately discernible are, in type, very different cases to the ones where this issue is really live. There are two hallmarks which appear to drive the distinction. The first is that in the *Gordon v Selico*/*Spice Girls* type case the representation is simple and cannot well be missed by the representee. There is no issue as to whether the representation is discerned so as to be operative. In the *Leeds* and current type case, the representation is being said to be capable of being implied despite complex contractual provisions, usually in complex multifaceted transactions. That pushes to the fore a need to see what has been registered or understood.

424. The second (related) distinction is that in the *Gordon v Selico*/*Spice Girls* type case the representation is one which is at the heart of the transaction. Are you buying a good flat or a money pit? Are you buying the star power of a flourishing or an imploding group? Both of these factors mean that the question of awareness is one to which the answer is obvious (the representee cannot miss it) and where the whole question of reliance is, in the light of that, likely to be susceptible of being decided by the presumption of inducement. As noted above, it would have taken a brave counsel to raise this point in *Gordon v Selico* (when the court had been prepared to find a representation). In *Spice Girls* a similar flavour emerges from the use of the word "inconceivable" in [72] of the Court of Appeal judgment. In the banking cases awareness is far from obvious; so much else is being said more explicitly that there are real questions as to whether a particular implicit message is received and understood. A proffering of a complex transaction such as this is not analogous to the ordering of a meal or the raising of an auction paddle.

Exhibit 2
Page 505

425. All of this of course feeds back in to the question of making of the representation. In these more complex cases the question will often arise either contingently (as here – arising only if I am wrong about the making of the representations) or (as in *Leeds*) based on an assumption which might never be made out; but the facts that drive the first conclusion impact on the situation where causation arises. In the simpler cases the answer is often either so obvious that there is no dispute, or the court may be prepared (instinctively, but I would suggest technically incorrectly) to elide the question into the presumption of inducement. That is in essence the point being made by Longmore LJ in *BV Nederlandse v Rembrandt Enterprises* [2019] EWCA Civ 596 [2020] QB 551 at [45] to which Mr Lord alluded in reply. None of this however affects the logic of the argument. Because points are not in some cases taken, does not mean that they are not there."

87. The final authority on implied representations to which I was taken was *Farol Holdings Ltd v Clydesdale Bank plc* [2024] EWHC 593 (Ch). That case involved four test claims brought by the borrowers of business loans who had agreed to pay a fixed interest rate calculated by reference to a basic rate plus an additional margin cost. They alleged that the bank had made an express representation about the break costs of those loans: see [20](1). But they also alleged that the bank had made a series of implied representations in relation both to the break costs and the interest rate: see [20](2) and [26]. These included representations that the margin was the only profit which the bank was making from the loans, that it did not include any hidden additional margin or profit and that the interest rate was a market rate fixed by reference to external sources. The borrowers brought claims in both negligence and deceit.

88. Zacaroli J (as he then was) dismissed all of the claims for a number of detailed reasons which it is unnecessary for me to rehearse here. However, he set out the elements of inducement and reliance in the tort of deceit more generally at [216] to [219]:

"216. Fifth, the representee must in fact have been induced to take action – for example entering into a contract – in reliance on the representation. The misrepresentation need not be the only reason for the representee's decision to enter into the contract, but the representee will have no cause of action if it would have entered into the contract on the same terms even if the representation had not been made. If it is proved that a false statement is made which was material – in the sense that it was likely to induce entry into the contract – then there is an evidential presumption (of fact, not law) that the representee was so induced. The presumption is stronger if the representation was made fraudulently.

217. The relevant question in this respect is whether the claimant would have entered into the contract if the representation had not been made at

Exhibit 2
Page 506

all, not whether it would have done so if it had been told the true position: see *Raiffeisen* (above) at [180], approved by the Court of Appeal in *SK Shipping Europe Ltd v Capital* VLCC 3 Corp [2022] EWCA Civ 231; [2022] 1 Lloyd's Rep 521 , per Males LJ at [61].

218. The identification of the appropriate counterfactual if the statement had not been made, however, is a question of fact, and in some cases this may necessarily involve asking what would have happened if the truth had been told. That might be the case where, if the representation had not been made, the true position would have been revealed as a result of questions asked by the representee: *Raiffeisen* at [182] to [185]; *SK Shipping* at [61]. Even then, however, the "truth" is that which is sufficient to correct the falsity of what was said: *Raiffeisen* at [192] to [193].

219. It is well established that the representee must have understood, at the time, that the representation – in the sense that the court ascribes to it – was being made: see, e.g. *Cassa di Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd* (above), per Hamblen J at §224, citing *Raiffeisen* at §87. As Hamblen J pointed out, this is probably not a separate requirement of a misrepresentation claim but rather is part of what the claimant needs to show in order to prove inducement. That follows from the fact that the essential question is one of causation: was the claimant induced to take action in reliance on the representation made? If the claimant did not appreciate at the time that the representation was made in the sense pleaded by the claimant, then it cannot show that, but for that representation being made, it would have acted differently."

89.    He then addressed the question whether there was a separate or distinct requirement that the representation must be "actively present" to the representee's mind and whether they must have given it "contemporaneous conscious thought". He cited *Leeds*, *Loreley* and *Crossley* before stating as follows:

"221. The issue identified in the relevant passages in those cases was that sometimes the court has found that a misrepresentation was relied on, apparently without a finding that the representee gave conscious or active thought to the representation (see for example the cases conveniently summarised at §380 of *Loreley*). An extreme example (discussed from §105 of *Leeds*) is the representation by a diner at a restaurant, made by the conduct of ordering a meal, that they have an intention to pay for it (see *DPP v Ray* [1974] AC 370, a criminal case but often cited in the cases dealing with misrepresentation in civil law). It is highly unlikely that the waiter who took the order gave any thought to whether such an implied representation was being made.

222. As Cockerill J noted, at §423 and §424 of *Loreley*, the cases in which inducement has been found without distinct evidence of understanding or awareness are where the representation is simple and cannot be missed by the representee, and where it is at the heart of the transaction. In such cases, it might be said that the fact represented, albeit implied from some other conduct or statement, is so obvious it goes without saying. Unless,

Exhibit 2
Page 507

therefore, the representee actively thinks about it and decides not to rely on it, it might be said that it goes without saying that the representee relied on it. That would explain, for example, cases where someone who gives their opinion on a matter – where the facts are not equally known by both sides – may be held to make an implied statement "that he knows facts which justify his opinion": *Smith v Land and House Property Corp* (1884) 28 Ch D 7, at p.15 . It will be rare, if ever, that a representee thinks further than that they trust the person giving the opinion and assume that he knows facts which support it. Yet the court is unlikely to require evidence that the representee actively thought at the time that the representation was being made.

223. I doubt the utility (as did Cockerill J) of breaking down this causation question into distinct elements and seeking to find a single universally applicable test for those elements. It is essential to keep in mind that in every case it is necessary to show, as a matter of fact, that the claimant's decision to take the action (or refrain from taking action) which caused it loss must have been caused by the representation made by the defendant. The evidence required to satisfy that requirement will differ greatly depending on where on the spectrum the case lies (from "it goes without saying", at one end, to a complex representation said to be implied from conduct and statements, at the other).

224. In relation to the Break Costs Representations, whether or not there is such a requirement is academic, since I am satisfied for the reasons set out below that the claimants understood at the time that the simple form of representation (i.e., that the amounts quoted were the break costs to which CB was contractually entitled) was being made.

225. The point is of most relevance to the implied Fixed Rate Representations. As developed in Part C below, these are inherently complex representations. In each case, the pleaded implied representation is far from the obvious or only interpretation of what was expressly said or done. It is well established that where there is any ambiguity in the conduct or statements relied on in support of an implied representation, it will always be necessary to establish that the representee appreciated at the time the representation was made that it was being made in the sense relied on by the claimant: see, for example, the decision of the Court of Appeal in *Spice Girls Ltd v Aprilia* [2002] EWCA Civ 15; [2002] EMLR 27, at §67, distinguishing cases such as *E.A. Grimstead & Sons Ltd v McGarrigan*, unreported, Court of Appeal 27th October 1999, referred to by Waksman J in Crossley at §81. Without such understanding, the essential causal link cannot be established."

*(4)    Autonomy*

90.    The only case to which either counsel referred in which the Court had considered the meaning of reliance in Paragraph 3 was *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) (to which I will refer as "**Autonomy**"). The facts of that case were very different to the facts of the present case but in the course of his detailed judgment

Exhibit 2
Page 508

Hildyard J considered the meaning of "reliance" in Paragraph 3 and also Davies 1 (above). He stated his conclusions at [501] to [506] under the heading "Reliance on what?":

> **Reliance on what?**
>
> 501. Sch 10A paragraph (1)(a) refers to the payment of compensation to a person who acquires, continues to hold or disposes of securities "in reliance on published information to which this Schedule applies". (Its predecessor, s. 90A, related only to acquisitions of shares and referred to compensation to a person who acquired shares "in reliance on the information in the publication"). The loss claimed must be caused by reliance on that statement or omission.
>
> 502. The focus is on statements or omissions in published information on which reliance is demonstrated to have been placed. Paragraph 3(2) refers to the issuer being "liable in respect of an untrue or misleading statement". Further, paragraph 3(1) states that compensation is only to be paid where the acquirer "suffers loss in respect of the securities as a result of—(i) any untrue or misleading statement in that published information, or (ii) the omission from that published information of any matter required to be included in it."
>
> 503. As Dr Lynch submitted in his written closing, it would not be enough for Bidco to show that it relied in some generalised sense on a piece of published information (e.g. the annual report for a given year): I accept the Defendants' submission that it cannot have been intended to give an acquirer of shares a cause of action based on a misstatement that he never even looked at, merely because it is contained in (say) an annual report, some other part of which he relied on. The requirement that loss suffered as a result of the untrue or misleading statement can only be satisfied where the person acquiring securities applied his mind to the statement in question, and where that statement induced the acquisition or (more relevantly for this case) induced the acquirer to transact on the terms he did.
>
> 504. This view gains support from the Davies Review on Issuer Liability. Discussing s. 90A, Professor Davies QC said this: "Section 90A …by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken." The same reasoning would apply in relation to Sch 10A .
>
> 505. Similarly, the requirement for reliance cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all: again, see *Marme v Natwest Markets Plc* at §§281-288. The statement must "have been present to the claimant's mind at the time when he took the action on which he bases his claim." Unless a document was reviewed, it cannot have been relied on. In this case, the Claimants have referred to alleged misstatements or omissions in a number of documents (for instance transcripts of earnings calls, and Quarterly Reports from long before the acquisition) which were not reviewed by or on behalf of any of the

Exhibit 2
Page 509

Claimants. These cannot found a claim, though they may be relevant evidence of intention.

506. That said, statements (or omissions) may in combination create an impression which no single one imparts. In my view, if the overall impression thus created is false it may found a claim, if the other conditions of liability are also met."

91.   The judge then went on to consider the degree of reliance required to establish liability. He rejected a submission that only a weak causal connection was required between the false statement and the acquisition of shares. He accepted, however, that the presumption of inducement (which he treated as an inference of fact) applies no less in a claim under Schedule 10A than it does in a claim for common law deceit. He stated as follows at [515]:

"(1) It is enough that a fraudulent representation has had "an impact on the mind" or an "influence on the judgement" of the claimant (see per Lord Goff of Chieveley in *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501, as quoted by Lord Clarke of Stone-cum-Ebony JSC in *Zurich Insurance Co plc v Hayward*). There is no "but for standard" in that context; and the fact that other considerations may have been predominant does not negate the deception if it did have some impact or influence, for (as Lord Cross of Chelsea said in *Barton v Armstrong* [1976] AC 104, 118-119) "in this field the court does not allow an examination into the relative importance of contributory causes."

(2) I was originally minded to agree with the Defendants that the so-called 'presumption of inducement' should not be read into the FSMA test; and that it would be difficult to integrate with the test of reasonable reliance which is expressly introduced by FSMA. On reflection, I think this would be to treat the "presumption of inducement" as, in effect, one of law: and as Lord Clarke explained in the *Zurich Insurance* case, it is simply an inference of fact. I have ultimately concluded that the presumption applies in the context of a FSMA claim no less than in other cases of deceit. The reason is simple: it aphoristically expresses the reality that once it has been established that a representor fraudulently intended his words to be taken in a certain sense and that the representee understood them in that sense and entered into the contract, it is natural to suppose, unless the presumption is rebutted on the facts, that the representee was induced to make his investment decision on the faith of the representor's statement.

(3) It remains a question of fact to be determined on the balance of probabilities whether having regard to all the circumstances it did in fact have "an impact on the mind" or an "influence on the judgment" (as Lord Goff put it in the *Pan Atlantic* case) of the representee in making that investment decision. But the presumption is difficult to shift.

(4) In *Hayward v Zurich Insurance Co plc*, Lord Clarke noted (at [36]) that the authorities are not entirely consistent as to what is required to rebut the

Exhibit 2
Page 510

presumption of inducement: and in particular, "whether what must be proved is that the misrepresentation played "no part at all" or that it did not play a "determinative part", or that it did not play a "real and substantial part". It was not necessary to decide how the test should be worded in that case since it was found that the presumption was not rebutted in that case on any of the formulations; but Lord Clarke did go on to say that "the authorities…support the conclusion that it is very difficult to rebut the presumption", citing Baroness Hale of Richmond DPSC's observation in *Sharland v Sharland* [2015] UKSC 60; [2016] AC 871 that a party who has practiced deception with a view to a particular end, which has been attained by it, cannot be allowed to deny its materiality or that it actually played a causative part in inducement.

(5) It seems to me that, it would be in accordance with the approach in the authorities cited above to avoid semantic debate and leave the issue to be determined according to a value judgment whether in all the circumstances the misrepresentation(s) should be taken as having influenced the decision, without entering into an assessment of its relevant importance amongst any other influences.

(6) Further, the additional requirement of FSMA that the reliance, if established, must also be shown by the claimant to have been reasonable does not remove, but does, in my view, mitigate the effect of the presumption. In my judgment, it introduces an additional test requiring consideration of whether it was reasonable for the representation so to have impacted on the mind and judgment of the representee; put another way, it seems to me that the claimant must show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it: and see further paragraphs [517 ff] below.

(7) It is also important to keep in mind that the propensity of a statement to influence the mind only gives rise to the presumption (if applicable) if it is shown to have been read or heard and understood by the representee in its deceptive sense and/or the claimant would have entered into the contract even if the misrepresentation had not been made: see *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm) (Males J, at §§18, 19 and 171-172): if it did not influence the mind, or if the representee understood it in some different sense and it was by reference to that different meaning that he acted, the presumption does not arise: and see the discussion about ambivalent or ambiguous statements in the recent decision of Cockerill J in *Leeds City Council and others v Barclays Bank plc* and another [2021] 2 WLR 1180.

