# Exhibit 7



12 Endeavour Square
London
E20 1JN

Tel:  +44 (0)20 7066 1000
Fax:  +44 (0)20 7066 1099
www.fca.org.uk

> **James Staley has referred this Decision Notice to the Upper Tribunal to determine: (a) in relation to the FCA's decision to impose a financial penalty, what (if any) is the appropriate action for the FCA to take, and remit the matter to the FCA with such directions as the Tribunal considers appropriate; and (b) in relation to the prohibition order, whether to dismiss the reference or remit it to the FCA with a direction to reconsider and reach a decision in accordance with the findings of the Tribunal.**
>
> **Therefore, the findings outlined in this Decision Notice reflect the FCA's belief as to what occurred and how it considers the behaviour of James Staley should be characterised. The proposed action outlined in the Decision Notice will have no effect pending the determination of the case by the Tribunal. The Tribunal's decision will be made public on its website.**

## DECISION NOTICE

To:                **Mr James Edward Staley**

Reference
Number:            **JXS02208**

Date:              **30 May 2023**

## 1.    ACTION

1.1.    For the reasons given in this Notice, the Authority has decided to:

1

Exhibit 7
Page 32

(1)  impose on Mr James Edward Staley a financial penalty of £1,812,800 pursuant to section 66 of the Act; and

(2)  make an order prohibiting Mr Staley from performing any senior management or significant influence function in relation to any regulated activity carried on by an authorised person, exempt person or exempt professional firm pursuant to section 56 of the Act.

**2.  SUMMARY OF REASONS**

2.1.  Mr Staley was appointed CEO of Barclays on 1 December 2015. Mr Staley was approved by the Authority and the PRA to perform the Senior Management Function 1 (Chief Executive) at Barclays from 7 March 2016 to 31 October 2021, the date on which he left Barclays. The CEO has a crucial role in providing an example to all staff at their firm.  The CEO also needs to demonstrate sound judgement when performing their role.

2.2.  As CEO of Barclays, Mr Staley was required to comply with the Code of Conduct, including by acting with integrity (ICR 1), being open and cooperative with the Authority, the PRA and other regulators (ICR 3) and by disclosing appropriately any information of which the Authority or the PRA would reasonably expect notice (SMCR 4).

2.3.  Mr Staley recklessly approved a letter sent by Barclays to the Authority on 8 October 2019 which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact. In doing so, Mr Staley failed to comply with ICR 1, ICR 3 and SMCR 4.

2.4.  In 2008, Mr Epstein was convicted of procuring a minor for prostitution by a Florida state court. Mr Epstein was sentenced to 18 months in prison for this offence.  Mr Staley was aware of this conviction at that time.  Mr Epstein was arrested again in July 2019 on federal charges relating to, among other things, the sex trafficking of minors. The Authority makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes.

2

Exhibit 7
Page 33

2.5.    On 15 August 2019, the Authority asked Barclays, in a telephone call between a senior executive at the Authority and a member of Barclays' board of directors, to explain in writing what it had done to satisfy itself that there was no impropriety with respect to the relationship between Mr Staley and Mr Epstein.

2.6.    On 8 October 2019, Barclays sent the Letter to the Authority.  The first paragraph of the Letter stated:

> "I am writing to close the loop on your request for assurance that we have informed ourselves and are comfortable in regard to any association of [Mr Staley] or Barclays with [Mr Epstein]. I can now report that [Board Member B], [Senior Executive A] and [Board Member A] have had separate conversations with [Mr Staley] where he has described his interactions with Mr Epstein. [Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein, and he is resolute that at no time did he see anything that would have suggested or revealed any aspect of the conduct that has been the subject of recent allegations. [Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015."

2.7.    The Letter was misleading in two respects, each of which was material.

2.8.    First, the Letter stated that "*[Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein.*" In the Authority's view this statement was misleading because it did not fairly and accurately reflect the following facts and matters, all of which were known to Mr Staley at the time he approved the Letter:

(1)    Mr Staley confided in Mr Epstein on significant matters relating to Mr Staley's career.  For example, Mr Staley disclosed to Mr Epstein details of discussions he was having with Barclays that led to Mr Staley's appointment as CEO in October 2015.  Notably, on 8 October 2015, Mr Staley disclosed to Mr Epstein the fact of the decision made by the Board Nominations Committee of Barclays Plc (the BNC) confirming its approval of Mr Staley's appointment, which was not in the public domain and which Mr Staley understood was "*very confidential*".

3

Exhibit 7
Page 34

(2)    Between July 2008 and December 2012, Mr Epstein and Mr Staley exchanged more than 1,100 emails. On several occasions Mr Staley described the strength of their friendship, including describing Mr Epstein as one of his "*deepest*" or "*most cherished*" friends and stating that he had few friendships as "*profound*" as his with Mr Epstein.  The emails also suggest that they spoke often on the telephone, as well as meeting in person. Mr Staley continued to communicate with Mr Epstein between January 2013 and October 2015, exchanging almost 600 emails during that period, including further emails from Mr Staley referring to the strength of their friendship.

(3)    Mr Staley visited various of Mr Epstein's properties, including Mr Epstein's island in the US Virgin Islands on three separate occasions (with the last visit taking place in April 2015), in addition to two further visits to a private marina owned by Mr Epstein nearby his island, and Mr Epstein's ranch in New Mexico. Mr Staley also visited Mr Epstein in Palm Beach, Florida to join a celebratory birthday dinner for Mr Epstein, in addition to more regular visits to Mr Epstein's home in New York. The visits to Mr Epstein's properties in the US Virgin Islands and New Mexico were for no obvious business or professional purpose. Mr Staley travelled to Florida to visit Mr Epstein during his prison sentence whilst he was on work release in January 2009, because he was a "*loyal person*" and "*just to show support*" to Mr Epstein.

(4)    Mr Epstein provided advice and assistance, over several years, to an individual connected to Mr Staley in connection with their career. In August 2015, Mr Staley informed Mr Epstein that this advice had been "*the gift of great friendship*".

2.9.    Mr Staley subsequently informed the Authority that he considered that he and Mr Epstein had a "*professional, fairly close relationship*".

2.10.    In addition, the Letter stated that "*[Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015*". This statement was incorrect and was also misleading.

4

Exhibit 7
Page 35

2.11.   Mr Staley and Mr Epstein were in contact via email until 25 October 2015: this was three days before Mr Staley's appointment as CEO of Barclays was announced, and only shortly before 1 December 2015, being the date that Mr Staley formally started in role. The matters discussed between Mr Staley and Mr Epstein up to and including 25 October 2015, relating to both Mr Staley's potential appointment as CEO of Barclays and press enquiries in connection with his likely appointment regarding his relationship with Mr Epstein, were significant and of importance to Mr Staley.

2.12.   The Letter made clear that Mr Staley was the source of the information that led to the two statements, and he must have known that neither statement was accurate. Mr Staley failed to suggest changes to this language or to make corrections, despite having been asked, by Senior Executive A, to review a draft of the Letter to ensure that it was "*fair and accurate*" on 6 October 2019. In an email dated 7 October 2019 to which Mr Staley was copied, Senior Executive A also confirmed to Board Member A that "*[Mr Staley] has reviewed [the Letter] as well and is comfortable with the language*".  No material amendments were made to the wording of the Letter after Mr Staley's review.

2.13.   The Authority was entitled to rely on the contents of the Letter as being an accurate characterisation by Barclays of the nature of the relationship between Mr Staley and Mr Epstein and it relied on the assurance provided by Barclays and the factual confirmations attributed to Mr Staley (among other things) in the Letter. The Authority concluded in light of the Letter that no further enquiries needed to be made of Barclays or Mr Staley. Had the Letter accurately described the nature of the relationship between Mr Staley and Mr Epstein, or the point at which the two last were in contact, the Authority would have been in a position at that stage to have considered whether it needed to ask further questions of Mr Staley and seek clarity on the nature and extent of the relationship.

2.14.   Mr Staley did not draft the Letter and earlier draft versions had included more detail about the nature and extent of Mr Staley's relationship with Mr Epstein. Mr Staley described his relationship with Mr Epstein to various members of senior management at Barclays, including in the context of the Authority's enquiry.  Mr Staley, and others at Barclays, understood the Authority's request, which resulted in the Letter, as being primarily focussed on whether Mr Staley was aware of, or

5

Exhibit 7
Page 36

had witnessed, any of the alleged criminal activities of Mr Epstein during the course of their apparent relationship.

2.15.    This does not, however, excuse Mr Staley for failing to correct the two misleading statements in the Letter:

(1)    Mr Staley was the only person who reviewed or discussed the contents of the Letter prior to it being finalised, who was able to comment on the accuracy of these two statements from his own personal knowledge. Those individuals at Barclays with whom Mr Staley discussed the matter had, as would have been obvious to Mr Staley at the time, no first-hand knowledge of the facts relating to the nature of the relationship between Mr Staley and Mr Epstein, nor of the frequency or extent of their contact.

(2)    By stating that "*[Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein*", the Letter implied that there was a distance between Mr Epstein and Mr Staley that did not accurately reflect the true position.

(3)    No individual at Barclays was aware that Mr Staley and Mr Epstein had discussed press enquiries regarding their relationship, in connection with Mr Staley's likely appointment as CEO of Barclays, up until 25 October 2015, or had any knowledge of the fact that Mr Staley had shared confidential information with Mr Epstein about negotiations relating to his impending appointment as CEO in October 2015 (including confidential decisions taken by the Board Nominations Committee of Barclays and Barclays plc on 8 October 2015). Mr Staley did not inform anybody at Barclays of these matters, which were clearly relevant to factual assertions that were included in the Letter.

2.16.    In fact, Mr Staley consistently did not accurately set out the nature and extent of his relationship with Mr Epstein to Barclays.  In particular:

(1)    In October 2015, in response to the press enquiries relating to Mr Staley's likely appointment as CEO, regarding his relationship with Mr Epstein, Barclays made statements which gave the misleading impression that Mr

6

Exhibit 7
Page 37

Staley and Mr Epstein did not have a close relationship, including that they had not had a discussion about the recruitment process that year and that they did not have *"anything resembling a close personal association"*. The Authority considers that these statements were based on information provided by Mr Staley and that, in light of his impending appointment as CEO, Mr Staley had an interest in giving Barclays the impression of a greater distance between himself and Mr Epstein than was the case at this time.

(2)     In September 2019, Mr Staley gave a presentation to the governing board of Academic Institution A, of which he was a member, to address enquiries about his relationship with Mr Epstein. A set of talking points (the Talking Points) were prepared to assist Mr Staley in making this presentation and subsequently provided part of the factual foundation for the Letter sent by Barclays to the Authority. The Talking Points were misleading in various aspects, for example, they included the inaccurate statements *"At no time after his conviction in 2008 did I allow [Mr Epstein] any connection with any aspect of my professional life"* and *"I had limited contact with him post his conviction"*. The Talking Points were based on information provided by Mr Staley to Barclays.

2.17.   The Authority has concluded that Mr Staley was aware of the risk which his association with Mr Epstein posed to his reputation and his career, and that this knowledge is relevant context to Mr Staley's failure in 2015, and subsequently in 2019, to set out accurately the nature and extent of his relationship with Mr Epstein to Barclays, and his failure to correct the two misleading statements in the Letter.

2.18.   The role of CEO requires an individual to exercise sound judgement and set an example to staff at their firm. Mr Staley disregarded information, that only he could have known, about his relationship with Mr Epstein and which contradicted the two misleading statements in the Letter. Mr Staley must have appreciated that the Authority would rely on the content of the Letter and must have been aware there was a risk that the Letter would mislead the Authority. Therefore, by approving the Letter containing the two misleading statements, Mr Staley acted recklessly and with a lack of integrity in breach of ICR 1.

7

Exhibit 7
Page 38

2.19.   Mr Staley must have realised that the Authority's request to Barclays for information about his relationship with Mr Epstein was important to the Authority. By approving the Letter which contained the two misleading statements, without informing Barclays that the statements were incorrect, Mr Staley failed to be open and cooperative with the Authority and failed to disclose appropriately information of which the Authority would have reasonably expected notice.  Consequently, Mr Staley failed to comply with ICR 3 and SMCR 4.

2.20.   These breaches represented a very serious failure of judgement by Mr Staley and involved a failure to act with integrity. Integrity, being open and cooperative with the Authority at all times, and demonstrating good judgement are fundamental requirements of senior managers, particularly a CEO of one of the UK's most significant financial institutions. The Authority expected Mr Staley, as CEO of Barclays, to recognise the importance of acting with integrity in all of his professional dealings and to recognise the importance of being open and cooperative with the Authority at all times. A necessary feature of the effective supervision of firms in the UK is for their senior managers to be open and frank in their dealings with the Authority, the PRA and other regulators, particularly where those interactions relate to sensitive or important matters.

2.21.   The Authority has also taken into account that Mr Staley was subject to regulatory action by the Authority and the PRA in 2018, albeit relating to matters not connected to the findings in this Notice. As a consequence of that action, the Authority would have expected Mr Staley to have been particularly careful to ensure that the Letter was factually accurate.

2.22.   The Authority therefore has decided to impose on Mr Staley a financial penalty of £1,812,800 pursuant to section 66 of the Act for breaching ICR 1, ICR 3 and SMCR 4.

2.23.   Given the nature of the failings described in this Notice, it appears to the Authority that Mr Staley is not a fit and proper person to perform the role of a CEO or any other senior management function at an authorised person, exempt person or exempt professional firm.

8

Exhibit 7
Page 39

2.24.   The Authority therefore has also decided to make an order prohibiting Mr Staley from performing any senior management or significant influence function in relation to any regulated activity carried on by an authorised person, exempt person or exempt professional firm pursuant to section 56 of the Act.

2.25.   This Notice refers to certain individuals and firms, in addition to Mr Staley.  By referring to these individuals and firms, the Authority does not seek to criticise their actions, and does so only to provide relevant factual context to the findings in this Notice.

**3.    DEFINITIONS**

3.1.   The definitions below are used in this Notice:

"Academic Institution A" means an academic institution that Mr Staley was on the governing body of as at the date of the Letter;

The "Act" means the Financial Services and Markets Act 2000;

The "Authority" means the Financial Conduct Authority;

"Barclays" means Barclays Bank Plc, the entity authorised by the PRA and regulated by the Authority and the PRA (with firm reference number 122702);

"BlueMountain" means BlueMountain Capital LLC;

"BNC" means the Board Nominations Committee of Barclays and Barclays Plc, which oversaw the recruitment process for Barclays' CEO in 2015;

"Board" means the board of directors for Barclays;

"Board Member A" means a member of the Board;

"Board Member B" means a second member of the Board;

"CEO" means Chief Executive Officer;

9

Exhibit 7
Page 40

"Code of Conduct" means the Code of Conduct (COCON) in the Handbook;

"DEPP" means the Authority's Decision Procedures and Penalties Manual, part of the Handbook;

"FCA Executive A" means a senior executive at the Authority;

"Firm A" means the firm at which Mr Staley was a non-executive director from May 2015 until 28 October 2015;

"Handbook" means the Authority's Handbook of Rules and Guidance;

"ICR 1" means Individual Conduct Rule 1;

"ICR 2" means Individual Conduct Rule 2;

"ICR 3" means Individual Conduct Rule 3;

"JPM" means JP Morgan Chase;

"Law Firm A" means a law firm engaged by Barclays in connection with an approach to Barclays by Newspaper A;

The "Letter" means the letter from Board Member A to the Authority dated 8 October 2019;

"Newspaper A" means a national newspaper;

"PRA" means the Prudential Regulation Authority;

"RDC" means the Regulatory Decisions Committee of the Authority (see further under Procedural Matters below);

"Senior Executive A" means a senior executive at Barclays;

"Senior Executive B" means a second senior executive at Barclays;

10

Exhibit 7
Page 41

"Senior Executive C" means a third senior executive at Barclays;

"SMCR 4" means Senior Manager Conduct Rule 4;

The "Tribunal" means the Upper Tribunal (Tax and Chancery Chamber);

The "Talking Points" means the document titled '[Academic Institution A] Talking Points; Draft 11.09.19', a set of talking points prepared to assist Mr Staley when providing a description of his relationship with Mr Epstein to Academic Institution A on 13 September 2019; and

The "Warning Notice" means the warning notice given to Mr Staley dated 3 November 2022.

## 4.    FACTS AND MATTERS

### Background

*The role and expectations of the CEO*

4.1.    The CEO is the most senior executive director on a board of directors.  The CEO therefore has a crucial role in providing an example to all staff at their firm. The CEO must at all times act with integrity and be open and cooperative with the Authority, the PRA and other regulators.  The CEO is also required to disclose appropriately any information of which the Authority or the PRA would reasonably expect notice.

4.2.    The Code of Conduct requires those who are subject to it to meet certain standards in discharging their roles and functions under the regulatory system, with high standards expected of senior personnel. It is particularly important that a CEO should act with integrity and demonstrate sound judgement, including when considering disclosure of information to the Authority or the PRA, and set an example to others of the importance of being open and cooperative with the Authority, the PRA and other regulators.

11

Exhibit 7
Page 42

*Mr Staley*

4.3.    Mr Staley was appointed CEO of Barclays on 1 December 2015. From 1 December 2015 to 6 March 2016, Mr Staley was approved by the PRA with consent from the Authority to perform Controlled Function 1 (Director), Controlled Function 3 (Chief Executive) and Controlled Function 29 (Significant management) for Barclays. Mr Staley was approved by the Authority and the PRA to perform Senior Management Function 1 (Chief Executive) for Barclays from 7 March 2016 to 31 October 2021, the date on which he left Barclays.

4.4.    On 11 May 2018, Mr Staley was subject to disciplinary action by the Authority and the PRA for breaching ICR 2 in the way he acted in response to an anonymous letter that Barclays received which raised concerns about its hiring process. This resulted in a total financial penalty of £642,400 being imposed on Mr Staley, split equally between two separate Final Notices issued by the Authority and the PRA.

*Mr Epstein*

4.5.    In 2008, Mr Epstein was convicted in the USA of procuring a minor for prostitution by a Florida state court. Mr Epstein was sentenced to 18 months in prison for this offence.  Mr Staley was aware of this conviction at that time.  Mr Epstein was arrested again in July 2019 on federal charges relating to, among other things, the sex trafficking of minors.  On 10 August 2019, Mr Epstein died whilst in prison. The Authority makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes.

