ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
JACOB G. GELMAN (344819)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jgelman@rgrdlaw.com
          – and –
MICHAEL A. TRONCOSO (221180)
DANIELLE S. MYERS (259916)
ASHLEY M. PRICE (281797)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>     vs.<br><br>BARCLAYS PLC, et al.,<br><br>                              Defendants. | Case No. 2:23-cv-09217-MEMF-KS<br><br>CLASS ACTION<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT JAMES E. STALEY'S MOTION TO DISMISS<br><br>DATE:  June 12, 2025<br>TIME:  10:00 a.m.<br>COURTROOM: 8B, The Honorable Maame Ewusi-Mensah Frimpong |

4922-9091-9184.v1

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS ......................................................................................1

III. LEGAL STANDARD.............................................................................................5

IV. THE COMPLAINT STATES SECURITIES FRAUD CLAIMS AGAINST STALEY ................................................................................................................5

    A.  The Complaint Alleges Material Misrepresentations and Omissions.....................5

        1.  Staley Made False and Misleading Statements and Omissions Concerning the Nature and Scope of His Relationship with Epstein and His Transparency About It..................................................................6

            a.  Staley Falsely Stated He "Never Engaged or Paid Fees" to Epstein...................................................................................................6

            b.  Staley Falsely Stated that the Relationship Was "Professional" ...................................................................................7

            c.  Staley Falsely Stated that the Relationship with Epstein "Taper[ed] off," with "No Contact" Once Staley Was at Barclays...................................................................................................8

            d.  Staley Said He Was "Transparent" and the Board Had "Full Confidence" ...................................................................................9

            e.  Staley's Statements Concerning the Response to the FCA Inquiry..................................................................................................11

        2.  Staley's Misrepresentations Were Material ..............................................12

    B.  Staley Does Not Dispute Scienter.........................................................................15

    C.  The Complaint Alleges Loss Causation.................................................................15

    D.  The Complaint Pleads Control-Person Liability....................................................17

V.  CONCLUSION.....................................................................................................18

4922-9091-9184.v1

# TABLE OF AUTHORITIES

**Page**

CASES

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
2024 WL 4647297 (S.D. Cal. Oct. 31, 2024) ...................................................................7

*Ansell v. Laiken*,
2011 WL 3274019 (N.D. Cal. Aug. 1, 2011) ....................................................................16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................5

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .............................................................................................7

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)................................................................................9

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........................................................................................8, 9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...........................................................................................10

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)..............................................................................13

*Daniels Family 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
709 F. Supp. 3d 1217 (D. Nev. 2024)...............................................................................17

*Dawod v. Garland*,
2023 WL 8168832 (C.D. Cal. Oct. 12, 2023)..................................................................18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................................15, 16

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ..............................................................................................5

*FSP Stallion 1 v. Luce*,
2010 WL 2640126 (D. Nev. June 25, 2010)....................................................................15

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ...................................................................................... *passim*

4922-9091-9184.v1

**Page**

*Greenhouse v. MCG Cap. Corp.*,
    392 F.3d 650 (4th Cir. 2004) ...............................................................................................14

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ...........................................................................................12, 15

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)..............................................................14, 17

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .............................................................................................14

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) ...............................................................................................12

*In re Avon Sec. Litig.*,
    2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).......................................................................11

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ...............................................................................................16

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ....................................................................................6, 11, 16

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .............................................................................................17

*In re Intuitive Surgical Sec. Litig.*,
    2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .....................................................................10

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .........................................................................................5, 10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .................................................................................................5

*In re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014).......................................................................13

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021) ...............................................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ..........................................................................................6, 12

- iii -

4922-9091-9184.v1

**Page**

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .................................................................................................7, 16

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)...................................................................................................................7

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..............................................................................................................5, 12

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) .....................................................................................................7

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015) .......................................................................................13

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v.*
*Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................................................13

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .................................................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................................................7, 10

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ...........................................................................................14, 17

*Purple Mountain Tr. v. Wells Fargo & Co.*,
432 F. Supp. 3d 1095 (N.D. Cal. 2020) ..................................................................................12

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .............................................................................................13, 15

*Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..................................................................................16

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017),
*aff'd sub nom. Cunningham v. Identiv, Inc.*,
716 F. App'x 663 (9th Cir. 2018) .........................................................................................8, 9

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ...................................................................................................15

- iv -

4922-9091-9184.v1

**Page**

*SEC v. Conrad*,
    354 F. Supp. 3d 1330 (N.D. Ga. 2019) ................................................................................13

*SEC v. Reys*,
    712 F. Supp. 2d 1170 (W.D. Wash. 2010)............................................................................14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................5, 15

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ......................................................................17

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
    2017 WL 2378369 (C.D. Cal. May 31, 2017) ........................................................................7

*White v. H&R Block, Inc.*,
    2004 WL 1698628 (S.D.N.Y. July 28, 2004) .......................................................................14

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b)..............................................................................................................................1, 5, 17
    §78t(a) ..........................................................................................................................................1

17 C.F.R.
    §240.10b-5 ...................................................................................................................................5
    §240.10b-5(b)..............................................................................................................................5

