ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JACOB G. GELMAN (344819)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jgelman@rgrdlaw.com
        – and –
MICHAEL A. TRONCOSO (221180)
DANIELLE S. MYERS (259916)
ASHLEY M. PRICE (281797)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Case No. 2:23-cv-09217-MEMF-KS |
| Plaintiff, ) ) | CLASS ACTION |
| vs. ) ) ) | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS BARCLAYS PLC'S AND NIGEL HIGGINS' MOTION TO DISMISS |
| BARCLAYS PLC, et al., ) ) | |
| Defendants. ) ) | DATE:  June 12, 2025 TIME:  10:00 a.m. COURTROOM:  8B, The Honorable Maame Ewusi-Mensah Frimpong |

4922-4099-6622.v2

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ......................................................................................................1

II.    STATEMENT OF FACTS ........................................................................................3

III.   LEGAL STANDARD................................................................................................7

IV.    THE COMPLAINT STATES SECURITIES FRAUD CLAIMS UNDER THE
       EXCHANGE ACT.....................................................................................................7

       A.    The Complaint Alleges Materially False and Misleading Statements....................7

             1.    Materially False and Misleading Statements Concerning the Nature
                   of Staley and Epstein's Relationship .........................................................8

             2.    Materially False and Misleading Statement Concerning the
                   Board's Internal Investigation and Conclusions ......................................10

             3.    Materially False and Misleading Statements Concerning Barclays'
                   Cooperation with Regulators ......................................................................12

             4.    Materially False and Misleading Statements Concerning the FCA's
                   Initial Findings ..........................................................................................13

             5.    The Barclays Defendants' Truth-on-the-Market Defense Is
                   Unavailable on the Motion to Dismiss.......................................................13

       B.    Higgins Is a "Maker" of False and Misleading Statements .................................14

       C.    The Complaint Sufficiently Pleads a Strong Inference of Scienter ......................15

             1.    The Barclays Defendants Knew or Deliberately Regarded the Risk
                   that Their Statements Were Misleading......................................................15

             2.    Staley's Knowledge Should Be Imputed to Barclays ...............................16

       D.    The Complaint Adequately Alleges Loss Causation ............................................17

       E.    The Complaint Pleads Control-Person Liability...................................................19

V.     THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER FSMA ..................20

       A.    The Court Should Exercise Supplemental Jurisdiction .......................................20

       B.    Forum Non Conveniens Does Not Justify Dismissal of the FSMA Claims..........22

       C.    The Complaint States a Claim of Dishonest Delay Under the FSMA..................24

VI.    CONCLUSION.......................................................................................................25

- i -

4922-4099-6622.v2

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abadilla v. Precigen, Inc.*,
2022 WL 1750033 (N.D. Cal. May 31, 2022) ...................................................................18

*Ansell v. Laiken*,
2011 WL 3274019 (N.D. Cal. Aug. 1, 2011) .........................................................................18

*Applied Materials, Inc. v. Advanced Micro-Fabrication Equip.*
*(Shanghai) Co., Ltd.*,
2009 WL 10692715 (N.D. Cal. Nov. 30, 2009) ...................................................................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................7

*Basic v. Levinson*,
485 U.S. 224 (1988)...............................................................................................................14

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .........................................................................14

*Bos. Telecomms. Grp., Inc. v. Wood*,
588 F.3d 1201 (9th Cir. 2009) .............................................................................................23

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)...................................................................................19

*Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*,
2016 WL 9413421 (S.D. Fla. June 29, 2016) .......................................................................19

*Camp v. Qualcomm, Inc.*,
2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) .......................................................................19

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) .............................................................................................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*
*Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................................................11

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt*
*Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)..............................................................................20, 23

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) ...................................................14

*Daniels Family 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
709 F. Supp. 3d 1217 (D. Nev. 2024).......................................................................................19

*Dawod v. Garland*,
2023 WL 8168832 (C.D. Cal. Oct. 12, 2023).........................................................................25

*DTEX, LLC v. BBVA Bancomer, S.A.*,
508 F.3d 785 (5th Cir. 2007) ..................................................................................................23

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................................17, 18, 19

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ................................................................................................7, 16

*Ervin v. OS Rest. Servs., Inc.*,
632 F.3d 971 (7th Cir. 2011) ...................................................................................................21

*Exec. Software N. Am., Inc. v. United States Dist. Court for Cen. Dist. of Cal.*,
24 F.3d 1545 (9th Cir. 1994), *overruled on other grounds by*
*Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008).....................20, 22

*Ferris v. Wynn Resorts Ltd.*,
2021 WL 3216462 (D. Nev. July 28, 2021) .....................................................................14, 15

*Freedman v. St. Jude Med., Inc.*,
4 F. Supp. 3d 1101 (D. Minn. 2014)...........................................................................................9

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .........................................................................................7, 14, 16

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ...........................................................................................15, 16

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...............................................................................................8, 16

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................................19

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..................................................................................10

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)......................................................................................12

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...................................................................................................18

- iii -

*In re BP P.L.C. Sec. Litig.*,
    2013 WL 6383968 (S.D. Tex. Dec. 5, 2013) ..........................................................................23

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015) ..............................................................................16, 17

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ..................................................................... *passim*

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..............................................................................19

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005).....................................................................15

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..........................................................................7, 16

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010)...................................................................17

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
    230 F. Supp. 2d 376 (S.D.N.Y. 2022).....................................................................23

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) ...................................................................19

*In re Teva Sec. Litig.*,
    512 F. Supp. 3d 321 (D. Conn. 2021).....................................................................20

*In re Tezos Sec. Litig.*,
    2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .......................................................22

*In re Thoratec Corp. Sec. Litig.*,
    2006 WL 1305226 (N.D. Cal. May 11, 2006) ......................................................10

*In re Toyota Motor Corp. Sec. Litig.*,
    2011 WL 2675395 (C.D. Cal. July 7, 2011).........................................................21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ................................................................................7

*In re Volkswagen AG Sec. Litig.*,
    661 F. Supp. 3d 494 (E.D. Va. 2023) ....................................................................19

*In re WRT Sec. Litig.*,
    1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) ........................................................17

4922-4099-6622.v2

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021) ...............................................................................................18

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...................................................................................................14, 20

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ......................................................................................7, 10, 11

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .............................................................................................18

*Lomingkit v. Apollo Educ. Grp. Inc.*,
    2017 WL 633148 (D. Ariz. Feb. 16, 2017)..............................................................................9

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ...............................................................................................18

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)...................................................................................................8, 13

*Manalevy v. Bofi Holding, Inc.*,
    2021 WL 794275 (S.D. Cal. Mar. 2, 2021) .......................................................................14, 15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).....................................................................................................7, 8, 9

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .............................................................................................19

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010).............................................................................................................22

*MTC Elec. Techs. Co. v. Leung*,
    869 F. Supp. 396 (C.D. May 17, 1995) .................................................................................23

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ....................................................................................18

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) .............................................................................................18

*Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*,
    2024 WL 5182634 (9th Cir. Dec. 20, 2024).........................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................................11

- v -

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ...............................................................................................10, 14

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ...................................................................................................9, 15

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .......................................................................................9

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ........................................................................................................16

*S.E.C. v. Mercury Interactive, LLC*,
2011 WL 5871020 (N.D. Cal. Nov. 22, 2011) .............................................................................14

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ........................................................................................................15

*Scott v. ZST Digital Networks, Inc.*,
2012 WL 538279 (C.D. Cal. Feb. 14, 2012)..................................................................................14

*SEC v. Leslie*,
2009 WL 688836 (N.D. Cal. Mar. 16, 2009)..................................................................................23

