**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | | |
|---|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | CASE NO.: 2:23-cv-09217-MEMF-KS |
| Plaintiffs, | ) ) | **DECLARATION OF ADAM KRAMER K.C.** |
| v. | ) ) | |
| BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS, | ) ) | |
| Defendants. | ) ) | |
| | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| _____ | ) | |

## I.    **Introduction**

1. I am a barrister practising from 3 Verulam Buildings, one of the leading commercial set of barristers chambers in London, England. I was called to the Bar in 2004, after a few years lecturing law at the Universities of Durham and Oxford, and appointed Queen's Counsel (now King's Counsel) in 2021.

2. I have a broad commercial practice and am ranked in the main chambers directories in a wide variety of areas: Commercial Litigation, Banking and Finance, Group Litigation, Civil Fraud, Insurance and Reinsurance, Energy and Natural Resources, and Insolvency. Annex 1 of this Declaration contains a true copy of my profile from the 3 Verulam Buildings website, together with my profile from two leading directories, Chambers & Partners and Legal 500.

3. My main specialisms in recent years are securities claims, other group litigation, insurance disputes, banking and fraud disputes, and damages issues (I am the author of leading practitioner textbook *The Law of Contract Damages*, published by Bloomsbury and now in its 3rd edition).

4. As part of my practice, I have significant experience of securities litigation cases under s.90 and s.90A of the Financial Services and Markets Act 2000 ("**FSMA**"), have worked as counsel on several of the leading authorities in the area, and am currently instructed on a number of live claims in the English courts.[1] I am therefore very familiar with claims under s.90A of FSMA and the law relating to them.

5. I have been asked by Robbins Geller Rudman & Dowd LLP, attorneys for the Plaintiffs, to provide a Declaration on aspects of claims under s.90A brought in an Amended Class Action Complaint against Barclays plc ("**Barclays**"), its former Chief Executive Officer, James Staley, and its Chairman, Nigel Higgins, (the "**Defendants**") on 12 August 2024 (the "**Complaint**"). This Declaration is given in support of Plaintiffs' opposition to the Defendants' Motion to Dismiss the Complaint dated 30 October 2024 (the "**Motion**"), and the Declaration provided by Martin Moore KC on 30 October 2024 at the invitation of

---

[1] Current claims: the *Glencore* s.90 and s.90A claim (set down for its first stage trial in 2026), and two confidential s.90A claims. Historic claims include the second round of s.90A *Tesco* claims, and the *Royal Bank of Scotland's* s.90 claim.

Skadden, Arps, Slate, Meagher & Flom LLP, the attorneys for the Defendants (the "**Moore Declaration**").

6.  In preparing this Declaration, I have had the benefit of reading the Moore Declaration, the Complaint and the Motion, as well as certain Barclays public documents which I cite herein. For convenience, I broadly follow the structure of the Moore Declaration.

7.  As I explain below, I understand from the Complaint that one of the claims brought is an English law claim under s.90A. Pursuant to the Motion, the Defendants have sought dismissal of that claim (together with other US law claims). I understand the purpose of this Declaration is to set out the relevant English law aspects of claims under s.90A. Like Mr Moore, I make this Declaration on the basis that, as would be the case in English proceedings, my duty is to the court and not to the parties who have appointed me to give the Declaration.

8.  In my securities litigation practice, I have acted for claimants in claims under s.90 and s.90A against several publicly listed companies, including the Royal Bank of Scotland, Glencore and Tesco. The claims by various shareholders against Glencore are currently ongoing before the English High Court and an application to strike out indirect/market reliance s.90A claims and dishonest delay s.90A claims, including those of my client, has recently been filed. I have not had to argue those points in court yet but may have to do so in the near future.

9.  I have represented Barclays in the English courts in several non-securities-related banking disputes in the past. I do not otherwise have a relationship with the law firms or parties in this litigation (or with Mr Moore).

## II.    Summary of opinions and conclusions

10.  As requested by Robbins Geller, I have focused my analysis on the matters addressed in the Motion, the Moore Declaration and the framework of s.90 and s.90A of the **FSMA**.

11.  As to the legal requirements of the s.90A claim, the para.3 omissions claim does require there to be an obligation to disclose and the para.5 delay claim likely also does, and such an obligation is usually found in the Disclosure and Transparency Rules/Market Abuse Regulation obligation to disclose inside information as soon as possible, considered at

paragraphs 61 to 72 below. Similarly, at least on the current state of English law, para.5 likely does require an ultimate corrective disclosure to be published for a delay claim to be brought, although I understand such corrective disclosures to form part of the Complaint here, so that cannot be a ground of the Defendants' attack on the Complaint. This is considered at paragraphs 80 to 85 below.

12. As to the two particular aspects of s.90A law relied upon in the Motion at pages 24-25:

    12.1.     There is no requirement of reliance at all for a para.5 dishonest delay claim. (The Motion does not dispute this point.) See paragraphs 107 to 108 below.

    12.2.     The summary of the reliance requirement in para.3 statement and omissions claims is overstated or incomplete. The current state of English law is that there is a requirement that the claimant at least have read the published information, although the law is developing and some types of indirect reliance, and perhaps even fraud on the market/price reliance, will also suffice at least for omissions claims. See paragraphs 109 to 137 below.

    12.3.     I agree that s.90A claims only apply to publications made by recognised means (or announced by recognised means). See paragraphs 42 to 47 below.

13. Finally, I do not address questions of whether matters have been pleaded with sufficient particularity, that being a matter of US law and practice. See paragraphs 73 and 86 to 89 below.

## III.    The Complaint and the Motion

14. I set out in summary my understanding of the Complaint and the Motion insofar as they relate to the claim under s.90A. I do so only to frame my opinion on the scope of s.90A.

### A.    The Complaint

15. There are three claims in the Complaint. The first two are US law claims under the Securities Exchange Act of 1934 and Rule 10b-5 promulgated by the US Securities and Exchange Commission. Those claims are not relevant to this Declaration and I do not

discuss them. The third claim (Count III beginning at [151] of the Complaint) is an action brought by one of the plaintiffs, the Firemen's Retirement System of St Louis ("**the St Louis Firemen**") and associated class[2] under s.90A and Schedule 10A of the English FSMA law in relation to ordinary Barclays shares traded on the London Stock Exchange ("**LSE**") purchased and held by investors in the period 22 July 2019 to 12 October 2023 (the "**Relevant Period**" and the "**s.90A Claim**").

16. Pursuant to the s.90A Claim, the St Louis Firemen allege that during the Relevant Period, Barclays made untrue or misleading representations in, and omissions from, its published information, and dishonestly delayed publishing information, contrary to s.90A and Sch.10A. It is alleged that the relevant wrongful conduct was carried out within Barclays under the supervision of its former CEO, Mr Staley, and Chairman of the Board of Directors, Mr Higgins, both of whom were *de jure* directors in Barclays.

17. The misrepresentations, omissions and dishonest delay relate to information about the personal relationship between Mr Staley and convicted sex offender Jeffrey Epstein. The St Louis Firemen allege that Barclays made materially untrue or misleading statements as to the extent and nature of Mr Staley's relationship with Mr Epstein despite an internal review at Barclays which revealed a close personal relationship. The St Louis Firemen allege further that Barclays, under the direction of Mr Staley and Mr Higgins, had misled the public and the UK Financial Conduct Authority ("**FCA**") about this relationship and continued to do so after Mr Staley's departure from Barclays.

18. Alleged misrepresentations followed a New York Times article on 22 July 2019 identifying ties between Mr Staley and Mr Epstein, and a subsequent request from the FCA to the Barclays Board of Directors on 15 August 2019, seeking confirmation that the Board had satisfied itself that there was no impropriety in the relationship between Mr Staley and Mr Epstein. On 8 October 2019, Barclays sent a letter informing the FCA that Mr Staley had confirmed he did not have a close relationship with Mr Epstein and his last contact with him was well before Mr Staley joined Barclays in 2015. Meanwhile, US investigators had obtained a cache of 1,200 emails which they forwarded to the FCA. Those emails appeared

---

[2] The s.90A Claim is also said to be brought by all members of "the Class", which is defined in the Complaint as "*all persons or entities who purchased or otherwise acquired on the LSE or continued to hold Barclays ordinary shares during the Class Period*".

to contradict the evidence given by Barclays to the FCA regarding the limited extent and solely professional nature of Mr Staley's relationship with Mr Epstein.

19. On 13 February 2020, Barclays disclosed that the FCA was conducting an investigation into Mr Staley's relationship with Mr Epstein. Barclays announced in its 2019 Annual Report that it retained full confidence in Mr Staley and that he had been transparent with Barclays about the nature and extent of his relationship with Mr Epstein. Accordingly, the Barclays Board recommended unanimously that Mr Staley be re-elected as CEO at the 2020 Annual General Meeting ("**the AGM**").

20. On 29 October 2021, the FCA privately informed Mr Staley and the Barclays Board of Directors about its preliminary findings regarding the relationship between Mr Staley and Mr Epstein. Subsequently on 1 November 2021, Barclays announced that Mr Staley would step down as CEO of Barclays with immediate effect. It is alleged by the St Louis Firemen that, following Mr Staley's departure, Barclays continued to seek to downplay the relationship between Mr Staley and Mr Epstein.

21. On 12 October 2023, the FCA announced in a Decision Notice its conclusions following its investigation. The FCA concluded that the 8 October 2019 letter sent by Barclays to the FCA contained two misleading statements as to the nature of Mr Staley's relationship with Mr Epstein and the point of their last contact, and Mr Staley had acted recklessly when approving that letter. Accordingly, the FCA fined Mr Staley £1.8 million and banned him from holding a senior management or significant influence function in the financial services industry. Barclays issued a press release that day announcing the FCA's findings and its decision that Mr Staley should be ineligible for or forfeit £17.8m of remuneration otherwise potentially due or payable to him.

