UMHOFER, MITCHELL & KING LLP
MATTHEW DONALD UMHOFER (SBN 206607)
ELIZABETH MITCHELL (SBN 251139)
767 S. Alameda Street, Suite 270
Los Angeles, CA 90021
Telephone:  213/394-7979
matthew@umklaw.com
elizabeth@umklaw.com

– and –

WILLIAMS & CONNOLLY LLP
BRENDAN V. SULLIVAN, JR. (admitted *pro hac vice*)
JOHN M. MCNICHOLS (admitted *pro hac vice*)
STEPHEN L. WOHLGEMUTH (admitted *pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone:  202/434-5800
bsullivan@wc.com
jmcnichols@wc.com
swohlgemuth@wc.com

Counsel for Defendant James Staley

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BARCLAYS BANK PLC, et al.,<br><br>Defendants | **Case No. 2:23-cv-09217-MEMF-KS**<br><br>**DEFENDANT JAMES E. STALEY'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>Hearing Date: May 15, 2025<br>Time: 10:00 AM<br>Courtroom: 8B<br>Hon. Maame Ewusi-Mensah Frimpong |

STALEY'S REPLY IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................................ii

I.      THE STATEMENTS AT ISSUE WERE NOT MISLEADING. ....................................... 1

II.     THE STATEMENTS AT ISSUE WERE NOT MATERIAL. .......................................... 6

III.    PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.................................................. 8

CONCLUSION.................................................................................................................... 11

# TABLE OF AUTHORITIES

## Cases

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019) ............................................................................ 10

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ....................................................................................... 1

*Carey Camp v. Qualcomm Inc.*,
    2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ................................................................ 10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ....................................................................................... 4

*Constr. Laborers Pension Tr. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020) ........................................................................... 7

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................................. 9

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024) ....................................................................................... 9

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ................................................................................... 5, 7

*Greenhouse v. MCG Cap. Corp.*,
    392 F.3d 650 (4th Cir. 2004) ....................................................................................... 7

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ................................................................ 10

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .................................................................................. 7, 8

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ................................................................................... 8, 9

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ..................................................................................... 7

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) .......................................................................... 10

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020) ........................................................................... 2

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ....................................................................................... 8

*Lopes v. Fitbit, Inc.*,
    2020 WL 1465932 (N.D. Cal. Mar. 23, 2020)........................................................................ 9

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ........................................................................................... 8

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ......................................................................................... 9

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ........................................................................................... 9

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .......................................................................... 2

*White v. H&R Block, Inc.*,
    2004 WL 1698628 (S.D.N.Y July 28, 2004) ..................................................................... 8

As Staley observed in his Motion To Dismiss, Plaintiffs' fraud theory hangs on the idea that certain of Defendants' public statements were misleading because U.K. financial authorities found *other* private statements misleading, which statements the investing public did *not* hear. This is a fatal failing, as the sued-upon public statements and the purportedly-misleading private ones are *not* the same, and the market is not misled by information it does not learn.

Plaintiffs' Opposition to the Motion To Dismiss does nothing to fix this problem. It repeatedly asserts that the many emails exchanged by Staley and Epstein belie any claim that the two men were "not close," but Defendants did *not* make that claim to the investing public. Moreover, Staley's relationship with Epstein had nothing to do with Barclays, and the details of the relationship were all in the public domain (and thus well-known to investors) at the very time that Plaintiffs claim the Barclays share price was inflated. And Plaintiffs still fail to plead loss causation, as they fail to connect the meager October 2023 stock drop to any correction of Defendants' *public* comments. The Motion To Dismiss should be granted, and Counts I and II—which are the only Counts against Staley—should be dismissed.

## I.      THE STATEMENTS AT ISSUE WERE NOT MISLEADING.

To state a claim for securities fraud, a plaintiff must plead a statement of material fact that is either false or misleading. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017). In their Opposition, Plaintiffs do not argue that any of the complained-of statements were actually false, but rather that they were misleading because they omitted (or, in Plaintiffs' words, "concealed") details of the intimacy of the Staley-Epstein relationship. ECF 066 ("Opp.") at 6. This argument runs aground on the well-established principle that a statement is *not* misleading merely because it is incomplete, as no statement can possibly disclose every relevant detail. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

***Staley "Never Engaged or Paid Fees" to Epstein.*** The earliest alleged misstatement is Barclays' July 2019 statement that Staley "never engaged or paid fees" to Epstein. Am. Compl. ¶ 53. The statement was made in a *New York Times* article discussing Staley's relationship with Epstein and the ways in which Epstein's connections had furthered Staley's career. *Id.* ¶¶ 52-53.

