PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone:     (213) 687-5000
Facsimile:     (213) 687-5600

SCOTT D. MUSOFF (admitted *pro hac vice*)
scott.musoff@skadden.com
BORIS BERSHTEYN (admitted *pro hac vice*)
boris.bershteyn@skadden.com
LARA A. FLATH (admitted *pro hac vice*)
lara.flath@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:     (212) 735-3000
Facsimile:     (212) 735-2000

Attorneys for Defendants Barclays PLC and Nigel Higgins

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS,<br><br>                              Defendants. | CASE NO.: 2:23-cv-09217-MEMF-KS<br><br>**DECLARATION OF MARTIN MOORE K.C. IN SUPPORT OF DEFENDANTS BARCLAYS PLC'S AND NIGEL HIGGINS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>Date: May 15, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8B<br>Judge: Hon. Maame Ewusi-Mensah Frimpong<br><br>Complaint Filed: November 1, 2023<br>Amended Complaint Filed: August 12, 2024 |

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

## I.    Introduction

1.    My First Declaration in this matter, dated 30 October 2024, related to aspects of English securities law in so far as they apply to the Complaint (my **First Declaration** or **Moore 1**). Save where otherwise stated, I adopt the definitions used in my First Declaration.

2.    I have now been asked to provide this Second Declaration in response to the Declaration of Adam Kramer KC dated 16 January 2025 (the **Kramer Declaration**) and on matters of English securities law arising from the memorandum in opposition to the Defendants' motion to dismiss filed on behalf of the St Louis Firemen (the **Plaintiff's Opposition**).

3.    As I noted in my First Declaration, it is an important requirement of the Court in England and Wales that persons giving expert evidence owe their duties to the Court to which their evidence is to be tendered and not to the party appointing them. Regardless of whether such a requirement exists in the United States District Court, I have made this Second Declaration on the same basis as I would were it made in English proceedings.

4.    I continue to hold the views expressed in my First Declaration and summarised in paragraph 10 of that document. In this Second Declaration, having reviewed the Kramer Declaration, I outline the areas of agreement and of disagreement between us, and summarise my position on those areas on which we disagree.

## II.    Overview

5.    Mr Kramer and I agree on much of the s. 90A regime. We also agree, for the most part, on the outcome of the leading cases in the area: *Autonomy* and (more recently) *Allianz*. The main (albeit not the only) points of difference flow from Mr Kramer's view that *Allianz* may have been wrongly decided and may be overturned in future cases.

6.    Whilst I agree with Mr Kramer that, at least as regards claims arising from delayed publication, the s. 90A jurisprudence is developing and in certain respects not straightforward, *Allianz* clearly reflects the current law of England and Wales. Moreover, and to the extent that it matters, I consider that the key parts of the decision in *Allianz*—the need to establish individual reliance, and the need in delay cases to establish later publication—were orthodox and correct.

1

DECLARATION OF MARTIN MOORE K.C.                              CASE NO.: 2:23-cv-09217-MEMF-KS

7.    It may assist if I begin with an overview of the ways in which s. 90A claims may be advanced, and the areas of agreement and disagreement on each. Thereafter I will deal with each of the main points of contention.

8.    The starting point, on which we both agree, is that there are three bases of liability under s. 90A of FSMA: **(i)** untrue or misleading statements; **(ii)** omissions and **(iii)** delay in publication.

9.    The Plaintiff's Opposition states on p. 24 that "*The Complaint sufficiently states a claim of dishonest delay under s. 90A of the FSMA against Barclays*". It does not say the same about claims for **(i)** liability for untrue or misleading statements or **(ii)** omissions. It may well be case that the Plaintiff no longer intends to pursue a case based on untrue or misleading statements or omissions liability. However, because Mr Kramer addresses all three bases of liability, I will deal with each in turn.

10.   So far as dishonest delay is concerned, as I explain in Section IV below, Mr Kramer and I disagree on two main points:

(a)    The first is as to *Allianz*, which Mr Kramer considers may have been wrongly decided. My view is that *Allianz* clearly reflects the current law of England and Wales and is, in any event, correct (see paragraphs 66 – 69 below).

(b)    The second is as to the circumstances in which an issuer may be liable for dishonest delay. As I explain in paragraphs 70 – 76 below, the claim formulated in the Complaint cannot properly be characterised as a 'delay' claim. It is in reality an allegation of omission or misstatement; and the English court would not in my view permit a claimant to avoid the need to show individual reliance (a requirement for omission and misstatement claims) by seeking to recast it as a 'delay' claim. Indeed, if the complaint in this case could be successfully characterised as a 'delay' claim, that would be true in most, if not all, cases. That was not the intent of the legislature in enacting the delay provision. A delay claim is in principle available where a publication is "*accurate but late*", but the publication to which Mr Kramer and the Plaintiff's Opposition point was not late. It could not have been published any

2

earlier. So far as the argument is that *some other* publication should have been made earlier, that is not a complaint about delay at all; in reality is an allegation of omission or misstatement.

**(I) Liability for untrue or misleading statements**

11.    As noted in paragraph 9 above, it may be that liability for untrue or misleading statements is no longer in issue. However, in case I am wrong about that, in order to establish liability for an untrue or misleading statement (Sch 10A, para 3) a claimant must establish four things:

(a)    a <u>misstatement</u>: an "*untrue or misleading*" statement in "*published information to which [Schedule 10A] applies*";

(b)    <u>fault</u>: that a PDMR "*knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading*";

(c)    <u>reliance</u> "*on published information*" and "*on the information in question*", at a time, and in circumstances in which, such reliance was reasonable; and

(d)    <u>loss</u> suffered in respect of the securities as a result of the untrue or misleading statement.

