# EXHIBIT A



Neutral Citation Number: [2025] EWHC 698 (Ch)

Case No: FL-2020-000038, FL-2021-000011, FL-2022-000009, FL-2022-000023

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**FINANCIAL LIST (ChD)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 25/03/2025

**Before** :

**Mr Justice Michael Green**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Persons Identified in Schedule 1** | **Claimants** |
| - and - | |
| **Standard Chartered PLC** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Graham Chapman KC, Shail Patel KC and William Harman** (instructed by **Signature Litigation LLP**) for the **Claimants**
**Adrian Beltrami KC, Natasha Bennett and Dominic Kennelly** (instructed by **Herbert Smith Freehills LLP**) for the **Defendant**

Hearing dates: **11th- 12th February 2025**
- - - - - - - - - - - - - - - - - - - -
# Approved Judgment

This judgment was handed down remotely at 10.00am on 25 March 2025 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

............................

THE HONOURABLE MR JUSTICE MICHAEL GREEN

**MR JUSTICE MICHAEL GREEN:**

## A. Introduction

1. This is an application by the Defendant ("**SC plc**") to strike out, alternatively for reverse summary judgment in respect of: (a) the Claimants' common reliance claims (the "**Common Reliance Claims**") under para. 3 of Schedule 10A to the Financial Services and Markets Act 2000 ("**FSMA**"); and (b) the Claimants' dishonest delay claims under para. 5 of Schedule 10A FSMA (the "**Delay Claims**").

2. The issues in relation to the Common Reliance Claims were previously directed by me to be determined at Trial 1 in these proceedings at the request of SC plc. However this application has now been brought by SC plc because of the recent decision of Leech J in *Allianz Funds Multi-Strategy Trust and ors v Barclays plc* [2024] EWHC 2710 (Ch) ("**Barclays**") in which he struck out similar claims, and which SC plc says are indistinguishable from the present claims. Mr Adrian Beltrami KC, appearing with Ms Natasha Bennett and Mr Dominic Kennelly for SC plc, submitted that Leech J has definitively ruled on the meaning of the relevant paragraphs of Schedule 10A FSMA and that, as a matter of judicial comity, I am bound to follow *Barclays* unless I am convinced that it is wrong.

3. Mr Graham Chapman KC, appearing with Mr Shail Patel KC and Mr William Harman for the Claimants, submitted first of all that I should decline to hear the application, as it would involve prolonged serious argument and will not obviate the need for a very substantial trial. We did hear full argument and so Mr Chapman KC's alternative argument was that *Barclays* is wrong, and/or I should not follow it, and/or it is distinguishable.

4. SC plc says that if the Common Reliance Claims (which it prefers to call, for obvious reason but perhaps somewhat presumptuously, the "No Reliance Claims") are struck out, it would remove 949 funds that are claiming, representing 68% of the total number of funds and with a claim value of c.£762 million (49% of the total value claimed in the proceedings). There would therefore be a real benefit in having these claims struck out. By contrast, the Claimants point to the fact that, whatever the outcome of the application, this will continue to be very heavy litigation and will continue to Trial 1 which is listed for 76 days from October 2026 in respect of the Individual Reliance Claims and s.90 FSMA claims worth c.£877 million, and without reducing by much either the time or money being spent on the case. Furthermore they say that all the Claimants bring Delay Claims and that, even on the *Barclays'* approach to Delay Claims (which is challenged), it means that all Claimants and funds will continue to advance a claim under s.90A and Schedule 10A FSMA and there will be no reduction in the quantum of the claim. In *Barclays*, Leech J said that the strike out affected 241 different funds with a value of £332 million which was c.60% of the total value of the claims.

5. Mr Beltrami KC's straightforward point was that Leech J had delivered a carefully-considered and well-reasoned judgment in *Barclays* (as he clearly did) and I am effectively bound by it as being the current state of the law. I should not attempt to reconsider the arguments that failed before him as the point of the rule as to judicial

comity is to avoid duplication of judicial resources and to achieve coherence and consistency in the law. While I fully understand the purpose and utility of the rule, I am in the awkward position of having heard substantial argument on the points in issue (although principally by reference to *Barclays* rather than the underlying authorities) and whether in the circumstances I should exercise my discretion to strike out the claims while also effectively being told that I must follow *Barclays* and strike out unless "*convinced*" that Leech J was wrong. I grapple with this conundrum below.

## B.   Background

6.      I set out the factual background of the claims in my judgment at the first CMC where I heard an earlier strike out/summary judgment application by SC plc reported at [2023] EWHC 2756 (Ch) – see [9] – [38] (upheld by the Court of Appeal at [2024] EWCA Civ 674). I will not repeat what I said there, but incorporate it by reference.

7.      There are presently 217 Claimants representing some 1391 funds claiming c.£1.5 billion. They all bring claims under s.90A and Schedule 10A FSMA under both: para.3 of Schedule 10A FSMA ("**Para. 3**") in respect of alleged untrue or misleading statements in and/or omissions from annual reports, half year reports and other information published by recognised means by SC plc between February 2007 and April 2019 (the "**Published Information**"); and para. 5 of Schedule 10A FSMA ("**Para. 5**") in respect of alleged dishonest delay. The latter has no reliance requirement.

8.      There is also no reliance requirement for claims under s.90 and Schedule 10 FSMA in respect of untrue or misleading statements in and/or omissions from three rights issue prospectuses published by SC plc between November 2008 and November 2015 (the "**Prospectuses**"). There are 167 of the Claimants that bring claims under these provisions in relation to the Prospectuses. They are not subject to this application and will continue to trial in any event.

9.      The Common Reliance Claims are pleaded in [80] to [85] of the Re-Re-Amended Particulars of Claim. (They are also said to be pleaded in [86.2.7] and [86.4] within the Individual Reliance Claims section.) They are made in order to satisfy the reliance requirement in the Para. 3 claims. The Delay Claims under Para. 5 are tersely pleaded in [78] to [79] of the Re-Re-Amended Particulars of Claim. SC plc say that these are merely the same claims as under Para. 3 rebadged to be brought under Para. 5 and probably to avoid any reliance requirement.

10.     Until *Barclays* was handed down on 25 October 2024, there was never any suggestion from SC plc that the Common Reliance Claims and Delay Claims could be summarily dismissed as clearly bad in law. On the contrary, while it applied to strike out other aspects of the Claimants' case, including the Individual Reliance Claims, it proposed at CMC2 on 16 and 17 April 2024 that the Common Reliance Claims be tried by sample at Trial 1 and that there should be directions for factual and expert evidence to deal with those issues. I did make that direction and, at the next CMC3, I approved the selection of three sample Claimants for the Common Reliance Claims to be tried at Trial 1, adjourning whether there should be a fourth Claimant as part of the sample. The Claimants subsequently applied for permission to adduce expert evidence on this issue in four different disciplines. I granted permission for one such expert and adjourned

consideration in relation to the other three. The Claimants have already taken steps to obtain that expert evidence and have exhibited preliminary reports to their evidence on this application. The Claimants have also, in accordance with my earlier direction, served s.2 DRDs for the three confirmed Common Reliance Claims sample Claimants.

11. The logic behind those directions is that there are possibly different facts applicable to the individual Claimants and that expert evidence may assist in the resolution of these claims. However, now SC plc says that this is all a waste of time as no factual or expert evidence is needed to deal with the Common Reliance Claims or Delay Claims as, based on *Barclays*, they cannot ever succeed.

## C.  Strike Out / Summary Judgment principles

12. The principles to be applied in considering whether to strike out or grant summary judgment in relation to claims are well known and do not need to be set out in detail.

13. Mr Chapman KC referred to the summary of strike out principles in [22] of *Re Regis UK Limited (In Administration)* [2019] EWHC 3073 (Ch) and emphasised that: the facts pleaded in the statement of case must be assumed to be true; "*it is not appropriate to strike out a claim in an area of developing jurisprudence since decisions as to novel points of law should be based on actual findings of fact*" made at trial; and that strike out should not be granted unless the court is certain that the claim is bound to fail.

14. Similarly in the context of summary judgment under CPR 24.2, Lewison J, as he then was, in *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch) at [15] provided a list of principles to take into account, including that it may be appropriate to decide a "*short point of law or construction*", but only if the Court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument. He explained: "*The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim…*"

15. Mr Beltrami KC disputed whether, in the light of *Barclays*, this was a "*developing area of law*" as the "*two short points of statutory construction*" (as he put it) had been conclusively decided by Leech J, who had "*grasped the nettle*", despite the prolonged argument that he heard. He referred to what the Chancellor had said in *Wirral Council v Indivior plc* [2025] EWCA Civ 40 ("*Wirral*") at [143], that *Barclays* represents the "*current state of the law*" and enables such claimants to be removed at an early stage of the proceedings.

16. However I think it would be to ignore reality to suggest that this is not a live and possibly developing area of the law. The *Barclays* decision must have come as a surprise to many involved in this sort of securities litigation, as no other defendant had sought to strike out on that basis. It was probably anticipated that it would be appealed but as it turned out the case settled before an application for permission could be made to the Court of Appeal. It was the first decision on the meaning of Para. 3 and Para. 5. I note that Waksman J in *Crossley v Volkswagen AG* [2021] EWHC 3444 (QB) ("*Crossley*") at [15(1)-(2)], gave two examples where, even if the claim had no real

prospect of success, there may be a compelling other reason for there to be a trial under CPR 24.3(b) namely where:

(1) the fact that the application concerns a developing area of the law; here, it may be desirable that the disputed legal questions should be resolved against the background of the facts as already found at the trial, and not hypothetical facts;

(2) where summary judgment will not dispose of the whole case; this will be so where there will be a trial anyway, regardless of the outcome of the summary judgment; it is particularly relevant if, at the trial, there will be or is likely to be evidence concerning the same or similar factual matters as those traversed in the application.

