```
 1                        UNITED STATES DISTRICT COURT
                         CENTRAL DISTRICT OF CALIFORNIA
 2                       WESTERN DIVISION - LOS ANGELES

 3

 4    STEPHEN MERRITT,              )  Case No. CV 23-9217-MEMF (KSx)
                                    )
 5         Plaintiff,               )  Los Angeles, California
                                    )  Thursday, May 15, 2025
 6              v.                  )  9:14 A.M. to 10:02 A.M.
                                    )  11:33 A.M. to 11:46 A.M.
 7    BARCLAYS PLC, et al.,         )
                                    )
 8         Defendants.              )
      _____)
 9

10

11

12

13                         TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG
14                     UNITED STATES DISTRICT JUDGE

15

16   Appearances:               See Page 2

17   Deputy Clerk:              Damon Berry

18   Court Reporter:            Recorded; CourtSmart

19   Transcription Service:     JAMS Certified Transcription
                                16000 Ventura Boulevard #1010
20                              Encino, California  91436
                                (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1   APPEARANCES:

 2   For the Plaintiff:        Robbins Geller Rudman and Dowd LLP
                               By:  ASHLEY M. PRICE
 3                             655 West Broadway, Suite 1900
                               San Diego, California  92101
 4                             (619) 231-1058
                               aprice@rgrdlaw.com
 5
                               Robbins Geller Rudman and Dowd LLP
 6                             By:  SHAWN A. WILLIAMS
                               Post Montgomery Center
 7                             One Montgomery Street, Suite 1800
                               San Francisco, California  94104
 8                             (415) 288-4545
                               shawnw@rgrdlaw.com
 9
     For the Defendants:       Williams and Connolly
10                             By:  JOHN M. MCNICHOLS
                               680 Main Avenue SW
11                             Washington, D.C.  20024
                               (202) 434-5043
12                             jmcnichols@wc.com

13                             Skadden Arps Slate Meagher & Flom LLP
                               By:  PETER B. MORRISON
14                             2000 Avenue of the Stars, Suite 200N
                               Los Angeles, California  90067
15                             (213) 687-5304
                               peter.morrison@skadden.com
16
                               Skadden Arps Slate Meagher & Flom LLP
17                             By:  BORIS BERSHTEYN
                               One Manhattan West
18                             New York, New York  10001-8602
                               (212) 735-3834
19                             boris.bershteyn@skadden.com

20                             Skadden Arps Slate Meagher & Flom LLP
                               By:  LARA A. FLATH
21                             One Manhattan West
                               New York, New York  10001-8602
22                             (212) 735-3717
                               lara.flath@skadden.com
23
                               Umhofer, Mitchell and King LLP
24                             By:  MATTHEW D. UMHOFER
                               767 South Alameda Avenue, Suite 270
25                             Los Angeles, California  90021
                               (213) 394-7979
                               matthew@umklaw.com
```

1    LOS ANGELES, CALIFORNIA, THURSDAY, MAY 15, 2025, 9:14 A.M.

2         THE CLERK:  Now calling item No. 1, Case No. L.A.

3    CV 23-09217, *Stephen Merritt v. Barclays PLC, et al.*

4         Counsel, please stand and state your appearances.

5         ASHLEY M. PRICE:  Good morning.  Ashley Price from

6    Robbins Geller Rudman and Dowd on behalf of the plaintiffs.

7         SHAWN A. WILLIAMS:  Good morning, Your Honor.

8    Shawn Williams, Robbins Geller Rudman and Dowd, on behalf of

9    the plaintiffs.

10        JOHN M. MCNICHOLS:  Good morning, Your Honor.

11   John McNichols from Williams and Connolly on behalf of

12   Mr. Staley.

13        PETER G. MORRISON:  Good morning, Your Honor.

14   Peter Morrison with Skadden Arps on behalf of Defendants

15   Barclays and Higgins, and with me today are my colleagues

16   Boris Bershteyn and Lara Flath, and Ms. Flath will be

17   handling the argument from our side.

18        THE COURT:  Thank you.  Good morning.

19        BORIS BERSHTEYN:  Good morning, Your Honor

20        LARA A. FLATH:  Good morning.

21        THE COURT:  Okay.  Good morning to all counsel.

22   Thank you.  You may be seated.

23        I trust the parties received the Court's tentative?

24        MULTIPLE SPEAKERS:  Yes, Your Honor.

25        THE COURT:  Okay.  Wonderful.

1          Well, since it's a defense motion, I will let the

2    defense be heard.  You can take the podium.  There is a

3    button to the right of the microphone if you need to raise or

4    lower the podium.

5          MS. FLATH:  Thank you, Your Honor.  Good morning

6    again.  Lara Flath from Skadden on behalf of Defendant

7    Barclays PLC and Mr. Higgins.

8          So thank you, Your --

9          THE COURT:  Sorry.  Just a moment, Counsel.

10         MS. FLATH:  Oh, of course.

11         (Pause.)

12         THE COURT:  I think there's somebody else that

13   wants to make an appearance.  You can come forward and --

14         MATTHEW D. UMHOFER:  I apologize.  Your Honor,

15   Matthew Umhofer.  I'm local counsel for Williams and Connolly

16   on the case.  I'm inconsequential today, but I think I needed

17   to make an appearance --

18         THE COURT:  Okay.  Thank you.

19         MR. UMHOFER:  Thank you.

20         THE COURT:  Thank you.

21         Okay, Counsel.  Please proceed.

22         MS. FLATH:  Thank you, Your Honor.

23         First, thank you for the tentative ruling issued in

24   order to assist us in preparing for the hearing.  Obviously,

25   I'm very happy to respond to any questions that the Court

1    might have but wanted to focus on just a few areas of the

2    tentative ruling with respect to the Exchange Act claim and

3    Section 10(b).  Probably no surprise, Your Honor, we will

4    agree that you certainly got the substance of the Section

5    90(a) claim, count three, correct in dismissing that.

6            I'd like to start by turning to loss causation and

7    really try to, hopefully, convince Your Honor that the

8    proposed finding, which is included in the tentative ruling

9    on page 16, that the FCA decision notice and 2023 press

10   release could conceivably have caused the alleged loss is

11   incorrect.  To start, we would submit, Your Honor, that the

12   applicable standard is not whether the alleged corrective

13   disclosure could have conceivably caused a loss.  Even in

14   *Twombly*, dealing with a Rule 8 standard of pleading, the

15   Supreme Court recognized that the question is whether

16   plaintiffs have nudged their claims across the line from

17   conceivable to plausible.

18           Here, in the context of a claim of securities

19   fraud, under Section 10(b) plaintiffs face an even higher

20   burden.  Certainly, they must comply with the strictures of

21   Rule 9(b), as Your Honor recognized, and the PSLRA.  That

22   applies to every single element, including loss causation.

