Adam S. Paris (SBN # 190693)
(parisa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone:    (310) 712-6600
Facsimile:    (310) 712-8800

Jeffrey T. Scott (*pro hac vice*)
(scottj@sullcrom.com)
Matthew J. Porpora (*pro hac vice*)
(porporam@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3558

[ADDITIONAL COUNSEL ON SIGNATURE BLOCK]

*Attorneys for Defendants Barclays PLC
and Nigel Higgins*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS,<br><br>Defendants. | Case No. 2:23-cv-09217-MEMF-KS<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION OR, ALTERNATIVELY, CERTIFICATION OF INTERLOCUTORY APPEAL**<br><br>[Notice of Motion and Motion; and [Proposed] Order Filed Concurrently]<br><br>Hearing Date:  August 21, 2025<br>Hearing Time:  10:00 A.M.<br>Courtroom:  8B<br>Judge:  Hon. Maame Ewusi-Mensah Frimpong |

# TABLE OF CONTENTS

*Page*

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................5

    A.    The Challenged Statements About Staley's Relationship With Epstein ..............5

    B.    Staley Resigns from Barclays, and the Media Reports Extensive Details About His Personal Relationship with Epstein With No Alleged Impact on Barclays' Stock Price ..................................................................................6

    C.    On October 12, 2023, the FCA Announces the Conclusion of Its Investigation....................................................................................................7

ARGUMENT..........................................................................................................................7

I.    The Court Should Reconsider Whether Plaintiff Has Adequately Alleged Materiality and Loss Causation ..........................................................................7

    A.    Plaintiff Did Not Adequately Allege Any Material Misstatements.....................8

    B.    Plaintiff Did Not Adequately Allege Loss Causation.........................................12

II.    Alternatively, the Court Should Certify the Order for Interlocutory Appeal Under 28 U.S.C. § 1292(b) ..............................................................................................14

CONCLUSION.......................................................................................................................18

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abad* v. *Bayer Corp.*,
563 F.3d 663 (7th Cir. 2009) ........................................................................................17

*In re Air Crash Over S. Indian Ocean*,
352 F. Supp. 3d 19 (D.D.C. 2018) ...............................................................................17

*In re Arcimoto Inc., Sec. Litig.*,
2022 WL 17851834 (E.D.N.Y. Dec. 22, 2022) ............................................................13

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ...........................................................................................18

*Catogas* v. *Cyberonics, Inc.*,
292 F. App'x 311 (5th Cir. 2008) .................................................................................16

*Constr. Laborers Pension Tr.* v. *CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)......................................................................10, 11

*Cunha* v. *Hansen Nat. Corp.*,
2012 WL 12886194 (C.D. Cal. Oct. 22, 2012)............................................................15

*Espy* v. *J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ........................................................................................13

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)..............................................................13

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2014 WL 2815571 (S.D.N.Y. June 23, 2014) ..............................................................18

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014)..................................................................18

*Greenhouse* v. *MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004) .............................................................................8, 11, 16

*Grigsby* v. *BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) ..........................................................................4, 5, 13, 16

*Hawaii ex rel. Louie* v. *JP Morgan Chase & Co.*,
921 F. Supp. 2d 1059 (D. Haw. 2013).........................................................................15

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 12732428 (C.D. Cal. Mar. 27, 2015).......................................................12, 13

*J & R Mktg., SEP* v. *Gen. Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) .........................................................................................9

*Livid Holdings Ltd.* v. *Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) .......................................................................................10

-ii-

*MacPhee* v. *MiMedx Grp., Inc.*,
  73 F.4th 1220 (11th Cir. 2023) ...................................................................................................16

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022) ...............................................................................3, 12, 13, 14

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)........................................................................................................16

*Reese* v. *BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ...............................................................................15, 16, 17

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ...............................................................................................3, 8, 9

*S. Ferry LP, No. 2* v. *Killinger*,
  542 F.3d 776 (9th Cir. 2008) .....................................................................................................15

*Shofet* v. *Zillow Inc.*,
  2024 WL 5275512 (C.D. Cal. Oct. 3, 2024)........................................................................8

*United States ex rel. Integra Med Analytics LLC* v. *Providence Health & Servs.*,
  2019 WL 6973547 (C.D. Cal. Oct. 8, 2019)........................................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2 F.4th 1199 (9th Cir. 2021) .....................................................................................................15

*Weyerhaeuser Co.* v. *AIG Prop. Cas., Inc.*,
  2023 WL 10423264 (C.D. Cal. Dec. 28, 2023) .....................................................................8

**Statutes and Rules**

28 U.S.C. § 1292(b) ...................................................................................................... *passim*

L.R. 7-18 ...................................................................................................................1, 2, 8

**INTRODUCTION**

Pursuant to Local Rule 7-18 and 28 U.S.C. § 1292(b), Defendants respectfully submit this motion for reconsideration, or, alternatively, certification of interlocutory appeal, of the Court's June 24, 2025 order granting in part Defendants' motions to dismiss (the "Order"; ECF No. 84).[1] Defendants do not file this motion lightly, but this is an exceptional case warranting reconsideration or interlocutory appeal.

