ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
HADIYA K. DESHMUKH (328118)
SHAO-JIA CHANG (356004)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
schang@rgrdlaw.com
– and –
MICHAEL A. TRONCOSO (221180)
DANIELLE S. MYERS (259916)
ASHLEY M. PRICE (281797)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BARCLAYS PLC, et al.,<br><br>Defendants. | Case No. 2:23-cv-09217-MEMF-KS<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS OF THE UNITED STATES AND THE UNITED KINGDOM<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 3

III. OVERVIEW .......... 4

IV. JURISDICTION AND VENUE .......... 9

V. PARTIES .......... 11

VI. CONTROL PERSONS .......... 13

VII. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......... 14

A. Epstein's Arrest Provokes Media Reports About Epstein's Wall Street Connections, Including with Staley .......... 14

B. Bank Regulators Launch Investigation into Staley's Relationship with Epstein and the Suitability of His Leadership .......... 19

C. Defendants Falsely Assured Investors of Staley's Transparency and Their Full Confidence in His Leadership .......... 22

D. Staley Leaves Barclays upon the FCA's Preliminary Findings that Staley Lied About His Ties to Epstein .......... 31

E. Private and Government Lawsuits Threaten to Expose Ugly Facets of Staley's Relationship with Epstein .......... 36

VIII. DISCLOSURES ESTABLISHING LOSS CAUSATION AND DISHONEST DELAY .......... 40

IX. NO SAFE HARBOR .......... 52

X. RELIANCE .......... 52

A. Applicability of Presumption of Reliance for U.S. Securities Laws Claims .......... 52

B. Reliance for U.K. Securities Laws Claim .......... 54

XI. PLAINTIFFS' CLASS ACTION ALLEGATIONS .......... 55

COUNT I .......... 56

For Violations of §10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants .......... 56

COUNT II .......... 59

For Violations of §20(a) of the Exchange Act Against All Defendants .......... 59

**Page**

COUNT III .......... 60

For Violations of Section 90A of the Financial Services and Markets Act of the United Kingdom Against Barclays .......... 60

PRAYER FOR RELIEF .......... 62

JURY DEMAND .......... 62

Lead Plaintiff Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees (the "Teamsters Funds") and plaintiff The Firemen's Retirement System of St. Louis ("St. Louis Firemen"), individually and on behalf of all others similarly situated (collectively, "Plaintiffs"), allege the following based upon personal knowledge as to Plaintiffs' own acts, and based upon the investigation of Plaintiffs' counsel, which included a review of regulatory filings and reports by Barclays PLC ("Barclays" or the "Company"), securities analysts' reports, media reports, press releases and other public statements issued by Barclays, regulatory decisions by the United Kingdom's Financial Conduct Authority ("FCA"), public court dockets, and other publicly available information. Plaintiffs believe that, after a reasonable opportunity for discovery, substantial additional evidentiary support will exist for the allegations set forth herein.

## I. INTRODUCTION

1. This is a securities class action on behalf of all persons or entities who: (i) purchased or otherwise acquired Barclays American Depositary Receipts ("ADRs") traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BCS" from July 22, 2019 through October 12, 2023, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (collectively, the "Exchange Act claims") against Defendants; and (ii) purchased or otherwise acquired Barclays ordinary shares traded on the London Stock Exchange ("LSE") under the ticker symbol "BARC" or continued to hold during the Class Period, seeking to pursue remedies under Section 90A and Schedule 10A of the U.K.

Financial Services and Markets Act 2000 ("FSMA") (the "FSMA claim") against Barclays (the "Class," as defined further below).[1]

2. This case arises from the material misrepresentations, omissions, and dishonest delay perpetrated by Barclays, its former CEO James ("Jes") E. Staley ("Staley"), and the Chairman of Barclays Group ("Group") Board of Directors ("Board") Nigel Higgins ("Higgins") (collectively, "Defendants"), relating to Staley's close and lasting personal relationship with the convicted sex offender Jeffrey Epstein ("Epstein") and Defendants' communications to the U.K. financial regulatory body, the FCA, regarding that relationship.

3. During the Class Period, Defendants materially misrepresented the status and nature of Staley's relationship with Epstein, and Defendants' knowledge thereof, Staley's purported transparency with Barclays' Board about that relationship, and the nature of the FCA's inquiry – even though Barclays had conducted an internal review of a cache of over 1,200 emails between Staley and Epstein that demonstrated that the two men shared a much closer, personal relationship than Defendants acknowledged to the FCA and the public. When the FCA privately informed Defendants of the outcome of its preliminary investigation, Staley left Barclays. Nevertheless, Barclays publicly continued to minimize the scope of the FCA's investigation into Staley's relationship with Epstein and voiced its support for its former CEO. Then, documents and pleadings filed in civil litigation in the United States brought against Staley's former employer, JPMorgan Chase & Co. ("JPMorgan"), in connection with Epstein's banking activities while he allegedly trafficked young women for sex, further exposed correspondence between Staley and Epstein that publicly revealed their relationship was more than

[1] Barclays ADRs and ordinary shares are collectively referred to as "Barclays Securities."

merely professional – contrary to the assurances Defendants made to investors in Barclays Securities.

4. Then, on October 12, 2023, the FCA issued a final decision finding Staley had "recklessly approved a letter sent by Barclays" to the FCA that "contained two misleading statements . . . about the nature of his relationship with Jeffrey Epstein and the point of their last contact." When Defendants' deception of the FCA and investors was revealed, the price of Barclays Securities again fell, and investors were further economically damaged.

## II. BACKGROUND

5. Barclays is a universal bank that operates internationally, providing financial services in retail, commercial, investment, and wholesale banking, as well as wealth management. It is headquartered in London and is one of the largest banks in the United Kingdom.

6. Throughout the Class Period, Barclays claimed that "[f]or over 325 years we have funded progress," and that while pursuing its financial goals, maintained values of "Respect, Integrity, Service, Excellence and Stewardship." As part of this pledge, Barclays' communications to investors insisted that the Company took significant actions to monitor and address how its business impacts "non-financial" matters, including environmental matters, data protection, diversity and equality policies, human rights, and modern slavery.

7. Barclays' governance is headed by its Board, which is responsible for "setting the strategic direction and risk appetite of the Group and is the ultimate decision-making body for matters of Group-wide strategic, financial, regulatory or reputational significance." It manages its oversight functions through several committees – namely, the Executive Committee, which includes the CEO, the Audit Committee, the Nominations Committee, the Risk Committee, and the Remuneration Committee. In 2019, Barclays dissolved its Reputation Committee, explaining that it "[r]ecognis[ed] the importance of our culture, reputation and the

environment to the Board and to all our stakeholders," and therefore transferred "primary oversight for these key matters . . . to the Board."

8. While the Board provides oversight to Barclays' strategies, the execution of those strategies and day-to-day management of the Company is headed by the CEO, who is supported in that role by the Executive Committee, known within Barclays as "ExCo." In addition to the CEO, the ExCo includes the Chief Financial Officer, other executive officers, and various heads of divisions and departments within the Company.

9. Barclays describes the division of responsibilities within the Company as the Non-Executive Directors being charged with "provid[ing] effective oversight and scrutiny, strategic guidance and constructive challenge, while holding the Executive Directors to account against their agreed performance objectives. The Non-Executive Directors, led by the Nominations Committee, have primary responsibility for appointment and removal of the Executive Directors."

10. Higgins became the Board's Chairman effective May 2, 2019. As Group Chairman, Higgins was, among other duties, "responsible for": "leading the Board and its overall effectiveness"; "demonstrating objective judgement"; "promoting a culture of openness and constructive challenge and debate between all Directors"; and "ensuring Directors receive accurate, clear and timely information." He also served on the Board Nominations Committee throughout the Class Period.

## III. OVERVIEW

11. Staley began his role as Barclays' CEO and an Executive Director on its Board on December 1, 2015. His tenure came as Barclays sought to revive its reputation in the wake of a string of scandals in which Barclays was accused of money laundering, tax avoidance, rate-fixing Libor, and engaging in manipulative trading in its unregulated "dark pool" trading system. To draw investors back to the bank, Staley's mandate was to grow shareholder value and strengthen Barclays' investment banking activities.

12. Staley was largely successful in shoring up Barclays' investment bank. By May 2019, Staley had beat back an activist investor who had sought to shrink the investment banking business at Barclays. By year-end 2019, Staley's investment banking strategy was paying off with a stronger investment bank returning higher profits for Barclays.

13. But in July 2019, Epstein, a long-time friend and former client of Staley's, was arrested on federal charges for the sex trafficking of teenage girls in Florida and New York.

14. In the wake of Epstein's arrest, media attention turned to the business associates and friends of Epstein, who was a well-connected financier, in addition to being a convicted sex offender and an accused sex trafficker. On July 22, 2019, *The New York Times* published an article titled "Jeffrey Epstein's Deep Ties to Top Wall Street Figures" that described how Epstein and Staley first met 20 years before when Staley was running JPMorgan's private bank where Epstein was a client.

15. According to the article, Staley sought "to maintain his relationship with Mr. Epstein" because Epstein referred rich individuals to Staley, who "over the next decade converted dozens of those referrals into clients of JPMorgan's private bank." However, the relationship did not remain purely professional for long as the two "soon became friends." Staley even visited Epstein "at his Palm Beach office, where [Epstein] had been permitted to serve some of his 13-month sentence in 2008 and 2009" after being convicted for soliciting prostitution of a minor.

16. In response to the facts reported in *The New York Times*, Defendants sought to appease nervous investors by weakening any connection between its CEO and Epstein. A Barclays spokesperson was quoted in *The New York Times* article stating: "'Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally . . . .'"

17. By August 2019, further press reports had noted the past connections between Staley and Epstein. For example, a *Bloomberg* article reported that when Staley was under consideration to be Barclays' next CEO, he had "***cut ties to Epstein***, according to a person with knowledge of the situation," within months of Staley sailing to Epstein's island in the U.S. Virgin Islands. A *Wall Street Journal* piece cited someone close to Staley in reporting he had not had contact with Epstein in years.

18. On August 10, 2019, Epstein committed suicide.

19. On August 15, 2019, the U.K.'s FCA, a regulatory body charged with regulating financial services firms and financial markets, contacted Higgins by phone to request in writing how the Board "'had satisfied themselves there was no impropriety to the relationship'" between Staley and Epstein. Higgins told Staley about the FCA's request and suggested that Bob Hoyt, Barclays' General Counsel from 2013 to 2020, draft the response. Staley provided information to be included in the written response and provided revisions to the letter itself. Higgins also made revisions to the letter and approved its language.

20. On October 8, 2019, Barclays sent to the FCA the requested letter in which Barclays affirmed to the FCA that Staley had told them he did not have a close relationship with Epstein, that Staley had not seen anything that would have suggested the alleged misconduct by Epstein, and that Staley's last contact with Epstein was "'well before he joined Barclays in 2015.'"

