1  Adam S. Paris (SBN # 190693)
   (parisa@sullcrom.com)
2  SULLIVAN & CROMWELL LLP
   1888 Century Park East
3  Los Angeles, California 90067
   Telephone:    (310) 712-6600
4  Facsimile:    (310) 712-8800

5  Jeffrey T. Scott (*pro hac vice*)
   (scottj@sullcrom.com)
6  Matthew J. Porpora (*pro hac vice*)
   (porporam@sullcrom.com)
7  SULLIVAN & CROMWELL LLP
   125 Broad Street
8  New York, New York  10004
   Telephone:    (212) 558-4000
9  Facsimile:    (212) 558-3558

10  [ADDITIONAL COUNSEL ON BRIEF]

11  *Attorneys for Defendants Barclays PLC*

12

13                **UNITED STATES DISTRICT COURT**

14                **CENTRAL DISTRICT OF CALIFORNIA**

15

16  STEPHEN MERRITT, Individually and          )    Case No. 2:23-cv-09217-MEMF-KS
17  on Behalf of All Others Similarly          )
    Situated,                                  )    **DECLARATION OF MARTIN MOORE**
18                                             )    **K.C. IN SUPPORT OF BARCLAYS**
                   Plaintiff,                  )    **PLC'S MOTION TO DISMISS THE**
19                                             )    **SECOND AMENDED COMPLAINT**
               v.                              )
20                                             )
    BARCLAYS PLC, JAMES E.                     )
21  STALEY, and NIGEL HIGGINS,                 )    Hearing Date:  November 13, 2025
22                                             )    Hearing Time:  10:00 A.M.
                                               )    Courtroom:  8B
23                 Defendants.                 )    Judge:  Hon. Maame Ewusi-Mensah
                                               )    Frimpong
24                                             )
25                                             )
26  _____     )

27

28

## I.    Introduction

1.    I am a barrister in private practice in London. I was called to the Bar of England and Wales in 1982 and, on completion of my pupillage, became a member of Erskine Chambers in 1983. Erskine Chambers, a set of Barristers Chambers, is widely regarded as the foremost company law Chambers in England and Wales. I was appointed Queens Counsel (now Kings Counsel) in 2002.

2.    During the course of my practice as a barrister, I have focused on company law litigation and advice, corporate finance, mergers and acquisitions, financial services, insolvency and corporate reorganisations. I have extensive experience advising companies ranging in size from major multinational public companies to small family companies.

3.    As I have become more senior, however, the focus of my practice has moved firmly toward acting for public limited companies, more often than not companies whose securities are publicly traded. I am competent to make this Declaration, and I make this Declaration based on my personal knowledge of the matters recited herein.

4.    Exhibit 1 hereto includes a true copy of my profile maintained on Erskine Chambers' website and extracts from Chambers UK Bar Guide 2025 published by Chambers & Partners (by whom I was named Company & Insolvency Silk of the year in 2016 and 2024) and The Legal 500 2025 published by Legalease. Exhibit 2 comprises copies of the statutory materials and cases referred to in this Declaration.

5.    I have been asked by Sullivan & Cromwell LLP, attorneys acting for Barclays plc (**Barclays**) and Nigel Higgins (**Mr Higgins**), to provide this Declaration on aspects of English securities law in so far as it applies to the Second Amended Class Action Complaint filed against Barclays, James E. Staley (**Mr Staley**) and Mr Higgins (the **Amended Complaint**). Whilst I do not understand it to be necessary or appropriate for me to analyse or evaluate in detail the factual allegations in the Amended Complaint, I have read the Amended Complaint and I am familiar with its contents. I summarise my understanding of the allegations which are salient to this Declaration below.

6.      It is an important requirement of the court in England and Wales that persons giving expert evidence owe their duties to the court to which their evidence is to be tendered and not to the party appointing them. Regardless of whether such a requirement exists in the United States District Court, I have made this Declaration on the same basis as I would were it made in English proceedings.

7.      Given my practice it is inevitable that I would have acted in a professional capacity for entities within the Barclays Group on discrete points of company law, and over the years I have done so. Most recently, I have advised Barclays (and another bank) on issues relating to the removal of the bankers' bonus cap and I was recently jointly instructed by Tesco Personal Finance plc and Barclays Bank UK plc (**Barclays Bank**) in relation to a banking business transfer under Part VII of the Financial Services and Markets Act 2000 (**FSMA**) which was sanctioned by the High Court on 17 October 2024. Besides producing this Declaration (and my two prior Declarations in this matter), I have no current engagements for Barclays or Barclays Bank.

8.      Prior to that, in 2018-2019 I acted for Barclays Bank in relation to a banking business transfer under Part VII of FSMA which was sanctioned by the High Court on 29 January 2019. In 2016-2018 I acted for four major British banks, including Barclays Bank, in relation to their ring-fencing transfers under Part VII of FSMA which in the case of Barclays Bank was sanctioned by the High Court on 9 March 2018. None of these matters relate (or related) to the subject matter of these proceedings nor the issues on which I express my views in this Declaration.

9.      I have previously given expert evidence for Barclays in proceedings in the Supreme Court of New York, New York County in the case of *Ezrasons, Inc v Rudd et al.*, Index No. 656400/2020.

10.     I would respectfully suggest that these engagements do not prevent me from complying with my obligations of independence of which, as I have said at paragraph 5 above, I am very mindful.

## II.    Background

11.    I have given two Declarations in this matter to date. My First Declaration, dated 30 October 2024, concerned aspects of English securities law in so far as they applied to the Amended Class Action Complaint dated 12 August 2024 (the **Original Complaint**). My Second Declaration, dated 28 February 2025, responded to the Declaration of Adam Kramer KC dated 16 January 2025 (the **Kramer Declaration**).

12.    Since then, I understand that the Court has delivered a decision dated 24 June 2025 (the **Decision**), in which it concluded that the s. 90A claim was insufficiently pleaded, but granted the plaintiff (**St Louis Firemen**) leave to amend. I return to the Decision in Section VII below.

13.    I have been provided with a copy of the Second Amended Complaint (**Amended Complaint**), which I address in further detail in Section VII below. At this stage, it is important only to note two points. First, I understand that the St Louis Firemen no longer allege that Barclays is liable in respect of untrue or misleading statements or omissions – the case is now founded only upon an alleged delay in publication. Secondly, as foreshadowed in the Decision, the Amended Complaint contains several amendments in relation to the delayed publication case. These are addressed below.

14.    In these circumstances, I have been asked by Sullivan & Cromwell LLP to address the following as a matter of English law:

(a)    an overview of the statutory regime for claims under s. 90A of FSMA;

(b)    the legal requirements of a claim of delay in publication under s. 90A of FSMA;

(c)    whether, in my opinion, an English court would allow the claim of delay in publication pleaded in the Amended Complaint to proceed;

(d)    the availability of domestic class action procedures, highlighting particular features of that landscape which may be relevant to the availability (and utility) of class action procedures for s. 90A claims in England and Wales; and

(e)     whether, in my opinion, the decisions of a United States court in a claim under s. 90A of FSMA, litigated by way of 'opt-out' class action, would be enforceable in England and Wales against a putative class member.

15.     Those questions overlap to some degree with those addressed in my First and Second Declarations. However, they are in certain respects narrower – for example, because there is no longer a claim of untrue/misleading statements or omissions – and in other respects broader. Accordingly, and for ease of reference, I set out my views *de novo* in this Declaration – with the consequence that, in several places, I repeat the points I made in my First and Second Declarations.

**III.     Summary of Conclusions**

16.     In summary, my conclusions are as follows:

(a)     In introducing the s. 90A regime, a careful balance was struck between (on the one hand) providing a remedy to those investors who rely upon fraudulent misstatements and omissions and thereby suffer losses and (on the other) a desire to avoid unnecessarily extending the scope of duties to investors and third parties. One important way in which that balance was struck was by incorporating a requirement in the case of misstatements and omissions to establish individual reliance: see **Sections IV** and **V** below, which summarise the background to the statutory regime and the regime itself – so far as it applies to misstatements and omissions.

(b)     Of the three bases of liability under s. 90A, delay in publication is the most uncertain. The purpose of introducing liability for dishonest delay was to plug a gap in liability; it is intended to apply to publications which are accurate but late. A claimant will need to show that the issuer was subject to an obligation to publish information within a particular time frame; that the required information was not in fact published until a later date; and that a person discharging managerial responsibilities within the issuer (**PDMR**) acted dishonestly *in delaying* the publication of the information: see **Section VI** below.

(c)     I respectfully agree with the Court's summary in its Decision of the relevant legal principles applying to delay claims. I do not consider that the amendments made to the Original Complaint remedy the defects identified in the Decision. As just one example, the Amended Complaint does not identify a later publication which was required to be published earlier: see **Section VII** below.

(d)     The approach to litigating securities claims differs significantly between the US and England and Wales. While the US supports opt-out class actions as a central mechanism for investor redress, England and Wales has not followed suit. Among the limited number of s. 90A claims that have been brought in England and Wales, so far as I am aware all have proceeded by way of ordinary multi-party proceedings. The only s. 90A claim of which I am aware that was brought by way of opt-in representative proceedings was successfully struck out by the Court on the grounds that it was not the appropriate procedure by which to bring the claim.[1] I am not aware of any s. 90A claim that has been permitted to proceed by way of representative proceedings, whether on an opt-out basis, or otherwise. This evidences and reinforces a deliberate policy choice in England and Wales to restrict the mass litigation of securities claims. I see no compelling reason why the English court would deviate from the current approach: see **Section VIII** below.

(e)     There is considerable uncertainty as to whether the decision of a United States court in favour of the defendant in respect of a claim under s. 90A of FSMA, and litigated by way of 'opt-out' class action, would be enforceable in England and Wales against a putative class member. Whilst there is no English authority directly on point, I consider that – at least as regards the putative class member who does not sufficiently and voluntarily participate in the US proceedings, which includes simply failing to opt out – it would not be: see **Section IX** below.

---

[1] Upheld on appeal in *Wirral Metropolitan Borough Council v Indivior Plc* [2025] EWCA Civ 40.

DECLARATION OF MARTIN MOORE K.C.

**IV.    The Background to the Statutory Regime**

**A.      History**

17.    Section 90A and Schedule 10A of FSMA make provision for the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of an untrue or misleading statement or dishonest omission in certain published information relating to the securities, or a dishonest delay in publishing information. They put on a statutory footing, and in some respects modify, the common law of deceit (or fraudulent misrepresentation, as it is also known) as it applies to issuer publications.

18.    Historically, English law provided no remedy for inaccurate statements in information simply by reason of their disclosure to the market by issuers. Section 90A was introduced in 2006 in order to ensure that English law met the requirements of the 2004 Transparency Directive of the European Union (the **Transparency Directive**).  The Explanatory Note to the legislation which introduced it explained that no issuer had at that time been found liable for damages under English law in respect of statements made in narrative reports or financial statements. That stood in contrast to liability for misstatements and omissions in prospectuses, which was first introduced in 1890 and now appears in s. 90 of FSMA.

19.    When s. 90A was introduced in 2006 it was what has been described as a "*stop-gap solution*" in order to ensure that UK law met the requirements of the Transparency Directive. Following its introduction in 2006, there was time for further enquiry and consideration of whether a more extensive regime was appropriate.

20.    A review of s. 90A was then commissioned by the government and undertaken by Professor Paul Davies KC, a pre-eminent company law academic. Professor Davies produced a discussion paper in March 2007 (the **Davies Discussion Paper**), followed by a final report in June 2007 (the **Davies Final Report**). Thereafter, in line with Professor Davies' recommendations, a number of (fairly modest) extensions to s. 90A were proposed and ultimately enacted by the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010. The substantive provisions now appear in

Schedule 10A of FSMA. Section 90A simply cross-refers to those provisions in Schedule 10A.

**B.    Purpose**

21.    As the Explanatory Notes made clear at [1643][2], s. 90A was designed to ensure that the scope of potential liability was kept within reasonable bounds. Those comments were directed to s. 90A in its original form in 2006 but are equally apposite to the regime as amended in 2010. It was noted that:

*"In particular, the Government was anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties, in order to protect the interests of company members, employees and creditors."*

22.    As will be seen below, the requirements to establish fraud[3] or dishonesty[4] and reliance significantly curtail the range of circumstances in which s. 90A and Schedule 10A give rise to liability. The restrictive nature of the regime is inextricably linked to two factors, in particular.