(8) I agree, therefore, with Mr Miles that the Court should not assume reliance by Bidco on every statement alleged by the Claimants to be potentially false or misleading, drawn from hundreds of pages of financial statements and transcripts going back months or years before the acquisition of Autonomy, merely because the Claimants allege that these statements were deliberately false or misleading."

F.    Summary Disposal

Exhibit 2
Page 511

Approved Judgment: Leech J          **Various Claimants v Barclays Bank PLC FL 2020 000051**

*(1)    Strike Out*

92.    CPR Part 3.4(2)(a) confers a power on the Court to strike out part of a statement of case
if it appears to the Court that it discloses no reasonable grounds for bringing or defending
a claim. CPR Part 3.4(3) also provides that when the Court strikes out part of a statement
of case it may make any consequential order it considers appropriate. The parties did not
cite any authorities giving particular guidance about the way in which the Court should
exercise these powers in the present case and both approached the Strike Out Application
on the basis that the test under CPR Part 3.4(2) and the test for reverse summary judgment
were for present purposes the same.

93.    The parties were agreed that even if the Court identified a defect in the pleaded case
which would render the claim unarguable, the Court should not strike it out without
giving the relevant party an opportunity to amend. Mr Nash also reminded me of the
Court's case management jurisdiction not to decide a strike out application where it
considered it inappropriate to do so for case management reasons. The parties approached
the Strike Out Application (as do I) on the basis that the Court had granted permission to
amend the Particulars of Claim and the POQ.

*(2)    Summary Judgment*

94.    There was no real dispute between the parties either in relation to the principles which
the Court should apply in deciding whether to grant summary judgment. Both parties
cited the familiar decision of Lewison J in *Easyair Ltd (t/a Openair) v Opal Telecom Ltd*
[2009] EWHC 339 (Ch) at [15] (which has been cited on many occasions both at first
instance and in the Court of Appeal):

> "As Ms Anderson QC rightly reminded me, the court must be careful
> before giving summary judgment on a claim. The correct approach on
> applications by defendants is, in my judgment, as follows:
>
> i) The court must consider whether the claimant has a "realistic" as
> opposed to a "fanciful" prospect of success: *Swain v Hillma*n [2001] 2 All
> ER 91;
>
> ii) A "realistic" claim is one that carries some degree of conviction. This
> means a claim that is more than merely arguable: *ED & F Man Liquid
> Products v Patel* [2003] EWCA Civ 472 at [8]
>
> iii) In reaching its conclusion the court must not conduct a "mini-trial":
> *Swain v Hillman*

Exhibit 2
Page 512

iv) This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: *ED & F Man Liquid Products v Patel* at [10]

v) However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond (No 5)* [2001] EWCA Civ 550;

vi) Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 63;

vii) On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd* [2007] EWCA Civ 725."

95.   Ms Davies and her team accepted that summary judgment may not be appropriate in an area of developing jurisprudence unless the claims are plainly and obviously bad (e.g. because there is no real prospect of the law developing sufficiently to enable the claim to succeed): see *Hudson v HM Treasury* [2003] EWCA Civ 1612 at [59] to [67] (Jonathan Parker LJ). They also drew my attention to *Getty Images (US) Inc v. Stability AI Ltd* [2023] EWHC 3090 (Ch) where Joanna Smith J stated as follows at [38]:

Exhibit 2
Page 513

> "On the issue of "compelling reason", it may be inappropriate to grant summary judgment where similar issues would remain to be determined at a full trial and extensive factual and expert evidence would have to be called, meaning that there would be much less in terms of saving costs and court time than is normal (see *Iliffe v Feltham Construction Ltd* [2015] EWCA Civ 715 at [71]-[73] per Jackson LJ). However, as the Defendant submitted, the mere existence of other arguable claims which must go to trial cannot, of itself, be a compelling reason why an unarguable claim must proceed to trial."

96.   Mr Nash and his team placed particular emphasis on paragraphs vi) and vii) from the principles in *Easyair* (above) and cited *Crossley* (above) for the proposition that where an application involves a novel point of law, that may provide a compelling reason for deciding the issue at trial when all of the facts are known regardless of the view which the Court may have taken to the merits. In *Crossley* Waksman J stated as follows at [15]:

> "In this case, and as will be explained below, both sides contend in respect of the applications made against them, that even if the claim or defence has no real prospect of success, there is in any event a compelling reason for a trial of it. In this regard, two important examples of a compelling reason are:
>
> (1) the fact that the application concerns a developing area of the law; here, it may be desirable that the disputed legal questions should be resolved against the background of the facts as already found at the trial, and not hypothetical facts;
>
> (2) where summary judgment will not dispose of the whole case; this will be so where there will be a trial anyway, regardless of the outcome of the summary judgment; it is particularly relevant if, at the trial, there will be or is likely to be evidence concerning the same or similar factual matters as those traversed in the application."

## V.   Paragraph 3

## G.   Submissions

### *(1)   The Bank*

97.   The Bank submitted that on a plain reading of Paragraph 3 there could be no claim unless the investor actually read the specific statement which was said to have been untrue or misleading or the specific piece of published information which was said to have contained an omission. Ms Davies relied on the use of the word reliance in both paragraph 3(1)(a) and paragraph 3(4). She submitted that reliance on the Bank's status as a listed company or its share price was plainly not "reliance on published information" or

Exhibit 2
Page 514

Approved Judgment: Leech J          Various Claimants v Barclays Bank PLC FL 2020 000051

"reliance on the information in question".

98.   Ms Davies also submitted that the meaning conveyed by the language of the statute was
confirmed beyond doubt by the legislative background. She took me through the common
law principles of deceit, Davies 1 and 2 and also Treasury 1 and 2 (above). She placed
particular reliance on Davies 1 and the passages in which Professor Davies contrasted
the statutory prospectus regime (now S.90) and in which he regarded the reliance
requirement as a distinguishing feature from US litigation in which the "fraud on the
market" theory has been adopted and class formation is much easier. She also relied on
the passage in Treasury 2 where HM Treasury stated that the Government had decided
to extend S.90A to holders of shares but regarded the reliance requirement as a brake on
litigation and gave a directly relevant example: see Treasury 2, §5.8 and §5.9 (at [57]
above).

99.   Finally, Ms Davies relied on *Autonomy* as the only authority on the meaning of reliance
under Paragraph 3. She did not submit that I was bound to follow Hildyard J's decision
unless I was satisfied that it was plainly wrong or that I should follow it as a matter of
comity but submitted that I should follow it because it demonstrated that Paragraph 3 had
a plain and obvious meaning and that I could be satisfied both that it was correct but also
that it was appropriate to grant summary judgment.

*(2)    The Claimants*

100.  The Claimants submitted that Parliament could not have intended to adopt the common
law concept of reliance from the tort of deceit because it extended liability to omissions
which are not actionable at common law. Mr Nash also submitted that Parliament could
not have intended to require investors to prove that they applied their minds to the
absence of a particular statement and that an omission could not be categorised as "the
information in question" but rather "an absence of information". He relied on the decision
of the Federal Court of Australia in *TPT Patrol Pty Ltd v Myer Holdings Ltd* [2019] FCA
1747 that it is conceptually incoherent to require an investor to prove inducement or
reliance in relation to an omission and the absence of information: see [1643]. In their
Skeleton Argument Mr Nash and his team submitted as follows:

> "56. By contrast, this issue does not arise under Cs' interpretation. The
> first question is whether the investor relied on the Published Information.

Exhibit 2
Page 515

The second question is then whether any loss the investor suffered was caused by the misstatement or omission. That reflects the difference in the statutory wording applied to causation and reliance.

57. If weight is being placed on the Treasury papers, it is also notable that paras 6.16 to 6.19 of the Second Treasury Report clearly contemplate that an issuer can be liable even if a claimant does not obtain information from the RIS (Published Information), but is relying on a "secondary source". That view would suggest that s.90A does indeed contemplate that reliance which occurs via others in some way (contra D's para 21(3)) is capable of giving rise to a claim. The question of where any line is drawn is obviously fact-sensitive.

58. A similar point is implicit in Professor Ferran's article cited by D at para 44(3). She observes that s.90A does not embody a "fraud on the market" concept, but makes clear that it is an open question whether determinations on "reliance/materiality" should involve a consideration of whether "(inferred) reliance on market prices was tantamount to (inferred) reliance on the information itself".

59. D is not correct to suggest (at para 22) that Price/Market Reliance would apply to "every claimant in every s.90A claim". The liability regime covers a wide range of securities, from issuers of listed shares in the LSE premium market, to obscure debt on relatively illiquid markets which may not be efficient in the relevant sense. It covers a wide range of investors, from professional investors such as Cs to holders of inherited family interests or strategic holdings by public authorities who may not hold by reference to price at all. It is not the case that any investor in respect of any issuer would be able to demonstrate such reliance. This is a question of fact."

101. Mr Nash also relied on the fact that it remains highly controversial whether claimants must demonstrate that they applied their minds to the statement in question. He relied on *Crossley* and the outstanding debate whether *Leeds* and *Loreley* were correctly decided. He also relied on the earlier cases cited by both Cockerill J in *Loreley* and Zacaroli J in *Farol Holdings* in which the Court of Appeal had made no mention of a separate requirement that the representee must have read or heard the relevant statement or that it must be present to the mind. Finally, he relied on the fact that where it is actionable, non-disclosure does not require reliance: see, e.g., section 8 of the Insurance Act 2015 (below).

## H.    The Test

### (1)    Does the common law test apply?

102. Paragraph 3(1) imposes liability upon an issuer to pay compensation upon an issuer to a

Exhibit 2
Page 516

person who acquires, continues to hold or disposes of securities "in reliance on published information to which this Schedule applies". The term "reliance" is used in the first instance, therefore, to limit the class of persons to whom an issuer is liable to those persons who have relied on published information. Paragraph 3(1) is to be contrasted with S.90(1)(a) which imposes liability to pay compensation to a person who has acquired securities to which listing particulars apply.

103. Paragraph 3(4) also provides that a loss is not to be regarded as suffered as a result of a statement or omission unless the person suffering it acquired, continued to hold or disposed of securities "in reliance on the information in question". The term "reliance" is used again, therefore, to limit the losses which are recoverable under Schedule 10A to those suffered by persons who have relied on the information which contained the untrue or misleading statement or from which the relevant matters were omitted. Again, paragraph 3(4) is to be contrasted with S.90(1)(b) which imposes liability to pay compensation for losses suffered as a result of any untrue or misleading statement in the relevant listing particulars or any omission from them.

104. I agree with Ms Davies that Parliament must have intended to give the term "reliance" some content and to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or omission being made to the market. Otherwise, the framers of Schedule 10A would have adopted very similar language to S.90. Indeed, when Parliament amended S.90A to include liability for delay it adopted exactly that course as a brief comparison between S.90 and Paragraph 5 will demonstrate. It follows that the Court must give effect to the term "reliance" which goes beyond causation of loss and requires investors to prove a separate ingredient of liability.

105. The obvious test for Parliament to adopt in Paragraph 3 was the common law test for inducement or reliance in the tort of deceit. The detailed analysis of the prospectus cases which I have set out above shows that by *Edgington v Fitzmaurice* (by the latest) the requirement for inducement or reliance was a separate ingredient of the tort: see, in particular, the formulation of the test by Bowen LJ at 481-2 (see [74] above). Moreover, the critical ingredients of the test had also been established in the prospectus cases:

(1)    It is necessary to show that the investor was deceived by the statement and acted

Exhibit 2
Page 517

upon it to their prejudice (see Cotton LJ in *Arkwright v Newbold* and *Smith v Chadwick*).

(2)  The Court may draw an inference of fact that the investor has been induced to subscribe for securities from the fact that the statement was material and the fact that the investor made the investment even if the investor does not give evidence. But this is an inference of fact and not a presumption or inference of law (see Lord Blackburn in *Smith v Chadwick*).

(3)  It is not necessary to show that the untrue or misleading statement was the sole inducement if it was actively present to the investor's mind and did induce the investor to make the investment (see Bowen LJ in *Edgington v Fitzmaurice*).

106.  Moreover, the Courts have consistently applied this test and these principles for almost 150 years and one can almost draw a straight line between the prospectus cases and the test for inducement or reliance applied in modern cases. I have cited two examples. First, in *Marme* Picken J traced the evolution of reliance from the prospectus cases and in *Farol Holdings* Zacaroli J adopted the same test and the same three principles: see [216] and [219]. The test has been refined in the intervening period and may not have completed its evolution at least in relation to implied representations (as I consider further below). But the nature of the test and the core principles have been settled for almost 150 years.

107.  In my judgment, therefore, the obvious interpretation of Paragraph 3 is that Parliament did not intend to "start afresh" but recognised that the Courts have developed a settled test of reliance in the tort of deceit where proof of liability requires a claimant to prove both reliance and causation as separate ingredients of the tort and incorporated both tests into Paragraph 3. The Davies Review and the Treasury Consultation confirm that this was the legislative intention and that reliance was intended to be a separate requirement of liability and to limit recovery: see, in particular, Davies 1, §26 and §55 (see [45] and [46] (above)), Davies 2, the recommendation in answer to Q1 (at [51]), the Treasury's impact assessment (at [56]) and Treasury 2, §5.7 to §5.9 (at [57]). The example given in Treasury 2 at §5.9 demonstrates that the authors had the test for fraudulent misstatement in mind.

108.  I accept Mr Nash's submission that the Davies Review and the Treasury Consultation (including the impact assessment) can only have a secondary role in the interpretation of

Exhibit 2
Page 518

Approved Judgment: Leech J                 Various Claimants v Barclays Bank PLC FL 2020 000051

Paragraph 3 and that I should not give them decisive weight: see *R(O) v Secretary of State for the Home Department* at [30] (see [63] above). But in my judgment, those materials do no more than confirm the obvious interpretation of Paragraph 3. They disclose the background to Schedule 10A and identify the purpose of the independent requirement of reliance, namely, to limit recovery to those investors who can prove that they relied on the published information in which the untrue or misleading statement was made or from which any matter which should have been included in that published information was omitted.

### (2)    What is the common law test?

109.    In my judgment, the test for reliance as it applies to express representations (whether made orally or in writing) requires the claimant to prove that they read or heard the representation, that they understood it in the sense which they allege was false and that it caused them to act in a way which caused them loss. I agree with Professor Cartwright at 3—54 (above) that this is because the test is one of causation and a statement can only cause an individual to act or operate on their decision-making process if they hear or read the statement or if the statement (or the gist of it) is communicated to them by a third party. If (as I have found) the common law test applies to misleading and untrue statements in Paragraph 3, then I agree with Hildyard J in *Autonomy* that the requirement for reliance in Paragraph 3 cannot be satisfied in respect of published information which the Claimants did not read or consider at all: see [505] (at [90] above).