*The Letter*

4.6.    On 15 August 2019, following a number of press reports, the Authority asked Barclays, in a telephone call between FCA Executive A and Board Member A, to explain in writing what it had done to satisfy itself that there was no impropriety with respect to the relationship between Mr Staley and Mr Epstein.

4.7.    On 8 October 2019, Barclays sent the Letter to the Authority.  The Letter included the following statements:

12

Exhibit 7
Page 43

*"[Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein"* and *"[Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015."*

**Mr Staley's relationship with Mr Epstein (1999 to July 2015)**

4.8.    Mr Staley's relationship with Mr Epstein began in 1999 or 2000, at a time when Mr Staley was the Head of JPM's Private Bank and Mr Epstein was a client of JPM's Private Bank.   Their relationship continued when Mr Staley left JPM and joined BlueMountain in 2013.   The evidence relating to the nature and extent of their relationship between 1999 and July 2015 is set out at Annex B.

**Mr Staley's relationship with Mr Epstein (July 2015 to October 2015)**

*Mr Staley's recruitment and appointment as CEO of Barclays*

4.9.    Between July 2015 and October 2015, Mr Staley and Mr Epstein discussed the approach by Barclays to Mr Staley in connection with his eventual appointment as CEO.   Email correspondence between Mr Staley and Mr Epstein from this time suggests that Mr Staley and Mr Epstein also spoke over the phone about this matter.

4.10.   The recruitment of Mr Staley in 2015 was managed by the BNC. On 11 July 2015, Mr Staley informed Mr Epstein in an email titled "B" that, *"A member of the board just reached out."*   Later on the same day, Mr Staley forwarded to Mr Epstein an email he had received from a member of the BNC, commenting *"Here we go"*. Following this email, there were further emails between Mr Staley and Mr Epstein about the matter:

(1)    On 11 July 2015, Mr Epstein asked Mr Staley whether he had been provided with further information from a recruiter. Mr Staley then sent an email to Mr Epstein that briefly summarised discussions Mr Staley had had with another recruiter about what Barclays had told that recruiter as to its expectations for the recruitment process.

13

Exhibit 7
Page 44

(2)     On 20 July 2015, in an email titled "B", Mr Staley informed Mr Epstein that a senior member of the Board wanted to meet him (Mr Staley). Mr Epstein and Mr Staley then appear to have spoken on the following day.

(3)     At a meeting on 23 July 2015, the BNC agreed to appoint an executive search firm to undertake the search for a new CEO and reviewed the role requirements for the new CEO.  Mr Staley appears to have been aware of this, and informed Mr Epstein of it on the same day, noting that "*It begins*".

(4)     On 24 July 2015, Mr Epstein informed Mr Staley by email that, "*better if you not email me. phone only*".  Subsequently, Mr Staley sent blank emails to Mr Epstein on 21 August 2015 and 4 September 2015 with respective subject headings "*Call my cell*" and "*Call me*".

4.11.   At a meeting on 5 August 2015, the BNC reviewed a list of candidates and identified four primary prospective candidates, one of which was Mr Staley. The BNC agreed that contact would be made with the candidates and interviews arranged.

4.12.   At a meeting on 11 September 2015, the BNC discussed the CEO candidates and agreed to progress discussions with Mr Staley.

4.13.   There was no written agreement between Barclays and Mr Staley which set out that the negotiations relating to his potential appointment ought to remain confidential. However, it is apparent from an email that he sent to a senior member of the Board on 18 September 2015, regarding a conversation he had had with a board member of Firm A about this matter, that Mr Staley understood that he needed to keep discussions relating to his potential appointment "*very confidential*". Mr Staley informed the Authority in interview that, in his view, this did not preclude him from "*seeking counsel*" from a "*couple of people*" about the discussions with Barclays.

4.14.   On 4 October 2015, Mr Staley wrote to Mr Epstein, in an email titled "Friendship", stating: "*You never wavered in our friendship these last three years. That means a lot too [sic] me. […] Cross your toes!!!*".

14

Exhibit 7
Page 45

4.15.   At a meeting on 8 October 2015, the BNC discussed Mr Staley as a candidate and unanimously resolved to recommend his appointment as CEO to the board of directors of Barclays Plc for approval. At a meeting on 8 October 2015, the Board Remuneration Committee of Barclays Plc approved the proposed compensation arrangements for Mr Staley.

4.16.   On 8 October 2015, Mr Staley sent an email to Mr Epstein relaying that the BNC had approved his appointment:

"*Nominating com approved. Friday, full board votes. I should have the contract by the weekend. We're very close.*"

4.17.   Mr Staley informed the Authority that Mr Epstein did not have a "*formal or informal advisory role*" in relation to the appointment, and that he was discussing this with Mr Epstein on the basis that he had previously discussed with Mr Epstein matters relating to his career and wanted to hear Mr Epstein's "*thoughts*" on the matter and because he "*trusted him to be discreet*".  Mr Staley's discussions with Mr Epstein relating to his potential appointment as CEO reflect the fact that, at the time, Mr Staley felt able to confide in Mr Epstein in relation to this very significant matter regarding his career.

4.18.   On 9 October 2015, the Board and the board of directors of Barclays Plc met and approved, in principle, the appointment of Mr Staley as CEO subject to regulatory approval and final confirmation of the appointment by the Chairman.

4.19.   On 10 October 2015, Mr Staley informed Barclays that BlueMountain may contact Barclays "*regarding restricting [BlueMountain] from trading in Barclays*", owing to the knowledge that BlueMountain may have (given that Mr Staley was Managing Partner of BlueMountain) of Mr Staley's impending appointment as CEO of Barclays.

4.20.   Mr Staley's likely appointment as CEO was first reported in the *Financial Times* on 12 October 2015, prior to the formal announcement by Barclays, and there was extensive press coverage of Mr Staley's likely appointment on 13 and 14 October 2015.  Mr Staley noted this in an email to Mr Epstein dated 15 October 2015, which stated: "*The press is all over me. Trying to lie low. Sorry.*"  Mr Staley's appointment was subsequently announced by Barclays on 28 October 2015.

15

Exhibit 7
Page 46

*Press enquiries at the time of Mr Staley's appointment – October / November 2015*

*Newspaper A's article dated 25 October 2015*

4.21. Following press speculation about Mr Staley's impending appointment as CEO of Barclays, Mr Staley, Barclays and Mr Epstein were each approached by Newspaper A about an article, which was ultimately published on 25 October 2015. Barclays appears to have been first contacted about the potential article on 24 October 2015.

4.22. Mr Staley and Mr Epstein discussed this approach from Newspaper A between 16 October 2015 and 25 October 2015:

(1) On 16 October 2015, Mr Epstein forwarded to Mr Staley an email he received from a journalist at Newspaper A, who wanted to talk to Mr Epstein in connection with Mr Staley's likely appointment as CEO of Barclays.

(2) On 17 October 2015, Mr Epstein and Mr Staley exchanged emails about a previous meeting at Mr Epstein's home in New York, and during this exchange, Mr Staley emailed Mr Epstein to note "*Don't worry. We will be fine.*"

(3) Later that day, Mr Epstein wrote to Mr Staley stating, "*I'm on the plane land in two hours*". Mr Staley responded, "*Ok. I'm going to play is [sic] simple. I've known you as a client. I will tell B tomorrow. […] Let me know if they say something else. But stay away from them. I'm fine.*" Mr Staley informed the Authority that this email reflected what he was planning to say to Newspaper A if asked, rather than what he was planning to say to Barclays. Mr Staley also suggested that it was possible that the reference to "B" might be to BlueMountain, rather than to Barclays.

(4) Later on 17 October 2015, Mr Staley emailed Mr Epstein to ask "*Anything new?*", to which Mr Epstein responded "*no, zero. […]*".

16

Exhibit 7
Page 47

(5)      On 22 October 2015, Mr Epstein forwarded on an email to Mr Staley showing that the journalist from Newspaper A had called him again.  Mr Epstein forwarded on another email from the journalist to Mr Staley on 24 October 2015.

4.23.   On 24 October 2015, the journalist from Newspaper A contacted Barclays in relation to the article, explaining that it would contain allegations that Mr Epstein sought to influence the selection of Mr Staley as CEO of Barclays, both during the process that had taken place in 2015, and also during an earlier process in 2012. The Authority has not seen evidence to suggest that Mr Epstein did, in fact, seek to influence either appointment process.

4.24.   On 24 October 2015, Barclays engaged Law Firm A in connection with the matter, and Law Firm A, acting for Barclays, wrote a letter to Newspaper A that day. Senior Executive B was responsible for coordinating Barclays' response to the proposed article.  On 24 October 2015, Senior Executive B spoke to Mr Staley and asked him about his relationship with Mr Epstein.  Mr Staley informed Senior Executive B that he knew Mr Epstein and that they had a professional relationship that had arisen due to Mr Epstein being a client of JPM's Private Bank when Mr Staley worked at JPM.  In relation to the allegations raised by Newspaper A, Mr Staley informed Senior Executive B that he may have spoken with Mr Epstein about the earlier recruitment process in 2012. Senior Executive B informed the Authority that they recalled, however, that Mr Staley informed them that he had had no discussions with Mr Epstein about the recruitment process in 2015.

4.25.   On 24 October 2015, a member of staff at Barclays informed Law Firm A that "*given we're likely to end up with an article even if it focuses on 2012, your letter should major on quashing the notion that the two are close…and certainly for 2015 that there has been no collaboration…*". This instruction was brought to Mr Staley's attention.  Senior Executive B told Mr Staley that they needed to keep the article "*historical and flimsy*" and asked Mr Staley if he was comfortable with a statement being provided to Newspaper A that, "*At no time has Mr Staley asked Mr Epstein to make representations on his behalf regarding his role.*" Mr Staley confirmed he was content with Barclays making that statement.

17

Exhibit 7
Page 48

4.26.    Mr Staley was provided with a draft of the letter to be sent from Law Firm A to Newspaper A on 24 October 2015.  The draft letter stated, among other things, that "*Mr Staley has informed [Barclays] that he is at best an acquaintance of [Mr Epstein].  They are certainly not close friends as your allegations might imply …*". Mr Staley suggested to Senior Executive B that the reference to "*he is at best an acquaintance of [Mr Epstein]*" should be removed and that the wording should be changed to "*Mr Staley has informed [Barclays] that while he knows Mr Epstein from his time at [JPM], they are certainly not close friends as your allegations might imply.*" However, when Mr Staley was informed by Senior Executive B that Law Firm A had sent the letter, due to timing pressures prior to publication of the article, and that the letter retained reference to the fact that Mr Epstein was "*at best an acquaintance*" of Mr Staley's, Mr Staley responded by stating "*no worries*". Mr Staley told the Authority that he had requested the change because he thought the use of the word "*acquaintance*" was "*too light*".

4.27.    Mr Staley also did not correct an inaccurate statement in the letter that "*Further, Mr Staley confirms that he has had no contact with Mr Epstein nor discussion of this matter this year*". This statement had not been included in the draft letter provided to Mr Staley and had subsequently been inserted following an email from Senior Executive B to Law Firm A stating that the letter needed to say, "*There has been no contact between Jes Staley or [sic] Jeffrey Epstein, or discussion of this matter this year*".  Mr Staley does not appear to have seen this statement, for which he is stated to be the source, until after the letter was sent, but there is also no evidence that Mr Staley subsequently clarified the position, despite the statement being untrue. In interview, Mr Staley said that this statement was not consistent with his recollection of his conversations with Senior Executive B, disputed informing Senior Executive B or anyone else at Barclays that he had had no contact with Mr Epstein in 2015, and said that his focus during his discussions with Senior Executive B was on confirming that he did not ask Mr Epstein to lobby on his behalf in 2012 or 2015.  Senior Executive B informed the Authority in interview that they had the impression from their discussions with Mr Staley, that Mr Staley had been in contact with Mr Epstein in 2015 and that contact had continued until reasonably recently.  However, as mentioned at paragraph 4.24 above, Senior Executive B also recalled that Mr Staley informed them that he had had no discussions with Mr Epstein about the recruitment process in 2015.

18

Exhibit 7
Page 49

4.28.    In the circumstances, the Authority concludes that Mr Staley did inform Senior Executive B on or around 24 October 2015 that he had had no discussions with Mr Epstein in connection with the recruitment process in 2015. Prior to 24 October 2015, Senior Executive B knew nothing of the relationship between Mr Staley and Mr Epstein, and information that they provided to Law Firm A in respect of the relationship on 24 October 2015 was based on information that they had received from Mr Staley. In addition, Mr Staley must have known that the inclusion of this sentence in the letter was inaccurate, particularly in view of ongoing correspondence he was exchanging with Mr Epstein at the time.

4.29.    On 25 October 2015, the article was published. Senior Executive B shared a copy of the article by email with senior individuals at Barclays and, separately, with Mr Staley. Mr Staley then forwarded this email, attaching the article, to Mr Epstein.

4.30.    There were subsequent press articles on this matter between 25 October 2015 and 1 November 2015. On 29 October 2015, Law Firm A explained to Barclays, having considered a more detailed briefing of historical press coverage relating to Mr Epstein, that Barclays ought to "*…be as strong as we possibly can be in dispelling the friendship myth.  If there is any more information that we can deploy to demonstrate distance between them it would be helpful…*".  Prior to an article published on 1 November 2015 by Newspaper A, the Barclays' Corporate Communications team received further queries from the journalist regarding Mr Staley's relationship with Mr Epstein, to which Barclays responded, noting that "*neither Barclays nor Mr Staley feel the need to respond to your two questions given that there is no obligation to distance ourselves from someone with whom neither party has anything resembling a close personal association.*"  Mr Staley was not copied into this email and there is no evidence that he saw or approved the wording.  However, the Authority considers that, insofar as Barclays was purporting to convey Mr Staley's position to the journalist, this was based on what Mr Staley had previously told Senior Executive B.

4.31.    The Authority recognises that the communications sent by or on behalf of Barclays to Newspaper A prior to the publication of the articles on 25 October 2015 and 1 November 2015 were in the context of a response from Barclays and Mr Staley to a journalist. However, in the Authority's view these communications show that Mr Staley did not accurately convey the nature of his relationship with Mr Epstein to

19

Exhibit 7
Page 50

Barclays. Mr Staley had informed Mr Epstein three weeks before that he had "*never wavered in our friendship these last three years. That means a lot too [sic] me. […]*" (to which Mr Epstein responded "*more than 10 years*") and had communicated to Mr Epstein details of confidential decisions made by the BNC relating to Mr Staley's appointment (see paragraph 4.17). The Authority considers that, in light of his impending appointment as CEO, Mr Staley had an interest in giving Barclays the impression of a greater distance between himself and Mr Epstein than was the case at this time.

4.32.   Mr Staley explained to the Authority that, around the time of the article in Newspaper A, Senior Executive B had advised Mr Staley that he should not have any contact with Mr Epstein going forward. Senior Executive B also recalled giving this advice to Mr Staley.  So far as the Authority is aware, Mr Staley had no further contact with Mr Epstein after 25 October 2015.

**Developments following Mr Epstein's arrest – from July 2019**

*6 July 2019 to 8 October 2019 – media reports*

4.33.   Mr Epstein was arrested on 6 July 2019. From around 17 July 2019, Barclays received a number of press enquiries requesting comment on articles that included reference to Mr Staley's apparent relationship with Mr Epstein. From this point, Mr Staley was involved in discussions with several individuals at Barclays, including Board Member A, Senior Executive A and Senior Executive B, in relation to Barclays' response to these press articles.

4.34.   The press articles that were then published from around 22 July 2019 until 8 October 2019 relating to Mr Staley's relationship with Mr Epstein included details of (among other things):

(1)    Mr Staley's visit in January 2009 to Mr Epstein whilst Mr Epstein was on work release during his prison sentence (see paragraph 1.18 of Annex B);

(2)    A large transaction that Mr Epstein was alleged to have introduced to JPM (via Mr Staley) (see paragraph 1.3 of Annex B); and

20

Exhibit 7
Page 51

(3)    Mr Staley's visit to Mr Epstein's island in the US Virgin Islands in April 2015 (see paragraph 1.33.2 of Annex B).

4.35.    Mr Staley discussed his relationship with Mr Epstein with various individuals at Barclays, including Board Member A, Senior Executive A, Board Member B and Senior Executive B.  During these discussions, Mr Staley explained that:

(1)    he had been introduced to Mr Epstein whilst in his former role as Head of the Private Bank at JPM, in around 1999 or 2000;

(2)    he had been on Mr Epstein's private plane, along with members of his family, once;

(3)    his contact with Mr Epstein had spanned the time that Mr Epstein was serving his custodial sentence following his 2008 conviction;

(4)    Mr Epstein had provided advice and assistance to an individual connected to Mr Staley in relation to an application relating to their career;

(5)    he and Mr Epstein were professionally fairly close, particularly as Mr Epstein had a propensity to introduce business to JPM, and that, whilst their relationship was predicated on business, they were on good terms;

(6)    he and Mr Epstein had not had any contact since Mr Staley had joined Barclays; and

(7)    nothing that Mr Staley saw whilst in Mr Epstein's company had given him any indication about the fact that Mr Epstein had been committing the crimes that were the subject of allegations from July 2019.

*August 2019 to September 2019 – Academic Institution A*

4.36.    As at the date of the Letter, Mr Staley was on the governing board of Academic Institution A and actively supported Academic Institution A. In August 2019, Academic Institution A made enquiries to Mr Staley about his relationship with Mr

21

Exhibit 7
Page 52

Epstein. Mr Staley offered to speak with the governing board of Academic Institution A to address those and any related enquiries about his relationship with Mr Epstein. Consequently, on 13 September 2019, Mr Staley made an oral presentation to the governing board of Academic Institution A.

4.37.    The Talking Points were prepared to assist Mr Staley to make this presentation. Senior Executive A, Senior Executive B and Senior Executive C each assisted in preparing the Talking Points and had discussions regarding their content with Mr Staley, and Board Member A recalled being read the Talking Points or the key points.