4922-9091-9184.v1

## I.    INTRODUCTION

This securities fraud action brought under §§10(b) and 20(a) of the Exchange Act and Section 90A of the FSMA involves the deceptive concealment of the damaging relationship between Barclays' CEO, Jes Staley, and the notorious sex offender, Jeffrey Epstein.[1]  This Memorandum responds to the motion to dismiss brought by Defendant James E. Staley, against whom Plaintiffs only bring claims under the Exchange Act.  ECF 56 (herein, "Staley's Motion" or "Staley's Mtn.").[2]

Failing to muster a single argument contesting Staley's fraudulent intent, Staley seeks to avoid liability by advancing arguments premised on ignoring the facts alleged in the Complaint. Staley asserts that his repeated statements assuring investors his relationship with Epstein was "professional" were not materially misleading – but can only do so by casting aside allegations detailing Staley's over 1,200 emails exchanged with Epstein, including emails affirming their "profound" and "cherished" friendship, and referring to his visits to Epstein's different residences. Likewise, Staley contends his statements claiming he was "transparent" with the Board were not false, but again, he has simply ignored that the FCA concluded he was "recklessly misleading" in concealing the true nature of his relationship with the Board and with the FCA.  Staley's only other arguments raise questions of fact that are improper at this stage.  Because the Complaint sufficiently alleges a claim against Staley for securities fraud, Staley's Motion should be denied.

## II.    STATEMENT OF FACTS[3]

As the Class Period commenced, Staley found himself at the center of a media maelstrom. His longtime close friend, Jeffrey Epstein, had been arrested on charges of sex trafficking girls and young women, and the media was digging into Epstein's political contacts and business associates.

---

[1]    Unless otherwise specified, capitalized terms shall have the meaning as defined in the Amended Class Action Complaint for Violations of the Securities Laws of the United States and the United Kingdom ("Complaint").  Paragraph references ("¶__" or "¶¶__") are to the Complaint.  Emphasis is added and citations are omitted throughout unless otherwise indicated.

[2]    This Memorandum is filed concurrently with the Memorandum of Points and Authorities in Opposition to Defendants Barclays PLC's and Nigel Higgins' Motion to Dismiss ("Barclays Opposition").

[3]    This factual summary is intended to address the facts most relevant to claims against Staley, but for additional factual context, Plaintiffs respectfully refer the Court to the Statement of Facts, §II, in the concurrently filed Barclays Opposition.

4922-9091-9184.v1

¶¶14, 52. Staley, then serving as Barclays' CEO, needed to hide the truth to protect his job, his reputation, and the reputation of Barclays: that he, in his own words in private correspondence with Epstein, shared a "***profound***" and "***most cherished***" friendship with Epstein, considered him "family," visited Epstein's residences, including his private island in the U.S. Virgin Islands, and consulted with him on numerous personal and professional issues. ¶¶67, 81.

Thus, Staley set Barclays on a course of public dissemblance in which, for example, Barclays told *The New York Times* that "'Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally.'" ¶¶16, 53. Then, when the FCA, Barclays' financial regulator in the U.K., asked Barclays to provide written confirmation concerning how the Barclays Board "'had satisfied themselves there was no impropriety to the relationship'" (¶19), Defendant Nigel Higgins, the Chairman of Barclays' Board, turned to Staley to explain his relationship with Epstein. ¶¶60-61. Working together with other Barclays executives, Staley and Higgins crafted a letter on behalf of Barclays to privately respond to the FCA. ¶61. Staley revised and approved the letter, which Higgins also approved. ¶¶61, 63. The letter, dated October 8, 2019, told the FCA that Staley "did not have a close relationship with Mr Epstein." ¶62.

Staley was well aware that the opposite was true. Contrary to Barclays' representation to the FCA that Staley's relationship with Epstein was "not . . . close," Staley exchanged at least 1,200 emails with Epstein, talked regularly on the phone with him, and visited his various residences. ¶67. Specifically, after visiting Epstein's private island, Staley wrote Epstein: "Your place is crazy, and special. It has a warmth and silliness that makes it yours. ***I count u as a deep friend***." ¶81. In an email to his daughter, Staley referred to Epstein as "uncle Jeff[re]y" and forwarded a message from Epstein regarding his help to get her into a graduate school. *Id.* Another time, he wrote Epstein: "I can't tell you how much your friendship has meant to me. . . . ***To my most cherished friend***." *Id.* The two also shared messages with inside references, such as when Staley wrote to Epstein: "That was fun. Say hi to Snow White," and Epstein responded: "[W]hat character would you like next?" to which Staley replied: "Beauty and the Beast." *Id.*

- 2 -

4922-9091-9184.v1

Despite knowledge of his own communications and interactions with Epstein, Staley made no clarifications to the October 2019 letter sent to the FCA – when it was being drafted or any time after. *See* ¶104.  Thus, when the FCA received a cache of 1,200 emails between Staley and Epstein from U.S. investigators who were investigating Epstein's activities, the FCA had further questions for Barclays.  Summoning Higgins on 24-hours' notice in December 2019, the FCA asked him to explain the discrepancy between Barclays' letter and the email cache.  ¶¶64-65.  Barclays initiated an internal inquiry into whether there was evidence of impropriety and whether Staley had been sufficiently transparent about his relationship.  Barclays hired outside counsel to review the emails, conduct interviews, and provide the Board a confidential report concerning the most controversial emails between Staley and Epstein.