*Smith v. K-Mart Corp.*,
899 F. Supp. 503 (E.D. Wash. 1995) .............................................................................................21

*Stoyas v. Toshiba Corp.*,
424 F. Supp. 3d 821 (C.D. Cal. 2020) ...........................................................................................22

*Swanson v. Interface, Inc.*,
2022 WL 2003990 (E.D.N.Y. June 6, 2022) .................................................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).............................................................................................................7, 15, 16

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ...............................................................................19

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966)......................................................................................................................21

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) .............................................................................................9

*Zelman v. JDS Uniphase Corp.*,
376 F. Supp. 2d 956 (N.D. Cal. 2005) ...........................................................................................17

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b) ..............................................................................................................1, 7, 8, 14, 19
   §78t(a) ................................................................................................................................1

28 U.S.C.
   §1367(a) ..........................................................................................................................20
   §1367(c)(2) ......................................................................................................................21
   §1367(c)(3) ......................................................................................................................21
   §1367(c)(4) .................................................................................................................21, 22

Federal Rules of Civil Procedure
   Rule 44.1 .........................................................................................................................22

17 C.F.R.
   §240.10b-5 .........................................................................................................................7

4922-4099-6622.v2

## I.    INTRODUCTION

This securities fraud action brought under §§10(b) and 20(a) of the Exchange Act and Section 90A of the FSMA involves the deceptive concealment of the damaging relationship between Barclays' CEO, Jes Staley, and the notorious sex offender, Jeffrey Epstein.[1]  This Memorandum responds to the motion to dismiss brought by Defendants Barclays PLC and Nigel Higgins (together, "the Barclays Defendants").  ECF 58 (herein, "Motion" or "Mtn.").

As the Class Period commenced, public attention focused on Epstein's business and political associates, including Staley, after Epstein was arrested and committed suicide while facing federal charges of sex trafficking.  To distance Barclays and its CEO from the scandal, Defendants insisted publicly and in private correspondence to the FCA that Staley's relationship with Epstein was purely "professional."  Facing an investigation into the propriety of Staley's connections to Epstein and his suitability to lead Barclays brought by the FCA, Barclays' financial regulator in the U.K., the Barclays Defendants continued to publicly stand by Staley, affirming his "transparency" about his relationship with Epstein, assuring investors of their "full confidence" in him, and affirming that Defendants had cooperated with the FCA in its investigation.

The truth was, however, that Epstein and Staley considered each other "family," sharing what they called a "profound" and "most cherished" friendship.  The Barclays Defendants knew but concealed these facts, as they had received a cache of 1,200 emails between the two men after the FCA summoned Higgins to explain the difference between the content in the emails and Barclays' letter to the FCA affirming that the men "did not have a close relationship."  Despite knowledge of the emails' content, the Barclays Defendants continued to publicly voice support for Staley – concealing what they knew even after Staley left the Company.

---

[1]    Unless otherwise specified, capitalized terms shall have the meaning as defined in the Amended Class Action Complaint for Violations of the Securities Laws of the United States and the United Kingdom ("Complaint").  Unless otherwise noted, paragraph references ("¶__" or "¶¶__") are to the Complaint.  Emphasis is added and citations are omitted throughout unless otherwise indicated.

- 1 -

4922-4099-6622.v2

When the FCA published the conclusion of its investigation into Staley's relationship with Epstein, including that Staley had "***recklessly misled*** the FCA and acted with a lack of integrity," the price of Barclays' Securities fell immediately with this disclosure.

The Barclays Defendants' Motion ignores almost entirely (but does not deny) that their statements publicly emphasizing Staley's "professional" relationship with Epstein were contradicted by what they knew from the emails – namely, that the men shared a "deep" friendship. Instead, they assert their assurances of Staley's "transparen[cy]" and the Board's "confidence" were merely inactionable opinions. But even if they were opinions, Barclays concealed the "***facts***" underlying them, establishing material falsity. And while Defendants' attempt to assert that the truth of Defendants' concealment of the real nature of Staley and Epstein's relationship from the FCA was known to the market before the final FCA Decision, such an argument "is not available" on a motion to dismiss because it is "intensely fact-specific."

Likewise, the Motion all but fails to contend with the strong inference of scienter the Complaint alleges. In fact, ***no Defendant challenges the inference of scienter raised as to Staley***. The Barclays Defendants merely claim – wrongly – that his inference cannot be imputed to Barclays, even while the Barclays Defendants continued to affirm their "full confidence" in him. Higgins' scienter is likewise in no doubt, as the Board's review of the email cache and involvement in the FCA inquiry confirms knowledge of the concealed facts, easily establishing that the Complaint alleges a strong inference of their scienter.

Having alleged loss causation upon the disclosure of the final FCA Decision, the allegations comport with Ninth Circuit precedent, and all the Barclays Defendants can do is quibble that the price drop in Barclays ADRs was not large enough. This is hardly dispositive, and thus the Complaint states a securities fraud claim under the Exchange Act.

Finally, the Court should exercise supplemental jurisdiction to adjudicate the overlapping FSMA claim of dishonest delay. The Complaint specifically alleges that Barclays dishonestly delayed publishing information regarding its knowledge that Staley has failed to provide accurate information to the FCA regarding his relationship with Epstein.

- 2 -

4922-4099-6622.v2

The detailed facts alleged in the Complaint exceed the PSLRA's heightened pleading standard. Defendants' quarrel with whether the truth was already known to investors is belied by the detail and impact of the corrective disclosures and in any event must wait for discovery and trial. The motion must therefore be denied.

## II.    STATEMENT OF FACTS

On December 1, 2015, Staley became Barclays' CEO and Executive Director. ¶11. Over the next four years, Staley's investment banking strategy appeared to return higher profits for Barclays. ¶12. But in July 2019, Staley's long-time friend and former client, Epstein, was arrested on federal charges for the sex trafficking of teenage girls. ¶13. Epstein's arrest and subsequent suicide provoked media buzz about his associations with the rich and famous. ¶14. Engulfed in this attention was Staley, who met Epstein while Staley ran the private bank at JPMorgan. ¶¶14-15. When *The New York Times* ran an article about Epstein's Wall Street contacts, including Staley, Barclays initiated a public campaign to conceal the true, personal nature of Staley's relationship with Epstein. ¶¶15, 52. Barclays stated: "'Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally.'" ¶53.

Yet Barclays' response failed to disclose that Staley and Epstein shared a "deep" friendship and vacationed together in the U.S. Virgin Islands immediately before his appointment as Barclays CEO. ¶56(c). In fact, Staley had called on Epstein for professional advice on various aspects involving his work at JPMorgan, including his pay, speeches, and internal JPMorgan business strategy. ¶56(a). In exchange, Staley protected Epstein when JPMorgan executives wanted to oust him because he was "a known child sleaze." ¶56(a)-(b).

As press coverage connected Staley and Epstein, the U.K.'s FCA, charged with regulating financial services firms and financial markets, contacted Higgins and requested in writing how the Board "'had satisfied themselves there was no impropriety to the relationship'" between Staley and Epstein. ¶¶19, 58, 60. The purpose of the FCA's inquiry (which was known to Barclays) was to seek "assurance that Barclays had discharged its regulatory obligations to ensure it understood and had properly managed the risks to which it was exposed." ¶60.