22. The 12 October 2023 press release issued by Barclays and referring to the FCA's Decision Notice is relied on as the "corrective disclosure" date on which the truth was (at least substantially) published and the share price dropped, causing (it is said) loss to the plaintiffs.

23. The St Louis Firemen alleged that each of various statements made by Barclays concerning Mr Staley's relationship with Mr Epstein, including Barclays' decision publicly to support Staley following its internal investigation, Barclays' cooperation with the FCA's investigation and its characterisation of the FCA's preliminary conclusions was materially

false and misleading, giving rise to a claim under s.90A. Further, the St Louis Firemen alleged that the omissions from Barclays' published information regarding the relationship between Mr Staley and Mr Epstein, and dishonest delay in publication of the same, also provide bases for a claim under s.90A.

24. For the purposes of the English law claim, it is said that the plaintiffs made a decision to acquire shares in the market at the inflated price at which they were in fact acquired, and had they known the truth, they would not have purchased the shares or not at the price paid (Complaint [160]-[161] and [122]-[125]).

**B.      The Motion**

25. By the Motion, Barclays invites the District Court to dismiss the s.90A Claim. That motion is brought on the following grounds:

25.1.      First, Barclays invites the Court not to exercise its jurisdiction over the s.90A Claim as a matter of US law.

25.2.      Second, in reliance on the Moore Declaration, Barclays alleges that the s.90A Claim is untenable because the Complaint does not plead with sufficient particularity that Barclays made untrue or misleading statements, or omitted material from published information, or that the St Louis Firemen suffered loss as a result of the alleged misstatements.

25.3.      Third, in reliance on the Moore Declaration, Barclays alleges that the St Louis Firemen do not satisfy the reliance requirements for claims under s.90A/Sch.10A, including because of its allegation that it transacted in Barclays shares based on "*automated*" decisions. I note here that the primary ground pursued in the Motion at pages 24-25 as to the Complaint not being able to satisfy the causes of action even if proven is an attack on the Complaint's failure to satisfy the legal requirements for reliance, but there is no reliance requirement for dishonest delay claims under para.5 (as Mr Moore agrees): see further below at paragraphs 107 to 108. Accordingly, none of these reliance arguments could apply to St Louis Firemen's dishonest delay claim.

25.4.    Fourth, again in reliance on the Moore Declaration, Barclays alleges that the St Louis Firemen are not able to base any claims on statements not published by "*recognised means*".

25.5.    Fifth, the only mention of dishonest delay in the Motion appears at 24 n.19, which quotes Mr Moore at his [63] for the proposition that plaintiff has failed to plead "*any identified legal obligation to publish information within a particular timeframe, and a plea that the required information was not published until a later date*". The requirement of a legal obligation to publish is addressed further below at paragraphs 78 to 85, and the question of alleged pleading failures is addressed at paragraphs 73 and 86 to 89 below.

26. The question of whether to decline jurisdiction (the first ground) is a matter of US law for the District Court and I do not address it. The second to fourth grounds seeking dismissal of the Complaint potentially engage aspects of English law concerning claims under s.90A and are considered in this Declaration, although the second ground is essentially a matter of US pleading rules and of rules relating to motions to dismiss, which are outside my expertise and a matter for the Court, as I further explain below.

## IV.    The statutory regime

27. Section 90A sets out the regime for issuer liability for periodic published information. This was set out in s.90A until 1 October 2010, and has since been contained in Sch.10A, following the enactment of the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010.

## A.    The legal background to s.90A and Schedule 10A

28. Section 90A was originally enacted in November 2006 by s.1270 of the Companies Act 2006. Prior to that, and as Mr Moore notes at his [21], the rights of shareholders where there was misleading periodic reporting by an issuer (or omission of information) were extremely limited. Issuers owed no general duty of care to investors[3] and actions in fraud

---

[3] *Caparo v Dickman* [1990] 2 AC 605.

entailed the onerous requirement that the issuer intended particular claimants to rely on the relevant statements.[4]

29. In 2004 the EU Transparency Directive[5] (2004/109/EC) introduced a regime for the periodic disclosure of information by listed companies on EU regulated markets. The Directive's purpose was to harmonise across EU Member States (including at that time, the United Kingdom) national requirements of transparency in financial markets. Section 90A was introduced to achieve compliance with the UK's obligations to ensure that its "*liability rules*" applied to the issuer obligations created by the Directive. The government's view at the time was that a statutory regime was required to comply with the Directive.[6]

30. By October 2006 (prior to s.90A coming into force), the government had asked a leading company law academic, Professor Davies QC, to carry out a consultation and review of the regime, which resulted in the "**2007 Davies Review**" and "**2007 Davies Final Report**".[7] Professor Davies' work was largely adopted by the UK government and led to substantial modification of the issuer liability regime with the enactment of Sch.10A on 1 October 2010.

31. The key substantive amendments introduced under Sch.10A were extensions of liability to (i) cases where an investor 'continued to hold' or 'sold' securities, in addition to cases of acquiring securities, (ii) liability for dishonest delay, (iii) misstatements in and omissions from *ad hoc* disclosures, and (iv) all multilateral trading facilities. These extensions were counterbalanced by the requirement that claimants prove fraud (as opposed to negligence or strict liability), which was a policy decision identified by Professor Davies QC in the 2007 Davies Final Report in June 2007.[8] As Mr Moore notes at his [23], s.90A is retained

---

[4] *Various Investors v G4S* [2022] EWHC 1081 (Ch); [2022] Bus LR 566 at [63] per Miles J ("*G4S*"). See, also: 2007 Davies Review at [25] *et seq*.

[5] A directive is a legislative act of the EU that sets out a goal that EU Member States must achieve. It is a matter for the individual Member States to devise their own laws to fulfil the directive's aims. A directive is therefore implemented by an EU Member State's legislature passing domestic law to achieve the aims of the relevant directive.

[6] "*The Government concluded that, were it not to implement a statutory regime, there was a material risk that the courts would decide that Government had not implemented the Directive correctly*", HM Treasury, 'Extending the scope of the statutory damages regime for disclosures required under the Transparency Directive', 9 August 2006, at [11].

[7] *Davies Review of Issuer Liability: Liability for misstatements to the market: A discussion paper by Professor Paul Davies QC*, March 2007; *Davies Review of Issuer Liability: Final report by Professor Paul Davies QC*, June 2007.

[8] *Ibid*. page 5.

in FSMA, but in a form in which that provision simply cross-refers to the substantive provisions of the cause of action, which are contained in Sch.10A.

32. In 2020, further minor non-substantive amendments were made to bring the EU framework into English domestic law following the UK's departure from the EU.

### B.    Interpretation of the statutory scheme

33. The principles governing s.90A claims are derived from interpreting the statutory language with the assistance of the relevant cases in the area, drawing on external aids where appropriate, including (i) the relevant EU law background (i.e., the Transparency Directive), (ii) material produced in the domestic legislative process (such as the 2007 Davies Review and 2007 Davies Final Report), (iii) the explanatory memorandum to the 2010 Regulations, and (iv) case law on analogous claims, including prospectus liability claims under s.90 and common law tort of deceit claims.

34. The Courts have emphasised that s.90A should be construed purposively, which is to say "*consistently with the admitted objectives of both the domestic legislature and the Transparency Directive*".[9]

35. The purpose of introducing a legislative scheme under s.90A as a means of providing recourse to investors is also reflected in the authorities. As Hildyard J explained in *Tesco*: "*these provisions were intended also to ensure a proper statutory regime of investor remedies for false statements or omissions required by the Transparency Directive in order to give teeth to the disclosure regime it requires, and compensation for breach of its rules.*"[10]

36. There have been relatively few cases dealing directly with claims under s.90A, and only one judgment on that provision following a full trial: *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) ("*Autonomy*"), and that was in an atypical case, arising not from a claim by a purchaser of shares on a public market but rather a corporate acquisition after bilateral negotiations. In addition to *Tesco* and *G4S*, which dealt with discrete aspects of the statutory

---

[9] *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch) [2020] Bus LR 250 ("*Tesco*") at [84].
[10] *Ibid.* at [87].

regime[11], there are two other significant judgments: (i) *Allianz Global Investors GmbH v RSA Insurance Group Ltd* [2021] EWHC 2950 (Ch) ("***RSA***"), and (ii) *Allianz Funds Multi-Strategy Trust v Barclays Bank plc* [2024] EWHC 2710 (Ch) ("***Allianz***").[12]

## C.    The scheme of s.90A and Sch.10A

37. Section 90A ("Liability of issuers in connection with published information") provides:

> "Schedule 10A makes provision about the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of –
>
> > (a) a misleading statement or dishonest omission in certain published information relating to the securities, or
> >
> > (b) a dishonest delay in publishing such information."

38. The scheme of Schedule 10A first sets out the scope of s.90A claims by reference to applicable securities (para.1) and applicable published information (para.2). It then identifies bases for liability for (i) untrue or misleading statements in published information (para.3), (ii) dishonest omissions from published information (para.3), and (iii) dishonest delay of matters to be included in published information (para.5).[13]

## V.    Scope of claims under s.90A and Schedule 10A

## A.    Securities

39. Paragraph 1 of Sch.10A provides in relevant part:

> "(1) This Schedule applies to securities that are, with the consent of the issuer, admitted to trading on a securities market, where -
>
> > (a) the market is situated or operating in the United Kingdom, or

---

[11] In *Tesco*, the Defendant sought to strike out claims brought by those claimants who were beneficial owners of shares, but not registered shareholders. The High Court concluded that ultimate beneficial owners through a chain of custody did have an "interest in securities" for the purposes of para.8(3) of Sch.10A and the strike out application failed. In *G4S*, the Defendant sought to strike out claims brought in respect of persons discharging managerial responsibilities who were not registered directors of the Defendant. Miles J rejected the strike out application, holding that persons discharging managerial responsibilities included *de facto* and shadow directors, as well as *de jure* (or registered directors), and it would be a matter for trial to determine whether certain individuals were directors.