As to this statement, Staley's principal argument was that the mere denial of a *paid* relationship—which, it bears repeating, was truthful—did not in any way deny the *other* aspects of the relationship discussed in the article, and thus it did not leave anyone with a misimpression of the extent of Staley and Epstein's dealings.  ECF 056 ("Staley's Mot.") at 9.

In response, Plaintiffs argue that the denial of payment "concealed the fact that the relationship was far more intimate than one that was purely transactional," and that "the purpose of the statement was to create distance between Staley and Epstein."  Opp. 6.  That *might* be a satisfactory response *if* showing an omitted detail were sufficient to sue.  But it is not.  No statement contains every detail, and thus the legal standard for actionability is *not* "omitted" (or even "concealed") but rather *misled*.  Absent a reason to think that investors would be misled about the intimacy of the relationship based on the denial of payment—and Plaintiffs provide no such reason—the statement is not actionable.  And Plaintiffs' comment about the "purpose" of the statement is simply irrelevant, as it is the *content* of a statement, not its *purpose*, that determines whether the statement is misleading.  *Cf. In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 n.11 (N.D. Cal. 2020) ("Allegations speaking to defendants' state of mind . . . are appropriately considered in the context of scienter, not falsity.").

***The Relationship Was "Professional."***  The next alleged misstatements concern the statements from February 2020 that the Epstein relationship was "professional."  Am. Compl. ¶¶ 69-72.  Staley argued that these statements were neither false nor misleading, noting that the relationship began as a client engagement at JPMorgan—clearly a "professional" context—and that the assertion of a professional relationship is not a denial of a personal one.  Staley's Mot. 9-10.  Staley further observed that Plaintiffs had tried to surmount this problem by alleging that Staley had said the relationship was "only" professional, Am. Compl. ¶¶ 25, 81(a), when in fact he said no such thing, *e.g.*, *Rok v. Identiv, Inc.*, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017) (statements not misleading because they did not say "only material weakness").

To rebut this point, Plaintiffs again do not claim that the statements were false, but that they were misleading because Staley was "holding back" the personal side of the relationship, at a time when investors were "facing new uncertainty" because of the FCA's investigation.  Opp.

7-8. But here again, all statements "hold[] back" something, and they are not misleading just because they do so. *Brody*, 280 F.3d at 1006. And while Plaintiffs are correct that context matters, investor "uncertainty" is meaningless as context: Investors are *always* facing uncertainty, and thus it has no bearing on whether a particular statement misled anyone. In this vein, the only relevant "context" is the extensive media coverage spelling out the very details of the Epstein relationship that Plaintiffs claim were omitted, ensuring that market prices reflected all the facts. Staley's Mot. 14 (noting *New York Times* and *Financial Times* articles discussing Staley's friendly personal interactions with Epstein).

**The Relationship "Taper[ed] Off," with "No Contact" at Barclays.** The next alleged misrepresentations are different in that they concern the *duration* of Staley's relationship with Epstein rather than its closeness, i.e., that the relationship "began to taper off quite significantly" after Staley left JPMorgan, and that he had "no contact" with Epstein once he began at Barclays. Am. Compl. ¶¶ 69, 71, 75. As to these, Staley's Motion argued that because these statements did not deny that the relationship continued up *until* Staley joined Barclays, they could not have misled anyone about how long the relationship lasted. Staley's Mot. 10.