*Limb 1: Misstatement*

12.    There are two components to the misstatement limb: the statement must be in "*published information to which [Schedule 10A] applies*" and it must be "*untrue or misleading*".

13.    As regards the former:

(a)    Mr Kramer and I agree that liability can arise only in relation to information "*published*" by the issuer by "*recognised means*" or "*by other means where the availability of the information has been announced by the issuer by recognised means*".[1] We therefore also agree that statements referred to in newspapers, in

---

[1] Moore 1, para 32; Kramer, paras 42 – 44.

3

television interviews and on earnings calls were not published by "*recognised means*".[2]

    (b)    We therefore agree that, unless the information identified in para 36(a) of my First Declaration was announced via RNS, it is <u>outside</u> the scope of s. 90A.[3] I have not seen any allegation that the information was so announced.

    (c)    That being the case, I believe that we are in agreement that the statements which could be within the scope of s. 90A are those I identified in my First Declaration as the 'Relevant Statements', namely those appearing at paras 69, 70, 77, 78, 79, 83, 88, 89, 94 and 98 of the Complaint.

14.    As regards the requirement for an "*untrue or misleading statement*":

    (a)    We agree that, in determining whether a statement is untrue or misleading, an English court applies an objective approach, seeking to ascertain the meaning that would be ascribed to the statement by the intended readership (my words) or the reasonable person with the characteristics of the actual representee (Mr Kramer's words) and in the context in which it was received.[4]

    (b)    I cannot detect anything of substance between us on the meaning of the words "*untrue or misleading*". We are agreed that the relevant statement must be read in the sense it was intended to convey and that the meaning which a statement conveys may sometimes be different from its literal meaning.[5]

15.    So far as the application of that test is concerned:

    (a)    I explained in my First Declaration that the Complaint did not appear to explain <u>why</u> it was said each statement was untrue or misleading, and that, to me, that was not

---

[2] Moore 1, para 34; Kramer, para 45.

[3] Moore 1, para 36(a); Kramer, paras 46 – 47.

[4] Moore 1, para 40; Kramer, para 49.

[5] Moore 1, paras 40 – 45; Kramer, paras 49 – 58.

4

DECLARATION OF MARTIN MOORE K.C.        CASE NO.: 2:23-cv-09217-MEMF-KS

self-evident. I referred to an example from para 77 of the Complaint, in which it was said that **(i)** the Board's governance processes were rigorously followed; **(ii)** Mr Staley retained the full confidence of the board; and **(iii)** Mr Staley was unanimously recommended for re-election.[6]

(b)     Based upon the allegations of the Complaint, it remains unclear what the Plaintiff alleges to be actually untrue about those statements. The Complaint did not, for example, identify any elements of the governance processes which were not rigorously followed. It did not state that, as a matter of fact, Mr Staley did not retain the full confidence of the board, or was not in fact recommended for re-election. That being the case, I view it as likely that an English court would not allow the allegation to proceed.[7]

(c)     Mr Kramer states in response that it would be sufficient, as a matter of English law, "*to plead that Mr Staley did not retain the full confidence of the Board (which may be by pleading simply that the statement that he made was false), without pleading "the basis for [that] assertion", which would be a matter for evidence not pleading*".[8] There are two points I would make in that respect.

(d)     First, it is striking that, so far as I can tell, the Complaint does not make the allegation which Mr Kramer suggests might be made. There is no assertion that Mr Staley "*did not retain the full confidence of the Board*". On the contrary, the central contention appears to be that, having regard to the evidence, the board *should have* lost full confidence in Mr Staley.[9] That is a different point and does not suggest that the statement was untrue or misleading.

[6] Moore 1, para 49.

[7] Moore 1, para 50.

[8] Kramer, para 89.

[9] Complaint, para 81(b) and (c).

5

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

(e)    Second, while pleading questions are always context-specific,[10] I do not think that in the context of the Complaint as a whole, it would be sufficient in proceedings in England and Wales simply to assert that, as a matter of fact, Mr Staley "*did not retain the full confidence of the board*". Such an allegation would make little sense in circumstances where Mr Staley was then unanimously recommended for re-election. It could only be pleaded by way of inference and, in my view, an English court would require a claimant to plead the facts upon which they rely to support the inference.

*Limb 2: Fault*

16.    The fault requirement entails that a PDMR within the issuer "*knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading*".

17.    Mr Kramer and I agree that Mr Staley and Mr Higgins were PDMRs of Barclays for the period in which they were directors, and that Mr Staley would not be considered a PDMR in relation to the period after he departed Barclays.[11]

18.    We also agree that what is required is knowledge that the statement was untrue or misleading or recklessness, i.e. lack of an honest belief in the truth of the statement.[12] I do not think a wider sense of recklessness would apply (which Mr Kramer only floats tentatively, and on which he does not elaborate[13]). I agree with Mr Kramer that there is no need to prove an intention that the claimant rely upon the statement.

*Limb 3: Reliance*

19.    A claimant must establish that he:

---

[10] Consistent with points (i) and (iii) in para 89 of the Kramer Declaration, I agree that it is open to the English court to take into account relevant information asymmetries when considering the degree of particularity required; and also that, where a defendant applies to strike out a claim on grounds of lack of particularity, the court will often grant the claimant an opportunity to amend its case before striking it out.