17. Mr Chapman KC referred to the Court of Appeal decision in *Partco Group Ltd v Wragg* [2004] BCC 782, which was not cited to Leech J in *Barclays*. Potter LJ held at [27] to [28] that where an application involves prolonged serious argument, the Court should "*as a rule*" decline to proceed to the argument unless it is satisfied that striking out will "*obviate the necessity for a trial or will substantially reduce the burden of the trial itself*". Mr Chapman KC made the point that this was binding on me as it was from the Court of Appeal, and it had itself relied on two decisions of the House of Lords.

18. In this context, Leech J and Mr Beltrami KC referred to *Getty Images (US) Inc v Stability AI Ltd* [2023] EWHC 3090 (Ch), in which Joanna Smith J said at [38]:

> "…as the Defendant submitted, the mere existence of other arguable claims which must go to trial cannot, of itself, be a compelling reason why an unarguable claim must proceed to trial."

### D.   Common Reliance Claims

### (a)   Introduction

19. The Common Reliance Claims, which are sometimes called claims based on "*price/market reliance*" or "*fraud on the market*", are pleaded to satisfy the "*reliance*" on Published Information element of a claim under Para. 3. They assume that the particular Claimant, or their agent, has not actually read or considered the Published Information, but has relied on the market to have set the price of SC plc's shares, having taken account of the Published Information that is alleged to have been untrue and misleading. In other words, the price of the shares is said to reflect the fact that other participants in the market read and considered the Published Information, which meant the price at which the shares were being traded was based on the truthfulness and accuracy of the Published Information. The Common Reliance Claimants are said to have acquired or continued to hold shares in reliance on the price of those shares and that they therefore were induced to do so at a false and artificial price.

20. In *Barclays*, Leech J held that Parliament must have intended the requirement for "*reliance*" to have some content and that meant that investors had to prove something more than that they suffered loss because of a false and misleading statement or omission being made to the market. He went on to hold that the test that Parliament

intended to apply was the common law test for inducement or reliance in the tort of deceit. He then considered what that common law test was and concluded that it required a claimant to prove that they read or were aware of at least the gist (possibly through their agent) of the representation and understood it in the sense in which it was alleged to be false and that it caused them to act in a way which caused them loss.

21. Having so held that that was the meaning of "*reliance*", he struck out what were called the "*Category C*" claims, which were the broad equivalent of the Common Reliance Claims in this case, because there was no real prospect of them succeeding at trial in proving reliance under Para. 3, based purely on reliance on the price of the shares. The question is whether he was right to do so and whether I should follow him and do the same in this case.

**(b) Para. 3**

22. Leech J in *Barclays* set out a comprehensive survey of the origins of s.90 and s.90A FSMA, and in particular Schedule 10A FSMA in Section IV D - [38] to [63] - of his judgment. This provided the building blocks for his conclusions as to Parliament's intention as to the meaning of "*reliance*" in Para. 3 and the reason why it was included in the legislative framework. In particular he referred to the "**Davies Review**", in which Professor Paul Davies QC, who was at the time the Cassel Professor of Commercial Law at the London School of Economics, was asked by the then Government to review the existing legislation on issuer liability. Professor Davies' final report was published in June 2007, and, following an extended consultation by HM Treasury, a new s.90A and Schedule 10A were introduced into FSMA by the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010.

23. I will gratefully rely on Leech J's helpful and detailed background to the enactment of Para. 3 (and Para. 5 in due course) as necessary below. It is only necessary for me to set out the terms of Para. 3 which are as follows (with emphasis added):

> "**3      Liability of issuer for misleading statement or dishonest omission**
>
> (1)     An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—
>
> (a) acquires, continues to hold or disposes of the securities <u>in reliance on published information to which this Schedule applies</u>, and
>
> (b) suffers loss in respect of the securities as a result of—
>
>      (i) any untrue or misleading statement in that published information, or
>
>      (ii) the omission from that published information of any matter required to be included in it.
>
> (2)     The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was

untrue or misleading.

(3)    The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4)    A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities-

(a) <u>in reliance on the information in question</u>, and

(b) <u>at a time when, and in circumstances in which, it was reasonable for him to rely on it</u>."

### (c)  Pleadings and evidence

24.    As noted above, the Common Reliance Claims are pleaded in [80] to [85] of the Re-Re-Amended Particulars of Claim. [80] and [81] are introductory, with the latter referring to the "*presumption of inducement applicable to cases of fraudulent misrepresentation which presumption "is very difficult to rebut" (Hayward v Zurich [2017] AC 142, at [37] per Lord Clarke)*" (hereinafter: "***Hayward***"). Mr Chapman KC relied on *Hayward* in his submissions before me to demonstrate that issues of reliance and inducement were questions of fact that would have to be determined at trial.

25.    In [82], the Claimants plead as follows:

"82. Acquiring or continuing to hold SC Shares at a price which was rendered false and artificial by the Untrue or Misleading Statements or Material Omissions (as set out in Section D above) is sufficient to satisfy paragraph 3(4) of Schedule 10A FSMA. Proof of this does not require any evidence to be adduced as to reliance other than evidence establishing that a Claimant acquired or continued to hold SC Shares at a price artificially inflated by untrue and misleading statements and material omissions."

26.    In [83], the Claimants plead as follows:

"83. As to that, and while it is a matter of legal submission, the Claimants will say:

83.1. The Untrue or Misleading Statements and Omissions influenced, by artificially increasing and/or maintaining, the price of SC Shares;

> 83.2. It is to be presumed that the influence on the price of the SC Shares induced the Claimants to acquire or continue to hold interests in SC shares (and it in fact did so);
>
> 83.3. Buying or continuing to hold interests in SC Shares in such circumstances amounted to reliance because the Claimants were induced to act to their detriment in buying or continuing to hold SC Shares at a false and artificial price; and
>
> 83.4. Further or alternatively the Claimants relied indirectly on the Published Information by believing or assuming that (a) information published by SC plc was fair, full, true and accurate (b) that other participants generally in the listed securities markets relied upon published information of SC plc as being fair, full, true and accurate and (c) as a result, the price at which they acquired or held SC shares reflected wholly or partly the published information of SC plc being fair, full, true and accurate."

Mr Chapman KC relied quite heavily on the pleading of "*belief*" in [83.4] to distinguish this case from *Barclays* in which he said there was no similar plea and where the claimants in that case alleged that they simply "*proceeded on the basis of various matters*". Mr Beltrami KC said that this was a distinction without a difference.

27. In [84] the Claimants plead that they relied on SC plc's compliance with the rules and criteria governing its membership of the FTSE 100 and other relevant share indices, and that such membership depended on SC plc's compliance with the requirements for the publication of correct, complete, timely, true and fair Published Information. And in [85] the Claimants assert that s.90A FSMA was intended to grant a remedy in particular to tracker funds so as to protect investors and deter misconduct in the market by issuers.

28. As was recognised expressly by the Claimants, the pleading was largely legal submission. This has been supplemented by the evidence the Claimants have filed on this application, namely: the eleventh witness statement dated 6 January 2025 of Mr Rory Spillman, a partner in the Claimants' solicitors, Signature Litigation LLP; and a witness statement dated 3 January 2025 of Mr David Murphy who is a director within the investment team of California State Teachers' Retirement System ("**CalSTRS**"), one of the Claimants in these proceedings. The Claimants have obtained some preliminary expert reports, originally in support of the application for permission to adduce expert evidence but now deployed on this application as exhibits to Mr Spillman's witness statement. These reports are from: (a) Dr Andrew Hildreth, a Senior Consultant with Resolution Economics in Los Angeles; (b) Dr Riccardo Curcio of Berkeley Research Group; and (c) Mr Neil Crowder, an independent consultant working for Valerie Capital Partners LLP. As Mr Beltrami KC pointed out, the first two, Drs Hildreth and Curcio, had produced reports that were before Leech J in *Barclays* and he accepted, for the purposes of considering whether to strike out, that the Claimants would be able to prove at trial whatever the experts had said as to the operation of the market.

29. The evidence can be summarised as follows:

(1) Dr Hildreth's evidence is to the effect that, in efficient markets, disclosures by issuers to the market leads to investors revising their expectations as to future prices, which then prompts investors to trade the stock, which changes the price until it has moved to the position where it will earn the expected rate of return.

(2) Dr Hildreth goes on to say that the interaction between "*sell-side*" equity analysts and professional investors plays an important role in stabilising expectations to reflect all available information. Those analysts form expectations about the company's future share price and disseminate their findings to professional investors on the "*buy-side*" and that leads to "*consensus estimates*" emerging that forms a kind of "*received wisdom*" in the market.

(3) Dr Curcio concentrated on the behaviour of index-tracking funds which aim to replicate or marginally exceed the performance of an index. He said that index-tracking funds do adopt some selection strategies and therefore published information by issuers influences not only the transaction price but also the decision whether to transact at all in circumstances where the company's weight in the index is generally determined with reference to the share price.