23   They must allege with particularity.  And that's certainly

24   been emphasized from the Court in recent holdings, including

25   *Espy* from just last year, as well as the *Cloudera* case that,

1  certainly, the tentative cites.

2         This is a demanding standard, and plaintiffs have

3  the burden to meet it with respect to those particularities,

4  and what we'd like to focus on today is, really, the argument

5  that the Barclays defendants, so Barclays PLC and

6  Mr. Higgins, specifically focused on and made.  And to fully

7  assess whether in fact the FCA's decision and 2023 press

8  release was a corrective disclosure, the entirety of the 2021

9  press release needs to be looked at, and that is, there is

10  more information in that press release than what the

11  Complaint selectively cites and alleges in Paragraph 83.

12         The 2021 press release, which as the tentative

13  notes is ECF 59-3, discloses that the FCA's conclusions

14  related to both Mr. Staley's characterization to Barclays of

15  his relationship with Epstein and the subsequent description

16  of that relationship in Barclays subsequent response to the

17  FCA.  The very next sentence: "In view of those conclusions,

18  and Mr. Staley's intention to contest them, the Board and

19  Mr. Staley have agreed...he will step down."

20         So there is a connection here that because of the

21  FCA's conclusions with respect to Staley's characterization

22  of his relationship and his characterization to Barclays of

23  that he left the bank.  The only plausible interpretation of

24  that is that the FCA's conclusions were not good with respect

25  to Mr. Staley in the view of whether he had characterized the

1  relationship appropriately.  He left the bank.  He left his

2  position as CEO.

3         In addition, the allegation from Paragraph 83 of

4  the Complaint that Barclays, quote, continued to support

5  Staley, is also contradicted by the full context and the full

6  language of the 2021 press release.  And of course, you know,

7  well-pleaded allegations can be taken as true, but if they

8  contradict a document that is fully, and Your Honor's

9  properly held, sort of the subject of this motion, the

10  document itself controls.

11         After stating that Staley will step down, the next

12  paragraph -- exactly as the tentative notes -- says: "The

13  Board is disappointed at the outcome," but then explains,

14  Staley had done a good job of running Barclays for the last

15  five years.  This is not a situation where the CEO was being

16  suspended or Barclays and Mr. Staley were contending and

17  contesting these findings.  Again, he left the bank.  There

18  is no good interpretation that is plausible of that

19  conclusion from the FCA relating to Mr. Staley's

20  representations to Barclays about his relationship with

21  Mr. Epstein.

22         In addition, the press release goes on to say: "The

23  regulatory process still has to run its full course," that

24  "it is not appropriate for Barclays to comment further."

25  That's, of course, right.  The investigation had already been

1    disclosed back in February of 2020, and there is no right of

2    confession that a pending investigation triggers, and indeed,

3    while a regulatory investigation or additional findings --

4    that process continues, there are confidentiality concerns

5    and obligations as to what can or cannot be shared.

6           So in light of all of that information -- the FCA

7    had investigated, it had come to a conclusion regarding what

8    Mr. Staley had said to both Barclays and the FCA about his

9    relationship -- Staley could no longer continue as CEO.

10          In addition, the comment about the central question

11   of the investigation -- in fact, the press release clarifies

12   that Barclays stated their prior support of Mr. Staley back

13   in 2019 was limited to the central question of whether

14   Mr. Staley saw or was aware of Mr. Epstein's alleged crimes.

15   That's the piece.  It is not sort of a comment about the

16   scope of the FCA investigation but actually temporally

17   linking the fact that the reason the board and others had

18   clarified their support of Staley at that time was that

19   question: Was he aware of alleged crimes?  The FCA has not

20   contradicted that piece.

21          Immediately after this information and this

22   disclosure -- which -- the day after the FCA announces these

23   -- releases these conclusions, the 2021 press release comes

24   out.  Analysts immediately connected this -- these

25   conclusions and Mr. Staley's departure -- linking them to the

1    characterization of his relationship with Mr. Epstein.

2    Plaintiffs themselves allege that.  That's in Paragraph 84.

3    Within ten days, by November 12th, articles start coming out

4    about the details of the investigation, including information

5    that plaintiffs claim is newly alleged in 2023.  That is

6    simply not supported by the record, including the articles

7    that they themselves rely upon and, again, are the subject of

8    judicial notice for purposes of this motion.

9           As of November 12, 2021 -- this is ECF 59-4,

10   The Financial Times article -- it's reporting that Mr. Staley

11   and Mr. Epstein exchanged 1,200 emails between 2008 and 2012,

12   when he was at JPMorgan, showing a close relationship.  The

13   article also references that these emails included

14   unexplained terms, that the -- that Mr. Staley and Epstein

15   had become sufficiently close for Mr. Staley to visit

16   Mr. Epstein years ago in Florida, and even just a few months

17   before joining Barclays in 2015 they had remained in contact.

18   Those are all of the alleged details and facts that

19   plaintiffs claim became newly disclosed in 2023.  Within ten

20   days they were already out into the public.

21          That continues on over the course of the next,

22   almost, two years.  By February of 2023, more about those

23   emails had come out, including the excerpts with

24   pronouncement of profound friendship and continued

25   allegations of a close personal relationship.  By

1  March of 2023, again, <u>The Financial Times</u>, other mainstream

2  media publications are reporting upon this.

3          And the reason why I harp, Your Honor, on all of

4  those facts and all of what is in the public is because, if

5  information had been disclosed prior to the alleged

6  corrective disclosure, the Ninth Circuit has held -- and

7  courts within this circuit applying that law -- that

8  plaintiffs cannot plead loss causation.  That's the *Lopes v.*

9  *Fitbit* case affirmed by the Ninth Circuit in 2021, as well as

10 other cases too.

11         And even the tentative, Your Honor, also recognizes

12 this.  It notes that the final notice and 2023 press release,

13 at most, recognize confirmation.  Confirmation inherently

14 means the disclosure cannot be corrective.  Plaintiffs bear

15 the burden of specifically pleading -- again, with

16 particularity under 9(b) and according to the demanding

17 standards of the PSLRA -- that there was something new.

18 Simply pointing to confirmatory or even additive information

19 is not enough to establish loss causation.

20         In addition, the only other, perhaps, new

21 information that plaintiffs do not point to that comes from

22 the 2023 press release is that Barclays itself was not the

23 subject of this proceeding, it was Staley, and that the FCA

24 found that Staley had misled Barclays.  Mr. Staley was the

25 only one with the full knowledge of his relationship with

1  Mr. Epstein.  Plaintiffs ignore that entirely.

2        My final point here, Your Honor, on the tentative

3  and loss causation -- I discussed, I think, sort of the

4  confirmatory information.  The second half of that sentence

5  in the tentative points out that the FCA's notice also

6  revealed, quote, details about defendant's specific

7  misleading statements to the FCA.  In reading that, it seems

8  to be a reference to Barclays's October 2019 letter to the

9  FCA --

10        THE COURT:  Sorry.  Where are you in the tentative,

11  again?