In the Order, the Court held, in relevant part, that Lead Plaintiff Teamsters Local 237 ("Plaintiff") adequately pled that Defendants violated Section 10(b) of the Securities Exchange Act of 1934.[2] In so holding, the Court "fail[ed] to consider material facts presented to the Court," L.R. 7-18(c)—namely, that Plaintiff's allegations of falsity, materiality, and loss causation are fundamentally incompatible. Plaintiff alleges that Defendants made misleading statements purporting to downplay the extent of the relationship between its then-CEO Jes Staley and Jeffrey Epstein by omitting that Staley had a "close, personal" relationship with Epstein, rather than merely a "professional" relationship. (AC ¶ 24.) Plaintiff alleges that information pertaining to Staley's relationship with Epstein was material to an investment decision in Barclays stock not because it was the subject of public interest, but because any revelation about Staley's relationship with Epstein would be so serious that Staley could be forced to resign as Barclays' CEO, which the market believed "would be a pity" given that Staley had delivered "solid financial performance" for the company. (AC ¶ 76; *see also id.* ¶¶ 12, 16 ("Staley's investment banking strategy was paying off with a stronger investment bank returning higher profits for Barclays" and "Defendants sought to appease nervous investors by weakening any connection between its CEO and Epstein.").) In other words, Plaintiff alleges that, because the market believed that Barclays was profitable under Staley's

---

[1] The Order was entered on the docket on June 25. (*See* ECF No. 84.) As noted in Barclays PLC's request for clarification, the defendant entity is Barclays PLC. (*See* ECF No. 85.)

[2] Plaintiff's Section 10(b) claim is based on Barclays American Depository Receipts ("ADRs") that are traded on the New York Stock Exchange. (AC ¶¶ 132-143.) The Court dismissed without prejudice the separate claim under English law brought by the Firemen's Retirement System of St. Louis that is tied to Barclays ordinary shares traded on the London Stock Exchange. (Order at 23-24.)

stewardship, information about his relationship with Epstein—which would end his tenure as Barclays' CEO—was material to investors.

Thus, under Plaintiff's theory of the case, the risk allegedly concealed by the alleged misstatements necessarily materialized in November 2021, when Barclays announced Staley's departure from Barclays after the British Financial Conduct Authority ("FCA") preliminarily found that Staley misrepresented to the FCA the nature of his relationship with Epstein. Consequently, that should be the relevant date for loss causation. What the market had feared—which the alleged misstatements sought to avoid—had come true: Staley's tenure as Barclays' CEO had ended. But Plaintiff does not allege that it incurred an investment loss on that date. Nor does Plaintiff allege that the challenged statements were corrected when, over the following weeks and months, the media further reported intimate details about Staley and Epstein's personal relationship, including the contents of the emails between them that Plaintiff spotlights throughout the Complaint. Instead, Plaintiff alleges that the challenged statements were corrected only after the FCA issued its final decision in October 2023, concluding that Staley had "misled both the FCA and the Barclays Board about the nature of his relationship with Mr Epstein." (AC ¶ 104.) Plaintiff apparently chose that date as its sole alleged corrective disclosure—and not any of the earlier dates—because that is the only disclosure that corresponded with a stock price decline. Based on those allegations, the Court held that Plaintiff has adequately pled a Section 10(b) claim.

The Court should grant reconsideration because the Court "fail[ed] to consider material facts presented to the Court" bearing on the elements of materiality and loss causation. L.R. 7-18(c).

*First*, in determining that Plaintiff adequately pled that the challenged statements are material, the Court overlooked Plaintiff's specific allegations as to why the challenged statements were supposedly material, as well as caselaw holding that materiality does not concern whether information is important generally, but whether it is important to the decision-making process of a reasonable investor buying Barclays stock. As the Ninth Circuit has explained, to be material, information must be "viewed by the reasonable investor as having

-2-

significantly altered the 'total mix' of information made available *for the purpose of decisionmaking by stockholders concerning their investments*." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (emphasis added; quotations omitted). Here, under Plaintiff's theory of the case, any statements about the relationship between Epstein and Staley could have "significance to stockholder decisionmaking," *id.* at 1275, only if the market believed that Barclays would be more profitable with Staley as CEO than it would be without him in that role. Plaintiff makes that allegation expressly: "analysts who reported on the [challenged statements] were comforted by Defendants' misrepresentations and voiced support for Staley in light of the solid financial performance he appeared to deliver for the Company." (AC ¶ 76.) Under Plaintiff's theory of materiality, Barclays' stock price should have declined when Staley was forced to resign. If it did not, that would mean that the market did not view Staley as indispensable to Barclays' success, and thus would not care about information bearing on his personal conduct that would be embarrassing or lead to his departure from the company. As it turns out, there was *no* market reaction when Staley resigned from Barclays. In sustaining the Complaint, the Court overlooked those alleged facts. Instead, in assessing materiality, the Court focused on the fact that both Barclays and the FCA initiated investigations into Staley's connection to Epstein, which the Court determined "shows at the very least that it was plausible that the information was material" at least to Barclays' Board and to the FCA. (Order at 15-16.) Respectfully, that is the wrong question for materiality. And in any event, the Court's holding is incompatible with Plaintiff's own theory of the case.