21. Meanwhile, U.S. investigators, who had obtained a cache of emails between Epstein and Staley while investigating Epstein's activities, sent the cache to the FCA a few weeks after the FCA received Barclays' letter. In early December 2019, U.K. regulators summoned Higgins to explain why the emails appeared to contradict Barclays' October 8, 2019 letter to the FCA. Barclays engaged a law firm to assist in the review of the 1,200 email cache and conduct interviews, after which

the law firm provided the Board a report on its findings. Higgins later privately admitted that the emails "ma[de] for uncomfortable reading."

22. On February 13, 2020, Barclays disclosed that the FCA was conducting a regulatory investigation into Staley's relationship with Epstein. Despite having reviewed the report and appended emails, as well as having access to the full cache of emails, the Board resolved to stand by Staley, stating in Barclays' 2019 Annual Report and a press release issued the same day that:

> ***Mr. Staley has been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein. Accordingly, Mr. Staley retains the full confidence of the Board***, and is being unanimously recommended for re-election at the 2020 AGM [Annual General Meeting].

23. The same day, during Barclays' earnings call with analysts and interviews with the press, Staley likewise affirmed that he had had "a long-standing ***professional*** relationship with Jeffrey Epstein," that the Board had conducted its own review of what he had told Barclays about that relationship, and that the Board "concluded indeed that I have been ***transparent and open*** with the bank."

24. As a result of these statements, investors remained unaware that Barclays had already conducted an internal review of the more than 1,200 emails and those communications had provided persuasive evidence that Staley's relationship with Epstein was far more than professional but instead, a close, personal one in which Staley considered Epstein "family."

25. As the FCA's investigation continued, Defendants publicly maintained that Staley only had a professional relationship with Epstein, that Staley was unaware of Epstein's alleged crimes, and that Defendants had been forthright with the FCA in describing Staley's relationship with the FCA.

26. On October 29, 2021, the FCA privately informed Staley and Barclays' Board of its preliminary findings regarding Staley's characterization of his relationship with Epstein.

27. On November 1, 2021, Barclays announced that in light of the preliminary findings, Staley was stepping down immediately as CEO of Barclays. Though announcing the preliminary findings and Staley's departure, Defendants continued to minimize the intimacy of Staley's relationship with Epstein and publicly supported Staley, despite knowledge of the men's communications. Thus, Barclays stated in its November 1, 2021 announcement: "It should be noted that the investigation makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr Staley following the arrest of Mr Epstein in the summer of 2019." It further emphasized that Staley had run Barclays "successfully."

28. On February 15, 2023, portions of a complaint filed in *Government of the United States Virgin Islands v. JPMorgan Chase Bank, N.A.*, No. 1:22-cv-10904 (S.D.N.Y.) ("USVI Litigation"), were unredacted, revealing for the first time more complete excerpts of the emails between Staley and Epstein, including the exchange invoking references to Snow White and Beauty and the Beast, and emails expressing pronouncements of "profound" friendship. These were the same communications that Barclays reviewed before the Board issued the February 13, 2020 press release announcing Staley's transparency and the Board's unanimous support of Staley's reappointment as CEO.

29. Then, on October 12, 2023, the FCA announced in a Decision Notice ("FCA Decision") the final conclusions of its investigation.[2] The FCA found that Staley had acted "***recklessly***" when approving the October 8, 2019 letter sent by

---

[2] While the FCA Decision is dated May 30, 2023, it was first published on October 12, 2023.

Barclays to the FCA, "which contained ***two misleading statements***, about the nature of his relationship with Jeffrey Epstein and the point of their last contact." As a result of misleading the FCA and failing to act with integrity while CEO of Barclays, the FCA fined Staley £1.8 million and banned him from holding a senior management position in the financial services industry.

30. Upon the market learning this news, the price of Barclays ADRs and ordinary shares declined on heavy volume, dropping 4.99% and 3.12%, respectively, and caused investors to suffer significant economic losses.

## IV. JURISDICTION AND VENUE

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1332 and 1367, and §27 of the Exchange Act (15 U.S.C. §78aa).

32. Certain of the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

33. With respect to the FSMA claim, this Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(d)(2). This is a class action filed under Rule 23 of the Federal Rules of Civil Procedure. There are more than 100 members of the putative class. Plaintiffs are members of the putative class and citizens of the United States. Defendants Barclays and Higgins are citizens of the United Kingdom. At least one class member is a citizen of a different state than defendant Staley. The amount in controversy under the FSMA exceeds $5 million, exclusive of interest and costs.

34. The FSMA claim is also related to the Exchange Act claims in as much as it forms part of the same case or controversy. Subject matter jurisdiction over the FSMA claim is therefore also conferred by 28 U.S.C. §1367.

35. Barclays is subject to personal jurisdiction in this case. Barclays maintains investment banking offices in three California locations, including in this

District at 10250 Constellation Boulevard, 7th Floor, Suite 750, Los Angeles, California 90067. As alleged in further detail below, Barclays made materially false and misleading statements and omissions, and failed to disclose information, which concealed the true nature of Staley's relationship with Epstein, and Barclays' knowledge thereof, resulting in a fraud on investors in the United States and California.

36. In committing the fraudulent acts complained of herein, Barclays operated an integrated enterprise with its wholly owned subsidiaries, including those with operations in California, and controlled the internal affairs and operations of those subsidiaries such that they functioned as instrumentalities of their parent. Barclays files annual reports and other documents with the SEC. Moreover, Barclays trades in the U.S. securities markets, purposefully availing itself of the protections and privileges of the United States in its transactions of Barclays ADRs. Additionally, approximately 20% of Barclays ordinary shares are owned by individuals and institutions within the United States.

37. Barclays likewise avails itself of U.S. protections and privileges in the transactions undertaken by its investment banking and individual credit card and consumer banking activities based in the United States. As Staley stated in an interview in 2019, Barclays "set up a whole new legal structure to operate in the United States a couple of years ago." As a result, Barclays, when reporting its year-end financials for 2023, stated: "The US is our main market outside the UK." For example, 31% of its total income in 2023, nearly 25% of its total income in 2022, and 32% of its total income in 2021 came from the United States, based on the location of the office where the transactions were recorded.

38. Individual Defendants Staley and Higgins are subject to personal jurisdiction in this District because they: (i) are or were control persons of Barclays; and (ii) each purposefully directed their activities as alleged herein toward the United States and this judicial district.

39. The FSMA claim arises out of the same common nucleus of operative facts as the Exchange Act claims. Personal jurisdiction is therefore also conferred over the FSMA claims by the doctrine of pendent personal jurisdiction. *Action Embroidery Corp. v. Atl. Embroidery Corp.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004).

40. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and (c)(3), and §27 of the Exchange Act (15 U.S.C. §78aa), because Barclays maintains an office for its investment banking operations in this District and because the alleged misstatements entered and the subsequent damages took place in this judicial district.

41. The FSMA claim is closely related to the Exchange Act claims. Venue is therefore also proper in this District under the doctrine of pendent venue.

42. In connection with the acts, conduct, and other wrongs alleged herein. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications, and the facilities of the national securities exchange.

## V. PARTIES

43. On January 2, 2024, the Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees was appointed Lead Plaintiff. ECF 31. The Teamster Funds purchased Barclays ADRs at artificially inflated prices during the Class Period, as set forth in the previously filed Certifications (ECF 19-2) and incorporated herein, and was damaged thereby.

44. Plaintiff The Firemen's Retirement System of St. Louis purchased Barclays ordinary shares at artificially inflated prices during the Class Period, as set forth in the attached certification, and was damaged thereby.

45. Defendant Barclays PLC is a British universal bank that provides consumer banking and credit card services, wealth management, and corporate and investment banking services. Barclays is incorporated in England and its head office

is located at 1 Churchill Place, London, E14 5 HP, England. Barclays ADRs trade on the NYSE under the ticker symbol "BCS." Barclays ordinary shares trade on the LSE under the ticker symbol "BARC."

46. Defendant James ("Jes") E. Staley served as the Company's Group CEO and a director on Barclays' Board from December 1, 2015 to October 31, 2021. Prior to joining Barclays, Staley was a JPMorgan employee. In 1999, he became head of JPMorgan's Private Banking division, during which time he met Jeffrey Epstein. In 2001, he was promoted to CEO of JPMorgan Asset Management and ran that division until 2009. In 2013, he left JPMorgan, and, on October 28, 2015, Barclays announced that he would become its CEO effective December 1, 2015. On November 1, 2021, Barclays announced that Staley would step down from his roles as CEO and Director of the Company. During the Class Period, as alleged herein, Staley made false and misleading statements in public filings, interviews with the press, and during an earnings call on February 13, 2020.

47. Defendant Nigel Higgins has served as the Company's Group Chairman of the Board since May 2019. He also served on the Board Nominations Committee throughout the Class Period. According to Barclays, "[i]t is the responsibility of the Group Chairman to ensure that Board agendas are focused on key strategy, risk, performance and other value creation issues, and that members of the Board receive timely and high-quality information to enable them to make sound decisions and promote the success of Barclays PLC." During the Class Period, as alleged herein, Higgins signed letters to shareholders incorporated in the Notices of Annual General Meeting for 2020 and 2023 that contained false and misleading statements.

48. Defendants Staley and Higgins are collectively referred to herein as the "Individual Defendants."

## VI. CONTROL PERSONS

49. Staley was an officer and director while Higgins was a director of Barclays, a publicly held company whose ordinary shares traded on the LSE and whose ADRs traded on the NYSE. As officers and/or directors and controlling persons of a publicly held company whose securities are publicly traded and are governed by the provisions of the federal securities laws and the securities laws of the United Kingdom, Staley and Higgins had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, financial statements, business, management, and present and future business prospects; not to make material misrepresentations with respect thereto or to omit material facts necessary to make the statements contained therein not misleading; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Barclays Securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

50. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various Annual Reports, SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Both Individual Defendants were provided with copies of the documents alleged herein to be misleading before or shortly after their issuance. Staley participated in interviews and a conference call with investors during which he made false and misleading statements, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

51. Both Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Barclays. Both Individual Defendants were directly involved in the management and day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its strategy, business, and operations. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws and the securities laws of the United Kingdom.

## VII. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Epstein's Arrest Provokes Media Reports About Epstein's Wall Street Connections, Including with Staley

52. The Class Period begins on July 22, 2019, when, in response to Epstein's arrest on July 6, 2019, and indictment two days later, *The New York Times* ran an article titled "Jeffrey Epstein's Deep Ties to Wall Street Figures." The article highlighted Epstein's ties to various Wall Street figures, including Staley. Specifically, it discussed how Staley had visited Epstein at his Palm Beach office where Epstein was on a work release while serving his prison sentence for soliciting prostitution of a minor. The article reported that Staley "had good reason to maintain his relationship with Mr. Epstein," because in the "clubby world of Wall Street," Epstein's referrals of his rich contacts to Staley converted into clients for JPMorgan.