23.    First, as regards the interests of company members generally, Professor Davies explained:

*"It can also be argued that, for long-term only investors, the financial benefits of being able to sue for damages may be small, if their position is looked at over time. They are as likely, it might be said, to be among the shareholders in the issuer which has made the misleading statement as among the investors who were misled. They benefit in the latter capacity but lose out in the first. Over time, their financial position may not be significantly different if they could not sue at all, except that they will have borne the transaction costs of the litigation. Thus, on both the compensation and deterrence fronts, the achievements of private litigation are limited."*

24.    Second, the statutory regime under s. 90A sits alongside public enforcement of the relevant disclosure rules. This is conducted largely by the Financial Conduct Authority (**FCA**), which has a range of enforcement mechanisms available to it, including, for example, powers to impose fines, to seek civil remedies from the High Court and to bring

---

[2] Explanatory Note to the Companies Act 2006, Schedule 13, Part 43, Section 1270 at [1643].

[3] I use the word "*fraud*" as shorthand for the mental element required in respect of a claim in respect of allegedly untrue or misleading statements.

[4] The applicable standard for claims in respect of omissions or delayed publication.

criminal prosecutions. The importance of those powers to the landscape of civil liability in the UK should not be understated. As Professor Davies noted when explaining his recommendation not to extend the legislation so as to cover negligence as well as fraud:

> *"...If private litigation were the only means of enforcing the negligence or due care standard, then one might want to accept these disadvantages of civil litigation in order to have effective enforcement in meritorious cases. The strategy I recommend thus relies on the continuing availability of public enforcement by the FSA. The primary role in securing the exercise of due care on the part of issuers in meeting their continuous disclosure obligations will continue to fall on the FSA..."[5]*

C.    **Limited Application by the English Courts**

25.    To date, only one s. 90A claim has reached a trial judgment: *Autonomy Corporation v Lynch* [2022] EWHC 1178. Autonomy concerned Hewlett-Packard's acquisition of Autonomy Corporation Plc in 2011, and is thought to have been one of the longest and most complex trials in English legal history.  The resulting judgment of 1315 pages on liability alone[6] is the leading, and in some respects the only, authority on s. 90A.[7] I consider aspects of the *Autonomy* decision in more detail later in this Declaration but note here that the court accepted that the Davies Report was relevant to the interpretation s.90A and that the court should not interpret and apply s. 90A in a way which exposes public companies and their shareholders to unreasonably wide liability.[8]

26.    There have also been a relatively small number of pre-trial hearings in respect of s. 90A claims. On 25 October 2024, Leech J handed down judgment in *Allianz Funds Multi-Strategy Trust and others v Barclays* [2024] EWHC 2710. Although this was not a judgment following a trial, it was a judgment on the merits, because Barclays applied,

---

[5] The Financial Services Authority (FSA) was the financial services regulator in the UK until 1 April 2013. The FSA was abolished by the Financial Services Act 2012 and its responsibilities split between two new regulators, the Financial Conduct Authority (FCA) and the Prudential Regulation Authority (PRA).

[6] The quantum judgment was subsequently delivered on 22 July 2025.

[7] The case concerned claims for misleading statements and omissions. The case did not concern claims for dishonest delay under paragraph 5 of Sch 10A FSMA, although the judgment touches upon the history of s. 90A and certain common elements which are of relevance to dishonest delay claims.

[8] *Autonomy* at [445].

successfully, for the summary disposal of the s. 90A claims brought by a number of claimants (the 'Category C Claimants'), as well as the dishonest delay claims brought by all claimants. The judgment in *Allianz* deals in considerable detail with the legislative background to s. 90A claims and with questions concerning reliance, as well as dishonest delay.

27.    Finally, on 25 March 2025, Michael Green J handed down judgment in *Various Claimants v Standard Chartered PLC* [2025] EWHC 698. As in *Allianz*, the bank applied for the summary disposal of certain of the claimants' claims, including all of the delay claims. In response, the claimants sought to challenge Leech J's analysis in *Allianz*. Michael Green J refused to dismiss the claims summarily – holding that they should proceed to trial. That conclusion was founded upon case management reasons, including (i) the need for a substantial trial on the merits, notwithstanding the summary disposal of certain of the claimants' claims; and (ii) the fact the bank's application was brought at an advanced stage of the proceedings when the case was already developed and moving towards trial – for example, disclosure had taken place and the parties had begun obtaining expert evidence, with preliminary reports already exhibited.[9] Furthermore, whilst expressing some doubts as to aspects of the reasoning in *Allianz,* Michael Green J held that, because the issues arising—including as to delay in publication – were developing areas of law, they should be determined on the basis of actual facts established at trial, rather than assumed or hypothetical facts.[10] I understand that, on 9 July 2025, Standard Chartered was granted permission to appeal the decision *Standard Chartered*. I do not know when that appeal will be heard.

**V.    The Statutory Regime**

28.    Section 90A and Schedule 10A are included in full in Exhibit 2. They establish three distinct bases of liability: **(i)** untrue or misleading statements, **(ii)** omissions and **(iii)** delayed publication. Because the St Louis Firemen no longer pursue claims in respect

---

[9] *Standard Chartered* at [10], [11] and [82].

[10] *Standard Chartered* at [79].

of untrue or misleading statements or omissions, I address those only by way of overview in this section. I address delayed publication in greater detail in Sections VI and VII below.

### A.    General Points Applicable to s. 90A

29.    Before summarising the elements of liability for untrue misleading statements and omissions, I should address three general points in relation to s. 90A—namely, the requirement of publication by recognised means, the requirement to prove fraud, and (so far as misstatement and omissions liability is concerned) the requirement to prove reliance.

### 1.    Information published by recognised means

30.    The first point is that liability under s. 90A can arise only in relation to information "*published*" by the issuer by "*recognised means*" (paragraph 2(1)(a)) or "*by other means where the availability of the information has been announced by the issuer by recognised means*": paragraph 2(1)(b).

31.    The term "*recognised means*" is defined by paragraphs 2(3) and 2(4). It is a "*service used for the dissemination of information in accordance with transparency rules*". Under rule 6 of the FCA's Disclosure and Transparency Rules (**DTR**), issuers are required to release regulated information to a regulatory information service (**RIS**) so that the information is disseminated to the market. An RIS is subject to regulatory approval by the FCA. The leading provider, which I understand was the provider used by Barclays, is Regulatory News Service (**RNS**).

32.    Publication by RNS constitutes publication by "*recognised means*" (within the meaning of paragraph 2(1)(a)). I explained in my First Declaration that statements in newspapers or on earnings calls would not qualify as publications by "*recognised means*". However, on the basis that the St Louis Firemen no longer pursue a case of untrue or misleading statements or omissions, that issue has now fallen away.

### 2.    Fraud/dishonesty

33.    So far as liability for untrue or misleading statements is concerned, s. 90A imposes liability only where a PDMR knew a statement to be untrue or misleading or was reckless as to whether it was untrue or misleading. This is the standard imposed by English law for the

tort of deceit (often referred to as "*fraud*"). As Professor Davies explained by reference to
the seminal case of *Derry v Peek* (1889) 14 App. Cas 337, it has been established since
1889 than an honest, even if unreasonable, belief in the truth of a statement prevents
liability in the tort of deceit in English law. Accordingly, an issuer may be liable for an
untrue or misleading statement if the PDMR knew it was untrue or misleading or was
reckless as to whether it was untrue or misleading. Professor Davies explained his
understanding that the English definition of fraud is narrower than the definition of fraud
imposed under s. 10b of the Securities Act 1934: paragraph 111 of the Davies Discussion
Paper.

34.    The Davies Final Report (at paragraph 9) rejected an extension of the deceit standard,
noting that imposing liability on a wider basis would be likely to cause issuers to become
more cautious, pushing them "*towards the less helpful and forthcoming end of the
spectrum*". Any overall gain to the market in terms of the accuracy of material released
would be "*likely to be outweighed by the loss in terms of the content of what would be
disclosed*".

35.    An issuer may be liable for an omission only if a PDMR "*knew the omission to be a
dishonest concealment of a material fact*" and may be liable for delayed publication only
if a PDMR "*acted dishonestly in delaying the publication of the information*". Pursuant to
paragraph 6 of Schedule 10, "*a person's conduct is regarded as dishonest if (and only if)
– (a) it is regarded as dishonest by persons who regularly trade on the securities market
in question, and (b) the person was aware (or must be taken to have been aware) that it
was so regarded*". I return to this below.

### 3.    Reliance

36.    Save in the case of dishonest delay claims brought under paragraph 5 of Schedule 10A,
the need for reliance upon the misstatement or omission in question is "*absolutely central
to the statutory form of action*" contained in Schedule 10A.[11] It is a significant and

---

[11] *Manning & Napier v Tesco plc* [2017] EWHC 3296 per Hildyard J at [29]. Cited in *Class
Actions in England & Wales* (2nd Ed) at 12-057.

deliberate limitation in the application of the statutory scheme. Paragraph 3 of Schedule 10A provides (emphasis supplied):

> "(1)    An issuer of securities to which this Schedule applies is liable to pay compensation to a person who -
>
>> (a) acquires, continues to hold or disposes of the securities *in reliance* on published information to which this Schedule applies…
>
> (4)    A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities –
>
>> (a)        *in reliance* on the information in question, and
>>
>> (b)    at a time when, and in circumstances in which, it was reasonable for him *to rely* on it."

37.    When pursuing a claim on the basis of an alleged misstatement or omission, a claimant must therefore establish that he:

(a)    acquired, held or disposed of the securities "*in reliance on published information to which [Schedule 10] applies*";

(b)    acquired, held or disposed of the securities "*in reliance on the information in question*"; and

(c)    did so at a time, and in circumstances in which, it was reasonable for him to rely on it.

38.    A claimant cannot claim merely on the basis that the market was distorted in some way by a misleading statement or improper omission. As is apparent from the language of the statute, he must show actual, individual reliance – and that such reliance was reasonable. English law does not recognise a "*fraud-on-the-market*" presumption of reliance. In the UK the protection of the integrity of the market (as opposed to individual investors) is in the hands of public bodies, largely the FCA. The FCA has been given various enforcement powers to do so and can, for example, apply to court for restitution orders where there has been a contravention of the DTRs or market abuse.

39.    By requiring reliance, the obvious inference is that Parliament's intention was to limit the remedy to those who had in fact relied on the statement. Whilst the provisions exist for investor protection the scope of the provisions involved a careful balancing act. As I

explain above (and in my First Declaration), s. 90A was designed to ensure that potential liability was kept within reasonable bounds; and it must be remembered that it is just one component of a wider securities regime in which the FCA carries out public enforcement of the relevant disclosure rules.[12] As emphasised in the amicus brief submitted on behalf of the United Kingdom Government before the Supreme Court in *Morrison v National Australia Bank* 561 US 247 (2010) these provisions are the result of reasonable and rational policy choices in the field of securities law which have been made by a sovereign state.

40. On the basis that the St Louis Firemen no longer pursue claims for misstatements or omissions, I need not delve any further into the question of reliance—which was previously addressed in more detail in my First and Second Declarations and in the Kramer Declaration. However, when considering the Amended Complaint and liability for delayed publication, it is important to keep firmly in mind the deliberate legislative choice to require individual reliance for misstatement and omission claims. As noted below, I consider it very unlikely indeed that the legislature would have intended to permit claimants to sidestep that requirement altogether by repackaging misstatement or omission claims as delayed publication claims.

**B.    Liability for untrue or misleading statements**

41. In order to establish liability for an untrue or misleading statement (Schedule 10A, paragraph  3) a claimant must establish four things.

42. <u>First</u>, the claimant must show an "*untrue or misleading*" statement in *"published information to which [Schedule 10A] applies*". I have addressed the "*published information to which [Schedule 10A] applies*" in paragraphs 30 – 32 above. Ascertaining whether a statement in the published information was untrue or misleading entails identifying the objective meaning of the statement in question.[13]

---

[12] Moore 1, paragraphs 24-26.

[13] *Autonomy,* at [460].

-13-

43.    Second, the claimant must show the requisite degree of fault, namely that a PDMR (defined above as a person discharging managerial responsibilities) "*knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading*".

44.    Third, the claimant must show reliance "*on published information*" and "*on the information in question*", at a time, and in circumstances in which, such reliance was reasonable: see paragraphs 36 – 39 above.

45.    Finally, the claimant must show loss suffered in respect of the securities as a result of the untrue or misleading statement.

## C.    Liability for Omissions

46.    In order to establish liability for an omission (Schedule 10A, paragraph 3) a claimant must similarly establish four things.

47.    First, the claimant must show an "*omission*" from that published information "*of any matter required to be included in it*". What information is "*required*" to be included in a publication is to be determined by reference to the disclosure obligations pursuant to which the publication is, or ought to have been, made.

48.    The onus is on the claimant to establish that disclosure of the allegedly omitted matter was "*required to be included*". As Hildyard J explained in Autonomy, this means "*mandated by applicable legislation or accounting standards*" in the relevant published information. In *Autonomy*, the question was whether the omitted disclosure was required by the relevant accounting standards to be disclosed: see, for example, the discussion of the disclosures required by IAS 18.35 at [1672] and following.