110.    I turn now to consider whether any of the individual arguments which Mr Nash advanced on behalf of the Claimants displace the obvious interpretation of Paragraph 3 which I have adopted. I also address Mr Nash's argument that the common law test is uncertain and the Court should follow *Crossley* and defer deciding whether the Claimants in Category C can satisfy the test until trial.

### (3)    Omissions

111.    Mr Nash was right, in my judgment, to focus his submissions on liability for omissions. The common law does not impose liability for the failure to speak unless that failure falsifies a positive representation (whether express or implied) and S.90A introduced a liability for omissions which is purely statutory. Indeed, I might well have accepted Mr Nash's argument that Parliament must have intended a wider test for reliance than the

Exhibit 2
Page 519

Approved Judgment: Leech J          **Various Claimants v Barclays Bank PLC FL 2020 000051**

common law test if I had also agreed with him that the effect of adopting that test would require investors to prove that they applied their minds to the absence of a particular statement. But in my judgment, Schedule 10A does not impose such a requirement upon investors for the following reasons:

(1)    I agree with Mr Nash that the term "reliance" must mean the same thing whether investors allege that they relied on an untrue or misleading statement or that they relied on an omission. This is no more than a consequence of the way in which both paragraph 3(1)(a) and paragraph 3(4) are drafted. Moreover, it is highly unlikely that Parliament intended to use the same term in different senses in the same paragraph of the schedule.

(2)    I also agree with Mr Nash that it would be almost impossible for investors to prove that they consciously considered whether matters had been omitted from published information and that if Schedule 10A imposed such a test, it would be virtually impossible to establish liability to omissions. As Mr Nash put it, liability would be limited to "known unknowns" and even then investors would have very similar problems to those claimants who seek to rely on implied representations (as the authorities above demonstrate).

(3)    However, in my judgment the framers of both S.90A and Schedule 10A were alive to this issue. They did not require investors to prove that they had relied on the omission itself (i.e. that they appreciated that the issuer had failed to include facts or matters in its published information). They required investors to prove that they had relied on the published information itself. S.90A(5)(a) excluded liability unless investors proved that they acquired the relevant securities "in reliance on the information in the publication" and Paragraph 3(4)(a) now requires investors to prove that they acquired, held or disposed of securities "in reliance on the information in question".

(4)    This makes sense in the context of liability for both misleading statements and omissions. I agree with Mr Nash (and the Federal Court of Australia in *TPT Patrol*) that an investor cannot rely on information which has been omitted from an annual report or a periodic statement if they do not know or cannot guess what has been omitted. But this is not what they have to prove. What they have to prove is that

Exhibit 2
Page 520

they relied on the annual report or the periodic statement itself and that their reliance in doing so was reasonable. The materiality of the facts or matters which the issuer has omitted and whether they would have made a difference to the investment decision will go to causation and the quantification of loss.

(5)     I accept that Hildyard J appeared to go further than this in *Autonomy* (above) at [503] and [515] where he accepted the submission of Mr Robert Miles QC (as he then was) that the claimants had to prove that they relied on the individual statements in the published information. However, the judge was considering liability for misleading or untrue statements and not for omissions. Moreover, it is unnecessary for me to decide on this application whether he was correct to go this far. For present purposes, it is enough that I agree with him that "the requirement for reliance cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all": see [505].

112.   I can illustrate the way in which Paragraph 3 operates by an example taken from the Particulars of Claim. In section C the Claimants make specific allegations that the Bank operated LX to favour high frequency traders and that they did not use a direct data feed from the New York Stock Exchange. They also allege that the Bank omitted this information from its published information during the Relevant Period:

> "C4:  Barclays'  EETD  Systems  did  not  adequately  safeguard  clients'
> interests and in fact assisted HFT Firms
>
> 40.  Barclays  represented  to  clients  and  potential  clients,  that  it  had
> implemented special safeguards to protect clients from high-frequency
> trading in its dark pool. For instance, Barclays represented that it had "End-
> To-End Client Order Protection" by which its electronic trading products
> and services (algorithms, smart order router, and dark pool) worked
> together to "protect client orders and minimize information leakage" to
> "maximize fill rates" and "minimize market impact" (meaning whether
> prices move against a client). That is, Barclays represented that it would
> use its algorithms, router, and dark pool for its clients' best interests, not
> its own, by seeking to increase the number of its clients' trades that were
> executed, secure better prices for those trades, and minimize the ability of
> HFT firms to anticipate the orders and trade ahead of them.
>
> 41. In fact, Barclays operated its algorithms, smart order router, and dark
> pool to favour HFTs over other clients and actively sought to attract HFTs
> by providing HFT firms with: a. Favourable prices and/or lower rates; b.
> Information not provided to institutional investors including the routing
> logic of Barclays' order router, a breakdown of trades executed in the dark
> pool by participant type, and a breakdown of trades executed in the dark

Exhibit 2
Page 521

pool by "toxicity" levels; and c. Technological tools to assist HFTs to take advantage of institutional investors in its dark pool including by permitting HFTs to "cross-connect" to its servers and by processing market data slowly to allow latency arbitrage to be employed by HFTs.

<u>C5: Barclays' EETD Systems did not use a direct data feed from the New York Stock Exchange</u>

42. US Regulation National Market System ("Regulation NMS") requires trading centres to have and enforce policies and procedures reasonably designed to prevent executions at prices that are inferior to prices that are displayed and available at another market centre.

43. Barclays represented to clients that it used direct data feeds for major exchanges.

44. In fact, and in contravention of Regulation NMS, LX did not during the relevant period subscribe to a direct market data feed from the New York Stock Exchange."

"68. Further or alternatively, the omission to include within Barclays Plc's published information during the Relevant Period the matters set out in Section C above amounted to an omission from that published information of any matter required to be included in it, within the meaning of paragraph 3(1)(b)(ii) of Schedule 10A."

113. Appendix C contains extracts from the Bank's 2011, 2012, 2013 and 2014 annual reports. The Claimants also rely on the Bank's interim announcements for the years 2011, 2012 and 2013 and the Prospectus itself. The Bank admits that it did not disclose any of the information in section C in any of its published information but denies various of the underlying allegations in paragraphs 41 to 44 (above) and denies that it made any material omissions: see the Defence, paragraph 46.

114. The Claimants may be able to prove the specific facts alleged in paragraphs 41 and 44 (above). They may also be able to satisfy the Court that the DTR imposed a duty on the Bank to publish those facts in its annual reports, interim announcements or the Prospectus and that it omitted those facts from each of these publications. For example, they may be able to prove that the Bank should have published those facts in its 2011 annual report and that Mr White or Mr King deliberately and dishonestly withheld those facts from the market when the 2011 annual report was being prepared and published. If they prove these facts, then the Claimants will succeed in establishing liability under Paragraph 3 subject to questions of reliance and causation.

115. To satisfy the common law test for reliance, however, it will not be necessary for each Claimant to satisfy the Court that a decision-maker or adviser read the 2011 annual

Exhibit 2
Page 522

report, considered the paragraphs on risk set out in Appendix C and asked themselves the question whether the Bank might have omitted information about the way in which it operated LX (or its algorithms, smart order router and dark pool) or whether it had complied with Regulation NMS. It will be enough for the Claimants to prove that the decision-makers or advisers reviewed the 2011 annual report in order to decide whether to acquire, hold or dispose of Barclays' shares and, if so, whether it was reasonable for them to do so. If the Claimants are also able to prove that they would not have acquired or continued to hold shares in the Bank or would have acquired or sold them at a different time and at a different price if the Bank had published the facts pleaded in paragraph 41 and 44 (above) in the 2011 annual report, then they will be entitled to compensation.

116.  Finally, although I would be very reluctant to decide such an important issue on a pleading point, I do consider it of some significance that the Claimants have pleaded their case in exactly this way. They do not allege that they relied on the omission or absence of any of the information in section C (including paragraphs 41 and 44) from the published information in Appendix C. They plead that they purchased or continued to hold shares in reliance on the Bank's published information: see paragraph 82 (which I have set out in full at [15] above).

*(4)   The presumption of inducement*

117.  I agree with both Hildyard J in *Autonomy* and Zacaroli J in *Farol Holdings* that the presumption of inducement is an inference of fact which the Court may properly make if the claimant has established that the defendant made the representation with the intention to mislead the claimant, who understood it in the sense which it was intended to have. I also accept that although it always remains open to the defendant to prove otherwise, the presumption is "difficult to shift": see *Autonomy* at [515](3). This is because it hardly lies in the mouth of the maker of a fraudulent statement to say that a victim, who understood the statement in the way in which it was intended, could not have placed any reliance upon it.

118.  But whether or not it applies to claims under Schedule 10A, the presumption does not assist the Claimants in Category C. They allege that it is to be inferred that they were induced or influenced in their investment decisions by the Bank's statements and omissions: see paragraph 82 (above). But if I am right that the test for reliance requires

Exhibit 2
Page 523

**Approved Judgment: Leech J**       **Various Claimants v Barclays Bank PLC FL 2020 000051**

them to prove that they read the untrue or misleading statements or that their gist was communicated to them by third parties, then the POR and the Questionnaires are sufficient by themselves to rebut any presumption and to prevent the Court from drawing such an inference. The Claimants in Category C do not allege that they read the statements in Appendices B to D and the three sample claimants (above) all answered Questions 1, 2 and 4 in the Reliance Questionnaire in the negative.

119.    Moreover, this is not simply a case in which the Claimants in Category C rely on the plain and obvious meaning of the words which the Bank used in its published information. They also allege that the overall impression which the Bank's published information gave, was false:

> "62. The statements set out in Appendix B were untrue and/or misleading in that: a. Read fairly, they presented the impression that Barclays was committed across its business to (i) integrity and ethics, (ii) putting customers' interests at heart of what they did, (iii) transparency and (iv) undergo cultural change with a view to putting ethics at the centre of what it did."

> "63. The statements set out in Appendix C were untrue and/or misleading in that: a. Read fairly, they presented the impression that while general risks were being described, Barclays was not aware of specific material risks other than those identified (being involvement in benchmark rates including LIBOR, ISDAfix, foreign exchange rates and gold prices, interest rate hedging products, and PPI), which were discussed in the relevant documents."

> "64. The statements set out in Appendix D were untrue and/or misleading in that: a. Read fairly, they presented the impression that Barclays was applying a strong (alternatively, an adequate) system of risk management and control to provide reasonable assurance that internal controls were effective to minimise risk."

120.    The Claimants in Category C do not, however, allege that their decision-makers or advisers read and understood the documents in Appendices B to D or took away the impression set out in these paragraphs from reading them. It follows, therefore, that the Claimants in Category C are in the same position as the plaintiff in *Smith v Chadwick* and the presumption does not arise. But there is a common sense answer too. The presumption of inducement gives rise to a genuine inference of fact and it is not intended to be a legal fiction. I consider it inconceivable that the Claimants in Category C will be able to persuade me at trial that I should draw the inference that they were induced to act by the statements in Appendices B to D when they accept that nobody who had any

Exhibit 2
Page 524

responsibility for their investment decisions read the Bank's Prospectus or its annual reports or its interim announcements at all.

121.   Finally, I am not satisfied that Professor Ferran's article provides any assistance to the Claimants in Category C either. She made it clear that the "fraud on the market" theory developed in US securities law gives rise to a rebuttable presumption of law and that it would be novel for an English court to adopt it. I agree with the counterview which she set out in the passage from her article which I have quoted. In my judgment, it would be inconsistent with Parliament's legislative intent to apply a legal presumption of reliance to Paragraph 3 and would deprive the concept of "reliance" of the meaning which it was intended to have. I accept Ms Davies submission that if "Price/Market Reliance" falls within reliance in paragraphs 3(1) and 3(4), then it applies to "every claimant in every s.90A claim". When challenged to explain why this was not correct, Mr Nash and his team gave a wholly unconvincing answer and could not provide an example of a case in which reliance would limit recovery in any way: see their Skeleton Argument, ¶59 (above).

*(5)   Secondary Sources*

122.   I do not consider that Mr Nash's appeal to Treasury 2 and the decision to permit reliance on secondary sources provides any real assistance to the Claimants either. The decision to extend reliance to secondary sources is reflected in the drafting of Schedule 10A and, in particular, in paragraphs 2(1)(b) and 2(3). Those paragraphs extend the definition of published information to include not only information published or a recognised information services ("**RIS**") but also to information published by alternative methods where the availability of that information has been published on a RIS and other means required or authorised to be used to communicate with the market where a RIS is not available. These extensions will include many secondary sources. But even if the investor cannot prove that they read or received the published information through any of these means, Schedule 10A does not require investors to prove that they relied exclusively on information published on a RIS. They only have to prove that they relied on the published information itself, however communicated (as the authors of Treasury 2 appreciated).

123.   Furthermore, the common law test of reliance is flexible enough to accommodate indirect reliance in the sense that the gist of the published information was communicated to the

Exhibit 2
Page 525

investor by a third party (and Mr Nash did not attempt to persuade me otherwise). Indeed, there are examples of cases at common law where the Court has recognised that a misrepresentation may be actionable where the information has been filtered through a third party who took the relevant decision. An example which came to my mind when Mr Nash was developing his submissions was *Banque Bruxelles Ltd v Eagle Star Ltd* [1995] All ER 769 at 793h-796d (Phillips J). Finally, the Claimants themselves distinguish between those Claimants who relied on secondary sources and those Claimants who relied on price movements and the market. The Claimants in Category B fall within the first category and the Claimants in Category C fall within the second. The Bank has not applied to strike out any of the claims in Category B.

124.    Indeed, Parliament's intention to recognise claims based on published information communicated through secondary sources demonstrates, in my judgment, that it must have intended liability to be limited to those investors who are able to prove that the published information or the gist of that information was communicated to them and that they either read it or read a summary of it or relied on an agent or third party who read and relied upon it. If it was unnecessary for the Claimants to prove that they received the information published by the Bank by recognised means either directly or indirectly, then it would have been unnecessary to extend Schedule 10A to secondary sources at all. It may well be argued that there is no real reason of policy or principle to draw the line between a Claimant who relied on a broker's report or a "buy" recommendation (which were based on published information) and a Claimant who relied solely on a movement in price (which was also influenced by that same information). That may be so but it is clear that this is where Parliament chose to draw the line and that line must be respected.[3]

*(6)    The Insurance Act 2015*

125.    Mr Nash and his team also relied on the fact that when Parliament has legislated for non-disclosure, it has not required a claimant to prove common law reliance. The example which they gave was section 8 of the Insurance Act 2015 which imposes liability for the breach of the duty of fair presentation:

---

[3] I add that there was no argument about the extent to which the Claimants in Category B are entitled to rely on Schedule 10A and the extent to which it enables them to rely on the examples in the text above is a matter to be argued in due course.