4.38.    The Talking Points included the statements that, "*At no time after his conviction in 2008 did I allow [Mr Epstein] any connection with any aspect of my professional life*" and that, "*I had limited contact with him post his conviction*". These sentences were inaccurate, in view of the significant number of interactions between Mr Epstein and Mr Staley relating to Mr Staley's career and the firms that he worked for (as described in Annex B and in paragraphs 4.9 to 4.32 above).  The Talking Points also stated that, "*At no time during my tenure at [BlueMountain] did I conduct any business with [Mr Epstein]*". Although the Authority has not seen any evidence that Mr Staley did, in fact, conduct any business with Mr Epstein whilst he was at BlueMountain, given that Mr Staley sought to onboard Mr Epstein as a client of BlueMountain in February and March 2013 (see paragraphs 1.21 to 1.23 of Annex B), and in view of the fact that Mr Epstein made certain introductions to possible business contacts for Mr Staley when Mr Staley was at BlueMountain (see paragraph 1.24 of Annex B), the Authority considers this statement to be potentially misleading. The Talking Points also stated that, besides attending roughly one dinner per year hosted by Mr Epstein after his conviction, most often with multiple guests, "*I have only ever been at a social gathering with him once*" and that "*I have visited his island twice*": these statements were also misleading, in view of the evidence regarding the nature of Mr Staley's relationship with Mr Epstein as set out in Annex B.

4.39.    A handwritten note taken by Senior Executive C from the meeting between Mr Staley and members of the governing body of Academic Institution A suggests that, in response to a question about why he continued to have a relationship with Mr Epstein following Mr Epstein's conviction in 2008, Mr Staley stated that "*it was a*

22

Exhibit 7
Page 53

*personal relationship*", he "*didn't socialise with him*" and he "*was wary and cautious*".   Again, these latter two statements were not accurate.

### The Authority's enquiry - 15 August 2019 to 8 October 2019

*The Authority's initial contact*

4.40.    On 14 August 2019, the Authority contacted Barclays by telephone seeking to speak urgently to Board Member A.  On 15 August 2019, FCA Executive A had a telephone call with Board Member A who was on vacation at the time. On 16 August 2019, FCA Executive A asked their assistant to record the following note of the call: "*[…] [Board Member A] advised that when the press comments had first emerged [Mr Staley] came to speak with [Board Member A] and stated that there wasn't any particular relationship between him and [Mr Epstein].  [Board Member A] advised [they] felt satisfied by that. [FCA Executive A] advised that the [Authority's] perception is that media reports had intensified around their relationship and asked [Board Member A] to consider these.  [FCA Executive A] further asked [Board Member A] to write to the [Authority] setting out how they had satisfied themselves there was no impropriety to the relationship.*"

4.41.    After his return from vacation, Board Member A informed Mr Staley of the Authority's request during a meeting on or around 23 August 2019.  Board Member A discussed the matter with Mr Staley, and informed Mr Staley that he ought to speak with Senior Executive A to formulate a response to the Authority's request. During this conversation, Mr Staley reiterated to Board Member A that he had no knowledge of Mr Epstein's alleged criminal activities following his earlier conviction in 2008, that he had had no contact with Mr Epstein since becoming CEO of Barclays and that he was not aware of Mr Epstein having any relationship with Barclays.

*Process for drafting the letter of response*

4.42.    The Talking Points were used as the basis for preparing a draft response to the Authority. Mr Staley discussed, on several occasions, the information that Barclays might require in order to prepare a draft response to the Authority with Board Member A, Senior Executive A, Senior Executive B and Senior Executive C. During these discussions, different versions of a draft letter, which had been prepared by

23

Exhibit 7
Page 54

Senior Executive A, were discussed, including a longer version containing more details about Mr Staley's relationship with Mr Epstein and some of their interactions. Mr Staley reviewed this longer version of the letter and was content with it, subject to it being reviewed again by others.

4.43.  This draft version of the letter was in the form of a letter from Mr Staley to Barclays, with the initial intention that Barclays would then send this letter on to the Authority. In late September 2019, Barclays and Mr Staley agreed that the letter to the Authority should be shorter and instead be from Barclays to the Authority (rather than from Mr Staley).

### Role of Board Member B

4.44.  On 2 October 2019, Board Member A asked Board Member B to speak to Mr Staley about the matter so that another individual at Barclays could consider the steps that Barclays was taking to respond to the Authority's request. Board Member A also asked Board Member B to consider whether the Board should be briefed on the issue.

4.45.  Board Member B then spoke with Mr Staley about the matter on 4 October 2019. During this conversation, Mr Staley informed Board Member B that:

(1)     Since being offered the CEO role at Barclays, he had not had contact with Mr Epstein;

(2)     Mr Epstein had no relationship with Barclays;

(3)     Mr Staley first met Mr Epstein in 1999/2000;

(4)     When they met, they generally met in Mr Epstein's office;

(5)     Mr Epstein did little of significance with JPM, but did provide an important introduction to a hedge fund that JPM acquired, and over a 12-month period helped negotiate the deal;

24

Exhibit 7
Page 55

(6) Mr Staley visited Mr Epstein in 2008 when Mr Epstein was on work release from prison;

(7) Mr Staley would see Mr Epstein every two months, and would have a dinner once a year with Mr Epstein at his house;

(8) BlueMountain did no business with Mr Epstein;

(9) Mr Staley did see Mr Epstein once when Mr Staley had anchored his boat off Mr Epstein's island in the US Virgin Islands;

(10) Mr Staley had never been interviewed by any authorities in connection to his relationship with Mr Epstein;

(11) Mr Staley asked himself how he could have missed what had since emerged about Mr Epstein's conduct, but noted that others who networked with Mr Epstein missed it too, and concluded that Mr Epstein led two completely distinct lives;

(12) Mr Epstein's stature came from his significant network of connections; and

(13) There were no pertinent facts about Mr Staley's relationship with Mr Epstein that were not in the public domain, other than the fact that Mr Staley once flew on Mr Epstein's private plane with members of his family.

4.46. Board Member B then informed Board Member A that there appeared to have been no relationship between Barclays and Mr Epstein and nothing from Mr Staley's explanation to suggest that this was something that ought to be escalated to the Board.

*4 October 2019 telephone call*

4.47. On 4 October 2019, Board Member A had a telephone call with FCA Executive A and read the content of the shorter version of the draft letter to FCA Executive A. Prior to this call, the draft letter included language referring to the meetings

25

Exhibit 7
Page 56

between Mr Epstein and Mr Staley since Mr Epstein's release from prison in 2009 as being "*occasional*".

4.48.  During this call, Board Member A understood that the Authority was most concerned to understand whether Mr Staley could have been involved in, or otherwise aware of, Mr Epstein's alleged criminal conduct. Board Member A then spoke with Senior Executive A and, separately, with Mr Staley about their conversation with FCA Executive A.  Senior Executive A informed the Authority in interview that Board Member A had told them that FCA Executive A had raised the question of whether or not Mr Staley had a close relationship with Mr Epstein.

4.49.  As a consequence of this call, further changes were made to the draft letter to the Authority, including removing the reference to the "*occasional*" nature of Mr Staley and Mr Epstein's meetings, and introducing a statement that Mr Staley had confirmed that he did not have a "*close relationship*" with Mr Epstein. On 5 October 2019, Board Member A suggested to Senior Executive A that, with respect to the aspect of the Letter that addressed the recency of Mr Staley's last contact with Mr Epstein, the draft could state that their last contact was "*a long time before"* Mr Staley joined Barclays; in response, Senior Executive A suggested that, based on his understanding of their last meeting, the Letter should state that their last contact was "*well before*" Mr Staley joined Barclays.

4.50.  Senior Executive A made these changes and shared a draft version of the Letter with Board Member A. On 6 October 2019, Senior Executive A asked Mr Staley to review the draft letter, stating:

"*Jes, Please have a look at the attached draft letter. It is only slightly revised from the draft I showed you last week, but we want to be sure you feel that the language is fair and accurate.  Based on a discussion between [Board Member A] and [the Authority] on Friday, we think it will meet the [Authority's] needs. If you have any questions or suggested edits please let us know…*"

4.51.  Mr Staley questioned the change in wording to include "*close relationship*" and discussed with Senior Executive A whether it was accurately expressed. He did not question the statement that his and Mr Epstein's last contact was "*well before*" he joined Barclays.  Senior Executive A informed Mr Staley that, based on what Mr

26

Exhibit 7
Page 57

Staley had told them about his relationship with Mr Epstein to that point, they considered that the letter as drafted was fair, but that Mr Staley would also need to satisfy himself of this.  Mr Staley confirmed that he had reviewed the letter and was comfortable with it.

***The Letter***

4.52.    On 8 October 2019, Barclays sent the Letter to the Authority.  The Letter stated:

*"I am writing to close the loop on your request for assurance that we have informed ourselves and are comfortable in regard to any association of [Mr Staley] or Barclays with [Mr Epstein]. I can now report that [Board Member B], [Senior Executive A] and [Board Member A] have had separate conversations with [Mr Staley] where he has described his interactions with Mr Epstein. [Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein, and he is resolute that at no time did he see anything that would have suggested or revealed any aspect of the conduct that has been the subject of recent allegations. [Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015.*

*Separately, Barclays' Financial Crime team has conducted a thorough review of our records, which did not reveal any client or customer relationship with Mr Epstein.*

*In sum, neither our discussions with [Mr Staley] nor our review of the bank's records have revealed any cause to suspect that Barclays or [Mr Staley] have played any role in the activities of Mr Epstein that have been under investigation.*

*I trust this addresses your questions."*

4.53.    The wording of the Letter was identical to the 6 October 2019 draft version reviewed by Mr Staley, except for a minor change to the end of the third paragraph which had previously referred to activities of Mr Epstein that "*are under investigation*".

27

Exhibit 7
Page 58

*The statement regarding the nature of Mr Staley's relationship with Mr Epstein*

4.54.    The Letter stated that "*[Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein*".

4.55.    Board Member A, Senior Executive A and Mr Staley each understood that the Authority was primarily interested in understanding whether or not Mr Staley had been in any way involved in, or aware of, Mr Epstein's alleged crimes. Board Member A has subsequently informed the Authority that they considered that Mr Staley had been "*entirely consistent*" with them in relation to the matters involving Mr Epstein.

4.56.    Mr Staley informed the Authority that he understood that he was being asked to confirm that he did not have a "*close relationship*" with Mr Epstein such that he could have known or otherwise been involved in any of Mr Epstein's alleged crimes. Mr Staley considered that, while he had a "*professional, fairly close relationship*" with Mr Epstein, he definitely did not have a "*close relationship*" with Mr Epstein in that context, and that he was not personally close to Mr Epstein in any event.

4.57.    Senior Executive A informed the Authority that they would have expected to have been told about certain interactions between Mr Staley and Mr Epstein, including those relating to Mr Staley's visit to Mr Epstein's ranch (see paragraph 1.19.2 of Annex B) and Mr Staley's apparent invitation to Mr Epstein to attend an academic ceremony for an individual connected to Mr Staley in 2015 (see paragraph 1.26 of Annex B), and that had they known of these matters they would have asked further questions and taken any answers into account when drafting the Letter. Senior Executive A, having subsequently been shown certain email communications between Mr Staley and Mr Epstein, considered that, albeit taken in isolation, certain of those communications appeared to show a relationship that did not align with the way it had been characterised in the Letter.

4.58.    The Authority's view is that, having regard to the evidence set out at Annex B and in paragraphs 4.9 to 4.32 above, including the following facts and matters, the assertion that Mr Staley "*did not have a close relationship with Mr Epstein*" was inaccurate and, consequently, misleading:

28

Exhibit 7
Page 59

(1)     Mr Staley himself informed the Authority during the course of its investigation that he considered that he and Mr Epstein were "*professionally fairly close*" or had a "*professional, fairly close relationship*".

(2)     Email communications from Mr Staley to Mr Epstein refer to the strength of their friendship, and Mr Staley described Mr Epstein as one of his "*deepest*" or "*most cherished*" friends and stated that he had few friendships as "*profound*" as his with Mr Epstein.  Mr Staley subsequently informed the Authority that these communications reflected the way he writes to business contacts and that, whilst he was grateful to Mr Epstein for his assistance on certain matters, he may have been "*gaming the relationship*" by conveying to Mr Epstein that they were closer than, in Mr Staley's view, they actually were.  In interview, Board Member A agreed that Mr Staley regularly used affectionate language in his email correspondence.  The Authority's view is that, whilst Mr Staley may use a warm tone to communicate with business contacts, his communications with Mr Epstein were different in tone and nature and strongly suggest that the relationship between Mr Staley and Mr Epstein was in any case objectively close.

(3)     Mr Staley travelled to Florida to visit Mr Epstein during his prison sentence whilst he was on work release in January 2009. He did this due to being a "*loyal person*" and "*just to show support*" to Mr Epstein.

(4)     Mr Staley visited various of Mr Epstein's properties, including Mr Epstein's island in the US Virgin Islands on three separate occasions, in addition to two further visits to a private marina owned by Mr Epstein nearby his island, and Mr Epstein's ranch in New Mexico. The visits to Mr Epstein's properties in the US Virgin Islands and New Mexico were for no obvious business or professional purpose.  Mr Staley also visited Mr Epstein in Palm Beach, Florida to join a celebratory birthday dinner for Mr Epstein, in addition to more regular visits to Mr Epstein's home in New York.

(5)     Mr Epstein provided advice and assistance, over several years, to an individual connected to Mr Staley in connection with their career. In

29

Exhibit 7
Page 60

August 2015, Mr Staley informed Mr Epstein that this advice had been "*the gift of great friendship*".

(6)    Mr Staley confided with Mr Epstein on significant matters relating to Mr Staley's career.  For example, Mr Staley disclosed to Mr Epstein details of discussions Mr Staley was having with Barclays that led to his appointment as CEO in October 2015, having previously discussed possible appointments to senior positions whilst at, and following his departure from, JPM.  Notably, on 8 October 2015, Mr Staley disclosed to Mr Epstein the fact of the decision made by the BNC confirming its approval of Mr Staley's appointment, which was not in the public domain and which Mr Staley understood was "*very confidential*".

### The statement: "[Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015"

4.59.    The Letter also stated that "*[Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015.*"

4.60.    Neither Board Member A nor Senior Executive A was aware that Mr Staley was exchanging emails and speaking on the phone with Mr Epstein in relation to his prospective appointment as CEO of Barclays (including that they had exchanged emails about this on 8 and 9 October 2015, following the recommendation of the BNC) or of the fact that Mr Staley was liaising with Mr Epstein in respect of the approach from Newspaper A up to 25 October 2015.

4.61.    Senior Executive A drafted the language "*well before*" into the Letter, on the basis that they understood that Mr Staley and Mr Epstein had last met in person during the visit by Mr Staley to Mr Epstein's island in the US Virgin Islands in April 2015. Senior Executive A considered that this was "*well before*" Mr Staley joined Barclays in December 2015.  Senior Executive A informed the Authority that the reference in the letter to "*last contact*" was based upon their understanding of when Mr Staley and Mr Epstein were last in each other's company, which is what Senior Executive A had understood was the relevant context of the Authority's enquiry. Senior Executive A informed the Authority that they did not have an impression that there had been any contact between Mr Staley and Mr Epstein around the time of Mr

30

Exhibit 7
Page 61

Staley's appointment as CEO of Barclays but that they never asked, and did not recall discussing, whether Mr Staley and Mr Epstein remained in contact by telephone or email after April 2015.

4.62.    Board Member A informed the Authority that, at the time the Letter was drafted, they did not know precisely when Mr Staley and Mr Epstein had last met.

4.63.    Mr Staley's appointment as CEO of Barclays was announced on 28 October 2015 and Mr Staley was in role from 1 December 2015. The statement in the Letter that Mr Staley's last contact was "*well before he joined Barclays in 2015*" was therefore inaccurate and misleading.

## 5.    FAILINGS

5.1.    The regulatory provisions relevant to this Notice are referred to in Annex A.

5.2.    Mr Staley was responsible for ensuring that aspects of the Letter that described his relationship with Mr Epstein were factually accurate.  The Letter was inaccurate and misleading in two respects, about the nature and extent of Mr Staley's relationship with Mr Epstein and about the point of their last contact. Mr Staley reviewed the penultimate draft of the Letter and suggested no amendments to the two statements that were misleading.

### *The nature of Mr Staley's relationship with Mr Epstein*

5.3.    The Letter was misleading by stating that Mr Staley "*did not have a close relationship with Mr Epstein*".

5.4.    In forming the view that this statement was misleading, the Authority has had regard to all the facts and matters set out in Annex B and in paragraphs 4.9 to 4.32 above.  In particular, the statement did not fairly and accurately reflect the following facts and matters, all of which were known to Mr Staley at the time he approved the Letter:

(1)    Mr Staley confided in Mr Epstein on significant matters relating to Mr Staley's career.  For example, Mr Staley disclosed to Mr Epstein details of

31

Exhibit 7
Page 62

discussions he was having with Barclays that led to Mr Staley's appointment as CEO in October 2015.  Notably, on 8 October 2015, Mr Staley disclosed to Mr Epstein the fact of the decision made by the BNC confirming its approval of Mr Staley's appointment, which was not in the public domain and which Mr Staley understood was "*very confidential*".

(2)     The extensive email communications between Mr Staley and Mr Epstein (including whilst Mr Epstein was serving his custodial sentence), written in a notably warm tone, including the following emails from Mr Staley to Mr Epstein:

   a.   the email of 1 November 2009 in which Mr Staley stated "*I owe you much. And I deeply appreciate our friendship. I have few so profound*.";

   b.   the email of 31 January 2015 which stated "*The strength of a Greek army was that its core held shoulder to shoulder, and would not flee or break, no matter the threat. That is us*.";

   c.   the email of 13 August 2015 in which Mr Staley stated "*The counsel you have given [an individual connected to Mr Staley] over the years has been a gift of great friendship.*"; and

   d.   the email of 4 October 2015 in which Mr Staley stated "*You never wavered in our friendship these last three years. That means a lot too [sic] me.*"

(3)     Mr Staley travelled to Florida to visit Mr Epstein during his prison sentence when he was on work release, and visited various of Mr Epstein's properties including the island owned by Mr Epstein in the US Virgin Islands on three occasions, in addition to two further visits to a private marina owned by Mr Epstein nearby his island, and his ranch in New Mexico. Mr Staley also visited Mr Epstein in Palm Beach, Florida to join a celebratory birthday dinner for Mr Epstein, and made more regular visits to Mr Epstein's home in New York.