On February 13, 2020, Barclays announced in its 2019 Annual Report signed by Staley and in a press release on a Form 6-K, both filed with the SEC, that the FCA had begun an investigation of Staley's relationship with Epstein.  ¶69.  Yet Barclays' announcement immediately sought to downplay the investigation's significance, assuring investors that the Board had reviewed "the information available to us and representations made by Mr. Staley," and concluded that his relationship with Epstein was "professional," warranting the Board's "full confidence" and unanimous recommendation for his re-election.  *Id.*  The 2019 Annual Report also stated that with regard to inquiries, investigations, and other proceedings to which Barclays was subject, Barclays was "cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate."  ¶70.

Although well aware of the true nature of his relationship with Epstein, Staley reiterated these false and misleading statements in an earnings conference call held with analysts the same day, as well as to other media outlets.  For example, he assured analysts that he "had a ***professional relationship***" "that stopped before [he] joined Barclays," and that he had "been ***transparent*** and open with the bank."  ¶71.  To *Bloomberg Television*, Staley stated: "***I have had a long-standing professional or had a long-standing professional relationship with Jeffrey Epstein***," about which he had "been ***very transparent*** with the bank."  ¶72.  And to the *Evening Standard*, Staley repeated: "I have been ***fully transparent*** and open."  ¶74.  The market was reassured by these representations,

- 3 -

which was reflected in *The Wall Street Journal* and various analyst reports issued on February 13 and 14, 2020.  ¶¶75-76.

On February 18, 2021, Barclays issued its 2020 Annual Report, which was filed with the SEC on a Form 20-F.  Rather than disclose the truth, the 2020 Annual Report stated the Board's conclusion from the prior year giving full confidence to Staley "remain[s] unchanged," continuing to conceal from investors the truth about Staley's close personal relationship with Epstein and that this relationship was mischaracterized to the FCA.  ¶78.  The 2020 Annual Report also reiterated the false and misleading statement that Barclays was cooperating with relevant authorities.  ¶79.

On November 1, 2021, Barclays announced that having learned of the preliminary conclusions by the FCA investigation regarding Barclays' characterization of Staley's relationship with Epstein, Staley would depart the Company.  ¶83.  Barclays nevertheless continued to publicly support Staley while concealing Staley's personal relationship with Epstein and Defendants had misled the FCA regarding that relationship.  ¶88.

The FCA completed its investigation and announced its final conclusions on October 12, 2023, disclosing that "Mr Staley recklessly approved a letter sent by Barclays to the FCA, which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact."  ¶104.  The FCA further stated that "in failing to correct the misleading statements in the letter, Mr Staley recklessly misled the FCA and acted with a lack of integrity."  *Id.*  It determined that Staley had failed to comply with FCA rules requiring senior managers of financial firms to "act with integrity," "be open and cooperative with the FCA . . . and other regulators," and "disclose appropriately any information of which the FCA . . . would reasonably expect notice."  ¶110.  Accordingly, the FCA fined Staley £1.8 million and banned him from holding senior management positions in the financial services industry, finding it "right to prevent him from holding a senior position in the financial services industry if we cannot rely on him to act with integrity by disclosing uncomfortable truths about his close personal relationship with Mr Epstein."  ¶104.  The FCA Decision released the same day documented in detail how the FCA reached its conclusions based on its review of the email cache.  ¶106.

- 4 -

4922-9091-9184.v1

The same day, Barclays issued a press release referring to the FCA Decision and stating that the Board had decided Staley was "ineligible for or [would] forfeit a number of awards" he had received in compensation, totaling £17.8 million.  ¶112.  As a result of the FCA and Barclays' disclosures, the price of Barclays ADRs fell 4.99%, economically damaging investors.  ¶113.

## III.   LEGAL STANDARD

In assessing the sufficiency of the Complaint, the Court must "accept all factual allegations . . . as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007); *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (allegations of material fact are construed "'in the light most favorable to the nonmoving party'").  A complaint need only contain sufficient factual matter to state claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Ninth Circuit has repeatedly recognized that "'[w]hile the PSLRA "significantly altered pleading requirements in private securities fraud litigation," it did not impose an insurmountable standard.'" *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 947 (9th Cir. 2023); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).

## IV.   THE COMPLAINT STATES SECURITIES FRAUD CLAIMS AGAINST STALEY

To state a claim under §10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

### A.   The Complaint Alleges Material Misrepresentations and Omissions

Under Rule 10b-5(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b).  "In the securities fraud context, statements and omissions are actionable false or misleading if they 'directly contradict what the defendant knew at that time,' or 'create an impression of a state of affairs that

- 5 -

4922-9091-9184.v1

differs in a material way from the one that actually exists.'" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018) ("Even if a statement is not false, it may be misleading if it omits material information."). Unlike scienter, which is considered under a "***strong inference*** standard of plausibility," falsity is only subject to "the ***reasonable inference*** standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (emphasis in original). The Complaint meets this standard.