- 3 -

4922-4099-6622.v2

Higgins and other Barclays executives drafted the letter, which Staley also revised and approved. ¶¶61-63. It stated that Staley "has confirmed to us that he did not have a close relationship with Mr Epstein" and his "last contact with Mr Epstein was well before he joined Barclays in 2015." ¶62. A few weeks later, however, U.S. investigators gave the FCA a cache of around 1,200 emails between Staley and Epstein. ¶64. The cache included emails such as Staley's affirmation to Epstein that he was "'my most cherished friend,'" that "'I owe you much. And I deeply appreciate our friendship. I have few so profound,'" and that "I count u as a deep friend.'" ¶67. The emails also made clear that the men communicated regularly, and that Staley had visited Epstein's island in the U.S. Virgin Islands, which was a hub for Epstein's alleged sex trafficking. *Id.* The cache also contained suggestive emails, including one exchange from July 2010 in which Staley wrote Epstein: "That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" to which Staley replied: "Beauty and the Beast." Epstein responded: "[W]ell one side is available." *Id.*

Concerned with the content of the emails, the FCA began an inquiry into whether Defendants had properly characterized the men's relationship in the October 8, 2019 letter. ¶64. In December 2019, U.K. regulators demanded that Higgins account for why the emails contradicted Barclays' letter to the FCA. ¶65. The Barclays Board then initiated an internal inquiry into whether Staley had been "sufficiently" transparent about his relationship with Epstein when he joined the bank in 2015 and again in 2019 after the FCA's August 2019 inquiry. ¶¶65-66. In January and February 2020, Barclays reviewed the email cache and hired a law firm to conduct an investigation. ¶66.

On February 13, 2020, Barclays announced that the Barclays Board retained "full confidence" in Staley. ¶69. In a press release titled "Director effectiveness assessment: disclosure of regulatory investigation," which was also incorporated into its 2019 Annual Report, Defendants claimed that Staley had "developed a ***professional*** relationship with Mr. Epstein," and that he had "been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein." *Id.* The Annual Report further affirmed that with regard to regulatory or governmental investigations and inquiries, Barclays was "cooperating with the relevant authorities

- 4 -

4922-4099-6622.v2

and keeping all relevant agencies briefed as appropriate." ¶70.  Staley reiterated that same day during an earnings call and to other news outlets in the days that followed that his relationship with Epstein was merely "professional" and that he had been "transparent" with Barclays about that relationship.  ¶¶71-75.

Barclays continued to publicly reaffirm its confidence in Staley.  On April 3, 2020, Barclays issued a Notice of Annual General Meeting for 2020, which included a letter signed by Higgins. ¶77.  In it, Higgins reaffirmed that "[t]he Board's governance processes were rigorously followed" and that "Jes retains the full confidence of the Board." *Id*.  With the issuance of the 2020 Annual Report on February 18, 2021, the Company referred to the prior year's Board decision regarding Staley, and stated those "conclusions remain unchanged." ¶78.

On November 1, 2021, after learning the FCA had reached preliminary conclusions in the investigation into Barclays' characterization of Staley's relationship with Epstein, Barclays announced Staley's departure from the Company.  ¶83.  Barclays emphasized, however, that the FCA made "no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr Staley." *Id*.

On February 23, 2022, Barclays issued its 2021 Annual Report, including an introductory letter from Higgins that praised Staley's leadership, under which "Barclays established a clear strategy, built up a secure capital base, improved its operational resilience and developed its business-leading franchises." ¶88.  Yet, the letter did not disclose what the Barclays Defendants knew about the true extent of Staley's relationship with Epstein or what Barclays and Staley concealed from the FCA.  Rather, Barclays reiterated in its 2021 Annual Report that it was cooperating with relevant authorities, including the FCA, in their investigations.  ¶89.

On November 24, 2022, plaintiff Jane Doe 1 filed a class action on behalf of herself and other alleged victims of Epstein's sex trafficking ("Doe Litigation").  ¶92.  She alleged that JP Morgan facilitated and benefitted from Epstein's sex-trafficking activities, and at the heart of this reciprocity was a "symbiotic" relationship between Staley and Epstein.  *Id*.  A month later, the Attorney General for the U.S. Virgin Islands filed a heavily redacted complaint against JPMorgan

- 5 -

claiming that the bank had participated in Epstein's sexual trafficking by providing banking services through which Epstein paid recruiters and victims ("USVI Litigation"). ¶93.

On February 15, 2023, while Barclays simultaneously reiterated in its 2022 Annual Report that it was continuing to cooperate with relevant authorities in their investigations, further portions of the complaint filed in the USVI Litigation were disclosed. ¶¶94-95. These unredacted portions contained excerpts of some of the 1,200 emails between Staley and Epstein from 2008 to 2012.

On March 8, 2023, in both the USVI Litigation and the Doe Litigation, JPMorgan filed a third-party complaint against Staley for indemnity, breach of fiduciary duty, and other claims. ¶97. These complaints alleged that Staley, when visiting Epstein's residences, had observed the trafficking and abuse for which Epstein was accused. *Id*. Responding to these new allegations, Higgins wrote in a Letter from the Group Chairman, included with Barclays' Notice of Annual General Meeting, insisting that Barclays' conclusion was "based on the information it had at the time" and that the recent allegations were "serious and new" to Barclays. ¶98.

In June 2023, JPMorgan settled the claims of over 150 alleged sex-trafficking victims for $290 million. ¶99. The same month, JPMorgan settled the USVI Litigation for $75 million. *Id*. The claims against Staley were also resolved confidentially. *Id*.

Then, on October 12, 2023, the FCA announced that it had decided to fine Staley £1.8 million and ban him from "holding a senior management or significant influence function in the financial services industry." ¶104. The FCA's announcement revealed that Staley "recklessly approved a letter sent by Barclays to the FCA, which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact." *Id*. It concluded that "in failing to correct the misleading statements in the letter, Mr Staley recklessly misled the FCA and acted with a lack of integrity." *Id*. Barclays issued a press release with the news on the same day and disclosed that given the FCA's findings, Staley was "ineligible for or [would] forfeit a number of awards" in compensation. ¶¶111-112. As a result of this news, the price of Barclays ADRs fell 4.99% while the price of Barclays ordinary shares fell 3.12%, economically damaging investors. ¶113.

- 6 -

## III.    LEGAL STANDARD

In assessing the sufficiency of the Complaint, the Court must "accept all factual allegations . . . as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007); *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (allegations of material fact are construed "'in the light most favorable to the nonmoving party'"). A complaint need only contain sufficient factual matter to state claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Ninth Circuit has repeatedly recognized that "'[w]hile the PSLRA "significantly altered pleading requirements in private securities fraud litigation," it did not impose an insurmountable standard.'" *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 947 (9th Cir. 2023); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).

## IV.    THE COMPLAINT STATES SECURITIES FRAUD CLAIMS UNDER THE EXCHANGE ACT

To state a claim under §10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

### A.    The Complaint Alleges Materially False and Misleading Statements

"In the securities fraud context, statements and omissions are actionably false or misleading if they 'directly contradict what the defendant knew at that time,' or 'create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018) ("Even if a statement is not false, it may be misleading if it omits material information."). Unlike scienter, which is considered under a "***strong inference*** standard of plausibility," falsity is only subject to "the ***reasonable inference*** standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (emphasis in original).

- 7 -

A fact is material under §10(b) "when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."'" *Matrixx*, 563 U.S. at 38.  Materiality questions are only appropriate for resolution as a matter of law "'if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021).

### 1.    Materially False and Misleading Statements Concerning the Nature of Staley and Epstein's Relationship

Repeatedly during the Class Period, the Barclays Defendants publicly insisted Staley's relationship with Epstein was merely "professional," even though, as Defendants knew, the men had shared an extremely close, personal relationship involving steady communications and visits to their homes.  ¶¶69, 72, 81.