[12] In *RSA*, the High Court rejected an application by the defendant to strike out certain claims, which it alleged had been brought outside the six-year limitation period. In *Allianz*, the High Court struck out claims in respect of which reliance could not be established and struck out dishonest delay claims where no delayed publication has taken place.

[13] The remainder of schedule 10A provides certain definitions (paras.6 and 8) and excludes certain other liabilities (paras.4 and 7).

(b) the United Kingdom is the issuer's home State…"

40. Paragraph 8 of Sch.10A and s.417 together define "*securities*" and "*securities market*" by reference to the EU Markets in Financial Instruments Regulation. Following *Tesco*[14]*,* it is sufficient for a claimant to hold securities through an intermediated chain of custody, i.e. as an ultimate beneficial owner of shares, to establish an "*interest in securities*" under para.8(3) of Sch.10A.

41. The shares in the s.90A Claim are ordinary Barclays shares traded on the LSE and are securities for the purposes of para.1 of Sch.10A. It does not seem to be disputed that the St Louis Firemen have an "*interest in securities*".

## B.    Published information

42. Paragraph 2(1) of Sch.10A provides that:

> "This Schedule applies to information published by the issuer of securities to which this Schedule applies—
>
> (a) by recognised means, or
>
> (b) by other means where the availability of the information has been announced by the issuer by recognised means."

43. This includes annual and half yearly reports and other information published via a regulatory information service ("**RIS**"), such as the Regulatory News Service ("**RNS**") (used by Barclays), including *ad hoc* disclosures.

44. I generally agree with the analysis in [32] to [37] (section IV) of the Moore Declaration. Information which was published by Barclays through "*recognised means*", in particular via RIS/RNS, or information the availability of which was announced by those "*recognised means*", constitutes published information for the purposes of para.2(1) of Sch.10A.

45. Therefore, statements referred to (i) in newspapers (New York Times, Wall Street Journal, Financial Times and Mail on Sunday), (ii) in television interviews and (iii) on earnings calls, were not published by "*recognised means*". I accordingly agree with the Motion's

---

[14] At [86].

contention (at page 25) that the identified other publications (e.g. through newspapers) do not qualify.

46. Those sources of information would only be "*published information*" under the statute if the availability of that information had been announced by Barclays via RIS/RNS. In that situation, the published information is the newspaper article, television interview etc, not the RIS/RNS announcement. But I agree with [35] and [36(b)] of the Moore Declaration that if information is published by RIS/RNS and also by newspaper article etc, but the newspaper article is not announced by RIS/RNS, then the relevant published information is only the RIS/RNS publication and not the newspaper article.

47. Subject to confirmation whether certain information relied on by the St Louis Firemen (and identified in the Moore Declaration at [36(a)]) that was not published by RIS/RNS[15] was "*announced*" via RNS (and thereby constituted information published "*by other means*"), my view is that (at least) the statements relied on by the St Louis Firemen in paragraphs 69[16], 70[17], 77[18], 78[19], 79[20], 83[21], 88[22], 89[23], 94[24] and 98[25] of the Complaint (as identified in the Moore Declaration at [37]) were announced by "*recognised* means" and therefore constitute published information for the purposes of para.2(1) of Sch.10A.

## VI.    **Conduct attracting liability**

## A.    **Untrue or misleading statements**

48. Paragraph 3 of Sch.10A provides in relevant part:

> "(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who –

---

[15] Statements referred to in [53] (New York Times), [71] (earnings call), [72] (television interview), [74] (Evening Standard), [75] (Wall Street Journal), [86] (Financial Times) and [87] (Mail on Sunday) of the Complaint.
[16] 2019 Annual Report.
[17] *Ibid.*
[18] Notice of Annual General Meeting for 2020, announced via RNS.
[19] 2020 Annual Report (also announced via RNS).
[20] 2020 Annual Report.
[21] Press release dated 1 November 2021, published via RNS.
[22] 2021 Annual Report.
[23] *Ibid.*
[24] 2022 Annual Report.
[25] Notice of Annual General Meeting, announced via RNS.

(a) acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies,[26] and

(b) suffers loss in respect of the securities as a result of –

(i) any untrue or misleading statement in that published information

[…]

(2) The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading…"

49. The information contained in the statement must be shown to be "*untrue or misleading*". This is the objective test of interpretation applied in English law to statements and other communications, contracts and deeds. The issue for determination will be the meaning that would be ascribed to a statement (or series of statements) by the reasonable person with the characteristics of the actual representee and in the context that the actual representee received it.[27] The context here is public statements to the market by a global publicly traded bank.[28]

50. The words "*untrue or misleading*" are not used in the Transparency Directive. However, that expression is used in s.90 of FSMA, which concerns liability for untrue or misleading statements in prospectuses. In this regard, s.90(1)(b) is materially identical to Sch.10A, para.3(1)(b). Accordingly, the approach taken to the definition of "*untrue or misleading*" in s.90 claims should be the same as the approach taken by English courts in cases under s.90A or, at the very least, provide relevant guidance.

51. In general terms, I agree with the Moore Declaration at [40] to [44] (leaving aside the point on reliance in [41] which I cover later on), although make some elaborations below.

52. First, I agree that the English law will have regard to the cases on the common law torts of deceit (and indeed negligent misrepresentation). However, as explained in the leading practitioners' textbook on misrepresentation (by reference to s.90 claims), "["untrue or misleading statement"] *is not technical language so there is no reason here to imply any of*

---

[26] Subject to limited exceptions, acquisition and disposal of securities include acquisition and disposal of interests in securities and contracting to acquire or dispose of securities or of any interest in securities: para.8(3) of Sch.10A. This language is given a purposive interpretation to capture ordinary trading in intermediated securities: *Tesco* at [112]-[123].
[27] *Autonomy* at [461]-[462] and [506].
[28] See similarly *Autonomy* at [462].

*the common law rules as to the meaning of a "misrepresentation", such as restriction to statements of fact*" (and cannot be grounded on "mere puffs", statements of opinion and forecasts and statements of intention).[29] This is to be contrasted with the statutory scheme for misrepresentation under the Misrepresentation Act 1967 which does use the expression "misrepresentation" and is therefore taken to import those common law restrictions.[30] Caution is therefore needed there.

53. Second, while I broadly agree with the distinction Mr Moore makes between something being literally true, and yet still potentially misleading, it is important to add that the concept of truth and meaning in English law goes beyond what one might think 'literal' truth means. A statement in English law is interpreted objectively in light of context and including its implications (and implied statements), which the Moore Declaration [44(b)] rightly touches on (last two sentences). Meaning in English law is not merely a matter of taking 'dictionary' meaning or similar.[31] Ultimately this may not matter as it is not necessary to separate out 'true' from 'misleading' for the purposes of applying s.90A, and so the two can be taken compendiously.

54. Third, I would add that the common law cases have elaborated on how literally true statements may nevertheless be actionable by virtue of what they omitted, making them misleading. Per Lord Chelmsford in the House of Lords decision in *Oakes v Turquand* (1867) LR 2 HL 325 (342-343):

> "…it is said that everything that is stated in the prospectus is literally true, and so it is; but the objection to it is, not that it does not state the truth as far as it goes, but that it conceals most material facts with which the public ought to have been made acquainted, the very concealment of which gives to the truth which is told the character of falsehood."

55. A partial or incomplete truth in a company's published information can therefore be misleading and so actionable under s.90A.

56. Fourth, and relatedly, the prospectus liability cases show that untrue and misleading statements can work in combination to produce a misleading overall impression in the prospectus. In the common law claim decision of *Greenwood v Leather Shod Wheel*

---

[29] Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (6th ed, 2022) at [7-54].
[30] *Ibid*.
[31] See e.g. the Supreme Court's summary in *Wood v Capita Insurance Services Ltd* [2017] AC 1173 at [10] to [13].

*Company* [1990] 1 Ch 421 at p.434, the High Court held that the defendants "*took no care at all to see that the prospectus as a whole was not misleading… which it clearly was*".[32]

57. Similarly, in *Autonomy* in the s.90A context, Hildyard J recognised that "*statements (or omissions) may in combination create an impression which no single one imparts. In my view, if the overall impression thus created is false it may found a claim, if the other conditions of liability are also met*".[33] As I explain below, and contrary to the view expressed by Mr Moore, this approach to falsity is consistent with the reliance requirement, pursuant to which claimants need only demonstrate that they relied on published information as a whole.

58. Fifth, I agree with the Moore Declaration at [44(b)] that in English common law there is typically no liability for omissions. He is right that such liability can sometimes arise in cases of a relationship in which there is a duty to speak (e.g. *Conlon v Simms* [2008] 1 WLR 484 found a duty to disclose past misconduct when negotiating a partnership agreement) and there can be misstatement through conduct (as in *Gordon v Sellico*, which Mr Moore cites; also *DPP v Ray* [1974] AC 370 (HL) where merely sitting down to order a meal in a restaurant implied the statement that the customer intended to pay). But, of course, omissions liability is expressly provided for in s.90A (and s.90) and is considered below.