Despite the different subject matter of these statements, Plaintiffs again simply repeat their arguments about the statements failing to disclose intimacy. Opp. 8 (statements "suggest to investors that [the] relationship was distant"). But intimacy and duration are *not* the same thing, and Plaintiffs' repeated complaint about failing to disclose intimacy cannot be the answer to everything, particularly when the statements at issue made *no comment* on it. Indeed, Plaintiffs appear to concede that the statements here were *not* misleading as to the duration of the relationship, as they write, "[W]ith Barclays' reputation resting on his shoulders, Staley did not continue direct contact with Epstein once he became CEO." *Id.* at 9 n.6.

**The Board Found Staley "Transparent" and Had "Full Confidence."** The next alleged misrepresentations are that the Barclays board had found Staley "transparent" about Epstein and that it had "full confidence" in him, which statements were allegedly misleading because the board made them after it had received emails showing a more intimate relationship than Staley had let on. Am. Compl. ¶¶ 69-74, 81. As explained in Staley's Motion, because these

statements described the board's own subjective views, they were inherently opinions, and thus not actionable absent facts showing that the board actually held different views, which Plaintiffs do not allege. Staley's Mot. 10-11; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) ("[L]iability . . . follows only if the speaker does not honestly hold the stated belief and the belief is objectively incorrect.").

In their Opposition, Plaintiffs challenge Staley's argument on both the law and the facts. On the law, Plaintiffs argue that an opinion can be actionable even if sincerely believed *if* "the speaker omitted facts 'going to the basis' of the opinion." Opp. 9-10. On the facts, Plaintiffs argue that some of the statements—i.e., the ones by Staley personally—were not opinions at all but statements of hard fact. *Id.* at 10. And Plaintiffs generally tout the FCA's conclusion that Staley "acted with a lack of integrity," suggesting that the FCA's views "corroborate" Plaintiffs' claim that the statements about transparency were misleading. *Id.* at 9. Plaintiffs are wrong on all points.

In the first place, the Ninth Circuit has been clear that when a plaintiff invokes the "omitted-the-basis" theory of misrepresentation, it is *not* sufficient merely to allege that the speaker knew, but did not disclose, certain facts that cut against his opinion. *City of Dearborn Heights*, 856 F.3d at 615-16 (liability "not necessarily established" when defendant withholds "some fact cutting the other way"). That is because "reasonable investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). For that reason, a plaintiff relying on an omitted-basis theory must "identify particular (and material) facts going to the basis for the issuer's opinion." *Id.* at 195. Here, that would require allegations describing the process by which the board reached its subjective opinion and why that process was deficient. *Id.* Plaintiffs, however, instead rely on the board's possession of the emails alone, which is fully consistent with a sincere and competent conclusion weighing a range of competing facts.

Addressing the statements themselves, Plaintiffs argue that the transparency-related comments by Staley were not opinions at all because they were not preceded by filler phrases like "I believe" or "I think." Opp. 10. That is nonsense. In the first place, Plaintiffs' own

pleadings describe Staley using the very type of qualifying words they now claim were missing. Am. Compl. ¶ 71 ("*I feel* very comfortable . . . I have been transparent and open with the bank."), ¶ 72 ("[I]t's *clear in my own mind . . .* I have been very transparent.").  But more fundamentally, Plaintiffs' argument would make sense only if the underlying content of the opinions were factual in nature, e.g., "*I think* that we have 10,000 units in inventory."  Here, by contrast, the statements consist of inherently subjective terms—e.g., "transparent," "open," "confident"—and thus are *necessarily* opinions, whether or not couched with the magic words that Plaintiffs claim are missing.  Plaintiffs fare no better in their separate argument that the statements somehow became less subjective because they were made in response to investor questions or because they were repeated.  Op. 10-11.  While Plaintiffs are correct that the circumstances of a statement can inform its content—e.g., mere puffing can become actionable when offered in response to focused questions about specific problems, *see Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (optimistic statements on "substantial" sales pipeline misleading given analyst questions about specific missed deals)—Plaintiffs identify nothing about the circumstances that gave additional meaning or concreteness to the phrase "sufficiently transparent," such that Defendants' statements of opinion would become misleading.