[11] Moore 1, para 68; Kramer, paras 104-106.

[12] Moore 1, paras 64 – 67; Kramer, paras 90 – 91.

[13] Kramer, para 91.

6

(a)     acquired, held or disposed of the securities "*in reliance on published information to which [Schedule 10] applies*";

(b)     acquired, held or disposed of the securities "*in reliance on the information in question*"; and

(c)     did so at a time, and in circumstances in which, it was reasonable for him to rely on it.

20.     Mr Kramer and I agree that reliance is required. We also agree that *Allianz* decided that a claimant is unable to prove reliance by reference to the 'fraud on the market' theory but must instead prove individual reliance by some means (even if indirectly 'through' a third party). My view is that *Allianz* clearly represents the law of England and Wales and (moreover) was correctly decided. I have not identified in the Complaint any allegation of reliance which would meet the requirements in *Allianz*.

21.     Mr Kramer considers it arguable that *Allianz* was wrongly decided and, on that basis, suggests that there may be no need to show individual reliance beyond the fraud on the market theory. Mr Kramer also considers that the reliance need only be on the publication as a whole, and need not be on the individual untrue or misleading statement. Because this is an area of wider disagreement I address it separately in Section III below.

*Limb 4: Loss*

22.     Mr Kramer and I have commented on the question of loss only at a high level. Mr Kramer agrees with the high-level summary in paragraphs 97(a) to (c) of My First Declaration.[14] I agree with his opinion that the date and measure of loss under s. 90A is still open to argument and determination. That having been said, as noted in my First Declaration, I find it difficult to understand why, when shares were acquired by the St Louis Firemen in 2022, almost a year after Mr Staley stepped down as CEO, the share price would be underpinned by anything relating to Mr Staley, or would continue to be so in 2023.[15]

---

[14] Kramer, para 140.

[15] Moore 1, para 98.

7

**(II) Liability for omissions**

23.    As noted in paragraph 9 above, it appears that liability for omissions is no longer in issue. For completeness, however, in order to establish liability for an omission (Sch 10A, para 3) a claimant must establish four things:

(a)    an <u>omission</u> from "*published information to which [Schedule 10A] applies*";

(b)    <u>fault</u>: that a PDMR "*knew the omission to be a dishonest concealment of a material fact*";

(c)    <u>reliance</u> "*on published information*" and "*on the information in question*", at a time, and in circumstances in which, such reliance was reasonable; and

(d)    <u>loss</u> suffered in respect of the securities as a result of the omission.

*Limb 1: Omission*

24.    I have addressed the limitation to "*published information to which [Schedule 10A] applies*" in paragraph 12 above.

25.    So far as omissions are concerned:

(a)    Mr Kramer and I agree that the information "*required*" to be included in a publication is determined by reference to the disclosure obligations pursuant to which the publication is or ought to be made, and that the onus is on the claimant to establish that disclosure of the allegedly omitted matter was "*mandated by applicable legislation or accounting standards*". We also agree that there are various sources of disclosure obligations, including the Listing Rules, the DTRs and the UK Market Abuse Regulation, and that in each case it would be incumbent upon the claimant to identify the legislation or rules in question, and the information which it says was required to be included in a publication.[16]

(b)    Mr Kramer is right to say that I did not proceed to address possibles sources of obligation to disclose.[17] However, we agree that it is for a claimant to identify the

---

[16] Moore 1, paras 52 – 54; Kramer, paras 60 – 61.

[17] Kramer, para 61.

8

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

legislation or rules in question, and to establish that the omitted matter was mandated by that legislation or rules. There being no such allegations in the Complaint, I do not speculate on a case which the Plaintiff had not advanced.

(c)     At paragraphs 62 – 71, Mr Kramer goes on to address two possible sources of an obligation to disclose, which are not mentioned in the Complaint, but to which I referred in passing at paragraph 54 of my First Declaration: the UK Market Abuse Regulation (**MAR**) and the DTR.

(d)     I agree with his summary of Article 17 of MAR in paragraphs 62 – 67 and the summary of the requirements of DRT 4.1 in paragraphs 69 – 70. There are further potentially relevant legal principles on the subject, such as Article 7(4) of MAR, which explains what is meant by "*would be likely to have a significant effect on prices*" and *Hannam v Financial Conduct Authority* [2014] UKUT 233, in which the Upper Tribunal addressed in some detail a number of questions of interpretation arising from the legislative provisions now to be found in MAR. However, I return to my earlier observation that the Complaint does not state what is alleged to have been omitted, or why it was required to be included.

(e)     I would also emphasise that the need for a clearly identifiable allegation in that regard is important not just for establishing the omission, but also for establishing fault. As Hildyard J explained in *Autonomy* at [469], the fault requirement entails that the PDMR "*must have applied his mind to the omission at the time the information was published, and appreciated that a material fact was being concealed*". That standard can only be applied with a firm understanding of the alleged omission in question.

(f)     Mr Kramer's statement that it is "*not a high threshold to establish that relevant information may have been omitted for the purposes of s.90A*" is rather Delphic.[18]

---

[18] Kramer, para 72.