(4) Mr Crowder explained the way the efficient market in SC plc's shares worked. The price of SC plc's shares generally adjusted to new published information in a single day. It would therefore play a key role, if not the key role, in determining if investors would acquire, continue to hold or dispose of shares and/or do so at a particular price during the relevant period. He went on to say that the false representations in the Published Information were of such a nature that they would have played a very key role in the decision making of reasonable investors and market participants.

30. As for Mr Murphy's witness statement, Mr Chapman KC submitted that this shows the kind of factual evidence that the Claimants would be putting forward at trial, albeit that it would be far more developed if he had had more time and a complete disclosure review. Mr Murphy's evidence was to the effect that it is one of CalSTRS' "*investment beliefs*" that global public equity investment markets are largely efficient and process information rapidly at very low cost. As such, CalSTRS's passive trading strategies "*depend on other market participants… reading and making investment decisions based on the information published by the listed issuers in the efficient market*". Accordingly, CalSTRS actively seeks out efficient markets for its passive investments and generally invests passively "*only in jurisdictions where the market is well-established and known to be subject to strict rules regarding transparency*".

31. Mr Beltrami KC said that all this evidence is irrelevant. He focused on the category of Claimants that this application is concerned with by reference to the Reliance Questionnaires. The Claimants were required to respond to the Reliance Questionnaire that was annexed to the Order I made on 16 January 2024. I am only concerned with the Common Reliance Claimants who have been defined by reference to whether they answered "*no*" to each of questions 1, 2 and 5 of the Reliance Questionnaire. By their answers, those Claimants are <u>not</u> advancing a case that they: (i) relied on specified statements in the Published Information; (ii) relied on the Published Information as a whole; or (iii) had a general practice of reviewing one or more of the conduit sources before making an investment decision. The reliance on conduit sources, whereby the Claimant was not reading the Published Information themselves but was reviewing or receiving the "gist" of that Published Information through communication with their

agents, brokers or other conduit sources, is pleaded broadly in [86.2] of the Re-Re-Amended Particulars of Claim. By one means or another, through a conduit source, the gist of the Published Information was conveyed to the Claimant. The dividing line between reliance on conduit sources and the Common Reliance Claims is not clear and this is examined below.

32.    Mr Beltrami KC submitted that these categories of reliance coincide precisely with the categories in *Barclays*. In [19] to [21], Leech J explained Categories A to C as follows:

(a)    Category A claimants were those who read and relied on the Published Information in making their investment decisions – this could be called "*direct*" reliance;

(b)    Category B claimants were those who relied on Published Information indirectly through other sources which acted as a conduit for the substantive contents of the Published Information – this could be called "*conduit*" or "*indirect*" reliance;

(c)    Category C claimants were those with whom Leech J was principally concerned as they were relying solely on share price and the listed status of Barclays – Leech J called this "*price/market*" reliance.

33.    Subject to the point about the pleading of a "*belief*" as referred to above, the Common Reliance Claimants put forward pretty much the same arguments as were put on behalf of the Category C claimants in *Barclays*, including relying on very similar proposed expert evidence. Mr Beltrami KC emphasised that on this application we are only focussed on the Common Reliance Claims and therefore those Claimants who did not read or rely on the Published Information directly or indirectly through any of the conduit sources.

**(d)  *Barclays***

34.    I now turn to Leech J's judgment in *Barclays*. His core findings on Para. 3 are as follows:

(1)  Parliament must have intended that the term "*reliance*" must mean something as it was not a requirement for claims under s.90 FSMA and Para. 5, but was specifically included in Para. 3. At [104], he said:

"104.    I agree with Ms Davies that Parliament must have intended to give the term "reliance" some content and to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or omission being made to the market. Otherwise, the framers of Schedule 10A would have adopted very similar language to S.90. Indeed, when Parliament amended S.90A to include liability for delay it adopted exactly that course as a brief comparison between S.90 and Paragraph 5 will demonstrate. It follows that the Court must give effect to

the term "reliance" which goes beyond causation of loss and requires investors to prove a separate ingredient of liability."

(2) Parliament intended to adopt the common law test for reliance and inducement in the tort of deceit. At [107], he said as follows:

> "107.    In my judgment, therefore, the obvious interpretation of Paragraph 3 is that Parliament did not intend to "start afresh" but recognised that the Courts have developed a settled test of reliance in the tort of deceit where proof of liability requires a claimant to prove both reliance and causation as separate ingredients of the tort and incorporated both tests into Paragraph 3. The Davies Review and the Treasury Consultation confirm that this was the legislative intention and that reliance was intended to be a separate requirement of liability and to limit recovery: see, in particular, Davies 1, §26 and §55 (see [45] and [46] (above)), Davies 2, the recommendation in answer to Q1 (at [51]), the Treasury's I impact assessment (at [56]) and Treasury 2, §5.7 to §5.9 (at [57]). The example given in Treasury 2 at §5.9 demonstrates that the authors had the test for fraudulent misstatement in mind."

(3) The common law test as it applies to express representations requires the claimant to prove that they read or heard the representation and understood it in the sense in which it is alleged to be false. At [109] he said as follows:

> "109.    In my judgment, the test for reliance as it applies to express representations (whether made orally or in writing) requires the claimant to prove that they read or heard the representation, that they understood it in the sense which they allege was false and that it caused them to act in a way which caused them loss. I agree with Professor Cartwright at 3-54 (above) that this is because the test is one of causation and a statement can only cause an individual to act or operate on their decision-making process if they hear or read the statement or if the statement (or the gist of it) is communicated to them by a third party. If (as I have found) the common law test applies to misleading and untrue statements in Paragraph 3, then I agree with Hildyard J in *Autonomy* that the requirement for reliance in Paragraph 3 cannot be satisfied in respect of published information which the Claimants did not read or consider at all: see [505] (at [90] above)."

The reference to "*Autonomy*" is to the long and detailed judgment of Hildyard J in *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) ("*Autonomy*") in which the facts were very distant from both *Barclays* and this claim. However Hildyard J did consider the requirement for reliance in Schedule 10A FSMA and held that a claimant must have been aware of and applied their mind to the statement in question.

(4) After dealing with some of the claimants' arguments concerning the impact on omissions claims and implied representations, his overall conclusion was contained in [129] and [130] which stated as follows:

> "129.   In my judgment, Parliament intended the Court to apply the common law test of inducement or reliance from the tort of deceit to Paragraph 3 and both to misleading statements and omissions. That test requires the Court to determine whether the Claimants were induced to rely on the published information set out in the Particulars of Claim, section E1 and Appendices B to D and whether that published information caused the Claimants to acquire, hold or dispose of the Bank's shares. I agree with Hildyard J in *Autonomy* that the Claimants in Category C cannot satisfy this test unless their representatives read and considered that published information or third parties who directed or influenced their investment decisions read and considered that published information.
>
> 130.   I leave open the question whether it is necessary for the Claimants to prove that their decision-makers or advisers applied their mind to the relevant misleading or untrue statements and that those statements induced them to acquire, continue to hold or dispose of their shares on the terms which they did: see *Autonomy* at [503]. This is a matter for further argument at trial (as is the scope of Category B). But I am satisfied that this is not a requirement of the test applicable to omissions for the reasons which I have given. Paragraph 3 requires reliance on the relevant published information not on the facts or matters which the Claimants allege to have been omitted."

It can be seen that Leech J recognised that there is potentially a different test of reliance applicable to omissions, but that that did not affect his overall conclusion that "*reliance*" required the application of their minds, whether directly or through those directing or influencing investment decisions, to the Published Information.

35.   As the Category C claimants in *Barclays* could not satisfy that test, they had no real prospect of succeeding at trial in proving "*reliance*" under Para. 3, and Leech J granted reverse summary judgment in respect of those claims.

36.   Mr Beltrami KC's submission was that Leech J was plainly correct and, with his comprehensive examination of the issue, I cannot possibly be "*convinced*" that he was wrong. I must therefore, on the grounds of judicial comity, follow him in relation to the Common Reliance Claims. He sought to bolster that position with the following submissions.

37.   First, he said that the wording of Para. 3 makes its meaning clear because it refers to "*reliance on published information*". That could not include reliance on a company's share price or its status as a listed issuer as that is not information which has been published within Schedule 10A FSMA.

38.     Second, he said that the aim and scope of Para. 3 was demonstrated by the legislative materials to which Leech J referred to extensively. Both Professor Davies and HM Treasury were well aware of the "*fraud on the market*" theory which underlies these sorts of claims and are prevalent in the US and were clear that this was not intended to be introduced into UK legislation.

39.     Third, Leech J was not the first to consider this point, as it had been dealt with by Hildyard J in *Autonomy*. He submitted that I would have to be convinced that both Judges were wrong if I were minded to depart from their conclusions.

40.     Fourth, he said that Leech J was obviously correct to apply the common law test of reliance in the law of deceit rather than a new, uncertain and unknown test that would be unique to Para. 3. He said that the common law test of reliance is bound up with issues of inducement and causation and that requires a representee to have read or heard the relevant statement or its gist for it to have operated on their mind. Mr Beltrami KC accepted that the common law accommodates the situation where the gist of a statement is passed on indirectly via third parties and he referred to *Brown v InnovatorOne plc* [2012] EWHC 1321 (Comm) ("**Brown**") at [884]. This is the conduit sources category of reliance or Category B in *Barclays*. And it also embraces the situation where a representation is made to and relied on by an agent, as the ordinary application of the law of agency.