12        MS. FLATH:  Of course, Your Honor.  It's on

13  page 17.

14        THE COURT:  Line?

15        MS. FLATH:  Let me get there right -- it would be

16  line -- I'm sorry -- 14 through 16 and, specifically,

17  15 through 16.

18        THE COURT:  Got it.

19        MS. FLATH:  Thank you.  I wrote down every other, I

20  think, line reference, Your Honor, but not that one.

21        THE COURT:  Go ahead.

22        MS. FLATH:  So details about defendants' specific

23  misleading statements to the FCA seems to be relating to the

24  October 2019 letter that was submitted.  That letter is not

25  an alleged misstatement that would rise -- give rise to

1   liability under the Securities Act -- or, excuse me -- the

2   Exchange Act and the securities laws of the United States.

3   It's not one of the alleged misstatements.  That makes sense.

4   It's not a public statement.  It is a statement to a

5   regulator.  It's not going to be the basis for actionable

6   securities fraud.

7            So even if, say, new information about that letter

8   came out, that's not the basis for the Section 10(b) claim

9   that plaintiffs are alleging here.  And again, plaintiffs

10  bear the burden, not the Court, of showing what happens here

11  and what inferences should be drawn.  They cannot -- they

12  must plead those specific facts, including with respect to

13  loss causation.  They have to articulate.  The Court does not

14  need to do that work for them.

15           And again, fundamentally, by this point Mr. Staley

16  had been gone from the bank for nearly two years.  That fact

17  should matter.  The investigation was disclosed in 2020, the

18  preliminary inclusions were disclosed in 2021, Mr. Staley

19  leaves, additional public information about these very

20  details that they claim were only revealed for the first

21  time, and then more information comes out in 2023.  That is

22  not enough under the PSLRA to plead loss causation.

23           Thank you.

24           THE COURT:  Thank you.

25           MS. FLATH:  Moving just briefly -- I promise I

1  would attempt to be targeted here -- to Mr. Higgins.

2  Mr. Higgins -- you know, I think there are two reasons, and I

3  went back and forth on, frankly, which one I should start

4  with, with respect to whether he is a maker of particular

5  statements or scienter.  I think in some ways they will go

6  together, but let me start just very quickly on why

7  Mr. Higgins should not be liable under 10(b) -- Section 10(b)

8  for particular statements.

9         So as a factual matter, the tentative does note

10 that, you know, certain documents -- this is on page 14,

11 lines 17 through 23, and in that -- in those -- in that

12 section it says (reading): As chairman of the board, it

13 logically follows that statements made by the board were made

14 or at least approved by Higgins.  And I'll come back to that

15 point, but the next sentence is (reading): Here the

16 allegations reflect that the statements were made by the,

17 quote, board, see, for example, paragraph 69.

18        That is the only -- Paragraph 69, Your Honor, is

19 actually the only allegation which relates to a statement

20 made by the board.  So the factual premise of what the

21 Complaint actually alleges and the statements is not true.

22 This reasoning would not apply to the statements where

23 Mr. Higgins is not the speaker, which would include

24 Paragraphs 70, 78, 83, 89, and 94.

25        And turning back to the point that "as chairman of

1    the board" it is logical to follow that Mr. Higgins was -- he

2    made those statements or approved them, that is not enough,

3    again, under the PSLRA to establish that Mr. Higgins is the

4    maker of these statements -- or the Supreme Court's case law.

5    The reason being: That does not establish substantial

6    participation or ultimate authority.  Plaintiffs have only

7    included the conclusory allegation here in Paragraph 50 and

8    51, but that is not enough.  Each statement, to be the basis

9    of a Section 10(b) claim, must be parsed.  Plaintiffs, as the

10   Ninth Circuit has noted repeatedly, including in *Cloudera*,

11   which the tentative cites -- each statement must be specific,

12   why, what, and what they knew.

13          And certainly, there's -- we cited this case,

14   Your Honor, in our papers, but the *Bruce v. Suntech Power*

15   case from the Northern District of California: To the extent

16   plaintiffs seek to hold an individual liable for other

17   statements on the basis of his position as, for example, CFO,

18   conclusory allegations that he had the authority to and to

19   control the making of those statements by virtue of the

20   responsibilities and activities as CFO lack the requisite

21   specificity.

22          Plaintiffs own case, the only case that they cite

23   in support of Mr. Higgins having the authority here is the

24   *Manalevy v. Bofi* case from the Southern District in 2021.

25   That case, too, notes that in fact the plaintiffs have not

1    alleged sufficient facts to show that, at that time, the

2    chairman of the board of directors was the maker of a press

3    release statement.

4          Otherwise, Your Honor, the result would be that the

5    chairman of the board would effectively be assumed to be the

6    maker of these statements without putting plaintiffs to their

7    burden and giving them inferences that they do not get at

8    this stage in a PSLRA case.  Otherwise, chairman of the board

9    would effectively be a primary violator under Section 10(b)

10   anytime there's, almost, a public statement.

11         In addition, Your Honor, the tentative recognizes

12   that there are certain statements -- for example,

13   Paragraph 83 -- that is not misleading.  If the statement is

14   not misleading, it cannot be the basis for the claim.  And

15   the claim should be assessed with respect to each and every

16   allegation.  It is not simply the claim moves forward.  It is

17   the claim with respect to each alleged misstatement.  In

18   particular, too, one of the comments -- one of the alleged

19   misstatements by Mr. Higgins purports to reveal comments made

20   to him during a private investor call.  Once again, that

21   cannot be the basis for a claim to the investing public and

22   an alleged misstatement.

23         Sticking with "Mr. Scienter" but moving to --

24   "Mr. Scienter" -- Mr. Higgins -- moving to scienter and

25   Mr. Higgins alleged scienter --

1           THE COURT:  Counsel, if I could just interrupt.

2           MS. FLATH:  Of course.

3           THE COURT:  I'm not sure how much longer you have

4   with your argument.  I do have a pretty full calendar.  So I

5   just -- I want to be mindful, and obviously I want to hear --

6           MS. FLATH:  I --

7           THE COURT:  -- from plaintiffs' counsel, and I

8   imagine you have some rebuttal.  So I'm hoping you can wrap

9   up in a couple of minutes?