*Second*, to plead loss causation, Plaintiff must allege a disclosure that "provided new information to the market" and "reveal[ed] the falsity of the defendant's prior misstatements." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839-40 (9th Cir. 2022) (brackets omitted). The Court held that Plaintiff met that burden by pleading that the FCA's announcement of its final decision on October 12, 2023, "revealed the truth about Staley's relationship with Epstein and Barclays Bank's knowledge thereof." (Order at 17.) But that is not what Plaintiff alleges in the Complaint. Nor could it, because October 12, 2023 was not the first time that the market

-3-

was informed that Epstein and Staley had more than a "professional" relationship. Barclays already had disclosed this when it reported the FCA's preliminary findings in November 2021 (AC ¶ 84), and the press reported extensively on the details of Staley and Epstein's relationship in July-August 2019, November 2021, and March 2023 (*id.* ¶¶ 52-55, 85, 96). For those reasons, in opposing the motions to dismiss, Plaintiff argued that the new information the market learned on October 12, 2023, was the "fact" that the FCA had "concluded" that its preliminary findings were correct. (Opp. 18; ECF No. 69.) Although the Court held that this disclosure was "corrective" because it "provided confirmation of Staley's misrepresentations" (Order at 18), as a matter of Ninth Circuit law this is insufficient: the "disclosure of confirmatory information" does not comprise a proper, corrective disclosure as a matter of law. *Grigsby* v. *BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020).

Alternatively, Defendants request that the Court certify the Order for interlocutory appeal pursuant to Section 1292(b). Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory review if (i) the order involves a "controlling question of law," (ii) on which there is "substantial ground for difference of opinion," (iii) and "immediate appeal from the order may materially advance the ultimate termination of the litigation." The Order implicates two important questions of law on materiality and loss causation that satisfy the standard for interlocutory appeal. *First*, whether information about the personal conduct of a CEO before joining the company is material to investor decision-making. *Second*, whether the disclosure of a regulator's "conclusion" about facts previously disclosed to the market may serve as a corrective disclosure for purposes of pleading loss causation. As discussed in more detail below, each of these questions are controlling questions of law, as they require application of law to facts alleged in the Complaint, and their resolution on appeal would "materially advance" the litigation because, if the Ninth Circuit agrees with Defendants, the lawsuit would be dismissed. There is also "substantial ground for [a] difference of opinion" on the two questions: as the Court recognized (Order at 15), there is no binding authority on the materiality question, and the Court's holding on loss causation conflicts with other decisions that "disclosure of confirmatory information" does not constitute a corrective disclosure. *E.g.*,

*Grigsby*, 979 F.3d at 1205.  As a result, if the Court declines to reconsider its Order, Defendants respectfully request that the Court certify the Order for interlocutory appeal to the Ninth Circuit.

## BACKGROUND

### A.     The Challenged Statements About Staley's Relationship With Epstein

On December 1, 2015, Barclays hired Staley as CEO "to grow shareholder value and strengthen Barclays' investment banking activities."  (AC ¶ 11.)  "By year-end 2019, Staley's investment banking strategy was paying off with a stronger investment bank returning higher profits for Barclays."  (*Id.* ¶ 12.)  In July 2019, however, Jeffrey Epstein, "a long-time friend and former client of Staley's, was arrested on federal charges of sex trafficking" (*id.* ¶ 13), and "media attention turned to business associates and friends of Epstein," including Staley (*id.* ¶ 14).  Plaintiff alleges that Staley's connection to Epstein became a focus in U.S. news outlets and "the British press."  (*Id.* ¶¶ 52-55.)

In the wake of that media attention, Barclays and Staley made several statements about the "professional" nature of Staley and Epstein's relationship, which Plaintiff alleges were false and misleading by omitting the "close, personal" nature of their relationship.  (*Id.* ¶ 24.)  For example:

- On July 22, 2019, a Barclays spokesperson was quoted in a *New York Times* article as stating that "Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally."  (*Id.* ¶ 53.)

- On February 13, 2020, in a press release and in the 2019 Annual Report, Barclays stated that "Mr. Staley developed a professional relationship with Mr. Epstein."  (*Id.* ¶ 69.)[3]

---

[3] The February 13, 2020 statements by Barclays confirming that Staley had a "professional relationship" with Epstein corrected precisely what the Court determined to be the allegedly false and misleading omission in the statement provided in the July 22, 2019 *New York Times* article, which implied "that Staley and Epstein did not advise or provide professional services to each other" at all.  (Order at 11.)  Thus, to the extent the Court viewed the July 2019 statement as misleading, it was made clear in February 2020.  As a result, at a minimum, the Court should dismiss the Section 10(b) claim as it pertains to the July 22, 2019 statement.

-5-

- Also on February 13, 2020, Staley participated on an earnings call with analysts, where he stated that his relationship with Epstein "began to taper off quite significantly" after Staley left JP Morgan, had "stopped before [Staley] joined Barclays," and the two have had "no contact . . . whatsoever since then." (*Id.* ¶ 71.)

Plaintiff alleges that these and other similar statements caused Barclays' stock to "trade[] at artificially inflated prices." (*Id.* ¶ 80.) The reason, according to Plaintiff, is that analysts "were comforted" by the alleged misstatements and Barclays' continued "support for Staley" because "Staley [had] deliver[ed] . . . solid [financial] numbers." (*Id.* ¶ 76.) Analysts were focused on the Staley-Epstein connection not because of the relationship *per se*, but because further "revelations" about their connection "could mean [Staley's] days" as CEO "are numbered. This would be a pity," because Barclays had "reported a better than expected set of full year results" for 2019 under Staley's stewardship of the bank. (*Id.*)

### B. Staley Resigns from Barclays, and the Media Reports Extensive Details About His Personal Relationship with Epstein With No Alleged Impact on Barclays' Stock Price

On November 1, 2021, Barclays issued a press release announcing that Staley would be departing Barclays after Barclays had been informed of "preliminary conclusions from the FCA" of its "investigation into Mr Staley's characterization to Barclays of his relationship with the late Mr Jeffrey Epstein and the subsequent description of that relationship in Barclays' response to the FCA." (*Id.* ¶ 83.) As Barclays stated, "[i]n view of those conclusions, and Mr Staley's intention to contest them, the Board and Mr Staley have agreed that he will step down." (ECF No. 59-3 at 11.)