53. In response, a Barclays spokesperson, Stephen Doherty, was quoted in the July 22, 2019 *The New York Times* article stating:

> "***Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services, either in his various roles at JPMorgan, or personally[.]***"

54. Other news outlets similarly reported that Staley and Epstein's relationship had petered out. On July 25, 2019, *The Wall Street Journal* published an article titled "Jeffrey Epstein Burrowed Into the Lives of the Rich and Made a Fortune." The article reported that "[a]ccording to a person close to Mr. Staley, now CEO of Barclays PLC, he hasn't had contact with Mr. Epstein in several years."

55. On August 6, 2019, *Bloomberg* published an article titled "Epstein's Endgame: One Last Shot to Stay in Wall Street's Favor," reporting that within months of Staley sailing his sailboat to Epstein's island, Little St. James, "Staley cut ties to Epstein, according to a person with knowledge of the situation." *Bloomberg* explained that once Staley "was in the running for the top job at Barclays, a position that required interviews and approvals by U.K. regulators," "[t]he wisdom of breaking from Epstein became apparent" since "the British press reported on their relationship." Per *Bloomberg*, "[w]hile there's no suggestion of any wrongdoing on the part of [Epstein's] Wall Street connections," which included Staley, "it all no doubt makes uncomfortable reading for them."

56. The statement in ¶53 concerning Staley's payment of fees for "professional services . . . or personally" was materially false and misleading when made because Defendants knew or deliberately disregarded and failed to disclose the following facts:

(a) The relationship between Staley and Epstein was close and personal enough that the offer or solicitation of business advice did not require the payment of fees or a formal engagement. Moreover, although Staley may not have formally engaged Epstein to provide advice or professional services, Staley had, within the scope of his business relations and friendship with Epstein, sought Epstein's personal and professional guidance and assistance. Not only did Epstein provide referrals of wealthy and powerful individuals to Staley as potential clients for JPMorgan's private bank, but Staley sought Epstein's advice on a variety of aspects relating to Staley's work, including Staley's pay, his speeches, internal

JPMorgan business strategy, and his approach toward pursuing the CEO position at Barclays.

(b) In exchange for Epstein's business counsel and contacts, Staley provided Epstein financial and professional protection allowing for Epstein to continue his bank dealings with JPMorgan, even though JPMorgan executives had identified Epstein as "a known child sleaze" and protested that "[h]e should not be a client." Epstein remained a JPMorgan client "due to Jes's personal relationship" and that banking relationship ended shortly after Staley left JPMorgan.

(c) As detailed in the FCA Decision, between January 2013 and July 2015, Staley and Epstein "exchang[ed] almost 600 emails during that period, including . . . emails from Mr Staley referring to the strength of their friendship." In 2015, the same year that Staley was appointed Barclays' CEO, Staley twice visited Epstein's properties in the U.S. Virgin Islands – once in January 2015 when Staley asked Epstein for "dock space" and moored his boat in Epstein's marina, and once in April 2015 while on vacation and Staley anchored his boat in front of Epstein's island. Following his visit, Staley wrote Epstein: "Your place is crazy, and special. It has a warmth and silliness that makes it yours. I count u as a deep friend."

(d) The Company's false assurance in ¶53 and its focus on a formal engagement or payment between Staley and Epstein omits an accurate description of their continued close business dealings even after Staley left JPMorgan and Epstein was no longer Staley's client. In fact, Staley and Epstein "continued to network and discuss potential business opportunities" after Staley's 2013 departure from JPMorgan until at least July 2015. For example, as the FCA Decision later found, Staley and Epstein "discussed arrangements for meetings between Mr Staley and certain prominent public figures and business figures in March 2013, April 2013, September 2013 and May 2014." The two men also discussed starting up a financial services firm together in New York in December 2013.

(e) Epstein assisted and provided personal and strategic advice to Staley to help him secure his appointment as Barclays' CEO. Staley later informed the FCA that while Epstein did not have a "'formal or informal advisory role'" relating to the CEO appointment, he discussed the matter with Epstein because he "had previously discussed with Mr Epstein matters relating to his career and wanted to hear Mr Epstein's 'thoughts' on the matter and because he 'trusted him to be discreet.'" According to the FCA Decision, between July 2015 and October 2015, Staley and Epstein emailed and discussed on the phone the approach Barclays made to recruit Staley as CEO. For example:

(i) On July 11, 2015, Staley emailed Epstein in an email titled "B" stating: "A member of the board just reached out."

(ii) On July 24, 2015, Epstein emailed Staley: "[B]etter if you not email me. phone only."

(iii) On October 4, 2015, Staley wrote Epstein in an email titled "Friendship," stating: "You never wavered in our friendship these last three years. That means a lot too [sic] me. . . . Cross your toes!!!" Epstein responded: "[M]ore than 10 years."

(iv) On October 8, 2015, Staley wrote Epstein: "'Nominating com[mittee] approved. Friday, full board votes. I should have the contract by the weekend. We're very close.'" The FCA determined that Staley understood this information was not in the public domain and was "'very confidential.'"

(f) The statement in ¶53, which bolstered other media outlets' reporting that Staley and Epstein had cut ties, is consistent with a strategy Defendants previously employed. As early as 2015, the Company knew it faced a public relations and reputational problem with Staley's appointment as CEO because of his relationship with Epstein. Rather than address the problem directly and acknowledge the depth and closeness of Staley and Epstein's relationship, the Company chose to affirmatively downplay the relationship, including by shifting the

quality of the relationship to one that was purely professional. The FCA Decision later noted Defendants' tactics to downplay the relationship between Staley and Epstein upon Staley's appointment and create a misleading perception of distance between the men in the press. For example:

(i) Staley wrote Epstein on October 17, 2015: "'Ok. I'm going to play is [sic] simple. I've known you as a client.'"

(ii) After one newspaper contacted Barclays to explain that it planned to print an article stating that Epstein had sought to influence the selection of Staley as CEO in both 2012 and 2015, a Barclays senior executive wrote Staley on October 24, 2015 that "they needed to keep the article 'historical and flimsy.'"

(iii) As subsequent articles were published, Barclays hired a law firm to assist in its media response. The FCA found that the firm advised that Barclays "ought to '. . . be as strong as we possibly ***can be in dispelling the friendship myth***. If there is any more information that we can deploy to demonstrate distance between them it would be helpful . . . .'"

(iv) Prior to another article's publication on November 1, 2015, the Barclays' Corporate Communications team responded to a journalist's inquiry, stating that "'neither Barclays nor Mr Staley feel the need to respond to your two questions given that ***there is no obligation to distance ourselves from someone with whom neither party has anything resembling a close personal association***.'" The FCA later concluded that this statement was "based on what Mr Staley had previously told a Barclays senior executive."

57. Following the July 22, 2019 misrepresentations and omissions alleged in ¶53, Barclays Securities traded at artificially inflated prices.

### B. Bank Regulators Launch Investigation into Staley's Relationship with Epstein and the Suitability of His Leadership

58. On August 10, 2019, Epstein committed suicide in his jail cell. With media attention on Staley and Epstein reigniting, the FCA, as the regulator charged with protecting the U.K. financial markets' integrity, took note.

59. The FCA is an independent non-governmental body, given regulatory powers under FSMA. The FCA is responsible for the regulation of organized financial markets, including "recognised investment exchanges," which, in turn, includes the LSE. The FCA's "single strategic objective" is to ensure that the markets for financial services function well. It seeks to achieve this goal, in part, by supervising trading platforms, as well as "protecting and enhancing the integrity of the UK financial system." Functionally, the FCA regulates through rulemaking and more targeted supervision responsibilities. Among the rules administered by the FCA are individual conduct rules and senior manager conduct rules.

60. On August 15, 2019, an executive from the FCA called Higgins asking that Barclays "explain in writing what it had done to satisfy itself that there was no impropriety with respect to the relationship between Mr Staley and Mr Epstein." The FCA made the request for a written explanation "in the light of recent press reports regarding [Staley and Epstein's] relationship, which called into question Barclays' CEO's judgement [sic] and potentially his fitness and propriety." As the FCA would later explain in the FCA Decision published in October 2023, the FCA's August 2019 inquiry was to seek "assurance that Barclays had discharged its regulatory obligations to ensure it understood and had properly managed the risks to which it was exposed."

61. Higgins informed Staley of the FCA's request during a meeting on or around August 23, 2019. Higgins told Staley that he should work with Barclays General Counsel Bob Hoyt to formulate a response. To draft the response, Staley provided information in discussions with Higgins, Hoyt, a second Board member,

and two other senior executives from Barclays. Staley reviewed and made revisions to the letter response. Higgins also reviewed and approved the letter. Barclays and Staley agreed that the response to the FCA should be from Barclays rather than from Staley.

62. On October 8, 2019, Barclays sent the requested letter to the FCA, in which Barclays stated:

> "I am writing to close the loop on your request for assurance that we have informed ourselves and are comfortable in regard to any association of [Mr Staley] or Barclays with [Mr Epstein]. I can now report that [Board Member B], [Hoyt] and [Higgins] have had separate conversations with [Mr Staley] where he has described his interactions with Mr Epstein. ***[Mr Staley] has confirmed to us that he did not have a close relationship with Mr Epstein***, and he is resolute that at no time did he see anything that would have suggested or revealed any aspect of the conduct that has been the subject of recent allegations. ***[Mr Staley's] last contact with Mr Epstein was well before he joined Barclays in 2015***.
>
> Separately, Barclays' financial Crime team has conducted a thorough review of our records, which did not reveal any client or customer relationship with Mr Epstein.
>
> In sum, neither our discussions with [Mr Staley] nor our review of the bank's records have revealed any cause to suspect that Barclays or [Mr Staley] have played any role in the activities of Mr Epstein that have been under investigation.
>
> I trust this addresses your questions."[3]

[3] The FCA's subsequent reproduction of the letter uses pseudonyms – *e.g.*, Board Member B. However, in an article dated March 4, 2023, the *Financial Times*

63. The FCA later confirmed that the wording of the letter ultimately sent was identical to a draft version reviewed by Staley two days earlier, except for a minor change.[4]

64. A few weeks later, JPMorgan informed the FCA that it identified various documents relating to the relationship between Staley and Epstein in the course of investigations by U.S. authorities. JPMorgan turned over to the FCA this cache of documents containing around 1,200 emails between Staley and Epstein in November 2019. After reviewing these emails, the FCA began an inquiry into whether Defendants had properly characterized Staley and Epstein's relationship in the October 8, 2019 letter to the FCA.

65. Barclays first learned of the cache in December 2019, when the Governor of the Bank of England at the time, Mark Carney, summoned Higgins, at 24 hours-notice, to see Carney, Andrew Bailey of the FCA, and Sam Woods of the Prudential Regulation Authority ("PRA"), another regulatory body that is part of the Bank of England and supervises financial institutions including banks and insurance companies. The U.K. regulators called the meeting to ask Higgins to account for why the emails contradicted the October 8, 2019 letter that Barclays had sent to the FCA. The U.K. regulators urged the Barclays Board to review the email cache and confirm whether Staley had played down his ties to Epstein.

66. With U.K. regulators questioning whether Staley should continue to head Barclays, the Board focused its internal inquiry on: (i) whether there was evidence of impropriety; and (ii) whether Staley had been "sufficiently" transparent about the scope of the relationship when he joined the bank in 2015 and again in 2019 following the FCA's initial inquiry in August 2019. Barclays hired the law

---

identified Higgins and Hoyt as the individuals who spoke with the FCA executives and drafted Barclays' letter.