49.    Second, so far as fault is concerned, a claimant must show that a PDMR "*knew the omission to be a dishonest concealment of a material fact*". It follows that, in order for liability in respect of an omission to arise, the PDMR "*must have applied his mind to the omission at the time the information was published, and appreciated that a material fact was being concealed (i.e. that it was required to be included, but was being deliberately left out).*"[14]

---

[14] *Autonomy*, [469].

-14-

50.  Put another way, the PDMR must have had actual knowledge, at the time of the omission of the published information of (i) a material fact which (ii) he also knew was required to be disclosed but which instead (iii) was being "*concealed*".

51.  <u>Third</u>, in common with liability for misstatements, the claimant must show reliance "*on published information*" and "*on the information in question*", at a time, and in circumstances in which, such reliance was reasonable—in the sense I have explained above.

52.  <u>Finally</u>, and again in common with liability for misstatements, the claimant must show loss suffered in respect of the securities as a result of the omission.

**VI.  Delay in publication: legal principles**

**A.    The test**

53.  Of the three bases of liability under Schedule 10A, delay in publication is the most uncertain.[15]

54.  Paragraph 5 of Schedule 10A establishes liability for dishonest delay. It provides as follows:

> "*Liability of issuer for dishonest delay in publishing information*
>
> *5(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—*
>
> > *(a)  acquires, continues to hold or disposes of the securities, and*
> >
> > *(b)  suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.*
>
> *(2)   The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.*"

55.  In order to establish liability for delayed publication a claimant must therefore establish three things:

(a)  delay by the issuer in publishing information to which Schedule 10A applies;

---

[15] As I noted in my Second Declaration, I agree with Mr Kramer's assessment (at paragraph 83 of his First Declaration) that the law regarding delay is not fully settled and may continue to develop.

(b)     the requisite degree of fault: that a PDMR "*acted dishonestly in delaying publication of the information*"; and

(c)     that the claimant acquired, held or disposed of securities, and suffered loss in respect of the securities as a result of the delay.

56.     I address the first and second of those two requirements in the following sub-sections. I have not been asked to address the third question (loss and damage) in any detail at this stage. In that regard, the section provides that an issuer is liable to pay compensation to a person who (i) acquired, held or disposed of securities and (ii) suffered loss in respect of the securities "*as a result of*" the delay. This imposes a causation requirement: a defendant will only be liable for loss suffered "*as a result of*" the delay.

**B.     Delay in publication**

**1.     The purpose of liability for delay**

57.     It is clear from the Davies Discussion Paper which gave rise to the delay provision that it was intended to capture "*statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules*".[16] The separate provision dealing with omissions was thought not to be apt to cover such situations because (i) it contemplates liability only for omissions "*from the statement which is made…rather than liability for failure to make any statement at all*" and (ii) it is difficult to see how reliance (a critical component of liability for omissions) could be established in the period when no statement had been made.[17]

58.     The delay provision was therefore intended to capture a situation where the issuer "*deliberately withholds information in order to mislead the market and to create a false market in its securities*". The "*core case*" is one in which "*the information when published is true, but it is late in arriving*".[18]

---

[16] Davies Discussion Paper, paragraph 83.

[17] Davies Discussion Paper, paragraph 85.

[18] Davies Discussion Paper, paragraph 86-87.

59.   Paragraph 5 of Schedule 10A was introduced in 2010 in order to "*plug this gap in liability*".[19] It was designed to capture "*statements which were accurate but late*".[20] Where liability is founded upon delay in publishing information, there is no requirement for reliance.[21]

60.   It seems to me fundamental as a matter of statutory interpretation that, as Leech J found in *Allianz* at [141], the delay provision must be read so that it does not overlap with paragraph 3 (omissions liability) to such a degree that it would render it almost redundant in allowing claimants to advance an omissions case under paragraph 5 without the need to establish reliance. Having carefully calibrated the scope of liability for misstatements and omissions, it is very unlikely that the legislature would have intended to run a coach and horses through the legislation by permitting all or most claimants simply to recharacterise their claim as one of delay. As indicated below, it seems to me that that is the effect of the case that the St Louis Firemen seek to advance in this case.

### 2.    Establishing delay in publication

61.   In my view liability for delay will be engaged where: (i) the issuer was subject to an obligation to publish information by a particular date or within a particular timeframe (possibly a very short one) but (ii) that required information was not in fact published until a later date: see *Allianz* at [138], [138(3)] and [138(6)]:

62.   As to the first element, in *Allianz* Leech J stated (as *obiter dicta*) at [138(6)]:

> "...But if the DTR (or any other regulations) did not impose a duty on the Bank to publish that information on a RIS promptly or within a specified time period or at all, then there can be no liability for delay in publication either."

63.   The second element reflects a determinative finding of the Court in *Allianz*.[22] In that case, the claimants' dishonest delay claims were struck out on the basis that the claimants did not plead that the allegedly delayed material was later published. (As indicated below, a

---

[19] As accepted by Mr Kramer in Kramer at paragraph 76.

[20] Kramer, paragraph 76.

[21] Kramer, paragraph 77.

[22] As appears to be accepted by Mr Kramer in Kramer at paragraph 80.

1    claimant would also need to establish that the PDMR acted dishonestly in delaying the

2    publication, which would carry with it a requirement to establish that the PDMR knew of

3    the requirement to publish by the earlier date, and would also need to show that the loss

4    flowed from the delay in publication.)

5    64.    The delay provision would therefore capture a situation where an issuer deliberately

6         withholds publication of its annual report beyond the date which by law it must be

7         published (four months after the end of each financial year: DTR r. 4.1), and in doing so

8         creates a false market for the shares. As the editors of *Class Actions in England & Wales*

9         note at 12-047[23], it might for example also apply where an issuer delays in notifying the

10        markets of significant transactions (UK Listing Rules[24] r.7.3); related party transactions

11        (UK Listing Rules r. 8.2); an issuer's purchase of its own shares (UK Listing Rules r. 9.6);

12        and (iv) dealings in relevant securities transactions by major shareholders (pursuant to

13        DTR r.5.8.12R). Those examples illustrate how the provision has its own distinct role to

14        play, but they are very different from the present case.

15   65.    I do not think there can be any real doubt that the two elements I have described in

16        paragraph 61 above reflect the current law of England and Wales. *Allianz* was a decision

17        on the merits, which held that paragraph 5 of Schedule 10A entails later publication.

18        Although (as noted below) in the later *Standard Chartered* decision, Michael Green J

19        doubted some of the analysis of *Allianz*, he expressly did not refuse to follow *Allianz*.

20        Whilst he decided that the claims should proceed to trial—and, in doing so, dismissed the

21        Defendant's strike-out/summary judgment application—that was not on the basis that

22        *Allianz* was found to be wrong on the law but instead on the basis that:

         (a)    It is a developing area of law, such that the legal questions should be determined

23                on the basis of actual facts established at trial, rather than assumed or hypothetical

24                facts (at [79]).

25

26

---

27   [23] Grave et al, *Class Actions of England & Wales*, 2 Edn (2022, Sweet & Maxwell) at 12-047.

28   [24] UK Listing Rules Sourcebook, Release 49, July 2025.

-18-

(b)     There was going to have to be a long trial in any event, and much of the cost had been incurred (at [80] – [82]).[25]

66.    The *Standard Chartered* decision was an example of active case management of s. 90A claims which, as I cover in Section VII, is an integral part of the English courts' procedural approach to multi-party securities law claims.

67.    Accordingly, *Allianz* continues to represent the current law of England and Wales. It follows that a claimant alleging liability for delayed publication will be required to point to a publication and, further, to prove that the issuer was under an obligation to make that publication at an earlier date but delayed in doing so.

### 3.     Challenges to *Allianz*

68.    In the Kramer Declaration, Mr Kramer opined that the conclusion in *Allianz* does not reflect "*the only available sensible interpretation*" of the delay provision, and that the question of whether a later publication is required has not been considered at an appellate level.

69.    It is perhaps relevant to note that, because *Allianz* was a strike-out and summary judgment application, the defendant could succeed only if the claim was found to have no realistic prospect of success: *Allianz* at [94]. Moreover, the English court may decline to award summary judgment in an area of developing jurisprudence unless the claims are "*plainly and obviously bad (e.g. because there is no real prospect of the law developing sufficiently to enable the claim to succeed)*": *Allianz* at [95].

70.    It follows that, for his part, Leech J must have had a high degree of certainty that there is a requirement for later publication. That is also consistent with his decision (noted by Mr Kramer) to refuse permission to appeal: permission will be granted where the appeal has a real prospect of success or there is another compelling reason for the appeal to be heard.[26]

---

[25] Although these paragraphs of the judgment were concerned with the separate question of reliance, "*much the same reasons*" applied to the delay claims: see [117] and [119].

[26] *Allianz* will not be considered by the Court of Appeal as the whole case settled shortly after Leech J gave judgment.

71. That, of course, does not mean that another court could not reach a different view—and clearly Michael Green J in *Standard Chartered* thought that is at least a possibility—but I mention it to explain the standard to which Leech J was required to be satisfied by the argument.

72. Mr Kramer was right to point out that the delay provision is not an easy one. However, even leaving to one side the fact that the point has now been determined at least at first instance in *Allianz*, it seems to me as a matter of principle that *Allianz* is correct, and the alternative interpretation of paragraph 5 of Schedule 10A offered by Mr Kramer is unlikely to be correct – for essentially the reasons Leech J gave in *Allianz*.

73. First, and most importantly, *Allianz* seems to me to be correct as a matter of the language used in the legislation. As Leech J noted at [138], liability may arise under paragraph 5 only where the claimant suffers loss "*as a result of delay by the issuer in publishing information to which this schedule applies*". Pursuant to paragraph 2, the schedule applies only to "*information published by the issuer*" by recognised means or announced by recognised means. In other words, absent a publication, there is simply no gateway to Schedule 10A.

74. In *Standard Chartered*, Michael Green J doubted this analysis. At [103] he said:

> "*But I am not sure that Para. 2 requires publication in that sense. It also seems to me a little extraordinary that such an apparently straightforward condition of liability – that there has to have been a later corrective publication – was not clearly spelled out in Para. 5. It would be easy to do. If Parliament really intended this to be a condition, I do not think it would have been done in a roundabout way through Para. 2.*"

75. With respect to the judge, I confess that I find the first sentence of that paragraph rather Delphic. It is not clear to me in what other sense paragraph 2 may have required publication – and *Allianz* seems to me the correct interpretation of the language used in the legislation. As to the other point, I would certainly agree with the judge that paragraph 5 of Schedule 10A (as with many other legislative provisions) could have been more clearly expressed. However, I would make two points in that regard:

   (a)    First, it inevitably cuts both ways. It might equally be said that, if Parliament had intended that 'delay in publication' should include cases where there is no

publication at all, it would have said so expressly – *a fortiori* in circumstances where the corollary would be that all or most misstatement or omission cases could simply be recast as delay cases.

(b)   Second, I do not think that the interpretation of paragraph 5 found in *Allianz* to be correct involves any gloss on the language used ("*suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies*"). In my view, the language makes clear that the provision is concerned with loss arising as a result of belated publication, as distinct from – say – loss arising as a result of non-publication.

76.   Second, as again Leech J noted at [138(4) – (5)], his interpretation targets the mischief which delay liability was introduced to target, namely "*statements which were accurate but late*".[27]

77.   There was a dispute before Leech J in *Allianz*,[28] and again before Michael Green J in *Standard Chartered*,[29] as to the mischief at which delay liability was targeted—having regard to paragraph 85 of the Davies Discussion Paper. For my part I think it is clear (and common ground with Mr Kramer) that the provision was targeted at statements "*which were accurate but late*".[30] I expect there is little to be gained by further lengthening this report with a detailed textual analysis of the Davies Discussion Paper. But I think the point that Professor Davies was making in paragraph 85 is that where, for example, an issuer is under an obligation to file its annual report but delays in doing so and thereby creates a false market for its shares, that would engage delay liability but not omissions liability. It cannot engage omissions liability because (i) omissions liability necessarily entails a publication from which there is some omission, and thus would not apply where there no publication at all at the time when publication was required; and (ii) the disclosure that

---

[27] Davies Discussion Paper at paragraph 83.

[28] *Allianz,* at [138(5)].

[29] *Standard Chartered,* at [104] – [105].

[30] This is clear both from page 7 and paragraph 83, both of which make clear that the very question which Professor Davies was considering was whether there should be liability for statements which "*were accurate but late*".

was required to be made earlier was accurate, and thus was not false or misleading. I therefore agree with Leech J that paragraph 85 of the Davies Discussion Paper does not undermine his interpretation of paragraph 5 of Schedule 10A.