Exhibit 2
Page 526

"**8 Remedies for breach**

(1) The insurer has a remedy against the insured for a breach of the duty of fair presentation only if the insurer shows that, but for the breach, the insurer— (a) would not have entered into the contract of insurance at all, or (b) would have done so only on different terms.

(2) The remedies are set out in Schedule 1.

(3) A breach for which the insurer has a remedy against the insured is referred to in this Act as a "qualifying breach".

(4) A qualifying breach is either— (a) deliberate or reckless, or (b) neither deliberate nor reckless.

(5) A qualifying breach is deliberate or reckless if the insured — (a) knew that it was in breach of the duty of fair presentation, or (b) did not care whether or not it was in breach of that duty.

(6) It is for the insurer to show that a qualifying breach was deliberate or reckless."

126. Mr Nash was quite right to point out that section 8 does not require the insurer to prove that it relied on the insured's presentation of risk but imposes a "but for" test of causation. In my judgment, section 8 does not assist the Claimants either. It shows how easy it would have been for the framers of Paragraph 3 to adopt a test of causation only (as in S.90 or Paragraph 5) and reinforces my conclusion that full effect must be given to the requirement of reliance in Paragraph 3 by applying the common law test.

*(7) Loreley: the "Awareness" test*

127. Finally, Mr Nash argued that the common law test was in a state of uncertainty and that this is a compelling reason in itself for deferring consideration of the issue until trial. For the purposes of the Strike Out Application I am prepared to accept that the test for reliance as it applies to implied representations or representations by conduct is not "complete or fully developed": see *Crossley* at [98]. I am also prepared to accept that the Court of Appeal might decide that Cockerill J was wrong to conclude that claimants relying on an implied representation must prove that they were aware of the representation and had it actively present to their minds when they acted on it: see *Loreley* at [421] (above). I did not hear full argument on this issue and it would be wrong for me to express a view about it on this application.

128. But even if it is unclear whether *Loreley* was properly decided, I am not satisfied that the Claimants in Category C have any real prospect of persuading me at trial either that they

Exhibit 2
Page 527

do not have to prove that they or their representatives read the published information in section E1 and Appendices B to D and acted on it or, alternatively, that they acted on the advice or at the direction of a third party (or even a chain of third parties) who read that published information. I have reached this conclusion for the following reasons:

(1)    Both *Crossley* and *Loreley* are concerned with implied representations or representations by conduct. There is no suggestion in either of those authorities that the debate whether the claimant was aware of the representation extended to express representations (whether made orally or in writing).

(2)    Moreover, in *Crossley* Waksman J distinguished both *Leeds* and *Loreley* on the basis that the implied representation or representation by conduct upon which the claimants in that case relied was "relatively simple" and did not arise out of a "complex web of communications": see [96]. As Zacaroli J pointed out in *Farol Holdings*, those cases in which the Court has made no finding that the claimant was aware of the representation or had it actively in mind involved clear and obvious statements where it "goes without saying" that the claimants relied on them. Cotton LJ said much the same thing in the Court of Appeal in *Smith v Chadwick*: see [69] (above).

(3)    But even if Waksman J intended to cast doubt on the test for reliance as it applies to express representations (and I do not accept that he did), then I respectfully disagree that there is any doubt about the test. He suggested that the question whether the investor was aware of the representation in the prospectus was not in issue in either *Smith v Chadwick* or *Edgington v Fitzmaurice*: see [57] and [58]. For reasons which I now explain, I do not accept that this conclusion is fully accurate.

(4)    I accept that in *Smith v Chadwick* there was no challenge to the plaintiff's answer to interrogatories stating that he had read or looked at the prospectus. I also accept that the question whether he relied on the statement in the prospectus was not determinative of the appeal because both the Court of Appeal and the House of Lords held the prospectus to be honest. But it was the first issue which Lord Blackburn (who gave the majority speech) addressed and he held that the plaintiff had not been induced to purchase shares by the representation. If it was unnecessary

Exhibit 2
Page 528

for him to prove that he read the prospectus or acted on the representation, then this conclusion was unnecessary and wrong.

(5)    By comparison, the conclusion that the representation was "actively present" to the plaintiff's mind did form part of the ratio in *Edgington v Fitzmaurice*. Counsel argued that the plaintiff did not rely on the prospectus and the Court of Appeal rejected that argument and held that he did because it operated on his mind at the same time as his mistaken belief that the debentures would be secured over the company's assets. If Waksman J intended to suggest that he or Cockerill J were not bound by this conclusion – and, as I say, I do not accept that he was addressing the requirement of reliance as it applies to express representations – then, in my judgment, he was not correct to do so.

(6)    Finally, it is clear that Waksman J was influenced by the fact that Cockerill J had given permission to appeal in *Leeds* and that the appeal was to be heard in the near future: see *Crossley* at [96]. However, the parties compromised the case before the appeal was heard: see *Loreley* at [374]. Moreover, Cockerill J has now reconsidered the issue in *Loreley* and Zacaroli J has followed her decision in *Farol Holdings*. As he pointed out, the fundamental question which the Court has to answer is whether the claimant's decision to take the action (or refrain from taking action) which caused it loss was caused by the representation made by the defendant: see [233].

*(8)    Conclusion*

129.    In my judgment, Parliament intended the Court to apply the common law test of inducement or reliance from the tort of deceit to Paragraph 3 and both to misleading statements and omissions. That test requires the Court to determine whether the Claimants were induced to rely on the published information set out in the Particulars of Claim, section E1 and Appendices B to D and whether that published information caused the Claimants to acquire, hold or dispose of the Bank's shares. I agree with Hildyard J in *Autonomy* that the Claimants in Category C cannot satisfy this test unless their representatives read and considered that published information or third parties who directed or influenced their investment decisions read and considered that published information.

130.    I leave open the question whether it is necessary for the Claimants to prove that their

Exhibit 2
Page 529

decision-makers or advisers applied their mind to the relevant misleading or untrue statements and that those statements induced them to acquire, continue to hold or dispose of their shares on the terms which they did: see *Autonomy* at [503]. This is a matter for further argument at trial (as is the scope of Category B). But I am satisfied that this is not a requirement of the test applicable to omissions for the reasons which I have given. Paragraph 3 requires reliance on the relevant published information not on the facts or matters which the Claimants allege to have been omitted.

I.    Summary Disposal

131.    Even though I have determined the legal argument against the Claimants, it does not automatically follow that the Bank is entitled to strike out the claims in Category C or to reverse summary judgment. Mr Nash submitted that not all of the 241 funds in Category C operated in the same way and that some of them involved the exercise of discretion by human decision-makers. But the Reliance Questionnaires completed by the sample Claimants in Category C (which I have quoted above) do not assert that any of their human decision-makers or their advisers read or considered any of the published information in section E1 or Appendices B to D (or relied on any secondary sources). Indeed, if they had read or considered that information, they would be included in Category A (or Category B).

132.    Moreover, Ms Hogan gave no evidence to that effect in Hogan 5. If the methodology of any of the Tracker Funds had involved a human fund manager considering the Bank's published information or, indeed, even an AI or computer assessment of that published information, those funds have had ample opportunity to adduce evidence to this effect. If any Tracker Funds had operated in this way, Ms Hogan would have given evidence to that effect. But she did not do so.

133.    Finally, I have considered whether there is any evidence which can reasonably be expected to be available at trial which might lead to a different conclusion. But it is striking that two of the Reliance Questionnaires which I have quoted stated that the Claimants had no relevant documents to disclose and the third stated that the Claimant had not conducted a search for documents. I am not satisfied, therefore, that there are any further contemporaneous documents which the Claimants in Category C could put before the Court. I accept that they may be able to adduce factual and expert evidence about the

Exhibit 2
Page 530

way in which they operated. But if they give evidence to the same effect as Dr Hildreth and Mr Curcio, I am not satisfied that the claims of those Claimants in Category C have any real prospect of success.

## VI.    Paragraph 5

### J.    Submissions

#### (1)    The Bank

134.  Ms Davies and her team submitted that Paragraph 5 only applied where the Bank had actually published information but had done so late. She relied on the dictionary definition of the word "delay" as the "action of deferring or postponing something" and also the wording of paragraph 5(2) which only applies where a PDMR has acted dishonestly in "delaying the publication of the information". It followed, so she argued, that Paragraph 5 only imposes liability upon an issuer where publication has taken place. Ms Davies also submitted that if the Court adopted a different construction, it would render the claims under Paragraph 3 redundant and absolve the Claimants from the need to prove reliance at all. In support of this submission, she relied on the statutory context and, in particular, Davies 1, §85 (see [47] above) and Treasury 1, §6.5 (see [54] above) where the Treasury intended to define liability precisely so that legitimate delay was not penalised. Finally, Ms Davies relied upon paragraph 7(1) as providing that the remedies in Paragraph 3 and Paragraph 5 were exclusive of each other.

#### (2)    The Claimants

135.  Mr Nash and his team also appealed to the normal meaning of the word "delay" and relied on the dictionary definition which includes not only "the action of deferring or postponing something" but also "procrastination" or "waiting". He relied on the example of the delivery of a parcel (upon which the Bank had originally relied). He submitted that the recipient would be entitled to complain about the delay in delivery after the due date whether or not it had been delivered (or even lost) and that it was nonsensical to suggest that the customer was not entitled to complain about the delay until the parcel was finally delivered.

136.  Mr Nash pointed out that, although the Bank had later published some information in

Exhibit 2
Page 531

answer to the Complaint and in the subsequent settlements, it had not published all the information in section C or all the information which the Claimants alleged that it was under a duty to disclose. Mr Nash submitted that it could not be right that the Bank could avoid liability under Paragraph 5 by failing to publish such information <u>at all</u>. If this was correct, so he submitted, the Claimants would not be entitled to bring a claim at all during any period of non-disclosure and permanent silence would prevent liability from ever arising under Paragraph 5. He had a number of answers to the apparent overlap between the two paragraphs:

> "45. The essential argument put forward by D (paras 64 and 67) appears to be that "every single Claimant could bring precisely the same claim under both paragraph 3 and paragraph 5 in every case", allowing them to escape the para 3 reliance requirement. However:
>
> a) It is not clear why potential overlap is a problem. There are many situations where concurrent claims exist (e.g. contract and in tort, and in the context of statutory claims – e.g. unfair prejudice, derivative actions and just and equitable winding up). D's reliance on the "exclusivity provisions" (as it terms them) in para 7 of Sch 10A is misconceived. These exclude other remedies (e.g. deceit). They do not suggest that there cannot be overlapping liability between limbs of Sch 10A. That is obviously not the case – to take a simple example, a statement which omits certain information such that it is misleading will give rise to claims in both misstatement and omission.
>
> b) On any view the overlap would not be complete. The example above demonstrates a period for which there could be no claim based on omission, because there is no Published Information and thus nothing from which to make an omission. The Davies Discussion Paper (para 85) notes this point in relation to omissions (emphasis added):
>
>> "The section <u>contemplates liability only for omissions from the statement which is made</u> ('omission from any such publication of any matter to be included in it') <u>rather than liability for failure to make any statement at all.</u> Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. <u>There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point</u>."
>
> c) D cites this passage at para 74 – but then proposes a construction which would give no remedy for dishonest delay in exactly that situation, so that dishonest delay would not plug the very gap which has been identified. The passage also raises interesting questions about the relationship between dishonest delay and omissions, and what is characterised as an omission for these purposes.
>
> d) Liability is not coterminous in other respects. For example, an issuer

Exhibit 2
Page 532

which had dishonestly delayed in making an announcement, but had not been dishonest in the preparation of an announcement that was eventually made, would be liable under para 5 but not para 3. Conversely an issuer which had delayed for legitimate reasons, but had then acted dishonestly in causing omissions from the statement once made, would be liable under para 3 but not para 5.

e) Liability under paras 3 and 5 might arise in respect of different periods of time. An issuer might, for example, be liable for dishonest delay in not announcing anything at all, and then liable for omissions from the point at which a partial, defective statement was made. It might be liable for continued dishonest delay in relation to matters not announced. In such a scenario, each stage of the analysis might proceed on a different factual basis, with the Court required to apply a different test to different information."

137.  Finally, Mr Nash submitted that this was not an exhaustive discussion but it highlighted the complexity of addressing the question in the abstract without concrete facts or without analysis of a full set of provisions. He also submitted that if the point fell to be decided on a summary basis, the analysis was heavily against the suggestion that dishonest delay is subject to a blanket requirement of subsequent, accurate publication.

K.    The Test

138.  Despite Mr Nash's attractive submissions, I am satisfied that Paragraph 5 only imposes liability upon an issuer of securities in relation to information which has been published on a RIS and does not impose liability where no publication has taken place. I have reached this conclusion for the following reasons:

(1)   I agree with Mr Nash's submission that the natural and obvious meaning of the word "delay" is capable of describing both the situation in which a parcel arrives later than was originally promised by the delivery company but also the situation in which it is not delivered at all. I am not satisfied, therefore, that Parliament intended Paragraph 5 to apply only where publication had taken place just by using the word "delay".

(2)   But that is not the end of the story. Paragraph 5 only imposes liability to pay compensation to a person who acquires, continues to hold or disposes of securities as a result of "a delay by the issuer in publishing information to which this Schedule applies": see paragraph 5(1)(b). Moreover, the issuer is only liable to pay compensation if a PDMR "acted dishonestly in delaying the publication of the

Exhibit 2
Page 533

information".

(3)    Paragraph 2 defines the information to which Schedule 10A applies. The schedule
only applies to information "published by the issuer" either "(a) by recognised
means" or "(b) by other means where the availability of the information has been
announced by the issuer by recognised means". It follows that Paragraph 5 has no
application to an issuer unless or until it has published the relevant information by
recognised means or it has announced the availability of that information by
recognised means. It also follows, in my judgment, that Schedule 10A does not
apply – and that there can be no liability for delay in publishing information –
unless or until it falls within paragraph 2 and has been published.

(4)    In my judgment, this construction of Schedule 10A addresses the mischief which
Professor Davies identified in Davies 1, §85. If the PDMRs of an issuer deliberately
and dishonestly delay the publication of information, e.g. to take advantage of it
personally before the market becomes aware of it, but then later publish it
accurately, there can be no liability under Paragraph 3 either for making a
misleading statement or for omitting to publish the information. But there will be
liability under Paragraph 5. This construction also addresses the need identified in
Treasury 2, §6.3 to §6.8 for the liability to be precisely drawn.