32

Exhibit 7
Page 63

5.5. Mr Staley subsequently informed the Authority that he considered that he and Mr Epstein were "*professionally fairly close*" or had a "*professional, fairly close relationship*".  This contradicts the language used in the Letter.

5.6. Mr Staley has informed the Authority that his correspondence with Mr Epstein reflects the way he writes to business contacts and that, whilst he was grateful to Mr Epstein for his assistance on certain matters, he may have been "*gaming the relationship*" by conveying to Mr Epstein that they were closer than, in Mr Staley's view, they actually were.  Whilst Mr Staley may use a warm tone to communicate with business contacts, his communications with Mr Epstein were different in tone and nature and very strongly suggest that the relationship between Mr Staley and Mr Epstein was in any case objectively close.

5.7. Consequently, this aspect of the Letter, which made clear that Mr Staley was the source of the information, was misleading.  Mr Staley had the opportunity to correct the misleading statement that he had "*confirmed to us that he did not have a close relationship with Mr Epstein",* but failed to do so. Mr Staley must have appreciated that the Authority would rely on this statement and must have been aware of the risk that it would mislead the Authority.   Therefore, by failing to correct the misleading statement, Mr Staley acted recklessly.

### *Mr Staley's last contact with Mr Epstein before he joined Barclays in 2015*

5.8. The Letter was misleading by stating that "*[Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015".*

5.9. Mr Staley and Mr Epstein were in contact, at least via email, until 25 October 2015: this was 3 days before Mr Staley's appointment as CEO was announced, and only shortly before 1 December 2015, being the date that Mr Staley formally started in role (see paragraph 4.63). The matters being discussed between Mr Staley and Mr Epstein up to and including 25 October 2015, relating to both Mr Staley's potential appointment as CEO of Barclays and press enquiries in connection with his likely appointment regarding his relationship with Mr Epstein, were significant and of importance to Mr Staley. Consequently, this aspect of the Letter, which made clear that Mr Staley was the source of the information, was inaccurate and misleading.

33

Exhibit 7
Page 64

5.10.    Mr Staley knew that he had been in contact with Mr Epstein about the progress of discussions with Barclays that led to Mr Staley's appointment as CEO, and in relation to the press enquiries, and that this contact continued until shortly before his appointment was announced and just a few weeks before he started in role. Mr Staley had the opportunity to correct this misleading statement in the Letter, but failed to do so. Mr Staley must have appreciated that the Authority would rely on this statement and must have been aware of the risk that it would mislead the Authority.   Therefore, by failing to correct the misleading statement, Mr Staley acted recklessly.

### *Mr Staley's explanation and the Authority's assessment of it*

5.11.    Mr Staley did not draft the Letter, and earlier draft versions had included more detail about the nature and extent of Mr Staley's relationship with Mr Epstein. Mr Staley described his relationship with Mr Epstein to various members of senior management at Barclays, including in the context of the Authority's enquiry.   Mr Staley, and others at Barclays, understood the Authority's request, which resulted in the Letter, as being primarily focussed on whether Mr Staley was aware of, or had witnessed, any of the alleged criminal activities of Mr Epstein during the course of their apparent relationship.

5.12.    This does not, however, excuse Mr Staley for failing to correct the two misleading statements in the Letter:

(1)    Mr Staley was the only person who reviewed or discussed the contents of the Letter prior to it being finalised, who was able to comment on the accuracy of these two statements from his own personal knowledge. Those individuals at Barclays with whom Mr Staley discussed the matter had, as would have been obvious to Mr Staley at the time, no first-hand knowledge of the facts relating to the nature of the relationship between Mr Staley and Mr Epstein, nor of the frequency or extent of their contact.

(2)    By stating that "*[Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein*", the Letter implied that there was a distance between Mr Epstein and Mr Staley that did not accurately reflect the true position. Had the Letter accurately described the nature of the

34

Exhibit 7
Page 65

relationship between Mr Staley and Mr Epstein, or the point at which the two last were in contact, the Authority would have been in a position at that stage to have considered whether it needed to ask further questions of Mr Staley and seek clarity on the nature and extent of the relationship.

(3)     No individual at Barclays was aware that Mr Staley and Mr Epstein had discussed press enquiries regarding their relationship, in connection with Mr Staley's likely appointment as CEO of Barclays, up until 25 October 2015, or had any knowledge of the fact that Mr Staley had shared confidential information with Mr Epstein about negotiations relating to his impending appointment as CEO in October 2015 (including the confidential decision taken by the BNC on 8 October 2015).  Mr Staley did not inform anybody at Barclays of these matters, which were clearly relevant to factual assertions that were included in the Letter (and which were misleading).

5.13.   In fact, Mr Staley consistently did not accurately set out the nature of his relationship with Mr Epstein to Barclays. In particular:

(1)     In October 2015, in response to the press enquiries relating to Mr Staley's likely appointment as CEO, regarding his relationship with Mr Epstein, Barclays made statements which gave the misleading impression that Mr Staley and Mr Epstein did not have a close relationship, including that they had not had a discussion about the recruitment process that year and that they did not have *"anything resembling a close personal association"*. The Authority considers that these statements were based on information provided by Mr Staley and that, in light of his impending appointment as CEO, Mr Staley had an interest in giving Barclays the impression of a greater distance between himself and Mr Epstein than was the case at this time.

(2)     In September 2019, Mr Staley gave a presentation to the governing board of Academic Institution A, of which he was a member, to address enquiries about his relationship with Mr Epstein.  The Talking Points were prepared to assist Mr Staley in making this presentation and subsequently provided part of the factual foundation for the Letter sent by Barclays to

35

Exhibit 7
Page 66

the Authority.  The Talking Points were misleading in various aspects, for example, they included the inaccurate statements "*At no time after his conviction in 2008 did I allow [Mr Epstein] any connection with any aspect of my professional life*" and "*I had limited contact with him post his conviction*". The Talking Points were based on information provided by Mr Staley to Barclays.

5.14.    The Authority has concluded that Mr Staley was aware of the risk which his association with Mr Epstein posed to his reputation and his career, and that this knowledge is relevant context to Mr Staley's failure in 2015, and subsequently in 2019, to set out accurately the nature and extent of his relationship with Mr Epstein to Barclays, and his failure to correct the two misleading statements in the Letter.

5.15.    The role of CEO requires an individual to exercise sound judgement and set an example to staff at their firm.  This is especially important in the context of the requirement on individuals to act with integrity, be open and cooperative with the Authority and the PRA, and to disclose appropriately information of which the Authority would reasonably expect notice.

5.16.    By failing to correct the two misleading statements in the Letter, Mr Staley misled the Authority. Mr Staley must have appreciated that the Authority would rely on the content of the Letter and he must have been aware of the risk that the Letter would mislead the Authority.  Therefore, by approving the Letter containing the two misleading statements, Mr Staley acted recklessly and with a lack of integrity and failed to comply with ICR 1.

5.17.    Mr Staley must have realised that the Authority's request to Barclays for information about his relationship with Mr Epstein was important to the Authority. By approving the Letter which contained the two misleading statements, without informing Barclays that the statements were incorrect, Mr Staley failed to be open and cooperative with the Authority and failed to disclose appropriately information of which the Authority would have reasonably expected notice.  Consequently, Mr Staley failed to comply with ICR 3 and SMCR 4.

36

Exhibit 7
Page 67

**6.    SANCTION**

**Financial penalty**

6.1.    The Authority's policy for imposing a financial penalty is set out in Chapter 6 of DEPP.  In respect of conduct occurring on or after 6 March 2010, the Authority applies a five-step framework to determine the appropriate level of financial penalty.  DEPP 6.5B sets out the details of the five-step framework that applies in respect of financial penalties imposed on individuals in non-market abuse cases.

*Step 1: disgorgement*

6.2.    Pursuant to DEPP 6.5B.1G, at Step 1 the Authority seeks to deprive an individual of the financial benefit derived directly from the breach where it is practicable to quantify this.

6.3.    The Authority has not identified any financial benefit that Mr Staley derived directly from his breaches of ICR 1, ICR 3 and SMCR 4.

6.4.    Step 1 is therefore £0.

*Step 2: the seriousness of the breach*

6.5.    Pursuant to DEPP 6.5B.2G, at Step 2 the Authority determines a figure that reflects the seriousness of the breach.  That figure is based on a percentage of the individual's relevant income.  The individual's relevant income is the gross amount of all benefits received by the individual from the employment in connection with which the breach occurred, and for the period of the breach. Where the breach lasted less than 12 months, the relevant income will be that earned by the individual in the 12 months preceding the end of the breach.

6.6.    Mr Staley's breaches lasted less than 12 months. Accordingly, the relevant income is his income from 9 October 2018 to 8 October 2019.  The Authority considers Mr Staley's relevant income for this period to be £5,493,526.

37

Exhibit 7
Page 68

6.7.    In deciding on the percentage of the relevant income that forms the basis of the Step 2 figure, the Authority considers the seriousness of the breach and chooses a percentage between 0% and 40%.  This range is divided into five fixed levels which represent, on a sliding scale, the seriousness of the breach; the more serious the breach, the higher the level.  For penalties imposed on individuals in non-market abuse cases there are the following five levels:

(1)    Level 1 – 0%

(2)    Level 2 – 10%

(3)    Level 3 – 20%

(4)    Level 4 – 30%

(5)    Level 5 – 40%

6.8.    In assessing the seriousness level, the Authority takes into account various factors which reflect the impact and nature of the breach, and whether it was committed deliberately or recklessly.

6.9.    DEPP 6.5B.2G(9) lists factors relating to the nature of the breach. Of these, the Authority considers the following factors to be relevant:

(1)    Mr Staley failed to act with integrity as he recklessly misled the Authority by failing to correct the two misleading statements in the Letter.

(2)    Mr Staley held a senior position within Barclays and a prominent position within the financial services industry as CEO of one of the largest global banks.

(3)    Mr Staley is an experienced industry professional.

6.10.    DEPP 6.5B.2G(11) lists factors tending to show the breach was reckless. Of these, the Authority considers the following factor to be relevant:

38

Exhibit 7
Page 69

> (1)   Mr Staley must have appreciated that there was a risk that his inaction in failing to correct the two misleading statements in the Letter could result in the Authority being misled.

6.11.   DEPP 6.5B.2G(12) lists factors likely to be considered 'level 4 or 5 factors'.  Of these, the Authority considers the following factors to be relevant:

> (1)   Mr Staley failed to act with integrity.

> (2)   Mr Staley held a prominent position within the financial services industry as CEO of one of the largest global banks.

> (3)   The breaches were committed recklessly as Mr Staley approved the Letter when he must have been aware of the risk that it would mislead the Authority.

6.12.   DEPP 6.5B.2G(13) lists factors likely to be considered 'level 1, 2 or 3 factors'.  Of these, the Authority considers the following factors to be relevant:

> (1)   No profits were made, or losses avoided, either directly or indirectly as a result of Mr Staley's actions.

> (2)   There was little or no loss or risk of loss to consumers, investors or other market users individually and in general as a result of Mr Staley's actions.

6.13.   Taking all of these factors into account, the Authority considers the seriousness of the breaches to be level 4 and so the Step 2 figure is 30% of £5,493,526.

6.14.   Step 2 is therefore £1,648,057.

### Step 3: mitigating and aggravating factors

6.15.   Pursuant to DEPP 6.5B.3G, at Step 3 the Authority may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

39

Exhibit 7
Page 70

6.16.   DEPP 6.5B.3G(2) lists factors which may have the effect of aggravating or mitigating the breach.  Of these, the Authority considers the following factor to be relevant:

(1)   The previous disciplinary record and general compliance history of the individual.  Mr Staley was the subject of regulatory action by the Authority and the PRA in 2018 for breaching ICR 2 in the way he acted in response to an anonymous letter that Barclays received raising concerns about its hiring process.

6.17.   The Authority has not identified any factors which mitigate the breaches.

6.18.   Having taken into account the aggravating factor and lack of mitigating factors, the Authority considers that the Step 2 figure should be increased by 10%.

6.19.   Step 3 is therefore £1,812,862.

### *Step 4: adjustment for deterrence*

6.20.   Pursuant to DEPP 6.5B.4G, if the Authority considers the figure arrived at after Step 3 is insufficient to deter the individual who committed the breach, or others, from committing further or similar breaches, then the Authority may increase the penalty.

6.21.   The Authority considers that the Step 3 figure of £1,812,862 represents a sufficient deterrent to Mr Staley and others, and so has not increased the penalty at Step 4.

6.22.   Step 4 is therefore £1,812,862.

### *Step 5: settlement discount*

6.23.   Pursuant to DEPP 6.5B.5G, if the Authority and the individual on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the Authority and the individual

40

Exhibit 7
Page 71

reached agreement.  The settlement discount does not apply to the disgorgement of any benefit calculated at Step 1.

6.24.    The Authority and Mr Staley did not reach agreement at Stage 1 and so no discount applies to the Step 4 figure.

6.25.    Step 5 is therefore £1,812,862.

*Penalty*

6.26.    The Authority therefore has decided to impose a total financial penalty of £1,812,800 (rounded down to the nearest £100 in accordance with the Authority's usual practice) on Mr Staley for breaching ICR 1, ICR 3 and SMCR 4.

**Prohibition order**

6.27.    The Authority has the power to make prohibition orders in respect of individuals under section 56 of the Act. The Authority's approach to exercising these powers is set out at Chapter 9 of the Enforcement Guide.

6.28.    In considering whether to impose a prohibition order, the Authority has had regard to all relevant circumstances of the case. In particular, the Authority has considered Mr Staley's fitness and propriety with regard to his integrity and in respect of his being open and cooperative with the Authority. The Authority has also had regard to the period of time that has passed since the events described in this Notice.

6.29.    The Authority considers that Mr Staley acted recklessly and without integrity by failing to correct the two misleading statements in the Letter. Mr Staley must have appreciated that the Authority would rely on the content of the Letter and that there was a risk that the Letter would mislead the Authority.

6.30.    Integrity, being open and cooperative with the Authority at all times, and demonstrating good judgement are fundamental requirements of senior managers, particularly a CEO of one of the UK's most significant financial institutions. These breaches represented a serious failure of judgement by Mr Staley when dealing with sensitive matters involving the Authority. The Authority has also had regard to the fact that Mr Staley was subject to regulatory action by the Authority and the PRA in 2018, albeit relating to matters not connected to the findings in this Notice.

41

Exhibit 7
Page 72

As a consequence of that action, the Authority would have expected Mr Staley to have been particularly careful to ensure that the Letter was factually accurate.

6.31.  The Authority therefore expected Mr Staley, as CEO of Barclays, to recognise the importance of acting with integrity in all of his professional dealings and to recognise the importance of being open and cooperative with the Authority at all times. A necessary feature of the effective supervision of firms in the UK is for their senior managers to be open and frank in their dealings with the Authority, the PRA and other regulators, particularly where those interactions relate to sensitive or important matters. When a senior manager of a major financial institution fails to act with integrity in a way that causes the Authority to be misled, there is a substantial risk of harm to the Authority's integrity objective, as such conduct undermines confidence in the financial markets.

6.32.  Given the nature of the failings described in this Notice, and having regard to the fact that Mr Staley's misconduct occurred only a year after regulatory action was taken against him in 2018, it appears to the Authority that Mr Staley is not a fit and proper person to perform the role of a CEO or other senior management function at an authorised or exempt person or exempt professional firm.

6.33.  The Authority considers that, to advance its integrity objective, and given the risk posed to that objective, it is appropriate and proportionate in all the circumstances to prohibit Mr Staley from performing any senior management or significant influence function in relation to any regulated activity carried out by an authorised person, exempt person or exempt professional firm.

## 7.  REPRESENTATIONS

7.1.  Annex C contains a brief summary of the key representations made by Mr Staley in response to the Warning Notice and how they have been dealt with.  In making the decision which gave rise to the obligation to give this Notice, the Authority has taken into account all of the representations made by Mr Staley, whether or not set out in Annex C.

42

Exhibit 7
Page 73

**8.    PROCEDURAL MATTERS**

8.1.    This Notice is given to Mr Staley under sections 57(3) and 67(4) and in accordance with section 388 of the Act.

8.2.    The following paragraphs are important.

**Decision maker**

8.3.    The decision which gave rise to the obligation to give this Notice was made by the RDC. The RDC is a committee of the Authority which takes certain decisions on behalf of the Authority. The members of the RDC are separate to the Authority staff involved in conducting investigations and recommending action against firms and individuals. Further information about the RDC can be found on the Authority's website:

https://www.fca.org.uk/about/who-we-are/committees/regulatory-decisions-committee

**The Tribunal**

8.4.    Mr Staley has the right to refer the matter to which this Notice relates to the Tribunal.  Under paragraph 2(2) of Schedule 3 of the Tribunal Procedure (Upper Tribunal) Rules 2008, Mr Staley has 28 days from the date on which this Notice is given to him to refer the matter to the Tribunal.  A reference to the Tribunal is made by way of a signed reference notice (Form FTC3) filed with a copy of this Notice.  The Tribunal's contact details are: The Upper Tribunal, Tax and Chancery Chamber, Fifth Floor, Rolls Building, Fetter Lane, London EC41 1NL (tel: 020 7612 9730; email: fs@hmcts.gsi.gov.uk).  Further information on the Tribunal, including guidance and the relevant forms to complete, can be found on the HM Courts and Tribunal Service website:

http://www.justice.gov.uk/forms/hmcts/tax-and-chancery-upper-tribunal

43

Exhibit 7
Page 74

8.5.    A copy of the reference notice (Form FTC3) must also be sent to the Authority at the same time as filing a reference with the Tribunal.  It should be sent to Richard Topham at the Financial Conduct Authority, 12 Endeavour Square, London E20 1JN.

8.6.    Once any such referral is determined by the Tribunal and subject to that determination, or if the matter has not been referred to the Tribunal, the Authority will issue a final notice about the implementation of that decision.

**Access to evidence**

8.7.    Section 394 of the Act applies to this Notice.

8.8.    The person to whom this Notice is given has the right to access:

(1)    the material upon which the Authority has relied in deciding to give this Notice; and

(2)    the secondary material which, in the opinion of the Authority, might undermine that decision.

**Third party rights**

8.9.    A copy of this Notice is being given to Barclays as a third party identified in the reasons above and to whom in the opinion of the Authority the matter to which those reasons relate is prejudicial.  As a third party, Barclays has similar rights to those mentioned in paragraphs 8.4 and 8.8 above in relation to the matters which identify it.