**1.      Staley Made False and Misleading Statements and Omissions Concerning the Nature and Scope of His Relationship with Epstein and His Transparency About It**

Because Staley made false and misleading statements and omissions that "'directly contradict[ed]'" what he knew at the time, the Complaint has sufficiently alleged falsity. *Facebook*, 87 F.4th at 948. Staley's challenges to falsity ignore the Complaint's well-pled facts demonstrating Staley's "profound" and "deep" friendship with Epstein and therefore fail.

**a.      Staley Falsely Stated He "Never Engaged or Paid Fees" to Epstein**

In the context of the July 22, 2019 *The New York Times* article's description of the "clubby world" in which Staley and Epstein operated, and where Staley kept up a relationship with Epstein to secure wealthy clients for JPMorgan, the quoted statement that Staley "'never engaged or paid fees to Mr. Epstein to advise him'" at JPMorgan "'or personally,'" was misleading. ¶¶52-53. The purpose of the statement was to create distance between Staley and Epstein. While the statement implied that Staley never sought Epstein's advice (or paid him for such), it concealed the fact that the relationship was far more intimate than one that was purely transactional. Although Staley asserts that this "limited denial" would leave no misimpression that Staley and Epstein "did not actually work together," that is beside the point. Staley's Mtn. at 9. What was concealed is that they also maintained the very type of close, personal relationship that concerned the investing public and about which analysts and the media inquired. ¶¶14, 56, 76. Indeed, the two exchanged hundreds of emails referring to the strength of their friendship, and in which Staley regularly sought Epstein's advice, making *The New York Times* statement misleading. ¶56; *Facebook*, 87 F.4th at 948

- 6 -

(statements are misleading that "'create an impression of a state of affairs that differs in a material way from the one that actually exists'"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (once defendants chose to speak, "they were bound to do so in a manner that wouldn't mislead investors").

### b.    Staley Falsely Stated that the Relationship Was "Professional"

Staley contends that his alleged misstatements assuring investors his relationship with Epstein was "professional" cannot be actionable because they expressed the "literal truth" and did not "deny the existence of a personal relationship."  Staley's Mtn. at 9-10.  But such an argument contravenes Supreme Court precedent stating that "literal accuracy is not enough: A [defendant] must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("'the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers'"); *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 2024 WL 4647297, at *9 (S.D. Cal. Oct. 31, 2024) ("half-truths[] are actionable").

Here, Staley's statement disclosed the existence of a "professional" relationship while "holding back" his personal relationship with Epstein.  *Id.*  That he did not explicitly "deny" his personal relationship with Epstein does not change the misleading character of the statement, especially given the context in which he was speaking – namely, a context where investors were facing new uncertainty resulting from Barclays' announcement of the FCA's investigation into Staley's relationship with Epstein.  ¶¶69-74; *see Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *13-*14 (C.D. Cal. May 31, 2017) (context is relevant to determining whether a statement is misleading).  Thus, Staley's representation that his relationship with Epstein was "professional" is "'[a] classic example of an actionable half-truth'" where Staley's "'representations . . . state the truth only so far as it goes, while omitting critical qualifying information.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (while the statement that there were

- 7 -

"'no serious doubts'" regarding a loan repayment may "[t]echnically . . . have been true," it "was plainly misleading when made" given defendant's statement omitted that "there was a basis for serious doubts").

Although Staley never publicly admitted during the Class Period that he had a "personal" as well as a "professional" relationship with Epstein, Staley misquotes and thus mischaracterizes the Complaint's allegations as reading that the relationship was "only professional." Staley's Mtn. at 10.[4] In fact, the Complaint alleged that Defendants' statements "maintained that Staley and Epstein's relationship was only 'professional.'" ¶81(a).[5] But even more importantly, because Staley and Barclays **only ever made statements affirming that the relationship was "professional**," while making **no mention** of a simultaneously existing close, personal relationship, the statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]" between Staley and Epstein. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

**c.    Staley Falsely Stated that the Relationship with Epstein "Taper[ed] off," with "No Contact" Once Staley Was at Barclays**

Fueling the false impression that Staley and Epstein's relationship was strictly professional, Staley made misleading statements indicating that his relationship with Epstein had ended prior to commencing at Barclays with "no contact . . . whatsoever since then." ¶¶69-71, 75. These statements further suggest to investors that Staley and Epstein's relationship was distant, professional, and ended when Staley started a new professional venture, as opposed to the true, personal relationship that the men shared. Right up until Staley's appointment as Barclays' CEO on October 28, 2015, Staley consulted with and kept Epstein in the loop while conducting confidential

---

[4]    Staley's argument also mis-cites ¶30, which makes no mention of Staley and Epstein's relationship.