For instance, when *The New York Times* published an article on July 22, 2019 reporting Staley visited Epstein while he was on house-arrest in Florida to cultivate business contacts with wealthy potential clients.  ¶52.  In response, Barclays claimed that Staley had "never engaged or paid" Epstein to advise him, provide him professional services, or for personal reasons.  ¶53.  In fact, as Staley and Barclays knew, Staley had repeatedly – over the course of years – turned to Epstein regarding business strategy and personal development.  ¶56.  And, as recompense, Staley gave Epstein protection while Staley was at JPMorgan to permit Epstein to continue banking there.  ¶56(b).  Then, to mitigate the impact of the news of the FCA investigation into Staley's relationship with Epstein, Barclays and Staley spun a public message creating the false impression of a distant, professional relationship between Barclays' CEO and Epstein.  ¶¶69-74.  On February 13, 2020, Barclays issued a press release, included in its Annual Report, emphasizing the "professional" relationship Staley had with Epstein and noting that contact between Staley and Epstein had ended once Staley became CEO.  ¶69.

These statements are classic "[h]alf-truths" that the Supreme Court recently affirmed are actionable misrepresentations "that state the truth only so far as it goes, while omitting critical qualifying information." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257,

- 8 -

4922-4099-6622.v2

263 (2024).  Having elected to speak about the quality of the relationship, Defendants were obligated to reveal their knowledge that (i) Staley had repeatedly sought Epstein's counsel on personal and professional matters; and (ii) the relationship was not merely professional, but was closely personal.  ¶¶56, 81.  To do otherwise does not make the statements "incomplete," but instead, "effectively denie[s]" that there was a personal relationship, making the statements misleading.  *Reese v. Malone*, 747 F.3d 557, 569-70 (9th Cir. 2014).[2]

Moreover, in the context of an ongoing investigation, Defendants' false reassurances of the professional nature of Staley's relationship with Epstein were material to the market's assessment of Barclays' risk and the ramifications such an investigation might bring Barclays.  ¶¶12, 76; *Reese*, 747 F.3d at 570 (materiality shown where subject of statement "was a key question raised in the media and government investigations"); *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014) (alleged misstatements found material in the context of "ever-increasing scrutiny" by the company's regulator).[3]  Withholding the true, personal nature of the relationship """"altered the "total mix" of information"""" made available to investors as they considered the FCA investigation's impact.  *Matrixx*, 563 U.S. at 38.

Defendants incorrectly contend that despite this false characterization, investors "had more than enough information at their disposal to make an informed judgment," *i.e.*, to see through the misrepresentations about Staley and Epstein's relationship.  Mtn. at 12-13.  "Though not labeled as such, Defendants appear to be asserting the 'truth-on-the-market' affirmative defense," which

---

[2]  Defendants' authority does not help them here. Mtn. at 11. In *Rok v. Identiv, Inc.*, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), the company "made no affirmative representations about expense reimbursements and internal controls," so they were not "obligated to disclose additional information about weaknesses in internal controls." *Id.* at *7. Here, by contrast, Defendants made "affirmative representations" that the Staley-Epstein relationship was "professional," rendering a duty to disclose the concealed information of their close friendship. In *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148 (D. Ariz. Feb. 16, 2017), the court found that needing to upgraded "key IT systems" was merely a problem that is "'the daily work of business people.'" *Id.* at *14. By contrast, here, there was nothing so mundane in concealing a close personal relationship with a known sex offender.

[3]  Defendants assert, citing *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019), that a pending investigation does not change the analysis. Mtn. at 13. The court found determinative that defendants were not aware of the conduct that was the subject of the investigation. *LendingClub*, 423 F. Supp. 3d at 806. Here, however, the Complaint clearly alleges that the Barclays Defendants were aware of the subject of the FCA's investigation. ¶¶60, 62, 64-66.

- 9 -

4922-4099-6622.v2

is not appropriate on a motion to dismiss. *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). Indeed, such an argument requires that Defendants show the information regarding the nature of Staley and Epstein's personal relationship and Barclays' knowledge thereof "was "'transmitted to the public with a ***degree of intensity and credibility*** sufficient to effectively counterbalance any misleading impression created by"'" Defendants' assurances that the relationship was "professional." *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996); *Amgen*, 544 F. Supp. 2d at 1025; *see also In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *10 (N.D. Cal. May 11, 2006).

### 2.    Materially False and Misleading Statement Concerning the Board's Internal Investigation and Conclusions

When Barclays disclosed that the FCA had launched an investigation into Staley's relationship with Epstein, Defendants rushed to reassure investors that the Board had "rigorously followed" its own governance processes to conclude that Staley had been "transparent" regarding that relationship, and that the Board retained "full confidence" in Staley. ¶¶69-74. But "'directly contradict[ing] what the defendant knew at that time,'" these assurances gave the market a materially misleading impression that the Board had seen nothing contradicting a conclusion that Staley's relationship with Epstein was purely professional and the risk that Staley knew of Epstein's illegal conduct was nil. *See Facebook*, 87 F.4th at 948.

In truth, by January 2020, the Barclays' Board already had at least 1,200 emails between Staley and Epstein that "cut against" Defendants' false assurances to the market. *Khoja*, 899 F.3d at 1009 (requiring "disclos[ure] [of] adverse information that cuts against the positive information"). Specifically, the emails between Staley and Epstein: (i) averred their "profound" and "deep" friendship; (ii) referred to each other as "family"; (iii) discussed visits to Epstein's residences, including to his island in the U.S. Virgin Islands; and (iv) exchanged suggestive messages that in one instance, referred to Disney characters, and in another attached "a picture of a young woman in a sexually suggestive pose." ¶81. Ignoring that the Board gave Staley its "full confidence" after reviewing these emails, the Barclays Defendants now question how the statement that the Board "rigorously followed" its processes could be misleading. Mtn. at 17. But reviewing

- 10 -

4922-4099-6622.v2

these emails and nevertheless concluding that Staley had been transparent about the "professional" nature of his relationship with Epstein does ***not*** invoke a "rigorous" process.  Similarly, the Barclays Defendants offer an implausible interpretation of the alleged misstatement that Staley "volunteered" to the Board an explanation of his relationship with Epstein.  Mtn. at 16.  They argue there was nothing misleading in Barclays' "word choice," yet, in truth, it furthered the misimpression that Staley was "transparent" and would have offered to disclose the information without the threat of an FCA investigation.  *Id.*  Thus, the Barclays Defendants' assurances when disclosing the FCA investigation creates an "'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Facebook*, 87 F.4th at 948.

The Barclays Defendants incorrectly suggest the statement regarding Staley's transparency is an inactionable opinion.  Mtn. at 13-14.  But even "opinions" may be false or misleading where: (i) both the "'the speaker did not hold the belief she profess[es]'" and the belief is objectively untrue; (ii) a fact contained within an opinion statement was untrue; or (iii) the statement is rendered misleading because the speaker omitted facts "'going to the basis'" of the opinion.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).  Even a sincerely held opinion is actionable if it omitted material facts about the issuer's inquiry into, or knowledge concerning, the opinion such that it does not fairly align with information a defendant possessed when it stated its opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 189 (2015).

Here, Defendants claim that the Board, having read Staley and Epstein's colorful emails, nevertheless "did not believe" Staley was not being transparent with Barclays since "[a]t most," the language contained in the emails are "banal expressions of flattery and gratitude."  Mtn. at 13. But Staley's writings to Epstein were plain (non-cryptic) expressions of ***personal*** adoration, for example, "I owe you much.  And I deeply appreciate our friendship.  I have few so profound," and "I can't tell you how much your friendship has meant to me. . . . To my most cherished friend." ¶81.  Thus, Defendants' misrepresentations omit facts that did not fairly align with the information it possessed "going to the basis" of such "opinions" *i.e.*, the 1,200 email cache that revealed the nature of Staley's relationship with Epstein.  *Omnicare*, 575 U.S. at 189, 194.