### B.    Omissions

59. Paragraph 3 of schedule 10A also relevantly provides:

> "(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who –
>
> (a) acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and
>
> (b) suffers loss in respect of the securities as a result of –
>
> […]
>
> (ii) the omission from that published information of any matter required to be included in it.
>
> […]

---

[32] See also: *Aarons Reefs v Twiss* [1896] AC 273, where it was held that "*one is entitled to look at the whole document and see what it means taken together*".
[33] At [506].

> (3) The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact…"

60. Omissions liability is one of the key aspects in which s.90A goes beyond the common law deceit and misrepresentation claims. Being a listed company falling within s.90A is enough (without any additional relationship to the claimant) to give rise to liability for omissions, in relation to matters "*required to be included*" in the information that was actually published. The Court recognised in *Autonomy* that the content of the published information, and what should be included, "*will often be governed by accounting standards, by the companies legislation and especially the Companies Act 2006, and by the Disclosure and Transparency Rules*".[34]

61. I therefore agree with the Moore Declaration at [52] to [54]. However, Mr Moore does not go on to consider the principal source of obligation to include matters in public information, which is the typical way in which s.90A omissions claims are brought.

62. From 1 July 2005 to 3 July 2016, prior to the Relevant Period, the Disclosure and Transparency Rules ("**DTR**") and FSMA gave effect to the Market Abuse Directive (Directive 2003/6/EC) with the introduction of DTR 2.2.1R and s.118C of FSMA.

63. From 3 July 2016, that regime was replaced following the introduction of the EU Market Abuse Regulation (Regulation No 596/2014/EU) ("**MAR**"),[35] which the Moore Declaration mentions in passing (at [54]). The provisions of MAR were in place throughout the Relevant Period and binding on Barclays.[36]

64. Article 17(1) of MAR[37] stipulates that:

> "1. An issuer shall inform the public as soon as possible of inside information which directly concerns that issuer. The issuer shall ensure that the inside information is made public in a manner which enables fast access and complete, correct and timely assessment of the information by the public".

---

[34] At [463].
[35] A regulation is a binding EU legislative act, which, unlike EU directives, applies directly at the national level without EU Member States having to pass national legislation to adopt the relevant measures.
[36] MAR was incorporated into UK law on 31 December 2020 by the European Union (Withdrawal) Act 2018, following the UK's exit from the EU.
[37] This provision is in materially the same form as former DTR 2.2.1R.

65. Accordingly, Article 17(1) provides for a particular time when inside information must be disclosed, namely as soon as possible after the information becomes true). That is subject to Article 17(4) of MAR[38], which provides in relevant part that:

> "4. An issuer… may, on its own responsibility, delay disclosure to the public of inside information provided that all of the following conditions are met:
>
> > (a) immediate disclosure is likely to prejudice the legitimate interests of the issuer…;
> >
> > (b) delay of disclosure is not likely to mislead the public;
> >
> > (c) the issuer… is able to ensure confidentiality of that information".

66. The definition of "*inside information*" is set out in article 7 of MAR[39], which provides in relevant part:

> "1. For the purposes of this Regulation, inside information shall comprise the following types of information:
>
> > (a) information of a precise nature, which has not been made public, relating, directly or indirectly, to one or more issuers or to one or more financial instruments, and which, if it were made public, would be likely to have a significant effect on the prices of those financial instruments or on the price of related derivative financial instruments;
> >
> > […]
> >
> > 2. For the purposes of paragraph 1, information shall be deemed to be of a precise nature if it indicates a set of circumstances which exists or which may reasonably be expected to come into existence, or an event which has occurred or which may reasonably be expected to occur, where it is specific enough to enable a conclusion to be drawn as to the possible effect of that set of circumstances or event on the prices of the financial instruments…"

67. Accordingly, throughout the Relevant Period, Barclays had an obligation under MAR to disclose "*inside information*" to the public as soon as possible. For these purposes, "*inside information*" was information that was (i) precise in nature, (ii) not already made available to the public, (iii) concerning the issuer, and (iv) if made public was likely to have a significant effect on the price of Barclays' shares.

---

[38] This provision is in materially the same form as the exception in DTR 2.5.1R under the regime that applied until 3 July 2016.

[39] This definition of "*inside information*" is in materially the same form as that contained in s.118C of FSMA, which was in force until 3 July 2016.

68. This is the principal basis on which s.90A omissions claims are typically brought, in my experience.

69. It will be a matter for the District Court to determine whether (and when) information as to the extent and nature of the relationship between Mr Staley and Mr Epstein (if Barclays had the information as alleged by the St Louis Firemen) and its concealment from the FCA constituted "*inside information*" and therefore had to be disclosed by Barclays through an *ad hoc* disclosure.

70. Finally, Barclays also had disclosure obligations during the Relevant Period in relation to its periodic publication of information. Pursuant to DTR 4.1.5R, Barclays was required to include a management report with its audited financial statements. In relation to the management report, DTR 4.1.8R and DTR 4.1.11R relevantly provide:

> DTR 4.1.8R.
>
> *"The management report must contain:*
>
> *(1) a fair review of the issuer's business; and*
>
> *(2) a description of the principal risks and uncertainties facing the issuer."*
>
> DTR 4.1.11R.
>
> *"The management report required by DTR 4.1.8 R must also give an indication of:*
>
> *(1) any important events that have occurred since the end of the financial year…"*

71. It will be a matter for the District Court to determine whether the management reports filed with Barclays' audited financial statements contained (among other things) a "*description of the principal risks and uncertainties facing Barclays*", in light of the contemporaneous allegations made as to the relationship between Mr Staley and Mr Epstein, and its concealment from the FCA, and any findings by the District Court as to Barclays' knowledge about the nature and extent of that relationship.

72. However, given the prescriptive nature of issuers' obligations to give disclosure of "*inside information*", as well as its obligations to give disclosure in periodic publications, it is not a high threshold to establish that relevant information may have been omitted for the purposes of s.90A.

73. Omissions liability is plainly invoked in the Complaint, but for the reasons noted below, I do not think it is helpful for Mr Moore or I to comment on what level of particularity would suffice for a pleading of omissions under English procedure, as he does in the Moore Declaration at [55] to [56]. As noted above, going by English practice, the comment in the Moore Declaration at [56] *at its highest* entails that an English court would give the claimant an opportunity to plead why the omitted information was required to be disclosed (most likely the MAR) before striking out a claim (and I do not read Mr Moore as saying anything different).

## C.    Delay

74. Paragraph 5 of Schedule 10A identifies a further basis for liability in cases of dishonest delay of publication:

> "(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who –
>
> (a) acquires, continues to hold or disposes of the securities, and
>
> (b) suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.
>
> (2) The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information."

75. Although overlapping with omissions claims under para.3, this para.5 delay claim is a separate basis of claim with distinct requirements.

76. This provision was introduced in the 2010 reforms to the statutory scheme, following the work of Professor Davies QC, who identified a liability gap in the old s.90A regime. As he explained in the 2007 Davies Paper, market respondents had raised an issue about "*how section 90A would operate in relation to ad hoc statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules*".[40] The problem was that the omissions liability in s.90A as it stood before 2010 "[did] *not cover this type of omission. The section contemplates liability only for omissions from the*

---

[40] At [83]. The "*FSA*" is the Financial Services Authority, which  was the agency that regulated financial services in the UK between 2001 and 2013. The regulatory authority was formally divided in 2013 into the FCA and the Prudential Regulation Authority (PRA) of the Bank of England.

*statement which is made*". The introduction of dishonest delay claims was intended to plug this gap in liability. Accordingly, I agree with the Moore Declaration at [58]-[59].

77. It is clear that there is no requirement of reliance for dishonest delay, as Mr Moore agrees (the Moore Declaration at [94]), but the statute provides room for interpretation as to what amounts to 'delay by the issuer in the publishing information to which this Schedule applies'.

78. Para. 5 specifies that delay is actionable for 'information to which this Schedule applies'. This is likely to be a reference to Schedule 10A para.2 (which specifies the information to which the Schedule applies), although in that case the delay claim can apply to information for which there is no requirement to publish (per the clarification in para.2(2)), which is a contrast with omissions liability under para.3 which (as noted above) expressly only applies to 'matter[s] required to be included in' published information'. On that view, there is no need to identify an obligation to disclose the information in order to set out a dishonest delay claim. However if, as seems likely, a dishonest delay claim will nevertheless only or normally only arise for information for which there is an obligation to disclose it at a particular time, that requirement will be satisfied by the obligations described at paragraphs 62 to 67 above to publish inside information as soon as possible. This is the obligation 'to publish information by a particular date or within a particular timeframe' to which Mr Moore refers at [60].

79. There does remain some uncertainty as to whether delay requires the information not only not to have been published at the earlier point when it could have been published (and as to which the complaint in the claim is made), but to have later been published albeit late, and if so by what means. I discuss this issue here, although it does not appear to be an uncertainty that affects the Complaint, which (as noted below) is a complaint that does rely on corrective publications having been made.

80. There has now been a single first instance decision (meaning a first level decision, not an appeal decision of the higher courts) of the English courts on this point, in *Allianz* on 25 October 2024. In that case, the claimants alleged that information had not been disclosed at a particular time and nor had it been published later, i.e. that there had not yet been any corrective disclosure. Leech J rejected the claimants' submission that dishonest delay could be established in these circumstances, without showing (and the claimants made clear they

did not intend to amend to allege this: see [145]) that the omitted/delayed information was subsequently published. As Leech J concluded at [138(3)], "*Paragraph 5 has no application to an issuer unless or until it has published the relevant information by recognised means or it has announced the availability of that information by recognised means*".