Finally, Plaintiffs get no traction from the FCA's conclusion that Staley had not been candid about his relationship.  Opp. 9.  The thrust of this argument appears to be that because the FCA held an unfavorable view about Staley's candor, the Barclays board could only have reached the same conclusion. *Id.*  This is groundless.  The very nature of an opinion is that it is subjective and, often, idiosyncratic.  There is no rationale that would allow this Court to infer that a private bank's standards for "transparen[cy]" and "confidence" were in any way aligned with those of a government regulator, or that two very different entities would necessarily arrive at the same opinion despite possessing the same materials.

***Statements About Staley's and Barclays' Response to the FCA.***  Plaintiffs also allege falsity in certain statements about the FCA's investigation, namely (i) that Barclays was "cooperating with the investigation," and (ii) that, in doing so, its board had "rigorously followed" its "governance processes."  Am. Compl. ¶¶ 69-70, 77, 79, 89, 94.  On Plaintiffs'

theory, these statements were misleading because, in its initial October 2019 letter, the bank had falsely told the FCA that Staley and Epstein were "not close," which meant that the bank could not later claim to have "cooperated" with the investigation at all.  As Staley noted, this made no sense as a theory of falsity: The "investigation" *did not exist* when the bank sent its October 2019 letter, as the letter was itself the *cause* of the investigation.  Staley's Mot. 12.

In response, Plaintiffs do not grapple with this point at all, and instead merely repeat their claims that the bank was "clearly ***not*** cooperating" because its October 2019 letter "concealed the true nature of [Staley's] relationship."  Opp. 11.  That argument, again, simply *assumes* that the FCA's inquiry soliciting the letter and its later investigation into that letter were the same thing.  They were not.  Plaintiffs' theory is akin to claiming that a person charged with making a false statement to law enforcement could never claim to cooperate with an investigation into that charge *if* he made the false statement in the first place. Neither law nor logic supports this theory.

The one other statement on this subject was Defendants' statement that Staley "volunteered" information regarding Epstein, which Plaintiffs claimed was misleading because Staley gave his account of events in response to the FCA's inquiry.  Am. Compl. ¶ 69.  As Staley noted, however, the idea that Staley "volunteered" information means only that he gave his account willingly, not that it was unsolicited.  Moreover, the fact that Staley gave his account in response to the FCA's inquiry was not concealed from anyone; quite to the contrary, Defendants disclosed the FCA's inquiry in the same breath.  Staley's Mot. 11.  On this point, too, Plaintiffs do not respond to Staley's argument.  Although they repeat their assertion that Staley would not have given an account of the Epstein relationship had the FCA not inquired about it, Opp. 12, they make no attempt to show how that was inconsistent with what Defendants said.

## II.    THE STATEMENTS AT ISSUE WERE NOT MATERIAL.

As to all of the alleged statements, Staley also observed in his Motion To Dismiss that even assuming any of them was misleading, they clearly were *not* material, for two reasons:  ***First***, none of the statements had anything to do with Barclays, and thus none of the information they conveyed would have made a difference to reasonable investors.  Staley's Mot. 12-13.  ***Second***, and equally importantly, all of the allegedly "concealed" information about the

Staley-Epstein relationship (or Staley's candor about it) was already in the public domain and thus presumably factored into Barclays' stock price. *Id.* at 14; *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) (no materiality "where th[e] information has been made credibly available to the market by other sources"). In response, Plaintiffs argue that materiality is a "fact intensive" issue, but on both of Staley's points—either of which is independently fatal to their claims—they fail to identify any dispute of fact actually requiring discovery, let alone a trial, to resolve. Opp. 12.

On the first point, Plaintiffs assert that the Staley-Epstein relationship must have mattered to investors because financial analysts asked about it in media events shortly after the FCA's investigation was announced. Opp. 12-13. But no case or other authority holds that events wholly unrelated to the company at issue can become material solely based on external inquiries. In the cases cited by Plaintiffs, the challenged statements *actually concerned the company at issue*, not the private affairs of the company's CEO from his previous career. *See, e.g., Glazer*, 63 F.4th at 770 (statements of optimism about sales pipeline); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (statements addressed "specific aspects of a company's operation"). Nor do Plaintiffs get traction by re-casting the Epstein relationship as a referendum on Staley's integrity. Opp. 13. Here, too, all of Plaintiffs' cited cases where integrity-related concerns were deemed material involved events occurring *while the executive was at the company in question*, not before he ever arrived. *Id.* (citing, e.g., *Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515, 540 (S.D.N.Y. 2020) (chairman's alleged misconduct happened while at corporation)). Here, by contrast, there is *no* allegation that the Epstein relationship continued into Staley's tenure at Barclays or otherwise impacted his job performance, and thus any "integrity" concerns relate to private issues of the type that courts have deemed immaterial as a matter of law. *E.g.*, *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 660 (4th Cir. 2004) (CEO's lie about bachelor's degree immaterial).