9

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

Certainly I do not think the threshold could in any sense be regarded as low. As Hildyard explained in *Autonomy* at [1668]:

"*Thus, to establish liability for an omission, the onus is on the Claimants to demonstrate on the balance of probabilities that:*

*(1) Disclosure of the omitted matter was "required to be included" (that is, mandated by applicable legislation or accounting standards) in the relevant published information;*

*(2) The relevant Defendant, being a PDMR, had actual knowledge, at the time of the omission of the published information in question, of (a) a material fact which (b) he also knew was required (in the sense explained above) to be disclosed but which instead (c) was being "concealed" (that is, deliberately being left out)."*

(g)    I do not disagree with Mr Kramer's point that the relevant pleading requirements may be a matter of US law, and not English law.[19] However, I remain of the view (with which I do not take Mr Kramer necessarily to disagree[20]) that an English court would not allow allegations of omission to proceed unless the claimant had adequately pleaded both that the disclosure was mandated by some particular legislation or rules and had adequately identified the legislation or rules.

*Limb 2: Fault*

26.    The fault requirement is that a PDMR "*knew the omission to be a dishonest concealment of a material fact*".

27.    We agree to the relevant tests: the PDMR must have had actual knowledge, at the time of the omission, of a material fact which he also knew was required to be disclosed but which instead was being concealed.[21] As I explained in my First Declaration, in the absence of an allegation as to the basis on which the information was "*required*", I could not see any basis for an allegation that the PDMR knew that the information allegedly omitted here was "*required*".[22]

---

[19] Kramer, paras 87 – 88.

[20] Kramer, para 73.

[21] Kramer, paras 93 – 100.

[22] Moore 1, para 76.

10

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

*Limb 3: Reliance*

28.   So far as reliance is concerned, the statutory requirements are as set out in paragraph 19 above, and the contours of the debate are broadly as set out in paragraphs 19(c) – 21 above. I address reliance in greater detail in Section III below. As noted above, I have not identified in the Complaint any allegation of reliance which would meet the requirements in *Allianz.*

*Limb 4: Loss*

29.   So far as loss is concerned, the position is as set out in paragraph 22 above.

**(iii) Liability for delayed publication**

30.   In order to establish liability for delayed publication (Sch 10A, para 5) a claimant must establish three things:

    (a)   <u>delay</u> by the issuer in publishing information to which Schedule 10A applies;

    (b)   <u>fault</u>: that a PDMR "*acted dishonestly in delaying publication of the information*"; and

    (c)   <u>loss</u>: that the claimant acquired, held or disposed of securities, and suffered loss in respect of the securities as a result of the delay.

*Limb (1): Delay in publication*

31.   So far as delay in publication is concerned, again Mr Kramer and I agree that the outcome of *Allianz* was that there can no liability for delayed publication unless the required information is in fact published at a later date. However, Mr Kramer considers that the conclusion in *Allianz* does not reflect "*the only available sensible interpretation*" and that the point remains open at appellate level.

32.   I remain of the view that *Allianz* represents the current law of England and Wales and, moreover, was correctly decided. It follows, in my view, that a claimant alleging liability for delayed publication will be required to point to a publication and, further, to prove that the issuer was under an obligation to make that publication at an earlier date but delayed in doing so.

11

DECLARATION OF MARTIN MOORE K.C.                                    CASE NO.: 2:23-cv-09217-MEMF-KS

33.    If Mr Kramer (and the unsuccessful claimants in *Allianz*) were correct, liability for delayed publication would be very wide indeed, and certainly would appear to swallow up most, if not all, of the omissions regime. On the approach which he postulates, there is no need for any publication and, potentially no need even for any requirement to publish at a particular time. The only brake on liability is the requirement for dishonesty, which on his view, is simply to be left to the judge or jury at trial.[23] I do not think this can be correct. It is contrary to the clear approach of the High Court in *Allianz*, and is also contrary to the reports which preceded the introduction of liability for delayed publication, all of which make clear that liability for delayed publication is intended to 'plug a gap' and must be kept within reasonable bounds.

34.    I address this point further in Section IV below.

*Limb (2): Fault*

35.    An issuer will be liable in respect of delay only if a PDMR "*acted dishonestly in delaying the publication of the information*".

36.    In my First Declaration, I suggested that this will require a claimant to show that the PDMR **(i)** knew that the issuer was obliged to publish the information by a particular date or within a particular timeframe (possibly a very short one); **(ii)** nevertheless caused the issuer to publish the information at a later date; and **(iii)** did so deliberately and dishonestly.[24]

37.    Mr Kramer disagrees, and fairly points out that under para 5, unlike under para 3(3) (omissions) there is no specified requirement of knowledge.[25] Whilst it is of course correct that the requirements I have suggested do not appear on the face of the legislation, I struggle to envisage a situation in which a PDMR could be held to have "*acted dishonestly in delaying*" publication without knowledge of the requirement to publish. That seems to me inherent in the concept of dishonest *delay*. Taking Mr Kramer's example in paragraph

---

[23] Kramer, para 103.

[24] Moore 1, para 78.

[25] Kramer, para 102.

DECLARATION OF MARTIN MOORE K.C.                              CASE NO.: 2:23-cv-09217-MEMF-KS

103, recklessly ignoring suspected corruption or false accounting might conceivably be regarded as dishonest; but I do not think it could fairly be described as "*acting dishonestly in delaying*" publication.

*Limb (3): Loss*

38.    We agree that, in establishing liability for delayed publication, there is no need to establish reliance.

39.    So far as loss is concerned, the position is as set out in paragraph 22 above.

**III.    Reliance**

40.    Having outlined the areas of agreement and disagreement above, in this section I address the question of reliance, which is one of the two principal areas of disagreement.