41.     Mr Beltrami KC's thesis, based on the old prospectus cases which were dealt with thoroughly in *Barclays*, was that, in every case, the representee must have been aware of the statement and must have understood it to bear the meaning which is found to be false. "*Awareness*" and "*understanding*" are used interchangeably in the cases and probably amount to the same thing. The 19th century prospectus cases in which this was said to be established are: *Arkwright v Newbold* (1881) 17 Ch 301 (CA), *Smith v Chadwick* (1884) 9 App Cas 187 (HL) and *Edgington v Fitzmaurice* (1885) 29 Ch 459 (CA). He said that this had been affirmed in multiple recent cases in the Commercial Court and Chancery Division, including *Brown* at [884].

42.     Anticipating the Claimants' arguments on implied representations, Mr Beltrami KC submitted that the same elements apply equally to all representations, whether express or implied. Again he referred to *Brown* at [906] where Hamblen J, as he then was, said: "*In so far as the Claimants were alleging implied representations it was incumbent on them to prove that such representations were understood to have been made since otherwise there could be no reliance.*" However by reference to some more recent cases, Leech J was prepared to accept that the common law test for reliance in implied representations cases was not "*complete or fully developed*": see *Barclays* at [127] and the quote from [98] of *Crossley*.

43.     Mr Beltrami KC's fifth point was that Leech J's conclusion is consistent with the views of leading textbook and journal authors. He referred to the following:

>       (a)     *Gullifer & Payne, Corporate Finance Law, Principles & Practice* (3rd Ed: 2020): at p. 588, the authors observed (by reference to Treasury 2) that a "*passive holder*" of shares, who continued to hold without giving the statement any thought, would have no claim because "*they would not be able to show reliance upon the statement in making their investment decision.*"   When comparing s.90 and s.90A FSMA, the authors commented (p. 590):

> "… in section 90 there is no requirement for the claimant to demonstrate that they have relied on the statement, or even that they have read the prospectus in order to establish a cause of action. This is sometimes described as 'fraud on the market' since the misstatement can be said to have caused the investor loss even though the particular investor was unaware of the misstatement. **No such fraud on the market concept has been adopted for the section 90A provisions**, and the claimant must therefore demonstrate that they relied on the publication, although it is possible for an inference of reliance to be drawn from the facts." (Emphasis added).

> (b)    Gore-Browne on Companies, 45th ed. (Ch 43) states, at [12A], that a claimant has to show "*reliance on (presumably actually have read) the published information, not just a 'fraud on the market' claim*".

> (c)    In an article following the introduction of s.90A FSMA , (2009) 9 JCLS 315, Professor Eilis Ferran commented that "*[t]he classic "fraud on the market" theory developed in US securities law, which affords investors trading in efficient markets a rebuttable legal presumption of reliance, has not been adopted in section 90A/schedule 10A*" (p. 327). Professor Ferran considered whether "*the efficient capital markets hypothesis [could be used] to form an argument that (inferred) reliance on market prices was tantamount to inferred reliance on the information itself.*"  She concluded that this would be a "*novel argument*" and "*would certainly merit a cautious reception from the judiciary*" (pp. 328-329). (A fuller quote was set out in [60] of *Barclays*.)

44.    Mr Beltrami KC also sought to place reliance on the references to *Barclays* in *Wirral*. In *Wirral*, the Court of Appeal upheld my decision that the representative procedure under CPR 19.8 was not appropriate for those claims under ss.90 and 90A FSMA and that they should be brought in the usual way by ordinary multi-party proceedings. Sir Julian Flaux C (with whom Nugee and Falk LJJ agreed) used *Barclays* as an example of the sort of issues that could not be tested at an early stage if the representative procedure was allowed to continue. He said at [128]:

> "One obvious advantage to the pursuit of the multi-party proceedings would be that the Court could make similar orders to those made by Leech J and, if it emerged that a number of claimants only relied in the market reliance sense, the defendants could apply to strike out those claims on the same basis as in *Barclays* and *Autonomy*."

Similarly at [142], Sir Julian Flaux C quoted from [108] of *Barclays* and then said:

> "This confirms the importance of the issue of reliance in these securities claims which, as I have said, Wirral seeks to relegate to a later stage by the use of representative proceedings. The requirement of reliance is a significant controlling mechanism in relation to what claims can be brought under section 90A of FSMA, as *Barclays* demonstrates. The effect of the

> representative proceedings is, as I have said, to deprive the Court of its case management powers to strike out speculative unmeritorious claims, which is inimical to the overriding objective."

And at [143]:

> "Importantly, the availability of those case management powers will enable the Court, as in *Barclays*, to determine at an early stage whether some of the claimants only rely on market/price or index reliance and therefore, on the current state of the law, do not have a claim at all."

45. However, the Court of Appeal in *Wirral* did not hear argument about the correctness or otherwise of the substantive issues in *Barclays*. The focus was on the case management tools which might in principle be available in a multi-party action as opposed to representative proceedings. *Barclays* was a good example of the effective deployment of those case management tools.

## (e)  Claimants' criticism and distinguishing of *Barclays*

46. Mr Chapman KC attacked *Barclays* on a number of fronts but in particular he said that Leech J was wrong to apply the common law test for reliance in the tort of deceit to Para. 3 and he was also wrong to conclude that the common law test required proof that representees read or heard express representations.

(i)   Application of the common law test to Para. 3

47. Mr Chapman KC's arguments in this respect concentrated on the way reliance would work in relation to omissions from Published Information, rather than untrue and misleading statements. Leech J also recognised that this was an important area to focus on – see [111]. It must be right, and Leech J so found in [111(1)], that "*reliance*" in Para. 3 means the same in the context of untrue or misleading statements and omissions. Parliament distinguished the fault requirements for untrue or misleading statements and for omissions in Paras. 3(2) and (3), but did not separate them when it came to reliance and causation in Paras. 3(1)(b) and 3(4).

48. Mr Chapman KC submitted that Parliament could not have intended to apply the common law test of reliance to omissions, as there is no such test for omissions and, as Leech J accepted in [111(2)], it would be virtually impossible to establish that an investor was aware of and consciously considered that a matter had been omitted from published information. It would be difficult to see how such a claimant could ever prove that they relied on an omission.

49. Further, Mr Chapman KC submitted that Leech J was wrong to consider that there was a choice between incorporating the common law test of reliance or "*starting afresh*" with a new definition of "*reliance*" – see [63] and [107] of *Barclays*. He said that because the same test had to be applied to both express misstatements and omissions, Parliament could not have intended the common law test of reliance to apply but left it

to Judges to decide what "*reliance*" meant, and it could incorporate some elements of the common law but not a complete adoption of the common law test, which could not work for omissions.

50.     Leech J said that Parliament was alive to this problem and the answer to it is to be found in the wording of Para. 3, which requires an investor to prove reliance on the published information itself, not the omission – see [111(3)]. They do not have to prove that they read a particular part of the published information, say an annual report, that was said to have omitted disclosable information. The only requirement is that they or the relevant third party read and considered the published information from which there was omitted material information, and that they acquired, continued to hold or sold shares in reasonable reliance on what they had read and considered.

51.     Mr Chapman KC submitted that Leech J was thereby creating a novel test for reliance that did not accord with what he had concluded in relation to the common law test. In [109] of *Barclays*, Leech J relied on *Autonomy* to state that the common law test required a claimant, in relation to express representations: "*to prove that they read or heard the representation, that they understood it in the sense which they allege was false and that it caused them to act in a way which caused them loss*." (emphasis added). But that is inconsistent with the meaning of "*reliance*" in relation to omissions. Leech J appeared to revise that test in [129] by focusing on the published information rather than the particular misstatement relied on.

52.     Leech J may well be right that the wording of Para. 3 suggests that Parliament intended that an investor could only claim if they, or a relevant third party, had read and considered the published information. But that gives rise to certain practical and conceptual difficulties that Mr Chapman KC drew my attention to. In particular it seems to me to be odd that an investor or third party only needs to have read and considered the published information in general terms. What if some of the published information was read, but not all of it? And what if the part that was said to have omitted relevant information was not read, but other parts were? Mr Chapman KC also pointed out difficulties and inconsistencies that would arise depending on whether the actual published information was read or a secondary source, such as a report of it in the newspaper.

53.     In [130] of *Barclays*, Leech J expressly left open whether reliance had to be on the relevant untrue or misleading statement, as Hildyard J held in *Autonomy*, or on the published information as a whole. But he made clear that in the case of omissions, it had to be on the published information itself. But if reliance has the same meaning for both, that would surely mean that the test for reliance in relation to untrue or misleading statements is more broadly stated than the common law test for reliance. It seems to me that these issues are not easy to resolve on a summary basis, and if they were it could have an impact on all reliance claims as to where the line is to be drawn.

54.     There is also force in Mr Beltrami KC's submission that these interesting questions as to where the line is drawn and which bit of the Published Information needs to have been read and relied upon in making investment decisions do not affect the position of the Common Reliance Claimants because they have admitted that they did not read or consider the Published Information at all, and merely relied on the price of the shares.

(ii)  The Requirements of the Common Law Test

55.    Mr Chapman KC took issue with the way Leech J defined the elements of the common law test for reliance in the tort of deceit, in particular in his conclusion that it always requires representees to prove that they, or their agents, read or heard express representations.