10          MS. FLATH:  I will --

11          THE COURT:  Okay.  Thank you.

12          MS. FLATH:  I will absolutely do that.  Thank you,

13  Your Honor.

14          THE COURT:  Thank you.

15          MS. FLATH:  Scienter -- respectfully, the tentative

16  applies the wrong standard.  Access to the alleged -- the

17  underlying disputed facts would not be enough to establish

18  scienter.  Plaintiff concedes that, especially with respect

19  to Mr. Higgins, it has no allegations of plausible motive to

20  commit fraud, and without that plaintiff bears the burden to

21  plead compelling and particularized facts showing deliberate

22  recklessness on a statement-by-statement basis -- that is,

23  again, an extreme departure from the standards of ordinary

24  care -- or it must have been so obvious that the actor must

25  have been aware of it.  That is no small hurdle for the

1   securities plaintiff -- the securities fraud plaintiff -- the

2   *Prodanova* case from the Ninth Circuit in 2021.

3         Simply alleging that Mr. Higgins had access to

4   these emails that are alleged to be at odds with these

5   disclosures is not enough to establish scienter.  Plaintiffs

6   have cast these statements now as omissions or half-truths,

7   and in that case, *Tellabs* from the Supreme Court shows that

8   the inference is even harder.  Omissions and ambiguities

9   count against inferring scienter.  To sort of simply accept

10  that if there is an alleged access to information -- that,

11  you know, certainly we would dispute, Your Honor, that there

12  are false and misleading statements, but to accept that would

13  to eviscerate the scienter requirement.

14         And plaintiffs do not allege that Mr. Higgins or

15  others at Barclays had actual access to information

16  contradicting the alleged falsities at the time those

17  statements were made.  That's the *Welgus* case affirmed by the

18  Ninth Circuit in 2019.

19         My last point on scienter, Your Honor, would be

20  simply, too, that -- we disagree for the reasons stated in

21  our paper.  Of course, we think *ChinaCast* is distinguishable

22  with respect to Mr. Staley and a corporation can only be held

23  to have scienter through the acts of its employees.

24  Certainly, by the time Mr. Staley left in 2021, his scienter

25  could not be imputed to Barclays for any alleged

1  misstatements after that departure.

2          And then, finally, Your Honor, recognizing of

3  course the time, with respect to whether or not all of the

4  alleged misstatements are false, we would simply make the

5  point that in assessing these allegations that the tentative

6  goes too far in accepting those allegations and drawing all

7  inferences in favor of the plaintiffs.  As both *Cloudera* and

8  the *Metzler* case from the Ninth Circuit, which the tentative

9  cites, recognize, courts need not indulge in unwarranted

10  inferences in order to save a claim from dismissal.  It is

11  the plaintiff's burden to precisely explain why each

12  particular statement is false, misleading with particularity.

13          And in the event of turning these into, quote,

14  omissions or otherwise, there is not an obligation to give

15  all information that perhaps the plaintiffs say they might

16  want.  There's an even higher standard in the context of a

17  statement being alleged to be misleading on the basis of

18  omission that plaintiffs themselves have to prove.  If

19  Your Honor is inclined to give them leave to amend on the

20  Section 90(a) claim, we certainly think that they should be

21  held to their burden with respect to both loss causation as,

22  as well to each of these alleged misstatements and scienter.

23          THE COURT:  Thank you.

24          MS. FLATH:  Thank you, Your Honor.  I would

25  appreciate a chance to rebut very briefly.

 1              THE COURT:  Thank you.

 2         Okay.  Let me hear from plaintiff's counsel.

 3         MR. MCNICHOLS:  Your Honor, one question

 4    beforehand?

 5              THE COURT:  Oh.  Yes?

 6         MR. MCNICHOLS:  Mr. Staley has moved separately.

 7              THE COURT:  Okay.

 8         MR. MCNICHOLS:  I don't intend to repeat everything

 9    that Ms. Flath said.  I don't know whether it's Your Honor's

10    preference to have me go next, after they've had a chance to

11    respond, or --

12              THE COURT:  It is my preference to go next -- for

13    you to go next.  I think -- I just now am going to sort of

14    need to -- we've taken up a lot of time now, and I -- I'm

15    concerned that we're not going to get to my 10:00 o'clock on

16    time.  So just be brief, and if we can't finish the hearing

17    today, we'll have to come back on another day.  So do you

18    think you'll need more than five minutes?

19         MR. MCNICHOLS:  I certainly don't intend to repeat

20    what Ms. Flath said.  I had one point to address, and then

21    I'll be done.

22              THE COURT:  Okay.  So you think you can do that in

23    five minutes?

24         MR. MCNICHOLS:  I think I can.

25              THE COURT:  Okay.  Wonderful.  Thank you.

1          MR. MCNICHOLS:  Again, Your Honor, John McNichols

2    from Williams and Connolly on behalf of Mr. Staley.

3          As the Court's aware from the briefing, there's a

4    lot of overlap between the arguments that we made and the

5    arguments that the other defendants made in this case, and as

6    I said before, I certainly don't intend to repeat the points

7    that Ms. Flath eloquently made.

8          One point that was, I think, unique to our briefing

9    concerned the materiality discussion that Your Honor takes up

10   on page 15 of the tentative, and just to refresh on this

11   point, our statement, you know, or argument in the brief,

12   separate from the "truth on the market" issue, was that the

13   withheld -- allegedly withheld information concerning the

14   nature of the relationship between Mr. Staley and Mr. Epstein

15   would not matter to a reasonable investor.

16         And your argument -- excuse me -- Your Honor has

17   taken that up in the middle of page 15 on lines 16 and 17.

18   There is a full page of discussion, but I think this really

19   encapsulates Your Honor's reasoning, where Your Honor wrote

20   (reading): Defendants have not shown that a reasonable

21   investor could not possibly find the relationship of a top

22   executive of Barclays bank with a convicted sex offender

23   related to their decisions.

24         We respectfully submit that that's not the right

25   question, Your Honor, and what I mean by that is that the

1   materiality analysis focuses not on the relationship as a

2   whole but solely on the withheld or misrepresented aspect of

3   the relationship.  As we know from the Complaint, accepting

4   it as true, at Paragraph 72, as of February 2020, defendants

5   -- this is right out of the horse's mouth; right -- tell the

6   investing public that Mr. Staley has had a long-standing

7   professional relationship with Jeffrey Epstein that began in

8   2000 when he was asked to run JPMorgan's private bank, where

9   Epstein was already a client.

10          So the investing public knows, as of the time of

11  the alleged misrepresentations in this case, during the class

12  period, that Mr. Staley had for more than a decade a

13  professional relationship providing client services to

14  someone who he knew was a convicted sex offender.  That's

15  what the public knew.  Now, on their reading of the facts, at

16  least according to the Complaint, what the public didn't know

17  was that he was also friends with him and that he went to his

18  house and that he saw him.