Eleven days later, on November 12, 2021, the *Financial Times* published an article titled "Jes Staley exchanged 1,200 emails with Epstein that included unexplained phrases," such as "snow white." (AC ¶ 85.) The article added that the emails were sent between 2008 and 2012 and "showed a close relationship"; so close that "Staley visited Epstein while he was serving a prison sentence in Florida." (ECF No. 59-4 at 14.)

On February 15, 2023, excerpts of the trove of emails described in the *Financial Times* article were publicly released and picked up by the press. Those emails "express[ed] pronouncements of 'profound' friendship" by Staley to Epstein, and included the infamous

-6-

email exchanges with "references to Snow White and Beauty and the Beast." (AC ¶¶ 28, 95; *see also* ECF No. 59-6 (Mar. 4, 2023 *Financial Times* Article).)

Plaintiff does not allege that these revelations to the market resulted in any impact on Barclays' stock price. (AC ¶¶ 57, 80, 90, 100.)

**C.    On October 12, 2023, the FCA Announces the Conclusion of Its Investigation**

Nearly two years after Staley left Barclays, on October 12, 2023, the FCA concluded that it was standing by its November 2021 preliminary determination—that Staley had mischaracterized the nature of his relationship with Epstein to the FCA. (*See* AC ¶ 104.) As the FCA stated, "Mr Staley recklessly approved a letter sent by Barclays to the FCA, which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact." (*Id.*) The FCA also concluded that Barclays had no knowledge of Staley's misconduct. In fact, the FCA concluded that Staley "*misled both the FCA and the Barclays Board* about the nature of his relationship with Mr Epstein." (*Id.* (emphasis added).) It emphasized that Barclays had "relied on information supplied by Mr Staley," and that Staley "was the only person at Barclays who knew the full extent of his personal relationship with Mr Epstein and the specific timings of his contact with him." (*Id.*) Barclays reported these developments in a press release the same day. (*Id.* ¶ 111.)

That day, the price of Barclays' ADRs, which are traded on the New York Stock Exchange, fell 4.99% and its ordinary stock price fell 3.12%. (*Id.* ¶ 113.)

**ARGUMENT**

**I.    The Court Should Reconsider Whether Plaintiff Has Adequately Alleged Materiality and Loss Causation.**

A "motion for reconsideration" is warranted where there is "(a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered." L.R. 7-18. Because "[a] district court 'possesses the inherent

procedural power to reconsider, rescind, or modify an interlocutory order' for sufficient cause," reconsideration also "is appropriate if the movant demonstrates clear error." *Weyerhaeuser Co.* v. *AIG Prop. Cas., Inc.*, 2023 WL 10423264, at *4 (C.D. Cal. Dec. 28, 2023); *see Shofet* v. *Zillow Inc.*, 2024 WL 5275512, at *6 (C.D. Cal. Oct. 3, 2024) (granting reconsideration where the "Court committed clear error").

### A.    Plaintiff Did Not Adequately Allege Any Material Misstatements.

In assessing materiality on a Section 10(b) claim, courts do not focus on the importance of information in a general sense.  Rather, the question is whether the particular fact that is allegedly misrepresented "altered the 'total mix' of information made available for use in stockholder decisionmaking."  *Hewlett-Packard*, 845 F.3d at 1277 (quotation omitted).  The federal securities laws "do *not* prohibit *any* misrepresentation—no matter how willful, objectionable, or flatly false—of *im* material facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the misrepresentation appear material." *Greenhouse* v. *MCG Cap. Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (emphasis in original).  Were it otherwise, "almost any misrepresentation by a CEO—including, perhaps, one about his or her marital fidelity, political persuasion, or golf handicap—that might cause investors to question management's integrity could, as such, serve as a basis for a securities-fraud class action." *Id.* at 660.

In its Order, the Court held that the Complaint adequately pleads materiality because "Defendants have not shown that a reasonable investor could not find the relationship of a top executive of Barclays Bank with a convicted sex offender related to their decisions."  (Order at 15.)[4]  But it was not Defendants' burden to rule out all possibility that investors would be

---

[4]  The Court noted that "Defendants have cited no binding authority that misrepresentations about matters personal to a CEO are not material." (Order at 15.)  But Defendants never argued that statements about the personal activities of the CEO of a company are immaterial as a matter of law.  Rather, Defendants argued and continue to maintain that Plaintiff has failed to adequately allege that facts about Staley's personal relationship with Epstein were material to a reasonable investor.  And as explained *infra* in Argument II, the lack of any controlling authority about the materiality of statements concerning a CEO's personal conduct would be reason to certify an interlocutory appeal.

interested in the interactions that Staley had with Epstein before becoming Barclays' CEO. Rather, it was *Plaintiff's* burden to allege facts supporting a pleading-stage inference that the specific statements Barclays made were significant *to an investment decision* to buy Barclays stock. *See Hewlett-Packard*, 845 F.3d at 1275 (materiality relates to information's "significance to stockholder decisionmaking"). Nor is the question for materiality simply whether the topic of "the relationship of a top executive of Barclays Bank with a convicted sex offender" is of interest to investors. (Order at 15.) The focus has to be on what specifically was allegedly misrepresented—here, Barclays' disclosure that the past relationship between Staley and Epstein was "professional," which allegedly implied that the relationship lacked a "personal" element. (AC ¶ 24.) *See, e.g.*, *J & R Mktg., SEP* v. *Gen. Motors Corp.*, 549 F.3d 384, 396 (6th Cir. 2008) (even if a "topic was important, materiality hinges on what particularly was represented").