[4] The change in wording was from "'are under investigation'" to "'have been under investigation'" in the penultimate sentence.

firm Clifford Chance to assist in reviewing the documents between January and February 2020. The law firm conducted interviews and provided a confidential report on their findings for the Board's review. The report appended the most controversial emails between Staley and Epstein.

67. The email cache contained 1,200 emails exchanged between Staley and Epstein from Staley's tenure at JPMorgan. The emails suggested that they also spoke regularly on the phone and met in person. From January 2013 to October 2015, after Staley had left JPMorgan until his appointment as Barclays' CEO, Staley and Epstein continued to exchange another nearly 600 emails. Their communications thus continued well after Epstein was Staley's client at JPMorgan. The cache included emails in which Staley told Epstein that he was "'my most cherished friend,'" that "'I owe you much. And I deeply appreciate our friendship. I have few so profound,'" and that "'I count u as a deep friend.'" The emails also made clear that Staley had visited Epstein's island in the U.S. Virgin Islands that was a primary location for Epstein's alleged sex trafficking. And the cache included suggestive emails, such as one exchange in July 2010 in which Staley wrote Epstein: "That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" to which Staley replied: "Beauty and the Beast." Epstein responded: "[W]ell one side is available."

### C. Defendants Falsely Assured Investors of Staley's Transparency and Their Full Confidence in His Leadership

68. On February 13, 2020, the Company issued a press release titled "Director effectiveness assessment: disclosure of regulatory investigation," which was furnished to the SEC on a Form 6-K. Barclays' statement in the press release was also incorporated into Barclays' 2019 Annual Report, issued the same day, announcing its results for the year ended December 31, 2019, and filed with the SEC on a Form 20-F. Attached to the 2019 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Staley attesting to the

accuracy of financial reporting, his evaluation of the effectiveness of the Company's disclosure control, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

69. In both the February 13, 2020 press release and the 2019 Annual Report filed the same day, Defendants disclosed that the FCA was conducting a regulatory investigation into Staley's relationship with Epstein in light of the media reports published in the prior six months linking the two men. Both the director effectiveness assessment and the 2019 Annual Report were published by means of the LSE's Regulatory News Service ("RNS") or their availability was announced by means of the RNS. Defendants stated:

> As has been widely reported, earlier in his career Mr. Staley developed ***a professional relationship with Mr. Epstein***. In the summer of 2019, in light of the renewed media interest in the relationship, ***Mr. Staley volunteered and gave to certain executives, and the Chairman, an explanation of his relationship with Mr. Epstein. Mr. Staley also confirmed to the Board that he has had no contact whatsoever with Mr. Epstein at any time since taking up his role as Barclays Group CEO in December 2015***.
>
> * * *
>
> ***Based on a review, conducted with the support of external counsel, of the information available to us and representations made by Mr. Staley, the Board (the Executive Directors having been recused) believes that Mr. Staley has been sufficiently transparent with the Company as regards the nature and extent of his relationship with Mr. Epstein***. Accordingly, Mr. Staley retains the full confidence of the Board, and is being unanimously recommended for re-election at the 2020 AGM.

70. The 2019 Annual Report also affirmed to investors that Barclays "cooperat[ed]" in the various investigations in which it was involved, which then included the FCA's inquiry into Staley's relationship with Epstein:

> The Group is also subject to enquiries and examinations, requests for information, audits, investigations and legal and other proceedings by regulators, governmental and other public bodies in connection with (but not limited to) consumer protection measures, compliance with legislation and regulation, wholesale trading activity and other areas of banking and business activities in which the Group is or has been engaged. ***The Group is cooperating with the relevant authorities and keeping all relevant agencies briefed as appropriate*** in relation to these matters and others described in this note on an ongoing basis.

71. Also on February 13, 2020, Staley participated on an earnings conference call with analysts to discuss the year-end results for 2019. During the question-answer session, Staley made the following statement regarding his relationship with Epstein and the FCA's inquiry:

> I think it's very well-known at my time with JP Morgan, at the beginning of 2000, when I started to run the private bank, where he was an existing client, ***I've had a professional relationship with him for that period***. As I left Morgan, the relationship began to ***taper off quite significantly. And that stopped before I joined Barclays. And obviously, there's been no contact . . . whatsoever since then***. The inquiry by the FCA is very narrowly focused on whether I've been transparent and open with the bank. And ***I feel very comfortable – going back to 2015, I have been transparent and open with the bank.*** [Per] the RNS [Regulatory News Service], ***the Board has done a review of that issue. And they have confirmed that they're also comfortable that I was transparent and open with them with respect***

> ***to that relationship*** and now the process will just go on at the FCA. But again, . . . ***I had no contact whatsoever . . . with Jeffrey Epstein, while I've been here with Barclays***.

72. Also on February 13, 2020, Staley appeared on Bloomberg Television to discuss the Company's annual results. This interview was posted on YouTube in a video titled "Barclays CEO Says He Was 'Very Transparent' About Jeffrey Epstein Relationship." In response to the interviewer's question about the FCA's investigation into Staley's relationship with Epstein, Staley made the following statement:

> So first it's well-known in the press that ***I have had a long-standing professional or had a long-standing professional relationship with Jeffrey Epstein***. It began in 2000 when I was asked to run JP Morgan's private bank and he was already a client of the bank at that time. The investigation is actually focused on transparency of whether I was transparent with and open with the bank and with the board with respect to my relationship with Jeffrey Epstein and ***indeed it's clear in my own mind that going all the way back to 2015 when I joined Barclays, I have been very transparent with the bank*** and very open and willing to discuss the relationship that I had with him. And if you look at the RNS, I think what's important to note is ***the Board has done its own review and they've looked back at my transparency and they concluded indeed that I have been transparent and open with the bank*** and with the board all along this process and in fact they have unanimously voted for me to be put up for reelection at the AGM meeting later this year so full support from the Chairman and from the board. But there is a regulatory process that is ongoing and we'll let that run its course.

73. Also on February 13, 2020, the *Evening Standard* published an article titled "Barclays boss Jes Staley fights for job over Epstein probe; Staley quizzed by City watchdog about relationship with financier." In it, the article stated that "Barclays investigated and found [Staley] had been honest in his account that it was a previous business relationship that ended in 2015 before he became chief executive. It then passed on the results of its probe to the regulator." It reported that U.K. regulators "had been unsatisfied with the response" and "launched an inquiry into what Staley told the bank, and what the bank disclosed in its submission to them." The article further stated that "Barclays revealed that ongoing inquiry alongside strong annual results which beat City forecasts and suggested Staley's turnaround of the company was bearing fruit."

74. The *Evening Standard* article further reported that when interviewed, Staley made the following statement:

> "***I have been fully transparent and open. I worked with the guy professionally***."

75. Reporting on Defendants' announcement, *The Wall Street Journal* published an article on February 13, 2020, headlined: "Barclays CEO Under Investigation Over Links to Jeffrey Epstein; U.K.'s second-biggest bank says CEO Jes Staley retains the confidence of its board." It reported:

> Barclays said . . . Mr. Epstein's death renewed interest in Mr. Staley's dealings with him, and that the CEO gave an explanation to executives, including chairman Nigel Higgins. ***Mr. Staley confirmed he had no contact with Mr. Epstein after becoming Barclays's CEO, the bank said***.

76. Market analysts who reported on the news were comforted by Defendants' misrepresentations and voiced support for Staley in light of the solid financial performance he appeared to deliver for the Company:

- RBC, February 13, 2020: "Reasonable financials overshadowed by FCA probe. . . . A reasonable financial performance could be offset on the day by the company announcing that the CEO is being investigated by the regulator in relation to his ties to Epstein. ***Based on the information available to it, the Board retains full confidence in Mr Staley. . . . The CEO has assured the Board that he had not had any contact since he joined BARC***. Based on the information available, the Board retains full confidence in Mr Staley."
- Investec, February 13, 2020: "***Staley delivers*** . . . Disclosures concerning an (ongoing) FCA investigation in CEO Jes Staley's relationship with Jeffrey Epstein offer an ***unwelcome distraction from solid numbers***."
- Shore Capital, February 13, 2020: "Barclays reported a better than expected set of full year results to 31st December 2019 which were unfortunately overshadowed by revelations that the FCA has been investigating CEO Jes Staley due to ***historical links*** with Jeffrey Epstein. While the Board has thrown its unanimous support behind Mr Staley, this latest revelation, on top of the previous issue around whistleblowing, could mean his days are numbered. This would be a pity, in our view . . . ."
- Berenberg, February 14, 2020: "News that UK regulators are investigating links between Barclays' CEO, Jes Staley, and a client of his former employer creates clear uncertainty. While we are mindful of risks to sentiment, ***we take comfort from three considerations***. First, the nature of the relationship appears consistent with Mr Staley's past role and ceased prior to his appointment at Barclays. Second, the investigation is focused narrowly on whether the past relationship was

declared. Third, ***an investigation by Barclays' board concluded that processes were followed***."

- Kepler Cheuvreux, February 14, 2020: "[T]he financial Conduct Authority indicated that Barclays CEO Jes Staley was under investigation for ties with Jeffrey Epstein. ***Nevertheless, the board added it maintained its full confidence in Staley***."

77. On April 3, 2020, Barclays issued on its website its Notice of Annual General Meeting for 2020, which included a signed letter from Higgins. The availability of the Notice of Annual General Meeting for 2020 was announced by Barclays via the RNS. In his letter, Higgins made the following statement regarding Barclays' evaluation of Staley in light of the FCA investigation:

> As part of our Director effectiveness assessment process, we also disclosed ongoing regulatory investigations by the Prudential Regulation Authority (the "PRA") and Financial Conduct Authority in relation to the Group Chief Executive. . . . ***The Board's governance processes were rigorously followed in relation to this matter***, and I will simply repeat here what we said at the time: ***Jes retains the full confidence of the Board***, and is being unanimously recommended for re-election.

78. On February 18, 2021, Barclays issued its 2020 Annual Report, which was also filed with the SEC on a Form 20-F, announcing its results for the year ended December 31, 2020, and its availability was announced by Barclays via the RNS. In it, the Company included a "Directors' report" from the Nominations Committee, which stated:

> As part of its decision in respect of Mr Staley, ***the Board has had regard to the conclusions it reached last year, which conclusions remain unchanged***, in relation to the investigations by the PRA and the

FCA, details of which were disclosed in our 2019 Annual Report and which remain ongoing.

79. In its 2020 Annual Report, Barclays also reiterated its false and misleading statement that the Company was cooperating with relevant authorities, including the FCA, in their investigations, as alleged in ¶70, above.

80. Following the misrepresentations and omissions made on February 13, 2020, April 3, 2020, and February 18, 2021, Barclays Securities traded at artificially inflated prices.