78. Third, liability for delay was introduced to "*plug a gap" in liability*. It cannot have been Parliament's intention that the delay liability would swallow up much of Schedule 10A and render liability for omissions redundant (*Allianz*, at [141] – [142]). It seems to me almost inevitable that, on Mr Kramer's alternative formulation, any claimant with an omission complaint would simply formulate it as a delay complaint and avoid the need to show reliance. Indeed, if neither of the two elements I have pointed to in paragraphs 62 and 63 above were required, there would be no check on liability at all. That cannot have been the intention of Parliament in seeking to "*plug a gap*".

79. In *Standard Chartered*, Michael Green J appeared to accept the premise of this argument, noting at [118]:

> *"I understand the point that the introduction of Para. 5 was intended to cover a quite narrow lacuna in issuer liability and that, as such, it should probably be construed to be quite confined in its reach, so far as possible…"*

80. However, he questioned the extent to which the publication requirement prevents the substantial overlap. At [111] – [112], he noted that there will remain cases of overlap and cautioned against the dangers of deciding points of interpretation based on hypothetical examples. However, it seems to me that, even if some room for overlap remains on Leech J's interpretation, that misses the more fundamental point, which is that, absent a requirement for later publication, *all* or almost all omissions cases would be capable of being recast as delay cases, which cannot in my view be correct.

81. Michael Green J also suggested (at [113]) that the requirement for later publication may act as a perverse incentive not to publish corrective information at all. That does not seem to me a significant consideration in circumstances where (i) the provision is designed to capture 'accurate but late' publications and (ii) where failures to publish corrective information will be enforceable as misstatements or omissions whenever the material in need of correcting was relied upon.

82.    Overall, if Mr Kramer (and the unsuccessful claimants in *Allianz*) were correct, liability for delayed publication would be very wide indeed, and certainly would appear to swallow up most, if not all, of the omissions regime. On the approach which he postulates, there is no need for any publication and, potentially no need even for any requirement to publish at a particular time. The only brake on liability is the requirement for dishonesty, which on his view, is simply to be left to the judge at trial. I do not think this can be correct. It is contrary to the clear approach of the High Court in *Allianz*, and is also contrary to the reports which preceded the introduction of liability for delayed publication, all of which make clear that liability for delayed publication is intended to 'plug a gap' and must be kept within reasonable bounds.

**C.    Fault**

83.    So far as fault is concerned, an issuer will be liable in respect of delay only if a PDMR "*acted dishonestly in delaying the publication of the information*".

84.    Whereas for omissions claims, the dishonesty must be as to the contents of a publication, for delay claims the dishonesty must relate to the delay or timing of the publication.[31]  In other words, for a dishonest delay claim the defendant must be dishonest as to the delay or timing of publication, whereas for omissions claims the defendant must be dishonest in the exclusion of content from the publication.

85.    The fault element of the dishonest delay was not addressed in *Allianz* or in any detail in *Standard Chartered*, and it is therefore a matter of possible controversy on which there is yet to be any judicial guidance. However, it seems to me that, in establishing that the PDMR acted dishonestly in delaying the publication of the information, a claimant would be required to show that the PDMR:

(a)    knew that the issuer was obliged to publish the information by a particular date or within a particular timeframe (possibly a very short one);

---

[31] See *Standard Chartered,* at [110]; see also Section 6 of the HM Treasury Consultation Paper 'Extension of the statutory regime for issuer liability' (July 2008), which refers to delay in relation to a publication, the necessary implication being the existence of a publication which was subject to delay.

(b)     nevertheless caused the issuer to publish the information at a later date; and

(c)     did so deliberately and dishonestly within the meaning of paragraph 6 of Schedule 10A.

86.     Mr Kramer disagreed, and fairly pointed out that under paragraph 5, unlike under paragraph 3(3) (omissions), there is no specified requirement of knowledge. Whilst it is correct that the requirements I have suggested do not appear on the face of the legislation, I cannot envisage a situation in which a PDMR could be held to have "*acted dishonestly in delaying*" publication without knowledge of the requirement to publish. That seems to me inherent in the concept of dishonest delay. Taking Mr Kramer's example in paragraph 103 of the Kramer Declaration, recklessly ignoring suspected corruption or false accounting might conceivably be regarded as dishonest; but I do not think it could fairly be described as "*acting dishonestly in delaying*" publication.

87.     As with omissions claims, a person's conduct will be dishonest for these purposes if and only if (i) it is regarded as dishonest by persons who trade on the securities market in question and (ii) the person was aware (or must be taken to have been aware) that it was so regarded: Schedule 10A, paragraph 6. The Court in *Autonomy* indicated that this standard is a codification of the common law test for dishonesty laid down in the criminal case of *R v Ghosh* [1982] 1 QB 1053 which required both an objective and subject standard.[32] This is a more exacting standard than that which English law now applies generally in assessing dishonesty, which, following *Ivey v Genting Casinos (UK) Ltd* [2018] AC 391, does not require the defendant to have been aware that his conduct was dishonest. Although Hildyard J referred to *Ivey v Genting Casinos* in *Autonomy* at [472], I do not read him to be suggesting that the *Ivey v Genting Casinos* standard applies to s.90A and Schedule 10A of FSMA, or that the standard under s. 90A and Schedule 10A

---

[32] The Court in *Ghosh* laid down the test for dishonesty which required consideration of two questions: (1) Was the defendant's conduct dishonest by the ordinary standards of reasonable people? (2) Did the defendant appreciate that this conduct was dishonest by those standards?

1    deviates from the twin requirements to which I have referred, and which are clearly spelled

2    out in the legislation.

3    88.    Although no English court has directly considered the issue, I do not believe that an

4    English court would equate recklessness with the dishonesty required to sustain a

5    dishonest delay claim. Put another way, a bare allegation of recklessness would not be

6    sufficient to substantiate a claim for dishonest delay. There are three points I would make

7    in that regard.

8    (a) First, whereas Schedule 10A expressly provides that liability for an untrue or

9        misleading statement may arise where a PDRM within the issuer "*was reckless as to*

10       *whether it was untrue or misleading*", it does not import the recklessness standard in

11       relation to liability for omissions or delayed publication.

12   (b) Second, in addressing concerns raised by issuers prior to the introduction of Schedule

13       10A, the UK government made clear that a "*requirement for recklessness would . . . be*

14       *insufficient*" because "*[t]here would be considerable uncertainty as to what delay*

15       *would be considered to be 'reckless' for these purposes*."[33] That supports the view that

16       the decision not to incorporate the recklessness standard was a deliberate, policy-

17       driven one: the legislature expressly adopted the then criminal standard in *R v Ghosh*,

18       which, the government explained, is a "*high evidential hurdle that claimants will have*

19       *to satisfy and thus reduces the possibility of opportunistic litigation*."[34]

20   (c) Third, one might conceivably regard as dishonest a PDMR who causes the issuer not

21       to make a publication in circumstances where he suspects a requirement to publish

22       exists and either does not care whether it should be published or deliberately does not

23       find out whether it should be published. But it does not necessarily follow in my view

24       that such a PDMR "*act[s] dishonestly in delaying*" publication. As a matter of

25       language, the reference to "*delaying*" publication seems likely in my view to entail a

---

[33] HM Treasury, Extension of the statutory regime for issuer liability (July 2008) at paragraph 6.6, cited in *Allianz* at [54].

[34] HM Treasury, Extension of the statutory regime for issuer liability: a response to consultation (March 2010) at paragraphs 7.11 and 7.13, cited in *Allianz* at [59].

1    deliberate act, carried out with knowledge that the publication is being "*delayed*" from

2    the time at which it should have been made.

3    89.   Rather, the dishonesty requirement in the context of a dishonest delay claim will generally

4    require a claimant to show that the PDMR deliberately delayed publication for the purpose

5    of inducing investors to acquire, or possibly dispose of, securities. This was the view of

6    the UK government, which agreed with Professor Davies that "*the definition of dishonesty*

7    *should focus on the purpose of the delay, and that civil liability should only be imposed if*

8    *the purpose, or the predominant purpose, fell within a prohibited category.*"[35]

9    90.   Dishonesty in this context is therefore, deliberately, a narrowly circumscribed concept;

10   and one which will generally entail a focus on the *purpose* of a deliberate delay in

11   publication.  Delay in order to obtain the full facts or even to permit the company to deal

12   more easily with the situation which had arisen would not give rise to liability.

13   **VII.   Delay in publication: application of legal principles**

14   **A.     The Court's Prior Decision in This Case**

15   91.   The Decision records the following at page 23:

16       "*...Nevertheless, the parties also do not dispute that the information that was*
         *delayed in being disclosed must have been ultimately published. As to this point,*
17       *the Firemen point to the press release issued in October of 2023 based on the*
         *FCA Decision. The Court notes that the 2023 Press Release is based specifically*
18       *on the FCA Decision, and thus could not have been disclosed earlier. FAC ¶¶*
         *111–12. Although the Court understands Plaintiffs' position to be that Defendants*
19       *knew what the FCA ultimately concluded earlier, as the 2023 Press Release is*
         *specifically based on the FCA's final determination and not on what Defendants*
20       *independently may have known, the Court finds that it cannot support a theory*
21       *of dishonest delay.*"

22

23   92.   On that basis, the Court concluded that Count 3 was insufficiently pleaded in the

24   Complaint but granted leave to amend.

25   93.   I respectfully agree with that articulation of the position as a matter of English law, which

26   makes clear, firstly, that there can be no liability without later publication and, secondly,

27   _____

28   [35] HM Treasury, Extension of the statutory regime for issuer liability (July 2008) at paragraph
     6.7, cited in *Allianz* at [54].

that where a publication could not have been disclosed earlier, the corollary must be that it was not delayed.

**B.    The Amended Complaint**

94.    In the Amended Complaint, the St Louis Fireman allege at paragraph 164 that Barclays:

"*...dishonestly delayed the publication of information...including in reports and statements published in response to provisions implementing Articles 4, 5, and 6 of Directive 2004/109/EC of the Transparency Obligations Directive of December 31, 2004, in its preliminary statements pertaining thereto, and as further set out herein.*"

95.    That claim is founded upon allegations at paragraphs 165 – 169 that:

(a)    Barclays' obligation to publish arose from the EU Market Abuse regulation (Regulation No 596/2014/EU) (**MAR**) Article 17(1) and the DTR rules 4.1.8R and 4.1.11R.

(b)    One or more of the Individual Defendants, in discharging their managerial responsibilities on behalf of Barclays, acted dishonestly "*in delaying the publication of information regarding Staley's close relationship with Epstein, Barclays' knowledge thereof, and Barclays knowledge that it had sent a misleading letter regarding Staley's relationship with Epstein to the FCA*".

(c)    This delay in publishing information and failure to correct the representations made in the letter to the FCA was regarded as dishonest by people who regularly trade on the securities market in question. Furthermore, such conduct was regarded as "*reckless[]*", "*a lack of integrity*" and "*a very serious failure of judgment*" by the FCA.

(d)    One or more of the Individual Defendants was aware (or must be taken to have been aware) that such a delay was regarded as dishonest.

(e)    The St Louis Firemen and the Class made a decision to acquire shares in the market at the inflated price at which they were in fact acquired. Had the St Louis Firemen and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

-27-

**C.    Analysis**

96.    In my First Declaration, I noted that, although the Original Complaint contained a bare assertion of dishonest delay, I had not been able to identify the basis for that allegation. As I explained, an English court would not in my view allow such a claim to proceed in the absence of an identified legal obligation to publish within a particular timeframe and (as *Allianz* shows) a plea that the required information was not published until a later date.

97.    Whilst several amendments have now been made to the Original Complaint, those amendments do not in my view remedy the defects in the delay claim. There are several points in that regard. Most importantly the Amended Complaint does not identify a later publication which could have been published earlier – the very defect identified in the Decision: see paragraphs 105 – 112 below.

98.    I address the requirements for delay liability in turn.

**1.    Delayed publication: obligation to publish**

99.    First, a claimant must establish that the issuer was subject to an obligation to publish information by a particular date or within a particular timeframe.

100.    It is now alleged in paragraph 165 of the Amended Complaint that Barclays' obligation to publish arose from Article 17(1) of MAR and DTR 4.1.8R and 4.1.11R. Whilst this provides the source of the alleged obligation to publish, the Amended Complaint does not identify **(i)** (at least with any precision) the information which it is alleged that Barclays was required to publish; or **(ii)** when that obligation is said to have arisen.

101.    Whilst the reading of the Complaint is a matter for the Court, and the relevant rules of pleading will be the procedural rules of the Court and not English law, these are matters which, as a matter of English law, would necessarily need to be clearly and distinctly pleaded.