(5)    I, therefore, reject Mr Nash's submission that Davies 1, §85 supports his own
construction rather than that of the Bank. In that paragraph Professor Davies was
drawing attention to the fact that S.90A only imposed liability for omissions from
information which had been published and did not apply where there was no
publication at all. But it is clear from the last sentence that the lacuna which he
identified was the late but accurate publication of information rather than the failure
to publish the information at all.

(6)    For example, the Claimants allege that the Bank was under an obligation to
announce the facts set out in section C to the market under the DTR and to publish
them in the Prospectus and in its management reports and interim management
reports. If they establish this and also that the Bank's PDMRs dishonestly and
deliberately failed to publish these facts in the Prospectus or the relevant reports,
they will establish liability for omissions under Paragraph 3 (subject to reliance and

Exhibit 2
Page 534

causation). But if the DTR (or any other regulations) did not impose a duty on the Bank to publish that information on a RIS promptly or within a specified time period or at all, then there can be no liability for delay in publication either.

139.   In my judgment, therefore, Paragraph 5 only imposes liability upon an issuer of securities in relation to published information whether one adopts a literal construction of the words used or a purposive construction of the schedule as a whole. The Bank can be liable for misleading or untruthful statements in its published information and for deliberately omitting to include facts in that published information or for delaying the publication of information which was accurate but doing so late. Schedule 10A does not impose liability on the Bank for misleading statements or omissions or delay unless and until it has published information to which Schedule 10A applies.

140.   But I am also satisfied that the Claimants' preferred solution would lead to an absurd result. Mr Nash accepted that there was a considerable overlap between Paragraph 3 and Paragraph 5 if liability under the latter was not dependent upon proof of publication on a RIS. Indeed, the Claimants had to say that the Bank was liable to pay compensation to them under Paragraph 5 even if they failed to prove reliance for the purposes of Paragraph 3 because they have applied for permission to amend the Particulars of Claim to plead no additional facts in support of the dishonest delay claim apart from the allegation the Bank delayed publication dishonestly: see the Particulars of Claim, paragraph 69.

141.   I can see no reason why Parliament would have intended to introduce a liability for delay in Paragraph 5 which overlapped to such a degree that it would render Paragraph 3 almost redundant in this way. This degree of overlap makes no sense at all given the significance which both the Davies Review and the Treasury Consultation attached to the requirement of reliance in Paragraph 3. The extent of the overlap between the two paragraphs also makes no sense given the Treasury's view that the issue was finely balanced but liability should be introduced provided that it was precisely defined. I found none of the reasons which Mr Nash and his team advanced to explain the subsequent overlap remotely convincing given the background to the introduction of Schedule 10A.

142.   Mr Nash's principal reason for justifying the overlap was that there are many situations in which concurrent liability in tort and contract or under statute may exist. But in those cases, each cause of action requires proof of a number of different elements and exists

Exhibit 2
Page 535

independently of the others. Put another way, there will be some cases in which liability will overlap but many cases in which it does not. But if Mr Nash's construction of Paragraph 5 is correct, then the liability for delay under Paragraph 5 will always overlap with liability for omissions under Paragraph 3. He advanced no positive reason why Parliament would have intended such a result and it is plainly inconsistent with both the Davies Review and the Treasury Consultation.

143.   Moreover, paragraph 7(1) was clearly intended to prevent concurrent liability of this kind arising. I agree with Mr Nash that this provision was primarily designed to ensure that Schedule 10A excluded other, non-statutory remedies such as damages for deceit. But Parliament did not intend S.90A to give rise to concurrent liability under the section and in contract or tort, I can see no reason why would it have amended S.90A to create concurrent liability between Paragraph 3 and Paragraph 5. In my judgment, the exclusivity provisions are consistent with both the Davies Review and the Treasury Consultation and provide further support for my preferred construction of Paragraph 5.

144.   Finally, I found neither of Mr Nash's examples convincing. They both assume that no liability for omissions will arise under Paragraph 3 if the Bank has delayed in publishing the information in section C for a significant period of time. But if the Bank had an obligation to publish that information in the Prospectus or in their interim or annual statements (as the Claimants allege), the deliberate failure to do so will give rise to liability under Paragraph 3 provided that the Claimants can prove reliance and causation. The paradigm example of liability under Paragraph 5 is insider trading and the dishonest delay by a PDMR in making an ad hoc disclosure to the market of price sensitive information or holding it back from information which the issuer was imminently about to publish: see Davies 2, §49 (see [50] above).

L.   Summary Disposal

145.   The Claimants do not allege that the Bank published any of the information in section C on a RIS or published it by other means where the availability of that information was published on a RIS. Indeed, they expressly plead that the announcement which the Bank made to the market on 26 June 2014 did not amount to an announcement of the matters in section C: see the Particulars of Claim, paragraph 58. Moreover, Mr Nash did not suggest that the Claimants would wish to amend to plead that the Bank had published

Exhibit 2
Page 536

any of the specific information in section C but had dishonestly delayed its publication. I am satisfied, therefore, that the Claimants have no real prospect of succeeding on their claims under Paragraph 5 at trial.

## VII. **Case Management**

146.  In the CMC1 Order I ordered that Trial 1 should be listed for hearing on the first open date in October 2025 with a time estimate of 8 weeks (later extended to 10 weeks) and it has now been listed to begin on 6 October 2025. In the CMC2 Order I ordered a split trial and that issues of reliance, causation and share price would be tried at Trial 1 in respect of a group of seven sample Claimants. I also made separate orders for disclosure and witness statements in respect of the sample Claimants (and a number of reserve Claimants). I also gave permission to the parties to call expert evidence in three disciplines.

147.  Mr Nash advanced a number of case management reasons why the Court should refuse to grant the Strike Out Application. His primary submission was that all of the Claimants in Categories A and B relied on Price/Market Reliance and their claims would be going to trial. He also relied on the fact that only one sample Claimant in Category C had been selected for trial (C68 above). In my judgment this is not a sufficient reason for refusing to strike out the claims in Category C or strike out the claims for dishonest delay. If I strike out all of the claims in Category C, then it will be unnecessary to call any factual evidence or any experts relating to Price/Market Reliance. This will undoubtedly lead to a saving in time and costs and I agree with Joanna Smith J in *Getty Images (US) Inc v. Stability AI Ltd* (above) that the existence of the claims in Categories A and B is not a compelling reason why the claims in Category C should proceed to trial.

148.  Mr Nash's second case management reason why the Court should refuse to grant the Strike Out Application was that both issues which I have decided are novel points of law and that it is overwhelmingly likely that the Claimants will appeal. I do not fully accept Mr Nash's characterisation of the issues because *Autonomy* provides authority on the scope of reliance under Paragraph 3. But I accept that the Claimants are likely to appeal and, whether or not I grant permission to appeal myself, I have to take into account the possibility that the Court of Appeal will grant permission to the Claimants.

149.  In my judgment, the possibility of an appeal is not a reason either for refusing to strike

Exhibit 2
Page 537

out the claims in Category C or to strike out the claims for dishonest delay. It is equally possible that the Bank will appeal given the importance of the issue. Moreover, the directions which I have given in both the CMC1 Order and the CMC2 Order are sufficiently flexible to accommodate a successful appeal (by either party). It will not be difficult to substitute a reserve Claimant for sample Claimant C68 at this stage. The Court can the try the claims in Category A and Category B at Trial 1. If the Claimants in Category C are successful on an appeal, then it ought to be possible to try the question of Price/Market Reliance discretely at Trial 2 (if judgment is handed down after Trial 1).

150. The Claimants do not rely on any additional facts in relation to their dishonest delay claims under Paragraph 5. They rely on the failure to publish the information in section C in relation to both liability for omissions under Paragraph 3 and liability for delay under Paragraph 5 and they allege dishonesty against the same individuals. I accept that there may be a difference between "dishonest concealment of a material fact" for the purposes of paragraph 3(2) and dishonest delay for the purposes of paragraph 5(2) but the overall test for dishonesty is the same: see Schedule 10A, paragraph 6. In my judgment, the findings which the Court makes at Trial 1 in respect of the allegations of dishonest concealment are likely to be determinative of the allegations of dishonest delay even if an appeal is allowed. I am not persuaded that the possibility that the Bank may be required to recall Mr White or Mr King at Trial 2 (or other PDMRs) to deal with the dishonest delay claims is a compelling reason to refuse to strike out claims which have no real prospect of success.

151. Finally, Mr Nash relied on the fact that in other S.90A cases the Court has permitted similar issues to go to trial. However, neither of the two cases upon which Mr Nash relied involved an application to strike out claims based on Price/Market Reliance or the Court delivering a considered judgment. Moreover, in *Various Claimants v Standard Chartered PLC* [2024] EWHC 1108 (Ch) Michael Green J accepted that the question of "common reliance" (which was not identical to Price/Market Reliance) involved "essentially a legal issue" and that it was an important legal point which ought to be decided as soon as possible: see [76]. I note in passing that in *Standard Chartered* Michael Green J heard and determined a strike out application in October 2023 and on 17 June 2024 the Court of Appeal handed down judgment on the appeal: see [2024] EWCA Civ 674.

152. In my judgment, there are no compelling reasons why I should permit the claims in

Exhibit 2
Page 538

Category C and the dishonest delay claims to go to trial having determined that they have no real prospect of success. Moreover, there is in my judgment a compelling reason why I should not permit them to go to trial. The Category C claims involve 241 different funds and have a total value of £332 million which is 60% of the total value of the claims. If I dispose of those claims on a summary basis, this ought to reduce the scope of the claims considerably and promote an early settlement. I will, therefore, do so.

## VIII. Disposal

153.  I am satisfied, therefore, that the Particulars of Claim disclose no reasonable claim for dishonest delay under Paragraph 5. I am also satisfied that the 241 funds or sub-funds who advance claims in Category C have no real prospect of succeeding at trial in proving reliance under Paragraph 3 and that I should grant reverse summary judgment in respect of those claims. I invite the parties to agree a form of order which reflects these findings and I will hear argument on any consequential issues at CMC3 which is listed in a window commencing on 25 November 2024. I will adjourn the final disposal of the Strike Out Application and extend time for any application for permission to appeal until 21 days after CMC3 and I invite the parties to incorporate such a provision in any agreed order.

Exhibit 2
Page 539

PART THREE: GROUNDS FOR AVOIDANCE

Exhibit 2
Page 540

Chapter 10

## MISREPRESENTATION[1]

*Hugh Beale*

| | | |
|---|---|---|
| 1. | In General ..................................... | 10-001 |
| 2. | What Constitutes Effective Misrepresentation .......... | 10-006 |
| (a) | Summary ................................... | 10-006 |
| (b) | False Statement of Fact or Law ................... | 10-007 |
| (c) | Statement By or Known to Other Party ............. | 10-031 |
| (d) | Who May Rely on a Misrepresentation ............. | 10-038 |
| (e) | Inducement ................................. | 10-042 |
| 3. | Damages for Misrepresentation ..................... | 10-054 |
| (a) | Fraudulent Misrepresentation ..................... | 10-056 |
| (b) | Negligent Misrepresentation ..................... | 10-085 |
| (c) | Innocent Misrepresentation ...................... | 10-112 |
| 4. | Rescission for Misrepresentation .................... | 10-123 |
| (a) | General .................................... | 10-123 |
| (b) | Restitutio in Integrum ......................... | 10-135 |
| (c) | Other Bars to Remedy of Rescission ............... | 10-143 |
| 5. | Exclusion of Liability for Misrepresentation ........... | 10-156 |
| 6. | Contracts Where a Duty of Disclosure ............... | 10-170 |
| (a) | Insurance .................................. | 10-172 |
| (b) | Contracts to Take Shares in Companies ............. | 10-184 |
| (c) | Family Settlements ........................... | 10-186 |
| (d) | Contracts for the Sale of Land ................... | 10-187 |
| (e) | Contracts of Suretyship ........................ | 10-189 |
| (f) | Partnership Agreements ........................ | 10-193 |
| (g) | General Releases ............................. | 10-195 |
| (h) | Fiduciary Relationships and Relationships of Trust and Confidence ................................. | 10-196 |

### 1.   In General

**Preliminary**   The modern law relating to misrepresentation is a somewhat   **10-001**
complex amalgam of rules of common law, equity and (as the result of the

---

[1]   See Allen, *Misrepresentation* (1988); Cartwright, *Unequal Bargaining* (1991), Ch.3; Cartwright, *Misrepresentation, Mistake and Non-disclosure*, 6th edn (2022); Spencer Bower and Handley, *Actionable Misrepresentation*, 5th edn (2014).

Exhibit 2
Page 541

statement of fact.[114] So a representation that planning permission exists for a particular use is a representation of fact, and not of law[115]; similarly with a representation by a landlord that he accepts liability for repairs under a lease.[116] On the other hand a statement of law made separately from a statement of fact was held not to be a misrepresentation.[117] This seems to rest on a distinction between a statement of an abstract proposition of law, which was not regarded as a misrepresentation, and a statement applying the law to the facts of a particular situation which, at least in some circumstances, may constitute a misrepresentation.[118] But thirdly, in the law of restitution (or unjust enrichment[119]) the distinction between a payment made under a mistake of fact and one made under a mistake of law has been held by the House of Lords not to be part of English law,[120] and, in the light of this, it was held in *Pankhania v Hackney LBC*[121] that the "misrepresentation of law" rule is no longer good law. Thus, for the purposes of the law of misrepresentation, the distinction between statements of law and statements of fact is no longer maintainable and that even an incorrect statement of an abstract proposition of law may amount to a misrepresentation unless it is apparent that all that is being offered is an opinion without implication that the speaker has reasonable grounds for that opinion.[122] It is submitted that the underlying principle here is the same as that suggested in the previous paragraph, viz that even a statement as to the law may be a misrepresentation if it was reasonable, in all the circumstances, for the representee to rely upon it.[123] In any event a statement of foreign law is here (as elsewhere in the law) treated as a statement of fact.[124]

**10-022**  **Non-disclosure**  The general rule is that mere non-disclosure does not constitute misrepresentation, for there is, in general, no duty on the parties to a contract to disclose material facts to each other, however dishonest such non-disclosure may be in particular circumstances.[125] So, for example, in *Percival v Wright*,[126] a company director who had inside information about certain facts likely to enhance the value of the company's shares was held to be under no duty to disclose this fact

---

[113]  (1867) L.R. 2 H.L. 149.

[114]  (1867) L.R. 2 H.L. 149 at 170.

[115]  *Laurence v Lexcourt Holdings Ltd* [1978] 1 W.L.R. 1128.

[116]  *Brikom Investments Ltd v Seaford* [1981] 1 W.L.R. 863. But cf. *China Pacific SA v Food Corp of India* [1981] Q.B. 403, 429; rev'd on different grounds [1982] A.C. 939, where an admission of liability was said to be a representation of law.