**Confidentiality and publicity**

8.10.   This Notice may contain confidential information and should not be disclosed to a third party (except for the purpose of obtaining advice on its contents).  In accordance with section 391 of the Act, a person to whom this Notice is given or copied may not publish the Notice or any details concerning it unless the Authority has published the Notice or those details.

44

Exhibit 7
Page 75

8.11.    However, the Authority must publish such information about the matter to which a decision notice or final notice relates as it considers appropriate.  The persons to whom this Notice is given or copied should therefore be aware that the facts and matters contained in this Notice may be made public.

**Authority contacts**

8.12.    For more information concerning this matter generally, contact Richard Topham (direct line: 020 7066 1180 or email: richard.topham@fca.org.uk) or Nick Larkman (direct line: 020 7066 6964 or email: nick.larkman@fca.org.uk) at the Authority.

**Tim Parkes**
**Chair, Regulatory Decisions Committee**

45

Exhibit 7
Page 76

## **ANNEX A**

## **RELEVANT STATUTORY AND REGULATORY PROVISIONS**

## **RELEVANT STATUTORY PROVISIONS**

1.1.    The Authority's statutory objectives, set out in section 1B(3) of the Act, include the integrity objective: protecting and enhancing the integrity of the UK financial system.

1.2.    Section 66 of the Act provides that the Authority may take action against a person if it appears to the Authority that he is guilty of misconduct and the Authority is satisfied that it is appropriate in all the circumstances to take action against him.

1.3.    Section 66A of the Act provides that, for the purposes of action by the Authority under section 66, a person is guilty of misconduct if any of conditions A to C is met in relation to that person.  Section 66A sets out Condition A, which states that:

'*(a) the person has at any time failed to comply with rules made by the [Authority] under section 64A, and*

*(b) at that time the person was –*

   *(i) an approved person,*

   *(ii) an employee of a relevant authorised person, or*

   *(iii) a director of an authorised person.'*

1.4.    Section 56 of the Act provides that the Authority may make an order prohibiting an individual from performing a specified function, any function falling within a specified description or any function, if it appears to the Authority that that individual is not a fit and proper person to perform functions in relation to a regulated activity carried on by an authorised person, exempt person or a person to whom , as a result of Part 20, the general prohibition does not apply in relation to that activity.  Such an order may relate to a specified regulated activity, any regulated activity falling within a specified description, or all regulated activities.

## **RELEVANT REGULATORY PROVISIONS**

*Code of Conduct*

1.5.    Individual Conduct Rule 1 (ICR 1) states: You must act with integrity.

1.6.    Individual Conduct Rule 3 (ICR 3) states: You must be open and cooperative with the [Authority], the PRA and other regulators.

1.7.    Senior Manager Conduct Rule 4 (SMCR 4) states: You must disclose appropriately any information of which the [Authority] or PRA would reasonably expect notice.

46

Exhibit 7
Page 77

*The Fit and Proper Test for Approved Persons*

1.8.    The part of the Authority's Handbook entitled "The Fit and Proper Test for Approved Persons" ("FIT") sets out the criteria that the Authority will consider when assessing the fitness and propriety of a candidate for a controlled function.  FIT is also relevant in assessing the continuing fitness and propriety of an approved person.

1.9.    FIT 1.3.1G states that the Authority will have regard to a number of factors when assessing the fitness and propriety of a person.  The most important considerations will be the person's honesty, integrity and reputation, competence and capability and financial soundness.

*The Authority's policy for exercising its power to make a prohibition order*

1.10.   The Authority's policy in relation to prohibition orders is set out in Chapter 9 of the Enforcement Guide ("EG").

1.11.   EG 9.1 states that the Authority may exercise this power where it considers that, to achieve any of its regulatory objectives, it is appropriate either to prevent an individual from performing any functions in relation to regulated activities or to restrict the functions which he may perform.

*DEPP*

1.12.   Chapter 6 of DEPP sets out the Authority's statement of policy with respect to the imposition and amount of financial penalties under the Act.

47

Exhibit 7
Page 78

## ANNEX B

### CHRONOLOGY OF MR STALEY'S RELATIONSHIP WITH MR EPSTEIN 1999 TO JULY 2015

**Mr Staley's relationship with Mr Epstein – 1999 to 2008**

1.1.    Mr Staley first met Mr Epstein in 1999 or 2000.  At that time, Mr Staley was the Head of JPM's Private Bank.  Mr Staley recalled being asked by JPM to speak or meet with Mr Epstein on the basis that Mr Epstein was a client of JPM's Private Bank.   From around 2002, Mr Staley also became the Head of the Asset Management business at JPM, a role which he held for a time alongside his role as the Head of the Private Bank.

1.2.    In around 2000 or 2001, it became apparent to Mr Staley that Mr Epstein had "*an incredible network*" and Mr Epstein arranged meetings for Mr Staley with prominent figures in business and politics.  Mr Staley recalled at the time being of the view that Mr Epstein was very knowledgeable about politics, economics and business.

1.3.    Mr Staley was introduced to a prominent figure in the financial services industry through Mr Epstein and, in 2004, as a consequence of this introduction, was able to lead an acquisition by JPM of a hedge fund.  Mr Staley recalls Mr Epstein playing an important role in introducing that transaction to Mr Staley and JPM, and in the subsequent negotiations. Mr Epstein did not, however, formally act for or advise either Mr Staley or JPM in connection with this transaction.

1.4.    At around this time, the Authority understands that Mr Staley would meet with Mr Epstein during the daytime at an office that Mr Epstein had access to in New York, and also at Mr Epstein's home in New York.

1.5.    In addition to his home in New York, Mr Epstein owned an island in the US Virgin Islands (named "Little St James"), a ranch in New Mexico, as well as properties in Florida, London and Paris. At some time in 2005 or 2006, Mr Staley travelled on Mr Epstein's private plane to Mr Epstein's island in the US Virgin Islands with members of Mr Staley's family, where they spent the night before transiting onto Mr Staley's boat. Mr Epstein was present for this visit by Mr Staley.

48

Exhibit 7
Page 79

**Evidence relating to Mr Staley's relationship with Mr Epstein – 2008 to January 2013**

1.6.     Mr Staley became the CEO of the Investment Bank at JPM in around September 2009, having been the CEO of Wealth and Asset Management at JPM since 2005. He remained as the CEO of the Investment Bank until July 2012, at which point he moved into the role of Chairman of the Investment Bank. In January 2013, Mr Staley left JPM and became Managing Partner at BlueMountain. Mr Epstein was a client of JPM's Private Bank from prior to 2008 until early 2013.

1.7.     Between July 2008 and December 2012, Mr Epstein and Mr Staley exchanged more than 1,100 emails via Mr Staley's JPM email address. The emails suggest that they spoke often on the telephone, as well as meeting in person. On certain occasions, Mr Staley also used a personal account to correspond with Mr Epstein, albeit that the nature of these communications was similar to those communications sent via Mr Staley's JPM email address.  This email correspondence continued after Mr Epstein ceased to be Mr Staley's client, following Mr Staley's move in 2009 to be the CEO of JPM's Investment Bank.

1.8.     On 30 June 2008, Mr Epstein pleaded guilty to two criminal state offences, of soliciting a minor and soliciting a prostitute, and was sentenced to 18 months in prison. Mr Epstein appears to have been released from prison by 15 August 2009. He remained a client of JPM, and email correspondence between Mr Epstein and Mr Staley continued throughout the period of Mr Epstein's imprisonment.

*Mr Staley and Mr Epstein's networking*

1.9.     Mr Staley recalled Mr Epstein providing him with important information about changes to Mr Staley's role at JPM, prior to Mr Staley being aware of these changes, at certain points between 2009 and January 2013.

1.10.    Between 2008 and 2012, Mr Epstein and Mr Staley engaged in networking, and there is evidence of apparent attempts by Mr Epstein to facilitate introductions for Mr Staley and/or JPM to a number of high-profile individuals. During this time, Mr Epstein and Mr Staley also discussed market fluctuations and related issues, including during the financial crisis of 2008. For example, in an email to Mr Epstein

49

Exhibit 7
Page 80

on 10 October 2008 (at which point Mr Epstein was in prison), Mr Staley stated that "*I am dealing with the Fed on an idea to solve things.  I need a smart friend to help me think through this stuff.  Can I get you out for a weekend to help me (are they listening?).  Jes*".

### *Emails in which Mr Epstein seeks to assist Mr Staley's career development*

1.11.   During this period, Mr Staley and Mr Epstein discussed Mr Staley's career and steps that he should take to develop it.  For example, on 7 September 2009, at or around the time of Mr Staley's appointment as CEO of the Investment Bank at JPM, Mr Epstein wrote to Mr Staley stating: "*I think you should start now, schedule a week a month world travel. You need more staff. Travel team etc at least two more people to do your grunt work and prep. Money well spent. They could be analysts cum gophers*."

1.12.   Further, in May 2010, Mr Epstein wrote to Mr Staley to offer him advice about how to most effectively answer television interview questions.

### *Evidence relating to the nature of the relationship*

1.13.   During this period, Mr Staley and Mr Epstein also discussed personal matters. This included introductions made by Mr Epstein to provide assistance to an individual connected to Mr Staley in respect of their career choices. Mr Staley stated that he was "*deeply appreciative of [Mr Epstein's] involvement*" in this regard.

1.14.   There are also emails where Mr Staley and Mr Epstein refer to the closeness of their 'friendship'. A number of these emails, including the following examples, were sent whilst Mr Epstein was serving his prison sentence:

    1.14.1.   On 11 July 2008, Mr Staley sent an email to Mr Epstein in which he stated: "*I miss you.  The world is in a tough place.  Hang in there. Jes*", to which Mr Epstein responded, "*So am I*".

    1.14.2.   On 12 July 2008, Mr Staley wrote to Mr Epstein to inform him that Mr Staley had gone "*…to Maine yesterday to see the new boat. [The boat] is coming along and will be everything that I hoped for. She wouldn't be*

50

Exhibit 7
Page 81

*there without your encouragement. 18 months until she is anchored in front of St Jeff* [a name believed to be a reference to Mr Epstein's island, Little St James]. *I hope we can talk this week. Jes.*"

1.14.3. On 31 July 2008, in an email from Mr Staley commenting on market conditions, Mr Staley stated, "*I hope you are hangin [sic] there. Just think of the island and my boat anchored in front.  I do.*"

1.15. Following Mr Epstein's release from prison in 2009, further emails sent by Mr Staley refer to his 'friendship' with Mr Epstein, including the following examples:

1.15.1. On 14 August 2009, Mr Epstein wrote to Mr Staley: "*hope you are enjoying your vacation. When you have some time, I would love to have you come visit*", to which Mr Staley responded on 15 August 2009, stating, "*I'm having a great time. The boat is a long dream come true. I will get to Florida soon. I need to shake your hand in freedom.  Your friend. Jes*"

1.15.2. On 1 November 2009, whilst staying at Mr Epstein's ranch in New Mexico, Mr Staley told Mr Epstein "*[…] I owe you much. And I deeply appreciate our friendship. I have few so profound*".

1.15.3. On 19 September 2010, an email exchange suggests that Mr Staley and Mr Epstein socialised with each other the previous evening. Mr Epstein said "*Thanks for last night*", to which Mr Staley responded "*It was fun. And great to see you with so many friends. […]*"

1.15.4. On 5 March 2011, Mr Staley sent an email to Mr Epstein, which stated:

"*[We] were talking tonight about what you have meant to me … You have paid a price for what has been accused. But we know what u have done for us. And we count you as one of our deepest friends. And most honest of people. Thanks, Jes*"

1.15.5. On 23 August 2012, shortly after Mr Staley had left his role as CEO of the Investment Bank at JPM, Mr Staley sent Mr Epstein an email stating:

51

Exhibit 7
Page 82

*"I can't tell you how much your friendship has meant to me. Thank you deeply for the last few weeks. All will be fine. […] To my most cherished friend, Jes."*

1.15.6.  On 31 December 2012, Mr Staley sent an email to Mr Epstein stating:

*"I've tried calling a few times, even though the service in [location] is pretty spotty.  Thanks for all the friendship this year.  You were enormously kind and supportive.  All looks good for next year.  More freedom, more deals, more building, more things we can do together. Say hi to everyone. Happy New Year, Jes"*

1.16.  Mr Staley has informed the Authority that, on one level, he did have a close relationship with Mr Epstein and had been appreciative of certain things that Mr Epstein had done for him. Mr Staley explained, however, that he considered that he had a "*professional, fairly close relationship*" with Mr Epstein, and not a personal friendship with Mr Epstein.

1.17.  Mr Staley suggested that the reference in an email to Mr Epstein being one of his "*deepest friends*" reflected the warmth of tone that Mr Staley seeks to convey to business contacts. Board Member A and Senior Executive C also informed the Authority that they considered that Mr Staley typically used a warm tone when communicating with business contacts.  Mr Staley also suggested that his reference to Mr Epstein as his "*deepest friend*" was in part reflective of Mr Staley "*gaming the relationship we had*", or conveying to Mr Epstein that they were closer than Mr Staley considered them to be, and that this was a form of "*banter*". Mr Staley also informed the Authority that he never saw, nor was aware of, Mr Epstein's alleged crimes, albeit that he knew that Mr Epstein had been convicted for procuring a 17-year-old for prostitution in 2008 and was aware of Mr Epstein's indictment in July 2019. The Authority makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes.

52

Exhibit 7
Page 83

*Visits to Mr Epstein's properties outside of New York, and visit to Mr Epstein whilst serving a custodial sentence*

1.18.    On or shortly after 15 January 2009, Mr Staley visited Mr Epstein during his prison sentence in Florida whilst he was on work release, which followed discussions seeking to arrange a visit from July 2008. Mr Staley informed the Authority that he visited Mr Epstein because he (Mr Staley) was a "*loyal person*" and "*just to show support*".

1.19.    Between 2008 and December 2012, Mr Staley visited (or planned to visit) certain of Mr Epstein's properties, in addition to the more regular meetings with Mr Epstein at Mr Epstein's home in New York.  For example:

1.19.1.    There was correspondence in October 2009 discussing a potential visit by Mr Staley to Mr Epstein's London house.  Mr Epstein and Mr Staley exchanged emails relating to a possible meeting, which appears not to have taken place. Mr Epstein wrote, "*I screwed up, he just landed in new your [sic] from london… when are you back?*", to which Mr Staley responded, "*Wednesday, then Washington Thurs and Friday. (and in my book you never screw up)*". Mr Staley informed the Authority that he never visited Mr Epstein's London house.

1.19.2.    On or around 1 November 2009, Mr Staley visited Mr Epstein's ranch in New Mexico. Mr Epstein was not at the ranch at the time of his visit. During this visit, Mr Staley sent an email to Mr Epstein which stated: "*So when all hell breaks lose [sic], and the world is crumbling, I will come here, and be at peace. Presently, I'm in the hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're here together.  I owe you much. And I deeply appreciate our friendship. I have few so profound*". Mr Staley informed the Authority that he did not recall Mr Epstein or anybody else being at the ranch when he visited (other than people who worked there), and that he stayed for two hours to view it and rode a horse, before continuing with his trip.

1.19.3.    On 15 January 2010, Mr Staley visited Mr Epstein's marina in St Thomas, near to Mr Epstein's island in the US Virgin Islands, where Mr Staley's

53

Exhibit 7
Page 84

boat had been given a private mooring by Mr Epstein. Mr Staley informed the Authority that he recalled mooring his boat at Mr Epstein's marina, and that Mr Epstein had briefly "*stopped by*" to "*take a look at*" Mr Staley's boat, before Mr Staley then departed.

1.19.4. On 20 January 2010, Mr Staley visited Palm Beach, Florida, for dinner with Mr Epstein and others, as part of a birthday celebration for Mr Epstein. Mr Staley explained to the Authority that he does not recall this visit.

1.19.5. Mr Staley also appears to have briefly visited Mr Epstein's island in the US Virgin Islands on 21 or 22 January 2011, shortly after Mr Epstein's birthday on 20 January. Following correspondence which suggested that Mr Staley was planning to visit Mr Epstein's island, on 22 January 2011 Mr Epstein wrote to Mr Staley that: "*You are welcome to use jetskis snorkels movies boats [sic]*"; then "*Atv's jet skis use the island, full gym up and running [sic]*". Mr Epstein then asked, "*did you like the kitchen*", to which Mr Staley responded, stating: "*Terrific. Lots of workers. What a paradise. When I retire, I'm going to put a mooring in front of your dock for my boat. Amazing place…*". Mr Staley informed the Authority that he did not recall this visit but thought that as part of a regular sailing trip in the US Virgin Islands it was possible he had docked at the island and taken a look around.

**Evidence relating to Mr Staley's relationship with Mr Epstein - January 2013 to July 2015**

1.20. On or shortly after 8 January 2013, Mr Staley left JPM and joined BlueMountain, as Managing Partner.  Mr Staley held the role of Managing Partner at BlueMountain from on or around 8 January 2013 until 1 December 2015, when he was appointed as CEO of Barclays.  During that period, until October 2015, Mr Staley and Mr Epstein continued to communicate extensively and fairly frequently, exchanging almost 600 emails.

54

Exhibit 7
Page 85

*Evidence of Mr Staley's interactions with Mr Epstein in a business context*

*Attempts to onboard Mr Epstein as a client of BlueMountain*

1.21.    From February 2013 to March 2013, Mr Staley attempted to onboard Mr Epstein as a client of BlueMountain.  On 25 February 2013, having exchanged correspondence with Mr Epstein about a possible "*BMC investment*", Mr Staley provided Mr Epstein with fund "subscription documents", noting, "*You're my first client!*".

1.22.    In March 2013, Mr Staley and Mr Epstein exchanged emails about Mr Epstein's possible investment, and on 26 March 2013, Mr Staley's personal assistant enquired with colleagues at BlueMountain about whether they had received Mr Epstein's "*trade documents*".

1.23.    In interview, Mr Staley's recollection was that Mr Epstein did not, in fact, invest into a fund managed by BlueMountain, and the Authority has not seen evidence that he did so.