[5]    *Rok v. Identiv, Inc.*, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom. Cunningham v. Identiv, Inc.*, 716 F. App'x 663 (9th Cir. 2018), does not support Staley's argument. Staley's Mtn. at 10. There, the court found that since the defendants had "made no affirmative representations about expense reimbursements and internal controls related thereto," they were not "obligated to disclose additional information about weaknesses in internal controls." *Rok*, 2017 WL 35496, at *7. But here, Staley (and Barclays) did make "affirmative representations" regarding the professional nature of the men's relationship, rendering their statements misleading since their relationship was one of "cherished" friendship. ¶81(a).

4922-9091-9184.v1

negotiations with the Barclays Board. ¶¶46, 56(e). Only three weeks before Staley's appointment, he wrote Epstein an email titled "Friendship," stating: "You never wavered in our friendship these last three years. That means a lot too [sic] me. . . . Cross your toes!!!" ¶56(e). Epstein responded: "[M]ore than 10 years." *Id.* Such an exchange validating their friendship just before Staley's appointment contradicts the impression that the men had merely formed a "professional" relationship that naturally ended with Staley's career change.[6]

### d.    Staley Said He Was "Transparent" and the Board Had "Full Confidence"

Following Barclays' announcement that the FCA was conducting an investigation into Staley's relationship with Epstein, Staley repeatedly – but falsely – represented that he was "transparent" and thus, the Board retained confidence in him. ¶¶69-74. As the FCA later concluded, Staley "knew all the relevant facts regarding his relationship with Mr Epstein," but he had concealed them because he was aware of the risk posed to his reputation and career. ¶81(e). Thus, the FCA determined that Staley had "***recklessly misled*** the FCA and ***acted with a lack of integrity***" in failing to disclose the truth about his personal relationship with Epstein. ¶104. Significantly, Staley's Motion is conspicuously silent regarding the FCA's conclusion, which corroborates Plaintiffs' plausible allegations that Staley's statement claiming he was "transparent" was misleading at best. *Glazer*, 63 F.4th at 766.

Staley only offers argument relating to one of the "transparent" statements – that the "Board . . . believes Mr. Staley has been sufficiently transparent." Staley's Mtn. at 11; ¶69.[7] Staley first argues that this statement cannot be misleading without "showing that the board actually – and contemporaneously – held a different view." Staley's Mtn. at 11. But an opinion may be actionable where: (i) both the "'the speaker did not hold the belief she profess[es]'" and the belief is objectively

---

[6]    Tellingly, the men understood that direct communications between them could create a problem for Staley, and thus Epstein told Staley while they were discussing the appointment: "[B]etter if you not email me phone only." *Id.* It may be little wonder that, with Barclays' reputation resting on his shoulders, Staley did not continue direct contact with Epstein once he became CEO.

[7]    Because Staley signed the Form 20-F that included the 2019 Annual Report containing this statement, Staley is considered a "maker" of this statement. ¶68; *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) ("'Courts have consistently held that the signer of a corporate filing is its "maker," because signing a filing implies "ultimate control" over its contents.'").

4922-9091-9184.v1

untrue; (ii) a fact contained within an opinion statement was untrue; or (iii) the statement is rendered misleading because the speaker omitted facts "'going to the basis'" of the opinion. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Staley limits his attack to only the first of these prongs. Staley's Mtn. at 11. The Complaint alleges, however, the Board had reviewed the email cache, and therefore any purported "belief" in Staley's transparency "omit[ted] material facts about [Barclays'] inquiry into" Staley's relationship with Epstein, particularly the emails revealing their close, personal relationship, and these facts "conflict[ed] with what a reasonable investor would take from the statement itself," making the statement actionable. *Omnicare*, 575 U.S. at 189; *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *4 (N.D. Cal. Sept. 29, 2017) (defendants said "'one thing'" and "'held back'" "'particular and material facts going to the basis'" of defendants' opinion, whose omission makes the opinions misleading).

Notably, Staley's other statements falsely asserting his transparency contain no "opinion" words but remain declarative statements of fact. *Omnicare*, 575 U.S. at 183 (phrases like "'I believe'" or "'I think'" transform factual statement into one of opinion). These statements – unaddressed in Staley's Motion – include: "I have been transparent and open," "I have been *very* transparent," and "I have been *fully* transparent and open." ¶¶71-72, 74. Because the opposite was true, as the FCA later determined, these statements are actionable.