- 11 -

4922-4099-6622.v2

Finally, Barclays Defendants' contention that "Barclays was in the dark" about the true nature of Staley's relationship with Epstein is absurd. Mtn. at 14. The fact that the FCA decision explicitly focused on Staley's "recklessly misleading" response to its inquiry, does not negate the fact that the letter to the FCA was *from Barclays*. ¶¶4, 19-21, 29, 61-65. Moreover, the FCA's decision not to pursue an enforcement action against Barclays is not determinative of its liability here. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017), is instructive. There, the court rejected the argument that the dismissal of criminal charges against the CEO of the bank by a Brazilian court defeated the plaintiffs' claims, finding, "[a]lthough the Brazilian court's dismissal of the criminal charges against [the CEO] may be relevant at the evidentiary stage of this proceeding, the Court concludes that it has no impact at the pleading stage." *Id.* at 636-37. The same reasoning applies here.

### 3. Materially False and Misleading Statements Concerning Barclays' Cooperation with Regulators

The Barclays Defendants falsely represented that they were "cooperating with relevant authorities" in their investigation because, as they knew, Barclays had sent the FCA a letter that did not accurately disclose – and in fact, the FCA later found was *recklessly misleading* of – the true nature of Staley's relationship with Epstein. ¶¶70, 81(d), 89. The Barclays Defendants suggest they did cooperate with the investigation because they received the email cache from the FCA. Mtn. at 15-16. This makes little sense. Despite reading the email cache that contradicted the FCA's letter, the Barclays Defendants apparently rebuffed the very concerns instigating the FCA's summons of Higgins in December 2019 and nevertheless affirmed their support of Staley. ¶¶65-67, 69, 70.[4] Indeed, they never withdrew their statements affirming Barclays' cooperation in its regulators' investigations. ¶¶79, 89, 94. These repeated assurances of cooperation with regulators – without any qualification – created an "'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Facebook*, 87 F.4th at 948.

---

[4]   As explained in §IV.C.2, *infra,* Staley's knowledge while CEO that he had recklessly misled the FCA in not providing forthright disclosures concerning his personal relationship with Epstein is attributable to Defendants.

- 12 -

4922-4099-6622.v2

**4.   Materially False and Misleading Statements Concerning the FCA's Initial Findings**

Barclays limited its disclosure regarding the FCA's preliminary findings to state only that the FCA made "no findings that Mr Staley saw or was aware of, any of Mr Epstein's alleged crimes" and noted that this "was the central question underpinning Barclays' support for Mr Staley." ¶83.  This misleading half-truth states "'the truth only so far as it goes, while omitting critical qualifying information.'" *Macquarie*, 601 U.S. at 263.  The FCA's investigation was a broader inquiry than simply whether Staley had witnessed Epstein's alleged crimes. ¶91.  Rather, its purpose was to seek "assurance that Barclays had discharged its regulatory obligations to ensure it understood and had properly managed the risks" that its CEO had a close personal relationship with an accused sex trafficker. ¶91(a).  Indeed, Higgins asked the FCA whether the October 2019 letter should include Staley's "'role in the activities of Mr Epstein that have been under investigation,'" positing that the FCA was "'probably more worried about judgement than involvement in wrongdoing.'"  ¶91(c).  Barclays' statement in the context of prior assurances suggested that there were no further relevant facts about the relationship, although there were.

Similarly, in the March 24, 2023 letter signed by Higgins and included in Barclays' Notice of Annual General Meeting 2023, Higgins claimed that "[t]he Board's original review, conducted in February 2020, was based on the information it had at the time and representations made by Mr Staley."  But the information Higgins "had at the time" was in fact the very emails that were subsequently disclosed in the JPMorgan litigation.  Thus, the Barclays Defendants perpetuated the false impression that they were unaware of Staley's close, personal relationship.  *Facebook*, 87 F.4th at 948 (statements are actionably misleading if they "'create an impression of a state of affairs that differs in a material way from the one that actually exists'").

**5.   The Barclays Defendants' Truth-on-the-Market Defense Is Unavailable on the Motion to Dismiss**

Defendants' repeated assurances, investors understood Staley's relationship with Epstein was professional, that he had been transparent about it, and that Barclays was cooperating with its regulators in their investigations.  ¶¶69-74, 77, 89, 94.  This information was plainly material to

- 13 -

4922-4099-6622.v2

investors. *Basic v. Levinson*, 485 U.S. 224, 232 (1988); *Glazer*, 63 F.4th at 771 (defendants' repeated assurances affirmatively created an impression of a state of affairs).

Defendants contend that the information regarding the fact that Staley and Epstein had a relationship was "widely reported," and thus immaterial. Mtn. at 12. But nothing in these disclosures reveal that the Barclays Defendants had reviewed an email cache revealing the close, personal relationship between Staley and Epstein, or that, given their review, they were aware that their October 2019 letter to the FCA was misleading. Attempting to say these concealed facts were known, Defendants advance a "truth-on-the market" defense that simply "is not available" on a motion to dismiss. *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*6 (N.D. Cal. Aug. 7, 2020) (citing *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011) (materiality is a mixed question of law and fact, proof of which is a matter for trial), *aff'd*, 568 U.S. 455 (2013)); *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279, at \*11 (C.D. Cal. Feb. 14, 2012) (noting the "'intensely fact-specific'" nature of the truth-on-the-market defense means "'courts rarely dismiss a complaint on this basis'"). Even at summary judgment, defendants carry a very high burden to establish that the so-called truth was available in market with such volume and intensity that "'no rational jury could find' that the market was misled." *Miller*, 102 F.3d at 1493. Defendants here have not come close to meeting this burden.

**B.    Higgins Is a "Maker" of False and Misleading Statements**

Plaintiffs agree, as required by *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), that Higgins can only be primarily liable under §10(b) for statements he made, which requires he had "ultimate authority over" them. *Id.* at 142; *see* Mtn. at 18-19. Higgins made statements alleged in ¶¶69-70, 77-78, 83, 87-89, 94, and 98, because the statements are either signed or approved by, or attributed to Higgins, which suffices for him to be the maker. *Janus*, 564 U.S. 142-43; *S.E.C. v. Mercury Interactive, LLC*, 2011 WL 5871020, at \*2 (N.D. Cal. Nov. 22, 2011); *Ferris v. Wynn Resorts Ltd.*, 2021 WL 3216462, at \*13 (D. Nev. July 28, 2021); *Mandalevy*, 2021 WL 794275, at \*7; *see also* ¶¶50-51. Higgins took credit for the process resulting the false statement from the February 13, 2020 "Director effectiveness assessment" alleged in ¶69, saying "[a]s part of *our* Director effectiveness assessment process." ¶77. *See*

- 14 -

*Manalevy v. Bofi Holding, Inc.*, 2021 WL 794275, at *6-*7 (S.D. Cal. Mar. 2, 2021) (involvement in the process contributed to finding that defendant was the statement's maker).[5]

### C.   The Complaint Sufficiently Pleads a Strong Inference of Scienter

In addition to an "'intent to deceive, manipulate, or defraud,'" scienter under the Exchange Act encompasses "'deliberate recklessness,'" which is defined as "'an ***extreme*** departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so ***obvious*** that the actor must have been aware of it.'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (emphasis in original).  The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  Allegations of motive are not necessary.  *Id.* at 325.