81. This remains an open point on English law. It has not been considered by any appellate court and is not settled. Permission to appeal was refused by Leech J in *Allianz* (both in relation to dishonest delay, and in relation to the reliance requirement of para.3, considered below) and the claim then settled without the claimants seeking permission from the Court of Appeal. However, I understand the same points are due to be considered in the *Standard Chartered* s.90A claim in February 2025, and are also the subject of an application to strike out in the *Glencore* s.90A claim although not yet listed for a hearing, and may arise in other cases. Leech J's decision is merely the first judicial exploration of the point, and while another first instance decision would be likely to follow Leech J as a matter of consistency,[41] the point remains open at appellate level in the Court of Appeal and Supreme Court, and cannot be considered settled law.

82. Moreover, Leech J's conclusions are certainly not the only available sensible interpretation of s.90A para.5. In particular:

82.1.    The word 'delay' does not necessarily require that the information was ultimately published. On its face, para.5 can cover the situation where the information is never published. Leech J in *Allianz* expressly agreed with this at [138(1)].

82.2.    Leech J took the view that, unless a later corrective publication was a requirement of para.5, there would be considerable overlap between para.3 omissions and para.5 dishonest delay claims (because a failure to publish entirely would *prima facie* amount to both an omission and a dishonest delay), which Leech J concluded "[made] *no sense at all*".[42] But on any view there is very substantial overlap indeed, because even on Leech J's view, wherever there is an eventual corrective publication

---

[41] As a matter of precedent, the High Court is not bound to follow its own previous decisions, but they are highly persuasive. Accordingly, a different decision to that of Leech J in *Allianz* could be reached on dishonest delay and reliance by another High Court judge in other proceedings, but only if the second judge thought Leech J was clearly wrong. An appellate judge would have no such deference and would simply consider the points of law on their merits.
[42] At [141].

of the delayed information, there will be para.5 liability from the date when the information was first not published until that corrective date. This is the same period (or a slightly longer period) than the liability for para.3 omissions, which runs from the date of the first periodic publication from which the information was omitted.

82.3.    Moreover, whether there is para.5 liability in such a case, as well as para.3 liability, would (on Leech J's view) turn on whether the defendant ultimately made a corrective disclosure. This creates a potential avoidance mechanism by which a defendant can choose in its corrective disclosure to e.g. disclose that is has been fined for bribery, without disclosing the particular corruption which it delayed disclosing, although this may be resolved by a broad interpretation of whether something was ultimately published so as to close the delay loop. (This is not a point Leech J considers in his judgment.)

82.4.    Further, and relatedly even if Leech J is right that the information must have become public for para.5 to be engaged, he may well be wrong that it has to have been published by recognised means (para.138(3)). The wrongdoing is in not publishing the information by recognised means, but if the information later becomes public by some other means (e.g. a court judgment, enforcement decision or plea agreement) then the delay is over, and it would make no sense to restrict liability to the situation where the delayed information that becomes public happens then to be repeated in a publication by recognised means. The wrongdoing is the failure, and there is little rationale for requiring that the correction is by recognised means.

82.5.    There is therefore a good argument that para.5 liability is simply a separate but overlapping liability with para.3 liability. It applies when there is a delay, without any reference to para.3 liability. Paragraph 7(1) provides that para.3 is the only provision providing liability for reliance on omissions, whereas para.5 is the only provision providing liability for delay, without suggesting that either excludes the other or seeking to resolve the overlap between them. It may be that dishonest delay (required by para.5(2)) is different to dishonest omission (required by para.3(3)). It may be that the circumstances in which failure to publish arises for delay purposes (apparently whether or not there was an obligation to publish the information: Sch. 10A para.2(2)) are different to those in which failure to publish arises for omission purposes (where the matter was required to be included), quite apart from the fact that delay is

necessarily broader in applying to failure to publish at any time and not only in a publication that was made.

83. Accordingly, while the first judicial consideration of para.5 does require there to have been an eventual publication (as the Moore Declaration [61] opines is required), the law is not settled and this may not be a requirement of English law. The law can expect to develop in the next couple of years, as noted above.

84. However, the Complaint is not a case where the plaintiffs do not allege eventual publication. In the current case that would be satisfied if the matters regarding the true nature and extent of the relationship between Mr Staley and Mr Epstein and its concealment from the FCA which could or should have been disclosed, later were published; and that information was later included in published information by recognised means, including where the availability of the information has been announced by recognised means; or, possibly, was published by other means[43].

85. On the present facts, this would require an investigation of any publications in or after October 2023, and potentially earlier. (I note the Motion at page 9 alleges that there was corrective disclosure in 2021 and on other dates.) This includes, of course, the press release of 12 October 2023[44] which refers to the FCA Decision Notice (and so likely incorporates or announces that Notice, although that is a matter for the trial), and the annual report of 2023 p194[45] which mentions the remuneration decisions following the FCA Decision Notice.

## D.    Pleading requirements

86. In relation to Mr Moore's observations (in his [46] to [51]) regarding the requirement to plead with specificity why a particular statement was untrue or misleading in the s.90A Claim, I agree with his comment at [47] that it is a matter for the District Court to read and interpret the submissions in the Complaint.

87. It is beyond my function to make any comment on whether, as a matter of US law, the Complaint is adequately pleaded. In that regard, I would note that I do not see why

---

[43] See paragraph 82.4 above.
[44]  https://www.londonstockexchange.com/news-article/BARC/decision-notice-issued-by-rdc-regarding-former-ceo/16164513.
[45] https://shorturl.at/gVx74.

requirements of pleading a claim under s.90A before an English court, which is a matter for the civil procedure of England and Wales, are relevant to the standards of pleading required in the US District Court. I therefore think it is unhelpful to the US court for me to comment on pleading requirements of English law, as they are irrelevant,[46] with neither Mr Moore nor I being experts in the law regarding US pleading.

88. This applies not only to the point about how to plead statements, but equally to Mr Moore's observations regarding English pleading standards as they relate to the omissions (his [54]-[56] and [76]), dishonest delay ([63]) and dishonesty ([69]-[71]). I note that the Motion expressly relies at page 24 on these paragraphs of the Moore Declaration in support of a contention that the Complaint does not plead the relevant claim sufficiently or with enough particularity, but in my view that is a matter of US pleading law (once the US Court is appraised of the elements of the English cause of action, as discussed in the Moore Declaration and this declaration).

89. By way of counterbalance, however, I note in case useful to the District Court that (i) the English courts are sensitive to the asymmetry of information between the parties prior to disclosure (discovery) and so will permit a certain level of lack of particularity in pleadings where necessary at the pleading stage,[47] (ii) in English law pleading requirements do not go so far as Mr Moore suggests (e.g. contrary to the Moore Declaration [49] it is enough in England to plead that Mr Staley did not retain the full confidence of the Board (which may be by pleading simply that the statement that he made was false), without pleading "*the basis for* [that] *assertion*", which would be a matter for evidence not pleading), and (iii) even where requirements for pleading particularity are breached in England, this will typically be rectified by amendment of a pleading rather than strike out of a claim. But, as I say above, I do not think these matters of English pleading requirements and procedure are relevant to the Motion this US court has to consider.

---

[46] This is rather highlighted by the fact that the quotations in the Moore Declaration at [46] from the case of *Kasem v University College London Hospitals NHS Foundation Trust* [2021] EWHC 136 (QB) at [42] draw from the Practice Direction 16 which forms part of the English Civil Procedure Rules published by the English Ministry of Justice (clearly of no import to US practice and procedure), which sets out (at [8.2]) that any claimant must set out in an English claim 'details of any misrepresentation', as was noted by the judge in *Kasem* at [38] before later going on to summarise the principles at [42].
[47] See the recent Court of Appeal decision in *Alame v The Shell Petroleum Company of Nigeria Ltd* [2024] EWCA Civ 1500, at [78] (in the context of pleas of causation in a group oil spill claim).

## VII.  Fault

### A.  Untrue or misleading statements

90. For the defendant to be liable, a "*person[s] discharging managerial responsibilities*" ("**PDMR**") must know or be reckless that the statement was untrue or misleading.[48] The PDMR must have actually known of or been reckless to (i.e., lacked an honest belief in) the falsity of the statement at the moment that the statement was made, and in the knowledge that the statement had been made, and with the understanding that the statement would be understood in the relevant sense in which it is properly understood and in which it is untrue.[49]

91. The term 'reckless' is not one with a single meaning in English law, but the likelihood is that (as the Davies review intended, and as was common ground in *Autonomy*[50]) the meaning will be taken from the common law of deceit, by which liability includes the situation where the claimant does not know the statement to be untrue or misleading but does not have a positive genuine belief that it is true or misleading and, in essence, does not care (*Derry v Peek* (1889) 14 App. Case 337). That said, a wider sense of recklessness may apply, given the 2007 Davies Final Report advice that the particular sense of recklessness be specified in the statute was, presumably deliberately, not taken up.[51]

92. It is clear, however, that the drafters of s.90A deliberately excluded the common law deceit requirement that the defendant intend the claimant to rely on the statement.[52] There is therefore no need to prove such an intention for the purposes of s.90.

### B.  Omissions

93. The fault requirement for omissions liability is that the PDMR actually knew the omission (of relevant material) to be a dishonest concealment of a material fact.[53]

94. There are two key differences between this fault requirement and that for statements.

---

[48] Para.3(2).
[49] *Autonomy* at [448], [468]-[470] and [477].
[50] [470].
[51] 2007 Davies Final Report at [27].
[52] For the reasons given in 2007 Davies Final Report at [30], and see 2007 Davies Paper at [54] and *Autonomy* at [510]
[53] Para.3(3).

95. The first is that recklessness will not suffice. In contrast with para.3(2) on misstatements, para.3(3) on omissions does not include any reference to recklessness.[54] Omissions liability therefore requires knowledge.