As to Staley's second point concerning the extent of publicly-available information on the Epstein relationship, Plaintiffs argue that the market could still be misled given the "heavy reliance" that investors give to statements by corporate insiders. Opp. 14. But the sources of

public information in this case were *exactly* the kind of market-moving periodicals that courts have deemed fully credible to the investing public. *In re Apple*, 886 F.2d at 1112, 1116. Moreover, the *kind* of information at issue here—tabloid fodder about personal friendships among the wealthy and famous—was in no way uniquely available to corporate insiders. *Cf. White v. H&R Block, Inc.*, 2004 WL 1698628, at *6 (S.D.N.Y July 28, 2004) (information not "only available to officers or directors"). In this regard, Plaintiffs' only attempt to show undisclosed material information is their assertion that "the lengths that Staley had gone to mislead the U.K. regulator" were "unknown." Opp. 14. But as noted in Staley's opening brief, the news coverage of Staley's situation *directly questioned his candor*, challenging the idea that he had been truthful at the very time that (according to Plaintiffs) investors were misled on that point. Staley's Mot. 14 (*Financial Times* reporting that "Staley was closer to Epstein than he had originally stated" and that emails "did not tally with a merely professional relationship, close or not"). No claim of materiality can exist on these facts, nor is there any factual dispute that would warrant moving this case into discovery.

## III.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.

On loss causation, Staley's brief argued that the FCA's Decision Notice of October 2023 was not, and could not be, a "corrective disclosure." Staley's Mot. 15-17. Although the Decision Notice announced that Barclays had made two misleading statements in its October 2019 letter to the FCA, those two statements were *not* among the ones that Plaintiffs have sued upon here—they were not publicly disseminated—and thus the Decision Notice did not "correct" anything of import to Plaintiffs' lawsuit. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (corrective disclosure must "relate back" to alleged misrepresentation). Moreover, the Decision Notice did not reflect any new information, as Barclays had disclosed the FCA's "preliminary conclusions" to the same effect two years before. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) (corrective disclosure must "reveal" new information). Nor did the Decision Notice cause any "significant" drop in Barclays' share price. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008).

Because each of these things is a legal prerequisite for loss causation, Plaintiffs' failing as to each is independently fatal to their claims.

Plaintiffs' Opposition fails to rebut any of these points. On the first point, Plaintiffs do not deny that the Decision Notice does not mention the alleged misstatements they have sued upon, but argue that a corrective disclosure need not be a "mirror image" of a prior misstatement so long as it covers "the same subject matter." Opp. 16. But while it is true that a disclosure need not directly call out a prior misstatement for a correction to be inferable, it is the plaintiff's burden to explain how and why the inference of falsity may be drawn. *See Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024) (heightened pleading standard applies to loss causation). Here, the Amended Complaint does not do this at all, and instead simply claims falsity without ever connecting even *one* of the sued-upon misstatements to the FCA's Decision Notice that supposedly corrected them. Am. Compl. ¶ 103. In this vein, Plaintiffs suggest that a correction may be inferred from the "temporal component," i.e., the fact that the stock fell shortly after the Decision Notice, Opp. 16, but that is preposterous. It is a bedrock principle of securities law that not all stock drops derive from fraud, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005), and, indeed, the whole point of requiring a plaintiff to "trac[e] the loss back" to the sued-upon misrepresentation is to preclude the very correlation-as-causation argument that Plaintiffs now employ, *In re Nektar Therapeutics*, 34 F.4th at 839; *see also Meyer v. Greene*, 710 F.3d 1189, 1202 (11th Cir. 2013) ("not every bit of bad news" is a corrective disclosure).