41.    It is common ground that there is no reliance requirement for dishonest delay claims.[26]

42.    However, in relation to both untrue or misleading statements and omissions, a claimant must establish that:

    (a)    he acquired, held or disposed of the securities "*in reliance on published information to which [Schedule 10] applies*";

    (b)    he acquired, held or disposed of the securities "*in reliance on the information in question*"; and

    (c)    he did so at a time, and in circumstances in which, it was reasonable for him to rely on it.

**(I) The need to prove reliance**

43.    Mr Kramer and I agree that the fraud on the market theory of indirect reliance has not been recognised by English courts and was expressly rejected in *Allianz* – the only case to have considered it.[27]

---

[26] Moore 1, para 94; Kramer, para 107.

[27] Moore 1, para 89; Kramer, para 89.

13

44. Under *Allianz*, it is a prerequisite to liability for misstatements or omissions that the representatives of a claimant read and considered (at least) the published information (or that third parties who directed or influenced their investment decisions did so).

45. I have not detected any such allegation in the Complaint. Assuming there is no such allegation, that would, in my view and as in *Allianz*, be the end of any case for liability for untrue or misleading statements or omissions – subject to Mr Kramer's opinion that it is "*seriously arguable that Allianz is wrong*", which I address in the next section.

**(II) Mr Kramer's view that *Allianz* may have been wrongly decided**

46. Mr Kramer is no doubt right to say that, in future cases, securities claimants may seek to argue that *Allianz* was wrongly decided, so as to avoid the need to establish that they relied individually on the misstatements or omissions in question. However, it is clear that *Allianz* represents the current law of England and Wales. Additionally, I consider that, in requiring a claimant to show individual reliance, and in rejecting the 'fraud on the market theory', *Allianz* is a statement of the orthodoxy and is correct as a matter of principle.

47. Briefly, the key components of Leech J's analysis, with which I agree, may be summarised as follows:

(a) The term "*reliance*" is used in Sch 10A, para 3(1) to <u>limit the class of persons</u> to whom an issuer is liable to those persons who have relied on published information [102].

(b) The same term is used in para 3(4) to <u>limit recoverable losses</u> to those suffered by persons who have relied on the information which contained the untrue or misleading statement or from which the relevant matters were omitted [103].

(c) In both cases, the provisions are to be contrasted with prospectus liability under s. 90(1) of FSMA, which imposes liability without any requirement for reliance.

(d) Parliament must have intended to give the term "reliance" some content and to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or

14

DECLARATION OF MARTIN MOORE K.C.                                    CASE NO.: 2:23-cv-09217-MEMF-KS

omission being made to the market. Otherwise they would have adopted language very similar to s. 90 of FSMA [104].

(e)    Accordingly, reliance and causation were intended to serve as separate ingredients. The Davies Review and the Treasury Consultation confirmed this [107].

(f)    The 'fraud on the market' theory is inconsistent with Parliament's legislative intent. If that theory were sufficient, it would apply to every claimant in every s. 90A claim, which cannot be correct, since the purpose of imposing two reliance requirements was to limit the class of persons capable of recovering, and to limit the recoverable losses, as set out above [121].

48. Dealing briefly with Mr Kramer's arguments at paragraph 129:

(a)    As to paragraph 129.1, the summary to which I have just referred explains why the 'fraud on the market' theory is inconsistent with s. 90A. I should add that this was also the view expressed by Professor Davies:[28]

"...*the statutory regime retains two features of the common law of deceit which restrict its impact. First and most important, the claimant can succeed only if it relied on the publication. As we have seen above [s. 90 of FSMA] does not require reliance. It adopts a 'fraud on the market theory'. If the misstatement in the prospectus affected the market price of the securities, that is enough, even though the claimant may not have known of the misstatement. Section 90A by contrast, requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken.*"

Mr Kramer's reference to the position in Australia does not assist, since, as he rightly notes in fn 91, the Australian legislation does not use the word 'reliance'. The Australian legislation requires claimants to establish loss or damage "*by*" or "*resulting from*" a contravention. As noted in a leading text on the subject matter (which predates *Allianz*), the Australian wording is "*more akin*" to s. 90 than s. 90A, and it "*would be a far greater leap*

---

[28] Davies Discussion Report, para 55.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

*for the UK courts to accept a theory of market-based causation in circumstances where there is an express reliance requirement, as with s. 90A.*"[29]

(b)    The argument at paragraph 129.2 is in substance the 'inferred reliance' argument suggested by Professor Eilìs Ferran in an academic article in 2009 and cited in *Allianz* at [60]. Professor Ferran noted that the argument would be "*novel*" and that the view that it "*is really fraud on the market by the back door and, as such,…inconsistent with the legislative intent…is likely to carry considerable weight*". Leech J was in my view correct to agree with that view (at [121]) finding that it would be inconsistent with parliament's legislative intent to apply a legal presumption of reliance. If indirect reliance of this kind were sufficient, the concept of reliance would not limit recovery in any way.

(c)    As to paragraph 129.3, it is of course correct that, if the courts were to disregard the need to show individual reliance, that would increase the pool of potential claimants. But that was (manifestly) not Parliament's intention. On the contrary, by requiring reliance, the obvious inference is that Parliament's intention was to limit the remedy to those who had in fact relied on the statement. Whilst the provisions exist for investor protection (as Mr Kramer says) the scope of the provisions involved a careful balancing act. As I explained in my First Declaration, s. 90A was designed to ensure that potential liability was kept within reasonable bounds; and it must be remembered that it is just one component of a wider securities regime in which the FCA carries out public enforcement of the relevant disclosure rules.[30]

(d)    Paragraphs 129.4 to 129.6 seem to me not so much a criticism of Leech J's rejection of the fraud on the market theory as a criticism of his (*obiter*) observations as to how a claimant in an omissions case may establish the requisite degree of reliance, and the circumstances in which reliance may be 'indirect'. Whilst those particular

---

[29] *Class Actions in England & Wales* (2nd ed) at 12-063.