56.    His first point was that reliance at common law is a causation test and the fundamental question is whether the representee was influenced by the misrepresentation to act in some way. Reliance is often referred to interchangeably with "*inducement*", as Leech J did. As such, Mr Chapman KC submitted that it is therefore ultimately a question of fact. In this respect, he referred to *Hayward* (also referred to in the pleading – see [24] above) which he said was not cited to Leech J. In the leading judgment in that case, Lord Clarke held that: "*the authorities show that questions of inducement and causation are questions of fact*" at [25]; and that the basic test was that: "*The claimant must have been influenced by the misrepresentation*" at [27]. Mr Beltrami KC submitted that the case was only dealing with "*belief*" that the representations were true, and said nothing about the awareness requirement, which was not in issue in the case.

57.    I think of more relevance was Mr Chapman KC's reliance on the cases dealing with indirect reliance and implied representations. As to the former, this comes within Category B in *Barclays* and the conduit source category in this case. SC plc does not seek to strike out these claims, it being accepted that the common law test of reliance can accommodate indirect reliance where the gist of the representation was communicated to the investor by a third party. Normally this would be via an agent but it is not limited to that route.

58.    Mr Chapman KC again referred to *Brown* in this context, saying that Hamblen J was prepared to accept that fraudulent misrepresentations made to a claimant's financial advisor which induced the latter to recommend the investment may be actionable in the same way as if the representation itself had been passed on – see [888]. This may have influenced what Leech J said at [124] of *Barclays* as to a "buy" recommendation from a broker:

> "It may well be argued that there is no real reason of policy or principle to draw the line between a Claimant who relied on a broker's report or a "buy" recommendation (which were based on published information) and a Claimant who relied solely on a movement in price (which was also influenced by that same information). That may be so but it is clear that this is where Parliament chose to draw the line and that line must be respected."

I have to say that I find it difficult to know where that line is being drawn and I am not sure that I could say that it is clear where Parliament has drawn the line, if it is accepted that the movement in price was also as a result of third parties reading the published information. Leech J accepted in [129] that the test would be satisfied by "*third parties who directed or influenced [the Claimants'] investment decisions read and considered that published information*".

59.    Mr Chapman KC took me to the decision of Park J in *Yianni v Edwin Evans* [1981] 3 WLR 843, in which it was held that a residential property buyer had been entitled to rely on a valuation report obtained by his lender even though the buyer had never seen the report. The buyer had understood that, because the lender had decided to advance

the money, the house must have been "*good*" (at 851H). This decision was subsequently approved by the House of Lords in *Smith v Bush* [1989] 2 WLR 790. Reference was also made to *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1995] 2 All ER 769 for the same point (this was cited by Leech J in [123]). Mr Chapman KC submitted that there is not a mechanistic reading or consideration requirement in the common law test and the courts apply a broad, fact-sensitive causation test.

60.    As to implied representations, the recent cases of Cockerill J in *Leeds City Council v Barclays Bank plc [2021] EWHC 363 (Comm), [2021] QB 1027*, and *Loreley Financing (Jersey) No 30 Ltd Ltd v Credit Suisse Securities (Europe) Ltd* [2023] EWHC 2759 (Comm) ("***Loreley***"), together with Waksman J's case of *Crossley* and Zacaroli J's (as he then was) case of *Farol Holdings Ltd v Clydesdale Bank plc* [2024] EWHC 593 (Ch) were carefully considered by Leech J in [81] to [89] of *Barclays*. To summarise the debate, it is whether the representee was aware of the implied representation and had it actively on their mind when they acted on it. There was no issue in those cases as to whether the representee had read or heard the words from which the implied representations were said to have arisen.

61.    Leech J (in [127]) accepted Waksman J's conclusion in *Crossley* at [98] that the test for reliance in relation to implied representations or representations by conduct is not "*complete or fully developed*". He also accepted that "*the Court of Appeal might decide that Cockerill J was wrong to conclude that claimants relying on an implied representation must prove that they were aware of the representation and had it actively present to their minds when they acted on it.*"

62.    Mr Chapman KC submitted that this shows that the common law test is not an area of law that has hard and fast rules and that it is much more flexible than that, as demonstrated by *Hayward*. Accordingly it is not possible, at this summary stage of the proceedings, to establish the parameters of the statutory liability regime under Para. 3, particularly when it is purportedly based on the uncertain boundaries of the common law. In response, Mr Beltrami KC said that whatever the precise boundaries of the test are, it is clear that the Common Reliance Claimants are way beyond what is contemplated by "*reliance*" in Para. 3 because they unquestionably did not read or consider any Published Information, and nor did anyone on their behalf. That is essentially what Leech J found in *Barclays*.

(iii) External aids to construction

63.    As noted in [22] above, Leech J relied on certain external evidence as to Parliament's intentions in relation to Para. 3, including the Davies Review, HM Treasury's Consultation and Professor Ferran's article. He said that these could only have a "*secondary role*" in the interpretation of Para. 3 (see [108] of *Barclays*) but he was clearly fortified by them in his conclusions on the meaning of Para. 3.

64.    Mr Beltrami KC introduced during the course of the hearing the Explanatory Memorandum to the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010 by which the new s.90A and Schedule 10A were enacted, bringing in claims for dishonest delay. At para. 4.2 of the Explanatory Memorandum, it said: "*Section 90A introduced a statutory liability regime for the disclosures required by the Transparency Directive, confirming the prior common law situation – that issuers are not liable to investors in negligence, and extending the prior common law on deceit,*

*applying it only to issuers and in favour of purchasers of shares*." However there is no reference to the requirement of "*reliance*" and it is probably talking about "*extending*" the common law because the old prospectus cases were based on deceit but did not extend generally to false statements put out to the market. A big limiting factor on the pursuit of claims under s.90A and Schedule 10A FSMA is the requirement to prove dishonesty.

65. Mr Chapman KC referred to Professor Davies' original discussion paper issued in March 2007 (see [43] to [48] of *Barclays*) in particular at para. 26 where he said that a claimant "*must in fact rely on the statement, as part of which requirement the claimant would have to be aware of the statement*." Mr Chapman KC submitted that there is no analysis of the common law test; nor consideration of the indirect reliance cases (which in any event largely post-date the paper); and there is no explanation as to how this would apply to omissions. As to the "*fraud on the market*" theory referred to by Professor Davies as being available in the US because there is no reliance requirement under US law (see [45] and [48] of *Barclays*), Mr Chapman KC submitted that Leech J had been led into error by Professor Davies because there is a reliance requirement under US law but this has been held to be satisfied by a legal presumption known as "*fraud on the market*". Accordingly he said that it cannot properly be said that a "*reliance*" requirement would rule out a "*fraud on the market*" claim.

66. Mr Chapman KC made various other submissions on the external aids to construction. But the main point that he made is that none of the material before me and Leech J actually considered what "*reliance*" means either under Para. 3 or at common law. Leech J concluded, correctly in my view, that Parliament must have intended it to have some content and for it to be a limiting factor on those who are able to claim. But it is correct to say that exactly where the line is to be drawn on reliance does not appear clearly from the external aids.

(iv) Common Reliance Claims are a form of Indirect Reliance

67. Mr Chapman KC argued that Leech J did not consider whether his analysis of the potentially broad definition of indirect reliance might be satisfied by the Category C claims or the Common Reliance Claims in this case. Leech J concluded at [129] that it would be sufficient to satisfy the test for reliance if "*third parties who directed or influenced their investment decisions read and considered that published information*". In [124] (set out in [58] above), Leech J recognised that the line between a claimant receiving a "buy" recommendation from a broker and a claimant relying on a price movement *"(which was also influenced by that same information)*" may be difficult to draw.

68. Mr Chapman KC said that the evidence shows that the Common Reliance Claims satisfy the way that Leech J characterised the conduit sources or indirect reliance claims in that they are based on the following: (a) market participants including analysts and active investors reading and considering the Published Information; and (b) those market participants influencing the Claimants' investment decisions because their trading in the shares was in reliance on the Published Information and the resulting price influenced the Claimants' decisions in relation to acquiring, continuing to hold or selling shares. Furthermore Mr Chapman KC said that there was no principled basis for distinguishing the influence that market participants through the medium of price and say a third party broker issuing a "buy" recommendation have on the Claimants when

both are based on reading and considering the Published Information. They are both types of indirect reliance in which a third party has read and considered the Published Information and only differ in the way they have caused the Claimants to act. Indeed he said that price is a more effective conduit for Published Information than a "buy" recommendation because price reflects all the Published Information, whereas the latter may not. Leech J accepted that the Claimants could be influenced by AI or computers – see [132] – but that is little different to price movements in an efficient market.

69.   Mr Beltrami KC rejected these points principally on the basis that there are multiple factors affecting the price and there could never be evidence that shows that the particular movement in price was as a result of market participants taking into account the Published Information. I agree that it may be difficult to prove, but that only goes to show that this is a matter for the evidence to be tested at trial to see if it can establish what the Claimants are alleging.

### (v)  Distinguishing *Barclays*

70.   As indicated above, Mr Chapman KC has pointed to a distinction on the pleadings between *Barclays* and this case in that some of the Claimants had the positive belief that the market share price of SC plc shares was based on all the information available, including the Published Information. The Reliance Questionnaire asked the following in relation to the Common Reliance Claims:

> "4.      Does the Claimant advance a case that (i) it knew of and relied on the price of the Shares in acquiring, holding or disposing of the shares, and (ii) it believed that the prevailing market price of the Shares reflected the value of those shares based on the information disclosed by the Defendant being true and complete?"