19          In our -- the materiality analysis here -- in other

20  words, to decide that this would matter to a reasonable

21  investor -- that is, the withheld information in this case --

22  the Court would have to conclude that to a reasonable -- a

23  reasonable investor might say, "I was fine with it when I

24  knew that the CEO of this bank had a long-standing

25  professional relationship providing client services to

1  someone who he knew was a convicted sex offender.  I was fine

2  with that.  But now that I know that he went to his house and

3  that he exchanged warm emails with him, I'm out."  And we

4  respectfully submit to Your Honor that that is not a

5  plausible line of reasoning for any reasonable investor to

6  take.  The personal nature of the relationship can't be the

7  straw that broke the camel's back given all the other

8  information that was already out there and acknowledged in

9  the public about the nature of the relationship.

10        Now, Your Honor has taken this up a little bit

11  further on the same page, down on page 15 again, and this is

12  line 17 through 19 where Your Honor writes (reading):

13  Frankly, the simple fact that Barclays Bank initiated an

14  investigation and that FCA initiated an investigation shows,

15  at the very least, that it was plausible that the information

16  was material.  Now, the use of the word "information" there

17  is critical, and I submit to the Court that the information

18  that was investigated by Barclays Bank and by the FCA was not

19  the same information that Your Honor needs to opine upon in

20  the materiality analysis.

21        And on this point I command Your Honor's statement

22  over on page 3 of the tentative at lines 12 through 14, where

23  Your Honor wrote (reading): On August 15, 2019, the U.K.'s

24  Financial Conduct Authority contacted Higgins to request a

25  written response detailing how the board had satisfied itself

1  that there was no impropriety in the relationship between

2  Staley and Epstein.  In other words, that's the FCA's

3  inquiry, and that's Barclays's inquiry.  That is a different

4  inquiry from the question whether they were friends.  That's

5  not the same thing.  And to say that the FCA's concern and

6  Barclays's concern about impropriety shows that there was

7  materiality in the friendly relationship between these two is

8  not a sound connection or conclusion.

9        And unless Your Honor has questions about this,

10 then I'll rest on the papers.  Thank you.

11        THE COURT:  Thank you.

12        MS. PRICE:  Thank you, Your Honor.  Ashley Price

13 from Robbins Geller Rudman and Dowd on behalf of the

14 plaintiffs.

15        We appreciated Your Honor's tentative ruling, of

16 course, and in oral argument I don't think that I could

17 further add to the well-thought-out arguments and issues that

18 Your Honor already addressed in the tentative.  So I don't

19 intend to add substantive arguments to that tentative today,

20 but if Your Honor has questions, I'm happy to ask -- answer

21 them.

22        We also appreciated that Your Honor provided leave

23 to amend on the FSMA dishonest delay claim.  We intend to do

24 so.

25        THE COURT:  Thank you.

1          Can you respond to the arguments that were made by

2    counsel for Barclays?  That would be helpful.

3          MS. PRICE:  Sure.  So with respect to the loss

4    causation arguments --

5          THE COURT:  Yes.

6          MS. PRICE:  -- to start with those, counsel for

7    Barclays stated that a lot of the information was already in

8    the public and that that therefore meant that the FCA

9    decision in October 2023 and the related Barclays press

10   release could not provide new information to the public.  But

11   what it in fact did -- we alleged the information that it

12   provided, which is that the FCA finally decided that the --

13   that -- I'm sorry -- that the FCA finally decided that the --

14   pardon me, Your Honor -- that the FCA finally decided that

15   Staley had misrepresented the close personal nature of his

16   relationship with Mr. Epstein to the FCA when the FCA had

17   asked about it.  That personal relationship was not disclosed

18   either to the public or to the FCA upon asking, and the FCA

19   made clear that that was misleading, and that was new

20   information to the public that the public had not heard

21   before.  It didn't know --

22         THE COURT:  Which I think what counsel was saying

23   was that by the time of the 2023 press release, the public

24   was aware of the personal relationship, and so, in her view,

25   there could be nothing -- the FCA determination didn't add

1    anything new.  And you're saying what it added was it was not

2    previously known that Staley had misrepresented his

3    relationship?

4           MS. PRICE:  That's right.  That Staley had

5    misrepresented his relationship, and that Barclays had

6    misrepresented that relationship because Barclays -- Barclays

7    actually sent the letter to the FCA.  Barclays -- and Higgins

8    signed that letter -- Mr. Higgins signed that letter, and so

9    that information was not disclosed prior to the FCA's

10   decision.  So that -- that's the information that was not

11   disclosed.

12          THE COURT:  But I guess they would argue, well, the

13   emails -- anyone could look at what Barclays had said and

14   what Staley had said and look at the emails and see that

15   there had been a misrepresentation.

16          MS. PRICE:  I don't agree with counsel for Barclays

17   on that.  The information was not provided to the public in

18   the same intensity or credibility that the final decision

19   eventually came out with, and that is the "truth on the

20   market" standard.  It needed to be not just various newspaper

21   articles.  It needed -- Barclays needed to come clean --

22   under *Provenz v. Miller* -- *Provenz v. Miller*, Barclays needed

23   to come clean about the fact that it had misrepresented to

24   the FCA Staley's close personal relationship.  Barclays, at

25   the time that it was asked by the FCA, had at its fingertips

1    a cache of 1,200 emails.  It never came clean about what it

2    looked at.  It -- and --

3         THE COURT:  And I think one of counsel's other

4    points was, first of all, there's not an obligation to say

5    everything that you knew and, secondly, that confirming

6    information that's already out there, that does not meet the

7    standard.  So can you address that.

8         MS. PRICE:  So --

9         THE COURT:  So in response to your point about

10   whatever information out there wasn't the same intensity or

11   credibility as the FCA findings.

12        MS. PRICE:  Well, so I think that I would refer

13   Your Honor to *Macquarie v. Moab*, which is a Supreme Court

14   case that says that half-truths are still actionable as --

15   going only so far as -- you know, only partially disclosing

16   the truth is not fully revealing the truth.  So -- so -- I'm

17   sorry.  What was the second part of your question?

18        THE COURT:  The second part of the question was

19   counsel indicated that to the extent that the 2023 material

20   confirmed or made more serious -- whatever word you want to

21   use -- had already been in the market, that's not enough for

22   the standard because it has to be new information.  It can't

23   simply be confirming something that already was out there for

24   the loss causation element.

25        MS. PRICE:  Right.  So what was not already out

1   there was the scope of the relationship.  What Barclays had

2   told the market was that "All that we were asked to look at

3   was whether or not Staley knew about the misconduct that

4   Mr. Epstein had engaged in, not the closeness of the

5   relationship," and why that's important is because as a bank,

6   as an institutional -- as an international institution, it

7   needed to be clear about its CEO's relationships with a

8   convicted sex offender and whether or not there were any sort

9   of issues along those lines.