Under the correct legal standard, there is no basis to conclude that Plaintiff has adequately pled that the specific statements it challenges were material to an investment decision in Barclays stock. Under Plaintiff's theory of the case, the challenged statements could have been material only if both (i) investors thought it was important that Staley remain as Barclays' CEO, and (ii) investors believed that Staley would not be able to continue on as CEO if the market learned that he had previously had a personal relationship with Epstein. (*See* AC ¶ 76.) Again, according to Plaintiff, analysts "were comforted" by Barclays' continued "support for Staley" because "Staley [had] deliver[ed] . . . solid [financial] numbers" (*id.*), and were concerned about further revelations only to the extent it "could mean [Staley's] days are numbered," which "would be a pity" given the financial results Barclays had obtained for its stockholders under his stewardship. (*Id.*; *see also* Opp. 9 (citing AC ¶ 76 as the basis for its materiality theory).)

That theory of materiality runs headlong into the fact that Barclays announced on November 1, 2021, that Staley was departing Barclays based on the initial report from the FCA of its investigation into the Staley-Epstein relationship—nearly two years prior to the alleged October 12, 2023 "corrective disclosure." That means that, by November 2021, any investors

who invested in Barclays because of Staley's stewardship knew that he was out as the CEO. And, Plaintiff does not allege that there was any drop in the share price or selloff in response to Staley leaving the bank, thereby refuting the factual predicate to its materiality theory. If the announcement of Staley's departure from Barclays in November 2021 after the FCA's preliminary findings did not result in a drop in Barclays' share price, it is implausible that an added disclosure of the additional fact that Staley also had a "personal" relationship with Epstein would have resulted in investors behaving differently. But the Court does not even need to make this logical inference here because there was extensive public disclosures on Staley's "personal" relationship with Epstein in July-August 2019, November 2021, and March 2023, *see supra* pp. 6-7, and Plaintiff does not allege that Barclays' share price dropped in response to any of that public reporting. According to Plaintiff's Complaint, what mattered from an investment perspective was information bearing on whether Staley would continue on as CEO, and the market learned in November 2021 that he would not. *See Livid Holdings Ltd.* v. *Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (materiality requires demonstration of a "substantial likelihood that a reasonable investor would have acted differently" if the fact was disclosed).

Tellingly, in the *CBS* case Plaintiff cites as its principal authority for the notion that "information regarding the reputation or integrity of an executive is material" (Staley Opp. 13), the court expressly held that statements purporting to downplay a CEO's exposure to #MeToo allegations were material to investor decision-making because the statements "reassur[ed]" the market that the company would *continue* being led by a CEO whose leadership was "crucial to [the company's] continued success." *Constr. Laborers Pension Tr.* v. *CBS Corp.*, 433 F. Supp. 3d 515, 539-40 (S.D.N.Y. 2020). There, CBS's CEO Les Moonves made statements about #MeToo that "implied that he had not known of these problems previously, even though, in truth, he was at that time actively seeking to conceal his own past sexual misconduct from CBS and the public." *Id.* The court held that the plaintiff "adequately—though barely—allege[d]" materiality, because the statement "falsely implied that he was not personally at risk of a forced resignation or ouster based on accusations of sexual harassment being leveled against him." *Id.*

The reason the statement was material to investor decision-making was not because "integrity" is important in the abstract sense, as Plaintiff argues (Staley Opp. 13), but because the statement "provid[ed] reassurance that Moonves, *the one executive that the Company and analysts viewed as crucial to CBS's continued success, would not be compromised* by the #MeToo Movement." *CBS*, 433 F. Supp. 3d at 540 (emphasis added).

Consider the Fourth Circuit's decision in *Greenhouse*. There, the court held that a false statement that the company's CEO had a Bachelor's degree in economics was immaterial as a matter of law, because "it is not substantially likely that reasonable investors would devalue the stock knowing that [the CEO] skipped out on his last year at Syracuse." 392 F.3d at 661. The court stated, "if one imagines a parallel universe of affairs where the one and only thing different was that [the company's] filings made no mention of [the CEO's] education (or, instead, said simply that he 'attended' Syracuse or 'studied economics' there), we find it incredible to believe that [the company's] stock would be worth even a penny more to a reasonable investor." *Id.* Here, there is no need to speculate how the market would react when the only new fact disclosed is that Staley and Epstein had a personal relationship—when, in November 2021 onward, the press reported on the trove of emails showing a deep personal relationship, Barclays' stock price did not decline. In short, "no matter the attendant outcry or opprobrium about a lie, if the specific fact misrepresented is immaterial, a suit cannot succeed." *Id.* at 656.[5]

---

[5] The other, related statements Plaintiff challenges are not material for the same reason—namely, that Staley had "volunteered" information to Barclays (AC ¶ 69), Barclays' belief that it had been "transparent" (*id.*), that Barclays was "cooperating with . . . relevant authorities" (*id.* ¶ 70), and that "[t]he Board's governance processes were rigorously followed" and that Staley "retain[s] the full confidence of the Board" (*id.* ¶ 77). Each of those statements bore on whether Staley could stay as CEO. Investors were not making a decision to invest in Barclays stock because Barclays was cooperating, or there was a governance processes around the investigation; instead, if investors cared about these statements, they did so, if at all, only because cooperation or a good governance process suggested that Staley did not have an Epstein issue that would drive him out as CEO. (*See id.* ¶ 76.)