81. Each of the above statements in ¶¶69-72, 74-75, and 77-79 concerning Staley's current and historical relationship with Epstein, Barclays' decision to back Staley following its own internal investigation, and Barclays' cooperation with the FCA's investigation was materially false and misleading when made as Defendants knew or deliberately disregarded and failed to disclose the following facts:

(a) In direct contradiction to Defendants' statements that maintained that Staley and Epstein's relationship was only "professional," the Company and its Board were in possession of unequivocal evidence that Staley, for years, had maintained an intimately close relationship with Epstein, in which they shared both professional and personal communications and experiences, such as exchanges regarding women, visits by Staley to Epstein's various residences (including the island Epstein owned in the U.S. Virgin Islands where much of Epstein's sex-trafficking activities had allegedly transpired), declarations of friendship, and advice on clients and confidential business dealings. This evidence included a cache of nearly 1,200 emails between Staley and Epstein, including:

(i) On November 1, 2009, Staley sent Epstein the following email while visiting Epstein's "Zorro Ranch" in New Mexico: "So when all hell breaks lose [sic], and the world is crumbling, I will come here, and be at peace. Presently, I'm in the hot tub with a glass of white wine. This is an amazing place.

Truly amazing. Next time, we're here together. ***I owe you much. And I deeply appreciate our friendship. I have few so profound***."

(ii) On numerous occasions, Staley and Epstein referred to each other as "family."

(iii) On April 27, 2009, Staley referred to Epstein as "uncle Jeffery [sic]" in an email he forwarded to his daughter regarding Epstein's effort to help Staley's daughter get into graduate school.

(iv) On December 5, 2009, Epstein wrote Staley: "[Y]ou were with larry, and i had to put up with . . . ." The email attached a redacted photograph, which the district court in the USVI Litigation described as "a picture of a young woman in a sexually suggestive pose." Staley responded "Don't tell me a french wine," and Epstein responded "always thoughts of alcohol," though Epstein was famously a teetotaler.

(v) In what appears to be a confidential request by Jamie Dimon, CEO of JPMorgan, for Staley's comments on a draft letter to JPMorgan shareholders, Staley nevertheless forwards the email to Epstein on March 28, 2010, and Epstein suggested revisions.

(vi) Between July 9 and 10, 2010, Staley and Epstein exchanged emails in which Staley wrote: "That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next" and Staley answered: "Beauty and the Beast . . . ." Epstein answers: "[W]ell one side is available."

(vii) On April 12, 2015, just six months before he would be announced as the CEO of Barclays, Staley and his wife visited Epstein on his island in the U.S. Virgin Islands, after which Staley wrote to Epstein: "Thanks for the flight and thanks for the lunch. Your place is crazy, and special. It has a warmth and silliness that makes it yours. ***I count u as a deep friend***."

(viii) On August 23, 2012, Staley wrote Epstein: "***I can't tell you how much your friendship has meant to me***. Thank you deeply for the last few weeks." He signed off his message: "***To my most cherished friend***."

(b) The evidence in the Board's possession seriously undermined the Board's stated confidence in Staley's leadership of the Company.

(c) Based upon the evidence in Barclays' possession, certain of the allegations concerning Epstein's criminal activities may have been credible, and Staley's personal relationship with Epstein, including the depth and scope of that relationship if discovered, could bring reputational, legal, and financial harm to Barclays.

(d) The evidence in Barclays' possession and Staley's own knowledge regarding his relationship with Epstein undermined Barclays' assertions that it was cooperating with its regulators' investigations.

(e) As the FCA later concluded, Staley, as Barclays' CEO, "knew all the relevant facts regarding his relationship with Mr Epstein," but concealed them because he was aware of the risk posed to his own reputation and career.

(f) Contrary to Defendants' press release and annual report, Staley had not "volunteered" an explanation of his relationship with Epstein, but, in fact, had responded to an inquiry from the FCA.

### D. Staley Leaves Barclays upon the FCA's Preliminary Findings that Staley Lied About His Ties to Epstein

82. As a result of Barclays and Staley's repeated false assurances, Barclays Securities on both the NYSE and the LSE continued to trade at artificially inflated prices.

83. On November 1, 2021, Barclays issued a press release that was furnished to the SEC on a Form 6-K, as well as published via the RNS. In the press release, Barclays announced Staley's departure from Barclays after Barclays and Staley "were made aware . . . of the preliminary conclusions from the FCA and PRA

of their investigation into Mr Staley's characterization to Barclays of his relationship with the late Mr Jeffrey Epstein and the subsequent description of that relationship in Barclays' response to the FCA." However, in continuing to voice its support for Staley, Barclays made the following statement:

> ***It should be noted that the investigation makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr Staley*** following the arrest of Mr Epstein in the summer of 2019.

The press release further announced that "[w]ith effect from 1 November 2021, Mr C.S. Venkatakrishnan (known as Venkat) will take over as Group Chief Executive, subject to regulatory approval, and as a director of Barclays."

84. Analysts reporting on Barclays' announcement repeated the measured response to the FCA's preliminary findings that Barclays had provided – namely, the assurance that Staley was not aware of Epstein's alleged crimes:

- <u>Credit Suisse, November 1, 2021</u>: "In an announcement . . . Barclays communicated that Mr Jes Staley will step down as CEO following preliminary conclusions from the FCA and the PRA's investigation into Mr Staley's characterisation to Barclays of his relationship with the late Mr Jeffrey Epstein, and his intention to contest the conclusions. The announcement noted that the investigation made no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr Staley following the arrest of Mr Epstein in the summer of 2019. The release noted that the Board is disappointed at the outcome since Jes Staley has run the Group successfully since December 2015, built the senior team, clarified the strategy, transformed the operations and materially improved the results."

- <u>JPMorgan, November 1, 2021</u>: "Following preliminary conclusions from the FCA/PRA of their investigation into Mr Staley's characterisation to Barclays of his relationship with the late Jeffrey Epstein and the subsequent description of that relationship in Barclays' response to the FCA, the Board and Mr Staley have agreed that he will step down from his role as Group Chief Executive and as a director of Barclays. Note that the investigation makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes."
- <u>UBS, November 1, 2021</u>: "Barclays this morning announced that CEO Jes Staley and the Board have agreed that he will step down from his role as Group Chief Executive Officer . . . . This follows preliminary conclusions shared on Friday on the FCA and PRA's investigation into Mr Staley's characterisation of his relationship with the late Mr Jeffrey Epstein and Mr Staley's intention to contest such findings. The company release notes that the investigation has made no findings that Mr Staley was aware of any of Mr Epstein's alleged crimes, and highlights Mr Staley's success in running the group since December 2015, including a clear strategy, transformation of operations and improvement of results."

85. On November 12, 2021, the *Financial Times* published an article titled "Jes Staley exchanged 1,200 emails with Epstein that included unexplained phrases." According to the article, "[c]entral to the probe" being conducted by U.K. regulators "was a cache of emails first provided to US regulators by JP Morgan." The article stated that "people familiar with the correspondence" between Staley and Epstein said it included unexplained terms such as "snow white." The article reported:

> The "snow white" reference was written in a short, two-message exchange referring to a conversation the men had previously had in

> person, one of the people familiar with the matter said. Regulators at the Financial Conduct Authority and Prudential Regulation Authority are yet to draw conclusions over the phrase, a second person said.

Meanwhile, the article quoted Staley's lawyer, Kathleen Harris, stating that "'[w]e wish to make it ***expressly clear*** that our client had no involvement in any of the alleged crimes committed by Mr Epstein, and code words were never used by Mr Staley in any communications with Mr Epstein, ever.'" She also claimed the emails were "innocuous." Notably, the newspaper did not quote or have access to the "snow white" email or the others in the 1,200 email cache.

86. As Staley's attorneys sought to detach Staley from the criminal allegations against Epstein and denied the use of "code words," Barclays likewise continued to put distance between Staley and Epstein. The November 12, 2021 *Financial Times* article quoted a Barclays' spokesperson reiterating Barclays' initial response to the FCA's preliminary findings:

> "[T]he investigation ***makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes***".

87. As reported by *The Mail on Sunday* on November 28, 2021, in the wake of Staley's departure, Higgins privately called prominent Barclays investors to warn them about the "uncomfortable" tenor of the emails. According to one of the bank's top 20 largest investors to whom Higgins spoke, "'[Higgins] said ***once you read the final report you will have questions for us because it makes for uncomfortable reading***.'"

88. Nevertheless, when Barclays issued its 2021 Annual Report on February 23, 2022, which was also filed with the SEC on Form 20-F, it included an introductory letter from Higgins in which he spoke of Staley in glowing terms, crediting the Company's 2021 performance to Staley's efforts:

> This performance was in no small way a credit to Jes Staley, who left Barclays as Chief Executive towards the end of the year, and the

> team he assembled. ***It is obviously not appropriate for me to comment at the moment, further than has been done already, on the circumstances of Jes's departure***. It is important to let the regulatory and related processes take their course and, at the time of writing this letter, they have not completed. It is appropriate, however, to recognise that under the leadership of Jes, Barclays established a clear strategy, built up a secure capital base, improved its operational resilience and developed its business-leading franchises. We are therefore grateful for the hard work that he put in for the Company.

89. In its 2021 Annual Report, Barclays also reiterated its false and misleading statement that the Company was cooperating with relevant authorities, including the FCA, in their investigations, as alleged in ¶70, above.

90. Following the misrepresentations and omissions made on November 1, 2021, November 12, 2021, and February 23, 2022, Barclays Securities traded at artificially inflated prices.

91. In addition to all of the reasons identified in ¶81, each of the above statements in ¶¶83 and 86-89 concerning Barclays' characterization of the FCA's preliminary conclusions, which focused on whether Staley was aware of Epstein's alleged crimes, and Defendants' cooperation in regulatory investigations, was materially misleading when made as Defendants knew or deliberately disregarded and failed to disclose the following facts:

(a) Whether or not Staley witnessed Epstein's crimes was not the sole issue under investigation by the FCA. Rather, as the FCA Decision stated, the FCA "wanted Barclays to explain how it was satisfied there was no impropriety with respect to the relationship between Mr Staley and Mr Epstein." The FCA undertook this inquiry because the FCA "was seeking assurance that Barclays had discharged its regulatory obligations to ensure it understood and had properly managed the risks

to which it was exposed." In other words, the FCA's inquiry was broader than whether Staley had witnessed Epstein's alleged crimes.

(b) Barclays' October 8, 2019 letter to the FCA makes clear that Barclays understood that its response to the FCA was broader than simply Staley's awareness of Epstein's alleged crimes. The letter stated: "'I am writing to close the loop on your request for assurance that we have informed ourselves and are comfortable in regard to any association of [Mr Staley] or Barclays with [Mr Epstein].'"

(c) The FCA Decision noted that Barclays understood the FCA's inquiry was broader than Staley's awareness of Epstein's alleged crimes because Higgins emailed an FCA executive asking whether a sentence regarding Staley's "'role in the activities of Mr Epstein that have been under investigation'" was necessary to include in the October 8, 2019 letter. Higgins wrote that he thought the FCA was "'probably more worried about judgement than involvement in wrong-doing.'"