102.    Without any articulation as to either what information it is alleged that Barclays was required to publish or when that obligation is said to have arisen, it is very difficult, if not impossible, to say whether there is a viable argument that there was indeed an obligation to publish. For example:

(a)    Article 17(1) of MAR provides that "*[a]n issuer shall inform the public as soon as possible of inside information which directly concerns that issuer*".

(b)    Pursuant to Article 7.1(a) of MAR, inside information is:

> "*information of a <u>precise nature</u>, which has not been made public, relating, directly or indirectly, to one or more issuers or to one or more financial instruments, and which, if it were made public, would be likely to have a <u>significant effect on the prices</u> of those financial instruments or on the price of related derivative financial instruments*"

(c)    As to the underlined words:

    (i)    Pursuant to Article 7.2 of MAR, information is deemed to be of a precise nature if it indicates a set of circumstances which exists or which may reasonably be expected to come into existence, or an event which has occurred or which may reasonably be expected to occur "*where it is specific enough to enable a conclusion to be drawn as to the possible effect of that set of circumstances or event on the prices*".

    (ii)    Pursuant to Article 7.4 of MAR, information would be likely to have a significant effect on prices if it is "*information a reasonable investor would be likely to use as part of the basis of his or her investment decisions*".

    (iii)    Reasonable investors base their investment decisions on information already available to them, so the question whether, in making an investment decision, a reasonable investor would be likely to take into account a particular piece of information should be appraised on the basis of the other information already available – and must assess the anticipated impact of the information in light of the totality of the issuer's activity: see Recital 14 of MAR.

(d)    Depending upon what information it is said that Barclays should have published, that may or may not be information of a "*precise nature,*" it may or may not be "*information already available,*" and it may or may not have been "*information a reasonable investor would be likely to use as part of the basis of his or her investment decisions*". Certainly it does not strike me that every piece of

information relating to Mr Staley on the topic in question was *ipso facto* precise or relevant to investment decisions.

(e)    The question of timing is also relevant. Mr Staley departed from Barclays on 1 November 2021. It seems inherently quite unlikely that, during the period after Mr Staley's resignation, a reasonable investor would use information relating to Mr Staley as part of the basis of his or her investment decisions.

103.    I would also emphasise that the need for a clear allegation as to what exactly Barclays was required to publish, and when, is important not just for establishing the obligation to publish but also in relation to fault. As noted above, the fault element entails in my view that a PDMR knew that the issuer was obliged to publish the information by a particular date or within a particular timeframe, and acted deliberately and dishonestly in delaying publication. Absent a clear allegation as to what was required to be published (and when) it is impossible to apply that framework.

104.    As a matter of English procedural law, this is a serious matter. Where an allegation of dishonesty is made, the courts often emphasise that fraud has to be pleaded clearly and with particularity—and that inferences are to be drawn from the pleaded facts, not generalities translated or culled from pleaded facts.

105.    A useful summary of the relevant rules in England and Wales is contained in the Davies Discussion Paper at paragraph 113:

> *"In spite of some relaxation in the strike out rules in English law in recent years, it remains the case that in the case of fraud the statement of case must allege fraud clearly and that allegation must be supported with particulars, which are capable of supporting the allegation of fraud. Fraud cannot be 'averred generally'. In addition, under the Bar Council's Code of Conduct a barrister may not draft a statement of case making 'any allegation of fraud unless he has clear instructions to make such allegation and has before him reasonably credible material which as it stands establishes a prima facie case of fraud.'"*

**2.    Delayed publication: later publication**

106.    Second, a claimant must establish that the required information was not in fact published until a later date.

107.     Prior to the Decision, Mr Kramer (in his declaration) and the St Louis Fireman (in its opposition brief) relied in that respect on the press release dated 12 October 2023 cited in paragraphs 111 – 112 of the Complaint.

108.     As I explained in my Second Declaration:

(a)     Whilst it is right to recognise that liability for delay remains a developing area, and there has been no authority directly on point, I was (and remain) confident—on the basis of the scheme of s. 90A as a whole, as well as Leech J's approach generally in *Allianz*—that this case is not one which can properly be advanced as a 'delay' claim. It is in reality an allegation of omission or misstatement; and the English court would not in my view permit a claimant to avoid the need to show individual reliance (a requirement for omission and misstatement claims) by seeking to recast it as a 'delay' claim.

(b)     In order to ascertain whether there has been a "*delay...in publishing information*", one needs in my view to start by identifying the information which was, in fact, published. The 12 October 2023 press release contained two strands of information. First, it noted and summarised the findings of the FCA's Decision Notice published the same day. Second, it noted that the Remuneration Committee had concluded that Mr Staley should be ineligible for or forfeit various bonuses and awards.

(c)     One then needs to ask whether there was a delay in publishing that information. Put another way, was the publication "*accurate but late*"? The clear and short answer, in my opinion, is: 'no'. The 12 October 2023 press release announced the Decision Notice and the outcome of the Remuneration Committee's deliberations immediately. I do not think it is suggested, or could be suggested, that either strand of information could have been released earlier.

(d)     If the St Louis Firemen's argument is not that this publication (i.e. the 12 October 2023 press release) should have been made earlier but, instead, that some other publication should have been made earlier then, in my view, that allegation is not of delayed publication at all. It is, in reality, an allegation of omission or (perhaps) misstatement.

(e)     On Mr Kramer's view, omissions claims and claims for dishonest delay would cover very similar ground—for example, it would be open to any claimant alleging

an omission (e.g. alleging that, pursuant to MAR, the publisher was obliged to publish a particular statement but failed to do so) to also frame that complaint as an allegation that there was a delay in publishing (e.g., alleging that the publisher was obliged to publish a particular statement at a certain time but delayed in doing so). That cannot have been the intention of the legislature: as Mr Kramer and I agree, liability for delay was introduced in order to 'plug the gap'. It cannot have been intended to enable claimants to recast misstatement or omissions claims as delay complaints, and thereby avoid the need to establish reliance.

109.    Consistent with that analysis, the Court concluded in its Decision that the 12 October 2023 press release could not have been disclosed earlier, and so could not support a theory of dishonest delay.

110.    The Amended Complaint does not point to any other publication of the allegedly delayed information, and does not suggest that—contrary to the Decision—the 12 October 2023 press release could have been disclosed earlier. It does not in my view therefore cure the defects in the Original Complaint.

111.    What is clear from the additions in paragraphs 105 – 119 of the Amended Complaint is that the St Louis Fireman place reliance on the FCA's findings to which Barclays referred in the 12 October 2023 press release. But that does not support or assist its case of delayed publication, or remedy the defects identified in the Decision. Instead, those findings appear to be relied upon to show that they "*contradicted Defendants' public and false assurances to investors*" (Amended Complaint, paragraph 113) and "*undermin[ed] the veracity of…Barclays' public misstatements*" (Amended Complaint, paragraph 115). In other words, they go to a case of misstatement, rather than delay.

112.    I note that in various places in the Amended Complaint reference is made to a failure to correct previous statements which were alleged to be untrue (paras 117, 118 and 167) or to a duty to correct such statements (paras 49 and 157). At best, this seems to me to be a facet of a misstatement or omissions liability, rather than a separate head of claim, but it does not seem to me to be at all relevant to a claim relating to dishonest delay. For a

1    dishonest delay claim, the basis for liability is delaying publication, not failing to correct

2    a publication that had been previously made.

3    113.    This further supports my belief that the case advanced remains in substance one of

4    misstatement or omission—albeit where the reliance required to make out such a claim is

5    missing. If it were possible to recast such a claim as one of 'delayed publication' in this

6    case, then the same would be true in every case. That was not, in my view, the intention

7    of the legislature in introducing liability for delayed publication and it is not a result which

8    an English court would permit.

9                    **3.    Fault**

10   114.    Third, as I have explained, a claimant would be required to show that the PDMR:

         (a)    knew that the issuer was obliged to publish the information by a particular date or
11
                within a particular timeframe;
12
         (b)    nevertheless caused the issuer to publish the information at a later date; and
13

14       (c)    did so deliberately and dishonestly.

15
16   115.    Mr Kramer and I agreed that Mr Staley and Mr Higgins were PDMRs of Barclays for the

17   period in which they were directors, and that Mr Staley would not be considered a PDMR

     in relation to the period after he departed Barclays.
18

19   116.    As I have explained, the Amended Complaint does not identify (i) (with any precision)

20   the information which it is alleged that Barclays was required to publish; or (ii) when that

21   obligation is said to have arisen. Accordingly, whilst the Amended Complaint asserts that

22   one or more of the Individual Defendants acted dishonestly, that is essentially a bare

23   allegation of dishonesty and does not identify that (or any basis for an allegation that) the

24   PDMRs knew that Barclays was required to publish particular information by a particular

25   date, or that they deliberately and dishonestly delayed in that regard. Indeed, I have not

26   identified any allegation in the Amended Complaint linking alleged dishonesty to the

27   alleged delay or timing of the publication. It is also vital to keep firmly in mind the

28   distinction between the dishonesty required for omissions liability and the dishonesty

1   required for delay liability. This is explained in *Standard Chartered* at [110], where the

2   judge agreed that there was an important distinction in that for omissions claims the

3   dishonesty is as to the contents of a publication whereas for delay claims the dishonesty

4   has to relate to the delay or the timing of the publication.

5   **4.    Loss**

6   117.   As noted above, I have not been asked to address the question of loss in any detail at this

7   stage.

8   118.   However, I note from Schedule A to the Original Complaint that the St Louis Firemen

9   acquired shares in Barclays August and September 2022, some 9-10 months after Mr

10   Staley stepped down as CEO of Barclays. At paragraph 44 of the Amended Complaint,

11   the St Louis Firemen allege that they acquired shares at "*artificially inflated prices*". That

12   is a question of fact or valuation on which I am not qualified to opine. However,

13   conceptually it is a little difficult to understand why, when those shares were acquired in

14   2022, almost a year after Mr Staley stepped down as CEO, Barclay's share price would

15   be underpinned by anything relating to Mr Staley, or would continue to be so in 2023.

16   **VIII.   Class actions in England & Wales**

17   119.   As noted above, I have been asked to address to the availability of class action procedures

18   in England and Wales and to highlight particular features of the class action landscape

19   which may be relevant to the availability (and utility) of class action procedures for FSMA

20   s. 90A claims in England and Wales.

21   **A.    English class action procedures**

22   **1.    Overview**

23   120.   In England and Wales there is no one generic class action regime applicable to all types

24   of claim. Indeed, there is no generally accepted English law definition of "*class action*".

25   There are four procedural mechanisms which—depending on the particular claim—may

26   be available to litigants seeking collective redress. Those are:

27   (a)    Standard procedures that allow (i) multiple claimants to be named in a single action
       (**Multi-claimant Proceedings**) and (ii) the consolidation of multiple proceedings

28   (**Consolidated Proceedings**);

(b)     representative proceedings which may be brought under rule 19.8 of the Civil Procedure Rules (**CPR**);

(c)     a Group Litigation Order (**GLO**) under CPR rule 19.22; and

(d)     collective actions proceedings for competition law claims in the Competition Appeals Tribunal (**CAT**) (which I address briefly at paragraph 141 below).

### 2.     Standard procedures

121.    Pursuant to CPR rule 19.1, a single claim form may be used by one or more claimants to commence proceedings against any number of defendants. The claims included in the claim form must be "*claims which can be conveniently disposed of in the same proceedings*".[36]

122.    Where claims are commenced using different claim forms, the court has power under its general case management powers to consolidate any number of individual claims into a single set of proceedings. The effect of doing so is that several separate claims may be managed and heard by the court together as if they were a single action.[37] The court may order consolidation on its own accord, or on the application of any party.

123.    These standard provisions of the CPR enable multiple claimants to seek collective redress by conventional legal methods, without the need for any specific class action regime. Where they do so, each claimant is (and elects to be) a party to proceedings in the usual way and is, in principle, liable to contribute to costs orders, to give disclosure, to comply with the court's procedural directions and to be bound by its orders. It is possible for a very large number of claimants to proceed against a single defendant in this way. For example, in *Weir v Secretary of State for Transport* [2005] EWHC 2192 (Ch) more than 48,000 shareholders, or representatives of shareholders, in Railtrack Plc brought claims against the UK Government in this manner.

---

[36] CPR rule 7.3.

[37] CPR rule 3.1(2)(h)).