[117]  *Rashdall v Ford* (1866) L.R. 2 Eq. 750; *Harse v Pearl Life Assurance Co* [1904] 1 K.B. 558.

[118]  See also, below, paras 33-049—33-055.

[119]  See para.33-001 below.

[120]  *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 A.C. 349. See below, para.33-052.

[121]  [2002] EWHC 2441(Ch). See also above, para.9-052.

[122]  cf. above, para.10-013. It has rightly been remarked that the reasons often given for refusing relief on the grounds of a mistake of law—for example, that it would be easy to claim a mistaken belief in the law and hard to disprove it—have much less weight when the mistake was the result of a misrepresentation by the other party: Cartwright, *Misrepresentation, Mistake and Non-disclosure*, 6th edn (2022), para.3-31.

[123]  See Cartwright, *Misrepresentation, Mistake and Non-disclosure*, 6th edn (2022), para.3-43.

[124]  *André & Cie SA v Ets Michel Blanc & Fils* [1977] 2 Lloyd's Rep. 166.

[125]  *Ward v Hobbs* (1878) 4 App. Cas. 13. In *Hurley v Dyke* [1979] R.T.R. 265, 303 Lord Hailsham suggested *Ward v Hobbs* might need reconsideration in the light of recent developments in negligence but expressed no concluded opinion. Certain statutes may impose duties of disclosure in particular circumstances: e.g. Housing Act 1985 (as amended) s.125(4A): see *Payne v Barnet LBC* (1998) 30 H.L.R. 295 (no duty at common law should be superimposed on statutory scheme).

[126]  [1902] 2 Ch. 421; cf. *Coleman v Myers* [1977] 2 N.Z.L.R. 225, and see also *Gething v Kilner* [1972] 1 W.L.R. 237; *Prudential Insurance Co Ltd v Newman Industries Ltd* [1981] Ch. 257, 295. Such

Exhibit 2
Page 542

to a shareholder from whom he bought some shares. For the same reason it is not possible to set up an estoppel on the basis of an omission to disclose unless a duty to disclose can be established in the particular circumstances of the case.[127] Tacit acquiescence in another's self-deception does not itself amount to a misrepresentation, provided that it has not previously been caused by a positive misrepresentation.[128] But there are exceptions to the general rule that there is no duty to disclose. First, there are many statutory exceptions.[129] Secondly, there are exceptions at common law where in particular types of contract there has been held to be a duty of disclosure (often categorised as contracts uberrimae fidei).[130] These include cases where there is a fiduciary relationship between the parties[131] and where the relationship between the parties is one of trust and confidence.[132] There may also be a duty to disclose where failure to disclose some fact distorts a positive representation. It is also possible for a person to be guilty of misrepresentation by conduct.[133] Cases of fiduciary relationships and relationships of trust and confidence are dealt with later.[134] Misrepresentation by conduct and cases in which a failure to disclose a fact distorts a positive misrepresentation are dealt with in the following paragraphs.

**Misrepresentation by conduct**    As previously mentioned, a person may be guilty    **10-023** of misrepresentation by conduct.[135] It is sometimes hard to distinguish misrepresentation by conduct from implied representation, but normally it is unnecessary to do so.[136] In the simplest case, conduct may be intended to convey information in precisely the same way as the written or spoken word. Thus a person who went

conduct could constitute an offence under the Criminal Justice Act 1993 s.52, but s.63(2) provides that no contract shall be void or unenforceable by reason only of s.52.

[127] *Moorgate Mercantile Co Ltd v Twitchings* [1977] A.C. 890.
[128] See *Keates v Cadogan* (1851) 10 C.B. 591; *New Brunswick and Canada Ry and Land Co v Conybeare* (1862) 9 H.L. Cas. 711; *Smith v Hughes* (1870-71) L.R. 6 Q.B. 597; *Turner v Green* [1895] 2 Ch. 205; see also *Jewson & Son Ltd v Arcos Ltd* (1933) 39 Com. Cas. 59; *Wales v Wadham* [1977] 1 W.L.R. 199. This sentence of the text was cited with approval in *Donegal International Ltd v Zambia* [2007] EWHC 197 (Comm), [2007] 1 Lloyd's Rep. 397 at [465] and in *ING Bank NV v Ros Roca* [2011] EWCA Civ 353, [2012] 1 W.L.R. 472 at [92].
[129] See e.g. below, para.10-184.
[130] See below, paras 10-170 et seq. Whether the label uberrimae fidei is useful is discussed below, para.10-170.
[131] See below, paras 10-098—10-099.
[132] See below, para.10-196.
[133] In certain circumstances failing to disclose information may be a criminal offence, e.g. Timeshare, Holiday Products, Resale and Exchange Contracts Regulations 2010 (SI 2010/2960) reg.12, replacing Timeshare Act 1992 s.1A (inserted by Timeshare Regulations 1997 (SI 1997/1081)).
[134] See below, paras 10-099 and 10-196.
[135] See above, para.10-019. The representation in *Spice Girls Ltd v Aprilia World Service BV, The Times* 5 April 2000, Ch D; rev'd in part on other grounds [2002] EWCA Civ 15, referred to in that paragraph, may equally well be interpreted as one of representation by conduct. There may also be a misrepresentation by conduct when a master agreement between the parties provides that each time one party enters a transaction under the agreement, it makes a representation that particular facts exist or have not occurred: see *TMT Asia Ltd v Marine Trade SA* [2011] EWHC 1327 (Comm). As with an implied representation, a representation by conduct must have been "actively present" to the representee's mind in order to satisfy the requirement of inducement (see below, para.10-042). There is no separate rule for representations by conduct: *Leeds City Council v Barclays Bank Plc and Newham LBC v Barclays Bank Plc* [2021] EWHC 363 (Comm), [2021] Q.B. 1027 at [102] and [131]; indeed it must be possible to articulate in words what is being represented by conduct: at [132].
[136] But it was necessary where the question was whether there is a representation in writing sufficient to satisfy the Statute of Frauds (Amendment) Act 1828 (Lord Tenterden's Act) (see below, para.10-055): *Contex Drouzhba v Wiseman* [2007] EWCA Civ 1201, [2007] All E.R. (D) 293 (Nov)

Exhibit 2
Page 543

CHAPTER 12

**SHAREHOLDER CLAIMS**

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTRODUCTION | 12-001 |
| 2. | ACTIONS UNDER FSMA | 12-003 |
| A. | Section 90 FSMA—liability for prospectuses and listing particulars | 12-005 |
| B. | Section 90A FSMA—liability for other published information | 12-043 |
| C. | FSMA s.90 and s.90A: a summary comparison | 12-065 |
| 3. | OTHER ACTIONS BASED ON FALSE STATEMENTS | 12-066 |
| A. | General principles relating to false representations | 12-067 |
| B. | Separate requirements for the causes of action | 12-075 |
| C. | Reliance | 12-087 |
| D. | Causation | 12-091 |
| 4. | A CASE STUDY ON OTHER CAUSES OF ACTION: THE LLOYDS/ HBOS GROUP LITIGATION | 12-096 |
| A. | Tortious duties | 12-097 |
| B. | Company law duties | 12-100 |
| C. | Fiduciary duties | 12-102 |
| 5. | REMEDIES | 12-104 |
| A. | Damages for deceit or negligent misstatement and under the Misrepresentation Act 1967 | 12-104 |
| B. | Damages under FSMA | 12-124 |
| C. | Damages for other common law claims | 12-131 |
| D. | Calculation of loss | 12-132 |
| E. | Rescission | 12-138 |
| 6. | ALTERNATIVE TO COMMENCING AN ACTION—COMPENSATION SCHEME | 12-140 |
| 7. | LIMITATION PERIOD FOR CLAIMS | 12-143 |
| A. | Claims in the tort of deceit | 12-143 |
| B. | Claims in the tort of negligent misstatement | 12-144 |
| C. | Claims under the Misrepresentation Act 1967 | 12-147 |
| D. | Claims under ss.90 and 90A FSMA | 12-148 |

1.  INTRODUCTION

Shareholder claims in relation to public companies have not historically been a **12-001**
significant feature of litigation in England and Wales. However, shareholders form
a natural constituency for group litigation and in recent years a number of significant
and high-profile cases have been brought by groups of shareholders. These include,

Exhibit 2
Page 544

alternative. This is illustrated by the *RBS Rights Issue Litigation*, where the claimants pursued only a s.90 claim and not a common law claim or a claim under the Misrepresentation Act.

## B.  Section 90A FSMA—liability for other published information

The UK's implementation of the Transparency Directive in 2007 (via the **12-043** Companies Act 2006) included the creation of the statutory liability regime set out in s.90A FSMA.[58] The original iteration of s.90A provided that the issuer would be liable to compensate an investor who acquired securities and suffered loss as a result of an untrue or misleading statement or omission in a periodic financial report required by the Transparency Directive or in a preliminary results statement.

However, soon after s.90A was put in place, the Government set in motion a consultation, including the Davies Review, on whether the regime should be extended to other disclosures and to other markets. In response to this consultation, the Government passed the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010. These Regulations, which apply to information published on or after 1 October 2010, substantially expanded the statutory regime for issuer liability for defects in publications to the market in s.90A FSMA.

As a result, s.90A provides a remedy for untrue or misleading statements made knowingly (or recklessly) or dishonest omissions contained in published information, or dishonest delays in publishing the relevant information, for securities traded on a regulated market. It covers all information published (or announced as having been made available) by issuers via a recognised information service.[59]

Section 90A provides for the codification, and modification, of the common law **12-044** of deceit. It was introduced in order to reflect the requirement, following the introduction of the Transparency Directive in 2004, that Member States introduce extensions to their civil liability regimes for disclosures caught by that legislation. It does this through the designation of statutory liability for specific types of flaws in the published information: untrue or misleading statements; omissions; and delays to publication. It also provides for a safe harbour for issuers from liability other than under s.90A, subject to certain specified categories of liability set out in Sch.10A para.7.

An issuer cannot be liable under s.90A in respect of a statement in, or omission from, information published in a prospectus or listing particulars where the issuer is already liable in respect of that information under s.90.[60]

Section 90A claims have been triggered by a broad range of events. Such events have included activities performed by the company, risks the company is facing, and publications of the company's financial and accounting information. There has also been a rise in cases being brought where the announcement of an issue affecting the company (for example, conduct which has been the subject of a regulatory investigation or settlement) has triggered a share price decline. In such cases, claimants have alleged that the relevant information which caused the share price decline was omitted from earlier publications and/or rendered general statements as to

---

[58] Sections 90A and 90B FSMA were inserted by s.1270 of the Companies Act 2006.

[59] The recent case of Autonomy considered whether the announcement, by a recognised information service, of an earnings call, meant that the transcript of that call (although not mentioned in the announcement) fell within the definition of information made available by a recognised information service. The Court held that it did not. *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [457].

[60] FSMA Sch.10A para.4.

[573]

Exhibit 2
Page 545

governance or compliance with systems and controls for the identification of fraud or other misconduct within those earlier publications untrue or misleading.

**(1) Untrue or misleading statements**

**12-045**    The codified liability regime under s.90A provides that issuers will be liable for any untrue or misleading statement contained in an applicable publication.[61] This has, as its focus, the actual information included in the relevant publication. It provides for a remedy where that information is itself flawed. So, for example, if the financial information provided by an issuer[62] is incorrect by virtue of overstating the revenue and/or profit for a given reporting period, that publication might be said to have contained an untrue or misleading statement with regard to the issuer's financial results. If it has caused loss to investors, this may give rise to a s.90A claim. This is the type of allegation which was made in the *Tesco* case.

The recent case of *Autonomy* has provided guidance on the meaning of "untrue or misleading" in the context of s.90A. In that case, Mr Justice Hildyard held that the relevant information has to be "objectively false" in order to constitute an "untrue or misleading" statement for the purposes of s.90A.[63] In order to answer the question of whether a statement is objectively false, a court will need to consider the "objective meaning of the impugned statement, that is the meaning which would be ascribed to it by the intended readership, having regard to the circumstances at that time".[64]

Establishing the context of the statement, and the characteristics of the representee, will be particularly complex in class actions brought under s.90A FSMA, especially where the relevant statements have been made over a significant period of time. Furthermore, the statements to which s.90A applies will often involve the exercise of "accounting judgment" on points where there may be "a range of permissible views". A statement should not be regarded as false where it can be "justified by reference to that range of views".[65]

Where there are multiple possible interpretations of a statement, one of which is false, the court should not seek to determine which interpretation is more likely, and the claim may fail "unless it is shown that the ambiguity was artful or contrived".[66]

In reaching his conclusions, Hildyard J relied upon the judgment in *Raiffeisen Zentralbank*,[67] in which the court held that, in the case of an implied statement, a claimant will need to show they understood the statement in the sense which has subsequently been ascribed to it.[68]

---

[61]   FSMA Sch.10A para.3(1)(b)(i).
[62]   Pursuant to LR r.9.7A.1R and DTR r.6.3.5R (preliminary annual results), DTR r.4.1.3R and DTR r.6.3.5R (annual results) or DTR r.4.2.2R and DTR r.6.3.5R (half-yearly results).
[63]   *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [448].
[64]   *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [460].
[65]   *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [463].
[66]   *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [465].
[67]   *Raiffeisen Zentralbank Osterreich AG v Royal Bank of Scotland Plc* [2010] EWHC 1392 (Comm); [2011] 1 Lloyd's Rep. 123; [2011] Bus. L.R. D65.
[68]   *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [461].

Exhibit 2
Page 546

#### (2) Omissions or delay

Section 90A also provides for liability in respect of an omission from published **12-046** information of any matter required to be included in it,[69] or if there is a delay to the publication of such information.[70] This has, as its focus, information which has not been included in a publication made, or which has not been provided to the market in any publication at all, contrary to the issuer's disclosure obligations in the particular circumstances.

What will amount to "required" information will be a matter for the courts to develop, but the starting point will likely be the content of the relevant disclosure obligations pursuant to which the relevant publication is (or ought to have been) made. This will depend on the circumstances and will require consideration of the variety of disclosure obligations that apply to companies under s.90A.

For example, the allegation may be that the issuer has failed to disclose inside **12-047** information (either within a publication made, in an omission case, or in a timely way, in a delay case) pursuant to the requirements of art.17 of the UK Market Abuse Regulation (UK MAR).[71] In such cases, the court will most likely look to test whether the information was "required" as a result of it meeting the test for "inside information". That is, whether it is information of a precise nature, concerning the issuer or its financial instruments, which has not been made public and which, if it were made public, would be likely to have a significant effect on the price of the issuer's shares or other financial instruments.[72] Disclosure of such information can only legitimately be delayed in certain specified circumstances in accordance with UK MAR.