*Continued networking between Mr Epstein and Mr Staley*

1.24.    Mr Staley and Mr Epstein continued to network and discuss potential business opportunities during this period. For example, Mr Epstein and Mr Staley discussed arrangements for meetings between Mr Staley and certain prominent public figures and business figures in March 2013, April 2013, September 2013 and May 2014. Mr Staley also sought to invite a prominent business figure to dinner at Mr Epstein's home in New York in June 2014, although it is not clear whether this dinner did, in fact, take place.

*Potential personal business deal*

1.25.    In December 2013, Mr Staley and Mr Epstein also discussed a potential investment that they might make together in a start-up financial services firm based in New York. Mr Staley did make an investment in the firm (in a personal capacity), although it appears that Mr Epstein ultimately did not.

55

Exhibit 7
Page 86

*Evidence relating to personal matters*

*Continued assistance from Mr Epstein to an individual connected to Mr Staley*

1.26. Mr Epstein and Mr Staley continued to discuss how Mr Epstein might assist an individual connected to Mr Staley with certain of their career choices. In March 2015, Mr Staley informally invited Mr Epstein to attend an academic ceremony for the individual, although it appears that Mr Epstein did not attend.

1.27. On 13 August 2015, Mr Staley wrote to Mr Epstein, stating: "*[…] I know you [sic] much of a role you had in arriving at this very big day. The counsel you have given […] over the years has been the gift of great friendship. Thanks my friend.*"

*References to nature of relationship*

1.28. Between January 2013 and July 2015, Mr Staley sent further emails describing Mr Epstein as his "friend", or wrote in similar terms. For example:

1.28.1. On 1 January 2015, Mr Staley emailed Mr Epstein, stating: "*Happy new year Jeffrey.  Thanks for being the friend you are.*"

1.28.2. On 31 January 2015, Mr Staley sent an email to Mr Epstein stating: "*The strength of a Greek army was that its core held shoulder to shoulder, and would not flee or break, no matter the threat. That is us.*"

1.29. There is also evidence that Mr Staley and Mr Epstein met socially during this period. For example:

1.29.1. On 19 September 2014, Mr Epstein's personal assistant emailed Mr Staley's personal assistant and told them "*we have ran [sic] out of the wine Jes likes*" and asked whether there was "*perhaps another sauvignon blanc that we could keep on hand for Jes*".

1.29.2. On 23 October 2014, Mr Epstein's personal assistant emailed Mr Staley's personal assistant to ask what Mr Staley would like for dinner that evening with Mr Epstein: "*could you please ask Jes what he is in the mood*

56

Exhibit 7
Page 87

*for for dinner tonight?! I asked Jeffrey what he would like for dinner and he requested I ask Jes!"*"

<u>*Evidence relating to Mr Staley's career*</u>

*Firm A*

1.30.    Mr Staley joined the board of Firm A in May 2015 as a non-executive director and held this role until 28 October 2015.  Mr Staley resigned from this role at the same time as it was announced that he had been appointed CEO of Barclays.

1.31.    On 27 May 2015, Mr Epstein sent an email to Mr Staley that stated, "*I would like a new investment person. Anyone at [Firm A]?*".  Mr Staley informed the Authority that he did not recall this email or taking any action in relation to it.

1.32.    Subsequently, on 25 June 2015, Mr Epstein sent an email to Mr Staley that asked whether it would "*be possible to set up an account at [Firm A]. Do not want to cause any problem for you, id start with 100 million*".  In response, Mr Staley wrote: "*I am getting closer to the people here. (I'm in the board meeting). Let's talk about it.*"  Mr Staley informed the Authority that he did not recall this email exchange or ever discussing the matter with Mr Epstein.  Mr Epstein did not become a client of Firm A.

<u>*Visits to Mr Epstein's properties*</u>

1.33.    Between January 2013 and April 2015, Mr Staley met with Mr Epstein from time to time at Mr Epstein's home in New York and also visited certain of Mr Epstein's properties outside of New York.

    1.33.1.  On 14 January 2015, following an email from Mr Staley to Mr Epstein in which he had asked for "*dock space*", Mr Staley moored his boat at Mr Epstein's marina in the US Virgin Islands.

    1.33.2.  On 12 April 2015, Mr Staley travelled to Mr Epstein's island with a family member whilst on vacation, for what he described as a "*three-hour stop*

57

Exhibit 7
Page 88

*in front of, or anchoring in front of his island*".  Later that day, Mr Staley wrote to Mr Epstein following his visit:

"*Thanks for the flight and thanks for the lunch. Your place is crazy, and special.  It has a warmth and silliness that makes it yours. I count u as a deep friend […] All the best.*"

58

Exhibit 7
Page 89

## ANNEX C

### REPRESENTATIONS

1. A summary of the key representations made by Mr Staley, and of the Authority's conclusions in respect of them (in **bold**), is set out below.

The focus of the Authority's enquiry

2. The Authority's enquiry of 15 August 2019 was made to Barclays and was focussed on, and was limited to, what Barclays had done to satisfy itself that Mr Staley had not participated in or been aware of Mr Epstein's alleged criminal activities. Mr Staley and the other individuals at Barclays involved in drafting the Letter understood that this was the focus of the Authority's enquiry. The brevity of the Letter reflected its purpose, namely, to reassure the Authority that Barclays had satisfied itself that Mr Staley had not participated in or been aware of Mr Epstein's alleged criminal activities.

3. That Barclays understood this to be the focus of the Authority's enquiry is established by the fact that the final paragraph of the Letter starts with "*In sum*", before proceeding to state that Barclays had no "*cause to suspect that Barclays or [Mr Staley] have played any role in the activities of Mr Epstein that have been under investigation*". The use of "*In sum*" emphasised what Barclays considered to be the focus and context of the Authority's request for information.

4. **The Authority's enquiry was not solely concerned with whether or not Mr Staley had participated in or been aware of Mr Epstein's alleged criminal activities. FCA Executive A's note of their telephone call with Board Member A on 15 August 2019 makes it clear that the Authority wanted Barclays to explain how it was satisfied there was no impropriety with respect to the relationship between Mr Staley and Mr Epstein. This request was made in the light of recent press reports regarding their relationship, which called into question Barclays' CEO's judgement and potentially his fitness and propriety. In making the enquiry, the Authority was seeking assurance that Barclays had discharged its regulatory obligations to ensure it understood and had properly managed the risks to which it was exposed.**

5. **The first sentence of the Letter makes clear what Barclays understood the enquiry to be about, as it says that Barclays was writing in response to a "*request for assurance that we have informed ourselves and are comfortable in regard to any association of [Mr Staley] or Barclays with [Mr Epstein]."* Mr Staley reviewed and did not query this wording. In interview, when commenting on his understanding of the Authority's enquiry, Mr Staley stated that Board Member A had told him that FCA Executive A "*had made an enquiry about what was Barclays aware of in terms of my relationship with Jeffery Epstein*" and that he also understood the enquiry to be concerned with whether "*Barclays or myself [was] aware of or engaged in the criminal activities of [Mr] Epstein*". Accordingly, Mr Staley and Barclays clearly understood the enquiry to be broader than Mr Staley now contends.**

59

Exhibit 7
Page 90

6. **That this was Barclays' understanding is supported by an email dated 5 October 2019, in which Board Member A asked Senior Executive A whether the final paragraph of the Letter was needed, commenting that they thought the Authority was "*probably more worried about judgement than involvement in wrong-doing*".**

Information provided by Mr Staley to Barclays

7. Mr Staley did not mislead Barclays regarding his relationship with Mr Epstein. He provided Barclays with a substantial amount of information relating to the history and extent of the relationship. This information was, and was perceived at the time as being, sufficient for Barclays to answer the Authority's enquiry, having regard to the context in which it was made and understood. How Barclays used that information to respond to the Authority's enquiry was not a matter determined by Mr Staley. Barclays was not prevented by Mr Staley from providing a fuller portrayal of his relationship with Mr Epstein; in late September 2019, Mr Staley had approved an earlier draft of the Letter which contained detailed information about his relationship with Mr Epstein.

8. Mr Staley did not inform Barclays, at any stage, that he had "*not had a close relationship*" with Mr Epstein, and this statement did not reflect what he had told Barclays. He also did not assert to Barclays that he was last in contact with Mr Epstein "*well before*" he joined Barclays. Mr Staley's clear instructions and consistently stated position to Barclays were that he had had a professional, fairly close relationship with Mr Epstein, that he had not had any relationship with Mr Epstein since he joined Barclays, and that the last occasion when Mr Staley met with Mr Epstein was around April 2015 when he and a member of his family visited Mr Epstein's island for a few hours whilst on vacation. These statements were true and were supported by an appropriate level of detail. The senior individuals at Barclays who were engaged in the response to the Authority's enquiry understood and accepted that Mr Staley's relationship with Mr Epstein had at times been close, but that it had not been anything other than a professional one and that Mr Staley had been entirely unaware of the unlawful activities for which Mr Epstein had been arrested in July 2019.

9. **The Authority acknowledges that Mr Staley provided Barclays with a certain amount of information regarding his relationship with Mr Epstein, and that the two misleading statements were not statements that he had made to Barclays but were instead drafted by Senior Executive A based on the information provided by Mr Staley to Barclays.**

10. **However, when the Letter was drafted, there was clearly material information that Barclays and those involved in drafting the Letter did not know, but which Mr Staley undoubtedly knew. This included information which makes it evident that the relationship between Mr Staley and Mr Epstein could not fairly or accurately be described as not having been a close relationship. In particular, Barclays was not aware that Mr Staley and Mr Epstein continued to have extensive and fairly frequent contact after Mr Epstein ceased to be Mr Staley's client in 2009, including exchanging almost 600 emails during the time that Mr Staley was at BlueMountain, or that on several occasions,**

60

Exhibit 7
Page 91

including shortly before he was appointed as CEO of Barclays, Mr Staley sent Mr Epstein emails describing the strength of their friendship.   Barclays was also not aware that Mr Staley had been in regular contact with Mr Epstein up to and during October 2015, and that they had discussed (i) his potential appointment, which Mr Staley understood to be "*very confidential*", and (ii) press enquiries in connection with it regarding their relationship.   Further, Barclays was not aware that Mr Staley had attempted to onboard Mr Epstein as a client of BlueMountain in 2013, that he had invited Mr Epstein to attend an academic ceremony for an individual connected to Mr Staley in March 2015, or that their social interactions were more extensive than Mr Staley had outlined, including that he had actually visited Mr Epstein's island on three occasions and had visited Mr Epstein's private marina on two further occasions.

11. **As described in paragraph 4.57 of this Notice, Senior Executive A informed the Authority that, had they known about certain interactions between Mr Staley and Mr Epstein (including those relating to Mr Staley's visit to Mr Epstein's ranch and the academic ceremony invitation), they would have asked further questions and taken any answers into account when drafting the Letter.  In addition, they considered that certain email communications between Mr Staley and Mr Epstein appeared to show a relationship that did not align with the way it had been characterised in the Letter.**

12. **Mr Staley was the only person at Barclays who knew all the relevant facts regarding his relationship with Mr Epstein.  He was the only person at Barclays who was able to comment on the accuracy of the two statements from his own personal knowledge and, having been asked to confirm that the Letter was fair and accurate, it was his responsibility to ensure they were accurate. Therefore, the fact that Mr Staley had provided Barclays with certain details of his relationship with Mr Epstein and that he did not draft the two misleading statements does not excuse his failure to correct them.**

Mr Staley's approval of the Letter

13. Mr Staley did not participate in the telephone conversations between Barclays and the Authority on 15 August 2019 and 4 October 2019.  He was not involved in the drafting of the Letter, did not seek to influence it (beyond suggesting, in the early stages, changes to the Talking Points), and did not make the amendments which introduced the two allegedly misleading statements after the telephone call of 4 October 2019.

14. When Senior Executive A provided Mr Staley with a draft of the Letter on 6 October 2019, they told Mr Staley that it was based upon the content of a telephone conversation which had taken place between FCA Executive A and Board Member A on 4 October 2019, as a result of which Senior Executive A considered that the draft would "*meet the [Authority's] needs*".  The draft included the two statements, which Senior Executive A had introduced after being informed by Board Member A about the 4 October 2019 telephone conversation.

61

Exhibit 7
Page 92

15. Mr Staley questioned the accuracy of the draft letter in respect of the statement that he did not have a close relationship with Mr Epstein.  Senior Executive A provided an explanation for the revised terms of the draft and Mr Staley reasonably accepted Senior Executive A's explanation and advice.  Senior Executive A's advice can reasonably be characterised as recommending approval of the draft and it can properly be inferred that it influenced Mr Staley to approve the draft.  It was reasonable for Mr Staley to leave the judgement as to the adequacy or otherwise of the drafting of the Letter to Senior Executive A, particularly in the knowledge that Senior Executive A was entirely aware of the relevant background and that the Letter had been drafted on the basis of discussions which had taken place between Board Member A and the Authority only two days beforehand.  Mr Staley was reasonably entitled to conclude that Board Member A and Senior Executive A would not have recommended a draft which they considered was either capable of misleading the Authority or which in any way fell short of the response that the Authority required.

16. **The Authority acknowledges that Mr Staley was not involved in the telephone conversations between Barclays and the Authority and that he did not draft the Letter.  However, the Authority does not consider that it can be inferred from the evidence regarding the correspondence between Mr Staley and Senior Executive A, that Mr Staley approved the draft letter as a result of Senior Executive A's advice.  Senior Executive A did not advise as to the accuracy of the two statements, but rather informed Mr Staley that, based on what Mr Staley had told them, they felt the Letter was fair, but Mr Staley needed to satisfy himself of this.  Further, Senior Executive A was not in the position to give such advice, given that only Mr Staley knew the true nature of his relationship with Mr Epstein.**

17. **Mr Staley cannot have understood Senior Executive A's indication that the Letter as drafted was likely to "*meet the [Authority's] needs*" as advice to approve the two factual statements, irrespective of their accuracy.  The evidence suggests that this statement reflected Senior Executive A's view at the time, based on what Board Member A had told them about their conversation with FCA Executive A on 4 October 2019, that the form of the Letter and the matters it addressed were suitable for Barclays' response to the Authority's enquiry.  Mr Staley cannot have thought it reasonable to leave the judgement as to the accuracy of the drafting of the Letter to Senior Executive A, given that Senior Executive A told him "*we want to be sure that you feel that the language is fair and accurate*" and in circumstances where he must have known that neither of the two statements was accurate.**

Mr Staley's knowledge

18. It is unfair for the Authority to seek to distinguish Mr Staley's position from that of Barclays, on the basis that only Mr Staley knew of the nature and extent of the relationship between himself and Mr Epstein.  Such a distinction ignores the volume of detailed information that Mr Staley provided to Barclays, of which Senior Executive A was entirely aware when the Letter was drafted and presented to Mr Staley on 6 October 2019.  In order to sustain the distinction, it would be necessary to impute to

62

Exhibit 7
Page 93

Mr Staley an unreasonable and unrealistic realisation that he was required to provide Barclays with an even greater level of detail concerning the history of his relationship with Mr Epstein than the detailed account which he had already provided.  Such a distinction also does not stand up to scrutiny when set against the knowledge or understanding that Senior Executive A and Board Member A had of the nature and purpose of the Authority's enquiry.

19. At the time he approved the Letter, Mr Staley did not possess copies of his email correspondence with Mr Epstein up to and including 25 October 2015; this correspondence had been via his JPM and BlueMountain email accounts to which he no longer had access.   It is unreasonable to expect, in the absence of that material, that Mr Staley would necessarily have remembered, almost four years later, when he was last in email correspondence or telephone contact with Mr Epstein, so as to positively cause him to question the second allegedly misleading statement.

20. The facts which were not within the public domain and not known to Barclays were the extent and content of this email correspondence.  The facts which were disclosed by this email correspondence add little if anything to a reasonable interpretation of the relationship between Mr Staley and Mr Epstein of which Barclays was aware and it is unreasonable to attribute to Mr Staley a recollection of their content by October 2019.

21. **As explained in paragraph 10 above, Barclays was not aware of material information regarding the nature of Mr Staley's relationship with Mr Epstein and when they were last in contact.  Only Mr Staley knew whether or not the Letter accurately characterised his relationship with Mr Epstein and when they had last been in contact.  Accordingly, the Authority considers that Barclays was in a position which was factually distinguishable from Mr Staley's position.**

22. **The Authority accepts that Mr Staley did not have access to his JPM and BlueMountain email accounts at the time the Letter was drafted.  However, Mr Staley must have known at that time that he had been in contact with Mr Epstein with respect to (i) Mr Staley's potential appointment as CEO of Barclays and (ii) press enquiries in connection with that appointment and regarding his relationship with Mr Epstein; Mr Staley must also have known that this contact continued until shortly before his appointment as CEO was announced, given that these matters were significant and of importance to him.  Further, the Authority considers that Mr Staley cannot have failed to recall the extent and nature of his email correspondence with Mr Epstein. As is clear from the chronology of their relationship summarised in Annex B, the emails provide ample evidence of social and personal interactions between Mr Staley and Mr Epstein, and include several emails from Mr Staley referring to the closeness of their friendship.**

23. **The Authority also considers it relevant, when considering what Mr Staley now says he remembered in 2019, that he did not accurately convey the nature of his relationship with Mr Epstein to Barclays in October 2015, when discussing press enquiries regarding that relationship and relating to Mr**

63

Exhibit 7
Page 94

**Staley's likely appointment as CEO. Mr Staley had access to his BlueMountain emails at that time and was also in contact with Mr Epstein regarding those press enquiries. The Authority has concluded that Mr Staley was aware of the risk which his association with Mr Epstein posed to his reputation and his career, and that this knowledge is relevant context to Mr Staley's failure to provide Barclays in 2015 and 2019 with material information regarding his relationship with Mr Epstein, and his failure to correct the two misleading statements in the Letter.**

Mr Staley's relationship with Mr Epstein

24. Mr Staley was correct to describe his relationship with Mr Epstein to the Authority as having been a "*professional, fairly close relationship*". It was a relationship that was grounded in business. Mr Epstein was a particularly valuable source of information and had many influential contacts in banking and commerce. It did not involve a personal friendship and there is no evidence that it did.

25. The email correspondence between Mr Staley and Mr Epstein does not demonstrate a close relationship, as the extent of the social interaction between them demonstrates otherwise. The email correspondence establishes regular email contact and, principally, correspondence concerning business, news items, informal requests for advice and occasional personal matters, none of which can reasonably be interpreted as unusual in an important business relationship of this value. There is no evidence within the emails of Mr Epstein ever visiting Mr Staley's home, going on holiday with him and his family, or attending private functions at which Mr Staley's family were present.