Next, Staley argues that the words "sufficiently transparent" are too subjective to be misleading (Staley's Mtn. at 11), but that is belied by the FCA's conclusion that he had concealed the relevant facts concerning his relationship with Epstein. ¶¶81(e), 104. Furthermore, the context militates against a finding that such a statement is vague or subjective. *Glazer*, 63 F.4th at 770 (even "'vague statements of optimism,'" when taken in context, may be actionable); *Quality Sys.*, 865 F.3d at 1143 (same). The statement was important enough to be included in the 2019 Annual Report *and* issued separately in a press release. ¶¶68-69. Defendants made this statement at the same time they revealed the FCA had begun an investigation, and thus, at a time when analysts were focused on and the market was concerned about the effect of the investigation on Barclays and its CEO. ¶¶69, 76; *Glazer*, 63 F.4th at 770-71 (since the challenged statements were the subject of analysts' questions

- 10 -

during earnings conference calls, they could not be discounted as mere "'puffery'"). Staley repeating the assurance that he was "transparent," particularly in this context, further rendered these statements material. *Glazer*, 63 F.4th at 771 ("When Defendants 'repeatedly reassured investors . . . that the pipeline was full and growing' they 'affirmatively create[d] an impression of a state of affairs.'"); *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*16 (S.D.N.Y. Nov. 18, 2019) ("Courts have found that when a company makes repeated representations on the same topic, even where those representation[s] would otherwise be puffery, the repetition itself communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'") (alteration in original).

Finally, Staley also repeated statements that the Board had "full confidence" in him, creating a state of affairs that was misleading since Staley knew the Board possessed the email cache that seriously undermined its "confidence" in Staley's leadership of Barclays. ¶81(b). Moreover, the Board's confidence was only formed from his dishonesty. ¶81(e). Staley's Motion makes no specific arguments regarding these statements and therefore cannot do so on reply.

### e. Staley's Statements Concerning the Response to the FCA Inquiry

Staley, having signed the Form 20-F that contained the 2019 Annual Report, misrepresented that Barclays was "cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate." ¶¶70, 79.[8] The Complaint alleges that Staley knew, and had in fact concealed the true nature of his relationship in a letter sent to the FCA – clearly ***not*** cooperating with the FCA's inquiry, as the FCA later found. ¶¶61-63, 104-106.[9] Thus, this statement "'directly contradict[ed]'" what he knew at the time, satisfying falsity. *Facebook*, 87 F.4th at 948. Staley's contention otherwise is implausible and inaccurate.

Staley also quibbles that the statement that he "volunteered" information regarding his relationship with Epstein is not false since there was purportedly no suggestion that his explanation

---

[8]    Staley's Motion improperly attributes this statement only to Barclays and Higgins, overlooking that Staley likewise signed the Form 20-F on which it appeared. ¶68.

[9]    Staley makes further arguments about the falsity of the Barclays' Defendants' statements. Staley's Mtn. at 11-12. Those arguments are addressed in the concurrently filed Barclays Opposition. *See* Barclays Opposition, §IV.A.2.

- 11 -

4922-9091-9184.v1

was "unsolicited."  Staley's Mtn. at 11.  In fact, his explanation was required and under exigent circumstances: the FCA was conducting an investigation about him.  It is implausible to believe that he would have disclosed information regarding his personal relationship with Epstein without such an impetus.

## 2.    Staley's Misrepresentations Were Material

Because there "is '"a substantial likelihood that the disclosure of the omitted fact"'" – here, Staley's "deep" friendship with Epstein – ""''would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available,"''" Staley's misrepresentations relating to that relationship, and his transparency and cooperation with the Board and the FCA in their inquiries into that relationship, were material.  *Matrixx*, 563 U.S. at 38.  Although Staley seeks dismissal on materiality grounds, such a contention is a very tall task at the pleading stage, which Staley comes nowhere close to meeting.  The materiality inquiry is fact-specific and almost never appropriate as a matter of law.  *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021); *see also In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) ("Where a complaint contains only '[c]onclusory allegations of law and unwarranted inferences,' dismissal of the complaint on materiality grounds is appropriate.").

As the Ninth Circuit has observed, "[t]he Supreme Court has eschewed brightline tests for materiality," like the one proposed by Staley's Motion, which suggests that so-called "personal matters" are *per se* immaterial.  *Khoja*, 899 F.3d at 1009.  Yet, so long as statements ""''significantly altered the 'total mix' of information made available"''" (*Matrixx*, 563 U.S. at 38), there is no requirement that they have "anything to do with quarterly revenue figures, product offerings, or any other factor bearing on Barclays' bottom line," contrary to Staley's assertion (Staley's Mtn. at 12).  Thus, the Ninth Circuit has held that "'when taken in context,'" statements may be found material, such as when statements respond to specific questions posed by financial analysts.  *Glazer*, 63 F.4th at 770-71; *see also Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1105 (N.D. Cal. 2020) ("The fact this question was posed shows that the answer was viewed as altering the total mix of information useful for investment decisions.").  In this case, after Barclays announced the FCA's inquiry Staley himself was asked about the FCA's inquiry, and his relationship with Epstein

- 12 -

both during the February 13, 2020 earnings conference call, as well as on a television interview the same day. ¶¶71-72. Given the context in which his statements were made, they were material.