Defendants tacitly concede that Staley acted with scienter, while otherwise only giving minimal attention to the element in their Motion.  *See* Mtn. at 19-21.  This only makes sense. Defendants' access to documentary evidence and contrary facts "corroborat[e] [Plaintiff's] allegations of what [the Barclays] Defendants knew." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005); *Reese*, 747 F.3d at 574 ("information directly contradicting [defendant's] statements, . . . which came to light through . . . government investigations [and] civil lawsuits," supports scienter inference).

### 1.   The Barclays Defendants Knew or Deliberately Regarded the Risk that Their Statements Were Misleading

The Barclays Defendants knew, or deliberately disregarded, that their statements relating to Staley's relationship with Epstein and the resulting FCA inquiry were materially false and misleading.  Scienter is adequately pled when an actor "'had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort.'" *Howard v. Everex*

---

[5]   Attribution of *The New York Times* statement (¶53) to Staley is "implicit from the circumstances because the statement[] directly responded to allegations" about him.  *Ferris*, 2021 WL 3216462, at *13.  Because the *Financial Times* (¶86) directly repeats a Barclays press release (¶83), Higgins can be considered its maker (¶¶50, 135).

- 15 -

*Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (alteration in original); *see Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at \*1 (9th Cir. Dec. 20, 2024) (same).

Because Higgins had access to a cache of emails indicating the longstanding, close, personal nature of Staley's relationship with Epstein, and the Barclays Board that he chaired conducted an internal inquiry, it is reasonable to infer he was aware of the emails' content, and was *at least* deliberately reckless in making false and misleading statements regarding the nature of Staley's relationship with Epstein and Barclays' compliance with the FCA investigation.[6] *See also* ¶¶47, 65-67; *Quality Sys.*, 865 F.3d at 1145 (particularized allegations that defendants had access to disputed information raise a strong inference of scienter); *Glazer*, 63 F.4th at 773-74 (same); *Alphabet*, 1 F.4th at 705-06 (same). Indeed, "access and review of contemporaneous reports are the most direct way to prove scienter." *NVIDIA*, 81 F.4th at 940.

The Barclays Defendants' argument that the emails were too "opaque" to support a strong inference of scienter flies in the face of the text of the documents themselves. Mtn. at 20. "In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). And opacity is no defense because if there was any question about an email's meaning, the Barclays Defendants could have asked Staley "'without extraordinary effort.'" *Howard*, 228 F.3d at 1064. The Barclays Defendants' scienter is pled.

### 2.    Staley's Knowledge Should Be Imputed to Barclays

Staley's scienter, which no Defendant contests, may be attributed to Barclays. *Alphabet*, 1 F.4th at 705. In the Ninth Circuit, "a corporation is responsible for a corporate officer's *fraud* committed 'within the scope of his employment' or '*for a misleading statement* made by an employee or other agent who has actual or apparent authority.'" *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 473-74, 476 (9th Cir. 2015). Not only did Barclays put Staley in a general

---

[6]    The Barclays Defendants do not dispute that Higgins' scienter may be imputed to Barclays. *See Alphabet*, 1 F.4th at 705.

- 16 -

position of trust and confidence, it specifically told investors they could rely on what Staley said about his relationship with Epstein. ¶69 ("Staley has been sufficiently transparent").[7] Thus, Staley's scienter should be imputed to Barclays because "third-party shareholders understandably relied on [Staley's] representations, which were made with the imprimatur of the corporation" that vouched for him on precisely the topic at issue. *ChinaCast*, 809 F.3d at 477-79.

Contrary to the Barclays Defendants' contentions that Staley's knowledge of his relationship with Epstein cannot be attributed to Barclays because it was obtained before the Class Period, is well-established in this Circuit and elsewhere that knowledge and actions from prior to the Class Period can inform the scienter inquiry. *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 970 (N.D. Cal. 2005) (crediting facts relating to scienter dating from before the class period); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1222-23 (S.D. Cal. 2010) (same and collecting cases). Likewise, because Plaintiffs are not pursuing claims against the Barclays Defendants for Staley's actions while employed at JPMorgan, Defendants' authority is irrelevant. Mtn. at 20-21; *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co., Ltd.*, 2009 WL 10692715, at *8 (N.D. Cal. Nov. 30, 2009) (defendant corporation could not be held liable for an employee's misappropriation of trade secrets, since the employee's misappropriation occurred while employed at another corporation).[8] Since Staley knew – informed by his own past actions and emails with Epstein – that his statements were false, his knowledge is attributable to Barclays.

### D.   The Complaint Adequately Alleges Loss Causation

A complaint adequately pleads loss causation by articulating the causal connection or relationship between the alleged misrepresentation and plaintiff's alleged economic loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "The burden of pleading loss causation is

---

[7]   Indeed, even after Staley's departure, Higgins praised Staley's "leadership" of Barclays. ¶88.

[8]   Barclays Defendants' citation to *In re WRT Sec. Litig.*, 1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) (Mtn. at 21), is equally inapposite because that case regarded whether an analyst employed by an underwriter could have his knowledge imputed to the underwriter when that knowledge was gained while he served as an "'ex officio advisor'" to the issuer. *WRT*, at *11. Such an issue is simply absent here.

- 17 -

4922-4099-6622.v2

typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016).  Pleading loss causation is "not meant to impose a great burden upon a plaintiff," but to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347; *see In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).

In the Ninth Circuit, the mere "announcement of an investigation does not 'reveal' fraudulent practices to the market" since "the market cannot possibly know what the investigation will ultimately reveal."  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *Lloyd*, 811 F.3d at 1209-10 (same).  By contrast, however, Ninth Circuit courts find loss causation is sufficiently pled when "an announcement contains an express disclosure of actual wrongdoing." *Loos*, 762 F.3d at 890 n.3; *Abadilla v. Precigen, Inc.*, 2022 WL 1750033, at *9-*10 (N.D. Cal. May 31, 2022) (disclosure of SEC order served to plausibly plead loss causation); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 983, 985 (N.D. Cal. 2015) (loss causation alleged where disclosure concerned completion of audit committee's review).

The Complaint alleges that the price of Barclays Securities fell upon the FCA's announcement that it had ***completed*** its investigation and concluded that Staley, while CEO of Barclays, had provided the FCA misleading information regarding his relationship with Epstein. ¶¶104, 113.  Because the FCA's announcement revealed that Barclays' CEO had violated FCA rules and misled Barclays' regulator (in the same way that it misled the investing public), and ***furthermore***, provided details concerning other Barclays executives' involvement in approving the misleading letter to the FCA, the stock price responded negatively on heavy volume, and Barclays' investors were damaged.  ¶¶30, 104, 110, 113.