96. The second is that in relation to omissions there is a requirement of dishonest concealment.

97. Dishonesty is not part of the common law of misrepresentation in English law (including deceit) but instead is a requirement of some criminal offences (such as theft) and some equitable wrongs (such as dishonest assistance). Dishonesty is defined in para.6 of Sch.10A:

> "a person's conduct is regarded as dishonest if (and only if)—
>
> (a) it is regarded as dishonest by persons who regularly trade on the securities market in question, and
>
> (b) the person was aware (or must be taken to have been aware) that it was so regarded."

98. In *Autonomy*, Hildyard J noted that para.6 of Sch.10A was a codification of the then-applicable common law test for dishonesty in the criminal decision of *R v Ghosh* [1982] 1 QB 1053 (CA), which has a mixed objective and subjective standard. Following the introduction of Sch.10A, the common law has developed in the Supreme Court decision of *Ivey v Genting* [2018] AC 391, which adopted a purely objective standard.[55]

99. It is not clear whether the High Court in *Autonomy* considered that para.6 should be construed to reflect the old or new common law on dishonesty. The logical view is that the effect of codifying the definition of dishonesty in 2010 (before *Ivey* was decided) is that the old law under *Ghosh* was intended to apply. However, I note that the words in parentheses in para.6(b), "*(or must be taken to be aware)*", are not part of the *Ghosh* test and might be said to negate its second subjective limb of the test. That is because the words "*or must be taken to be aware*" appear to deem awareness where there is none, although the effect of

---

[54] And see *Autonomy* at [468].

[55] In *Ghosh*, the Court applied a two-stage test: (i) was the defendant's conduct dishonest by the ordinary standards of reasonable people? If so, (ii) did the defendant appreciate that this conduct was dishonest by those standards? This test led to the unsatisfactory consequence that even if a person's conduct was regarded as clearly dishonest by the standards of reasonable people (stage one), if that person believed that his conduct was not dishonest by reference to those standards (stage two), he would not be found to be dishonest. *Ivey* therefore introduced a new test which remedied this fault, which asked (i) what was the defendant's actual state of knowledge or belief as to the facts, and (ii) was his conduct dishonest by the standards of ordinary people?

these words are yet to be worked out in the case law. Subject to this point, I agree with the Moore Declaration at [74]-[75].

100.    Concealment has not been considered in the context of s90A claims. In practice it is likely to mean little more than that the matter "*was being deliberately left out*" of the publication, as the judge in *Autonomy* paraphrased the issue.[56] In the different but analogous context of limitation (time bar) provisions, the Supreme Court has confirmed that something was 'concealed' (under s32(1)(b) of the Limitation Act 1980) where it was withheld with the intention of keeping it secret.[57]

101.    It will be for the District Court to determine whether the conduct alleged against the PDMRs, Mr Staley and Mr Higgins (the alleged omission from Barclays' public information of the true nature and extent of the relationship between Mr Staley and Mr Epstein and its concealment from the FCA) (i) was dishonest by the standards of persons who regularly traded on the LSE, and (ii) the PDMRs were aware (or must be taken to have been aware) that the omission would be regarded as dishonest.

## C.    Delay

102.    The fault requirement for delay is (as with omissions) also dishonesty: that the PDMR "*acted dishonestly in delaying the publication*" (para.5(2)). Dishonesty has the same meaning as in relation to omissions, above (per para.6), but unlike in relation to statements and omissions there is no specified requirement of knowledge (nor of 'deliberateness').

103.    The exclusion of reference to knowledge suggests that dishonesty is to be considered at face value according to the test in para.6. The second element of that test imports a requirement of knowledge *that the conduct would be regarded as dishonest*. But that does not mean that there is a requirement of knowledge of untruth, or the requirements that the Moore Declaration specifies at [78]-[79]. It may well be that a PDMR who suspects corruption or false accounting (i.e. is reckless but does not have knowledge), does not investigate it, and thereby facilitates its remaining undiscovered and so undisclosed, would be regarded as dishonest by others trading on the LSE and would be aware (or must be

---

[56] *Autonomy* at [469].
[57] *Canada Square Operations v Potter* [2024] AC 679 at [98]-[99].

taken to be aware) that it would be so regarded. In my opinion the question of dishonesty will simply be one to leave to the fact-finding judge (or jury).

## D.    PDMR

104.    The fault required as set out above is attributed to the corporate defendant share issuer by reference to "*person[s] discharging managerial responsibilities*", namely "*any director of the issuer (or person occupying the position of director, by whatever name called)*": para.8(5)(a) of Sch.10A [58]

105.    Following *G4S*,[59] this has been construed as requiring the PDMR to be a director as a matter of English company law. That definition includes *de jure* directors,[60] *de facto* directors[61] and shadow directors.[62] The definition excludes senior executives who do not occupy the position of director. That construction has since been described as "*unassailable*".[63] Accordingly, although possible, I do not consider it likely that English courts would depart from that definition of PDMR, either by widening or narrowing its scope.

106.    It is common ground that the individual defendants, Mr Staley and Mr Higgins, were PDMRs in their capacity as *de jure* directors of Barclays, although I agree with the Moore Declaration at [68] that Mr Staley would not be a PDMR in respect of any misstatements, omissions or delay after he ceased to be a director on 1 November 2021, as he would no longer be a PDMR or have responsibility for Barclays' publications.

---

[58] This definition of "director" mirrors the definition in s.250 of the Companies Act 2006: "*In the Companies Acts "director" includes any person occupying the position of director, by whatever name called.*"
[59] At [117]-[149].
[60] A person validly appointed as a director under the Companies Act 2006.
[61] A person who acts as a director and is held out by the company as such, but has not been validly appointed under the Companies Act 2006. See, e.g., *Smithton Ltd v Naggar* [2014] EWCA Civ 939, [2015] 1 WLR 189 at [34]-[44].
[62] A person who does not claim or purport to act as a director, but whose instructions and directions the directors of the company are accustomed to follow. See, s.251 of the Companies Act 2006 and *Secretary of State for Trade and Industry v Deverell* [2001] Ch 340 (CA) at [35].
[63] *Various Claimants v Standard Chartered plc* [2023] EWHC 2756 (Ch) at [77].

## VIII.  Causation and reliance

### A.    Causation and reliance in relation to dishonest delay

107.    A dishonest delay claim under para.5 of Sch.10A requires that the claimant acquires (or holds or disposes of) shares and suffers loss "*as a result of*" the delay. Like the s.90 prospectus claim, and unlike the Sch.10A para.3(4) statement/omission claim, there is no reliance requirement.[64] This appears to be a deliberate distinction for reasons explained in the 2007 Davies Paper: "*It is difficult to see how that requirement could be retained in the case of liability for late publication. An investor can hardly be said to rely on something of which he or she is not aware.*"[65] I agree with the Moore Declaration at [94] on this point. It means that the main legal thrust of the Motion (the first respect in which s.90A is said to be more restrictive than US securities law, on pages 24-5 of the Motion), that there is a strict reliance requirement that cannot be satisfied by the Complaint, can only apply to the para.3 misstatement and omissions claim and not the para.5 dishonest delay claim.

108.    Accordingly, as a matter of causation, the St Louis Firemen will be able to establish a dishonest delay claim if they can show that earlier publication of the information regarding the nature and extent of the relationship between Mr Staley and Mr Epstein, and its concealment from the FCA, would have led to a share price drop earlier than it did, and that this would have meant that the claimants would accordingly have (i) not acquired shares that they in fact acquired, (ii) acquired shares at a cheaper price, or (ii) sold the shares at a higher price than they later sold them. This is a matter of quantification and timing, similar to fraud on the market claims.

### B.    Causation and reliance in statements and omissions claims

109.    In contrast, there is a reliance requirement in relation to the para.3 statements and omissions claim. Pursuant to para.3(1)(a) and (b) of Sch.10A, a claim will lie for statements and omissions claims if a claimant acquires, continues to hold or disposes of securities in reliance on published information and loss has been suffered as a result of false or misleading statements in, and/or dishonest omissions from, published information, and para.3(4) restricts the meaning of "*a result of*" in para.3(1)(b) as follows:

---

[64] *Allianz* at [104].
[65] At [86].

"A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities –

(a) in reliance on the information in question, and

(b) at a time when, and in circumstances in which, it was reasonable for him to rely on it."

110.    This reliance requirement in the s90A claim remains a key point of contention and is undergoing legal development, although there has been limited first instance judicial exposition of the requirement in *Autonomy* and *Allianz*. I would emphasise that the topic of reliance has been, and continues to be, heavily contested in other s.90A proceedings.

*(i)*        ***The common law tort of deceit***

111.    Reliance in the tort of deceit has been explored in a series of recent decisions at first instance that have grappled with the question of whether a claimant must have been 'consciously aware' of an express misstatement or misleading conduct from which an implied misstatement is derived. (The common law does not consider omissions, as in the tort of deceit there can be no liability for omissions.)

112.    This question was considered most recently in *Loreley Financing (Jersey) No 30 v Credit Suisse Securities (Europe) Ltd*[66] and *Farol Holdings Ltd v Clydesdale Bank plc.*[67] Neither of these cases concerned securities claims, or claims based on general publications of the sort giving rise to securities claims, but the essence of the decisions in those cases is that in deceit (i) the representation must have caused the claimant's action,[68] (ii) at least with complex implied representations, the claimant must have actually understood the implied representation in that sense for it to satisfy the causation requirement,[69] although (iii) with some simple implied representations (such as that the defendant has some basis for what they say) it may well not be necessary to show that the claimant actively or consciously understood the representation to show that it caused the conduct and a 'quasi-reflexive understanding' may be enough, and there is no 'single universally applicable test'.[70]

---

[66] [2023] EWHC 2759 (Comm).
[67] [2024] EWHC 593 (Ch).
[68] *Farol* at [223].
[69] *Ibid.* at [225] and [219].
[70] *Ibid.* at [221]-[222]; *Loreley* at [388], [396]-[397] and [423]-[425].