Weaker still is Plaintiffs' response to Staley's argument that the Decision Notice "added no new information to the market." *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020) (cleaned up) (dismissing plaintiffs' complaint for failure to allege loss causation). On that point, Plaintiffs argue that the information already in the market was not delivered with the necessary "intensity or credibility," Opp. 17 (citing *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)), but that, too, is preposterous. As noted in Staley's opening brief, the source of the information "already in the market" was the *FCA itself*, which had concluded, two years before the Decision Notice issued, that (in Plaintiffs' words) "Staley Lied About His Ties to Epstein." Am. Compl. at p.30. In other words, the *same* entity that Plaintiffs allege upended the

market in October 2023 also provided the preexisting information that Plaintiffs ask this Court to discount.  Moreover, Plaintiffs are undermined by their above-mentioned argument that a corrective disclosure need only be of the "same subject matter" as the alleged misrepresentations.  Plaintiffs cannot credibly argue that the Decision Notice of October 2023 directly rebutted the alleged misrepresentations in this case, while at the same time arguing that a *similar* statement two years earlier by the *same* entity on the *identical* subject matter had no effect at all.

Finally, Plaintiffs fail to plead a "significant" drop in stock price as loss causation requires.  As Staley observed in his opening brief, the meager 4.99% decline in Barclays' stock is well below the standard for courts in the Ninth Circuit, where "securities complaints tend to be predicated on double digit declines." *Carey Camp v. Qualcomm Inc.*, 2020 WL 1157192, at *6 (S.D. Cal. Mar. 10, 2020).  Plaintiffs argue that courts in the Ninth Circuit "routinely" find loss causation in single-digit stock drops, *see* ECF 069 (Pls. Opp. to Barclays' and Higgins' Mot.) at 19, but all of Plaintiffs' examples involve *multiple* price drops that *collectively* exceed ten percent easily, *e.g., In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 931 (N.D. Cal. 2020) (five total drops of 2.5, 5, 2.5, 2.6, and 9%); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (three total drops "ranging from 2% to 8.59%"); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *6 (C.D. Cal. Aug. 4, 2014) (three total drops of 2.3, 2.1, and 9.1%).  Such cases provide no support for loss causation here, predicated on a single drop of less than five percent.  Plaintiffs similarly get no traction from their contention that the Court should consider the "average trading range" for Barclays stock.  Opp. 17.  As Staley initially observed, Barclays' closing share price on the day of the Decision Notice was $7.43, just $0.01 below the average price for that month *and* the month prior.  ECF 057, Ex. 07.  In other words, there is no measure by which the sued-upon price drop in this case appears in any way anomalous.

## CONCLUSION

For the foregoing reasons, the Consolidated Amended Class Action Complaint should be dismissed.

DATE: February 28, 2025                    UMHOFER, MITCHELL & KING LLP


                                          s/ Elizabeth A. Mitchell
                                          Matthew Donald Umhofer
                                          Elizabeth A. Mitchell

                                          WILLIAMS & CONNOLLY LLP

                                          Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
                                          John M. McNichols (admitted *pro hac vice*)
                                          Stephen L. Wohlgemuth (admitted *pro hac vice*)

                                          Counsel for Defendant James Staley

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for defendant James E. Staley, certifies that this brief is prepared in Times New Roman font with text no less than twelve (12) point font (with footnotes no less than ten (10) point font) and is 10 pages, which complies with the limits set in Section VIII.C of the Court's Civil Standing Order of May 2024, which is the current version available on the Court's website.

DATE: February 28, 2025                    UMHOFER, MITCHELL & KING LLP


                                           s/ Elizabeth A. Mitchell
                                           Matthew Donald Umhofer
                                           Elizabeth A. Mitchell

                                           WILLIAMS & CONNOLLY LLP

                                           Brendan V. Sullivan, Jr. (admitted *pro hac vice*)
                                           John M. McNichols (admitted *pro hac vice*)
                                           Stephen L. Wohlgemuth (admitted *pro hac vice*)

                                           Counsel for Defendant James Staley