[30] Moore 1, paras 24-26.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

questions no doubt pose challenging issues to be worked out in future cases, it does not follow that the court should abandon the need to show individual reliance.

(e) The point made at paragraph 129.7 does not in my view advance the argument any further. The fraud on the market theory is not available in misrepresentation claims any more than it is under s. 90A. That is why Professor Davies described s. 90A as 'retaining' a reliance requirement which precluded the fraud on the market theory, and Professor Ferran described the point as "*novel*" so far as the English courts are concerned.[31]

(f) As to paragraph 129.8, for the reasons I have explained, it seems to me that the use (twice) of the word "*reliance*" was intended to limit the class of persons entitled to relief, and to require claimants to show actual, individual reliance.

**(III) Elements of reliance**

49. For completeness, I address the various more specific elements of reliance in this section. However, for the sake of clarity, if I am correct that **(i)** *Allianz* is good law; and **(ii)** the Plaintiff has not alleged individual reliance, I do not think any of these points arise.

*The presumption*

50. It is common ground that there exists a presumption as outlined in paragraph 87 of my First Declaration, but that, so far as there is a requirement to read to the published information (per *Allianz*, as set out above) the presumption does not assist a claimant.[32]

*Reliance on what?*

51. So far as misstatements are concerned, my view (as expressed in my First Declaration) is that a claimant must show that it applied its mind to the misstatement in question. That seems to me to follow from the statutory requirement to establish "*reliance on the information in question*" (paragraph 3(4)(a)), which I take to be a reference to the "*untrue*

---

[31] Davies Discussion Report, para 55.

[32] Moore 1, para 87; Kramer, para 118.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

*or misleading statement*" (paragraph 3(1)(b)). That also seems to me to have been the clear conclusion of Hildyard J in *Autonomy* at [503]:

"*...it would not be enough for Bidco to show that it relied in some generalised sense on a piece of published information (e.g. the annual report for a given year)...The requirement that loss be suffered as a result of the untrue or misleading statement can only be satisfied where the person acquiring securities applied his mind to the statement in question, and where that statement induced the acquisition or (more relevantly for this case) induced the acquirer to transact on the terms he did.*"

52.    Mr Kramer's opinion is that this overstates the position, relying on dicta from *Allianz* at [115]. However, at [115] of *Allianz*, Leech J was dealing expressly with omissions, not misstatements. As is common ground, he left over the question in relation to misstatements at [130]. That is unsurprising, since *Allianz* was a strike-out application and the question did not fall to be determined. It seems to me therefore that the test applied in *Autonomy*, on which I relied in my First Declaration, remains good law.

53.    So far as <u>omissions</u> are concerned, I agree with Mr Kramer that *Allianz* holds that what must be shown is reliance on the published information from which the omission was made (rather than the facts or matters alleged to have been omitted).[33]

*Reliance by whom?*

54.    In my First Declaration, I stated that the reliance must be on the part of the person who acquired the relevant securities, and it was not enough that some other person, who is not the claimant, applied his mind to the representation. That seemed (and seems) to me to be the clear from *Autonomy* at [481] – [482].

55.    Mr Kramer rightly notes that, in *Allianz*, Leech J considered that it would be enough for a claimant to show that it acted on the advice or at the direction of a third party who read that published information or that third parties who directed or influenced their investment decisions read and considered that published information.[34]

---

[33] Moore 1, para 86; Kramer, para 122.

[34] Kramer, para 131.

18

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

56. Whilst there is a tension between the way in which the two judges express themselves, I do not think there is any real inconsistency (and the observations in both cases were *obiter*). Hildyard J was correct in *Autonomy* to say that the remedy is only available to a person who acquired, held or sold "*in reliance*" on the published information. It follows, as Mr Kramer agrees, that the reliance requirement must be satisfied by the claimant, and nobody else.

57. However, how that requirement is satisfied in any given case will be a fact-sensitive enquiry, focusing on the causal link between the statement and the claimant's own actions (in buying, holding or selling): *Allianz* at [64]. I do not think it is helpful (or indeed possible) to lay down in the abstract the circumstances in which there will be sufficient reliance. The claimants in *Allianz* did not allege indirect reliance 'through' a third party and nor, so far as I am aware, does the Plaintiff in this case. It strikes me as conceptually possible that a claimant in an appropriate case will be able to establish reliance 'through' a third party, but that would depend entirely on the facts alleged and proved.

*Reasonable reliance*

58. It is common ground that a claimant must show that the securities were acquired, held or disposed of "*at a time when, and in circumstances in which, it was reasonable for [the claimant] to rely on [the information in question]*."

59. I agree with Mr Kramer that this is not a requirement that the claimant should exercise due diligence. I also agree that it will usually be reasonable to rely on published information as being accurate and complete.[35] However, as noted in my First Declaration, on the facts of this case it would require some explanation as to how a market participant acquiring shares some time *after* Mr Staley stepped down as CEO would reasonably rely on statements concerning Mr Staley published before his departure as CEO.[36]

**IV.   Delay**

---

[35] Kramer, para 124.

[36] Moore 1, para 93.