71.   From the analysis of the answers to the Reliance Questionnaires it appears that not all Claimants answered "*yes*" to questions 4(i) and (ii). Only two of the three sample Claimants answered "*yes*". As all Claimants are pursuing Common Reliance Claims, that means that there are some that do not assert a positive belief that the price at which they acquired or held shares reflected the Published Information as being true and complete. Also, the fact that SC plc wanted answers to this question indicates that it saw "*belief*" in such respect to be material to the Common Reliance Claims.

72.   In *Barclays*, there was no consideration of the impact of such a positive "*belief*" as it was not pleaded in that way. Instead the claimants pleaded that their investment processes "*proceeded on the basis*" that the bank's share price would reflect the contents of the published information, which is more akin to a passive "*assumption*" than an active "*belief*". Mr Murphy's evidence highlighted what the Claimants' evidence might be as to this. I cannot determine at this stage whether it will have any impact on the outcome of the Common Reliance Claims, save that it may have some impact. Mr Chapman KC said that the Claimants with such a belief are indistinguishable from, for example, the buyers in *Yianni* who relied on a valuation report that they did not read but believed that their lender did and that it would have relied on it when deciding whether to lend to them.

73.   Mr Beltrami KC said that there is no real distinction between "*believed or assumed that*" and "*proceeded on the basis that*" and this was just different counsel's drafting.

Furthermore he said that the claimants in *Barclays* were largely the same as the Claimants in this case, so it is unlikely that there would be any difference in terms of their belief and understanding as to what the market price represented. He also fairly pointed out that, as set out in [25] of *Barclays*, precisely the same question as to belief was asked in their reliance questionnaires.

74. However Leech J does not deal with this point, presumably because it was not argued before him. I, like Leech J in [116], would not want to decide this application on a pleading point, but I do think that the fact that "*belief*" was not considered in *Barclays*, is a valid distinction that can be made, and if it is relevant, that the testing of the evidence as to that could be significant.

75. Another point of distinction with *Barclays* is the Claimants' extensive reliance on implied representations, whereas in *Barclays* there was only one implied representation being relied on. Leech J accepted that the test for reliance on implied representations is developing. Mr Chapman KC submitted that those claims could not possibly be struck out in those circumstances and that it would be impractical and contrary to authority just to strike out the claims based on express representations or omissions, as they are all bound up together.

(vi) The Claimants' solution

76. After all these criticisms of Leech J's judgment, what do the Claimants suggest should be the test for reliance that Parliament intended? Mr Chapman KC submitted that "*reliance*" in Para. 3 imposes a broad inducement test that could encompass the counterfactual of truth ("**CFOT**") approach that Waksman J held was arguable in *Crossley*. The CFOT looks at how a claimant would have acted if they had been told the truth. In this case, because liability for omissions is based on an issuer failing to tell the market something that it should have disclosed, Mr Chapman KC said that it would be natural to look at what the investor would have done, or not done, if the issuer had disclosed what it was duty-bound to include in its published information. This would get to the heart of what it means to be influenced by an omission. Much more so than in a misstatement case, where there is doubt as to whether the counterfactual is no statement at all, or a true statement, the causative effect of omissions can only sensibly be tested in this way.

77. Mr Beltrami KC criticised this suggestion for throwing out all the authorities as to the awareness requirement in the common law test of reliance. He also said that it would make no sense to look at the CFOT for Claimants who accept they never read, considered or knew about the Published Information, or even the gist of it, and simply look at what they would have done if they had been aware of the omitted information. This would basically let in every claimant to every s.90A claim.

78. I think that is slightly to misunderstand what is being said. For the Common Reliance Claims, the CFOT must be to test how the market price would have been affected if the Published Information had been true and complete and the influence that would have had on the Claimants' decisions as to whether to buy or continue to hold the shares. As identified above, there are problems with the test for reliance in relation to omissions because such a test does not exist at common law. Accordingly it is not beyond the realms of possibility that, as reliance is so bound up with inducement and causation, there could be a place for the CFOT test applying at least in relation to omissions. Mr

Chapman KC submitted that, if it is arguable that it applies to omissions, then because the test for omissions and misstatements should be the same, it must also be arguable that a reliance or inducement test short of "*reading and considering*" the Published Information may also apply in relation to misstatements. Alternatively, Mr Chapman KC submitted that this at least shows that the test for reliance is a developing area of law and should only be decided after a trial on the facts.

### (f) Conclusion as to the Common Reliance Claims

79.    I have little doubt that, had I been hearing this application in relation to Para. 3 without the benefit of Leech J's judgment in *Barclays,* I would have refused to strike out the Common Reliance Claims or grant reverse summary judgment. In my view it is clearly a developing area of law, in that there had been no decision on the meaning of "*reliance*" in Para. 3 and certain elements of the test of reliance in the common law are not fully established. I would agree with Waksman J in *Crossley* that such disputed legal questions should be resolved on the basis of actual facts established at a trial, and not on assumed or hypothetical facts.

80.    Furthermore, there will in any event be a very substantial trial of this action in which all factual issues as to SC plc's liability under Para. 3, as well as under Para. 5 and s.90 FSMA will be explored in great detail. A strike out of the Common Reliance Claims will not dispose of the case by any means and it will not "*substantially reduce the burden of the trial itself*" (see [17] above). Trial 1 has been listed for 76 days and SC plc anticipates that it will have spent c.£43.17 million by June 2025. It had said at CMC2 that the Common Reliance Claims would not materially increase the duration, costs or complexity of Trial 1, and I agreed with that when deciding that they should be part of Trial 1. Because of my directions to such effect, the parties have already spent time and costs in preparing the Common Reliance Claims for trial.

81.    Mr Beltrami KC said that the expert evidence on the Common Reliance Claims had been estimated to cost c.£450,000. Therefore if both sides produced such evidence together with factual evidence and the cost of making legal submissions, there would be a saving of over £1 million if the Common Reliance Claims are struck out. Even though that is a lot of money on any view, there is no escaping the fact that it is a relatively small amount by comparison with the overall costs that are and will be expended on this litigation. While the Court will always be keen to encourage parties to spend less on their litigation, it seems to me that such a saving cannot in itself carry much weight in considering whether the Claims ought to be struck out.

82.    *Barclays* was unquestionably smaller in scale to this case in terms of the length of trial (8-10 weeks), the extent of disclosure, the amounts at stake and what it would cost. By Leech J's judgment, 60% of the value of the claim was removed. There had also not been any directions in relation to the trying of the Category C claims and so little, if any, time or money had been spent on them. These are points of distinction between the two cases that may be relevant to the exercise of discretion, or whether there is another compelling reason why the claims should go to trial even though they have no real prospect of success.

83.    There is a further point that I should deal with and that is about settlement. Leech J considered that disposing of such a large proportion of the claim ought to "*promote an early settlement*" – see [152] – and that this was a compelling reason why the Category C claims should not be permitted to go to trial. The Court of Appeal in *Wirral* appeared to endorse that approach, saying that the strike out of those claims "*is more likely to facilitate settlement*" – see [143] – although that was said after it was known that *Barclays* had actually settled.

84.    Mr Chapman KC said that settlement would not be more likely to happen in this case because, if the Delay Claims are allowed to continue, there is still the full value of the claim being pursued. Furthermore, it is difficult to read anything into the settlement of the claims in *Barclays* and it could have been nothing to do with the judgment. All other multi-claimant s.90A FSMA claims have settled before or at trial, without any such strike out or summary judgment application having been made. Whilst obviously wishing to encourage settlement, I do not think that the possibility of settlement can really be taken into account in my decision not to strike out.

85.    The difficulty for me is that I am not deciding the matter afresh as I have the benefit of *Barclays* and Leech J's clear conclusion that the Category C claimants could never satisfy the reliance requirement in Para. 3. I am not "*convinced*" that Leech J was wrong about that. Indeed he could well be right. But, because of what the Claimants have submitted to me, I do have my doubts as to whether it is right to say that the common law test for reliance was intended by Parliament to be adopted for the requirement to prove "*reliance*" in Para. 3. That is mainly because of the curious case of omissions and how the common law test, imposed on the statutory wording, can work consistently with its application to misstatements. I think it is arguable that a broader test for reliance is contemplated by Para. 3, in order to accommodate omissions, and there is also the uncertain and developing law in relation to implied representations. I think, as did Leech J, that the precise line between conduit/indirect reliance and the Common Reliance Claims based on price, is not easy to draw. There may also be something in Mr Chapman KC's point about positive belief, which could only be resolved after hearing and testing the evidence in such respect.

86.    In relation to the principle of judicial comity, Mr Beltrami KC referred me to *Lornamead Acquisitions Ltd v Kaupthing Bank HF* [2011] EWHC 2611 (Comm), a decision of Gloster J, as she then was. At [53] she quoted Volume 11, para. 98 of *Halsbury's Laws* which said as follows:

> "There is no statute or common law rule by which one Court is bound to abide by the decision of another Court of co-ordinate jurisdiction. Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice   is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong…"

Then at [56] Gloster J concluded that "*despite [her] doubts*" she would follow an earlier decision of Burton J "*in the interests of comity*" because she was not "*convinced*" that he was wrong. The principle has been applied recently: see *Commercial Bank of Dubai*

*PSC v Al Sari* [2024] EWHC 3304 (Comm) at [114]; and *Steel v Spencer Road LLP* [2023] EWHC 2492 (Ch).