10          THE COURT:  And why isn't the fact that the emails

11  purportedly came out prior to this press release -- why isn't

12  that sufficient?  Because the emails would show everybody,

13  "Wow, they were really close, and that's not what Barclays

14  said."

15          MS. PRICE:  There were only scattered emails.  It

16  didn't come out with the same intensity and credibility, and

17  that's really the important standard for "truth on the

18  market."  It needs -- various press releases -- or, excuse me

19  -- various press reports -- you know, one-off press reports

20  don't come at the same intensity and credibility as an FCA --

21  a regulator's investigation and Barclays itself actually

22  disclosing what it knew about Mr. Staley's relationship.

23          THE COURT:  And can you address counsel's arguments

24  that the press release itself contradicts some of the

25  allegations in the Complaint, in particular, the idea that

1    Barclays continued to support Staley because, according to

2    counsel, he left the bank, and the full email suggests that

3    things were not good, and so on what basis can you assert

4    that Barclays continued to support Staley?

5          MS. PRICE:  So Barclays continued to support Staley

6    in various of its press releases.  For instance, in the -- it

7    claimed that Mr. Staley -- it claimed that Mr. Staley had

8    been a good leader of the bank and that it was continuing and

9    that the information that it received from Mr. Staley did not

10   differ from what it reported --

11         THE COURT:  And that's in the 2021 press release?

12         MS. PRICE:  No.  In the 2021 press release, the

13   press release focuses on what the investigation was looking

14   at and so their -- Barclays made a narrow claim that all that

15   they were asked to look at by the FCA was whether Mr. Staley

16   knew about the misconduct of Mr. Epstein, and they claimed

17   that they did not.  So that is all that the focus was on.

18         THE COURT:  And I think counsel's concern was that

19   Paragraph 83 makes reference to Barclays continuing to voice

20   support for Staley, but according to counsel, the press

21   release does not show a "continuing to voice support for

22   Staley."

23         MS. PRICE:  Well, simply the fact that Mr. Staley

24   is leaving the company and providing -- and is contesting the

25   FCA's decision does not voice support for Staley.

1          I'd like to --

2          THE COURT:  I'm sorry.  Say that again?

3          MS. PRICE:  The fact that Mr. Staley decided to

4     leave the bank and contest the FCA decision -- that doesn't

5     voice any sort of support by Barclays for Mr. Staley.

6          THE COURT:  No, but the allegation is -- I guess I

7     thought it was the opposite.  Your -- the allegation in the

8     Complaint is that Barclays "continued to voice its support

9     for Staley."  That's in --

10          MS. PRICE:  That's right.

11          THE COURT:  -- Paragraph 83.

12          MS. PRICE:  Right.

13          THE COURT:  And counsel is saying that is a

14     conclusory allegation that is contradicted by the actual

15     press release, which does not show support for Staley.

16          MS. PRICE:  And I think that they pointed to the

17     fact that Mr. Staley was leaving the company at the time.

18     They pointed to the fact that Mr. Staley was leaving, and

19     that fact by itself doesn't show one way or another.  It just

20     shows that he's deciding to contest the FCA's decision.

21          I'd like to point out that in Paragraph 88, which

22     is after the press release that we're looking at right now,

23     Barclays continues -- does continue to voice support for

24     Mr. Staley and discusses how Mr. Staley had improved the bank

25     under his leadership, provided clear strategy, and they

1    continue to note that it's not important to comment on the

2    FCA's investigation.  But the support continues well after

3    Mr. Staley's departure from the bank.

4          THE COURT:  Can you address counsel's arguments

5    that the Complaint fails to properly allege under the PLRS --

6    the standard of the act substantial participation and

7    ultimate authority by Mr. Higgins with respect to some of the

8    statements and that the -- for the Court to determine that it

9    was plausible or possible -- I can't remember what words were

10   used -- that as the chairman of the board -- he made these

11   statements -- that's not sufficient under the relevant case

12   law; even though that he was the -- he had the role of the

13   chairman of the board, you need to allege these other

14   elements.

15         MS. PRICE:  Sure.  So we address that in our

16   opposition -- on page 14 of our opposition, particularly to

17   Barclays, and we identified the particular statements to

18   which he -- to which we attributed to him, and it suffices

19   for him to be a maker when he signed or approved any of the

20   statements, and we specifically identified those statements

21   that we're discussing.  In addition, he took credit for the

22   director effectiveness assessment, and that was on the

23   alleged misstatements on February -- at the beginning of

24   February 2020.

25         THE COURT:  And then can you address -- counsel

 1  also indicated that the Court used the incorrect standard for

 2  scienter?  Can you address that?

 3        MS. PRICE:  We believe that the Court used the

 4  correct standard for scienter.  The standard is laid out in

 5  *Tellabs*, as counsel put forward, but we've provided -- we've

 6  alleged a strong inference of scienter, which the Court did

 7  find.  Mr. Higgins was involved in the investigation

 8  following the FCA providing the cache of emails to Barclays

 9  when asked about the inconsistency of the October 2019 letter

10  sent to the FCA.  He reviewed the emails.  He reviewed the

11  draft letter to the FCA.  He reviewed -- and he approved the

12  letter and ultimately signed it.  He was involved in all of

13  those things.  He had at his fingertips and was sitting on

14  the board when the board conducted its internal investigation

15  into the email cache and -- and for all of those reasons, he

16  had -- he knew that the representations made to the FCA and

17  then the representations made to the market were false and

18  misleading because they represented that Staley's

19  relationship was not close, was only professional.

20        THE COURT:  And then, finally, can you address the

21  arguments made by Staley's counsel that the market already

22  knew that Mr. Staley had a long-standing professional

23  relationship with somebody he knew to be a sex offender and

24  so it couldn't be material to the market to know that he also

25  had a friendship with somebody who was a known sex offender.

1          MS. PRICE:  Sure.  So I think that this goes,

2    again, to the "truth on the market" standard that needs to be

3    applied at the pleading stage.  It's really a materiality

4    question, and materiality at this stage of the proceedings is

5    -- well, materiality, in general, is a fact-intensive inquiry

6    and so that -- at this stage of the proceedings, it's really

7    not proper to make a ruling based on it.  So the -- again,

8    the standard for "truth on the market" is that the

9    information be released with the same intensity and

10   credibility.  So whether or not Mr. Staley was -- had

11   professional relationships with Mr. Epstein, had personal

12   relationships with him, knew about the sex offender -- these

13   are all materiality questions that should be determined at a

14   later date.