-11-

**B.      Plaintiff Did Not Adequately Allege Loss Causation.**

To establish loss causation, plaintiff must "trace[] [his] losses 'back to the very facts about which the defendant [allegedly] lied.'"  *Nektar*, 34 F.4th at 839.  An alleged corrective disclosure must provide "new information to the market" that "expose[s] the alleged falsity" of the challenged statements.  *Id.*  The Court should reconsider its loss causation determination because the Court failed to fully consider Plaintiff's factual allegations about what "new" information was revealed by the October 12, 2023 "corrective" disclosure that purportedly caused the stock price drop.

In assessing whether Plaintiff adequately pleads loss causation, the Court focused on the wrong causal link.  As the Court stated, the challenged statements misled the market "about the nature of Staley and Epstein's relationship, including implying that their relationship was only professional in the face of an FCA investigation."  (Order at 18.)  Based on that allegation, the Court would have needed to conclude that the FCA's October 2023 decision revealed for the first time that Staley's relationship with Epstein was more than just professional.  But the Court did not make that determination, nor could it have based on the allegations in the Complaint.  As discussed (*supra* pp. 6-7), Plaintiff alleges that *well before* that "corrective" disclosure, information about Staley's personal relationship with Epstein, including their extensive email correspondence "expressing pronouncements of 'profound' friendship" and "references to Snow White and Beauty and the Beast," had been widely disseminated to the market.  (AC ¶¶ 28, 95.)  Indeed, Plaintiff expressly asserts that the contents of the "emails exchanged with Epstein, including emails affirming their 'profound' and 'cherished' friendship, and referring to his visits to Epstein's different residences" are proof positive that the challenged statements were untrue.  (Staley Opp. 1; *see also* Opp. 2.)  Because the contents of those emails were made public well before the sole alleged corrective disclosure date, that should have ended the loss-causation inquiry.

As Judge Fischer held in this exact same scenario, the Complaint's "inclusion of additional events that purportedly revealed Herbalife's fraudulent practices, but were not included in the [complaint's] loss causation section, reinforces the Court's conclusion that

-12-

Plaintiffs have not established loss causation." *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428, at *8 (C.D. Cal. Mar. 27, 2015); *see Espy* v. *J2 Glob., Inc.*, 99 F.4th 527, 542 (9th Cir. 2024) (Plaintiff "alleges no facts plausibly explaining why this information—already publicly available, requiring no 'expertise or specialized skills beyond what a typical market participant would possess' to uncover and disseminate—was not yet reflected in [the company's] stock price.") (internal citation omitted).

Instead, the Court agreed with Plaintiff's argument that the October 12, 2023 "corrective" disclosure revealed two new "facts": (i) that the FCA had "concluded," based on facts already known to the market, that Staley "provided the FCA misleading information regarding his relationship with Epstein," and (ii) "details concerning other Barclays executives' involvement in approving the misleading letter to the FCA." (Opp. 18; *see* Order at 18 & n.11.) Respectfully, neither of those two "facts" constitutes a corrective disclosure as a matter of law.

*First*, the FCA's "legal conclusion" based on facts already known to the market is not a corrective disclosure. *In re Arcimoto Inc., Sec. Litig.*, 2022 WL 17851834, at *7 (E.D.N.Y. Dec. 22, 2022). Such a disclosure "reveal[ed] no new facts" and only reflected "opinions or conclusions drawn from existing facts." *Id.*; *see In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13 (N.D. Cal. Mar. 11, 2024) (shortening class period at class certification because "Plaintiffs do not contend that [the later disclosure] is the first time the market learned about the manipulations themselves," only that "this is when the market learned about the FDA's reaction, a fact which cannot properly be characterized as a corrective disclosure"); *Grigsby*, 979 F.3d at 1205 (disclosure of "confirmatory information" does not constitute a corrective disclosure as a matter of law).

*Second*, the Court held that prior media reports did not cover "the extent of the details" identified in the FCA's decision. (Order at 18 n.11.) Although the Court did not specify what those additional "details" were, this appears to refer to Plaintiff's contention that the FCA's decision revealed "details concerning other Barclays executives' involvement in approving the misleading letter to the FCA." (Opp. 18 (citing AC ¶¶ 30, 104, 110, 113).) Paragraph 104 of the Complaint is the only one that identifies any supposed "details" revealed in the FCA's

-13-

decision, but the details it identifies do not implicate Barclays in any misconduct—a fact that the Court overlooked.  Specifically, Paragraph 104 states that Staley "*was the only person at Barclays who knew* the full extent of his personal relationship with Mr Epstein and the specific timings of his contact with him" and that "he *misled both the FCA and the Barclays Board* about the nature of his relationship with Mr Epstein."  (AC ¶ 104 (emphasis added).)[6]  The FCA's conclusion about the limited information available to Barclays in no way "expose[s] the alleged falsity" of the challenged statements. *Nektar*, 34 F.4th at 839.  On the contrary, it confirmed that Barclays believed that its prior statements were true when they were made.