(d) Despite the admitted broader scope of the FCA's inquiry, and despite Barclays' possession of the email cache evidencing Staley and Epstein's close, personal relationship, Defendants misrepresented the nature of Staley and Epstein's relationship to the FCA.

(e) Higgins' reference to the "circumstances of Jes's departure" omits his knowledge that Barclays' letter to the FCA contained misleading statements regarding Staley's relationship with Epstein.

### E. Private and Government Lawsuits Threaten to Expose Ugly Facets of Staley's Relationship with Epstein

92. On November 24, 2022, plaintiff Jane Doe 1 filed a class action captioned *Jane Doe 1 v. JP Morgan Chase & Co.*, No. 1:22-cv-10019 (S.D.N.Y) ("Doe Litigation"), on behalf of herself and other alleged victims of Epstein's sex trafficking, seeking damages from JPMorgan for facilitating and benefitting from

Epstein's sex-trafficking activities. The complaint alleged a "symbiotic" relationship between Epstein and Staley and stated, for example:

> Epstein agreed to bring many ultra-high wealth clients to JP Morgan, and in exchange, Staley would use his clout within JP Morgan to make Epstein untouchable. This meant that JP Morgan would keep Epstein on as a client at all costs, including failing to act on any red flags and ultimately allowing him the ability to run and grow what to the bank was obviously an operation designed to sexually abuse and traffic countless young women.

93. On December 27, 2022, the Attorney General for the United States Virgin Islands filed a civil action against JPMorgan (the USVI Litigation), asserting claims of trafficking against the bank for providing banking services to Epstein connected with his alleged sexual trafficking of young women and girls. That complaint alleged that "JP Morgan knowingly, negligently, and unlawfully provided and pulled the levers through which recruiters and victims were paid and was indispensable to the operation and concealment of the Epstein trafficking enterprise." However, much of the initially filed complaint was redacted.

94. On February 15, 2023 in its 2022 Annual Report, which was also filed with the SEC on a Form 20-F, Barclays reiterated its false and misleading statement that the Company was cooperating with relevant authorities, including the FCA, in their investigations, as alleged in ¶70, above.

95. Also on February 15, 2023, in the USVI Litigation, portions of the complaint were unredacted, revealing for the first time excerpts of the messages sent between Epstein and Staley. These unredacted portions contained excerpts of several of the 1,200 emails between Staley and Epstein from 2008 to 2012, including a message from July 2010, sent from Staley to Epstein that said: "Maybe they're tracking u? That was fun. Say hi to Snow White." Epstein replied: "[W]hat character would you like next?" Staley answered, "Beauty and the Beast," to which

Epstein said, "well one side is available." Another email from November 2009, excerpted in the unredacted complaint in the USVI Litigation, was sent from Staley to Epstein and stated:

> Presently, I'm in the hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're here together. I owe you much. And I deeply appreciate our friendship. I have few so profound.

The unredacted complaint alleged that such emails demonstrated the "close personal relationship" between the men "and even suggest that Staley may have been involved in Epstein's sex-trafficking operation."

96. On March 4, 2023, the *Financial Times* published an article titled "Why the Jeffrey Epstein scandal continues to haunt JPMorgan and Barclays," which described the renewed scrutiny that the Doe and USVI Litigations' allegations put on the actions taken by Barclays and Higgins when responding to the FCA's 2019 inquiry. It noted that "Barclays declined to comment" on why the "emails it had seen did not tally with a merely professional relationship, close or not."

97. On March 8, 2023, in both the USVI Litigation and the Doe Litigation, JPMorgan filed a third-party complaint against Staley for indemnity, contribution, breach of fiduciary duty, and breach of the faithless servant doctrine in the event that JPMorgan was found liable. The complaints alleged that Staley, when visiting Epstein's residences, had observed the trafficking and abuse for which Epstein was accused.

98. On March 24, 2023, Barclays issued on its website its Notice of Annual General Meeting 2023, which included a Letter from the Group Chairman, signed by Higgins, and its availability was announced by Barclays via the RNS. Without mentioning Epstein, the letter noted the Board's observations regarding the legal proceedings involving JPMorgan and Staley and described the "allegations [as] serious and new." But Higgins' letter failed to make a full disclosure of what

Barclays learned in the course of conducting its internal investigation of Staley. Instead, without acknowledging that Barclays had the same emails that were recently disclosed in the Doe and USVI Litigations, Higgins continued to insist that Barclays had reached its conclusion based on "information it had at the time":

> The Board has noted the recent allegations made in the context of proceedings involving Mr Jes Staley's former employer, and against Mr Staley himself, in relation to events a few years prior to his joining Barclays. These allegations are serious and new. Barclays itself has received no material new evidence from regulators or law enforcement agencies since Mr Staley left in November 2021. ***The Board's original review, conducted in February 2020, was based on the information it had at the time and representations made by Mr Staley***.

99. In June 2023, a settlement was reached in the Doe Litigation in which JPMorgan agreed to pay $290 million to resolve the claims of over 150 alleged sex-trafficking victims. In September 2023, weeks before a scheduled trial, JPMorgan agreed to pay $75 million to settle the claims brought by the U.S. Virgin Islands. An agreement was also reached to resolve JPMorgan's claims against Staley, the terms of which are confidential.

100. Following the misrepresentations and omissions made on February 15, 2023 and March 24, 2023, Barclays Securities traded at artificially inflated prices.

101. In addition to all of the reasons identified in ¶¶81 and 91, each of the above statements in ¶¶94 and 98 concerning Barclays' original review at the FCA's request of Staley's relationship with Epstein and Defendants' cooperation in regulatory investigations were materially false and misleading when made as Defendants knew or deliberately disregarded and failed to disclose the following facts:

(a) Barclays had examined the cache of 1,200 emails with the assistance of outside counsel when it had conducted its "original review" in January

and February 2020, after which Defendants had falsely assured the FCA and investors of Staley's purely "professional" relationship with Epstein and Staley's transparency to the Board.

(b) The information that Barclays "had at the time" (*i.e.*, the 1,200 email cache) unequivocally showed that Staley's relationship with Epstein was closer and more personal than represented to the FCA, and that Defendants' description of that relationship to the FCA upon the FCA's inquiry was misleading.

102. Accordingly, because Defendants either (i) reviewed the email cache between Staley and Epstein revealing the close, personal friendship between the men and conducted interviews with Staley, or (ii) in the case of Staley, actually communicated, socialized with, and visited Epstein, Defendants knew or recklessly disregarded that Defendants' statements regarding Staley's relationship with Epstein, Defendants' transparency about that relationship, and the nature of the FCA's investigation into that relationship were materially false and misleading.

## VIII. DISCLOSURES ESTABLISHING LOSS CAUSATION AND DISHONEST DELAY

103. As detailed herein, Defendants made materially false and misleading statements, and/or omitted material information, and/or delayed the disclosure of information concerning Staley's relationship with Epstein and Barclays' knowledge thereof. Defendants' misstatements and omissions were designed to and did artificially inflate, maintain, and manipulate the price of Barclays Securities and deceived Plaintiffs and the Class, causing purchasers of Barclays Securities to suffer economic harm as the truth reached the market. When the truth began to be revealed, it caused the price of Barclays Securities to fall as the prior artificial inflation came out of the price of the securities.

104. On October 12, 2023, the FCA published an announcement on its website titled "FCA decides to fine and ban James Staley." The announcement stated, in pertinent part:

The FCA has decided to fine former CEO of Barclays, James Staley, £1.8 million and ban him from holding a senior management or significant influence function in the financial services industry.

The FCA has found that ***Mr Staley recklessly approved a letter sent by Barclays to the FCA, which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact***.

Therese Chambers, joint Executive Director of Enforcement and Market Oversight at the FCA said: 'A CEO needs to exercise sound judgement and set an example to staff at their firm. Mr Staley failed to do this. ***We consider that he misled both the FCA and the Barclays Board about the nature of his relationship with Mr Epstein***.

'Mr Staley is an experienced industry professional and held a prominent position within financial services. ***It is right to prevent him from holding a senior position in the financial services industry if we cannot rely on him to act with integrity by disclosing uncomfortable truths about his close personal relationship with Mr Epstein***.'

In August 2019, the FCA asked Barclays to explain what it had done to satisfy itself that there was no impropriety in the relationship between Mr Staley and Mr Epstein. In its response, Barclays relied on information supplied by Mr Staley. Mr Staley confirmed the letter was fair and accurate.

***The letter claimed that Mr Staley did not have a close relationship with Mr Epstein***. In reality, in emails between the two ***Mr Staley described Mr Epstein as one of his 'deepest' and 'most cherished' friends***.

The letter from Barclays to the FCA also claimed Mr Staley ceased contact with Mr Epstein well before he joined Barclays.

***However, Mr Staley was in fact in contact with Mr Epstein in the days leading up to his appointment as CEO being announced on 28 October 2015. Mr Staley joined Barclays in December 2015***.

While Mr Staley did not draft the letter there was no excuse for his failure to correct the misleading statements when he was the only person at Barclays who knew the full extent of his personal relationship with Mr Epstein and the specific timings of his contact with him. The FCA has found that Mr Staley was aware of the risk that his association with Mr Epstein posed to his career.

***The FCA considers that, in failing to correct the misleading statements in the letter, Mr Staley recklessly misled the FCA and acted with a lack of integrity***.

105. The FCA's announcement provided a link to the FCA Decision, which was published for the first time that same day.

106. The FCA Decision stated the conclusions of the FCA's investigation into the accuracy of and intent behind Barclays and Staley's October 8, 2019 letter. It also provided a comprehensive and detailed description of the evidence that the FCA collected regarding that relationship, which spanned from 1999 until at least 2015. The FCA Decision explained the import of the evidence on which it relied, which included hundreds of emails exchanged between Staley and Epstein, internal Barclays documents, interviews with, among others, Staley, Higgins, and Hoyt, and Staley's written representations in response to an FCA Warning Notice dated November 3, 2022.[5] Specifically, the FCA Decision stated the following:

[5] The November 3, 2022 Warning Notice was not published.

The documentary evidence demonstrates that: (i) the statement that Mr Staley and Mr Epstein did not have a close relationship is false, and (ii) Mr Staley and Mr Epstein were in contact until just before Mr Staley's appointment as CEO. Therefore, the two statements were ***clearly misleading*** and, as they were material to the Authority's enquiry…, they misled the Authority.

107. Although the FCA's investigation and the resulting FCA Decision were limited to evaluating whether statements made to the FCA in Barclays' October 8, 2019 letter were materially misleading (as opposed to passing judgment on Barclays' public disclosures), it concluded more broadly, and in detailed fashion, that the "extensive email communications between Mr Staley and Mr Epstein . . . , and the tone and nature of those communications . . . , strongly suggest that the relationship between Mr Staley and Mr Epstein were objectively close." Thus, while the FCA's conclusion specifically addressed the representations Barclays made in its private October 8, 2019 letter to the FCA, its finding also contradicted the public representations Barclays and Staley made to investors about the nature of the relationship.