### 3.      Representative Proceedings

124.    Representative proceedings enable a claim to begin, or be continued, by or against one or more persons as representatives for others who have the "*same interest*" in the claim. The representative action has existed for hundreds of years and originally developed in order to provide a solution to the prior stringent 'complete joinder rule', which provided that all persons materially interested in the subject-matter of a claim should be joined as a party to it.[38]

125.    The representative proceedings regime is currently contained in CPR rule 19.8,[39] which provides as follows:

> ***Representative parties with same interest***
> *19.8—(1) Where more than one person has the same interest in a claim–*
>      *(a) the claim may be begun; or*
>      *(b) the court may order that the claim be continued, by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.*
> *(2) The court may direct that a person may not act as a representative.*
> *(3) Any party may apply to the court for an order under paragraph (2).*
> *(4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule–*
>      *(a) is binding on all persons represented in the claim; but*
>      *(b) may only be enforced by or against a person who is not a party to the claim with the permission of the court.*
> *(5) This rule does not apply to a claim to which rule 19.9 applies.*

126.    CPR rule 19.8 imposes a single condition which must be satisfied before representative proceedings may be brought as of right.[40] That is, that the representative must have the "*same interest*" in the claim as the persons represented. Lord MacNaghten's words in *Duke of Bedford v Ellis* [1901] AC 1 are often cited as the traditional formulation of the test, requiring that claimants demonstrate "*a common interest and a common grievance, a representative suit was in order if the relief sought was in its nature beneficial to all whom*

---

[38] See, for example, *Adair v New River Co* (1805) 11 Ves Jr 429; 32 ER 1153 and *Cockburn v Thompson* (1809) 16 Ves Jr 321; 33 ER 1005.

[39] Cf CPR Rule 19.9, which provides a representative regime in relation to specified types of claim, namely those concerned with the estates of deceased persons, property subject to a trust or the meaning of a document including a statute. Such proceedings are *sui generis* and I don't address them further in this declaration.

[40] *Wirral Council v Reckitt Benckiser Group Plc and Indivior plc* [2023] EWHC 3114 (Comm) at [31]; and [2025] EWCA Civ 40 at [12] and [123].

*the plaintiff proposed to represent*".  The Supreme Court in *Google LLC v Lloyd* [2021] UKSC 50—the now leading case in the area of representative actions—clarified that such a formulation must not be adhered to too rigidly and that the "*same interest*" test must instead be interpreted purposively in light of the overriding objective of the CPR[41] and the rationale for the representative procedure.[42]

127.    Members of the represented class are not joined as parties to the action. Instead, representative proceedings are begun on an 'opt-out' basis. Where they are brought and allowed to proceed on an 'opt-out' basis, the represented class need not take any positive action to be represented in the claim and be bound by the result. In this respect, the representative proceedings can sometimes achieve something akin to a US-style opt-out class action. However, the regime is "*entirely flexible*"[43] and *"not a rigid matter of principle but a flexible tool of convenience in the administration of justice*"[44], meaning that – even when begun on an 'opt-out' basis, it is always open to the court to impose a requirement that the claim proceeds instead on an opt-in basis.

128.    Once representative proceedings are brought, the court retains a discretion as to whether to allow a claim to proceed as a representative action, pursuant to CPR rule 19.8(1)(b).[45] For example, where the membership of the class of persons represented cannot be sufficiently defined from the outset, the court may exercise its discretion to order that the claim cannot proceed by way of representative proceedings.[46] Furthermore, the court may—either of its own motion, or on the application of any party—order that a person may no longer act as a representative for others, pursuant to CPR 19.8(2) and 19.8(3).

---

[41] The Overriding Objective can be found at CPR rule 1.1. It provides that that the objective of the CPR is to enable the court to deal with cases justly and at proportionate cost by ensuring that parties are on an equal footing, saving expense, dealing with the case in ways which are proportionate to the amount of money involved, ensuring that the case is dealt with expeditiously and fairly, and allotting to it an appropriate share of the court's resources.

[42] *Google LLC v Lloyd* [2021] UKSC 50 at [71].

[43] *Google LLC v Lloyd* [2021] UKSC 50 at [77].

[44] *John v Rees* [1970] Ch 345, 370 per Megarry J.

[45] *Google LLC v Lloyd* [2021] UKSC 50 at [77].

[46] See, for example, *Wirral Metropolitan Borough Council v Indivior Plc* [2025] EWCA Civ 40.

1    Such orders, if made, may effectively bring the representative nature of the proceedings

2    to an end.

3    129.   Another means by which representative proceedings may be brought to an end is by way

4    of a strike out application. A party to the proceedings may apply, and in several cases has

5    applied, to strike-out the proceedings on the grounds that representative proceedings are

6    inappropriate in the circumstances.

7    130.   One important example is *Wirral Metropolitan Borough Council v Indivior Plc* [2025]

8    EWCA Civ 40 (discussed in further detail below) in which the defendants made a

9    successful application to strike out the claimant's claim under ss. 90 and 90A of FSMA

10   brought by way of opt-in representative proceedings on the grounds that it was not the

11   appropriate procedure for FSMA claims. The defendants argued, and the Court agreed,

12   that the claim should be brought in the usual way by ordinary Multi-claimant

13   proceedings—i.e., that all prospective claimants be made a formal party to the action.   I

14   discuss this case further below in Paragraphs 144 and 146.

15   131.   As noted below, to date, no s. 90A claims have been permitted to proceed by way of

16   representative proceedings.

17                  **4.    The GLO**

18   132.   A group of prospective claimants who wish to bring claims which give rise to common or

19   related issues of fact or law may also apply to the English courts for a Group Litigation

20   Order. The rules introducing GLOs were added to the CPR by the Civil Procedure

21   (Amendment) Rules 2000 (SI 2000/221) and came into force on 2 May 2000.

22   133.   Prior to their introduction, there were no specific rules concerning collective proceedings

23   in England and Wales and claims proceeded by either the informal means or by way of

24   representative proceedings (both as described above). Such claims were subject to *ad hoc*

25   case management. The introduction of the GLO came as a result of recommendations

26

27

28

DECLARATION OF MARTIN MOORE K.C.

1   made by Lord Woolf following his Access to Justice Inquiry in 1996[47] (the **Woolf Report**)

2   and in light of a perceived gaps in the existing procedural mechanisms.

3   134.   The GLO procedure is designed to provide a case management framework for managing

4   individual claims which give rise to common or related issues of fact or law. It is a broad

5   regime, not restricted for use in a particular type of claim or in respect of certain subject

6   matter.

7   135.   The GLO provides solely for an opt-in procedure. Prospective claimants who opt-in to the

8   proceedings, prior to any cut-off date order by the court, will be entered onto a GLO

9   register. Each claim on the register remains legally distinct, although they are managed as

10  one. As discussed below, the opt-in nature of the GLO is a marked difference to the well-

11  known class action procedure in the US, which—as I understand it—proceeds on an opt-

12  out basis. The UK Government's list of group litigation orders shows that there have not

13  been any s. 90A claims that have been subject to a GLO[48] although the authors of *Class*

14  *Actions in England & Wales* note that the Tesco shareholder claims brought under s. 90A

15  FSMA, whilst not formally subject to a GLO, were case managed by the Court in a manner

16  closely resembling the GLO procedure.[49]

17  136.   Unless the court orders otherwise, judgments or orders made in the proceedings are

18  binding on the parties to all other claims that are on the group register at the time the

19  judgment is given or the order is made.[50]

20      **B.     Opt-in / opt-out**

21  137.   A key distinguishing feature of the English collective action regime is that claims in

22  England proceed predominantly on an '*opt-in*' basis.

---

[47] Lord Woolf, Access to Justice: Final Report to the Lord Chancellor on the Civil Justice System in England and Wales (HMSO, 1996).

[48]    Reflecting   the   position   as   at   12   February   2025. https://www.gov.uk/government/publications/group-litigation-orders/list-of-group-litigation-orders

[49] *SL Claimants v Tesco Plc* [2019] 10 WLUK 405; Grave et al, *Class Actions of England & Wales*, 2 Edn (2022, Sweet & Maxwell) at 1-027.

[50] CPR rule 19.23(1)(a).

138. Opt-out proceedings are those brought on behalf of each class member except those who actively choose to opt-out. This allows proceedings to be brought on an individual's behalf without them taking any affirmative step, and possibly without their knowledge of the litigation at all. By contrast, opt-in proceedings require claimants to take an active step and positively agree to become a party to the litigation.

139. I have already alluded to the two exceptions to the general opt-in nature of English collective actions.

140. First, representative proceedings under CPR rule 19.8 may proceed on an opt-out basis. Nevertheless, as discussed above, the courts retain discretion to require an opt-in approach, and claimants may themselves choose to proceed on that basis, as in *Wirral Council v Indivior*.  As noted below in Paragraph 142, I am not aware of any s. 90A claim that has been permitted to proceed by way of representative proceedings, whether on an opt-out basis, or otherwise.

141. Second, section 47B of the Competition Act 1998 (added by the Enterprise Act 2002 and as amended by the Consumer Rights Act 2015) establishes a collective redress regime for competition law claims (which I understand are referred to as 'antitrust' claims in the US) in the Competition Appeal Tribunal (**CAT**)—a specialist court whose function it is to hear cases involving competition or financial regulatory issues. Whilst some claims brought under that section are brought by way of opt-out proceedings, the 2015 amendments gave the court discretion to determine whether collective proceedings should follow an opt-in or opt-out approach. Furthermore, pursuant to the Competition Act 1998 ss.49A-49B, those domiciled outside of the UK can participate only on an opt-in basis. To be clear: there is no equivalent specialist regime for securities claims under FSMA.

C.    **Group s. 90A claims**

142. There have been few claims brought under s. 90A FSMA since its introduction. Whilst it is a matter of speculation, one suspects that is at least in part a consequence of the risk profile of such claims. Section 90A imposes exacting standards on prospective claimants, in particular in providing individual reliance (except in the case of liability for delay).

Where claims fail, the claimants will generally be liable for the Defendant's costs (including legal fees) as well as their own.

143.    When claims are brought, they overwhelmingly proceed as ordinary Multi-claimant Proceedings. I am not aware of any s. 90A claim that has been permitted to proceed by way of representative proceedings, whether on an opt-out basis, or otherwise.

144.    Whilst that is the reality, the Court of Appeal in *Wirral Council v Indivior* noted that there is no hierarchy of different procedures in the case of s. 90A actions and the Court will "*assess the advantages and disadvantages of each with no predilection towards one form of procedure rather than another*".[51]

145.    However, when making that judgment the court will consider the constituent elements of the claim in question. I have identified in Section IV above the necessary elements of a s. 90A claim. It is inevitable that in such claims with such a wide variety of claimants that there will be very considerable variation in the factual circumstances of claimants in respect of each element.

146.    Michael Green J at first instance in *Wirral Council v Reckitt Benckiser Group Plc and Indivior Plc* [2023] EWHC 3114 (Comm)[52] (upheld in the Court of Appeal ([2025] EWCA Civ 40) declined to permit those proceedings to proceed by way of opt-in representative proceedings. In doing so, he examined the manner in which securities claims have historically been brought and managed at [19] – [21], and noted as follows:

> "There have not been many securities claims brought under s.90A and Schedule 10A FSMA since its introduction in 2010. Mr. Chapman KC would put that down to the disinclination of investors to litigate in the UK requiring a heavy front-loading of costs. Furthermore, none of the s.90A and Schedule 10A FSMA claims have actually reached a trial, even of a first stage issue. Some have settled and others are progressing towards a trial.
>
> Like any other forms of civil litigation, securities claims must be case managed and tried in accordance with the overriding objective, in particular so that the Court can deal with cases justly and at proportionate cost. The Court's duty of active case management specifically includes, by CPR 1.4(2), "deciding the order in which issues are to be resolved", "helping the parties to settle the whole or part of the case", "fixing timetables or otherwise controlling the progress of

---

[51] *Wirral Council v Reckitt Benckiser Group Plc and Indivior plc* [2025] EWCA Civ 40 at [124].

[52] With which the Court of Appeal did not disagree.

DECLARATION OF MARTIN MOORE K.C.

*the case" and "dealing with as many aspects of the case as it can on the same occasion".*

*Case management issues that commonly arise for determination in securities claims include whether there should be a split trial and, if so, what split; and, if there is a split trial, whether and to what extent progress should nevertheless be made on the deferred issues in the meantime, e.g. by requiring the provision of further information, disclosure or witness evidence. The Court weighs the different options by reference to the particular circumstances of the case and after there has been a debate between the parties and the Court at a CMC, normally after the close of pleadings. Critically it is down to the Court to decide for itself what the appropriate case management should be for the case before it."*

147.    He went on to note the perceived drawbacks of the representative proceedings regime in the context of securities claims. Those drawbacks were:

(a)    First, that representative proceedings which proceed on a bifurcated basis (i.e. where only certain elements of a cause of action are tried on a common basis) risk the inadequate assessment of individual claims at the outset of proceedings. The Court referred at [22] to *Manning & Napier v Tesco Plc* [2017] EWHC 3296 (Ch) and the words of Hildyard J at [29], that "*joinder of claimants to Group actions, whether or not subject to a GLO, should not be a matter of subscription but of orderly and careful assessment in respect of each claimant and the statutory requirements to establish liability are appreciated and satisfied....There is a danger in the case of group actions that people do subscribe to the action in the expectation, or at least hope, of settlement, without at that stage giving sufficient focus to the need for its case to be tested with the same degree of particularity as would be the case if they were fewer in number.*"

(b)    Second, members of the representative class are not ordinarily liable to contribute to costs incurred by the representative in pursuing the claim (including any adverse costs order).