Similarly, obligations to notify the markets of: (i) significant transactions (pursuant to Listing Rules r.10); (ii) related party transactions (pursuant to Listing Rules r.11); (iii) an issuer's purchase of its own shares (pursuant to Listing Rules r.12); and (iv) dealings in relevant securities transactions by major shareholders (pursuant to Disclosure and Transparency Rules r.5.8.12R) or by persons discharging managerial responsibilities (pursuant to UK MAR art.19(1)) might give rise to complaint in the event that omitting to publish, or a delay in publishing, such information is said to have caused loss.

Alternatively, information may have been published on an ad hoc basis, pursuant to, for example, the Listing Rule requirement[73] for an issuer to publish a Class 1 circular. In such instances, what is "required" for the purposes of any omission from a circular is likely to be informed by reference to the Listing Rule requirement that shareholders be provided with "sufficient information" to make an informed decision on what they are being asked to approve.

---

[69] FSMA Sch.10A para.3(1)(b)(ii).

[70] FSMA Sch.10A para.5(1).

[71] Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (market abuse regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC, as brought into effect in UK law by the European Union (Withdrawal) Act 2018 (as amended), as supplemented by the Market Abuse (Amendment) (EU Exit) Regulations 2019 (SI 2019/310) (2019 Regulations).

[72] For more detail on the meaning and application of the EU Market Abuse Regulation, see Karen Anderson, Jenny Stainsby, Mark Bardell and Carol Shutkever, *Practitioner's Guide to the Law and Regulation of Market Abuse*, 2nd edn (Sweet & Maxwell, 2016).

[73] Listing Rule (LR) r.10.5.1R and LR r.10.8.4G.

Exhibit 2
Page 547

### (3) Fault standard

**12-048**    The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities (PDMR)[74] for that issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.[75] The issuer is liable in respect of omissions or delays only if a PDMR knew the omission to be a dishonest concealment of a material fact,[76] or acted dishonestly in delaying the publication.[77]

Claimants will have to demonstrate "actual knowledge" on the part of a PDMR of the issuer.[78] The requirement for PDMR knowledge is a requirement that, at the time of publication, it was present in the PDMR's mind that (a) in the case of an alleged misstatement, the statement was untrue or (b) in the case of an omission, a material fact was being concealed.[79]

Liability will also extend to recklessness, but that will have the meaning laid down in *Derry v Peek*,[80] "that is, not caring about the truth of the statement, such as to lack an honest belief in its truth. Honest belief in the truth of a statement defeats a claim of recklessness, no matter how unreasonable the belief (though of course the more unreasonable the belief asserted the less likely the finder of fact is to accept that it was genuinely held)."[81] Where the meaning of a statement is unambiguous, but a PDMR genuinely considered that the statement conveyed a different meaning, then mere implausibility of that belief will not be sufficient to ground a claim.[82]

Further, the requirement for PDMR knowledge must be satisfied in respect of each statement which the claimants allege to be misleading, and each alleged omission.[83]

For the purposes of s.90A, dishonesty is defined as conduct which would be "regarded as dishonest by persons who regularly trade on the securities market in question", and the person "was aware (or must be taken to have been aware) that it was so regarded".[84] This will obviously involve an enquiry into the steps taken by the issuer's board to investigate and consider the disclosure requirements applicable in the circumstances that arise. Also highly relevant to any question of dishonesty will be what advice was sought and obtained by the issuer (most

---

[74]  FSMA Sch.10A(8) provides guidance on who will qualify as a person discharging managerial responsibilities for these purposes, and the definition is different to that which applies under UK MAR. It will include a director (or member) of the issuer or, if there are no directors or members, any senior executive having responsibility for the published information. See also *Various Claimants v G4S Ltd* [2022] EWHC 1081 (Ch).

[75]  FSMA Sch.10A para.3(2).

[76]  FSMA Sch.10A para.3(3).

[77]  FSMA Sch.10A para.5(2).

[78]  *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [468].

[79]  *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [469].

[80]  *Derry v Peek* (1889) 14 App. Cas. 337; (1889) 5 T.L.R. 625.

[81]  *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [470].

[82]  *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [464].

[83]  *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [477].

[84]  FSMA Sch.10A para.6. This mirrors the two-phase test for dishonesty in criminal proceedings set out in *R. v Ghosh* [1982] Q.B. 1053 CA (Crim Div); [1982] 3 W.L.R. 110; (1982) 75 Cr. App. R. 154, which included both an objective and subjective limb. In *Ivey v Genting Casinos UK Ltd (t/a Crockfords)* [2017] UKSC 67; [2017] 3 W.L.R. 1212; [2018] 1 Cr. App. R. 12, the Supreme Court held that the correct test for dishonesty in criminal proceedings is simply whether or not the defendant's conduct is dishonest by the objective standards of ordinary, reasonable and honest people, which would remove the second limb of the *Ghosh* test.

Exhibit 2
Page 548

relevantly, given the regulatory context in which such disclosure obligations arise, from the issuer's sponsor bank) in relation to such matters: "the requirement for dishonesty is unlikely to be satisfied where the director was acting in accordance with the advice of reputable professionals".[85]

Strong evidence will be required to ground a finding of dishonesty given the inherent improbability of fraud, and the requirement that the evidence overcomes the general presumption that "innocent incompetence is more likely than dishonest design".[86]

The fault standard to be applied to s.90A was considered shortly after the **12-049** introduction of the cause of action in the Davies Review in 2007. In particular, Prof. Davies QC considered whether the threshold of recklessness (in the case of statements) or dishonesty (in the case of omissions or delays) struck the appropriate balance between, on the one hand, investor protection and, on the other, the desire not to encourage a wave of disclosure-based litigation and the consequential impact on corporate reporting practices. He concluded that it did.

He was persuaded that, in contrast to prospectuses and listing particulars, which are selling documents produced specifically for the purpose of soliciting the purchase of the securities in question, the purpose of the publications in question was for companies to comply with disclosure obligations to the market, to meet their statutory requirement to publish their periodic reports and accounts, or to comply with various other ad hoc disclosure requirements, such as the provisions of the Listing Rules (e.g. the publication of Class 1 circulars for the approval of large transactions by their shareholders). In addition, the existence of parallel regulatory sanctions for breaches of the disclosure requirements created an appropriate way for issuers to be penalised for such breaches given that, by their nature, such sanctions would need to be proportionate (in contrast to civil liability).

The recent case of *Autonomy* also highlighted the need to strike a balance between, on the one hand, "the desirability of encouraging proper disclosure and affording recourse to a defrauded investor in its absence" and on the other "the need to protect existing and longer term investors who, subject to any claim against relevant directors (who may not be good for the money), may indirectly bear the brunt of any award", ultimately holding that "the Court should not interpret and apply the section in a way which exposes public companies and their shareholders to unreasonably wide liability".[87]

### (4) Materiality

There is no express requirement that the offending statement or delayed informa- **12-050** tion be "material". In the case of omissions, however, a materiality threshold is included in the fault standard which applies; for the issuer to be liable, a person discharging managerial responsibilities within the issuer must have known the omission to be a dishonest concealment of a material fact.

However, there are various arguments to support the assumption by practitioners that there is an in-built, objective materiality concept as part of the s.90A regime generally.

In relation to dishonest omissions and delays, it is only information which is

---

[85] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [475].
[86] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [473].
[87] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [442], [445].

Exhibit 2
Page 549

required but omitted (or publication of which is delayed) which is caught by the provisions. The *Autonomy* judgment provides some guidance as to what is required to be disclosed for the purposes of s.90A(3)(b) and Sch.10A para.3(1) to give, overall, a true and fair view of a company's position and performance.[88] In this case, the court agreed with the defendants that what is "required" in these circumstances will be determined ordinarily by reference to the relevant disclosure obligations pursuant to which the publication was (or ought to have been) made. However, the court acknowledged that there will be rare circumstances where the materiality of the matter in question is such that disclosure is required notwithstanding that there are no specific standards unequivocally mandating it. This will ultimately be a question of degree, to be answered taking into account: (a) any judgement as to why specific requirements, which are themselves a useful litmus test of materiality, do not apply; (b) any reasons why disclosure is thought to be unnecessary or commercially unwise; and (c) whether having regard to (a) and (b), disclosure is nonetheless required in order to provide, in the round, a true and fair view.

That is likely to import a concept of materiality, or something akin to materiality, into s.90A by virtue of the nature of these obligations.

Furthermore, Sch.10A para.3(4) provides that a loss is not regarded as suffered as a result of an untrue or misleading statement, or an omission, unless it was reasonable for the investor to place reliance on it. Although this is not expressly aimed at the question of materiality of the statement or omission, it is likely that a court will be slow to find that it was reasonable for an investor to rely on a statement or omission which was immaterial.

Finally, in respect of untrue or misleading statements, omissions or delays to the provision of information, it seems inherently unlikely that any loss will arise as a result unless they are material.

### (5)  Claimants

**12-051**    Section 90A applies to any "person who has suffered loss" as a result of the untrue or misleading statement, omission or delay in respect of the applicable securities. Issuers may be liable to buyers, sellers or holders of securities under the express terms of the statute.[89] References to acquisition or disposal of securities include the acquisition or disposal of any interest in securities, as well as contracting to acquire or dispose of securities or any interest in securities.[90]

In a strike-out application in the *Tesco* case,[91] Tesco sought to strike out the claims of claimants in custody chains with more than one intermediary on the basis that:

- the interest of the claimants in a custody chain was not a proprietary interest sufficient to constitute an "interest in securities" within the meaning of Sch.10A para 8(3); and
- even if the claimants had a sufficient "interest in securities", they had not "acquired, continued to hold or disposed of" that interest, as a beneficial interest could be created or extinguished, but could not be bought or sold.

**12-052**    The court found against Tesco and held that:

---

[88]  *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [1731]–[1733].
[89]  FSMA Sch.10A paras 3(1)(a) and 5(1)(a).
[90]  FSMA Sch.10A para.8(3).
[91]  *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch); [2020] Bus. L.R. 250.

[578]

Exhibit 2
Page 550

- the claimants did have a sufficient "interest in shares" (if they could show that they did "acquire, continue to hold or dispose" of the securities in question in reliance upon a relevant statement or omission) even though, where there is a chain of intermediaries, the claimant would not have a direct proprietary interest in the underlying security. In the court's judgment, the "right to the right" which the investor had through the intermediated chain could be equated to an equitable property right;[92] and

- the concepts of "acquisition" and "disposal" could be interpreted sufficiently broadly to encompass the creation or extinction of an equitable property right. In doing so the court concluded:

    > "any process whereby, in a transaction or transactions on CREST, the ultimate beneficial ownership of securities that are, with the consent of the issuer, admitted to trading on a securities market in accordance with paragraph 1 of Schedule 10A, comes to be vested in, or ceases to be vested in a person constitutes (respectively) 'the acquisition or disposal of any interest in securities'".[93]

**12-053**  The Law Commission has since considered whether to reform the law in relation to intermediated securities, including whether a legislative amendment should be made in order to clarify how s.90A applies to ultimate investors.[94] If any such amendment is made, it will be interesting to see whether it:

- codifies the findings in the *Tesco* case; and
- clarifies how the s.90A reliance requirement applies to ultimate investors, and whether indirect reliance will be sufficient to overcome the hurdle.

The court in the *Tesco* case appeared to envisage that the ultimate investor would need to demonstrate reliance.[95] In circumstances where the ultimate investor has not made any investment decisions (for example, because such decisions were made by an investment manager) it would seem that, unless indirect reliance (such as reliance on their behalf by the investment manager) is sufficient, their claim must fail.

Notwithstanding the court's finding in the *Tesco* case that claimants in custody chains with more than one intermediary can bring a claim under s.90A, such custody chains can be complex, and this has given rise to issues in a number of s.90A class actions which have come before the courts. By way of example, in *Various Claimants v G4S*, G4S Plc successfully struck out the claims of a number of claimants, where the legal entity with the necessary standing to bring the claim had not been correctly identified in the claim form.[96]

#### (6) Defendants

**12-054**  In terms of who may be named as a defendant, unlike under s.90 FSMA,[97] liability is limited under s.90A to the "issuer of securities".[98]

"Issuer" is defined to include:

---

[92] *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch); [2020] Bus. L.R. 250 at [79].

[93] *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch); [2020] Bus. L.R. 250 at [120].

[94] *https://s3-eu-west-2.amazonaws.com/lawcom-prod-storage-11jsxou24uy7q/uploads/2020/11/Law-Commission-Intermediated-Securities-Scoping-Paper.pdf* [Accessed 27 June 2022].

[95] *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch); [2020] Bus. L.R. 250 at [86].

[96] *Various Claimants v G4S Plc* [2021] EWHC 524 (Ch); [2021] 4 W.L.R. 46.

[97] See para.12-030 above.

[98] FSMA Sch.10A para.7(2).

Exhibit 2
Page 551

"in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading…the issuer of the securities represented."[99]

### (7) Reliance

**12-055**   In respect of untrue or misleading statements and dishonest omissions, at least, s.90A expressly requires a successful claimant to establish reliance. This is liable to present substantial challenges in bringing claims of this sort in practice.

The requirement for reliance is made clear in Sch.10A para.3(4), which provides:

"A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—

(a)   in reliance on the information in question, and
(b)   at a time when, and in circumstances in which, it was reasonable for him to rely on it.'"

In respect of dishonest delay, the statute is silent on whether reliance is a necessary element, although this is potentially simply a symptom of the fact that the untrue or misleading statements or omissions provision relates to published information (to which the concept of reliance more naturally bites) whereas delayed publication envisages no publication at all.

**12-056**   In a group action context, the need to prove reliance is potentially very challenging. A finding of reliance necessarily implies that a claimant would have behaved differently but for the defect in question. To date, there has been little court guidance as to how groups of shareholders can establish reliance in this sense. For example, will each claimant need to establish individual reliance, including by proving that they read, and made their investment decisions based on, the specific part of the published information which contains the relevant flaw? Or might it be possible for the claimants as a whole to satisfy the court that an alternative approach to establishing reliance is permissible?

If proof of individual reliance is needed, there is clear scope for divergence of approach, and likelihood of success, as between investors who fall into different groups on this issue. For example, a more sophisticated investor is more likely to be able to evidence receipt of, and potentially detailed consideration of, the published information as a result of its standard investment practices. By contrast, it may be difficult for a retail investor to prove that they even read the document in question at all, let alone based their investment decision on particular passages.

**12-057**   In a judgment following the first case management conference in the *Tesco* case, Hildyard J recognised the importance of reliance to the cause of action, noting the need to plead reliance with sufficient particularity:

"on a matter which is absolutely central to the statutory form of action, that is to say, the issue of reliance, the court should be properly astute to ensure that sufficient particularity is supplied. That is both in order to ensure that the defendant knows precisely what is alleged, or sufficiently precisely what is alleged, and also to focus the mind of each of the individual claimants, who have brought very serious allegations, as to precisely the basis on which individually they have proceeded."[100]

---

[99]   FSMA Sch.10A para.8(2)(a).
[100]   *SL Claimants/MLB Claimants v Tesco Plc* [2017] EWHC 3296 (Ch) at [29].