26. There were four separate aspects of Mr Staley's personal life which involved Mr Epstein: the first related to the assistance provided by Mr Epstein to an individual connected to Mr Staley; the second concerned two separate visits by Mr Staley to Mr Epstein's island in the company of family members (one of which was business related); the third involved Mr Staley visiting Mr Epstein in January 2009 when Mr Epstein was on work release while serving a prison sentence; and the fourth involved Mr Staley's visit to Mr Epstein's ranch when Mr Epstein was not present. These were extremely isolated events when viewed in the context of a relationship which extended over a period of approximately 15 years. The occasional dining invitations to Mr Epstein's home in New York, at which many well connected persons were usually present, were for business purposes.

27. The fact that Mr Staley decided to cease all contact with Mr Epstein when his appointment as CEO to Barclays was confirmed in October 2015, because he considered that such a relationship would be inconsistent with that position, is not reflective of a personal friendship.

28. **Mr Staley's explanation to the Authority that he and Mr Epstein had a "*professional, fairly close relationship*" contradicts the statement in the Letter that they did <u>not</u> have a close relationship. Mr Staley had the**

64

Exhibit 7
Page 95

opportunity to correct the Letter, so that it did not inaccurately describe the nature of their relationship, but he chose not to do so.

29. Furthermore, the extensive email communications between Mr Staley and Mr Epstein (including whilst Mr Epstein was serving his custodial sentence), and the tone and nature of those communications (including emails sent by Mr Staley shortly before he was appointed as CEO of Barclays), strongly suggest that the relationship between Mr Staley and Mr Epstein was objectively close. Mr Staley sent emails to Mr Epstein which were written in a notably warm tone and referred to the strength of their friendship, including those emails mentioned at paragraph 5.4(2) of this Notice and other emails which described Mr Epstein as one of his *"deepest"* or *"most cherished"* friends. Notwithstanding that there is no evidence of certain types of social interactions between Mr Staley and Mr Epstein (for example, of Mr Epstein ever visiting Mr Staley's home), there is ample evidence of social and personal interactions between them.  It is therefore evident from the emails exchanged between them that their relationship could not fairly or accurately be described as not having been a close relationship.

30. In addition, the four aspects of his personal life that Mr Staley says involved Mr Epstein support the Authority's view that the statement that Mr Staley and Mr Epstein did not have a close relationship is inaccurate and misleading:

   a. Mr Staley told Mr Epstein in August 2015 that the counsel he had given to the individual connected to Mr Staley *"has been the gift of great friendship"*.

   b. Mr Staley in fact visited Mr Epstein's island in the US Virgin Islands on three separate occasions, in addition to two further visits to a private marina owned by Mr Epstein nearby his island.

   c. Mr Staley not only visited Mr Epstein during his prison sentence in Florida while he was on work release, but also sent Mr Epstein a number of supportive emails whilst he was serving his prison sentence.

   d. On his visit to Mr Epstein's ranch, Mr Staley told Mr Epstein *"[…] I owe you much. And I deeply appreciate our friendship.  I have few so profound."*  Like his visits to Mr Epstein's properties in the US Virgin Islands, Mr Staley's visit to Mr Epstein's ranch was for no obvious business or professional purpose.

31. Further, the statement that Mr Staley and Mr Epstein did not have a close relationship is inconsistent with the fact that Mr Staley confided in Mr Epstein on significant matters relating to Mr Staley's career, including his impending appointment as CEO of Barclays, which was not in the public domain and which Mr Staley understood was *"very confidential"*.

65

Exhibit 7
Page 96

32. **Mr Staley did not independently decide to cease all contact with Mr Epstein. Rather, he made that decision on the advice of Senior Executive B that he should not have any contact with Mr Epstein going forward.**

The accuracy and materiality of the two allegedly misleading statements

33. The two statements were not factually inaccurate since they were reasonably required to be interpreted in the context in which they were provided.  Mr Staley did not have a close relationship with Mr Epstein when considered in the context of the focus of the Authority's enquiry.  The statement that Mr Staley's last contact with Mr Epstein was "*well before*" he joined Barclays was intended by Senior Executive A to convey the date of the last meeting between Mr Staley and Mr Epstein, which would have been the last occasion on which Mr Staley could have been aware of Mr Epstein's alleged criminal activities, and so was accurate in that context.

34. The two statements were also not material to answering the Authority's enquiry and were not intended to be.  The statements were not the focus of the Authority's enquiry. They would only have been material had the Authority asked for a description of the nature and extent of Mr Staley's relationship with Mr Epstein or been asked to be informed of all contact between them before and after Mr Staley was appointed to the position of CEO of Barclays.

35. **The Authority considers that both statements were clearly factually inaccurate.  As set out in paragraphs 28 to 31 above, the evidence of Mr Staley's interactions with Mr Epstein, along with Mr Staley's own description of the relationship to the Authority, demonstrates the inaccuracy of the statement that Mr Staley and Mr Epstein did not have a close relationship.  In respect of the statement regarding Mr Staley's last contact with Mr Epstein, they were in contact regarding Mr Staley's potential appointment as CEO of Barclays, and in relation to press enquiries in connection with that appointment regarding their relationship, until shortly before his appointment was announced.  The fact that Senior Executive A had in mind the date when Mr Staley and Mr Epstein last met in person when drafting this statement does not make it factually accurate.  Further, Senior Executive A, unlike Mr Staley, was not aware that Mr Staley and Mr Epstein continued to be in contact until October 2015.**

36. **The Authority does not agree that the statements were accurate in the context of the focus of the Authority's enquiry.  Both statements implied a greater distance between Mr Staley and Mr Epstein than was the case prior to Mr Staley's appointment as the CEO of Barclays.  Further, as explained in paragraphs 4 to 6 above, the evidence does not support Mr Staley's assertion that the Authority was only interested in whether or not Mr Staley had participated in, or been aware of, Mr Epstein's alleged criminal activities.**

37. **The Authority also disagrees with Mr Staley's assertion that the two statements were not material.  They were clearly material to the Authority's request for assurance about the association between Mr Staley and Mr Epstein**

66

Exhibit 7
Page 97

**as well as its concern about Mr Staley's judgement in relation to that association. Further, their materiality is evident from the fact that they were advanced by Barclays in order to explain why Mr Staley was not aware of Mr Epstein's conduct: the first statement indicates a distance between Mr Staley and Mr Epstein in order to explain why Mr Staley was not aware of Mr Epstein's misconduct, while the second statement gives the misleading impression of temporal distance in the relationship.**

<u>Whether the Authority was misled</u>

38. Having regard to the focus of the Authority's enquiry, the purpose of the Letter, the factual context in which it was drafted and the materiality of the two allegedly misleading statements, the Letter did not mislead the Authority.

39. It is disingenuous for the Authority to claim that, in the light of the contents of the Letter, the Authority concluded that it did not need to make any further enquiries. The lack of immediate follow-up reflects the fact that the Letter addressed the reason for the enquiry, namely, to ascertain whether Barclays was satisfied that Mr Staley had not participated in or been aware of Mr Epstein's alleged criminal activities.

40. The contents of the Letter might have been expected to have prompted further enquiry by the Authority, if it did not reflect what had been agreed in the telephone conversation on 4 October 2019. Board Member A clearly provided a preview of the proposed response to FCA Executive A on 4 October 2019, which appears to have resulted in Senior Executive A making the changes introducing the allegedly misleading statements and the advice to Mr Staley that the letter as drafted was considered to be sufficient to meet the Authority's needs. The proposition that the Authority was misled, that the two statements were material, and that no further questions were asked in the light of the contents of the Letter, is therefore fundamentally disputed.

41. **The documentary evidence demonstrates that: (i) the statement that Mr Staley and Mr Epstein did not have a close relationship is false, and (ii) Mr Staley and Mr Epstein were in contact until just before Mr Staley's appointment as CEO. Therefore, the two statements were clearly misleading and, as they were material to the Authority's enquiry (see paragraph 37 above), they misled the Authority.**

42. **The Authority was entitled to expect the content of the Letter to be an accurate characterisation of the nature of the relationship between Mr Staley and Mr Epstein. The Authority relied on the information provided by Barclays in order to determine what further action to take, if any. The Letter, on its face, did not give rise to any need to seek clarification. FCA Executive A's interpretation of the Letter was that Barclays and Mr Staley were confirming that Mr Staley's relationship with Mr Epstein was not of a personal nature but was instead a client/business relationship which had ceased a significant period of time prior to Mr Staley joining Barclays. As a result of the Letter and the assurances it contained, the matter of Mr Staley's relationship with Mr Epstein was reasonably not considered further by the Authority until**

67

Exhibit 7
Page 98

**additional information came to light a few weeks later. Had the Letter accurately described the nature of the relationship between Mr Staley and Mr Epstein, or the point at which the two last were in contact, the Authority would have been in a position at that stage to have considered whether it needed to ask further questions of Mr Staley and seek clarity about the nature and extent of the relationship.**

43. **The amendments to the draft of the Letter following the 4 October 2019 telephone call, which resulted in the two misleading statements being introduced, support the Authority's view that the statements were material and relevant to the Authority. The fact that the Letter was considered by Senior Executive A to be sufficient to meet the Authority's needs does not mean that it was reasonable for Mr Staley to approve the Letter, in circumstances where (i) he must have known that the two statements were inaccurate, and (ii) he was the only person who reviewed or discussed the contents of the Letter prior to it being finalised, who was able to comment on the accuracy of the two statements from his own personal knowledge.**

Mr Staley's account to Barclays of the nature of his relationship with Mr Epstein

44. The allegation that Mr Staley consistently did not accurately set out the nature of his relationship with Mr Epstein to Barclays is wrong and unfair. It is not the basis of the case against Mr Staley and is irrelevant to the case against him based on the two statements in the Letter.

45. Barclays' statement in response to press enquiries in 2015 (denying that Mr Epstein and Mr Staley had a close personal relationship) was accurate and consistent with what was stated in the Letter. The press interest was in the context of allegations of sexual misconduct by Mr Epstein.

46. Mr Staley was only provided with a version of the letter containing the statement "*[Mr Staley] confirms that he has had no contact with [Mr Epstein] nor discussion of this matter this year*" after it was sent and so he had no opportunity to correct it. In any event, Senior Executive B knew that Mr Staley's contact with Mr Epstein had continued up until October 2015. Mr Staley disputes any suggestion that he told anyone at Barclays that he had no contact with Mr Epstein in relation to the recruitment process in 2015.

47. The Talking Points were not drafted by Mr Staley, were intended to be no more than an aide memoire for the purposes of an oral presentation by Mr Staley to Academic Institution A and did not set out the full extent of the information provided by Mr Staley.

48. The Talking Points drew attention to the fact that Mr Staley had many business meetings with Mr Epstein, he attended dinners hosted by Mr Epstein, he visited Mr Epstein's island and he visited Mr Epstein while Mr Epstein was on work release from prison. In so far as Mr Staley did not inform Barclays of some of the details of his relationship with Mr Epstein, it is unreasonable for the Authority to contend either that he should have done so or that this constituted a pattern of misleading conduct. Mr

68

Exhibit 7
Page 99

Staley could not reasonably have been expected to provide Barclays with every aspect of his professional and commercial involvement with Mr Epstein given the context of the media interest in 2019 and the context of the Authority's request for reassurance.

49. **The evidence supports the Authority's conclusion that Mr Staley consistently did not accurately set out the nature and extent of his relationship with Mr Epstein to Barclays.  The Authority has concluded that, both in 2015 and in 2019, Mr Staley was aware of the risk which his association with Mr Epstein posed to his reputation and his career. The Authority considers this is relevant context in assessing Mr Staley's failure to correct the two misleading statements.**

50. **In October 2015, Barclays made inaccurate statements about Mr Staley's relationship with Mr Epstein to the press on the basis of information provided to Barclays by Mr Staley.  Notwithstanding the context of the press enquiries, Mr Staley did not reveal to Barclays that he had shared with Mr Epstein confidential information relating to the process of his appointment as CEO. The Authority considers that, in the light of his impending appointment as CEO, Mr Staley had an interest in giving Barclays the impression of a greater distance between himself and Mr Epstein than was the case at the time.**

51. **The Authority considers that the statement made by Barclays to a journalist prior to an article published on 1 November 2015, that Mr Staley and Mr Epstein did not have "*anything resembling a close personal association*", was inaccurate for the same reasons as the statement in the Letter that they did not have a "*close relationship*" was inaccurate.**

52. **The statement that Mr Staley and Mr Epstein had not discussed Mr Staley's potential appointment as the CEO of Barclays in 2015 was also inaccurate, as Mr Staley must have known at the time.  Mr Staley's denial that he told anyone at Barclays that he had had no such contact with Mr Epstein is inconsistent with the evidence of Senior Executive B, who told the Authority in interview that they were very assiduous to ensure that what Barclays asserted was in accordance with what Mr Staley recollected.  As Senior Executive B had no previous knowledge of the relationship between Mr Staley and Mr Epstein, and as the information they provided to Law Firm A was based on information that they had received from Mr Staley, the Authority considers it reasonable to conclude that Mr Staley did inform Senior Executive B that he had had no discussions with Mr Epstein in connection with the recruitment process in 2015.  The Authority acknowledges that Mr Staley does not appear to have seen the statement until after the letter containing it was sent, but there is also no evidence that Mr Staley subsequently clarified the position.**

53. **Whilst the Talking Points were not drafted by Mr Staley, they were prepared on the basis of information provided by him. Although they contained certain information regarding Mr Staley's relationship with Mr Epstein, they also included some materially inaccurate statements which demonstrate that, as at October 2015, Mr Staley had not accurately set out the nature and extent**

69

Exhibit 7
Page 100

of his relationship with Mr Epstein to Barclays.  In particular, the Talking Points falsely stated, "*At no point after his conviction in 2008 did I allow [Mr Epstein] any connection with any aspect of my professional life*" and, "*I had limited contact with him post his conviction*".  This was therefore not simply a matter of Mr Staley not informing Barclays of all details of his relationship with Mr Epstein, but instead involved him in giving Barclays a misleading impression of the nature and extent of that relationship.

Failings in the Authority's management of its enquiry

54. The Authority's management of its enquiry is largely, if not wholly, responsible for the alleged deficiencies in the Letter. There were significant evidential and procedural flaws in the Authority's process, both before and after the Letter was sent.

55. The Authority failed to specify in the telephone call of 15 August 2019 the extent and detail of the information required and failed to formalise its enquiry in writing.  This created uncertainty within Barclays as to what was required and is likely to have influenced the final draft of the Letter.  The Authority also failed to make a note of or formalise in writing the content of the telephone call of 4 October 2019, which clearly influenced the changes to the draft made by Senior Executive A on 5 October 2019. Mr Staley has been seriously prejudiced as a result.

56. The Authority unreasonably did not give Mr Staley or Barclays an opportunity to respond to its concern that the Letter did not contain accurate information before commencing its investigation.  Rather than immediately commence an investigation, the Authority should have explored whether there had been a misunderstanding as to the nature and extent of the Authority's enquiry.  A request for clarification would have revealed that Mr Staley had provided Barclays with a substantial amount of information in respect of his relationship with Mr Epstein, which had been incorporated into earlier drafts.  Further, it would have revealed that Mr Staley did not inform Barclays that he did not have a close relationship with Mr Epstein or that his last contact with Mr Epstein was well before he joined Barclays.

57. **The fact that the Authority's request to Barclays was not made in writing does not excuse or mitigate Mr Staley's conduct, nor does the lack of a record of the telephone call of 4 October 2019.  It is clear from the Letter that Barclays understood what the Authority expected of it.  In any event, regardless of whether there was any uncertainty within Barclays as to what was required, there cannot have been any doubt that it was required to provide a factually accurate response.**

58. **The Authority does not consider that it was unreasonable or unfair to commence an investigation, and not seek clarification from Barclays and/or Mr Staley, after it received information following receipt of the Letter, which suggested that the Letter included two misleading statements.  The Authority reasonably expects to be provided with accurate information by the firms and individuals it regulates and to be able to rely on this information.  The Authority does not consider that its approach has caused any prejudice to Mr**

70

Exhibit 7
Page 101

**Staley, as he has had the opportunity during the course of the Authority's investigation and these RDC proceedings to explain why the statements were made.**

Mr Staley did not act recklessly and did not breach ICR 1

59. The Authority cannot establish, as a matter of fact and law, that Mr Staley acted recklessly.  In order to prove recklessness, it is necessary for the Authority to establish that Mr Staley was aware of a risk that the Authority might be misled and chose to disregard it.  Mr Staley acted on his understanding of the purpose of the enquiry made to Board Member A, and the advice provided to him by Senior Executive A that the Letter would meet the Authority's needs, and the proper inference to be drawn from the evidence is that he did not perceive a risk that the Authority might be misled.  Mr Staley's actions and omissions, in not correcting or altering the draft of the Letter presented to him on 6 October 2019, constituted no more than inadvertence on his part in failing to ensure that the Letter reflected his consistent instructions to Barclays, and do not amount to recklessness.

60. Further, there was no significant risk that the Authority might be misled, given the purpose of its enquiry and the reported terms of the telephone conversation of 4 October 2019.  The two statements were not material to the Authority's enquiry and the Authority was not in fact misled.

61. As the allegation that Mr Staley acted with a lack of integrity is grounded, and is entirely dependent, upon the allegation that he acted recklessly, if recklessness is not established then there would be an insufficient basis for concluding that Mr Staley acted without integrity in breach of ICR 1. Further, while reckless conduct is capable of resulting in a finding of a lack of integrity, the two are not synonymous.