Courts also regularly find information regarding the reputation or integrity of an executive is material. *See, e.g.*, *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 540 (S.D.N.Y. 2020) (in context of #MeToo movement, the CEO's statement that the "'company's culture will not allow for this'" was material since a reasonable investor could have understood the statement to mean the CEO – and thus CBS – did not have exposure to sexual misconduct allegations); *SEC v. Conrad*, 354 F. Supp. 3d 1330, 1345 (N.D. Ga. 2019) (after "repeated invocations" of an executive's experience, the nondisclosure of his disciplinary history was material); *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 973-74 (N.D. Cal. 2015) (recognizing that materiality is not based simply on a company's bottom line, but that investors may make decisions on factors including "'management ethics and accountability'"). Indeed, in *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *16 (N.D. Cal. Oct. 31, 2014), the court rejected similar arguments that a CEO's ethical conduct, or lack thereof, while in a previous position were not material at the motion to dismiss stage. That there was a government investigation relating to the concealed information in this case is further indicative of materiality. *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014).

Here, in light of Staley's repeated statements regarding his so-called "professional" relationship with Epstein, his "transparency" to the Board and the FCA during an investigation of him, and the Company's cooperation with its regulators, reasonable investors would consider it material to their investment decision to know that, in fact, Barclays' CEO not only concealed a personal relationship with a known sex offender, but concealed it from Barclays' own regulator. ¶¶56, 81, 104-108. In fact, Higgins himself recognized the materiality of the misrepresentations and concealed information when he told an investor that "'once you read the final report *you will have questions for us because it makes for uncomfortable reading*.'" ¶87. And as indicated by the reaction in the price of Barclays Securities upon the disclosure of the FCA's conclusions, investors did find that the concealed information affected their investment decisions. *See No. 84 Employer-*

- 13 -

4922-9091-9184.v1

*Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (noting that a stock price drop, even if delayed, can support finding of materiality).

Finally, Staley's argument that personal matters are immaterial is based on a misreading of the primary case he relies on, *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650 (4th Cir. 2004), which arose from a company's CEO lying about attending college. Staley's Mtn. at 12-13. But deploying *Greenhouse* in this manner is particularly inappropriate because that case recognized "materiality is a fact-specific determination." 392 F.3d at 657; *see also SEC v. Reys*, 712 F. Supp. 2d 1170 (W.D. Wash. 2010) (refusing to dismiss on materiality grounds based on *Greenhouse*). Staley's relationship with Epstein, and his and Barclays' response to a government investigation regarding his integrity about that topic demonstrate how distinguishable *Greenhouse* is from this case. The FCA specifically found that Staley acted with such a lack of integrity that he could not be permitted to serve again as a senior manager in the financial sector. ¶¶104-108. Clearly, Staley's lack of integrity was material to the FCA, and it was to investors as well.

Staley's truth-on-the-market defense – that the true information was already in the public domain – likewise fails because it is a fact-dependent consideration not appropriate on a motion to dismiss. *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *18 (C.D. Cal. Aug. 4, 2014). Indeed, Staley's citation to *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989), supports Plaintiffs, as the Ninth Circuit, at the summary judgment stage, emphasized that it is only in limited circumstances that a truth-on-the-market defense will succeed and that "[t]he investing public justifiably places heavy reliance on the statements and opinions of corporate insiders." *Id.* at 1116; *see* Staley's Mtn. at 14. Nor does *White v. H&R Block, Inc.*, 2004 WL 1698628, at *6 (S.D.N.Y. July 28, 2004), help Staley since the discussion Staley references found the plaintiffs' suit was time-barred and did not concern materiality. In this case, not only was the extent of Staley's relationship with Epstein concealed from the public, but the lengths that Staley had gone to mislead the U.K. regulator were unknown. Staley has not met his "heavy burden of proof" on this point. *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996). Indeed, he admits that "the emails themselves were ***partially*** revealed" and that "the question whether Barclays and Staley had been

- 14 -

candid about the relationship in connection with the FCA investigation" had been asked – but it was not answered until the FCA announced its conclusions.  Staley's Mtn. at 14.

### B.    Staley Does Not Dispute Scienter

Remarkably for a securities fraud action, Staley does not dispute that he acted with scienter when making the alleged misrepresentations and omissions.  Scienter refers to a defendant's "'intent to deceive, manipulate, or defraud.'"  *Tellabs*, 551 U.S. at 319.  The Ninth Circuit also defines scienter as encompassing "'deliberate recklessness,'" which is "'an ***extreme*** departure from the standards of ordinary care . . . [that] presents a danger of misleading buyers or sellers that is either known to the defendant or is so ***obvious*** that the actor must have been aware of it.'"  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (emphasis in original).  Staley's concession only makes sense, given the FCA's conclusion that Staley "recklessly misled" the FCA when concealing the true nature of his relationship with Epstein, which Staley also concealed from Barclays' investors.  Staley's own private affirmations to Epstein of a "profound" and "deep" friendship directly contradicted his public statements declaring his relationship with Epstein to only be "professional" and demonstrate his actual knowledge that these statements were false and misleading.  *Compare* ¶¶56(c), 56(e)(iii), 67, 81, 95 (private affirmation of friendship), *with* ¶¶56(f)(i), 69, 71-75, 85 (public declarations of professional relationship); *see Alphabet*, 1 F.4th at 706 (allegations that defendants "necessarily knew" about the concealed vulnerabilities raise a strong inference of scienter); *Reese*, 747 F.3d at 574 (information "directly contradicting" alleged misstatement supports scienter inference).  Likewise, the FCA's conclusion that Staley had failed to act with integrity by not making frank disclosures to it about his relationship with Epstein also indicates Staley's fraudulent intent when making public assurances of his "transparency" and that Barclays was "cooperating with the relevant authorities" in their investigations.  ¶¶70-72, 74; *Reese*, 747 F.3d at 574; *see also FSP Stallion 1 v. Luce*, 2010 WL 2640126, at *2 (D. Nev. June 25, 2010) (observing that inconsistent internal statements support inference of scienter).