Moreover, because the "drop in share price" for Barclays' Securities "occurred immediately" on the day the FCA announced its investigation's conclusions the Complaint "plausibly allege[s] that the market reacted" to the disclosure of Defendants' fraud.  ¶¶29-30, 104, 113; *Ansell v. Laiken*, 2011 WL 3274019, at *5 (N.D. Cal. Aug. 1, 2011); *Irving Firemen's Relief*

- 18 -

4922-4099-6622.v2

*& Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) ("'a disclosure followed by an immediate drop in stock price is more likely to have caused the decline'").  Defendants nevertheless find fault with the size of the price drop, raising a factual dispute that is improper at the pleading stage.  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  But "[t]here is no hard cutoff for what percentage drop constitutes a 'significant' drop for a stock price; instead, such determinations will 'vary depending on the average trading range for the particular stock.'"  *Daniels Family 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1237 (D. Nev. 2024).  And courts in this Circuit, and elsewhere, routinely find loss causation alleged for disclosures that cause less than a 10% stock price drop.  *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 931-35 (N.D. Cal. 2020) (loss causation alleged for stock price drops ranging between 2.5% and 9%); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (loss causation sufficiently pled on stock drops ranging between 2% and 8.59%); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *6, *14, *19 (C.D. Cal. Aug. 4, 2014) (stock drops of 2.3%, 2.1%, and 9.1% sufficiently alleged loss causation).[9]  Thus, as required by the Supreme Court, the Complaint gives Defendants "some indication of the loss and the causal connection that [Plaintiffs] [have] in mind."  *Dura*, 544 U.S. at 347.[10]

**E.    The Complaint Pleads Control-Person Liability**

Defendants' sole argument against the Complaint's §20(a) claim is that it failed to plead the underlying §10(b) claim.  Mtn. at 21.  But since the Complaint "establishes a primary violation, Defendants' argument . . . is unavailing." *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *14 (C.D. Cal. Apr. 12, 2016).

---

[9]    *See also In re Volkswagen AG Sec. Litig.*, 661 F. Supp. 3d 494, 536 (E.D. Va. 2023) (single-digit loss does not defeat loss causation); *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *3 (E.D.N.Y. June 6, 2022) (3.3% stock price drop is not fatal to plaintiff's case); *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421, at *6 (S.D. Fla. June 29, 2016) (loss causation found when stock price dropped 4.48%).

[10]    In contrast to the stock drop alleged here, in *Camp v. Qualcomm, Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020), cited by Defendants (Mtn. at 10), there was a "more plausible explanation" for the stock's negative reaction.  *See also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1065 (9th Cir. 2008) (finding a "more plausible reason for the resulting drop").  Neither the Complaint nor Defendants provide any alternative reason for the significant price decline in Barclays' Securities on October 12, 2023.

- 19 -

4922-4099-6622.v2

## V.  THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER FSMA

The Court should exercise supplemental jurisdiction over St. Louis Firemen's §90A claims under FSMA and reject Barclays' cursory efforts to dismiss those claims under the procedural doctrine of forum non conveniens and on their merits.[11]

### A.  The Court Should Exercise Supplemental Jurisdiction

It is black letter law that the Court "***shall*** have supplemental jurisdiction over all other claims" that "form part of the same case or controversy" as the claims over which the Court has original jurisdiction.  28 U.S.C. §1367(a).  Thus, there is no dispute that the Court has supplemental jurisdiction over the FSMA claim of dishonest delay since it is "so related to claims in the action" over which the Court has original jurisdiction (*i.e.*, the Exchange Act claims) that it "form[s] part of the same case or controversy under Article III."  *See id.*

"By use of the word 'shall,' the statute makes clear" that the Court may decline to assert supplemental jurisdiction "***only if*** one of the four categories specifically enumerated in section 1367(c) applies."  *Exec. Software N. Am., Inc. v. United States Dist. Court for Cen. Dist. of Cal.*, 24 F.3d 1545, 1555-56 (9th Cir. 1994), *overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008).  Barclays has offered no basis for the Court to "properly invoke[] a section 1367(c) category," and therefore the Court should assert supplemental jurisdiction.

***First,*** St. Louis Firemen's FSMA claim does not raise a "novel or complex issue" under Section 1367(c)(1).  In fact, Barclays recognizes that claims under the FSMA, in large part, overlap with the federal securities claims.  *See* Mtn. at 24; *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 107 (S.D.N.Y. 2022) (FSMA claim did not raise "a novel, unresolved issue"); *see also In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 358 (D.

---

[11]    Subsequent to the filing of the Complaint, the U.K. High Court issued *Allianz Funds Multi-Strategy and others v Barclays* [2024] EWHC 2710, declining to apply the theory of market reliance under Section 90A for false and misleading statements and omissions claims.  ¶¶122-125.  In light of this intervening authority, St. Louis Firemen, despite recognizing that the *Allianz* decision may be appealed or otherwise overturned, *see* Kramer Decl., ¶81 n.41, 133-135,[11] are only pursuing Section 90A liability against Barclays under a claim of dishonest delay.  *See* Section 90A, ¶5.

- 20 -

4922-4099-6622.v2

Conn. 2021) (speculation about what a foreign court might do in the future does "not introduce enough potential complexity to warrant declining jurisdiction"). Nothing about the dishonest delay claim is particularly complex since it overlaps with an omissions claim. Kramer Decl., ¶75. Nor has Barclays identified any specific issues that would be difficult for the Court to administer. Instead, it asserts that there have been hearings on a relatively small number of §90A claims. Mtn. at 22. However, the number of judicial decisions on a foreign law claim is not dispositive of whether it presents a "novel or complex issue" under §1367(c)(1). *Smith v. K-Mart Corp.*, 899 F. Supp. 503, 507 (E.D. Wash. 1995).

*Second,* Barclays has not shown that the FSMA claim substantially predominates over the Exchange Act claims. 28 U.S.C. §1367(c)(2). The mere fact that there may be more parties involved under FSMA does not make the exercise of supplemental jurisdiction inappropriate. As the Seventh Circuit explained in *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971 (7th Cir. 2011), "[a] simple disparity in numbers should not lead a court to the conclusion that a state claim 'substantially predominates,'" as "'predomination under section 1367 generally goes to the type of claim, not the number of parties involved.'" *Id.* at 980. Accordingly, the Court should reject the analysis in *In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *6 (C.D. Cal. July 7, 2011), which found substantial predominance of foreign securities claims based on number of purchasers of securities on a foreign exchange, rather than assessing the claim itself. Similarly, the amount of damages is not a determinative factor, as the Supreme Court ruled in its decision recognizing supplemental jurisdiction. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (the "comprehensiveness of the remedy sought," not its size, informed the predominance of non-federal claims). Barclays makes no suggestion that the remedy sought – *i.e.*, damages – is more "comprehensive" under FSMA than the Exchange Act.

*Third*, as explained herein, the Court should not dismiss the Exchange Act claims, and, accordingly, 28 U.S.C. §1367(c)(3) does not support declining supplemental jurisdiction here.

*Fourth*, the Court should reject Barclays' argument that *Toyota* stands for the proposition that comity is an exceptional circumstance requiring it to decline supplemental jurisdiction. Mtn. at 22-23; 28 U.S.C. §1367(c)(4). If Barclays' interpretation of *Toyota* is correct, supplemental

- 21 -

4922-4099-6622.v2

jurisdiction can never be exercised because all cases under §1367 involve a federal court hearing a case under the law of a different jurisdiction in a deviation from comity – the opposite of an exceptional circumstance required under §1367(c)(4). *See Exec. Software*, 24 F.3d at 1558 ("declining jurisdiction outside of subsection (c)(1)-3 should be the exception, rather than rule"). Not only is such a position antithetical to §1367, but it also disregards Fed. R. Civ. P. 44.1, which facilitates federal courts' determination of federal law. No other exceptional circumstance warrants declining supplemental jurisdiction here.[12]

Accordingly, no §1367(c) category provides a basis for the Court to decline its mandatory exercise of supplemental jurisdiction over St. Louis Firemen's FSMA claim.

### B. Forum Non Conveniens Does Not Justify Dismissal of the FSMA Claims

The Court should not dismiss St. Louis Firemen's FSMA claims under the common law doctrine of forum non conveniens, which is "'an ***exceptional tool to be employed sparingly***.'" *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011).