113.    More generally, the Supreme Court in *Zurich v Hayward* has confirmed that the causation requirement in misrepresentation cases is 'inducement', which is a question of fact, and that the state of mind of the defendant may be *but is not necessarily* relevant to that requirement and "[t]*he way in which a fraudulent misrepresentation may cause the representee to act to his detriment will depend on the circumstances*".[71] In that case it was confirmed that the claimant to a misrepresentation claim did not need to believe the representation if the representation nevertheless induced the claimant to contract because the claimant thought the defendant's statement might be believed by others (although that was therefore a case where the claimant was actively aware of the representation).

114.    This goes to show that in the tort of deceit the requirement of 'inducement' is not clear cut, albeit it does generally require the claimant (or an agent—see below) to have been aware of the representation and not simply for the representation to have caused the transaction (as would suffice for a 'fraud on the market' approach to causation).

*(ii)*        ***The* Autonomy *and* Allianz *decisions***

115.    The *Autonomy* decision was an unusual s.90A case because it involved a bilateral negotiated corporate acquisition and not an acquisition of publicly traded shares induced by public reports and owned by multiple shareholders. The judge there held that to satisfy the reliance requirement for a misstatement under s.90A the claimant had to have applied its mind to the statement,[72] and to satisfy the reliance requirement for an omission the claimant must have read the published information.[73]

116.    Leech J in the *Allianz* case struck out a claim based on fraud on the market reliance, i.e. reliance in which the claimant did not read the published information, on the basis that:

> "Parliament intended the Court to apply the common law test of inducement or reliance from the tort of deceit to Paragraph 3 and both to misleading statements and omissions. That test requires the Court to determine whether the Claimants were induced to rely on the published information … and whether that published information caused the Claimants to acquire, hold or dispose of the … shares. … the Claimants … cannot satisfy this test unless their representatives read and considered that published information or third parties who directed or

---

[71] *Zurich Insurance Co Ltd v Hayward* [2017] AC 142 at [18], [25], [63], [71].
[72] [503].
[73] [505].

influenced their investment decisions read and considered that published information."[74]

117.    The Court in *Allianz* justified these conclusions on the following grounds:

117.1.    The reference in para.3 of Sch.10A can be contrasted with s.90, which has no reliance requirement. The use of "*reliance*" wording in para.3 therefore had to be given "*some content … to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or omission being made to the market*"[75] (i.e. both reliance and causation).

117.2.    The "*obvious test*" to adopt was the common law test for inducement or reliance in the tort of deceit. Given the consistent application of this test for almost 150 years, it was clear to Leech J that para.3 did not intend to "*start afresh*" but to apply the "*settled*" approach at common law.[76]

117.3.    The 2007 Davies Paper and the 2007 Davies Report, as well as the Consultation Paper of HM Treasury from 2008 and the HM Treasury Response Paper from 2010, confirm that this was the legislative intention and that reliance was intended to be a separate requirement of liability. Those secondary sources confirmed the obvious interpretation of para.3.[77]

118.    Leech J also accepted that the 'presumption' or 'inference' of inducement, such that it is presumed as a matter of fact that the representor intends to mislead by their statement (or omission), does apply in s.90A claims as in common law deceit claims.[78] This presumption (noted in the Moore Declaration at [87]) is "*difficult to shift*", since it can only be rebutted by showing that the statement played no causative role at all in the claimant's investment decision.[79] (The Supreme Court in *Zurich v Hayward* described it as "*very difficult to rebut*", given that it does not easily lie in the mouth of a fraudster to say that his fraud was ineffective.[80]) But I agree that this does not alter the underlying test for reliance, and that if

---

[74] *Allianz* at [129].
[75] *Ibid.* at [104].
[76] *Ibid.* at [105]-[107].
[77] *Ibid.* at [107]-[108].
[78] *Ibid.* at [117]-[118].
[79] *Autonomy* at [515(3)-(5)].
[80] *Zurich* at [37].

that test requires that the claimant read the published information, the presumption will not help the claimant that did not read the information to prove reliance.

119.   Further, Leech J accepted that the 'awareness' aspect of reliance at common law (i.e., awareness of the representation; see the cases considered at paragraph 112 above), especially in the context of implied (or other) representations, was a developing principle which might be overturned by the Court of Appeal.[81]

120.   And, significantly, Leech J expressly left open the question of whether the claimant had to have applied its mind to the relevant misleading or untrue statement (as was the view of the judge in *Autonomy*) for the purposes of s.90A, at [130], as the Moore Declaration footnote 41 notes, and accordingly that question is obviously unsettled in English law. Leech J did, however, consider that it would always be a requirement that a claimant read the published information, or that a representative or relevant third party did: [128]-[129]. I briefly consider the difficulties of this awareness analysis in respect of omissions and 'fraud on the market'/indirect reliance claims below.

>      *(d)     Reliance on published information as a whole*

121.   It is suggested in the Moore Declaration that reliance needs to be placed by claimants on individual statements in published information, not the published information itself.[82] If so, that would appear to overstate the position. It is clear from *Allianz* that in the s.90A context, reliance does not need to be placed on individual statements in published information, but rather on the published information as a whole. As Leech J explained, in addition to proving that had the truth been published the claimants would have been better off:

> "It will be enough for the Claimants to prove that the decision-makers or advisers reviewed the 2011 annual report in order to decide whether to acquire, hold or dispose of Barclays' shares and, if so, whether it was reasonable for them to do so."[83]

122.   Similarly, for omissions claims reliance is not on the omission but rather the published information from which the relevant material has been omitted:

---

[81] *Allianz* at [127].
[82] See, e.g., the Moore Declaration at [41] and [80].
[83] *Allianz* at [115].

> "They did not require investors to prove that they had relied on the omission itself (i.e. that they appreciated that the issuer had failed to include facts or matters in its published information)… Paragraph 3(4)(a) now requires investors to prove that they acquired, held or disposed of securities "in reliance on the information in question"."[84]

### (iii)      Reasonable reliance

123.    It is an additional requirement that the claimant's reliance must have been reasonable. As explained in *Autonomy*:

> "[this] introduces an additional test requiring consideration of whether it was reasonable for the representation so to have impacted on the mind and judgment of the representee; put another way, it seems to me that the claimant must show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it."[85]

124.    This is not a requirement that the claimant should exercise due diligence or that it had the means of discovering the truth, but a question of whether, in the circumstances prevailing at the time that the statement or omission was made, it was reasonable to place reliance on the published information. If a claimant is not on notice of some irregularity, it is usually reasonable to rely on published information as being accurate and complete, given its status as a regulated source of information published by recognised means.[86]

### (iv)      Reliance in omissions cases, and the 'fraud on the market theory'

125.    Omissions liability is not part of the common law tort of deceit (from which a reliance requirement could then be read across). Moreover, although 'reliance' is an express requirement under para.3(4), the concept of 'reliance' does not sit easily with omissions. An omission is the failure to publish something that would have made a difference. By its nature the omitted information was not known and did not cross the reader's mind. They were not aware of it, consciously or otherwise. As Professor Davies explained "[a]*n investor can hardly be said to rely on something of which he or she is not aware*".[87] That statement was made in the context of delay claims (for which there is no reliance requirement), and is quoted above under that heading, but applies equally to omissions.

---

[84] *Ibid.* at [111(3)].
[85] At [515(6)].
[86] *Autonomy* at [519] and [522].
[87] 2007 Davies Paper at [86].

Omissions do not change a pre-existing decision-making process: the investor already believes or assumes something and the causal impact of the omission is that the absence of the statement does not set the investor on a different course.

126.     Accordingly, in insurance law, where there is a duty to disclose, inducement is satisfied if the disclosure would have led the insurer not to write the policy or to do so on different terms.[88] That is the causation test applicable, not a 'reliance' test. In other words, the most natural causation test for omissions is one of simple causation that does not involve the claimant's state of mind at all, i.e. a fraud on the market approach. There is therefore a good case that 'reliance' in the omissions context merely means causation.

127.     Leech J, in *Allianz* at [111], accepted that omissions liability was novel and meant that the common law on reliance in the tort of deceit provided little assistance. He nevertheless concluded that although there was no requirement for the claimant to have applied its mind to the absence of the omitted information (at [111] esp. [111(2)]), i.e. relied "*on the omission itself*" [111(3)], the reliance requirement did require the claimant to have read the published information from which the omitted information was omitted: [111(3)-(4)], [115] and [129]-[130]). Accordingly, Leech J rejected the possibility of price/market reliance (i.e. fraud on the market) satisfying the reliance requirement at [121].

128.     This is a novel interpretation of previously untested law (omissions liability under s.90A), not previously found in any case law, by a first instance judge. It is an arguable middle way between requiring reliance on the omission itself (impractical) and only requiring causation or market reliance. It seeks to give effect to the use of the term 'reliance' in para.3 in relation to omissions, where it would have been possible to require only causation as in s.90 or in insurance non-disclosure cases[89], and to the terminology in para.3(1) and 3(4) of "*reliance on the published information*" emphasised by Leech J at [111(3)].

129.     However, another arguable view that remains open to the English courts would be one which agrees with Leech J that there cannot be a requirement of reliance on the omission itself, but also holds that fraud on the market suffices as the claimant relied on the publications being accurate generally, and on the market responding to them:

---

[88] *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501 (HL).
[89] *Allianz* at [125]-[126].