19

DECLARATION OF MARTIN MOORE K.C.                              CASE NO.: 2:23-cv-09217-MEMF-KS

60.     The other principal area of disagreement concerns liability for delayed publication. On that question, Mr Kramer and I agree as to the history of paragraph 5 of Schedule 10A and as to the purpose of introducing that provision in 2010, namely to "*plug a gap in liability*".  It was designed to capture "*statements which were accurate but late*".[37] We also agree that, where liability is founded upon delay in publishing information, there is no requirement for reliance.[38]

61.     I would also agree with Mr Kramer that the law regarding delay is not fully settled, and may continue to develop.[39] However, on any basis, I do not consider that the claim as formulated in respect of the Company properly to be of delayed publication.

**(I) The circumstances in which liability for delay will arise**

62.     In my First Declaration, I said that liability for delay will be engaged where:

(a)     the issuer was subject to an obligation to publish information by a particular date or within a particular timeframe, possibly a very short one; but

(b)     the required information was not in fact published until a later date.[40]

63.     My understanding is that, broadly-speaking, Mr Kramer agrees (or at least does not strongly disagree) with the first limb of that test. He mentions an argument that a delay claim may apply even if there is no requirement to publish, but concludes that it is likely that a dishonest delay will "*only or normally only arise*" for information for which there is an obligation to disclose at a particular time. For my part, I do not see how a publication could be regarded as "*delayed*" if there was no obligation to publish it earlier.

64.     In any event, the first limb was held (albeit in *obiter dicta*) to be correct in the only case to have considered the point. In *Allianz*, Leech J said at [138(6)]:

---

[37] Moore 1, paras 58 – 59; Kramer, para 76.

[38] Moore 1, para 77; Kramer, para 77.

[39] Kramer, para 83.

[40] Moore 1, para 61.

20

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

> "*...But if the DTR (or any other regulations) did not impose a duty on the Bank to publish that information on a RIS promptly or within a specified time period or at all, then there can be no liability for delay in publication either.*"

65. Turning to the second limb, Mr Kramer and I agree that this reflects the outcome of *Allianz*. However, as in relation to the reliance test, Mr Kramer questions whether that decision is correct, stating that Leech J's interpretation is "*not the only available sensible interpretation*", and that the point remains open at appellate level.  But on the law as it stands in England and Wales, it seems to me clear that the second limb is indeed a requirement.

**(II) Mr Kramer's view that *Allianz* may have been wrongly decided**

66. It is perhaps relevant to note that, because *Allianz* was a strike-out and summary judgment application, it could succeed only if the claim was found to have no realistic prospect of success: *Allianz* at [94]. Moreover, the English court may decline to award summary judgment in an area of developing jurisprudence unless the claims are "*plainly and obviously bad (e.g. because there is no real prospect of the law developing sufficiently to enable the claim to succeed)*": *Allianz* at [95]. It follows that, for his part, Leech J must have had a high degree of certainty that there is a requirement for later publication. That is also consistent with his decision (noted by Mr Kramer[41]) to refuse permission to appeal: permission will be granted where the appeal has a real prospect of success or there is another compelling reason for the appeal to be heard.[42]

67. That, of course, does not mean that another court could not reach a different view, but I mention it to explain the standard to which Leech J was required to be satisfied by the argument.

68. Mr Kramer is right to point out that the delay provision (Schedule 10A, para 5) is not an easy one. However, even leaving to one side the fact that the point has now been

---

[41] Kramer, para 81.

[42] Rule 52.6 of the Civil Procedure Rules of England and Wales.

21

DECLARATION OF MARTIN MOORE K.C.                              CASE NO.: 2:23-cv-09217-MEMF-KS

determined at least at first instance in *Allianz*, it seems to me as a matter of principle that the alternative interpretation of para 5 offered by Mr Kramer is unlikely to be correct – for essentially the reasons Leech J gave:

(a)     First, Leech J's interpretation seems to me to be correct as a matter of language. As he noted at [138], liability may arise under paragraph 5 only where the claimant suffers loss "*as a result of delay by the issuer in publishing information to which this schedule applies*". Pursuant to paragraph 2, the schedule applies only to "*information published by the issuer*" by recognised means or announced by recognised means. In other words, absent a publication, there can be no gateway to Schedule 10A.

(b)     Second, as again Leech J noted at [138(4) – (5)], this interpretation targets the mischief which delay liability was introduced to target, namely "*statements which were accurate but late*".

(c)     Third, liability for delay was introduced to "*plug a gap in liability*". It cannot have been Parliament's intention that the delay liability would swallow up much of Schedule 10A and render liability for omissions otiose. It seems to me almost inevitable that, on Mr Kramer's alternative formulation, any claimant with an omission complaint would simply formulate it as a delay complaint and avoid the need to show reliance [141 – 142]. Indeed, if neither of the two limbs I have pointed to in paragraph 62 above were required, there would be no check on liability at all. That cannot have been the intention of Parliament in seeking to "*plug a gap*".

69.     To my mind, none of Mr Kramer's counterarguments (at paragraph 82) overcome those fundamental points. Turning briefly to the reasons he gives:

(a)     As to paragraph 81.1, I agree that it is not necessarily inherent in the word "*delay*" that the delayed event must actually happen, though to my mind that is its usual meaning: it refers to the action of deferring or postponing something. But that misses the point. As noted above, the critical words are those which limit the

22

provision to information "*to which this schedule applies*", which entails actual publication or announcement *at some point in time* by recognised means.