87. However I find it difficult to apply this to the application before me. Even though I am not convinced that Leech J was wrong in his conclusions on the legal points before him as to the meaning of "*reliance*" in Para. 3, I do not think it would be right in this case to strike out the Common Reliance Claims. There are points of difference between this case and *Barclays* that I have referred to above. But the principal reason is that, as I have sought to explain above, there are complications with the application of a consistent test for reliance to both misstatements and omissions and there remain doubts as to the parameters of the common law test. I therefore do not think that it is as clear as perhaps Leech J saw it and that it is a developing area that has potentially a huge impact on a number of different claims. There are factual matters that, in my view, require determination and the expert evidence might assist in understanding the extent to which the Published Information would have affected the market price and its influence therefore on the decisions made by the Claimants.

88. While respecting the principle of judicial comity, in particular the need for coherence, consistency and predictability in the law, I think that there are two issues here: (i) if I was actually deciding in this case the meaning of "*reliance*" in Para. 3, I would be bound to follow *Barclays* because I am not "*convinced*" it is wrong; but (ii) if I am deciding whether to defer a decision on that legal question to trial by not striking out the Common Reliance Claims, I am not bound to follow Leech J's decision to grant summary judgment on the Category C claims. He did so on the basis of his legal conclusions on Para. 3 but also the particular circumstances pertaining in *Barclays*. I do not consider that I have to be convinced that he was wrong to do so before deciding in this case that the right thing to do is not to strike out the Common Reliance Claims. In other words, it is open to me, as a matter of case management, but also in the light of my uncertainty as to the correct answer to the legal question, to leave it to be determined at trial.

89. I appreciate the difficulties that the Common Reliance Claims face and these have been carefully articulated both by Leech J and Mr Beltrami KC. But while it may be an uphill struggle for the Claimants, I do think that they should have the opportunity of putting the Common Reliance Claims forward at trial and for a decision in relation to them to be based on all the evidence, both factual and expert.

90. I am of course mindful of what the Court of Appeal said in *Wirral*, both as to the reliance requirement "*being a significant controlling mechanism in relation to what claims can be brought under*" s.90A FSMA, and also the case management benefits of weeding out at an early stage unmeritorious claims that are bad in law. The desire to avoid speculative US style securities litigation is clear from the external aids that I and Leech J were referred to. But one serious limiting factor to control this type of litigation is the requirement to plead and prove dishonesty. And the extent to which "*reliance*" in Para. 3 provides a further limitation on these sorts of claims is something that I consider needs to be explored further at trial and that difficult question is unsuitable to be decided at this stage. If, at trial, the Common Reliance Claims are found to be unsustainable and bad in law, no doubt that will be a significant decision that will affect future such claims.

### E.  Delay Claims

### (a)  Introduction

91.    The Delay Claims under Para. 5 are pleaded in very abbreviated fashion and were clearly designed to be an alternative way of putting the Claimants' main case under Para.3. At [78] to [79] of the Re-Re-Amended Particulars of Claim the Claimants plead as follows:

> "78.    The Claim PDMRs[1] knew of the Untrue and Misleading Statements and Omissions as aforesaid. Each PDMR was also aware of his and SC plc's obligation to publish correct information, and did not take steps to publish the true information. Consequently, between the date of such knowledge and 9 April 2019 the relevant Claims PDMRs acted dishonestly in delaying the publication of the true information.
>
> 79.    The Claimants suffered losses as a consequence of such delay are entitled to damages and/or compensation under paragraph 5 of Schedule 10A of the Act".

92.    Mr Beltrami KC says that this is a wholly inadequate plea, particularly as it is one of dishonesty. There are no facts pleaded in addition to the facts pleaded as to the alleged untrue and misleading statements in, and omissions from the Published Information that are relied upon in the Para. 3 claims. There is no reliance requirement under Para. 5 and Mr Beltrami KC suggested that the Para. 3 claims, which do have a reliance requirement, have simply been repackaged to come within Para. 5 to take advantage of this.

93.    Mr Chapman KC accepted that the Delay Claims have been concisely pleaded and may require amendment. However he fairly pointed out that the Re-Amended Defence to the Delay Claims does not plead the issue that SC plc seeks to argue on this application arising out of *Barclays*. SC plc merely pleads as follows in [69.3] of the Re-Amended Defence:

> "The Claimants' claims are in reality claims based on untrue or misleading statements in (or omissions from) Published Information. It is denied that they are properly characterised as claims for delay within the meaning of Schedule 10A, paragraph 5."

94.    The point that was decided in *Barclays* by Leech J was that Para. 5 only imposes liability on an issuer for dishonest delay if the issuer has actually later published the delayed information on a recognised information service ("**RIS**") or by "*recognised means*". Para. 5 does not say that expressly but Leech J concluded that: (i) that was its meaning; (ii) it addresses the mischief identified in the Davies Review for the introduction of dishonest delay liability; and (iii) any other construction would lead to an "*absurd result*".

---

[1] Persons discharging managerial responsibilities – defined in para. 8(5) of Schedule 10A FSMA

95.   *Barclays* was the first time, it appears, that this point was taken. It was not being run by SC plc, as is apparent from its Re-Amended Defence. And different points were taken about the construction of Para. 5 in other similar cases such as the claims against Glencore plc and RSA Insurance Group Ltd. (This was explained in Mr Spillman's witness statement and the Glencore plc Amended Defence was before me.)

96.   It is important to note that the Claimants' Delay Claims are expressly limited to the period from the date of knowledge of the obligation to publish correct information and 9 April 2019. As everyone knows, the 9 April 2019 date is in the pleading as an oblique reference to Published Information issued on that day which included the publication of the outcome of the 2019 Settlements, which are a part of the Relevant Misconduct as so defined in the Re-Re-Amended Particulars of Claim. The Claimants argue that Leech J was wrong in his interpretation of Para. 5. But even if he was correct and I decided to follow him, they say that there was a corrective publication on 9 April 2019 that would satisfy the element of the cause of action that Leech J held existed under Para. 5.

### (b) Para. 5

97.   I therefore turn to the wording of Para. 5 itself which states as follows:

> "5.   (1) An issuer of securities to which this Schedule applies is liable to   pay compensation to a person who-
>
> (a)   acquires, continues to hold or disposes of the securities, and
>
> (b)   suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.
>
> (2) The issuer is liable only if a person discharging managerial   responsibilities within the issuer acted dishonestly in delaying the   publication   of   the information."

98.   Leech J's analysis of Para. 5 was dependent on the reference to "*information to which this Schedule applies*" in Para. 5(1)(b). He then relied on para.2(1) of Schedule 10A FSMA to explain what that means:

> "**2.   Published Information to which this Schedule applies**
>
> (1) This Schedule applies to information published by the issuer of securities to which this Schedule applies-
>
> (a) By recognised means, or
>
> (b) By other means where the availability of the information has been announced by the issuer by recognised means."

"*Recognised means*" normally means through a RIS.

99. Leech J also relied on the apparent mischief as to what was lacking in the original s.90A FSMA in terms of issuer liability which was sought to be addressed by the introduction of dishonest delay claims in Para. 5. He referred to para. 85 of Professor Davies' original discussion paper dated March 2007 which said as follows:

> "Although section 90A goes beyond the common law by imposing liability for omissions, and late disclosure could be analysed as an omission (ie during the period between $t_1$ and $t_2$), it seems clear that the section does not cover this type of omission. The section contemplates liability only for omissions from the statement which is made ('omission from any such publication of any matter to be included in it') rather than liability for failure to make any statement at all. Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point".

### (c)   Textual Analysis

100. In [138(1)] of *Barclays*, Leech J agreed that the word "*delay*" can mean when something happens late or when something does not happen at all. He gave the example of a parcel either being delivered late or not at all. Both situations are covered by the word "*delay*". Hence, the use of that word itself does not mean that there would have to have been a corrective publication. It would be necessary to find other words than "*delay*" in Para. 5 by which Parliament required there to be a later publication to establish liability for dishonest delay. SC plc does not dispute this.

101. As noted above, Leech J found those other words in Paras. 5(1)(b) and (2), and Para.2(1). In [138(3)] of *Barclays* Leech J said that: "*Paragraph 2 defines the information to which Schedule 10A applies.*" Actually, it seems to me that that might not be wholly correct, as Para. 2 defines the "*published information to which this Schedule applies*" (emphasis added). It applies to Para. 3 claims as well, and so defines the sources of published information that are relevant to claims brought under Schedule 10A. So for instance, as discussed above, an omissions claim depends on showing that information was dishonestly omitted from particular published information. If there was no published information within Para. 2, there can be no omissions claim and obviously no reliance on it.

102. Leech J however regarded Para. 2 as requiring information to be published. He held at [138(3)] that:

> "It follows that Paragraph 5 has no application to an issuer unless or until it has published the relevant information by recognised means or it has announced the availability of that information by recognised means. It also follows, in my judgment, that Schedule 10A does not apply – and

> that there      can be no liability for delay in publishing information –
> unless or until it falls within paragraph 2 and has been published."

103.   But I am not sure that Para. 2 requires publication in that sense. It also seems to me a little extraordinary that such an apparently straightforward condition of liability – that there has to have been a later corrective publication – was not clearly spelled out in Para. 5. It would be easy to do. If Parliament really intended this to be a condition, I do not think it would have been done in a roundabout way through Para. 2.