15          But the fact that he was close friends with a

16   sex offender is material to investors because investors want

17   to know whether or not their CEO has sound judgment.  He

18   continued to be friends with Mr. Staley well after

19   Mr. Staley's initial conviction.  He continued to be friends

20   with Staley after several civil litigation cases came out.

21   He continued to communicate with him.  He continued to

22   communicate with him regarding confidential information and

23   expressing extreme closeness with somebody that investors

24   would question whether or not it was good judgment to

25   continue such a relationship, particularly in the context of

1    running a bank, where there's regulations about anti-money

2    laundering and regulations about anti-racketeering -- and

3    that sort of thing -- that Staley as -- excuse me -- that

4    Staley needed to abide by and Barclays needed to abide by.

5            THE COURT:  And then, finally, Counsel, can you

6    address the argument made by the defense that Barclays's

7    statements to the FCA which were not public cannot be -- give

8    rise to liability under the securities laws.

9            MS. PRICE:  Sure.  The -- Barclays's statements to

10   the FCA that are not public were -- what was revealed at the

11   end of the class period is the fact that Barclays and Staley

12   misrepresented to the FCA that -- the closeness of the

13   relationship.  So what is revealed is confirmed, as

14   Your Honor said in the tentative, that the -- that the

15   relationship was closer than was originally stated to be by

16   Barclays.

17           THE COURT:  But you would agree that their actual

18   statements to the FCA cannot be actionable; the issue is

19   whether or not what was publicly represented about their

20   statements was accurate?

21           MS. PRICE:  I agree that their private statements

22   to the FCA are not actionable, but what is actionable is that

23   -- is statements, for instance, where Barclays says that they

24   are cooperating with regulators.  If you are lying to the

25   regulators, you are not cooperating with them.  So that's --

1    that is the truth that's revealed at the end of the class

2    period.

3              THE COURT:  Understood.  Anything further?

4              MS. PRICE:  No, Your Honor.  Thank you.

5              THE COURT:  Okay.  As mentioned, I have a number of

6    other matters.  So we'll have to take this on a second call,

7    and hopefully there will be time for the defense to provide

8    some rebuttal.  Thank you.

9         (Recess from 10:02 a.m. to 11:33 a.m.)

10

11                        AFTER RECESS

12              THE COURT:  Okay.

13              MS. FLATH:  Good morning, again, Your Honor.  Thank

14   you for allowing me what I promise will still be as efficient

15   and crisp of a rebuttal as I can as though we were still in

16   our original time.

17              THE COURT:  Okay.

18              MS. FLATH:  So thank you.  Once again, Lara Flath

19   for the Barclays PLC and Mr. Higgins defendants.

20              THE COURT:  Thank you.  And I will give you a limit

21   of ten minutes.  I'll put my chess timer on because, yeah, as

22   I mentioned, we have a busy calendar today.

23              MS. FLATH:  Understood, Your Honor, and I will

24   absolutely do my best to beat that clock.

25              THE COURT:  Okay.  Great.  Thank you.

1           MS. FLATH:  Fundamentally, the question that

2    remains on loss causation is What was new in 2023?

3    Plaintiffs have pointed to two things, one, the finality, so

4    to speak, of the FCA's decision and; two, these additional

5    emails that come out are additional details.

6           First, on the FCA decision point, it was not final

7    until October 12, 2023, when it was then immediately

8    disclosed by the press release.  And second, on this point of

9    the availability of information and whether, as counsel

10   articulated, it needs to come from a more credible source,

11   that is fundamentally at odds with the efficient market

12   theory by which plaintiffs allege this entire case.  If there

13   is information that is out there, it is being incorporated

14   into the price.

15          But most, perhaps, broadly, I think the colloquy

16   between plaintiff's counsel and the Court really showed that,

17   as pleaded, plaintiffs cannot point to a coherent theory of

18   precisely what was new, and we submit that the Court should

19   dismiss the Complaint such that, when they amend for the

20   Section 90(a) claim, they articulate whatever theory it is

21   they believe they can do with respect to loss causation with

22   the particularity required by the PSLRA.  And then, when we

23   are inevitably back in front of Your Honor on an amended

24   complaint, we can respond to precisely those allegations, but

25   as pleaded, plaintiffs have not met their burden.

1          One factual point I would like to clarify relates

2    to -- and the discussions about Barclays, quote, "continued

3    support for Mr. Staley" following his departure in 2021,

4    again, two years before, ultimately, the alleged corrective

5    disclosure.  In 2021, the press release notes Barclays also

6    agreed that Mr. Staley would be stepping down.  This was not

7    simply Mr. Staley resigning.  The press release says that.

8    The statement that Mr. Staley had done good work colloquially

9    is a past statement: While he had been at Barclays, he had

10   done good work as a CEO.  That's not alleged to be false.

11   That does not show continued support for him.

12          But the piece that I would especially point

13   Your Honor to is in the Complaint itself.  It's

14   Amended Complaint Paragraph 98.  In March of 2023, in which

15   the board notes allegations in a litigation between

16   Mr. Staley and his former employee -- employer -- excuse me

17   -- JPMorgan, where he had been from 2008 to 2012, when the

18   majority of those emails were sent, and it states the

19   allegations against Mr. Staley are serious, and goes on to

20   say that the committee -- Barclays's committee continued to

21   suspend the vesting of Mr. Staley's outstanding deferred

22   bonus and long-term incentive plan awards.

23          That is not continued support.  As of 2021, we had

24   agreed he was going to part ways.  He was moving on.  He was

25   contesting those findings.  We had said, "We will not" -- "We

1  suspend the vesting of his compensation."  And this is seven

2  months before then, ultimately, the final decision comes out.

3  That is not continued support.

4        Your Honor, plaintiffs simply cannot plead and do

5  not plead loss causation in this Amended Complaint with the

6  standards, and we'd ask that the Court dismiss for those

7  reasons, as well as those stated in our papers on the host of

8  other arguments.

9        THE COURT:  Thank you.

10        Anything further from Mr. Staley's counsel?

11        MR. MCNICHOLS:  No, Your Honor.

12        THE COURT:  Okay.  Thank you.

13        Let me just make sure I don't have any final

14 questions.

15        MS. PRICE:  Your Honor?

16        THE COURT:  Yes?

17        MS. PRICE:  May I please make another point in

18 regards --

19        THE COURT:  Sure.  Go ahead.

20        MS. PRICE:  Thank you, Your Honor.

21        THE COURT:  Go ahead.

22        MS. PRICE:  I just wanted to return to this

23 question of loss causation.

24        THE COURT:  Okay.

25        MS. PRICE:  Your Honor got the standard exactly

1  right in the tentative ruling on page 16.  All we have to

2  plead is the causal connection between the misrepresentation

3  and the loss.  The FCA decision confirmed the close personal

4  nature of the relationship and that defendants had falsely

5  told the FCA that the gentlemen were not close.  The

6  information was new to the market previously with the

7  disclosure of the preliminary findings of the investigation.