*Lastly*, the Court raised on its own a new factual question about whether "Barclays [] had not cooperated" with the FCA's investigation.  (Order at 19.)  But Plaintiff did not make that argument as to loss causation (*see* Opp. 19), and for good reason—nothing in the FCA's decision remotely suggests that Barclays had not provided cooperation to the FCA.  Rather, in the paragraph of the FCA's decision that the Court cited, the FCA had determined that "Mr Staley consistently did not accurately set out the nature and extent of his relationship with Mr Epstein *to Barclays*."  (ECF No. 59-7 at 2.16.) The FCA's conclusion that Staley misled Barclays does not suggest that Barclays did not cooperate with the FCA.

## II.    Alternatively, the Court Should Certify the Order for Interlocutory Appeal Under 28 U.S.C. § 1292(b).

In the alternative, Defendants respectfully request that the Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) to resolve two important questions of law on materiality and loss causation.  *First*, whether information about the personal conduct of a CEO before joining the company is material to investor decisionmaking.  *Second*, whether the disclosure of a regulator's "conclusion" about facts already known to the market may serve as a proper corrective disclosure for purposes of pleading loss causation.

Under 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory review if (i) the order involves a "controlling question of law," (ii) on which there is "substantial

---

[6] For avoidance of doubt, Mr. Staley disagrees with the FCA's conclusion.

ground for difference of opinion," (iii) and "immediate appeal from the order may materially advance the ultimate termination of the litigation." All three criteria are met here.

*First*, the questions for interlocutory review reflect controlling questions of law because, if the answer to either question is "no," the case would be dismissed. Because a question of "whether Lead Plaintiff has stated a claim . . . implicate[s] a straightforward application of [Rule] 12(b)(6), taking into account the relevant elements of such a claim," it is a "legal question, not one which will turn on factual disputes or fact-finding." *Cunha* v. *Hansen Nat. Corp.*, 2012 WL 12886194, at *6 (C.D. Cal. Oct. 22, 2012) (finding the first prong satisfied); *see United States ex rel. Integra Med Analytics LLC* v. *Providence Health & Servs.*, 2019 WL 6973547, at *6 (C.D. Cal. Oct. 8, 2019) (certifying the "dispositive" "question of whether the [plaintiff] pleaded falsity" where "the Circuit need only look at the face of the complaint"). The Ninth Circuit repeatedly has granted interlocutory review of legal questions in securities fraud cases that require the Ninth Circuit to evaluate the sufficiency of plaintiffs' allegations. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021); *Reese* v. *BP Expl. (Alaska) Inc.*, 643 F.3d 681, 692 (9th Cir. 2011); *S. Ferry LP, No. 2* v. *Killinger*, 542 F.3d 776, 781 (9th Cir. 2008). Even if part of the order to be reviewed "addressed some factual issues," including "portions of the pleadings," interlocutory appeal is nonetheless warranted where, as here, the "legal issues are at the heart" of the "proposed interlocutory appeal." *Hawaii ex rel. Louie* v. *JP Morgan Chase & Co.*, 921 F. Supp. 2d 1059, 1066 (D. Haw. 2013).

*Second*, there is a substantial ground for differences of opinion on these legal questions. The Ninth Circuit has explained that a "substantial ground for difference of opinion" exists when "novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions." *Reese*, 643 F.3d at 688. Novel and difficult questions of first impression exist even if "there are no cases directly conflicting with the district court's construction of the law." *Id.* ("[A] novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent.").

In its Order, the Court recognized that there is "no binding authority that misrepresentations about matters personal to a CEO are not material" as a matter of law—it is thus a novel question in this Circuit.  (Order at 15.)  Moreover, at least one other court has recognized that there are circumstances where matters relating to the personal conduct of a CEO are not material as a matter of law.  In *Greenhouse*, the Fourth Circuit Court of Appeals held that a lie by the CEO about his educational background was immaterial as a matter of law.  *See* 392 F.3d at 661.  In contrast, the Court here held that omitted facts relating to the personal relationship between Epstein and Staley were material.  Accordingly, the question of whether statements about the personal activity of a CEO before he joined the company are material to a reasonable investor's investment decision is plainly a question on which "fair-minded jurists might reach contradictory conclusions." *Reese*, 643 F.3d at 688.

With respect to loss causation, the Court held that the October 12, 2023 press release announcing the final results of the FCA's investigation was a corrective disclosure that was sufficient to plead loss causation.  Even though information revealing that Staley and Epstein did, in fact, have a close personal relationship was already known to the market, the Court held that the FCA's decision disclosing its "ultimate conclusion" based on those publicly known facts was "corrective" because it "provided confirmation of Staley's misrepresentations." (Order at 18.)  There are plainly reasonable grounds for divergence of opinion on this issue, given that the Ninth Circuit and other courts have held that "disclosure of confirmatory information" does not constitute a corrective disclosure.  *Grigsby*, 979 F.3d at 1205; *see MacPhee* v. *MiMedx Grp., Inc.*, 73 F.4th 1220, 1243 (11th Cir. 2023) ("[B]ecause a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory."); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("[A] . . . [re]characterization of previously disclosed facts does not constitute a corrective disclosure."); *Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) ("[C]onfirmatory information—that [is] information already known to the market—may *not* constitute . . . a corrective disclosure.").