108. In reaching its conclusion, the FCA Decision provided examples of the "notably warm tone" between Staley and Epstein in their emails to each other, which the FCA reprinted in ¶5.4(2) of the FCA Decision:

(a) the email of 1 November 2009 in which Mr Staley stated: "I owe you much. And ***I deeply appreciate our friendship. I have few so profound***.";

(b) the email of 31 January 2015 which stated: "***The strength of a Greek army was that its core held shoulder to shoulder***, and would not flee or break, ***no matter the threat. That is us***.";

(c) the email of 13 August 2015 in which Mr Staley stated: "***The counsel you have given*** [an individual connected to Mr Staley] ***over the years has been a gift of great friendship***."; and

(d) the email of 4 October 2015 in which Mr Staley stated: "***You never wavered in our friendship these last three years***. That means a lot too [sic] me."

109. The FCA Decision explained that after receiving the October 8, 2019 letter, it received additional information that shed light on the relationship. Specifically, JPMorgan, involved in Epstein-related investigations by U.S. authorities, had identified approximately 1,200 emails between Staley and Epstein, which it turned over to the FCA in November 2019.

110. In December 2019, the FCA summoned Higgins to account for the differences between the October 8, 2019 letter and the emails turned over to the FCA, and urged the Barclays Board to review the emails to determine whether Staley had downplayed his relationship with Epstein. ¶65.

111. The Barclays Board internally reviewed the emails provided by the FCA in January and February 2020 with the assistance of an outside law firm that conducted interviews and prepared a confidential report for the Barclays Board. That report appended the most controversial emails between Staley and Epstein. *See* ¶66, *supra*. While that report has never been made public, the conclusions published in the October 12, 2023 FCA Decision were based in significant part on the same emails that Barclays possessed in January 2020.

112. The FCA Decision in fact reprinted and analyzed portions of numerous emails between Staley and Epstein – the same emails Barclays possessed no later than January 2020.

- On July 11, 2008, Staley sent an email to Epstein while Epstein was in prison, stating: "***I miss you***. The world is in a tough place. Hang in there. Jes," to which Epstein responded, "So am I."
- On October 10, 2008, while Epstein was still in prison, Staley wrote Epstein: "I am dealing with the Fed on an idea to solve things. ***I need a smart friend to help me think through this stuff. Can I get you out for a weekend to help me (are they listening***?). Jes."
- On July 31, 2008, while Epstein was in prison, Staley emailed Epstein: "I hope you are hangin [sic] there. ***Just think of the island and my boat anchored in front. I do***."
- On August 14, 2009, after his release from prison, Epstein wrote to Staley: "hope you are enjoying your vacation. When you have some time, ***I would love to have you come visit***," to which Staley responded on August 15, 2009, stating, "I'm having a great time. The boat is a long dream come true. I will get to Florida soon. ***I need to shake your hand in freedom. Your friend. Jes***"
- On November 1, 2009, while staying at Epstein's ranch in New Mexico, Staley told Epstein "So when all hell breaks lose [sic], and the world is crumbling, I will come here, and be at peace. Presently, I'm in the hot tub with a glass of white wine. This is an amazing place. Truly amazing. Next time, we're here together. ***I owe you much. And I deeply appreciate our friendship. I have few so profound***."
- A September 9, 2010 email exchange suggests that Staley and Epstein socialized with each other the previous evening. Epstein said: "***Thanks for last night***," to which Staley responded "***It was fun***. And great to see you with so many friends. […]"
- On January 22, 2011, it appeared Staley visited Epstein's island in the Virgin Islands. Epstein wrote to Staley: "You are welcome to use jetskis snorkels movies boats [sic]"; then "Atv's jet skis use the island, full gym up and running [sic]." Epstein then asked, "did you like the

kitchen," to which Staley responded: "Terrific. Lots of workers. What a paradise. ***When I retire, I'm going to put a mooring in front of your dock for my boat***. Amazing place…"

- On March 5, 2011, Staley emailed Epstein: "[We] were talking tonight about what you have meant to me . . . You have paid a price for what has been accused. ***But we know what u have done for us. And we count you as one of our deepest friends. And most honest of people***. Thanks, Jes"

- On August 23, 2012, Staley emailed Epstein: "***I can't tell you how much your friendship has meant to me***. Thank you deeply for the last few weeks. All will be fine. […] ***To my most cherished friend***, Jes."

- On December 31, 2012, Staley emailed Epstein: "I've tried calling a few times, even though the service in [location] is pretty spotty. ***Thanks for all the friendship this year***. You were enormously kind and supportive. All looks good for next year. ***More freedom, more deals, more building, more things we can do together***. Say hi to everyone. Happy New Year, Jes."

113. Defendants' possession of these documents and the dishonest concealment of the facts these documents establish contradicted Defendants' public and false assurances to investors about the nature of the relationship between Staley and Epstein (¶¶69-72), the confidence that the Barclays Board had professed in Staley even after reviewing the emails (¶69), and the assertions that Barclays was cooperating with its regulators in their investigations (¶¶70-71).

114. Together, the FCA Decision and the reprinted emails substantiate, contextualize, and confirm what had not been previously publicly disclosed: a years-long, close, personal friendship between Staley and Epstein – one that Staley, as Barclays' CEO, and thereby Barclays, misrepresented, denied, concealed, and dishonestly delayed the publication of its truth. Likewise, because Higgins, as

Barclays' Chairman, had reviewed the emails in the course of the Board's internal investigation in early 2020, his knowledge of the truth that contradicted Barclays' public statements and was concealed and dishonestly delayed from disclosure is imputed to Barclays.

115. With the imprimatur of the U.K.'s financial regulator, the October 12, 2023 publication of the FCA Decision presented the timeline and detailed analysis of this evidence that makes clear that: (i) the true nature of the relationship was more than professional or short-lived but rather personal and close; and (ii) Barclays' possession of these emails by January 2020 gave Higgins (and therefore Barclays), independent knowledge of the true nature of Staley and Epstein's relationship and the facts undermining the veracity of both the misleading ***private*** statements made in Barclays' October 8, 2019 letter to the FCA and Barclays' ***public*** misstatements.

116. The publication of the FCA Decision and its specific findings in the section titled "Mr Staley's knowledge" also made clear to the investing public that Barclays, and Staley, while he was still CEO and speaking on behalf of Barclays, had falsely assured investors that Barclays had done a review of its records and cooperated with regulators (*see* ¶¶69-72). Thus, Staley (and accordingly, Barclays) knew that he had misrepresented the nature of the relationship to the FCA in the October 8, 2019 letter and to the public.

> ***Mr Staley must have known at that time [of the October 8 letter] that he had been in contact with Mr Epstein with respect to (i) Mr Staley's potential appointment as CEO of Barclays and (ii) press enquiries in***

> ***connection with that appointment and regarding his relationship with Mr Epstein*** . . . .
>
> As is clear from the chronology of their relationship summarised in Annex B, the emails provide ample evidence of social and personal interactions between Mr Staley and Mr Epstein, and include several emails from Mr Staley referring to the closeness of their friendship.

117. Though Barclays had received the email cache by January 2020, providing strong evidence of the close relationship between Epstein and Staley, neither Staley, Higgins, nor Barclays, ever publicly corrected their public misstatements, which gave the same misperception, that Epstein and Staley's relationship was not close and merely professional, that was made in the October 8, 2019 letter. Barclays knew of, but concealed, the content of the email exchanges between the two men, knowing that the emails were inconsistent with the representations that both Staley and Barclays had made to the public.

118. The FCA Decision went even further concluding that Staley's contributions to and approval of the October 8, 2019 letter, including his failure to correct the inaccurate statements, were "not inadvertent":

> Mr Staley's failure to correct the statements ***cannot reasonably be described as inadvertence, carelessness or negligence***. He was expressly asked to consider whether the language used was fair and accurate, and he had the benefit of discussing the Letter with Senior Executive A. . . .
>
> Further, the Authority considers that the fact that Mr Staley did not accurately set out the nature and extent of his relationship with Mr Epstein to Barclays in October 2015, and subsequently in 2019, supports its conclusion that ***Mr Staley's approval of the Letter containing the misleading statements was not inadvertent, careless or negligent.***

119. The truth concerning those statements in the October 8, 2019 letter, which were made on behalf of both Staley and Barclays, was dishonestly concealed and not revealed until the publication of the FCA Decision.

120. With respect to articulating the specific support for its conclusions, the FCA found "inaccurate and consequently, misleading" the statement that Staley "'confirmed to us [Barclays] that he did not have a close relationship with Mr Epstein.'" To establish the statement's inaccuracy, the FCA pointed to the "[e]mail communications from Mr Staley to Mr Epstein [that] refer to the strength of their friendship"; Staley's visit to Epstein in Florida "during his prison sentence"; Staley's visits to various of Epstein's residences, including his ranch in New Mexico and his island in the U.S. Virgin Islands, which the FCA found "were for no obvious business or professional purpose"; Epstein's advice to Staley's daughter on her graduate work, which Staley characterized as "'the gift of great friendship'"; and Staley confiding with Epstein "on significant matters" relating to Staley's career, including the "'very confidential'" approval by Barclays' Board of Staley's appointment as CEO.

121. Although the letter said that Staley's "'last contact with Mr Epstein was well before he joined Barclays in 2015,'" the FCA pointed to emails between Staley and Epstein in October 2015 discussing his appointment as CEO, as well as Staley's visit to Epstein's island in the U.S. Virgin Islands in April 2015.

122. In reaching its conclusion to impose a penalty of £1.8 million on Staley and ban him from senior management positions in the financial sector, the FCA considered the fact that Staley had previously been subject to regulatory action by the FCA and the PRA. In 2018, the FCA and PRA had imposed a total financial penalty of £642,400 on Staley for his actions in response to a whistleblower letter relating to the hiring process for a senior employee at Barclays. The FCA found that while the prior regulatory action was unrelated to its Staley-Epstein investigation, it denied that the 2018 action had no relevance because "Staley's reckless failure to

correct the misleading statements in the [October 2019] Letter occurred only a year after" the prior sanction. "As a consequence of that regulatory action" in 2018, the FCA "would have expected Mr Staley to have been particularly careful to ensure that the Letter was factually accurate."

123. Instead, Staley approved the October 8, 2019 letter, which contained statements the FCA considered to be "clearly misleading."

124. As a result, the FCA determined that Staley had failed to comply with FCA rules governing the conduct of senior managers for firms like Barclays. Specifically, the rules violated were:

- Individual Conduct Rule ("ICR") 1: "You must act with integrity."
- ICR 3: "You must be open and cooperative with the FCA, the PRA and other regulators."
- Senior Manager Conduct Rule 4: "You must disclose appropriately any information of which the FCA or PRA would reasonable expect notice."

125. Also on October 12, 2023, Barclays issued a press release on the FCA Decision's findings regarding Staley. In it, Barclays stated:

> The [FCA Decision] finds that Mr Staley acted recklessly in approving a letter dated 8 October 2019 from Barclays to the FCA regarding his relationship with Jeffrey Epstein (which the RDC [Regulatory Decisions Committee] concluded was misleading) and, by doing so, that he breached Individual Conduct Rule 1 (acting with integrity), Individual Conduct Rule 3 (being open and cooperative with regulators) and Senior Management Conduct Rule 4 (disclosing appropriately information of which the FCA or PRA would reasonably expect notice).