(c)    Third, there arises a risk that litigation burden is allocated unfairly between claimant and defendant in bifurcated representative proceedings. The reasons for that concern were highlighted in the case of *Allianz Global Investors GmbH & Ors v RSA Insurance Group plc* [2021] EWHC 570, in which Miles J ordered that the issue of reliance be determined during the first stage of the trial. He found, that to do otherwise, would place an undue burden on the defendants in addressing the

common issues, while also permitting the claimant to avoid upfront costs, such as the cost of establishing standing or proving reliance, at least in misstatement or omissions claims. At [64] Miles J stated the following: "*It seems to me that the claimants, having brought the action, should be prepared to undertake substantial work in ensuring the expeditious progress of the proceedings to resolution.*"

### D. How do US and UK securities class actions differ?

148. As I have alluded to, there are significant differences between the English approach to collective action and my understanding of the US model. The following points are worthy of emphasis.

149. <u>First</u>, the usual approach to costs in English litigation is that, unless otherwise ordered, the unsuccessful party is required to pay the costs and legal fees of the successful party—referred to as the 'loser pays' rule.[53] The general consensus is that class actions are not sufficiently distinct from ordinary litigation so as to justify a departure from the ordinary costs-shifting rule that applies in English litigation.[54] Furthermore, where claims are brought by way of representative proceedings, members of the representative class are not automatically liable to contribute to costs incurred by the representative in pursuing the claim, including any adverse costs order.[55] In contrast, my understanding is that the approach in the US is generally that each party will typically bear only their own costs. The result is that litigants in England face a greater risk of having costs awarded against them, which serves as a deterrent to initiating legal action in the first place.

150. <u>Second</u>, in England and Wales, prospective claimants and the lawyers representing them face fewer financial incentives to bring or support class actions, owing primarily to the opt-in nature of English proceedings. Professor Davies in the Davies Discussion Paper, articulated the point, as follows:

> *115.However, the factor which was mentioned most often by respondents as promoting securities litigation in the United States were the financial incentives for law firms to initiate litigation. These incentives seem to depend on two*

---

[53] Contained in CPR rule 44.2(2)(a)

[54] Lord Woolf, Access to Justice: Final Report, paragraph. 58, p.239.

[55] *Google LLC v Lloyd* [2021] UKSC 50 at [79].

*matters, neither of which is replicated in the United Kingdom. First, class actions in the US operate on an 'opt out' basis, whereas the closest analogy here under the Civil Procedure Rules is the 'group litigation order' which operates on an 'opt in' basis. Under the US system a court will award recovery for all the members of the class (for example, investors who bought securities after the false statement was made and before the truth emerged) unless they choose to take themselves out of the class action at an early stage. The burden is on the investor to do so, not on the claimant's lawyer to seek their consent to be included in the class. Under a Group Litigation Order under the CPR the court's judgement will benefit only identified claimants, either those who are on the 'group register' when the judgment is handed down or, if the court so directs, claimants who bring claims in the future. Consequently, to maximise the size of the recovery under the British system, the lawyers must identify the full range of class claimants and seek to obtain the permission of as many of them as possible to join in the litigation and have their claims entered on the register.*

*116. In connection with the formation of the class, it is also important to revert again to the reliance requirement in section 90A… In the United States a typical class is constituted by those who bought shares after the misleading statement was made and still held the shares at the point the truth emerged. Under the 'fraud on the market' theory, adopted in the US for misleading continuing disclosures as well as for misstatements in prospectuses, it is not necessary for the claimant to show knowledge of and reliance on the misstatement in question. Thus, class formation is easier and classes are larger than where reliance has to be shown.*

151.    The prospect of a general opt-out collective action regime for all types of claim has been the subject of considerable commentary in England and Wales, including as follows:

(a)    The Woolf Report recommends that "*The Court should have power to progress the MPS [multi-party situation] on an 'opt-out' or 'opt-in' basis, whichever contributes best to the effective and efficient disposition of the case.*"[56] It has been proposed on a number of subsequent occasions, including in the Civil Justice Council's 2008 report Improving Access to Justice through Collective Actions.[57]

(b)    The Government responded in 2009 to the Civil Justice Council's recommendation to implement a general class action regime applicable to all types of claim. The

---

[56] Lord Woolf, Access to Justice: Final Report, p.249, Recommendation (9).

[57] Civil Justice Council, Improving Access to Justice through Collective Actions: Developing a More Efficient and Effective Procedure for Collective Actions – Final Report, November 2008.

Government's response was to reject the proposal and opt instead for a "*sector based approach*".[58]

(c)   It was not until 2012 when the Department for Business Innovation and Skills (**BIS**) developed a consultation on options for reform in the competition law area that the suggestion was advanced, leading ultimately to the birth of the collective redress regime for competition claims in the CAT in October 2015.

(d)   To date, the only sector to have implemented such a regime is competition law and no such mechanism has been implemented in the financial services arena. Furthermore, the only opt-out collective competition action to have reached trial and secured a substantive judgment to my knowledge is that of *Le Patourel v BT Group Plc and British Telecommunications Plc* [2024] CAT 76.[59]

(e)   Just a few weeks ago, on 6 August 2025—marking nearly a decade since the introduction of the opt-out collection actions regime in competition law—the Department for Business & Trade published an open call for evidence titled "*Opt-out collective actions regime review: call for evidence*", in order to gather feedback on experiences of the CAT's collective proceedings regime.[60] The outcome of that survey remains to be seen.

152.   Third, lawyers in England and Wales have less financial incentive to promote securities litigation compared to their counterparts in the US, due to differing remuneration structures. Professor Davies in the Davies Discussion Paper articulated the point, as follows:

> 117. Second, contingent fee arrangements in the United States permit lawyers to enter into agreements whereby they take in a successful case a significant proportion of the recovery awarded to the claimants (thus reinforcing the 'opt out' rule from the point of view of the lawyers) but are not remunerated at all if the case is unsuccessful. In the UK section 58 of the Courts and Legal Services Act 1990 permits conditional fee arrangements, by which lawyers can agree to no payment if the case is unsuccessful and an increase of their normal fee (but

---

[58] See the Government's response to the Civil Justice Council's Report: 'Improving Access to Justice through Collective Actions' (July 2009), paragraphs 9-13.

[59] Appeal decision [2025] EWCA Civ 1061.

[60] UK Government, 'Opt-out collective actions regime overview: call for evidence' (6 August 2025)    https://www.gov.uk/government/calls-for-evidence/opt-out-collective-actions-regime-review-call-for-evidence/opt-out-collective-actions-regime-review-call-for-evidence

DECLARATION OF MARTIN MOORE K.C.

*not a share of the recoveries) if the case is successful. Such agreements may lead to a doubling (but no more) of the fees otherwise payable. The overall effect of the UK provisions is, it would seem, to give law firms a much less powerful incentive to promote private securities litigation than in the US. There seem to be no law firms in the UK, as there are in the US, whose business model is based wholly or mainly on the promotion of private securities litigation, though the arrival in Europe from the US of such a firm was often mentioned as a possibility by respondents. However, it is clear that the issue of the funding of civil litigation in the United Kingdom is still the subject of debate and that the current rules cannot be assumed to represent the situation which will continue in the future.*

153.    That said, it is important to recognise that litigation funding is an evolving area in England and Wales. First, in 2012, Parliament introduced a second type of contingent fee arrangement (Damages-Based Agreements or **DBAs**), which *do* calculate a legal representative's return based on the damages or settlement achieved by their client, rather than by reference to the legal representative's costs. However, DBAs have seen limited use owing primarily to a lack of certainty as to the interpretation of the relevant regulations.[61] Second, litigation funding by third parties (as opposed to the party's legal representatives) has continued to grow—albeit curtailed somewhat by a 2023 decision of the Supreme Court whose effect was that many litigation funding arrangements would be unenforceable.[62]

154.    <u>Finally</u>, as identified by Professor Davies, US securities class actions are routinely tried by juries, who determine both liability and damages. The UK government has stated that US jury trials "*can generate some higher damage verdicts, and as a result of this risk, higher settlements*".[63] In England, such claims are invariably tried by judges, sitting without juries.

155.    It seems to me likely that it is as a result of these differences that there are comparatively fewer class actions in England than there are in the US. By way of example, the authors

---

[61] See, for example, *Lexlaw Ltd v Zuberi* [2021] EWCA Civ 16 in which Lord Justice Coulson noted that the Damages-Based Agreements Regulations 2013 were not the "*draftsman's finest hour*" at [74].

[62] *R (PACCAR Inc and others) v Competition Appeal Tribunal and others* [2023] UKSC 28.

[63] Brief for United Kingdom as Amicus Curiae at 16, *Toshiba Corp. v Auto. Indus. Pension Trust Fund*, No. 18-486 (U.S. Dec. 4, 2018).

DECLARATION OF MARTIN MOORE K.C.

of the text '*Class Actions in England & Wales*' estimate that there were only approximately 110 GLOs between the introduction of the GLO procedure in May 2000 and the date of that publication (2022).[64] By contrast, in 2024 alone, it appears that there were 225 securities class actions filed in the US[65]

156. In the Davies Discussion Paper, Professor Davies asked, having regard to securities class action litigation in the US: "*Can super-optimal levels of fraud-based litigation be avoided?*"[66] He considered that "*[t]here are strong reasons for thinking that a fraud-based investor action would operate very differently in the UK from the way in which private securities litigation operates in the US*".[67] There are "*substantial differences in the operation of the civil litigation systems in the two countries, which are probably as important as the differences in the substantive law*".[68] As Professor Davies explained:

> "*These differences in procedural law tend to reinforce the differences in the substantive law, ie to discourage private securities litigation in England and to encourage it in the US.*"

157. There has been some academic debate around the desirability of an opt-out class action regime in the financial service sector. For my part, I doubt that UK law will adopt such an approach and has shown little appetite to do so in the 15 years or so since it was mooted in the 2010 Financial Services Bill. My view is based on two factors:

(a) First, I have already referred (in paragraphs 20 – 24 and 37 above) to the careful balancing task undertaken by the Government in introducing s. 90A and, in particular, its desire not to extend unnecessarily the scope of any duties to investors or third parties. Ultimately, s. 90A was designed to ensure that potential liability was kept within reasonable bounds—and (for example) that claims could only be pursued by those who had in fact relied on the particular misstatement or omission.

---

[64] Grave et al, *Class Actions of England & Wales*, 2 Edn (2022, Sweet & Maxwell), at 1-027.

[65] Cornerstone Research, Securities Class Action Filings – 2024 Year in Review, https://www.cornerstone.com/wp-content/uploads/2025/01/Securities-Class-Action-Filings-2024-Year-in-Review.pdf

[66] Davies Discussion Paper, at [110] – [118].

[67] Davies Discussion Paper, at [111].

[68] Davies Discussion Paper, at [112].

Section 90A was introduced as just one component of a wider securities regime in which the FCA carries out the primary role in securing compliance by issuers with their disclosure obligations. The policy stance in England and Wales against encouraging mass securities claims was again reinforced earlier this year by the Court of Appeal in *Wirral Council v Indivior*, which held at [130] that "*To allow the representative proceedings to continue without the court being able to require the claimants to identify how many of them only rely on market-index reliance would be to encourage precisely <u>the sort of speculative litigation which, as the Davies Review confirmed, the fraud-based and reliance requirements of section 90A and Schedule 10A of FSMA are **designed** to avoid</u>*". (emphasis added).

(b)    <u>Second</u>, the approach of the Court of Appeal in *Wirral Council v Indivior* strongly suggests that group securities claims will continue to be conducted under the Multi-party and GLO procedures which appears to be working well under the active case management of experienced judges and is more in keeping with the prevailing UK procedural environment.  The case for a radical departure from existing procedural norms has not been made out.

## IX.    Recognition in England and Wales

158.    I have also been asked to consider the question of whether the English court would recognise and enforce a judgment or court-approved settlement in a US opt-out class action.

159.    A judgment of a foreign court has no direct operation in England and Wales. However, a judgment of a US court may be recognised or enforced in England pursuant to common law principles. It may also be enforced through the operation of statute or international conventions to which the UK is a signatory or has otherwise acceded. No statutes or conventions apply to the matters under discussion in this section. This section is thus limited to recognition and enforcement under the common law.