Exhibit 2
Page 552

At a subsequent hearing in that case, the court ordered the claimants to provide disclosure of documents that addressed the question of reliance.[101] The court found that the claimants had to take additional steps to identify documents which would allow the defendants to test whether they had relied upon alleged untrue or misleading statements or omissions. The court held that "reliance will ultimately have to be established in the case of each investor"[102] and "the documents seemed to be as necessary for the purposes of establishing as they are for rebutting the reliance case".[103] This was a significant decision in circumstances where claimants often argue that there are alternatives to the requirement that each claimant must individually prove reliance.[104]

In similar vein, in *Allianz Global v RSA*,[105] Miles J imposed an unless order on    **12-058** claimants who had failed to comply with the court's order requiring them to submit answers to questionnaires in relation to the issue of reliance, which were a precursor to the selection of sample claimants asserting different modes of reliance on information published by RSA. The judge said:

> "…the orders I have made are not to be treated as optional or merely directional; they were orders requiring the provision of this information by each of the claimants separately. The defendant cited Hildyard J's comment in a similar case that where a claimant becomes party to an action of this kind it is not a mere question of subscription in the sense of just signing up to the proceedings and sitting back; every claimant who becomes a party is bound to comply with the rules governing the litigation. I agree."

The court in *Autonomy* has considered the reliance requirement under s.90A and Sch.10A in more detail. It considered the question of reliance in four parts: (1) reliance by whom? (2) reliance on what? (3) what degree of reliance? and (4) when is reliance reasonable?

In relation to the first question, the court held that reliance must be by the person acquiring the securities, and not by some other person.[106]

In relation to the second question, the court held that reliance must be upon a statement or omission, rather than, in some generalised sense, on a piece of published information. In order to demonstrate reliance upon a statement or omission, a claimant will have to demonstrate that they were consciously aware of the statement or omission in question, and that it induced them to enter into the transaction.[107] The requirement for reliance upon a piece of information will not be satisfied when the claimant cannot demonstrate that they reviewed or considered the information: "it cannot have been intended to give an acquirer of shares a cause of action based on a misstatement that he never even looked at, merely because it is contained (say) in an annual report, some other part of which he relied on".[108]

Notwithstanding the above, the court also found that statements and omissions may in combination create an impression which no single one imparts and, if that

---

[101] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315 (Ch).
[102] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315 (Ch) at [83].
[103] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315 (Ch) at [101].
[104] See further paras 12-059 to 12-063 below.
[105] *Allianz Global Investors GmbH v RSA Insurance Group Ltd* [2021] EWHC 3091 (Ch) at [7].
[106] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [481].
[107] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [503].
[108] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [503] and [505].

Exhibit 2
Page 553

impression is false, that may found a claim (subject to the "awareness" point above).[109]

As to the degree of reliance that the claimants must demonstrate, the court held that it would be enough that a fraudulent representation would have an "impact on the mind" or an "influence on the judgement" of the claimant.[110]

In the context of misrepresentation claims at common law, there can be, in certain circumstances, a presumption that the claimant was induced to act in a certain way, which will assist the claimant when proving reliance.[111] When considering the third question, the court in *Autonomy* considered whether such a presumption will also apply in a s.90A context, and held that it would.[112] However, for the purposes of s.90A and Sch.10A, any reliance must be "reasonable", and that reasonableness requirement mitigates the effect of the presumption: "it introduces an additional test requiring consideration of whether it was reasonable for the representation so to have impacted on the mind and judgment of the representee; put another way, it seems to me that the claimant must show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it".[113] The court also reiterated the "awareness" requirement in this context: "It is also important to keep in mind that the propensity of a statement to influence the mind only gives rise to the presumption (if applicable) if it is shown to have been read or heard and understood by the representee in its deceptive sense… if it did not influence the mind, or if the representee understood it in some different sense and it was by reference to that different meaning that he acted, the presumption does not arise".[114]

On the fourth and final question, the court held that "the test of reasonableness is not further defined, but is plainly to be applied by reference to the conditions at the time when the representee claimant relied on it. Circumstances, caveats or conditions which qualify the apparent reliability of the statement relied on by the claimant are all to be taken into account. The question of when reliance is reasonable is fact-sensitive".[115]

**12-059**  Other jurisdictions where group litigation is more prevalent, such as the US and Australia, have established approaches to the consideration of reliance in shareholder class actions, such as the "fraud on the market theory". It is an open question whether the English court would adopt a similar approach.

In the US, the "fraud on the market theory", established by the US Supreme Court in *Basic Inc*,[116] creates a rebuttable presumption of class-wide reliance on the basis that well-developed markets are efficient processors of public information. Accordingly, the price paid by an investor for shares at any given time will reflect all publicly available information about the company which is known to the market, including any misrepresentations. The theory posits that, in an efficient market, reliance is established by the fact that an investor unknowingly purchased the shares at a price that was inflated because of the misrepresentation.

---

[109] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [506].
[110] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [515(1)].
[111] See further para.12-087 below.
[112] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [515].
[113] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [515(6)].
[114] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [515(7)].
[115] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [520].
[116] *Basic Inc v Levinson* 485 US 224 (1988).

Exhibit 2
Page 554

If, however, it cannot be shown that the market in which the shares were traded was working efficiently, then the price of the shares will not accurately reflect the misrepresentation and the presumption will be rebutted.[117]

In Australia, there is precedent for a principle known as the "indirect market **12-060** based theory of causation" to be adopted to manage reliance issues in class actions. This theory was first accepted in *HIH Insurance*,[118] outside of the class actions context. In *HIH*, the company had overstated its operating profits in its company accounts, causing its shares to trade at an inflated price. A judge of the New South Wales Supreme Court held that the investors could establish causation by showing that they purchased shares in the market at an inflated price, i.e. the investors did not have to show that they actually read the misleading company accounts.[119]

Subsequently, in *TPT v Myer*, Justice Beach of the Federal Court of Australia accepted the market-based causation theory in a shareholder class action.[120] That case concerned earnings guidance given to the market by Myer's CEO in September 2014. The court considered the CEO's statements to be de facto earnings guidance by the company. On 19 March 2015, the company announced that earnings would in fact be lower. The share price fell on that date. The court found that Myer had breached its continuous disclosure obligations by failing to correct the CEO's statement, and accepted the concept of market-based causation. Ultimately, however, the court did not find that the breach had caused the shareholders' losses.

In *TPT v Myer* Justice Beach described the steps required to establish market-based causation as follows:

- non-disclosure of material information by the company to the market;
- inflation of the price of the relevant securities by virtue of the non-disclosure; and
- purchase of the securities by the investors at an inflated price.

Justice Beach suggested, however, that the following may be circumstances which could break the chain of causation:

- actual knowledge by the claimant of the true state of affairs;
- a lack of belief by the claimant in the integrity of the market price; or
- any purchase which would have been made even if the true state of affairs had been known.

There are three key points, however, which may make the adoption of a similar **12-061** approach to establishing reliance on the part of a group of shareholders less likely in the English courts.

First, the US concept of fraud on the market has arisen in very different procedural circumstances to those that prevail in the English courts. The US has an opt-out regime for class actions, with a key initial stage of class certification in which the putative claimant seeks to commence proceedings on behalf of a prospective class of similarly placed claimants. At that stage, the individual members of the class are unknown, even if the class itself has identifiable characteristics. Therefore, there is no prospect of the US courts being able to test the individual features of individual claimants' circumstances such that a requirement to show reliance could

---

[117] *Basic Inc v Levinson* 485 US 224 (1988).
[118] *HIH Insurance Ltd (In Liquidation)* (2016) 335 A.L.R. 320.
[119] *HIH Insurance Ltd (In Liquidation)* (2016) 335 A.L.R. 320.
[120] *TPT Patrol Pty Ltd as trustee for Amies Superannuation Fund v Myer Holdings Ltd* [2019] FCA 1747.

Exhibit 2
Page 555

be investigated. As such, the court has identified a pragmatic way of avoiding such claims being frustrated at an early stage.

Such practical issues are, in theory at least, less pronounced in shareholder actions in the English court, which proceed on an opt-in basis. If a class action is commenced under the GLO mechanism, each claimant must be named on an issued claim form (or schedule thereto) and be entered on the GLO register. Moreover, schedules of information about each claimant could provide information and/or, subject to practical considerations, each could serve a witness statement explaining how each claimant sought to establish reliance. The imperative for the English courts to recognise a mechanism akin to fraud on the market as a substitute for individual reliance is, therefore, less pronounced.

**12-062**     Second, there are limits even to the fraud on the market theory, which means that it will not always be possible to deploy it successfully even if it is accepted in principle. As explained above, for example, it will only create a rebuttable presumption of reliance if it can be established that the market for the securities in question was efficient. In other words, it needs to be established that information in relation to the issuer was immediately incorporated into the price of the securities when released to the market such that an untrue or misleading statement, or omission or delay in the publication of information, will affect the traded price of the securities.

However, the informational efficiency of the market is affected by a number of factors, including the depth of trading, the extent of the coverage by research analysts, and the speed with which new information is incorporated into the price. Moreover, the US courts recognise that the presumption of reliance can be rebutted by evidence that the market was already aware of the information to which the untrue or misleading statement related or which is said to have been omitted or delayed.

**12-063**     Third, the market-based causation argument, which has been accepted in Australia, has been accepted in circumstances where there is no requirement within the Australian statutes to show claimants acted "in reliance on" a contravention; the wording in the applicable Australian statutes requires claimants to establish loss or damage "by" or "resulting from" a contravention, wording more akin to s.90 in the UK (which requires claimants to show they have suffered loss "as a result of" a contravention). It would be a far greater leap for the UK courts to accept a theory of market-based causation in circumstances where there is an express reliance requirement, as with s.90A.

### (8)   Safe harbours

**12-064**     Unlike s.90, s.90A provides a form of safe harbour from other claims. Subject to certain exceptions,[121] Sch.10A para.7 confirms that issuers are not subject to alternative common law or statutory liability arising from reliance on statements or omissions where Sch.10A para.3 liability applies. In this way, s.90A provides a degree of certainty to issuers in terms of the potential claims that might be brought on the basis of company announcements in the UK.

However, despite the appearance of a safe harbour, it is worth noting the potential breadth of some of the exceptions cited in Sch.10A para.7(3). These provide that issuers may still be liable for claims under the Misrepresentation Act and breach of contract as well as civil liability "arising from a person's having assumed

---

[121]   Set out in FSMA Sch.10A para.7(3) and outlined below.

[584]

Exhibit 2
Page 556

responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned" (i.e. under the tort of negligent misstatement). One of the reasons for the latter exclusion was to ensure that the introduction of s.90A and its associated safe harbour had not unintentionally removed shareholders' rights to "sufficient information" in a Class 1 circular for the purposes of making an informed decision as to how to vote.[122]

Another important carve-out in Sch.10A is for regulatory action. Paragraph 7(4) provides that the s.90A safe harbour does not affect the powers conferred by FSMA ss.382 (powers of the court to make restitution) and 384 (powers of the FCA or Prudential Regulation Authority (PRA) to require restitution).

Schedule 10A does not contain a carve-out for claims in deceit.

## C. FSMA s.90 and s.90A: a summary comparison

**12-065** Below is a summary comparison between s.90 and s.90A FSMA.

**Table 12.1**

| | **s.90: compensation for statements in listing particulars or prospectus** | **s.90A: liability of issuers in connection with published information** |
|---|---|---|
| *Relevant documents* | Prospectuses and listing particulars (including supplementary prospectuses and listing particulars) | A broad range of other published information (including periodic financial disclosures and other announcements via a recognised information service) |
| *Scope of liability* | Loss suffered as a result of any untrue or misleading statement or the omission of any matter required to be included | Loss suffered as a result of any untrue or misleading statement made knowingly or recklessly, or any dishonest omission or delay |
| *Claimants* | Anyone who has acquired the securities or has contracted to acquire any interest in the securities | Anyone who has suffered loss including buyers, sellers and holders of securities |
| *Defendants* | Any person responsible for the relevant document, including the issuer, its directors, those stated as accepting responsibility for the document, and any other person who has authorised its contents | Issuers only |
| *Materiality* | Express requirement in respect of prospectuses to provide in- | Express requirement of materiality included in the fault |

[122] Herbert Smith LLP's response to the Davies Review, 4 May 2007, available here: *http://webarchive.nationalarchives.gov.uk/20080910210137/http://www.hm-treasury.gov.uk/media/B/8/davies_review_herbert_smith.pdf* [Accessed 27 June 2022].

|  | s.90: compensation for statements in listing particulars or prospectus | s.90A: liability of issuers in connection with published information |
|---|---|---|
|  | formation which is material to an investor for making an informed assessment, and likely to be an implicit materiality requirement in respect of listing particulars | standard for omissions, and likely to be necessary in practice to establish other types of claim |
| *Reliance* | No express requirement to show reliance | Individual reliance must be established |
| *Safe harbours* | No safe harbour from alternative claims | Safe harbour from other claims, subject to exceptions for (among other things) claims under the Misrepresentation Act, breach of contract and negligent misstatement |
| *Defences* | Various statutory exemptions, including a reasonable belief defence (subject to certain conditions) | No statutory exemptions |

### 3.   OTHER ACTIONS BASED ON FALSE STATEMENTS

**12-066**     In addition to claims under FSMA, shareholder claimants may have claims in respect of false statements under s.2 of the Misrepresentation Act or at common law in the torts of deceit or negligent misstatement.

To establish any of these causes of action, an investor must show that the company,[123] by issuing the prospectus or listing particulars, or by making some other disclosure, either expressly or impliedly represented something as a fact to the investor (or their agent),[124] which was untrue. The burden of proving falsity is on the claimant.[125]

General principles relating to false representations, which are applicable to claims under s.2 of the Misrepresentation Act and in the torts of deceit and negligent misstatement, are discussed immediately below, followed by an analysis of the specific requirements to establish liability under each separate cause of action.

---

[123] Or arranging bank: see *Golden Belt 1 Sukuk Co BSC(c) v BNP Paribas* [2017] EWHC 3182 (Comm); [2018] 3 All E.R. 113; [2018] Bus. L.R. 816 and discussion at para.12-086 below.

[124] *Chagos Islanders v Attorney General* [2003] EWHC 2222 at [364]; *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [547].

[125] *Edgington v Fitzmaurice* (1885) 29 Ch. D. 459 CA (Civ Div).

Exhibit 2
Page 558