62. **The Authority considers that Mr Staley must have appreciated that the Authority would rely on the contents of the Letter.  The Authority relies on accurate information from firms and individuals approved to perform senior management functions to allow it to effectively regulate and make enquiries as necessary, based on the information provided.  Regardless of his understanding of the primary focus of the Authority's enquiry, Mr Staley must have appreciated that the two statements were material to the Authority's enquiry, as they implied a greater distance between Mr Staley and Mr Epstein than was the case prior to Mr Staley's appointment as CEO of Barclays, and were advanced by Barclays in order to explain why Mr Staley was not aware of Mr Epstein's conduct.  In any case, as Barclays' CEO, it must have been obvious to Mr Staley that the response needed to be prepared with care and not be misleading.**

63. **Mr Staley must also have been aware that the two statements were inaccurate.  In interview he characterised his relationship with Mr Epstein as being a "*professional, fairly close relationship*", which contradicts the wording in the Letter that "*he did not have a close relationship with Mr Epstein*". As noted in paragraph 22 above, Mr Staley must have known that**

71

Exhibit 7
Page 102

he was in contact with Mr Epstein until just before he was appointed as CEO of Barclays, given that the matters they discussed related to Mr Staley's potential appointment and press enquiries in connection with his likely appointment regarding his relationship with Mr Epstein, and so were significant and of importance to Mr Staley.  He must therefore have known that the statement that his last contact with Mr Epstein was "*well before*" he joined Barclays was inaccurate.

64. As Mr Staley must have been aware that the Authority would rely on the contents of the Letter, and that the two statements were inaccurate, it is not credible for Mr Staley to assert that he was not aware that, in allowing inaccurate information to be contained in the Letter, there was a risk that the Authority would be misled.

65. As set out in paragraphs 16 and 17 above, the Authority does not consider it was reasonable for Mr Staley to rely on Senior Executive A's view that the Letter would meet the Authority's needs.  Mr Staley was the only person who reviewed or discussed the contents of the Letter prior to it being finalised, who was able to comment on the accuracy of the two statements from his own personal knowledge.  Senior Executive A had no first-hand knowledge of the facts relating to the nature of the relationship between Mr Staley and Mr Epstein, or of the frequency or extent of their contact, and was unaware of material information relevant to the accuracy of the statements, which Mr Staley had failed to provide to Barclays.  Mr Staley was aware of this and so must have realised that Senior Executive A's comment that the Letter would meet the Authority's needs reflected their view that the form of the Letter and the matters it addressed were suitable for Barclays' response to the Authority's enquiry, and was not a comment on the factual accuracy of its contents.

66. Mr Staley's failure to correct the statements cannot reasonably be described as inadvertence, carelessness or negligence.  He was expressly asked to consider whether the language used was fair and accurate, and he had the benefit of discussing the Letter with Senior Executive A.  He knew that the statements were introduced by Senior Executive A following Board Member A's call with FCA Executive A on 4 October 2019 and he must therefore have realised that they were connected to Barclays' understanding that the Letter would "*meet the [Authority's] needs*", which ought to have made him particularly focus on whether they were accurate.  He must have known that the Authority would determine whether to take further action upon receipt of the Letter: he had ample opportunity to correct the statements but did not do so.  Further, the Authority considers that the fact that Mr Staley did not accurately set out the nature and extent of his relationship with Mr Epstein to Barclays in October 2015, and subsequently in 2019, supports its conclusion that Mr Staley's approval of the Letter containing the misleading statements was not inadvertent, careless or negligent. The Authority therefore considers

72

Exhibit 7
Page 103

**that it is reasonable and appropriate to conclude that Mr Staley acted recklessly.**

67. **The Authority agrees that recklessness is not synonymous with a lack of integrity. However, recklessness as to the truth of statements made to others who will or may rely upon them is a well-recognised example of a lack of integrity. In the circumstances, the Authority considers that Mr Staley's recklessness constitutes a lack of integrity and that he therefore failed to comply with ICR 1.**

*The statement regarding the nature of Mr Staley's relationship with Mr Epstein*

68. The evidence does not support a finding that Mr Staley was aware of a risk that the statement that he did not have a close relationship with Mr Epstein might mislead the Authority and/or that he nonetheless chose to take that risk. Instead, it supports a finding that Mr Staley considered the risk that the draft of the Letter provided to him on 6 October 2019 might not address the substance of the Authority's enquiry, as a result of which, on Mr Staley's initiative, he questioned the wording of the statement in a telephone conversation with Senior Executive A, who provided him with appropriate assurances.

69. The evidence therefore gives rise to the inference that Mr Staley approved the draft of the Letter as a result of Senior Executive A's advice, and that upon receiving and accepting that advice Mr Staley did not perceive a risk that the Authority would be misled. Further, it would be illogical to reach the conclusion that Mr Staley decided to take the risk of misleading the Authority and/or was indifferent as to the consequences of a risk of which he was aware, given that he had already provided Barclays with a substantial amount of information as to his relationship with Mr Epstein in order to permit Barclays to respond to the Authority.

70. **The Authority considers that Mr Staley must have been aware of the risk that the statement that he did not have a close relationship with Mr Epstein might mislead the Authority. Although Senior Executive A told Mr Staley that they considered that the draft letter would meet the Authority's needs and that the letter as drafted was fair, they also made it clear that Mr Staley would need to satisfy himself of this. Mr Staley must have known that the statement that he did not have a close relationship with Mr Epstein was inaccurate. Unlike Senior Executive A, he knew that he had had extensive email communications with Mr Epstein for many years before joining Barclays and that he had told Mr Epstein on several occasions how much their relationship meant to him, and he also knew that he had confided in Mr Epstein on significant matters relating to Mr Staley's career, including his potential appointment as CEO of Barclays. Further, Mr Staley knew that he had not informed Barclays of these matters.**

71. **The Authority therefore does not agree with Mr Staley's submission that the evidence gives rise to the inference that Mr Staley approved the draft letter because of Senior Executive A's advice. Given his knowledge of the nature of**

73

Exhibit 7
Page 104

his relationship with Mr Epstein, Senior Executive A's view that the Letter as drafted was fair could not reasonably have assured Mr Staley that there was no risk that it could mislead the Authority.  In addition, as mentioned in paragraph 17 above, Mr Staley cannot have thought it reasonable to leave the judgement as to the accuracy of the drafting of the Letter to Senior Executive A, given that Senior Executive A told him **"*we want to be sure that you feel that the language is fair and accurate*".**

*The statement that Mr Staley's last contact with Mr Epstein was well before he joined Barclays*

72. This statement was drafted by Senior Executive A, based upon their understanding that Mr Staley's last meeting with Mr Epstein had been around April 2015 and that that information was in the public domain.  Mr Staley's position, as outlined to Barclays on many occasions, was that he had last met with Mr Epstein around April 2015 and that he had not had any contact with Mr Epstein since joining Barclays.  Senior Executive A did not ask when Mr Staley and Mr Epstein were last in telephone or email contact and the statement was not an attempt to identify the last time when any contact was made between them.  It would be unreasonable to conclude that Mr Staley should have raised this, given the context and purpose of the enquiry, as understood by him and Barclays.

73. Mr Staley had not sought to conceal the fact that he had been in contact with Mr Epstein more recently, since he had made Senior Executive B aware that as of October 2015 there had been reasonably recent contact of some form.  Further, Senior Executive B stated in interview that they would have understood the phrase "*well before he joined Barclays*" to mean that Mr Staley's last contact with Mr Epstein was prior to November 2015, which is factually correct.  This supports the conclusion that Mr Staley had given to Barclays the information that he had remained in contact with Mr Epstein until days before his appointment was announced and undermines the Authority's case that Mr Staley was responsible for misleading the Authority in relation to this statement.

74. **Unlike Senior Executive A, Mr Staley knew that he had been in contact with Mr Epstein until shortly before his appointment as CEO of Barclays was announced and just a few weeks before he started in role, and so he must have known that the statement that they had last been in contact "*well before he joined Barclays*" was inaccurate.  Mr Staley must have appreciated that the Authority would rely on this statement and that there was a risk that the Authority would be misled.  Mr Staley had the opportunity to correct this statement and it was not reasonable for him to approve a statement that he must have known might mislead the Authority.**

75. **Although Senior Executive B had the impression from their discussions with Mr Staley in October 2015 that Mr Staley had had reasonably recent contact with Mr Epstein, Senior Executive B was not aware that they had been in contact in respect of Mr Staley's potential appointment as CEO of Barclays or in respect of the press enquiries in connection with his likely appointment in relation to their relationship.  Nor is it clear from the evidence that Senior Executive B was aware that they had continued to be in contact until shortly**

74

Exhibit 7
Page 105

**before Mr Staley's appointment as CEO of Barclays was announced. Further, Senior Executive B was not involved in the preparation of the Letter, was not involved in any discussions that led to its creation and did not see the draft of the Letter containing the statement that Mr Staley's last contact with Mr Epstein was "*well before he joined Barclays*". In the circumstances, the Authority concludes that Mr Staley acted recklessly in failing to correct this statement.**

Mr Staley did not breach ICR 3 or SMCR 4

76. The alleged contraventions of ICR 3 and SMCR 4 are associated, on the Authority's case, with the circumstances in which the draft letter of 6 October 2019 was approved. On the Authority's own case, inadvertence, carelessness or mere negligence is insufficient to establish a lack of integrity and would be insufficient to establish a failure to comply with ICR 3 or SMCR 4.

77. Mr Staley was open and cooperative with the Authority at all times and so did not breach ICR 3. He provided Barclays with detailed and accurate information concerning the history of his relationship with Mr Epstein, without access to emails or any other material to aid his recollections. He was aware that that information was to be used by Barclays for the purpose of responding to the Authority's enquiry of 15 August 2019. He was involved in correcting some of the drafts of the Letter and was open and cooperative at all times with Barclays which, rather than Mr Staley, had the responsibility of responding to the Authority.

78. Mr Staley did not fail to disclose appropriately any information about which the Authority would reasonably expect notice and so did not breach SMCR 4. Mr Staley was not a party to the dialogue between Barclays and the Authority, but he was aware of the Authority's enquiry and he provided appropriate and accurate information to Barclays so that Barclays could formulate the necessary response. Having provided Barclays with detailed and accurate instructions, he was entitled to assume that those who had been involved in or were aware of the discussions that had taken place with FCA Executive A were best placed to judge what was to be conveyed to the Authority.

79. **The Authority acknowledges that Mr Staley provided Barclays with certain information regarding his relationship with Mr Epstein. However, he did not inform Barclays of material facts and matters, in particular those summarised in paragraph 10 above, which demonstrate the inaccuracy of the two statements in the Letter. Although Mr Staley did not have access to his JPM or BlueMountain emails at the time the Letter was drafted, he must have known that: (i) his relationship with Mr Epstein could not fairly or accurately be described as not having been a close relationship, and (ii) he had been in contact with Mr Epstein regarding his potential appointment as CEO of Barclays until shortly before he was appointed to that role.**

80. **Mr Staley must have realised that the Authority's request to Barclays for information about his relationship with Mr Epstein was important to the Authority. Although he questioned the "*close relationship*" wording which**

75

Exhibit 7
Page 106

**had been inserted by Senior Executive A, it was not reasonable for him to approve that wording, on the basis that Senior Executive A considered that the letter as drafted was fair, based on what Mr Staley had told them about the relationship. Senior Executive A told Mr Staley that he needed to satisfy himself that the language was fair and accurate and, as would have been obvious to Mr Staley at the time, he was the only person who reviewed or discussed the contents of the Letter prior to it being finalised, who was able to comment on the accuracy of the two statements from his own personal knowledge. Mr Staley must also have realised that, although the Letter was from Barclays, that did not obviate his responsibility to ensure that the information contained in the Letter regarding his relationship with Mr Epstein was accurate. Accordingly, by approving the Letter which contained the two misleading statements without informing Barclays that the statements were incorrect, Mr Staley failed to be open and cooperative with the Authority in breach of ICR 3 and failed to disclose appropriately information of which the Authority would have reasonably expected notice in breach of SMCR 4.**

Penalty

81. In the circumstances, it is not appropriate to impose a financial penalty on Mr Staley. Alternatively, if it is concluded that Mr Staley acted negligently, only a moderate financial penalty would be appropriate. The proposed penalty is grossly disproportionate.

82. The calculation of Mr Staley's relevant income at Step 2 of the penalty calculation is flawed as it includes an amount in relation to unvested shares that Mr Staley was awarded. These unvested shares have been suspended by Barclays pending further developments in these proceedings. Since the shares have not vested and their vesting is contractually contingent, it is not possible to conclude that the value of the unvested shares has been 'received' by Mr Staley for the period in question, and so they should not count as relevant income as defined in DEPP 6.5B.2G(1). Further, Enforcement's attempt to determine a value for the unvested shares is speculative and does not proceed on a sound evidential basis. Accordingly, the calculation of Mr Staley's relevant income should disregard any part of the value of the unvested shares.

83. The seriousness of the breach should not be considered to be level 4. If there was any breach by Mr Staley, its seriousness would be more appropriately fixed at level 1 or 2:

   a. The Authority's concern was to obtain an assurance that Barclays had satisfied itself that there was no impropriety in the relationship between Mr Staley and Mr Epstein in the light of the wider allegations against Mr Epstein. Board Member A on behalf of Barclays was so satisfied. The Authority has made no finding that there was any such impropriety.

   b. There is no reasonable likelihood of any recurrence of the conduct in question, as the circumstances were quite exceptional.

76

Exhibit 7
Page 107

c. No financial benefit accrued to Mr Staley and no loss was avoided.  Any breach did not have the capacity to impact on the orderly conduct of markets or result in any loss of confidence.

84. The previous regulatory action taken by the Authority and the PRA against Mr Staley in 2018 should not be considered an aggravating factor at Step 3 of the penalty calculation, as it has no relevance to this case.

85. **The Authority considers that it is appropriate, and in accordance with the Authority's penalty policy as set out in Chapter 6 of DEPP, to impose a financial penalty on Mr Staley in respect of his breaches of ICR 1, ICR 3 and SMCR 4.  As described in section 6 of this Notice, the Authority has calculated the financial penalty by applying the five-step framework set out in DEPP 6.5B.  The Authority does not consider the resulting penalty of £1,812,800 to be disproportionate to the breaches, given the seriousness of the breaches (which include acting with a lack of integrity) and the level of Mr Staley's relevant income.**

86. **The Authority considers that it is appropriate to include in the calculation of his relevant income the deferred shares earned by Mr Staley during the Relevant Period which have not yet vested.  A person who earns deferred shares has a reasonable appreciation of the likelihood that they will ultimately receive them and factors that likelihood into their assessment of their remuneration.   The Authority considers that all benefits awarded for performance in the period when the breach occurred, and which at the time the individual in question reasonably expected to receive, should be included in the calculation of their relevant income, including benefits to be received in future periods.**

87. **As the vesting of the deferred shares awarded to Mr Staley is contingent on achieving certain performance metrics, the vesting of the full amount of the award is not guaranteed, and so the Authority considers their value should be adjusted to reflect their contingent nature.   The Authority considers it reasonable to apply a contingency adjustment to the value of the deferred shares based on the average percentage of deferred shares awarded to Mr Staley in previous years, and so has taken that approach.**

88. **The Authority considers it is unrealistic to place zero value on the shares.  At the time that they were earned, it is extremely unlikely that Barclays or Mr Staley or anyone else would have considered them to be worthless.  They formed part of Mr Staley's remuneration package and must have had a meaningful value.  Further, Barclays has not yet made a decision in respect of the unvested shares, and it cannot be assumed that Barclays will act in a particular way.  In any event, the possibility that Barclays will not award any of the shares to Mr Staley, if he is found to have committed misconduct, does not make it appropriate to attribute zero value to the shares, as that would then make the finding of misconduct determinative of the level of relevant income.**

77

Exhibit 7
Page 108

89. **The Authority considers the seriousness of Mr Staley's breaches to be level 4. The Authority has taken into account the relevant factors listed in paragraphs 6.9 to 6.12 of this Notice in reaching that conclusion. The factors mentioned by Mr Staley do not affect the Authority's view as to the seriousness of his breaches:**

   a. **The Authority has made no findings at all as to whether Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes. That is beyond the ambit of this case, which is concerned with the factual accuracy of statements made to the Authority regarding the nature and recency of Mr Staley's relationship with Mr Epstein.**

   b. **The Authority does not agree that these were exceptional circumstances, such that there is no reasonable likelihood of any recurrence of the misconduct. The circumstances in question required Mr Staley, as the CEO of Barclays, to ensure that information provided by Barclays to the Authority was accurate and not misleading. Mr Staley's failure to ensure the Letter was accurate and not misleading raises concerns about his judgement and candour when communicating with the Authority.**

   c. **The fact that no profits were made, or losses avoided, either directly or indirectly as a result of Mr Staley's actions, is a factor mentioned in paragraph 6.12 of this Notice. The Authority does not consider the impact of Mr Staley's breaches on the markets to be a relevant factor in this case, but is of the view that a failure by a CEO of a major bank to act with integrity or to be open and cooperative with the Authority does have the potential to adversely affect confidence in the markets.**

90. **The Authority does not agree that the regulatory action taken by the Authority and the PRA against Mr Staley in 2018 has no relevance to this case. Mr Staley's reckless failure to correct the misleading statements in the Letter occurred only a year after that regulatory action which, like this case, involved a failure of judgement by Mr Staley. As a consequence of that regulatory action, the Authority would have expected Mr Staley to have been particularly careful to ensure that the Letter was factually accurate. That it is appropriate to regard the previous regulatory action taken against Mr Staley as an aggravating factor is also consistent with DEPP 6.5B.3G, which includes "*(i) the previous disciplinary record and general compliance history of the individual*" among a list of factors which may have the effect of aggravating or mitigating the breach.**

Prohibition

91. As Mr Staley did not act with a lack of integrity, he does not lack fitness and propriety and so it is disproportionate to impose a prohibition order on him and there can be no justification for doing so. Further, Mr Staley's successful record as CEO of Barclays illustrates his competence and personal characteristics, including his integrity, and

78

Exhibit 7
Page 109

demonstrates his fitness and propriety.  His achievements as CEO also support the conclusion that it is inherently unlikely that he would have conducted himself recklessly with regard to the accuracy of information which was to be provided to the Authority.

92. **The Authority considers that Mr Staley is not a fit and proper person to perform the role of a CEO or other senior management function, and that it is appropriate and proportionate to prohibit Mr Staley from performing any senior management or senior influence function in relation to any regulated activity carried on by an authorised person, exempt person or exempt professional firm, for the reasons set out in paragraphs 6.27 to 6.33 of this Notice.  The Authority notes Mr Staley's submissions regarding his record as CEO but considers that the evidence supports its conclusion that he acted recklessly and with a lack of integrity.**

79

Exhibit 7
Page 110