### C.    The Complaint Alleges Loss Causation

A complaint adequately pleads loss causation by articulating the causal connection or relationship between the alleged misrepresentation and the plaintiff's alleged economic loss.  *Dura*

- 15 -

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd*, 811 F.3d at 1209. Pleading loss causation is "not meant to impose a great burden upon a plaintiff," but to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347; *see In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).

Here, the FCA's announcement that it had concluded its investigation and found that Staley had "recklessly misled the FCA and acted with a lack of integrity" directly contradicted Staley's Class Period misrepresentations that his relationship with Epstein was "professional" and he had been "transparent." ¶¶69-74, 104-106. The same day, Barclays issued a press release regarding the FCA's findings, and in an acknowledgement of the findings' severity, Barclays stated that it was making Staley forfeit or be ineligible for several awards in compensation. ¶¶111-112. The price of Barclays ADRs immediately fell 4.99%. Thus, the Complaint "plausibly allege[s] that the market reacted" to the disclosure of Staley's fraud. ¶¶104, 113; *Ansell v. Laiken*, 2011 WL 3274019, at *5 (N.D. Cal. Aug. 1, 2011); *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) ("temporal component" to loss causation since "'a disclosure followed by an immediate drop in stock price is more likely to have caused the decline'").

Importantly, "a 'corrective disclosure need not be a "mirror image" disclosure – a direct admission that a previous statement is untrue; it must simply "relate to the same subject matter as the alleged misrepresentation."'" *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018); *see also Facebook*, 87 F.4th at 956 (emphasizing that plausibly pleading "'a causal relationship'" is all that is required "at the very early motion to dismiss stage, and that discovery and further proceedings are necessary to illuminate the issues surrounding loss causation"). Although Staley asserts that the FCA's Decision Notice could not be a corrective disclosure because it only addressed statements that were "not public" (Staley's Mtn. at 15), Staley overlooks that his public representations – *i.e.*, his relationship with Epstein was "professional" and

- 16 -

4922-9091-9184.v1

that he had been "transparent" regarding it – were made following Barclays' disclosure that the FCA was conducting an inquiry (¶¶69-74). Thus, the Complaint sufficiently ties the FCA's findings that Staley recklessly misled the Board and the FCA to his public statements that he was "transparent" with the Board about his so-called "professional" relationship with Epstein.

Although Barclays and Higgins continued to publicly support Staley even after his departure from Barclays, Staley attempts again to raise a "truth-on-the-market" defense in relation to loss causation. But even if any information released before the FCA's announcement had corrected Defendants' fraudulent representations, it was not disclosed ""'"with a degree of intensity and credibility sufficient to effectively counterbalance"''" the misleading impression Defendants created. *Provenz*, 102 F.3d at 1493. Defendants have not met their "heavy burden" to justify dismissal on this account. *Amgen*, 2014 WL 12585809, at *15 (collecting cases). Nor is the size of the drop in the security price a reason for dismissal at the pleading stage. *Daniels Family 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1237 (D. Nev. 2024) ("There is no hard cutoff for what percentage drop constitutes a 'significant' drop for a stock price; instead, such determinations will 'vary depending on the average trading range for the particular stock.'"); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (recognizing that "it is normally inappropriate to rule on loss causation at the pleading stage" and that it should be an issue decided at a later proof stage). The Complaint thus alleges loss causation.

### D. The Complaint Pleads Control-Person Liability

Staley's only substantive argument against the Complaint's §20(a) claim for the period that he was Barclays' CEO is that the Complaint failed to plead the underlying §10(b) claim. Staley's Mtn. at 17. But since the Complaint "establishes a primary violation, [Staley's] argument . . . is unavailing." *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *14 (C.D. Cal. Apr. 12, 2016). Plaintiffs do not assert a claim for Staley's control-person liability following his departure from the Company.

- 17 -

4922-9091-9184.v1

## V.    CONCLUSION

For the foregoing reasons, the Court should deny in its entirety Staley's Motion.  Should the Court decide to dismiss the Complaint in whole or in part, Plaintiffs request leave to amend.  *See Dawod v. Garland*, 2023 WL 8168832, at *5 (C.D. Cal. Oct. 12, 2023).

DATED:  January 17, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL A. TRONCOSO
DANIELLE S. MYERS
ASHLEY M. PRICE

s/ Ashley M. Price
ASHLEY M. PRICE

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JACOB G. GELMAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jgelman@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 18 -

4922-9091-9184.v1