In this case, Barclays' invocation of forum non conveniens is self-defeating. It only moves to dismiss the FSMA claim on this ground, not the Exchange Act claims, which involve the same evidence and witnesses. If its arguments were accepted, this case would be bifurcated, imposing an additional burden on both parties, and require St. Louis Firemen to litigate their claims in an unchosen and foreign forum. *See Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 829 (C.D. Cal. 2020) (neither comity nor forum non conveniens compelled dismissal of plaintiffs' Japanese law claims).

Because St. Louis Firemen's choice of forum is "generally entitled to great deference," it should only "be 'disturbed' by a balance of private and public factors weighing '***strongly*** in favor' of the defendants." *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *6 (N.D. Cal. Aug. 7, 2018).

---

[12] Barclays' citation to *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) (Mtn. at 22-23), is inapposite because there, the question before the Supreme Court concerned the jurisdictional reach of U.S. securities laws, not the propriety of supplemental jurisdiction over foreign securities claims.

- 22 -

Barclays cannot meet that burden. *See DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 794 (5th Cir. 2007) (defendants bear the burden of proving forum non conveniens).

Of the "private" factors in the forum non conveniens analysis, Barclays only mentions the locations of witnesses and evidence and the availability of compulsory processes, Mtn. at 23-24; *see also Bos. Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1206-07 (9th Cir. 2009) (listing private factors). None satisfy Barclays' burden. The location of witnesses and evidence is not a major factor when the defendant is a major conglomerate like Barclays. *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 389 (S.D.N.Y. 2022); *see also MTC Elec. Techs. Co. v. Leung*, 869 F. Supp. 396, 401 (C.D. May 17, 1995). Nor does Barclays' claim about compulsory process weigh strongly in favor of dismissal since the United States and United Kingdom are both signatories to the Hague Convention and service can be effected that way to obtain the necessary evidence. *SEC v. Leslie*, 2009 WL 688836, at *3 (N.D. Cal. Mar. 16, 2009). Moreover, evidence to prove the FSMA claim involves activities in the United States, including the critical cache of emails produced by U.S. investigators. ¶64. With evidence and witnesses drawn from both countries, dismissal under forum non conveniens is unfounded.

Nor has Barclays shown any "public" factors support forum non conveniens. *Bos. Telecomms*, 588 F.3d at 1211 (listing public factors). "[T]he Court is certainly capable of applying English law, which shares so many strong similarities with U.S. law due to a common heritage." *In re BP P.L.C. Sec. Litig.*, 2013 WL 6383968, at *55 (S.D. Tex. Dec. 5, 2013). Indeed, one court declined to dismiss an FSMA claim on grounds of forum non conveniens, finding that the FSMA claim "would turn on evidence that complements the Exchange Act claims." *City of Sterling Heights*, 587 F. Supp. 3d at 107. Moreover, given the claims involve activities of an American (Staley), there is interest in a U.S. court adjudicating the claims. Since the Court is already adjudicating the Exchange Act claim, adjudicating the FSMA claim does not add congestion in the court. Nor has Barclays identified any increased burden on local courts and juries. Thus, Barclays has not met its burden to satisfy dismissal under forum non conveniens.

- 23 -

4922-4099-6622.v2

**C.      The Complaint States a Claim of Dishonest Delay Under the FSMA**

The Complaint sufficiently states a claim of dishonest delay under §90A of the FSMA against Barclays. Dishonest delay requires pleading that a person discharging managerial responsibilities ("PDMR") within the issuer acted dishonestly in delaying publication of information by "recognised means." FSMA, §90A; *see also* Kramer Decl., ¶74; Moore Decl., ¶30.[13] The dishonest delay provision offers broad protection and is intended to protect investors in the event that an issuer publishes an accurate statement, but one that should have been disclosed earlier. Kramer Decl., ¶76.

Here, the Complaint alleges that Staley and Higgins were Barclays CEO and Chairman of the Board, respectively, and thus were PDMRs within Barclays. ¶¶7-11, 46-51; Kramer Decl., ¶¶88-104. No Defendant disputes that fact. Mtn. at 24-25; *see generally* ECF 56. The Complaint further alleges that Staley and Higgins directed and approved (and in the case of Staley, was personally consulted on) Barclays' October 2019 response to the FCA's private inquiry into Staley's relationship with Epstein. ¶¶60-67. By the time Barclays publicly disclosed the FCA's investigation on February 13, 2020, both Staley and Higgins understood that the response to the FCA was inaccurate and misleading: Staley, as the investigation's main subject, was the co-author of the emails raising the FCA's concerns, while Higgins had reviewed the email cache that spurred the FCA's investigation. ¶¶64-67. Nevertheless, Staley and Higgins dishonestly delayed publishing information regarding the failure to accurately disclose Staley's personal relationship with Epstein to the FCA. ¶¶2, 81, 91, 101-102, 153, 154, 157-159. As a result, St. Louis Firemen and similarly situated investors suffered loss when the true information was disclosed. ¶¶103-114, 161.

Because dishonest delay does not require any showing of reliance, as Barclays' expert agrees, Barclays' reliance argument is irrelevant and no basis for dismissal. Moore Decl., ¶94; Mtn. at 24-25; *see also* Kramer Decl., ¶77. And although Barclays argues that claims under §90A must be based on information published by "recognised means," Mtn. at 25, this point does not

---

[13]   "Moore Decl." refers to the Declaration of Martin Moore K.C. (ECF 58-1).

- 24 -

require dismissal because, again, Barclays **delayed** publication of the truth that Staley, when serving as its CEO, recklessly misled the FCA.  In any case, as Barclays' expert admits, "[t]en of the seventeen statements relied upon were undoubtedly published by recognised means."  Moore Decl., ¶10(a).

In a footnote, Barclays incorrectly posits that there must be a "legal obligation to publish information," though the statute itself does not specifically so provide.  Mtn. at 24 n.19; FSMA Sch.10A, para. 2/ Sch. 10.  In fact, "the delay claim can apply to information for which there is no requirement to publish," and thus "there is no need to identify an obligation to disclose the information" to plead a dishonest delay claim.  Kramer Decl., ¶78.

Finally, Barclays suggests that to state a dishonest delay claim, the Complaint must allege that the information was published.  Mtn. at 24 n.19.  It does so.  *See* Kramer Decl., ¶84.  Specifically, Barclays issued a press release acknowledging that Staley, while CEO, had acted recklessly and in violation of FCA rules of conduct and alerting readers to the availability of the final FCA Decision.  ¶¶111-112; *see also* FSMA Sch. 10A(2)(1)(b).  Therefore, the Court should sustain St. Louis Firemen's dishonest delay claim under FSMA §90A.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny in its entirety the Barclays Defendants' Motion.  Should the Court decide to dismiss the Complaint in whole or in part, Plaintiffs request leave to amend.  *See Dawod v. Garland*, 2023 WL 8168832, at *5 (C.D. Cal. Oct. 12, 2023).

DATED:  January 17, 2025             Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL A. TRONCOSO
DANIELLE S. MYERS
ASHLEY M. PRICE

                                    s/ Ashley M. Price
                                    ASHLEY M. PRICE

- 25 -

4922-4099-6622.v2

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JACOB G. GELMAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jgelman@rgrdlaw.com

Lead Counsel for Lead Plaintiff

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief is prepared in Times New Roman font with text no less than twelve (12) point font (with footnotes no less than ten (10) point font) and is 25 pages, which complies with the limits set in Section VIII.C of the Court's Civil Standing Order published as of May 3, 2024, which is the current version available on the Court's website.

DATED:  January 17, 2025

s/ Ashley M. Price
ASHLEY M. PRICE

- 26 -

4922-4099-6622.v2