129.1.    This is known as the 'fraud on the market' theory, which, I understand, is akin to the rebuttable presumption in US securities litigation that well-developed markets are efficient processors of public information and, accordingly, the price paid by an investor for shares at any given time will reflect all publicly available information about the company which is known to the market (which would include any untrue or misleading statements and dishonest omissions), and that this suffices to establish loss causation.[90] Similarly, in Australia, it is sufficient for investors to show that the price for securities when purchased was inflated due to the non-disclosure of material information (i.e. showing causation without reliance).[91]

129.2.    The natural meaning of 'reliance on the published information' is capable of encompassing the claimant having relied on the belief that all published information (from which the market price was determined) was accurate, and on the efficient market responding to it, i.e. reliance on the market being told the truth and acting on it. This is indirect reliance, but it is nevertheless still reliance on the published information.

129.3.    A very substantial proportion of share trades are by passive funds such as tracker funds. These funds do not read published materials and do not make active trading decisions; they simply rely on the market being efficient and seek to track that market. The statutory purpose of these provisions is investor protection, and as Hildyard J observed in the s.90A claim *Tesco* at [117], although considering a different provision: "*Unless the wording was without any semantic doubt entirely deficient to apply in such circumstances, ordinary principles of statutory construction require the court to ensure that the statutory purpose is not thwarted.*" Accordingly, to avoid excluding a large part of the market from protection under s.90A, the reliance requirement must be construed as being satisfied by fraud on the market i.e. causation. As noted above, the wording is perfectly capable of encompassing this approach.

129.4.    There is no good reason for requiring that the claimant read the published information, especially where there is no requirement that had the omitted information been published that would have acted on the claimant's mind: Leech J's approach in

---

[90] See, e.g., *Basic Inc v Levinson* 485 US 224 (1988)
[91] See, e.g., *TPT Patrol Pty Ltd v Myer Holdings Ltd* [2019] FCA 1747. Although the relevant legislation there does not use the word 'reliance'.

*Allianz* does require that the claimant read the published information but avowedly does not specify that had the information been published it would have acted on the claimant's mind to alter its decision to acquire etc.[92] The omitted information was not in the published information, and no one reads every word of an annual report (Leech J requires that the claimant "*reviewed*" the publication at [115]), so the requirement that the claimant read some of the document that necessarily did not contain the omitted matter is of no significance such as could justify determining who can and cannot sue. It would be an arbitrary gateway to this cause of action in those circumstances.

129.5.    Leech J himself acknowledged (at [124]) the illogicality ("*no real reason of policy or principle*") of allowing a claimant to claim if it relied on a buy recommendation by a third party who read the published information, but not if he relied on the market pricing by third parties who read the published information.

129.6.    The requirement of omission from published information by recognised means still provides an important gateway to s.90A whether or not that information needs to have been read by the claimant.[93] Section 90A liability only applies to information required to be included in such publications by recognised means (or announced by recognised means), which are the key publications that are held out as being actionable when misleading. And they are only actionable when the misstatements or omissions resulted in the acquisition, sale or holding of shares. Indeed, this view of the gateway makes more sense given that it is clear that liability is still intended even where the claimant did not read the published information through the recognised means but only came by it through a different means, providing it also happened to be published by a recognised means: see Leech J at [58] and [122].

129.7.    As noted above (see paragraphs 112 to 113), the fundamental requirement of misrepresentation is one of causation as to which the state of mind of the claimant is

---

[92] Instead, he concluded that it is necessary that "*the Claimants are also able to prove that they would not have acquired or continued to hold shares in the Bank or would have acquired or sold them at a different time and at a different price if the Bank had published the facts pleaded in paragraph 41 and 44 (above) in the 2011 annual report*" (at [115]).
[93] Accordingly, the argument in *Allianz* at [124] is unpersuasive.

not a necessary element. This is even more so for causation by omissions (see paragraphs 125ff above).

129.8.    The language used in para.3 is not used with high precision. While para.3(1) and 3(4) do speak of "*reliance on the published information*", para.3(7) refers to "*reliance… on… the omission*" (which is an approach rejected by Leech J).

130.    Before summarising my conclusions in relation to fraud on the market/indirect reliance, it is important to consider one other aspect.

*(v)*        ***Reliance by claimants, representatives and those directing decision making***

131.    Mr Moore's view (the Moore Declaration at [84]) is that "*reliance must be on the part of the person who acquired the relevant securities*". He is right that it is the claimant who must satisfy the reliance requirement,[94] but it was confirmed in *Allianz* at [124] that the reliance requirement can be satisfied if reliance by representatives and relevant third parties can be shown, and indeed at [128] that it would be enough for a claimant to show that it "*acted on the advice or at the direction of a third party (or even a chain of third parties) who read that published information*"[95] or at [129] that "*third parties who directed or influenced their investment decisions read and considered that published information*". Thus it would be enough if the claimant did not read the published information but relied on a 'buy' recommendation from someone who did: [124].

132.    More generally, at common law claimants have been able to sue property valuers for negligent valuations even if the claimant never read the valuation, where it knew that a third party (the mortgage lender or insurer) had read and relied on the valuation,[96] an example cited with approval by Leech J in *Allianz* at [123]. The parallel with the fraud on the market/indirect reliance approach is clear, and indeed seems to go beyond the indirect reliance through the relaying of information considered in the previous paragraph of this Declaration.

---

[94] Although in *Autonomy* at [484]-[500] the claimant spv was able to satisfy the requirement even though it was its parent who relied and the spv was set it in order to carry out the transaction, by virtue of the controlling mind of the spv being found to be the parent.
[95] *Ibid.* at [128].
[96] *Harris v Wyre Forest District Council; heard with Smith v Eric S Bush* [1990] 1 AC 831 (HL); *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1995] 2 All ER 769, 794 to 795 (Phillips J) *obiter* (because in that case it was found that the valuation did not induce the insurer).

### (vi)        Conclusions as to fraud on the market/indirect reliance

133.    Accordingly, while I agree with Mr Moore that the 'fraud on the market' theory of indirect reliance has not been recognised by English courts and was rejected in *Allianz*, I consider that it is seriously arguable that claims based on 'fraud on the market' do satisfy the reliance requirements of Schedule 10A.

134.    As noted above, in such a case (or at least in many such cases) there is reliance on the published information (and its accuracy and completeness), indirectly through third parties in the market having read it and the market price therefore having reflected what the published information said. As also noted above (in paragraph 132), the common law has found causation/reliance when a claimant is merely aware that others have relied on information. Leech J in *Allianz* accepted that reliance included where third parties read the published information and influenced the claimant's decision, and could not identify a rationale for distinguishing a general fraud on the market approach from the indirect reliance cases he accepted did fall within s.90A. I note that the Moore Declaration does not consider these aspects of Leech J's decision and the implications Leech J's endorsement of indirect reliance.

135.    Moreover, the law is still developing, with more decisions on exactly this point likely in the coming months. At the very least, I would expect a court at trial to need to consider whether on the facts of a particular claimant, fraud on the market falls within the scope of the indirect reliance that does (including on Leech J's view) satisfy the reliance requirement. Surprising though it may be in relation to a law that has been on the English statute books for some time, the question of indirect reliance under s.90A claims is only now starting to be explored in the case law, and has not yet received any appellate attention.

136.    I note that the Motion's legal attack on the para.3 s.90A claim is founded on the complaint (at page 25) that "[a] *plaintiff must plead (and ultimately prove) that a challenged statement was actually present on the claimant's mind when transacting, and that this actual, individual reliance was reasonable under the circumstances. (Id. ¶¶ 84-86.) St. Louis Firemen does not even try to allege, as it must, that it read or heard any of the purported misstatements*."

137.    As to that, as I hope I have explained above (and leaving aside arguments as to what must be *pleaded* for the reasons given above), in my opinion:

137.1.    Going by the single first instance decision engaging with the point (*Allianz*), a claimant must prove that it read or was conveyed the sense of the published information in general in order to claim for omissions. For omissions liability, that is all that is required for the reliance requirement. For misstatement liability, it remains unsettled whether or to what extent the claimant must have read or been aware of the particular statement.

137.2.    It remains seriously arguable that *Allianz* is wrong and reliance can be satisfied for omissions where the claimant relied on the market having read the published information, i.e. market reliance.

137.3.    This does not apply to the dishonest delay claim under para.5, which imposes no reliance requirement and hence no requirement that the claimant read the publication and permits a fraud on the market type approach (and on this, Mr Moore and I agree).

## IX.    Loss

138.    As I have explained in my analysis of causation, a claimant is entitled to recover for losses suffered 'as a result of' false or misleading statements in, dishonest omissions from, and/or dishonest delay of, published information.

139.    The issue of loss is a complex one in the context of s.90A claims and is outside the scope of this Declaration, which has been prepared in the context of the Motion which seeks to strike the s.90A Claim on the basis of other alleged deficiencies but not for reasons relating to loss.

140.    I generally agree with the summary in paragraph 97(a) to (c) of the Moore Declaration, save that the position in paragraph 97(d) is a little simplistic. The date of assessment for the quantification of losses flowing from breaches of s.90A is a particularly difficult and complex area of such claims, which is yet to be resolved and frequently involves parties ultimately serving statements of case on quantum which contain numerous alternative formulations of loss (including based on the inflated price at the date of acquisition, or the difference between the acquisition price and actual sale price, or the difference between the acquisition price and market price at a date of discovery, etc). The date and measure of loss under s.90A is therefore still open to argument and determination.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in London, United Kingdom on 16 January 2025.

**Adam Kramer KC**

3 Verulam Buildings

Gray's Inn, London, UK