(b)  At paragraph 82.2, I am not sure that Mr Kramer is correct to say that, even on Leech J's view, there will be a substantial overlap with omissions liability. In *Allianz*, there was no need to determine the precise contours between liability for omissions and liability for delay: the lack of any pleaded publication was sufficient to dispose of the claim. However, Leech J's view overall, like mine, appeared to be that the two grounds of liability (omissions and delay) were intended to operate in mutually exclusive spheres. How the two grounds of liability interact can be seen most easily by reference to the example given in the Plaintiff's Opposition, which I address in the next section below.

(c)  I do not fully understand the point that is made in paragraph 82.3, but I note that on the face of it, Mr Kramer suggests a possible resolution to the "*potential avoidance mechanism*" he identifies.

(d)  At paragraph 82.4, Mr Kramer suggests that Leech J may be wrong to say that later publication must have been by recognised means. That argument ignores the wording of paragraph 2 of Schedule 10A. The Schedule only applies to information published or announced by recognised means.

(e)  At paragraph 82.5, Mr Kramer suggests various possible ways of regulating the point of division between delay, on the one hand, and omissions, on the other. Amongst other things, he suggests that "*the circumstances in which failure to publish arises for delay purposes…are different to those in which failure to publish arises for omission purposes*". On this point, we agree. As indicated below, in many, if not most, cases I think there will be a clear distinction between the two. Leech J's finding that, in the case of delay, later publication is required supports, and certainly does not undermine, that distinction.

**(III) Application**

23

DECLARATION OF MARTIN MOORE K.C.                                    CASE NO.: 2:23-cv-09217-MEMF-KS

70.     In my First Declaration, I noted that, although the Complaint contains a bare assertion of dishonest delay, I had not been able to identify the basis for that allegation. As I explained, an English court would not in my view allow such a claim to proceed in the absence of an identified legal obligation to publish within a particular timeframe and (as *Allianz* shows) a plea that the required information was not published until a later date.[43]

71.     In his declaration, Mr Kramer says that "*the Complaint is not a case where the plaintiffs do not allege eventual publication*".[44] Both he, and the Plaintiff, in p. 25 of the Plaintiff's Opposition, refer to the press release dated 12 October 2023 cited in paragraphs 111 – 112 of the Complaint. As I understand it, what is now suggested is that the Complaint gives rise to a properly arguable delay claim in accordance with *Allianz* on the grounds that publication was made 'late' on 12 October 2023.

72.     Whilst it is right to recognise that liability for delay remains a developing area, and there has been no authority directly on point, I am confident  - on the basis of the scheme of s. 90A as a whole, as well as Leech J's approach generally in *Allianz* - that this case (at least as I understand it) is not one which can properly be advanced as a 'delay' claim. It is in reality an allegation of omission or misstatement; and the English court would not in my view permit a claimant to avoid the need to show individual reliance by seeking to recast it as a 'delay' claim.

73.     In order to ascertain whether there has been a "*delay…in publishing information*", one needs in my view to start by identifying the information which was, in fact, published. The 12 October 2023 press release contained two strands of information. First, it noted and summarised the findings of the FCA's Decision Notice published the same day. Second, it noted that the Remuneration Committee had concluded that Mr Staley should be ineligible for or forfeit various bonuses and awards.

---

[43] Moore 1, para 63.

[44] Kramer, para 84.

DECLARATION OF MARTIN MOORE K.C.                    CASE NO.: 2:23-cv-09217-MEMF-KS

74. One then needs to ask whether there was a delay in publishing that information. Put another way, was the publication "*accurate but late*". The clear and short answer, in my opinion, is: 'no'. The 12 October 2023 press release announced the Decision Notice and the outcome of the Remuneration Committee's deliberations immediately. I do not think it is suggested, or could be suggested, that either strand of information could have been released earlier.

75. If the Plaintiff's argument is not that *this* publication (i.e. the 12 October 2023 press release) should have been made earlier but, instead, that *some other* publication should have been made earlier then, in my view, that allegation is not of delayed publication at all. It is, in reality, an allegation of omission or (perhaps) misstatement. This is in essence what I think is being alleged at pages 24 and 25 of the Plaintiff's Opposition: the gist of the allegation is that Barclays did not publish information "*regarding the failure to accurately disclose Staley's personal relationship with Epstein to the FCA*". Although portrayed as an allegation of delay, presumably so as to avoid the need to show reliance, it is in reality an allegation of omission. The allegation is *not* really that the 12 October 2023 press release was delayed, but rather that *some other* publication should have been made earlier.

76. On Mr Kramer's view, it would I think be open to any claimant alleging an omission (e.g. that, pursuant to MAR, the publisher was obliged to publish a particular statement but failed to do so) to frame that complaint as an allegation that there was a delay in publishing (that the publisher was obliged to publish a particular statement but delayed in doing so). That cannot have been the intention of the legislature: as Mr Kramer and I agree, liability for delay was introduced in order to 'plug a gap'. It cannot have been intended to enable claimants to recast misstatement or omissions claims as delay complaints, and thereby avoid the need to establish reliance.

## V.   **Conclusion**

77. A summary of the requirements for each ground of liability under s. 90A is included in Section II above. I remain happy to assist the Court should further questions arise.

25

DECLARATION OF MARTIN MOORE K.C.                                    CASE NO.: 2:23-cv-09217-MEMF-KS

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in London, United Kingdom on February 28, 2025.

Signed by:

*Martin Moore*

26BCE542729546E...

Martin Moore K.C.

26