104.   Leech J relied on para. 85 of Professor Davies' discussion paper quoted above which identified the mischief as there potentially being no liability under the statutory regime where there is a dishonest delay in publishing inside information for personal advantage. As Mr Chapman KC pointed out, Professor Davies refers to the lacuna in the issuer liability regime as being where there is a "*failure to make any statement at all*." It would be odd to fill that lacuna by making liability for that delay dependent on a later statement being made. That would not, in my view, be a way of addressing the mischief.

105.   Mr Beltrami KC and Leech J preferred to focus on the last sentence of para. 85, but I think that Mr Chapman KC is correct in analysing that sentence as being about liability for omissions under Para. 3, as it talks about reliance and the requirement that there had to have been published information which was relied on. If the omitted information is finally published, there can be no liability thereafter because there will be no Para. 3 claim, whether on the basis of omissions or untrue and misleading statements.

106.   Mr Chapman KC also referred to para. 86 of Professor Davies' discussion paper to which Leech J did not refer in [138] (he did set it out in [47]). There, Professor Davies concluded that there should be liability for delay because it would be "*unattractive not to impose liability where an issuer deliberately withholds information in order to mislead the market and to create a false market in its securities*". Professor Davies does not mention any requirement to publish the correct position; nor does he suggest that this is necessary to address the identified mischief.

107.   The other external aid to interpretation that Leech J cited at [138(4)] are paras. 6.3 and 6.8 of Treasury 2 where HM Treasury identified the need for liability to be precisely drawn. However, those passages do not suggest that the mechanism by which this is to be achieved is to limit delay claims to accurate but late disclosures. Actually at para. 6.7, HM Treasury noted that Professor Davies had recommended that liability should only attach to dishonest delay, and the definition of dishonest delay should "*focus on the purpose of delay*" and ensure that liability is only imposed "*if the purpose, or predominant purpose, fell within a prohibited category*". Dishonesty appears to have been the control mechanism for delay claims that HM Treasury were more concerned about.

108.   I therefore think that there are substantial arguments against the textual analysis and use of external aids that Leech J adopted in relation to Para. 5.

   **(d)  Overlap with Omissions claims under Para. 3**

109.    Mr Beltrami KC strongly supported Leech J's conclusions in [140] to [144] of *Barclays* that, unless there was a later corrective publication, it would lead to an "*absurd result*" and render Para. 3 omissions liability and the requirement to prove reliance "*almost redundant*". He made these comments because of the perceived substantial overlap between dishonest delay and omissions claims and he thought that that degree of overlap did not sit well with the Davies Review and the Treasury Consultation which placed much emphasis on the requirement of reliance under Para. 3. It seems that many hypothetical examples were considered to test the extent of the overlap and how both Paras. 3 and 5 would work, with and without the requirement for later publication. Leech J found the examples provided by Counsel for the claimants in *Barclays* to be unconvincing.

110.    Further, Mr Beltrami KC emphasised the important distinction between omission and delay claims by reference to the dishonesty that has to be proved. For omissions claims under Para. 3, the dishonesty is as to the contents of a publication; whereas for delay claims, the dishonesty has to relate to the delay or the timing of the publication. He said that these are qualitatively different and yet the Claimants appeared to be relying on the same particulars of dishonesty to support both claims. I agree with him that this is an important distinction. But this is really a pleading point and SC plc has not sought fit to ask for further information and to try to drill down on the pleading of dishonesty. I do not think that this is material to the point in issue on this application, which is whether the cause of action under Para. 5 requires the truth to have been published at some later time.

111.    The main problem that I have with this is that I do not see how the imposition of a requirement to publish the correct information prevents the substantial overlap. Mr Chapman KC provided the example of an issuer dishonestly delaying publishing inside information on a RIS from 2007 to 2019 when it does eventually publish. Even on Leech J's construction of Para. 5, there is potentially a dishonest delay claim for the whole period and also a Para. 3 omissions claim, subject to proof of reliance. If Leech J is wrong on this point, and there was no later publication, then the same claims under Para. 5 and Para. 3 would still be available.

112.    I think there is a danger in trying to construe Para. 5 by reference to multiple hypothetical examples demonstrating the extent of the overlap with Para. 3. Far better, it seems to me, would be to decide the requirements of liability under Para. 5 by reference to the actual facts in the case, as applied to the wording of the statute. There is no particular vice in an overlap between the Paras. and it is not surprising that there is such an overlap given that dishonest delay claims were only inserted into the existing regime by amendment. It is relevant to be reminded of what I said above about other defendants in s.90A FSMA proceedings making alternative suggestions as to the construction of Para. 5 and the overlap with Para. 3.

### (e)   Arbitrary Requirement

113.    Mr Chapman KC submitted that to require later corrective disclosure is an arbitrary requirement that is quite separate from the dishonest delay that is said to have caused loss. It is not clear from Leech J's judgment whether a claimant needs to have read the later published information in order to make a delay claim or what the point of such

disclosure is. The purpose of the legislation is to encourage "*accurate, comprehensive and timely information*" being disclosed to the market (see recital 1 to the Transparency Directive set out at [39] of *Barclays*). In fact, if there is a requirement as proposed by Leech J, it provides a perverse incentive on an issuer not to publish the corrective information so as to avoid liability under Para. 5. Furthermore, if the corrective information is not published until a very long time later, it could be that the limitation period will only start running from the date of publication as that is when the cause of action is complete. That could mean issuers remaining liable for many years after the relevant wrongdoing and the investor has suffered loss.

114.    There might also be difficulties in establishing whether the corrective information actually covers all of the misconduct alleged. As in this case, where SC plc says that the 9 April 2019 Published Information only related to the 2019 Settlements and not the Brutus or Bribery Scheme Allegations, it would be somewhat artificial to have to pick apart the later disclosure if the claimants could establish that there had indeed been dishonest delay.

115.    In *Barclays*, the claimants had alleged that there had at least been a partial disclosure by Barclays of its wrongdoing and settlements with the authorities but it is unclear if Leech J directly dealt with whether partial disclosure would be sufficient. He seemed to be under the impression in [145] that there had been no later disclosure by Barclays. By contrast in this case, later disclosure is (rather elliptically) pleaded by the reference to 9 April 2019 in [78] of the Re-Re-Amended Particulars of Claim and this is perhaps a point of distinction with *Barclays*. I do not think I could possibly strike out the Delay Claims while the Claimants may be able to establish that they have satisfied the publication requirement, at least to the extent of the claims in relation to the 2019 Settlements.

### (f)    Conclusion in relation to the Delay Claims

116.    Mr Beltrami KC again submitted that I am bound by the principle of judicial comity to follow Leech J's decision on the requirements of Para. 5 unless I am convinced that he was wrong. He also said that *Barclays* is indistinguishable from this case in this respect and so the Delay Claims should be struck out or reverse summary judgment granted to SC plc.

117.    I am not going to do that, for much the same reasons as in relation to the Common Reliance Claims. I have to say that I have more doubts about whether Leech J was correct to conclude that dishonest delay claims are dependent on the issuer publishing corrective information at some stage. I do not think that such a requirement necessarily fits with the objective of imposing liability in respect of a dishonest delay and doubt whether it serves any useful purpose. Most importantly perhaps, I am not sure that I would agree with the construction of Para. 5 together with Para. 2(1).

118.    I understand the point that the introduction of Para. 5 was intended to cover a quite narrow lacuna in issuer liability and that, as such, it should probably be construed to be quite confined in its reach, so far as possible. But the requirement of later publication does not seem to me to cure that problem or necessarily lead to a tightening of the boundaries of issuer liability. On the contrary, it could lead to some arbitrary anomalies

in the extent of the overlap with Para. 3. I also fully appreciate the desire to ensure that there is as little overlap as possible. But again, the wording cannot be stretched to such an extent so as to prevent any overlap. In any event, the solution proposed by Leech J and now adopted by SC plc, does not prevent there being a substantial overlap, as I have explained above.

119. I have said above that it is better to decide this novel point of law – and this really was a novel point on Para. 5 – on the basis of the actual facts, rather than assumed or hypothetical facts. That is consistent with the position I adopted in relation to the Common Reliance Claims and it holds good for the Delay Claims too. Without *Barclays*, I would definitely have left this matter to be determined at trial. Because of my doubts about the correctness of *Barclays* in this respect, I do not think my judgment should change as a result of the clear conclusions that Leech J arrived at as to the meaning of Para. 5. The Delay Claims covered by the 9 April 2019 Published Information would have to continue anyway, even if *Barclays* is correct. There is no good case management reason therefore for removing other Delay Claims from the trial, where the requirement for later publication will be fully argued by reference to the facts in this case, including the extent of the disclosure on 9 April 2019.

120. In all the circumstances, it would be inappropriate to strike out or grant summary judgment in respect of the Delay Claims and I refuse to do so.

## F.   Overall Conclusion

121. For the reasons set out above, I dismiss both parts of SC plc's application. Both the Common Reliance Claims and the Delay Claims will proceed to trial. The parties may well need to look at their pleadings in relation to both of these Claims and ensure that they cover everything that they wish to rely on at trial. It seems to me that there are a number of potential deficiencies in the way they have been drafted in this respect.

122. I would ask the parties to prepare an Order reflecting my judgment. I hope that consequential matters can be agreed, but if not, I could deal with any such disputes in writing, or at a hearing, if the parties think that is necessary.