8  There was no disclosure that defendants had misrepresented to

9  the FCA the true, close nature of the relationship.

10         What's more, by the fact that this was a disclosure

11  only about the preliminary investigation, Ninth Circuit

12  precedent *Loos v. Immersion Corp*. and *Lloyd v. CVB* find an

13  announcement of a preliminary investigation cannot support

14  loss causation because the public can't know what the

15  investigation will ultimately reveal, and here what was

16  ultimately revealed was that Barclays had misled the FCA

17  about the closeness of the relationship.

18         THE COURT:  Okay.  Thank you.

19         Anything further from defense counsel?

20         MS. FLATH:  Your Honor, there is no allegation in

21  the Complaint or otherwise that Barclays misled the FCA.

22  That's Paragraph 104 of the Amended Complaint, in which the

23  final decision states Mr. Staley misled both the FCA and

24  Barclays.  So to suggest otherwise is simply factually

25  unsupported.

1          Finally, the *Loos* case we -- is very

2   distinguishable -- that was just cited -- L-o-o-s -- in that

3   a preliminary investigation -- ultimately there is an

4   investigation found where the defendant had -- the company

5   had engaged in fraud according to the regulator.  Again,

6   there's no such finding here whatsoever.

7          Thank you.

8          THE COURT:  Thank you.

9          I don't want to continue to go back and forth, but

10  was there a particular paragraph of the Complaint that you

11  wanted to point to -- this is a question for plaintiff's

12  counsel -- that one of the concerns was the idea that Barclay

13  [sic] misled the FCA?  Defense counsel says there's no

14  allegation of that.

15         MS. PRICE:  Sure, Your Honor.

16         THE COURT:  Okay.

17         MS. PRICE:  So if you look at paragraph -- I

18  believe it's 21.  In Paragraph 21 we allege that the FCA

19  turned over to Barclays the email cache and then Barclays

20  conducted an internal investigation.  At no point after that

21  investigation did Barclays come back and say to the public or

22  otherwise, "Yes, the letter" -- October -- "in October 2019,

23  where we represented that Staley did not have a close

24  relationship" -- and now I'm looking at Paragraph 20 -- "was

25  false and misleading to the FCA."  So --

1          THE COURT:  But where -- I guess, maybe, I

2     understood her to be saying -- and perhaps I'm mistaken as to

3     this.  Where do you allege that Barclays's misleading of the

4     FCA supports liability by Barclays and their -- I think that

5     was the point that defense counsel is making is that there's

6     not currently an allegation in the Complaint that one of the

7     bases for liability is that Barclays misled the FCA and then

8     misled the public that it had misled the FCA.

9          Is that correct?

10          MS. FLATH:  Yes, Your Honor.

11          THE COURT:  Okay.

12          So the question for you, Counsel, is where is it --

13     do you allege that Barclays's misrepresentations to the

14     market about the truthfulness of its communications with the

15     FCA is a basis for liability?

16          MS. PRICE:  So I will try to respond to all of

17     that.

18          THE COURT:  Okay.

19          MS. PRICE:  So Paragraph 61 -- we again have a

20     continuation of the story that I pointed out before in

21     Paragraph 21, where Higgins is involved in the drafting of

22     the letter to the FCA.  That was misleading and false about

23     the close relationship between Staley and Barclays.

24          And then in paragraphs -- starting around --

25          THE COURT:  The response was misleading?

1          MS. PRICE:  That --

2          THE COURT:  What was misleading?

3          MS. PRICE:  Correct.  The letter to the FCA --

4          THE COURT:  Okay.

5          MS. PRICE:  -- asking about -- when the FCA asked

6   about the relationship between Staley and Epstein, wanted

7   assurances that there was no impropriety, that Barclays took

8   it upon itself, drafted the letter with Mr. Hoyt's initial

9   drafting, Staley reviewed, Higgins reviewed -- these are all

10  senior executives at Barclays reviewing, working on this

11  letter that is sent to the FCA and was misleading.

12          THE COURT:  Okay.

13          MS. PRICE:  Then, after that occurs, the FCA

14  receives the email cache.  The email cache raises a lot of

15  questions for the FCA, and the FCA informs Barclays of the

16  issues -- this is now Paragraph 65 -- asking them to account

17  for it.

18          And Barclays conducts its own internal

19  investigation.  And then Paragraph 69, it comes out in

20  support of Mr. Staley after having reviewed the email cache.

21  It also says that it -- and it also says that the --

22          THE COURT:  Do you need a moment?

23          MS. PRICE:  I'm sorry.

24          So -- and it also says that the letter -- I

25  apologize.  So the false and misleading statements in 69, for

1    instance, are a follow-on to the FCA asking about the close

2    relationship, and the FCA began an investigation, and Staley

3    and the company then comes out and says that they were

4    cooperating with regulators in the investigation --

5              THE COURT:  And which paragraph --

6              MS. PRICE:  -- and that's Paragraph 70.

7              THE COURT:  Okay.  Thank you.

8              MS. PRICE:  "The Group is cooperating with the

9    relevant authorities" -- you can't cooperate with relevant

10   authorities -- and that's how I ended earlier -- when you've

11   misled them.

12             THE COURT:  Understood.  Okay.

13             I did want to give defense the last word, since

14   it's your motion, and then we'll end.  Thank you.

15             MS. FLATH:  Thank you, Your Honor.  It will be very

16   brief.

17             First, it was established earlier in our

18   discussions today, both with Your Honor and then between

19   Your Honor and plaintiff's counsel, that the October 2019

20   letter to the FCA is not the basis of liability here.

21             Second, the FCA did not, in 2023 or ever, conclude

22   that Barclays misled it.  We direct the Court to the 2023

23   FCA decision notice, which speaks for itself.  Because the

24   FCA never reached that conclusion, the public could not have

25   learned that in 2023.  That information is not out there.

1   That is not the basis for an alleged corrective disclosure.

2           Thank you.

3           THE COURT:  Thank you.

4           Okay.  Well, thank you to the parties.  I

5   appreciate the briefing and the lengthy argument.  The Court

6   will take the matter under submission and issue its order.

7           Thank you.  Take good care, counsel.

8           MULTIPLE SPEAKERS:  Thank you, Your Honor.

9       (Proceedings adjourned at 11:46 a.m.)

10  ///

11  ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                              CERTIFICATE

5         I certify that the foregoing is a correct transcript

6    from the electronic sound recording of the proceedings in the

7    above-entitled matter.

8    /s/ Julie Messa                    May 18, 2025
     Julie Messa, CET**D-403            Date
9    Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25