*Third*, resolution of these legal questions would "'materially advance' the litigation." *Reese*, 643 F.3d at 688. The Section 10(b) claim is the only claim asserted by the court-appointed lead plaintiff. Although another plaintiff has unilaterally decided to join this action and assert a claim under English law for "dishonest delay," this Court dismissed that claim. (Order at 23.) The fact that the Court dismissed that claim without prejudice does not change the analysis. Even assuming that such a claim could be re-pled to state a claim, if the Ninth Circuit were to hold that the Section 10(b) claim could not survive, there would be no basis for this Court to retain jurisdiction over a novel claim under English law based on securities traded solely on the London Stock Exchange. As then-judge Ketanji Brown Jackson explained, claims involving "complex, novel legal issues" of foreign law "are better left to courts in those countries." *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 41 (D.D.C. 2018); *see also Abad* v. *Bayer Corp.*, 563 F.3d 663, 671 (7th Cir. 2009) (Posner, J.) ("[T]he uncertainty of Argentine law is a compelling reason why this case should be litigated in Argentina. . . . When the decision of a case is uncertain because the orthodox sources of law do not provide adequate guidance . . . , the court asked to decide must make law, in this case Argentine law; and an Argentine court is the more competent maker of Argentine law."). Of course, there is no need to grapple with those issues here. The point is only that dismissal of the only claim asserted by the court-appointed lead plaintiff under U.S. law would "advance materially the litigation," justifying leave for interlocutory appeal. *Reese*, 643 F.3d at 688 (rejecting that "certification [of interlocutory appeal] was improvidently granted because a decision in [defendant's] favor will not resolve all of [plaintiff's] claims against it").[7]

\* \* \*

In the *Goldman Sachs* litigation, the district court denied reconsideration and leave for interlocutory appeal in similar circumstances where the challenged statements about Goldman

---

[7] It is very unlikely that the Firemen's Retirement System of St. Louis could amend the Complaint to plead a "dishonest delay" claim under English law. Barclays could not have disclosed what the results of the FCA's investigation would be until after the FCA announced its decision. (*See* Order at 23.)

-17-

Sachs' "controls for avoiding conflicts" were immaterial as a matter of law and there was a clear disconnect between the specific statement plaintiffs claimed were material, and the corrective disclosure that allegedly caused the loss.[8]  Both parties went on to incur massive expense over the course of many years litigating class certification—including three trips to the Second Circuit and a trip to the Supreme Court—all of which could have been avoided.  *See Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 86-90, 105 (2d Cir. 2023) (decertifying the class and lamenting the case's "long and difficult history").  Here, too, Plaintiff's allegations and judicially noticeable facts demonstrate that the statements it challenges had no impact on Barclays' stock price at the time the statements were made.  This precludes any presumption of reliance from applying, as necessary to meet Rule 23(b)(3)'s predominance requirement.  Thus, recent experience demonstrates that this is an unusual case where the interest of judicial economy counsels in favor of granting reconsideration, or leave for interlocutory appeal.

**CONCLUSION**

The Court should grant Defendants' motion for reconsideration of the Court's Order and dismiss the Amended Complaint with prejudice.  Alternatively, the Court should certify interlocutory appeal of the Court's Order pursuant to 28 U.S.C. § 1292(b).

---

[8] *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (denying reconsideration); 2014 WL 5002090, at *3 (S.D.N.Y. Oct. 7, 2014) (denying interlocutory appeal).

MEM. OF POINTS & AUTHORITIES IN SUPPORT OF DEFS.' MOT. FOR RECONSIDERATION / INTERLOCUTORY APPEAL

Dated:  July 9, 2025

/s/ Adam S. Paris

Adam S. Paris (SBN # 190693)
(parisa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone:    (310) 712-6600
Facsimile:    (310) 712-8800

Jeffrey T. Scott (*pro hac vice*)
(scottj@sullcrom.com)
Matthew J. Porpora (*pro hac vice*)
(porporam@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3558

Peter B. Morrison (SBN # 230148)
(peter.morrison@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone:    (213) 687-5000
Facsimile:    (213) 687-5600

Scott D. Musoff (*pro hac vice*)
(scott.musoff@skadden.com)
Boris Bershteyn (*pro hac vice*)
(boris.bershteyn@skadden.com)
Lara A. Flath (*pro hac vice*)
(lara.flath@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:    (212) 735-3000
Facsimile:    (212) 735-2000

*Attorneys for Defendants Barclays PLC
and Nigel Higgins*

-19-

/s/ Matthew Donald Umhofer

Matthew Donald Umhofer (SBN # 206607)
Elizabeth Mitchell (SBN # 251139)
UMHOFER, MITCHELL & KING LLP
767 S. Alameda Street, Suite 270
Los Angeles, California 90021
Telephone:    (213) 394-7979

Brendan V. Sullivan, Jr. (*pro hac vice*)
John M. McNichols (*pro hac vice*)
Stephen L. Wohlgemuth (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone:    (202) 434-5800
Facsimile:    (202) 434-5029

*Attorneys for Defendant James E. Staley*

-20-

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Barclays PLC and Nigel Higgins, certifies that this brief contains 18 pages, which complies with the page limit set in Section VIII.C of the Court's Civil Standing Order.

Dated:  July 9, 2025                          SULLIVAN & CROMWELL LLP


                                                    /s/ Adam S. Paris
                                                    Adam S. Paris

                                                    *Attorney for Defendants Barclays PLC and Nigel Higgins*

MEM. OF POINTS & AUTHORITIES IN SUPPORT OF DEFS.' MOT. FOR RECONSIDERATION / INTERLOCUTORY APPEAL

**SIGNATURE CERTIFICATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated:  July 9, 2025                                   SULLIVAN & CROMWELL LLP


/s/ Adam S. Paris
Adam S. Paris

*Attorney for Defendants Barclays PLC and Nigel Higgins*

-22-