126. The October 12, 2023 press release by Barclays also disclosed the decision by the Board's Remuneration Committee: "Following consideration of the

detailed findings in the [FCA Decision] and the information referred to in it," the Committee concluded that Staley was "ineligible for or [would] forfeit a number of awards." As identified in the press release, these awards were:

- his bonus award in respect of the 2021 performance year.
- his unvested LTIP awards that were still subject to performance conditions, with a face value of £14.3m, and other unvested LTIP awards for which the performance conditions had already been assessed, with a face value of £1.4m.
- his other unvested deferred bonus awards from earlier years. These awards had a face value of £2.1m, which was reduced to zero through the application of 'malus'.

According to the press release, "[t]he total value of the lapsed LTIP awards and forfeited deferred compensation awards was £17.8m."

127. On this news, the price of Barclays ADRs fell $0.39 per ADR, or 4.99%, to close at $7.43 per ADR on October 12, 2023, economically damaging investors. Also on this news, the price of Barclays ordinary shares fell £4.90 per share, or 3.12%, to close at £152.28 per share on October 12, 2023.

128. The declines in the price of Barclays Securities after the corrective disclosures came to light were the direct result of the revelation of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages suffered by Plaintiffs and the other Class members, was a direct result of Defendants' misstatements, omissions, and delay in revealing the truth, and the subsequent significant decline in the value of Barclays Securities when Defendants' misrepresentations and other fraudulent conduct were revealed.

## IX. NO SAFE HARBOR

129. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged. Certain of the statements herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements, including because the circumstances about which such cautionary language warned had in fact already occurred.

130. To the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew or had actual knowledge that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Barclays who knew that the statement was false when made.

## X. RELIANCE

### A. Applicability of Presumption of Reliance for U.S. Securities Laws Claims

131. Plaintiffs and the other members of the Class will rely, in part, upon the presumption of reliance established by the fraud-on-the-market presumption of reliance in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) Barclays ADRs traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Barclays ADRs; and

(e) Plaintiffs and the other members of the Class purchased Barclays ADRs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts began to be disclosed, without knowledge of the misrepresented or omitted facts.

132. At all relevant times the market for Barclays ADRs was an efficient market for the following reasons, among others:

(a) Barclays met the requirements for listing, and was listed and actively traded on the LSE, an efficient and automated market, in the form of ordinary shares;

(b) Barclays ADRs met the requirement for listing, and were listed and actively traded on the NYSE, an efficient and automated market;

(c) Barclays ADRs were sponsored by the Company and represented Barclays ordinary shares, which were listed and actively traded on the LSE, a highly efficient and automated market;

(d) According to the Company's 2023 Annual Report, there were nearly 15.2 billion Barclays ordinary shares and 185.3 million ADRs issued and outstanding, held by thousands of nominees, individuals, and institutional investors, representing a very broad and active trading market;

(e) Barclays regularly communicated with investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(f) Barclays filed periodic public reports with the SEC and published such reports on the RNS;

(g) Barclays was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(h) Unexpected material news about Barclays was rapidly reflected in and incorporated into the prices of Barclays Securities during the Class Period.

133. Because Barclays is a publicly traded company, Defendants knew, understood, and had reason to expect that: (i) their misstatements would artificially inflate the price of Barclays Securities; (ii) investors would rely on the prices of Barclays Securities as reflecting accurate information known to Barclays and its principals; and (iii) their misstatements and omissions would induce Plaintiffs and/or their agents and other Class members to purchase Barclays ADRs during the Class Period.

134. As a result of the foregoing, the market for Barclays ADRs promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Barclays ADRs. Under these circumstances, all purchasers of Barclays ADRs during the Class Period suffered similar injury through their purchase of Barclays ADRs at artificially inflated prices, and a presumption of reliance applies.

135. Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose. Specifically, Plaintiffs are entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding Staley's close personal relationship with Epstein, Barclays' internal investigation thereof, and Defendants' lack of transparency with the FCA.

**B. Reliance for U.K. Securities Laws Claim**

136. Under English law, Plaintiffs and the Class need not demonstrate reliance to state a claim of dishonest delay.

## XI. PLAINTIFFS' CLASS ACTION ALLEGATIONS

137. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of: (i) all persons or entities who purchased or otherwise acquired Barclays ADRs on the NYSE in the United States during the Class Period; and (ii) all persons or entities who purchased or otherwise acquired on the LSE or continued to hold Barclays ordinary shares during the Class Period; and who were damaged thereby (collectively, the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

138. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE and LSE markets. Upon information and belief, these shares are held by thousands of geographically dispersed individuals and entities.

139. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. These common questions of law and fact include: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants violated U.K. statutory law; (iii) whether Defendants omitted and/or misrepresented material facts, and/or delayed the publication of information; (iv) whether Defendants knew or recklessly disregarded that their statements were false; (v) whether the prices of Barclays Securities were artificially inflated during the Class Period; and (vi) the extent of and appropriate measure of damages.

140. Plaintiffs' claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of securities laws in the United States and the United Kingdom that is complained of

herein. Prosecutions of individual actions would create a risk of inconsistent adjudications.

141. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

142. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of §10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants**

143. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

144. This Count is brought by the Teamsters Funds on behalf of themselves and the Class.

145. This Count is brought against all Defendants.

146. During the Class Period, each of the Defendants named in this Count disseminated or approved the statements as specified above in ¶¶53, 69-72, 74-75, 77-79, 83, 86-89, 94, and 98, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made not misleading.

147. Defendants named in this Count violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Barclays ADRs during the Class Period.

148. Defendants, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce, and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Barclays' business and operations as specified herein.

149. By virtue of their positions at Barclays, the Individual Defendants, whose knowledge and/or recklessness is imputed to Barclays, had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class; or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to them. Said acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

150. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the officers and/or directors of Barclays, the Individual Defendants had knowledge of the details of Barclays' internal affairs.

151. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the

statements of Barclays. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Barclays' businesses and operations.

152. During the Class Period, Barclays ADRs were traded on an active and efficient market. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Barclays ADRs was artificially inflated during the Class Period. At the time of the purchases and/or acquisitions by the Teamsters Funds and the Class, the true value of Barclays ADRs was substantially lower than the prices paid by the Teamsters Funds and the other members of the Class. Had the Teamsters Funds and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. The market price of Barclays ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of the Teamsters Funds and Class members. In ignorance of the falsity of Barclays' statements, the Teamsters Funds and the other members of the Class purchased or otherwise acquired Barclays ADRs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

153. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

154. As a direct and proximate result of these Defendants' wrongful conduct, the Teamsters Funds and the other Class members suffered damages in connection with their Class Period transactions in Barclays ADRs.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against All Defendants

155. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156. During the Class Period, Defendants, during the time they held their positions at Barclays, participated in the operation and management of Barclays, and conducted and participated, directly and indirectly, in the conduct of Barclays' business affairs. Because of their senior positions, they knew the adverse non-public information about Barclays' business as alleged herein.

157. As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to Barclays' operations, and to correct promptly any public statements Barclays issued that had become materially false or misleading.

158. Barclays had the power to control and influence the other Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Barclays had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Defendants, including the content of their public statements.

159. Because of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Barclays disseminated in the marketplace during the Class Period concerning Barclays' business and operations. Throughout the Class Period, Defendants exercised their power and authority to cause Barclays to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of Barclays within the meaning of §20(a) of the Exchange Act. In this

capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of Barclays ADRs.

160. Each of the Defendants, therefore, acted as a controlling person of Barclays. By reason of holding positions as officers and/or directors of Barclays, each of the Defendants had the power to direct the actions of, and exercised the same to cause, Barclays to engage in the unlawful acts and conduct complained of herein. Each of the Defendants exercised control over the general operations of Barclays and possessed the power to control the specific activities which comprise the primary violations about which the Teamsters Funds and the other members of the Class complain.

161. By reason of the above conduct, Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Barclays.

## COUNT III

### For Violations of Section 90A of the Financial Services and Markets Act of the United Kingdom Against Barclays

162. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163. This Count is brought pursuant to Section 90A of the FSMA, as amended by the Companies Act of 2006 and the FSMA 2000 (Liability of Issuers) Regulations 2010 (2010/1192), and Schedule 10A of the FSMA against Barclays seeking damages in relation to St. Louis Firemen's and the Class's acquisition and/or retention of Barclays ordinary shares during the Class Period.

164. Barclays, as an issuer of securities to which Schedule 10A applies, dishonestly delayed the publication of information (within the meaning of paragraph 5 of Schedule 10A), including in reports and statements published in response to provisions implementing Articles 4, 5, and 6 of Directive 2004/109/EC of the Transparency Obligations Directive of December 31, 2004, in its preliminary statements pertaining thereto, and as further set out herein.

165. Barclays' obligation to publish arose from (1) the EU Market Abuse Regulation (Regulation No 596/2014/EU) ("MAR") Article 17(1), requiring an issuer to inform the public as soon as possible of inside information that directly concerns the issuer; and (2) the FCA's Disclosure and Transparency Rules ("DTR"), requiring under DTR 4.1.8R that Barclays provide in its management report (which is included in its audited financial statements) a description of the principal risks and uncertainties facing the issuer, and under DTR 4.1.11R that Barclays indicate any important events that occurred since the end of the financial year.

166. One or more of the Individual Defendants, in discharging their managerial responsibilities on behalf of Barclays, acted dishonestly in delaying the publication of information regarding Staley's close relationship with Epstein, Barclays' knowledge thereof, and Barclays' knowledge that it had sent a misleading letter regarding Staley's relationship with Epstein to the FCA.

167. This delay in publishing information and failure to correct the representations made in the letter to the FCA was regarded as dishonest by people who regularly trade on the securities market in question. Furthermore, such conduct was regarded as "reckless[]," "a lack of integrity," and "a very serious failure of judgment" by the FCA.

168. One or more of the Individual Defendants, as alleged herein, was aware (or must be taken to have been aware) that such a delay was regarded as dishonest.

169. St. Louis Firemen and the Class made a decision to acquire shares in the market at the inflated price at which they were in fact acquired. Had St. Louis Firemen and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

170. St. Louis Firemen and the Class have suffered losses with regard to their purchase and retention of Barclays ordinary shares as a result of the dishonest

delay in publishing truthful information regarding Staley and Barclays' knowledge thereof.

171. By reason of the foregoing, Barclays is liable to St. Louis Firemen and the Class for compensation as provided by Section 90A of the FSMA 2000, as amended.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action is a proper class action, and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: July 24, 2025

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
HADIYA K. DESHMUKH
SHAO-JIA CHANG

s/ Shawn A. Williams

SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
schang@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
MICHAEL A. TRONCOSO
DANIELLE S. MYERS
ASHLEY M. PRICE
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

Lead Counsel for Lead Plaintiff