160.    A foreign judgment will only be recognised or enforced in England under the common law if:

(a)     the foreign court is a court of competent jurisdiction (i.e., it has jurisdiction over the subject-matter of the litigation and the parties whom the judgment of the court will bind);

(b)     the foreign judgment was (a) "*final and conclusive*", (b) for a definite sum or money; and (c) not for a penalty such as a fine or a tax;

(c)     the foreign judgment was one decided on the merits of the case; and

(d)     there does not exist any available defences to recognition. One of those defences is where recognition of the foreign judgment would be contrary to the public policy of England and Wales. In determining the availability of that defence, the English courts will generally focus on whether the recognition of a foreign judgment would contravene public policy, rather than assessing whether the underlying subject matter of the judgment is objectionable on that basis.[69] Another defence is whether the proceedings in which the judgment was obtained were opposed to natural justice.

161.    Provided the requirements above are satisfied, the foreign judgment may act as a *res judicata*[70] between the parties giving rise to (i) a cause of action estoppel, which prevents a party from re-litigating the existence of the same cause of action, or (ii) an issue estoppel, which precludes a party from denying any matter of fact or law necessarily decided by the earlier judgment.

162.    There is no English case which has had to consider the question of the recognition or enforcement in England and Wales of a judgment or court-approved settlement in a modern US securities law opt-out class action. The only English case which has touched upon the subject is *Campos v Kentucky & Indiana Terminal Railroad Co [1962] 2 LLR 429* in which McNair J remarked *obiter* that "*in accordance with private international law, a foreign judgment could not give rise to a plea of res judicata in the English Courts unless the party alleged to be bound had been served with the process which led to the foreign judgment*". It has rightly been pointed out by numerous commentators that the

---

[69] *Lenkor Energy Trading DMCC v Puri* [2021] EWCA Civ 770.

[70] The Latin term meaning literally "*a matter already judged*".

1   class action involved was not an opt-out class action and Miss Campos was not a

2   bondholder when it commenced and thus would not have been bound under US principles,

3   let alone English ones. It is thus of limited utility in the context of this debate.

4   163.   There has been considerable consideration of the topic, however, in academic articles and

5         textbooks and in opposing declarations from English law experts in US proceedings

6         dealing with the question in the context of what I understand is the "*superiority*"

7         requirement when certifying classes in the US.  As I understand it, some US courts have

8         concluded that an English court would be likely to recognise a judgment or approved

9         settlement in a US opt-out class action because, as a matter of US law, there is a rebuttable

10        presumption, in the absence of an affirmative showing to the contrary, that it would do so.

11        Whilst the English court would accord US decisions applying domestic law with respect,

12        it would be unlikely in my view to apply any weight to a US decision determining a

13        question of English law on the basis of expert foreign law evidence. Indeed, even the

14        decisions of the English court on questions of foreign law do not set any precedent in

15        England and Wales.[71] The real question is what an English court would do to decide on

16        the issue.

17  164.   Whatever may be one's view on the substantive question, it is, I consider, uncontroversial

18        that:

19        (a)   The question will be debated against the backdrop of (a) the different policy choices

20              that have been made by the UK and the US in the context of securities claims (as

21              to which see paragraphs 20-23 and 37 above) and (b) the different procedural

              mechanisms available in multi-claimant actions.

22        (b)   The question may well be debated in circumstances where the relevant US court

23              has made findings concerning the elements of an English Law cause of action which

24              are regarded in England as unsettled or developing as a matter of English

25              jurisprudence.

26        (c)   A decision to recognise a judgment or approved settlement in US opt-out class

27              action, given that it amounts to, in effect, the importation into the UK of US-style

28  ──────────────
[71] *Re Marsailles Extension Railway* (1885) 30 Ch D 598 at 602.

securities litigation, both in substance and form, would be regarded as highly significant and, in many quarters, as highly controversial.

(d)    The question is not an easy one and is one on which respected commentators and practitioners take differing views, and thus the question would be unlikely to be regarded as fully settled until a decision one way or the other by the UK Supreme Court.

165.    I do not wish to burden the Court with an extensive exegesis of this issue and my views upon it. The opposing camps are well represented by Professor Jonathan Harris[72] and Professor Rachel Mulheron in an article for the Modern Law Review[73]. In summary, the views of Professor Harris and Professor Mulheron are, as follows:

(a)    Professor Mulheron identifies this topic as "*an increasingly challenging area of class actions jurisprudence*" and one which "*no English court has been asked to adjudicate"*. She concludes that a class actions judgment or settlement issued by a US court would not be recognised and would not be given preclusive effect in England should absent English class members wish to re-litigate the same grievance before an English court. She bases her conclusion on the fact that two separate preconditions for such recognition and preclusive effect would likely fail in this context: (i) that a US court would typically lack the requisite 'personal jurisdiction' over absent English class members; and (ii) the necessary 'identity of parties' would be absent.

(b)    Professor Harris, notes at [15] that "*it would be impossible to conclude there was anything approaching certainty as to the law in this area*." Nevertheless, he concludes that a strong case existed for the recognition and enforcement of a US class action judgment in England on the facts of *Anwar*. He further concludes at [17] that "*If an English court were to develop rules on recognition and enforcement of foreign judgments to apply to absent class members, I believe that a persuasive case can be made for arguing that the judgment in the present proceedings should*

---

[72] Declaration of Professor Jonathan Harris, *Anwar v Fairfield Greenwich Ltd.*, Case No. 09-cv-00118 (S.D.N.Y. Feb. 15, 2013), ECF No. 1048.

[73] Professor Rachael Mulheron, "The Recognition, and Res Judicata Effect, of a United States Class Actions Judgment in England: A Rebuttal of Vivendi" (2012) 75 M.L.R. 195

*be recognised; and that it would not be contrary to English standards of natural justice or public policy to do so*." He does so on the basis that there may exist a 'privity of interest' between the absent plaintiffs, and that those plaintiffs will have received notice of the proceedings and been given full opportunity to participate in the action,[74] such as to render them bound by the US class action judgment.

166.   I note that both authors give the public policy defence short shrift and note that this defence has had little success in English law in enabling a party to resist enforcement of a foreign judgment. This lack of success is not very surprising in that most legal systems share common values and the cases where the public policy defence has been successful tend to feature clashes in moral values reflected in legal systems. However, in the highly important area of securities law and regulation it is by no means clear to me that the defence should be limited to such considerations. In my view, it is possibly a mistake to dismiss the public policy defence too readily. There is clearly a clash of legal policy between the US and England & Wales in the areas of securities litigation and class actions generally and, owing to the limited jurisprudence on the topic, the precise ambit of the public policy defence is under-explored as a matter of English law.

167.   That observation aside, I think it likely that an English court would find the conclusion of Professor Mulheron more persuasive, broadly for the reasons she gives. English commentators, as well as the UK government, agree that there is a significant risk that a UK court would not enforce a judgment in a US-style opt-out litigation against members of the absent class.

168.   For example, the authors of *Class Actions* state at 2-117 that "*In circumstances where a person has involuntarily been made a party to foreign proceedings, for example, in opt-out proceedings of which they are unaware (and where adequate publicity was not provided), an estoppel would likely not arise*".

---

[74] To be contrasted with the position in England and Wales identified below at paragraphs 173 - 175.

169.    The same view is taken in the amicus brief submitted on behalf of the UK Government before the Supreme Court in *Morrison v National Australia Bank* 561 US 247 (2010). Section III C of that brief reads, as follows:

> "*Serious doubt exists as to whether a judgment or court-approved settlement in a US Securities class action would bind a non-US plaintiff who did not opt out of the class. This issue has been addressed directly in only one English case, where the judge, obiter, expressed doubt as to whether a foreign "opt-out" class action could give rise to res judicata.* [ref: Campos v Kentucky] *Thus, since the common law of England and Wales and UK legislation provide various causes of action for misstatements and omissions in connection with securities, it is possible that plaintiffs could have two bites of the apple and defendants could face inconsistent outcomes. There is the accompanying risk that the "precious resources of United States courts and law enforcement agencies" could be devoted to cases that may be unfairly duplicated in other jurisdictions…*"

170.    The leading English textbook on private international law takes the same view: see *Dicey, Morris & Collins on the Conflict of Laws* (16th ed) at 14-038: "*In the absence of what English law will accept as having been a submission to the adjudicatory jurisdiction of the foreign court, a person who is involuntarily made a party to foreign proceedings, or who is placed by the foreign court in an analogous position, will not be estopped by the decision of the foreign court.",* and at 14-072 fn 284: "*…a foreign judgment would not, therefore, be enforceable against absent English members of a foreign opt-out class action who had not actively assented to the proceedings*".

171.    It seems to me that Professor Mulheron is correct to focus on the position of the English class members who have not opted out but are dissatisfied with the outcome. The question is properly framed as dependent upon whether the plaintiff who seeks to litigate the claim in England has voluntarily participated sufficiently in the US proceedings so that the desirability of finality in litigation overcomes their desire to litigate in their home English forum an English Law claim. Conversely, the US courts that have addressed this issue, such as the court in *Anwar v Fairfield Greenwich Limited*, 289. F.R.D. 105 (S.D.N.Y 2013), appear to have focused on whether a defendant would be bound by a judgment against it in a US court, and not whether members of the class would be bound by a judgment.

172.  Moreover, the issue may not be a binary question in all cases as the English court's approach will depend upon the extent to which it considers that the person seeking to bring a new claim has participated in the class action. I agree that simply failing to opt out when told of the judgment or order would not be sufficient voluntary participation—in England & Wales, a party should not be bound by litigation in which they have not actively chosen to engage and conversely should not be lightly shut out of litigation in which they wish to engage and are prima facie entitled to engage in. In this respect, I would place greater weight than Professor Mulheron on the principle established in *Felthouse v Bindley* (1862) 142 ER 1037, namely that silence cannot be taken as consent, meaning in this context that participation must be affirmatively demonstrated, not passively presumed. There may be many reasons why a plaintiff failed to opt out. Examples would be non-delivery of the notice to opt out, failure to understand the significance of the issue, unwillingness to take advice, lack of time etc. As Professor Mulheron posits at p.201 there may also be further intermediate states which a court would not consider sufficient voluntary participation.

173.  The English court will be mindful that if the judgment or court-approved settlement is recognised the plaintiffs would be shut out of litigating English law claims on the basis of failing to take a step in an overseas jurisdiction in a procedure which is unfamiliar to them. The position is a fortiori where the court can have no assurance that the class members as a whole were aware of the opt-out, or even of the class action at all. In my view, the larger the class the less the court will be comfortable making any such assumption.

174.  The class in relation to the s.90A claims is potentially very large. The class in relation to the Amended Complaint has been defined as those who "*purchased or otherwise acquired Barclays ordinary shares traded on the London Stock Exchange … or continued to hold during the Class Period, seeking to pursue remedies under Section 90A and Schedule 10A of the U.K*". I am not instructed as to the precise number of trades or total volume of trading of Barclays stock on the LSE but it will be a significant number and when coupled with the 4½ year class period the possible number of potential class members is very large.

175.    The position is further complicated by reason of the manner in which shares in UK listed companies are generally held. They are generally held in what is known as 'dematerialised form' using custodians to acquire, hold or dispose of shares. Typically shares are held in a custody chain, with a custodian at the top of the chain, and the investor at the bottom of the chain. In summary:

(a)    The investor (at the bottom of the chain) will contract with an intermediary to purchase an indirect interest in the shares.

(b)    In some cases, that intermediary will be a custodian—usually a large investment bank.

(c)    In other cases, the intermediary will be a third-party broker, who in turn will contract with the custodian.

(d)    In some cases, the custodian will hold legal title to the shares directly. In other cases, it will appoint a sub-custodian or nominee to hold them.

176.    Accordingly, in almost all cases, investors will be at least one stage removed from legal ownership of the shares. In many cases, they will be several stages removed. Those underlying investors holding intermediated securities have an "*interest in securities*" so as to confer standing to sue under s. 90A of FSMA. *SL Claimants v Tesco PLC* [2019] EWHC 2858 at [86].

177.    Thus, the likely difficulty in this case from the perspective of the English court is that, so far as I am aware, the St Louis Firemen would have no means of identifying the underlying investors and putative members of the class—still less of notifying them of the action purportedly brought on their behalf or informing them of the opt-out option. Indeed, even the issuer (Barclays) will for the most part be unable to identify them.

178.    In summary, my view on this difficult question of English Law is that an English court would not recognise a US judgment or court-approved settlement in a US opt-out securities action in all circumstances, but may be prepared to do so if satisfied that the plaintiff has sufficiently voluntarily participated in the US proceedings, although simply failing to opt out would not be sufficient voluntary participation.

**X.      Conclusion**

179.    A summary of my conclusions is set out in Section III above. I remain happy to assist the Court should further questions arise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Hampshire, United Kingdom on September 5, 2025.

*Martin Moore*

Martin Moore K.C.

DECLARATION OF MARTIN MOORE K.C.