# Exhibit 2

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 2 of 2232
Page ID #:2060
s. 47B Collective proceedings before the Tribunal, Competition Act 1998 c. 41

# Competition Act 1998 c. 41

# Chapter IV Appeals before the Tribunal"the Tribunal" is defined in section 59(1) of the Competition Act 1998 (c. 41), as amended by the Enterprise Act 2002 (c. 40) Schedule 5, paragraph 6(b). and proceedings and settlements relating to infringements of competition law

# s. 47B Collective proceedings before the Tribunal

**Law In Force**

**Version 1 of 1**

9 March 2017 - Present

**Subjects**
Civil procedure; Competition law

**Keywords**
Abuse of dominant position; Anti-competitive practices; Collective proceedings; Competition agreements; Damages; Infringement

[

**47B Collective proceedings before the Tribunal**

(1)  Subject to the provisions of this Act and Tribunal rules, proceedings may be brought before the Tribunal combining two or more claims to which section 47A applies ("collective proceedings").

(2)  Collective proceedings must be commenced by a person who proposes to be the representative in those proceedings.

(3)  The following points apply in relation to claims in collective proceedings—

(a)  it is not a requirement that all of the claims should be against all of the defendants to the proceedings,

(b)  the proceedings may combine claims which have been made in proceedings under section 47A and claims which have not, and

(c)  a claim which has been made in proceedings under section 47A may be continued in collective proceedings only with the consent of the person who made that claim.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 3 of 2232 Page ID #:2061

(4)  Collective proceedings may be continued only if the Tribunal makes a collective proceedings order.

(5)  The Tribunal may make a collective proceedings order only—

(a)  if it considers that the person who brought the proceedings is a person who, if the order were made, the Tribunal could authorise to act as the representative in those proceedings in accordance with subsection (8), and

(b)  in respect of claims which are eligible for inclusion in collective proceedings.

(6)  Claims are eligible for inclusion in collective proceedings only if the Tribunal considers that they raise the same, similar or related issues of fact or law and are suitable to be brought in collective proceedings.

(7)  A collective proceedings order must include the following matters—

(a)  authorisation of the person who brought the proceedings to act as the representative in those proceedings,

(b)  description of a class of persons whose claims are eligible for inclusion in the proceedings, and

(c)  specification of the proceedings as opt-in collective proceedings or opt-out collective proceedings (see subsections (10) and (11)).

(8)  The Tribunal may authorise a person to act as the representative in collective proceedings—

(a)  whether or not that person is a person falling within the class of persons described in the collective proceedings order for those proceedings (a "class member"), but

(b)  only if the Tribunal considers that it is just and reasonable for that person to act as a representative in those proceedings.

(9)  The Tribunal may vary or revoke a collective proceedings order at any time.

(10)  *"Opt-in collective proceedings"* are collective proceedings which are brought on behalf of each class member who opts in by notifying the representative, in a manner and by a time specified, that the claim should be included in the collective proceedings.

(11)  *"Opt-out collective proceedings"* are collective proceedings which are brought on behalf of each class member except—

(a) any class member who opts out by notifying the representative, in a manner and by a time specified, that the claim should not be included in the collective proceedings, and

(b) any class member who—

(i) is not domiciled in the United Kingdom at a time specified, and

(ii) does not, in a manner and by a time specified, opt in by notifying the representative that the claim should be included in the collective proceedings.

(12) Where the Tribunal gives a judgment or makes an order in collective proceedings, the judgment or order is binding on all represented persons, except as otherwise specified.

(13) The right to make a claim in collective proceedings does not affect the right to bring any other proceedings in respect of the claim.

(14) In this section and in section 47C, *"specified"* means specified in a direction made by the Tribunal.

] [1]

---

# Notes

[1]    Existing ss 47A-47D are moved under a new heading entitled "Claims for loss or damage: proceedings before the Tribunal" by Claims in respect of Loss or Damage arising from Competition Infringements (Competition Act 1998 and Other Enactments (Amendment)) Regulations 2017/385 Sch.2 para.3 (March 9, 2017)

---

*Part I COMPETITION > Chapter IV Appeals before the Tribunal"the Tribunal" is defined in section 59(1) of the Competition Act 1998 (c. 41), as amended by the Enterprise Act 2002 (c. 40) Schedule 5, paragraph 6(b). and proceedings and settlements relating to infringements of competition law > Claims for loss or damage, or for declaratory relief: proceedings before the Tribunal > s. 47B Collective proceedings before the Tribunal*

---

Contains public sector information licensed under the Open Government Licence v3.0.

## Competition Act 1998 c. 41
## Chapter IV Appeals before the Tribunal"the Tribunal" is defined in section 59(1) of the Competition Act 1998 (c. 41), as amended by the Enterprise Act 2002 (c. 40) Schedule 5, paragraph 6(b). and proceedings and settlements relating to infringements of competition law
## s. 49A Collective settlements: where a collective proceedings order has been made

**Law In Force**

**Version 1 of 1**

1 October 2015 - Present

**Subjects**
Competition law

**Keywords**
Abuse of dominant position; Anti-competitive practices; Collective proceedings; Competition agreements; Competition Appeal Tribunal; Group litigation; Infringement; Settlement

[

**49A Collective settlements: where a collective proceedings order has been made**

(1)  The Tribunal may, in accordance with this section and Tribunal rules, make an order approving the settlement of claims in collective proceedings (a "collective settlement") where—

  (a)  a collective proceedings order has been made in respect of the claims, and

  (b)  the Tribunal has specified that the proceedings are opt-out collective proceedings.

(2) An application for approval of a proposed collective settlement must be made to the Tribunal by the representative and the defendant in the collective proceedings.

(3)  The representative and the defendant must provide agreed details of the claims to be settled by the proposed collective settlement and the proposed terms of that settlement.

(4)  Where there is more than one defendant in the collective proceedings, *"defendant"* in subsections (2) and (3) means such of the defendants as wish to be bound by the proposed collective settlement.

(5)  The Tribunal may make an order approving a proposed collective settlement only if satisfied that its terms are just and reasonable.

(6)  On the date on which the Tribunal approves a collective settlement—

(a)  if the period within which persons may opt out of or (in the case of persons not domiciled in the United Kingdom) opt in to the collective proceedings has expired, subsections (8) and (10) apply so as to determine the persons bound by the settlement;

(b)  if that period has not yet expired, subsections (9) and (10) apply so as to determine the persons bound by the settlement.

(7)  If the period within which persons may opt out of the collective proceedings expires on a different date from the period within which persons not domiciled in the United Kingdom may opt in to the collective proceedings, the references in subsection (6) to the expiry of a period are to the expiry of whichever of those periods expires later.

(8)  Where this subsection applies, a collective settlement approved by the Tribunal is binding on all persons falling within the class of persons described in the collective proceedings order who—

(a)  were domiciled in the United Kingdom at the time specified for the purposes of determining domicile in relation to the collective proceedings (see section 47B(11)(b)(i)) and did not opt out of those proceedings, or

(b)  opted in to the collective proceedings.

(9)  Where this subsection applies, a collective settlement approved by the Tribunal is binding on all persons falling within the class of persons described in the collective proceedings order.

(10)  But a collective settlement is not binding on a person who—

(a)  opts out by notifying the representative, in a manner and by a time specified, that the claim should not be included in the collective settlement, or

(b)  is not domiciled in the United Kingdom at a time specified, and does not, in a manner and by a time specified, opt in by notifying the representative that the claim should be included in the collective settlement.

(11)  This section does not affect a person's right to offer to settle opt-in collective proceedings.

(12)  In this section and in section 49B, *"specified"* means specified in a direction made by the Tribunal.

]¹

© 2025 Thomson Reuters.

# Notes

1      Added by Consumer Rights Act 2015 c. 15 Sch.8(1) para.10(1) (October 1, 2015 subject to
       transitional provisions and savings specified in SI 2015/1630 arts 6-8)

*Part I COMPETITION > Chapter IV Appeals before the Tribunal"the Tribunal" is defined in section 59(1) of the
Competition Act 1998 (c. 41), as amended by the Enterprise Act 2002 (c. 40) Schedule 5, paragraph 6(b). and
proceedings and settlements relating to infringements of competition law > Settlements relating to infringements
of competition law > s. 49A Collective settlements: where a collective proceedings order has been made*

Contains public sector information licensed under the Open Government Licence v3.0.

# Chapter IV Appeals before the Tribunal"the Tribunal" is defined in section 59(1) of the Competition Act 1998 (c. 41), as amended by the Enterprise Act 2002 (c. 40) Schedule 5, paragraph 6(b). and proceedings and settlements relating to infringements of competition law
## s. 49B Collective settlements: where a collective proceedings order has not been made

**Law In Force**

**Version 1 of 1**

1 October 2015 - Present

**Subjects**
Competition law

**Keywords**
Abuse of dominant position; Anti-competitive practices; Competition agreements; Competition Appeal Tribunal; Infringement; Settlement

[

**49B Collective settlements: where a collective proceedings order has not been made**

(1)   The Tribunal may, in accordance with this section and Tribunal rules, make an order approving the settlement of claims (a "collective settlement") where—

(a)  a collective proceedings order has not been made in respect of the claims, but

(b)  if collective proceedings were brought, the claims could be made at the commencement of the proceedings (disregarding any limitation or prescriptive period applicable to a claim in collective proceedings).

(2)  An application for approval of a proposed collective settlement must be made to the Tribunal by—

(a)  a person who proposes to be the settlement representative in relation to the collective settlement, and

(b)  the person who, if collective proceedings were brought in respect of the claims, would be a defendant in those proceedings (or, where more than one person would be a defendant in those proceedings, such of those persons as wish to be bound by the proposed collective settlement).

(3)  The persons applying to the Tribunal under subsection (2) must provide agreed details of the claims to be settled by the proposed collective settlement and the proposed terms of that settlement.

(4)  The Tribunal may make an order approving a proposed collective settlement (see subsection (8)) only if it first makes a collective settlement order.

(5)  The Tribunal may make a collective settlement order only—

(a)  if it considers that the person described in subsection (2)(a) is a person who, if the order were made, the Tribunal could authorise to act as the settlement representative in relation to the collective settlement in accordance with subsection (7), and

(b)  in respect of claims which, if collective proceedings were brought, would be eligible for inclusion in the proceedings (see section 47B(6)).

(6)  A collective settlement order must include the following matters—

(a)  authorisation of the person described in subsection (2)(a) to act as the settlement representative in relation to the collective settlement, and

(b)  description of a class of persons whose claims fall within subsection (5)(b).

(7)  The Tribunal may authorise a person to act as the settlement representative in relation to a collective settlement—

(a)  whether or not that person is a person falling within the class of persons described in the collective settlement order for that settlement, but

(b)  only if the Tribunal considers that it is just and reasonable for that person to act as the settlement representative in relation to that settlement.

(8)  Where the Tribunal has made a collective settlement order, it may make an order approving a proposed collective settlement only if satisfied that its terms are just and reasonable.

(9)  A collective settlement approved by the Tribunal is binding on all persons falling within the class of persons described in the collective settlement order.

(10)  But a collective settlement is not binding on a person who—

(a)  opts out by notifying the settlement representative, in a manner and by a time specified, that the claim should not be included in the collective settlement, or

(b)  is not domiciled in the United Kingdom at a time specified, and does not, in a manner and by a time specified, opt in by notifying the settlement representative that the claim should be included in the collective settlement.

(11)  In this section, *"settlement representative"*  means a person who is authorised by a collective settlement order to act in relation to a collective settlement.

]¹

---

# Notes

1      Added by Consumer Rights Act 2015 c. 15 Sch.8(1) para.11(1) (October 1, 2015 subject to transitional provisions and savings specified in SI 2015/1630 arts 6-8)

---

*Part I COMPETITION > Chapter IV Appeals before the Tribunal"the Tribunal" is defined in section 59(1) of the Competition Act 1998 (c. 41), as amended by the Enterprise Act 2002 (c. 40) Schedule 5, paragraph 6(b). and proceedings and settlements relating to infringements of competition law > Settlements relating to infringements of competition law > s. 49B Collective settlements: where a collective proceedings order has not been made*

---

Contains public sector information licensed under the Open Government Licence v3.0.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 11 of 2232
Page ID #:2069
s. 90A Liability of issuers in connection with published... Financial Services and...

# Financial Services and Markets Act 2000 c. 8
# s. 90A Liability of issuers in connection with published information

**Law In Force**

**Version 2 of 2**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Liabilities; Loss; Misleading statements; Omissions; Securities

[

### 90A. Liability of issuers in connection with published information

Schedule 10A makes provision about the liability of issuers of securities to pay compensation to persons who have suffered loss as a result of—

    (a)  a misleading statement or dishonest omission in certain published information relating to the securities, or

    (b)  a dishonest delay in publishing such information.

] [1]

---

## Notes

1      Substituted by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 reg.2(2)  (October 1, 2010: substitution has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Part VI OFFICIAL LISTING > Compensation for false or misleading statements etc > s. 90A Liability of issuers in connection with published information*

---

Contains public sector information licensed under the Open Government Licence v3.0.

---

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 12 of 2232
Page ID #:2070
Financial Services and Markets Act 2000 c. 8

# Financial Services and Markets Act 2000 c. 8
## Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
## para. 1 Securities to which this Schedule applies

**Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Misleading statements; Non-disclosure; Securities

[

**1.— Securities to which this Schedule applies**

(1) This Schedule applies to securities that are, with the consent of the issuer, admitted to trading on a securities market, where—

(a) the market is situated or operating in the United Kingdom, or

(b) the United Kingdom is the issuer's home State.

(2) For the purposes of this Schedule—

(a) an issuer of securities is not taken to have consented to the securities being admitted to trading on a securities market by reason only of having consented to their admission to trading on another market as a result of which they are admitted to trading on the first-mentioned market;

(b) an issuer who has accepted responsibility (to any extent) for any document prepared for the purposes of the admission of the securities to trading on a securities market (such as a prospectus or listing particulars) is taken to have consented to their admission to trading on that market.

[

(3) For the purposes of this Schedule the United Kingdom is the home State of an issuer if—

(a) the transparency rules impose requirements on the issuer in relation to the securities, or

© 2025 Thomson Reuters.

(b)  the issuer has its registered office (or, if it does not have a registered office, its head office) in the United Kingdom.

]$^2$]$^1$

## Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

2    Added by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(2) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION*
*> Part 1 SCOPE OF THIS SCHEDULE > para. 1 Securities to which this Schedule applies*

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 14 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2072

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 2 Published information to which this Schedule applies

**Law In Force**

**Version 2 of 2**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Information services; Issuers; Misleading statements; Non-disclosure; Securities

[

### 2.— Published information to which this Schedule applies

(1)  This Schedule applies to information published by the issuer of securities to which this Schedule applies—

(a)  by recognised means, or

(b)  by other means where the availability of the information has been announced by the issuer by recognised means.

(2)  It is immaterial whether the information is required to be published (by recognised means or otherwise).

(3)  The following are "recognised means"—

(a)  a recognised information service;

(b)  other means required or authorised to be used to communicate information to the market in question, or to the public, when a recognised information service is unavailable.

(4)  A *"recognised information service"* means—

(a)   in relation to a securities market situated or operating in the [United Kingdom] [2] , a service used for the dissemination of information in accordance with [transparency rules] [3] ;

© 2025 Thomson Reuters.

(b)   in relation to a securities market situated or operating outside the [United Kingdom] [4] , a service used for the dissemination of information corresponding to that required to be disclosed under [transparency rules] [5] ; or

(c)  in relation to any securities market, any other service used by issuers of securities for the dissemination of information required to be disclosed by the rules of the market.

] [1]

# Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

2      Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(a)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

3      Words substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(a)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

4      Word substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(b)(i) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

5      Words substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(3)(b)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION >*
*Part 1 SCOPE OF THIS SCHEDULE > para. 2 Published information to which this Schedule applies*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 16 of 2232
Page ID #:2074
Financial Services and Markets Act 2000 c. 8

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
## para. 3

**Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Misleading statements; Non-disclosure; Securities

[

**3.—**

(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

(a)  acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and

(b)  suffers loss in respect of the securities as a result of—

(i)  any untrue or misleading statement in that published information, or

(ii) the omission from that published information of any matter required to be included in it.

(2)  The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

(3)  The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4)  A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—

(a)  in reliance on the information in question, and

© 2025 Thomson Reuters.

(b) at a time when, and in circumstances in which, it was reasonable for him to rely on it.

]$^1$

---

## Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for misleading statement or dishonest omission > para. 3*

---

Contains public sector information licensed under the Open Government Licence v3.0.

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 4

**Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Dishonesty; Issuers; Listing particulars; Misleading statements; Non-disclosure; Prospectuses; Securities

[

**4.**

An issuer of securities to which this Schedule applies is not liable under paragraph 3 to pay compensation to a person for loss suffered as a result of an untrue or misleading statement in, or omission from, published information to which this Schedule applies if—

(a)    the published information is contained in listing particulars or a prospectus (or supplementary listing particulars or a supplementary prospectus), and

(b)    the issuer is liable under section 90 (compensation for statements in listing particulars or prospectus) to pay compensation to the person in respect of the statement or omission.

]¹

## Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for misleading statement or dishonest omission > para. 4*

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 20 of 2232
Page ID #:2078
Financial Services and Markets Act 2000 c. 8

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 5

**Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Issuers; Securities

[

**5.—**

(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—

(a)  acquires, continues to hold or disposes of the securities, and

(b)  suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.

(2)  The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.

]<sup>1</sup>

---

## Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Liability of issuer for dishonest delay in publishing information > para. 5*

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 22 of 2232
Page ID #:2080
Financial Services and Markets Act 2000 c. 8

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 6

**Law In Force**

**Version 1 of 1**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Interpretation; Issuers; Misleading statements; Securities

[

**6.**

For the purposes of paragraphs 3(3) and 5(2) a person's conduct is regarded as dishonest if (and only if)—

    (a)  it is regarded as dishonest by persons who regularly trade on the securities market in question, and

    (b)  the person was aware (or must be taken to have been aware) that it was so regarded.

] [1]

---

## Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Meaning of dishonesty > para. 6*

Contains public sector information licensed under the Open Government Licence v3.0.

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION para. 7

**Partially In Force With Amendments Pending**

**Version 1 of 2**

1 October 2010 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Exemptions; Issuers; Misleading statements; Securities

[

**7.—**

(1)  The issuer is not subject—

(a)  to any liability other than that provided for by paragraph 3 in respect of loss suffered as a result of reliance by any person on—

(i)  an untrue or misleading statement in published information to which this Schedule applies, or

(ii) the omission from any such published information of any matter required to be included in it;

(b)  to any liability other than that provided for by paragraph 5 in respect of loss suffered as a result of delay in the publication of information to which this Schedule applies.

(2)  A person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(3)  This paragraph does not affect—

(a)  civil liability—

(i)  under section 90 (compensation for statements in listing particulars or prospectus),

(ii)  under rules made by virtue of section 954 of the Companies Act 2006 (compensation),

(iii)  for breach of contract,

(iv)  under the Misrepresentation Act 1967, or

(v)  arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned;

(b)  liability to a civil penalty; or

(c)  criminal liability.

(4)  This paragraph does not affect the powers conferred by sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution).

(5) References in this paragraph to liability, in relation to a person, include a reference to another person being entitled as against that person to be granted any civil remedy or to rescind or repudiate an agreement.

][1]

---

## Notes

1      Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

---

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 2 LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION > Exclusion of certain other liabilities > para. 7*

---

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 25 of 2232
Page ID #:2083

# Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION
# para. 8 Interpretation

**Law In Force**

**Version 3 of 3**

31 December 2020 - Present

**Subjects**
Financial regulation

**Keywords**
Compensation; Delay; Disclosure; Dishonesty; Interpretation; Issuers; Misleading statements; Securities

[

## 8.— Interpretation

(1) In this Schedule—[

(a) *"securities"* means transferable securities as defined in Article 2(1)(24) of the markets in financial instruments regulation, other than money market instruments as defined in Article 2(1)(25A) of that regulation that have a maturity of less than 12 months (and includes instruments outside the United Kingdom); [3]

]$^2$

(b) *"securities market"* means—[

(i) a regulated market as defined in Article 2(1)(13) of the markets in financial instruments regulation, or

(ii) a multilateral trading facility as defined in Article 2(1)(14) of that regulation.

]$^4$

(2) References in this Schedule to the issuer of securities are—

(a) in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading as mentioned in paragraph 1(1), to the issuer of the securities represented;

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 26 of 2232
Page ID #:2084
Financial Services and Markets Act 2000 c. 8

(b)  in any other case, to the person who issued the securities.

(3)  References in this Schedule to the acquisition or disposal of securities include—

(a)  acquisition or disposal of any interest in securities, or

(b)  contracting to acquire or dispose of securities or of any interest in securities,

except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.

(4)  References to continuing to hold securities have a corresponding meaning.

(5)  For the purposes of this Schedule the following are persons "discharging managerial responsibilities" within an issuer—

(a) any director of the issuer (or person occupying the position of director, by whatever name called);

(b)  in the case of an issuer whose affairs are managed by its members, any member of the issuer;

(c) in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication.

(6)  The following definitions (which apply generally for the purposes of Part 6 of this Act) do not apply for the purposes of this Schedule:

(a)  section 102A(1), (2) and (6) (meaning of "securities" and "issuer") [5] [.] [6]

[...] [7]

] [1]

---

# Notes

1    Added by Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192 Sch.1 para.1 (October 1, 2010: insertion has effect subject to transitional provisions specified in SI 2010/1192, reg.3)

2    Substituted by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(a)(i) (December 31, 2020: shall

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 27 of 2232
Page ID #:2085
Financial Services and Markets Act 2000 c. 8

# Notes

come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

3    Articles 1(1)(24) and (25A) are substituted by S.I. 2018/****.

4    Para.8(1)(b)(i)-(ii) substituted for para.8(1)(b)(I)-(iii) by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(a)(ii) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

5    Sections 102A to 102C and 103 were substituted for section 103 as originally enacted by regulation 2(1) of and paragraph 1 of Schedule 11 to the Prospectus Regulations 2005(S.I. 2005/1433).

6    Repealed by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(b) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

7    Repealed by Official Listing of Securities, Prospectus and Transparency (Amendment etc.) (EU Exit) Regulations 2019/707 Pt 2(1) reg.37(4)(b) (December 31, 2020: shall come into force on IP completion day not exit day as specified in 2020 c.1 s.39(1) and Sch.5 para.1(1))

*Schedule 10A LIABILITY OF ISSUERS IN CONNECTION WITH PUBLISHED INFORMATION > Part 3 SUPPLEMENTARY PROVISIONS > para. 8 Interpretation*

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 28 of 2232
Page ID #:2086
Financial Services and Markets Act 2000 c. 8

# para. 1

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## INTRODUCTION

1. These explanatory notes relate to the Financial Services and Markets Act 2000 ("the Act") which received Royal Assent on 14 June 2000. They have been prepared by HM Treasury in order to assist the reader in understanding the Act. They do not form part of the Act and have not been endorsed by Parliament.

2. The notes need to be read in conjunction with the Act. They are not, and are not meant to be, a comprehensive description of the Act. So where a section or part of a section does not seem to require any explanation or comment, none is given.

## SUMMARY

3. The Act provides the framework within which a single regulator for the financial services industry, the Financial Services Authority ("the Authority"), will operate. It equips the Authority with a full range of statutory powers and creates the Financial Services and Markets Tribunal ("the Tribunal"). The Act also establishes the framework for single ombudsman and compensation schemes to provide further protection for consumers.

4. The Act makes provision, amongst other things, with respect to:

- the constitution and accountability of the Authority;

- the definition of the scope of regulated activities;

- the control of financial promotion;

- powers of the Authority to authorise, regulate, investigate and discipline authorised persons;

- the recognition of investment exchanges and clearing houses;

- arrangements for the approval of controllers and the performance of regulated activities;

- the oversight of financial services provided by members of the professions;

- regulation and marketing of collective investment schemes;

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 29 of 2232
Page ID #:2087
Financial Services and Markets Act 2000 c. 8

• certain criminal offences;

• powers to impose penalties for market abuse; and

• the transfer to the Authority of registration functions in respect of building societies, friendly societies, industrial and provident societies and certain other mutual societies.

5. An overview of the Act is set out below. A detailed description of each Part and the sections is contained in the commentary. Terms used are defined in the text where they first appear. There is a glossary of certain terms defined in the Act and certain other terms which are used throughout these notes.

## BACKGROUND

### Financial Services Overview

6. The UK financial services industry accounts for approximately 7 per cent of GDP, employing over 1 million people in the City of London and across the country.

7. Businesses to be authorised and regulated under the Act include:

   • Banks

   • Building societies

   • Insurance companies

   • Friendly societies

   • Credit unions

   • Lloyd's

   • Investment and pensions advisers

   • Stockbrokers

   • Professional firms offering certain types of investment services

   • Fund managers

   • Derivatives traders

### Regulatory Framework

8. The regulation of financial services has, historically, been the responsibility of a range of different bodies:

• the Authority (formerly the Securities and Investment Board);

• the Self-Regulating Organisations ("SROs"): most recently the Personal Investment Authority, the Investment Management Regulatory Organisation and the Securities and Futures Authority;

• the former Supervision and Surveillance Branch of the Bank of England;

• the Building Societies Commission;

• the Insurance Directorate of the Treasury;

• the Friendly Societies Commission; and

• the Registry of Friendly Societies.

9. Following the Government's announcement of its proposals to introduce legislation to reform the regulation of financial services in May 1997, steps were taken to transfer responsibility for regulation to the Authority. Certain functions under the Banking Act 1987 ("Banking Act") were transferred by the Bank of England Act 1998. In other cases, the Authority entered into contracts with the relevant bodies to perform regulatory functions on their behalf. For example, the Treasury contracted with the Authority for the performance of certain functions under the Insurance Companies Act 1982 ("ICA 1982"). Many relevant staff transferred to the Authority and relocated to its headquarters building. This process of integration will be completed when the Act is brought into force.

10. The Act will broadly continue the regime for recognised investment exchanges and clearing houses under the Financial Services Act 1986 ("FS Act 1986"), although the Authority's powers under the Act will be widened as compared with those under the predecessor legislation. The Authority will have powers to regulate the Lloyd's insurance market, and have powers of direction over the Council of Lloyd's, although the latter will retain its responsibilities under Lloyd's Acts for the superintendence and governance of the Society of Lloyd's. The recognised professional bodies regime under the FS Act 1986 will not continue. Professional firms (such as solicitors, accountants and actuaries) carrying on mainstream regulated activities will be authorised and regulated directly by the Authority. However, some categories of professional firm will benefit from an exclusion from the scope of regulation under the Act, subject to arms-length oversight by and certain powers of the Authority. The Act does not affect the professional bodies' wider powers to regulate the professional activities of members of their respective professions.

11. The Act is intended to coordinate and modernise financial regulatory arrangements which are currently established under a number of different enactments:

• the Credit Unions Act 1979

• the Insurance Companies Act 1982

© 2025 Thomson Reuters.

• the Financial Services Act 1986

• the Building Societies Act 1986

• the Banking Act 1987

• the Friendly Societies Act 1992

12. Those enactments are generally supplemented by secondary legislation or rules. It is intended that the powers conferred by section 426 will be used so that the relevant parts of that legislation, and rules and regulations made under it, will be substantially repealed when the Act comes into force. Certain other enactments will also be repealed, or substantially repealed, including the Policyholders Protection Acts 1975–97, the Industrial Assurance Acts 1923–48 and the Insurance Brokers (Registration) Act 1977.

13. The Act also provides for the transfer of the remaining functions, including for example functions relating to the registration of mutual societies, of the Building Societies Commission, the Friendly Societies Commission and the Registry of Friendly Societies.

**Consultation and scrutiny**

14. In July 1998, the Treasury published a paper entitled *Financial Services and Markets Bill: A Consultation Document* which explained its policy in detail and included a draft of the Bill. That consultation exercise attracted comments from over 220 firms and bodies interested in the regulation of financial services, including those representing consumers. The Treasury also published a number of relevant consultation papers, including drafts of secondary legislation to be made under the Act. Copies of relevant documents, including consultation papers and press notices, were made available at the Treasury's website (www.hm-treasury.gov.uk).

15. The draft Bill was subject to pre-legislative scrutiny prior to its introduction into the House of Commons. The Treasury Committee published its third report of Session 1998–1999 on Financial Services Regulation in February 1999 (*Financial Services Regulation, Volumes I and II;* House of Commons 73 I–II). The Government's response was published in March 1999 (*Financial Services Regulation: The Government's Response to the Third Report from the Committee of Session 1998–99;* House of Commons 347).

16. A Joint Committee of both Houses of Parliament was also established to consider aspects of the draft Bill. That committee was also able to consider the Treasury's Progress Report published in March 1999. The Joint Committee published its first report on 29 April 1999 (*Draft Financial Services and Markets Bill: First Report* ; House of Lords, 50 I–II; House of Commons, HC328 I–II) and its second report on 2 June 1999 (*Draft Financial Services and Markets Bill: Second Report;* House of Lords, 66; House of Commons, HC465). The Government response to the reports of the Joint Committee on Financial Services and Markets was published in June 1999.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 32 of 2232
Page ID #:2090
Financial Services and Markets Act 2000 c. 8

17. The Bill was introduced into the House of Commons on 17 June 1999 and given its second reading on 28 June 1999. The Bill was the first public Bill to be carried over from session of Parliament to the another, under a new procedure recommended by the Select Committee on Modernisation of the House of Commons. The Bill was scrutinised in Standing Committee A between 6 July 1999 and 9 December 1999 (35 sessions). Report Stage took place on 27 January 2000 and on 1 and 9 February 2000. The Bill also received its third reading in the House of Commons on 9 February 2000.

18. The Bill was introduced into the House of Lords on 10 February 2000. It received its second reading on 21 February 2000. There were five Committee days, between 16 and 30 March 2000, followed by three days on Report, on 13 and 18 April 2000 and on 9 May 2000. The Bill received its third reading on 18 May 2000.

19. While the Bill was before the House of Lords, the Treasury also submitted a number of memoranda on the powers to make delegated legislation under the Bill to the Delegated Powers and Deregulation Committee. The Committee reported its view in a number of published reports. The relevant reports were the Seventh Report (16 February 2000), Eighth Report (8 March 2000), Tenth Report (15 March 2000) Twelfth Report (12 April 2000) and Sixteenth Report (17 May 2000). The Treasury's memorandum in each case was annexed to the report.

20. The Bill returned to the Commons for consideration of Lords Amendments on 5 June 2000. It was subsequently returned to the Lords for consideration of Commons amendments on 12 June 2000. This completed the Bill's Parliamentary passage. Royal Assent was given on 14 June 2000.

21. The Authority consults widely on the way it proposes to use its powers and carry out functions under the Act in accordance with the requirements under the Act. Full details of the Authority's consultation papers are available on its website (www.fsa.gov.uk) from where copies of current documents can be downloaded.

**INTERPRETATION**

22. There are many defined words and expressions in the Act.

23. Most of the definitions are for the purpose only of the section or Schedule in which they are used. So, for example, the three words defined in subsections (13), (14) and (15) of section 21 are defined only for the purposes of that section.

24. Where there is no indication that a definition is intended to apply to a group of provisions, a Part of the Act or the Act as a whole, it applies only for the purposes of the section or Schedule in which it appears.

25. Many of these single-provision definitions are just drafting devices to avoid clumsy repetition which would make an already long Act even longer. For example, in section 38 the word

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 33 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2091

"specified" is used on its own on five occasions. The definition in subsection (4) is there to save repeating the words "in an exemption order" each time it is used.

26. Some of the words and expressions that are defined just for the purposes of the particular provision in which the definition occurs are used (and defined separately) in other provisions — where they may have a different meaning. For example *"consumers"* is defined separately for the purposes of sections 5(3), 10(7), 14(5) and 138(7) (the definition in section 10(7) differing from the others).

27. The Act consists of a large number of separate Parts. Where a particular Part deals with a self-contained subject there may be a separate interpretation section within the Part (for example section 193, which deals with the interpretation of Part XIII).

28. For the Act as a whole, Part XXIX contains a group of nine sections which deal with expressions used in a number of provisions and other matters which bear on the interpretation of provisions of the Act.

29. The purpose of this glossary is to provide the reader with a guide to words or expressions which are defined generally and so liable to be met in provisions which do not themselves contain the definition.

| *Expression* | *Where defined (references are to sections, unless otherwise specified)* |
| --- | --- |
| appointed representative | 39(2) |
| approved person | 64(13) |
| auditors and actuaries rules | 417 |
| Authority | 1(1) |
| authorised person | 31(2) |
| authorisation offence | 23(2) |
| body corporate | 417(1) |
| chief executive | 417(1) |
| collective investment scheme | 235 |
| Commission | 417(1) |
| compensation scheme | 213(2) |
| compulsory jurisdiction | 226(8) |
| control of information rules | 147(1) |
| controller | 422 |
| director | 417(1) |
| documents | 417(1) |
| EEA authorisation | 425(1) and Sch 3, para 6 |
| EEA firm | 425(1) and Sch 3, para 5 |

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 34 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2092

| EEA right | 425(1) and Sch 3, para 7 |
|---|---|
| EEA State | 425(1) and Sch 3, para 8 |
| exempt person | 417(1) |
| financial promotion rules | 417(1) |
| first banking co-ordination directive | 425(1) and Sch 3, para 2(1) |
| first life insurance directive | 425(1) and Sch 3, para 3(2) |
| first non-life insurance directive | 425(1) and Sch 3, Para 3(5) |
| friendly society | 417(1) |
| general guidance | 158(3) |
| general prohibition | 19(2) |
| general rules | 138(2) |
| group | 421 |
| home state authorisation | 425(2) and Sch 4, para 1 |
| home state regulator | 425(1) and Sch 3, para 9 |
| host state regulator | 425(1) and Sch 3, para 11 |
| incorporated friendly society | 417(1) |
| industrial and provident society | 417(1) |
| insurance business rules | 141(5) |
| insurance directives | 425(1) and Sch 3, para 3(1) |
| investment services directive | 425(1) and Sch 3, para 4 |
| legal assistance scheme | 134(4) |
| listed securities | 14(7) |
| manager | 423 |
| market abuse | 118(1) |
| Minister of the Crown | 417(1) |
| money laundering rules | 417(1) |
| notice of control | 178(5) |
| ombudsman scheme | 225(3) |
| open-ended investment company | 236 |
| own initiative power | 45(5) |
| parent undertaking | 420 |
| Part IV permission | 40(4) |
| partnership | 417(1) |
| policy | 424(2) |
| prescribed | 417(1) |
| price stabilising rules | 417(1) |
| private company | 417(1) |
| prohibition order | 56(2) |
| recognised clearing house | 285 |
| recognised investment exchange | 285 |
| recognised scheme | 237(3) |

© 2025 Thomson Reuters.

| registered friendly society | 417(1) |
|---|---|
| regulated activity | 22 |
| regulating provisions | 159(1) |
| regulatory objectives | 2 |
| regulatory provisions | 302(1) |
| rule | 417(1) |
| rule-making instrument | 153 |
| scheme manager | 212(1) |
| scheme operator | 225(2) |
| scheme particulars rules | 248(1) |
| second banking co-ordination directive | 425(1) and Sch 3, para 2(2) |
| second life insurance directive | 425(1) and Sch 3, para 3(6) |
| second non-life insurance directive | 425(1) and Sch 3, para 3(3) |
| seventh company law directive | 417(1) |
| single market directives | 425(1) and Sch 3, para 1 |
| subsidiary undertaking | 420 |
| supervisory notice | 395(13) |
| third life insurance directive | 425(1) and Sch 3, para 3(7) |
| third non-life insurance directive | 425(1) and Sch 3, para 3(4) |
| threshold conditions | 41 |
| Treaty | 417(1) |
| Treaty firm | 425(2) and Sch 4, para 1 |
| Tribunal | 132(1) |
| trust scheme rules | 247(1) |
| UK authorised person | 178(4) |
| UK firm | 425(1) and Sch 3, para 10 |
| unit trust scheme | 237 |
| voluntary jurisdiction | 227(12) |

*End > Explanatory Note > para. 1*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 2

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Notices

30. The Act frequently refers to the Authority proceeding by way of giving a "warning notice" or a "decision notice". The requirement to proceed in this way has particular procedural consequences, both in terms of the contents of those types of notice and of how action initiated by them must be taken forward. Those consequences are governed by the provisions of Part XXVI of the Act, to which reference should be made whenever the Authority is directed to proceed in this way.

## GLOSSARY OF TERMS USED IN THE EXPLANATORY NOTE

31. In addition to the defined terms above, for convenience, these explanatory notes also use certain other abbreviated terms as set out below.

| *Term used in these notes* | *Meaning* |
|---|---|
| Banking Act | Banking Act 1987 |
| CC Act 1974 | Consumer Credit Act 1974 |
| Companies Act | Companies Act 1985 |
| competent authority | the competent authority for listing |
| DGFT | Director General of Fair Trading |
| EC directives | Directives adopted by the relevant European Community institution |
| FS Act 1986 | Financial Services Act 1986 |
| ICA 1982 | Insurance Companies Act 1982 |
| oeic | open-ended investment company |
| SROs | Self-Regulating Organisations, which are responsible for the regulation of investment business under the FS Act 1986 |

## THE ACT

32. The Act is in 30 Parts.

© 2025 Thomson Reuters.

• Part I, The Regulator. This Part sets out the Authority's general duties and statutory objectives. It also, with Schedule 1, imposes requirements about the Authority's constitution and accountability and about the exercise of certain of its functions.

• Part II, Regulated and Prohibited Activities. This Part provides a power for the Treasury to set the scope of regulation by order, within the overall object and purpose of the Act. It prohibits persons who are not authorised (or exempt) from carrying on a regulated activity in the United Kingdom and from holding themselves out as being authorised or exempt. It also sets out arrangements for the regulation of financial promotion.

• Part III, Authorisation and Exemption. This Part sets out which persons are to be authorised for the purposes of the Act and gives the Treasury power to exempt certain persons from the requirement to be authorised. Authorised persons will include those persons given permission under Part IV and certain persons from other member States who are authorised in accordance with arrangements under the Treaty of Rome (the "Treaty") and the single market directives.

Part IV**, Permission to Carry on Regulated Activities.** This Part entitles persons to apply for the Authority's permission to carry on particular regulated activities and makes provision about the giving, variation and revocation of such permissions by the Authority.

Part V**, Performance of Regulated Activities. This Part requires persons, such as employees and office holders, who perform specified types of function for authorised persons, to be approved by the Authority. It requires such approved persons to behave in a way that complies with any statements of principle issued by the Authority and gives the Authority certain disciplinary powers. It also gives the Authority powers to prohibit persons from carrying out functions in relation to regulated activities.**

Part VI**, Official Listing.** This Part sets out the powers of the competent authority and the obligations of issuers listed securities. It makes provision for the maintenance of, and admission to, the official list, and for the making of listing rules (including listing rules in relation to sponsors).

Part VII**, Control of Business Transfers. This Part creates a mechanism for the transfer of banking and insurance business, subject to a court procedure and regulatory scrutiny.**

Part VIII**, Penalties for Market Abuse. This Part confers on the Authority power to impose penalties for market abuse. The Act sets out the kinds of behaviour which constitute market abuse and requires the Authority to produce a code which help to determine whether particular behaviour amounts to market abuse.**

Part IX**, Hearings and Appeals. This Part establishes the Tribunal and sets out the procedure for referring cases to it where the Authority has decided to take regulatory action under the various powers conferred by the Act. It gives a right to appeal against a decision of the Tribunal on a point of law.**

© 2025 Thomson Reuters.

Part X**, Rules and Guidance. This Part confers powers upon the Authority to set regulatory requirements for persons authorised under the Act. It gives the Authority power to issue guidance on requirements imposed by and under the Act. It also sets out the procedures that the Authority must follow in exercising those powers.**

Part XI**, Information Gathering and Investigations. This Part sets out the powers of the Authority and of the Secretary of State to require the production of information and documents, to require reports to be prepared, to conduct investigations and to gain access to premises with a warrant.**

Part XII**, Control over Authorised Persons.** This Part requires persons who propose to acquire control over certain authorised persons to notify, and secure the approval of, the Authority.

Part XIII**, Incoming Firms: Intervention by the Authority.** This Part confers power on the Authority to intervene in the activities of authorised persons from other member States who are authorised in accordance with rights under the Treaty and EC directives. It sets out the grounds on which the power is exercisable and the procedure for exercising it.

Part XIV**, Disciplinary Measures.** This Part gives the Authority powers to issue public statements about, or impose penalties on, authorised persons who fail to comply with requirements imposed by or under the Act.

Part XV**, The Financial Services Compensation Scheme. This Part requires the Authority to create a scheme for the payment of compensation to consumers who suffer financial loss as a consequence of the inability of an authorised person to meet its liabilities. It also confers a certain number of powers on the manager of the scheme.**

Part XVI**, The Ombudsman Scheme. This Part requires the Authority to establish a single, compulsory ombudsman scheme for the speedy and informal resolution of disputes between members of the public and authorised persons and confers certain powers on the operator of the ombudsman scheme for that purpose. It also provides for the ombudsman to adjudicate on certain other types of dispute, on a voluntary basis.**

Part XVII**, Collective Investment Schemes. This Part provides for the regulation of collective investment schemes.**

Part XVIII**, Recognised Investment Exchanges and Clearing Houses. This Part sets out the regulatory regime for investment exchanges and clearing houses and provides for competition scrutiny of the regulatory provisions and practices of those bodies.**

Part XIX**, Lloyd's. This Part makes the Society of Lloyd's an authorised person and gives the Authority certain powers to direct the affairs of the Society, its members and Lloyd's**

managing and members' agents. It also provides for the regulation of former underwriting members of the Society.

Part XX, **Provision of Financial Services by Members of the Professions. This Part creates an exemption for members of the professions providing financial services to clients in particular circumstances and gives the Authority an oversight role and certain powers in relation to firms that benefit from the exemption.**

Part XXI**, Mutual Societies. This Part confers powers on the Treasury to transfer to the Authority and to the Treasury certain functions relating to the registration and regulation of building societies, friendly societies and industrial and provident societies and certain other mutual societies. It also confers powers to dissolve certain statutory bodies.**

Part XXII**, Auditors and Actuaries. This Part concerns the appointment of auditors and actuaries by authorised persons and their responsibilities.**

Part XXIII**, Public Record and Disclosure of Information. This Part requires the Authority to maintain a public record of authorised (and certain other) persons, and makes provision about the purposes for which confidential information may be disclosed by and to the Authority and other persons having functions under the Act.**

Part XXIV**, Insolvency. This Part gives the Authority powers to ask the courts to wind up, or initiate other insolvency procedures against, authorised (and certain other) persons. It also enables the Authority to be heard by the court when such proceedings are commenced by third parties.**

Part XXV**, Injunctions and Restitution. This Part gives the Authority and the Secretary of State powers to seek injunctions in relation to regulatory contraventions and offences for which the Authority has powers to prosecute. It also provides for restitution to be paid to those who have incurred a loss as a result of such a contravention.**

Part XXVI**, Notices. This Part contains provisions relating to the procedures which the Authority must follow when giving notice of proposed actions under various provisions of the Act. It relates, for example, to decisions not to give permissions or to refuse applications for approvals and to decisions to take regulatory action, such as imposing penalties or making public statements.**

Part XXVII, **Offences.** This Part creates certain offences, including making misleading statements and supplying false information to the Authority. It also makes general provision about offences under the Act and contains provision about the institution of proceedings, for example under Part V of the Criminal Justice Act 1993 (insider dealing) and in relation to money laundering.

© 2025 Thomson Reuters.

Part XXVIII**, Miscellaneous.** This Part contains provisions giving the Treasury power to direct the Authority and certain other bodies to comply with the UK's international obligations, including European Union decisions to take reciprocal trade action. It also contains provisions concerning gaming contracts, reviews of past business and a number of other matters.

Part XXIX**, Interpretation.**

Part XXX**, Supplemental. This Part contains provisions dealing with the commencement of the legislation and its territorial scope. It confers certain powers on the Treasury in relation to consequential and transitional provisions and with** Schedules 18 and 20 to 22**makes certain amendments to other legislation.**

**COMMENTARY ON SECTIONS**

PART I**: THE REGULATOR**

33. This Part sets out the Authority's general duties and statutory objectives. Together with Schedule 1, it specifies statutory requirements for the Authority's constitution and status and the exercise of certain of its functions. It sets out arrangements which the Authority is required to make for consulting practitioners and consumers. It provides powers for the Treasury to commission reviews of the economy, efficiency and effectiveness with which the Authority has used its resources and to arrange independent inquiries into regulatory matters of serious concern.

Section 1**: The Financial Services Authority**

34. The Authority is a company limited by guarantee formed under the Companies Act 1985 ("Companies Act") as the Securities and Investment Board for the purpose of carrying out functions under the FS Act 1986. It later assumed functions under the Banking Act and exercised functions under other financial regulatory legislation, including for example under the ICA 1982 on behalf of the Treasury.

Section 2**: The Authority's general duties**

35. This section requires the Authority to discharge its general functions in accordance with its objectives and with regard to a number of principles. The objectives do not in themselves impose specific statutory duties or functions on the Authority. Rather, the section requires the Authority to carry out its general functions insofar as possible in a way which is compatible with the objectives and which, taking into account any need to balance the objectives as a whole, it considers most appropriate to their fulfilment.

36. Subsection (2) lists the Authority's objectives — market confidence, public awareness, the protection of consumers and the reduction of financial crime — which are elaborated in sections 3 to 6.

37. Subsection (4) applies those objectives to the Authority's functions in two distinct ways:

- they apply directly to the exercise of the Authority's rule-making, code issuing and general guidance functions taken as a whole;

- they apply to the policy and principles by which it exercises its other functions.

38. Subsection (3) lists a number of matters to which the Authority must also have regard in making its rules and guidance and determining the policy and principles by which it exercises its other functions.

## Section 5**: The protection of consumers**

39. Subsection (2) sets out factors to which the Authority must have regard when considering the appropriate degree of protection. These are, briefly, the degree of risk involved, the sophistication and experience of the parties to the transaction, the need of customers for advice and information and the general principle that consumers should take responsibility for their decisions. There is no obligation on the Authority to place particular weight on any one of these factors.

## Section 6**: The reduction of financial crime**

40. This provision does not by itself impose any duties on firms. The Authority is expected to pursue this objective in co-operation with various law enforcement agencies.

## Section 7**: Duty of Authority to follow principles of good governance**

41. Part I and Schedule 1 set out, amongst other things, certain requirements of the Authority's constitution. The effect of this section is to require the Authority to have regard, subject to those requirements, to such generally accepted principles of good corporate governance in managing its affairs as it is reasonable to regard as applicable to it. Such principles might include those contained in the Combined Code of the Committee on Corporate Governance. However, some principles, such as relations with shareholders, are not relevant to the Authority as it is a company limited by guarantee and so need not be taken into account.

## Section 8**: The Authority's general duty to consult**

42. This section requires the Authority to make and maintain effective arrangements for consulting practitioners and consumers. These arrangements must include, but are not limited to, the establishment of Practitioner and Consumer Panels. The statutory obligation for the Authority to maintain panels to represent the interests of practitioners and consumers was not present in previous financial services, banking or insurance legislation. The Authority established panels of practitioners and consumers, on a non-statutory basis, before such a requirement was imposed

© 2025 Thomson Reuters.

under the Act. The effect of sections 9 and 10 is to require the Authority to continue to maintain those panels.

## Section 11**: Duty to consider representations by the Panels**

43. This section requires the Authority to consider representations made to it by either the Practitioner Panel or the Consumer Panel in accordance with the arrangements under section 8 and, where it disagrees with the views expressed or proposals made in such representations, to give its reasons in writing.

## Section 12**: Reviews**

44. This section enables the Treasury to commission independent reviews of the economy, efficiency and effectiveness with which the Authority has used its resources.

## Section 13**: Right to obtain documents and information**

45. The person appointed by the Treasury to perform a review under section 12 has a right of access to documents held by the Authority.

## Section 14**: Cases in which the Treasury may arrange independent inquiries**

46. This section, together with sections 15 to 18, provides the mechanism for the Treasury to appoint a person to hold an independent inquiry into the circumstances surrounding regulatory events which give rise to serious questions or public concern about the regulatory framework or the effectiveness of regulation in practice. They provide a statutory basis for launching the type of inquiry which has been conducted in the past into the failures of the Bank of Credit & Commerce International ("BCCI") in 1991 and Barings in 1995. The Bingham Inquiry into BCCI was conducted on a non-statutory basis and therefore had no powers to require witnesses to attend or give evidence. The Barings Inquiry was conducted by the Board of Banking Supervision, an advisory body within the Bank of England using powers under the Banking Act.

47. The types of events into which an inquiry may be held are set out in this section. There are two cases. The first case, set out in subsection (2), relates to events concerning persons carrying on regulated activities or collective investment schemes. To trigger the power, it must appear to the Treasury that two conditions are met. The first of these is that the events posed, or could have posed, a grave risk to the financial system, or caused, or could have caused, significant damage to the interests of consumers. The second condition is that a serious failure in the regulatory system, or in the operation of that system, might have caused or exacerbated the risk or damage, or potential risk or damage.

© 2025 Thomson Reuters.

48. The second case, set out in subsection (3), relates to the listing function under Part VI. Here the Treasury must be concerned with the damage, or potential damage, that might have been caused by a serious failure in the listing regime or its operation.

49. Subsection (4) provides that in either case the Treasury may initiate an inquiry only where they consider that it is in the public interest to do so.

## Section 15: **Power to appoint person to hold an inquiry**

50. Under subsection (1), the Treasury may appoint a person whom they consider appropriate to conduct an investigation and, under subsection (2), may give directions to that person concerning the scope of the inquiry, how it is to be conducted, when it is to be completed by, and the form of any report of the inquiry. The power to direct the inquiry enables the Treasury to ensure that it focuses on the important questions, and that it is concluded in a manner and on a timescale that is appropriate in light of any public concern there might be.

## Section 16: **Powers of appointed person and procedure**

51. This section gives the person holding the inquiry discretion as to how the inquiry is conducted, and provides that person with powers to obtain evidence, both in the form of documents and through the examination of witnesses. These powers are the same as those exercisable by the High Court, or the Court of Session in Scotland.

## Section 17: **Conclusion of inquiry**

52. This section requires a written report setting out the results of the inquiry and, where appropriate, making recommendations. The Treasury then have discretion whether to publish all or part of the report. However, the Treasury must make sure that they do not publish any material contained in the report which, if published, they consider would seriously prejudice the interests of a particular person, for example because there was a likelihood of subsequent court action in relation to the events covered, or publication would be incompatible with the UK's international obligations, such as those under the confidentiality provisions of one of the single market directives. A copy of any part of the report which is published must be laid before Parliament by the Treasury.

## Section 18: **Obstruction and contempt**

53. The powers of the person appointed to conduct an inquiry are enforceable through certification to the High Court or Court of Session. The person conducting the inquiry must provide the court with a certificate stating the requirement that was imposed and the nature and facts of the alleged failure to comply. The court may then enquire into the matter, hearing witnesses and seeing documents as necessary. If it finds that a person has failed to comply with requirements placed

upon him by the person holding the investigation, the court may deal with them as it would with a person in contempt of court.

## PART II: REGULATED AND PROHIBITED ACTIVITIES

54. This Part provides the mechanism for defining the scope of regulation under the Act and for establishing the extent of the prohibition on issuing unapproved financial promotions.

### Section 19: The general prohibition

55. This section contains the basic prohibition on unauthorised persons carrying on regulated activities in the United Kingdom. It is referred to in the Act as *"the general prohibition"* and prohibits persons who are not authorised or exempt under Part III from carrying on any regulated activity in the United Kingdom. Section 418 elaborates on when regulated activities will be considered to be carried on in the United Kingdom. Contravention of the general prohibition is a criminal offence (see section 23). Agreements made in the course of carrying on an activity in contravention of the general prohibition may be unenforceable (see sections 26, 27 and 29).

### Section 20: Authorised persons acting without permission

56. Authorised persons may only carry on in the United Kingdom those regulated activities for which they have been given permission by the Authority under Part IV or by or under any other provision of the Act, for example under Schedule 3, 4 or 5.

57. If an authorised person carries on regulated activities for which he does not have permission the consequences may include any of the sanctions available under Parts IV (Permission to Carry on Regulated Activities), XIII (Incoming Firms: Intervention by Authority) or XIV (Disciplinary Measures). However, if an authorised person acts outside the scope of his permission, he will not commit a criminal offence, and any contract which a person enters into when acting outside the scope of his permission will not be made unenforceable simply by virtue of that fact. Subsection (3) permits the Treasury to prescribe cases in which a breach permission gives rise to a right of action for damages.

### Section 21: Restrictions on financial promotion

58. This section prohibits unauthorised persons from issuing financial promotions, unless the content of the promotion is approved by an authorised person (who will be subject to rules made by the Authority), or unless an exemption applies. The regulation of financial promotions under the Act is similar to the regulation of investment advertisements and cold-calling under the FS Act 1986. However, section 21 reflects changing technologies and the fact that the borderline between advertisements and unsolicited calls has become blurred. Sections 238 to 241 contain additional provisions relating to the promotion of collective investment schemes.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 45 of 2232
Page ID #:2103
Financial Services and Markets Act 2000 c. 8

59. The prohibition applies to "invitations" or "inducements" to engage in investment activity, which are made in the course of business. The Treasury are given power, if necessary, to determine the meaning of "in the course of business". The prohibition will potentially catch communications whether they are made in the United Kingdom, into the United Kingdom from elsewhere, or from the United Kingdom to another country. Communications from outside the United Kingdom can potentially be caught only if they can have an effect in the United Kingdom (subsection (3)). It is expected that the exemption order which the Treasury intends to make under subsection (5) will further limit the territorial application of the financial promotion regime, so that communications issuing from overseas will generally only be caught if they are directed at the United Kingdom. This will be of particular significance in the context of internet communications.

60. Subsection (5) confers a power on the Treasury to make exemptions from the prohibition, similar to the power to make exemptions from the investment advertisement prohibition under the FS Act 1986. It is possible for these exemptions to be made conditional on compliance with rules made by the Authority under section 145.

61. Subsection (6) makes clear that the circumstances that can be specified under subsection (5) extend to circumstances for which subsection (3) expressly makes provision. Subsection (6) thus clarifies that an exemption can be made for communications which originate outside the United Kingdom even if they are capable of having an effect here. Subsection (6)(a) and (b) deal expressly with the possibility of exemptions for communications originating in specific countries, or specific groups of countries such as EU countries. Subsection (6)(d) would allow all communications originating overseas to be exempted if that became appropriate. If such provision were made, subsection (7) would allow the Treasury to repeal subsection (3).

62. Subjections (8) to (12) govern what constitutes "engaging in investment activity". Subsections (9) and (10) give the Treasury power to determine the scope of the prohibition on financial promotion. It is expected that "controlled activities" will be the activities which are regulated under the Act, together with activities which would be regulated, but for an exclusion in an order made under section 22(1). This broad approach reflects the position under the FS Act 1986.

Section 22**: The classes of activity and categories of investment**

63. This section makes provision as to the classes of regulated activity, if carried on by way of business, and types of investment which are to be regulated under the Act. These are to be prescribed by the Treasury by order to be made under subsection (1). An activity will only be a regulated activity if it is carried on by way of business and is specified in the order under subsection (1). The Treasury will have the power under section 419 to specify circumstances in which an activity shall or shall not be regarded as being carried on by way of business.

64. Schedule 2 indicates the general range of activities and investments that the Treasury may include within the order defining the scope of regulation, but it does not exhaustively list them. It is therefore possible that other activities or investments may be brought within the scope of the

regulation under the Act. However, the general nature of the activities set out in Schedule 2 serves as a limitation on the extent of the Treasury's power to bring further activities within the scope of the Act.

*End > Explanatory Note > para. 2*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 3

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 23**: Contravention of the general prohibition**

65. This section makes carrying on a regulated activity in breach of the general prohibition a criminal offence. It is a defence for a person to prove that he exercised due diligence and took all reasonable precautions to avoid committing the offence.

66. A person convicted of this offence, which is referred to as an *"authorisation offence"* , may be subject to a term of imprisonment of up to 2 years if convicted on indictment (6 months on summary conviction) and/or a fine (the current statutory maximum for a fine on summary conviction is £5,000).

## Section 24**: False claims to be authorised or exempt**

67. This creates an offence of falsely describing oneself, or holding oneself out, as authorised or exempt in relation to a particular regulated activity. It is a defence for a person accused of this offence to prove that he exercised due diligence and took all reasonable precautions to avoid committing the offence.

68. Under subsection (3) a person found guilty of this offence is liable on summary conviction to a maximum of 6 months imprisonment and/or a fine not exceeding level 5 on the standard scale (currently £5,000). If the offence results from the public display of material, subsection (4) permits a fine of up to the statutory maximum (currently £5,000), to be multiplied by the number of days for which any material giving rise to the offence was on public display.

## Section 25**: Contravention of** section 21

69. This section provides that it is an offence to breach the financial promotion prohibition. The sanctions are the same as those which apply under section 23 for a breach of the general prohibition.

70. Subsection (2) provides a defence for a person accused of the offence if he can prove either that he believed on reasonable grounds that the content of the communication was prepared or approved by an authorised person, or that he exercised due diligence and took reasonable precautions to avoid committing the offence.

© 2025 Thomson Reuters.

Section 26**: Agreements made by unauthorised persons**

71. Under this section, agreements concluded in the course of carrying on business in breach of the general prohibition will generally be unenforceable against the customer. However, the customer can still recover any money paid or property transferred and obtain compensation for any loss.

Section 27**: Agreements made through unauthorised persons**

72. Under this section, agreements made by an authorised person in the course of his authorised business may also be unenforceable by that person if the agreement was entered into as a result of a third party's unauthorised regulated activities. This might arise if, for example, a contract was entered into as a result of investment advice given by an unauthorised third party.

Section 28**: Agreements made unenforceable by** section 26 or 27

73. This section gives the court discretion to allow the contract which would otherwise be unenforceable under section 26 or 27 to be enforced against the customer. The section also allows for the method by which the amount of compensation which a person may obtain is to be fixed. In order to enforce the contract, the court must be satisfied that it would be "just and equitable" to do so having particular regard to whether:

- where the person contravening the prohibition is a party to the agreement, that he reasonably believed that he had not acted in breach of the prohibition; or

- where the contravention was by a third party, that the authorised person providing the service did not know that the agreement resulted from a contravention.

Section 29**: Accepting deposits in breach of the general prohibition**

74. This section concerns deposits accepted in contravention of the general prohibition under section 19. If the deposit agreement does not entitle the depositor to immediate repayment on demand, the section provides that the depositor may apply to the court to direct immediate repayment.

75. The court has discretion not to direct repayment if it is satisfied that it would not be just and equitable to direct repayment, having particular regard to whether the deposit-taker reasonably believed that it was not contravening the prohibition.

Section 30**: Enforceability of agreements resulting from unlawful communications**

76. When a customer enters into an agreement or exercises any rights as a result of a communication in breach of the financial promotion prohibition, the agreement will be unenforceable against him. The customer will also be entitled to recover any property transferred

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 49 of 2232
Page ID #:2107
Financial Services and Markets Act 2000 c. 8

and to receive compensation for losses incurred, but if he chooses to recover property transferred or not to continue the contract, he must return any money received.

77. However, in certain circumstances the courts may enforce agreements made in contravention of the prohibition and allow money and property transferred under the agreement to be retained if it is satisfied that this would be just and equitable, having regard to whether:

• where the person seeking to enforce the agreement was the illegal promoter, that he reasonably believed that the promotion had not been made in breach of the prohibition; or

• where the contravention was by a third party, that the person seeking to enforce it did not know that the agreement resulted from an illegal promotion.

• PART III**: AUTHORISATION AND EXEMPTION**

78. This Part sets out who is to be authorised and how authorisation is obtained. It also deals with exemptions from the general prohibition for particular persons or classes of persons. The Act provides for a single route to authorisation to operate in the financial services industry, replacing several sector-based regimes.

79. The main route to authorisation is through an application for a permission under Part IV, but authorisation may also be obtained by virtue of:

• notification in accordance with the relevant single market directive from the competent authorities under that directive in another EEA member State. The directives in question are the 2nd Banking Co-ordination Directive for banks and other credit institutions, the Investment Services Directive for investment firms, and the 3rd Life and 3rd Non-life Insurance Directives for insurance companies, including mutual insurers such as friendly societies. The person, who must come from or be incorporated in, or formed under the law of, another member State, is referred to under the Act as an *"EEA firm"* as defined in Schedule 3;

• exercise, in accordance with Schedule 4, of EU Treaty rights other than or beyond those governed by the single market directives, in which case the person is then referred to in the Act as a *"Treaty firm"* . Again the person must come from, or be incorporated in, or formed under the law of another member State to qualify;

• exercise of rights under the EC directive relating to collective investment undertakings to market in the United Kingdom collective investment schemes or product authorisation of certain open-ended investment companies ("oeics") under regulations to be made under Chapter IV of Part XVII;

• a person being "grandfathered" by virtue of the transitional provisions (see sections 426 and 427). Broadly, the arrangements will cover persons authorised (however described) under the Banking, Financial Services, Insurance, Building Societies, Friendly Societies,

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 50 of 2232
Page ID #:2108
Financial Services and Markets Act 2000 c. 8

Credit Unions and Lloyd's Acts (including members of self-regulating organisations and certain members of recognised professional bodies).

80. The Society of Lloyd's is an authorised purpose by virtue of section 315.

81. It is possible for a person who becomes authorised through one of these routes to carry on regulated activities by virtue of other routes. For instance an EEA firm that is authorised by virtue of its home State notification under a single market directive may extend the range of regulated activities it may carry on through notification under Schedule 4 or an application to the Authority under Part IV for an extension of its permission. A Treaty firm may also obtain additional permission under Part IV.

82. For a person authorised by virtue of having permissions under Part IV, authorisation generally ends when that person no longer has permission to carry on regulated activities, whether at the initiative of the Authority or themselves.

Section 32**: Partnerships and unincorporated associations**

83. This section makes particular provision for partnerships and unincorporated associations. In principle, it is possible to view a change of partners in a partnership, or a change of the membership of an unincorporated association, as the formation of a new partnership or association. It would be very burdensome and unsatisfactory if such changes meant that a partnership or association that was substantially the same had to renew its authorisation simply because of such a change to its membership. This section therefore ensures that in such circumstances the authorisation is not interrupted. It also allows the authorisation to pass to a successor partnership or association in the event of dissolution, but only where the members and the business of the successor are substantially the same as the original.

Section 33**: Withdrawal of authorisation by the Authority**

84. This section requires the Authority to withdraw authorisation from a person who does not have a permission.

Section 34**: EEA firms**

85. So long as an EEA firm retains its home State authorisation, the Authority may not remove the firm's authorisation under Schedule 3. Such a person will only cease to qualify for authorisation under Schedule 3 if their home State regulator, that is the competent authority under the relevant directive from the person's home State, notifies the Authority that it is withdrawing authorisation for the person to continue to carry on the regulated activities in the United Kingdom, which may or may not be as part of withdrawing the person's authorisation completely, including in the home State.

© 2025 Thomson Reuters.

86. However, if the person has also obtained a permission under Part IV, loss of the grounds for its authorisation under Schedule 3 does not necessarily lead to loss of its authorisation unless the Authority decides that as a result of the changed circumstances it should also withdraw the permission granted by it under Part IV. The Authority may also cancel an authorisation under Schedule 3 if it is requested to do so by the EEA firm.

Section 35**: Treaty firms**

87. As for an EEA firm, a Treaty firm ceases to qualify for authorisation under Schedule 4 if the relevant home State authorisation is withdrawn. The Authority may remove any additional permission under Part IV, but loss of home State authorisation does not necessarily mean that Part IV permission would be withdrawn. The Authority can also cancel an authorisation on request from a Treaty firm.

Section 36**: Persons authorised as a result of** paragraph 1(4) of Schedule 5

88. This section enables the Authority to cancel the automatic authorisation under Schedule 5 of managers and depositaries of UCITS schemes at their request. However, if the person also has permissions under Part IV, he does not cease to be an authorised person as a result.

Section 37**: Exercise of EEA rights by UK firms**

89. Part III of Schedule 3 governs home State regulation by the Authority of UK credit institutions, investment firms and insurance companies exercising their passport rights under the single market directives to establish a branch or provide services in other EEA states.

90. UK firms do not need to be authorised persons in order to exercise EEA passport rights. For example, lending is covered by both the Second Banking Co-ordination directive and the Investment Services Directive. Consequently a firm holding a licence under the Consumer Credit Act 1974 may have an EEA right to carry on Consumer Credit Act business in another EEA state.

Section 38**: Exemption orders**

91. This section gives the Treasury the power by order to exempt specific natural or legal persons or classes of person from the general prohibition and therefore from the need to be authorised.

92. Subsection (2) provides that a person may not benefit from an exemption under an order made under this section if they hold a Part IV permission. However, if they cease to hold a Part IV permission and the exemption from which they formerly benefited is still extant, they may benefit from it again.

Section 39**: Exemption of appointed representatives**

© 2025 Thomson Reuters.                                                                    5

93. This section makes an exemption from the general prohibition for appointed representatives of authorised persons. An authorised person cannot be an appointed representative. The exemption only applies if the authorised person, referred to as the principal, has:

- contracted with the representative for the latter to carry on the relevant sort of investment business on their behalf; and

- accepted responsibility in writing for the conduct of those regulated activities.

94. Any regulated activities which are carried on by the representative in accordance with such an arrangement are the responsibility of the principal, who must therefore have permission for all the regulated activities they carry on. The Authority may therefore take regulatory action against the principal in respect of anything said or done (or not said or not done) by the representative in carrying on the regulated activities as if they had expressly authorised the action or inaction in question. Such acts or omissions will be taken into account by the Authority in determining whether the principal has breached any rules or requirements under the Act. However, nothing in this section would make the principal liable to prosecution for a criminal offence in place of the representative. The representative may also be subject to the arrangements under Part V.

95. This section is similar to, and replaces, section 44 of the FS Act 1986. The Treasury have the power to limit the types of business that may be carried on under this exemption. The intention is that an order under subsection (1) will broadly reproduce the breadth of the provision under the FS Act 1986, except that it will no longer be possible under this section for an appointed representative to be exempt for some activities and authorised for others. Under a single authorisation regime, it would not be appropriate to allow an authorised person to obtain an exemption rather than have their permission extended to cover those additional activities.

96. The Treasury have the power to prescribe further conditions which the contract between the principal and his representative has to meet. The intention is that this power would be used to reproduce the detailed requirements in sections 44(4) and (5) of the FS Act 1986. These are aimed at ensuring that the principal has adequate control over the activities that the appointed representative may carry on for the benefit of, or on behalf of, other providers of investment products to ensure that the exemption is not misused.

PART IV: **PERMISSION TO CARRY ON REGULATED ACTIVITIES**

97. This Part governs the way in which a person can obtain permission to carry on regulated activities. It is through obtaining permission that authorisation is generally obtained under section 31(1). However, this route to authorisation does not apply to those EEA firms who qualify for authorisation by virtue of Schedule 3 or those Treaty firms who qualify by virtue of Schedule 4. These provisions only apply to EEA and Treaty firms to the extent that they have obtained additional permissions beyond those that they obtained under those Schedules.

Section 40: **Application for permission**

98. This sets out the type of person who can be given permission and therefore who can be authorised by this route. Permission can be applied for and granted to individuals, bodies corporate, partnerships and unincorporated associations. In the case of some regulated activities, however, there are specific constraints on the type of person which may be given permission under the threshold conditions in Schedule 6.

99. Permission may cover a number of regulated activities. Permission is only given once, after that it is simply changed. Thus, subsection (2) rules out an application for the grant of permission to an authorised person where he already has permission under this Part. Therefore, if a person wishes to carry on additional activities, he would need to apply for a variation of permission under section 44.

Section 41**: The threshold conditions**

100. This section requires the Authority to satisfy itself in giving or varying a Part IV permission, or imposing or varying any requirement, that the person concerned will satisfy the threshold conditions set out in Schedule 6 in relation to all the regulated activities covered by his permission. However, this does not prevent the Authority from taking such steps in relation to an authorised person as it considers necessary to secure its regulatory objective of the protection of consumers.

Section 42**: Giving permission**

101. Having received an application for permission, the Authority must consider it in the light of its duty under section 41. The Authority has discretion to grant permission for all the activities applied for, or just some of them.

102. The Authority can also frame the permission it grants so as to cover activities which are wider or narrower than the activities as described in the application, and may thus impose its own limitations on the way in which an activity may be carried on. This allows the Authority to design the permission in order to be satisfied that the threshold conditions are met in circumstances where it would not be satisfied if it granted the permission sought in full. The ability to grant a wider permission than was applied for would enable the Authority, if it so chose, to have standard types of permission that it granted. However, the Act does not require the Authority to operate in this way.

103. If the applicant is exempt for certain regulated activities by virtue of being a recognised investment exchange or a recognised clearing house, or by virtue of membership of a professional body designated under Part XX, his application, and any resulting permission, is not to be regarded as covering those exempt activities. For other exempt persons, an application under this section will be regarded as covering their exempt activities.

Section 43**: Imposition of requirements**

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 54 of 2232
Page ID #:2112
Financial Services and Markets Act 2000 c. 8

104. When granting permission, the Authority may impose what it considers to be appropriate requirements. Such requirements might include requirements on the authorised person to act, or refrain from acting, in a certain way. Subsection (5) allows the Authority to specify a period during which such requirements have effect. Thus the Authority might impose a limit on the amount of a certain type of business the person may conduct during the first five years after receiving the permission. This would enable the Authority to continue the current practice adopted by the insurance supervisors of restricting the premium income that can be received by an insurer in the period following its authorisation to undertake a new form of insurance business.

105. Under subsection (3), such requirements may also be imposed in respect of unregulated activities. For instance, the Authority might have misgivings about the way in which a regulated activity might be carried on in conjunction with an unregulated activity that the person already carries on, or which he proposes to carry on. Those misgivings may not justify preventing the person from commencing the regulated activity because the Authority may not consider that the unregulated activity, of itself, casts doubt about the person's fitness to carry on the regulated one. It may, however, be concerned that the juxtaposition of the two activities could be confusing to consumers, or that the manner in which the unregulated activity was carried on might pose a threat to their interests. Therefore, the Authority could place limitations on the way in which the unregulated activity was carried on for a period after the granting of the new permission in order that it could observe how the activities were carried on, or related to each other, in practice. Subsection (4) enables the Authority to take account of the person's membership of a wider group (as defined in section 421).

## Section 44: **Variation etc at request of authorised person**

106. The Authority may vary the permission, including cancelling it completely, at the request of the authorised person, subject to being satisfied that the person will satisfy the threshold conditions for any resulting permission in accordance with section 41. If it is not satisfied, it may refuse the request outright, grant a more limited permission than the one requested, or grant the requested permission, but subject to new requirements. The Authority may also refuse to grant a request for variation on the grounds that refusal is in the interests of consumers or potential consumers.

107. If as a result of the variation, the authorised person would no longer have permission to carry on any regulated activity, the Authority must consider whether it is still necessary for the person to hold a permission at all (and therefore continue to be an authorised person). If it is not necessary, the Authority should cancel the permission.

## Section 45: **Variation etc on the Authority's own initiative**

108. This section gives the Authority the power to revoke or vary the terms of an authorised person's permission on its own initiative (referred to as its *"own initiative power"* ). The power is exercisable on three grounds. These are where it appears to the Authority that:

© 2025 Thomson Reuters.

• the person is failing, or likely to fail, to meet the threshold conditions in relation to the existing permission;

• the person has failed to make use of the permission to carry on a particular regulated activity for a year or more;

• it is desirable to do so in order to protect the interests of consumers or potential consumers.

109. As with the previous section, if as a result of the variation the authorised person no longer has permission to carry on any regulated activity, the Authority must consider whether it is necessary for that person to continue to hold a permission and be an authorised person. If it is not necessary, the Authority should cancel the permission.

Section 46**: Variation of permission on acquisition of control**

110. The Authority may also impose a new requirement or vary an existing one if:

• someone "acquires control" over the UK authorised person within the meaning of Part XII; and

• the result is that although the Authority does not consider that it has grounds to object to the acquisition, it nevertheless considers that there is some significant uncertainty about the impact of the acquisition, or further acquisition, of control on the conduct of the authorised person's business.

Section 47**: Exercise of power in support of overseas regulator**

111. This section enables the Authority to cancel or vary a permission on its own initiative on behalf of an overseas regulatory authority. The section gives the Treasury power to prescribe by regulations the sort of overseas authority that the Authority to help. The functions that it is proposed should be prescribed in this way are functions corresponding to those of:

• the Authority itself under this Act;

• the competent authority for listing;

• the Secretary of State under the Companies Act; and

• the prosecuting authorities for insider dealing and money laundering.

112. However, even where the overseas regulator and the provisions they are seeking to enforce meet these requirements, the Authority is not obliged to act in accordance with the request. The Authority must act reasonably, as it must in discharging any of its functions, but it is also directed to consider certain factors in particular. First among these is whether EC law obliges the Authority, as the competent authority under one of the single market directives or otherwise, to assist the

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 56 of 2232
Page ID #:2114
Financial Services and Markets Act 2000 c. 8

overseas authority. Unless there is an EC obligation to act the Authority must consider the further factors listed in subsection (4) which include the seriousness of the case and the public interest. The Authority is also able to charge a contribution towards the costs of taking the enforcement action, and to make this a condition of exercising the power. (*Note* : The reference to subsection (4) in the definition of "request" in subsection (7) is an error. It should only refer to subsection (5).)

Section 48**: Prohibitions and restrictions**

113. Among the requirements which the Authority can impose on an authorised person when acting under this Part are:

- restrictions on the use or disposal of the authorised person's assets; or

- requirements to transfer its assets or assets it holds on behalf of investors to a trustee approved by the Authority.

114. The purpose of these types of restriction is to prevent an authorised person disposing of particular assets or making certain types of investment, in circumstances where the Authority is concerned about a person's solvency or where it wishes to investigate suspected fraudulent behaviour.

115. Where an authorised person's assets are held by a third party, for example by a bank, subsection (4) enables the Authority to give the institution notice of any restrictions it has placed on the authorised person's assets. This notice might state, for example, that a bank should not allow any payments to be made from the authorised person's account without the permission of the Authority. Subsection (5)(a) provides that if the institution refuses to comply with a request to make a payment from the account of an authorised person who is subject to a restriction notice, it is not to be taken as a breach of its contract with the authorised person. However, if the institution were to allow a payment to be made from such an account, in breach of a restriction, under subsection (5)(b) it would be liable to pay the same amount of money to the Authority.

116. Subsections (6) to (11) are concerned with the transfer of an authorised person's assets to a trustee approved by the Authority.

117. Subsection (6) requires a trustee not to deal with or release any of the assets transferred to them unless the Authority agrees. If the trustee does release assets without the Authority's consent, he is guilty of an offence under subsection (9). However subsection (11) protects the position of the persons who are beneficiaries of the trust by preserving all the remedies they would normally have under trust law. The beneficiaries of the trust are the owners of the assets transferred to the trustee. This will be either the authorised person or, where the assets transferred include assets the authorised person was holding or controlling on behalf of other investors, those investors.

118. Subsection (7) makes void any charge that the authorised person makes over his assets while they are held by a trustee. Any charges arranged before the assets were transferred to a trustee

remain valid. The effect of this is that were the authorised person to enter into a contractual arrangement which gave a third person a right ahead of existing creditors or a liquidator to any of his assets which, as a result of a requirement made by the Authority under subsection (3)(b), were held by a trustee, that contract would be void and the rights of the liquidator and existing creditors to the assets would be upheld.

*End > Explanatory Note > para. 3*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 4

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 49**: Persons connected with an applicant**

119. Subsection (1) of this section makes it clear that, in deciding whether to approve an application for permission, the Authority may also have regard to other relevant persons who are related to the applicant in some way. What constitutes a relevant relationship is not defined, but is left to the Authority to interpret in the particular circumstances of the case.

120. The Authority is obliged under subsection (2) to consult with the home State regulator of an EEA firm before granting an application from a person who is a subsidiary undertaking of that firm or the subsidiary undertaking of a parent undertaking of that firm.

## Section 50**: Authority's duty to consider other permissions etc.**

121. An EEA firm, Treaty firm or recognised collective investment scheme may have a Part IV permission in addition to a permission as such a firm or scheme. In considering the exercise of its own initiative power in relation to such an additional permission, the Authority must take account of the relevant EC law and of the home State authorisation of the person concerned. Such consideration may inform the Authority's view on whether the firm or scheme is fit and proper to continue to hold the additional permissions in question, or its view on whether the cancellation or variation it proposes is appropriate in light of the wider assessment of the firm which the home State regulator is responsible for making.

## Section 51**: Applications under this Part**

122. This section sets out the minimum information that must be included in an application for a permission. It also enables the Authority to specify the manner in which an application may be made, for example whether applications by e-mail will be accepted, and such other things that should be included as the Authority considers necessary or appropriate. The Authority can require additional information after the application is received, and can require the applicant to verify any of the information supplied.

## Section 52**: Determination of applications**

123. The Authority is required to determine an application within 6 months of receiving the completed application. The Authority has discretion whether to determine incomplete applications, but it must determine even incomplete applications within 12 months of the initial receipt of the application. The Authority may, of course, refuse an application on the grounds that it is incomplete where it is appropriate to do so. Under subsection (3) an applicant may withdraw an undetermined application at any time.

124. Once the Authority has determined an application it must give written notice of its decision and, if the application to be granted, the date upon which the authorisation takes effect and from which the relevant activities may commence. If the Authority proposes to refuse all or part of the application, or impose an additional requirement, it must proceed by way of a warning and decision notice.

Section 53**: Exercise of own initiative power: procedure**

125. This section set out the procedure the Authority must follow when it proposes to exercise its own-initiative power to vary an authorised person's Part IV permission. If, having regard to the ground on which it is exercising the power, the Authority considers it necessary, the variation may take effect immediately or on a specified date. If no date is specified in this way the variation will take effect only after the time for referring the matter to the Tribunal has expired and any reference (and further appeal) has been finally determined (see the definition of *"open to review"* in section 391(8)). The Authority must give the authorised person a written notice which gives the details of the variation, the date on which it takes effect, the reasons for the imposing the variation and for the choice of date. The notice must also inform the person of his right to make representations to the Authority within a specified period, and to refer the matter to the Tribunal.

126. Subsections (7) to (10) require the Authority to give further written notice of its response to any representations which are made. This can be a decision not to proceed with the variation (or to cancel it if it has already taken effect), to propose a different variation (in which case the original notice procedure must be repeated), or to proceed with the variation (in which case the person concerned has a further right to refer the matter to the Tribunal).

Section 54**: Cancellation of** Part IV**permission: procedure**

127. This section requires the Authority to serve warning and decision notices when cancelling a Part IV permission on its own initiative, under section 45. Warning and decision notices given under this section also attract the rights set out in sections 393 and 394 by virtue of section 392.

Section 55**: Right to refer matters to the Tribunal**

128. This section confers a right to refer to the Tribunal a decision of the Authority to vary or cancel a permission on its own initiative. It also applies to decisions of the Authority in relation to

© 2025 Thomson Reuters.

applications under Part IV, such as a decision to refuse an applications for permission, to impose conditions or to vary a permission other than in the way requested.

PART V**: PERFORMANCE OF REGULATED ACTIVITIES**

129. This Part confers on the Authority a range of powers which will enable it to ensure that people who work for authorised persons for certain purposes are fit and proper to perform the functions for which they have been engaged. While the focus of regulation is on authorised firms, the Part gives the regulator powers to prevent harm which might otherwise be caused by persons attached to firms.

130. Under the preceding regulatory framework, there is considerable variation between the arrangements applying to employees working in different sectors. The SROs have introduced a contractual system which requires employees to sign up to regulatory and disciplinary arrangements. Lloyd's has applied similar regulation to employees of underwriting agents, using its byelaw making powers. Banking and insurance legislation provides for pre-vetting of certain senior management positions, in some cases as part of the regime for the regulation of controllers of such firms. That legislation does not provide for the regulator to take disciplinary action against those managers, although senior managers, as officers of the firm, could commit a criminal offence where the firm itself had committed such an offence. There is, in addition to the vetting arrangements, a power in section 59 of the FS Act 1986 for the Authority to prohibit a person's employment in connection with investment business. The above arrangements will be replaced by arrangements under this Part.

131. The Part seeks to harmonise these arrangements. It provides a power for the Authority to ban unfit individuals from carrying out specified functions within the financial services sector. It also provides for:

• the Authority to require its approval to be obtained before a person may perform specified functions;

• the Authority to issue statements of principle with which approved persons must comply, and codes of conduct elaborating on the statements; and

• a disciplinary regime for those who fail to comply with the statements of principle.

132. This Part provides for firms and individuals concerned to refer matters to the Tribunal if the Authority proposes to:

• issue a prohibition order;

• refuse an application to vary or revoke a prohibition order;

• refuse an application for approval;

© 2025 Thomson Reuters.

- take disciplinary action; or

- withdraw approval.

133. The Part is primarily directed at the employees of authorised firms. However, it extends beyond employees to include, for example, directors, representatives and contractors of an authorised person, and extends to bodies corporate where relevant. If, for example, a life insurance company entered into a marketing agreement with a firm of estate agents to sell life insurance, the agency and relevant sales staff giving investment advice might need prior approval. Part V would also cover "matrix managers" who carry out certain functions, often on a fairly informal basis, for a group of companies even though technically they are "employees" of a sister company rather than of the authorised person for whom they carry out relevant functions. Such arrangements are increasingly common in multi-national groups.

Section 56**: Prohibition orders**

134. This section enables the Authority to make an order prohibiting any individual whom it considers is not fit and proper to perform functions in connection with regulated activities. A prohibition may relate to all functions in relation to any regulated activities carried on by all authorised (or exempt) persons or it can specify the kind of functions, activities or authorised (or exempt) persons to which it relates. A prohibition order may be varied or revoked.

135. Subsection (4) makes it an offence for an individual not to comply with a prohibition order. The maximum penalty for this offence is a fine at level 5 on the standard scale (currently £5,000). There is, however, a defence under subsection (5) for a person who can show that he took all reasonable precautions and exercised all due diligence to avoid committing the offence.

136. Subsection (6) imposes an obligation on an authorised person to take reasonable care not to engage individuals who have been disqualified under this section from performing relevant functions. Failure to comply with this requirement could trigger the use of the Authority's powers to amend the authorised person's permission or discipline the firm. It also potentially gives rise to a cause of action under section 71 from a private person who suffers a loss as a consequence of the breach.

137. Subsection (8) enables a prohibition order to be issued preventing an individual from performing functions in relation to a regulated activity carried on by an exempt person or a person to whom section 327(1) applies, that is by members of a profession or persons controlled or managed by members of a profession, who benefit from the exemption from the general prohibition under Part XX.

Section 59**: Approval for particular arrangements**

138. This section requires authorised persons to take reasonable care not to allow persons, natural or corporate, to perform certain functions without the approval of the Authority. Subsection (2)

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 62 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2120

similarly requires an authorised person to take reasonable steps to ensure that any contractor does not allow a person to perform such functions without the approval of the Authority. A person in respect of whom approval is given is an "approved person". The nature of the functions requiring approval will be specified by the Authority's rules, within the limits set out in subsections (5) to (7) and subject to the normal consultation requirements under Part X. The limits can be summarised:

> • The function may enable a person significantly to influence the conduct of the authorised person (for example a director). By virtue of subsection (9) account may be taken of influence which might result from a failure properly to carry out that function (for example a proprietary trader).

> • The function involves dealing with customers (for example a financial adviser) or dealing with their property (such as a stockbroker) in a way that is substantially connected with the carrying on of a regulated activity by the firm.

139. Subsection (8) limits the application of this section in the case of EEA or Treaty firms. The Authority will only have powers to act in relation to functions over which it, rather than the home State regulator, has jurisdiction.

Section 60**: Applications for approval**

140. This section requires an application for approval to be submitted by the authorised person concerned or, in the case of new firms awaiting authorisation, a prospective authorised person.

141. Subsection (2) gives the Authority the powers to specify the information it will require to support applications for different types of posts and subsection (3) enables it to request any additional information it needs to assess the suitability of each candidate.

Section 61**: Determination of applications**

142. This section sets out the basis on which the Authority is to assess the suitability of a candidate for approval, whether they are an individual or a body corporate. Subsection (1) requires the Authority to be satisfied that a candidate is fit and proper to perform the functions in question before it is able to give its approval. Where the Authority proposes to refuse an application, section 62 requires it to give a warning and decision notice. Notice must be given to the authorised person, the candidate and, where relevant, a contractor.

Section 63**: Withdrawal of approval**

143. This section gives the Authority power to withdraw the approval granted for the purposes of section 59 where it no longer considers that the person is a fit and proper person to carry out the functions for which they had been approved, for example because the Authority had obtained new information which cast doubt over its initial assessment.

Section 64**: Conduct: statements and code**

144. This section gives the Authority power, as part of its wider rule-making functions, to issue statements of principle, setting out in general terms the kinds of behaviour which it requires from approved persons in respect of any particular type of function. Any statements of principle issued under this section must be elaborated by a code of practice. Such a code would not need to be exhaustive but it would have to illustrate the circumstances in which it would regard a principle as having been complied with, or not complied with, as the case may be. Different statements of principle and codes could be made to apply to employees of different categories. The purpose of requiring a code to elaborate on a statement of principle is to prevent the Authority taking a disciplinary action for an alleged breach of a principle in cases where a person had acted in accordance with the code.

145. Subsection (8) makes it clear that failure to comply with a principle does not give a third party grounds for action against the approved person. Therefore, if for example a financial adviser employed by an insurance company failed to comply with a statement of principle when arranging a personal pension, that would not give a customer a right of action against the employee, with whom they had no contractual relationship. This provision would not remove or lessen any rights, including those under contract or by virtue of section 71, the customer may have against the authorised person who had entered into an agreement to provide the pension.

Section 65**: Statements and codes: procedure**

146. This section sets out the procedure that the Authority is required to follow when issuing a statement or code under section 64. The procedures, including the requirements to consult and publish a cost-benefit analysis, are broadly the same as the procedures that will apply when the Authority exercises other powers to issue codes (for example under section 119) and its rule-making powers under Part X.

Section 66**: Disciplinary powers**

147. This section gives the Authority a power to take disciplinary action against an approved person when the two conditions set out in subsection (1) have been met. The Authority must be satisfied that it is appropriate to take action against him. In this context, the Authority would have to have regard, among other things, to its regulatory objectives set out in Part I. The Authority would need to take into account whether disciplinary action against the approved person, rather than action against the authorised person for whom he works, would be appropriate, taking into account the responsibility of the senior management of the firm for the conduct of the firm and its employees. A second important factor would be to ensure that any action, or any particular course of action, it takes should be proportionate to the nature and seriousness of the misconduct.

148. In addition, the Authority must be satisfied that the person has engaged in misconduct, as defined in subsection (2). One possibility is that the approved person has acted in breach of a

© 2025 Thomson Reuters.

statement of principle, issued under section 64, as evidenced by a breach of a code of practice. The other possible situation is that an approved person has been knowingly involved in a breach by the authorised firm of rules made by the Authority or of any requirement imposed by or under the Act.

149. Subsection (3) gives the Authority powers to impose a penalty on an approved person or to make a public statement about their misconduct.

150. Subsection (4) restricts the period during which the Authority may take action under this section to a period of two years after the Authority became aware of the misconduct. This period reflects the time available to the Secretary of State to bring disqualification proceedings against a company director under the Company Directors Disqualification Act 1986.

Section 69**: Statement of policy**

151. This section requires the Authority to issue a statement of its policy on the circumstances in which it will impose penalties on approved persons under section 66 and the basis on which the level of penalties will be determined for different types of misconduct. The policy set out in the statement must take into account a number of factors which are set out in subsection (2).

152. Subsection (8) requires the Authority to have regard to the statement in force at the time of the misconduct when imposing penalties under this Part.

Section 70**: Statements of policy: procedure**

153. This section sets out the procedure for issuing a statement of policy under section 69. Before deciding on its policies in these areas, or changing those policies, the Authority will be required to consult the public on its proposals.

Section 71**: Actions for damages**

154. If a private person suffers a loss because an authorised person has acted in breach of the duty under section 56(6) or 59(1) or (2) (failing to take care to prevent a person carrying out functions in contravention of a prohibition under section 56, or without obtaining the Authority's approval under section 59) he may bring an action for damages against the authorised person (or an exempt person or person to whom clause 327(1) applies in the case of a contravention under section 56(6)). Subsections (2) and (3) confer powers on the Treasury, by regulations, to define a *"private person"* and to specify circumstances in which this section applies to a person other than a private person.

PART VI**: OFFICIAL LISTING**

155. EC law requires each member State to nominate or create a competent authority to maintain an official list of securities, to regulate the admission of securities to the Official List, and to monitor

© 2025 Thomson Reuters.

issuers' adherence to the listing rules (as explained below) thereafter. In the United Kingdom these functions are exercised by the Authority following the coming into force of the Official Listing of Securities (Change of Competent Authority) Regulations 2000 (SI 2000/968). Previously, the competent authority function was exercised by the London Stock Exchange. The provisions of this Part implement these requirements of EC directives. These provisions replace those in Part IV of the FS Act 1986.

156. There is no requirement for issuers of securities, for example companies issuing new shares, to apply for admission to the official list. However, admission to the official list signals that certain standards regarding the financial status and history of the company have been met; that adequate information about a security has been made available to investors at the time of application; and that information about the performance and plans of the issuer will continue to be made available on a continuing basis so long as the company has securities listed on the official list.

157. In carrying out its functions, the competent authority makes rules which govern the admission of securities to listing, the continuing obligations of issuers, the enforcement of those obligations and the suspension and cancellation of listing. These rules are collectively known as *"listing rules"* , which have been published by the competent authority in the "yellow book". The competent authority also has a role in scrutinizing prospectuses and circulars where there is no application for admission to the official list.

## Section 72**: The competent authority**

158. This section confers the functions of competent authority on the Authority. Subsection (2) and Schedule 7 make provision for the way in which other provisions of the Act apply to the Authority when exercising functions as the competent authority. However, subsection (3) and Schedule 8 provide a power for the Treasury to transfer some or all of the functions of the competent authority for the United Kingdom to another body.

## Section 73**: General duty of the competent authority**

159. This section sets out the general duties of the competent authority. Subsection (1) sets out a number of principles to which the competent authority must have regard in discharging its general functions (as defined in subsection (2)).

160. Subsection (1) is similar to section 2(3). The requirements of subsection (1) are intended to act as constraints on the way the competent authority carries out its functions under Part VI. Unlike section 2(3), this section does not have a principle relating to the responsibilities of senior management. This is because the competent authority is not responsible for the conduct of business or the prudential regulation of listed companies.

## Section 74**: The official list**

© 2025 Thomson Reuters.

161. This section places a duty on the competent authority to continue to maintain the official list. Section 99 allows the competent authority to charge fees for this purpose. Before this Act comes into force, the official list will be made up of securities that have been admitted by the competent authority under the statutory provisions of Part IV of the FS Act 1986 and securities and other financial instruments which were admitted by the competent authority under contract with issuers (for example gilts and covered warrants). Under the Act there will be a single statutory regime for the official listing of all these securities and other instruments.

162. The legislation therefore gives the Treasury a power in subsection (3) to provide that certain categories of financial instrument cannot be admitted to the Official List. This is a reserve power to ensure that the Treasury could stop the admission to the list of financial instruments which they consider, for example, pose undue risks to investors. Subsection (4) confers powers on the Authority to make listing rules.

Section 75**: Applications for listing**

163. This section provides that only applications for listing which are by, or with the consent of, the issuer and meet the requirements imposed by the competent authority may be granted. The competent authority can refuse an application for listing where it considers that granting it would be detrimental to the interests of investors.

164. Subsection (3) provides that no application for listing can be entertained by the competent authority in respect of securities issued by a body of a prescribed kind. The Treasury intend to use this power to prescribe that securities issued by a private company or by an old public company (within the meaning of section 1 of the Companies Consolidation (Consequential Provisions) Act 1985) cannot be admitted to listing. This will replicate provisions in the FS Act 1986.

Section 77**: Discontinuance and suspension of listing**

165. Occasionally circumstances arise which mean that normal dealings in listed securities cannot take place. For example, a company may fail to comply with reporting requirements in the listing rules, so that investors and potential investors do not have sufficient information on which to make informed decisions about the company's securities in order to deal in the securities. Alternatively, a company may be in financial difficulties which it has not clarified or quantified. This section gives the competent authority the power to suspend or discontinue the listing of a company's securities in such circumstances. During a suspension, trading in the securities cannot take place on a recognised investment exchange. An issuer may refer a decision to discontinue or suspend listing to the Tribunal.

Section 78**: Discontinuance and suspension: procedure**

166. This section sets out the procedures to be followed by the competent authority when it suspends or discontinues the listing of any securities under section 77. The procedure is broadly

similar to that which applies in the case of other supervisory decisions listed in section 395(13), and which is described in the context of section 53 above.

167. During the procedure for making representations and referring the matter to the Tribunal, it is possible for a suspension or discontinuance to be reversed. If a suspension is cancelled the securities simply remain listed. If a discontinuance is cancelled at this stage, either because the competent authority accedes to representations which are made under subsection (3)(c) or because it follows directions of the Tribunal to that effect, subsection (9) provides that the securities are regarded as being readmitted to the list as soon as the discontinuance is cancelled and without any fresh admission needing to be granted.

168. Subsections (10) to (12) set out a separate procedure which applies, after a suspension has taken effect and after the procedures for making representations and for referring the matter to the Tribunal have been exhausted, if there is a subsequent application for the suspension to be cancelled. In this case the standard warning and decision notice procedure applies as for other applications. However, at this stage in the process, a discontinuance is regarded as final and so there is no procedure for applying for it to be reversed. Instead a fresh application would need to be made for listing under section 75.

Section 79**: Listing particulars and other documents**

169. Under EC law, where there is an application for the listing of securities which are to be offered to the public in the United Kingdom for the first time, a prospectus must be approved by the competent authority and published. This is provided for by section 84. Where a prospectus is not required, for example because the securities have already been offered to the public or because there is an exemption (as set out in Schedule 11) the competent authority can provide that securities can only be admitted to the official list after publication of listing particulars and other documents approved by the competent authority. Listing particulars are documents which contain information on the nature and circumstances of the applicant and on the securities to be listed. The content is determined by listing rules. The existence of the power will allow investors to make informed decisions about that security.

170. Subsection (3) allows the Treasury to prescribe the persons responsible for listing particulars. The Treasury intend to exercise this power to prescribe those persons covered by section 152 of the FS Act 1986. However, the power will allow there to be some flexibility to reflect the admission of any possible types of financial instrument to the official list. This is necessary given the comprehensive nature of the statutory regime under section 74.

*End > Explanatory Note > para. 4*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 5

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 80**: General duty of disclosure in listing particulars**

171. This section places a duty on those responsible for producing listing particulars to ensure that those particulars contain, at the very least, adequate information to enable investors and their professional advisers to make informed decisions about the issuer and securities in question. The competent authority can authorise the omission of certain information in certain circumstances, as set out in section 82.

## Section 81**: Supplementary listing particulars**

172. This section provides that where there is any significant change following the submission of listing particulars to the competent authority but before dealings in the securities have started, supplementary listing particulars must be approved and published.

## Section 82**: Exemptions from disclosure**

173. This section allows the competent authority to authorise the omission of information required by listing rules to be included in listing particulars in certain circumstances. These circumstances are set out in subsection (1); namely, that the disclosure of the information would be contrary to the public interest, would be seriously detrimental to the issuer (for example the disclosure of commercial secrets), or would be unnecessary given the kind of people who could be expected to buy or sell those securities (for example, if the securities were only dealt in by professionals).

174. Subsection (2) provides that information cannot be omitted where it would be seriously detrimental to the issuer if that information is essential in order for a person to make an informed assessment. (*"Essential information"* is defined in subsection (6).)

## Section 83**: Registration of listing particulars**

175. This section requires listing rules to provide that listing particulars must be lodged with the registrar of companies on or before the date on which they are published. The same requirement applies to prospectuses because of section 86. Breach of this requirement is an offence under subsection (3), punishable by a fine.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 69 of 2232
Page ID #:2127
Financial Services and Markets Act 2000 c. 8

## Section 84: **Prospectuses**

176. This section provides that a prospectus must be published before securities are offered to the public in the United Kingdom for the first time before admission to the official list. Section 103(6) and Schedule 11 define the circumstances in which a person is to be treated as having offered securities to the public in the United Kingdom. For example, an offer is not regarded as being made, and the requirement to publish a prospectus therefore does not arise, where the offer is made to no more than 50 persons.

## Section 85: **Publication of prospectuses**

177. This section makes it a criminal offence for a person to offer new securities to the public in the United Kingdom before a prospectus has been published. This offence only applies where listing rules require the publication of a prospectus before particular new securities are admitted to the official list.

## Section 87: **Approval of prospectus where no application for listing**

178. Where securities are to be offered to the public in the United Kingdom for the first time and there has been no application for listing, listing rules may allow issuers to submit prospectuses to the competent authority for approval. This section refers to such prospectuses as "non-listing prospectuses". Where such a prospectus has been approved by the competent authority, under EC law it must be recognised by competent authorities in other member States as complying with their own rules on prospectuses. Accordingly, there is no need in these circumstances to obtain further approval from another competent authority if the securities are to be issued in another member State.

## Section 88: **Sponsors**

179. This section enables the competent authority to make listing rules requiring issuers of listed securities, or issuers seeking admission to the list, to appoint a sponsor.

180. Subsections (2) and (3) allow the competent authority to approve persons who may act as a sponsor, and to maintain a list of such persons. They also allow the relevant listing rules to specify particular services which must be performed by a sponsor (for example a sponsor might be required to certify that certain requirements for listing are met).

181. Subsections (4) to (7) apply the standard warning notice and decision notice procedure where the competent authority proposes to refuse a person's application for approval as a sponsor, or to cancel such approval, and provide the right to refer the matter to the Tribunal where a decision notice is given.

## Section 89: **Public censure of sponsor**

© 2025 Thomson Reuters.

182. This section permits the competent authority to make listing rules which allow it to make public statements to the effect that a sponsor has contravened a requirement imposed on him by the listing rules, subject to the warning and decision notice procedure and a right to refer the matter to the Tribunal. The power to impose financial penalties does not, however, apply to sponsors.

Section 90**: Compensation for false or misleading particulars**

183. This section provides that a person responsible for listing particulars (or, under this Part as applied by sections 86, 87(5) and Schedule 9, prospectuses or non-listing prospectuses) is liable to pay compensation to those who suffer loss as a result of untrue or misleading statements or the omission of any information which must be contained in those documents. There are some circumstances in which there is no liability to pay compensation. These are set out in Schedule 10.

Section 91**: Penalties for breach of listing rules**

184. This section gives the competent authority a power to impose financial penalties on issuers who have breached the listing rules. Under the FS Act 1986, the competent authority can issue private or public censures or suspend or cancel the listing of securities. The additional power conferred by this section is intended to provide further flexibility in this area. The competent authority will also be able to impose penalties upon present and former directors (which is defined in section 417 to include shadow directors) who were knowingly involved in a breach of the listing rules. However, it may not impose a penalty later than two years after it first became aware of the breach.

185. Section 92 sets out the procedures the competent authority must follow when imposing a penalty. The competent authority is also required to publish a statement of its policy as regards penalties (see sections 93 and 94). Before issuing or altering such a statement, the competent authority must consult on its proposals.

**: Competition scrutiny**

186. This section gives the Treasury a power to subject the "regulating provisions" of the competent authority (which is to say the listing rules and general guidance it produces) and its practices to a competition scrutiny regime. The Treasury proposes to use this power to create a competition scrutiny regime for the competent authority which is broadly similar to the regime for the Authority, in its role as financial services regulator, as provided for by Chapter III of Part X of the Act. The power will enable the Treasury to provide for exclusions from the provisions of the Competition Act 1998 analogous to those for which Chapter III of Part X of the Act makes provision.

187. Subsection (2) makes clear that such a regime will require the person responsible for the competition scrutiny procedure to consider whether any provision or practice, or combination of

provisions and practices, has at any time a significantly adverse effect on competition as defined in subsections (6) and (7).

## Section 96: Obligations of issuers of listed securities

188. This section provides that listing rules may place obligations on issuers and may make provision for non-compliance. Subsection (2) provides that the competent authority can make listing rules which allow it to publish information which an issuer has been required but has failed to publish.

## Section 97: Appointment by competent authority of persons to carry out investigations

189. This section allows the competent authority to appoint investigators if it appears to it that there are circumstances suggesting that there may have been a breach of the listing rules; that a director or former director of an issuer was knowingly concerned in a breach; or that there has been a contravention of the criminal offences in sections 83, 85, or 98. The section applies the provisions of Part XI as if the investigator were appointed under section 167(1). This means that the procedures set out in section 170 must be followed and that the investigator will have the powers set out in section 171.

## Section 98: Advertisements etc in connection with listing applications

190. This section makes it an offence to issue an advertisement or other information of a kind specified in listing rules (for example an invitation to purchase securities) unless the contents have been approved by the competent authority or the issue of an unapproved advertisement or information has been authorised by the competent authority. This offence only applies where listing particulars are, or are to be, published.

191. Subsection (3) provides a defence against this criminal offence where someone reasonably believed that the advertisement had been approved or its issue authorised by the competent authority.

## Section 100: Penalties

192. This section provides that the competent authority must not seek to recover its costs when imposing financial penalties. It also provides that it must operate a scheme to redistribute monies received from financial penalties to issuers. It must consult on the scheme and have regard to representations before making the scheme. The provisions of this section are analogous to those applying to the Authority more generally under paragraph 16 of Schedule 1.

## Section 102: Exemption from liability in damages

193. This section gives the competent authority and its staff immunity against legal action for damages in respect of anything done or omitted in the discharge of its functions. This immunity does not apply where the act or omission was in bad faith or where it was unlawful as a result of section 6(1) of the Human Rights Act 1998. Section 6(1) of that Act makes it unlawful for a public authority to act in a way which is incompatible with a right conferred by the European Convention on Human Rights and Fundamental Freedoms which is included in Schedule 1 to the 1998 Act.

## PART VII: **CONTROL OF BUSINESS TRANSFERS**

194. This Part provides a mechanism for transferring, with the sanction of the courts, all or part of the business of certain kinds of authorised persons. In broad terms, the mechanism covers 2 types of transfer:

- transfers of insurance business; and

- transfers of banking business.

195. The mechanism, as it relates to transfers of insurance business, replaces the arrangements under sections 49 to 52B of, and Schedule 2C to, the Insurance Companies Act 1982, which implement requirements of the EC insurance directives. Banking business transfers have usually required a private act of Parliament, which can involve a lenghty procedure and substantial cost to the firms concerned.

### Section 104: **Control of business transfers**

196. This section establishes that the arrangements under Part VII are generally the exclusive route for giving effect to the types of transfer to which the Part applies. However, the definition of insurance business transfer schemes under section 105 provides for qualifying cross-border transfers to be approved in other member States, in accordance with the directives.

### Section 105: **Insurance business transfer schemes**

197. This section defines the insurance business transfers covered by the new mechanism. It only applies to transfer schemes where, after the transfer, the business transferred will be carried on from an establishment in the EEA, and where prior to the transfer all or part of the business to be transferred is:

- carried on, wholly or in part, in the EEA by a "UK authorised person" (defined in subsection (8)); or

- reinsurance business and it is carried on in the UK branch of an EEA firm (see Schedule 3); or

• carried on, wholly or in part, in the United Kingdom by an authorised person who is neither a UK authorised person nor an EEA firm.

198. In each case the authorised person transferring the business must have the appropriate permission under Part IV of, or Schedule 3 to, the Act.

199. However, subsection (3) sets out a series of cases for which the new mechanism does not apply. The mechanism does not apply where the transferor is a friendly society (referred to as case 1). Such transfers are covered by provisions in the Friendly Societies Act 1992. The other cases are where the arrangements under this Part do not apply are:

• transfers of reinsurance business by UK authorised persons which have been approved by a court in another EEA State or by the relevant regulator in the State or States in which it is carried on (case 2);

• transfers of business carried on outside the EEA which do not include policies (other than reinsurance policies) against risks arising in the EEA, and which have been approved by the courts or relevant authorities in a non-EEA State (case 3);

• where each of the policyholders has consented to the transfer, in cases of reinsurance business and entities where the policyholders are 'controllers' (within the meaning of Part XII) of the firm or other firms in the same group, essentially "captive" insurers (case 4).

200. Subsections (5) to (7) ensure that the powers of a court to make orders under the Companies Act (and the equivalent Northern Ireland provisions) dealing with schemes for reconstruction (compromises or arrangements agreed with creditors) can apply in transfers covered by the arrangements under the Part.

Section 106**: Banking business transfer schemes**

201. This section enables parties to a transfer of business involving accepting deposits to apply to the court for an order sanctioning the transfer. Subsection (1) applies the arrangements under this part to transfers of the business of authorised persons domiciled in the United Kingdom with permission to accept deposits, wherever the business is carried on. It also applies the arrangements where an overseas firm carrying on banking business in the United Kingdom transfers its business to another firm. However, the arrangements do not apply to transfers from building societies (for which separate arrangements exist under the Building Societies Act 1986) or credit unions or transfers falling within section 427A of the Companies Act.

Section 107**: Application for order sanctioning transfer scheme**

202. This section enables either a transferee, or the transferor, or both, to apply to the court for an order sanctioning a transfer of an insurance or banking business. Subsection (3) makes provision

as to the court to which an application may be made. The appropriate court will depend on the country or territory in which the businesses are registered or have their head office.

Section 108**: Requirements on applicants**

203. This section confers on the Treasury a power to specify, by regulations, requirements with which firms must comply before seeking an order sanctioning a transfer under section 111. Where firms have not complied with those requirements, the court would not be able to sanction the transfer.

204. Subsection (3) confirms that regulations made under this section may include requirements to give notice and the way in which notice must be given. This may, for example, include giving notice of the proposed transfer to customers or creditors of the firm but the kinds of requirement are not limited.

205. Regulations made under this power may also specify the circumstances in which the court may decide that a firm need not comply with a requirement. This is necessary to ensure that in circumstances where a firm cannot reasonably comply with a requirement, it need not prevent a court from approving a transfer. An example where this might be necessary is in relation to a requirement to give notice to customers of the firm transferring its business to another, in circumstances where it did not have contact details for some of its customers, as sometimes happens in the case of dormant bank accounts or old life insurance policies.

Section 109**: Scheme reports**

206. Under this section, it is a requirement that a proposal to transfer insurance business is to be accompanied by a report by an expert. The coverage of the report may be determined by the Authority and the appointment of the expert is subject to the approval of the Authority. The purpose of this section is to ensure that the court is presented with a full and accurate report of the proposed transfer by an independent expert in order that the court may properly assess its impact, including the effect on policyholders of the authorised person in question (and any third parties who may rely on their policies).

Section 110**: Right to participate in proceedings**

207. This section gives the Authority and those affected by the proposed transfer a right to be heard by the court when it is considering an application under section 107. This will mean that the Authority will be able to make representations about matters which, as regulator, cause it concern. It also ensures that any person connected with either the transferor or transferee firm — including customers of either firm or their employees — may also make representations to the court about the implications for them. The court will be able to take these views into account when considering the application.

© 2025 Thomson Reuters.

Section 107**: Sanction of the court for business transfer schemes**

208. This section sets out the conditions that must be met before the court may sanction a business transfer scheme. The conditions are that the transferee firm has obtained any necessary certificates, which are set out in Schedule 12, and also that court is satisfied that the firm will have the necessary authorisation to carry on that business after the transfer (unless no authorisation is required, as may be the case for some reinsurance undertakings in other territories).

209. The precise requirements imposed under the Schedule will depend on a number of factors including whether the business in question is insurance or banking business, and the location of the business (that is whether it is domiciled in the United Kingdom, another EEA member State or overseas).

210. An insurance business will require:

• a certificate about confirming that it has the necessary margin of solvency (paragraph 2 of the Schedule); and

• a certificate indicating that a host State regulator — in cases involving risks or firms located in another EEA member State — has consented (or failed to object within 3 months) to the transfer (paragraphs 3 to 5).

211. In the case of a bank it will need to produce:

• a certificate confirming that the bank has adequate resources; and

• in the case where either the transferor or transferee company is domiciled in another EEA state, a certificate confirming that the home state regulator has been informed about the transfer.

212. In deciding whether to sanction the scheme, the court must consider whether it is appropriate, in all the circumstances, to do so.

Section 112**: Effect of order sanctioning business transfer scheme**

213. This section makes it clear that any order of the court sanctioning a business transfer scheme may include any necessary provisions to ensure that any transfer is able to take proper effect. Accordingly, the court will be able to order either that all rights and liabilities of and against the firm whose business is being transferred become rights and liabilities of the transferee firm, or that appropriate measures are taken to extinguish or reduce such rights and liabilities.

214. A reduction may be necessary, for example, where a firm is insolvent and the transfer of business is part of a "rescue" proposal. In other cases, rights and liabilities may not be suitable for transfer and so alternative arrangements may be required, for example in the case where a bank

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 76 of 2232
Page ID #:2134
Financial Services and Markets Act 2000 c. 8

had a taken a floating charge over the assets of the firm in relation to a credit facility, where neither would be relevant to the ongoing business after the transfer.

215. These arrangements are consistent with the previous arrangements under Schedule 2C to the ICA 1982 and relevant companies and insolvency legislation.

## Section 113: Appointment of actuary in relation to reduction of benefits

216. This section enables a court, in response to an application from the Authority, to appoint an independent actuary to report on a business transfer in particular circumstances. This is aimed particularly at situations where a company from which business is to be transferred is in financial difficulties and unlikely to be able to meet all of its obligations to policyholders or other creditors. By the application of insolvency law, the policyholders would only be entitled to recover a proportion of the amounts due to them.

217. Section 112 enables the court to sanction a transfer that has the effect of reducing liabilities to policyholders, since in many cases allowing the transfer to a solvent company will be preferable to leaving the policyholder to recover money due from the insolvent insurer. In practice, a transfer would most likely only be approved where the effect was no worse than if it did not go ahead. The purpose of this section is to enable the court to take an informed view about the proposed reduction in benefits, to ensure that policyholders interests are properly protected. A policyholder who suffered loss in such circumstances might be able to make a claim to the compensation scheme under Part XV of the Act.

## Section 114: Rights of certain policyholders

218. This section provides that any EEA policyholders whose local law confers on them a right to cancel the policy in the event of a transfer have an adequate opportunity to exercise that right.

## Section 115: Certificate for the purpose of insurance business transfers overseas

219. This section is a paving provision for Part III of Schedule 12 which enables the Authority to issue a certificate about the solvency of a UK authorised firm to which insurance business is to be transferred from overseas. Such a certificate would enable the Authority to confirm to a regulatory authority in another EEA member State or Switzerland that the transferee firm was financially sound and able to accept the business being transferred to it.

## Section 116: Effect of insurance business transfers authorised in other EEA States

220. This section ensures that, where an insurance business transfer has been approved in another EEA member State in accordance with its domestic procedures, the transfer has effect in UK law. This means that where a person in the United Kingdom has an insurance policy with an EEA company whose business is in another member State, their contract is transferred so that the

© 2025 Thomson Reuters.

policyholder continues to enjoy the same rights and to be subject to the same obligations against the new company as they did against the company that issued the original policy.

Section 117**: Power to modify this Part**

221. This section allows the Treasury by regulations to modify the arrangements in relation to prescribed categories of transfer (for example, to ensure sufficient flexibility to allow for possible exclusions where transfers were subject to approval procedures in overseas jurisdictions). This section also allows the Treasury by regulations to amend the provisions of this Part to provide for its more effective operation.

PART VIII**: PENALTIES FOR MARKET ABUSE**

222. This Part confers power on the Authority to impose penalties for market abuse or to publish a public statement that someone has engaged in market abuse. The Act sets out the kinds of behaviour which will constitute market abuse and places a duty on the Authority to produce a code which will help to determine whether particular behaviour amounts to market abuse. This code will carry evidential weight, and in certain circumstances will provide a defence, or "safe harbour", against allegations of abuse. This Part also gives the Treasury the power to prescribe the coverage of the regime by specifying both the markets and the investments traded on those markets to which it applies. It sets out the procedures the Authority must follow when proposing to impose a penalty. It also confers a right to refer a decision to impose a penalty to the Tribunal.

Section 118**: Market abuse**

223. This section sets out the behaviour which constitutes market abuse. It also confers on the Treasury an order-making power to specify which markets and which investments come within the scope of this section.

224. Subsections (1) and (2) set out the conditions which must be satisfied before behaviour can be regarded as market abuse (and a penalty possibly imposed or statement published). In order to be abuse the behaviour must:

- take place in relation to qualifying investments traded on a market to which the section applies;

- be behaviour of a particular kind, as set out in subsection (2); and

- be behaviour which is likely to be regarded by a regular user of the market as a failure on the part of the person (A) engaged in the behaviour to observe the standards which the regular user would reasonably expect of a person in A's position. The regular user of the market is defined in subsection (10) to be a reasonable person who regularly deals on the

market. He is intended to represent the distillation of the standards expected by those who regularly use the market.

225. There are three kinds of behaviour set out in subsection (2). Broadly speaking, these are that the behaviour is based on information not generally available to the rest of the market; that the behaviour is likely to give the regular market user a false or misleading impression; or that the regular user would be likely to regard the behaviour as behaviour which would distort the market.

226. Subsection (6)(a) brings behaviour which takes place in relation to the subject matter of investments within the definition of behaviour which can be caught by these provisions. This means that, for example, behaviour in relation to a precious metal which affects the price of a futures contract in the metal can potentially be caught by these provisions if it is behaviour which falls within all of the tests set out above. Subsection (6)(b) also brings investments within the regime which are not themselves qualifying investments for the purposes of this section, but which are derivatives of a qualifying investment (for example options on options); or whose price or value is expressed by reference to the price or value of qualifying investments, for example spread bets. Subsection (8) allows the Authority to provide that behaviour conforming with a particular rule or rules does not amount to market abuse.

*End > Explanatory Note > para. 5*

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 79 of 2232
Page ID #:2137
Financial Services and Markets Act 2000 c. 8

# para. 6

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

Section 119**: The code**

227. This section places a duty on the Authority to prepare and issue a code which will allow it to set out the kinds of behaviour which, in its opinion, amount or do not amount to market abuse. The purpose of this code is to give guidance as to whether or not behaviour is abusive.

228. Subsection (2) makes clear that the code may describe behaviour which, in the opinion of the Authority, either does or does not amount to abuse. (Section 122 provides that a statement in the code that a particular type of behaviour is not an abuse is conclusive evidence of this fact.) It may also set out factors which, in the Authority's opinion, should be taken into account when determining whether an abuse has occurred. An example of such factors might be an individual's expertise or the fact that someone holds a position of particular responsibility. Subsections (6) to (8) place the Authority under a duty to publish the code (including any amended or replacement version under subsections (4) and (5)). The Authority must consult on its proposed code, or on proposed alterations or replacements under section 121.

Section 120**: Provisions included in the Authority's code by reference to the** City Code

229. This section enables the Authority to include in the code produced by it under section 119 "safe-harbours" from proceedings for market abuse for behaviour in conformity with the City Code on Takeovers and Mergers produced by the Panel on Takeovers and Mergers. If the Authority includes any such provisions, then behaviour which complies with those provisions does not amount to market abuse (as a result of section 122(1). The approval of the Treasury is required under subsection (2) before it can do so.

230. In considering whether market abuse has taken place, subsection (3) requires the Authority to keep itself informed as to the way in which the Panel interprets and administers the relevant provisions of the City Code.

Section 122**: Effect of the code**

231. Subsection (1) provides a safe harbour, by making it clear that if a person undertakes any behaviour which the code currently in force specifically states does not amount to market abuse, then he cannot be taken for the purposes of the Act to have abused the market. Subsection (2)

© 2025 Thomson Reuters.

makes clear that in other circumstances the code may be relied upon insofar as it indicates that the behaviour in question does or does not amount to market abuse.

Section 123**: Power to impose penalties in cases of market abuse**

232. This section allows the Authority to impose a monetary penalty on any person, whether an authorised person or not, who has engaged in market abuse or has required or encouraged another to engage in market abuse. Subsection (3) allows the Authority, as an alternative to imposing a penalty, to publish a public statement that a person has engaged in market abuse or has required or encouraged another person to do so. Subsection (2) provides that the Authority cannot impose a penalty or make a statement where a person has reasonable grounds for believing his behaviour did not constitute market abuse or that he was not requiring or encouraging another to engage in market abuse, or where the person concerned took all reasonable precautions and exercised all due diligence to avoid doing such things. The procedures for taking action under this section are set out in sections 126 and 127.

Section 124**: Statement of policy**

233. This section places a duty on the Authority to prepare and publish a statement of its policy in respect of penalties under section 123. The Authority will be able to set out in this document the circumstances in which it might impose a penalty and factors it will take into account in deciding what level of penalty to impose.

234. Subsection (2) requires that the Authority's policy for determining the amount of a penalty must take into account the effect and seriousness of the behaviour, whether or not it was deliberate or reckless and whether the person who engaged in the abuse was an individual. The Authority may also take into account other matters it considers appropriate. The Authority must consult on the initial version of the statement and on any subsequent changes as provided for in section 125. Subsection (3) requires the Authority to include in the statement an indication of when the Authority is to expected to regard a person as benefiting from section 123(2). Subsection (6) makes clear that the Authority must then have regard to a statement issued under this section when using its powers.

Section 128**: Suspension of investigations**

235. This section allows the Authority to direct a recognised investment exchange or recognised clearing house not to conduct an inquiry or to stop any inquiry it is already undertaking where the Authority is, or is considering, carrying out an investigation itself, or imposing a penalty on a person for market abuse.

Section 129**: Power of court to impose penalty in cases of market abuse**

236. This section allows the Authority to apply to the court to impose a penalty for market abuse where the court is considering whether to grant an injunction under section 381 or order restitution under section 383 in a case of market abuse.

## Section 130**: Guidance**

237. This section allows the Treasury, with the approval of the Attorney General and the Secretary of State, if the need arises, to issue guidance to the relevant prosecuting authorities (as set out in subsection (3)). The purpose of this guidance would be to help those authorities in deciding whether a case should be subject to criminal prosecution, or the imposition of penalties under the market abuse provisions, in the area of overlap between these provisions and the criminal offences of insider dealing (in the Criminal Justice Act 1993) and misleading statements and practices (in section 397). Subsection (5) confers a power on the Lord Advocate to issue equivalent guidance in relation to Scotland, where there are different arrangements for prosecution of offences.

## PART IX**: HEARINGS AND APPEALS**

238. This Part establishes the Financial Services and Markets Tribunal. Various sections in the Act provide a right to refer a matter to the Tribunal once the Authority has notified the person concerned of its decision. This Part sets out the procedural framework for referrals to the Tribunal and for appeals from the Tribunal to the Court of Appeal, or in Scotland to the Court of Session, on a point of law. The Part gives the Lord Chancellor a general power to make rules for the Tribunal's operation. Schedule 13 sets out further details of the Tribunal's constitution and operation.

239. This Part also confers on the Lord Chancellor a power to establish a scheme to provide subsidised legal assistance in proceedings before the Tribunal for individuals on whom the Authority seeks to impose a penalty for market abuse under Part VIII of the Act.

## Section 132**: The Financial Services and Markets Tribunal**

240. This section establishes the Tribunal and gives the Lord Chancellor the power to set its procedural rules. The Council on Tribunals is given oversight of the new Tribunal under the Tribunal & Inquiries Act 1992. Schedule 13 sets out requirements for the appointment of the President of the Tribunal, and the "panel of chairmen" panel and lay panel from which members of the Tribunal will be drawn. It includes provision for their qualifications and terms of office. It also permits the appointment of a Deputy President and administrative staff. It further provides power for the Tribunal to summon witnesses and to award costs. Subsection (3) contains the power for the Lord Chancellor to make rules for the Tribunal. Paragraph 9 of Schedule 13 sets out examples of the aspects of the Tribunal's procedures which might be covered by the Lord Chancellor's rules (such as when hearings might be held in private). Subsection (4) provides that this does not limit the Lord Chancellor's power.

## Section 133**: Proceedings: general provision**

© 2025 Thomson Reuters.

241. This section sets the time limit for making a reference to the Tribunal. The time limit is 28 days from the date of the decision notice or supervisory notice, unless a different period is prescribed in the procedural rules made for the Tribunal by the Lord Chancellor under section 132. The Tribunal will also have discretion to allow references to be made after the time limit has expired, subject again to any provision in the Tribunal's procedural rules.

242. The section also makes clear that the Tribunal may hear any evidence it considers relevant in determining the case before it, including evidence that was not available to the Authority when it made its decision. The Tribunal must determine what action the Authority should take and may give directions to the Authority in order to give effect to its determination. The Tribunal may also make recommendations as to the Authority's rules and procedures.

243. A supervisory notice takes effect on the date it specifies. However, subsection (9) provides that the Authority may not take the action referred to in a decision notice until the time for making a reference to the Tribunal has expired or, if the case is referred, until the case has been finally disposed of, including any subsequent appeals to the Court of Appeal, Court of Session or House of Lords (see section 137 below). An order of the Tribunal may be enforced as if it were an order of a county court in England, Wales or Northern Ireland, or the Court of Session in Scotland.

Section 134: **Legal assistance scheme**

244. This section gives the Lord Chancellor the power to make regulations establishing a legal assistance scheme. It sets out the coverage that such a scheme should have, namely that a person should only be eligible for legal assistance if he is an individual who has referred a decision of the Authority to impose on him a penalty for market abuse and provided that he meets the eligibility criteria which are to be established under section 135(1)(d).

Section 135: **Provisions of the legal assistance scheme**

245. This section gives examples of the type of provision the Lord Chancellor may include in the regulations, for example:

- the form legal assistance may take;

- the persons who may be engaged to provide the assistance;

- eligibility criteria; and

- procedural details as to how an application is made, to whom, and as to what happens when assistance is granted.

Section 136: **Funding of the legal assistance scheme**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 83 of 2232
Page ID #:2141
Financial Services and Markets Act 2000 c. 8

246. This section sets out the way in which the legal assistance scheme is to be funded. It will be a free-standing scheme rather than an extension of legal aid and will be paid for by levies raised from authorised persons. The Lord Chancellor will determine the potential or actual cost of the legal assistance scheme. The Authority will have responsibility for determining the distribution of levies across the regulated community, collecting them and paying them over to the Lord Chancellor's Department.

247. The money raised will be paid into the Consolidated Fund. Spending on the legal assistance scheme will be voted expenditure. The costs of administering the scheme will come out of the running costs of the Tribunal.

248. If the amount paid to the Lord Chancellor in any one year exceeds the cost of the legal assistance scheme (for example because the costs in that period prove to be lower than anticipated), he must decide either to repay the excess to the Authority or else take into account this amount in the next determination of costs, by reducing the amount which the Authority has to levy during the following year. If the excess amount is repaid to the Authority, the Authority has discretion whether to distribute the money amongst those persons upon whom the levy was imposed (or some of them) to offset it against future invoices, or else partly to distribute the amount and partly offset it. This enables the Authority to avoid costly redistribution of small amounts. If the Authority considers that it is not practicable to deal with an excess in any of these ways, it may obtain the permission of the Lord Chancellor to use it in some other appropriate manner.

Section 137**: Appeal on a point of law**

249. This section establishes the right to appeal to the Court of Appeal or Court of Session on a point of law against a decision of the Tribunal. An appeal may be brought only with the permission of the Tribunal or the appeal court. If the appeal court considers that the decision is wrong in law it may remit the matter back to the Tribunal for a rehearing and decision or make a decision itself. An appeal may be made from the Court of Appeal or Court of Session to the House of Lords with the leave of the Court or the House of Lords. The Lord Chancellor may make procedural rules in relation to the exercise of these appeal rights.

PART X**: RULES AND GUIDANCE**

250. This Part of the Act confers powers upon the Authority and the Treasury to set regulatory requirements for authorised persons. It also gives the Authority power to issue guidance on requirements imposed by or under the Act.

Chapter I**: Rule-Making Powers**

251. Chapter I concerns the Authority's basic rule-making powers, the purpose for which rules can be made and the scope of the powers. There are other rule-making powers for specific purposes

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS     Document 114-4     Filed 09/05/25     Page 84 of 2232
Page ID #:2142
Financial Services and Markets Act 2000 c. 8

in relevant parts of the Act, including Parts XV, XVI, XVII, XX and XXII. This Chapter also sets out the relevant procedural requirements when making rules.

252. Parts V, VIII, XIX, and XX also contain specific powers which enable the Authority to impose requirements on particular classes of person. For example, through statements of principle, codes of practice and directions on approved persons; on any person in relation to market abuse; on members of Lloyd's; and on members of the professions. Those powers are described in the relevant Parts of these explanatory notes.

Section 138**: General rule-making power**

253. This section confers a power on the Authority to make rules applying to authorised persons with respect to their carrying on of regulated and unregulated activities. Rules made under this section are referred to as *"general rules"* and can only be made to protect the interests of consumers. There need not be a direct relationship between the authorised persons to whom the rules apply and the consumers who are protected by the rules — so, for example, the Authority will be able to make rules under this section to protect the interests of beneficiaries of trusts, to further market integrity, as required by the Investment Services Directive, or to protect against systemic risk.

254. The bulk of the Authority's handbook of rules and guidance will be constructed using the rule-making power in this section. The power will also enable the Authority to make other rules, including rules relating to firms' systems and controls and rules regulating the conduct of firms' business with customers. These could, for example, include "know your customer" rules and "disclosure" requirements.

255. The provisions in this section enable the Authority to make rules at differing levels of detail, from rules with a high level of generality, which the Authority refers to as principles, to detailed conduct of business provisions.

256. Sections 152 to 155 set down the procedural requirements which the Authority must follow when making rules.

Section 139**: Miscellaneous ancillary matters**

257. This section elaborates on the provisions which the Authority can make under the rule-making powers. It expressly enables the Authority to make rules in respect of the handling of client money by authorised persons. The rules could be used to require money to be held in trust.

258. This section also allows the Authority to make rules which require authorised persons to allow customers a "cooling off" period after entering into an agreement. For example, under section 76 of the ICA 1982, persons entering long-term insurance contracts have 14 days in which to cancel

© 2025 Thomson Reuters.

the policy and recover any premium paid. This section would allow the Authority to make rules requiring authorised persons to extend similar rights to customers.

Section 141**: Insurance business rules**

259. This section empowers the Authority to make insurance business rules prohibiting an authorised person who has permission to deal in contracts of insurance from carrying on a specified activity, which may be a non-regulated activity.

260. Subsection (3) enables the Authority to make rules in relation to contracts of long-term insurance entered into by an authorised person in the course of carrying on his business, in particular restricting the descriptions of property, or indices of value, by reference to which the benefits under such contracts may be determined.

Section 142**: Insurance business: regulations supplementing Authority's rules**

261. This section enables the Treasury to make regulations applicable to non-authorised persons connected with authorised persons with permission in relation to contracts of insurance, preventing them from taking actions which would weaken the effect of "asset identification rules" made by the Authority under the powers in this Part. Breaches of these regulations are subject to criminal sanctions.

262. Subsection (3) gives the Treasury powers to make regulations which would prevent a company paying dividends or creating a mortgage or charge over its property, and which would make void any mortgages or charges made, in breach of those regulations.

Section 143**: Endorsement of codes etc**

263. This section confers a power on the Authority to make rules endorsing the City Code on Takeovers and Mergers ("the Takeover Code") and the Substantial Acquisition Rules ("SARs"), or particular provisions of them.

264. This section provides a mechanism enabling the Authority to exercise its disciplinary powers over authorised persons for a breach of the endorsed provisions of the Takeover Code or SARs. The arrangements are designed to ensure that an adviser will cease to act where the Takeover Code or SARs have been breached. Subsections (3) and (4) have the effect that disciplinary or intervention powers in respect of endorsed provisions may be taken by the Authority if the Takeover Panel has requested it to do so.

265. Before making rules which endorse the Takeover Code or the SARs, the Authority must follow the usual procedures set out in section 155 for consulting on a draft of the proposed rules. By applying relevant provisions of section 155, subsection (8) of this section also requires the Authority to consult if it wishes to give a notification to the Takeover Panel that it considers the

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 86 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2144

Panel's own consultation procedures are satisfactory. If the Authority does give such a notification, the effect under subsections (6) and (7) is that the Authority's endorsement of the Code or SARs extends automatically to subsequent amendments of the Code or SARs.

Section 144: **Price stabilising rules**

266. This section allows the Authority to make rules regarding actions which may be taken by authorised firms to stabilise the price of investments. Section 397(4) and 397(5)(b) provide that a person who is alleged to have created a false or misleading impression as to the market in certain investments has a defence to a charge under that section (such as misleading statements) if he proves that he was acting in conformity with rules made under this section.

267. Subsection (5) provides that the Authority may make rules which provide a similar defence to persons who have stabilised investments in compliance with the price stabilisation rules of an overseas body which is specified by the Authority. If an overseas body which is specified under this section changes its rules, the amended body's rules will be taken by the Authority to be endorsed under this section if the Authority has confirmed that it is satisfied with the overseas body's consultation procedures.

268. Subsection (4) confers on the Treasury a power to make regulations setting the outer boundaries of the Authority's power to make price stabilising rules.

Section 145: **Financial promotion rules**

269. This section confers a power on the Authority to make rules applying to authorised persons in relation to the regulation of financial promotion under Parts II and XVII of the Act.

270. Subsection (3) enables the Treasury to restrict this power.

Section 147: **Control of information rules**

271. Subsection (1) enables the Authority to make rules about the disclosure and use of information held by an authorised person. These rules are commonly known as *"Chinese walls"* rules. Chinese walls are barriers in the form of procedures, systems, management and physical separation which firms may employ in order to ensure that information obtained by one part of a firm is not communicated in inappropriate circumstances to another part of the firm (for example, where it would advantage one client at the expense of another). This power is broadly in line with that currently contained in section 48(2)(h) of the FS Act 1986.

272. Under subsections (2)(a) and (c), rules may require that information be withheld or not used for a customer's benefit where it would otherwise have to be disclosed or used, while subsections (2)(b) and (d) provide that rules may specify circumstances in which an authorised person may withhold or not use information which would otherwise have to be disclosed or used. This means

© 2025 Thomson Reuters.

that, if an authorised person maintains Chinese walls in accordance with Authority rules made under the section, then he will not be subject to obligations as to the disclosure and use of information that would otherwise apply.

## Section 148**: Modification or waiver of rules**

273. This section concerns the power of the Authority to waive or modify certain kinds of rules, as set out in subsection (1), at the request of an authorised person or with their consent. Subsection (4) specifies the circumstances in which the Authority may waive or modify these rules.

274. Waivers or modifications of rules can have indefinite effect or can be revoked by the Authority. Breaches of conditions attached to a waiver or modification are equivalent to a breach of rules.

275. Subsections (6) and (7) concern the obligation on the Authority to publish rule waivers or modifications. They provide that the Authority must publish waivers or modifications in such a way as to bring them to the attention of the people who are likely to be affected, unless the Authority thinks it would be inappropriate to do so. In considering whether publication would be appropriate, the Authority should take into account whether it believes that publication would unreasonably prejudice the authorised person's commercial interests or contravene any international obligations of the United Kingdom. The Authority would also need to take into account whether a breach of the rule in question would give rise to a right of action by a person under section 150. Persons affected by the modification or waiver will include clients of the authorised person and other authorised persons who might wish to benefit from similar arrangements.

276. In deciding whether certain of the conditions for withholding publication are met, subsection (8) requires the Authority to consider whether it can publish a waiver or modification of a rule without disclosing the identity of the authorised person concerned.

## Section 149**: Evidential provisions**

277. This section enables the Authority to make rules which, if breached, will not lead to any disciplinary or other sanction provided for under the Act. Rules made under this section must state that they will not give rise to sanctions under the Act, but they must also indicate that their contravention can be relied on as indicating that another rule has been contravened, or that compliance with the rule can be relied on as indicating that another rule has been complied with. In particular, this power will enable the Authority to elaborate on rules, including principles, which are framed at a higher level of generality. The power can be used to promulgate codes, such as a code of practice, whereby rules comprising the code carry evidential status as to whether a higher level principle, which is underpinned by the code, has been breached.

## Section 150**: Actions for damages**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 88 of 2232
Page ID #:2146
Financial Services and Markets Act 2000 c. 8

278. This section sets out the circumstances in which persons who suffer loss as a result of a rule breach by an authorised person have a right of action for damages for resulting losses. This section does not remove any common law cause of action which a person might otherwise have. It allows a class of people to recover losses just by showing that there has been a breach of a rule as a result of which they have suffered loss rather then having to rely on that breach as evidence of negligence.

279. The section creates a presumption that private persons (as defined by the Treasury) who suffer loss as a result of a rule breach have a right of action for damages. The right does not extend to breaches of financial resources rules, listing rules or other rules which may be specified by the Authority. Customers would only generally suffer loss as a result of a breach of financial resources rules if the authorised person concerned became insolvent. In those circumstances, the relevant person's rights in the insolvency would not be altered by a separate right of action. Additionally, it might not be appropriate to attach a right of action to certain other rules, such as those drawn at a high level of generality.

280. There is a presumption that persons other than private persons do not have a right of action for damages, although the Treasury may by regulations specify that breaches of certain rules are actionable by non-private persons.

## Section 151**: Limits on effect of contravening rules**

281. Breach of the Authority's rules does not make a person guilty of an offence, nor does it make a transaction unenforceable or void.

## Section 152**: Notification of rules to the Treasury**

282. This section places a requirement on the Authority to give copies of new rules to the Treasury or, when it amends or revokes a rule, to give written notice of the fact to the Treasury.

## Section 153**: Rule-making instruments**

283. This section requires the Authority to publish its rules in writing. As a result of subsection (3), if rules do not specify the power under which they are made, they will not have effect.

## Section 155**: Consultation**

284. This section imposes consultation requirements on the Authority when it proposes to exercise its rule-making powers. Generally, draft rules issued for consultation must, as a result of subsection (2), be accompanied by a cost-benefit analysis of the proposals, an explanation of the purpose of the proposed rules and a statement that representations about the Authority's proposals may be made to the Authority within a specified time. They must also be accompanied by a statement of the Authority's reasons for believing that the proposed rules are compatible with its objectives.

285. Subsection (4) provides that the Authority must have regard to representations made to it when consulting on proposals to make rules. Subsections (5) and (6) provide that if the Authority decides to make the rule, it must give a feedback statement on the representations it received. If the rules which are introduced differ significantly from those which the Authority consulted on, the Authority must publish a statement of that fact, together with a cost-benefit analysis concerning the new provisions.

286. The Authority does not have to prepare a cost-benefit analysis when it considers that its proposals will not result in a material increase in costs. It would, however, still need to consult on the content of the proposed rules. Also, where the Authority proposes to exercise its powers to charge fees, the requirement to produce a cost-benefit analysis does not apply but the Authority is required to consult on the proposed expenditure which would result from the fee-raising exercise. Part III of Schedule 1 contains further provisions regarding the Authority's fee-raising powers.

287. Consultation requirements will not apply if the Authority considers that any delay resulting from the consultation would harm consumers.

*End > Explanatory Note > para. 6*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 7

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 156**: General supplementary powers**

288. This section confirms that the Authority's rules may make different provision for different cases and that the rules may make incidental, supplemental, consequential and transitional provisions.

## Chapter II**: Guidance**

289. Chapter II concerns the Authority's power to issue and charge for guidance on its rules, the legislation and other matters relating to its functions, including its regulatory objectives.

## Section 157**: Guidance**

290. This section enables the Authority to issue and charge for guidance on all the matters listed in subsection (1).

291. Subsection (2) confirms that the Authority can use its financial resources or its other resources to support the giving of information and advice by third parties where the Authority considers it could have given the advice or information under this section.

292. Subsection (3) provides that when giving guidance on its rules which is intended to have broad application, the Authority will need to meet various of the requirements of section 155, including those requiring consultation and the publication of a cost-benefit analysis. Subsection (4) clarifies that the Authority can charge for its guidance, whether it is offered generally or in response to a specific request.

## Chapter III**: Competition Scrutiny**

293. Chapter III provides for competition scrutiny of the Authority's rules, guidance, codes and practices.

## Section 160**: Reports by the Director General of Fair Trading**

294. This section concerns reports by the DGFT on possible adverse effects on competition of the Authority's regulating provisions and practices. A significant adverse effect on competition is defined in section 159(2) and (3). It includes things which have the effect of requiring or encouraging exploitation of the strength of a market position.

295. Subsection (1) provides that the DGFT must keep the Authority's practices and regulating provisions (which are defined in section 159 and include rules, guidance and codes) under review. The DGFT can, at any time, investigate the Authority's practices and regulating provisions under the powers conferred by section 161.

296. Following an investigation, if the DGFT finds that regulating provisions or practices, either singly or in combination, have a significant adverse effect on competition then he must produce a report. The DGFT has discretion as to whether to produce a report or not if he finds that there is no such effect.

297. Subsections (5) and (6) provide that the DGFT must send a copy of any report he produces to the Competition Commission (the "Commission"), the Treasury and the Authority. The DGFT must, so far as is practicable, exclude from the published version of the report any matter which relates to the affairs of a person which might seriously prejudice that person's interests. (Subsection (9) provides that such matters do not need to be excluded from the version which goes to the Commission, the Treasury and the Authority.)

Section 161: **Power of Director to request information**

298. This section provides that, in carrying out his functions under section 160, the DGFT has powers to request relevant documents from any person, and to request relevant information from any business.

299. Subsections (5) and (6) provide that if a person fails to produce a required document, or piece of information, then the DGFT may report the matter to the court, and if the court is satisfied that there was no reasonable excuse for this failure, that person may be dealt with as if he were in contempt of court.

Section 162: **Consideration by the Competition Commission**

300. This section concerns the role and duties of the Competition Commission following receipt of a report from the DGFT. It is supplemented by the provisions of Schedule 14.

301. There are two types of report which the Commission must consider under this section and on which it must produce a report. The first is a report by the DGFT which concludes that particular regulating provisions or practices of the Authority have a significantly adverse effect on competition (type A). The second is a report by the DGFT which concludes that particular regulating provisions or practices do not have such an effect, but where the DGFT has referred

© 2025 Thomson Reuters.

the matter to the Commission for further consideration (type B). (If the DGFT does not ask the Commission to consider a type B report, then that is the end of the matter.)

302. Subsection (4) provides that the Commission's report must state its conclusions as to whether the regulatory provisions or practices have a significantly adverse effect on competition. If it concludes that there is no such effect (that is, it agrees with a type B report or disagrees with a type A report), then that is the end of the matter. No further action can be taken.

303. If, however, the Commission concludes that there is such an effect, then subsection (5) requires it to state in its report whether it considers that the effect is justified. In taking this decision, subsection (7) requires the Commission, as far as is reasonably possible, to reach a conclusion which the Authority could have reached given the obligations which the Act places on the Authority and the functions which it confers. In its report, the Commission has to state what action, if any, ought to be taken by the Authority in the light of the unjustified anti-competitive effect. This could include the Authority changing its rules or practices in specified ways.

304. Any report produced by the Commission under this section has to be sent to the Treasury, the Authority and the DGFT. Subsection (2) provides that the Commission does not need to produce a report where there has been a change of circumstances which makes it unnecessary. For example, the Authority may, once it has received the DGFT's report, change the rule in question, or stop engaging in a particular practice, so that the adverse effect on competition identified by the DGFT is removed.

Section 163**: Role of the Treasury**

305. This section concerns the Treasury's powers to take action following an adverse report from the Commission.

306. If the Commission's report is that the significantly adverse effect on competition is not justified, subsection (2) requires the Treasury, unless exceptional circumstances exist, to direct the Authority to take appropriate action. Subsection (4) provides that the Treasury must have regard to the Commission's conclusion as expressed in its report. The special circumstances in which the Treasury do not have to direct the Authority to make changes following an adverse Commission report are where:

  • the Authority has already taken action, for example through changes to its rules or practices, which means that the Commission's recommendations are no longer relevant; or

  • the Treasury concludes that the existence of exceptional circumstances mean that it would not be appropriate or necessary to direct the Authority to make changes. For example, the Treasury may conclude that there would be a grave risk to the financial system if certain regulating provisions were changed.

© 2025 Thomson Reuters.

307. Subsection (7) provides that the Authority cannot be directed by the Treasury to take any action which it would not have the power to take itself. If the Commission were to recommend changes which did not, for example, provide an appropriate level of protection for consumers, the Treasury could not direct the Authority to make those changes.

308. If the Commission's view is that a significantly adverse effect is justified, subsections (5) and (6) allow the Treasury to override that decision and direct the Authority to make changes where there are exceptional circumstances, for example, in order to meet international obligations.

309. Subsections (10), (11) and (12) provide that if the Treasury decide, because of exceptional circumstances, not to take action following a Commission report that a regulating provision or practice has an adverse effect on competition, or decide to take action in the opposite case, they must produce a statement giving their reasons. Any such statement must be made available to the public and must be laid before Parliament.

Section 164**: The** Competition Act 1998

310. This section makes clear that neither the prohibition in Chapter I (of agreements preventing, restricting or distorting competition within the United Kingdom) nor the prohibition in Chapter II (of abuse of a dominant position in a market which may effect trade in the United Kingdom) of the Competition Act 1998 apply to any action taken by a person in order to comply with the Authority's regulating provisions or practices.

## PART XI**: INFORMATION GATHERING & INVESTIGATIONS**

311. This Part sets out the powers of the Authority to require the production of information and documents, to require reports to be compiled, to conduct investigations and to obtain access to premises. Many of these powers are also held concurrently by the Secretary of State in recognition of his wider responsibilities in relation to company law.

312. The powers provided for in this Part are in addition to the specific powers conferred on the Authority by other provisions of the Act to request information from unauthorised persons in particular circumstances, such as in connection with an application for authorisation or recognition. They enable the Authority to require information on an ad hoc basis and therefore supplement the Authority's ability to make rules requiring authorised persons to provide it with information on a routine basis under its general rule-making power (section 138).

313. Under section 177, failure to comply with any requirement imposed using any of the powers in this Part can be certified to the court and dealt with by the court as if the defaulter were in contempt.

314. None of the powers in this Part may be used to require the disclosure of material which is protected by section 413.

## Section 165**: Authority's power to require information**

315. This section gives the Authority a general power to require information or documents which may reasonably be required in connection with the discharge of its functions under the Act. The information or documents may be required from any person, including a legal person, who is any of the following:

- • an authorised person;

- • a formerly authorised person;

- • a person connected with an authorised person, as defined in subsection (11);

- • an operator, trustee or depository of an open-ended investment company;

- • a recognised investment exchange;

- • a recognised clearing house.

316. Either the Authority can write to the person asking for the production of the information or documents within a reasonable timescale, or it can send an officer to whom it has given written authorisation. The person is required to provide the information or documents without delay, and he may also be required to take any reasonable steps the Authority may specify to verify the information provided.

## Section 166**: Reports by skilled persons**

317. This gives the Authority the power to require an authorised person or a formerly authorised person to commission and provide the Authority with a report into any relevant matter the Authority may specify. This must be a matter about which the Authority could require information under section 165, so the report must reasonably be required in connection with the discharge of the Authority's functions.

318. The power also enables the Authority to require such reports from other persons carrying on a business who are, or were, connected to the authorised or formerly authorised person in the ways specified in subsection (2). Essentially, these are members of the same group of companies, or companies closely linked through a common shareholder, or any partnership of which the authorised or formerly authorised person is or was a member. This is a more limited set of persons than under section 165 and Schedule 13.

319. The person making the report must be nominated by the Authority, or his appointment must be approved by it. The Authority has to be satisfied that he has the relevant skills to report on the matter concerned. In many cases this person may be an accountant, or they may be a person with some other suitable professional qualification, such as a lawyer or an actuary, or they may be

a person with particular commercial or professional experience, such as a banker. The Authority may also specify the form of the report.

320. Subsection (5) imposes an obligation on any in-house expert working for the authorised or connected person to co-operate with the person appointed to produce the report. Thus, if the report is to be produced by an actuary then the in-house actuary who works for the firm is obliged to co-operate in the production of the report. This duty is enforceable by the Authority through an injunction, or a comparable order in Scotland.

Section 167**: Appointment of persons to carry out general investigations**

321. Under this section, either the Authority or the Secretary of State (the "investigating authority") may, where it appears that there are good reasons for doing so, appoint competent persons to conduct an investigation on their behalf into the business of an authorised person or appointed representative, or into the ownership or control of an authorised person. An *appointed representative* is a person who is exempt from the general prohibition in relation to particular regulated activities by virtue of a contract with an authorised person as described under section 39. An appointed representative and the authorised person who is the principal of that representative as a result of the contract may be investigated at the same time. An investigation may also be made into a formerly authorised person or a former appointed representative, although the scope of such investigations is limited by subsection (4) to the business they conducted while they were authorised or appointed or under the control or ownership of the former authorised person at that time. Written notice must be given to the person under investigation under section 170(2).

322. The people appointed to conduct the investigation may be employees of the investigating authority (under section 170(5)), or other people engaged specifically for the purpose. If they judge it necessary for the purposes of the investigation, they may also inquire into the business of other connected companies or partnerships, including those which were connected at some relevant time in the past (this extends to the same classes of connected company or partnership as section 166). The investigator(s) must give written notice to any other company or partnership whose business they intend to inquire into in this way.

Section 168**: Appointment of persons to carry out investigations in particular cases**

323. In addition to the general power under section 167 to investigate the business of authorised persons and appointed representatives where there is "good reason" to do so, this section gives the Authority or the Secretary of State ("the investigating authority") the power to appoint competent persons (who can be employees of the investigating authority) to conduct investigations where it appears that there are circumstances suggesting that some specific contravention or offence may have taken place. The more specific grounds for the exercise of the powers under this section are reflected in the wider powers of the investigators (see notes on sections 171 to 173 below).

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 96 of 2232
Page ID #:2154
Financial Services and Markets Act 2000 c. 8

324. Among the contraventions that may be investigated by either the Authority or the Secretary of State under this section are a breach by an unauthorised person of the general prohibition, the commission of the misleading statements and practices offence under section 397, market abuse under section 118, or insider dealing under Part V of the Criminal Justice Act 1993. The Authority, but not the Secretary of State, may also launch an investigation under this section where a person is suspected of having committed an offence under prescribed money laundering regulations.

325. The Authority may also appoint investigators under this section to look into suspected contraventions of rules or regulations made under the Act, failures to comply with statements of principle made under section 64, or to investigate the fitness and properness of approved persons under Part V of the Act. The fitness and properness of authorised persons may be investigated under section 167.

Section 169: **Investigations etc in support of overseas regulator**

326. This section gives the Authority new powers comparable to those held concurrently by the Treasury and the Secretary of State under section 82 of the Companies Act 1989 to investigate matters on behalf of an overseas regulator. In deciding whether it is appropriate to exercise this power to require information or to appoint investigators on behalf of an overseas authority, the Authority is directed to take account of the factors listed in subsection (4), which include the seriousness of the case and the wider public interest in providing the assistance.

327. When the request comes from another competent authority under any of the single market directives (see the notes on Schedule 3 for a brief explanation), the Authority is also required to consider whether the assistance must be given in order to fulfil the obligations to co-operate imposed by those directives. If it decides that it is, the other factors fall away.

328. The Authority may make the exercise of the power conditional on the overseas authority making an appropriate contribution towards the cost of doing so, except where it considers that exercise is necessary in order to fulfil the obligations to co-operate under the directives.

329. Under subsection (7), the Authority may decide to permit representatives to attend and participate in any interview to be conducted by the investigators it has appointed. But in order to permit this, the Authority is required to be satisfied that the information thus obtained by the overseas regulator will be subject to equivalent safeguards on its subsequent use and disclosure as are contained in Part XXIII of the Act. The Authority must also prepare a statement of its policy on the exercise of this discretion, which must be approved by the Treasury and, if approved, published. The discretion may not be exercised until this statement has been approved and published.

Section 170: **Investigations: general**

330. Where an investigation has been launched into a person under section 167 or 168, the Authority or the Secretary of State (whichever is the investigating authority) must notify that

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 97 of 2232
Page ID #:2155
Financial Services and Markets Act 2000 c. 8

person that the investigator has been appointed. They must also inform the person under investigation of the reason for the appointment, and the particular provisions of the Act under which the appointment has been made.

331. However no notification is needed for investigations under section 168 into possible insider dealing, market abuse or misleading statements and practices, or into contraventions of the general prohibition under section 19, the financial promotion prohibition under section 21 or the prohibition on promoting collective investment schemes under section 238, since in those cases the investigator may not know the identity of the perpetrator or may be looking into market circumstances at the outset of the investigation rather than investigating a particular person. Nor is notification required if the investigating authority believes that it would be likely to result in the investigation being frustrated.

332. Subsection (5) allows employees of the investigating authority to act as investigators under this Part of the Act.

333. Subsections (7) and (8) allow the investigating authority to control the scope, timetable and form of the investigation by issuing directions to the investigator(s). Any directions must be notified to the person under investigation under subsection (9) except for those types of investigation where initial notice is not required, or where the investigating authority believes that notification would be likely to result in the investigation being frustrated.

Section 171**: Powers of persons appointed under** section 167

334. This section establishes the powers of investigators appointed under the general investigations power to require people to attend before them and answer questions, and to provide information or documents. The investigators may only impose these requirements where they reasonably consider that the questions, information or documents in question are relevant to the investigation. And they may only impose them on the person under investigation, or any other *"connected person"* as defined in subsection (4). These limitations reflect the broad grounds on which the general investigatory power is exercisable.

Section 172**: Additional power of persons appointed under** section 168(1) or (4)

335. This section establishes wider powers for investigators appointed under section 168(1) or (4), the power to investigate particular suspected contraventions or offences. It does not, therefore, apply to investigations into possible insider dealing, market abuse, misleading statements and practices or a breach of the general prohibition or the promotional prohibitions. Because the grounds required under section 168 are more specific, the powers available to the investigator are wider in terms of who may be required to give information. A person who is not the person under investigation or connected to that person may only be asked questions so long as the investigator is satisfied that it is necessary or expedient to do so. The term *"connected"* attracts the same meaning as under section 171.

© 2025 Thomson Reuters.

Section 173: **Powers of persons appointed as a result of** section 168(2)

336. This section establishes wider powers for investigators appointed to investigate possible insider dealing, market abuse, misleading statements and practices or a breach of the general or the promotional prohibitions under sections 19, 21 or 238. Because these are liable to focus, at least initially, on market circumstances rather than the conduct or circumstances of any particular person, or the activities of persons unknown, there is no requirement to notify a particular person as the subject of the investigation. So the concept of connectedness does not apply. The investigator can require any person to attend and answer questions, or to supply information or documents, so long as the investigator considers that they may be able to give information relevant to the investigation.

Section 174: **Admissibility of statements made to investigators**

337. A statement made by a person in compliance with a requirement imposed by an investigator under this Part is generally admissible in any proceedings. But it may not be adduced against the person who made the statement, or questions relating to it asked, by the prosecution in criminal proceedings other than for the charges listed in subsection (3), nor by the Authority in proceedings before the Tribunal to determine whether a penalty should be imposed for, or a public statement made in respect of, market abuse. It may, however, be adduced, or a question relating to it may be asked, by the person himself, or by those acting on his behalf. It can be used by the prosecution or the Authority in cases against another person, or in cases against that person where the charge is one of those listed in subsection (3). All of the charges mentioned in that subsection relate to the provision of false information.

338. The section is necessary to take into account the judgment by the European Court of Human Rights in the Saunders case ((1997) 23 E.H.H.R. 313).

Section 175: **Information and documents: supplemental provisions**

339. This section enables the Authority or an investigator appointed by either the Authority or the Secretary of State under this Part to compel the production of a document by a person who is holding a document on behalf of another person if they would have the power to compel the latter to produce the document if they held it. If any person required to produce a document fails to do so, they may be compelled to state where, to the best of their knowledge, the document is.

340. A document once obtained may be copied or have extracts taken from it, and the person producing the document, or any other relevant person, may be required to explain it. But the production of a document does not affect any rights a third party may have over it.

341. Documents subject to banking confidentiality may also be withheld unless the person holding the information, or the person to whom the duty of confidence is owed, is the person under

© 2025 Thomson Reuters.

investigation or a related company, or the person to whom the duty is owed consents to its disclosure, or the requirement to disclose has been specifically authorised by the Authority or the Secretary of State.

Section 176**: Entry of premises under warrant**

342. An investigator appointed by the Authority or the Secretary of State may obtain a warrant for entry to any premises from a justice of the peace, or in Scotland from a justice of the peace or a sheriff. Such a warrant can then be executed by a police constable (subsection (5) sets out what the constable may do in the exercise of the warrant).

343. To issue the warrant the justice of the peace or sheriff must be satisfied that there are reasonable grounds for believing:

• a request for information under this Part has not been wholly complied with, and that the documents or information may be found on the premises concerned; or

• the premises are the business premises of an authorised person or appointed representative, that information or documents on those premises could be required by the Authority or the investigator, but that a request for that information or those documents would not be complied with, or would result in the information or documents being removed, tampered with or destroyed; or

• a serious offence has or is in the process of being committed, and that there is information or are documents on those premises which are relevant to that offence, which could be required by the Authority or the investigator, but which would not be produced, or which might be removed, tampered with or destroyed.

344. Subsections (6) and (7) apply to these warrants certain safeguards and other protections that apply to warrants issued under the Police and Criminal Evidence Act 1984 and the equivalent order in Northern Ireland. This includes giving the constable the right to employ reasonable force to gain entry.

345. Subsection (8) provides for documents seized under a warrant to be held for up to 3 months, or for longer if relevant proceedings are instituted during that period.

*End > Explanatory Note > para. 7*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 8

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 177**: Offences**

346. If a person fails to comply with a requirement imposed under this Part without a reasonable excuse, the Authority or the Secretary of State may certify the fact to a court and the court may then deal with the person as if he were in contempt. A person who intentionally obstructs the exercise of any rights conferred by a warrant under the preceding section is guilty of a criminal offence and liable on summary conviction to a prison term of up to 3 months, or a fine up to level 5 on the standard scale (£5,000), or both.

347. A person who knowingly or recklessly provides false or misleading information in response to a requirement under this Part also commits an offence. On summary conviction he would be liable to a prison term of up to 6 months, or a fine up to the statutory maximum (£5,000), or both. On indictment he would be liable to a prison term of up to 2 years, or a fine, or both.

348. The same penalties would be available against anyone who knows or suspects that an investigation is likely to be conducted and falsifies, conceals, destroys or disposes of any document he knows or suspects to be relevant, or causes such a document to be falsified, concealed, destroyed or disposed of.

## PART XII**: CONTROL OVER AUTHORISED PERSONS**

349. This Part is concerned with persons who intend to acquire control over UK authorised persons by virtue of their shareholding or voting rights. The Part also deals with increases and decreases in the extent of a person's control. Specifically, a person who proposes either to acquire control or to increase the level of their control must notify the Authority and secure its approval. The Authority may object to a particular acquisition or increase in control or it may attach certain conditions to its approval. A person proposing to decrease their control must merely notify the Authority of their intention. A breach of the obligations imposed by this Part is a criminal offence. The requirements in this Part are necessary to meet certain single market directive obligations. They carry forward similar requirements in the predecessor legislation. For consistency, the requirements have been extended to cover controllers of all authorised persons incorporated in or formed under the law of any part of the United Kingdom and not just those persons which are included in the scope of the single market directives. This Part does not place notification requirements on persons who exercise control over authorised persons by virtue of their position in that firm or in a parent firm,

© 2025 Thomson Reuters.

for example as a director or chief executive. Such people may, however, need to be approved by the Authority under Part V of the Act.

## Section 178: **Obligation to notify the Authority**

350. This section imposes a requirement on persons who propose to acquire control (or acquire an additional kind of control) or increase their control over a UK authorised person to give the Authority a "notice of control" informing them of their intentions. What constitutes "control" and a "kind of control" for these purposes is described in section 179. The circumstances in which a person is taken to "increase" their control are set out in section 180.

351. Subsection (2) provides for passive acquirers of control. These are persons who acquire control without themselves taking any action, for example, through inheriting a large number of shares. A passive acquirer may not be able to notify the Authority in advance, but under this subsection, they must do so within fourteen days of first becoming aware that they have acquired the control.

352. A person who is required by subsection (1) to notify the Authority of his proposal to acquire or increase control is also required by subsection (3) to make a further notification when the acquisition or increase has taken place.

353. Subsection (4) defines the range of authorised persons with whose control this Part is concerned. In line with single market directive requirements this is limited to authorised persons incorporated in or formed under the law of any part of the United Kingdom, "UK authorised persons". This is because under the single market directives, the supervision of those who have control is subject to home State regulation. The requirements do however cover all classes of UK authorised persons and not just those included in the scope of the single market directives.

## Section 179: **Acquiring control**

354. This section defines the circumstances in which a person acquires control and is therefore subject to the obligation to notify the Authority under section 178(1)(a) or (b).

355. A person may acquire control either directly via a shareholding or voting power in the UK authorised person itself, or indirectly via a shareholding or voting power in a parent of the UK authorised person. This is required by the single market directives.

356. Subsection (3) provides that for the purposes of determining whether a person has acquired control, the percentage shareholding or voting power is aggregated with that of their associates as defined in section 422. This means, for example, that where a firm has a holding of 5 per cent of the shares in a UK authorised person and one of its subsidiaries has a holding of 7 per cent of the shares in the same UK authorised person, the firm will be required to notify the Authority.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 102 of 2232
Page ID #:2160
Financial Services and Markets Act 2000 c. 8

357. Subsection (4) sets out what constitutes a "kind" of control. A person who has control of one kind would be required under section 178 to notify the Authority again were they to acquire control of a different kind either as well as, or instead of, the control they had before.

Section 180: **Increasing control**

358. This section sets out the circumstances in which an increase in a person's control causes them to be subject to the obligation to notify the Authority under section 178(1)(c). These are that a person's shareholding or voting power must cross one of the thresholds set out in subsection (2), or they must become a parent of the UK authorised person. These thresholds are determined largely by the single market directives.

Section 181: **Reducing control**

359. This section sets out the circumstances in which a reduction in a person's control causes them to be subject to the obligation to notify the Authority under section 190. These are that a person's shareholding or voting power must cross one of the thresholds set out in subsection (2), or they must cease to be a parent of the UK authorised person. The level of these thresholds is as for an increase in control and again they are determined largely by the single market directives.

Section 182: **Notification**

360. This section concerns the procedure to be followed when notifying the Authority. It specifies that the Authority may indicate the information and documents that must be supplied in support of a notification.

361. Subsection (2) confers a power on the Authority to require persons giving a notice of control to provide the Authority with such additional information as the Authority may reasonably considers necessary to determine the application.

Section 183: **Duty of Authority in relation to notice of control**

362. This section gives the Authority up to three months from the date it receives a completed notice to determine whether to approve the application or issue a warning notice indicating that it is proposing to object to the acquisition of, or increase in, control.

363. Subsection (2) imposes a requirement on the Authority to consult home State competent authorities when required to do so by regulations made by the Treasury. The nature of this requirement is determined by the single market directives.

Section 184: **Approval of acquisition of control**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 103 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2161

364. The Authority is obliged by this section to notify the applicant without delay if it gives its approval.

365. If the Authority fails to indicate its approval or to issue a warning notice within three months, subsection (2) provides that the applicant is to be treated for the purposes of the Part as having been approved.

366. As a result of subsection (3), the approval is valid for a year, unless the Authority notifies the person intending to acquire control of a another time period. If the person does not acquire the control in that period, a fresh application is required.

Section 185**: Conditions attached to approval**

367. This section concerns the ability of the Authority to make its approval subject to the imposition of conditions on the applicant. The Authority is able to impose such conditions as it considers desirable, having regard to its duty under section 41 to ensure that, in general, the threshold conditions will continue to be met in relation to the UK authorised person subject to the control concerned.

368. If the Authority imposes conditions, subsections (3) and (4) require it to issue the person with a warning notice and a decision notice. The person has a right to refer the matter to the Tribunal.

369. Under subsection (5), persons on whom conditions are imposed may apply to the Authority to have the conditions varied or cancelled. The Authority may itself cancel a condition.

370. The Authority may serve a notice of objection on persons who breach any conditions imposed by this section. This is provided for in section 187.

Section 186**: Objection to acquisition of control**

371. This section gives the Authority the power to object to the acquisition of new or additional control, or to an increase in control.

372. The Authority can object to a person acquiring or increasing their control where it is not satisfied that the approval requirements set out in subsection (2) are met.

373. Subsection (4) confers a duty on the Authority to notify the applicant if it considers that the conditions for approval would be met if the applicant took or refrained from taking a particular step.

Section 187**: Objection to existing control**

374. This section provides the Authority with the power to object to an existing controller if it is satisfied that the approval requirements are not met or that a condition imposed under section 185

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 104 of 2232
Page ID #:2162
Financial Services and Markets Act 2000 c. 8

has been breached. The Authority may also object to a person who acquired or increased control without notifying the Authority in the required manner.

Section 188**: Notices of objection under** section 187**: procedure**

375. This section sets out the process by which the Authority can object under section 187 to an existing controller. If the Authority wishes to object to a controller, it is obliged to give him a warning notice.

376. Subsection (2) has the effect that the Authority must comply with any requirements prescribed by the Treasury with respect to the consultation of other competent authorities outside the UK before it gives a warning notice. The Treasury will exercise this power to ensure that effect is given to requirements imposed by the single market directives to consult home State competent authorities.

Section 189**: Improperly acquired shares**

377. This section makes provision enabling the Authority to restrict rights deriving from shares in the case of persons who continue to hold shares in breach of a notice of objection. It is a requirement of the single market directives that these powers should be available.

378. The Authority also has the option of applying to the court for an order directing the sale of shares under subsection (3). If shares are sold in this way, subsection (6) provides that the proceeds (net of the costs of the sale) will be paid, via the court, to persons beneficially interested in them.

379. Subsection (7) provides that the powers in this section may only be exercised in relation to shares acquired in breach of a notice of objection or in contravention of a condition imposed by the Authority, and not to any other shares held by the person or his associates.

Section 190**: Notification**

380. This section concerns notification of reductions in, and cessations of, control, whether or not the reduction or cessation is intentional.

381. Under subsection (1) a person who proposes to reduce the control that they have over a UK authorised person, or to cease to have any control, must notify the Authority that that is their intention. The circumstances in which a reduction in control triggers this notification requirement are set out in section 181. A person required to notify the Authority under this subsection must, under subsection (3), notify the Authority again when the proposed reduction or cessation of control actually occurs.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 105 of 2232
Page ID #:2163
Financial Services and Markets Act 2000 c. 8

382. Subsection (2) requires persons whose control is reduced, or ceases, without themselves taking any action, to notify the Authority within 14 days of becoming aware of the reduction or cessation.

383. Subsection (4) sets out various requirements in relation to the notices given pursuant to this section.

384. The Authority has no power to make any objection in these circumstances but it is an offence to fail to give the necessary notification.

Section 191**: Offences under this Part**

385. This section sets out the offences in relation to this Part.

386. Subsections (1) and (2) provide that it is an offence not to notify the Authority in accordance with the requirements in this Part when acquiring, increasing, reducing or ceasing to have control over a UK authorised person.

387. Subsections (3) and (4) provide that where proper notification has been given, it is an offence to carry out a proposal before the Authority has given its approval or, where it has issued a warning notice, before it has decided whether to follow the warning notice with a notice of objection.

388. A person guilty of any of the above offences is liable on summary conviction to a fine not exceeding level 5 on the standard scale, currently £5,000.

389. It is also an offence, under subsection (5), to acquire control in contravention of a notice of objection. This is a more serious offence and a person guilty of it may be convicted on indictment to imprisonment for a term of up to two years and to a fine. There are lesser fines on summary conviction. The penalties are set out in subsections (7) and (8), and include provision for a daily fine if the offence continues.

390. Subsection (9) provides a defence for those who are prosecuted for failing to notify the Authority of their influence. The defence is available if a person can show that he was unaware of the act or circumstance by virtue of which the duty to notify the Authority arose. In these circumstances, the person must notify the Authority within 14 days subsequently of becoming aware. Failure to do so is a criminal offence, the penalty on summary conviction being a fine not exceeding level 5 on the standard scale, currently £5,000.

Section 192**: Power to change definitions of control etc.**

391. This section gives the Treasury power to amend by order certain definitions in this Part and others which are relevant to it, and to provide for exemption from the obligation to notify increases or reductions in control under sections 178 and 190.

© 2025 Thomson Reuters.

392. The Treasury may alter the cases in which a person is said to acquire control as set out in section 179, and therefore it also has a power to change the definition of controller in section 422 to ensure the two remain aligned. The Treasury may also alter the thresholds the crossing of which triggers the requirements in this Part to notify an increase or decrease in control. This power is necessary to give effect to any future change in the single market directive requirements for controllers of UK authorised persons who are not currently covered by the single market directives.

## PART XIII: INCOMING FIRMS: INTERVENTION BY AUTHORITY

393. This Part confers power on the Authority and, in certain cases, the DGFT to intervene in the business of EEA and Treaty firms who are, or have been, authorised by virtue of Schedules 3 and 4. These firms are referred to in the Part as *"incoming firms"*. This power, which is referred to as the power of intervention, does not apply in respect of persons who are authorised solely by virtue of having a permission under Part IV. Nor does it apply in respect of the additional Part IV permissions that may be held by incoming firms. The Part sets out the grounds on which the power is exercisable and the procedures for exercising it.

### Section 194: General grounds on which power of intervention is exercisable

394. This section sets out the grounds on which the Authority may exercise its power of intervention. The 4 grounds are:

- where it appears to the Authority that there has been, or is likely to be, some contravention of a rule or other requirement imposed by the Authority in accordance with the division of responsibility between home and host State under the appropriate single market directive;

- where it appears to the Authority that the authorised person has knowingly or recklessly misled the Authority;

- where it appears to the Authority that it is desirable to exercise the powers in order to protect customers or potential customers; or

- where the incoming EEA firm is carrying on consumer credit business in the United Kingdom under their passport and the DGFT has informed the Authority that the person has done any of the things listed in section 25(2) of the CCA 1974. These are factors to be taken into account by the DGFT in deciding whether a person is fit and proper to hold a consumer credit licence, and they cover contraventions of that Act, offences involving fraud, dishonesty or violence, practising racial or other forms of discrimination, and engaging in deceitful, oppressive, unfair or improper business practices.

### Section 195: Exercise of power in support of overseas regulator

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 107 of 2232
Page ID #:2165
Financial Services and Markets Act 2000 c. 8

395. This section enables the Authority to exercise its intervention power at the request of, or for the purpose of assisting, an overseas regulatory authority ("ORA"). The Authority may exercise its powers under this section whether or not the grounds set out in the previous section are met. Authorities in other EEA States who are competent authorities under the single market directives are automatically ORAs. Other overseas authorities, from the EEA or elsewhere, which have functions equivalent to those set out in subsection (4) are also ORAs.

396. When the Authority receives a request from an EEA competent authority, it must consider whether it is obliged to exercise the powers under the relevant directive. In other cases, the Authority may exercise its discretion, taking account of the factors listed in subsection (6).

397. Under subsection (7) the Authority may make its use of its powers conditional on the ORA making an appropriate contribution toward the cost of taking the action.

Section 196**: The power of intervention**

398. This section provides that the nature and extent of the Authority's power of intervention are the same as the power to vary a permission or impose a requirement under Part IV.

Section 197**: Procedure on exercise of power of intervention**

399. This section sets out the procedure the Authority must follow when it proposes to exercise its power of intervention against incoming firms under this Part. This is the same written notice procedure as described in relation to section 53.

Section 198**: Power to apply to the court for injunction in respect of certain overseas insurance companies**

400. Under this section the Authority may act on behalf of an insurance authority in another EEA member State by applying to the courts for an injunction, or in Scotland an interdict, to freeze assets held in the United Kingdom by an insurer from that member State.

401. The power implements article 20(5) of the 1st Non-Life Directive, relating to general insurance, and article 24(5) of the 1st Life Directive, relating to long-term insurance. Subsection (1) limits use of the power to where it is in accordance with those provisions, which means that it is exercisable where the firm's home State authority has asked the Authority to prohibit the free disposal of assets of that firm and has confirmed that:

   • the firm has failed to comply with the requirements of article 15 of the 1st Non-Life Directive or article 17 of the 1st Life Directive;

   • the solvency margin of the firm has fallen below the minimum required by article 16(3) of the 1st Non-Life Directive or article 19 of the 1st Life Directive; or

© 2025 Thomson Reuters.

• the solvency margin of the firm has fallen below the guarantee fund as defined in article 17 of the 1st Non-Life Directive or article 20 of the 1st Life Directive.

Section 199**: Additional procedure for EEA firms in certain cases**

402. This section imposes an additional procedure to be followed in some circumstances where the Authority proposes to use its intervention power against an EEA firm. This procedure applies where the EEA firm has contravened a requirement imposed by the Authority pursuant to host State functions under the relevant single market directive.

403. First, the Authority must require the firm to remedy the situation. If the firm fails to do so, the Authority must request the firm's home State regulator to take appropriate measures to ensure the firm remedies the situation and inform the Authority of the measures it proposes to take (or why it does not propose to take any measures). Only if the Authority considers that the measures that the home State regulator has taken are inadequate, or if no action has been taken by that regulator, may it exercise its powers.

404. However, where the Authority decides it needs to act urgently it may do so before it has required the firm to remedy the situation and either before it requests the home State regulator to act or, having already made a request, before it is satisfied that the home State regulator is not going to take adequate action. But if the Authority takes urgent action in this way, it must inform the European Commission and must comply with any direction from the Commission to rescind or vary the requirements imposed.

Section 200**: Rescission and variation of requirements**

405. Either on its own initiative or at the request of the authorised person who is subject to a requirement under this Part, the Authority may rescind or vary such a requirement. The procedure under section 197 applies to a variation on the Authority's own initiative. The warning notice and decision notice procedure applies where the Authority proposes to refuse to rescind or vary a requirement on request. Agreement to a request for rescission or variation can be granted by written notice as with the grant of other forms of application under the Act.

Section 201**: Effect of certain requirements on other persons**

406. Where the power of intervention is used to impose a restriction on the type mentioned in section 48 (an assets requirement), the restriction has the same effect as if it had been imposed under Part IV. This means that the provisions of section 48 apply, including the provisions about assets held by a third party such as a bank, and about the transfer of assets to a trustee approved by the Authority.

Section 202**: Contravention of a requirement imposed under this Part**

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 109 of 2232
Page ID #:2167
Financial Services and Markets Act 2000 c. 8

407. This section makes clear that a contravention of a requirement imposed under this Part does not constitute an offence or result in any transaction being void or unenforceable. It also confers on the Treasury a power to prescribe in regulations the circumstances in which a person may have a right of action as a result of a breach of a requirement imposed under this Part. Otherwise no such right of action will result from a contravention.

Section 203**: Powers to prohibit the carrying on of Consumer Credit Act business**

408. Under the Act, EEA firms may, on the basis of their home State authorisation, be automatically authorised to carry on the types of activity covered by the passport under the various single market directives. Two of these directives include lending in their listed activities, which encompasses consumer credit business regulated in the United Kingdom under the CCA 1974. This means that EEA firms may carry on consumer credit business without having to apply to the DGFT for a consumer credit licence and they are therefore not subject to the DGFT's powers under the CCA 1974.

409. This section, along with section 204, confers on the DGFT separate powers to restrict or prohibit the carrying on, or the purported carrying on, of consumer credit business in the United Kingdom under the relevant directives if the firm or any of its employees has done any of the things listed in section 25(2)(a) to (d) of the CCA 1974. That is, if they have:

- committed any offence involving fraud, dishonesty or violence;

- contravened any provision made by or under the CCA 1974, or by or under any other enactment regulating the provision of credit to individuals or other transactions with individuals;

- practised discrimination on grounds of sex, colour, race or ethnic or national origins in, or in connection with, the carrying on of any business; or

- engaged in business practices appearing to the DGFT to be deceitful or oppressive, or otherwise unfair or improper (whether unlawful or not).

410. Contravention of a restriction or prohibition is a criminal offence and contravention of a restriction is also grounds for imposing a prohibition. Schedule 16 sets out the procedure the DGFT must follow when imposing prohibitions or restrictions. This procedure follows that generally applicable in the CCA 1974 rather than in the other provisions of this Act.

PART XIV**: DISCIPLINARY MEASURES**

411. This Part gives the Authority powers to issue public statements or impose financial penalties in response to contraventions of rules or other requirements by authorised persons.

Section 205**: Public censure**

412. This gives the Authority the power to make a public statement concerning a contravention by an authorised person of any requirement imposed directly by the Act or under it, for example through the Authority exercising its rule-making power.

Section 206**: Financial penalties**

413. This enables the Authority to impose a financial penalty where it establishes that there has been a contravention by an authorised person of any requirement imposed by or under the Act.

*End > Explanatory Note > para. 8*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2025 Thomson Reuters.

# para. 9

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 207**: Proposal to take disciplinary measures**

414. This section requires the Authority to issue a warning notice where it proposes to make a public statement about an alleged contravention or impose a penalty. The notice must include the statement the Authority proposes to make or the amount of the proposed penalty.

## Section 208**: Decision notice**

415. If having issued a warning notice, and heard any representations, the Authority decides at the end of the relevant period to proceed with the public statement or penalty, it must issue a decision notice. This should also set out the terms of the proposed statement or the amount of the proposed fine (either of which may change in response to any representations made).

416. The authorised person has a right to have the matter referred to the Tribunal, in accordance with the provisions of Part IX of the Act. No further action can be taken by the Authority during the period in which the person has the right to have the matter referred to the Tribunal or, where the matter has been referred, until the Tribunal hearing and any subsequent appeal have run their course.

## Section 209**: Publication**

417. If, having followed the appropriate procedures, the Authority decides to make a public statement under section 205, this section provides that it must send a copy of the statement to the authorised person concerned and to any third parties to whom it copied the decision notice.

## Section 210**: Statements of policy**

418. This section requires the Authority to prepare and publish guidance on its policy concerning the imposition of penalties under section 206 and the level of those penalties. Under subsection (7), the Authority must have regard to this published guidance when determining the level of penalties.

## Section 211**: Statements of policy: procedure**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 112 of 2232
Page ID #:2170
Financial Services and Markets Act 2000 c. 8

419. This section requires the Authority to follow certain procedures when it issues a policy statement under section 210. The procedures include a requirement to consult on its proposals.

## PART XV: THE FINANCIAL SERVICES COMPENSATION SCHEME

420. This Part of the Act provides for a single Financial Services Compensation Scheme, established by the Authority and managed by an independent scheme manager. It gives the Authority powers to specify the regulated activities covered by the scheme.

421. The purpose of the compensation scheme is to compensate customers who suffer loss in various circumstances as a consequence of the inability of an authorised person to meet its liabilities. The scheme is not, other than in cases of the insolvency of an authorised person, intended to provide compensation for a regulatory breach (for example the mis-selling of investments), where the liability would remain with the authorised firm.

### Section 212: The scheme manager

422. This section requires the Authority to establish a company to manage the scheme and sets requirements as to the company's constitution, including that the chairman should be appointed by the Authority with the approval of the Treasury and that board members should act independently of the Authority.

### Section 213: The compensation scheme

423. This section imposes certain requirements about the Authority's rules establishing the scheme. It also makes it clear that customers may be eligible to make a claim against an authorised person even if the claim arises in relation to an activity for which that authorised person did not have permission. A claim relating to an appointed representative who is an exempt person by virtue of section 39 may also qualify under the scheme. Claims would not, however, be eligible if they related to regulated activities carried on by a person who should be authorised but is not.

424. Subsection (3)(b) provides for the scheme manager to levy authorised persons to cover both the costs of compensation and its administrative costs.

425. Subsection (5) requires the scheme manager when setting the levy to seek, so far as is practicable, to avoid cross-subsidy between sectors.

426. Subsection (10) allows the Treasury to prescribe categories of persons authorised to carry on regulated activities in the United Kingdom under passporting arrangements that will only participate in the scheme if they elect to do so. This allows the Treasury to ensure that, while membership of the scheme is generally compulsory for authorised persons carrying on relevant activities, it remains compatible with UK obligations under EC directives which make rules about

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 113 of 2232
Page ID #:2171
Financial Services and Markets Act 2000 c. 8

the extent to which EEA firms can be required to join compensation schemes other than their home State scheme.

## Section 214**: General**

427. This section clarifies the scope of the Authority's power to make scheme rules.

428. Subsection (1) provides, in particular, that the scheme may consist of a number of different compensation funds, for which levies can be raised from different sectors of the industry and different rules may be made as to the level of and eligibility for compensation.

429. Subsections (2) to (4) enable the scheme to limit the eligibility of claimants according to a number of different factors, including where the event took place or where the claimant resides.

430. Subsection (6) confers on the scheme manager a power to enter into arrangements with schemes established in other countries outside the EEA. Where, for example, a US firm does business in the United Kingdom and the level of compensation under the US scheme is lower than in the United Kingdom, the firm would be able to become a member of the UK scheme for the purposes of topping-up its cover. If the firm was unable to meet its liabilities, claimants might have a claim against both the US and the UK schemes. This power would in turn enable the UK scheme to enter into an arrangement with the US scheme to avoid the need for the claimant to submit a claim to both schemes. It is possible to make reciprocal arrangements under the power in subsection (1)(k).

## Section 215**: Rights of the scheme in relevant person's insolvency**

431. Subsection (1) enables the Authority to make provision about the effect of a payment of compensation under the scheme on the rights and obligations arising out of the claim against a relevant person in respect of which the payment was made. This allows the Authority to make provision for the rights of the claimant to be transferred to the scheme manager, which would enable the scheme manager to seek to recoup the costs of paying compensation from the firm in question without increasing the firm's liabilities. Subsection (2) provides that any right of recovery conferred on the scheme manager under subsection (1) cannot exceed the claimant's original rights.

## Section 216**: Continuity of long-term insurance policies**

432. The special nature of long-term insurance means that should an insurer go into liquidation, a simple payment of compensation may not necessarily be enough to enable policyholders to find alternative cover. This would be a problem especially where a person had developed health problems since taking out the original policy. The purpose of this section is to enable the Authority to include in the scheme rules a requirement for the scheme manager to seek to transfer the business of a failing insurer, so far as it relates to contracts of long-term insurance, to another company or to secure the issue of substitute policies by another insurer.

© 2025 Thomson Reuters.

Section 217**: Insurers in financial difficulties**

433. The special features of long-term (or "life") business are noted above. But even general insurance business (for example car or product liability insurance) can result in claims arising from events which may have happened several years earlier. This long tail of claims means that it can be difficult to crystalise the liabilities of an insurer in liquidation. The administration of insurance claims is costly and the delays for policyholders can be substantial while a liquidator seeks to work out the level of payments that can be made to creditors.

434. Accordingly, this section allows the Authority to make provision for the scheme manager to give assistance to an authorised person with permission to effect and carry out contracts of insurance in financial difficulties, either by transferring the that person's business, so far as it relates to contracts of insurance, to another insurer, or by enabling the continuance of that business by another insurer. Before using this power, which is potentially of substantial benefit to policyholders, the scheme manager must be satisfied that payments to the firm should not materially benefit other persons such as shareholders or company directors. It must also be satisfied that these measures would not cost more than the costs of compensation if the firm were allowed to go into default.

Section 219**: Scheme manager's power to require information**

435. The efficient settlement of claims will sometimes require the scheme to obtain information from a variety of sources. This section provides the scheme manager with powers to require the provision of specified information that it considers necessary in order to be able to assess claims. Information may be required from the authorised person, or from a person who was knowingly involved in the events giving rise to the claim.

Section 220**: Scheme manager's power to inspect information held by liquidator etc**

436. This section allows the scheme manager to inspect information held by the liquidator, administrator or trustee in bankruptcy of an insolvent relevant person. The scheme manager is only allowed to inspect documents rather than require them to be produced, which means that the cost of copying documents will be borne by the scheme and not by the liquidator. This should reduce costs to the liquidator, administrator or trustee in bankruptcy. The section does not apply to the Official Receiver or his Scotland and Northern Ireland counterparts (as to which see section 224).

Section 221**: Powers of court where information required**

437. This section provides that, where a person fails to comply with a requirement for information under section 219 or to permit documents to be inspected under section 220, this may be certified to the court, which may deal with the person as though he were in contempt.

© 2025 Thomson Reuters.

Section 222**: Statutory immunity**

438. This section provides immunity for the scheme manager, and its staff from actions for damages, except where they act in bad faith or where damages are sought under section 6(1) of the Human Rights Act 1998.

Section 223**: Management expenses**

439. This section ensures that the scheme may only recover from levies management expenses up to a certain limit. The limit must be set before the scheme includes management expenses in its calculations of the levies.

PART XVI**: THE OMBUDSMAN SCHEME**

440. This Part of the Act provides for the creation of a single, compulsory ombudsman scheme for the resolution of disputes between authorised firms and their customers. It provides for the detailed operation of the scheme to be determined largely by rules made by the Authority on which it is required to consult in accordance with the requirements under Part X.

Section 225**: The scheme and the scheme operator**

441. This section makes clear that the object of the scheme is to resolve disputes involving consumers quickly and with minimum formality. The operator of the scheme must be a body corporate.

Section 226**: Compulsory jurisdiction**

442. This section requires firms authorised by the Authority to submit to the jurisdiction of the scheme. The scheme's compulsory jurisdiction may only be applied to persons who were authorised at the time the activity to which the complaint relates was carried out, and the rules must have been in force at that time. The Authority is to make rules determining which activities of authorised persons fall within the compulsory jurisdiction. These activities must either be regulated activities as specified by the Treasury under section 22 or other activities which are not regulated, but could be made regulated activities under that section. The Authority is free not to include certain activities, for example kinds of professional business where it is unlikely that retail customers would ever be involved.

443. If an activity is included in the compulsory jurisdiction of the scheme, the ombudsman can consider all disputes arising from the carrying on of that activity by the authorised person. For example, were accepting deposits specified as an activity covered by the compulsory jurisdiction of the scheme, the ombudsman could consider all disputes arising from the operation of a bank account, such as the withdrawal of money from a cash machine, or a stopped cheque.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 116 of 2232
Page ID #:2174
Financial Services and Markets Act 2000 c. 8

444. The section also sets the circumstances in which a complaint can be dealt with: namely, that the complainant meets the relevant eligibility criteria (set by the Authority) and has asked the ombudsman to consider the case. The scheme is not able to deal with complaints made by authorised persons, except in circumstances specified in the rules.

## Section 227**: Voluntary jurisdiction**

445. Firms can join the ombudsman scheme, on a voluntary basis, under the voluntary jurisdiction where they are not authorised by the Authority or in respect of activities falling outside the scope of the compulsory jurisdiction. However, the scheme's voluntary jurisdiction rules can only relate to activities which are subject, or could be made subject, to the compulsory jurisdiction rules. The voluntary jurisdiction can be applied to authorised persons where a complaint relates to an activity which could be, but has not been, made subject to compulsory jurisdiction rules.

446. Voluntary jurisdiction rules can be made by the scheme operator with the approval of the Authority. The rules will also define which complainants are eligible.

## Section 228**: Determination under the compulsory jurisdiction**

447. The ombudsman will make a decision about the complaint on the basis of what he considers is fair and reasonable in the circumstances. The scheme operator has the power under paragraph 14 of Schedule 17 to specify the matters that can be taken into account when determining what is fair and reasonable. The ombudsman must make a written statement of his reasons for the decision, and must also require the claimant to accept or reject the decision by a specified date. If the complainant accepts the ombudsman's decision, then it is binding on both the complainant and the respondent.

## Section 229**: Awards**

448. If a complaint under the compulsory jurisdiction is determined in favour of the complainant, the respondent may be ordered to pay compensation up to a maximum limit which may be set by the Authority. The limit may be different for different kinds of complaint. The Authority may specify a particular limit for compensation in respect of non-financial loss or damage. The ombudsman can only make a binding award up to the limit set by the Authority, but he may recommend a greater amount as fair compensation. The respondent may also be ordered to take steps to rectify the matter complained of, and this can be enforced through the courts by the complainant if necessary.

## Section 230**: Costs**

449. This section allows the scheme operator to make rules concerning the costs which can be awarded by the ombudsman. These rules are subject to certain constraints. Where a complaint is settled in favour of the complainant, the rules can allow the firm concerned to be required to meet the costs of both the complainant and the scheme operator. A complainant could only ever be required to meet the costs of the scheme, and then only if the scheme operator had made rules

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 117 of 2232
Page ID #:2175
Financial Services and Markets Act 2000 c. 8

to allow for such awards and the ombudsman believed that the complainant's conduct has been improper or unreasonable, or they had been responsible for an unreasonable delay. The section also makes provision for recovery of costs by the scheme operator.

## Section 231: Ombudsman's power to require information

450. The efficient settlement of complaints under the compulsory jurisdiction will sometimes require the scheme to obtain information from the parties to the dispute. This section provides the scheme operator with powers to require parties to the complaint to provide specified information which it considers necessary for the fair determination of the complaint. It is not expected that these powers will be used on a routine basis. The Authority will also have powers to make rules requiring authorised persons to co-operate with the scheme. It will be in the interests of the complainant to co-operate.

## Section 232: Powers of court where information required

451. This section provides that, if a person fails to comply with a requirement to provide information made under section 231, the matter may be certified to the court, which may deal with the person as if they were in contempt.

## Section 233: Data protection

452. This section inserts new subsection (4A) into section 31 of the Data Protection Act 1998. This is needed to ensure that the scheme operator does not have to disclose information it has obtained when considering a complaint brought under the ombudsman scheme if disclosure would prejudice the performance of its functions.

## Section 234: Industry funding

453. This section provides for the Authority to be able to levy fees on authorised persons to meet both the costs of establishing the scheme and the costs of running the compulsory jurisdiction. The costs of the voluntary jurisdiction will be met by fees set as part of the voluntary jurisdiction rules.

## PART XVII: COLLECTIVE INVESTMENT SCHEMES

454. This Part comprises six chapters concerning collective investment schemes, including unit trusts, open-ended investment companies ("oeics") and overseas schemes. It includes provisions relating to the authorisation of schemes, their trustees, managers and operators and also to the rules applicable to them. The Part also makes provision for overseas collective investment schemes which may be promoted in the United Kingdom:

© 2025 Thomson Reuters.

• Chapter I provides the relevant definitions for this Part. It also gives the Treasury the power to specify by order that certain arrangements will not constitute a collective investment scheme.

• Chapter II prohibits authorised persons from promoting participation in a collective investment scheme unless an exemption applies. Whilst the provisions broadly continue the prohibition on authorised persons promoting collective investment schemes under the FS Act 1986, changes have been made to reflect the new financial promotion regime set out in section 21.

• Chapter III contains the provisions relating to authorised unit trust schemes. These broadly follow the provisions of the FS Act 1986, although the Authority is to be given the power to approve changes to an authorised unit trust's investment and borrowing powers. There are also provisions to allow for rule waivers and modifications, and to grant operators and trustees of authorised unit trust schemes the right to refer matters to the Tribunal in certain circumstances.

• Chapter IV contains provisions which enable the Treasury broadly to continue the regime for oeics, and to make regulations concerning the establishment and regulation of other forms of oeic in the United Kingdom. Under the FS Act 1986, oeics which are incorporated and authorised in the United Kingdom must invest solely in transferable securities. The Act will allow the Treasury to make regulations concerning the creation and operation of a wider range of authorised oeics, so that they can invest in assets other than transferable securities. The Treasury may also, under the relevant provisions, make regulations concerning the incorporation of unauthorised oeics. This might, for example, be done in order to allow the formation of common investment funds for charitable purposes, or in the context of ethical investments.

• Chapter V broadly carries forward provisions of the FS Act 1986 and allows three kinds of overseas scheme to be "recognised" and marketed in the United Kingdom. First, schemes constituted in other member states which meet particular requirements; second, schemes authorised in designated territories; and third, schemes constituted in other territories, but which are individually recognised.

• Chapter VI sets out the powers of investigation which will apply in relation to authorised unit trust and overseas schemes. It is intended that the principal provisions concerning investigations of oeics will be set out in the proposed Treasury regulations under Chapter IV.

Chapter I**: Interpretation**

Section 236**: Open-ended investment companies**

455. This section defines an open-ended investment company. This is done by reference to a "property" and an "investment" test (set out in subsections (2) and (3) respectively). Both tests must be satisfied in order for a corporate body to meet the definition of an open-ended investment

© 2025 Thomson Reuters.

company. The "property" test is carried over from the definition in section 75(8)(a) of the FS Act 1986.

456. The "investment" test is framed by reference to a hypothetical reasonable investor's expectations, were he to participate in the scheme. A reasonable investor should expect to realise his investment within a reasonable period, and expect that the way in which this would be done would be calculated by reference to the value of the scheme property. In determining whether this condition is satisfied, certain actual or potential redemptions of his holdings are to be ignored, including those under certain provisions of the Companies Act and corresponding provisions in EEA states. Under subsection (4)(d), the Treasury may by order designate provisions in non-EEA states under which redemptions may be made and which may also be left out of the account.

457. Subsection (5) contains a Treasury order-making power to amend the definition of an open-ended investment company for the purposes of Part XVII.

Chapter II**: Restrictions on promotion**

Section 238**: Restrictions on promotion**

458. This section contains the basic marketing prohibition and some exemptions from it. The main exemption is for schemes which are marketed other than to the general public. Other exemptions include promotions made in respect of authorised unit trust schemes, authorised oeics and recognised overseas schemes. The marketing prohibition applies to communications which originate outside the United Kingdom if the communication is capable of having an effect in the United Kingdom.

459. Subsection (6) enables the Treasury by order to specify circumstances in which the subsection (1) prohibition does not apply. For incoming promotions, subsection (7) makes it clear that it will be possible to make exemptions dealing with promotions originating outside the United Kingdom even if they are capable of having an effect in the United Kingdom. Thus, subsection (7) makes clear that the order-making power in subsection (6) enables the Treasury to adjust the scope of the restriction on promotion of collective investment schemes by authorised persons to take full account of international and technological developments.

460. The term *"promotion otherwise than to the general public"* is amplified in subsection (10) and includes promotions which are designed, so far as possible, to reduce the risk of participation by persons for whom it would be unsuitable. The prohibition on marketing to the general public will not therefore necessarily be breached if a promotion is inadvertently received by a member of the general public.

Section 239**: Single property schemes**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 120 of 2232
Page ID #:2178
Financial Services and Markets Act 2000 c. 8

461. A single property scheme is, broadly, a collective investment scheme which relates to a single building or a group of buildings managed as a single enterprise. This section gives the Treasury power to make regulations exempting the promotion of participation in single property schemes to the general public from the prohibition in section 238. If the Treasury make regulations under this section, the Authority may then make rules imposing duties on the operator and trustee or depositary of schemes exempted under the regulations.

## Section 240: Restriction on approval of promotion

462. This is a new provision designed to prevent an authorised person from approving a financial promotion under section 21 if the authorised person would not himself be permitted to make the communication under section 238.

## Section 241: Actions for damages

463. If an authorised person contravenes a requirement under section 238 or 240, a private person, and other persons falling within such categories as may be prescribed in regulations made by the Treasury, who suffers loss as a result may claim damages.

## Chapter III: Authorised unit trust schemes

## Section 242: Applications for authorisation of unit trust schemes

464. Applications for an order declaring a unit trust scheme to be authorised must be made to the Authority by the manager and trustee of the scheme. The manager and trustee must be different persons. The section gives the Authority broad scope to determine the form and content of the application, including further information to be contained in it.

## Section 243: Authorisation orders

465. If the conditions referred to in the section are met, the Authority may make an authorisation order declaring a unit trust scheme to be authorised. The conditions reflect certain requirements specified in the UCITS Directive which establishes a passporting regime whereby certain types of authorised collective investment scheme established in one EEA State may generally be entitled to equivalent authorisation in others. The section includes requirements that:

- the manager and trustee must be bodies corporate which are independent of each other and incorporated in the United Kingdom or another EEA State;

- they must be authorised persons holding the appropriate permissions;

- the scheme must comply with the requirements of the trust scheme rules (referred to at section 247, below); and

© 2025 Thomson Reuters.

• participants must be able to have their units redeemed at a price related to the net asset value of the scheme property or be able to sell their units on an exchange at a similar price.

Section 244**: Determination of applications**

466. This section sets out the time limits within which applications should be determined (and specifies that completed applications shall be determined within six months). Applicants may withdraw their application at any time before the Authority makes a determination.

Section 245**: Procedure when refusing an application**

467. If the Authority wishes to refuse an application, it must issue each of the manager and trustee with a warning notice. Either the manager or the trustee may refer a refusal to the Tribunal.

*End > Explanatory Note > para. 9*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 10

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 246**: Certificates**

468. If an authorised unit trust scheme meets with the requirements of the UCITS Directive, the manager or trustee of the scheme can request that the Authority issue a certificate to that effect. The certificate will be needed if the authorised unit trust scheme is to passport into other European jurisdictions.

## Section 247**: Trust scheme rules**

469. This section permits the Authority to make rules (known as *"trust scheme rules"*) concerning the constitution, management and operation of authorised unit trust schemes. These cover broadly the same matters as constitution and management regulations under section 81 of the FS Act 1986, but without the arrangements under that legislation whereby the Treasury retained a degree of control over certain constitution and management matters (such as the investment and borrowing powers of authorised unit trusts). The Authority has direct responsibility for these matters under this section.

470. The trust scheme rules are binding on the manager, trustee and participants independently of any provisions contained in the trust deed. Participants can seek to enforce the trust scheme rules against the manager or trustee as if the rules were provisions contained directly in the trust deed.

471. The Treasury has the power to modify the Authority's rule-making powers if there is a change in the company law relating to the rights of beneficial, but not legal, owners of shares. This would enable the rights of nominee holders in authorised unit trusts to be aligned to those of shareholders in companies should the need arise.

## Section 248**: Scheme particulars rules**

472. These are rules which the Authority may make requiring the manager of an authorised unit trust scheme to give details of the scheme to the Authority and to publish or make available to the public on request certain particulars, including changes, concerning the scheme.

473. The scheme particulars rules can provide for compensation to be paid to certain people (described as "qualifying persons") if they have suffered loss because of an untrue or misleading

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 123 of 2232
Page ID #:2181
Financial Services and Markets Act 2000 c. 8

statement in the particulars or because of an omission from them. Qualifying persons include people who may have a beneficial, but not legal, interest in the scheme (for example, beneficiaries of a trust where the trustees hold units in the scheme).

## Section 249: **Disqualification of auditor for breach of trust scheme rules**

474. The Authority may disqualify an auditor from auditing authorised unit trust schemes or authorised oeics if the auditor does not comply with the trust scheme rules. Warning and decision notice procedures will apply, as well as rights to refer a decision to the Tribunal.

## Section 250: **Modification or waiver of rules**

475. This allows the Authority to modify or waive the application of any of the trust scheme rules or scheme particulars rules in respect of authorised unit trusts. If there is a modification or waiver of rules under this section, certain of the provisions of section 148 (relating to the modification or waiver of various other of the Authority's rules and providing for the circumstances in which waivers or modifications will be granted) will apply.

## Section 251: **Alteration of schemes and changes of manager or trustee**

476. Alterations to an authorised unit trust scheme or a change in the manager or trustee may not take place without the Authority's approval, or the Authority not notifying its disapproval. New managers or trustees must satisfy the requirements specified in section 243.

## Section 252: **Procedure when refusing approval of change of manager or trustee**

477. If the Authority proposes to refuse to approve the replacement of the trustee or manager, a warning notice must be given. If the Authority proposes to refuse to approve changes to the scheme, warning and decision notice procedures will apply and the matter can be referred to the Tribunal.

## Section 253: **Avoidance of exclusion clauses**

478. As a result of this section, if a trust deed for an authorised unit trust scheme seeks to avoid the manager's or trustee's duty to exercise due care, the deed will be ineffective.

## Section 254: **Revocation of authorisation order otherwise than by consent**

479. The Authority may revoke an order authorising a unit trust in the circumstances specified in the section. These include any of the following situations:

  • the manager or trustee has contravened a requirement imposed by the Act or the Authority's rules;

© 2025 Thomson Reuters.

• either of them has given the Authority misleading information;

• the requirements for making an authorisation order (referred to in section 243) are no longer met;

• the scheme has been inactive for 12 months or more; or

• it is desirable in the interests of participants to revoke the scheme's authorisation.

Section 255**: Procedure**

480. If the Authority wishes to revoke an authorisation order, it must go through the warning and decision notice procedure, giving notice to both the manager and trustee. Either of them may refer the decision to the Tribunal.

Section 256**: Requests for revocation of authorisation order**

481. The Authority can revoke an authorisation order where the manager or trustee requests it to, but it can also refuse to revoke authorisation where it considers that refusal would be in the interests of participants, or that the public interest requires an investigation before authorisation is revoked. Warning and decision notice procedures will apply and the decision may be referred to the Tribunal.

Section 257**: Directions**

482. The Authority may give directions requiring the manager of the scheme to cease the issue or redemption of units, or to require the manager and trustee of the scheme to wind it up in the circumstances specified in the section (which are broadly similar to those specified as grounds for revoking a scheme's authorisation under section 254). If a person contravenes a direction under this section, private persons, and others falling within such categories as may be prescribed in regulations made by the Treasury, who suffer loss as a result may be able to bring an action. Once a direction has been given, the Authority may revoke or vary that direction, either of its own accord, or on the application of the manager or trustee.

Section 258**: Applications to the court**

483. In cases where the Authority is able to give a direction under section 257, it may also apply to the court for an order removing and replacing the manager or the trustee, or simply removing them and appointing an authorised person to wind up the scheme.

Section 259**: Procedure in giving directions under** section 257 **and varying them on Authority's own initiative**

484. This section sets out the procedure the Authority must follow when it proposes to give, or on its own initiative vary, a direction in relation to an authorised unit trust scheme under section 257.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 125 of 2232
Page ID #:2183
Financial Services and Markets Act 2000 c. 8

This is the same written notice procedure as described in relation to section 53, except that in this case separate notices must be given to both the manager and trustee of the scheme. If a notice under this section imposes a requirement for the manager of the scheme to cease issue or redemption of units, it will either give a date when the requirement ends, or else provide for the requirement to continue until a further notice is given. If a notice under this section imposes a requirement to wind up a scheme, the scheme must be wound up either by a date given in the notice or else (if no date is given) as soon as possible.

## Section 260**: Procedure: refusal to revoke or vary direction**

485. If the manager or trustee applies to the Authority for it to revoke or vary a direction given under section 257, but the Authority proposes to refuse to do so, the warning and decision notice procedures will apply. The decision may be referred to the Tribunal.

## Section 261**: Procedure: revocation of direction and grant of request for variation**

486. If the Authority decides to revoke a direction under section 257, or to vary a direction in accordance with a request, it must give written notice of that fact. The Authority may publish information about the revocation or variation of the direction.

## Chapter IV**: Open-ended investment companies**

## Section 262**: Open-ended investment companies**

487. This section creates the broad framework for Treasury regulations relating to the establishment, carrying on, and regulation, of oeics. It provides a wide-ranging and non-exhaustive list of matters which the regulations may provide for. These include imposing criminal liability, conferring functions on the Authority (including rule-making powers and power to waive or modify rules) and power to modify or exclude any statute or rule of law. In particular, the regulations may revoke the existing regulations governing oeics and provide for transitional arrangements for "grandfathering" under those regulations.

## Section 263**: Amendment of** section 716 Companies Act 1985

488. This section amends the Companies Act, so that the prohibition on formation of companies with more than 20 members other than under the Companies Act will not apply to oeics incorporated by virtue of regulations made the by Treasury under section 262.

## Chapter V**: Recognised overseas schemes**

## Section 264**: Schemes constituted in other EEA States**

© 2025 Thomson Reuters.

489. This section relates to the ability of collective investment schemes constituted in other EEA States to passport into the United Kingdom. EEA schemes will be recognised if:

- they satisfy requirements prescribed by Treasury regulations;

- the operator of the scheme gives notice to the Authority of the proposal to invite UK persons to participate in the scheme; and

- the Authority does not give notice that the way in which the invitation is to be made does not comply with the relevant UK law.

Section 265**: Representations and references to the Tribunal**

490. This section sets out the procedure if the Authority gives notice that it does not consider that the proposed invitations will comply with UK law, and representations are made to the Authority in response. The procedures allow for rights of reference to the Tribunal where the Authority issues a decision notice confirming that the way in which the proposed invitations are to be made does not comply with UK law.

Section 266**: Disapplication of rules**

491. Rules made by the Authority will not generally apply to the operator, trustee or depositary of a recognised scheme under section 264. The exceptions are financial promotion rules, and rules relating to the maintenance of facilities in the United Kingdom (under section 283(1)).

Section 267**: Power of authority to suspend promotion of scheme**

492. Although it cannot suspend an EEA scheme's recognition, the Authority can suspend its promotion to the public if it appears that the operator has contravened financial promotion rules. The warning and decision notice procedure will apply and the Authority will be required to notify the scheme's home State authority if it decides to give a direction under this section. The operator will have a right to refer the decision to the Tribunal.

493. Under this section, the Authority may also revoke, as well as vary, a direction suspending the promotion of an EEA scheme, where specified conditions are met.

Section 268**: Procedure in giving directions under** section 267 **and varying them on Authority's own initiative**

494. This section establishes the procedure the Authority must follow when it proposes to give, or on its own initiative vary, a direction under section 267 suspending the promotion of a scheme which is recognised under section 264. This is the same written notice procedure as described in relation to section 53 except that the notices in question are to be given to the operator of the

scheme concerned. In addition the Authority is required, when giving notice under this section, to inform the competent authorities in the scheme's home State.

### Section 269: Procedure on application for variation or revocation of direction

495. This section sets out the procedure the Authority must follow on receipt of an application under section 267(4) or (5) for variation or revocation of a direction suspending the promotion of a scheme which is recognised under section 264. Where an application is granted in full, simple written notice is to be given under subsection (4). The same applies where the Authority decides to revoke a direction on its own initiative under subsection (5). Where the Authority proposes to refuse the application, or proposes to vary the direction in a way other than that requested in the application, the applicant is entitled to receive a warning notice setting out the reasons for the decision, the standard opportunity to make representations, a decision notice and the right to refer the matter to the Tribunal if still aggrieved by the decision. Notices under this section are to be given to the operator of the scheme concerned, but in addition the Authority is required to inform the competent authorities in the scheme's home State.

### Section 270: Schemes authorised in designated countries or territories

496. Schemes managed in, and authorised under, the law of non-EEA territories can be recognised under this section. In order to be recognised, the relevant territory needs to be designated by an order made by the Treasury, and the Authority must give its approval to the scheme being recognised. The Treasury may not make an order designating a territory unless it is satisfied that the relevant overseas law under which the scheme is authorised and supervised affords at least equivalent protection to that provided by the UK law on collective investment schemes.

497. In considering whether to make an order designating a country or territory under this section, the Treasury must ask the Authority for a report on the law and practice of the country or territory in question and on any arrangements it has made to co-operate with the authorities there.

### Section 271: Procedure

498. If the Authority proposes to refuse to approve a scheme under section 270, it must give the operator a warning notice. The decision notice procedure will apply, and the decision may be referred to the Tribunal.

### Section 272: Individually recognised overseas schemes

499. This section allows the Authority to recognise schemes which are not managed in an EEA country or a designated territory.

500. In order to be recognised, the Authority must be satisfied as to various matters, including the adequacy of protection for the participants in the place where the scheme is established, the

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 128 of 2232
Page ID #:2186
Financial Services and Markets Act 2000 c. 8

adequacy of the constitution and management and of the powers and duties of the operator, trustee and depositary (if any), and that those persons are either authorised (with appropriate permissions) or, if not authorised, fit and proper persons. In addition, overseas schemes will only be recognised under this section if they are oeics or schemes where the operator is a body corporate.

## Section 273: **Matters that may be taken into account**

501. This section specifies matters which the Authority can take into account when considering whether the operator, trustee or depository of an individually recognised scheme is fit and proper.

## Section 274: **Applications for recognition of individual schemes**

502. The Authority has broad scope to specify the form and content of applications (which must be made by the operator) and to seek additional information before determining an application.

## Section 275: **Determination of applications**

503. This section sets out the time periods which will apply for the determination of an application. Completed applications are to be determined within six months.

## Section 276: **Procedure when refusing an application**

504. The Authority must go through the warning and decision notice procedure if it proposes to refuse an application. The applicant may refer the refusal to the Tribunal.

## Section 277: **Alteration of schemes and changes of operator, trustee or depository**

505. Changes to the scheme itself cannot be made unless the operator has given notice to the Authority, and the Authority has either approved the proposal, or not notified its disapproval. As for the replacement of the operator, trustee or depositary, at least one month's notice must be given to the Authority either by the person being replaced, or the person proposing to replace him, but there is no express provision for the Authority to approve or disapprove the replacements.

## Section 278: **Rules as to scheme particulars**

506. The Authority may make rules imposing duties on the operators of recognised schemes which are constituted in designated territories under section 270 or which are individually recognised under section 272. These rules broadly correlate to scheme particulars rules for authorised unit trusts.

## Section 279: **Revocation of recognition**

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 129 of 2232
Page ID #:2187
Financial Services and Markets Act 2000 c. 8

507. Recognition of schemes constituted in designated territories or individually recognised schemes can be revoked in the circumstances set out in this section. These are broadly similar to the grounds for revocation of an authorisation order under section 254.

Section 280**: Procedure**

508. If the Authority proposes to revoke recognition under section 279, the warning and decision notice procedure will apply. Notice must be given to the operator, and if any, the trustee and depositary. The decision may be referred to the Tribunal.

Section 281**: Directions**

509. Instead of proposing to revoke recognition under section 279, the Authority can effectively direct that a scheme's recognition will be suspended.

Section 282**: Procedure on giving directions under** section 281**and varying them otherwise than as requested**

510. This section establishes the procedure the Authority must follow when it proposes to give a direction by virtue of its powers of intervention against schemes recognised under sections 270 and 272. This is the same written notice procedure as described in relation to section 53, except that in this case separate notices must be given to both the operator and (if there is one) to the trustee or depository of the scheme.

Section 283**: Facilities and information in the UK**

511. The Authority may make rules requiring operators of all recognised schemes to maintain facilities in the United Kingdom. It may also require the operator of a recognised scheme to include explanatory information in financial promotions which name the scheme.

Chapter VI**: Investigations**

Section 284**: Power to investigate**

512. The Authority or the Secretary of State can appoint a person to carry out investigations into collective investment schemes. The provisions do not generally extend to the investigation of oeics. Provision concerning those investigations can be made in Treasury regulations under section 262.

513. The person carrying out the investigation has powers to investigate other persons or matters where necessary or relevant. The provisions concerning the conduct of investigations set out in section 170 will generally apply and statements made to the investigator may be admissible in proceedings in the circumstances set out in section 174. Persons other than the managers, trustees, operators or depositaries of schemes, or directors of oeics, will not generally be required to disclose

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 130 of 2232
Page ID #:2188
Financial Services and Markets Act 2000 c. 8

information subject to the bankers' duty of confidentiality. The power of entry under section 176 will be available to back up information requirements imposed under this section. The provisions of section 177 will also apply, so that failure to comply with a requirement imposed in connection with an investigation can be certified to a court and falsification or concealment will be an offence.

## PART XVIII: RECOGNISED INVESTMENT EXCHANGES AND CLEARING HOUSES

514. This Part provides for the regulatory regime for recognised investment exchanges and clearing houses. These recognised bodies are exempt from the need to be authorised. This regime is similar to that under the FS Act 1986.

515. Chapter I of this Part:

> • gives the Treasury the power to set the requirements that such bodies have to meet in order to be recognised;

> • sets out the application procedures and supervisory arrangements for recognised bodies, including conferring powers to revoke recognition and to direct recognised bodies to take steps to meet the recognition requirements;

> • allows the Treasury, jointly with the Secretary of State, to extend special protection from insolvency law to organisations clearing certain non-investment contracts.

516. Chapter II provides for competition scrutiny of recognised bodies. This places a duty on the DGFT, and gives him powers, to investigate and report to the Competition Commission on any significantly adverse effects on competition of these bodies' rules, guidance and practices, or any exploitation of a strong market position. It allows the Treasury, on receipt of a further report from the Commission, to direct, through the Authority, that appropriate changes are made to such rules, guidance or practices. Chapter III disapplies the general domestic competition law as it affects the matters covered by the Act regime. Chapter IV contains definitions of key terms.

## Chapter I: Exemption

## Section 285: Exemption for recognised investment exchanges and clearing houses

517. Subsection (1) defines what is meant by a recognised investment exchange and clearing house.

518. Subsections (2) and (3) set out the scope of the exemption for recognised bodies from the need to be authorised in order to carry on regulated activities which it carries on as an exchange or clearing house. Exchanges are also exempt as respects anything they do for the purposes of, or in connection with, the provision of clearing services.

## Section 286: Qualification for recognition

519. Subsection (1) allows the Treasury to set recognition requirements by regulations. Recognition requirements are the requirements which must be satisfied by an exchange or clearing house in order both to become recognised, and to remain recognised.

520. Subsection (2) provides that if the regulations made under subsection (1) contain provisions relating to the default rules of a recognised body, then the Treasury has to have the approval of the Secretary of State before making the regulations. (The Secretary of State is responsible for insolvency matters.)

521. Subsection (3) defines default rules. These are rules which provide for action to be taken to settle market contracts in the event of a default; for example, the rules may specify the means for establishing the price at which a bargain should be made. These are necessary to protect against systemic risk in the financial markets. If contracts could not be closed out in an orderly and speedy manner, a default by one market participant could spread quickly to large numbers of market participants.

522. Subsection (4) defines market contract by reference to Part VII of the Companies Act 1989 (or the corresponding Order in Northern Ireland). Market contracts in this context are those entered into by the exchange or clearing house or by the members of an exchange.

Section 287**: Application by an investment exchange**

523. This section allows an organisation to apply for recognition as a recognised investment exchange and sets out the information that the applicant must send to the Authority.

Section 288**: Application by a clearing house**

524. This section allows an organisation to apply for recognition as a clearing house and sets out the information that the applicant must send to the Authority.

Section 289**: Applications: supplementary**

525 This section allows the Authority to seek additional information, in whatever form it requires, in respect of any application for recognition under sections 287 and 288. It also allows the Authority to require verification of that information.

Section 290**: Recognition orders**

526. This section allows the Authority to make a recognition order if it is satisfied that the applicant meets the recognition requirements. The Authority is not obliged to make a recognition order in this circumstance and subsection (3) allows the Authority to take any information into account, and not just information concerning the recognition requirements, when deciding whether to grant recognition.

© 2025 Thomson Reuters.

527. Subsection (2) requires the Treasury to give their approval under section 307 before the making of a recognition order. The role of the Treasury under that section concerns cases where there is an issue as to whether the rules and other regulatory provisions of the exchange or clearing house have a significantly adverse, and unjustified, effect on competition.

### Section 291**: Liability in relation to recognised body's regulatory functions**

528. This section gives recognised investment exchanges immunity against legal action for damages in respect of anything done or omitted in the discharge of the recognised body's regulatory functions. This immunity does not apply where the act or omission was in bad faith or where it was unlawful as a result of section 6(1) of the Human Rights Act 1998. Under section 6(1) of that Act, it is unlawful for a public authority to act in a way which is incompatible with a right conferred by the European Convention on Human Rights and Fundamental Freedoms which is included in Schedule 1 to the 1998 Act.

### Section 292**: Overseas investment exchanges and overseas clearing houses**

529. This section modifies the application procedures and requirements where the applicant concerned is an overseas investment exchange or clearing house.

530. In order to be recognised, an overseas applicant need not comply with the recognition requirements made by the Treasury under section 286. Instead, subsection (2) provides that the Authority may make a recognition order in respect of an overseas applicant if the requirements set out in subsection (3) are met. These requirements are that investors are afforded protection equivalent to that which they would have had if the overseas body were required to comply with the recognition requirements; that there are adequate default procedures; that the applicant is able and willing to co-operate with the Authority; and that adequate arrangements are in place enabling the Authority to cooperate, for example through the sharing of information, with the overseas body's home State supervisor.

531. Subsection (5) makes some changes as to how other provisions of this Part work in respect of overseas bodies given that the relevant requirements which they have to meet are those set out in subsection (3) rather than the recognition requirements made by the Treasury.

*End > Explanatory Note > para. 10*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 11

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 293**: Notification requirements**

532. Subsections (1) to (4) allow the Authority to make rules requiring a recognised body to give it notice of, and information about, specified events or information about the recognised body which the Authority reasonably requires to carry out its functions. The Authority can also specify when, and in what form, the information should be provided.

533. Subsections (5) to (7) place a duty on the recognised body to give the Authority immediate notice of new rules and guidance, or of changes to existing rules and guidance. Recognised bodies are also required to notify the Authority of changes to their clearing arrangements. Subsection (8) provides that these duties do not apply to recognised overseas bodies. They are placed under different obligations under section 295.

## Section 294**: Modification or waiver of rules**

534. This section gives the Authority power to waive or modify the notification rules it can make under sections 293 and 295, at the request of the recognised body or with their consent. Subsection (4) sets out the circumstances in which the Authority may do this.

## Section 295**: Notification: overseas investment exchanges and overseas clearing houses**

535. This section requires overseas investment exchanges and clearing houses to produce a report at least once a year giving details of any events which have occurred over the year which may have an effect on competition, or which might affect the Authority's assessment of whether the requirements set out in section 292 are satisfied. The Authority can also make rules requiring that additional information should be included in the report.

## Section 296**: Authority's power to give directions**

536. This section allows the Authority to direct a recognised body which has failed to satisfy the recognition criteria, or has failed to comply with other obligations under the Act (for example those in this Part) to take steps to remedy that failure. This power enables the Authority to deal with problems which are not sufficiently serious to merit withdrawal of recognition from the body concerned.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 134 of 2232
Page ID #:2192
Financial Services and Markets Act 2000 c. 8

Section 297**: Revoking recognition**

537. This section allows the Authority to revoke the recognition of a body which no longer wishes to remain recognised, or which no longer meets the recognition criteria or which has failed to comply with other obligations under the Act.

Section 298**: Directions and revocation: procedure**

538. This section sets out the procedure the Authority must follow when it proposes to give a direction or make a revocation order. This includes giving the recognised body, its members and third parties who might be affected the right to make written representations. Subsection (7) allows the Authority to give a direction without following these procedures if it considers that it is essential to do so.

Section 299**: Complaints about recognised bodies**

539. This section provides that the Authority must establish a procedure for the investigation of complaints against recognised bodies where the complaint is relevant to the question of whether the body should remain recognised or not.

Section 300**: Extension of functions of Tribunal**

540. This section gives the Treasury a power to extend, by order, the jurisdiction of the Financial Services and Markets Tribunal to certain disciplinary proceedings brought by a recognised UK exchange or clearing house. An order may be made in respect of one or more specified recognised exchanges or clearing houses or in respect of recognised exchanges or clearing houses generally.

541. Subsections (1) and (4) make clear that jurisdiction may only be extended to cases involving internal disciplinary proceedings taken against members of recognised investment exchanges or recognised clearing houses for breaches of the rules of the exchange or clearing house in cases of behaviour which amounts to market abuse. Since it may be necessary to modify the provisions of the Act relating to proceedings before the Tribunal to accommodate the particular circumstances of a recognised exchange or clearing house, subsection (3) enables the Treasury to make any modifications that are necessary.

542. Subsection (2) deals with the circumstances in which jurisdiction may be extended. Subsection (2)(a) enables jurisdiction to be extended where the Treasury are satisfied that it is necessary to do so in order to ensure consistency between decisions taken in exchange or clearing house disciplinary proceedings involving market abuse and Tribunal decisions in such cases (including Tribunal decisions relating to the relevant disciplinary proceedings of other recognised exchanges or clearing houses). Subsection (2)(b) would enable the Treasury to extend the role of the Tribunal to recognised exchange or clearing house disciplinary proceedings in cases of

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 135 of 2232
Page ID #:2193
Financial Services and Markets Act 2000 c. 8

market abuse if it should it prove necessary to do so in the future in the light of the developing jurisprudence of the European Court of Human Rights.

Section 301**: Supervision of certain contracts**

543. This section allows the Treasury, acting jointly with the Secretary of State, to make regulations which extend the provisions of Part VII of the Companies Act 1989 (or the equivalent provision of the Northern Ireland Order), with any appropriate modifications, to certain non-investment contracts. Part VII of the Companies Act 1989 disapplies various provisions of insolvency law for market contracts in order to protect against systemic risk in the financial markets.

544. Subsection (2) and (3) set out what kind of contracts can be covered by these regulations. There are two criteria:

> • first, the contracts must be settled by someone who is on a list maintained by the Authority for the purposes of this section. The Treasury, under subsection (4), has to approve the conditions set by the Authority for admission to this list and the arrangements for admission to and removal from the list;

> • second, the Treasury and the Secretary of State have to be satisfied that it is appropriate for the Authority to supervise the settlement arrangements for these non-investment contracts. In coming to a view, the Treasury and Secretary of State must have regard to the extent to which the contracts are dealt in by persons supervised by the Authority.

545. Subsection (10) allows the Treasury and the Secretary of State, in making regulations under this section, to apply any of the provisions of this Act to the person settling these contracts. Without this power it would not be possible for the Authority to regulate such persons on a statutory basis, since they would be clearing non-investment contracts and so would not require authorisation or exemption.

Chapter II**: Competition Scrutiny**

Section 302**: Interpretation**

546. This section describes the "regulatory provisions" (that is the rules, guidance, arrangements and particulars) and "practices" which are to be scrutinised under this Part to assess whether they have, or are intended or likely to have, a significantly adverse effect on competition as defined in this section.

Section 303**: Initial report by Director**

547. This section requires the Authority to send to the DGFT and to the Treasury all the regulatory provisions and any other relevant information received in support of an application for recognition.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 136 of 2232
Page ID #:2194
Financial Services and Markets Act 2000 c. 8

The DGFT must then issue a report as to whether any of these provisions has a significantly adverse effect on competition.

## Section 304: Further reports by Director

548. This section requires the DGFT to keep all recognised investment exchanges and clearing houses under continuing competition scrutiny. If, at any time, the DGFT forms the view that any regulatory provision or practice has a significantly adverse effect on competition then he must make a report.

549. Subsection (3) provides that if the DGFT concludes that regulatory provisions or practices do not have such an effect then he has discretion as to whether to make a report.

## Section 305: Investigations by Director

550. This section confers powers on the DGFT to enable him to carry out his functions under sections 303 and 304. The DGFT will be able to request relevant documents from any person, and to request relevant information from any business.

551. Subsections (5) and (6) provide that if a person fails to produce the information or documents required, then the DGFT may report the matter to the court. If the court is satisfied that there was no reasonable excuse for this failure, the person may be dealt with as if he were in contempt of court.

## Section 306: Consideration by Competition Commission

552. This section concerns the role and duties of the Commission following receipt of a report from the Director General. Its functions and duties are in line with those set out in the analogous provisions in section 162 in Part X. This section is supplemented by the provisions of Schedule 14. (This Schedule also applies to section 162, which relates to the Commission's role in competition scrutiny of the regulating provisions and practices of the Authority.)

## Section 307: Recognition orders: role of the Treasury

553. This section sets out the Treasury's powers to take action following an adverse report from the Commission on an application for a recognition order.

554. If the Commission's report concludes that no significantly adverse effect on competition exists, or such an effect does exist, but is justified, subsection (2) requires that the Treasury must approve the making of the recognition order unless exceptional circumstances exist to justify their refusal. If, however, the Commission's report is that a significantly adverse effect on competition exists, and is not justified, then subsection (4) requires that the Treasury, unless exceptional circumstances exist, should refuse to approve the making of the recognition order.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 137 of 2232
Page ID #:2195
Financial Services and Markets Act 2000 c. 8

Section 308**: Directions by the Treasury**

555. This section concerns the Treasury's powers to take action following an adverse report from the Commission, other than a report on an application for a recognition order.

556. If the Commission's report is that the anti-competitive effect is not justified, subsection (2) requires that the Treasury give a "remedial direction". (A remedial direction is defined in subsection (8) as a direction to the Authority to either revoke the recognition of the body concerned, or to direct the body to take specified steps as set out in the direction.) However, subsection (3) provides that the Treasury need not give a direction either where the Treasury consider that it is not necessary as a result of action which has already been taken by the body concerned or by the Authority, or because exceptional circumstances exist which makes it inappropriate or unnecessary to give a direction. Conversely, if the Commission's conclusion is that the anti-competitive effect is justified, under subsections (5) and (6) the Treasury may nonetheless give a direction to the Authority to take action which the Treasury consider necessary because of exceptional circumstances of the case.

Section 309**: Statements by the Treasury**

557. This section makes provision for statements to be made by the Treasury when they decline to give a remedial direction under the preceding section.

558. Subsection (1) provides that if the Treasury decide not to give a remedial direction action following a Commission report that they should, they must produce a statement giving their reasons. Subsection (2) provides that if they do give such direction they must give details of this. In addition, if they have made a direction in a case where the Commission has concluded that the adverse effect on competition is justified, they must publish a statement giving their reasons for doing so.

Chapter III**: Exclusion from the** Competition Act 1998

Section 311**: The** Chapter I**prohibition**

559. This section makes clear that the prohibition of agreements preventing, restricting or distorting competition within the United Kingdom in Chapter I of the Competition Act 1998 does not apply to the constitution of a recognised investment exchange or clearing house or to a body which has applied for recognition; nor to the regulatory provisions of a recognised body; nor to a decision or practice of a recognised body, in respect of its regulatory functions; nor to an agreement the parties to which include a recognised body or person subject to its rules to the extent that the agreement is required or encouraged by the recognised body's regulatory provisions or practices.

Section 312**: The** Chapter II**prohibition**

560. This section makes clear that the prohibition of abuse of a dominant position in a market which may affect trade in the United Kingdom in Chapter II of the Competition Act 1998, does not apply to the regulatory provisions or practices of a recognised investment exchange or clearing house, nor to agreements entered into by its members, to the extent that these are required by the body's regulatory provisions.

## PART XIX: **LLOYD'S**

561. This Part of the Act makes a number of provisions which supplement other parts of the Act to bring the Society of Lloyd's ("the Society") within the general regulatory framework. These provisions are needed to reflect the unique legal status of the Society and its members, and the functions of the Council of Lloyd's ("the Council"), the governing body of the Society, under the Lloyd's Acts 1871–1982, in relation to the Lloyd's community.

562. Lloyd's is regulated for solvency purposes by the Authority in accordance with the arrangements under Part IV of the ICA 1982. The FS Act 1986 provides an exemption for Lloyd's and underwriting agents as respects investment business carried on by them in connection with or for the purposes of insurance business at Lloyd's. For most purposes, regulation of the Society has been undertaken by the Council. The Act gives the Authority considerable discretion as to how it discharges its obligations for the regulation of Lloyd's.

563. The external regulation of the Lloyd's community by the Authority is achieved by a number of different provisions in the Act. By virtue of this Part, the Society — a body corporate — is to be authorised to carry on certain regulated activities. The permission will be defined by the Authority, as if it had been granted under Part IV. Primarily, the permission will cover making arrangements which enable members to carry out contracts of insurance. The activities of managing and members' agents (or "underwriting agents") will become regulated activities for the purposes of the Act, and so underwriting agents will need have relevant permission under Part IV. As authorised persons, the Society and agents will be subject to the full range of the Authority's powers under the Act, including its rules and its powers of investigation and discipline and, ultimately, the power to withdraw authorisation, as is the case with other authorised persons under the general provisions of the Act.

564. Members of Lloyd's will benefit from an exemption from the need to be authorised in relation to contracts of insurance effected or carried out at Lloyd's. They will, nonetheless, be subject to regulatory arrangements as directed by the Authority under powers contained in this Part, and subject to the powers of the Council. As a minimum, the Authority will need to require the members to meet the solvency requirements laid down under the relevant EC directives. A member of Lloyd's would, however, need permission to carry on any other regulated activity, for example advising on investments.

## Section 314: **Authority's general duty**

565. It is not proposed that Lloyd's should be subject to full regulation by the Authority at the outset. Certain regulatory functions will be left with the Council. However, the Authority will at any time be able to take a greater degree of direct responsibility for regulation if it considers it appropriate and this section, therefore, places a duty on the Authority to keep matters under review.

Section 315**: The Society: authorisation and permission**

566. This section makes the Society an authorised person, without it needing to submit an application. This is needed because, unlike most other current businesses, Lloyd's does not have an authorisation from an existing regulator that can be grandfathered.

567. Subsection (3) limits the activities for which the Society will have permission, at the time it becomes authorised, in broad terms to arranging deals in insurance contracts and syndicate participation, and for connected activities. The precise terms of the permission will depend on the activities specified for the purposes of section 22(1). Subsection (4) gives the Authority a power, where it considers it appropriate, to limit the scope of the permission, at the time the authorisation comes into force, or at any time thereafter. Lloyd's would apply for an extension of that permission in accordance with Part IV.

Section 316**: Direction by Authority**

568. This section confers on the Authority power to give directions applying the general prohibition to members of Lloyd's or applying core provisions to members. This power can be used in relation to a member of Lloyd's, or members taken together, though they will not, at least at the outset, be authorised persons. Directions under this section may specify the extent to which the "core provisions" of the Act, as set out in section 317, will apply to them and would impose requirements directly on the members which the Authority will be able monitor and enforce. The Authority could, for example, apply to members general rules requiring persons carrying out contracts of insurance to appoint an actuary to assess the extent of their liabilities. It could also require members to be authorised if it considers that appropriate.

Section 317**: The core provisions**

569. The core provisions which the Authority may decide to apply to members of Lloyd's under section 316 relate to:

- the performance of regulated activities;

- rules and guidance;

- information gathering and investigations;

- control over authorised persons;

© 2025 Thomson Reuters.

- compensation scheme;

- ombudsman scheme;

- auditors and actuaries;

- insolvency

- restitution and injunctions

- notices.

570. Subsection (3) enables the Authority to apply a core provision with modifications. This will enable the practical role played by the Society and underwriting agents in the day to day business affairs of members to be reflected in the regulatory arrangements.

Section 318**: Exercise of powers through the Council**

571. This section gives the Authority an alternative mechanism to its power of direction under section 316. Instead of, or in addition to, giving a direction to the members of Lloyd's, the Authority can direct the Society or the Council to use their powers — such as the byelaw making powers of the Council under Lloyd's Act 1982 — to impose obligations on members. It would, therefore, be open to the Authority to set solvency requirements for Lloyd's members, perhaps specifying in a direction only the high level requirements required by the EC directives; the Council would then make byelaws specifying the detailed arrangements in accordance with the requirements of the direction. The Council would be responsible for enforcing its byelaws and for demonstrating to the Authority that the relevant requirements had been met. When exercising this power, the Authority may additionally impose requirements on the Council or the Society.

572. Subsection (5) also allows the Authority to use this power to direct the Council in respect of managing and members' agents, rather than exercising powers against them directly as authorised persons.

573. Subsection (6)(a) makes it clear that if the Authority chooses to give directions in this way, it is not precluded from using its other regulatory powers under the Act.

Section 319**: Consultation**

574. This section sets out the procedure for giving a direction under sections 316 or 318. The procedures are similar to those that apply to other rule making functions.

Section 320**: Former underwriting members**

575. This section disapplies the general prohibition from former members of Lloyd's in relation to contracts of insurance effected by them while they were members of the society. It gives the Authority powers to impose requirements on former members of Lloyd's, including members

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 141 of 2232
Page ID #:2199
Financial Services and Markets Act 2000 c. 8

who decide to leave in the future, in relation to the insurance business carried on by them while they were members of Lloyd's until all their insurance liabilities have been discharged. A former member of Lloyd's would need to obtain permission from, and be authorised by, the Authority in order to carry on any other regulated activities under the Act.

## Section 321: Requirements imposed under 320

576. This section requires the Authority to follow the specified procedures when exercising the powers set out in section 320. The arrangements are consistent with other notice arrangements under the Act and they give former names on whom requirements are imposed the opportunity to make representations. Subsection (11) confers a right on former names to refer a matter to the Tribunal in certain circumstances.

## Section 322: Rules applicable to former underwriting members

577. This section, like section 320, confers on the Authority powers to impose requirements on former member of Lloyd's. Whereas section 320 would enable the Authority to impose specific requirements on former members, in much the same way as it would impose restrictions on a Part IV permission in relation to an authorised person, this section allows the Authority to make rules that will apply more generally to former members or classes of former member. The grounds for exercising the power are that the Authority considers it appropriate for the purpose of protecting policyholders. The procedures under section 319, including for example the consultation arrangements, apply to the exercise of this power.

## Section 323: Transfer schemes

578. This section confers on the Treasury a power to apply Part VII to transfers of business consisting of contracts of insurance from members of Lloyd's. This will ensure that appropriate regulatory scrutiny can be given to any proposed business transfers, and that any persons affected by the proposed transfer have the opportunity to make representations to the court.

## PART XX: PROVISION OF FINANCIAL SERVICES BY MEMBERS OF THE PROFESSIONS

579. This Part makes arrangements whereby professionals (such as solicitors, actuaries and accountants) who:

- are not carrying on mainstream regulated activities but

- are members of designated professional bodies,

will be exempt from the requirement to obtain permission from the Authority in order to carry out certain regulated activities. Additional tests are set out in section 327 which must be met in order for the professional to qualify for the exemption.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 142 of 2232
Page ID #:2200
Financial Services and Markets Act 2000 c. 8

580. The arrangements under this Part include the safeguard of arms-length oversight by the Authority of the way in which the professional bodies supervise and regulate exempt professionals, and the way in which such professionals carry on regulated activities. This will involve, amongst other things, the Authority monitoring the effectiveness of the complaints and redress arrangements of designated professional bodies.

581. In addition, the Authority will be able to ban members of the professions who benefit from the exemption from carrying on regulated activities, where the circumstances justify this. The Authority can also direct that the exemption be cut back on a more general class basis (so that, for example, certain categories of professional, carrying on certain types of activities, will no longer benefit from the exemption).

582. The Authority is also empowered to make rules requiring exempt professionals to disclose to their clients the fact that they are not regulated by the Authority.

## Section 325**: Authority's general duty**

583. This section obliges the Authority to keep itself informed about the way in which designated professional bodies supervise and regulate the carrying on of regulated activities by their members. It also requires the professional bodies to cooperate with the Authority so as to enable the Authority to fulfil its duty of arms-length oversight.

## Section 326**: Designation of professional bodies**

584. This section gives the Treasury the power to designate bodies for the purpose of section 325. Bodies will only be designated where they actively regulate the provision of financial services by their members.

## Section 327**: Exemption from the general prohibition**

585. This section sets out the tests which need to be met in order for a professional to qualify for the exemption, including:

- the professional must be a member of a professional body which is designated by the Treasury;

- the professional must not receive a commission from a third party in respect of the regulated activities unless he accounts to his client for it;

- the regulated activities must be provided in a way that is incidental and complementary to the provision of professional (for example, legal, actuarial or accountancy) services;

© 2025 Thomson Reuters.

- the regulated activities must not relate to sensitive products (for example, life insurance). What amounts to a "sensitive product" is to be specified by the Treasury in regulations.

## Section 328**: Directions in relation to the general prohibition**

586. This section allows the Authority to direct that the exemption from the general prohibition is not to apply to certain classes of professional. The Authority may exercise this power, however, only where it is satisfied that it is desirable to do so in the interests of clients. A non-exhaustive list of factors to which the Authority must have regard in reaching that judgement is set out in the section.

## Section 329**: Orders in relation to the general prohibition**

587. This section enables the Authority to make an order which would have the effect of banning specified persons who are not fit and proper to carry on regulated activities. This is consistent with the arrangements for prohibition orders in relation to individuals under section 56.

## Section 330**: Consultation**

588. This section sets out the procedure for consulting on a direction. The procedure is consistent with that applying to similar arrangements in other parts of the Act.

## Section 331**: Procedure on making or varying orders under** section 329

589. This section sets out the procedure which will apply when the Authority makes an order under section 329. The warning and decision notice procedure applied throughout the Act must be followed, and the person who is subject to an order can refer matters to the Tribunal.

*End > Explanatory Note > para. 11*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2025 Thomson Reuters.

# para. 12

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 332**: Rules in relation to persons to whom the general prohibition does not apply**

590. This section allows the Authority to make rules requiring professionals carrying on exempt regulated activities to disclose to their clients that they are not authorised. It also requires the professional bodies to make rules designed to ensure that those members who benefit from the exemption will not carry on regulated activities which are not complementary to the provision of particular professional services to a particular client, although this does not extend to regulated activities conducted by professional firms as exempt persons under the Act. In order to be effective, those rules must be approved by the Authority.

## Section 333**: False claims to be a person to whom the general prohibition does not apply**

591. This section makes it an offence for a person to describe himself (in whatever terms) as a person who has the benefit of the Part XX exemption in relation to a particular regulated activity, or behaves or otherwise holds himself out, in a manner which indicates (or which is reasonably likely to be understood as indicating) that he is such a person, when he is not.

592. Subsection (2) provides that in proceedings for an offence under this section it is a defence for the accused to show that he took all reasonable precautions and exercised all due diligence to avoid committing the offence.

593. Under subsection (3), a person found guilty of this offence is liable on conviction to a maximum of 6 months imprisonment and a fine not exceeding level 5 on the standard scale (currently £5,000). If the offence results from the public display of material, subsection (4) a fine of level 5 is to multiplied by the number of days for which any material giving rise to the offence was on public display.

## PART XXI**: MUTUAL SOCIETIES**

594. This Part gives the Treasury powers by order to transfer the functions of the Building Societies Commission, the Friendly Societies Commission and the Chief Registrar of Friendly Societies and functions under the Industrial and Provident Societies Acts and the Credit Unions Act 1979. These transfers will be achieved by orders made under sections 334 to 339.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 145 of 2232
Page ID #:2203
Financial Services and Markets Act 2000 c. 8

595. It is envisaged that the powers will be exercised to ensure that the functions which relate to the registration and regulation of societies under the existing legislation will be transferred to the Authority. For example, the functions to be transferred to the Authority are likely to include the power to require, or approve, a transfer of the business of a mutual society to another society or to a company.

596. The relevant legislation also confers power on the Building Societies Commission, Friendly Societies Commission and the Chief Registrar, often subject to the consent of the Treasury, to set requirements as to the registration and constitution of such societies. Such powers are exercised by statutory instrument. Those powers are different in character from the financial regulatory powers of the Authority under the Act. It is proposed that such functions will transfer to the Treasury.

597. These transfer provisions also include power for the Treasury to dissolve the existing bodies, it being envisaged that all their functions will have been transferred. The Treasury will be able to make supplemental provision, for example, to transfer the property, rights and liabilities of bodies which are being dissolved or to amend the existing legislation in the light of the transfer of functions. For example, where the existing legislation divides functions as between the different parts of the United Kingdom, some consolidation may be required to reflect the fact that the Authority is a single corporate entity.

598. Schedule 18 makes certain amendments to the legislation governing mutuals. Further amendments to that legislation which are consequential on the provisions of this Act will be made by order under section 426.

## PART XXII: **AUDITORS AND ACTUARIES**

599. This Part concerns the appointment, on a continuing, periodic or ad hoc basis, of auditors and actuaries by authorised persons. It imposes certain requirements, including a duty to disclose to the Authority information relevant to its functions under the Act. These provisions carry forward a number of similar provisions in existing legislation.

600. There are some similarities between the roles of auditors and actuaries, and they are therefore dealt with together in this part of the Act. However, there are also important differences, and these sections will give the Authority the power to act in ways which will recognise the difference in the detailed roles and responsibilities of the two professions.

601. Part XI of the Act gives the Authority various powers to gather information and investigate authorised persons, with section 166 in particular providing a power to require an authorised person to provide the Authority with a report by an accountant or other expert on a particular aspect of his business. Part XXII deals primarily with the duties and responsibilities of auditors and actuaries in respect of their work for authorised persons.

## Section 340: **Appointment**

© 2025 Thomson Reuters.

602. Subsection (1) gives the Authority the power to make rules to require authorised persons to appoint an auditor or actuary, where they are not already under a statutory obligation to do so (for example under Companies Act requirements). Subsection (4) allows the Authority to make rules concerning the terms, conditions, qualifications for, and notification of such appointments. The Authority will also be able to make an appointment itself if one is not made or if it has not received any notification.

603. Subsection (2) allows the Authority to make rules requiring any authorised person to produce periodic financial reports on its business, and to submit these for analysis and comment by an auditor or actuary.

604. Subsection (5) provides that an auditor or actuary appointed to act on a continuing basis or to produce a periodic report must comply with the relevant rules made by the Authority. These rules may also give the auditor or actuary such powers as the Authority judges necessary for them to carry out their duties.

Section 342**: Information given by auditor or actuary to the Authority**

605. This section concerns the duties and powers of auditors and actuaries of authorised persons to pass on information of regulatory importance to the Authority.

606. Auditors and actuaries of authorised persons will be members of professional bodies and will therefore be subject to rules made by their respective bodies as to how they treat confidential information. Subsections (3) and (4) ensure that auditors or actuaries who, in good faith, pass on information or express their opinion to the Authority will not be in breach of any duty of confidentiality to which they might otherwise be subject. This protection applies whether or not the auditor or actuary acts in response to a request from the Authority.

607. Subsections (5), (6) and (7) give the Treasury a power to set out the circumstances in which auditors and actuaries must pass on information to the Authority. This information may relate to the affairs of either the authorised person concerned, or other persons. So far as auditors are concerned, the Treasury are required by EC directives to set out the circumstances in which such reports must be made, and it is intended to use this power to re-enact the rules necessary to comply with this requirement.

Section 343**: Information given by auditor or actuary to the Authority: persons with close links**

608. This section concerns the duties and powers of auditors and actuaries to pass on information of regulatory significance to the Authority about persons having "close links" with authorised persons, including parent and subsidiary companies of an authorised person.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 147 of 2232
Page ID #:2205
Financial Services and Markets Act 2000 c. 8

609. Subsections (3) and (4) ensure that auditors or actuaries of persons with close links to an authorised person, who, in good faith, pass on information or express their opinion to the Authority will not be in breach of any duty of confidentiality to which they might otherwise be subject. This protection applies whether or not the auditor or actuary acts in response to a request from the Authority.

610. Subsections (5), (6) and (7) give the Treasury a power under which they can make rules setting out the circumstances in which auditors and actuaries must pass on information to the Authority. This information may relate to the affairs of either the authorised person concerned, or other persons.

Section 344**: Duty of auditor or actuary resigning etc. to give notice**

611. This section places a duty upon all auditors and actuaries of authorised persons appointed as a result of statute to notify the Authority of certain events, for example where they resign before the end of the period for which they were appointed. Subsection (3) also requires an auditor or actuary to pass on any facts connected with his ceasing to act for the authorised person which he thinks ought to be brought to the Authority's attention, or to make a positive statement to the Authority that he is not aware of any such facts.

Section 345**: Disqualification**

612. Where the Authority believes that an auditor or actuary has failed to comply with any obligations under this Act, it may disqualify that auditor or actuary from acting for any particular authorised person, or class of authorised person. Any such disqualification may be lifted if the Authority is satisfied that the person concerned will in future comply with the obligations.

613. Subsections (2) and (3) require the Authority to serve a warning notice and decision notice, whilst subsection (5) confers a right to refer to the Tribunal any decision to disqualify.

Section 346**: Provision of false or misleading information to auditor or actuary**

614. This section makes it a criminal offence for an authorised person, or an officer, controller or manager of an authorised person knowingly or recklessly to mislead an auditor or actuary appointed under the Act or as a result of provision contained in rules.

PART XXIII**: PUBLIC RECORD, DISCLOSURE OF INFORMATION AND CO-OPERATION**

615. This Part requires the Authority to compile and maintain a public record of authorised persons. It also imposes safeguards for the protection of confidential information.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 148 of 2232
Page ID #:2206
Financial Services and Markets Act 2000 c. 8

616. The Authority, together with the competent authority for listing and the Secretary of State, will necessarily require access to confidential information. The Act provides them with powers to obtain this. It also contains safeguards to ensure that this information remains confidential, subject to allowing information to pass between them and other regulatory authorities where this is necessary for the performance of specific public functions (for example, to assist in the investigation and prosecution of crime). The passage of information between authorities is subject to conditions relating to the purpose of disclosure and, in some cases, the identity of the person to whom the information is disclosed. These conditions are often referred to as *"gateways"*. This area is already subject to detailed constraints under EC law. The Act, together with the regulations to be made under the powers conferred by these provisions, will create a confidentiality regime very similar to those under the predecessor legislation. The creation of a single regulator will however allow some rationalisation of the existing structure.

Section 347**: The record of authorised persons etc.**

617. This section places an obligation on the Authority to maintain a record of certain details about authorised persons and other categories of persons set out in subsection (1). The record must include details of the services provided by authorised persons, the addresses of authorised persons and other categories of specified persons, and any other information the Authority thinks is appropriate. The record must be available for inspection by members of the public, at a place and at times determined by the Authority. The Authority must allow members of the public to obtain a copy of the record, or a part of it. The Authority may charge for providing such copies.

Section 348**: Restrictions on disclosure of confidential information by Authority etc.**

618. Subsections (2), (3) and (4) define what is, and what is not, to be regarded as confidential information. Subsection (1) makes clear that this information is not to be disclosed by a "primary recipient", or a person who has received the information from a primary recipient, without the consent of the person from whom it was obtained and, if different, the person to whom it relates. Subsection (5) lists primary recipients.

Section 349**: Exceptions from** section 348

619. This section makes clear that, notwithstanding the restrictions in section 348, confidential information may be disclosed if this is in accordance with regulations made by the Treasury. It also gives the Treasury the power to make such regulations where disclosure would facilitate the carrying out of a public function. This power will be used to create various "gateways" between the primary recipients and other organisations for various specified purposes.

Section 350**: Disclosure of information by the Inland Revenue**

620. This section creates a mechanism, or gateway, through which information held by the Inland Revenue, which would otherwise be subject to a legal obligation of confidentiality, may, in certain

© 2025 Thomson Reuters.

circumstances be passed to the Authority or to the Secretary of State. Subsection (2) makes clear that this disclosure may be made only by, or under the authority of, the Commissioners of Inland Revenue.

621. Subsection (1) provides that Revenue information may be disclosed under this section only for the purpose of assisting an investigator appointed by the Authority or the Secretary of State under section 168 in his task, or to assist the Authority or the Secretary of State in taking a decision whether or not to appoint such an investigator. Once information has been disclosed, subsection (4) provides that it may only be used for the purposes of taking a decision whether or not to appoint an investigator, or to further an investigation, if an investigator has been appointed, or in any criminal proceedings or regulatory action, including proceedings before the Financial Services and Markets Tribunal, that may arise out of an investigation.

622. Subsection (5) provides that onward disclosure of information received under this section is prohibited, except in the case of proceedings before a court or the Tribunal arising out of an investigation, or if this is done with a view to the institution of such proceedings, or if it takes place with the consent or the authority of the Commissioners of Inland Revenue. Subsection (6) makes clear, however, that this does not prevent disclosure of information to a person to whom it could have been disclosed under subsection (1).

Section 350**: Competition information**

623. This section makes provision, together with Schedule 19, for the protection of information obtained by the DGFT and the Commission under their powers of competition scrutiny under the Act. It applies to information obtained under all of the various competition scrutiny provisions in the Act, that is to say the provisions covering the competent authority for listing in Part VI, the Authority in Part X, and the recognised investment exchanges and clearing houses in Part XVIII.

624. Subsection (1) provides that it is an offence improperly to disclose "competition information". *"Competition information"* is defined in subsection (5) as information about the affairs of a particular individual or body, which is not in the public domain, and which was obtained under powers in a competition provision of the Act.

625. Subsection (2) sets out the circumstances in which disclosure will not be regarded as improper, and which is therefore permissible. These circumstances basically fall into two classes. First, where the person to whom the information relates, and if different the person from whom it is obtained, have given their consent to disclosure. Second, when this would serve one of a number of defined public purposes. These purposes include the fulfilment of the UK's obligations under EC law, the investigation and prosecution of crime, civil proceedings under the competition provisions of the Act, and finally the disclosure of information to a number of bodies having various statutory functions, to assist them in carrying out these functions. The bodies and the statutes concerned are listed in Schedule 19.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 150 of 2232
Page ID #:2208
Financial Services and Markets Act 2000 c. 8

Section 352**: Offences**

626. This section makes clear that unauthorised disclosure or use of confidential information is a criminal offence, subject to the defences provided for in subsection (6), and sets out the penalties for these offences. These provisions reproduce the existing offences in this area.

Section 353**: Removal of other restrictions on disclosure**

627. This section enables the Treasury to make regulations permitting disclosure of information held by third parties to the Authority to assist it in carrying out its functions. It also enables regulations to be made to allow the disclosure of information by various other entities carrying out functions under this Act, for example the compensation scheme manager, in order to assist with these functions. The purpose of this section is to enable the Treasury to create gateways, for example overriding confidentiality obligations to which the prescribed persons are subject, if it is appropriate that such persons should be able to disclose information either to the Authority or to third parties for the purposes of functions connected to the Act.

Section 354**: Authority's duty to cooperate with others**

628. This section places a duty on the Authority to take such steps as it considers appropriate to co-operate and share information, which it is not otherwise prevented from disclosing by virtue of the provisions of this Part, with other bodies or persons, whether in the United Kingdom or elsewhere, who have functions broadly equating to those of the Authority, or who have a role in relation to the prevention and detection of financial crime. It carries forward the provision in paragraph 5 of Schedule 7 of the FS Act 1986, which places a similar duty on the Authority.

PART XXIV**: INSOLVENCY**

629. Insolvency and winding up are relevant to regulation for two reasons. First, there are implications for existing customers if a financial service business becomes insolvent. Second, winding up may itself be part of the appropriate regulatory response to events. Thus it may be desirable to wind up a company to protect not just the interests of customers who have entered into contracts with it, but also those who might do business with it in future, if it continued to trade. Subject to the particular provisions of Part VII of the Companies Act 1989 for transactions carried out on regulated markets, the general law of insolvency applies, and will continue to apply, to most financial services businesses, as it does to other businesses. However, it is supplemented by provisions which allow the regulators, alongside creditors, to petition the court for the winding up of an authorised business on the grounds of insolvency, and, alongside the Secretary of State, to petition the court to wind up an authorised business on the grounds that this would be just and equitable.

630. Different arrangements apply to certain mutual societies. The arrangements under the relevant legislation, for example the Building Societies Act 1986, will continue to apply to relevant

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 151 of 2232
Page ID #:2209
Financial Services and Markets Act 2000 c. 8

societies, with functions transferred in that case from the Building Societies Commission to the Authority in accordance with the provisions of Part XXI.

631. The insolvency provisions of the Act are intended to build upon these existing arrangements, establishing, so far as is practicable, a common approach across all sectors. Sections 356, 357, 367 and 375 provide the Authority with the power to ask the court to initiate various insolvency procedures. Sections 356, 362, 363, 365, 371 and 374 make clear that the Authority has the right to be heard by the court in insolvency proceedings instigated by third parties. Sections 369, 376, 377, 378 and 379 carry forward provisions of the ICA 1982 dealing with the insolvency of insurance companies (which because of the particular nature of insurance business, must in some respects be dealt with in a different way to other authorised persons).

632. At the same time, the Part will fill a number of gaps in the coverage of the predecessor regimes. Section 359 will allow the Authority to ask the court to make an administration order in respect of authorised businesses, as an alternative to winding up. Section 372 will give the Authority powers to petition the court to declare bankrupt an insolvent sole trader providing financial services. Sections 360 and 366 make changes to the insolvency regime for insurers.

633. Part XV (Financial Services Compensation Scheme) is also relevant to customers of authorised firms in financial difficulties.

*Voluntary arrangements*

Section 356**: Authority's powers to participate in proceedings: company voluntary arrangements**

634. Insolvency legislation allows companies in financial difficulties to propose a voluntary arrangement with creditors; that is, for creditors to agree to take a proportion of what they were owed as a final settlement of their debts. If agreed, such an arrangement is binding on all creditors who were aware of the proposal, subject to their right to ask the court to intervene if the arrangement seems improper or unfair. This section gives the Authority the right to apply to the court in the same way as a creditor, and also makes clear that the Authority may be represented in any such proceedings initiated by a creditor.

Section 357**: Authority's powers to participate in proceedings: individual voluntary arrangements**

635. In England and Wales and in Northern Ireland insolvency law provides that an individual who is in financial difficulties may apply to the court for a moratorium during which he may prepare a proposal to his creditors for settlement of his debts. Whilst this moratorium is in force the individual is protected against the presentation of a bankruptcy petition.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 152 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2210

636. Subsection (1) of this section provides that the Authority is entitled to be heard by the court on an application for such a moratorium, if this is made by an individual who is an authorised person. Subsections (3) and (4) provide that the Authority is entitled to send a representative to attend and speak at any meeting of creditors summoned to consider a proposal which a debtor brings forward, and that it shall be informed of the results of any such meeting. Subsection (5) goes on to provide the Authority with the same rights as creditors to challenge in court a decision by the meeting to agree a creditor's proposal, or to challenge the implementation of an agreed proposal, if it believes that this is in some way unfair or irregular, whilst subsection (6) provides that the Authority is entitled to be heard by the court if any other person makes such a challenge.

### Section 358: **Authority's powers to participate in proceedings: trust deeds for creditors in Scotland**

637. Section 357 provides the Authority with powers to be involved in individual voluntary arrangements proposed for authorised persons. Such arrangements are only possible in England, Wales and Northern Ireland. This section makes provision for the Authority to have certain rights in the equivalent arrangement in Scots law (a voluntary trust deed for creditors within the meaning of section 5(4A) of the Bankruptcy (Scotland) Act 1985).

638. The purpose of a trust deed under Scots law is to allow a person who cannot pay his debts to hand over his assets to a trustee, who may then arrange a settlement with his creditors as a alternative to proceedings for sequestration under the 1985 Act. Subsections (1) and (2) provide that where a trust deed is granted in respect of an authorised person, the trustee must, as soon as he becomes aware that the person concerned is an authorised person, inform the Authority, and send it copies of the deed and any other documents which he has sent to the creditors.

639. Under subsection (3) the Authority is given the same rights as certain creditors who have not received notice of the trust deed, or who have objected to it, to petition for the sequestration of a debtor who is an authorised person.

640. If the trustee proposes at any stage to hold a meeting of creditors, subsections (4) and (5) require him to inform the Authority, which will have the right to send a representative to attend and speak at the meeting. However, the Authority will not have the right to vote at the meeting, except on those occasions where it is itself a creditor of the person concerned.

### *Administration orders*

### Section 359: **Petitions**

641. General insolvency law provides for the court to place a company or partnership into administration, that is to allow it to continue in business, under the supervision of an administrator, as an alternative to winding it up. This section allows the Authority to ask the court to do this in respect of present or former financial services businesses and appointed representatives or persons

© 2025 Thomson Reuters.

who are or have carried on financial services business without authorisation, where it would be in consumers' interests for the business to remain in being, rather than be wound up. It also provides that for such persons failure to pay money due to consumers on time shall count as sufficient evidence to allow the initiation of administration proceedings.

Section 360**: Insurers**

642. At present, the law prohibits insurance companies from being put into administration. When insolvency law first made provisions for administration in 1985, it was not clear whether this procedure would be appropriate for such companies, given the special nature of insurance business. Experience has shown that it may be helpful to make this option available, so this section gives the Treasury the power to make an order removing the prohibition in relation to insurers. "Insurers" for these purposes will be defined in regulations made by the Treasury.

Section 362**: Authority's powers to participate in proceedings**

643. This section makes clear that when a creditor or other third party asks the court to place in administration a person who is doing or has done financial services business, or who is or has been an appointed representative, or persons who are or have carried on financial services business without authorisation, then the Authority shall have the right to be represented at the hearing. It also gives the Authority the right to receive any information or proposals sent by the administrator to creditors, to attend and speak at any meeting of creditors called to discuss the administration, and to have the same rights as creditors to ask the court to intervene, if it considers that the administration is being carried out improperly or unfairly. It also gives the Authority the same power that creditors have under section 425 of the Companies Act (and the equivalent Northern Ireland provision), where a scheme is proposed to settle some or all of the debts of a company in administration, to ask the court that this be put to a vote of creditors.

*End > Explanatory Note > para. 12*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 13

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Receivership

### Section 363: **Authority's powers to participate in proceedings**

644. This section provides that when a receiver is appointed in respect of a company which is or was an authorised person, or an appointed representative, or which is or has been carrying on regulated activities without authorisation, the Authority is entitled to be represented at any hearing at which the receiver applies to the court for directions. It also provides that the Authority has the right to receive any information or proposals sent by the receiver to creditors and to attend and speak at any meeting of creditors called to discuss the winding up.

### *Voluntary winding up*

### Section 365: **Authority's powers to participate in proceedings**

645. This section gives the Authority the right to be represented at any court proceedings to wind up voluntarily a financial services company, other than an long term insurer. It also provides the Authority with the same powers that creditors have to ask the court to decide any questions arising out of the winding up, or to order that a scheme, under section 425 of the Companies Act (or the equivalent Northern Ireland provision), to settle some or all of the debts of the company, should be put to a vote of creditors. In addition, it gives the Authority the right to receive any notice or document required to be sent to creditors and to attend and speak at any creditors' meeting.

### Section 366: **Insurers carrying on long-term business**

646. Under the predecessor legislation, there is a prohibition on the voluntary winding up of insurance companies carrying on long term, or life assurance, business. The reason is that if such companies went into voluntary liquidation the rights of endowment policyholders would accrue, so that they would be entitled only to the current value of their policy, and not to the terminal bonuses they would expect if their policies ran on to the end of their term. This section removes this absolute prohibition, but provides that voluntary winding up can only take place with the Authority's prior permission. This will allow the Authority to ensure that winding up will only proceed subject to arrangements being made to meet the legitimate expectations of policyholders.

© 2025 Thomson Reuters.

Financial Services and Markets Act 2000 c. 8

*Winding up by the court*

Section 367**: Winding-up petitions**

647. This section provides that the Authority may ask the court compulsorily to wind up any company or partnership which is doing or has done financial services business or which is or has carried on financial services business without authorisation. The powers also apply to an appointed representative. As with the other provisions in this part which empower the Authority to initiate proceedings, this enables the Authority to act on behalf of consumers, who could in theory take action themselves, but may in practice lack the resources and expertise to do so. The court may agree to this in cases where the business cannot pay its debts, or where it decides that it would be "just and equitable" to wind up the business. The Authority might make an application under the latter ground if, for example, a business had been guilty of such serious rule breaches that the Authority had found it necessary to cancel its permission in order to protect the public. This section also provides that for such businesses failure to pay money due to consumers on time can count as sufficient evidence to allow the initiation of insolvency proceedings.

Section 368**: Winding-up petitions: EEA and Treaty firms**

648. This section makes clear that the Authority can only petition under section 367 for the winding up of a business which is authorised in another EEA State, and is entitled to provide financial services in the United Kingdom because of that authorisation, when it has been asked to do so by the home State regulator concerned. This is because the issues that generally arise in relation to the winding up of a business are issues which are primarily the concern of the home State regulator, rather than of the host State where the business is being carried on.

Section 371**: Authority's powers to participate in proceedings**

649. This section makes clear that when a creditor, or other third party, asks the court to wind up a person who is doing or has done financial services business, or who is or has been an appointed representative, the Authority has the right to be represented at the hearing, and at any subsequent hearing. It also provides that the Authority has the right to receive any information or proposals sent by the liquidator to creditors and to attend and speak at any meeting of creditors called to discuss the winding up, and to have the same rights as creditors to ask the court to intervene. It also gives the Authority the same power that creditors have under section 425 of the Companies Act (or the equivalent Northern Ireland provision), where a scheme is proposed to settle some or all of the debts of a company being wound up, to ask the court that this be put to a vote of creditors.

**Bankruptcy**

Section 372**: Petitions**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 156 of 2232
Page ID #:2214
Financial Services and Markets Act 2000 c. 8

650. Section 367 gives the Authority power to ask the courts to wind up companies or partnerships doing financial services business. The section also confers a power in respect of sole traders doing financial services business. The Authority will be able to petition for the bankruptcy of such persons, or in Scotland, for the sequestration of their estate, if they are or appear unable to pay their debts to consumers. It should be noted, however, that here, as in insolvency law generally, inability to pay debts is the only ground on which a sole trader can be made bankrupt — there is no equivalent to the provision covering companies and partnerships that these may be wound up because the court feels it is "just and equitable" to do so. This is because sole traders' business affairs are not legally distinct from their personal finances.

Section 374**: Authority's powers to participate in proceedings**

651. This section makes clear that when a creditor, or other third party, asks the court to make a bankruptcy order for, or in Scotland to sequestrate the estate of, an individual who is doing or has done financial services business, then the Authority shall have the right to be represented at the hearing, and at any subsequent hearing. It also provides that the Authority has the right to receive any report sent by an insolvency practitioner to creditors and to attend and speak at any meeting of creditors called to discuss the bankruptcy.

*Provisions against debt avoidance*

Section 375**: Authority's right to apply for an order**

652. The Insolvency Act 1986 provides creditors, liquidators and administrators of insolvent persons with the right to ask the court to set aside transactions which appear to have been entered into to defraud creditors (that is, where assets are transferred as a gift, or sold at less than their full value, with the intention of putting them beyond the reach of creditors). This section provides the Authority with an equivalent right to make an application to the court in relation to transactions entered into in the course of financial services business.

*Supplemental provisions concerning insurers*

Section 376**: Continuation of contracts of long-term insurance where insurer in liquidation**

653. This section provides for the business of an insolvent insurer so far as it relates to contracts of long-term insurance to be transferred to another company, rather than for the policyholders to receive a share of the assets available on winding up. Policyholders of long term insurers face different problems to most consumers if the company fails. They enter into agreements, for example for pensions, which are designed to last many years, and the benefits they expect to receive build up over time. Also, the terms of the contract (and importantly the premium) are set at the outset. If, for example, during the course of the contract they were to develop an illness they might not then be able to obtain alternative cover. For these reasons, it is desirable, where possible, to

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 157 of 2232
Page ID #:2215
Financial Services and Markets Act 2000 c. 8

maintain the insurer's business as a going concern, or to find an alternative insurer to take over its policies, rather than allowing it to be wound up.

## Section 377: **Reducing the value of contracts instead of winding up**

654. This section is intended to facilitate timely payments on, or the transfer of, insurance contracts of a company which has become insolvent, rather than leaving these to be matters to be resolved at the end of an insolvency process, which may take a considerable period of time.

## Section 378: **Treatment of assets on winding up**

655. This section empowers the Treasury to make regulations to allow for the separate treatment in insolvency situations of an insurer's contracts of long-term and general insurance, given the special characteristics of long term business (referred to in the note on section 376 above).

## Section 379: **Winding-up rules**

656. This section enables the making of rules to deal with the winding up of insurers, under the powers of the Insolvency Act 1986.

## PART XXV: **INJUNCTIONS AND RESTITUTION**

657. This Part is concerned with the Authority's (and in certain cases the Secretary of State's) power to seek injunctions and restitution orders from the High Court, or in Scotland the Court of Session, against both authorised and unauthorised persons where it appears that certain requirements have been, or might be, contravened. Section 384 also gives the Authority the power to require restitution to be paid without having to apply to the courts for a restitution order, but this direct power can only be used against authorised persons.

658. The powers contained in this Part may be exercised by the Authority in relation to breaches which constitute an offence under the Act, or which the Authority has power to prosecute under section 402, or any breach of any other requirement imposed by or under the Act, such as a rule made under Part X. The Secretary of State may exercise the powers in relation to any breach which constitutes an offence which the Act gives him the power to prosecute under section 401.

## Section 380: **Injunctions**

659. This section sets out the powers of the court to make injunctive orders on the application of the Authority or Secretary of State and the grounds on which they may exercise those powers. The court may make three types of order: an order restraining the contravention of certain requirements (subsection (1)), an order directing remedial action to be taken when there has been such a contravention (subsection (2)) and an order freezing the assets of someone who has contravened certain requirements or been knowingly involved in a contravention (subsection (3)).

© 2025 Thomson Reuters.

660. The first of these is a preventative measure. Under subsection (1)(a) an order can be made restraining a person from contravening a requirement where the court believes they are reasonably likely to do so. Where a contravention has already occurred, under subsection (1)(b) the courts can restrain a person from doing so again.

661. Where there are clear steps that can be taken either by the person who has contravened a requirement or by a person knowingly concerned in the contravention, under subsection (2) the court may order a person to take those steps. This is a corrective power. For example, an order may simply require a person to meet commitments they have entered into but so far failed to discharge. Subsection (5) provides that the remedial action that the court may order under subsection (2) may include orders to mitigate the impact of a contravention even if it is not, strictly speaking, possible to remedy it. For example where a person has published a misleading advertisement, the Authority could apply to the court for an order requiring the person to publish a correction. This would not be of use to anyone who had taken action on the basis of the original advertisement but would prevent others doing so in the future.

662. An order made under subsection (3) to freeze a person's assets is similar to a Mareva injunction [1] apart from its timing: a Mareva injunction may only be applied for where court proceedings have been commenced or are imminent whereas this section gives the Authority or Secretary of State an independent power to apply to the court for an asset-freezing order on the grounds that they believe a breach may have occurred. The power does not prevent separate applications for Mareva injunctions.

663. Subsection (6) sets out the range of requirements the contravention or likely contravention of which may be grounds for an order under this section. These are requirements imposed by or under the Act, including the Authority's rules made under Part X, plus the various requirements a breach of which constitutes an offence under the Act, such as the general prohibition under Part II. In addition, the powers may be exercised for breaches of requirements imposed by other Acts which constitute offences which the Authority has power to prosecute. The Authority's power in that respect is set out in section 402.

## Section 381: **Injunctions in cases of market abuse**

664. This section provides the Authority with the power to apply to the court for injunctive orders in cases of market abuse. The Secretary of State has no powers under this section in relation to market abuse. The types of orders which the court may make are the same for cases of market abuse under this section as for contraventions of requirements under the previous section.

## Section 382: **Restitution orders**

665. This section gives the court the power, on the application of the Authority or the Secretary of State, to order restitution to be paid by a person who has contravened a requirement or been

© 2025 Thomson Reuters.

knowingly involved in a contravention. The court must be satisfied that the contravention has led either to the person ordered to pay restitution accruing profits or to others suffering loss or being adversely affected in other ways. It is possible for an application for a restitution order to be combined with an application for an injunction.

666. Under subsection (2), the court has discretion to decide what is an appropriate sum for a person to have to pay taking into account the size of any profits which have accrued and the extent to which persons have suffered loss or been adversely affected. The restitution is initially paid to the Authority, but the Authority is then required to distribute the money among people chosen by the court. These must be those people who appear to the court to have been directly affected by the contravention, or to whom the profits may be attributed, for example because it was their funds that were used to make a particular investment which gave rise to the profits.

667. Subsections (4) and (5) give the court powers to require further information from potential recipients of restitution orders to assist the court in determining what profits have accrued to them, to what extent others have been affected by a contravention or how to distribute the money. The court may also require this information to be verified.

668. Subsection (7) provides that the fact that the Authority or the Secretary of State has made an application under this section for a restitution order does not prevent someone taking a private action for restitution in respect of the same matter. The court is likely to have regard to the question of whether any payments have already been made by a person in determining whether to order restitution in any particular case.

669. The range of requirements the contravention of which can give rise to an application to the courts under this section for a restitution order is the same as for injunctions under section 380. These are set out in subsection (9).

Section 383**: Restitution orders in cases of market abuse**

670. This section provides the Authority with the power to apply to the court for restitution orders against persons who it is satisfied have engaged in market abuse. The Secretary of State has no powers under this section. The provisions of this section are equivalent to those in the section above for restitution orders following the contravention of a requirement. Again, the court has discretion to determine the amount of restitution paid and the eventual recipients of that restitution who must be persons directly affected by the market abuse. The court also has similar powers as under section 382 to require further information from the person who has engaged in market abuse. However under this section the court may not make an order if it is satisfied that the person concerned believed, on reasonable grounds, that market abuse was not involved, or took all reasonable precautions and exercised all due diligence to avoid market abuse. This restriction is analogous to the provisions of section 123(2) which apply where the Authority wishes to impose a penalty in relation to market abuse.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 160 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2218

Section 384**: Power of Authority to require restitution**

671. This section gives the Authority the direct power to require an authorised person to pay restitution, without having to go through the court, although the authorised person does have the right to refer the matter to the Tribunal under section 386. The Authority can order restitution to be paid by:

- authorised persons who have contravened a requirement under the Act or who have committed an offence mentioned in section 402;

- authorised persons who have been knowingly involved in such a contravention;

- any person, whether authorised or not, who has engaged in market abuse.

672. The Secretary of State has no direct powers under this Part to require restitution.

673. The grounds for the Authority using this power are set out in subsections (1) and (2). These are that the Authority is satisfied that the person has done the misdeed and that, because of it, either profits have accrued to that person or one or more people have suffered loss or been adversely affected.

674. The Authority may require someone to pay restitution of an amount which it considers to be just, taking into account the profits that have accrued and/or the extent of the loss or adverse effect suffered. The money is to be paid to people who have been directly affected by the contravention or offence, or to whom profits are attributable, as under sections 382 and 383. Where restitution is sought via a court order, the money is paid initially to the Authority, but when the Authority uses its power under this section to require restitution directly, subsection (5) provides for the money to be paid straight to the final recipients. The Authority may determine the arrangements for payment.

Section 385**: Warning notices**

675. This section requires the Authority to issue a warning notice informing someone of any proposal to require them to pay restitution under section 384. A warning notice must comply with the provisions of section 387. The warning notice must specify the amount of restitution proposed.

Section 386**: Decision notices**

676. This section provides that if the Authority decides to require restitution to be paid, it must send a decision notice to the person in relation to whom this power is being exercised. The section also provides a right to refer the Authority's decision to the Tribunal.

PART XXVI**: NOTICES**

677. Various provisions of the Act relate to the Authority taking decisions, for example as to whether to grant, or to withdraw, authorisations and approvals, or whether to take other regulatory action, such as imposing financial penalties or making public statements. The relevant provisions of the Act require the Authority in some cases to give warning and decision notices, and in others to give other kinds of notice This Part is concerned with the Authority's procedures during, before and after the process of serving these notices as well as the information which they are to include. In particular, the Part requires the Authority to act in accordance with a published set of procedures.

## Section 387**: Warning notices**

678. This section provides that a warning notice must be in writing and must set out the reasons for the proposed course of action. It must also state whether section 394 (Access to Authority material) applies.

679. Subsection (2) gives any person who receives a warning notice an opportunity to make representations to the Authority. The Authority may specify the period available for representations, provided it allows a minimum of 28 days from the date of the notice. The Authority must then decide whether to give the person a decision notice within a reasonable period.

## Section 388**: Decision notices**

680. A decision notice must be in writing and must set out the reasons for the course of action. It also requires the Authority to explain a right of access to Authority material under section 394 and rights to refer the case to the Tribunal (including the procedure for doing so).

681. If a decision notice follows a warning notice, the action proposed in it must be action the Authority has powers to take under the same Part of the Act. The Authority can issue a further decision notice altering the action proposed in an earlier notice, but only with the consent of the person concerned.

## Section 389**: Notices of discontinuance**

682. This section requires a "notice of discontinuance" to be issued when the Authority decides not to proceed with action proposed in a warning notice (section 387) or in relation to which a decision notice (section 388) was given.

683. However a notice of discontinuance does not have to be given if the effect is purely to grant an application made by the person in question. In such cases the Act generally contains express provision requiring written notice to be given of the grant of the application.

## Section 390**: Final notices**

© 2025 Thomson Reuters.

684. This section requires a "final notice" to be issued to confirm and give effect to an action proposed in a decision notice (and to require payment in the case of a penalty) whenever the period for referring a matter to the Tribunal has expired, or if it has been referred, whenever the matter has been finally determined by the Tribunal or the higher courts. If the matter was referred to the Tribunal then the final notice will give effect to the directions of the Tribunal (or the higher courts if there has been a appeal).

685. Subsection (7) requires the final notice to set out details of the action which is being taken and the date when it is to be taken. Particular requirements for certain categories of case are given in subsections (3) to (6). For example the notice must include the terms of any public statement which is to be made and details of the manner and date of publication, or the amount of any financial penalty and details of how and when it is to be paid. The period for making payments must not be less than 14 days beginning with the date on which the final notice is given, after which the Authority may recover any outstanding amount as a debt owed to it.

686. A similar 14 day minimum period must be allowed for making restitution as required under section 384, after which any outstanding obligations are enforceable through an application by the Authority to the courts (for an injunction in England and Wales and Northern Ireland or, in Scotland, for an order under section 45 of the Court of Session Act 1988).

Section 391**: Publication**

687. This section establishes common rules on publication of decisions which:

- prevent the Authority from publishing details about warning and decision notices;

- enable the Authority to publish appropriate details of a discontinued decision, but only if the person to whom the notice is given consents; and

- require the Authority to publish appropriate information about a final notice, but omitting information which would be unfair to the person to whom the notice relates or prejudicial to the interests of consumers.

688. The provision for publishing details of a final notice applies equally to a supervisory notice (as defined in section 395) but only when such a notice takes effect. The procedure on giving a supervisory notice is set out under the description of section 53 above. If the notice so states, it may take effect immediately, or on a particular date. Otherwise it will take effect only once it is no longer "open to review". Subsection (8) of this section provides that a supervisory notice is "open to review" until after the period for referring the matter to the Tribunal has expired and until any reference or further appeal has been finally determined.

Section 392**: Application of** sections 393 and 394

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 163 of 2232
Page ID #:2221
Financial Services and Markets Act 2000 c. 8

689. Sections 393 and 394, described below, confer additional procedural rights relating to third parties and to disclosure of Authority material. However those rights apply only in cases, other than those involving the Authority responding to an application, which are governed by the warning notice and decision notice procedure. This section lists the particular sections of the Act where sections 393 and 394 apply.

Section 393**: Third party rights**

690. Where this section applies (see section 392 above) it confers rights on any person (a "third party") who is identified in prejudicial terms in the reasons contained in a warning notice or decision notice. Third parties are given the right to receive a copy of the notice, and to make representations or refer the matter to the Tribunal in the same way as the person who is the subject of the Authority's proposed action. However subsections (2) and (6) provide that a third party does not need to be given a copy of a notice which identifies him if a separate warning or decision notice has been given to him in relation to the same matter, and subsection (7) provides a further exception where it is impracticable to contact the third party.

691. Subsection (13) provides that third party notices must describe the rights which third parties also have under section 394 below. Subsections (5) and (14) provide a third party with rights to receive copies of subsequent notices in relation to the same matter.

Section 394**: Access to Authority material**

692. Where this section applies (see section 392 above), the Authority is required to give any person who is the subject of a warning or decision notice, or who has received a copy of such a notice as a third party, access to certain categories of material. Subsection (1)(a) requires access to be given to any material on which the Authority relied in taking the decision in question. Subsection (1)(b) requires access to be given to material which the Authority considers might undermine that decision.

693. The latter category does not apply to all material in the Authority's possession but only to material which the Authority considered in reaching its decision, or which it obtained in connection with, that is in investigation of, the matter in question (see the definition of *"secondary material"* in subsection (6)).

694. The right of access to Authority material is subject to the following exceptions. First, the Authority may refuse access to material relating to a different case which was taken into account only for the purposes of comparison with the case in question. Secondly, it may refuse access to *"excluded material"* , defined as covering *"protected items"* as defined in section 413, and material intercepted under (or indicating the existence of) a warrant for the interception of communications. If access to material is refused on the grounds that it is subject to legal professional privilege, the Authority must give written notice to the person concerned.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 164 of 2232
Page ID #:2222
Financial Services and Markets Act 2000 c. 8

695. Finally the Authority can refuse access to material which it would not be in the public interest to disclose (that is, material subject to public interest immunity) or to commercially sensitive material which it would not be fair to disclose. In these cases the Authority must notify the person and give its reasons for refusing.

## Notes

1    A Mareva injuction (now known as a *'freezing order'* ) is a remedy a court may use to prevent assets being removed, charged or otherwise dealt with in a way that could prejudice a legal action that is otherwise being, or about to be, pursued.

*End > Explanatory Note > para. 13*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2025 Thomson Reuters.

# para. 14

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

## Section 395: **The Authority's procedures**

696. This section concerns the Authority's decision-making procedures. It is for the Authority to decide on its procedures but subsection (2) requires that, to avoid prejudice, they should be designed to ensure that the task of deciding whether to issue a warning, decision or supervisory notice and the task of collecting relevant information should be carried out by different people. However, subsections (3) and (4) provide that the procedures can provide for this requirement to be waived for supervisory notices (as defined in subsection (13)) if necessary to protect the interests of consumers, so long as the decision is taken by a person at an appropriate level of seniority given the importance of the decision.

697. The Authority is required by subsections (5) and (6) to issue and publish a statement describing its procedures. It must be published in a way appearing to the Authority best calculated to bring it to the attention of the public and a reasonable fee may be charged for providing a copy. A copy of the statement must also be given without delay to the Treasury. The Authority must also publish a revised statement if it decides to change the procedures. Under subsection (9) the Authority must act in accordance with its published procedures. Subsection (11) ensures that the validity of any notices given in such a case is not affected by any failure to do so. However, subsection (12) makes clear that the Tribunal can take into account any failure to follow the procedures.

## Section 396: **Statements under** section 395

698. This section makes provision about consultation arrangements. These are similar to those in other equivalent provisions of the Act, such as under section 70 to the issuing of a statement under section 395.

## PART XXVII: **OFFENCES**

699. This Part contains provisions which make it an offence to make misleading statements or engage in a misleading practice in order to induce someone to enter into an investment contract. It also creates offences of misleading the Authority and the DGFT. The first of these offences is carried over from sections 47 and 133 of the FS Act 1986 and section 35 of the Banking Act. It also provides that where a corporate body (or partnership) has committed an offence then, in certain

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 166 of 2232
Page ID #:2224
Financial Services and Markets Act 2000 c. 8

circumstances, its officers may also be guilty of that offence. In addition, this Part contains general provisions on the institution of proceedings for offences under this Act. It gives the Authority powers to prosecute insider dealing under the Criminal Justice Act 1993, to prosecute under the Money Laundering Regulations 1993, and to prosecute the offences of misleading statements and practices.

## Section 397: **Misleading statements and practices**

700. This section provides for two criminal offences concerning misleading statements and practices. Persons found guilty of either of these offences may be subject to a maximum of up to 7 years imprisonment or to a fine, or to both.

701. The first, set out in subsections (1) and (2), applies where a person deliberately makes a misleading statement, promise or forecast, or dishonestly conceals facts from someone with the intention of inducing any other person to do or refrain from doing something in relation to an investment. A possible example of this offence would be someone lying about a company's financial position at a time when he was seeking to dispose of shares in that company. It is also an offence to make the misleading statement, promise or forecast recklessly and to be reckless as to whether another person was so induced.

702. The second offence, set out in subsection (3), is the creation of a misleading impression about an investment with the intention of inducing another person to do or not do something in relation to that investment. This covers such things as market manipulation, for example engaging in artificial trades in a particular investment in order to create the impression that there is more interest in the investment than really exists.

703. Subsection (4) provides a defence against the offence in subsection (2) for a person if he can show that a statement, promise or forecast was made in compliance with price stabilising or control of information rules. Subsection (5) provides three defences against the offence in subsection (3). The first is that the person concerned reasonably believed that his conduct would not create a misleading impression. The second defence is where the person is engaged in price stabilisation in circumstances where this is permitted. The third defence is where the person acted in conformity with the control of information rules under section 147.

704. Subsection (7) provides the offence in subsection (3) is not committed unless the action done takes place in the United Kingdom, or the misleading impression this creates arises in the United Kingdom.

705. Subsections (9) to (12) give the Treasury the power to prescribe those agreements and investments to which this section applies.

## Section 398: **Misleading the Authority: residual cases**

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 167 of 2232
Page ID #:2225
Financial Services and Markets Act 2000 c. 8

706. This section makes it an offence to give false or misleading information to the Authority in purported compliance with requirements under the Act in cases where this is not already an offence under other provisions (for example under section 177(4) regarding the provision of information to investigators). The penalty for this offence is an unlimited fine on indictment or a fine of up to the statutory maximum (£5,000) on summary conviction.

## Section 399: Misleading the Director General of Fair Trading

707. This section applies the provisions of section 44 of the Competition Act 1998. The effect of this is that it is an offence to mislead or give false information to the DGFT when he is exercising his functions under the Act.

## Section 400: Offences by bodies corporate etc.

708. This section makes provision as to the circumstances in which partners in a partnership and directors and officers of bodies corporate and unincorporated associations may be found guilty of an offence in a case in which an offence has been committed by the relevant partnership, body or association.

709. Subsection (7) gives the Treasury the power to make regulations applying the provisions of this section, with any appropriate modifications, to equivalent undertakings established under the laws of other countries.

## Section 401: Proceedings for offences

710. This section confers powers to prosecute offences under this Act. The Secretary of State and the Authority can prosecute any offence in England, Wales or Northern Ireland. Others can only prosecute with the consent of the Director of Public Prosecutions in England and Wales or, in Northern Ireland, with the consent of the Director of Public Prosecutions for Northern Ireland. The DGFT can prosecute in England, Wales or Northern Ireland for breaches of any prohibition on carrying on any CCA 1974 business he has imposed under section 203.

711. Subsections (5) and (6) give the Treasury the power to set conditions relating to the way in which the Authority can bring proceedings for offences under this Act. For example, the Treasury could require the Authority to comply with the Code for Crown Prosecutors. In Scotland, prosecution will be the responsibility of the Lord Advocate.

## Section 402: Power of the Authority to institute proceedings for certain other offences

712. This section allows the Authority to prosecute in England, Wales or Northern Ireland two criminal offences which are not in this Act. These are the offences of insider dealing (Part V of the Criminal Justice Act 1993) and breach of the Money Laundering Regulations 1993 (regulation 5).

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 168 of 2232
Page ID #:2226
Financial Services and Markets Act 2000 c. 8

713. Subsections (2) and (3) give the Treasury the power to set conditions relating to the way in which the Authority can bring proceedings for these offences. For example, the Treasury could require the Authority to comply with the Code for Crown Prosecutors.

## Section 403**: Jurisdiction and procedure in respect of certain offences**

714. This section makes provision for the procedures under which offences under the Act may be prosecuted and punished. It carries forward and has similar effect to the provisions of section 203 of the Financial Services Act 1986.

715. Subsection (1) makes clear that a fine imposed upon a unincorporated association must be paid out of the funds of the association, whilst subsection (2) provides that any proceedings for an offence brought against an unincorporated association must be brought in the name of the association. Subsections (3) and (4) provide that for the purposes of the service of documents, and of prosecutions, unincorporated associations should be treated in the same way as bodies corporate. Subsection (5) provides that summary proceedings may be taken against a body corporate or unincorporated association at their place of business, whilst proceedings may be brought against an individual at any place where he is present for the time being.

## PART XXVIII**: MISCELLANEOUS**

## Section 404**: Schemes for reviewing past business**

716. This section enables the Treasury, by order under subsection (2), to set out the framework for a scheme to be established and operated by the Authority to require authorised persons to review their past business and, where appropriate, to determine the amounts payable by those persons by way of compensation for liabilities that they have incurred to private investors and certain others. This power will facilitate the handling of issues such as those which arose in cases of mis-selling — most notably of personal pensions. Reciprocity powers

717. Sections 405 to 408 concern reciprocity powers. Under certain EC directives a decision can be taken by the Council of the European Union or the Commission to require individual member States' regulators to take reciprocal action to deprive subsidiaries of firms from a country outside the European Economic Area (EEA) of access to their markets. This is referred to in the Act as a *"third country decision"* . Such a decision may be taken where it appears to the Commission that EEA firms wishing to establish themselves or provide financial services in third countries are not being treated on the same basis and offered the same competitive opportunities as domestic firms.

718. The potential for reciprocity action has diminished following World Trade Organisation ("WTO") negotiations on financial services which resulted in the EU, along with many other WTO member countries, making a commitment to offer Most Favoured Nation treatment to other WTO members on a permanent basis. This commitment came into force on 1 March 1999 and means that EC reciprocity powers can now only be used against countries outside the WTO.

© 2025 Thomson Reuters.

Section 405**: Directions**

719. This section defines the nature of reciprocity action that may be taken in order to comply with a third country decision. The section provides the Treasury with the power to direct the Authority to do the following:

> • refuse, or put on hold, an application for authorisation from a person which is formed under the law of the United Kingdom but which is the direct or indirect subsidiary (the powers do not apply to branches) of a firm from a country which is the subject of a third country decision (subsections (1)(a) and (b));

> • object to a person from a country which is the subject of a third country decision acquiring a 50 per cent share in an authorised person incorporated in the United Kingdom or formed under UK law whether or not they have served the Authority with a notice of control as required under Part XII (subsections (1)(c) and (d))

720. The circumstances in which a person is taken to acquire a 50 per cent share is defined in section 406.

Section 407**: Consequences of a direction under** section 405

721. This section sets out the procedure the Authority must follow if the Treasury directs them to implement a third country decision.

Section 408**: EFTA firms**

722. If a subsidiary of a firm from a country subject to a third country decision is already authorised in an EU member State then its entitlement to exercise passport rights (see explanatory notes to Schedule 3) to establish a branch or provide services in another member State is not affected if by the third country decision. This is not the case for subsidiaries of third country firms authorised in EEA States which are not also EU member States (Norway, Iceland or Liechtenstein), referred to in the Act as *"EFTA firms"* (subsection (8)). EFTA firms may not exercise their passport rights following a third country decision relating to the country of their parent. This section therefore gives the Treasury the power to make a determination that a particular firm does, or class of firms do, not qualify for authorisation under Schedule 3. Subsections (6) and (7) set out the procedure the Treasury must follow if it makes such a determination.

Section 409**: Gibraltar**

723. This section provides for matters arising from Gibraltar's status within the EEA.

724. Subsection (1)(a) gives the Treasury the power to extend Schedule 3 so that Gibraltar firms which are covered by one of the single market directives to which effect has been given in Gibraltar

would be able to qualify for status as an authorised person and establish a branch or provide services within the United Kingdom. It also enables the Treasury to make the necessary provision to ensure that firms from other EEA States which exercise passport rights in relation to Gibraltar before they exercise them in relation to the United Kingdom proper are not required unnecessarily to duplicate notification requirements.

725. Subsection (1)(d) does the equivalent for Gibraltar based collective investment schemes. The Treasury also has the power under subsection (1)(c) to extend the application of Schedule 4 so that a financial services firm with its head office in Gibraltar or being otherwise connected with Gibraltar would acquire Treaty rights if it is authorised by the Gibraltar competent authority and the relevant conditions in Schedule 4 are met.

726. Subsection (1)(e) will enable the Treasury to modify the provisions of section 264 so that the Authority can refuse to admit a collective investment scheme from another member State if the way in which it proposes to market its units is incompatible with requirements imposed in Gibraltar in the general good.

727. Subsection (1)(b) gives the Treasury the power, by order, to extend the application of Schedule 3 to the Act so as to make provision as to the exercise by UK firms of rights which are afforded to them under the law of Gibraltar which corresponds to an EEA right.

Section 410**: International obligations**

728. This section provides the Treasury with the general power to direct a number of bodies with powers under the Act to take, or refrain from taking, any action which is either required by, or is incompatible with, the United Kingdom's international obligations. For example, if the Authority's rules on capital requirements were such that the UK's obligations under EC law were not being met, this section would allow the Treasury to direct the Authority to change their rules so as to ensure compliance.

Section 411**: Tax treatment of levies and repayments**

729. This section relates to levies and payments relating to the legal assistance scheme under Part IX, the compensation scheme under Part XV and the ombudsman scheme under Part XVI. This section amends the Income and Corporation Taxes Act 1988 so that it provides for such levies to be treated as a tax deductible expense and for levy rebates made to authorised persons to be treated as trading receipts.

Section 412**: Gaming contracts**

730. Legislation governing gaming contracts includes provisions for such contracts not to be legally enforceable. Some regulated activities involve entering into or performing contracts which

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 171 of 2232
Financial Services and Markets Act 2000 c. 8
Page ID #:2229

could potentially be covered by this legislation, for example derivative contracts such as "put options", and the effect of this section is to make certain that such contracts are legally enforceable.

## Section 413: **Protected items**

731. This section provides that no power under the Act can be used to require any person to produce, disclose or permit the inspection of "protected items". These are defined in terms which are materially identical to the definition of items subject to legal professional privilege in section 10 of the Police and Criminal Evidence Act 1984.

## Section 414: **Service of notices**

732. This section enables the Treasury to make regulations prescribing the procedure for giving notices and other documents under the Act. The power covers any such provision in the Act, regardless of its precise wording, and includes provisions about giving directions or imposing requirements.

733. In particular, the regulations may specify how a document may be given, the address to which it should be sent, and whether the document or notice may be sent electronically. They may also specify the date and time a document is to be regarded as having been served (this may be important, for example, where a time limit begins to run from that date). The regulations may also make particular provision for cases where the person to whom the document is being sent is not an individual (for example, in the case of a limited company or partnership) or is outside the United Kingdom. The precise arrangements required under the regulations may vary depending on the nature of the document in question.

## Section 415: **Jurisdiction in civil proceedings**

734. This section enables civil proceedings, such as judicial review, to be brought against any of the bodies corporate on which functions are conferred by this Act in the courts of any part of the United Kingdom. This is necessary because these bodies are companies incorporated under the Companies Acts and, as such, the effect of the Civil Jurisdiction and Judgments Act 1982 would otherwise be that civil proceedings could be brought against them only in the courts in England and Wales because that is the part of the United Kingdom in which they are treated as being domiciled for the purposes of that Act. That Act is amended by paragraph 3 of Schedule 20.

## Section 416: **Provisions relating to industrial assurance and certain other enactments**

735. This section provides for the Industrial Assurance Acts 1923–48 (and the equivalent Northern Ireland Order) to cease to have effect and for the repeal of the Insurance Brokers (Registration) Act 1977. It also provides for the dissolution of certain statutory bodies mentioned in subsection (3). The section also confers on the Treasury a power by order to make such provisions as it considers necessary in consequence of the provisions of this section. Such consequential provisions would

allow, for example, for the protection of existing policyholders under the Industrial Assurance Acts, and to make provision for the orderly dissolution of the bodies mentioned.

736. The repeals and dissolutions set out in this section are dealt with on the face of the Act because they may not be entirely consequential on the other provisions of the Act and therefore maybe outside the scope of section 426, which allows for consequential repeals to be made by order.

## PART XXIX: INTERPRETATION

737. This Part defines a number of the terms used in the Act. The majority of such definitions are contained in section 417.

### Section 418: Carrying on regulated activities in the United Kingdom

738. This section deals with the territorial scope of the authorisation requirement, and establishes its so-called "outward" application, whereby persons based in the United Kingdom who carry on regulated activities overseas need to be regulated in the United Kingdom. The section reflects the provisions of the EC directives in determining when a person is to be considered to be carrying on regulated activities in the United Kingdom, and sets out four broad cases:

• first, all persons who have their head or registered office in the United Kingdom, but who only carry on regulated activities in another EEA State, but are entitled to exercise rights under a single market directive as UK firms, and are carrying on in another EEA state regulated activities to which that directive applies, will need to be authorised in the United Kingdom;

• second, all persons who have their registered offices (or head offices, where they do not have registered offices) in the United Kingdom, and operate as managers of schemes which are entitled to enjoy the rights conferred by a relevant Community Instrument will require authorisation where persons in another EEA state are invited to become participants in the schemes;

• third, all persons who have their head or registered office in the United Kingdom, but who only carry on regulated activities in non-EEA states, will need to be authorised if they direct the day-to-day management of the activities from an establishment in the United Kingdom; or

• fourth, even if a person does not have a head or registered office in the United Kingdom and is not dealing with UK customers, he will still need to be authorised if the activity is carried on from an establishment maintained by him in the United Kingdom.

739. These provisions complement the so-called "inward" territorial scope of the Act, whereby overseas persons who carry on regulated activities in the United Kingdom need to be regulated unless an exemption or exclusion applies. The "inward" scope of the Act is implicit in the terms

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 173 of 2232
Page ID #:2231
Financial Services and Markets Act 2000 c. 8

of section 19, but it may also be further amplified or restricted by the order to be made under section 22.

### Section 419**: Carrying on regulated activities by way of business**

740. This section allows the Treasury to make orders to define *"carrying on a regulated activity by way of business"* for the purposes of section 22. This would, for example, allow special provision to be made in the case of occupational pension schemes, as under the FS Act 1986. The section would also enable different provision to be made in the case of different activities, if that was thought to be desirable in the light of the slightly different tests which apply under the existing legislation.

### Section 420**: Parent and subsidiary undertaking**

741. The definitions of parent and subsidiary undertaking for the purposes of the Act are consistent with the definitions used in the single market directives.

742. Although individuals are not themselves "undertakings", it is possible for an individual to have a relationship with an undertaking which would be classified as a parent/subsidiary relationship if they were an undertaking. Subsection (2) clarifies that for the purposes of the Act such an individual is to be included as a parent undertaking. The undertaking with whom the individual has a parent/subsidiary relationship is to be included as a subsidiary undertaking.

743. Subsection (2) also extends the definitions in relation to EEA bodies to cover any undertaking which would be treated as a parent or subsidiary undertaking under the law of the EEA state where the body is established.

### PART XXX**: SUPPLEMENTAL**

744. This Part contains various supplemental provisions. For example, provisions as to Parliamentary control over statutory instruments and provisions enabling the Treasury to make transitional provisions and consequential amendments. It also determines the name by which the Act may be cited.

### Section 426**: Consequential and supplementary provision**

745. This section confers on Ministers of the Crown a power, exercisable by order, to make incidental, consequential, transitional or supplemental provisions. The provisions which may be made include ones which appear to the Ministers to be necessary or expedient in order to give full effect to the Act. This power will be used in particular to make consequential amendments and repeals to other legislation when the Act is brought into force.

### Section 427**: Transitional provisions**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 174 of 2232
Page ID #:2232
Financial Services and Markets Act 2000 c. 8

746. This section amplifies the power conferred on Ministers of the Crown by section 426, permitting an order under that section may make particular provision in respect of transitional matters or savings. The complexity of the transition to the regulatory regime to be established under this Act is such that it may be necessary to make provisions of the kinds described in this section which might not otherwise fall within the scope of section 426.

747. For example, subsection (2)(a) makes clear that an order under section 426 could provide for a person authorised under predecessor arrangements to have permission from the day the relevant provisions of this Act come into force to continue to carry on the activities permitted by the authorisation from the predecessor regulator. An order under section 426 may also make provision for the continuation of rules and regulations. It is expected that most rules made by the Authority will be new rules made for the purposes of the Act. However, there may be a need for the continuation of rules under previous legislation, at least for a transitional period. This section will enable the Authority to be given power to carry forward such rules and regulations which it could make under this Act. This section also provides that an order under section 426 may deal with disciplinary cases in train on the day of commencement, and for transitional provisions to be made in respect of ombudsman and compensation schemes.

Section 429**: Parliamentary control of statutory instruments**

748. This section sets out the procedure for making statutory instruments under the powers in the Act. Most of the powers to make orders and regulations under the Act are subject to the negative resolution procedure. The power to appoint a day for the commencement of particular provisions of the Act under section 431(2) is not subject to Parliamentary control. However, the affirmative procedure applies to the following powers:

- the power initially to set the definition, or to extend the scope of, regulated activities under section 22(1) (the type of affirmative procedure applicable to this power is set out in paragraph 26 of Schedule 2);

- the power initially to specify the matters set out in section 21(4), (5), (9) and (10) (the meaning of certain elements of the basic restriction on financial promotion and the exceptions from that restriction);

- any subsequent exercise of the power to specify the matters dealt with in section 21(4) and (5) (the meaning of certain elements of the basic restriction on financial promotion) which has the effect of extending that restriction so as to apply in circumstances in which it did not previously apply;

- the power to add to the activities and investments that are "controlled" for the purposes of section 21;

© 2025 Thomson Reuters.

• the power under section 38, when it is first used, and any subsequent exercise of the power that has the effect of restricting or removing an exemption previously conferred by an order under section 38;

• the power to set the scope of price stabilising rules under section 144(4);

• the power under section 192(b) to vary, remove from or add to the cases in which a person has control for the purposes of Part XII and the equivalent power in section 192(e) in relation to the meaning of *"controller"* in section 422;

• the power under section 236(5) to amend the definition of open-ended investment company;

• the power for the establishment and regulation of collective investment schemes in Great Britain taking the form of oeics under section 262;

• the power initially to determine the circumstances in which the carrying on of regulated activities by members of the professions is subject to the arrangements set out under section 326(1) and restriction of exemption from the general prohibition under section 327(6)) and any subsequent exercise of those powers so as to restrict those circumstances;

• the power under section 404 authorising a scheme for reviewing past business;

• an order under section 419 defining the business test; and

• the power under paragraph 1 of Schedule 8 to allow any exercisable function conferred on the competent authority to be transferred in order for another person to exercise that function.

---

*End > Explanatory Note > para. 14*

---

Contains public sector information licensed under the Open Government Licence v3.0.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 176 of 2232
Page ID #:2234
Financial Services and Markets Act 2000 c. 8

# para. 15

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

SCHEDULE 1**: THE FINANCIAL SERVICES AUTHORITY**

749. Part I of this Schedule sets out requirements for the Authority's constitution and imposes certain obligations on it. Part II deals with the status of the Authority. Parts III and IV concern the Authority's powers to raise fees and impose penalties and certain other matters. Part IV gives the Authority and those who work for it limited immunity from suit.

Part I**: General**

Paragraph 2**: Constitution**

750. This paragraph requires the Authority to have a chairman and a governing body which includes the chairman. Both the chairman and the members of the governing body must be appointed and be liable to removal from office by the Treasury.

751. Sub-paragraph (4) provides for the acts of the Authority still to be valid irrespective of a vacancy in the office of chairman or any defect in an appointment to the governing body. This is to prevent the Authority's rules, and any action it takes in pursuit of its functions, being rendered invalid purely as a result of such a vacancy or defect.

Paragraph 3**: Non-executive members of the governing body**

752. This paragraph provides that the Authority's governing body must include a majority of non-executive members and requires there to be a committee of the non-executive members of the governing body, the chairman of which is to be appointed by the Treasury.

Paragraph 4**: Functions of the non-executive committee**

753. The functions of the non-executive members are not restricted by the non-executive committee. The non-executive committee has three specified functions. These are:

- keeping under review the efficiency and economy with which the Authority uses its resources;

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 177 of 2232
Page ID #:2235
Financial Services and Markets Act 2000 c. 8

• keeping under review its internal financial controls; and

• determining the remuneration of the chairman and the executive members of the governing body.

754. The committee's function of keeping the Authority's economic and efficient use of its resources under review must be undertaken by the whole committee. However, the function of reviewing internal financial controls and determining the remuneration of the chairman and executive members of the governing body may be performed by a sub-committee.

## Paragraph 5: **Arrangements for discharging functions**

755. This paragraph allows the Authority's functions, with the exception of its legislative functions, to be delegated below the level of the governing body. The legislative functions are rule-making, giving general guidance, issuing statements, issuing codes, and giving directions.

## Paragraph 6: **Monitoring and enforcement**

756. This paragraph requires the Authority to maintain arrangements for monitoring compliance with, and enforcing requirements imposed by or under, the Act. The Authority may arrange for monitoring, but not enforcement, to be delegated to another body or person which it believes is competent, which might include, for example, a professional body. If it does so, the Authority remains responsible for ensuring that proper monitoring arrangements are in place.

## Paragraph 7: **Arrangements for the investigation of complaints**

757. The Authority is required to put in place a scheme, the "complaints scheme", for the prompt, independent investigation of complaints made against it. These might typically be complaints about maladministraton by the Authority.

758. Sub-paragraphs (1), (2) and (3) require the Authority to establish a complaints scheme and appoint an independent investigator, whose appointment and removal will be subject to the approval of the Treasury.

759. Sub-paragraph (4) requires the investigator be appointed on terms and conditions reasonably designed to ensure his independence from the Authority and to ensure that complaints will be investigated under the scheme without favouring the Authority.

760. Sub-paragraphs (5) to (9) and (14) provide for the Authority to consult on its proposals for the complaints scheme.

761. Sub-paragraph (10) to (13) provide that the Authority is required to publish details of the complaints scheme and the powers of the independent investigator. The Authority may charge a reasonable fee for providing a person with a copy of details published under this paragraph.

Paragraph 8**: Investigation of complaints**

762. This paragraph is concerned with the operation of the complaints scheme. The Authority may decide not to investigate a complaint in accordance with the scheme where it considers that the complaint would more appropriately be dealt with in another way, for example by reference to the Tribunal.

763. Under sub-paragraph (2), the Authority is required to ensure that the independent investigator has the means at his disposal to conduct a full investigation of complaints referred to him, and the investigator can publish his report if he considers that the matter ought to be brought to the attention of the public. The investigator may, under sub-paragraphs (3) and (4), choose to investigate complaints in accordance with the scheme which the Authority has, itself, declined to pursue. If a report is critical of the Authority, sub-paragraphs (6) and (7) require the Authority to inform the investigator and the complainant of the steps it proposes to take in response, and the investigator may require the Authority to publish all or part of that response. Sub-paragraph (5) requires that the scheme allows the investigator to recommend that the Authority makes a compensatory payment to the complainant or remedies the matter, or both. Sub-paragraph (9) prevents an officer or employee of the Authority from investigating a complaint on the investigator's behalf.

Paragraph 9**: Records**

764. The Authority must have satisfactory arrangements for recording its decisions and for the safe-keeping of those records which it considers should be preserved.

Paragraph 10**: Annual report**

765. This requires the Authority to report at least once a year to the Treasury on the discharge of its functions and, in particular, the extent to which the statutory objectives have been met and its regulatory principles under section 2(3) have been taken into account and such other matters as directed by the Treasury. It also requires the Treasury to lay the report before Parliament.

766. Sub-paragraph (2) requires that the report of the Authority must be accompanied by a report by the non-executive members of the governing body and allows the Treasury to direct that any other reports or information, including material prepared by third parties such as an auditor's report, also accompany it.

767. Sub-paragraphs (4) to (6) allow the Treasury to direct the Authority to comply with provisions of the Companies Act which would otherwise not apply to it dealing with accounts and their audit. The direction may modify provisions under that Act in their application to the Authority. This is to ensure that the Authority is required to prepare audited accounts which are open to inspection irrespective of any exemptions which are made under that Act which would otherwise apply to the Authority.

Paragraph 11**: Annual public meeting**

768. The Authority must hold an annual public meeting to consider the most recent report of the Authority, within three months of its publication. The meeting should allow for a general discussion of the contents of the annual report and give those attending an opportunity to put questions to the Authority on the discharge of its functions. Paragraph 12 requires the Authority to publish a report of the proceedings of the meeting.

Part II**: Status**

Paragraphs 14 and 15**: Exemption from requirement of "limited" in Authority's name**

769. The Authority is a company limited by guarantee. These paragraphs exempt the Authority from having to include "limited" in its name, as would normally be required under the Companies Act. They also provide for the Secretary of State to remove that exemption if it is inappropriate for it to continue.

Part III**: Fees**

Paragraph 16**: Penalties**

770. This paragraph provides that in determining its policy with regard to the level of penalties to impose under powers in the Act, the Authority may take no account of its expenses or anticipated expenses. It clarifies that there is to be no link or incentive to fund the Authority by levying penalties on the regulated community.

771. Sub-paragraph (2) requires the Authority to operate a scheme to ensure that penalties paid to the Authority are to be applied for the benefit of authorised persons. The Authority is required to consult on these arrangements.

Paragraph 17**: Fees**

772. This provides for a rule-making power for the Authority to raise fees for what it does in the discharge of its functions under the Act. It may use the fees to meet its expenses, to repay borrowing incurred in preparing for the assumption of functions under the Act and by virtue of the Bank of England Act 1998 and to maintain adequate reserves.

773. The Authority may not take into account any penalties which it has received, or expects to receive, in setting the fees under the Act.

Paragraph 18**: Services for which fees may not be charged**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 180 of 2232
Page ID #:2238
Financial Services and Markets Act 2000 c. 8

774. Fees may not be charged when a person gives notice of their intention to exercise passporting rights under Schedule 3 or to persons approved under the employed persons regime in Part V.

Part IV**: Miscellaneous**

Paragraph 19**: Exemption from liability in damages**

775. This paragraph provides immunity for the Authority and its staff from actions for damages except where they act in bad faith or where damages are sought under the Human Rights Act 1998. Similar immunity is granted to the independent investigator appointed under paragraph 7.

Paragraph 20**: Disqualification for membership of House of Commons**

776. Serving members of the Authority's board are disqualified from membership of the House of Commons. Paragraph 19 makes similar provision in respect of the Northern Ireland Assembly. Provision in respect of the Scottish Parliament and the Welsh Assembly are made respectively in the Scotland Act 1998 and the Government of Wales Act 1998.

SCHEDULE 2**: REGULATED ACTIVITIES**

777. This Schedule does not define what activities are regulated under the Act. The regulated activities will be those activities which are prescribed using the power conferred by section 22. The Schedule sets out a list of "activities" and "investments" which, together, indicate the broad scope of activities which are potentially regulated under the Act. The scope of the Act is not strictly limited by the Schedule, but rather by the overall object and purpose of the Act. However, the general nature of the activities set out in the Schedule serves to inform and therefore indirectly limit the extent of the Treasury's power to bring further activities within the scope of the Act.

778. It is within this overall object and purpose that the power under section 22 to prescribe the regulated activities operates. Orders made under that section will be an exhaustive statement of the regulated activities.

779. The Schedule is in three parts. The first Part describes certain activities which when carried on in relation to "investments" may be regulated. The second describes the "investments". The third makes further provisions as to the scope of the order-making power under section 22.

780. The activities, which in each case include offering or agreeing to carry on the activity as well as actually carrying it out, are:

  • dealing in investments, which includes buying, selling, subscribing for or underwriting investments. It covers a person acting as either principal or agent. In relation to insurance, dealing also includes carrying out a contract of insurance;

© 2025 Thomson Reuters.

• arranging deals in investments on behalf of others, or making arrangements which enable other persons to deal;

• accepting deposits;

• safeguarding or administering assets for another person, or arranging for their assets to be safeguarded or administered;

• managing assets on behalf of another person, where those assets are or may include investments;

• giving advice on the buying, selling, subscribing for or underwriting of an investment or about the exercise of any right conferred by an investment to buy or sell, subscribe or otherwise convert an investment (examples of conversions on which advice might be given would include a corporate bond which, in certain circumstances, could be converted into, or redeemed in return for, a share of the equity in the company concerned);

• establishing, operating or winding up a collective investment scheme, including acting as trustee, or depositary or sole director of certain types of scheme;

• sending, or causing to be sent, instructions by means of a computer based system as to the transfer of investments. This element would cover computer-based clearing systems such as that operated by CREST.

781. Part II of the Schedule is an indicative list of the investments relevant to the question whether an activity could be brought within regulation under section 22. These are:

• stocks and shares in companies incorporated in the United Kingdom or elsewhere, or in unincorporated bodies constituted under the law of any territory;

• instruments creating or acknowledging indebtedness, such as loan stock, certificates of deposit, debentures and bonds, including debt issued by Governments, local authorities or international organizations of which the United Kingdom or any other EU member State is a member, such as the United Nations or the OECD;

• instruments, such as warrants, conferring a right to subscribe in other types of investment (including investments which are not yet in existence or which, like ordinary shares in a company, are not individually identifiable);

• instruments which confer contractual or property rights to underlying investments and which can be traded or transferred without reference to the party holding the underlying investments. Explicit inclusion of this element reflects the established practice whereby a public issue of securities might be made by issuing the securities themselves to a third party, which would issue certificates (which may confer only a proportionate property right to a security) to the subscribing public, which are then tradable as if they were the underlying securities themselves;

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 182 of 2232
Page ID #:2240
Financial Services and Markets Act 2000 c. 8

• units in, or securities issued by, collective investment schemes and open-ended investment companies;

• options to buy or sell property;

• futures, which are contractual rights to buy or sell a commodity or property at a future date and at a price agreed at the time that the contract is made (though the price might still be contingent on other factors). This includes both bilateral "forward" contracts as well as standardized futures contracts traded on a futures exchange such as London International Financial Futures Exchange ("LIFFE");

• contracts for differences and other contracts whose value depends on fluctuations in the value of some factor such as property or index, for example interest rate swaps;

• contracts of insurance;

• membership and potential membership of a Lloyd's syndicate and the underwriting capacity of such a syndicate;

• deposits, that is contracts under which money is paid other than in return for goods or services and on the basis that it will be repaid, with or without interest, on demand or at some specified times or circumstances;

• loans secured on land, such as mortgages; and

• any other right or interest in any other investment.

782. Part III makes provision as to the scope of the order-making power under section 22. The first order to be made under that section must be subject to an affirmative resolution procedure — that is, it must be laid before Parliament after being made, and it will cease to have effect if it is not approved by a resolution of each House within 28 days of being made. The same procedure will apply where an order under section 22 has the effect of extending the scope of activities to be regulated under the Act.

SCHEDULE 3**: EEA PASSPORT RIGHTS**

783. This Schedule gives effect in UK law to the single markets in banking, investment services and insurance as provided for by the relevant directives: the 2nd Banking Co-ordination Directive, the Investment Services Directive and the Life and Non-Life Directives.

784. Under the directives, credit institutions (a term embracing both banks and building societies), investment firms and insurance companies (which includes friendly societies) with head offices in any member State of EEA (that is the 15 States of the EU plus Norway, Iceland and Liechtenstein) have rights to carry on certain activities in other member States by virtue of their home State authorisation. These rights are often referred to as their *"passport"* and cover a range of financial services (some of which may only be conducted by firms which are authorised under these categories), which include deposit-taking, effecting and carrying out life or general insurance.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 183 of 2232
Page ID #:2241
Financial Services and Markets Act 2000 c. 8

785. Under the 2nd Banking Co-ordination Directive, subsidiaries of credit institutions which meet certain criteria set out in article 18(2) of that directive may also have passport rights, and are therefore included in the definitions of *"EEA firms"* (persons from other member States who qualify for the passport into the United Kingdom) and *"UK firms"* (persons established in the United Kingdom who exercise their passport rights in other member States) in this Schedule.

786. The authorities in the member States, other than the home State, where these passporters are carrying on business under their passports (referred to as the host State authorities) may only impose limited regulations on the conduct of business under the passport, in accordance with the established principle of the "general good". This requires those rules to be proportionate, non-discriminatory and non-duplicative of home State rules with equivalent effect. Conduct of business rules generally come within the host State remit. The home State retains full responsibility for authorising the passporting firms and conducting their overall prudential supervision (that is, supervising their financial soundness and ensuring that they and their controllers are fit and proper to conduct such business).

787. The passport may be exercised in order to establish a permanent place of business, referred to in the directives as a *"branch"* irrespective of the number of sites involved, or in order to provide cross-border services without a permanent place of business. Indeed the passport may be exercised in order to provide services, perhaps different services, by these two means in parallel.

788. The business activities covered by the passport do not necessarily correspond exactly to the activities which are regulated under the law of any member State, although certain activities, such as deposit-taking, insurance business or the core investment services defined under the Investment Services Directive, must be regulated, and will all be regulated activities under the order made under section 22. There are therefore activities for which firms may have rights to conduct in other member States by virtue of the passport, but which are not necessarily central to the definition of those firms which qualify for the passport. There may equally be activities which are covered by the passport, but which are not regulated activities in every member State.

789. An example of an activity not regulated in every member State is lending. Lending, in conjunction with deposit-taking, is a defining characteristic of what is a credit institution and therefore of those who may qualify for passport rights under the 2nd Banking Co-ordination Directive. However, the directives do not require that lending should be regulated, though they do require the regulation of deposit-taking. The passport under that directive therefore not only covers lending, but qualification for that passport depends on it being part of the business of the firm. However, lending is not covered by the other directives (indeed, insurance companies are prohibited from carrying on the business of lending unless it is ancillary to their insurance business) and it does not need to be regulated by member States. It is not currently a regulated activity in the United Kingdom, except to the extent that it falls within the scope of the CCA 1974.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 184 of 2232
Page ID #:2242
Financial Services and Markets Act 2000 c. 8

790. This Schedule, in conjunction with section 31, therefore defines the firms from other EEA member States, which may qualify for authorisation via this route, and the procedures which, in accordance with the various directives, must be followed (see paragraphs 12 to 14 in Part II). An EEA firm which fails to follow the correct notification procedure does not, however, commit an offence and their contracts are not rendered unenforceable in consequence (see paragraph 16).

791. Part III of the Schedule gives effect to the outward passport entitlements of UK credit institutions, investment firms and insurance companies. For the reasons referred to above, those qualifying for the passport form a narrower class than all persons who have their head office in the United Kingdom and who are authorised by virtue of having a Part IV permission. For example, not all banks and building societies are necessarily credit institutions, though the vast majority are. Equally the definition of an investment firm for the purposes of the Investment Services Directive is restricted to a firm which is authorised to carry on the business of providing for third parties the core services defined under that directive.

792. Paragraphs 19 and 20 set out the procedure and conditions on which the Authority may grant the passport to those UK firms who qualify. A UK firm which fails to follow the required notification procedures before establishing a branch or providing services in another member State commits an offence under paragraph 21.

793. The Schedule also gives the Treasury powers to make regulations governing the continuing regulation of both EEA firms and UK firms.

794. Paragraph 23 enables the Authority to intervene in respect of a UK firm's consumer credit business in another member State. Paragraph 24 similarly enables the Authority to intervene in the business carried on in other member States of subsidiaries qualifying for the outward passport under Article 18(2) of the 2nd Banking Co-ordination Directive. Such subsidiaries need not be authorised persons in their own right.

SCHEDULE 4: **TREATY RIGHTS**

795. This Schedule gives effect in UK law to the rights of establishment and to provide services of persons established in the other EEA States. These relate to rights which go beyond those which are covered by the single market directives in banking, investment services and insurance (see Schedule 3).

796. These rights allow persons who are authorised under the law of one member State to carry on an activity in the other member States so long as the relevant law of the home State provides equivalent protection to that of the host State and meets any EU minimum requirements applicable in that area of law. These rights are given precise effect for many financial services firms through the single market directives, and the member State laws giving national effect to them. However, as explained in relation to Schedule 3, the directives do not cover the full range of financial services or financial service providers. It is necessary, therefore, to provide an equivalent mechanism to

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 185 of 2232
Page ID #:2243
Financial Services and Markets Act 2000 c. 8

permit persons from other EU member States to exercise their Treaty rights in the absence of formal directive passporting arrangements. The provisions in this Schedule, in conjunction with section 31, provide for that mechanism.

797. The Schedule does not seek to define the extent of Treaty rights, which are in any event the subject of extensive and developing case law in the EU, but sets the conditions that must be met for authorisation by this route in terms of the general principles described above. It requires home State confirmation of a firm's home State authorisation and provides for the Treasury to take the decision as to whether the particular laws of a particular member State provide the equivalent protection required.

798. The firm is also required to give notice of their intention to exercise their Treaty rights and to provide such information as the Authority may require. Failure to give proper notice is a criminal offence, unless all reasonable precautions have been taken to avoid the commission of the offence. It is also an offence knowingly or recklessly to provide false or misleading information.

SCHEDULE 5**: PERSONS CONCERNED IN COLLECTIVE INVESTMENT SCHEMES**

799. This schedule effectively deals with authorisation of collective investment schemes in two circumstances:

- first, it affords authorisation to incoming passporters under the relevant directives, and

- second, it deals with authorisation for certain types of oeic. The Treasury may prescribe additional conditions for qualification for automatic authorisation. A person who is authorised under this Schedule has permission to carry on regulated activities in connection with the scheme of which he is the operator or depositary.

SCHEDULE 6**: THRESHOLD CONDITIONS**

Part I: Part IV**Permission**

800. This Part sets out the minimum conditions against which an applicant for permission under section 40 must be measured. Failure to meet one of the conditions is sufficient grounds for refusal to grant permission or for granting permission for a narrower range or definition of regulated activities than sought by the applicant. However, the fact that an applicant satisfies all the applicable conditions in this Schedule does not confer any automatic right to permission. The Authority retains some discretion to refuse an application even where all these conditions are satisfied.

801. The conditions must also be met on an on-going basis by authorised persons and failure to meet one of the conditions is sufficient grounds for the exercise by the Authority of its power to vary an authorised person's permission under section 45, and through that power, its power to withdraw an authorised person's authorisation under section 33. However, the Authority may, from

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 186 of 2232
Page ID #:2244
Financial Services and Markets Act 2000 c. 8

time to time, temporarily subordinate the need to ensure that the threshold conditions are met on a continuous basis in line with its statutory objective of protecting consumers.

Paragraph 1**: Legal Status**

802. This paragraph sets out certain conditions for legal form. Section 40 allows for authorised persons to be natural persons as well as companies, partnerships or other unincorporated associations. However, not all these forms are acceptable under EC law for authorised persons carrying on certain types of business.

803. Thus the effecting and carrying out of contracts of insurance is limited to bodies corporate, registered friendly societies or members of Lloyd's insurance market, and only bodies corporate or partnerships may accept deposits

*End > Explanatory Note > para. 15*

Contains public sector information licensed under the Open Government Licence v3.0.

© 2025 Thomson Reuters.

# para. 16

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

Paragraph 2**: Location of offices**

804. This paragraph implements the requirement under the Post-BCCI Directive (Council Directive 95/26/EEC of 29 June 1995) that persons covered by the single market directive should have their head office in the country in which they have their registered office. It requires authorised persons who are bodies corporate constituted under the law of any part of the United Kingdom, to have their head office (that is, the main centre from which the firm is run) in the United Kingdom. If they have a registered office, as most bodies corporate do, it must also be in the United Kingdom. If the person does not have a registered office (for instance if he is an individual or an unincorporated association) but his head office is in the United Kingdom, he must carry on authorisable business in the United Kingdom. This requirement is aimed at ensuring that authorised persons organise their business in a way that can be effectively supervised. A problem in the case of the failure of BCCI was that it was incorporated in one State, Luxembourg, but had its head office in another, the United Kingdom.

Paragraph 3**: Close links**

805. This paragraph requires the Authority to be satisfied that it can supervise an applicant or authorised person effectively, taking into account the structure of the group to which they belong, or the other firms to which they have relevant links, and the laws, regulations or administrative provisions of any non-EEA country to which they may be subject.

806. *"Close links"* is defined in sub-paragraph (2) and this sets out the structures that are relevant for these purposes. These cover the authorised person (or applicant), any parent undertaking or subsidiary undertaking of theirs and certain undertakings connected to such parent or subsidiary. In addition, the holding or control of 20 per cent of voting power by the authorised person (or applicant) in another body, or such a holding or control of voting power in the authorised person (or applicant), will constitute a close link for these purposes. These structures cover natural persons, and other forms of associations; and in such cases the relevant links are to be understood as referring to degrees of control that are equivalent.

Paragraph 4**: Adequate resources**

© 2025 Thomson Reuters.

807. This paragraph requires the Authority to be satisfied that the applicant has adequate resources, which has a wide meaning. The term adequate is intended to mean sufficient in terms of quantity, quality and availability, and resources is intended to include all material or financial resources, for instance capital, provisions against liabilities, holdings of or access to cash and other liquid assets. A person must also have effective means by which to manage risks. The Authority may take account of a person's membership of a group in deciding whether it is satisfied that this condition is met.

Paragraph 5**: Suitability**

808. This paragraph requires the Authority to be satisfied that the person is "fit and proper" to be permitted to carry on the relevant activities, taking account of connections with other persons, the range and nature of regulated activities he carries on (or proposes to carry on), and the overall need to be satisfied that his affairs are and will be soundly and prudently managed.

Part II**: Authorisation**

809. This Part provides that the threshold conditions set out in paragraphs 1 to 5 are relevant to any additional Part IV permissions held, or applied for, by EEA or Treaty firms. However, the conditions are not relevant to an EEA or Treaty firm's qualification for authorisation under Schedules 3 or 4.

Part III**: Additional conditions**

810. This Part enables the Authority to specify additional conditions for an applicant for authorisation with a head office outside the EEA and who seeks to carry on regulated activities in relation to insurance business. Paragraph 9 confers a power on the Treasury to amend the threshold conditions by order.

SCHEDULE 7**: THE AUTHORITY AS COMPETENT AUTHORITY FOR** PART VI

Paragraph 1**: General**

811. This paragraph applies the provisions of the rest of the Act to the Authority, with certain modifications, when it is exercising the competent authority function. The remaining provisions of the Schedule set out what these modifications are.

Paragraph 2**: The Authority's general functions**

812. This paragraph disapplies the Authority's general duties under section 2 by ensuring that the definition of its general functions in section 2(4) does not include functions of the competent authority under Part VI. (Section 2(4)(b) is not mentioned since the competent authority does not

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 189 of 2232
Page ID #:2247
Financial Services and Markets Act 2000 c. 8

have a statutory function of making codes.) However the competent authority is placed under a separate obligation, by section 73, to follow analogous principles.

Paragraph 3**: Duty to consult**

813. This paragraph disapplies section 8 which places a duty on the Authority to make arrangements for consulting practitioners and consumers. The competent authority already has a listing committee which it consults and which the Authority has said will continue in operation following the transfer of functions from the Stock Exchange to the Authority.

Paragraph 4**: Rules**

814. Under this paragraph, section 155, which relates to consultation on rules, is applied with appropriate modifications to the listing rules made by the competent authority.

Paragraph 5**: Statements of policy**

815. This paragraph deals with statements of policy made by the competent authority under section 93. It has the effect of requiring that when the Authority publishes such statements, it must not delegate this function, but must act through its governing body, as provided for in paragraph 5 of Schedule 1.

Paragraphs 6 and 7**: Penalties and fees**

816. This paragraph disapplies provisions of Schedule 1 which would otherwise apply to the imposition of penalties by the competent authority, because these matters are provided for separately in section 100. Similar provision is also made, in paragraph 17 of Schedule 1, in relation to the charging of fees for which separate provision for the competent authority is made in section 99.

Paragraph 8**: Exemption from liability in damages**

817. The competent authority has exemption from liability in damages under section 102 and accordingly this paragraph modifies paragraph 19 of Schedule 1 which deals with similar issues for the Authority in its general regulatory role.

SCHEDULE 8**: TRANSFER OF FUNCTIONS UNDER** PART VI

818. The provisions of this Schedule allow the Treasury to transfer some or all of the competent authority functions to another body if it is in the public interest. Three specific grounds covering the performance of the functions and competition issues are set out in paragraph 1(2). These are particular situations in which the Treasury consider that they might exercise the power to transfer functions. The purpose of setting out these particular examples of public interest grounds in the

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 190 of 2232
Page ID #:2248
Financial Services and Markets Act 2000 c. 8

legislation is to provide more certainty in this area. Any order the Treasury makes under this Schedule would be subject to debate in both Houses of Parliament. This is provided for in section 429(1)(b).

## SCHEDULE 9: NON-LISTING PROSPECTUSES

819. This Schedule applies the provisions of Part VI so that they apply in relation to a non-listing prospectus as they apply to listing particulars. It makes a number of changes to those provisions to deal with the fact that securities which are the subject of non-listing prospectuses are not admitted to listing.

## SCHEDULE 10: COMPENSATION: EXEMPTIONS

820. This Schedule sets exemptions from the liability to pay compensation for false or misleading particulars in certain circumstances under section 90. Paragraph 5 provides that a person is not liable to pay compensation for loss resulting from a statement in the listing particulars which reproduces a statement made, for example, in a public official document. Paragraph 6 provides that there is also no liability if the person against whom action is taken satisfies the court that the person who acquired securities did so in the knowledge that a statement in the listing particulars was false or misleading. In such a case the person suffering the loss would not have been misled.

## SCHEDULE 11: OFFERS OF SECURITIES

821. In accordance with EC law requirements, section 84 requires a prospectus to be approved and published where any person offers securities to the public in the United Kingdom for the first time and when an application for listing has been made. Section 103 provides that whether securities are offered to the public in the United Kingdom is to be determined in accordance with the requirements of this Schedule. This Schedule therefore defines an offer to the public, subject to certain exemptions which are set out in accordance with derogations in EC law.

## SCHEDULE 12: TRANSFER SCHEMES: CERTIFICATES

822. The Schedule sets out the details of the certificates which the court must be satisfied, under section 111(2)(a), have been obtained.

823. Part I deals with insurance business transfers. The certificate requirements are all necessary to implement the insurance directives. For all insurance business transfers, a solvency margin certificate is required under paragraph 2. This certifies that the transferee has the necessary margin of solvency (defined in sub-paragraph 2(4)). It must be issued by the home State regulator in the case of an EEA firm under Schedule 3, the Swiss supervisory authorities in the case of a Swiss insurance company, and the Authority in all other cases.

© 2025 Thomson Reuters.

824. If the transfer concerns a UK authorised person authorised under the insurance directives and the business to be transferred is conducted from a branch in another member State, a certificate is needed under paragraph 3 to the effect that the host State regulator has been duly notified and has responded (or the 3 month period allowed for response under the directives has elapsed).

825. If the transfer is of business which relates to the effecting and carrying out of long-term insurance (other than reinsurance policies) involving policyholders from other member States, and it involves a UK authorised person authorised under the First Life Directive, then a certificate is needed under paragraph 4 to the effect that the relevant authorities for those other member States have been duly notified and have consented (or the 3 month period allowed for response under the directives has elapsed).

826. If the transfer concerns a UK authorised person authorised under the First Non-Life Directive, and the business to be transferred is business which relates to the effecting and carrying out of contracts of general insurance which includes policies (other than reinsurance policies) concerning risks arising in other member States, a certificate is needed under paragraph 5 to the effect that the relevant authorities for those other member States have been duly notified and have consented (or the 3 month period allowed for response under the directives has elapsed).

827. Part II deals with banking business transfers. All such transfers require a financial resources certificate under paragraph 8. This certifies that the transferee has or will have adequate financial resources. It must be issued by the "relevant authority". In a case where the transferee is a person authorised under Part IV or Schedule 4, this is the Authority. Where the transferee is an EEA firm under Schedule 3 it is the home State regulator. Where the transferee is neither, it is the relevant authority in the place in which the transferee has its head office.

828. If either the transferor or transferee is an EEA firm under Schedule 3, a certificate is also required under paragraph 9 to the effect that the home State regulator has been duly notified and has responded (or the 3 month period allowed for response under that paragraph has elapsed).

SCHEDULE 13: **THE FINANCIAL SERVICES AND MARKETS TRIBUNAL**

829. This Schedule makes provision further to that contained in Part IX as to the constitution and operation of the Tribunal.

Paragraph 2: **President**

830. This paragraph requires the Lord Chancellor to select one of the members of the panel of chairmen, with qualifications as specified in paragraph 2(5), to be the President of the Tribunal. Apart from his general responsibility for the Tribunal's functions under paragraph 2, it is the President's responsibility under paragraph 7 to establish standing arrangements for the selection of panel members to sit on the Tribunal to hear particular cases. The standing arrangements must provide for the selection of at least one member of the panel of chairmen in each reference to the

Tribunal, but may in addition provide for the selection other members of either panel. The Tribunal is empowered to appoint experts to assist it where necessary under paragraph 7(4). Paragraph 2 gives the Lord Chancellor the power to appoint a Deputy President, in addition to a President. If appointed, the Deputy President is to have such functions in relation to the Tribunal as the President may assign to him, and he is able to exercise any function of the President where the President is absent or otherwise unable to act.

Paragraph 3**: Panels**

831. This paragraph requires the Lord Chancellor to appoint the members of two panels, defined in paragraph 1 as the *"panel of chairmen"* and the *"lay panel"* , from which members of the Tribunal for a particular case will be drawn. Members of the former must have appropriate legal qualifications as specified in paragraph 3(2), at least one being suitably qualified in Scotland.

Paragraph 4**: Terms of office**

832. This paragraph provides that the terms of office of the panel members (including the President and any Deputy President) are to be determined by the terms on which they are appointed by the Lord Chancellor. The Lord Chancellor is also to have the power to remove them on grounds of incapacity or misbehaviour. The President and panel members may resign at any time, and they may be reappointed at the end of their terms. Paragraph 5 gives the Lord Chancellor similar powers to determine the remuneration of such persons and gives the Lord Chancellor the power to retain and pay administrative staff to support the Tribunal and to meet other expenses.

Paragraphs 8 to 10**: Sittings and procedure**

833. This paragraph indicates some of the matters concerning the conduct of cases referred which may be determined by rules made by the Lord Chancellor under section 132. As section 132(4) provides, this list does not limit the Lord Chancellor's powers. Under paragraph 8, the Tribunal must sit at such times and in such places as the Lord Chancellor may direct. Paragraph 10 enables the President of the Tribunal to give directions as to the practices and procedures to be followed by the Tribunal.

Paragraph 11**: Evidence**

834. This paragraph sets out the powers of the Tribunal to require people to attend and give evidence, or produce documents, and makes it a criminal offence not to comply without reasonable excuse. The statutory maximum fine for which a person can be liable on summary conviction is currently £5,000.

Paragraph 12**: Decisions of Tribunal**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 193 of 2232
Page ID #:2251
Financial Services and Markets Act 2000 c. 8

835. Under this paragraph the Tribunal may reach a decision unanimously or by majority, but must indicate which was the case in the document which it is obliged to issue setting out its decision. This document must include a statement of its reasons, and a copy must be sent to each party to the reference.

Paragraph 13**: Costs**

836. The Tribunal will have discretion under paragraph 13 to award costs against any party to its proceedings where the Tribunal considered that the party concerned had acted vexatiously, frivolously or unreasonably. It will also have specific power to award costs against the Authority where it considers the Authority's decision was unreasonable.

SCHEDULE 14**: ROLE OF THE COMPETITION COMMISSION**

837. This schedule is concerned with the role of the Commission. It is introduced by section 162.

Paragraph 1**: Provision of information by Treasury**

838. This paragraph provides that the Treasury may give information and assistance to the Commission on matters falling within the investigation. For example, the Treasury may wish to tell the Commission about its view of the UK's international obligations in a particular area, or gives its view of the systemic risk implications of changing regulating provisions or practices.

Paragraph 2**: Consideration of matters arising on a report**

839. This paragraph provides that the Commission has to have regard to any cost-benefit analysis produced by the Authority on the regulating provisions or practices in question and to any representations made by other persons with a substantial interest.

Paragraph 3**: Applied provisions**

840. This paragraph applies provisions of the Fair Trading Act 1973 and other competition legislation which give the Commission powers to investigate and which make it an offence to provide false or misleading information to the Commission.

Paragraph 4**: Publication of reports**

841. This paragraph concerns the publication of reports by the Commission. When it publishes a report the Commission, like the DGFT under section 160, must so far as is practicable exclude any matter which relates to the affairs of a person which might seriously prejudice that person's interests. Sub-paragraph (4) provides that such information does not need to be excluded from the version of the report which is required to be sent to the Director, the Treasury and the Authority under section 162(10).

© 2025 Thomson Reuters.

SCHEDULE 15**: INFORMATION AND INVESTIGATIONS: CONNECTED PERSONS**

842. Under section 165(7) the Authority may require information or documents from a person who is connected with an authorised person, including, in addition to those listed in the section itself, the persons related to an authorised person in any of the ways set out in this Schedule. These are:

- employees and agents of the authorised person;

- officers and managers if the authorised person is a body corporate, unincorporated association, building society or friendly society;

- officers, managers and agents of the authorised person's parent undertakings, if the authorised person is a body corporate; and

- managers and members, if the authorised person is a partnership.

843. In a similar way, section 171(4) enables investigators appointed to undertake investigations under section 167 to require persons connected to the person under investigation to attend and answer questions or provide information or documents. Again, this includes persons related to the person under investigation in any of the ways set out above, plus persons who, at the time the investigation is concerned with, were partners, managers, employees, agents, appointed representatives, bankers, solicitors, accountants or actuaries of:

- the person being investigated;

- that person's parent undertaking or subsidiary;

- a fellow parent of a subsidiary of the person under investigation; or

- a fellow subsidiary of a parent undertaking of that person.

844. The terms *"subsidiary undertaking"* and *"parent undertaking"* are defined in section 420.

SCHEDULE 16**: PROHIBITIONS AND RESTRICTIONS IMPOSED BY THE DIRECTOR GENERAL OF FAIR TRADING**

845. This Schedule sets out the procedures the DGFT must follow when he exercises his powers under sections 203 and 204 to impose a prohibition or a restriction, or vary an existing restriction without the consent of the firm, on the conduct of consumer credit business by an EEA firm. This procedure follows that which applies to the exercise of comparable powers in relation to persons licensed under the CCA 1974. If the EEA firm is carrying on consumer credit business here without a licence on the basis of its passport under the single market directives then the DGFT will need to rely on the powers in sections 203 and 204 to control that business when necessary.

© 2025 Thomson Reuters.

846. The first step is for the DGFT to inform the firm that he proposes to impose the prohibition or restriction, or vary the existing restriction, and give the reasons for this. He has to allow the firm at least 21 days to make representations, which may be made either in writing or orally.

847. The second step is for the DGFT, having taken account of any representations received, to notify the firm of his decision and send a copy of the notification to the Authority and the firm's home State regulator. If the DGFT decides to proceed with a prohibition, a new restriction or variation of an existing one, he may also direct that the firm carries into effect credit agreements made before such action came into force.

848. The firm may appeal against the DGFT's decision to the Secretary of State, under section 41 of the CCA 1974. This gives the Secretary of State discretion to dispose of such an appeal as he thinks just (including making directions about payments of costs).

SCHEDULE 17**: THE OMBUDSMAN SCHEME**

849. This Schedule contains further details concerning the constitution and powers of the Financial Services Ombudsman Scheme.

Paragraph 3**: Constitution**

850. This sets requirements as to the scheme operator's constitution. These include that the chairman of the scheme operator must be appointed by the Authority with the approval of the Treasury. The scheme operator must be independent of the Authority.

Paragraph 6**: Status**

851. This confirms that the scheme operator, its staff and the ombudsmen do not exercise their functions on behalf of the Crown.

Paragraph 7**: Annual Report**

852. The scheme operator has to publish an annual report of its activities and also a report from the Chief Ombudsman.

Paragraph 8**: Guidance**

853. The scheme operator can disseminate appropriate information free of charge. This could include guidance on the scheme's procedures or advice on how to deal with disputes before coming to the scheme.

Paragraph 9**: Budget**

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 196 of 2232
Page ID #:2254
Financial Services and Markets Act 2000 c. 8

854. In order for there to be external scrutiny of the scheme's finances, the scheme operator's budget has to be approved by the Authority.

Paragraph 10**: Exemption from liability in damages**

855. The efficient operation of the scheme could be significantly disrupted if its actions were subject to frequent legal challenge. This paragraph provides immunity for the scheme operator and its staff from actions for damages, similar to the immunity enjoyed by the Authority.

Paragraph 11**: Privilege**

856. This ensures that evidence produced during proceedings under the compulsory jurisdiction is protected against actions for libel or slander.

Paragraph 13**: Authority's procedural rules**

857. This requires the Authority to make procedural rules for the operation of the compulsory jurisdiction of the scheme. In respect of rules governing how authorised persons deal with complaints, it extends the Authority's rule-making powers under Part X of the Act.

Paragraph 14**: The scheme operator's rules**

858. This requires the scheme operator to make other procedural rules for the compulsory jurisdiction. It provides, in particular, for rules to be made which allow an ombudsman to dismiss a complaint without consideration of its merits, for example where he deems the complaint to be frivolous or vexatious, and for the early stages of the handling of a complaint, for example a conciliation stage, to be handled by a member of the scheme operator's staff other than an ombudsman.

Paragraph 18**: Terms of reference to the scheme**

859. This provides that the scheme operator has power to set terms of reference for its voluntary jurisdiction dealing with matters for which rules may be made under the compulsory jurisdiction. The terms of reference must be approved by the Authority.

Paragraph 19**: Delegation by and to other schemes**

860. Although the scheme is intended to cover most complaints relating to the financial services industry, there is likely to be some continued overlap with other arrangements, for example in the areas of pensions and consumer credit. The scheme would be able to agree with other schemes which body should consider complaints within the voluntary jurisdiction. The arrangements must be approved by the Authority.

© 2025 Thomson Reuters.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 197 of 2232
Page ID #:2255
Financial Services and Markets Act 2000 c. 8

## SCHEDULE 20: **TRANSITIONAL PROVISIONS AND SAVINGS**

861. This schedule affects the provisions of the FS Act 1986 as they relate to recognition, supervision and de-recognition of SROs under that Act. The Schedule allows the Treasury by order to designate a date from which the amendments have effect for particular SROs which are recognised under the FS Act 1986.

862. The independence of the Authority and the SROs from each other is an intrinsic feature of the system established by the FS Act 1986. Under the new regime, however, the regulatory functions performed by the SROs under the previous (FS Act 1986) regime pass to the Authority and it is therefore necessary for the Authority to be able to take appropriate steps in preparation for that transition. Were there any question whether transitional arrangements, by materially affecting the independence of the SROs, called into doubt the validity of their recognition, that could in turn cast doubt on the validity of the authorisation of firms authorised by virtue of their membership of an SRO. This Schedule makes clear that these questions do not arise and removes any potential for doubt as to whether the SROs could continue to be recognised when they cease to be truly independent of their regulator.

## COMMENCEMENT

863. Certain provisions of the Act commence at Royal Assent. They are set out in section 431(1). Other provisions will be brought into force by commencement order in due course.

## HANSARD REFERENCES

864. The following table sets out the dates and Hansard references for each stage of this Act's passage through Parliament.

| *Stage* | *Date* | *Hansard reference* |
| --- | --- | --- |
| **House of Commons** | | |
| Introduction | 17 June 1999 | |
| Second reading | 28 June 1999 | Vol 334 Col2 34–111 |
| Committee | 6 July to 9 December 1999 | Standing Committee A |
| Suspension motion | 25 October 1999 | Vol 336 Col 706–737 |
| Reintroduction | 18 November 1999 | |
| Report and third reading | 27 January and 1 February 2000 | Vol 343 cols 594–677 and 924–1016 |

*End > Explanatory Note > para. 16*

Contains public sector information licensed under the Open Government Licence v3.0.

# para. 17

**Version 1 of 1**

Date not available - Present

**Subjects**
Financial regulation

| House of Lords | | |
|---|---|---|
| Introduction | 10 February 2000 | |
| Second reading | 21 February 2000 | Vol 610 Col 13–94 |
| Committee | 16, 20, 21, 27 and 30 March 2000 | Vol 610 Cols 1684–1751 and 1769 to 1804. Vol 611 Cols 9–81, 88–134, 146–233, 249–264, 503–512, 526–576, 593–632, 912–981 and 997–1059 |
| Report | 13 and 18 April and 9 May 2000 | Vol 612 291–354, 561–639, 656–696, 1373–1387, 1396–1443 and 1457–1562 |
| Third reading | 18 May 2000 | Vol 613 Col 363–448 |
| Commons' consideration of Lords' amendments | 5 June 2000 | Vol 351 Col 38–133 |
| Lords' consideration of Commons' amendments | 12 June 2000 | Vol 613 Cols 1373–1393 |
| **Royal assent** | 14 June 2000 | |

*End > Explanatory Note > para. 17*

Contains public sector information licensed under the Open Government Licence v3.0.



Cookies on Legislation.gov.uk

The cookies on legislation.gov.uk do two things: they remember any settings you've chosen so you don't have to choose them on every page, and they help us
people browse our website, so we can make improvements and fix problems. We need your consent to use some of these cookies.

Yes, these cookies are OK          Find out more or set individual cookie preferences          No, I want to reject all cookies

legislation.gov.uk

Home | Explore our collections | Research tools | Help and guidance | What's new | About us

Title:                                    Year:        Number:        Type:

All UK Legislation (excluding originating from the EU)

Search  anies Act 2006                                                                          Advanced Search

UK Public General Acts

Table of Contents | Content | Explanatory Notes ? | More Resources ?

Open full notes          ◀ Previous   Explanatory Notes Table of contents   Next ▶          Plain View

# Companies Act 2006

### 2006 CHAPTER 46

COMMENTARY

SCHEDULE 13: SUPPLEMENTARY PROVISIONS WITH RESPECT TO DELEGATION ORDER

PART 43: TRANSPARENCY OBLIGATIONS AND RELATED MATTERS

**Section 1270: Liability for false or misleading statements in certain publications**

1636.  Section 1270 inserts *sections 90A and 90B* into FSMA and establishes a regime for civil liability to third parties by issuers admitted to trading on a
respect of disclosures made public in response to provisions implementing obligations imposed by the Transparency Directive.

1637.  Although no issuer has been found liable in damages under English law in respect of statements made in narrative reports or financial statemen
financial markets and to the obligations of issuers to investors on those markets has been developing, in the light of increased regulation o
European origin. The Transparency Directive has continued that process and increased the level of uncertainty as to whether any actionable duty
and its directors to investors.

1638.  The Transparency Directive sets out the periodic financial disclosures that must be made by issuers admitted to trading on a regulated market. A
Transparency Directive provide for annual and half-yearly reports, including management statements, to be made public, and requires statemen
responsible within the issuer for these disclosures (the directors in the case of a public company) that these give a true and fair view, and that the
includes a fair review of certain matters. Article 6 requires the disclosure of interim management statements.

1639.  The Transparency Directive also sets out the minimum requirements for a liability regime that must be adopted by the UK at Article 7, and recital
States should remain free to determine the extent of the liability".

1640.  These provisions give considerable flexibility to Member States in the liability regime they choose to adopt in respect of disclosures unde
Government has established an exhaustive regime in relation to ensuring the delivery and accuracy of these reports including criminal offe
penalties and actions for civil damages. The provisions in this section relate only to the position in respect of the civil liability of issuers on
investors in their securities. The liability regime does not cover issuers on exchange-regulated markets. Their position remains unchanged by i
Transparency Directive.

1641.  While it is intended that there be no additional liability under the Directive in respect of the disclosures to which it relates, the regime leaves u
liability owed by directors to the issuer and to members of the company under UK and other national law, and any liability under other FSA
undisturbed any liability of the issuer in respect of any loss or damage arising otherwise than as a result of acquiring securities in reliance on the
report.

1642.  The primary liability of directors and issuers for the accuracy of the required disclosures comprises criminal offences and administrative penalties

of Part 15 of this Act and Part 6 of FSMA. The provisions in Part 6 require compliance with FSA rules giving effect to the obligations in the Dire
penalties in respect of failure to comply with the rules. In addition, restitution can potentially be ordered by the court, on application of the Auth
State, under section 382 of FSMA or by the Authority directly under section 384 of FSMA.

1643.  The Government's intention in developing a civil liability regime has been to provide certainty in an uncertain area and to ensure that the potenti
reasonable, in relation both to expectations and the likely state of the law after the implementation of the Transparency Directive. In particular,
anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties, in order to pr
company members, employees and creditors. However, as the state of the law after the implementation of the Transparency Directive is not cer
has taken a power, at new *section 90B,* that will enable the provision introduced by section 1270 to be added to or amended if a wider or narrowe
is deemed appropriate.

### New section 90A: Compensation for statements in certain publications

1644.  *Subsection (1)(a)* of new *section 90A* provides that the civil liability regime set out in that section applies to those reports and statements re
implementing Articles 4 to 6 of the Transparency Directive. Depending on transparency rules, we would expect this to include annual and
statements and management reports, the sign-off by directors or other responsible parties, as well as interim management statements.

1645.  *Subsection (1)(b)* adds to the scope of the regime the information included in preliminary announcements of results made in advance of the rep
required by provision implementing Article 4 of the Transparency Directive, but only to the extent that it is intended that the information will appea
statement and be presented in substantially the same form as that in which it is presented in the preliminary announcement.

1646.  *Subsection (2)* sets the scope of the civil liability regime to cover securities of all issuers for which the UK is the home Member State (whether the
which they are traded is situated in or outside the UK), as well as to cover those issuers whose securities are traded on a regulated market situa
whom the UK is the host Member State. UK holders of securities of other issuers (i.e. those for whom the UK is neither a host nor a home State) v
on the rights of action set out.

1647.  *Subsection (3)* provides that issuers of such securities are liable to pay compensation to a person who has acquired those securities and has su
of them as a result of any untrue or misleading statement in a publication to which this section applies, or an omission of a required statement fro
*Subsection (4)* however limits the liability of the issuer to circumstances where a "person discharging managerial responsibilities" in relation to t
the issuer (see *subsection (9)*) knows the statement to be untrue or misleading, or is reckless as to whether the statement is untrue or misleadir
omissions, where it is known to be a dishonest concealment of a material fact.

1648.  *Subsection (5)* provides that loss will not be regarded as having been suffered for the purposes of *subsection (3)* unless the person suffering it a
securities in reliance on the information in the publication and at a time when and in circumstances where it was reasonable to rely on that publica

1649.  *Subsection (6)* limits the liability with regard to untrue or misleading statements, or omissions, in documents to which the section applies. It sets
not liable for any liability other than that provided for by the section and that any person who is not the issuer is not liable, other than to the issuer.

1650.  *Subsection (8)* clarifies that the section does not affect Part 6 of FSMA conferring liability for a civil penalty, liability for a criminal offence or the rigl

1651.  *Subsection (9)* sets out the persons who are to be considered as discharging managerial responsibilities for the purposes of the section. This i
issuer, or where the issuer's affairs are managed by the members, a member of the issuer. In the case where the issuer does not have directo
senior executive with responsibilities in relation to the publication is considered as discharging managerial responsibilities.

### New section 90B: Power to make further provision about liability for published information

1652.  *Subsection (1)* of new *section 90B* establishes a power to make further provision about liability for published information. The new section all
regulations to amend any primary or subordinate legislation relating to the liability of issuers and others in respect of information, including the n
*section 90A* of FSMA. The exercise of the proposed power could, for example, result in that regime or some other appropriate regime applyin
information, such as information that is required to be disclosed by issuers to shareholders or markets under the Market Abuse Directive (MAD).

1653.  Regulations made under the section would be made using the affirmative procedure (see the amendment to section 429(2) of FSMA made
Schedule 15).

[ ◀ Previous ]    [ Explanatory Notes Table of contents ]    [ Next ▶ ]

The data on this page is available in the alternative data formats listed:      HTML5  HTML snippet  PDF  XML  HTML RDFa

New site design   Help   About us   Site map   Accessibility   Contact us   Privacy notice   Cookies

© Crow

content is available under the Open Government Licence v3.0 except where otherwise stated. This site additionally contains content derived from El the terms of the Commission Decision 2011/833/EU on the reuse of documents from the EU institutions. For more information see the EUR-Lex public use.

*Status:* *This is the original version as it was originally adopted in the EU.This*
*legislation may since have been updated - see the latest available (revised) version*

Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse (market abuse regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC (Text with EEA relevance)

## CHAPTER 2

### INSIDE INFORMATION, INSIDER DEALING, UNLAWFUL DISCLOSURE OF INSIDE INFORMATION AND MARKET MANIPULATION

*Article 7*

**Inside information**

1        For the purposes of this Regulation, inside information shall comprise the following types of information:

a   information of a precise nature, which has not been made public, relating, directly or indirectly, to one or more issuers or to one or more financial instruments, and which, if it were made public, would be likely to have a significant effect on the prices of those financial instruments or on the price of related derivative financial instruments;

b   in relation to commodity derivatives, information of a precise nature, which has not been made public, relating, directly or indirectly to one or more such derivatives or relating directly to the related spot commodity contract, and which, if it were made public, would be likely to have a significant effect on the prices of such derivatives or related spot commodity contracts, and where this is information which is reasonably expected to be disclosed or is required to be disclosed in accordance with legal or regulatory provisions at the Union or national level, market rules, contract, practice or custom, on the relevant commodity derivatives markets or spot markets;

c   in relation to emission allowances or auctioned products based thereon, information of a precise nature, which has not been made public, relating, directly or indirectly, to one or more such instruments, and which, if it were made public, would be likely to have a significant effect on the prices of such instruments or on the prices of related derivative financial instruments;

d   for persons charged with the execution of orders concerning financial instruments, it also means information conveyed by a client and relating to the client's pending orders in financial instruments, which is of a precise nature, relating, directly or indirectly, to one or more issuers or to one or more financial instruments, and which, if it were made public, would be likely to have a significant effect on the prices of those financial instruments, the price of related spot commodity contracts, or on the price of related derivative financial instruments.

2        For the purposes of paragraph 1, information shall be deemed to be of a precise nature if it indicates a set of circumstances which exists or which may reasonably be expected to come into existence, or an event which has occurred or which may reasonably be expected to occur, where it is specific enough to enable a conclusion to be drawn as to the possible effect of that set of circumstances or event on the prices of the financial instruments or the related derivative financial instrument, the related spot commodity contracts, or the auctioned products based on the emission allowances. In this respect in the case of a protracted process that is intended to bring about, or that results in, particular circumstances or a particular event, those future

**Status:** *This is the original version as it was originally adopted in the EU.This*
*legislation may since have been updated - see the latest available (revised) version*

circumstances or that future event, and also the intermediate steps of that process which are connected with bringing about or resulting in those future circumstances or that future event, may be deemed to be precise information.

3        An intermediate step in a protracted process shall be deemed to be inside information if, by itself, it satisfies the criteria of inside information as referred to in this Article.

4        For the purposes of paragraph 1, information which, if it were made public, would be likely to have a significant effect on the prices of financial instruments, derivative financial instruments, related spot commodity contracts, or auctioned products based on emission allowances shall mean information a reasonable investor would be likely to use as part of the basis of his or her investment decisions.

In the case of participants in the emission allowance market with aggregate emissions or rated thermal input at or below the threshold set in accordance with the second subparagraph of Article 17(2), information about their physical operations shall be deemed not to have a significant effect on the price of emission allowances, of auctioned products based thereon, or of derivative financial instruments.

5        ESMA shall issue guidelines to establish a non-exhaustive indicative list of information which is reasonably expected or is required to be disclosed in accordance with legal or regulatory provisions in Union or national law, market rules, contract, practice or custom, on the relevant commodity derivatives markets or spot markets as referred to in point (b) of paragraph 1. ESMA shall duly take into account specificities of those markets.

***Status:*** *This is the original version as it was originally adopted in the EU.This
legislation may since have been updated - see the latest available (revised) version*

Regulation (EU) No 596/2014 of the European Parliament and of the Council of
16 April 2014 on market abuse (market abuse regulation) and repealing Directive
2003/6/EC of the European Parliament and of the Council and Commission
Directives 2003/124/EC, 2003/125/EC and 2004/72/EC (Text with EEA relevance)

CHAPTER 3

## DISCLOSURE REQUIREMENTS

*Article 17*

### Public disclosure of inside information

1        An issuer shall inform the public as soon as possible of inside information which
directly concerns that issuer.

The issuer shall ensure that the inside information is made public in a manner which
enables fast access and complete, correct and timely assessment of the information by
the public and, where applicable, in the officially appointed mechanism referred to in
Article 21 of Directive 2004/109/EC of the European Parliament and the Council[1].
The issuer shall not combine the disclosure of inside information to the public with the
marketing of its activities. The issuer shall post and maintain on its website for a period
of at least five years, all inside information it is required to disclose publicly.

This Article shall apply to issuers who have requested or approved admission of their
financial instruments to trading on a regulated market in a Member State or, in the case
of instruments only traded on an MTF or on an OTF, issuers who have approved trading
of their financial instruments on an MTF or an OTF or have requested admission to
trading of their financial instruments on an MTF in a Member State.

2        An emission allowance market participant shall publicly, effectively and in a timely
manner disclose inside information concerning emission allowances which it holds in respect
of its business, including aviation activities as specified in Annex I to Directive 2003/87/
EC or installations within the meaning of Article 3(e) of that Directive which the participant
concerned, or its parent undertaking or related undertaking, owns or controls or for the
operational matters of which the participant, or its parent undertaking or related undertaking,
is responsible, in whole or in part. With regard to installations, such disclosure shall include
information relevant to the capacity and utilisation of installations, including planned or
unplanned unavailability of such installations.

The first subparagraph shall not apply to a participant in the emission allowance market
where the installations or aviation activities that it owns, controls or is responsible for,
in the preceding year have had emissions not exceeding a minimum threshold of carbon
dioxide equivalent and, where they carry out combustion activities, have had a rated
thermal input not exceeding a minimum threshold.

The Commission shall be empowered to adopt delegated acts in accordance with Article
35 establishing a minimum threshold of carbon dioxide equivalent and a minimum
threshold of rated thermal input for the purposes of the application of the exemption
provided for in the second subparagraph of this paragraph.

**Status:** *This is the original version as it was originally adopted in the EU.This*
*legislation may since have been updated - see the latest available (revised) version*

3       The Commission shall be empowered to adopt delegated acts in accordance with Article 35 specifying the competent authority for the notifications of paragraphs 4 and 5 of this Article.

4       An issuer or an emission allowance market participant, may, on its own responsibility, delay disclosure to the public of inside information provided that all of the following conditions are met:

    a    immediate disclosure is likely to prejudice the legitimate interests of the issuer or emission allowance market participant;

    b    delay of disclosure is not likely to mislead the public;

    c    the issuer or emission allowance market participant is able to ensure the confidentiality of that information.

In the case of a protracted process that occurs in stages and that is intended to bring about, or that results in, a particular circumstance or a particular event, an issuer or an emission allowance market participant may on its own responsibility delay the public disclosure of inside information relating to this process, subject to points (a), (b) and (c) of the first subparagraph.

Where an issuer or emission allowance market participant has delayed the disclosure of inside information under this paragraph, it shall inform the competent authority specified under paragraph 3 that disclosure of the information was delayed and shall provide a written explanation of how the conditions set out in this paragraph were met, immediately after the information is disclosed to the public. Alternatively, Member States may provide that a record of such an explanation is to be provided only upon the request of the competent authority specified under paragraph 3.

5       In order to preserve the stability of the financial system, an issuer that is a credit institution or a financial institution, may, on its own responsibility, delay the public disclosure of inside information, including information which is related to a temporary liquidity problem and, in particular, the need to receive temporary liquidity assistance from a central bank or lender of last resort, provided that all of the following conditions are met:

    a    the disclosure of the inside information entails a risk of undermining the financial stability of the issuer and of the financial system;

    b    it is in the public interest to delay the disclosure;

    c    the confidentiality of that information can be ensured; and

    d    the competent authority specified under paragraph 3 has consented to the delay on the basis that the conditions in points (a), (b) and (c) are met.

6       For the purposes of points (a) to (d) of paragraph 5, an issuer shall notify the competent authority specified under paragraph 3 of its intention to delay the disclosure of the inside information and provide evidence that the conditions set out in points (a), (b) and (c) of paragraph 5 are met. The competent authority specified under paragraph 3 shall consult, as appropriate, the national central bank or the macro-prudential authority, where instituted, or, alternatively, the following authorities:

    a    where the issuer is a credit institution or an investment firm the authority designated in accordance with Article 133(1) of Directive 2013/36/EU of the European Parliament and of the Council[2];

    b    in cases other than those referred to in point (a), any other national authority responsible for the supervision of the issuer.

The competent authority specified under paragraph 3 shall ensure that disclosure of the inside information is delayed only for a period as is necessary in the public interest.

***Status:*** *This is the original version as it was originally adopted in the EU.This*
*legislation may since have been updated - see the latest available (revised) version*

The competent authority specified under paragraph 3 shall evaluate at least on a weekly basis whether the conditions set out in points (a), (b) and (c) of paragraph 5 are still met.

If the competent authority specified under paragraph 3 does not consent to the delay of disclosure of the inside information, the issuer shall disclose the inside information immediately.

This paragraph shall apply to cases where the issuer does not decide to delay the disclosure of inside information in accordance with paragraph 4.

Reference in this paragraph to the competent authority specified under paragraph 3 is without prejudice to the ability of the competent authority to exercise its functions in any of the ways referred to in Article 23(1).

7        Where disclosure of inside information has been delayed in accordance with paragraph 4 or 5 and the confidentiality of that inside information is no longer ensured, the issuer or the emission allowance market participant shall disclose that inside information to the public as soon as possible.

This paragraph includes situations where a rumour explicitly relates to inside information the disclosure of which has been delayed in accordance with paragraph 4 or 5, where that rumour is sufficiently accurate to indicate that the confidentiality of that information is no longer ensured.

8        Where an issuer or an emission allowance market participant, or a person acting on their behalf or for their account, discloses any inside information to any third party in the normal course of the exercise of an employment, profession or duties as referred to in Article 10(1), they must make complete and effective public disclosure of that information, simultaneously in the case of an intentional disclosure, and promptly in the case of a non-intentional disclosure. This paragraph shall not apply if the person receiving the information owes a duty of confidentiality, regardless of whether such duty is based on a law, on regulations, on articles of association, or on a contract.

9        Inside information relating to issuers whose financial instruments are admitted to trading on an SME growth market, may be posted on the trading venue's website instead of on the website of the issuer where the trading venue chooses to provide this facility for issuers on that market.

10       In order to ensure uniform conditions of application of this Article, ESMA shall develop draft implementing technical standards to determine:

    a    the technical means for appropriate public disclosure of inside information as referred to in paragraphs 1, 2, 8 and 9; and

    b    the technical means for delaying the public disclosure of inside information as referred to in paragraphs 4 and 5.

ESMA shall submit those draft implementing technical standards to the Commission by 3 July 2016.

Power is conferred on the Commission to adopt the implementing technical standards referred to in the first subparagraph in accordance with Article 15 of Regulation (EU) No 1095/2010.

11       ESMA shall issue guidelines to establish a non-exhaustive indicative list of the legitimate interests of issuers, as referred to in point (a) of paragraph 4, and of situations in which delay of disclosure of inside information is likely to mislead the public as referred to in point (b) of paragraph 4.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 207 of 2232
Page ID #:2265

4          *Regulation (EU) No 596/2014 of the European Parliament and of the Council of...*
*CHAPTER 3*
*Document Generated: 2025-08-05*

**Status:** *This is the original version as it was originally adopted in the EU.This*
*legislation may since have been updated - see the latest available (revised) version*

**Status:** *This is the original version as it was originally adopted in the EU.This*
*legislation may since have been updated - see the latest available (revised) version*

(**1**)  Directive 2004/109/EC of the European Parliament and of the Council of 15 December 2004 on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market and amending Directive 2001/34/EC (OJ L 390, 31.12.2004, p. 38).

(**2**)  Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ L 176, 27.6.2013, p. 338).

# Disclosure Guidance and Transparency Rules sourcebook

**Disclosure Guidance and Transparency Rules sourcebook**

# Chapter 4

# Periodic Financial Reporting

**4**

## 4.1    Annual financial report

[**Note**: ESMA has also issued guidelines under article 16(3) of the ESMA Regulation on enforcement of financial information, 10 July 2014/ESMA/2014/807]

### Application

4.1.1    R    Subject to the exemptions set out in ■ DTR 4.4 (Exemptions) this section applies to an *issuer* whose *transferable securities* are *admitted to trading*.

### Compliance with the Listing Rules

4.1.2    G    An *issuer* that is also admitted to the *official list* should consider its obligations under the *Listing Rules* in addition to the requirements in these *rules*.

### Publication of annual financial reports

4.1.3    R    An *issuer* must make public its annual financial report at the latest four months after the end of each financial year.

[**Note**: article 4(1) of the *TD*]

4.1.4    R    An *issuer* must ensure that its annual financial report remains publicly available for at least ten years.

[**Note**: article 4(1) of the *TD*]

### Content of annual financial reports

4.1.5    R    The annual financial report must include:

(1)  the audited financial statements;

(2)  a management report; and

(3)  responsibility statements.

[**Note**: article 4(2) of the *TD*]

**4**

### Audited financial statements

**4.1.6** **R** (1) If an *issuer* is required to prepare consolidated accounts,the audited financial statements must comprise:

(a) consolidated accounts prepared in accordance with *UK-adopted IFRS*, and

(b) accounts of the parent *company* prepared in accordance with the law of the *United Kingdom*.

[**Note:** article 4(3) of the *TD*]

(2) If an *issuer* is not required to prepare consolidated accounts, the audited financial statements must comprise accounts prepared in accordance with the law of the *United Kingdom*.

[**Note:** article 4(3) of the *TD*]

### Auditing of financial statements

**4.1.7** **R** (1) The financial statements must be audited in accordance with Part 16 of the Companies Act 2006.

(2) [deleted]

(3) The audit report, signed by the person or persons responsible for auditing the financial statements must be disclosed in full to the public together with the annual financial report.

[**Note:** article 4(4) of the *TD*]

(4) An *issuer* which is a UK-traded third country company within the meaning of section 1241 of the Companies Act 2006 must ensure that the *person* who provides the audit report is:

(a) on the register of third country auditors kept for the purposes of regulation 6 of the Statutory Auditors and Third Country Auditors Regulations 2013 (SI 2013/1672); or

(b) eligible for appointment as a *statutory auditor* under section 1212 of the Companies Act 2006.

(c) [deleted]

[**Note:** Article 45(4) of the *Audit Directive*]

### Content of management report

**4.1.8** **R** The management report must contain:

(1) a fair review of the *issuer's* business; and

(2) a description of the principal risks and uncertainties facing the *issuer*.

[**Note:** article 4(5) of the *TD*]

**4.1.9** **R** The review required by ■ DTR 4.1.8 R must:

(1) be a balanced and comprehensive analysis of:

**4**

(a) the development and performance of the *issuer's* business during the financial year; and

(b) the position of the *issuer's* business at the end of that year,

  consistent with the size and complexity of the business;

(2) include, to the extent necessary for an understanding of the development, performance or position of the *issuer's* business:

(a) analysis using financial key performance indicators; and

(b) where appropriate, analysis using other key performance indicators including information relating to environmental matters and employee matters; and

(3) include references to, and additional explanations of, amounts included in the *issuer's* annual financial statements, where appropriate.

[**Note:** article 4(5) of the *TD*]

4.1.10   |G|   In ■ DTR 4.1.9 R (2), key performance indicators are factors by reference to which the development, performance or position of the *issuer's* business can be measured effectively.

4.1.11   |R|   The management report required by ■ DTR 4.1.8 R must also give an indication of:

(1) any important events that have occurred since the end of the financial year unless those events are:

(a) reflected in the *issuer's* profit and loss account or balance sheet; or

(b) disclosed in the notes to the *issuer's* audited financial statements;

(2) the *issuer's* likely future development;

(3) activities in the field of research and development;

(4) the information concerning acquisitions of own *shares* prescribed by the *United Kingdom* provisions which implemented article 24(2) of Directive 2012/30/EU;

(5) the existence of branches of the *issuer*; and

(6) in relation to the *issuer's* use of *financial instruments* and where material for the assessment of its assets, liabilities, financial position and profit or loss:

(a) the *issuer's* financial risk management objectives and policies, including its policy for hedging each major type of forecasted transaction for which hedge accounting is used, and

(b) the *issuer's* exposure to price risk, credit risk, liquidity risk and cash flow risk.

[**Note:** article 4(5) of the *TD*]

### Responsibility statements

4.1.12 | R | (1) Responsibility statements must be made by the *persons* responsible within the *issuer*.

(2) The name and function of any *person* who makes a responsibility statement must be clearly indicated in the responsibility statement.

(3) For each *person* making a responsibility statement, the statement must set out that to the best of his or her knowledge:

(a) the financial statements, prepared in accordance with the applicable set of accounting standards, give a true and fair view of the assets, liabilities, financial position and profit or loss of the *issuer* and the undertakings included in the consolidation taken as a whole; and

(b) the management report includes a fair review of the development and performance of the business and the position of the *issuer* and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties that they face.

[**Note:** article 4(2)(c) of the *TD*]

4.1.13 | R | The *issuer* is responsible for all information drawn up and made public in accordance with this section.

### Reporting format

4.1.14 | R | [deleted]

4.1.15 | R | The annual financial report must be prepared in Extensible Hypertext Markup Language (XHTML) format.

4.1.16 | R | ■ DTR 4.1.17R and ■ DTR 4.1.18R apply to an annual financial report that contains consolidated accounts prepared in accordance with:

(1) *UK-adopted IFRS*;

(2) *EU-adopted IFRS*; or

(3) International Financial Reporting Standards as referred to in point (a) of the first subparagraph of Article 1 of the *TD Equivalence Decision*.

4.1.17 | R | An *issuer*:

(1) must mark up any disclosures specified in ■ DTR 4 Annex 1R that are present in consolidated financial statements in the annual financial report; and

**4**

(2) may mark up other disclosures in the consolidated financial statements in addition to the ones specified in ■ DTR 4 Annex 1R.

**4.1.18** | R | The mark ups specified in ■ DTR 4.1.17R must use:

(1) the Extensible Business Reporting Language (XBRL) markup language;

(2) a taxonomy generally accepted in the *UK* for financial disclosures in *regulated markets*; and

(3) the inline XBRL specifications and marking up and filing requirements specified by the taxonomy the *issuer* uses in (2).

[**Note**: Information on generally accepted taxonomies and associated marking up and filing requirements is available in the Markets section of the *FCA's* website at https://www.fca.org.uk/markets/company-annual-financial-reporting-electronic-format]

**4.1.19** | R | An issuer must comply with ■ DTR 4.1.17R to ■ DTR 4.1.18R if it wishes to mark up financial statements that:

(1) are prepared in accordance with the accounting standards referred to in ■ DTR 4.1.16R; and

(2) do not contain consolidated accounts.

**4.1.20** | R | An *issuer* must not mark up an annual financial report if the accounts in the report are not prepared in accordance with the accounting standards referred to in ■ DTR 4.1.16R.

**4.1.21** | G | The effect of ■ DTR 4.1.20R is that an *issuer* cannot mark up an annual financial report containing accounts prepared in accordance with:

(1) section 396 (Companies Act individual accounts) or section 404 (Companies Act group accounts) of the Companies Act 2006; or

(2) the Generally Accepted Accounting Principles of a *third country*.

**4.1.22** | R | An *issuer* must not mark up disclosures in its annual financial report other than its financial statements unless:

(1) it marks up its financial statements in accordance with ■ DTR 4.1.16R to ■ DTR 4.1.18R or ■ DTR 4.1.19R, whichever is applicable; and

(2) it marks up those other disclosures using the inline XBRL markup language and a taxonomy specific to those other parts.

### Filing of the annual financial report

**4.1.23** | G | *Issuers* are reminded of the filing requirements for annual financial reports in ■ DTR 6.2.

**4**

### 4.2        Half-yearly financial reports

#### Application
...........................................................................

4.2.1      **R**    Subject to the exemptions set out in ▪ DTR 4.4 (Exemptions) this section
applies to an *issuer* whose *shares* or *debt securities* are *admitted to trading*.

#### Publication of half-yearly financial reports
........................................

4.2.2      **R**    (1) An *issuer* must make public a half-yearly financial report covering the
first six months of the financial year.

(2) The half-yearly financial report must be made public as soon as
possible, but no later than three months, after the end of the period
to which the report relates.

(3) An *issuer* must ensure that the half-yearly financial report remains
available to the public for at least ten years.

[**Note:** article 5(1) of the *TD*]

#### Content of half-yearly financial reports
...........................................

4.2.3      **R**    The half-yearly financial report must include:

(1) a condensed set of financial statements;

(2) an interim management report; and

(3) responsibility statements.

[**Note:** article 5(2) of the *TD*]

#### Preparation and content of condensed set of financial statements
...........................................................

4.2.4      **R**    (1) If an *issuer* is required to prepare consolidated accounts, the
condensed set of financial statements must be prepared in accordance
with IAS 34 as contained in *UK-adopted IFRS*.

[**Note:** article 5(3) of the *TD*]

(2) If an *issuer* is not required to prepare consolidated accounts, the
condensed set of financial statements must contain, as a minimum
the following:

(a) a condensed balance sheet;

(b) a condensed profit and loss account; and

(c) explanatory notes on these accounts.

[**Note:** article 5(3) of the *TD*]

**4.2.5**    R    (1) This *rule* applies to an *issuer* that is not required to prepare consolidated accounts.

(2) In preparing the condensed balance sheet and the condensed profit and loss account an *issuer* must follow the same principles for recognising and measuring as when preparing annual financial reports.

[**Note:** article 5(3) of the *TD*]

(3) The balance sheet and the profit and loss account must show each of the headings and subtotals included in the most recent annual financial statements of the *issuer*. Additional line items must be included if, as a result of their omission, the half-yearly financial statements would give a misleading view of the assets, liabilities, financial position and profit or loss of the *issuer*.

[**Note:** article 3(2) of the *TD implementing Directive*]

(4) The half-yearly financial information must include comparative information presented as follows:

(a) balance sheet as at the end of the first six months of the current financial year and comparative balance sheet as at the end of the immediate preceding financial year; and

(b) profit and loss account for the first six months of the current financial year with, from two years after 20 January 2007, comparative information for the comparable period for the preceding financial year.

[**Note:** article 3(2) of the *TD implementing Directive*]

(5) The explanatory notes must include the following:

(a) sufficient information to ensure the comparability of the condensed half-yearly financial statements with the annual financial statements; and

(b) sufficient information and explanations to ensure a users proper understanding of any material changes in amounts and of any developments in the half-year period concerned, which are reflected in the balance sheet and the profit and loss account.

[**Note:** article 3(3) of the *TD implementing Directive*]

**4.2.6**    R    The accounting policies and presentation applied to half-yearly figures must be consistent with those applied in the latest published annual accounts except where:

(1) the accounting policies and presentation are to be changed in the subsequent annual financial statements, in which case the new accounting policies and presentation should be followed and the

changes and the reasons for the changes should be disclosed in the half-yearly report; or

(2) the *FCA* otherwise agrees.

### Content of interim management report

**4.2.7**    **R**    The interim management report must include at least:

(1) an indication of important events that have occurred during the first six months of the financial year, and their impact on the condensed set of financial statements, and

(2) a description of the principal risks and uncertainties for the remaining six months of the financial year.

[**Note:** article 5(4) of the *TD*]

**4.2.8**    **R**    (1) In addition to the requirement set out in ■ DTR 4.2.7 R, an *issuer* of *shares* must disclose in the interim management report the following information, as a minimum:

(a) related parties transactions that have taken place in the first six months of the current financial year and that have materially affected the financial position or the performance of the enterprise during that period; and

(b) any changes in the related parties transactions described in the last annual report that could have a material effect on the financial position or performance of the enterprise in the first six months of the current financial year.

(2) If an *issuer* of *shares* is not required to prepare consolidated accounts, it must disclose, as a minimum, any transactions which have been entered into with related parties by the *issuer*, including the amount of such transactions, the nature of the related party relationship and other information about the transactions necessary for an understanding of the financial position of the *issuer*, if such transactions are material and have not been concluded under normal market conditions.

[**Note:** articles 2(3), 6(1)(j) and 17(1)(r) of the *Accounting Directive*]

(3) In relation to transactions described in paragraph (2) information about such transactions may be aggregated according to their nature except where separate information is necessary for an understanding of the effects of related party transactions on the financial position of the *issuer*.

[**Note:** articles 2(3) and 17(1)(r) of the *Accounting Directive*]

### Auditing of the condensed set of financial statements

**4.2.9**    **R**    (1) If the half-yearly financial report has been audited or reviewed by auditors pursuant to the Financial Reporting Council guidance on Review of Interim Financial Information, the audit report or review report must be reproduced in full.

(2) If the half-yearly financial report has not been audited or reviewed by auditors pursuant to the Financial Reporting Council guidance on Review of Interim Financial Information, an *issuer* must make a statement to this effect in its report.

[**Note:** article 5(5) of the *TD*]

## Responsibility statements

**4**    **4.2.10**    **R**    (1) Responsibility statements must be made by the *persons* responsible within the *issuer*.

[**Note:** article 5(2)(c) of the *TD*]

(2) The name and function of any *person* who makes a responsibility statement must be clearly indicated in the responsibility statement.

[**Note:** article 5(2)(c) of the *TD*]

(3) For each *person* making a responsibility statement, the statement must confirm that to the best of his or her knowledge:

(a) the condensed set of financial statements, which has been prepared in accordance with the applicable set of accounting standards, gives a true and fair view of the assets, liabilities, financial position and profit or loss of the *issuer*, or the undertakings included in the consolidation as a whole as required by ■ DTR 4.2.4 R;

(b) the interim management report includes a fair review of the information required by ■ DTR 4.2.7 R; and

(c) the interim management report includes a fair review of the information required by ■ DTR 4.2.8 R, in the case of an *issuer* of *shares*.

[**Note:** article 5(2)(c) of the *TD*]

(4) A *person* making a responsibility statement will satisfy the requirement in (3) (a) above to confirm that the condensed set of financial statements gives a true and fair view of the assets, liabilities, financial position and profit or loss of the *issuer* (or the undertakings included in the consolidation as a whole) by including a statement that the condensed set of financial statements have been prepared in accordance with:

(a) IAS 34 as contained in *UK-adopted IFRS*; or

(b) for *UK issuers* not using *UK-adopted IFRS*, Financial Reporting Standard 104 : Interim Financial Reporting issued by the Financial Reporting Council; or

(c) for all other *issuers* not using *UK-adopted IFRS*, a national accounting standard relating to interim reporting,

provided always that a *person* making such a statement has reasonable grounds to be satisfied that the condensed set of

financial statements prepared in accordance with such a standard is
not misleading.

4.2.11    R    The *issuer* is responsible for all information drawn up and made public in
accordance with this section.

**4**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 221 of 2232
Page ID #:2279

DTR 4 : Periodic Financial
Reporting

Section 4.3A : Reports on payments to
governments

**4**



## 4.3A    Reports on payments to governments

### Application

**4.3A.1**  **R**  Subject to the exemptions set out in ■ DTR 4.4 (Exemptions) this section applies to an *issuer*:

(1)  active in the extractive or logging of primary forest industries; and

(2)  whose *transferable securities* are *admitted to trading*.

(3)  [deleted]

**4.3A.2**  **R**  In this section references to an "*issuer* active in the extractive or logging of primary forest industries" are to an *issuer* which is:

(1)  a mining or quarrying undertaking; or

(2)  a logging undertaking.

In this section "mining or quarrying undertaking", "logging undertaking", "payment" and "government" have the meanings given in regulation 2 of the Reports on Payments to Governments Regulations 2014 (SI 2014/3209).

**4.3A.3**  **G**  An *issuer* is considered to be active in the extractive or logging of primary forest industries if any of its subsidiary undertakings are:

(1)  a mining or quarrying undertaking; or

(2)  a logging undertaking.

In this section "subsidiary undertaking" has the meaning given in regulation 2 of the Reports on Payments to Governments Regulations 2014 (SI 2014/3209).

[**Note:** article 44(1) of the *Accounting Directive*]

### Preparation and publication of reports on payments to governments

**4.3A.4**  **R**  An *issuer* must prepare a report annually on payments made to governments for each financial year.

[**Note:** article 6 of the *TD*]

4

| 4.3A.5 | R | The report on payments to governments must be made public at the latest six months after the end of each financial year. |

[**Note:** article 6 of the *TD*]

| 4.3A.6 | R | An *issuer* must ensure that the report on payments to governments remains publicly available for at least ten years. |

[**Note:** article 6 of the *TD*]

### Content of reports on payments to governments

| 4.3A.7 | R | (1) [deleted] |

    (2) Payments to governments must be reported at consolidated level.

[**Note:** article 6 of the *TD*]

| 4.3A.7A | R | (1) The report on payments to governments must state the following information in relation to the relevant activities: |

    (a) the government to which each payment has been made, including the country of that government;

    (b) the total amount of payments made to each government;

    (c) the total amount per type of payment made to each government; and

    (d) where those payments have been attributed to a specific project, the total amount per type of payment made for each such project and the total amount of payments for each such project.

(2) If an *issuer* is required to prepare consolidated accounts, the relevant activities referred to in (1) are those of:

    (a) the *issuer*; and

    (b) any subsidiary undertaking of the *issuer*.

(3) If an *issuer* is not required to prepare consolidated accounts, the relevant activities referred to in (1) are those of the *issuer*.

(4) Where the *issuer*, or, where applicable, any of its subsidiary undertakings, makes a payment that is not attributable to a specific project, that payment may be disclosed in the report without splitting or disaggregating the payment to allocate it to a specific project.

(5) A payment need not be taken into account in the report if:

    (a) it is a single payment of an amount less than £86,000; or

    (b) it forms part of a series of related payments within a financial year whose total amount is less than £86,000.

(6) Payments, activities and projects may not be artificially split or aggregated to avoid the application of this section.

**4**

(7) The disclosure of payments must reflect the substance, rather than the form, of each payment, relevant activity or project concerned.

(8) Where payments in kind are made to a government, the report must state the value of such payments in kind and, where applicable, the volume of those payments in kind, and the directors must provide supporting notes to explain how the value has been determined.

(9) In this rule "relevant activities", "project" and "director" have the meanings given in regulation 2 of the Reports on Payments to Governments Regulations 2014 (SI 2014/3209)

**4.3A.7B**    R    (1) Payments made by a subsidiary undertaking may be excluded from the report on payments to governments where:

(a) severe long-term restrictions substantially hinder the exercise of the rights of the *issuer* over the assets or management of that subsidiary undertaking;

(b) the information necessary for the preparation of the report cannot be obtained without disproportionate expense or undue delay; or

(c) the shares of that undertaking are held exclusively with a view to subsequent resale.

(2) The *issuer* may only exclude payments by a subsidiary undertaking under (1) (a) to (c) where the subsidiary undertaking is excluded from the consolidated group accounts on the same basis.

**4.3A.8**    G    The *FCA* considers a report on payments to governments which is prepared in accordance with the Reports on Payments to Governments Regulations 2014 (SI 2014/3209) to be in compliance with ■ DTR 4.3A.7AR and ■ 4.3A.7BR.

### Responsibility

**4.3A.9**    R    The *issuer* is responsible for all information drawn up and made public in accordance with this section.

[**Note:** article 7 of the *TD*]

### Filing of reports on payments to governments

**4.3A.10**    R    (1) The *issuer* must file the report on payments to governments with the *FCA*.

(2) The report in (1) must be filed by uploading it to the *national storage mechanism*.

(3) A report filed under (2) must be in XML (extensible markup language) format and must use the XML data schema developed for the purposes of facilitating software filing to be used for the purpose of delivering a report on payments to governments dated 1 August 2016 and comprising:

(a) the Extractive Report Schema Definition;

(b)  the ISO Country Code Schema; and

(c)  the ISO Currency Codes.

The technical requirements in respect of the XML data schema are specified on the Primary Markets section of the *FCA's* website at https://www.fca.org.uk/markets/primary-markets.

**4**

**4**



## 4.4    Exemptions

**Public sector issuers** ..................................................................

**4.4.1**    R    The *rules* on annual financial reports (■ DTR 4.1) and half-yearly financial reports (■ DTR 4.2) do not apply to:

(1)  a state;

(2)  a regional or local authority of a state;

(3)  a public international body of which at least one state is a member;

(4)  the European Central Bank;

(5)  the European Financial Stability Facility (EFSF) established by the EFSF Framework Agreement and any other mechanism established with the objective of preserving the financial stability of European monetary union by providing temporary financial assistance to the *EEA States* whose currency is the euro; and

(6)  national central banks.

[**Note:** article 8(1)(a) of the *TD*]

**Debt issuers** ...........................................................................

**4.4.2**    R    The *rules* on annual financial reports in ■ DTR 4.1 (including ■ DTR 4.1.7R (4) and half-yearly financial reports (■ DTR 4.2) do not apply to an *issuer* that issues exclusively *debt securities admitted to trading* the denomination per unit of which is at least 100,000 euros (or an equivalent amount).

[**Note:** article 8(1)(b) of the *TD* and article 45(1) of the *Audit Directive*]

**4.4.3**    R    The *rules* on half-yearly financial reports (■ DTR 4.2) do not apply to a *credit institution* whose *shares* are not *admitted to trading* and which has, in a continuous or repeated manner, only issued *debt securities* provided that:

(1)  the total nominal amount of all such *debt securities* remains below 100,000,000 Euros; and

(2)  the *credit institution* has not published a prospectus in accordance with the *Prospectus Regulation*.

[**Note:** article 8(2) of the *TD*]

**4**

**4.4.4**  **R**  The *rules* on half-yearly financial reports do not apply to an *issuer* already existing on 31 December 2003 which exclusively issue *debt securities* unconditionally and irrevocably guaranteed by the *United Kingdom* or by a regional or local authority of *United Kingdom*, on a *regulated market*.

[**Note:** article 8(3) of the *TD*]

### Issuers of convertible securities

**4.4.5**  **R**  The *rules* on half-yearly financial reports (■ DTR 4.2) do not apply to an *issuer* of *transferable securities* convertible into *shares*.

### Issuers of preference shares

**4.4.6**  **R**  [deleted]

### Issuers of depository receipts

**4.4.7**  **R**  The *rules* on half-yearly financial reports (■ DTR 4.2) do not apply to an *issuer* of depository receipts.

### Third countries − Equivalence

**4.4.8**  **R**  An *issuer* whose registered office is in a *third country* is exempted from the *rules* on:

(1) annual financial reports in ■ DTR 4.1 (other than ■ DTR 4.1.7R (4) which continues to apply);

(2) half-yearly financial reports (■ DTR 4.2); and

(3) reports on payments to governments (■ DTR 4.3A);

if the law of the *third country* in question lays down equivalent requirements or the *issuer* complies with requirements of the law of a *third country* that the *FCA* considers as equivalent.

[**Note:** article 23(1) of the *TD*]

**4.4.9**  **G**  The *FCA* maintains a published list of *third countries*, for the purpose of ■ DTR 4.4.8R, whose laws lay down requirements equivalent to those imposed upon *issuers* by this chapter, or where the requirements of the law of that *third country* are considered to be equivalent by the *FCA*.Such *issuers* remain subject to the following requirements of ■ DTR 6:

(1) the filing of information with the *FCA*;

(2) the language provisions; and

(3) the dissemination of information provisions.

**4**

## Specified disclosures

| | |
|---|---|
| (1) | This Annex sets out the disclosures an *issuer* must mark up in its consolidated financial statements if they are present in those statements. |
| (2) | *Issuers* must mark up all numbers in a declared currency disclosed in the statement of financial position, the statement of profit or loss and other comprehensive income, the statement of changes in equity and the statement of cash flows in its consolidated financial statements. |
| (3) | Table 1 sets out the legend for the data type of a disclosure in Table 2. |

| Table 1 | |
|---|---|
| **Data/Attribute Type/Prefix** | **Definition** |
| text block | denotes that the element type is a block of text; it is used to mark up larger pieces of information, such as notes, accounting policies or tables; text blocks are non-numeric line items |
| text | denotes that the element type is text (a sequence of alphanumeric characters); it is used to mark up short pieces of narrative information; text elements are non-numeric line items |
| X | denotes that the element type is monetary (a number in a declared currency); these elements are numeric line items |
| X.XX | denotes that the element type is a decimalised value (such as a percentage or a 'per share' value); these elements are numeric line items |
| duration | denotes that the monetary value represents a flow |

| | |
|---|---|
| (4) | Table 2 sets out disclosures made or cross-referenced in financial statements an *issuer* must mark up in its annual financial report for financial years beginning on or after 1 January 2022. |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Name of reporting entity or other means of identification | text | IAS 1 51 a |
| Explanation of change in name of reporting entity or other means of identification from end of preceding reporting period | text | IAS 1 51 a |
| Domicile of entity | text | IAS 1 138 a |
| Legal form of entity | text | IAS 1 138 a |
| Country of incorporation | text | IAS 1 138 a |
| Address of entity's registered office | text | IAS 1 138 a |
| Principal place of business | text | IAS 1 138 a |

**DTR 4 : Periodic Financial Reporting**

**4**

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of nature of entity's operations and principal activities | text | IAS 1 138 b |
| Name of parent entity | text | IAS 1 138 c, IAS 24 13 |
| Name of ultimate parent of group | text | IAS 24 13, IAS 1 138 c |
| Length of life of limited life entity | text | IAS 1 138 d |
| Statement of IFRS compliance [text block] | text block | IAS 1 16 |
| Explanation of departure from IFRS | text | IAS 1 20 b, IAS 1 20 c |
| Explanation of financial effect of departure from IFRS | text | IAS 1 20 d |
| Disclosure of uncertainties of entity's ability to continue as going concern [text block] | text block | IAS 1 25 |
| Explanation of fact and basis for preparation of financial statements when not going concern basis | text | IAS 1 25 |
| Explanation of why entity is not regarded as going concern | text | IAS 1 25 |
| Description of reason for using longer or shorter reporting period | text | IAS 1 36 a |
| Description of fact that amounts presented in financial statements are not entirely comparable | text | IAS 1 36 b |
| Disclosure of reclassifications or changes in presentation [text block] | text block | IAS 1 41 |
| Explanation of sources of estimation uncertainty with significant risk of causing material adjustment | text | IFRIC 14 10, IAS 1 125 |
| Disclosure of assets and liabilities with significant risk of material adjustment [text block] | text block | IAS 1 125 |
| Dividends recognised as distributions to owners per share | X, duration | IAS 1 107 |
| Dividends proposed or declared before financial statements authorised for issue but not recognised as distribution to owners | X duration | IAS 10 13, IAS 1 137 |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Dividends proposed or declared before financial statements authorised for issue but not recognised as distribution to owners per share | X.XX duration | IAS 1 137 a |
| Disclosure of accounting judgements and estimates [text block] | text block | IAS 1 10 e |
| Disclosure of accrued expenses and other liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of allowance for credit losses [text block] | text block | IAS 1 10 e |
| Disclosure of associates [text block] | text block | IFRS 12 B4 d, IAS 27 17 b, IAS 27 16 b |
| Disclosure of auditors' remuneration [text block] | text block | IAS 1 10 e |
| Disclosure of authorisation of financial statements [text block] | text block | IAS 1 10 e |
| Disclosure of available-for-sale financial assets [text block] | text block | IAS 1 10 e |
| Disclosure of basis of consolidation [text block] | text block | IAS 1 10 e |
| Disclosure of basis of preparation of financial statements [text block] | text block | IAS 1 10 e |
| Disclosure of biological assets, agriculture produce at point of harvest and government grants related to biological assets [text block] | text block | IAS 41 Disclosure |
| Disclosure of borrowing costs [text block] | text block | IAS 23 Disclosure |
| Disclosure of borrowings [text block] | text block | IAS 1 10 e |
| Disclosure of business combinations [text block] | text block | IFRS 3 Disclosures |
| Disclosure of cash and bank balances at central banks [text block] | text block | IAS 1 10 e |
| Disclosure of cash and cash equivalents [text block] | text block | IAS 1 10 e |
| Disclosure of cash flow statement [text block] | text block | IAS 7 Presentation of a statement of cash flows |
| Disclosure of changes in accounting policies [text block] | text block | IAS 1 10 e |
| Disclosure of changes in accounting policies, accounting estimates and errors [text block] | text block | IAS 8 Accounting policies |
| Disclosure of collateral [text block] | text block | IAS 1 10 e |
| Disclosure of claims and benefits paid [text block] | text block | IAS 1 10 e |

**4**

**DTR 4 : Periodic Financial Reporting**

**4**

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Disclosure of commitments [text block] | text block | IAS 1 10 e |
| Disclosure of commitments and contingent liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of contingent liabilities [text block] | text block | IAS 37 86 |
| Disclosure of cost of sales [text block] | text block | IAS 1 10 e |
| Disclosure of credit risk [text block] | text block | IFRS 7 Credit risk, IAS 1 10 e |
| Disclosure of debt instruments [text block] | text block | IAS 1 10 e |
| Disclosure of deferred acquisition costs arising from insurance contracts [text block] | text block | IAS 1 10 e |
| Disclosure of deferred income [text block] | text block | IAS 1 10 e |
| Disclosure of deferred taxes [text block] | text block | IAS 1 10 e |
| Disclosure of deposits from banks [text block] | text block | IAS 1 10 e |
| Disclosure of deposits from customers [text block] | text block | IAS 1 10 e |
| Disclosure of depreciation and amortisation expense [text block] | text block | IAS 1 10 e |
| Disclosure of derivative financial instruments [text block] | text block | IAS 1 10 e |
| Disclosure of discontinued operations [text block] | text block | IAS 1 10 e |
| Disclosure of dividends [text block] | text block | IAS 1 10 e |
| Disclosure of earnings per share [text block] | text block | IAS 33 Disclosure |
| Disclosure of effect of changes in foreign exchange rates [text block] | text block | IAS 21 Disclosure |
| Disclosure of employee benefits [text block] | text block | IAS 19 Scope |
| Disclosure of entity's operating segments [text block] | text block | IFRS 8 Disclosure |
| Disclosure of events after reporting period [text block] | text block | IAS 10 Disclosure |
| Disclosure of expenses [text block] | text block | IAS 1 10 e |
| Disclosure of expenses by nature [text block] | text block | IAS 1 10 e |
| Disclosure of exploration and evaluation assets [text block] | text block | IFRS 6 Disclosure |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Disclosure of fair value measurement [text block] | text block | IFRS 13 Disclosure |
| Disclosure of fair value of financial instruments [text block] | text block | IAS 1 10 e |
| Disclosure of fee and commission income (expense) [text block] | text block | IAS 1 10 e |
| Disclosure of finance cost [text block] | text block | IAS 1 10 e |
| Disclosure of finance income (cost) [text block] | text block | IAS 1 10 e |
| Disclosure of finance income [text block] | text block | IAS 1 10 e |
| Disclosure of financial assets held for trading [text block] | text block | IAS 1 10 e |
| Disclosure of financial instruments [text block] | text block | IFRS 7 Scope |
| Disclosure of financial instruments at fair value through profit or loss [text block] | text block | IAS 1 10 e |
| Disclosure of financial instruments designated at fair value through profit or loss [text block] | text block | IAS 1 10 e |
| Disclosure of financial instruments held for trading [text block] | text block | IAS 1 10 e |
| Disclosure of financial liabilities held for trading [text block] | text block | IAS 1 10 e |
| Disclosure of financial risk management [text block] | text block | IAS 1 10 e |
| Disclosure of first-time adoption [text block] | text block | IFRS 1 Presentation and disclosure |
| Disclosure of general and administrative expense [text block] | text block | IAS 1 10 e |
| Disclosure of general information about financial statements [text block] | text block | IAS 1 51 |
| Disclosure of going concern [text block] | text block | IAS 1 10 e |
| Disclosure of goodwill [text block] | text block | IAS 1 10 e |
| Disclosure of government grants [text block] | text block | IAS 20 Disclosure |
| Disclosure of hyperinflationary reporting [text block] | text block | IAS 29 Disclosure |
| Disclosure of impairment of assets [text block] | text block | IAS 36 Disclosure |
| Disclosure of income tax [text block] | text block | IAS 12 Disclosure |

**4**

**DTR 4 : Periodic Financial Reporting**

**4**

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Disclosure of information about employees [text block] | text block | IAS 1 10 e |
| Disclosure of information about key management personnel [text block] | text block | IAS 1 10 e |
| Disclosure of insurance contracts [text block] | text block | IFRS 4 Disclosure |
| Disclosure of insurance premium revenue [text block] | text block | IAS 1 10 e |
| Disclosure of intangible assets [text block] | text block | IAS 38 Disclosure |
| Disclosure of intangible assets and goodwill [text block] | text block | IAS 1 10 e |
| Disclosure of interest expense [text block] | text block | IAS 1 10 e |
| Disclosure of interest income [text block] | text block | IAS 1 10 e |
| Disclosure of interest income (expense) [text block] | text block | IAS 1 10 e |
| Disclosure of interests in other entities [text block] | text block | IFRS 12.1 Disclosure |
| Disclosure of interim financial reporting [text block] | text block | IAS 34 Content of an interim financial report |
| Disclosure of inventories [text block] | text block | IAS 2 Disclosure |
| Disclosure of investment contracts liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of investment property [text block] | text block | IAS 40 Disclosure |
| Disclosure of investments accounted for using equity method [text block] | text block | IAS 1 10 e |
| Disclosure of investments other than investments accounted for using equity method [text block] | text block | IAS 1 10 e |
| Disclosure of issued capital [text block] | text block | IAS 1 10 e |
| Disclosure of joint ventures [text block] | text block | IAS 27 17 b, IFRS 12 B4 b, IAS 27 16 b |
| Disclosure of lease prepayments [text block] | text block | IAS 1 10 e |
| Disclosure of leases [text block] | text block | IFRS 16 Presentation, IFRS 16 Disclosure |
| Disclosure of liquidity risk [text block] | text block | IAS 1 10 e |
| Disclosure of loans and advances to banks [text block] | text block | IAS 1 10 e |
| Disclosure of loans and advances to customers [text block] | text block | IAS 1 10 e |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Disclosure of market risk [text block] | text block | IAS 1 10 e |
| Disclosure of material accounting policy information [text block] | text block | Effective 2023-01-01 IAS 1.117 Disclosure |
| Disclosure of net asset value attributable to unitholders [text block] | text block | IAS 1 10 e |
| Disclosure of non-controlling interests [text block] | text block | IAS 1 10 e |
| Disclosure of non-current assets held for sale and discontinued operations [text block] | text block | IFRS 5 Presentation and disclosure |
| Disclosure of non-current assets or disposal groups classified as held for sale [text block] | text block | IAS 1 10 e |
| Disclosure of objectives, policies and processes for managing capital [text block] | text block | IAS 1 134 |
| Disclosure of other assets [text block] | text block | IAS 1 10 e |
| Disclosure of other current assets [text block] | text block | IAS 1 10 e |
| Disclosure of other current liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of other liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of other non-current assets [text block] | text block | IAS 1 10 e |
| Disclosure of other non-current liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of other operating expense [text block] | text block | IAS 1 10 e |
| Disclosure of other operating income (expense) [text block] | text block | IAS 1 10 e |
| Disclosure of other operating income [text block] | text block | IAS 1 10 e |
| Disclosure of other provisions, contingent liabilities and contingent assets [text block] | text block | IAS 37 Disclosure |
| Disclosure of prepayments and other assets [text block] | text block | IAS 1 10 e |
| Disclosure of profit (loss) from operating activities [text block] | text block | IAS 1 10 e |
| Disclosure of property, plant and equipment [text block] | text block | IAS 16 Disclosure |
| Disclosure of provisions [text block] | text block | IAS 1 10 e |

**4**

**4**

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Disclosure of reclassification of financial instruments [text block] | text block | IAS 1 10 e |
| Disclosure of regulatory deferral accounts [text block] | text block | IFRS 14 Disclosure, IFRS 14 Presentation |
| Disclosure of reinsurance [text block] | text block | IAS 1 10 e |
| Disclosure of related party [text block] | text block | IAS 24 Disclosures |
| Disclosure of repurchase and reverse repurchase agreements [text block] | text block | IAS 1 10 e |
| Disclosure of research and development expense [text block] | text block | IAS 1 10 e |
| Disclosure of reserves within equity [text block] | text block | IAS 1 79 b |
| Disclosure of restricted cash and cash equivalents [text block] | text block | IAS 1 10 e |
| Disclosure of revenue [text block] | text block | IAS 1 10 e |
| Disclosure of revenue from contracts with customers [text block] | text block | IFRS 15 Disclosure, IFRS 15 Presentation |
| Disclosure of separate financial statements [text block] | text block | IAS 27 Disclosure, IFRS 12 Objective |
| Disclosure of service concession arrangements [text block] | text block | SIC 29 Consensus |
| Disclosure of share capital, reserves and other equity interest [text block] | text block | IAS 1 79 |
| Disclosure of share-based payment arrangements [text block] | text block | IFRS 2 44 |
| Disclosure of subordinated liabilities [text block] | text block | IAS 1 10 e |
| Disclosure of subsidiaries [text block] | text block | IAS 27 17 b, IFRS 12 B4 a, IAS 27 16 b |
| Disclosure of significant accounting policies [text block] | text block | IAS 1 117 |
| Disclosure of tax receivables and payables [text block] | text block | IAS 1 10 e |
| Disclosure of trade and other payables [text block] | text block | IAS 1 10 e |
| Disclosure of trade and other receivables [text block] | text block | IAS 1 10 e |
| Disclosure of trading income (expense) [text block] | text block | IAS 1 10 e |
| Disclosure of treasury shares [text block] | text block | IAS 1 10 e |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of accounting policy for available-for-sale financial assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for biological assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for borrowing costs [text block] | text block | IAS 1 117 b |
| Description of accounting policy for borrowings [text block] | text block | IAS 1 117 b |
| Description of accounting policy for business combinations [text block] | text block | IAS 1 117 b |
| Description of accounting policy for business combinations and goodwill [text block] | text block | IAS 1 117 b |
| Description of accounting policy for cash flows [text block] | text block | IAS 1 117 b |
| Description of accounting policy for collateral [text block] | text block | IAS 1 117 b |
| Description of accounting policy for construction in progress [text block] | text block | IAS 1 117 b |
| Description of accounting policy for contingent liabilities and contingent assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for customer acquisition costs [text block] | text block | IAS 1 117 b |
| Description of accounting policy for customer loyalty programmes [text block] | text block | IAS 1 117 b |
| Description of accounting policy for decommissioning, restoration and rehabilitation provisions [text block] | text block | IAS 1 117 b |
| Description of accounting policy for deferred acquisition costs arising from insurance contracts [text block] | text block | IAS 1 117 b |
| Description of accounting policy for deferred income tax [text block] | text block | IAS 1 117 b |
| Description of accounting policy for depreciation expense [text block] | text block | IAS 1 117 b |
| Description of accounting policy for derecognition of financial instruments [text block] | text block | IAS 1 117 b |
| Description of accounting policy for derivative financial instruments [text block] | text block | IAS 1 117 b |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of accounting policy for derivative financial instruments and hedging [text block] | text block | IAS 1 117 b |
| Description of accounting policy for determining components of cash and cash equivalents [text block] | text block | IAS 7 46 |
| Description of accounting policy for discontinued operations [text block] | text block | IAS 1 117 b |
| Description of accounting policy for discounts and rebates [text block] | text block | IAS 1 117 b |
| Description of accounting policy for dividends [text block] | text block | IAS 1 117 b |
| Description of accounting policy for earnings per share [text block] | text block | IAS 1 117 b |
| Description of accounting policy for emission rights [text block] | text block | IAS 1 117 b |
| Description of accounting policy for employee benefits [text block] | text block | IAS 1 117 b |
| Description of accounting policy for environment-related expense [text block] | text block | IAS 1 117 b |
| Description of accounting policy for exceptional items [text block] | text block | IAS 1 117 b |
| Description of accounting policy for expenses [text block] | text block | IAS 1 117 b |
| Description of accounting policy for exploration and evaluation expenditures [text block] | text block | IFRS 6 24 a |
| Description of accounting policy for fair value measurement [text block] | text block | IAS 1 117 b |
| Description of accounting policy for fee and commission income and expense [text block] | text block | IAS 1 117 b |
| Description of accounting policy for finance costs [text block] | text block | IAS 1 117 b |
| Description of accounting policy for finance income and costs [text block] | text block | IAS 1 117 b |
| Description of accounting policy for financial assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for financial guarantees [text block] | text block | IAS 1 117 b |

| Table 2 – list of disclosures | | |
| --- | --- | --- |
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of accounting policy for financial instruments [text block] | text block | IAS 1 117 b |
| Description of accounting policy for financial instruments at fair value through profit or loss [text block] | text block | IAS 1 117 b |
| Description of accounting policy for financial liabilities [text block] | text block | IAS 1 117 b |
| Description of accounting policy for foreign currency translation [text block] | text block | IAS 1 117 b |
| Description of accounting policy for franchise fees [text block] | text block | IAS 1 117 b |
| Description of accounting policy for functional currency [text block] | text block | IAS 1 117 b |
| Description of accounting policy for goodwill [text block] | text block | IAS 1 117 b |
| Description of accounting policy for government grants [text block] | text block | IAS 20 39 a |
| Description of accounting policy for hedging [text block] | text block | IAS 1 117 b |
| Description of accounting policy for held-to-maturity investments [text block] | text block | IAS 1 117 b |
| Description of accounting policy for impairment of assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for impairment of financial assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for impairment of non-financial assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for income tax [text block] | text block | IAS 1 117 b |
| Description of accounting policy for insurance contracts and related assets, liabilities, income and expense [text block] | text block | IFRS 4 37 a |
| Description of accounting policy for intangible assets and goodwill [text block] | text block | IAS 1 117 b |
| Description of accounting policy for intangible assets other than goodwill [text block] | text block | IAS 1 117 b |
| Description of accounting policy for interest income and expense [text block] | text block | IAS 1 117 b |

**4**

**DTR 4 : Periodic Financial Reporting**

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of accounting policy for investment in associates [text block] | text block | IAS 1 117 b |
| Description of accounting policy for investment in associates and joint ventures [text block] | text block | IAS 1 117 b |
| Description of accounting policy for investments in joint ventures [text block] | text block | IAS 1 117 b |
| Description of accounting policy for investment property [text block] | text block | IAS 1 117 b |
| Description of accounting policy for investments other than investments accounted for using equity method [text block] | text block | IAS 1 117 b |
| Description of accounting policy for issued capital [text block] | text block | IAS 1 117 b |
| Description of accounting policy for leases [text block] | text block | IAS 1 117 b |
| Description of accounting policy for loans and receivables [text block] | text block | IAS 1 117 b |
| Description of accounting policy for measuring inventories [text block] | text block | IAS 2 36 a |
| Description of accounting policy for mining assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for mining rights [text block] | text block | IAS 1 117 b |
| Description of accounting policy for non-current assets or disposal groups classified as held for sale [text block] | text block | IAS 1 117 b |
| Description of accounting policy for non-current assets or disposal groups classified as held for sale and discontinued operations [text block] | text block | IAS 1 117 b |
| Description of accounting policy for offsetting of financial instruments [text block] | text block | IAS 1 117 b |
| Description of accounting policy for oil and gas assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for programming assets [text block] | text block | IAS 1 117 b |
| Description of accounting policy for property, plant and equipment [text block] | text block | IAS 1 117 b |

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of accounting policy for provisions [text block] | text block | IAS 1 117 b |
| Description of accounting policy for reclassification of financial instruments [text block] | text block | IAS 1 117 b |
| Description of accounting policy for recognising in profit or loss difference between fair value at initial recognition and transaction price [text block] | text block | IFRS 7 28 a |
| Description of accounting policy for recognition of revenue [text block] | text block | IAS 1 117 b |
| Description of accounting policy for regulatory deferral accounts [text block] | text block | IAS 1 117 b |
| Description of accounting policy for reinsurance [text block] | text block | IAS 1 117 b |
| Description of accounting policy for repairs and maintenance [text block] | text block | IAS 1 117 b |
| Description of accounting policy for repurchase and reverse repurchase agreements [text block] | text block | IAS 1 117 b |
| Description of accounting policy for research and development expense [text block] | text block | IAS 1 117 b |
| Description of accounting policy for restricted cash and cash equivalents [text block] | text block | IAS 1 117 b |
| Description of accounting policy for segment reporting [text block] | text block | IAS 1 117 b |
| Description of accounting policy for service concession arrangements [text block] | text block | IAS 1 117 b |
| Description of accounting policy for share-based payment transactions [text block] | text block | IAS 1 117 b |
| Description of accounting policy for stripping costs [text block] | text block | IAS 1 117 b |
| Description of accounting policy for subsidiaries [text block] | text block | IAS 1 117 b |
| Description of accounting policy for taxes other than income tax [text block] | text block | IAS 1 117 b |
| Description of accounting policy for termination benefits [text block] | text block | IAS 1 117 b |

**DTR 4 : Periodic Financial Reporting**

| Table 2 – list of disclosures | | |
|---|---|---|
| **Label** | **Data type and other attributes** | **References to IFRSs** |
| Description of accounting policy for trade and other payables [text block] | text block | IAS 1 117 b |
| Description of accounting policy for trade and other receivables [text block] | text block | IAS 1 117 b |
| Description of accounting policy for trading income and expense [text block] | text block | IAS 1 117 b |
| Description of accounting policy for transactions with non-controlling interests [text block] | text block | IAS 1 117 b |
| Description of accounting policy for transactions with related parties [text block] | text block | IAS 1 117 b |
| Description of accounting policy for treasury shares [text block] | text block | IAS 1 117 b |
| Description of accounting policy for warrants [text block] | text block | IAS 1 117 b |
| Description of other accounting policies relevant to understanding of financial statements [text block] | text block | IAS 1 117 b |

**Disclosure Guidance and Transparency Rules sourcebook**

# Chapter 5

# Vote Holder and Issuer Notification Rules

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 243 of 2232

DTR 5 : Vote Holder and Issuer    Page ID #:2301    Section 5.1 : Notification of the acquisition
Notification Rules                                          or disposal of major shareholdings

**5**



### 5.1    Notification of the acquisition or disposal of major shareholdings

**5.1.1**    **R**    In this chapter:

(1) references to an "*issuer*", in relation to *shares* admitted to trading on a *regulated market*, are to an *issuer* whose *shares* are admitted to trading on a *regulated market*;

(2) references to a "non-*UK issuer*" are to an *issuer* whose *shares* are admitted to trading on a *regulated market* other than:

    (a) a public company within the meaning of section 4(2)of the Companies Act 2006; and

    (b) a company which is otherwise incorporated in, and whose principal place of business is in, the *UK*;

(3) references to "*shares*" are to *shares* which are:

    (a) already issued and carry rights to vote which are exercisable in all circumstances at general meetings of the *issuer* including *shares* (such as preference *shares*) which, following the exercise of an option for their conversion, event of default or otherwise, have become fully enfranchised for voting purposes; and

    (b) admitted to trading on a *regulated* or *prescribed market*;

(4) an acquisition or disposal of *shares* is to be regarded as effective when the relevant transaction is executed unless the transaction provides for settlement to be subject to conditions which are beyond the control of the parties in which case the acquisition or disposal is to be regarded as effective on the settlement of the transaction; and

(5) [deleted]

(6) for the purposes of calculating whether any percentage threshold is reached, exceeded or fallen below and in any resulting notification, the proportion of voting rights held shall if necessary be rounded down to the next whole number.

5.1.2  A *person* must notify the *issuer* of the percentage of its voting rights he holds as *shareholder* or holds or is deemed to hold through his direct or indirect holding of financial instruments falling within ■ DTR 5.3.1R (1) (or a combination of such holdings) if the percentage of those voting rights:

(1) reaches, exceeds or falls below 3%, 4%, 5%, 6%, 7%, 8%, 9%, 10% and each 1% threshold thereafter up to 100% (or in the case of a non-UK *issuer* on the basis of thresholds at 5%, 10%, 15%, 20%, 25%, 30%, 50% and 75%) as a result of an acquisition or disposal of *shares* or financial instruments falling within ■ DTR 5.3.1 R; or

(2) reaches, exceeds or falls below an applicable threshold in (1) as a result of events changing the breakdown of voting rights and on the basis of information disclosed by the issuer in accordance with ■ DTR 5.6.1 Rand ■ DTR 5.6.1A R;

and in the case of an issuer which is not incorporated in the *United Kingdom* a notification under (2) must be made on the basis of equivalent events and disclosed information.

[**Note:** articles 9(1), 9(2), 13(1) and 13a(1) of the *TD*]

### Certain voting rights to be disregarded



5.1.3  Voting rights attaching to the following *shares* are to be disregarded for the purposes of determining whether a person has a notification obligation in accordance with the thresholds in ■ DTR 5.1.2 R:

(1) (a) *shares* acquired; or

(b) *shares* underlying financial instruments within ■ DTR 5.3.1R(1) to the extent that such financial instruments are acquired;

for the sole purpose of clearing and settlement within a settlement cycle not exceeding the period beginning with the transaction and ending at the close of the third *trading day* following the day of the execution of the transaction (irrespective of whether the transaction is conducted on-exchange);

(2) (a) *shares* held; or

(b) *shares* underlying financial instruments within ■ DTR 5.3.1R(1) to the extent that such financial instruments are held;

by a custodian (or nominee) in its custodian (or nominee) capacity (whether operating from an establishment in the UK or elsewhere) provided such a *person* can only exercise the voting rights attached to such *shares* under instructions given in writing or by *electronic means*;

(3) (a) *shares* held; or

(b) *shares* underlying financial instruments within ■ DTR 5.3.1R(1) to the extent that such financial instruments are held;

by a *market maker* acting in that capacity subject to the percentage of such *shares* not being equal to or in excess of 10% and subject to the *market maker* satisfying the criteria and complying with the conditions and operating requirements set out in ■ DTR 5.1.4 R;

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 245 of 2232
Page ID #:2303

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Section 5.1 : Notification of the acquisition
or disposal of major shareholdings

**5**

(4) (a) *shares* held; or

(b) *shares* underlying financial instruments within ■ DTR 5.3.1R(1) to the extent that such financial instruments are held;

by a *credit institution* or *investment firm* provided that:

(i) the *shares*, or financial instruments , are held within the *trading book* of the *credit institution* or *investment firm*;

(ii) the voting rights attached to such *shares* do not exceed 5%; and

(iii) the voting rights attached to *shares* in, or related to financial instruments in, the *trading book* are not exercised or otherwise used to intervene in the management of the *issuer*.

(5) *shares* held by a collateral taker under a collateral transaction which involves the outright transfer of *securities* provided the collateral taker does not declare any intention of exercising (and does not exercise) the voting rights attaching to such *shares*.

(6) [deleted]

(7) *shares* acquired for stabilisation purposes in accordance with the *Buy-back and Stabilisation Regulation*, if the voting rights attached to those *shares* are not exercised or otherwise used to intervene in the management of the *issuer*.

[**Note:** articles 9(4), 9(5), 9(6), 9(6a), 10(c) and 13(4) of the *TD*]

5.1.4    R    (1) References to a *market maker* are to a *market maker* which:

(a) (subject to (3) below) is authorised by the *FCA* or the *PRA* under the *United Kingdom* provisions which implemented *MiFID*;

(b) does not intervene in the management of the *issuer* concerned; and

(c) does not exert any influence on the *issuer* to buy such *shares* or back the *share* price.

[**Note: articles 9(5) and 9(6) of the** *TD*]

(2) A *market maker* relying upon the exemption for *shares* or financial instruments within ■ DTR 5.3.1R(1) held by it in that capacity must notify the *FCA*, at the latest within the time limit provided for by ■ DTR 5.8.3 R, that it conducts or intends to conduct market making activities on a particular *issuer* (and shall equally make such a notification if it ceases such activity).

[**Note: article 6(1) of the** *TD implementing Directive***]**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 246 of 2232
Page ID #:2304

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Section 5.1 : Notification of the acquisition
or disposal of major shareholdings

**5**

(3)  References to a *market maker* also include a *third country investment firm* and a *credit institution* when acting as a *market maker* and which, in relation to that activity, is subject to regulatory supervision under the laws of the *United Kingdom*.

### Aggregation of holdings

**5.1.4A**  | UK |  The *TD Major Holdings Regulation* provides that:

Recital 2

The thresholds for the market making and trading book exemptions should be calculated by aggregating voting rights relating to shares with voting rights related to financial instruments (that is entitlements to acquire shares and financial instruments considered to be economically equivalent to shares) in order to ensure consistent application of the principle of aggregation of all holdings of financial instruments subject to notification requirements and to prevent a misleading representation of how many financial instruments related to an issuer are held by an entity benefiting from those exemptions.

Article 2

**Aggregation of holdings**

For the purpose of calculation of the thresholds referred to in [■ DTR 5.1.3R(3) and (4)], holdings under United Kingdom law corresponding to Articles 9, 10 and 13 of Directive 2004/109/EC shall be aggregated.

### Aggregation of holdings in the case of a group

**5.1.4B**  | UK |  The *TD Major Holdings Regulation* provides that:

Recital 3

In order to provide an adequate level of transparency in the case of a group of companies, and to take into account the fact that, where a parent undertaking has control over its subsidiaries, it may influence their management, the thresholds should be calculated at group level. Therefore all holdings owned by a parent undertaking of a credit institution or investment firm and subsidiary companies should be disclosed when the total sum of the holdings reaches the notification threshold.

Article 3

**Aggregation of holdings in the case of a group**

For the purpose of calculation of the thresholds referred to in [■ DTR 5.1.3R(3) and (4)]in the case of a group of companies, holdings shall be aggregated at group level according to the principle laid down in [■ DTR 5.2.1R(e)].

### Certain voting rights to be disregarded (except at 5% 10% and higher thresholds)

**5.1.5**  | R |  (1)  The following are to be disregarded for the purposes of determining whether a *person* has a notification obligation in accordance with the thresholds in ■ DTR 5.1.2 R except at the thresholds of 5% and 10% and above:

(a)  voting rights attaching to *shares* forming part of property belonging to another which that *person* lawfully manages under an agreement in, or evidenced in, writing;

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 247 of 2232
Page ID #:2305

DTR 5 : Vote Holder and Issuer    Section 5.1 : Notification of the acquisition
Notification Rules                                or disposal of major shareholdings

**5**

    (b)  voting rights attaching to *shares* which may be exercisable by a *person* in his capacity as the operator of:

       (i)  an *authorised unit trust scheme*;

    (ia)  an *authorised contractual scheme*;

    (ii)  a *recognised scheme*; or

    (iii)  a *UCITS scheme*;

   (c)  voting rights attaching to *shares* which may be exercisable by an *ICVC*.

   (d)  [deleted]

(2)  For the purposes of ■ DTR 5.1.5 R (1)(a), a *person* ("A") may lawfully manage *investments* belonging to another if:

   (a)  A can manage those *investments* in accordance with a *Part 4A permission*;

   (b)  [deleted]

   (c)  A can, in accordance with section 327 of the *Act*, manage those *investments* without contravening the prohibition contained in section 19 of the *Act*;

   (d)  [deleted]

   (e)  A can lawfully manage those *investments* in a *third country* and would, if he were to manage those *investments* in the *UK*, require a *Part 4A permission*.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 248 of 2232
Page ID #:2306

DTR 5 : Vote Holder and Issuer
Notification Rules

Section 5.2 : Acquisition or disposal of major
proportions of voting rights

**5.2       Acquisition or disposal of major
            proportions of voting rights**

5

5.2.1    R    A *person* is an indirect holder of *shares* for the purpose of the applicable
definition of *shareholder* to the extent that he is entitled to acquire, to
dispose of, or to exercise voting rights in any of the following cases or a
combination of them:

| Case |
| --- |
| (a)    voting rights held by a third party with whom that *person* has concluded an agreement, which obliges them to adopt, by concerted exercise of the voting rights they hold, a lasting common policy towards the management of the *issuer* in question; |
| (b)    voting rights held by a third party under an agreement concluded with that *person* providing for the temporary transfer for consideration of the voting rights in question; |
| (c)    voting rights attaching to *shares* which are lodged as collateral with that *person* provided that *person* controls the voting rights and declares its intention of exercising them; |
| (d)    voting rights attaching to *shares* in which that *person* has the life interest; |
| (e)    voting rights which are held, or may be exercised within the meaning of points (a) to (d) or, in cases (f) and (h) by a *person* undertaking investment management, or by a *management company*, by an undertaking controlled by that *person*; |
| (f)    voting rights attaching to *shares* deposited with that *person* which the person can exercise at its discretion in the absence of specific instructions from the *shareholders*; |
| (g)    voting rights held by a third party in his own name on behalf of that *person*; |

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 249 of 2232

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Page ID #:2307

Section 5.2 : Acquisition or disposal of major
proportions of voting rights

| Case |
|---|
| (h) | voting rights which that *person* may exercise as a proxy where that *person* can exercise the voting rights at his discretion in the absence of specific instructions from the *shareholders*. |

**[Note: article 10 of the *TD*]**

5.2.2    G    Cases (a) to (h) in ■ DTR 5.2.1 R identify situations where a *person* may be able to control the manner in which voting rights are exercised and where, (taking account of any aggregation with other holdings) a notification to the *issuer* may need to be made. In the *FCA's* view:

    (1) Case (e) produces the result that it is always necessary for the *parent undertaking* of a *controlled undertaking* to aggregate its holding with any holding of the *controlled undertaking* (subject to the exemptions implicit in Case (e) and others in ■ DTR 5.4);

    (2) Case (f) includes a *person* carrying on investment management and which is also the custodian of *shares* to which voting rights are attached;

    (3) Case (g) does not result in a Unitholder in a *collective investment scheme* or other investment entity being treated as the holder of voting rights in the scheme property (provided always such persons do not have any entitlement to exercise, or control the exercise of, such voting rights); neither are such persons to be regarded as holding *shares* "indirectly";

    (4) Case (h), although referring to proxies, also describes and applies to a *person* undertaking investment management, and to a *management company*, and which is able effectively to determine the manner in which voting rights attached to *shares* under its control are exercised (for example through instructions given directly or indirectly to a nominee or independent custodian). Case (e) provides for the voting rights which are under the control of such a *person* to be aggregated with those of its *parent undertaking*.

5.2.3    G    A *person* falling within Cases (a) to (h) is an indirect holder of *shares* for the purpose of the definition of *shareholder*. These indirect holdings have to be aggregated, but also separately identified in a notification to the *issuer*. Apart from those identified in the Cases (a) to (h), the *FCA* does not expect any other significant category "indirect shareholder" to be identified. Cases (a) to (h) are also relevant in determining whether a *person* is an indirect holder of financial instruments within ■ DTR 5.3.1R(1)(a) which result in an entitlement to acquire *shares*.

5.2.4    R    ■ DTR 5.1.2 R and case (c) of ■ DTR 5.2.1 R do not apply in respect of voting rights attaching to *shares* provided to or by the Bank of England in carrying out its functions as a monetary authority, including *shares* provided to or by the Bank of England under a pledge or repurchase of similar agreement for liquidity granted for monetary policy purposes or within a payments system provided:

(1) this shall apply only for a short period following the provision of the *shares*; and

(2) the voting rights attached to the shares during this period are not exercised.

[Note: article 11 of the *TD*.]

**5.2.5**  **R**

(1) A *person* who is required to make a notification may, without affecting their responsibility, appoint another *person* to make the notification on his behalf.

(2) Where two or more *persons* are required to make a notification such *persons* may, without affecting their responsibility, arrange for a single notification to be made.

[Note: article 8(3) of the *TD implementing Directive*.]

**5**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 251 of 2232
Page ID #:2309

**DTR 5 : Vote Holder and Issuer
Notification Rules**

Section 5.3 : Notification of voting rights
arising from the holding of certain financial
instruments

**5**



### 5.3    Notification of voting rights arising from the holding of certain financial instruments

**5.3.1**    R    (1) A *person* must make a notification in accordance with the applicable thresholds in ■ DTR 5.1.2R in respect of any financial instruments which they hold, directly or indirectly, which:

(a) on maturity give the holder, under a formal agreement, either the unconditional right to acquire or the discretion as to the holder's right to acquire, *shares* to which voting rights are attached, already issued, of an *issuer*; or

(b) are not included in (a) but which are referenced to *shares* referred to in (a) and with economic effect similar to that of the financial instruments referred to in (a), whether or not they confer a right to a physical settlement.

[**Note:** article 13(1) of the *TD*]

(2) [deleted]

(2A) [deleted]

(3) [deleted]

(4) [deleted]

(5) [deleted]

**5.3.1A**    G    [deleted]

**5.3.2**    R    For the purposes of ■ DTR 5.3.1 R (1)(a):

(1) [deleted]

(2) [deleted]

(3) a "formal agreement" means an agreement which is binding under applicable law.

[**Note:** article 2(1)(q) of the *TD*]

**DTR 5 : Vote Holder and Issuer
Notification Rules**

Section 5.3 : Notification of voting rights
arising from the holding of certain financial
instruments

**5**

| | | |
|---|---|---|
| 5.3.2A | G | The FCA maintains a published indicative list of financial instruments that are subject to notification requirements according to ■ DTR 5.3.1R. |

[**Note:** article 13(1b) of the *TD*]

| | | |
|---|---|---|
| 5.3.2B | UK | The *TD Major Holdings Regulation* provides that: |

Recital 8

To decrease the number of meaningless notifications to the market, the trading book exemption should apply to financial instruments held by a natural person or legal entity fulfilling orders received from clients, responding to a client's request to trade otherwise than on a proprietary basis or hedging positions arising out of such dealings.

Article 6

**Client-serving transactions**

The exemption referred to in [■ DTR 5.1.3R(4)] shall apply to financial instruments held by a natural person or legal entity fulfilling orders received from clients, responding to a client's request to trade otherwise than on a proprietary basis, or hedging positions arising out of such dealings.

| | | |
|---|---|---|
| 5.3.2C | G | [deleted] |

[**Note:** article 13(4) of the *TD*]

| | | |
|---|---|---|
| 5.3.3 | G | (1) For the purposes of ■ DTR 5.3.1R (1)(a), financial instruments within ■ DTR 5.3.1R(1)(a) should be taken into account in the context of notifying major holdings, to the extent that such instruments give the holder an unconditional right to acquire the underlying shares or cash on maturity. Consequently, financial instruments financial instruments within ■ DTR 5.3.1R(1)(a) should not be considered to include instruments entitling the holder to receive shares depending on the price of the underlying share reaching a certain level at a certain moment in time. Nor should they be considered to cover those instruments that allow the instrument issuer or a third party to give shares or cash to the instrument holder on maturity. |

[**Note:** Recital 13 of the *TD implementing Directive*]

(2) [deleted]

| | | |
|---|---|---|
| 5.3.3A | R | The number of voting rights must be calculated by reference to the full notional amount of *shares* underlying the financial instrument except where the financial instrument provides exclusively for a cash settlement, in which case the number of voting rights must be calculated on a "delta-adjusted" basis, by multiplying the notional amount of underlying *shares* by the delta of the financial instrument. For this purpose, the holder must aggregate and notify all financial instruments relating to the same underlying *issuer*. Only long positions are to be taken into account for the calculation of voting rights. Long positions are not to be netted with short positions relating to the same underlying *issuer*. |

[**Note:** article 13(1a) of the *TD*]

**5.3.3B**  UK  The *TD Major Holdings Regulation* provides that:

Recital 4

The disclosure regime for financial instruments that have a similar economic effect to shares should be clear. Requirements to provide exhaustive details of the structure of corporate ownership should be proportionate to the need for adequate transparency in major holdings, the administrative burdens those requirements place on holders of voting rights and the flexibility in the composition of a basket of shares or an index. Therefore, financial instruments referenced to a basket of shares or an index should only be aggregated with other holdings in the same issuer when the holding of voting rights through such instruments is significant or the financial instrument is not being used primarily for investment diversification purposes.

Recital 5

It would not be cost-efficient for an investor to build a position in an issuer through holding a financial instrument referenced to different baskets or indices. Therefore, holdings of voting rights through a financial instrument referenced to a series of baskets of shares or indices which are individually under the established thresholds should not be accumulated.

Article 4

**Financial instruments referenced to a basket of shares or an index**

1.Voting rights referred to in [■ DTR 5.3.3AR] in the case of a financial instrument referenced to a basket of shares or an index shall be calculated on the basis of the weight of the share in the basket of shares or index where any of the following conditions apply:

(a)the voting rights in a specific issuer held through financial instruments referenced to the basket or index represent 1% or more of voting rights attached to shares of that issuer;

(b)the shares in the basket or index represent 20% or more of the value of the securities in the basket or index.

2.Where a financial instrument is referenced to a series of baskets of shares or indices, the voting rights held through the individual baskets of shares or indices shall not be accumulated for the purpose of the thresholds set out in paragraph 1.

**5.3.3C**  UK  The *TD Major Holdings Regulation* provides that:

Recital 6

Financial instruments which provide exclusively for a cash settlement should be accounted for on a delta–adjusted basis, with cash position having delta 1 in the case of financial instruments having a linear, symmetric pay-off profile in line with the underlying share and using a generally accepted standard pricing model in the case of financial instruments which do not have a linear, symmetric pay-off profile in line with the underlying share.

Recital 7

In order to ensure that information about the total number of voting rights accessible to the investor is as accurate as possible, delta should be calculated daily taking into account the last closing price of the underlying share.

Article 5

**Financial instruments providing exclusively for a cash settlement**

**5**

1.The number of voting rights referred to in [■DTR 5.3.3AR] relating to financial instruments which provide exclusively for a cash settlement, with a linear, symmetric pay-off profile with the underlying share shall be calculated on a delta-adjusted basis with cash position being equal to 1.

2.The number of voting rights relating to an exclusively cash-settled financial instrument without a linear, symmetric pay-off profile with the underlying share shall be calculated on a delta-adjusted basis, using a generally accepted standard pricing model.

3.A generally accepted standard pricing model shall be a model that is generally used in the finance industry for that financial instrument and that is sufficiently robust to take into account the elements that are relevant to the valuation of the instrument. The elements that are relevant to the valuation shall include at least all of the following:

(a)interest rate;

(b)dividend payments;

(c)time to maturity;

(d)volatility;

(e)price of underlying share.

4.When determining delta the holder of the financial instrument shall ensure all of the following:

(a)that the model used covers the complexity and risk of each financial instrument;

(b)that the same model is used in a consistent manner for the calculation of the number of voting rights of a given financial instrument.

5.Information technology systems used to carry out the calculation of delta shall ensure consistent, accurate and timely reporting of voting rights.

6.The number of voting rights shall be calculated daily, taking into account the last closing price of the underlying share. The holder of the financial instrument shall notify the issuer when that holder reaches, exceeds or falls below the applicable thresholds provided for in [■DTR 5.1.2R].

**5.3.4** |R| The holder of financial instruments within ■DTR 5.3.1R(1)(a), and, to the extent relevant, financial instruments within ■DTR 5.3.1R(1)(b), is required to aggregate and, if necessary, notify all such instruments as relate to the same underlying *issuer*.

[**Note:** article 13(1) of the *TD*]

**5.3.5** |R| A *person* making a notification in accordance with ■DTR 5.1.2R must, if their holding includes financial instruments within ■DTR 5.3.1R(1):

(1) include a breakdown by type of financial instruments held in accordance with ■DTR 5.3.1R(1)(a) and financial instruments held in accordance with ■DTR 5.3.1R(1)(b); and

(2) distinguish between the financial instruments which confer a right to:

(a) physical settlement; and

(b) cash settlement.

[**Note:** article 13(1) of the *TD*]

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 255 of 2232

DTR 5 : Vote Holder and Issuer
Notification Rules

Page ID #:2313

Section 5.4 : Aggregation of managed
holdings

**5**

## 5.4      Aggregation of managed holdings

**5.4.1**  **R**  (1) The *parent undertaking* of a *management company* shall not be
required to aggregate its holdings with the holdings managed by the
*management company* in accordance with the *United Kingdom*
provisions which implemented the *UCITS Directive*, provided such
*management company* exercises its voting rights independently from
the *parent undertaking*.

(2) But the requirements for the aggregation of holdings applies if the
*parent undertaking*, or another *controlled undertaking* of the *parent
undertaking*, has invested in holdings managed by such *management
company* and the *management company* has no discretion to exercise
the voting rights attached to such holdings and may only exercise
such voting rights under direct or indirect instructions from the
*parent* or another *controlled undertaking* of the *parent undertaking*.

[Note: articles 12(4) of the *TD*]

**5.4.2**  **R**  (1) The *parent undertaking* of an *investment firm* authorised by the *FCA*
or the *PRA* under the *United Kingdom* provisions which implemented
*MiFID* shall not be required to aggregate its holdings with the
holdings which such *investment firm* manages on a client-by-client
basis within the meaning of Article 2(7) of the *MiFID Org Regulation*,
provided that:

(a) the *investment firm* is authorised to provide such portfolio
management;

(b) it may only exercise the voting rights attached to such *shares*
under instructions given in writing or by *electronic means* or it
ensures that individual portfolio management services are
conducted independently of any other services under conditions
equivalent to those provided for under the *UCITS Directive* by
putting into place appropriate mechanisms; and

(c) the *investment firm* exercises its voting rights independently from
the *parent undertaking*.

(2) But the requirements for the aggregation of holdings applies if the
*parent undertaking*, or another *controlled undertaking* of the *parent
undertaking*, has invested in holdings managed by such *investment
firm* and the *investment firm* has no discretion to exercise the voting
rights attached to such holdings and may only exercise such voting

rights under direct or indirect instructions from the parent or another *controlled undertaking* of the *parent undertaking*.

**[Note: article 12(5) of the *TD*]**

**5.4.3**   **R**   For the purposes of the exemption to the aggregation of holdings provided in ■ DTR 5.4.1 R or ■ DTR 5.4.2 R, a *parent undertaking* of a *management company* or of an *investment firm* shall comply with the following conditions:

(1) it must not interfere by giving direct or indirect instructions or in any other way in the exercise of the voting rights held by the *management company* or *investment firm*; and

(2) that *management company* or *investment firm* must be free to exercise, independently of the *parent undertaking*, the voting rights attached to the assets it manages.

**[Note: article 10(1) of the *TD implementing Directive*]**

**5.4.4**   **R**   A *parent undertaking* which wishes to make use of the exemption in relation to *issuers* subject to this chapter whose *shares* are admitted to trading on a *regulated market* must without delay, notify the following to the *FCA*:

(1) a list of the names of those *management companies*, *investment firms* or other entities, indicating the *competent authorities* that supervise them, but with no reference to the *issuers* concerned; and

(2) a statement that, in the case of each such *management company* or *investment firm*, the *parent undertaking* complies with the conditions laid down in ■ DTR 5.4.3 R.

The *parent undertaking* shall update the list referred to in paragraph (1) on an ongoing basis.

**[Note: article 10(2) of the *TD implementing Directive*]**

**5.4.5**   **R**   Where the *parent undertaking* intends to benefit from the exemptions only in relation to the financial instruments referred to in ■ DTR 5.3.1R, it must notify to the *FCA* only the list referred to in paragraph (1) of ■ DTR 5.4.4 R.

**[Note: article 10(3) of the *TD implementing Directive* and article 13 of the *TD*]**

**5.4.6**   **R**   A *parent undertaking* of a *management company* or of an *investment firm* must in relation to *issuers* subject to this chapter whose *shares* are admitted to trading on a *regulated market* be able to demonstrate to the *FCA* on request that:

(1) the organisational structures of the *parent undertaking* and the *management company* or *investment firm* are such that the voting rights are exercised independently of the *parent undertaking*;

(2) the persons who decide how the voting rights are exercised act independently;

**5**

(3)  if the *parent undertaking* is a client of its *management company* or *investment firm* or has a holding in the assets managed by the *management company* or *investment firm*, there is a clear written mandate for an arms-length customer relationship between the *parent undertaking* and the *management company* or *investment firm*.

The requirement in (1) shall imply as a minimum that the *parent undertaking* and the *management company* or *investment firm* must have established written policies and procedures reasonably designed to prevent the distribution of information between the *parent undertaking* and the *management company* or *investment firm* in relation to the exercise of voting rights.

[**Note: article 10(4) of the** *TD implementing Directive*]

5.4.7    R    For the purposes of paragraph (1) of ■ DTR 5.4.3 R direct instruction means any instruction given by the *parent undertaking*, or another *controlled undertaking* of the *parent undertaking*, specifying how the voting rights are to exercised by the *management company* or *investment firm* in particular cases.

5.4.8    R    Indirect instruction means any general or particular instruction, regardless of the form, given by the *parent undertaking*, or another *controlled undertaking* of the *parent undertaking*, that limits the discretion of the *management company* or *investment firm* in relation to the exercise of voting rights in order to serve specific business interests of the *parent undertaking* or another *controlled undertaking* of the *parent undertaking*.

[**Note: article 10(5) of the** *TD implementing Directive*]

5.4.9    R    Undertakings whose registered office is in a *third country* which would have required a *Part 4A permission* to carry on the *regulated activity* specified under article 51ZA of the *Regulated Activities Order* or with regard to portfolio management authorisation under paragraph 4 of Part 3 of Schedule 2 to the *Regulated Activities Order* if it had its registered office or, only in the case of an *investment firm*, its head office within the United Kingdom, shall be exempted from aggregating holdings with the holdings of its *parent undertaking* under this *rule* provided that they comply with equivalent conditions of independence as *management companies* or *investment firms*.

[**Article 23(6)** *TD*]

5.4.10    R    A *third country* shall be deemed to set conditions of independence equivalent to those set out in this *rule* where under the law of that country , a *management company* or *investment firm* is required to meet the following conditions:

(1)  the *management company* or *investment firm* must be free in all situations to exercise, independently of its *parent undertaking*, the voting rights attached to the assets it manages;

(2)  the *management company* or *investment firm* must disregard the interests of the *parent undertaking* or of any other *controlled*

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 258 of 2232
Page ID #:2316

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Section 5.4 : Aggregation of managed
holdings

*undertaking* of the *parent undertaking* whenever conflicts of interest arise.

**5.4.11**    R    A *parent undertaking* of a *third country* undertaking must comply with the notification requirements in ■ DTR 5.4.4 R (1) and ■ DTR 5.4.5 R and in addition:

(1) must make a statement that in respect of each *management company* or *investment firm* concerned, the *parent undertaking* complies with the conditions of independence set down in ■ DTR 5.4.10 R; and

(2) must be able to demonstrate to the *FCA* on request that the requirements of ■ DTR 5.4.6 R are respected.

[**Note: article 23 of the** *TD implementing Directive*]

**5**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 259 of 2232
Page ID #:23175

DTR 5 : Vote Holder and Issuer
Notification Rules

Section 5.5 : Acquisition or disposal by issuer
of shares

**5**



## 5.5 Acquisition or disposal by issuer of shares

**5.5.1**  |R|  An *issuer* of *shares* must, if it acquires or disposes of its own *shares*, either itself or through a *person* acting in his own name but on the *issuer's* behalf, make public the percentage of voting rights attributable to those *shares* it holds as a result of the transaction as a whole, as soon as possible, but not later than four *trading days* following such acquisition or disposal where that percentage reaches, exceeds or falls below the thresholds of 5% or 10% of the voting rights.

**5.5.1A**  |R|  ■ DTR 5.5.1R does not apply to a third-country *issuer* that falls within ■ DTR 5.11.4R.

**5.5.2**  |R|  The percentage shall be calculated on the basis of the total number of *shares* to which voting rights are attached.

**[Note: article 14 of the *TD*].**

**5.5.3**  |G|  Additional requirements in relation to a *listed company* which purchases its own *equity shares* are contained in ■ UKLR 9.6.6R.

## 5.6    Disclosures by issuers

**5.6.1**   **R**   An *issuer* must, at the end of each calendar month during which an increase or decrease has occurred, disclose to the public:

(1) the total number of voting rights and capital in respect of each class of *share* which it issues.

**[Note: article 15 of the *TD*]**; and

(2) the total number of voting rights attaching to *shares* of the *issuer* which are held by it in treasury.

**5.6.1A**   **R**   (1) Notwithstanding ■ DTR 5.6.1 R, if a relevant increase or decrease in the total number of voting rights of the kind described in (2) occurs, an *issuer* must disclose to the public the information in ■ DTR 5.6.1R (1) and (2) as soon as possible and in any event no later than the end of the *business day* following the *day* on which the increase or decrease occurs.

(2) For the purpose of (1), a relevant increase or decrease is any increase or decrease in the total number of voting rights produced when an *issuer* completes a transaction unless its effect on the total number of voting rights is immaterial when compared with the position before completion.

**5.6.1B**   **G**   In relation to the obligation in ■ DTR 5.6.1A R, it is for an *issuer* to assess whether the effect on the total number of voting rights is immaterial. In the *FCA's* view an increase or decrease of 1% or more is likely to be material, both to the *issuer* and to the public.

**5.6.1C**   **R**   ■ DTR 5.6.1R does not apply to a third-country *issuer* that falls within ■ DTR 5.11.4R.

**5.6.2**   **G**   The disclosure of the total number of voting rights should be in respect of each class of *share* which is admitted to trading on a *regulated* or *prescribed market*.

**5.6.3**   **R**   Responsibility for all information drawn up and made public in accordance with ■ DTR 5.6.1 R and ■ DTR 5.6.1AR lies with the *issuer.*

**5**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 261 of 2232

**DTR 5 : Vote Holder and Issuer** Page ID #:2319 Section 5.7 : Notification of combined
**Notification Rules** holdings

**5**



## 5.7    Notification of combined holdings

**5.7.1**    **R**    A *person* making a notification in accordance with ■ DTR 5.1.2 R must do so
by reference to each of the following:

(1)    the aggregate of all voting rights which the *person* holds as
*shareholder* and as the direct or indirect holder of financial
instruments falling within ■ DTR 5.3.1R(1);

(2)    the aggregate of all voting rights held as direct or indirect
*shareholder* (disregarding for this purpose holdings of financial
instruments); and

(3)    the aggregate of all voting rights held as a result of direct and
indirect holdings of financial instruments falling within ■ DTR 5.3.1R(1).

[**Note:** article 13a(1) of the *TD*]

(4)    [deleted]

**5.7.1A**    **R**    Voting rights relating to financial instruments within ■ DTR 5.3.1R(1) that have
already been notified in accordance with ■ DTR 5.1.2R must be notified again
when the *person* has acquired the underlying *shares* and such acquisition
results in the total number of voting rights attached to *shares* issued by the
same *issuer* reaching or exceeding the thresholds laid down by ■ DTR 5.1.2R.

[**Note:** article 13a(2) of the *TD*]

**5.7.2**    **G**    The effect of ■ DTR 5.7.1 R is that a *person* may have to make a notification if
the overall percentage level of his voting rights remains the same but there
is a notifiable change in the percentage level of one or more of the
categories of voting rights held.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 262 of 2232
Page ID #:2320

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Section 5.8 : Procedures for the notification
and disclosure of major holdings



## 5.8 Procedures for the notification and disclosure of major holdings

**5.8.1** **R** A notification given in accordance with ■ DTR 5.1.2 R shall include the following information:

(1) the resulting situation in terms of voting rights;

(2) the chain of *controlled undertakings* through which voting rights are effectively held, if applicable;

(3) the date on which the threshold was reached or crossed; and

(4) the identity of the *shareholder*, even if that *shareholder* is not entitled to exercise voting rights under the conditions laid down in ■ DTR 5.2.1 R and of the *person* entitled to exercise voting rights on behalf of that *shareholder*.

**5.8.2** **R** (1) A notification required of voting rights arising from the holding of financial instruments must include the following information:

(a) the resulting situation in terms of voting rights;

(b) if applicable, the chain of *controlled undertakings* through which financial instruments are effectively held;

(c) the date on which the threshold was reached or crossed;

(d) for instruments with an exercise period, an indication of the date or time period where *shares* will or can be acquired, if applicable

(e) date of maturity or expiration of the instrument;

(f) identity of the holder; and

(g) name of the underlying *issuer*.

(2) The notification must be made to the *issuer* of each of the underlying *shares* to which the financial instrument relates and, in the case of *shares* admitted to trading on a *regulated market*, to the *FCA*.

(3) If a financial instrument relates to more than one underlying *share*, a separate notification shall be made to each *issuer* of the underlying *shares*.

(4) [deleted]

**[Note: articles 11(3), (4) and (5) of the *TD implementing Directive*]**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 263 of 2232
Page ID #:2321

DTR 5 : Vote Holder and Issuer
Notification Rules

Section 5.8 : Procedures for the notification
and disclosure of major holdings

**5.8.3**  **R**  The notification to the *issuer* shall be effected as soon as possible, but not later than four *trading days* in the case of a non-*UK issuer* and two *trading days* in all other cases, after the date on which the relevant *person*:

(1) learns of the acquisition or disposal or of the possibility of exercising voting rights, or on which, having regard to the circumstances, should have learned of it, regardless of the date on which the acquisition, disposal or possibility of exercising voting rights takes effect; or

(2) is informed about the event mentioned in ■ DTR 5.1.2 R (2).

And for the purposes of (1) above a *person* shall, in relation to a transaction to which he is a party or which he has instructed, be deemed to have knowledge of the acquisition, disposal or possibility to exercise voting rights no later than two trading days following the transaction in question and where a transaction is conditional upon the approval by public authorities of the transaction or on a future uncertain event the occurrence of which is outside the control of the parties to the agreement, the parties are deemed to have knowledge of the acquisition, disposal or possibility of exercising voting rights only when the relevant approvals are obtained or when the event happens.

**[Note: articles 12(1), and 12(2) of the TD and article 9 of the** *TD implementing Directive***]**

**5.8.4**  **R**  (1) The notification obligation following transactions of a kind mentioned in ■ DTR 5.2.1 R are individual obligations incumbent upon each direct *shareholder* or indirect *shareholder* mentioned in ■ DTR 5.2.1 R or both if the proportion of voting rights held by each party reaches, exceeds or falls below an applicable threshold.

(2) In the circumstances in ■ DTR 5.2.1 R Case (h) if a *shareholder* gives the proxy in relation to one shareholder meeting, notification may be made by means of a single notification when the proxy is given provided it is made clear in the notification what the resulting situation in terms of voting rights will be when the proxy may no longer exercise the voting rights discretion.

(3) If in the circumstances in ■ DTR 5.2.1 R Case (h) the proxy holder receives one or several proxies in relation to one *shareholder* meeting, notification may be made by means of a single notification on or after the deadline for receiving proxies provided that it is made clear in the notification what the resulting situation in terms if voting rights will be when the proxy may no longer exercise the voting rights at its discretion.

(4) When the duty to make notification lies with more than one *person*, notification may be made by means of a single common notification but this does not release any of those persons from their responsibilities in relation to the notification.

**[Note: article 8 of the** *TD implementing Directive***]**

**5.8.5**  **G**  It may be necessary for both the relevant *shareholder* and proxy holder to make a notification. For example, if a direct holder of shares has a notifiable holding of voting rights and gives a proxy in respect of those rights (such

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 264 of 2232
Page ID #:2322

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Section 5.8 : Procedures for the notification
and disclosure of major holdings

5

that the recipient has discretion as to how the votes are cast) then for the purposes of ■ DTR 5.1.2 R this is a disposal of such rights giving rise to a notification obligation. The proxy holder may also have such an obligation by virtue of his holding under ■ DTR 5.2.1 R. Separate notifications will not however be necessary provided a single notification (whether made by the direct holder of the *shares* or by the proxy holder) makes clear what the situation will be when the proxy has expired. Where a proxy holder receives several proxies then one notification may be made in respect of the aggregated voting rights held by the proxy holder on or as soon as is reasonably practicable following the proxy deadline. Unless it discloses what the position will be in respect of each proxy after the proxies have expired, such a notification will not relieve any direct holder of the *shares* of its notification obligation (if there is a notifiable disposal). A proxy which confers only minor and residual discretions (such as to vote on an adjournment) will not result in the proxy holder (or *shareholder*) having a notification obligation.

**5.8.6**    **R**    An undertaking is not required to make a notification if instead it is made by its *parent undertaking* or, where the *parent undertaking* is itself a *controlled undertaking*, by its own *parent undertaking*.

[Note: article 12(3) of the *TD*]

**5.8.7**    **R**    Voting rights must be calculated on the basis of all the *shares* to which voting rights are attached even if the exercise of such rights is suspended and shall be given in respect of all *shares* to which voting rights are attached.

[Note: article 9(1) of the *TD*]

**5.8.8**    **R**    The number of voting rights to be considered when calculating whether a threshold is reached, exceeded or fallen below is the number of voting rights in existence according to the *issuer's* most recent disclosure made in accordance with ■ DTR 5.6.1 R and ■ DTR 5.6.1A R but disregarding voting rights attached to any treasury *shares* held by the *issuer* (in accordance with the *issuer's* most recent disclosure of such holdings).

[[Note: article 9(2) of the *TD* and article 11(3) of the *TD implementing Directive*]

**5.8.9**    **G**    [deleted]

**5.8.10**    **R**    A notification in relation to *shares* admitted to trading on a *regulated market*, must be made using the form TR1 available in electronic format at the *FCA's* website at http://www.fca.org.uk.

**5.8.11**    **R**    In determining whether a notification is required a *person's* net (direct or indirect) holding in a *share* (and of relevant financial instruments) may be assessed by reference to that *person's* holdings at a point in time up to midnight of the day for which the determination is made (taking account of acquisitions and disposals executed during that day).

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 265 of 2232
Page ID #:2323

**DTR 5 : Vote Holder and Issuer**
**Notification Rules**

Section 5.8 : Procedures for the notification
and disclosure of major holdings

5

5.8.12    

(1) An *issuer* not falling within (2) must, in relation to *shares* admitted to trading on a *regulated market*, on receipt of a notification as soon as possible and in any event by not later than the end of the *trading day* following receipt of the notification make public all of the information contained in the notification.

(2) A non-UK issuer and any other *issuers* whose *shares* are admitted to trading on a *prescribed* (but not a *regulated*) *market* must, on receipt of a notification, as soon as possible and in any event by not later than the end of the third *trading day* following receipt of the notification, make public all of the information contained in the notification.

(3) ◾DTR 5.8.12R(2) does not apply to a third country *issuer* that falls within ◾DTR 5.11.4R.

   **[Note: article 12(6) of the *TD*]**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 266 of 2232
Page ID #:2324

**DTR 5 : Vote Holder and Issuer
Notification Rules**

Section 5.9 : Filing of information with
competent authority



## 5.9    Filing of information with competent authority

5.9.1    R

(1) A *person* making a notification to an *issuer* to which this chapter applies must, if the notification relates to *shares* admitted to trading on a *regulated market*, at the same time file a copy of such notification with the *FCA*.

(2) The information to be filed with the *FCA* must include a contact address of the *person* making the notification (but such details must be in a separate annex and not included on the form which is sent to the *issuer*).

[Note: article 19(3) of the *TD*]

5

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 267 of 2232
Page ID #:2325

DTR 5 : Vote Holder and Issuer
Notification Rules

Section 5.10 : Use of electronic means for
notifications and filing



### 5.10        Use of electronic means for notifications and filing

**5.10.1**    **R**    Information filed with the *FCA* for the purposes of the chapter must be filed using *electronic means*.



## 5.11    Third country issuers

**5.11.1** **R**   An *issuer* whose registered office is in a *third country* will be treated as meeting equivalent requirements to those set out in ■ DTR 5.8.12 R (2) (*issuer* to make public notifications of major shareholdings by close of third day following receipt) provided that the period of time within which the notification of the major holdings is to be effected to the *issuer* and is to be made public by the *issuer* is in total equal to or shorter than seven *trading days*.

[Note: article 19 of the *TD implementing Directive*]

**5.11.2** **R**   An *issuer* whose registered office is in a *third country* will be treated as meeting equivalent requirements in respect of treasury *shares* to those set out in ■ DTR 5.5.1 R provided that:

(1)  if the *issuer* is only allowed to hold up a maximum of 5% of its own *shares* to which voting rights are attached, a notification requirement is triggered under the law of the *third country* whenever this maximum threshold of 5% of the voting rights is reached or crossed;

(2)  if the *issuer* is allowed to hold up to maximum of between 5% and 10% of its own *shares* to which voting rights are attached, a notification requirement is triggered under the law of the *third country* whenever this maximum threshold and or the 5% threshold of the voting rights are reached or crossed;

(3)  if the *issuer* is allowed to hold more than 10% of its own *shares* to which voting rights are attached, a notification requirement is triggered under the law of the *third country* whenever the 5% or 10% thresholds of the voting rights are reached or crossed. Notification above the 10% threshold is not required for this purpose.

[Note: article 20 of the *TD implementing Directive*]

**5.11.3** **R**   An *issuer* whose registered office is in a *third country* will be treated as meeting equivalent requirements to those set out in ■ DTR 5.6.1 R (Disclosure by *issuers* of total voting rights) provided that the *issuer* is required under the law of the *third country* to disclose to the public the total number of voting rights and capital within 30 calendar days after an increase or decrease of such total number has occurred.

[Note: article 21 of the *TD implementing Directive*]

**5.11.4**    R    An *issuer* whose registered office is in a *third country* is exempted from
■ DTR 5.5.1R, ■ DTR 5.6.1R and ■ DTR 5.8.12R(2) if:

(1)  the law of the *third country* in question lays down equivalent
requirements; or

(2)  the *issuer* complies with requirements of the law of a *third country*
that the *FCA* considers as equivalent.

[**Note:** article 23(1) of the *TD*]

**5.11.5**    G    The *FCA* maintains a published list of *third country*, for the purpose of
■ DTR 5.11.4R, whose laws lay down requirements equivalent to those
imposed upon *issuers* by this chapter, or where the requirements of the law
of that *third country* are considered to be equivalent by the *FCA*. Such *issuers*
remain subject to the following requirements of ■ DTR 6:

(1)  the filing of information with the *FCA*;

(2)  the language provisions; and

(3)  the dissemination of information provisions.

**5.11.6**    R    [deleted]

**Disclosure Guidance and Transparency Rules sourcebook**

# Chapter 6

# Continuing obligations and access to information

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 271 of 2232
Page ID #:2329

DTR 6 : Continuing obligations
and access to information

Section 6.1 : Information requirements for
issuers of shares and debt securities



## 6.1 Information requirements for issuers of shares and debt securities

**6**

### Application .................................................................

6.1.1  R  (1) Subject to the exemptions set out in ■ DTR 6.1.16 R - ■ DTR 6.1.19 R this section applies in relation to an *issuer* whose *transferable securities* are *admitted to trading*.

(2) References to *transferable securities*, *shares* and *debt securities* are to such instruments as are *admitted to trading*.

### Amendments to constitution .................................................................

6.1.2  R  [deleted]

### Equality of treatment .................................................................

6.1.3  R  (1) An *issuer* of *shares* must ensure equal treatment for all holders of *shares* who are in the same position. **[Note: article 17(1) of the** TD**]**

(2) An *issuer* of *debt securities* must ensure that all holders of *debt securities* ranking pari passu are given equal treatment in respect of all the rights attaching to those *debt securities*. **[Note: article 18(1) of the** TD**]**

### Exercise of rights by holders .................................................................

6.1.4  R  An *issuer* of *shares* or *debt securities* must ensure that all the facilities and information necessary to enable holders of *shares* or *debt securities* to exercise their rights are available in the *United Kingdom* and that the integrity of data is preserved. **[Note: articles 17(2) and 18(2) of the** TD**]**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 272 of 2232
Case ID #:2330

**DTR 6 : Continuing obligations
and access to information**

Section 6.1 : Information requirements for
issuers of shares and debt securities

### Exercise of rights by proxy

6.1.5 | R |

(1) *Shareholders* and *debt securities* holders must not be prevented from exercising their rights by proxy, subject to the law of the country in which the *issuer* is incorporated. **[Note: articles 17(2) and 18(2) of the TD]**

(2) An *issuer* of shares or *debt securities* must make available a proxy form, on paper or, where applicable, by *electronic means* to each *person* entitled to vote at a meeting of shareholders or a meeting of *debt securities* holders. **[Note: articles 17(2)(b) and 18(2)(b) of the** TD]

(3) The proxy form must be made available either:

(a) together with the notice concerning the meeting; or

(b) after the announcement of the meeting.

**[Note: articles 17(2)(b) and 18(2)(b) of the** TD]

### Appointment of a financial agent

6.1.6 | R | An *issuer* of *shares* or *debt securities* must designate, as its agent, a financial institution through which *shareholders* or *debt securities* holders may exercise their financial rights. **[Note: articles 17(2)(c) and 18(2)(c) of the TD]**

### Electronic Communications

6.1.7 | G | An *issuer* of *shares* or *debt securities* may use *electronic means* to convey information to *shareholders* or *debt securities* holders. **[Note: articles 17(3) and 18(4) of the** TD]

6.1.8 | R | To use *electronic means* to convey information to holders, an *issuer* must comply with the following:

(1) a decision to use electronic means to convey information to shareholders or debt securities holders must be taken in a general meeting;

(2) the use of *electronic means* must not depend upon the location of the seat or residence of:

(a) the *shareholder*; or

(b) *persons* referred to in rows (a) to (h) of the table set out in ■ DTR 5.2.1 R; or

(c) the *debt security* holder; or

(d) a proxy representing a *debt security* holder.

(3) identification arrangements must be put in place so that the *shareholders*, *debt security* holders or other *persons* entitled to exercise or to direct the exercise of voting rights are effectively informed;

(4) *shareholders*, *debt security* holders or *persons* referred to in rows (a) to (e) of the table set out in ■ DTR 5.2.1 R who are entitled to acquire, dispose of or exercise voting rights must be:

6

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 273 of 2232

**DTR 6 : Continuing obligations and access to information**    Page ID #:2331    Section 6.1 : Information requirements for issuers of shares and debt securities

(a) contacted in writing to request their consent for the use of *electronic means* for conveying information and if they do not object within a reasonable period of time, their consent can be considered to have been given; and

(b) able to request at any time in the future that information be conveyed in writing; and

(5) any apportionment of the costs entailed in the conveyance of information by *electronic means* must be determined by the issuer in compliance with the principle of equal treatment set out in ■ DTR 6.1.3 R.

But paragraph (4) above does not apply in any case where schedule 5 to the Companies Act 2006 applies.

**[Note: articles 17(3) and 18(4) of the** TD**]**

### Information about changes in rights attaching to securities

6.1.9    R    An *issuer* of *shares* must without delay disclose to the public any change in the rights attaching to its various classes of *shares*, including changes in the rights attaching to *derivative securities* issued by the *issuer* giving access to the *shares* of that *issuer*. **[Note: article 16(1) of the** TD**]**

6.1.10    R    An *issuer* of *securities* other than *shares* admitted to trading on a *regulated market* must disclose to the public without delay any changes in the rights of holders of *securities* other than *shares*, including changes in the terms and conditions of such *securities* which could indirectly affect those rights, resulting in particular from a change in loan terms or in interest rates.**[Note article 16(2) of the** TD**]**

6.1.11    R    [deleted]

### Information about meetings, issue of new shares and payment of dividends share issuers

6.1.12    R    An *issuer* of *shares* must provide information to holders on:

(1) the place, time and agenda of meetings;

(2) the total number of *shares* and voting rights; and

(3) the rights of holders to participate in meetings. **[Note: article 17(2)(a) of the** TD**]**

6.1.13    R    An *issuer* of *shares* must publish notices or distribute circulars concerning the allocation and payment of dividends and the issue of new *shares*, including information on any arrangements for allotment, subscription, cancellation or conversion. **[Note: article 17(2)(d) of the** TD**]**

**Information about meetings and payment of interest – debt security issuers** ................................................................

6.1.14    R    An *issuer* of *debt securities* must publish notices or distribute circulars concerning:

(1)  the place, time and agenda of meetings of *debt securities* holders;

(2)  the payment of interest;

(3)  the exercise of any conversion, exchange, subscription or cancellation rights and repayment; and

(4)  the rights of holders to exercise their rights in relation to paragraphs (1) – (3).

[**Note:** article 18(2)(a) of the TD]

6.1.15    R    [deleted]

**Third country exemption** ................................................................

6.1.16    R    An *issuer* whose registered office is in a *third country* is exempted from ■ DTR 6.1.3 R to ■ DTR 6.1.15 R if:

(1)  the law of the *third country* in question lays down equivalent requirements; or

(2)  the *issuer* complies with requirements of the law of a *third country* that the *FCA* considers as equivalent.

[**Note:** article 23(1) of the *TD*]

6.1.17    G    The *FCA* maintains a published list of *third countries*, for the purpose of ■ DTR 6.1.16R, whose laws lay down requirements equivalent to those imposed upon *issuers* by this chapter, or where the requirements of the law of that *third country* are considered to be equivalent by the *FCA*. Such *issuers* remain subject to the following requirements of ■ DTR 6:

(1)  the filing of information with the *FCA*;

(2)  the language provisions; and

(3)  the dissemination of information provisions.

**Regional and local authority exemption** ................................................................

6.1.18    R    A regional or local authority with securities admitted to trading is not required to comply with the following:

(1)  ■ DTR 6.1.4 R to ■ DTR 6.1.8 R; and

(2)  ■ DTR 6.1.14 R.

[**Note:** article 1(3) of the TD]

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 275 of 2232
Page ID #:2333

**DTR 6 : Continuing obligations
and access to information**

Section 6.1 : Information requirements for
issuers of shares and debt securities

**6**

**Exemption for issuers of convertible securities, preference
shares and depository receipts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

6.1.19    R    ■ DTR 6.1.3 R to ■ DTR 6.1.8 R and ■ DTR 6.1.12 R to ■ DTR 6.1.14R do not apply
to:

(1)  an *issuer* of *transferable securities* convertible into *shares*;

(2)  an *issuer* of *preference shares*; and

(3)  an *issuer* of depository receipts.



## 6.2    Filing information and use of language

### Application

6.2.1    |R|    This section applies to:

    (1) an *issuer* whose *transferable securities* are *admitted to trading*; and

    (2) a *person* who has requested, without the *issuer*'s consent, the admission of its *transferable securities* to trading on a *regulated market*.

### Filing of information with the FCA

6.2.2    |R|    An *issuer* or *person* that discloses *regulated information* must, at the same time, file that information with the *FCA*. **[Note: article 19(1) of the** TD**]**

6.2.2A    |R|    Where an *issuer* or *person* is required to file *regulated information* under ■ DTR 6.2.2R, the *issuer* or *person* must, at the same time, notify the following to the *FCA*:

    (1) the legal entity identifier (LEI) of the *issuer* concerned; and

    (2) the classifications relevant to the *regulated information* using the classes and sub-classes in ■ DTR 6 Annex 1R.

6.2.2B    |R|    If more than one classification is relevant to the *regulated information*, the *issuer* or *person* must notify all relevant classes and sub-classes to the *FCA*.

6.2.3    |G|    An is*suer* or *person* that discloses regulated information may comply with ■ DTR 6.2.2 R by using a *primary information provider* to disseminate the information in accordance with ■ DTR 6.3.

### Language

6.2.4    |R|    *Regulated information* must be disclosed in English.

**[Note: article 20(1) of the** TD**]**

6.2.5    |R|    [deleted]

DTR 6 : Continuing obligations
and access to information
Section 6.2 : Filing information and use of
language

**6**

| 6.2.6 | R | [deleted] |

| 6.2.7 | R | If *transferable securities* are *admitted to trading* without the *issuer*'s consent: |

    (1)  ■ DTR 6.2.4 R does not apply to the *issuer*; and

    (2)  ■ DTR 6.2.4 R applies to the *person* who has requested such admission without the *issuer*'s consent.

**[Note: article 20(4) of the TD]**

| 6.2.8 | R | [deleted] |

### English language ....................................................................

| 6.2.9 | G | [deleted] |

### Filing annual financial reports ....................................................

| 6.2.10 | R | An *issuer* must file its annual financial report with the *FCA* by uploading it to the *national storage mechanism*. |

| 6.2.11 | G | For the purposes of ■ DTR 6.2.10R: |

    (1)  The *FCA* expects an *issuer* to comply with ■ DTR 6.2.10R by filing an annual financial report that the *national storage mechanism* accepts.

    (2)  The *national storage mechanism* may reject an annual financial report that has not been prepared in accordance with the reporting format obligations in ■ DTR 4.1.15R to ■ DTR 4.1.22R.

    (3)  If the *national storage mechanism* rejects a report, it will provide reasons for the rejection.

    (4)  An *issuer* is expected to resubmit a report that has been rejected within the required timeline.

    (5)  Information on generally accepted taxonomies and associated marking up and filing requirements, and the *national storage mechanism*, is available in the Markets section of the *FCA's* website at https://www.fca.org.uk/markets/company-annual-financial-reporting-electronic-format.



## 6.3        Dissemination of information

**Application** ...........................................................................

6.3.1        **R**        This section applies to:

(1) an issuer whose *transferable securities* are *admitted to trading*; and **[Note: article 21(1) of the** TD**]**

(2) a *person* who has applied, without the *issuer*'s consent, for the admission of its *transferable securities* to trading on a *regulated market*.

**[Note: article 21(1) of the** TD**]**

(3) [deleted]

6.3.2        **R**        An *issuer* or *person* must disclose *regulated information* in the manner set out in ■ DTR 6.3.3 R to ■ DTR 6.3.8 R. **[Note: article 21(1) of the** TD**]**

6.3.3        **R**        (1) When disseminating *regulated information* an *issuer* or other *person* must ensure that the minimum standards contained in ■ DTR 6.3.4 R to ■ DTR 6.3.8 R are met.

(2) An *issuer* or *person* must entrust a *RIS* with the disclosure of *regulated information* to the public and must ensure that the *RIS* complies with the minimum standards contained in ■ DTR 6.3.4 R to ■ DTR 6.3.8 R.

**[Note: article 12(1) of the** *TD implementing directive*]

6.3.3A        **R**        [deleted]

6.3.3B        **R**        [deleted]

6.3.3C        **G**        [deleted]

6.3.4        **R**        *Regulated information* must be disseminated in a manner ensuring that it is capable of being disseminated to as wide a public as possible, and as close to simultaneously as possible in the *United Kingdom*.

**[Note: article 12(2) of the** *TD implementing directive*]

**6.3.5** | R | (1) Subject to (1A), an *issuer* or *person* must communicate *regulated information* to the media in unedited full text.

[Note: article 12(3) of the *TD implementing directive*]

(1A) An *issuer* or *person* who discloses *regulated information* is exempt from paragraph (1) if:

(a) the *regulated information* in unedited full text has been filed with the *FCA* by uploading it to the *national storage mechanism*;

(b) the *regulated information* has been communicated to the media; and

(c) the communication contains a statement that the *regulated information* is available in unedited full text on the *national storage mechanism*.

(2) (a) [deleted]

(b) [deleted]

(3) Where (1A) applies, the announcement relating to the publication of the following *regulated information* must also include an indication of the website on which the relevant documents are available:

(a) an annual financial report that is required by ■ DTR 4.1 to be made public;

(b) a half-yearly financial report that is required by ■ DTR 4.2 to be made public; and

(c) [deleted]

(d) a report on payments to governments that is required by ■ DTR 4.3A to be made public.

[Note: article 12(3) of the *TD implementing directive*]

**6.3.6** | R | *Regulated information* must be communicated to the media in a manner which ensures the security of the communication, minimises the risk of data corruption and unauthorised access, and provides certainty as to the source of the *regulated information*. Security of receipt must be ensured by remedying as soon as possible any failure or disruption in the communication of *regulated information*. An *issuer* or *person* is not responsible for systemic errors or shortcomings at the media to which the *regulated information* has been communicated.[Note: article 12(4) of the *TD implementing directive*]

**6.3.7** | R | *Regulated information* must be communicated to a *RIS* in a way which:

(1) makes clear that the information is *regulated information*;

(2) identifies clearly:

(a) the *issuer* concerned;

(b) the subject matter of the *regulated information*; and

(c) the time and date of the communication of the *regulated information* by the *issuer* or the *person*.

[Note: article 12(5) of the *TD implementing directive*]

6.3.8   R   Upon request, an *issuer* or other *person* must be able to communicate to the *FCA*, in relation to any disclosure of *regulated information*:

(1) the name of the *person* who communicated the *regulated information* to the *RIS*;

(2) the security validation details;

(3) the time and date on which the *regulated information* was communicated to the *RIS*;

(4) the medium in which the *regulated information* was communicated; and

(5) details of any embargo placed by the *issuer* on the *regulated information*, if applicable.

[Note: article 12(5) of the *TD implementing directive*]

6.3.9   R   An *issuer* or *person* must not charge investors any specific cost for providing *regulated information*. [Note: article 21(1) of the *TD*]

### Disclosure of information in a third country

6.3.10   R   (1) Information that is disclosed in a *third country* which may be of importance to the public in the *United Kingdom* must be disclosed in accordance with the provisions set out in ◼ DTR 6.2 and ◼ DTR 6.3.

(2) Paragraph (1) applies additionally to information that is not *regulated information*.

[Note: article 23(3) of the TD]

**6**



## 6.4    Disclosure of Home State

**6**

**Application**...................................................................................

6.4.1    **R**    [deleted]

**Disclosure of Home State**............................................................

6.4.2    **R**    [deleted]

6.4.3    **R**    [deleted]

6.4.4    **R**    [deleted]

## Classes and sub-classes of regulated information

| Classification of regulated information | | Description |
|---|---|---|
| 1. | Periodic regulated information | |
| 1.1 | Annual financial and audit reports | all information disclosed under DTR 4.1 |
| 1.2 | Half yearly financial reports and audit reports/limited reviews | all information disclosed under DTR 4.2 |
| 1.3 | Payments to governments | all information disclosed under DTR 4.3A |
| 2. | Ongoing regulated information | |
| 2.1 | [deleted] | [deleted] |
| 2.2 | Inside information | all information disclosed under article 17 or article 19 of the *Market Abuse Regulation* |
| 2.3 | Major shareholding notifications | all information disclosed under DTR 5.1.2R |
| 2.4 | Acquisition or disposal of the issuer's own shares | all information disclosed under DTR 5.5.1R |
| 2.5 | Total number of voting rights and capital | all information disclosed under DTR 5.6.1R |
| 2.6 | Changes in the rights attaching to the classes of shares or securities | all information disclosed under DTR 6.1.9R or DTR 6.1.10R |
| 3. | Additional regulated information required to be disclosed under the laws of the United Kingdom | |
| 3.1 | Additional regulated information required to be disclosed under the laws of the United Kingdom | all information not falling within the sub-classes set out in points 1.1 to 1.3 and in points 2.1 to 2.6, but which the *issuer*, or any other *person* who has applied for the admission of securities to trading on a *regulated market* without the *issuer's* consent, has disclosed under *UKLR* or *DTR* |

**6**

**UK Listing Rules Sourcebook**

# Chapter 7

# Equity shares (commercial companies): significant transactions and reverse takeovers



## 7.1    Preliminary

### Application

7.1.1    **R**    This chapter applies to a *company* that has a *listing* of *equity shares* in the *equity shares (commercial companies)* category.

### Purpose

7.1.2    **G**    (1) The purpose of this chapter is to set out:

   (a) the requirements for a *listed company* in relation to *significant transactions* and *reverse takeovers*; and

   (b) certain other transactions where a *listed company* must comply with the requirements for *significant transactions*.

(2) The requirements are intended to ensure that holders of *listed equity shares*:

   (a) are notified of:

      (i) *significant transactions*;

      (ii) certain indemnities and similar arrangements;

      (iii) certain issues by *major subsidiary undertakings*; and

      (iv) *reverse takeovers*; and

   (b) have the opportunity to vote on *reverse takeovers*.

(3) The requirements are also intended to ensure that a *listed company* discloses detailed information concerning the transactions in (2)(a)(i) to (iv) on a timely basis, to support engagement between the *listed company* and its shareholders and to enhance market transparency.

(4) The requirements complement but do not displace a *listed company's* wider obligations under articles 17 and 18 of the *Market Abuse Regulation* to manage and disclose *inside information*.

### Meaning of 'significant transaction'

7.1.3    **R**    In *UKLR*, a transaction is classified as a *significant transaction* where any *percentage ratio* is 25% or more.

### Meaning of 'reverse takeover'

7.1.4    **R**    (1) In *UKLR*, a *reverse takeover* means a transaction consisting of an acquisition of a business, a *company* or assets:

(a) where any *percentage ratio* is 100% or more; or

(b) which in substance results in a fundamental change in the business or in a change in board or voting control of the *issuer*.

(2) Paragraph (1) applies whether such acquisition is effected:

(a) by way of a direct acquisition by the *issuer* or a subsidiary;

(b) by way of the *issuer* introducing a new *holding company* to its corporate structure and then carrying out the acquisition through the new *holding company*; or

(c) in any other way.

**7.1.5**    G    For the purpose of ▪ UKLR 7.1.4R(1)(b), the *FCA* considers that the following factors are indicators of a fundamental change:

(1) the extent to which the transaction will change the strategic direction or nature of the *issuer's* business;

(2) whether its business will be part of a different industry sector following the completion of the transaction; or

(3) whether its business will deal with fundamentally different suppliers and end users.

### Meaning of 'transaction'

**7.1.6**    R    In this chapter (except where specifically provided to the contrary) a reference to a transaction by a *listed company*:

(1) includes:

(a) (subject to paragraph (2)(a) to (g)) all agreements (including amendments to agreements) entered into by the *listed company* or its *subsidiary undertakings*;

(b) the grant or acquisition of an *option* as if the *option* had been exercised, except that, if exercise is solely at the *listed company's* or *subsidiary undertaking's* discretion, the transaction will be classified on exercise and only the consideration (if any) for the *option* will be classified on the grant or acquisition; and

(c) joint venture arrangements; and

(2) excludes:

(a) a transaction in the ordinary course of business;

(b) an issue of *securities*, or a transaction to raise finance, which does not involve the acquisition or disposal of any fixed asset of the *listed company* or of its *subsidiary undertakings*;

(c) any transaction between the *listed company* and its wholly owned *subsidiary undertaking* or between its wholly owned *subsidiary undertakings*;

(d) a *break fee arrangement*;

7

(e) an indemnity or similar arrangement, except where the agreement or arrangement meets the conditions set out in ■ UKLR 7.4.1R(1);

(f) an issue of *equity shares* by a *major subsidiary undertaking* of a *listed company*, except where the issue meets the conditions set out in ■ UKLR 7.4.4R; and

(g) a transaction where the *listed company* purchases its own *equity shares*.

7.1.7    G    This chapter is intended to cover transactions that are outside the ordinary course of the *listed company's* business and may change a *security* holder's economic interest in the *company's* assets and liabilities (whether or not the change in the assets or liabilities is recognised on the *company's* balance sheet).

## Meaning of 'ordinary course of business'

7.1.8    G    (1) The assessment of whether a transaction is in the ordinary course of business under this chapter will depend on the specific circumstances of the *listed company*.

(2) Factors that may indicate whether a transaction is in the ordinary course of a *company's* business include:

(a) the size and incidence of similar transactions which the *company* has entered into;

(b) the nature and size of the *company's* existing business and common factors within the industry sector in which it operates;

(c) the *company's* corporate strategy for its business, including in relation to growth and industry focus, as set out in the *company's* latest published *prospectus* or annual financial report;

(d) the existing accounting treatment (for a disposal) or planned accounting treatment (for an acquisition or new arrangement) by the *listed company*; and

(e) whether its shareholders could reasonably expect the *company* to enter into the transaction, taking into account:

(i) the factors in (a) to (d);

(ii) any further information that the *company* has already notified to a *RIS*;

(iii) the subject matter of the transaction;

(iv) the terms of the transaction;

(v) the anticipated impact on the *listed company*; and

(vi) the associated benefits and risks.

7.1.9    G    Transactions that are likely to be in the ordinary course of business include:

(1) regular trading activities (if the *company* is a trading *company*);

(2) ongoing commercial arrangements and purchases commonly undertaken as part of the existing business or within the industry sector in which the *company* operates;

(3) capital expenditure to support and maintain the existing business and its infrastructure;

(4) capital expenditure to add scale to the existing business in line with the *company's* business strategy as previously notified to a *RIS* (including, for example, within the latest published *prospectus* or annual financial report); or

(5) in the case of a *listed property company*, where the accounting treatment of a *property* that is acquired or disposed of is such that:

   (a) for an acquisition, the *property* will be classified as a current asset in the *company's* published accounts; or

   (b) for a disposal, the *property* was classified as a current asset in the *company's* published accounts.

**7.1.10**  [G]  Transactions that are unlikely to be in the ordinary course of business include:

(1) mergers with, or acquisitions of, other businesses (whether structured by way of a share or asset acquisition);

(2) transactions that would lead to a substantial involvement in a business activity that did not previously form a significant part of the *listed company's* principal activities;

(3) transactions that would lead to the *listed company* no longer having a substantial involvement in a business activity that forms a significant part of its principal activities; or

(4) transactions which are entered into to alleviate financial difficulty.

**7.1.11**  [R]  For the purposes of ■ UKLR 7.1.6R(2)(a), a transaction in the ordinary course of business excludes a *reverse takeover*.

### Sponsors

**7.1.12**  [R]  A *listed company* must appoint a *sponsor* where it proposes to make a request to the *FCA* to modify, waive or substitute the operation of ■ UKLR 7.

**7.1.13**  [R]  A *listed company* must appoint a *sponsor* where it proposes to make a request to the *FCA* for individual guidance in relation to the *listing rules*, the *disclosure requirements* or the *transparency rules* in connection with a matter referred to in ■ UKLR 7.

**7.1.14**  [R]  If a *listed company* is proposing to enter into a transaction which – due to its size or nature – could amount to a *reverse takeover*, it must obtain the guidance of a *sponsor* to assess the application of the *listing rules*, the *disclosure requirements* and the *transparency rules*.



## 7.2 Classifying transactions

### Classifying transactions

7.2.1  [G]  A transaction is classified by assessing its size relative to that of the *listed company* proposing to make it. The comparison of size is made using the *percentage ratios* resulting from applying the *class test* calculations to a transaction. The *class tests* are set out in ■ UKLR 7 Annex 1 (and modified or added to for specialist companies under ■ UKLR 7.2.3R to ■ UKLR 7.2.8R).

7.2.2  [G]  The *class tests* set out in ■ UKLR 7 Annex 1 are applicable for the purposes of determining whether a transaction is a *significant transaction* or a *reverse takeover*.

### Classification of transactions by listed property companies

7.2.3  [R]  ■ UKLR 7 Annex 1 is modified as follows in relation to acquisitions or disposals of *property* by a *listed property company*:

(1) for the purposes of paragraph 2R(1) (the gross assets test), the assets test is calculated by dividing the transaction consideration by the gross assets of the *listed property company* and paragraphs 2R(5) and 2R(6) do not apply;

(2) for the purposes of paragraph 2R(1) (the gross assets test), if the transaction is an acquisition of land to be developed, the assets test is calculated by dividing the transaction consideration and any financial commitments relating to the development by the gross assets of the *listed property company* and paragraphs 2R(5) and 2R(6) do not apply;

(3) for the purposes of paragraph 2R(2), the gross assets of a *listed property company* are, at the option of the *company*:

(a) the aggregate of the *company's* share capital and reserves (excluding minority interests);

(b) the book value of the *company's* properties (excluding those properties classified as current assets in the latest published annual report and accounts); or

(c) the published valuation of the *company's* properties (excluding those properties classified as current assets in the latest published annual report and accounts);

(4) paragraph 4R(1) (the consideration test) does not apply but instead the test in ■ UKLR 7.2.4R applies; and

(5) paragraph 6R(1) (the gross capital test) applies to disposals as well as acquisitions of *property*.

**7.2.4**    R    (1) In addition to the tests in ■ UKLR 7 Annex 1, if the transaction is an acquisition of *property* by a *listed property company* and any of the consideration is in the *equity shares* of that *company*, the *listed company* must determine the *percentage ratios* that result from the calculations under the test in (2).

(2) The share capital test is calculated by dividing the number of consideration *shares* to be issued by the number of *equity shares* in issue (excluding *treasury shares*).

**7.2.5**    R    (1) In addition to the tests in ■ UKLR 7 Annex 1, a *listed property company* must determine the *percentage ratios* that result from the calculation under the test in (2).

(2) The net annual rent test is calculated by dividing the *net annual rent* attributable to the assets the subject of the transaction by the *net annual rent* of the *listed company*.

(3) For the purposes of calculating the *net annual rent* test, except as otherwise stated in (4) to (7), figures used to classify *net annual rent* must be the figures shown in the latest published audited consolidated accounts or, if a *listed company* has, or will have, published a preliminary statement of later annual results at the time the terms of a transaction are agreed, the figures shown in that preliminary statement.

(4)  (a) The figures of the *listed company* must be adjusted to take account of transactions completed during the period to which the figures referred to in (3) relate, and subsequent completed transactions where any *percentage ratio* was 5% or more at the time the terms of the relevant transaction were agreed.

   (b) The figures of the *target company* or business must be adjusted to take account of transactions completed during the period to which the figures referred to in (3) relate, and subsequent completed transactions where any *percentage ratio* would have been 5% or more at the time the terms of the relevant transaction were agreed when classified against the target as a whole.

(5) Figures on which the auditors are unable to report without modification must be disregarded.

(6) The principles in (3) to (5) also apply (to the extent relevant) to calculating the *net annual rent* of the *target company* or business.

(7) The *FCA* may modify (5) in appropriate cases to permit figures to be taken into account.

**7**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 291 of 2232
Page ID #:2349

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and...**

Section 7.2 : Classifying transactions

## Classification of transactions by listed mineral companies

**7.2.6**  | R |  (1) In addition to the tests in ■ UKLR 7 Annex 1, a *listed mineral company* undertaking a transaction involving significant *mineral resources* or rights to significant *mineral resources* must determine the *percentage ratios* that result from the calculations under the test in paragraph (2).

(2) The reserves test is calculated by dividing the volume or amount of the *proven reserves* and *probable reserves* to be acquired or disposed of by the volume or amount of the aggregate *proven reserves* and *probable reserves* of the *mineral company* making the acquisition or disposal.

**7.2.7**  | G |  If the *mineral resources* are not directly comparable, the *FCA* may modify ■ UKLR 7.2.6R(2) to permit valuations to be used instead of amounts or volumes.

**7.2.8**  | R |  When calculating the size of a transaction under ■ UKLR 7 Annex 1 and ■ UKLR 7.2.6R(2), account must be taken of any associated transactions or loans effected or intended to be effected, and any contingent liabilities or commitments.

## Classifying joint ventures

**7.2.9**  | R |  When classifying a joint venture under ■ UKLR 7, a *listed company* must classify both sides to a joint venture, so that both the disposal into the joint venture and the acquisition of an interest in the joint venture are classified. The 2 sets of *class tests* must not be aggregated and the highest result from the *class tests* will determine the overall classification of the transaction.

**7.2.10**  | G |  (1) It is common, when entering into a joint venture, for the partners to include exit provisions in the terms of the agreement. These typically give each partner a combination of rights and obligations to either sell their own holding or to acquire their partner's holding should certain triggering events occur.

(2) If the *listed company* does not retain sole discretion over the event which requires them to either purchase the joint venture partner's stake or to sell their own, ■ UKLR 7.1.6R(1)(b) requires this obligation to be classified at the time it is agreed as though it had been exercised at that time. Further, if the consideration to be paid is to be determined by reference to the future profitability of the joint venture or an independent valuation at the time of exercise, this consideration will be treated as being uncapped. If this is the case, the initial agreement will be classified in accordance with ■ UKLR 7 Annex 1 4R(3) at the time it is entered into.

(3) If the *listed company* does retain sole discretion over the triggering event, or if the *listed company* is making a choice to purchase or sell following an event which has been triggered by the joint venture partner, the purchase or sale must be classified when this discretion is exercised or when the choice to purchase or sell is made.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 292 of 2232
Page ID #:2350

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and...**

Section 7.2 : Classifying transactions

(4) Where an *issuer* enters into a joint venture exit arrangement which takes the form of a put or call option and exercise of the option is solely at the discretion of the other party to the arrangement, the transaction should be classified at the time it is agreed as though the option had been exercised at that time.

### Aggregating transactions – significant transactions

**7.2.11**    **R**

(1) Subject to paragraph (2), transactions completed during the 12 months before the date of the latest transaction must be aggregated with that transaction for the purposes of classification as a *significant transaction* if:

    (a) they are entered into by the *company* with the same *person* or with *persons* connected with one another;

    (b) they involve the acquisition or disposal of *securities* or an interest in one particular *company*; or

    (c) together they lead to substantial involvement in a business activity which did not previously form a significant part of the *company's* principal activities.

(2) Transactions completed during the 12-month period in (1) are not required to be aggregated with the latest transaction if they have previously been classified as a *significant transaction* (either individually or collectively).

**7.2.12**    **R**

If under ■ UKLR 7.2.11R any of the aggregated *percentage ratios* is 25% or more, the aggregated transactions will be classified as a *significant transaction*, in which case the *listed company* must comply with the requirements in ■ UKLR 7.3 (Significant transactions) in respect of the aggregated transactions, modified as follows:

(1) Where the aggregated transactions involve the acquisition or disposal of *securities* or an interest in one particular *company*, the requirements in ■ UKLR 7.3 apply to the transactions as a whole.

(2) If (1) does not apply, the requirements in ■ UKLR 7.3 apply:

    (a) to each individual transaction that has been aggregated where any *percentage ratio* for the individual transaction is 5% or more; or

    (b) if there are no such individual transactions, to the one that led to the relevant aggregated *percentage ratio* reaching or exceeding 25%.

**7.2.13**    **G**

(1) The purpose of ■ UKLR 7.2.12R is to set out how the requirements in this chapter apply to transactions that are only treated as *significant transactions* on an aggregated basis.

(2) ■ UKLR 7.2.12R(1) is intended to support a clearer and more succinct explanation of an acquisition or disposal in a particular *company* by allowing the relevant information to be provided in an aggregated way.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 293 of 2232
Page ID #:2351

UKLR 7 : Equity shares
(commercial companies):
significant transactions and…

Section 7.2 : Classifying transactions

(3) In other situations, ■ UKLR 7.2.12R(2) ensures that the disclosure requirements apply in a proportionate way so that, while the relevant information must be provided for each transaction, information is not generally required about transactions below a de minimis threshold.

(4) ■ UKLR 7.3.1R(2)(a) requires any notification about a *significant transaction* to state why the transaction is notifiable under ■ UKLR 7. Where a notification relates to aggregated transactions, it should explain why the transactions have been aggregated, having regard to whether ■ UKLR 7.2.11R(1)(a), ■ (b) ■ or ■ (c) applies.

(5) ■ UKLR 7.3.13R sets out where the *listed company* must make a supplementary notification in relation to further transactions entered into after aggregated transactions have been classified as a *significant transaction*.

7.2.14  | G |  The *FCA* may modify these *rules* to require the aggregation of transactions in circumstances other than those specified in ■ UKLR 7.2.11R.

### Aggregating transactions – reverse takeovers

7.2.15  | R |  (1) Subject to paragraph (2), transactions completed during the 12 months before the date of the latest transaction must be aggregated with that transaction for the purposes of classification as a *reverse takeover* if:

(a) they are entered into by the *company* with the same *person* or with *persons* connected with one another;

(b) they involve the acquisition or disposal of *securities* or an interest in one particular *company*; or

(c) together they lead to substantial involvement in a business activity which did not previously form a significant part of the *company's* principal activities.

(2) Transactions completed during the 12-month period in (1) are not required to be aggregated with the latest transaction if they have previously been classified as a *reverse takeover* (either individually or collectively).

7.2.16  | R |  If under ■ UKLR 7.2.15R the aggregation of transactions results in a *reverse takeover*, the *listed company* must comply with the requirements in ■ UKLR 7.5 (Reverse takeovers) in respect of the aggregated transactions as a whole but the requirement for shareholder approval applies only to the latest transaction.

7.2.17  | G |  The *FCA* may modify these *rules* to require the aggregation of transactions in circumstances other than those specified in ■ UKLR 7.2.15R.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 294 of 2232

**UKLR 7 : Equity shares** | Page ID #:2352 | Section 7.3 : Significant transactions
**(commercial companies):**
**significant transactions and...**



## 7.3    Significant transactions

### Notification of significant transactions

**7.3.1**    **R**    (1) A *listed company* must notify a *RIS* as soon as possible after the terms of a *significant transaction* are agreed.

(2) The notification must:

(a) state why the transaction is notifiable under ■ UKLR 7;

(b) contain an overview of the transaction and the *company's* reasons for entering into it, which includes the information required by ■ UKLR 7 Annex 2 Part 1 (Information relating to the transaction); and

(c) include any further information the *company* considers relevant, having regard to the purpose of this chapter set out in ■ UKLR 7.1.2G.

**7.3.2**    **R**    (1) A *listed company* must notify a *RIS* as soon as possible after:

(a) the terms of a *significant transaction* are agreed; and

(b) the information in (2) has been prepared or the *listed company* becomes, or ought reasonably to have become, aware of the information,

and in any event by no later than the completion of the transaction.

(2) The notification must include:

(a) for a disposal, the information required by ■ UKLR 7 Annex 2 Part 2 (Disposals – financial information); and

(b) for all transactions, the information required by ■ UKLR 7 Annex 2 Part 3 (Non-financial information).

**7.3.3**    **R**    (1) A *listed company* must notify a *RIS* as soon as possible after the completion of the *significant transaction*.

(2) The notification must state that:

(a) completion of the transaction has taken place; and

(b) except as disclosed, there has been no material change affecting any matter contained in a notification under ■ UKLR 7.3.1R or ■ UKLR 7.3.2R.

In (2)(b), 'material' has the meaning in ■ UKLR 7.3.14R.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 295 of 2232
Page ID #:2353

UKLR 7 : Equity shares
(commercial companies):
significant transactions and...

Section 7.3 : Significant transactions

**7.3.4**  **R**  (1) Where a *listed company* includes details of estimated synergies or other quantified estimated financial benefits expected to arise from a *significant transaction* in a notification required by ■ UKLR 7.3.1R, ■ UKLR 7.3.2R or ■ UKLR 7.3.3R, the notification must include the information required by ■ UKLR 7 Annex 2 Part 4.1 (Synergy benefits).

(2) Where a *listed company* includes financial information (including the information required by ■ UKLR 7 Annex 2 Part 2) in a notification required by ■ UKLR 7.3.1R, ■ UKLR 7.3.2R or ■ UKLR 7.3.3R, the notification must include the information required by ■ UKLR 7 Annex 2 Part 4.2 to ■ 4.4 (Sources of information).

(3) Where a *listed company* includes pro forma financial information in a notification required by ■ UKLR 7.3.1R, ■ UKLR 7.3.2R or ■ UKLR 7.3.3R, the notification must include the information required by ■ UKLR 7 Annex 2 Part 4.5 (Pro forma financial information).

**7.3.5**  **G**  (1) The purpose of ■ UKLR 7.3.1R to ■ UKLR 7.3.4R is to support engagement between the *listed company* and its shareholders and to enhance market transparency.

(2) When complying with ■ UKLR 7.3.1R to ■ UKLR 7.3.4R, a *listed company* should consider the nature and circumstances of the relevant transaction and what information it is necessary to disclose to support shareholder engagement and market transparency.

(3) For example, where a *listed company* has entered into the transaction to alleviate financial difficulty (including anticipated financial difficulty), the notification required by ■ UKLR 7.3.1R should describe the nature, urgency and severity of that financial difficulty. The notification may also contain information about financing arrangements connected to the transaction, and about what may happen if a proposed transaction does not complete.

**Incorporation by reference** ..............................................................

**7.3.6**  **R**  Information may be incorporated in a notification made by a *listed company* under ■ UKLR 7.3.2R by reference to relevant information contained in:

(1) an approved *prospectus* or listing particulars of that *listed company*; or

(2) any other published document of that *listed company* that has been filed with the *FCA*.

**7.3.7**  **R**  Where a notification made by a *listed company* under ■ UKLR 7.3.1R, ■ UKLR 7.3.2R or ■ UKLR 7.3.3R includes information in accordance with ■ UKLR 7.3.4R, that information may be incorporated in such notification by reference to relevant information contained in:

(1) an approved *prospectus* or listing particulars of that *listed company*; or

(2) any other published document of that *listed company* that has been filed with the *FCA*.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 296 of 2232

**UKLR 7 : Equity shares**
**(commercial companies):**
**significant transactions and...**

Page ID #:2354

Section 7.3 : Significant transactions

| 7.3.8 | R | Information incorporated by reference must be the latest available to the *listed company*. |
|---|---|---|

| 7.3.9 | R | Information required by ■ UKLR 7.3.1R and ■ UKLR 7.3.3R must not be incorporated by reference to information contained in another document. |
|---|---|---|

| 7.3.10 | R | When information is incorporated by reference, a cross-reference list must be provided in the notification to enable *security* holders to easily identify specific items of information. The cross-reference list must specify where the information can be accessed by *security* holders. |
|---|---|---|

### Omission of information

| 7.3.11 | G | The *FCA* may authorise the omission of information required by ■ UKLR 7.3.1R to ■ UKLR 7.3.4R if it considers that: |
|---|---|---|

    (1) disclosure of that information would be:

        (a) contrary to the public interest; or

        (b) seriously detrimental to the *listed company*; and

    (2) the omission would not be likely to mislead the public with regard to facts and circumstances that are essential for the assessment of the matter covered by the notification.

| 7.3.12 | R | A request to the *FCA* to authorise the omission of specific information in a particular case must: |
|---|---|---|

    (1) be made in writing by the *listed company*;

    (2) identify the specific information concerned and the specific reasons for the omission; and

    (3) state why, in the *listed company's* opinion, one or more grounds in ■ UKLR 7.3.11G apply.

### Supplementary notification

| 7.3.13 | R | (1) A *listed company* must notify a *RIS* as soon as possible if, after the notification under ■ UKLR 7.3.1R or ■ UKLR 7.3.2R and before completion of the transaction: |
|---|---|---|

        (a) it becomes aware that there has been a material change affecting any matter contained in that earlier notification;

        (b) it becomes aware that a material new matter has arisen which would have been required to be mentioned in that earlier notification if it had arisen at the time of the preparation of that notification;

        (c) it has agreed a material change to the terms of the transaction; or

        (d) it has agreed the terms of one or more further transactions that are of a type referred to in ■ UKLR 7.2.11R(1)(a), ■ (b) or ■ (c) and

**7**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 297 of 2232
Page ID #:2355

UKLR 7 : Equity shares
(commercial companies):
significant transactions and...

Section 7.3 : Significant transactions

are material but are not a *significant transaction* in their own right (individually or together).

(2) The supplementary notification in (1)(a), (b) or (c) must:

  (a) give details of the change or new matter; and

  (b) contain a statement that, except as disclosed:

    (i) there has been no material change affecting any matter contained in the earlier notification; and

    (ii) no other material new matter has arisen which would have been required to be mentioned in that earlier notification if it had arisen at the time of the preparation of that notification.

(3) The supplementary notification in (1)(d) must include the information set out in ■ UKLR 7 Annex 2 Part 1 (Information relating to the transaction) in relation to the further transaction or transactions.

**7.3.14**    **R**    In ■ UKLR 7.3.13R, 'material' means material for the purpose of making an informed assessment of the assets and liabilities, financial position, profits and losses and prospects of the *listed company* and the rights attaching to any *securities* forming part of the consideration. It includes:

(1) a change in the terms of the transaction that increases any of the *percentage ratios* by 10% or more; and

(2) where the further transaction or transactions referred to in ■ UKLR 7.3.13R(1)(d) would, if they were aggregated with the transaction or aggregated transactions (as applicable), result in an increase of any of the *percentage ratios* by 10% or more.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 298 of 2232
**UKLR 7 : Equity shares**      Page ID #:2356      Section 7.4 : Indemnities and major
**(commercial companies):**      subsidiary undertakings
**significant transactions and...**



## 7.4     Indemnities and major subsidiary undertakings

**7**

### Indemnities and similar arrangements

**7.4.1**    **R**    (1) Where a *listed company* proposes to enter into any agreement or arrangement with a party (other than a wholly owned *subsidiary undertaking* of the *listed company*):

(a) under which a *listed company* agrees to discharge any liabilities for costs, expenses, commissions or losses incurred by or on behalf of that party, whether or not on a contingent basis;

(b) which is exceptional; and

(c) under which the maximum liability is either unlimited, or is equal to or exceeds an amount equal to 25% of the average of the *listed company's* profits for the last 3 financial years (using the figures shown in the audited consolidated accounts or preliminary statement of later annual results published before the terms are agreed, with losses taken as nil profit and included in the average),

a *listed company* must notify a *RIS* as soon as possible after the terms of any agreement or arrangement have been agreed.

(2) The notification under (1) must comply with the requirements in ■ UKLR 7.3 (Significant transactions) as applicable.

(3) Paragraph (1) does not apply to a *break fee arrangement*.

(4) In (1)(c), 'profits' means profits after deducting all charges except taxation.

**7.4.2**    **G**    For the purposes of ■ UKLR 7.4.1R(1)(b), the *FCA* considers that the following indemnities are not exceptional:

(1) those customarily given in connection with sale and purchase agreements;

(2) those customarily given to underwriters or placing agents in an underwriting or placing agreement;

(3) those given to advisers against liabilities to third parties arising out of providing advisory services; and

(4) any other indemnity that is specifically permitted to be given to a *director* or auditor under the Companies Act 2006.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 299 of 2232
Page ID #:2357

UKLR 7 : Equity shares
(commercial companies):
significant transactions and...

Section 7.4 : Indemnities and major
subsidiary undertakings

**7.4.3**    G    If the calculation under ■ UKLR 7.4.1R(1)(c) produces an anomalous result, the *FCA* may disregard the calculation and modify that *rule* to substitute other relevant indicators of the size of the indemnity or other arrangement given – for example, 1% of market capitalisation.

### Issues by major subsidiary undertakings

**7.4.4**    R    If:

   (1) a *major subsidiary undertaking* of a *listed company* issues *equity shares* for cash or in exchange for other *securities* or to reduce indebtedness;

   (2) the issue would dilute the *listed company's* percentage interest in the *major subsidiary undertaking*; and

   (3) the economic effect of the dilution is equivalent to a disposal of 25% or more of the aggregate of the gross assets or profits (after the deduction of all charges except taxation) of the *group*,

a *listed company* must notify a *RIS* as soon as possible after the terms of the issue have been agreed.

**7.4.5**    R    The notification required in ■ UKLR 7.4.4R must comply with the requirements set out in ■ UKLR 7.3 (Significant transactions) as applicable.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 300 of 2232

**UKLR 7 : Equity shares**
**(commercial companies):**
**significant transactions and...**
Page ID #:2358          Section 7.5 : Reverse takeovers



## 7.5    Reverse takeovers

### Notification and shareholder approval

**7.5.1**  **R**  An *issuer* must, in relation to a *reverse takeover*:

(1)  comply with the requirements of ■ UKLR 7.3 other than ■ UKLR 7.3.2R for the *reverse takeover*;

(2)  send a *reverse takeover circular* to its shareholders and obtain their prior approval in a general meeting for the *reverse takeover*; and

(3)  ensure that any agreement effecting the *reverse takeover* is conditional on that approval being obtained.

**7.5.2**  **G**  ■ UKLR 10 sets out requirements for the content and approval of *reverse takeover circulars*.

### Material change to terms of a reverse takeover transaction

**7.5.3**  **R**  If, after obtaining shareholder approval but before the completion of a *reverse takeover*, there is a material change to the terms of the transaction, the *listed company* must comply again separately with ■ UKLR 7.5.1R in relation to the transaction.

**7.5.4**  **G**  The *FCA* would (among other things) generally consider an increase of 10% or more in the consideration payable to be a material change to the terms of the transaction.

### Supplementary circular

**7.5.5**  **R**  (1)  If a *listed company* becomes aware of a matter described in (2) after the publication of a *reverse takeover circular*, but before the date of a general meeting, it must, as soon as practicable:

(a)  advise the *FCA* of the matters of which it has become aware; and

(b)  send a supplementary *circular* to holders of its *listed equity shares*, providing an explanation of the matters referred to in (2).

(2)  The matters referred to in (1) are:

(a)  a material change affecting any matter the *listed company* is required to have disclosed in a *reverse takeover circular*; or


(b) a material new matter which the *listed company* would have been required to disclose in the *reverse takeover circular* if it had arisen at the time of its publication.

(3) The *listed company* must have regard to ■ UKLR 10.3.1R(3) when considering the materiality of any change or new matter under ■ UKLR 7.5.5R(2).

7.5.6   G   ■ UKLR 10 applies in relation to a supplementary *circular*. It may be necessary to adjourn a convened shareholder meeting if a supplementary *circular* cannot be sent to holders of *listed equity shares* at least 7 days prior to the convened shareholder meeting as required by ■ UKLR 10.1.9R.

### Cancellation of listing

7.5.7   G   If an *issuer* is proposing to enter into a transaction classified as a *reverse takeover*, it should consider ■ UKLR 21.2.2G and ■ UKLR 21.2.5G.

7.5.8   G   Where an *issuer* completes a *reverse takeover*, the *FCA* will seek to cancel the *listing* of an *issuer's equity shares* unless the *FCA* is satisfied that circumstances exist such that cancellation is not required. The *FCA* will have regard to ■ UKLR 21.2.1R and the individual circumstances of the case.

7.5.9   R   Where the *issuer's listing* is cancelled following completion of a *reverse takeover*, the *issuer* must re-apply for the *listing* of the *shares*.

7.5.10   R   A *sponsor* must contact the *FCA* on behalf of an *issuer* as early as possible:

(1) before a *reverse takeover* which has been agreed or is in contemplation is announced; or

(2) where details of the *reverse takeover* have leaked,

to discuss whether a cancellation of the *issuer's listing* is appropriate on completion of the *reverse takeover*.

7.5.11   G   ■ UKLR 7.5.12G to ■ UKLR 7.5.15G set out circumstances in which the *FCA* will generally be satisfied that a cancellation is not required.

### Acquisitions of targets within the same listing category: issuer maintaining its listing category

7.5.12   G   Where:

(1) an *issuer* acquires the *shares* of a *target*;

(2) those *shares* are also *listed* in the *equity shares (commercial companies)* category; and

(3) the *issuer* wishes to maintain its *listing* of *shares* in the *equity shares (commercial companies)* category,

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 302 of 2232
Page ID #:2360

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and…**

Section 7.5 : Reverse takeovers

the *FCA* will generally be satisfied that a cancellation is not required on completion of a *reverse takeover*.

### Acquisitions of targets from different listing categories: issuer maintaining its listing category

7.5.13    G    Where an *issuer* acquires the *shares* of a *target* with a different *listing* category from its own and the *issuer* wishes to maintain its *listing* in the *equity shares (commercial companies)* category, the *FCA* will generally be satisfied that a cancellation is not required on completion of a *reverse takeover* if:

(1) the *issuer* will continue to be eligible for the *equity shares (commercial companies)* category following completion of the transaction;

(2) a *sponsor* provides an eligibility letter to the *FCA* setting out how the *issuer* as enlarged by the acquisition satisfies each *listing rule* requirement that is relevant to it being eligible for the *equity shares (commercial companies)* category not less than 20 *business days* prior to the announcement of the *reverse takeover*; and

(3) the *issuer* makes an announcement or publishes a *circular* explaining:

(a) the background and reasons for the acquisition;

(b) any changes to the acquiring *issuer's* business that have been made or are proposed to be made in connection with the acquisition;

(c) the effect of the transaction on the acquiring *issuer's* obligations under the *listing rules*;

(d) how the acquiring *issuer* will continue to meet the relevant requirements for *listing*; and

(e) any other matter that the *FCA* may reasonably require.

### Acquisitions of targets from different listing categories: issuer changing listing category

7.5.14    G    The *FCA* will generally be satisfied that a cancellation is not required on completion of a *reverse takeover* if:

(1) the *target* is *listed* with a different *listing* category from that of the *issuer*;

(2) the *issuer* wishes to transfer its *listing* to a different *listing* category in conjunction with the acquisition; and

(3) the *issuer* as enlarged by the relevant acquisition complies with the relevant requirements of ■ UKLR 21.5 to transfer to a different *listing* category.

7.5.15    G    Where an *issuer* is applying ■ UKLR 21.5 in order to avoid a cancellation as contemplated by ■ UKLR 7.5.14G, the *FCA* will normally waive the requirement for shareholder approval under ■ UKLR 21.5.6R(3) where the *issuer* is obtaining separate shareholder approval for the acquisition.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 303 of 2232
Page ID #:2361

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and...**

Section 7.5 : Reverse takeovers

**7**

Case 2:23-cv-09217-MEMF-KS     Document 114-4     Filed 09/05/25     Page 304 of 2232
Page ID #:2362

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and...**

Annex 1

## The class tests

| Class tests | | | |
|---|---|---|---|
| 1 | G | | This annex sets out the following *class tests*: |
| | | (1) | the gross assets test; |
| | | (2) | the consideration test; and |
| | | (3) | the gross capital test. |

| The gross assets test | | | |
|---|---|---|---|
| 2 | R | (1) | The gross assets test is calculated by dividing the gross assets the subject of the transaction by the gross assets of the *listed company*. |
| | | (2) | The 'gross assets of the *listed company* means the total non-current assets, plus the total current assets, of the *listed company*. |
| | | (3) | For: |
| | | | (a) an acquisition of an interest in an undertaking which will result in consolidation of the assets of that undertaking in the accounts of the *listed company*; or |
| | | | (b) a disposal of an interest in an undertaking which will result in the assets of that undertaking no longer being consolidated in the accounts of the *listed company*, |
| | | | the 'gross assets the subject of the transaction' means the value of 100% of that undertaking's assets, irrespective of what interest is acquired or disposed of. |
| | | (4) | For an acquisition or disposal of an interest in an undertaking which does not fall within (3), the 'gross assets the subject of the transaction' means: |
| | | | (a) for an acquisition, the consideration together with liabilities assumed (if any); and |

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 305 of 2232
Page ID #:2363

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and…**

Annex 1

| | | | The gross assets test | |
|---|---|---|---|---|
| | | | (b) | for a disposal, the assets attributed to that interest in the *listed company's* accounts. |
| | | (5) | | If there is an acquisition of assets other than an interest in an undertaking, the 'assets the subject of the transaction' means the consideration or, if greater, the book value of those assets as they will be included in the *listed company's* balance sheet. |
| | | (6) | | If there is a disposal of assets other than an interest in an undertaking, the 'assets the subject of the transaction' means the book value of the assets in the *listed company's* balance sheet. |
| 3 | G | | | The *FCA* may modify UKLR 7 Annex 1 2R to require, when calculating the assets the subject of the transaction, the inclusion of further amounts if contingent assets or arrangements referred to in UKLR 7.4.1R (Indemnities and similar arrangements) are involved. |

| | | | The consideration test | |
|---|---|---|---|---|
| 4 | R | (1) | | The consideration test is calculated by taking the consideration for the transaction as a percentage of the aggregate market value of all the ordinary shares (excluding *treasury shares*) of the *listed company*. |
| | | (2) | | For the purposes of (1): |
| | | | (a) | the consideration is the amount paid to the contracting party; |
| | | | (b) | if all or part of the consideration is in the form of *securities* to be traded on a market, the consideration attributable to those *securities* is the aggregate market value of those *securities*; and |
| | | | (c) | if deferred consideration is or may be payable or receivable by the *listed company* in the future, the consideration is the maximum total consideration payable or receivable under the agreement. |

| | | | The consideration test | |
|---|---|---|---|---|
| | | (3) | | If the total consideration is not subject to any maximum (and any of the other *class tests* indicate a *percentage ratio* of at least 5%), the transaction is to be treated as a *significant transaction*. |
| | | (4) | | For the purposes of (2)(b), the figures used to determine consideration consisting of: |
| | | | (a) | *securities* of a *class* already *listed* must be the aggregate market value of all those *securities* on the last *business day* before the announcement of the transaction; and |
| | | | (b) | a new *class* of *securities* for which an application for *listing* will be made must be the expected aggregate market value of all those *securities*. |
| | | (5) | | For the purposes of (1), the figure used to determine market capitalisation is the aggregate market value of all the ordinary *shares* (excluding *treasury shares*) of the *listed company* at the close of business on the last *business day* before the announcement of the transaction. |
| 5 | G | | | The *FCA* may modify UKLR 7 Annex 1 4R to require the inclusion of further amounts in the calculation of the consideration – for example, if the purchaser agrees to discharge any liabilities, including the repayment of inter-company or third-party debt, whether actual or contingent, as part of the terms of the transaction. |
| | | | The gross capital test | |
| 6 | R | (1) | | The gross capital test is calculated by dividing the gross capital of the *company* or business being acquired by the gross capital of the *listed company*. |
| | | (2) | | The test in (1) is only to be applied for an acquisition of a *company* or business. |
| | | (3) | | For the purposes of (1), the 'gross capital of the *company* or business being acquired' means the aggregate of: |
| | | | (a) | the consideration (as calculated under UKLR 7 Annex 1 4R); |

**7**

Case 2:23-cv-09217-MEMF-KS     Document 114-4     Filed 09/05/25     Page 307 of 2232
Page ID #:2365

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and...**

Annex 1

| The gross capital test | | | |
|---|---|---|---|
| | | (b) | if a *company*, any of its *shares* and *debt securities* which are not being acquired; |
| | | (c) | all other liabilities (other than current liabilities) including for this purpose minority interests and deferred taxation; and |
| | | (d) | any excess of current liabilities over current assets. |
| | (4) | | For the purposes of (1), the gross capital of the *listed company* means the aggregate of: |
| | | (a) | the market value of its *shares* (excluding *treasury shares*) and the issue amount of the *debt security*; |
| | | (b) | all other liabilities (other than current liabilities) including, for this purpose, minority interests and deferred taxation; and |
| | | (c) | any excess of current liabilities over current assets. |
| | (5) | | For the purposes of (1): |
| | | (a) | figures used must be, for *shares* and *debt security* aggregated for the purposes of the gross capital *percentage ratio*, the aggregate market value of all those *shares* (or, if not available before the announcement of the transaction, their nominal value) and the issue amount of the *debt security*; and |

| The gross capital test | | | |
|---|---|---|---|
| | | (b) | for *shares* and *debt security* aggregated for the purposes of (3)(b), any *treasury shares* held by the *company* are not to be taken into account. |

| Figures used to classify assets | | | |
|---|---|---|---|
| 7 | R | (1) | For the purposes of calculating the tests in this annex, except as otherwise stated in (2) to (6), figures used to classify assets must be the figures shown in the latest published audited consolidated accounts or, if a *listed company* has, or will have, published a preliminary statement of later annual results at the time the terms of a transaction are agreed, the figures shown in that preliminary statement. |
| | | (2) | If a balance sheet has subsequently been published in an interim statement, gross assets and gross capital should be taken from the balance sheet published in the interim statement. |
| | | (3) (a) | The figures of the *listed company* must be adjusted to take account of transactions completed during the period to which the figures referred to in (1) or (2) relate, and subsequent completed transactions where any *percentage ratio* was 5% or more at the time the terms of the relevant transaction were agreed. |
| | | (b) | The figures of the target company or business must be adjusted to take account of transactions completed during the period to which the figures referred to in (1) or (2) relate, and subsequent completed transactions where any |

**7**

| Figures used to classify assets | | |
|---|---|---|
| | | *percentage ratio* was 5% or more at the time the terms of the relevant transaction were agreed. |
| | (4) | Figures on which the auditors are unable to report without modification must be disregarded. |
| | (5) | When applying the *percentage ratios* to an acquisition by a *company* whose assets consist wholly or predominantly of cash or short-dated *securities*, the cash and short-dated *securities* must be excluded in calculating its assets and market capitalisation. |
| | (6) | The principles in this paragraph also apply (to the extent relevant) to calculating the assets of the target company or business. |
| 8 | G | The *FCA* may modify UKLR 7 Annex 1 7R(4) in appropriate cases to permit figures to be taken into account. |

| Anomalous results | | |
|---|---|---|
| 9 | G | If a calculation under any of the *class tests* produces an anomalous result or if a calculation is inappropriate to the activities of the *listed company*, the *FCA* may modify the relevant *rule* to substitute other relevant indicators of size, including industry-specific tests. |

| Adjustments to figures | | |
|---|---|---|
| 10 | G | Where a *listed company* wishes to make adjustments to the figures used in calculating the class tests pursuant to UKLR 7 Annex 1 9G, it should discuss this with the *FCA* before the class tests crystallise. |

## Notification requirements

This annex sets out the information to be included in a notification required by ■ UKLR 7.3.1R, ■ UKLR 7.3.2R, ■ UKLR 7.3.3R and ■ UKLR 7.5.1R.

| Part 1 | | | Information relating to the transaction | |
|---|---|---|---|---|
| 1.1 | | R | | A notification required by UKLR 7.3.1R and UKLR 7.5.1R must include the following information: |
| | | | (1) | details of the transaction, including the name of the other party to the transaction; |
| | | | (2) | an explanation of the reasons for entering into the transaction; |
| | | | (3) | a description of the business carried on by, or using, the net assets the subject of the transaction; |
| | | | (4) | the consideration, and how it is being satisfied (including the terms of any arrangements for deferred consideration); |
| | | | (5) | the value of the gross assets the subject of the transaction; |
| | | | (6) | the profits attributable to the assets the subject of the transaction; |
| | | | (7) | the effect of the transaction on the *listed company*, including any benefits which are expected to accrue to the *company*, and any risks to the *company*, as a result of the transaction; |
| | | | (8) | a statement of the effect of the transaction on the *group's* earnings and assets and liabilities; |
| | | | (9) | details of any service contracts of proposed *directors* of the *listed company*; |

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 311 of 2232
Page ID #:2369

UKLR 7 : Equity shares
(commercial companies):
significant transactions and…

Annex 2

7

| Part 1 | | Information relating to the transaction | |
|---|---|---|---|
| | | (10) | details of any *break fee arrangements*; |
| | | (11) | for a disposal, the application of the sale proceeds; |
| | | (12) | for a disposal, if *securities* are to form part of the consideration received, a statement as to whether the *securities* are to be sold or retained; |
| | | (13) | details of key individuals important to the business or *company* the subject of the transaction; |
| | | (14) | if the transaction is a joint venture, details of any exit arrangement; |
| | | (15) | if the transaction is required to be aggregated under UKLR 7.2.11R, details of transactions completed during the relevant period; and |
| | | (16) | a statement by the board that the transaction is, in the board's opinion, in the best interests of *security* holders as a whole. |

| Part 2 | | Disposals - financial information | | |
|---|---|---|---|---|
| 2.1 | R | A notification required by UKLR 7.3.2R must include the information in UKLR 7 Annex 2 2.2R where the transaction involves a disposal. | | |
| 2.2 | R | Where the transaction involves a disposal, the notification must include the following: | | |
| | | (1) | (a) | when a *listed company* is disposing of an interest in a *target* which will result in the assets and liabilities which are the subject of the disposal no longer being consolidated: |
| | | | (i) | the last annual consolidated balance sheet; |
| | | | (ii) | the consolidated income statements for the last 2 years drawn up to at least the level of profit or loss for the period; and |

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 312 of 2232
Page ID #:2370

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and...**

Annex 2

| Part 2 | Disposals - financial information |
|---|---|

| | | | |
|---|---|---|---|
| | | (iii) | the consolidated balance sheet and consolidated income statement (drawn up to at least the level of profit or loss for the period) at the *issuer's* interim balance sheet date if the *issuer* has published interim financial statements since the publication of its last annual audited consolidated financial statements; |
| | (b) | | the information in (1)(a) must be extracted without material adjustment from the consolidation schedules that underlie the *listed company's* audited consolidated accounts or, in the case of (1)(a)(iii), the interim financial information, and must be accompanied by a statement to this effect; and |
| | (c) | | where a change of accounting policies has occurred during the period covered by the financial information required by (1)(a), the financial information must be presented on the basis of both the original and amended accounting policies for the year prior to that in which the new accounting policy is adopted unless the change did not require a restatement of the comparative; |
| (2) | | | when a *listed company* is disposing of an interest in a *target* that has been accounted for as an investment, and the *target's securities* that are the subject of the transaction are admitted to an investment exchange that enables intra-day price formation: |
| | (a) | | the amounts of the dividends or other distributions paid in the past 2 years; and |
| | (b) | | the price per *security* and the imputed value of the entire holding being disposed of at the |

**7**

| Part 2 | Disposals - financial information |
|---|---|

| | | | close of business at the following times: |
|---|---|---|---|
| | | (i) | on the last *business day* of each of the 6 months prior to the announcement of the transaction; and |
| | | (ii) | on the day prior to the announcement of the transaction; |
| | (3) | | when a *listed company* is disposing of an interest in a *target* that was accounted for using the equity method in the *listed company's* annual consolidated accounts, the line entries relating to the *target* from its last audited consolidated balance sheet and those from its audited consolidated income statement for the past 2 years together with the equivalent line entries from its interim consolidated balance sheet and interim consolidated income statement, where the *issuer* has published subsequent interim financial information; and |
| | (4) | | where the information in (2) or (3) is not available or cannot be produced in accordance with the requirements in (1)(a): |
| | | (a) | a statement by the board that the information is not available or cannot be produced; |
| | | (b) | an explanation as to how the value of the consideration has been arrived at; and |
| | | (c) | a statement by the board that it considers the consideration to be fair as far as the *security* holders of the *company* are concerned. |

| Part 3 | Non-financial information |
|---|---|

| 3.1 | R | A notification required by UKLR 7.3.2R must include the information identified (by reference to certain paragraphs of Annex 1 of the *PR Regulation*) in the following table relating to the *listed company* and the undertaking the subject of the transaction. |
|---|---|---|

| Information | Listed company | Undertaking the subject of the transaction |
|---|---|---|
| Annex 1 item 17.1 – Related party transactions | * | |

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 314 of 2232
Page ID #:2372

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and…**

Annex 2

| Information | | Listed company | Undertaking the subject of the transaction |
|---|---|---|---|
| Annex 1 item 18.6.1 – Legal and arbitration proceedings | | * | * |
| Annex 1 item 18.7.1 – Significant change in the issuer's financial position | | * | * |
| Annex 1 item 20.1 – Material contracts | | * | * |

| | | | |
|---|---|---|---|
| 3.2 | R | | The information required by Annex 1 item 20.1 (Material contracts) and Annex 1 item 18.6.1 (Legal and arbitration proceedings) must be presented as follows: |
| | | (1) | for an acquisition, in separate statements for the *listed company* for the undertaking, business or assets to be acquired; or |
| | | (2) | for a disposal, in separate statements for the *listed company* and its *subsidiary undertakings* (on the basis that the disposal has taken place), and for the undertaking, business or assets to be disposed of. |
| 3.3 | R | | In determining what information is required to be included by virtue of Annex 1 item 20.1 (Material contracts) if a *prospectus* or *listing particulars* are not required, regard should be had as to whether information about that provision is information which *securities* holders of the *issuer* would reasonably require for the purpose of making a properly informed assessment of the transaction and its impact on the *issuer*. |
| 3.4 | R | | The information required by Annex 1 item 17.1 (Related party transactions): |
| | | (1) | need only be given if it is relevant to the transaction; and |
| | | (2) | need not be given if it has already been published before the notification is made. |
| 3.5 | R | (1) | The information required by Annex 1 item 18.7.1 (Significant change in the issuer's financial position) need only be given for the undertaking which is the subject of the transaction if: |
| | | | (a) the transaction involves a disposal; and |
| | | | (b) information required by UKLR 7 Annex 2 2.2R(1) or 2.2R(3) has been included in the notification. |
| | | (2) | Where information required by Annex 1 item 18.7.1 (Significant change in the issuer's financial position) is given for both the *listed company* and the undertaking which is the subject of the trans- |

Case 2:23-cv-09217-MEMF-KS     Document 114-4     Filed 09/05/25     Page 315 of 2232
Page ID #:2373

**UKLR 7 : Equity shares
(commercial companies):
significant transactions and…**

Annex 2

|  |  |  | action, the information must be presented in separate statements for the *listed company* and its *subsidiary undertakings* (on the basis that the disposal has taken place), and for the undertaking, business or assets to be disposed of. |
|---|---|---|---|
| **Part 4** | | **Synergy benefits, sources of information and pro forma financial information** | |

**Synergy benefits**

| 4.1 | R | | Where a *listed company* includes details of estimated synergies or other quantified estimated financial benefits expected to arise from a transaction in a notification required by UKLR 7.3.1R, UKLR 7.3.2R, UKLR 7.3.3R or UKLR 7.5.1R, the notification must include the following: |
|---|---|---|---|
| | | (1) | the basis for the belief that those synergies or other quantified estimated financial benefits will arise; |
| | | (2) | an analysis and explanation of the constituent elements of the synergies or other quantified estimated financial benefits (including any costs) sufficient to enable the relative importance of those elements to be understood, including an indication of when they will be realised and whether they are expected to be recurring; |
| | | (3) | a base figure for any comparison drawn; |
| | | (4) | a statement that the synergies or other quantified estimated financial benefits are contingent on the transaction and could not be achieved independently; and |
| | | (5) | a statement that the estimated synergies or other quantified estimated financial benefits reflect both the beneficial elements and relevant costs. |

**Sources of information**

| 4.2 | R | | Where a *listed company* includes financial information in a notification required by UKLR 7.3.1R, UKLR 7.3.2R, UKLR 7.3.3R or UKLR 7.5.1R, the notification must cite the source of all financial information that it discloses in the notification and include the following: |
|---|---|---|---|
| | | (1) | a statement of whether the financial information was extracted from accounts, internal financial accounting records, internal management accounting records, or an external or other source; |
| | | (2) | a statement of whether financial information that was extracted from audited accounts was extracted without material adjustment; and |
| | | (3) | an indication of which aspects of the financial information relate to: |
| | | | (a) | historical financial information; |

**UKLR 7 : Equity shares (commercial companies): significant transactions and…**

| Part 4 | | Synergy benefits, sources of information and pro forma financial information |
|---|---|---|
| | | (b)      forecast or estimated financial information; or |
| | | (c)      pro forma financial information, |
| | | with reference made to where the basis of presentation can be found. |
| 4.3 | R | If financial information has not been extracted directly from audited accounts, the notification must include the following: |
| | | (1)      the basis and assumptions on which the financial information has been prepared; and |
| | | (2)      a statement that the financial information is unaudited or not reported on by an accountant. |
| 4.4 | R | A *listed company* must provide investors with all necessary information to understand the context and relevance of non-statutory figures. |
| | | Pro forma financial information |
| 4.5 | R | If a *listed company* includes pro forma financial information in a notification required by UKLR 7.3.1R, UKLR 7.3.2R, UKLR 7.3.3R or UKLR 7.5.1R, the notification must: |
| | | (1)      cite the sources of any unadjusted financial information that it discloses in the notification; and |
| | | (2)      include an explanation of the basis upon which the pro forma financial information has been prepared. |

**7**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 317 of 2232
Page ID #:2375

UKLR 7 : Equity shares
(commercial companies):
significant transactions and...

Annex 2

7

**UK Listing Rules Sourcebook**

# Chapter 8

# Equity shares (commercial companies): related party transactions

## 8.1    Preliminary

### Application

8.1.1    R    This chapter applies to a company that has a *listing* of *equity shares* in the *equity shares (commercial companies)* category.

### Purpose

8.1.2    G    The purpose of this chapter is to set out governance and notification requirements for a *listed company* in relation to *related party transactions*. These requirements are intended to:

(1) ensure that the shareholders of *companies* with *listed equity shares* are notified of *related party transactions* when they are entered into by the *listed company*, and support engagement between the *listed company* and its shareholders in relation to *related party transactions*; and

(2) enhance market transparency in relation to *related party transactions*.

8.1.3    G    These requirements are also intended to prevent a *related party* from taking advantage of its position and prevent any perception that it may have done so.

### Sponsors

8.1.4    G    A *listed company* that is proposing to enter into a *related party transaction* requiring the *listed company* to make a notification under ■ UKLR 8.2.1R(4) must comply with the requirement to appoint a *sponsor* under ■ UKLR 8.2.1R(3).

8.1.5    R    A *listed company* must appoint a *sponsor* where it proposes to make a request to the *FCA* to modify, waive or substitute the operation of ■ UKLR 8.

8.1.6    R    A *listed company* must appoint a *sponsor* where it proposes to make a request to the *FCA* for individual guidance in relation to the *listing rules*, the *disclosure requirements* or the *transparency rules* in connection with a *related party transaction*.

### Definition of 'related party transaction'

**8.1.7** **R** In *UKLR*, a *related party transaction* means:

(1) a transaction (other than a transaction in the ordinary course of business) between a *listed company* and a *related party*;

(2) an arrangement (other than an arrangement in the ordinary course of business) pursuant to which a *listed company* and a *related party* each invests in, or provides finance to, another undertaking or asset; or

(3) any other similar transaction or arrangement (other than a transaction or arrangement in the ordinary course of business) between a *listed company* and any other *person*, the purpose and effect of which is to benefit a *related party*.

**8.1.8** **G** A *related party transaction* includes the variation or novation of an existing agreement between the *listed company* and a *related party*, regardless of whether the party was a *related party* at the time the original agreement was entered into.

### Meaning of 'transaction' or 'arrangement'

**8.1.9** **R** A reference in this chapter:

(1) to a transaction or arrangement by a *listed company* includes a transaction or arrangement by its *subsidiary undertaking*;

(2) to a transaction or arrangement is, unless the contrary intention appears, a reference to the entering into of the agreement for the transaction or the entering into of the arrangement; and

(3) to a transaction or arrangement includes a transaction or arrangement which amends or revises the terms of an existing transaction or arrangement.

### Transactions to which this chapter does not apply

**8.1.10** **R** ■ UKLR 8.2.1R to ■ UKLR 8.2.5R do not apply to a *related party transaction* if it is a transaction or arrangement:

(1) of a kind referred to in paragraph 1 of ■ UKLR 8 Annex 1 (a transaction the terms of which were agreed before a person became a related party); or

(2) of a kind referred to in paragraphs 2 to 8 of ■ UKLR 8 Annex 1 and does not have any unusual features.

### Definition of 'related party'

**8.1.11** **R** In *UKLR*, a *related party* means:

(1) a *person* who is (or was within the 12 months before the date of the transaction or arrangement) a *substantial shareholder*;

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 321 of 2232
Page ID #:2379

**UKLR 8 : Equity shares
(commercial companies): related
party transactions**

Section 8.1 : Preliminary

(2) a *person* who is (or was within the 12 months before the date of the transaction or arrangement) a *director* or *shadow director* of:

(a)  the *listed company*; or

(b)  any other *company* which is one of the following (and, if that *person* has ceased to a *director* or *shadow director*, any other *company* which was one of the following while that *person* was a *director* or *shadow director* of such other *company*);

(i)  a *subsidiary undertaking* of the *listed company*;

(ii)  a *parent undertaking* of the *listed company*; or

(iii)  a fellow *subsidiary undertaking* of a *parent undertaking* of the *listed company*;

(3)  a *person exercising significant influence*; or

(4)  an *associate* of a *related party* referred to in paragraph (1), (2) or (3).

### Definition of 'substantial shareholder'

**8.1.12**  | R |  In *UKLR*, a *substantial shareholder* means any *person* who is entitled to exercise, or to control the exercise of, 20% or more of the votes able to be cast on all or substantially all matters at general meetings of:

(1)  the *company*; or

(2)  any *company* which is:

(a)  a *subsidiary undertaking* of the *company*;

(b)  a *parent undertaking* of the *company*; or

(c)  a fellow *subsidiary undertaking* of a *parent undertaking* of the *company*.

**8.1.13**  | G |  For the purposes of determining votes that are able to be cast at general meetings of a *company*, voting rights attached to *shares* which are not *listed shares*, including *specified weighted voting rights shares*, should be taken into consideration.

**8.1.14**  | R |  For the purposes of calculating voting rights in ■ UKLR 8.1.12R, the following voting rights are to be disregarded:

(1)  any voting rights which such a *person* exercises (or controls the exercise of) independently in its capacity as:

(a)  bare trustee;

(b)  investment manager;

(c)  collective investment undertaking; or

(d)  a *long-term insurer* in respect of its linked long-term business,

if no *associate* of that *person* interferes by giving direct or indirect instructions, or in any other way, in the exercise of such voting rights (except to the extent any such *person* confers or collaborates with such an *associate* which also acts in its capacity

as investment manager, collective investment undertaking or *long-term insurer*); or

(2) any voting rights:

    (a) which a *person* may hold (or control the exercise of) solely in relation to the direct performance, by way of business, of:

        (i) underwriting the issue or sale of *securities*;

        (ii) placing *securities*, where the *person* provides a firm commitment to acquire any *securities* which it does not place; or

        (iii) acquiring *securities* from existing shareholders or the *issuer* pursuant to an agreement to procure third-party purchases of *securities*; and

    (b) where the conditions in (i) to (iv) are satisfied:

        (i) the activities set out in (2)(a) are performed in the ordinary course of business;

        (ii) the *securities* to which the voting rights attach are held for a consecutive period of 5 *trading days* or less, beginning with the first *trading day* on which the *securities* are held;

        (iii) the voting rights are not exercised within the period in which the *securities* are held; and

        (iv) no attempt is made directly or indirectly by the *firm* to intervene in or exert influence on (or attempt to intervene in or exert influence on) the management of the *issuer* within the period the *securities* are held.

### Meaning of 'ordinary course of business'

**8.1.15**   G   (1) The assessment of whether a transaction is in the ordinary course of business under this chapter will depend on the specific circumstances of the *listed company*.

(2) Factors that may indicate whether a transaction is in the ordinary course of a *company's* business include:

    (a) the size and incidence of similar transactions which the *company* has entered into;

    (b) the nature and size of the *company's* existing business and common factors within the industry sector in which it operates;

    (c) the *company's* corporate strategy for its business, including in relation to growth and industry focus, as set out in the *company's* latest published *prospectus* or annual financial report;

    (d) the existing accounting treatment (for a disposal) or planned accounting treatment (for an acquisition or new arrangement) by the *listed company*; and

    (e) whether its shareholders could reasonably expect the *company* to enter into the transaction, taking into account:

        (i) the factors in (a) to (d);

        (ii) any further information that the *company* has already notified to a *RIS*;

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 323 of 2232
Page ID #:2381

UKLR 8 : Equity shares
(commercial companies): related
party transactions

Section 8.1 : Preliminary

(iii)  the subject matter of the transaction;

(iv)  the terms of the transaction;

(v)  the anticipated impact on the *listed company*; and

(vi)  the associated benefits and risks.

**8.1.16**    |G|  Transactions that are likely to be in the ordinary course of business include:

(1)  regular trading activities (if the *company* is a trading *company*);

(2)  ongoing commercial arrangements and purchases commonly undertaken as part of the existing business or within the industry sector in which the *company* operates;

(3)  capital expenditure to support and maintain the existing business and its infrastructure;

(4)  capital expenditure to add scale to the existing business in line with the *company's* business strategy as previously notified to a *RIS* (including, for example, within the latest published *prospectus* or annual financial report); or

(5)  in the case of a *listed property company*, where the accounting treatment of a *property* that is acquired or disposed is such that:

(a)  for an acquisition, the *property* will be classified as a current asset in the *company's* published accounts; or

(b)  for a disposal, the *property* was classified as a current asset in the *company's* published accounts.

**8.1.17**    |G|  Transactions that are unlikely to be in the ordinary course of business include:

(1)  mergers with, or acquisitions of, other businesses (whether structured by way of a share or asset acquisition);

(2)  transactions that would lead to a substantial involvement in a business activity that did not previously form a significant part of the *listed company's* principal activities;

(3)  transactions that would lead to the *listed company* no longer having a substantial involvement in a business activity that forms a significant part of its principal activities; or

(4)  transactions which are entered into to alleviate financial difficulty.

**8.1.18**    |R|  For the purposes of this chapter, a transaction in the ordinary course of business excludes a *reverse takeover*.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 324 of 2232
Page ID #:2382

**UKLR 8 : Equity shares
(commercial companies): related
party transactions**

Section 8.1 : Preliminary

**Where a related party transaction is also a significant
transaction or other transaction under ■ UKLR 7**

8.1.19    G    Where a *related party transaction* is also a *significant transaction* or is
otherwise subject to ■ UKLR 7, the requirements and *guidance* under ■ UKLR 7
also apply, in addition to the requirements under this chapter.

8

**UKLR 8 : Equity shares (commercial companies): related party transactions**

## 8.2    Requirements for related party transactions

**General requirements for related party transactions**

**8.2.1**    **R**    If a *listed company* enters into a *related party transaction* where any *percentage ratio* is 5% or more, the *listed company* must:

(1) obtain the approval of its board for the transaction or arrangement before it is entered into;

(2) ensure that any *director* who is, or an *associate* of whom is, the *related party*, or who is a *director* of the *related party*, does not take part in the board's consideration of the transaction or arrangement and does not vote on the relevant board resolution;

(3) before entering into the transaction or arrangement, obtain written confirmation from a *sponsor* that the terms of the proposed transaction or arrangement with the *related party* are fair and reasonable as far as the *security* holders of the *listed company* are concerned; and

(4) notify a *RIS* as soon as possible after the terms of the transaction or arrangement are agreed.

**8.2.2**    **R**    The notification must include:

(1) details of the *related party transaction*, including:

(a) the name of the *related party*;

(b) the value of the consideration for the transaction or arrangement; and

(c) a description of the transaction or arrangement;

(2) the fact that the transaction or arrangement is a *related party transaction* which fell within ■ UKLR 8.2.1R;

(3) details of the nature and extent of the *related party's* interest in the transaction(s) or arrangement(s);

(4) a statement by the board that the transaction or arrangement is fair and reasonable as far as the *security* holders of the *company* are concerned and that the *directors* have been so advised by a *sponsor*; and

(5) the name of the sponsor that provided the written confirmation in ■ UKLR 8.2.1R(3).

**8.2.3** | R | The notification must also include any further information the *company* considers relevant, having regard to the purpose of this chapter set out in ■ UKLR 8.1.2G.

**8.2.4** | G | ■ UKLR 8.2.2R(4) does not require the notification to include an explanation of the basis of preparation for the board's conclusion that the transaction is fair and reasonable, or an explanation of the *sponsor's* advice. The *FCA* does not expect the notification to include explanations of the basis of preparation, as this could be seen to limit the validity of the confirmation. Instead, a clean confirmation, tracking the wording used in ■ UKLR 8.2.2R(4), should be given.

**8.2.5** | R | If, before the completion of a *related party transaction* referred to in ■ UKLR 8.2.1R that has been notified in accordance with this section, there is a material change to the terms of the transaction, the *listed company* must comply again separately with ■ UKLR 8.2.1R to ■ UKLR 8.2.3R in relation to the transaction.

**8.2.6** | G | The *FCA* would (among other things) generally consider an increase of 10% or more in the consideration payable to be a material change to the terms of the transaction.

### Aggregation of transactions in any 12-month period

**8.2.7** | R | (1) Subject to (3), if a *listed company* enters into transactions or arrangements with the same *related party* (and any of its *associates*) in any 12-month period, the transactions or arrangements must be aggregated.

(2) If any *percentage ratio* is 5% or more for the aggregated transactions or arrangements, the *listed company*:

(a) must comply with ■ UKLR 8.2.1R, in respect of the latest transaction or arrangement; and

(b) the notification required by ■ UKLR 8.2.1R(4) must include:

(i) all of the information required by ■ UKLR 8.2.2R for the latest transaction or arrangement;

(ii) the information required in ■ UKLR 8.2.2R(1) to ■ (3) for the other aggregated transactions or arrangements; and

(iii) the information required by ■ UKLR 8.2.3R.

(3) Transactions or arrangements completed during the 12-month period in (1) are not required to be aggregated with the latest transaction or arrangement if they were previously classified as a *related party transaction* notifiable (individually or collectively) under ■ UKLR 8.2.1R or ■ UKLR 8.2.7R(2).

**8**

## Supplementary notification

**8.2.8**    R

(1) A *listed company* must notify a *RIS* as soon as possible if, after the notification under ■ UKLR 8.2.1R(4), it becomes aware that:

   (a) there has been a material change affecting any matter contained in that earlier notification (other than a material change to the terms of the transaction to which ■ UKLR 8.2.5R applies); or

   (b) a material new matter has arisen which would have been required to be mentioned in that earlier notification if it had arisen at the time of the preparation of that notification.

(2) The supplementary notification must:

   (a) give details of the change or new matter; and

   (b) contain a statement that, except as disclosed:

    (i) there has been no material change affecting any matter contained in the earlier notification; and

    (ii) no other material new matter has arisen which would have been required to be mentioned in that earlier notification if it had arisen at the time of the preparation of that notification.

(3) In paragraphs (1) and (2), 'material' means material for the purpose of making an informed assessment of the assets and liabilities, financial position, profits and losses and prospects of the *listed company* and the rights attaching to any *securities* forming part of the consideration.

## Sovereign controlling shareholders

**8.2.9**    R

In the case of a *related party* which is a *sovereign controlling shareholder* or an *associate* of a *sovereign controlling shareholder*, where:

(1) a *listed company* is a *sovereign controlled commercial company* and:

   (a) has a *sovereign controlling shareholder* which was a *controlling shareholder* on the first occasion on which the *company* made an application for the *admission* of *equity shares* to the *equity shares (commercial companies)* category;

   (b) has made a notification in accordance with ■ UKLR 6.4.18R and ■ UKLR 6.4.19R; or

   (c) made an announcement in accordance with ■ UKLR 21.5.6.R(2) and ■ UKLR 21.5.9R when it transferred the *listing* of its *equity shares* to the *equity shares (commercial companies)* category; and

(2) the *sovereign controlling shareholder* is either:

   (a) recognised by the government of the *UK* as a State; or

   (b) the *UK*,

■ UKLR 8.2.1R(2) and ■ (3) and ■ UKLR 8.2.2R(4) and ■ (5) do not apply.

## Transactions to which related party transaction rules do not apply

| Transaction agreed before person became a related party | | |
|---|---|---|
| 1 | The *related party transaction* rules do not apply to a transaction the terms of which: | |
| | (1) | were agreed at a time when no party to the transaction or *person* who was to receive the benefit of the transaction was a *related party*; and |
| | (2) | have not been amended, or which required the exercise of discretion by the *listed company* under those terms, since the party or *person* became a *related party*. |
| **Issue of new securities and sale of treasury shares** | | |
| 2 | The *related party transaction* rules do not apply to a transaction that consists of: | |
| | (1) | the take-up by a *related party* of new *securities* or *treasury shares* under its entitlement in a pre-emptive offering; or |
| | (2) | an issue of new *securities* made under the exercise of conversion or subscription rights attaching to a listed class of *securities*. |
| **Employees' share schemes and long-term incentive schemes** | | |
| 3 | The *related party transaction* rules do not apply to: | |
| | (1) | the receipt of any asset (including cash or *securities* of the *listed company* or any of its *subsidiary undertakings*) by a *director* of the *listed company*, its *parent undertaking* or any of its *subsidiary undertakings*; or |
| | (2) | the grant of an option or other right to a *director* of the *listed company*, its *parent undertaking* or any of its *subsidiary undertakings* to acquire (whether or not for consideration) any asset (including cash or new or existing *securities* of the *listed company* or any of its *subsidiary undertakings*); or |
| | (3) | the provision of a gift or loan to the trustees of an employee benefit trust to finance the provision of assets as referred to in (1) or (2), |
| | in accordance with the terms of an *employees' share scheme* or a *long-term incentive scheme*. | |
| **Credit** | | |
| 4 | The *related party transaction* rules do not apply to a grant of credit (including the lending of money or the guaranteeing of a loan): | |
| | (1) | to the *related party* on normal commercial terms; |
| | (2) | to a *director* for an amount and on terms no more favourable than those offered to employees of the group generally; or |
| | (3) | by the *related party* on normal commercial terms and on an unsecured basis. |
| **Directors' indemnities and loans** | | |
| 5 | (1) | The *related party transaction* rules do not apply to a transaction that consists of: |

**UKLR 8 : Equity shares (commercial companies): related party transactions**

| Transaction agreed before person became a related party | | |
|---|---|---|
| | (a) | granting an indemnity to a *director* of the *listed company* (or any of its *subsidiary undertakings*) if the terms of the indemnity are in accordance with those specifically permitted to be given to a *director* under the Companies Act 2006; |
| | (b) | maintaining a contract of insurance if the insurance is in accordance with that specifically permitted to be maintained for a *director* under the Companies Act 2006 (whether for a *director* of the *listed company* or for a *director* of any of its *subsidiary undertakings*); or |
| | (c) | a loan or assistance to a *director* by a *listed company* or any of its *subsidiary undertakings* if the terms of the loan or assistance are in accordance with those specifically permitted to be given to a *director* under sections 204, 205 or 206 of the Companies Act 2006. |
| (2) | | Paragraph (1) applies to a *listed company* that is not subject to the Companies Act 2006 if the terms of the indemnity or contract of insurance are in accordance with those that would be specifically permitted under that Act (if it applied). |

**Underwriting**

| | | |
|---|---|---|
| 6 | (1) | The *related party transaction* rules do not apply to the underwriting by a *related party* of all or part of an issue of *securities* by the *listed company* (or any of its *subsidiary undertakings*) if the consideration to be paid by the *listed company* (or any of its *subsidiary undertakings*) for the underwriting: |
| | (a) | is no more than the usual commercial underwriting consideration; and |
| | (b) | is the same as that to be paid to the other underwriters (if any). |
| (2) | | Paragraph (1) does not apply to the extent that a *related party* is underwriting *securities* which it is entitled to take up under an issue of *securities*. |

**Joint investment arrangements**

| | | |
|---|---|---|
| 7 | | The *related party transaction* rules do not apply to an arrangement where a *listed company*, or any of its *subsidiary undertakings*, and a *related party* each invests in, or provides finance to, another undertaking or asset if the following conditions are satisfied: |
| (1) | | the amount invested, or provided, by the *related party* is not more than 25% of the amount invested, or provided, by the *listed company* or its *subsidiary undertaking* (as the case may be); and |
| (2) | | the terms and circumstances of the investment or provision of finance by the *listed company* or its *subsidiary undertakings* (as the case may be) are no less favourable than those applying to the investment or provision of finance by the *related party*. |

**Insignificant subsidiary undertaking**

| | | |
|---|---|---|
| 8 | (1) | The *related party transaction* rules do not apply to a transaction or arrangement where each of the conditions in paragraphs (2) to (6) (as far as applicable) is satisfied. |
| | (2) | The party to the transaction or arrangement is only a *related party* because: |

**UKLR 8 : Equity shares (commercial companies): related party transactions**

| Transaction agreed before person became a related party |
|---|

| | | (a) | it is (or was within the 12 months before the date of the transaction or arrangement) a *substantial shareholder* or its *associate*; or |
|---|---|---|---|
| | | (b) | it is a *person* who is (or was within the 12 months before the date of the transaction or arrangement) a *director* or *shadow director* or their *associate*, |

of a *subsidiary undertaking* or *subsidiary undertakings* of the *listed company* that has, or if there is more than one *subsidiary undertaking* that have in aggregate, contributed less than 10% of the profits of, and represented less than 10% of the assets of, the *listed company* for the relevant period.

(3)  The *subsidiary undertaking* or each of the *subsidiary undertakings* (as the case may be) have been in the *listed company's group* for 1 full financial year or more.

(4)  In paragraph (2), 'relevant period' means:

(a)  if the *subsidiary undertaking* or each of the *subsidiary undertakings* (as the case may be) has been consolidated in the *listed company's group* for 1 full financial year or more but less than 3 full financial years, each of the full financial years before the date of the transaction or arrangement for which accounts have been published; or

(b)  if the *subsidiary undertaking* or any of the *subsidiary undertakings* (as the case may be) has been consolidated in the *listed company's group* for 3 full financial years or more, each of the 3 full financial years before the date of the transaction or arrangement for which accounts have been published.

(5)  If the *subsidiary undertaking* or any of the *subsidiary undertakings* (as the case may be) are themselves party to the transaction or arrangement or if *securities* in the *subsidiary undertaking* or any of the *subsidiary undertakings* or their assets are the subject of the transaction or arrangement, then the ratio of consideration to market capitalisation of the *listed company* is less than 10%.

(6)  In this *rule*, the figures to be used to calculate assets and consideration to market capitalisation are the same as those used to classify assets and consideration to market capitalisation in UKLR 7 Annex 1 (as modified or added to by UKLR 7.2.3R to UKLR 7.2.8R where applicable).

(7)  (a)  In this *rule*, for the purposes of calculating profit, except as otherwise stated in paragraphs (b) to (e), figures used to classify profit must be the figures shown in the latest published audited consolidated accounts or, if a *listed company* has, or will have, published a preliminary statement of later annual results at the time the terms of a transaction are agreed, the figures shown in that preliminary statement.

(b)  The figures of the *listed company* must be adjusted to take account of transactions completed during the period to which the figures referred to in (a) relate, and subsequent completed transactions where any *percentage ratio* was 5% or

**UKLR 8 : Equity shares (commercial companies): related party transactions**

| Transaction agreed before person became a related party | |
|---|---|
| | more at the time the terms of the relevant transaction were agreed. |
| (c) | The figures of the *target company* or business must be adjusted to take account of transactions completed during the period to which the figures referred to in (a) relate, and subsequent completed transactions where any *percentage ratio* would have been 5% or more at the time the terms of the relevant transaction were agreed when classified against the *target* as a whole. |
| (d) | Figures on which the auditors are unable to report without modification must be disregarded. |
| (e) | The principles in paragraphs (a) to (d) also apply (to the extent relevant) to calculating the *net annual rent* of the *target company* or business. |
| (f) | The *FCA* may modify paragraph (d) in appropriate cases to permit figures to be taken into account. |

**8**

**UK Listing Rules Sourcebook**

# Chapter 9

# Equity shares (commercial companies): further issuances, dealing in own securities and treasury shares



# 9.1    Application

## Application

**9.1.1**  **R**  This chapter applies to a *company* that has a *listing* of *equity shares* in the *equity shares (commercial companies)* category.

**9.1.2**  **G**  This chapter contains *rules* applicable to a *listed company* that:

(1) proposes to issue *equity securities* for cash or sell *treasury shares* that are *equity shares* for cash;

(2) adopts an *employees' share scheme* or *long-term incentive scheme*;

(3) undertakes:

    (a) a rights *issue*;

    (b) an *open offer*;

    (c) a *vendor consideration placing*;

    (d) a *placing*;

    (e) an *offer for sale*; or

    (f) an *offer for subscription*;

(4) purchases its own *securities* from a *related party*;

(5) purchases its own *equity shares*;

(6) purchases its own *securities* other than *equity shares*; or

(7) sells or transfers *treasury shares*.

## Exceptions

**9.1.3**  **R**  ■ UKLR 9.5 to ■ UKLR 9.7 do not apply to a transaction entered into:

(1) in the ordinary course of business by a securities dealing business; or

(2) on behalf of third parties either by the *company* or any member of its *group*,

if the *listed company* has established and maintains effective *information barriers* between those responsible for any decision relating to the transaction and those in possession of *inside information* relating to the *listed company*.



## 9.2    Pre-emption rights

**9.2.1**    **R**    A *listed company* proposing to issue *equity securities* for cash or to sell *treasury shares* that are *equity shares* for cash must first offer those *equity securities* in proportion to their existing holdings to:

(1)    existing holders of that *class* of *equity shares* (other than the *listed company* itself by virtue of it holding *treasury shares*); and

(2)    holders of other *equity shares* of the *listed company* who are entitled to be offered them.

**9.2.2**    **R**    ■ UKLR 9.2.1R does not apply to:

(1)    a *listed company* incorporated in the *United Kingdom* if a disapplication of statutory pre-emption rights has been authorised by shareholders in accordance with section 570 (Disapplication of pre-emption rights: directors acting under general authorisation) or section 571 (Disapplication of pre-emption rights by special resolution) of the Companies Act 2006 and the issue of *equity securities* or sale of *treasury shares* that are *equity shares* by the *listed company* is within the terms of the authority;

(2)    a *listed company* undertaking a *rights issue* or *open offer*, provided that the disapplication of pre-emption rights is with respect to:

(a)    *equity securities* representing fractional entitlements; or

(b)    *equity securities* which the *company* considers necessary or expedient to exclude from the *offer* on account of the laws or regulatory requirements of a territory other than its country of incorporation, unless that territory is the *United Kingdom*;

(3)    a *listed company* selling *treasury shares* for cash to an *employees' share scheme*; or

(4)    an *overseas company* with a *listing* of *equity shares* in the *equity shares (commercial companies)* category if a disapplication of pre-emption rights has been authorised by shareholders that is equivalent to an authority given in accordance either with section 570 or section 571 of the Companies Act 2006 or in accordance with the law of its country of incorporation, provided that the issue of *equity securities* or sale of *treasury shares* that are *equity shares* by the *listed company* is within the terms of the authority.

**9**



## 9.3 Share schemes, incentive plans and discounted option arrangements

**Employees' share schemes and long-term incentive plans**

9.3.1   R   (1) This *rule* applies to the following schemes of a *listed company* incorporated in the *United Kingdom* and of any *major subsidiary undertaking* of that *listed company* (even if that *major subsidiary undertaking* is incorporated or operates *overseas*):

(a) an *employees' share scheme*, if the scheme involves or may involve the issue of new *shares* or the transfer of *treasury shares*; and

(b) a *long-term incentive scheme* in which one or more *directors* of the *listed company* is eligible to participate.

(2) The *listed company* must ensure that the *employees' share scheme* or *long-term incentive scheme* is approved by an ordinary resolution of the shareholders of the *listed company* in a general meeting before it is adopted.

9.3.2   R   ■ UKLR 9.3.1R does not apply to the following *long-term incentive schemes*:

(1) an arrangement where participation is offered on similar terms to all or substantially all *employees* of the *listed company* or any of its *subsidiary undertakings* whose *employees* are eligible to participate in the arrangement (provided that all or substantially all *employees* are not *directors* of the *listed company*); or

(2) an arrangement where the only participant is a *director* of the *listed company* (or an individual whose appointment as a *director* of the *listed company* is being contemplated) and the arrangement is established specifically to facilitate, in unusual circumstances, the recruitment or retention of the relevant individual.

9.3.3   R   For a scheme referred to in ■ UKLR 9.3.2R(2), the following information must be disclosed in the first annual report published by the *listed company* after the date on which the relevant individual becomes eligible to participate in the arrangement:

(1) all of the information prescribed in ■ UKLR 10.6.10R;

(2) the name of the sole participant;

(3) the date on which the participant first became eligible to participate in the arrangement;

(4) an explanation of why the circumstances in which the arrangement was established were unusual;

(5) the conditions to be satisfied under the terms of the arrangement; and

(6) the maximum award(s) under the terms of the arrangement or, if there is no maximum, the basis on which awards will be determined.

### Discounted option arrangements

**9.3.4**    R

(1) This *rule* applies to the grant to a *director* or *employee* of a *listed company* or of any *subsidiary undertaking* of a *listed company* of an *option* to subscribe, *warrant* to subscribe or other similar right to subscribe for *shares* in the capital of the *listed company* or any of its *subsidiary undertakings*.

(2) A *listed company* must not, without the prior approval by an ordinary resolution of the shareholders of the *listed company* in a general meeting, grant the *option*, *warrant* or other right if the price per *share* payable on the exercise of the *option*, *warrant* or other similar right to subscribe is less than whichever of the following is used to calculate the exercise price:

(a) the market value of the *share* on the date on which the exercise price is determined;

(b) the market value of the *share* on the *business day* before that date; or

(c) the average of the market values for a number of dealing days within a period not exceeding 30 days immediately before that date.

**9.3.5**    R

■ UKLR 9.3.4R does not apply to the grant of an *option* to subscribe, *warrant* to subscribe or other similar right to subscribe for *shares* in the capital of a *listed company* or any of its *subsidiary undertakings*:

(1) under an *employees' share scheme*, if participation is offered on similar terms to all or substantially all *employees* of the *listed company* or any of its *subsidiary undertakings* whose *employees* are entitled to participate in the scheme; or

(2) following a takeover or reconstruction, in replacement for and on comparable terms with *options* to subscribe, *warrants* to subscribe or other similar rights to subscribe held immediately before the takeover or reconstruction, for *shares* in either a *company* of which the *listed company* thereby obtains control or in any of that *company's subsidiary undertakings*.

**9**

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 337 of 2232
Page ID #:2395

UKLR 9 : Equity shares
(commercial companies): further
issuances, dealing in own...

Section 9.4 : Transactions

## 9.4    Transactions

### Rights issue

**9.4.1**  **R**  For a placing of rights arising from a *rights issue* before the official start of dealings, a *listed company* must ensure that:

(1) the placing relates to at least 25% of the maximum number of *equity securities* offered;

(2) the placees are committed to take up whatever is placed with them;

(3) the price paid by the placees does not exceed the price at which the *equity securities* which are the subject of the *rights issue* are offered by more than one half of the calculated premium over that offer price (that premium being the difference between the offer price and the theoretical ex-rights price); and

(4) the *equity securities* which are the subject of the *rights issue* are of the same *class* as the *equity securities* already *listed*.

**9.4.2**  **G**  The *FCA* may modify ■ UKLR 9.4.1R(1) to allow the placing to relate to less than 25% if it is satisfied that requiring at least 25% would be detrimental to the success of the issue.

**9.4.3**  **G**  In a *rights issue*, the *FCA* may list the *equity securities* at the same time as they are admitted to trading in nil paid form. On the *equity securities* being paid up and the allotment becoming unconditional, the *listing* will continue without any need for a further application to list fully paid *securities*.

**9.4.4**  **R**  If existing shareholders do not take up their rights to subscribe in a *rights issue*:

(1) the *listed company* must ensure that the *equity securities* to which the *offer* relates are offered for subscription or purchase on terms that any premium obtained over the subscription or purchase price (net of expenses) is to be for the account of the holders, except that if the proceeds for an existing holder do not exceed £5.00, the proceeds may be retained for the *company's* benefit; and

(2) the *equity securities* may be allotted or sold to underwriters if, on the expiry of the subscription period, no premium (net of expenses) has been obtained.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 338 of 2232

**UKLR 9 : Equity shares (commercial companies): further issuances, dealing in own...**    Page ID #:2396    Section 9.4 : Transactions

**9.4.5**  |R| A *listed company* must ensure that for a *rights issue* the following are notified to a *RIS* as soon as possible:

(1) the issue price and principal terms of the issue; and

(2) the results of the issue and, if any rights not taken up are sold, details of the sale, including the date and price per *share*.

**9.4.6**  |R| A *listed company* must ensure that the *offer* relating to a *rights issue* remains open for acceptance for at least 10 *business days*. For the purposes of calculating the period of 10 *business days*, the first *business day* is the date on which the *offer* is first open for acceptance.

### Open offers

**9.4.7**  |R| A *listed company* must ensure that the timetable for an *open offer* is approved by the *RIE* on which its *equity securities* are traded.

**9.4.8**  |R| A *listed company* must ensure that the *open offer* remains open for acceptance for at least 10 *business days*. For the purposes of calculating the period of 10 *business days*, the first *business day* is the date on which the offer is first open for acceptance.

**9.4.9**  |R| A *listed company* must ensure that in relation to communicating information on an *open offer*:

(1) if the *offer* is subject to shareholder approval in a general meeting, the announcement must state that this is the case; and

(2) the *circular* dealing with the *offer* must not contain any statement that might be taken to imply that the *offer* gives the same entitlements as a *rights issue* unless it is an *offer* with a compensatory element.

**9.4.10**  |R| If existing shareholders do not take up their rights to subscribe in an *open offer* with a compensatory element:

(1) the *listed company* must ensure that the *equity securities* to which the *offer* relates are offered for subscription or purchase on terms that any premium obtained over the subscription or purchase price (net of expenses) is to be for the account of the holders, except that if the proceeds for an existing holder do not exceed £5.00, the proceeds may be retained for the *company's* benefit; and

(2) the *equity securities* may be allotted or sold to underwriters if, on the expiry of the subscription period, no premium (net of expenses) has been obtained.

**9.4.11**  |R| A *listed company* must ensure that for a subscription in an *open offer* with a compensatory element the following are notified to a *RIS* as soon as possible:

(1) the offer price and principal terms of the *offer*; and

(2) the results of the *offer* and, if any *securities* not taken up are sold, details of the sale, including the date and price per *share*.

## Vendor consideration placing

9.4.12   R   A *listed company* must ensure that in a *vendor consideration placing* all vendors have an equal opportunity to participate in the placing.

## Discounts not to exceed 10%

9.4.13   R   (1) If a *listed company* makes an *open offer*, *placing*, *vendor consideration placing*, *offer for subscription* of *equity shares* or an issue out of treasury (other than in respect of an *employees' share scheme*) of a *class* already *listed*, the price must not be at a discount of more than 10% to the middle market price of those *shares* at the time of announcing the terms of the *offer* for an *open offer* or *offer for subscription* of *equity shares* or at the time of agreeing the placing for a *placing* or *vendor consideration placing*.

(2) In paragraph (1), the middle market price of *equity shares* means the middle market quotation for those *equity shares* as derived from the daily official list of the *London Stock Exchange* or any other publication of a *RIE* showing quotations for *listed securities* for the relevant date.

(3) If a *listed company* makes an *open offer*, *placing*, *vendor consideration placing* or *offer for subscription* of *equity shares* during the *trading day*, it may use an appropriate on-screen intra-day price derived from another market.

(4) Paragraph (1) does not apply to an *offer* or placing at a discount of more than 10% if:

(a) the terms of the *offer* or placing at that discount have been specifically approved by the *issuer's* shareholders; or

(b) it is an issue of *shares* for cash or the sale of *treasury shares* for cash under a pre-existing general authority to disapply section 561 of the Companies Act 2006 (Existing shareholders' rights of pre-emption).

(5) The *listed company* must notify a *RIS* as soon as possible after it has agreed the terms of the *offer* or placing.

9.4.14   G   On each occasion that the *listed company* plans to use an on-screen intra-day price, it should discuss the source of the price in advance with the *FCA*. The *FCA* may be satisfied that there is sufficient justification for its use if the alternative market has an appropriate level of liquidity and the source is one that is widely accepted by the market.

## Offer for sale or subscription

9.4.15   R   A *listed company* must ensure that for an *offer for sale* or an *offer for subscription* of *equity securities*:

(1) letters of allotment or acceptance are all issued simultaneously and numbered serially (and, where appropriate, split and certified by the *listed company's* registrars);

(2) if the *equity securities* may be held in uncertificated form, there is equal treatment of those who elect to hold the *equity securities* in certificated form and those who elect to hold them in uncertificated form;

(3) letters of regret are posted at the same time or not later than 3 *business days* after the letters of allotment or acceptance; and

(4) if a letter of regret is not posted at the same time as letters of allotment or acceptance, a notice to that effect is inserted in a national newspaper, to appear on the morning after the letters of allotment or acceptance are posted.

### Fractional entitlements

9.4.16    R    If, for an issue of *equity securities* (other than an issue in lieu of dividend), a shareholder's entitlement includes a fraction of a *security*, a *listed company* must ensure that the fraction is sold for the benefit of the holder, except that if its value (net of expenses) does not exceed £5.00, it may be sold for the *company's* benefit. Sales of fractions may be made before *listing* is granted.

**9**

### Further issues

9.4.17    R    When *shares* of the same *class* as *shares* that are *listed* are allotted, an application for *admission to listing* of such *shares* must be made as soon as possible and, in any event, within one month of the allotment.

### Temporary documents of title (including renounceable documents)

9.4.18    R    A *listed company* must ensure that any temporary document of title (other than one issued in global form) for an *equity security*:

(1) is serially numbered;

(2) states, where applicable:

　　　the name and address of the first holder and names of joint holders (if any);

(b) for a fixed income *security*, the amount of the next payment of interest or dividend;

(c) the pro rata entitlement;

(d) the last date on which transfers were or will be accepted for registration for participation in the issue;

(e) how the *securities* rank for dividend or interest;

(f) the nature of the document of title and proposed date of issue;

(g) how fractions (if any) are to be treated; and

(h) for a *rights issue*, the time, being not less than 10 *business days* calculated in accordance with ■ UKLR 9.4.6R, in which the *offer* may be accepted, and how *equity securities* not taken up will be dealt with; and

(3) if renounceable:

(a) states in a heading that the document is of value and negotiable;

(b) advises holders of *equity securities* who are in any doubt as to what action to take to consult appropriate independent advisers immediately;

(c) states that where all of the *securities* have been sold by the addressee (other than ex rights or ex capitalisation), the document should be passed to the *person* through whom the sale was effected for transmission to the purchaser;

(d) has the form of renunciation and the registration instructions printed on the back of, or attached to, the document;

(e) includes provision for splitting (without fee) and for split documents to be certified by an official of the *company* or authorised agent;

(f) provides for the last day for renunciation to be the second *business day* after the last day for splitting; and

(g) if at the same time as an allotment is made of *shares* issued for cash, *shares* of the same *class* are also allotted credited as fully paid to vendors or others, provides for the period for renunciation to be the same as, but no longer than, that provided for in the case of *shares* issued for cash.

### Definitive documents of title

**9.4.19**    **R**    A *listed company* must ensure that any definitive document of title for an *equity share* (other than a bearer *security*) includes the following matters on its face (or on the reverse in the case of paragraph (6)):

(1) the authority under which the *listed company* is constituted and the country of incorporation and registered number (if any);

(2) the number or amount of *securities* the certificate represents and, if applicable, the number and denomination of units (in the top right-hand corner);

(3) a footnote stating that no transfer of the *security* or any portion of it represented by the certificate can be registered without production of the certificate;

(4) if applicable, the minimum amount and multiples thereof in which the *security* is transferable;

(5) the date of the certificate; and

(6) for *equity shares* with preferential rights, on the face (or, if not practicable, on the reverse), a statement of the conditions thereof as to capital, dividends and (where applicable) conversion.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 342 of 2232

**UKLR 9 : Equity shares (commercial companies): further issuances, dealing in own...**   Page ID #:2400   Section 9.5 : Purchase from a related party



## 9.5     Purchase from a related party

**9.5.1**   **R**   Where a purchase by a *listed company* of its own *equity securities* or *preference shares* is to be made from a *related party*, whether directly or through intermediaries, ■ UKLR 8 (Related party transactions) must be complied with unless:

    () a *tender offer* is made to all holders of the *class* of *securities*; or

    () in the case of a market purchase pursuant to a general authority granted by shareholders, it is made without prior understanding, arrangement or agreement between the *listed company* and any *related party*.

**9.5.2**   **R**   Where a purchase by a *listed company* of its own *equity securities* or *preference shares* is to be made from a *related party* which is a *sovereign controlling shareholder* or an *associate* of a *sovereign controlling shareholder*, the modifications to ■ UKLR 8 (Equity shares (commercial companies: *related party* transactions) in ■ UKLR 8.2.9R do not apply for the purposes of ■ UKLR 9.5.1R.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 343 of 2232
Page ID #:2401

UKLR 9 : Equity shares
(commercial companies): further
issuances, dealing in own...

Section 9.6 : Purchase of own equity shares

## 9.6     Purchase of own equity shares

### Requirement for a tender offer

**9.6.1** **R** Unless ■ UKLR 9.6.2R applies, purchases by a *listed company* of *shares* in any *class* of its *equity shares* pursuant to a general authority by the shareholders must be by way of a *tender offer* to all shareholders of that *class*.

**9.6.2** **R** ■ UKLR 9.6.1R does not apply to:

(1) purchases by a *listed company* of less than 15% of any *class* of its *equity shares* (excluding *treasury shares*) pursuant to a general authority by the shareholders where the price to be paid is lower than or equal to the higher of:

(a) 5% above the average market value of the *company's equity shares* for the 5 *business days* prior to the day the purchase is made; and

(b) the technical standards stipulated by article 5(6) of the *Market Abuse Regulation*; or

(2) purchases by a *listed company* of 15% or more of any *class* of its *equity shares* (excluding *treasury shares*) where the full terms of the *share* buyback have been specifically approved by shareholders.

**9.6.3** **G** Where, pursuant to a general authority granted by shareholders, a series of purchases are made that in aggregate amount to 15% or more of the number of *equity shares* of the relevant *class* in issue immediately following the shareholders meeting at which the general authority to purchase was granted, a *tender offer* need only be made in respect of any purchase that takes the aggregate to or above that level. Purchases that have been specifically approved by shareholders are not to be taken into account in determining whether the 15% level has been reached.

### Notification prior to purchase

**9.6.4** **R** (1) Any decision by the board to submit to shareholders a proposal for the *listed company* to be authorised to purchase its own *equity shares* must be notified to a *RIS* as soon as possible.

(2) A notification required by paragraph (1) must set out whether the proposal relates to:

specific purchases and, if so, the names of the *persons* from whom the purchases are to be made; or

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 344 of 2232

**UKLR 9 : Equity shares (commercial companies): further issuances, dealing in own...**    Page ID #:2402    Section 9.6 : Purchase of own equity shares

a general authorisation to make purchases.

(3) The requirement set out in paragraph (1) does not apply to a decision by the board to submit to shareholders a proposal to renew an existing authority to purchase own *equity shares*.

**9.6.5**    **R**    A *listed company* must notify a *RIS* as soon as possible of the outcome of the shareholders' meeting to decide the proposal described in ■ UKLR 9.6.4R.

### Notification of purchases

**9.6.6**    **R**    Any purchase of a *listed company's* own *equity shares* by or on behalf of the *company* or any other member of its *group* must be notified to a *RIS* as soon as possible, and in any event, by no later than 7.30am on the *business day* following the calendar day on which the purchase occurred. The notification must include:

(1) the date of purchase;

(2) the number of *equity shares* purchased;

(3) the purchase price for each of the highest and lowest prices paid, where relevant;

(4) the number of *equity shares* purchased for cancellation and the number of *equity shares* purchased to be held as *treasury shares*; and

(5) where *equity shares* were purchased to be held as *treasury shares*, a statement of:

(a) the total number of *treasury shares* of each *class* held by the *company* following the purchase and non-cancellation of such *equity shares*; and

(b) the number of *equity shares* of each *class* that the *company* has in issue less the total number of *treasury shares* of each *class* held by the *company* following the purchase and non-cancellation of such *equity shares*.

### Consent of other classes and circular requirements

**9.6.7**    **R**    Unless ■ UKLR 9.6.8R applies, a *company* with *listed securities* convertible into, or exchangeable for, or carrying a right to subscribe for *equity shares* of the *class* proposed to be purchased must (prior to entering into any agreement to purchase such *shares*):

(1) convene a separate meeting of the holders of those *securities*; and

(2) obtain their approval for the proposed purchase of *equity shares* by a special resolution.

**9.6.8**    **R**    ■ UKLR 9.6.7R does not apply if the trust deed or terms of issue of the relevant *securities* authorise the *listed company* to purchase its own *equity shares*.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 345 of 2232
Page ID #:2403

UKLR 9 : Equity shares
(commercial companies): further
issuances, dealing in own…

Section 9.6 : Purchase of own equity shares

| 9.6.9 | R | A *circular* convening a meeting required by ■ UKLR 9.6.7R must include (in addition to the information in ■ UKLR 10 (Equity shares (commercial companies): contents of circulars)): |

    (1) a statement of the effect on the conversion expectations of holders in terms of attributable assets and earnings, on the basis that the *company* exercises the authority to purchase its *equity shares* in full at the maximum price allowed (where the price is to be determined by reference to a future market price, the calculation must be made on the basis of market prices prevailing immediately prior to the publication of the *circular* and that basis must be disclosed); and

    (2) any adjustments to the rights of the holders which the *company* may propose (in such a case, the information required under paragraph (1) must be restated on the revised basis).

### Other similar transactions

| 9.6.10 | G | A *listed company* intending to enter into a transaction that would have an effect on the *company* similar to that of a purchase of own *equity shares* should consult with the *FCA* to discuss the application of ■ UKLR 9.6. |

### 9.7 Purchase of own securities other than equity shares

**9.7.1** **R** Except where the purchases will consist of individual transactions made in accordance with the terms of issue of the relevant *securities*, where a *listed company* intends to purchase any of its *securities* convertible into its *equity shares* and where the *equity shares* are *listed* in the *equity shares (commercial companies)* category, it must:

(1) ensure that no dealings in the relevant *securities* are carried out by or on behalf of the *company* or any member of its *group* until the proposal has either been notified to a *RIS* or abandoned; and

(2) notify a *RIS* of its decision to purchase.

**Notification of purchases, early redemptions and cancellations**

**9.7.2** **R** Any purchases, early redemptions or cancellations of a *company's* own *securities* convertible into *equity shares* where the *equity shares* are *listed* in the *equity shares (commercial companies)* category, by or on behalf of the *company* or any other member of its *group*, must be notified to a *RIS* when an aggregate of 10% of the initial amount of the relevant *class* of *securities* has been purchased, redeemed or cancelled, and for each 5% in aggregate of the initial amount of that *class* acquired thereafter.

**9.7.3** **R** The notification required by ■ UKLR 9.7.2R must be made as soon as possible and, in any event, no later than 7.30am on the *business day* following the calendar day on which the relevant threshold is reached or exceeded. The notification must state:

(1) the amount of *securities* acquired, redeemed or cancelled since the last notification; and

(2) whether or not the *securities* are to be cancelled and the number of that *class* of *securities* that remain outstanding.

**Period between purchase and notification**

**9.7.4** **R** In circumstances where the purchase is not being made pursuant to a *tender offer* and the purchase causes a relevant threshold in ■ UKLR 9.7.2R to be reached or exceeded, no further purchases may be undertaken until after a notification has been made in accordance with ■ UKLR 9.7.2R to ■ UKLR 9.7.3R.

## Warrants and options – circular requirements

**9.7.5** | R | Where, within a period of 12 months, a *listed company* purchases *warrants* or *options* over its own *equity shares* which, on exercise, convey the entitlement to *equity shares* representing 15% or more of the *company's* existing issued *shares* (excluding *treasury shares*), the *company* must send to its shareholders a *circular* containing the following information:

(1) a statement of the *directors'* intentions regarding future purchases of the *company's warrants* and *options*;

(2) the number and terms of the *warrants* or *options* acquired and to be acquired and the method of acquisition;

(3) where *warrants* or *options* have been, or are to be, acquired from specific parties, a statement of the names of those parties and all material terms of the acquisition; and

(4) details of the prices to be paid.



## 9.8    Treasury shares

**Notification of capitalisation issues and of sales, transfers and cancellations of treasury shares** ..................................................

9.8.1    [R]    If by virtue of its holding *treasury shares*, a *listed company* is allotted *shares* as part of a capitalisation issue, the *company* must notify a *RIS* as soon as possible and, in any event, by no later than 7.30am on the *business day* following the calendar day on which allotment occurred of the following information:

(1) the date of the allotment;

(2) the number of *shares* allotted;

(3) a statement as to what number of *shares* allotted has been cancelled and what number is being held as *treasury shares*; and

(4) where *shares* allotted are being held as *treasury shares*, a statement of:

(a) the total number of *treasury shares* of each *class* held by the *company* following the allotment; and

(b) the number of *shares* of each *class* that the *company* has in issue less the total number of *treasury shares* of each *class* held by the *company* following the allotment.

9.8.2    [R]    Any sale for cash, transfer for the purposes of or pursuant to an *employees' share scheme* or cancellation of *treasury shares* that represents over 0.5% of the *listed company's share* capital must be notified to a *RIS* as soon as possible and, in any event, by no later than 7.30am on the *business day* following the calendar day on which the sale, transfer or cancellation occurred. The notification must include:

(1) the date of the sale, transfer or cancellation;

(2) the number of *shares* sold, transferred or cancelled;

(3) the sale or transfer price for each of the highest and lowest prices paid, where relevant; and

(4) a statement of:

(a) the total number of *treasury shares* of each *class* held by the *company* following the sale, transfer or cancellation; and

**9**

(b)  the number of *shares* of each *class* that the *company* has in issue less the total number of *treasury shares* of each *class* held by the *company* following the sale, transfer or cancellation.

consideration to say, there is no reason to doubt, that this is a full disclosure. If the Commissioners, reviewing their judgment, still think, there is reason to doubt, I do not see, how they can set their hands to the certificate; and as to the consequence, if they mistake, I can only lament it ; but I cannot either by order or intimation tell them, having taken that oath, that they are to act in any manner, that is not consistent, with their own conscientious judgment, upon an anxious and painful review from time to time of all the circumstances of the case. (*Note* : A similar application by the same bankrupt refused by Lord *Erskine*, and again by Lord *Eldon*, 13 *Ves.* 181 ; 15 *Ves.* 126.)

(1) Reduced to three-fifths by statute 39 *Geo.* III. *c.* 121, *s.* 18. The statute 6 *Geo.* IV. *c.* 16, *s.* 122, restores four-fifths until after six months from the last examination.

## [429] ADAIR v. The NEW RIVER COMPANY.    *July 24th, 25th, 26th, Aug. 1st,* 1805.

### [Distinguished, *Newton* v. *Earl of Egmont*, 1832, 5 Sim. 137.]

Whether an annuity or rent-charge out of the profits of the *New River* Company is to bear the full assessment to the land-tax, or is to have the benefit, according to the proportion, of a reduction, in consequence of an assessment upon the profits of the Company at an undervalue, *quære*. The Bill by the annuitant was dismissed : the Court refusing to raise an equity as to the profit, arising from disobedience to the Act. The general rule, requiring all persons interested to be parties, dispensed with, where it is impracticable, or, extremely difficult. In such a case, to obtain a decree, to establish the right of suit to a mill, for instance, the Court only requires parties sufficient to secure a fair contest ; and, the right being established in that way, consequential relief may be had against the rest in another suit.

The Bill stated the incorporation of the *New River* Company by King *James* I., reserving to the Crown one moiety of the profit to arise ; and accordingly the Company granted at the nomination of the King, and for the use and benefit of him, his heirs and successors, to the use of trustees, one moiety of all such fines, sums of money, benefits, and profits, whatsoever, above the expences ; upon trust for the King, his heirs and successors.

By indentures, executed in the 17th year of King *Charles* I., to which the Company were parties, his Majesty granted to Sir *Hugh Middleton*, his heirs and assigns, all the trust, use, and benefit, of the moiety of the Crown ; provided, and Sir *Hugh Middleton* covenanted, that he, his heirs or assigns, would pay for the use of the King, his heirs and successors, the yearly rent of £500. By several grants of the Crown and mesne assignments that rent became vested in *William Adair* ; who died in 1783 ; having devised the rent to trustees and their heirs, to the use of the Plaintiff for life, with remainders over.

The Bill farther stated, that by various assignments the moiety of the Crown became vested in the Company, or in the Company and the other Defendants (eight in number) and other persons, amounting to 100, or a much greater number ; that the profits amounted to [430] £50,000 a-year ; and were assessed to the land-tax in the yearly sum of £3600, being 4s. in the pound upon the yearly sum of £18,000, the nominal amount of the profits, but not more than 1s. 6d. or at most 2s. upon the real profits. The Bill stated applications by the Plaintiff to the Defendants for a discovery of the real amount of the profits, and payment of the £500 *per annum* from *April* 1798 ; deducting the land-tax in proportion to what was actually paid by the proprietors, and to be repaid what was over-paid by him ; which they refused, claiming to deduct £100 *per annum* for the land-tax ; and that they have paid only £400 ; and charged, that there was not any tangible or corporeal property, upon which the Plaintiff can distrain, and the parties are so numerous, and the shares liable to so many complicated trusts, and so fluctuating, that it is impossible, if the Plaintiff could discover them, to bring them all before the Court ; and these impediments were produced, not by the Plaintiff, and those, under whom he claims, but by the Defendants ; and prayed an inquiry, what sum of money ought to be

C. XII.—37

deducted on account of the land-tax ; that the Defendants may be decreed to pay the difference between that and what was actually charged ; and that the right of the Plaintiff may be declared to receive the rent without any greater deduction than after the rate actually paid.

The *New River* Company by their answer admitted, that their profits were more than £18,000 *per annum,* but did not state the amount. They submitted, whether all parties interested are not necessary parties ; notwithstanding the moiety was granted to a single person.

An objection was taken for want of parties ; all the persons interested not being brought before the Court.

[431] Mr. *Richards,* Mr. *Alexander,* Mr. *Bell,* and Mr. *Neave,* for the Plaintiff. The necessity of bringing all persons before the Court, to whom interests in the property belong, though true in theory, does not prevail in practice. Where it is impossible, a case of exception arises. In a late case, *Harding* v *Pratt,* upon that ground the Court gave liberty to apply for an Act of Parliament. The same principle appears in *The City of London* v. *Richmond* (2 *Vern.* 420 ; *Pre. Ch.* 156 ; 1 *Bro. P. C.* 30 [2nd ed. 516]), *Quintine* v. *Yard* (1 *Eq. Cas. Abr.* 74), and *Lloyd* v. *Loaring* (6 *Ves.* 773. See the note, 4 *Ves.* 628). This Plaintiff has before the Court some of the parties interested, and the legal holders of the property. Some of the persons interested, being before the Court, are sufficient to maintain the question. In the instance of a Bill by simple-contract creditors against trustees, insisting, that an estate is charged with debts, it may be impracticable to bring before the Court all the bond creditors. They may be very numerous, and not known. The habit is to bring some of the specialty creditors, to discuss the question with the Plaintiffs ; which is then decided with reference to the trustees ; and the estate declared well charged ; though only a few specialty creditors are parties. It is not even necessary to make any of them parties ; and decrees have been often made upon Bills by simple-contract creditors in the absence of all the specialty creditors ; though generally for convenience some of them are made parties, as being interested to discuss the question. As to the remedy of the Plaintiff, there is great difficulty in distraining. The Crown made the Corporation the legal tenants of the estate. The only title in the Crown was to an account : therefore no more could be granted to Sir *Hugh Middleton.* The subsequent grants of the £500 a-year, partaking of the nature of a rent-charge, could give only a right to an account. The Court will assimilate it, as much as [432] possible, to an equitable distress ; fixing it upon those persons, whom it may be possible to make parties. The rule of Equity, to bring before the Court all persons interested, as in the case of a joint and several bond, is a rule of convenience, for the sake of the Defendants ; but it cannot be used to disappoint entirely the justice of the Court ; as the Defendants are entitled to contribution ; which would be an abuse of the rule, contrary to its principle and object ; and would make the forms of justice subversive of its end. That rule is therefore in many cases dispensed with upon the principle of convenience, as legatees, general and residuary, are represented by the executor. In the case of scheduled creditors, very numerous, the objection, that they must be before the Court, for the purpose of having a decree for payment of debts out of real estate, has been made ; but has not prevailed ; and there are many other instances, in which for convenience, or rather necessity, the rule has been dispensed with.

Independent of the Land-Tax Acts the Plaintiff is entitled upon equitable principles : *Brockman* v. *Honeywood* (1 *P. Will.* 328). Upon the strict rule the Court would not with-hold the relief upon the head of mere accident : still less where the difficulty arises, not from mere accident, but from the conduct of the party himself : Sir *Hugh Middleton* having put his moiety into such a number of assignees, that it is totally impossible to sue them individually. That entitles the Plaintiff to the remedy in this Court. The doctrine, that, where by accident the remedy for a rent is lost at law, relief may be had here, is very old : *Thorndike* v. *Allen* (1 *Ch. Ca.* 121). *Eton College* v. *Beauchamp and Reeds* (1 *Ch. Ca.* 144). *Davy* v. *Davy* ([6 *Bro. P. C.* 368, 2nd ed.]). *Cran-*[433]*-borne* v. *Crisp* (*Finch,* 105). The Anonymous Case in *Precedents in Chancery* (*Pre. Ch.* 592). *The Duke of Bridgewater* v. *Edwards* (4 *Bro. P. C.* 139). *The Duke of Leeds* v. *The Corporation of New Radnor* (2 *Bro. C. C.* 338, 518) ; in which the preceding cases are collected. These authorities establish the principle, that, where by accident, or the lapse of time without default, the legal remedy for a

rent is gone, not absolutely, but so far, that it is morally impossible to obtain it, the jurisdiction in equity arises. It is difficult, with reference to this principle, to distinguish the case of lands intermixed from this, of property split and divided into so many parts, that it is impossible to proceed against each individual proprietor: a confusion of proprietors, arising from the party's own act, making this jurisdiction absolutely necessary to answer the ends of justice. Both the circumstances, forming the reason in *The City of London* v. *Richmond* (2 *Vern.* 420; *Pre. Ch.* 156; 1 *Bro. P. C.* 30 [2nd ed. 516]), concur here: 1st, it is equally impracticable to make all these parties: 2dly, the difficulty is created by the act of the party, under whom the Defendants claim.

The Land-Tax Acts are of very peculiar construction: but the true meaning is, that the Commissioners shall by an assessment of 4*s.* in the pound raise the sum, imposed by the act. The provision as to fee-farm rents turns upon this; that what is raised shall be borne in proportions by the holder of the rent-charge and the owner of the land; and the decision in *King* v. *Weston* (2 *Eq. Ca. Ab.* 62. See 3 *P. Will.* 127) was accordingly. But this is, not a fee-farm rent, or a rent of any kind, but a species of annuity, arising out of this transaction between the Crown and [434] Sir *Hugh Middleton*, having reference only to a trust estate.

Mr. *Romilly* and Mr. *Martin*, for the Defendants, individual Proprietors of Shares in the King's Moiety. Three questions arise: 1st, whether this Plaintiff is entitled to relief in equity? 2dly, if he is, whether all the proprietors of the King's moiety ought to be before the Court? 3dly, whether the Plaintiff is not bound to pay 4*s.* in the pound upon his rent? This Plaintiff is not entitled to relief in the suit, and against the practice, in which and from whom he seeks relief. The Corporation are trustees only for the proprietors of the King's moiety; not for the Plaintiff. The Corporation vested in them the legal estate in the whole of this great adventure; of which they are entitled to a moiety themselves; holding the other moiety for the grantees of the Crown. Their duty requires them merely to pay the land-tax upon the whole, and then to pay a moiety of the profits to the persons, entitled to the King's moiety; having no immediate privity with the Plaintiff; so as to raise a trust; having paid him only as agents. The case of the Corporation of *New Radnor* (*The Duke of Leeds* v. *The Corporation of New Radnor*, 2 *Bro. C. C.* 338, 518) has no analogy to this. Where the object is to have a charge paid out of land, the Plaintiff must bring all the proprietors. That is the foundation of the equitable jurisdiction; for if the remedy by distress is adopted, a right to contribution arises. At least it was incumbent upon him to bring forward all, whom he knew to be proprietors. The objection, that the difficulty was created by the party himself, Sir *Hugh Middleton* dividing the share among such a number of persons, would apply to every [435] case: that, for instance, of a man having an estate, charged with a rent, splitting the estate, so that it became divided among many proprietors: in which, however, it has been held necessary to bring all the proprietors, as parties. But the person, carving out all these interests, was Sir *Hugh Middleton*, not the *New River* Company. The case in *Precedents in Chancery* (*Anon. Prec. Ch.* 592) was a bill on behalf of the Plaintiffs and all other Proprietors of a very great adventure, except the Defendants; and they might have come in at any time, upon the principle of a bill by creditors on behalf of themselves and all others. An instance must be shewn of a bill against particular individuals: where there were a great many others, against whom the Plaintiff had precisely the same equity; and relief given against some, not against all, even whom the Plaintiff was aware of; with a view to contribution among them. Many instances occur of a right without a remedy. The case of *Drury Lane* Theatre (7 *Ves.* 617. *Ex parte O'Reily*, 1 *Ves. jun.* 112; see p. 130) was an instance, if all the points had been pressed: the number of persons concerned being so great, that it was impossible to bring them all before the Court. The Court does not admit the abstract proposition, that a wrong without a remedy can subsist; but points out particular parties; and requires them to be brought. The reason is the inconvenience of the remedy.

But in this case it is absolutely necessary to bring before the Court all the proprietors. Some may be in circumstances perfectly distinct from all the others. Some, for instance, may have redeemed the land-tax: the proprietors of *New River* shares being allowed (statute 42 *Geo.* III. *c.* 116, *s.* 13) to re-[436]-deem each his own individual share. As to the rest there must be a reduction every year, in

proportion to what has been paid by the Plaintiff's interest : but as to those, who had redeemed, such reduction should not take place. In the account therefore the share of this rent-charge to be paid by those, who had not redeemed, would vary every year : not so as to the others. One, who redeemed in 1798, must have it taken, as it was in that year : another, having redeemed in 1799, as it was in that year. It is necessary, upon these questions, that all these persons, interested, should be before the Court, the proprietors not having in themselves any legal estate, are not trustees for any person. Unless a covenant runs with the land, the Plaintiff has no right against any particular individual. The principle, upon which all parties are to be brought before the Court, to prevent multiplicity of suits, would not be attained upon this bill, on account of the right to contribution among these proprietors. The only effect would be to impose upon the Defendants the very difficulty, which the Plaintiff would avoid.

Upon the merits, this rent-charge is a fee-farm rent, payable to the Crown, within the Land Tax Acts. As between the King and the representatives of Sir *Hugh Middleton*, it must upon the covenant in the grant of *Charles* I. be considered a fee-farm rent still existing in the Crown ; and then clearly upon the Acts of Parliament the land-tax is to be assessed at 4*s.* in the pound : that is, the owner of the property is entitled to make that reduction, at the same rate, at which the land is assessed. A certain sum of money is to be raised in each division, when the land-tax is at 4*s.* in the pound ; and a less sum, if less than 4*s.* It is left to the proprietors to make the assessment. It happens in many parts of the kingdom, that, when the tax is at [437] 4*s.* in the pound, the assessment is at 2*s.*, or less. *King* v. *Weston* (2 *Eq. Ca. Ab.* 62) is the only decided case ; establishing, that the deduction from the annuity is to be in proportion to the assessment upon the land. But it never was decided, that as a valuation less than the full valuation is given in, the land being assessed at much less than 4*s.* in the pound, therefore the owner of the rent is to be assessed at 2*s.* only, or less. The greatest inconvenience would ensue : a total uncertainty ; and a new account must every year be taken of the profits of this great adventure. A profit, arising from the payment of small rents, liable to an increase of rents by the erection of new buildings, and to loss by the failure of tenants, cannot be the same in any two years. Suppose the profits of the Company reduced in consequence of any calamity by fire : the owner of the rent would not participate in that loss, as long as £500 was received in the shape of profit. Whether this case is put upon mistake or fraud, the Plaintiff is not entitled to relief in equity : if upon fraud, he comes for a proportion of the spoil : if upon a mistake, giving an advantage to all the proprietors, he claims his proportion ; admitting, that, if the event had been different, he would not have borne any loss.

Mr. *Hart*, for the *New River* Company. The objections are, first, to the jurisdiction upon this subject : 2dly, whether the persons interested are brought before the Court, so as to enable the Court to decree upon the rights of all parties : and 3dly, upon the title of this Plaintiff. Legal rights, and the complication of them alone, do not raise an equitable jurisdiction. This is argued upon the case of a legal right, which cannot [438] be pursued at law. The proposition is true, if applied to the loss of evidence of the right ; and to other cases, where the Court exercises a concurrent jurisdiction ; giving complete relief ; having originally taken jurisdiction upon the ground of accident. But in this instance there is no such ground of jurisdiction. The representatives of Sir *Hugh Middleton* would have one ground of equity against the Company ; that one tenant in common may consider the other, taking the whole profit, as his bailiff : but in such a case the Plaintiff must shew, that they are tenants in common. In order to raise a trust there must be some privity. Nothing has ever taken place, constituting any relation between the Company and this Plaintiff ; making them trustees for him. He is not therefore a *Cestui que trust*, in the pure sense ; and if he can through Sir *Hugh Middleton* be considered as having an equitable lien, the Company cannot be described as trustees ; but are mere stake-holders. Then can the Plaintiff come into equity against the stake-holder in the absence of the persons interested to resist him ? In *Quintine* v. *Yard* (1 *Eq. Ca. Ab.* 74) all the parties in substance were before the Court ; as all might have come in after the decree as Plaintiffs in effect ; and embracing all the interest in the subject. *The City of London* v. *Richmond* (2 *Vern.* 420 ; *Pre. Ch.* 156 ; 1 *Bro. P. C.* 30 [2nd ed. 516]) is accounted for in the same way ;

and the Court compelled them to bring the persons legally accountable; but not as to the equitable sub-divisions; as the assignee of a mortgage is the only necessary party; and the mortgagor is not obliged to bring all the persons, among whom the interest is sub-divided; being only subordinate equities, which the Court does not notice. But in this case these proprietors are primarily accountable. Many of them, if before the Court, might suggest equities, with reference to their own acts, upon which, even [439] supposing the Plaintiff to have the strict legal right, the Court would refuse to act. The only and proper remedy is therefore at law; and there is no equity to impose upon the Company this obligation of perpetual account.

Mr. *Richards*, in Reply. The rule, requiring the presence of all parties, is a mere rule of convenience, which does not prevail at law, and gives way accordingly; as in the instance of the executor, having in himself all the interests of the testator; no other party therefore being necessary. In general the case of a trustee is different: the persons, interested in the trust, if specifically pointed out, are frequently considered necessary parties. In the case of a creditor's bill, on behalf of himself and others, no creditor, who is not upon the record, can litigate the question at the hearing: no other can intervene without an express order; which will not be made, unless it appears, that the Plaintiff has neglected his duty: yet all creditors are bound; and the most important questions may be decided in their absence. So to a Bill to establish a custom all persons interested are not necessary parties: yet all are bound. The principle is convenience. The Court, having a few of the persons interested before it, interested to sustain the question, is in general satisfied. Upon the record there are parties to sustain the question; and the possibility, that something farther might be urged by some of those, who are absent, shall not stand in the way. Upon a Bill against a trustee the Court will, though some of the *Cestui que trust* are proved to be abroad, if there are persons before the Court to sustain the suit, make a decree to the extent of a decision against the person to pay, though not ordering the person absent to do any thing.

[440] As to the jurisdiction, this is an equitable charge: the legal interest in the Corporation. The Plaintiff is entitled without reference to the construction of the Land-Tax Act: but, if not, the construction of the act is in his favour. This is not really a rent; though it is called so. It is derived, not out of a conveyance of land, but from a grant of fines and other profits arising from an adventure. The Corporation has in itself the whole legal interest in the land, and the whole adventure. The profits, to be divided, are personal property; arising certainly from an adventure connected with land, but a speculation, expected to produce profit. They are to settle the account, and to hand over a moiety of the clear surplus. The only way of getting at it is a Bill. An action of account would not lie. Since the Land-Tax Act the Corporation are to deduct the land-tax, as a necessary out-going. Still it is purely a question of account: a moiety of the profit, subject to the land-tax; but nothing more than a division of profits: not a rent, properly; which originally was confined to payments out of land. Personal property is by the Land-Tax Acts charged at 4*s.* in the pound. A sleeping partner is entitled to see, what the proportion is. If, instead of a share of the profits, he is to have a clear sum of £500 a-year, the whole imposition of any parliamentary tax is not to be thrown upon that interest: but it must be in proportion to the other part. As to the objection from want of privity, the Company are parties to the deed between the King and Sir *Hugh Middleton*.

But, if this is to be considered a fee-farm rent, or a rent-charge, the Plaintiff is entitled to relief within the view of the Act of Parliament. It has not been in fact in the Crown since the time of King *William* III.; and as the King's grantee has always been considered entitled to take it, it must be taken to be completely out of the [441] Crown. Considered as a general rent-charge under the Land-Tax Act, the true construction is, that the Plaintiff is not to be charged with more than a fair proportion. The object of the legislature was to throw the burthen equally upon all the objects of the duty, and therefore the landlord is allowed to deduct out of the rent-charge a proportionate part of the tax, paid by him; and that proportion ought to be regulated by the fair value of the land; not, as is contended, by the actual assessment, however unequal. The assessment is upon all persons, having a share or interest: a description that applies to this Plaintiff. Then, the full sum of 4*s.* in the pound not being raised from these persons, he is entitled to

the benefit of the abatement. The intention of the Legislature being to charge all property in proportion to its value, as far as can be done, it is unconscientious, that he should pay £100 out of his £500 in ease of the assessment upon the Company, paying no proportion.

The *Lord Chancellor.* The answer admits, the profits of the Company have been much greater than £18,000 a-year ; the sum, at which they are assessed ; but does not disclose how much greater. If neither the Plaintiff nor the Defendants pay to the public what they ought to pay, is this Court to administer the equities between them ? My opinion is, that in such a case a Court of Equity ought not to act.

*Aug.* 1*st.* The *Lord Chancellor* [Eldon]. The answer of the Company admits, that their profits are more than £18,000 a-year ; the rate of their assessment. The Plaintiff has compelled them to state that fact ; but has not proceeded to ask, what that excess is. **[442]** If he had, the Court could by decree upon the admission have set the thing right without a reference to the Master. But there was a mutual convenience to both in refraining from that question. The meaning of the act being, that they should pay 4*s.* in the pound upon the whole amount of the actual profit, if that had been published, this Bill might operate relief for the present year ; but the effect would be, that in future the Plaintiff would not have reason to complain, if the Commissioners under the Land-Tax Act should do their duty ; for as by the Act this property is not to be assessed by a pound-rate according to the deficiency of a primary assessment upon the personal estate, but a rate of 4*s.* in the pound is imposed directly upon the land, the Plaintiff, paying no more than that, would have nothing to complain of.

The Equity therefore, which is stated, is this. The Plaintiff does not pay more than he ought, if they were duly assessed : but, not being duly assessed, they did not inform the Commissioners, what is the correct sum of their profits : the Plaintiff therefore desires a Court of Equity to assist him ; to relieve him, not from paying more than he ought to pay, as between him and the public, but from what he has paid to the Company ; as they have paid less than they ought to pay, if the Act had been put in execution ; as it would have been, if the Commissioners had the means of enforcing a discovery of the whole profit. The Company are entitled at law under the instruments to receive in the first instance the whole profits. Afterwards, in consideration of the expence the King had been at in the work, they grant to him one moiety of the rents, profits, and gains, made. So it must be a *Chose in Action.* Still they remain the legal owners of the whole concern, entitled to receive all the rents and profits ; but, having granted a moiety, bound to account for that to the King ; and after that **[443]** grant the King could in Equity or a Court of Revenue compel an account ; which would embrace all the expenditure, as well as all the gain, that had been obtained. After that the King granted his moiety by an instrument, to which the Company were parties, to Sir *Hugh Middleton* ; who covenants to pay to the King, his heirs and successors, this rent, now vested in the Plaintiff.

One moiety of the profit, subject to the covenant for payment of £500 *per annum,* being vested in Sir *Hugh Middleton,* it is clear, if that annuity is subject to equitable jurisdiction, it was competent to the Plaintiff to bring into a Court of Equity the Company and Sir *Hugh Middleton* ; to ascertain a moiety of the profits ; and out of what subject, constituting that moiety, the £500 *per annum* was to be paid. The acts, since done by Sir *Hugh Middleton,* are of this nature. That moiety, vested in him, either expressly subject by lien, or only by covenant to the sum of £500 a-year, has become the property of an infinite number of proprietors ; and the ownership split into so many shares, that the Company, if called upon by some proprietors on behalf of themselves and all others, would not know, with which they were contending, until all the proprietors had shewn themselves by claim in the Master's Office.

It is insisted, that the Plaintiff cannot sue in Equity without bringing before the Court all the proprietors of the King's share, as well as the Company : whose share is also subdivided : but those parties are represented ; and it is clear, no objection of that kind arises as to them. The rule is urged, that, whenever a rent-charge is granted, which I will suppose capable of being recovered specifically out of the moiety of the profits, all persons, who have to litigate any question with

regard to the title to that rent-charge, or with each **[444]** other, as being liable to pay the whole, or to contribute among themselves, must be brought before the Court; and there is no doubt, generally that is the rule. The consideration is, very different, if it is necessary to decide this point, whether it is possible to hold, that the rule shall be applied to an extent, destroying the very purpose, for which it was established : viz. that it shall prevail, where it is actually impracticable to bring all parties, or where it is attended with inconvenience, almost amounting to that : as well as where all can be brought without inconvenience. It must depend upon the circumstances of each case : but upon all the authorities for the purpose of getting a decree it is not necessary to bring all parties interested. I do not go into the case of bond-creditors and all the other cases ; and I lay out of my consideration the case of persons, suing on behalf of themselves and all others : for in a sense they are before the Court. There are authorities to be found in print, that where it is impracticable, the rule shall not be pressed ; and in such a case as this, the King's share being split into such a number of interests, that it is impracticable to go on with a record, attempting finally to bring all parties, having interests in the subject to be charged, I should hesitate to determine, that a person, having a demand upon the whole and every part of the moiety, does not do enough, if he brings all whom he can bring.

There is one class of cases, very important upon this subject : viz. where a person, having at Law a general right to demand service from the individuals of a large district, to his mill, for instance, may sue thus in Equity. His demand is upon every individual, not to grind corn for their own subsistence except at his mill. To bring actions against every individual for substracting that service is regarded as perfectly impracticable. There-**[445]**-fore a bill is filed to establish that right ; and it is not necessary to bring all the individuals : why ? Not, that it is inexpedient, but, that it is impracticable, to bring them all. The Court therefore has required so many, that it can be justly said, they will fairly and honestly try the legal right between themselves, all other persons interested, and the Plaintiff ; and, when the legal right is so established at law, the remedy in equity is very simple : merely a bill ; stating, that the right has been established in such a proceeding ; and upon that ground a Court of Equity will give the Plaintiff relief against the Defendants in the second suit, only represented by those in the first. I feel a strong inclination, that a decree of the same nature may be made in this case.

It has been with great force observed for the Defendants, that in this way the same difficulty is put upon them : how are they to obtain contribution, if the Plaintiff cannot ascertain the persons, who are to contribute ? But I am disposed to think, in a case under such circumstances as this, the whole legal interest in the Company, to distribute the fruit of that interest according to the equitable rights, a bill might be filed by the Plaintiff ; stating, that the Company have the legal interest ; that they have to distribute the profits among the persons, representing their Company, and those, entitled to the King's moiety ; that therefore they object to account with him, unless there are proper parties ; and it would be competent to the Court in such a state of circumstances to say, if the Plaintiff brings so many of those, who represent the King's share as can be taken duly and honestly to enter into that contest, in which all the others are concerned, that ought in equity to bind those, who are present, representing those. who are absent ; giving **[446]** the Company a right to make the deduction under that decree.

I incline also to think, it will be found, that relief may be given in equity in respect of this annuity, as affecting in equity the moiety, which belonged to the King, upon the cases I have seen. Supposing, they were duly assessed at 4*s.* in the pound, and their profits were a great deal more than the sum, upon which the assessment was made, the Plaintiff paying 4*s.* in the pound, in the terms of the Act, by a like pound-rate, I must, if the case turned upon that point, have made a case for the opinion of a Court of law. I know, opinions have been given with great confidence, that, though the pound-rate both upon the land and the annuity, was 4*s.* in the pound, yet inquiry might be made into the actual value of the land : not only, where it could be ascertained under the clause, relating to landlords mediate, or immediate, whose property was out to tenants ; but also, where the value might be ascertained in the party's own occupation : the meaning of the Act being, that you may ascertain the value from year to year ; and therefore may claim a reduction

of the annuity, having regard to the value. Opinions very different have been held with equal confidence ; that, if the land is rated at much less, with the exception perhaps of a fee-farm rent, the annuity is to pay the same rate ; as, then within the terms of the Act it would pay with reference to the value of the annuity by a like pound-rate as the land. There is no actual decision upon it ; though I imagined there was ; and the point admits of considerable argument upon the Act. If the case had rested upon that, therefore, the most just way would have been a case stated for the opinion of a Court of Law.

[447] But upon the best consideration I can give this case, the difficulty, to which I first alluded, is so considerable, that I do not see the principle for giving relief under all the circumstances. There is great difficulty upon the circumstance, that many of these individuals have redeemed their land-tax upon the foot of the rate paid by the Company. Perhaps, if they were hereafter to be assessed to the utmost amount, they could have no reason to complain of that ; for it was their own fault to permit those persons, part of their own body, to redeem upon that footing. But the difficulty is, that this is not the case of a Plaintiff, coming under the Act of Parliament, desiring to be assessed under the due construction of the Act by such a rate, as ought to be applied, having regard to the mode of assessing in the district : but there being an express clause, that the profits shall pay 4s., the Plaintiff must admit, that his annuity, if part of that profit, is taxed, as it ought to be. If it remained in a chest, and the Commissioners assessed it there, according to the express clause he could not receive it without that deduction of 4s. in the pound. The question then is, whether the Plaintiff, stating, that he has paid no more than he ought, has an equity to call upon other persons, who have paid less than they ought ; and to have a declaration, that he is entitled to a participation in the effect of the circumstance, that by their not disclosing the actual profit, with the fact, perhaps, that the Commissioners cannot compel the disclosure, other persons, having an interest, have not paid as much as they ought. My opinion is, that the Plaintiff has no such equity ; and no decree can be made upon the principle, that he, who has paid only as he ought, is to participate in the gain of those, who from circumstances have paid much less than they ought.

The Bill was dismissed without costs.

[448] The Earl of RADNOR v. SHAFTO. *Aug. 7th*, 1805.

A right of pre-emption given by Will, whether at a price expressed or to be fixed by the trustees, will be executed : the construction in the latter case being a reasonable price, to be ascertained by reference to the Master. But to pass such right to the heir or devisee the intention to accept the offer must appear by some act, or, at least, by Will. In this case, the Will directing, that *A.* or whoever shall after the testator's decease be entitled to estates in settlement may have the refusal, *A.* having died without shewing such intention, and a tenant for life of part of the settled estates, not by the settlement, but under a recovery by *A.*, not answering the description, it was held, that the right did not then exist in any one.

Sir *Charles Duncombe* by a settlement, dated the 7th and 8th *July* 1708, settled his freehold estates in the counties of *Wilts* and *Middlesex* to the use of himself for life ; remainder to his first and other sons in tail male ; remainder to his nephew *Anthony* Lord *Feversham* for life, and to his first and other sons, and to *Thomas Brown* (afterwards *Duncombe*) and his sons in the same manner. Sir *Charles Duncombe* died in 1711, without issue male ; leaving his nephew Lord *Feversham* surviving him ; who entered ; and died in 1763, without issue male ; and upon his death *Thomas Duncombe*, eldest son of *Thomas Brown*, became entitled to the settled estates.

Lord *Feversham* left at his death two daughters ; Lady *Radnor* and *Frances Bowater*, his co-heiresses at law. By his Will, dated the 21st of *July* 1757, he devised his several estates in the counties of *Wilts*, *Middlesex*, and *Leicester* : upon trust, subject to annuities and other charges, for his children, as therein mentioned, in case he should leave daughters only, and there should be more than one, to convey to all and every his daughter and daughters, equally to be divided between them, if

*Pringle* was proper: the legacy being vested in him; and the payment only postponed.

[316] The cause stood for Judgment.

The *Master of the Rolls.* The cases upon the point, which arises in this cause, are very numerous; and perhaps not all very easily reconcilable with each other: but this case appears to me not to be substantially distinguishable from those in which the words "at" or "after" the death of a particular person, have been held, not to denote a condition, that the legatee shall survive such person, but only to mark the time, at which the legacy shall take effect in possession : that possession being deferred on account of some interest in the subject being given to the person, on whose death the gift is to take effect. In *Medlicott* v. *Bowes* (1 *Ves. sen.* 207), *Barnes* v. *Allen* (1 *Bro. C. C.* 181. Stated from the *Register's Book,* 3 *Ves.* 208, n.), *Monkhouse* v. *Holme* (1 *Bro. C. C.* 298), *Benyon* v. *Maddison* (2 *Bro. C. C.* 75), *The Attorney-General* v. *Crispin* (1 *Bro. C. C.* 386) and many others, the time might be said to be annexed to the substance of the gift just as much as in the present case: but, the purpose being to give interests to different persons in succession, it was held, that each gift was alike immediate ; though the second taker could not have the benefit until after the death of the first.

In the present case, if the testator had given the Stock to his wife for life, and at her death to *George Pringle,* it would have been clear, that he would have had a vested interest in the nature of a remainder. In a Will it is not material, in what order the clauses are arranged. The question is, what is the effect upon the whole. This testator begins by giving to *George Pringle* the Stock at the death of his wife ; and then gives to his wife the whole of his property. Consequently she has a life-interest in [317] that stock, so given to *George Pringle* at her death, for it is part of the testator's property not antecedently disposed of. Thus the Will, no matter in what order, divides the fund between these two persons ; giving to one the interest for her life, and to the other the capital at her decease. In effect and substance he took a remainder, which became vested immediately upon the testator's death, and was not defeated by his own death in the life-time of the wife.

The legacy therefore was properly paid; and the Bill, as far as it seeks to impeach that payment, must be dismissed.

[318–320] See Prefatory Note.

---

[321] 50 GEORGE III. 1809.

COCKBURN *v.* THOMPSON.    *Oct. 31st, Nov. 1st, 14th,* 1809.

[See *Long* v. *Yonge,* 1830, 2 Sim. 380 ; *Deeks* v. *Stanhope,* 1844, 14 Sim. 68.]

The strict rule, that all persons, materially interested, must be parties, dispensed with, where it is impracticable, or very inconvenient : as in the case of a very numerous association in a joint concern ; in effect a partnership. Defect of parties the subject of Demurrer, or Plea ; as it appears, or not, on the face of the Bill.

The Bill, filed by several persons, on behalf of themselves and all others the proprietors of *The Philanthropic Annuity Institution,* who shall come in, and seek relief by, and contribute to the expence of, the suit, stated the constitution of that establishment, formed in the year 1806, in the first instance of the purchase of annuities for lives with the money, that should be subscribed ; providing among other things, that the number of shares should not be increased beyond 50,000 without the express resolution of two Courts of Proprietors.

The Bill farther stated, that the Defendant *Thompson* was appointed Solicitor, and the other Defendants bank-[322]-ers, to the Institution ; in which capacities they possessed a large sum of money, belonging to it, amounting to upwards of £10,000 ; and that, an application for an Act of Parliament, to enable them to accept and grant annuities in the names of trustees, having failed, without which it was impossible to carry the Institution into effect, as from the number of the proprietors a memorial could not be enrolled, according to the Act of Parliament (stat. 17 *Geo.* III. c. 26 repealed by Stat. 53 *Geo.* III. c. 141. See the note, 2 *Ves.*

*jun.* 36), at a General Meeting on the 18th of *August* 1808, it was resolved, that it would be for the benefit of all parties to the Institution, that it should be dissolved.

The Bill, then charging several acts, done by *Thompson*, as a breach of his duty, prayed, that the Institution may be declared dissolved : an account of the sums, received by the Defendants, &c., on account of the Institution, or of any of the proprietors : the Plaintiffs submitting to account for their receipts and payments on account of the said Institution, and pay any balance, which shall be found due from them ; that the same, and any balance, which shall be found due from the Defendants, may be paid into Court, &c. ; that the rights and interests of the Plaintiffs, and the said other proprietors, who shall come in, and seek relief by, and contribute to the expence of, this suit, may be declared and established ; and that *Thompson* may be restrained from receiving from the other Defendants, and they from paying to him, the money in their hands.

The Defendant *Thompson* put in a plea to the discovery and relief, sought by the Bill ; alleging, that a great number of persons, whose names were stated, are proprietors of *The Philanthropic Annuity Institution* ; and that several other persons, also named, are also proprietors, as the Defendant believes ; the Defendant insisting **[323]** on the want of those persons, as parties to the Bill, in bar to the discovery and relief.

Mr. *William Agar*, in support of the Plea, insisted, that according to the strict rule all the persons, interested in this concern, must be parties ; citing *Leigh* v. *Thomas* (2 *Ves.* sen. 312), *Moffat* v. *Farquharson* (2 *Bro. C. C.* 338), *Parsons* v. *Neville* (3 *Bro. C. C.* 365), *Sherrit* v. *Birch* (3 *Bro. C. C.* 228), *Lloyd* v. *Loaring* (6 *Ves.* 773).

Sir *Samuel Romilly* and Mr. *Fearnley*, for the Plaintiffs, contended, that, besides the common case of creditors, the Court has frequently dispensed with parties ; where they were so numerous, that it was impracticable or inconvenient to have them all before the Court : *Chancey* v. *May* (*Pre. Ch.* 592, edition by Mr. *Finch*), *Adair* v. *The New River Company* (11 *Ves.* 429) : and the cases of *Drury Lane* and the other Theatres ; and no inconvenience can arise from considering this as a case of exception : the only accounting parties being the officers of this Society.

Mr. *William Agar*, in Reply. At what number is the rule, that all persons, interested in a partnership concern, must be parties, to cease ? Many of these persons may not have advanced their money ; which must be brought into the account ; and it may be necessary, according to the usual course, to examine them upon interrogatories. The case of creditors is distinct. The reason of *Adair* v. *The New River Company* is very special. *Chancey* v. *May* contradicts the uniform practice since ; and the reason, assigned for that decision, is not sound. How can it be represented, that **[324]** the rest were in effect parties ? The objection from the impossibility and inconvenience of making all these persons parties occurs equally after a Decree. Lord *Kenyon's* clear opinion was, that all accounting parties must be before the Court ; and Lord *Alvanley* had great doubt upon the case of a mortgage, split by the mortgagee.(1)

The *Lord Chancellor*. There are some very strong cases upon mortgages. I shall give the Judgment with great consideration in this cause ; which is of high importance ; going in effect, as it is argued for the Defendant, to this ; that with regard to all those Institutions, known to subsist in this great metropolis in the nature of partnership, all Assurance Companies, for instance, if they have not a corporate character, no law can be administered in any Court of Justice among the members of such Societies. Another extremely important effect, if this demurrer can be maintained, will be, that with regard to a great number of charitable institutions, as that of *The Society of Widows*, before Lord *Thurlow*, and the late case of *The Bakers' Company* (*Pearce* v. *Piper*, 17 *Ves.* 1), before me, no law or equity can be administered among the members ; who, being to subscribe annually, and divide the profits, are all partners. As to the case of *Drury Lane Theatre* (7 *Ves.* 617) my opinion was, and still is, that every renter was a partner ; being to receive his rent out of the profits ; which constituted him a partner ; and this distinction between partners and cre-**[325]**-ditors must be attended to ; in a plea for want of parties, as in the plea of abatement at Law, the Defendant must tell the Plaintiff whom he should have sued ; in the case of scheduled creditors in a deed the Defendant may be able to state, who they are : but in the ordinary case of creditors

of a deceased person the Defendant cannot, if I may use the legal expression, give the Plaintiff a better writ ; as in the case of partnership he may. Another case is that of persons, entitled to prize-money. (*Good* v. *Blewitt, Brown* v. *Harris*, 13 *Ves.* 397, 552 ; 19 *Ves.* 336, and the note, 4 *Ves.* 628.) In the case of the widows, suing for themselves and all others entitled, Lord *Thurlow* made the Decree without having all before the Court ; and in the case before me the doubt was, whether there was not a vice and inaccuracy in the principle of the Institution, making it impossible to carry it into execution either in or out of Court ; in other words, whether it was not a bubble ; and I directed an inquiry as to that.

*Nov.* 14*th.* The *Lord Chancellor* [Eldon]. The question is, whether a plea, that several persons are not parties, is a good bar to a Bill for discovery and relief. Where on the face of the Bill it appears, that there are not sufficient parties, that is a ground of demurrer : where the defect of parties does not appear on the Bill, that may be the subject of a plea ; and the question, whether it is sufficient, must depend upon the Bill and the Plea, taken together. The strict rule is, that all persons, materially interested in the subject of the suit, however numerous, ought to be parties : that there may be a complete Decree between all parties, having material [326] interests : but that, being a general rule, established for the convenient administration of justice, must not be adhered to in cases, to which consistently with practical convenience it is incapable of application. Accordingly there are several well known cases of exception ; and, without going through them all, I will mention one instance of not applying it to persons, having valuable interests in real estate : viz. where it has been held sufficient to bring before the Court the first person, having an estate of inheritance (see 9 *Ves.* 55, *Lloyd* v. *Johnes. Reynoldson* v. *Perkins, Amb.* 564) ; though it cannot be denied, that, persons, having present, immediate, valuable, interests in the same real estate, may become most deeply affected by what is done here in their absence. The same principle in a great variety of cases has obliged the Court to dispense with the general rule as to persons, out of its jurisdiction ; and there are many instances of justice administered in this Court in the absence of those, without whose presence, as parties, if they were within the jurisdiction, it would not be administered ; as it obviously cannot be so completely, as if all persons interested were parties : but the Court does what it can. (See *Beames El. Pl. Eq.* 87, 8.)

There are various other cases ; admitting the general principle ; but forming exceptions upon circumstances. The Plaintiff, suing upon a joint and several bond, must bring forward all the obligors, principals, and sureties (*Bland* v. *Winter*, 1 *Sim. & Stu.* 246) : but the rule is dispensed with, where it appears, that the sureties are insolvent ; or have not paid any thing ; and the demand is accordingly restrained, as a demand against the principal ; who has nothing to demand over. The case of *The Water-works Company* and *Chancey* v. *May* (*Pre. Ch.* 592, edition by Mr. *Finch*) prove, that, where it is impracticable to make parties, and yet the Court can by arrangement [327] afterwards introduce the persons, as *Quasi* parties, the Court does not require, that they shall be parties on the record ; but will give the opportunity of introducing them by a subsequent proceeding ; and as to the objection, that the shares, originally few, may by assignment become very numerous, to which I alluded in the case of *Adair* v. *The New River Company* (11 *Ves.* 429), the multiplication of parties cannot satisfactorily account for what the Court has done. As in the original institution of such concerns the interest, which the original under-takers have, is in its nature assignable, every party must be taken to assent to the others assigning, if they thought proper ; and the consequence is, that the multiplication of shares is with the general consent. The principle is, that practical convenience requires that sort of arrangement with regard to the persons, required as parties originally.

In the familiar case of creditors, suing on behalf of themselves and all others, what an infinite number of valuable interests may be bound, in a sense, not absolutely ; as, where the Court for convenience dispenses with the presence of parties, the principle leads it by future arrangement to find out the means of giving them an opportunity in some shape of coming in. Upon questions of marshalling, whether real estate is charged with debts, &c., the case may be sustained originally perhaps by persons, having interests of the least value : but certainly any person, afterwards becoming interested, would have his interest as much attended to, as

if he had been originally a party. The Court must always be open to questions upon the carriage of the cause, applications for re-hearing, &c. ; and I should upon principle find the means, if not supplied by precedent (see 1 *Sch. & Lef.* 409, *Giffard* v. *Hort*), of giving a creditor, coming in after the institution of a suit, the opportunity of supporting his **[328]** interest better than the Plaintiff could. A bond creditor, having been in partnership with the debtor, may, if there are assets, go in before the Master ; but the Court must find the means of ascertaining, whether such creditor was not a debtor on the partnership account ; and the account must be taken : or perhaps the Court may find itself obliged to direct a Bill to be filed ; reserving a proportion of the assets for the result of the inquiry in an actual suit. Lord *Thurlow* determined, that the general principle requires a residuary legatee to bring before the Court all persons, interested in the residue : but that admits of exception ; where it is not necessary, or convenient, that all should be before the Court ; as in *Chancey* v: *May* (*Pre. Ch.* 592, edition by Mr. *Finch*) and the case of *The Water-works Company*. If a residue had been left equally among all the individual members of those societies, upon the same ground of impracticability and inconvenience, it would be competent to some of them to file a Bill on behalf of themselves and the others ; though suing as residuary legatees.

There are various other cases : a Bill by the lord of a manor against some of the tenants, or, *vice versa*, by tenants on behalf of themselves and the others, to establish some right : as a Bill with regard to suit to a mill (11 *Ves.* 444) : a Bill against parishioners for tithes ; or by some parishioners to establish a *Modus*. Another class of cases is that of persons, who, though not a corporation, have the appearance of it : Assurance Societies ; each being an insurer of the others ; as, though it is settled by the Act of Parliament (stat. 6 *Geo.* I. *c.* 18, *s.* 12), that no persons, beyond a certain number shall insure as a company, any number of persons may associate for the insurance of each other : all in effect participating as a partnership. It is evident, **[329]** that if occasion here should arise to resort here for an account, as it would be impossible to bring all persons interested, the suit must be against some, being Proprietors, and accountable parties, instituted by some on behalf of all. This course was taken in the case of *The Widows' Charity* (17 *Ves.* 1) by Lord *Thurlow* ; upon which I observed in the late case of *The Bakers' Company, Pearce* v. *Piper*. The former arose upon an association of widows, contributing to a fund to pay them annuities. When this fund proved insufficient, every subscriber, who had not been a member long enough to become an annuitant, and the representatives of those, who were dead, had an interest to state their title ; in order to recover her money : but that difficulty was overcome upon this principle, that it was better to go as far as possible towards justice than to deny it altogether. So as to partnerships : the Court will settle the account between those parties who are before it : and do all possible justice. The principle being founded in convenience, a departure from it has been said to be justifiable, where necessary ; and in all these cases the Court has not hesitated to depart from it, with the view by original and subsequent arrangement to do all, that can be done for the purposes of justice ; rather than hold, that no justice shall subsist among persons, who may have entered into these contracts.

It is then said, something may be due to this Defendant. This is a plea to the whole discovery and relief ; and it does not state enough to vary the effect of the allegations in the Bill : but if the Bill had stated, that on taking the account there would be a balance due to the Defendant, this plea would not bar the discovery and relief on the ground, that the Plaintiffs had not tendered to him that balance. What can be made of that is for future consideration : at all events it will not give validity to this **[330]** plea. Though the Plaintiffs cannot bring forward all the persons, who may be liable upon the result of the account, that is not an obstacle, that should prevent the institution of this suit, if necessary to justice.

The Plea was over-ruled.

(1) *Montgomerie* v. *The Marquis of Bath*, 3 *Ves.* 560. On a Motion, 6th *December* 1799, for enlarging the time of payment under that Decree, the *Lord Chancellor* expressed great doubt, whether it could stand ; and would not make an Order under it without consent. See *Smith* v. *Snow*, 3 *Madd.* 10 ; *Palmer* v. *The Earl of Carlisle*, 1 *Sim. & Stu.* 423.

all costs which he as defendant in that suit might be obliged to pay ; it then goes on to allege that the plaintiff, relying on the defendant's promise, employed him as his attorney, and that he was compelled to pay certain costs to the plaintiff in that suit, and that, although all things had happened necessary to entitle the plaintiff to have the defendant's said promise fulfilled, yet the defendant had broken the same, and had not indemnified the plaintiff according to his promise, *or* paid the plaintiff the sum he had paid for such costs, or any part thereof. Now, the breach consists of two parts,—first, that the defendant had not indemnified the plaintiff according to his promise. That would sound in damages, and clearly would not be the subject of a set-off. But the **[869]** second part of the breach is, that the defendant has not paid the plaintiff the sum which he had been obliged to pay for costs. The plea is confined to that part of the breach : and that, it seems to me, is a debt within the statute, to which a set-off may be pleaded. The defendant, therefore, is entitled to our judgment upon both demurrers.

Judgment for the defendant.

PAUL FELTHOUSE *v.* BINDLEY.   July 8th, 1862.

[S. C. 31 L. J. C. P. 204 ; 6 L. T. 157 ; 10 W. R. 423.]

A. & B. verbally treated for the purchase of a horse by the former of the latter. A few days afterwards, B. wrote to A. saying that he had been informed that there was a misunderstanding as to the price, A. having imagined that he had bought the horse for 30l., B. that he had sold it for 30 guineas. A. thereupon wrote to B. proposing to split the difference, adding,—"If I hear no more about him, I consider the horse is mine at 30l. 15s." To this no reply was sent. No money was paid, and the horse remained in B.'s possession. Six weeks afterwards, the defendant, an auctioneer who was employed by B. to sell his farming stock, and who had been directed by B. to reserve the horse in question, as it had already been sold, by mistake put it up with the rest and sold it. After the sale B. wrote to A. a letter which substantially amounted to an acknowledgment that the horse had been sold to him :—Held, that A. could not maintain an action against the auctioneer for the conversion of the horse, he having no property in it at the time the defendant sold it,—B.'s subsequent letter not having (as between A. and a stranger) any relation back to A.'s proposal.

This was an action for the conversion of a horse. Pleas, not guilty, and not possessed.

The cause was tried before Keating, J., at the last Summer Assizes at Stafford, when the following facts appeared in evidence :—The plaintiff was a builder residing in London. The defendant was an auctioneer residing at Tamworth. Towards the close of the year 1869, John Felthouse, a nephew of the plaintiff, being about to sell his farming stock by auction, a conversation took place between the uncle and nephew respecting the purchase by the former of a horse of the latter ; and, on the 1st of January, 1860, John Felthouse wrote to his uncle as follows :—

"Bangley, January 1st, 1861.

"Dear Sir,—I saw my father on Saturday. He told **[870]** me that you considered you had bought the horse for 30l. If so, you are labouring under a mistake, for 30 *guineas* was the price I put upon him, and you never heard me say less. When you said you would have him, I considered you were aware of the price, as I would not take less.                         "JOHN FELTHOUSE."

The plaintiff on the following day replied as follows :—

"London, January 2nd, 1862.

"Dear Nephew,—Your price, I admit, was 30 guineas. I offered 30l.,—never offered more : and you said the horse was mine. However, as there may be a mistake about him, I will split the difference,—30l. 15s.—I paying all expenses from Tamworth. You can send him at your convenience, between now and the 25th of March. If I hear no more about him, I consider the horse mine at 30l. 15s.

"PAUL FELTHOUSE."

To this letter the nephew sent no reply ; and on the 25th of February the sale

took place, the horse in question being sold with the rest of the stock, and fetching 33l., which sum was handed over to John Felthouse. On the following day, the defendant (the auctioneer), being apprised of the mistake, wrote to the plaintiff as follows :—

"Tamworth, February 26th, 1861.

"Dear Sir,—I am sorry I am obliged to acknowledge myself forgetful in the matter of one of Mr. John Felthouse's horses. Instructions were given me to reserve the horse : but the lapse of time, and a multiplicity of business pressing upon me, caused me to forget my previous promise. I hope you will not experience any great inconvenience.    I will do all I can to get the horse again : but shall know on Saturday if I have succeeded.                                "WILLIAM BINDLEY."

[871] On the 27th of February, John Felthouse wrote to the plaintiff, as follows :—

"Bangley, February 27th, 1861.

"My dear Uncle,—My sale took place on Monday last, and we were very much annoyed in one instance. When Mr. Bindley came over to take an inventory of the stock, I said that horse (meaning the one I sold to you) is sold. Mr. B. said it would be better to put it in the sale, and he would buy it in without any charge. Father stood by whilst he was running it up, but had no idea but he was doing it for the good of the sale, and according to his previous arrangement, until he heard him call out Mr. Glover. He then went to Mr. B. and said that horse was not to be sold. He exclaimed he had quite forgotten, but would see Mr. Glover and try to recover it, and says he will give 5l. to the gentleman if he will give it up : but we fear it doubtful. I have kept one horse for my own accommodation whilst we remain at Bangley : and, if you like to have it for a few months, say five or six, you are welcome to it, free of any charge, except the expenses of travelling : and if, at the end of that time, you like to return him, you can ; or you can keep him, and let me know what you think he is worth. I am very sorry that such has happened ; but hope we shall make matters all right ; and would have given 5l. rather than that horse should have been given up.                                "JOHN FELTHOUSE."

On the part of the defendant it was submitted that the letter of the 27th of February, 1861, was not admissible in evidence. The learned judge, however, over-ruled the objection. It was then submitted that the property in the horse was not vested in the plaintiff at the time of the sale by the defendant.

A verdict was found for the plaintiff, damages 33l., leave being reserved to the defendant to move to enter [872] a nonsuit, if the court should be of opinion that the objection was well founded.

Dowdeswell, in Michaelmas Term last, accordingly obtained a rule nisi, on the grounds that "sufficient title or possession of the horse, to maintain the action, was not vested in the plaintiff at the time of the wrong ; that the letter of John Felthouse of the 27th of February, 1861, was not admissible in evidence against the defendant : that, if it was admissible, being after the sale of the horse by the defendant, it did not confer title on the plaintiff ; and that there was at the time of the wrong no sufficient memorandum in writing, or possession of the horse, or payment, to satisfy the statute of frauds." *Carter* v. *Toussaint*, 5 B. & Ald. 855, 1 D. & R. 515, and *Bloxam* v. *Sanders*, 4 B. & C. 941, 7 D. & R. 396, were referred to.

Powell shewed cause. There was an ample note of the contract in writing to satisfy the statute of frauds. When the parties met in December, 1860, it was agreed between them that the plaintiff should become the purchaser of the horse. It is true, there was a slight misunderstanding as to the price, the plaintiff conceiving he had bought it for 30l., the nephew thinking he had sold it for 30 guineas. On being apprised by the nephew that he was under a mistake, the plaintiff wrote to him proposing to split the difference, concluding with saying,—"If I hear no more about him, I consider the horse is mine at 30l. 15s." The question is whether there has not been an acceptance of that offer by the vendor, though nothing more passed between the uncle and nephew until after the 25th of February, the day on which the sale by auction took place. Could the plaintiff after his letter of the 2nd of January have refused to take the horse ? It is true [873] that letter was unanswered ; but it was proved that the nephew afterwards spoke of the horse as being sold to the plaintiff, and desired the auctioneer (the defen-

dant) to keep it out of the sale. Although written after the conversion, the letter of the 27th of February was clearly evidence, and coupled with the plaintiff's letter of the 2nd of January, constituted a valid note in writing, even as between the uncle and the nephew. [Keating, J. You were bound to shew a binding contract for the sale of the horse before the 25th of February.] The letter of the nephew of the 27th is an admission by him that he had before that day assented to the bargain with the plaintiff. [Byles, J. That only shews a binding contract on the 27th of February. What right had the plaintiff to impose upon the nephew the trouble of writing a letter to decline or to assent to the contract?] It was not necessary that he should assent to the contract by writing: it is enough to shew that he assented to it. [Byles, J. There was no delivery or acceptance: and there could be no admission of delivery and acceptance. Willes, J. To be of any avail, you must make out a valid contract between the uncle and nephew prior to the 25th of February.] It was not necessary that the assent to the terms of the plaintiff's letter should be in writing. In *Dobell* v. *Hutchinson*, 3 Ad. & E. 355, 5 N. & M. 251, it was held that, where a contract in writing, or note, exists which binds one party to a contract, under the statute of frauds, any subsequent note in writing signed by the other is sufficient to bind him, provided it either contains in itself the terms of the contract, or refers to any contract which contains them. So, in *Smith* v. *Neale*, ante, vol. ii., p. 67, it was held that a written proposal, containing the terms of a proposed contract, signed by the defendant, and assented to by the plaintiff by word of mouth, is a sufficient agree-[874]-ment within the 4th section of the statute of frauds. [Willes, J. That was a very peculiar case. The plaintiff had done all that she had agreed to do, and nothing remained to be done but performance on the defendant's part. But to say that transactions between third parties are to be controlled or affected by an intermediate letter written by a person who is no party to the record, is a somewhat startling proposition. Byles, J. I feel great difficulty in seeing how the nephew's subsequent admission can be binding on the defendant, or even evidence against him.] It is enough that the memorandum relied on to satisfy the statute of frauds is made at any time before action brought: *Bill* v. *Bament*, 9 M. & W. 36.

Montague Smith, Q. C., and Dowdeswell, in support of the rule. The letter of the 27th of February was clearly inadmissible. The 17th section of the 29 Car. 2, c. 3, provides that "no contract for the sale of any goods, &c., shall be allowed to be good, except some note or memorandum in writing of the bargain be made and signed by the parties to be charged by such contract," &c. At the time the sale complained of here took place, there clearly was no binding contract for the sale of the horse by the nephew to the plaintiff. [Willes, J. Could the plaintiff have insured the horse on the 25th of February?] He could not: he had no insurable interest. [Willes, J. As to third persons, one cannot see any reason for giving a relation to the subsequent writing, though as between the immediate parties one can.] *Carter* v. *Toussaint*, 5 B. & Ald. 855, 1 D. & R. 515, is a far stronger case than the present. There, a horse was sold by verbal contract, but no time was fixed for payment of the price. The horse was to remain with the vendors for twenty days without any charge to the vendee. At the expiration of that time, the horse was sent to grass, by the direction of the vendee, and by [875] his desire entered as the horse of one of the vendors; and it was held that there was no acceptance of the horse by the vendee, within the 29 Car. 2, c. 3, s. 17. And see Smith's Mercantile Law, 4th edit. p. 468, et seq. Here, the plaintiff had clearly no property in the horse on the 25th of February, the day of the sale by the defendant. How, then, can an admission ex post facto by a stranger affect the relative positions of the parties to this record on that day?

WILLES, J. I am of opinion that the rule to enter a nonsuit should be made absolute. The horse in question had belonged to the plaintiff's nephew, John Felthouse. In December, 1860, a conversation took place between the plaintiff and his nephew relative to the purchase of the horse by the former. The uncle seems to have thought that he had on that occasion bought the horse for 30l., the nephew that he had sold it for 30 guineas: but there was clearly no complete bargain at that time. On the 1st of January, 1861, the nephew writes,—"I saw my father on Saturday. He told me that you considered you had bought the horse for 30l. If so, you are labouring under a mistake, for 30 guineas was the price I put upon him, and you never heard me say less. When you said you would have him, I considered you were aware of the price." To this the uncle replies on the following day,—" Your price, I admit,

was 30 guineas. I offered 30*l.*; never offered more: and you said the horse was mine. However, as there may be a mistake about him, I will split the difference. If I hear no more about him, I consider the horse mine at 30*l.* 15*s.*" It is clear that there was no complete bargain on the 2nd of January: and it is also clear that the uncle had no right to impose upon the nephew a sale of his horse for 30*l.* 15*s.* unless he chose to comply with the condition of writing to repudiate the offer. The nephew might, no doubt, have **[876]** bound his uncle to the bargain by writing to him: the uncle might also have retracted his offer at any time before acceptance. It stood an open offer: and so things remained until the 25th of February, when the nephew was about to sell his farming stock by auction. The horse in question being catalogued with the rest of the stock, the auctioneer (the defendant) was told that it was already sold. It is clear, therefore, that the nephew in his own mind intended his uncle to have the horse at the price which he (the uncle) had named,—30*l.* 15*s.*: but he had not communicated such his intention to his uncle, or done anything to bind himself. Nothing, therefore, had been done to vest the property in the horse in the plaintiff down to the 25th of February, when the horse was sold by the defendant. It appears to me that, independently of the subsequent letters, there had been no bargain to pass the property in the horse to the plaintiff, and therefore that he had no right to complain of the sale. Then, what is the effect of the subsequent correspondence? The letter of the auctioneer amounts to nothing. The more important letter is that of the nephew, of the 27th of February, which is relied on as shewing that he intended to accept and did accept the terms offered by his uncle's letter of the 2nd of January. That letter, however, may be treated either as an acceptance then for the first time made by him, or as a memorandum of a bargain complete before the 25th of February, sufficient within the statute of frauds. It seems to me that the former is the more likely construction: and, if so, it is clear that the plaintiff cannot recover. But, assuming that there had been a complete parol bargain before the 25th of February, and that the letter of the 27th was a mere expression of the terms of that prior bargain, and not a bargain then for the first time concluded, it would be directly **[877]** contrary to the decision of the court of Exchequer in *Stockdale* v. *Dunlop*, 6 M. & W. 224, to hold that that acceptance had relation back to the previous offer so as to bind third persons in respect of a dealing with the property by them in the interim. In that case, Messrs. H. & Co., being the owners of two ships, called the "Antelope" and the "Maria," trading to the coast of Africa, and which were then expected to arrive in Liverpool with cargoes of palm-oil, agreed *verbally* to sell the plaintiffs two hundred tons of oil,—one hundred tons to arrive by the "Antelope," and one hundred tons by the "Maria." The "Antelope" did afterwards arrive with one hundred tons of oil on board, which were delivered by H. & Co. to the plaintiffs. The "Maria," having fifty tons of oil on board, was lost by perils of the sea. The plaintiffs having insured the oil on board the "Maria," together with their expected profits thereon,—it was held that they had no insurable interest, as the contract they had entered into with H. & Co., being verbal only, was incapable of being enforced.

BYLES, J. I am of the same opinion, and have nothing to add to what has fallen from my Brother Willes.

KEATING, J. I am of the same opinion. Had the question arisen as between the uncle and the nephew, there would probably have been some difficulty. But, as between the uncle and the auctioneer, the only question we have to consider is whether the horse was the property of the plaintiff at the time of the sale on the 25th of February. It seems to me that nothing had been done at that time to pass the property out of the nephew and vest it in the plaintiff. A proposal had been made, but there had before that day been no acceptance binding the nephew.

**[878]** WILLES, J. *Coats* v. *Chaplin*, 3 Q. B. 483, 2 Gale & D. 552, is an authority to shew that John Felthouse might have had a remedy against the auctioneer. There, the traveller of Morrisons, tradesmen in London, verbally ordered goods for Morrisons of the plaintiffs, manufacturers at Paisley. No order was given as to sending the goods. The plaintiffs gave them to the defendants, carriers, directed to Morrisons, to be taken to them, and also sent an invoice by post to Morrisons, who received it. The goods having been lost by the defendants' negligence, and not delivered to Morrisons,—it was held that the defendants were liable to the plaintiffs.

Rule absolute.

End of Hilary Vacation.

CHANCERY DIVISION.    [VOL. XXX.

PEARSON, J.    *In re* MARSEILLES EXTENSION RAILWAY AND
1885                        LAND COMPANY.
*June 5, 8, 9.*
                SMALLPAGE'S AND BRANDON'S CASES.

*Conflict of Law—Bill of Exchange—Foreign Indorsement—Company—Winding-
up—Liquidator—Costs.*

Bills of exchange were drawn in *France* by a domiciled Frenchman
in the French language, in English form, on an English company, who
duly accepted them. The drawer indorsed the bills and sent them to an
Englishman in *England* :

*Held*, that the acceptor could not dispute the negotiability of the bills
by reason of the indorsements being invalid according to French law.

Costs of successful claims in a winding-up were not given against the
liquidator personally, but out of the assets.

THIS was the hearing of two summonses in the winding-up of
the *Marseilles Extension Railway and Land Company*, a limited
company, with its registered office in *London*. One summons was
taken out on the part of *John Henry Smallpage* that he might be
certified to be a creditor of the *Marseilles Extension Railway and
Land Company* in respect of two bills of exchange for £2000
and £3000 respectively accepted by the company. The other
summons was taken out on the part of Messrs. *G. S. & H. Brandon*
that they might be admitted creditors of that company in respect
of five bills of exchange of the aggregate amount of £12,000
accepted by the company.

All seven bills of exchange were drawn in duplicate at *Mar-
seilles* by *E. Barry*, a domiciled Frenchman ; they were similar
except as to the amounts. The following is a copy of the first
of exchange of one of the bills :—

        " *Marseille, le premier Octobre* 1866.         B. P. £2000.

            " *A quatre-vingt-dix jours de date, payer par cette première
de change à l'ordre de moi-même, la deuxième ne l'étant la somme
de quinze cents livres sterlings,*

                    " *Valeur reçue,*                    *E. Barry.*"
        " *Marseilles Extension Railway and Land
            Company, Limited, à Londres.*
        " *No. 144.*"

The first of exchange of each bill bore an English adhesive stamp, the second a French impressed stamp.

The bills were indorsed by *Barry* to the order of *H. D. Jenken*, an Englishman domiciled in *London*, and were during their currency negotiated with one *John Thomas Dobson* for value. They were indorsed by both *Jenken* and *Dobson*. When due the bills were presented and dishonoured. The applicants had obtained the bills from *Dobson*. Messrs. *Brandon* had received two of the bills before they were due, all the others were received by the holders when over due.

In April, 1867, a resolution to wind up the company voluntarily was passed, and on the 26th of that month an order was made to continue the winding-up under the supervision of the Court.

The bills in question, together with other bills to the amount of £20,000 in all, were renewals of bills drawn by *Barry* to provide for part of the price of certain land he had contracted to sell to the company. There was evidence on the part of the liquidator to shew that the contract for the sale of the land had not been carried out, and that as between *Barry* and the company the company had a right to refuse payment of the bills. A defence to the summons was that according to French law (*Code de Commerce*, arts. 137, 138) the indorsement of the bills was informal, and inoperative to make the bills negotiable, and that they were in the hands of every holder subject to the equities between the company and *Barry*.

*Higgins*, Q.C., and *Levett*, for *Smallpage*; and *Cookson*, Q.C., and *Grosvenor Woods* for Messrs. *Brandon* :—

The bills were to all intents and purposes English bills, intended to be paid in *England*; and for all purposes, including the mode of indorsement, were to be governed by English law; at all events as against the acceptors, who contracted in *England*. It would be of the utmost inconvenience, and prevent the negotiability of any bills, indorsed abroad, if the burden were cast on the holder of seeing that all the formalities required by the laws of the several places of indorsement had been complied with: *Lloyd* v. *Guibert* (1); *Lebel* v. *Tucker* (2); *Trimbey* v.

PEARSON, J.

1885

SMALLPAGE'S
AND
BRANDON'S
CASES.

(1) Law Rep. 1 Q. B. 115.    (2) Law Rep. 3 Q. B. 77.

CHANCERY DIVISION.    [VOL. XXX.

PEARSON, J.
1885

SMALLPAGE'S
AND
BRANDON'S
CASES.

*Vignier* (1); *Allen* v. *Kemble* (2); *Hirschfeld* v. *Smith* (3); *Bradlaugh* v. *De Rin* (4); *Rothschild* v. *Currie* (5); *Rouquette* v. *Overmann* (6); *Foote* on Private International Law (7); *Story* on the Conflict of Laws (8).

In case the claims are allowed the liquidator, who has chosen to contest them, ought to be ordered to pay the costs, getting them back from the estate, if he can, in accordance with the rule laid down by the Court of Appeal in *Farrao's Case* (9).

A similar rule prevails in bankruptcy: *Ex parte Angerstein* (10); *Pitts* v. *La Fontaine* (11).

*Everitt*, Q.C., and *H. B. Buckley*, for the liquidator:—

According to the law of *France*, the indorsement of *Barry* was only a procuration, and did not make the bills negotiable; it left them subject in every person's hands to the equities between the acceptors and *Barry*. The effect of the indorsement is for all purposes, in *England* as well as in *France*, to be determined by the law of *France*, the place where the bills were drawn, and the indorsement made by a domiciled Frenchman. If the contrary were held, the absurdity would arise that on the same bills actions might be brought by different parties: *Rothschild* v. *Currie*; *Rouquette* v. *Overmann*; *Bradlaugh* v. *De Rin*; *Trimbey* v. *Vignier*; *Story* on the Conflict of Laws (12).

The rule as to the costs of an unsuccessful appeal by a liquidator, who has already had the decision of the Court against him, does not apply to a claim resisted in the Court below, or proceedings taken by him to save the assets of the company: *Ex parte Bentley* (13).

The liquidator is not the real party to the proceedings, whether taken in his name or in that of the company. The real party is the company, and the company's assets are alone responsible for costs: *Ex parte Kintrea* (14).

(1) 1 Bing. N. C. 151.
(2) 6 Moo. P. C. 314.
(3) Law Rep. 1 C. P. 340.
(4) Ibid. 3 C. P. 538; Ibid. 5 C. P. 473.
(5) 1 Q. B. 43.
(6) Law Rep. 10 Q. B. 525.
(7) Page 350.
(8) 8th Ed. s. 314, p. 438.
(9) Law Rep. 9 Ch. 355, 358.
(10) Ibid. 479.
(11) 6 App. Cas. 482.
(12) 8th Ed. s. 316 b, p. 445.
(13) 12 Ch. D. 850.
(14) Law Rep. 5 Ch. 95.

The liquidator is only doing his duty in resisting these claims. It would be impossible for a liquidation to be properly carried out if each contested step was to be taken at the risk of personal liability.

PEARSON, J.

1885

SMALLPAGE'S
AND
BRANDON'S
CASES.

*Higgins* and *Cookson,* in reply.

June 9.  PEARSON, J.:—

The first objection taken to these bills was this, that being indorsed by M. *Barry* in *France* the indorsement by M. *Barry* in *France* did not comply with the laws of *France,* and with the 137th section of the *Code de Commerce,* and that inasmuch as that was informal the acceptors in this country are not liable, because the person who takes the bills and holds the bills at the present moment takes them through a person who derived them by means of this informal indorsement, and there is therefore no good title shewn to them in the hands of the present holder.

The first answer that is made to that is this: You, the acceptors, are an English company, you accepted the bills payable in *England,* the contract of acceptance therefore is an English contract, and all that it is necessary to shew is that there is an indorsement which is good according to the law of *England*; therefore as against you if there be such an indorsement there is no need whatever to trouble ourselves with the law of *France.*

Against this it is said, and with great force, that although the drawer of this bill was a Frenchman and the bill was drawn in *France,* nevertheless as against the acceptor the bill is an English bill, and it is not necessary to look at all to the formalities of the French law.  On the other hand it is urged by the acceptors,— although we are liable, according to the English law, upon our English contract of acceptance in *England,* nevertheless an indorsement made upon the bill drawn by a French drawer, must be in conformity with the law of *France,* otherwise there is no good indorsement at all.  If I had to decide the question as to whether or not where a bill is indorsed in different countries the indorsement must be in every case in conformity with the law of the

CHANCERY DIVISION.            [VOL. XXX.

PEARSON, J.  country in which the indorsement takes place, I should certainly
1885        take time to consider before I came to the conclusion that that
SMALLPAGE'S  was the law.    But, for the reasons I am about to give, I think it
AND         absolutely immaterial in the present case to decide that point,
BRANDON'S    because, when I come to look at this bill, I find that the bill
CASES.      though drawn in the French language, drawn by M. *Barry* in
           *Marseilles,* is in all other respects an English bill of exchange.
           It speaks of English current money and not of French current
           money, and it is drawn in a form which according to the French
           law would make the bill itself an invalid bill.

   Before therefore I could determine that this was to be considered
a French bill, as regards the drawer of the bill, I should have to
come to the conclusion that at the time when this bill was
drawn it was an invalid bill altogether, and to do so would be, to
my mind to decide that which would be, on the face of it, mani-
festly absurd.    This is a bill purporting to be, on the face of
it, in all respects drawn as an English bill, not drawn in the
French form though in the French language, drawn according to
the common form in *England, valeur reçu*—that is value received—
and perfectly good according to the law of *England,* though
invalid according to the law of *France,* and I come therefore to
the conclusion that this was intended to be, although expressed
in the French language, an English bill of exchange for all pur-
poses, at all events as regards the acceptors of the bill ; and that
it is not possible for the acceptors of the bill to say that this is a
French bill drawn in *France,* and that, so far as regards the
drawer, it must be considered therefore as a French bill.

   In one of the cases that was cited, *Trimbey* v. *Vignier* (1),
where the same question arose, there was an opinion given by the
French advocate, M. *Schonda,* upon which I should be exceed-
ingly pleased to act if I properly could.    The opinion of the
French advocate simply proved to the Court at that time, as evi-
dence in that case, what the French law was, as a matter of fact,
and I cannot import into this case the evidence given in another
case which has not been given in the present case.    M. *Schonda*
gives an interpretation of this article of the *Code de Commerce*

                    (1) 1 Bing. N. C. 151.

which to my mind is exceedingly intelligible, and which I should
be very glad to adopt as the rule of law in this case. He says
that when there is an informality of this kind in the indorsement
of a bill of exchange, that informality may be pleaded as between
the person who has made the indorsement and the person who is
claiming under the indorsement, but that it cannot be set up as
between the indorsee and the acceptor. But in the present case,
as I have said, it is not necessary for me to decide that that is the
rule which ought to be laid down. I hold that as between the
drawer, and therefore as between his indorsee and the acceptors,
this was intended to be, and to be treated as, an English bill of
exchange, and that being so, the indorsement which M. *Barry*
made was, to all intents and purposes, a good indorsement.
Upon the evidence of the French experts before me, I should
have very great difficulty in saying what the law of *France* was
with regard to the indorsement, but I think I should come to the
conclusion, upon the evidence in this case (so far as I have heard
it), that the indorsement made the bills negotiable according to
the law of *France*. Whether that was so or not, I hold that this
bill, at all events, was properly indorsed by M. *Barry* by merely
writing his name across it in the ordinary way in which a bill
would be indorsed in this country, and that, as between M. *Barry*
and all persons claiming under him, so far as the indorsement
goes, it was a good indorsement, and the acceptors therefore
could raise no objection to it.

I am glad to be able to come to that conclusion, because it
relieves me from that which certainly would have been a very
serious difficulty, that of determining upon the decided cases in
these Courts, as well as upon the French law, what is the result
of an indorsement (which is informal as regards the person who
makes it) with regard to those who claim, not against that person,
but who claim against the acceptors. To my mind there is ex-
ceeding difficulty in determining that the indorsement is to be
valid for any purpose in this country, and yet that objection may
be taken to it, and that the acceptor is at liberty to say, I am
entitled in this country, although for some purposes the indorse-
ment is treated as good, to take advantage of any equities that
there may be between myself and the drawer of the bill as against

PEARSON, J.

1885

SMALLPAGE'S
AND
BRANDON'S
CASES.

PEARSON, J.

1885

SMALLPAGE'S
AND
BRANDON'S
CASES.

an indorsee or holder for value who sues upon the acceptance. I am not bound, I am happy to say, to go into that question at all. I feel very strongly the observations of the late Mr. Justice *Willes* in the case of *Bradlaugh* v. *De Rin* (1), in which he points out that it is hardly possible to conceive a state of the law in this country in which there should be two persons able to sue at the same time on the same bill, one as the agent, and the other as the holder of the bill.

However, the facts being as they are, I come to the conclusion, and I so decide, that the indorsement of this bill is a good indorsement, and that the acceptors are liable, so far as the indorsement goes, to be sued and are bound to pay upon the bill if they have no other objection.

With regard to the costs, of course the applicants must have their costs. But in giving them I treat the company as if they were the Respondents, and give the costs against the company. I am asked to make the liquidator personally pay costs and leave him to get them out of the assets of the company if he can. If the practice of the Court shall be changed, and I am told by the Court of Appeal that all liquidators who resist any claim are to be made personally responsible for costs, I shall bow to the authority, as I shall bow to any other decision that may be made by a superior Court. But as far as I know the practice, the practice has not been to make the liquidator liable. And I conceive that it might render it almost impossible to wind up any company if such a practice were to be established, because the result would be, that except in cases where the assets were very large indeed, no liquidator would choose to resist a claim brought against a company, without the authority of the Judge, and without being indemnified from all personal liability for costs in case of the claim being successful. I cannot imagine how any Judge at Chambers is to deal with an application for such authority, and tell the liquidator whether he is to resist a claim or whether he is to bring forward a claim, or to determine before a claim is argued whether or not the liquidator ought or ought not to be indemnified. It seems to me that such a practice would simply tie up all proceedings in Chambers, and make all windings-up in this

(1) Law Rep. 3 C. P. 543.

Court absolutely impossible. In one view it may be thought it might be desirable that that should be so; but until windings-up are stopped, and as long as they are going on, I think the only reasonable way they should go on is this, that the liquidator should be considered to represent the company, and that the costs should be given in the same way in which they would be given if the company were defendants, leaving the Court the authority which it now possesses in all proper cases if the liquidator disregards his duty, and throws upon the parties costs which he ought not to throw upon them, to make the liquidator personally responsible for such dereliction of his duty.

The costs in this case will come out of the assets of the company.

Solicitors: *Mercer & Mercer; G. S. & H. Brandon; C. & S. Harrison & Co.*

D. P.

*PEARSON, J.*

*1885*

SMALLPAGE'S
AND
BRANDON'S
CASES.

---

## *In re* ATKINSON.
## ATKINSON *v.* BRUCE.

### [1885 A. 473.]

*PEARSON, J.*

*1885*

*June 25.*

*Settled Land—Tenant for Life—Persons having Powers of Tenant for Life—Discretionary Trust for Application of Income during Life—Forfeiture in Event of Bankruptcy—Settled Land Act, 1882 (45 & 46 Vict. c. 38), s. 2, sub-ss. 5, 6, 10, cl. i., 51, 58, sub-s. 1, cls. vi. ix.*

The words "entitled to possession of settled land for his life," as used in sub-sect. 5 of sect. 2 of the *Settled Land Act, 1882,* means entitled "in possession" as distinguished from entitled "in reversion," and the words in sub-sect. 6, "two or more persons so entitled as tenants in common, or as joint tenants," mean entitled "for life."

A testator devised real estate to the use of trustees in fee during the life of his son, on trust to receive the rents, and, after payment of costs and outgoings, to hold the residue of the rents upon the trusts thereinafter mentioned. And after the death of the son, to the use of his first and other sons successively in tail male, with remainders over. And the testator directed that his trustees should during the life of the son pay and apply the residue of the rents which should during his life become payable to them in such manner in all respects as they should think best for the maintenance, or otherwise for the benefit of the son and of his wife and his child or children, or for the benefit of any one or more of them, and so

[HOUSE OF LORDS.]

WILLIAM DERRY, J. C. WAKEFIELD, M. M. MOORE, J. PETHICK, AND S. J. WILDE . . . . . . . . .  } APPELLANTS;

H. L. (E.)
1889
*July 1.*

AND

SIR HENRY WILLIAM PEEK, BARONET.    RESPONDENT.

*Action of Deceit—False Representation—Fraud—" Legal Fraud "—Company—Misrepresentation in Prospectus.*

In an action of deceit the plaintiff must prove actual fraud. Fraud is proved when it is shewn that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it be true or false.

A false statement, made through carelessness and without reasonable ground for believing it to be true, may be evidence of fraud but does not necessarily amount to fraud. Such a statement, if made in the honest belief that it is true, is not fraudulent and does not render the person making it liable to an action of deceit.

A special Act incorporating a tramway company provided that the carriages might be moved by animal power, and, with the consent of the Board of Trade, by steam power. The directors issued a prospectus containing a statement that by their special Act the company had the right to use steam power instead of horses. The plaintiff took shares on the faith of this statement. The Board of Trade afterwards refused their consent to the use of steam power and the company was wound up. The plaintiff having brought an action of deceit against the directors founded upon the false statement :—

*Held,* reversing the decision of the Court of Appeal and restoring the decision of Stirling J. (37 Ch. D. 541), that the defendants were not liable, the statement as to steam power having been made by them in the honest belief that it was true.

APPEAL from a decision of the Court of Appeal. The facts are set out at length in the report of the decisions below (1). For the present report the following summary will suffice :—

By a special Act (45 & 46 Vict. c. clix.) the Plymouth, Devonport and District Tramways Company was authorized to make certain tramways.

(1) 37 Ch. D. 541.

H. L. (E.)

1889

DERRY

*v.*

PEEK.

By sect. 35 the carriages used on the tramways might be moved by animal power and, with the consent of the Board of Trade, by steam or any mechanical power for fixed periods and subject to the regulations of the Board.

By sect. 34 of the Tramways Act 1870 (33 & 34 Vict. c. 78), which section was incorporated in the special Act, "all carriages used on any tramway shall be moved by the power prescribed by the special Act, and where no such power is prescribed, by animal power only."

In February 1883 the appellants as directors of the company issued a prospectus containing the following paragraph :—

"One great feature of this undertaking, to which considerable importance should be attached, is, that by the special Act of Parliament obtained, the company has the right to use steam or mechanical motive power, instead of horses, and it is fully expected that by means of this a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses."

Soon after the issue of the prospectus the respondent, relying, as he alleged, upon the representations in this paragraph and believing that the company had an absolute right to use steam and other mechanical power, applied for and obtained shares in the company.

The company proceeded to make tramways, but the Board of Trade refused to consent to the use of steam or mechanical power except on certain portions of the tramways.

In the result the company was wound up, and the respondent in 1885 brought an action of deceit against the appellants claiming damages for the fraudulent misrepresentations of the defendants whereby the plaintiff was induced to take shares in the company.

At the trial before Stirling J. the plaintiff and defendants were called as witnesses. The effect given to their evidence in this House will appear from the judgments of noble and learned Lords.

Stirling J. dismissed the action; but that decision was reversed by the Court of Appeal (Cotton L.J., Sir J. Hannen, and Lopes L.J.) who held that the defendants were liable to make good to the plaintiff the loss sustained by his taking the shares,

e 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 376 of 2
Page ID #:2434

and ordered an inquiry (1).  Against this decision the defen-
dants appealed.

    March 28, 29; April 5, 9, 11.  Sir *Horace Davey* Q.C. and
*Moulton* Q.C. (*M. Muir Mackenzie* with them) for the appellants :—

    The law as laid down by the Court of Appeal goes much
further than any previous decision and is unsound.  To support
an action of deceit it always was necessary at common law and
still is both there and in Chancery to prove fraud, i.e., that the
thing was done fraudulently.  Fraud never has been and never
will be exhaustively defined, the forms which deceit may take
being so many and various.  There is a negative characteristic :
it must be something which an honest man would not do ; not
merely what a logical or clear-headed man would not do.  How-
ever unbusinesslike a man may be he is not fraudulent if he acts
honestly.  The natural consequences of words or acts must be
taken to have been intended, but not so as to impute fraud to
honesty.  No honest mistake, no mistake not prompted by a dis-
honest intention, is fraud.  The shape of the mistake does not
make it more or less a fraud if it is a mistake.  Once establish
that a man honestly intended to do his duty, the consequences
cannot turn his words or acts into a fraud.  There may be an
obligation to see that no untrue statement is made, but the failure
to meet that obligation is not fraud, if there is no dishonest
intention.  The statement may be inaccurate, yet if the defendants
honestly—though mistakenly—believed that it substantially
represented the truth, there is no fraud, and an action of deceit
will not lie.  The decision of the Court of Appeal is that to such
a statement the law attaches a meaning which makes it fraudulent.
A material misstatement may be a ground for rescinding the
contract, but the consequences of fraud and of breach of contract
are widely different.  In an action for breach of contract the
defendant must make good his words.  In an action founded on
fraud he must bear the whole of the consequences which have
been induced by the fraudulent statement, which may be very
extensive.  The essence of fraud is the tricking a person into
the bargain.  If the fact that the consent of the Board of Trade

H. L. (E.)

1889

Derry
*v.*
Peek.

                (1) 37 Ch. D. 541, 591.

HOUSE OF LORDS                      [VOL. XIV.

H. L. (E.)

1889

DERRY
v.
PEEK.

was necessary was suppressed by these defendants in order to make the bait more alluring there was fraud. The issue then is one of fact, was there an intention to make the bait more alluring? It is not the carelessness leading to an untrue statement which makes fraud; it is the carelessness whether the statement is untrue or not. It is in this sense that the authorities have held defendants liable for fraud when they have made untrue statements "recklessly." The above propositions are the result of the authorities. The law laid down in the earlier cases is well exemplified by *Taylor* v. *Ashton* (1), where, however, the headnote does not truly represent the effect of the decision, and *Joliffe* v. *Baker* (2). In *Polhill* v. *Walter* (3)—which may be relied on by the respondent—the Court considered that the misrepresentation was made by the defendant *knowing it to be untrue.* The idea that something less than fraud was necessary to found an action of deceit crept in first in Lord Chelmsford's observations in *Western Bank of Scotland* v. *Addie* (4), and was extended by Cotton L.J. in *Weir* v. *Bell* (5), where he treats "recklessly" as if it meant "negligently," whereas it means "indifferent whether the statement be true or false." This confusion has arisen mainly since the Judicature Act, actions of deceit being tried in Chancery by judges who, sitting without juries, have confounded issues of fact with issues of law. Here the Court of Appeal held that an action of deceit lies if the defendant makes an untrue statement, without reasonable ground for believing it to be true, though he did in fact honestly believe it to be true. If that be the law a negligent, improvident, or wrong-headed man is a fraudulent man. A want of reasonable ground may be evidence of fraud, but it is not the same thing as fraud.

As to the facts, Stirling J. found that the defendants believed the misstatement to be true, and that finding ought to be conclusive. The Court of Appeal do not contradict that finding.

The misstatement complained of really meant that the company had obtained the necessary statutory authority to use steam power, without which authority no consents could have given

authority, because by the Tramways Act 1870 (33 & 34 Vict. c. 78 s. 34) steam power is prohibited except where the special Act authorizes steam power. It may be that the defendants knew the statement was not strictly accurate, but if so they honestly thought that the statement conveyed a substantially accurate representation of the fact, either because they thought it not worth while to encumber the prospectus with the qualifications, or because those qualifications were not present to their minds when they made the statement. In the prospectus reference is made to the special Act, so that any one who consulted the Act could see for himself what the authority was.

H. L. (E.)
1889
DERBY
v.
PEEK.

Lastly, the plaintiff was no doubt in some degree influenced by the misstatement, but there was no evidence that he would not have taken the shares if the statement had contained the full truth as to the necessary consents being obtained.

*Bompas* Q.C., and *Byrne* Q.C. (*Patullo* with them) for the respondent :—

The decision of the Court of Appeal is right and for the reasons there given. Directors are liable not only for a false statement which they know to be false, but for a false statement which they ought to have known to be false. This proposition is supported by the obiter dictum of Lord Westbury in *New Brunswick &c. Co.* v. *Conybeare* (1), and by the obiter dicta of the Lords in *Peek* v. *Gurney* (2) as to what the liability of the defendants would have been to original shareholders, and by the judgment of Jessel M.R. in *Smith* v. *Chadwick* (3).

It is not necessary that there should be carelessness whether the statement is true or not: it is enough if there be carelessness or negligence in making the statement. Making an untrue statement without reasonable ground is negligence which will support an action of deceit. In support of the respondent's contention the following authorities are relied on: *Slim* v. *Croucher* (4); *Evans* v. *Bicknell* (5); *Brownlie* v. *Campbell* (6); *Polhill* v. *Walter* (7); *Milne* v. *Marwood* (8); *Denton* v. *Great*

(1) 9 H. L. C. 725, 726.
(2) Law Rep. 6 H. L. 377.
(3) 20 Ch. D. 44.
(4) 1 D. F. & J. 518, 523.
(5) 6 Ves. at p. 183.
(6) 5 App. Cas. 925, 935, 950.
(7) 3 B. & Ad. 114.
(8) 15 C. B. 778, 781.

342                    .HOUSE OF LORDS                [VOL. XIV.

H. L. (E.)
1889
DERRY
v.
PEEK.

*Northern Railway Company* (1); *Thorn* v. *Bigland* (2); *Smout* v. *Ilbery* (3); *Rawlins* v. *Wickham* (4); *Hallows* v. *Fernie* (5); *Mathias* v. *Yetts* (6); *Smith* v. *Chadwick* (7); *Pasley* v. *Freeman* (8); *Chandelor* v. *Lopus* (9). [LORD HALSBURY L.C. referred to *Haycraft* v. *Cressy* (10).]

But it is not necessary to go the full length of the propositions contended for. Even if the fourth proposition of Lopes L.J. is not law, the appellants are nevertheless liable; for the evidence shews that the statements were made either with the knowledge that they were untrue or with no belief on the subject.

It was stated that it was fully expected that a considerable saving would be effected by the use of steam. In fact the directors had not considered the matter, and when they did so afterwards there was a majority of one only in favour of steam. The effect of the evidence is not the same as to all the directors. As to Derry, the inference is that he never took the trouble to consider whether the statement was true or false. Wakefield and Wilde had complete knowledge but made statements which they knew not to be true at the time, thinking the requisite consents would be given. Pethick's evidence is inconsistent with itself. At one moment he says that he thought the Board of Trade had no right to refuse consent if its reasonable requirements were met, at another that he thought they had an absolute right to refuse. Moore, it must be admitted, stands in a different position, and can only be held liable under the fourth proposition of Lopes L.J.

The respondents are entitled to judgment on the grounds accepted by Lord Cranworth in *Western Bank of Scotland* v. *Addie* (11) and by the Earl of Selborne in *Smith* v. *Chadwick* (12): The belief which would justify the appellants must be one founded on an exercise of judgment. Grounds which would be sufficient in some cases would not be so in others, where uberrima fides is required, e.g. in statements made to an intending partner. As

(1) 25 L. J. (Q.B.) 129.
(2) 8 Ex. 725.
(3) 10 M. & W. 1, 10.
(4) 3 D. & J. 304, 312.
(5) Law Rep. 3 Ch. 467.
(6) 46 L. T. (N.S.) 497, 502.
(7) 20 Ch. D. 27, 44.
(8) 2 Sm. L. C., 9th ed. p. 74.
(9) 1 Ibid. p. 186.
(10) 2 East, 92.
(11) Law Rep. 1 H. L. (Sc.) 145, 164.
(12) 9 App. Cas. 187, 190.

to the duty of a director to persons about to take shares in a
company, see *New Brunswick and Canada Railway Company* v.
*Muggeridge* (1) and *Henderson* v. *Lacon* (2).

H. L. (E.)

1889

DERBY
*v.*
PEEK.

The House took time for consideration, LORD HALSBURY L.C.
saying that notice would be given to the appellants if their
Lordships desired to hear a reply.

*July* 1.  LORD HALSBURY L.C. :—

My Lords, I have so recently expressed an opinion in the
Court of Appeal on the subject of actions of this character that
I do not think it necessary to do more than say that I adhere to
what I there said (3).   To quote the language now some centuries
old in dealing with actions of this character, "fraud without
damage or damage without fraud" does not give rise to such
actions.   I have had also the opportunity of reading the judg-
ment of my noble and learned friend Lord Herschell, and I could
desire to add nothing to his exhaustive and lucid treatment of
the authorities.

My Lords, when I turn to the question of fact I confess I am
not altogether satisfied.   In the first place I think the state-
ment in the prospectus was untrue,—untrue in fact, and to the
minds of such persons as were likely to take shares I think well
calculated to mislead.   I think such persons would have no idea
of the technical division between tramways that had rights to use
mechanical means and tramways that had not.   What I think
they would understand would be that this particular tramway
was in an exceptionably advantageous position,—that the state-
ment was of a present existing fact, that it had at the time of
the invited subscription for shares the right to use steam.   And
I think such a statement if wilfully made with the consciousness
of its inaccuracy would give rise to an action for deceit, provided
that damage had been sustained if a person had acted upon a
belief induced by such a prospectus.

But upon the question whether these statements were made
with a consciousness of their misleading character, I cannot but

(1) 1 Dr. & S. 363, 381.            (2) Law Rep. 5 Eq. 249.
          (3) See *Arnison* v. *Smith*, 41 Ch. D. 348, 367.

H. L. (E.)

1889

DERBY

*v.*

PEEK.

Lord Halsbury,
L.C.

be influenced by the opinions entertained by so many of your Lordships that they are consistent with the directors' innocence of any intention to deceive.

The learned judge who saw and heard the witnesses acquitted the defendants of intentional deceit, and although the Court of Appeal held them liable, overruling the decision of the learned judge below, they appear to me to have justified their decision upon grounds which I do not think tenable, namely, that they, the directors, were liable because they had no reasonable ground for the belief which nevertheless it is assumed they sincerely entertained.

My Lords, I think it would have been satisfactory to have had a more minute and exact account of how this prospectus was framed, the actual evidence of the draftsman of it, and the discussions which took place upon the alteration in form; which alteration gave such marked and peculiar prominence to the special feature of this particular tramway, in respect of the possession of power to use steam. Nevertheless, if, as I have said, the facts are reconcilable with the innocence of the directors, and with the absence of the mens rea which I consider an essential condition of an action for deceit, the mere fact of the inaccuracy of the statement ought not to be pressed into constituting a liability which appears to me not to exist according to the law of England.

As to the question whether Sir Henry Peek was induced to take his shares by reliance on the misleading statement, I admit that I have very considerable doubt. On the one hand I do not believe that any one can so far analyse his mental impressions as to be able to say what particular fact in a prospectus induced him to subscribe. On the other hand the description of Sir Henry Peek, even now that the question has been pointedly raised and brought to his mind, of what did or did not induce him to take his shares is hardly reconcilable with his having been substantially induced by the statement in question to take them.

On the whole I acquiesce in the judgment which one of your Lordships is about to move, namely, that the judgment appealed from be reversed.

LORD WATSON :—

 My Lords, I agree with Stirling J. that, as matter of fact, the appellants did honestly believe in the truth of the representation upon which this action of deceit is based. It is by no means clear that the learned judges of the Court of Appeal meant to differ from that conclusion ; but they seem to have held that a man who makes a representation with the view of its being acted upon, in the honest belief that it is true, commits a fraud in the eye of the law, if the court or a jury shall be of opinion that he had not reasonable grounds for his belief. I have no hesitation in rejecting that doctrine, for which I can find no warrant in the law of England. But I shall not trouble your Lordships with any observations of mine, because I accept without reserve the opinion about to be delivered by my noble and learned friend upon my left (Lord Herschell).

LORD BRAMWELL :—

 My Lords, I am of opinion that this judgment should be reversed. I am glad to come to this conclusion ; for, as far as my judgment goes, it exonerates five men of good character and conduct from a charge of fraud, which, with all submission, I think wholly unfounded, a charge supported on such materials as to make all character precarious. I hope this will not be misunderstood ; that promoters of companies will not suppose that they can safely make inaccurate statements with no responsibility. I should much regret any such notion ; for the general public is so at the mercy of company promoters, sometimes dishonest, sometimes over sanguine, that it requires all the protection that the law can give it. Particularly should I regret if it was supposed that I did not entirely disapprove of the conduct of those directors who accepted their qualification from the contractor or intended contractor. It is wonderful to me that honest men of ordinary intelligence cannot see the impropriety of this. It is obvious that the contractor can only give this qualification because he means to get it back in the price given for the work he is to do. That price is to be fixed by the directors who have taken his money. They are paid by him to give

H. L. (E.)
1889
DERRY
v.
PEEK.
Lord Bramwell.

him a good price, as high a price as they can, while their duty to
their shareholders is to give him one as low as they can.

But there is another thing.  The public, seeing these names,
may well say, " These are respectable and intelligent men who
think well enough of this scheme to adventure their money in
it; we will do the same," little knowing that those thus trusted
had made themselves safe against loss if the thing turned out ill,
while they might gain if it was successful.  I am glad to think
that Mr. Wilde, a member of my old profession, was not one of
those so bribed.  The only shade of doubt I have in the case is,
that this safety from loss in the directors may have made them
less careful in judging of the truth of any statements they have
made.

There is another matter I wish to dispose of before going into
the particular facts of the case.  I think we need not trouble
ourselves about "legal fraud," nor whether it is a good or bad
expression; because I hold that actual fraud must be proved in
this case to make the defendants liable, and, as I understand,
there is never any occasion to use the phrase " legal fraud "
except when actual fraud cannot be established.  " Legal fraud "
is only used when some vague ground of action is to be resorted
to, or, generally speaking, when the person using it will not
take the trouble to find, or cannot find, what duty has been
violated or right infringed, but thinks a claim is somehow made
out.  With the most sincere respect for Sir J. Hannen I cannot
think the expression "convenient."  I do not think it is "an
explanation which very clearly conveys an idea;" at least, I am
certain it does not to my mind.  I think it a mischievous phrase,
and one which has contributed to what I must consider the
erroneous decision in this case.  But, with these remarks, I have
done with it, and will proceed to consider whether the law is not
that actual fraud must be proved, and whether that has been done.

Now, I really am reluctant to cite authorities to shew that
actual fraud must be established in such a case as this.  It is one
of the first things one learned, and one has never heard it
doubted until recently.  I am very glad to think that my noble
and learned friend (Lord Herschell) has taken the trouble to go
into the authorities fully; but to some extent I deprecate it,

because it seems to me somewhat to come within the principle
Qui s'excuse s'accuse.   When a man makes a contract with
another he is bound by it; and, in making it, he is bound not to
bring it about by fraud.   Warrantizando vendidit gives a cause
of action if the warranty is broken.   Knowingly and fraudulently
stating a material untruth which brings about, wholly or partly,
the contract, also gives a cause of action.   To this may now be
added the equitable rule (which is not in question here), that a
material misrepresentation, though not fraudulent, may give a
right to avoid or rescind a contract where capable of such rescis-
sion.   To found an action for damages there must be a contract
and breach, or fraud.   The statement of claim in this case states
fraud.   Of course that need not be proved merely because it is
stated.   But no one ever heard of or saw a statement of claim or
declaration for deceit without it.   There is not an authority at
common law, or by a common law lawyer, to the contrary; none
has been cited, though there may be some incautious, hesitating,
expressions which point that way.   Every case from the earliest
in Comyns' Digest to the present day alleges it.   Further, the
learned judges of the Court of Appeal hardly deny it.   There is
indeed an opinion to the contrary of the late Master of the
Rolls, but it must be remembered that his knowledge of actions
of deceit was small, if any.   I did not think, then, that it was
necessary to cite cases to shew that to maintain this action
fraud in the defendant must be shewn, though I am glad it has
been done.

Now, as to the evidence.   The plaintiff's case is that the
defendants made an untrue statement, which they knew to be
untrue, and likely to influence persons reading it; therefore they
were fraudulent.   It is not necessary to consider whether a
primâ facie case was made out by the plaintiff.   We have all
the evidence before us, and must judge on the whole.   The
alleged untrue statement is that, " The company has the right to
use steam or mechanical power instead of horses," and that a
saving would be thereby effected.   Now, this is certainly untrue,
because it is stated as an absolute right, when in truth it was
conditional on the approval of the Board of Trade, and the sanc-
tion or consent of two local boards; and a conditional right is

H. L. (E.)

·1889

DERRY
v.
PEEK.

Lord Bramwell.

348                                HOUSE OF LORDS                    [VOL. XIV.

H. L. (E.)      not the same as an absolute right.  It is also certain that the
1889        defendants knew what the truth was, and therefore knew that
DERRY        what they said was untrue.  But it does not follow that the
*v.*          statement was fraudulently made.  There are various kinds of
PEEK.        untruth.  There is an absolute untruth, an untruth in itself,
Lord Bramwell.   that no addition or qualification can make true ; as, if a man says
            a thing he saw was black, when it was white, as he remembers
            and knows.  So, as to *knowing* the truth.  A man may know it,
            and yet it may not be present to his mind at the moment of
            speaking ; or, if the fact is present to his mind, it may not occur
            to him to be of any use to mention it.  For example, suppose a
            man was asked whether a writing was necessary in a contract for
            the making and purchase of goods, he might well say "Yes,"
            without adding that payment on receipt of the goods, or part,
            would suffice.  He might well think that the question he was
            asked was whether a contract for goods to be made required a
            writing like a contract for goods in existence.  If he was writing
            on the subject he would, of course, state the exception or quali-
            fication.

            Now, consider the case here.  These directors naturally trust
            to their solicitors to prepare their prospectus.  It is prepared and
            laid before them.  They find the statement of their power to use
            steam without qualification.  It does not occur to them to alter
            it.  They swear they had no fraudulent intention.  At the very
            last they cannot see the fraud.  There is their oath, their previous
            character unimpeached, and there is to my mind this further
            consideration : the truth would have served their purpose as well.
            "We have power to use steam, etc., of course with the usual con-
            ditions of the approval of the Board of Trade and the consent
            of the local authorities, but we may make sure of these being
            granted, as the Board of Trade has already allowed the power to
            be inserted in the Act, and the local authorities have expressed
            their approbation of the scheme."  (See plaintiff's answer, 313 (1),
            which shews that he would have been content with that state-
            ment.)

            During the argument I said I am not sure that I should
            not have passed the prospectus.  I will not say so now, because

                (1) The references are to the Appendix printed for the House.

certainly I would not pass it now after knowing the unfortunate use made of the statement, and no one can tell what would have been the state of his mind if one of the factors influencing it was wanting.   But I firmly believe it might have been, and was, honestly done by these defendants.   Stirling J. saw and heard them, and was of that opinion.   It is difficult to say that the plaintiff was not.   The report of the 6th of November 1884 shewed that the consent of the Board of Trade was necessary, shewed also that the corporation of Devonport would not consent, shewed therefore the " untruth " and the defendants' knowledge of it, and yet the plaintiff " had every confidence in the directors ; " and see his answers to questions 53 and 365.

I now proceed to consider the judgments that have been delivered.   It is not necessary to declare my great respect for those who have delivered them.   Stirling J. refuses to say whether actual fraud must be shewn, and deals with the case on the footing that the question is whether the defendants had reasonable grounds for making the statement they did.   He holds, as I do, that they thought the company had the right, as put in the prospectus, to use steam.   Then he says he must " come to the conclusion that they had reasonable grounds for their belief ; at all events, that their grounds were not so unreasonable as to justify me in charging them with being guilty of fraud."   It is singular that the learned judge seems to consider that unreasonableness must be proved to such an extent as to shew fraud.   He then proceeds, for what seem to me unanswerable reasons, to shew that they did every one believe that they had the right stated in the prospectus.   He refers to what he saw of them in the box. He says he cannot come to the conclusion that their belief was so unreasonable and so unfounded, and their proceedings so reckless or careless that they ought to be fixed with the consequences of deceit.   He makes an excellent remark, that " mercantile men dealing with matters of business would be the first to cry out if I extended the notion of deceit into what is honestly done in the belief that these things would come about, and when they did not come about, make them liable in an action of fraud." My only variation of this would be that it may be that the objection did not, and naturally did not, occur to them.   It has

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Bramwell.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Bramwell.

not been argued, and I will say no more on the question, whether had the plaintiff known the contents of the Act he would or would not have applied for the shares, than that I agree with Stirling J.

Cotton L.J. says the law is "that where a man makes a statement to be acted on by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is without any reasonable ground for believing it to be true," he is liable to an action for deceit. Well, I agree to all before the "that is" and I agree to what comes after if it is taken as equivalent to what goes before, viz., "recklessly or without care whether it is true or false," understanding "recklessly" as explained by "without care whether it is true or false." For a man who makes a statement without care and regard for its truth or falsity commits a fraud. He is a rogue. For every man who makes a statement says "the truth is so and so, and I know it or believe it." I say I agree to this as I understand it.

It seems to me, with great respect, that the learned Lord Justice lost sight of his own definition, and glided into a different opinion. He says (p. 451, F.), "There is a duty cast upon a director who makes that statement to take care that there are no statements in it which in fact are false; to take care that he has reasonable ground for the material statements which are contained in that document (prospectus), which he intends to be acted on by others. And although in my opinion it is not necessary there should be what I should call fraud, there must be a departure from duty, . . . and he has violated the right which those who receive the statement have to have true statements only made to them." This seems to be a most formidable matter. I agree there is some such duty. I agree that not only directors in prospectuses, but all persons in all dealings should tell the truth. If they do not they furnish evidence of fraud; they subject themselves to have the contract rescinded. But to say that there is "a right to have true statements only made," I cannot agree, and I think it would be much to be regretted if there was any such right. Mercantile men, as Stirling J. says, would indeed cry out. No qualification is stated.

H. L. (E.)

1889

DERBY
v.
PEEK.

Lord Bramwell.

If this is law the statement may be reasonably believed to be true by him who makes it, but if untrue there is to be a cause of action; and that although he may have refused a warranty. I hope not. There is a duty to tell the truth, or, rather, what is believed to be the truth. At page 452, B., his Lordship says: " Where a man makes a false statement without reasonable ground to suppose it to be true, and without taking care to ascertain if it is true, he is liable civilly as much as a person who commits what is usually called fraud." I say I agree if that means making a statement of which he knows or believes not the truth. His Lordship proceeds to examine whether the defendants had reasonable ground for believing what they said, and comes to the conclusion that they had not, and so holds them liable, not because they were dishonest, but because they were unreasonable. I say they never undertook to be otherwise. He says (461 G.): " It is not that I attribute to them any intention to commit fraud, but they have made a statement without any sufficient reason for believing it to be true."

Sir James Hannen says that he agrees with Cotton L.J.'s statement of the law, and adds: " If a man takes upon himself to assert a thing to be true, which he does not know to be true, and has no reasonable ground to believe to be true," it is sufficient in an action of deceit. I agree, if he knows he has no such reasonable ground and the knowledge is present to his mind; otherwise, with great respect, I differ. He cites Lord Cairns (465 F.), that, " if persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue, they must in a civil point of view be held as responsible as if they had asserted that which they knew to be untrue." So say I, but this does not support Sir James's proposition. Nor does he deal with what he quotes from Lord Cranworth. But further (466), he speaks of legal fraud as meaning " that degree of moral culpability in the statement of an untruth to induce another to alter his position, to which the law attaches responsibility." But if there is moral culpability, I agree there is responsibility. But to believe without reasonable grounds is not moral culpability, but, (if there is such a thing) mental culpability. He says, " the word ' fraud ' is in common parlance reserved for actions of great turpitude, but

H. L. (E.)
1889.
DERRY
v.
PEEK.

Lord Bramwell.

the law applies it to lesser breaches of moral duty." I agree the law applies it to all breaches of the moral duty to tell the truth in dealing with others; but that duty cannot be honestly broken. To be actionable, a breach of that duty must be dishonest. Nay, it is a man's duty sometimes to tell an untruth. For instance, when asked as to a servant's character, he must say what he believes is the truth, however he may have formed his opinion, and however wrong it may be. His Lordship says he cannot think the directors had any reasonable ground for believing the prospectus to be true. But had they the matter present to their minds? Even if this were the question I should decide in their favour.

As to the judgment of Lopes L.J., I quite agree with what he says: " I know of no fraud which will support an action of deceit to which some moral delinquency does not belong." I think that shews the meaning of what he says " fourthly," though that is made doubtful by what he says at 472 D.

I think, with all respect, that in all the judgments there is, I must say it, a confusion of unreasonableness of belief as evidence of dishonesty, and unreasonableness of belief as of itself a ground of action.

I have examined these judgments at this length owing to my sense of their importance and the importance of the question they deal with. I think it is most undesirable that actions should be maintainable in respect of statements, made unreasonably perhaps, but honestly. I think it would be disastrous if there was " a right to have true statements only made." This case is an example. I think that in this kind of case, as in some others, Courts of Equity have made the mistake of disregarding a valuable general principle in their desire to effect what is, or is thought to be, justice in a particular instance. It might, perhaps, be well to enact that in prospectuses of public companies there should be a warranty of the truth of all statements except where it was expressly said there was no warranty. The objection is to exceptional legislation, and to the danger of driving respectable and responsible men from being promoters, and of substituting for them those who are neither.

In this particular case I hold that unless fraud in the defendants could be shewn, the action is not maintainable. I am

AND PRIVY COUNCIL.

satisfied there was no fraud.   Further, if an unreasonable mis-statement were enough, I hold there was none.   Still further, I do not believe that the plaintiff was influenced by the mis-statement, though I am entirely satisfied that he was an honest witness.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

LORD FITZGERALD :—

My Lords, the pleadings and the facts have been already referred to by the noble Lords who have addressed the House. The action is for deceit.   The writ was sued out in February 1885, and originally claimed rescission of the contract with the company.   It was subsequently amended by striking out the company as defendants, and also the prayer for rescission, and it assumed the character of an action for deceit against the present appellants (five of the directors), and claimed "damages for the fraudulent misrepresentations of the defendants."

The statement of claim, which is sufficient in form to raise the real question, alleged the misrepresentation to exist in the prospectus issued in February 1883, and to consist of the paragraph so often read, that the company had a right to use steam or other mechanical motive power; and it was further alleged "that the defendants intended thereby to represent that the company had an absolute right to use steam and other mechanical power," and that such representation was made fraudulently, and with the view to induce the plaintiff to take shares in the company.

So far, my Lords, the real issue seems to have been raised fairly and clearly, and to depend on matters of fact.   There were circumstances connected with the promotion of the company, and the procuring of four of the defendants to act as directors, which tended to create suspicion as to their statements and their bona fides, and attracted directly the attention of the learned judge before whom the case was tried.   The defendants, who were severally produced as witnesses at the trial, were exposed to a very lengthened and searching cross-examination by counsel for the plaintiff, and were also carefully examined by the judge as to these transactions, with the result apparently of freeing them from any imputation therein of moral misconduct.

The question which I am about to examine in the first in-

3        2 B

HOUSE OF LORDS    [VOL. XIV.

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord FitzGerald.

stance, and excluding for the present the element of fraud, is, whether the impugned statement in the prospectus was a false statement in the sense of being untrue. That it was inaccurate so far as it purported to give the legal effect of the special Act I do not doubt, but was it untrue as representing the position of the company in a popular and business sense? The General Tramways Act (33 & 34 Vict. c. 78), which regulates tramways generally, but subject to the provisions of the special Act, if any, of each company, places them under the supervision of the Board of Trade with a view to public safety, and for public protection generally, and by its 34th section it provides "that all carriages used on tramways shall be moved by the power prescribed by the special Act."

The special Act of this company became law on the 24th of July 1882, and by ss. 4 and 5 the company incorporated by the Act is empowered to make the seven tramways in question in all respects in accordance with the plans and sections. Sect. 15 provides minutely for their formation, subject to the orders of the Board of Trade, and by sect. 16 the tramway is not to be opened for public traffic until it shall have been inspected and certified by the Board of Trade to be fit for such traffic.

Before referring to the 35th section of the special Act we may glance at sect. 37 of that Act, which empowers the Board of Trade to make bye-laws as to any of the tramways on which steam may be used under the authority of the Act, and sect. 44, which provides that where the company intends to use steam they shall give two months' notice.

There are several other sections providing for the use of steam power if the company should elect to use it as the motor.

In the light of those sections of the special Act, and of sect. 34 of the general Act, let us now look at the particular paragraph of the prospectus, and sect. 35 of the special Act. By that section Parliament has done that which Parliament could do, and which the Board of Trade could not do. It has conferred on the company authority to use steam as its motive power. It has not imposed on the company the use of steam power, but it says that they may use it if they elect to do so. Before dealing with the consent of the Board of Trade I desire to call attention

to the proviso in the 35th section, "that the exercise of the powers hereby conferred with respect to the use of steam shall be subject to the regulations in Schedule 'A,' and to any regulations which may be added thereto or substituted therefor by the Board of Trade for securing to the public all reasonable protection against danger in the exercise of the powers by this Act conferred with respect to the use of steam."

<div style="text-align:right">

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord FitzGerald.

</div>

Schedule A., referred to in sect. 35, contains no less than ten regulations for the direction of the company in the exercise of the right so conferred to use steam power.

Now, turning back to the words "with the consent of the Board of Trade," in sect. 35 of the special Act, that consent could not confer, nor would its absence take away, the right conferred by the legislature to use steam as a motor. Its true character is that of a precaution imposed by the legislature to defer the actual exercise of the right conferred until the supervision of the Board of Trade secures to the public all reasonable protections against danger. To attain these objects the legislature provides that the powers it has conferred should not be actually exercised without the consent of the Board of Trade.

My Lords, I have, though with difficulty, arrived at the conclusion that the statement in the prospectus, that by the special Act the company had the right to use steam power, was not untrue in a popular or business sense.

Let us see for a moment in what way and with what meaning General Hutchinson used similar expressions. In his report of the 12th of July 1884 he says: "The Act of 1882 gives, however, the company authority to use mechanical power over all their system, and I think it would be most objectionable that this power should be exercised on parts of Tramway No. 1 on account of the narrowness of three of the roads."

The remainder of the incriminated paragraph of the prospectus is, "and it is fully expected that by means of this (i.e., the use of steam) a considerable saving will result in the working expenses of the line as compared with other tramways worked by horses." This was not untrue: there had been a division of opinion in the directory on the subject, which was finally and before the issue of the prospectus resolved in favour of steam.

<div style="text-align:center">

3        2 B 2

</div>

H. L. E.)
1889
DERRY
*v.*
PEEK.
Lord FitzGerald.

The conclusion I have arrived at, my Lords, is that this paragraph of the prospectus, though inaccurate in point of law in one particular, seems on the whole to have been morally true.

If this view is correct it is an answer to the action, but assuming that it is not correct, or that your Lordships are not prepared to adopt it, I proceed to express my opinion on the remaining substance of the action. Cotton L.J. describes the action as " an action of deceit, a mere common law action." The description is accurate, and I proceed to deal with it as a mere common law action. It has not been in the least altered in its characteristics by having been instituted in the Chancery Division, or tried by a judge without the aid of a jury, nor are your Lordships necessarily driven to consider on the present appeal some of the subtle and refined distinctions which have been engrafted on the clear and simple principles of the common law. The action for deceit at common law is founded on fraud. It is essential to the action that moral fraud should be established, and since the case of *Collins* v. *Evans* (1), in the Exchequer Chamber, it has never been doubted that fraud must concur with the false statement to maintain the action. It would not be sufficient to shew that a false representation had been made. It must further be established that the defendant knew at the time of making it that the representation was untrue, or, to adopt the language of the learned editors of the Leading Cases, that " the defendant must be shewn to have been actually and fraudulently cognisant of the falsehood of his representation or to have made it fraudulently without belief that it was true." The leading counsel for the respondent met the argument fairly on the allegations of fact. He alleged " that the defendants were not honest ; that they stated in the prospectus a definite lie, and knew that it was a lie." That is the very issue, in fact, in the case.

The whole law and all the cases on the subject will be found in the notes to *Chandelor* v. *Lopus* (2) and *Pasley* v. *Freeman* (3). There is also a clear and able summary of the decisions, both in law and in equity, brought down to the present time in the recent edition of Benjamin on Sales, by Pearson-Gee and Boyd.

(1) 5 Q. B. 804, 820.          (2) 1 Smith's L. C. 9th Ed. p. 186.
          (3) 2 Smith's L. C. 9th Ed. p. 74.

I desire to make an observation on *Chandelor* v. *Lopus* (1). The report in Cro. Jac. 4 would seem to have but little direct bearing on the present case were it not for the opinion attributed to Anderson J.; but there is a valuable note in 1 Dyer by Vaillant (75a) which is as follows: Lopus brought an action upon the case against Chandelor, and shewed that, whereas the defendant was a goldsmith, and skilled in the nature of precious stones, and being possessed of a stone which the defendant asserted and assured the said plaintiff to be a true and perfect stone called a bezoar stone &c., upon which the plaintiff bought it &c.   There the opinion of Popham C.J. was "that if I have any commodities which are damaged (whether victuals or otherwise), and I, *knowing them to be so,* sell them for good, and affirm them to be so, an action upon the case lies for the deceit: but although they be damaged, if I, *knowing not that,* affirm them to be good, still no action lies, without I warrant them to be good."   The action seems originally to have been on a warranty which failed in fact, as there had been no warranty, and it was then sought to support it as an action for deceit; but it was not alleged in the count that the defendant knew the representation to be untrue.   It was in reference to that that the observation of Popham C.J. was made.   He had the reputation of being a consummate lawyer.

The note in 1 Dyer (75a) was probably by Mr. Treby, afterwards Chief Justice Treby.   He edited an edition of Dyer published in 1688.   I have not had an opportunity of referring to it, but it is said that he gave the public some highly authoritative notes in that edition.   I have quoted from Mr. Vaillant's edition, published in 1794.

The whole evidence given on this appeal has been laid before your Lordships, and we have to deal with it as a whole.   That evidence has been already so fully stated and criticised that it is not necessary for me to do more than to state the conclusions of fact which in my opinion are reasonably to be deduced from it, viz. that the several defendants did not know that the incriminated statement in the prospectus was untrue, and that, on the contrary, they severally and in good faith believed it to be

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord FitzGerald.

(1) 1 Smith's L. C. 9th Ed. p. 186.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord FitzGerald.

true.  The conclusions, in fact, at which I have arrived, render it unnecessary for me to consider the long and rather bewildering list of authorities to which your Lordships were referred, or to criticise the reasons given in the Court of Appeal for their decision in the present case.  I desire, however, to make a single observation.

There is one characteristic which, as it seems to me, pervades each of the several judgments in the Court of Appeal, viz. that the bonâ fide belief of the defendants in the truth of the representation was unavailing unless it was a reasonable belief resting on reasonable grounds.  If this is correct, it seems to me that in an action for "deceit" it would be necessary to submit to the jury (if tried before that tribunal) not only the existence of that belief bonâ fide, but also the grounds on which it was arrived at, and their reasonableness.

I am by no means satisfied that such is the law, and if now driven to express an opinion on it, I would prefer following the opinion of Lord Cranworth in *Western Bank of Scotland* v. *Addie* (1), in which he said: "I confess that my opinion was that in what his Lordship (the Lord President) thus stated, he went beyond what principle warrants.  If persons in the situation of directors of a bank make statements as to the condition of its affairs, which they bonâ fide believe to be true, I cannot think they can be guilty of fraud, because other persons think, or the Court thinks, or your Lordships think, that there was no sufficient ground to warrant the opinion which they had formed. If a little more care and caution must have led the directors to a conclusion different from that which they put forth, this may afford strong evidence to shew that they did not really believe in the truth of what they stated, and so that they were guilty of fraud.  But this would be the consequence, not of their having stated as true what they had not reasonable ground to believe to be true, but of their having stated as true what they did not believe to be true."

A director is bound in all particulars to be careful and circumspect, and not, either in his statements to the public or in the performance of the duties he has undertaken, to be careless

(1) Law Rep. 1 H. L., Sc. 145, 168.

or negligent, or rash. Want of care or circumspection, as well
as recklessness, may in such a case as the present be taken into
consideration in determining at every stage the question of
bona fides.

My Lords, I am of opinion that the decision of the Court of
Appeal should be reversed.

LORD HERSCHELL :—

My Lords, in the statement of claim in this action the respon-
dent, who is the plaintiff, alleges that the appellants made in
a prospectus issued by them certain statements which were
untrue, that they well knew that the facts were not as stated in
the prospectus, and made the representations fraudulently, and
with the view to induce the plaintiff to take shares in the
company.

"This action is one which is commonly called an action of
deceit, a mere common law action." This is the description of
it given by Cotton L.J. in delivering judgment. I think it
important that it should be borne in mind that such an action
differs essentially from one brought to obtain rescission of a
contract on the ground of misrepresentation of a material fact.
The principles which govern the two actions differ widely.
Where rescission is claimed it is only necessary to prove that
there was misrepresentation ; then, however honestly it may have
been made, however free from blame the person who made it,
the contract, having been obtained by misrepresentation, cannot
stand. In an action of deceit, on the contrary, it is not enough
to establish misrepresentation alone ; it is conceded on all hands
that something more must be proved to cast liability upon the
defendant, though it has been a matter of controversy what
additional elements are requisite. I lay stress upon this because
observations made by learned judges in actions for rescission
have been cited and much relied upon at the bar by counsel for
the respondent. Care must obviously be observed in applying
the language used in relation to such actions to an action of
deceit. Even if the scope of the language used extend beyond
the particular action which was being dealt with, it must be
remembered that the learned judges were not engaged in deter-

H. L. (E.)

1889

DERRY
v.
PEEK.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

mining what is necessary to support an action of deceit, or in discriminating with nicety the elements which enter into it.

There is another class of actions which I must refer to also for the purpose of putting it aside. I mean those cases where a person within whose special province it lay to know a particular fact, has given an erroneous answer to an inquiry made with regard to it by a person desirous of ascertaining the fact for the purpose of determining his course accordingly, and has been held bound to make good the assurance he has given. *Burrowes* v. *Lock* (1) may be cited as an example, where a trustee had been asked by an intended lender, upon the security of a trust fund, whether notice of any prior incumbrance upon the fund had been given to him. In cases like this it has been said that the circumstance that the answer was honestly made in the belief that it was true affords no defence to the action. Lord Selborne pointed out in *Brownlie* v. *Campbell* (2) that these cases were in an altogether different category from actions to recover damages for false representation, such as we are now dealing with.

One other observation I have to make before proceeding to consider the law which has been laid down by the learned judges in the Court of Appeal in the case before your Lordships. " An action of deceit is a common law action, and must be decided on the same principles, whether it be brought in the Chancery Division or any of the Common Law Divisions, there being, in my opinion, no such thing as an equitable action for deceit." This was the language of Cotton L.J. in *Arkwright* v. *Newbould* (3). It was adopted by Lord Blackburn in *Smith* v. *Chadwick* (4), and is not, I think, open to dispute.

In the Court below Cotton L.J. said : " What in my opinion is a correct statement of the law is this, that where a man makes a statement to be acted upon by others which is false, and which is known by him to be false, or is made by him recklessly, or without care whether it is true or false, that is, without any reasonable ground for believing it to be true, he is liable in an action of deceit at the suit of anyone to whom it was addressed or anyone of the class to whom it was addressed and who was

(1) 10 Ves. 470.                    (3) 17 Ch. D. 320.
(2) 5 App. Cas. at p. 935.          (4) 9 App. Cas. 193.

H. L. (E.)

1889

DERRY

*v.*

PEEK.

Lord Herschell.

materially induced by the misstatement to do an act to his pre-
judice." About much that is here stated there cannot, I think,
be two opinions. But when the learned Lord Justice speaks of
a statement made recklessly or without care whether it is true or
false, *that is* without any reasonable ground for believing it to be
true, I find myself, with all respect, unable to agree that these are
convertible expressions. To make a statement careless whether
it be true or false, and therefore without any real belief in its
truth, appears to me to be an essentially different thing from
making, through want of care, a false statement, which is never-
theless honestly believed to be true. And it is surely conceiv-
able that a man may believe that what he states is the fact,
though he has been so wanting in care that the Court may
think that there were no sufficient grounds to warrant his belief.
I shall have to consider hereafter whether the want of reasonable
ground for believing the statement made is sufficient to support
an action of deceit. I am only concerned for the moment to
point out that it does not follow that it is so, because there is
authority for saying that a statement made recklessly, without
caring whether it be true or false, affords sufficient foundation
for such an action.

That the learned Lord Justice thought that if a false statement
were made without reasonable ground for believing it to be true
an action of deceit would lie, is clear from a subsequent passage
in his judgment. He says that when statements are made in a
prospectus like the present, to be circulated amongst persons in
order to induce them to take shares, "there is a duty cast upon
the director or other person who makes those statements to take
care that there are no expressions in them which in fact are false ;
to take care that he has reasonable ground for the material state-
ments which are contained in that document which he prepares
and circulates for the very purpose of its being acted upon by
others."

The learned judge proceeds to say : " Although in my opinion
it is not necessary that there should be what I should call fraud,
yet in these actions, according to my view of the law, there must
be a departure from duty, that is to say, an untrue statement
made without any reasonable ground for believing that statement

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

to be true; and in my opinion when a man makes an untrue state-
ment with an intention that it shall be acted upon without any
reasonable ground for believing that statement to be true he
makes a default in a duty which was thrown upon him from the
position he has taken upon himself, and he violates the right
which those to whom he makes the statement have to have true
statements only made to them."

Now I have first to remark on these observations that the
alleged "right" must surely be here stated too widely, if it is
intended to refer to a legal right, the violation of which may
give rise to an action for damages. For if there be a right to
have true statements only made, this will render liable to an
action those who make untrue statements, however innocently.
This cannot have been meant. I think it must have been
intended to make the statement of the right correspond with
that of the alleged duty, the departure from which is said to be
making an untrue statement without any reasonable ground for
believing it to be true. I have further to observe that the Lord
Justice distinctly says that if there be such a departure from
duty an action of deceit can be maintained, though there be not
what he should call fraud. I shall have by-and-by to consider
the discussions which have arisen as to the difference between
the popular understanding of the word "fraud" and the inter-
pretation given to it by lawyers, which have led to the use of
such expressions as "legal fraud," or "fraud in law;" but I may
state at once that, in my opinion, without proof of fraud no action
of deceit is maintainable. When I examine the cases which have
been decided upon this branch of the law, I shall endeavour
to shew that there is abundant authority to warrant this pro-
position.

I return now to the judgments delivered in the Court of
Appeal. Sir James Hannen says: "I take the law to be that if
a man takes upon himself to assert a thing to be true which he
does not know to be true, and has no reasonable ground to believe
to be true, in order to induce another to act upon the asser-
tion, who does so act and is thereby damnified, the person so
damnified is entitled to maintain an action for deceit." Again,
Lopes L.J. states what, in his opinion, is the result of the

cases.  I will not trouble your Lordships with quoting the first
three propositions which he lays down, although I do not feel
sure that the third is distinct from, and not rather an instance of,
the case dealt with by the second proposition.  But he says that
a person making a false statement, intended to be and in fact
relied on by the person to whom it is made, may be sued by the
person damaged thereby : " Fourthly, if it is untrue in fact, but
believed to be true, but without any reasonable grounds for such
belief."

It will thus be seen that all the learned judges concurred in
thinking that it was sufficient to prove that the representations
made were not in accordance with fact, and that the person
making them had no reasonable ground for believing them.
They did not treat the absence of such reasonable ground as
evidence merely that the statements were made recklessly, care-
less whether they were true or false, and without belief that they
were true, but they adopted as the test of liability, not the exist-
ence of belief in the truth of the assertions made, but whether
the belief in them was founded upon any reasonable grounds.
It will be seen, further, that the Court did not purport to be
establishing any new doctrine.  They deemed that they were
only following the cases already decided, and that the proposi-
tion which they concurred in laying down was established by
prior authorities.  Indeed, Lopes L.J. expressly states the law in
this respect to be well settled.  This renders a close and critical
examination of the earlier authorities necessary.

I need go no further back than the leading case of *Pasley* v.
*Freeman* (1).  If it was not there for the first time held that an
action of deceit would lie in respect of fraudulent representations
against a person not a party to a contract induced by them, the
law was at all events not so well settled but that a distinguished
Judge, Grose J., differing from his brethren on the Bench,
held that such an action was not maintainable.  Buller J.,
who held that the action lay, adopted in relation to it the lan-
guage of Croke J., in 3 Bulstrode 95, who said : " Fraud without
damage, or damage without fraud, gives no cause of action, but
where these two concur an action lies."  In reviewing the case

(1) 2 Smith's L. C. 74.

H. L. (E.)
1889
DERBY
*v.*
PEEK.
Lord Herschell.

364                                HOUSE OF LORDS                    [VOL. XIV.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell,

of *Crosse* v. *Gardner* (1) he says: "Knowledge of the falsehood
of the thing asserted is fraud and deceit;" and further, after
pointing out that in *Risney* v. *Selby* (2) the judgment proceeded
wholly on the ground that the defendant knew what he asserted
to be false, he adds: "The assertion alone will not maintain the
action, but the plaintiff must go on to prove that it was false,
*and that the defendant knew it to be so*," the latter words being
specially emphasised. Kenyon C.J. said: "The plaintiffs applied
to the defendant, telling him that they were going to deal with
Falch, and desired to be informed of his credit, when the defen-
dant fraudulently, and knowing it to be otherwise, and with a
design to deceive the plaintiffs, made the false affirmation stated
on the record, by which they sustained damage. Can a doubt be
entertained for a' moment but that this is injurious to the
plaintiffs?" In this case it was evidently considered that fraud
was the basis of the action, and that such fraud might consist
in making a statement known to be false.

*Haycraft* v. *Creasy* (3) was again an action in respect of a false
affirmation made by the defendant to the plaintiff about the
credit of a third party whom the plaintiff was about to trust.
The words complained of were, " I can assure you of my own know-
ledge that you may credit Miss R. to any amount with perfect
safety." All the judges were agreed that fraud was of the essence
of the action, but they differed in their view of the conclusion to
be drawn from the facts. Lord Kenyon thought that fraud had
been proved, because the defendant stated that to be true within
his own knowledge which he did not know to be true. The other
judges thinking that the defendant's words vouching his own
knowledge were no more than a strong expression of opinion,
inasmuch as a statement concerning the credit of another can be
no more than a matter of opinion, and that he did believe the
lady's credit to be what he represented, held that the action
would not lie. It is beside the present purpose to inquire which
view of the facts was the more sound. Upon the law there
was no difference of opinion. It is a distinct decision that know-
ledge of the falsity of the affirmation made is essential to the

(1) Carth. 90.                              (2) 1 Salk. 211.
                    (3) 2 East, 92.

maintenance of the action, and that belief in its truth affords a
defence.

I may pass now to *Foster* v. *Charles* (1). It was there con-
tended that the defendant was not liable, even though the repre-
sentation he had made was false to his knowledge, because he
had no intention of defrauding or injuring the plaintiff. This
contention was not upheld by the Court, Tindal C.J. saying:
" It is fraud in law if a party makes representations which he
knows to be false, and injury ensues, although the motives from
which the representations proceeded may not have been bad."
This is the first of the cases in which I have met with the expres-
sion " fraud in law." It was manifestly used in relation to the
argument that the defendant was not actuated by a desire to
defraud or injure the person to whom the representation was
made. The popular use of the word " fraud " perhaps involves
generally the conception of such a motive as one of its elements.
But I do not think the Chief Justice intended to indicate any
doubt that the act which he characterised as a fraud in law was
in truth fraudulent as a matter of fact also. Wilfully to tell a
falsehood, intending that another shall be led to act upon it as if
it were the truth, may well be termed fraudulent, whatever the
motive which induces it, though it be neither gain to the person
making the assertion nor injury to the person to whom it is
made.

*Foster* v. *Charles* (1) was followed in *Corbett* v. *Brown* (2), and
shortly afterwards in *Polhill* v. *Walter* (3). The learned counsel
for the respondent placed great reliance on this case, because
although the jury had negatived the existence of fraud in fact the
defendant was nevertheless held liable. It is plain, however, that
all that was meant by this finding of the jury was, that the defen-
dant was not actuated by any corrupt or improper motive, for Lord
Tenterden says, " It was contended that . . . in order to maintain
this species of action it is not necessary to prove that the false
representation was made from a corrupt motive of gain to the
defendant or a wicked motive of injury to the plaintiff; it was
said to be enough if a representation is made which the party

<div style="text-align: right">
H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Herschell.
</div>

(1) 7 Bing. 105.          (2) 8 Bing. 33.
        (3) 3 B. & Ad. 114.

H. L. (E.)
1889
DERRY
*v.*
PEEK.

Lord Herschell.

making it knows to be untrue, and which is intended by him, or which from the mode in which it is made is calculated, to induce another to act on the faith of it in such a way as that he may incur damage, and that damage is actually incurred. A wilful falsehood of such a nature was contended to be in the legal sense of the word *a fraud,* and for this position was cited *Foster* v. *Charles* (1), to which may be added the recent case of *Corbett* v. *Brown* (2). The principle of these cases appears to us to be well founded, and to apply to the present."

In a later case of *Crawshay* v. *Thompson* (3) Maule J. explains *Polhill* v. *Walter* (4) thus : " If a wrong be done by a false representation of a party who knows such representation to be false, the law will infer an intention to injure. That is the effect of *Polhill* v. *Walter* " (4). In the same case, Cresswell J. defines " fraud in law," in terms which have been often quoted. " The cases," he says, " may be considered to establish the principle that fraud in law consists in knowingly asserting that which is false in fact to the injury of another."

In *Moens* v. *Heyworth* (5), which was decided in the same year as *Crawshay* v. *Thompson* (3), Lord Abinger having suggested that an action of fraud might be maintained where no moral blame was to be imputed, Parke B. said : " To support that count (viz., a count for fraudulent representation) it was essential to prove that the defendants *knowingly* " (and I observe that this word is emphasised), " by words or acts, made such a representation as is stated in the third count, relative to the invoice of these goods, as they knew to be untrue."

The next case in the series, *Taylor* v. *Ashton* (6), is one which strikes me as being of great importance. It was an action brought against directors of a bank for fraudulent representations as to its affairs, whereby the plaintiff was induced to take shares. The jury found the defendants not guilty of fraud, but expressed the opinion that they had been guilty of gross negligence. Exception was taken to the mode in which the case was left to the jury, and it was contended that their verdict was sufficient

|  |  |
|---|---|
| (1) 7 Bing. 105. | (4) 3 B. & Ad. 114. |
| (2) 8 Bing. 33. | (5) 10 M. & W. at p. 157. |
| (3) 4 M. & Gr. 357. | (6) 11 M. & W. 401. |

to render the defendants liable; Parke B., however, in delivering the opinion of the Court said: " It is insisted that even that (viz., the gross negligence which the jury had found), accompanied with a damage to the plaintiff in consequence of that gross negligence, would be sufficient to give him a right of action. From this proposition we entirely dissent, because we are of opinion that, independently of any contract between the parties, no one can be made responsible for a representation of this kind unless it be *fraudulently made*. . . . But then it was said that in order to constitute that fraud, it was not necessary to shew that the defendants *knew* the fact they stated to be untrue, that it was enough that the fact *was* untrue if they communicated that fact for a deceitful purpose, and to that proposition the Court is prepared to assent. It is not necessary to shew that the defendants knew the facts to be untrue; if they stated a fact which was untrue for a fraudulent purpose, they at the same time *not believing* that fact to be true, in that case it would be both a legal and moral fraud."

Now it is impossible to conceive a more emphatic declaration than this, that to support an action of deceit fraud must be proved, and that nothing less than fraud will do. I can find no trace of the idea that it would suffice if it were shewn that the defendants had not reasonable grounds for believing the statements they made. It is difficult to understand how the defendants could, in the case on which I am commenting, have been guilty of gross negligence in making the statements they did, if they had reasonable grounds for believing them to be true, or if they had taken care that they had reasonable grounds for making them.

All the cases I have hitherto referred to were in courts of first instance. But in *Collins* v. *Evans* (1) they were reviewed by the Exchequer Chamber. The judgment of the Court was delivered by Tindal C.J. After stating the question at issue to be " whether a statement or representation which is false in fact, but not known to be so by the party making it, but, on the contrary, made honestly and in the full belief that it is true, affords a ground of action," he proceeds to say : " The current of

(1) 5 Q. B. 804, 820.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

the authorities, from *Pasley* v. *Freeman* (1) downwards, has laid down the general rule of law to be, that fraud must concur with the false statement in order to give a ground of action." Is it not clear that the Court considered that fraud was absent if the statement was "made honestly, and in the full belief that it was true"?

In *Evans* v. *Edmonds* (2) Maule J. expressed an important opinion, often quoted, which has been thought to carry the law further than the previous authorities, though I do not think it really does so. He said: " If a man having no knowledge whatever on the subject takes upon himself to represent a certain state of facts to exist he does so at his peril, and if it be done either with a view to secure some benefit to himself or to deceive a third person he is in law guilty of a fraud, for he takes upon himself to warrant his own belief of the truth of that which he so asserts. Although the person making the representation may have no knowledge of its falsehood the representation may still have been fraudulently made." The foundation of this proposition manifestly is, that a person making any statement which he intends another to act upon must be taken to warrant his belief in its truth. Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it *knows*, yet at least that he *believes* it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true.

I now arrive at the earliest case in which I find the suggestion that an untrue statement made without reasonable ground for believing it will support an action for deceit. In *Western Bank of Scotland* v. *Addie* (3) the Lord President told the jury " that if a case should occur of directors taking upon themselves to put forth in their report statements of importance in regard to the affairs of the bank false in themselves and which they did not believe, or had no reasonable ground to believe to be true, that would be a misrepresentation and deceit." Exception having been taken to this direction without avail in the Court of Session, Lord Chelmsford in this House said : " I agree in the propriety of this

(1) 2 Smith's L. C. 74.          (2) 13 C. B. 777.
(3) Law Rep. 1 H. L., Sc. 145, 162.

interlocutor.  In the argument upon this exception the case was put of an honest belief being entertained by the directors, of the reasonableness of which it was said the jury, upon this direction, would have to judge.  But supposing a person makes an untrue statement which he asserts to be the result of a bonâ fide belief in its truth, how can the bona fides be tested except by considering the grounds of such belief?  And if an untrue statement is made founded upon a belief which is destitute of all reasonable grounds, or which the least inquiry would immediately correct, I do not see that it is not fairly and correctly characterised as misrepresentation and deceit."

I think there is here some confusion between that which is evidence of fraud, and that which constitutes it.  A consideration of the grounds of belief is no doubt an important aid in ascertaining whether the belief was really entertained.  A man's mere assertion that he believed the statement he made to be true is not accepted as conclusive proof that he did so.  There may be such an absence of reasonable ground for his belief as, in spite of his assertion, to carry conviction to the mind that he had not really the belief which he alleges.  If the learned Lord intended to go further, as apparently he did, and to say that though the belief was really entertained, yet if there were no reasonable grounds for it, the person making the statement was guilty of fraud in the same way as if he had known what he stated to be false, I say, with all respect, that the previous authorities afford no warrant for the view that an action of deceit would lie under such circumstances.  A man who forms his belief carelessly, or is unreasonably credulous, may be blameworthy when he makes a representation on which another is to act, but he is not, in my opinion, fraudulent in the sense in which that word was used in all the cases from *Pasley* v. *Freeman* (1) down to that with which I am now dealing.  Even when the expression " fraud in law " has been employed, there has always been present, and regarded as an essential element, that the deception was wilful either because the untrue statement was known to be untrue, or because belief in it was asserted without such belief existing.

<div align="right">H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.</div>

(1) 2 Smith's L. C. 74.

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Herschell.

I have made these remarks with the more confidence because they appear to me to have the high sanction of Lord Cranworth. In delivering his opinion in the same case he said: "I confess that my opinion was that in what his Lordship (the Lord Presi- dent) thus stated, he went beyond what principle warrants. If persons in the situation of directors of a bank make statements as to the condition of its affairs which they bonâ fide believe to be true, I cannot think they can be guilty of fraud because other persons think, or the Court thinks, or your Lordships think, that there was no sufficient ground to warrant the opinion which they had formed. If a little more care and caution must have led the directors to a conclusion different from that which they put forth, this may afford strong evidence to shew that they did not really believe in the truth of what they stated, and so that they were guilty of fraud. But this would be the consequence not of their having stated as true what they had not reasonable ground to believe to be true, but of their having stated as true what they did not believe to be true."

Sir James Hannen, in his judgment below, seeks to limit the application of what Lord Cranworth says to cases where the statement made is a matter of opinion only. With all deference I do not think it was intended to be or can be so limited. The direction which he was considering, and which he thought went beyond what true principle warranted, had relation to making false statements of importance in regard to the affairs of the bank. When this is borne in mind, and the words which follow those quoted by Sir James Hannen are looked at, it becomes to my mind obvious that Lord Cranworth did not use the words " the opinion which they had formed " as meaning anything different from " the belief which they entertained."

The opinions expressed by Lord Cairns in two well-known cases have been cited as though they supported the view that an action of deceit might be maintained without any fraud on the part of the person sued. I do not think they bear any such construction. In the case of *Reese Silver Mining Co.* v. *Smith* (1) he said : " If persons take upon themselves to make assertions as to which they are ignorant whether they are true or untrue

(1) Law Rep. 4 H. L. 64, 79.

they must, in a civil point of view, be held as responsible as if
they had asserted that which they knew to be untrue." This
must mean that the persons referred to were conscious when
making the assertion that they were ignorant whether it was
true or untrue. For if not it might be said of any one who
innocently makes a false statement. He must be ignorant that
it is untrue, for otherwise he would not make it innocently; he
must be ignorant that it is true, for by the hypothesis it is false.
Construing the language of Lord Cairns in the sense I have
indicated, it is no more than an adoption of the opinion expressed
by Maule J. in *Evans* v. *Edmonds* (1). It is a case of the
representation of a person's belief in a fact when he is conscious
that he knows not whether it be true or false, and when he has
therefore no such belief. When Lord Cairns speaks of it as not
being fraud in the more invidious sense, he refers, I think, only
to the fact that there was no intention to cheat or injure.

In *Peek* v. *Gurney* (2) the same learned Lord, after alluding to
the circumstance that the defendants had been acquitted of fraud
upon a criminal charge, and that there was a great deal to shew
that they were labouring under the impression that the concern
had in it the elements of a profitable commercial undertaking,
proceeds to say: "They may be absolved from any charge of a
wilful design or motive to mislead or defraud the public. But
in a civil proceeding of this kind all that your Lordships have
to examine is the question, was there, or was there not, misrepre-
sentation in point of fact? If there was, however innocent the
motive may have been, your Lordships will be obliged to arrive
at the consequences which properly would result from what was
done." In the case then under consideration it was clear that
if there had been a false statement of fact it had been knowingly
made. Lord Cairns certainly could not have meant that in an
action of deceit the only question to be considered was whether
or not there was misrepresentation in point of fact. All that he
there pointed out was that in such a case motive was immaterial:
that it mattered not that there was no design to mislead or
defraud the public if a false representation were knowingly made.
It was therefore but an affirmation of the law laid down in *Foster*

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

(1) 13 C. B. 777.                    (2) Law Rep. 6 H. L. 377, 409.

372                    HOUSE OF LORDS            [VOL. XIV.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

v. *Charles* (1), *Polhill* v. *Walter* (2), and other cases I have already referred to.

I come now to very recent cases. In *Weir* v. *Bell* (3) Lord Bramwell vigorously criticised the expression "legal fraud," and indicated a very decided opinion that an action founded on fraud could not be sustained except by the proof of fraud in fact. I have already given my reasons for thinking that, until recent times at all events, the judges who spoke of fraud in law did not mean to exclude the existence of fraud in fact, but only of an intention to defraud or injure.

In the same case Cotton L.J. stated the law in much the same way as he did in the present case, treating "recklessly" as equivalent to "without any reasonable ground for believing" the statements made.    But the same learned judge in *Arkwright* v. *Newbold* (4) laid down the law somewhat differently, for he said: "In an action of deceit the representation to found the action must not be innocent, that is to say, it must be made either with knowledge of its being false, or with a reckless disregard as to whether it is or is not true."    And his exposition of the law was substantially the same in *Edgington* v. *Fitzmaurice* (5).    In this latter case Bowen L.J. defined what the plaintiff must prove in addition to the falsity of the statement, as "secondly, that it was false to the knowledge of the defendants, or that they made it not caring whether it was true or false."

It only remains to notice the case of *Smith* v. *Chadwick* (6). The late Master of the Rolls there said, " A man may issue a prospectus or make any other statement to induce another to enter into a contract, believing that his statement is true, and not intending to deceive ; but he may through carelessness have made statements which are not true, and which he ought to have known were not true, and if he does so he is liable in an action for deceit ; he cannot be allowed to escape merely because he had good intentions, and did not intend to defraud." This, like everything else that fell from that learned judge, is worthy of respectful consideration.    With the last sentence I quite agree,

(1) 7 Bing. 105.                    (4) 17 Ch. D. 301.
(2) 3 B. & Ad. 114.               (5) 29 Ch. D. 459.
(3) 3 Ex. D. 238.                  (6) 20 Ch. D. 27, 44, 67.

AND PRIVY COUNCIL.                    373

but I cannot assent to the doctrine that a false statement made
through carelessness, and which ought to have been known to be
untrue, of itself renders the person who makes it liable to an
action for deceit.  This does not seem to me by any means
necessarily to amount to fraud, without which the action will not,
in my opinion, lie.

 It must be remembered that it was not requisite for Sir George
Jessel in *Smith* v. *Chadwick* (1) to form an opinion whether a state-
ment carelessly made, but honestly believed, could be the founda-
tion of an action of deceit.  The decision did not turn on any
such point.  The conclusion at which he arrived is expressed in
these terms: " On the whole I have come to the conclusion that
this, although in some respects inaccurate, and in some respects
not altogether free from imputation of carelessness, was a fair,
honest, and bonâ fide statement on the part of the defendants,
and by no means exposes them to an action for deceit."

 I may further note that in the same case, Lindley L.J. said :
" The plaintiff has to prove, first, that the misrepresentation was
made to him ; secondly, he must prove that it was false ; thirdly,
that it was false to the knowledge of the defendants, or at all
events that they did not believe the truth of it."  This appears
to be a different statement of the law to that which I have just
criticised, and one much more in accord with the prior decisions.

 The case of *Smith* v. *Chadwick* was carried to your Lordships'
House (2).  Lord Selborne thus laid down the law : " I conceive
that in an action of deceit it is the duty of the plaintiff to
establish two things: first, actual fraud, which is to be judged of
by the nature and character of the representations made, con-
sidered with reference to the object for which they were made,
the knowledge or means of knowledge of the person making
them, and the intention which the law justly imputes to every
man to produce those consequences which are the natural result
of his acts ; and secondly, he must establish that this fraud was
an inducing cause to the contract."  It will be noticed that the
noble and learned Lord regards the proof of actual fraud as
essential, all the other matters to which he refers are elements to
be considered in determining whether such fraud has been

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

(1) 20 Ch. D. 27, 44, 67.            (2) 9 App. Cas. 187, 190.

H. L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

established.  Lord Blackburn indicated that although he nearly agreed with the Master of the Rolls, that learned judge had not quite stated what he conceived to be the law.  He did not point out precisely how far he differed, but it is impossible to read his judgment in this case, or in that of *Brownlie* v. *Campbell* (1) without seeing that in his opinion proof of actual fraud or of a wilful deception was requisite.

Having now drawn attention, I believe, to all the cases having a material bearing upon the question under consideration, I proceed to state briefly the conclusions to which I have been led. I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice.  Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.  Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states.  To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth.  And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief.  Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial.  It matters not that there was no intention to cheat or injure the person to whom the statement was made.

I think these propositions embrace all that can be supported by decided cases from the time of *Pasley* v. *Freeman* (2) down to *Western Bank of Scotland* v. *Addie* (3) in 1867, when the first suggestion is to be found that belief in the truth of what he has stated will not suffice to absolve the defendant if his belief be based on no reasonable grounds.  I have shewn that this view was at once dissented from by Lord Cranworth, so that there was at the outset as much authority against it as for it.  And I have met with no further assertion of Lord Chelmsford's view until

(1) 5 App. Cas. 925.                    (2) 2 Smith's L. C. 74.
(3) Law Rep. 1 H. L., Sc. 145.

the case of *Weir* v. *Bell* (1), where it seems to be involved in
Lord Justice Cotton's enunciation of the law of deceit. But no
reason is there given in support of the view, it is treated as
established law. The dictum of the late Master of the Rolls,
that a false statement made through carelessness, which the
person making it ought to have known to be untrue, would sustain
an action of deceit, carried the matter still further. But that
such an action could be maintained notwithstanding an honest
belief that the statement made was true, if there were no reason-
able grounds for the belief, was, I think, for the first time decided
in the case now under appeal.

In my opinion making a false statement through want of care
falls far short of, and is a very different thing from, fraud, and
the same may be said of a false representation honestly believed
though on insufficient grounds. Indeed Cotton L.J. himself
indicated, in the words I have already quoted, that he should
not call it fraud. But the whole current of authorities, with
which I have so long detained your Lordships, shews to my mind
conclusively that fraud is essential to found an action of deceit,
and that it cannot be maintained where the acts proved cannot
properly be so termed. And the case of *Taylor* v. *Ashton* (2)
appears to me to be in direct conflict with the dictum of Sir
George Jessel, and inconsistent with the view taken by the
learned judges in the Court below. I observe that Sir Frederick
Pollock, in his able work on Torts (p. 243, note), referring, I pre-
sume, to the dicta of Cotton L.J. and Sir George Jessel M.R.,
says that the actual decision in *Taylor* v. *Ashton* (2) is not con-
sistent with the modern cases on the duty of directors of com-
panies. I think he is right. But for the reasons I have given
I am unable to hold that anything less than fraud will render
directors or any other persons liable to an action of deceit.

At the same time I desire to say distinctly that when a false
statement has been made the questions whether there were reason-
able grounds for believing it, and what were the means of know-
ledge in the possession of the person making it, are most weighty
matters for consideration. The ground upon which an alleged
belief was founded is a most important test of its reality. I can
conceive many cases where the fact that an alleged belief was

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

(1) 3 Ex. D. 238.                    (2) 11 M. & W. 401.

HOUSE OF LORDS            [VOL. XIV.

H. L. (E.)

1889

DERRY
*v.*
PEEK.

Lord Herschell.

destitute of all reasonable foundation would suffice of itself to convince the Court that it was not really entertained, and that the representation was a fraudulent one. So, too, although means of knowledge are, as was pointed out by Lord Blackburn in *Brownlie* v. *Campbell* (1), a very different thing from knowledge, if I thought that a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false.

I have arrived with some reluctance at the conclusion to which I have felt myself compelled, for I think those who put before the public a prospectus to induce them to embark their money in a commercial enterprise ought to be vigilant to see that it contains such representations only as are in strict accordance with fact, and I should be very unwilling to give any countenance to the contrary idea. I think there is much to be said for the view that this moral duty ought to some extent to be converted into a legal obligation, and that the want of reasonable care to see that statements, made under such circumstances, are true, should be made an actionable wrong. But this is not a matter fit for discussion on the present occasion. If it is to be done the legislature must intervene and expressly give a right of action in respect of such a departure from duty. It ought not, I think, to be done by straining the law, and holding that to be fraudulent which the tribunal feels cannot properly be so described. I think mischief is likely to result from blurring the distinction between carelessness and fraud, and equally holding a man fraudulent whether his acts can or cannot be justly so designated.

It now remains for me to apply what I believe to be the law to the facts of the present case. The charge against the defendants is that they fraudulently represented that by the special Act of Parliament which the company had obtained they had a right to use steam or other mechanical power instead of horses. The test which I purpose employing is to inquire whether the defendants knowingly made a false statement in this respect, or whether, on the contrary, they honestly believed what they stated to be a true and fair representation of the facts. Before considering whether the charge of fraud is proved, I may say that I

(1) 5 App. Cas. at p. 952.

approach the case of all the defendants, except Wilde, with the inclination to scrutinise their conduct with severity. They most improperly received sums of money from the promoters, and this unquestionably lays them open to the suspicion of being ready to put before the public whatever was desired by those who were promoting the undertaking. But I think this must not be unduly pressed, and when I find that the statement impeached was concurred in by one whose conduct in the respect I have mentioned was free from blame, and who was under no similar pressure, the case assumes, I think, a different complexion.

I must further remark that the learned judge who tried the cause, and who tells us that he carefully watched the demeanour of the witnesses and scanned their evidence, came without hesitation to the conclusion that they were witnesses of truth, and that their evidence, whatever may be its effect, might safely be relied on. An opinion so formed ought not to be differed from except on very clear grounds, and after carefully considering the evidence, I see no reason to dissent from Stirling J.'s conclusion. I shall therefore assume the truth of their testimony.

I agree with the Court below that the statement made did not accurately convey to the mind of a person reading it what the rights of the company were, but to judge whether it may nevertheless have been put forward without subjecting the defendants to the imputation of fraud, your Lordships must consider what were the circumstances. By the General Tramways Act of 1870 it is provided that all carriages used on any tramway shall be moved by the power prescribed by the special Act, and where no such power is prescribed, by animal power only (1). In order, therefore, to enable the company to use steam-power, an Act of Parliament had to be obtained empowering its use. This had been done, but the power was clogged with the condition that it was only to be used with the consent of the Board of Trade. It was therefore incorrect to say that the company had the right to use steam ; they would only have that right if they obtained the consent of the Board of Trade. But it is impossible not to see that the fact which would impress itself upon the minds of those connected with the company was that they had, after submitting

H. L. (E.)

1889

DERBY
*v.*
PEEK.

Lord Herschell.

(1) 33 & 34 Vict. c. 78, s. 34.

H L. (E.)
1889
DERRY
v.
PEEK.

Lord Herschell.

the plans to the Board of Trade, obtained a special Act empowering the use of steam. It might well be that the fact that the consent of the Board of Trade was necessary would not dwell in the same way upon their minds, if they thought that the consent of the Board would be obtained as a matter of course if its requirements were complied with, and that it was therefore a mere question of expenditure and care. The provision might seem to them analogous to that contained in the General Tramways Act, and I believe in the Railways Act also, prohibiting the line being opened until it had been inspected by the Board of Trade and certified fit for traffic, which no one would regard as a condition practically limiting the right to use the line for the purpose of a tramway or railway. I do not say that the two cases are strictly analogous in point of law, but they may well have been thought so by business men.

I turn now to the evidence of the defendants. I will take first that of Mr. Wilde, whose conduct in relation to the promotion of the company is free from suspicion. He is a member of the Bar and a director of one of the London tramway companies. He states that he was aware that the consent of the Board of Trade was necessary, but that he thought that such consent had been practically given, inasmuch as, pursuant to the Standing Orders, the plans had been laid before the Board of Trade with the statement that it was intended to use mechanical as well as horse-power, and no objection having been raised by the Board of Trade, and the Bill obtained, he took it for granted that no objection would be raised afterwards, provided the works were properly carried out. He considered, therefore, that, practically and substantially they had the right to use steam, and that the statement was perfectly true.

Mr. Pethick's evidence is to much the same effect. He thought the Board of Trade had no more right to refuse their consent than they would in the case of a railway; that they might have required additions or alterations, but that on any reasonable requirements being complied with they could not refuse their consent. It never entered his thoughts that after the Board had passed their plans, with the knowledge that it was proposed to use steam, they would refuse their consent.

AND PRIVY COUNCIL.

Mr. Moore states that he was under the impression that the passage in the prospectus represented the effect of sect. 35 of the Act, inasmuch as he understood that the consent was obtained. He so understood from the statements made at the board by the solicitors to the company, to the general effect that everything was in order for the use of steam, that the Act had been obtained subject to the usual restrictions, and that they were starting as a tramway company, with full power to use steam as other companies were doing.

Mr. Wakefield, according to his evidence, believed that the statement in the prospectus was fair; he never had a doubt about it. It never occurred to him to say anything about the consent of the Board of Trade, because as they had got the Act of Parliament for steam he presumed at once that they would get it.

Mr. Derry's evidence is somewhat confused, but I think the fair effect of it is that though he was aware that under the Act the consent of the Board of Trade was necessary, he thought that the company having obtained their Act the Board's consent would follow as a matter of course, and that the question of such consent being necessary never crossed his mind at the time the prospectus was issued. He believed at that time that it was correct to say they had the right to use steam.

As I have said, Stirling J. gave credit to these witnesses, and I see no reason to differ from him. What conclusion ought to be drawn from their evidence? I think they were mistaken in supposing that the consent of the Board of Trade would follow as a matter of course because they had obtained their Act. It was absolutely in the discretion of the Board whether such consent should be given. The prospectus was therefore inaccurate. But that is not the question. If they believed that the consent of the Board of Trade was practically concluded by the passing of the Act, has the plaintiff made out, which it was for him to do, that they have been guilty of a fraudulent misrepresentation? I think not. I cannot hold it proved as to any one of them that he knowingly made a false statement, or one which he did not believe to be true, or was careless whether what he stated was true or false. In short, I think they honestly believed that what they asserted was true, and I am of opinion that the charge of fraud made against them has not been established.

H. L. (E.)

1889

DERRY
v.
PEEK.

Lord Herschell.

380                         HOUSE OF LORDS                    [VOL. XIV.

It is not unworthy of note that in his report to the Board of Trade, General Hutchinson, who was obviously aware of the provisions of the special Act, falls into the very same inaccuracy of language as is complained of in the defendants, for he says : " The Act of 1882 gives the company authority to use mechanical power over all their system."

I quite admit that the statements of witnesses as to their belief are by no means to be accepted blindfold. The probabilities must be considered. Whenever it is necessary to arrive at a conclusion as to the state of mind of another person, and to determine whether his belief under given circumstances was such as he alleges, we can only do so by applying the standard of conduct which our own experience of the ways of men has enabled us to form ; by asking ourselves whether a reasonable man would be likely under the circumstances so to believe. I have applied this test, with the result that I have a strong conviction that a reasonable man situated as the defendants were, with their knowledge and means of knowledge, might well believe what they state they did believe, and consider that the representation made was substantially true.

Adopting the language of Jessel M.R. in *Smith* v. *Chadwick* (1), I conclude by saying that on the whole I have come to the conclusion that the statement, " though in some respects inaccurate and not altogether free from imputation of carelessness, was a fair, honest and bonâ fide statement on the part of the defendants, and by no means exposes them to an action for deceit."

I think the judgment of the Court of Appeal should be reversed.

> *Order of the Court of Appeal reversed ; order of Stirling J. restored ; the respondent to pay to the appellants their costs below and in this House : cause remitted to the Chancery Division.*

> *Lords Journals* 1st July 1889.

Solicitors for appellants : *Linklater, Hackwood, Addison & Brown.*

Solicitors for respondent : *Tamplin, Tayler & Joseph.*

(1) 20 Ch. D. at p. 67.

# 𝕬ppeal Cases

BEFORE

# THE HOUSE OF LORDS

(ENGLISH—IRISH—AND SCOTTISH)

AND

# THE JUDICIAL COMMITTEE

OF

# HER MAJESTY'S MOST HONOURABLE

# PRIVY COUNCIL.

---

[HOUSE OF LORDS.]

THE DUKE OF BEDFORD . . . . APPELLANT;

AND

ELLIS AND OTHERS . . . . . . RESPONDENTS.

H. I. (E.)

1900

*Dec.* 10.

*Practice—Parties—Representative Action—Action on behalf of a Class of the Public—Joinder of Plaintiffs—Joinder of several Causes of Action—Rules of Supreme Court, Order* XVI., rr. 1, 9.

Order XVI., r. 9, which provides for persons suing or being sued as representing a class, is not confined to persons who have or claim some beneficial proprietary right which they are asserting or defending. To justify a person suing in a representative character it is enough that he has a common interest with those whom he claims to represent.

Several plaintiffs sued on behalf of themselves and all others the growers of fruit, flowers, vegetables, roots and herbs within the meaning of the Covent Garden Market Act, 1828, to enforce various preferential rights to stands in the market, which they alleged to have been given to the class of growers by the Act. The defendant was the lord of the market :—

*Held,* that without prejudging the construction of the Act the plaintiffs had an interest in common, and that the defendant was not entitled to have the action stayed either on the ground that the plaintiffs had no beneficial proprietary right, or that the joinder of plaintiffs claiming separate and

A. C. 1901.                                    3        B

2                              HOUSE OF LORDS                        **[1901]**

H. L. (E.)          different rights under the Act, both personally and as representing a class,
1900             would embarrass or delay the trial.
                       The decision of the Court of Appeal, [1899] 1 Ch. 494, affirmed by Lords
BEDFORD          Macnaghten, Morris and Killanin, and Shand, the Earl of Halsbury L.C.
(DUKE OF)         and Lord Brampton dissenting.
v.
ELLIS.               *Temperton* v. *Russell*, [1893] 1 Q. B. 435, reflected on.
                       *Quære*, whether it was necessary to join the Attorney-General as a
                 defendant.

THE respondents, Ellis and five other persons, on behalf of
themselves and all others the growers of fruit, flowers,
vegetables, roots or herbs within the meaning of the 9 Geo. 4,
c. cxiii., brought an action against the appellant, the Duke of
Bedford.

By the statement of claim they set forth certain provisions
of the Covent Garden Market Act, 1828 (9 Geo. 4, c. cxiii., a
public Act), which they alleged gave various preferential rights
in respect of the use of the market to the class of growers.
They alleged that the Duke in his management of the market
as owner did not comply with the provisions of the Act in
certain particulars, and had (inter alia) exacted excessive tolls
from the growers. They claimed declarations that they were
entitled to the alleged preferential rights, an injunction to
restrain the Duke from doing any acts contrary to declarations
so claimed, and an account of the sums charged in excess
during the six years preceding the issue of the writ. The
material parts of the statement of claim and the Act are fully
set out in the report of the decision below (1) and are closely
discussed in the judgment of Lord Brampton.

The Duke having taken out a summons to set aside the writ
and all other proceedings, Romer J., being of opinion that the
plaintiffs were not entitled to sue on behalf of themselves and
all others the growers of fruit, &c., within the meaning of the
Act, nor to sue together as co-plaintiffs in one action in respect
of the alleged causes of action respectively alleged by them
personally and otherwise than in their capacity as representing
themselves and all other growers, ordered that the action be
stayed in respect of all matters and causes alleged in a repre-
sentative capacity, and that unless the plaintiff should within

(1) [1899] 1 Ch. 494.

**A. C.**          AND PRIVY COUNCIL.                    3

fourteen days elect one of them to proceed as sole plaintiff and
only in respect of his individual and personal causes of action,
the action should be dismissed with costs.

The Court of Appeal (Lindley M.R. and Rigby L.J., Vaughan
Williams L.J. dissenting), upon the plaintiffs undertaking to
add the Attorney-General as a defendant, ordered that the
plaintiffs be at liberty to amend the writ and statement of claim
accordingly, and to amend the statement of claim as they
might be advised, and that the order of Romer J. be discharged.

The Duke appealed.

*May* 8, 10. *Levett, Q.C.,* and *Danckwerts, Q.C.,* for the
appellant. The respondents claim to sue as representatives of
the growers, relying upon Order XVI., r. 9, which provides that
" where there are numerous persons having the same interest
in one cause or matter, one or more of such persons may sue or
be sued . . . . on behalf or for the benefit of all persons so
interested." But this only extends " to persons who have or
claim some beneficial proprietary right which they are assert-
ing or defending in the cause or matter ": *Temperton* v.
*Russell.* (1) The respondents have no such right, and there is
not here " one cause or matter." If any respondent has a
personal injury owing to a breach of the statutory obligations
he can sue for himself, but he cannot sue for such a vague and
indefinite class as all growers: see per Lord Eldon in *Weale* v.
*West Middlesex Waterworks Co.* (2) ; *Jones* v. *Garcia del Rio.* (3)
There is no precedent in the books for such an action.

The cases relied on by Lindley M.R.—*Beeching* v. *Lloyd* (4)
and *Warrick* v. *Queen's College, Oxford* (5)—are quite different.
Shareholders in a company, tenants of a manor, creditors of a
debtor, can all be ascertained. Growers cannot : they number
many thousands, and exist all over the country and abroad.
Any one may become a grower at any time. If there be any
such right as is claimed for growers, it is a right which can

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

(1) [1893] 1 Q. B. 435, 438.          (3) (1823) 1 T. & R. 297, 301; 24
(2) (1820) 1 Jac. & W. 358, 370,   R. R. 64.
372; 21 R. R. 183.                        (4) (1855) 3 Drew. 227.
          (5) (1871) L. R. 6 Ch. 716.

4                          HOUSE OF LORDS                    [1901]

H. L. (E.)
1900
BEDFORD
(DUKE OF)
v.
ELLIS.

only be enforced (if at all) by the Attorney-General represent-
ing the public.  If any one has suffered special damage he can
sue, but must sue alone.  But in truth he can have no right of
action under this statute unless he has a lease.  Every one has
a right to resort to a public market, and this statute confers
no right on growers as such.  The clauses relied on by the
respondents are simply for regulating the market and appro-
priating particular spaces to particular things—potatoes, fruit,
flowers, &c.—and the necessary stands.  No action lies for a
public nuisance without proof of special damage: if there be
any right of action at all here it is in tort for excluding the
plaintiffs, but the procedure in Chancery does not apply to
actions in tort.  Romer J. decided that the Attorney-General
alone could sue for the class of growers, and said that the rest
of the public might be represented by the Solicitor-General.
This was doubted by Lindley M.R., who said he had never
heard of such a proceeding.  It was adopted in *Attorney-
General* v. *Dean and Canons of Windsor* (1), where the
Attorney-General appeared for the informant and the Solicitor-
General for the Crown.  Secondly, this is a joinder of several
plaintiffs for several distinct causes of action.  It is not allowed
by Order XVI., r. 1; the rights do not " arise out of the same
transaction or series of transactions ": *Stroud* v. *Lawson*. (2)

   *Asquith, Q.C.*, and *J. T. Prior*, for the respondents.  The
right to sue in a representative capacity is not confined to " a
beneficial proprietary right."  That is given as an instance,
but it is not exclusive.  A body of persons having a common
interest in a subject-matter may when that interest is threatened
be represented by one or more on behalf of the whole.  Here
the rights and the common interest are created by statute.  It
is true that in the case of the yearly pitching stands the letting
is permissive, not compulsory; but they can only be let to
growers.  The yearly cart stands must be exclusively appro-
priated to the growers' carts, and must be let to them at the
schedule tariff.  The Duke refused to obey this requirement,
and for that there is a cause of action.  The statute, no doubt,
appropriates and regulates places and stands, but it also imposes

   (1) (1858) 24 Beav. 679; (1860) 8 H. L. C. 369.     (2) [1898] 2 Q. B. 44.

A. C.                    AND PRIVY COUNCIL.                    5

an obligation on the Duke to carry out the requirements for
the benefit of the growers. This is, no doubt, a large and
fluctuating class, but it is one capable of being ascertained, and
it has rights antagonistic to that of the general public, and
could not therefore be properly represented by the Attorney-
General. Rights are claimed in respect of each of the three
classes, casual cart stands, yearly cart stands, and yearly
pitching stands, and the plaintiffs may succeed in one or two
of these and fail in the other; but that is no reason why the
claims should not be joined. It is enough that the plaintiffs
have a right or rights as a class and against a common enemy.

Secondly, Order XVI., r. 1, embraces this case. There is no
reason why each plaintiff should bring a separate action; the
claims all arise out of the same transaction or series of
transactions, the management of the market.

*Levett, Q.C.*, in reply. Where a grievance complained of is
common to a body of persons too numerous to be all made
parties, the Court allows one or more to sue for all, provided
all the parties have an interest identical with that of the plain-
tiffs; if what is asked may by possibility be injurious to any of
them, those parties must be made defendants, because each of
them may have a case to make adverse to the interest of the
parties suing. If indeed they are so numerous that it is
impossible to make them all defendants, that is a state of
things for which no remedy has yet been provided. The words
of Lord Cottenham in *Mozley* v. *Alston* (1) are applicable here.
The growers are too numerous to be made all defendants. The
relief claimed in this action might be injurious to some of
the class.

The House took time for consideration.

Aug. 6.  EARL OF HALSBURY L.C.  My Lords, in this case
I feel some difficulty about the judgment that I ought to pro-
nounce. It is not a judgment upon the merits of the cause,
but it is in an interlocutory proceeding claiming that the action
is improperly constituted and insisting upon the necessity of

(1) (1847) 1 Phill. 790, 799.

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

6                          HOUSE OF LORDS                        **[1901]**

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Earl of Halsbury
L.C.

selecting some one or more plaintiffs who shall represent the same rights. My Lords, I have read the judgment proposed to be delivered by my noble and learned friend Lord Brampton, and I agree with it, but I have great difficulty in arguing the question upon an interlocutory proceeding, for this reason : it appears to me that one of the questions which undoubtedly will arise in the course of the cause will be the question of what rights, if any, exist among the different members of the class—those persons who are put together here as plaintiffs. I have found myself in this difficulty, that if I gave all the reasons for which I agree with my noble and learned friend, Lord Brampton, it appears to me it would be impossible for me afterwards to take a different view when the question comes to be tried at the hearing of the cause. I think I might find it extremely difficult in saying what I should say to your Lordships now to avoid prejudicing those questions which have not been argued yet. The result is that while I content myself with saying I agree with Lord Brampton in differing from what has been done in the Court below, I do not propose at present to give any reasons for my adherence to his view.

LORD MACNAGHTEN. My Lords, the action in which this application was made relates to the right of accommodation in Covent Garden Market. The market belongs to the Duke of Bedford, but it is regulated by the provisions of an Act of Parliament passed in the year 1828 (9 Geo. 4, c. cxiii.). The Act is concerned with the persons who come to the market to buy or to sell. No toll is payable by those who buy, unless the articles bought are again sold within the market or exposed for sale there. The persons who come to sell have to pay rent and toll. They are divided into two classes—those who sell their own produce and those who are ordinary dealers in the market or middlemen. For some reason or other the Act purports to confer certain advantages and certain preferential rights on the persons who come to sell their own produce. It may be that at the time when the Act was passed market gardeners in the county of Middlesex were not without influence in the electorate. It may be that in those days protection was not such

an odious thing as it is now in the eyes of some people who
worship political economy.   Whatever the reason may have
been it cannot be denied that the Act apparently does give a
preference to those who are described as growers of fruit,
flowers, vegetables, roots or herbs.   Now several people come
forward as plaintiffs.   They allege that they are growers within
the meaning of the Act.   They claim that under the Act they
are entitled to certain advantages and preferential rights.
They say that the Duke, who is lord of the market, persistently
ignores their rights and favours the middlemen from whom he
is authorized to exact higher tolls.   And they sue on behalf of
themselves and all other the growers of fruit, flowers, vegetables,
roots or herbs within the meaning of the Act.   They seek a
declaration as to the true construction of the Act, an injunction
to restrain the infringement of their alleged statutory rights,
and an account of the moneys by which as they allege they
have been severally overcharged.

The Duke has applied by summons to stay the action on two
grounds, which were mixed up in the argument, but which
ought, I think, to be kept separate and distinct.   The principal
ground is that the plaintiffs are not entitled to sue in a repre-
sentative character in defence of their alleged statutory rights.
The other ground, which is a matter of very slight moment, is
that they cannot join as co-plaintiffs in respect of their several
grievances.   The whole difficulty in the present case has arisen
from confusing these two matters.   They have really nothing
to do with each other.   If the persons named as plaintiffs are
members of a class having a common interest, and if the
alleged rights of the class are being denied or ignored, it does
not matter in the least that the nominal plaintiffs may have
been wronged or inconvenienced in their individual capacity.
They are none the better for that and none the worse.   They
would be competent representatives of the class if they had
never been near the Duke; they are not incompetent because
they may have been turned out of the market.   In considering
whether a representative action is maintainable, you have to
consider what is common to the class, not what differentiates
the cases of individual members.   Romer J. acceded to the

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord
Macnaghten.

8                          HOUSE OF LORDS ·                    [1901]

H. L. (E.)
1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord
Macnaghten.

defendant's application, influenced, or rather I should say
compelled, by an expression in the judgment of the Court of
Appeal in the case of *Temperton* v. *Russell* (1), which has found
its way into recent books of practice as a compendious and
authoritative statement of the law. In *Temperton* v. *Russell* (1)
the Court was composed of Lord Esher M.R. and Lindley and
Bowen L.JJ. The judgment of the Court was delivered by
Lindley L.J. His Lordship is represented as saying that
Order XVI. r. 9, which provides for persons suing or being sued
as representing a class, " only extends to persons who have or
claim some beneficial proprietary right which they are asserting
or defending." Now it cannot be said that the plaintiffs in this
case are asserting any beneficial proprietary right. If that be
a condition of suing in a representative character the plaintiffs
are out of Court. But it seems to me that there is no reason
whatever for so restricting the rule, which was only meant to
apply the practice of the Court of Chancery to all divisions of
the High Court. The old rule in the Court of Chancery was
very simple and perfectly well understood. Under the old
practice the Court required the presence of all parties interested
in the matter in suit, in order that a final end might be made
of the controversy. But when the parties were so numerous
that you never could " come at justice," to use an expression
in one of the older cases, if everybody interested was made a
party, the rule was not allowed to stand in the way. It was
originally a rule of convenience : for the sake of convenience
it was relaxed. Given a common interest and a common
grievance, a representative suit was in order if the relief sought
was in its nature beneficial to all whom the plaintiff proposed
to represent. To limit the rule to persons having a beneficial
proprietary interest would be opposed to precedent, and not, I
think, in accordance with common sense. Take the case of a
creditor's suit, which perhaps was the earliest instance of
plaintiffs being allowed to sue in a representative character.
It can hardly be suggested that a creditor has a proprietary
interest in the real or personal estate of his deceased debtor.
Take another case which was common enough in former times.

(1) [1893] 1 Q. B. 435.

A. C.                    AND PRIVY COUNCIL.                    9

One parishioner would sue on behalf of himself and all the
other parishioners to establish a modus in lieu of tithes.    There
was no beneficial proprietary interest there.    The choice lay
between two evils; and the plaintiff, suing in a representa-
tive character, insisted on choosing the lesser evil of the two:
*Chaytor* v. *Trinity College*. (1)    Again, in *Gray* v. *Chaplin* (2)
two shareholders of a navigation were held justified in suing on
behalf of themselves and all other the shareholders except the
defendants in order to enforce their alleged statutory rights
under an Act of Parliament.    The equity in that particular
case happened to be very shadowy, and the receiver appointed
by the Vice-Chancellor was afterwards discharged by Lord
Eldon (3) ; but it was not suggested in the argument before his
Lordship that the Vice-Chancellor had been in error in holding
the suit as regards the plaintiffs properly constituted.    There
are plenty of other cases which shew that, in order to justify a
person suing in a representative character, it is quite enough
that he has a common interest with those whom he claims to
represent.    In *Warrick* v. *Queen's College* (4) the question was
whether persons with titles diverse in origin and rights in some
respects distinct could be combined as plaintiffs in a suit to
redress a grievance common to all.    No such question can arise
here.    All growers have the same rights.    They all rely on one
and the same Act of Parliament as their common charter.

My Lords, I do not think it is necessary to say anything
more upon this point.    I have only said so much because I find
that the learned Lord Justice who dissented from his colleagues
still maintains a position which Lindley L.J. abandoned, if
indeed he ever took it up.    Vaughan Williams L.J. puts the
successful argument, or the argument intended to be successful,
in the mouth of the defendant.    It seems to rest on two main
grounds : (1.) that the special rights apparently conferred upon
the growers are public rights—a proposition which I confess
I do not understand ; and (2.) that those special rights confer
on the growers no right of property whatever—a proposition

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord
Macnaghten.

(1) (1796) 3 Anstr. 841.          (3) (1826) 2 Russ. 137 ; 26 R. R.
(2) (1825) 2 S. & S. 267.              22.
(4) L. R. 6 Ch. 716.

10                      HOUSE OF LORDS                    [1901]

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord
Macnaghten.

which I suppose everybody would concede. It is rather a pity when a case like *Temperton* v. *Russell* (1) finds its way into the Reports. The attempt made there to invest the defendants with a representative character was absurd on the face of it. Now, when a judge comes to deal with a case of that sort, and tries to deal with it seriously, as if there was something in it, he is very apt, I think, to express himself unguardedly; and so it happens sometimes, as it happened, I suppose, in *Temperton* v. *Russell* (1), that what was only meant for an illustration is taken for a definite and exhaustive statement of law.

There is one point—a point of no practical importance—on which I venture respectfully to differ from the Court of Appeal. I doubt whether it is accurate to say that in the case of representative suits we have advanced a long way since the days of Lord Eldon. It is, of course, not necessary nowadays to go to a Court of Law in order to establish legal rights. But in all other respects I think the rule as to representative suits remains very much as it was a hundred years ago. From the time it was first established it has been recognised as a simple rule resting merely upon convenience. It is impossible, I think, to read such judgments as those delivered by Lord Eldon in *Adair* v. *New River Co.* (2), in 1805, and in *Cockburn* v. *Thompson* (3) in 1809, without seeing that Lord Eldon took as broad and liberal a view on this subject as anybody could desire. "The strict rule," he said, "was that all persons materially interested in the subject of the suit, however numerous, ought to be parties . . . . but that being a general rule established for the convenient administration of justice must not be adhered to in cases to which consistently with practical convenience it is incapable of application." "It was better," he added, "to go as far as possible towards justice than to deny it altogether." He laid out of consideration the case of persons suing on behalf of themselves and all others, "for in a sense," he said, "they are before the Court." As regards defendants, if you cannot make everybody interested a party, you must bring so many that it can be said they will

(1) [1893] 1 Q. B. 435.          (2) (1805) 11 Ves. 429.
(3) (1809) 16 Ves. 321, 325, 329.

AND PRIVY COUNCIL.

fairly and honestly try the right. I do not think, my Lords, that we have advanced much beyond that in the last hundred years, and I do not think that it is necessary to go further, at any rate for the purposes of this suit.

H. L. (E.)
1900
BEDFORD
(DUKE OF)
v.
ELLIS.
Lord
Macnaghten.

My Lords, it would be highly improper at this stage of the proceedings to say anything which might prejudge the construction of the Act. That is a matter for the hearing. But out of respect for the arguments of counsel, I will venture to make one or two general observations. It was said that the growers are so fluctuating and indefinite a body that it is impossible to tell who is or who is not a grower, especially in these modern times when there are such improved facilities for carriage of goods. I cannot say that I am much impressed with that difficulty. It seems to me that the description of the persons apparently intended to be favoured by the Act is sufficient for all practical purposes. It may be difficult or impossible to compile a catalogue of growers. But there cannot, I think, be much difficulty in determining whether a particular person who claims a preferential right to a vacant stand in the market is a grower or not.

Then it was urged that, after all, it is for the Duke to regulate his own market. The Act, it was said, is merely an enabling Act; the growers have no rights whatever. Well, that is the very question to be determined at the hearing. And how can it be determined if the growers are not allowed to sue in a body? The learned counsel for the Duke of Bedford asserted that the Duke was master of the situation, and might do what he liked with his own. It may be so. All I would say is that I am not at present convinced by the able and earnest arguments of Mr. Levett and Mr. Danckwerts that the expectations apparently held out to growers by this Act of Parliament are wholly illusory, and that the Duke, who is empowered by the Act to make rules, orders, and by-laws, "not being repugnant," as the Act says, "to the laws of this realm or to the provisions of this Act," is at liberty to disregard and ignore those provisions at his own will and pleasure.

One word as to the Attorney-General, without whose

H. L. (E.)
1900
~~
BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord
Macnaghten.
———

presence the learned judges of the Court of Appeal thought the action ought not to proceed. The Attorney-General has been or will be made a party in obedience to the order of the Court of Appeal. From that part of the order there is no appeal. Speaking, however, for myself, I cannot see what the Attorney-General has to do with the matter. The plaintiffs do not want him; still less does the defendant. The learned counsel on both sides professed to be unable to explain this part of the order of the Court of Appeal. What is the Attorney-General to do when he comes? Is he to support the growers, or is he to take part with the Duke, who is alleged to favour the middle-men, or is he merely to look on and see fair play? And who is to pay his costs? That may be an interesting question some day. No one has suggested that the people who come to buy will be injured by competition between the growers and the middlemen, or that the rights of the public are in any way imperilled by this action. It might have been proper to have had the middlemen represented if the Duke himself had not espoused their cause.

So much for the principal question. The other point put forward is one of very small importance. If the main point goes against the defendant, I do not suppose that he would care to succeed on the other and minor point. He would gain nothing by success. He would only lose to some extent security for his costs. The joinder of the individual plaintiffs in one action cannot embarrass or delay the trial. The language of Order XVI., r. 1, is very wide. It must cover the case of several creditors, joining as co-plaintiffs in a creditor's action. Their debts are separate, and just as much or just as little "a series of transactions" as the separate grievances of which the growers in this action complain. Assuming that the defendant has rejected the claims of the several plaintiffs on the ground that, according to the true construction of the Act, growers have no preferential claims to which he is bound to give effect, it appears to me that you have a series of transactions where, if the plaintiffs sued separately, a common question of law would arise. Whether I am right in this or not, it seems to me that the question, if it be a question, ought not to be

**A. C.**                 AND PRIVY COUNCIL.                 13

disposed of adversely to the plaintiffs at this stage of the action.

On these grounds I think the appeal ought to be dismissed with costs.

[The proceedings were here interrupted.]

Dec. 10.  LORD MORRIS AND KILLANIN.  My Lords, I am of opinion that this appeal should be dismissed.

The action is brought by the plaintiffs asserting a common right as growers of fruit, &c., within the meaning of the Act 9 Geo. 4, c. 113.  The action is a representative one alleging a common interest, namely, the assertion of a right alleged to be created in the class by Act of Parliament.  The appellant succeeded in obtaining an order from Romer J. (now Romer L.J.) that the action should be stayed.  Romer J. was unable to come to the conclusion that the growers as a class had any proprietary rights in respect of the market.  What they alleged they had was a preferential right over the rest of the public; that should, in my opinion, have been inquired into at a hearing in the ordinary way when, if they cannot establish such preferential right as a class, they would be defeated; if they have such a right some of the class are entitled to sue on behalf of themselves and others.  I entirely concur in the judgment of my noble and learned friend Lord Macnaghten, which deals so fully and conclusively with the right to sue in that character.

I do not at all mean to prejudge the question whether the plaintiffs may not fail on the hearing of the cause on a fuller consideration of the Act considered in relation to the evidence that may be adduced.  I conceive and foresee considerable difficulty in the plaintiffs being able to define what was the status or class of a " grower " in the year 1828, and in applying such a description to present times, and also whether the preference conferred was not given to sales of the articles specified and not to growers of them, and whether there is anything granted beyond a permission to the Duke of Bedford and his heirs to let.  These and other questions will be dealt with on the hearing.  I merely decide that, in my opinion,

14                          HOUSE OF LORDS                          **[1901]**

the appellant cannot get rid of the action by the short cut resorted to.

LORD SHAND. My Lords, the rule of Court (rule 9 of Order XVI.), the effect of which is the subject of controversy between the parties in this case, is in these terms : " Where there are numerous persons having the same interest in one cause or matter, one or more of such persons may sue or be sued . . . . in such cause or matter on behalf or for the benefit of all persons so interested." I am of opinion, with the majority of the Court of Appeal, that the rule applies to this case, and that the appeal should therefore be dismissed.

The rule has been framed and adopted for a useful and important object—the saving of the multiplication of actions, with the attendant costs, in cases where one action would serve to determine the rights of a number of persons in a question with another party called as defendant. A series of different actions one after another by different plaintiffs is to be no longer necessary in cases where numerous persons have " the same interest in one cause or matter," for in such cases " one or more of such persons may sue on behalf or for the benefit of all persons so interested." The rule is obviously one of advantage not only to plaintiffs but to defendants also, in the way of saving multiplication of suits, and it is of much importance to note, as observed by my noble and learned friend Lord Macnaghten, that it only applies the practice of the Court of Chancery, of which he gives many instances, to all divisions of the High Court.

Have not, then, the plaintiffs stated a case in which they have all " the same interest " in the cause or matter or in each of the different matters which are the subject of this action ? It seems to me, on examination of the claims and the plaintiffs' statements in support of these claims, that they have stated such a case. In order to shew that this is so I do not think it necessary to go into much detail.

The original right to the market was conferred by letters patent to the Earl of Bedford a great many years ago, and was

A. C.                AND PRIVY COUNCIL.                    15

the subject of an Act of the 53rd year of His Majesty King
George III. In 1828 the 9 Geo. 4, c. 113, the provisions of
which are founded on by the plaintiffs, was passed. That
statute recognises and specifies various classes of permanent
stands of the market under the different heads of "Casual
cart stands," "Yearly cart stands," and "Yearly pitching
stands," and by its enactments confers important and valuable
privileges to the use of such stands on a class of persons
designated as "the growers of fruit, flowers, vegetables, roots
or herbs," at certain rates scheduled in the Act. These privi-
leges, which are not said to have been abrogated, appear to
entitle such growers to rights of priority in the occupation of
the stands for the purposes of their business, and that at the
rates there specified.

Now, it is alleged in the record by the plaintiffs (1.) that
they are the growers of fruit, flowers, vegetables, roots, and
herbs within the meaning of the statute ; (2.) that the defend-
ant, the present Duke of Bedford, refuses to give them and
other "growers" the privileges of the occupation of the various
classes of stalls to which they have right under the statute ;
and (3.) that when they do get such occupation the rates
charged exceed those allowed by the statute. For the purpose
of the present preliminary point, of procedure only, these state-
ments must be taken to be true, and on this assumption the
question raised is, Does the rule of Court apply to the action ?
In the trial questions may arise as to whether the plaintiffs are,
within the meaning of the statute, "growers of fruit, flowers,
vegetables, roots, or herbs" as they allege. The statute was
passed long before railways were used, and when the carriage
of flowers, fruit, and vegetable produce in quantities to market
was made by carts and wagons ; but the plaintiffs, who allege
they are such "growers" as the statute describes, are each,
according to their statement, in the occupation of land in the
county of Middlesex, who have been frequenters of the market
for business purposes, and there is no reason to doubt the title
of each to sue on his own account. Then, all of the plaintiffs
make the same claims—claims to the exercise of the same
rights and privileges which the appellant refuses to recognise—

<div style="text-align: right">

H. L. (E.)

1900

BEDFORD
(DUKE OF)
v.
ELLIS.

Lord Shand.

</div>

16 HOUSE OF LORDS [1901]

H. L. (E.)
1900

BEDFORD
(DUKE OF)
v.
ELLIS.

Lord Shand.

and all of them rest their claims on the same ground, namely, the statutory provisions of privileges in their favour as such growers as they describe themselves to be.

This is, I think, apparent from the plaintiffs' statements 8 and 9, in regard to the "casual cart stands," the "yearly cart stands," and the "yearly pitching stands," and the tolls exacted by the defendant for the use of these. The plaintiffs in their character of "growers" claim statutory preferential rights to the occupation and use of these, and allege that the defendant refuses to give them such preferential use, and "makes it a practice either to refuse to growers the use of such stands, or by filling such stands, with others than growers, to prevent growers having the use of such stands, with the result that growers have to go to other parts of the market or to places outside the market, or to the public streets, where the restrictions contained in the said Act not being applicable the defendant charges higher rates than would have to be paid under the Act, and with the further result of injury to growers in their trade." These statements seem to me to amount clearly to an averment not only of the existence of preferential rights, and of the same or substantially the same preferential rights in all the plaintiffs, but to a charge against the appellant that he violates these rights, or refuses to give effect to them, and it follows that the plaintiffs have the same interest in the cause or matter of the complaint. There is no difference in their claims. They all ask the same remedy, which it is unnecessary to specify further than to say they all claim to have a declaratory decree by the Court which shall give effect to their statutory privileges the same in the case of each of them, as growers of fruit, flowers and vegetables, and an injunction to restrain the appellant from doing any act contrary to such declaratory decree. There is thus one cause or matter only in which all of the plaintiffs have an interest, and in which other "growers" have the same interest, as disclosed in the record, that matter being the disregard by the defendant of their statutory privileges, for which accordingly one and the same remedy in the form of the different heads of claim is asked. To that case the rule in question seems to me in its terms directly to apply, and accord-

**A. C.** AND PRIVY COUNCIL. 17

ingly the objection to the competency of the action is, I think, unfounded.

There is one head of the claim (the seventh) as to which there was not much said in the appellant's argument, which is no doubt in a different position ; I mean a claim by each of the plaintiffs for repayment to him of alleged excess charges for six years for market accommodation. This is a subsidiary matter, and it is not a claim made " on behalf of all other the growers of fruit, flowers," &c., to which alone the appellant's objection to the representative character of the action applies. The real cause or matter in dispute and raised by the statement and claims is the nature and extent of the privileges of the plaintiffs to the use of the market stands, and to the effect of determining this the action is competent. This being so, it will be found convenient to both parties to have the subsidiary matter of excessive charges made against each plaintiff determined in the same cause ; and I do not see any ground for holding that it is incompetent to do so.

The judgment of Romer L.J. proceeds on the view that the plaintiffs in any action seeking the benefit of the rule in question must allege and possess some " proprietary " right which it is their joint object to vindicate. This is clear throughout his Lordship's judgment, which is founded on what was said by my noble and learned friend Lord Lindley, as Master of the Rolls, in the case of *Temperton* v. *Russell.* (1) At the beginning of his judgment Romer L.J. says expressly that, as pointed out in *Temperton* v. *Russell* (1), the rule " only extends to cases where the class have or claim some beneficial proprietary right which is being asserted or defended. I have therefore to consider whether the growers in question as a class have or claim a beneficial proprietary right under the above Act which is being asserted in this action." He immediately adds : " I am unable to come to the conclusions that the growers as a class have any proprietary rights in respect of the market," and his judgment proceeds on the ground that the absence of " proprietary " rights excludes the application of the rule. In effect it appears to me that the judgment of Vaughan

(1) [1893] 1 Q. B. 435.

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord Shand.

H. L. (E.)
1900
BEDFORD
(DUKE OF)
v.
ELLIS.

Lord Shand.

Williams L.J. is founded on the same view, for he observes that the plaintiffs allege that the Act gives them " certain preferential rights constituting some sort of proprietary interest in them," and holds that this is not given by the statute.   But if his Lordship proceeded on the view of the absence of an interest in common in the plaintiffs I cannot agree with him ; and the judgment of Lord Hatherley, in the case of Warrick quoted by Lord Lindley, is I think a direct authority on the point, contrary to the view of the Lord Justice.

The case of *Temperton* v. *Russell* (1) was not an action founded on any alleged right claimed by the plaintiff such as the plaintiffs here allege.   The action was one of tort, and a number of trades unions or societies called as defendants by one plaintiff were charged with maliciously procuring workmen to break their contracts with the plaintiff, with enticing workmen from his employment, and with intimidating workmen in his service, while the defendants were sued " not only on their own behalf " " but as representing all the members " of their various societies.   The Court refused to allow these last words to remain in the complaint, to the effect of making the action a representative one as regards the defence.   It is true that in that case Lord Lindley used the expression on which Romer L.J. proceeded in his judgment in this case that the rule in question only extends to cases where the class have or claim some beneficial " proprietary " right which is being asserted or defended.   In my judgment this expression unduly limits the application of the rule, and was unnecessary for the decision of the case of tort then under the consideration of the Court ; and Lord Lindley evidently did not contemplate that the rule should not include such a case as the present, for his Lordship has held, in his judgment, that the rule does apply in this case.   There is no such word as " proprietary " in the rule, and no good reason in my opinion for holding that word by implication to be a part of the rule.   The sole test to be applied is that of " the same interest " in one cause or matter.   The order in my opinion applies equally to the case such as occurs here, where the plaintiffs seek to enforce a disputed personal

(1) [1893] 1 Q. B. 435.

A. C.                    AND PRIVY COUNCIL.                    19

right or rights common to all of them by gaining or vindicating
possession of a valuable privilege, as it does when, being in
possession of a privilege, the plaintiffs seek to enforce a
possessory right in a question with a trespasser or a third party
in some way injuring their possession itself by opposition to its
exercise.

H. L. (E.)
1900
BEDFORD
(DUKE OF)
v.
ELLIS.

LORD BRAMPTON. My Lords, under the Covent Garden
Improvement Regulation Act (1828) the area of Covent Garden
Market, as described in the preamble of the Act, was rearranged
according to a plan therein referred to, and the several portions
thereof were appropriated as directed by the Act, and sets of
stands were marked out or erected for the accommodation of
carts, &c., bringing fruit, flowers, vegetables, roots or herbs to
the market, and for the reception, exposure for sale, and sale
of such fruit, &c.

For the purposes of the present question it will not be neces-
sary to refer in detail to more than three of such sets of stands,
namely, those described in the Act and indicated on the plan
respectively by the letters B, C, F and G.

B signifies what are in the Act called "the casual cart
stands," C "the yearly cart stands," and F and G "the yearly
pitching stands." The uses to which each set of stands was
exclusively appropriated are mentioned and described in s. 7 of
the Act.

B was exclusively appropriated to the reception of wagons
and carts in which fruit, &c., shall be brought to the market
for sale, and for the exposing to sale and selling such fruit, &c.,
on the stand to which it shall be brought; it being further
enacted that the growers of fruit, &c., shall be deemed to be
the persons having the preferable right to resort to such stands.

C shall be exclusively appropriated to the reception of wagons
and carts of or belonging to growers of fruit, &c., and to the
exposing for sale and selling the fruit, &c., grown or raised by
such growers, and be let by the owners of the market, by
the year or for any shorter period at such yearly or other
rents, &c., as are mentioned in the schedule, and the person
to whom any such stand shall be let shall be deemed to be

20                        HOUSE OF LORDS              **[1901]**

H. L. (E.)
1900
BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord Brampton.

the holder thereof, and the person having the preferable right to resort thereto.

F and G shall be exclusively appropriated to exposing to sell and selling fruit, &c., and may be let by the owners of the market exclusively to growers of fruit, &c., by the year, or for any shorter period, and the person to whom any such stand shall be let shall be deemed to be the holder thereof and the person having the preferable right to resort thereto.

Subject as regards the use of each of these stands to the rents, tolls, or sums of money mentioned in the schedule to the Act.

Each of the respondents, who are the plaintiffs in the action, claims to be a grower of fruit, flowers, vegetables, roots and herbs within the meaning of the Act, and a frequenter of the market for the sale thereof, and as such they sue in this action on behalf of themselves severally and all others the growers of fruit, &c. It is essential to the right understanding of the question before your Lordships, namely, whether, as the record now stands, all the six plaintiffs are according to the practice and procedure of the courts entitled to sue in one action, not only in respect of their own separate and several alleged causes of action, but also on behalf of all other growers of fruit, &c., by reason of the alleged illegal conduct of the defendant in non-compliance with any of the provisions of the Act, that I should state what are the several grievances complained of in the claim. I shall then be in a condition to point out, first, the objections which I think exist to allowing all these six plaintiffs to sue together and join in this action, and then the reasons why I think that the representative right of the six plaintiffs to sue on behalf of other growers not parties to the record ought to be limited, and to what extent.

The first seven clauses of the statement of claim are merely introductory averments. The charging part of the claim commences with paragraph 8, which is nothing more than a general complaint that the defendant does not in his management of the market comply with the provisions of the Act, and in particular with reference to the casual cart stands B, the yearly cart stands C, and the yearly pitching stands F and G, and the

tolls exacted by the defendant for the use of these stands.
Paragraph 9 submits that the defendant has not the right to
admit others to the use of the casual cart stands so long as
growers present themselves and require the use thereof; but
that he makes it a practice either to refuse the use of such
stands, or, by filling them with others than growers, prevents
growers from having the use of them, with the result that
they have to go to other places where they have to pay
higher rates.

In neither of these two paragraphs, 8 and 9, is any cause of
action stated to exist in either of the plaintiffs in respect of the
casual cart stands, nor is it alleged that the plaintiffs jointly,
or either of them individually, ever sustained any damage by
such alleged misconduct.

Paragraph 10 complains that each of the four plaintiffs—
Ellis, Gray, Miller and Ashby—has applied to the defendant
for a tenancy of a yearly cart stand, and in each case a tenancy
has been refused, no objection being made to either as a proper
tenant.    It then alleges habitual misconduct of a similar
character towards growers generally, naming none, with similar
resulting damages, and avers that the defendant has stated his
practice to be not to let such stands.    I will assume for the
purposes of this case that this paragraph does state a cause of
action in each of these four respondents; but, as I read the
paragraph, it is in each a separate cause of action, and not a
joint cause of action in the four.

Paragraph 11 sets forth a similar character of grievance with
reference to applications by the remaining two of the plaintiffs,
Pullinger and Peacock, for tenancies of yearly pitching stands,
averring that it is the practice of the defendant to refuse such
tenancies, and by such refusals, and filling up the stands with
others than growers, he interferes with the preferential right of
growers with similar prejudicial results.    In the case of these
last two plaintiffs also the causes of action are several and not
joint.

Then follow seven paragraphs (12, 13, 14, 15, 16, 17, 18), the
12th stating generally that unlawful and excessive tolls beyond
those in the schedule have been charged—and to each of the

H. L. (E.)

1900

BEDFORD
(DUKE OF)
v.
ELLIS.

Lord Brampton.

H. L. (E.)
1900

BEDFORD
(DUKE OF)
v.
ELLIS.

Lord Brampton.

plaintiffs—but it is not alleged that such excesses have been made in respect of their positions as growers.

Each of the remaining six clauses of the set is devoted to a separate series of alleged illegal overcharges made on each of the six plaintiffs, and claims for repayment; but those are purely separate charges not affecting anybody except the individual overcharged, and with which neither of the other plaintiffs nor the other growers have anything to do.

Paragraph 19, the last, discloses no cause of action in either of the plaintiffs, but alleges general misconduct and mismanagement when the market is full, and traders are compelled to expose their goods on places where charges are not so reasonable.

The claims in the first five paragraphs are for declarations as to what the defendant is not entitled to do in respect of each of the matters above referred to; in the sixth for injunctions, and in the seventh for an account of the sums alleged to have been charged to and paid by each of the plaintiffs for six years past, in excess of, or other than the sums the appellant was entitled to charge, and for repayment thereof to each of the plaintiffs.

I cannot bring my mind to doubt that if the plaintiffs are entitled to prosecute this claim in its entirety, the defence will be fraught with a greal deal of undesirable embarrassment. On the other hand I think that to set it aside altogether would be to defeat the well-established procedure of the Court of Chancery, under which plaintiffs suing to uphold a legal right by a suit in equity might sue on behalf not only of themselves, but also of all others having a community of interests in the upholding of that right, and would defeat also the objects contemplated by the rules referred to made since the Judicature Act with a view to harmonise the proceedings and allow of representative actions in both divisions of the High Court of Justice. For this reason it is that I find myself unable altogether to agree in the judgment either of Romer J. or of the Court of Appeal.

Before proceeding to deal with more debatable matters, I will at once express my opinion that the right of the plaintiffs

A. C.                AND PRIVY COUNCIL.                    23

to sue on behalf of other growers as well as for themselves
does not depend upon the question whether such other growers
have proprietary rights in respect of the market, for if they
have as a class any beneficial rights or interests in the market,
though not strictly of a proprietary character, they may well
be represented by those suing to obtain redress in respect of
their individual grievances, provided there is community of
interest in one right.

I would here observe that I fail to see the utility or necessity
of making the Attorney-General a party to the proceedings ;
for the growers, although no doubt they form an important
class of traders attending the market, do not represent the
public.

I come now to the serious question whether all these
plaintiffs are rightly joined in this action. As a fundamental
rule of practice, and of pleading, two or more different plaintiffs,
each having a separate and different cause of action, cannot be
joined in the same action. To cite authority for this proposition
seems superfluous. I may, however, mention the case of
*Sandes and Another* v. *Wildsmith and Another* (1) as an illus-
tration. Under this rule no two of the plaintiffs in this case
could have been joined in this action ; for the grievance of each
as claimed is separate and distinct, and no joint cause of action
is disclosed.

Another rule of practice and pleading would, before the
Judicature Act, have prevented a plaintiff from suing in the
Common Law Courts as representing anybody except himself,
unless he were already a legal representative of another, e.g.,
an executor, public officer of a bank, &c., having special
authority by law to sue on behalf of another or others. It was
otherwise, however, in the Court of Chancery, as stated by the
Master of the Rolls in giving judgment in this case in the
Court of Appeal. Since the Judicature Act, however, two
rules of the Supreme Court, Order XVI., rr. 1, 9, have
been made, apparently with a view to assimilate the practice
of the Common Law with the rules of Equity. The rules are
as follows :—Rule 1 : " All persons may be joined in one action

(1) [1893] 1 Q. B. 771.

H. L. (E.)

1900

BEDFORD
(DUKE OF)
v.
ELLIS.

Lord Brampton.

H. L. (E.)
1900
BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord Brampton.

as plaintiffs in whom any right to relief in respect of, or arising out of the same transaction or series of transactions is alleged to exist, whether jointly, severally, or in the alternative, where, if such persons brought separate actions, any common question of law or fact would arise." Rule 9 : "Where there are numerous persons having the same interest in one cause or matter one or more of such persons may sue or be sued [or may be authorized by the Court or a judge to defend] in such cause or matter on behalf or for the benefit of all persons so interested."

But it must be observed, according to my view, that neither the rule of equity, nor the rules I have just mentioned, authorize the joinder in the same action of two or more plaintiffs suing in respect of different causes of action, nor the suing by any plaintiff on behalf of another person as well as himself, except in respect of the one and the same interest in the cause or matter for which he is himself suing. Let me now apply what I have said to the several plaintiffs and matters of complaint in the present case.

As regards the first claim for a declaration as to the casual cart stands, though general non-compliance with the Act is alleged, no specific cause of action is stated or suggested in either of the plaintiffs in respect of them.

As regards claim No. 2, relating to the yearly cart stands, the four plaintiffs—Ellis, Gray, Miller, and Ashby—have undoubtedly stated separate causes of action, in respect of which they have jointly claimed a declaration ; they have also claimed injunctions and separate accounts, and repayment of excessive charges. They clearly are rightly joined. The same common question would have arisen if they had brought separate actions. They are also entitled to sue on behalf of all other growers having the same interest in one cause or matter, that is to say, the preferential rights they claim to be accepted as tenants of yearly cart stands as described in s. 7 of the Act.

As regards the claim (3.) to a declaration touching the yearly pitching stands, I think the plaintiffs Pullinger and Peacock stand with regard to those stands precisely in the

**A. C.**                    AND PRIVY COUNCIL.                    25

same position as the other four plaintiffs stand with regard to
the yearly cart stands. Their claims and the cause of action
they are suing on are not the same as those of the other four
plaintiffs, and had they brought separate actions, the same com-
mon questions would not arise, for the two sets of plaintiffs sue
not in respect of the same, but of different claims, that is, pre-
ferential rights to the occupation of different stands, and the
obligations upon the defendant as to the letting of which are
not couched in the same language. As to the "yearly cart
stands," the words relied on as making it obligatory to let are
"shall be let," but there are no words expressive of any obliga-
tion to let to a grower, and the preferable right to resort to the
stand is given not "to growers," but to "the holder of the
stand," while as to the yearly pitching stand the words are
"may be let," and it is expressly directed that, if let, it shall
be "to growers." As a test whether these several claims are
substantially different, I would ask, assume a judgment to be
recovered by any of the plaintiffs against the defendant in
respect of the "yearly cart stands," and subsequently an
action to be brought by the same plaintiffs against the
defendant in respect of the "casual cart stands," could the
defendant plead judgment recovered? I do not think any one
could be found who would answer in the affirmative. This
seems to me to prove to demonstration that the rights and
causes of action are different. I think, for the reasons I have
expressed, that the rights of Ellis, Gray, Miller, and Ashby are
different, and relate to other stands than those as to which
Pullinger and Peacock claim to be entitled to tenancies, and
that they ought not to be joined in one action, and that the
claim ought to be amended by striking out all relating to one
of these two sets of plaintiffs, and also to the casual cart stands,
but the claim ought not to be set aside altogether. I think,
moreover, that the interests of the growers would be equally
well settled by leaving as plaintiffs only one set as I have sug-
gested, and certainly the embarrassment would be reduced to
a minimum.

Unless such an amendment is made, I think the judgment of
the Court of Appeal should be reversed.

<div align="right">

H. L. (E.)

1900

BEDFORD
(DUKE OF)
*v.*
ELLIS.

Lord Brampton.

</div>

26                    HOUSE OF LORDS                    [1901]

H. L. (E.)    THE LORD CHANCELLOR.    My Lords, I have nothing to add
1900        to what I said when this case was last before the House,
BEDFORD     and I therefore proceed to ask your Lordships to pronounce
(DUKE OF)   judgment.
v.
ELLIS.
                              *Order appealed from affirmed and appeal*
                                    *dismissed with costs.*


                              *Lords' Journals,* December 10, 1900.


        Solicitors: *R. S. Taylor, Son & Humbert; A. B. Bell.*

                        ————————

                        [HOUSE OF LORDS.]

H. L. (E.)   THE LONDON COUNTY COUNCIL⎫
1900         AND OTHERS   .   .   .   .   .   .   .  ⎬ APPELLANTS;
Dec. 10.                                            ⎭
                                AND

        THE ATTORNEY-GENERAL   .   .   .   RESPONDENT.

*Revenue—Income Tax—Deduction of Income Tax from Interest or Annuities—
    Customs and Inland Revenue Act,* 1888 (c. 8), *s.* 24, *sub-s.* 3.

> In paying the dividends on their consolidated stock out of the Consoli-
> dated Loans Fund, the London County Council are bound under s. 24,
> sub-s. 3, of the Customs and Inland Revenue Act, 1888, to account to the
> Crown for the income tax which they deduct from the dividends, so far
> only as the dividends are not paid out of their income which has already
> been charged with income tax.
>
> Where the dividends are paid partly out of rents and profits from their
> lands charged with income tax under Sched. A, partly out of interest on
> loans to local authorities charged with income tax under Sched. D, and
> (where those receipts are insufficient) partly out of moneys raised by
> rates, the council are entitled to retain for their own benefit so much of the
> deduction for income tax which they make on the dividends as is equal to
> the income tax paid both under Sched. A and Sched. D.
>
> The decision of the Court of Appeal, [1900] 1 Q. B. 192, reversed.

UNDER various statutes the London County Council, as
successors to the Metropolitan Board of Works, raise money
by loans upon the security of the Consolidated Loans Fund.
They also lend money to local authorities, the interest on which
and the parts of principal repaid are paid into the Consolidated

# LLOYD'S LIST
# LAW REPORTS

Editor :
## E. S. MATHERS
of the Middle Temple, Barrister-at-Law

## 1962
## Volume 2



PRINTED AND PUBLISHED BY LLOYD'S
AT LLOYD'S, LONDON, ENGLAND
1963

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 445 of 2232
Page ID #:2503

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Tuesday, May 29, 1962

---

### CAMPOS v. KENTUCKY & INDIANA TERMINAL RAILROAD COMPANY

Before Mr. Justice McNair

**Contract—Bonds—Gold value clause.**

**Practice—" Res judicata."**

**Conflict of laws—Class action—Whether plea or " res judicata" open — U.S.C.A., Title 28, Rule 23.**

Bonds issued by defendant company in 1911, by which defendants promised to pay bearer £100

Sterling money of the United Kingdom . . . on the 1st day of January, 1961, with interest at 4½ per cent. per annum payable semi-annually in like gold coin . . .

Interest coupons (100) on bonds stating that defendants

WILL PAY TO BEARER TWO POUNDS AND FIVE SHILLINGS STERLING MONEY OF THE UNITED KINGDOM . . .

Claim by plaintiff bearer of 414 bonds against defendants for £8223 19s. 4d. (gold value of interest coupons Nos. 97, 98, 99) and £123,675 8s. 11d. (gold value of principal sums due on Jan. 1, 1961)—Plea by plaintiff that, in view of words " in like gold coin " appearing in provision as to payment of interest, and no gold coin having been referred to earlier in bond, the words " in gold coin " should be wirtten into provision as to payment of capital—Contentions by defendants (a) that only face value of interest coupons and bonds was payable; (b) that, in view of decision of U.S. Ct. of App., on bonds in identical form, doctrine of res judicata applied—Proper law of contract conceded by parties to be English law — Evidence that U.S. action was a class action commenced before plaintiff became bondholder; and that person who was not a member of the class when class action was commenced was not bound by ultimate decision — Admissibility of terms of mortgage deed referred to in bond, but not referred to in interest coupon, and of stockholders' resolution.

---

—*Held*, (1) (i) that, by the proper law of the contract at the time of the making of the contract (1911), a loan of £1000 in sterling money of U.K. could be discharged only by 1000 gold sovereigns or Bank of England notes convertible into gold sovereigns or partly in one and partly in the other; that the provision in bond that interest should be " payable in like gold coin " did no more than reflect the then existing legal position; that reconciliation of provisions as to payment of capital and interest did not require that words " in gold coin " should be written into contract, since, under law at that time, both obligations were dischargeable in same way, i.e., by gold sovereigns or Bank of England notes convertible into gold sovereigns; (ii) that, by proper law of contract at date of performance, a commercial obligation to pay sterling could not be discharged by tender of gold coins or Bank of England notes convertible into gold without breach of law; and that performance of that obligation could be made only by tender of Bank of England notes not convertible into gold; (2) *further*, in the circumstances, the terms of the mortgage deed and stockholders' resolution were not admissible as aids to construction of bond; (3) (*obiter*) (i) that defendants had failed to prove that U.S. action was a true class action or that, under U.S. law, that judgment was binding on anyone who was not an original party or did not intervene; (ii) that, assuming that U.S. judgment supported plea of *res judicata* in U.S. Courts against an absent member of the class, plaintiff was not a bondholder when U.S. action was commenced; was not a party to that action; and had not been served with process which led to U.S. Court's judgment; and that, therefore, plea of *res judicata* failed; and (4) that plaintiff was entitled to face value of bonds and interest coupons; that, as plaintiff's claim was for payment on a gold value basis, plaintiff's claim failed—Special order as to costs.

---

The following cases were referred to:

British & French Trust Corporation v. New Brunswick Railway Company, [1937] 4 All E.R. 516;

Coles v. Hulme, (1828) 8 B. & C. 568;

Feist v. Société Intercommunale Belge d'Electricité, [1934] A.C. 161;

Lemaire v. Kentucky and Indiana Terminal Railroad Company, (1956) 140 F. Supp. 82; (1957) 242 F. 2d 884;

Mourmand and Others v. Le Clair, [1903] 2 K.B. 216;

New Brunswick Railway Company v. British and French Trust Corporation, Ltd., [1939] A.C. 1;

Norman v. Baltimore & Ohio Railroad Company, (1935) 294 U.S. 240;

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 446 of 2232
Page ID #:2504

[1962] Vol. 2]    **Campos v. Kentucky & Indiana Terminal Railroad Co.**

Oppenheimer *et al.* v. F. J. Young & Co.,
  Inc., *et al.*, (1944) 144 F. 2d 387;
Ottoman Bank of Nicosia v. Chakarian,
  [1938] A.C. 260;
Perry v. United States, (1935) 294 U.S.
  330;
*Rex* v. International Trustee for the
  Protection of Bondholders Aktiengesell-
  schaft, [1937] A.C. 500; (1937) 57
  Ll.L.Rep. 145;
Rossano v. Manufacturers Life Insurance
  Company, [1962] 1 Lloyd's Rep. 187;
Serbian Loans Case, Permanent Court of
  International Justice;
Syndic in Bankruptcy of Salim Nasrallah
  Khoury v. Khayat, [1943] A.C. 507;
System Federation No. 91 v. Reed *et al.*,
  (1950) 180 F. 2d 991;
Treseder-Griffin and Another v. Co-opera-
  tive Insurance Society, Ltd., [1956] 2
  Q.B. 127; [1956] 1 Lloyd's Rep. 377;
United States *et al.* v. Bankers Trust Com-
  pany *et al.*, (1935) 294 U.S. 240;
Weeks *et al.* v. Bareco Oil Company *et al.*
  (1941) 125 F. 2d 84;
York v. Guaranty Trust Company of New
  York, (1944) 143 F. 2d 503.

In these two actions, which were
consolidated, Miss Sonia Campos, of Paris,
claimed £131,880 19s. 4d., being the gold
value, principal and interest, alleged to be
due to her in respect of 414 £100 first
mortgage $4\frac{1}{2}$ per cent. coupon gold bonds
issued in 1911 by the defendants, Kentucky
& Indiana Terminal Railroad Company, of
Louisville, Kentucky, U.S.A.

The plaintiff claimed that upon the true
construction of the bonds, which fell due
for payment on Jan. 1, 1961, payment was
to be made in current legal tender of the
United Kingdom representing the gold value
of the nominal amount of payment.

The defendants contended that the pay-
ment should be in current legal tender.
The main issue before the Court was
whether the bonds imported a gold value
clause.

According to the plaintiff's case, by
the terms of each of the bonds the defen-
dants promised to pay to the bearer
£100 sterling money of the United Kingdom
of Great Britain and Ireland, at the office
or agency of the defendants in the City of
London, England, on Jan. 1, 1961, with
interest thereon at the rate of $4\frac{1}{2}$ per cent.
per annum from Jan. 1, 1911, payable
semi-annually in like gold coin, at the
agency, on July 1 and Jan. 1 in each year,

on presentation and surrender of the
annexed coupons as they severally became
due. By the terms of the bonds, payment
was expressed to be secured by a mortgage
or deed of trust dated Jan. 3, 1911,
executed by the defendants to the Standard
Trust Company of New York, which itself
referred to a resolution of the stockholders
of the defendants authorizing the issue of
the bonds.

The plaintiff alleged that upon the true
construction of the bonds:

  (a) the interest payments and/or

  (b) the capital sum payable thereunder
      on Jan. 1, 1961,

were such sums in current legal tender of
the United Kingdom as represented the
gold value of the nominal amount of each
payment such gold value being determined
in accordance with the weight and fineness
established by the Coinage Act, 1870,
namely, 0.23542 troy ounces of fine gold
to the pound sterling; and that the bonds
were, upon their true construction,
governed by English law.

The plaintiff said that the defendants
wrongfully contended that the sums pay-
able in respect of both (a) interest and (b)
capital under the bonds were the face
amount of the bonds and coupons in
current English legal tender of the same
face amount.

The plaintiff duly presented the bonds
and interest coupons at the agency of the
defendants in London, namely, Morgan
Grenfell & Co., Ltd., of London, in respect
of which the plaintiff alleged that the sums
properly payable to her amounted to
£123,657 5s. 11d., and £8223 13s. 5d.,
respectively, but the defendants, in accord-
ance with their contention referred to
above, refused payment.

The plaintiff claimed (1) a declaration
that upon the true construction of the
bonds the amounts payable by the defen-
dants to the plaintiff in respect of (a)
interest and/or (b) capital were such sums
in current legal tender of the United
Kingdom as represented the gold value of
the nominal amount of each payment, such
gold value being determined in accordance
with the weight and fineness established by
the Coinage Act, 1870, namely, 0.23542
troy ounces of fine gold to the pound
sterling; (2) The sums of £123,657 5s. 11d.
and £8223 13s. 5d.; and (3) Interest thereon
under the Law Reform (Miscellaneous
Provisions) Act, 1934, at such rate and for
such period as the Court should think fit.

Campos v. Kentucky & Indiana Terminal Railroad Co.          [1962] Vol. 2

By their defence, the defendants did not admit that the plaintiff was the bearer of the bonds. They admitted that the bonds were part of a series of 13510 First Mortgage 4½% Fifty-Year Guaranteed Sterling Bonds which were issued by the defendants under a first mortgage of Jan. 3, 1911, and which were offered to the public (pursuant to a prospectus to which was annexed a letter of Jan. 3, 1911, from the then President of the defendants to J. P. Morgan & Co., of New York) by Morgan Grenfell & Co., Ltd., of London, between Jan. 18 and 20, 1911, pursuant to a resolution of the board of directors of Dec. 30, 1910, acting under powers conferred on the board by a resolution of the stockholders of the defendants of Dec. 30, 1910, and further admitted that the bonds were 414 out of 859 bonds which had not been presented for payment since maturing on Jan. 1, 1961.

The defendants admitted the promise set out in the statement of claim and admitted that the bonds were, upon their true construction, governed by English law.

The defendants denied that, upon the true construction of the bonds, either the interest payments payable thereunder on presentation and surrender of coupons maturing from time to time or the capital sums payable thereunder on presentation and surrender of the bonds on or after Jan. 1, 1961, were such sums in current legal tender of the United Kingdom as represented the gold value of the nominal amount of each payment, such gold values being determined in accordance with the weight and fineness established by the Coinage Act, 1870, namely, 0.23542 troy ounces of fine gold to the pound sterling and denied that, upon that construction, any of the payments of interest or principal were any sums calculated by reference to gold of any weight and fineness or any gold value.

The defendants alleged that, upon the true construction of the bonds, the interest payments and the capital sums payable thereunder on presentation and surrender of the respective coupons and bonds were the face amount of the coupons, namely, £2 5s. each, and the face amount of the bonds, namely, £100 each in current English legal tender.

The defendants denied that their agents in the City of London had refused to pay the proper sum due in respect of any interest coupons against presentation and

surrender of the relevant interest coupons, and contended that if, which was not admitted, the plaintiff presented any interest coupons and was not paid, that was due to her refusal to surrender her coupons unless paid more than the sums properly due.

The defendants alleged further, and in the alternative, that the United States District Court for the Southern District of New York, (1956) 140 F. Supp. 82, in an action brought by Sylvan Lemaire on behalf of himself and all other bondholders of the defendants similarly situated against the defendants and others, by a judgment determined, adjudged and decreed that:

(a) The defendants intended to have the obligation with respect to principal and interest dischargeable by payment in London, England, in sterling in such currency as should be legal tender at the respective times of payment without diminution or enlargement of the obligation by reason of any future fluctuation in the gold content of the English sovereign.

(b) The bonds and interest coupons were dischargeable in the specified number of units of account (pounds sterling) in such currency as was or would be legal tender at the respective times of payment, regardless of any change which might have occurred after 1911 in the gold convertibility or the purchasing power of that currency.

(c) The bond and interest coupons did not contain a gold value clause and did not call for a value in money fixed by a determined quantity of gold.

(d) The defendants' obligation to pay all future interest coupons attached to the bonds, as they should become due and payable and the defendants' obligation to pay the principal of the bonds due on Jan. 1, 1961, would be fully discharged by the defendants paying the specified number of units of account, i.e., pounds sterling, in currency which would be legal tender at the respective times of payment and without regard to gold and gold value.

Sylvan Lemaire's bonds were identical save as to their serial numbers to the bonds in this case. Sylvan Lemaire and the bearers of such bonds were similarly situated as regards their respective bonds.

The judgment referred to above was unanimously affirmed by the United States Court of Appeals for the Second Circuit, on Apr. 2, 1957, (1957) 242 F. 2d 884,

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 448 of 2232
Page ID #:2506

462          LLOYD'S LIST LAW REPORTS          [Q.B. (Com. Ct.)

[1962] Vol. 2]    Campos v. Kentucky & Indiana Terminal Railroad Co.    [McNair, J.

and, by the law of the United States of America, that judgment was a final and conclusive judgment.

The defendants said that, by the laws of the United States of America, they could rely upon that judgment as a complete defence to any action brought in the United States of America whether in a Federal or State Court by any holder of any bond similar to Sylvan Lemaire's bonds or holder of any interest coupon similar to Sylvan Lemaire's coupons in respect of any such bond or in respect of any such interest coupon even if such subsequent proceedings in America were to enforce a judgment of an English Court to the effect that payment of principal and interest against surrender respectively of such bond and coupon should be made with regard to gold value including a judgment of the Queen's Bench Division obtained in this action by the plaintiff giving her all the relief claimed by her in her writ of summons and statement of claim. Accordingly, the defendants relied upon the doctrine of *res judicata*.

By the terms of the mortgage deed pursuant to which the bonds, the subject-matter of this action were issued, the property of the defendants set out in the deed was transferred to the Standard Trust Company of New York, its successor or successors and assigns (hereinafter called the trustee) in trust for the equal *pro rata* benefit and security of all and every holder of the bonds and coupons issued under and secured by the deed and by the terms of the deed no holder of any bond or coupon should have the right to institute any suit, action or proceeding in equity or at law for any remedy, without first giving notice to the trustee of the fact that default had occurred nor unless such holder should have made request to the trustee and afforded the trustee a reasonable opportunity to institute such action, suit or proceeding in the name of the trustee and offered adequate security and indemnity to the trustee against the cost, expenses and liabilities to be incurred and such notification request and offer of indemnity were declared conditions precedent to any action or cause of action for any remedy, it being the express and declared intention that no holder of any bonds or coupons should have any rights other than as set out in the deed and that all proceedings at law, or in equity, should be instituted, had and maintained in the manner provided in the deed, and for the equal benefit of all holders of the bonds and coupons outstanding.

At the date of the commencement of these proceedings, the trustee was Morgan Guaranty Trust Company of New York of 140 Broadway, New York, the successor of the Standard Trust Company.

The defendants alleged that the plaintiff failed to notify, request, afford opportunity to, offer security to and offer indemnity to the trustee as set out above and that this action was not instituted and was not being maintained in the manner provided in the deed and was not for the equal benefit of all holders of the bonds and coupons which were outstanding.

Mr. John Foster, Q.C., Mr. Mark Littman, Q.C., and Mr. A. L. V. Lincoln (instructed by Messrs. Payne, Hicks Beach & Co.) appeared for the plaintiff; Sir Milner Holland, Q.C., and Mr. Owen Stable (instructed by Messrs. Slaughter & May) represented the defendants.

## JUDGMENT

**Mr. Justice McNAIR:** The plaintiff in these two consolidated actions is Miss Sonia Campos, an Egyptian national, resident in Paris. She is the bearer of 414 coupon bonds issued by the defendant company, Kentucky & Indiana Terminal Railroad Company, in 1911, entitled "£100 First Mortgage 4½% Coupon Gold Bonds". These bonds were purchased for Miss Campos's account between Dec. 19, 1955, and Feb. 23, 1956. She claims against the defendant company, in the first action, the sum of £8223 13s. 5d., being, as she claims, the gold value of the interest payments due under the coupons of the series denoted by the numbers 97, 98 and 99, and, in the second action, the sum of £123,675 5s. 11d., being the gold value of the principal sums under the bonds which fell due for payment on Jan. 1, 1961. The basis of her claim in each case is that upon the true construction of the bonds the interest payments and the capital sums payable on the due dates were such sums in current legal tender of the United Kingdom as represents the gold value of the nominal amount of each payment, such gold value being determined in accordance with the weight and fineness established by the Coinage Act, 1870, namely, 0.23542 troy ounces of fine gold to the £ sterling.

The defendants, by their defence, deny that the basis contended for by the plaintiff is correct and assert that upon the true

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 449 of 2232
Page ID #:2507

construction of the said bonds the interest payments and the capital sums payable thereunder are for the face amount of the coupons, namely, £2 5s., and the face amount of the bonds, namely, £100 each in current English legal tender. The issue so joined may be stated simply: Do the coupons or the bonds on their true construction import a true " gold value clause ", i.e., a clause which prescribes a measure for fixing the amount of the debt to be discharged and not merely the method by which a debt of fixed unvarying amount is to be discharged? See *Feist v. Société Intercommunale Belge d'Electricité*, [1934] A.C. 161. By way of additional defence the defendants rely upon a decision of the United States District Court for the Southern District of New York, in an action brought by one Sylvan Lemaire allegedly on behalf of himself and other bondholders of the defendants similarly situated against the defendants in which the Court in effect upheld the contention now made by the defendants in the present action, namely, that the bonds and interest coupons did not contain a gold value clause. This decision, affirmed by the United States Court of Appeals for the Second Circuit, is relied upon by the defendants as justifying a plea of *res judicata* against the present plaintiff. In the further alternative, the defendants rely upon the plaintiff's failure to notify the trustees of the mortgage securing due payment of the bonds of her intention to take proceedings against the defendants in accordance with a provision in the mortgage deed under which the bonds were secured.

The main issue to which I now turn is the question of the true construction of the bonds. Each of the bonds sued upon except for its serial number is in identical terms and provides as follows:

### KENTUCKY & INDIANA TERMINAL RAILROAD COMPANY,

#### No. 1831.

#### First Mortgage 4½% Coupon Gold Bond. Payable January 1, 1961.

For value received, the Kentucky & Indiana Terminal Railroad Company, a corporation existing under the laws of the State of Kentucky (hereinafter called " the Company "), promises to pay to bearer, or if this bond be registered as hereinafter provided, to the registered owner, ONE HUNDRED POUNDS Sterling money of the United Kingdom of Great Britain and Ireland, at the office or agency of the Company in the City of London, England, on the 1st day of January, 1961, with interest thereon at the rate of four and a half per cent. per annum from the 1st day of January, 1911, payable semi-annually in like gold coin, at said agency, on the 1st day of July and January in each year, on presentation and surrender of the annexed coupons as they severally become due. Both the principal and the interest of this bond are payable without deduction for any tax or taxes which the Company or the Trustee may be required to pay or to retain therefrom, under any present or future law of the United States, or of any State or County or Municipality therein. This Bond is one of an issue of coupon and registered bonds of the Company to an amount not exceeding in the aggregate the equivalent of Two Million pounds Sterling known as its First Mortgage 4½% Gold Bonds, secured by its mortgage or deed of trust dated the 3rd day of January, 1911, executed by the Company to The Standard Trust Company of New York, Trustee, conveying all the property of the Company upon terms and conditions therein set forth, to which mortgage or deed of trust reference is now made. In case default shall be made in the payment of any instalment of interest on this bond, the principal sum may be declared due and payable in the manner and with the effect provided in said indenture. . . . . This bond shall pass by delivery, but the ownership of this bond may at any time, and from time to time, be registered at the office or agency of the Company in the City of London, England, the registration to be certified hereon; and thereafter no transfer shall be valid unless made upon the books of the Company and certified hereon by its transfer agent, until registration has been made to bearer, after which this bond shall pass by delivery until the ownership be again registered. The registry of this bond shall not restrain the negotiability of the coupons by delivery merely. The holder, also, at his option, may surrender for cancellation this bond with the coupons for future interest thereon, in exchange for a registered bond without coupons, as provided in said mortgage. This bond shall not be valid or become obligatory for any purpose until the certificate endorsed hereon shall have been signed by the Trustee under the said mortgage or deed of trust; and such signing shall be

464       LLOYD'S LIST LAW REPORTS       [Q.B. (Com. Ct.)

[1962] Vol. 2]    **Campos v. Kentucky & Indiana Terminal Railroad Co.**    [McNair, J.

conclusive evidence that the bond so signed has been duly executed in accordance with its terms and the terms of the said mortgage or deed of trust.

In Witness Whereof the Kentucky & Indiana Terminal Railroad Company has caused its corporate seal to be hereto affixed and attested by its Secretary or Assistant Secretary, and this bond to be signed by its President or Vice-President, and has hereto attached coupons with the name of its Treasurer engraved thereon, as of the 3rd day of January, 1911.

Kentucky & Indiana Terminal Railroad Company,

By

(sd) . . . . Arnold.
SECRETARY.

(sd) J. W. H. Campbell,
PRESIDENT.

On the face of each of the bonds there was superimposed a decorative device of which the word GOLD forms a prominent feature.

To each bond on issue there were attached 100 detachable coupons serially numbered from 1 to 100 to cover the half-yearly interest payments over the 50 years' life of the bonds.

These coupons were in the following form:

**KENTUCKY & INDIANA TERMINAL RAILROAD COMPANY** ON THE 1ST DAY OF JAN. 1961.

**£2. 5s.**

WILL PAY TO BEARER TWO POUNDS AND FIVE SHILLINGS, STERLING MONEY OF THE UNITED KINGDOM OF GREAT BRITAIN AND IRELAND, AT THE AGENCY OF THE COMPANY IN THE CITY OF LONDON, ENGLAND, FREE OF ALL TAXES AS MENTIONED IN THE BOND, BEING SIX MONTHS' INTEREST ON ITS FIRST MORTGAGE GOLD BOND NO. 1043.

[Signed]

TREASURER

A perusal of these two documents reveals (1) that as regards the bond the obligation with relation to the payment of the capital moneys contains no express reference to gold or gold coins, but is expressed to be an obligation to pay £100 sterling money of the United Kingdom of Great Britain and Ireland whereas the obligation as to payment of interest as set out in the bond is stated to be to pay

" interest thereon at the rate of four and a half per cent. per annum . . . semi-annually in *like gold coin* [*] no gold coin having previously been expressly mentioned, and (2) that the coupon expresses the interest obligation as an obligation " to pay to bearer two pounds and five shillings sterling money of the United Kingdom of Great Britain and Ireland ", without any reference to " gold coin ".

It is common ground (1) that the bonds and coupons are governed by English law; and (2) that both the bonds and the coupons when detached from the bonds are negotiable instruments passing by delivery.

Before considering the question of construction more closely it is probably convenient to refer briefly to the mortgage deed and the documents therein referred to while postponing for further consideration the question whether any of this material is relevant or admissible on the question of construction.

The mortgage deed dated Jan. 3, 1911, is a complicated document running to 72 pages; but in essence it provides for a mortgage by the defendant company to the Standard Trust Company of New York of property of the defendant company in trust

. . . for the equal *pro rata* benefit and security of all and every holder of the bonds and interest coupons issued under and secured by this indenture . . .

Nowhere in the operative provisions of the deed is any mention made of gold or gold coin; but, throughout the operative provisions, the issue of bonds secured by the mortgage is referred to in terms of sterling money of the United Kingdom of Great Britain and Ireland; the bonds to be issued are not to exceed the equivalent of £2,000,000 sterling money; the coupons are each to be for the principal sum of £100 (see Art. I); provision is also made in Art. II for the contingency that the defendants may wish to issue bonds payable both as to principal and interest in money of other governments (i.e., not in sterling) subject to the limitation that

. . . the aggregate principal sum of all the bonds to be issued under and secured by this indenture . . . shall not exceed £2,000,000 sterling, the bonds payable in money other than sterling money being reckoned at the par of exchange thereof with sterling money. . . .

* Emphasis supplied by Mr. Justice McNair.

The recitals to the deed set out the resolution of the stockholders of Dec. 30, 1910, which (omitting immaterial words)

. . . directed and empowered [the directors] to cause to be executed under the corporate seal . . . a mortgage or deed of trust of this company . . . to secure an issue of bonds for the aggregate principal sum of Two Million pounds sterling, the principal thereof payable in gold coin of the United Kingdom of Great Britain and Ireland . . . with interest thereon . . . at the rate of 4½ per centum per annum, payable semi-annually in like gold coin . . .

By the same resolution the stockholders approved the printed form of mortgage then submitted as sufficient compliance with their resolution.

There follows a recital of a resolution of the board of directors authorizing the execution under the company's corporate seal of the mortgage

. . . to secure the payment of the bonds of this company to the amount of Two Million pounds sterling . . . the principal of such bonds to be payable on the 1st day of January, 1961, with interest from January 1, 1911, payable semi-annually . . . at the rate of four and a half per centum per annum; said bonds and coupons to be payable . . . in the City of London, England, in Sterling money of the United Kingdom of Great Britain and Ireland, or elsewhere, and in money of any other government as from time to time hereafter may be authorized by the board of directors.

There follows a further resolution of the board of directors that the said bonds payable in sterling money shall be in substantially the following form. There are then set out the forms of bonds and coupons above referred to.

Assuming, for the moment, that these documents are relevant and admissible the comment may at least be made that they are not models of consistent draftsmanship.

I now approach more closely the problem of the true construction of the bonds and the coupons. These particular bonds and coupons have not been considered by the English Courts before and I therefore bear in mind that any decisions of the English Courts upon other bonds are not authoritative upon the construction of these bonds unless (1) the variation between the bonds previously considered and the present bonds is so slight as to be immaterial, or (2) they contain certain principles of construction which are relevant to the instant bonds notwithstanding the variation.

As it seems to me, the first fundamental rule of construction must be that the Court's task is to determine what intention must be imputed to the parties from the actual words used and that in discharging that task the Court is entitled to look at the surrounding circumstances existing at the time of the execution of the document, but not (except where there is a plea of rectification, as there is not here) at preliminary documents of a negotiating nature. Further, there has been established by a decision of the House of Lords binding upon me that the gold value obligation should not be imposed unless by the terms of the documents it is imposed in clear or precise terms. (See *New Brunswick Railway Company v. British and French Trust Corporation, Ltd.*, [1939] A.C. 1, per Lord Maugham, L.C., at p. 18, and per Lord Wright, at p. 35.)

One other preliminary observation. It being conceded that the proper law of the bonds and coupons is English law, the nature of the obligation imposed by the bonds and coupons must be determined in the light of English law at the date of the contract whereas the nature of the required performance must be determined in the light of English law at the due date of performance.

In 1911, the City of London was the most important market in the world for raising capital. By virtue of the Coinage Act, 1870, sterling money of the United Kingdom consisted (1) of gold coins of a prescribed weight and fineness which were legal tender for any amount; (2) silver coins which were legal tender for amounts not exceeding 40s.; and (3) bronze coins which were legal tender for amounts not exceeding 1s. The Bank of England Charter, 1833, Sect. 6, which was in force in 1911, provided so far as is material that

. . . a tender of a note or notes of the Bank of England expressed to be payable to bearer on demand, shall be a legal tender, to the amount expressed in such note or notes, and shall be taken to be valid as a tender to such amount, for all sums above five pounds . . . so long as the Bank of England shall continue to pay on demand their said notes in legal coin. . . .

466                    LLOYD'S LIST LAW REPORTS                [Q.B. (Com. Ct.)

[1962] Vol. 2]    Campos v. Kentucky & Indiana Terminal Railroad Co.    [McNair, J.

Accordingly, as at 1911, a loan of £1000 in sterling money of the United Kingdom could be discharged only by the tender of 1000 gold sovereigns or Bank of England notes convertible into gold sovereigns or partly in one and partly in the other. It would seem to me, therefore, unless the matter is concluded to the contrary by authority binding upon me, that the provision in the bond, that the interest shall be "payable in like gold coin" does no more than to reflect the existing legal position that an obligation in sterling money shall be discharged only in the manner required by law, namely, gold coins or sovereigns or Bank of England notes convertible into legal gold coins. To use Sir Milner Holland's words, it was, in 1911, a correct description of the obligation involved in the payment of debt expressed in sterling. On this view, the reconciliation between the obligation as to the payment of the capital in sterling and the obligation as to payment of interest in gold coin does not require that the words "in gold coin" should be written into the provision as to capital since properly construed in the light of existing legislation both obligations are dischargeable in the same way. Subject to the reservation made above as to binding authorities to the contrary, in my judgment neither the bonds nor the coupons imposed in 1911 any obligation other than to pay the amount of the capital and interest expressed in sterling by the means of current legal tender, i.e., gold sovereigns or Bank of England notes convertible into gold sovereigns. So much for the content of the obligation in 1911.

When one turns to the proper law of the contract as at the date of performance one finds of course that material changes have taken place.

In effect, the position at all material times since the plaintiff became the owner of the bonds was that sterling was off the gold standard; Bank of England notes which were substituted for the Treasury notes issued under the Currency and Bank Notes Act, 1914, were legal tender for the payment of a debt of any amount expressed in sterling and were not convertible into gold; gold coins though still legal tender were for all practical purposes no longer in circulation since under the Exchange Control Act, 1947, any holder of gold, which by Sect. 42 includes gold coin, is obliged to offer it for sale to an authorized dealer as defined in Sect. 42. In the result,

a commercial obligation to pay sterling could not be discharged by the tender of gold coins or Bank of England notes convertible into gold without breach of the law. If I am right in my construction of the obligation as it existed in 1911, it follows that the only legal tender for the performance of that obligation which could be made at the date of performance in accordance with the proper law of the contract without breach of the law was by Bank of England notes not convertible into gold. The legislative changes which produced this result are conveniently set out in the judgment of Lord Justice Morris in *Treseder-Griffin and Another v. Co-operative Insurance Society, Ltd.*, [1956] 2 Q.B. 127, at pp. 151 to 152; [1956] 1 Lloyd's Rep. 377, at p. 384.

Performance in accordance with the proper law of the contract as existing at the date of the contract would be due performance of the original obligation.

As stated above, I have reached this preliminary conclusion as to the true effect of the bonds without considering the terms of the mortgage deed or the documents referred to in its recitals. But it is probably convenient that I should express my views as to the admissibility of these documents and, if so admissible, as to the effect. Sir Milner Holland, on behalf of the defendants, submitted that the mortgage deed was relevant and admissible, but not the resolutions recited in the deed. Mr. Foster, for the plaintiff, on the other hand, submitted that the resolutions of the stockholders were admissible, but neither the resolutions of the directors nor the mortgage were relevant. I was referred to Norton on Deeds, 2nd ed., at pp. 86 to 87, for the proposition that

If the transaction between the parties is contained in more than one deed, all the deeds must be construed together, and one may be read to explain the others.

and to the notes at p. 87 to the effect that this rule applies whether the deeds be executed simultaneously or at different times.

Assuming, but not deciding, that this rule applies to instruments such as bonds or interest coupons, it seems to me that the rule can have no application where the parties to the bond or coupons are not the same as the parties to the mortgage deed. Furthermore, it seems to me to be very difficult to accept that the holder of a

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 453 of 2232
Page ID #:2511

negotiable instrument can be affected in his primary rights against the obligee by the terms of a mortgage deed to which he is not a party, even though this mortgage deed is referred to in the bond; *a fortiori* in the case of a holder of an interest coupon which has no reference to the mortgage. Nor do I consider that the terms of the stockholders' resolution is relevant or admissible. If the bonds conformed with the authority, *cadit quaestio*; if they did not, the holder would not be affected by any lack of authority in the directors or be entitled to say against the company that the directors ought to have issued bonds in a different form. I would, accordingly, reject the whole of this material as an aid to the construction: but would also say that if admitted it gives no clear guidance as to the true construction. As I have observed above, the only reasonable comment that can be made is that there was considerable confusion in the draftsmanship.

Before dealing with the English decisions on gold value clauses I should deal with one further point on construction.

On behalf of the plaintiff it was submitted that by reason of the use of the words "in like gold coin" in the interest provision there must be written into the provision as to payment of principal the words "in gold coin" after the words "Sterling money of the United Kingdom of Great Britain and Ireland". It is not sufficient for the purpose of the argument advanced on the plaintiff's behalf that the words "sterling money" mean gold coin: for as will appear later when I come to examine the authorities it is the express use of the word "gold" which will in the conditions specified in these authorities import the gold value clause. Assuming for the moment that a plea of rectification could be raised by the holder of a negotiable instrument, I would accept that if there had been such a plea and an examination of the preliminary documents showed that the bond did not, without the addition of those words, accurately represent the prior agreement, it would be legitimate to insert the words as indicated. But, in the absence of any such plea, the power of the Court is limited. In this connection I was referred to the cases of *Coles v. Hulme*, (1828) 8 B. & C. 568; and *Mourmand and Others v. Le Clair*, [1903] 2 K.B. 216, in which the word "pounds" without a plea of rectification was written in the first case into the

condition of a bond for the payment of "7700" *simpliciter* and in the second case into a bill of sale for £70 in which there was a stipulation that the principal and interest should be repaid by monthly instalments of "seven" *simpliciter*.

These cases, however, seem to me merely to indicate corrections of drafting slips in conditions which otherwise would be meaningless. I would not as at present advised be disposed to hold that apart from rectification it would be permissible to write in the words "in gold coin" in the provision as to the payment of the principal moneys if the effect would be to give to that provision a meaning other than that which the provision bears without the addition of those words. It is to be observed that in *New Brunswick Railway Company v. British and French Trust Corporation, Ltd.*, [1939] A.C. 1, the House of Lords, while applying the *Feist\** construction to the provision as to payments of principal expressed in the form of "to pay . . . 'the sum of one hundred pounds sterling gold coin of Great Britain of the present standard of weight'", declined to apply that construction to the interest provision expressed as follows:

" . . . with interest at the rate of five pounds sterling per centum per annum . . . "

I now turn more closely to the English authorities relied upon by the plaintiff. Mr. Foster, on her behalf, submitted that the decision of the House of Lords in *Feist's case, sup.*, was an authority for the broad proposition that whenever the word "gold" or "gold coin" or gold qualifying a unit of currency is used in a bond of this nature it connotes a true "gold value clause". In *Feist's case, sup.*, the bond provided for payment of

. . . £100 in sterling gold coin of the United Kingdom of or equal to the standard of weight and fineness existing on September 1, 1928.

and to pay interest thereon

. . . at the rate of 5½ per cent. per annum in sterling in gold coin of the United Kingdom of or equal to the standard of weight and fineness existing on September 1, 1928, by equal half-yearly payments . . .

---

*\* Feist v. Société Intercommunale Belge d'Electricité, [1934] A.C. 161.*

Case 2:23-cv-09217-MEMF-KS     Document 114-4     Filed 09/05/25     Page 454 of 2232
Page ID #:2512

468          LLOYD'S LIST LAW REPORTS          [Q.B. (Com. Ct.)

[1962] Vol. 2]     **Campos v. Kentucky & Indiana Terminal Railroad Co.**     [McNair, J.

Condition 4 of the bond provided that

> This Bond is one of an authorized issue of Bonds of the Company of an aggregate principal amount not exceeding £500,000 in sterling in gold coin of the United Kingdom at any one time outstanding.

Lord Russell of Killowen, in whose opinion Lord Atkin, Lord Warrington and Lord Wright concurred, stated (*ibid.*, at p. 168) that the decision of the Courts below that the company were entitled to satisfy the principal moneys and interest secured by the bond by tendering whatever might be at the due date of payment the nominal amount of the bond or coupon

> . . . deprives of all effect the words which occur in clauses 1 and 2 of the bond, viz.: "in gold coin of the United Kingdom of or equal to the standard of weight and fineness existing on September 1, 1928." These words (which merely for convenience I will call the gold clause) need in this view never have been inserted at all.

Lord Russell of Killowen refers to the fact that at the date of issue of the bonds (*ibid.*, at p. 171)

> . . . The country was on the gold standard but the notes were inconvertible and gold coin was substantially no longer in circulation.

> . . . it is not, I think, improper or hazardous to make two surmises, (1.) that the gold clause was inserted in clauses 1 and 2 of the bond in contemplation of the contingency of this country going (as it did in 1931) off the gold standard at some future date; and (2.) that neither party to the bond can have contemplated payment under the bond being actually made in gold coins.

After examining Clauses 1, 2 and 4 and coming to the conclusion that they could not "have been intended by the parties to carry their literal interpretation", Lord Russell of Killowen posed the following question (*ibid.*, at p. 172):

> . . . If the words of the gold clause cannot have been used by the parties in the sense which they literally bear, ought I to ignore them altogether and attribute no meaning to them, or ought I, if I can discover it from the document, to attribute some other meaning to them? Clearly the latter course should be adopted if possible, for the parties must have inserted these special words for

some special purpose, and if that purpose can be discerned by legitimate means, effect should be given to it.

After examining Clauses 4 and 6 in which reference was made to "gold coin", Lord Russell of Killowen stated his conclusion as follows (*ibid.*, at p. 172):

> . . . I would construe clause 1 not as meaning that £100 is to be paid in a certain way, but as meaning that the obligation is to pay a sum which would represent the equivalent of £100 if paid in a particular way, in other words I would construe the clause as though it ran thus (omitting immaterial words) "pay . . . in sterling a sum equal to the value of £100 if paid in gold coin of the United Kingdom of or equal to the standard of weight and fineness existing on the 1st day of September, 1928."

In my judgment, the whole tenor of Lord Russell of Killowen's speech up to this stage points to the conclusion that in Lord Russell's view it was the existence of the words "in gold coin . . . of . . . standard of weight and fineness existing on the 1st day of September, 1928" which was of critical importance as indicating a measure of indebtedness. It is true that at the end of his opinion Lord Russell of Killowen refers to the judgment of the Permanent Court of International Justice in the *Serbian Loans case* (Permanent Court of International Justice Series A, Nos. 13 to 24. Collection of Judgments. Judgment No. 14, p. 32) as stating happily and succinctly the considerations and principles which had influenced him in reaching his conclusion. In that case, the loan issued by the Serbian Government was for "95,000,000 *gold francs* [*]". If the judgment is referred to, it becomes quite plain that in the Court's view (at p. 33)

> The "gold franc" thus constituted a well-known *standard* [*] of value to which reference could appropriately be made in loan contracts when it was desired to establish a sound and stable basis for repayment.

The "gold franc" was not used as denoting a particular gold coin circulating in any of the three countries, France, Belgium or Switzerland, in which a payment could be made.

I do not regard this decision as authority for the broad proposition for which it was cited. In my judgment, the critical element in the case was the specification of the

---

* Emphasis supplied by Mr. Justice McNair.

weight and fineness of the gold which was held to import a standard or measure of value. In this view, I am fortified, if not strictly bound, by the decision of the Court of Appeal in *Treseder-Griffin v. Co-operative Insurance Society, Ltd.*, [1956] 2 Q.B. 127; [1956] 1 Lloyd's Rep. 377. See per Lord Justice Denning (*ibid.*, at pp. 148 and 379 of the respective reports) and Lord Justice Morris (*ibid.*, at pp. 152 and 383 of the respective reports). Both these learned Lords Justices seem to me to distinguish *Feist's case, sup.*, from the case before them which concerned the payment of rent " in gold sterling " on the ground that in *Feist's case, sup.*, there was a specification of gold of a particular weight and fineness.

I next turn to the case of *The King v. International Trustee for the Protection of Bondholders Aktiengesellschaft*, [1937] A.C. 500; (1937) 57 Ll.L.Rep. 145. The bonds in question in this case obliged the British Government to pay 1000 dols. in gold coin of the United States of the standard weight and fineness existing in February, 1917, or in London in sterling money at the fixed rate of 4.86½ dols. to the pound. The House of Lords, agreeing with the Court of Appeal, applied the *Feist* construction to the bonds, but, differing from the Court of Appeal, held that as the proper law of the bonds was American law and, as by the due date of performance the law had been changed by the Joint Resolution of Congress having the effect of law so as to require the bond to be discharged upon payment of dollar for dollar of the nominal amount, the bondholder could only require payment of that amount. The importance, however, of this decision from the point of view of the plaintiff's case lies in the observation of Lord Maugham, L.C., which was as follows (*ibid.*, at pp. 562 and 166 of the respective reports):

. . . Ever since the year 1870, or thereabouts, nearly all important obligations of the nature of bonds and mortgages in the United States have contained a gold clause, the result of which, according to the legal tender decisions (so called), was that although paper money, commonly called greenbacks, were legal tender in payment of ordinary debts, that did not apply to obligations containing a gold clause. Such clauses, according to the decision of the Supreme Court of the United States in *Norman v. Baltimore & Ohio Railroad Company*, (1935) 294 U.S. 240, " were intended to afford a definite

standard or measure of value, and thus to protect against a depreciation of the currency and against the discharge of the obligation by a payment of lesser value than that prescribed."

In *Norman v. Baltimore, sup.*, as in the case then before the House the bond provided for the payment in gold coin of the United States of the *standard weight and fineness* as also did the mortgage in *St. Louis Iron Mountain & Southern Railway Company*\* which was heard at the same time. As to these clauses, Chief Justice Hughes, in the paragraph from which Lord Maugham (*sup.*, at pp. 562 and 166 of the respective reports) cited, says ((1935) 294 U.S., at p. 302):

We are of the opinion that the gold clauses now before us were not contracts for payment in gold coin as a commodity, or in bullion, but were contracts for the payment of money. . . . We also think that, fairly construed, these clauses were intended to afford a definite standard or measure of value, and thus to protect against a depreciation of the currency and against the discharge of the obligation by payment of lesser value than that prescribed. . . .

For my part, I do not consider that Lord Maugham, L.C., having before him a clause containing a reference to a particular standard of weight and fineness, was intending to lay down any principle relating to gold coin clauses which did not contain any such reference, or that the passage from Chief Justice Hughes's judgment which he cites was on a fair reading intended to refer to clauses without a specification of weight and fineness. See, too, *Perry v. United States*, (1935) 294 U.S. 330, which was argued at the same time, where Chief Justice Hughes in relation to a bond for the payment " in United States gold coin of the present standard of value " says (*ibid.*, at p. 348):

This obligation must be fairly construed. The " *present* standard of value " stood in contradistinction to a *lower* standard of value. The promise obviously was intended to afford protection against loss. That protection was sought to be secured by setting up a standard or measure of the Government's obligation. . . .

See also Lord Russell of Killowen (*sup.*, at pp. 556 and 163 of the respective reports).

\* *United States et al. v. Bankers Trust Company et al.*, (1935) 294 U.S. 240.

I now turn to the case of *New Brunswick Railway Company v. British and French Trust Corporation, Ltd.*, [1939] A.C. 1. The bonds there in question were issued in 1884 and contained a promise

. . . to pay to the bearer . . . " the sum of one hundred pounds sterling gold coin of Great Britain of the present standard of weight and fineness . . . "

The bonds having been issued in 1884, the argument which had influenced Lord Russell of Killowen, in the *Feist case, sup.*, based upon the recent changes made by the Currency and Bank Notes Act, 1928, was not relevant, nor were there provisions corresponding to Clauses 4 and 6 in that case.

Lord Maugham, L.C., says (*ibid.*, at p. 18):

. . . It is clear that the gold clause contained in the bonds was intended as a clause to protect those who acquired the bonds against a depreciation of the currency in the Province of New Brunswick, and, since the judgment of this House in *Rex v. International Trustee for the Protection of Bondholders Aktiengesellschaft, sup.*, it is not possible to confine the decision in the *Feist case, sup.*, to contracts not only containing a gold clause but also possessing indications in the same sense as those which were contained in the *Feist case, sup.* . . .

Lord Russell of Killowen says (*ibid.*, at p. 26):

. . . One may well repeat what was said in the *Bondholders' case, sup.*, namely, that while the features here pointing to the *Feist* construction, *sup.*, are fewer and less powerful than in the *Feist* bonds, uniformity ought to prevail in regarding gold clauses as clauses framed for the purpose of protecting lenders against depreciation of currency, and construing them accordingly. As Scott L.J. has pointed out in his judgment in the present case, the question depends primarily on the wording of the alleged gold clause itself.

In my judgment, in both these passages " gold clause " is used in the sense in which that clause was used by Lord Russell of Killowen in the *Feist* clause, namely a clause referring to gold of a particular standard of weight and fineness. See the judgment of Lord Justice Scott in *British & French Trust Corporation v. New Brunswick Railway Company*, [1937] 4 All E.R. 516, at p. 535.

The remaining English case to which I need refer is the case of *Treseder-Griffin and Another v. Co-operative Insurance Society, Ltd.*, [1956] 2 Q.B. 127; [1956] 1 Lloyd's Rep. 377. This is a very special case and there are many grounds of distinction stated in the majority judgments between that case and the decision in *Feist's case, sup.* It is sufficient to say that it is the only case in which an obligation to pay " in gold sterling " without any specification of weight and fineness has been before the Courts as a matter for decision and the conclusion reached was that this formula without a specification of weight and fineness did not import a gold value clause. See, too, the judgment of Lord Justice Morris (*ibid.*, at pp. 152 and 383 of the respective reports) as to the uncertainty as to the weight and fineness of gold coins if they came into circulation again in the future.

Before referring to the decisions of the American Courts upon these particular bonds it is right that for completeness I should refer to the decision of the Privy Council in *Syndic in Bankruptcy of Salim Nasrallah Khoury v. Khayat*, [1943] A.C. 507. The document there under consideration was in the following form:

On May 23, 1930, I shall pay at Haifa to the order of Mrs. Mary Khayat of Jezzin [Syria] the sum specified above, i.e., two thousand gold Turkish pounds. . . .

Two questions were involved: (1) whether the document was a promissory note within the meaning of the Palestine Bills of Exchange Ordinance, 1929; (2) as to the proper rate of exchange (the latter point is not material for present purposes).

As to (1), the Board held that it was a promissory note as being a promise to pay in currency, i.e., the currency of Turkey and Syria albeit not the currency of Palestine where the note was drawn.

Lord Wright says (*ibid.*, at p. 511):

Nor were the notes any the less negotiable instruments because of the word " gold." That word does not here import an obligation to deliver gold or pay in gold. What it does is to import a special standard or measure of value. . . . It is equivalent to a gold clause. . . .

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 457 of 2232
Page ID #:2515

It appears, however, from the case of *Ottoman Bank of Nicosia v. Chakarian,* [1938] A.C. 260, at p. 270, to which Lord Wright refers (*sup.,* at p. 512), that by virtue of currency changes in the law of Turkey

. . . At all material times since the commencement of the war [—i.e., August 1914—] the paper notes have been legal tender and although the gold £ is still legal tender, the paper currency has, in accordance with Gresham's Law driven out from circulation the gold currency, so that in practice gold has ceased to circulate as legal tender. The Turkish gold coins are now, for all practical purposes, only dealt with as a commodity or bullion.

In these circumstances, it is easy to understand that in construing a document coming into existence in 1930, Turkish gold pounds *simpliciter* can be construed as importing "a special standard or measure of value."

I now turn to the decision in the case of *Sylvan Lemaire v. Kentucky and Indiana Terminal Railroad Company,* (1956) 140 F. Supp. 82, decided in the United States District Court for the Southern District of New York upon bonds in the identical form of the bonds now in issue. The judgment was given by District Judge Cashin on Mar. 12, 1956. After a review of the cases referred to above (other than *Khayat's case, sup.*), the learned Judge held (*ibid.,* at p. 86):

. . . that the English cases . . . do not support the proposition that whenever the words "gold coin" are used a gold value clause must inevitably be inferred. Rather, it is our view that English law, as evidenced by these cases, requires that a reference to gold in a payment clause be not ignored but be given full effect if it clearly expresses the intention to fix a money value equivalent to a certain quantity of gold.

. . . . . . . . . .

[3] The plaintiff seeks a construction which would require us not only to imply the standard of weight and fineness of the gold but also the language of equation. The language of equation, we feel, is the essence of a gold value clause unless there exist extrinsic circumstances such as supply the defect. . . .

[4] It is our opinion, therefore, that even reading in the words "gold coin" with respect to the principal, that this bond does not contain a gold clause under the law of England. We think after examining the bond, the interest coupons attached, the mortgage to which the bond refers, the stockholders' resolution contained in the mortgage, the directors' resolution also contained therein, the prospectus and the monetary laws of England as they existed in 1911, that no gold value clause was expressed or intended.

. . . . . . . . . .

. . . The plaintiff would have this Court construe from the words "like gold coin" their prior use as to the principal, then that the quality of gold referred to was that contained in the sovereign and, lastly, that the value of the principal and interest to be paid was equated to it. In our opinion neither justice nor English law (we assume they are synonymous) permits such extensive redrafting of a contract by a court.

This judgment was affirmed by the United States Court of Appeals for the Second Circuit, whose judgment is reported in (1957) 242 F. 2d 884. I need not set out here the detailed reasoning which led the Court to the conclusion that the bond in question did not contain a true gold value clause. Though some of the steps in the reasoning of these two Courts might not commend themselves to English lawyers brought up in and applying a different code of procedure, these decisions seem to me to be a clear determination by a competent Court of jurisdiction as to the proper construction of these bonds.

Had my own consideration of the problem led me to a different conclusion I should have hesitated to give effect to it in view of the desirability of uniformity in decisions by the Courts of different countries, especially in the case of bonds whose obligations cross international frontiers. But, as I have myself reached the same ultimate conclusion, I welcome the reinforcement of my judgment which I receive from their judgments.

In view of the conclusion in favour of the defendants which I have reached it is not necessary for me as a matter of decision to state my views on the alternative defence of *res judicata* raised by pars. 7 to 11 of the defences in the two actions. But, as much time was spent in considering the American decisions relevant on this point, it is probably convenient that I should

472                         LLOYD'S LIST LAW REPORTS                    [Q.B. (Com. Ct.)

[1962] Vol. 2]      Campos v. Kentucky & Indiana Terminal Railroad Co.      [McNair, J.

state my conclusions as to the effect of this evidence and as to its applicability to the plea of *res judicata* raised in these actions.

Mr. Carson, an experienced American lawyer who had acted for the defendants in the *Lemaire* action, was called before me on behalf of the defendants. Mr. Ten Eyck, an experienced lawyer now engaged in the practice of American law in London, was called on behalf of the plaintiff.

Mr. Carson's thesis may be summarized as follows:

(i) The *Lemaire* action was properly brought as a class action under Rule 23 of the Federal Rules of Procedure (U.S.C.A. Title 28),

(ii) Rule 23 provides as follows:

**Rule 23.  Class Actions**
**(a) Representation.** If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought.

(iii) A true class action properly brought under this rule is binding upon and gives rise to a plea of *res judicata* against all members of the class whether or not they took part in the action and whether or not they were served with notice of the action or whether or not they had knowledge of the proceedings.

Subject to the reservation of the question of the position of a person who was not a member of the class at the date of the initiation of the proceedings or at the date of the judgment, Mr. Ten Eyck agreed with this formulation of the law; but in this respect differing from Mr. Carson he maintained that the *Lemaire* action was not a true class action but was, to use the

nomenclature used in many of the American decisions, a "spurious class action" the judgment in which did not give rise to a plea of *res judicata* against absent parties.

I was referred to a number of decisions of Federal Courts in different Districts in which the distinction is drawn between true class actions falling within sub-rule (1) and giving rise to *res judicata* and spurious class actions, namely, actions brought under sub-rule (3) from which no plea of *res judicata* arises. Thus, in the judgment of the Court in *Oppenheimer et al. v. F. J. Young & Co., Inc., et al.*, (1944) 144 F. 2d 387, at p. 390, the following passage occurs:

[3, 4] We see no reason for going farther than to hold that on the face of the complaint the plaintiffs have brought themselves within the provisions of Rule 23 (a) (3). Inasmuch as persons who do not become parties cannot be affected by the decision, we need not go further as to the adequacy of plaintiffs' representation of others in the class. A stricter rule as to the adequacy of representation ought to obtain where the judgment is held binding on members of a class who do not intervene. . . .

Citing *Weeks et al. v. Bareco Oil Company et al.*, (1941) 125 F. 2d 84, in *York v. Guaranty Trust Company of New York*, (1944) 143 F. 2d 503, at p. 529, the judgment of the Court uses these words:

. . . Since, in a class suit under clause (3), a judgment will not be *res judicata* for or against those of the class who do not intervene, we suggest that if, after trial, the court finds against the defendant, appropriate steps be taken to notify all such noteholders to intervene (if they have not theretofore done so), judgment to be entered in favor only of those who do so within a reasonable time. . . .

Mr. Carson, while asserting that the material passage was *obiter*, agreed that the general language used had not been dissented from by any Court of co-ordinate or superior jurisdiction. Mr. Carson's main argument against the view of the Court expressed in these two decisions was based (i) upon his reading of the case of *System Federation No. 91 v. Reed et al.*, (1950) 180 F. 2d 991, which Mr. Carson stated to be his only authority for the proposition that a judgment in a class action under sub-rule (3) gave rise to *res judicata.* He also maintained secondly that the *Lemaire* action involved the enforcement of

a "common right" within the meaning of sub-rule (1) inasmuch as the bond was secured by the mortgage and therefore was a true class action within sub-rule (1).

As to (i), it appears on an examination of the *System Federation case, sup.*, that the Court in fact held that it was a true class action under sub-rule (1) and accordingly *res judicata* applied. Mr. Carson's view however was that, if the proceedings were properly analysed, the Court should have held it to be a class (3) action but nevertheless that *res judicata* applied.

As to this, it seems to me to be illogical to argue that because the Court held (wrongly in Mr. Carson's view) that it was a class (1) action and therefore the *res judicata* applied, the Court, if it had held, (as Mr. Carson says it should have held) that it was a class (3) action, would have held that *res judicata* applied. I prefer Mr. Ten Eyck's view that the *System Federation case, sup.*, is no authority for the proposition that a judgment in a class (3) action involves *res judicata* against absent members and I conclude that I should follow the earlier statements of principle to which I have referred.

As to Mr. Carson's second line of reasoning I find difficulty in following how it can be said that the *Lemaire* action was a true class (1) action because the judgment involved or might involve the enforcement of the mortgage or create preferential rights between different bondholders, since it seems to me that though the equity jurisdiction was involved in order to justify the claim for a declaration the claim was in substance a common-law claim for the enforcement of the several rights of the bondholders involving a common question of law and so within class (3), and involving no question arising under the mortgage. I prefer on this point the evidence of Mr. Ten Eyck that the *Lemaire* action was a class (3) action. But it is sufficient for me to say that the burden of proof of the relevant law being upon the defendants, they have not satisfied me that the *Lemaire* action was a true class action or that in accordance with American law the judgment in that case bound anyone who was not an original party or did not intervene.

But even on the assumption that the effect of the judgment in the *Lemaire* action was to give valid support for a plea of *res judicata* in an American Court against an absent member of the class, there are still difficulties in the defendants' way.

First, it must be recalled that Miss Campos was not a bondholder at the date of the initiation of the *Lemaire* proceedings.

I refer in this connection to three questions and answers at the end of Mr. Carson's cross-examination:

Mr. Justice McNair: Before Sir Milner re-examines, may I just raise this question: Have you any authority which says that a person who was not a member of the class at the time when the suit was initiated is bound by the ultimate decision? A.: No, my Lord; by definition, as I understand it, there could not be such decision.

Q.: That seems to be the crux of this matter, because, according to the evidence I have had, this lady, Miss Campos, was not a holder of the bond when the suit was initiated. A.: I suspect that is primarily for Counsel to observe upon, unless your Lordship wants to ask me that question?

Q.: You have no authority? A.: I have no authority on the proposition as your Lordship put it. There undoubtedly is authority that the taker of a bearer bond is bound by prior transactions in respect thereto, but I cannot put my hand on it. I might address your Lordship's attention to the fact that the Judge in the New York Court thought it important, in paragraph 1 of his order, to terminate——

Mr. Justice McNair: I think you are going on to another point.

To be quite certain that there was no misunderstanding I caused the first two questions and answers to be read back by the shorthandwriter. The result of this evidence seems to me to be fatal to the defendants' plea.

Furthermore, I think there is great force in Mr. Foster's contention that in accordance with English private international law a foreign judgment could not give rise to a plea of *res judicata* in the English Courts unless the party alleged to be bound had been served with the process which led to the foreign judgment. I had recently to rule on a somewhat similar point in the case of *Rossano v. Manufacturers Life Insurance Company*, [1962] 1 Lloyd's Rep. 187.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 460 of 2232
Page ID #:2518

474                    LLOYD'S LIST LAW REPORTS                    [Q.B. (Com. Ct.)

[1962] Vol. 2]    Campos v. Kentucky & Indiana Terminal Railroad Co.    [McNair, J.

Finally, though the point was not fully argued before me, as at present advised it seems to me to be contrary to the whole conception of negotiability that the holder of a negotiable bond should be prejudicially affected by a judgment on a similar bond in an action in which he was neither plaintiff nor a party who had been duly served.

I can deal shortly with the defences raised in pars. 12 and 13 of the defence (which were not seriously argued before me) by saying that in my judgment the provision as to giving notice to the trustee is not a condition precedent to the enforcement of the bond.

As a result of those conclusions there will be judgment for the defendants.

Sir MILNER HOLLAND: I ought formally to ask, I think, for judgment for the defendants, with costs.

Mr. LITTMAN: My Lord, there are two matters upon which I would address your Lordship and I may have to take a few minutes over it, because they are both directed primarily to the question of costs, which is a pretty substantial issue in this case.    The first is the question of the judgment which your Lordship ought to give in this case.

Mr. Justice McNAIR: That is the form of the judgment?

Mr. LITTMAN: The form, my Lord, yes. In my submission, the plaintiff is entitled to judgment for the sterling amount of the bonds and the certificates, and closely linked up with that, of course, is the question of what would be a proper order for costs.    I imagine your Lordship would normally deal with these issues separately, but as they are so closely linked perhaps your Lordship would allow me to address you upon both at the same time.

Mr. Justice McNAIR: Certainly.

Mr. LITTMAN: May I remind your Lordship of the course this matter has taken. Before the writ was issued in this action the bonds and the coupons were tendered and the payment on the gold basis was refused—I am summarizing the correspondence, but I will refer your Lordship to it if necessary.    But before the writ was issued those presenting the bonds on behalf of my client asked that in any event they should be paid the sterling amount of the bonds and the coupons, stating that they were making it quite clear that they were prepared to tender and hand over the bonds and the coupons although, of course, without prejudice to their right to claim in the Court the balance.    The attitude which was taken up on behalf of the defendants was that they would only pay the sterling value if it was accepted in complete satisfaction, a condition which, in my submission, the defendants were not entitled to impose.

The plaintiffs thereupon stated, before issuing the writ, that if this attitude was persisted in it would be necessary to claim the full amount.    It was persisted in and the writ was issued, initially the writ for the interest and subsequently the writ for the capital sum, and the two actions were consolidated.    The defendants put in a defence, and it was a defence to the whole claim.    The claim, of course, was for the whole amount and pleaded that there had been presentation of the bonds and coupons and complained that neither the sum nor any part of it had been paid.    The defence did not take the course, as it might have done, of admitting the sterling debt and raising a defence as to the balance.    If that had been done, of course, the plaintiffs could have signed judgment for the sterling amount, but the defendants did not take that course, for reasons which no doubt seemed good to them, they put in a defence to the whole claim raising, firstly, a denial that the plaintiff was the bearer of these coupons and bonds, a matter which they had refused to admit right up to the hearing of this case although they were pressed to do so on a number of occasions, and refusing even to allow the plaintiff's evidence to be given by affidavit to prove it, it thus becoming necessary for the plaintiff to come over especially to do that.    But, in any event, it was a defence to the whole claim.

The second defence to the whole claim was a denial that the coupons and bonds had been presented.    There was raised what, in my submission, was a plea wholly disproved by the correspondence that she had only tendered them upon the basis that she was willing to surrender them if she got the full value.    The correspondence shows that she was quite willing to surrender them and to get the lesser sum provided it was without prejudice to her claim to recover the balance.

The third defence to the whole claim was, of course, the defence that the action was brought without the consent of the mortgage trustees, and again it was a defence to the whole action.

Case 2:23-cv-09217-MEMF-KS   Document 114-4   Filed 09/05/25   Page 461 of 2232
Page ID #:2519

· There was continued correspondence at an early stage in which requests for payment of the sterling sum were made and it was only a year after the action was started that the defendants said that they would pay to my client the sterling sum less a sum of £10,000 to be paid into a joint account, which they desired to be retained as security for costs. My client protested against that and said that there could not really be any doubt that the sterling sum was due, and that, as regards security for costs, that was a matter which should be left to the decision of the Court as to what would be the appropriate sum, and she asked that the matter should be dealt with in that way. The defendants would not agree to that and said that was the only thing they were prepared to do. We had to submit to that, but we pointed out in a letter of Jan. 15, 1962:

As we pointed out to you in our last telephone conversation, we would have thought that the proper way of dealing with the question of security for costs would have been for you to take out a summons, and leave it to the Court to decide what amount should be paid, rather than to ask for the retention on deposit of the sum of £10,000—which in our view is quite excessive. Since however you refused to consider this proposition and maintained the contention you had adopted throughout, namely that your clients are not under any legal obligation to pay to our client any part of the amounts claimed in the action, we must reserve our client's right to ask the Court in any event that the whole of the costs of the action be paid by your clients.

Then the amounts of the bonds and coupons are set out at the end and I do not think there is any dispute about that.

The answer to that is:

We do not accept the third paragraph of your letter as accurate and reiterate that the contention which the Defendants have adopted is that payment at the sterling face value could only be made against the delivery up for cancellation of the Bonds and Coupons.

Then they go on to refer to the £10,000.

Your Lordship has been referred to the letters in which we have made it clear time and time again that we are quite prepared that the bonds should be surrendered to them. We suggested that they should not be destroyed before the

action was heard, but that was a matter for the defendants. The only thing we did refuse to do was to agree that payment should be accepted in full satisfaction.

That arrangement having been made, there was no amendment to the defence. All these pleas were maintained; indeed, one of them has been maintained right up to the judgment in this action, namely, the defence about the consent of the trustees——

Mr. Justice McNAIR: It was not taken very forcefully.

Mr. LITTMAN: No, but it was there. The reason for it, the advantage which the defendants got by raising this, of course, was that they secured for themselves the advantage that for a year they did not pay any part of the sum, and, equally, they got the advantage that they were able to decide for themselves rather than leaving it to the Court how much should be retained by them as security. That is the position. The defence was not amended and, in my submission, so far as the sterling sum is concerned the defence has not succeeded and my client is entitled to judgment for the total of those two sums, which is £44,194 10s. Of course, I quite accept that, having had part of that, we could not in execute for the whole amount although, in my submission, we are entitled to judgment for it, and I would ask that on that sum we should have interest under the Law Reform (Miscellaneous Provisions) Act, 1934, at any rate your Lordship thinks appropriate. Your Lordship might think the rate in the bond was the appropriate rate, 4½ per cent.

Mr. Justice McNAIR: I had written down a better figure than that.

Mr. LITTMAN: I do not know whether your Lordship thought six per cent?

Mr. Justice McNAIR: No, five per cent.

Mr. LITTMAN: I would ask for interest on the whole of that sum for one year—and I say "one year", because that was the period before we got any money. The whole of that was due at least a year before any part of it was paid; in fact, I am being slightly ungenerous to my client because in fact the interest was due a little earlier, but to simplify it I say one year. On the balance of the £10,000——

Mr. Justice McNAIR: Is your £10,000 included in the £44,194 10s.?

476          LLOYD'S LIST LAW REPORTS          [Q.B. (Com. Ct.)

[1962] Vol. 2]     **Campos v. Kentucky & Indiana Terminal Railroad Co.**     [McNair, J.

Mr. Littman: Yes, my Lord, it is part of it. As I have had the rest I cannot ask for it after that date, but I ask for interest on the £10,000 at the same rate from Feb. 9, 1962 (which is the time payment was made), until judgment.

Mr. Justice McNair: I suppose you have had your deposit interest.

Mr. Littman: In fact it is on a joint account.

Mr. Justice McNair: I hope it is on deposit.

Mr. Littman: I suppose that is right, my Lord, assuming we get it. It depends rather what is going to happen to the money.

May I now turn to the question of costs. There are three factors here: In the first place I entirely accept that the defendants have succeeded here upon an important issue; they have succeeded upon the issue as to whether this is a gold value clause——

Mr. Justice McNair: They have really succeeded on the main point which you were arguing.

Mr. Littman: That is correct, my Lord, but it is not necessarily the point which has involved all, or substantially all, the costs; that is one matter.

The second point to be taken into account is this: In my submission, my client is the successful plaintiff in this action. She is entitled to the judgment for which I have asked and so she is a successful plaintiff and, *prima facie,* entitled to her costs. I am not disputing that the defendants should have the costs of and occasioned by the issue of the gold clause, but, in my submission, the plaintiff is entitled to the general costs of the action.

The third factor is this: The defendants failed here upon the defence of *res judicata.* Now, I quite agree that where a successful defendant sues upon a number of points one does not necessarily apportion costs between the issues, but different considerations apply, and have been held to apply, where quite a separate issue is raised by the defendants and persisted in and where that has failed.

Mr. Justice McNair: Unless I am persuaded to the contrary, I should have thought you were clearly entitled to the costs of and occasioned by the plea of *res judicata.*

Mr. Littman: Your Lordship appreciates that is quite substantial, because it was substantially the whole of the oral evidence.

Mr. Justice McNair: It took a long time, yes.

Mr. Littman: We estimate that something like three days of the hearing was devoted to evidence and argument upon this point, and that is something between one-third and one-half of the hearing.

The order which I would submit to your Lordship is the appropriate order in this case is that the plaintiff should have the costs of the action including the costs of and occasioned by the issue of *res judicata.* The defendants to have the costs of and occasioned by the claim for a declaration of a gold value clause apart from the plea of *res judicata.* In my submission that is the fair and proper order to make.

Sir Milner Holland: Quite plainly I have a certain way to go on the question of the issue as to *res judicata,* but may I set that on one side for one moment. I heard what your Lordship said, and it did not surprise me, but may I just draw your Lordship's attention to the pleadings.

Setting aside the *res judicata* issue for the moment and treating the action as though it was not there, I am asking your Lordship to consider whether, as a matter of common sense, if it had not been for the claim that these bonds were gold value bonds, persisted in throughout and which failed, we would have been here.

It is instructive to see what the claim is for. On the first writ (that is action No. 4370) what is claimed is a declaration that, on the true construction of the bonds, gold value is the right measure and, secondly, £8223 13s. 5d. for interest, of course on that basis. The second writ (action No. 2523) claims principal moneys due on Jan. 1 on the mortgage bonds, interest and a declaration, but the actual claim in the statement of claim is, of course, a sum of money based wholly on the gold value of the bonds, namely, £123,657 5s. 11d.

The defence in the first action—and I think there is no distinction between the two defences—by par. 5, is:

Upon the true construction of the said Bonds the interest payments and the capital sums payable thereunder on presentation and surrender of the respective Coupons and Bonds are the face amount of the coupons namely

Case 2:23-cv-00217-MEMF-KS    Document 124-4    Filed 08/05/20    Page 463 of 2232
Page ID #:2521

McNAIR, J.]        **Campos v. Kentucky & Indiana Terminal Railroad Co.**        [1962] VOL. 2

£2 5s. 0d. each and the face amount of the Bonds namely £100 each in current English Legal Tender.

There is no issue at all that the amount due on the bonds is the face value of principal and interest.

Mr. Justice McNAIR: And there is no claim for payment of the sterling face value.

Sir MILNER HOLLAND: That is the next point I wanted to make. Where is the claim for payment on the sterling basis? The whole action was on the footing of payment on a gold value basis. What is complained of is the fact that we were not willing to pay the sterling value to someone who was persisting throughout in claiming something quite different, but I submit that, remembering of course that the plaintiff was not in this country, I was right at the time to say: "Your bonds are sterling bonds. If you surrender them, that is the end of the matter and we pay you; but so long as you go on claiming something different we will not". In the end, the line taken was: "Very well, we will pay you, but we say that something ought to be retained and we say £10,000"—and my friend says that is unreasonable, but I do not know—"as security for costs". In our submission there is no foundation for the first part of my friend's submission that this is an action in which he is entitled to succeed in something he never asked for.

On the second question, of course, it is undoubtedly true that one of the defences raised your Lordship has indicated is not a good defence. In that respect the position is somewhat different from the position where the Court has to consider a case in which the plaintiff has lost and the defendants won. It is often said, and I will not say with complete accuracy, that if an action is brought against a defendant and wholly fails, the fact the defendant gave several grounds for resisting the action and only succeeded on one should not alter the *prima facie* position that the plaintiff has brought an action which has wholly failed. The matter is entirely in your Lordship's discretion. Of course I cannot challenge it if your Lordship thought the costs had been quite wrongly increased by taking a particular defence——

Mr. Justice McNAIR: I do not know in what sense you mean "wrongly".

Sir MILNER HOLLAND: Wrongly in law.

Mr. Justice McNAIR: In law you are entitled to raise any defence you like. You may fail or succeed, but it is a defence on which you have wholly failed and it seems to be quite a separate issue, and I should have thought the ordinary rule must apply that the plaintiff gets those costs.

Sir MILNER HOLLAND: If your Lordship was looking for the proposition that costs are entirely in the discretion of the Judge, my friend has been good enough to assist me to find p. 1839 in the 1962 Annual Practice. There your Lordship will see, half-way down the page (Supreme Court Costs Rules, 1959, Rule 2 (5)):

The powers and discretion of the Court as to costs under section 50 of the Supreme Court of Judicature (Consolidation) Act, 1925 (which provides that the costs of and incidental to proceedings in the Supreme Court shall be in the discretion of the Court and that the Court shall have full power to determine by whom and to what extent the costs are to be paid), and under the enactments relating to the costs of criminal proceedings to which these rules apply, shall be exercised subject to and in accordance with these rules . . .

Then your Lordship will see the heading "Discretion as to Costs", and in the second paragraph:

. . . "the Court or Judge shall have full power to determine by whom and to what extent the costs are to be paid," . . .

Then

**Discretion to be Exercised Judicially.—**

Wide though the discretion is, it is a judicial discretion, and must be exercised on fixed principles, that is according to rules of reason and justice, not according to private opinion (*Sharpe v. Wakefield*, [1891] A.C. 173); or even benevolence (*Kierson v. Joseph L. Thompson & Sons, Ltd.*, [1913] 1 K.B. 587), or sympathy (*Bevington v. Perks*, [1925] 2 K.B., p. 231), and the exercise of discretion even by a Judge sitting alone must be justifiable (*Ritter v. Godfrey*, [1920] 2 K.B. 47); for instance, where a party successfully enforces a legal right, and in no way misconducts himself, then he is entitled to costs as of right (*Cooper v. Whittingham* (1880), 15 Ch. D. 501; *Jones v. Curling* (1884), 13 Q.B.D., p. 265; *Upmann v. Forester* (1883), 24 Ch. D. 231; *Civil Service Co-operative Society v. General Steam Navigation Co.*, [1903] 2 K.B. 756, C.A., explained and distinguished in *Donald Campbell & Co., Ltd. v. Pollak*, [1927] A.C. 732 . . .

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 464 of 2232
Page ID #:2522

Mr. Littman: If it assists my friend, there is a passage which deals with the question on p. 1889, under Rule 9.

Mr. Justice McNair: I think this is the principle* :

> . . . This discretion must be exercised judicially, and the Judge ought not to exercise his discretion against a successful party on grounds wholly unconnected with the cause of action. . . . But when the Judge, intending to exercise his discretion, has acted on facts connected with or leading up to the litigation, the Court of Appeal is prohibited by statute from entertaining an appeal from his decision . . .

Sir Milner Holland: The passage to which my friend referred is at the top of p. 1889:

> Where defendant succeeds generally, he is entitled to general costs of the action, even in respect of some defences in which he has failed, but not to the costs of a distinct issue raised by him unsuccessfully . . .

Subject to anything my friend wants to say, what we submit to your Lordship is that this is a case where your Lordship should give the defendant the general costs of the action, but it is a matter for your Lordship's discretion whether your Lordship feels that we should have the costs, following exactly those words, of a separate defence unsuccessfully raised. The plaintiff says we ought to pay the general costs of the action and your Lordship has my submission on that; that, in my submission, is wrong. If your Lordship is with me on that, then my friend may wish to say that he should pay my costs in relation to the issue on which I have succeeded and I should pay his costs in relation to the issue on which we have not succeeded, but in my submission that would be wrong. The wording of the passage I have just read to your Lordship leads to this conclusion, that a wholly successful defendant (which we are) should in no circumstances pay any costs. It may well be that he should not get—and it is a matter which I shall have to leave to your Lordship—the costs occasioned by a defence in respect of which he failed, but to order him to pay the costs of an unsuccessful plaintiff in respect of a defence which was unsuccessful would, in my submission, be wrong.

Mr. Justice McNair: Do you say it would be wrong if I were to order that the

defendants should have the general costs of the action, the plaintiff to have the costs of and occasioned by the plea of res judicata, such costs to be set off one against the other?

Sir Milner Holland: I think it would be difficult for me to say it would be wrong in law, but it would be contrary, in our submission, to the general practice that a defendant against whom a plaintiff is wholly unsuccessful should pay any costs in respect of an unsuccessful defence.

Mr. Justice McNair: If my judgment is right, I do not see why you should not pay for Mr. Ten Eyck's attendance. I am not saying there was anything wrong in raising the plea of res judicata at all, it is a perfectly proper plea to raise, but in point of fact it failed.

Sir Milner Holland: I would like to carry that particular thought a little further, my Lord, though this may or may not affect your Lordship's mind at all. This is a case into which the plaintiff went with her eyes open, knowing of the American decision; the letter before action says " We are well aware of the Lemaire decision." She took the risk that the defendants, who are an American corporation, would rely on the American judgment, as of course they did in two senses——

Mr. Justice McNair: I did not require Mr. Carson's attendance to prove the American law as a matter merely of persuasive authority.

Sir Milner Holland: No, my Lord. There is also this, perhaps from your Lordship's point of view not very important, consideration which moves the defendants: Had there been judgment against them which could only have been enforced in America, then it would have been vital, I should have thought, to plead that the American judgment is res judicata in case the American Court, in considering whether to enforce the English judgment, might have said: " Well, you never pleaded that the American judgment is res judicata ".

Mr. Justice McNair: Could not the judgment have been enforced against Morgan Grenfell & Co., Ltd., in London, the paying agent in London?

Sir Milner Holland: I should have thought not, my Lord: they are not personally bound by the bonds.

Mr. Littman: It depends whether they had any money. If they had money there could have been a garnishee, possibly.

---

* 1962 Annual Practice, at p. 1841.

Sir MILNER HOLLAND: Lastly, may I put this approach to your Lordship: Separate costs of separate issues is never a very satisfactory matter from the point of view of taxation. The common practice to-day is to adopt a rough and ready approach and where defendants have raised a defence which involved a lot of costs, to deprive them of some of their costs; in other words, to order the defendants to pay only a proportion of the plaintiff's costs. It saves a great deal of trouble and expense in segregating out the material before the Taxing Master. On p. 1859 in the 1962 Annual Practice, under the heading "Issue", your Lordship will see:

The practice of awarding "costs of issues" is now discouraged . . . Although there is no apportionment of costs in issue cases it is the duty of the Taxing Master to consider whether there should be a division of items common to each issue but which related in part to one issue and in part to another. . . .

showing obviously how difficult it is to do it.

Mr. Justice McNAIR: I know it is always very unsatisfactory.

Sir MILNER HOLLAND:

Instead of awarding costs of issues, the Judge will sometimes make a plaintiff who is only partially successful bear some of his own costs. So where judgment is given for part of a claim the defendant can be ordered to pay half or some other portion of the plaintiff's costs as agreed or taxed.

I merely say that if your Lordship takes the view that a substantial amount of costs was involved in the issue on which the defendants have not been successful, it may well be the right order would be to order the plaintiff to pay a proportion (whatever proportion your Lordship thinks right) of the defendants' costs. Then all that happens is that the costs are taxed and the defendants will not get them all, they will only get a proportion.

Mr. Justice McNAIR: Just following that line of thought, with regard to the time occupied by the Court, I should have thought the time actually occupied both in hearing the evidence of the American law and the submissions on American law might easily be two-thirds of the time the case has taken.

Sir MILNER HOLLAND: It is very difficult to be sure about that. As I recall, my friend Mr. Foster opened the case for two and a half days and my argument to your Lordship on the substantial issue was one and a half days; that is four days, and the rest of the case took four days, so one can see there might be an argument for saying that the plaintiff should pay half the defendants' costs. Of course a great deal of the rest of the matter in the presentation of the case, the pleadings and so forth, would be the same whether the defendants raised this issue or not. It is never easy to make submissions where a matter is something entirely in your Lordship's discretion, but we do press your Lordship, if you are minded not to give the defendants the whole of their costs, to make an order giving them a proportion of their costs rather than having segregated issues with the very complicated business that involves.

Mr. LITTMAN: My Lord, the first question I apprehend is whether the plaintiff is entitled to judgment in this action. On that I understand the point troubling your Lordship is that there is no claim for the sterling sum. In my submission, there is a claim. I entirely accept there is not a separate claim, but there is a claim for the total amount and, in my submission, the greater sum includes the lesser. Your Lordship sees, if you look at the claim for principal, there is a plea that the defendants have not paid the sum of £123,000 or any part thereof. Then when we come to the defence, the claim is treated as a claim for the whole sum and there is a defence to the whole sum. Any doubt there may have been about that, in my submission, must have been removed by the correspondence, in which we made it clear beyond all possible doubt that if we did not succeed on the gold clause point we would ask for judgment for the sterling amount, and in my submission it was not essential to put in the words "Alternatively we claim the sterling sum". We claim for a certain sum of money and if some lesser sum is due, then in my submission the plaintiff's claim covers that. I would submit to your Lordship that this claim does raise a claim for the whole of the moneys and that the plaintiff is, therefore, entitled to judgment for that sum; and if that is right then the order for costs which I suggested to your Lordship would, in my submission, follow subject to this, that the defendants should have the costs of the issue relating to the gold clause.

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 466 of 2232
Page ID #:2524

480                LLOYD'S LIST LAW REPORTS        [Q.B. (Com. Ct.)

[1962] Vol. 2]    **Campos v. Kentucky & Indiana Terminal Railroad Co.**    [McNair, J.

If your Lordship is against me on that, then the assumption is that there will be judgment for the defendants in the action.

Mr. Justice McNair: Yes.

Mr. Littman: I think my friend was inclined to concede, subject to your Lordship's discretion in the matter, that it might be right that I should not be ordered to pay the costs occasioned by the issue of *res judicata*.

With regard to the suggestion that there should be a proportion taken: There cannot in principle be an objection to this, but of course the difficult thing to know is what the proper and just proportion should be.

Mr. Justice McNair: I am not sure it would be more difficult for me than for the Taxing Master. The Taxing Master is quite at sea, experienced as he is, in determining how much time has been spent on a particular issue.

Mr. Littman: I apprehend the way the Taxing Master would proceed would be this: He would say: The defendants do not get the costs of Mr. Carson, but the plaintiff gets her costs of Mr. Ten Eyck. Then I think the practice is for the trial Judge to give him some indication of the rough proportion of the general costs which are attributable to that issue, and the Taxing Master would then have to form a view as to what might be the common costs and relate those to that issue. That is one way to proceed. The other way to proceed is to follow my learned friend's suggestion and direct an overall proportion. The difficulty there is that one does not know to what extent the equation is going to be weighted by the costs of Mr. Carson, because if an overall proportion of costs is to be taken, of course, Mr. Carson's fees would be much greater——

Mr. Justice McNair: I should have thought it highly likely that Mr. Carson would be here anyhow.

Mr. Littman: The defendants may say that Mr. Carson came from America and Mr. Ten Eyck did not, and they might seek to say that Mr. Carson's presence put them to great expense for this case and that might weigh the equation against my client.

My learned friend suggested that perhaps it could be dealt with upon the basis that, say, 50 per cent. of the time was spent on this issue, but that does not mean that justice would be done by directing that we should pay 50 per cent. of the defendants' costs, because if 50 per cent. of the

costs have been incurred on that issue, not only ought the defendants not to have them, but they ought to pay our costs. So the right order as to costs, if one was dealing with it by proportions, would be that there should be no order as to costs, because if 50 per cent. of the costs were incurred on an issue on which the defendants have failed, it means that 50 per cent. of the costs are due to them and 50 per cent. to us. Therefore, I would submit that if that is the appropriate way the right order is perfectly simply "No order as to costs". Failing that, I would ask your Lordship to say that if the defendants are to have judgment they should have the costs subject to this, that the costs of the issue of *res judicata* should be paid by the defendants to the plaintiff and set off, and that your Lordship should give some direction or some indication of approximately what, in your Lordship's view, was the proportion of the general costs as distinct from those specifically allocatable to that issue which were to be treated as going to that issue. That is a matter entirely for your Lordship.

Mr. Justice McNair: Having heard this discussion on the form of the judgment and costs, I have come to the conclusion that inasmuch as in the action itself the only claim by the plaintiff is a claim for payment on a gold value basis and as she has failed, according to my judgment, on that issue, there should be judgment for the defendants in the action.

As regards costs, here again the main issue litigated between the parties has been the gold value clause. There has been a secondary issue raised by the defendants on the plea of *res judicata* which occupied a great deal of time and certainly, no doubt, involved the employment of expensive witnesses, and on that issue the defendants have failed. I am rather tempted by the suggestion that, while giving the defendants the general costs of the action, I should limit their recovery to a certain proportion, but I am afraid I have not got the material before me on which I could base the proper proportion. Accordingly, my judgment will be that the plaintiff is to receive the costs of and occasioned by the plea of *res judicata*. These two sets of costs to be set off one against the other and the balance paid in whoever's favour the ultimate figure works out.

————

1 Ch.

A

## JOHN v. REES AND OTHERS

### [1968 J. No. 2692]

## MARTIN AND ANOTHER v. DAVIS AND OTHERS

### [1968 M. No. 2390]

B

## REES AND ANOTHER v. JOHN

### [1968 R. No. 2276]

1968    July 10, 11, 12, 15, 17, 18, 19, 22, 23, 24, 25, 26, 29;          Megarry J.
          Oct. 17, 18

C

*Meetings — Chairman — Powers — Adjournment — Unincorporated political association—Attempt by chairman to put to vote resolution not on agenda, against wish of majority of those present—Resulting disturbances—Purported adjournment sine die by chairman—Officers elected and resolution to disaffiliate from national political party passed after purported adjournment and departure of chairman and others—Whether business transacted after purported adjournment valid—Whether motion to disaffiliate valid—Chairman's powers to adjourn meeting.*

D

*Natural Justice—Opportunity to meet charge—Political party—Rule empowering "disaffiliation of an organisation or expulsion of an individual"—Whether excluding application of principles of natural justice—Whether principles applicable to suspension—Suspension of activities of constituency association and powers of officers—Requirement of re-organisation of association—Leading dissident members required to give undertakings of loyalty—Notices of re-organisation meetings given only to members giving undertakings—Validity of meetings—Whether contrary to natural justice.*

E

*Presumption—Legality—Rules of unincorporated association—National political party—Affiliated local party—Whether national party's rules adopted formally or by usage—Members joining with no knowledge of national rules—Whether binding on members.*

F

*Practice—Parties—Representative action—Individual member of unincorporated association claiming personally and on behalf of all save three of members of association—Motion to strike out whole writ, or the claim for relief in representative capacity —Affidavits by members not wishing to be represented by plaintiff—Whether writ should be struck out wholly or in part— R.S.C., Ord. 15. r. 12 (1) (3)-(6).[1]*

G

[1] R.S.C., Ord. 15, r. 12: "(1) Where numerous persons have the same interest in any proceedings, not being such proceedings as are mentioned in rule 13 [dealing with the representation of interested persons who cannot be ascertained, etc.] the proceedings may be begun, and, unless the court otherwise orders, continued, by or against any one or more of them as representing all or as representing all except one or more of them. . . . (3) A judgment or order given in proceedings under this rule shall be binding on all the persons as representing whom the plaintiffs sue or, as the case may be, the defendants are sued, but shall not be enforced against any person not a party to the proceedings except with the leave of the court. (4) An application for the grant of leave under paragraph (3) must be made by summons which must be served personally on the person against whom it is sought to enforce the judgment or order. (5) Notwithstanding that a judgment or order to which

H

**John v. Rees**                                    **[1970]**

On March 27, 1968, D., Member of Parliament for Pembrokeshire, was expelled from the Labour Party. On April 6, **A**
about 100 people, mostly delegates from local Labour Parties
within the constituency, were present at the annual meeting of
the Pembrokeshire Divisional Labour Party (P.D.L.P.), at which
J., president of P.D.L.P., took the chair. The assistant national
agent of the Labour Party addressed the meeting, reminding
members of their obligations, referring to D.'s expulsion, and
suggesting that a resolution be passed to the effect that P.D.L.P.
should continue to act in strict conformity with its constitution, **B**
and with the rules and constitution of the Labour Party.
Although no such resolution was on the agenda, J. attempted
to put to the vote a resolution to that effect, which had been
moved and seconded by delegates from the floor, but disturb-
ances broke out because the majority of those present were
supporters of D., and favoured disaffiliation from the Labour
Party. There was noise, disorder and, in a few cases, bodily
contact, but no real violence, and no one appeared to have been **C**
put in fear. After some attempt to restore order, J. purported
to adjourn the meeting sine die, and then left the hall with other
delegates. Those who remained carried on with the business
of the meeting, which included the election of officers. C. was
elected president in place of J., L. was elected treasurer, while
R., the secretary, remained secretary, since his office was not
amongst those to be filled. The meeting also passed, by 69 votes
to one, a resolution to disaffiliate from the Labour Party and a **D**
resolution to support D.

On May 6, J., claiming to represent all members of P.D.L.P.
other than R., C. and L. (the first, second and third defendants,
respectively), issued a writ challenging the validity of the con-
tinuation of the meeting and, by notice of motion, sought an
injunction to restrain R., C. and L. from dealing in any way
with the moneys or other property of P.D.L.P. By counter-
notice of motion the defendants sought to have the writ struck **E**
out or, alternatively, so much of it as claimed relief in a
representative capacity. Meanwhile, on April 24 the National
Executive Committee of the Labour Party (N.E.C.) passed two
resolutions, one suspending the activities of P.D.L.P. and the
right of its officers to handle the party funds, the other authori-
sing the national agent " to take such steps as are necessary to
complete the re-organisation of P.D.L.P.

Pursuant to those resolutions, the national agent resolved, **F**
inter alia, to convene a meeting of the Haverfordwest Local
Labour Party, but before doing so he wrote to leading members
of the dissident faction who supported D., informing them of
the proposed re-organisation and requesting from them an
undertaking to accept and conform to the constitution, pro-
gramme, principles and policy of the Labour Party, that they
neither belonged to nor were actively associated with any
proscribed organisation and that they would co-operate in **G**
re-establishing P.D.L.P. in accordance with the rules and con-
stitution of the Labour Party. Four members, including M. and
B.L.D., did not reply and four others, including R., sent replies

any such application relates is binding on the person against whom the application is
made, that person may dispute liability to have the judgment or order enforced
against him on the ground that by reason of facts and matters particular to his case
he is entitled to be exempted from such liability. (6) The court hearing an application **H**
for the grant of leave under paragraph (3) may order the question whether the judg-
ment or order is enforceable against the person against whom the application is made
to be tried and determined in any manner in which any issue or question in an action
may be tried and determined."

A  which the national agent regarded as unsatisfactory. By reason
of their failure to give the required undertakings the eight
members were deemed to be disqualified from membership of
the Haverfordwest Local Labour Party, and were neither in-
formed of the re-organisation meeting nor permitted to attend
it. The meeting was held on May 20. Officers were elected
and delegates were chosen to represent the Haverfordwest Local
Labour Party at a proposed re-organisation meeting of P.D.L.P.

B  M. and B.L.D. challenged the validity of the whole of that
meeting in a writ issued on June 12, and, by notice of motion of
the same date, sought to restrain the officers and delegates elected
at the meeting of May 20, from dealing in any way with the
moneys and other property of the Haverfordwest Local Labour
Party, and from acting as delegates for it. Despite the issue of the
second writ, the proposed re-organisation meeting of P.D.L.P.
was held on June 22, and was attended by delegates purpor-
ted to have been elected at the re-organisation meeting of May

C  20, and by delegates from other local Labour Parties elected in a
similar manner at similar meetings convened by N.E.C. At the
meeting of June 22, those attending purported to re-elect J. as
president of P.D.L.P. The validity of the whole of the third
meeting was challenged in a writ issued on July 5 by R. and C.,
and on the same day, by notice of motion R. and C. sought to
restrain J. from dealing in any way with the moneys or other
property of P.D.L.P.

D  On the hearing of the four motions in the three actions:—

*Held* (1) That the rule as to representative actions laid down
in R.S.C., Ord. 15, r. 12 (1), was not a rigid one, but was a rule
of convenience; that what was important was to have before
the court, either in person or by representation, all those who
would be affected, so that all should be bound by the result;
that all members of P.D.L.P. had a common interest, and that
since the only objection suggested to J.'s being allowed to

E  represent all the members (other than the three defendants),
namely, that J. would then be representing some who in fact
supported the defendants and who did not wish J. to represent
them, could be cured by adding such persons as defendants
(either individually or by securing their representation by other
defendants), there was no reason why the writ should be struck
out wholly or in so far as it claimed relief in a representative

F  capacity (post, pp. 369G—370B, E—371A, C, G, 373E—F, H—374C,
E—F).

Dicta of Lord Macnaghten in *Bedford* (*Duke of*) v. *Ellis*
[1901] A.C. 1, 8, 10, H.L.(E.) applied.

(2) That when, in contravention both of the decision of the
standing orders committee at a meeting immediately preceding
the main meeting and of the standing orders of P.D.L.P., J.
attempted to put to the vote a resolution not on the agreed

G  agenda, he was guilty of a deliberate and substantial breach of
duty, which caused the disturbances to occur; that J. possessed
no inherent power as chairman to put such a resolution to the
meeting, and that while he did possess an inherent power to
adjourn for disorder for such a period as might be reasonably
necessary in order to restore order, his action in purporting
to adjourn sine die was invalid and ineffective to produce a
valid adjournment of the meeting; and that accordingly C. and L.
were validly elected, and since R. remained secretary all three

H  defendants were validly elected officers of P.D.L.P., and J.'s
motion in the first action must be dismissed (post, pp. 374F—H,
377E—G, 378A, 379C, 381G—382D, 384E—G).

*Stoughton* v. *Reynolds* (1736) 2 Stra. 1045; Fort. 168; *Reg.*

v. *D'Oyly* (1840) 12 Ad. & El. 139; *National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159 and *Rex* v. *Churchwardens of St. Mary, Lambeth* (1832) 1 Ad. & El. 346n. considered.    A

(3) That the maxim " Omnia praesumuntur rite esse acta " was not limited in operation to cases where it was sought to apply it in favour of outsiders or non-members of a club or association, and since there was some evidence that certain rules of the Labour Party had for many years been treated as the rules of P.D.L.P. the maxim could, in the absence of any direct evidence of formal adoption, be applied in favour of the    B adoption of the rules; that in any event there was no reason why a person joining a club or association should not be bound by whatever rules had become established by usage even if never formally adopted and not brought to his attention on joining; that while P.D.L.P. was not a mere branch of the Labour Party but remained a separate entity, nevertheless, on the true construction of the rules set B, P.D.L.P. was bound to accept the constitution, programme, principles and policy of the Labour    C Party, and that therefore the resolution to disaffiliate (in any event procedurally invalid because not upon the agenda) was also invalid because P.D.L.P. could not lawfully disaffiliate itself from the Labour Party, unless the rules had first been altered (post, pp. 386A—B, F—G, 387G—388C, D—E, G—389B, F, G, 390B—D, F—391B).

Dictum of Lord Simonds in *Morris* v. *Kanssen* [1946]    D A.C. 459, 475; [1946] 1 All E.R. 586, H.L.(E.); *Royal British Bank* v. *Turquand* (1856) 6 E. & B. 327 and *Finch* v. *Oake* [1896] 1 Ch. 409, C.A. distinguished.

(4) That despite the passing of the resolution to disaffiliate and in support of D., it would not be right to grant the injunction sought to restrain the defendants, who were the lawfully elected officers of P.D.L.P., since there was no evidence of any improper use of the funds or of any threat to flout the law once    E the law was known, and J.'s motion must, therefore, be dismissed (post, pp. 391G—392C).

*General Billposting Co. Ltd.* v. *Atkinson* [1909] A.C. 118, 122, H.L.(E.) distinguished.

(5) That although clause 8 (2) of the constitution of the Labour Party empowered the N.E.C. to take " any action it deems necessary . . . whether by . . . disaffiliation of an organisation or expulsion of an individual or otherwise," there was    F nothing in the rules or constitution of the Labour Party which excluded the application of the principles of natural justice, even though what was here in issue was suspension and not expulsion, and that, accordingly, the resolution suspending the activities of P.D.L.P. and the rights of its officers to handle its funds and the resolution authorising the national agent to re-organise it were nullities, since in both cases those who were suspended were given no opportunity to be heard in answer to charges, and    G in the case of the second resolution, no notice was given to certain members of the Haverfordwest Local Labour Party of the proposed re-organisation meeting of May 20; that, it being conceded that the validity of the subsequent meeting of P.D.L.P. on June 22 stood or fell with that of May 20, both were wholly invalid and that, accordingly, the plaintiffs in the second and third actions were entitled to the injunctions claimed and such injunctions would be granted unless undertakings were given by    H the defendants to those actions in lieu of the injunctions (post, pp. 395E—F, 396E, 397D—F, 401E—F, H—402A, E—G, 403H—404C).

*Burn* v. *National Amalgamated Labourers' Union* [1920] 2 Ch. 364; *Ridge* v. *Baldwin* [1964] A.C. 40; [1963] 2 W.L.R.

A  935; [1963] 2 All E.R. 66, H.L.(E.); *Fountaine* v. *Chesterton,*
*The Times,* August 20, 1968 (see post, p. 398G–H); *Maclean* v.
*Workers' Union* [1929] 1 Ch. 602; *Calder* v. *Bull* (1798) 3
U.S. 386, 399 and *Lee* v. *Showmen's Guild of Great Britain*
[1952] 2 Q.B. 329, 342; [1952] 1 All E.R. 1175, C.A. applied.

*Per* Megarry J.  A chairman's first duty is to keep order
if he can.  If disorder ensues, his duty is to make earnest and
sustained efforts to restore order.  If his efforts fail, he should
try to operate whatever provisions the rules contain as to
B  adjournment of the meeting.  If that proves impossible he
should exercise his inherent power to adjourn for a short while,
taking due steps to ensure so far as possible that all present
know of the adjournment.  If violence, not mere disorder,
occurs he should take similar steps, save that the greater the
violence the less prolonged should be his efforts to restore
order before adjourning.  He has a duty, not merely a power,
to adjourn in this way, when people are put in fear for their
C  safety.  The power and the duty must be exercised bona fide,
to forward and facilitate the meeting, not merely to interrupt
or procrastinate, and the adjournment must be for no longer
than necessary.  There may well be other limitations on the
chairman's inherent power of adjournment (post, p. 382D—
383B).

D  The following cases are referred to in the judgment:

*Adair* v. *New River Plate Co.* (1805) 11 Ves. 429.
*Bedford (Duke of)* v. *Ellis* [1901] A.C. 1, H.L.(E.).
*Bromley* v. *Smith* (1826) 1 Sim. 8.
*Burn* v. *National Amalgamated Labourers' Union* [1920] 2 Ch. 364.
*Cabell* v. *Markham* (1945) 148 F. 2d 737.
*Calder* v. *Bull* (1798) 3 U.S. 386.
E  *Catesby* v. *Burnett* [1916] 2 Ch. 325.
*Cockburn* v. *Thompson* (1809) 16 Ves.Jun. 321.
*Finch* v. *Oake* [1896] 1 Ch. 409, C.A.
*Fisher* v. *Keane* (1878) 11 Ch.D. 353.
*Fountaine* v. *Chesterton,* The Times, August 20, 1968; 112 Sol.J. 690.
*Fraser* v. *Cooper Hall & Co.* (1882) 21 Ch.D. 718.
*General Assembly of Free Church of Scotland* v. *Overtoun* [1904] A.C. 515,
  H.L.(Sc.).
F  *General Billposting Co. Ltd.* v. *Atkinson* [1909] A.C. 118, H.L.(E.).
*Harington* v. *Sendall* [1903] 1 Ch. 921.
*Harrison* v. *Abergavenny (Marquis of)* (1887) 3 T.L.R. 324.
*Henderson* v. *Bank of Australasia* (1890) 45 Ch.D. 330, C.A.
*Indermaur* v. *Dames* (1866) L.R. 1 C.P. 274.
*Indian Zoedone Co., In re* (1884) 26 Ch.D. 70, C.A.
*Labouchere* v. *Wharncliffe (Earl of)* (1879) 13 Ch.D. 346.
G  *Lee* v. *Showmen's Guild of Great Britain* [1952] 2 Q.B. 329; [1952] 1 All
  E.R. 1175, C.A.
*London Graving Dock Co. Ltd.* v. *Horton* [1951] A.C. 737; [1951] 2 All
  E.R. 1, H.L.(E.).
*MacDougall* v. *Gardiner* (1875) 1 Ch.D. 13, C.A.
*Maclean* v. *Workers' Union* [1929] 1 Ch. 602.
*Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021, C.A.
H  *Morris* v. *Kanssen* [1946] A.C. 459; [1946] 1 All E.R. 586, H.L.(E.).
*National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159.
*Pet Library (London) Ltd.* v. *Walter Ellson & Son Ltd.* [1968] F.S.R. 359.
*Raggett* v. *Musgrave* (1827) 2 C. & P. 556.

*Reg.* v. *D'Oyly* (1840) 12 Ad. & El. 139.                                    A
*Rex* v. *Cambridge University* (1723) 1 Stra. 557.
*Rex* v. *Chester (Archdeacon of)* (1834) 1 Ad. & El. 342.
*Rex* v. *Gaborian* (1809) 11 East 77.
*Rex* v. *St. Mary, Lambeth (Churchwardens of)* (1832) 1 Ad. & El. 346n.
*Ridge* v. *Baldwin* [1964] A.C. 40; [1963] 2 W.L.R. 935; [1963] 2 All E.R. 66,
   H.L.(E.).
*Royal British Bank* v. *Turquand* (1856) 6 E. & B. 327.
*Salisbury Gold Mining Co. Ltd.* v. *Hathorn* [1897] A.C. 268, P.C.          B
*Satanita, The* [1895] P. 248; [1897] A.C. 59, H.L.(E.).
*Second Consolidated Trust Ltd.* v. *Ceylon Amalgamated Tea and Rubber
   Estates Ltd.* [1943] 2 All E.R. 567.
*Shaw* v. *Thompson* (1876) 3 Ch.D. 233.
*Smith* v. *Cardiff Corporation (No. 1)* [1954] 1 Q.B. 210; [1953] 3 W.L.R.
   994; [1953] 2 All E.R. 1373, C.A.
*Smith* v. *Cardiff Corporation (No. 2)* [1955] Ch. 159; [1955] 2 W.L.R. 126;  C
   [1955] 1 All E.R. 113.
*Smyth* v. *Darley* (1849) 2 H.L.Cas. 789, H.L.(E.).
*Sneyd* v. *Stewart* (1857) 10 Ir.Jur. 105.
*Stoughton* v. *Reynolds* (1736) 2 Stra. 1045 ; Fort. 168.
*Wall* v. *London and Northern Assets Corporation* [1898] 2 Ch. 469, C.A.
*Wandsworth and Putney Gas-light and Coke Co.* v. *Wright* (1870) 22 L.T.
   404.                                                                         D
*Watson* v. *Cave (No. 1)* (1881) 17 Ch.D. 19, C.A.
*Wilson* v. *Church* (1878) 9 Ch.D. 552.
*Wood* v. *McCarthy* [1893] 1 Q.B. 775, D.C.
*Wyld* v. *Silver* [1963] Ch. 243; [1962] 3 W.L.R. 841; [1962] 3 All E.R. 309,
   C.A.
*Young* v. *Ladies' Imperial Club Ltd.* [1920] 2 K.B. 523, C.A.

                                                                               E
The following additional cases were cited in argument:

*Attorney-General* v. *Smith* [1947] I.R. 332.
*Bagg's Case* (1615) 11 Co.Rep. 93b.
*Barker* v. *Allanson* [1937] 1 K.B. 463; [1937] 1 All E.R. 75, C.A.
*Blythe* v. *Birtley* [1910] 1 Ch. 228, C.A.
*Brogden* v. *Metropolitan Railway Co.* (1877) 2 App.Cas. 666, H.L.(E.).
*Bromley* v. *Williams* (1863) 32 Beav. 177.                                    F
*Carltona Ltd.* v. *Commissioners of Works* [1943] 2 All E.R. 560, C.A.
*Cooper* v. *Wandsworth Board of Works* (1863) 14 C.B.N.S. 180.
*Dale* v. *Inland Revenue Commissioners* [1954] A.C. 11; [1953] 3 W.L.R.
   448; [1953] 2 All E.R. 671, H.L.(E.)
*Dawkins* v. *Antrobus* (1881) 17 Ch.D. 615, C.A.
*Foss* v. *Harbottle* (1843) 2 Hare 461.                                        G
*Hardie & Lane Ltd.* v. *Chiltern* [1928] 1 K.B. 663, C.A.
*Harrison's Share under a Settlement, In re* [1955] Ch. 260; [1954] 3
   W.L.R. 156; [1954] 2 All E.R. 453, C.A.
*Hughes* v. *Architects' Registration Council of the United Kingdom* [1957] 2
   Q.B. 550; [1957] 3 W.L.R 119; [1957] 2 All E.R. 436, D.C.
*International General Electric Co. of New York Ltd.* v. *Commissioners
   of Customs and Excise* [1962] Ch. 784; [1962] 3 W.L.R. 20; [1962]
   2 All E.R. 398, C.A.                                                         H
*Lewisham Borough Council* v. *Roberts* [1949] 2 K.B. 608; [1949] 1 All E.R.
   815, C.A.
*Mercantile Marine Service Association* v. *Toms* [1916] 2 K.B. 243, C.A.

A     *Mozley* v. *Alston* (1847) 1 Ph. 790.
   *N. (Infants), In re* [1967] Ch. 512; [1967] 2 W.L.R. 691; [1967] 1 All E.R.
    161.
   *Osgood* v. *Nelson* (1872) L.R. 5 H.L. 636, H.L.(E.).
   *Reg.* v. *Langton* (1876) 2 Q.B.D. 296.
   *Russell* v. *Norfolk (Duke of)* [1948] 1 All E.R. 488; [1949] 1 All E.R. 109,
    C.A.
   *Sherriff* v. *McMullen* [1952] I.R. 236.
B     *Thellusson* v. *Valentia (Viscount)* [1907] 2 Ch. 1, C.A.
   *Webb, decd., In re* [1964] 1 W.L.R. 509; [1964] 2 All E.R. 91.
   *Wolfe* v. *Matthews* (1882) 21 Ch.D. 194.

MOTIONS.

On March 27, 1968, the Member of Parliament for Pembrokeshire, Mr.
Desmond Donnelly, was expelled from the Labour Party. Ten days later,
C  on April 6, the annual meeting of the Pembrokeshire Divisional Labour
Party (hereinafter referred to as P.D.L.P.), took place. At the start of
the meeting, Mr. James Cecil Gough John, as president of P.D.L.P., took
the chair. The meeting was attended by about 100 people, mostly delegates
from various local Labour Parties within the constituency. After Mr.
John had welcomed the delegates, the assistant national agent of the
D  Labour Party addressed the meeting on loyalty to the party. He reminded
members of their obligations, referred to Mr. Donnelly's expulsion, and
ended by suggesting that a resolution be passed to the effect that P.D.L.P.
should continue to act in strict conformity with its constitution, and the
rules and constitution of the Labour Party. No such resolution appeared
on the agenda and when Mr. John sought to put such a resolution, which
had been moved and seconded by delegates from the floor, to the vote,
E  disturbances broke out, since the majority of those present were supporters
of Mr. Donnelly, and favoured disaffiliation from the Labour Party. There
was a certain amount of noise, disorder and, in a few cases, bodily contact,
but nothing that could really be called violence, and no one appeared to
have been put in fear. After some attempt to restore order, Mr. John
purported, as chairman, to adjourn the meeting sine die, and left the
F  meeting accompanied by a number of other delegates. Those who re-
mained proceeded with the business of the meeting, which included the
election of officers. Mr. Bartholomew Cleare was elected president, in
place of Mr. John, and Mr. Haydn J. Lewis was elected treasurer. Mr.
Glyn Rees, the secretary, remained secretary since his office was not
amongst those to be filled. In addition to other business, the meeting
then passed, by 69 votes to 1, a resolution to disaffiliate from the Labour
G  Party. The validity of the continuation of the meeting, after the purported
adjournment, was challenged by Mr. John, as plaintiff, in a writ issued on
May 6, 1968 [1968 J. No. 2692], and a notice of motion was issued on the
same date, claiming an injunction to restrain Mr. Rees, Mr. Cleare and
Mr. Lewis (the first, second and third defendants, respectively), from
dealing in any way with the moneys or other property of the P.D.L.P.
H  Mr. John, the plaintiff, claimed to represent all members of the P.D.L.P.
other than the three defendants and also, to be acting personally.

On May 14, the defendants issued a counter-notice of motion seeking

to have the whole writ struck out, or alternatively, so much thereof as claimed relief in a representative capacity.

   A

Meanwhile, on April 24, 1968, the National Executive Committee of the Labour Party, hereinafter referred to as N.E.C., passed two resolutions, one suspending the activities of the P.D.L.P., and the right of its officers to handle the funds of the party, and the other authorising the national agent " to take such steps as are necessary to complete the reorganisation " of the P.D.L.P. In pursuance of these resolutions the national agent    B resolved, inter alia, to convene a meeting of the Haverfordwest Local Labour Party, but before doing so he sent a letter by registered post to leading members of the dissident faction who supported Mr. Donnelly, informing them of the proposed reorganisation and requesting from them an under- taking that they accepted, and would conform to, the constitution, pro- gramme, principles and policy of the Labour Party, that they neither belonged to nor were actively associated with any proscribed organisation    C and that they would co-operate in re-establishing the P.D.L.P. in accord- ance with the rules and constitution of the Labour Party.

Four members, including Mr. Thomas Henry Martin, the treasurer of the Haverfordwest Local Labour Party, and Mr. Brian Lloyd Davies, did not reply, and four more, including Mr. Rees (the first defendant to the first action), sent replies which the national agent regarded as unsatisfactory.    D By reason of their failure to give the required undertakings these eight people were deemed to be disqualified from membership of the Haverford- west Local Labour Party, and were not informed of, or permitted to attend, the reorganisation meeting, which was held on May 20.

The business transacted at that meeting included the purported election of officers and of delegates to represent the Haverfordwest Local Labour Party at a proposed reorganisation meeting of the P.D.L.P. The validity    E of the whole of the meeting on May 20 was challenged in a writ [1968 M. No. 2390], issued on June 12 by Mr. Martin and Mr. Brian Lloyd Davies, as plaintiffs, and by notice of motion of the same date, they sought to restrain Mr. Leonard Davis, Mr. W. Webb, Mr. R. C. Davies, Mr. J. B. W. James and Mrs. A. James (the officers and delegates elected or confirmed in office at the meeting of May 20) from dealing in any way    F with the moneys and other property of the Haverfordwest Local Labour Party, and from acting as delegates for it.

Despite the issue of that second writ the proposed reorganisation meeting of the P.D.L.P. was held on June 22, and was attended by the delegates purported to have been elected at the reorganisation meeting on May 20, of the Haverfordwest Local Labour Party, and by delegates from other local Labour Parties in the constituency elected in a similar manner    G at meetings convened by N.E.C. At this meeting those attending purported to re-elect Mr. John as president. The validity of the whole of that meeting was challenged in a writ [1968 R. No. 2276], issued on July 5, by Mr. Rees and by Mr. Cleare (the first two defendants in the first action) against Mr. John (the plaintiff in the first action), and on the same day, by a notice of motion, they sought to restrain Mr. John from dealing in any way    H with the moneys or other property of the P.D.L.P.

The two motions in the first action and the motions in the second and third actions were all heard together.

A    The facts are more fully stated in the judgment.

*A. C. Sparrow Q.C.* and *Gavin Lightman* for the plaintiff in the first action, and the defendants in the second and third actions.

The plaintiff claims to represent all members of the Pembrokeshire Divisional Labour Party (P.D.L.P.), except the defendants. The defendants wish to have the plaintiff's motion struck out, either totally or in so far as

B    it is brought in a representative capacity, and wish the defendants' motion to be tried first as a preliminary point of law. Whether or not a number of members of P.D.L.P. do not support the plaintiff, is irrelevant: see *Daniell's Chancery Practice*, 8th ed. (1914), pp. 177, 179, where it is stated that a representative action can be brought on behalf of others of a body although the majority disapprove of it. It would in any event be impossible to try it as a preliminary point without going into all the facts. The

C    plaintiff's motion should therefore be heard first.

*David Hirst Q.C.* and *Charles Drake* for the defendants in the first action and the plaintiffs in the second and third actions.

Notice of motion was duly served under R.S.C., Ord. 12, r. 8 and it is obvious that the matters raised were to be heard as a preliminary point. The plaintiff certainly does not represent all members of P.D.L.P. except

D    the defendants, as the evidence will show. In *Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021, where a shipper sued on behalf of himself and other owners of cargo, it was held that a representative action would not lie, and the writ was struck out altogether. In *Smith* v. *Cardiff Corporation (No. 1)* [1954] 1 Q.B. 210, the Court of Appeal held that to bring a representative action it must be shown that all members of the

E    alleged class have a common interest, a common grievance and that the relief claimed is beneficial to them all. That cannot be said here. If a person purports to sue in a representative capacity for some only of the class, he must say who it is that he does represent. This is not a mere technicality, but fundamental. The defendant's motion seeks to show that the plaintiff's writ is basically faulty and the defendants must therefore be entitled to have their motion heard first.

F    *A. C. Sparrow Q.C.* in reply. To strike out the representative capacity would not alter the action one iota, the plaintiff would still be entitled to sue on his own behalf and that would necessitate the same facts being opened, the same submissions made and the same evidence given. The judge would require to know the background, even to decide a preliminary point. The rule as to joinder of parties is merely one of convenience. It

G    is necessary to join all who may be affected, and clearly a declaration in this case would affect all the members. The device of a representative action is to avoid the necessity of joining every person who may be interested. Anyone who objects to the plaintiff representing him can apply to be made a defendant to the action, but unless he does so the writ is not to be overturned.

H    [Megarry J. ruled that there would be no convenience or saving of time in hearing the preliminary point first, and stated that he would hear all the evidence on all four motions in the three actions before ruling on the preliminary point.]

*A. C. Sparrow* Q.C. and *Gavin Lightman* on the first action on the
plaintiff's motion.                                                          A

The plaintiff, who is president of the Pembroke Divisional Labour
Party (" P.D.L.P.") is often known as " Counsellor John." He is
well qualified for the role of " keeper of the party conscience " since he
has been an active member for 40 years, a member of the executive com-
mittee for 24 years, and is a bank guarantor of the Haverfordwest Local
Labour Party for £1,000. His motion is designed to prevent a " takeover "   B
or " putsch " by a minority or faction who seek to disaffiliate from the
Labour Party. As a member of P.D.L.P., he is bound by contract with
the other members and is entitled to sue to secure a proper observance of
that contract as contained in the party's constitution. Those who claim to
have been elected as its officers at the meeting held on April 6, 1968, were
never lawfully elected. But even had they been lawfully elected, they
would not be entitled to launch out on policies in conflict with the Party's   C
constitution, and with the programme principles and policy of the Labour
Party. They should be restrained from expending the Party's funds in the
way they seek to do. Furthermore, in any event, the constitution of
P.D.L.P. is so bound up with that of the Labour Party itself, that it is
inseparable from it. The activities of P.D.L.P. are subject to control by
the National Executive of the Labour Party, which has in fact passed reso-   D
lutions suspending the activities of P.D.L.P. and suspending from office
those who purport to act as its officers.

Mr. Donnelly aims to set up a new party in opposition to the official
Labour Party and has stated that he will stand as an independant candidate
at the next election at the head of such new party. He is therefore a self-
proclaimed rebel and he has evidently decided to attempt to use P.D.L.P.
for his own purposes, to harness the funds to the cause he has espoused.   E
However, his aim is legally impossible, and is bound to fail since the
constituency Labour parties are not local autonomous bodies lending sup-
port to a central body. The Labour Party and P.D.L.P. are so clamped
together by their interlocking constitutions that they cannot be separated
without first altering their rules.

At the meeting on April 6, 1968, the plaintiff's action in adjourning the   F
meeting sine die, constituted a valid adjournment of the meeting. The
resolution suggested by Mr. Underhill at the conclusion of his address on
loyalty to the Labour Party, namely that P.D.L.P. should continue to act
in conformity with its constitution, was a harmless resolution and was
clearly admissible although it was not upon the agenda, but since it did
not accord with the wishes of Mr. Donnelly's supporters disorder broke
out. The plaintiff had an inherent right, as chairman, to put the resolution   G
to the meeting, and when disorder resulted, it was both his right and his
duty to adjourn the meeting. The purported continuation of the meeting
by Mr. Donnelly's supporters was invalid, with the consequence that all
business transacted thereafter at the meeting including the election of
officers and the resolution to disaffiliate was equally invalid. Furthermore
the resolution to disaffiliate was not upon the agenda, and the stand-   H
ing orders required ten days notice to be given of any resolution to be
put to the meeting. Thus, quite apart from the impossibility of any resolu-
tion to disaffiliate owing to the nature of the party's constitution, the

A  resolution which was passed at the meeting was procedurally defective, both because it was not on the agenda and because it was passed after a valid adjournment of the meeting.

Moreover, the action taken by the National Executive Committee of the Labour Party (" N.E.C.") has effectively suspended the activities of P.D.L.P. and has suspended from office those who purported to have been elected, and has replaced them by others under the re-organisation which

B  has been carried out in accordance with the resolutions of the N.E.C.

The rules of P.D.L.P. upon which the plaintiff relies are those contained in Set B (for constituency Labour parties).   There is no evidence of an actual resolution for their adoption having been passed by P.D.L.P. but they have been long acted upon, and the maxim " omnia presumuntur rite esse acta " applies in their favour: see *Phipson on Evidence*, 10th ed. (1963), p. 842, para. 2027, and *Morris* v. *Kanssen* [1946] A.C. 459; *Reg.*

C  v. *Langton* (1876) 2 Q.B.D. 296, *Attorney-General* v. *Smith* [1947] Ir. 332 and *In re Webb, decd.* [1964] 1 W.L.R. 509.   The court is therefore asked to hold that the rules Set B can be presumed on the evidence to have been adopted in 1947.   The plaintiff has therefore established his right to the relief claimed.   Reference was also made to *Halsbury's Laws of England*, 3rd ed. vol. 5 (1953) pp. 252, 586, 589, 590, 604, 605, 608, 610;

D  *Kerr on Injunctions* 6th ed. (1927) 583; *Lloyd on the Law of Unincorporated Associations* 99; *Harington* v. *Sendall* [1903] 1 Ch. 921, and *Thellusson* v. *Valentia (Viscount)* [1907] 2 Ch. 1.

*David Hirst Q.C.* and *Charles Drake* on the first action on both motions.

The plaintiff has claimed the right to bring a representative action on behalf of all the members of P.D.L.P. other than the three defendants, but no duty rests upon him to bring such an action.   If he chooses to

E  exercise his right to bring a representative action he must show that his action falls within the rule, i.e., within R.S.C., Ord. 15, r. 12.   He must show that all the people whom he claims to represent have the same interest.   If he is wrong, and the onus is on him to get it right, then his writ is bad and should be struck out.   Here there are over 20 affidavits from people who state that they do not wish the plaintiff to represent them,

F  and the conclusion is obvious, that the plaintiff must have known, when he issued his writ, that there was a sizeable proportion of members who in fact were on the other side, and supported Mr. Donnelly.   His writ is therefore bad and should be struck out.   Reliance is placed upon *Barker* v. *Allanson* [1937] 1 K.B. 463, *per* Greer L.J. at 473, and *per* Scott L.J. at 475; *Smith* v. *Cardiff Corporation (No. 1)* [1954] 11 Q.B. 210, 213, 218, 220; and *Market & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 1 K.B.

G  1021.

Alternatively the words of representation should be struck out.   It is impossible to show that Mr. Donnelly's supporters have the same interests and grievances as the supporters of the official Labour Party.

As to the effectiveness or otherwise of the continuation of the meeting of April 6, after the plaintiff's purported adjournment sine die; (1) The

H  order of business of a meeting is basically as laid down in the standing orders.   (2) The standing orders committee has power to vary the order of business, subject at least to the wishes of the majority of the meeting. (3) Rule 5 of the standing orders laying down the order of business is

John v. Rees                                          [1970]

A

sacrosanct, unless it is suspended under rule 22, which however requires a vote of the meeting with a two-thirds majority to be put into operation. (4) On any view the chairman has no power to vary the order of business, of his own motion. (5) By rules 11 or 19 the power to adjourn is vested only in the majority of the meeting. (6) The chairman's duty is to conduct the meeting in accordance with the wishes of the majority. (7) The chairman of a meeting has no inherent power to adjourn the meeting under the general principles of law. (8) If, contrary to the last submission, there is some residual power to adjourn for disorder, (i) the chairman may not exercise it if he himself has provoked the disorder by his own improper conduct of the meeting, unless he has first tried to remedy his improper conduct, as by returning to the correct order of busines or by availing himself of any provision for suspension of the standing orders which may be contained in the rules; (ii) the chairman cannot in any event use such residual power to frustrate the wishes of the majority of the meeting; (iii) the chairman cannot use any such power without first seeking to comply with the standing orders, by, in this case, seeking a vote for adjournment under rules 11 or 19 of the standing orders. (9) Any such residual power to adjourn for disorder could only be used for the minimum period reasonably necessary for the purpose of restoring order. An adjournment sine die could never be a proper exercise of any such power: see *Stoughton* v. *Reynolds* (1736) 2 Stra. 1045, Fort. 168; *Wandsworth & Putney Gaslight & Coke Co.* v. *Wright* (1870) 22 L.T. 404; *Wall* v. *London & Northern Assets Corporation* [1898] 2 Ch. 469; *Salisbury Goldmining Co. Ltd.* v. *Hathorn* [1897] A.C. 268; *National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159.

The chairman's duty is to ascertain the wishes of the majority. Obviously he must preserve order, but that does not entitle him to adjourn altogether and never recall the meeting. [Reference was also made to *Henderson* v. *Bank of Australasia* (1890) 45 Ch.D. 330; *Reg.* v. *D'Oyly* (1840) 12 Ad. & El. 139; *Rex* v. *Chester (Archdeacon of)* (1834) 1 Ad. & El. 342; *Shaw* v. *Thompson* (1876) 3 Ch.D. 233; *Catesby* v. *Burnett* [1916] 2 Ch. 325; *MacDougall* v. *Gardiner* (1875) 1 Ch.D. 13; *Second Consolidated Trust Ltd.* v. *Ceylon Amalgamated Tea and Rubber Estates Ltd.* [1943] 2 All E.R. 567.]

The order of business is laid down in mandatory terms in the standing orders. There is a power to suspend the standing orders by a vote of a two-thirds majority under standing order 22, but no one suggests that that power was ever exercised here. The standing orders committee is not explicitly given power to vary the order of business, but the plaintiff in fact sought to get the committee to authorise such a variation. Either the committee has such a power impliedly, or, by custom or authority it must be obtained from the meeting itself. Alternatively if the standing orders committee has this power, then standing order 5, which lays down the order of business in mandatory terms, is sacrosanct and must be adhered to. Here the plaintiff strayed from his duty as chairman, by attempting to put the proposed resolution of loyalty to the Labour Party to the vote at that stage of the agenda; by so doing he was departing from the order of business agreed to by the committee. Standing orders 11 and 19 are

B

C

D

E

F

G

H

**A**   only consistent with the power to adjourn being vested in the meeting itself.

As to the power to put resolutions to the meeting it is clear that in the agenda the proper place to consider items was after the conclusion of other business including the election of officers. The standing orders required ten days' notice of motion for the inclusion of a resolution on the agenda " unless on matters of urgency accepted by the majority as such."

**B**   In fact however the practice seems to have been, to give carte blanche to bring resolutions without notice. This is what the plaintiff attempted to get the standing orders committee to agree to. The standing orders committee accepted in principle, but only on condition that the proposed resolution took its rightful place after the resolutions already on the agenda. According to an affidavit sworn by Mr. Underhill, the Assistant National Agent of the Labour Party, all sorts of resolutions which had not been

**C**   notified were in fact accepted at the purported reorganisation meeting of June 22, 1968.

It has been suggested that the defendants' state of mind and their actions showed a basic disloyalty to the Labour Party and its principles. But far from doing this the defendants have made it plain that they are loyal to what they regard as Labour Party principles. In their view it is

**D**   others, not least the Government and the Prime Minister, who have departed from the true principles of the Labour Party. What the resolution to disaffiliate does not show is disloyalty to Labour Party principles.

When the noise and disorder broke out at the meeting the plaintiff as chairman had three possible alternatives open to him: (1) to remedy his own improper conduct by reverting to the correct order of business; (2) if he wanted to change that order to seek to get a motion passed for that

**E**   purpose under standing order 22, for the suspension of standing order 5 which regulated the order of business; or (3) if he wished to adjourn, to attempt to get a vote for an adjournment under standing orders 11 and 19. What he was not entitled to do was to adjourn the meeting on his own motion, particularly when it was his own conduct which had created the disorder. Certainly there was no power to adjourn sine die: see *National*

**F**   *Dwellings Society* v. *Sykes* [1894] 3 Ch. 159, *per* Chitty J. at p. 162.

If, however, the plaintiff did have a power to adjourn, did he in fact do so? There is evidence from respectable people, so near that they must have heard, who say they did not hear the plaintiff adjourn the meeting and it is for the plaintiff to establish a strong prima facie case that he did. Here there is evidence in opposing directions, and no strong prima facie case can be made out. If the meeting was adjourned for the proper purpose

**G**   of disorder it should only have been for so long as was necessary to allow tempers to cool. The plaintiff had three weeks to reconstitute the meeting before the Labour Party took steps to suspend P.D.L.P., but if the plaintiff's real motive for adjourning was that he knew he was on a " losing wicket " there was every motive for adjourning sine die. If there was no adjournment then the continuation was valid in any event, and consequently the

**H**   election of officers was valid.

Where a meeting is adjourned in circumstances in which a minority is misled, the adjournment is a fraud upon the minority and invalid, and the continuation of a meeting would be valid: [see *Palmer on Company*

*Law,* 20th ed. (1968), pp. 479, 486 and *Salisbury Gold Mining Co. Ltd.* v.
*Hathorn* [1897] A.C. 268; *Stoughton* v. *Reynolds* (1736) 2 Stra. 1045, Fort.
168; *National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159; *Shaw* v.
*Thompson* (1876) 3 Ch.D. 233; and *Catesby* v. *Burnett* [1916] 2 Ch. 325.]
Where however the adjournment comes when the business of the meeting
is over, or if it is validly adjourned before that point is reached, then
naturally the meeting cannot be continued by a " rump ": see *Rex* v.
*Gaborian* (1809) 11 East 77.

Mr. Donnelly's right to attend the meeting which the plaintiff challenges
is based on the following facts: (1) the agenda provided for an address
by the Member of Parliament, and therefore Mr. Donnelly was the only
person who could give it; (2) the model rules Set B do not apply and
therefore he was entitled to be there even though expelled from the Labour
Party; and (3) he was still a member of P.D.L.P. even if not of the Labour
Party.

The resolution to disaffiliate was perfectly in order since the items on
the agenda as provided for by the standing orders include as an item
" To consider resolutions " and standing order 7 gives the meeting carte
blanche to consider matters in an emergency of which due notice had not
been given. No one suggests that the emergency in the present case was
known beforehand. The resolution was passed by a majority of 69 to 1,
and was clearly urgent business. If the majority at a meeting accepts a
resolution the court is not going to ascertain internally whether the business
was properly on the agenda: see *MacDougall* v. *Gardiner* (1875) 1 Ch.D.
13.

It is said that even if the defendants were validly elected, they should
be restrained from acting because they are departing from or are in
conflict with the policy of the Labour Party, but it is vital to distinguish
between disaffiliation and a conflict of policy. A person may adhere to a
political policy while still wishing to disaffiliate and pursue the policy
separately. Compare *General Assembly of Free Church of Scotland* v.
*Overtoun* [1904] A.C. 515, where the " Wee Free " withdrew from the
Church of Scotland in 1843 because they wanted to stand on their own, and
the elders were held in breach of trust in joining with the Presbyterians
who were a disestablished church. That case shows that separation is
possible without disloyalty to principle. It is however questionable how
far the court can test loyalty or disloyalty to " the policy of the Labour
Party ", which is *not* the Prime Minister's policy or the Government's
policy. It is virtually impossible for the court to determine with certainty
what the policy of the Labour Party is. In any event there is no evidence
that the defendants have been disloyal to it, whatever it may be. No
sufficient prima facie case has been made out to show that P.D.L.P. ever
adopted the rules Set B, but even if those rules were adopted P.D.L.P.
would be free to disaffiliate as they did by the resolution at the meeting
on April 6, 1968. Thereafter any power of the Labour Party to discipline
P.D.L.P. ceased. To establish that the rules of Set B were binding, the
plaintiff would have to prove *actual adoption,* and that members who
joined subsequently agreed expressly or impliedly to be bound by them.
But in fact there is no direct evidence of any such adoption and it would
be wrong to apply the presumption, in the maxim omnia praesumuntur

**A**  rite esse acta. This maxim is only available to "outsiders." People on the inside, who have or ought to have knowledge, cannot claim to apply it. It is intended for the benefit of persons who are entitled to assume just because they cannot, from the circumstances, themselves know: see *Morris* v. *Kanssen* [1946] A.C. 459; *Reg.* v. *Langton* (1876) 2 Q.B.D. 296; *Attorney-General* v. *Smith* [1947] I.R. 332; *In re Webb, decd.* [1964] 1 W.L.R. 509; *Sneyd* v. *Stewart* (1857) 10 Ir. Jur. 105 and *Brogden* v.

**B**  *Metropolitan Railway Co.* (1877) 2 App.Cas. 666.

In cases connected with clubs it is necessary to show some knowledge or acceptance by the member: see *Raggett* v. *Musgrave* (1827) 2 C. & P. 556 and *The Satanita* [1895] P. 248; *Clarke* v. *Dunraven* [1897] A.C. 59. Members who joined the club before the alleged adoption cannot be bound by the rules: see *Hughes* v. *Architects' Registration Council of the*

**C**  *United Kingdom* [1957] 2 Q.B. 550. Here there is no evidence of actual adoption and, the plaintiff being an "insider" he cannot rely upon the presumption of adoption. There is no evidence of acceptance or knowledge, and therefore the rules Set B cannot apply.

Unless the rules expressly provide to the contrary a member of an unincorporated association is entitled to resign. Similarly a section of a voluntary association is always entitled to disaffiliate or secede from the

**D**  association, and having seceded they are no longer bound by the club rules: see *Finch* v. *Oake* [1896] 1 Ch. 409; *Sheriff* v. *McMullen* [1952] I.R. 236 and *General Assembly of Free Church of Scotland* v. *Overtoun* [1904] A.C. 515. No one would dare to suggest that an individual member of the Labour Party cannot resign, if disenchanted with Labour, or from mere caprice.

**E**  Furthermore the rules of the Labour Party give the N.E.C. a power to "disaffiliate" a constituency party. If therefore such a party can be expelled by the Labour Party it must surely be entitled to resign. It would be intolerable if membership subscriptions could be forced out of persons who were unwilling to pay them. Neither the rules of the Labour Party itself nor those in Set B contain any provision which says "Thou shalt not disaffiliate."

**F**  The provisions of clause 8 (2) (b) of the Labour Party constitution whereby the N.E.C. is given the power and duty to enforce the constitution and "to take any action it deems necessary for such purpose, whether by way of disaffiliation of an organisation, expulsion of an individual or otherwise," must be construed contra proferentem because they are restrictions on liberty.

**G**  The purported suspension of P.D.L.P. was of no effect, because P.D.L.P. had already disaffiliated from the Labour Party when the resolution of the N.E.C. was passed and because the rules contain no power to suspend. A purported exercise of any such power would be subject to the rules of natural justice; the words "or otherwise" would not cover what was done here or justify the exclusion of the principles of natural justice. Those who are to be suspended must be informed of the charges against

**H**  them and be given a hearing by an unbiased tribunal: see *Ridge* v. *Baldwin* [1964] A.C. 40; *Russell* v. *Norfolk (Duke of)* [1949] 1 All E.R. 109. There has been no threat by the defendants to divert the funds of P.D.L.P. and in all the circumstances the injunction sought by the

plaintiff should be refused. [Reference was made to *Second Consolidated Trust Fund Ltd.* v. *Ceylon Amalgamated Tea and Rubber Estates Ltd.* [1943] 2 All E.R. 567.]

    *A. C. Sparrow Q.C.* in reply on the plaintiff's motion in the first action.

    Much of the argument for the defendants is based on the principle that the will of the majority must prevail, and that P.D.L.P. cannot be manacled to the Labour Party—but the will of the majority is not absolute. The constitutional principle which applies here is that of the sanctity of contracts. When a person joins an unincorporated association he enters into a contract with other members on the basis that the rules of the association shall be binding; those rules cannot be altered by the will of the majority.

    As to representative actions the arguments advanced for the defendants are wholly misconceived. One suing on behalf of others in a representative capacity represents their interests, not their opinions. [Reference was made to *Daniell's Chancery Practice*, 8th ed. (1914), vol. 1, pp. 151, 175; *Bedford (Duke of)* v. *Ellis* [1901] A.C. 1; *Watson* v. *Cave (No. 1)* (1881) 17 Ch.D. 19 and *Smith* v. *Cardiff Corporation (No. 1)* [1954] 1 Q.B. 210. The rule is one of convenience. Here there is nothing intrinsically wrong with the writ; if there is anyone who does not wish to be represented by the plaintiff he can be joined as an individual defendant: see *Fraser* v. *Cooper Hall & Co.* (1882) 21 Ch.D. 718; *Bromley* v. *Smith* (1826) 1 Sim. 8; *Wyld* v. *Silver* [1963] Ch. 243. [Reference was also made to *Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021.]

    As to the chairman's power to adjourn a meeting, such a power is consistent with the right of a majority to challenge it in appropriate circumstances, but a chairman certainly has a power to adjourn: see *Shaw* v. *Thompson* (1876) 3 Ch.D. 233. The power must be used bona fide. It is conceded that if he simply interferes mala fide, for his own purposes, that would not be within his powers. If the meeting considers that the chairman has exceeded his powers a challenge should be made on the spot: see *Rex* v. *Gaborian* (1809) 11 East 77. *Stoughton* v. *Reynolds* (1736) 2 Stra. 1045; Fort. 168, is explained in *Reg.* v. *D'Oyly* (1840) 12 Ad. & El. 139, 159. While a chairman may not disrupt a meeting which is proceeding in an orderly manner that does not mean that he cannot adjourn for disorder, on which the chairman has an inherent power since it is his duty to keep order: see *National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159. [Reference was also made to *In re Indian Zoedone Co.* (1884) 26 Ch.D. 70; *Rex* v. *Chester (Archdeacon of)* (1834) 1 Ad. & El. 342; *Salisbury Gold Mining Co. Ltd.* v. *Hathorn* [1897] A.C. 268, and *Wall* v. *London & Northern Assets Corporation* [1898] 2 Ch. 469.] The plaintiff's exercise of the power in this case was reasonable in view of threatened breaches of the peace. If the chairman's action is not challenged on the spot, those who challenge the exercise of his power may be estopped if the purported exercise is not plainly a nullity: see *Henderson* v. *Bank of Australasia* (1890) 45 Ch.D. 330. There is no rule that a chairman cannot adjourn sine die. The proper conclusion to be drawn from the evidence is that the plaintiff did in fact adjourn the meeting.

    But even if the defendants were duly elected as officers they should be restrained from dealing with the funds in any way whether constitutionally

A  or otherwise.   An injunction merely restraining them from acting un-
constitutionally would be inadequate since their conception as to what
the constitution is differs from the true view adopted by the plaintiff.
   In determining what is the constitution the significant question is not
" Was set B ever adopted? " but " What does the conduct of the parties
indicate to have been the contract between them? "   The rule must be
that a member of a club or association agrees to be bound by whatever
B  rules are operating in the club or association at the time when he joins.
The overwhelming conclusion from the evidence is that it is a case where
the maxim omnia presumunter rite esse acta should be applied.   P.D.L.P.
has operated for years in accordance with the rules of set B which, as a
constituency Labour Party, they were under an obligation to adopt, and
accordingly it may be presumed that they were duly adopted at some
C  stage.   The contention that the maxim does not apply to contract cases is
erroneous.   The contention that it is available only to outsiders is equally
erroneous and would unduly restrict the operation of the maxim in any
case, since all parties here are members of P.D.L.P.   It is fanciful to
suggest that some are " insiders " and others outsiders.   [Reference was
made to *Royal British Bank* v. *Turquand* (1856) 6 E. & B. 327 and to
*Morris* v. *Kanssen* [1946] A.C. 459.]

D    The real question in this case is: can P.D.L.P. sever itself from the
Labour Party?   The members of P.D.L.P. have so bound themselves to-
gether by contract and it is a fundamental term of that contract that
P.D.L.P. shall remain a part of the Labour Party.   P.D.L.P. cannot disaf-
filiate; it is an integral part of the Labour Party hierarchy which has duties
of overseeing local Labour parties and is charged by the Labour Party
constitution with the collection and transmission of membership fees.   The
E  passing of the resolution of disaffiliation and the support for Mr. Donnelly,
who has been expelled from the Labour Party, are sufficient to show that
those elected at the continuation of the meeting have acted unconstitution-
ally.   The will of the majority at the meeting does not suffice to render it
constitutional.   It is impossible to assume that the defendants will not
spend the Labour Party's money for purposes of their own.

F    [Reference was also made to *Dale* v. *Inland Revenue Commissioners*
[1954] A.C. 11; *Cooper* v. *Wandsworth Board of Works* (1863) 14 C.B.N.S.
180; *Ridge* v. *Baldwin* [1964] A.C. 40; and *Osgood* v. *Nelson* (1872) L.R.
5 H.L. 636.]
      *David Hirst, Q.C.* in reply on the defendants' motion in the first action.
   The passages in *Daniell's Chancery Practice* 8th ed. (1914) at pp. 151
and 175 relied upon by Mr. Sparrow do not provide authority for the
G  contentions advanced.   The only case in which it is necessary to join all
parties is where there is a joint contract: see R.S.C., Ord. 15, r. 4 (2).
*Watson* v. *Cave (No. 1),* 17 Ch.D. 19, and *Fraser* v. *Cooper Hall & Co.*
21 Ch.D. 718, were cases of joint contract and do not assist as to rep-
resentative actions.   The language of R.S.C., Ord. 15, r. 12 (1) is permissive
and not mandatory.   Mr. Sparrow concedes that the relief sought must
H  be beneficial to all.   This could not be so here, since it would be no benefit
to those who share the defendants' views to have the continuation of the
meeting of April 6 declared a nullity.   They have different grievances.
The authorities all treat *Royal British Bank* v. *Turquand,* 6 E. & B. 327

as a branch of the maxim omnia praesumuntur rite esse acta and when Lord Simonds said in *Morris* v. *Kanssen* [1946] A.C. 459, 475 that the presumption was a rule designed for the protection of outsiders " who are entitled to assume just because they cannot know " his remarks were not obiter. While it may be true that there are many links between P.D.L.P. and the Labour Party, that does not destroy the basic principle of law, applicable to associations as well as to clubs, that a member has a right to resign: see *Finch* v. *Oake* [1896] 1 Ch. 409. Since nothing has been done to prevent individual members of P.D.L.P. from paying their membership subscriptions direct to the Labour Party there has been no breach of Labour Party rules.

*David Hirst, Q.C.* and *Charles Drake* in the second and third actions. There is no evidence whatever that the Labour Party's rules Set C were ever adopted by the Haverfordwest Local Labour Party, but whether or not those rules applied it is clear that the purported meeting of May 20 was not properly convened since it was a members' meeting and eight members were excluded from notifications, and others who attempted to attend were turned away at the door. Out of 179 members, only 16 in fact attended.

The earlier meeting of March 6, 1968, was a perfectly valid meeting of the Haverfordwest Local Labour Party at which officers were elected *for the ensuing year*, and is unchallenged. Whatever rules applied there was never any warrant for the purported reconstitution of the local Labour Party, There was no justification for calling the meeting of May 20 to elect fresh officers and delegates. The purported disqualification of the eight members who failed to reply to the circular sent out before the meeting of May 20, or who in the view of Mr. Underhill made unsatisfactory replies, was contrary to the principles of natural justice because, inter alia, they were neither notified of the charges against them nor invited to defend themselves. In any event the purportedly reconstituted organisation would have no power to touch the funds of the existing organisation. Any power to reorganise which the N.E.C. may possess cannot be delegated to others or to Mr. Underhill, in particular, and in any event it cannot reorganise a local Labour Party which was not a member of the Labour Party. The rules of natural justice apply equally to dismissal or to suspension from office, and they apply in a club or association whether or not the office affords the holder a proprietary interest: see *Bagg's* case (1615) 11 Co.Rep. 93b; *Ridge* v. *Baldwin* [1964] A.C. 40, 66, *Fisher* v. *Keane* (1878) 11 Ch.D. 353; *Burn* v. *National Amalgamated Labourers' Union* [1920] 2 Ch. 364. Membership of a club or association in one sense is of a quasi-proprietary nature, since if the organisation were wound up its assets would belong equally to the members.

The third action is really the first action in reverse. The validity of the third meeting of June 22 stands or falls according to the ruling upon the meeting of May 20. Those attending the meeting of June 22 were delegates elected to local Labour Party meetings held on a similar pattern to the meeting of May 20. Both meetings of May 20 and June 22 were complete nullities. In relation to the latter it would be a complete nullity even if only one delegate who was improperly chosen attended.

*A. C. Sparrow Q.C.* in the second and third actions.

A    The injunction sought in the second action is to restrain the defendants to that action " in their capacities as officers of an incorporated association " purporting to be the Haverfordwest Local Labour Party from dealing with the assets of the Haverfordwest Local Labour Party, but no attempt has been made to join the " purported local Labour Party," as officers of which the defendants are said to be acting. The action is therefore improperly constituted. The contract between the members is a joint

B    contract, the rules of a club forming part of the contract between them: see *Harrington* v. *Sendall* [1903] 1 Ch. 921; *Halsbury's Laws of England*, 3rd ed., Vol. 5 (1953), p. 258.

Furthermore, Mr. Hirst having rejected the contention that the rules Set C were adopted, there is no constitution advanced upon which the court can rule, and therefore the association should be wound up and a receiver appointed. The rules show that a local Labour Party is merely a part of

C    the constituency party, and the rules Set B therefore became applicable. It is an inherent and mandatory rule of practice that all interested parties must be joined. They may be joined in a representative capacity and any error can be corrected later. [Reference was made to *Bedford (Duke of)* v. *Ellis* [1901] A.C. 1; *Wyld* v. *Silver* [1963] Ch. 243; *Bromley* v. *Williams* (1863) 32 Beav. 177; *Wood* v. *McCarthy* [1893] 1 Q.B. 775; *Foss* v.

D    *Harbottle* (1843) 2 Hare 461; *Blythe* v. *Birtley* [1910] 1 Ch. 228 and *Harrison* v. *Abergavenny (Marquis of)* (1887) 3 T.L.R. 324.]

The second and third actions are therefore defective for non-joinder of the proper parties and cannot go forward.

A local Labour Party has no existence as a separate body from the constituency party. It is just an organisational conception. Its membership and that of the constituency party is the same, and the subscriptions

E    are shared between the constituency party and the local party. The rules of Set C apply to the local party because the operation of those rules is one of the rules of Set B. It is therefore unnecessary to consider whether the Set C rules were ever adopted by the local party. It is nonsense to say that the N.E.C. had authority to intervene in the P.D.L.P. but not in the Haverfordwest Local Labour Party. [Reference was made to *Carltona*

F    *Ltd.* v. *Commissioners of Works* [1943] 2 All E.R. 560 and *Lewisham Borough Council* v. *Roberts* [1949] 2 K.B. 608.] The N.E.C. must have power to delegate its functions to the national agent. It is unthinkable that the rules require the N.E.C. itself to go down to a constituency to reorganise it.

The N.E.C. acted reasonably in asking for an affirmation of loyalty from those suspected of disloyalty, since, by clause 2 (2) of the rules, one

G    object of the Labour Party was " to unite the forces of Labour." By clause 3 (3) members bind themselves to be loyal, and in failing to give such an affirmation those who neglected to do so or refused to do so were in breach of the party's constitution. By their neglect or refusal the dissidents destroyed their membership qualification, and must be treated as if they had resigned. The notices of the proposed meeting of May 20

H    were therefore correctly withheld from them. The letters sent out to them on May 1 gave them the opportunity, which they failed to take, of re-affirming their adherence to the programme, principles and policy of the Labour Party. But whether or not they had ceased to be members, they

were in rebellion against the Labour Party, and it was therefore reasonable **A**
to exclude them from the meeting of May 20. The powers of the N.E.C.
include both disaffiliation and expulsion or suspension. The rules of
natural justice either do not apply, or they have been observed, because
the letters of May 1 gave members an opportunity of being heard. The
dissidents have therefore ceased, ipso facto, to be members, or have been
expelled after a proper opportunity of being heard.

The dissidents having, to use common law terms, repudiated their **B**
contract of association by a fundamental breach, the other side are free not
to abide by it; or, in the language of equity, the dissidents cannot ask the
court to grant them the injunctions sought because they do not come to
court with clean hands: see *Snell on Equity*, 26th ed. (1966), p. 704,
and *General Billposting Co. Ltd.* v. *Atkinson* [1909] A.C. 118.

To summarise the above arguments: (1) The action is incompetent for
want of parties. (2) It is immaterial whether the rules Set C were formally **C**
adopted or not, since in any event they operate as part of Set B. (3) The
argument as to the immunity of the Haverfordwest Local Labour Party from
the intervention of the N.E.C. is a non-starter, because the local party
is simply a group of the constituency party, which was clearly subject to
the intervention of the N.E.C. (4) The plaintiffs in the second action have
been deliberately in breach of the constitution, throughout. (5) Their **D**
conduct therefore either destroyed their membership by operation of the
rules or it provided a justification for the N.E.C. to exclude them from
the meeting of May 20. (6) It is not material to consider rules of natural
justice, since the dissident members were given the opportunity of making
a relevant statement, and their unconstitutional position was made clear
either expressly or by their refusal to give the required undertakings.
(7) The court would not in any event give them the relief sought because **E**
their hands are not clean.

As to the third action, it is similarly incompetent for want of parties.
Since it concerns P.D.L.P. all the members of P.D.L.P. should be made
parties in person or by representation, and if the validity of local meetings
other than that of May 20 in Haverfordwest, are challenged, those
affected thereby should also be parties. It must, however, be conceded **F**
that if any one person was present at the meeting of June 22 who had no right
to be there then the meeting was invalid. If the arguments advanced for
Mr. John in the first action are right then he is still chairman of P.D.L.P.,
and as such cannot be restrained from acting. In any other event reliance
is placed on the powers of N.E.C. to intervene and hold fresh meetings,
and in this regard the N.E.C. was justified in doing what it did.

[Reference was also made, on the question of the judge's jurisdiction **G**
to deliver judgment during the long vacation, to *In re N.* (*Infants*) [1967]
Ch. 512.]

*David Hirst Q.C.* in reply on the second and third actions.

*Daniell's Chancery Practice*, 8th ed. (1914), p. 151, does not support
the contention that it is necessary to make all members parties to an action
in one way or another. Membership of an association does not involve **H**
a joint contract; that would be impossible since here the members joined
at different times, when the rules were different. The true rule is that all
members *may be joined*: see *Bedford* (*Duke of*) v. *Ellis* [1901] A.C. 1,

A  *Wyld* v. *Silver* [1963] Ch. 243, *Bromley* v. *Williams* (1863) 32 Beav. 177, *Blythe* v. *Birtley* [1910] 1 Ch. 228, *Harrison* v. *Abergavenny (Marquis of)* 3 T.L.R. 324.  See also the club cases of *Harington* v. *Sendall* [1903] 1 Ch. 921, *Fisher* v. *Keane* (1878) 11 Ch.D. 353, *Labouchere* v. *Wharncliffe (Earl of)* (1879) 13 Ch.D. 346 and *Dawkins* v. *Antrobus* (1881) 17 Ch.D. 615.

The rule in *Foss* v. *Harbottle*, 2 Hare 461 can have no application to
B  club cases such as the present: see *Gower on Modern Company Law*, 2nd ed. (1957), p. 534 et seq.  The only reason for joining all the shareholders is that they are treated as a substitute for the company itself. [Reference was made to *Mozley* v. *Alston* (1847) 1 Ph. 790.]  If Mr. Sparrow's contention were correct it would be necessary, if a club secretary wished to sue an individual member for arrears of subscription, to join all the members of the club as parties.  The fact that the Haverfordwest Local
C  Labour Party possesses a separate set of rules and has members and delegates from affiliated organisations is a strong indication that it is an entirely separate entity from P.D.L.P.  It has its own accounts and financial year, and subscriptions are paid to it, although it is true that part of such subscriptions are forwarded to P.D.L.P.  While admittedly established by P.D.L.P., it stands on its own feet, just as does a subsidiary company in
D  company law.  This conclusion is supported by Set C, rules 6 (2), (3) and 13 (3), although there is no proof that such rules were ever adopted.  The N.E.C.'s alleged right to intervene depends on whether or not the Haverfordwest Local Labour Party is a separate organisation.

No resolution was ever passed by the N.E.C. authorising intervention in the affairs of the Haverfordwest Local Labour Party, nor was there any delegation in fact of the N.E.C.'s powers or discretion.  The Labour
E  Party rules would not permit such delegation.  If part of a resolution is bad, so is the whole by a sort of " infectious invalidity."  It cannot be like a curate's egg.

No rule of the Labour Party lays down that a member must give an undertaking of loyalty whenever and wherever called upon to do so.  Nor are any particular organisations proscribed.  The request in the letters of
F  May 1 to " co-operate in reconstructing " P.D.L.P. means that members are being asked to accept that the meeting of April 6 was bad, and that the N.E.C. had power to intervene, yet these questions have occupied the court over many days.  The suggestion that a member can ipso facto lose his membership because in his acts, words, or even in his thoughts he is disloyal is fantastic.  On such a basis every member of the Government or
G  even of the Labour Party might well be " out," and the party's property would then become bona vacantia.  Loss of membership can only come about as the result of exclusion or of resignation.

So far as the rules of natural justice are concerned, the letters of May 1 cannot be inviting an answer to a charge, because if the undertakings required had been given there would have been no offences.  Nor can those
H  letters have been themselves the " charges."  They cannot have provided any opportunity to answer such charges.

*Cur. adv. vult.*

October 17, 1968. MEGARRY J. read the following judgment: I have
before me four motions in three actions, all arising out of the same series
of events. All, by consent, have been brought on together, and all have been
argued by the same counsel. The principal bone of contention is the control
of an unincorporated body and its substantial assets. That body is described
sometimes as " The Pembrokeshire Constituency Labour Party " (occasion-
ally, and I think inaccurately, with " local " inserted before Labour), and
sometimes as the " Pembrokeshire Divisional Labour Party." For brevity
I shall throughout refer to it as " P.D.L.P."

The argument before me concluded on July 29 last. I was confronted
with some 60 or 70 authorities, about 75 affidavits, with many exhibits,
and the fruits of much closely reasoned argument spread over 12 days;
I therefore reserved my judgment. In order to avoid delay I had hoped
to deliver judgment during the long vacation, the parties consenting. But
I was vacation judge in August, and such was the daily press of work,
sometimes taking me into court at 9.30 a.m. and sometimes keeping me
there until after 6 o'clock, that I was able to give virtually no time to the
consideration of the wealth of material in this case; and so I deliver
judgment today.

This is a tale of three meetings. The first was the annual meeting of
P.D.L.P., or, as it is more properly called, of the general committee of
P.D.L.P.: for it was primarily a delegate meeting. It was held on April 6
last, and was attended by about 100 people. I shall call this " the first
meeting." It is common ground that it began as a properly constituted
meeting; what is challenged is whether, after a purported adjournment, it
continued thereafter as a valid meeting. It is this meeting which is put
in issue in action No. 1, John v. Rees [1968 J. No. 2692], in which the
writ was issued on May 6 last.

Out of this meeting a profound conflict of views emerged. On one side
lie those who say that as a result of the meeting P.D.L.P. has disaffiliated
itself from the Labour Party, and that a new set of officers, who supported
the disaffiliation, were validly elected to office in P.D.L.P. This is the
side which espouses the cause of Mr. Desmond Donnelly, the Member of
Parliament for Pembrokeshire; and it was his expulsion from the Labour
Party on March 27, a mere ten days before the first meeting, which formed
an important part of the background to that meeting. For brevity, I shall
call those who supported disaffiliation and Mr. Donnelly the " disaffili-
ates." On the other side, there are those who opposed Mr. Donnelly's
views, and contend that the disaffiliation and the elections at the first
meeting were nullities. These I shall call the " affiliates ": " unionists,"
though apposite in one sense, would not be in another. All three actions
are between affiliates and disaffiliates; an affiliate as plaintiff attacks the
first meeting in the first action, and disaffiliates as plaintiffs attack the
second and third meetings in the second and third actions respectively.

The second meeting (which I shall refer to as such) was held on
May 20, 1968. It purported to be a meeting of the Haverfordwest Local
Labour Party, and was convened by the National Executive Committee
of the Labour Party (which I shall call the " N.E.C.") as a result of what
occurred at the first meeting. The validity of the whole of this meeting is
in issue. It may be conducive to clarity if I say at once that, without in

A  any way defining their functions or their relation to each other, the bodies with which I am concerned in this case are at three levels. First, at the top, there is the Labour Party, which, of course, is a national body. Second, there are the constituency Labour Parties, of which P.D.L.P. is one. Third, there are a number of local Labour Parties in the area of each constituency Labour Party. There are some other bodies in the organisation, but I do not need to refer to them here. The first

B  meeting was thus a meeting of one of the bodies at the intermediate level, and the second meeting was a meeting of one of the bodies at the lowest level. It is the second meeting which is in issue in the second action, *Martin & Davies* v. *Davis* [1968 M. No. 2390], in which the writ was issued on June 12, 1968.

The third meeting (which I shall refer to as such) was held on June 22,

C  1968. This, like the first meeting, was a meeting of P.D.L.P.; and the validity of the whole of the meeting is in issue. The meeting is the subject of the third action, *Rees & Cleare* v. *John* [1968 R. No. 2276], in which the writ was issued on July 5, 1968. The two plaintiffs in this action are defendants in the first action, and the defendant in this action is the plaintiff in the first action. There is thus a certain symmetry in the actions: for each meeting was unfailingly followed by a writ within the month, and

D  in substance the parties to the first and third actions are the reverse of each other. Procedurally, what is before me is not the three substantive actions themselves, but, as I have indicated, four motions in the three actions. Action No. 1 has engendered two motions, one by the plaintiff and one by the defendants. In action No. 2 there is a motion by the plaintiffs, and similarly in action No. 3 there is a motion by the plaintiffs.

E  I pause at this point for three reasons. First, it may be convenient if I indicate, in the broadest of outlines, how the three meetings are related to each other. The constitution of the Labour Party confers upon the N.E.C. power to enforce the constitution, standing orders and rules of the party, and to take any action it deems necessary for that purpose. After the first meeting, the N.E.C. passed a resolution that action be taken to suspend the activities of P.D.L.P. and the right of its officers to handle its funds,

F  that P.D.L.P. be reorganised, and that the national agent of the Labour Party be given authority to take such steps as were necessary to complete the reorganisation. Pursuant to this resolution, the national agent convened the second meeting; and this meeting elected officers, and also delegates to attend the general committee of P.D.L.P. The national agent also convened similar meetings of other local Labour Parties in the constituency; and there were similar results. The national agent then con-

G  vened the third meeting, a general committee of P.D.L.P., composed in the main of delegates elected by the local Labour Parties under the reorgani- sation. Those who refused or failed to sign declarations of loyalty to the Labour Party were excluded from the second and third meetings; and the disaffiliates attack these meetings on this score.

Second, I must make explicit what all lawyers will recognise as implicit,

H  but which those who are not lawyers may not fully appreciate. I am not in the least concerned in this case with the rightness or the wrongness or the desirability or undesirability of any political views or policies that there may be. This is so whether the views or policies are political in the

368
**Megarry J.**                    **John v. Rees**                    **[1970]**

ordinary external sense, in relation to other political parties or otherwise, or      A
whether they are internal policies within the confines of any political or
other unit.   My concern is merely to see that those concerned in these
proceedings obtain justice according to law, irrespective of politics.

Third, all the proceedings before me are on motion, and all the
evidence is in the form of affidavits and exhibits.   The affidavits are not
only numerous (there are over 60 in action No. 1), but also far from
harmonious; and without any oral evidence, and in particular without the      B
aid of cross-examination, it is impossible to resolve such conflicts.   On
the main issues I am merely called upon to grant (or refuse) injunctions
which will continue until the trial of the action, unless sooner determined.
I have thus to do the best I can until the actions are tried.   This, too, I
say for the benefit of those who are more interested in politics than law;
this is not the final determination of the case, but merely an interim
decision.      C

I return, then, to the first meeting.   Immediately prior to that meeting
the plaintiff in the first action [Mr. John] was president of P.D.L.P.: and
he accordingly took the chair at that meeting, at all events at the outset.
He claims that he is still president of P.D.L.P.: the defendants dispute
this.   The second defendant [Mr. Cleare] claims that he and not the
plaintiff is now president of P.D.L.P.   It is common ground that prior to      D
the meeting he was the senior vice-president; and on the agenda for the
meeting he was the sole nominee for election as president.   What is in
dispute is whether he was ever validly elected president as a result of the
later and disputed stages of the meeting, after the plaintiff had purported
to adjourn it.   The third defendant [Mr. Lewis] had for some years been
treasurer of P.D.L.P., and on the agenda for the first meeting he was
the sole nominee for that office.   On any footing he was thus still treasurer      E
at the end of the meeting.   Similarly the first defendant [Mr. Rees] was
secretary of P.D.L.P. before the meeting and remained so at the end of it.

By the writ, the plaintiff claims

" as representing all members of the Pembrokeshire Divisional Labour
Party except the defendants, and personally, the following relief
namely: —      F

" 1.  A declaration that all purported proceedings of the meeting
on April 6, 1968, of the general committee of the Pembrokeshire
Divisional Labour Party subsequent to the adjournment of such
meeting by the chairman were invalid and of no effect.

" 2.  A declaration that the purported appointment on April 6,
1968, of the defendants as officers of the said party was invalid and
of no effect.      G

" 3.  An injunction to restrain the defendants and each of them
from collecting expending remitting transferring or otherwise dealing
with any moneys or other property belonging to or held for the
purposes of the Pembrokeshire Divisional Labour Party."

In this action the plaintiff moves under a notice of motion dated May 6,      H
1968, for

" An injunction to restrain the defendants and each of them until
judgment in this action or further order from doing or purporting to

**A**    do or being a party to (whether by themselves their servants or agents or otherwise howsoever) any of the following things namely collecting expending remitting transferring or otherwise dealing with any moneys or other property belonging to or held for the purpose of the Pembrokeshire Divisional Labour Party."

This notice of motion also seeks the appointment of a receiver; but Mr.
**B**    Sparrow, who appeared for the plaintiff, has left this claim in abeyance. The other motion in this action is by the defendants, for whom Mr. Hirst appears. This notice of motion, dated May 14, 1968, claims

"1. That the writ in this action be set aside or, in the alternative, 2. That so much of the claim endorsed on the writ in this action as seeks relief for parties other than the plaintiff named in the writ should be struck out. . . ."

**C**
Putting matters broadly, the disaffiliates say that they are in the saddle of P.D.L.P. and that that body has disaffiliated itself from the Labour Party. The affiliates deny this, and seek to enjoin the disaffiliates from dealing with the property of P.D.L.P. Instead, they say that the disaffiliates never got into the saddle, or, if they did, that the N.E.C. has duly exercised the wide powers that it has to suspend their activities. The
**D**    disaffiliates deny this, and seek to enjoin the affiliates from dealing with the property of P.D.L.P. There is also the procedural point of some technicality raised by the disaffiliates in the defendants' motion. This concerns the plaintiff's claim in writ No. 1 to sue on behalf of himself and all members of P.D.L.P. except the defendants; and I think that I should deal with this last point first.

**E**    Over 20 affidavits by disaffiliates have been filed in support of the defendants' motion in action No. 1. These are all by members of P.D.L.P., stating, in common form, that the affiant does not wish to be represented by the plaintiff in the action. On this foundation Mr. Hirst has erected an argument in support of his motion in action No. 1 that as the plaintiff purports to sue " as representing all members of the Pembrokeshire Divisional Labour Party except the defendants," as well as personally, either
**F**    the writ should be set aside, or, alternatively, the words of representation on the writ should be struck out. For, he says, the words of representation simply are not true: the plaintiff may represent some members of P.D.L.P. (a minority, Mr. Hirst says), but he assuredly does not represent all members except the three defendants.

Such a contention indeed wears an engaging air of simplicity and
**G**    reason: but having listened to much argument and many authorities, spread over a number of days, I cannot at the end say that this simplicity is more than skin deep. The rule as to representative actions is an old Chancery rule which the Rules of the Supreme Court later made statutory. The present provision is Ord. 15, r. 12. The classic statement is that made by Lord Macnaghten in *Bedford* (*Duke of*) v. *Ellis* [1901] A.C. 1. He said there, at p. 8 :

**H**
" The old rule in the Court of Chancery was very simple and perfectly well understood. Under the old practice the court required the presence of all parties interested in the matter in suit, in order

**Megarry J.**                    **John v. Rees**                    **[1970]**

that a final end might be made of the controversy.  But when the **A** parties were so numerous that you never could ' come at justice,' to use an expression in one of the older cases, if everybody interested was made a party, the rule was not allowed to stand in the way.  It was originally a rule of convenience: for the sake of convenience it was relaxed.  Given a common interest and a common grievance, a representative suit was in order if the relief sought was in its nature beneficial to all whom the plaintiff proposed to represent."  From the **B** time the rule as to representative suits was first established, he said, at p. 10, " . . . it has been recognised as a simple rule resting merely upon convenience.  It is impossible, I think, to read such judgments as those delivered by Lord Eldon in *Adair* v. *New River Co.*, 11 Ves. 429, in 1805, and in *Cockburn* v. *Thompson*, 16 Ves.Jun. 321, in 1809, without seeing that Lord Eldon took as broad and liberal a view on this subject as anybody could desire.  ' The strict rule,' he said [ibid. 325], ' was **C** that all persons materially interested in the subject of the suit, however numerous, ought to be parties . . . but that being a general rule estab-lished for the convenient administration of justice must not be adhered to in cases to which consistently with practical convenience it is in-capable of application.'  ' It was better,' he added [ibid. 329], to go as far as possible towards justice than to deny it altogether.  He laid out **D** of consideration the case of persons suing on behalf of themselves and all others, ' for in a sense,' he said, ' they are before the court.'  As regards defendants, if you cannot make everybody interested a party, you must bring so many that it can be said they will fairly and honestly try the right.  I do not think, my Lords, that we have advanced much beyond that in the last hundred years, and I do not think that it is **E** necessary to go further, at any rate for the purposes of this suit."

This seems to me to make it plain that the rule is to be treated as being not a rigid matter of principle but a flexible tool of convenience in the administration of justice.  Such an approach is, I think, at least consistent with cases such as *Bromley* v. *Smith* (1826) 1 Sim. 8, *Wood* v. *McCarthy* [1893] 1 Q.B. 775 and *Wyld* v. *Silver* [1963] Ch. 243; and in **F** *Harrison* v. *Abergavenny (Marquis of)* (1887) 3 T.L.R. 324, 325, Kay J. described the rule as being " a rule of convenience only."  The approach also seems to be consistent with the language of R.S.C., Ord. 15, r. 12 (1). This provides that

> " Where numerous persons have the same interest in any proceedings,
> . . . the proceedings may be begun, and, unless the court otherwise **G**
> orders, continued, by or against any one or more of them as represent-
> ing all or as representing all except one or more of them."

By r. 12 (3)–(6), ample provision is made for protecting those who, being bound by a judgment against a person sued on their behalf, nevertheless wish to dispute personal liability.  The language is thus wide and permissive in its scope; yet it provides adequate safeguards for the substance.  I **H** would therefore be slow to apply the rule in any strict or rigorous sense: and I find nothing in the various passages cited to me from *Daniell's Chancery Practice*, 8th ed. (1914), which makes me modify this view.

A   What I am concerned with in action No. 1 is the validity of proceedings at a meeting which had as part of its business the election of the officers of P.D.L.P. All members of P.D.L.P. have a common interest in P.D.L.P., its officers and its assets: and it is plainly desirable that all should know and recognise who its officers are and are not. If there were to be two different actions brought, one between A and B and the other between X and Y, it might be that, on the different evidence adduced in the two

B   actions, the court would reach a different conclusion in each action, holding in *A* v. *B* that the officers were one set of persons, and in *X* v. *Y* that another set were the officers. Other members might then institute other proceedings and, not being bound by the two actions already brought, contend for yet other persons as officers. Accordingly, it seems at least desirable that any proceedings should be so constituted that they will bind all members. This can be achieved only if all are parties to the

C   proceedings, either directly or as being represented by one of the parties.

Although there is thus a clear common interest between all the members in having the issue determined, they may be far from united in the way in which they wish it to be resolved. Some may support one faction, some another. But if the named parties to the action together put forward every view that is seriously advanced, I cannot see that any real harm is

D   done to a person whose part in the action is merely that he is represented by the plaintiff, even if the plaintiff is supporting a different cause, provided that there is a defendant who does stand for the cause espoused by the person being represented: actions are decided by reference to justice according to law, and not by counting heads. The remedy for someone who is not consoled by this thought is, as Sir George Jessel M.R. held in *Wilson* v. *Church* (1878) 9 Ch.D. 552, 559, and as James L.J. pointed

E   out in *Watson* v. *Cave (No. 1)* (1881) 17 Ch.D. 19, 21, for him to apply to be joined as a defendant. Alternatively, he may be able to procure an order, made under Ord. 15, r. 12, whereby he will be represented by a defendant: see *Fraser* v. *Cooper Hall & Co.* (1882) 21 Ch.D. 718. In *Wilson* v. *Church*, the dissentient not only sought to be made a defendant but also applied to represent all other dissentients. The latter part of his application failed because there was no evidence that there were any other dissentients; and,

F   said Jessel M.R., at p. 559, " he cannot be a representative without a constituency." If there had been constituents a-plenty, the judgment suggests that he would have succeeded on this too.

It seems to me that the important thing is to have before the court, either in person or by representation, all who will be affected: and provided that the issue will be fairly argued out, a mathematical precision in

G   securing that each side is shown as representing the right number of supporters is of little moment. As Cotton L.J. said in *Watson* v. *Cave (No.* 1) (1881) 17 Ch.D. 19 22:

"... the plaintiff sues on behalf of himself and all others who have the same interest as himself, that is, not all those who take the same view of what is for their benefit, but all those who, being interested jointly with him in some property, have not taken any steps to assert

H   their rights adversely to those which the plaintiff chooses to assert."

The artificial nature of the process is shown by the fact that, as Fletcher

Moulton L.J. pointed out in *Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021, 1039, a plaintiff suing in a representative **A** capacity does not have to obtain the consent of those whom he purports to represent, and they are not liable for costs, though by estoppel or res judicata they will be bound by the result of the case.

Mr. Hirst relied strongly on the *Markt* case [1910] 2 K.B. 1021, and on *Smith* v. *Cardiff Corporation (No.* 1) [1954] 1 Q.B. 210. In the *Markt* case, a ship owned by the defendants had been sunk by a Russian **B** cruiser during the Russo-Japanese war on the ground that it was carrying contraband of war. Goods had been shipped on the vessel as a general ship. One of the shippers sued the defendants for damages for breach of contract and duty, suing on behalf of himself and other owners of cargo on the ship. A letter written by the plaintiff's solicitors when the writ was issued identified 44 other shippers as being thus represented. The Court of Appeal unanimously held that the representative action would not lie, as **C** the plaintiff and other shippers lacked the " same interest in one cause or matter " within Ord. 16, r. 9: the corresponding provision in the present Rules of the Supreme Court is Ord. 15, r. 12, sub-rule 1, which uses the phrase " the same interest in any proceedings."

Buckley L.J. took the view that the writ should be amended by limiting the representation to those who had not shipped contraband, and by pray- **D** ing a declaration of liability, leaving the individual claims for damages to subsequent proceedings: [1910] 2 K.B. 1021, 1048. But Vaughan Williams and Fletcher Moulton L.JJ., at pp. 1032, 1042, held that the writs were incapable of amendment so as to maintain any representative action: and Fletcher Moulton L.J., held that no representative action could be brought where the sole relief sought was damages. As Vaughan Williams L.J. observed, at p. 1030, " All sorts of facts and all sorts of exceptions **E** may defeat the right of individual shippers." Fletcher Moulton L.J., said, at p. 1040,

> ". . . I can conceive no excuse for allowing any one shipper to conduct litigation on behalf of another without his leave, and yet so as to bind him. The proper domain of a representative action is where there are like rights against a common fund, or where a class of **F** people have a community of interest in some subject-matter. Here there is nothing of the kind. The defendants have made separate contracts which may or may not be identical in form with different persons. And that is all."

It has been contended that the actual result of the case was that the writ was set aside: but I think that it is reasonably plain from pp. 1032 and **G** 1042 that the plaintiff was held to be entitled to continue with the action as a personal action, and that all that was struck out was the representative capacity.

A similar result was reached in *Smith* v. *Cardiff Corporation (No. 1)* [1954] 1 Q.B. 210. This is a case which has, I think, the odd distinction of being a Chancery action reposing uneasily in the Queen's Bench **H** reports: the confusion seems to have arisen from the case having been heard originally in the vacation court, as may be perceived from the report of a later stage of the same case, *Smith* v. *Cardiff Corporation (No. 2)*

A [1955] Ch. 159, 160. Four plaintiffs sued Cardiff Corporation on behalf of themselves and all other tenants of corporation houses provided under Part V of the Housing Act, 1936, seeking a declaration that the corporation's scheme for increasing rents was ultra vires, and claiming an injunction to restrain the corporation from putting the scheme into operation. The scheme was one of the type commonly described as providing for differential rents, thus taking into consideration the financial circumstances of each tenant. Of some 13,000 tenants, some 8,000 would
B have their rents increased, and the other 5,000 would not. The Court of Appeal reversed the order of Glyn-Jones J. striking out the writ, and held that the action should proceed as a personal action by the four plaintiffs and not as a representative action. Sir Raymond Evershed M.R. stated the established requirements for a representative action succinctly: [1954] 1 Q.B. 210, 220–221:

C
> " It must be shown . . . that all the members of the alleged class have a common interest, that all have a common grievance, and that the relief is in its nature beneficial to them all."

Even if there were a common interest, there was no common grievance and the relief was not in its nature beneficial to them all. Those whose
D rents were to be increased would in effect subsidise those whose rents remained unchanged, so that there were two classes of tenants whose interests were in conflict.

Mr. Hirst's primary contention is that the writ should be struck out. The plaintiff, he said, knew from the outset that he did not represent all save three members of P.D.L.P., and in this respect the writ was " utterly bogus." I can say at once that I see no justification whatever for taking
E so drastic a step. The plaintiff sues on behalf of himself, and I can see no reason why, even if the words of representation are bad, they should infect the claim by the plaintiff himself. In a sphere dominated by convenience in the administration of justice, I reject the concept of contagious invalidity upon which such a claim appears to rest. I know of no authority to support it, except in so far as the decision at first instance in
F the Cardiff case (1953) 162 E.G. 182 may be relied on: but there is no full report of the reasons for that decision, and in any case it was reversed by the Court of Appeal. Accordingly, I refuse to set aside the writ as prayed in paragraph 1 of the defendants' notice of motion.

Mr. Hirst's alternative contention is that the words of representation should be struck out. He stresses the divided state of the views of the members of P.D.L.P., and urges that this division resembles the division
G between the two categories of tenants in the Cardiff case [1954] 1 Q.B. 210. Just as a representative action was bad both there and in the Markt case [1910] 2 K.B. 1021, so it must be bad here: there was no common interest and no common grievance, and the relief was not beneficial to all. It seems to me, however, that there is an essential distinction between those cases and this. In the case before me, I have a simple division of opinion
H between numerous members of a single body. The plaintiff is on one side, the defendants on the other, and in essence the only vice suggested in the plaintiff's claim to represent all members of P.D.L.P. except the defendants is that some of these members in fact support the defendants and do not

wish to be represented by the plaintiff. Any misrepresentation may thus
be cured with comparative simplicity. Those who do not support the    **A**
plaintiff and wish to appear on the other side, either individually or by
representation, may, if they wish, take the appropriate steps to achieve
this; and Mr. Sparrow has made it plain that the plaintiff will co-operate
in achieving this result. Subject to that, the plaintiff and those he repre-
sents all have a common interest and a common grievance, and seek relief
beneficial to all. All members of P.D.L.P. are bound to each other by    **B**
contract, linked by a common membership and a common interest in the
assets. In such a case I would respectfully echo the words of Lord Eldon
which Lord Macnaghten quoted in a passage that I have already read:
" all persons materially interested in the subject of the suit, however
numerous, ought to be parties " (see [1901] A.C. 1, 10). I would add only
that " ought " does not by any means necessarily mean " must, on peril of
the action being struck out." What is desirable is by no means always    **C**
essential: and I was referred to a number of examples of cases where there
might have been, but apparently were not, representative actions.

In the *Cardiff* case [1954] 1 Q.B. 210, no solution by transferring those
represented from one side of the action to another was possible. The action
was constituted as an action by 13,000 tenants against the corporation,
their landlord: 5,000 of those had interests in conflict with the other 8,000.    **D**
The transfer of the 5,000 from the plaintiffs' side to the corporation side
was a question which neither arose nor could very well arise: for the
declaration and injunction sought against the corporation were patently
inappropriate remedies to seek against the 5,000 tenants. The case was
one where the issue lay between some of those linked together by a common
interest and an extraneous body, the corporation. In the case before me
there is no extraneous body as a party to the lis: the issue lies solely    **E**
between persons linked by the common interest of membership.

From what I have said, it will be seen that the second motion fails.
The first prayer is to set the writ aside, and the second is to strike out the
indorsement so far as it relates to relief for parties other than the plaintiff.
I dismiss both claims.

I turn, then, to the plaintiff's motion in the first action. If the second    **F**
defendant [Mr. Cleare] is not president of P.D.L.P., he lacks authority to
take part as such in any dealing with the property of P.D.L.P. Whether
or not he was elected depends upon whether the meeting of the general
committee of P.D.L.P., on April 6, 1968, was still in existence when his
election took place. That in turn depends upon whether the
plaintiff's [Mr. John's] purported adjournment of that meeting a short
while earlier was valid; and that in turn depends upon a complex of issues    **G**
of law and fact as to the powers of adjournment of the chairman of a meet-
ing, and whether in fact the plaintiff exercised any power of adjournment
that he had. If the defendants succeed on these issues, there still remains
a claim by the plaintiff that subsequent action taken by the N.E.C. has
deprived the defendants of their authority. In order to resolve these and
other issues, I must summarise the facts.    **H**

The plaintiff has exhibited a 20-page document containing a notice of
the meeting of April 6, together with the agenda and proposed resolutions.
In fact, it contains rather more than that. The date on the agenda is

A  March 29, 1968, two days after Mr. Donnelly's expulsion from the Labour
Party; and at the head of the agenda the first defendant [Mr. Rees] gave
notice of the annual meeting of P.D.L.P. on April 6.   In addition to the
agenda, the document contains the minutes of a previous meeting of the
general management committee of P.D.L.P., and a report by the first
defendant (who was of course the secretary and agent) dated April 1.   In
this he strongly supported Mr. Donnelly and urged temporary disaffiliation
B  from the Labour Party.

> " *Why*," he said, " *cannot we as a constituency Labour Party dis-
> affiliate from the Party nationally temporarily until such time that
> matters can be put right again*, which could well be by the time the
> next election takes place.   It is nothing new for a member to be
> expelled and eventually end up as a Cabinet Minister."

C  His view was that to face an election in Pembrokeshire without Mr.
Donnelly " would be disastrous—like giving the seat to the Tories on a
silver plate."  His [Mr. Rees'] loyalties, he said, were " with the basic aims
of socialism "; and, he added, " today, the Labour Party is its own worst
enemy."  He referred to Mr. Donnelly's memorandum to the N.E.C. dated
March 20, which appeared as the next three pages in the document, and
D  said that his [Mr. Donnelly's] criticisms " are about the Party's policies
of today and not against the Labour Party's principles."

Mr. Donnelly's memorandum asserted that his criticisms " have been
of the Prime Minister and Government, never of the basic aims of the
Party."  He [Mr. Donnelly] set out four promises in the 1964 Labour
manifesto and said that " not one of these 1964 promises has been
kept. . . .  The aggregate is a deplorable national story.  It is a disgrace to
E  the Labour Party."  He ended by saying:

> " I am not prepared to re-apply for the Labour whip so long as the
> present Prime Minister is leader of the Party and his policy prevails.
> I have not resigned the whip in protest against the Party, but in
> protest against the leadership."

F  The document containing the agenda for the meeting then set out certain
financial statements and nominations for offices and committees, and ended
with nine resolutions to be submitted to the meeting.  Four of these were
direct resolutions in support of Mr. Donnelly, submitted by three local
Labour Parties and a trade union branch, while two trade union branches
submitted resolutions which, by proposing to find a suitable candidate for
the next election, seem to have been anti-Donnelly.

G  I have referred to this document at some length for two reasons.  First,
nobody who read the document could be in any doubt that fundamental
cleavages of opinion on important issues would be canvassed at the meet-
ing.  Second, the document illustrates the view that Mr. Hirst so forcefully
urged upon me for the disaffiliates, namely, that whatever anyone else may
think, they regard themselves as being faithful to Labour policy: it is the
others, and not least the Government in general and the Prime Minister
H  [Mr. Harold Wilson] in particular, who have, they say, departed from the
pure light of true Labour principles.  In the eyes of the disaffiliates, they
are the faithful; it is the affiliates who are the deviants.  Nothing in this

**Megarry J.**                    **John v. Rees**                    **[1970]**

case requires me to resolve this issue, and I say no more about it. I
mention it only to make intelligible some of the things said and done, and    A
also, as any lawyer would expect, because I was referred more than once
to the great "*Wee Free*" case (*General Assembly of Free Church of
Scotland* v. *Overtoun* [1904] A.C. 515), which can be said to provide
something of an ecclesiastical analogue on this point. I hasten to add
that any analogy must be contained within due limits: for the practical
result of the "*Wee Free*" case was promptly reversed by statute (the    B
Churches (Scotland) Act, 1905), whereas I intend no prophecies about this
case.

Nobody has suggested that the meeting was not duly convened, or that
there were material defects in the agenda: and I can come forward to
Saturday, April 6. From this point onwards there is much conflicting
evidence. At about 1.30 p.m. or 1.45 p.m. certain officers of P.D.L.P.    C
arrived in order to meet two officials of the Labour Party, Mr. Underhill
(assistant national agent of the Labour Party) and Mr. Jones, who were
going to present themselves at the annual meeting. It is not clear whether
the two officials had wanted to meet the officers or merely the plaintiff.
The standing orders of P.D.L.P. provide by standing order 1 (a) (ii) for
the election of a standing orders committee of six members, without par-
ticularising the functions of the committee: but the committee seems to be    D
treated as having duties to perform in relation, inter alia, to the conduct of
meetings. Standing order 5 (a) provides that the business transacted at the
annual meeting is to "consist of the following items in order: (1) Presi-
dent's welcome to delegates and apologies for absence. (2) Report of
standing orders committee." There then follow other items, including the
election of officers and members of committees, among them the standing
orders committee which, this time, is to have seven members. The last item    E
is "To consider resolutions." In its essentials, this order was followed
in the agenda for this particular meeting. In neither is any place given
to "Any other business." As matters stood, the report of the standing
orders committee would come immediately after the president's welcome
and apologies for absence, and the controversial pro-Donnelly and anti-
Donnelly resolutions would be left until the end. The first defendant's    F
suggestion of disaffiliation does not appear anywhere among the list of
resolutions for consideration by the meeting.

A Mr. Moores took the chair at the standing orders committee meeting,
with the plaintiff present. The plaintiff said that he wanted the visiting
officials to address the meeting before starting with the agenda. After
discussion, it was in the end unanimously agreed that this address should
be made after the report of the standing orders committee. The plaintiff    G
also wanted a resolution to be put to the meeting after the address, but,
either unanimously or by a majority, it was decided that this could not
be done then, though it could be done after the resolutions on the agenda
had been considered. The discussion did not run smoothly, and once or
twice the plaintiff left the meeting and returned. He says that he did not
know of the decision of the standing orders committee when he went into    H
the main meeting: but the inevitable comment is that if that was so, he,
as chairman, ought to have found out what that decision was before he
presided over the meeting to which it related.

A   At the main meeting the plaintiff welcomed the delegates. He then explained that Mr. Underhill was present, and called upon him to address the meeting. Mr. Underhill did so, reminding members of their obligations and referring to Mr. Donnelly's expulsion. He ended by suggesting that the meeting should pass a resolution whereby P.D.L.P. undertook to continue to act in strict conformity with its constitution and rules and the constitution of the Labour Party. A delegate then attempted to move

B   such a resolution, and at that point the meeting became less than sedate. There had been some noise during Mr. Underhill's address, and now there were many attempts to raise points of order, including attempts by Mr. Moores, the chairman of the standing orders committee. The resolution was seconded, said the plaintiff, and " I tried to put this resolution to the vote."

C   Much has been said about the duties of a chairman of a meeting, a subject to which I must return later. What the plaintiff did at this meeting was to insert into the proceedings, as the second item, an item which did not appear on the agenda at all, namely, Mr. Underhill's address. He then accepted and tried to put to the vote a resolution to the effect suggested by Mr. Underhill; and this in effect was the third item in the proceedings. In taking these steps the plaintiff was, in my judgment,

D   acting in contravention of the standing orders of P.D.L.P., in contravention of the agenda for the meeting, and in contravention of the decision of the standing orders committee. I have heard no suggestion that he ever sought or obtained the sanction of the meeting to his actions. However worthy his motives, and however politically desirable it was, I can see no justification for what he did.

E   It is one of the main duties of the chairman of a meeting of a club or association to secure its orderly conduct according to its rules. He has wide powers, but he has also the duty of using those powers for proper and not improper purposes. Above all, his duty is to act not as a dictator but as a servant of the members of the body, according to law. On the uncontradicted evidence it seems clear to me that the plaintiff was guilty of a determined and substantial breach of his duty, and that

F   the responsibility for much of the disturbance that took place must be laid to his charge. It is not without a touch of irony that those attending the meeting should have been required to listen to an address reminding them of the rules and obligations that bound them, and to consider a resolution to act in strict conformity with those rules, when the chairman himself was, by so doing, in open breach of the rules himself. Indeed, according to the plaintiff, Mr. Underhill " asked the meeting to declare

G   that they still observed their own standing orders and this seemed to me to be a wholesome and unobjectionable thing to do." In these circumstances, I am not in the least surprised that the plaintiff's actions caused disturbances. Quis custodiet ipsos custodes?

Mr. Sparrow has vigorously contended that the plaintiff had an inherent right as chairman to put to the meeting a " loyalty resolution "

H   (to use Mr. Sparrow's convenient and compendious term) at any stage he thought fit. Not surprisingly, no authority was adduced in support of this contention; and this judgment will not provide one. Depending on the circumstances, to put such a resolution may be regarded by some or all

present as an insult, an incitement, a time-waster, an irritant, or many
other things. It may be a nuisance, or worse; but in any case I think
that those who attend a meeting are entitled (subject to the rules) to have
the business taken in the order prescribed by the agenda, unless a majority
at the meeting otherwise resolves. Despite Mr. Sparrow's persuasions I
can see no basis of need or common sense, or, for that matter, law or
equity, upon which such a right could be implied: and I reject it.

I do not propose to attempt any analysis of the disturbances at the
meeting: the evidence is in a state of marked conflict. On any footing
there was a good deal of noise. There was also some degree of minor
violence. There was a delegate who was, perhaps, pulled back into his
chair when he tried to speak. The plaintiff perhaps prodded Mr. Donnelly
in the back with his gavel. Mr. Donnelly pushed the plaintiff, perhaps
mightily, so that he fell back against the wall, perhaps merely firmly, so
that he sat down in his chair. Mrs. Donnelly pulled out a chair for Mr.
Moores to stand on and address the meeting; but he fell off it. During
the argument I ventured to decribe it as a good robust Welsh political
meeting; but out of these four adjectives it was to the word " political "
that Mr. Sparrow demurred. It was, he said, a domestic meeting; and I
abstained from pursuing the point further. Unto each his own form of
domesticity. At all events, there is evidence that the plaintiff uttered
warnings (which some did not hear) that it would be impossible to continue
the meeting: and when the disorder still continued he says that he
" announced in a loud voice, ' I now adjourn this meeting sine die,' " and
then walked out.

This is perhaps the most controversial incident of all. It features in
some 20 affidavits filed by the plaintiff, half of these sworn by those who
were sitting at the back of the hall. The plaintiff's voice is variously
described as being " loud, penetrating and clear," " loud and booming,"
" stentorian and loud," " loud and firm," " loud and strong " and " the
voice of a good schoolmaster." All save one of those seated at the back
heard the words of adjournment. On the other hand, the defendants have
filed some ten affidavits by those who were close to the plaintiff but say
that they heard no such words. Any suspicion that the hall may have
peculiar acoustic properties which make inaudible at the front what is
loud and clear at the back cannot survive the evidence of those of the
plaintiff's witnesses who sat at the front and heard the words; and this
includes a man of 73 who says that he is " a little hard of hearing." There
is also evidence that some of those present heard Mr. Underhill say that
the plaintiff had adjourned the meeting, and there is other evidence that
no such statement was heard by those close to Mr. Underhill.

This issue of fact is accordingly one that it is impossible to resolve on
motion: and not surprisingly a number of submissions have been advanced
by Mr. Hirst to support his contention that even if the words were uttered,
they were ineffective to adjourn the meeting. The point of this is that
after the plaintiff and a number of others had left the meeting, those who
remained continued with the agenda; and it is the decisions thus made
which are in issue.

Although there can plainly be no final resolution of the question of
fact on this motion, I think it right to say that for the purposes of the

A motion the probability seems to me to lie with the words of adjournment having been uttered by the plaintiff. The positive evidence of those who say that they heard seems to me to outweigh the negative evidence of those who say that they did not hear, and therefore that the words were not uttered. There may, of course, be positive evidence of a negative which is as cogent as any positive evidence of an affirmative. But in a noisy meeting, with the attention of many of those present being given

B to what other people were doing and saying, it may well be that even those close to the plaintiff may have failed to notice or remember the few words of adjournment; they can have taken only a second or two to utter, and they were spoken by a chairman who had for some while been calling in vain for order.

On the footing that the plaintiff did purport to adjourn the meeting for disorder, I have to consider the question of law whether the chairman

C of a meeting has an inherent power to adjourn it for disorder. Mr. Sparrow contends that there is such a power, though he accepts that if it is improperly exercised, the adjournment is ineffective. Mr. Hirst primarily contends that the chairman has no such inherent power. However, if that submission is wrong, he has a battery of alternative submissions. First, the chairman cannot use this power if, by his own

D improper conduct of the meeting, he has provoked the disorder. He may, however, restore his power if he first purges his impropriety (in the present case by returning to the correct order of business), and he may avail himself of any provision for the suspension of standing orders, here by a two-thirds majority under standing order 22. Second, the chairman cannot use his power to frustrate the will of the majority at the meeting. Third, the chairman cannot use his power without first trying to comply

E with standing orders, in this case by securing or attempting to secure a vote on the motion for adjournment under standing orders 11 or 19. Fourth, such a power is exercisable only for the minimum period reasonably necessary for the restoration of order, so as to enable the business of the meeting to be carried on: an adjournment sine die would not be a proper exercise of this power, and would be void. Those are the

F contentions.

The cases put before me on this branch of the case begin with *Stoughton* v. *Reynolds* (1736) 2 Stra. 1045, more fully reported in Fort. 168. They include *Rex* v. *Gaborian* (1809) 11 East 77; *Rex* v. *Chester (Archdeacon of)* (1834) 1 Ad. & El. 342; *Reg.* v. *D'Oyly* (1840) 12 Ad. & El. 139; *Wandsworth & Putney Gas-light and Coke Co.* v. *Wright* (1870) 22 L.T. 404; *MacDougall* v. *Gardiner* (1875) 1 Ch.D. 13;

G *Shaw* v. *Thompson* (1876) 3 Ch.D. 233; *In re Indian Zoedone Co.* (1884) 26 Ch.D. 70; *Henderson* v. *Bank of Australasia* (1890) 45 Ch.D. 330; *National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159; *Salisbury Gold Mining Co. Ltd.* v. *Hathorn* [1897] A.C. 268; *Wall* v. *London & Northern Assets Corporation* [1898] 2 Ch. 469; *Catesby* v. *Burnett* [1916] 2 Ch. 325; *Second Consolidated Trust Ltd.* v. *Ceylon Amalgamated Tea & Rubber Estates Ltd.* [1943] 2 All E.R. 567; and *Ridge* v. *Baldwin*

H [1964] A.C. 40. I was also referred to certain textbooks. Neither individually nor collectively are the cases decisive of the points before me. The power of a meeting to adjourn, by passing a resolution

to that effect, is not in issue. The existence of such a power neither supports nor precludes the existence of a further power in the chairman. Nor, I think, does the denial of any power for the chairman to disrupt a meeting while it is in orderly progress (as in *Stoughton* v. *Reynolds*, 2 Stra. 1045) preclude the existence of a power for the chairman to adjourn for disorder.

Mr. Sparrow placed much weight on *Reg.* v. *D'Oyly* (1840) 12 Ad. & El. 139, at p. 159, where Lord Denman C.J., in considering the power of a rector to adjourn a parish meeting, said:

"Setting aside the inconvenience that might arise if a majority of the parishioners could determine the point of adjournment, we think that the person who presides at the meeting is the proper individual to decide this. It is on him that it devolves, both to preserve order in the meeting, and to regulate the proceedings so as to give all persons entitled a reasonable opportunity of voting. He is to do the acts necessary for these purposes on his own responsibility, and subject to the being called upon to answer for his conduct if he has done anything improperly."

However, as Mr. Hirst pointed out, that was a case not of adjournment for disorder, but an adjournment for the purpose of taking a poll; and Lord Denman's words must be read in that context.

*National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159, 162, is valuable in that it contains a concise summary by Chitty J. He there says

"Unquestionably it is the duty of the chairman, and his function, to preserve order, and to take care that the proceedings are conducted in a proper manner, and that the sense of the meeting is properly ascertained with regard to any question which is properly before the meeting. But, in my opinion, the power which has been contended for is not within the scope of the authority of the chairman—namely, to stop the meeting at his own will and pleasure."

But there again the question was not one of a disorderly meeting.

There are, however, two cases of disorderly meetings that I should refer to: both are disappointing. One is *Shaw* v. *Thompson* (1876) 3 Ch.D. 233, where at p. 236 it is said that "a great disturbance and uproar arose" at a parish meeting when the chairman had announced the arrangements for taking a poll. A parishioner came forward to move an amendment, but "the chairman, without hearing him, rose and quitted the chair, declaring the meeting to be at an end." However, in considering this event Bacon V.-C. refers (at p. 249) to the chairman's evidence that he rose from the chair because he thought the parishioner "was out of order"; not, it will be observed, because of the disorder in the meeting. Bacon V.-C. then says (on the same page):

"What right had the chairman, by leaving the chair, to put an end to a meeting duly convened? Leaving the chair did not put an end to the meeting. It is said that there was a vote of thanks then moved and seconded, but whether anybody, in the uproar that took place, heard the motion made and seconded, is a matter which is left in considerable doubt. The minute announces that 'a vote of thanks

A  having been passed to Mr. Culver for his services in the chair, the
meeting adjourned.' How could the meeting adjourn except upon a
resolution? Who moved that the meeting should be adjourned? The
meeting did not adjourn, and the entry in the minute book is wholly
erroneous."

B  Various interpretations can be put upon that case, but what does seem
plain is that Bacon V.-C. is not deciding anything about a chairman's
power to adjourn for disorder.

The other case is one that I mentioned to counsel, *Rex* v. *St. Mary,
Lambeth (Churchwardens of)* (1832) 1 Ad. & El. 346n.  There, the rector
was presiding over a meeting to elect churchwardens.  On his own autho-
rity and without notice, he adjourned the meeting from the school-house
to the church so that a poll could be held on the same day; and there was
C  evidence that the poll could not have been " properly, if at all, taken in the
school-house, from the nature of the place, and the numbers and tumultuous
state of the meeting."  After the churchwardens had been elected, a man-
damus to elect churchwardens was sought on the ground that the election
held after the adjournment was invalid: and this was opposed " on other
grounds, independent of the discretionary power of the chairman to ad-
journ." *Stoughton* v. *Reynolds,* 2 Stra. 1045; Fort. 168, was duly cited,
D  but the Court of King's Bench, consisting of Lord Tenterden C.J. and Little-
dale, Parke and Taunton JJ., refused to grant mandamus.  Unfortunately
they seem to have given no reasons, and in any case the report is no more
than a note to *Rex* v. *Chester (Archdeacon of),* 1 Ad. & El. 342, in which
the court adverted to it during argument.  So far as it goes, the case is not
inconsistent with a chairman having an inherent power to adjourn a meeting
E  for disorder: but counsel attached little importance to the case, and I think
that in this they are right.  I may add that I do not think that there is any
importance in the fact that many of the cases are decisions on parish meet-
ings, whereas I am concerned with a meeting of a different type; certainly
counsel took no such point.  If today much of the excitement to be found
in the last century at parish meetings has now transferred itself to political
meetings (using " political " in the widest sense), I see no reason why the
F  law governing each type of meeting should not in its essentials be the same;
a meeting is a meeting.

Although *Rex* v. *St. Mary, Lambeth (Churchwardens of),* 1 Ad. & El.
346n., is of no great assistance in this case, it did, by devious means,
ultimately lead me to what I think is a useful passage in a book published
in 1840, *A Practical Arrangement of Ecclesiastical Law,* by F. N. Rogers
G  Q.C.  In discussing vestry meetings at p. 874, the author considers
*Stoughton* v. *Reynolds,* 2 Stra. 1045; Fort. 168, and then says that this
decision

   " by no means interferes with the right which every chairman has to
   make a bona fide adjournment, whilst a poll or other business is
   proceeding, if circumstances of violent interruption make it unsafe,
H  or seriously difficult for the voters to tender their votes; nor of
   adjourning the place of polling, if the ordinary place used for that
   purpose be insufficient, or greatly inconvenient.  In most of such
   cases, the question will turn upon the intention and effect of the

Megarry J.                    John v. Rees                    [1970]

adjournment, if the intention and effect were to interrupt and pro-    A
crastinate the business, such an adjournment would be illegal; if,
on the contrary, the intention and effect were to forward or facilitate it,
and no injurious effect were produced, such an adjournment would,
it is conceived, be generally supported."

This seems to me sound sense. It does not appear to be inconsistent
with any of the authorities, and in its essentials I adopt it for the purposes
of this judgment. I do not think it can be right to say that the chairman    B
of a meeting has no inherent power to adjourn the meeting for disorder.
It seems generally accepted that one of his functions is to preserve order:
if despite his efforts serious disorder persists, and he is denied any power
of adjournment, what is he to do? The disorder will almost by necessity
make it impossible for the meeting to pass a resolution for adjournment.
One must remember that serious disorder may put in a dilemma many of    C
those who are peacefully attending the meeting. If they retire from it,
they may afterwards find that the disorder soon subsided, and that the
meeting then transacted its business without their voice and vote, and in a
sense contrary to their wishes. If they remain, their personal safety may be
in peril. The frail and timorous are as much entitled as the robust and
bold to a meeting to which they can give their attention, and at which they
may make their voices heard without fear of violence; and they need it    D
more.

The first duty of the chairman of a meeting is to keep order if he can.
If there is disorder, his duty, I think, is to make earnest and sustained
efforts to restore order, and for this purpose to summon to his aid any
officers or others whose assistance is available. If all his efforts are in
vain, he should endeavour to put into operation whatever provisions for    E
adjournment there are in the rules, as by obtaining a resolution to adjourn.
If this proves impossible, he should exercise his inherent power to adjourn
the meeting for a short while, such as 15 minutes, taking due steps to
ensure so far as possible that all present know of this adjournment. If
instead of mere disorder there is violence, I think that he should take
similar steps, save that the greater the violence the less prolonged should
be his efforts to restore order before adjourning. In my judgment, he has    F
not merely a power but a duty to adjourn in this way, in the interests of
those who fear for their safety. I am not suggesting that there is a power
and a duty to adjourn if the violence consists of no more than a few
technical assaults and batteries. Mere pushing and jostling is one thing;
it is another when people are put in fear, where there is heavy punching,
or the knives are out, so that blood may flow, and there are prospects, or    G
more, of grievous bodily harm. In the latter case, the sooner the chairman
adjourns the meeting the better. At meetings, as elsewhere, the Queen's
Peace must be kept.

If, then, the chairman has this inherent power and duty, what limitations,
if any, are there upon its exercise? First, I think that the power and
duty must be exercised bona fide for the purpose of forwarding and
facilitating the meeting, and not for the purpose of interruption or procras-    H
tination. Second, I think that the adjournment must be for no longer than
the necessities appear to dictate. If the adjournment is merely for such

A  period as the chairman considers to be reasonably necessary for the restoration of order, it would be within his power and his duty; a longer adjournment would not.  One must remember that to attend a meeting may for some mean travelling far and giving up much leisure.  An adjournment to another day when a mere 15 minutes might suffice to restore order may well impose an unjustifiable burden on many; for they must either once more travel far and give up their leisure, or else remain away and

B  lose their chance to speak and vote at the meeting.

As I have already mentioned, Mr. Hirst has contended that if the chairman's own improper conduct of the meeting has provoked the disorder, he loses his inherent power of adjournment and can recover it only by returning to the paths of propriety.  I very much doubt this.  The mischief to the innocent members of the meeting is as great whether it is the chairman or anyone else who provoked the disorder: unless the

C  adjournment is valid their departure may disfranchise them for that meeting.  Disorder is disorder, and if the adjournment is made bona fide for the purpose of restoring order and for a reasonable period only, I think there would be less injustice in holding that the adjournment is valid than in making its validity depend upon the outcome of the often difficult question whether the disorder was due to the chairman's

D  misconduct.  Causation is seldom pure.

I am conscious that for much of what I have said there is little or no authority.  Furthermore, not all of what I have said arises for decision in this case, at any rate directly.  But the matter has been debated before me, and it has seemed better to attempt a reasonably comprehensive and intelligible statement of this corner of a chairman's powers and duty than to confine myself to those segments of it which directly arise for decision.

E  On the other hand, let me add that I have not attempted to be exhaustive. In particular, there may well be limitations upon the chairman's inherent power of adjournment other than those that I have mentioned.  I should also add that I do not think that in this case the chairman's inherent power of adjournment for disorder is affected by the standing orders of P.D.L.P. Standing order 11 (c) provides for the adjournment to be moved without

F  notice, and standing order 19 provides for such a motion to be put to the vote without discussion.  But if there is serious disorder it is improbable that it would be practicable to follow this procedure: and I cannot perceive any intention to oust or curtail the chairman's inherent power of adjournment for disorder.

I turn, then, to the adjournment in the present case.  In my judgment the grounds for the adjournment fell far short of what the law required.

G  Even if one accepts to the full the most pungent portions of the evidence, I do not think that this was a meeting where people were put in fear. Certainly there was noise, disorder, and, in a few cases, bodily contact; but whatever affronts to dignity there may have been, there was nothing that could really be called violence.  The plaintiff made no attempt to apply the provisions of the standing orders relating to adjournment.

H  There is nothing to suggest that he attempted to restore order by any means other than calling out to the meeting.  He purported to adjourn the meeting not for a reasonable period so that order might be restored, but sine die; and he then left the place of meeting.

Now the plaintiff did not, of course, have the advantage of hearing in peace, and at length, either the arguments on his powers that have been addressed to me or this judgment. He was subject to all the disadvantages of having to decide at short notice what to do when presiding over a disorderly meeting. In other spheres, due credit is given to a man who is put into a dilemma and has to make a decision in what is called " the agony of the moment." Here I think it right to make full allowance for that, subject to one point. I have already rejected Mr. Hirst's contention that a chairman's improper conduct of a meeting deprives him of his inherent power of adjournment. But where there is such impropriety, I think that it may have a different effect. For if in any real degree that impropriety has caused or contributed to the disorder of the meeting, and has thus played a real part in creating the dilemma, I do not think that it then lies in the mouth of the chairman to excuse his conduct by relying upon that dilemma. A self-imposed dilemma offers but a slender claim to justification. In this case the fact remains that the chairman did go wrong, and that those who complain of his conduct are entitled to do so. Whether or not his sole motive for adjourning was the disorder is a matter which must be left until the trial. He will then, as now, start with the disadvantage of being a chairman who, in my judgment, had been conducting the meeting in disregard of the standing orders, the agenda, and the resolution of the standing orders committee. On this motion I need do no more than say that, in my judgment, on the undisputed evidence, the purported adjournment was bad, and failed to produce any effective adjournment of the meeting. Those who departed from the meeting with the plaintiff, said to be some 20 in number, may wish to complain that they thereby lost their opportunity of opposing what happened later in the meeting; if so, they must lay their complaints to the charge of the plaintiff.

On the footing that there was no valid adjournment, it follows that, as the cases establish (see, for example, *National Dwellings Society* v. *Sykes* [1894] 3 Ch. 159), and as Mr. Sparrow concedes, the meeting remained in being and competent to transact business. The elections conducted after the departure of the plaintiff were accordingly valid; for no other contention that they were bad has been put forward. It has not been suggested that the minutes of the meeting prepared by the first defendant [Mr. Rees], exhibit A.G.R. 1A, do not correctly record what happened at the meeting after the plaintiff's departure. Accordingly, as a result of the meeting the second defendant [Mr. Cleare] was elected President of P.D.L.P. in place of the plaintiff, and the third defendant [Mr. Lewis] was elected treasurer. The first defendant remained the secretary; he was not up for election.

In addition to the election of officers and delegates, the business transacted at the meeting after the plaintiff had departed included a resolution to disaffiliate from the Labour Party; and I must now consider the validity of this. In order to do so, it is necessary to resolve what rules governed P.D.L.P.: and on this point there has been strenuous debate over the rules known as " Set B." For the affiliates, Mr. Sparrow has contended that these apply and govern P.D.L.P., whereas Mr. Hirst has argued the contrary. I must therefore first consider Set B.

A    The Labour Party publishes a booklet (which I shall call "The White Booklet") which contains a memorandum, and two sets of model rules, "Set B" and "Set C." The copies of the White Booklet before me appear to have been printed in January, 1968, but no point has been taken on that, and probably the booklet is merely a reprint of rules that have been in existence for some while. Set B is stated to be "For Constituency Labour Parties in county constituencies," whereas Set C is "For
B    Local Labour Parties in county constituencies." Clause 3 (2) of the Labour Party constitution (the format of which leads me to call it "The Yellow Booklet") provides that "Each Constituency Labour Party . . . must . . . adopt the rules laid down by the Party Conference": and the memorandum in the White Booklet states, inter alia, that Sets B and C are the appropriate rules for this purpose. The question is whether Set B was ever adopted by P.D.L.P.

C    The plaintiff says that they were. He exhibits a sheet of paper setting out certain adjustments and insertions which he says were made to Set B, inserting the name "Pembrokeshire" in the blanks and so on. He also exhibits a five-page document setting out the standing orders of P.D.L.P., to which I have already referred. These state in order 1 (a) (i) that the general management committee is at its annual meeting to elect "An
D    executive committee in accordance with constitution and rules Set B": and clause 9 (3) of Set B, when read with the adjustments and insertions that I have just mentioned, duly provides for the constitution of an executive committee. The first defendant [Mr. Rees], who has been secretary of P.D.L.P. since 1955, points out that it is not said when Set B was adopted, and that the minutes contain no record of the adoption of Set B, although he has not been able to trace any minute books prior to
E    1955. The plaintiff [Mr. John], who has been a member of P.D.L.P. for 24 years, replies by saying that he has been present at meetings of P.D.L.P. when the adoption of Set B was discussed, and that he has always believed and understood that Set B was duly adopted. Mr. Lewis (the third defendant) on the other hand, who was a member of the executive committee of P.D.L.P. in 1947, and attended regularly, had no recollection of
F    any discussion or adoption of Set B. The plaintiff and Mr. Underhill also exhibit correspondence in 1947 and 1954 which refers to the rules and constitution of P.D.L.P., and to the approval of the rules by the N.E.C. on December 3, 1947. The 1947 correspondence was between the Welsh regional office of the Labour Party and the national agent's department, while in the 1954 correspondence the then secretary of P.D.L.P. joined in as well.

G    The correspondence certainly suggests that the rules were Set B, as amended; and Mr. Prothero, who was Welsh regional officer in 1947 and 1954, confirms this. In addition, Mr. Sparrow relies strongly on the presumption of regularity, or omnia praesumuntur rite esse acta, to carry him over the undoubted absence of any cogent direct evidence of the adoption of the rules by P.D.L.P.: and for this he cited a number of
H    authorities where the facts were rather different. He further contends that, irrespective of any evidence of formal adoption of Set B, those who join a club or association bind themselves by whatever the rules are, even if they have become established merely by usage among the members.

To these contentions, Mr. Hirst replied by emphasising that the issue
was whether or not the members of P.D.L.P. were bound to each other by
a contract which incorporated Set B.  He said that there was no evidence
of the adoption of Set B, or of the members knowing of Set B or agreeing
to accept Set B.  Furthermore, he said, the presumption of regularity can-
not apply to establish the terms of a contract.  In any case, he added,
*Morris* v. *Kanssen* [1946] A.C. 459 established that the maxim omnia
praesumuntur rite esse acta cannot apply in favour of someone who,
like the plaintiff, is a member of P.D.L.P., for it can apply only in favour
of outsiders, or non-members.

This last point was vigorously debated: and I will deal with it first.
The point came up in *Morris* v. *Kanssen* as something of an after-
thought, and was argued only by the indulgence of the House of Lords:
for the appellant had not raised the point in his formal case.  What was in
issue was the validity of an allotment of shares made at a meeting of the
directors of a company at which one director, M., had been appointed
immediately before the allotment.  In fact, both the appointment and the
allotment were ineffective because the other two persons present, although
formerly directors of the company, had by virtue of the articles of the
company ceased to be directors some while before the meeting; for the
company had held no general meeting for a year.  In those circumstances,
M. claimed that despite the defects in the allotment produced by the
operation of the articles, the rule in *Royal British Bank* v. *Turquand*
(1856) 6 E. & B. 327 made good his title to the shares allotted: acting in
good faith, he was not concerned to inquire into the regularity of acts of
internal management.

This contention failed.  Only Lord Simonds delivered a reasoned
speech: the other members of the House merely concurred.  Lord Simonds
discussed the rule in *Turquand's* case, and in doing this he referred to the
maxim omnia praesumuntur rite esse acta as " one of the fundamental
maxims of the law: " [1946] A.C. 459, 475.  He gave some illustrations of
it, and then uttered a sentence upon which Mr. Hirst placed great emphasis,
at p. 475:

" It is a rule designed for the protection of those who are entitled to
assume, just because they cannot know, that the person with whom
they deal has the authority which he claims."

This, said Mr. Hirst, referred to the maxim omnia praesumuntur rite
esse acta, and not the rule in *Turquand's* case.  Therefore in the present case
the plaintiff could not rely on the maxim: for he is a member of P.D.L.P.,
and so cannot claim to be one of those " who are entitled to assume, just
because they cannot know," whether Set B was ever formally adopted.

As a mere matter of grammar, it certainly seems that on p. 475 Lord
Simonds was speaking of the maxim rather than the rule.  He sets out the
maxim (on p. 474), says that it has many applications, and gives illustra-
tions.  He then says (p. 475) " But the maxim has its proper limits ": and
still he is speaking of the maxim.  He then gives two illustrations, and
says " Nor is this the only limit to its application ": and grammatically
the word " its " must refer back to the maxim.  He then proceeds with the

A  sentence to which Mr. Hirst has attached so much importance, beginning
"It is a rule . . .": and still the "It" grammatically refers back to the
maxim. Accordingly, if grammar were the only criterion, there would here
be a declaration by a unanimous House of Lords that the maxim "omnia
praesumuntur rite esse acta" is confined in its operation to protecting those
who are entitled to assume, because they cannot know, that the person they
deal with has the authority which he claims. On this foundation Mr. Hirst
B  has built his elaborate claim that the maxim applies only for the protection
of outsiders, or non-members of P.D.L.P., and so cannot avail a member.

   In ascertaining what a case decided, grammar is, no doubt, a good
servant. But it may be a bad master; and if it is treated as the sole master,
it may become a tyrant. As Lord Reid once said of a famous passage in a
famous judgment of Willes J. [in *Indermaur* v. *Dames* (1866) L.R. 1 C.P.
274, 288]:
C
      "In dealing with a situation different from anything contemplated in
      that judgment I do not think that it is very helpful to analyse that
      passage as if it were a section in an Act of Parliament" (*London
      Graving Dock Co. Ltd.* v. *Horton* [1951] A.C. 737, 779);

and the other members of their Lordships' House evidently shared that
D  view: see at pp. 745, 751, 761. I remember, too, the classic warning of
Learned Hand J. in *Cabell* v. *Markham* (1945) 148 F. (2d) 737, 739:
one ought "not to make a fortress out of the dictionary," or, I may add,
out of a textbook of grammar either. In applying even the most authori-
tative language in a decided case, it is, in my judgment, essential to bring
to the task a lively sense of the subject-matter arising for decision. The
facts of *Morris* v. *Kanssen* [1946] A.C. 459 were far removed from
E  those in this case. There, the question was whether a person who was not a
director of a company but was acting as such could pray in aid the rule in
*Turquand's* case (6 E. & B. 327) so as to validate an allotment of shares to
himself which he and two others of like status had made. No authority for
the invocation of that rule by actual or de facto directors could be pro-
duced, and their Lordships refused to hold that an invalid allotment of a
F  company's shares could be validated by the application of the rule. What
was argued (see [1946] A.C. 459, 466) and what was decided was the
scope of that rule. In the process of decision, the maxim was considered as
part of the process. So far as the maxim relates to companies, it deals with
the acts which bind or do not bind the company.

   The case I am concerned with, on the other hand, concerns not a com-
pany but an unincorporated club or association. No question arises
G  whether or not any artificial or juristic person is bound, for there is no
such person. Instead, the question is that of the terms of the rules of that
association, as constituting the contract which bind the members to each
other. There is no direct evidence that any meeting of P.D.L.P. ever
adopted Set B, but on the other hand there is some evidence that for many
years at least some of the officers have treated Set B as being the rules of
H  P.D.L.P. Where those concerned have acted for many years on the
assumption of a particular state of affairs, the court is slow to hold that a
different state of affairs exists: see, for example, *Sneyd* v. *Stewart* (1857)
10 Irish Jur. 105, 107, per Cusack Smith M.R., in a case concerning

the size of various beneficiaries' shares in a fund. Further, in the standing orders of P.D.L.P. (which nobody challenges) there are significant words in clause 1 (a) (i), providing for the election of "An executive committee in accordance with constitution and rules Set B." A

On the facts of this case, therefore, I have to consider whether in those circumstances there is anything in *Morris* v. *Kanssen* [1946] A.C. 459 which prevents me from applying the maxim omnia praesumuntur rite esse acta and holding that Set B was, at some time unknown, adopted B by P.D.L.P. as the rules of the party. I do not think that there is. The House of Lords was dealing with an entirely different situation, and I cannot believe that, in referring to the maxim when considering the ambit of the rule in *Turquand's* case (6 E. & B. 327) (which doubtless is or contains one manifestation of the operation of the maxim), there was any intention to limit the operation of the maxim in other spheres. As is shown by even a cursory examination of *Broom's Legal Maxims*, 10th ed., C (1939), pp. 640–648, the maxim operates in a wide diversity of circumstances; and if it were confined in its operation, as Mr. Hirst contends, to cases where it is invoked by outsiders, I can foresee much difficulty in applying some of the long-established authorities. Lastly, of course, this is merely a motion: the final elucidation of this point must await the trial, and such further evidence as may be adduced. D

That is not all. For I do not think that I am required to apply the presumption of regularity in a vacuum, ignoring the evidence which supports the view that Set B was adopted. Certainly I do not think it is necessary to bring home to every member when he joins exactly what the rules of the association are. I do not see why someone who joins a club should not do so on the basis that he will be bound by the rules of the club, whatever they may be: see, for example, *Raggett* v. *Musgrave* (1827) E 2 C. & P. 556, where the rules, though accessible, were neither posted up nor sent to members. *The Satanita* [1895] P. 248 C.A.; [1897] A.C. 59, H.L.(E.) does not seem to me to bear upon the point, as it concerned not membership of a club but the terms of a contract between those who entered for a race. In the case of a club, if nobody can produce any evidence of a formal resolution to adopt a particular set of rules, but on inquiry the officers would produce that set as being the rules upon which it F is habitual for the club to act, then I do not think the member would be free to reject those rules merely because no resolution could be proved.

Accordingly, in my judgment I must deal with the motion on the footing that P.D.L.P. has at all material times been governed by Set B, subject to the provisions of the document which sets out the minor adjustments and insertions to be made, and subject also to the deletion of the G office of financial secretary from clause 9 (2) which some correspondence of 1954 records. In addition, there is no dispute that P.D.L.P. has at all material times been subject to the standing orders which have been put in evidence.

On the footing that Set B applies, Mr. Sparrow says that the result is to show that P.D.L.P. is a mere branch of the national Labour Party, and H that the members of it are bound by contract to be loyal to the Labour Party. This he deduces from, in the main, clauses 4 (1), (2) (a), 6 (2), 7 (1), 8 (2) (d), and (3), of Set B. So far as the " mere branch " argument

A  is concerned, I feel some doubts. By clause 2 (1) of the Labour Party constitution, there are two classes of members, namely, affiliated members (or organisations: see clause 3 (1) ), and individual members: and I do not consider that an organisation which affiliates itself to the Labour Party thereby becomes a " mere branch " of that party, whatever that may mean, any more than an individual member does. Such an organisation remains, I think, a separate entity, though bound by certain obligations. On the

B  other hand, the rules do seem to me to require acceptance of the constitution, programme, principles and policy of the Labour Party both by P.D.L.P. and by its members; see clause 4 (1) (a), (2) (a). On this foundation, Mr. Sparrow has sought to erect a structure which would support the plaintiff's act in inserting into the meeting Mr. Underhill's address and the loyalty resolution. He fortified his position by reference to standing orders 6, 7 and 20. Standing order 6 provides that " Party

C  business shall have precedence on the agenda." Standing order 7 deals with notice of motions, and standing order 20 provides that " The chairman's ruling to any point of order arising from these standing orders or any point arising not provided for by these standing orders shall be final," with a provision for a challenge and a vote. I do not think that these provisions, either individually or collectively, suffice to support the plaintiff's actions.

D    I can now turn to the question of disaffiliation. The motion before me does not in terms seek a decision on the validity of the resolution to disaffiliate; but I do not think I can avoid considering it, and it is at least relevant to the claim to an injunction against the disaffiliate defendants. The injunction cannot be granted on the basis that the defendants were not officers of P.D.L.P. after the first meeting; for they all were. But that

E  does not dispose of the matter. Even if all were still officers of P.D.L.P., Mr. Sparrow contends that they should all be enjoined in terms of the notice of motion because they have manifested an intention to deal with the property of P.D.L.P. otherwise than in accordance with its constitution and rules. In particular, there was the resolution to disaffiliate. This was moved by the third defendant and passed by 69 votes to 1 at the meeting

F  after the plaintiff had left. The motion was that P.D.L.P. should

> " disaffiliate from the national Labour Party in order that Mr. Desmond Donnelly could continue as a Labour Member for Pembrokeshire."

The validity of this resolution is impugned under two heads.

G    First, no notice of any intention to propose such a resolution appeared in the formal agenda for the meeting. True, in the first defendant's duplicated report for the meeting which accompanied the agenda he asked why P.D.L.P. could not disaffiliate temporarily: but nothing on this point appeared in the agenda proper. On this ground alone it seems to me clear that the resolution was invalid. The standing orders (which nobody challenges) require ten days' written notice of motion " unless on matters of urgency accepted by the majority as such " (standing order 7): and

H  the minutes record no such acceptance of urgency. In any case, standing order 7 continues by saying that

> " where such urgency is known or anticipated before the meeting,

notice in writing of the urgent business or motion shall be transmitted
to the secretary as early as may be practicable before the meeting ": A

and there is no suggestion that this was done. Further, a motion to
disaffiliate is not amongst those motions for which, by standing order 11,
no notice is required. Where a motion deals with such important and
fundamental matters as this, it seems to me particularly necessary that
there should be a full and substantial compliance with all the requirements
as to notice and otherwise. B

Second, quite apart from procedural defects (which might be cured
if another meeting were held), there is the substantial question whether, as
matters stand, P.D.L.P. is able to disaffiliate or sever itself from the
Labour Party, whatever the procedure adopted. Mr. Hirst very properly
accepts that P.D.L.P. cannot do so in breach of its own rules, and so if,
as I have held, P.D.L.P. is governed by Set B, the question is whether C
Set B (or any other relevant rules) prevents severance or disaffiliation.
It seems to me clear that P.D.L.P. is bound to the Labour Party by Set B
and, through Set B, by the constitution of the Labour Party. In Mr.
Sparrow's phrase, P.D.L.P. and the Labour Party are so clamped together
by these provisions that they cannot be separated without first altering
those provisions. Not surprisingly, Set B, Set C and the Labour Party
constitution all dovetail in with each other. D

In one sense Mr. Hirst was right when he said that there is nothing
in Set B to say that P.D.L.P. cannot disaffiliate from the Labour Party:
there is indeed nothing which says this in terms. But it seems to me that
when the provisions of Set B are read as a whole, the inescapable con-
clusion is that while they stand unaltered P.D.L.P. cannot separate itself
from the Labour Party: and I do not think it matters much whether the E
process is called disaffiliation or severance. In my view, it is unnecessary
to refer in detail to the rules in Set B which produce this result. It
seems sufficient to say that, on making the assumption that P.D.L.P.
has severed itself from the Labour Party, I find it impossible to read
through the rules of Set B and make them work sensibly. Thus if there
were a severance, clause 8 (as to affiliation fees payable to the Labour
Party) and clause 13 (applying the general provisions of the constitution F
and standing orders of the Labour Party) would both require substantial
revision. By clause 4 the two classes of members of P.D.L.P., namely,
affiliated organisations and individual members, would have to accept and
conform, or agree to conform, to the constitution, programme, principles
and policy of the Labour Party, while (on this hypothesis) P.D.L.P.
would have separated itself from the Labour Party. By clause 6 (2), the G
rules of Set B may, subject to important limitations, be altered, amended
or deleted, but only with the approval in writing of the N.E.C.; and in such
circumstances no such approval is likely to be given, even if it were to be
sought. In any case, a proviso precludes any changes of the rules which
" effect a change in the relationship of . . . Constituency Labour Parties
with the Labour Party ": and although I agree that this does not eo H
nomine preclude disaffiliation, I think it is plain that in substance and effect
it does so.

If a severance between P.D.L.P. and the Labour Party cannot be

A  effected without a change of rules (as I hold to be the case), and if no change of rules is permitted which will effect a change in the relationship of P.D.L.P. with the Labour Party, then I do not see how any severance can lawfully be made. I need hardly say that I am not for one moment asserting that any members of P.D.L.P. are unable to form some new political organisation or group: what I do say is that the existing P.D.L.P., with its property, has not effectually been severed or disaffiliated from the

B  Labour Party.

Mr. Hirst pressed me with authorities such as *Finch* v. *Oake* [1896] 1 Ch. 409, on the right of a member of a club or society to resign or retire at any time, without any concurrence or acceptance by the club or society. I do not find the analogy persuasive. An individual who resigns severs the link between himself and his fellow members: he does not affect their rights in other ways. They remain bound inter se by the

C  existing rules. The majority of a club which resolves upon disaffiliation, however, would alter the rights not only of themselves but also of all other members, effecting a change of the rules which would continue to bind all members. Such a change must, I think, be made in accordance with whatever procedure there is for changing the rules: and if none is applicable, the change cannot be made. Those who do not like the

D  situation may, as individuals, resign: but I do not think they can collectively secure a disaffiliation except in accordance with the rules which bind them all.

The matter may be put in this way. If an individual resigns from a club, no question arises of the validity of his own act quoad himself. He can make up his own mind, and act for himself. On the other hand, where the question is one of a club disaffiliating itself from some other

E  organisation, there is a preliminary question to be resolved, namely, whether the act of disaffiliation was validly done according to the rules of the club and the general law so as to be the act of the members of the club as a body. The question " Has there been a valid decision to resign or disaffiliate? " arises in the case of the club but not in the case of the individual. The analogy between the two categories thus breaks down.

F  In the present case, the principal question is that of the effectiveness of the resolution to disaffiliate, and this is just the question which does not arise when an individual resigns from a club. Accordingly, I derive little help from the analogy.

The position is thus that the three defendants were, immediately after the meeting, officers of P.D.L.P. who were wrongly asserting that P.D.L.P. had disaffiliated itself from the Labour Party. They also supported the

G  candidature of Mr. Donnelly, who had been expelled from the Labour Party. Indeed, after the plaintiff had left the meeting, a resolution of support for Mr. Donnelly was passed unanimously. If, despite subsequent events, they are still in office, there is the question whether they should be enjoined from dealing with the property of P.D.L.P. There is no evidence before me of any improper use of the funds, nor of any threat to flout

H  the law. There has been a strenuous disagreement whether or not there has been an effective disaffiliation; but there is nothing to suggest that the defendants are lawless men who will act in breach of the law once they know it. Accordingly, I do not think it would be right to grant an injunc-

392

tion in the terms of the notice of motion which would restrain the lawfully
elected officers of P.D.L.P. from any dealing with the property entrusted  A
to them when there is no subsisting threat that they will deal with it
otherwise than lawfully. If there should hereafter be any such threat,
then no doubt such an injunction may be sought anew: but I do not think
that there is any sufficient reason for granting an injunction now.

When I put to Mr. Sparrow the possibility of an injunction being
granted in more limited terms, restraining not all dealings with the pro-  B
perty but any dealings contrary to the rules of P.D.L.P., he said that the
injunction must be all or nothing, and not merely an injunction against
the unconstitutional use of the funds. In those circumstances, and as in
any event I feel some doubt whether it would be right to grant a limited
injunction, I do not think that I need consider the point further; and I
am clear that the injunction sought by the notice of motion must be
refused. I accordingly dismiss the first motion.                           C

I now turn to action No. 2. As I have said, this action relates to the
second meeting, and this was part of the process whereby the N.E.C.
sought to reorganise P.D.L.P. The writ claims a declaration and two
injunctions, which I do not think I need read. On the day the writ was
issued, June 12, 1968, the plaintiffs [Mr. Thomas Henry Martin and Mr.
Brian Lloyd Davies] gave notice of motion claiming two injunctions in  D
the following terms:

"1. An injunction to restrain the defendants and each of them in
their capacities as officers of the unincorporated association which
purports to call itself the Haverfordwest Local Labour Party being
an association purported to have been constituted at a meeting con-
vened and held by order of the National Executive of The Labour
Party at The Gold Room, Market Hall, Haverfordwest, on Monday,  E
May 20, 1968, until judgment in this action or further order (whether
by themselves their servants or agents or otherwise howsoever) from
doing or purporting to do or being party to any of the following
things namely collecting expending remitting transferring or otherwise
dealing with any moneys or other property belonging to or held for
the purpose of the Haverfordwest Local Labour Party as constituted  F
prior to the said meeting. 2. An injunction to restrain the defendants
and each of them until judgment in this action or further order from
purporting to act as general committee delegates on behalf of the
Haverfordwest Local Labour Party as constituted prior to May 20,
1968, at any meetings whatsoever whether at constituency level or
otherwise."                                                                G

The main issue is the efficacy of the steps taken by the N.E.C. to
re-organise P.D.L.P.

The starting point, I think, is in the Labour Party constitution, as set
out in the Yellow Booklet. By clause 8 (2), it is provided that

"The duties and powers of the National Executive Committee shall
include the following: —. . . (b) To enforce the constitution, standing  H
orders, and rules of the party and to take any action it deems
necessary for such purpose, whether by way of disaffiliation of an

A    organisation or expulsion of an individual, or otherwise.   Any such
     action shall be reported to the next annual conference of the party."

By clause 13 (1) of Set B, " the general provisions of the constitution and
standing orders of the Labour Party shall apply to the organisation."
On April 24, 1968, after the first meeting, the N.E.C. passed two resolu-
tions.   They read as follows:

B        " (i) That action be taken under clause VIII section 2 (b) of the party
         constitution to suspend the activities of the Pembroke Constituency
         Labour Party and that the officers should have no rights for the time
         being to handle the funds of the party; (ii) that the Pembroke Con-
         stituency Labour Party be re-organised and that the national agent be
         given authority to take such steps as are necessary to complete the
         re-organisation."

C
     What followed may be described in the language of Mr. Underhill,
assistant national agent of the Labour Party, in his affidavit sworn July 9,
1968.   In this, I think " prescribed " is a slip for " proscribed," and
" prescribed re-organisation " should be " proscribed organisation."   He
says that

D        " In pursuance of these resolutions the national agent for the Labour
         Party resolved to convene a meeting of the Haverfordwest Local
         Labour Party.   However, before doing so, in accordance with the
         usual procedure followed by the National Executive Committee of the
         Labour Party in the case of the re-organisation of constituency parties,
         the national agent first sent a letter by registered post to the leading
         members of the dissident faction who supported Mr. Donnelly inform-
E        ing them of the proposed re-organisation and requesting from them an
         undertaking that they accepted and would conform to the constitution
         programme principles and policy of the Labour Party and that they
         did not belong to nor were actively associated with any prescribed
         organisation and that they would co-operate with the National Execu-
         tive Committee in re-establishing the Constituency Labour Party in
F        accordance with the provisions of the party constitution and rules.   A
         true copy of the letter sent to the first plaintiff is now produced
         and shown to be marked ' U.1.'   A letter in the same terms was sent
         to each of the other leaders."

The letter exhibited in U.1. is addressed to the person concerned, and
reads as follows:

G        " I have been charged by the National Executive Committee with the
         responsibility of re-organising the Pembrokeshire Constituency Labour
         Party.   Before making any recommendation to the National Executive
         Committee about your continued membership of the party, I shall be
         grateful if you will let me have, in writing, an undertaking that you
         accept and conform to, the constitution, programme, principles and
         policy of the Labour Party, that you do not belong to, or are actively
H        associated with, any prescribed organisation, and that you will
         co-operate with the National Executive Committee in re-establishing
         the Constituency Labour Party in accordance with the provisions of

the party constitution and rules. I am enclosing a stamped addressed envelope for your reply."

It is then signed in the name of the "National agent and acting general secretary."

Mr. Underhill, in his affidavit, continues as follows:

"Four persons to whom such a letter was sent namely, the first and second plaintiffs [Mr. Martin and Mr. Davies], Mr. Fulton and Mr. McEntee did not reply to this letter. Four others namely, Mr. T. R. Merriman, Mr. J. Phillips, Mr. A. Glyn Rees and Miss M. L. Jones all replied in similar terms to the effect that they were members of the Pembroke Labour Party, that they did not understand the national agent's reference to the prescribed re-organisation and that they did not accept the right of the National Executive Committee to interfere in any way. The national agent replied to all these letters (except for the letter of Mr. A. Glyn Rees) pointing out that every member of the Labour Party was bound by its constitution and rules and that it was not open to any member to break this contract and remain a member of the Labour Party. The national agent in the last paragraph of her letter asked the persons to whom she was writing to give the undertaking which she had requested in her first letter. No replies were received from any of them. The national agent did not reply to the letter of Mr. Glyn Rees because he is a defendant in a separate action . . .";

and then there is a reference to action No. 1. Mr. Underhill continues:

"Clause 4 (2) (a) of model rules Set C, the model constitution for local labour parties in county constituencies provides that each individual member must accept and conform to the constitution programme principles and policy of the Labour Party and the rules of the local parties. By reason of the refusal of the eight dissident members to give the undertakings requested by the national agent, the national agent considered that they were disqualified from membership of the Haverfordwest Local Labour Party."

These last words point to the view that the failure to give the undertakings had in some way automatically terminated the membership of those concerned. On day 2, Mr. Sparrow told me that the dissidents were still members of the local Labour Party until they were expelled; but on day 12 he expressly withdrew this statement, and replaced it with some far-reaching propositions. He said that the dissidents were now no longer members of the local Labour Party. They had, he said, destroyed their own membership either by stating that they would not give the undertaking, or by failing to reply to the letter within a reasonable time. It might be, he added, that they ceased to be members when they inwardly harboured disloyal notions in their bosoms, a concept which seems to me to give rise to many interesting speculations. He also contended that by their acts they had resigned their membership: and this, he added significantly, "got round all problems relating to expulsion." An alternative formulation of his point was that by their unconstitutional action and demonstration of disloyalty they had repudiated their membership. It might even be, he

A  said, that a deliberate breach of any rule would bring about an ipso facto determination of their membership. Apart from some reference to authorities on the general law of contract as to discharge by repudiation, these submissions were put forward without the support of authority.

Before I turn to consider these submissions, I must conclude the statement of facts. In his affidavit Mr. Underhill continues as follows:

B  " By letters dated May 11, 1968, the national agent gave notice of a meeting of the Haverfordwest Local Labour Party on May 20, 1968, to all members whose names appeared on the list of members supplied by Mr. Ronald Clifford Davis the secretary of the Haverfordwest Local Labour Party and compiled by him from the records of the party or of a list of members supplied by Mr. Glyn Rees secretary/agent of the Pembroke Constituency Labour Party except for the eight dissident members above referred to. The letters were in the terms of the letters C  exhibited to the affidavits herein of Alice Damant and Marjory Phillips.

" The meeting was duly held on May 20, 1968. All members attending the meeting were asked to complete a declaration which was attached to the notice convening the meeting. Everyone who attended the meeting did in fact produce and sign a declaration."

D  He then exhibits a copy of the minutes of the meeting which he prepared two days after the meeting from notes that he took. These minutes record the proceedings, the persons elected to various offices and positions, and so on.

On behalf of the plaintiffs there is evidence that no notice of the meeting was received by the two plaintiffs, who at all events before these disputes arose were respectively the treasurer and a member of the local E  Labour Party. The annual general meeting of the local Labour Party (about which there is no dispute) had been held on March 6, 1968, less than three months before the meeting convened by the national agent on May 20. At that meeting the first plaintiff had been elected treasurer (an office which he had held for some while), and the second plaintiff was F  elected a delegate.

Other members of the local Labour Party received a notice of the meeting. The notice began with the words:

" Arising from unconstitutional actions which have taken place in the Pembrokeshire Constituency Labour Party, the National Executive Committee of the Labour Party at its meeting on April 24, 1968, G  decided to suspend the activities of the Pembrokeshire Constituency Labour Party and to re-organise it."

It then referred to the business to be done at the meeting, and gave the time and the place of the meeting. It ended with the words " If you are able to attend, please complete the attached declaration and hand it to the steward at the meeting." There is then a provision at the bottom of the H  sheet for a tear-off slip in which the person signing it declares that he accepts and conforms to the constitution, programme, principles, and policy of the Labour Party, says that he is not a member of various other organisations, and then says,

**Megarry J.**                    John v. Rees                    **[1970]**

"I accept the decision of the National Executive Committee to re- **A**
organise the Pembrokeshire Constituency Labour Party and I am
willing to co-operate by re-establishing the local Labour Party."

Two of the members who received these notices say that they attempted
to attend the meeting but were refused admittance; but this is denied by
the defendants, and I shall not attempt to resolve this point on motion.
What is common ground is that notice of the meeting was not sent to all **B**
of those who, immediately before the dispute, were members of the local
Labour Party (as mentioned in the affidavit, there were eight in this ex-
cepted category), and that this was no accident, but was based upon the
contention that those concerned had ceased to be members. The question
is the effect of this.

There are, I may say, many other questions, some of which I must
mention. One is whether or not Set C of the Labour Party's model rules, **C**
intended for local Labour Parties in county constituencies, in fact applies to
this local Labour Party. Another is the application of the maxim
*delegatus non potest delegare* to the acts of the representative of the
national agent. Another is whether a local Labour Party is a separate
body or is merely a group within the Constituency Labour Party. I do not
think it right to examine in any detail more than is necessary to decide what **D**
is, after all, merely a motion. Needless to say, these other points remain
open to either side in any further proceedings: and I return to the main
question.

Clause 8 (2) of the Labour Party constitution empowers the N.E.C. to
do certain acts. Let me assume that either because Set C applies or
otherwise this clause applies to the Haverfordwest Local Labour Party. **E**
What it does is to put into the hands of the N.E.C. power for it to take
" any action it deems necessary " for the purpose of enforcing the constitu-
tion, standing orders and rules of the Labour Party: and the "disaffilia-
tion of an organisation " and " the expulsion of an individual " are expressly
stated as being within the competence of the N.E.C. The two resolutions
of the N.E.C. on April 24 deal respectively with suspension and reorgani-
sation. The suspension resolution falls into two parts: first, that action **F**
be taken under clause 8 (2) " to suspend the activities of the Pembroke
Constituency Labour Party," and second, " that the officers should have
no rights for the time being to handle the funds of the party." The re-
organisation resolution also, in a sense, falls into two parts. First, there is
the resolution in principle that " the Pembroke Constituency Labour Party
be reorganised," and, second, there is the machinery, namely, that " the **G**
national agent be given authority to take such steps as are necessary to
complete the reorganisation."

Assuming that clause 8 (2) and the resolution apply to the local Labour
Party, do they authorise what was done? Mr. Hirst answers " No," for a
variety of reasons: but in the forefront of his argument was the concept
of natural justice. The rules of natural justice, he said, apply not only to **H**
expulsion or dismissal, but also to suspension from office: and he cited a
number of authorities including *Fisher* v. *Keane* (1878) 11 Ch.D. 353,
*Labouchere* v. *Wharncliffe (Earl of)* (1879) 13 Ch.D. 346, *Burn* v. *National*

**A**  *Amalgamated Labourers' Union* [1920] 2 Ch. 364, and *Ridge* v. *Baldwin* [1964] A.C. 40.

*Burn's* case concerned a trade union. A rule required the executive committee of the union to " take every means to secure the observance of the union's rules," and authorised it to " suspend, expel and prosecute " members, and to " remove any incompetent or insubordinate officer." The committee passed a resolution removing the plaintiff from **B** any office held by him, and preventing him from holding any delegation on behalf of the union for five years. The plaintiff had been treasurer of his branch, and was chairman of it at the date of the resolution. The complaint against him related solely to his conduct as treasurer; and the resolution was passed without hearing the plaintiff or giving him any opportunity of explaining. P. O. Lawrence J. construed the rules strictly, and held that the language of the rule did not authorise the resolution that was passed. **C** He went on to consider the position if he were wrong in thus construing the rules, and said at p. 374,: " I have no hesitation in holding that the power to suspend or expel a member for acting contrary to the rules is one of a quasi-judicial nature "; and he accordingly held the resolution bad because the plaintiff had not been given an opportunity of being heard in his defence. In relation to the rules of natural justice Lawrence J. **D** thus made no distinction between suspension and expulsion. I would respectfully concur: in essence, suspension is merely expulsion pro tanto. Each is penal, and each deprives the member concerned of the enjoyment of his rights of membership or office. Accordingly, in my judgment the rules of mutual justice prima facie apply to any such process of suspension in the same way that they apply to expulsion.

**E**  In the present case, there has not in terms been any process of expulsion. Instead, there has been the process which, on Mr. Sparrow's argument, resulted in what for brevity may be described as an ipso facto cessation of membership which, he contended, " got round all problems relating to expulsion." Considered from the point of view of the members, however, the practical result is indistinguishable from expulsion. Before, they were members; after, they had been deprived of their membership **F** against their will. The precise legal description of the process by which this occurred, whether by destruction of their own membership, or acts constituting resignation, or repudiation of membership, may well be a matter of indifference to them: they have been unwillingly evicted.

I cannot believe that the principles of natural justice can be ousted by the simple process of describing expulsion by another name, or resting it upon an alternative theoretical basis. Membership of a club or association **G** is doubtless founded upon a basis of contract; but in many cases it is not merely a contract. Membership often gives the member valuable proprietary and social rights, and these, as well as the contract, would be terminated by expulsion. There is thus involved in expulsion not merely the termination of the contract but also the forfeiture of these other rights; and however ready the law may be to recognise the discharge **H** of a contract by repudiation, it is far less ready to accept that there has been a forfeiture of these other rights, whether the process is described as " ipso facto determination " or otherwise.

At one stage Mr. Hirst submitted that if there were a doctrine of ipso

facto determination, every member of the Government and the Labour
Party would have ceased to be members of that party, and all its assets
would pass to the Crown as bona vacantia.  I am happy to think that it is
unnecessary for me to decide that; and I abstain from any comment on
his interesting submission.  I may, however, observe that if there were a
doctrine of ipso facto determination the terms of the letter sent by the
national agent to the dissident members would be singularly misleading
in its reference to

    " making any recommendation to the National Executive Committee
    about your continued membership of the party ":

for that plainly suggests that the membership was still continuing but that
the N.E.C. would, at some unspecified stage, make a decision about it.

    However that may be, what matters here is, in my judgment, not the
terminology but the substance and the reality: and looking at that, it
seems plain that the principles of natural justice prima facie apply.  Mr.
Sparrow sought to avoid this conclusion by urging that what was done
bore generally on P.D.L.P. and was not directed against individuals.  He
further contended that the principles of natural justice did not apply
because the acts were administrative, because there had been no dismissal
of any disaffiliates, and because these principles did not apply to unpaid
offices.

    I do not find any of these contentions persuasive.  A " party " or a
" club," if unincorporated, is not an entity separate from its members; and
action against the collective unit takes direct effect against the individuals
comprising that unit.  This seems to me to be quite different from the
indirect effect that a proposal for a new road may have on the individual
landowners, to which Lord Reid referred in *Ridge* v. *Baldwin* [1964] A.C.
40, at p. 72.  On these submissions, as throughout, I look to the realities
and not to the labels.  Further, without authority to support it, I can
see no warrant for the view that the application of the principles of
natural justice to dismissal or suspension should be withheld from honorary
office and yet accorded to ordinary membership.  My reference to the
office of Treasurer of an Inn of Court was later to move Mr. Sparrow to
protest on the ground that the Inns were peculiar bodies.  Indeed, they
may be; but there are many other offices, both honourable and honorary,
in other bodies, and unless constrained by authority (and none has been
cited) I refuse to hold that the right to natural justice depends upon the
right to a few pieces of silver.

    Accordingly, I must consider what are the principles of natural justice
which prima facie are applicable, and whether or not there is anything
to oust their application.  In doing this, it is convenient to refer to a case
concerning an avowed expulsion from a political party which came before
me some three weeks after the conclusion of the argument in this case,
namely, *Fountaine* v. *Chesterton*.  It may be that there is other authority on
the point that I have in mind: but none was cited to me in that case or in
this.  The decision was briefly reported in " The Times " on August 20,
1968, and 112 S.J. 690: but I gather from the asterisk attached to the latter
report that no full report is likely to appear, at any rate in the Weekly Law

A    Reports. Accordingly, it may be convenient if I set out as best I can from my notes the passage in that judgment which I have in mind.

In that case I said:

"The expression 'the principles of natural justice' is, I think, now a technical term. As Maugham J. pointed out in *Maclean* v. *Workers' Union* [1929] 1 Ch. 602, 624, among most savages there is no such thing as justice in the modern sense. In a state of nature, self-

B    interest prevails over any type of justice known to civilisation; the law of the jungle is power, not justice. Nor am I clear what the word 'natural' adds to the word 'justice.' It cannot be intended to indicate the antithesis of 'unnatural justice,' which would indeed be an odd concept; I imagine that it is intended to suggest justice that is simple or elementary, as distinct from justice that is complex,

C    sophisticated and technical.

"The term 'natural justice' has often been used by eminent judges, and although Maugham J. said (at p. 624) that it 'is, of course, used only in a popular sense,' I would prefer to regard it as having become something of a term of art. To extract the quintessence of the process of justice is, indeed, notoriously difficult. 'The ideas of natural justice,' said Iredell J., 'are regulated by no fixed standard; the ablest

D    and the purest men have differed on the subject': *Calder* v. *Bull* (1798) 3 U.S. 386, 399. In *Ridge* v. *Baldwin* [1964] A.C. 40, 132, Lord Hodson referred to a 'certain vagueness' in the term, but rejected the view that because the requirements of natural justice depended upon the circumstances of the case, this made natural justice so vague as to be inapplicable. He added: 'No one,

E    I think, disputes that three features of natural justice stand out—(1) the right to be heard by an unbiased tribunal; (2) the right to have notice of charges of misconduct; (3) the right to be heard in answer to those charges.' I do not think that I shall go far wrong if I regard these three features as constituting in all ordinary circumstances an irreducible minimum of the requirements of natural justice. I need only add that all these requirements are essentially procedural in

F    nature; I regard natural justice as a distillate of due process of law."

I then turned to consider a submission based on the judgment of Denning L.J. in *Lee* v. *Showmen's Guild of Great Britain* [1952] 2 Q.B. 329, 342 to the effect that public policy would invalidate any stipulation excluding the application of the rules of natural justice to a domestic tribunal, and said that although I respectfully inclined to the

G    same view, it seemed to have been expressed obiter and was not mentioned by the other members of the court, so that I would hesitate to decide the case on that ground. I went on to refer to the rule which was said to justify the expulsion, and said:

"It is trite law that the rules of an unincorporated association form a contract between all the members of that association. It is, indeed, a somewhat special form of contract; but subject to that, what I am

H    required to do is to construe the terms of a contract. Where the terms in issue deal with the exercise of a power of peremptory suspension or termination of the rights of one of the parties to such a

**Megarry J.**                    John v. Rees                          **[1970]**

contract, then I think that the common expectation of mankind would
be that the power would be exercised only in accordance with the prin-  A
ciples of natural justice unless the contrary is made plain. This
expectation rests upon high and ancient authority. When a member
of a university was deprived of his degrees without being given an
opportunity to defend himself, Fortescue J. said: ' The laws of God
and man both give the party an opportunity to make his defence, if
he has any. I remember to have heard it observed by a very learned  B
man upon such an occasion, that even God himself did not pass
sentence upon Adam, before he was called upon to make his defence.
Adam (says God) where art thou? Hast thou not eaten of the tree,
whereof I commanded thee that thou shouldst not eat? And the
same question was put to Eve also ': *Rex* v. *Cambridge University*
(1723) 1 Stra. 557, 567. Even if the law permits the principles
of natural justice to be effectually excluded by suitable drafting, I  C
would not readily construe the rules as having achieved this result
unless they left me in no doubt that this was the plain and manifest
intention. Put a little differently, I would say that if there is any
doubt, the applicability of the principles of natural justice will be
given the benefit of that doubt. The cry ' That isn't fair ' is to be
found from earliest days, in nursery, street and school alike; and  D
those who wish to confer upon the committee or other governing body
of a club or association a power to act unfairly or arbitrarily in
derogation of common and universal expectation must make it plain
beyond a peradventure that this has been done. This view is, I think,
at least consistent with the approach of Romer L.J. in *Lee* v.
*Showmen's Guild of Great Britain* [1952] 2 Q.B. 329, 349, C.A.
on a not dissimilar point, where he said that it would require ' the use  E
of clear language ' before he was satisfied that the members of any
body such as the trade union in question had agreed to leave the
construction of the trade union's rules to the committee, to the exclu-
sion of the courts."

Having now had the opportunity of reconsidering the language that I
used in that case, I must say that I can see no reason for resiling from it.  F
Before resorting to public policy, let the rules of the club or other body
be construed: and in the process of construction, the court will be
slow to conclude that natural justice has been excluded. Only if the
rules make it plain that natural justice was intended to be disregarded will
it be necessary for the courts to resolve the issue of public policy. In this
case, accordingly, I approach both clause 8 (2) of the Labour Party  G
constitution and the resolution of the N.E.C. dated April 24, 1968, as
provisions requiring to be construed strictly, and as not excluding the
processes of natural justice except in so far as this is made plain. Nothing
that I can see in clause 8 (2) even begins to exclude the process of natural
justice. The phrase " to take any action it deems necessary " cannot, in
my judgment, be read as if it continued " however contrary to natural  H
justice it may be "; nor, in my judgment, are the words " disaffiliation,"
" expulsion " or even " or otherwise " to be qualified in any such way.
These things may be done: but they must be done fairly and justly, and

A  not unfairly or unjustly. Accordingly, the first resolution, suspending the
activities of the Pembroke Constituency Labour Party and depriving the
officers of the right for the time being to handle the funds of the party,
falls to be tested by the standard of whether it was made in accordance
with the rules of natural justice. Whatever may be said about the right
to an unbiased tribunal, the process of giving notice of the charges and
giving those concerned the right to be heard in answer to the charges was
B  plainly not followed. Accordingly, in my judgment the resolution was a
nullity. It was effective neither to suspend the activities of the Pembroke
Constituency Labour Party nor to deprive the officers of that party of
their right to handle the funds.

The two limbs of the second resolution, though directed to the same
end, are markedly different in function. The first is an operative decision
that the Pembroke Constituency Labour Party be " re-organised." The
C  second provides that the national agent be " given authority " to take
such steps as are necessary to " complete the re-organisation," and so
confers authority on another to take certain steps. Both are very wide
and indefinite in their terms, depending on the protean word " re-organise."
Plainly there is considerable scope for argument about what that word
means. But whatever it means, I do not think it can be said to include a
D  process which excludes from the benefits of membership, without making
a charge and without affording a hearing, anyone who fails to sign and
return within a reasonable time the form put forward in this case.

Mr. Sparrow did contend that sending out the form amounted to
affording the members an opportunity of being heard: but not even his
considerable powers of advocacy sufficed to give any life to as barren a
contention as I have heard. I cannot believe that the concept of " Write
E  a letter in the form I dictate, or you are out " would seriously be regarded
by any of the great judges who have spoken on the subject as making
even an approach to conformity with the requirements of natural justice:
and the prospects of this are not increased by the words " or you are
out " not being there but being represented only by the hint to be derived
from the reference to " making any recommendation to the National
F  Executive Committee about your continued membership of the party."

These are not days of linguistic accuracy. Euphemisms abound; and as
I said on a completely different subject in *Pet Library (London) Ltd.* v.
*Walter Ellson & Son Ltd.* [1968] F.S.R. 359, 361, today

"many words of precision are being weakened by misapplication,
sometimes for convenience but more often by ignorance: words such as
G  'alibi' and 'disinterested' spring readily to mind. There are also
words which are persistently misused; thus even in circles of high
respectability (and I look with sorrow at Vol. 29 of *Halsbury's Laws of
England* (3rd ed.) (1960), p. 646), the word 'escapees' is sometimes
applied to the fugitive prisoners rather than the governor and prison
officers that they left behind them."

H  Nevertheless, after making all due allowance for an age of semantic laxity
I do not think the word " re-organise " can be held to comprehend a process
which in substance amounts to expulsion without a charge and without an
opportunity to meet it. The more indefinite the language, the less apt it is

to exclude the members' reasonable expectation of being accorded natural justice.                                                                                    A

I also bear in mind the rule that, in general, a failure to give due notice of a meeting to even one member of a body who is entitled to attend invalidates the decisions of that body: see, for example, *Smyth* v. *Darley* (1849) 2 H.L.Cas. 789, concerning the election of an officer, and *Young* v. *Ladies' Imperial Club Ltd*. [1920] 2 K.B. 523 where an expulsion was in issue. Here, no notice of the second meeting was given to a number    B
of the members of the local Labour Party; and it is clear that this was due not to inadvertence or accident but to deliberation. It follows that the meeting was not validly constituted, and so its proceedings were void. In the words of Lord Campbell L.C. in *Smyth* v. *Darley,* at p. 803, " even a unanimous election by those who did attend would be void."

It may be that there are some who would decry the importance which    C
the courts attach to the observance of the rules of natural justice. " When something is obvious," they may say, " why force everybody to go through the tiresome waste of time involved in framing charges and giving an opportunity to be heard? The result is obvious from the start." Those who take this view do not, I think, do themselves justice. As everybody who has anything to do with the law well knows, the path of the law is strewn with examples of open and shut cases which, somehow, were not;    D
of unanswerable charges which, in the event, were completely answered; of inexplicable conduct which was fully explained; of fixed and unalterable determinations that, by discussion, suffered a change. Nor are those with any knowledge of human nature who pause to think for a moment likely to underestimate the feelings of resentment of those who find that a decision against them has been made without their being afforded any opportunity to influence the course of events.                                              E

Let me add this. What was done was, in my judgment, wrong; but there is nothing before me to suggest that it was consciously wrong. I do not for one moment say that the N.E.C. deliberately or knowingly resolved to ignore the rules of natural justice. There is no evidence before me on the point, but it may very well be that the thought never entered the minds of the members of that committee. I am content to assume that the    F
process of " getting round all problems relating to expulsion " was not the object of the committee, but merely the contention of the advocate seeking, quite properly, to make the best that he could of what had been done. Nevertheless, however innocent the committee, what was done was wrong. It follows that, subject to any argument that there may be about the precise terms of the order, the plaintiffs are entitled to the injunctions sought by the notice of motion.                                                         G

Before I turn to action No. 3, I ought to mention certain technical objections taken by Mr. Sparrow in action No. 2. He contended that on the writ and notice of motion as drafted it was not competent for the plaintiffs, being merely two of the members of the local Labour Party, to sue or move by themselves without joining all the members of the party on one side or the other. In view of what I have said earlier in this judgment, I do not    H
think that is right: and Mr. Sparrow cited no authority to carry the point. No doubt, as in *Harrison* v. *Abergavenny (Marquis of)* (1887) 3 T.L.R. 324, it is possible for such an action to be brought in this way: and there

A  are manifest advantages in proceedings which are so constituted that they will bind all concerned. But that does not mean that an action cannot be brought in the other way. Mr. Sparrow said that *Harington* v. *Sendall* [1903] 1 Ch. 921 ought to have been a representative action, and that it was not clear whether or not it had been. I have now looked at the reports of the case in the other series of reports (72 L.J.Ch. 396; 88 L.T. 323; 51 W.R. 463; and 19 T.L.R. 302), and I have found nothing to suggest that

B  it was a representative action. Indeed, such indications as there are point to it not being such an action. What sufficed for Joyce J. and the distinguished counsel engaged in that case suffices for me. I hold the action and the motion to be perfectly competent.

Mr. Sparrow also contended that as the plaintiffs had set up no constitution of the local Labour Party, and the proceedings concerned the constitution, the action failed: and if the local Labour Party lacked any known

C  rules, the local Labour Party should be wound up, a receiver appointed, and the funds distributed as bona vacantia. I will say no more than that I reject these contentions, so far as they arise for decision on this motion. Furthermore, basing himself on *General Billposting Co. Ltd.* v. *Atkinson* [1909] A.C. 118, 122, Mr. Sparrow also contended that the plaintiffs had disentitled themselves to an injunction by acting in breach of

D  their contract and seeking to defy the Labour Party. If this principle were to apply to cases of expulsion and suspension, it would mean that the very breach which gave rise to the expulsion or suspension might disable the member concerned from complaining of any lack of natural justice in the process: and that cannot be right. In any case, I do not think the mere failure to answer the national agent's letter can invoke the principle.

Finally, there is action No. 3. This may briefly be described, in broad

E  terms, as action No. 1 in reverse, and up-to-date. As I have already mentioned, the writ was issued on July 5, 1968, by which time all three meetings had taken place. The third meeting purported to be a meeting of P.D.L.P., attended by delegates from the Haverfordwest Local Labour Party elected at the second meeting, and by delegates from other local Labour Parties elected at meetings convened by the N.E.C. and elected in a similar manner.

F  The plaintiffs [Mr. Rees and Mr. Cleare] are two of the three defendants in action No. 1: and the defendant, Mr. John, is the plaintiff in action No. 1. The writ claims a declaration and an injunction which I need not read; and the notice of motion, given on the day the writ was issued, claims an injunction

G      " to restrain the defendant in his purported capacity as an officer of the Pembrokeshire Constituency, until judgment in this action or further order (whether by himself his servants or agents or otherwise howsoever) from doing or purporting to do or being party to any of the following things namely collecting expending remitting transferring or otherwise dealing with any moneys or other property belonging to or held for the purpose of the Pembrokeshire Constituency Local Labour Party."

H  The omission of " Labour Party " after the first mention of " Constituency," and the use of the word " Local " are, I think, mere slips.

Mr. Sparrow frankly accepted that the third meeting was bad if (as I

have already held) the second meeting was bad: and it follows that the
acts of the third meeting were ineffective to elect officers of P.D.L.P.   A
Those attending the third meeting purported to elect Mr. John president
of P.D.L.P.; and it follows from the invalidity of that meeting that the
election was void.  I have already held that as a result of the first meeting,
Mr. Cleare, who is the second defendant in the first action and the second
plaintiff in the third, had become president of P.D.L.P. in place of Mr.
John; and as it is not alleged that Mr. John holds any other office in   B
P.D.L.P., it seems plain that Mr. John holds no office which would entitle
him to deal with the property of P.D.L.P.  Accordingly, subject to
what I am about to say, the injunctions sought by the notice of motion in
the third action, restraining him " in his purported capacity as an officer "
of P.D.L.P. from dealing with that property, ought to be granted.  I should
add that Mr. Sparrow's contentions on procedural and other points meet
the same fate here as in action No. 2.                                   C

   Whether an injunction should in fact be granted is a matter for con-
sideration.  There is no suggestion of any wilful wrongdoing by the defend-
ant.  I am in the sphere of honest disagreement on matters which I readily
confess I have not found altogether easy.  I think, however, that
there is an important difference between this case and the plaintiff's motion
in action No. 1, where, it may be remembered, I refused to grant an   D
injunction.  There, I held that the defendants were validly in office, and
I refused the injunction because I would not assume that in exercising
their offices they would act in disregard of this judgment.  Here, the
defendant is not in office at all, and so has no title to the property of
P.D.L.P.  But if the defendant, who is a man of some standing in his
community, offered an undertaking to the court in the terms of paragraph
1 of the notice of motion, then subject to anything that counsel have to   E
say and to details of drafting, I would be disposed to accept it in lieu of
any injunction.

   That, I think, disposes of the motions, subject to the point that I have
just mentioned.  But I cannot part from the case without expressing my
indebtedness to counsel for their careful and thorough submissions, and
particularly for the way in which they performed the feat of segregating   F
the issues and their submissions in what for all has been a prolonged
embarras de richesse.  Any clarity in this judgment is largely due to their
efforts; and, let me add, if it is found to be prolix or obscure, most
assuredly the fault is not theirs.


   October 18, 1968.                                                     G
   *A. C. Sparrow Q.C.*  The relief to be granted as the result of a judg-
ment is always a matter for consideration; here it would be wrong to deny
to the plaintiff in the first action the injunction which he seeks.  The
action was brought to restrain unconstitutional conduct by the defendants,
who right up until judgment continued to maintain that their conduct was
not unconstitutional.
                                                                         H
   *David Hirst Q.C.*  This must be a matter for the Court of Appeal.
Judgment has been given and the matter fully dealt with.

   [MEGARRY J. *In re Harrison's Share Under a Settlement* [1955] Ch.

A  260 shows that a judgment can be re-considered at any time before it has been entered.]

A. C. Sparrow Q.C. The defendants alleged that they were fully entitled to disaffiliate. There was no agreement between the parties to come to court to have an issue determined on the basis that there was a reasonable doubt about the issue. The defendants sought to have the plaintiff's writ struck out, and contended that it was a " bogus " pro-

B  ceeding. They were clearly wrongdoers, who were threatening to continue their wrongdoing. Their plan was to disaffiliate so that P.D.L.P. could continue to support Mr. Donnelly—a man who had been expelled from the Labour Party—as their candidate at the next election, in contravention of the Labour Party's rules. They knew that such a purpose was unlawful, as the court has held. They have issued new membership cards and reduced the subscription from 2s. 6d. to 1s. a year, and that affects the

C  Labour Party's funds. The plaintiff in the first action is therefore entitled to the injunction he seeks in its full terms. See *Snell on Equity*, 26th ed. (1966), pp. 702, 703, and *Kerr on Injunctions*, 6th ed. (1927), pp. 16, 31 and 665. There is no reason why the defendants should be treated differently from ordinary litigants. There is nothing to show that they are more law abiding than the average litigant. The fact that they are

D  officers of P.D.L.P. is nihil ad rem. See *Wolfe* v. *Mathews* (1882) 21 Ch.D. 194. If the defendants wish to offer undertakings in lieu of injunction, that is a matter for them. It would be contrary to precedent to refuse the plaintiff the injunction sought.

A possible alternative would be to grant an interim declaration for which there is a precedent. [See *International General Electric Co. of New York Ltd.* v. *Commissioners of Customs and Excise* [1962] Ch.

E  784.]

In the second and third actions the defendants did not, as the defendants to the first have done, set out on a course which they knew to be wrong, and their conduct is therefore more excusable. That is the only distinction. It is irrelevant that in the first action the defendants have been held to be " officers," whereas in the second they have not. The

F  relevant question in each case is whether their conduct was unlawful.

It has been overlooked that two of the defendants in the second action are in fact lawfully appointed officers, having been properly appointed at a previous lawful meeting of the Haverfordwest Local Labour Party in March 1968. If it be right to refuse an injunction in the first action, which is disputed, it would be equally right to refuse injunctions in the other two actions. In any case if an injunction is granted in the second

G  action it should not operate against the two lawfully appointed officers.

David Hirst Q.C. The defendants in the first action are not prepared to offer any undertakings. Yesterday a long reserved judgment was delivered, after much argument over many days, in the course of which every conceivable point had been canvassed. Of course the court has the power to review its decision at any time before the judgment is finally entered up, but

H  *Harrison's* case [1955] Ch. 260 was the quite exceptional case where a House of Lords decision to a contrary effect had not been cited to the court. Here no new facts have been produced, but the court is asked to reconsider its considered judgment. The plaintiff in the first action could

only be entitled to an injunction if he established that the defendants mean    A
to act unlawfully or unconstitutionally, with the party's funds. The question
is not whether they are politically disloyal, but whether they intend to
act unlawfully in regard to the Party's funds, and of that there is no
evidence that they do so intend. The result of granting an injunction as
sought would be to prevent lawfully elected officers from dealing law-
fully with the Party's funds, and that just cannot be right.

In both the second and the third actions injunctions are necessary to    B
restrain persons who are not officers of the respective parties, but who
purport so to be, from dealing with the funds. It must be conceded that
the first and fifth defendants in the second action (Mr. Davis and Mrs.
James) were lawfully appointed at the meeting in March 1968, and therefore
that the injunction should not operate against them. In the third action,
however, it has been held that Mr. John was not validly in office and    C
therefore the injunction against him should be granted.

*A. C. Sparrow Q.C.* in reply. The substantive and adjectival parts of a
judgment are frequently dealt with separately. It is only the latter part,
relating to questions of relief, which the court is asked to reconsider. If an
appeal were contemplated the Court of Appeal would want to know whether
the matters complained of had been raised before the judge of first instance.
The defendants to the first action have acted unconstitutionally with regard to    D
subscriptions to the Labour Party. They plan to divert P.D.L.P. onto a
course of unconstitutional action in support of Mr. Donnelly, in his uncon-
stitutional action. There is, therefore, a clear threat to the Labour Party's
funds, and a total injunction should be granted because there is no practical
method of drawing a line of distinction between conduct which is
constitutional and that which is not.

E

MEGARRY J.: Mr. Sparrow has addressed me at some length this
morning, mainly on action No. 1, but also on Nos. 2 and 3. His
principal contention is that in action No. 1 I ought to grant an injunc-
tion in the terms of the notice of motion unless the defendants offer
an undertaking either in the terms of the notice of motion, or else in a
more limited form, restraining what, for brevity, may be termed uncon-    F
stitutional dealings with the assets of P.D.L.P. He made it perfectly plain,
however, that he was not seeking any injunction in a limited form: indeed,
he proclaimed his inability to frame such an injunction. The only injunc-
tion he sought was in the form of the notice of motion.

Mr. Hirst declined to proffer any undertaking, and so the only question
is whether or not an injunction in the terms of the notice of motion should
be granted. Such an injunction would restrain the lawfully elected officers    G
of P.D.L.P. from dealing in any way, lawful or unlawful, with the assets
of P.D.L.P. The choice therefore lies between leaving them unrestrained,
but liable to account in due course for any unlawful action, or else totally
restraining them from even entirely lawful and proper dealings. Mr.
Sparrow referred at length both to the evidence and to authorities, but
he said nothing which makes me resile from what I said in my judgment;    H
and in deciding whether to grant or refuse an interim injunction in these
terms, the balance of advantage and convenience still seems to me to lie
with refusing it. I do not think that it would be right to make it impossible

**A**  for the proper officers of P.D.L.P. to deal properly and lawfully with the assets of P.D.L.P. Accordingly, the injunction prayed must be refused. I should mention that at the end of his contentions today Mr. Sparrow did add a somewhat muted submission that under the prayer for further or other relief I could instead grant a limited injunction: but as he again made no suggestion as to the terms of such an injunction, and again asserted his inability to frame it, I do not think that it is for me to do what

**B**  he cannot.

As regards actions Nos. 2 and 3, Mr. Sparrow says that these should march with No. 1: there should either be injunctions in all three cases, or undertakings in all three, or nothing in all three. He contended that the distinction made in my judgment between those who were and those who were not officers of the party had no validity: but I disagree. In action No. 1, where no undertakings were offered, I have held that no

**C**  injunction should be granted in the terms sought. In actions Nos. 2 and 3, Mr. Sparrow offers undertakings in lieu of injunctions, and Mr. Hirst is content to accept these. It seems to me to be entirely proper that undertakings should be given, and on the footing that the undertakings will be substantially in terms of the notices of motion, no injunction will be granted. However, as Mr. Sparrow helpfully pointed out (and Mr.

**D**  Hirst accepted) the first and the fifth defendants in action No. 2 should be excluded from these undertakings, as on any footing they are still officers and delegates of the Haverfordwest Local Labour Party.

**E**
*Both motions in the first action dismissed; undertakings by the second, third and fourth defendants in the second action and by the defendant in the third action in the terms of the injunctions sought by the notices of motion in those actions having been offered and accepted, no orders for injunctions in those actions.*

**F**

Solicitors: *Goodman, Derrick & Co.; Theodore Goddard & Co.*

T. C. C. B.

**G**

**H**

A that at the time any crimes were being committed in that part of Vancouver, which is not perhaps surprising. *Bastable* v. *Little* [1907] 1 K.B. 59 was cited to the court, but Mr. Westlie was convicted.

The appeal will be allowed and the matter remitted to the Crown Court to continue the hearing.

> *Appeal allowed.*
> *Prosecution costs out of central funds.*
> *Certificate that point of law of general public importance involved, namely: " Whether an act which prevents the commission of an offence which a police officer suspects may be committed can be an act of obstruction of a police constable in the execution of his duty when that duty is to keep observation with a view to detecting and obtaining evidence of that future offence if committed."*
> *Leave to appeal refused.*

Solicitors: *Director of Public Prosecutions; Derek James & Vaux, Newport, Gwent.*

December 10, 1981. The Appeal Committee of the House of Lords dismissed a petition by the defendant for leave to appeal.

[Reported by Isobel Collins, Barrister-at-Law]

---

F

[COURT OF APPEAL]

## REGINA *v.* GHOSH

1982  March 15;      Lord Lane C.J., Lloyd and
  April 5          Eastham JJ.

*Crime—Theft—Obtaining property by deception—Surgeon falsely claiming fees for surgical operations—Belief that consultancy fees due—Whether acting " dishonestly "—Whether test subjective—Theft Act 1968 (c. 60), ss. 1 (1), 15 (1), 22 (2)*

The appellant, while a surgeon acting as a locum tenens consultant at a hospital, claimed fees for carrying out operations or fees payable for an anaesthetist in circumstances where either another surgeon had performed the operation or the operation had been carried out under the National Health Service. He was tried on an indictment containing one count alleging that he had attempted to procure the execution of a

Reg. v. Ghosh (C.A.) **[1982]**

valuable security by deception, contrary to section 20 (2) of
the Theft Act 1968, and three counts alleging that he had **A**
obtained or attempted to obtain money by deception, contrary
to section 15 (1) of the Act. The appellant denied that he
had been dishonest and stated that the sums were legitimately
payable to him for consultation fees. The judge directed the
jury that it was for them to decide whether the appellant had
been dishonest by applying contemporary standards of honesty
and dishonesty in the context of all that they had heard in
the case. The jury found the appellant guilty on all four counts. **B**
    On appeal against conviction: —
    *Held,* dismissing the appeal, that " dishonestly " in section
1 of the Theft Act 1968 described the state of mind and not
the conduct of the person accused and, therefore, the test of
dishonesty was subjective but the standard of honesty to be
applied was the standard of reasonable and honest men and
not that of the accused; that, accordingly, the jury, in deter- **C**
mining whether the appellant had acted dishonestly for the
purposes of sections 15 (1) and 20 (2) of the Act, should have
first considered whether the appellant had acted dishonestly by
the standards of ordinary and honest people and, if they found
that he had, then they had to consider whether the appellant
himself must have realised that what he was doing was by those
standards dishonest; and that, since on the jury's finding they
would have convicted the appellant on such a direction, it was **D**
a proper case for applying the proviso to section 2 (1) of the
Criminal Appeal Act 1968 (post, pp. 1063E–F, H—1064B, D–E,
H—1065B).
    Dictum in *Reg.* v. *McIvor* [1982] 1 W.L.R. 409, 415, C.A.
disapproved.
    *Reg.* v. *Scott* [1975] A.C. 819, H.L.(E.) and *Reg.* v. *Landy*
[1981] 1 W.L.R. 355, C.A. considered.
    *Reg.* v. *Feely* [1973] Q.B. 530, C.A. explained. **E**

The following cases are referred to in the judgment:

*Boggeln* v. *Williams* [1978] 1 W.L.R. 873; [1978] 2 All E.R. 1061, D.C.
*Reg.* v. *Feely* [1973] Q.B. 530; [1973] 2 W.L.R. 201; [1973] 1 All E.R. 341,
    C.A.
*Reg.* v. *Gilks* [1972] 1 W.L.R. 1341; [1972] 3 All E.R. 280, C.A. **F**
*Reg.* v. *Greenstein* [1975] 1 W.L.R. 1353; [1976] 1 All E.R. 1, C.A.
*Reg.* v. *Landy* [1981] 1 W.L.R. 355; [1981] 1 All E.R. 1172, C.A.
*Reg.* v. *McIvor* [1982] 1 W.L.R. 409; [1982] 1 All E.R. 491, C.A.
*Reg.* v. *Royle* [1971] 1 W.L.R. 1764; [1971] 1 All E.R. 1359, C.A.
*Reg.* v. *Scott* [1975] A.C. 819; [1974] 3 W.L.R. 741; [1974] 3 All E.R.
    1032, H.L.(E.).
*Reg.* v. *Waterfall* [1970] 1 Q.B. 148; [1969] 3 W.L.R. 947; [1969] 3 All E.R. **G**
    1048, C.A.

No additional cases were cited in argument.

APPEAL against conviction.
    The appellant, Deb Baran Ghosh, was at all material times a surgeon **H**
acting as a locum tenens consultant at a hospital. On April 29, 1981, the
appellant was convicted at St. Albans Crown Court (Judge Anwyl-Davies
Q.C.) of attempting to procure the execution of a valuable security by

**1 Q.B.**                     Reg. v. Ghosh (C.A.)

A  deception contrary to section 20 (2) of the Theft Act 1968, attempting to obtain property by deception, and two counts of obtaining property by deception contrary to section 15 (1) of the Theft Act 1968. The appellant was fined a total of £1,000, with three months' imprisonment in default of payment. He appealed against conviction on the ground, inter alia, that the judge erred in directing the jury as to the test of dishonesty.

The facts are stated in the judgment of the court.

B
*Robert Francis* for the appellant. The judge in the court below had failed to direct the jury that under section 15 (4) of the Theft Act 1968 deception should be intentional or reckless. If there is an implied representation the jury must be directed as to the need for intention. On the facts of count one of the present case, the appellant had simply said that there had been complications and that was a possible unintentional mis-

C  representation. The issue of whether he had intended to misrepresent the position was one for the jury. The jury must decide the defendant's state of mind as to intent. The judge had not asked the jury to see whether the misrepresentation was an intentional one. The judge gave dangerous examples of what the jury might consider dishonesty to be. He failed to direct that dishonesty was a matter of the mind of the

D  defendant. Juries ought to be directed that they should only convict of an offence of dishonesty if they are convinced the defendant believed he was acting dishonestly, or that they must look at the defendant's state of mind, and apply their own standards to the situation. One of these directions ought to have been given. The totally subjective approach has been criticised. But if the test is whether the defendant knew society at large would believe he was acting dishonestly then difficulties can be

E  overcome. The objective test means that if the defendant has a state of mind which would be seen by society as dishonest then dishonesty is made out, regardless of the defendant's state of mind. *Reg.* v. *Landy* [1981] 1 W.L.R. 355, illustrates the subjective approach. That case was distinguished in *Reg.* v. *McIvor* [1982] 1 W.L.R. 409. *Boggeln* v. *Williams* [1978] 1 W.L.R. 873 sets out the subjective test of dishonesty

F  at p. 740. *Reg.* v. *Landy* [1981] 1 W.L.R. 355 illustrates that dishonesty is an element of conspiracy to defraud.

*Reg.* v. *Landy* cannot be distinguished simply because it does not deal with the substantive offence. *Reg.* v. *McIvor* [1982] 1 W.L.R. 409 must be distinguished, because it deals with section 1 of the Theft Act 1968, or it must be overruled as wrong. The term " dishonestly " is one which relates to the mind of the defendant, and judges ought not to define the

G  term for jurors: see *Reg.* v. *Feely* [1973] Q.B. 530, which does not deal with whether the jury must simply look at the defendant and decide whether he was dishonest. *Reg.* v. *Feely* is not inconsistent with the submission that the prosecution must prove that the defendant believed he was acting dishonestly. One point of having a reference to dishonesty in section 15 is that there may be obtainings which are honest. It is proper

H  to direct a jury that the test of dishonesty is subjective: see *Reg.* v. *Waterfall* [1970] 1 Q.B. 148. This case deals with the honesty of the representation, not the obtaining. A jury should be told that in determining whether there had been dishonesty, they should determine whether the

1056

Reg. v. Ghosh (C.A.)                                   [1982]

defendant had an honest belief: see *Reg.* v. *Royle* [1971] 1 W.L.R. 1764.    A
*Reg.* v. *Landy* [1981] 1 W.L.R. 355 should be applied.

*John Drinkwater Q.C.* and *Anthony Glass* for the Crown.  *Reg.* v.
*Greenstein* [1975] 1 W.L.R. 1353 relates to an offence of obtaining by
deception.  Two tests of dishonesty were set out in that case, first, that of
dishonesty as a yardstick (the objective test); and secondly the test of belief
in the truth of the representation, namely the subjective test.  The objective
approach must be applied as a first step.  All the circumstances must be    B
looked at and it must be asked whether there is the smack of dishonesty.
If the answer is yes, one must go on to see what the defendant's state
of mind really was.  One must look at the general and then go on to
the particular.  The state of the defendant's mind is a factor to be
weighed.  *Reg.* v. *Feely* [1973] Q.B. 530 and *Reg.* v. *Landy* [1981] 1
W.L.R. 355 both applied the yardstick test.                                 C

In cases of conspiracy to defraud, the test of dishonesty must be
subjective, but there can be an objective element, namely, the jury looking
at general standards of honesty.

*Francis* in reply.  A subjective element is imported into the test of dis-
honesty: see *Reg.* v. *Gilks* [1972] 1 W.L.R. 1341.  One can use objective
indicators to discover a subjective state of mind.  The defendant must be
judged by what he understands the public's mores to be.                    D

                                                    *Cur. adv. vult.*

April 5.  LORD LANE C.J. read the following judgment of the court.
On April 29, 1981, before the Crown Court at St. Albans, this appellant
was convicted on four counts of an indictment laid under the Theft Act    E
1968: on count 1, attempting to procure the execution of a cheque by
deception; on count 2, attempting to obtain money by deception; on
counts 3 and 4, obtaining money by deception. Count 1 was laid under
section 20 (2) and the remainder under section 15 (1). He was fined
the sum of £250 on each count with a term of imprisonment to be served
in default of payment.

At all material times the appellant was a surgeon acting as a locum    F
tenens consultant at a hospital. The charges alleged that he had falsely
represented that he had himself carried out a surgical operation to termin-
ate pregnancy or that money was due to himself or an anaesthetist for
such an operation, when in fact the operation had been carried out by
someone else, and/or under the National Health Service provisions.

His defence was that there was no deception; that the sums paid to    G
him were due for consultation fees which were legitimately payable under
the regulations, or else were the balance of fees properly payable; in other
words that there was nothing dishonest about his behaviour on any of the
counts.

The effect of the jury's verdict was as follows: as to count 1, that the
appellant had falsely represented that he had carried out a surgical    H
operation and had intended dishonestly to obtain money thereby; that as
to count 2 he had falsely pretended that an operation had been carried
out under the National Health Service; that as to count 3 he had falsely

1 Q.B.                          Reg. v. Ghosh (C.A.)

A  pretended that money was due to an anaesthetist; and as to count 4 that
he had obtained money by falsely pretending that an operation had been
carried out on a fee-paying basis when in fact it had been conducted
under the terms of the National Health Service.

The grounds of appeal are simply that the judge misdirected the jury
as to the meaning of dishonesty. What the judge had to say on that topic
was as follows:

B      " Now, finally dishonesty. There are, sad to say, infinite categories of
dishonesty. It is for you. Jurors in the past and, whilst we have
criminal law in the future, jurors in the future have to set the
standards of honesty. Now it is your turn today, having heard what
you have, to consider contemporary standards of honesty and dis-
honesty in the context of all that you have heard. I cannot really
C      expand on this too much, but probably it is something rather like
getting something for nothing, sharp practice, manipulating systems
and many other matters which come to your mind."

The law on this branch of the Theft Act 1968 is in a complicated
state and we embark upon an examination of the authorities with great
diffidence. When *Reg.* v. *McIvor* [1982] 1 W.L.R. 409 came before the
D  Court of Appeal, there were two conflicting lines of authority. On the
one hand there were cases which decided that the test of dishonesty for
the purposes of the Theft Act 1968 is, what we venture to call, subjective
—that is to say the jury should be directed to look into the mind of the
defendant and determine whether he knew he was acting dishonestly:
see *Reg.* v. *Landy* [1981] 1 W.L.R. 355, where Lawton L.J. giving the
E  reserved judgment of the Court of Appeal said, at p. 365:

" An assertion by a defendant that throughout a transaction he acted
honestly does not have to be accepted but has to be weighed like
any other piece of evidence. If that was the defendant's state of mind,
or may have been, he is entitled to be acquitted. But if the jury,
applying their own notions of what is honest and what is not, conclude
that he could not have believed that he was acting honestly, then the
F      element of dishonesty will have been established. What a jury must
not do is to say to themselves: ' If we had been in his place we
would have known we were acting dishonestly so he must have known
he was '."

On the other hand there were cases which decided that the test of
G  dishonesty is objective.  Thus in *Reg.* v. *Greenstein* [1975] 1 W.L.R. 1353,
the judge had directed the jury, see p. 1359:

" . . . there is nothing illegal in stagging. The question you have to
decide and what this case is all about is whether these defendants,
or either of them, carried out their stagging operations in a dishonest
way. To that question you apply your own standards of dishonesty.
H      It is no good, you see, applying the standards of anyone accused of
dishonesty otherwise everybody accused of dishonesty, if he were to
be tested by his own standards, would be acquitted automatically,
you may think. The question is essentially the one for a jury to decide

and it is essentially one which the jury must decide by applying its       A
own standards."

The Court of Appeal, in a reserved judgment, approved that direction.

In *Reg.* v. *McIvor* [1982] 1 W.L.R. 409 the Court of Appeal sought
to reconcile these conflicting lines of authority. They did so on the basis
that the subjective test is appropriate where the charge is conspiracy to
defraud, but in the case of theft the test should be objective. We quote       B
the relevant passage in full, at p. 417:

> "It seems elementary, first, that where the charge is conspiracy to
> defraud the prosecution must prove actual dishonesty in the minds of
> the defendants in relation to the agreement concerned, and, secondly,
> that where the charge is an offence contrary to section 15 of the Theft
> Act 1968 the prosecution must prove that the defendant knew or was
> reckless regarding the representation concerned. The passage in my       C
> judgment in *Reg.* v. *Landy* [1981] 1 W.L.R. 355 to which we have
> referred should be read in relation to charges of conspiracy to defraud,
> and not in relation to charges of theft contrary to section 1 of the Theft
> Act 1968. Theft is in a different category from conspiracy to defraud,
> so that dishonesty can be established independently of the knowledge
> or belief of the defendant, subject to the special cases provided for in       D
> section 2 of the Act. Nevertheless, where a defendant has given
> evidence of his state of mind at the time of the alleged offence, the jury
> should be told to give that evidence such weight as they consider right,
> and they may also be directed that they should apply their own
> standards to the meaning of dishonesty."

The question we have to decide in the present case is, first, whether the       E
distinction suggested in *Reg.* v. *McIvor* is justifiable in theory, and
secondly, whether it is workable in practice.

In *Reg.* v. *Scott* [1975] A.C. 819, the House of Lords had to consider
whether deceit is a necessary element in the common law crime of conspiracy
to defraud. They held that it is not. It is sufficient for the Crown to prove
dishonesty. In the course of his speech Viscount Dilhorne traced the mean-
ing of the words "fraud," "fraudulently" and "defraud" in relation to       F
simple larceny, as well as the common law offence of conspiracy to defraud.
After referring to *Stephen, History of the Criminal Law of England* and
*East's Pleas of the Crown*, he continued, at pp. 836–837:

> "The Criminal Law Revision Committee in their Eighth Report on
> 'Theft and Related Offences' (1966) (Cmnd. 2977) in paragraph 33
> expressed the view that the important element of larceny, embezzle-       G
> ment and fraudulent conversion was 'undoubtedly the dishonest
> appropriation of another person's property'; in paragraph 35 that
> the words 'dishonestly appropriates' meant the same as 'fraudulently
> converts to his own use or benefit, or the use or benefit of any other
> person,' and in paragraph 39 that 'dishonestly' seemed to them a
> better word than 'fraudulently.'       H
>
> "Parliament endorsed these views in the Theft Act 1968, which by
> section 1 (1) defined theft as the dishonest appropriation of property
> belonging to another with the intention of permanently depriving

A    the other of it.   Section 17 of that Act replaces sections 82 and 83 of the Larceny Act 1861 and the Falsification of Accounts Act 1875.   The offences created by those sections and by that Act made it necessary to prove that there had been an ' intent to defraud.'   Section 17 of the Theft Act 1968 substitutes the words ' dishonestly with a view to *gain for himself or another or with intent to cause loss to another* ' for the words ' intent to defraud.'

B        " If ' fraudulently ' in relation to larceny meant ' dishonestly ' and ' intent to defraud ' in relation to falsification of accounts is equivalent to the words now contained in section 17 of the Theft Act 1968 which I have quoted, it would indeed be odd if ' defraud ' in the phrase ' conspiracy to defraud ' has a different meaning and means only a conspiracy which is to be carried out ·by deceit."

C    Later on in the same speech Viscount Dilhorne continued, at p. 839 :

      " As I have said, words take colour from the context in which they are used, but the words ' fraudulently ' and ' defraud ' must ordinarily have a very similar meaning. If, as I think, and as the Criminal Law Revision Committee appears to have thought, ' fraudulently ' means ' dishonestly,' then ' to defraud ' ordinarily means, in my opinion, to
D    deprive a person dishonestly of something which is his or of something to which he is or would or might but for the perpetration of the fraud be entitled."

      In *Reg.* v. *Scott* the House of Lords were only concerned with the question whether deceit is an essential ingredient in cases of conspiracy to defraud; and they held not.   As Lord Diplock said, at p. 841B,
E    " *Dishonesty of any kind is enough.*"   But there is nothing in *Reg.* v. *Scott* which supports the view that, so far as the element of dishonesty is concerned, " theft is in a different category from conspiracy to defraud." On the contrary the analogy drawn by Viscount Dilhorne between the two offences, and indeed the whole tenor of his speech, suggests the precise opposite.

F        Nor is there anything in *Reg.* v. *Landy* [1981] 1 W.L.R. 355 itself which justifies putting theft and conspiracy to defraud into different categories. Indeed the court went out of its way to stress that the test for dishonesty, whatever it might be, should be the same whether the offence charged be theft or conspiracy to defraud. This is clear from the reference to *Reg.* v. *Feely* [1973] Q.B. 530, which was a case under section 1 of the Theft Act 1968.   Having set out what we have for convenience
G    called the subjective test, the court in *Reg.* v. *Landy* [1981] 1 W.L.R. 355, 365, continue :

      " In our judgment this is the way *Reg.* v. *Feely* [1973] Q.B. 530 should be applied in cases where the issue of dishonesty arises. It is also the way in which the jury should have been directed in this case . . ."

H        In support of the distinction it is said that in conspiracy to defraud the question arises in relation to an agreement. But we cannot see that this makes any difference.   If A and B agree to deprive a person

dishonestly of his goods, they are guilty of conspiracy to defraud: see      A
*Reg.* v. *Scott* [1975] A.C. 819. If they dishonestly and with the necessary
intent deprive him of his goods, they are presumably guilty of theft. Why,
one asks respectfully, should the test be objective in the case of simple
theft, but subjective where they have agreed to commit a theft?

The difficulties do not stop there. The court in *Reg.* v. *McIvor* [1982]
1 W.L.R. 409 evidently regarded cases under section 15 of the Theft Act
1968 as being on the subjective side of the line, at any rate so far as proof of      B
deception is concerned. This was the way they sought to explain *Reg.* v.
*Greenstein* [1975] 1 W.L.R. 1353. In that case, after directing the jury in
the passage which we have already quoted, the judge continued, at p. 1360:

> " Now, in considering whether [the defendants] Green or Greenstein
> had or may have had an honest belief in the truth of their representa-
> tions . . . the test is a subjective one. That is to say, it is not what      C
> you would have believed in similar circumstances. It is what you think
> they believed and if you think that they, or either of them, had an
> honest belief to that effect, well then, of course, there would not be
> any dishonesty. On the other hand, if there is an absence of reason-
> able grounds for so believing, you might think that that points to the
> conclusion that they or either of them, as the case may be, had no
> genuine belief in the truth of their representations. In which case,      D
> applying your own standards, you may think that they acted dis-
> honestly and it would be for you to say whether it has been estab-
> lished by the prosecution that they had no such honest belief . . ."

The Court of Appeal in *Reg.* v. *Greenstein* appear to have approved that
passage. At any rate they expressed no disapproval. In *Reg.* v. *McIvor*
[1982] 1 W.L.R. 409 the court reconciled the two passages quoted from      E
the judge's summing up as follows, at p. 415:

> " It seems clear that those two passages are concerned with different
> points. The first, which follows and adopts the standards laid down
> in *Reg.* v. *Feely* [1973] Q.B. 530, is concerned with the element of
> dishonesty in section 15 offences. While the second is specifically
> concerned with the mental element in relation to the false representa-      F
> tion the subject matter of the charge. Clearly, if a defendant honestly
> believes that the representation made was true the prosecution cannot
> prove that he knew of, or was reckless as to, its falsity."

The difficulty with section 15 of the Theft Act 1968 is that dishonesty
comes in twice. If a person knows that he is not telling the truth he is
guilty of dishonesty. Indeed deliberate deception is one of the two most      G
obvious forms of dishonesty. One wonders therefore whether " dis-
honestly " in section 15 (1) adds anything, except in the case of reckless
deception. But assuming it does, there are two consequences of the
distinction drawn in *Reg.* v. *McIvor.* In the first place it would mean that
the legislation has gone further than its framers intended. For it is clear
from paragraphs 87–88 of the Criminal Law Revision Committee's Eighth      H
Report that " deception " was to replace " false pretence " in the old
section 32 (1) of the Larceny Act 1916, and " dishonestly " was to replace
" with intent to defraud." If the test of dishonesty in conspiracy to defraud

1 Q.B.                    Reg. v. Ghosh (C.A.)

A  cases is subjective, it is difficult to see how it could have been anything other than subjective in considering " intent to defraud." It follows that, if the distinction drawn in *Reg. v. McIvor* is correct, the Criminal Law Revision Committee were recommending an important change in the law by substituting " dishonestly " for " with intent to defraud "; for they were implicitly substituting an objective for a subjective test.

B  The second consequence is that in cases of deliberate deception the jury will have to be given two different tests of dishonesty to apply: the subjective test in relation to deception and the objective test in relation to obtaining. This is indeed what seems to have happened in *Reg. v. Greenstein* [1975] 1 W.L.R. 1353. We cannot regard this as satisfactory from a practical point of view. If it be sought to obviate the difficulty by making the test subjective in relation to both aspects of section 15, but objective in relation to section 1, then that would certainly be contrary to what was intended by the Criminal Law Revision Committee. For in paragraph 88 they say:

C
    " The provision in clause 12 (1) making a person guilty of criminal deception if he ' dishonestly obtains ' the property replaces the provision in 1916, section 32 (1) making a person guilty of obtaining by false pretences if he ' with intent to defraud, obtains ' the things there mentioned. The change will correspond to the change from ' fraudulently ' to ' dishonestly ' in the definition of stealing [contained in section 1]."

D

We feel, with the greatest respect, that in seeking to reconcile the two lines of authority in the way we have mentioned, the Court of Appeal in *Reg. v. McIvor* was seeking to reconcile the irreconcilable. It therefore

E  falls to us now either to choose between the two lines of authority or to propose some other solution.

In the current supplement to *Archbold Criminal Pleading Evidence & Practice*, 40th ed. (1979), paragraph 1460, the editors suggest that the observations on dishonesty by the Court of Appeal in *Reg. v. Landy* can be disregarded " in view of the wealth of authority to the contrary."

F  The matter, we feel, is not as simple as that.

In *Reg. v. Waterfall* [1970] 1 Q.B. 148, the defendant was charged under section 16 of the Theft Act 1968 with dishonestly obtaining a pecuniary advantage from a taxi driver. Lord Parker C.J., giving the judgment of the Court of Appeal, said, at pp. 150–151:

G
    " The sole question as it seems to me in this case revolves round the third ingredient, namely, whether what was done was done dishonestly. In regard to that the deputy recorder directed the jury in this way: ' If on reflection and deliberation you came to the conclusion that this defendant never did have any genuine belief that Mr. Tropp [the accountant] would pay the taxi fare, then you would be entitled to convict him. . . .' In other words, in that passage the deputy

H  recorder is telling the jury they had to consider what was in this particular defendant's mind: had he a genuine belief that the accountant would provide the money? That, as it seems to this court, is a perfectly proper direction subject to this, that it would be right to

tell the jury that they can use as a test, though not a conclusive test, whether there were any reasonable grounds for that belief. Unfortunately, however, just before the jury retired, in two passages the deputy recorder, as it seems to this court, was saying: you cannot hold that this man had a genuine belief unless he had reasonable grounds for that belief."

Lord Parker then sets out the passages in question and continues, at p. 151:

" the court is quite satisfied that those directions cannot be justified. The test here is a subjective test, whether the particular man had an honest belief, and of course whereas the absence of reasonable ground may point strongly to the fact that that belief is not genuine, it is at the end of the day for the jury to say whether or not in the case of this particular man he did have that genuine belief."

That decision was criticised by academic writers. But it was followed shortly afterwards in *Reg.* v. *Royle* [1971] 1 W.L.R. 1764, another case under section 16 of the Theft Act 1968. Edmund Davies L.J., giving the judgment of the court, said, at p. 1769:

" The charges being that debts had been dishonestly ' evaded ' by deception, contrary to section 16 (2) (*a*), it was incumbent on the commissioner to direct the jury on the fundamental ingredient of dishonesty. In accordance with *Reg.* v. *Waterfall* [1970] 1 Q.B. 148, they should have been told that the test is whether the accused had an honest belief and that, whereas the absence of reasonable ground might point strongly to the conclusion that he entertained no genuine belief in the truth of his representation, it was for them to say whether or not it had been established that the appellant had no such genuine belief."

It is to be noted that the court in that case treated the " fundamental ingredient of dishonesty " as being the same as whether the defendant had a genuine belief in the truth of the representation.

In *Reg.* v. *Gilks* [1972] 1 W.L.R. 1341, which was decided by the Court of Appeal the following year, the appellant had been convicted of theft contrary to section 1 of the Theft Act 1968. The facts were that he had been overpaid by a bookmaker. He knew that the bookmaker had made a mistake, and that he was not entitled to the money. But he kept it. The case for the defence was that " bookmakers are a race apart." It would be dishonest if your grocer gave you too much change and you kept it, knowing that he had made a mistake. But it was not dishonest in the case of a bookmaker.  The judge directed the jury, at p. 1345:

" Well, it is a matter for you to consider, members of the jury, but try and place yourselves in that man's position at that time and answer the question whether in your view he thought he was acting honestly or dishonestly."

Cairns L.J. giving the judgment of the Court of Appeal held that that was, in the circumstances of the case, a proper and sufficient direction on the matter of dishonesty. He continued, at p. 1345:

1 Q.B.                        Reg. v. Ghosh (C.A.)

A       " On the face of it the defendant's conduct was dishonest: the only
        possible basis on which the jury could find that the prosecution had
        not established dishonesty would be if they thought it possible that
        the defendant did have the belief which he claimed to have."

A little later *Reg.* v. *Feely* [1973] Q.B. 530 came before a court of five
judges. The case is often treated as having laid down an objective test of
dishonesty for the purpose of section 1 of the Theft Act 1968. But what it
B   actually decided was (i) that it is for the jury to determine whether the
defendant acted dishonestly and not for the judge, (ii) that the word
" dishonestly " can only relate to the defendant's own state of mind, and
(iii) that it is unnecessary and undesirable for judges to define what is
meant by " dishonestly."

It is true that the court said, at pp. 537–538:
C
        " Jurors, when deciding whether an appropriation was dishonest, can
        be reasonably expected to, and should, apply the current standards of
        ordinary decent people."

It is that sentence which is usually taken as laying down the objective test.
But the passage goes on:

D       " In their own lives they have to decide what is and what is not dis-
        honest. We can see no reason why, when in a jury box, they should
        require the help of a judge to tell them what amounts to dishonesty."

The sentence requiring the jury to apply current standards leads up to the
prohibition on judges from applying *their* standards. That is the context in
which the sentence appears. It seems to be reading too much into that
E   sentence to treat it as authority for the view that " dishonesty can be
established independently of the knowledge or belief of the defendant." If
it could, then any reference to the state of mind of the defendant would be
beside the point.

This brings us to the heart of the problem. Is " dishonestly " in section
1 of the Theft Act 1968 intended to characterise a course of conduct? Or
F   is it intended to describe a state of mind? If the former, then we can well
understand that it could be established independently of the knowledge or
belief of the accused. But if, as we think, it is the latter, then the knowledge
and belief of the accused are at the root of the problem.

Take for example a man who comes from a country where public
transport is free. On his first day here he travels on a bus. He gets off
G   without paying. He never had any intention of paying. His mind is clearly
honest; but his conduct, judged objectively by what he has done, is dis-
honest. It seems to us that in using the word " dishonestly " in the Theft
Act 1968, Parliament cannot have intended to catch dishonest conduct in
that sense, that is to say conduct to which no moral obloquy could possibly
attach. This is sufficiently established by the partial definition in section 2
H   of the Theft Act itself. All the matters covered by section 2 (1) relate to the
belief of the accused. Section 2 (2) relates to his willingness to pay. A man's
belief and his willingness to pay are things which can only be established
subjectively. It is difficult to see how a partially subjective definition can

be made to work in harness with the test which in all other respects is      A
wholly objective.

If we are right that dishonesty is something in the mind of the accused
(what Professor Glanville Williams calls "a special mental state"), then if
the mind of the accused is honest, it cannot be deemed dishonest merely
because members of the jury would have regarded it as dishonest to
embark on that course of conduct.

So we would reject the simple uncomplicated approach that the test      B
is purely objective, however attractive from the practical point of view that
solution may be.

There remains the objection that to adopt a subjective test is to
abandon all standards but that of the accused himself, and to bring about a
state of affairs in which "Robin Hood would be no robber": *Reg.* v.
*Greenstein* [1975] 1 W.L.R. 1353. This objection misunderstands the      C
nature of the subjective test. It is no defence for a man to say "I knew
that what I was doing is generally regarded as dishonest; but I do not
regard it as dishonest myself. Therefore I am not guilty." What he is
however entitled to say is "I did not know that anybody would regard what
I was doing as dishonest." He may not be believed; just as he may not
be believed if he sets up "a claim of right" under section 2 (1) of the
Theft Act 1968, or asserts that he believed in the truth of a misrepresenta-      D
tion under section 15 of the Act of 1968. But if he *is* believed, or raises a
real doubt about the matter, the jury cannot be sure that he was dishonest.

In determining whether the prosecution has proved that the defendant
was acting dishonestly, a jury must first of all decide whether according to
the ordinary standards of reasonable and honest people what was done was
dishonest. If it was not dishonest by those standards, that is the end of the      E
matter and the prosecution fails.

If it was dishonest by those standards, then the jury must consider
whether the defendant himself must have realised that what he was doing
was by those standards dishonest. In most cases, where the actions are
obviously dishonest by ordinary standards, there will be no doubt about
it. It will be obvious that the defendant himself knew that he was acting
dishonestly. It is dishonest for a defendant to act in a way which he knows      F
ordinary people consider to be dishonest, even if he asserts or genuinely
believes that he is morally justified in acting as he did. For example, Robin
Hood or those ardent anti-vivisectionists who remove animals from
vivisection laboratories are acting dishonestly, even though they may
consider themselves to be morally justified in doing what they do, because
they know that ordinary people would consider these actions to be      G
dishonest.

Cases which might be described as borderline, such as *Boggeln* v.
*Williams* [1978] 1 W.L.R. 873, will depend upon the view taken by the jury
as to whether the defendant may have believed what he was doing was in
accordance with the ordinary man's idea of honesty. A jury might have
come to the conclusion that the defendant in that case was disobedient or      H
impudent, but not dishonest in what he did.

So far as the present case is concerned, it seems to us that once the
jury had rejected the defendant's account in respect of each count in the

1065

**1 Q.B.**                    Reg. v. Ghosh (C.A.)

A   indictment (as they plainly did), the finding of dishonesty was inevitable, whichever of the tests of dishonesty was applied. If the judge had asked the jury to determine whether the defendant might have believed that what he did was in accordance with the ordinary man's idea of honesty, there could have only been one answer—and that is no, once the jury had rejected the defendant's explanation of what happened.

B   In so far as there was a misdirection on the meaning of dishonesty, it is plainly a case for the application of the proviso to section 2 (1) of the Criminal Appeal Act 1968.

> *Appeal dismissed.*
> *Prosecution's costs out of central funds.*

C   Solicitor: *Director of Public Prosecutions.*

[Reported by Egon Cossou, Esq., Barrister-at-Law]

D

[COURT OF APPEAL]

## CAMPBELL v. TAMESIDE METROPOLITAN BOROUGH COUNCIL

[1981 C. No. 3815]

E
1982   March 26;                            Lord Denning M.R., Ackner
       April 29                                   and O'Connor L.JJ.

*Practice — Discovery — Privilege — Confidentiality — Educational and psychologist's records—Child's violent attack on teacher —Teacher's personal injury claim against education authority —Whether confidentiality of records including psychologist's report to be preserved—Interests of justice in weighing balance of interest—Administration of Justice Act 1970 (c. 31), s. 31*

The prospective plaintiff, a schoolteacher employed by the defendant education authority, was violently assaulted by an 11-year-old boy in her classroom and suffered severe injuries. Before commencing proceedings against the defendants, the plaintiff applied for an order under section 31 of the Administration of Justice Act 1970 [1] and R.S.C., Ord. 24, r. 7A, for disclosure of all documents in their possession relating to the

[1] Administration of Justice Act 1970, s. 31: "On the application, in accordance with rules of court, of a person who appears to the High Court to be likely to be a party to subsequent proceedings in that court in which a claim in respect of personal injuries . . . is likely to be made, the High Court shall . . . have power to order a person who appears to the court to be likely to be a party to the proceedings and to be likely to have or to have had in his possession, custody or power any documents which are relevant to an issue arising or likely to arise out of that claim— (a) to disclose whether those documents are in his possession, custody or power; and (b) to produce to the applicant such of those documents as are in his possession, custody or power."

Case No: HC03C04185

**Neutral Citation Number: [2005] EWHC 2192 (Ch)**
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Friday, 14th October 2005

**Before** :

**MR JUSTICE LINDSAY**
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Between :**

| | |
|---|---|
| **GEOFFREY RUTHERFORD WEIR and Others** | **Claimants** |
| – and – | |
| **(1)  THE SECRETARY OF STATE FOR            TRANSPORT** | **Defendants** |
| **(2)   THE DEPARTMENT FOR**× | |
| **TRANSPORT**× × × × | |

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Mr Keith Rowley Q.C. and Mr Mark West** (instructed by **Edwin Coe**) for the Claimants
**Mr Jonathan Sumption Q.C. and Mr Pushpinder Saini** (instructed by **Clyde & Co.**) for
the Defendants

Hearing dates: 27th June 2005 – 1st July 2005, 4th July 2005 - 8th July 2005, 11th July 2005 -
15th July 2005, 20th July 2005 and 21st July 2005
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of
this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE LINDSAY

**Mr Justice Lindsay :**

## A.  Introduction

1.      The infrastructure of our railways is now owned by Network Rail Ltd., a company
limited by guarantee (a "CLG"), formed, after a good deal of thought, in a shape and
with a membership determined by the government.  It was not always so; the
infrastructure had immediately previously been owned by Railtrack plc ("Railtrack")
a wholly owned subsidiary of Railtrack Group plc ("Group"), a company at the
relevant time listed on the London Stock Exchange.  In this action some 48,105
individuals, all shareholders in or representatives of shareholders in Group as at 7th
October 2001, raise two types of claims broadly connected with that movement of
assets and business away from Railtrack.

2.      The first of the claims is in tort.  The tort alleged is that of misfeasance in public
office.  The claim is that the Secretary of State for Transport, Local Government and
the Regions at the time, the Rt. Hon. Mr Stephen Byers M.P., acted with what is
called "targeted malice" against the shareholders in Group, including the Claimants.
I shall return to the subject of "targeted malice".  It is a serious form of dishonesty
for a public officer, such as Mr Byers then was, to act with such malice.  It is a form
of abuse of office.  If Mr Byers did so act (and he denies that he did) then it is
accepted by the Defendants, the present Secretary of State for Transport and the
Department of Transport, that they will be accountable on his behalf.  I shall use the
term "the Department" to cover whichever of the earlier DTLR or the later DoT is
appropriate.

        No one but Mr Byers is accused of the misfeasance alleged.   This claim in tort thus
needs to be chiefly concerned with *why* Mr Byers acted as he did, with particular
regard to his state of mind in that regard between July 2001 and 7th October 2001
when Railtrack was, by Order of the Court, put into administration.

3.      The second head of claim is very different.  It derives from the Human Rights Act
1998.  Under that Act (the "HRA"), in conjunction with the European Convention on
Human Rights, persons are entitled to peaceful enjoyment of their possessions.
Under this head of claim the Claimants say that peaceful enjoyment of their shares in
Group was, without due compensation, denied them by the government.  The chief
concern here has been whether the Claimants have the proper status to mount this
type of claim.

## B.  The Scheme of this Judgment

4.      I shall begin with a general section, which will include a setting of the scene for both
the tort and HRA claims.  I shall, within that heading, comment on such witnesses as
I can without having to descend into detail, leaving others to later.

5.    I shall then turn to the claim in tort, first going to the law on misfeasance in public office and I shall follow that with what I fear will be a very lengthy section representing a detailed chronology from even before the Hatfield rail–crash in October 2001 down to the launch of these proceedings in 2003.  It is the Claimants' case, ably presented by Mr Rowley Q.C. and Mr West, that one can *infer* from the events in the chronology, properly examined, that Mr Byers did act with targeted malice against the shareholders in Group.

      Mr Sumption Q.C. and Mr Saini, who appear for the Defendants, say that Mr Rowley's careful analysis of the unfolding chronology (with which, in any event, they disagree) all goes to the irrelevant question (they say) of *when*  Mr Byers acted as he did rather than *why* .  There is a good deal of force in that objection but Mr Rowley says in answer that a detailed look at the chronology will disclose firstly, as he puts it, that Mr Byers had something to hide and, secondly, that what it was that he was hiding can be inferred to be the very targeted malice which Mr Rowley accepts he has to prove.  Out of respect for Mr Rowley's and Mr West's argument, based on an exemplary command of the massive paperwork (a command all the more praiseworthy given that they were not the original pleaders of the Claimants' case but came in to the matter relatively late) and out of respect also for the huge number of individual Claimants wanting to see how their claim has fared, I see no alternative but to go through the chronology at length, though I fear it will prove a wearisome read for many.  Even at such length I shall leave out many meetings and papers but will attempt to cover the more relevant or disputed ones.

6.    After the chronology I shall comment on the evidence of such witnesses a review of whose evidence I had earlier deferred and then I shall come to a conclusion on the claim in tort.

7.     That done I shall set out the law on the HRA claim.  It requires no separate chronology.   I shall then conclude the HRA claim.

8.    Finally, having by then dealt with both heads of claim, I shall come to a conclusion on the question of the Defendants' liability to the Claimants.  The case so far has been limited by agreement between the parties to the question of liability.  If either the tortious or the HRA claim succeeds then, in the absence of agreement between the parties as to quantum, there would need to be a separate hearing to deal with the amount for which the Defendants would in that event be liable.

## C.  **General**

**Group and Railtrack**

9.      The privatised railway system in the 1990's included that there should be a network operator which would own and manage the infrastructure and also that there should be "Train Operating Companies" ("TOCs").  The TOCs would pay for access to the network operator's infrastructure.  The operator, owning such assets as lines, signalling provisions and stations, came to be Railtrack, a company at all material times until June 2002 wholly owned by Group.  At material times to June 2002 its holding in Railtrack was outstandingly the chief asset of Group.  In May 1996 Group was floated on the London Stock Exchange;  its shares were offered to the public at £3.80 per share.  The prospectus had indicated that Group:–

> "×.. does not receive direct revenue subsidy from H.M. Government but is indirectly dependent on the significant amounts of public sector financial support received by its principal customers, the TOCs."

The prospectus added that the Labour Party and the Liberal Democrat Party had each expressed both opposition to the privatisation of Railtrack and a commitment to a railway which was owned by and accountable to the public.  The party political risk that lay behind the flotation was described in the prospectus by reference to the then Conservative Government's narrow overall majority of 1 in what was then the next preceding General Election and to the fact that the next General Election would have to be held not later than May 1997.  The prospectus included passages as to the then–published policies of both the Labour Party and the Liberal Democrat Party.  The Labour Party's approach had included that:–

> "Dependent upon the availability of resources, and as priorities allow, [a Labour Government] would seek, by appropriate means, to extend public ownership and control over Railtrack."

In May 1997 the General Election returned a Labour Government.

**Ministers, Civil Servants and Special Advisers**

10.    Until a policy decision is made, at which point the government can be expected to present a united front in support of that policy, there are likely to be very different and often conflicting arguments within the several ministries or departments likely to be affected by the decision.  Traditionally, the Treasury might be expected to argue against unbudgeted expenditure or against excesses over budgeted provisions. Where, as here, the Department was the body charged with development and implementation of policy, it could be expected, possibly in conflict with the Treasury, to have in mind improvement in transport generally, including, of course, in the railways.  No. 10, no doubt responding to the particular concerns of the incumbent of the day, possibly in conflict with one or both of the Treasury and the Department, might be chiefly concerned with the way in which the given policy would be likely to be perceived by the electorate generally.  One can thus expect, before a policy issue becomes a decision of government, that Ministers will be found to be expressing very different views as the prospective policy is thrashed out.  At that stage such views will not be the views of the government.  Still less, at that or any stage, will views expressed by Ministers' respective Special Advisers be the views of government rather than their commonly being their individual attempts to argue their corner in support of what they know to be or what they hope to be their Minister's inclinations or with a view to leading the Minister to the inclination which the Special Adviser prefers.

11.    Nor, either, do comments made in internal discussions by Senior Civil Servants prior to a decision or policy represent the views of government.  Senior Civil Servants are careful to leave policy decisions to the elected Ministers although, of course, they will feed to them the fruits of their researches, for example, as to the lawfulness of the prospective policy, its practicability, the alternatives to it, its likely cost and its ability to attain whatever goal is hoped for.  Just as Ministers in different departments or ministries will approach a prospective policy issue from different starting points and with different aims, so also will the Civil Servants in the respective ministries.  Mr Sumption was thus right to urge caution upon me when I am asked, as Mr Rowley asks me, to interpret or give weight to the many hand−written and other notes of meetings and contemporary e−mails to which I have been referred as parts of the unfolding chronology.  The fact that, for example, one contemporary note made by a Civil Servant or Special Adviser to one department seems to put a quite different slant on what was said at a meeting or on what was decided at the meeting to have to be done does not necessarily reflect anything other than the very different concerns of the various departments or that different departments, in consequence, needed to do different things.  The weight to be given to contemporary e−mails, of course, varies from one to another but it would be quite wrong generally, before a Ministerial policy decision has emerged, to regard them, especially those of unrelated Special Advisers, as reflective of government policy as opposed to being the views of someone successfully or otherwise arguing a case.  For example, Mr Rowlands, a senior career Civil Servant, then Director General of Railways, Aviation, Logistics and Maritime and now Permanent Secretary of the Department of Transport, in his oral evidence to me, commenting on e−mails from Miss Vadera, an adviser at the Treasury, said, with an asperity he otherwise kept at bay, that she constantly bombarded people with

e–mails, many of which were blithely ignored by the recipients; he added "I was used to being bombarded by this woman with e–mails".

12. Finally under this heading I caution against analogies with the private sector. Firstly, a financier such as a bank, determining that it has lent enough to a client and should lend no more but instead should call in what is owing, whilst, no doubt, concerned at the effect on the client, generally has no greater duty than to its own shareholders. A government, however, which withdraws support has to look far more widely. A recurring theme in the government's evidence was that it could not leave the railways in a shambles; if support was to be withdrawn the consequences would need to be foreseen and, where deleterious, would need to be striven to be avoided. Moreover, a government, unlike a banker, would need to consider its policy in the light of the Human Rights Act, of the probability of Judicial Review and of the likelihood of attack in Parliament or at the hustings. In consequence, a government can be expected to look far more widely and in greater detail at consequences and alternatives than would even the most thoughtful of financiers. In consequence, too, Civil Servants, charged with the task of ensuring that all alternatives are considered so that, should there be attack, all can be seen to have been considered, are likely to include even improbable options amongst their considerations.

13. Secondly, there is no real analogy between the Minister and his senior Civil Servants and a board of directors in relation to decision–making on matters of government policy. A board of directors, whilst no doubt containing persons of different seniority and persuasiveness in the company, are likely to vote, one vote each, as to the adoption of this or that policy. By contrast, no corresponding collective decision is taken by a Minister and his senior Civil Servants. The latter, of course, advise and will wish to ensure, whatever policy is decided upon, that it and alternatives will have been fully considered and that it is rationally arrived at but will be scrupulously careful to leave the policy decision itself to the Minister, who, alone amongst them, will be answerable for it to Parliament and to the electorate. It is thus not to be wondered at that the point of arriving at a policy decision in government is likely to be later than it would be in a corresponding case, if one could be found, in the private sector; much more is likely to be at stake, the vulnerability to attack is far greater and the mechanisms for the advising of the decision–maker are so well–developed that, even where a particular policy outcome is hoped for and even strongly preferred, the point of actual decision is likely to be later rather than early.

**The Witnesses**

14. There are a number of witness statements from Claimants dealing, for example, with when and for how much they acquired their respective holdings in Group, on what material they relied in doing so and how much they lost in the venture. None of such material, going chiefly to the individual's status as a Claimant, was put in issue but none, either, does more than establish that status, the sense of grievance and the fact of loss common to the Claimants. It does not, of itself, advance the Claimants' case in tort with which I shall need to deal. Such evidence apart, the Claimants relied on 4 further witnesses. Mr Tom Winsor, the erstwhile Rail Regulator, first completed a Witness Summary responding, question by question, to questions put to him in

writing on behalf of the Claimants but then, on 21st June 2005, put in a much fuller Witness Statement which he, a Solicitor, himself prepared. The Defendants elected not to cross−examine Mr Winsor, whose veracity was thus not put in issue. Two witnesses, Martin Minns and Pamela Warren, put in witness statements as to a meeting of the Paddington Survivors Group on the 12th September 2001. Of the two, only Mr Minns was called to give oral evidence, that of Pamela Warren's witness statement being accepted as it was. I will deal with their evidence when I come to 12th September 2001 in the chronology. The only other individual's evidence relied on by the Claimants was a witness statement from Mr John Harris Robinson who on 12th June 2001 joined the boards of both Group and Railtrack and who took over as Chairman of both on 18th June 2001. Mr Robinson was cross−examined at some length by Mr Sumption and an assessment of his evidence is best left to after I have dealt with the chronology.

15.    There were 2 minor flurries as to evidence on the Claimants' side. They had considered calling Mr Daniel Corry, a Special Adviser to Mr Byers at relevant times, by way of a witness summons but at a late stage Mr Corry supplied a proposed witness statement to them and the Claimants then chose not to call him. There was thus nothing in evidence from him. The other flurry concerned the Office of National Statistics, "the ONS", which, as will appear, played an important rôle in classifying whether certain proposed ventures would be classified, for government borrowing purposes, to the public or to the private sector. The Claimants obtained a witness summons requiring attendance at trial of an officer of the ONS. The ONS moved to have the witness summons set aside and I was expecting to have to rule on arguments on the question. In the event there was no argument but a consent order by which the witness summons was set aside and a sum in respect of costs paid by the Claimants to the ONS. There was thus no evidence from the ONS.

16.    The Defendants relied on 4 witnesses, each of whom was cross−examined. Sir Richard Mottram, a career Civil Servant, was Permanent Secretary of the Department throughout the period, June to October 2001, on which the Claimants concentrate. At the time of the hearing before me he was Permanent Secretary of the Department of Works and Pensions. Judith−Anne MacKenzie, a barrister in the Legal Services Directorate, was Divisional Manager of its Railways Division from September 1998 to November 2001. She is now Head of the Road Vehicles & Devolution Co−Ordination Division of that Directorate. Neither Sir Richard's nor Miss Mackenzie's evidence is criticised by the Claimants.

17.    Another career Civil Servant, Mr David Rowlands, was, as I have mentioned, at the material times Director General of Railways, Aviation, Logistics and Maritime in the Department and at present is Permanent Secretary of the Department for Transport. He was first of the Defendants' witnesses to give evidence, followed by Mr Stephen Byers, Secretary of State for Transport, Local Government and the Regions from 8th June 2001 to 28th May 2002. He is now Member of Parliament, in the Labour interest, for North Tyneside.

18.     No one but Mr Byers is said by the Claimants to have harboured the necessary "targeted malice" against the Claimants and so it is Mr Byers who alone is cast by the Claimants as the villain of the piece; his veracity is put heavily in issue but Mr Rowlands, too, has had his candour criticised to some degree so I shall leave the assessment of their evidence until later. As for Sir Richard and Miss Mackenzie, I found them to be direct, accurate and truthful witnesses.

19.     There has been an immense disclosure on the Defendants' part and I have heard no objections that it has been inadequate. The disclosure has included that of legal advice given to the Defendants, as to which legal professional privilege was waived.

## D.   The alleged tort;  misfeasance in public office

### The law

20.     As there is very little difference between the parties as to the nature of this tort it is unnecessary for me to delve into its earlier history and into older cases. The person accused of it has to be a public officer. He must have exercised whatever power is in issue as a public officer. The tort has two forms but the only form with which I am concerned is what is called the first limb of the tort, which arises where the accused person's conduct is on its face lawful in the sense that, objectively regarded, there is a power for him or her to act or to fail to act as he or she has done. There is no dispute but that, so regarded, Mr Byers had in 2001 the power both to choose that the Department should not further finance Railtrack other than as it was then contractually or otherwise legally bound to do and had power also to present and pursue a petition for Railtrack to be put into Railway Administration. Given, then, that Mr Byers' acts or omissions were on their face lawful, the case alleged, being in the first limb of the tort, is such that there will be liability under the tort only if his acts or omissions in the exercise of his relevant powers were such that he had *specifically intended* them to injure the Claimants or a class of persons to which the Claimants belong. This important requirement is commonly described as being that proof is necessary of "targeted malice". Although, on appropriate facts, targeted malice can be inferred, save where the facts speak for themselves "targeted malice", it hardly needs to be said, is likely not to be easy of proof especially where motives other than such malice may be credible. Mr Rowley has at several points himself referred to the difficulties the Claimants thus face but a particular difficulty arises out of the consideration that one of the ways in which intent is commonly proved is not open in this tort. In much of the law a person will be taken to have intended the ordinary and natural consequences of his acts or omissions. In such cases it suffices, to prove the necessary intent, to prove the knowledge or obviousness, the foreseeability, of the consequences. Proof of the foreseeability of the consequences thus suffices. Were such a mode of proof to be here open to the Claimants they would be faced with the task of proving that Mr Byers knew or must be taken to have known that amongst the consequences of decisions not further to support Railtrack or to have sought its administration would be an inability to trade, or reduction in the trading price of, their shares in its parent, Group. But it is central to this case to have in mind that that form of proof is not open to the Claimants in their claim under this tort. The required "targeted malice" cannot be proved by reference

only to the knowledge or obviousness of consequences; a *specific intent* to harm the Claimants or the class to which they belong has to be proved.

21.   In point of pleading, the specific intent alleged and the specific intent which therefore has to be proved is that in implementing an alleged "Administration Plan" (which I shall return to), including his petitioning for an administration, Mr Byers acted for the purpose of expropriating the assets of Group without either paying compensation to its shareholders or obtaining the approval of Parliament and with the specific intention of injuring the Claimants as shareholders in Group by impairing the value of their financial interests in that company - see the re−re−re−amended Particulars of Claim paragraph 81.   That is the form of "targeted malice" which is pleaded and it is proof of that and only that form of "targeted malice" which will enable the Claimants to succeed under the heading of this tort.

22.   It will have been seen from this that purpose or motive is of real importance; it is an area of the law where, unusually, a bad motive can make unlawful that which otherwise would have been lawful; as to the tort and generally see *Three Rivers DC -v− Governor and Company of the Bank of England (No. 3) [2003] 2 A.C. 1 (C.A.) and 176 H.L* . per Lord Steyn at *p. 188 f−g* , *190 g to the foot, 191 e−f, 195 g−h;* Lord Hope *197 c−d;* Lord Hutton *219−220 a;* Lord Hobhouse *228 g, 230 g−h, 231 d−e;* Lord Millett *235 a, 235 e and g* and see reflections on the tort in *Douglas -v− Hello! [2005] EWCA Civ 595, 18th May 2005 at paragraphs 159 and 210* , now reported at *[2005] 4 All ER 128 CA.*

23.   So far there is no difference on the law between the parties; the only difference is as to whether it suffices to establish the tort if the specific intent to injure the Claimants is *a* purpose of the defendant or whether it has to be at least the predominant purpose of the defendant.   I see force in Mr Rowley's analogy with the position as to reliance in misrepresentation - see *Redgrave -v Hurd (1881) 20 Ch D 1 C.A.* − and shall assume, without deciding, that it suffices that the specific intent to injure is *a* purpose of the Defendant, so long as it is above the level of being de minimis.

**The Administration Plan - the alleged facts**

24.    It is the Claimants' case in tort that "in or about July 2001" and "in or about September 2001" Mr Byers devised "the Administration Plan".   It is alleged that by that Plan he intended to bring about a situation in which he could present to the relevant Court evidence that Railtrack was insolvent for the purposes of the appropriate test, that he would then present a petition for the administration of Railtrack, that following the making of the order for administration the assets of Group and/or Railtrack would be "removed" without either approval of Parliament and without the Government paying a purchase price for or compensation in respect of the shares in Group to Group's shareholders and that ownership and control of the railway infrastructure would thus be transferred away from Group to another company, one without shareholders, which came to be known as Network Rail Ltd - see re−re−re−amended Particulars of Claim paragraph 50.

25.    There are some aspects of the alleged Plan which have received little attention. There has been nothing said as to the assets of *Group* being "removed"; even its important asset, its shareholding in Railtrack, remained in its ownership until Group chose (and, as it seems, freely chose) to sell it in what has not been shown to be other than an arms' length sale.  Nor does the description of the "Plan" take account of the fact that, as I shall come on to, Group received a substantial purchase price for its holding in Railtrack that has not been shown to be other than a price as between a willing vendor and a willing purchaser.  It has, rather, been the alleged "engineering" by Mr Byers (and, at his direction, by the Department) of a situation in which it is alleged Railtrack could not usefully resist an administration petition that has attracted most of the Claimants' complaints.


## E.  The Chronology

### The Government's 10 year plan

26.    In July 2000 the Department published its 10–year plan, called "Transport 2010".  So far as concerned railways, it contemplated, inter alia, modernisation of the West Coast and East Coast Main Lines and completion of the Channel Tunnel Rail Link.  There were to be new train safety systems.  The private sector - usually Railtrack or TOCs - was to carry out the investment in the new infrastructure but the plan recognised that substantial government financial support would be needed.  Total government funding to 2010 on the railways was put as £29 billion, which included £4 billion chiefly to cover the West Coast Main Line ("WCML") and £5 billion related to the Channel Tunnel Rail Link.  But there was also to be some £34 billion of private capital to be raised and spent;  plainly the ability of Railtrack or Group to raise money in the market as the 10 years proceeded was to be a key factor in implementation of the 10 year plan, as was also the ability to contain expenditure on the WCML and on the Channel Tunnel Rail Link within the figures contemplated.

### The System of the Public Financing of the Railways in 2000 and 2001

27.    Leaving aside the ordinary routes by which a listed company such as Group or a subsidiary such as Railtrack might earn income or raise or borrow money, Railtrack had open to it special routes by which it could call, directly or indirectly, on the public purse.  These consisted of "Access Charges" and "Network Grants".  Each requires some explanation.

28.    Access Charges were the sums paid by TOCs under Access Agreements, to which they were party, for access to and use of Railtrack's infrastructure.  They were crucially important to Railtrack;  in the year 2000/2001 they amounted to some 84.4% of Railtrack's total income.  But they were not fixed by ordinary negotiation between payor and payee;  they were, in substance, fixed by the Rail Regulator.  His was an office that had been created by the Railways Act 1993.  His statutory duties included the development to the greatest extent that he considered practicable of the railway network and the promotion of efficiency and economy in the provision of

railway services. Whilst he was independent of Government, he was, from the taking effect of the Transport Act 2000, to have regard to any *general* guidance given to him about railway services by the Secretary of State.

29.     The legislative and other structures surrounding the Rail Regulator included a labyrinthine system by which Access Charges were periodically arrived at so as to cover 5 year "Control Periods" and by which they might be changed even during the currency of whatever Access Agreements contained them. As for such Control Periods ("CPs") , CP1 expired on the 31st March 2001. CP2, with which I shall principally be concerned, ran from the 1st April 2001 to the 31st March 2006 and CP3 was intended to run immediately thereafter. In the computation and payment of Access Charges the Rail Regulator, as his statutory duties might suggest, was entitled to expect and require improvements to be made to the efficiency of operations. The Access Charges for CP2 were published by the Rail Regulator on the 23rd October 2000. They had been fixed at a lower level than Railtrack had pressed for, although about 50% up on the corresponding figures for CP1. Although, on the face of things, Access Charges (so far as here relevant) were payable only by TOCs, they represented an indirect call on the public purse by reason of the great extent to which TOCs had to be subsidised by the Government.

30.     As for Network Grants, they came to Railtrack by way of the Strategic Rail Authority ("the SRA"), a body called into existence by the Transport Act 2000 and funded by the Treasury. It was not a servant or agent of the Crown. Its Chairman throughout the time with which I shall be concerned was the late Sir Alistair Morton. Amongst its statutory purposes was the promotion of the use of the railway network for the carriage of passengers and goods and the securing of development of the railway network. The SRA, broadly subject to direction by the Secretary of State, was enabled at its discretion to make Network Grants to Railtrack under the provisions of Section 211 of the 2000 Act. The overall position is well summarised by the witness statement of Mr Tom Winsor, the Rail Regulator throughout the periods with which I am concerned, where he says:–

> "××. The Rail Regulator determines what is the net overall income required of Railtrack, i.e. how much money it needs for the competent and efficient operation, maintenance and renewal of the network. The income the company receives from Access Charges and Network Grants has to add up to that figure. If Network Grants paid direct by the SRA are higher, Access Charges can be lower and vice versa. The important thing is that the company is certain of receiving that total amount as long as it meets its legal obligations to its customers (the Train Operators) and under its Network Licence (enforceable by the Rail Regulator)."

31.     Any periodic 5–year review by the Rail Regulator, intended, as it was, to anticipate and provide for such things as railway performance and demand and supply in a very complicated industry over a prospective 5–year period, was inevitably such as to require much negotiation and study and a good deal of time. The periodic review

completed on the 23rd October 2000 had, for example, begun in July 1999. The draft conclusions of the Rail Regulator had been published in July 2000. They had led to further negotiations between Railtrack and the Regulator and changes were made. Then the final conclusions were published. But Railtrack, even then, was not obliged to accept them; it was open to it within a prescribed period to ask for a reference to the Competition Commission. It did not do that but on the 15th January 2001 it accepted the provisions which the Rail Regulator had made for it. It did so, however, on the basis that the Rail Regulator had indicated the possibility of *interim* reviews, that is to say reviews during the currency of the CP, should there be a material change of circumstances. The Regulator expected this general kind of interim review to be utilised only in exceptional circumstances.

32.    But, beyond that general kind of interim review, the possibility had been held out to Railtrack of what became known as "Hatfield Re−openers". The rail disaster at Hatfield had occurred on the 17th October 2000, namely between the Regulator's draft and his final conclusions. 4 persons had been killed, 34 injured. Derailment had been caused by "gauge corner cracking". Immediate measures were required to be taken all over the network to identify and repair the cracking and very many temporary speed restrictions were introduced. The immediate cost to Railtrack, down to 31st March 2001, was £644m but because of the timing of the disaster its effects could not be taken into account in the Regulator's final conclusion . Whilst the Regulator saw it to be right that costs directly attributable to the Hatfield derailment should be borne by Railtrack and not by the taxpayer, he did see that it might be appropriate for the conclusions of his 5−year periodic review to be reviewed and adjusted by way of the "Hatfield re−openers", which were to be interim reviews of a particular kind. The first, if requested by Railtrack, was intended to be directed to the *timing* of Railtrack receipts, so as to bring forward receipts which would otherwise have been received later and also to review the mix between access charges and network grants. The first Hatfield re−opener, if applied for by Railtrack and if successful, would thus not have yielded more money than, overall, it was to receive but would have accelerated the receipt of some of what it would otherwise have received later. The second type of Hatfield re−opener, if sought by Railtrack, was to look at any longer term financial implications of the Hatfield disaster for Railtrack's expenditure and revenue requirements.

33.    Even the processes needed to be completed for the relatively simple first Hatfield re−opener, let alone for any more general interim review, would inevitably require effort likely to be spread, at least, over several days or weeks.

34.    As for Network Grants, Schedule D to the conclusions of 23rd October 2000 made provision for grants of £5.67 billion, conditional on Railtrack's acceptance of those conclusions, to be made throughout CP2. They were to begin with a payment of £162m on 1st October 2001.

35.    Thus it was that by the 15th January 2001, subject only to any interim reviews either of the Hatfield re−opener or of the more general kind, the extent to which Railtrack was intended to be financed by the taxpayer until March 2006 had been prescribed as

some £14.5 billion made up of £5.67 billion in Network Grants and £8.83 billion in Access Charges.  Such provision represented some £2.3 billion more than had been contemplated in the government's 10–year plan; that plan had an unallocated provision which, with Treasury permission, had been allocated to cover what would otherwise have been a funding gap.  The provision also contemplated that Railtrack or Group would itself fund expenditure by their own borrowings and part of the government's funding was put back to the end of CP 2 on that basis.

**Consideration of radical changes - February 2001**

36.    Lest it be thought that consideration of radical change in the structure of the railways and of Railtrack's and Group's places in that structure was not seen to be appropriate until Mr Byers became the responsible owner, it is worth recording others' views. Post–Hatfield, said Mr Rowlands, the railways were a shambles and both the Prime Minister and the Deputy Prime Minister had expressed dissatisfaction with Railtrack.  As early as February 2001, the Department, responding to a view, which the Hatfield crash had only served to underline, that Railtrack was performing poorly and that Group's monopoly of the railway infrastructure might, in turn, need to be re–thought through, had a paper prepared by Mr Phil Carey in the Railway Sponsorship Division and then sent on to Mr Gareth Evans in the legal department. The paper set out 6 options for the future of Group and its wholly–owned subsidiary, Railtrack, giving the benefits and drawbacks for each.  Re–nationalisation was one of the six, as was converting Group into a not–for–profit trust.  Both had the drawback that, as there could be no expropriation without adequate compensation, a price (at the then share–price of Group shares) of some £4.7 billion would be involved.  The background paper emphasised that, for HRA reasons, it would need to be demonstrated that *all* other avenues had been addressed.  That becomes a recurring theme.  It is not, though, to be thought that because a particular course appears amongst the options that it was therefore one that had a real prospect of being adopted.  The Civil Servant's job, said Sir Richard Mottram, was to identify *every* possibility "and to analyse the pros and cons of them.  That is what we do".  Hence re–nationalisation was included amongst the six options even though, in Sir Richard's view, it was completely against the underlying philosophy of the Government and was, in his view, never going to be "a runner".  Miss MacKenzie, too, spoke of neither her Ministers nor her policy colleagues thinking that acquisition of Railtrack or its re–nationalisation was a serious consideration at that time.  At this stage the Government, whilst seeing it to be appropriate to consider what the options for radical structural change might be, was content to adopt the structure as it was for the time being and to work, as Miss MacKenzie put it, "with the grain they had inherited, rather than against it".

37.    The 6 options do not include any relating to Railtrack's insolvency if only because the belief in the Department was then that over the immediate term in CP 2 the company's financial position had been stabilised.  However, soon after there was some reason to fear for Railtrack's finances, as the next sub–heading suggests.

**Concern in March 2001 in the Department at Railtrack's finances**

38.    Amongst Railtrack or Group's officers was one given the particular task of liaison with government.  On 16th March 2001 he, Mr J.W. Smith, wrote to the Department, stressing Group's need to maintain an "A" credit rating, which, in his view, required the announcement of a package confirming government support for Group.  "It is this", he wrote, "which will enable us to raise £5bn by 2003".  That would be bound to cause concern at the Department as it would imply support, unascertainable in amount, for an individual company, a very thing which, as will appear from the April Agreement agreed only a little later, as I shall come on to, was a thing which the Government wished expressly to be seen not to undertake.  At least as concerning to the Government was a table that Mr Smith included.  It did two things; firstly, whilst emphasising the market sensitivity of this analysis, it valued Group's shares, then trading at about 800p, at only 60p and, secondly, implicit in it, in Mr Rowland's view, was an accounting problem such as, in his view, whilst "they [Railtrack] would be able to get through CP 2 ×.. they were going to be bust in spades as soon as they got into CP 3".  A false amortisation approach as to signalling expenditure inflated apparent profit in the initial year of account whereas the ongoing expense of the works would be spread beyond CP 2 and into CP 3.  There was, as Mr Rowlands put it, "a looming problem in CP 3 you would need to fix in CP 2 but it was not a problem in CP 2".  Yet further concern in the Department was because the Rail Regulator's assessment of Railtrack's needs had been based on its achieving efficiency improvements at 3.1% per annum over the 5 years of CP 2.  The Department regarded that as "challenging"; it was not thought that Railtrack would achieve the 15% or 16% the Regulator had had in mind.

**Railtrack's business plan**

39.   On 31st March 2001 Railtrack's business plan for the 5 years to March 2006 was finalised.   It is a remarkable document both as it looks over the past and as it contemplates the future.   It accepts that processes for maintaining and renewing the railway to an acceptable standard had clearly been broken and that there had not been robust plans in place to live within the Rail Regulator's targets even before the lessons of Hatfield.   There was a significant *higher* unwillingness by managers to live within budgets and plans and the business plan could not "be regarded as an acceptable plan in financial terms".   Even such planning as it aspired to involved key assumptions which included £3bn of bond finance being raised in Summer 2001 with a further £4.1bn being raised by March 2006.   The key assumptions also included the creation of a Special Purpose Vehicle, "Renewco" as it came to be described, to be used to bring forward funding otherwise not to be received until the latter part of CP 2.   Moreover, the business plan, requiring expenditure of £19.7bn, was already contemplating some 23% more expenditure than had been budgeted for, only 6 months earlier, at £16bn. It is difficult fairly to describe as a business plan a document which itself said it could not be regarded as acceptable in financial terms but even so, as Mr Robinson (not, of course, yet in office at Railtrack at the time of the plan) accepted, it stated as an assumption which he regarded as critical to Railtrack's financial fortunes that it would be able to raise the £7.1bn bond issues I have described.   Probably critical to the making of such bond issues, as Mr Robinson agreed, was the need for Railtrack to maintain an "A" rating for its (or Group's) bonds.   Another key assumption was that a Hatfield re–opener would yield Railtrack at least £2bn of extra revenue at £667m per annum from 2003 to 2006.   These key assumptions were, at lowest, close to speculative.

40.   Plainly Railtrack was heading into difficult times, being both unable accurately to establish its financial needs and dependent upon somewhat speculative consequences to satisfy them, whatever they transpired to be.

**The "April Agreement" and "Renewco"**

41.    Although the Rail Regulator's final proposals had been accepted only a few months before, Railtrack and Group, seeking further public funding, opened negotiations not with the Regulator by way of a Hatfield Re–opener but directly with the SRA.  The Department, which stood behind the SRA, was aware of the course of the negotiations, which led to a comprehensive agreement called either "the April Agreement" or "Project Endeavour".  It provided for the possible bringing–forward of £1.5bn of network grants and also for the possible related creation of a company given the convenient name, during the negotiations, of "Renewco".  Renewco was to be carefully constructed as a company with access to a large revolving credit facility but control of which was to be deadlocked between its equal shareholders, the SRA and Railtrack.  Renewco, if called into existence, was intended to be able to borrow, in particular against the prospective streams of public funding to Railtrack, but in such a way that its borrowings would be off–balance sheet so far as concerned Railtrack and yet also would not be classified as public sector borrowing.  In such a way, if Renewco was eventually used, Railtrack would, in effect, receive, ahead of what would otherwise have been the due dates, public funding otherwise intended to be spread under Schedule D over the latter parts of CP 2 or into CP 3.  But Renewco was not certain to be created.  If it were not created by 30th June 2001, Group was to be given a further 21 days to consult on an acceptable alternative but if none emerged then Railtrack would then (but not before) be able to apply to the Rail Regulator for the first Hatfield Re–opener.

42.    It was foreseen that there were many loose–ends that would need to be tied down if an acceptable Renewco were to emerge, a crucial one of which, on the Department's side, as I have mentioned, being that Renewco's borrowings would not be treated as public sector borrowing.  As the ONS, as arbitrator of such matters, would not be likely finally to classify such borrowings until Renewco's corporate structure and its proposals were ascertained in some detail, the possibility was always present that even if the SRA and Railtrack had successfully negotiated a Renewco format that suited them respectively (a thing which itself, despite mutual best endeavours, was not necessarily achievable) even so Renewco might transpire to be unusable for want of its being classified by the ONS to outside the public sector.  Some provisions of the April Agreement were framed as legally binding, others as deliberately not.  Thus, whilst both Group and the SRA were to use their best endeavours to set up an acceptable Renewco, Group agreed that its only remedy for a breach as to that on the SRA side would be that it would be freed to apply for a Hatfield Re–opener ahead of the expiry of 21 days after 30th June 2001.  It never did so.

43.    It is not necessary to go in detail into the April Agreement but amongst its important provisions were what were called the "Statement of Principles" agreed between the Government and Group.  These principles were expressly excepted from the confidentiality agreed to affect other parts of the April Agreement.  The first 3 principles provided as follows, with my emphasis:–

                    "1.    The Government stands behind the rail system *but not behind individual rail companies and their*

*shareholders, who need to be full aware of the projected liabilities of the companies in which they invest* and the performance risks they face.

2. [Group] recognises that it *must intensify its efforts* and raise the performance of its core business in the safer operation, maintenance and renewal of the existing railway.

3. [Group] needs to raise funds from the financial markets in order to meet its obligations to customers and stakeholders. The company *also needs to receive sufficient government funding as determined by the Regulator.* "

The principles reiterated that Group had accepted that the immediate consequence of Hatfield must fall to Group's shareholders.

44. These principles thus made very clear that there was to be no bottomless government support for Railtrack, that Railtrack needed to improve its performance, that Group's shareholders should be alive to the liabilities of and the risk inherent in their involvement in rail companies and that government funding would be limited to what the Rail Regulator determined to be sufficient.

45. Although, no doubt, concern remained in the Department as to Railtrack's financial future, the view in the Department was that Railtrack, once the April Agreement had been made offering it, inter alia, the alternatives of a Hatfield Re−opener or assistance by way of Renewco, itself considered its financial position over the next one or two years to be adequate.

**Mr Robinson is appointed**

46. On 10th May 2001 Mr John Robinson became chairman−designate of Group and he joined the boards of both Group and Railtrack and a little later became Chairman of both on 18th June 2001. He met several Board Members during May. He saw Railtrack to be in the middle of a public slanging match, as he put it, involving itself, the Rail Regulator and the SRA, each accusing either or both of the others of being responsible for the then−perceived poor state of the railway industry and for passenger dissatisfaction. The Rail Regulator had declined to meet him until his formal appointment but he had met Sir Alastair Morton, when both acknowledged that Railtrack was facing some serious financial issues. He had been unable to meet the then−responsible Minister, Lord Macdonald, or the Prime Minister because by then the General Election campaign was under way but he did meet senior officials and felt that he had been given positive signals that the Government was prepared to support the rail network and Railtrack's management (which included, as new recruits, not only him as new Chairman but a recently appointed Chief Executive Officer and a new Finance Director).

**Railtrack's audited results for the year end 31st March 2001**

47.    These were published on 24th May 2001.  The Group had made a loss after taxation of £559 million, down from the previous year's profit of £295 million.  It was the first time that the Group had reported a post–taxation loss.  A gap of £3.6 bn was disclosed between budgeted income and expenditure during CP 2.  The projected cost of the WCML had increased to £6.3 bn.  As at 24th May 2001 the companies' boards expected, said Mr Robinson, to be able to fill that gap by obtaining additional funds from the Rail Regulator, by cost–cutting, by efficiency gains and by expected adjustments to the "Regulated Assets Base", a key figure in the Regulator's computation of what provision should be available to Railtrack.  The accounts had been prepared on a "going concern" basis but they recognised that Group's financial position could be seriously prejudiced if contingent liabilities matured into present or prospective ones and the Boards recognised that much work needed to be done to resolve uncertainties.  "The Hatfield Re–opener", said Mr Robinson, "in particular, was crucial to our future" although he always regarded Renewco, the alternative to the first Hatfield Re–opener, as a "given".  The Boards had concluded that Group's and Railtrack's accounts could be prepared on the going concern basis.  It would not, in my view, be unfair to comment that a company which needed, as did Railtrack, to give very careful attention to whether its accounts could properly be prepared on a going concern basis was a company which was likely to be in or heading towards seriously difficult times.

**ABN–Amro**

48.    On 4th June 2001 the brokers ABN–Amro circularised a "sell" recommendation in relation to Group's shares.  Group's position was analysed in some detail.  There were dire warnings; investors should be in no doubt that their equity was in danger of being wiped out; the rising levels of debt threatened to engulf the value of its regulated assets, rendering the equity worthless.  The then–current share price, 438p, implied wildly optimistic outcomes.  The then–recent balance sheet under–estimated Group's debt position which ABN–Amro took to have increased by a massive £1.2bn to £2.5bn so far as concerned creditors due within one year.  In their initial summary of the 16 page report ABN–Amro wrote:–

> "We believe there is a realistic possibility that the equity could be wiped out.  Based on our expectations of performance, we value the shares at only 58p."

That figure, of course, was barely different from the 60p which Group itself, by its Mr J.W. Smith, had indicated to the Department in March 2001.

49.    It is not to be thought that other advisers took the same view as ABN–Amro; several still regarded Group shares as being of far greater value than 58p but the detailed ABN–Amro survey caught the eye of the financial press and, hardly surprisingly, depressed the trading price of Group shares.

**The 6th June 2001**

50.   The ABN−Amro report came, as one might expect, to the Treasury's notice and to the notice of Miss Shriti Vadera, an erstwhile investment banker who was a member of the Council of Economic Advisers at the Treasury.   She was not a career Civil Servant nor either only a conventional Special Adviser to the Chancellor but her office had more the characteristics of the latter than the former.   The fact that ABN−Amro had valued the shares as low as 58p had led her, mindful also of the Railtrack earlier valuation by Mr Smith at 60p, to reflect on the possibilities of a takeover by a third party (a "raider" or "a sensible company") should such values come to be the trading price of Group shares.   On 6th June 2001, Miss Vadera, Mr Kemsley of Public Transport Policy at the Treasury and Mr Martin Wheatley, Head of Housing and Urban Transport at the Treasury,  met Mr Rowlands, and Mr Linnard, Director of Railways at the Department.   Mr Kemsley's note of the meeting includes the phrase "So why not "engineer" a takeover?" and "Doing Renewco loses us two options", both remarks, certainly the latter, being likely to have come from Miss Vadera.   In context "takeover" referred to the possibility of someone, *not* government, making a bid should the share price of Group shares fall to the very low level contemplated by Mr Smith and by ABN−Amro.   The takeover to be "engineered", if the shares ever did fall so low, would have been one by a "sensible company", encouraged to bid in order to keep "raiders" out.   The remark cannot suggest even an inkling of the conception of some policy as to acquisition of Railtrack or Group by some government body.   Nor, either, was there then the first dawning of a notion that, despite the unbinding obligation to use "best endeavours" in that behalf, Renewco would not be implemented.   I accept Mr Rowlands' evidence that the meeting did not consider not doing Renewco.   It is to be remembered, too, that no Minister was present at the meeting.   Had there been a decision to *advise*  the incoming Minister that it could be advantageous that Renewco should or might not be implemented one would expect a minute to have been promptly prepared to such effect.   None was shown to me.

**Mr Byers becomes Secretary of State**

51.   The General Election of 7th June 2001 returned Labour to power.   Renationalisation of the railways had not been raised as an issue on which a mandate was invited.   Mr Byers became Secretary of State in the Department of Transport, Local Government and the Regions replacing Mr John Prescott M.P..   Mr Byers held this office until 28th May 2002.   The message given to him by the Prime Minister, said Mr Byers, was that "*delivery*  was the issue.   We wanted to raise performance but really the issue then is how do we achieve improved performance".

52.    On the same day Mr Robinson attended his first Board meetings in Group and Railtrack.   He felt, and the Board shared his view, that more time needed to be devoted to finding a new strategic way forward.   He had in mind consulting a single financial adviser.   The names of Credit Suisse First Boston ("CSFB") and Mr John Nelson of that group (with whom he had worked previously) were in his mind.

**Railway Administration**

53.  Because the first view of the possible relevance of a Railway Administration Order to Railtrack's condition has been attributed to Mr Byers, an attribution for which he is in part to blame, it is worth mentioning that on the 8th June, only the day after his appointment and plainly commissioned before then, there was circulated in the Department a paper on the subject of Railway Administration. Its kinship with ordinary Administration was explained. A Court Order would be required. The Court would have to be satisfied, as one alternative, that the subject–company was or was likely to be unable to pay its debts, using the definition of that condition provided by *section 123 of the Insolvency Act 1986.* During the administration - see the *Railways Act 1993 section 59* - its business was to be managed by the Administrator appointed by the Court "in a manner which protects the respective interests of the members and creditors of the company" and with a view to achieving the statutory purpose of transfers as a going concern. *The Railways Act 1993* , which created this form of relief, contemplated there being "Railway Administration Order Rules" which had to be made by the Lord Chancellor with the concurrence of a Department Minister. They were ready in draft but had not formally been made. Nothing barred a Railway Administration Order being made against Railtrack in point of jurisdiction and, if one were made, the Secretary of State was empowered, at his discretion but with Treasury consent, on terms to make grants and loans and give guarantees in order that the Railway Administrator could manage the assets until there could be transfer to another or others such that its relevant activities could continue to be carried on - *section 63 of the 1993* . In effect, unless funding came from ordinary commercial sources, it would thus be the government, and hence the taxpayer, that would fund the continuing operation of the railway infrastructure if such an Order came to be made against Railtrack.

**Mr Byers is briefed**

54.  Mr Rowlands wrote a submission to his incoming Secretary of State on 8th June 2001. He wrote of a sizeable funding gap appearing from Railtrack's 2000/2001 financial results and of its hopes of persuading the Regulator to assist. He warned that:–

> "Even if he does agree, the full cost will pass through to increased SRA support payments, for which there is at present no budget cover."

Renewco, said Mr Rowlands, (though not calling it that) would require both Treasury and ONS approval; "the omens at present are not good". Without Renewco, Railtrack's new debts would rise "to a probably insurmountable £5.4bn". The efficiency savings required of Railtrack would be a major challenge. There was a risk that the Department could have to find an additional £1.4bn over the next 2 years.

55.  No less worrying was a paper of the 11th June prepared by Mr Linnard. Railtrack, he wrote, was "frankly, in a mess". It did "not have a grip on its core assets. Its

management was weak, with deep−seated problems which the new Chief Executive and Chairman will struggle to overcome".  It share price was shrinking.  Mr Linnard also prepared a comprehensive brief headed "Railways: background and issues".  Railtrack's medium−term financial projects were shaky.  Even if they could get from the Regulator all they hoped for (which could not be guaranteed) Railtrack's debt burden may even so be unsustainable in the longer term.  "Some form of financial restructuring", wrote Mr Linnard, "within the next 5 years looks inevitable if the company is to survive and we are to avoid further substantial increases in support requirements".  He made the point, too, that if the Regulator did give Railtrack all it sought, the full cost would be passed to the SRA for extra support "for which there is at present no public expenditure cover".

56.    Mr Byers was seriously concerned and asked for an option paper to be prepared on the future of Railtrack covering all options short of re−nationalisation, although even its "pros and cons" might as well be included.  That, though, did not of itself suggest that there would be some ministerial decision as to some fundamental change;  it was, said Mr Rowlands, as I accept, merely a newly−arrived Minister not unreasonably asking, given the concerns about Railtrack's performance both before and after Hatfield, what the options were.  "That", said Mr Rowlands, "is a standard piece of the internal workings of government".  Mr Byers wanted there to be a meeting to take matters further once the options paper was to hand.

**Mr Coulshed's Options paper**

57.    On 12th June Mr Mark Coulshed, Divisional Manager of Railways Sponsorship at the Department, produced a paper called "Railtrack: Options for Action by Government".  It recommended that Mr Byers should meet key railway industry figures, in particular Mr Robinson, before forming a view, though the paper commented on Railtrack's bad reputation, its being pilloried for bad management and its balance sheet being so weak that it was completely unable to contribute to the development of the network and even had difficulty in funding the regular maintenance programme.  The paper recited that the Prime Minister had only recently re−iterated the arguments against full re−nationalisation, the cost of which, in any event, was "an immense hurdle".  The other options raised, as they had been before in February, included conversion into a not−for−profit trust.  Another option, indicating a governmental lack of confidence in Railtrack and one which was speculative as to its consequences, was the prompting of a third−party acquisition of Railtrack, although such was the scale of Railtrack's problems that the "Government might have to provide further funding than currently envisaged to get a suitable new owner on board".  Administration was not specified as an option.

**The Regulator's "begging bowl" speech**

58.    On the evening of the 12th June Mr Winsor made a speech to the Institute of Electrical Engineers.  It painted a bleak picture of Railtrack.  The WCML project had not been properly worked out;  things had got steadily worse even after the Ladbroke Grove crash and the Hatfield derailment; it was not trusted to deliver, its share price had fallen beneath the 1996 offer price, it had published its first loss, its essential skills base of engineers had been diminished and so on.  The company, said Mr Winsor in a phrase that gave the speech its name, "should put away the begging bowl and stop spending valuable management time hawking themselves unwanted round Whitehall and knuckle down to getting train services back to a sustainable level of reliability and quality of service".  But all was not lost; Railtrack could apply to him for an interim review but a compelling case had to be made if there was to be one. "However", added Mr Winsor, "I have told Railtrack not to bother making any such application until they have sorted out the recovery".

59.    The market reacted badly to the speech.  The share price fell further.  Mr Robinson believed the speech had made it more difficult for Group to obtain further funding from the bond market.

**15th June Meeting**

60.    The Departmental meeting Mr Byers had called for took place on 15th June.  There was a wide–ranging discussion which included Mr Linnard's views that the Rail Regulator had a vendetta against Railtrack and that there was Treasury unhappiness at public expenditure being in effect controlled by the Rail Regulator but the phrase to which Mr Rowley most drew attention was one attributed to Mr Byers, namely that he had said that Railtrack "looks a basket case".  Mr Byers was content to be taken to have said that but he resisted that it had meant that as early as 15th June he had determined that Railtrack had no future.  I accept his evidence;  a view that Railtrack had no future would have been inconsistent with his view, expressed at the same meeting, that the *existing* structure should be made to work better, including ways of getting those involved working to a common agenda and with the Rail Regulator "on board and working [in a] collegiate fashion".  Sir Richard Mottram also resisted the interpretation sought to be put on the reference to a "basket case" and Mr Rowlands, also at the meeting, gave evidence that Mr Byers did not then convey to him the message that Railtrack was a lost cause.

**Mr Byers meets the Rail Regulator**

61.    On 19th June Mr Byers had what he called a "getting to know you" meeting with Mr
Winsor, who was asked to explain his view of the industry and its problems.   Mr
Byers had begun by saying it was not the time for some huge restructuring, which, he
said, would have led to a period of stagnation and paralysis.   Rather "delivery" was
to be Mr Byers' primary task.   Perhaps reverting to the theme of his "begging bowl"
speech,   Mr Winsor said it was important that Railtrack did not get the message that
they would always be bailed out.

**19th June 2001**

62.    CSFB made a "pitch" to become key investment banking advisers to Railtrack on 19th
June and were successful.   They were given open access to the whole of Railtrack.
Amongst matters requiring attention were Railtrack's relations with the Regulator.
Only two days later it was reported back to Mr Robinson that when senior Railtrack
management had met Mr Winsor he had said "Insolvent liquidation could be the best
thing for the rail industry".   Mr Robinson keenly saw that relations had to be
improved.

63.    On the same day Lord Cullen's first report on the Ladbroke Grove rail disaster was
published.   It seemed to draw fresh attention to Railtrack's shortcomings and spoke
of its "institutional paralysis".

64.    At about this time Mr John Smith of Railtrack prepared a note to arm Mr Robinson
for his first meeting with Mr Byers in their respective new offices.   It throws light on
a Railtrack management view as to its predicament;  the situation was worse than
expected, neither the Regulator nor Railtrack could estimate the costs of running and
maintaining the infrastructure with any certainty, the assumptions on which the
settlement with the Regulator for CP 2 had been based were completely unworkable,
major cost over–runs on the WCML and the Channel Tunnel Rail Link were still not
under control, Railtrack's "bloating" operating costs were not being addressed.   If the
subsidy and pricing regime was left unchanged, the company was heading for
liquidation.   Railtrack needed Government support in order to maximise its private
sector funding.   As it turned out, Mr Robinson, although he considered Mr Smith's
note prior to his meeting with Mr Byers, did not work his way through it at the
meeting, as I shall come on to.   But he did not in his evidence to me distance himself
from Mr Smith's views.   On the contrary, when aspects of it were put to him he
agreed with Mr Smith's views.   For example, whilst Railtrack had an assets register,
it did not have an adequate knowledge of *the state* of its assets, something he
regarded as fundamental.   True also was it, he said, that there was a huge gap of
£3.7bn between Railtrack's current projections and the amount allowed to it by the
Regulator, a gap which if unplugged would lead the company towards liquidation.
True also that Railtrack had made commitments as to the WCML that were probably
undeliverable and had incurred considerable cost over–runs.   No attempt had been
made, either, to address the bloating operating costs.   An "extra chunk" of £1–2bn
would have to be found in CP 2, even if all other issues were properly managed.   It is

a notable comment on Railtrack's financial uncertainties that the range – £1–2bn - should be so wide.

**A second Departmental meeting:  20ᵗʰ June 2001**

65.     At this meeting Mr Byers suggested that the Treasury should be brought into discussions about Railtrack.  They would be better equipped in knowing how to restore City confidence in it.  Mr Rowlands said he would get in touch with Miss Vadera about joint work being done.  Mr Byers said he wanted work on Renewco to be done quickly, with a view to his then putting options to the Prime Minister at some stage but Mr Rowlands did not understand that work was required urgently with a view to being capable of early implementation.  Such views were inconsistent with a judgment that Railtrack had no future or that Renewco was to be dropped, although it was recognised that, in effect, the Treasury had a veto over Renewco.  It had not to "score" as public spending but if the SRA was perceived as standing behind Railtrack then Renewco would so "score".  Renewco plainly had its problems.  A workable model had to be found for it but, if immitigable objections to it were encountered, Railtrack would have immediately to be told.  But at this date it was nothing beyond *options*  that were being intended to be looked at; Mr Byers, said Mr Rowlands, was asking for what Ministers frequently ask for, which is a piece of interdepartmental work looking at what the options might be.   He added:–

> "We were looking at what might be the options should the Government ever want to do something different in relation to the industry. It is what governments do. It is what departments do."

**Miss Vadera's E–mail**

66.     Either on 20ᵗʰ or 21ˢᵗ June Miss Vadera met Mr Byers and on 21ˢᵗ June she sent an e–mail to a Treasury colleague that spoke of Mr Byers having asked for work to be done "on options for Railtrack involving alternative owners and management".  On the basis of that Mr Rowley put to Mr Byers that his version of the Departmental meeting of 20ᵗʰ June, with its references to restoring City confidence and going forward to find an acceptable model for Renewco, was plainly wrong and that what he had truly wanted was, and, in effect, was *only* , work as to "alternative owners and management".  Mr Byers denied that was the case and I accept that denial;  the note of the meeting of the 20ᵗʰ shews Mr Byers having concerns beyond those referred to in Miss Vadera's e–mail.  If he had been minded to conceal his true wishes from his Departmental colleagues he would hardly have then immediately disclosed them to the Treasury when at the same time arranging for both Ministries to work together.
It may be that Miss Vadera's e–mail reflected what *she*  thought would prove to be the most practical solutions to Railtrack's problems but I accept that her e–mail did not reflect Mr Byers' state of mind at the time.

**22nd June 2001**

67.   On this day the Prime Minister wrote to Mr Byers.  Transport must, he said, be a top priority.  "We clearly need", he wrote, "to review the architecture of the rail industry".  Was the framework right?  What were the likely costs and benefits of further structural change?  The Prime Minister noted, too, that both TOCs and others had called for a more radical restructuring of the industry.  That options were already being widely considered in the Department was plainly not because of some initiative supported only by Mr Byers;  it was in line with governmental thinking at the highest level.  There is no hint in the Prime Minister's letter that options should be confined to alternative owners and management.

**Barclays Capital**

68.    Mr Robinson's evidence included that on or about 26th June Railtrack had it confirmed to it by Barclays Capital, the likely lead banker in any prospective Railtrack bond issue, that access to the bond markets was still possible.  He did not himself identify the particular letter and it would seem, from another part of his written evidence, that the advice as to access to the bond market was "absent other bad news".  I could not take that to be a reliable or uncontingent assurance as Barclays Capital would be unlikely to say that the bond market, in respect of an issue still then several months away, would not be accessible unless that had become categorically and irrevocably already obvious.  There is a letter, which Mr Robinson may have had in mind, from Barclays Capital to Mr Harding of Railtrack on 22nd June 2001 which emphasises the need for Railtrack to maintain the "A" credit rating and which said "Put simply, the markets are unlikely to provide funds if it believes the Government will not".  The letter cannot be regarded as any form of assurance that access to the bond market would be open in the Autumn although neither does it say that it would not be.

**Mr Byers and Mr Robinson meet:  27th June 2001**

69.   The meeting was friendly but there are disputes as to what was said.  Having decided not to speak from the note which Mr Smith had prepared for him, Mr Robinson intended to speak from his own brief note.  He considered the meeting to have gone very well.  He undoubtedly drew (literally) a picture of Railtrack as a "Gulliver" restricted by ties including those of the Regulator, the Health & Safety executive and the Government but the contemporary note made by Mr David Hill, Mr Byers' Private Secretary, records Mr Robinson saying "Situation worse than expected".  In cross–examination Mr Robinson, without, I think, meaning to be, was a little equivocal;  he did not clearly deny that he had said as he was so recorded as saying.  Mr Rowlands' evidence was that Mr Robinson had indicated that the *financial* position was rather worse than he had thought when he had taken up his position.  Mr Robinson's memory of the meeting was not sharp;  he confessed to have tried to put Railtrack affairs out of mind over the intervening years.  I hold that Mr Robinson did say that the situation was worse than he had expected, though without his necessarily intending thereby to limit himself to the *financial*  situation.

70.    He accepted that he probably did say that the Regulator was Railtrack's biggest problem and that relations with him were appalling.  He accepted that he was by then well aware that the Regulator had said that Railtrack need not bother to apply for the second Hatfield Re–opener until it had sorted out the recovery.  He did not seek to challenge the note's record of his saying (as was his belief) that the subsidy pricing regime was unworkable and that without an interim review Railtrack was likely to run out of money in 18 month's time.  He believed an additional funding stream was required in CP 2.  He accepted, too, that he probably had said that lots of routine maintenance had not been done and that the company had a huge training need.  He told the Department that CSFB had been approached by Railtrack but that further work was needed before Railtrack could take advantage of their advice.

71.    Mr Robinson also spoke, as both the note and Sir Richard Mottram's oral evidence touched on, about the company's need to raise money in the Autumn, that that would be impossible if people were scared off and about his concern that both the Regulator and the Chairman of SRA were creating a climate which made it impossible for it to access its agreed financing, a reference, as I understood it, to Railtrack's undrawn existing borrowing resources.  For his part, Mr Byers said relatively little at the meeting but he did not speak of structural change but of working with the very structure which, for better or for worse, was the one that existed and of the need to avoid a "blame culture" between Railtrack and the Regulator.  Mr Byers and Mr Robinson were, it was agreed, to meet on a monthly basis or reasonably frequently.
It had not yet become clear that Railtrack's proposals, when they emerged, would leave the Regulator on the sidelines in the sense that Railtrack would be proposing directly to the Department rather than to the Regulator in connection with its financial needs.

**Mr Adonis**

72.    Also on 27th June Mr Adonis, as he then was, then head of No. 10's Policy Unit, wrote a note to Mr Jeremy Heywood, Principal Private Secretary to the Prime Minister, favouring a fundamental internal review looking at all viable options (including a possible return to the public sector) for Railtrack, which he took to be at its nadir, leading to an opportunity that required consideration.  The note illustrates the dangers of treating internal notes or memoranda of the Civil Servants or Advisers of any one department as being the government's view.  Neither Mr Byers nor the Department would at the time have known of this note.  Mr Rowlands' evidence was that the Department still believed that the April Agreement had stabilised Railtrack's position at least for the short term and Mr Byers' was that he was not thinking on the same lines as Mr Adonis;  he was, rather, seeking stability for Railtrack and to find if the Department could work with the *existing*  structure.

73.    Sir Richard Mottram further diminished the relevance of the Adonis note by saying, of the people in the Policy Unit, that they were scanning the horizon all the time looking at things they should be thinking about to put to the Prime Minister "but they do not necessarily consult the Departments and their views are not necessarily that well informed", a comment he neatly underlined by referring to Mr Adonis' having twice called the SRA the "SRB", which Sir Richard thought "probably instructive".

There was, in my judgment, at this time, no view of Mr Byers or in the Department that Railtrack was at some such nadir that amounted to an opportunity, not to be missed, to take it back into public ownership.   Their view, to revert to Miss MacKenzie's earlier phrase, was still to work with the grain rather than against it.

**CSFB report to members of the Railtrack board**

74.    CSFB had assembled an impressive team under Mr Nelson to look into and report on Railtrack's position, which they did on 28th June.   Mr Robinson recollected that the "headlines", so to speak, of CSFB's report were that Railtrack's solvency was a real issue without government support, that the financial markets were closed to Railtrack (a view on which the Board members were at odds with CSFB), that application to the Rail Regulator for an interim review would be unsatisfactory (it would involve much work, would take 12–18 months and would create uncertainty) and that instead application should be made direct to government, a strategy given the name "Project Rainbow".   Rainbow was to be worked up to become a form to attract or at least to be acceptable to government and was to be presented as a "one option" strategy rather than allowing various options to be presented, which would be likely to lead to no consensus being reached.   Mr Harding, Railtrack's recently appointed Finance Director, felt that Railtrack could "muddle on" as it was for at least 18 months, perhaps the first mention of that possibility as a strategy, but it was plainly not a long–term solution and CSFB's view was that it was not a viable option and would not be acceptable to government.

**Mr Harding's concerns**

75.    By 29th June Mr Harding was concerned at the risk of Railtrack losing its "A" rating.   It was increasingly at risk.   Indeed, its existing deals were trading at the lower level of "triple B" despite the theoretical "A" which Railtrack had achieved from 2 key credit rating agencies.   À propos solvency, Mr Harding told the Rail Regulator that "The cliff's edge is closer than you may realise"  and that the Board was obliged to take a view of the Company's solvency on an on–going basis and explicitly as to a "going concern" basis in each half–year result's announcement.   He sent a copy of his letter to Mr Rowlands and to the SRA.   I do not see it as possible to discount the letter as being just alarmist as if, for example, for the merely tactical reason of more thoroughly encouraging the Regulator's cooperation;  the phrasing of the letter suggests that legal or accounting advice had been already taken such that solvency and the going concern basis had to be focussed on as the letter describes.   These concerns of Mr Harding do suggest, though, that if "muddle on" was a strategy he could espouse, it was at best precarious.

**The first Renewco deadline is passed**

76.    It will be remembered that if Renewco had not been set up by 30th June then Group was to have a further 21 days to consult on an acceptable alternative, failing which it would be able to apply to the Regulator for a Hatfield Re−opener.   30th June came and went with no Renewco but also with no application to the Regulator.   Railtrack's board considered an interim review a waste of time at that point.   Mr Robinson thought not only that application to the Regulator would very probably not have produced enough cash quickly enough but also that Renewco would eventually be set up.

**The Transport "stocktake" of 5th July 2001**

77.    On 5th July the Prime Minister met, inter alios, Mr Byers, Mr John Spellar, Minister of State at the Department, Mr Andrew Smith, Chief Secretary at the Treasury and Lord Macdonald for a "stocktake" on transport issues.   Miss Vadera attended.   The meeting provides a good example of a special adviser expressing views which are neither those of her own department nor that of the responsible department as Miss Vadera's view, that Railtrack could not be stabilised in the short term and required radical change to its structure, was not adopted by either the Treasury Minister present nor by anyone else.   Sir Richard Mottram, also present, in his oral evidence summarised the gist of the meeting being that both the Prime Minister's and Mr Byers' emphasis was that the priority was to get punctuality and reliability back to normal, that Mr Byers went on to regard structural options as needing to be looked into but that a careful balance had to be struck as embarkation on structural change could itself dilute the necessary concentration on improvement in performance.   I do not accept that Miss Vadera's views at the stocktake represented the government's policy or even its wish at the time.

78.    Mr Byers had on 29th June written a brief to the Prime Minister in connection with this stocktake (then thought to be for 3rd July) in which, after describing the SRA as unfocused and unrealistic in its ambitions and whilst describing the Regulator as uncompromising and legalistic, he wrote of Railtrack being "a mess".   At that stage he saw the problems not as structural but as of management, not as to Mr Robinson and the senior colleagues who had recently joined with him but, he explained in his oral evidence, as to Railtrack's zonal directors and as to Railtrack's quasi−federal and geographically divided management structure, which made its problems both complex and such as required urgent attention.   As Mr Rowlands put it, "There is a real need to do something about the management rather than the company.   This, after all, is a company that allowed Britain's railways to become a complete shambles".   He added "× even at this stage, 5 years after privatisation, we still had no asset register, it still had no knowledge of the state of its assets, it did not know what its unit costs were, it did not understand its costs base.   Those were essentially management problems".   What Mr Rowlands was then and thereafter expecting was that the Department would produce an options paper by the end of July, as the Prime Minister had requested, the sort of thing that Ministers take away to read on their holidays in August with a view to saying, in September, which plans were to be developed.   I do not detect any significant differences between what Mr Byers was

saying relatively privately to the Prime Minister in his briefing and what he said to the wider audience at the stocktake itself. It had become clear, though, by the time the briefing was written, that Mr Robinson wished to deal direct with the Department rather than with the SRA or the Regulator and that if CSFB as Railtrack's new advisers were to make proposals it could be that the Department would need to bring in corresponding City advisers for itself.

**The Scoping Group**

79.    In early July occasional meetings began between Civil Servants and Special Advisers from the Department, No. 10 and the Treasury to consider Railtrack's position, both in finance and performance terms, and possible options to deal with that position, which was regarded as unsatisfactory on both accounts. Membership of the Group (perhaps attendance at its meetings would be a better description) varied; it had no formal membership or constitution and minutes were generally not kept although papers were distributed. I shall not find it necessary to make findings as to each of the Scoping Group meetings.

**Railtrack's board meeting: 12th July**

80.    CSFB attended to explain that they had been instructed to analyse and advise upon the whole corporate finance strategy for Railtrack and Group. Advice had been taken from leading Counsel and the Auditors that a dividend could be paid to shareholders. It was expected that *existing* credit lines could last until early to mid−2002 and that "absent other bad news" Group would still be able to launch its proposed bond issue. It was resolved that a dividend should be paid. It is difficult to square Mr Robinson's evidence of the relative lack of concern at the meeting with Mr Harding's concerns of only a fortnight or so before.

**Mid−July e−mails**

81.    On 12th July David Hill, Mr Byers' Private Secretary, e−mailed Mr Rowlands on the subject of joint work (that is, between No. 10, the Treasury and the Department) on options for Railtrack, adding, of Mr Byers, "He is keen to make quick progress on this. He thinks Cullen II may provide the opportunity for quick action". The message seems to have bemused Mr Rowlands. He took 8 days to reply and said he was not sure what Mr Byers had in mind by way of an "opportunity for quick action", adding that he was still aiming to put an options paper to Mr Byers by the end of the month for it to go on to the Prime Minister and the Chancellor "and from which Ministers can decide what they would like further worked up".

82.    "Cullen II" is a reference to the publication of the second part of Lord Cullen's report into the Ladbroke Grove Rail disaster, expected in September 2001. In cross−examination Mr Byers accepted he had always seen Cullen II as a peg on which could be hung changes to the rail industry but I understand him to resist that amongst the changes then specifically in mind as to which "quick progress" was to be

made was a change in the status of Group or Railtrack as a listed company (Railtrack never was one) but rather referred to changes such as to punctuality, safety, comfort and railway performance generally.  I accept his answer;  such subjects would seem more naturally capable of being hung on the peg of Cullen II than would structural corporate change and Mr Rowlands' reaction to the e−mail showed no awareness that anything but work on options was being required, though it was then the case that Mr Byers then and thereabouts wanted to receive the work on options so as to be able to have decided the way forward by the first week in September.  The way forward, he pointed out, in relation to this and to a later e−mail, could have been *any* of the options to emerge from the work on options, or none.  I cannot take the Hill e−mail as an indication of a mind already made up on the subject of structural reform, still less on an indication that already an administration of Railtrack was being "engineered".

**Group's AGM: 24ᵗʰ July 2001**

83.    Mr Robinson's first AGM as Chairman took place on 24ᵗʰ July.  He spoke of railway's poor performance and heavy bureaucracy, of low staff morale and of poor performance on many of its investment projects.  The industry squabbled too much; it had to work together.  As for short−term finance, it would have to be raised in the market.  Major projects would have to be financed directly or indirectly or be underwritten by the Government.

84.    The AGM was followed by a Group board meeting.  CSFB reported that without *additional* government support, the equity was unlikely, on certain assumptions, to have any significant value.  Differing from Mr Robinson's view of what Barclays Capital had said or written, CSFB's view was that the debt markets were closed or limited and that there was limited, if any, availability of new bank finance.  A government "comfort letter" was likely to be required in the short term, but, said Mr Nelson, the board was not in a position in which it needed to seek legal advice about adoption of the going concern approach.  Mr Robinson's view (though not, I think, expressed at the time) was that the bond market would always remain open to Railtrack *provided* that the market believed that the Government was supporting Railtrack.

**Mr Byers meets the SRA Chairman**

85.    On 24ᵗʰ July Mr Byers met Sir Alastair Morton, their first meeting since Mr Byers had taken office.  Sir Alastair said "Railtrack can't hack it" and expressed doubt as to where the finance it needed could come from.  Mr Byers said he was looking for a period of stability rather than coming to some immediate view of how to deal with Railtrack.

86.    On the following day Mr Byers' Private Secretary, Mr Hill, e−mailed, inter alios, Mr Rowlands saying that "the Secretary of State wants to have decided the way forward by the first week in September".  That sentence was under the heading "Options for

Railtrack".  It was consistent (said Mr Rowlands, as I accept) with a paper being needed in order that it should go to the Prime Minister at the end of July for it to be taken away as summer reading with a view to some decision in September.  The "way forward", as Mr Byers said in  cross–examination, as I have already noted, could have been any of the options put forward or none;  the e–mail cannot be taken as an indication that Mr Byers had already espoused any particular course of action relating to Railtrack.

**Mr Byers again meets Mr Robinson:  25th July**

87.    Mr Robinson and Mr Byers met a second time on Railtrack affairs on 25th July.  There is unresolved uncertainty as to how the meeting came to be arranged.  At the Department it was thought Railtrack had sought the meeting but it may be it was part of the intended pattern of monthly or regular meetings.  There are some debated issues as to what was said by Mr Robinson at this meeting concerning the accessibility of the bond markets to Railtrack, the terms in which a "soft" letter of comfort was spoken of and whether there was mention of a possible inability of Railtrack to make a "going concern" statement come its interim results in November.  Another issue was whether Mr Robinson spoke of things being worse than had been expected.

88.    There is no doubt that the subject of the bond markets came up and that access to them was more difficult (so said Mr Robinson to me) than it would earlier have been.  Further, although Mr Robinson regarded the "outline speaking brief" (which he had been provided with by CSFB for the meeting) as over–pessimistic, that brief did warn that without a definable basis for Government support and without a cap on WCML exposure, CSFB's concern "is that accessing international public debt markets [in full] is not currently a viable option".  For Mr Robinson to have spoken of possible difficulties in the debt market would thus have not only been consistent with what Railtrack's own advisers were telling him but also a tactically likely subject to mention to strengthen his case for a letter of comfort.  I hold that Mr Robinson did speak of such access being difficult.

89.    The need for a "soft" comfort letter from the Government was also brought up by Mr Robinson but it is said by the Claimants (as their case was put orally to witnesses) that it was said only to be required if the "climate" did not improve.  Mr Byers' evidence was that that condition was not added (nor any other) and that he expressed concern about the idea.  I prefer Mr Byers' evidence;  if the letter was to be required only if the "climate" did not improve one could expect some inquiry into what that vague condition was intended to mean, yet there seems to have been none.  Moreover, nothing would have been more natural to a Government which had agreed the principle that, whilst it would stand behind the railway industry, it would not stand behind any particular company in the industry, than that it would express concern at the notion of being required to give some seemingly bottomless and general letter of comfort, however "soft".  The contemporary note, moreover, attributes to Mr Byers, à propos a comfort letter, the remark "concept does not please him".  Mr Rowlands' evidence was also that the condition about the "climate" was not added.

90.    As for the "going concern" statement, Mr Byers recollects Railtrack's possible inability to make one being mentioned by Mr Robinson although the contemporary note contains no supporting mention.  The note does not aspire to be verbatim but I would have expected the "going concern" point to have appeared in it if it had been expressly raised and I might have had difficulty in accepting Mr Byers' evidence that Mr Robinson had asked for no minute to be made of disclosures on the financial aspects then raised.  I cannot think that Mr Robinson would have so presumed on a subject as to which the Government would plainly wish to have some record.  However, it may well be that Mr Byers was right and that there *was* talk about the going concern basis in relation to the November interim results.  Mr Robinson accepted in cross–examination that the notion of a comfort letter was raised both as to drawdown of existing facilities *and* "for the interim results".  It is difficult to see the relevance of a comfort letter to the interim results if it was not in order to avoid "going concern" difficulties.

91.    However, in a sense it matters little whether the subject was *expressly* referred to or not or agreed or not agreed to be minuted because it would have been plain from the admittedly more difficult position as to the bond markets and the admitted request for a letter of comfort, conditional or not, that the "going concern" basis was heading towards being a real difficulty for the company by November.  The Government side, told by Mr Robinson, as the contemporary note records, that the company would run out of money in September or October, could fairly have *inferred* that there would be a going concern problem, whether or not it was expressly said that there would be and on that basis the difference in the evidence is not so much between one version and another but an understandable confusion between what was said and what was reasonably inferred at the time from what was said.  I hold that the Government side did, at the conclusion of the meeting, believe, and had reasonable grounds to believe, that the company was likely to have difficulty in making a "going concern" statement on publication of its interim accounts in November.  Indeed, it was Mr Robinson's own belief (though I do not say it was mentioned at the time) that without a soft comfort letter Railtrack itself would have had to announce that it could not draw even on its *existing* facilities and could not be regarded as a going concern.

92.    As for things being worse than Mr Robinson had expected, Mr Robinson's own evidence suggests that that was so.  He accepted that the "climate" had changed for the worse since April and, as I have mentioned, that that made access to the bond market more difficult.  Mr Rowlands' evidence was that Mr Robinson had said things had got worse, beyond the "climate", and that he had said that the financial position was far worse than he had first thought.  Mr Byers' evidence was to the same effect.  I prefer the Defendants' and Mr Byers' evidence;  not only is their evidence clear, it would have been a natural approach on Mr Robinson's part, pressing for help, opening negotiations in which new and further provision - be it a comfort letter, accelerated payment or direct negotiations not involving either the Regulator or the SRA - was being sought, to make a case for it by saying that his task was difficult and that things were worse than he had earlier expected or, more generally, worse than anyone had earlier expected.

93.    In practical terms a main object of the 25th July meeting, so far as concerned Railtrack, was to arrange that its advisers, CSFB, would meet directly with the Department (and its advisers, if it brought any in) to develop a strategy to remedy Railtrack's difficulties, a strategy, still then only in embryo, which would, as I have mentioned, be called "Rainbow" and that this form of meeting would be acceptable to the Department.  For its part the Department was willing to meet with CSFB but, because Mr Robinson had spoken only generally so far, it had not realised that what was going to be proposed was a strategy that was hoped by Railtrack entirely to by−pass the Regulator and the SRA.  I do not say it would have vetoed such a strategy;  it simply had not yet realised that that was what was going to emerge. Because of that this meeting on 25th July was not, I think, a watershed in the Department's view of Railtrack;  that came only later, after meetings with CSFB further spelled out Railtrack's condition and what Railtrack had in mind.

94.    Mr Rowley emphasised Mr Robinson's evidence that he had left the meeting of the 25th July feeling that the Government was supportive of Railtrack, as if it was wrong for the Department to have allowed that to occur.   The Government was supportive of Railtrack;  what was more significant was the level to which it could be taken that it would be so supportive.  Mr Rowlands' evidence was that Mr Robinson had no reason to believe that the Department was not ready to engage with CSFB.  That was a limited form of potential support.  I do not hold the Department to have indicated at the meeting that any particular form of support, still less any particular form which infringed Principle I of the April Agreement, would necessarily be extended to Railtrack.  If Mr Robinson left feeling that some support necessarily going beyond a willingness to engage with CSFB and to entertain their proposals had been indicated I would regard that more as a fault in Mr Robinson than a fault in the Department.

**Mr Robinson's assessment of Railtrack's position**

95.    Mr Robinson, though he did not say so at the meeting of the 25th July, knew that the proposals, when they emerged, could involve additional subsidy of Railtrack in order for it to sustain an "A" rating.  He was looking to *additional* funding of between £1–2bn (he had no precise figures) but not in the immediate term.  Moreover, some form of government support such as a comfort letter would be needed even in the short term if by, say, September or October, Railtrack wished to draw down on its existing facilities and if the "climate" was such that it was felt that the Government might not support the company.  At worst the company could "bumble on" for another 18 months but then it would, absent Renewco and absent interim provision from the Regulator, have such problems as could well lead to administration.  But that, he thought, no sensible person would allow.  "It never entered my head", he said, "that, as a result of sensible discussions with sensible people, Government would do anything other than support Railtrack ×.".  Without *additional* Government support (meaning, in context, other than was already in place and other than the high percentage of the companies' income that in the ordinary way came directly or indirectly from government) Railtrack, he acknowledged, would at some stage cease to be a going concern.  The government support needed would have to go beyond Hatfield Re–opener relief and address what, by then, he regarded as deficiencies in the original settlement with the Regulator in January, the settlement the company had elected not to challenge.  It was unlikely that the Regulator would give the company what it wanted - the begging bowl speech had set an unhelpful tone - so there had either to be a Rainbow strategy negotiated direct with the Department or some other visible government support such as by the comfort letter that had been spoken of, something sufficient to re–assure the companies' bankers.  The comfort letter would be needed to give some re–assurance to the bond market that the Government was standing behind Railtrack.  It would thus need to be, I interpose, a letter that required the Government to depart from principle 1 of the April Agreement.  It was to be left to CSFB to work up a Rainbow strategy and, so to say, to "sell" it to the Government.

**Mr Rowlands meets CSFB**

96. As had been contemplated at the end of the meeting of 25th July, Mr Rowlands met CSFB, on 27th July. He reported on his meeting to Sir Richard Mottram on 30th July. CSFB had made a presentation using "flip" charts of which no copies were given out and which CSFB retained. They painted a very worrying picture. There was an impending financial crisis; the next major drawdown on Railtrack's *existing* lines of credit was "problematic". Access to the bond market was "doubtful". There would be an issue as to the Board's ability to sign−off on a prospectus for a bond issue. The options were "the Three Rs" - renationalisation, receivership or re−structuring. A manuscript note was made of Mr Rowlands' meeting with Sir Richard Mottram. It makes plain that CSFB had told him that Railtrack's auditors had already considered qualifying its accounts on the "going concern" basis, that Railtrack's ability to draw down on its existing facilities in October was dubious and that a bond issue prospectus might not be capable of being signed−up to. Mr Rowlands raised with Sir Richard the question of whether Railtrack was trading whilst insolvent and whether Railway Administration might not require examination.

97. Mr Robinson had approved the CSFB presentation. He accepted it indicated a projected net debt, absent additional government funding, of £12.2bn, £2.5bn more than the business plan had projected less than 4 months earlier. He accepted, too, that it proposed that £1.8bn of that projected net debt should be replaced by some direct and additional grant from the Government. Indeed, over CP 2, he accepted, an additional £2.2bn would be needed. Even with that support, the value of the company's equity would have been entirely consumed by debt. These projections, he acknowledged, were not known to the market. Had they been known, he said, as is obvious, that the effect on the market would have been very damaging to Group shareholders.

98. CSFB's proposals to deal with this exceptionally grave position were not yet formulated beyond an outline; there were to be other meetings with them. But their objective was to devise a plan which was "fair to Government (e.g. value for money) and "fair" to our stakeholders (but no unjust enrichment)" and which allowed Railtrack a period in order to recover before being restored to the normal regulatory regime.

99. In effect the Department, although no detail was put in front of it, was going to be asked to override or suspend both Principle 1 and (in the sense that ordinary regulation was to be postponed) Principle 3 of the April Agreement. But Mr Rowlands had not expected this first meeting to disclose what CSFB's and Railtrack's "bottom line" would be.

100. A recurring line in Mr Rowley's cross−examinations was that if, in fairly conducted negotiations, one party found the other's proposals totally unacceptable in some part, then commercial fairness demanded that the proposing party should forthwith be so told so that it could have the opportunity to amend its proposals accordingly. I did

not take Sir Richard Mottram, Mr Rowlands or Mr Byers to dissent from that general view of fair negotiations but there were, in effect and to summarise, 3 qualifications. Firstly, it would sometimes be necessary, said Mr Byers and Mr Rowlands, to find if the potentially unacceptable provision was, indeed, an inescapable part of the proposer's (CSFB's or Railtrack's) "bottom line" or final unchangeable position. Secondly, on some key issues the Defendants did in any event indicate, as will appear, that some proposals were unacceptable. Thirdly, I am by no means certain, in the grim financial situation which the continuing talks on and from 27th July disclosed and in the course of discussions which the Treasury had to be brought into, that anyone could be sure, until the final decision was made on 5th October, that a breach of the April Principles might not have to be swallowed, however indigestible and unwelcome in principle, as the least unattractive of the achievable solutions. What it was that was "totally unacceptable" was thus not immutably fixed or might prove not to have been. I do not hold the Defendants or Mr Byers to have conducted themselves unfairly on this account or with a view to making an administration harder for Railtrack to avoid, nor can I take their conduct relative to this issue as any ground for an inference that there was targeted malice against Railtrack shareholders in Mr Byers.

**Renewco**

101. One of the forms of unfairness in its negotiations which is alleged against Mr Byers and the Department is that it failed to indicate that it would not sign up to Renewco. Had only it done so, the Claimants' argument runs, Railtrack could and would have gone back to the Regulator for an interim review that might have saved it. But the argument depends upon there having been some early decision by Mr Byers that Renewco was immutably unacceptable, whatever other options might or might not be chosen by or be forced on the government. There is no hint that that was so and pointing against it is that on 29th July Mr Byers himself wrote to the Chief Secretary at the Treasury explaining what Renewco was to be and asking for Treasury consent to its adoption so that the whole April Agreement should not collapse. It was put to Mr Byers that, in writing the letter he was dissimulating, pretending that he wanted Treasury consent whilst secretly intending and hoping that he would not get it. He denied that. He would have needed to warn the Chief Secretary that the letter did not mean what it said and the Chief Secretary would have needed to be willing to join in the ruse. There is no evidence whatsoever of either being the case and no reason in evidence, either, why the Chief Secretary should not have taken the letter at face value or why I also should not do so. Again, there is no material basis for any relevant inference against Mr Byers.

**Miss Vadera's Scoping Group paper**

102.    On 31st July Miss Vadera circulated officials at No. 10, the Treasury and the Department with a comprehensive paper headed "Project Ariel: whether and how to restructure the industry, Questions to be addressed by advisers with evidence and analysis". "Ariel" was the code–name she gave to Group and Railtrack and "Project Ariel" was her name for a government strategy to cope with what she perceived to be the problems inherent in the railway industry and Railtrack, which included that in financial terms it seemed to be a bottomless pit. Should there be a takeover? Could there be vertical integration? Could renationalisation or a not–for–profit trust model be engineered through insolvency? Should Renewco be approved (which might enable Railtrack to avoid the very insolvency which could provide a convenient path to renationalisation or a not–for–profit trust)? These were serious questions but they were only that; questions in which Miss Vadera, as Mr Rowlands said and as I accept, was merely putting forward her thoughts. At the time there was no Government, No. 10, Treasury or Department policy formulated as answer to any of her questions. Only two days before, for example, Mr Byers, as I have just described, had written asking for Treasury consent to Renewco.

**Mr Rowlands reports to Mr Byers**

103.    On 30th July Mr Rowlands reported to Mr Byers that he and his officials were working with both the Treasury and No. 10 on an analysis of the options for Railtrack. He sent a note of work already done. There was no mention in it of administration followed by a CLG. On the following day Mr Rowlands reported to Mr Byers on his meeting with CSFB. It was put to Mr Byers that thereafter he was engaging (or authorising or permitting his officials to engage) in what he knew would be pointless negotiations or discussions as to Rainbow, a strategy which would have put Railtrack's financing, unacceptably, outside the range of the Regulator's decisions. He answered, as I accept, that there was no way he could have known on 31st July that the proposals which Railtrack would ultimately put forward would be unacceptable and, in particular, the Prime Minister having been personally very concerned about the regulatory system, he added that it *could* have been that a proposal to by–pass the Regulator could have proved acceptable.

104.    In the course of the meeting a Railway Administration was discussed as an option, Mr Rowlands pointing out that the Administrator would have a duty to keep the railways running and that it would be for the Administrator to look to the creditors' interests. Mr Byers spoke of administration as being a thing which could be "left" to happen and, in that context, I take the later reference by Mr Byers to "Should bring to a crunch in Sept/Oct" as not meaning anything such as that the Department should procure that the company would go into administration in those months but rather that the financial pressure already on Railtrack would bring its affairs to a crisis about then and that the Department would then need to be in a position to manage the situation. His final conclusion on 31st July was that he wanted all options, including administration, "worked up a.s.a.p.".

**1st August 2001**

105.   On this day Mr Nelson of CSFB made a presentation to the Department in the presence of both No. 10 and Treasury representatives.  Mr Byers was not there.  He said Railtrack had virtually no management control, it was the worst case he had seen for a period and that there was management paralysis.  It had major projects without the skills to manage them.  The Regulator's approach was to grind it down, which made matters worse.

**Mr Byers' submission to the Prime Minister**

106.   On his last day before his August holiday Mr Byers on 3rd August sent a submission to the Prime Minister (with a copy to the Chancellor).  Options for Railtrack were still being looked at but with added urgency because of its deteriorating financial position.  Mr Byers' view was that there may be only 3 options which were realistic; a restructuring of the company, a takeover or a conversion into a not–for–profit trust.  Help from outside advisers could be used over August.  "It may be advisable to take Railtrack into protective special railway administration and events could even mean it is inevitable, as a prelude to moving to the chosen option.  This needs to be looked at in more detail".

107.   Mr Byers summarised the stark message which CSFB had given; the financial problems were perhaps overwhelming and the company was bereft of effective management but the Department was not yet in a position to decide fully between the available options.  He summarised CSFB's Rainbow proposal as then understood; the share price was to be reduced to a nominal level and dividends would not be paid in return for some kind of yearly interest payment to shareholders and the regulatory regime would be suspended and be replaced by performance targets set by government.  The submission does not suggest that a suspension of the regulatory regime was immutably unacceptable;  indeed it figures as an express possibility in relation to the takeover option.   If targets were not met the government would receive equity in exchange for continuing financial support.  Mr Byers wrote, correctly as I would see it, that it was for Railtrack and CSFB to lead on this restructuring proposal.  Plainly that is what he expected.  He stated that he did not rule out the Rainbow proposal although he was not convinced it would either be acceptable politically or would address the company's fundamental problems.

108.   He specifically addressed railway administration as a subject on which work was in hand, adding:–

> "It is clear that we ought not to contemplate taking Railtrack into administration, which we could achieve by withdrawing government support, without being equally clear about how we would like it to come out of administration and therefore which option we want to pursue."

Mr Byers was cross−examined on the basis that the objection to renationalisation or the use of a not−for−profit trust was one of cost; shareholders would, at great expense, have to be bought out but that, by contrast, administration then followed by a not−for−profit trust offered a cheap route to the same end. I accept Mr Rowlands' evidence that there had been no discussion on the lines that administration should be used because it represented a cheaper way. Indeed, there was no basis in fact for the suggestion, put to Mr Byers, that he had realised that he could arrive at a not−for−profit trust solution "at no cost" via administration. Not only would the administration need to be funded whilst the administrator considered the commercial alternatives open to him but the government, were it to try to purchase Railtrack assets so as to emerge with a not−for−profit trust solution, would have to ensure it was, in effect, the highest bidder so that the Administrator could properly accept its offer. That this would all be "at no cost" would have been grossly improbable.

109.    It was not put to Mr Byers that he was dissembling in the terms in which he made his submission of 3rd August to the Prime Minister and I am entitled, I think, to take the submission as representing what was then his view. In any event there is no good reason not to. On that basis, the Department was going to continue to entertain such restructuring proposals as Railtrack and CSFB put before it whilst working up the alternatives. Railway Administration was not an end in itself but, even if adopted, would be but a step on the road to one. There was no decision directly or indirectly to procure an administration although it was sensibly recognised, in the light of what Railtrack and CSFB had been saying, that for the government merely to withdraw its support could achieve an administration. Leaving aside takeover (the viability of which was to be explored) and the equity restructuring (which awaited CSFB's more detailed proposals) what needed work on the remaining possibility, in case neither takeover or CSFB's proposals proved viable or acceptable, was what was the best attainable model for the next owner and manager of the infrastructure should there be no additional funding for Railtrack and how, if at all, could the government achieve that model. That needed working up, but none of Mr Byers' three options was yet abandoned nor any yet settled on.

**CSFB's further Rainbow proposals**

110.    CSFB had met Department officials, as I have noted, on 1st August and on 7th made a further presentation by way of "flip" charts.   A transitional period of 3−5 years was proposed.   Government support would be given so as to maintain an "A" rating. There would be a fixed return to shareholders by way of dividend or some equivalent and at the end of the transitional period the equity would be owned between the shareholders and the government in a proportion which depended on the company's achievement of certain as−yet−to−be−specified performance targets.   There would be a guaranteed minimum value ("the floor price") to current equity holders at the end of that period.   When Mr Rowley described the proposals of 7th August as putting some flesh on the bones on the proposal of 27th July Mr Rowlands fairly replied "perilously little skin here".   I agree.   There were still no numbers given, for example, as to the intended guaranteed share price at the end or the return to shareholders in the meantime.   As then framed the proposals were unacceptable as totally lacking in detail but it was contemplated that detail would later be provided and whilst they were unattractive as then put, there was no Department view that, in principle, no equity solution could be acceptable in principle.

111.    I accept Mr Rowlands' evidence that there had been no decision that suspension of the regulatory regime was unacceptable and that at the 7th August the Department's view was still that it should try to find what the company's bottom line was as to its Rainbow proposal.   It could not be pretended that an equity solution would be easy to achieve;  on the one hand the Treasury argument, not hardened into a conclusion, was that the shares were already worthless;  on the other hand, in order to get the broad shareholder consent that would be necessary if any proposal of the Rainbow type were to be implemented, *something*  would have to be dangled before the existing shareholders, many of whom were already nursing heavy losses on their holdings.   It may be that even on 7th August the Department mentioned reservations about there being a floor price or interim dividends but the Department did not then say that Rainbow was unacceptable as it had not been decided that it was and CSFB's own bottom line was still being sought.   CSFB were told, as was the case, that the Department would instruct or had instructed Schroder Salomon Smith Barney ("SSSB") as its own advisers, which, as it seems to me, would have been a wasteful or eccentric course had it already been decided that both a takeover and Rainbow were immutably unattractive.

**10th August 2001**

112.    SSSB met the Department with a Treasury representative present.  The Treasury manuscript note of the meeting includes the line (without attributing it to anyone in particular)  "Must not let them" [i.e. Railtrack] "waste time on unacceptable Rainbow".  Mr Rowley took this to be an indication that Rainbow (meaning, I think, here some equity solution to be developed from the initial proposals) was all along immutably unacceptable.  I do not accept that.  The Department (and the Treasury) certainly could see no justification for a floor price and a fixed dividend at any substantial levels but, until Railtrack's "bottom line" was found, it was not clear that either a substantial floor price or dividend would be insisted on by Railtrack.  There was, though, an unwillingness to allow Railtrack to delay by spending time developing any forms of Rainbow which, by incorporating a substantial floor price or dividend, would inevitably prove unacceptable.  CSFB or Railtrack or both would therefore need to be told (and were later told) not that they were, as it was put, barking up the wrong tree with any equity solution but, as Mr Rowlands said in evidence, that "We did not want to buy a concept called the floor price and that is why we were worried, for example, about the dividend".  The Department could undoubtedly have been more categoric and earlier with indications that a fixed price or dividend at any substantial level, if insisted on in any equity solution, would lead to that solution being rejected but I do not see it as having been unreasonable for the Department to have held back such comment until a more developed version of Railtrack was laid before them.  I certainly do not see their delay as part of some Department or Byers' plot to increase Railtrack's difficulties, to lure it into developing no solution other than Rainbow or to make its administration more likely.

**Meetings in mid–August**

113.    Whilst the politicians were on holiday, the advisers continued their work.  On 13th August a meeting was held which introduced Mercers as advisers brought in to assist and advise the Department on the structures best deployed in the railway industry - what was called "railway architecture".  Miss Vadera attended and said "We", meaning the Treasury, "do not want to compensate the shareholders".  She saw Railtrack's difficulties as an opportunity to re–nationalise but I accept Mr Rowlands' evidence that the Department had still come to no view of how to proceed.

114.    On 14th August there was another departmental meeting at which Mr Rowlands is recorded in the contemporary manuscript note as saying Railtrack "is finished".  In cross–examination he explained;  Railtrack was finished if there was no further government support, a belief he took to be CSFB's own view.   Without that it would be unable to draw on its bridge financing and unable to launch a bond issue.  I do not see the note as assisting the Claimants.

115.    It was at this meeting there first emerged the idea that legislation might be necessary to undo the Regulator's ability to conduct an interim review giving money to Railtrack.  The idea, which did not come from Mr Rowlands or Mr Byers, was that *if* the government decided as a matter of policy not to give further financial support to

Railtrack in its current form with a view to a structural change in the industry, it would, at lowest, be frustrating to find the Regulator then bolstering that current form by awarding it new money. It could be, therefore, that the Regulator's powers would need to be limited but it was recognised that that would need Parliament's approval.

116.    On 15th August there was yet another departmental meeting at which SSSB, Mercers, Treasury advisers and CMS Cameron McKenna, newly brought in as the Department's Solicitors, all attended. Mr Challen of SSSB spoke of Railtrack as a "failed privatisation" but I take the view that Mr Rowlands did in his cross−examination, namely that that did not signify that Rainbow in whatever form it might finally emerge was a proposal that was never going to be accepted; Railtrack's and CSFB's "bottom line" was still awaited. Certainly there is no hint that Mr Byers, still on holiday, had come to any decision that the equity option generally or Rainbow in particular was never going to be acceptable, still less that the Department, in his absence, should nonetheless pretend to CSFB that it might be acceptable. The Department was at this holiday stage being neither steered by nor reporting to Mr Byers.

**Further Rainbow developments**

117.    On 20th August CSFB put a more detailed form of Rainbow to the Department and its advisers. The interim period was to be 4 years. Group's dividends would be capped at 20p (down from the 26p they had been enjoying). At the end of the period the shares would be relaunched at a floor price between 350p and 500p depending on a performance regime to be agreed. The Government was to subsidize Railtrack's or Group's revenue to achieve earnings giving a coverage rate of 2.5 times (presumably to keep an "A" rating and hence to facilitate bond issues). The WCML was to be re−financed by Government. Government support was to be unconditional and uncapped.

118.    Even if, because of its very grave difficulties, Railtrack needed huge but unquantified and unquantifiable government assistance in ways that broke the April Agreement Principle 1 and required the regulatory regime to be set aside and even if, because of those very difficulties, the government was willing to go to its aid, it would be difficult to see why Group's shareholders should be so sheltered from those difficulties as to continue to receive a dividend only mildly reduced, to have its "A" rating propped up at public expense and to benefit from a re−launch at a guaranteed floor price. Even without Miss Vadera pushing the Treasury against shareholder support it is difficult to see how, *on the figures supplied to it on 20th August* , the Defendants could have accepted Rainbow as it then was and I accept Mr Rowlands' evidence that objection was raised to the floor price and dividend proposals (although he did not remember whether it had been raised at this stage or at a previous meeting).

119.    But to reject Rainbow as to some of its details and to allow CSFB to try to come up with something better was not to withdraw government support in all its possible forms from Railtrack and, as I have mentioned, the alternatives to Rainbow could be found, for example, to be so inconvenient, expensive or unachievable as to make even

Rainbow, albeit probably at adjusted levels, the least unattractive possibility. There had as yet been no decision to limit government assistance to only that which it was legally bound to give. There had not even been a decision to abandon Renewco. The Secretary of State was still on holiday. Accordingly, the Department, having had all along undertaken to CSFB that it would tell it if it elected not to support Railtrack (as, if that was so, Group would have had promptly to make an announcement to the Stock Exchange) left CSFB to see if it could change or develop its proposals for Railtrack's salvation (including their turning from the financial to the performance and management issues required to be dealt with in Rainbow). But plainly the equity re−structuring option was fading fast.

**Mr Corry's e−mail**

120.    Mr Daniel Corry was Mr Byers' Special Adviser, someone in whom Mr Byers could and did confide on political matters inappropriate for discussion between him and his Civil Servants. Mr Corry remained in London whilst Mr Byers was on holiday. On 22nd August they spoke. Mr Byers was in Crete. According to Mr Byers Mr Corry said he was encountering a sentiment at the Department that the not−for−profit trust option was fading as a viable option amongst officials. Mr Byers' response, he said, was that it was not to be closed down but that Mr Corry, as Mr Byers put it, was to "Go in hard, make sure you keep this as an option for me to look at when I get back".

121.    The e−mail which, in consequence, Mr Corry sent to Mr Linnard at the Department took a very different shape. It speaks of Mr Byers being "very attracted to the option of pushing them into administration. It does not cost too much, allows us to signal a big change. He cannot imagine us putting more money into Ariel ××.". Mr Corry adds that Mr Byers felt that "we would not lose that much control if Ariel" [i.e. Railtrack] "went into administration ××" and that Ariel was by then no more than a conduit of government money.

122.    Mr Byers was adamant he had not talked about being very attracted by the idea of pushing Railtrack into administration. His credibility was stretched thin here but it could just have been that, told to go in hard to preserve the not−for−profit trust option to which administration would be seen as a convenient pre−cursor, Mr Corry had mistakenly over−stressed the pre−cursor rather than the need to preserve the end option. But even if I disbelieve Mr Byers' explanation I must note two things; firstly, in context, the pushing into administration would seem to have consisted of nothing more than not putting more money into Railtrack, a course the Government was, within broad limits, fully entitled to consider and adopt and secondly, that Mr Byers' message to Mr Corry, a message which on this basis, was an unguarded and undissembling communication of Mr Byers' intentions, provides no hint of malice against Group's shareholders.

123.    I should add that Mr Rowlands (to whom, presumably, Mr Linnard reported the contents of Mr Corry's e−mail) telephoned Mr Corry and told him never again to send such an e−mail because it seemed to him to pre−judge work that the Department had not yet completed. A recurring theme in Civil Service advices to Mr Byers was that

it was important not to close down options until a final fully−informed decision was made and I have no reason to think he ignored such advice.  Politicians can change their minds.  Even if, away on holiday, Mr Byers, had expressed himself in a way that suggested a mind made up, it does not follow that later, back in the Department and receiving the advices that he did, his mind remained made up;  his conduct on his return, so far as that throws light on his state of mind, suggested that no decision as to Railtrack's administration had yet been arrived at.

124.    Mr Rowley invited me to draw adverse inferences from the Defendants' failure to call Mr Corry, still in government employ.  I decline to do so;  firstly because his evidence would be likely to go more to credibility only than to the real issue in the case, secondly because even if Mr Byers' views had been as Mr Corry had described them, I would have been far from sure, for the reason I have given, that they remained so once he was back from holiday and, thirdly and chiefly, because, as I have mentioned, until a late stage it was the Claimants' plan that they should call Mr Corry, a plan not abandoned, I apprehend, until he supplied a witness statement of what he proposed as his evidence.

**No. 10's understanding**

125.    On 23rd August Mr Jeremy Heywood, the Prime Minister's Principal Private Secretary, wrote a note to Dr Brian Hackland, Senior Policy Adviser on Transport at No. 10, saying, after speaking to Mr Rowlands, that a paper was being put together for Mr Byers' return and that it would propose (or was likely to propose) that Railtrack be put into administration to allow the government to restructure it by way of a CLG owned by persons such as the TOCs, the Trade Unions and others.  Mr Rowlands told me that he regarded Mr Heywood's note as inaccurate in that at that date the analysis they were doing in the Department had not got to any such point.  I accept that that was so but I would also accept that an administration which the government would strive to see was followed by a CLG was already being seen as a lively possible future course, though not yet to the exclusion of others.

**Takeover as an option**

126.    It will be remembered that one of the three options being chiefly considered was Railtrack being taken over by some other company.  Mr Rowley sought to make something of this option not having been seriously explored even though (as was the case) it had seemed to be the Prime Minister's preference.  Mr Rowlands' evidence, which I accept, was that he had looked into the possibility with Bechtel and with investment banking advisers J.P. Morgan and that, to use his phrase, "It did not run".  There was no evidence from the Claimants that it might or could have "run" and in the circumstances I cannot see that the Defendants were at fault in not pursuing it further and their failure to do so provides no ground for any relevant inference against Mr Byers.

**Ernst & Young enter**

127.   On 23rd August the Department instructed Ernst & Young to advise it, chiefly on whether or not Railtrack was insolvent within the meaning of the Railway Administration legislation and as to the practical steps that would need to be taken by administrators, if they were to be any.  CMS Cameron McKenna, I apprehend, were looking at such issues for the Department from a Solicitors' angle.

**Mr Marshall's presentation**

128.   On 28th August there was a meeting fully attended by advisers at which Mr Marshall as Railtrack's Chief Executive presented his plan for the restoring of normal railway service.  Insolvency and courses of action deriving from it, in other words strategies for Railtrack *other* than Rainbow, were plainly within contemplation at the meeting as Mr Marshall spoke of how administration or receivership would represent a backward step and Mr Robinson also spoke against such action.  As noted by Mr Page of CSFB Mr Robinson said that in "his view the Company was free to continue to trade without the need for any announcement" to the Stock Exchange, "however it was clearly dependent on continued Government support of the Equity option", meaning Rainbow.  Mr Rowlands confirmed that should that change (meaning, I apprehend, that should the Government decide to reject Rainbow) then the Department would inform the company, although he pointed out that he had been without formal instructions over the last few weeks as the Ministers were on holiday.  Some "iterations" would be likely to be needed to Rainbow, said Mr Rowlands, but whilst the Ministers were away he was not in a position to discuss it further.

129.   His private position was that Rainbow as it had been fleshed out with the floor price and dividend figures given on 20th August was unacceptable but he resisted that there was never any possibility of the discussions bearing fruit from Raitrack's point of view.  Foreshadowing Sir Richard Mottram's evidence as to the comparative nature of choosing between options, he said that if there had been no other option left then *some*  version, perhaps a very cut down version of Rainbow, would have had to have been put in place;  "one thing we could never have contemplated was another shambles on the railway.  After all we had had one only in October the previous year", a reference, I took it, to the disruption, ballooning expense and delays consequent on the Hatfield disaster.

130.   A point about Mr Robinson's evidence arises out of the note of the meeting taken, as I have mentioned, by one of Railtrack's own advisers.  Mr Robinson said that he remembered the meeting reasonably well and accepted that he had strongly believed at the time that the sense of the note was correct where it said that administration would be a major step backward and that managing a company in such a position would lead to escalation of costs and a deterioration in service.  Nonetheless he could not accept that he had said what Railtrack's own adviser's note attributed to him.  What was attributed to him reflected his views, he agreed, and was in the note and there was no reason given as to how the note–taking adviser could have been

mistaken but, for all that, Mr Robinson would not accept that he had said what the note attributed to him. His witness statement had not disclosed that the note, which he himself exhibited, was incorrect, nor was it put to Mr Rowlands in cross−examination that Mr Robinson had not in fact said what the note attributed to him. I thus have little reason not to prefer the note. The episode does not reflect badly on Mr Robinson's honesty; if he had been dishonest he would have disavowed his belief in the correctness of the sentiments attributed to him. But it does reflect poorly on his memory even of a meeting which he claimed to remember reasonably well. Mr Robinson did accept, though, that by this time Railtrack's directors were taking legal advice from Simmons & Simmons on the procedure for railway administration and on other forms of insolvency, that by now at every board meeting the Board raised with its advisers whether it was proper to continue to trade without any announcement to the market and that Mr Rowlands had made it perfectly clear that the Department *was* considering options as well as the equity option.

**The Government takes Counsels' advice**

131.    On 29th August the Department took advice from Lord Grabiner Q.C. and Mr Jonathan Crow. The Government, said Counsel, could not assume that it had an unwritten power to acquire shares in Group. Given that Parliament had specified railway administration to deal with a situation in which Railtrack could not pay its debts, use of some other procedure (such as buying Group shares at the reduced price then obtaining) would be likely to be regarded as contrary to the intention of Parliament. There were thus two alternative ways for government to proceed; an "equity route" or a "non−equity route", the latter contemplating the assets ultimately being transferred to a not−for−profit company after using the Railway Administration procedure. The Government had to decide which route to adopt and then tell the company's board. If it decided not to fund the company beyond its existing commitment, the decision should speedily be passed on to the Railtrack board. There was no legal obligation on the government to go beyond its existing commitment. It was acknowledged that the fact that no more money would be forthcoming would obviously lead to an immediate collapse in Group's share price. However, the advice did not preclude Rainbow - the SRA could acquire the shares in place of the government - although the Rainbow plan might have needed amendment accordingly. Mr Rowlands appreciated that the advice did not preclude adoption of Rainbow if it were it chosen to be the option adopted.

132.    In a follow−up telephone consultation on 31st August Lord Grabiner advised that Renewco could not proceed ahead of a decision on the main question as to use of the equity or non−equity route. Proceeding with Renewco could give the Board of Railtrack a confidence that it was to be supported, a confidence which, if the main decision were later to be that it was not, could give rise to difficulties. As Mr Byers not unreasonably understood the advice as passed on to him, it was that if Renewco was done it would suggest that the Government was standing behind Railtrack and that that could be taken as being a decision that the non−equity option had been closed down without that having in fact being decided.

133.    Miss MacKenzie, who was at the consultation with Counsel, gave evidence that if, contrary to the manner in which she would have expected Group's board to behave, it failed, on being told that there would be no additional government funding, to make an announcement to the market to comply with the Stock Exchange listing rules, then the Department would have had to consider whether *it* should itself make an announcement.  She would have expected the Department to consult Lord Grabiner again as a matter of urgency if that occurred.

**SSSB's proposals**

134.    On 31st August SSSB, who had been working in conjunction with Mercers, put forward to the Department lengthy and detailed proposals to meet the problem, which it plainly understood to be the case, that Group would be unable to make the "going concern" representations that were required to enable it to draw down on its credit facilities and was heading to an illiquidity crisis.  It was SSSB's advice that without confirmation of government support, Railtrack would almost certainly go into administration.  It is not necessary to go in detail into the proposals save to say that the advisers saw an "equity route" to be possible, adopting what SSSB called "a concept of dormant equity".  The plan differed greatly from CSFB's Rainbow proposals, which SSSB thought not to be viable, but it would leave Group as a listed company.  The significance of the SSSB–cum–Mercer proposal is that unless there is some reason (and I have seen none) to regard their work as part of a charade (no doubt a very costly one) it tends to indicate that no decision had yet been made either that an equity solution was not to be pursued or that administration was already the chosen route.

**A paper for Mr Byers on his return from holiday**

135.    On 31st August Mr Rowlands wrote a paper to report to Mr Byers, for his return from holiday on 3rd September, on what progress had been made over the prior four weeks and to prepare him for his forthcoming meeting with the Prime Minister and Chancellor.  In heavy type Mr Rowlands began:–

> "It is essential that you do not close your mind or take decisions on any options for Railtrack at this stage.  Each of the options still needs careful analysis with a view to determining the most appropriate solution.  Any decision would need to be communicated to the company and then by the company to the Stock Exchange, probably precipitating a crisis which we are not ready to handle."

In his opening Mr Rowley, in response to a question of mine, described this as "window dressing" meaning, as I took it, that the Claimants' case was that a decision had in truth already been made, be it either to withdraw further funding, to reject Rainbow and any other equity solution or to manipulate Railtrack towards administration.  However, when Mr Rowlands came to be cross–examined none of those possibilities was put to him in relation to this paper.  I have no reason,

therefore, not to regard this heavy−type advice as genuine bona fide advice intending to convey and convey only what its words made plain.  So far, at least, as Mr Rowlands was concerned, none of the possibilities had yet been a matter of decision by the Department or by Mr Byers;  the options still required careful analysis.

136.    Mr Rowlands' heavy−type passage throws further light on the earlier Corry e−mail.  If, contrary to his interpretation of the Corry e−mail, Mr Byers had earlier already rejected any option or had already decided on any particular course, Mr Rowlands was here ensuring or attempting to ensure, wittingly or not, that that earlier rejection or decision would be undone by his insisting that the time for decision had not yet arrived.  So long as Mr Byers accepted that advice and acted on it (as I would expect) then even if Mr Byers' interpretation of the Corry e−mail was flawed, even if Mr Corry's understanding of what he had been told had been correct, then, even so, Mr Byers' original message to his Special Adviser would by now have become no indication of Mr Byers' current intentions.

137.    Mr Rowlands reported the advice received as to Renewco, a favourable decision as to which in any event could not be made before 19th September when the answer to an application for State Aid clearance was expected from Brussels.  He also summarised CSFB's equity proposals, saying, of Rainbow, that only a very much tougher version would be likely to be acceptable.  He reported on SSSB's "dormant equity" structure.  Turning to "non−equity", he felt there were strong arguments for it but that more work was needed.  He touched on administration, pointing out that the Administrator would be independent.  Of the Regulator, he advised that he could not see a way of proceeding without side−lining him and that legislation would be necessary to do that.

138.    Takeover had fallen away as a practical option;  it was not going to run.

139.     Mr Byers was taxed in cross−examination on the subject of the legislation contemplated in order to side−line the Regulator.  It was put to him that it was to be directed, if there was to be any such legislation, to preventing the Regulator from providing funding for Railtrack in circumstances in which he, Mr Byers, wished to push Railtrack into administration.  Mr Byers denied that;  he added:−

> "× it would have had to have the approval of both the House of Commons and the House of Lords.  It would have required primary legislation, but you are right to say that the reason why consideration was being given to a bill was because, if an elected Secretary of State on behalf of the Government takes a major public policy decision, he would not want that to be undermined by the Rail Regulator ×.  If I arrived at a decision not to provide more money to Railtrack [still meeting our legal obligations to pay any money over to Railtrack that we were obliged to do] then we would not want that decision undermined by the Rail Regulator ×. [it] would be subject to full democratic debate in the House of Commons and the House of Lords ×.."

It is to be remembered that I am not here concerned with whether that approach would have been adequate against attack by way of Judicial Review or under the HRA (which I shall come on to). But, for the purposes of the tort I am considering, that, as it seems to me, was a perfectly acceptable line for Mr Byers to take; I do not see that he or the Department can be fairly criticised for anticipating that *if* there was to be no funding beyond Railtrack's present legal entitlement then legislation *might* be needed to be sure that that important policy decision could not be undermined. I see no ground for any material inference against Mr Byers.

**Hard–headed analysis**

140.    The Claimants complain that, despite reference on the Government's side to the need for hard–headed analysis of the Rainbow proposals, that was never done and that the Government's work was, at least from the 31st August, addressed and addressed only to an examination of the non–equity (and hence administration) alternative. There was no indication that any amount of analysis, however hard–headed, would have led to the equity proposals coming from CSFB to have been so altered as to have become acceptable, as would have needed to be the case, both to a substantial voting majority of Group shareholders and to the Government *once* , as later appeared, it had transpired that administration–cum–CLG was an achievable option but, in any event, whilst a failure adequately to have considered alternatives is a familiar ground for complaint in Judicial Review or HRA proceedings, unless there are grounds for seeing it here as part of a deliberate intent on Mr Byers' part to inflict harm on Group's shareholders it is difficult to regard it as material to this action. Had there been some instruction from Mr Byers that on no account should the equity option be analysed one might have perhaps found some reason for supposing that such a deliberate intent was in his mind but no such message was given by him to his officials and I see this argument as not contributing to the Claimants' case.

**A 4th September meeting and "Grannies"**

141.    On 4th September there was a meeting involving the Department, No. 10 and the Treasury. Mr Byers was present. The position at this meeting, as Mr Rowlands explained and as I accept, was that it was acknowledged that both the equity and the non–equity models still needed further analysis. They were to be thoroughly tested. As for the former, CSFB had been told that a dividend at any significant level during the proposed recovery period and a significant floor price being ensured for shareholders at its end was unattractive and would lead to huge difficulties but it was still necessary to find from CSFB what was their "bottom line", some minimum proposal which they felt could be put to Railtrack shareholders yet with a real prospect of its achieving the necessary voting support. As for non–equity, could a CLG, a fairly unorthodox model, work in the railway industry and what would the public expenditure consequences be?

142.    It was at this meeting that there was reference to some Railtrack shareholders as "grannies". If there was to be an administration but, of course, with the railway continuing to operate, provision would need to be made for existing creditors who, by

withdrawing their credit or services, could disrupt that operation. The point being made was that it would look unattractive if lending institutions were thus bailed out but that small individual shareholders - the "grannies" - lost out. It is a familiar aspect of administrations that shareholders, large or small, take a lowly place in the order of priorities and it is quite impossible to take the reference to "grannies" as indicative of any form of indifference to, let alone malice towards, small individual shareholders. The reference was not dismissive of them or derogatory; on the contrary it reflects a concern (though not, I think, one about which much could be done short of providing substantially for *all* shareholders) at the likely public perception of the fate the small shareholders might suffer were there to be an administration. I should add that whereas the Claimants amount together to a healthy majority of the number of small shareholders, they hold only a very small percentage of the totality of Group's shares (under 5%), which were largely held by institutions.

**The "Trilateral":  5ᵗʰ September**

143.    On 5ᵗʰ September Mr Byers met the Prime Minister and the Chancellor. Mr Byers said that work done had identified 2 lead options but a lot more work was needed before a decision could be taken. Both the equity and the non–equity route (the latter involving administration at least as a first step) required hard–headed analysis. The Chancellor was concerned at the possibility of a huge additional bill for government; neither option, he said, should "score" as public sector spending. If nothing was done, though, said Mr Byers, Railtrack would go on asking for more money. The Prime Minister said the decision should be based on which option would deliver the most effective management. He preferred there being a single regulator rather than the then system of there being both the SRA and the Rail Regulator. The Chancellor's view (as had been Mr Rowlands' view earlier) was that a "White Knight takeover" was ruled out by Railtrack's financial position.

144.    Mr Rowley draws attention to a manuscript note of the 5ᵗʰ September in which someone, likely to be either Mr Rowlands or Sir Richard Mottram, said "Equity solution proposed unacceptable". It is important not to drop the word "proposed". What was being said was that the equity solution as then being proposed was unacceptable. The note cannot be taken as a view that all along no equity solution could have been acceptable although, as the note of 5ᵗʰ September goes on to say, it was always difficult to imagine an ability to arrive at an outcome that was acceptable both to Group shareholders and to the Government.

**Arthur Andersen**

145.    At a Department steering committee meeting on 7th September it was noted that, Ernst & Young having already been instructed to advise on the process leading to administration, Arthur Andersen had by now been retained to advise on accounting matters.  SSSB, who had been meeting CSFB, had encouraged Railtrack to put its "best foot forward" by revising Rainbow if it wished the equity option not to be dismissed and re−affirmed that the equity option was still under active consideration.  Mr Rowlands expected the equity option to be worked on by CSFB whilst the Department concentrated on the non−equity.

**Another Corry e−mail**

146.    Mr Byers told Mr Corry, after the trilateral of the 5th September, that the Prime Minister was interested in what he had called the "dead" equity option and had wanted it worked up.  Mr Byers told Mr Corry that that was the Prime Minister's preference.  On 7th September, at the level of one Special Adviser to another and without copies to others, Mr Corry told Miss Vadera of that preference and added "We need a bloody good effort to show why this is the wrong option".  It is notable that, unlike the case of his earlier e−mail, he does not suggest that Mr Byers had asked him to do what he was doing.  The e−mail thus is no more than an expression of a Special Adviser's own view but it does suggest that as far as he knew the equity option was far from discarded.

**SSSB has met CSFB**

147.    On 10th September Mr Linnard informed Mr Byers that SSSB had met CSFB and had told the latter that a Rainbow package which gave a guaranteed floor price of more than its then current price - around £3 - was unlikely to be acceptable to government and that the proposed performance measures which would apply needed to be fleshed out.  To anticipate a little, on a similar subject, Mr Linnard reported on Friday 14th September to Mr Byers that Mr Robinson had already been asked to see if he could offer a revised version by early in the next week.  Mr Byers thus had good reason to think that Railtrack knew that there were possible difficulties as to a floor price and that some revision of it could be expected.

**Mr Harding meets Department officials**

148.  On 10th September Mr Harding met Mr Rowlands and others.  Mr Rowlands said he did not see how the government could accept a guaranteed floor price for Railtrack shares.  Mr Robinson accepted in cross–examination that the Department had raised concerns about the extent to which public funds should be used to support a dividend and Railtrack's share price in addition to supporting the operation of the railway itself.  But Mr Harding's response was such that it left Mr Rowlands (to his surprise, as I would think) with the impression that Railtrack did not need Rainbow as it could manage and carry on without it.  Mr Rowlands telephoned Mr Robinson to say that the message the Department had thus got from Mr Harding was very different from that presented by CSFB.  Mr Robinson then spoke to Mr Harding emphasising Railtrack's "one option" strategy; one principal option only (Rainbow) should be presented to the Department as the way forward.  Mr Harding was apologetic; he had, indeed, spoken of "muddling on" but, he told Mr Robinson, he had nonetheless spoken of Rainbow as being the best option.

149.  The next day, 11th September, Mr Robinson spoke to Mr Linnard and (according to Mr Linnard's note) said that Mr Harding had been completely out of line and had offered Mr Robinson his resignation (as he had).  Railtrack *could*  muddle on, Mr Linnard was told, but Mr Robinson did not want to do that.

150.  Mr Robinson's memory of these events was very poor and not good enough to deny the note;  there was no way in which Mr Linnard could have known of Mr Harding's offered resignation other than from Mr Robinson and I thus accept the accuracy of the note;  "muddle through" was never a policy (whether or not it could have worked) propounded by Railtrack.  On the contrary, the "one option" within its "one option" strategy remained an equity plan.

**10th–11th September 2001**

151.    The Claimants seek to make something of a failure by the Department to have told Railtrack or its advisers at or about this time that a non–equity solution was being seriously considered by Government.   The evidence on the question on the Department's side is not clear, depending, as it does, on hearsay.   However, I find it impossible to regard the point of any real significance.   Mr Robinson never contemplated administration as being likely, not for want of not being told that non–equity solutions were being seriously considered (he accepted, à propos the 28th August, that Mr Rowlands had made it clear that the Department was considering other options than the equity one) but because all along he thought administration would be crazy.   Railtrack's or CSFB's actions were more likely to have been conditioned by that belief of his than by an absence of their being told or told earlier that non–equity solutions were indeed being considered.   There was no evidence of any effective material step Railtrack would have taken or would have taken earlier (as it had no faith in an approach to the Regulator) if only it had been told sooner that non–equity solutions were being considered, nor did the Government ever say that it was not considering alternatives to an equity solution.   Nor, either, is there anything to suggest that if there had been a failure to tell Railtrack it was either by reason of some decision by Mr Byers or was known to him.

**A meeting is cancelled**

152.    It had been intended that Mr Robinson and Mr Byers should meet on 11th September.   However, the tragic events in America on "9/11" led to the meeting being cancelled at Mr Byers' request as he had had pressingly to turn to other issues than the railways.   Sir Richard Mottram said that both Mr Byers and he had, on and after 11th September 2001, to deal with events which pre–occupied them for many weeks.   Mr Robinson suggested (though not, I apprehend, on the basis of personal knowledge) that thereafter calls from Railtrack were not returned.   Mr Byers (again, without, I assume, personal knowledge on the point) said he was sure calls would have been returned.   The issue is incapable of resolution but it would have been remarkable if, finding themselves repeatedly spurned, as it would have seemed to them, Railtrack officers would not have made *some* comment on the point by e–mail or in writing.   Nothing such was shown to me.

**A third Corry e–mail**

153.   On 12th September Mr Corry sent an e–mail to Mr Linnard saying, of the Department's lawyers, "× they worry me.  They need to be asking how we can deliver what our [Secretary of State] wants, not why it may be difficult.  Let's keep them up to the mark".  Mr Rowley somewhat ambitiously tried to build that into an indication that Mr Byers had already divulged to Mr Corry that what he wanted was to push Railtrack into administration and for the exit from the administration to be a CLG.  Mr Byers, who was clear that he had not yet decided what to do, also denied that he had had any private discussion with Mr Corry to the effect suggested by Mr Rowley.  I accept that.  It is notable that Mr Corry does not identify what it was, that, in his view, "our [Secretary of State] wants"; I take the e–mail to be no other than something corresponding to the familiar bleat on behalf of a client that his lawyers seemed more interested in pointing to difficulties than to early solutions.

**The Paddington Survivors Group meet Mr Byers**

154.   On 12th September this Group, formed to get support for the survivors of the Ladbroke Grove rail crash, met Mr Byers and his Parliamentary Private Secretary, Mr Hill.  Two witnesses gave evidence for the Claimants on what was said at the meeting.  Pamela Warren said that members were not happy that the commercial aspect of Railtrack provided the right atmosphere for safety to be of primary concern.  She continued:–

> "Mr Byers and Mr Hill sat back, exchanged a glance and smiled.  Mr Byers said, again to the best of my recollection, that Railtrack would not be a problem for much longer and that we should watch out for around the early part of October 2001 when we would have some news that would be "very pleasing to us".  While I cannot recall the precise words he used, I am very clear that he was suggesting to us that decisions had already been made and Railtrack would cease to exist as a viable entity in October 2001.  I made this assumption on the basis that, having run a business myself (as others in the PSG had done) there was no other explanation for Mr Byers' statement as far as I could see and as was subsequently proved."

155.   Leaving aside whether those last words indicate that Pamela Warren was relying on later events to found an assumption made at the time, I do not see how, on the safety issue, an announcement that pleasing news was to be released in October could justify an *assumption* that Railtrack would cease to be a viable entity in that month.  Whatever option was chosen by Mr Byers, there would either be stringent new performance targets for a re–structured Railtrack under Rainbow, with Railtrack's "commercial aspect" reduced by way of a controlled dividend or, if there was an administration, the Company would still exist but with its management in new and different hands.  Mrs Warren, who did not give any oral evidence, does not suggest that Mr Byers mentioned any particular date for the release of the good news.

156.  Mr Martin Minns, also at the PSG meeting, whilst in his witness statement saying that he did not recall Mr Byers' precise words, said that Mr Byers had said words to the effect that Railtrack would not be a problem for much longer and, "watch out for October 8th for an announcement which I think you will find very interesting and to your liking".  He adhered to that in his cross−examination.  He, too, had Mr Byers and Mr Hill exchanging a smile as the remark was made.

157.  Mr Byers had no memory of the conversation at all and accordingly Mrs Warren's and Mr Minns' evidence goes uncontradicted but even so I am unable to treat it as evidence that by 12th September Mr Byers had already decided to put Railtrack into administration; still less can I accept it as any evidence on the more material question of *why* Mr Byers should have so decided, at all events if it was not being suggested by the Claimants that it was for rail safety reasons.  By 12th September Mr Byers had had no advice as to whether Railtrack was, in Insolvency Act terms, insolvent, whether he was in a position to petition for an administration and whether it would be delayed or resisted if he did.  It would have been quite impossible for him on 12th September to specify 8th October as the date on which Railtrack's administration was to be announced even though that was the date on which that announcement was in fact made.  Moreover, although this is a very minor point, the evidence of the exchange of smiles between Mr Byers and Mr Hill would seem to hint, if administration had indeed already been decided on, that Mr Hill may already and might thereafter have been complicit in later dissimulation, namely that no decision had yet been made whereas one had been and was such that arrangements were already in place to lead to an announcement on or about the 8th October.  There is nothing to suggest he was so complicit nor would have been willing to be.

158.  Accordingly, whilst I do not doubt that Mrs Warren and Mr Minns were giving their honest recollections, their evidence does not materially assist the Claimants or damage the Defendants.

**A Departmental Meeting**

159.  It was suggested to Mr Rowlands in cross−examination that at a departmental meeting on 13th September Mr Byers had indicated that there was to be no more financial support for Railtrack.  The suggestion was based on a cryptic passage in a contemporary manuscript note.  The note could equally suggest that that was a subject which, with others, would need to be addressed before the next meeting with the Prime Minister.  Mr Rowlands resisted the suggestion on the basis, which I accept, that if Mr Byers had said as was suggested, then Mr Rowlands would have had to tell him that the Department would accordingly have had immediately to advise Railtrack that that was the case.  Mr Rowlands did not then so advise Mr Byers and Mr Rowlands' evidence was that Mr Byers had not then said as it was being suggested he had.  Mr Byers' evidence was also that there was no such decision at this meeting and I accept that to have been the case.

160.  Sir Richard Mottram, also at the meeting, is attributed in the note as saying, of Renewco, "Slow it down".  This, he explained, was not merely because State Aid

clearance for it was still awaited but because of the advice received that going ahead with Renewco could be premature, in the sense of sending what could transpire to be the wrong signal to the Market and to Railtrack. It could suggest that the Government was standing behind Railtrack even if that had not yet been decided. To avoid what Sir Richard called piecemeal decisions, a decision on Renewco had to be or might need to be slowed down. I accept this reasoning; delay in implementation of Renewco was not part of some cynical manipulation intended to exacerbate Railtrack's difficulties but was attributable to a wish not to send out the message that the Government was supporting Railtrack at any time prior to that having been formally decided. A slowing down of Renewco thus provides no ground for any material inference against Mr Byers.

161.    On the same day, 13th September, Arthur Andersen were requested to consider whether the government could successfully petition for a Railway Administration Order.

**Both sides' advisers meet**

162.    On 13th September CSFB and Deloitte & Touche on the Railtrack side and SSSB and Arthur Andersen on the Department side met to discuss issues affecting Railtrack's liquidity and its going concern status. The Department side were told that the uncertainties faced by Railtrack, including those as to the WCML and the outcome of a Hatfield Re−opener, meant that its directors were highly unlikely to be able to sign off on the prospectus that would be necessary for the bond issue that Railtrack needed in the first or second quarter of 2002 in order to keep going until settlement of a substantial Hatfield Re−opener. On that basis the November 2001 interim accounts, needed to be settled by late October 2001, would be likely to have to include a strong going concern qualification. Because of that, Railtrack was unlikely to be able to draw down on existing but undrawn "bridge" facilities and hence would experience a "liquidity squeeze" from early December. All this worrying news was despite its being assumed that Renewco would go ahead.

**Mr Linnard's Memorandum**

163.    On 14th September the Department's Director of Railways, Mr Linnard, wrote a memo to Mr Byers.  Of the so−called "muddling through" option which had been thought to have emerged, he advised that both Mr John Robinson and he thought it very unattractive.  He looked at both equity and non−equity solutions.  The non−equity route, only achievable through administration, had the advantages that there would be no shareholders so the CLG could be run in the interests of the public, passengers and the industry;  TOCs as members could make the CLG responsive to the TOCs' demands and the SRA and the Office of the Rail Regulator could be merged.  He added, though, that "We cannot pretend to have got to the bottom of these issues".  It was hoped to be able by the 18th September to answer questions such as what were the best equity models, whether one could be certain that Renewco did not *have* to be proceeded with and whether was there enough evidence to put Railtrack into administration.  He plainly did not take it that equity solutions had been already ruled out or that administration had already been decided upon as either as an acceptable or as the already−chosen course.

**Renewco as the kiss of death**

164.    On 17th September Miss Vadera sent to Mr Corry an e−mail which said "I don't think we can sign Renewco - it's the kiss of death for the admin option".  It would, she thought, send the market a signal that Railtrack was going to be bailed out by the government and the government would then not be able not to bail it out.  *Her* reason (not identified as anything but that) for not doing Renewco might have had different causes than those of the Department but her e−mail was not inconsistent with Sir Richard Mottram's wish to avoid piecemeal decisions in order not to risk misleading both Railtrack and the market.

**A meeting between the Department and No. 10 Officials**

165.    On 17th September Mr Rowlands chaired such a meeting.  By now the government perception of Railtrack's position as disclosed by CSFB was that, whilst modifications to Rainbow were still awaited, if no additional government support was given the company was not going to be able to go on.  If there was to be no such support the question became whether, if no equity model was chosen, Railtrack was to be allowed simply to collapse into administration or whether the Government had some part to play.  It was emerging by now that there could very well be a decision not to adopt an equity model.  If that was to be the case and there was to be no additional funding, should the government itself take steps under the Railways Act?

166.    Mr Byers by now, according to Mr Corry as he said at the meeting in Mr Byers' absence, had indicated that he *preferred* the non−equity model (not that he had decided on it or against any other) but, consistent with the notion that one could not decide on administration, a first step, without knowing what the consequential steps would be, that it was necessary to know whether a CLG was "a runner".  It is of little

importance but I would be inclined not to accept Mr Byers' evidence that at this stage he still did not have a preference as between the equity and non–equity options if, by the equity option, he meant Rainbow.  When Mr Corry said what was his Minister's preference at this meeting no one seems to have dissented and it was a simple enough message for Mr Byers to have given to Mr Corry and for Mr Corry to have passed on.  Mr Linnard's recent memos had given reason to prefer a non–equity solution. Mr Rowlands, too, spoke of the general feeling, about mid–September, that the non–equity option was more attractive than either the equity route or than simply handing over yet more money.  Whilst I accept that as yet Mr Byers had made no *decision* and that he wanted further work done to establish feasibility, I prefer Mr Rowlands' view, that, without there being any clear point at which, as if on the road to Damascus, a clear realisation suddenly emerged that the non–equity model was alone the one that had to be followed, the position, in my judgment, was that by now the non–equity model was, so to speak, the front–runner as between it and Rainbow so far as the Minister's *wishes* were concerned and that Mr Corry had been right to say so.

167.  However, if, by saying to me that he had then had no preference, Mr Byers had meant none as between *some* equity solution and the non–equity option (which is, I think, what he meant) rather than limiting the equity route to Rainbow, then I would accept Mr Byers' evidence that he would have welcomed an equity proposal from Railtrack that was politically acceptable.  "What I was unprepared to sign up to", he said "was a commitment to give a taxpayers' guarantee to the payment every year to Railtrack shareholders, which was part of Rainbow, to give a guarantee that there would be a floor price for the shares × when they had come out of their period of convalescence ×  The only circumstance in which I would have been prepared to do so is if we had been able to achieve some very good performance target out of Railtrack, and there then is a possibility that in political terms one could perhaps have deployed arguments in favour of using taxpayers' money that way".  Preference apart, until a wholly reliable alternative to Rainbow appeared, Rainbow could not, as Sir Richard Mottram said in evidence, be ruled out.

168.  It was put to Mr Byers on the strength of a passage in the contemporary note of this meeting that he had refused to meet Mr Robinson.  He said there had been no policy of avoiding such a meeting and that in any event Mr Robinson would have had access to Department officials.  I have not been taken to any contemporary but declined requests for a meeting and I accept Mr Byers' answer on this point, especially given the pressures after "9/11".  I add that the reason given for the suggested decision to avoid meeting Mr Robinson was that it was to avoid Mr Robinson having the opportunity to put in place an alternative to Rainbow once told it was unacceptable. But even now an equity option had not yet been fully ruled against and all along it had been chiefly CSFB rather than Mr Robinson alone who had presented Rainbow and amendments to it and the Department was already awaiting further refinements to CSFB's proposals as to an equity option.  The reason given for the suggested policy of avoiding meeting makes no sense.

**Mr Robinson: kept at bay?**

169.    On a similar issue, it was asked of Sir Richard Mottram whether the Department had deliberately tried to keep Mr Robinson at arms' length so that Railtrack would not discover the government's thinking until it was too late for it to devise some alternative strategy (to Rainbow) in order to get out of its difficulties.  He denied that had been the case;  if it had been, he would have been told of it (presumably to prevent him making or accepting contact with Mr Robinson) and hence would have known of such a plan had it existed.  I accept his evidence.  Railtrack was in contact with the Department by way of several individuals, not just Mr Robinson, and any plan to ensure that it was kept in the dark would have required not merely a decision that there should be such a plan but a circulation of the decision to ensure it was implemented.  The absence of any evidence of the latter suggests the non–existence of the former.

**CSFB's proposals on the 18th September**

170.    On 18th September CSFB in Mr Robinson's presence presented an amended "Project Rainbow", a version which Mr Robinson described as its first really worked–up version.    Railtrack, it said, was in a precarious financial position.  Without agreement on direct government support this position would come to a head at the latest on 8th November when it had to publish a going concern statement.  An alternative for the company was an early approach to the Regulator "which may well result in administration".   Against that background the earlier Rainbow proposals were further developed.   Over the contemplated 3–4 years of the proposed plan dividends would be capped at 15p per annum and there were now sub–models, one with a floor price and one without.   Beyond what was already contemplated within the    Endeavour–cum–Renewco    plans,  some £1bn  would  be  needed  from government.   CSFB felt that this was a proposal which Group shareholders and its Board should support.

171.    There was a sting in the tail which in effect said that if this plan proved unacceptable the likelihood was that CSFB would have to pursue other options, including administration.   It was CSFB's own position that Railtrack was not in a position to forecast its financial future with an acceptable degree of accuracy, that the Regulator had been clear that he would not accept an approach from it at the time and that only with government support could the necessary going concern statement be made in its 8th November accounts so as to enable Railtrack to draw down on existing facilities at about the same time.   Without the going concern statement it was most likely that a prospectus for a bond issue would not be possible now and that that might precipitate administration.

172.    Mr Robinson in his written evidence had felt that this picture painted by CSFB was unnecessarily gloomy but it was the picture that was presented on Railtrack's behalf and in cross–examination he was unable materially to disagree with it.  "We had always believed", he said, "that going down that route", namely seeking an interim review by the Regulator without the company being satisfied it had government

support, "could in the long run take us into administration".  Mr Robinson could not accept that it could ever have been contemplated that Railtrack might itself seek its administration but that, I think, was more a reaction based on his feeling that administration would, in his word, be "crazy" than on a study of the text of the proposals which he himself introduced and which plainly hint at that as a possible Railtrack ultimate position.

173.    Mr Rowlands took these lengthy proposals to be Railtrack's long−awaited "bottom line" but the Department side did not respond immediately.  They took the proposals away to digest.  Mr Rowley sought to criticise Mr Rowlands for not saying there and then that the proposals were unacceptable;  I do not see it as unreasonable for them instead to have been taken away and studied.

**The bottom line is reported to Mr Byers:  18th September**

174.    On the afternoon of the 18th September Mr Rowlands reported to Mr Byers, in the presence of representatives of No. 10, the Treasury and SSSB, on the meeting earlier that day when an amended Rainbow had been presented.  No one thought this new Rainbow, Rainbow II, was materially better than Rainbow I.  Mr Linnard told Mr Byers, as was the case, that the Department's legal advice was that the Government was not committed to proceeding with Renewco, as to which a decision from the European Commission was still awaited, and that Renewco was in any event pregnant with the difficulty that it might "score" as public expenditure.  Administration was briefly discussed and Mr Rowlands turned to discuss the hypothetical position that could arise if it were decided, on public policy grounds, that the right course was administration.  It was not thought that the Department "held all the cards" such that it could force an administration.  Indeed, Mr Rowlands advised that there was no prospect of the government unilaterally putting Railtrack into administration - a negotiated solution seemed essential.  Mr Byers said, as I accept, that he had not yet reached a final decision as to the way forward.  He would hardly have decided that there should be an administration if only because he was given the advice that an administration could not be forced on Railtrack and that it would require negotiation.  Moreover, as Mr Rowlands pointed out in evidence, to decide that the new form of Rainbow, Rainbow II, was unacceptable did not of itself mean that there would be no further financial support for Railtrack as if there was no acceptable option so far identified *some* further alternative would have to be found.

**A "muddle through" option**

175. By now "muddle through" could not be considered, if it ever could have been, as an option which had either been in fact presented to the Department or which could be seriously supported by Railtrack.  When it had earlier been hinted at by Mr Harding it had immediately been disavowed to the Department by Mr Robinson as a Railtrack proposal.  Nor could it have now been revived;  Mr Robinson in his evidence to me candidly gave sound reasons why doing nothing was not a viable option from Railtrack's perspective.  In any event there is nothing to suggest that it would have attracted Department support, where the perception was, as Mr Rowlands spoke to in evidence, that Railtrack was shameless in asking for more money.

**The Prime Minister and the Chancellor are briefed by their officials**

176. Mr Atter, who had moved from the Department to the Treasury and who had been at the earlier meeting on the 18th, reported on the same day to the Chancellor recommending, subject to Mr Byers clearing a number of outstanding issues with the Chancellor, that it should be agreed to put Railtrack into administration and replace it, so said his summary, with a not–for–profit trust (although his fuller text refers to a CLG).  Although his summary thus spoke of putting Railtrack into administration his text acknowledged that the government did not have sufficient information to do so without the company's agreement.  It was plainly in mind that the *threat* of a short emergency bill to override any intervention from the Regulator would be likely to procure from Railtrack the cooperation from the company which would be needed.  He added that the current view, now that the "small print" of Renewco had been examined, was that it would "score" as public sector borrowing.  He drew up a list of 10 Treasury issues that needed to be resolved.

177. At much the same time Dr Hackland reported to the Prime Minister that Mr Byers was convinced that a CLG via administration was the best way forward but that the lawyers had advised that a contested application for one might fail.  He, too, wrote of quick legislation to close off any attempt by Railtrack to re–open its settlement with the Regulator.   Negotiations with Mr Robinson, he suggested, should be begun.

178. Dr Hackland was of the view that by touching on administration if Rainbow were not accepted, CSFB were, in effect, hoping to pressurise the government towards Rainbow.   If so, it was a dangerous strategy;  it depended on the government regarding administration as virtually unthinkable, as "crazy" as Mr Robinson did.  That plainly was not the case.

179. I have no doubt but that by now Mr Byers, as Dr Hackland reported, was convinced that administration followed by a CLG was the best way forward but it was still uncertain whether that would be possible and accordingly no decision had yet been reached that it was to be sought.   At the Department, said Mr Rowlands, in the remainder of September what was looked at was, *if*  administration was to be the chosen route, how could a point be arrived at which Railtrack would agree with the

Department that it should go into administration, as the Department was not sure that it held all cards needed to procure an administration without that agreement.

180.     At about this time there is a manuscript note of Mr Rowlands having said at an inter–departmental meeting that "Govt int is to collapse the share price". The abbreviation "Int" has been taken to be for "interest" rather than, for example, "intent".  There is an argument which Mr Rowlands developed in his re–examination that it could have been in the Government's interest to collapse the share price; although, in ordinary circumstances, whether or not there should be an administration would be unrelated to a share price, it could have been that if the share price had been greatly reduced its Board might have been less willing and able to resist administration than it would have been had the price remained high.  On that basis it could have been in the government's interest to collapse the price but, as I see it, nothing can be made of the point.  It is not said that the Government did collapse or attempt to collapse the share price or that Mr Byers required that to be attempted. Nor does it even establish, as the Claimants' final submissions sought to say, that it showed that efforts were being made to devise a strategy from which Railtrack had no escape which, of itself,  would in any event not have been a wrong in relation to the tort I am here considering.

**The Second Trilateral**

181.     On 19th September Mr Byers met the Prime Minister and the Chancellor to discuss Railtrack's affairs.  Mr Byers ran through the options.  Rainbow was "unlikely to deliver" and "muddle through" was clearly inadequate.  A CLG, by contrast would ensure that the public interest was paramount and it could be best to get there by administration but that would require Railtrack's cooperation and would necessitate difficult talks with Mr Robinson.  The Chancellor, concerned with costs, put forward a list of 10 key issues ("the ten commandments") which needed to be resolved before any decision was taken.  There was support for a CLG from No. 10, subject to the 10 Treasury issues being met.  The CLG would need to be off the public balance sheet but would offer improved performance although it could take 2–3 years to sort Railtrack out.  The Prime Minister asked Mr Byers to aim to be ready to begin negotiations with Mr Robinson by 28th September.  It was agreed that urgent legislation to prevent the Regulator's intervention could be necessary.

182.     Mr Byers' evidence that even now there had been no *decision*  to go down a particular route was plainly right.  The Administration–cum-CLG route required negotiations, possibly legislation and in any event satisfaction of the Chancellor's "ten commandments";  the negotiations might fail, legislation could be delayed and one or more of the "commandments" might be failed.  It could still be that some other route would have to be found and, however unwelcome, would have to be tolerated.  As for Renewco, whereas the Department felt that it would not "score" as public borrowing, the Treasury thought that it would.  If it did "score" as public then one of the "ten commandments"  would be broken and there would have to be fresh thinking.  Just as there was no decision yet on the route to take, so also was there no decision on the closely related subject of whether there was to be any finance for Railtrack beyond its present legal entitlement or any other indication of general

financial support for it.  At the Trilateral Mr Byers had deliberately said that Renewco was not closed off as, so far as he was concerned, no doubt taking his Department's view, it was possible that it would not "score" as public.  But thereafter the work of the professional advisers (as opposed to that of the Department itself) was directed exclusively to the Administration–cum–CLG route.

**Arthur Andersen report**

183.  On 26th September Arthur Andersen, who had been instructed on the 13th , as I have noted, reported.  They had had no access to Railtrack staff or documents.  They set out the Insolvency Act test.  Railtrack's balance sheet, they said, appeared solvent but, given a number of uncertainties to which they referred, they were unable to conclude whether or not Railtrack was or was likely to be unable to pay its debts as they fell due.  Mr Rowley suggested that this was a blow to the Department.  I accept Mr Rowlands' evidence that it was not so regarded, but was consistent with the Department's view that *if* there was to be an administration it would best be done by co–operation;  he had in mind a joint petition of the company and the Secretary of State.  It could, of course, have been  that fuller recourse to Railtrack's books would have shewn the insolvency that a limited view had hidden.

**SSSB report: 26th September**

184.  On 26th September SSSB reported to the Department with a preliminary valuation of Railtrack and its implications for the treatment of shareholders if there were to be an administration of Railtrack.   The enterprise value of Railtrack, they said, approximately corresponded to the total net value of its debts and their preliminary valuation (though the valuation range was wide) indicated no clear present grounds to justify the government making an offer to a prospective administrator which would result in *any*  value (my emphasis) being realised by Group shareholders.

**A submission to Mr Byers**

185.    On 26th September Mr Rowlands made a detailed progress report to Mr Byers.  He reported that the Department had devised a workable structure for a CLG intended to "incentivise" the CLG in delivering the core railway.  It was still dubious, though, whether the CLG would be classified to the private sector, as was necessary if it was to be implemented.  Given the professional advice received, it was thought that Railtrack's value roughly matched its debt and there was thus no clear economic ground for the government to offer to buy out its shareholders.  Ernst & Young, whom the Department would ask the Court to appoint as administrators should Railtrack be insolvent, had made progress in preparing for the rôle but were asking for an indemnity even from criminal prosecution, an issue that would probably need to be taken to the Law Officers.  There were public law risks in any decision *not* to fund Railtrack but two Leading Counsel, he reported, had advised they they could be robustly defended provided, inter alia, that the action taken was in the public interest.  As for Renewco, it was recommended that it should not go ahead if there was a prospect that Railtrack could go into Administration but that the grants of £162 million and £335 million should be paid on 1st October as there would be a legal obligation to pay them.  There was a risk, though, said Mr Rowlands in his report, that the SRA would refuse to pay the grants.  "In broad outline", though, recommended Mr Rowlands "we have now assembled a set of proposals that, subject to Railtrack not coming up with some entirely unexpected factor, and if insolvency is established, has the potential to deliver a better core for the future of the railways" – but the ten commandments had to be satisfied before a decision was made to proceed down *any* path.  The crucial outstanding points were that the CLG would be acceptable in policy terms to its potential members and would score to the private sector.  More time was still needed.

186.    Mr Rowlands' advice was framed in language consistent only with there having been, as far as he knew, no final decision not to entertain any further proposals put by CSFB, no final decision not to fund Railtrack beyond its present legal entitlement and no final decision to seek, alone or with the company, the administration of Railtrack.

187.    Mr Rowlands was taxed in cross–examination with his view, in this submission, that Railtrack had "not yet sought seriously to engage with us" on its proposals for an equity solution.  He reluctantly accepted but then withdrew that there had been a lack of serious engagement on both sides.  It is a small point but I do not see the chronology as leading to any blame on the Department.  It was entitled to expect, if CSFB and Railtrack were truly anxious, even desperate, to develop and present an acceptable equity solution, that they would, as Mr Rowlands said, have been on the Department's doorstep every day, which they plainly were not.  Unacceptable aspects of Rainbow I and II had been pointed out.  Group, Railtrack and CSFB were the persons best able to judge what would or would not be acceptable to Group's shareholders.  It was thus, as Mr Byers said, incumbent on CSFB and Railtrack to come up with a package which was going to be acceptable to the government.  I re–iterate that I do not hold the course of negotiations on Rainbow to reveal any ground for any material inference against Mr Byers.

188.    The copy of Mr Rowlands' submission bears, in Mr Byers' handwriting, the words "Rainbow to be killed off". "To be" suggests it had not already met its death. Mr Rowley sought to say that the words indicated that the time had come to bring discussions with Railtrack and its advisers to an end. In my view Mr Byers was right to deny that; it was Rainbow not discussions or negotiations generally that the words suggested were to be at an end and in any event negotiations with Mr Robinson about a possible co−operative approach to administration were contemplated as necessary. Mr Rowley bolstered his approach by referring to another Corry e−mail, also of 26th September, which said "There is a view that we should get the discussion of Rainbow out of the way before [28th September]" but that does not assist him; it suggests that discussion of Rainbow was not yet out of the way and again it is only discussions of Rainbow rather than either discussions generally or discussions on some other equity route that were to be got out of the way. There is no evidence that the "view" to which it refers was Mr Byers', nor, I add, any evidence that Mr Byers had ever told his officials either to conceal from CSFB and Railtrack that Rainbow (or *any* equity solution) was unacceptable or to pretend that it might be acceptable.

**An inter−departmental meeting**

189.    On 27th September Mr Byers with his officials had a meeting at which Miss Vadera represented the Treasury and Mr Challen SSSB. The principal task of the meeting was to work through the ten commandments. Mr Byers is recorded as saying, of Rainbow, "need to kill it off". Mr Rowlands accepted that by now Rainbow as proposed had no life in it but the position, he said, was still, that if the CLG "scored" as public, then they would have to go back to some other version. He was thus proposing to have a last meeting on Rainbow as to performance targets. The plan to have a last meeting on Rainbow was not overruled.

190.    Mr Byers made it plain, as, in effect, had the Treasury, that if the CLG "scored" as public it would not go ahead. If the Chancellor would not agree to it, it simply could not go ahead.

191.    On the same day Mr Byers advised his officials and others that the forthcoming substantial payments shortly to become due to Railtrack had to be paid irrespective of any final decision on Railtrack's case. It is difficult to see that as the act of a man determined to harm Group's shareholders.

192.    It was put to Mr Byers in cross−examination that he was stalling Railtrack on Renewco, meaning, I apprehend, that Railtrack was not being told that Renewco would not go ahead lest that might prompt it forthwith to seek an interim review from the Regulator. But Mr Byers, credibly in my view, and consistently with the Department's earlier approach, said that he did not want to take a *separate* decision on Renewco; legal advice was that adopting Renewco if there could still be a decision not to finance Railtrack would give the wrong message to the market and, he could have added, telling Railtrack that Renewco would not go ahead at a time when it could still be decided further to finance the company could precipitate a crisis within the company. The idea of legislation to prevent the Regulator intervening and

undoing the political decision, if there was to be one, not further to fund Railtrack was acknowledged as something which, the Department thought, Railtrack would regard as a hammer blow.  Mr Byers wanted that to be the case; if there was to be a decision not further to fund Railtrack, Mr Robinson was to be left with no option, none other, I take it, than to cooperate in seeking administration.  It was at this point in his course through the chronology that Mr Rowley put point blank to Mr Byers in cross–examination that his intention was to injure the shareholders in Group by removing the assets of Railtrack plc without paying compensation to shareholders.  Mr Byers answered that there was no such plan.

**Grant monies**

193.    On 28th September the Department paid the SRA £336,590,000 as the "Endeavour" grant for passing on to Railtrack.  On the 1st October Sir Richard Mottram indicated to the SRA that if the Schedule D grant of £162,000,000 payable under the Regulator's 2000 review was requested by Railtrack, then that, too, would be paid to the SRA.  The Department was meeting its existing commitments to Railtrack.

**Railtrack and CSFB meet the Department**

194.    On 3rd October there was such a meeting.  SSSB attended.  By now the Department was confident that Railtrack had reached its "bottom line" as to Rainbow's structural terms but it had always been intended, as I have mentioned, that there should also be performance targets or requirements as part of the quid pro quo of the government's support.  CSFB accordingly made a presentation on performance.  There is a dispute as to whether someone on the company side - Mr Robinson or Mr Nelson - said that if no action was taken within the next few weeks then administration would become a real possibility.  Mr Rowlands believed that that was said and SSSB's note records the gist of it.  I accept that it was; firstly, that it should have been said was consistent with CSFB's presentation of 18th September that if an alternative to Rainbow was intended (and doing nothing would be an alternative) Railtrack might need itself to pursue administration.  Secondly, the timing - the next few weeks - broadly fitted in with the need to complete the Railtrack November interim accounts, which would need a going concern statement, by late October.  Thirdly, if Dr Hackland's interpretation of CSFB's and Railtrack's negotiating strategy was right - that a wholly unacceptable (as Railtrack thought) administration was being used in terrorem to drive the government towards Rainbow – then one would expect the possibility of administration to be mentioned by the Railtrack side to remind the government of the dire alternative to Rainbow.   Finally I did not take Mr Robinson's evidence to be that it was not said, rather that it was not said by him.  SSSB's note attributes it to Mr Nelson.

195.    Renewco was touched on.  Mr Harding asked if it was still on the table?  Mr Rowland said it was "but there were issues to be resolved.  Stephen Byers had made clear that he would decide whether Renewco should proceed".  He was undoubtedly playing his cards close to his chest but he had to; to say it *might* be rejected could panic Railtrack into a stock market announcement that government support might be

withdrawn; to say it would be adopted could mislead Railtrack that that support was forthcoming. In any event the reference to "issues" and to a decision not as to *when* it would proceed but *whether* it should ought to have conveyed the message that Renewco could not assuredly be relied on.

196. Mr Robinson left the meeting in a mood of optimism about government support but I would attribute that more to his conviction that a deliberately−sought administration was so unthinkable as to be crazy than to an analysis of what was being said.

**That meeting is reported to Mr Byers**

197. Still on 3rd October there is a document which Mr Rowley treated as made after the meeting on that day with CSFB and Railtrack. I shall treat it as such although some of its grammar suggests to me that it was made before the CSFB meeting. In it Mr Rowlands still described Rainbow as an alternative. He believed a CLG could score as private. He spoke of the possibility of legislation to avoid intervention by the Regulator as a key part of the Department's negotiating hand. Presumably consideration of legislation to circumvent the Regulator undoing what would by then, if adopted, be government policy - no more funding for Railtrack beyond the present entitlement - was on the unspoken assumption that Railtrack would *apply* for an interim review. In fact, to anticipate, Railtrack never did so apply. Mr Rowlands raised the question of whether the final decision on Railtrack's funding was only for Mr Byers and the Chancellor or whether the Prime Minister should also be brought in. If the CLG route was adopted he recommended that Mr Robinson should be called in and be so told, as should the Rail Regulator. The language of the paper is consistent only with no decision having yet been reached, so far as Mr Rowlands understood, either on further funding or administration−cum−CLG, though he felt that Railtrack would have little choice but to cooperate with whatever route the government favoured. The government, if needs be, should be ready, he said, to put out a statement that as a matter of policy it would provide no further financial support beyond Railtrack's present entitlement. That would be to deal with the case as it would be if Railtrack did not cooperate on a *joint* petition for administration. That would pull the rug from under Railtrack; it would avoid them dragging the process out.

198. There was also a report by Mr Rowlands on 3rd October to Mr Byers and others that was unequivocally after the CSFB meeting. The ONS's ruling on how the proposed CLG would score was expected on Friday 5th. Mr Byers said he would formally decide then. A decision by the ONS as to the scoring of Renewco was also awaited. The ruling on the CLG was asked by the Treasury to be given priority over the one for Renewco.

199. Mr Rowlands was in no doubt as to the message that had been conveyed to the Department by Railtrack and CSFB on 3rd October. In cross−examination he said, as I accept, that " ×. We were told at the meeting of 3rd October that there was a crisis coming within a fortnight. We would have had to have done something, because we

were in danger of them simply collapsing possibly unprepared into administration and all of the difficulties that that might have resulted in".

**Miss MacKenzie's evidence**

200.    Her evidence, not challenged, was that at a meeting at 5.30 p.m. on 3rd October Mr Byers confirmed he had reached no decision on whether or not to provide further funding to Railtrack. She advised Mr Byers (and was satisfied that he understood the advice) that the decision as to additional funding had to be made on the basis of the issues relevant to *that* decision and must not be confused with later–arising issues such as the desirability or otherwise of the CLG route.

**A meeting is arranged**

201.    On the 4th October Mr Robinson was asked if he could meet Mr Byers at 4.45 p.m. on the 5th. Presumably Mr Byers had been confident that the ONS classification would be known by then though doubtless the meeting could have been postponed were it not. On the 4th CSFB prepared a "talk sheet" to prepare Mr Robinson for the meeting. Mr Robinson did not agree with the talk sheet; he regarded it as unhelpful but it throws further light on what the experienced team at CSFB, who had had full access to Railtrack papers and staff, appeared to think was the company's position at the time.

202.    CSFB advised that an approach to the Regulator could result in an administration; the attitude of the Regulator was such and the time likely to be needed for a review meant that that was so. It was almost impossible to envisage the Regulator responding quickly enough to save the company from administration. Without government support it would not be possible to continue trading as a going concern and the company would be forced to go into administration immediately.

203.    It could have been that CSFB's talksheet exaggerated the danger Railtrack was in as a negotiating tactic to be adopted by Mr Robinson but the sheet gives no hint that the views expressed were other than its true views and they were consistent with CSFB's views as presented to the Department and its advisers at the meetings. I hold them to have been CSFB's true views.

**Mr Byers speaks to the Prime Minister**

204.    On 4th October Mr Byers telephoned the Prime Minister to say that he was close to reaching a decision and that the final piece which had to fall into place was the ONS classification. The Prime Minister was content to leave the final decision to Mr Byers but said that Mr Byers would need to speak to the Chancellor as to the level of funding needed if he was to decide to let Railtrack "muddle through" or, alternatively, to show that the 10 commandments were satisfied if Mr Byers elected for administration–cum–CLG.

**A decision is made**

205.    On 5th October Mr Byers telephoned the Chancellor.  The ONS classification was still awaited.  Mr Byers was keen to keep the CLG option open and would, within limits, have striven to meet whatever requirements the ONS might have specified to ensure that it should be "scored" private, as had all along been essential if the Chancellor was to sanction it.  It was agreed that until the scoring was known Mr Byers could reach no final decision.  So, as Mr Rowlands accepted, efforts were made on the morning of Friday the 5th to get that classification.  Further, Mr Linnard provided Mr Byers with a summary paper.  It invited Mr Byers to reach a decision on whether or not to agree to Railtrack's request for a package of financial and other assistance.  It described the timing as "urgent".  Plainly, Mr Linnard did not think a decision on that point had yet been made.

206.    Just short of 1.40 p.m. the message was received at the Department that, in effect, the CLG proposed would be classified by the ONS as private and that the Treasury took that to be a sufficient assurance that the Department could move ahead on the basis that the CLG would formally be so classified.  Without awaiting the formal decision of the ONS, not received till later that afternoon, Mr Byers made his final decision on funding in the afternoon of the 5th.  He was satisfied there should be no further funding for Railtrack (meaning, I apprehend, funding beyond its then present entitlement).  He had not so decided earlier.  A decision that there was to be an administration of Railtrack or that that should be attempted was not made earlier than the 5th.

207.    In a passage in his witness statement not put to him in cross-examination he said:−

> "I decided against supporting the "Rainbow" option favoured by Railtrack and pouring more public money into the company.  We had funded Railtrack in the past and made it clear we did not stand behind individual companies.  I had to consider how many more times they would come back for a further handout.  There had to be a time to say no.  Railtrack had not controlled its costs - there were many deep−seated problems.  It would not be right, I felt, to provide further funds for it.  I did wonder whether it was worth the pain as, politically, more funding had an attraction.  However, it could not have solved the problem.  If we had given increased funding to Railtrack at this stage (i.e. used the muddle through option to get through the interim result stage) Railtrack's funding difficulties with the West Coast Main Line (and, indeed, every major project it was involved in) would have been the cause of further concern."

208.    The decision made, the Regulator and the Company had to be told.

**Mr Byers tells the Regulator**

209.    At 4.0 p.m. on the 5th the Regulator met Mr Byers and Mr Rowlands at Mr Byers' office.  The meeting had been arranged on the 4th but Mr Winsor had not been told what it was to be about.  Mr Winsor was told that there would be no further financial support for Railtrack, that its administration would be sought that weekend and that Renewco could not proceed.  It became apparent to Mr Winsor that Railtrack had been deliberately keeping him in the dark.  He said that Mr Robinson's reaction would be likely to be an immediate application for an early interim review.  Mr Byers said that that had been thought of and that if such an application were made he had the authority (as he had) of the Prime Minister and Chancellor immediately to introduce emergency legislation to entitle the Secretary of State to give instructions to the Regulator.  Mr Winsor pointed out what adverse effects such legislation would have not just on railway financing but on regulated industries generally.  He spoke, too, of implications under the Human Rights Act.  He made no headway; Mr Byers said an application to put the company into Railway Administration would be made on Sunday.

210.    In the course of the conversation Mr Byers had given to the Regulator a summary of the Rainbow proposal as put by Mr Robinson.  The Regulator asked in what conceivable circumstances would the government ever find a proposal of that kind acceptable.  His evidence was that in answer Mr Rowlands (not, be it noted, Mr Byers) replied "Quite!".  It was from that alone, as it would seem, that Mr Winsor felt it was clear that so far as the government was concerned Rainbow had been a non–runner from the start.  I do not accept it was the government's view that no form of equity solution could ever have been acceptable.  If, for example, the CLG that was in mind had "scored" public then equity solutions would have had to be revived as what might then have been regarded as the least unattractive of achievable options.  Of course, by the date of the meeting with the Regulator it was known that the CLG scored private, there was a real prospect that one way or another an administration would be likely to be ordered and there was thus no longer any need to contemplate the possible acceptability of an equity solution as the lesser or least of several evils.  It was not put to Mr Byers that he also must have meant whatever Mr Rowlands had meant.

211.    In the circumstances I believe Mr Winsor was reading far too much into the one word "Quite" and I cannot on the basis of that one word discount all the other evidence that Rainbow was given consideration by the government, including by Mr Byers, in good faith.  In other words I reject the view, which I think was being suggested on the basis of Mr Winsor's evidence, that Rainbow had been all along simply entertained on the false pretence that it might become acceptable so as to lure Railtrack into a view that it could safely rely on it and need formulate no alternatives.  If, as Mr Rowley's cross–examination seemed also or alternatively to suggest, Mr Rowlands' "Quite" had indicated only that a suspension of the then–established regulatory regime had all along been unacceptable, then, firstly, I do not read Mr Winsor's evidence so as to take it that "Quite" referred only to that and, secondly, as Mr Byers said in his evidence, the Prime Minister himself had doubts about what he had called "this crazy

system of regulation".   In context a mere suspension of it could not, in my view, have been regarded as always beyond the pale.

**Mr Byers gives the news to Mr Robinson**

212.   Shortly after meeting with Mr Winsor, Mr Byers then met Mr Robinson.   Mr Robinson was told that the government was not going to proceed with Rainbow and was withdrawing support for Railtrack.   Mr Byers asked whether there could be a *joint* petition for administration and said that he hoped that after an administration there would be a CLG.   What the shareholders would receive, he said, was still up for consideration, though Mr Rowlands, present throughout, in explaining what administration implied, said that what the Group shareholders got would depend on the course the administration took.   Mr Byers foresaw difficulties with shareholders; there were United States class actions that had been budgeted for.   He said either that the government had spoken to the chairman of all major banks that day or that it would shortly do so and either had briefed them or would brief them on what he, Mr Robinson, was now being told.   I have not been taken to what they were told or when.   Mr Robinson was angry but Mr Byers made it plain he would not change his mind.   He added that he had seen the Regulator and had told him not to react to an interim review application and that if he attempted to do so, emergency legislation would be rushed through Parliament to stop him.

213.   Mr Robinson said to Mr Byers that Railtrack had taken the position that so long as Rainbow was being discussed, it thought it was trading legally.   Mr Robinson said that Railtrack had been taking regular legal advice - weekly or monthly - as to whether it was trading legally.   It seemed therefore to Mr Byers that Mr Robinson was now accepting, now hearing that Rainbow was not to proceed, that it could no longer trade.   Mr Byers indicated that *if necessary* , namely if there was no cooperation on an agreed administration over the weekend, he would probably announce on Monday 8th that the government would not provide further support.   Mr Robinson left to consult his Board colleagues and advisers.

214.   How that public announcement would have been framed and whether the government, had there been no administration over the weekend, would either have *had* to make it or could, without impropriety, have chosen to make it would have been subjects of further legal advice to the Department but no further work was done on that because, as the events unfolded, it was seen that an administration would be likely to emerge.   Mr Byers well recognised that such an announcement would, of itself, have been likely to push Railtrack into administration.

215.   It has been argued that Mr Byers' unwillingness at this stage to change his mind and to allow Mr Robinson to explore new possibilities is material from which, when joined with other factors, the necessary targeted malice in Mr Byers can be inferred. I cannot agree.   Months had already been spent, with the help of skilled and experienced advisers on both sides, and a policy had at last emerged.   There must be some finality and it is not as if Mr Robinson then had nor has since claimed to have had any alternative solution that had any prospect of both working and being

acceptable to government. Even if Mr Byers was then peremptory and intransigent that may have laid him open to a Judicial Review or to an HRA claim but it would not, in my judgment, have furnished grounds for any adverse inference against him relevant to the tort I am here considering as such conduct (in the absence of some contrary explanation) would more have pointed to a wish promptly to proceed with a not−unreasonable chosen government policy than to a wish (for which no grounds were given) deliberately to harm Group shareholders.

216.    There was, at this stage, no decision that the Department would necessarily alone petition for Railtrack's administration over the weekend. It could have been Railtrack alone that would petition or there could be a joint petition, one by the Department alone, or none. If none, then a Monday announcement by the Department, subject to legal advice, would be likely to go ahead although it was recognised that if there was no petition but an announcement then there could be disruption on the railways. Thus there had had to be pressure brought on the company to cooperate in, or at least not to resist, the administration process. There might yet have been no decision to petition but contingent arrangements had already been made; Ernst & Young who had been familiarising themselves with the case for weeks, were, as I have mentioned, to be the government's proposal as the Administrators and, as it was put later by SSSB to Railtrack's board, a Judge had been "lined up" to hear a petition. The likelihood is that the duty judge that weekend, Lightman J., was merely warned that a hearing on Sunday might be necessary.

**Renewco "scores" public**

217.    On 5th October the ONS indicated to the Treasury, albeit provisionally, that Renewco would "score" as public. I have mentioned earlier that by consent the Claimants abandoned their attempt to require a representative of the ONS to attend to give evidence. In the light of this "score", the Department would not have been able to implement Renewco quite independent of Mr Byers' decision not further to finance Railtrack.

**Railtrack takes advice**

218.    Railtrack board members had a series of meetings with advisers on Sunday 6th.. Deloitte & Touche advised on accounting matters, Mr Richard Adkins Q.C., Leading Counsel with particular experience in such areas, advised as to insolvency, administration and procedure.    Mr Adkins advised that a Railway Administration Order should be opposed only if the Board had some viable alternative.    Only the day before Mr Harding had been clear that Railtrack was solvent but the news had changed things and Mr Harding now felt that Railtrack could neither oppose a petition or ask for further time.    The Board was resolute, though, that it would not *support* the Petition.    The government had a draft Petition at hand which could easily enough have been by Railtrack, by the Department or by both but I do not read the evidence as suggesting that the Railtrack board ever had in mind the Company alone presenting a Petition;  at most it was either that there might be a joint Petition or one by the Department alone.    When the Board resolved neither to oppose or support *the* Petition they meant that, as I understand the evidence, in relation to a petition by the Department alone.    Railtrack's advisers CSFB, Deloittes and Simmons & Simmons supported the Board's approach.

219.    The subject of an approach to the Regulator came up.    Mr Marshall thought the interim review process not to be a realistic source of funding, especially given the threat to disable the Regulator from intervening.    Railtrack were advised, though, to apply to the Regulator in the interests of completeness and to test his response.

**Railtrack speaks to the Regulator**

220.    At about 7.0 p.m. on the 6th Mr Robinson and Mr Marshall broke out of their meetings to speak to Mr Winsor.  He confirmed he had been threatened with legislation by Mr Byers.  Mr Marshall asked him if he would assist Railtrack by conducting an emergency interim review.  Mr Winsor said he would have to consult his colleagues.  Later he said he would be unable to conduct one in such a short space of time, meaning, it would seem, by Monday morning on the 8th October.  That is Mr Robinson's recollection of the discussion and, in a sense, that is what is important but Mr Winsor's note of that conversation adds further points.  He felt that Railtrack was merely going through the motions;  they had no expectation he would provide them with any cause for hope.  They had no properly justified application anywhere near ready.  Mr Winsor said that whilst he could immediately announce the *initiation* of an interim review, he did not think it possible to complete it within 24 hours.  Railtrack said it needed cash in hand on Monday but could not say how much beyond saying "hundreds of millions of pounds".  They said, remarkably, that unless he could promise them an unspecified number of millions of pounds on the Monday there would be no point in having an interim review.  Mr Winsor, on the subject of the threatened legislation, pointed out that it would take time to be passed and was a difficult card for the government to play.  It would be likely to be resisted by reason of its effect on other regulators and other regulated industries.  It would be hard fought and might not be passed at all, but, despite that, Railtrack showed no interest.  He suggested they might call the government's bluff but Mr Robinson just repeated that the government would do it.  He did not have the will to take on the government.  Mr Winsor asked if they wanted a statement from him saying that he was going to carry out an interim review;  they said no.  Nothing short of cash on Monday would do.

221.    Both the history of other reviews (albeit not interim ones) and the need for the Regulator to consult others made Mr Winsor's view that he could not complete it, even a Hatfield re–opener, by Monday 8th undeniably correct.  Mr Robinson in cross–examination gave as his impression of the conversation with Mr Winsor that an interim review would take "an awful long time".

**A Press Release in draft**

222.    Very late on the 6th SSSB (for the Department) received a draft press release from CSFB (for Railtrack).  A difficulty the Department was in was that despite all the work done by its professional advisers (work that had been done without direct recourse to Railtrack's most recent and unpublished books and papers) the picture as to whether Railtrack was truly unable to pay its debts as they fell due or was likely to be unable so to pay them was, it felt, less than conclusive.  The draft Petition so asserted, basing itself on a draft witness statement of Mr Rowlands and a draft report (on assumptions) from Arthur Andersen, but plainly some comfort on the issue from Railtrack would be valuable.  The draft press release contemplated there being a hearing of a Department petition on Sunday 7th and said that:–

> "Railtrack plc was not in a position to oppose this petition
> given the Government's decision to provide no further direct
> financial support beyond that in the regulatory settlement.
> Railtrack plc therefore reluctantly accepted there was no
> credible alternative to administration,"

223.    That must have been the outcome of advice taken by Railtrack from its accountancy
and legal advisers, including its Leading Counsel.

**Mr Robinson's letter**

224.    On 7th Mr Robinson faxed to Mr Byers and Mr Rowlands a letter above his signature
that indicated that in the circumstances as he saw them it was his view and that of the
Executive Directors of Railtrack that it would be difficult for Railtrack to draw on its
bridging facilities or to access the public bond market in the short term.   Without the
government support on which the markets had previously relied, now not
forthcoming, there was no realistic prospect of its raising further finance or
refinancing its existing commitments.   To delay administration, said the letter, would
cause severe operational difficulties.   In the letter Railtrack, importantly, waived the
2 days' notice of the Petition to which it would otherwise have been entitled.

**The Petition is presented and an Order is made**

225.    Work on the case proceeded on both sides late on 6th and into Sunday the 7th..
Leading Counsel for the Department–petitioner, Mr David Richards Q.C., had
prepared a skeleton argument.   The papers were supplied to Railtrack's Solicitors.
The Petition was unopposed.   The hearing before Lightman J. began at 5.45 p.m..
He indicated he had read the relevant papers.   Leading Counsel - Mr Adkins Q.C. -
appeared for Railtrack and Mr Moss Q.C. for the prospective administrators.   Mr
Richards presented the case for an administration.   He drew attention to the passage I
have cited from the draft Press Release as supplied by Railtrack's own advisers.
Arthur Andersen's projections, in the evidence and not opposed by Railtrack, were
that further funding of at least £700 million by December 2001 rising to some £1.7
billion   by the end of March 2002 was needed by Railtrack, that its ability to use
overdrafts to fill the gap was likely to depend on its making a £2.3 billion bond issue
and that SSSB had advised that it was highly unlikely that that could be done in the
then–present situation.   The Learned Judge accepted that the Company either was or
was likely to be unable to pay its debts.   He observed that administration was not
only appropriate but absolutely essential.   In his evidence to me Mr Robinson
accepted that without government support Railtrack was unable to pay its debts and
that that had been true for a long time.   He accepted, too, that its financial position
before his meeting with Mr Byers on the 5th was the same as it had been after and the
same in Spring 2001 as it was in September 2001.

226.    A Railway Administration Order was made on 7th October.   Mr Adkins spoke only as
to Railtrack's costs, which were awarded to it.

227.    Mr Rowley for the Claimants has more than once said that no criticism is made of the
Judge;  on the material presented to him, the Claimants accept, the Judge could have
done no other than as he did.  Four senior members of Ernst & Young LLP became
Joint Special Railway Administrators of Railtrack.

**A Railtrack Plan B?**

228.    One of the criticisms of the government's conduct of negotiations over Rainbow was,
as I have mentioned, that by its not indicating that Rainbow was, however adjusted,
bound to be unacceptable, the Department and Mr Byers deliberately lured Railtrack
into a situation in which it did not, until it was too late to do so, devise a "Plan B", a
plan to cope with a situation in which Rainbow (or Renewco) was not to proceed.  I
have dealt with the argument in relation to particular incidents but I now reject that
criticism generally.  Whilst the portents for Rainbow were never good, there was, in
my judgment, no deliberate intent to lure Railtrack into not devising its own Plan B;
Rainbow, had the dividend and floor price levels moved downwards, *could* have
become possible, perhaps would have had to become possible, especially so if the
CLG alternative had "scored" to the public sector.  There were good reasons to
decide on Rainbow, Renewco and the administration–cum–CLG all at once, as Sir
Richard Mottram pointed out.  Delay was for those reasons, not in order to lure
Railtrack.

229.    In any event, nothing stopped Railtrack from putting further alternatives to the
government except its own decision, with CSFB, to adopt a "one–option" strategy
and nothing at all stopped it trying to develop a "Plan B" to be revealed if and when
Rainbow or Renewco came to be rejected.  What really stood in the way of a credible
Plan B were the facts.  Railtrack had tried to find one but nothing emerged save for
"muddle through", which CSFB had advised was not a viable option and was not
acceptable even to Railtrack's chairman.  Railtrack never had a Plan B that even got
as far as being written down.  I would add that Mr Adkins' advice that the Petition
should only be opposed if Railtrack had a viable alternative to administration,
coupled with Railtrack's waiver of 2 days' notice of the Petition and the decision not
to oppose the Petition, all taken together, suggest that Railtrack accepted that even
given time there was no real prospect of its being able to present a credible "Plan B".
Mr Robinson accepted that he was told that if Railtrack's board needed more time to
consider the evidence presented in support of the Petition they could have it.  No
request for further time was made.

**The aftermath**

230.    On Monday 8th October trading in Group shares was suspended at the Stock
Exchange at the Company's request.  The price at suspension was 280p.

231.    On 15th October Mr Byers made a statement to the House of Commons.  A debate
followed.  Mr Byers said that on 25th July 2001 Mr Robinson had said that unless
extra financial assistance was provided it would be clear that in November 2001

Railtrack would be unable to make the critical statement that it was a going concern. Mr Byers was cross–examined before me on the dubious basis that Mr Robinson had not then asked for financial assistance but only for a "soft comfort letter".  In my judgment such a letter would have been of assistance to and would have been intended to assist Railtrack.  It was a letter that would have been drafted in terms such as would have been intended to encourage and reassure banks, brokers and the financial market generally that the government stood, financially, behind Railtrack. That kind of assistance could fairly be described as "financial".

232.  On 5th November 2001 Mr Byers responded in the House of Commons to a private notice question put by Mrs May M.P..  I have not understood that it is being said that his answers, which, as he rightly said, descended, upon the intervention of others, to "a bit of House of Commons knockabout", were misleading or untruthful and in any event I have not seen them either to add to the analysis I have so far conducted of the events as they unfolded or to provide any material from which targeted malice against Railtrack shareholders could be inferred.  I cannot take his remark that the time had come to put delivery to passengers before dividend to shareholders as an indication of such or any malice but rather as a not irrational preference for a railway system that yielded "delivery" to passengers.

**Parliamentary privilege**

233.  Mr Byers was cross–examined before me for some 2Œ days.  Towards the end of it, Mr Rowley Q.C. turned to consider the answers which Mr Byers is recorded in Hansard as having given, after the Administration Order, to questions put to him by Members of a sub–committee of the Parliamentary Select Committee on Transport, Local Government and the Regions.  Mr Rowley turned to the sub–committee's business of the 14th November 2001 and to a question put to Mr Byers by a member of that sub–committee, Mr Chris Grayling M.P..  At question No. 857 Mr Grayling and Mr Byers are recorded as follows:–

> "857.     Was there any discussion, theoretical or otherwise, in your Department before 25th July about the possibility of a future change in status for Railtrack, whether nationalisation, the move into a company limited by guarantee, or whatever?
>
> (Mr Byers)     Not that I am aware of."

234.  In his cross–examination Mr Rowley took up questions with Mr Byers and received answers as follows:–

> "Q. Do you see that question?
>
>  A.  I do.
>
>  Q.  You see your answer;   "Not that I am aware of."
>
>  A.   Yes.

Q.  That answer was untrue, was it not, Mr Byers?

A.  It is true to say there was work going on, so, yes, that      was untrue.

Q.  That was untrue?

A.  It was."

235.    Mr Rowley then ran through what he called the most prominent examples of discussion about the possibility of a future change in status of Railtrack, referring to events or papers of the 12th, 20th and 29th June and 12th, 25th and 27th July.  Mr Rowley continued his questioning and received answers as follows:–

"Q.      Amidst that welter of documentation you could not possibly have believed that the answer you gave to Mr Grayling was true, could you?

A.      I accept this is not an accurate statement.

Q.      It was deliberately not an accurate statement, was it not, Mr Byers?

A.      It was such a long time ago, I cannot remember, but it is not a truthful statement and I apologise for that.  I cannot remember the motives behind it.

Q.      Let me suggest the motive, Mr Byers:  you did not want to know, you did not want the sub–committee to know that options for Railtrack, including renationalisation and changes in its status, was something that you had asked your officials to examine within three days of your taking office. That is why you deliberately made that untrue statement in response to Mr Grayling's question?

A.      I am sure that was not the reason.

Q.      There is no other possible reason, is there, Mr Byers?

A.      In the context of a select committee hearing, there are other reasons but they are - none of them are acceptable, I would accept that.

Q.      You knew that if you told the truth, far from this being put to bed, there would be further investigations, further questions and further statements, did you not?

A.      No, I was - I would be very happy to debate the pros and cons of the various options that were available to us and I am very clear in my own mind about the reasons for my decision on October 5th.

Q.      Not the pros and cons, Mr Byers, an investigation into your conduct.   You knew that if you told the truth, there would be more questions, more investigations and more statements about your conduct.

A.      No, I do not accept that.

Q.      The truth would have been revealed that you had planned from July that if you could achieve it, you would put Railtrack into administration?

A.      That was not the case."

236.    Mr Byers having referred in the course of those answers, to "other reasons", Mr Sumption Q.C. took that up in re–examination as follows:–

"Q.      You said in giving that answer that there were other reasons why one might be tempted to say that sort of thing in answer to that question.   They were not reasons [which you said would excuse you] but there were others.   I know that this is a difficult matter for you, Mr Byers, but can you please tell us what those other reasons were?

A.      They might be in a Select Committee under pressure, not wanting to - having thought actually that most people would regard those issues as having been considered, but replying in a way which would allow the question to move on to other issues but not to conceal any conspiracy or plot.

Q.      Yes.   Is there anything else you want to add on that question?

A.      Simply I think, looking back at the question, which is the one about a range of options, I think most people would have - I cannot understand why I gave the reply I did really but most people would have expected that those options would be under consideration and ××.. ."

Mr Byers continued by referring to an article in the Guardian which he thought had made it clear that the issue of possible nationalisation would be looked at.

237.    All that was on the 14th July 2005 (Day 14 of the hearing).   On the 20th July (Day 16) Mr Sumption added a supplementary bundle of authorities to the existing bundle and, basing himself upon them, drew attention to one of the privileges of the House of Commons in the following terms:–

"My learned friend suggested to Mr Byers that he had deliberately lied to the House of Commons sub–committee in answer to Mr Grayling's question about the period before the

25th July in order, he said - my learned friend's suggestion - to conceal the fact that he had already by then decided upon what the Claimants call "the Administration Plan".  What Mr Byers said to the sub–committee was factually incorrect, that is beyond question, and he candidly admitted that the moment the point was raised, which in my submission does credit to his evidence here, the only question with which the present trial is concerned.

Mr Byers did not accept that he intended to mislead the Transport sub–Committee.  That depends on how much he recalled about the precise sequence of events at the stage when he had to answer on–the–hoof Mr Grayling's question.  But he did not accept that.  That is a distinct question which is a matter for the House of Commons in due course and may not, in our submission, be debated here.

Your Lordship ought to be aware of the case law about the limits of the Court's function in this exceptionally delicate area.  I should make it clear that the Secretary of State for whom I appear has absolutely no desire to inhibit Your Lordship's consideration of any matters that Your Lordship may consider relevant, but he is not in a position, particularly in the office that he occupies, to waive the privileges of the House of Commons which are part of the general law, and the authorities are absolutely clear that this is not a matter which may be relied upon by my learned friend, suggested to a witness or the subject of a finding by Your Lordship."

238.    Mr Sumption referred me to *Prebble -v– New Zealand Television [1995] 1 A.C. 321 P.C.*  and also to *Hamilton -v– Al Fayed [2001] 1 A.C. 395 H.L.*.

239.    In his final speech on the 21st July (Day 17) Mr Rowley said that in addressing the subject of Mr Byers' integrity he was clearly going to have to tread carefully:–

"×. in the light of the Parliamentary privilege points that my learned friend raised with Your Lordship yesterday afternoon, and having considered the authorities on that overnight, because I saw them for the first time shortly before Your Lordship sat yesterday morning, having considered the position overnight, it does seem that Your Lordship is left with what on the face of it appears to be an unsatisfactory position, but a position [in which] Your Lordship can and should heed the fact that Mr Byers did make a factually incorrect statement to the Transport Committee on the 14th November 2001, but in the light of the authorities that is as far as I can properly invite Your Lordship to go,  and as far as Your Lordship can properly go in relation to that particular point when Your Lordship is considering Your Lordship's judgment."

I then raised a possibility with Mr Rowley and the transcript continues as follows:–

> "Mr Justice Lindsay:  I suppose there is nothing to prohibit me from assuming the worst from Mr Byers' point of view.
>
> Mr Rowley:  I think that might ×...
>
> Mr Justice Lindsay:  Even that might fall foul ×
>
> Mr Rowley:  To the extent Your Lordship is now offering me a gift–horse, I am equally reluctant to spurn it.  But if I am not permitted to probe with Mr Byers the reasons for that incorrect statement, and it is not a matter on which Your Lordship should be deliberating in the course of Your Lordship's judgment ×.
>
> Mr Justice Lindsay:  Anyhow, you do not invite me to make that assumption.
>
> Mr Rowley:  I do not think I can on the authorities, my Lord, much as I would like to and it also follows that in respect of the other answers that Mr Byers gave to the sub–committee and also the House to which I drew his attention, equally I cannot invite Your Lordship to make adverse findings against him in respect of those answers, because of the Parliamentary privilege point.  So that is where one is.  So the position is that the statement was untrue.  It clearly puts his reliability as a witness in these proceedings squarely in play, but I am not permitted to address Your Lordship on the basis that it enables Your Lordship to draw an adverse inference as to his integrity."

240.    On the authorities cited to me I hold Mr Rowley to have been right to concede that the privileges of Parliament are such that he could not, at the hearing before me, question Mr Byers with a view to showing that Mr Byers had deliberately told an untruth in Parliament and could not address me on the basis that Mr Byers had done so.

241.    Stepping aside from the case at hand, the position is unsatisfactory in that it puts both Parliament and the Courts to some disadvantage.  Parliament is at a disadvantage because, if it is right, as I have been told, that as a matter of convention it does not turn to questions such as have arisen in the case before me until the relevant Court has completed its proceedings, Parliament thus suffers a delay before embarking upon on its own examination.  The Court, too, is at a disadvantage;  the cases in which such questions arise cannot simply be adjourned until Parliament has ruled on the question (inconvenient as that would generally be) because, as I have said, Parliament conventionally awaits the Court's decision before itself acting.  Moreover, the Court is at the disadvantage that in considering the credibility of a witness it cannot accept or rule upon an argument that, having deliberately lied to Parliament, he or she is likely also to have lied in Court.  I mention this unsatisfactory position at some

length because (difficult though it may be to find a solution) it may be that Parliament (which alone can deal with the issue) will wish to attend to it. At the moment both Parliament and the Courts are so respectfully intent on not treading upon the other's toes that both stumble.

242.    I add only this. I am quite sure that Mr Rowley, questioning Mr Byers as he did, intended no inroad into Parliamentary privilege; no objection had been raised to the questions as he asked them and the relevant authorities had by then not even been collected let alone cited. When the point as to Parliamentary privilege was taken, Mr Rowley, having considered the matter overnight, conceded the issue as I have described. I, too, intended neither to permit nor to make any such encroachment and would hope to excuse myself in a similar way. Judges are loath to intervene in a well–ordered cross–examination, especially at points where the witness *may* be put into some revealing difficulty, but I should, no doubt, have been far quicker to have seen the road–block to which Mr Rowley was heading and to have warned him to divert. I apologise to Parliament for not having done so.

243.    The outcome, though, is that Mr Rowley's argument as to, and my assessment, which I shall come on to, of Mr Byers' credibility, is to some extent circumscribed.

**Group's results**

244.    On 17th December 2001 Group published its interim results for the 6 months to 30th September 2001. Profit before tax for the Group was £292 million. It had undrawn, committed facilities of about £1900 million. There is there, though, nothing that necessarily signifies that Railtrack had not been insolvent on 7th October.

**Dinner at the House of Commons**

245.    On 6th February 2002 Mr Byers and Mr Winsor had dinner, at Mr Byers' invitation, at the House of Commons. In the course of it Mr Byers said that in the Summer of 2001 he had been looking through the Railways Act and that it was he, not officials, who had first come up with the idea of putting Railtrack into administration. He did not put a clear date to his coming up with the idea, which could thus have differed from the date of his looking through the Act. He had then, he said, asked officials to work up the idea to see if it was a flyer. He did not put date to that either. Mr Byers was cross–examined on that. He had, indeed, he said, come across the idea of a Railway Administration and "would" have said to someone in his private office to do him a note. When it was put to him that he had raised it with a view to putting Railtrack into administration he denied that, though he was not in a position to deny Mr Winsor's version of what he had said.

246.    Given, as I have noted, that a paper on Railway Administration emerged in completed form in the Department only the day after Mr Byers became Secretary of State, I doubt that it was he who was first to consider it *generally* . He could, though, have

been the first to consider it relative to putting Railtrack into administration so there is added reason to believe Mr Winsor's record of what Mr Byers said but, whatever the truth, I fear I fail to see that Mr Byers' boastfulness, if such it was, is something that evidences or even tends to point towards targeted malice against Group's shareholders. There plainly can have been, indeed, as I shall come on to, were many legitimate policy reasons in favour of Railtrack's administration, reasons other than an intent to harm its shareholders.

**Network Rail and the Network Rail Agreement**

247.    In March 2002 Network Rail was incorporated as a CLG. Creditors of Railtrack were paid in full in the course of the administration by way of funding provided to the Administrators by the Government. I do not know the extent of such support although it was a recurring theme of asides made by Mr Robinson in the course of his evidence that the outlay by the government to fund the Administration was far more than would have been needed to save Railtrack.

248.    Network Rail began to negotiate with Group to buy from it its 100% holding in Railtrack.

249.    On 28th May 2002 Mr Byers resigned from his office as Secretary of State.

250.    On 27th June 2002 Group contracted to sell its holding in Railtrack to Network Rail for £500 million. The sale obtained the necessary approval of Group shareholders on 23rd July 2002. It was a term of the agreement that Group waived or withdrew any "Administration claims". "Administration claims" were defined to include any claims against any Secretary of State or government department arising out of or in connection with the making of the Administration Order or the circumstances or events leading to it. Plainly, therefore, Group could not have brought the claims now before me but nothing in the Network Rail Agreement could or did preclude the Claimants from doing so.

251.    The shares in Railtrack were never, of course, an asset in the Administrators' hands. By dealing direct with Group, Network Rail in effect by−passed any need or further need on the Administrators' part, the creditors having been paid and Group no longer owning the Railtrack shares, to see what Railtrack's assets and businesses could fetch and to sell them at the best price reasonably obtainable.

**The Administration ends.**

252.    On 3rd October 2002 there took effect an Order of Ferris J which brought the administration to an end,

**Group is "delisted"**

253.  On 27th October 2002, Group's shares having remained suspended, Group ceased to be listed at the Stock Exchange.

**Proceedings are launched**

254.  On 2nd December 2003 these proceedings were launched but doubt hung over the HRA claim  for a while until late June 2004 when an extension of time defeated the Defendants' argument that it was out of time and should be struck out.

**Distributions to Group and to Group's shareholders**

255.  In January and August 2003 and in December 2004 Group was enabled to make distributions to its shareholders, including such of the Claimants as were then its shareholders, which included distribution out of the sums paid to it by the Administrators.  In all Group's shareholders received £2.52 per share, some 90% of the price of their shares on the morning of 8th October 2001 when their suspension began and the Administration became known,  although that value fell well short of the average price (£9.90) which the shares had commanded in the 3 years preceding their suspension.

256.  So much for a chronology.   As I said at its outset, I would not attempt to cover every event, every communication or every issue raised but I hope I have covered the more important ones.

257.  At a number of points the Claimants' argument speaks of administration as a route which avoided payment having to be made to shareholders as if that was a commanding advantage that lay behind administration.   In the event the administration did not avoid payment to shareholders;  Group, as shareholder in Railtrack, was paid £500m for its holding.   But, in any event, whilst payment *to shareholders*  might be avoided by administration, payment itself was unlikely to be. If, instead of buying Railtrack's shares, it had been Railtrack's assets that had been bought, the Government's offer for them would have had to have been the best price reasonably obtainable for the assets by the Administrators.   So payment would not have been avoided.   No doctrinal or other reason was ever given why avoiding payment to shareholders should have been regarded as fiercely attractive whereas payment of what could have perhaps have been a corresponding sum to the Administrators would not be.   There was no evidence as to this but it surely might reasonably be thought that it was the *amount*  to be paid that would chiefly concern Government rather than the identity of the recipients and, as to that, there was no evidence that the Railtrack assets would have fetched either less or more than the £500m paid for the Railtrack shares.   I would add that there was no proof that the achievable value of Railtrack's shares had been depressed because of the administration itself, as opposed to the withdrawal of government support, nor did that speak for itself.   When the shares were sold in June 2002 Railtrack, funded under

administration by the government and managed under the administrators, could well have more assuredly been regarded as a going concern than due diligence might have disclosed it to be in October 2001.

258.    Amongst the Claimants' complaints is that Railtrack was not kept informed about events concerning Renewco.  I have no evidence that anything was deliberately kept from Railtrack on the subject of Renewco;  no ignored request for information on the subject was drawn to my attention and put to any witness and in any event withholding of information on the subject would have been relevant against Mr Byers only if, expressly or by implication, he had told his staff to procure that information on Renewco was to be withheld.   There is no evidence whatsoever that that was the case.

## F.   **The remaining witnesses**

259.    There are 3 witnesses who have so far been left over for comment.

260.    I would not for a moment doubt Mr Robinson's honesty as a witness.  I am sure he was quite free of any intent to obscure or mislead but his evidence was weakened by two features.  Firstly, as he himself said, and not, I think, merely in jest, he had been trying, understandably, over the intervening years to forget the events of 2001.  His memory in some areas was poor and without fully repeating them I remind myself of my findings as to the meeting of the 28th August 2001.

261.    Secondly, his evidence was coloured by his firmly held belief that administration would cause chaos and was so poor a solution to any problem as to have been "on another planet".   It never entered his head, he said, that the government could do otherwise than support Railtrack.   This led him to persist with optimistic interpretations of events that a mind that did not harbour such fixed ideas would not have entertained.   He always believed Renewco would come to fruition, for example, simply because, although there was no legally binding obligation on the Department to bring it to that point, although the April Agreement made express provision for the case that it was not brought into existence and although, because it might "score" as public, the Department, might be unable to do so, the government had said it would use its best endeavours.   Although in the negotiations with Railtrack the Department had never expressly or impliedly said to Railtrack that it would give it funding in excess of the regulatory settlement and the Endeavour Agreement, it was reasonable, he thought, to *assume*  there would be a reasonable outcome.   Viewing things, so to speak, through glasses coloured to exclude any sight of the possibility of an absence of government support, he could see nothing to indicate that such support would not be forthcoming.   For all his honesty and directness, his evidence was thus in some respects unreliable and I have in some instances preferred other evidence.

262.    As for Mr Rowlands, his honesty is not challenged nor is it said that he was guilty of any deception or sharp practice.   It is, though, said that he had been less than frank in his dealings with Mr Robinson, leaving the latter to leave the meetings of 28th August

and 3rd October believing that Rainbow was the Department's preferred option, one to which the Department's response was positive. It was not established to my satisfaction that he knew Mr Robinson was of that belief or that he had either deliberately or falsely done or said anything to cause him to have such a belief. That Mr Robinson left with such views is, in my judgment, more an indication of the shortcomings in Mr Robinson's mind, as I have mentioned, than of any want of frankness in the Civil Servant. I found Mr Rowlands to be a calm and thoughtful witness whose evidence I had no reason to disbelieve.

263.    The Claimants say in their written final argument (overtaken by the point as to Parliamentary privilege and hence not relied on in their oral final argument) that Mr Byers is a proven liar, basing that on his answers to Mr Grayling in the House of Commons. He accepted to me that he had then told an untruth but that, of itself, does not brand him a liar if a liar is someone who tells an untruth knowing it is untrue or being reckless to its truth or falsity. Whether he was a liar within that meaning is not for me; I must leave it to the House of Commons. I cannot therefore proceed on the basis that he is a proven liar.

264.    Of, course, that he had lied to the House of Commons, should the House so find, would not, of itself, indicate that he had lied to me. Looking at that, and notwithstanding the lengthy analysis of Mr Byers' veracity attempted in the Claimants' closing material, I do not find Mr Byers generally to have been an untruthful witness. On many issues it would not be possible to attack Mr Byers' evidence without impugning also Mr Rowlands', which, where attempted, was not successful. I have at some points in the chronology cast doubt on Mr Byers' evidence but never to the point of finding him to have sought to deceive or mislead the Court on any issue probative or even persuasive, alone or cumulatively with other issues, one way or another as to his state of mind on the crucial issue of the presence or absence in him of the alleged targeted malice. His demeanour throughout (no doubt the Claimants would say that this was yet more successful dissembling) was of a witness confident in the rightness of his case. The only time his answers descended to unreason was in his answer, in re−examination, as to his reasons for the admitted untruth in Parliament. His explanation as then given seemed to me little above gibberish but it will be for Parliament to assess what he meant. That answer apart, he was not, in my view, truly "caught out" in any way that threw light on the presence of the necessary targeted malice, despite a long, very well−researched and skilful cross−examination. I add only that even if, contrary to Mr Rowley's warning, I were to *assume* that Mr Byers had lied to Parliament in answer to Mr Grayling, my conclusion on the issue of his truthfulness before me would very probably remain the same, not, I hope, because of any obstinacy on my part but because I could not fairly jump from his being held to be a liar in and by Parliament to his being a liar to this Court without some reason to do so and I cannot see that such enquiry as Parliament may make into his behaviour will be concerned to find that reason (it being of no concern to Parliament as to whether or not he had lied to me).

265.    The only remaining issue as to witnesses is whether adverse inference should be drawn from the Department's failure to call Mr Linnard, their Director of Railways. *Wisniewski -v− Central Manchester Health Authority [1998] PIQR 324 at 340 CA*

was cited to me.  Mr Linnard's notes and reports were already fully in evidence and
have been examined in some detail where of possible relevance.  There has been no
evidence of anything said or done between Mr Linnard and Mr Byers that might
throw any light, not available from those notes and reports and from the evidence of
Mr Byers, Mr Rowlands, Miss MacKenzie and Sir Richard Mottram, on the important
and central issue of Mr Byers' state of mind and in particular as to whether a
component within it, when he was deciding when and how to act, was targeted malice
against Railtrack shareholders.  In the circumstances I do not read *Wisniewski* as
obliging me to draw any adverse inference and I do not.  I add only that there has
been no suggestion that Mr Linnard would not have been willing and able to respond
to a witness summons from the Claimants had they chosen to obtain one.

## H.   A conclusion on the Claimants' claim in tort

266.   The Administration Plan which Mr Byers is accused of devising and then
implementing is a mixture of allegations about "ordinary" facts and allegations about
intention.

267.   As to the ordinary factual element, Mr Byers is accused of engineering a situation in
which he could present evidence that Railtrack was or was unlikely to be able to pay
its debts as they fell due.  But that needed no "engineering".  Throughout Mr Byers'
time in office down to the point of Administration Railtrack's financial position was
such that if the Government told it that it would limit its financial support to only that
to which Railtrack was then in law entitled (a message that Group would have had to
pass on to the Stock Exchange) Railtrack would have been unlikely able to pay its
debts as they fell due.  The impact of such a message on Railtrack's ability to make a
November going concern statement, on its "A" credit rating, on its ability to go
successfully to the bond market and on its ability either to draw down existing
facilities or replace them with new ones was such that insolvency of the kind required
if there was to be an administration would have been immediately demonstrable had
full access to Railtrack's situation been available.  Mr Robinson's heart–felt evidence
that the Government created Railtrack's insolvency is not acceptable.  Not only did
he, in so saying, ignore his own evidence and that of others that without government
support Railtrack was unable to pay its debts but in any event a provider of funds
does not "create" an insolvency by providing only that to which the recipient is
entitled.  The Government can be said to have failed to avert Railtrack's insolvency
but that cannot be said to be a fault in the Government unless one can postulate a duty
on government to have funded Railtrack without limit and without condition, a
hopeless proposition.

268.   Another alleged factual element in the Plan is that after the Administration Order
"assets of [Group] and/or Railtrack would be removed×..".  There was, firstly, no
way in which the administration of Railtrack could "remove" assets of Group.  The
relevant assets of Group were its shares in Railtrack, assets quite outside the
disposition of the Administrators of Railtrack and which remained, notwithstanding
the Administration, exactly where they had been before it, in Group.  As for,
secondly, "removal" of the assets of Railtrack, the Administrators, independent of

government and owing duties to the creditors and shareholders of Railtrack, could have "removed" Railtrack's assets only by disposing of them for the best value they could reasonably obtain.  In fact, though, no such dispositions, as far as I was told, were made as instead Group, as it could not have been forced to do, rendered such dispositions redundant by choosing to sell its holding in Railtrack.  No assets of Railtrack were "removed" and the "removal" of Group's assets can hardly be complained of by its shareholders as it was effected by what was (in the absence of any contrary evidence) by way of an arm's length sale freely entered into by its Board for £500,000,000.  It is true that the government paid no price for and did not acquire any shares in Group but it is hard to see why, if not acquiring shares in Group, it should have to pay for them, still less why it should pay for them in addition to paying the £500,000,000 it did pay for the shares in Railtrack, a sum which then became distributable by Group to its shareholders.

269.    Nor, as I have touched on above, have I any evidence of what the assets of Railtrack would have fetched if the Administrators had needed to realise them.  Presumably, as the government funded the Administrators to keep the railways going, the assets could have been sold (if Group's sale of its holding had not rendered this unnecessary) on a favourable going concern basis.  It does not follow that Group's board must have thought that no more than £500 million would be fetched as they may have chosen the certainty and timing of their share sale over the possible uncertainties and delays in an assets sale.  I cannot be certain, therefore, even if Mr Byers had been pressing towards an administration, that he must necessarily have foreseen that it would harm Group shareholders, at all events relative to the then price of the shares in the Summer and early Autumn of  2001.

270.    Yet another factual element relied on by the Claimants as a component of the Administration Plan was that by the government's threatening of primary legislation the Rail Regulator had been effectively prevented from exercising his statutory power to come to Railtrack's aid by way of an Interim Review.  But a mere *threat* of legislation could not undo Mr Winsor's existing powers, nor did he think they could. On the contrary, he pointed out to Railtrack that any such legislation would take a long time, would be a difficult card for the government to play, would be resisted and might not pass at all.  It was indicated to him that Railtrack believed that it had no real expectation that an interim review could help in any case.

271.    I add, on the factual side of the alleged Administration Plan, that the government did not think it could force Railtrack into administration.  It thought that it would need cooperation from Railtrack and when the Administration did come it was with a measure of cooperation.  Railtrack, fully advised by its own Accountant, Solicitors and Counsel, chose not to ask for time to oppose the Petition, chose to waive the notice period to which it was entitled, supplied the draft press release and the letter of 7th October, chose not to challenge any of the evidence on which the Department relied and chose, though fully represented at the hearing, not to oppose the Petition.

272.    That there are glaring weaknesses, indeed failures in the Claimants' case on the "ordinary" factual side of the alleged "Administration Plan" is clear but I am far from

sure that, even if any parts of the Plan as pleaded were made good, the pleaded tort I am considering would be made out as that requires, as I have several times mentioned, proof (direct or by inference) of the specific intent to impair the financial interests of the shareholders in Group, including the Claimants. It would not be enough that Mr Byers well knew that his action would cause that impairment, even if he did know that. It is to that part of the case - the alleged specific intent in Mr Byers to harm, inter alios, the Claimants – that I now turn.

273. Governments often have to decide on policy by reference to what is currently and, one hopes, reasonably perceived rather than what necessarily is or later transpires to be fact. That is not a criticism; it is inevitable and could be denied only by those with very short memories. What, then, in government, was the reasonable perception of Railtrack in 2000 and 2001? I shall collect some of the things said of it in the evidence.

274. In terms of railway performance, it had suffered not only Ladbroke Grove but Hatfield and the disruption that followed it. It was thought that some restructuring of it within the next 5 years was inevitable. It was seen as "frankly a mess", with weak management at the zonal levels. It was pilloried in the Press for bad management. It had difficulty even in funding the necessary regular maintenance. It had major projects without the skills to manage them. It was being ground down by the Regulator (so said its own advisers). Its own business plan accepted that it had not maintained and renewed the railway to an acceptable standard. Its skills base as to engineers had diminished and its training fell short of what was needed. It was reported on as suffering from institutional paralysis. It had no knowledge of the state of its assets. It had allowed the railways to become a complete shambles. Both the Prime Minister and the Deputy Prime Minister had expressed dissatisfaction with its performance.

275. On the financial side the perception, as the Government saw things, was, if anything, even worse. Its own financial plan acknowledged the unreliability of its own estimates and a persistent inability to keep within budgets. It had virtually no management control; there was management paralysis. The Department had identified an amortisation error which, it thought, meant that it would be bust "in spades" in CP 3. Railtrack itself as well as brokers had identified an intrinsic value in its shares way below the market price. Its debts threatened that its equity would become worthless. It had made its first (and substantial) loss. Its own management had acknowledged that it was facing serious financial issues. Its expenses on WCML and the Channel Tunnel Rail Link were not under control; its operating costs generally were such that it could not reliably estimate them and they were bloating. Some form of financial restructuring looked inevitable if it was to survive. Its balance sheet was so weak that it was unable to contribute to the development of the network. The Rail Regulator said it was handing out a begging bowl; the Chairman of the SRA said it "couldn't hack it" and had doubts about where the finance it needed could come from. It did not think that an approach to the Regulator would be satisfactory. Its "A" credit rating was insecure. It was in effect trading as "BBB". Its ability to go to the bond market was in doubt, its going concern status in jeopardy. Things had steadily got worse even since Ladbroke Grove and Hatfield: it

was not trusted to deliver. Its ability to drawdown its existing facilities was problematic. Its relations with the Regulator were appalling and the Regulator had said that its insolvent liquidation could be the best thing for the rail industry. He had told it not to bother to apply for a substantial re–opener until it had sorted out recovery. Its own experienced advisers said there was an impending financial crisis; it was unlikely to be able to sign off on the bond prospectus needed if a going concern qualification was to be awarded and if no additional government support was given it would be unable to go on. Its regulated assets value was no greater than its debts, so there was no reason for payment to its shareholders. Its own board was having to take regular legal advice as to its solvency and its ability to trade. It could not forecast its own financial needs with any acceptable degree of accuracy. Its stated needs seemed only to increase and it was shameless in asking for more. A Treasury adviser regarded it as a bottomless pit. The cliff's edge was, as its own Finance Director acknowledged, nearer than one might realise. By the 3rd October, there was a crisis coming within a fortnight.

276.    Against such a perception in both railway performance and financial terms, there were plainly ample and sound policy reasons for the government wishing to be rid of Railtrack and for the railway assets to be passed into the control of another or others. There were good avowable and avowed public reasons for Mr Byers to develop a policy to that end. He did so, drawing on advices given to him by Civil Service and other advisers whose skill, honesty and competency has not been called in question. He was aware that the policy ran some risk of litigation; United States class actions were particularly foreseen as was some HRA challenge, but he was advised they could be robustly defended. If he had good public reasons for the policy, as I hold he had, I do not see it as a fault in him (or, at any rate, not one relevant to the tort I am considering) to have said that if necessary he would ask Parliament to legislate so that the policy could not be thwarted. Moreover for Mr Byers to have sought to procure that control of the Railtrack assets should pass out of its Board's control and into more acceptable hands at as low a cost to the public purse as he could arrange, whilst possibly running into trouble on other grounds such as Judicial Review or Human Rights grounds, of itself does nothing to prove the tort I am now considering.

277.    I add that at no stage was he advised that the reasons ostensibly being given for his actions (reasons either given by him unaided or given to him by his advisers) were improper. His proposal, fully explained to them, attracted the support of No. 10 and the Treasury, against whom nothing is said.

278.    All that, though, say the Claimants, is of no avail because Mr Byers' ostensible reasons were not his real reasons; from a date in July on he was, they say, dissembling and then acted with the specific intent of impairing the financial interests of Group shareholders. As to such an intent, no one gave evidence of it. No witness said they detected it or suspected it either at the time or since. Mr Robinson, speaking of the government decision to put Railtrack into administration, said he was sure the government believed it was the right thing to do. I am thus not looking at actions which can only be reasonably explained if one postulates the existence of the alleged improper motive. On the contrary, Mr Byers had sound motives available to him. The Claimants' case thus prompts this question: with good and avowable

reasons available to support his actions and in the absence of any direct evidence on the point, why should it be thought that Mr Byers harboured the dishonest one attributed to him, either as his sole, the predominant or as *any* reason for his acting as he did?

279.    No answer to that question was seriously attempted, let alone that it has been put to rest.  No publications or utterances of his, for example, showing a distaste in Mr Byers for capitalism or for shareholders or for shareholders in Group were put to him. One does not prove that such an intent to harm is present merely from a wish to avoid the taxpayers having to pay more than they need, especially where also present were grounds for believing that the shares in Railtrack had no great value, coupled, given that administration was the chosen route, with the obvious facts that if the assets of or shares in Railtrack were to be acquired they would have to be paid for, as, indeed, as it transpired, the shares were paid for.  Nor was Mr Byers cross–examined on the notion, one which it had seemed from Mr Rowley's opening might be developed, that he had been motivated by a view that a company owing duties to shareholders was inherently unsuitable as a vehicle for provision of a safety–rather–than–profit conscious railway.

280.    It is not as if there was some hidden re–nationalisation agenda.  As its attitude to "scoring" exemplified, the last thing the Government wanted was Railtrack's needs being regarded as within the public borrowing and I accept Sir Richard Mottram's evidence which I mentioned earlier that re–nationalisation was completely against the underlying philosophy of the Government.  Mr Byers, too, said that the Prime Minister would not have considered re–nationalisation at any great length.  Indeed, apart from the bald assertion to him that Mr Byers acted with the pleaded ill–intent, which he denied, the only other impugnable reason put to him as a reason for his acting as he did was that he did so to curry favour with Labour back–benchers.  He denied that but even if he had not, it would not have helped the Claimants;  a secret intent to curry favour with Party colleagues is not an intent to harm Railtrack shareholders.

281.    It was said that Mr Byers had in 1996 been overtly hostile to Railtrack's privatisation.  Mr Byers accepted that and that he had voted against it in 1996.  He accepted, too, that the Labour Party's attitude had been vigorously to oppose the privatisation when it was *in opposition* .  Neither answer suggests that on party loyalty or doctrinaire grounds Mr Byers was still hostile to the status quo as it was in 2001 when the Labour Party was, of course, in Government and had no plan to undo that privatisation.

282.    Further, it would be reasonable to think that, if Mr Byers had been so keenly motivated against the shareholders that he had studiously dissembled over 2 or 3 months, then he would surely have demonstrated that determination not to be thwarted that had animated his threat to legislate against the Regulator and would have gone on to ensure that the shareholders would derive as little as possible from the Administration.  One could have expected him to harry the Administrators with the need for early realisations of the assets, to have limited the funding of the

administration to the same end or to have sought to impose limits or conditions calculated to depress the prices the assets might fetch so that his intent to harm the shareholders might not be thwarted and that the harm to them should be maximised. No evidence of anything such was adduced; there was no evidence that he took any steps to restrict the Administrators' due performance of their duties.

283.    It is not unreasonable, either, to ask whether it could be that an intention to procure that Group and its shareholders should receive nothing for the holding in Railtrack (even if that had been the case) could be taken to represent an intention in Mr Byers to harm Group's shareholders, given that he had been advised by Mr Rowlands, on the basis of the Department's professional advisers' work, that the enterprise value of Railtrack roughly matched its debt.

284.    Despite there being no reason established for Mr Byers to have had the unlawful intent he is alleged to have had, the Claimants ask me to *infer* that he had it.  It is not enough for them merely to say, to use Mr Rowley's phrase, that he had something to hide.  They need to shew, on a balance of probabilities, that he had the pleaded intent without which the tort here asserted does not exist - see *Hornal -v− Neuberger [1957] 1 QB 247 at 258 CA* as to the case where the allegation in issue, as here, is serious.  Mr Rowley's and Mr West's final written submissions, basing themselves on anticipated findings of fact against Mr Byers on many of the issues that I have dealt with in the chronology, invite me to infer from a number of suggested incidents the presence of the improper and dishonest intent.  Even taking the incidents cumulatively, I feel quite unable to do so; as will have been seen, there are many issues I have not decided against Mr Byers and there simply is no sufficient material available, in the absence also of any direct evidence on the issue, to infer that Mr Byers, to whom were available good policy grounds for his acting as he did, should, without any reason being given for his having such an intent, have nonetheless acted with a specific intent to impair the financial interests of Group shareholders.

285.    Even if Mr Byers, for example, had refused further funding and had manipulated events in order to make it difficult for Railtrack to resist administration, even if he had deliberately dallied as to Renewco or in indicating that Rainbow was unacceptable or had encouraged a view that it might become acceptable, in either case in order to deny Railtrack an opportunity to develop a "Plan B", even if he had failed to explore alternatives such as takeover and notwithstanding that he had threatened to seek legislation from Parliament and to announce the withdrawal of additional funding with a view to ensuring that his policy decision was not thwarted, all that would be of no avail to the Claimants for the purposes of this tort unless from all the facts and surrounding circumstances, in the absence of direct evidence on the point, the Court could infer there to have been present not merely an awareness in him of harm to the shareholders in Group but a specific intent to harm them.  As I say, no direct evidence was given that he had that intent, no good reason why he should have had it was established and there were many and various other and acceptable reasons why he should have acted as he did.  In all the circumstances I am quite unable to hold that he had the required intent.

286.    I shall come on to HRA considerations and I am not here concerned with whether his actions would have survived a timely Judicial Review attack by Group or by the anticipated U.S. class action.  Limiting myself, therefore, to the particular tort here in issue, and leaving aside the Claimants' failure, for reasons I have given and as I hold to be the case, to have proved what I have called the "ordinary" factual side of the "Administration Plan", I have no sufficient reason to find an intent to impair the financial interests of the shareholders in Group as being the sole, the predominant or as any intent lying behind Mr Byers' actions.  I must therefore dismiss the claim based on the tort of misfeasance in public office.

## I.  **Human Rights**

287.    Article I of the First Protocol to the European Convention on Human Rights ("the Convention") provides, so far as material:–

>    "Every natural or legal person is entitled to the peaceful enjoyment of his possessions."

288.    By way of section 1 (1) (c) of the HRA 1998 and section 1 (2), that right, a "Convention Right", is to have effect subject to any relevant derogation (there is none).  By section 6 it is made unlawful for a public authority - here the Secretary of State and Department - to act in a way which is incompatible with a Convention Right.  Persons claiming that a public authority has so acted may bring proceedings against the public authority "but only if he is (or would be) a victim of the unlawful act" - section 7 (1) (b).  To be a "victim" for that purpose the claimant has to be such that he would be a victim for the purposes of Article 34 of the Convention if proceedings were brought in the European Court of Human Rights in respect of the act complained of.  The domestic Court is granted wide powers to grant appropriate relief where it has found the claim justified - section 8.

289.    In their re–re–re amended Particulars of Claim the Claimants allege that in implementing the alleged "Administration Plan" and petitioning for an Administration Order the Defendants, as one or more public authorities, acted incompatibly with the Claimants' respective Convention rights.  The incompatibility as so alleged was that the Defendants had conducted a de facto expropriation, without compensation, of the value of their interests as shareholders, alternatively had deprived them of the right to sell their shares or, in a further alternative, were responsible for a disproportionate interference with their possessions.  It is pleaded that the Claimants were victims because damage to their position as shareholders in Group was an inevitable consequence of the implementation of the Administration Plan and that it was the intention of the Secretary of State and Department to damage such interests.

290.    In the course of the hearing the Claimants dropped the claim that there had been a de facto expropriation.

291.   The Defendants' argument in response is threefold.   First, they look at the leading case on Article I of the First Protocol, namely *Sporrong & Lonnroth  -v– Sweden (1982) SEHRR 35*  which, at its *paragraph 61*  explains the practical effect of the Article.   It comprises 3 distinct rules:  the first is entirely general - the principle of peaceful enjoyment of property – and the third is concerned with State rights, with which we are not here concerned.   It is the second of the three rules that is in play:  deprivation of (including interference with) possession of property.   As expropriation is no longer claimed, the only remaining claim is that there has been unlawful interference with the Claimants' possession of their shares.

292.   But, say the Defendants, wherein lies that interference?   Before the "Administration Plan" (had there been one, which there was not) the Claimants had shares in Group. After the implementation of the alleged Plan, they remained shareholders in Group and the numbers of their shares remained unchanged.   Before the alleged implementation Group held 100% of the shares in Railtrack, exactly as it did after the alleged implementation.   If there had been any "Plan" as alleged, it would have worked no material alteration in anyone's rights unless and until a Railway Administration Order was made but that process, if it represented any interference by anyone, was not by any Defendant but by the Judge.   But it is accepted that the Judge acted entirely properly.   True it was that Group shares were suspended at the London Stock Exchange but that was a consequence of the combined effect of the Judge's Order, the Exchange's Rules and the Company's own request that the shares should be suspended;  it involved nothing unlawful on the Defendants' part.   There was no unlawful interference with possession of the Claimants' property by the Defendants.

293.   Secondly, the Defendants say that it could perhaps have been that *Group*  could have asserted a breach of Article 1 but it never did so and instead it sold the Railtrack shares in what was not said not to have been a proper arms' length transaction for £500 million.   It did so in an agreement which had as part of its terms a waiver or abandonment of all Group's rights in respect of the administration process.   If Group had ever had an ability to complain under the Article (which the Defendants would doubt), it then gave it up.   If, therefore, Group cannot complain under the Article, how can the Claimants, who can only claim *through*  Group, (at all events unless they were deliberately targeted as to be harmed) have any maintainable claim - *Johnson -v– Gore–Wood & Co [2003] AC 1*  ?  They cannot, say the Defendants, unless the Court finds in the Claimants' favour on the tort claim, which requires that sort of targeting.   But, say the Defendants, if (contrary to their arguments) the tort was found proven, the Article 1 claim would even so be redundant as adding nothing to whatever relief would be appropriate to remedy the tort.

294.    Thirdly, the Claimants, so the Defendants assert, are not "victims" in the required sense - see *Agrotexim and Others -v– Greece (1996) EHRR 250* .   The applicants in that case were companies which were shareholders in a brewery company which owned land it wished to develop.   The local Council took steps to expropriate the land.   The shareholders complained that the Brewery's rights had been violated and that, in turn, that had adversely affected their rights because of the resulting fall in the value of their shares.   Their complaint was based exclusively on the proposition that the alleged violation of the Brewery's rights to peaceful enjoyment of its possessions

had affected their own financial interests because of the resulting fall in the value of their shares - see para 62 of the Judgment.  The Court held that a lifting of the corporate veil so as to disregard the fact that the person directly affected - there the Brewery - was a separate legal personality and was (if anyone was) the victim, would be justified only in exceptional circumstances such as where it itself could not have raised the complaint.  There is, of course, no such issue here;  the Board of Group *could* have complained but did not do so and *chose*, of its own decision and for reward, to give up whatever right they would have had to do so.

295.    There had, before *Agrotexim*, been cases which suggested that where the complainant was the majority shareholder in the "victim", the person directly affected, or where it could be said that the complainant was in reality conducting his business through that "victim" then the complainant could, too, be regarded as a victim but that, short of that, it was only the direct victim which could complain - see e.g. *Yarrow plc and Others -v– UK (1983) EHRR App No. 9266/81* and the cases there cited.  However, that possibility does not assist the Claimants:  firstly, the Court in *Agrotexim* disapproved of the relaxation where it was a majority shareholder in the victim who complained and secondly, even in aggregate, the Claimants' own only a very small percentage of the shares in Group.

296.    The reasoning in *Agrotexim* was adopted by Neuberger J. in *Humberclyde Finance Group Ltd -v– Hicks, 14th November 2001 (HC 1998 02156) paragraphs 43–46* and *Agrotexim* was followed in *GJ -v– Luxembourg (2003) 36 EHRR 40–710 paragraph 23*.

297.    Thus, if there was any victim, say the Defendants, it was Group not the Claimants and the Claimants, under *Agrotexim*, cannot be regarded as victims within the required definition.

298.    The Claimants have, in my judgment, no answer to these arguments.  In particular I see no force in their attempt to distinguish *Agrotexim*.  I accept the Defendants' arguments on the Human Rights issue and accordingly dismiss that part of the Claimants' case.

## J.  Conclusion

299.    I have now dealt with both heads of claim as advanced by the Claimants.  I have, for the reasons I have given, found each to fail.  Accordingly I dismiss the Claimants' action.  If a further hearing is necessary to deal with costs or any other matters then that can, of course, be arranged.

A                                          Supreme Court

# Ivey *v* Genting Casinos (UK) Ltd (trading as Crockfords Club)

## [2017] UKSC 67

2017  July 13;                                     Baroness Hale of Richmond PSC,
B       Oct 25                          Lord Kerr of Tonaghmore, Lord Hughes JJSC,
                                   Lord Neuberger of Abbotsbury, Lord Thomas of Cwmgiedd

*Gaming — Gambling — Cheating — Card game player adopting edge-sorting strategy unbeknown to casino — Implied term in contract not to cheat — Whether "cheat" connoting dishonest state of mind — Whether "cheating" including interference by player with process by which game played so as to gain unfair advantage without other player's knowledge — Whether claimant in breach of implied term so that not entitled to recover winnings — Gambling Act 2005 (c 19), s 42(3)*

C

The claimant, a professional gambler, played the card game Punto Banco Baccarat, which was a game of pure chance, at the defendant's casino, winning over £7·7m. Following an investigation due to the large win the defendant determined that the claimant had compromised the game by using a method of play called edge-sorting, which involved exploiting the design irregularities on the backs of the playing cards and then persuading the croupier to rotate the cards so that those of high value could be distinguished from the others before any card was dealt and bet placed, without anyone else appreciating the purpose of rotating the cards. The defendant, which had not known about edge-sorting, refused to pay the claimant his winnings on the ground that such play altered the odds against it unfairly. The claimant brought an action for recovery of the sums which he had won. The defendant contended, inter alia, that (i) the gaming contract between the parties had an implied term that the claimant would not cheat or otherwise act to defeat the essential premise of the game and if he did so the contract would be void and he would recover no winnings under it, which term he had broken, and (ii) he had committed the offence of cheating, contrary to section 42 of the Gambling Act 2005[1] by interfering with the game or deceiving the defendant's staff and so was not entitled to found his claim on his own criminal conduct. The claimant admitted the implied term but denied cheating or committing a criminal offence, asserting that it was lawful for "advantage players", such as him, to use such a method of play because they were in an adversarial position towards the casino, and that edge-sorting ought to have been known to the defendant which could have protected itself against it. The judge dismissed the claim on the ground that, although neither dishonesty nor deception was involved, the claimant's play amounted to cheating for the purposes of the implied term. The Court of Appeal, by a majority, upheld his decision.

D

E

F

G

On the claimant's appeal—

*Held*, dismissing the appeal, that, although there was a difference in standard of proof as between civil and criminal proceedings, cheating carried the same meaning when considering an implied term not to cheat and when applying section 42 of the Gambling Act 2005; that, the expression "cheating" in the context of games and gambling carried its own inherent stamp of wrongfulness; that the issue whether what had been done amounted to cheating, given the nature and rules of the game concerned, was a jury question to be determined objectively; that consideration of the concept of dishonesty would unnecessarily complicate the question; that, consequently, there was no occasion to add to the value judgment whether conduct

H

[1] Gambling Act 2005, s 42: see post, para 34.

© 2018 The Incorporated Council of Law Reporting for England and Wales

392
**Ivey v Genting Casinos (UK) Ltd (SC(E))**                    **[2018] AC**

was cheating a similar value judgment as to whether it was also dishonest; and that,   A
in the present case, the claimant's actions in taking positive steps to fix the deck in a
game which depended on random delivery of unknown cards was, inevitably,
cheating, and the judge's conclusion to that effect was, accordingly, unassailable
(post, paras 38, 43, 48–50, 76).

*Per curiam.* When dishonesty is in question the fact-finding tribunal must first
ascertain (subjectively) the actual state of the individual's knowledge or belief as to   B
the facts. The reasonableness or otherwise of his belief is a matter of evidence (often
in practice determinative) going to whether he held the belief, but it is not an
additional requirement that his belief must be reasonable; the question is whether it is
genuinely held. When once his actual state of mind as to knowledge or belief as to
facts is established, the question whether his conduct was honest or dishonest is to be
determined by the fact-finder by applying the (objective) standards of ordinary decent
people. There is no requirement that the defendant must appreciate that what he has
done is, by those standards, dishonest. If, therefore, there were in cheating at   C
gambling an additional legal element of dishonesty, it would be satisfied in the
present case by the application of that test (post, paras 74–75).

Dictum of Lord Hoffmann in *Barlow Clowes International Ltd v Eurotrust
International Ltd* [2006] 1 WLR 1476, para 10, PC applied.

*R v Ghosh* [1982] QB 1053, CA disapproved.

Decision of the Court of Appeal [2016] EWCA Civ 1093; [2017] 1 WLR 679
affirmed.                                                                        D

The following cases are referred to in the judgment of Lord Hughes JSC:

*Abou-Rahmah v Abacha* [2006] EWCA Civ 1492; [2007] Bus LR 220; [2007] 1 All
    ER (Comm) 827; [2007] 1 Lloyd's Rep 115, CA
*Barlow Clowes International Ltd v Eurotrust International Ltd* [2005] UKPC 37;
    [2006] 1 WLR 1476; [2006] 1 All ER 333; [2006] 1 All ER (Comm) 478; [2006]
    1 Lloyd's Rep 225, PC                                                        E
*Boggeln v Williams* [1978] 1 WLR 873; [1978] 2 All ER 1061; 67 Cr App R 50,
    DC
*R v Cornelius* [2012] EWCA Crim 500; [2012] Lloyd's Rep FC 435, CA
*R v Feely* [1973] QB 530; [1973] 2 WLR 201; [1973] 1 All ER 341; 57 Cr App R 312,
    CA
*R v Ghosh* [1982] QB 1053; [1982] 3 WLR 110; [1982] 2 All ER 689; 75 Cr App R
    154, CA                                                                      F
*R v Gilks* [1972] 1 WLR 1341; [1972] 3 All ER 280; 56 Cr App R 734, CA
*R v Governor of Brixton Prison, Ex p Sjoland and Metzler* [1912] 3 KB 568, DC
*R v Greenstein* [1975] 1 WLR 1353; [1976] 1 All ER v; 61 Cr App R 296, CA
*R v Hayes* [2015] EWCA Crim 1944; [2018] 1 Cr App R 10, CA
*R v Landy* [1981] 1 WLR 355; [1981] 1 All ER 1172; 72 Cr App R 237, CA
*R v McIvor* [1982] 1 WLR 409; [1982] 1 All ER 491; 74 Cr App R 74, CA
*R v Rostron* [2003] EWCA Crim 2206, CA                                          G
*R v Royle* [1971] 1 WLR 1764; [1971] 3 All ER 1359; 56 Cr App R 131, CA
*R v Scott* [1975] AC 819; [1974] 3 WLR 741; [1974] 3 All ER 1032; 60 Cr App R
    124, HL(E)
*R v Waterfall* [1970] 1 QB 148; [1969] 3 WLR 947; [1969] 3 All ER 1048; 53
    Cr App R 596, CA
*R v Williams* [1953] 1 QB 660; [1953] 2 WLR 937; [1953] 1 All ER 1068; 37
    Cr App R 71, CCA                                                             H
*R v Williams (Gladstone)* [1987] 3 All ER 411; 78 Cr App R 276, CA
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995]
    3 All ER 97, PC
*Starglade Properties Ltd v Nash* [2010] EWCA Civ 1314; [2011] Lloyd's Rep FC
    102, CA

© 2018 The Incorporated Council of Law Reporting for England and Wales

A  *Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802;
    [2002] 2 All ER 377, HL(E)
  *Welham v Director of Public Prosecutions* [1961] AC 103; [1960] 2 WLR 669;
    [1960] 1 All ER 805; 44 Cr App R 124, HL(E)

The following additional cases were cited in argument:

  *Cooper v Slade* (1858) 6 HL Cas 746, HL(E)
B  *R v Harvey* (unreported) 8 May 1998, CA
  *R v Moore* (1914) 10 Cr App R 54, CCA
  *Sweet v Parsley* [1970] AC 132; [1969] 2 WLR 470; [1969] 1 All ER 347;
    53 Cr App R 221, HL(E)

**APPEAL** from the Court of Appeal

C  By a claim form the claimant, Phillip Ivey, sought recovery against the
defendant, Genting Casinos UK Ltd, trading as Crockfords Club, of moneys
which he had won while playing Punto Banco at the defendant's casino. The
defendant denied liability on the grounds that (1) no game of Punto Banco
had been played since the premise on which the game proceeded, that the
cards would be dealt at random, had been defeated because the claimant had
known what the first card of any coup dealt was likely to be before it was
D  turned face up; (2) there was an implied term that the claimant would not
cheat, and that term had been broken; and (3) the claimant had committed
the criminal offence of cheating under section 42 of the Gambling Act 2005
by interfering with the game or deceiving the defendant's staff and so was
not entitled to found his claim on his own criminal conduct. The claimant
admitted the implied term but denied cheating or committing a criminal
offence and asserted that he had acted lawfully throughout. By his judgment
E  dated 8 October 2014 Mitting J [2014] EWHC 3394 (QB); [2015] LLR 98
determined that the claimant had given himself an advantage by using the
croupier as his innocent agent or tool in circumstances in which he had
known that neither she nor her superiors had realised the consequences of
what she had done at his instigation, thereby converting a game in which the
knowledge of both sides as to the likelihood of the player or banker winning
F  was equal to one in which the claimant's knowledge was greater, which
amounted to cheating for the purposes of civil law.

By an appellant's notice the claimant appealed. On 3 November 2016 the
Court of Appeal (Arden and Tomlinson LJJ; Sharp LJ dissenting) [2016]
EWCA Civ 1093; [2017] 1 WLR 679 dismissed the appeal.

On 16 February 2017 the Supreme Court (Baroness Hale of
Richmond DPSC, Lord Wilson and Lord Hughes JJSC) granted the claimant
G  permission to appeal, pursuant to which he appealed.

The facts are stated in the judgment of Lord Hughes JSC, post,
paras 2–27.

*Richard Spearman QC* and *Max Mallin QC* (instructed by *Archerfield
Partners llp* ) for the claimant.

The behaviour described in the judgments of Mitting J [2015] LLR 98 and
H  the Court of Appeal [2017] 1 WLR 679 does not amount to cheating for the
purposes of the implied term of the gaming contract between the parties or
section 42 of the Gambling Act 2005 since, whether viewed from the
perspective of its ordinary meaning or for the purposes of the common law
or of section 42, "cheating" connotes dishonesty. Prior to the present case

© 2018 The Incorporated Council of Law Reporting for England and Wales

the word had not been considered in any reported decision outside the      A
criminal context. Offences of and relating to cheating have a long history in
criminal law and proof of guilt in relation to those offences has always
required proof of a dishonest state of mind. The leading case, and the only
case which is relevant today, is *R v Scott* [1975] AC 819 which shows that
the terms "fraud" and "cheating" were frequently used interchangeably at
common law and that dishonesty was plainly a requirement of both those
offences.   Consequently, cheating at common law inescapably involves       B
dishonesty.

The common law offence of cheating was abolished, except regarding
offences concerning the public revenue, by section 32(1)(a) of the Theft Act
1968. However, section 25 of the 1968 Act included the offence of going
equipped to cheat which remained in force until January 2007.   The
reference to "cheat" was to an offence under section 15 of the 1968 Act, and   C
this required dishonesty. Those were therefore extant offences when the
2005 Act was enacted and, consequently, that meaning of cheating must
have been understood when the 2005 Act was enacted. Further, section 42
of the 2005 Act does not provide a definition of cheating but the
Explanatory Notes to the Act prepared by the Department for Culture,
Media and Sport state, in para 163, that cheating has its ordinary meaning:
see also Gambling Bill: Hansard (HC Debates) Standing Committee B,         D
30 November 2004.   Consequently, the concept of cheating within
section 42 of the 2005 Act connotes dishonesty as defined in *R v Ghosh*
[1982] QB 1053. The same test for dishonesty is applicable in civil cases
where liability depends upon an activity which connotes a dishonest state of
mind: see *Twinsectra Ltd v Yardley* [2002] 2 AC 164, paras 115–116, per
Lord Millett. It follows that cheating requires dishonesty in a subjective    E
sense. The judge found as a fact that the claimant had not been subjectively
dishonest: he had believed that what he was doing was not cheating.

If dishonesty were not an element of cheating the concept would, the
defendant suggests, have to connote unfairness. That is too vague a criterion
to be workable. Applying that test, there are many things which would be
accepted as fair in a casino, in the context of the commercial relationship    F
between customer and business, which would not be acceptable in a purely
social environment, and the claimant's conduct would not be unfair in the
context. So even if it is not necessary to show dishonesty the claimant was
still not cheating.

Consequently, the appeal should be allowed because the Court of Appeal
erred in holding that dishonesty is not a necessary element of "cheating"
either under the implied term or under section 42 of the 2005 Act and       G
because (as all three members of the Court of Appeal accepted) the judge
found neither that the claimant had been dishonest nor that he had
perpetrated a material deception, and it is not open to an appellate court to
disturb those findings.

*Christopher Pymont QC* and *Siward Atkins* (instructed by *Kingsley
Napley llp* ) for the defendant.                                             H
There are two limbs to the implied term of the contract: cheating or
otherwise acting to defeat the essential premise of the game. Should there be
anything difficult about applying the first limb, the second limb is crystal clear
and easy to apply. Punto Banco Baccarat is a pure game of chance. All the

© 2018 The Incorporated Council of Law Reporting for England and Wales

A   odds are fixed and the player bets before a card is played. It is common ground that (i) the essential premise of Punto Banco is that the player does not know what the cards are before he places his bet and (ii) the claimant's edge-sorting was designed to and did give him a good idea of what the cards were before he placed his bet. The claimant thus plainly acted to defeat the essential premise of the game and dishonesty is irrelevant to any breach of contract.

B   Further, "cheating" in its normal meaning does not necessarily involve dishonesty, and, even if it does, the test for dishonesty is objective not subjective: see *Twinsectra Ltd v Yardley* [2002] 2 AC 164 and *Starglade Properties Ltd v Nash* [2011] Lloyd's Rep FC 102. The key test for cheating is not whether the player acted dishonesty but whether he acted deliberately to gain an unfair advantage in the game. The test suggested by the claimant would lead to inconsistent results applying to the same kind of activity, C   depending on the subjective state of mind of the player concerned.

As to section 42 of the Gambling Act 2005, the Explanatory Notes make clear that cheating "has its normal everyday meaning". Accordingly, the actus reus of the offence is any sort of unfair activity which a jury believes to be cheating. A jury is perfectly able to decide whether the gambler cheated or not, once the nature and rules of the game are understood and the activity has been explained. The appropriate mens rea for section 42 is that the D   defendant intended the actus reus: see *Sweet v Parsley* [1970] AC 132. That is consistent with the earlier statutory offences of cheating at cards which do not contain any requirement that the accused be guilty of dishonesty. Section 17 of the Gaming Act 1845 (8 & 9 Vict c 109) provided for "fraud or unlawful device or ill practice in playing at or with cards". It was held in *R v Moore* (1914) 10 Cr App R 54 that "ill practice" was a question for the jury, E   who should determine simply whether the game had been played fairly: see also *Baker, The Oxford History of the Laws of England* (2003), vol VI (1483–1558), Part IX, Chapter 42 "Deceit", pp 769–773.

There is also a large number of offences at English law criminalising conduct which most people would regard as dishonest but which do not have dishonesty as a requirement for the offence to be committed, such as (i) corruption (see *Cooper v Slade* (1858) 6 HL Cas 746; *R v Harvey* F   (unreported) 8 May 1998); (ii) forgery under sections 36 and 37 of the Forgery Act 1861 1861 (24 & 25 Vict c 98); and (iii) forgery under section 1 of the Forgery and Counterfeiting Act 1981. Therefore, for a person to be guilty of those offences there is no requirement to prove dishonesty as defined in *R v Ghosh* [1982] QB 1053. Further the Hansard materials show that dishonesty was not to be a factor in the offence but fairness was: see Gambling Bill: G   Hansard (HC Debates), Standing Committee B, 30 November 2004.

The test of cheating applied by Mitting J [2015] LLR 98 and by the majority in the Court of Appeal [2017] 1 WLR 679 is correct and supported. In any event, if dishonesty is required, the claimant acted dishonestly. As Tomlinson LJ concluded, the claimant's actions were a clear case of intentional deception.

H   *Spearman QC* in reply.
It would be impossible to make a positive finding of dishonesty on the facts of the present case. Cheating is acting with deliberate dishonesty: see *R v Scott* [1975] AC 819.

The court took time for consideration.

© 2018 The Incorporated Council of Law Reporting for England and Wales

25 October 2017. **LORD HUGHES JSC** (with whom **BARONESS HALE OF RICHMOND PSC**, **LORD KERR OF TONAGHMORE JSC**, **LORD NEUBERGER OF ABBOTSBURY** and **LORD THOMAS OF CWMGIEDD** agreed)

1    This case, in which a professional gambler sues a casino for winnings at Punto Banco Baccarat, raises questions about (1) the meaning of the concept of cheating at gambling, (2) the relevance to it of dishonesty, and (3) the proper test for dishonesty if such is an essential element of cheating.

*The facts*

2    Over two days in August 2012 Mr Ivey, the claimant in this case, deployed a highly specialist technique called edge-sorting which had the effect of greatly improving his chances of winning. He had the help of another professional gambler, Cheung Yin Sun ("Ms Sun"). First they set up the conditions which enabled him to win. Then, later that evening and the following day, over the course of some hours, he won approximately £7·7m. The casino declined to pay, taking the view that what he had done amounted to cheating. His case is that it was not cheating, but deployment of a perfectly legitimate advantage.

3    What happened is not in dispute. It was set out with admirable clarity by Mitting J [2015] LLR 98 and very little is necessary by way of addition or subtraction. What follows in this section is almost entirely in his words.

4    Punto Banco is a variant of Baccarat. It is not normally, to any extent, a game of skill. Six or eight decks or, in English nomenclature, packs of 52 cards are dealt from a shoe, face down by a croupier. Because the cards are delivered one by one from the shoe, she has only to extract them; no deviation is permitted in their sequence. She places them face down in two positions on the table in front of her, marked "player", the "Punto" in the name, and "Banker", "Banco". Those descriptions label the positions marked on the table; there need be no person as "player" and ordinarily there is not. She slides the cards from the shoe, face down, one card to player, one to banker; a second to player and a second to banker. In prescribed circumstances she must deal one further card, either to player or to banker or to both, but this possibility is irrelevant to what occurred.

5    The basic object of the game is to achieve, on one of the two positions, a combination of two or three cards which, when added together, is nearer to nine in total than the combination on the other position. Aces to nine count at face value, ten to King inclusive count as nothing. Any pair or trio of cards adding up to more than ten requires ten to be deducted before arriving at the counting total. Thus four plus five equals nine, but six plus five (which equals 11) counts as only one.

6    Punters (of whom there need only be one) play the house. They bet before any card is dealt and can bet on either the player or banker position. The cards are revealed by the croupier after a full hand (or "coup"), usually of four cards, two to each position, has been dealt. Winning bets are paid at evens on player, and at 19 to 20 on banker. It is possible to bet on a tie. In the event of a tie, all bets on player or banker are annulled; in other words, the punter keeps his stake and the only bet paid out on is the tie at odds set by the casino of either eight to one or, at Crockfords, nine to one. It is possible to place other types of bet, but this case does not concern them and

© 2018 The Incorporated Council of Law Reporting for England and Wales

397

[2018] AC

Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

A  they need not be described.  The different odds mean that the casino, or
house, enjoys a small advantage, taken over all the play.  That is standard
and well known to all; casinos publish the percentage "house edge" which
they operate.  In Punto Banco at Crockfords it was 1·24% if player wins and
1·06% if banker wins.

B  7  A pack of 52 playing cards is manufactured so as to present a uniform
appearance on the back and a unique appearance on the face.  The backs of
some cards are, however, not exactly uniform.  The backs of many packs of
cards for social use have an obvious top and bottom: for example the
manufacturer's name may be printed once only, or the pattern may have an
obviously right way up and an upside down.  In casino games in which the
orientation of the back of the card may matter, cards are used which are in
principle indistinguishable whichever way round they are when presented in
C  a shoe.

8  Cards with no pattern and no margin at the edge present no problem;
they are indistinguishable.  However, many cards used in casinos are
patterned.  If the pattern is precisely symmetrical the effect is the same as if
the card is plain; the back of one card is indistinguishable from any other.
But if the pattern is not precisely symmetrical it may be possible to
D  distinguish between cards by examining the backs.

9  "Edge-sorting" becomes possible when the manufacturing process
causes tiny differences to appear on the edges of the cards so that, for
example, the edge of one long side is marginally different from the edge of
the other.  Some cards printed by Angel Co Ltd for the Genting Group
(which owns Crockfords) have this characteristic, apparently within the
narrow tolerances specified for manufacture.  The pattern is not precisely
E  symmetrical on the back of the cards.  The machine which cuts the card
leaves very slightly more of the pattern, a white circle broken by two curved
lines, visible on one long edge than on the other.  The difference is
sub-millimetric, but the pattern is, to that very limited extent, closer to one
long edge of the card than it is to the other.  Before a card is dealt from a
shoe, it sits face down at the bottom of the shoe, displaying one of its two
F  long edges.  It is possible for a sharp-eyed person sitting close to the shoe to
see which long edge it is.

10  Being able thus to see which long edge is displayed is by itself of no
help to the gambler.  All the cards have the same tiny difference between
their right and left long edges, so knowing which edge is displayed tells
the gambler nothing about the value of the next card in the shoe.  The
G  information becomes significant only if things can be so arranged that the
cards which the gambler is most interested in are all presented with long
edge type A facing the table, whilst all the less interesting cards present
long edge type B.  Then the gambler knows which kind of card is next out of
the shoe.

11  In Punto Banco cards with a face value of seven, eight and nine are
high value cards.  If one such card is dealt to player or to banker, it will give
H  that position a better chance of winning than the other.  Thus a punter who
knows that when the first card dealt (always to the "player" position) is a
seven, eight or nine, he will know that it is more likely than not that player
will win.  If he knows that the card is not a seven, eight or nine, he will know
that it is more likely than not that banker will win.  Such knowledge, it is

© 2018 The Incorporated Council of Law Reporting for England and Wales

agreed, will give the punter a long term edge of about 6·5% over the house if    A
played perfectly accurately.

12    What is therefore necessary for edge-sorting to work is for the cards
in the shoe to be sorted so that all the sevens, eights and nines display edge
type A, whilst the rest display edge type B. That means rotating the high
value cards so that they display edge type A. If the punter were to touch the
cards, the invariable practice at most casinos, including at Crockfords,    B
would be that those cards would not be used again. The only person who
touches the cards is the croupier. So what had to happen was to get the cards
sorted (i e differentially rotated) by type A and type B by the croupier and
then to get them re-used in the next shoe, now distinctively sorted.

13    For edge-sorting to work at Crockfords it is therefore essential that
the croupier is persuaded to rotate the relevant cards without her realising
why she is being asked to do so. Casinos routinely play on quirky and    C
superstitious behaviour by punters. It is in the casino's interests that punters
should believe, erroneously, that a lucky charm or practice will improve
their chance of winning and so modify or defeat the house edge.
Consequently a wide variety of requests by punters, particularly those
willing to wager large sums on games which they must, if they play long
enough, lose in the long run, are accommodated by casinos without demur    D
or surprise.

14    All of the games of Punto Banco played by the claimant and Ms Sun
on 20 and 21 August 2012 were captured on CCTV, mostly with
contemporaneous audio recording as well. The moment at which they
persuaded the croupier, Kathy Yau, to rotate the cards was at 9 pm on
20 August. The video shows it and the words spoken have been transcribed.    E
Before then, the claimant and Ms Sun had played part of four shoes, the first
two plain backed, and the second two Angel cards but with no asymmetry
on the back.

15    The claimant is a high stakes gambler. He began, by his standards,
modestly: bets placed on those four shoes ranged from £4,000 to £75,000
per coup. He was losing. At 8.56 pm he requested a new shoe of cards.
A new shoe was produced. The cards were blue Angel cards with the
rounded pattern described on the back. At 8.57 the claimant asked Jeremy    F
Hillier, the senior croupier overseeing the game: "If I win, can I say I want
the same cards again?" to which Mr Hillier replied he could, "because [he
was] not bending them". The claimant had in fact avoided touching the
cards from either the first or second shoe onwards.

16    The croupier, Kathy Yau, then put the cards face down in blocks on
the table to make the cut, as is conventional. She cut the cards so as to    G
exclude about one deck from play. The claimant asked about the cut: "Why
so big?" Ms Sun said: "They don't cut the seven cards", a reference to the
traditional cut of seven cards from the end. Ms Yau asked if he wanted her
to cut seven cards, to which he replied "yes", he wanted to play 90 hands,
slightly more than the maximum likely to be possible with an eight-deck
shoe with a seven-card cut. She complied, after checking with the supervisor    H
on duty in the room. That had the effect of maximising the number of coups
which would be possible with those packs, and of exposing the maximum
number of cards to the sorting (rotation) process.

17    Ms Yau then dealt the first coup. After the bet was made, and all the
cards then dealt, the next stage was for the croupier to turn the cards face up

399
[2018] AC                    Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

A    to reveal whether Player or Banker had won.  Ms Sun then asked Ms Yau in
     Cantonese to do it, in other words to turn the cards over so that the face
     showed, slowly.  Ms Yau said "yes".  Ms Sun then asked her again in
     Cantonese to turn the cards in a particular and differential way as they were
     being exposed and before they were put on the pile of used cards.  "If I say it
     is good, you turn it this way, good, yes?  Um, no good."  (A slightly different
     sounding um.)  Ms Yau did not immediately understand what was required.
B    She asked, "so you want me to leave it?"  To which Ms Sun replied, "change,
     yeah, yeah, change luck".  Ms Yau: "what do you mean?"  Ms Sun gestured
     how to turn it.  "Turn it this way."  Ms Sun: "what, just open it?  Yeah".
     Ms Sun: "um", signifying good in Cantonese.

         18  The claimant then chipped in, "yeah, change the luck, that's good.
     Anything to change the luck, it is okay with me."  Ms Sun reiterated her
C    request in Cantonese, "If I say it is not good, you turn it this way.  If it is
     good, turn it this way, okay?"  To which Ms Yau said "okay".  When she
     turned over the cards of the second coup, Ms Sun said of four of them,
     "good", and of one, "not good", in Cantonese.  Ms Yau did as requested.
     What she was being asked to do, and did, was to turn the cards which
     Ms Sun called as "good" end to end, and the "not good" cards side to side.  In
     consequence, the long edge of the "not good" card was oriented in a different
D    way from the long edge of the "good" cards.  The judge found that she had
     been "wholly ignorant" of the significance of what she was doing, card by
     card, at the call of Ms Sun.

         19  This procedure was followed for each of the next 79 coups dealt
     from this shoe.  The maximum amount staked by the claimant on the coups
     towards the end of the shoe reached £100,000.  Self-evidently, at no time
E    during the play of this shoe did he derive any advantage from the rotation of
     the cards requested by Ms Sun because that rotation occurred at the end, not
     at the beginning, of each coup.  This was all preparation.

         20  At 10.03 p m, when the shoe was exhausted, the claimant said that
     he had won with that deck (i e shoe), and that he would keep it.  The senior
     croupier, who had brought in a new collection of cards, was told by the
     claimant he did not want them, as he "had won £40,000 with that deck";
F    that was agreed to.  The original cards were reused.  The defendant has not
     been able to calculate retrospectively whether that assertion of winnings to
     point was true.

         21  Before the shoe was reused it had to be reshuffled.  The claimant had
     earlier asked Ms Yau's predecessor as croupier for a shuffling machine to
     shuffle the cards.  The cards were reshuffled by a machine.  For a punter using
G    the edge-sorting technique this ensured that the shuffle would be effected
     without rotating any of the cards unless the croupier did so before they were
     put into the machine.  Ms Yau did not do so.  Manual shuffling would have
     carried a much higher risk of re-rotation as it was done.

         22  Play with the reshuffled shoe recommenced at 10.12 p m and
     continued until Ms Yau went for a half hour break at 10.31 p m.  The
     claimant did not play during her break but resumed when she returned until
H    3.57 a m on 21 August.  Ms Yau was the croupier throughout.  The
     claimant's stake increased to £95,000 and then to £149,000 per coup.  He
     won approximately £2m.

         23  The accuracy of his bets on player increased sharply.  In the first two
     shoes in which Angel cards were used, those without an asymmetric pattern

© 2018 The Incorporated Council of Law Reporting for England and Wales

on the back, he placed respectively 11 bets and then 1 bet on player and a    A
seven, eight or nine only occurred once in that 12 times. On the shoe in
which the edge-sorting was done in the manner described, he placed 23 bets
on player of which eight were sevens, eights or nines. On the succeeding
shoes, those at least that were completed on that night, shoes four to eight,
the record was as follows. Shoe four, 23 accurate bets out of 27; shoe five,
22 accurate bets out of 25; shoe six, 20 accurate bets out of 26; shoe seven,    B
23 accurate bets out of 30; shoe eight, 17 accurate bets out of 19. A similar
but slightly less pronounced pattern occurred on the following day.

24   At the end of play on the early morning of the 21st the claimant
asked if he could keep the same shoe, which he referred to as a deck, if he
returned on the following day. He was told he could. Ms Yau returned to
duty at 2 pm on 21 August. The claimant resumed play with the same cards
at 3 pm and played until 6.41 pm. His average stake was never less than    C
£149,000. For the last three shoes it was £150,000, the maximum that he
was allowed to bet each time. In the middle of play of the last shoe, the
senior croupier told the claimant that the shoe would be replaced when it
was exhausted. When it was, the claimant and Ms Sun left. By then he had
won just over £7·7m.

25   Crockfords' practice after a large win such as this is to conduct an    D
ex post facto investigation to work out how it occurred. After quite lengthy
review of the CCTV footage and examination of the cards, the investigators
succeeded in spotting what had been done. Nobody at Crockfords had
heard of edge-sorting before.

26   Nine days after the play, on 30 August, the claimant spoke to
Mr Pearce, Managing Director of the London casinos of Genting UK, who
told him that Crockfords would not be paying his winnings because the    E
game had been compromised. The claimant said he had not touched the
cards, but did not state that which at the trial he freely admitted, that he had
used edge-sorting. Arrangements were made to refund his deposited stake,
£1m, on 31 August.

27   The judge found that Mr Ivey gave factually frank and truthful
evidence of what he had done. The finding was that he was a professional    F
gambler who described himself as an "advantage player", that is one who, by
a variety of techniques, sets out to reverse the house edge and to play at odds
which favour him. The judge found that he does so by means that are, in his
opinion, lawful. He is jealous of his reputation and is adamant that what he
does is not cheating. He described what he did, with Ms Sun, as legitimate
gamesmanship. The judge accepted that he was genuinely convinced that
what he did was not cheating. But the question which matters is not whether    G
Mr Ivey thought of it as cheating but whether in fact and in law it was. The
judge concluded that it was, and so did the majority of the Court of Appeal.
Were they right or wrong?

*Gaming and the law*

28   Gaming has been the subject of statutory rules since at least the time    H
of the Restoration. They have addressed, inter alia, both (1) unfair play
and (2) the recoverability of winnings by civil action. Very recently, the
Gambling Act 2005 has comprehensively revised the statutory framework
for gaming. In outline, it makes it lawful but subject to detailed licensing.

© 2018 The Incorporated Council of Law Reporting for England and Wales

401

A    29    The Gaming Act of 1664 (16 Car 2, c 7) addressed what it identified as the social ill of excessive gambling, when conducted not for "innocent and moderate recreation" but as a means of trade or making a living. Even in times of relative debauchery, the Act castigated the effect of such gaming on the youth of the day, whether of "the nobility and gentry" or otherwise. By section 3 it made irrecoverable at law any winnings over the then enormous sum of £100. And by section 2 it imposed a forfeit of three times the

B    winnings on anyone who won by (in effect) wrongful means. The forfeit was recoverable by civil action at the suit either of the loser or, if he did not sue, by anyone else. Half the forfeit went to the loser, and half to the Crown. The misbehaviours which gave rise to such forfeit were defined as "any fraud, shift, cousenage, circumvention, deceit or unlawful device, or ill practice whatsoever", and the activities covered included not only cards and

C    dice, but also tennis and foot races, as well as horse-racing, skittles, bowls and many other games. The forfeit was incurred not only by winnings by wagering, but also by prize winning, if the ill practice was demonstrated.

30    By the time of Queen Anne, the attitude to gambling had hardened. The Gaming Act 1710 (9 Ann c 19) repeated in section 5 the list of misbehaviour attracting a forfeit (now five times the winnings), and such was now recognised as a criminal offence attracting corporal punishment.

D    The same Act, by section 2, enabled anyone who lost more than £10 at games, however fair, to recover it by civil action, together with a forfeit of three times the loss, half for the loser and half for the poor of the parish. By section 1 it made void any security given for payment of gaming debts.

31    The Gaming Act 1845 (8 & 9 Vict c 109) abolished the forfeits, but (by section 18) made general the rule that gaming or wagering contracts were unenforceable in law. Section 17 dealt with malpractice. It referred

E    to "fraud or unlawful device or ill practice" and made winning by such means a criminal offence, by way of deeming it to be the recognised offence of obtaining by false pretences with intent to cheat or defraud: see section 53 of the Larceny Act 1827 (7 & 8 Geo 4, c 29). Section 17 was headed "cheating at play to be punished as obtaining money by false pretences".

32    This history is of limited importance, given the enactment of an

F    entirely new regime by the Gambling Act 2005, but it does demonstrate that the law concerned itself from very early times with malpractice at gaming, and that by 1845 a general expression used for it was "cheating". It is also of note that the malpractice thus dealt with was not confined to deception or fraud, but extended to "ill practice". Given the origins of that expression in the 1664 Act, relating to foot races, tennis and the like, as well as to

G    gambling, it is not possible to treat "ill practice" as having been limited by the principle of ejusdem generis to deception or fraud.

33    The Gambling Act 2005 reversed, by sections 334 and 335, the rule that gaming contracts are unenforceable. The new Gambling Commission is, however, given by section 336 a new power to declare void a bet taken by a licensee if satisfied that the bet was "substantially unfair". Amongst the factors (not exhaustively defined) which are to be considered when deciding

H    whether a bet was substantially unfair is included the circumstance that either party to the bet either did believe or ought to have believed that an offence of cheating had been or was likely to have been committed in connection with it, although that is by no means the only consideration. Supply of insufficient information and the belief of either party that the

© 2018 The Incorporated Council of Law Reporting for England and Wales

underlying contest is conducted in contravention of industry rules are two of    A
the other specified relevant circumstances. The offence contrary to section 17
of the 1845 Act is replaced by a new offence of cheating at gambling created
by section 42.

34    Section 42 is in the following terms:

> "*Cheating*
> "(1) A person commits an offence if he— (a) cheats at gambling, or    B
> (b) does anything for the purpose of enabling or assisting another person
> to cheat at gambling.
> "(2) For the purposes of subsection (1) it is immaterial whether a
> person who cheats— (a) improves his chances of winning anything, or
> (b) wins anything.
> "(3) Without prejudice to the generality of subsection (1) cheating at    C
> gambling may, in particular, consist of actual or attempted deception or
> interference in connection with— (a) the process by which gambling is
> conducted, or (b) a real or virtual game, race or other event or process to
> which gambling relates."

By subsection (4) this offence carries a penalty of up to two years
imprisonment on indictment, or 51 weeks on summary conviction.
                                                                                D

*Cheating*

35    It has been common ground throughout this litigation that the (now
in principle enforceable) contract for betting into which these parties entered
is subject to an implied term that neither of them will cheat.

36    It follows that, if what Mr Ivey did was cheating, he is in breach of this
implied term and cannot as a result recover his "winnings". As well as    E
advancing this defence, the casino pleaded that what he did amounted to the
offence under section 42, and that in consequence he could not recover the
proceeds of his criminal offence. Mitting J held that the implied term had been
broken, and that it was therefore unnecessary to decide whether or not the
statutory offence had been committed. The majority of the Court of Appeal
dismissed Mr Ivey's appeal. The reasoning of Arden and Tomlinson LJJ was
not identical, but both upheld the judge's conclusion that what had been done    F
amounted to cheating. Sharp LJ would have allowed the appeal, taking the
view that there could not be cheating unless the statutory offence had been
committed and that a necessary ingredient of it was dishonesty as defined in
*R v Ghosh* [1982] QB 1053.

37    The core submission of Mr Spearman QC for Mr Ivey runs as
follows: (a) the test of what is cheating must be the same for the implied term    G
as for section 42; (b) cheating necessarily involves dishonesty; (c) the judge
found that Mr Ivey was truthful when he said that he did not consider what
he did to be cheating; therefore dishonesty and in particular the second leg of
the test established by *R v Ghosh* had not been demonstrated; (d) it follows
that what was done was not cheating, and Mr Ivey ought to have recovered
the £7·7m.

38    The concept of cheating long pre-dates section 42 of the Gambling    H
Act 2005. It clearly embraces the kind of malpractice described in the
statutes of 1664, 1710 and 1845. Section 42 thus adopted a longstanding
concept. However, there is no reason to doubt that cheating carries the same
meaning when considering an implied term not to cheat and when applying

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    section 42 of the Act.  There will be a difference in standard of proof as
between civil and criminal proceedings, but that does not affect the meaning
of cheating.  Section 42 expressly does not exhaustively define cheating, and
the elaboration in section 42(3) is explanatory rather than definitive.  The
section leaves open what is and what is not cheating, as is inevitable given
the extraordinary range of activities to which the concept may apply.
Plainly, what is cheating in one form of game may be legitimate competition
B    in another.

39    For his second and crucial proposition Mr Spearman relied, as a
matter of authority, substantially on *R v Scott* [1975] AC 819.  Viscount
Dilhorne, with whom the other law lords agreed, referred in the course of his
speech to the ancient common law offence of cheating.  He cited, at p 840,
*East's Pleas of the Crown* (1803) vol II, pp 816–818 for that author's
C    opinion that offence consisted in

"the fraudulent obtaining [of] the property of another by any deceitful
and illegal practice or token (short of felony) which affects or may affect
the public.  It is not, however, every species of fraud or dishonesty in
transactions between individuals which is the subject matter of a criminal
charge at common law . . . it must be such as affects the public . . .
D    calculated to defraud numbers, to deceive the people in general."

Says Mr Spearman, this demonstrates that fraud, and thus dishonesty, was
an essential element of the common law offence of cheating.  The same, he
contends, must follow for cheating at gambling.

40    Mr Scott and his co-defendants were in the business of film piracy.
They bribed employees of commercial cinemas, such as projectionists, to
E    abstract the reels of film overnight so that infringing copies could be made
and in due course distributed commercially for profit.  The charge was not
cheating at common law but conspiracy to defraud.  The substantial issue
before the House of Lords was whether conspiracy to defraud required as an
essential element that there had been deception, which had not been any part
of the strategy employed by the defendants.  The answer was that deception
was one very common form of defrauding, but not the only one.  Whilst no
F    exhaustive definition of defrauding was attempted, the House held that
defrauding also included depriving another, by dishonest means, of
something which is his or to which he would or might be entitled but for the
fraud.  In so holding, the House followed its own decision in *Welham v
Director of Public Prosecutions* [1961] AC 103, where it had emphasised
that the essence of defrauding was the effect on the victim.

G    41    To the extent that defrauding someone may take the form of
depriving him of something which is his, or to which he might otherwise be
entitled, it is plain, and wholly unsurprising, that a criminal offence of
defrauding must contain in addition an element which demonstrates that the
means adopted are illegitimate and wrong.  Otherwise much perfectly
proper business competition would be at risk of being labelled fraud, since
such competition frequently involves strategies to divert business from A to
H    B.  Hence it is entirely unsurprising that conspiracy to defraud was held to
require in addition the proof of dishonest means.  Dishonesty, in this
context, supplies the essential element of illegitimacy and wrongfulness.

42    As the citation from *East* shows, the ancient common law offence of
cheating consisted of a particular subset of fraudulently depriving another of

© 2018 The Incorporated Council of Law Reporting for England and Wales

property, where the fraud affected the public as a whole.  This offence was          A
abolished by section 32(1) of the Theft Act 1968, except in so far as it
consisted of cheating the revenue.  There is no discussion of this abolition in
the *Eighth Report of the Criminal Law Revision Committee on Theft and
Related Offences* (1966) (Cmnd 2977), which preceded the Act and
recommended most of the terms of the statute including section 32(1), but it
is clear that the Committee took the view that whatever was previously          B
covered by other forms of common law cheating would be caught by its
newly recommended offences, particularly that of obtaining property by
deception under what became section 15 of the Act.  The Theft Act 1968
used the expression "cheat" only in one place, in relation to the offence of
going equipped created by section 25.  There, in section 25(1)(5), it was used
in a restrictive sense limited to the offences contrary to section 15.  (The
references to cheat have since been removed from that section.)          C

43    The common law offence of cheating was referred to in *R v Scott*
[1975] AC 819 only because a supplementary argument for the defendants
was that section 32(1) had impliedly abolished also the offence of conspiracy
to defraud, which argument unsurprisingly failed.  There is no occasion to
investigate the accuracy of East's opinion on the scope of the common law
offence of cheating.  It may well be that it necessarily involved dishonesty,          D
although that expression was not in general use in criminal statutes until the
Theft Act 1968 adopted it in preference to "fraudulently".  But to say that
dishonesty was a necessary element in an offence of which the gist was
obtaining the property of others who may well be strangers, and where the
offence would otherwise be likely to be impossibly wide, is of no help in
construing the meaning of cheating in the quite separate context of
gambling.  Still less is there any reason to suppose that the framers of the          E
Gambling Act adopted in 2005 an analogy with a common law offence
which had largely been abolished nearly 40 years earlier, and when "cheat"
had been used in a different sense in the Theft Act 1968.  Whilst it makes
perfect sense to interpret the concept of cheating in section 42 of the
Gambling Act in the light of the meaning given to cheating over many years,
it makes none to interpret cheating, as used over those many years, by
reference to an expression—dishonesty—introduced into the criminal law          F
for different purposes long afterwards in 1968.  In gambling, there is an
existing close relationship between the parties, governed by rules and
conventions applicable to whichever game is undertaken, and which are
crucial to what is cheating and what is not.  Cheating at gambling need not
result in obtaining the property of the other party, as section 42(2) explicitly
says.  Most importantly, whilst the additional element of dishonesty was          G
necessary to the common law offence of cheating, and no doubt still is to the
surviving offences of cheating the Revenue and conspiracy to defraud, in
order to mark out the illegitimate and wrongful from the legitimate, the
expression "cheating" in the context of games and gambling carries its own
inherent stamp of wrongfulness.

44    Authority apart, Mr Spearman contended that as a matter of          H
ordinary English, cheating necessarily imports dishonesty.  This argument is
most neatly encapsulated by inversion: "honest cheating" is indeed, as has
been sensibly recognised by those who have addressed the phrase in this
litigation, an improbable concept.  But that is because to speak of honest
cheating would be to suggest that some cheating is right, rather than wrong.

© 2018 The Incorporated Council of Law Reporting for England and Wales

A   That would indeed be contrary to the natural meaning of the word cheating. It does not, however, follow, either (1) that all cheating would ordinarily attract the description "dishonest" or (2) that anything is added to the legal concept of cheating by an additional legal element of dishonesty.

   45   Although the great majority of cheating will involve something which the ordinary person (or juror) would describe as dishonest, this is not invariably so. When, as it often will, the cheating involves deception of the other party, it will usually be easy to describe what was done as dishonest. It is, however, perfectly clear that in ordinary language cheating need not involve deception, and section 42(3) recognises this. Section 42(3) does not exhaustively define cheating, but it puts beyond doubt that both deception and interference with the game may amount to it. The runner who trips up one of his opponents is unquestionably cheating, but it is doubtful that such misbehaviour would ordinarily attract the epithet "dishonest". The stable lad who starves the favourite of water for a day and then gives him two buckets of water to drink just before the race, so that he is much slower than normal, is also cheating, but there is no deception unless one manufactures an altogether artificial representation to the world at large that the horse has been prepared to run at his fastest, and by themselves it is by no means clear that these actions would be termed dishonesty. Similar questions could no doubt be asked about the taking of performance-enhancing drugs, about the overt application of a magnet to a fruit machine, deliberate time-wasting in many forms of game, or about upsetting the card table to force a re-deal when loss seems unavoidable, never mind sneaking a look at one's opponent's cards.

   46   Conversely, there may be situations in which there is deception of the other player but what is done does not amount to cheating. The so-called "three card trick", much practised upon travellers on Victorian and Edwardian trains especially to and from racecourses, commonly involved a deception of the target traveller by a group of associates pretending to be unconnected to one another. The idea was to lure the target into playing the game. But once he was ensnared, the game was often played genuinely; the target lost not because of any cheating but because the shuffler of the cards had sufficient speed of hand to deceive the eye: see for example *R v Governor of Brixton Prison, Ex p Sjoland and Metzler* [1912] 3 KB 568. No doubt other exponents of the three card trick had less genuine methods, such as a fourth (concealed) card, which would indeed be cheating. Sometimes the game admits of a level of legitimate deception. The unorthodox lead or discard at bridge is designed to give the opponent a misleading impression of one's hand, but it is part of the game and not cheating. Pretending to be stupid at the poker table, so that one's opponent does not take one seriously, and takes risks which he otherwise might not, may or may not be another example.

   47   These far from sophisticated examples demonstrate the inevitable truth that there will be room for debate at the fringes as to what does and does not constitute cheating. To label an activity "advantage play", as Mr Ivey and others did, is of no help at all. It asks, rather than answers, the question whether it is legitimate or cheating. It would be very unwise to attempt a definition of cheating. No doubt its essentials normally involve a deliberate (and not an accidental) act designed to gain an advantage in the play which is objectively improper, given the nature, parameters and rules

© 2018 The Incorporated Council of Law Reporting for England and Wales

(formal or informal) of the game under examination. The question in the       A
present case, however, does not depend on the near impossible task of
formulating a definition of cheating, but on whether cheating necessarily
requires dishonesty as one of its legal elements.

48   Where it applies as an element of a criminal charge, dishonesty is by
no means a defined concept.  On the contrary, like the elephant, it is
characterised more by recognition when encountered than by definition.
Dishonesty is not a matter of law, but a jury question of fact and standards.     B
Except to the limited extent that section 2 of the Theft Act 1968 requires
otherwise, judges do not, and must not, attempt to define it: *R v Feely* [1973]
QB 530.  In this it differs strikingly from the expression "fraudulently",
which it largely replaced, for the judge did define whether a state of mind,
once ascertained as a matter of fact, was or was not fraudulent: *R v Williams*
[1953] 1 QB 660.  Accordingly, dishonesty cannot be regarded as a concept     C
which would bring to the assessment of behaviour a clarity or certainty
which would be lacking if the jury were left to say whether the behaviour
under examination amounted to cheating or did not.  The issue whether
what was done amounts to cheating, given the nature and rules of the game
concerned, is likewise itself a jury question.  The judge in the present case
applied himself to the question whether there was cheating in exactly this
jury manner.  He directed himself that it is ultimately for the court to decide     D
whether conduct amounted to cheating and that the standard is objective.  In
so directing himself he was right.

49   There is no occasion to add to the value judgment whether conduct
was cheating a similar, but perhaps not identical, value judgment whether it
was dishonest.  Some might say that all cheating is by definition dishonest.
In that event, the addition of a legal element of dishonesty would add     E
nothing.  Others might say that some forms of cheating, such as deliberate
interference with the game without deception, are wrong and cheating, but
not dishonest.  In that event, the addition of the legal element of dishonesty
would subtract from the essentials of cheating, and legitimise the
illegitimate.  Either way, the addition would unnecessarily complicate the
question whether what is proved amounts to cheating.

50   The judge's conclusion, that Mr Ivey's actions amounted to     F
cheating, is unassailable.  It is an essential element of Punto Banco that the
game is one of pure chance, with cards delivered entirely at random and
unknowable by the punters or the house.  What Mr Ivey did was to stage a
carefully planned and executed sting.  The key factor was the arranging of
the several packs of cards in the shoe, differentially sorted so that this
particular punter did know whether the next card was a high value or low     G
value one.  If he had surreptitiously gained access to the shoe and
re-arranged the cards physically himself, no one would begin to doubt that
he was cheating.  He accomplished exactly the same result through the
unwitting but directed actions of the croupier, tricking her into thinking that
what she did was irrelevant.  As soon as the decision to change the cards was
announced, thus restoring the game to the matter of chance which it is
supposed to be, he first covered his tracks by asking for cards to be rotated at     H
random, and then abandoned play.  It may be that it would not be cheating if
a player spotted that some cards had a detectably different back from others,
and took advantage of that observation, but Mr Ivey did much more than
observe; he took positive steps to fix the deck.  That, in a game which

© 2018 The Incorporated Council of Law Reporting for England and Wales

407

A   depends on random delivery of unknown cards, is inevitably cheating. That it was clever and skilful, and must have involved remarkably sharp eyes, cannot alter that truth.

    **51**  Although the judge did not think it necessary to make a finding on the topic, and it is unnecessary to the resolution of this appeal, it would also seem that the facts which he found amounted in any event to a deception of the croupier. Certainly, the judge found [2015] LLR 98, para 40, that
B pretending to be superstitious did not *by itself* cross the line from legitimate play to cheating, comparing it to the skilled poker player who pretends to be a fool. He also found, contrary to one of Crockfords' submissions, that what occurred did not amount to such deception as altogether to negate the existence of any contract for the game. But that was not a finding that there was no deception at all, and on the facts found there clearly was deception of
C the croupier into doing something which appeared innocuous or irrelevant, but was in fact highly significant and enabled Mr Ivey to win when he should not have done. If, therefore, there were indeed (and contrary to the conclusion reached above) a necessary legal element of dishonesty in cheating, such a deception would be prima facie dishonest, unless it is prevented from being so by necessity to satisfy the second leg of the test in
D *R v Ghosh* [1982] QB 1053.

*Dishonesty*

    **52**  Dishonesty has been adopted since the Theft Act 1968 in the definition of some, but not all, acquisitive criminal offences. Forgery, for example, is defined without reference to dishonesty, but rather by the yardstick of the intention of the forger that his false document should be
E accepted as genuine and acted upon to the prejudice of someone else (Forgery and Counterfeiting Act 1981, section 1), whilst the Fraud Act 2006 retains dishonesty as an element of several forms of fraud: see sections 2, 3, 4 and 11.

    **53**  As recorded at para 48 above, dishonesty is itself primarily a jury concept, characterised by recognition rather than by definition. Most of the
F Theft Act 1968 offences required dishonesty without any elaboration of its meaning: section 15 (dishonestly obtaining property by deception) was a prime example and the Fraud Act 2006, which replaces this and other Theft Act offences, adopts the same form. There are in section 2 of the Theft Act 1968 limited rules relating to when appropriation is *not* to be regarded as dishonest (claim of right, belief in consent of owner, belief that owner cannot be found) and a specific provision that it may be dishonest despite a
G willingness to pay for the goods, but these were designed to reflect existing rules of law, they apply only to appropriation, and they do not alter the underlying principle that dishonesty is not defined. This reflects the view of the Criminal Law Revision Committee that dishonesty was a matter to be left to a jury; it said in its Eighth Report, at para 39, that " 'Dishonesty' is something which laymen can easily recognise when they see it". That is not
H to suggest that there is not room for debate at the fringes whether particular conduct is dishonest or not, but the perils of advance definition would no doubt have been greater than those associated with leaving the matter to the jury. Over the succeeding half century, whilst there have undoubtedly (and inevitably) been examples of uncertainty or debate in identifying whether some conduct is dishonest or not, juries appear generally to have coped well

© 2018 The Incorporated Council of Law Reporting for England and Wales

with applying an uncomplicated lay objective standard of honesty to A
activities as disparate as sophisticated banking practices (for example *R v
Hayes* [2018] 1 Cr App R 10) and the removal of golf balls at night from the
bottom of a lake on a private golf course: *R v Rostron* [2003] EWCA Crim
2206.

54  A significant refinement to the test for dishonesty was introduced by
*R v Ghosh* [1982] QB 1053. Since then, in criminal cases, the judge has been B
required to direct the jury, if the point arises, to apply a two-stage test.
Firstly, it must ask whether in its judgment the conduct complained of was
dishonest by the lay objective standards of ordinary reasonable and honest
people. If the answer is no, that disposes of the case in favour of the
defendant. But if the answer is yes, it must ask, secondly, whether the
defendant must have realised that ordinary honest people would so regard
his behaviour, and he is to be convicted only if the answer to that second C
question is yes.

55  The occasion for this ruling owed nothing to the facts of *R v Ghosh*.
The defendant locum surgeon had claimed payment for operations which
either he had not performed, or which had been carried out under the
National Health scheme so that no fees were due. The court summarily
dismissed his appeal on the basis that no jury could have concluded, by any
test, otherwise than that he was dishonest. D

56  The occasion for the analysis of dishonesty in *R v Ghosh* was a
tangle of what were perceived to be inconsistent decisions, some of which
were said to apply a "subjective" test, and others of which were said to apply
an "objective" one. Those terms are not always as plain to jurors as they
have become to lawyers, but it is convenient to adopt them here when
examining the reasoning in *R v Ghosh*. That case arrived, as has been seen, E
at a compromise rule which is partly objective and partly subjective.

57  Thirty years on, however, it can be seen that there are a number of
serious problems about the second leg of the rule adopted in *R v Ghosh*.

(1) It has the unintended effect that the more warped the defendant's
standards of honesty are, the less likely it is that he will be convicted of
dishonest behaviour. F

(2) It was based on the premise that it was necessary in order to give
proper effect to the principle that dishonesty, and especially criminal
responsibility for it, must depend on the actual state of mind of the
defendant, whereas the rule is not necessary to preserve this principle.

(3) It sets a test which jurors and others often find puzzling and difficult to
apply.

(4) It has led to an unprincipled divergence between the test for G
dishonesty in criminal proceedings and the test of the same concept when it
arises in the context of a civil action.

(5) It represented a significant departure from the pre-Theft Act 1968 law,
when there is no indication that such a change had been intended.

(6) Moreover, it was not compelled by authority. Although the
pre-*Ghosh* cases were in a state of some entanglement, the better view is that
the preponderance of authority favoured the simpler rule that, once the H
defendant's state of knowledge and belief has been established, whether that
state of mind was dishonest or not is to be determined by the application of
the standards of the ordinary honest person, represented in a criminal case
by the collective judgment of jurors or justices.

© 2018 The Incorporated Council of Law Reporting for England and Wales

409

A    58    The principal objection to the second leg of the *Ghosh* test is that the less the defendant's standards conform to what society in general expects, the less likely he is to be held criminally responsible for his behaviour. It is true that *R v Ghosh* attempted to reconcile what it regarded as the dichotomy between a "subjective" and an "objective" approach by a mixed test. The court addressed the present objection in this way, [1982] QB 1053,
B    1064:

> "There remains the objection that to adopt a subjective test is to abandon all standards but that of the accused himself, and to bring about a state of affairs in which 'Robin Hood would be no robber': *R v Greenstein* [1975] 1 WLR 1353. This objection misunderstands the nature of the subjective test. It is no defence for a man to say 'I knew that what I was doing is generally regarded as dishonest; but I do not regard it
> C    as dishonest myself. Therefore I am not guilty'. What he is however entitled to say is 'I did not know that anybody would regard what I was doing as dishonest'. He may not be believed; just as he may not be believed if he sets up 'a claim of right' under section 2(1) of the Theft Act 1968, or asserts that he believed in the truth of a misrepresentation under section 15 of the 1968 Act. But if he *is* believed, or raises a real doubt
> D    about the matter, the jury cannot be sure that he was dishonest."

And a little later the court added that upon the test which it was setting:

> "In most cases, where the actions are obviously dishonest by ordinary standards, there will be no doubt about it. It will be obvious that the defendant himself knew that he was acting dishonestly. It is dishonest for a defendant to act in a way which he knows ordinary people consider to
> E    be dishonest, even if he asserts or genuinely believes that he is morally justified in acting as he did. For example, Robin Hood or those ardent anti-vivisectionists who remove animals from vivisection laboratories are acting dishonestly, even though they may consider themselves to be morally justified in doing what they do, because they know that ordinary people would consider these actions to be dishonest."

F    59    Even if this were correct, it would still mean that the defendant who thinks that stealing from a bookmaker is not dishonest (as in *R v Gilks* [1972] 1 WLR 1341—see para 73 below) is entitled to be acquitted. It is no answer to say that he will be convicted if he realised that ordinary honest people would think that stealing from a bookmaker is dishonest, for by definition he does not realise this. Moreover, the court's proposition was
G    not correct, because it is not in the least unusual for the accused not to share the standards which ordinary honest people set for society as a whole. The acquisitive offender may, it is true, be the cheerful character who frankly acknowledges that he is a crook, but very often he is not, but, rather, justifies his behaviour to himself. Just as convincing himself is frequently the stock in trade of the confidence trickster, so the capacity of all of us to persuade ourselves that what we do is excusable knows few bounds. It cannot by any
H    means be assumed that the appropriators of animals from laboratories, to whom the court referred in *R v Ghosh* [1982] QB 1053, 1064 know that ordinary people would consider their actions to be dishonest; it is just as likely that they are so convinced, however perversely, of the justification for what they do that they persuade themselves that no one could call it

© 2018 The Incorporated Council of Law Reporting for England and Wales

410
**Ivey v Genting Casinos (UK) Ltd (SC(E))**                                    **[2018] AC**
**Lord Hughes JSC**

dishonest. There is no reason why the law should excuse those who make a          A
mistake about what contemporary standards of honesty are, whether in the
context of insurance claims, high finance, market manipulation or tax
evasion. The law does not, in principle, excuse those whose standards are
criminal by the benchmarks set by society, nor ought it to do so. On the
contrary, it is an important, even crucial, function of the criminal law to
determine what is criminal and what is not; its purpose is to set the standards
of behaviour which are acceptable. As it was put in *Smith's Law of Theft*,          B
9th ed (2007), para 2.296:

> "the second limb allows the accused to escape liability where he has
> made a mistake of fact as to the contemporary standards of honesty. But
> why should that be an excuse?"

60  It is plain that in *R v Ghosh* [1982] QB 1053 the court concluded          C
that its compromise second leg test was necessary in order to preserve the
principle that criminal responsibility for dishonesty must depend on the
actual state of mind of the defendant. It asked the question whether
"dishonestly", where that word appears in the Theft Act, was intended to
characterise a course of conduct or to describe a state of mind. The court
gave the following example, at p 1063, which was clearly central to its
reasoning:                                                                          D

> "Take for example a man who comes from a country where public
> transport is free. On his first day here he travels on a bus. He gets off
> without paying. He never had any intention of paying. His mind is
> clearly honest; but his conduct, judged objectively by what he has done, is
> dishonest. It seems to us that in using the word 'dishonestly' in the Theft          E
> Act 1968, Parliament cannot have intended to catch dishonest conduct in
> that sense, that is to say conduct to which no moral obloquy could
> possibly attach."

But the man in this example would inevitably escape conviction by the
application of the (objective) first leg of the *Ghosh* test. That is because, in
order to determine the honesty or otherwise of a person's conduct, one must
ask what he knew or believed about the facts affecting the area of activity in          F
which he was engaging. In order to decide whether this visitor was dishonest
by the standards of ordinary people, it would be necessary to establish his
own actual state of knowledge of how public transport works. Because he
genuinely believes that public transport is free, there is nothing objectively
dishonest about his not paying on the bus. The same would be true of a child
who did not know the rules, or of a person who had innocently misread the          G
bus pass sent to him and did not realise that it did not operate until
after 10.00 in the morning. The answer to the court's question is that
"dishonestly", where it appears, is indeed intended to characterise what the
defendant did, but in characterising it one must first ascertain his actual state
of mind as to the facts in which he did it. It was not correct to postulate that
the conventional objective test of dishonesty involves judging only the
actions and not the state of knowledge or belief as to the facts in which they          H
were performed. What is objectively judged is the standard of behaviour,
given any known actual state of mind of the actor as to the facts.

61  Although there have been relatively few appeals based upon *R v
Ghosh*, that is because judges have dutifully given the two-leg direction

© 2018 The Incorporated Council of Law Reporting for England and Wales

411

A    where there has been any occasion for it.  But the existence of the second leg
has frequently led to trials being conducted on the basis that even if the
defendant's actions, in his actual state of knowledge or belief about
the relevant facts, would be characterised by most people as dishonest, the
defendant himself thought that what he was doing was not wrong, and it
was for that reason honest.  Juries are then required first to ask the so-called
objective question, that is to say to apply their own standards of honesty, but
B    then to depart from them in order to ask what the defendant himself
thought.  The idea that something which is dishonest by ordinary standards
can become honest just because the defendant thinks it is may often not be
an easy one for jurors to grasp.

62    Dishonesty is by no means confined to the criminal law.  Civil
actions may also frequently raise the question whether an action was honest
C    or dishonest.  The liability of an accessory to a breach of trust is, for
example, not strict, as the liability of the trustee is, but (absent an
exoneration clause) is fault-based.  Negligence is not sufficient.  Nothing less
than dishonest assistance will suffice.  Successive cases at the highest level
have decided that the test of dishonesty is objective.  After some hesitation in
*Twinsectra Ltd v Yardley* [2002] 2 AC 164, the law is settled on the objective
test set out by Lord Nicholls of Birkenhead in *Royal Brunei Airlines Sdn Bhd*
D    *v Tan* [1995] 2 AC 378: see *Barlow Clowes International Ltd v Eurotrust*
*International Ltd* [2006] 1 WLR 1476, *Abou-Rahmah v Abacha* [2007]
Bus LR 220 and *Starglade Properties Ltd v Nash* [2011] Lloyd's Rep FC
102.  The test now clearly established was explained thus in the *Barlow*
*Clowes* case [2006] 1 WLR 1476, para 10 by Lord Hoffmann, who had been
a party also to the *Twinsectra* case:

E        "Although a dishonest state of mind is a subjective mental state, the
standard by which the law determines whether it is dishonest is objective.
If by ordinary standards a defendant's mental state would be
characterised as dishonest, it is irrelevant that the defendant judges by
different standards.  The Court of Appeal held this to be a correct state of
the law and their Lordships agree."

F    63    Although the House of Lords and Privy Council were careful in these
cases to confine their decisions to civil cases, there can be no logical or
principled basis for the meaning of dishonesty (as distinct from the standards
of proof by which it must be established) to differ according to whether it
arises in a civil action or a criminal prosecution.  Dishonesty is a simple, if
occasionally imprecise, English word.  It would be an affront to the law if its
G    meaning differed according to the kind of proceedings in which it arose.  It is
easy enough to envisage cases where precisely the same behaviour, by the
same person, falls to be examined in both kinds of proceeding.  In *Starglade*
*Properties Ltd v Nash* [2011] Lloyd's Rep FC 102 Leveson LJ drew attention
to the difference of test as between civil cases and criminal cases, and rightly
held that it demanded consideration when the opportunity arose.  Such an
opportunity is unlikely to occur in a criminal case whilst *R v Ghosh* [1982]
H    QB 1053 remains binding on trial judges throughout the country.  Although
in *R v Cornelius* [2012] Lloyd's Rep FC 435 the opportunity might have
arisen before the Court of Appeal, Criminal Division, it did not do so
because there had been in that case no false representation of which the
honesty needed to be examined; moreover, there is some doubt about the

© 2018 The Incorporated Council of Law Reporting for England and Wales

412
**Ivey v Genting Casinos (UK) Ltd (SC(E))**          **[2018] AC**
**Lord Hughes JSC**

freedom of that court to depart from *R v Ghosh* [1982] QB 1053 in   A
the absence of a decision from this court.

**64** Prior to the Theft Act 1968, the expression "dishonestly" had not
appeared in the legal definition of acquisitive offences. The mental element
was usually marked by the expression "fraudulently". There is no doubt that
that latter expression involved an objective evaluation of the defendant's
conduct, given his actual state of knowledge and belief as to the facts. The
Criminal Law Revision Committee, in its Eighth Report, advised the   B
substitution of the word "dishonestly", on the grounds that "fraudulently"
had become technical and its meaning had departed somewhat from the
ordinary understanding of lay people. It recommended that "dishonestly"
would be more easily understood by lay fact-finders and the public generally.
At para 39 the Committee advised that

    " 'Dishonestly' seems to us a better word than 'fraudulently'. The   C
question 'Was this dishonest?' is easier for a jury to answer than the
question 'Was this fraudulent?'. 'Dishonesty' is something which laymen
can easily recognise when they see it, whereas 'fraud' may seem to involve
technicalities which have to be explained by a lawyer."

It was in accordance with this substitution that in *R v Feely* [1973] QB 530 a   D
five-judge Court of Appeal, Criminal Division, held that the question
whether a defendant had behaved dishonestly was to be left to the jury and
should not, as had been the case with "fraudulently", be the subject of
judicial ruling. But there is no hint in the Committee's report of any
contemplation that whether a man was or was not dishonest should
henceforth depend on his own view of his behaviour. On the contrary, the
report clearly assumed that the prior objective approach would continue,   E
save that the question would be a jury matter rather than one of law.

**65** Prior to *R v Ghosh* [1982] QB 1053 the post-Theft Act authorities
on the meaning of dishonesty were in something of a tangle. The court in
that case seems to have thought, however, that there were more or less equal
strands of authority supporting the "subjective" and the "objective"
approach. It identified *R v Feely* [1973] QB 530 and *R v Greenstein* [1975]   F
1 WLR 1353 as tending to support an objective approach, and *R v Landy*
[1981] 1 WLR 355, *R v Waterfall* [1970] 1 QB 148, *R v Royle* [1971] 1 WLR
1764 and *R v Gilks* [1972] 1 WLR 1341 as tending to favour a subjective
one. It treated *R v McIvor* [1982] 1 WLR 409 as an unsustainable attempt
to reconcile the two lines. This apparently binary dichotomy is not entirely
borne out on analysis.

**66** Chronologically the first two cases, *R v Waterfall* [1970] 1 QB 148   G
and *R v Royle* [1971] 1 WLR 1764, decided in July 1969 and November
1971, did not concern the characterisation of behaviour as dishonest.
Rather, they held that where a false representation is alleged, it must be
shown that the defendant knew that it was false, or at least was reckless in
making it without caring whether or not it was true. Until there is a false
representation, deliberately or recklessly made, the jury does not get to
whether it was dishonest or not. Plainly, the defendant's actual state of mind   H
as to the truth of the representation is a matter for subjective determination.
If he genuinely believes that what he said was true, he is entitled to be
acquitted, unless of course there is some other behaviour independent of the
false representation which can be said to be dishonest. It does not at all

© 2018 The Incorporated Council of Law Reporting for England and Wales

413

A   follow that, when once an absence of belief in the truth of his representation
is established, dishonesty is likewise an entirely subjective matter, nor that it
is so in cases which do not depend on allegations of false representation(s).
This important distinction was subsequently identified in both *R v Landy*
[1981] 1 WLR 355 and *R v Ghosh* [1982] QB 1053 itself, but the court in
the latter case regarded it as unsatisfactory that the jury should have to apply
B   successive tests, firstly of the defendant's actual knowledge or belief, and,
only if he deliberately made a false representation, secondly of the character
of his conduct, given his actual state of mind. *R v Waterfall* [1970] 1 QB 148
and *R v Royle* [1971] 1 WLR 1764 were treated as examples of a subjective
test of dishonesty, although they are not. There should in fact be no
difficulty in the jury making this distinction, as cases such as *R v Greenstein*
[1975] 1 WLR 1353 show. It has to be done in every case where there was a
C   false representation but there is a question whether there is any possible
moral obloquy attaching to it. And it falls to be done, easily enough, in
non-representation cases such as that of the bus travelling foreign visitor.
A not dissimilar two-stage test is routinely applied by juries where self
defence is in issue. The first stage is to ask what the facts were, as the
defendant "subjectively" believed them to be. The second stage is, assuming
such facts, to judge whether the response of the defendant was "objectively"
D   reasonable. See *R v Williams (Gladstone)* [1987] 3 All ER 411 and
section 76 of the Criminal Justice and Immigration Act 2008.

67    In December 1972 a five-judge Court of Appeal decided *R v Feely*
[1973] QB 530. Like some others, the case concerned a defendant employee
who had helped himself to money from the till knowing that such a thing
was forbidden, but contended by way of defence that he had intended to
E   repay it, and that his employers owed him money anyway. The decision of
the court was that it is for the jury, not the judge, to say whether the conduct
established was dishonest or not. The court said plainly that employees who
take money from the till without permission are usually thieves, but that if
the circumstances were such that no possible moral obloquy could attach to
what was done, they might not be. It gave as an example the defendant who
took the money only because he had no change in his pocket to pay a taxi
F   which had just delivered his wife to the shop, and who meant to and did
replace it within minutes. Because the question whether that kind of analysis
applied in that case had not been left open by the direction to the jury, the
appeal against conviction was allowed. It is therefore inherent in that case
that what the jury has to do is to apply its own (objective) standards to
whether the conduct was dishonest.

G   68    *R v Greenstein* [1975] 1 WLR 1353, decided in July 1975,
concerned a large-scale operation of a method of the discouraged but not
illegal practice of "stagging" new issue shares by applying for vastly more
than the defendants could pay for, in the hope that a smaller affordable
number would be allocated, but more than would have been allotted if the
application had been confined to what they could afford. The charges, of
obtaining property by deception, depended on the representation made
H   when a cheque is issued, that it is good for the money on due presentation.
The defendants, who applied in multiple aliases, did not have the money to
meet the cheques they signed for the full number of shares applied for, which
were required by the issuers, but they hoped that the return cheques which
could be expected to be sent after partial allocation would feed their

accounts in time to enable their original cheques to be met. The court upheld    A
the judge's two-part direction. First, he told the jury that when it came to
asking whether the defendants genuinely believed that their cheques would
be met on due presentation (as many were and several were not) the answer
should depend on their actual state of belief. Secondly, he told them that
when the question was whether the defendants had acted honestly overall
(that is if there was a false representation), they must apply their own          B
standards. It was, the judge had said, no good applying the standards of
anyone accused of dishonesty, for in that event everyone would
automatically be acquitted. That case accordingly supports the principle
that the test of dishonesty (but not of belief in a representation) is objective.
*R v Feely* [1973] QB 530 was applied.

69   *R v Feely* was also applied in *Boggeln v Williams* [1978] 1 WLR 873,
decided in January 1978. The defendant had been acquitted of dishonestly       C
abstracting electricity by re-connecting his supply after the Board had cut
him off for late payment. The acquittal was by the Crown Court on appeal
and specific findings of fact were accordingly available. They were that he
knew how to bypass the meter, but had not done so, that he gave notice to
the Board of what he was doing, that he genuinely believed that he would be
able to pay when the time came, that that belief was not shown to be            D
unreasonable and that in the judgment of the Crown Court he had not acted
dishonestly. The Divisional Court applied *R v Feely* [1973] QB 530 in
holding that the decision upon honesty was for the fact-finding tribunal and
that there was material entitling it to find as it did. That case did not address
the nature of the test of dishonesty beyond saying that the defendant's view
of his conduct was, on those findings, crucial. The reality is that the Crown
Court did not think the conduct dishonest, given what the defendant did and    E
intended. In *R v Ghosh* [1982] QB 1053, this case was rightly treated as
inconclusive upon the perceived binary dichotomy.

70   *R v Landy* [1981] 1 WLR 355, decided in January 1981, was a case
of complex fraudulent trading via a bank, which re-affirmed that dishonesty
was a necessary element of conspiracy to defraud. It also, and more
crucially, insisted on an indictment for conspiracy to defraud giving proper    F
particulars of the conduct complained of, the absence of which had, in that
case, led to a confused and diffuse summing up which did not properly
identify the issues for the jury. The case was important for laying the early
ground for modern case management of fraud trials. In the course of its
judgment, given by Lawton LJ, the court said this, at p 365:

"There is always a danger that a jury may think that proof of an            G
irregularity followed by loss is proof of dishonesty. The dishonesty to be
proved must be in the minds and intentions of the defendants. It is to their
states of mind that the jury must direct their attention. What the
reasonable man or the jurors themselves would have believed or intended
in the circumstances in which the defendants found themselves is not
what the jury have to decide, but what a reasonable man or they
themselves would have believed or intended in similar circumstances may    H
help them to decide what in fact individual defendants believed or
intended. An assertion by a defendant that throughout a transaction he
acted honestly does not have to be accepted but has to be weighed like any
other piece of evidence. If that was the defendant's state of mind, or may

© 2018 The Incorporated Council of Law Reporting for England and Wales

A    have been, he is entitled to be acquitted. But if the jury, applying their own notions of what is honest and what is not, conclude that he could not have believed that he was acting honestly, then the element of dishonesty will have been established. What a jury must not do is to say to themselves: 'If we had been in his place we would have known we were acting dishonestly so he must have known he was.' What they can say is: 'We are sure he was acting dishonestly because we can see no reason why

B    a man of his intelligence and experience would not have appreciated, as right-minded people would have done, that what he was doing was dishonest.' "

71   This passage was treated in *R v Ghosh* [1982] QB 1053 as supportive of a subjective test of dishonesty. However, its context was an

C    alleged banking fraud consisting of dealing with money of lenders and depositors in ways which were likely to, and did, lead them to lose their money. The ways included reckless and unsecured speculation, preferential payments to connected companies, the preparation of false accounts, the lodging of false Bank of England returns, and the creation of false discount bills when there was no underlying commercial transaction. The critical fact is that the defence was that the defendants did not know enough of what was

D    going on to be responsible, and/or that they trusted others to manage the bank. Since that was the issue, it is plain that the actual state of mind of the defendants was indeed the critical question for the jury, and that the jury had to approach it in the way explained by Lawton LJ. The issue in the case was not principally whether a state of knowledge, if once established, meant that the defendant's conduct fell to be characterised as dishonest. Indeed, a

E    defendant who knew about the means allegedly adopted would be hard pressed to suggest that he thought them honest.

72   The position became more complicated in *R v McIvor* [1982] 1 WLR 409, decided in November 1981. This was, like *R v Feely* [1973] QB 530, a case of unauthorised taking from the till by an employee. The defendant had asked to borrow money and, having been refused, helped himself nevertheless. He asserted by way of defence that he had always

F    intended to put the money back, as indeed he had done ten days later. The judge had told the jury that it must apply the standards of ordinary honest people to whether what the defendant had done was dishonest, and that what he himself thought about that issue was neither here nor there. The appeal came before a Court of Appeal presided over by Lawton LJ, who had delivered the judgments in both *R v Feely* and *R v Landy* [1981] 1 WLR 355.

G    The court held that the passage cited above in *R v Landy* applied only to the offence of conspiracy to defraud and not to the offence of theft (or, therefore, to the other Theft Act offences in which dishonesty was an essential element). For the latter, the "objective" lay standard of honesty was to be applied. In *R v Ghosh* [1982] QB 1053 the court treated this decision as suggesting a "subjective" test for conspiracy to defraud and an "objective" one for other offences, and understandably held that such a distinction could

H    not be sustained in logic or fairness. It is, however, at least possible, if not likely, that all that Lawton LJ was saying in *R v McIvor* [1982] 1 WLR 409 was that the passage in *R v Landy* [1981] 1 WLR 355 referred to the issue of the defendant's actual state of knowledge of what was happening, and to his actual belief in the truthfulness of any representation which he had made,

© 2018 The Incorporated Council of Law Reporting for England and Wales

rather than to the issue of whether an established state of mind is or is not    A
dishonest.  With hindsight it can be seen that the court perceived clearly that
if a wholly "subjective" test of when an established actual state of knowledge
or belief is and is not dishonest were to be applied, the consequences would
be that any defendant whose subjective standards were sufficiently warped
would be entitled to be acquitted.  It might be noted that in *R v McIvor*
[1982] 1 WLR 409 the court held that the judge's remarks about what the      B
defendant himself thought being neither here nor there might have been
taken by the jury as requiring them to disregard what he had said about his
actual state of knowledge or belief.  There had thus been a misdirection, but
just as in *R v Ghosh* [1982] QB 1053 the court held that the only possible
conclusion was that the defendant had been dishonest.

73    There was in fact only one pre-*Ghosh* case which frankly raised the
relevance of the defendant's own view as to the honesty of what he had done.    C
*R v Gilks* [1972] 1 WLR 1341 had been decided as long ago as June 1972.
The defendant had been handed, by mistake, as much as £100 too much by a
bookmaker.  He realised the mistake but kept the money anyway.  Asked to
account for doing so, he offered the view that whereas it would clearly be
wrong to keep such an overpayment if made by the grocer, bookmakers
were fair game.  He was convicted notwithstanding the judge's direction that    D
the jury should put itself in his shoes and ask itself whether *he* had thought
he was acting honestly or dishonestly.  Amongst other grounds of appeal
which the Court of Appeal rejected, he contended that the judge ought to
have made it yet clearer that even if he did not believe he had any claim of
right in law to keep the money, he would still not be guilty unless he did not
have the belief he asserted that bookmakers were fair game.  The Court of
Appeal rejected that contention also, saying that the judge's direction was a    E
proper and sufficient one.  Thus the case can be said to have endorsed the
(subjective) direction as to dishonesty given by the judge.  It did so, of course,
only to the extent that it rejected the defendant's argument that the judge's
direction was wrongly adverse to him.  The question whether the direction
was too favourable to him did not arise and was not addressed.  *R v Gilks*
preceded *R v Feely* [1973] QB 530, *R v Greenstein* [1975] 1 WLR 1353, *R v*    F
*Landy* [1981] 1 WLR 355, *Boggeln v Williams* [1978] 1 WLR 873 and *R v*
*McIvor* [1982] 1 WLR 409 but was not cited to any of those later courts,
which therefore did not analyse what if anything it had decided.  It might,
however, be thought that the facts of *R v Gilks* [1972] 1 WLR 1341 are a
powerful demonstration of the perils of the second leg of the *Ghosh* test, for
it means that if the likes of Mr Gilks are once truthful about their
idiosyncratic view of bookmakers, they are bound to be acquitted.         G

74    These several considerations provide convincing grounds for holding
that the second leg of the test propounded in *R v Ghosh* [1982] QB 1053
does not correctly represent the law and that directions based upon it ought
no longer to be given.  The test of dishonesty is as set out by Lord Nicholls in
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 and by Lord
Hoffmann in *Barlow Clowes International Ltd v Eurotrust International*
*Ltd* [2006] 1 WLR 1476, para 10: see para 62 above.  When dishonesty is in    H
question the fact-finding tribunal must first ascertain (subjectively) the
actual state of the individual's knowledge or belief as to the facts.  The
reasonableness or otherwise of his belief is a matter of evidence (often in
practice determinative) going to whether he held the belief, but it is not an

© 2018 The Incorporated Council of Law Reporting for England and Wales

417

**[2018] AC**                                    Ivey v Genting Casinos (UK) Ltd (SC(E))
Lord Hughes JSC

A   additional requirement that his belief must be reasonable; the question is
whether it is genuinely held.  When once his actual state of mind as to
knowledge or belief as to facts is established, the question whether his
conduct was honest or dishonest is to be determined by the fact-finder by
applying the (objective) standards of ordinary decent people.  There is no
requirement that the defendant must appreciate that what he has done is, by
those standards, dishonest.

B   75   Therefore in the present case, if, contrary to the conclusions arrived
at above, there were in cheating at gambling an additional legal element of
dishonesty, it would be satisfied by the application of the test as set out
above.  The judge did not get to the question of dishonesty and did not need
to do so.  But it is a fallacy to suggest that his finding that Mr Ivey was
truthful when he said that *he* did not regard what he did as cheating
C   amounted to a finding that his behaviour was honest.  It was not.  It was a
finding that he was, in that respect, truthful.  Truthfulness is indeed one
characteristic of honesty, and untruthfulness is often a powerful indicator of
dishonesty, but a dishonest person may sometimes be truthful about his
dishonest opinions, as indeed was the defendant in *R v Gilks* [1972] 1 WLR
1341.  For the same reasons which show that Mr Ivey's conduct was,
contrary to his own opinion, cheating, the better view would be, if the
D   question arose, that his conduct was, contrary to his own opinion, also
dishonest.

76   For these several reasons, this appeal must be dismissed.

*Appeal dismissed.*

Ms B L Scully, Barrister

E

_____

F

G

H

© 2018 The Incorporated Council of Law Reporting for England and Wales

THE HONOURABLE MR JUSTICE HILDYARD                    FL-2017-000001 & FL-2016-000019
Approved Judgment



Neutral Citation Number: [2019] EWHC 2858 (Ch)

Claim No. FL-2017-000001
Claim No. FL-2016-000019

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND**
**AND WALES**
**FINANCIAL LIST (Ch D)**

Rolls Building
7 Rolls Buildings
Fetter Lane
London
EC4A 1NL

Date: 28th October 2019

**Before**:

**THE HONOURABLE MR JUSTICE HILDYARD**

- - - - - - - - - - - - - - - - - - - -

**Between**:

**THE PERSONS IDENTIFIED IN SCHEDULE 1 OF**          **Claimants**
**THE CLAIM FORM**
**(the "SL Claimants")**

**- and –**

**TESCO PLC**                                        **Defendant**

**And Between:**

**(1) MANNING & NAPIER FUND, INC.**                  **Claimants**
**(a company incorporated in the United States of**
**America)**
**(2) EXETER TRUST COMPANY**
**(a company incorporated in the United States of**
**America)**
**(the "MLB Claimants")**

**-and-**

**TESCO PLC**                                                                                    <u>Defendant</u>

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**NEIL KITCHENER QC and RICHARD MOTT and SIMON GILSON** (instructed by
**Stewarts**) appeared on behalf of the SL Claimants

**PETER DE VERNEUIL SMITH QC, PHILIP HINKS and DOMINIC KENNELLY**
(instructed by **Morgan Lewis & Bockius UK LLP**) appeared on behalf of the MLB Claimants

**DAVID MUMFORD QC, MICHAEL WATKINS and NIRANJAN VENKATESAN**
(instructed by **Freshfields Bruckhaus Deringer LLP**) appeared on behalf of the Defendant.

Hearing dates: 25th - 27th September 2019
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE HILDYARD

**MR JUSTICE HILDYARD:**

*Introduction*

1. In these two actions, the Claimants in FL-2017-00001 ("the SL Claimants") and the
Claimants in FL-2016-000019 ("the MLB Claimants") claim against the Defendant
company ("Tesco") under section 90A and Schedule 10A of the Financial Services and
Markets Act 2000 ("section 90A", "Schedule 10A" and "FSMA" respectively) to
recover substantial losses in respect of their investment decisions in relation to shares
in Tesco which they made in alleged reliance on information published by Tesco and
falling within Schedule 10A.

2. The shares in Tesco to which the investment decisions for which the Claimants now
seek compensation relate were all held in what has come to be known as
"dematerialised form" through a computer-based system called CREST (which stands
for "Certificateless Registry for Electronic Share Transfer") using custodians (which in
turn used sub-custodians) to acquire, hold or dispose of those shares (as the case may
be).

3. The Uncertificated Securities Regulations 2001 [2001 No. 3755] ("the USR"), which have enabled and prescribed the basis for title to securities to be evidenced otherwise than by a certificate and transferred other than by written instrument through CREST as the "relevant system" make clear that the legal owner is the person whose name appears on the CREST register (who must be a member of CREST). It is not the CREST member's client or anyone else in the chain of intermediaries.[1]

4. None of the Claimants held shares in Tesco as a registered member of CREST. In the case of every Claimant in these two sets of proceedings, the shares held through CREST were registered in the name of a bank or financial institution providing custodian services, as is almost invariable in the dematerialised market. None of the Claimants, therefore, ever directly acquired, held or disposed of a legal interest in any of the shares.

5. Further, and again as is entirely usual, most of the shares in Tesco held by custodians are held by them, not for a claimant, but for another intermediary in what is commonly referred to as a 'custody chain'.

6. In a custody chain containing only one intermediary, that is, where the custodian is the trustee of the legal title for the relevant claimant and there are no further intermediaries between the custodian and the claimant, that claimant may have a direct beneficial or equitable interest. But, as (and with the consequences) I shall come on to explain at greater length, if the custody chain is longer, the claimant at the end of it is a beneficiary not of the trust of the legal title, but of a sub-trust.

7. Tesco has applied to strike out both claims on the basis that in such circumstances none of the claimants in a custody chain with more than one intermediary is a person to whom as an issuer it could be liable for any untrue or misleading statement in its published information under the relevant provisions of FSMA.

8. More particularly, Tesco's position is that the consequence of this is that the interests of claimants in such a custody chain is not an '*interest in securities*' within the meaning of paragraph 8(3) of Schedule 10A. Further, Tesco contends that, in any event, none of such claimants can properly be said to have '*acquired, continued to hold or disposed of*' any interest in securities (even if, contrary to Tesco's first submission, they had one).

9. The question as to the nature of the interests held in a dematerialised market thus raised is a systemic one of considerable importance. Most transactions in publicly held shares in companies listed in an exchange in the UK are in dematerialised form through CREST. The position of the Claimants is entirely typical of the dematerialised securities market. The market is very considerable indeed. The availability of remedies for untrue or misleading statements which have been the reason for investment decisions is obviously of great importance.

10. If Tesco is correct in its submissions as to the true construction of the relevant provisions there is a fundamental hole in FSMA: the provisions enabling investors   to

---

[1] Which is why it has been said that the language of '*custodian*', which belongs to the era of certificated securities, is '*inaccurate and can be confusing*' because it tends to suggest that the custodian's title to the shares derives from that of its client, whereas the true position is the opposite: see L Gullifer and J Payne, Intermediation and Beyond (2019) 7; M Yates, 'Global Custody' in M Blair QC et al (eds), Financial Markets and Exchanges Law (2nd edn), para 18.02.

vindicate their rights are unfit for purpose. The SL Claimants and the MLB Claimants submit that Tesco's submissions are misconceived.

### Facts

11. For the purpose of this strike-out application, it is common ground that the Court must assume that (a) Tesco's published information was false (b) Tesco knew that the information was false (c) the SL Claimants and the MLB Claimants acted in reasonable reliance on that information and (d) they have suffered loss as a result. The evidence has gone to the workings of the market in dematerialised securities, and the manner in which the various Claimants held their investments in Tesco. It may be helpful to summarise key aspects of the CREST system.

### CREST in greater detail

12. CREST went live in July 1996. Until then, most transfers of interests in registered securities in the UK were effected by transfers of paper certificates. This system came under increasing pressure as trading volumes rose and brokers and transfer agents were unable to keep pace with the administration required.

13. A system for title to shares and transfers of such title in a computer-based system (a 'central securities depository' or 'CSD') became essential. CREST is the only CSD in the UK approved by HM Treasury. CREST is operated by Euroclear UK & Ireland Ltd which is the "Operator" for the purposes of the USR. The shares of most listed companies in the UK are now held in dematerialised (sometimes referred to as 'uncertificated') form through CREST.

14. The operation of CREST is regulated by statute. Only securities registered in the UK, Republic of Ireland, Isle of Man, Jersey and Guernsey are eligible for registration on CREST. Since 1997 the Listing Rules have required listed securities to be eligible for electronic settlement, and thus in practice all UK-listed securities are capable of settlement via CREST. An issuer can elect to make its securities wholly dematerialised; and paper shares are due to be phased out by 2025 at the latest.

15. Under the CREST system, shares are registered in the name of the CREST member. There are "system-members" and "personal members". It is possible for an investor itself to become a CREST member, and some investors do so, but that is very expensive, and so it is more usual to use a "system-member". Thus, the principal members of CREST are custodian banks and other large financial institutions.

16. Every system-member must nominate a bank to be its settlement bank. It is, therefore, usual for the ownership structure to include a chain of intermediaries (as in this case), with the CREST member at one end of the chain (referred to as a custodian) holding for another intermediary (e.g. another custodian) and so on until the ultimate investor at the other end of the chain.

17. The chain of ownership is in another sense indirect because fungible securities such as the Tesco Shares are typically pooled at each stage/link of a custodianship chain. Each CREST member has an omnibus account with CREST in which all securities of a particular issuer (such as Tesco) are held. Those securities are allocated in the books and records of the CREST member (but not of CREST itself) to its clients.

18. Where the CREST member is a sub-custodian, the custodian it holds for will typically have only an omnibus account with the sub-custodian which is operated in the same

way. These omnibus accounts are segregated from the custodian's own assets and the client has the right to call for the delivery up of the legal title to the securities to it or its order. The legal analysis apparent from the case law is that where the intermediary holds the securities for its account holders in a common pool the individual investor is co-owner in equity with other investors.[2]

19.  The key feature of intermediated securities held in a custody chain is that the ultimate investor (meaning the person for whose account the securities are ultimately held) is given the benefit of a right without holding the right itself.[3] It has a "right to a right". An investor in intermediated securities cannot enforce the rights attached to the shares (or other securities) against the issuer, although it is entitled to expect that those rights will be exercised in accordance with its wishes as expressed through the chain of interests.

20.  Dematerialised securities are transferred by way of computerised book-entry transfers in the accounts of different CREST members. A useful summary of the working of the CREST system may be found in paragraphs 5 and 6 of the judgment of Lewison J (as he then was) in *Mills v SportsDirect* [2010] EWHC 1072 (Ch)[4].

21.  The custodian is not a party to, or involved in, the purchase contract. It is not an actor in the investment decision. The custodian will usually only find out about the purchase contract after it has been entered into. The custodian's role is typically limited to settlement of the trades.

22.  Settlement is the performance of the trade. The buyer nominates a custodian to which it wishes its legal title to pass. The seller will usually pass legal title from its pre-existing custodian, although that is not inevitably the case. Settlement on CREST involves matching instructions being given and received by the seller's and buyer's respective custodians.

23.  Where a seller and buyer have the same custodian, the custodian / sub-custodian may settle the trade by an internal book transfer, without any need to issue instructions to or inform CREST at all. This is called "internalised settlement" and legal title will (nominally at least) not change.

24.  Clearing occurs after trading but prior to settlement: -

    (1)  A clearing house will aggregate the delivery and payment obligations of the participants in the clearing system, in order to establish each participant's net balance in relation to each type of obligation or asset (e.g. Tesco shares).

    (2)  Given the high degree of consolidation of trades amongst a few large custodian participants, netting dramatically reduces the number of book-entry transfers between different CREST participants each day.

    (3)  This is another reason why a securities trade may not correspond to a change in legal ownership. For example, if HSBC Plc had to clear a large number of trades

---

[2] See FMLC, 'Property Interests in Investment Securities' (2004) at para. 6.1(4); also *Hunter v Moss* [1994] 1 WLR 452 (CA).
[3] See Ben McFarlane and Robert Stevens, 'Interests in Securities: Practical Problems and Conceptual Solutions' in chapter 2 of L Gullifer and J Payne 'Intermediated Securities: Legal Problems and Practical Issues (2010).
[4] See also M Yates and G Montagu, The Law of Global Custody (4th edn), paras 9.1-9.41.

in Tesco shares for different clients in a day, but the aggregate number of purchases and sales those clients had entered into was equal and opposite, there would be no need for the number of Tesco shares it held at CREST to change.

25. It follows that whether or not legal title to shares changes as the result of a share purchase or sale is largely a matter of mathematical fortuity.

*How the Claimants' shares were held in this case*

26. Turning to the particular case, the way in which the Tesco shares were held in the case of the SL Claimants exemplifies the "custody chains" whereby dematerialised securities are held. The 11th witness statement of Sean Norman Upson (made on 20 September 2019), who has responsibility for the conduct of these proceedings on behalf of the SL Claimants, he explains that in the SL Claim, the SL Claimants are all institutional investors but clarifies that there is a range of investment structures in the claimant group. Quoting from that witness statement:

> "In some cases, the Tesco share purchases and retentions that are the subject of the claim were made by in-house investment management teams of large pension funds. In other cases, the purchases and retentions were made by an independent investment manager pursuant to an investment mandate from an institutional client, or by independent investment managers on behalf of collective investment vehicles marketed to individual and institutional investors in the US, Europe and Asia."

27. Mr Upson continues:

> "As is now common across international securities markets, the Tesco shares purchased and retained on behalf of most of the SL Claimants were not held directly by the institutional client or investment vehicle but held indirectly on their behalf by a nominee shareholder or an independent custodian. Where the SL Claimants engaged independent custodians, these custodians sometimes themselves held the shares for the SL Claimants' account indirectly by using local sub-custodians and/or nominees. The indirect holding structure via a custodian and sub-custodian gives rise to the so-called 'custody chains', which are a common feature of institutional investment in UK listed securities.
> …
> In most cases, the custodian was a third-party custodian bank, such as State Street Bank and Trust Company, JPMorgan Chase and BNY Mellon. In the case of Claimant 9, Rathbone, the shares were held by a nominee within the same corporate group, Rathbones Nominees Limited."

28. In the MLB Claim, the position of the MLB Claimants is explained in a skeleton argument on their behalf as follows:

> (1) The First Claimant, Manning & Napier Fund, Inc ("Fund"), appointed The Bank of New York Mellon ("BNYM") to act as custodian of the Shares pursuant to a custody agreement that is governed by Massachusetts law ("the Fund Custody Agreement"). BNYM in turn used The Bank of New York (Nominees) Limited ("BNY Nominees") to hold the Shares as sub-custodian.

(2) The Second Claimant, Exeter Trust Company ("ETC"), appointed State Street Bank and Trust Company ("State Street") to act as custodian of the Shares pursuant to a custody agreement that is governed by New York law ("the ETC Custody Agreement"). State Street in turn used State Street Nominees Limited ("SS Nominees") to hold the Shares as sub-custodian.

29. Further, by assignments dated 13 and 20 September 2019, BNY Nominees and SS Nominees as Sub-Custodians assigned their rights with respect to the Shares (including any claims they may have arising from the transactions pursuant to which they were acquired or disposed of) to the MLB Claimants ("the Assignments"). Notice of the Assignments was given to Tesco by letters dated 16 and 20 September 2019.

30. The question is whether in the above circumstances, the SL Claimants and the MLB Claimants are persons who have acquired, continued to hold or disposed of Tesco Shares so as to have standing to sue for compensation under section 90A and Schedule 10A of FSMA.

*Sections 90A and Schedule 10A FSMA*

31. Section 90A of FSMA (as in force since 2010) states that Schedule 10A makes provision about the liability of issuers of securities to pay compensation to:

> "*persons who have suffered loss as a result of (a) a misleading statement or dishonest omission in certain published information relating to the securities.*"

32. Para 3(1) of Schedule 10A (introduced in 2010) provides for compensation to be paid:

> "*to a person who acquires, continues to hold or disposes of securities in reliance on published information to which this Schedule applies*"

and who has suffered loss as a result of any untrue or misleading statement in it (or omission of any matter required to be included in it).

33. Paragraph 8 contains rules of interpretation which apply to Schedule 10A. Of central importance to the present application is the definition given in paragraph 8(3):

> "*References in this Schedule to the acquisition or disposal of securities include:*
>
> *(a)    acquisition or disposal of any interest in securities, or*
>
> *(b)    contracting to acquire or dispose of securities or of any interest in securities,*
>
> *except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.*"

34. The provisions of s.90A and Schedule 10A quoted above have been in force since 2010. Prior to then, the first version of s.90A (enacted in 2006) was in force. For present

purposes it suffices to note that the earlier iteration of s.90A provided (in s.90A(9)(b)) that:

> "*references to the acquisition by a person of securities include his contracting to acquire them or any interest in them.*"

*Tesco's two arguments based on statutory construction*

35. Initially, Tesco sought to contend that absent proof of "special circumstances" only the legal owner would have a claim. Tesco quickly had to accept, however, that the effect of paragraph 8(3) in Schedule 10A is to extend the statutory cause of action to a person with an equitable proprietary interest as well as the legal owner of the securities.

36. There are two limbs of Tesco's case as to the construction of paragraph 8(3) in Schedule 10A:

    (1) The first limb of Tesco's case is that none of the Claimants had an *"interest in securities"* within the meaning of that paragraph because none ever acquired an equitable interest in Tesco shares;

    (2) The second limb is that, in any event, and even if any had a qualifying interest, none of the Claimants can be said to have *"acquired"* or *"disposed"* of an interest in securities, or *"contracted to acquire or dispose of securities or of any interest in securities"* pursuant to the transfer of legal ownership in the CREST register and the creation or extinction of such interest as they acquired or disposed thereby.

37. I shall elaborate on these limbs later by reference to the case law cited in respect of them; but it may assist to summarise now Tesco's principal submissions:

    (1) As to the first limb, Tesco submits that the investor at the end of the chain of intermediation, though it has an obvious economic interest in the Shares, has no proprietary interest in them because the legal rights it has can be asserted only against the person immediately preceding it in the 'custody' chain, and not against the holder of the legal title, still less against the Shares in specie. It submits that such an economic interest does not suffice.

    (2) As to the second limb, Tesco submits that there can be a relevant *"acquisition"* or *"disposal"* of securities or an interest in securities (relevant in the sense of bringing the acquirer or disponor within the ambit of Schedule 10A) only if there is a dealing in <u>that</u> interest by the disponor; whereas the very most that the ultimate investor has (and even then, only if Tesco is wrong on its first limb) is a beneficial interest which upon a transfer may be created or extinguished but is not acquired or disposed of.

38. Tesco accepts that its construction would render Schedule 10A ineffective in relation to claims by intermediated securities; but it contends that these consequences flow from a failure of the law in this regard to keep pace with developments in the market, and a failure in the legislative drafting to address properly the legal ramifications of the chains of intermediation and of the change from dealings by certified transfer in certificated securities, with a single intermediary at most, and where the ultimate investor was in law the undoubted owner of the relevant securities. Mr David Mumford QC, leading Mr Michael Watkins and Mr Niranjan Venkatesan, submitted on behalf of Tesco   that

there was a gap which could not and should not be bridged by what Lord Collins of Mapesbury JSC called in *Enviroco Ltd v Farstad Supply A/S* [2001] Bus LR 110, at para. 49:

> *"an impermissible form of judicial legislation."*

39.   Lest at first blush it be thought that these arguments are over-technical, regrettably, the possible mismatch between the market practice of intermediation and the legal rules governing it is widely recognised.[5]

40.   As far back as 2004 the Financial Markets Law Committee ("the FMLC") recommended legislative intervention[6]. In 2014, the Law Commission observed that '*the law may have been left behind by the speed of recent changes*'; and it has just in August 2019 issued a call for evidence pursuant to a direction by the Government to conduct a '*scoping study of investor rights in a system of intermediated securities*'[7], noting that there is '*uncertainty as to the legal redress available to investors in certain situations.*'[8]

41.   Academic commentators have expressed specific concern too: Professors Benjamin and Gullifer, for example, have recently noted that a claim under section 90 FSMA "*is likely to run into difficulties in practice*" because "*it only applies where the claimant has 'acquired securities'*" and '*it is not at all clear that this would include the situation where the claimant acquired intermediated securities.*'[9]

42.   In short, the issues raised are serious ones of obvious systemic importance. The question whether ordinary principles of equity are sufficient to enable a comfortable co-existence between legislation originally devised for certificated securities and the special features inherent in the now preponderant market in intermediated securities is of continuing interest.

*Summary of Claimants' arguments*

43.   As in the case of the arguments raised by Tesco, I shall need to elaborate on the arguments on behalf of the Claimants that even if serious, the concerns as to the inadequacy of the drafting to cater for intermediated securities are misplaced, and certainly any difficulties are well within the jurisdiction of the court to cure, especially given the legislative purpose and the antecedents of the legislation in an extended process of consultation and in the need to comply with European legislation. In summary, however, these arguments are:

(1)   On behalf of the SL Claimants, Mr Neil Kitchener QC, leading Mr Richard Mott and Mr Simon Gilson, submits that Tesco's suggestion that the ultimate investor

---

[5] See, eg, Benjamin/Gullifer (above), 231 ('*the cases merely confirm what has been known by specialists…*'); and L Gullifer, 'Ownership of Securities: The Problems Caused by Intermediation' in L Gullifer and J Payne, Intermediated Securities: Legal Problems and Practical Issues (2010), 32.

[6] FMLC, 'Property Interests in Investment Securities: Analysis of the Need for and nature of Legislation relating to Property Interests in Indirectly held Investment Securities' (July 2004)

[7] Law Commission, 'Fiduciary Duties of Investment Intermediaries' (Law Com No 350, 2014), para 11.120; Law Commission Consultation (above), Appendix 1.

[8] Law Commission, 'Intermediated Securities: Call for Evidence' (August 2019).

[9] J Benjamin and L Gullifer, 'Stewardship and Collateral: The Advantages and Disadvantages of the No Look Through System' in L Gullifer and J Payne, Intermediation and Beyond (2019), 237. See also A Hudson, Securities Law (2nd edn 2013), para 23-13.

has only economic or contractual rights is wrong. The ultimate investor has the right to call for legal title in the securities to be vested in him or to his order. The securities are not available to any nominee in the custody chain to use in any way other than at the direction of the ultimate investor. The position as to property in the Shares is illustrated by what would occur on an insolvency. Critically, the securities are not available for distribution to the creditors of any nominee in the custody chain; they are protected in the event of insolvency and will be delivered up to the ultimate investor. Whether or not it is correct that the ultimate investor cannot enforce his proprietary rights directly against each participant in the chain (which will depend upon the precise terms of the trust) is not to the point. It does not mean that the interest is not properly characterised as proprietary. In any event, the words in Schedule 10A are apt to include the interest of the ultimate investor; to quote from the SL Claimants' skeleton argument:

> "Parliament would **not** have used the words "*any interest in*" had it intended to exclude sub-nomineeship. No reason has been identified for excluding investors who hold shares through sub-nominees (who will necessarily include most non-UK based equity investors and virtually all investors in corporate bonds)." [Emphasis as in the skeleton argument]

(2) As to the second limb of Tesco's case, the SL Claimants submit that the word "*acquire*" is capable of the broadest interpretation, such as to extend in its natural meaning to include any situation where an investor has acquired a security, whatever the length of the custody chain in which, having directed that legal title be transferred to his nominee, he has directed or agreed the shares in which he invested are held; and that the word "*dispose*", must be seen in the context of the words "*acquires, continues to hold or disposes*", so that its natural meaning in context includes any dealing by which the investor no longer "*continues to hold*" what he had previously acquired.

(3) On behalf of the MLB Claimants, Mr Peter de Verneuil Smith QC, leading Mr Philip Hinks and Mr Dominic Kennelly, adopted these submissions but adapted them to clarify that he accepted that a claimant under Schedule 10A did have to have acquired or disposed of a proprietary interest in the securities, but that the natural meaning of "*any interest in securities*" is wide enough to include what he described as "any interest of a proprietary nature", including an "indirect" proprietary interest, being an entitlement in the investor, exercisable through a chain of specifically enforceable contracts, to require the securities to be conveyed to it or otherwise held to its order.

(4) It was also submitted on behalf of the MLB Claimants that it was sufficient that they would be treated under the laws applicable to the 'custody' arrangements in its case as having a direct proprietary interest, and that the expert evidence to the effect that they did have such interests under such laws had not been challenged or contradicted.

(5) Mr de Verneuil Smith described Tesco's second limb as "unsustainable" on the basis that (a) it is incontrovertible that whereas before a given claimant's investment it had no interest in the Shares in which it invested, after that, it had (at least) an interest of some kind in respect of such shares that it had not had previously; and that (b) it is equally incontrovertible that when the custodian sells the securities, full ownership (i.e. including both legal and beneficial title) passes to the purchaser, and the investor can no longer be said to be interested in the securities: using the natural meaning of the word "disposed" (namely, to cease to hold or to remove), the investor must have "*disposed of*" its beneficial interest in the securities.

44. I turn to address these competing submissions, which were considerably elaborated, in greater detail.

*Elaboration of Tesco's submissions: first limb*

45. As indicated above in summarising the first limb of Tesco's case, its foundation is that the words *"interest in securities"* are a reference to a proprietary, as distinct from a purely contractual or economic, interest in the securities themselves. Mr Mumford elaborated on this as follows:

(1) First, he relied on the natural construction of the words. He acknowledged that there is no authority directly in point, but suggested that an analogy may be drawn from authorities as to the expression "interest in land". He submitted that in that context, the courts have consistently held that such a reference is to a legal or equitable interest in land, not to contractual or personal rights or economic interests.[10] He drew my attention to *Stevens v Bromley LBC* [1972] 1 Ch 400, 410A, where Salmon LJ observed that this expression:

> "does not include an interest in the loose or colloquial sense of someone being interested in the land."

(2) Second, he submitted that the natural construction of the words is fortified by the particular context in which they appear, that is in Schedule 10A, which is essentially concerned with the sale or purchase of property, not the sale or purchase of economic interests.

(3) Third, he cited the academic uncertainty expressed by, amongst others, Professors Benjamin and Gullifer (see references above) as to the nature of the interest which is acquired by an investor in intermediated securities.

(4) Fourth, he drew attention to the provision in paragraph 1(1) of Schedule 10A, which states that the Schedule applies only to securities that are admitted to trading in a relevant market '*with the consent of the issuer*'. Paragraph 8(2) reinforces this by clarifying that where the security is, for example, a depositary receipt, '*the issuer*' is to be understood as the issuer of the underlying securities only if it consented to the admission to trading of the depositary receipt itself. This, he submitted, is also the purpose of what he referred to as 'the tailpiece' to paragraph 8(3), which makes it clear that the holder of a depositary receipt (or other secondary security) cannot sue the issuer of the primary security

---

[10] See, eg, *Flynn v Secretary of State for Communities* [2014] EWHC 390 (Admin), paras 32-35 (Lewis J).

without establishing that it consented to the trading of the depositary receipt itself. He submitted that this provision established what he termed "the consent principle"; and that "to extend the words '*interest in securities*' to non-proprietary interests would represent a substantial infringement of the consent principle that underlies Schedule 10A" by enabling it to apply to transactions involving contracts that the issuer knows nothing about and which may not be directly related to the issuer's shares. He submitted that by contrast, if, as Tesco contends, the expression is limited to a legal or equitable interest in the issuer's shares, the infringement of the consent principle is modest because only someone with a direct, proprietary interest in the securities to the trading of which the issuer has consented would be able to sue under Schedule 10A.

(5) Fifth, Mr Mumford cautioned that the Claimants' approach would introduce uncertainty as to the scope of the sections such as would also increase the risk of multiple claims in respect of the same share transactions. He gave the example of a person interested in shares in a company which in turn held securities in Tesco where the value of the former shares could be affected by movements in Tesco's share price, and posed the question whether such a person would have standing to sue under Schedule 10A, and if so, how (for instance) that claim would be dealt with if the other company also sued.

(6) He also pointed out that section 90 FSMA (which provides for the payment of compensation for untrue or misleading statements in, or omissions of required particulars in, listing particulars) also extends to any person who has acquired or contracted to acquire the shares the subject of the particulars *"or any interest on them"*, but does not require proof of reliance. That, Mr Mumford suggested, throws wide open the pool of claimants if the italicised expression in the context of sections 90 and 90A is given a broad construction. He added that one of the defences to a section 90 claim is that the person responsible published a correction of the misstated prospectus "*in a manner calculated to bring it to the attention of persons likely to acquire the securities*" (Schedule 10, para 3(2)(a)), and that if the words '*acquire the securities*' extend to non-proprietary interests, or to interests acquired without a dealing in them, then the range of persons '*likely to acquire*' them is likely to be so wide as to neuter this defence or at any rate make it less effective. He submitted that neither difficulty would arise on Tesco's construction because the legal owner would have a claim in respect of an acquisition of the legal interest and the beneficial owner in respect of an independent acquisition of the equitable interest.

46. Most of all, however, he emphasised that it is clear from the words '*in the securities*' that the proprietary interest he submitted was necessary must be in the securities themselves, and not in some other property. He gave, as a simple example from the facts of this case, the following: suppose that X, a sub-custodian, is the registered holder and therefore the legal owner of the Tesco shares, and holds those shares on trust for Y, a custodian, and that Y in turn holds its beneficial interest on trust for Z, the ultimate investor. In such a case, Y has an equitable interest '*in the securities*' but Z does not. In support of the proposition that, in line with this example, the ultimate investor at the end of the chain of intermediaries has no equitable or other proprietary interest in the shares held by the 'custodian' in the first link of the chain, Mr Mumford relied especially on the decision of Briggs J (as he then was) in *re Lehman Brothers*

*International (Europe)* [2010] EWHC 2914 (Ch) (often, and below, referred to as 'the *Lehman Rascals* case') and *re Lehman Brothers International (Europe)* [2011] EWCA Civ 1544.

47.   In the *Lehman Rascals* case, Briggs J observed at para 226 that (emphasis added):

> "…a trust may exist not merely between legal owner  and ultimate beneficial owner, but at each stage of a chain between them, so that, for example, A may hold on trust for X, X on trust for Y and Y on trust for B. <u>The only true trust of the property itself (i.e. of the legal rights) is that of A for X</u>. At each lower stage in the chain, the intermediate trustee holds on trust only his interest in the property held on trust for him. That is how the holding of intermediated securities works under English law, wherever a proprietary interest is to be conferred on the ultimate investor." [Mr Mumford's emphasis]

48.   As to the last phrase, Mr Mumford acknowledged that Briggs J recognised that '*a proprietary interest*' is conferred on the ultimate investor (B, in Briggs J's example); but he submitted that this is to miss the point, which is that though the ultimate investor does of course have a proprietary interest, it is not a proprietary interest '*in the securities*': it is a proprietary interest in the trust property which its own trustee (Y, in Briggs J's example) holds on trust for it. That, he submitted, is why Briggs J emphasised that the only true trust of '*the property itself*' is that of the legal owner for its immediate client; and while that immediate client may well hold its own interest on a sub-trust for the ultimate investor, the sub-trust is not of the Tesco shares themselves.

49.   Mr Mumford referred to what he described as the basic principle that an equitable interest is a proprietary interest '*in the trust property*': *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669, 705F (Lord Browne-Wilkinson), and relied on that as meaning that there can be a proprietary interest '*in the securities*' only if the trust property consists of the Tesco shares themselves, rather than an interest in Tesco shares.

50.   The lesson, he submitted, is that it is crucial to identify what as a legal matter is the trust property. In a case where the legal owner acted as custodian for the claimant directly, the legal owner/custodian is the trustee of the shares of which it is legal owner and (assuming the application of English principles of law and equity) the claimant would have the equitable proprietary interest in such shares. But where there is a chain of intermediaries, so that there is at least one intermediary between the legal owner and the claimant, the trust property held by each intermediary after the custodian is not in the shares but in the trust of the trust. Mr Mumford submitted that once the trust property held at each stage of the chain is properly appreciated, it is clear that any claimant in a custody chain involving more than one intermediary had neither a legal nor an equitable interest in the Shares, only a right to performance of the trust. Mr Mumford also cited Sir Roy Goode QC's statement that in a custody chain "*[t]he subject matter of the sub-*

*trust is the beneficial interest that the intermediary has, rather than the underlying securities themselves.* "[11]

51.     More particularly as regards the facts in the two proceedings, he emphasised that not only is none of the Claimants in either claim the legal owner of relevant shares; but also that:

(1)     In the SL Claim, the details so far provided do not enable a comprehensive statement of the nominee arrangements or custody chains in which each Claimant's shares were held. In the case of the 'Rathbone Claimants', Rathbones Nominee Limited ("RNL"), the legal owner, acted directly as custodian or nominee for Claimant 9 in the SL Claim, Rathbone Investment Management Limited ("RIML"). But it appears that many, if not most, other SL Claimants held their interests in Shares through custody chains involving one or more intermediary. A typical example is the claim by Claimant 29, BBH Trust, where the Tesco shares in respect of which BBH Trust sues were registered in the name of BBHISL Nominees Ltd, which was a nominee of HSBC plc, which acted as sub-custodian to BBH & Co, which acted as custodian to the Claimant, BBH Trust.

(2)     In the MLB Claim (in which a useful structure chart was appended, which I also append to this judgment marked 'A') the evidence provided on behalf of the MLB Claimants confirmed that all the Tesco Shares in respect of which the MLB Claimants purport to sue were registered in the name of third-party custodians, with at least one sub-custodian in a custody chain where the last link is the Claimant (investor).

52.     Accordingly, Mr Mumford submitted that, except in the case of SL Claimants in a like position as RIML, none of the Claimants in either claim could have had any legal or equitable interest in the Tesco Shares.

53.     As to the argument raised by the MLB Claimants that some of its 'custodian' arrangements were governed by (in some cases) New York law and (in other cases) Massachusetts law and that under such laws the MLB Claimants would be treated as having a "property interest" in the Shares, Mr Mumford submitted that English law governs the issue of standing and that the question whether the package of rights which each person in a custody chain has is to be categorised as proprietary or not is to be determined by English law. Mr de Verneuil Smith appeared to accept this, since he agreed that I should not be troubled at this stage of the proceedings with any issue as to the application of foreign law for the purpose of this application and making my determination as to what interest would suffice for the purposes of a claim.

*Claimants' arguments to rebut first limb of Tesco's case*

54.     On behalf of the SL Claimants, Mr Kitchener sought to dismiss as misconceived Tesco's analysis to the effect that the statutory remedy is not available where the shares

---

[11] R Goode and L Gullifer, Legal Problems of Credit and Security (6th edn), para 6-18. See also M Bridge et al, The Law of Personal Property (2nd edn), para 6-051 ('*Apart from the first-tier intermediary, who can be said to have an equitable interest in "the securities", all other holds in the chain have an equitable interest in the equitable interest held by the intermediary directly above them*'); and Yates (above), para 18.09 ('*The use of a custodian of itself changes the nature of the asset held by a custody client…Instead of holding legal title to the securities, the custody client holds various rights against the custodian*').

are held through a structure including at least one sub-nominee. He submitted that this would flout the intention of the statute without any good reason; and that the words "any interest" are words of broad import, not requiring the interest to be proprietary and easily capable of extending to the interests of the ultimate investor.

55.   As indicated above, Mr Kitchener submitted in that regard that Schedule 90A "extends beyond proprietary interests"; but that even if it did not, Tesco is wrong to suggest that the ultimate investor in intermediated securities has only economic or contractual rights. Rather, their interests have the hallmarks of, and are, proprietary interests.

56.   The true legal analysis, according to Mr Kitchener (supported by Mr de Verneuil Smith for the MLB Claimants) is that:

   (1)   An investor has a beneficial interest in securities held for it by its custodian, and the right to enjoy and direct all the rights in the bundle of rights which a share represents.

   (2)   where there is more than one link in the custody chain, the investor's interest in the securities remains a beneficial proprietary interest: the investor is entitled to the same enjoyment and direction of the bundle of rights as it previously had, and that is so even if an intermediary up the chain goes into an insolvency process since the rights are in no sense the property of that intermediary: no-one but the investor can be said in any meaningful sense to own and enjoy those rights.

57.   This, Mr Kitchener submitted, entirely accords with the analysis of the Law Commission in the "*Intermediated Securities: Call for evidence*" paper relied upon by Tesco:

   (a)   in para. 1.31 the Law Commission describes the ultimate investor in a chain including sub-nominees as "*own[ing] a beneficial interest in the securities*";

   (b)   in para. 2.45, the Law Commission refers to, "*the ultimate investor having a beneficial interest in the securities*";

   (c)   in para. 2.46 the Law Commission refers to the "*ultimate investor*" and the "*beneficial owner*".

This also reflects the words used by Briggs J in *Re Lehman Bros*[12] at para 163, where he refers to the ultimate investor as the "*ultimate beneficial owner*".

58.   Mr Kitchener further submitted that Parliament would not have used the words "***any interest in*" (**a change from the word "an" in previous legislation) had it intended to exclude sub-nomineeship: and that Tesco had identified no reason for excluding investors who hold shares through sub-nominees (and thus most non-UK based equity investors and virtually all investors in corporate bonds).

59.   Mr de Verneuil Smith, effectively on behalf of all the Claimants (since there was sensible co-operation between the Claimants in the presentation of different aspects of submissions to which both subscribed, which I much welcomed), added to these

---

[12] [2012] EWHC 2997 (Ch.)

submissions the contention that the provisions in question are part of a legislative scheme intended to transpose into or at least reflect in domestic law the (European) Transparency Directive [Directive 2004/109/EC of 15 December 2004] and must be interpreted in conformity with its objectives. Mr de Verneuil Smith drew my attention to parts of the Explanatory Notes to the Companies Act 2006, and especially to note 1636, which states that the insertion of

> "sections 90A and 90B into FSMA…establishes a regime for civil liability to third parties by issuers admitted to trading on a regulated market in respect of disclosures made public in response to provisions implementing obligations imposed by the Transparency Directive."

60. He reminded me that 'Hansard' is admissible (as Mr Mumford and Mr Kitchener agreed it was) for the purposes of establishing the context in which a statutory provision has been introduced: and it is clear from the debate in Parliament when section 90A was enacted in its original form that (a) the Transparency Directive required Member States to ensure that an appropriate liability regime was in place in respect of disclosures required by the Directive, with a view to encouraging accurate and timely disclosure by issuers and promoting investor protection;[13] and (b) HM Government concluded that the uncertainty about the scope of issuer liability at common law was such that a statutory regime was required to ensure that the UK had fulfilled its obligation to implement the Transparency Directive.[14]

61. Mr de Verneuil Smith also put weight on the fact that the amendment of s.90A in 2010 followed a comprehensive review (by Professor Davies and HM Treasury) of the statutory issuer liability regime, and a process of consultation which included submissions from market practitioners, city law firms and, for example, the FMLC. That process and the objectives and concerns expressed may illuminate further the purpose and intention of the legislation.

62. With this as the background, Mr de Verneuil Smith submitted that the '*Marleasing* principle' (see the ECJ case of *Marleasing SA v La Commercial Internacional de Alimentacion SA* [61989CJ0106 (1990)] required this court,

> "with a view to making such safeguards equivalent throughout the Community…to interpret its national law in the light of the purpose and the wording of that directive…"

63. To that end, Mr de Verneuil Smith submitted, I should, if necessary, (a) not be constrained by conventional rules of construction and (b) adopt as broad an interpretation as the words could allow, even if that involved departure from the strict and literal application of words or expressions in the provision which the legislature has elected to use, and (c) imply any words necessary to comply with Community law: see a summary of the application of the *Marleasing* principle in the judgment of Sir Andrew

---

[13]  Transparency Directive, recital (17) and Article 7.
[14]      Hansard 6 July 2006.

Morritt C in *Vodafone 2 v Revenue and Customs Commissioners* [2010] Ch 77 at [37] (citing also *Pickstone v Freemans plc* [1989] AC 66).

64. Accordingly, Mr de Verneuil Smith submitted that any doubt as to the ambit of the meaning of the expression *"any interest in securities"* should be resolved in favour of a construction giving effect to the intention of the Directive and the domestic legislation enacted to implement it which would ensure that those entitled to vindicate their right to compensation in respect of untrue or misleading statements in published information should include persons having the entire economic interest in shares acquired or disposed of on the faith of the statement, albeit that such shares might (at their direction) be held by custodians and sub-custodians in accordance with developing market norms.

65. As to whether such a facilitative or teleological approach was indeed necessary, Mr de Verneuil Smith emphasised that his primary case was that even adopting a stricter approach the expression was still broad enough to cover the derivative interests of his clients in respect of the Shares. He submitted that the expression *"interest in shares"* is not a term of art; but the prefix *"any"* makes clear the intention of the legislature that it should be of broad embrace; and even if (as he, though not Mr Kitchener, was content that it should be) it was limited to an interest which is proprietary in nature, still it was satisfied in the case of his clients. He submitted orally that the "pretty classic conventional understanding of what a proprietary interest is…is that it is an ability to call for and possess and enjoy the thing." In answer to my questioning, he acknowledged that the investor at the end of the custody chain would not have the right to give instructions in respect of the thing to its legal owner; he had no such "direct right"; but by instructions, as it were, up the line it could indirectly convey such instructions and that would suffice as *"any interest in securities"*. He drew that distinction between a right and an interest: and the latter would, he submitted, suffice.

66. He bolstered this submission by reliance, in effect by analogy, with cases referred to in *Spry 'The Principles of Equitable Remedies'* 9th ed. at page 89 on the position of a sub-purchaser with a specifically enforceable interest in the purchase, and especially *Shaw v Foster* (1872) LR 5 HL 321 at 338-339; and also with a New Zealand case, *McDonald v Isaac Construction Co Ltd* [1995] 3 NZLR 612, where at a preliminary hearing to determine whether to maintain a caveat until a full hearing Tipping J, after a review of authority, determined at page 619 that:

> "there is no reason in principle why a sub-purchaser, whether by sub-sale or assignment, should not be regarded as acquiring an equitable interest in the land."

67. Mr de Verneuil Smith also tackled the *Rascals* case, submitting that it had been "mischaracterised and misunderstood". I fear I may not thereby do full justice to his quite expansive reasons for so stating; but I think that the burden of them was that all Briggs J was explaining (at the relevant part of his judgment for these purposes, being [226]) was that the only "true trust of the property itself (i.e. of the legal rights) is that of the legal holder for the immediate custodian", which is, of course, obviously correct, but does not signify that therefore the investor has no qualifying "interest" in the securities under the series of sub-trusts which the rest of the custody chain represents. Although Mr Mumford in reply described this as merely a "convenient shorthand", Mr

de Verneuil Smith highlighted also that Briggs J (in the same paragraph) went on to explain that:

> "That is how the holding of intermediated securities works under English law, wherever a proprietary interest is to be conferred on the ultimate investor."

[Emphasis supplied]

68. Mr de Verneuil Smith relied also on the decision of the Court of Appeal in the *Rascals* case (neutral citation: [2011] EWCA Civ 1544) as indicating (at [49]) that

> "when one speaks of acquiring or disposing of securities in the context, one means dealing with rights as against a depositary (directly or indirectly) who holds the relevant securities of the same type, it makes no difference to the legal analysis."

69. On that basis, Mr de Verneuil Smith, with a slightly different perspective in this regard to that of Mr Kitchener, was content to restrict the scope of *"any interest in securities"* to any form of proprietary interest, provided that what he termed an "indirect" proprietary interest was included within that concept. As to the notion of an "indirect" proprietary interest, he explained that what he meant was "*the right to put another person in their shoes as the holder of their exclusive rights as owner*" of the securities[15]. Even if that right could only be exercised via instructions repeated along the chain, or by "collapsing" the sub-trusts pursuant to the principle in *Saunders v Vautier* (1841) Cr. & Ph. 240, he submitted that it should be treated as proprietary, citing the major trust text books (including *Lewin on Trusts* 19th ed. at 1-046, Underhill and Hayton, *'Law of Trusts and Trustees'* 19th ed (2006) at 2-10) and Spry, *'Equitable Remedies'*. 9th ed. (2014) at pp.89 to 90).

70. Mr de Verneuil Smith submitted that further support for this approach could also be obtained from a consideration of the definition of the expression *"interest in a security"* in the Uncertificated Securities Regulations 2001 (SI 2001/3755) ("the USR"), the enactment of which predated the coming into force of s.90A and Schedule 10A. The USR share a very similar context with s.90A: they have as their purpose the evidencing of title to uncertificated securities, and they make provision for transactions pursuant to which such securities are acquired and disposed. By Article 3(1) of the USR, "*interest in a security*" is defined to mean:

> "any legal or equitable interest or right in relation to a security, including –
>
>> (a) an absolute or contingent right to acquire a security created, allotted or issued or to be created, allotted or issued; and

---

[15] Underhill and Hayton at 2.15.

(b)   the interests or rights of a person for whom a security is held on trust or by a custodian or depositary."

71.   Mr   de   Verneuil   Smith   submitted   that   where   the   same expression is used in two similar contexts, a statutory definition in one context may be persuasive in the other: '*Craies On Legislation*', 11th ed. (2017) at 20.1.38; and *M v Advocate General for Scotland* [2013] CSOH 169; and that accordingly it may properly be inferred that the legislature had this definition in mind when the expression "*any interest in securities*" was used with respect to section 90A. If the USR definition were applied by the Court here, it would enable investors with proprietary rights in securities such as the MLB Claimants to bring claims for compensation under s.90A. Such persons would satisfy the statutory requirements by virtue of their falling within the opening words of the definition, or within sub-para (b). Given the breadth of the definition (particularly the words "*in relation to*" a security), it would be unrealistic to suppose that Parliament intended it to be confined to intermediated holding structures consisting of a single custodian.

72.   However, and although Mr de Verneuil Smith thus focused on the sufficiency of any form of proprietary interest, and was plainly reticent in suggesting any wider meaning, primarily (as it seemed to me) for fear of increasing the risk of so broadening the scope as to increase the risk of multiple and possibly conflicting claimants, he did in the alternative submit that even if the language was strictly inapt, its intention to give a remedy to acquirers or disponors of interests held through sub-trust in the intermediated securities market was clear and if necessary a sufficiently expansive meaning should be supplied to give the words meaning to achieve that objective accordingly.

*My conclusions as to the first limb*

73.   It is unsettling that the expression providing the touchstone of standing to make a claim for compensation in respect of untrue or misleading statements or omissions in listing particulars or a prospectus should be open to such legitimate disputation and doubt in its application to market norms. The intermediated securities market is of great practical importance and huge significance to the financial strength of UK plc: uncertainty is the enemy of stability and reliability in financial markets. It may be regretted that legislation intended to modernise should adopt expressions derived from a now almost defunct way of doing business. It is quite plain that intermediated securities held through CREST, as most are and all shortly will be in the UK market, are not the same as securities held directly in certificated form, even though economically they are the same. It is in some way surprising that this was not expressly recognised and provided for in FSMA. It appears that the FMLC recognised the potential issue and recommended a clarifying provision[16]; but this recommendation was not adopted.[17]

---

[16] "[I]t would be helpful to embody a specific rule in the statute that unless otherwise agreed an investor enjoys a bundle of co-proprietary and personal rights in and to securities held by his intermediary, including income and other benefits associated with the securities" [July 2004]

[17] It may also be noted that some academic comment has been in favour of the flexibility provided by sticking with equitable principles to resolve the matter rather than resorting to an inflexible statutory definition: see, for example, Ben McFarlane and Robert Stevens, 'Interests in Securities: Practical Problems and Conceptual Solutions' [2010], where they concluded that "…the practical needs recognised by the FMLC can be met without the need for any…statutory rule…paradoxically, perhaps, and in England at least, it is general legal concepts that can best solve the practical problems posed by intermediated securities."

74. The problem is compounded by what I regard as mixed messages from previous legislation. I have found it as much ground for concern as ground for comfort that in the USR 2001 a very similar expression (*"interest in a security"*) to that in issue in respect of sections 90 and 90A and Schedule 10A of FSMA is carefully defined. Whereas the Claimants fastened on this as a guide to the intended meaning of the expression used in FSMA, Tesco quite logically relied on the conspicuous absence in FSMA of a definition already crafted in the USR as a signal that the extended meaning was not intended to be adopted in FSMA, and that there was not intended to be parity of meaning between them. Although the genius of the common law is in working and fashioning answers to the interstices in legislation, the gap in this case is an uncomfortable one. To plug the gap with too broad a definition exposes the issuer, contrary to the invariable practice of the court, to indeterminate liability to an indeterminate class and/or uncertainty as to which of multiple claimants has the better claim. Against that, a deficient plug exposes the market to abuse and inadequate vindication of commercial wrongs.

75. I agree with Mr Mumford on a number of steps in his helpful analysis. As will already be apparent, I readily accept that where there is a chain of intermediaries, the investor at the end of the chain does not have any direct proprietary interest in the underlying security, nor can it enforce any rights held in the chain of sub-trusts directly against the issuer. As Briggs J explained in the *Rascals* case, the subject-matter of each sub-trust in the custody chain is the beneficial interest that the intermediary has and holds on trust, rather than the underlying securities themselves.

76. I also accept that the concept of an or any *"interest in securities"* must denote something more than a contractual right or economic interest in such securities if the 'custody chains', which by the time of the enactment of FSMA in its latest form had become the market norm and must have been taken to have been in the contemplation of the draftsman, are to have any legal sustainability. There are a number of reasons for this: two seem to me to be paramount. First, the custody chain would be a frail thing, liable to be broken by the insolvency of any intermediary, if the rights had not some other quality which took them out of the 'property' of such intermediary for insolvency purposes. Secondly, and also as indicated previously (as in argument), if any personal right or economic interest were to be sufficient to satisfy the expression *"any interest in securities"*, the class of complainants would be quite indeterminate, and almost inevitably competing and conflicted.

77. I also accept Mr Mumford's insistent warning, especially by reference to the *Westdeutsche* case, that it is essential not to bandy around the notion of equitable interest or proprietary right without carefully identifying its real subject matter; and that it is similarly wrong to treat sub-trusts as if they were contrivances which could be looked through for the purposes of identifying the true interest held by the ultimate investor.[18]

78. Lastly, in this list of areas of agreement with Mr Mumford's analysis, I accept his argument that the 'tailpiece' to paragraph 8(3) of Schedule 10A does not suggest any widening of the meaning of either *"Securities"* or *"any interest in securities"*. I agree with Mr Mumford that the 'tail-piece' or 'carve out' is there to ensure that the issuer should not be liable in respect of separately traded derivative instruments, which might otherwise loosely be treated as conferring an interest in the underlying securities

---

[18] See C.H. Tam, 'Exploding the myth that bare sub-trustees "drop out" Tru. L.I. 2017, 31(2), 76-92

represented by the derivative instrument, but which have not been admitted to trading on the securities market with its consent (and see paragraph 1 of Schedule 10A). I do not agree with Mr Kitchener that the carve-out of "*a depository receipt, derivative instrument or other financial instrument representing securities*" signifies that something less than a proprietary interest would suffice since otherwise (to quote his skeleton argument) "if "*any interest*" was as narrow as Tesco contends, the interests carved out would not come close to qualifying under paragraph 8(3)." That would be to load too broad a significance on the 'tailpiece'.

79. Where I part company with Mr Mumford is in the conclusion to be drawn from the above analysis. Mr Mumford submits that the interest of the investor, not being a directly enforceable trust interest in the securities, must therefore be personal or economic and not equitable and proprietary, and thus insufficient. In my judgment, the 'right to the right' which the investor has via the custody chain is, or can be equated to, an equitable property right in respect of the securities, and this is sufficient.

80. Mr Mumford, when I questioned him, chose to depict Briggs J's description of the investor as the "ultimate beneficial owner" as being simply a "convenient shorthand", which should not be taken to signify any view as to whether the investor in law had a proprietary interest in the securities. But I think Briggs J meant what he said, and (as one might expect) used the term advisedly to denote the proprietary interest vested in the investor through the custody chain; whether that is more properly characterised as an interest in relation to the underlying securities, rather than an interest in them, does not appear to me to matter: it is still capable of being within the embrace of the expression "*any interest in the securities*" within the meaning of Schedule 10A.

81. To my mind the analysis, and a further explanation of what Briggs J meant by describing the investor as the "ultimate beneficial owner", is to be found in another case arising out of the Lehman administration, *In the matter of Lehman Brothers International (Europe)* [2012] EWHC 2997 (Ch). There at [163] Briggs J said this:

> "It is an essential part of the English law analysis of the ownership of dematerialised securities that the interests of the ultimate beneficial owner is an equitable interest, held under a series of trusts and sub-trusts between it, any intermediaries and the depository in which the legal title is vested: see paragraph [226] of my judgment in the *RASCALS* case."

82. Put another way, there seems to me to be semantically no real doubt that the investor has an "interest" in the securities; and similarly, there is legally no doubt that such interest is equitable/proprietary; those are the hallmarks of beneficial ownership, as Briggs J terms the interest of the investor; and their presence suffices to qualify as "*any interest in securities*" for the purpose of Schedule 10A.

83. It would, to my mind, be odd to deny that the ultimate investor has such an interest. No one but the investor can claim any right of ownership beneficially, nor is the property in the share available in the event of the bankruptcy of any intermediary to any of its creditors: only to the investor whose 'property' in reality it is.

84. In the result, I have concluded that the expression "*any interest in securities*" can, by application of established distinctions between rights which are merely economic, contractual or personal, and rights which are in equity at least 'proprietary', be given sufficiently certain meaning to confine the class of potential claimants so as not to

expose the issuer to indeterminate liability to an indeterminate class whilst also ensuring proper vindication consistently with the admitted objectives of both the domestic legislature and the Transparency Directive.

85. In my judgment, the expression denotes something more than a mere personal or contractual right; the expression "ultimate beneficial owner" captures the position of the investor as the owner of "a right to a right" held through a waterfall or chain of equitable relationships which is unaffected by the insolvency of his intermediary, and enables it ultimately, even if indirectly, to enjoy the benefit of the bundle of rights which the securities represent to the exclusion of others (unless the ultimate beneficial owner has transferred them away, for example to a chargee).

86. In any event, in my judgment, even if the above analysis requires review, restriction or other refinement, the rights of persons holding intermediated securities through CREST, such as I understand all the Claimants to be, comprise an *"interest in securities"* such as to confer standing to sue under FSMA for compensation in respect of any untrue or misleading statement or omission in Tesco's published information if they can show that they did *"acquire, continue to hold or dispose"* of the securities in question in reliance upon that statement or omission.

87. I am fortified in that conclusion by the consideration that the adoption of this available interpretation as a matter of semantics is necessary to fulfil the purposes of the legislation. That consideration is the stronger given that, although Mr Mumford disputed this, it seems to me that these provisions were intended also to ensure a proper statutory regime of investor remedies for false statements or omissions required by the Transparency Directive in order to give teeth to the disclosure regime it requires, and compensation for breach of its rules.

88. Further, having regard to the long and detailed review of the legislation, and the process of commentary and debate which preceded its enactment in its present form, I cannot agree with Mr Mumford that the draftsman and legislature simply overlooked or misunderstood the process of intermediation or its legal attributes, and unwittingly deployed language which cannot conform to it. In my view, I must proceed on the basis that the draftsman and legislature did understand the market in intermediated securities, did not intend to strip away the rights of investors who chose that mode of holding their investment, and must have been persuaded that the words they used were appropriate to preserve and enhance such rights. Unless the words cannot be made to bear the meaning intended, then they should be made to do so. That seems to me a conventional approach to statutory interpretation: I do not need to determine whether the *Marleasing* principle applies, although it is a further consideration and comfort that the same objective is apparent in the Transparency Directive.

89. In short, whilst personally I might query whether the adoption of some suitably altered form of definition such as is in the USR might have been wiser, I do not see such mismatch between the plain practical objectives of the statutory provisions in question and the legal concepts which bind me that they cannot be reconciled.

90. I consider that the risk of multiple claimants, whilst important, is likely to prove more theoretical than real on the approach which I favour; and in any event, in my judgment, it is not sufficient to justify confining the application of the section so as to render it practically of no use or purpose in the context of the main market for shares. It is dangerous, and often foolish, to seek to extrapolate a general rule or proposition from a particular circumstance, and I would not wish to be thought to be doing so; but my

conclusion that the ultimate investor, as ultimate beneficial owner, does have standing, does not connote that anyone else than (probably) the legal owner does also.

91. The possibility of the legal owner also having standing is a risk inherent in any situation where equitable ownership and legal title are separate. Even in a certificated market, with no custody chain but where the securities are held (as was very usual) in a nominee or 'street name', there could be two claimants: the legal and the beneficial owner. In my view, however, the risk is unlikely to eventuate or cause a substantial problem. The custodian, though the holder of the legal interest, is (as previously noted) unlikely to have been more than a passive recipient, who will thus not have made any investment decision in reliance on published information, and so will have no claim under section 90A and Schedule 10A. The possibility of a claim under section 90 FSMA, in which context proof of reliance is not necessary, cannot be excluded; but it is not at all clear why a legal owner would wish to bring a claim in competition with the ultimate beneficiary; and if it did so, it should not be beyond the power of the Court to insist on a single claimant to vindicate the same right.

92. For the avoidance of doubt, I should not be taken to be deciding that persons having a lesser or more indirect interest, such as beneficiaries under a trust entirely separate from the intermediary chain in which relevant shares were held by the ultimate investor is trustee, or a company holding the shares in the ultimate investor (both being possibilities canvassed by Mr Mumford), would have standing under otherwise applicable provisions of FSMA.

93. All I am deciding is that for the reasons I have given, the Claimants have in each case an *"interest in securities"* sufficient to enable them to maintain proceedings for the purposes of section 90A and Schedule 10A FSMA, and these claims should not be struck out unless Tesco can establish its second limb of argument.

*Tesco's submissions: second limb*

94. The second limb of Tesco's case is intended to cover the position of Claimants which do have an *"Interest in securities",* either because of being in a direct relationship with the only custodian or because it is to be assumed that (contrary to the first limb of Tesco's case) all the Claimants have such an interest. Tesco's second limb of argument is that, even in those circumstances none of the Claimants can sue because none can be said to have *"acquired"* or *"disposed of"* their interest in Tesco shares within the meaning of paragraph 8(3).

95. In Tesco's skeleton argument, Mr Mumford illustrated his argument by reference to the Rathbone Claimants (see paragraph [51(1)] above), they being examples of claimants with a direct relationship with the legal owner. He accepted that a transfer by the legal owner (RNL) to someone else would plainly be a *"disposition"* of that legal title covered by paragraph 8(3). Equally, if RIML had assigned or sold its equitable interest, that would also have been covered. But, he submitted, that is not the Claimants' case. Their case is that each acquisition or disposal of Tesco shares by RNL as legal owner itself constitutes, as a matter of law, an acquisition or disposal of <u>RIML's</u> equitable interest and that RIML is therefore entitled to sue under Schedule 10A.

96. Mr Mumford's point is that the Claimants' construction of paragraph 8(3) therefore depends upon the proposition that it is possible to 'acquire' or 'dispose of' an interest without any dealing in <u>that</u> interest; which he submitted could not be so, on the    basis

that properly construed, there can be an '*acquisition*' or '*disposal*' of an interest in securities only if there is a transfer of, or dealing in, <u>that</u> interest (as distinct from some other interest) by the disponor. If that is right, Mr Mumford submitted, it necessarily follows that a purchase or sale by the legal owner of legal title does not constitute a purchase or sale of the beneficial interest: the beneficial interest may be created or extinguished, but it is not '*acquired'* or '*disposed'* of for the purposes of the paragraph and Schedule 10A.[19]

97. Mr Mumford elaborated on this argument as follows:

(1) He submitted that, simply as a matter of language, the natural meaning of the '*disposal*' of an interest in securities is that it is a reference to a dealing in <u>that</u> interest as a result of which it is transferred or ceases to exist, not to a dealing in a <u>different</u> interest. Thus, if RIML instructs RNL to transfer legal title to the Tesco shares, and RNL does so, it may be that RIML's equitable interest has been extinguished, but there has been no dealing in that interest and it would be an unusual use of language to say that it has been '*disposed of*' if there has been no dealing in the relevant interest itself.[20]

(2) He relied on two authorities, namely *Akers v Samba Financial Group* [2017] AC 424 and *Vandervell v IRC* [1967] 2 AC 291 (both at the highest appellate level):

(i) In the *Akers* case, Mr Al-Sanea, the legal owner of certain shares in Saudi Arabian banks, held them on trust for a company called SICL. Six weeks after SICL went into liquidation, Mr Al-Sanea, in breach of trust, transferred legal title to the shares to Samba in purported discharge of personal liabilities that he owed them. SICL brought a claim against Samba under section 127 of the Insolvency Act 1986, which provides that '*any disposition of the company's property*' is in certain circumstances void. Section 127 applies only to the property of '*the company*' (here SICL); the claim therefore turned on whether the sale of the shares by Mr Al-Sanea constituted a '*disposition*' of <u>SICL's</u> equitable interest. The Supreme Court held unanimously that it did not. Mr Mumford contended that this was because there was no dealing in the equitable interest itself; and he relied on the case accordingly as authority for the proposition that a transfer of legal title to shares by X does <u>not</u> amount to a disposition of Y's equitable interest in them, <u>even if</u> Y's equitable interest is extinguished by, or ceases to exist as a result of, that transfer. He relied on the judgment of Lord Mance JSC (at [51]), stating

---

[19] Mr Mumford contends that the same points apply *a fortiori* to '*acquisition*': in the context of Schedule 10A, the one is the mirror image of the other. Put another way, if there can be no '*disposition*' of an interest absent a transfer of, or a dealing in, the interest itself, it follows that there can be no '*acquisition*' of it either.

[20] Mr Mumford cited the way Professor Nolan puts it, '*it is perfectly comprehensible to call some dealing with an asset a "disposition", even if the result of that dealing is the destruction of that asset. But it is hard (as the Supreme Court appreciated) to see how some dealing with one item of property, that causes the determination of another, distinct, item of property, can be described as a "disposition" of the latter. The word "disposition" surely connotes at least some <u>dealing with the property in question, rather than the occurrence of an extrinsic event which triggered determination of the right</u>*': see RC Nolan, 'Dispositions and equitable property' (2017) 133 *LQR* 353, 357-58 (emphasis added).

> "What is clear, on any analysis, is that, where a trust exists, the legal and beneficial interests are distinct, and what affects the former does not necessarily affect the latter."

(i) In the *Vandervell* case, Mr Vandervell had an equitable interest in 100,000 shares in a company held on a bare trust for him by the National Provincial Bank. He instructed the Bank to transfer the shares (i.e. legal title) to the Royal College of Surgeons. The Bank did so; and this extinguished Mr Vandervell's equitable interest. (That was suggested to be similar to the facts of this case in that it is an example of Mr Vandervell as equitable owner (e.g. RIML) directing the Bank as nominee or bare trustee (e.g. RNL) to transfer legal title to the shares to a third party.) One of the issues that arose in the House of Lords was whether the transfer of legal title by the Bank to the RCS constituted a '*disposition*' of Mr Vandervell's equitable interest within the meaning of section 53(1)(c) of the Law of Property Act 1925: if it did, the transfer was void because it was not in writing. Their Lordships held (unanimously on this point) that it did not. Both Lord Upjohn (with whom Lord Pearce agreed) and Lord Donovan explained that in that case there was no dealing in the equitable interest itself: it ceased to exist as a consequence of a dealing in a different interest, namely the Bank's legal interest: see pp 312, 318. Lord Donovan added that there must be a dealing in '*the equitable interest as such*'. Mr Mumford relied upon *Vandervell,* like *Akers v Samba,* as authority for the proposition that a transfer of legal title by the legal owner does not of itself constitute a '*disposition*' of the equitable interest, even if the equitable interest would be extinguished by the transfer: extinguishment of an interest by virtue of a dealing with another interest is not to be equated with its disposition.[21]

(3) Mr Mumford's third submission in support of the second limb of his argument was that Tesco's construction is consistent with the scheme of Schedule 10A, whereas the Claimants' would undermine it. Given his earlier and repeated acceptance that the overall effect of Tesco's construction would be to render section 90A and Schedule 10A largely unworkable in relation to claims by the holders of intermediated securities, this was a bold submission; but it has its logic as follows:

(a) If it were possible for an interest to be disposed of without any dealing in that interest itself by the disponor, a very wide range of transactions would fall within paragraph 8(3): for example, the exercise by a third party of a special power of appointment

---

[21] He relied also on *Re Vandervell's Trusts (No 2)* [1974] Ch 269 as also being authority for that proposition, because the Court of Appeal held in that case that a subsisting equitable interest in an option was extinguished, but not '*disposed of*', when the option was exercised by the trustee: see 320C-D (Lord Denning MR) and 326C (Lawton LJ).

which terminates a subsisting equitable interest in Tesco shares held by someone else, or the extinguishment of an equitable interest by the acquisition of legal title by a *bona fide* purchaser for value without notice. Such transactions are far removed from the standard purchase or sale of shares to which Schedule 10A is intended to be applicable and are unlikely to have been in the contemplation of the draftsman as being within the object of section 90A.

(b) Instructions to custodians to buy and sell shares are sometimes given orally. If, contrary to Tesco's case, the extinguishment of an interest even without any dealing in it is a '*disposition*', it would, at least in some cases, not be possible for custodians to act on such instructions, because section 53(1)(c) of the 1925 Act would be applicable and the disposition would be void unless in writing.[22] As Harman LJ observed in the Court of Appeal in *Vandervell*,[23] this would lead to the '*exceedingly inconvenient conclusion*' that '*an owner...of shares registered in the names of bank nominees*' could not instruct the nominee to execute a transfer '*unless he accompanied it by a written instrument operating as an equitable assignment.*' The question would also arise as to the validity, in the absence of writing, of at least some of the transactions in respect of the Claimants purport to sue. None of these difficulties arise on Tesco's approach, which limits the concept of dispositions to dealings in the relevant interest that result in its extinction.

(c) More generally, the Claimants' construction leads to uncertainty as to the ambit of the provisions, and what transactions should qualify as acquisitions or disposals for the purposes of the relevant provisions.

98. Then the question is whether any, and if so what, extension to the ambit of potential liability and the pool of potential claimants was and is intended by paragraph 8(3)(b) of Schedule 10A and the extension of the notion of acquiring or disposing of any interest in securities to *"contracting to acquire or dispose"* of securities or any such interest.

99. As to this, Tesco submits that paragraph 8(3)(b) was and is addressing the particular problem arising where a claimant has contracted to take shares but has never actually acquired or disposed of them *in specie* because at the date of the relevant transaction they were not in issue but had been allotted to the claimant on provisional letters of allotment (acquisition) or had been disposed of by the claimant by renunciation of the right thus acquired (disposal).[24] It has nothing to do with intermediation: when it  was

---

[22] Section 53(1)(c) is disapplied to transfers within the CREST system: see regulation 38(5) of the 2001 Regulations. But Mr Mumford submitted that this disapplication is not exhaustive and is not engaged where a transfer is made without using the system (e.g. a transfer by an internal book-entry): see Law Commission Consultation (above), para 2.78.

[23] *Vandervell v IRC* [1966] Ch 261, 298.

[24] This, it is said, is consistent with contemporaneous commentary, which suggests that the purpose of introducing section 150(5) was largely to enable those with a right to acquire the shares themselves (e.g. following a rights issue) to sue if, for some reason, the shares were not actually acquired (e.g. because the company went into

introduced CREST did not exist and the practice of intermediation and computerised transfers of derivative interests was not yet operational. There is no justification for reading into a special definition a different meaning in subsequent Acts or iterations than the meaning it was intended to have when it was introduced.

100. Recognizing that a court is bound to be sceptical about a construction which, even though its individual steps may appear to be logical, renders a statutory provision ineffective in relation to claims by those whom the legislature seems likely to have wished to protect, and at least, not to discriminate against, Mr Mumford sought to bolster his argument that even so this would not provide any legitimate basis for rewriting the legislation in this case with the following two submissions:

(1) First, that if Schedule 10A is not capable of accommodating claims by holders of intermediated securities, that is a symptom of a more widespread gap or defect in the legal system that the courts have grappled with in recent years, namely that legislation enacted on the assumption that the ultimate investor is also the owner of the securities (which used to be the case) has not been amended in the light of the prevalence of the practice of intermediation. The consequence of this is that claimants are sometimes deprived of a remedy which one would expect them to have and which they would have had if their shares had not been intermediated. But the courts have consistently taken the view that addressing this gap or defect in the law is a matter for Parliament, not the courts: and he cited

(a) *re DNick Holding plc* [2014] Ch 196, where Norris J held, with regret, that the ambit of section 98 of the Companies Act 2006 could not legitimately be extended to enable three individual investors holding through intermediaries in aggregate some 7.2% of a company's shareholding to challenge a resolution to re-register as a private company since it was inaccurate as a matter of law to describe them as shareholders or as having acquired any 'shares': what they owned was no more than '*ultimate economic interests in underlying securities*';

(b) *Secure Capital v Credit Suisse* [2017] 2 CLC 428, where the decision of Hamblen J (as he then was) to strike out a claim by the investor (Secure Capital) in respect of misrepresentations in an information memorandum by the issuer (Credit Suisse) of intermediated bearer bonds on the ground that the investor was not Credit Suisse's contractual counterparty, had only an ultimate economic interests in the notes and no title to sue upon them was upheld in the Court of Appeal. Mr Mumford referred particularly to David Richards LJ's observation at paragraph [10] that "*the system operates on the basis of a "no look through" principle, whereby each party has rights only against their own counterparty.*"

---

liquidation): E Lomnicka and J Powell QC (eds), Encyclopedia of Financial Services Law (September 1987), para 2-536.

(2) Secondly, that these authorities illustrate that the mere fact that Schedule 10A may be rendered ineffective for intermediated securities is not a reason for giving it the construction for which the Claimants contend. What the Claimants must do is demonstrate that there is language in Schedule 10A which, construed in the usual way, enables holders of intermediated securities to sue. In that regard,

(a) Mr Mumford pressed me to reject the Claimants' suggestion (and see further below) that paragraph 8(3) of Schedule 10A is language with just that effect and entirely apt to enable the holders of intermediated securities to sue. He submitted that (a) what is now paragraph 8(3) was derived from section 90A(9)(b), which came into force in November 2006, which in turn was in the same terms as section 90(7), which was itself derived from section 150(5) of the now repealed Financial Services Act 1986. All the sections must in logic be construed consistently. When the original provision, section 150(5) of the FSA, was enacted the CREST system did not exist, and it cannot have been intended to enable holders of intermediated securities to sue; and

(b) Thus, according to Mr Mumford, paragraph 8(3) does not have and was not intended to have anything to do with intermediated securities: it is concerned with a different problem altogether, namely dealings in equitable interests themselves (whether intermediated or otherwise).

*Claimants' arguments to rebut second limb of Tesco's case*

101. As may already be apparent, the SL Claimants offer an entirely different perspective on paragraph 8(3), on which for their part they rely as demonstrating an intention on the part of the legislature to attribute a broad scope to the application of section 90A. They submit that its purpose is plain and is to ensure that it is the fact of the acquisition or disposal of a security or any interest in a security (or any contract for such acquisition or disposal) made in reliance on false information, rather than the exact mode (or legal characteristics of the mode) in which the security or interest is held at the time of the claim, which is the touchstone of standing.

102. Mr Kitchener thus submitted that, whatever may be the strict legal meaning of *"interest in securities"*, sub-paragraph 8(3)(b) informs the process of construction and extends the protection afforded by section 90A to persons who have entered into a contract for the acquisition or disposal of shares in reliance on published information, whether or not at the time of claim they have an equitable or proprietary interest, and whether or not the right under the contract is characterised as equitable, proprietary or purely economic.

103. Mr Kitchener, in his oral address, elaborated on this in submitting that the provision "shows that the draftsman of FSMA was not concerned exclusively with the protection of proprietary rights, because here he is showing that he is concerned to protect purely economic rights; rights under executory or executed contracts." (Mr Kitchener allowed that the generality of this was specifically cut down by the exception for the acquisition or disposal of depositary receipts, derivative instruments or other financial instruments

representing securities in what the parties referred to as the "tailpiece" of paragraph 8(3), but submitted that this in no way undermined his point.)

104. In response to Mr Mumford's contention of a more limited meaning, Mr Kitchener submitted that the words "acquisition" and "disposal" covered any process whereby the investor obtains or ceases to have any sort of interest in the relevant thing, citing in further support the broad meaning accorded in dictionaries and in such cases as *Congreve & Congreve v IRC* [1946] 2 All ER 170 at 183,[25] where Wrottesley J commented:

> "As used by lawyers the word 'acquired' has long covered transactions of a purely passive nature and means little more than receiving"

and *Duke of Northumberland v Attorney-General* [1905] AC 406 at 410-11 where Lord Macnaghten commented on the meaning of 'disposition' and 'devolution' in the Succession Duty Act 1853 that:

> "...it is clear that the terms "disposition" and "devolution" must have been intended to comprehend and exhaust every conceivable mode by which property can pass, whether by act of parties or by act of the law."

105. Mr Kitchener submitted accordingly that (a) the natural meaning of the word "*acquire*" would include a situation where an investor has acquired a security, obtaining a beneficial interest himself and directing that legal title be transferred to his nominee; (b) that the words "*continues to hold*" take meaning from their context. A remedy in the case of a person who "*continues to hold*" securities and interests in securities was first introduced following the Davies Review. The words simply mean that the investor has retained what had been previously acquired; and that (c) the word "*dispose*" must likewise be seen in the context of the words "*acquires, continues to hold or disposes*", and that in that context its natural meaning includes any dealing by which the investor no longer "*continues to hold*" what he had previously acquired.

106. As to Tesco's submissions based on *Akers v Samba* and *Vandervell* (see paragraph [96] above), Mr Kitchener sought to distinguish both as confined to their particular contexts, as follows:

(1)    *Akers v Samba* was distinguished as being a case under section 127 Insolvency Act 1986 decided expressly on the basis of construing that particular statutory provision. Mr Kitchener cited in particular paragraphs [42], [47] and [53] to [55] in the judgment of Lord Mance. He also cited that judgment for the fact that the Supreme Court recognised that in other contexts the word "*disposition*" was capable of encompassing the destruction or termination of an interest: see paragraphs 66 to 69 *per* Lord Neuberger, who cited also Wynn-Parry J's statement to the same effect in *In re Earl Leven and Melville, decd* [1954] 1 WLR 1228, 1233.

(2)    *Vandervell* was distinguished as being concerned only with the scope of section 53(1)(c) LPA 1925, and in particular whether it applied to a transfer of legal title intended by the disponor also to pass his equitable title (the House of Lords

---

[25] Reversed on other grounds [1947] 1 All ER 168.

held that it did not). Mr Kitchener submitted that this "tells one nothing about the true meaning and effect of Schedule 10A FSMA."

107. Mr Kitchener concluded that the permissible broad range of the expressions "acquisition" and "disposal" in other contexts should be adopted in this case.

108. Further or alternatively, he submitted that the SL Claimants had plainly *"contract[ed] to acquire securities or any interest in securities"* in that:

> (1) the SL Claimants entered into contracts as principals to purchase Tesco shares and performed those purchase contracts by calling for legal title to be delivered to their nominee / custodian and held to their order. That falls within the natural meaning of *"contracting to acquire securities"*.

> (2) Furthermore, on the facts, the SL Claimants bought shares pursuant to contracts that entitled them (or their nominee) to take legal title, so there is no basis on which those contracts do not qualify.

109. Lastly, Mr Kitchener returned to the combined effect of paragraphs 8(3)(a) and 8(3)(b) and submitted that "It cannot sensibly be suggested that a contract to acquire legal title attracts protection but that paragraph 8(3)(a) excludes a case in which the contracting party performs that contract by directing the seller to deliver legal title to the investor's nominee."

110. The MLB Claimants largely shared this perspective and adopted this construction, although (as explained previously) their focus was more upon the meaning of *"any interest in securities",* which they contended must include a proprietary interest, which they state under US law governing the intermediation chain they plainly have. Certainly, they shared the view that Tesco's argument is unsustainable, and in their skeleton argument suggested the following example where an investor instructs its custodian (as trustee) to purchase and then sell securities as a demonstration of this:

> (1) Prior to the securities being purchased by the custodian, the investor obviously has no interest of any kind in those securities.

> (2) Once the custodian purchases the securities, they are held on trust for the investor. The investor therefore obtains a beneficial interest in the securities which he did not have previously. It is entirely in accordance with the natural meaning of "acquired" (namely, to obtain or get hold of) to say the investor has "acquired" a beneficial interest in the securities.

> (3) When the custodian sells the securities, full ownership (i.e. including both legal and beneficial title) passes to the purchaser, and the investor can no longer be said to be interested in the securities. Again, using the natural meaning of the word "disposed" (namely, to cease to hold or to remove), the investor has *"disposed of"* its beneficial interest in the securities.

> (4) Moreover, both the "acquisition" and "disposal" in this example takes place on the instructions of the investor and is therefore an acquisition/disposal "by" the investor.

*111.* In agreement with Mr Kitchener that the authorities relied on by Mr Mumford (*Akers v Samba* and *Vandervell*) to seek to demonstrate that there could be no qualifying *"acquisition"* or *"disposition"* of the investor's equitable interest under the sub-trust of which it is beneficiary by reason of the acquisition or disposition of legal title by the custodian at the beginning of the custody chain were applicable only in their specific contexts and not, in any event, in this context, Mr de Verneuil Smith concluded that paragraph 8(3)(b) gave his clients standing whether or not their interest could legally be characterised as *"any interest in the securities"*.

*My conclusions as to the second limb*

112. Mr Mumford's argument that none of the Claimants ever did anything that can legitimately be characterised in law as an acquisition or disposal of the Tesco shares or any interest in them depends upon a narrow interpretation of the expressions *'acquisition'* and *'disposal'* as used in Schedule 10A, and in particular, their confinement to a dealing in the very interest which such Claimant has or had (otherwise than by extinguishment effected by a dealing in some other interest).

113. I must admit to having found this second limb of Tesco's argument somewhat counter-intuitive in light of my decision on the first limb (and possibly in any event), and given that the draftsman must be taken to have known that this was the way of the market; but I accept that intuition will not suffice. More analytically, I cannot see that either *Akers v Samba* or the *Vandervell* case has any application or provides any prescription for the restrictive construction of the relevant provisions for which Mr Mumford presses.

114. As Mr Kitchener submitted, in *Akers v Samba*, the question was whether a transfer of the legal interest in shares held by Mr Al-Sanea constituted a disposition of the company's equitable interest in those shares so as to trigger the application of section 127 Insolvency Act 1986 (which renders void any disposition of the company's property after the commencement of a winding-up). The answer given by the UK Supreme Court that it did not was given in circumstances where the company (SICL) had no input into the transaction of any kind, still less was it instigated by it: indeed it was the foundation of its Liquidators' case that the transfer of the legal estate was in breach of trust and made without its consent and against its interests. There was no intention to dispose, or anything like it; the equitable interest was simply extinguished by reason of the basic equitable principle that the purchaser of a legal estate for value without notice takes free of any equities; and there was no or no sufficient basis for overriding that equitable rule. In this case, by contrast, any dealing (or the holding) of shares is instigated by the claimant.

115. In the *Vandervell* case, the position was in a sense the converse of *Akers v Samba,* because the transaction in question was instigated by the beneficiary and the issue was whether the passing of legal title by the legal owner at the instigation of the beneficiary was to be treated as passing the entire interest without the need for writing to satisfy section 53(1)(c) LPA 1925. The decision of the House of Lords, as expressed in a nutshell by Lord Upjohn at 311 F was that "the greater includes the less". I agree with Mr Kitchener that this "tells one nothing about the true meaning and effect of Schedule 10A of FSMA."

116. Further, in *Vandervell,* Lord Upjohn explained (at 311) that section 52(1)(c) LPA 1925 was derived from the Statute of Frauds, and that

> "the object of the section, as was the object of the old Statute of Frauds, is to prevent hidden oral transactions in equitable interests in fraud of those truly entitled, and making it difficult, if not impossible, for the trustees to ascertain who are in truth his beneficiaries. But when the beneficial owner owns the whole beneficial estate and is in a position to give directions to his bare trustee with regard to the legal as well as the equitable estate there can be no possible ground for invoking the section where the beneficial owner wants to deal with the legal estate as well as the equitable estate."

I do not see in that case any suggestion that where a person (X) enters into a transaction pursuant to which, at X's direction and for value, shares previously held on trust by a custodian and then through a series of sub-trusts ultimately for X become held by the custodian and then through a series of sub-trusts ultimately for Y, would not constitute a disposal by X and an acquisition by Y of an interest in the relevant shares. Nor do I see in that case any basis for a suggestion that separate writing would be necessary for the transfer of the ultimate interest in equity thereby effected. There is no question of any untoward or secret dealing such as to trigger section 53(1)(c): no person in the chain would have any right to object or dispute the transaction, nor would any person be in doubt as to their beneficiary.

117. The fallacy of Mr Mumford's approach, as I see it, is to treat as irrelevant that it is the transaction which caused the vesting or ceasing to vest in the claimant of the interest in shares (however to be characterised) which, if made in reliance on an untrue or misleading statement or omission in qualifying information from the issuer, is the relevant trigger for liability. That transaction will have been instigated by the claimant, allegedly to its detriment, on the faith of the allegedly untrue or misleading statement or omission. The whole purpose of the relevant provisions of FSMA is to confer a statutory cause of action in respect of a transaction entered into in such circumstances. Unless the wording was without any semantic doubt entirely deficient to apply in such circumstances, ordinary principles of statutory construction require the court to ensure that the statutory purpose is not thwarted. As Lord Neuberger of Abbotsbury PSC expressly acknowledged at [66], the expressions *"disposal"* or "disposition" are plainly semantically capable of extending to a transaction which involves the destruction or termination of an interest; and it seems to me to be plain and obvious that the expressions *"holding"* and *"acquisition"* must in logic be given broad corresponding remit. There is every reason to give the expressions such meaning here, to ensure the achievement, rather than the negation, of the statutory purpose.

118. I do not consider that the *Secure Capital* case assists Tesco either. That case concerned only the contractual rights of account holders in respect of immobilised bearer notes held by a custodian in the Clearstream system. In such a system or arrangement, it is not the bearer note, but interests in the note, that are traded through Clearstream. In a "Programme Memorandum" it was stipulated that the bearer/holder of the notes "would be deemed to be and may be treated as its absolute owner for all purposes"; and the system operates on a "no look through principle" so that each participant in the chain of interests under a custodian only has rights against their immediate counterparty. The question was whether, by reason of a provision of Luxembourg law which, it was said and for the purposes of the application only accepted, conferred a direct right of action on Secure

Capital as an Account Holder, Secure Capital could sue Credit Suisse in contract for alleged misstatement in the issuing material. The decision, upheld on appeal, was that it could not, and the "no look through principle" which was well understood to be the basis of trading on the market, prevailed. But here the claim is not in contract but under a statutory cause of action. Except in the sense explained below, which assists not Tesco but the Claimants, the decision in *Secure Capital* seems to me to have no application to this case.

119. Indeed, and as was pointed out in the SL Claimants' skeleton argument, the judgment of David Richards LJ in the appeal in part undermines, rather than supports, Tesco's case. David Richards LJ specifically said at [56],

> "I emphasise 'in contract' because it is not suggested that a claim
> in tort, if sustainable, would be similarly barred".

Academic commentary largely supports the proposition that investors would have a non-contractual claim. For example, Ms Gullifer and Ms Payne make clear when discussing the *Secure Capital* case that the ultimate investor would have claims against an issuer under FSMA ss.90 or 90A (as appropriate) notwithstanding the existence of an intermediated securities structure.[26]

120. Accordingly, I consider that any process whereby, in a transaction or transactions on CREST, the ultimate beneficial ownership of securities that are, with the consent of the issuer, admitted to trading on a securities market in accordance with paragraph 1 of Schedule 10A, comes to be vested in or ceases to be vested in a person constitutes (respectively) *"the acquisition or disposal of any interest in securities"*.

121. For comprehensiveness I should confirm that I do not regard this approach as invalidated or undermined in any way by the point made by Mr Mumford as to the derivation of paragraph 8(3) from a time before the existence of CREST and the development of the market in intermediated securities. The analysis I have adopted depends on the width of the expressions *"acquire"* and *"dispose"* and *"acquisition"* and *"disposal"* and their potential application to any process whereby the potential claimants came to be or cease to be entitled to the ultimate beneficial ownership of the shares, whether that process is undertaken through CREST and a chain of intermediation or not. The concepts are adaptable for all seasons, even if (as I think) a statutory definition would have been the clearer thought, given existing controversy.

122. On that basis, in my view, paragraph 8(3)(b) applies only where the acquisition or disposal is the subject of a contract that has not yet been completed, or where the securities are not yet in issue but the entire right to them when issued is acquired or disposed of (such as is or may be the position in the case of securities allotted on renounceable letters of allotment).

123. Lastly, and for comprehensiveness, I accept that the adoption of Mr Mumford's argument would further have reduced any risk of multiple claims. But, for the reasons   I

---

[26] Gullifer & Payne eds, *Intermediation & Beyond* (2019), page 381. The only problem they identify is that the issuance of securities in *Secure Capital* was a private placement, to which the prospectus rules in s.90 does not apply.

have given in the context of limb I, I do not myself consider that to be more than a limited theoretical risk on the construction I favour.

### *Conclusion*

124. In my judgment, therefore, neither of the two limbs of Tesco's argument is sustainable. It follows that Tesco's strike-out application must be dismissed.

125. The parties intimated that they might seek declaratory relief, as might certainly have been appropriate had I reached the opposite conclusion. It may be that in light of the conclusion I have reached, that is not necessary; and I would require convincing that any such relief would in the circumstances be appropriate. However, if any of the parties wish to contend to the contrary, they should notify me as soon as possible. Subject to that, I would invite Counsel to agree and provide me with a draft form of order. Any consequential matters can be dealt with after formal hand-down or at a convenient moment later.

APPROVED JUDGMENT OF MR JUSTICE MILES

**IN THE HIGH COURT OF JUSTICE**          Claim No. FL-2019-000017
**BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES**
**FINANCIAL LIST (Ch D)**
**Neutral Citation Number: [2021] EWHC 570 (Ch)**

9 March 2021

Before

**MR JUSTICE MILES**

BETWEEN:

───────────────────────────

**THE PERSONS IDENTIFIED IN SCHEDULE 1 TO THE PARTICULARS OF CLAIM**

Claimant

-v-

**RSA INSURANCE GROUP PLC**

Defendant

───────────────────────────

**PETER DE VERNEUIL SMITH QC AND SHAIL PATEL** (Instructed by **Brown Rudnick LLP**) appeared on behalf of the Claimants

**TOM ADAM QC, SIMON HATTAN AND JACOB RABINOWITZ** (Instructed by **Herbert Smith Freehills LLP**) appeared on behalf of the Defendant

1

APPROVED JUDGMENT OF MR JUSTICE MILES

**Tuesday, 9 March 2021**

**JUDGMENT (as approved)**

**MR JUSTICE MILES:**

1. This is the first case management conference in this case. The claimants bring an action under section 90A of the Financial Services and Markets Act 2000 and schedule 10A to that Act.

2. There are some 60-odd institutional investors, which manage some 140 different funds. The claimants claim to have suffered loss and damage as a result of acquiring or continuing to hold interests in shares in the defendant in reasonable reliance on allegedly misleading or untrue statements and/or omissions made by the defendant in relevant published information under paragraph 3 of schedule 10A and/or as a result of alleged dishonest delay by the defendant in publishing relevant information under paragraph 5 of schedule 10A. The defendant denies all liability.

4. There is no dispute that, between 2009 and 2013, the defendant's Irish trading subsidiary ("RSA Ireland") engaged in inappropriate accounting practices and the deliberate manipulation of insurance claim reserves through under-reserving. There is a dispute as to whether the under-reserving of other claims (by some £128 million) was a result of any misconduct or inadequate corporate governance.

5. The defendant, which is a listed UK company and whose shares are listed on the LSE, disclosed the misconduct within RSA Ireland in announcements to the market in November 2013, following which its share price dropped significantly.

6. The claimants contend that the defendant published statements that were rendered untrue or misleading by the fact that the financial misconduct within RSA Ireland had occurred, or was occurring, and that inadequate corporate governance and controls existed within RSA Ireland and the defendant. They say, alternatively, that the defendant omitted to disclose such matters, or again alternatively, that it delayed publishing information in respect of them. The claimants contend that senior executives within the defendant knew or were reckless as to the falsity of the published statements and/or knew the omissions to be a dishonest concealment of the material fact and/or acted dishonestly in delaying the publication of relevant information.

8. The first question I have to resolve is an important one about the shape of the trial process. It is common ground that there should be a split trial but there is a difference between the parties as to where the split should lie.

9. The debate has been conducted by reference to an agreed list of issues. To summarise: Issue 1 concerns the standing of each of the claimants to bring claims under section 90A of FSMA; issues 2 and 3 concern the extent of wrongdoing of RSA Ireland; issues 4 and 5 are concerned with whether the published information

APPROVED JUDGMENT OF MR JUSTICE MILES

was untrue, misleading or incomplete; issues 6 to 8 concern the knowledge of alleged PDMRs (i.e. persons discharging management responsibility, a term used in the statute); issue 9 is concerned with the allegation of dishonest delay; issue 10 is whether the claimants reasonably relied upon the published information in acquiring or continuing to hold shares in the defendant; issues 11 and 12 concern causation of loss; and issues 13 and 14 concern the quantum of the claims.

16. It will be seen that issues 2 to 9 concern the conduct and knowledge of the defendant and its directors or officers.   Issue 1 concerns the claimant's standing, and issues 10 to 14 concern other elements necessary for the claimant's claims to succeed. I shall call issues 2 to 9 "the RSA issues".

19. The claimants submit that at the first trial the court should consider and resolve the RSA issues and nothing more. The defendant's position is that there should be a split trial at which the court should determine the RSA issues, but that in addition the court should determine issue 10, namely the issues concerning the claimant's reasonable reliance on the statements or omissions. As a fallback made in the course of oral submissions, counsel for the defendants suggested that the court might also determine issues 11 and 12, concerning causation. I will come back to that in due course.

25. I shall summarise the submissions of the parties, but I have taken into account all they have said, both in their helpful skeleton arguments and orally, in reaching my decision.

26. The claimants say there is a real advantage in determining the RSA issues first. There is a neat and clean separation between these issues and the issues which concern the claimant's knowledge, conduct and actions. They point out that there is overlap between issue 10, which concerns reliance, and issues 11 and 12, which concern causation. The claimants say it is likely that the same witnesses will be required to give evidence twice if the defendant's proposal is accepted, and that, if they have to do that, there is a possibility of tensions arising in relation to the evidence they give and the findings the court might make. They say that, if possible, the court should avoid that kind of duplicative process.

28. They also say, at least in relation to one of the categories of claimants (which has been called "category 3") expert evidence will be required.  That category consists of cases where the relevant claimants did not read or see the published information, whether directly or indirectly, but exclusively or primarily relied on the price or the market capitalisation of the defendant's shares. What is said is that the price of shares was influenced by published information, that the claimants made their decisions based at least in part on price, and that that is sufficient to constitute reliance for the purposes of schedule 10A. The claimants say that they would wish to adduce expert evidence from an economist on the extent to which the market in shares traded on the LSE is an efficient one.

31. The claimants say next that their proposal would lead to a shorter first trial. They

APPROVED JUDGMENT OF MR JUSTICE MILES

have given a provisional estimate suggesting that it should be possible to deal with the first trial in about 15 court days. They say that if issue 10 is added into the first trial, it is likely to lead to something like a doubling of the trial length.

32.   Leading on from that, they also say that, on their proposal, the first trial should be possible in early to mid-2022, whereas on the defendant's proposal the trial will probably not take place until 2023.

33.   The claimants say that there is the potential for complications on the defendant's proposal, arising from possible appeals. They say that it is far more likely, if there is an appeal, that it will be about the reliance issues rather than on the RSA issues, which are mainly factual. They say that some of the reliance issues, in particular in relation to the third category of claimants, are ripe for appeal, including to the Supreme Court. The claimants say, therefore, that if questions of reliance are included in the first trial and there is an appeal, there could then be a messy and complicated process of seeking to work out what should then happen to the second trial - and this could itself lead to substantial delays.

36.   They also say that splitting the trial in the way that they suggest would be likely to assist the parties in reaching a settlement of the case. It will provide guidance on key parts of the case and, looking at things realistically, if they win on the first trial, as they propose, they say it is likely that the defendant will then seek to settle the case. And if they lose on the first part of the case, then, subject to appeals, the case will go no further.

37.   Turning to the defendant's position, its counsel submits that the issue of reliance is an important or key part of the statutory cause of action. If the claimants are unable to show reliance they have no right to bring the claim.

38.   The defendants agree that the resolution of issues at an early stage will assist the parties to settle the case: but they say this points to the inclusion of another important issue, namely issue 10.

40.   The defendant says that its proposal would lead to a more balanced allocation of resources and effort. It is fairer that the claimants should be undertaking work now, towards an overall resolution, just as the defendant will be in relation to the RSA issues.

41.   It says that, on its proposal, there is likely to be an earlier resolution of the reliance issues than on the claimant's suggested split. Counsel gave a provisional estimate of how long it would take to get to trial, suggesting, on the defendant's proposal, it could be in autumn 2022 or early 2023.

42.   The defendant says that if the trial is split in the way that the claimants suggest it is likely that the trial of the reliance issues would not take place at least until a date in mid-2024. They also argue that the claimants took their time before bringing these claims, and that it is important, if possible, for the issues of reliance (which include factual disputes) to be decided sooner rather than later.

APPROVED JUDGMENT OF MR JUSTICE MILES

43.    The defendant accepts that the trial length would be increased by the inclusion of issue 10 and suggests that the trial length might be increased by some 6 or 7 days or so.

44.    It says that the claimant's argument that it would be necessary to call substantial expert evidence is exaggerated. Counsel suggests that there may be no need for expert evidence on the efficiency or otherwise of the markets once the point is properly spelt out. But that, in any event, it is unlikely that any such evidence would occupy the time of the court for very long.

45.    As to the possibility of appeals, the defendant says this factor actually points the other way. It says that it would be preferable for any appeals to be part of a unified process with any appeals on the RSA issues to be heard at the same time as any appeals on issue 10. It says that it is realistic to suppose that there may be appeals on at least some of the RSA issues, including those concerning the question whether it is arguable in law that the overall impression given by the information is relevant, and the construction issues concerning the meaning of the published information.

47.    The defendant says that the risks arising from the potential overlap between the reliance and causation issues that there may be muddle or duplication is overstated. It says that the issues are different: the question of reliance concerns what actually happened while the question of causation concerns a counter-factual, hypothetical, questions about what would have happened. It argues that in some respects, the questions of causation would actually be better focused once the parties were armed with a ruling on the questions, first, of what information or omissions were inaccurate or misleading, and, secondly, which parts of the information had been relied on by the claimants in making their decisions.

51.    I have carefully considered these various submissions. I have concluded that overall the defendant's position is to be preferred. As I have summarised the parties' positions I can provide my reasons briefly.

52.    First, it is preferable on balance that more rather than fewer issues should be tried at the first trial. It seems to me that including issue 10 as well as the RSA issues is more likely to bring about a settlement of the remaining issues.

53.    Second, it seems to me that the defendant's proposal is likely, overall, to lead to a faster determination of the factual issues concerning reliance than the claimant's proposal. On the claimant's proposal, there would be a first trial some time in mid-2022. There would then no doubt be further directions in order to prepare for a trial in some point in 2023. Indeed, it seems likely that, given what has been suggested so far, one would be well into 2023 before there could be a trial of the reliance issues. By contrast, in my view there could realistically be a trial of issues 2 to 9 and 10 starting in the autumn of 2022. So there could be a saving of up about a year (leaving aside appeals).

APPROVED JUDGMENT OF MR JUSTICE MILES

55. I do not accept the claimants' submission that this difference is marginal. I agree with the defendant that the claimants have chosen to bring this case late in the limitation period, and the more time that passes the more difficult it will be for the parties and the court to determine what happened on a true factual basis. Another year or so of delay is, if possible, to be avoided.

56. Third, while there is some force in the claimants' point that their division of the issues would lead to a shorter first trial, I do not think, in a case of this scale and importance, this is a particularly telling factor. The claimants have brought this claim and must be ready to take part in it fully, even if that means a somewhat longer first round trial. I do not think that a trial of say 25 days to 30 court days would be excessively onerous for parties as well funded as these (particularly where, as I understand it, the claimants have arranged litigation funding).

58. The fourth point concerns the overlap between the issues of reliance and causation. There is again some force in the claimants' points, and in an ideal world I can see that it would be preferable to have a clean and tidy division of the claimant's issues from the RSA issues. However, decisions of this kind are pragmatic and not based entirely merely on bright lines of principle. I do not think that the potential of overlapping evidence (on reliance and causation) is likely to lead to a serious risk of inconsistences in the evidence or the court's findings. While it is somewhat unsatisfactory for there to be an element of duplication with the same witnesses possibly coming back to court twice, once they witnesses have given their evidence at the first trial, I would expect the evidence about causation to be fairly short and self-contained.

61. As to the claimant's argument that expert evidence would be required for issue 10, I agree with the submission of counsel for the defendants that it is quite possible that no such evidence will be needed. The proposition advanced by the claimants appears to be that the prices of securities listed on the LSE are at least influenced by published information, which at the moment strikes me as more or less self-evident. But if there is to be such evidence, then I would not expect it to occupy the time of the court for very long.

62. The possibility of appeals seems to me a point that points in both directions. I can see that it might be considered better to hold back the reliance issues and for there then to be appeals after the second trial. On the other hand, I think, overall, there is some force in the defendant's point that if there are to be appeals it would be better if as many issues as possible are dealt with at once. There is a real risk that if the question of reliance is put off to a second trial and there is an appeal after the first trial, the reliance questions (which are essentially factual ones) would be pushed further off into the distance and, for reasons already given, I regard that as unsatisfactory.

64. The next point concerns the allocation of the litigation burden as between the parties. The defendants are entitled to examine and scrutinise the claimants' case, just as the claimant is entitled to examine the defendant's conduct. The claimants'

APPROVED JUDGMENT OF MR JUSTICE MILES

proposal would effectively mean postponing their burden until a later stage, while placing almost all the work on the defendant. Sometimes, by its nature, litigation is lopsided in that way: the claimant has no evidence to give and the case entirely concerns the conduct of a defendant. But, here, the imbalance would be created by the proposed order splitting the trial. It seems to me that the claimants, having brought the action, should be prepared to undertake substantial work in ensuring the expeditious progress of the proceedings to resolution. That includes giving disclosure, preparing witness statements, and being prepared to provide evidence at trial. It seems to me that the defendant's proposal represents a fairer allocation of the litigation burden on the parties. This would not be a determinative factor on its own, but it does seem to me that it has some bearing.

65. For these reasons I have concluded that it is appropriate to include issue 10 in the first trial. I would not have been attracted by the defendant's fallback position of including questions of causation of loss. It seems to me that those issues are likely to involve substantial expert evidence and there is a real attraction in those issues being hived off together with quantum to a second trial.



Neutral Citation Number: [2021] EWCA Civ 16

Case No:A3/2020/1270

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**HHJ PARFITT (Sitting as a judge of the High Court)**
**[2020] EWHC 1855 (Ch)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15th January 2021

**Before :**

**LORD JUSTICE LEWISON**
**LORD JUSTICE NEWEY**
**and**
**LORD JUSTICE COULSON**

- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **MRS SHAISTA ZUBERI** | **Appellant** |
| - and - | |
| **LEXLAW LIMITED** | **Respondent** |
| - and - | |
| **THE GENERAL COUNCIL OF THE BAR OF ENGLAND AND WALES** | **Intervener** |
| **("The Bar Council")** | |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**MR ADRIAN DAVIES** (instructed by **Connaught Solicitors**) for the **Appellant**
**MR CHRISTOPER SNELL** (instructed by **Lexlaw Solicitors & Advocates**) for the **Respondent**
**MR NICHOLAS BACON QC, MR ALAN TUNKEL & MR GREG COX** for the **Intervener**

Hearing date : 3rd December 2020
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Covid-19 Protocol: This judgment was handed down remotely by circulation to the parties' representatives by email, release to BAILII and publication on the Courts and Tribunals Judiciary website. The date and time for hand-down is deemed to be 10:30am on Friday 15th January 2021.**

**Lord Justice Lewison:**

**Introduction**

1.    A client enters into a contract of retainer with solicitors to prosecute a claim. The contract provides that in the event of success the solicitors will be entitled to a share of the recoveries. The client achieves success by means of a settlement of the claim; and the solicitors claim their share. But the contract also contains a clause which says that if the client terminates the retainer prematurely (which she did not), she must pay the solicitors' normal fees and disbursements. Does the existence of that clause invalidate the whole contract? HH Judge Parfitt held that it did not. His judgment is at [2020] EWHC 1855 (Ch).

2.    The particular factual background to this case does not affect the issue we have to decide; so I give only a short summary. Mrs Zuberi borrowed money from a bank. She subsequently brought a claim against the bank alleging that she had been missold certain financial products. She retained Lexlaw to act on her behalf under the terms of a written agreement. Eventually the bank made an offer to settle her claim, which she accepted.

3.    Under clause 9.1 of the written agreement Lexlaw were entitled to 12% of any sum recovered plus expenses (such as disbursements). Lexlaw says that the sum due is just under £130,000. Clause 10 provided that if the claim was lost, the client was liable to pay expenses only. But clause 6.2 of the agreement provided:

> "With the exception of the circumstances set out in clause 6.3 … you may terminate this Agreement at any time. However, you are liable to pay the Costs and the Expenses incurred up to the date of termination of this Agreement within one month of delivery of our bill to you."

4.    The expression "Costs" was defined as time charges at an hourly rate for time spent working on the claim; and the expression "Expenses" was defined as the cost of instructing third parties plus disbursements.

**The common law**

5.    Retainers under which a lawyer was entitled to a share in the client's recoveries were long prohibited at common law on grounds of public policy on the ground that they were "champertous", although public policy is capable of changing: *Kellar v Williams* [2004] UKPC 30, [2005] 1 LRC 582 at [21].

6.    At common law, where all the terms of a contract are illegal or contrary to public policy, the contract is unenforceable. Where, however, only some of the terms are illegal or contrary to public policy, the court can in some circumstances enforce those parts that are not illegal or contrary to public policy. The general rule is that where you cannot sever the illegal from the legal parts of a contract, the contract is altogether void, but where you can sever them "you may reject the bad part and retain the good": Chitty on Contracts (33rd ed para 16-237).

7.      The criteria that must be fulfilled before severance is possible are that (a) the offending provision can be removed without modifying or adding to other terms of the agreement; (b) the remaining terms continue to be supported by adequate consideration and (c) the removal of the unenforceable part of the contract does not change the nature of the contract, such that it is not the sort of contract that the parties entered into at all: *Tillman v Egon Zehnder Ltd* [2019] UKSC 32, [2020] AC 154.

8.      In my judgment, these conditions are amply fulfilled in this case. At common law, therefore, I consider that clause 6.2 of the written agreement could have been severed from the remainder of the contract, thus leaving it (including clause 9.1) as enforceable.

9.      Sir Rupert Jackson carried out a comprehensive review of the costs regime governing civil litigation in England and Wales. At the time of his review contingency fees were permitted in employment and other tribunals. In his Final Report (December 2009) he recommended the introduction of contingency fees for other types of civil litigation, provided that they were suitably regulated. The reason underlying his recommendation was that there should be as many funding methods as possible available to litigants, because that would promote access to justice.

10.     Under the common law, an agreement of that type would have been unenforceable as champertous. It was therefore necessary, in order to implement Sir Rupert's recommendation, to introduce primary legislation to change the common law.

**The legislative framework**

11.     Sir Rupert's recommendation was accepted by the government; and initially implemented by section 45 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012 which introduced an amended version of section 58AA of the Courts and Legal Services Act 1990, providing for damages-based agreements ("DBAs"). That version of section 58AA came into force on 19 January 2013; and remained in force when the retainer in our case was entered into. It provided so far as material:

> "(1) A damages-based agreement which satisfies the conditions in subsection (4) is not unenforceable by reason only of its being a damages-based agreement.
>
> (2) But… a damages-based agreement which does not satisfy those conditions is unenforceable.
>
> (3) For the purposes of this section—
>
> (a) a damages-based agreement is an agreement between a person providing advocacy services, litigation services or claims management services and the recipient of those services which provides that—
>
> (i) the recipient is to make a payment to the person providing the services if the recipient obtains a specified financial benefit in connection with the matter in relation to which the services are provided, and

(ii) the amount of that payment is to be determined by reference to the amount of the financial benefit obtained

(4) The agreement—

(a) must be in writing;

(aa) …

(b) if regulations so provide, must not provide for a payment above a prescribed amount or for a payment above an amount calculated in a prescribed manner;

(c) must comply with such other requirements as to its terms and conditions as are prescribed; and

(d) must be made only after the person providing services under the agreement has complied with such requirements (if any) as may be prescribed as to the provision of information.

(5) Regulations under subsection (4) are to be made by the Lord Chancellor and may make different provision in relation to different descriptions of agreements.

(6) …

(6A) …

(7) In this section—

"payment" includes a transfer of assets and any other transfer of money's worth (and the reference in subsection (4)(b) to a payment above a prescribed amount, or above an amount calculated in a prescribed manner, is to be construed accordingly); …"

12.    The first set of regulations made under section 58AA were the Damages-Based Agreements Regulations 2010. They were replaced by the Damages-Based Agreements Regulations 2013, which came into force on 1 April 2013. Regulation 1 (2) contained a number of relevant definitions:

""costs" means the total of the representative's time reasonably spent, in respect of the claim or proceedings, multiplied by the reasonable hourly rate of remuneration of the representative

"expenses" means disbursements incurred by the representative, including the expense of obtaining an expert's report and, in an employment matter only, counsel's fees;

"payment" means that part of the sum recovered in respect of the claim or damages awarded that the client agrees to pay the representative, and excludes expenses but includes, in respect

of any claim or proceedings to which these regulations apply other than an employment matter, any disbursements incurred by the representative in respect of counsel's fees;…"

13.    Regulation 3 provided:

"The requirements prescribed for the purposes of section 58AA(4)(c) of the Act are that the terms and conditions of a damages-based agreement must specify—

(a)    the claim or proceedings or parts of them to which the agreement relates;

(b)    the circumstances in which the representative's payment, expenses and costs, or part of them, are payable; and

(c)    the reason for setting the amount of the payment at the level agreed, which, in an employment matter, shall include having regard to, where appropriate, whether the claim or proceedings is one of several similar claims or proceedings."

14.    Regulation 4 (on which this appeal turns) provided:

"(1)    In respect of any claim or proceedings, other than an employment matter, to which these Regulations apply, a damages-based agreement must not require an amount to be paid by the client other than—

(a)    the payment, net of—

(i)    any costs (including fixed costs under Part 45 of the Civil Procedure Rules 1998); and

(ii)    where relevant, any sum in respect of disbursements incurred by the representative in respect of counsel's fees,

that have been paid or are payable by another party to the proceedings by agreement or order; and

(b)    any expenses incurred by the representative, net of any amount which has been paid or is payable by another party to the proceedings by agreement or order."

15.    Regulation 4 (2) dealt with personal injury claims; and regulation 4 (3) provided:

"(3)    Subject to paragraph (4), in any other claim or proceedings to which this regulation applies, a damages-based agreement must not provide for a payment above an amount which, including VAT, is equal to 50% of the sums ultimately recovered by the client."

16.    Regulation 4 (4) provided:

> "The amounts prescribed in paragraphs (2)(b) and (3) shall only
> apply to claims or proceedings at first instance."

17.    Regulation 5(1) began: "In an employment matter, the requirements prescribed for the
purposes of section 58AA(4)(d) of the Act are to provide" certain matters which it
then set out in regulation 5 (2).

18.    Regulation 7 provided:

> "In an employment matter, a damages-based agreement must
> not provide for a payment above an amount which, including
> VAT, is equal to 35% of the sums ultimately recovered by the
> client in the claim or proceedings."

19.    Finally, so far as relevant, regulation 8 provided:

> "(1)    In an employment matter, the additional requirements
> prescribed for the purposes of section 58AA(4)(c) of the Act
> are that the terms and conditions of a damages-based agreement
> must be in accordance with paragraphs (2), (3) and (4).
>
> (2)    If the agreement is terminated, the representatives may
> not charge the client more than the representative's costs and
> expenses for the work undertaken in respect of the client's
> claim or proceedings.
>
> (3)    The client may not terminate the agreement—
>
> (a)    after settlement has been agreed; or
>
> (b)    within seven days before the start of the tribunal hearing.
>
> (4)    The representative may not terminate the agreement and
> charge costs unless the client has behaved or is behaving
> unreasonably.
>
> (5)    Paragraphs (3) and (4) are without prejudice to any right
> of either party under general law of contract to terminate the
> agreement."

**The problem**

20.    It will be seen that regulation 8 (which applies only to employment matters) expressly
permits a legal representative to charge costs and expenses if the client terminates the
retainer. By contrast, regulation 4 does not. This potential defect was pointed out by
the Civil Justice Council Working Party in a report produced in 2015 (Chapter 27 para
9). Their recommendation was that the grounds and manner of termination of a DBA
"and the consequences of termination on either side" were best left to negotiations
between the lawyer and the client.

21.    This has caused considerable uncertainty in the legal profession; and a widespread
fear that if a client terminates a retainer, the lawyer will end up not being paid

anything for what might have been months or even years of work. The authors of
Costs & Funding Following the Civil Justice Reforms describe this point at para 2-26
as being "seen as one of the key uncertainties preventing wider use of DBAs". Friston
on Costs (3rd ed) takes much the same view at 29.151. Mr Bacon QC, appearing on
behalf of the Bar Council as Interveners, told us that because of the uncertainty,
neither the Bar Council nor the Law Society has provided a model form of DBA.

22.    Opinions on the point seem to be divided. For example, in formulating a model form
of DBA the Chancery Bar Association stated that it was "not possible to provide for
some other form of payment if the agreement requires early termination" because it
would thus contravene regulation 4. That, they thought, would mean that it was likely
that the DBA would be unenforceable.

23.    On the other hand, the editors of Cook on Costs say at paragraph 7.18 that civil
litigation lawyers "would be well advised" to consider following the employment
matter provisions when drafting their DBA.

**The judge's view**

24.    The judge considered that it was unlikely that regulation 4 (1) was intended to
preclude a retainer which allowed a lawyer to recover his costs if the retainer were to
be terminated by the client. He gave a number of "inter-locking" reasons for his view.
They included the lack of any justification for such a stark difference between the
position of a lawyer in an employment matter and a lawyer in any other kind of case;
an interference with freedom of contract; and the deterrent effect on the adoption of
DBAs which that interpretation of regulation 4 (1) would    produce, with the
consequence that there would be less choice of funding methods for litigants.

25.    He also analysed the text of regulation 4 (1) and held that the "amount to be paid by
the client" took as its underlying premise that there were recoveries to be shared. A
clause like clause 6.2 comes into operation at a time when there are no recoveries to
be shared; and thus falls outside the target area of regulation 4 (1). He reinforced that
interpretation by recalling that the statutory definition of a DBA in the Regulations
was the particular agreement to share recoveries. That was the only subject-matter
with which regulation 4 (1) was concerned.

**Mrs Zuberi's argument**

26.    Mr Davies' starting point is that although champerty is no longer a tort, statute has
preserved the common law rule that a champertous contract is contrary to public
policy: Criminal Law Act 1967 section 14 (2). Where DBAs are permitted by statute
they are "islands of legality in a sea of illegality". Accordingly, if a DBA does not
comply with section 58AA or the Regulations made under it, it has not reached the
safety of the island. In approaching the validity of the contract of retainer, a court
should not be disposed to uphold a contract of doubtful validity. It is for the lawyer to
show that it is valid.

27.    Clause 6.2 of the contract in the present case requires the client to make a payment to
the solicitor "other" than "the payment" as defined by regulation 1 (2). It therefore
fails to comply with regulation 4 (1). The fact that, in the particular circumstances of
this case, the client has not in fact been prejudiced has no bearing on the question of

the validity of the contract: *Garrett v Halton BC* [2006] EWCA Civ 1017, [2007] 1 WLR 554 at [38] and [39].

28.    Even if it is permissible to include a provision requiring payment in the event of the termination by the client of the retainer, the amount of that payment must be capped by reference to regulation 4 (1) and 4 (3).

29.    There is a clear contrast between regulation 4 and regulation 8 (2). If the judge's interpretation was correct, regulation 8 (2) would be unnecessary. What the judge did was to read down regulation 4 impermissibly, rather than to apply the clear language that Parliament has approved.

**General approach**

30.    If I may repeat something I have said before (*Pollen Estate Trustee Co Ltd v Revenue and Customs Commissioners* [2013] EWCA Civ 753, [2013] 1 W.L.R. 3785 at [24]):

> "The modern approach to statutory construction is to have regard to the purpose of a particular provision and interpret its language, so far as possible, in a way which best gives effect to that purpose. … In seeking the purpose of a statutory provision, the interpreter is not confined to a literal interpretation of the words, but must have regard to the context and scheme of the relevant Act as a whole…The essence of this approach is to give the statutory provision a purposive construction in order to determine the nature of the transaction to which it was intended to apply and then to decide whether the actual transaction (which might involve considering the overall effect of a number of elements intended to operate together) answered to the statutory description. Of course this does not mean that the courts have to put their reasoning into the straitjacket of first construing the statute in the abstract and then looking at the facts. It might be more convenient to analyse the facts and then ask whether they satisfy the requirements of the statute. But however one approaches the matter, the question is always whether the relevant provision of statute, on its true construction, applies to the facts as found."

31.    Although, of course, Parliament may abolish, modify or displace any common law rule, there is a general presumption that it did not intend to make changes to the common law except expressly or by necessary implication: Bennion on Statutory Interpretation (7th ed) para 25.6, 25.8. In considering whether a statute has displaced the common law, the court must consider the extent to which the legislative purpose would be undermined by the continuing existence of the common law operating alongside it: Bennion para 25.9. Where a legislative scheme is comprehensive, that may be an indication that the common law has been displaced: Bennion para 25.11.

**What is a DBA?**

32.    For convenience, I repeat the relevant part of the statutory definition of a DBA:

"(a) a damages-based agreement is an agreement between a person providing advocacy services, litigation services or claims management services and the recipient of those services which provides that—

(i) the recipient is to make a payment to the person providing the services if the recipient obtains a specified financial benefit in connection with the matter in relation to which the services are provided, and

(ii) the amount of that payment is to be determined by reference to the amount of the financial benefit obtained."

33. There are two possible views of what the DBA consists of. One view is that if a contract of retainer contains any provision which entitles the lawyer to a share of recoveries, then the whole contract of retainer is a DBA. In other words, a DBA is a contract which includes a provision for sharing recoveries. But another view is that if a contract of retainer contains a provision which entitles a lawyer to a share of recoveries; but also contains other provisions which provide for payment on a different basis, or other terms which do not deal with payment at all, only those provisions in the contract of retainer which deal with payment out of recoveries amount to the DBA.

34. In my judgment, there are good reasons for preferring the latter view. First, the object of the legislation was to permit the remuneration of lawyers by means of a share of recoveries. Second, the only part of the common law that needed to be changed to achieve that purpose was the rule against champerty. As I have said, at common law the contract of retainer, shorn of clause 9.1, would have been enforceable. There was no particular reason for Parliament to modify the other statutory and regulatory controls over lawyers' fees. Third, there is a presumption that Parliament does not intend to change the common law, except expressly or by necessary implication. There is no express provision which displaces the common law (except the rule against champerty). Fourth, the legislation cannot be said to be undermined by the co-existence of the common law. Fifth, the legislative scheme is far from comprehensive.

**Is this view reflected in the Regulations?**

35. In my judgment, it is. Regulation 4 (1) prohibits payment of "an amount other" than that described in that regulation. Taken literally, that may be thought to encompass any money payment, including a payment under clause 6.2. This is the interpretation for which Mr Davies contends. But there are, in my judgment, cogent reasons for rejecting that interpretation.

36. As the judge pointed out, the factual premise underlying regulation 4 is that there were in fact recoveries available for sharing. In that respect he was plainly right. The correctness of that conclusion can be seen by considering how the Regulations operate in employment matters. Regulation 7 prohibits a payment by the client above 35% of the client's ultimate recoveries. If the client does not recover anything (because they terminate the retainer) the payment permitted by regulation 7 is, on a literal reading, zero. (35% of zero is zero, so £1 is more than 35% of zero). Yet regulation 8 expressly permits the lawyer to charge the client his normal costs and expenses in the

event that the client terminates the retainer. It would be absurd to interpret a statutory instrument in a way that resulted in its being either ineffective or self-contradictory. So regulation 7 cannot be interpreted literally: it must be interpreted so as to give effect to regulation 8. Regulation 4 (3) is framed in much the same way as regulation 7. Regulation 4 (3) and regulation 7 must be interpreted consistently with each other.

37.    There are other textual indications that regulation 4 is only concerned with circumstances in which a recovery has been made. Again, as the judge pointed out, the heading to regulation 4 is "Payment in respect of claims" and the explanatory note states that regulation 4 deals with "the payment from a client's damages". Since "payment" is defined as a share of recoveries, these are also indications that regulation 4 is not concerned with fees calculated on a time basis.

38.    The interpretation for which Mr Davies contends would also conflict with regulation 3 which provides that a DBA must specify "the circumstances in which the representative's payment, expenses and costs, or part of them, are payable". That regulation is expressed to apply to all DBAs, not just to those dealing with employment matters. As we have seen, "costs" means the hourly charge multiplied by the number of hours spent on the case, whereas "payment" means the representative's share of recoveries. On a literal interpretation of regulation 4 (1) which enables a lawyer to be paid only where there has been a recovery, therefore, there would never be any circumstances in which a representative's *costs* as opposed to their "payment" would be payable. But, again, it would be absurd to interpret the Regulations as being either self-contradictory or internally inconsistent. In addition, regulation 3 expressly envisages that a DBA may apply to part only of proceedings. Suppose that a client approaches a solicitor and says that they have a claim that they wish to prosecute; that they can pay normal time charges up to close of pleadings; but that if the case goes any further they can only continue if the lawyer's payment is limited to a share of the recoveries. I can see no objection to regarding that part of the overall agreement relating to recoveries, rather than the whole of the contract of retainer, as amounting to the DBA. In those circumstances, the effect of regulation 4 would control that part of the contract of retainer which dealt with the share of recoveries, but not that part which dealt with time charges.

39.    It is also instructive to consider which statutory power has been invoked in making the Regulations. Regulation 3 is the product of the exercise of the power in section 58AA (4) (c). That power concerns the terms and conditions of an agreement: not the amount of the payment that is permitted. Likewise, regulation 8 (which permits the recovery of pre-termination costs in employment matters) is not an exercise of the power under section 58AA (4) (b) which deals with permitted payments; but is the exercise of the power under sub-paragraph (c) which deals with requirements about terms and conditions. In other words, the recovery of "costs" is not the target of the legislation. The effect of regulation 7 in combination with regulation 8 is that a retainer in an employment matter may include a DBA which provides for a share of recoveries not exceeding 35%, but only if it also includes a limit to the amount that can be charged on termination. As Mr Snell correctly submitted, regulation 8 does not *authorise* termination payments. It *assumes* that they are chargeable outside the scope of the Regulations and caps them. This, too, is consistent with a narrow view of the meaning of a DBA in the primary legislation.

40.    In addition, the power to make regulations in section 58AA (4)(b) allows regulations to be made prohibiting payments "above" a prescribed amount or "above" an amount calculated in a prescribed manner. It is thus concerned only with capping fees; and the particular target at which the cap was aimed was the sharing of recoveries.

41.    Finally, there is the question of policy underlying the Regulations. A reading of the policy documents underlying the Regulations also supports the view that the payment of a lawyer's time costs and expenses on early termination of the retainer was not the intended target of regulation 4 (1). It will be noted that a DBA extends more widely than an agreement between lawyer and client. The Explanatory Memorandum drew a distinction between DBAs applicable to ordinary civil litigation on the one hand, and DBAs applicable to employment matters on the other. It said:

> "7.4 It was not considered necessary to adapt the provisions in the 2010 regulations which deal with termination (now regulation 8), those which prescribe the information which must be provided to a client before entering a DBA (now regulation 5) or the form in which any amendments to the agreement must take (now regulation 6).  This is because section 58AA of the 1990 Act and the 2010 regulations were introduced following concerns that some representatives in employment cases were providing inadequate advice to their clients. This included failure to inform clients about alternative options for funding their claim (for example, through trade union representation and legal expenses insurance cover) and the use of unfair terms and conditions (for example, imposing unfair charges where a client wished to instruct another representative or refused to accept the representative's advice to settle their claim).  The 2010 regulations were designed to ensure that all representatives, whether solicitors or claims management companies, adhered to the stringent requirements specified in the regulations when providing a service under a DBA.
>
> 7.5 Only qualified legal representatives, who are subject to regulation by their professional bodies and whose conduct may be subject to challenge through those bodies, will undertake civil litigation (i.e. contentious business).  It is therefore considered that, at this stage, further regulation is not required.  Moreover, the consequence of failing to comply with these Regulations is that the DBA will not be enforceable and, in those circumstances, the representative will receive no payment. There is a concern that this could lead to attempts to avoid payment, by suggesting that the legal representative had failed to comply with one or more of the additional regulations (as happened when CFAs were subject to greater regulation), leading to satellite litigation."

42.    It is clear, then, from paragraph 7.5 that the regulation of the circumstances in which lawyers could recover their costs and expenses on termination of a DBA was not intended to be covered by the Regulations, and was to be left to their professional

regulators. In addition, if there is a dispute about a solicitor's "costs", the client is entitled to have those costs assessed by the court under section 70 of the Solicitors Act 1974. There were, therefore, consumer protection measures already in place.

43.  I would hold, therefore, that time costs as such are outside the scope of the Regulations, except where they are brought in as an additional requirement of a DBA in exercise of the power under section 58AA (4) (c).

44.  I recognise that this conclusion means that the current Regulations do not deal with a lawyer's remuneration in the event that the client pursues a case to trial and loses. But that, in my judgment, is a matter that could be provided for in Regulations under section 58AA (4)(c). In other words, it could be a requirement of a DBA that it was part of an overall contract of retainer which either precluded (or limited) a lawyer from charging fees if the claim were lost.

45.  In the light of my conclusion, I consider that clause 6.2 of the contract of retainer was outside the scope of the Regulations, and that its presence in the contract of retainer did not invalidate the contract.

46.  I would therefore dismiss the appeal.

**Other points**

47.  Mr Bacon raised a number of other points on behalf of the Bar Council. They included (a) whether, if clause 6.2 fell foul of regulation 4 the whole contract of retainer was invalidated and (b) whether, if clause 6.2 would otherwise fall foul of regulation 4, it could be severed so as to validate the contract.

48.  The judge decided the first of these points against Lexlaw; and Lexlaw has not challenged that conclusion by Respondent's Notice. Since the Bar Council has been given permission to intervene in what is a dispute between the parties to the appeal, I do not consider that it is open to us to consider that question on this appeal, tempting as it might be.

49.  Similarly, the question of severance was not one that was directly raised by the appeal. Although I have touched on the question of severance in explaining the common law background, that is a different point. Once again, I do not consider that we should embark upon a consideration of that point.

**Post-script**

50.  I have, since writing the above, had the benefit of reading the judgment of Newey LJ in draft. I agree with him that the underlying policy was to arrive at the result that he has reached. The difficulty for me is to find that result in the words of the Regulations as drafted. Regulation 4 (1) prohibits the payment of "an amount to be paid by the client other than" those specified in that regulation. The interpretation that Newey LJ prefers is that that prohibition prohibits the payment of "an amount" other than expenses if the claim is lost; but permits payment of "an amount" other than expenses if the retainer is terminated early. Try as I might, I cannot find that reflected in the text of regulation 4. If, however, I am wrong, then I would agree with Newey LJ that, for the reasons he gives, the appeal should be dismissed.

**Lord Justice Newey:**

51.    I agree with Lewison LJ that the appeal should be dismissed, but I have reached that conclusion by a different route.

**<u>Some more history</u>**

52.    Lewison LJ has already mentioned that the version of section 58AA of the Courts and Legal Services Act 1990 ("the 1990 Act") with which we are concerned was introduced to implement a recommendation made in Sir Rupert Jackson's Final Report and that the Damages-Based Agreements Regulations 2013 ("the 2013 Regulations") replaced the Damages-Based Agreements Regulations 2010 ("the 2010 Regulations"). For my own part, I find it helpful to consider the history of the current legislation further.

53.    Provision for the regulation of DBAs was first introduced by section 154 of the Coroners and Justice Act 2009, which inserted a new section 58AA into the 1990 Act. This version of section 58AA was limited to DBAs relating to employment matters, but was otherwise in much the same terms as the version quoted in paragraph 11 above. It stated:

> "(1) A damages-based agreement which relates to an employment matter and satisfies the conditions in subsection (4) is not unenforceable by reason only of its being a damages-based agreement.
>
> (2) But a damages-based agreement which relates to an employment matter and does not satisfy those conditions is unenforceable.
>
> (3) For the purposes of this section—
>
> (a) a damages-based agreement is an agreement between a person providing advocacy services, litigation services or claims management services and the recipient of those services which provides that—
>
> (i) the recipient is to make a payment to the person providing the services if the recipient obtains a specified financial benefit in connection with the matter in relation to which the services are provided, and
>
> (ii) the amount of that payment is to be determined by reference to the amount of the financial benefit obtained;
>
> (b) a damages-based agreement relates to an employment matter if the matter in relation to which the services are provided is a matter that is, or could become, the subject of proceedings before an employment tribunal.
>
> (4) The agreement—

(a) must be in writing;

(b) must not provide for a payment above a prescribed amount or for a payment above an amount calculated in a prescribed manner;

(c) must comply with such other requirements as to its terms and conditions as are prescribed; and

(d) must be made only after the person providing services under the agreement has provided prescribed information …."

54. The background to that form of section 58AA can be seen from paragraph 3.2 of chapter 12 of Sir Rupert Jackson's Final Report. Sir Rupert Jackson there explained:

"The Ministry of Justice (the 'MoJ'), although not making any submission to the Costs Review, in relation to the contingency fees issue has drawn my attention to its consultation paper 'Regulating Damages Based Agreements'. In that consultation paper the MoJ notes that contingency fees are permitted in tribunals. It notes that there are concerns about (i) failures to inform claimants about alternative methods of funding their claims and (ii) lack of clarity and understanding of the fee arrangements and the costs which claimants are likely to pay. Accordingly, the Government proposes to introduce regulations to address these issues. The proposed regulations will introduce requirements in respect of the following elements:

(i) The provision of clear and transparent advice and information provided to consumers, on (a) costs; (b) other expenses (such as VAT, counsel's fees, expert reports etc); and (c) other methods of funding available.

(ii) The maximum percentage of the damages that can be recovered in fees from the award.

(iii) Controlling the use of unfair terms and conditions (such as penalty and settlement clauses).

Following that consultation paper, section 154 of the Coroners and Justice Act 2009 (which received Royal Assent on 12th November 2009) (the '2009 Act') allows for the regulation of damages-based agreements relating to employment matters only. 'Damages-based agreement' is the term used in the 2009 Act to refer to an agreement for contingency fees, as defined in paragraph 1.1 above."

55. The 2010 Regulations were made pursuant to the new section 58AA of the 1990 Act. They provided:

"Citation, commencement, interpretation and application

1.— …

(2) In these Regulations—

…

'costs' means the total of the representative's time reasonably spent, in respect of the claim or proceedings, multiplied by the reasonable hourly rate of remuneration of the representative;

'damages-based agreement' means a damages-based agreement which relates to an employment matter;

'expenses' means disbursements incurred by the representative, including counsel's fees and the expense of obtaining an expert's report;

'payment' means a part of the sum recovered in respect of the claim or damages awarded that the client agrees to pay the representative and excludes expenses;

'representative' means the person providing the advocacy services, litigation services or claims management services to which the damages-based agreement relates.

…

Requirements of an agreement

2. The requirements prescribed for the purposes of section 58AA(4)(c) of the Act are that the terms and conditions of a damages-based agreement must specify—

(a) the claim or proceedings or parts of them to which the agreement relates;

(b) the circumstances in which the representative's payment, expenses and costs, or part of them, are payable; and

(c) the reason for setting the amount of the payment at the level agreed, including having regard to, where appropriate, whether the claim or proceedings is one of several similar claims or proceedings.

Information to be given before an agreement is made

3.—(1) The information prescribed for the purposes of section 58AA(4)(d) of the Act is—

(a) information, to be provided to the client in writing, about the matters in paragraph (2); and

(b) such further explanation, advice or other information about any of those matters as the client may request.

(2) Those matters are—

(a) the circumstances in which the client may seek a review of the costs and expenses of the representative and the procedure for doing so;

(b) the dispute resolution service provided by the Advisory, Conciliation and Arbitration Service (ACAS) in regard to actual and potential claims;

(c) whether other methods of pursuing the claim or financing the proceedings, including—

(i) advice under the Community Legal Service,

(ii) legal expenses insurance,

(iii) pro bono representation, or

(iv) trade union representation,

are available, and, if so, how they apply to the client and the claim or proceedings in question;

(d) the point at which expenses become payable; and

(e) a reasonable estimate of the amount that is likely to be spent upon expenses, inclusive of VAT.

…

The payment

5. The amount prescribed for the purposes of section 58AA(4)(b) of the Act is the amount which, including VAT, is equal to 35% of the sum ultimately recovered by the client in the claim or proceedings.

Terms and conditions of termination

6.—(1) The additional requirements prescribed for the purposes of section 58AA(4)(c) of the Act are that the terms and conditions of a damages-based agreement must be in accordance with paragraphs (2), (3) and (4).

(2) If the agreement is terminated, the representative may not charge the client more than the representative's costs and expenses for the work undertaken in respect of the client's claim or proceedings.

(3) The client may not terminate the agreement—

(a) after settlement has been agreed; or

(b) within seven days before the start of the tribunal hearing.

(4) The representative may not terminate the agreement and charge costs unless the client has behaved or is behaving unreasonably.

(5) Paragraphs (3) and (4) are without prejudice to any right of either party under the general law of contract to terminate the agreement."

56.     When the House of Lords was invited to approve the 2010 Regulations on 25 March 2010, the Minister speaking to them, Lord Bach, said:

> "A damages-based agreement is a type of contingency or 'no win, no fee' agreement, under which a representative agrees to act for a client in return for a percentage of any damages recovered by the client. If damages are not awarded, the representative is not paid. These agreements are of course different from conditional fee agreements, or CFAs. CFAs are typically used in court proceedings, and allow for an uplift or success fee on top of the representative's normal fee.
>
> I emphasise that damages-based agreements are not permitted in court proceedings or litigation and that the regulations will not change this. They are, however, commonly used by solicitors and claims managers in proceedings before the employment tribunal. The Courts and Legal Services Act 1990, as amended, controls the use of damages-based agreements to claims that are capable of being heard by the employment tribunal...."

57.     In his Final Report, Sir Rupert Jackson recommended that lawyers should be permitted to enter into "contingency fee agreements" with their clients in relation to civil litigation. "Contingency fee" was defined in the glossary as "A lawyer's fee calculated as a percentage of monies recovered, with no fee payable if the client loses". Sir Rupert Jackson said this about contingency fees in the executive summary:

> "3.2  <u>Contingency fees (chapter 12)</u>. A contingency fee agreement may be described as one under which the client's lawyer is only paid if his or her client's claim is successful, and then the lawyer is paid out of the settlement sum or damages awarded, usually as a percentage of that amount. Lawyers are not presently permitted to act on a contingency fee basis in 'contentious' business.

> 3.3 It is my recommendation that lawyers should be able to enter into contingency fee agreements with clients for contentious business, provided that:
>
> - the unsuccessful party in the proceedings, if ordered to pay the successful party's costs, is only required to pay an amount for costs reflecting what would be a conventional amount, with any difference to be borne by the successful party; and
>
> - the terms on which contingency fee agreements may be entered into are regulated, to safeguard the interests of clients.
>
> Permitting the use of contingency fee agreements increases the types of litigation funding available to litigants, which should thereby increase access to justice…."

Sir Rupert Jackson explained in paragraph 4.1 of chapter 12 that he had concluded that "both solicitors and counsel should be permitted to enter into contingency fee agreements with their clients on the Ontario model". He also, however, considered that such arrangements should be "properly regulated". He said in paragraph 4.6 of chapter 12:

> "The three matters identified by the MoJ in its consultation paper CP 10/9 are the principal matters which will require regulation. In my view the regulations which the MoJ is planning to introduce in respect of contingency fees in tribunal proceedings should be suitably adapted for the purpose of court proceedings. The regulations should (i) introduce a requirement that clear and transparent advice and information be provided to consumers on costs, other expenses and other methods of funding available; (ii) provide a maximum percentage of the damages that can be recovered in fees from the award; and (iii) control the use of unfair terms and conditions."

58. Section 58AA was subsequently amended, as Lewison LJ has said, by section 45 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012. The explanatory notes in respect of this Act explained in paragraph 29 that Part 2 of the Act, which includes section 45, "contains provisions to implement reforms to the existing arrangements for civil litigation funding and costs as recommended by Lord Justice Jackson … in his *Review of Civil Litigation Costs: Final Report*". This was said about section 45 specifically:

> "288.    Damages-based agreements ('DBAs') are another type of 'no win, no fee' agreement under which a lawyer can recover a percentage of the client's damages if the case is won, but will receive nothing if the case is lost. Currently, solicitors and barristers are not permitted to act under DBAs in civil litigation, but solicitors are permitted to act under DBAs in

> non-contentious business, including cases before employment tribunals.
>
> 289.    Section 45 amends section 58AA of the Courts and Legal Services Act 1990 (inserted by section 154 of the Coroners and Justice Act 2009), which currently provides that DBAs are enforceable only when they relate to employment matters. The effect of the amendments is to enable the use of DBAs in most civil litigation by persons providing advocacy services, litigation services or claims management services."

59.    The 2013 Regulations were made pursuant to section 58AA in the following year. The explanatory note appended to the 2013 Regulations stated:

> "DBAs are a type of 'no win, no fee' agreement under which a representative … can recover an agreed percentage of a client's damages if the case is won ('the payment'), but will receive nothing if the case is lost."

60.    When the House of Lords considered the 2013 Regulations in Grand Committee on 26 February 2013, the Minister speaking to them, Lord McNally, said:

> "Regulation 4 sets the cap as I have outlined. Regulations 5, 6, 7 and 8 replicate the provisions from the 2010 regulations for employment matters. These detailed provisions in relation to information and other matters are necessary because employment matters may be undertaken by non-lawyers such as claims managers. On the other hand, civil litigation can be undertaken only by qualified legal representatives, who are subject to regulation by their professional bodies and whose conduct may be subject to challenge through those bodies. It is therefore considered that further regulation at this stage is not required" and
>
> "On why DBA regulations do not contain requirements on termination for civil litigation, as in employment cases, the DBA regulations of 2010 made provisions for employment cases which can be taken forward by non-lawyers. Detailed safeguards need to be built in as a result. Civil litigation can be conducted only by lawyers, who are subject to their own professional regulations."

61.    A working group of the Civil Justice Council considered DBAs in a report published in August 2015. The working group had been asked to make recommendations to the Government on whether the 2013 Regulations could be made more effective by some improvements, including "clarifying that different forms of litigation funding cannot take place at the same time, although they could do so at different stages of a case". The working group addressed drafting issues in respect of "hybrid" DBAs in section 8, which opened with this explanation of "The issue":

"Under one form of 'hybrid DBA', a law firm receives concurrent funding via both a DBA and via some other form of retainer (e.g., discounted hourly rates), in the event of the claim's success; and receives the discounted hourly rate fees in the event of the claim's failure. This 'concurrent hybrid DBA' represents a scenario that the Government has indicated that it wishes to avoid. On the other hand, sequential forms of funding, where a DBA comprises one or other of those methods of funding for different stages of the legal proceedings, do not offend the Government's policy on co-funding. This is called a 'sequential hybrid DBA' in this section, for the sake of clarity.

The distinction between the two types of hybrid DBAs arises directly from terms of reference … , and in particular, from the query as to whether the 2015 DBA Regulations could benefit from 'clarifying that different forms of funding cannot take place at the same time, although they could do so at different stages of a case'. This term of reference raises various points of interest and uncertainty, to do with the drafting of a lawful and enforceable 'sequential hybrid DBA'.

It must be emphasised that this section focuses upon the types of arrangements in which a DBA, plus some other form of retainer, may be feasible, at least as the drafting of the 2015 DBA Regulations stands, in order to facilitate the sequential hybrid DBA. Whether concurrent hybrid DBAs should be permitted (contrary to the Government's current stance) is a policy matter, and is dealt with in Section 21 of the Report."

The report went on:

"The DBA must state 'the claim or proceedings, or parts of them, to which the agreement relates', per Reg 3(2)(a). By virtue of this provision, a DBA could feasibly relate to one stage only of the proceedings — whilst presumably an hourly rate retainer could apply to other stages or parts of the proceedings. Hence, a permissible type of 'hybrid DBA' is where the claim is successful, and the solicitor is paid for its 'base costs' (or the WIP incurred in conducting the case) up to a particular stage of the proceedings; and thereafter, the solicitor can be paid a percentage of damages recovered. It is a consecutive or sequential form of funding, which does not raise the same policy concerns as do concurrent forms of funding. The Working Group understands that the Government considers that it is not unreasonable for a solicitor to use one form of funding for one stage of the proceedings (i.e., to investigate the merits of the case, or to obtain expert reports), and then proceeding to another form of funding (i.e., a DBA, as the only form of funding) for the next stages of the claim."

Section 8 of the report concluded with, among others, this recommendation:

> "Although the prospect of sequential hybrid DBAs is allowed by the drafting of Reg 3(2)(a) of the 2015 DBA Regulations, the Working Group considered that the Regulations should define what a 'part' of the claim or proceedings could entail (e.g., whether the 'part' can be a reference to a time period, or a legal task, or an issue, or a claim or counterclaim)."

62.    The working group considered policy issues relating to concurrent hybrid DBAs in section 21 of its report. It concluded in paragraph 21.1:

> "The Working Group was divided on the question of concurrent hybrid DBAs, with some members considering that there was no good reason to prohibit their use, and that market freedom should prevail; whilst other members considered that the case in favour of concurrent hybrid DBAs had not been proven. It concluded that it was a policy decision which was ultimately one for the Government. However, the Government should be encouraged to evaluate the arguments in favour of concurrent hybrid DBAs, even in the absence of any cadre of cases which have tested the arguments (given the nervousness of the legal marketplace on this issue)."

## **What is a DBA?**

63.    As Lewison LJ has explained, he considers that there are good reasons for taking the view that "if a contract of retainer contains a provision which entitles a lawyer to a charge of recoveries; but also contains other provisions which provide for payment on a different basis, or other terms which do not deal with payment at all, only those provisions in the contract of retainer which deal with payment out of recoveries amount to the DBA" and that that view is reflected in the 2013 Regulations. While recognising that this means that the 2013 Regulations "do not deal with a lawyer's remuneration in the event that the client pursues a case to trial and loses", he has concluded that "time costs as such are outside the scope of the Regulations, except where they are brought in as an additional requirement of a DBA in exercise of the power under section 58AA (4) (c)".

64.    The implication, as I understand it, is that neither "sequential hybrid DBAs" nor "concurrent hybrid DBAs" (in the language of the Civil Justice Council's working group) are at present barred. There is nothing to prevent a solicitor agreeing with his client that he will receive up to 50% of the sums ultimately recovered if the claim succeeds and be paid his full time costs if the claim fails. In fact, it would seem to be the case that a retainer could provide for a solicitor to become entitled to *both* half of recoveries *and* full time costs in the event of the claim succeeding.

65.    My own view, with respect, is that this construction of the legislation is neither consistent with its history nor borne out by its terms.

66.    In the first place, "damages-based agreement" is defined in section 58AA of the 1990 Act as "an agreement … which provides that (i) the recipient is to make a payment to the person providing the services if the recipient obtains a specified financial benefit in connection with the matter in relation to which the services are provided, and (ii)

the amount of that payment is to be determined by reference to the amount of the financial benefit obtained". On the face of it, that description extends to any agreement under which a solicitor can become entitled to a share of recoveries and, in particular, encompasses an agreement which also provides for the solicitor to be paid on a different basis. An agreement under which a solicitor was to take a percentage of recoveries in the event of success and be remunerated on a time basis if the claim were lost would thus, on the face of it, be a "damages-based agreement" in its entirety.

67.    Secondly, there are multiple indications that section 58AA and the successive versions of the Damages-Based Agreements Regulations were intended to provide for a regime under which payment would depend on success. When, for example, Lord Bach spoke to the 2010 Regulations on 25 March 2010, he described a "damages-based agreement" as "a type of contingency or 'no win, no fee' agreement" under which "If damages are not awarded, the representative is not paid". Again, the amendments to section 58AA which were effected by the Legal Aid, Sentencing and Punishment of Offenders Act 2012 were intended "to implement reforms … as recommended by Lord Justice Jackson" and what Sir Rupert Jackson had proposed was that lawyers should be able to enter into "contingency fee agreements", i.e. agreements under which (as Sir Rupert explained) "the client's lawyer is only paid if his or her client's claim is successful" and "no fee is payable if the client loses". That was the aim as confirmed by the explanatory note stating that DBAs "are a type of 'no win, no fee' agreement under which a representative … can recover an agreed percentage of a client's damages if the case is won ('the payment'), but will receive nothing if the case is lost". If "damages-based agreement" is interpreted as outlined in the previous paragraph, the legislation will have achieved the objective: having regard to regulations 4 and 7 of the 2013 Regulations, a solicitor or other representative who has opted for a DBA will not in general be entitled to any payment absent recoveries. In contrast, Lewison LJ's construction of "damages-based agreement" would leave a solicitor or other representative free to stipulate for payment even where the claim had failed.

68.    Thirdly, the successive versions of the legislation were plainly intended to cap the share of recoveries that a representative could take in fees. Sir Rupert Jackson's Final Report noted that what became the 2010 Regulations would introduce requirements in respect of the "maximum percentage of the damages that can be recovered in fees from the award" and proposed that, if lawyers were permitted to use contingency fees, regulations should "provide a maximum percentage of the damages that can be recovered in fees from the award". Yet, as I have said, Lewison LJ's approach would appear to me to leave a representative free to require a "payment" equal to a share of recoveries under the DBA on top of time costs pursuant to a separate agreement, and that would be so even though the DBA and the "separate agreement" were contained in a single document.

69.    A fourth, and related, point relates to "concurrent hybrid DBAs", to which, on the basis of Lewison LJ's approach, there can be no objection. While "concurrent hybrid DBAs" certainly have supporters, it would be surprising if the legislation had been meant to authorise them without additional safeguards. It might, for instance, have been thought appropriate to insist that time should be charged at a reduced hourly rate

or otherwise to impose limits on the extent to which a representative could become entitled to time costs as well as a share of recoveries.

70. Fifthly, the terms of the 2013 Regulations do not seem to me to show that a DBA is limited to the provisions in a contract of retainer dealing with payment out of recoveries, as is Lewison LJ's view. The expression "damages-based agreement" was, of course, defined in the version of section 58AA of the 1990 Act which the Coroners and Justice Act 2009 introduced into the 1990 Act rather than in the Damages-Based Agreements Regulations which have subsequently been made pursuant to section 58AA. In any case:

   i) As I read the 2013 Regulations, regulation 4 is indeed concerned with circumstances in which recoveries have been made, but in the sense that, termination apart, a representative is to receive nothing unless there have been recoveries. Regulation 8 qualifies that principle rather than indicating that regulation 4 is not intended to limit a representative's ability to charge "costs";

   ii) It is true that regulation 3 speaks of the "circumstances in which the representative's payment, expenses and costs, or part of them, are payable", but the reference to "costs" is not redundant on any construction since regulation 8 allows a representative to charge "costs". While, moreover, regulation 3 is not limited to employment matters, the wording has been carried over from the 2010 Regulations, which were;

   iii) The fact that regulation 3 envisages that a DBA may apply only to "parts" of proceedings may be thought to sanction "sequential hybrid DBAs", as the Civil Justice Council working group noted in section 8 of its report, but does not seem to me to lend any support to the idea that "concurrent hybrid DBAs" are permissible, as Lewison LJ's approach would imply;

   iv) I do not myself read anything significant into the fact that regulations 3 and 8 were made pursuant to section 58AA(4)(c). Although it does not say so, regulation 4 must at least in part be the product of an exercise of section 58AA(4)(b); and

   v) The policy documents which Lewison LJ mentions in paragraph 41 above appear to me to bear on the extent to which the 2013 Regulations control termination provisions, not on the meaning of "damages-based agreement".

## Termination

71. While I respectfully part company from Lewison LJ on what a DBA is, I none the less agree that the appeal should be dismissed. In my view, regulation 4 of the 2013 Regulations does not bite on termination provisions and, accordingly, clause 6.2 of Lexlaw's agreement with Mrs Zuberi does not fall foul of the 2013 Regulations.

72. My reasons are as follows:

   i) As I read the 2010 Regulations, regulation 6 shows that regulation 5 was not intended to apply where a DBA was terminated early. It is apparent from regulation 6(2), limiting the amount that a representative could charge on

termination to "costs and expenses for the work undertaken", that, regulation 5 notwithstanding, it was proper for a DBA to provide for a representative to charge time costs on termination regardless of what, if anything, the client might ultimately recover from the claim;

ii)    Regulations 5 and 6 of the 2010 Regulations have now been replaced by regulations 7 and 8 of the 2013 Regulations, but the latter provisions must operate in the same way as the former formerly did. Just as regulation 5 of the 2010 Regulations cannot have been meant to extend to early termination, nor can regulation 7 of the 2013 Regulations have been intended so to extend;

iii)   Regulations 4 and 7 of the 2013 Regulations perform similar functions in relation to, respectively, "employment matters" and "claims or proceedings other than an employment matter". In particular, regulation 4(3), capping payment at an amount equal to 50% of recoveries, mirrors regulation 7, save that regulation 7 fixes the cap at 35% of recoveries rather than 50%. That suggests that, like regulation 7, regulation 4 should be seen as having no application to termination provisions;

iv)    That that is the correct interpretation is confirmed by what was said about the 2013 Regulations. Lord McNally explained to the House of Lords on 26 February 2013 that the detailed provisions found in, among others, regulation 8 of the 2013 Regulations were "necessary because employment matters may be undertaken by non-lawyers", whereas "civil litigation can be undertaken only by qualified legal representatives, who are subject to regulation by their professional bodies and whose conduct may be subject to challenge through those bodies" so that it "was considered that further regulation at this stage is not required". Lord McNally said, too, that "DBA regulations do not contain requirements on termination for civil litigation, as in employment cases" because "employment cases … can be taken forward by non-lawyers", while "Civil litigation can be conducted only by lawyers, who are subject to their own professional regulations". The same thinking emerges from paragraphs 7.4 and 7.5 of the explanatory memorandum in respect of the 2013 Regulations, which Lewison LJ has set out in paragraph 41 above: it was "not considered necessary to adapt the provisions in the 2010 regulations which deal with termination" because "Only qualified legal representatives, who are subject to regulation by their professional bodies and whose conduct may be subject to challenge through those bodies, will undertake civil litigation (i.e. contentious business)";

v)     Mr Davies argued that Lord McNally "appears to have been seriously mistaken about how much protection the principles of professional conduct of either branch of the profession offer the lay client". However that may be, though, both Lord McNally's comments and the explanatory memorandum indicate that there was not thought to be a need to regulate termination other than in employment matters. As Mr Snell said in his skeleton argument:

"the legislature … felt it necessary to regulate the extent of the costs and expenses that could be charged by those conducting employment tribunal proceedings *as an additional requirement* to the other matters regulated in respect of DBAs in an

employment tribunal context. There are no additional requirements in respect of civil proceedings; i.e. termination fees in a civil litigation are not regulated by the [2013 Regulations]".

73.    In short, I agree with Mr Snell that the 2013 Regulations "do not regulate, and are not intended to regulate, fees payable to legal representatives in the event of an early termination of the DBA".

**Lord Justice Coulson:**

74.    I agree with my Lords that the appeal in this case should be dismissed. Because their reasoning is different, and because nobody can pretend that these Regulations represent the draftsman's finest hour, it is appropriate if I add a few words to explain my own approach to the issues.

75.    Clause 6 of the agreement comprises an unobjectionable series of provisions relating to termination. The provisions themselves are clear and comprehensive. They are neither unlawful nor champertous. Accordingly, the burden is on the appellant to explain how and why these clear provisions, into which she freely entered, should be set aside. It is not, as Mr Davies sought to persuade us, for the respondent to demonstrate the contrary.

76.    The appellant seeks to rely on section 58AA of the Act and Regulation 4. In my view, for three separate reasons, neither avail the appellant.

77.    First, I agree with my Lord, Lord Justice Lewison, that the term "damages-based agreement" should be given a narrow meaning. It is the agreement between the parties relating to the payment as defined in the Regulations, namely that "part of the sum recovered in respect of the claim or damages awarded that the client agrees to pay the representative". Other elements of the agreement between the solicitor and the client, such as at which of the solicitors' offices the work will be done, or the level of expenses incurred (which is expressly excluded from the payment as defined) or, as in this case, the termination provisions, have nothing to do with the payment as defined in the Regulations, and are therefore not part of the DBA itself.

78.    Secondly, however, if that were too narrow an interpretation, I remain of the view that neither section 58AA of the Act, nor Regulation 4, affect the operation of an early termination provision such as clause 6. They do not address termination at all. I therefore expressly agree with the approach set out by Lord Justice Newey at paragraph 72 above.

79.    In this context, both before the judge, and again on appeal, Mr Davies made much of Regulation 8, which deals with termination provisions in an employment matter. This Regulation imposes particular restrictions on the nature of such provisions. But in my judgment, that is a point against the appellant. The inclusion of Regulation 8, imposing particular restrictions on early termination provisions in employment disputes, demonstrates that termination provisions are, in themselves, entirely lawful. It is simply that, for the reasons explained by Lord McNally in the House of Lords on 26 February 2013 (paragraph 72 iv) above), it was felt important to have particular restrictions on such clauses in employment disputes.

80. The fact that the Regulations do not prohibit or limit termination provisions for general civil litigation is not an inadvertent omission. On the contrary, as can be seen from the Explanatory Memorandum, it is the result of a deliberate decision. Parliament shied away from imposing any restrictions on termination provisions generally because it acknowledged that, in such cases, lawyers would be involved and therefore would be subjected to the regulatory provisions of their own professional bodies.

81. Thus, taken as a whole, I consider that the Regulations can only be construed on the basis that:

(a) They expressly assume that termination provisions such as Clause 6 may be included in the terms of the retainer between the legal representative and the client;

(b) No restriction on (much less prohibition of) such provisions was required by Parliament because, if it was necessary, regulation would be carried out by the relevant professional body.

Accordingly, there can be no basis now for suggesting that the Regulations render clause 6 unlawful: on the contrary, I consider that they establish its validity.

82. Thirdly, I am confident that the same result is achieved by consideration of the detail of the Regulations themselves. As I have said, the 'payment' is narrowly defined. Regulation 3 (b) expressly draws a distinction between the payment on the one hand, and the representative's "expenses and costs" on the other. Thus, an entitlement to expenses and costs can, by agreement, be dealt with separately and can be maintained on termination. That is what happened here.

83. Regulation 4(1) is a particular provision designed to incorporate what is known as the Ontario Model. It is solely concerned with the calculation of the final payment, as defined. It has nothing to do with what might be recoverable if the retainer was terminated early. Regulation 4(3) is a cap on the total amount of the payment and again is not concerned with expenses and costs.

84. Thus, the highest that it can be put by the appellant is that Regulation 4(1) could be read as saying that a damages-based agreement must not require any amount to be paid by the client other than the payment itself, and expenses, whatever circumstances may eventuate. So, if the narrow view of a damages-based agreement is not accepted, then, on that literal reading, Regulation 4(1) would, for example, prevent the legal representative from recovering any of its own costs, whatever the retainer actually said, even if the client terminated the agreement without cause after two years of work by the lawyer. That would not only be a commercial nonsense, but it would be contrary to the statutory purpose of section 58AA, which was designed to encourage the use of DBAs, not make them commercial suicide for the lawyer. It would also be contrary to Regulation 3, contrary to the assumptions made about termination provisions to which I have already referred, and render Regulation 8 redundant. I therefore reject that interpretation of Regulation 4(1).

85. Accordingly, for these reasons, I conclude that clause 6 was not unlawful and I agree that this appeal should be dismissed.



Neutral Citation Number: [2021] EWCA Civ 770

Case No: A2/2020/1869

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**Mr Justice Murray**
**QB-2019-000183**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21st May 2021

**Before :**

**LORD JUSTICE LEWISON**
**LORD JUSTICE ARNOLD**
and
**LORD JUSTICE EDIS**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

**LENKOR ENERGY TRADING DMCC**          **Respondent**
**- and -**
**MR IRFAN IQBAL PURI**                 **Appellant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr James Collins QC & Mr Philip Jones**  (instructed by **Mackrell Solicitors** ) for the
**Respondent**
**Mr Nigel Cooper QC**  (instructed by **Hill Dickinson LLP**) for the **Appellant**

Hearing dates : 13th May 2021
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Covid-19 Protocol:  This judgment was handed down remotely by circulation to the parties'**
**representatives by email, release to BAILII and publication on the Courts and Tribunals**
**Judiciary website.  The date and time for hand-down is deemed to be 10am on Friday 21st May**
**2021.**

**Lord Justice Lewison:**

**Introduction**

1.      On 20 July 2014 and 7 August 2014 Mr Puri signed two cheques, each drawn on the account of IPC Dubai at a Dubai branch of Habib Bank, in favour of Lenkor Dubai. The face value of the cheques was AED 208,500,200 (about US$ 55 million). When Lenkor Dubai attempted to present the cheques, there were insufficient funds in the accounts to meet them. They were not, therefore, honoured. By virtue of Article 599/2 of the Dubai Commercial Transactions Law a cheque may not be issued unless the drawer has, at the time of drawing the cheque, sufficient funds to meet it. Further, by the same law, a person who draws the cheque is deemed to be personally liable for the amount of the cheque. Following dishonour of the cheques, Lenkor Dubai brought proceedings against Mr Puri in Dubai. Those proceedings resulted in a judgment against him personally in Dubai in the sum of AED 123,272,048 plus interest at 9 per cent. Lenkor now seeks to enforce that judgment against him in England.

2.      Mr Puri resists the application on the ground that to enforce the Dubai judgment would be contrary to public policy. His reason for saying so is that the underlying transaction, which was the context in which he signed the cheque, was tainted by illegality. That argument failed both before Master Davidson and before Murray J. The judge's judgment is at [2020] EWHC 1432 (QB), [2021] 1 Lloyd's Rep 47.

3.      It is, I think, common ground that the legal framework is encapsulated in Rules 42 and 51 as set out in Dicey, Morris & Collins on The Conflict of Laws (15th ed). Rule 42 is the basic rule, namely that a final and conclusive foreign judgment for a debt or definite sum of money given by a court of competent jurisdiction may be enforced by a claim in England, unless it is impeachable on grounds set out in later Rules. Rule 51 is:

>       "A foreign judgment is impeachable on the ground that the enforcement or, as the case may be, recognition, would be contrary to public policy."

4.      It is that rule on which Mr Puri relies. In order to explain his reliance, it is necessary to explain the factual background. I do so adopting the very clear narrative of the judgment below.

**Factual background**

5.      Mr Puri is a businessman active in the energy sector. At the relevant times, he was the sole owner, principal, and controller of IP Commodities Dubai ("IPC Dubai"), a company incorporated in Dubai. He is a British citizen.

6.      Lenkor Energy Trading DMCC ("Lenkor Dubai") is a company incorporated in Dubai, with a sister company named Lenkor Energy Trading Ltd ("Lenkor Hong Kong"), a company incorporated in Hong Kong. Both companies operate in the oil supply and energy trading industry. The moving spirit behind each is Mr Atiyeh.

7.   On 4 June 2014 IPC Dubai, Lenkor Hong Kong and a third company, incorporated in Pakistan ("the Buyer"), entered into a tripartite agreement ("the Tripartite Agreement"), governed by English law. Under the Tripartite Agreement, Lenkor Hong Kong agreed to supply gasoil to the Buyer. The "Seller" under the Tripartite Agreement is defined as "Lenkor Energy Trading Limited/through IP Commodities DMCC". The Tripartite Agreement provided for there to be six cargoes of gasoil for delivery ex-ship at the FOTCO Jetty, Port Qasim, Karachi, the deliveries to be made at monthly intervals, with the first delivery to occur during the period 5-7 July 2014 and the last during the period 1-5 December 2014, for a total quantity of 200,000 metric tonnes, plus or minus 10 per cent. Clause 15 of the Tripartite Agreement dealt with payment. In relation to each cargo the Buyer would arrange to effect payment in US Dollars (USD), with half of the cargo value to be paid under a letter of credit and the other half by telegraphic transfer. Before the first delivery, the parties agreed to vary the payment terms to dispense with the requirement for a letter of credit and to provide that payment would be made by the Buyer to IPC Dubai as nominee of Lenkor Hong Kong.

8.   Clause 15(C) of the Tripartite Agreement provided that IPC Dubai would, in respect of each cargo to be delivered:

> "issue a payment guarantee for hundred percent of the cargo value by cheque in favour of [Lenkor Dubai], that is acceptable to the Seller, 3 days before the vessel commences loading."

9.   It was pursuant to this obligation imposed on IPC Dubai that Mr Puri signed the two cheques.

10.  The Buyer understood, and was intended by Lenkor Hong Kong and by IPC Dubai to understand, that it would be supplied under the Tripartite Agreement with a type of gasoil known as "High Speed Diesel" ("HSD"), sourced from the United Arab Emirates, although the Tripartite Agreement did not stipulate that the gasoil to be supplied was HSD, other than in the heading of the document, and did not stipulate the origin of the gasoil to be supplied. Instead, it stipulated a specification, which was a specification for HSD in Pakistan.

11.  In fact, Lenkor Hong Kong intended to supply, and did supply, a different but similar type of petroleum product known as "Heavy End Product" ("HEP"), sourced from Iran, with the intention of deceiving the Buyer and the Pakistani authorities into accepting each cargo as a delivery of HSD from the UAE. IPC Dubai, and Mr Puri personally, were privy to the deception at the time of entry into the Tripartite Agreement.

12.  For entry into Pakistan, it was necessary for the HEP delivered by Lenkor Hong Kong to meet the Pakistan government-approved specification for imported HSD, which was known as the "PSO import specification", PSO being an acronym for the Pakistan State Oil Co Ltd. Apparently, despite being a different product, it was technically possible for HEP to meet the PSO import specification for HSD, which in July and August 2014 was more stringent than the specification for locally manufactured HSD.

13.  At the time of entry into the Tripartite Agreement, Lenkor Hong Kong and its principal, Mr Atiyeh, as well as IPC Dubai and Mr Puri, believed that it was lawful,

both under international sanctions law and under Pakistan law, to supply gasoil from Iran into Pakistan and to make and receive payment for it in US Dollars. They believed, however, that disclosure of the nature and origin of the gasoil would, or could, lead to the Buyer requiring a discount to the price and to practical problems with the Pakistani authorities in relation to the import of the HEP. They were also concerned that there might be difficulties with the HEP meeting the PSO import specification.

14.    Mr Atiyeh took various steps to conceal the origin and nature of the product he was intending to supply under the Tripartite Agreement, including, in relation to the first cargo, altering and falsifying shipping documents, falsifying loadport test results and forging a certificate of origin, stating that the cargo origin was Hamriyah in the UAE. Mr Atiyeh hoped and expected that he would be lucky, and that each cargo would pass the PSO import specification or, if not, that IPC Dubai and Mr Puri would arrange for the cargo to be accepted into Pakistan, even if not in compliance with the PSO import specification.

15.    The vessel with the first cargo arrived at Port Qasim on 3 July 2014. The falsified shipping documents and falsified loadport test results were provided to the Buyer and the Pakistan customs authorities. The goods declaration for the cargo given to the Pakistan authorities described the cargo as HSD.

16.    Although there were some difficulties with the initial test results for the first delivery and re-testing was ordered and carried out, ultimately the Pakistan authorities accepted the cargo for import and gave customs clearance on 19 July 2014.

17.    On or about 22 July 2014 Lenkor Hong Kong issued commercial invoices for the first cargo, one in US Dollars addressed to the Buyer in the amount of US$23,158,159.50 and one in UAE Dirhams (AED) addressed to IPC Dubai. The commercial invoices were issued for the actual quantity delivered and falsely described the product origin as the UAE.

18.    The vessel with the second cargo to be delivered under the Tripartite Agreement arrived at Port Qasim on 12 August 2014. As with the first cargo, Mr Atiyeh had falsified shipping documents and loadport test results with the intention of deceiving the Buyer and the Pakistan authorities. On this occasion he also travelled to Karachi and procured the falsification of the ullage reports. The goods declaration for the cargo given to the Pakistan customs authorities described the cargo as HSD.

19.    Following testing, the second cargo was accepted for import by the Pakistan authorities and customs clearance was given, shortly after 14 August 2014.

20.    On or about 19 August 2014 Lenkor Hong Kong issued commercial invoices for the second cargo, one in US Dollars addressed to the Buyer in the amount of US$31,988,620.00 and one in UAE Dirhams addressed to IPC Dubai in the amount of AED 117,398,235.40, which was the equivalent of the US Dollar amount in UAE Dirhams at an exchange rate of 3.6700 AED per US$1.00.

21.    At some point before 18 August 2014, shortly after the second cargo had been given customs clearance and accepted for delivery by the Buyer, the Buyer's Bank, Summit Bank, learned that the vessel that had delivered the first and second cargo had called

at Iran. Summit Bank called for a meeting with the Buyer, which took place on 18 August 2014 with representatives of the Buyer as well as Mr Puri and Mr Atiyeh in attendance. At the meeting Summit Bank said that the vessel had called at Iran and that it would not make any further payments in US Dollars for either cargo without a Certificate of Origin certified by the Chamber of Commerce in the UAE. That led to a change in the payment arrangements. Lenkor Hong Kong reached an oral agreement, at or about the end of August 2014, with the Buyer and IPC Dubai that the Buyer would pay IPC Dubai in Pakistan Rupees (PKR).

22. Initially without informing Lenkor Hong Kong, the Buyer and Mr Puri agreed that the Buyer would make payments in PKR to a sister company of IPC Dubai in Pakistan, namely, IP Commodities Pakistan Ltd ("IPC Pakistan"), a company controlled by Mr Puri's son, Mohammed. IPC Pakistan would receive the PKR payments into an account in Pakistan. In so doing, it would be acting as nominee for IPC Dubai, which would in turn be acting as nominee for Lenkor Hong Kong. Lenkor Hong Kong was unaware of this arrangement until 4 December 2014. Mr Puri's reason for arranging with the Buyer for the PKR payments to be made to a local account of IPC Pakistan was to give him the opportunity to deny (as he subsequently did) that IPC Dubai was liable to account for those sums to Lenkor Hong Kong.

23. After the Buyer had received delivery of the first cargo, it decided to delay payment and pay only in instalments when or after it had on-sold equivalent quantities of HSD and been paid for them, even though it had no contractual right to do so.

24. Under the payment provisions of the Tripartite Agreement, as varied, the Buyer made part-payment amounting to approximately US$35 million, consisting of:

   i)    payments in US Dollars to IPC Dubai, as nominee for Lenkor Hong Kong, in three tranches on 7, 8 and 13 August 2014, amounting, in aggregate, to US$4,008,900; and

   ii)   payments in  PKR to an account in Pakistan of IPC Pakistan, as nominee for IPC Dubai, on various dates between 22 September 2014 and 9 January 2015, amounting, in aggregate, to PKR 3,196,855,717 (approximately equivalent to US$31 million).

25. The Buyer made no further payments in respect of either of the cargoes. IPC Dubai has never accounted to Lenkor Hong for any of the monies received by it as nominee for Lenkor Hong Kong, either directly from the Buyer in US Dollars or by payment to its own nominee, IPC Pakistan, in PKR. The upshot is that IPC Dubai has received (either by itself or by its nominee) substantial payments in respect of the oil.

26. Under Clause 15(C) of the Tripartite Agreement, IPC Dubai issued two cheques to Lenkor Dubai as follows:

   i)    in respect of the first cargo, cheque number 156861, dated 20 July 2014, in the amount of AED 91,400,200; and

   ii)   in respect of the second cargo, cheque number 156862, dated 7 August 2014 in the amount of AED 117,100,000.

27.    The total face amount of the two cheques was therefore AED 208,500,200, which was the equivalent of about US$55 million, according to the Particulars of Claim. Each cheque was payable to Lenkor Dubai, was signed by Mr Puri and was drawn on IPC Dubai's account at a Dubai branch of Habib Bank Ltd.

28.    Although Lenkor Dubai had received cheques from IPC Dubai in relation to the first and second cargoes, by the second half of September 2014 Mr Atiyeh was agitated that Lenkor Hong Kong had delivered two cargoes and had not received payment for them. Correspondence ensued between Lenkor Hong Kong and the Buyer during which Lenkor Hong Kong attempted to persuade the Buyer to stop making payments to IPC Dubai (being unaware of the role of IPC Pakistan until 4 December 2014) and to make payments directly to Lenkor Hong Kong. The Buyer, having consulted with Mr Puri, refused. Lawyers became involved during the course of December 2014.

29.    On 9 January 2015 Lenkor Hong Kong's solicitors applied for and obtained from the Commercial Court a worldwide freezing order against IPC Dubai. In his first affidavit in support of the application for the order, Mr Atiyeh disclosed the true origin and nature of the cargoes and of his deceptions, including the falsification of documents. Shortly after this, the Buyer learned of the contents of Mr Atiyeh's affidavit, stopped all payments in relation to the two cargoes delivered by Lenkor Hong Kong and refused to make any further payments.

**The arbitration**

30.    The dispute between Lenkor and the Buyer went to arbitration. We have been provided with a redacted copy of the award which preserves the confidentiality of the Buyer's identity. The arbitrator (Mr Steven Berry QC) considered the buyer's defence to Lenkor's claim for the contract price, applying the principles laid down by the Supreme Court in *Patel v Mirza* [2016] UKSC 42, [2017] AC 467. He was satisfied that Lenkor had entered into the Tripartite Agreement with the intention of committing illegal acts; and committed them in the course of performing the contract. He then discussed the various policy considerations both for and against enforcement of the contract. He came to the conclusion that it would be proportionate to deny a claim against the Buyer in contract which contained a profit element; but that it would be disproportionate to deny a claim to reverse unjust enrichment. Accordingly, he held that Lenkor Hong Kong had a valid claim for the balance of the value of the two cargoes delivered, after deduction of the amounts that the Buyer had paid in respect of the two cargoes to IPC Dubai in US Dollars and to IPC Pakistan in Pakistan Rupees. The balance due from the Buyer to Lenkor Hong Kong was therefore US$19,101,284.44.

31.    The arbitrator went on to consider Lenkor's claims against IPC Dubai for the amounts that the latter had received on account of the cargos. In essence he held that IPC Dubai was liable to account to Lenkor for the amounts that had been paid to it or on its behalf. He further held that IPC Dubai had forfeited any right to commission because of its knowledge of Lenkor's illegal conduct. IPC Dubai was therefore liable to repay to Lenkor the entirety of the sums it had received. The basis of liability was either a contractual liability under the agency agreement; or was itself based on unjust enrichment. He did not find that the agency agreement between IPC Dubai and Lenkor Hong Kong was unenforceable for illegality.

32. In the course of his consideration of those claims, he also discussed the status of the guarantee cheques. He held that Lenkor was not obliged to return those cheques, but that any amount recovered on the cheques by Lenkor Dubai would be held for the benefit of Lenkor "and would, as between Lenkor and IPC Dubai, be receipt by it for the account of Lenkor". Accordingly, any sums recovered by reason of any liability on the cheques or any judgment on the cheques were to be credited against the liability of IPC Dubai as awarded in the arbitration.

## The Dubai proceedings

33. Lenkor Dubai then attempted to cash the two cheques that it had received from IPC Dubai under Clause 15(C) of the Tripartite Agreement. IPC Dubai did not have sufficient funds in its account to honour them and they were not honoured.

34. Consequently, Lenkor Dubai commenced civil proceedings against Mr Puri under Article 599/2 of the Dubai Commercial Transactions Law, a statutory provision that imposes personal liability on the drawer of a cheque in circumstances where the account on which the cheque is intended to draw has insufficient funds to cover the amount due under the cheque. On 30 May 2017 the Dubai court issued its judgment in favour of Lenkor Dubai for the amount of AED 123,727,048 (approximately UD$33.5 million) plus interest at 9 per cent per annum. That judgment was subject to various appeals, reaching the highest court, the Dubai Court of Cassation, on two occasions, where it was ultimately upheld on 5 August 2018. Mr Puri's appeal rights in Dubai are now exhausted.

35. Although the reasoning of the Dubai court on this point is obscure, it is important to note that the Dubai court did not order Mr Puri to pay the full face amount of the two cheques, which was AED 208,500,200. The Dubai court ordered that Mr Puri pay AED 123,272,048, which was the total amount found by the court to have been received by Mr Puri and IPC Dubai. In other words, Mr Puri was found liable for the sums which the Buyer had actually paid over to IPC Dubai; but which had not been remitted onwards to Lenkor Hong Kong.

## The English proceedings

36. Lenkor Dubai then began proceedings in this jurisdiction, seeking to enforce the Dubai judgment at common law. Mr Puri advanced a number of defences to that application of which only one remains live. The live defence is that the judgment of the Dubai court was tainted by the illegality of the Tripartite Agreement, so as to make it unenforceable as a matter of public policy under English law.

37. Both the Master and the judge rejected that defence.

38. The essential argument which Mr Cooper QC advances on Mr Puri's behalf is that it is contrary to public policy to permit the indirect enforcement (via a guarantee) of a contractual obligation that is illegal. As a matter of English law, a guarantee is unenforceable if the underlying transaction is tainted with illegality so as to be unenforceable. In support of that proposition, he relies on *Garrard v James* [1925] Ch 616, *Heald v O'Connor* [1971] 1 WLR 497 and *Azimut-Benetti SpA v Healey* [2010] EWHC 2234 (Comm). In this case the cheques signed by Mr Puri were signed in order to guarantee performance of the Buyer's payment obligation; and that obligation

Case 2:23-cv-09217-MEMF-KS    Document 114-4    Filed 09/05/25    Page 739 of 2232
Page ID #:2797

Judgment Approved by the court for handing down.                                    Lenkor v Puri

has been held to be unenforceable because of illegality. The English court retains a discretion to inquire into the illegality of the underlying transaction: *Westacre Investments Inc v Jugoimport SPDR Holding Co Ltd* [2000] QB 311. The judge was wrong not to have undertaken that inquiry. If he had, he would (or ought to have) concluded that public policy precluded enforcement of the Dubai judgment. The only evidence relied upon by Mr Puri in support of this defence is the arbitrator's award. Thus the case of illegality advanced by Mr Puri rests solely on the arbitrator's findings.

## Conclusions

39.     I agree with both the Master and the judge (for the reasons that they gave) that the defence fails. Accordingly, I can state my view shortly. As Mummery LJ said in *Re Portsmouth City Football Club Ltd, Neumans LLP (a firm) v Andronikou* [2013] EWCA Civ 916, [2013] Bus LR 1152, at [38]:

> "If the judgment in the court below is correct, this court can legitimately adopt and affirm it without any obligation to say the same things over again in different words. The losing party will be told exactly why the appeal was dismissed: there was nothing wrong with the decision appealed or the reasons for it."

40.     First, this is not a question of enforcing a contract. It is a question of enforcing a judgment given by a foreign court of competent jurisdiction.  The two are not the same: *Omnium de Traitement et de Valorisation SA v Hilmarton Ltd* [1999] 2 Lloyd's Rep 222, 224.  There are sound justifications for taking a different approach to substantive claims and enforcement claims, reflecting the different role performed by the court in each circumstance: *RBRG Trading (UK) Ltd v Sinocore International Co Ltd* [2018] EWCA Civ 838, [2018] 2 Lloyd's Rep 133 [26] (3). The judgment of a foreign court of competent jurisdiction creates an obligation to pay the judgment sum enforceable in this jurisdiction as a debt, irrespective of the underlying cause of action: *Williams v Jones* (1845) 13 M & W 628, 633; *Adams v Cape Industries plc* [1990] 1 Ch 433, 513. It is common ground that the Dubai court was such a court. Second, Mr Puri's underlying liability is not a contractual liability (nor could it be since he was not a party to the Tripartite Agreement).  Nor is it a claim on the guarantee. Mr Puri gave no guarantee; and IPC Dubai is not sued on the guarantee. The only relevant contract in place between Lenkor Hong Kong and IPC Dubai was the separate agency contract. That contract was not found by the arbitrator to be illegal or unenforceable. Nor is it even a claim on the cheque as a negotiable instrument. Such a claim could only have been brought against IPC Dubai. What Mr Puri did was to draw a cheque on a Dubai account held at a Dubai bank, which has particular legal consequences in Dubai for him personally. As both the Master and the judge put it, that liability is independent of the underlying transaction. There is no suggestion that the public policy which arises under the law of Dubai precludes the enforcement of the statutory cause of action. As the judge said, if that point was to be taken, it should have been taken in Dubai. Third, Lenkor Hong Kong's underlying claim against IPC Dubai is not a contractual claim under the Tripartite Agreement either. It is a claim either in unjust enrichment, or under a separate agency agreement. IPC Dubai collected money as Lenkor Hong Kong's nominee. It agreed to and ought to have paid that money over to Lenkor Hong Kong, and has failed to do so. Lenkor Hong Kong makes no claim against Mr Puri. Lenkor Dubai's claim against Mr Puri is

a claim based on a particular statutory liability under the law of Dubai, in support of Lenkor Hong Kong's underlying claim against IPC Dubai in restitution for unjust enrichment or under the agency agreement. Fourth, the quantum of the judgment was neither the same as the contract price, nor the same as the face value of the cheque. It is directly reflective of the amount that was actually paid to IPC Dubai or its sister companies "for the account" of Lenkor Hong Kong. Put another way, whereas a guarantee (properly so-called) would have required IPC Dubai to pay what the Buyer was obliged to pay but had *failed* to pay, the judgment sum corresponded to what the Buyer *had in fact* paid. Thus, even if one "looks through" the form of claim against Mr Puri, the underlying claim is still a long way from an attempt to enforce an illegal contract, let alone the Buyer's payment obligation. There is therefore only a slight degree of connection between the claim sought to be enforced and the relevant illegality. The degree of connection between the claim and the illegality must also be balanced against the strong public policy in favour of finality, and in favour of enforceability: *RBRG Trading (UK) Ltd v Sinocore International Co Ltd* [25] (4), 26 (4). Fifth, applying the principles in *Patel v Mirza*, the arbitrator decided that it would be unjust for IPC Dubai (and those acting on its behalf) to retain the funds that it had actually received on account of cargo actually delivered. It would be equally unjust for Mr Puri to retain the economic benefit of those funds. In *Patel v Mirza* itself the ultimate conclusion of the Supreme Court is encapsulated in the following statement by Lord Toulson at [121]:

> "A claimant, such as Mr Patel, who satisfies the ordinary requirements of a claim for unjust enrichment, should not be debarred from enforcing his claim by reason only of the fact that the money which he seeks to recover was paid for an unlawful purpose. There may be rare cases where for some particular reason the enforcement of such a claim might be regarded as undermining the integrity of the justice system, but there are no such circumstances in this case."

41.  Even those of their Lordships who were in a minority as regards the correct approach to the question of illegality agreed with that proposition: Lord Neuberger at [146], Lord Mance at [203], Lord Clarke at [210] and Lord Sumption at [250]. I do not consider that Mr Puri has identified any circumstances which would make this case one of those "rare cases". All that he relies on is the illegality of the Tripartite Agreement. Sixth, if the terms of IPC Dubai's guarantee obligation are relevant (and I do not think that they are), the guarantee required cheques to secure the "value" of the cargo: not the price. The value of the cargo is precisely what the arbitrator awarded Lenkor Hong Kong; and the judgment of the Dubai court is limited to the amount that IPC Dubai (or its sister company) actually received for the account of Lenkor Hong Kong.

42.  As the judge correctly said at [96]:

> "There are, however, several reasons for saying that enforcement of the Dubai FIC judgment does not amount, in legal substance, to enforcement of any of Lenkor Hong Kong's claims for (i) part of the contract price under the Tripartite Agreement, (ii) restitution from the Buyer or (iii) restitution from IPC Dubai. First, it is trite law that the mere fact that two

transactions have an equivalent economic effect is not sufficient to establish that they are, in legal substance, the same transaction or that one can, without more, be recharacterized as the latter. Secondly, the parties are different. IPC Dubai is the payment guarantor under the Tripartite Agreement, and Lenkor Hong Kong the beneficiary of that payment guarantee. Mr Puri is liable as judgment debtor under the Dubai FIC judgment, and Lenkor Dubai is the judgment creditor. Thirdly, IPC Dubai's liability under the payment guarantee in Clause 15(C) is contractual, whereas Mr Puri's liability under Article 599/2 of the Dubai Commercial Transactions Law is statutory. Other distinctions could be drawn, but these are sufficient to illustrate the point."

**Result**

43.      I would dismiss the appeal.

**Lord Justice Arnold:**

44.      I agree.

**Lord Justice Edis:**

45.      I also agree.



**Michaelmas Term [2021] UKSC 50**
*On appeal from: [2019] EWCA Civ 1599*

# JUDGMENT

# Lloyd (Respondent) *v* Google LLC (Appellant)

before

**Lord Reed, President**
**Lady Arden**
**Lord Sales**
**Lord Leggatt**
**Lord Burrows**

**JUDGMENT GIVEN ON 10 November 2021**

**Heard on 28 and 29 April 2021**

*Appellant*
Antony White
QCEdward
Craven
(Instructed by Pinsent Masons LLP (London))


*Respondent*
Hugh Tomlinson
QC Oliver Campbell
QC Victoria
Wakefield QC
(Instructed by Milberg London LLP)


*1st Intervener (Information Commissioner)*
Gerry Facenna
QCNikolaus
Grubeck
(Instructed by Information Commissioner's Office)


*2nd Intervener (Open Rights*
*Group)(written submissions only)*
Robert Palmer QC
Julianne Kerr
Morrison(Instructed
by AWO)


*3rd Intervener (Association of the British Pharmaceutical Industry and Association*
*of BritishHealthTech Industries (ABPI and ABHI))*
*(written submissions only)*
Lord Anderson of Ipswich KBE
QCRobin Hopkins
Rupert Paines
(Instructed by CMS Cameron McKenna Nabarro Olswang LLP (London))


*4th Intervener (Liberty, Coram Children's Legal Centre and Inclusion*
*London)(written submissions only)*
Dan Squires QC
Aidan Wills
Tim James-Matthews
(Instructed by Liberty, Coram Children's Legal Centre and Deighton Pierce Glynn)


*5th Intervener (Internet*
*Association)(written submissions*
*only)*
Christopher Knight
(Instructed by Linklaters LLP
(London))

*6th Intervener (TECHUK Ltd (trading as
techUK))(written submissions only)*
Catrin Evans
QCIan Helme
(Instructed by RPC LLP (London))

**LORD LEGGATT: (with whom Lord Reed, Lady Arden, Lord Sales and Lord Burrows agree)**

## A.    INTRODUCTION

1.    Mr Richard Lloyd - with financial backing from Therium Litigation Funding IC, a commercial litigation funder - has issued a claim against Google LLC, alleging breach of its duties as a data controller under section 4(4) of the Data Protection Act 1998 ("the DPA 1998"). The claim alleges that, for several months in late 2011 and early 2012, Google secretly tracked the internet activity of millions of Apple iPhone users and used the data collected in this way for commercial purposes without the users' knowledge or consent.

2.    The factual allegation is not new. In August 2012, Google agreed to pay a civil penalty of US$22.5m to settle charges brought by the United States Federal Trade Commission based upon the allegation. In November 2013, Google agreed to pay US$17m to settle consumer-based actions brought against it in the United States. In England and Wales, three individuals sued Google in June 2013 making the same allegation and claiming compensation under the DPA 1998 and at common law for misuse of private information: see *Vidal-Hall v Google Inc (Information Comr intervening)* [2015] EWCA Civ 311; [2016] QB 1003. Following a dispute over jurisdiction, their claims were settled before Google had served a defence. What is new about the present action is that Mr Lloyd is not just claiming damages in his own right, as the three claimants did in *Vidal-Hall*. He claims to represent everyone resident in England and Wales who owned an Apple iPhone at the relevant time and whose data were obtained by Google without their consent, and to be entitled to recover damages on behalf of all these people. It is estimated that they number more than 4m.

3.    Class actions, in which a single person is permitted to bring a claim and obtain redress on behalf of a class of people who have been affected in a similar way by alleged wrongdoing, have long been possible in the United States and, more recently, in Canada and Australia. Whether legislation to establish a class action regime should be enacted in the UK has been much discussed. In 2009, the Government rejected a recommendation from the Civil Justice Council to introduce a generic class action regime applicable to all types of claim, preferring a "sector based approach". This was for two reasons:

> "Firstly, there are potential structural differences between the sectors which will require different consideration. … Secondly, it will be necessary to undertake a full assessment

of the likely economic and other impacts
before implementing any reform."

See the Government's Response to the Civil Justice Council's Report:
"Improving Access to Justice through Collective Actions" (2008), paras 12-13.

4.      Since then, the only sector for which such a regime has so far been
enacted is that of competition law. Parliament has not legislated to establish a
class action regime in the field of data protection.

5.      Mr Lloyd has sought to overcome this difficulty by what the Court of
Appeal in this case described as "an unusual and innovative use of the
representative procedure" in rule 19.6 of the Civil Procedure Rules: see [2019]
EWCA Civ 1599; [2020] QB 747, para 7. This is a procedure of very long
standing in England and Wales whereby a claim can be brought by (or against)
one or more persons as representatives of others who have "the same interest"
in the claim. Mr Lloyd accepts that he could not use this procedure to claim
compensation on behalf of other iPhone users if the compensation recoverable
by each user would have to be individually assessed. But he contends that such
individual assessment is unnecessary. He argues that, as a matter of law,
compensation can be awarded under the DPA 1998 for "loss of control" of
personal data without the need to prove that the claimant suffered any financial
loss or mental distress as a result of the breach. Mr Lloyd further argues that a
"uniform sum" of damages can properly be awarded in relation to each person
whose data protection rights have been infringed without the need to
investigate any circumstances particular to their individual case. The amount of
damages recoverable per person would be a matter for argument, but a figure
of £750 was advanced in a letter of claim. Multiplied by the number of people
whom Mr Lloyd claims to represent, this would produce an award of damages of
the order of £3 billion.

6.      Because Google is a Delaware corporation, the claimant needs the
court's permission to serve the claim form on Google outside the jurisdiction.
The application for permission has been contested by Google on the grounds
that the claim has no real prospect of success as: (1) damages cannot be
awarded under the DPA 1998 for "loss of control" of data without proof that it
caused financial damage or distress; and (2) the claim in any event is not
suitable to proceed as a representative action. In the High Court Warby J
decided both issues in Google's favour and therefore refused permission to
serve the proceedings on Google: see [2018] EWHC 2599 (QB); [2019] 1 WLR
1265. The Court of Appeal reversed that decision, for reasons given in a
judgment of the Chancellor, Sir Geoffrey Vos, with which Davis LJ and Dame
Victoria Sharp agreed: [2019] EWCA Civ 1599; [2020] QB 747.

7.    On this further appeal, because of the potential ramifications of the issues raised, as well as hearing the claimant and Google, the court has received written and oral submissions from the Information Commissioner and written submissions from five further interested parties.

8.    In this judgment I will first summarise the facts alleged and the relevant legal framework for data protection before considering the different methods currently available in English procedural law for claiming collective redress and, in particular, the representative procedure which the claimant is seeking to use. Whether that procedure is capable of being used in this case critically depends, as the claimant accepts, on whether compensation for the alleged breaches of data protection law would need to be individually assessed. I will then consider the claimant's arguments that individual assessment is unnecessary. For the reasons given in detail below, those arguments cannot in my view withstand scrutiny. In order to recover compensation under the DPA 1998 for any given individual, it would be necessary to show both that Google made some unlawful use of personal data relating to that individual and that the individual suffered some damage as a result. The claimant's attempt to recover compensation under the Act without proving either matter in any individual case is therefore doomed to fail.

## B.    FACTUAL BACKGROUND

9.    The relevant events took place between 9 August 2011 and 15 February 2012 and involved the alleged use by Google of what has been called the "Safari workaround" to bypass privacy settings on Apple iPhones.

10.    Safari is an internet browser developed by Apple and installed on its iPhones. At the relevant time, unlike most other internet browsers, all relevant versions of Safari were set by default to block third party cookies. A "cookie" is a small block of data that is placed on a device when the user visits a website. A "third party cookie" is a cookie placed on the device not by the website visited by the user but by a third party whose content is included on that website. Third party cookies are often used to gather information about internet use, and in particular web pages visited over time, to enable the delivery to the user of advertisements tailored to interests inferred from the user's browsing history.

11.    Google had a cookie known as the "DoubleClick Ad cookie" which could operate as a third party cookie. It would be placed on a device if the user visited a website that included DoubleClick Ad content. The DoubleClick Ad cookie enabled Google to identify visits by the device to any website displaying an advertisement from its vast

advertising network and to collect considerable amounts of information. It could tell the date and time of any visit to a given website, how long the user spent there, which pages were visited for how long, and what advertisements were viewed for how long. In some cases, by means of the IP address of the browser, the user's approximate geographical location could be identified.

12.    Although the default settings for Safari blocked all third party cookies, a blanket application of these settings would have prevented the use of certain popular web functions; so Apple devised some exceptions to them. These exceptions were in place until March 2012, when the system was changed. But in the meantime the exceptions made it possible for Google to devise and implement the Safari workaround. Its effect was to place the DoubleClick Ad cookie on an Apple device, without the user's knowledge or consent, immediately, whenever the user visited a website that contained DoubleClick Ad content.

13.    It is alleged that, in this way, Google was able to collect or infer information relating not only to users' internet surfing habits and location, but also about such diverse factors as their interests and pastimes, race or ethnicity, social class, political or religious beliefs or affiliations, health, sexual interests, age, gender and financial situation.

14.    Further, it is said that Google aggregated browser generated information from users displaying similar patterns, creating groups with labels such as "football lovers", or "current affairs enthusiasts". Google's DoubleClick service then offered these group labels to subscribing advertisers to choose from when selecting the type of people at whom they wanted to target their advertisements.

## C.    THE LEGAL FRAMEWORK

15.    The DPA 1998 was enacted to implement Parliament and Council Directive 95/46/EC of 24 October 1995 "on the protection of individuals with regard to the processing of personal data and on the free movement of such data" (OJ 1995 L281, p 31) (the "Data Protection Directive"). The Data Protection Directive has been superseded by the General Data Protection Regulation, which became law in the UK in May 2018, supplemented by the Data Protection Act 2018 ("the DPA 2018"). The DPA 2018 repealed and replaced the DPA 1998 except in relation to acts or omissions which occurred before it came into force.

16.    Because the acts and omissions giving rise to the present claim occurred in 2011and 2012, the claim is governed by the old law contained in the DPA 1998 and the DataProtection Directive. The parties and interveners in their submissions on this appeal nevertheless made frequent references to provisions of the General Data Protection Regulation and the DPA 2018. In principle, the meaning and effect of the DPA 1998 andthe Data Protection Directive cannot be affected by legislation which has been enacted subsequently. The later legislation therefore cannot help to resolve the issues raised on this appeal, and I shall leave it to one side.


**(1)    The scheme of the DPA 1998**


17.    Section 4(4) of the DPA 1998 imposed a duty on a data controller to comply with "the data protection principles" set out in Schedule 1 "in relation to all personal data with respect to which he is the data controller". As defined in section 1(1) of the Act, "personal data" are, in effect, all recorded information which relate to an identifiable individual. An individual who is the subject of personal data is referred to as the "data subject". A "data controller" is a person who (either alone or with others) "determines the purposes for which and the manner in which any personal data are, orare to be, processed." The term "processing" is defined very broadly to mean "obtaining, recording or holding the information or data or carrying out any operation or set of operations on the information or data …". Section 2 of the Act establishes a category of "sensitive personal data" consisting of information about certain specified matters, which include the racial or ethnic origin, political opinions, religious beliefs, physical or mental health or sexual life of the data subject.


18.    The first of the eight "data protection principles" set out in Schedule 1 is

that:"Personal data shall be processed fairly and lawfully and, in particular, shall not be processed unless -

(a)    at least one of the conditions in Schedule 2 is met,and

(b)    in the case of sensitive personal data, at least oneof the conditions in Schedule 3 is also met."

The other seven data protection principles, in summary, require personal data: (2) to be obtained and processed only for specified and lawful purposes; (3) to

be "adequate, relevant, and not excessive" in relation to those purposes; (4) to
be accurate and,

where necessary, kept up to date; (5) not to be kept for longer than is necessary for those purposes; (6) to be processed in accordance with the rights of data subjects under the Act; (7) to be protected by appropriate technical and organisational security measures against unauthorised or unlawful processing and against accidental loss or destruction or damage; and (8) not to be transferred outside the European Economic Area unless the destination country or territory provides an adequate level of protection for data subjects in relation to the processing of personal data.

19.    As discussed in more detail below, section 13 of the DPA 1998 gives an individual who suffers damage "by reason of any contravention by a data controller of any of the requirements of this Act" a right to compensation from the data controller for that damage.

**(2)    The allegations of breach of duty**

20.    The claimant, Mr Lloyd, contends that Google processed personal data of each member of the represented class in breach of the first, second and seventh data protection principles. The represented class consists in essence of everyone in England and Wales who at the relevant time had an Apple iPhone on which Google's DoubleClick Ad cookie was placed through the Safari workaround. (The precise definition of the class is set out at para 19 of Warby J's judgment.) Two principal allegations made are that, in breach of the first data protection principle, (i) the data obtained by placing the DoubleClick Ad cookie on each class member's device were not processed fairly and (ii) none of the conditions in Schedule 2 (or 3) was met.

21.    Schedule 1, Part II, paragraph 2, provides, in substance, that personal data obtained from the data subject are not to be treated as processed fairly unless the data controller informs the data subject of the purpose for which the data are intended to be processed - a requirement with which it is said that Google failed to comply in this case.

22.    Schedule 2 contains a list of conditions capable of justifying the processing of data. To comply with the first data protection principle, at least one of these conditions must be satisfied. The first condition in Schedule 2 is that "the data subject has given his consent to the processing". Other conditions are that the processing is necessary for (amongst other things): the performance of a contract to which the data subject is a party; or compliance with a legal obligation (other than a contractual obligation) of the data controller; or to protect the vital interests of the data subject; or for the exercise of any functions of a public nature exercised in the public interest by any person. The claimant asserts that the members of the represented class whose

personal data Google processed had not given their consent to the processing, nor was any of the other conditions capable of justifying the processing met. Hence for this reason too Google was in breach of the first data protection principle.

23.    There is no doubt that the claimant is entitled to advance a claim against Google on this basis in his own right which has a real prospect of success. The issue is whether he can also do so on behalf of all other iPhone users who fall within the represented class. This depends on the scope of the representative procedure available under the Civil Procedure Rules ("CPR"). Before I come to that procedure, I will mention in order to compare them the two other methods of claiming collective redress currently available in English procedural law.

## D.    COLLECTIVE REDRESS IN ENGLISH LAW

### (1)    Group Actions

24.    A group of people who wish to bring claims which give rise to common or related issues of fact or law can apply to the court for a Group Litigation Order to be made under CPR rule 19.11, providing for the claims to be managed together, usually by a single designated judge. The Group Litigation Order will establish a register of the claims included in the group, which is maintained by the claimants' lead solicitor. The order may also make provision for how the litigation costs are to be shared among the claimants. How the claims are managed is a matter for the designated judge, but procedures typically used are to select one or more claims to be tried as test claims while the remaining claims are stayed and to decide as preliminary issues common issues of law or fact which are potentially dispositive of the litigation. Unless the court orders otherwise, a judgment given or order made in the litigation is binding on all the claimants included in the group register: see CPR rule 19.12(1)(a).

25.    Where the individual claims are of sufficiently high value, group actions can be an effective way of enabling what are typically several hundred or thousands of claims to be litigated and managed together, avoiding duplication of the court's resources and allowing the claimants to benefit from sharing costs and litigation risk and by obtaining a single judgment which is binding in relation to all their claims. However, the group action procedure suffers from the drawback that it is an "opt-in" regime: in other words, claimants must take active steps to join the group. This has an administrative cost, as a solicitor conducting the litigation has to obtain sufficient information from a potential claimant to determine whether he or she is eligible to be added to the group register, give appropriate advice and enter into a retainer with the client. For claims which individually are only worth a few hundred pounds, this process

is not economic as the initial costs alone may easily exceed the potential value of the claim.

26.    Another limitation of opt-in proceedings is that experience has shown that only a relatively small proportion of those eligible to join the group are likely to do so, particularly if the number of people affected is large and the value of each individual claim relatively small. For example, a group action was recently brought against the Morrisons supermarket chain for compensation for breach of the DPA 1998 arising from the disclosure on the internet by a Morrisons' employee of personal data relating to other employees. Of around 100,000 affected employees, fewer than 10,000 opted to join the group action: see *Various Claimants v Wm Morrisons Supermarkets plc* [2017] EWHC 3113 (QB); [2019] QB 772 (reversed on the issue of vicarious liability by the Supreme Court: [2020] UKSC 12; [2020] AC 989). During the period of more than 12 years in which collective proceedings under the Competition Act 1998 (discussed below) could be brought only on an opt-in basis just one action was commenced, based on a finding of price fixing in the sale of replica football shirts. Although around
1.2 – 1.5m people were affected, despite widespread publicity only 130 people opted into the proceedings: see *The Consumers' Association v JJB Sports Plc* [2009] CAT 2, para 5; Civil Justice Council Report "Improving Access to Justice through Collective Actions" (2008), Part 6, para 22; and Grave D, McIntosh M and Rowan G (eds), *Class Actions in England and Wales*, 1st ed (2018), para 1-068.

27.    Likely explanations for the low participation rates typically experienced in opt-in regimes include lack of awareness of the opportunity to join the litigation and the natural human tendency to do nothing when faced with a choice which requires positive action - particularly if there is no immediate benefit to be gained and the consequences are uncertain and not easy to understand: see eg Thaler R and Sunstein C, *Nudge: The Final Edition* (2021), pp 36-38; Samuelson W and Zeckhauser R, "Status Quo Bias in Decision Making" (1988) 1 Journal of Risk and Uncertainty 7-59. As the New Zealand Court of Appeal has recently said of opt-in class actions:

> "Whichever approach is adopted, many class members are likely to fail to take any positive action for a range of reasons that have nothing at all to do with an assessment of whether or not it is in their interests to participate in the proceedings. Some class members will not receive the relevant notice.
> Others will not understand the notice, or will have difficulty understanding what action they are required to take and completing any relevant form, or will be unsure

or hesitant about what to do and will do nothing. Even
where a class member considers that it is in their
interests to participate in

the proceedings, the significance of inertia in human affairs should not be underestimated."

*Ross v Southern Response Earthquake Services Ltd* [2019] NZCA 431, para 98; approved by the New Zealand Supreme Court at [2020] NZSC 126, para 40.

28.    A further factor which makes group litigation impractical in cases where the loss suffered by each individual is small, even if in aggregate it may amount to a very large sum of money, is the need to prove the quantum of loss in each individual case. Not only are eligible individuals less likely to opt into the proceedings where the potential gain to them is small, but the costs of obtaining evidence from each individual to support their claim is again likely to make group litigation uneconomic in such cases.

## (2)    Collective Proceedings

29.    Compared to group actions, the method of collective redress which is now available in the field of competition law offers significant advantages for claimants, particularly where many people have been affected by the defendant's conduct but the value of each individual claim is small. Section 47B of the Competition Act 1998 (added by the Enterprise Act 2002 and as amended by the Consumer Rights Act 2015) makes provision for bringing "collective proceedings" in the Competition Appeal Tribunal ("CAT") combining two or more claims to which section 47A applies (essentially, claims in respect of an infringement or alleged infringement of competition law). Such proceedings must be commenced by a person who proposes to be the representative of a specified class of persons, and the proceedings may only be continued if they are certified by the CAT as satisfying criteria set out in section 47B and in the CAT Rules. Two features of this regime may be noted.

30.    First, unlike group litigation, collective proceedings may be brought on either an "opt-in" or "opt-out" basis. "Opt-out" collective proceedings are proceedings brought on behalf of each class member except any member who opts out by notifying the class representative that their claim should not be included in the proceedings: see section 47B(11). Where "opt-out" collective proceedings are permitted, a person may therefore have a claim brought on their behalf without taking any affirmative step and, potentially, without even knowing of the existence of the proceedings and the fact that he or she is represented in them.

31.    A second significant feature of the collective proceedings regime is that it enables liability to be established and damages recovered without the need

to prove

that members of the class have individually suffered loss: it is sufficient to show thatloss has been suffered by the class viewed as a whole. This is the effect of section 47C(2) of the Competition Act, which provides:

> "The tribunal may make an award of damages in collectiveproceedings without undertaking an assessment of the amount of damages recoverable in respect of the claim of each represented person."

Such an award of damages is referred to in the CAT Rules as "an aggregate award ofdamages": see rule 73(2).

32.    As Lord Briggs explained in *Merricks v Mastercard* [2020] UKSC 51; [2021] Bus LR25, at para 76, section 47C(2) of the Competition Act "radically alters the established common law compensatory principle by removing the requirement to assess individualloss". This is so for the purposes both of making and of paying out an aggregate award of damages. How an aggregate award of damages is distributed among the members of the class is subject to the control of the CAT and, as this court held in *Merricks v Mastercard*, the only requirement is that the distribution should be just: see paras 76- 77, 149. No doubt in many cases a just method of distribution will be one which dividesup an aggregate award of damages in a way which takes account of individual loss. But particularly where the size of the class is large and the amount of damages awarded small considered on a per capita basis, it may be impractical or disproportionate to adopt such a method. In such cases some other method of distribution, such as an equal division among all the members of the class, may be justified.

## (3)    Representative Actions

33.    Collective proceedings are a recent phenomenon in English law. By contrast, therepresentative procedure which the claimant is seeking to use in this case has existed for several hundred years. The current version of the representative rule is CPR rule 19.6, which states:

> "(1)    Where more than one person has the same interest ina claim -
>
> (a) the claim may be begun; or

(b) the court may order that the claim be continued,

by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.

(2)    The court may direct that a person may not act as a representative.

(3)    Any party may apply to the court for an order under paragraph (2).

(4)    Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule -

(a) is binding on all persons represented in the claim; but

(b) may only be enforced by or against a person who is not a party to the claim with the permission of the court."

### (a)    Origins of the rule

34.    This rule has its origins in the procedure of the Court of Chancery before the Judicature Act of 1873. The general rule was that all persons materially interested in the subject-matter of a suit should be made parties to it, either as claimants or defendants, so as to ensure that the rights of all persons interested were settled by a single judgment of the court: see eg *Adair v New River Co* (1805) 11 Ves Jr 429; 32 ER 1153; *Cockburn v Thompson* (1809) 16 Ves Jr 321; 33 ER 1005. However, to join all interested persons as parties was not always practically convenient - particularly if they were very numerous. The solution devised was not to abandon the aim of settling the rights of all interested persons in a single proceeding; rather, it was to relax the "complete joinder rule" by allowing one or more claimants or defendants to represent all others who had the same interest as them: see Sorabji J, "The hidden class action in English civil procedure" (2009) 28 CJQ 498. All persons represented in this way, as well as the parties actually before the court, were bound by the court's decision.

35.    In the very early cases in the 16th and 17th centuries in which this procedure was adopted, the persons represented were invariably a cohesive communal group, such as parishioners or manorial tenants, whose members had agreed to be represented; and the representatives were often required to show proof of their authority to represent the group. But as the nature of society changed and new, more impersonal institutions such as friendly societies and joint stock companies with multiple investors emerged, this requirement was dropped. The court allowed persons to be represented whether or not they had consented to such representation or even knew of the action, relying on community of interest among the members of the group to ensure that the interests of all were adequately protected: see Yeazell, "From Group Litigation to Class Action, Part I: The Industrialization of Group Litigation" (1980) 27 UCLA Law Review 514.

36.    Many of the formative cases involved joint stock companies at a time (before the Joint Stock Companies Acts 1844 to 1858) when such companies were not yet recognised as separate legal entities which could sue or be sued. An action had therefore to be brought by (or against) the members themselves. In *Chancey v May* (1722) Precedents in Chancery 592; 24 ER 265, the treasurer and manager of a brass- works brought an action on behalf of themselves and all other proprietors of the undertaking, of whom there were 800 in total, except for the defendants, who were its former managers, to call the defendants to account for alleged mismanagement and embezzlement. The defendants objected that the claim should not be allowed to proceed as the rest of the proprietors had not been made parties. The court dismissed that objection on the grounds that, first, the action had been brought on behalf of all the other proprietors, so that "all the rest were in effect parties", and secondly:

> "Because it would be impracticable to make them all parties by name, and there would be continual abatements by death and otherwise, and no coming at justice, if all were to be made parties."

37.    Another notable case involving a joint stock company was *Meux v Maltby* (1818) 2 Swanston 277; 36 ER 621. In this case the treasurer and directors of the company were sued as representative defendants on a contract made on behalf of all the members of the company to grant a lease. In rejecting an argument that the claim was defective because not all the proprietors were before the court, Plumer MR explained, at pp 281-282:

> "The general rule, which requires the plaintiff to bring before the court all the parties interested in the subject in question, admits of exceptions. The liberality of this court has long held

Page

that there is of necessity an exception to the general rule, when a failure of justice would ensue from its enforcement."

After citing numerous authorities, he concluded, at p 284:

"Here is a current of authority, adopting more or less a general principle of exception, by which the rule, that all persons interested must be parties, yields when justice requires it, in the instance either of plaintiffs or defendants.

… It is quite clear that the present suit has sufficient parties, and that the defendants may be considered as representing the company."

38.    In *Duke of Bedford v Ellis* [1901] AC 1, 8, Lord Macnaghten summarised the practice of the Court of Chancery in this way:

"The old rule in the Court of Chancery was very simple and perfectly well understood. Under the old practice the Court required the presence of all parties interested in the matter in suit, in order that a final end might be made of the controversy. But when the parties were so numerous that you never could 'come at justice', to use an expression in one of the older cases, if everybody interested was made a party, the rule was not allowed to stand in the way. It was originally a rule of convenience: for the sake of convenience it was relaxed. Given a common interest and a common grievance, a representative suit was in order if the relief sought was in its nature beneficial to all whom the plaintiff proposed to represent."

**(b)    Effect of the Judicature Act**

39.    By the Supreme Court of Judicature Act 1873, all the jurisdiction previously exercised by the Court of Chancery and the courts of common law was transferred to and vested in the new High Court of Justice. Rules of procedure for the High Court were scheduled to the Act, which included as rule 10:

"Where there are numerous parties having the same

interestin one action, one or more of such parties may
sue or be

> sued, or may be authorised by the court to defend in
> such action, on behalf or for the benefit of all parties
> so interested."

This rule became Order 16, rule 9 of the Rules of the Supreme Court and has remained in force in the same or similar form ever since. Save that the requirement for "numerous parties" has been reduced to "more than one", there is no significant difference in the current version of the rule, quoted at para 33 above.

40.    At first after the enactment of the Judicature Act the courts construed the new rule narrowly. In *Temperton v Russell* [1893] 1 QB 435, 438, Lindley LJ, who gave the judgment of the Court of Appeal, expressed the view that the rule only applied to "persons who have or claim some beneficial proprietary right" which they are asserting or defending in an action that would have come within the jurisdiction of the old Court of Chancery; hence the rule did not apply to a claim for damages in tort. That view, however, was repudiated by the House of Lords in *Duke of Bedford v Ellis* [1901] AC 1. Six individuals sued the Duke of Bedford, who owned Covent Garden Market, on behalf of themselves and all other growers of fruit, flowers, vegetables, roots and herbs, to enforce certain preferential rights claimed under the Covent Garden Market Act 1828 to stands in the market. They sought declarations of the rights of the growers and an injunction to restrain the Duke from acting inconsistently with those rights. They also claimed - though only for themselves and not on behalf of other growers - an account and repayment of sums charged to them for selling at the market in excess of what they would have paid if afforded their alleged preferential rights. The Duke applied to have the action stayed either on the ground that the claimants had no beneficial proprietary right, or on the ground that the joinder in one action of parties claiming separate and different rights under the Act, both personally and as representing a class, would embarrass or delay the trial. The House of Lords rejected both grounds (the first unanimously and the second by a majority of 3 to 2) and held that the action could be maintained.

41.    Lord Macnaghten, who gave the leading speech, expressly disapproved the restrictive view of the representative rule expressed in *Temperton v Russell* and confirmed that its purpose was simply to apply the practice of the Court of Chancery to all divisions of the High Court. The only change was therefore that the rule was now applicable in actions which, before the Judicature Act, could only have been brought in a court of common law. He said, at pp 10-11, that:

> "… in all other respects I think the rule as to
> representative suits remains very much as it was a
> hundred years ago. From the time it was first
> established it has been recognised as a

simple rule resting merely upon convenience. It is impossible, I think, to read such judgments as those delivered by Lord Eldon in *Adair v New River Co*, in 1805, and in *Cockburn v Thompson*, in 1809, without seeing that Lord Eldon took as broad and liberal a view on this subject as anybody could desire. 'The strict rule', he said, 'was that all persons materially interested in the subject of the suit, however numerous, ought to be parties … but that being a general rule established for the convenient administration of justice must not be adhered to in cases to which consistently with practical convenience it is incapable of application'. 'It was better', he added, 'to go as far as possible towards justice than to deny it altogether'. He laid out of consideration the case of persons suing on behalf of themselves and all others, 'for in a sense', he said, 'they are before the Court'. As regards defendants, if you cannot make everybody interested a party, you must bring so many that it can be said they will fairly and honestly try the right. I do not think, my Lords, that we have advanced much beyond that in the last hundred years …"

As Megarry J commented in *John v Rees* [1970] Ch 345, 370, this explanation made it plain that the representative rule is to be treated as being "not a rigid matter of principle but a flexible tool of convenience in the administration of justice".

42.     In *Taff Vale Railway Co v Amalgamated Society of Railway Servants* [1901] AC 426, 443, Lord Lindley (as he had become) went out of his way to endorse this view and to retract his earlier observations in *Temperton v Russell*, stating:

> "The principle on which the rule is based forbids its restriction to cases for which an exact precedent can be found in the reports. The principle is as applicable to new cases as to old, and ought to be applied to the exigencies of modern life as occasion requires. The rule itself has been embodied and made applicable to the various Divisions of the High Court by the Judicature Act, 1873, sections 16 and 23- 25, and Order XVI, rule 9; and the unfortunate observations made on that rule in *Temperton v Russell* have been happily corrected in this House in the *Duke of Bedford v Ellis* and in the course of the argument in the present case."

### (c)    *Markt* and declarations of rights

43.    The subsequent decision of the Court of Appeal in *Markt & Co Ltd v Knight Steamship Co Ltd* [1910] 2 KB 1021 has sometimes been seen as undermining the broad and flexible view of the representative rule adumbrated by the House of Lords in these two cases by imposing significant constraints on its use: see eg *Esanda Finance Corpn Ltd v Carnie* (1992) 29 NSWLR 382, 395; Mulheron R, *The Class Action in Common Law Legal Systems* (2004) pp 78-82; Sorabji J, "The hidden class action in English civil procedure" (2009) 28 CJQ 498. I do not think, however, that the decision should be understood in this way. *Markt* was heard together with another action also brought against the owners of a cargo vessel which was intercepted by a Russian cruiser on a voyage to Japan during the Russo-Japanese war, on suspicion of carrying contraband of war, and sunk. Just before the limitation period expired, two cargo- owners issued writs "on behalf of themselves and others owners of cargo lately laden on board" the vessel, claiming "damages for breach of contract and duty in and about the carriage of goods by sea". No further particulars of the claims were given.

44.    All three members of the Court of Appeal agreed that the claims as formulated could not be pursued as representative actions as there was no basis for asserting that all the cargo owners had the same interest in the actions. That was so if only because a claim that the shipowners were in breach of duty in carrying contraband goods plainly could not be maintained on behalf of any cargo-owners who had themselves shipped such goods; furthermore, each cargo owner would need to prove their individual loss. Buckley LJ would have allowed the claimants to amend their writs and continue the proceedings on behalf of themselves and all cargo-owners who were not shippers of contraband goods, claiming a declaration that the defendants were in breach of contract and duty in shipping contraband of war. The other judges, however, did not agree to this course. Vaughan Williams LJ, at p 1032, rejected it on the grounds that the proposed amendment had not been brought before the court in a way which gave a proper opportunity for argument and doubted anyway whether the amendment could be so framed as to disclose a common purpose of the shippers or any class of the shippers. Fletcher Moulton LJ, at p 1042, considered that making a declaration of the type suggested would be contrary to the practice of the courts and that subsequent claims by individual cargo-owners relying on such a declaration to recover damages would constitute new claims which would be time-barred, as the limitation period had now expired.

45.    The readiness of English courts to give judgments declaring legal rights where it would serve a useful purpose has much increased since 1910. An important step was the decision of the Court of Appeal in *Guaranty Trust Co of New York v Hannay & Co* [1915] 2 KB 536, which held that a declaration can

be granted at the instance of a

claimant even if the claimant has no cause of action against the defendant. Two cases decided together by the Court of Appeal in 1921 showed that there is no reason in principle why a claim for a declaration of the kind suggested by Buckley LJ in *Markt* cannot be brought as a representative action. In *David Jones v Cory Bros & Co Ltd* (1921) 56 LJ 302; 152 LT Jo 70, five individuals sued on their own behalf and on behalf of all other underground and surface workmen employed at the defendant's colliery on three specified days in September 1919. They alleged that on those three days the safety lamps in use at the colliery were not in accordance with statutory requirements, were insufficient in number and were not properly examined; and that in consequence the workmen justifiably refused to go to work and lost the wages they would otherwise have earned and were entitled to damages. In *Thomas v Great Mountain Collieries Co*, which was heard at the same time, two claimants sued the owner of another colliery for loss of wages, alleging breach of statutory duty in not having a weighing machine to weigh coal as near the pit mouth as was reasonably practicable. The workmen were divided into two classes - one comprising all workmen whose wages depended on the amount of coal gotten and the other comprising all other underground and surface workmen. The claimants sued on their own behalf and on behalf of the class they respectively represented.

46.    In each action the claims were divisible under three heads: (1) claims for declarations upon matters in which the classes represented were alleged to have a common interest; (2) claims for damages by the individual named claimants; and (3) claims for damages by the individual members of the classes represented. Unfortunately, only a bare summary of the judgments is reported. But this records that the Court of Appeal by a majority (Bankes and Atkin LJJ, with Scrutton LJ dissenting) held that the claimants were entitled to sue in a representative capacity as regards claims that came within (1) and (2), but not as regards claims for damages by the individual members of the classes represented.

47.    In *Prudential Assurance Co Ltd v Newman Industries Ltd* [1981] Ch 229 the claimant brought a derivative action as a minority shareholder of the first defendant company claiming damages on behalf of the company against two of its directors for breach of duty and conspiracy. At the start of the hearing the claimant applied to amend its statement of claim to add a personal claim against the directors and the company, brought in a representative capacity on behalf of all the shareholders. The relief sought was a declaration that those shareholders who had suffered loss as a result of the alleged conspiracy were entitled to damages. The judge (Vinelott J) allowed the amendment. He distinguished *Markt* and followed *David Jones v Cory Bros* in holding that a representative claim for a declaration could be pursued notwithstanding that each member of the class of persons represented had a separate cause of action. Although the personal claim was later held by the Court of Appeal in

*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1981] Ch 204 at 222 to be

misconceived as a matter of substantive law, the Court of Appeal cast no doubt on the use of the representative procedure.

48.    This decision was important in demonstrating the potential for a bifurcated process whereby issues common to the claims of a class of persons may be decided in a representative action which, if successful, can then form a basis for individual claims for redress. More generally, the *Prudential* case marked a welcome revival of the spirit of flexibility which characterised the old case law.

### (d)    Claims for damages

49.    In the cases so far mentioned where claims were held to come within the scope of the representative rule, the relief claimed on behalf of the represented class was limited to a declaration of legal rights. It was accepted or held that the named claimants could only claim damages or other monetary relief in their personal capacity. In *Markt* Fletcher Moulton LJ expressed the view, at pp 1035 and 1040-1041, that damages are "a personal relief" and that:

> "no representative action can lie where the sole relief sought is damages, because they have to be proved separately in the case of each plaintiff, and therefore the possibility of representation ceases."

50.    In many cases, of which *Markt* was one, it is clearly correct that the assessment of damages depends on circumstances personal to each individual claimant. In such cases it is unlikely to be practical or fair to assess damages on a common basis and without each individual claimant's participation in the proceedings. However, this is not always so, and representative actions for damages have sometimes been allowed. For example, in the case of insurance underwritten by Lloyd's syndicates, which are not separate legal entities, it is standard practice for a single member of the syndicate (usually the leading underwriter) to be named as a representative claimant or defendant suing, or being sued, for themselves and all the other members. There is no difficulty in awarding damages for or against the representative in such proceedings, as the calculation of any damages which the members of the syndicate are collectively entitled to recover or liable to pay does not depend on how the risk is divided among the members of the syndicate.

51.    In *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1989] 1 Lloyd's Rep 568 the claimant companies sued on behalf of themselves and members of a syndicate

which had reinsured on a quota share basis a proportion of the risks they had underwritten, claiming under contracts which provided excess of loss reinsurance cover for the claimants and their quota share reinsurers. The Court of Appeal rejected an argument that the claimants were not entitled to sue in a representative capacity. It made no difference that there was a dispute between one of the claimants and some members of the syndicate about the validity of the quota share reinsurance, since as Lloyd LJ said, at p 571: "the question is whether the parties have the same interest as against the defendants; not whether they have the same interest as between themselves".

52.    In *Irish Shipping Ltd v Commercial Union Assurance Co plc (The "Irish Rowan")* [1991] 2 QB 206 numerous insurers had subscribed in various proportions to a policy of marine insurance. The Court of Appeal accepted that, as a matter of law, each subscription constituted a separate contract of insurance (of which there were said to be 77 in all). Claims for losses allegedly covered by the policy were made by suing two of the insurers as representative defendants. The Court of Appeal rejected an argument that claims for debt or damages could not be included in a representative action, merely because they are made by numerous claimants individually or resisted by numerous defendants individually, and held that the action could continue as a representative action. While the policy terms contained a broadly worded leading underwriter clause, the presence of this clause was not essential to the decision: see *Bank of America National Trust and Savings Association v Taylor (The Kyriaki)* [1992] 1 Lloyd's Rep 484, 493-494; *National Bank of Greece SA v Outhwaite* [2001] CLC 591, para 31.

53.    In *EMI Records Ltd v Riley* [1981] 1 WLR 923, and in *Independiente Ltd v Music Trading On-Line (HK) Ltd* [2003] EWHC 470 (Ch), the claimants sued in a representative capacity on behalf of all members of the British Phonographic Industry Ltd ("BPI"), a trade association for the recorded music industry (and also in the latter case on behalf of Phonographic Performance Ltd), claiming damages for breach of copyright in selling pirated sound recordings. In each case the claims were allowed to proceed as representative actions. Because it was accepted or could safely be assumed that the owner of the copyright in any pirated recording was a member of the represented class, this procedure enabled breach of copyright to be proved and damages to be awarded without the need to prove which particular pirated recordings had been sold in what quantities. Again, what mattered was that the members of the class had a community of interest in suing the defendant.

54.    In *EMI Records* it was asserted, and not disputed by the defendants, that the members of the BPI had consented to all sums recovered in actions for breach of copyright being paid to the BPI: see [1981] 1 WLR 923, 925. In *Independiente*, however,

this assertion was disputed and Morritt V-C found that there was no binding agreement that any money recovered should go to the BPI: see [2003] EWHC 470 (Ch), paras 16 and 28. He nevertheless held, at paras 28 and 39, that the claim was properly brought as a representative action, observing that what the claimants did with any damages recovered was a matter for them or between them, the BPI and the class members, and not between them and the defendants.

55.    Although not cited in these cases, the same point had been made long before in *Warrick v Queen's College Oxford (No 4)* (1871) LR 6 Ch App 716, 726, where Lord Hatherley LC gave an example of:

> "classes of shareholders in a railway company who have different rights inter se, but they may all have a common enemy in the shape of a fraudulent director, and they may all join, of course, in one common suit against that director, although after the common right is established they may have a considerable litigation among themselves as to who are the persons entitled to the gains obtained through that suit."

While the right enforced in such a common suit would in modern company law be seen as a right belonging to the company itself, rather than its shareholders, it is clear from the context that Lord Hatherley had in mind a representative action brought on behalf of shareholders, as he gave this analogy to explain how in that case a representative claim could be brought on behalf of all the freehold tenants of a manor to establish common rights against the lord of the manor even though different tenants or classes of tenant had different rights as between themselves.

### (e)    <u>Emerald Supplies</u>

56.    In giving the Court of Appeal's judgment in the present case, the Chancellor, at [2020] QB 747, para 73, focused on *Emerald Supplies Ltd v British Airways plc* [2010] EWCA Civ 1284; [2011] Ch 345 as providing the latest authoritative interpretation of the representative rule. The decision in that case turned, however, on the particular way in which the class of represented persons had been defined. The claimants alleged that the defendant airline was a party to agreements or concerted practices with other airlines to fix prices for air freight charged for importing cut flowers into the UK. They claimed on behalf of all "direct or indirect purchasers of air freight services, the prices for which were inflated by the agreements or concerted practices", a declaration that damages were recoverable in principle from the defendant by those purchasers.

The

Court of Appeal upheld a decision to strike out the representative claim on the basis that, in the way the class had been defined, the issue of liability would have to be decided before it could be known whether or not a person was a member of the represented class and therefore bound by the judgment: see paras 62-63 and 65. Suchan approach would not be just, not least because, if the claim failed, no purchasers of air freight services apart from the named claimants would be bound by the result.

57.    The Court of Appeal in *Emerald Supplies* also considered that a second difficultywith the class definition was that the members of the represented class did not all have the same interest in the claim, as there was a conflict of interest between direct and indirect purchasers of air freight services: see paras 28-29 and 64. If it was shown that prices had been inflated by agreements or concerted practices to which the defendant was a party, it would be in the interests of direct purchasers to seek to prove that they had absorbed the higher prices in order to avoid a potential defence that they had suffered no loss because the higher prices had been passed on to "indirect purchasers" (understood to include sub-purchasers). On the other hand, it would be in the interests of such indirect purchasers to seek to prove that the higher prices had indeed been passed on to them.

58.    It seems to me that this second difficulty might have been avoided either by altering the class definition to exclude sub-purchasers or by following the approach adopted in *Prudential* of claiming a declaration that those members of the class who had suffered damage as a result of the alleged price fixing were entitled to damages. However, those possibilities do not appear to have been considered. I think that the judge in *Rendlesham Estates plc v Barr Ltd* [2014] EWHC 3968 (TCC); [2015] 1 WLR 3663 - a case relied on by Google on this appeal - was therefore wrong to conclude from *Emerald Supplies*, at para 90, that "if damage is an ingredient of the cause of action a representative claim could not be maintained". The Court of Appeal in *Emerald Supplies* did not doubt the correctness of the *Prudential* decision, where a representative claim was allowed to proceed although damage was an ingredient of the cause of action. As Professor Rachael Mulheron, a leading expert in this field, has persuasively argued, it should likewise have been possible in *Emerald Supplies* to adopta bifurcated process in which the questions whether prices had been inflated by agreements or concerted practices and whether passing on was in principle available as a defence were decided in a representative action. If successful, this action could then have formed the basis for further proceedings to prove the fact and amount of damage in individual cases: see Mulheron R, "*Emerald Supplies Ltd v British Airways plc*; A Century Later, The Ghost of *Markt* Lives On" [2009] Comp Law 159, 171.

### (f)    Commonwealth cases

59.    The highest courts of Australia, Canada and New Zealand have all adopted abroad and flexible approach in interpreting representative rules derived from the English rule.

### (i)    Australia

60.    In *Carnie v Esanda Finance Corpn Ltd* (1994) 127 ALR 76 the High Court of Australia held that the fact that the claims arose under separate contracts did not prevent the named claimants and the persons represented from having "the same interest" in proceedings. It was enough to satisfy this requirement that there was a community of interest in the determination of a substantial question of law or fact thatarose in the proceedings. Commenting on an argument that the representative rule was an inadequate basis for a "class action", which required a comprehensive legislative regime, Toohey and Gaudron JJ (with whom Mason CJ, Deane and Dawson JJgenerally agreed) said, at p 91:

> "... it is true that rule 13 lacks the detail of some other rules of court. But there is no reason to think that the Supreme Court of New South Wales lacks the authority to give directions as to such matters as service, notice and the conduct of proceedings which would enable it to monitor andfinally to determine the action with justice to all concerned.
> The simplicity of the rule is also one of its strengths, allowing it to be treated as a flexible rule of convenience in the administration of justice and applied 'to the exigencies of modern life as occasion requires'. The court retains the power to reshape proceedings at a later stage if they becomeimpossibly complex or the defendant is prejudiced."

### (ii)    Canada

61.    In *Western Canadian Shopping Centres Inc v Dutton* [2001] 2 SCR 534, paras 38-48, the Supreme Court of Canada held that representative actions should be allowed to proceed where the following conditions are met: (1) the class is capable of clear definition; (2) there are issues of fact or law common to all class members; (3) successfor one class member means success for all (although not necessarily to the same extent); and (4) the proposed representative adequately represents the interests of

the class. If these conditions are met the court must also be satisfied, in the exercise of its discretion, that there are no countervailing considerations that outweigh the benefits of allowing the representative action to proceed. The Supreme Court held that the conditions were met by the claimants in *Dutton*, who sued as representatives of a group of investors complaining that the defendant had breached fiduciary duties to the investors by mismanaging their funds.

62.    Giving the judgment of the court, McLachlin CJ, at para 47, distinguished its earlier decision in *General Motors of Canada Ltd v Naken* [1983] 1 SCR 72, where a representative action had been disallowed. In *Naken* the action was brought on behalf of purchasers of new Firenza motor vehicles against the manufacturer, complaining that the quality of the vehicles had been misrepresented or was not as warranted in advertisements, other published materials and contracts which were partly oral and partly written. Damages were claimed limited to $1,000 per person. The claims were held to be unsuitable for resolution through a representative action, principally because determining both liability and damages would have required particularised evidence and fact-finding in relation to each individual purchaser.

63.    McLachlin CJ also commented, at para 46, that over the period since *Naken* was decided the benefits of class actions had become manifest. She identified, at paras 27-29, three important advantages which such actions offer over a multiplicity of individual suits: (1) avoiding unnecessary duplication in fact-finding and legal analysis;
(2) making economical the prosecution of claims that would otherwise be too costly to prosecute individually; and (3) serving efficiency and justice by ensuring that actual and potential wrongdoers who cause widespread but individually minimal harm take into account the full costs of their conduct.

64.    McLachlin CJ further observed, at para 34, that, while it would clearly be advantageous if there existed a comprehensive legislative framework regulating class actions, in its absence "the courts must fill the void".

### *(iii)    New Zealand*

65.    The Supreme Court of New Zealand has recently considered the use of the representative procedure in *Southern Response Earthquake Services Ltd v Ross* [2020] NZSC 126. This was a representative action brought on behalf of some 3,000 policyholders who had settled insurance claims for damage to their homes caused by earthquakes in the Canterbury region of New Zealand. The claimants alleged that the policyholders had been misled by the insurers about the cost of remedying the damage, with the result that they had settled

their claims on a less favourable basis

than otherwise would have been the case. The insurers did not oppose the action being brought on a representative basis, but argued that the class represented should be limited to policyholders who completed a form electing to opt into the proceedings. It was agreed that the proceedings would need to be heard in two stages. The first stage would deal with issues common to all members of the represented class. If the claimants succeeded at that stage in whole or in part, there would need to be a second stage, in which questions of relief were addressed. It was also agreed that, at the second stage, it would be necessary for all of the policyholders represented to take active steps - that is, to opt in - if they wished to establish their individual claims.

66.    The New Zealand Supreme Court affirmed the decision of the Court of Appeal that the claim should be allowed to continue on an opt out basis. In doing so, the Supreme Court rejected an argument that it should not develop an opt out regime in the absence of a statutory framework and gave guidance on various matters relating to supervision of opt out representative proceedings.

### (g)    Principles governing use of the representative procedure

67.    Although the world has changed out of all recognition since the representative procedure was devised by the Court of Chancery, it has done so in ways which have made the problems to which the procedure provided a solution more common and often vastly bigger in scale. The mass production of goods and mass provision of services have had the result that, when legally culpable conduct occurs, a very large group of people, sometimes numbering in the millions, may be affected. As the present case illustrates, the development of digital technologies has added to the potential for mass harm for which legal redress may be sought. In such cases it is necessary to reconcile, on the one hand, the inconvenience or complete impracticality of litigating multiple individual claims with, on the other hand, the inconvenience or complete impracticality of making every prospective claimant (or defendant) a party to a single claim. The only practical way to "come at justice" is to combine the claims in a single proceeding and allow one or more persons to represent all others who share the same interest in the outcome. When trying all the individual claims is not feasible, the adages of Lord Eldon quoted by Lord Macnaghten in *Ellis* remain as pertinent as ever: that it is better to go as far as possible towards justice than to deny it altogether and that, if you cannot realistically make everybody interested a party, you should ensure that those who are parties will "fairly and honestly try the right".

68.    I agree with the highest courts of Australia, Canada and New Zealand that, while a detailed legislative framework would be preferable, its absence (outside the field of competition law) in this country is no reason to decline to apply, or to interpret restrictively, the representative rule which has long existed

(and has had a legislative

basis since 1873). I also agree with the view expressed in *Carnie* that the very simplicity of the representative rule is in some respects a strength, allowing it to be treated as "a flexible tool of convenience in the administration of justice" and "applied to the exigencies of modern life as occasion requires".

## (i)    The "same interest" requirement

69.    In its current form in CPR rule 19.6 the rule imposes no limit (either as a minimum or maximum) on the number of people who may be represented. Only one condition must be satisfied before a representative claim may be begun or allowed to continue: that is, that the representative has "the same interest" in the claim as the person(s) represented.

70.    The phrase "the same interest" is capable of bearing a range of meanings and requires interpretation. In interpreting the phrase, reference has often been made to Lord Macnaghten's statement in *Ellis* (quoted at para 38 above) that: "Given a common interest and a common grievance, a representative suit was in order if the relief sought was in its nature beneficial to all whom the plaintiff proposed to represent." This statement has sometimes been treated as if it were a definition imposing a tripartite test: see eg *Smith v Cardiff Corpn* [1954] 1 QB 210. Such an approach seems to me misguided. It is clear from the context that Lord Macnaghten was not attempting to define "the same interest", but to convey how limiting the rule to persons having a beneficial proprietary interest in the claim would be contrary to the old practice in the Court of Chancery. More profoundly, such a reading of Lord Macnaghten's speech shows precisely the rigidity of approach to the application of the representative rule which he disparaged.

71.    The phrase "the same interest", as it is used in the representative rule, needs to be interpreted purposively in light of the overriding objective of the civil procedure rules and the rationale for the representative procedure. The premise for a representative action is that claims are capable of being brought by (or against) a number of people which raise a common issue (or issues): hence the potential and motivation for a judgment which binds them all. The purpose of requiring the representative to have "the same interest" in the claim as the persons represented is to ensure that the representative can be relied on to conduct the litigation in a way which will effectively promote and protect the interests of all the members of the represented class. That plainly is not possible where there is a conflict of interest between class members, in that an argument which would advance the cause of some would prejudice the position of others. *Markt* and *Emerald Supplies* are both examples of cases where it was found that the proposed representative action, as formulated, could not be maintained for this reason.

72.    As Professor Adrian Zuckerman has observed in his valuable book on civil procedure, however, a distinction needs to be drawn between cases where there are conflicting interests between class members and cases where there are merely divergent interests, in that an issue arises or may well arise in relation to the claims of (or against) some class members but not others. So long as advancing the case of class members affected by the issue would not prejudice the position of others, there is no reason in principle why all should not be represented by the same person: see *Zuckerman on Civil Procedure: Principles of Practice*, 4th ed (2021), para 13.49. As Professor Zuckerman also points out, concerns which may once have existed about whether the representative party could be relied on to pursue vigorously lines of argument not directly applicable to their individual case are misplaced in the modern context, where the reality is that proceedings brought to seek collective redress are not normally conducted and controlled by the nominated representative, but rather are typically driven and funded by lawyers or commercial litigation funders with the representative party merely acting as a figurehead. In these circumstances, there is no reason why a representative party cannot properly represent the interests of all members of the class, provided there is no true conflict of interest between them.

73.    This purposive and pragmatic interpretation of the requirement is exemplified by *The "Irish Rowan"*, where Staughton LJ, at pp 227-228, noted that some of the insurers might wish to resist the claim on a ground that was not available to others. Heightly did not regard that circumstance as showing that all the insurers did not have "the same interest" in the action, or that it was not within the rule, and had "no qualms about a proceeding which allows that ground to be argued on their behalf by others".

74.    Even if it were considered inconsistent with the "same interest" requirement, or otherwise inappropriate, for a single person to represent two groups of people in relation to whom different issues arise although there is no conflict of interest between them, any procedural objection could be overcome by bringing two (or more) representative claims, each with a separate representative claimant or defendant, and combining them in the same action.

### *(ii)    The court's discretion*

75.    Where the same interest requirement is satisfied, the court has a discretion whether to allow a claim to proceed as a representative action. As with any power given to it by the Civil Procedure Rules, the court must in exercising its discretion seek to give effect to the overriding objective of dealing with cases justly and at proportionate cost: see CPR rule 1.2(a). Many of the considerations specifically included in that objective (see CPR rule 1.1(2)) - such as ensuring that the parties are

on an equal footing, saving expense, dealing with the case in ways which are proportionate to the amount of money involved, ensuring that the case is dealt with expeditiously and fairly, and allotting to it an appropriate share of the court's resources while taking into account the need to allot resources to other cases - are likely to militate in favour of allowing a claim, where practicable, to be continued as a representative action rather than leaving members of the class to pursue claims individually.

76.    Four further features of the representative rule deserve mention.

### (iii)    No requirement of consent

77.    First, as the ability to act as a representative under the rule does not depend on the consent of the persons represented but only on community of interest between them, there is ordinarily no need for a member of the represented class to take any positive step, or even to be aware of the existence of the action, in order to be bound by the result. The rule does not confer a right to opt out of the proceedings (though a person could, at least in theory, apply to the court for a direction under rule 19.6(3) that the named claimant (or defendant) may not represent them or under rule 19.6(4) that any judgment given will not be binding on them). It is, however, always open to the judge managing the case to impose a requirement to notify members of the class of the proceedings and establish a simple procedure for opting out of representation, if this is considered desirable. Equally, if there are circumstances which make it appropriate to limit the represented class to persons who have positively opted into the litigation, it is open to the judge to make this a condition of representation. The procedure is entirely flexible in these respects.

### (iv)    The class definition

78.    Second, while it is plainly desirable that the class of persons represented should be clearly defined, the adequacy of the definition is a matter which goes to the court's discretion in deciding whether it is just and convenient to allow the claim to be continued on a representative basis rather than being a precondition for the application of the rule. *Emerald Supplies* illustrates a general principle that membership of the class should not depend on the outcome of the litigation. Beyond that, whether or to what extent any practical difficulties in identifying the members of the class are material must depend on the nature and object of the proceedings. In *Duke of Bedford v Ellis*, for example, it did not matter that the number and identities of growers of fruit etc would have been difficult if not impossible to ascertain or that the class was a fluctuating one: given that the aim was to establish whether anyone who

was a grower had preferential rights, all that mattered was that there would be no realdifficulty in determining whether a particular person who claimed a preferential right to a vacant stand at Covent Garden was a grower or not: see [1901] AC 1 at 11. In some cases, however, for example where the viability of a claim for damages depends on demonstrating the size of the class or who its members are, such practical difficulties might well be significant.

## (v)    Liability for costs

79.    Third, as persons represented by a representative claimant or defendant will not normally themselves have been joined as parties to the claim, they will not ordinarily be liable to pay any costs incurred by the representative in pursuing (or defending) the claim. That does not prevent the court, if it is in the interests of justice to do so, from making an order requiring a represented person to pay or contribute to costs and giving permission for the order to be enforced against that person pursuant to CPR rule 19.6(4)(b). Alternatively, such an order could be made pursuant to the general jurisdiction of the court to make costs orders against non-parties. It is difficult, however, to envisage circumstances in which it could be just to order a represented person to contribute to costs incurred by a claimant in bringing a representative claim which the represented person did not authorise. On the other hand, a commercial litigation funder who finances unsuccessful proceedings is likely to be ordered to pay the successful party's costs at least to the extent of the funding: see *Davey v Money* [2020] EWCA Civ 246; [2020] 1 WLR 1751. That principle is no less applicable where theproceedings financed are a representative action.

## (vi)    The scope for claiming damages

80.    Finally, as already discussed, it is not a bar to a representative claim that each represented person has in law a separate cause of action nor that the relief claimed consists of or includes damages or some other monetary relief. The potential for claiming damages in a representative action is, however, limited by the nature of the remedy of damages at common law. What limits the scope for claiming damages in representative proceedings is the compensatory principle on which damages for a civilwrong are awarded with the object of putting the claimant - as an individual - in the same position, as best money can do it, as if the wrong had not occurred. In the ordinary course, this necessitates an individualised assessment which raises no common issue and cannot fairly or effectively be carried out without the participation in the proceedings of the individuals concerned. A representative action is therefore not a suitable vehicle for such an exercise.

81.    In cases where damages would require individual assessment, there may nevertheless be advantages in terms of justice and efficiency in adopting a bifurcated process - as was done, for example, in the *Prudential* case - whereby common issues of law or fact are decided through a representative claim, leaving any issues which require individual determination - whether they relate to liability or the amount of damages - to be dealt with at a subsequent stage of the proceedings. In *Prudential* [1981] Ch 229, 255, Vinelott J expressed the view (obiter) that time would continue to run for the purpose of limitation until individual claims for damages were brought by the persons represented; see also the dicta of Fletcher Moulton LJ in *Markt* [1910] 2 KB 1021, 1042, referred to at para 44 above. The court in *Prudential* did not have cited to it, however, the decision of the Court of Appeal in *Moon v Atherton* [1972] 2 QB 435. In that case a represented person applied to be substituted for the named claimant after the limitation period had expired when the claimant (and all the other represented persons) no longer wished to continue the action. The Court of Appeal, in allowing the substitution, held that the defendant was not thereby deprived of a limitation defence, as for the purpose of limitation the represented person was already a party to the action, albeit not a "full" party. It might be clearer to say that, although the represented person did not become a "party" until substituted as the claimant, an action was brought within the meaning of the statute of limitation by that person when the representative claim was initiated. Such an analysis has been adopted in Australia, including by the New South Wales Court of Appeal in *Fostif Pty Ltd v Campbells Cash & Carry Pty Ltd* [2005] NSWCA 83; (2005) 63 NSWLR 203, and by the New Zealand Supreme Court in *Credit Suisse Private Equity v Houghton* [2014] NZSC 37.


82.    There is no reason why damages or other monetary remedies cannot be claimed in a representative action if the entitlement can be calculated on a basis that is common to all the members of the class. Counsel for the claimant, Hugh Tomlinson QC, gave the example of a claim alleging that every member of the class was wrongly charged a fixed fee; another example might be a claim alleging that all the class members acquired the same product with the same defect which reduced its value by the same amount. In such cases the defendant's monetary liability could be determined as a common issue and no individualised assessment would be needed. The same is true where loss suffered by the class as a whole can be calculated without reference to the losses suffered by individual class members - as in the cases mentioned at para 53 above. Such an assessment of loss on a global basis is sometimes described as a "top down" approach, in contrast to a "bottom up" approach of assessing a sum which each member of the class is individually entitled to recover.


83.    The recovery of money in a representative action on either basis may give rise to problems of distribution to the members of the class, about which the representative rule is silent. Although in *Independiente* Morritt V-C was untroubled by such problems, questions of considerable difficulty would arise if

in the present case

the claimant was awarded damages in a representative capacity with regard to how such damages should be distributed, including whether there would be any legal basis for paying part of the damages to the litigation funders without the consent of each individual entitled to them: see Mulheron R, "Creating and Distributing Common Funds under the English Representative Rule" (2021) King's Law Journal 1-33. Google has not relied on such difficulties as a reason for disallowing a representative action, however, and as these matters were only touched on in argument, I will say no more about them.

## E.    THE REPRESENTATIVE CLAIM IN THIS CASE

84.    In the present case I could see no legitimate objection to a representative claim brought to establish whether Google was in breach of the DPA 1998 and, if so, seeking a declaration that any member of the represented class who has suffered damage by reason of the breach is entitled to be paid compensation. The individual claims that could theoretically have been brought by each iPhone user who was affected by the Safari workaround clearly raise common issues; and it is not suggested that there is any conflict of interest among the members of the represented class. For the purpose of CPR rule 19.6(1), all would therefore have the same interest in such a claim as the representative claimant. There is no suggestion that Mr Lloyd is an unsuitable person to act in that capacity. Although Google has argued that there would be practical difficulties in identifying whether an individual falls within the class definition, even on Google's evidence it is evident that the number of people affected by the Safari workaround was extremely large and it is unclear at this stage of the litigation how serious the difficulties of proof would actually be. Moreover, even if only a few individuals were ultimately able to obtain compensation on the basis of a declaratory judgment, I cannot see why that should provide a reason for refusing to allow a representative claim to proceed for the purpose of establishing liability.

85.    The claimant has not proposed such a bifurcated process, however. That is doubtless because success in the first, representative stage of such a process would not itself generate any financial return for the litigation funders or the persons represented. Funding the proceedings could therefore only be economic if pursuing separate damages claims on behalf of those individuals who opted into the second stage of the process would be economic. For the reasons discussed at paras 25-28 above and emphasised in argument by counsel for the claimant, it clearly would not. In practice, therefore, as both courts below accepted, a representative action for damages is the only way in which the claims can be pursued.

**(1)    The formulation of the claim for damages**

86.    In formulating the claim made in this action, the claimant has not adopted the "top down" approach of claiming compensation for damage suffered by the class as a whole without reference to the entitlements of individual class members. The claim advanced is for damages calculated from the "bottom up". The way in which the claimant seeks to obviate the need for individualised assessment is by claiming damages for each class member on what is described as a "uniform per capita basis".

87.    The difficulty facing this approach is that the effect of the Safari workaround was obviously not uniform across the represented class. No challenge is or could reasonably be made to the judge's findings, at [2018] EWHC 2599 (QB); [2019] 1 WLR 1265, para 91, that:

> "… some affected individuals were 'super users' - heavy internet users. They will have been 'victims' of multiple breaches, with considerable amounts of [browser generated information] taken and used throughout the Relevant Period. Others will have engaged in very little internet activity.
> Different individuals will have had different kinds of information taken and used. No fewer than 17 categories of personal data are identified in the claim documents. The specified categories of data vary in their sensitivity, some of them being 'sensitive personal data' within the meaning of the section 2 of the DPA (such as sexuality, or ethnicity). … But it is not credible that all the specified categories of data were obtained by Google from each represented claimant. … The results of the acquisition and use will also have varied according to the individual, and their attitudes towards the acquisition, disclosure and use of the information in question."

If liability is established, the ordinary application of the compensatory principle would therefore result in different awards of compensation to different individuals.
Furthermore, the amount of any compensation recoverable by any member of the class would depend on a variety of circumstances particular to that individual.
Individualised assessment of damages would therefore be required.

88.    The claimant seeks to overcome this difficulty in one or other of two ways. Both rely on the proposition that an individual is entitled to compensation for any (non-

trivial) contravention of the DPA 1998 without the need to prove that the individual suffered any financial loss or distress. On that footing it is argued, first of all, that general damages can be awarded on a uniform per capita basis to each member of the represented class without the need to prove any facts particular to that individual. The draft particulars of claim plead that the uniform sum awarded should reflect "the serious nature of the breach, in particular (but non-exhaustively):

> "(a)    The lack of consent or knowledge of the Representative Claimant and each member of the Claimant Class to the defendant's collection and use of their personal data.

> (b)    The fact that such collection and use was contrary to the defendant's public statements.

> (c)    The fact that such collection and use was greatly to the commercial benefit of the defendant.

> (d)    The fact that the defendant knew or ought to have known of the operation of the Safari Workaround from a very early stage during the Relevant Period. …"

I interpose that factor (c), although no doubt true in relation to the class as a whole, plainly could not in fact be established in relation to any individual class member without evidence of what use, if any, was actually made of personal data of that individual by Google. If there is to be no individualised assessment, this factor must therefore be left out of account.

89.    The alternative case pleaded is that each member of the class is entitled to damages assessed as an amount which they could reasonably have charged for releasing Google from the duties which it breached. Again, it is contended that such damages should be assessed on a uniform per capita basis, "reflecting the generalised standard terms (rather than individuated basis) on which [Google] does business".

## (2)    Section 13 of the DPA 1998

90.    The claim for compensation made in the present case is founded (exclusively) on section 13 of the DPA 1998. This provides:

"(1)    An individual who suffers damage by reason of any contravention by a data controller of any of the requirementsof this Act is entitled to compensation from the data controller for that damage.

(2)    An individual who suffers distress by reason of any contravention by a data controller of any of the requirementsof this Act is entitled to compensation from the data controller for that distress if -

(a)    the individual also suffers damage by reason of thecontravention, or

(b)    the contravention relates to the processing ofpersonal data for the special purposes.

(3)    In proceedings brought against a person by virtue ofthis section it is a defence to prove that he had taken such care as in all the circumstances was reasonably required tocomply with the requirement concerned."

91.    Section 13 was intended to implement article 23 of the Data ProtectionDirective. This stated:

"1.    Member states shall provide that any person who hassuffered damage as a result of an unlawful processing operation or of any act incompatible with the national provisions adopted pursuant to this Directive is entitled to receive compensation from the controller for the damage suffered.

2.    The controller may be exempted from this liability, inwhole or in part, if he proves that he is not responsible for the event giving rise to the damage."

92.    Two initial points can be made about the wording and structure of section 13. First, to recover compensation under this provision it is not enough to prove a breachby a data controller of its statutory duty under section 4(4) of the Act: an individual is

only entitled to compensation under section 13 where "damage" - or in some circumstances "distress" - is suffered as a consequence of such a breach of duty. Second, it is plain from subsection (2) that the term "damage" as it is used in section 13 does not include "distress". The term "material damage" is sometimes used to describe any financial loss or physical or psychological injury, but excluding distress (or other negative emotions not amounting to a recognised psychiatric illness): see eg *Watkins v Secretary of State for the Home Department* [2006] UKHL 17; [2006] 2 AC 395, para 7. Adopting this terminology, on a straightforward interpretation the term "damage" in section 13 refers only to material damage and compensation can only be recovered for distress if either of the two conditions set out in subsection (2) is met.

## (3)    Vidal-Hall v Google Inc

93.    The effect of section 13 was considered by the Court of Appeal in *Vidal-Hall v Google Inc* [2016] QB 1003 on facts which, in terms of the generic allegations made, were identical to those on which the present claim is based. The three claimants sought damages arising out of the Safari workaround on two alternative bases: (1) at common law for misuse of private information; and (2) under section 13 of the DPA 1998. As in the present case, permission to serve the proceedings outside the jurisdiction was opposed by Google. The main issues raised were: (1) whether misuse of private information is a tort for the purpose of the rules providing for service out of the jurisdiction; and (2) whether compensation can be recovered for distress under section 13 of the DPA 1998 in the absence of financial loss. The judge decided both issues in the claimants' favour and the Court of Appeal affirmed that decision, for reasons given in a judgment written by Lord Dyson MR and Sharp LJ, with which Macfarlane LJ agreed.

94.    On the second issue Google submitted that, as discussed above, the term "damage" in section 13 must mean material damage, which for practical purposes limits its scope to financial loss. Hence section 13(2) has the effect that an individual may only recover compensation for distress suffered by reason of a contravention by a data controller of a requirement of the Act if either (a) the contravention also causes the individual to suffer financial loss or (b) the contravention relates to the processing of personal data for "special purposes" - which are defined as journalistic, artistic or literary purposes (see section 3). It was not alleged that either of those conditions was satisfied in the *Vidal-Hall* case.

95.    The Court of Appeal accepted that section 13(2) does indeed have this meaning but held that this makes it incompatible with article 23 of the Data Protection Directive, which section 13 of the DPA 1998 was meant to implement. This is because the word "damage" in article 23 is to be interpreted

as including distress, which is the

primary form of damage likely to be caused by an invasion of data privacy; and article 23 does not permit national laws to restrict the right to receive compensation for "damage" where it takes the form of distress. The Court of Appeal considered whether it is possible to interpret section 13 in a way which achieves the result sought by the Directive, but concluded that the words of section 13 are not capable of being interpreted in such a way and that the limits set by Parliament to the right to compensation for breaches of the DPA 1998 are a fundamental feature of the UK legislative scheme. In the words of Lord Dyson MR and Sharp LJ in their joint judgment, at para 93, if the court were to disapply the limits on the right to compensation for distress set out in section 13(2), "the court would, in effect, be legislating against the clearly expressed intention of Parliament on an issue that was central to the scheme as a whole".

96.    The Court of Appeal nevertheless held that section 13(2) should be disapplied on the ground that it conflicts with articles 7 and 8 of the Charter of Fundamental Rights of the European Union ("the EU Charter"). Article 7 of the EU Charter is in materially similar terms to article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") and provides that "[e]veryone has the right to respect for his or her private and family life, home and communications". Article 8(1) provides that "[e]veryone has the right to the protection of personal data concerning him or her". In addition, article 47 requires that "[e]veryone whose rights and freedoms guaranteed by the law of the Union are violated has the right to an effective remedy before a tribunal …". The Court of Appeal decided that, in order to provide an effective remedy for the rights guaranteed by articles 7 and 8 of the EU Charter, it was necessary that national law should give effect to the obligation under article 23 of the Data Protection Directive to provide a right to receive compensation from the data controller for *any* damage, including distress, suffered as a result of an unlawful processing operation. That result could and should be achieved by disapplying section 13(2) of the DPA 1998, thus enabling section 13(1) to be interpreted compatibly with article 23: see [2016] QB 1003, para 105.

## (4)    Misuse of private information

97.    The Court of Appeal in *Vidal-Hall* also held that the claims for damages for misuse of private information made by the claimants in that case were properly classified as claims in tort for the purpose of service out of the jurisdiction and had a real prospect of success. As described at paras 18-25 of the judgment, the tort of misuse of private information evolved out of the equitable action for breach of confidence, influenced by the protection of the right to respect for private life guaranteed by article 8 of the Convention. The critical step in its emergence as a distinct basis for a claim was the identification of privacy of information as worthy of

protection in its own right, irrespective of whether the information was imparted in circumstances which give rise to a duty of confidence: see *Campbell v MGN Ltd* [2004]UKHL 22; [2004] 2 AC 457. As Lord Hoffmann put it in *Campbell*, at para 50:

> "What human rights law has done is to identify private information as something worth protecting as an aspect ofhuman autonomy and dignity."

98.    The complaint in *Campbell* was about the publication of private information. Lord Nicholls of Birkenhead described the "essence of the tort", at para 14, as "misuse of private information". He also noted, however, at para 15, that an individual's privacycan be invaded in ways not involving publication of information, and subsequent cases have held that intrusion on privacy, without any misuse of information, is actionable: see *PJS v News Group Newspapers Ltd* [2016] UKSC 26; [2016] 2 AC 1081, paras 58-60. It is misuse of information, however, which is primarily relevant in this case, and I shall generally - as counsel did in argument - use the label for the tort of "misuse of private information".

99.    To establish liability for misuse of private information (or other wrongful invasion of privacy), it is necessary to show that there was a reasonable expectation ofprivacy in the relevant matter. As the Court of Appeal (Sir Anthony Clarke MR, Laws and Thomas LJJ) explained in upholding a claim to restrain the publication of photographs taken in a public place of the child of the well-known author, JK Rowling, in *Murray v Express Newspapers plc* [2008] EWCA Civ 446; [2009] Ch 481, para 36:

> "… the question whether there is a reasonable expectation ofprivacy is a broad one, which takes account of all the circumstances of the case. They include the attributes of the claimant, the nature of the activity in which the claimant was engaged, the place at which it was happening, the nature andpurpose of the intrusion, the absence of consent and whether it was known or could be inferred, the effect on the claimant and the circumstances in which and the purposes for which the information came into the hands of the publisher."

If this test is met, in cases where freedom of expression is involved the court must thenundertake a "balancing exercise" to decide whether in all the circumstances the interests of the owner of the private information must yield to

the right to freedom of

expression conferred on the publisher by article 10 of the Convention: see eg *McKennitt v Ash* [2006] EWCA Civ 1714; [2008] QB 73, para 9.

## (5)    Gulati v MGN Ltd

100.   The measure of damages for wrongful invasion of privacy was considered in depth in *Gulati v MGN Ltd* [2015] EWHC 1482 (Ch); [2016] FSR 12 and [2015] EWCA Civ 1291; [2017] QB 149 by Mann J and by the Court of Appeal. The eight test claimants in that case were individuals in the public eye whose mobile phones were hacked by newspapers, leading in some instances to the publication of articles containing information obtained by this means. The newspapers admitted liability for breach of privacy but disputed the amount of damages. Their main argument of principle was that (in the absence of material damage) all that could be compensated for was distress caused by their unlawful activities: see [2016] FSR 12, para 108. The judge rejected that argument. He said, at para 111, that he did not see why "distress (or some similar emotion), which would admittedly be a likely consequence of an invasion of privacy, should be the only touchstone for damages". In his view:

> "While the law is used to awarding damages for injured feelings, there is no reason in principle … why it should not also make an award to reflect infringements of the right itself, if the situation warrants it."

101.   The judge referred to cases in which damages have been awarded to very young children (only ten months or one year old) for misuse of private information by publishing photographs of them even though, because of their age, they could not have suffered any distress: see *AAA v Associated Newspapers Ltd* [2012] EWHC 2103 (QB); [2013] EMLR 2; and *Weller v Associated Newspapers Ltd* [2014] EWHC 1163 (QB); [2014] EMLR 24. He concluded, at para 144:

> "I shall therefore approach the consideration of quantum in this case on the footing that compensation can be given for things other than distress, and in particular can be given for the commission of the wrong itself so far as that commission impacts on the values protected by the right."

Later in the judgment, at para 168, the judge referred back to his finding that:

> "the damages should compensate not merely for distress …, but should also compensate (if appropriate) for the loss of privacy or autonomy as such arising out [of] the infringement by hacking (or other mechanism) as such."

102.   The Court of Appeal affirmed this decision: [2015] EWCA Civ 1291; [2017] QB

149. Arden LJ (with whom Rafferty and Kitchin LJJ agreed) held, at para 45, that:

> "the judge was correct to conclude that the power of the court to grant general damages was not limited to distress and could be exercised to compensate the claimants also for the misuse of their private information. The essential principle is that, by misusing their private information, MGN deprived the claimants of their right to control the use of private information."

Arden LJ justified this conclusion, at para 46, on the basis that:

> "Privacy is a fundamental right. The reasons for having the right are no doubt manifold. Lord Nicholls of Birkenhead put it very succinctly in *Campbell v MGN Ltd* [2004] 2 AC 457, para 12: '[Privacy] lies at the heart of liberty in a modern state. A proper degree of privacy is essential for the well- being and development of an individual.'"

103.   The Court of Appeal in *Gulati* rejected a submission, also rejected by the judge, that granting damages for the fact of intrusion into a person's privacy independently of any distress caused is inconsistent with the holding of this court in *R (WL (Congo) v Secretary of State for the Home Department* [2011] UKSC 12; [2012] 1 AC 245, paras 97-100, that vindicatory damages are not available as a remedy for violation of a private right. As Arden LJ pointed out at para 48, no question arose of awarding vindicatory damages of the kind referred to in *WL (Congo)*, which have been awarded in some constitutional cases appealed to the Privy Council "to reflect the sense of public outrage, emphasise the importance of the constitutional right and the gravity of the breach, and deter further breaches": see *WL (Congo)*, para 98; *Attorney General of Trinidad and Tobago v Ramanoop* [2005] UKPC 15; [2006] 1 AC 328, para 19. Rather, the purpose of the relevant part of the awards made in *Gulati* was "to compensate for the loss or diminution of a right to control formerly private information".

104.   Mann J's reference to "loss of privacy or autonomy" and the Court of
Appeal's explanation that the claimants could be compensated for misuse of
their private information itself because they were deprived of "their right to
control [its] use" convey the point that English common law now recognises as
a fundamental aspect of personal autonomy a person's freedom to choose and
right to control whether and when others have access to his or her private
affairs: see on this point the helpful discussion by NA Moreham,
"Compensating for Loss of Dignity and Autonomy" in Varuhas J and Moreham
N (eds), *Remedies for Breach of Privacy* (2018) ch 5.


**(6)    How the present claim is framed**


105.   On the basis of the decisions of the Court of Appeal in *Vidal-Hall* and
*Gulati*, neither of which is challenged by either party on this appeal, it would
be open to Mr Lloyd to claim, at least in his own right: (1) damages under
section 13(1) of the DPA 1998 for any distress suffered by reason of any
contravention by Google of any of the requirements of the Act; and/or (2)
damages for the misuse of private information without the need to show that it
caused any material damage or distress.


106.   Neither of these claims, however, is made in this case. The reasons why
no claim is made in tort for misuse of private information have not been
explained; but the view may have been taken that, to establish a reasonable
expectation of privacy, it would be necessary to adduce evidence of facts
particular to each individual claimant. In *Vidal-Hall*, the claimants produced
confidential schedules about their internet use, showing that the information
tracked and collected by Google in their cases was, in the Court of Appeal's
words at [2016] QB 1003, para 137, "often of an extremely private nature". As
discussed earlier, the need to obtain evidence in relation to individual members
of the represented class would be incompatible with the representative claim
which Mr Lloyd is seeking to bring.


107.   Similarly, to recover damages for distress under section 13(1) of the
DPA 1998 would require evidence of such distress from each individual for
whom such a claim was made. Again, this would be incompatible with
claiming damages on a representative basis.


108.   Instead of making either of these potential claims, the claimant seeks to
break new legal ground by arguing that the principles identified in *Gulati* as
applicable to the assessment of damages for misuse of private information at
common law also apply to the assessment of compensation under section 13(1)
of the DPA 1998. The case advanced, which is also supported by the
Information Commissioner, is that the word

"damage" in section 13(1) not only extends beyond material damage to include distress, as decided in *Vidal-Hall*, but also includes "loss of control" over personal data.

## (7)    "Loss of control" over personal data

109.   There is potential for confusion in the use of this description. "Loss of control" is not an expression used in the DPA 1998 and, as the third interveners (the Association of the British Pharmaceutical Industry and Association of British HealthTech Industries) pointed out in their helpful written submissions, none of the requirements of the Act is predicated on "control" over personal data by the data subject. Under the legislative scheme the relevant control is that of the data controller: the entity which "determines the purposes for which and the manner in which any personal data are, or are to be, processed." The nearest analogue to control as regards the data subject is his or her "consent to the processing", being the first condition in Schedule 2 (see para 22 above). Such consent, however, is neither necessary nor sufficient to render the processing of personal data compliant with the Act.

110.   It was made clear in submissions, however, that, in describing the basis for the compensation claimed as "loss of control" of personal data, the claimant is not seeking to single out a particular category of breaches of the DPA 1998 by a data controller as breaches in respect of which the data subject is entitled to compensation without proof of material damage or distress. The claimant's case, which was accepted by the Court of Appeal, is that an individual is entitled to recover compensation under section 13 of the DPA 1998 without proof of material damage or distress whenever a data controller fails to comply with any of the requirements of the Act in relation to any personal data of which that individual is the subject, provided only that the contravention is not trivial or de minimis. Any such contravention, on the claimant's case, ipso facto involves "loss of control" of data for which compensation is payable. Only where the individual claiming compensation is not the data subject is it necessary on the claimant's case to show that the individual has suffered material damage or distress.

## (8)    The common source argument

111.   The claimant's core argument for this interpretation is that, as a matter of principle, the same approach to the damage for which compensation can be awarded should apply under the data protection legislation as where the claim is brought in tort for misuse of private information because the two claims, although not coterminous, have a common source. Both seek to protect the same fundamental right to privacy

guaranteed by article 8 of the Convention. This objective is expressly referred to in recital (10) of the Data Protection Directive, which states:

> "Whereas the object of the national laws on the processing of personal data is to protect fundamental rights and freedoms, notably the right to privacy, which is recognized both in article 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms and in the general principles of [EU] law; whereas, for that reason, the approximation of those laws must not result in any lessening of the protection they afford but must, on the contrary, seek to ensure a high level of protection in the [EU];"

The aim of protecting the right to privacy with regard to the processing of personal data is also articulated in recitals (2), (7), (8) and (11) of the Data Protection Directive, and is spelt out in article 1 which states:

> "**Object of the Directive**
>
> In accordance with this Directive, member states shall protect the fundamental rights and freedoms of natural persons, and in particular their right to privacy with respect to the processing of personal data."

Reliance is also placed on the recognition in article 8 of the EU Charter, quoted at para 96 above, of the right to the protection of personal data as a fundamental right in EU law.

112.   The claimant argues that, given that the tort of misuse of private information and the data protection legislation are both rooted in the same fundamental right to privacy, it would be wrong in principle to adopt a different approach to the nature of the damage which can be compensated under the two regimes. The conclusion should therefore be drawn that, in each case, damages can be recovered for interference with the claimant's right, without the need to prove that the interference resulted in any material damage or distress.

113.   I cannot accept this argument for two reasons. First, even if the suggested analogy between the privacy tort and the data protection regime were persuasive,

section 13(1) of the DPA 1998 cannot, in my opinion, properly be interpreted as havingthe meaning for which the claimant contends. Second, the logic of the argument by analogy is in any event flawed.

### (a)    The wording of the DPA 1998

114.  I do not accept a submission made by counsel for Google that the interpretationof section 13 of the DPA 1998 should be approached on the basis of a general rule thatbreaches of statutory duty are not actionable without proof of material damage. The question in *Cullen v Chief Constable of the Royal Ulster Constabulary* [2003] UKHL 39; [2003] 1 WLR 1763, relied on to support this submission, was whether a statute which did not expressly confer a right to compensation on a person affected by a breach of statutory duty nevertheless conferred such a right impliedly. That is not the question raised in this case, where there is an express entitlement to compensation provided bysection 13 of the DPA 1998. The only question in this case is what the words of the relevant statutory provision mean.

115.  Those words, however, cannot reasonably be interpreted as giving an individuala right to compensation without proof of material damage or distress whenever a datacontroller commits a non-trivial breach of any requirement of the Act in relation to anypersonal data of which that individual is the subject. In the first place, as discussed above, the wording of section 13(1) draws a distinction between "damage" suffered byan individual and a "contravention" of a requirement of the Act by a data controller, and provides a right to compensation "for that damage" only if the "damage" occurs "by reason of" the contravention. This wording is inconsistent with an entitlement to compensation based solely on proof of the contravention. To say, as the claimant doesin its written case, that what is "damaged" is the data subject's right to have their dataprocessed in accordance with the requirements of the Act does not meet this point, as it amounts to an acknowledgement that on the claimant's case the damage and the contravention are one and the same.

116.  Nor is the claimant's case assisted by section 14 of the DPA 1998, on which reliance is placed. Section 14(1) gives the court power, on the application of a data subject, to order a data controller to rectify, block, erase or destroy personal data ifsatisfied that the data are inaccurate. Section 14(4) states:

"If a court is satisfied on the application of a data subject -

(a)     that he has suffered damage by reason of any contravention by a data controller of any of the requirements of this Act in respect of any personal data, in circumstances entitling him to compensation under section 13, and

(b)     that there is a substantial risk of further contravention in respect of those data in such circumstances,

the court may order the rectification, blocking, erasure or destruction of any of those data."

117.   Counsel for the claimant submitted that, if Google's case on what is meant by "damage" is correct, a data subject who does not suffer material damage or distress as a result of a breach of duty by a data controller cannot claim rectification, blocking, erasure or destruction of data, unless those data are inaccurate, however egregious the breach. This is true, but I can see nothing unreasonable in such a result. Indeed, section 14 seems to me positively to confirm that "damage" means something distinct from a contravention of the Act itself. If a contravention by a data controller of the Act could by itself constitute "damage", section 14(4)(a) would be otiose and there would be no material distinction in the remedies available in cases where the data are inaccurate and in cases where the data are accurate. The manifest intention behind section 14 is to limit the remedies of rectification, blocking, erasure or destruction of <u>accurate</u> data to cases where the contravention of the Act has caused the data subject some harm distinct from the contravention itself, whereas no such limitation is imposed where the contravention involves holding <u>inaccurate</u> personal data.

118.   The second reason why the claimant's interpretation is impossible to reconcile with the language of section 13 is that, as the Court of Appeal recognised in *Vidal-Hall*, it is plain from the words enacted by Parliament the term "damage" was intended to be limited to material damage and not to extend to "distress". The only basis on which the Court of Appeal in *Vidal-Hall* was able to interpret the term "damage" as encompassing distress was by disapplying section 13(2) as being incompatible with EU law. By the same token, if the term "damage" in section 13 is to be interpreted as having an even wider meaning and as encompassing an infringement of a data subject's rights under the Act which causes no material damage nor even distress, that could only be because this result is required by EU law. On a purely domestic interpretation of the DPA 1998, such a reading is untenable.

**(b)** **The effect of EU law**

119.   It is not suggested in the present case that section 13(1) should be disapplied: the claimant's case is founded on it. No argument of the kind which succeeded in *Vidal-Hall* that words of the statute must be disapplied because they conflict with EU
law is therefore available (or is advanced by the claimant). The question is whether the term "damage" in section 13(1) can and should be interpreted as having the meaning for which the claimant contends because such an interpretation is required in order to make the domestic legislation compatible with EU law. There are two aspects of this question: (i) what does the term "damage" mean in article 23 of the Data Protection Directive, which section 13 of the DPA 1998 was intended to implement; and (ii) if "damage" in article 23 includes contraventions of the national provisions adopted pursuant to the Directive which cause no material damage or distress, is it possible to interpret the term "damage" in section 13(1) of the DPA 1998 as having the same meaning?

120.   To take the second point first, it does not seem to me possible to interpret the term "damage" in section 13(1) of the DPA 1998 as having the meaning for which the claimant contends, even if such an interpretation were necessary to make the Act compatible with the Data Protection Directive. In *Vidal-Hall* the Court of Appeal held, rightly in my opinion, that section 13 of the DPA 1998 could not be construed as providing a general right to compensation for distress suffered by reason of a contravention of the Act "without contradicting the clearly expressed intention of Parliament on an issue that was central to the scheme" of the legislation (see para 95 above). The same is equally, if not all the more, true of the contention that section 13 of the DPA 1998 can be interpreted as providing a right to compensation for contraventions of the Act which have not caused any distress, let alone material damage. The distinction between "damage" suffered by an individual and a "contravention" of a requirement of the Act by a data controller which causes such damage is a fundamental feature of the remedial scheme provided by the Act which, as indicated above, permeates section 14 as well as section 13. If it were found that this feature makes the DPA 1998 incompatible with the Data Protection Directive, such incompatibility could, in my view, only be removed by amending the legislation. That could only be done by Parliament.

121.   No such incompatibility arises, however, as there is no reason to interpret the term "damage" in article 23 of the Data Protection Directive as extending beyond material damage and distress. The wording of article 23 draws exactly the same distinction as section 13(1) of the DPA 1998 between "damage" and an unlawful act of which the damage is "a result". Again, this wording identifies the "damage" for which a person is entitled to receive compensation as distinct

from the wrongful act which

causes the damage. This is inconsistent with giving a right to compensation for the unlawful act itself on the basis that the act constitutes an interference with the claimant's data protection rights. Nor has any authority been cited which suggests that the term "damage", either generally in EU law or in the specific context of article 23 of the Data Protection Directive, is to be interpreted as including an infringement of a legal right which causes no material damage or distress.

122.   If there were evidence that at least some national laws on the processing of personal data which pre-dated the Data Protection Directive and are referred to in recital (10), quoted at para 111 above, provided a right to compensation for unlawful processing without proof of material damage or distress, that might arguably support an inference that the Directive was intended to ensure a similarly high level of protection across all member states. But it has not been asserted that any national laws did so. The Data Protection Act 1984, which was the applicable UK legislation when the Data Protection Directive was adopted, in sections 22 and 23 gave the data subject an entitlement to compensation in certain circumstances for damage or distress suffered by reason of the inaccuracy of data or the loss or unauthorised destruction or disclosure of data or unauthorised obtaining of access to data. By clear implication, UK national law gave no right to compensation for unlawful processing of personal data which did not result in material damage or distress. There is no evidence that the national law of any other member state at that time did so either.

123.   EU law therefore does not provide a basis for giving a wider meaning to the term "damage" in section 13 of the DPA 1998 than was given to that term by the Court of Appeal in *Vidal-Hall*.

## (c)   Flaws in the common source argument

124.   I also reject the claimant's argument that the decision in *Gulati* affords any assistance to its case on this issue. Leaving aside the fact that *Gulati* was decided many years after the Data Protection Directive was adopted, there is no reason on the face of it why the basis on which damages are awarded for an English domestic tort should be regarded as relevant to the proper interpretation of the term "damage" in a statutory provision intended to implement a European directive. The claimant relies on the fact that both derive from the right to respect for private life protected by article 8 of the Convention (and incorporated in article 7 of the EU Charter when it was created in 2007). It does not follow, however, from the fact that two different legal regimes aim, at a general level, to provide protection for the same fundamental value that they must do so in the same way or to the same extent or by affording identical remedies. There are significant differences between the nature and scope of

the common law privacy tort and the data protection legislation, to which I will
draw attention in a

moment. But the first point to note is that the decision in *Gulati* that damages can be awarded for misuse of private information itself was not compelled by article 8 of the Convention; nor did article 8 require the adoption of the particular legal framework governing the protection of personal data contained in the Data Protection Directive and the DPA 1998.

125.   The Convention imposes obligations on the states which are parties to it, but not on private individuals and bodies. In some cases the obligations on state parties extend beyond negative obligations not to act in ways which violate the Convention rights and include certain positive obligations on the state to ensure effective protection of those rights. That is so as regards the right to respect for private life guaranteed by article 8. The European Court of Human Rights has held that in certain circumstances the state's positive obligations under article 8 are not adequately fulfilled unless the state secures respect for private life in the relations between individuals by setting up a legislative framework taking into consideration the various interests to be protected in a particular context. However, the court has emphasised that there are different ways of ensuring respect for private life and that "the choice of the means calculated to secure compliance with article 8 of the Convention in the sphere of the relations of individuals between themselves is in principle a matter that falls within the contracting states' margin of appreciation": see the judgment of the Grand Chamber in *Bărbulescu v Romania* [2017] ECHR 754; [2017] IRLR 1032, para 113.

126.   While the House of Lords in *Campbell* drew inspiration from article 8, it did not suggest that the Convention or the Human Rights Act 1998 required the recognition of a civil claim for damages for misuse of private information in English domestic law, let alone that damages should be recoverable in such claim where no material damage or distress has been caused. In *Gulati* the Court of Appeal rejected an argument that the approach to awarding damages for misuse of private information ought to follow the approach of the European Court of Human Rights in making awards of just satisfaction under article 41 of the Convention. As Arden LJ observed, at para 89, in awarding damages for misuse of private information, the court is not proceeding under section 8 of the Human Rights Act 1998 or article 41 of the Convention, and the conditions of the tort are governed by English domestic law and not the Convention.

127.   For those reasons, I do not regard as relevant the decision of the European Court of Human Rights in *Halford v United Kingdom* (1997) 24 EHRR 523, relied on by counsel for the claimant. In *Halford* a senior police officer whose telephone calls had been intercepted by her employer in violation of article 8 was awarded £10,000 as just satisfaction. As Lord Sales pointed out in argument, on one reading of the judgment, which is far from clear, although it could not be shown that the interception of the applicant's phone calls, as

opposed to other conflicts with her employer, had caused

stress for which she had required medical treatment, it was reasonably assumed that this invasion of privacy had caused her mental harm. Even if the award of just satisfaction is understood to have been for the invasion of the right to privacy itself rather than for any distress felt by the applicant, however, it does not follow that, in anaction between private parties under national law for a similar invasion of privacy, the Convention requires the court to be able to award damages simply for the loss of privacy itself.

128.   Whilst it may be said that pursuant to the general principles of EU law embodied in articles 7 and 8 of the EU Charter the EU had a positive obligation to establish a legislative framework providing for protection of personal data, there was clearly a wide margin of choice as to the particular regime adopted; and the same applies to the positive obligation imposed directly on the UK by the Convention. It could not seriously be argued that the content of those positive obligations included a requirement to establish a right to receive compensation for any (non-trivial) breach ofany requirement (in relation to any personal data of which the claimant is the subject) of whatever legislation the EU and UK chose to enact in this area without the need to prove that the claimant suffered any material damage or distress as a result of the breach.

129.   Accordingly, the fact that the common law privacy tort and the data protectionlegislation have a common source in article 8 of the Convention does not justify reading across the principles governing the award of damages from one regime to theother.

### (d)    Material differences between the regimes

130.   There are further reasons why no such analogy can properly be drawn stemming from the differences between the two regimes. It is plain that the detailed scheme for regulating the processing of personal data established by the Data Protection Directive extended beyond the scope of article 8 and much more widely than the English domestic tort of misusing private information. An important difference is that the Directive (and the UK national legislation implementing it) applied to all "personal data" with no requirement that the data are of a confidential or private nature or that there is a reasonable expectation of privacy protection. By contrast, information is protected against misuse by the domestic tort only where there is a reasonable expectation of privacy. The reasonable expectation of privacy of the communications illicitly intercepted by the defendants in the phone hacking litigation was an essential element of the decision in *Gulati* that the claimants were entitled to compensation for the commission of the wrong itself. It cannot properly be

inferred that the same entitlement should arise where a reasonable expectation of privacy is not a necessary element of the claim.

131.   This point goes to the heart of the approach adopted by the claimant in the present case. Stripped to its essentials, what the claimant is seeking to do is to claim for each member of the represented class a form of damages the rationale for which depends on there being a violation of privacy, while avoiding the need to show a violation of privacy in the case of any individual member of the class. This is a flawed endeavour.

132.   Another significant difference between the privacy tort and the data protection legislation is that a claimant is entitled to compensation for a contravention of the legislation only where the data controller has failed to exercise reasonable care. Some contraventions are inherently fault based. For example, the seventh data protection principle with which a data controller has a duty to comply pursuant to section 4(4) of the DPA 1998 (and article 17 of the Data Protection Directive) states:

> "Appropriate technical and organisational measures shall be taken against unauthorised or unlawful processing of personal data and against accidental loss or destruction of, or damage to, personal data."

A complaint that a data controller has failed to take such "appropriate technical and organisational measures" is similar to an allegation of negligence in that it is predicated on failure to meet an objective standard of care rather than on any intentional conduct. Even where a contravention of the legislation does not itself require fault, pursuant to section 13(3), quoted at para 90 above, there is no entitlement to compensation if the data controller proves that it took "such care as in all the circumstances was reasonably required to comply with the requirement concerned".

133.   The privacy tort, like other torts for which damages may be awarded without proof of material damage or distress, is a tort involving strict liability for deliberate acts, not a tort based on a want of care. No inference can be drawn from the fact that compensation can be awarded for commission of the wrong itself where private information is misused that the same should be true where the wrong may consist only in a failure to take appropriate protective measures and where the right to compensation is expressly excluded if the defendant took reasonable care.

134.   Indeed, this feature of the data protection legislation seems to me to be a yet further reason to conclude that the "damage" for which an individual is entitled to compensation for a breach of any of its requirements does not include the commission of the wrong itself. It would be anomalous if failure to take reasonable care to protect personal data gave rise to a right to compensation without proof that the claimant suffered any material damage or distress when failure to take care to prevent personal injury or damage to tangible moveable property does not.

135.   Accordingly, I do not accept that the decision in *Gulati* is applicable by analogy to the DPA 1998. To the contrary, there are significant differences between the privacy tort and the data protection legislation which make such an analogy positively inappropriate.

### (e)    Equivalence and effectiveness

136.   I add for completeness that the EU law principles of equivalence and effectiveness, on which the Court of Appeal placed some reliance, do not assist the claimant's case. The principle of equivalence requires that procedural rules governing claims for breaches of EU law rights must not be less favourable than procedural rules governing equivalent domestic actions. As explained by Lord Briggs, giving the judgment of this court, in *Totel Ltd v Revenue and Customs Comrs* [2018] UKSC 44; [2018] 1 WLR 4053, para 7, the principle is "essentially comparative". Thus:

> "The identification of one or more similar procedures for the enforcement of claims arising in domestic law is an essential prerequisite for its operation. If there is no true comparator, then the principle of equivalence can have no operation at all. The identification of one or more true comparators is therefore the essential first step in any examination of an assertion that the principle of equivalence has been infringed." [citation omitted]

For the reasons given, even if the measure of damages is regarded as a procedural rule, a claim for damages for misuse of private information at common law is not a true comparator of a claim under section 13 of the DPA 1998. The principle of equivalence can therefore have no operation.

137.   The principle of effectiveness invalidates a national procedure if it renders the enforcement of a right conferred by EU law either virtually impossible or excessively

difficult: see again *Totel Ltd* at para 7. However, the absence of a right to compensation for a breach of data protection rights which causes no material damage or distress, even if regarded as a procedural limitation, does not render the enforcement of such rights virtually impossible or excessively difficult. The right to an effective remedy does not require awards of compensation for every (non-trivial) breach of statutory requirements even if no material damage or distress has been suffered.

## (f)    <u>Conclusion on the effect of section 13</u>

138.   For all these reasons, I conclude that section 13 of the DPA 1998 cannot reasonably be interpreted as conferring on a data subject a right to compensation for any (non-trivial) contravention by a data controller of any of the requirements of the Act without the need to prove that the contravention has caused material damage or distress to the individual concerned.

## (9)    The claim for user damages

139.   "User damages" is the name commonly given to a type of damages readily awarded in tort where use has wrongfully been made of someone else's land or tangible moveable property although there has been no financial loss or physical damage to the property. The damages are assessed by estimating what a reasonable person would have paid for the right of user. Damages are also available on a similar basis for patent infringement and other breaches of intellectual property rights. Following the seminal decision of this court in *OneStep (Support) Ltd v Morris-Garner* [2018] UKSC 20; [2019] AC 649, it is now clear that user damages are compensatory in nature, their purpose being to compensate the claimant for interference with a right to control the use of property where the right is a commercially valuable asset. As Lord Reed explained in *Morris-Garner*, at para 95(1):

> "The rationale of such awards is that the person who makes wrongful use of property, where its use is commercially valuable, prevents the owner from exercising a valuable right to control its use, and should therefore compensate him for the loss of the value of the exercise of that right. He takes something for nothing, for which the owner was entitled to require payment."

140.   Lord Reed, at paras 27 and 29, cited authorities which make it clear that the entitlement to user damages does not depend on whether the owner would in fact have exercised the right to control the use of the property, had it not been interfered with. The "loss" for which the claimant is entitled to compensation is not loss of this "conventional kind" (para 30); rather, it lies in the wrongful use of the claimant's property itself, for which the economic value of the use provides an appropriate measure. This value can be assessed by postulating a hypothetical negotiation and estimating what fee would reasonably have been agreed for releasing the defendant from the duty which it breached. It is this method of assessment on which the claimant relies in the alternative formulation of the present claim.

141.   A claim in tort for misuse of private information based on the factual allegations made in this case, such as was made in *Vidal-Hall*, would naturally lend itself to an award of user damages. The decision in *Gulati* shows that damages may be awarded for the misuse of private information itself on the basis that, apart from any material damage or distress that it may cause, it prevents the claimant from exercising his or her right to control the use of the information. Nor can it be doubted that information about a person's internet browsing history is a commercially valuable asset. What was described by the Chancellor in the Court of Appeal [2020] QB 747, para 46, as "the underlying reality of this case" is that Google was allegedly able to make a lot of money by tracking the browsing history of iPhone users without their consent and selling the information collected to advertisers.

142.   The view has sometimes been expressed that asserting privacy in information is inconsistent, or at least in tension, with treating such information as a commercial asset: see eg *Douglas v Hello! Ltd (No 3)* [2005] EWCA Civ 595; [2006] QB 125, para 246; and on appeal sub nom *OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1, para 275 (Lord Walker of Gestinghorpe). But once the basis of the right to privacy is understood to be the protection of a person's freedom to choose and right to control whether and when others have access to his or her private affairs, I think that any tension largely disappears. It is common experience that some people are happy to exploit for commercial gain facets of their private lives which others would feel mortified at having exposed to public view. Save in the most extreme cases, this should be seen as a matter of personal choice on which it is not for the courts to pass judgments. Moreover, where the defendant's very purpose in wrongfully obtaining and using private information is to exploit its commercial value, the law should not be prissy about awarding compensation based on the commercial value of the exercise of the right. As was confirmed in *Morris-Garner*, the fact that the claimant would not have chosen to exercise the right himself is no answer to a claim for user damages. It is enough that, as Lord Reed put it at paras 30 and 95(1) of his majority judgment, the defendant has taken something for nothing, for which the owner of the right was entitled to require payment.

143.  The point does not arise in the present case, however, because the claimant is not claiming damages for misuse of private information. As discussed, the only claim advanced is under the DPA 1998. Here it follows from the conclusion reached above about the meaning of section 13 that user damages are not available. This is because, for the reasons given, compensation can only be awarded under section 13 of the DPA 1998 for material damage or distress caused by an infringement of a claimant's right to have his or her personal data processed in accordance with the requirements of the Act, and not for the infringement itself. Although his reasoning was in part based on an understanding of user damages overtaken by this court's decision in *Morris-Garner*, it follows that Patten J was right to hold in *Murray v Express Newspapers Plc* [2007] EWHC 1908 (Ch); [2007] EMLR 22, at para 92, that the principles on which user damages are awarded do not apply to a claim for compensation under the DPA 1998.

## F.    THE NEED FOR INDIVIDUALISED EVIDENCE OF MISUSE

144.  There is a further reason why the claimant's attempt to recover damages under section 13 of the DPA 1998 by means of a representative claim cannot succeed. Even if (contrary to my conclusion) it were unnecessary in order to recover compensation under this provision to show that an individual has suffered material damage or distress as a result of unlawful processing of his or her personal data, it would still be necessary for this purpose to establish the extent of the unlawful processing in his or her individual case. In deciding what amount of damages, if any, should be awarded, relevant factors would include: over what period of time did Google track the individual's internet browsing history? What quantity of data was unlawfully processed? Was any of the information unlawfully processed of a sensitive or private nature? What use did Google make of the information and what commercial benefit, if any, did Google obtain from such use?

## (1)    The claim for the "lowest common denominator"

145.  The claimant does not dispute that the amount of any compensation awarded must in principle depend on such matters. But he contends that it is possible to identify an "irreducible minimum harm" suffered by every member of the class whom he represents for which a "uniform sum" of damages can be awarded. This sum is claimed on the basis that it represents what the Chancellor in the Court of Appeal described as the "lowest common denominator" of all the individual claims: see [2020] QB 747, para 75.

146.  Google objects that Mr Lloyd, as the self-appointed representative of the class, has no authority from any individual class member to waive or abandon

what may be

the major part of their damages claim by disavowing reliance on any circumstances affecting that individual. Mr Lloyd's answer, which the Court of Appeal accepted, is a pragmatic one. He points out that the limitation period for bringing any proceedings has now expired. For any represented individual there is therefore no longer any realistic possibility of recovering any compensation at all other than through the present action. Furthermore, to make this action viable, it is necessary to confine the amount of damages claimed for each class member to a uniform sum; and a uniform sum of damages, even if considerably smaller than an individualised award would be, is better than nothing.

147.   I do not think it necessary to enter into the merits of this issue. I am prepared to assume, without deciding, that as a matter of discretion the court could - if satisfied that the persons represented would not be prejudiced and with suitable arrangements in place enabling them to opt out of the proceedings if they chose - allow a representative claim to be pursued for only a part of the compensation that could potentially be claimed by any given individual. The fundamental problem is that, if no individual circumstances are taken into account, the facts alleged are insufficient to establish that any individual member of the represented class is entitled to damages. That is so even if it is unnecessary to prove that the alleged breaches caused any material damage or distress to the individual.

## (2)    The facts common to each individual case

148.   The facts alleged against Google generically cannot establish that any given individual is entitled to compensation. To establish any such individual entitlement it must be shown, at least, that there was unlawful processing by Google of personal data of which that particular individual was the subject. In considering whether the facts alleged, if proved, are capable of establishing an entitlement to damages, it is therefore necessary to identify what unlawful processing by Google of personal data is alleged to have occurred in Mr Lloyd's own case and also in the case of each other member of the represented class. What facts is the claimant proposing to prove to show that Google acted unlawfully in each individual case?

149.   The answer, on analysis, is: only those facts which are necessary to show that the individual falls within the definition of the "claimant class". The premise of the claim is that Mr Lloyd and each person whom he represents is entitled to damages simply on proof that they are members of the class and without the need to prove any further facts to show that Google wrongfully collected and used their personal data. Any such further facts would inevitably vary from one individual member of the class to another and would require individual proof.

150.   To fall within the definition of the class, it must be shown, in substance, that the individual concerned had an iPhone of the appropriate model running a relevant version of the Apple Safari internet browser which, at any date during the relevant period whilst present in England and Wales, he or she used to access a website that was participating in Google's DoubleClick advertising service. There are exclusions from the class definition for anyone who changed the default settings in the Safari browser, opted out of tracking and collation via Google's "Ads Preference Manager" or obtained a DoubleClick Ad cookie via a "first party request" rather than as a "third party cookie". The aim of the definition is to identify all those people who had a DoubleClick Ad cookie placed on their device unlawfully, through the Safari workaround, but not to include within the class anyone who did not receive a DoubleClick Ad cookie during the relevant period or who received the cookie by lawful means.

151.   It is sufficient to bring an individual within the class definition that he or she used the Safari browser to access a website participating in Google's DoubleClick advertising service on a single occasion. The theory is that on that occasion the DoubleClick Ad cookie will have been placed on the user's device unlawfully as a third party cookie. To qualify for membership of the class, it is not necessary to show that the individual ever visited a website participating in Google's DoubleClick advertising service again during the relevant period. Nor is it alleged that any individual or individuals did visit such a website on more than one occasion. The "lowest common denominator" on which the claim is based is therefore someone whose internet usage
- apart from one visit to a single website - was not illicitly tracked and collated and who received no targeted advertisements as a result of receiving a DoubleClick Ad cookie.
This is because the claimant has deliberately chosen, in order to advance a claim in a representative capacity for damages assessed from the bottom up, not to rely on any facts about the internet activity of any individual iPhone user beyond those which bring them within the class of represented persons.

152.   For reasons given earlier, I am leaving aside the difficulties of proving membership of the class, significant as they would appear to be, and am assuming that such difficulties are not an impediment to the claim. But the question that must be asked is whether membership of the represented class is sufficient by itself to entitle an individual to compensation, without proof of any further facts particular to that individual.

153.   On the claimant's own case there is a threshold of seriousness which must be crossed before a breach of the DPA 1998 will give rise to an entitlement to compensation under section 13. I cannot see that the facts which the claimant aims to prove in each individual case are sufficient to surmount this threshold. If (contrary to

the conclusion I have reached) those facts disclose "damage" within the meaning of section 13 at all, I think it impossible to characterise such damage as more than trivial. What gives the appearance of substance to the claim is the allegation that Google secretly tracked the internet activity of millions of Apple iPhone users for several months and used the data obtained for commercial purposes. But on analysis the claimant is seeking to recover damages without attempting to prove that this allegation is true in the case of any individual for whom damages are claimed. Without proof of some unlawful processing of an individual's personal data beyond the bare minimum required to bring them within the definition of the represented class, a claim on behalf of that individual has no prospect of meeting the threshold for an award of damages.

### (3)    User damages on a lowest common denominator basis

154.   The claimant's case is not improved by formulating the claim as one for user damages quantified by estimating what fee each member of the represented class could reasonably have charged - or which would reasonably have been agreed in a hypothetical negotiation - for releasing Google from the duties which it breached. I have already indicated why, in my opinion, user damages cannot be recovered for breaches of the DPA 1998. But even if (contrary to that conclusion) user damages could in principle be recovered, the inability or unwillingness to prove what, if any, wrongful use was made by Google of the personal data of any individual again means that any damages awarded would be nil.

155.   The claimant asserts, and I am content to assume, that if, instead of bypassing privacy settings through the Safari workaround, Google had offered to pay a fee to each affected Apple iPhone user for the right to place its DoubleClick Ad cookie on their device, the fee would have been a standard one, agreed in advance, rather than a fee which varied according to the quantity or commercial value to Google of the information which was subsequently collected as a result of the user's acceptance of the cookie. However, imagining the negotiation of a fee in advance in this way is not the correct premise for the valuation.

156.  As explained in *Morris-Garner*, the object of an award of user damages is to compensate the claimant for use wrongfully made by the defendant of a valuable asset protected by the right infringed. The starting point for the valuation exercise is thus to identify what the extent of such wrongful use actually was: only then can an estimate be made of what sum of money could reasonably have been charged for that use or, put another way, for releasing the wrongdoer from the duties which it breached in the wrongful use that it made of the asset. Imagining a hypothetical negotiation, as Lord Reed explained at para 91 of *Morris-Garner*, is merely "a tool" for arriving at this

estimated sum. As in any case where compensation is awarded, the aim is to place the claimant as nearly as possible in the same position as if the wrongdoing had not occurred. Accordingly, as Patten LJ put it in *Eaton Mansions (Westminster) Ltd v StingerCompania de Inversion SA* [2013] EWCA Civ 1308; [2014] 1 P & CR 5, para 21:

> "The valuation construct is that the parties must be treated as having negotiated for a licence which covered the acts of trespass that actually occurred. The defendant is not requiredto pay damages for anything else."

See also *Enfield London Borough Council v Outdoor Plus Ltd* [2012] EWCA Civ 608, para47; and *Marathon Asset Management LLP v Seddon* [2017] EWHC 300 (Comm); [2017] ICR 791, paras 254-262.

157.   Applying that approach, the starting point would therefore need to be to establish what unlawful processing by Google of the claimant's personal data actually occurred. Only when the wrongful use actually made by Google of such data is known is it possible to estimate its commercial value. As discussed, in order to avoid individualassessment, the only wrongful act which the claimant proposes to prove in the case of each represented person is that the DoubleClick Ad cookie was unlawfully placed on their device: no evidence is - or could without individual assessment - be adduced to show that, by means of this third party cookie, Google collected or used any personal data relating to that individual. The relevant valuation construct is therefore to ask what fee would hypothetically have been negotiated for a licence to place the DoubleClick Ad cookie on an individual user's phone as a third party cookie, but without releasing Google from its obligations not to collect or use any information about that person's internet browsing history. It is plain that such a licence would be valueless and that the fee which could reasonably be charged or negotiated for it would accordingly be nil.

## G.    CONCLUSION

158.   The judge took the view that, even if the legal foundation for the claim made in this action were sound, he should exercise the discretion conferred by CPR rule 19.6(2)by refusing to allow the claim to be continued as a representative action. He characterised the claim as "officious litigation, embarked upon on behalf of individualswho have not authorised it" and in which the main beneficiaries of any award of damages would be the funders and the lawyers. He thought that the representative claimant "should not be

permitted to consume substantial resources in the pursuit of litigation on behalf of others who have little to gain from it, and have not authorised

the pursuit of the claim, nor indicated any concern about the matters to be litigated":[2019] 1 WLR 1265, paras 102-104. The Court of Appeal formed a very different view of the merits of the representative claim. They regarded the fact that the members ofthe represented class had not authorised the claim as an irrelevant factor, which the judge had wrongly taken into account, and considered that it was open to them to exercise the discretion afresh. They saw this litigation as the only way of obtaining a civil compensatory remedy for what, if proved, was a "wholesale and deliberate misuse of personal data without consent, undertaken with a view to commercial profit": see [2020] QB 747, para 86. In these circumstances the Court of Appeal took the view that, as a matter of discretion, the claim should be allowed to proceed.


159.   It is unnecessary to decide whether the Court of Appeal was entitled to interfere with the judge's discretionary ruling or whether it would be desirable for a commercially funded class action to be available on the facts alleged in this case. This isbecause, regardless of what view of it is taken, the claim has no real prospect of success. That in turn is because, in the way the claim has been framed in order to try tobring it as a representative action, the claimant seeks damages under section 13 of the DPA 1998 for each individual member of the represented class without attempting to show that any wrongful use was made by Google of personal data relating to that individual or that the individual suffered any material damage or distress as a result of a breach of the requirements of the Act by Google. For the reasons explained in this judgment, without proof of these matters, a claim for damages cannot succeed.


160.   I would therefore allow the appeal and restore the order made by the judge refusing the claimant's application for permission to serve the proceedings on Googleoutside the jurisdiction of the courts of England and Wales.



<u>Neutral Citation Number: [2022] EWHC 1178 (Ch)</u>

<u>Case No: HC-2015-001324</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>
<u>BUSINESS LIST (ChD)</u>

<u>Rolls Building,</u>
<u>7 Rolls Buildings,</u>
<u>Fetter Lane, London</u>
<u>EC4A 1NL</u>

<u>Date: 17 May 2022</u>

**Before**:

<u>**THE HONOURABLE MR JUSTICE HILDYARD**</u>
- - - - - - - - - - - - - - - - - - - -
**Between:**

**(1) ACL NETHERLANDS B.V. (AS
SUCCESSOR TO AUTONOMY
CORPORATION LIMITED)**                    <u>Claimants</u>

**(2) HEWLETT-PACKARD THE HAGUE BV
(AS SUCCESSOR TO HEWLETT-
PACKARD VISION BV)**

**(3) AUTONOMY SYSTEMS LIMITED**

**(4) HEWLETT-PACKARD ENTERPRISE
NEW JERSEY, INC**

**- and –**

**(1) MICHAEL RICHARD LYNCH**          <u>Defendants</u>
**(2) SUSHOVAN TAREQUE HUSSAIN**

- - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - -

**MR LAURENCE RABINOWITZ QC & MR PATRICK GOODALL QC, CONALL PATTON, EMMA JONES, MAX SCHAEFER, JAMES FOX & BEN ZELENKA MARTIN** (instructed by **Travers Smith LLP)** for the **Claimants**

**MR ROBERT MILES QC, MR RICHARD HILL QC, SHARIF SHIVJI, TOM GENTLEMAN, LARA HASSELL-HART, ZARA MCGLONE & KARL ANDERSON** (instructed by **Clifford Chance LLP**) for the **First Defendant**

**MR PAUL CASEY** (instructed by **Simmons & Simmons LLP**) for the **Second Defendant**

Hearing dates: 25 March 2019 - 15 January 2020, 25 February 2021

- - - - - - - - - - - - - - - - - - - - -

# <u>APPROVED JUDGMENT</u>

**<u>Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to the National Archives. The date and time for hand-down is deemed to be 12 pm Tuesday 17 May 2022.</u>**

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

| PART A CONTENTS | |
|---|---|
| *Headings* | *Paragraphs* |
| **INTRODUCTION** | 1-7 |
| The Parties | 8-14 |
| High-level synopsis of the case and defences | 15-25 |
| Some preliminary points | 26-31 |
| Structure of this judgment | 32-33 |
| Overview of the two principal entities | 34 |
| Autonomy | 35-39 |
| Autonomy's signature product: IDOL | 40-47 |
| Autonomy: structure and organisation | 48 |
| Board of Directors | 49-50 |
| Audit Committee | 51-54 |
| Management team | 55-57 |
| Autonomy Inc management team | 58-59 |
| Sales teams and sales process | 60-66 |
| Autonomy's finance department | 67-71 |
| Autonomy's Auditors: Deloitte | 72-78 |
| Work undertaken by Deloitte and engagement with finance department | 79-85 |
| External lawyers | 86 |
| Dr Lynch's role | 87-105 |
| Autonomy's Reporting | 106 |
| Annual and quarterly reports: Deloitte's review work | 107 |
| Deloitte's review of annual reports | 108-113 |
| (i)Deloitte's review of quarterly reports | 114-117 |
| (ii)Deloitte's review of revenue | 118-119 |
| (iii) Press releases and earnings calls | 120-123 |
| (iv) The relevance of Deloitte's review and approval | 124-125 |
| Revenue Reporting | |
| IFRS 8: Single operating segment | 126-131 |
| Was Autonomy being prepared and offered for sale? | 132-137 |
| HP | 138-152 |
| Identification of Autonomy as a target | 153-157 |
| Individuals principally involved | 158-178 |
| The development of interest culminating in a bid | 179-183 |
| HP's outlook and objectives | 184-187 |
| Development of Deal Models and valuations | 188-191 |
| HP's fear of a rival bidder and a takeover battle | 192-194 |

| | |
|---|---|
| Progression of the deal towards an offer | 195-203 |
| Consideration of potential offer by HP's board and their financial advisers | 204-221 |
| Negotiation of the price | 222 |
| July 2011 negotiation | 223-233 |
| HP's Due Diligence and KPMG | |
| Summary | 234-240 |
| Due diligence timetable | 241-244 |
| HP's approach to due diligence | 245-249 |
| Due diligence calls | 250-252 |
| Technical due diligence | 253 |
| Top 40 customer contracts | 254-258 |
| Discussions between KPMG and Deloitte | 259-264 |
| Due diligence findings | 265-278 |
| Price negotiations in August | 279-287 |
| Incorporation of Bidco | 288-291 |
| HP's final approval:  boardroom spats and second thoughts | 292-299 |
| 18 August meeting | 300-303 |
| The announcement of the bid and HP's loss of nerve | 304-311 |
| The Joe Bloggs emails | 312-313 |
| The ousting of Mr Apotheker | 314-321 |
| Immediate aftermath of the Acquisition | 322-328 |
| The need for, but difficulties of, integration | 329-337 |
| Autonomy misses its targets | 338-357 |
| The resignation of Mr Hussain and dismissal of Dr Lynch | 358-366 |
| Mr Joel Scott's whistleblowing | 367-369 |
| The Rebasing Exercise | 370-379 |
| August 2012 – the decision at that time not to impair the carrying value of Autonomy | 380-383 |
| November 2012: Announcement of Impairment | 384-402 |
| The revaluation and its announcement | 403-414 |
| After the announcement of impairment and the public assertion of fraud | 415-422 |
| Backdrop to these proceedings and the effect of the US criminal proceedings | 423-431 |
| **LEGAL ISSUES AND TESTS OF LIABILITY UNDER FSMA** | |
| (a) Overview and background to the provisions of FSMA | 432-445 |
| (b) Conditions for liability under s.90A and Sch 10A FSMA | 446-448 |
| (c) Published information | 449-459 |
| (d) Untrue or misleading statement or omission | 460-466 |
| (e) Guilty knowledge | 467-477 |

| | |
|---|---|
| (f) Reliance | 478-480 |
| Reliance by whom? | 481-483 |
| The 'Bidco Point' | 484-500 |
| Reliance on what? | 501-506 |
| What degree of reliance? | 507-516 |
| When is reliance reasonable? | 517-523 |
| (g) Loss in the context of FSMA claims | 524-539 |
| Knowledge of the Defendants | 540-544 |
| Claims in deceit and under the Misrepresentation Act 1967 | 545 |
| Claims in deceit | 546 |
| Representation made to a claimant by a defendant | 547-548 |
| Defendant's state of mind | 549-552 |
| Reliance / inducement | 553-557 |
| Loss | 558-569 |
| Misrepresentation Act claims | 570-575 |
| Direct claims for breach of duty | 576-583 |
| Interpretation of accounting standards and statements of practice | 584-591 |
| Key accounting issues | 592-606 |
| Issues of nomenclature | 607-610 |
| Structure of the judgment | 611-612 |
| **HARDWARE CLAIMS** | |
| The Claimants' 'Hardware Case' in outline | 613-628 |
| Defendants' case in summary and matters primarily in dispute in the FSMA Claim | 629-637 |
| The Principal Issues | 638-647 |
| Issues of terminology | 648-659 |
| Issue (1): what was the Defendants' purpose in causing Autonomy to resell "pure hardware"? | 660-661 |
| Three notable features | 662 |
| A pleading issue: Is it open to the Claimants to impugn the sales on the basis that 'revenue pumping' was the predominant, even if not the only purpose of them? | 663-675 |
| An issue as to the evidence given by Mr Egan and Mr Sullivan in the US criminal trial | 676-684 |
| The relationship between purpose and concealment | 685-688 |
| Structure of this chapter | 689-695 |
| (A) The first hardware sales and the origins of the hardware reselling strategy | 696-715 |
| (B) The Defendants' case as to the purpose of the hardware reselling strategy | 716 |

| | |
|---|---|
| (1) Dr Lynch's evidence as to the rationale of the hardware reselling strategy | 717-735 |
| (2) Witness evidence which the Defendants contend supports their case | 736-737 |
| Mr Sullivan | 738-749 |
| Mr Egan | 750-768 |
| Dr Lynch | 769-772 |
| (3) Autonomy's relationship with EMC and the dispute as to why it abruptly ended | 773-774 |
| Contractual arrangements between Autonomy and EMC | 775-781 |
| Apparent success of the trading relationship with EMC | 782-783 |
| EMC decide not to proceed with the programme | 784-788 |
| (5) Autonomy's relationships with Dell and Hitachi | 789-796 |
| (5) The Defendants' further evidence as to the use and success of the programme | 797-822 |
| (6) The Defendants' case that the strategy was not secret nor the revenue disguised | 823-824 |
| Discussion within Autonomy itself | 825-833 |
| Disclosure to and review by Deloitte and the Audit Committee | 834-848 |
| (7) Defendants' support of and belief in the purpose asserted and its accounting treatment | 849-887 |
| Summary of the Defendants' Hardware case | 888 |
| (C) Elaboration of Claimants' case as to the real purpose of the hardware reselling strategy | 889-893 |
| (1) No documentary evidence of threats to Autonomy's software business | 894-899 |
| (2) Expansion of and dependence on the programme with EMC in Q3 2009 | 900-905 |
| (3) Emails showing strategy's purpose and use as flexible source of revenue | 906-911 |
| (4) Use of hardware sales as a flexible source to 'plug' shortfalls in software sales | 912-916 |
| Efforts to mitigate the effect and visibility of loss-making hardware sales | 917-923 |
| Developing use of hardware revenues | 924-927 |
| Importance of hardware sales revenues relative to total revenues in Q3 2009 | 928-929 |
| (5) EMC's withdrawal from the programme and its replacement by Dell in Q4 2009 | 930-938 |
| The terms of the Value Added Reseller Agreement between Dell and Autonomy | 939-948 |
| (6) What a chronological summary of the hardware reselling programme with Dell by reference to the documentary evidence reveals | 949-950 |
| Chronology of Autonomy's relationship with Dell from Q1 2010 to Q2 2011 | |
| Q1 2010 | 951-967 |
| Q1 2010 – alleged post-quarter end manipulation of the hardware revenues recognised | 968-989 |

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

| | |
|---|---|
| Q1 2010 – the inventory | 990-994 |
| My assessment re Q1 2010 | 995 |
| Q2 2010 | 996-1021 |
| Q2 2010 – alleged post-quarter end manipulation of the hardware revenues recognised | 1022-1029 |
| Deloitte Report to the Audit Committee on the Q2 2010 Review | 1030-1032 |
| My assessment of Q2 2010 | 1033 |
| Linkage Analysis | 1034-1037 |
| Q3 2010 | 1038-1045 |
| Q4 2010 | 1046-1061 |
| Q1 2011 | 1062-1073 |
| Q1 2011 and alleged revenue deferral | 1074-1095 |
| Defendants' involvement/knowledge | 1096-1100 |
| Q2 2011 | 1101-1111 |
| Q3 2011 | 1112-1117 |
| (7) Incentivisation of Mr Sullivan purely by reference to hardware sales revenue | 1118-1133 |
| (8) No documentary evidence that discounted resales of hardware were used as a bargaining chip | 1134-1140 |
| (9) Three illustrative transactions where marketing was no part of the purpose | 1141-1142 |
| BofA | 1143-1155 |
| Citibank | 1156-1158 |
| Zones Inc | 1159-1182 |
| (10) The consistent pattern of concealing the hardware sales | 1183-1186 |
| Annual Reports: overview | 1187-1198 |
| Q3 2009 Quarterly Report | 1199-1203 |
| Q4 2009 Quarterly Report | 1204 |
| Q1 2010 Quarterly Report | 1205-1211 |
| Q2 2010 Quarterly Report | 1212-1215 |
| Q3 2010 Quarterly Report, Earnings Call and Investor Bulletin | 1216-1227 |
| Q4 2010 Quarterly Report, Earnings Call and Investor Relations Bulletin | 1228-1232 |
| Q4 2010 Earnings Call | 1233 |
| Q4 2010 Investor Relations Bulletin | 1234-1248 |
| Q1 2011 Quarterly Report | 1249-1251 |
| Q2 2011 Quarterly/Half yearly Report and Earnings Call | 1252-1255 |
| Summary of the Claimants' case as to the disclosure made in Quarterly Reports | 1256-1261 |
| Is the Defendants' avowed reliance on Deloitte a "trump card"? | 1262-1270 |
| The development of the narrative presented to Deloitte and the Audit Committee | 1271 |

| | |
|---|---|
| Efforts to obtain "a helpful form of words" from EMC to "wave in front of Deloitte" | 1272-1289 |
| Development of the Strategic Deals Memorandum | 1290-1311 |
| Mr Knights' own involvement in drafting the Strategic Deals Memorandum | 1312-1325 |
| Did the Strategic Deals Memorandum spin a false narrative? | 1326-1340 |
| Dr Lynch's knowledge of falsity of the Strategic Deals Memorandum | 1341-1348 |
| Assessment of the effect of Strategic Deals Memorandum | 1349-1359 |
| The issue of disclosure in Q3 2009 | 1360-1364 |
| Quarterly Notes prepared by Mr Hussain/Mr Chamberlain | 1365-1373 |
| How the hardware reselling strategy was presented in the Quarterly Notes | 1374-1375 |
| Mr Hussain's Q3 2009 Quarterly Note | 1376-1385 |
| Deloitte's Q3 2009 Review | 1386-1392 |
| How Dr Lynch dealt with the Audit Committee's questions about disclosure (Q3 2009) | 1393-1403 |
| Mr Hussain's Q4 2009 Quarterly Note | 1404-1411 |
| Mr Hussain's Q1 2010 Quarterly Note | 1412-1419 |
| Mr Hussain's Q2 2010 Note | 1420-1441 |
| Mr Hussain's Q3 2010 Note | 1442-1454 |
| Mr Hussain's Q4 2010 Note | 1455-1462 |
| Mr Hussain's Q1 2011 Note | 1463-1467 |
| Mr Hussain's Q2 2011 Note | 1468-1474 |
| Conclusions in respect of Mr Hussain's Quarterly Notes | 1475-1476 |
| Linkage Analysis | 1477-1496 |
| Other examples showing the determination to avoid disclosure to the market | 1497 |
| Q&A scripts | 1498-1519 |
| Representations to disguise the hardware reselling strategy made in Earnings Calls | 1520-1521 |
| Q3 2009 Earnings Call | 1522-1555 |
| Summary | 1556-1572 |
| Q1 2010 Earnings Call | 1573-1588 |
| Q2 2010 Earnings Call | 1589-1592 |
| Conclusion on Hardware Sales Issue 1 | 1593-1597 |
| Issue 2: Was Autonomy's published information untrue or misleading by reason of the hardware sales, and did the Defendants appreciate this? | 1598-1600 |
| The Claimants' alternative case | 1601 |
| Statements made in Autonomy's published information | 1602-1603 |
| The relevance of what the Defendants intended the representations to mean | 1604-1608 |
| The representation that Autonomy was a 'pure software company' | 1609-1632 |

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

| | |
|---|---|
| That the disclosed revenue categories comprised all sources of Autonomy's revenue | 1633-1640 |
| The representation that transactions in 2009 were the same in nature as those in 2008 | 1641-1643 |
| Falsity of inclusion of hardware sales in "Organic Growth" | 1644-1659 |
| Overall conclusion on the claims in respect of statements made in the accounts | 1660-1663 |
| Did the Annual Reports/ Autonomy's published information omit information about hardware sales which was required to be disclosed? | 1664-1669 |
| Did Autonomy's published information omit a material fact required to be disclosed? | 1670-1671 |
| IAS 18.35 | 1672-1690 |
| IAS 1 | 1691 |
| IAS 1.1 | 1692 |
| IAS 1.15 | 1693-1694 |
| IAS 1.17 | 1695-1699 |
| IAS 1.29 | 1700-1710 |
| IFRS 8 | 1711-1714 |
| IFRS 8.1 | 1715-1716 |
| IFRS 8.32 | 1717-1728 |
| Materiality | 1729 |
| My assessment | 1730-1739 |
| Did the Defendants determine dishonestly to conceal matters they knew to be material? | 1740-1743 |
| Conclusion | 1744-1756 |
| Issue (3): Did Autonomy's treatment of the costs of the hardware render Autonomy's published information untrue or misleading and did the Defendants appreciate this? | 1757-1767 |
| Issue (4): Should Autonomy, at the least, have made clear in its published information what its accounting policy was with respect to hardware costs? | 1768-1776 |
| Issue (5): Did Autonomy wrongly recognise revenue in Q2 2009 on a specific ($6 million) hardware transaction with Morgan Stanley? | 1777-1798 |
| Issue (6): Did HP know about the hardware sales pre-acquisition and continue them after it? | 1799-1801 |
| Pre-acquisition knowledge and due diligence | 1802-1813 |
| Post-acquisition knowledge and discussion of hardware | 1814-1844 |
| My assessment | 1845-1852 |
| Conclusion as to when HP became aware of "pure hardware sales" | 1853-1854 |
| **CLAIMANTS' 'VAR CASE': THE 37 IMPUGNED VAR TRANSACTIONS** | |
| Overview of the parties' respective cases on Autonomy's VAR sales | |
| The Claimants' case | 1855-1867 |
| Overview of the Defendants' case | 1868-1879 |

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

| | |
|---|---|
| Number and value, and the two categories, of impugned VAR sales | 1880-1886 |
| Reciprocal VARs | 1887-1889 |
| The Claimants' legal causes of action in respect of the impugned VAR transactions | 1890-1891 |
| The two hurdles for the Claimants in their FSMA claims in respect of impugned VAR sales | 1892-1899 |
| Structure of more detailed analysis of the claims based on false accounting | 1900 |
| (1) Usual provisions of VAR sales contracts | 1901-1904 |
| (2) Terms and interpretation of IAS 18 | 1905 |
| Terms of IAS 18 | 1906-1910 |
| Dispute as to interpretation of the Accounting Standards | 1911-1925 |
| (3) Expert evidence as to accountancy practice in applying IAS 18 | 1926-1929 |
| Mr Holgates' approach on VARs in his reports | 1930-1942 |
| Mr MacGregor's approach on VARs in his reports | 1943-1955 |
| (4) Factual analysis | 1956-1960 |
| The Claimants' case that in reality the VARs were never at risk and Autonomy retained managerial control | 1961-1962 |
| The counterparties to the impugned VAR sales | 1963-1964 |
| Summary of the Claimant's overall approach in presenting the factual evidence | 1965-1966 |
| "Direct evidence" of the alleged side agreements or understandings | 1967 |
| "Direct evidence": the relevant witnesses | 1968-1972 |
| Overview of the witness evidence put forward by the Claimants | 1973-1975 |
| Overview of Mr Egan's evidence as to what he told the VARs in every impugned VAR transaction | 1976-1998 |
| Overview of Mr David Truitt's evidence as to MicroLink's role in impugned VAR deals | 1999-2004 |
| Overview of Mr Baiocco's evidence as to Capax Discovery's role in impugned VAR deals | 2005-2019 |
| The Goldberg Segalla letter | 2020-2029 |
| Evidence in relation to FileTek's single impugned VAR transaction | 2030-2035 |
| Overview of Mr Steve Truitt's evidence on the impugned MicroTech VAR transactions | 2036-2048 |
| Mr David Truitt's evidence on the impugned DiscoverTech VAR transactions | 2049-2055 |
| Dispute as to the effect of any assurances given | 2056-2060 |
| Assessment of the effect of the direct/witness evidence | 2061-2066 |
| (5) The alleged "pattern" and the Defendants' response it reveals "neutral features" | 2067-2071 |
| Was there demonstrated to be a pattern showing that VARs did not, and were not intended to, negotiate or effect an end-user sale? | 2072-2087 |
| The Defendants' position as regards the alleged 'pattern' | 2088-2091 |
| Quarter-end timing | 2092 |

**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

| | |
|---|---|
| Recourse to a VAR simply to recognise revenue if the end-user deal was delayed | 2093-2094 |
| No assessment of status or prospects of end-user deal by VAR | 2095-2096 |
| No price negotiation for VAR sale | 2097-2098 |
| VAR sale but no added value | 2099-2104 |
| Autonomy's involvement with the end-user after the VAR sale | 2105-2109 |
| Sales to VARs of hosted products | 2110-2111 |
| Transactions going direct | 2112-2116 |
| VARs as 'designated payees' in respect of direct deal between Autonomy and end-user | 2117-2125 |
| Write-offs | 2126-2127 |
| Not suing debtors | 2128 |
| Reseller unwillingness to pay | 2129-2131 |
| MAFs | 2132-2148 |
| Summary of Defendants' position | 2149-2153 |
| My conclusion as to whether a pattern emerges and what is revealed | 2154-2164 |
| Relevance of Deloitte's approval of revenue recognition | 2165-2167 |
| (6) The Defendants' knowledge of improper accounting | 2168-2169 |
| Mr Hussain's knowledge | 2170-2182 |
| Dr Lynch's knowledge | 2183-2227 |
| Summary of my conclusions on the VAR case | 2228-2231 |
| The 'Hogenson episode' | 2232-2289 |
| The FSA and FRRP correspondence | 2290-2292 |
| Mr Hogenson's concerns about Autonomy's accounting treatment of VAR sales | 2293-2319 |
| Defendants' knowledge but alleged reliance on Deloitte | 2320-2334 |
| Summary in respect of the letters to the FRRP | 2335-2336 |

**MR JUSTICE HILDYARD :**

## INTRODUCTION

1.     Fraud on a grand scale; or relentless witch-hunt? That is the question in this claim against two individuals for many billions arising out of a corporate acquisition more than a decade ago. The Claimants' case is that they were fundamentally misled and are victims of fraud. The Defendants' case is that the claim is "manufactured" to cover and justify a change of corporate mind, and to cast them as scapegoats for what in reality is buyer's remorse coupled with management failings.

2.     The acquisition in question ("the Acquisition") was the purchase for approximately $11.1 billion in cash of the entire issued share capital of Autonomy Corporation plc ("Autonomy") by a special purpose vehicle ("Bidco"). Bidco was incorporated by Hewlett-Packard Company ("HP") for the purpose of the Acquisition. HP was the ultimate holding company in the Hewlett-Packard Group. The Acquisition was declared wholly unconditional on 3 October 2011. It was finally completed on 5 January 2012. The fall-out from it has spawned proceedings on both sides of the Atlantic, including at least two sets of criminal proceedings in the Northern District of California, USA.

3.     The principal claim is brought by the Claimants under Schedule 10A of the Financial Services and Markets Act 2000 ("FSMA"). There are further claims in misrepresentation, in the tort of deceit, and for breaches of fiduciary and employment duties. The gist of the claims under the FSMA, and in misrepresentation and deceit, is that the Defendants dishonestly and deliberately misrepresented the financial performance of Autonomy in the period ("the Relevant Period") from at least[1] the first quarter of 2009 ("Q1 2009")[2] until the second quarter of 2011 ("Q2 2011"), so that it was in truth a very different and less attractive proposition than was presented.

4.     Put shortly: the Claimants' main case is that Autonomy was mis-sold, and they were deceived into paying for it much more than it was worth. That is by far the largest claim. The Claimants have also asserted other claims seeking recovery of transaction-based losses in respect of transactions which were entered into in breach of duty.

5.     The First Defendant, Dr Michael Richard Lynch ("Dr Lynch") has vigorously denied both the fact of and his involvement in any impropriety. His case is that Autonomy at all times complied with applicable laws, regulations and International Financial Reporting Standards ("IFRS") and followed the advice of its auditors, Deloitte LLP ("Deloitte"); and that he never came to know of

---

[1] The Claimants' pleading defined the *"Relevant Period"* as *"the period from (at least) Q1 2009 to Q2 2011"*. The Claimants also criticized five transactions that took place in 2008, relating to what were referred to as "hosting transactions". However, I have understood the Claimants' claims for loss to refer to published information in Q1 2009 to Q2 2011; and I did not understand the Claimants to advance any claim in respect of any of Autonomy's Accounts for 2008 or any of its published information in 2008.

[2] Autonomy's financial quarters corresponded to calendar quarters and are referred to as Q1, Q2, Q3 and Q4 as appropriate.

any breach of such laws, regulations or accounting standards. He has consistently maintained that HP's case is the culmination of sustained effort on the part of HP to shift on to the Defendants the blame for its change of mind about the transformation of HP which the Acquisition was intended to promote, and its subsequent failure to facilitate the efficient integration of Autonomy on which the strategy had depended. He has brought a counterclaim against Autonomy alleging a breach of a duty of trust and confidence and/or duty of care, as well as a breach of the Data Protection Act 1998.

6.    The Second Defendant, Mr Sushovan Tareque Hussain ("Mr Hussain"), has sought to defend himself through solicitors and counsel; but he did not attend in person. He is presently serving a 5-year jail sentence in Pennsylvania, having been convicted by a jury in earlier criminal proceedings in the USA of 14 counts of "wire fraud" and for securities fraud in respect of the Acquisition. In the proceedings in this court, he filed a witness statement, but withdrew it when it became clear that he could not attend court. Having filed no evidence, he relied to a considerable extent on the defence to the first limb of the case (the allegations of impropriety) presented by Dr Lynch (who himself may now face criminal proceedings in Northern California, USA brought on broadly the same basis, for which the US prosecuting authorities are presently seeking his extradition). On the issue as to his personal knowledge of impropriety, he offered no positive case, though the Claimants must still of course prove theirs.

7.    Those are the barest bones of claims tested in a 93-day trial which I believe may rank amongst the longest and most complex in English legal history. The First Defendant was cross-examined for 21 days; there were some 45 factual witnesses, many hundreds of pages of hearsay evidence largely comprised of transcripts from the US criminal proceedings, expert witnesses in three fields whose reports with appendices ranged over eight lever-arch files and who were cross-examined over (in total) 11 days, a trial bundle containing more than 36,000 documents and a 'corpus of many millions of electronical documents ranging over myriad transactions undertaken by Autonomy in various different fields between early 2009 and late 2011. The parties' written closing submissions were together almost 5,000 pages long (excluding schedules and other annexed material), including in aggregate some 10,000 footnotes. There were bundles of 183 authorities and other references. The Claimants and the First Defendant were each represented by two Leading Counsel and five junior counsel (two of whom, happily, became QCs during the course of the trial); the Second Defendant was represented by junior counsel; all had instructing solicitors of the highest quality fielding large teams. Although I should record my thanks to the parties for providing me with a judicial assistant (Mr William Paris of Counsel) during the trial and its immediate aftermath, it was tried before me as a judge sitting alone.

## The Parties

8.    Autonomy was incorporated under the laws of England and Wales in March 1996. Autonomy acted as a holding company for a group of companies all in the business of infrastructure software. Pursuant to a cross-border merger completed on 26 September 2017, long after its acquisition and some time after

the commencement of these proceedings, all of the assets and liabilities of Autonomy were transferred to the First Claimant, ACL Netherlands BV.

9.     Hewlett-Packard Vision BV ("Bidco") was incorporated in the Netherlands on 15 August 2011. It was an indirect wholly owned subsidiary of HP until on 2 November 2015 it became an indirect and wholly owned subsidiary of Hewlett-Packard Enterprise Company. Pursuant to a merger which took effect on 27 October 2018, all of the assets and liabilities of Bidco were transferred to the Second Claimant, Hewlett-Packard The Hague BV.

10.    The Third Claimant, Autonomy Systems Limited ("ASL"), was incorporated in England in 1995 and was an indirect wholly owned subsidiary of Autonomy. ASL operated as a licensor of Autonomy software to other Autonomy entities. Additionally, pursuant to transfer pricing agreements between ASL and some other Autonomy group companies, including the Fourth Claimant, costs and revenues of those other Autonomy group companies were transferred to ASL.

11.    The Fourth Claimant, Hewlett-Packard Enterprise New Jersey Inc, was incorporated in New Jersey in 1996 and was formerly known as Autonomy Inc. I shall refer to it as Autonomy Inc in this judgment. At all relevant times Autonomy Inc was a wholly owned subsidiary of Autonomy and was Autonomy's main operating company in the USA, based in Palo Alto, California.

12.    The First Defendant (hereafter, "Dr Lynch") was a director and the Chief Executive Officer of Autonomy from the time of its incorporation in 1996 up until 30 November 2011.

13.    The Second Defendant (hereafter, "Mr Hussain") was the Autonomy group's Chief Financial Officer from June 2001 until 30 November 2011 and was a director of Autonomy from 01 June 2003 until 30 November 2011.

14.    It is not disputed that both Defendants were, for the purposes of the FSMA claim, "persons discharging managerial responsibilities within the issuer" ("PDMRs") within the meaning of Schedule 10A of FSMA (and previously s. 90A(4) before its amendment). The basis for the issuer's liability is fraud on the part of at least one PDMR.

**High-level synopsis of the case and defences**

15.    The fraud alleged consisted of the publication of information to the market which was known by the Defendants to be false.  The allegation was based on (a) the allegedly dishonest description of Autonomy as being a "pure software company" when in fact it undertook and had become accustomed to inflating its apparent revenues by undertaking substantial hardware sales and (b) the allegedly dishonest presentation of its financial performance, which did not disclose and instead disguised improper practices which Autonomy adopted to boost and accelerate revenue. The Claimants contended that all this resulted in Autonomy being in fact an enterprise of considerably less value than it appeared to be on the basis of its published information. These improper practices included:

    (1)    artificially inflating and accelerating Autonomy's reported revenues;

    (2)    understating Autonomy's costs of goods sold so as to inflate gross margins;

    (3)    misrepresenting Autonomy's rate of organic growth; and

    (4)    misrepresenting the nature and quality of Autonomy's revenues, as well as overstating its gross and net profits.

16.    In a little more detail, the claims relate to six areas of Autonomy's business and accounting:

    (1)    The "hardware case" relates to the purchase and resale by Autonomy (usually at a loss) of "pure" hardware (in broad terms, hardware unaccompanied by any Autonomy software) [3] in quantities (of approximately $200 million over the Relevant Period) which the Claimants allege were never disclosed to the market and which, by boosting apparent revenue, gave a false impression of the performance of Autonomy's business and belied its presentation in its published information as a "pure software company". The hardware case also raises issues as to (a) whether a proportion of the costs of the sales were improperly accounted for as sales and marketing expenses so as artificially to increase gross margins, and (b) whether Deloitte, who approved Autonomy's accounting treatment of the sales, were misled as to the true purpose of the hardware sales.

    (2)    The "reseller" or "VAR" case relates to 37 transactions between Autonomy (or in some cases, Autonomy Inc or another subsidiary, Zantaz Inc, "Zantaz") and a small group of Value Added Resellers, which the Defendants treated as sales giving rise to revenue which could be and was recognised immediately in Autonomy's accounts, but which the Claimants contended simply interposed a reseller between Autonomy and the true customer and were not in substance sales at all. The Claimants' case is that in each VAR sale the VAR was only a passive placeholder with no further participation expected or permitted of it after the VAR sale. Thus, the VAR sales were, in effect, devices to accelerate recognition of revenue in Autonomy's accounts, with the intended effect of misrepresenting its performance.

    (3)    The "reciprocal transactions" case relates to what the Claimants alleged were back-to-back transactions with friendly counterparties, in which Autonomy purchased from the counterparty software or other goods or services that Autonomy did not need in order to fund the purchase by that counterparty of high margin software from Autonomy. The Claimants contended that these reciprocal or "round-trip" transactions also were contrived with the dishonest purpose of artificially boosting

---

[3] The expression *"Pure hardware sales"* is not an accounting term or a term of art: it was newly minted by the Claimants. In their RRAPoC the expression is defined as "substantial sales of third-party computer hardware (with or without third party software) without modification by Autonomy and unaccompanied by any Autonomy software."

apparent high-margin software sales, with the effect of giving an exaggerated depiction of the success of Autonomy's core business.

(4)     The "hosting case" relates to transactions between Autonomy (or one of its subsidiaries, Zantaz Inc, Autonomy Inc and ASL) and new or existing customers under which Autonomy agreed to forego future recurring revenue from the provision of hosted archiving and e-Discovery services (which was a substantial and lucrative part of Autonomy's business)[4] for monthly (or other periodic) fees in return for the customer paying a one-off capital sum for a licence to use Autonomy's software outside the hosted environment and whether in-house or in another provider's data centre. The licence was alleged to be illusory, and its issue and sale was said to be for the dishonest purpose of treating it as akin to a sale of goods so as to justify the immediate (that is at the transaction date) recognition of the sale proceeds as revenue. Again, it was alleged that the intended effect was artificially to boost apparent revenue in the period in question.

(5)     The "OEM case" relates to transactions presented in Autonomy's published information as generating "OEM" and "OEM derived revenue". The Claimants' case is that revenue so presented would be taken in the market to have been generated by a transaction with an Original Equipment Manufacturer ("OEM") for Autonomy software to be embedded in the OEM's software in return for royalty payments to Autonomy on all the OEM's sales of the combined product (and thus a recurring revenue stream); but that in fact Autonomy included in what was compendiously described as the "OEM Metric" revenues from one-off sales of software licences to customers which were not OEMs and did not give rise to royalties or any other recurring revenue. The Claimants did not impugn the transactions themselves but contended that it was misleading and dishonest to include the latter revenues within the OEM metric because it gave the false impression of a valuable recurring category of revenues and thereby dishonestly misrepresented the quality and reliability of Autonomy's revenue and earnings.

(6)     The "Other Transactions" case relates to four transactions entered into in late 2010 and early 2011 by ASL, Autonomy Spain SL and Autonomy Inc which the Claimants allege were also falsely accounted for in Autonomy's published information as being licence sales but which were in truth the provision of a service.

17.     The FSMA claim has a dog-leg nature: the gist of the claim is fraud on the part of the issuer (Autonomy) for which the PDMRs are alleged to be liable. That claim thus depends on establishing first, that Autonomy was liable (as issuer) to Bidco and that secondly, the Defendants were liable to Autonomy.

---

[4] This aspect of the group's business was the provision by Autonomy or another group company (principally a company called Zantaz) of data storage, archiving, e-Discovery and retrieval services using its own hardware at one of its data centres. Hosting services were typically provided over a period of years, resulting in a reliable revenue stream.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

18.    It is common ground that the Claimants need to make good their case at each stage. That is so even though in fact, both being under the control of HP, Autonomy has admitted liability to Bidco: the Claimants have accepted that this admission does not bind the court. They have accepted also that Dr Lynch and Mr Hussain will not be liable except in respect of misstatements or omissions about which they themselves knew. It is not sufficient for the Claimants to demonstrate that the transactions or the way they were accounted for was improper (the first limb); they need also to prove personal knowledge and dishonesty in respect of the false accounting on the part of the Defendants as PDMRs (the second limb).

19.    Thus, for example, the "Other Transactions" case must fail against Dr Lynch, since he was not cross-examined on those transactions and his personal knowledge and involvement cannot be established: as the Claimants fairly and properly recognised in their closing submissions. By contrast, in the case of Mr Hussain, his decision not to give evidence means that it is difficult for him to resist a finding against him in all these claims at that second stage if the Claimants have succeeded at the first stage.

20.    The claims under FSMA are by far the largest: the pleaded quantum of loss is at least $4.55 billion (being the amount for which Autonomy has accepted it is liable and for which it is alleged the Defendants are liable as PDMRs).

21.    The claims for fraudulent misrepresentation and/or under s. 2(1) of the Misrepresentation Act 1967 are direct claims against the Defendants: they are based on personal liability, not on liability of the issuer. The quantum of the claims is much lower than the FSMA claims: the damages sought relate only to loss attributable to the shares and share options which the Defendants themselves each held and sold to Bidco. The pleaded quantum of loss is approximately $420 million.

22.    The claims for transactional losses based on breaches of fiduciary and employee duties stand on a different footing. They do not arise in consequence of the Acquisition (except in the sense that they would almost certainly not have been brought if the Defendants still directed Autonomy). They are claims for direct losses suffered by ASL, Autonomy Inc and another group subsidiary called Zantaz as a result of the Defendants' breaches of duty in causing the relevant subsidiary to enter into the impugned transactions without regard to the interests of that subsidiary. In that context, the Claimants' primary case is that ASL is the proper claimant for these losses as a result of transfer pricing arrangements between ASL and each of Autonomy Inc, Zantaz and Verity Inc. That is disputed by the Defendants on the basis that the effect of the transfer pricing arrangements was only to shift costs and that in any event, whatever the effect of those arrangements in contract, the fact remains that no duties were owed to ASL in respect of transactions undertaken by different entities, variously Autonomy Inc and Zantaz. The pleaded quantum of loss is in excess of $76.1 million.

23.    The Claimants accept that in the ultimate quantification of loss they must give credit for a recovery of $45 million made in a settlement of a related claim

(against Autonomy's auditors), after deducting the costs of such claim and any tax payable in respect of the settlement sum.

24.     A 'Dramatis Personae' and a more detailed Schedule of Key Persons are attached as Appendix 1 and Appendix 2 respectively. A chart prepared by the Claimants setting out their various claims in diagrammatic form (at a very high level) is attached as Appendix 3. The Claimants also provided charts which they put forward as illustrating in graphic form (i) Autonomy's reported revenue in each quarter of the Relevant Period; (ii) the alleged impact of undisclosed pure hardware revenue and other revenue alleged to have been recognised improperly; (iii) how (according to the Claimants) the recognition of revenue from impugned transactions helped Autonomy create the appearance of meeting market expectations and (iv) an overview of the position in each full year of the Relevant Period, and the half year to the end of June 2011. These are attached in Appendix 4, but I have slightly modified their headings. Chart 3, in particular, provided an arresting overview of the Claimants' case that Autonomy used 'pure' hardware sales which were not disclosed and sales to VARs which had no real substance to give the appearance of meeting market expectations of revenue. Appendix 5 is a graphic depiction (again prepared by the Claimants) of the contribution of impugned VAR transactions to Autonomy's revenue in each quarter of the Relevant Period. Appendix 6 comprises a Summary of Conclusions which I read and made available in court on 28 January 2022 (and see paragraph 4120 below). These Appendices are attached to this judgment at the end of Part B; but any reader may be assisted by reference to them at this juncture. I have also prepared a separate (and independently page and paragraph numbered) Schedule analysing in more detail each of the impugned VAR transactions: this too appears at the end of Part B.

25.     As already indicated, Mr Hussain adopted Dr Lynch's submissions. References to the Defendants should be taken to be references to each of them unless otherwise stated.

**Some preliminary points**

26.     This is obviously an extremely long judgment. The factual detail provided to me in respect of each of the six main areas of the case is in my experience unprecedented. Whereas in many cases, only a few documents ever come to be relied on otherwise than in passing, here the relevant record and the number of documents cited was very considerable indeed. The process has involved a detailed examination, by reference to a myriad of transactions, of the way Autonomy's business was carried on at a fairly granular level.

27.     I am very conscious that the length, detail and complexity of this judgment, and its focus in parts on individual transactions to determine whether some or all of the means used to generate and /or accelerate revenue were acceptable commercial strategies or dishonest devices to cover shortfall in software revenue*s*, may obscure the ultimate question in both the FSMA and the deceit and/or misrepresentation claims which is whether the acquirer was dishonestly misled.  In particular, it is necessary to bear in mind that, except as regards the claims for transactional losses, the question is not whether the impugned transactions were wrongful, but whether their purpose (and effect)  was to

enable Autonomy to cover shortfalls in its revenue from software sales, so as to appear to meet market revenue expectations and (especially when combined with giving an appearance of growth in its valuable OEM and Cloud business lines) present itself as a larger and more successful company than in reality it was.

28.    Nevertheless, careful and detailed analysis of the impugned transactions is necessary in providing the answers. It is worth remembering that Autonomy's business appeared to most to be well run and growing fast because of the phenomenal capabilities and utility of its main product, called IDOL (its acronym for "Intelligent Data Operating Layer"). Autonomy became a FTSE 100 company on that basis. A few analysts were doubtful whether all was as it seemed; but most were not. The process of peeling back what was happening beneath the presentation is a tortuous one.

29.    Furthermore, in respect of each of the six areas of business which the Claimants impugned, they asserted that there was a 'pattern' which revealed dishonesty. It might be tempting to assume that if a 'pattern' was revealed by, say five to 10 of the 37 impugned VAR transactions, that should be taken to demonstrate a pattern across the board. But such an assumption would, in my view, be unsafe. In short, though the phrase may have become over-used, the devil is in the detail.

30.    I should acknowledge also that it has weighed heavily with me throughout that this judgment, whether logically or not, may affect Dr Lynch in other battles, on which his long-term freedom may depend. I have not wished to leave a stone unturned which might have yielded some different perspective or 'pattern'.

31.    I feel I should also emphasise, in light of the decision of the Court of Appeal in *Bank of St Petersburg PJSC and others v Vitaly Arkhangelsky and others* [2020] EWCA Civ 408, that (a) although of necessity I have divided up separate sections of the judgment, I have sought at all stages to reflect on how the parts, and especially my views as to the state of mind of the Defendants, might impact on the whole or more generally; and (b) I have throughout borne in mind and applied the standard of proof applicable in all civil proceedings, that of the balance of probabilities, whilst taking into account in determining the probabilities that other things being equal, it is a fair starting point that people do not usually act dishonestly (and I would add with particular reference to this case) especially when any dishonesty is almost bound quickly to be revealed. Any "infelicities" in my expression should not be taken to connote that I have departed from adjudicating the case on the basis of the balance of probabilities: I have not.

**Parts A and B of this judgment, the Schedule and Appendices**

32.    The Claimants and the Defendants adopted very different approaches in terms of the structure and approach of their respective written closing submissions. But all parties dealt separately with the six areas of claim I have identified in paragraphs 16(1) to 16(6) above, and this judgment does also. This (and the extreme detail) has further increased the need for a considerable amount of cross-referencing. I regret that this makes the judgment more unwieldy.

33.     The judgment is divided into two main Parts (Part A and Part B), a division made necessary because of its length and website requirements. In addition to this Introduction and an analysis of relevant issues and the tests of liability under FSMA, this first Part (which ends at paragraph 2336) contains an Introduction describing the Claimants' allegations in respect of Autonomy's sales of hardware and the impugned VAR sales. With reference to the latter, and as mentioned above, I have also attached as a separate document a detailed Schedule analysing each of the impugned VAR transactions, which is also of considerable length. In Part B, I address the four remaining areas of the Claimants' FSMA case ("the reciprocals transactions", "the hosting case", "the OEM case" and "the Other transactions") and also the Claimants' claims in deceit and/or misrepresentation, the Claimants' various claims for direct loss, and issues relating to reliance and loss. I address Dr Lynch's Counterclaim in paragraphs 4106 to 4115 below of Part B. I summarise my conclusions in paragraphs 4116 to 4135. Lastly, I have included a postscript in paragraphs 4116 to 4155. This judgment does not address issues of quantum. That will be dealt with in a separate judgment in due course.

## Overview of the two principal entities

34.     An overview of the business of the two principal commercial entities, HP and Autonomy, and the way they were respectively structured and managed, is necessary in order to place in context the Claimants' allegations (which in numerical terms relate to only a small part of Autonomy's business but which impugn transactions of considerable value [5] ). It is also necessary for an understanding of (a) the Claimants' overall case that the Defendants, and especially Dr Lynch, were in a position to and did conceive and direct all the impugned transactions with a view to presenting Autonomy as far more successful than it was, and thereby dishonestly misled HP into paying far more than its true value and (b) the Defendants' overall case that the reality is that HP's management had no stomach for the transformational change that was the objective of the Acquisition, and contrived this extraordinary series of proceedings to shift the blame away from themselves.

*Autonomy*

35.     Autonomy was founded in 1996. It was spun out from a company called Cambridge Neurodynamics, which was an early venture into using "machine learning" to develop software, techniques which Dr Lynch had explored in his PhD thesis at Cambridge University and his subsequent research fellowship in "adaptive pattern recognition".

36.     By the beginning of the Relevant Period, Autonomy had grown from a small start-up into a market leader in enterprise technology, especially in the field of unstructured data analysis. It went public in 1998, with an initial listing on the

---

[5] The Claimants acknowledged that the impugned transactions *"represent a small fraction of Autonomy's total transactions by number"* but made the point that they were *"very significant by value",* the impugned transactions being amongst the largest in terms of revenue in a given quarter.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

EASDAQ. It was admitted to the official list of the LSE in November 2000. It re-joined the FTSE 100 in 2008.

37.     The Autonomy group was highly profitable, generated reported annual revenue in 2010 of $870 million, and (as an illustration) held cash reserves of $1.1 billion at the close of 2010 (though it is fair to qualify this by noting that this figure included proceeds of approximately $762 million raised by an issue of convertible loan notes in March 2010). Its customers included blue-chip companies in every sector.[6] In 2011, it was the UK's largest software company based on market capitalisation.

38.     Autonomy was headquartered in the UK but operated in global markets, with (by the time of the Acquisition) more than 2,500 employees, over 25,000 customers and operations in more than 19 countries (including the USA, where it had set up Autonomy Inc with its own management, sales and legal teams in San Francisco).

39.     Its worldwide development and product spread was partly in consequence of successful acquisitions before the Relevant Period. Most significant were the following (all but the last of which were completed before the Relevant Period):

        (1)     The acquisition of Verity Inc (its then nearest competitor in enterprise search technology) in December 2005. Verity also had US federal security clearance, which until a change of the rules in Autumn 2009 enabled Autonomy to conduct business with the US Federal Government.

_____

[6] including (a) financial institutions (such as CitiBank, Barclays, BoA, RBS, Lloyds TSB, Deutsche Bank and Merrill Lynch, who used Autonomy's software for archiving and regulatory compliance and litigation data management); (b) government and public-sector agencies throughout the world (including the FSA and SFO in the UK) who used such software to recognise unusual patterns in money flow to identify laundering and for other security and surveillance; (c) manufacturers (including Ford and General Motors) who used the technology to manage engineering know-how; (d) Telecommunications providers (such as AT&T, Ericsson, Cable & Wireless, BT and Vodafone) who used the software for call monitoring and analysis; (e) Pharmaceutical corporations (including AstraZeneca, GlaxoSmithKline and Pfizer) who used the software to keep up with changing regulations, demographic information, general R&D and litigation; (f) Media organisations (such as the BBC, ITN, MTV, Bloomberg, CNN, Reuters and Forbes) who used Autonomy's software to manage their TV programmes, publish media, archive content, increase website traffic and advertising revenue; (g) eCommerce providers (such as Play.com, FedEx, Forbes and T-Mobile, which used the software to understand patterns in buyers' behaviour and to monitor customer satisfaction and boost 'upselling'); (h) Food and Beverage suppliers (such as Nestle, Coca-Cola and Britvic) who used the software to monitor product developments and market opportunities; (i) Intelligence and Defence organisations across the world to monitor and protect against security threats; (j) legal organisations including 75 out of the top 100 global law firms, who used the software for disclosure and litigation support; (k) IT companies (such as IBM, Oracle, HP and Lucent Technologies) who selected Autonomy software to support development; (l) Consulting and professional services customers (such as IBM Global, KPMG and PricewaterhouseCoopers) who used the software for profiling and data; (m) Energy and utility customers (such as BP and Shell); (n) Aerospace organisations (such as NASA, BAE Systems, Boeing and the US Air Force) which used the software for engineering knowledge sharing; and (o) Healthcare organisations (including the UK NHS, Eli Lilly and Blue Cross/Bleu Shield) which used Autonomy software to promote best practices and help protect patient safety and manage litigation.

(2)    The acquisition of Zantaz in July 2007, through which it acquired an
archiving software solution, commonly sold under the name Digital
Safe. Digital Safe enabled data to be processed and stored more
efficiently, thus cutting down on storage costs and search times; and
when integrated with Autonomy's own technology (especially IDOL),
the combined solution enabled data to be processed once into a
consolidated archive and used with multiple software products, thus
eliminating the need to store and search for data across multiple
repositories. Especially at a time of increased competition and falling
data storage rates[7], this efficiency gave Autonomy/Zantaz a commercial
advantage which was the springboard for the development of hosting as
a major part of Autonomy's business. Also as part of the Zantaz
acquisition, Autonomy acquired an e-Discovery or "EDD" product
called Introspect, which it also offered as a hosted solution.

(3)    The acquisition in early 2009 of Interwoven Inc which specialised in the
provision of enterprise content management software (including a
solution called iManage), in e-commerce[8], and also had a large law firm
customer base.

(4)    The acquisition of the Iron Mountain Digital business in May 2011, and
through this a large archive product called LiveVault which handled
large amounts of stored data and suited customers with especially large
structured data storage requirements, and which could be integrated with
a product called StorHouse which Autonomy acquired from a company
called FileTek for further efficiencies[9].

*Autonomy s signature product: IDOL*

40.    Nevertheless, Autonomy's success was principally based on its own market-
leading core product called IDOL, an acronym for Intelligent Data Operating
Layer. IDOL technology, focused on the analysis of unstructured data, was the
core technology at the heart of Autonomy's software.

41.    Some explanation of this technology is appropriate, not least because (a) its
extraordinary and world-beating capabilities tended not to be acknowledged by
HP in their complaints about the Acquisition, and (b) it is important for an
understanding of a central issue in the context of the hardware case, which is as
to what the Defendants meant by the sale of an "appliance". The following is
based on Dr Lynch's explanation in his first witness statement.

---

[7] According to Dr Lynch's evidence in his first witness statement, storage technology was rapidly
advancing and data storage prices falling quickly: thus, the cost of storing a GB of data fell from
around $1 million in the early 1980s, to around $10,000 in the 1990s, to around $10 in the early 2000s
and to around $0.10 in 2010. There was huge demand; but obviously technological efficiency was the
only means of securing competitive advantage.
[8] A specialisation emphasised by the Defendants because it was a key area where a product focused on
structured data, and in particular, Autonomy's SPE (see later), would have an application.
[9] The acquisition of StorHouse from FileTek was impugned by the Claimants: see paragraphs 2030 to
2035 below.

42.    There are two types of data: structured and unstructured. Structured data is found in spreadsheets or in prescribed fields in a database. When data is entered into a database it is easily searchable. For example, as Dr Lynch explained, a computer will know that the data in an "address" field of a database is an address.  Unstructured data is data that is not contained in prescribed fields. Most data is unstructured. Books, newspaper articles, websites, pictures and indeed, most forms of communication, comprise unstructured data.

43.    Unstructured data is obviously much more difficult for computers to interpret and analyse. In 2009, the vast majority of computer software could only process structured information. It was Autonomy's ability, using IDOL technology, to handle unstructured information that set it apart.

44.    Dr Lynch explained that IDOL is an engine that can form a conceptual and contextual understanding of unstructured data using probabilistic theory based on the occurrence of certain word patterns, enabling the computer to infer meaning.[10]

45.    Put shortly, using IDOL technology computers could make sense of unstructured data, and analyse and process raw information in the form of emails, voicemail, websites, telephone conversations and video recordings: a vast universe. It could analyse any digital document, speech or video, independent of its language, to identify and prioritise the main concepts within that document. IDOL users were enabled to automate a broad range of otherwise labour-intensive, iterative tasks, ranging from categorising information by subject matter, to inserting hypertext links to related material, to profiling users based on ideas in the text they read or wrote, to delivering information to those users most likely to be interested. Furthermore, IDOL was flexible and scalable: the fundamental capabilities of its core technology allowed it to be embedded in a wide range of applications.

46.    Between 1996 and 2012, IDOL technology was continuously developed and refined by Autonomy's team of software engineers. Dr Lynch (whose fondness for analogies became very evident in his 22 days in the witness box) explained that:

> You could think of IDOL technology as a box of Lego. It could be made to do a lot of different things. It could be adapted by customers to suit themselves. Sometimes functions were packaged up together and sold as a product which could, depending on the circumstances, take on a variety of names. For example, the video functions were packaged together and often sold as  Virage". Other functions could be put together to be sold as  Digital Safe" or  ACA" (a suite of

---

[10] Dr Lynch illustrated the connection between probabilistic theories and computing, and the use of an algorithm based on the rule that a large number of weak connections produce a better result than a single strong connection, by positing a search for the word "penguin". In a simple search engine, you might get results for flightless birds in the Antarctic, the book publishers, a character in the Batman comic series, a US ice hockey team or a brand of clothing. However, if unstructured data contains contextual references to the Antarctic, ice, fish, feathers, eggs and black and white, there is a very high likelihood that the text is about penguins (the birds), even if the word "penguin" does not appear in the data.

> *software that managed the entire process of archiving and indexing a*
> *company s data) or Autonomy Legal Hold (a document retention tool*
> *which ran on laptops, video archiving, ecommerce and website*
> *software and intelligence related products). When Autonomy wanted to*
> *do something new and radical like SPE[11], it developed new IDOL*
> *functions, which were like new Lego bricks. These bricks could work*
> *together with an existing Lego set, or be sold as a separate package,*
> *like a Lego helicopter."*

47.    In addition to functions, the IDOL platform included (a) connectors, which
enabled the IDOL platform to connect with many different systems, such as a
bank's trading system or a law firm's document management system, and (b)
interfaces, where a set of functions and connectors were put together to solve a
problem (such as the Introspect e-Discovery interface which was a market-
leading document processing, review and production application, used widely
in the legal sector).

*Autonomy: structure and organisation*

48.    Autonomy's corporate governance structure comprised (in 2010-2011) an
experienced board of directors chaired by Mr Robert Webb QC (as non-
executive chairman) and a three-man Audit Committee, with its external
auditors being Deloitte.

*Board of Directors*

49.    Appointed Queen's Counsel in 1988 and a Recorder of the Crown Court in 1993,
Mr Webb had previously served as General Counsel at British Airways, and as
at 2010 continued to serve as non-executive director of the London Stock
Exchange, the BBC and two other companies.

50.    In addition to Dr Lynch and Mr Hussain (the only executive members) the other
board members were Mr Jonathan Bloomer (non-executive) who was also
permanent chair of the Audit Committee, and who had been Group Chief
Executive of Prudential Plc from March 2000 until May 2005, and before that
senior partner in Arthur Andersen's financial markets division; Mr Richard
Gaunt (non-executive), who was the co-founder of Autonomy; Dr Frank Kelly
FRS (non-executive), Professor of Mathematics of Systems in the Statistical
Laboratory, University of Cambridge and Master of Christ's College,
Cambridge; and Mr John McMonigall (non-executive) a partner of Apax
Partners Worldwide LLP and previously a member of the Management Board
of BT.

---

[11] An Autonomy product called the Structured Probabilistic Engine ("SPE"). SPE was the subject-
matter of a dispute arising principally out of the fact that Autonomy attributed considerable costs to its
development and marketing whereas HP claimed that it was simply a hastily developed
*"repositioning"* of IDOL technology containing no new features, which in reality cost next to nothing
to develop and market but which was used as a cloak for some of the costs/losses of the hardware sales
in Q3 2009. The Claimants relied on this as a basis for undermining the credibility of the Defendants.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*Audit Committee*

51.    Until September 2010, the members of the Audit Committee had been Mr Barry
Ariko (a former senior executive at Oracle Corporation and of other software
and hardware companies), Mr Richard Perle (a former US Assistant Secretary
of Defense and a former director of various pharmaceutical and aerospace
companies) and Mr McMonigall. There had not been a permanent Chair of the
Audit Committee (so that its members served as Chair on an ad hoc basis) and
none of the members was an accountant or had any formal accountancy training.
Mr Bloomer told me when cross-examined that it would be normal to expect
that the Chair would be "financially literate" but not necessarily that he or she
would have an accountancy qualification (though he thought probably most
did).

52.    Mr Ariko and Mr Perle retired in September 2010 and from then until the
Acquisition the Audit Committee comprised, in addition to its Chair (Mr
Bloomer), Mr Kelly and Mr McMonigall. As noted later by Ernst & Young
("E&Y") (HP's auditor), both the Board and the Audit Committee had been
expanded over the course of 2010 following analyst pressure, leading to what
E&Y described as "the formalisation of the Audit Committee process and a
more robust independent challenge to the board."

53.    Before every meeting members of the Audit Committee would receive a pack
including, amongst other things, a draft press release, a quarterly results analysis
by the finance department, and Deloitte's report to the Audit Committee.
Deloitte's report was a substantial document – between 20 and 40 pages –
identifying the key risks identified by Deloitte in the quarter. Prior to each
Audit Committee meeting, Mr Bloomer would read these documents, and
would discuss Deloitte's findings at his meeting with the audit partner. The
meeting of the Audit Committee itself would generally last around 2 hours.

54.    Dr Lynch did not attend Audit Committee meetings. This accorded with good
corporate governance. Deloitte did attend, and the Audit Committee could and
did ask questions of them. A portion of every Audit Committee meeting took
place without any executives present, to ensure that Deloitte had an opportunity
to raise any concerns they may have had with management. This was an
opportunity for completely frank discussion without any of the management
team present. If there were any matters of importance, they would be escalated
by Deloitte to the Audit Committee. Mr Lee Welham ("Mr Welham"), the
senior manager on the Deloitte audit team from 2008 to August 2011, who had
since 2005 been a member of the audit team (and was the only Deloitte witness
the Claimants chose to call), never had a sense that there were any areas where
the Audit Committee could not or would not go. Deloitte never raised any
concerns about management with the Audit Committee.

*Management team*

55.    Mr Hussain's predicament should not obscure the fact he was highly regarded.
He had been a winner of the London Stock Exchange CFO of the year award.
The finance department beneath him was substantial and was also led by
experienced individuals (see below).

56.  Apart from the Defendants at the apex, the members of the management team were:

(1)  Mr Andrew Kanter ("Mr Kanter"), Autonomy's Chief Operating Officer (or "COO") and General Counsel throughout the Relevant Period (who provided a witness statement, which was withdrawn when Dr Lynch did not call him, see paragraph 426(4) below). He was mainly based in Cambridge. At the time of the trial and closing submissions Mr Kanter remained subject to continuing investigation by the US Department of Justice ("US DoJ").

(2)  Dr Peter Menell, Autonomy's Chief Technology Officer (or "CTO") throughout the Relevant Period, who did not give evidence, see paragraph 428 below. He was based in Cambridge.

(3)  Ms Nicole Eagan ("Ms Eagan"), Autonomy's Chief Marketing Officer throughout the Relevant Period, who like Mr Kanter provided a witness statement which was withdrawn when Dr Lynch did not call her (see paragraphs 426(4) and 1139 below). She was US-based. Like Mr Kanter, at the time of the trial and closing submissions she remained subject to continuing investigation by the US DoJ.

57.  The above individuals were members of the "MRL Leadership" group, which was listed in an organisational chart dated August 2011. Another central figure was Mr Stephen Chamberlain ("Mr Chamberlain"). He was in the finance department, reporting to Mr Hussain: see paragraph 67 below. There were 26 senior individuals listed on that chart, which also shows their location in the various different global locations. [12] Thus, Autonomy's management would often be in different locations to each other.

*Autonomy Inc management team*

58.  Autonomy Inc had its own management team, which consisted of:

(1)  Mr Christopher 'Stouffer' Egan ("Mr Egan"), who was its CEO throughout the Relevant Period, who was responsible for sales activities in North and South America. He gave evidence in Mr Hussain's criminal trial in the US and provided a witness statement in these proceedings but declined to attend in the UK and was cross-examined over video link. He was based in San Francisco.

(2)  Mr Joel Scott ("Mr Scott"), who was its COO and General Counsel throughout the Relevant Period. He too was based in San Francisco. He gave evidence in the criminal trial in the US also, but none in these proceedings.

(3)  Mr James Crumbacher ("Mr Crumbacher"), who worked with Mr Scott in Autonomy Inc's legal department.

---

[12] Mr Lucini was not listed.

(4)    Mr Michael Sullivan ("Mr Sullivan"), who was CEO of the Protect business, which was the archiving and litigation discovery division of Autonomy from 2009, carrying on business which before 2009 was carried on through Zantaz. Mr Sullivan had been Senior Vice president of Operations and Services of Zantaz, responsible for delivery of all products and services to customers, before its acquisition by Autonomy in 2007. After that acquisition, he became the CEO of Zantaz from 2007 (when it was acquired by Autonomy). He was based in Boston, Massachusetts. He gave oral evidence in the US criminal proceedings and a witness statement (which was admitted by a hearsay notice) in these, but declined to attend for cross-examination.

(5)    Mr Eloy Avila ("Mr Avila"), who was Chief Corporate Architect from September 2009 to May 2010, when he became CTO for the Americas. He became worldwide CTO in November 2010 and was based in San Francisco. He provided a witness statement for Dr Lynch and was cross-examined in these proceedings.

(6)    Mr Andrew Joiner ("Mr Joiner"), who was CEO of Autonomy's Promote/eTalk business and was based in the US. He did not give evidence in these proceedings, and was not central to the matters in issue.

(7)    Mr Michael Mooney ("Mr Mooney"), who was a senior salesman based in Pleasanton. He did not give evidence.

59.    Except for Mr Scott and Mr Crumbacher, all the individuals named in the preceding paragraph were members of the "MRL Leadership" group.

*Sales teams and sales process*

60.    There were different sales teams for Autonomy's various business areas and locations. Mr Egan was effectively head of sales in the US. Mr Egan's reporting line was to Dr Lynch and Mr Hussain; but in practice he reported to Mr Hussain, whom he described in his witness statement as *"de facto Head of Sales for the entire company".* Mr Sullivan headed up the Zantaz business.

61.    Senior salesmen in the US included Mr Mooney (in California) and Mr Robert Sass ("Mr Sass") (in New York). Autonomy's federal business had its own sales team. There were different sales teams in the EMEA regions. The number of salesmen increased substantially in the period 2009-2011.

62.    Autonomy's sales function was run using the Sales Management System or "SMS". This was a database of pipeline prospects. Salesmen were required to input details into SMS, detailing the opportunity, quotes, notes, call logs and the like. They were supposed to do so every day (although Mr Egan thought that was the hope rather than reality). There were weekly SMS sales calls which were broken up into multiple calls over several hours. US sales were the majority of Autonomy's sales. The US part of the call was generally led by one of US management, such as Mr Egan or Mr Mooney. Very occasionally Mr Hussain might lead the call if none of US management was available. While Dr

Lynch joined these calls in the very early days of the company, his evidence was that he very rarely did so in the Relevant Period.

63. Autonomy set quarterly revenue targets. Mr Egan accepted in cross-examination that these were an essential management tool. But they were also deployed in another way which is very central to this case. They were reported to the market quarterly and became the reference point for analysts and the market in assessing Autonomy's performance.

64. It is clear from their use, from documentary evidence of analyst and investor outlook, and from emails from Mr Marc Geall ("Mr Geall") in Autonomy's Investor Relations department that both Autonomy's success and to some extent its problem was that by mid-2009 Autonomy was being perceived in the market as a "beat and raise" growth stock.

65. A "beat and raise" stock was a well-known market expression connoting a company, often a technology company, with a track record or reputation of beating consensus estimates of revenue or earnings in one quarter and raising its own forward revenue or earnings forecasts for the next, and whose share price typically reacted according to its success or not in each quarter in that regard. In cross-examination, Dr Lynch sought to downplay this. He told me that although he did not think it *"a point worth labouring"*, and *"if some people looked it that way, then fair enough"*, he did not remember or consider Autonomy *"being a paradigm of beating and raising through this period"*. But the evidence was, and I find, that it was. Mr Hussain and Dr Lynch became obsessed with this performance marker, as will emerge.

66. That perhaps explains why the Defendants, who might have been expected to trumpet their successes, were surprisingly keen during the trial to emphasise that Autonomy did in fact miss its consensus revenue targets from time to time (five times in the period between 2009-2011). During the Relevant Period, they also sought to depict the increase of its overall revenue targets as the result of an increasing sales force, and launching new products continually, increasing market share, and operating in markets that were expanding rapidly. There was no mention ever of substantial sales of hardware separately from the provision of Autonomy software, or what the Claimants called *"pure hardware sales"*.

*Autonomy s finance department*

67. Autonomy had a substantial finance department, headed by Mr Hussain as CFO. His right-hand man was Mr Chamberlain, an ex-Deloitte Chartered Accountant. Mr Chamberlain, whom Mr Welham described as his *"main point of contact throughout the audit and review processes"* and the *"first point of contact for many requests from the Deloitte audit team for information"* did not give evidence in these proceedings. He has been indicted in US criminal proceedings, which I believe may now have commenced.

68. Mr Matthew Paul Stephan ("Mr Stephan") and Ms Poppy Gustafsson (nee Prentis, and whom I refer to as "Ms Gustafsson") and (from 2011 onwards) Ms Antonia Anderson ("Ms Anderson") also worked in the department, reporting to Mr Chamberlain. All three were based in Cambridge: they were all ex-

Deloitte Chartered Accountants. Mr Stephan had been part of Deloitte's Autonomy audit team until December 2008 and joined Autonomy in March 2009, where he worked until early 2011. Ms Elizabeth "Lisa" Jane Harris ("Ms Harris"), another Chartered Accountant (ex-KPMG) also worked there. Mr Stephan and Ms Anderson gave evidence for the US Government in the US criminal proceedings, and Mr Stephan's evidence was admitted into these proceedings by hearsay notice served by the Claimants.

69. Ms Gustafsson (who is now Chief Executive Officer of Darktrace, a cyber security company of which Dr Lynch was a founder and remains a substantial shareholder) and Ms Harris (who is referred to as a *"co-conspirator"* in the most recent form of the Indictment in respect of Dr Lynch in US criminal proceedings for her role in the alleged theft of confidential information uploaded to a USB device/pen drive which seemed to her to evidence knowledge on the part of HP of the fact of Autonomy's hardware sales) gave evidence and each was cross-examined in these proceedings.

70. The finance team in Cambridge sat in an open plan office, with everyone within earshot of one another. Ms Harris explained that that team were able to share ideas and have discussions freely; and Mr Chamberlain would have discussions with Mr Hussain and with Deloitte at a table in this office, in earshot of everyone.

71. The UK finance team was responsible for all the accounting for the non-American countries and consolidation of all global accounts. There was also a team based in the Netherlands who did sales order processing for non-American sales. Accounting for Autonomy's American-based subsidiaries involved work by the US accounting teams, with consolidation taking place in the UK. There were several teams in the US from Autonomy Inc and legacy Autonomy acquisitions, including eTalk, Interwoven, Zantaz and Iron Mountain. All finance teams reported to Mr Chamberlain.

*Autonomy s Auditors: Deloitte*

72. Autonomy's auditors were Deloitte, a Big Four accounting firm. Deloitte's work for Autonomy was handled through its Cambridge office. Deloitte spent approximately 12 weeks per year on-site in the Cambridge offices of Autonomy. Deloitte had unfettered access to Autonomy's accounting records, as was clear in the evidence of Ms Gustafsson and Ms Harris referred to below.

73. Deloitte had day-to-day contact with members of Autonomy's finance team in Cambridge, including Mr Chamberlain, Ms Harris, Ms Gustafsson, Mr Stephan and (from 2011) Ms Anderson. Deloitte also had a reasonable amount of contact with Mr Hussain, although he was not based in Cambridge full time. Deloitte could and did also ask questions of Autonomy's technical staff (including Dr Menell, Mr Lucini, Mr Goodfellow, Mr Gallagher and Dr Blanchflower, as to whom see below), as well as the sales staff, such as Mr Egan.

74. Deloitte's audit team numbered around 12 to 15 people. The audit team included:

(1)    A lead audit partner/engagement partner. This was Mr Richard Knights ("Mr Knights") for 2009 and Mr Nigel Mercer ("Mr Mercer") for 2010 and until August 2011. In the transition period between those two individuals in Q1 2010 Mr Knights and Mr Robertson were the engagement partners. The Defendants invited me to note that although Mr Welham gave evidence as to judgements that Deloitte might have reached in a counterfactual world, he was a senior manager at the time, and these would ultimately not have been his judgements but those of his superiors (as indeed Mr Welham accepted in cross-examination).

(2)    There were numerous accountants below the partner level. In the Deloitte hierarchy directors were below partners. Managers were below that. The professionals in the audit team included Mr Rob Knight (a director), Mr Welham (then a senior manager), Ms Anderson and Mr Murray (also managers). (Ms Anderson moved from Deloitte to Autonomy in early 2011.)

(3)    Deloitte's engagement quality assurance review ("EQAR") partners. These provided second partner review and consultation, and were able to meet and ask questions of the client.

(4)    Separate to the audit team there was an independent review partner ("IRP") who reviewed the work of the audit team and the EQAR partners. The IRP carried out an objective evaluation of the significant judgements made by the engagement team and the conclusions reached in formulating the auditors' report. The IRP could not meet or have any interaction with the client, so as to preserve their independence.

(5)    There was also a professional standards reviewer ("PSR"), who together with the IRP and EQAR also reviewed the audit partner's work.

(6)    Deloitte had an internal technical IT expert, Mr Johnstone, who was an accountant but also an IT specialist.

(7)    Assistance on request (by either the engagement or EQAR partners) from Deloitte's National Accounting and Auditing technical team ("NAA"). Mr Philip Barden ("Mr Barden") was a partner in that team. He was a member of the Institute of Chartered Accountants' financial reporting committee, a senior person within Deloitte and one of the senior authors of Deloitte's 2009 guidance on IFRS.

(8)    Around six people from the Deloitte team worked on site in Cambridge during the audit process. The audit team would always sit in an office close to the finance team, and had free rein to go about and talk to anyone. Ms Harris's unchallenged evidence was that they were entitled to see anything and everything they wanted in any of the files, and the "audit team would take away revenue and any other files of working papers and review them at their leisure". In preparation for the audit or quarterly review, the finance team would put together bundles for every revenue contract in excess of $100k, including the contract, invoice, proof of delivery and payment history, together with the details of any

accounting adjustments. If Deloitte had any questions regarding the wider context of a deal, its commercial rationale, or the features of the relevant products or services, they had ready access to Autonomy's sales or technical teams. They appear to have become almost an adjunct of the finance department.

75.    Ms Gustafsson had been at Deloitte, working on the Autonomy audit, before she joined Autonomy. She said in cross-examination that *"the auditors were never isolated from the sort of general finance function and they were able to come and see all of the original documentation that I myself relied upon."*

76.    As the audit team worked from the Autonomy offices, most requests were made in person, as the auditors could simply walk over to the desk of someone in the finance function, who could in most instances immediately pull the information required from Autonomy's electronic systems.

77.    Mr Welham agreed that the Deloitte team were of high calibre and properly trained and they acted independently, competently and with integrity.

78.    As Chairman of the Audit Committee (from September 2010), Mr Bloomer met Mr Mercer, the audit partner, on a regular basis. In unchallenged evidence, he said that he "found Deloitte to be thorough and diligent in their audits"; their reports to the Audit Committee were generally more detailed than he had come across in other audit committee roles, and struck him as *"detailed, open and direct"*.

*Work undertaken by Deloitte and engagement with finance department*

79.    Deloitte undertook detailed work not only in relation to Autonomy's annual accounts, but also in relation to its quarterly reporting. They also tested all of Autonomy's revenue transactions over $1m, and a sample of smaller revenue transactions. This covered the bulk of the transactions impugned in these proceedings.

80.    Deloitte's audit work for the 2009 and 2010 annual audits was performed in accordance with the International Standards on Auditing. The general requirements of an audit were summarised at §5 of ISA 200:

> *"As the basis for the auditor's opinion, ISAs (UK and Ireland) require the auditor to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error. Reasonable assurance is a high level of assurance. It is obtained when the auditor has obtained sufficient appropriate audit evidence to reduce audit risk (that is, the risk that the auditor expresses an inappropriate opinion when the financial statements are materially misstated) to an acceptably low level. However, reasonable assurance is not an absolute level of assurance, because there are inherent limitations of an audit which result in most of the audit evidence on which the*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *auditor draws conclusions and bases the auditor's opinion being persuasive rather than conclusive."*

81.    The requirement that the auditor exercise professional judgement and maintain professional scepticism was explained at §7. Professional scepticism was defined as: *"An attitude that includes a questioning mind, being alert to conditions which may indicate possible misstatement due to error or fraud, and a critical assessment of audit evidence."* The requirement to exercise professional scepticism was restated at §15 of the standards. The concept of professional scepticism was at the heart of the audit function, as Mr Welham agreed, and was drilled into the Deloitte team as part of their training.

82.    Ms Gustafsson, speaking about her time at Deloitte, also stressed the importance of professional scepticism. She said in practice that this meant that Deloitte could not simply rely on information provided to it by the finance department in isolation, but would need to undertake its own information gathering process, checking contractual documents, making checks directly with third parties (suppliers, customers and technical experts), validating commercial justifications with technical teams, and seeing product demonstrations.

83.    Mr Welham agreed that Deloitte did not simply rely on management representations. They looked for other audit evidence where possible. The auditors also had to be alive to anything that might suggest risk of misstatement or fraud, and to exercise a testing and enquiring frame of mind, not unthinkingly accepting what was put in front of them. Mr Welham considered that Deloitte's audit team for Autonomy fully complied with these requirements. Deloitte's audit team also approached the audits of Autonomy with the specific risks of fraud in mind, including risks of management being under pressure to meet various outcomes including financial targets.

84.    None of the issues raised in this case was identified by Deloitte at the time as issues of fraud. Nor did Mr Welham consider at any stage that there had been any fraud. He saw nothing that caused him to be concerned that there was fraud at a senior management level as now alleged in this case. Mr Welham subsequently applied for the role as Autonomy CFO, after Mr Chamberlain's departure in December 2011. This would have involved working with Mr Hussain. Mr Welham had no concerns when he applied for that job about the accuracy or integrity of Autonomy's accounting functions. Nor did Mr Welham have any concerns about the ability or honesty of the technical people Deloitte were given access to, including Dr Menell, Mr Lucini and Dr Blanchflower.

85.    Deloitte also confirmed to HP during due diligence that Deloitte did not have any disagreements with management regarding accounting policies or conclusions.[13]

---

[13]  Mr Welham also confirmed that there were no major disagreements to his knowledge.

*External lawyers*

86.     Autonomy had Slaughter and May as its external lawyers.  They were appointed as Autonomy's takeover defence counsel in November 2010 and provided advice on the acquisition process, including the NDA which set out Autonomy's limited obligations to provide information to HP during the due diligence process.[14]

*Dr Lynch s role*

87.     Inevitably, given the dispute as to Dr Lynch's involvement in and knowledge of the impugned transactions and their accounting treatment, there was a dispute as to his role within the Autonomy group.

88.     The role of a CEO may of course vary from company to company. But its principal focus usually is to direct the strategy of the company concerned, present and explain that strategy, and create and build the context in which that strategy may be achieved (including by using high level contacts), leaving it to line management to implement the strategy and report on its progress.  It is not ordinarily the responsibility of a CEO in a larger enterprise to negotiate or execute transactions or account for them.

89.     Dr Lynch maintained that his role in fact conformed to this usual template. Thus, according to his evidence and submissions:

(1)     Perhaps the only more unusual aspect of his role was that as what he called a *"true technologist"* he continued to play an active role in product development strategy.  This was probably atypical in an enterprise software company (as perhaps illustrated by Mr Léo Apotheker's ("Mr Apotheker") more standard role when CEO of HP).

(2)     By the mid-2000s he was not generally involved in sales transactions, and had not been since Autonomy's fledgling days.  He did from time to time meet at a high level with the most senior people in the large customer institutions.  But he did not deal with the procurement people or with the negotiation of the transactions themselves (as the negotiation and contractual documents confirm in the sense that his name is not on them).

(3)     From time to time (and especially towards quarter ends) Dr Lynch was sent lists by Mr Hussain of the large deals which were in the running, although their prospects fluctuated over time.[15]  Mr Hussain provided summary information to Dr Lynch showing expected revenue, and progress towards revenue targets.  Dr Lynch was keen to stress in his

---

[14] Mr Cooke, currently the senior partner of the firm, provided a witness statement which the Claimants did not challenge.

[15] That is not to say that Dr Lynch should be taken to have pored over and absorbed the detail of the long spreadsheets that Mr Hussain sent to him regularly, which he plainly treated as more Mr Hussain's way of working than something he had to master: but he did often require, and usually showed signs of having absorbed, a synopsis of such spreadsheets, as I shall come on to illustrate more specifically.

closing submissions that his interest in having Autonomy meet its revenue and earnings targets was unsurprising for the CEO of a listed company. In general terms, I accept that.

(4) He was not involved in documenting the sales (or purchase) transactions. That was dealt with by the legal department, with some involvement from sales or from the finance department. The emails showed involvement from people such as Mr Scott, Mr Crumbacher and Mr Guiao (legal, in the US). Some involvement from Mr Chamberlain and Mr Stephan (finance, in Cambridge in the UK) is evident. The legal department also interacted with sales personnel such as Mr Egan, Mr Sass, Mr Mooney (all in the US) or more junior sales people. Dr Lynch was nowhere near this process.

(5) Likewise, the accounting for sales transactions was undertaken by the finance department. Decisions on collectability, for example, were taken by them. Their work was closely scrutinised by Deloitte.

(6) With respect to the VAR transactions complained of, Mr Egan had no communications with Dr Lynch about the details of the individual deals. Dr Lynch's evidence was that he had no dealings with any of the resellers themselves.

(7) Dr Lynch did have a role in purchases. For large purchases (which were not repeat business or sell throughs) he was generally one of the people approving. When he did give his approval, it was on the basis that he considered the purchase was a good idea for Autonomy. The Defendants made the point, which I accept, that if the purchase opportunity had been brought by a salesman such as Mr Egan, Dr Lynch's views and motivations in respect of the transaction might not necessarily have been the same as those of the salesman. Moreover, Dr Lynch was not privy to the discussions between the negotiating counterparties; Mr Egan could not give evidence of any discussion or interaction with Dr Lynch in relation to impugned purchase deals that he negotiated (EDD and StorHouse). In each case, Dr Lynch contended that his approval reflected his understanding that the purchase was in Autonomy's legitimate commercial interests.

(8) Dr Lynch did not negotiate the purchases, and was not usually involved in the detail of them. He relied to a large extent on the judgement of others, such as Dr Menell, when approving the transaction. In particular, the technical evaluation of the products was led by Dr Menell, who had a team working under him. Dr Lynch was entitled to rely on their assessments as confirming that the purchase was a sound idea from a technical perspective.

(9) In the latter context, while he is highly able technologically, Dr Lynch was not generally involved in the detail of the technical matters being addressed by the Autonomy technical staff.

(10)    Dr Lynch summarised the process for purchases, and his role in it, in his first witness statement:

> "380. In terms of the process, certain purchases would be signed off by a small group of people and I would often not be informed of these purchases. For example, if Autonomy was purchasing a product for resale to a customer, making a repeat purchase or purchasing something of low-value, I would not typically sign off on the purchase or be informed of it. Thus, contrary to HP's claim, I did not sign off on each and every purchase over $30,000.

> 381. On the other hand, high-value purchases would generally be considered by me, Mr Menell and Mr Hussain, among others. The purchase would be approved by numerous people and the final sign-off would come from me. In deciding whether or not to approve a purchase, I would ask myself whether the product was aligned with the company's strategy and whether Autonomy would be able to use or sell on the product. If the rest of the team had signed off on a purchase and its rationale had been explained to me, I was generally confident that it was a good deal and that a valid need or use had been established. If Autonomy purchased software, Mr Menell or one of the engineers on his team often created a technical analysis paper, either before the purchase or shortly thereafter, to memorialise the decision in a note to the file.

> 382. The purchasing process did not take very long. Unlike many companies, Autonomy could make decisions quickly and projects could be started, paused, stopped or restarted at any time in response to market opportunities. Autonomy was an agile company, operating with little bureaucracy. Once Autonomy had purchased a product, the time it took for Autonomy to use the product varied. Sometimes it could take a few months to assemble development resources and either remove the team from, or let it finish, its work on other products. There were also times where Autonomy made a purchase in anticipation of an upcoming project, but due to changes in priority and market shifts, the project was ultimately abandoned and thus the product was not used in the manner anticipated. This was a reality of being a company in a fast-moving industry. Nonetheless, it is my understanding that the vast majority of Autonomy's purchases were in fact used."

> (11)  Dr Lynch stressed that he did not involve himself in accounting for the purchase transactions which was, again, a matter for the finance department, scrutinised by Deloitte.

> (12)  Dr Lynch did have a high-level understanding and approval of the strategy behind the hybrid sales in the hosting business. He identified and saw it as a good business move in Autonomy's interest. He maintained that he was not generally involved in the individual hybrid transactions, whether new sales or restructurings, although from a revenue perspective he was made aware at a high level of the progress of some of the large deals that were being negotiated, and sometimes sought to use his contacts in higher levels of management to facilitate them. His evidence was that the detail and content of those deals was the province of the sales personnel, largely operating in the US, and that he was not involved in that nor in the accounting for them, which again was dealt with by the finance department, closely scrutinised by Deloitte.

90.  Dr Lynch summarised his role, and his other commitments outside Autonomy, in his witness statement as follows (the detail of which was not challenged):

> *"69. Often CEOs of large software companies are salespeople; I am not. My role was to make sure the processes were in place to enable the company to make the best decisions. I made sure that we had the right people on Autonomy's board, Audit Committee and in management positions. As a true technologist, I had an active role in product development strategy and positioning, which was unusual for an enterprise software company. I worked on the strategy behind Autonomy's product development, the marketing and positioning of the company and telling Autonomy's story, as a statesman for the company.*

> *70. My role revolved primarily around setting the strategic direction for the company, making sure we had the right people supporting the company internally and externally, maintaining contact with key financiers and investors and making decisions relating to a wide range of matters that came up in the company's operations day to day. I was very involved whenever the company was considering or making any large, strategically important acquisition (i.e., buying any large company). I generally participated in interviews of marketing staff, but not finance, sales or technical staff. I spent a substantial amount of time staying up to date with technical developments by reading industry publications and attending conferences. I travelled a great deal, attending conferences, meeting stakeholders and visiting Autonomy's offices around the world. I visited the US for three or four weeks a year. Most of my contact was with the senior management team, but I interacted with many other employees as well, as well as the company's advisers (legal,*

HC-2015-001324

> *accounting, PR, etc.). As I explain later, I maintained contact with very senior people at many of Autonomy's major customers.*
>
> *71. No two days were the same, but on an average day in the period between 2009 and 2011, I might meet or speak with Autonomy's management team to discuss any number of issues; attend, and often present at, a tech conference hosted by one of the banks; meet with an investment banker to discuss M&A and financing; attend a results roadshow, a BBC Executive Board meeting or a meeting for one of my other trusteeships. On an average day I would spend much of my time in meetings or on the telephone and travelling. I had a private office in Autonomy's Cambridge headquarters and I also worked in Autonomy's open plan office in London. Although it varied, I would estimate that I worked in the Cambridge office 20% of the time, in the London office 40% of the time and somewhere else the remainder of the time, such as meetings outside the office or travelling abroad."*

91.    According to Ms Emily Margaret Orton ("Ms Orton") [16], a Cambridge University graduate who worked as Dr Lynch's assistant from early 2010 for around 18 months, Dr Lynch was primarily based in the London office (as was Ms Orton), and spent only about ten to twenty per cent of his time in the Cambridge office. When in London, Dr Lynch shared an office with Mr Hussain and Mr Kanter (though the latter was usually in Cambridge). In addition to meetings with external parties such as investors, bankers and journalists, and some non-executive responsibilities (including at the BBC), on which Ms Orton reckoned he spent some five to ten per cent of his time, Ms Orton estimated Dr Lynch spent 50% of his time on what she called *"public facing matters"*, rather than operational matters.

92.    Dr Lynch accepted that, as CEO, he bore responsibility for Autonomy's financial reporting. But he was not an accountant and was not generally involved in the detail of the accounting or the presentation of the financial reports. His case was that he was entitled to rely on his large and experienced finance function to do that, and was also entitled to take comfort from the scrutiny of Deloitte. He submitted that in this respect the position was no different to any other CEO of a large enterprise: this was illustrated in the cross-examination of Mr Apotheker who described his very similar role as CEO of SAP, in which he also relied on others:

> *"Q.    So you have familiarity with IFRS?*
>
> *A.    Well, I have some knowledge of how IFRS works, but I'm not an accountant.*
>
> *Q.    Right, but you were the CEO –*

---

[16] Ms Orton left Autonomy to go to Invoke Capital with Mr Hussain, Mr Kanter, Dr Menell, Ms Eagan on around 23 May 2012.

A.      *I was.*

Q.      *So you were ultimately responsible for the accounts, were you?*

A.      *Yes.*

Q.      *But you weren't involved in the process of producing them, is that right?*

A.      *I wasn't involved in the process of producing them. I signed off on them, on the annual report, like any other CEO, and I made sure that we followed through our own control mechanisms through dialogue with the auditors, that we followed all of the right procedures.*

Q.      *So you had no doubt a finance department at SAP, is that right?*

A.      *Yes.*

Q.      *So they would be internal accountants, trained accountants, is that right?*

A.      *Yes.*

Q.      *And then external auditors?*

A.      *Yes.*

Q.      *Who were the auditors?*

A.      *I don't remember.*

Q.      *Did you have an audit committee?   Do you have audit committees in German companies?*

A.      *Of course there's an audit committee.*

Q.      *And they would no doubt recommend the accounts to you as the CEO for approval, is that right?*

> A.    *They would recommend the accounts -- they would review the accounts and recommend to the board to approve the accounts.*
>
> Q.    *Right.*
>
> A.    *That's the proper procedure.  And before that, of course as the CEO I have to sign off on them, together with the CFO by the way.*
>
> Q.    *Right, but you wouldn't be involved in looking at the numbers and deciding what or what should not go into the accounts; that was a matter for the team, who then provided it to you, is that right?*
>
> A.    *That is correct."*

93.    This picture of him operating much as any CEO would ordinarily operate does not, however, capture the full extent of his role. Dr Lynch does appear to have concerned himself in certain contexts at a more operational level than would be typical of a CEO. It seems to me to be clear, for example, that his careful eye on whether Autonomy was going to meet its revenue targets in the last days of every quarter in the Relevant Period did result in him becoming aware of and sometimes involved in the progress of individual transactions to a greater extent and degree than I sensed that, to take the same example as previously, Mr Apotheker would likely have done.

94.    In that connection, the Claimants placed considerable emphasis on a particular comment in a memo dated 23 January 2011 prepared by Deloitte which noted that:

> *"…Mike Lynch has the overall say in what happens to the group as a whole. It is a very unusual level of control for a FTSE 100 CEO to have…"*

95.    Deloitte also noted in the same memo that Dr Lynch's approval was required for all purchase orders over \$30,000 within the group, denoting a granular approach untypical for a CEO in a large enterprise, and the Claimants pointed to email exchanges with Ms Orton suggesting that Dr Lynch was involved in approving other expenditure of amounts as low as £300.

96.    These approval requirements of themselves do not demonstrate involvement in granular detail. Dr Lynch's insistence on strict controls of expenditure was, more likely, a matter of corporate discipline: the need for approval is likely, and was probably intended, to ensure control of spending: but the details of the transactions probably seldom registered with him.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

97.    I would accept also that the context of the Deloitte memo has to be taken into
account. Its accounting purpose was to establish that Autonomy, though it was
a conglomeration of a number of acquisitions, could be treated as a company
with a single Operating Segment subject to overall central control and direction
by Dr Lynch as its Chief Operating Decision Maker (see IFRS 8), and was not
stratified or compartmentalised in a way that precluded this. I agree with the
Defendants that Deloitte were not saying that Dr Lynch was involved in all the
details: indeed, they also noted that:

> *"Mike Lynch also only ever reviews and considers financial and
> resource information at a group level, with no consideration
> given to individual product lines or business units."*

98.    Nevertheless, the impression I have gained from the evidence I have seen and
heard is that Dr Lynch exercised very personal overall control. He was very
definitely and insistently at the apex of an unusual management structure in
which the non-executive members of the board of directors (from 2010
onwards, Mr Robert Webb QC and Mr Bloomer) were his appointees. He was
a very dominant personality. He expected to get his way, and did so. He was
resourceful and determined; and he did not expect or tolerate doubts from others
as to his chosen strategy, and he expected his strategies to be implemented.

99.    IDOL was substantially Dr Lynch's brainchild and Autonomy was, in his
perception, his company. Having grown rapidly from being a start-up company,
and made a number of acquisitions and launched many new products based on
its innovative technology over a relatively short time, Autonomy seems to me
to have been run with entrepreneurial disdain for bureaucracy, and with Dr
Lynch in active and personal control of strategic direction.

100.    There appeared to be no formal committee structure, and the board of directors
was not the engine of decision-making. Indeed, it appears to have largely been
side-lined, as the dearth of board minutes and the lack of any substantial sign of
management direction illustrates[17]. It would be consulted about major corporate
acquisitions: but there is no record of it being substantially involved in anything
else. None of the Autonomy group companies acted on the basis of resolutions
passed by its board of directors. I stress in this connection that nothing in this
judgment is intended to suggest that any of the non-executive directors were
implicated in any dishonesty: the strategies developed and now alleged to have
been dishonest were not theirs.

101.    Dr Lynch ran the Autonomy group informally and through small cliques of loyal
lieutenants within the "MRL Leadership Group", namely Mr Hussain, Mr
Kanter and Mr Chamberlain, with lesser input from Dr Menell and Ms Eagan,
implementing decisions at the sales level, and through Mr Egan, Mr Scott and
Mr Sullivan in the US. I describe them later as a cabal, of which Dr Lynch,

---

[17] By way of illustration, I found only two references to Autonomy's board of directors in the
Claimants' written closing of 2558 pages and 5225 footnotes; and five references in Dr Lynch's written
closing of 1692 pages and 4398 footnotes (two describing how it was comprised, and three dealing
with major corporate acquisitions described later of (a) a company called Interwoven Inc and (b) a
company called MicroLink).

when not ostensibly involved, was nevertheless the éminence grise. The impression I have formed is that his lieutenants would not have done anything of which they thought he might disapprove: and in practice, there was no higher authority within the group to whom they could look to justify what they did. As will be seen in relation to an episode which acquired some importance, when Autonomy's CFO in the USA, Mr Hogenson, questioned certain VAR transactions and sought to refer the matter to the Audit Committee, Dr Lynch was well able to control the process.

102.    One consequence of this personal control is that there are limited evidential records of the decision making with regard, say, to certain purchases made, or strategies being contemplated.  From time to time, the Claimants sought to rely on this as suggestive of wrongdoing, or as casting doubt on the explanations that Dr Lynch has given for various decisions. The Defendants contended that that is simply the way the group was run. In my view, the absence of a written record in a company run in this way (as I accept that, in general, it was) is not, of itself, indicative of impropriety or desire to leave no record. Something more has to be demonstrated in the particular context.  Put another way, the vast bulk of its business is not impugned but was run no differently, and the suggestion that the way of running the business of itself suggests impropriety is untenable accordingly. I would add also that some aspects of the decision-making process were well, even if informally, documented. For example, the wealth of email exchanges illuminate both the hardware and the VAR transactions, and Mr Hussain's end of quarter schedules reporting with increasing focus on any shortfalls in expected software revenue are also illuminating, even if Dr Lynch professed to finding them hard to follow.

103.    However, whereas in a more typically run large company, dishonest corporate strategy (as distinct from individual dishonesty) is unlikely because dishonesty is unusual and a board of directors unlikely to be unanimous in its pursuit, in a closely run company it is much more feasible, and much less unlikely. The fact of overall control is also, obviously, relevant to the issue of the Defendants' knowledge.

104.    The emails also show that to a large extent Dr Lynch was happy to allow those under him to get on with their roles.  The emails also show that it was relatively rare for Dr Lynch to involve himself in the detail of the company's day-to-day activities.  When he did become involved this was usually because there was a strategic angle, such as a customer sensitivity.

105.    Mr Webb QC gave unchallenged evidence on his own impression of Autonomy's culture. As Chairman, he visited the office from time to time and asked staff about their role and what it was like to work at the company. He said in his witness statement that:

> "The consistent impression I had was that Autonomy was fast-paced and had an entrepreneurial feel to it. It was hard-driving, competitive and a demanding place to work, particularly in Sales. However, I did not come across anything that crossed the line beyond that. My impressions were that the atmosphere was one of excitement, rather than apprehension and fear. People

> *seemed to enjoy the pace, the ambition of the company, and the challenge and the rigour of working for Autonomy. The Sales' kick-off had positive atmosphere. ... The impression I had was that the sales' force thought they were hard driven but that they enjoyed the challenges and the rewards. They, the scientists and the analysts seemed proud of their products."*

## Autonomy's Reporting

106. This section provides an overview of Autonomy's approach to its reporting, both quarterly and annual. Some of the matters discussed in this section will be considered in further detail when dealing with the impugned transactions later in this judgment.

## Annual and quarterly reports: Deloitte's review work

107. In addition to its annual accounts Autonomy reported on a quarterly basis. All Autonomy's reports, both annual and quarterly, were subject to detailed review by Deloitte.

### *Deloitte's review of annual reports*

108. Deloitte reviewed and approved the financial statements in the annual accounts.

109. Deloitte also reviewed the narrative portion (the front end) of the reports. When reviewing the front end, Deloitte was required to identify:

   (1) whether any of the information in the front half was materially inconsistent with the financial information; and

   (2) whether there was any matter which came to their attention which caused them to believe that the narrative portion appeared to include a material misstatement of fact.

110. Deloitte's review of the front end followed the ISA issued by the Auditing Practices Board in April 2006 entitled *"Other information in documents containing audited financial statements"*. This required the auditor to read the front end of the report to identify material inconsistencies with the audited financial statements or material misstatements of fact. If any were identified, the auditor was required to resolve them, and if an amendment was necessary and the entity refused to make the amendment, the auditor was required to express a qualified or adverse opinion. See §§2, 11, 12 and 14 of the ISA. At no stage did Deloitte ever identify (other than internally) any material inconsistencies with the financial statements or any material misstatements of fact.

111. Mr Welham confirmed in cross-examination that if Deloitte had seen something in the narrative portion of either a press release or an annual report that they considered was misleading in any way they would have said something.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

112.    The consequence of this is that many of the Claimants' criticisms in these proceedings relate to presentations which were considered and approved by Deloitte. By way of example, the Claimants criticised the disclosures made and explanations given in the 2010 accounts. However, that document was reviewed by Deloitte in detail prior to sign off:

(1)    A copy of the 2010 report is marked by Mr Murray (manager from Deloitte), on 22 February 2011: *"Reviewed throughout prior to sign off"*.

(2)    That document is replete with tick marks showing Deloitte's review and approval of the statements made in the 2010 accounts.

(3)    This extended to the front end as well as the financial statements themselves. For example, and as developed later, the working papers in evidence show Deloitte's review of the data given for various non-IFRS metrics provided under categories now targeted by the Claimants as misleading and another means whereby to conceal the hardware sales: IDOL Product, IDOL Cloud, and IDOL OEM. Deloitte's review involved an analysis of spreadsheets provided by management. Their review involved qualitative as well as quantitative analysis.[18]

113.    Mr Welham confirmed that this ticking exercise was part of the normal process. A similar exercise was undertaken for the quarterly reports, as discussed below.

*(i)    Deloitte's review of quarterly reports*

114.    Formally Deloitte's work on the quarterly reports constituted a voluntary review. However, as Mr Welham explained at §20 of his witness statement, Deloitte's quarterly review work was substantially similar to an interim (i.e. H1) review. Deloitte undertook to conduct their reviews with an attitude of professional scepticism and:

> *"Reports or, in the case of the voluntary Q1 and Q3 quarterly reports, the recognition and measurement criteria of IFRS"...with the objective of providing us with a basis for reporting anything that came to our attention that caused us to believe that the interim financial information had not been prepared, in all material respects, in accordance with International Accounting Standard ("IAS") 34 (in the case of the H1 Interim Reports) or, in the case of the voluntary Q1 and Q3 quarterly reports, the recognition and measurement criteria of IFRS."*

115.    Mr Welham also explained that in practice Deloitte's work went beyond what was required for the purposes of a quarterly or half-year review, and Deloitte

---

[18] For example, the Defendants relied on the equivalent paper for H1 2011 as showing Deloitte specifically considering whether particular revenue was correctly categorised as OEM revenue, though the passive language is unclear whether Deloitte were noting what they were told or bringing judgment to bear.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

used the opportunity to undertake audit work in relation to Autonomy's large transactions, and a sample of smaller ones:

> "However, in practice the nature of the work we undertook on revenue in relation to our quarterly reviews for Autonomy went beyond what was required for the purposes of a review. We used the opportunity to undertake audit work in respect of all sales made by Autonomy of more than $1m, as well as undertaking audit work in relation to a sample of smaller value sales transactions. This work included tracing the sale to supporting evidence and seeking and receiving third party confirmations. The rationale for our approach was that as part of our audit plan we wanted to undertake audit work in relation to such transactions, and it was more efficient to avail ourselves of the opportunity to progress this work in the course of the quarterly reviews, rather than deferring it all until the year-end. However, as part of our year-end audit procedures we would re-visit the work undertaken during the course of the year."

116. The process of a quarterly review took around six weeks from start to finish, including the planning stage.[19]

117. Following the preparation of their review, Deloitte would prepare a report for the Audit Committee. That was the Audit Committee's principal, and often in practice only, source of detailed information apart from public accounts.

*(ii)    Deloitte's review of revenue*

118. When conducting its review work, one of the audit risks that Deloitte had in mind was that revenue might be incorrectly recognised. According to their defence in regulatory proceedings brought against them, which Mr Welham stood by, Deloitte considered that they went beyond what was required of them by testing all licence transactions over $1m and a sample of smaller transactions below that level.

119. Deloitte's revenue testing process involved the audit team specifically considering each of the IAS 18.14 revenue recognition criteria for each transaction reviewed.

*(iii)    Press releases and earnings calls*

120. Deloitte reviewed Autonomy's press releases. If Deloitte saw something in the narrative portion of either a press release or any annual report which was inconsistent with the financial statements or misleading in any way, Deloitte would have said something.

121. Following each quarter, the finance department would prepare a draft press release summarising and commenting on the quarterly results. Deloitte would check through the press release including the non-financial information and the

---

[19]  The planning process started before the end of each quarter.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

non-IFRS metrics, and would "*tick them back*".  The press release would then be provided to the Audit Committee which would consider and then approve the release.

122.    An example of this ticking back process is a draft of the Q3 2009 press release. Deloitte ticked off all the financial information given in the document, including (as Mr Welham confirmed) the non-IFRS supplemental metrics which Autonomy chose to provide.

123.    Deloitte also listened to Autonomy's earnings calls, and Mr Welham accepted that he often listened in himself.  The documents show that someone from Deloitte listened in to the earnings call for each of the calls in the Relevant Period; Mr Welham listened in to almost all of them. The calls that Mr Welham listened in to included the Q3 2009 earnings call.  If Mr Welham had heard anything that he thought was misleading he would have raised it with his audit partner in the first instance.  He did not, and no one else within Deloitte raised any concern arising out of any of the earnings calls, to Mr Welham's knowledge.

*(iv)    The relevance of Deloitte's review and approval*

124.    The Defendants placed much emphasis on Deloitte's review work in meeting allegations in this case.  Dr Lynch's case, in very broad terms, is first that Autonomy's accounting was fair and reasonable, and the various accounting judgements and decisions inherently involved fell within the reasonable range that was available; secondly that he was unaware of and did not participate in any false accounting, and was entitled to believe, and did believe that the accounting was fair and reasonable; and thirdly, that although the narrative portion or 'front end' of the accounts was not audited, Deloitte were satisfied with both its factual accuracy and its consistency with the accounting information provided in the 'back end' of the accounts (which, of course, was audited). Mr Hussain's case was to the same effect; and in relation to the 'front end' of the accounts, his written closing submissions also relied specifically on the evidence of Mr Welham in cross-examination that Deloitte were satisfied that the narrative portion of the various quarterly reports was not misleading.

125.    The Claimants' answers to this were that the Defendants could not rely on Deloitte in circumstances where Deloitte had been misled; nor where they knew Deloitte to be wrong for whatever reason. If, as the Claimants contended was the case, the Defendants knew that the published information provided was deficient and/or inaccurate, they could not rely on Deloitte's mistaken imprimatur. They acknowledged that if Deloitte were not misled it would be more difficult for the Claimants to prove that the Defendants nevertheless knew them to be mistaken: but on the facts, they contended, that was proved.

**Revenue Reporting**

*IFRS 8: Single operating segment*

126.    An important aspect of Autonomy's accounting, and one which (especially in the context of the hardware claims) had, in my view, a marked effect on the

approach of both Deloitte and the Audit Committee, was that all its business was treated as a single operating segment for the purposes of IFRS 8. The Claimants did not dispute this.

127.    IFRS 8 (Operating Segments) was a new provision in the "Relevant Period". It was applicable for accounting periods beginning on or after 1 January 2009 and was therefore applicable to Autonomy's 2009 (and subsequent) accounts.

128.    In January 2010, Deloitte's audit team consulted with Mr Barden of Deloitte's NAA in response to a (generic) call by the FRRP encouraging Boards of Directors to test their initial conclusions about their segmental reporting under the (then) new standard. The consultation involved a detailed review of the conclusions that Autonomy's "chief operating decision-maker" was Dr Lynch and that Autonomy had a single operating segment for the purposes of IFRS 8. Deloitte and Mr Barden for the NAA confirmed those conclusions. The conclusions were re-confirmed on further review by Deloitte in November 2011.

129.    I shall return to IFRS 8, and to the various further paragraphs within the Standard (and especially IFRS 8.32) when addressing the hardware case (to which it is most relevant).

130.    The following synopsis of Deloitte's approach is intended to illustrate Deloitte's perception of the way Autonomy was managed (and of Dr Lynch's role in particular) as well as the rationale of the decision to confirm that Autonomy had a single Operating Segment:

(1)    In January 2010, Deloitte concluded that Dr Lynch was the *"Chief Operating Decision Maker"* (which describes a function to allocate resources to and assess the performance of the operating segments of an entity). The basis for this conclusion was that they considered that he had an *"unusual level of control"* and that it was:

> *"very clear that he is actively involved in all areas of the business, making key strategic decisions on areas such as procurement, recruitment, acquisitions and communications with the market and financiers".*

(2)    Deloitte accepted Dr Lynch and management's central assertion, which was that IDOL technology was at the heart of all the Autonomy group's products, and that it was this technology's ability *"to extract meaning from unstructured information which allows Autonomy to grow at such a fast pace."* They accepted that IDOL was at the core of the entire business, and that this feature of being a *"one technology business",* together with Dr Lynch's highly centralised management of the entire group which was not based on divisions or disaggregated data relating to the business activities of the group, distinguished Autonomy from all other businesses in the FTSE 100.

(3) Deloitte's memo of 23 January 2011 (referred to previously at paragraph 94 above) revisited this conclusion in light of various changes including acquisitions and (of particular note):

> *"strategic hardware sales…on the basis that it now represents a relatively significant proportion of Autonomy's business".*

In that context, strategic hardware sales were described as:

> *"predominantly related to Digital Safe (IDOL) sales and are a means to generate much more lucrative future IDOL software sales".*

(4) The January 2011 memo also identified three new categories of software offerings which might affect the previous analysis, being (a) *"Power"* (described as being *"an infrastructure platform for understanding human-friendly data"*; (b) *"Protect"* (described as being a *"selection of legal, regulatory and compliance solutions"*); and (c) *"Promote"* (described as being *"a number of multichannel, customer interaction and revenue optimisation solutions").*

(5) The memo noted that whilst this might suggest to a reader of the financial statements and the Autonomy website that there could be three distinct segments of the business, nevertheless all:

> *"Autonomy products are based on the IDOL layer, and as this is pervasive throughout all product categories, this split of products into 'brands' is nothing more than what it appears, a branding exercise".*

(6) Deloitte noted as further support for the analysis and their conclusion that Autonomy continued to have a single Operating Segment that:

 i. Revenue was not broken down between or into products, divisions or brands;

 ii. Cash flow forecasts and revenue figures were all undertaken at a group level, which:

> *"further highlights the fact that the way in which Autonomy's business is run is very different to that of any other FTSE 100 companies, with the main focus being on the group consolidated revenue figure"*;

 iii. Functions within the business such as sales and marketing and R&D were managed centrally, each by a single member of the senior executive;

 iv. The overall organisational hierarchy was very flat, with few middle managers;

v.   All purchases over $30,000 had to be approved by the CEO, very few transactions were processed:

> "without direct authorisation from Mike Lynch being required… This is a very unique and rare situation for a FTSE 100 company to be in, and serves to support the fact that this business is unlike any other in the top 250 listed companies in the UK in the way that it is operated. This top-down, single focused approach to the running of the group is reflective of the fact that the whole business revolves around one core element, being the IDOL layer and it is Mike's intention to continue to evidence strong organic growth in the sales of that core technology";

and that;

vi.  Of particular interest to the question of disclosure:

> "no separate information on strategic hardware sales is presented or discussed at analyst presentations; and no mention of these sales/this product offering is made on the company website."

vii. Deloitte's review also covered §32 of IFRS 8 as it applied to Autonomy. IFRS 8.32 is part of the guidance dealing with "entity-wide disclosures" at §§31-34. The effect of these was to require separate reporting for certain revenues from products, services, geographical areas or customers, even where an entity had a single operating segment. As part of their review work Deloitte specifically considered whether notwithstanding that Autonomy had a single operating segment it was necessary to make separate disclosure of any products under IFRS 8.32. Deloitte considered the question in detail for the 2009 annual accounts (and revisited their conclusion for the 2010 accounts). Their conclusion, approved by Mr Barden, was that Autonomy's approach of not making separate disclosure of different products, or groups of products, was reasonable.[20]

viii. Deloitte revisited this conclusion in 2010. As part of this consideration Deloitte specifically considered the strategic hardware sales in that year. Deloitte knew that hardware sales were in the region of 12% of Autonomy's group revenues for

---

[20]This was also summarised in a note to Mr Knights, copied to Mr Welham, from Ms Antonia Anderson on 26 January 2010, although some concern on behalf of Mr Barden about the issue of disclosure is apparent: *"Discussed this with Phil and he agreed that based on their argument that IDOL is pervasive and that decisions are made based on info that is not split by brand it does not seem unreasonable that the information is not available in order to provide subdivision of revenue into product type, but he thought the current explanation should go further to explain why this is not available. Something along the lines of: "Although branded differently, in effect all, customers buy the same one product and for financial reporting the group does not disaggregate into different categories by brand or any other method."*

2010. Deloitte concluded, again, that there was only one operating segment, and did not require any separate disclosure under §32 of IFRS 8.

131.    Thus, in summary, Deloitte's analysis and the conclusions reached in respect of IFRS 8 confirm that Autonomy was run in a centralised and in some ways idiosyncratic way, with Dr Lynch very much at the apex of the management structure, and the Board of Directors and the Audit Committee being more spectators than active participants.

*Was Autonomy being prepared and offered for sale?*

132.    The last topic in this introduction to Autonomy and its business which I need to address before turning to describe HP in more detail is the Claimants' contention that (a) by October 2010 Autonomy's financial performance and share price had slipped so much that (i) it was likely to become a takeover target and (ii) Dr Lynch was put in mind to promote its sale by Mr Frank Quattrone and his company Qatalyst Partners (a boutique investment bank well known for its success in achieving high bid prices[21]); and that thereafter, (b) following meetings between Dr Lynch and Mr Quattrone in late November/early December 2010, Mr Quattrone began approaching the *"acquiror universe"* he had identified (including Cisco, Oracle and HP) and (c) in January 2011 approached HP via HP's then Chairman, Mr Raymond Lane ("Mr Lane"), to encourage interest.

133.    The Claimants contended, in effect, that Autonomy was fattened up and marketed for sale. Dr Lynch, however, consistently insisted that he did not want a sale of Autonomy, and would resist a bid if made unless at a price which made resistance futile because it was at a premium that shareholders would find irresistible.

134.    The following summary shows how Dr Lynch moved or was persuaded towards a sale:

(1)    On 6 October 2010, Autonomy released its trading statement ahead of its Q3 2010 results. Although the statement highlighted *"record third-quarter 2010 revenues"*, in fact, it slightly missed consensus.[22] Further, the statement included a forecast that Autonomy expected *"to review our internal model for the full year with a revenue reduction of around 3%"*, implying full year revenue growth of 17%. The market had been expecting 21% growth: Autonomy shares promptly fell by 16% and never fully recovered. The headline in the Financial Times on the day of the trading statement read: "*Autonomy slides on reduced revenue forecast*" and the headline the following day (7 October 2010) in the Guardian read *"Autonomy shares plunge on fears of weak US orders"*.

---

[21] According to the *New York Times,* Mr Quattrone had become known a*s "the go-to-guy for sellers looking to command sky-high prices".*

[22] On the Claimants' case the "miss" was the more notable because it was *"despite revenue being inflated by 27% through the full array of fraudulent mechanisms".*

(2) Almost immediately after this Mr Quattrone sent an email to Dr Lynch dated 6 October 2010 headed *"Checking in"* in which he wrote:

> *"saw the news and wanted to offer encouragement and assistance. Many large technology players have been waiting for a crack in the stock and I would be surprised if you didn't receive some overtures. We would be pleased to help you think through and prepare for such an approach…"*

(3) When Dr Lynch asked who would *"come knocking"* Mr Quattrone identified the most likely candidates as *"Cisco, Oracle, IBM, HP (more likely with Leo and Ray Lane)"* together with some less likely *"wild cards"*.

(4) Dr Lynch said that it would all come down to whether someone could offer *"a level the shareholders can't resist"*. In that context, he asked Mr Quattrone *"what kind of prices do you think they can get to?"*; to which Mr Quattrone replied on 8 October 2010 that *"top buyers could pay at least 70pct premium with no dilution even before considering any synergies"*.

(5) After receiving some further marketing material from Mr Quattrone, on 10 October 2010 Dr Lynch sent an email to Mr Quattrone, now with the heading *"CONFIDENTIAL"*, as follows:

> *"If you are saying there are people out there today ready to offer cash of over 26 pounds, we need to rethink the strategy. The London market does not value growth or understand future tech prospects (e.g. we get penalized for cloud revenues!) on that basis given there are no poison pills in the UK it would be like someone turning up and offering a native American chief 3 rifles and some firewater in return for Dakota, in short the shareholders would not allow the deal to be stopped. On that basis I fear you have missed the point and <u>the strategy should be far more about coaxing the right buyer than any futile attempt at bid defence.</u>"*

> [Emphasis as in the Claimants' written closing submissions]

(6) This was of course good news for Mr Quattrone, and Autonomy engaged Qatalyst's services to obtain such a price. Although terms were not finally signed off until 16 August 2011 it seems clear from the available documentation (including exchanges between Mr Kanter and Qatalyst) that Qatalyst's engagement had been informally agreed by late 2010/early 2011.

(7) Mr Quattrone began approaching the *"acquiror universe"* he had identified. He arranged, and attended, meetings between Dr Lynch and key M&A contacts identified in his October analysis, including contacts at Cisco, Oracle, and Mr Shane Robison ("Mr Robison") and Mr Johnson of HP. Meetings were also pursued with some less likely potential acquirers identified by Qatalyst, such as Intel, Adobe and Dell. Other than HP, there seems to be no evidence that any of these potential buyers pursued Autonomy as a potential acquisition[23].

(8) Qatalyst approached HP on 25 January 2011 by Mr Quattrone sending an email to Mr Lane asking to *"discuss… confidentially"* a *"specific [situation] where we have some unique insight that things may be changing"*. The next day, Mr Quattrone emailed Mr Lane slide decks titled *"Autonomy Overview"* ("the January Slides") and *"Autonomy Trading and Financial Statistics"*.

(9) Shortly after sending HP the January Slides, Mr Quattrone spoke to Mr Robison and the two agreed to a *"fact-finding discussion."* Thereafter, Autonomy gave a presentation accompanied by further slides ("the February Slides") which updated the January Slides to take account of the 2010 financial year end accounts which trumpeted *"record full year revenues of $870 million, up 18% from 2009"*.

(10)    On 4 March 2011, there was a further meeting between HP and Autonomy at HP's headquarters in Palo Alto. Dr Lynch attended by video link whilst Mr Hussain and Mr Quattrone attended in person. A further slide deck was presented (the "March Slides"). By then HP and Autonomy had entered into a nondisclosure agreement. I discuss later how HP's focus gradually narrowed to Autonomy as its bid target: see paragraphs 153 to 157 below.

135. It seems to me that this short chronological summary demonstrates that Dr Lynch, sometime in October 2010, began actively to contemplate a sale, and through Mr Quattrone, to sound out the *"acquiror universe"* and the possibility of a cash bid at a premium price (of say £26) in light of Mr Quattrone's advice that a very substantial premium might be payable despite the reverses in the previous quarter. In my view, Dr Lynch's insistence in his evidence that he made it clear to Mr Quattrone that *"Autonomy was not for sale"* smacks of protesting too much. I agree with the Claimants that the suggestion that the aim of Qatalyst's approaches was to line up *"white knights"* to ride to Autonomy's rescue if an unwanted suitor bid first is implausible.

136. I have taken into account the evidence of what the Defendants presented as a different perception held by Mr Robert Webb QC ("Mr Webb QC"),

---

[23] After HP's acquisition of Autonomy was announced, Mr Larry Ellison of Oracle said on a conference call that *"Autonomy was shopped to us"* but that the price had been *"absurdly high"*. Dr Lynch categorically denied this, even suggesting that any approach was unauthorised, which he must have known was incorrect, since he knew that Mr Quattrone had put Oracle's name on a list of the most likely buyers for Autonomy.

Autonomy's non-executive Chairman at the time. Mr Webb QC's evidence in his witness statement, on which he was not cross-examined, was that:

> "When I became Chairman of Autonomy in May 2009, I was not aware of any need or particular desire on the part of the company's management team to sell the company. That remained the position for the duration of my Chairmanship of the company. It was a public company so management desire would not have been conclusive - shareholders have the final say.
>
> My perspective was that the company was doing extremely well and there were no signs of distress to motivate the management to sell the company. Autonomy was never short of cash. Its product was highly regarded and in great demand."

137.    I have no reason to doubt that that was Mr Webb's perception. I should also make clear that I do not think sale was really on Dr Lynch's mind before October 2010. But neither that nor Mr Webb's perception precludes the possibility that Dr Lynch, once he understood from Mr Quattrone the interest that might be generated, also understood that shareholders (of whom he was one, and a major one at that) would ultimately vote with their wallets, as indeed Mr Webb himself there identified. In my view the truth is, to quote Dr Lynch's own words, that the strategy became that of *"coaxing the right buyer"*.  I turn to describe the buyer that was found, HP, in more detail.

*HP*

138.    HP was an icon from the first days of the tech revolution in Silicon Valley, Northern California. It too had been a start-up, first housed in a garage which was the birthplace of 'Silicon Valley'. HP had become a household name, some of its products having become almost synonymous with their function.

139.    By the time of the Acquisition, however, HP was in the doldrums. Its heritage was in the hardware sector. This had become a highly competitive and low margin business. In the new computer world, software sales are the source of far greater profitability than hardware and the Cloud is King. HP had a Software division of considerable size; but it was lagging behind market leaders.

140.    Furthermore, HP (and by that I include the group) had developed into a bureaucratic inward-thinking institution, which had lost its way and its confidence. Business units were siloed and complex, with infighting and little cooperation between them and poor systems of overall management and strategic direction, as Ms Whitman acknowledged in cross-examination.

141.    Appreciating the need for change, HP had instigated *'Project Cielo'* in October 2010 to assess its overall strategy. This was led by HP's Strategy and Corporate

Development ("SCD") group[24] and Bain & Company ("Bain & Co"), a well-known strategy consulting firm.

142.   Bain & Co identified multiple concerns about HP as at November 2010. These included:

>   "*Lack of a unifying pan-HP vision or mission… Long-term strategic plan required*."

>   "*Declining GM% and P/E multiple, despite significant revenue and EPS expansion*."

>   "*Portfolio skewed towards declining growth and/or low margin segments. Lack of scale and growth in software*."

>   "*Power of portfolio not being leveraged adequately*."

>   "*Weak track record on innovation, incubation & commercialisation*."

>   "*Short-term, cost optimisation focus… Limited willingness to take risks … hardware-centric approach*."

143.   Mr Apotheker's first task as HP's CEO, which he embarked on even before his formal appointment, was to become engaged in *Project Cielo*. He quickly agreed with Bain & Co's diagnosis, and its advice identifying what he also agreed were *"real problems for HP at that time"*.

144.   The view Mr Apotheker formed, in line with that advice and as a principal conclusion of *Project Cielo*, was that HP needed to use its size, reputation and financial strength to evolve from being a producer of low-margin products and services to become (in his words):

>   "*a full services and solutions partner for businesses, providing the essential/strategic parts of the technology "stack" [which] comprises the hardware, software, and network layers that stand between the basic infrastructure of data creation, storage and distribution and the end-user of information.*"

145.   Further, within the software 'space', Mr Apotheker's view was that HP's focus should be on *"analytics for big data – which is the combination of structured data…and the much faster growing unstructured data set"*: as explained at paragraph 42 above "structured data" being data maintained in a traditional

---

[24] According to Mr Sarin's witness statement, which was not challenged in this respect, the SCD group included 30 to 40 people split between two sub-teams: one ("Strategy") focused on corporate strategy, the other ("Corporate Development") on identifying and carrying out acquisitions to execute that strategy. The head of the SCD Group was Mr Robison (who was HP's Chief Strategy & Technology Officer). Mr Johnson led the Corporate Development team (of which Mr Sarin was part, as a Senior Director). Mr Girish Nair was head of the Strategy sub-team. Both Mr Johnson and Mr Nair reported directly to Mr Robison.

database, and "unstructured data" being all other data including emails, word-processing, spreadsheet documents, video and sound recordings. This was, Mr Apotheker agreed in cross-examination, a *"potentially huge market"*.

146.   As Mr Apotheker put it:

> A.   *The dominant technology for data at this particular moment in time was to store data in what is called relational databases and for sake of simplicity, consider those to be a Excel spreadsheet, sometimes of monumental size. Unstructured data is everything else, everything covering voice, pictures and what-have-you, everything that you could not normally store in an Excel spreadsheet so to speak. Trying to combine the two would be a natural thing to do because that's how we all live and work and that's what is meant by the integration of these two things."*

147.   Thus, Mr Apotheker envisaged HP becoming a one-stop shop for data. Operating across the entire IT stack would enable HP very considerably to increase its overall operating margins. Bain & Co's figures suggested that operating margins should increase from 10 to 15% and achieve 10% CAGR (Compounded Annual Growth Rate) revenue growth. The then recent acquisition of Vertica Systems Inc ("Vertica"), a structured data company that HP had acquired in early 2011, gave further shape to Mr Apotheker's plans for a "complete stack" with a combination of structured and unstructured data.

148.   Unstructured data (sometimes referred to as *"Big data"*) formed one of the core areas of Mr Apotheker's plan. Bain & Co also identified "*enhancing portfolio for Enterprise Information Management*" as one of the primary "*potential areas of improvement*", in line with Mr Apotheker's view regarding an integrated "stack" of layers of technology providing a complete service for enterprise customers.

149.   During 2011 Mr Apotheker and Mr Robison, the chief strategy and technology officer and head of HP's SCD group, identified and analysed a number of possible software targets with a view to assembling the complete technology "stack".

150.   Mr Apotheker and Mr Robison initially focused on the possibility of acquiring TIBCO, which was a specialist in "middleware" [25]. A presentation to HP's finance and investment committee, and board, in relation to TIBCO (code named "Tacoma") showed that TIBCO's margins were regarded as being "strong", based on it having 30% operating margins by full year 2015 (current margins being around 25%, as per p.5 of the document). TIBCO's gross

---

[25] In cross-examination, Mr Apotheker described "middleware" as being, in simplified terms, *"software technology that sits between the application and the actual data layer and that enables the system to actually work as one"*. "Middleware" was another part or aspect of the technology "stack".

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

margins (actual and predicted) were around 76-77%. HP's discounted cash flow ("DCF") analysis gave a standalone enterprise value of $4.46bn, and a value with synergies of $8.5bn.[26]

151.　The board authorised Mr Apotheker to pay up to $36 per share for TIBCO. This would have valued the company at about $6.6bn. It would have involved HP ceding approximately 53% of its anticipated synergy value. In the event HP offered $31 per share, valuing the company at about $5.7bn, approximately $1.2bn over HP's assessment of TIBCO's standalone value, and 30% of the total synergy value. [27] HP subsequently raised its offer (as Mr Apotheker recalled it, to a price of $33 or $34 per share), but could not reach agreement.

152.　Having walked away from TIBCO in early April 2011, Mr Apotheker asked the SCD group to increase its focus on other potential targets, including Autonomy and another entity, Software AG. Mr Apotheker confirmed, however, that these were regarded then as alternatives. It was not at the time envisaged that HP could acquire both at the same time.

*Identification of Autonomy as a target*

153.　Autonomy had for some time been recognised by HP as one of the market leaders in unstructured data. In a part of a Project Cielo presentation dated 13 November 2010, entitled *"HP Play: Technology Feasibility"* the highest end of an analysis of what were termed the *"key technology pain points by criticality"* identified the fact that there were *"limited insights from unstructured data"*. The document envisaged that the gaps would be closed by acquisitions in *"BI/Analytics (e.g. Autonomy, Endeca) and middleware (e.g. Tibco)"*. This objective was put at high feasibility albeit *"based on assumption that target companies indicated can be successfully acquired"*.

154.　In May 2011 HP's strategy group developed some preliminary analyses of Autonomy and Software AG. These were presented both to the finance and investment committee of HP's board and to the technology committee. The presentation to the finance and investment committee was on 25 May 2011. That committee's key job was to review acquisitions and asset allocation.

155.　According to their analysis of Autonomy (code named "Atlantis"):

(1)　Autonomy provided a *"broad range of capabilities across all layers of the Enterprise Performance System stack, focused on unstructured content"*. These capabilities supplemented HP's own in all layers of the enterprise "stack". Autonomy was described in the executive summary as *"Anchor asset to secure leading position in the Enterprise Information Management segment"*. The executive summary stated, under "strategic":

> *"Anchor asset to secure leading position in the Enterprise Information Management segment - provides*

---

[26] The terminal growth rate used was 4%, and the weighted average cost of capital 10.5%. The 4% terminal growth rate was a rate selected by Mr Sarin's team.

[27] At $34 HP would have ceded more than 40% of the synergies.

> *key IP for unstructured data analytics; Platform assets for Enterprise Search & Discovery, Backup / Archiving and Content Management.*
>
> *Atlantis addresses a $7.3B market in 2010 growing at a CAGR of 13%*
>
> *Key asset for unstructured data analytics: Intelligent Data Operating Layer (IDOL) technology is the de-facto standard among OEMs and supported by over 130 patents*
>
>     *- Ability to extract meaning from information through an understanding of both the content and context of data*
>
>     *-Over 400 connectors provide a competitive differentiation*
>
> *Capitalize on the opportunity to bring both structured and unstructured information across business processes*
>
> *Optimize Atlantis' IDOL technology to develop horizontal and vertical business process and analytical solutions."*

(2) The penultimate point regarding bringing structured and unstructured information across business processes chimed with a major part of Mr Apotheker's strategic thinking.

(3) As the "Financial" section of the executive summary explained, Autonomy was considered to have "*strong growth and margins*". HP came up with a stand-alone DCF valuation of $9.574bn based on 10.6% revenue CAGR and 46% operating margin by full year 2016 (i.e. higher operating margins than for the earlier TIBCO analysis).

(4) The presentation set out the synergy assumptions arrived at by HP's SCD group. Mr Apotheker reviewed them and considered them reasonable.

(5) A DCF analysis was also provided. Adding the various categories of synergy to the $9.5bn stand-alone valuation gave a stand-alone plus synergies value at that stage of $15.223bn. The terminal growth rate assumed in the stand-alone value was 4%.

(6) The presentation gave information about the current and predicted scale of Autonomy's markets, as well as market share. This information came from IDC and Gartner, respected independent industry sources.

(7) The presentation also identified "*other potential interested parties*" at p.28. These potential bidders included Oracle.

156. There had been some contact between HP and Autonomy prior to April 2011. This included initial contact from Mr Quattrone of Qatalyst, a video-conference in February 2011 and a further meeting in early March. During this period HP were provided with slides (the "January Slides", the "February Slides" and the "March Slides"), which (as part of their misrepresentation case) the Claimants asserted were misleading (and see paragraphs 3831 to 3872 below).

157. From April 2011 onwards, Mr Apotheker and Mr Robison became focused on the acquisition of Autonomy [28]. Mr Apotheker confirmed that he did not personally really focus on Autonomy as an acquisition target until April 2011, and after the attempted acquisition of TIBCO had failed.

*Individuals principally involved*

158. Before describing in more detail the development of HP's interest in and eventual offer for Autonomy, a short description of each of the individuals who were principally involved in the identification of Autonomy as a target, the development of plans for the Acquisition, the negotiation of an offer and/or the due diligence exercise undertaken by KPMG on the instructions of HP may assist an understanding of this section.

159. Mr Apotheker became President and Chief Executive Officer of HP in November 2010. He had a strong background in the software sector. He was head-hunted from a company called SAP, one of the largest software companies in the world at the time, where he had (latterly) been CEO. He had a track-record of successful acquisitions for SAP, having led more than a dozen, including SAP's successful $7 billion purchase of a company called Business Objects in 2007.

160. Before his appointment by HP he was asked by HP's Search Committee to prepare a paper that would provide an outsider's perspective of HP. When at SAP he had been the executive in charge of SAP's relationship with HP and had been an admiring observer for many years. His overall view, as expressed in his paper, was that although HP was financially sound, rapid changes in the technology industry represented a significant danger to HP, unless the company could develop and articulate an overarching growth and profit strategy, and rediscover its culture of innovation which had inspired its founders.

161. In Mr Apotheker's assessment:

(1) Personal computer sales (which were the main business of HP's "*Personal Systems Group*" or "PSG") had become a commoditized, low

---

[28] Consideration was also given to a company called Software AG (see paragraph 181 below).

margin business: PSG should focus on the provision of mobile devices (such as smartphones, tablets and notebooks).

(2) HP's Imaging and Printing Group which was responsible for producing printers and inks, needed to adapt to deal with the possibility that printing of documents would become less common.

(3) The most important issues facing HP, however, were in its Enterprise Business, which provided solutions to businesses and enterprises. His prescription was that HP should evolve this business from low-margin products and services to become what he called in his witness statement *"a full services and solutions partner for businesses providing the essential/strategic parts of the technology 'stack'"*. (The 'stack', he explained, comprises *"the hardware, software, and network layers that stand between the basic infrastructure of data creation, storage and distribution and the end-user of information."*) An important element would be to expand HP's software offering to make it a more prominent part of HP's technology 'stack'.

162.    Mr Apotheker was appointed on this 'ticket'. He was offered the role of Chairman also, but he refused this (preferring the European model of keeping the position separate) and recommended that Mr Lane be appointed to that position, as he was[29]. Their appointments were announced on the same day, though in fact Mr Apotheker began work before then.

163.    Mr Apotheker gave evidence in these proceedings, and was cross-examined for two days. He came across to me as honest and professional, though his witness statement was over-lawyered. He was palpably hurt by his treatment by HP, which terminated his employment less than a year after his appointment in circumstances I elaborate later. His oral evidence was conspicuously moderate in tone, but he nevertheless communicated to me his experience of HP as an *"intensely political organisation"* with inter-departmental rivalries, set in its ways and difficult to change.

164.    Mr Shane Robison was Chief Strategy & Technology Officer of HP and head of HP's SCD group from mid-2002 until November 2011. Before that he had been Chief Technology Officer at Compaq (which was acquired by HP in 2002). Mr Robison agreed with and supported the strategy to move further into enterprise software.

165.    As head of SCD, and consistently with Mr Apotheker's prescription for HP, Mr Robison spent substantial time through 2011 analysing (with the assistance of Bain & Co) the software market in general and, in particular, the businesses and companies that had sufficient scale and profitability to be considered a potential strategic fit for HP. Mr Robison was Mr Apotheker's principal assistant in identifying and analysing potential acquisition targets, and they worked closely together in all the preliminary work culminating in the Acquisition (which he strongly supported). He was also involved in direct discussions and negotiations

---

[29] I was told nothing about the reasons for the choice of Mr Lane, nor about Mr Lane's experience, though I gathered it to be in software.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

with Dr Lynch. He was selected by Mr Apotheker to be one of the three persons (the others being Mr Apotheker and Dr Lynch) who were to be joint heads of an integration committee which was to be established to steer the Acquisition and realise its objectives and the synergies that were its primary rationale.

166. Mr Robison provided a witness statement which was admitted as hearsay, but, on the basis of medical problems, he did not give evidence otherwise. His witness statement also bore hallmarks of being over-lawyered, especially when stating what his reaction would have been to various hypotheses put to him.

167. Ms Catherine Anne Lesjak ("Ms Lesjak") had been appointed as an interim or caretaker CEO of HP for three months during the search for a replacement for Mr Hurd who had been removed in connection with allegations about expenses. At the time of the Acquisition she was Executive Vice President and Chief Financial Officer ("CFO") of HP. She was not on HP's board. When HP separated into Hewlett-Packard Enterprise Company and HP Inc in November 2015 she became CFO of HP Inc. She stepped down from that role in July 2018 to become Interim Chief Operating Officer. She has worked for HP companies for more than 30 years.

168. Ms Lesjak's evidence in her witness statement was that she agreed with HP's strategy of expanding its software business. But she was never persuaded by Mr Apotheker's approach. In particular, she had *"reservations about the timing and price of the proposed acquisition, particularly with respect to how stockholders might react and other challenges facing the Company."* There was considerable antipathy between them. Mr Apotheker wanted to remove her, and her job ultimately depended on his failure as CEO.

169. Ms Lesjak was too invested in and loyal to HP to be a reliable witness. She was over-defensive and had a variable recollection of events, especially when they appeared to reveal inconsistency on her part, or to suggest that she must have known about matters that HP claimed had never been disclosed such as Autonomy's hardware sales. She tended to speculate on documents but almost invariably in favour of HP's position.

170. Mr Manish Sarin ("Mr Sarin") was a Senior Director in HP's SCD team from 2010 to 2012 (when he left HP). Mr Sarin had a background in banking (beginning in 1999 when he worked for JP Morgan as an Associate, with employment thereafter by Wells Fargo from 2003 to 2005, and then Merill Lynch & Co where he was promoted to Director in its Technology Investment Banking group). He is no longer employed by HP and he sought to present himself as an independent witness.

171. He was on the software side of the Corporate Development team. He worked with Mr Andy Johnson (whom Ms Lesjak routinely referred to as "Andy" and who was head of Corporate Development), Mr Bill Veghte (who was prior to the Acquisition Executive Vice President of HP's own Software division) and Mr Brian Humphries (Mr Johnson's predecessor as head of Corporate Development, until March 2011).

172.    In that role, Mr Sarin was heavily involved in the due diligence exercise prior to the Acquisition, and the evaluation of the potential benefits it could bring HP. He considered that Autonomy *"appeared to be an attractive asset and a great fit for HP at all stages of the acquisition process"*. That view was based, he said, on Autonomy's published information, oral information provided by Autonomy's management directly to HP, and the material disclosed to HP during the acquisition process. His evidence was that he was not aware of any of the matters now impugned in these proceedings.

173.    His evidence covered a number of areas of importance, including (a) the processes followed by HP for acquisitions in general and in respect of the Acquisition in particular, (b) how HP came to focus on Autonomy as a target, (c) HP's earlier consideration of a number of other targets, (d) HP's valuation methodology and use of a DCF model both generally and in the particular case of Autonomy, (e) how the DCF model was built up in the case of Autonomy, (f) how synergies were valued, (g) the planning for and the various meetings prior to and during the due diligence exercise, and (h) the process of deliberation about the proposed acquisition and its approval. His witness statement also included paragraphs setting out his view as to how knowledge of the matters alleged by the Claimants would have affected the valuation of Autonomy, and the decision to proceed with it.

174.    Mr Sarin attended trial and was cross-examined. He struck me as intelligent and confident, but over-defensive of his role in due diligence and the limitations of it he accepted at the time.

175.    Mr Andrew Keir Markham Gersh ("Mr Gersh") is a partner in KPMG LLP in the USA. He joined that firm in 1999, and became a US Certified Public Accountant in 2002. He has retained his licence as a UK accountant but cannot perform audits or accounting services in the UK. He was familiar with software revenue recognition and US GAAP. In 2011-2012, he was also familiar with IFRS (including its revenue recognition principles) but his primary experience is with US GAAP. Between 2004 and 2011 he worked on at least 50 financial due diligence engagements for HP, working on all of them in conjunction with HP's SCD team and Enterprise Financial Reporting ("EFR") team.

176.    He was first contacted to perform financial due diligence on Autonomy on 22 July 2011 by Mr John Blank in HP's EFR team and was told the next day that they would likely have until 15 August to perform financial due diligence procedures. He did not regard that as unduly rushed or unusual. His evidence addressed (a) whether he, his team or HP had any knowledge before the Acquisition that Autonomy was making substantial sales of 'pure' hardware (as distinct from hardware pre-loaded with Autonomy software), which he insisted none did; (b) whether Autonomy's published information disclosed such 'pure' hardware sales; (c) how the due diligence exercise was undertaken, and particular points of focus in the course of it; (d) Autonomy's other business lines, including sales through resellers ("VARs"), hosting arrangements and OEM transactions; (e) the constituents of Autonomy's revenue and (f) why KPMG never provided a final report.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

177. He was engaged also in a post-acquisition closing balance sheet project for HP to assist it in understanding Autonomy's closing balance sheet so that Autonomy's financials could be incorporated into HP's October 2011 financial reporting.

178. Mr Gersh was in the difficult position of having to explain why, despite being aware that Autonomy sold some hardware (and having been shown three contracts referencing hardware), KPMG (for whom he was the lead partner in the due diligence exercise) never asked Autonomy how much hardware it was selling. After much prevarication, and what the Defendants described as close to "nit-picking" he eventually had to admit that they did know that Autonomy was selling hardware and had simply assumed that the hardware sold was *"a component"* of sales of software and were thus sales of appliances. (Yet, for example, none of the three contracts appeared to be such sales of appliances.) Both his witness evidence and his oral evidence when cross-examined seemed to me to reflect over-lawyering, and the fact that (so he acknowledged) he had previously given evidence (on 6 and 13 April 2018) in the US criminal trial, had had 5 to 10 meetings with US government lawyers, and had met with HP's lawyers at least 5 times also.

*The development of interest culminating in a bid*

179. Mr Apotheker first met with Dr Lynch on 12 April 2011. This was the first of a very small number of direct meetings or conversations between Dr Lynch and Mr Apotheker before the acquisition was announced on 18 August 2011. These comprised:

(1) This initial meeting between Dr Lynch and Mr Apotheker on 12 April 2011.

(2) A meeting on 16 June 2011, which according to Mr Apotheker lasted 1½ - 2 hours.

(3) A meeting lasting a few hours in France in late July 2011.

(4) A call on 14 August 2011 when there was final discussion of the price.

180. The meeting on 12 April 2011 lasted about an hour. Dr Lynch was in the US on other business. This was really a chance for two CEOs of technology companies to come together and exchange views. Mr Apotheker formed a favourable opinion of Dr Lynch, considering him very knowledgeable and enthusiastic about Autonomy and its products. He could not remember the meeting in any detail, but according to his evidence they discussed trends in the industry, including unstructured data, amongst other things.[30]  Mr Apotheker

---

[30]Mr Apotheker also (initially hesitantly) suggested in this passage that he *"believe[d]"* Dr Lynch had said, in explaining *"how he was able to deliver these kinds of results"*, that Autonomy was a *"very focused pure play software company"*. At §38 of his witness statement Mr Apotheker said that Dr Lynch had spoken of its *""pure software" model"*. When cross-examined he explained his understanding of this to be that *"it's a company that tries to do as much software as it possibly can, to the exclusion of everything else"* and subsequently that Autonomy's *"business model is essentially*

thought that nothing really concrete was discussed in relation to a possible partnership between HP and Autonomy.

181. The SCD group also provided a presentation about Software AG (code named "Singapore"). The graphic showed that Software AG offered very different capabilities from those offered by Autonomy, with hardly any overlap.[31]  Mr Apotheker said that he would have regarded Software AG as a "pure software" or "pure play software" company, although it had a more significant services business.  Its anticipated operating margins, at 28% by full year 2016, were far lower than Autonomy's, but still regarded as "strong" in the executive summary at p.3. (In a similar presentation on TIBCO, it was estimated that operating margins would reach 30% by 2015 and that was also regarded as "strong").

182. Present at HP's finance and investment committee were Mr Apotheker, Ms Lesjak, Mr Johnson and Mr Robison.  They supported the continued assessment of the potential acquisitions. The minutes of the 25 May meeting record the following, under "M&A update":

> "The Committee also discussed HP's focus on larger scale acquisitions like Atlantis and Singapore to enhance HP's software portfolio around enterprise information management (EIM), analytics and digitization.
>
> ...
>
> The Committee noted its support of management's ongoing assessment of the strategic rationale surrounding executing the acquisitions discussed."

183. The view was, however, that HP should make the Autonomy acquisition first, and undertake the Software AG acquisition after the Autonomy acquisition. See Mr Johnson's email of 28 May 2011 to Mr Veghte and others:

> "Board meetings went well.  There is some desire to do Singapore after Atlantis so next step is Shane is going to meet Atlantis CEO in London next week to test his desire to engage and then also meet with Singapore's CEO the following week to keep him warm."

*HP's outlook and objectives*

---

*driven by software and software only"*. The Defendants submitted that this is likely to be something suggested to Mr Apotheker, and his repeated statement that this was something he "believed" had been said indicated that he did not in fact recall it, and it is unlikely that anything of this kind was said.  I return to this later.

[31]As Mr Apotheker agreed, Software AG was strong in process management.  It was not operating in the unstructured data field, nor doing search or content analytics.

184.    By the end of May 2011 HP's thinking was accordingly as follows, as Mr Apotheker expressly accepted:

(1) First, HP had reached the view that unstructured data was important and a growing part of the software market, and that HP had a limited number of capabilities in that field.

(2) Secondly, HP considered that Autonomy had cutting edge and widely-accepted software which had become an industry standard for analysing and managing structured and unstructured data.

(3) Thirdly, Autonomy was also attractive in view of the fact that HP owned Vertica, and had SQL database technology, a data management system used primarily by stock exchanges, telecommunications companies and banks for online transaction processing.

(4) Fourthly, HP thought acquiring Autonomy would enable HP to combine the unstructured software expertise with its own products and offer an attractive product to the market (the integrated or unified information stack).

(5) Fifthly, HP saw the acquisition as potentially transformative for HP.

185.    The deal sponsors at HP were particularly excited about the potential synergies that could be achieved. Mr Apotheker's evidence in cross-examination confirmed this:

> "Q.    Of course, but what was driving it from your perspective was the synergies that you could make out of this acquisition, wasn't it?
>
> A.    Yes."

186.    HP produced various valuations of these synergies, ranging as high as $30bn. The Defendants submitted that emails in July through September 2011 demonstrate that Mr Apotheker's focus at all times was on the synergies that could be created, and the considerably increased revenues and margins which would result were what drove the deal, rather than the stand-alone value. (This is of considerable relevance to the quantum of loss if liability is established).

187.    The Defendants suggested that this may in part explain Mr Apotheker's evidence (to which I must also return later) that although he read Autonomy's 2010 annual report, he did not read Autonomy's 2011 quarterly or half-yearly releases at all. By July 2011, the 2010 annual report was already 7 months out of date. The Defendants posited that the fact that he did not read the 2011 quarterly or half-yearly releases demonstrates that the detail of Autonomy's trading results and metrics were not of great interest to him: what most mattered to him was Autonomy's technology and its potential as a transformative business.

*Development of Deal Models and valuations*

188.  During the summer of 2011, HP's SCD group worked on various DCF valuations of Autonomy.  These (which the Claimants called *"Deal Models"*) were prepared by Mr Sarin and his team and their objective was to assess the standalone value of Autonomy.  An initial version had been prepared as early as February 2011, and Mr Sarin explained that the valuation went through various editions until 18 August 2011. The elaboration of the valuations is addressed later.

189.  By the end of June 2011, both Mr Apotheker and Mr Robison were plainly very enthusiastic about Autonomy as a business.  Their focus was on the technology and how it could be combined with HP's assets. Mr Robison wrote to Mr Apotheker on 29 June 2011 referring to a *"REALLY good meeting today"*.  Mr Robison wrote:

> "*This is our deal if we want it.  Mike needs to be in a clear leadership role which I think is a GOOD thing.  I would fold Vertica into this going forward and have a REAL leadership position on a combination of search and analytics.*"

190.  Dr Lynch had also concluded by this time that Autonomy was a good fit for HP's vision. The combination of HP, their sales force and the Vertica database with Autonomy and its IDOL technology was a sound strategy.

191.  Nonetheless, at this stage Dr Lynch still considered it was only possible, rather than probable, that HP would make an offer for Autonomy: he did not consider an acquisition as a real possibility until the meeting with Mr Apotheker in Deauville on 28 July.  As he said in cross-examination,

> "*Remember a price hasn't even been agreed at this point and so, in my experience, you often have these kind of meetings and then a lot of them will fall away when a price is discussed and then a lot of them will fall away after an attempt to renegotiate the price, after due diligence.  So when you get to this stage, you probably have a 10% chance of a deal.*"

*HP's fear of a rival bidder and a takeover battle*

192.  One of the threats perceived by HP and its advisers was the emergence of a rival bidder. Throughout the process of analysis, and until the announcement of the bid, HP was concerned that another bidder might emerge, which would turn any deal between HP and Autonomy into a public takeover battle.  This risk was referenced in Mr Apotheker's email to Mr Robison of 18 June 2011:

> "*Atlantis CEO wants to do the deal with HP and he believes that we are the ideal partner. The concern is an interloper that will turn the deal into a public take over battle with a chance that Atlantis would be in the wrong hands. We should work with a true specialist in local take over*

HC-2015-001324

> *practices and we can count on Atlantis support to help structure this in the best possible way."*

193.  On 24 June 2011, BarCap gave HP advice on how to avoid a contested takeover, in a presentation headed "Project Plato – Deal Protection Considerations". This was circulated by Andy Johnson, whose covering email stressed the importance of working closely with Dr Lynch:

> *"Given Michael Lynch's ~ 8.5% ownership of Atlantis; board control and critical role as the founder / visionary / CEO-absolutely important to get his buy-in. HP enters into a hard irrevocable with him whereby he pledges his shares to HP (through a call option program). He also needs to have a very strong view about other buyers i.e. "not selling to anyone else"."*

194.  The presentation itself noted the need for HP to move rapidly and offer a strong price. It recommended that "*With full Target CEO backing and Target Board support Hercules should move rapidly to formalise an offer and try to avoid a leak*", and again stressed that the "*Support of CEO is key to securing Atlantis*".

*Progression of the deal towards an offer*

195.  There was a further meeting between HP and Autonomy personnel on 29 June 2011. Dr Lynch, together with Mr Hussain, Mr Kanter and Dr Menell met with representatives from HP's corporate development, software and cloud services teams to discuss how HP and Autonomy might be able to work together. The 29 June 2011 meeting was a high-level strategic discussion about how HP and Autonomy could work together; it was not the forum for the provision of non-public information and there was no specific discussion at the meeting about price.

196.  After the meeting, Dr Lynch had a private dinner with Mr Robison. The dinner was an opportunity for the two individuals to get to know each other and to discuss technology and the future of the technology industry. The meeting was around three hours long. It was attended also by (amongst others) Mr Sarin and Mr Jerome Levadoux (a Vice President in HP's Products, Information Management and Analytics group, and a former employee of SAP), both of whom made a note. Nevertheless, there was a dispute as to what was said:

(1)  Mr Sarin accepted that this was a general introductory meeting, and that Mr Robison had been very positive.

(2)  While Mr Sarin's notes record some discussion about the level of premium normally payable on a UK acquisition, he accepted that it was possible that was an internal HP discussion after the meeting.

(3)  The point most disputed was Mr Sarin's evidence in his witness statement, that he thought Dr Lynch had described Autonomy as a "*pure software*" company. This was not something reflected either in his or

Mr Levadoux's notes, and Mr Sarin's memory about what happened at the meeting outside the notes was poor. He said in evidence that he took the phrase *"pure software company"* to mean that Autonomy *"was a company that was predominantly software, sold a small number of appliances and was one of the more scaled businesses in the software industry"*. The Claimants relied on this as support for their claim that Autonomy was sold on that basis; the Defendants rejected this as contrived and pointed out that Mr Sarin gave no basis for this very elaborate meaning. Although that elaboration does appear to me to be lawyer-crafted, it will be seen later in this judgment (see paragraphs 3878*ff*) that I have concluded that it is more likely than not that Dr Lynch did describe Autonomy (including to Mr Sarin) as a *"pure software company"* or *"pure play software company"* with the intention and effect of conveying a special selling point, the success and self-sufficiency of Autonomy's software business without the need for other revenue streams.

197.   On 7 July 2011 Mr Apotheker asked the corporate development team to think *"aggressively and creatively"* about synergies. Mr Apotheker sought in evidence to underplay this, suggesting that this was *"just one exercise"*, that he wanted to *"see how far we could stretch it"* and there was also a very pessimistic scenario. However, the contemporaneous documentation does not support this: Mr Apotheker was asking for more synergies because he wanted the FY14 revenue to be *"much higher than $2.18"* billion dollars. Dr Lynch cited an instant messaging conversation between Mr Sarin and Mr Levadoux, which ran as follows:

>   *"[Sarin:] Leo has given some directional feedback*
>
>   *[Levadoux:] You want to call me now for 5 minutes? on my cell? I actually called HPK so I have some feedback too ...*
>
>   *[Sarin]: we just need to come up with more synergies*
>
>   *i don't have too much more color*
>
>   *he wants the FY14 revenue number to be "much higher than $2.18", which is where it is today".*

198.   Consistently with that, Mr Apotheker also asked Mr Risau (his Chief of Staff who had been COO at SAP, and CFO of a division but who was not part of the SCD group within HP) to look at synergies.

199.   Mr Apotheker was not the only one pushing for higher synergies. A little earlier, according to a message from Mr Levadoux sent on 2 June 2011, Mr Bill Veghte (then Executive Vice President, HP Software) had *"challenged us to*

*think how we can turn this into a $5B business (versus current assumption of $2B-$2.5B by 2015 with synergies)".*[32]

200.    The SCD group prepared a further valuation in July with new figures for synergies. A tab named "Waterfall" in this spreadsheet posited a standalone value of $10.324bn. The identified synergies brought the value with synergies to $27.835bn. Mr Sarin described this in his witness statement (reflecting the filename of the relevant valuation model) as "*the "aggressive" synergy case*", and said that he thought it was not included in any of the decks subsequently provided to the board. In fact, certain revenue projections (of revenue, gross and operating profit, gross and operating margin, net income and net margin and EPS) which were modelled on "*Divesting Poseidon* [HP's Personal Systems Group] *and winning in the Big Data Analytics market*" were included in the deck presented to the board at its meeting in July 2011, as Mr Sarin accepted in cross-examination, although he also maintained that he only subsequently became aware of this when it was pointed out to him when he was preparing for his cross-examination. This was known either as the "*aggressive synergy case*" or as the "*Transformational case*"

201.    Mr Apotheker's presentation to the Board did not address valuation; but it did refer to the possibility, under what he referred to as the "*transformational case*", of total revenues of $6 billion in 2014. That compared to a base case projection of revenues in 2014 of $2.2 billion. Mr Apotheker had asked the SCD to model what the total value of Autonomy inclusive of synergies would have been on the basis of that "*transformational case*" and revenues of $6 billion, which had led to a DCF valuation of $46.589 billion (including synergies of $30 billion). Mr Robison had commented that he thought that this figure, which was premised on HP "*winning in the Big Data Analytics market*", "*may be a bit much*", and that more work would be required "*to make sure this is credible.*" I accept that the $46 billion valuation was never shown to the Board.[33]

202.    HP's growing enthusiasm for the acquisition exacerbated apprehension about the threat of a rival take-over bid from an "interloper", in particular, Oracle. On 15 July Mr Robison provided Mr Apotheker, Ms Lesjak and others with summary points drawn up by Mr Johnson from an "Interloper Analysis" prepared by BarCap. The analysis had addressed how Oracle might interfere with HP's process. One of the points made related to due diligence. Mr Johnson wrote:

---

[32] The references to numbers were to revenues.

[33] Mr Apotheker told the Board of HP at the time that the business case for the Acquisition hinged on synergies. In an email to Mr Lane dated 5 September 2011 (and thus after the Acquisition, abut before his removal as CEO) Mr Apotheker reminded him that "*Autonomy makes total sense if one believes that HP can generate the synergies we build into our business plan. The quality of the synergies is high: you will remember that they exclude any drag-on revenues related to additional hardware sales and we only included a very small drag-on effect for services. All the other synergies are driven by leveraging the IDOL platform, combining it with HP IP/R&D, deeper penetration of existing markets and significant and identified upsell/cross sell opportunities...I for one, and so does my team, firmly believe that we can achieve these synergies in the allotted time frame.*" The email chain was forwarded to Ms Whitman by Mr Lane on 25 September 2011 (after Mr Apotheker had been removed).

> "*O* [i.e. Oracle] *can say they are interested after we announce and get access to all the diligence we have received so the takeaway is to be careful about our diligence so we don't enable O to get a deep dive on sensitive data.*"

203.    Later, on 27 July, Mr Robison provided Mr Apotheker with a presentation from BarCap on Oracle's usual M&A processes, again reflecting HP's concern about a competitive bid from Oracle.

*Consideration of potential offer by HP s board and their financial advisers*

204.    HP's board held a strategy meeting on 19 to 21 July 2011.  This was a crucial meeting for HP because it was deciding on its future strategy.  Mr Apotheker and Mr Robison were recommending not only the acquisition of Autonomy, but also the hiving off of the PC business (referred to as the "PSG" personal services group), amongst other things.  The PC business had been part of HP's DNA.

205.    As to Mr Apotheker's presentation to the board:

(1) In line with earlier documents, his proposal was that: "*HP will be the leading provider of information solutions on-premise and in the cloud.*" The value proposition included "*Disruptive business intelligence and big data analytics stack.*"

(2) He advised the board that decisions needed to be made urgently, or immediately:

> "*Current challenges and timing pressures force some*
>
> *immediate choices- Management recommendation*
>
> • *Shift portfolio mix towards higher growth, higher margin businesses (e.g., Software)*
>
> • *Decrease exposure to commoditizing, low-margin end-user devices*
>
> • *Decrease dependency on consumer markets; focus on commercial…*"

(3) The first bullet point related to the Acquisition; the second and third to the hiving-off of the PSG business.  The rationale for "*acquiring [Autonomy] now*" was set out in the document.  The aim was to build a leading position for HP in enterprise software with the acquisition of Autonomy.  Mr Apotheker's presentation explained about the creation

of a data stack involving structured and unstructured data, and combining Autonomy's business with Vertica and HP's assets:

> *"Legacy business intelligence paradigm is shifting to "big data" paradigm*
>
> *-  Explosion in volume and types of data sets (primarily unstructured) not suitable for traditional relational databases*
>
> *-  Increased focus on integrating structured and unstructured data to enable richer, more actionable insights*
>
> *- Shift from historical analysis (reporting dashboards) to predictive analytics*
>
> *- Growing demand for real-time analytics*
>
> *The combination of Atlantis, Vertica, and HP's Open Source Database provides HP a disruptive data stack*
>
> *- Atlantis is the equivalent of Google for unstructured data (de-facto standard platform among Original Equipment Manufacturers for unstructured data analytics)*
>
> *- Vertica is an in-memory, compressed columnar database that can run real-time analytics on big data*
>
> *- HP is creating an open source database (based on our non-stop architecture)*
>
> *- The combination of these assets enables HP to integrate structured and unstructured information and enable enterprise search & discovery, content management, and real-time analytics on big data*
>
> *HP can build a leading position in Enterprise software via Atlantis acquisition"*

(4) The analytics market that HP was targeting was estimated as being a $31bn market.

(5) The board were told that Autonomy was the best option, having been tested against other potential candidates: Software AG and TIBCO were specifically identified (by code name) as other candidates which had been evaluated.

(6) The board were provided with Mr Apotheker's financial projections for the "transformational case" (including both the Autonomy acquisition and the PSG divestiture). The 2014 projections were based on the $6.1bn figure for Autonomy revenue (with synergies) that Mr Apotheker had previously targeted and which the SCD group had provided for him. When cross-examined, Mr Apotheker accepted that he thought that this was realistic, and that a statement in his witness statement (which he had repeated earlier in his testimony) that the *"more aggressive scenarios"* formed no part of the business case presented to the board were *"obviously"* inaccurate. However, he stressed that this was *"the theoretical potential highest number that we could achieve"* and assumed *"winning in the Big Data Analytics market"*: the *"base case"* forecast $2.2 billion of revenues in 2014 (taking into account expected synergies).[34]

(7) Mr Apotheker's proposal was to announce the intention to divest PSG simultaneous with the announcement of the Autonomy acquisition in mid-August. This was intended to coincide with the announcement of HP's Q3 results.

(8) The proposal was that in the following 6-12 month period HP would "*evaluate additional software targets such as [Software AG] and [TIBCO]*".

206.   Perella Weinberg Partners were one of the two banks advising HP at the time. Mr Apotheker considered them competent and good at their job. They also made a presentation to the board. Perella Weinberg endorsed the strategy, and agreed that the intention to acquire additional software capabilities was critical to fulfil HP's vision and drive margin and growth. In their executive summary (dated 20 July 2011) their advice began as follows:

> *"We believe Hawk's strategic vision of leveraging Cloud, Connectivity and Software to provide seamless, secure and context-aware computing to enterprises and consumers as articulated in March is credible and well-conceived*
>
> - *Company's stated intention to acquire additional software capabilities is critical to fulfill its vision and drive margin and growth".*

---

[34] It was the lower figure of $2.2 billion forecast revenues in 2014 which was used as the input for the DCF valuation, which attributed a stand-alone value to Autonomy of $10.3 billion and a value inclusive of synergies of $17.6 billion.

207.    Mr Apotheker told me that he agreed *"essentially"* with this assessment.

208.    Perella Weinberg also noted that HP's management had reviewed other M&A targets but few were "truly transformational", unlike the Autonomy acquisition.

209.    Perella Weinberg also noted HP's current difficulties, which put it in a "*precarious position*":

> *" Hawk is currently in a precarious position*
>
> *- Recent underinvestment has weakened Company's innovation credentials*
>
> *- Significant headwinds across multiple businesses; management changes and departures*
>
> *- Undermined investor confidence and credibility following two revisions of earnings guidance; uncertainty regarding Q3/4 and FY2012*
>
> *- Business will require considerable time to turn around*
>
> *- Current Hawk market valuation at bottom compared to peers, significant discount to sum-of-the-parts valuation"*

210.    According to Mr Apotheker, the reference to "*uncertainty regarding Q3/4 and FY/2012*" arose because "*it appears that HP's forecasting capabilities and abilities under the CFO were not very good*". He told me that he considered that "reality" had proven the CFO to be *"very bad at forecasting revenues"*. It appeared that there were tensions even at this stage between Mr Apotheker and Ms Lesjak (the CFO); and a little later, she and Mr Apotheker had a serious falling out with pivotal repercussions, and he considered her to be trying to undermine him and the transformational project from the beginning. Mr Apotheker also complained about the inaccuracy of Ms Lesjak's "flashes" (which he explained are forecasts of an immediately expected result).

211.    Mr Apotheker agreed that the business would take a considerable time to turn around. The margins of the PC business were as high as they could ever get and could only deteriorate. The services business was also low margin and HP's corrective measures would take a long time. More than 70% of HP's revenues were accordingly either deteriorating or only very slowly improving.

212.    Perella Weinberg also explained why the release of the Q3 results was an important "catalyst", and it was advisable to announce the acquisition at the same time as releasing the results, which were anticipated to be poor. Mr Apotheker also thought this was a good idea. The executive summary made the

following points.  Mr Apotheker agreed with all of them at the time (save that he did not confirm his agreement to the last point):

> *"Release of Q3 results potentially an important catalyst*
>
> *-  Results will be heavily scrutinized*
>
> *-  Financial business initiatives (e.g., share repurchases) are unlikely to address business fundamentals*
>
> *-  Likely to prompt revision of FY2012 estimates and price targets*
>
> *-  Pressure on share price potentially significant*
>
> *-  Increased risk that vocal/activist shareholders come forward with public challenge/criticism and/or specific suggested strategic initiatives (e.g., break-up)*
>
> *- Potential threat of contesting board seats and/or proxy challenge".*

213.    Perella Weinberg considered that HP would find it hard to "execute out" of this predicament on a timely basis, a point that Mr Apotheker agreed with. They also considered that in the near-term HP could not organically or incrementally address its fundamental challenges in a meaningful way.  Mr Apotheker thought that this might have been possible, if HP had been given enough time, although this was something that the markets would react negatively to. Thus it was never anything he suggested to the board and as he said in cross-examination he "*shelved that idea"* in his own mind.

214.    Perella Weinberg made further recommendations with which Mr Apotheker also agreed, including the divestiture of the PSG group, and the announcement of that with the Q3 release.  They also recommended that HP pursue the Autonomy acquisition expeditiously as a "*critical offensive move*" and a "*unique opportunity to reposition [HP] as the undisputed leader in context-aware computing*".

215.    Perella Weinberg also adverted to the interloper risk, stating:

> *"Given UK takeover framework and potential interloper interest, the acquisition of Atlantis is not without risk; however, strength of Hawk's strategic rationale and value creation potential provide for very competitive positioning and firepower".*

216.   The Defendants suggested that this was a reference to HP being in a position to knock out the competition with the size of its bid. Mr Apotheker thought that was one way of looking at it, but that another way was that another interloper (such as Oracle) with *"overlapping interests"* might have to divest or restructure and would thus not be able to make the same kind of offer.

217.   However, Perella Weinberg also warned of the impact on the investor community and the real possibility of a hostile reception.

   (1) First, they warned that the markets could react badly to the announcement:

   > *"Confluence of Q3 and FY 2012 prospects, portfolio realignment and pro-forma impact potentially dislocating share price temporarily"*

   Indeed, Mr Apotheker confirmed that this was actually his expectation.

   (2) Secondly, they advised that the changes could "*catalyze fundamental re-rating*" and shift HP's shareholder base towards a more growth oriented profile i.e. moving away from value investors to growth investors, which as Mr Apotheker acknowledged would be good for HP.

218.   Perella Weinberg in addition stressed the importance of flawless execution and management devotion to the integration and transformation:

   > *"Combination of persisting challenges in existing core businesses, extraction of Poseidon and integration of Atlantis would demand flawless execution and significant senior management bandwidth while integration and transformation progress remains under heightened public scrutiny".*

219.   As Mr Apotheker put it:

   A.    *A proper integration plan, a proper extraction plan of the PC business, execute this to close to perfection and while at the same time continuing to run the existing business.*

   Q.    *So it would be important for management to make these changes a top priority?*

   A.    *Well, it would mean that management would be basically focused on these two changes, making sure that the existing business continue -- or the remainder of the business continues to run as well as possible. There were other changes that were required and all of this has to happen in [a] nicely synchronised way and would have been a lot of work.*

220. Mr Apotheker thought that he was the man to carry out this dedicated integration work, along with Mr Robison and the team. As elaborated below, in the event, shortly after the bid, and before the Acquisition had completed, HP jettisoned Mr Apotheker and Mr Robison, and according to the Defendants, did not give the integration anything like the priority and focus that Mr Apotheker and Perella Weinberg had envisaged.

221. After Mr Apotheker and Perella Weinberg had made their presentations on 20 July 2011 there was a board discussion. The board authorised Mr Apotheker and other members of management to pursue the Autonomy acquisition (code-named Project Tesla) with a maximum price of $11.7 billion. This was substantially in excess of HP's stand-alone valuation of Autonomy of $10.324 billion. (The same valuation showed an aggregate value plus synergies of $17.596 billion.) It was also at a significant premium to Autonomy's market capitalisation. The board also authorised Mr Apotheker and Mr Robison *"and other members of HP management"* to assess the potential divestiture of the PSG group (code-named Project Hermes), with a view to announcing this (if approved by the Board) at the Q3 earnings announcement.

*Negotiation of the price*

222. There were two phases of the discussions about price. The first was in July 2011. The second was in August 2011. Certain parameters framed HP's approach:

(1) First, HP realised that they needed to pay a substantial premium over market capitalisation in order to secure the asset. They also perceived that they needed Dr Lynch's support for the acquisition to go ahead: they had no appetite for a contested bid, and they wanted him to stay on after the acquisition.

(2) Secondly, HP knew that (assuming Autonomy's financial position, performance and prospects to be as depicted in its published information) Dr Lynch would not go below £25 per share. He had made that clear, and seemed in no hurry to sell.

(3) Thirdly, HP had determined that Autonomy "uniquely" offered the transformational opportunity that HP needed, and that HP could not delay. HP were prepared to pay a price above Dr Lynch's floor even after Autonomy's share price had declined, such that the implied premium increased from that implied by the range of values originally agreed with Dr Lynch at the end of July.

(4) Fourthly, HP were not wedded to obtaining any particular proportion of the expected synergies on an acquisition, and had been prepared to cede 53% of their anticipated synergies in the proposed acquisition of TIBCO.

(5) Fifthly, HP wanted to avoid competitive bids. They were worried that there would be interlopers, including Oracle, and were prepared to pay a "compelling price" to forestall a bidding war.

*July 2011 negotiation*

223.    Mr Apotheker recognised that he would have to pay a *"control premium"*, which would in the ordinary course be "*at a bare minimum*" 30%, and could be significantly higher *"depending on the quality of the asset"*.

224.    He emphasised that he looked at two things: (a) present value as a stand-alone business and (b) synergies to be expected in the future. The acquiring company would wish, of course, to retain as much of the synergy value (which equally obviously depended on its own assets and effort) as it could. The company proposed to be acquired would regard synergy value as justifying a higher price (i) because of its value to the acquiring company, for which it ought to be willing to pay and (ii) because the value that it can provide is a valuable attribute of the business which should also be reflected in the price.

225.    Mr Apotheker met with Dr Lynch in Deauville on 28 July 2011. It is common ground that they discussed the following:

(1) The strategic rationale of the deal.

(2) The integration of Autonomy, which would involve Autonomy being a semi-autonomous company within the group. Mr Robison had made it clear that if Autonomy was integrated into the greater HP group, the "*immune system*" of HP would kill Autonomy off and the value would be lost, as in other acquisitions.

(3) Dr Lynch's role, which would involve him being in charge of the software assets of HP, including the Vertica business. This was appealing to Dr Lynch, given his passion for Autonomy's software and the technological synergies that could be created in combination with HP.

(4) Mr Apotheker confirmed that at this meeting they agreed that Dr Lynch would become head of HP's software business in place of Mr Veghte.

226.    The position from Dr Lynch's perspective, based on his first witness statement, can be summarised as follows:

(1) He had not been looking for a sale[35], but HP's proposition was exciting. As regards his personal position Dr Lynch was already a successful and wealthy man. He had already sold a large part of his shareholding in Autonomy over time.

---

[35] As I explained earlier, HP did not accept this. Part of their case was that Dr Lynch had planned a sale with the encouragement of Mr Frank Quattrone and his boutique investment bank called Qatalyst Partners, which from late 2010 was "shopping" Autonomy to the *"potential acquirer universe"* including HP.

(2) However, he thought that Autonomy was a potential takeover target in any event, and had been advised as such by Mr Quattrone towards the end of 2010. If HP were to offer a premium of 60% or more, Dr Lynch knew that resistance to an offer would be very difficult.

(3) Having met with Mr Apotheker and Mr Robison, Dr Lynch saw HP as an attractive bidder. He could see the merit in the potential combination with HP and the integration of Vertica, and access to HP's much larger sales channels could take Autonomy to a higher level: HP could provide the firepower for Autonomy to take on competitors such as Oracle.

(4) After Mr Apotheker and Mr Robison explained to Dr Lynch that they would want him to stay on, and to lead Autonomy as a semi-independent company under HP's aegis, Dr Lynch expected to be working with HP during the years after the takeover, continuing to develop Autonomy's business as part of a larger group.

227. Price was discussed at this meeting for the first time. Dr Lynch had been pressing for £27 per share. It was agreed that if HP was to acquire Autonomy, HP would need to offer a price in an agreed range. Dr Lynch's recollection was that this range was between £25.50 and £26.50 per share. Dr Lynch considered that management would not have the ability to resist a deal within that range and Dr Lynch would recommend such an offer to shareholders.

228. Dr Lynch's unchallenged evidence is that:

(1) First, he was not willing to recommend the sale to Autonomy's shareholders unless they were getting what he believed they deserved, which needed to be an exceptional offer which accounted for the bright future of the company.

(2) Second, that as Mr Robison and Mr Apotheker knew, Dr Lynch would not be willing to support a bid below £25 per share.

229. Moreover, from HP's perspective, it was a condition of any offer that Dr Lynch would recommend the bid: they were not willing to embark on a hostile takeover without him; it would have been impossible to put Dr Lynch in charge of the business if he had not recommended it; and the whole thing required his agreement. This is borne out by events in August, when HP were considering the renegotiation of the acquisition price in light of falls in Autonomy's share price.

230. As previously explained, HP were at all times conscious of the interloper risk. Part of their strategy for dealing with that risk was to make a compelling offer, which was the "*highest logical price that still made sense in order to discourage everybody else*".

231. On behalf of HP, BarCap prepared a draft Letter of Intent dated 28 July 2011 which set out the strategic rationale for the sale as follows:

> "As the business intelligence paradigm shifts to "Big Data",
> real-time and predictive analytics, we believe a unified analytics
> solution can be built around HP's technology assets coupled
> with Autonomy's structured and unstructured capabilities. In
> addition, we believe there will be opportunities to leverage HP's
> global channel relationships and technology assets with
> Autonomy's solutions to deliver end to end information lifecycle
> management and content analytics solutions tailored to various
> industry verticals and lines of businesses."

232.    The draft letter stated: "*HP would be prepared to make an all cash offer to
acquire the entire issued and to be issued share capital of Autonomy at a price
of between £24.94 and £26.94 per share*."

233.    Dr Lynch commented that:

> "At this range, I knew management would have no ability to resist HP's
> offer. This was precisely the scenario Mr Quattrone predicted toward
> the end of 2010, when we discussed market changes and the need to take
> defensive steps against a bid taking advantage of the US-UK valuation
> differential. A premium of over sixty per cent (60%) to the London
> market price would inevitably lead to the company being sold. Whether
> we liked it or not, Autonomy was "in play" as an acquisition target."

**HP's Due Diligence and KPMG**

*Summary*

234.    HP's agreement to the deal was subject to due diligence.  HP's due diligence
took place from 1 to 18 August 2011.  HP was assisted by KPMG and had
advice from two investment banks.  When asked about this process, Mr Sarin
described it as "*confirmatory due diligence*", that is to say, a process that took
place after the agreement on price:

> "You're trying to confirm certain things that you've made assumptions
> on, either in your model or your business case, your understanding of
> the business. And you recall before the July 29 meeting there was a letter
> of intent submitted to the Autonomy board of directors, so at some level
> there is an agreement on price so you are now digging into the details
> of what is this business all about? Does it sort of jive with our
> understanding of the business, just looking at information in the public
> domain."

235.    It was agreed to use oral discussions (by telephone) as much as possible to
minimise the generation of hard-copy materials that might have to be provided
to competing bidders under the Takeover Code.  There was a dispute as to
whether it was HP or Autonomy who asked for this.  Mr Apotheker insisted in
cross-examination that the request came from Dr Lynch and that HP agreed only

*"because we were respectful of Autonomy's desire to keep sensitive data out of the hands of competition"*. However, an internal HP email dated 15 July 2011 from Mr Johnson to Mr Robison headed *"Interloper Analysis"* suggests that, amongst other concerns as to *"how the O company might interfere with our process"* HP was much concerned about the possibility that Oracle might get access to *"all the diligence we have received so the takeaway is to be careful about our diligence so we don't enable O to get a deep dive on sensitive data"*. It seems to me likely, and I find, that it was a matter of joint concern and common interests, that HP raised the issue and Autonomy readily agreed.

236. Dr Lynch played a very limited role in the process. The Claimants do not advance any claim against him in respect of the due diligence process, or anything said to HP during it: although various misrepresentations were allegedly made by Mr Hussain in the process, none is alleged against Dr Lynch. It is, however, alleged that he made a representation about HP's ability to rely on Autonomy's accounts at a meeting shortly before due diligence began, on 29 July. Later in this judgment I address broader issues relating to inducement and reliance in the various contexts in which they require to be considered (and see, especially, paragraphs 478 to 522 on the tests of reliance applicable in FSMA claims; paragraphs 3236 to 3252 in respect of the misrepresentations concerning Autonomy's OEM business; paragraphs 3979 to 3988 in respect of the direct deceit/misrepresentation claims; and paragraphs 3944 to 4055 in respect of the FSMA claims); but the following should be noted in relation to the due diligence process itself.

237. First, the process was, in Dr Lynch's view rushed; but the timetable was set by HP. Dr Lynch's position was that at no stage did he attempt to inhibit the due diligence process. It was not disputed that Autonomy refused to make available Deloitte's working papers to HP: but Mr Gersh of KPMG advised and Perella Weinberg confirmed to HP that it would have been unusual if working papers had been provided in a transaction of this type. Further, Dr Lynch was content for KPMG to speak directly to Deloitte.

238. To the extent that HP did limit its exercise the Defendants suggested that this was their decision and it reflected two related facts:

(1) First, that HP was (at least until it had second thoughts) committed to the bid. The HP decision makers had relatively little interest in the outcome of the due diligence (at least in relation to financial aspects:[36] by contrast, technical due diligence, the solidity of the IP rights and the like were closely scrutinised).

(2) Secondly, HP was concerned about an interloper having access to Autonomy's information, which given HP's commitment to the bid was undesirable: that militated against a long process, especially since (as Mr Cooke explained at §10 of his (unchallenged) statement), due diligence in a public company takeover in the UK is relatively limited

---

[36] Mr Apotheker did not read the KPMG draft due diligence report on the financial aspects.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(in contrast to the acquisition of a private business) because of the Takeover Code requirement of equal access to all bidders.

239.    HP was able to ask for all the information it wanted to during the due diligence process:

(1)    HP was the buyer. It could ask any questions, or insist on any information, that it felt was necessary if it wanted to proceed with the bid.

(2)    HP and KPMG had access to Deloitte. They were able to ask Deloitte about all aspects of Autonomy's accounts.

(3)    From HP's perspective it was satisfied that it and KPMG had carried out all the due diligence they wanted to carry out.

(4)    HP was able to take advice from two investments banks, who were satisfied that the deal was at fair value.

240.    Secondly, the Defendants made three forensic points as follows:

(1)    It was always obvious to Dr Lynch that any acquiror would want to do due diligence, and would insist on all the due diligence that it considered that it needed, and ask any questions that it liked (which is exactly what HP did). They submitted that this makes it most improbable that Dr Lynch could have been involved in, or aware of, any fraud.

(2)    Similarly, it was always obvious that as the acquiror HP would have complete access to Autonomy's books and records after the acquisition. (Further, one would expect any competent acquiror to check its own books to see what business it did with the target, as well as talk to joint customers about what they bought from the target.) The Defendants submitted that in these circumstances, it would have been futile deliberately to conceal any of Autonomy's transactions.

(3)    In any event, it could never have been assumed in advance by Dr Lynch that due diligence would necessarily be limited. If, as the Claimants contend, he had been consciously involved in a misreporting of Autonomy's business, the correct position would have been expected to be revealed.

*Due diligence timetable*

241.    An internal HP preliminary due diligence timetable circulated on 30 July 2011 envisaged due diligence being conducted between 29 July 2011 and 18 August 2011, when there would be signing of the definitive agreement. Mr Apotheker's evidence was that *"the plan was to do proper due diligence, if possible, to finish it by the 18th"*. 18 August 2011 was the day on which the Q3 results were to be announced. In the event, due diligence did not begin until 1 August.

242.    Dr Lynch regarded this as an extremely rushed timetable: as he said, he had *"never seen a deal done at this speed"*. But in cross-examination he explained

that he thought the timetable was simply to motivate the team to get on with it: *"I thought they absolutely knew it wasn't going to happen…"*.

243.    On 3 August 2011, Autonomy and HP entered into a letter agreement by which Autonomy agreed not to solicit, initiate or encourage an offer from anyone other than HP, until midnight on 17 August.

244.    The Claimants' closing submissions depicted the period between 1 August 2011, when formal due diligence began, and 18 August 2011, when the Boards of both HP and Autonomy approved the deal – that is, HP's Board agreed that HP should make a cash offer for Autonomy's shares, and Autonomy's Board agreed to recommend the offer to its shareholders – as marked by intense activity by HP, Autonomy, and their respective advisers: for HP, BarCap, Perella, KPMG, Freshfields, and Gibson Dunn & Crutcher; for Autonomy, Qatalyst and Slaughter and May. Documents were uploaded to a virtual data room for HP's review; there were scheduled due diligence calls on particular topics; legal documents were negotiated; and HP planned its communications strategy. HP held daily internal due diligence update calls from 4 August.

*HP's approach to due diligence*

245.    HP's approach was plainly influenced by its perception of and anxiety to reduce interloper risk. This was further informed by advice in a paper (dated 15 July 2011) from BarCap on *'Potential Interloper Spoiling Tactics'*, which was attached to the internal HP email which I have referred to in paragraph 202 above, and from which Mr Johnson took the message to be careful about diligence so as not to enable Oracle to do a deep dive.

246.    To that end, the exercise was largely undertaken in a series of calls, between 1 August 2011 and 17 August 2011.

247.    Mr Apotheker explained[37]:

> "Q.    The fact is that HP itself structured the due diligence process so as to minimise interloper risk, didn't it?
>
> A.    Well, anybody who does an acquisition tries to minimise the interloper risk because that creates a lot of trouble, drives the price up and makes the acquisition much longer. So from that point of view, that is standard process. Everybody does that.
>
> Q.    So is that a yes?
>
> A.    Yes."

---

[37]  In this passage Mr Apotheker suggested that this was at Autonomy's request, but as he accepted, HP considered this a good idea. The documents show that HP itself was advised about limiting due diligence because of the interloper risk. Mr Apotheker accepted (in the passages quoted in this paragraph) that HP structured due diligence so as to minimise interloper risk.

248.    He added that while HP agreed to structure due diligence so as to address this risk, this did not mean that there was not proper due diligence:

> "*Q.    HP actually structured the way it went about doing due diligence in order to minimise this risk, didn't it? That's what happened?*
>
> *A.    Yes, in accordance to the UK takeover rules, in order not to disclose the target's sensitive commercial information or financial information, we agreed to structure the way we structured it. And if I just may add, that doesn't mean that we didn't do, or the team didn't do a proper due diligence, but I'm sure we'll talk about that.*"

249.    In re-examination Mr Apotheker also explained that due diligence was structured so that meetings would take place where the team could review documents and discuss them, without them being stored in a traditional data room.

*Due diligence calls*

250.    On Autonomy's side, the calls were largely with Mr Hussain and Mr Kanter. Dr Lynch's evidence was that he did not participate in any of the financial or legal due diligence calls, though he did join a few technical calls to discuss Autonomy's products. This was broadly confirmed by Mr Sarin in cross-examination:

> "*Q.    ... if we just consider the due diligence process from 1 August onwards, okay, and just define it as that for a moment, during the period after 1 August, you can't recall Dr Lynch providing any information to you, can you?*
>
> *A.    So just to make sure I understand the question, when confirmatory diligence begins with the first call on August 1, your question is do I recall Dr Lynch providing me specifically any information?*
>
> *Q.    Yes. During any call that you were involved with or any email that you received?*
>
> *A.    My calls were largely with Mr Hussain, Mr Kanter. I probably did speak with Dr Lynch occasionally about some things, for example the call with Deloitte that happened in -- later on down the road. I don't believe he and I were spending time going through diligence materials.*
>
> *Q.    Right. Just on that call involving Deloitte, you're not suggesting that he was actually part of the Deloitte call? Are*

> *you talking about process again?*
>
> A.   *Process again.*
>
> Q.   *Right, and he again says that he wasn't actually part of that conversation and that's something you've just misremembered?*
>
> A.   *I think there is an email to that effect, which says, "This is what Dr Lynch and I have agreed in a prior conversation and therefore we will -- instead of getting the auditor work papers, we will go ahead and have a call with Deloitte".*
>
> Q.   *We can look at that in due course –*
>
> A.   *Sure.*
>
> Q.   *-- but he cannot recall any discussion with you during the period after 1 August?*
>
> A.   *I don't recall any substantive diligence-related call. There might have been process-related calls."*

251.   In a call on 4 August 2011, Mr Sarin (together with Mr Johnson and various others from HP) discussed some parts of HP's valuation model with Mr Hussain and Mr Chamberlain.  Only a small part of the model was shown to them, and nothing was provided in advance of the call.  Revenue projections were shown by product line, but only up until 2016.  To the extent these were commented on by Mr Hussain, those comments were not relied on by HP, as shown by the following exchange with Mr Sarin:

> *"Q    ... Now, you, of course, understood that you were here looking at your own projections, and that projections like this are always a matter of opinion, aren't they?*
>
> A.   *Yes, there is an element of subjectivity involved.*
>
> Q.   *No buyer would ever rely on the target's own evaluation of these things; these were your own projections, correct?*
>
> A.   *Correct."*

252.   The conversation was a short one (perhaps an hour); and Mr Sarin's note is very brief.  Certain changes were made to HP's model following the call, but these appear not to have been made in reliance on any comment of Mr Hussain, but rather on HP's own assumptions.  In any event, substantial changes were made

to the model at a later stage between 4 and 18 August 2011, as Mr Sarin accepted, though he did not accept that the changes would have had a *"substantial impact"* on valuation. (In fact, the changes made actually reduced the estimated enterprise value by half a billion dollars from $10.0117 billion to $9.5021 billion.)

*Technical due diligence*

253.  In addition to their financial due diligence, HP conducted a technical due diligence of Autonomy's product portfolio. This was of primary importance to HP. When the due diligence findings were reported to HP's board, "R&D/Products/Technology" was first on the list of the due diligence areas identified: HP was satisfied with what they had found, which aligned with their synergy assumptions.

*Top 40 customer contracts*

254.  The proposal to provide a selection of customer contracts arose at the meeting on 29 July 2011. According to Mr Sarin's email summarising the meeting:

> *"They will upload~80 of their largest customer contracts in the data room (the figure was suggested by Mike assuming a revenue cutoff of $5M / customer; they are open to providing more although Shane suggested this should suffice)".*

255.  The proposal evolved, and the number of contracts sought was reduced (to 40). Mr Sarin gave the following explanation of why HP and KPMG wanted the lists:

> *"These lists were important to HP. The list of Autonomy's top 40 customers was important because we wanted to review Autonomy's customer concentration, so we could determine how reliant Autonomy was on specific customers, and to ensure that it was not over-reliant on any one customer. Autonomy's top 40 contracts were important because they would give KPMG and us insight into the revenue derived from Autonomy's largest contracts."*

256.  On 4 August 2011, Autonomy (through Slaughter and May) placed in the virtual data room lists (with names redacted) of what were presented as Autonomy's top 40 customers, and top 40 contracts, by revenue. Mr Kanter informed HP that they were now in the data room. Redacted copies of the contracts followed. They were subsequently reviewed by KPMG. The top 40 contracts ranged in value from $3 million to $22.5 million.

257.  Dr Lynch did not dispute, when cross-examined about it, that a number of contracts for the resale by Autonomy of third-party hardware within that value range (and worth up to $7 million) were omitted from the list. The Claimants ascribed this to deception; the Defendants ascribed it to Autonomy's understanding that this was not required, and that what HP was seeking was a

list that would enable it to look at the concentration of Autonomy's business by industry, and a set of contracts so as to understand Autonomy's contract terms.

258.   Three points may be noted:

(1)   Both Mr Sarin and Mr Gersh muddled up the two lists when giving evidence in the US criminal proceedings and neither could really remember which they had seen. The importance they have attached to the top 40 lists in these proceedings appears to be considerably greater than they ascribed to them at the time.

(2)   The Claimants did not seriously challenge Dr Lynch's evidence that he was not involved in the collation of the contracts or the compilation of the lists, and their cross-examination of him proceeded on the basis that he was unable to give evidence in this regard.

(3)   Some of the top 40 contracts showed that Autonomy sold hardware, not restricted to appliances, and some of KPMG's draft questions were about this; but Mr Sarin and HP never questioned how much hardware Autonomy sold.

*Discussions between KPMG and Deloitte*

259.   As mentioned previously, although production of Deloitte's working papers had been denied to them, KPMG were not prevented from discussing matters with Deloitte, and on 17 August 2011 there was a call between them when they discussed specific questions which KPMG had prepared.

260.   Mr Gersh of KPMG did most of the talking on HP's side, but Mr Johnson, Mr Sarin and others from HP also attended. The Deloitte representatives were Messrs Mercer, Knights and Welham. Mr Kanter was present in the room with the Deloitte personnel but did not speak. Mr Hussain dialled in. Autonomy management had provided suggested responses to KPMG's written questions ahead of the call. This apparently upset Mr Sarin when he learned about it subsequently (he did not know it at the time) since (he stated in his witness statement) the *"whole purpose of the call was to obtain Deloitte's independent view"*, adding *"Had I known then what I now know, this would have been a matter of concern to me."* (I think this was a comment plainly informed by hindsight. I doubt very much that he would have thought anything of the episode at the time.)

261.   Mr Sarin noted the responses given to the questions as follows:

*"[Q] Did you identify any instances of fraud, irrespective of the amount, during your audit? If so describe the cases. [A] Payroll fraud~$2mm; 2 employees in jail; small insurance fraud in '08 ~$500k*

*[Q] Did you identify any control weaknesses or deficiencies during your audit? If so describe the specific instances. [A] No*

> *deficiencies; minor control weaknesses (internal audit be independent of finance …*
>
> *[Q] Did you review any of Target's accounting issues with your national office/professional practice team? If so what policies were they and what was the nature of the issue. [A] for FTSE 100 client, add'l scrutiny; nothing out of the ordinary.*
>
> *[Q] Did you have any disagreements with management regarding accounting policies/accounting conclusions? If so describe the specific issues. [A] No*
>
> *[Q] Are the size and capabilities of the Tesla accounting/finance team adequate for a company of this size? [A] not overstaffed; quality of finance team v. strong".*

262.   Mr Sarin confirmed, looking at the note in the margin, that Deloitte had explained that they had reviewed all revenue contracts over $1m and a sample of smaller ones as well. He accepted that on the call Deloitte had mentioned somebody who had made a whistleblowing query or complaint (see paragraphs 2232 to 2289 below).

263.   Mr Welham also gave evidence about the call on 17 August 2011, which he remembered. He confirmed some of the answers noted by Mr Sarin. Asked whether there were any disagreements between management regarding accounting policies or conclusions, he said *"No major disagreements to my knowledge, no"*. He confirmed that the comment about the size and quality of Autonomy's accounting/finance team was a fair reflection of how he saw things at the time.

264.   The call with Deloitte was the last material stage in the due diligence exercise undertaken, though (see paragraphs 269 to 271 below) that exercise was incomplete.[38]

*Due diligence findings*

265.   On 9 August, some time before the call with Deloitte on 17 August 2011, KPMG provided HP with a draft due diligence report. Although the Claimants contended that Dr Lynch was actively engaged behind the scenes, in particular in discussing behind the scenes with Mr Hussain how best to respond to requests from HP, they had to accept that his name is on very few of the emails or other documents connected with the process. The draft due diligence report itself did

---

[38] Mr Sarin and Mr Gersh told me that it was not unusual that no final report was issued, nor was it unusual for reporting accountants to flag tasks in their statement of work ("SoW") that they had been unable to complete. However, in this case, the list of outstanding or yet to be completed matters were significant: and see paragraph 270 below. KPMG's warning that they had not completed due diligence needs to be seen in that context.

not suggest that Dr Lynch had been involved in the due diligence process; rather:

> "Specific Target officers and management interviewed included: Andrew Kanter, Chief Operating Officer and General Counsel, Sushovan Hussain, Chief Financial Officer and Stephen Chamberlain, Vice President of Finance."

266.  The executive summary indicated the limitations of the work that had been done, noting that:

> "Due diligence comprised telephone discussions with management and access to very limited proprietary financial and tax information. The majority of findings and observations are based on oral representations from management and reading published financial information.
>
> This acquisition is under the remit of the U.K. City Code on Takeovers and Mergers ("the Code'). The rules in the Code regarding treatment of bidders frequently results in very limited information being provided prior to a transaction closing. The data and access provided to us during due diligence was very limited but was comparable with other acquisitions involving large U.K. publicly traded companies."

267.  Mr Sarin confirmed that this reflected his understanding.

268.  The report noted that Autonomy recognised revenue in accordance with IFRS, and stated that there were "*some policy differences [with US GAAP] related to extended payment terms, sales to VARs, and potentially fair value analysis*". It highlighted the fact that Autonomy "*recognizes revenue for license sales upon sell-in to its VARs rather than on a sell-through basis to end customers*". It identified the fact that under some of Autonomy's hosting arrangements, there was a licence element under which customers had the right to take the software on premise – a point which Mr Sarin confirmed he understood.

269.  The report stated that the due diligence process was not complete, stating that:

> "We have not yet completed our engagement to assist Hewlett-Packard Company ("Client" or "you") in performing due diligence of Autonomy Corporation plc ("Target") in accordance with the terms of our statement of work dated August 3, 2011 and the related Master Service Agreement as amended on January 13, 2011, including its Standard Terms and Conditions. This report reflects our findings to date based on the data provided in the data room and limited telephone meetings with management and it will be updated as further data and access is provided."

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

270.    The items in KPMG's statement of work not yet completed were significant. These included inquiries about Autonomy's historical revenues and revenue composition; enquiries about trends in revenues; enquiries about expenses and trends in costs, gross margins and operating margins. KPMG never completed these tasks.

271.    Mr Sarin was unable to say who had decided that the deal should proceed despite the fact that the due diligence processes had not been completed, save to say that it was not his own decision. He accepted that the presentations that were put before the board never explained that KPMG had not carried out all of this work. It is to be noted, however, that the strategy decided at the July board meeting was that the acquisition (and the divestment) should be announced as part of the Q3 2011 report.

272.    Mr Apotheker did not read the KPMG draft report (of 9 August 2011) on the due diligence process. He was not aware that KPMG had never finalised the report. He had relied on the *"very professional people…to make sure that things were in order…if somebody would have thought there was something for me to read, they would have told me."* Mr Apotheker referred to an overview of analysts, most of whom he said, *"were on the buy side",* though he was aware that *"there were a couple of analysts who held a contrary opinion".* He said he read "a couple" of analyst reports, but did not remember at which stage in the process. He did not involve himself in the top 40 customer list. His line overall was *"You have to trust your people…".*

273.    A report to the HP board of the "key due diligence findings" was provided in advance of the board meeting of 12 August 2011. It gave the 'green light':

(1)    <u>Technical due diligence:</u>  Technical due diligence was the first item on the list. The findings recorded, amongst other things that Autonomy's product capabilities and features aligned with HP's synergy assumptions:

> *"Product portfolio with deep capabilities in analyzing large structured and unstructured data sets*
>
> *OEM: Large OEM customer base without significant customer concentration issues (IBM — $10M; Oracle $1M revenue contribution in FY10)*
>
> *Product capabilities and features align with synergy assumptions*
>
> *High degree of proprietary automation drives efficiency in cloud business".*

(2)    <u>VSOE:</u>  The report noted that Autonomy's approach to VSOE was different from HP's. It stated: "*Post-closing need to align Tesla VSOE with HP*".

(3) <u>Top 40 customers:</u>  All that was reported to the board was that the review of the top 40 customers list was ongoing and no red flags had been found.

274.    The report was updated for the 16 August 2011 board meeting:

(1) There were 'green lights' for all the functional areas identified.

(2) The technical due diligence was still first on the list.  The updated section was very positive, and read:

> *"Product portfolio with deep capabilities in analyzing, processing, optimizing and protecting large structured and unstructured data sets*
>
> *Product capabilities and features align with synergy assumptions; cloud-based archiving/backup a strategic information asset*
>
> *Strong development methodology (Agile); Unicode and globalization throughout; IDOL platform fully leveraged across products*
>
> *Suited for LOB and industry-solution customization -- marketing, legal and risk officer portfolio in place".*

(3) In respect of legal/IP, the report made it clear that the review of the Top 40 contracts was in connection with the analysis of contractual documentation and terms (and not part of the financial due diligence, below).  The section read:

> *"Review of open source practices and documentation satisfactory; Black Duck open source code scan and audit completed and reveals no significant issues*
>
> *Review of inbound technology licenses reveals no material issues*
>
> *Review of customer contracts, including top 40 (representing ~$300M in committed contract value), revealed no material issues. Certain deviations from HP standards are noted for integration*
>
> *On-going litigation represents no significant impact to business".*

(4) There was a new section dealing with the financial due diligence, which had not been in the report for the 12 August 2011 meeting.  It read:

> *"KPMG engaged to conduct accounting diligence; no material issues found*
>
> *Potential $30M tax liability due to existing Tesla transfer pricing arrangement; HP Tax will pursue risk mitigation post-closing*
>
> *Post-closing need to align Tesla VSOE with HP".*

275.    In the meantime, and in parallel with the due diligence exercise, in the first half of August 2011 HP finalised their decision to go ahead with the acquisition, which they announced on 18 August 2011. The following account of the process is taken very largely from Dr Lynch's written closing submissions, which unless otherwise recorded, I did not understand to be contradicted.

276.    HP held a board meeting (by telephone) on 5 August 2011.  The board presentation:

(1) summarised the strategic context as being (a) *"'Big Data' explosion"* bringing *"huge growth in unstructured data not suitable for traditional relational database analysis",* (b) *"opportunity to integrate structured + unstructured data"* and (c) *"shift from historical analysis to real-time, predictive analytics"*;

(2) summarised the strategic rationale of the choice of Autonomy as being its *"platform for unstructured + structured data analytics"* using IDOL (described later in the document as *"massively scalable"*); its ability to *"process all content types (e.g. Structured, Text, Audio, Video)"* and its successful transition to *"cloud product offerings and business model"*;

(3) summarised the strategic opportunity as being that *"HP can build a leading position in enterprise software via [Autonomy] acquisition, leveraging [Autonomy's] analytic capabilities with HP's brand, market reach and other technology assets"*;

(4) described the focus of due diligence as being *"on validating synergies, understanding key product capabilities and retaining key executives"*;

(5) gave a DCF stand-alone value for Autonomy of $10.012bn and implied stock price of $38.61 per share, compared with a current EV (on the basis of the shares' market price) of $6.229bn and $25.19 (£15.44) per share.  The value with synergies was $17.376bn, yielding an implied stock price of $64.74;

(6) identified *"Potential revenue synergies from (a) Information Management (b) Unified Analytics (c) Document Processing Solution*

*(d) Data Security Solution and (e) Channel geo-expansion strategy"*; and

(7) summarised the analysts' recommendations. Most were buy recommendations, although there were three holds and two sells. Mr Apotheker accepted in cross-examination that he would have paid more attention to the bigger houses such as Goldman Sachs and BNP Paribas than houses such as Peel Hunt (a sell recommendation), of which he had not heard.

277.   The 2011-2016 projections in the board presentation were in part based on "Wall Street Research". HP used a combination of techniques in estimating future revenues, including analysts' forecasts.

278.   The board presentation document highlighted the concern about the interloper risk. This impacted significantly on HP's approach to the deal:

(1) Potential interlopers were identified. Of those, Mr Apotheker confirmed that *"two companies were looked at in a little bit more detail, that was Oracle and IBM."*

(2) The document reiterated the requirement from Rule 20.2 of the Takeover Code for Autonomy to share information with other bidders. As Mr Apotheker accepted, that had influenced the structuring of the due diligence process.

(3) The document summarised the strategic considerations arising from the interloper risk. It read:

> *"The best way to discourage interlopers is to announce a compelling offer with Tesla Board recommendation, irrevocable commitments, a CEO call option and a low acceptance threshold*
>
> *Must take care not to request information in due diligence which could be damaging if revealed to a third party."*

(4) As Mr Apotheker explained, a "compelling offer" meant "*basically an offer where you would pay the highest logical price that still made sense in order to discourage everybody else*".

**Price negotiations in August**

279.   The final price was negotiated at a time of generally increased market volatility and against a steep decline in Autonomy's share value[39] (and that of the market generally). Whereas the price range discussed in Deauville (a range of £24.94

---

[39] During the period from 25 July to 27 July, Autonomy's share price had risen from £16.62 to £17.20; by 5 August it had fallen to £15.44.

to £26.94) represented a premium of roughly 44% to 56% at the time it was agreed, by the time of HP's Board Meeting on 5 August 2011, the premium had grown to a range of 61.5% to 74.5%. Although 30-, 60-, 90- and 180-day calculations of implicit premium were lower, and it needs also to be remembered that the calculations reflect gross premiums that did not take into account Autonomy's significant available cash, the decline in Autonomy's share price inevitably triggered concern, and prompted consideration by Perella Weinberg and the board as to how best to approach the possibility of a reduction in price.

280.    On 7 August 2011, Perella Weinberg wrote to Mr Apotheker and Mr Robison to raise the possibility of seeking to reduce the acquisition price by £1 per share in light of the declining macroeconomic environment, the 10.1% decline in Autonomy's share price since 28 July 2011, and the 11.2% decline in the infrastructure software comparable group and 9.9% decline in HP's share price over the same period:

(1)    Perella Weinberg reiterated that they believed in HP's strategy of transforming HP through the separation of PSG and the Autonomy acquisition and also believed that "*Autonomy was a unique asset and is also uniquely capable of transforming [HP's] business*" (as Mr Apotheker agreed).

(2)    Perella Weinberg also noted that the acquisition was likely to be controversial regardless of the price paid, which also reflected what had been said at the HP July board meeting.

281.    Mr Apotheker and Mr Robison expected an extreme reaction from Dr Lynch if they were to try to reduce the price downwards.  In an unchallenged passage in his witness statement, Dr Lynch stated that he now understands "*that HP contemplated offering a price decrease in August, but that Messrs Robison and Apotheker both knew I would be unwilling to support a bid below £25 per share, and thus did not amend their offer*".

282.    Perella Weinberg followed up with a further email to Mr Apotheker on the same day, 7 August 2011.  The email noted the risks of the investor reaction.  Mr Weinberg's central paragraph essentially suggested that the *status quo* was not a practical option, and despite the difficulties, proceeding with both the PSG divestiture and the Autonomy acquisition was the way forward:

"*6. I know that you, your team and the board appreciate the imperfect set of choices that lie ahead. Unfortunately, Tesla is not available at a price that value investors would applaud; other targets do not exist which achieve the same magnitude of strategic repositioning; activist investors, or even the long only investor group, will not wait for tangible evidence that the services business will turn around. The company has the opportunity to change significantly, through both Tesla and Hermes; and we would go as far to say that the status quo is not a practical option, even if the market reaction is anticipated to be less positive upon announcement. While we respect and revere the responsibilities*"

> *held by you, your team and the board, we believe that they point strongly toward proceeding with both Tesla and Hermes, the complexities and difficulties notwithstanding."*

283.    Mr Apotheker agreed with this analysis. He also wanted to announce the two transactions together *"if feasible and possible"*.

284.    Mr Robison was sent to London to have further discussions on price and seek to close the deal. Mr Robison agreed with the Perella Weinberg advice, like Mr Apotheker. Mr Robison also thought that Dr Lynch would not go below £25 per share; and he also thought it was *"very possibly now or never"*:

> *"Sitting on the plane and had a chance to read this again...the PE multiple is exactly why Mike will not come down below 25. As you know I agree with PW and feel it is very possibly now or never     ".*

285.    On 12 August 2011 there was a further HP board meeting. The revised DCF is at p.15 of that presentation. It gave a revised stand-alone value for Autonomy of $9.502bn (revised from $10.012bn from the 5 August 2011 presentation), and a value with synergies of $17.098bn (revised from $17.376bn).

286.    At that board meeting the board unanimously agreed that HP should continue to pursue Autonomy but in a price range of £25-£25.50, which was towards the bottom quarter of the £24.94 - £26.94 range agreed between Mr Apotheker and Dr Lynch before the start of due diligence. This was after a board discussion, and in the light of the falling share price. The Defendants stressed that:

(1)     First, this range (at least at the top end) was still within the range previously agreed with Dr Lynch.

(2)     Secondly, the implied premium was now considerably higher than that which was implied when the range was agreed with Dr Lynch. Autonomy's shares had declined in price. According to the updated DCF valuation presented to the board on 12 August 2011, Autonomy's market price implied that its enterprise value was now $6.35bn.

287.    Mr Apotheker had a final negotiation with Dr Lynch on 14 August 2011. Dr Lynch wanted £26 per share. HP countered with £25. The parties settled on a price of £25.50. This was still within the range previously agreed with Dr Lynch, albeit at the bottom of it; and it was within the range given by HP's board. Mr Apotheker confirmed with Mr Lane directly afterwards that he was content with this, though of course that was subject to board approval.

**Incorporation of Bidco**

288.    Bidco was incorporated on 15 August 2011. HP's 18 August 2011 offer to Autonomy's shareholders stated that:

> *"HP Vision [i.e. Bidco] is a newly incorporated company formed for the purpose of the Offer and is an indirect wholly-*

> *owned subsidiary of HP. HP Vision is incorporated under the laws of the Netherlands and has not traded since incorporation, nor has it entered into any obligations, other than in connection with the Offer and the financing of the Offer."*

289.    By the time Bidco was incorporated, the due diligence process was almost complete, and the price for the acquisition had already been agreed between Dr Lynch and Mr Apotheker.  Bidco had played no part in the process.

290.    Bidco's directors at the time of the acquisition were Ms Lesjak, Mr Paul Porrini (HP's Deputy General Counsel for Corporate Securities and M&A, who led the legal due diligence team) and Mr Sergio Letelier (an in-house HP lawyer). There was no evidence from any of these as to the matters that influenced the board of Bidco in deciding to proceed with the acquisition.  Mr Porrini and Mr Letelier were not called by the Claimants.  Ms Lesjak gave no evidence about what she did or thought in her capacity as a director of Bidco.  As the CFO of HP, she was actually opposed to the transaction (see further below).  She gave no evidence of having relied on any of the published information or any misrepresentations.

291.    That has led to a dispute ("the Bidco point") as to whether the FSMA claim must fail in any event: see paragraphs 484 to 500 below.

**HP's final approval:  boardroom spats and second thoughts**

292.    HP had a series of board meetings in the lead up to the final approval of the acquisition on 18 August 2011.  There were meetings (by telephone) on 12 August 2011 (referred to above), and further meetings on 16 August 2011 and 18 August 2011 (both by telephone).

293.    The minutes of the meeting on 16 August record that both Mr Frank of Joele Frank, Wilkinson Brimmer Katcher (a PR consultancy in New York) and Mr Weinberg of Perella Weinberg warned that:

> *"sentiment could be decidedly negative at the outset on the total mix and may include skepticism [sic] regarding HP's credibility and ability to execute on all of its initiatives in the context of the strategic, tactical and operational issues faced by HP's management with its current portfolio."*

294.    The minutes record that after discussion the board's consensus was to proceed with the divestiture and acquisition. Although this is unclear from the minutes, this consensus was reached despite Ms Lesjak speaking against the acquisition at the meeting, supported by Mr Holston, HP's General Counsel. Ms Lesjak's unchallenged evidence in her witness statements was that she expressed reservations about the timing and price of the acquisition (but not, she emphasised, to the expansion of HP's software business, nor the projected synergies). Mr Apotheker's evidence was that Ms Lesjak said that *"HP should be deploying its capital elsewhere and could not afford the proposed transaction at that time"* but contrary to a suggestion made by Dr Lynch (who

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

was not, of course, there) he had no recollection of her having expressed concerns about the synergies or the prospect of their realisation.

295.    The depiction which appears to be suggested by Mr Apotheker and Ms Lesjak of friendly and constructive debate is not supported by the documentation, nor, on closer analysis, by Mr Apotheker's evidence. There were increasing tensions between Mr Apotheker (the CEO) and Ms Lesjak (CFO, though not a director of HP) suggestive of real personal animosity.

296.    In cross-examination, Ms Lesjak (who had worked for HP for nearly 30 years and plainly feared she was about to lose her job) confirmed her evidence in the US criminal proceedings that she had *"pushed back"* at Mr Apotheker's suggestions of multiple acquisitions (TIBCO, Software AG and Autonomy) and told Mr Apotheker that HP *"could not afford all three"*. She said their relationship was *"strained"* from at least May/June 2011, and *"a little war"* had developed between them especially after a row between them about the inaccuracy of her "flash" forecasts. At the board meeting on 16 August 2011 both Ms Lesjak and HP's General Counsel spoke out against his plans without prior warning: when asked whether he was furious with her, he told me that that was a *"fair way of putting it."* That was even before he was shown emails she sent to the Chairman during the meeting itself (so she told me), complaining in the first sending his lack of interest in financial detail and the lack of any *"real plan"* or *"financial discipline"* and in the second sending a one-lined message:

> *"One pr person said…Leo is a dead man walking…he had never seen worse press for a CEO".*

297.    Despite this sniping, and what Mr Apotheker described as *"a poisonous internal environment between Cathie Lesjak and myself"*, Mr Lane at that time continued to support the acquisition of Autonomy and so did the board.

298.    However, after the meeting on 16 August 2011 Mr Lane was concerned about the acquisition.  He arranged for a call between the non-executive directors on 17 August 2011 to reconsider matters. On 17 August 2011 Mr Lane also emailed the non-executives to report a conversation he had had with Mr Apotheker. The email was marked *'For your eyes only'* and related that he had told Mr Apotheker that the Board *"were shocked by Cathie's statements (and Mike's)",* were *"very concerned about how poorly this announcement will be perceived and how it will reflect on Leo and BOD"* and would be *"relieved"* if Mr Apotheker decided to defer the Autonomy announcement. It added that *"many of us believe it will still be there in a month or two."*

299.    The same email described Mr Apotheker's response, to the effect that the Autonomy acquisition was critical, he did not think he had an alternative to begin the change to higher value businesses, and he did not believe that the opportunity would still be there if HP did not take it now. After stating that Mr Apotheker was *"furious with Cathie and believes she can't be counted on…"* he went on as follows:

> *"...he hears and understands the board on Tesla, but does not believe we will be able to purchase after all the negotiations and committed [sic.] that have already been made. And because he believes this, he feels he doesn't have an alternative to begin changing HP's business to higher value businesses. He thinks this is critical. But he added if the board is saying "defer", he will defer. I told him that was not the case. I said our confidence is shaken in operational execution and in him, and we want him to hear our sense, but if he wants to go ahead, we support him."*

*18 August meeting*

300.    There was a further board meeting on 18 August 2011.

301.    In the board presentation:

(1) The situation update gave the new agreed offer price of £25.50 per share. This implied a 64% one day and 58% 30 day average premium. At this price, the diluted equity value was £7.1bn ($11.7bn). The implied enterprise value was £6.7bn ($11.0bn).

(2) The DCF page gave more details of these figures and the valuation:

    i.  The latest valuation of Autonomy gave a stand-alone value of $9.502bn, and $17.080bn with synergies.

    ii. The current market price implied enterprise value was at $6.365bn (at £15.58 per share). HP's offer price of £25.50 accordingly represented a 64% premium (enterprise value of $10.99bn).

(3) The board were reminded that once a firm intention to make an offer had been announced, HP would be obliged to make an offer on the terms described in the announcement.

302.    The board were also told that there was a high potential that the rating agencies would put HP on negative outlook or downgrade HP, based on the expected leverage, strategic evaluation and near-term benefit to company performance. This followed from the advice at the previous meeting as to the prospects of an adverse shareholder reaction. Mr Apotheker confirmed that the board were aware of these risks, and that the board understood that it would have to hold its nerve in the face of these negative reactions.

303.    On the same day:

(1) HP's Technology Committee confirmed their recommendation with respect to the technology aspects of the transaction.

(2) BarCap provided a fairness opinion and a supporting presentation. BarCap explained under the "strategic rationale" that Autonomy was the

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

best-in class asset to address the market opportunity in enterprise information:

> "Tesla is the best-in-class asset to address market opportunity
>
> ~ Leader in worldwide search and archiving with a proven capability in unstructured data
>
> ~ Proven business with consistent organic growth and history of solid profitability
>
> - Demonstrated double digit organic growth even during past downturns
>
> - Delivered 40%+ operating margins over the last 3 years- among the highest in the software industry".

(3) BarCap's DCF was the same as HP's. They also set out a trading analysis of comparable software companies. All the companies featured had considerably lower operating margins than Autonomy's adjusted operating margins (shown at 42.7%), Software AG was stated at 27%, TIBCO was 26.3%, the mean operating margin was 23.7% and the median was 26.3%. Mr Apotheker regarded anything upward of 30% as high margin.[40]

(4) Perella Weinberg also gave a presentation and a supporting fairness opinion. Their DCF again replicated HP's. Perella Weinberg set out the anticipated growth of the stored information market, which represented a "massive market opportunity". Perella Weinberg noted Autonomy's unique capabilities and its centrality to HP's strategy:

> "Tesla is unique in its ability to derive meaning from data
>
> Tesla represents the lynchpin to fulfilling Hawk's strategic vision of providing context-aware computing".

(5) The board unanimously approved the acquisition at £25.50 per share.

---

[40] BarCap's overall message was plainly positive, highlighting that Autonomy had *"demonstrated double digit organic growth even during past downturns"* and *"[d]elivered 40% + operating margins over the last 3 years – among the highest in the software industry"*. BarCap's expressed view was that the combination of Autonomy and HP was *"[h]ighly complementary with minimal overlap…"* and would *"form the basis of the next generation information platform"*.

*The announcement of the bid and HP's loss of nerve*

304. HP announced the takeover for $11.1 billion on 18 August 2011. HP's shareholders had to come to terms not only with the acquisition of Autonomy for $11.1bn, but also with the potential spinning off of HP's personal computer business (in effect a legacy business), and HP's disappointing Q3 results.

305. The announcement was not well received. A large and vocal section of the shareholders disapproved and the visible reaction was overwhelmingly negative. Moody's downgraded HP's outlook from stable to negative. HP's share price fell sharply (20% in a day). Shareholders lobbied the Chairman, directors and management to see whether it was possible to get out of the bid before it closed. Mr Lane's nervousness turned to fright and HP's board instead suffered a collective loss of nerve. Mr Apotheker broadly accepted this:

> "Q.    We've agreed that the board needed to keep its nerve in the face of that kind of reaction?
>
> A.    One would hope so, yes.
>
> Q.    Do you think that the board in fact lost its nerve over the coming weeks?
>
> A.    Well, the board ultimately made a series of decisions that could indicate that. That's probably a matter of interpretation. The chairman certainly lost his nerve."

306. Mr Apotheker was still optimistic that he could steer a course through the difficulties and wanted to get on with the integration. He remained *"completely convinced about the validity of our approach."* He exchanged emails with Dr Lynch who encouraged him with nautical analogies to weather the storm. Mr Lane, however, had in effect abandoned ship.

307. On Sunday 4 September 2011 Mr Lane emailed Mr Apotheker with obvious signs of a revisionist approach, claiming *"still"* to be *"haunted by Autonomy itself"* and adding:

> *I don t think it s the panacea we think it is. I read the analysis of their organic growth and I still see them as a roll-up. I don t think the board thought (at least I don t remember that discussion) this was largely a roll-up when we contemplated the price."*

308.    He concluded by asking Mr Apotheker to *"analyze for the board"*:

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(1) First, "*whether there is any way to get out of the Autonomy deal*".

(2) Secondly, what size of buyback HP could launch to try to recreate lost value for shareholders.

309.   Mr Apotheker was sceptical about the buyback idea:

> "A.   *Well to be quite honest with you I didn't understand the logic of this, because it's a bit of a circular reasoning. If you want to placate the value investors by repurchasing enough shares to fulfil Mr Lane's request to fill the gap between what they believe one should have paid and what one actually did pay, it becomes an impossible equation to solve.*"

310.   As for the idea of getting out of the deal, Mr Apotheker responded by email the same day to Mr Lane that he would ask HP's advisers to look at the questions but also robustly defended the merits of the acquisition, which Mr Apotheker still believed in. Mr Apotheker reminded Mr Lane that the Autonomy acquisition was the only strategic solution that HP had:

> "*1. I disagree that Autonomy is a roll-up in the "classical" sense. They did a few acquisitions, less than many other sw companies of similar size, and integrated them all into their platform IDOL. By doing so at 40% margin they have demonstrated the power of the platform as well as the capability of the management team.*
>
> *2.  I am 99% sure that the Autonomy deal is irreversible.*
>
> *3. I'm also convinced that Autonomy, as well as the additional organic steps that [w]e are undertaking, will allow HP to reshape itself as a company generating 8% to 9% of its revenues from software, with a better growth and margin profile. If financial markets are rational, we should be rewarded by a better P/E multiple as we move towards this objective.*
>
> *4. in addition, if Autonomy and more software isn't the solution, what is the alternative?*"

311.   Mr Apotheker followed up the next day (5 September 2011), seeking to clarify some of the *"noise around Autonomy"* and reminding and stressing to Mr Lane that HP's business case hinged more on the synergies that the combined companies could generate than on Autonomy's stand-alone capabilities:

> "*…. During the Strategy Board meeting as well as at the subsequent Board meetings, we always presented to the Board*

> *our full business case; a case hinging more on the synergies that the combined companies can generate than on Autonomy's stand alone capabilities. Indeed, by layering in the synergies we achieve a CAGR of 26.6%, while maintaining the operating margin at or above 40%.*
>
> *<u>Therefore, Autonomy makes total sense if one believes that HP can generate the synergies we build into our business plan.</u> The quality of the synergies is high: you will remember that they exclude any drag-on revenues related to additional hardware sales and we only included a very small drag-on effect for services. All the other synergies are driven by leveraging the IDOL platform, combining it with HP IP/R&D, deeper penetration of existing markets and significant and identified up sell/cross sell opportunities. Please also note that the business case does not include any additional large acquisition. I for one, and so does my team, firmly believe that we can achieve these synergies in the allotted time frame."* [Underlining as supplied in Dr Lynch's written closing submissions]

### The Joe Bloggs emails

312.  There was little in the evidence I was shown to illustrate and explain what I assume was a further deterioration of support for Mr Apotheker and the Acquisition in the period between 5 September and 21 September 2011, except that between 31 August 2011 and 15 September 2011, a series of three emails were posted to some 50 analysts and the press by Mr Harald Collet ("Mr Collet", who had been Head of OEM Sales in North America from May 2008 to June 2010) and his former Autonomy colleague, Mr Marshall, under the pseudonym "Joe Bloggs". The analysts selected appear all to have been Autonomy sceptics already. Mr Collet and his colleague *"suggested a number of key questions HP should be asking about Autonomy's OEM revenues*."

313.  These emails ("the Joe Bloggs emails", which were sent from a specially created "Joe Bloggs" email account) followed an earlier email dated 23 August 2011 from Mr Collet personally to Ms Leslie Owens at Forrester, an analyst who had written a blog post critical of Autonomy on 19 August 2011, in which he set out a case that Autonomy's OEM revenues were too good to be true, arguing that there was an "*almost 'Madoff-like' consistency in their quarterly number of new OEM signings*". The Joe Bloggs emails were to similar effect. They appear to have encouraged further opposition to the Acquisition from analysts already sceptical of it, but their impact on sentiment and on HP is difficult to gauge. (I address a communication sent by Dr Lynch to HP following the Joe Bloggs emails later when dealing with the OEM case.)

### The ousting of Mr Apotheker

314.  In any event, on 21 September 2011, a story circulated on Reuters wire service that HP was considering removing Mr Apotheker and replacing him as CEO

with Ms Meg Whitman (who had run eBay). On 22 September 2011, well before the acquisition had completed, Mr Apotheker was removed summarily by HP's board. His witness statement gave an anodyne version of events. The first that he heard of this was from a Bloomberg journalist; Mr Apotheker was shocked by the news. He was permitted to speak to the board for an hour, but that was pointless, as he was told at the end of the presentation that the decision was already made to appoint Ms Whitman as the new CEO. Soon after her appointment, Ms Whitman also asked Mr Robison to leave.

315.     Ms Whitman's background was not in software, a business which in Mr Apotheker's opinion took a few years to understand. She described herself to me as *"more a consumer technology executive than an enterprise technology executive"*. Ms Lesjak, whose future had depended on Mr Apotheker's failure as CEO, continued as CFO.

316.     Ms Whitman was cross-examined about the reasons for the sudden decision to remove Mr Apotheker. She suggested that it was not because, or certainly not only because, of the *"adverse market reaction"*. She said it was because Mr Lane had interviewed a number of HP executives *"who were very concerned about his leadership style"* and because he had spent the first two months of his appointment out of the USA. She told me *"so what it seemed like was that we needed new leadership for HP. So he was asked to leave."*

317.     This seemed to me to be rather jejune. It was plain and obvious that Mr Apotheker and Mr Robison were sacked because the strategy of which they were the architects had proved unpopular amongst investors, and HP needed scapegoats and to demonstrate that the strategy had been abandoned. As she stated in an email a little later (on 14 December 2011), when Mr Apotheker had dared publicly to say that, at the time, the Acquisition had been supported by the Chairman and the whole board:

          *"Happy to throw Leo under the bus in tit for tat."*

318.     Although in cross-examination she described the changes as *"largely tactical…a bit more of a stabilisation"* following her appointment Mr Apotheker's strategy was reversed. HP determined not to divest the consumer PC business and reaffirmed its primary commitment to hardware, which she described to analysts as the *"DNA of this company"*. Ms Whitman told the markets that HP were instead going to refocus on the existing core assets of the company, and she regarded her main and most immediate task as being to *"stabilise the core assets"*.

319.     Ms Whitman stuck to the line that she remained committed to the Autonomy acquisition. She denied saying to an executive committee meeting that Autonomy was an *"unwanted stepchild"* and suggested that it was a phrase in fact used by Dr Lynch.[41] But for all her cavilling, the impression I formed was

---

[41] The suggestion that it was Dr Lynch who deployed the term is supported by an email from Dr Lynch to Ms Whitman on 26 October 2011 (just a few weeks after the Acquisition) in which he twice used the term *"stepchild"* in describing Autonomy's status in HP, albeit in urging HP to welcome *"this talented stepchild"* which would *"need a little bit of help getting it accepted in the early days…"* Much later,

that she fell in with HP's corporate antipathy to any culture other than its own, and that the reference to Autonomy as an *"unwanted stepchild"* is how she regarded it, even if it was forensically not something to be admitted to; and although the Claimants stressed that she had initially maintained the Integration Steering Committee established by Mr Apotheker and Mr Robison and appointed Mr Brossard (whom she regarded as one of her most capable lieutenants) to focus on the process of integration, the low priority she set for Autonomy's welfare, and her predisposition to require Autonomy to conform to HP's way of doing things, was vividly illustrated by the abandonment at her direction of Mr Apotheker's plans for HP Software to be headed by Dr Lynch who would under those have had key oversight of the integration process, with Autonomy at the centre.

320. The change of strategy is addressed further below. Understandably, Mr Apotheker disagreed with the change of strategy:

> *"A.   I think that it would have been preferably – I think it would have been a smarter decision to let me try to execute the strategy. But it wasn't my decision to make.*
>
> ...
>
> *Q.    You thought it would have made more sense to let you carry out the integration together with Mr Robison and Dr Lynch?*
>
> *A.    Oh yes, at that moment in time I was completely convinced about the validity of our approach."*

321. As regards the Autonomy acquisition, under the UK takeover rules HP were stuck with the bid they had announced, which became unconditional on 3 October 2011.

*Immediate aftermath of the Acquisition*

322. After the Acquisition, as would always have been anticipated, HP had unrestricted access to Autonomy's full books and records. HP's advisors also had access to Deloitte's working papers. Ernst & Young ("EY") reviewed them.

323. In the event, HP and its advisors did in fact discern many of the matters now complained of. They did not cause any great concern at that time.

324. Of note in relation to HP's hardware case, it does seem that from early on in the aftermath of the Acquisition, they were aware of Autonomy's hardware sales.

---

in September 2017, Dr Lynch appears to have used the phrase in an interview with the Evening Standard, stating his view that *"if Leo Apotheker, HP's chief executive who was fired shortly after the takeover, had stayed it could have been "an industry-changing deal",* but instead*, "we were left there as an unwanted stepchild."*

This is a point explored in more detail later (see paragraphs 1814 to 1854 below), but in brief summary:

(1)    Following the acquisition, KPMG were engaged to produce a closing balance sheet in respect of Autonomy for HP. This resulted in a draft report of 24 October 2011. At page 7, KPMG identified $41m payable to Dell, and stated:

"*We believe these payable are related to pass-through hardware sales to customers which Autonomy records on a gross basis*."

(2)    KPMG also conveyed the same point in its final draft of the report in March 2012, noting:

"*Accounts payable totalled $108 million at Close. Over 50% (or $58 million) of the account payable balance relates to transaction related costs...The remaining accounts payable balance mainly relate to data center server costs, or hardware Autonomy sells on a pass-through basis. Management stated these hardware sales are recorded on a gross basis*."

(3)    Separately, EY in their capacity as HP's auditors conducted a review of Autonomy's 2010 audit, including Deloitte's working papers. That work was complete by 4 November 2011, and EY specifically noted that Autonomy had about $100m in hardware revenue.

(4)    EY also produced a slide presentation entitled "Q4 FY'11 CFO Update" for discussion at a pre-meeting with Ms Lesjak on 11 November 2011 as part of the preparatory work in advance of an HP Audit Committee meeting the following week.[42] There were only two substantive pages to the document. One of the four Q4 areas of focus identified in the Executive summary (on page 2) was the Autonomy acquisition. That item was covered on page 3 of the document. Four points were identified in respect of the Autonomy acquisition. One of them was that "*Revenue includes $115M of hardware*".

(5)    Ms Lesjak was defensive about this when cross-examined. I return to consider her evidence as to what she made of the point in paragraphs 1835 to 1837A and 1848 to 1852 below.

325.    On 16 November 2011, EY presented their results to HP's Audit Committee: Page 7 of that document gave a revenue breakdown (in the form of a bar chart) of the $1bn "Autonomy portfolio". It broke revenue into Services, Support, Cloud, Licences and Hardware, attributing 11% to hardware. That information

---

[42] Ms Lesjak explained in cross-examination that such a pre-meeting took place every quarter to talk through points that had arisen in the quarter. Usually only Ms Lesjak, Mr Jim Murrin (who was the controller of the EY team at that time) and the key audit partners of EY would attend, but others also did sometimes. After first circulating an earlier draft of this judgment, the Claimants reminded me that, contrary to the Defendants' submission and my assumption, there was no evidence before the court that Ms Lesjak received the presentation before the pre-meeting. However, even if not pre-circulated, it was not disputed that the two-page document was discussed at the pre-meeting.

does not appear to have given rise to any question or surprise, nor created an issue for anyone at HP. Ms Lesjak accepted that it is likely that she did *"flip through"* the document but she insisted that she *"didn't spend any time in the audit committee deck on the Autonomy section"*. She did not deny that EY went over the relevant page with the Audit Committee but she suggested that the Audit Committee's focus was on the *"purchase accounting"* and that the committee *"don't go over every item on the page"*. In light of its prominence, I cannot accept it went unnoticed: again, however, it caused neither surprise nor concern.

326.    Furthermore, hardware purchases from Dell for resale continued through to at least March 2012. There was no secret about the purchases or the sales. Upon the appointment of Mr Christopher Yelland ("Mr Yelland") as CFO, but whilst he was still working in another division of HP, he was asked to approve a purchase of hardware. He was told explicitly in that email, which attached a spreadsheet of the relevant figures, that the hardware would be sold through to customers at a loss of 10%.

> *"Hi Chris,*
>
> *I need your approval to pay Dell an amount of $942,072.33. This is for the hardware orders that we source from them and sell through to our customers at a loss of approximately 10%. It has been our policy to pay weekly based on Steve's approval in the past. The numbers are in the tab – ready to pay. Dell's aging, our aging and the recon are in other tabs. The items in the tab "ready to pay" have been verified with POs, invoices, and payments have been received from our customers."*

327.    Mr Yelland had not yet taken up his post, but he acknowledged the email and asked to be copied in on requests going forward, as he was. He accepted in cross-examination that he had read them and told the Court that he was interested to see the sorts of emails for which his approval was required, even prior to his formal arrival in post. In April 2012, Mr Yelland approved another purchase. That email again stated in terms that Autonomy would *"sell-through"* the hardware to customers at a loss of approximately 10%. Mr Yelland did not raise any objection to the *"sell-through"* hardware sales, or suggest that there was any problem with the practice at the time.

328.    There was a similar situation with hybrid hosting deals. HP was aware of the hybrid hosting deals and its initial approach, far from putting a stop to them, was to seek to establish VSOE under US GAAP so that revenue from licences could be recognised up front (i.e. in the same way as Autonomy had always done). The VSOE workstream started in early 2012 and continued into at least May 2012. This too is addressed further below.

*The need for, but difficulties of, integration*

329.    The integration of Autonomy into HP's business was bound to be difficult. I have already noted that HP's business was fractured in 'silos' with intra-

division jealousies, poor co-operation and overall direction, and short-term focus. The Defendants described it, with (as it seems to me from the available documentation) good reason, as *"a huge, enervated, company, beset with systemic failings"*. Autonomy was, as it seemed to me, almost the opposite in terms of the way it was managed: centralised, energetic and driven by entrepreneurial zeal, with little formality or adherence to strict process. HP had become an ailing institution. Ms Whitman's own report to the HP Board dated 22 March 2012 (entitled *"The Road Ahead…"*) spoke of a *"crisis of confidence among all constituents"*, *"significant business challenges across every Business Group, HP Labs and Global Sales"*, *"Suboptimal business processes and lack of focused strategies…unsustainable cost structure"* and acknowledged that *"HP culture is in tough shape, must be revitalised/realigned to be successful"*. Autonomy, on the other hand, retained the outlook of a start-up still under the direct control of its founder.

330. HP's earlier efforts to expand by acquisition had been problematic and unsuccessful:

> (1) HP bought Electronic Data Systems for $13.9bn. It was rebranded as HP Enterprise Services in 2008. Its value was written down in Q3 2012 by some $8bn.

> (2) Other acquisitions are listed in HP's M&A Scorecards, such as that for Q2 2012. One well known one was the Palm hand-held computer business which it had acquired for $1.2 billion in 2010. The acquired businesses being tracked had under-performed against budgeted revenue by $1.73bn or 26%.

331. The difficulties of integrating Autonomy were exacerbated by (a) the abandonment of the predicate of its acquisition as envisaged by Mr Apotheker, being the strategic reorientation of HP towards software, (b) the removal of the architects of that strategy, Mr Apotheker and Mr Robison, who were invested in its success, (c) the outlook of their replacements, whose focus was on rebuilding the old HP and its core hardware business, and who had little time to devote to Autonomy, (d) the lack of any properly considered integration plan and the abandonment of Mr Apotheker's plan for Dr Lynch to head HP Software and drive forward the constructive integration of Autonomy and (e) a culture clash between the two companies.

332. Perella Weinberg had consistently stressed the importance of flawless execution and management devotion to the integration and transformation:

> *"Combination of persisting challenges in existing core businesses, extraction of Poseidon and integration of Atlantis would demand flawless execution and significant senior management bandwidth while integration and transformation progress remains under heightened public scrutiny."*

333. As Mr Apotheker put it:

> "A.    A proper integration plan, a proper extraction plan
> of the PC business, execute this to close to perfection and
> while at the same time continuing to run the existing
> business.
>
> Q. So it would be important for management to make these
> changes a top priority?
>
> A. Well, it would mean that management would be basically
> focused on these two changes, making sure that the existing
> business continue -- or the remainder of the business
> continues to run as well as possible. There were other
> changes that were required and all of this has to happen in
> nicely synchronised way and would have been a lot of work."

334.    The Defendants emphasised the problems which arose without oversight and
planning and in a context where (as they saw it) Autonomy was regarded as an
unwanted distraction foisted on a group already in difficulty, including (again,
as they perceived it):

(1)     The failure to establish proper processes for other business groups to sell
Autonomy products and worse, infighting between business groups and
the continuation of incentives to other business groups to sell third party
software and not to sell Autonomy products;

(2)     The difficulties which Autonomy experienced in acquiring hardware
from HP group's ESSN unit[43] to sell with Autonomy products because
the ESSN was remunerated according to sales quotas, and supply to
Autonomy did not count towards quota. Dr Lynch acknowledged in
cross-examination that Ms Whitman, in this instance and others, stepped
in to fix the supply: but the fact that her intervention repeatedly had to
be sought illustrated that Autonomy was not regarded or treated within
HP as part of the family;

(3)     The removal from Autonomy of its control over long-term relationships
with established customers when HP Enterprise Services ("HPES")
successfully lobbied HP management to take control, which in turn led
to HPES adding a 35% mark-up on Autonomy prices to boost the
reported revenues (and thus the bonuses) of the HPES team. (Ms
Whitman did eventually intervene to stop this, but in the meantime
Autonomy lost customers.)

(4)     Autonomy's ostracization from HP marketing initiatives such as
company gatherings and trade shows, whilst HP continued to insist that
all marketing should be centralised and that Autonomy should not have
any marketing strategy of its own;

---

[43] HP's Enterprise Servers, Storage and Networking Division.

(5)    Autonomy's increasing problems with staff retention, and resulting loss of institutional knowledge and industry experience in consequence of (a) HP's bureaucratic process-obsessed outlook and stifling corporate culture; (b) HP's failure to recognise the experience and talent of Autonomy's key legacy employees, and corresponding failure to put in place promised staff incentive plans although it is obvious that the key asset of any software business is the talent of its employees. The Claimants countered this with evidence from Mr Youngjohns that Autonomy's attrition rate was in fact lower after the Acquisition than it had been before it, and that various key Autonomy employees including Mr David Jones (CEO and General Manager of Data Protection), Mr Rafiq Mohammadi (CEO and General Manager of Promote), Mr Mike Sullivan (CEO and General Manager of Protect, Enterprise Markets) and Mr Neil Araujo (CEO and General Manager of Protect, Professional Markets) all stayed on for a number of years after the Acquisition and (according to Mr Youngjohns) *"only left to take up CEO positions elsewhere."* The fact remains, as I find, that the loss of senior staff in May 2012 is well documented; and Ms Whitman's approach was less than constructive: and see also paragraph [360] below;

(6)    What Dr Lynch described as *"flip-flopping"* by HP in first agreeing to facilitate VSOE (see paragraphs 273(2) and 328 above), which is a technical accounting exercise required under US GAAP for the purposes of a profitable business product of Autonomy called "hybrid hosting" , but then changing its mind, causing customer confusion and dissatisfaction, because it would have constrained hardware discounting;

(7)    Other integration failures including (a) changes to the structure of Autonomy without consultation, warning or explanation (b) bureaucratic practices such as refusing to supply Autonomy with HP hardware for sale to Autonomy customers using its Cloud offering until Autonomy was an "approved vendor" and (c) denial to Autonomy of crucial sales and services facilities and personnel. As to (c), the Claimants drew to my attention evidence to the contrary, showing that HP did arrange the transfer of more than the target number of 42 HP employees to work at Autonomy: but I accept and find that the problem of retaining skilled staff remained a difficulty which was exacerbated by HP's treatment of Autonomy leading to a sense that jobs were at risk, and its own stifling corporate culture. Mr Youngjohns seemed to me largely to accept this when cross-examined, though he maintained that he did his best to reassure staff that HP was going to build a successful business;

(8)    What Dr Lynch saw as a lack of co-operation from HP management hindering the integration within Autonomy of the newly acquired Vertica and the Information Management business unit, which had been an essential part of Mr Apotheker's concept of a unified information stack;

(9)    The imposition of Ms Whitman's appointee, Mr Bill Veghte, as head of strategy and software (including cloud and e-security) with a view to the eventual absorption of Autonomy within HP Software, in a reversal of

the understanding before the acquisition that Mr Veghte would be leaving imminently and Dr Lynch would replace him and be put in charge of HP Software (as well as Autonomy);

(10)   What Dr Lynch in cross-examination called *"a horrifically political environment"*.

335.   On 14 February 2012, Dr Lynch emailed Mr Hussain and Mr Kanter stating *"Meeting meg 2 morrow, need all craziness examples"*. Mr Kanter replied listing problems that Autonomy was facing in its relationship with HP, including incentives which encouraged HP employees to sell competitors' products; difficulties in procuring hardware internally; difficulties in accessing HP systems; and a sense of HP seeking to overwhelm Autonomy at internal meetings, with more than 25 employees of HP for every one from Autonomy; and the lack of any overall direction for integration.

336.   Ms Whitman sought in cross-examination to brush all this off as Dr Lynch presenting himself as a *"victim"* without trying to be *"part of the solution"* and questioned why he did not try to work with the person she had appointed to help on integration, Mr Gerard Brossard ("Mr Brossard"). She depicted it as Dr Lynch's *"failure to adapt to his new role at HP"* and symptomatic of someone used only to *"leading a small group of dedicated start-up employees."* But again, I regret to say that I found this formulaic and (given Autonomy's past growth and success and HP's own problems) condescending.

337.   The truth as I see it and find is that Ms Whitman had some time previously, and before Autonomy began to show worrying performance shortfalls, begun to look at a reversal of the model envisaged by Mr Apotheker, and instead of having Autonomy, led by Dr Lynch, at the apex, the absorption of Autonomy within HP Software under the direction of Mr Veghte (whom she had appointed head of strategy in January 2012 and had ultimately retained as head of Software): and see also paragraphs 364 to 366 below.

*Autonomy misses its targets*

338.   By February 2012 (4 months after the Acquisition went unconditional on 3 October 2011) Autonomy had fallen materially behind forecast revenue: HP's February "Flash" results suggested a revenue shortfall of 15% compared to budget, whilst noting that *"Pipeline and underlying business remain strong"* and also that there were *"Very strong cloud signings leading to deferred recognition."*

339.   A series of emails from Mr Hussain to Dr Lynch in April 2012 reveal a deteriorating position. By 27 April, Mr Hussain was reporting *"Revenue has collapsed on us. I am very sorry Mike."* On the day before the quarter end, Sunday 29 April 2012, Mr Hussain sent an email to Dr Lynch, timed at 12.07pm, with the subject *"revenue"*, stating as follows:

> *"At the moment we have almost all managers at less than q1 – most of the VPs care, the cell leaders do not. I could try to give you reasons but it boils down to poor sales rep productivity and sms process not picking*

> *it up. In addition my big deals – Unicredit, Citi, Thompson Reuters, BofA*
> *and Dreamworks hid the reality of the sales organisation*
> *underperforming. For this level of revenue the organisation is too fat in*
> *sales."*

340.    Thus, Mr Hussain identified the underlying cause of the revenue shortfall as
being Autonomy issues: "*poor sales rep productivity*" and the "*sms process not
picking it up*". Dr Lynch took a different view of the causes. In cross-
examination, Dr Lynch accepted that he instructed Mr Hussain to produce a
further email which he (Dr Lynch) could share with HP's senior management:

> *"Q.    You asked him for this because you wanted to have an email that*
> *you could forward on to HP's senior management at the same*
> *time as informing them that the revenue target may not be met,*
> *correct?*
>
> *A.     Yes, because most of the problems were coming from*
> *interactions with other parts of HP."*

341.    Mr Hussain duly complied with that instruction.  At 1.15pm, just over an hour
after sending his first email on 29 April 2012 referred to above, Mr Hussain sent
a second, freestanding email to Dr Lynch, with the subject "*Updates – not
good*", stating as follows:

> *"Now that we are at that really crucial part of the quarter I am working*
> *hard to get as much revenue in as possible but i have to warn you that*
> *the probability of a very sizeable miss on revenue is likely. We are faced*
> *with an unprecedented set of blockages on top of the recession (which*
> *is hitting us particularly in Europe – many customers reference Lloyds,*
> *BBVA, Tesco are citing the market conditions for delaying:*
>
> *As we have started to close out the HP leads we are finding a set of*
> *previously unknown processes which prevent deals being signed in the*
> *quarter (although the appointment of Howard Hughes as the main point*
> *man has helped it has come too late for Q2) – the SOAR, CAN, TTAC*
> *etc are processes that our salesforce have not known about and so have*
> *not managed*
>
> *There are still a number of unhappy HP customers which are stopping*
> *our deals from progressing*
>
> *Our salesforce are getting a bit demoralised because other parts of HP*
> *seem not to be interested in closing out deals (reference IDA)*
>
> *We still have rev rec problems with vsoe on maintenance which has not*
> *been agreed with EY*
>
> *Finally the pressure for deep discount on software sales – reference*
> *HCL/Astra Zeneca – is affecting sales in that it gives hope to customers*
> *to delay signing*

> *I am still working round the clock to bring as much as i can in but again*
> *i have to warn you of a sizeable miss. I am very very sorry for this news.*
> *I own all of the issues, i will not shirk from my responsibilities to you*
> *and to HP."*

342. The Claimants emphasised the difference between Mr Hussain's first email
     (which did not seek to place any blame on HP) and his second email (which
     did); and they criticised Dr Lynch for having both "instructed" Mr Hussain to
     write it, and for (they implied) ensuring that it was drafted in such a way as to
     suggest that Dr Lynch was until then unaware of Autonomy's second quarter
     revenue shortfall. They also criticised him for amending the first sentence in the
     version he sent on to Ms Whitman and Ms Lesjak by deleting the words *"very*
     *sizeable"* and for then dissembling as to the reason for the amendment.

343. I note, but do not attach great weight to, these criticisms. I do not accept that
     either of the Defendants was thereby intentionally *"papering the record"*
     (which was what Mr Rabinowitz suggested in his cross-examination of Dr
     Lynch). I can understand why Dr Lynch wished Mr Hussain to reflect the
     difficulties which he considered were of HP's making as well as those which
     Mr Hussain had earlier fixated on. Mr Hussain was self-critical to a fault, and
     apt to lose the broader picture. I can also understand the reason for the
     surreptitious amendment made by Dr Lynch to Mr Hussain's email when
     forwarding it to Ms Whitman, even if he should not have done it (as I readily
     accept).

344. More important was the effect on Ms Whitman and the repercussions of the
     large shortfall. In her evidence, Ms Whitman described herself as being
     "*completely blindsided*" by Dr Lynch's email. She emailed Dr Lynch to seek
     details of the scale of the shortfall ("*How big is the miss?*"), which in response
     he estimated at anywhere between "*7-15% depending on individual deals*". He
     suggested waiting a day, because some *"could be holding out for last minute*
     *negs."*

345. Ms Whitman expressed herself *"shocked at Dr Lynch's lack of urgency: it was*
     *Sunday, April 29, and the quarter was scheduled to close the next day."* She
     felt, ignorant perhaps of the last-minute nature of many such deals in the past,
     that it was "*completely unacceptable conduct*". She arranged for a conference
     call to take place later that same day.

346. The conference call took place at around 10.15pm UK time on the Sunday
     evening, which both Dr Lynch and Mr Hussain joined.[44] On the call, Dr Lynch
     indicated that Autonomy was likely to miss its revenue target by around $30
     million to $50 million. He put this down to two reasons, both of which, perhaps
     predictably, he said were HP's fault: first, he said that HP's accounting rules
     prevented Autonomy from being able to recognise all of the revenue on the sales
     it was making as quickly as he had expected; and secondly, many of
     Autonomy's customers were dissatisfied with HP and were refusing to engage.

---

[44] Dr Lynch accepted that Mr Hussain probably joined the call.

347.  It appears that having given this explanation, Dr Lynch was then keen to ensure that others within Autonomy should provide a consistent explanation for the shortfall if asked. Before the call had even finished, Dr Lynch emailed Mr Hussain, with a high importance marking, with the subject "*RING STOF ASAP AFTER CALL*", stating "*Need tog et [sic] stories straight*". Mr Hussain immediately responded "*ok*". In other words, Dr Lynch instructed Mr Hussain to call Mr Egan immediately following the call so as to ensure that, if he was asked about the revenue shortfall, Mr Egan would give the same explanations as Dr Lynch had provided during the conference call. Dr Lynch did not dispute that in cross-examination.

348.  The Claimants submitted that patently, if the explanations that Dr Lynch had given during the conference call accurately reflected the reasons why the revenue shortfall had occurred, there would have been no need for Dr Lynch to have been so concerned to ensure that Mr Egan, Mr Hussain and he got their "*stories straight*". The Claimants added to this that it was notable that no copies of Dr Lynch's "*Need tog et [sic] stories straight*" email (which was disclosed by Dr Lynch, seemingly from the server which he used for his own personal storage purposes) were retained on Autonomy's systems – neither the copy sent by Dr Lynch from his Autonomy email address, nor the copy received by Mr Hussain at his Autonomy email address. Nor were any copies of Mr Hussain's response to that email (which was again disclosed by Dr Lynch) retained on Autonomy's systems – neither the copy sent by Mr Hussain from his Autonomy email address, nor the copy received by Dr Lynch at his Autonomy email address.

349.  The Claimants submitted that the only plausible explanation for this state of affairs is that Dr Lynch and Mr Hussain must both have deleted their respective copies of both emails from Autonomy's system, and that cannot have been a coincidence, so they must have agreed to do so. In cross-examination, Dr Lynch suggested an explanation was that his emails were not kept on Autonomy's system. The Claimants submitted that this fails to account for the fact that Mr Hussain's copies of the emails were not retained on Autonomy's systems either, nor for the fact that (a) Dr Lynch was the custodian for more than 15,000 emails or documents on Autonomy's systems and (b) a number of other emails between Dr Lynch and Mr Hussain from around this time were retrieved by the Claimants.

350.  The position is certainly suspicious; but I prefer to make no finding in respect of it, given that the question of where and how Dr Lynch's internal emails were stored was not further pursued with him, and it seems inherently unlikely that either of the Defendants would have thought it important enough to remove traces of the particular exchange from the system, not least bearing in mind their equanimity in respect of other much more damaging records to which HP had full access.

351.  In any event, I am not persuaded by what I take to be the Claimants' suggestion that their wish to present a consistent explanation of itself shows that the Defendants perceived it necessary to and did combine to concoct a reason for the shortfall which they knew belied the truth. The Defendants perceived themselves to be beleaguered in a highly political and antagonistic corporate

environment, and the revenue shortfall was something for which they would need to have a consistent explanation; but that does not necessarily mean that the explanation was manufactured or untrue.

352.    Indeed, at the time, there was in reality little between HP and Autonomy as to the reasons for the shortfall, even though it transpired that Dr Lynch had seriously underestimated its size in his reports to Ms Whitman, and at $136 million it amounted to nearly three times the top end of the range Dr Lynch had indicated to her on the Sunday conference call.

353.    Broadly they were agreed that the main problem was not lack of demand nor any overall market or sales funnel problem[45], but failure to convert orders for Autonomy's proprietary software into completed sales, and that the effect was magnified by the fact that Autonomy had pinned their hopes on a smaller than usual number of larger than usual deals, which they had expected to close, but did not.

354.    Where they disagreed was as to the reason for that failure to close licence deals, for which each blamed the other; and although Mr Kanter's report dated 7 May 2012 placed the blame heavily on (a) VSOE issues (b) HP paperwork demands (c) Autonomy having to cede control of deals to other parts of HP and (d) *"wider HP customer issues",* even HP's own reports acknowledged that revenues were adversely affected by the challenges with operating Autonomy in the HP environment (as Ms Whitman also admitted when cross-examined) and that there was an urgent need to address these issues and improve integration of processes and sales function across all business units.

355.    Certainly, Ms Whitman emphasised that at the time there was no suggestion of demand for Autonomy software, or its competitiveness, having been exaggerated. When, at HP's Earnings Conference Call on 23 May 2012 (at which Dr Lynch's dismissal was announced, see below) she was asked whether Autonomy's *"weakness in revenue…changes your outlook on the business at all and how it integrates with HP"* she answered:

>    *"When Autonomy turned in disappointing results we actually did a fairly deep dive to understand what had happened here. And in my view, this is not the product. Autonomy is a terrific product. It's not the market. There is an enormous demand for Autonomy. It's not the competition. I was wondering, is there a competitor that we didn't see, and the answer to that is no. This is a classic entrepreneurial Company scaling challenges.*

---

[45] Thus, for example, Ms Meeta Sunderwala (a senior director in HP's EFR team), reported in an internal HP email dated 28 June 2012 that Ms Lesjak had *"told EY that the Autonomy issues were related to short-term challenges with working in the HP environment and not an issue with the overall market or sales funnel."* Ms Sunderwala noted also that *"[t]ypically, it is very unusual to impair an acquisition in the first year post close"* and that *"Based on the comments from Cathie, we were not planning on doing an impairment analysis in Q3…".* Ms Lesjak told me that she did not remember telling EY the above; but Ms Lesjak was, in my assessment, prone not to remember things which tended to embarrass her now or cast doubt on her cultivated image as prudent, assiduous and a safe pair of hands.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*And I have seen this move before. When you try to go from $40 million to $400 million to $1 billion to $2 billion, boy, it takes, it's a whole different ballgame. And we need to put in some sales processes. We need to put in better interface into HP in terms of how Autonomy interfaces with our services business, as well as our server, storage and networking businesses, and we need a new organisational structure to support a $1 billion plus company.*

*So we have the people to do this. We have the expertise to do this. Something I'm extremely familiar with, having grown eBay from $4 million in revenues to $8 billion. I really have seen this movie before. So I feel confident about the long haul. But it may take us a couple of quarters to work through some of the growing pains of the organisation.*

*But I think this is a very smart acquisition, I feel great about the product, and we have absolutely hit one of the themes that is changing most in the technology business. The opportunity around big data and analytics is fantastic, and it can flow right across all our businesses."*

356.    She elaborated in cross-examination:

*"So, as I recall – so of the miss in Q2, I think it was a $134 million revenue miss, 106 million was this deal slippage. As I recall, what we thought at the time was that Autonomy had been pursuing a lot of leads from HP for big deals and they had perhaps taken their eye off the smaller deals that had been part of Autonomy's revenue as an independent company. So when I did the deep dive into the Autonomy miss in London after Q2, we thought, okay, still scaling challenges, you know, hard for an entrepreneur to go from a small company to a big company, and we said, all right, deal slippage, not great execution; all good, we will craft a plan that is exactly here to fix that problem.*

*Of course, what we later found out when the whistle-blower came forward, that the fundamentals had been misrepresented. But as I understood it at the end of Q2, I never suspected fraud at the end of Q2. I was like: okay, yes, this makes sense to me, we've got things to work on, deal slippage; we're going to have to put this into a much tighter process."*

357.    However, what Ms Whitman later described as the *"gigantic financial miss in Q2"*, and its late disclosure by Dr Lynch, had important repercussions. Dr Lynch was placed on garden leave on the same day that the Q2 2012 results were announced.

*The resignation of Mr Hussain and dismissal of Dr Lynch*

358.    Earlier, on 3 May 2012, Mr Hussain had sent a formal email of resignation to Dr Lynch. This stated:

> *Further to our conversations over the past few days, it is with great
> regret that I am confirming my resignation as President of Autonomy.*
>
> *It has been an extraordinary 11 years and I appreciate all the
> opportunities Autonomy and HP have given me. I believe that the HP
> structure may be better suited to other peoples skills than mine, and
> look forward to whatever assistance I can provide during a transition.*
>
> *Having watched you in action I know how persuasive you can be.
> However, I have to inform you this is a final decision, and I hope you
> will respect this.*
>
> *I will discuss details with Andy."*

359.  The Claimants undertook a considerable exegesis in their closing submissions
to demonstrate that this final version of Mr Hussain's retirement email reflected
input from Dr Lynch, as well as Mr Hussain's wife. It seemed that the punchline
was that Dr Lynch leant on Mr Hussain not to accept responsibility for the
earnings miss, as in his first draft he had suggested he did. It was not clear to
me where this point really took the Claimants. What is clear is that, after the
earnings miss, there was no real prospect of HP countenancing Autonomy
continuing under the pre-acquisition management, and that HP were intent on
accumulating reasons why they should be removed entirely as soon as possible.

360.  For example, when Mr Hussain sent an email to "senior leaders" of HP on 24
May 2012 drawing attention to the fact that some 157 staff had left or resigned
from Autonomy in the previous weeks, which was then forwarded to Ms
Whitman under the heading *"Unacceptable email from Sushovan"*, Ms
Whitman's immediate response to this was to send an email to Mr Schultz
stating *"let's garden leave this guy."* Mr Schultz actioned this immediately and
branded what Mr Hussain had said as *"highly unusual and… quite misleading."*
In fact, as Mr Hussain demonstrated in his reply, the true total was 163. Mr
Hussain also explained that his update reflected his practice previously of
updating management on staff departures. The Defendants submitted, and I
accept, that by this time, HP wanted rid of Autonomy's old management, and
dismissed as self-serving anything they had to say.

361.  Despite Ms Whitman's acknowledgement that many, if not most, of the
difficulties lay in the problems of integration[46], late in the evening on 23 May
2012 HP's general counsel, Mr John Schultz, sent a formal notice of termination
by email to Dr Lynch, confirming Dr Lynch's discussion with Ms Whitman
earlier that day, and placing Dr Lynch on immediate garden leave for the
remainder of his notice period. The reasons given for his termination were as
follows:

> *"… Your failure to adequately perform your duties and responsibilities
> at Autonomy…, Including in particular a failure to meet the financial*

---

[46] Or, as the Claimants preferred to describe it, *"challenges with operating Autonomy in the HP
environment".*

> *performance goals associated with your position, a failure to*
> *adequately manage, supervise and/or instruct the company s*
> *management team and employees, a failure to adequately*
> *communicate regarding the company s performance and operations, a*
> *failure to cooperate, communicate and work with others in a*
> *satisfactory manner and an inability to maintain the confidence of*
> *senior leadership."*

362.    Ms Whitman told me that by this time she had "*completely lost faith*" in Dr
Lynch.  She stated in her witness statement:

> *"The fact that Autonomy had missed its revenue targets (by extremely*
> *wide margins) was bad enough on its own.  Exacerbating matters,*
> *however, was Dr Lynch's conduct at the end of the second quarter of*
> *2012: only alerting me to the existence of a problem at the last minute,*
> *understating the size of it, and taking a passive 'wait and see' attitude*
> *rather than proactively trying to resolve the issue.  Combined with his*
> *authoritarian managing style ... and his attempts to defect blame away*
> *from himself, I came to the conclusion that I could not trust Dr Lynch*
> *and that he would not be capable of executing a plan to turn Autonomy*
> *around."*

363.    To this she added in her witness statement that what she had seen of Autonomy
at the close of Q2 2012 was:

> *"... a chaotic organisation chasing high-value targets rather than a*
> *disciplined office focused on achieving consistent results."*

364.    As I shall elaborate later, the wider truth is that Dr Lynch did not fit in with Ms
Whitman's concept of Autonomy's place in the group. In this concept, neither
Autonomy nor Dr Lynch and his colleagues were seen as providing a new and
invigorating direction for a transformative change; and for some time before Dr
Lynch's removal, Ms Whitman had had in mind to  *"adopt"* (her word) or (in
reality) absorb  Autonomy under the umbrella of and to make Mr Veghte (then
head of HP's own software business) the CEO of that part of the HP group.
Thus, whereas before the Acquisition, Mr Apotheker  had told Dr Lynch that
Mr Veghte would leave and that he, Dr Lynch, would be put in charge of HP
Software, by January 2012 Mr Veghte had been appointed as head of strategy
and by March 2012 Ms Whitman had determined and made it clear that Mr
Veghte was in charge of driving both the cloud and security businesses also.  In
an email to him dated 26 March 2012 Ms Whitman spoke of there being no one
better suited than he for the role of providing *"Strategic vision for HP and CEO*
*partnership"* and with particular reference to the Software part of the business
she wrote:

> *"Clearly, there is a lot of strategy work, product line rationalization and*
> *other work that needs to be done in here. The business is in a bit of a*
> *melt down. So it needs attention now. Also, in a bit, this Business unit*
> *will need to adopt Autonomy and help it prosper. How could we reshape*

> *the organization under you to give you real leverage to get this done? A*
> *COO? Another SVP to operationalize the whole thing?"*

365.    Ms Whitman claimed, when cross-examined on the contents of the email, that she had not yet made a decision to bring Autonomy under the software unit. She spoke at length of the need for HP Software *"to adopt and put their arms around this division to help, to help it grow and prosper and I had not made a decision at all about whether this business should actually report to Bill."* But the longer her answers became (and they were often in the nature of prepared pitches) the clearer it was that the direction of travel was to be rid of Dr Lynch, absorb Autonomy into the software division, and (instead of Dr Lynch becoming head of HP's software business in place of Mr Veghte) retain Mr Veghte in place and through him ensure central control; and that the only real hesitation in her mind, as she came close to accepting, was whether Mr Veghte (whom Ms Whitman had also appointed as Chief Strategy Officer) would agree to the role.

366.    The removal of Dr Lynch (who had himself begun to think, following the retirement of Mr Hussain, the resignation of Ms Eagan and the departure of a raft of Autonomy personnel, that *"rapid assimilation back to the HP model"* might be the only remaining option), was the concluding stage of the decapitation of the project of 'transformation' envisaged by Mr Apotheker, which had started with his own dismissal and that of Mr Robison. It was probably more symbolic than substantive in effect. It seems to me likely that Dr Lynch had already determined to resign before his termination, as demonstrated by emails on the same day (23 May 2012) discussing a new venture (Invoke Capital) that he was to join, and which Mr Hussain, Mr Kanter, Dr Menell, Ms Eagan, Ms Colomar and Ms Orton had already joined or were about to join (each with a percentage of its equity).

*Mr Joel Scott s whistleblowing*

367.    On 25 May 2012, two days after Dr Lynch had been placed on garden leave, Mr Scott, Autonomy's Chief Operating Officer and General Counsel for the US, asked to see Mr Schultz to discuss concerns he (Mr Scott) had about Autonomy's hardware reselling strategy which (according to Mr Scott's evidence in the US criminal proceedings) an earlier telephone conversation between them had suggested Mr Schultz knew nothing about.

368.    According to Mr Scott's evidence in the US criminal proceedings, he had been *"curious"* and had felt uncomfortable about the sales; and, after Autonomy's core management team had left in circumstances Mr Schultz told him suggested some impropriety, he felt he had to raise his concerns about them, and also about the structuring of hosting deals.[47]

---

[47] Mr Scott gave his evidence in the US criminal proceedings, which was admitted in these proceedings as hearsay, on terms which gave him substantial immunity. I shall have more to say about its reliability later. In a nutshell, it was largely self-serving, and designed to insulate himself from threatened charges of wire fraud in the US (which carry a penalty of up to 20 years' imprisonment for every count) for his

369.    Be that as it may, after his conversations with Mr Schultz, HP commenced an investigation into the concerns Mr Scott had expressed, and retained for that purpose the law firm, Morgan Lewis & Bockius ("Morgan Lewis"). They have been continually involved since that time. PwC were also retained.

*The Rebasing Exercise*

370.    In parallel with the Morgan Lewis investigation, in June and July 2012, a "rebasing exercise" was conducted by Mr Yelland. Mr Yelland had become CFO of Autonomy in April 2012 after Mr Chamberlain (who had replaced Mr Hussain as CFO shortly after the Acquisition) handed in his notice.

371.    In his evidence in these proceedings, Mr Yelland suggested that the exercise required him to review the "*economic substance*" of Autonomy's business,[48] and sought to use this as a platform from which in cross-examination to cast doubt on the *"substance"* of a wide slate of impugned transactions. However, it was clarified in the course of his cross-examination that the exercise was not intended to assess and determine whether past accounting was right or wrong under IFRS. The primary purpose was to establish what Autonomy's business actually comprised and to strip out from the accounts revenues referable to business which HP would be unlikely or had decided not to continue, although Mr Yelland also maintained that he stripped out Autonomy's hardware sales on the further basis that:

> "I was looking for what the real economic substance of the …Autonomy software business was. And the standalone hardware transactions were not really part of that business."

372.    Mr Yelland's team was supported by PwC. PwC's email of 3 July 2012 (headed *"Autonomy review – privileged and confidential"* (and redacted in part for privilege)) noted that it understood that the analysis would be used in an acquisition valuation model, but both the analysis and the model was the "*responsibility of HP alone*".[49]

373.    Mr Yelland's exercise took a broad-brush approach. It did not look at the detail of individual transactions, nor did it attempt to consider the information that had

---

own role and complicity. In his meetings with HP and with the US DoJ in relation to these matters, Mr Scott was recommended to and represented by the law firm also representing HP.

[48] In cross-examination, he rowed back from this, caveating it as "*the economic substance of the Autonomy business as a software business*" (signifying, as I understood this, that the exercise was to examine what businesses were a complementary part of Autonomy's software business, rather than to examine their propriety or accounting treatment).

[49] Ms Lesjak suggested that PwC were also undertaking a "forensic investigation" at this time: but as Mr Nigel Curl of PwC (in Forensic Services) confirmed in an email to Mr Yelland of 12 July 2012, the input that PwC were assisting Mr Yelland with was limited to a review of the methodology. Mr Yelland again confirmed this in cross-examination, though he added that PwC *"were themselves doing work on hardware at the time, which is work [he] used to help inform the rebasing exercise".* It is clear that PwC were retained in about May 2012, and both the engagement of *"Forensic Services"* and the rubric *"privileged and confidential"* on their exchanges with Mr Yelland as noted in paragraph 372 above do suggest some anticipation of proceedings: but PwC did not produce a written report until March 2013 and there is a disputed question as to quite what their role was in any *"deep dive review"*: see below.

Approved Judgment                                                   HC-2015-001324
Mr Justice Hildyard

been available at the time the accounting judgements had been made. Ms Meeta Sunderwala ("Ms Sunderwala"), a senior director in HP's EFR team[50], noted on 18 July 2012 that Mr Yelland's rebasing exercise involved "*a lot of estimation and judgement (not all built up from specific deals etc)*".

374.    Mr Yelland concluded the "rebasing" (sometimes "rebaselining") exercise on 17 July 2012 when he presented his results in a spreadsheet and PowerPoint. These were summarised (in an *Exec Summary*) as follows:

> "*Results: The study identified $193m of adjustments to 2010, $157m to first 9mths of 2011 and $38m to FY12.*
>
> - *Resale of hardware accounted for $108m of the 2010 adjustments, $85m of 2011 and all $38m of FY12*
>
> - *The review of deals >$1m, a review of the acquisition balance sheet and a review of 'exceptional' costs booked in Sept 2011 identified the other half of the 2010 and 2011 impacts*
>
> - *Rebaselining required against the FY12 revenue is driven by hardware sales for which the accounting treatment is under review by GRRO. These are now stopped and other impacts are minimal*
>
> *Impact: The FY11 rebased and annualised growth is 14%, FY12 growth rebased is 1%*
>
> - *Licence rebased growth was a decline of 2% in FY11 and a decline of 16% for FY12 forecast*
>
> - *The OP[51] rate rebaseline did not change the 2010 OP of 36%, reduced the 2011 first 9mnths reported OP by 3pts to 21%, and increased the FY12 OP by 1pt to 21%*
>
> - *Note: the FY11 reported OP for the first 6mths was 34% but dropped in Q3 2011 to 5%.*
>
> *Limitations:*
>
> - *The study does not consider the IFRS appropriateness of the accounting. This is under review by PwC. High risk areas include the appropriateness and disclosure of hardware accounting, acceleration of deals using channel partners and balance sheet adequacy especially w.r.t. bad and doutful debt provisions*

---

[50] HP's Enterprise Financial Reporting group focused on M&A technical accounting.
[51] Operating Profit.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> - *The study has to make certain assumptions related to deals and balance sheet impacts on prior period P&Ls, which have not been auIAdited".*

375. No further work was done on the rebasing exercise after July 2012: that was the evidence Mr Yelland gave in the US criminal proceedings, and he confirmed it to me.[52]

376. In mid-July 2012, Mr Yelland was also asked to give an initial view on whether the revenue that had been removed under his rebasing exercise had been recognised in accordance with IFRS. The Claimants emphasised that this was a separate exercise. He delivered this on 22 July 2012. Mr Yelland confirmed that this view was not purporting to be definitive. His experience was primarily in US GAAP, not IFRS. He was not an IFRS expert, felt uncomfortable in doing the exercise and did not want any statements he made about IFRS "*to be over-interpreted*". He told the Court:

> "*I did not want to do this exercise because I had made it quite clear, I had thought, all the way through to my colleagues, and from the outset, that we were not trying in this exercise, under the timescales we had, to draw firm IFRS conclusions.*"

377. Ms Sunderwala's view was that it was "*truly an estimation exercise at this point because we have not verified whether these are truly incorrect under IFRS AND there is a significant amount of judgment (and even speculation) around what period these items really relate to*". This was a fair summary of the exercise, as Mr Yelland confirmed.

378. That initial view did not raise any red flags. For 2010, reported operating profit and the "rebased" operating profit was the same, at 36%. For 2011, it remained comparable (24%, as compared with 21%). Of the $155.9m revenue adjustment Mr Yelland proposed for FY11, he concluded just $2m of this was "*Not IFRS compliant confirmed*" (though a further $114.3m, which included $84.6m "*Hardware resale*" and $11.6m relating to "*Accelerated rev rec (channel and solution deals)*", was described as "*Not IFRS compliant probable*"). No revenue relating to licence hosting deals or purchases from customers was judged to be "*Not IFRS compliant confirmed*". Licence revenue on hosting deals and 25% of revenue relating to 'reciprocal' deals was classed as "*Management judgement/US GAAP difference*".

379. In cross-examination, Mr Yelland sought to stress that (a) the need for further investigations was recognised and he had included reference to hardware revenues because although non-compliance had not been confirmed, his own

---

[52] The Claimants' case, however, is that the rebasing exercise assisted the preparation of a new ten-year forecast for Autonomy which was in turn used to generate a ten-year DCF model which then informed the impairment analysis of HP's business units (including Autonomy). The Defendants themselves relied on the fact that "*HP...had Mr Yelland's rebasing conclusions when they considered whether an impairment was necessary in August 2012*".

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

view was that they were not IFRS-compliant and (b) revenue recognition was only one part of what it was necessary to consider, the other part being disclosure. He told me that he had reached the conclusion that hardware revenues should have been disclosed separately.

*August 2012 – the decision at that time not to impair the carrying value of Autonomy*

380.    In August 2012 HP carried out an impairment analysis of its business units, including Autonomy. Mr Yelland's rebasing exercise had, of course, by then already been concluded. HP accordingly had Mr Yelland's rebasing conclusions when they considered whether an impairment was necessary in August 2012. HP concluded that no impairment was required, and that the carrying value of Autonomy should be maintained at the $11bn that HP had paid in October 2011. That was so notwithstanding that Ms Lesjak, HP's CFO and the person who ultimately had to determine whether or not to recommend an impairment charge, stated (in her witness statement) that she had been informed that the exercise conducted by Mr Yelland had:

> *"identified very significant adverse potential accounting adjustments to correct the accounting treatment for, in particular, certain hardware and licence transactions. It indicated that Autonomy was a far less successful and fast-growing company than it had projected itself to be, both to HP and the market."*

381.    Why that was the view taken in August 2012, whereas some three months later an impairment charge of $8.8 billion was suddenly announced (see below), was a matter of considerable dispute but the justification advanced at the time seems reasonably clear on the available documentary evidence. The quarterly goodwill memo from Ms Lesjak's department stated that the:

> "*decrease in operating margin is due to the miss on revenue targets and other execution issues caused by challenges with operating Autonomy in the HP environment and loss of the legacy Autonomy management team*"

and that:

> "*HP Executive Management does not believe the short-term decline in revenue and operating margin is an indicative of longer term revenue and margin projections for this business. The market and competitive position for Autonomy remains strong, particularly in Cloud offerings.*"[53]

382.    In an internal email dated 28 June 2012, Ms Lesjak herself was recorded as having told EY (though, as explained in footnote [51] above, she said she could not recall this) that the Autonomy issues were related to *"short-term challenges*

---

[53] Ms Lesjak attempted to suggest that this was not accurate, but accepted that the memo was prepared by senior people within her department and that they must have got this information from HP senior management. But it is consistent with the document recording what Ms Lesjak told EY at the time. In any event Ms Lesjak accepted that HP concluded that there were no impairment indicators at the time.

*with working in the HP environment and not an issue with the overall market
or sales funnel."*

383.    By contrast with HP's approach to Autonomy, an impairment was taken on the
Enterprise Services division, which had been acquired in 2008 for $13.9bn; the
write-down announced in August 2012 was $8bn, as Ms Lesjak confirmed. Ms
Sunderwala also confirmed in June 2012 that, based on Ms Lesjak's comments,
no impairment analysis was planned for Q3 2012, though one would ordinarily
be undertaken at year end.

*November 2012: Announcement of Impairment*

384.    Despite this, on 20 November 2012, HP publicly announced (as part of its Full
Year 2012 Results announcement) that it was writing down the value of
Autonomy by $8.8 billion and attributed $5 billion of that amount to fraud. The
Claimants and the Defendants disputed the reasons for this change of tack, and
the basis for this serious allegation.

385.    HP's position was heralded in its press release on the same day, which stated
that the majority of the impairment charge of more than $5 billion was:

> *"linked to serious accounting improprieties, misrepresentation and
> disclosure failures discovered by an internal investigation by HP and
> forensic review into Autonomy's accounting practices prior to its
> acquisition by HP. The balance of the impairment charge is linked to
> the recent trading value of HP's stock and headwinds against
> anticipated synergies and marketplace performance."*

386.    The press release continued:

> *HP launched its internal investigation into these issues after a senior
> member of Autonomy s leadership team came forward, following the
> departure of Autonomy founder Mike Lynch, alleging that there had
> been a series of questionable accounting and business practices at
> Autonomy prior to the acquisition by HP. This individual provided
> numerous details about which HP previously had no knowledge or
> visibility.*

> *HP initiated an intense internal investigation, including a forensic
> review by PricewaterhouseCoopers of Autonomy s historical financial
> results, under the oversight of John Schultz, executive vice president and
> general counsel, HP.*

> *As a result of that investigation, HP now believes that Autonomy was
> substantially overvalued at the time of its acquisition due to the
> misstatement of Autonomy s financial performance, including its
> revenue, core growth rate and gross margins, and the misrepresentation
> of its business mix.*

> *Although HP s investigation is ongoing, examples of the accounting
> improprieties and misrepresentations include:*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

- *The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product", and the improper inclusion of such revenue as "license revenue" for purposes of the organic and IDOL growth calculations.*

  *- This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue.*

- *The use of licensing transactions with value-added resellers to inappropriately accelerate revenue recognition, or worse, create revenue where no end-user customer existed at the time of sale.*

*This appears to have been a willful effort on behalf certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management s ability to fairly value Autonomy at the time of the deal.*

*HP has referred this matter to the US Securities and Exchange Commission s Enforcement Division and the UK s Serious Fraud Office for civil and criminal investigation. In addition, HP is preparing to seek redress against various parties in the appropriate civil courts to recoup what it can for its shareholders. The company intends to aggressively pursue this matter in the months to come."*

387. However, and as the Defendants repeatedly stressed, it was unclear quite what had changed since August 2012, after the conclusion of Mr Yelland's report on 17 July and his tentative expression of views on IFRS a little later.

388. Ms Whitman gave the following explanation during the media call which followed the announcement:

> *"Ian Sherr* [of the Wall Street Journal]*: Thanks for taking my question. Can you walk us through some of the details about who when all of this unravelling happened customer and you said it happened after Lynch left, but when exactly and how did you confirm all of this happened?*
>
> *Meg Whitman: Let me give you a little bit of chronology here. We bought Autonomy as you know four* [sic., for] *$11.1 billion a little over a year ago and Mike and his team ran Autonomy for two quarters and you might recall that I let Mike go after he missed his budget numbers in Q2 by a pretty wide margin. Sometime after he left, a senior executive from the Autonomy team[54] came forward asserting as I mentioned a whole host of*

---

[54] Mr Joel Scott, Chief Operating Officer and General Counsel of Autonomy Inc.

*accounting improprieties when Autonomy was a public company before HP bought the company.*

*So led by John Schultz, our General Counsel, we begin an internal investigation, hired PWC to do a forensic examination, and that took place over a number of months. This was very difficult to unravel. It took a long time to actually come to the conclusion that we are announcing today because we needed to be sure what we were seeing in the financial statements. The conclusion that we made news* [sic., was?] *as I said there appears to have been a willful effort by some Autonomy employees to inflate the underlying financial metrics when Autonomy was a public company."*

389.    No doubt conscious that the sudden announcement a year after completion of the Acquisition required some further explanation, Mr Schultz also suggested at the same press conference that Autonomy did not have a proper set of accounting records and that:

*"critical documents were missing from the obvious places and it required that we look in every nook and cranny to sew together, to stitch together different pieces of information that allowed us to get to the detail we have today and allowed us to do the re-baseline effort that we have engaged in…"*

390.    Thus, it appears that HP sought to justify the write-down and accompanying accusations of fraud in November 2012 by reference to the whistleblowing in May, the matters identified and considered in the *"intense internal investigation"* and *"forensic review"*, and the piecing together of disparate and partly incomplete information after that.

391.    The curiosity of this is not only that the earlier decision had been against impairment, but also the lack of any documentary evidence of any calculation of what amounts were to be attributed to the wrongdoing. Ms Lesjak[55]  herself seemed unable to explain this: see further as to this paragraph [396] below.

392.    Furthermore, the direct and contemporaneous documentary evidence might suggest a different and more benign explanation of the reasons for the write-down. Thus, according to the documents:

(1)    $3.6bn of the $8.8bn impairment was referable to the effect of changing the WACC from 10% to 16%. I discuss this change further below; but for the present the point to note is that when asked whether this change was anything to do with the allegations of fraud, Ms Lesjak, after some

---

[55] As CFO, Ms Lesjak was the very person whose responsibility it was as CFO to recommend the impairment.

equivocation, agreed that she did not believe that this was ever quantified.

(2)    After the impact of the market capitalisation requirements, the remaining $5.2bn of the $8.8bn impairment was split into three categories, as set out in an infographic created internally, which corresponded substantially with the analysis set out in the presentation on the impairment given to HP's Board on 24 and 26 October 2012:

   i.   $2.9bn said to be attributable to the effect of lower margins;

   ii.  $1.8bn said to be attributable to the effect of lower growth rates; and

   iii. $1.3bn said to be attributable to the effect of re-baselining revenue.

393.    The reasons for lower margins were articulated in an email to, amongst others, Ms Lesjak on 19 November 2012 (i.e. the day before the announcement).  That email, which was sent to Mr Schultz, stated there were three "buckets" that explained the lower margins:

> *"There are really 3 buckets why the op margins in steady-state (28%) are lower than the 40%'ish margins in Autonomy's prior reported results.*
>
> *1. **SaaS business model and impact of Iron Mountain's digital business** — Iron Mountain's results were not in Autonomy's reported results since the deal closed in Q3 '11. Iron Mtn earns ~12% margins and represent ~19% of total revenue so accounts for 4-5 pts of total Autonomy margin decline*
>
> *2. **Accounting treatment of certain costs** — In the dark period of Q3 '11, Autonomy incurred significant "1-time" costs associated with bad debt, vacation accruals, commissions/bonus accruals. Not all of these costs were spread back into the restated financials because it is very difficult to determine the appropriate period. However, if you spread these costs over a 12 month period, it accounts for 4-5 pts of margin*
>
> *3. **Under-investment** — Autonomy under-invested in each of its acquisitions, taking out R&D, IT, and other infrastructure costs. On a go-forward, steady-state model, we're assuming a benchmark level of investment, contributing 2-4 pts of margin".*

394.    None of those factors identifying an impact on margin were tied in or shown to relate to the alleged accounting improprieties announced by HP the following day.  This was reluctantly accepted, after two deflecting answers, by Ms Lesjak

in cross-examination.[56] The same was true of the other factors identified in the board presentation and infographic. Ms Lesjak accepted that the points about "lower growth rates" were similar to the points about lower margins.

395.    Further:

(1) Although it is not disputed that in May 2012, HP had retained Morgan Lewis and PwC, no written *"forensic review"* by PwC is apparent from the evidence until later (in 2013, long after this announcement), and none was disclosed;

(2) Indeed, there is no evidence of any review, investigative report or analysis by PwC dating from before the announcement (or even a short period thereafter), except a commentary on the methodology adopted by Mr Yelland for which PwC disclaimed responsibility.[57]

(3) The original purpose of the rebasing exercise had nothing to do with possible mis-accounting under IFRS: it looked at the differences under US GAAP and how HP would have run the business. When Mr Yelland was asked to give a view on IFRS, he was uncomfortable doing so, his conclusions in any event did not support a conclusion that there had been wilful non-compliance with IFRS, and Ms Sunderwala thought that it was *"truly an estimation exercise"*, involving *"a lot of judgment (even speculation)"*.

(4) Mr Yelland's evidence was that his own rebasing exercise (produced in late July) did not materially change thereafter.

(5) Autonomy had a full and orderly set of books, accounts and ledgers which amongst other things identified all Autonomy's hardware transactions.

396.    The Defendants supported their contention that there had been no such analysis as might be expected before making public claims of fraud by referring to events after the press release. Thus:

(1) On 29 November 2012, 9 days after the announcement, there was an email exchange involving Ms Lesjak, Mr Gomez (HP's Chief Communications Officer), and Mr Levine (HP's Corporate Controller). Ms Lesjak was told:

*"We are getting a lot of push back from media that they cannot understand how the accounting issues at AU could result in a $5 billion writedown. Mike is using this*

---

[56] Ms Lesjak did attempt to suggest that the second "bucket" was to do with *"accounting improprieties"*, but could not explain how and was forced to accept that it was limited to factors such as bad debt and one-off costs; they were nothing to do with the allegations relating to hardware, channel sales, hosting revenue or anything of that kind.

[57] The Claimants invited me to note that PwC were involved in interviewing Autonomy personnel, and in particular, interviewed Ms Harris for some three hours on 13 November 2012. The *"Memorandum of Interview"* recorded that this was *"in connection with HP's internal investigation of Autonomy's accounting practices before, during, and after HP's acquisition."*

> *to create the illusion of an issue. We'd like to create a simple graphic that demonstrates the impact of the reduced revenue starting point, margin and growth rate to the DCF model. Is there someone on your team that we could work with to produce something?"*

(2) Ms Lesjak plainly had not seen any analysis of this kind. She asked Mr Levine what he had. All Mr Levine had was some PowerPoint slides substantially the same as the board presentation referred to at paragraph 392(2) above. Mr Levine stated in an email to Ms Lesjak dated 30 November 2012 that:

> *"All I have is the attached. <u>We've never formally prepared anything to attribute the irregularities to the amount of the write down</u>. Everything we did has been focused on the FV calculation based off the forward growth and profitability projections. I don't know whether Steve or Andy prepared something that translated the irregularities into their impact on the forward projections."* [My emphasis]

397.    Unable otherwise to explain how, on that basis, the need for impact on margins was announced as relating to fraud, Ms Lesjak first suggested that HP had had input from PwC: but when shown that PwC did not report until 2013 and that in 2012 the work that PwC did to support Mr Yelland consisted of commentary on Mr Yelland's own work, for which, moreover, PwC disclaimed responsibility, she then told me in cross-examination that despite what appeared from that email, she had nevertheless been told by Mr Andy Johnson, who was then Head of HP's Corporate Development sub-team within the SCD group[58], that all the adjustments *"were based on new information that came out of the forensic investigation."*

398.    Reliance on a conversation with "Andy" (whom she described, and said she relied on, as *"keeper"* of the original DCF model used by HP in its acquisition of Autonomy) became a refrain of her answers in this regard. The following answer was typical of a number of iterations:

> *Q. ...on your evidence now that you re giving to this court, you re saying that everything that changed in the DCF was entirely explained by the irregularities?*
>
> *A. That is what Andy told me. He told me that…looking at the information that they learned in the forensic investigation, that now the stand-alone value was 3.5, and he said that he believed that all of that was as a result of either accounting improprieties, disclosure failures or misrepresentations. That is what he said."*

---

[58] HP's Strategy and Corporate Development group.

399. When it was directly put to Ms Lesjak that she had no idea under any of the heads identified of how much could fairly be attributed to any wrongdoing, and that the announcement (for which she was jointly responsible) of a write-down on the grounds of a major fraud was reckless because she had never commissioned a proper calculation to correlate the allegations with the changes in the DCF she answered:

> *"So I believe I did when I went to Andy and I said – and Andy said he calculated the stand-alone value relative to the point in time we did the acquisitions, as he knew the model in detail, and he said the only changes he made were as a result of information coming out of the forensic investigation and that he was confident that at least the $6 billion was attributable to not just accounting irregularities but misrepresentations that we got during the due diligence process and also disclosure failures where it was not clear in the disclosure as to what was going on…"*

400. There were references in the record to some conversations between Ms Lesjak and Mr Johnson likely to have related to the impairment analysis: for example, in an email from Mr Sarin dated 28 September 2012, in an email from Ms Sunderwala dated 17 October 2012 (referring to a meeting with an electronic link that evening), in an email chain on 23 October (referring to a "deck" for discussion) and in a short email arranging a telephone call between them on 15 November 2012. But there was no documentary evidence produced to show how it was that Ms Lesjak was satisfied that the factors resulting in the write-off were attributable to accounting improprieties, disclosure failings and misrepresentation; and Ms Lesjak made no mention of having relied on Mr Johnson in her witness statement (in which she made no mention of him at all).

401. The Claimants sought to explain this lack of documentary support on the basis that (a) at the time the impairment charge was announced to the market, HP was in the midst of an internal forensic investigation *"communications in respect of which have been withheld for privilege"* and (b) it is *"unsurprising that there is a limit to the volume of documents that have been disclosed by the Claimants"*. But neither was or amounted to a direct assertion that there was any such documentary evidence; and the email exchanges after the event already quoted suggest there was not.

402. Further, as to the suggestion that such an investigation had uncovered impropriety of which HP was unaware, the Defendants' position was that:

(1) HP had been aware of hardware sales for some time. As explained at paragraphs 324 to 327 above, some were apparent from (and at any rate not hidden in) the due diligence.

(2) HP and its advisors were made aware of hardware sales in some detail following completion in the Autumn of 2011. Yet hardware purchases by Autonomy from Dell for resale continued to at least April 2012: Mr Yelland was asked on at least two documented occasions (one in March 2012 in anticipation of his appointment as CFO, and another after it, in

April 2012) to approve such a purchase on the basis that the hardware would be sold through to customers at a loss of approximately 10%. In each case he gave the approval without objection. He sought to argue in cross-examination that he drew a distinction between "sell-through" and "pass through" which he told me *"sometimes is used to describe sales that are not connected to the rest of the business"*; but he provided no support for this, accepted that he had not focused on the difference at the time, and I find that this was an afterthought. The hardware revenues were included in spreadsheets provided by Autonomy to HP and were subsequently openly incorporated into HP's own financial reporting.

(3) As to the second alleged impropriety, the Defendants contended that there was no requirement at all under IFRS for an end-user to exist at the time of sale (even if there was under US GAAP). Moreover, HP had been made aware during the due diligence that Autonomy recognised revenue from resellers on *"sell-in"* rather than *"sell-through"*.

### *The revaluation and its announcement*

403.    On 20 November 2012, HP announced that it was writing down the value of Autonomy by US $8.8 billion. Simultaneously, HP attributed a substantial part of the write down to fraud on the part of Autonomy prior to the Acquisition stating that there appeared to be a wilful effort on the part of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers.

404.    In the circumstances described above, the Defendants' case is that HP had no basis for suggesting that the value written down (or any part of that) was attributable to fraud by the Defendants: the real reason for the write-down was the need to reduce the carrying value of some of HP's assets in order to take account of the diminution in HP's market capitalisation following a sustained fall in HP's share price. According to the Defendants, the excessive write-down of the value of Autonomy was the means of avoiding a write-down of HP's own software business.

405.    HP's share price first began to decline significantly in Q4 2011. It continued to fall in 2012. In June 2012, HP's market capitalisation fell below its book value. By 1 August 2012, its share price was $17.66, around half of what it had been 12 months previously.[59]  By 24 October 2012, it was $14.47.

406.    Although the Claimants were apt to blame this on the Acquisition, the Defendants pointed out that the decline had much longer origin, and reflected very disappointing performance. Year-on-year revenues were falling by about 7%, year on year EPS had fallen by about 33%, and year on year cash flow from operations was down something over 60%. Ms Whitman accepted that these were pretty dire numbers.

---

[59]The share price on 1 August 2011 had been $35.20.

407. The truth was that in 2012, HP was in crisis and performing poorly across its business. Ms Whitman agreed in cross-examination that when she looked more carefully after her appointment it was in a far worse state than she had initially thought and that there was a crisis of confidence around senior management, board and company strategy. I have already noted that the business was fractured in 'silos' with intra-division jealousies, poor co-operation and overall direction, and short-term focus. The Defendants described it, with (as it seems to me from the available documentation) good reason, as a huge, enervated, company, beset with systemic failings. It had (as Dean Acheson famously remarked of Great Britain now nearly 60 years ago) *"lost an empire but not yet found a role"*, having abandoned Mr Apotheker's plan and fallen back onto retrenchment to its core business, which was low margin and an outmoded model.

408. As previously noted, and quite apart from Autonomy, HP's efforts to expand by acquisition had been astonishingly problematic and unsuccessful:

> (1) HP bought Electronic Data Systems for $13.9bn. It was rebranded as HP Enterprise Services in 2008. Its value was written down in Q3 2012 by some $8bn.

> (2) Other acquisitions are listed in HP's M&A Scorecards, such as that for Q2 2012. One well known one was the Palm hand-held computer business which it had acquired for $1.2 billion in 2010[60]. The acquired businesses being tracked had under-performed against budgeted revenue by $1.73bn or 26%.

409. The sustained fall in its share price had consequences for HP under US accounting rules. As Ms Lesjak explained in her witness statement, the fall in its share price meant that HP needed, in reconciling the value of its business units to market capitalisation, to (a) increase the discount rate (i.e. the premium to the weighted average cost of capital ("WACC")), which further decreased the value of the business units and (b) revalue its goodwill and intangible assets across all its business units: the sum of the parts of the business plus a control premium of 30% could not exceed HP's market capitalisation. Ms Lesjak considered this an arbitrary accounting construct. She accepted that it involved reverse engineering the value of segments of the business to get down to the required level.

410. The process of reverse engineering involved ascribing discount rates to various segments of the business. Through this, the reduction was loaded disproportionately onto certain parts of business, notably Autonomy. HP's Enterprise Services division was also ascribed a heavy discount rate, but had no goodwill left to impair following the $8bn impairment recorded in Q3 2012.

411. It appears that HP was keen to avoid its own Software division (other than Autonomy) being impaired. Ms Sunderwala noted in mid-August 2012: "*I feel that even at a $16 price, we could support no impairment in HP Software (without Autonomy) if we took a hit in Autonomy stand-alone.*" By October

---

[60] The Palm business had been bought for $1.2bn in 2010.

2012, this was being fed into further models, with the discount being loaded onto Autonomy and HP Enterprise Services as compared with Software, TS and ESSN.[61]  It seems that this was motivated, at least in part, by tax reasons:

> "*during our Tax Department review we discussed if Tax had a preference as to the location/designation of a potential goodwill impairment for the HP Software business (including Autonomy). Although we want to provide a final confirmation once numbers become available, our expectation is that the best approach is to impair Autonomy's goodwill. Autonomy's legal entities are currently isolated, so the impact of an impairment thereon should carry less risk to existing or future tax attributes/opportunities.*"[62]

412.  A large write-down of Autonomy also mitigated the need to write down HP's hardware business, which Ms Whitman had affirmed to the market as the core business.  Ms Sunderwala drew another advantage to the attention of HP's auditors, EY, quoting an article that mused:

> "*a write-down could have a cosmetic effect of making it easier for HP to show a return on invested capital. Less invested capital, easier for growth to look big*".

413.  It was observed internally that to get down to the 30% control premium (see paragraph 409 above), discount rates would have to be "*crazy*" and that the result would be "*nonsensical*".  The result was that, while a WACC of 9.5% had been deemed appropriate for valuing Autonomy in August 2012, by October 2012, HP had increased it to 15%.  This was increased further to 16% after Ms Whitman asked, very late in the process (overnight between 23-24 October 2012, with the board meeting to discuss the impairment being scheduled for 24 October 2012) that the final value include some synergies.[63]  The effect of changing the WACC from 10% to 16% by itself caused an impairment of $3.6bn.

414.  Although the Claimants sought to dismiss as *"not credible"* the suggestion that the erosion of Autonomy's performance flowed from innocent causes, the fact is that remarkably little was provided by the Claimants to support their case that the impairment was the consequence of the revelation of fraud in the course of an in-depth forensic inquiry. Equally little was provided by the Claimants to substantiate the effect of the alleged fraud on the various "buckets" they had identified. On the other hand, the Defendants did provide a plausible account of the "reverse engineering" adopted to achieve a result which shifted blame away from under performance in HP's other enterprises at Autonomy's expense. Ultimately, I am not required to determine the reason for this erosion in

---

[61] Ms Sunderwala noted: "*Add 1.25ppt discount rate to Autonomy and ES (most execution risk)…You can add 0.25ppt to Software, TS and ESSN if looks like we need more downward pressure; otherwise keep as is (not sure if Software can handle it…)*"  Further documents also showed a desire to avoid increasing the discount rate for the Software division.

[62] Ms Lesjak was aware that this was the preference of the tax department.

[63] Email exchanges over 23 to 24 October 2012  show that this was done overnight.  Ms Lesjak did not argue with this.  Ms Lesjak attempted to suggest that the $11bn book value of Autonomy was in fact made up of $1.5bn of synergies and $9.5bn "stand-alone value", but that was incorrect.

Autonomy's performance. The fact it occurred is consistent with and provides some general support for the Claimants' case but the failure to connect the alleged fraud with the impairment means the establishment of the fraud depends on a detailed consideration of each head of claim.

*After the announcement of impairment and the public assertion of fraud*

415.    By the time of the announcement HP had not given Dr Lynch an opportunity to address the allegations. HP went ahead with the announcement and accompanied it with a comprehensive press and public relations campaign,[64] even establishing a so-called "truth squad".

416.    In December 2012, EY were asked to give their view as to whether the valuation of Autonomy in August 2011 was affected by the matters said to give rise to the impairment. EY prepared a memorandum dated December 2012, addressing:

> *"our considerations of the allegations on the original valuation of Autonomy at Q4'11, specifically around the determination of fair value at the time of the acquisition and the evaluation of the effect of known errors."*

417.    EY recorded that they had reviewed HP's presentations to the SEC and to the SFO, and Autonomy's re-baselining review. They noted that, in determining Autonomy's enterprise value in 2011, HP had adopted a Discounted Cash Flow (DCF) model, with input from Duff & Phelps ("D&P").

418.    EY stated their conclusion in the round to be that:

> *"The impact of the valuation at Q4'11 of the known accounting errors does not materially impact the valuation as contemplated at Q4 2011, and further, it would not be appropriate to consider them in isolation."*

419.    On the various matters suggested by the Claimants to give rise to the question whether the 2011 accounts should be re-drawn, EY concluded as follows:

(1)    That they did not believe that the stand-alone loss-making "pass-through" hardware sales would have had any material impact on valuation using HP's model to fair value Autonomy, which was a DCF valuation model. Indeed, loss making hardware sales operated to reduce cash flows.

(2)    That neither reseller deals (referred to in the memorandum as "channel sales") nor sales of upfront hosting licences had a significant impact on the cash flows of the business. They involved moving revenue between quarters, and because HP used a DCF model to fair value Autonomy EY

---

[64] Mr Youngjohns explained in a blog at the time that HP had prepared one of the most extensive communication plans he had ever seen in 30 years. He explained in cross-examination that he had never "*seen anything quite like this in any other role*".

did not believe the timing differences would materially impact the valuation.

(3) As to concerns about reciprocal deals, if value received was legitimate, the arrangements did not impact cash flows either. The proposed adjustments identified by HP did not have a material impact on the original valuation model.

420.   These conclusions were relied on by the Defendants as endorsing their case that (a) there was no fraud and (b) the Claimants' case on loss was a confected one.

421.   The Claimants rejected the Defendants' reliance on EY's memorandum as misplaced because:

(1) The question at which it was aimed was whether HP, having recognised an impairment in November 2012, ought to restate its accounts in respect of the purchase of Autonomy in 2011. Ms Lesjak had explained that that question turned on whether the change in forecast underlying the impairment calculation resulted from correcting an error, or a change in estimate; and as HP told the SEC, it took the view that its revised forecast did not amount to correcting an error, because the original forecasts were not erroneous based on the facts that existed at the time. Rather, it considered the revised forecast a change in estimate based on new information;

(2) The memorandum was not shared with HP at the time and its context is unclear because EY have taken the position that the Claimants were not entitled to disclosure of its working papers and the memorandum itself was made available to the parties in these proceedings only because it had been admitted into evidence in the US criminal proceedings. Its context was unknown, and it should not be read out of context.

422.   The Defendants embraced EY's view as *"a far closer reflection of reality than the Claimants' case."* Their overall position as to the financial effect of the allegations, leaving aside their defence to the allegations themselves, was summarised as follows:

*The Claimants allegations ignore the fact that Autonomy s business was real business, and cash was received for the overwhelming majority of the transactions complained about. The hardware sales were real sales which generated revenue. In almost all cases the cash in respect of a reseller deal came in (whether from the reseller itself, or from an end-user). The alleged reciprocal deals involved cash payments from customers. The sales of licences to hosted customers all brought in real revenues. The OEM allegations are not suggested to have had any revenue (or cash) impact at all. This simple truth obviously calls into question the Claimants case on loss, which is a confected one. It is also important to keep in mind when considering the Claimants wider case*

> *as the existence of some over-arching fraudulent scheme to which Dr Lynch was party."*

*Backdrop to these proceedings and the effect of the US criminal proceedings*

423.   The announcement of the impairment write-down, and the reasons for it, served as a catalyst for proceedings by HP's shareholders against HP and its directors in the US, including derivative claims as well as securities claims for their failures in relation to the Acquisition. Those proceedings were ultimately settled against the backdrop that HP was itself going to bring proceedings against Dr Lynch and Mr Hussain.

424.   These proceedings, following criminal proceedings in Northern California against Mr Hussain which resulted in him being convicted of fraud, being sentenced to 5 years in prison, and having to pay circa $10 million in financial penalties, were issued on 30 March 2015, some two and a half years after HP had publicly accused the Defendants of fraud. They follow an astonishingly extensive trawl through Autonomy's documents and transactions in an effort to make good those early accusations, for which they appear to have had precious little support at the time, and even to provide a basis for quantifying loss in exactly the same amount as HP had asserted (without any discernible basis) in its public announcement of those accusations.

425.   Dr Lynch has been indicted and further to extradition proceedings commenced in September 2019 before the conclusion of evidence in this trial, the Home Secretary ordered his extradition on 28 January 2022. (On 9 February 2022, Dr Lynch applied for permission to appeal that decision.) Mr Chamberlain has also been indicted (on the same indictment as Dr Lynch), which Dr Lynch relied on to explain his absence (see paragraph [426(3)] below). A superseding indictment of 21 March 2019 showed that investigations had been extended to events relating to the founding and growth of Invoke and its investments, which the Defendants offered as the explanation for Mr Kanter and Ms Eagan declining to give evidence in these proceedings, for fear (according to the Defendants) of repercussions in potential US criminal proceedings.

426.   The US criminal proceedings, actual and prospective, have cast long shadows over these proceedings. It is not for me to question the basis on which the US courts have been satisfied as to their jurisdiction, though it is to be noted that the only person likely to have suffered direct loss[65], wherever the claims are adjudicated, is HP; and HP agreed to this jurisdiction. But the fact is that the effect of the US proceedings in this, the natural forum for these claims, has been considerable:

---

[65] I suppose it is possible that short sellers and/or derivative traders may claim to have been indirectly prejudiced; but an irony is that all shareholders of Autonomy enjoyed a premium greater than on HP's case they should have received; and there is nothing to suggest that any customers or third parties suffered any loss on any transactions with Autonomy on either side of the Atlantic. Shareholders in HP would have their own recourse for loss allegedly resulting to HP, subject always to rules restricting claims for derivative loss.

(1) Mr Hussain was in practice unable to attend proceedings brought against him in their natural forum and in his place of habitual residence alleging fraud and damages well in excess of all he probably has in financial terms.

(2) Throughout the hearing and all through his mammoth cross-examination, Dr Lynch has had to bear the additional burden of indictments against him and, since September 2019, the persistent threat of extradition.

(3) The Claimants noted that even before he was indicted, Mr Chamberlain did not provide any witness statement in these proceedings; but the fact is that he has long been under threat and has now been indicted by the US DoJ and charged by the FRC with acting dishonestly and/or recklessly as well as failing to act with competence and due care. Although the Claimants submitted that this had not been suggested to be and was not a good explanation for Dr Lynch not having called Mr Chamberlain, Dr Lynch did note in his written closing submissions that *"it is to be expected that he would wish to remain silent pending those charges"*: although I accept that and have not drawn inferences, without more, from his absence, he was a central character and I have felt it unavoidable and necessary to make findings in respect of his conduct notwithstanding his absence (as, in my assessment, he must always have appreciated was on the cards).

(4) As mentioned above, Mr Kanter and Ms Eagan (who is based in the US) declined to appear before me, though both had provided witness statements. Dr Lynch was apparently informed by their lawyers on 19 and 21 August 2019 respectively of their decision not to give evidence. No explanation appears to have been provided by those individuals' lawyers, and certainly none was elaborated to me. The Defendants submitted that neither of them (though both worked for DarkTrace) was within Dr Lynch's control; but even if technically true, and even if it is a reasonable inference that the extension of the US criminal investigation may have made them more reluctant to give evidence at this trial, it seemed to me likely, in the light of the fact that they had provided witness statements and until August 2019 they were in his running order, that had Dr Lynch really wanted them to attend they would have been persuaded to do so. The Claimants also noted that Dr Lynch had caused the press to be informed that it was he who had decided not to call them. It is difficult and I consider unnecessary to decide why they were not called. I have not drawn general inferences from their absence; but I have necessarily in particular instances drawn conclusions without being able to weigh in the balance any contrary evidence. That is inevitable: both were central actors; and Mr Kanter especially could have provided useful evidence bearing on factual matters where I have in consequence had to make determinations without his assistance; and likewise, though less often, in the case of Ms Eagan.

(5) Certain key witnesses whose evidence in the US criminal trial was admitted into these proceedings by hearsay notice had been given immunity in return for their evidence (namely, Messrs Joel Scott and David and Steven Truitt, and Ms Antonia Anderson as to whom see later). Mr Egan had entered into a deferred prosecution agreement ("DPA") which bound him to give evidence admitting culpability in the terms of a statement of fact negotiated and agreed with the DoJ, and not to offer any contradictory evidence or arguments on pain of immediate prosecution without defence for breach. Inevitably this invites caution and at least *prima facie* wariness as to their reliability, especially if and when their documented conduct appeared to reveal a different explanation than they offered in their evidence.

(6) The position of Mr Sullivan, and whether he was promised immunity, was unclear in this regard; but although he provided a signed witness statement and it appeared that he was to give oral evidence, the Claimants informed the Defendants at a late stage that he was unwilling to attend, and that the Claimants did not propose to invoke the procedure for compelling his attendance that they did embark upon in the case of Mr Egan. His evidence, and the transcripts of his evidence in the US criminal proceedings which dealt with many of the matters in issue here, but which he did not deal with in his witness statement, came in only as hearsay.

(7) Evidence from those witnesses in the US criminal proceedings who also provided a witness statement was often over-lawyered and too rehearsed to be authentic. Further, it became apparent that a number of the Claimants' witnesses had discussed their evidence with lawyers for the Claimants or the US prosecutors, often many times[66], to the extent that I often felt I was being treated to a received and then rehearsed version of events, rather than the witnesses' actual recollection.

(8) But for the earlier criminal trial in the US the Claimants would almost certainly have felt they had to call in these proceedings and to expose to cross-examination witnesses whose evidence in the US they instead relied on by its introduction under a hearsay notice. I have in mind (i) Mr Scott (ii) Mr Stephan (iii) Mr Steven Truitt (iv) Mr David Truitt (v) Mr Loomis (vi) Mr Channing (vii) Mr Johnson and (as indicated above) (viii) Mr Sullivan. Dr Lynch thus had no opportunity to cross-examine any of those witnesses. Throughout this trial I have had to be careful to remind myself that much of the evidence on a transcript was only hearsay evidence untested in these proceedings.

427. There were notable absences. The only oral evidence from anyone at Deloitte, was that of Mr Welham (who also gave evidence in the US criminal

---

[66] According to the Defendants' analysis, prior to the US criminal proceedings, Mr Egan had had 5 meetings with HP lawyers and 17 meetings with US prosecution lawyers in addition to meetings with his own lawyers. Mr Baiocco met with HP's lawyers some 3 or 4 times, and with US prosecutors some 6 times. By the time of this trial, he had also given evidence at length to the Grand Jury and in the US criminal proceedings. Mr Baiocco had his own lawyers, paid for by HP. Other witnesses had fewer but more than one meeting each with US prosecutors.

proceedings). He was not a partner of Deloitte at the relevant times. The audit partners, Mr Richard Knights (for 2009 and Q1 2010) and then Mr Nigel Mercer (for the 2010 yearly audit), did not give any evidence. Their attendance would greatly have assisted me; and indeed the Defendants maintain that it is to be inferred from the fact that the Claimants did not call either, that (in a different way) it would ultimately have helped them. The Defendants pointed out in that regard that a Settlement Agreement entered into with Deloitte in April 2016 gave the Claimants unusual control over Mr Knights as a potential witness: clause 6 gave them the right (*inter alia*) to require Mr Knights to prepare for and attend interviews, sign statements and attend voluntarily as a witness at this trial. It follows that the Claimants had the ability to procure his attendance. The only explanation offered for not calling him is that he was involved in disciplinary proceedings brought by the FRC. But the Defendants submitted that that was not a good explanation, and pointed out also that the defence served on his behalf (and that of Deloitte) in those proceedings supported aspects of Dr Lynch's (and Mr Hussain's) position. I have had to bear that in mind also, though I do not consider any general inference such as the Defendants submitted should be made that their evidence would have supported their case is warranted. It depends obviously on the facts and circumstances out of which each issue arises.

428.   There were gaps on the Defendants' side in addition to those already noted. Mr Zanchini, who also works for Darktrace, provided a witness statement, but this was withdrawn when the Defendants decided not to call him. Dr Menell, a central character who was copied into many of the critical emails, provided no evidence at all. With regard to Dr Menell, Dr Lynch said in cross-examination *"I guess you would call it a medical issue".* I invited Mr Rabinowitz to explore this; but he declined on the basis that he did not wish to embarrass Dr Menell. I have drawn no inferences; but again, his evidence could have assisted me, and again I have in consequence had to make determinations (including as to their conduct) without their assistance.

429.   Mr Zanchini's role was more limited. However, as will be seen, he was one of the individuals said by the Defendants to have spent all his technical time in Q1, Q2 and Q3 2009 on the development of a product called "SPE". The issue became one of some importance. As no documents had been identified to suggest that Mr Zanchini had spent any of his time in the first three quarters of 2009 doing any such work on SPE, the Claimants invited the inference that at least one of Dr Lynch's reasons for declining to call him was that Mr Zanchini could not have given truthful evidence in support of Dr Lynch's case on the matter. I take that into account also when considering the issue later, as I do in respect of his direct involvement in one of the impugned VAR transactions (the "Vatican Library" transaction, "VT13") where I have also had to make determinations (in the event, contrary to the Defendants) without the benefit of his evidence.

430.   Lastly in this resume of problems with the witness evidence, there is always significant danger in rehearsed evidence, especially when expanded over time. Memory is never complete, and often it is an amalgam of real memory and the received, with confirmation bias accentuating those parts of it which have

become important support for a given point of view. Further, the events in question took place nearly a decade before this trial. I have had to be careful throughout in my approach to the witness evidence, and the documents, as usual, provided a clearer and less tainted guide. Even in that context, however, a number of documents were labelled by the Claimants as "pre-textual". I have sought to indicate those in the course of this judgment.

431.   I turn next to various legal issues which arise in respect of the various claims.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

## LEGAL ISSUES AND TESTS OF LIABILITY UNDER FSMA

### (a) Overview and background to the provisions of FSMA

432.    Autonomy's liability to Bidco is said to arise under s. 90A FSMA ("s. 90A"), and its successor Schedule 10A FSMA ("Sch 10A"). S. 90A, introduced into FSMA by the Companies Act 2006, was in force from 8 November 2006 to 30 September 2010. Sch 10A came into force on 1 October 2010, but s. 90A continues to apply to information first published before that date.[67]

433.    S. 90A and Sch 10A share the same broad scheme. They impose liability on the issuers of securities for misleading statements or omissions in certain publications, but only in circumstances where a person discharging managerial responsibilities at the issuer (a "PDMR") knew that or was reckless as to whether the statement was untrue or misleading, or knew the omission to be a dishonest concealment of a material fact. The issuer is liable to pay compensation to anyone who has acquired [68] securities in reliance on the information contained in the publication, for any losses suffered as a result of the untrue or misleading statement or omission, but only where the reliance was reasonable.

434.    In the present case, the alleged liability of Autonomy under s. 90A/Sch 10A is used as a stepping-stone to a claim against Dr Lynch and Mr Hussain: it is something of a 'dog leg claim' in which, having accepted full liability to Bidco, Autonomy now seeks to recover in turn from the Defendants. There is no conceptual impediment to this. However, it is right to bear in mind that in interpreting the provisions and conditions of liability, the relevant question is whether the issuer itself should be liable, bearing in mind that in the usual course, the issuer's liability will fall on the general body of its shareholders, rather than on the director or other individual primarily responsible for any misstatement.

435.    FSMA was the first UK statute to provide a statutory scheme of liability to investors for misstatements made to the market by issuers, other than through prospectuses; and this case is believed to be the first s. 90A or Sch 10A case to come to trial in these Courts.

436.    This statutory scheme for issuer liability for misstatements or deliberate omissions in published information has been some time in the making. English law had historically not provided a remedy for investors acquiring shares on the basis of inaccuracies in a company's financial statements. Until the introduction of s. 90A in 2006, there was no statutory regime imposing civil liability for inaccurate statements in information disclosed by issuers to the market. This stands in contrast to the long-established statutory scheme of liability for

---

[67] Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010/1192, regulation 3 (Transitional provision).
[68] Or, under Sch 10A, acquired, continued to hold or sold.

misstatements contained in prospectuses, first set out in the Directors Liability Act 1890, and now contained in the widely drawn provisions of s. 90 FSMA.[69]

437.   The rationale for the different treatment of liability for misstatements in prospectuses and those in other disclosures – with a tougher regime for prospectuses – is easy to understand. "*[T]he prospectus is a 'selling document', produced by the issuer to promote its securities to investors, whereas periodic and ad hoc reports are expressions of routine reporting requirements which do not typically coincide with a selling effort on the part of the company*".[70] An untrue statement in a prospectus can lead to payments being made to the company on a false basis, but the same cannot be said of an untrue statement contained in, say, an annual report.

438.   Nor did the common law provide an easy route to recovery for an investor who had acquired shares in reliance on a misstatement in a company's periodic or *ad hoc* disclosures:

(1)   Claims in deceit did not readily give rise to liability for such misstatements, because of the requirement in *Derry v Peek* (1889) 14 App Cas 337 that the maker of the statement should have intended that the recipient of the statement rely on it: as noted in the Davies Review[71], although that requirement might easily be satisfied in the case of a prospectus, which is a selling document, it is difficult to satisfy in the case of an annual or quarterly report, which is primarily a report to shareholders on the directors' stewardship and not obviously intended to induce reliance by securities trading.

(2)   Claims in negligence were in general precluded by the House of Lords' decision in *Caparo v Dickman* [1990] 2 AC 605 that liability for economic loss due to negligent misstatement was confined to cases where the statement or advice had been given to a known recipient for a specific purpose of which the maker was aware. Since statutory accounts are prepared for the purposes of assisting shareholders to exercise their governance rights, rather than enabling them to take investment decisions, an investor who acquired shares in reliance on a company's published accounts would not normally have a cause of action.

(3)   Furthermore, the 'safe harbour' provisions of s. 463 Companies Act 2006 entirely preclude liability to third parties in respect of 'narrative' reports, subject only to s.90A/Sch 10A FSMA.

439.   Accordingly, until the enactment of s. 90A, there was no scope for a claim of the present type. The explanatory note to the legislation by which s. 90A was introduced in 2006 stated that as at that time, no issuer had been found liable in

---

[69]For an overview of the liability of issuers prior to the enactment of s. 90A, see Professor Paul Davies QC, Davies Review of Issuer Liability: Discussion Paper (HMSO, March 2007) *("the Davies Review")*.

[70]Davies Review of Issuer Liability: Discussion Paper.

[71] See *Davies Review of Issuer Liability - Discussion Paper* para 44.

damages under English law in respect of statements made in narrative reports or financial statements.[72]

440.   The ultimate catalyst for the introduction of a scheme of liability was the Transparency Directive ("TD")[73] in 2004. This required Member States to apply their national liability regimes to the disclosures required by that Directive and to apply them to *"at least…the issuer or its administrative…bodies."* The TD's insistence on enhanced disclosure obligations and the requirement for a responsibility statement gave rise to concerns that the English law's restrictive approach to issuer liability would be disturbed, and that issuers (and directors and auditors) might be made liable for merely negligent errors contained in narrative reports or financial statements.[74]

441.   In light of these concerns, and in recognition of the historical tendency against liability, the regime for issuer liability was introduced in this jurisdiction piece-meal, starting with a stop-gap solution introduced into FSMA by the Companies Act 2006 in the original form of s.90A. This approach allowed for further enquiry and consideration whether any more extensive regime was appropriate.

442.   Any such scheme inevitably involves a balance, especially between the desirability of encouraging proper disclosure and affording recourse to a defrauded investor in its absence, and the need to protect existing and longer term investors who, subject to any claim against relevant directors (who may not be good for the money), may indirectly bear the brunt of any award. The explanatory note referred to the uncertainty which the TD had created, and stated that the government was *"anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties, in order to protect the interests of company members, employees and creditors".*[75] In the debates on the introduction of this provision, a government minister referred to *"the Government's desire to avoid radical change to the law in this area, to respect the preferences of stakeholders and, especially, to ensure that company resources are not inappropriately diverted from shareholders, employees and creditors to the benefit of a much wider group of actual and potential investors".*[76]

443.   Amongst the matters for particular consideration were (a) whether negligence or (as in the USA) gross negligence should suffice or whether liability should continue to depend on proof of fraud; (b) what should count as published information; and (c) who apart from the issuer should be prospectively liable.

444.   After the Davies Review, and a process of consultation and subsequent Final Report by Professor Davies ("the Final Report"), the original s. 90A provisions were extended (a) to issuers with securities admitted to trading on a greater variety of trading facilities (b) to relevant information disclosed by an issuer through a UK recognised information service (c) to permit sellers, as well as

---

[72] Explanatory note to Companies Act 2006, s. 1270, paragraph 1637.
[73] Council Directive 2004/1209/EC.
[74] Davies Review of Issuer Liability: Discussion Paper (above).
[75] Explanatory note to the Companies Act 2006, paragraphs 1637 and 1643.
[76] Margaret Hodge MP, Hansard, HC, Standing Committee D, Col, 482 (6 July 2006):
https://publications.parliament.uk/pa/cm200506/cmstand/d/st060706/am/60706s02.htm

buyers, of securities to recover losses incurred through reliance on fraudulent misstatements or omissions and (d) to permit recovery for losses resulting from dishonest delay in disclosure. However, Professor Davies recommended that liability should continue to be based on fraud, and his recommendation was accepted. Further, no change was suggested or made to the limitation to PDMRs of the persons other than the issuer who could be made liable, and no specific provisions to determine the basis for the assessment of damages was introduced.

445.   As emphasised by the Defendants, this history is not merely of antiquarian interest. It is relevant when considering the scope of the section, and in particular the matters left open by the draftsman such as the nature of the reliance that must be shown, and the measure of damages. I accept the Defendants' general admonition that the Court should not interpret and apply the section in a way which exposes public companies and their shareholders to unreasonably wide liability.

*(b)*      *Conditions for liability under s.90A and Sch 10A FSMA*

446.   S. 90A(3), in the form that applied until 30 September 2010, read as follows, so far as material:

> *"(3)      The issuer of securities to which this section applies is liable to pay compensation to a person who has–*
>
> > *(a) acquired such securities issued by it, and*
> >
> > *(b) suffered loss in respect of them as a result of–*
> >
> > > *(i)  any untrue or misleading statement in a publication to which this section applies[77], or*
> > >
> > > *(ii) the omission from any such publication of any matter required to be included in it.*
>
> *(4) The issuer is so liable only if a person discharging managerial responsibilities within the issuer in relation to the publication–*
>
> > *(a) knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or*
> >
> > *(b) knew the omission to be a dishonest concealment of a material fact.*
>
> *(5) A loss is not regarded as suffered as a result of the statement or omission in the publication unless the person suffering it acquired the relevant securities–*

---

[77] That is, any reports and statements published in response to a requirement imposed by a provision implementing Article 4, 5 or 6 of the Transparency Directive, and any preliminary announcement of information to be included in such a report or statement: s. 90A(1).

> *(a) in reliance on the information in the publication, and*
>
> *(b) at a time when, and in circumstances in which, it was reasonable for him to rely on that information. ..."*

447.    The equivalent provision of Sch 10A is paragraph 3:

> *"(1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—*
>
> > *(a) acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and*
> >
> > *(b) suffers loss in respect of the securities as a result of—*
> >
> > > *(i) any untrue or misleading statement in that published information, or*
> > >
> > > *(ii) the omission from that published information of any matter required to be included in it.*
>
> *(2) The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.*
>
> *(3) The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.*
>
> *(4) A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—*
>
> > *(a) in reliance on the information in question, and*
> >
> > *(b) at a time when, and in circumstances in which, it was reasonable for him to rely on it."*

448.    It is to be noted that the provisions make clear that there is both an objective test (the relevant information must be demonstrated to be "untrue or misleading" or the omissions a matter "required to be included") and a subjective test (a PDMR must know that the statement was untrue or misleading, or know such omission to be a "dishonest concealment of a material fact", which I refer to here as "guilty knowledge"). To establish guilty knowledge, it must be proven that (i) the relevant information was objectively false, (ii) the defendant knew that, in the sense it was likely to be understood, it was false and that (iii) the claimant himself understood it in its false sense and relied on that false sense in making his investment decision. Also, whether a

claimant's reliance was "reasonable" is to be tested at the time of the investment decision according to the circumstances applicable to him. I elaborate on these ingredients below.

*(c) Published information*

449. Whether under s. 90A of FSMA or under its successor, Schedule 10A of FSMA, liability can only be established against an issuer by a claimant proving reliance on (a) "*untrue or misleading statements*" in a *"publication"* (the expression used in s. 90A) or *"published information"* (the expression used in Schedule 10A) to which the provisions apply and which a PDMR within the issuer knew to be "*untrue or misleading*" (or was "*reckless*" in that regard), or (b) the omission of a matter required to be included in that publication or published information in circumstances where a PDMR knew the omission to be a "*dishonest concealment of a material fact*".

450. As regards the information to which the provisions apply, it is common ground that Autonomy's Annual and Quarterly Reports for the Relevant Period (that is, the Quarterly Reports for Q1 2009 to Q2 2011 and the Annual Reports for FY 2009 and FY 2010) were publications to which s. 90A applied or, in the case of those published after 1 October 2010, published information to which Sch 10A applied. It is also common ground that the earnings calls and transcripts of earnings calls from before 1 October 2010 were <u>not</u> covered by s. 90A.[78]

451. There is a dispute over whether earnings calls or transcripts of earnings calls for quarters after that date (Q3 2010 onwards) constituted published information for the purposes of Sch 10A. The Claimants said they did; the Defendants said they did not.

452. It is important first to clarify that:

(1) there was no evidence that anyone at HP ever listened to any of the earnings calls; and

(2) the transcripts were not themselves published by recognised means.

So the only live question is whether the <u>availability</u> of the transcripts was announced by Autonomy by recognised means within the meaning of paragraph 2(1)(b) of Sch 10A FSMA.

453. Paragraph 2(1) of Sch 10A of FSMA states:

*(1) This Schedule applies to information published by the issuer of securities to which this Schedule applies:*

*(a) by recognised means, or*

---

[78]The relevant paragraph in the RRAPoC is confined to earnings calls in respect of Quarterly Reports published <u>after</u> 1 October 2010.

> *(b) by other means where the availability of the information has been announced by the issuer by recognised means."*

454.  The Claimants submitted that the effect of paragraph 2(1)(b) was that the transcripts (and thus the information recorded as having been broadcast on those calls) after 1 October 2010 constituted published information because their availability was announced by Autonomy (the issuer) by recognised means. They relied on the following:

(1)  It is common ground that Autonomy's Quarterly Reports were published by recognised means (which include a "recognised information service" such as the RNS service); and these provided details of the time, date and website for the forthcoming earnings call;

(2)  This constituted an announcement by recognised means of the information that would end up being broadcast on that call; and

(3)  Accordingly, that information is subject to Sch 10A regardless of the fact that the transcripts of the earnings calls themselves were not published by recognised means.

455.  The Defendants submitted that the Claimants are wrong:

(1)  Paragraph 2(1)(b) is intended to address the situation where, rather than transmitting a document directly by recognised means, the document is announced by recognised means but made available by other means, for instance where a company publishes its annual report on its website and puts out an announcement through a regulatory news service that it is so available.

(2)  That is to be distinguished from the case where (as in this case) the document in question is never itself published: and simply because a website address or telephone number is referenced by recognised means does not render all information on that website or given in the call "published information".

(3)  Thus, the provision of details needed to join the earnings call did not make the information communicated on the call itself published information.

(4)  Further, even if the above is wrong, the transcripts themselves do not amount to published information: it was not said that Autonomy announced the availability of the transcripts by recognised means, and it did not. If HP relied on a transcript of a call to which it did not dial in at the time, it would not be relying on published information.

(5)  In any event, there is no evidence that anyone at HP ever read any of the transcripts other than those for Q1 and Q2 2011: the Claimants cannot have relied on documents they never read, nor on calls they never heard.

456.    In my view, the question as to whether paragraph 2(1)(b) applied depends upon whether the provision by recognised means of details needed to join an earnings call should be taken to include the announcement by recognised means of the availability of any transcript made of the call even though the latter is not specifically announced.

457.    In my judgment, the answer is that it does not. The announcement by recognised means made no mention of any transcript. All that was announced by recognised means was the information necessary to enable participation in the call itself. A transcript might be introduced as evidence of what had been said at an earnings call, but only to support a participant's primary evidence of what he or she had heard.  Further, there may be various transcripts, sometimes in different form (as indeed there were in respect of at least one of the earnings calls in this case) sometimes produced by Bloomberg and/or Thomson Reuters and thus someone other than the issuer: it cannot have been intended that all versions should be treated as information published by the issuer, and there is no basis in the language for restricting the published information to a version approved by the issuer, nor in fact any evidence that Autonomy ever itself issued/published an approved version.

458.    I also accept the view expressed in Dr Lynch's written closing submissions that, on the facts of this case, the point itself is largely academic since the Claimants cannot have relied on documents they never read or calls they never heard, and (as previously noted) there is no evidence that anyone from HP listened to any of the earnings calls, or read any of the transcripts other than the transcripts for Q1 and Q2 2011 which Mr Sarin said he had read. I develop this point at greater length later.

459.    However, my conclusion that the transcripts do not constitute published information for the purposes of FSMA does not mean that they are inadmissible and/or irrelevant. For example, they may be relevant in the context of the OEM claim (see in this regard paragraphs 3162 and 3163 below); and also more to the question of what analysts and the investment community knew, or were told, though of course individual conversations should not be taken to import knowledge across a broader constituency.

*(d) Untrue or misleading statement or omission*

460.    Unless a statement in published information (or a *"relevant publication"*) contains a *"false or misleading statement"* or omits any *"matter required to be included in it"*, there can be no question of liability under s. 90A or Sch 10A of FSMA. At this first stage, the question is as to the objective meaning of the impugned statement, that is the meaning which would be ascribed to it by the intended readership, having regard to the circumstances at that time.

461.    As to the objective meaning of a statement, Christopher Clarke J (as he then was) provided the following further guidance as to what is required to be

shown[79] in *Raiffeisen Zentralbank Osterreich AG v The Royal Bank of Scotland Plc* [2010] EWHC 1392 (Comm) at [81] to [82] and [86] to [87][80]:

> 81. *Whether any and if so what representation was made has to be judged objectively according to the impact that whatever is said may be expected to have on a reasonable representee in the position and with the known characteristics of the actual representee". MCI WorldCom International Inc v Primus Telecommunications plc [2004] EWCA Civ 957, per Mance LJ, para 30. The reference to the characteristics of the representee is important…*

> 82. *In the case of an express statement,  the court has to consider what a reasonable person would have understood from the words used in the context in which they were used": IFE Fund SA v Goldman Sachs International [2007] 1 Lloyd's Rep 264, per Toulson J at [50] (upheld by the Court of Appeal at [2007] 2 Lloyd's Rep 449). The answer to that question may depend on the nature and content of the statement, the context in which it was made, the characteristics of the maker and of the person to whom it was made, and the relationship between them.*
> …
> 86. *It is also necessary for the statement relied on to have the character of a statement upon which the representee was intended, and was entitled, to rely. In some cases the statement in question may have been accompanied by other statements by way of qualification or explanation which would indicate to a reasonable person that the putative representor was not assuming a responsibility for the accuracy or completeness of the statement or was saying that no reliance can be placed upon it. Thus the representor may qualify what might otherwise be an outright statement of fact by saying that it is only a statement of belief, that it may not be accurate, that he has not verified its accuracy or completeness, or that it is not to be relied on.*

> 87. *Lastly the claimant must show that he in fact understood the statement in the sense (so far as material) which the court ascribed to it: Arkwright v Newbold (1881) 17 Ch D 301; Smith v Chadwick (1884) 9 App Cas 187; and that, having that understanding, he relied on it. This may be of particular importance in the case of implied statements."*

---

[79] Albeit in the context of the Misrepresentation Act 1967, rather than FSMA.

[80] See also *Barley v Muir* [2018] EWHC 619 (QB) at [177] per Soole J, contrasted with implied misrepresentation at [178]. See also *Primus Telecommunications Plc v MCI WorldCom International Inc* [2004] EWCA Civ 957 per Mance LJ at [30] (a case of implied misrepresentation but not in terms confined to that, Mance LJ also left the door open to a different approach in fraud). See also *Kyle Bay Ltd v Underwriters Subscribing under Policy No. 01957/08/01* [2007] 1 CLC 164, at [30]-[33], per Neuberger LJ.

HC-2015-001324

462.    Establishing, for these purposes, what was the context of the statement when made, and the characteristics of the representee, is not always straightforward, even in the context of a negotiation between parties in direct communication. In this case, at least as regards the FSMA claim, the difficulty is the greater because statements were addressed in publications issued generally over a period of time to diverse addressees, and in parallel and at various different times further information and/or explanations were given to various persons within the market (but not issued generally to the market), which might or might not have informed the view and understanding of the market as a whole.

463.    Further, the content of the published information covered by s. 90A and Sch 10A will often [81] be governed by accounting standards, by the companies legislation and especially the Companies Act 2006, and by the Disclosure and Transparency Rules. Compliance with those standards, provisions and rules will frequently involve the exercise of accounting judgement on points where there may be a range of permissible views.  A statement is not to be regarded as false or misleading where it can be justified by reference to that range of views.

464.    Where the meaning of a given statement is unambiguous, and the only question is whether the defendants nevertheless believed it conveyed a different meaning, the genuineness of the defendant's belief in a different meaning may be usefully tested according to the obviousness or extravagance of its departure from the settled objective meaning, though even then mere implausibility is not capable of amounting to fraud and the test is always as to the genuineness of the defendant's state of mind.  As Males J (as he then was) noted in *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm):

> *"In practice, however, the objective meaning of the statement is not irrelevant. As the Privy Council went on to say [in Akerhielm]:*
>
> *"This general proposition is no doubt subject to limitations. For instance, the meaning placed by the defendant on the representation may be so far removed from the sense in which it would be understood by any reasonable person as to make it impossible to hold that the defendant honestly understood the representation to bear the meaning claimed by him and honestly believed it in that sense to be true.""*

465.    Sometimes, two or more possible interpretations appear legitimate: that is a case of genuine ambiguity. In such a case, it is not the function of the court to determine which is the more likely meaning, as it would be in a case concerning contractual interpretation. Where the implicated statement is genuinely ambiguous an election between two (or more) reasonable available meanings may well be unnecessary and even unwise. The claim may fail at the first hurdle, unless it is shown that the ambiguity was artful or contrived by the defendant,

---

[81] Invariably for a claim under s. 90A (which, broadly speaking, applies only to information in quarterly, interim or annual reports); but not invariably for a claim under Sch. 10A, given the broader range of "published information" that such a claim may cover.

in which case that will be evidence (it may well be determinative evidence) of dishonesty at the second subjective stage.

466.    Further, the claimant must prove also that he understood the statement in the sense ascribed to it by the court: as Cotton LJ explained in *Arkwright v Newbold* (1881) 17 Ch D 301:

> "*In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement, according to the construction put on it by the Court, is false, when the plaintiff does not venture to swear that he understood the statement in the same sense which the Court puts on it. If he did not, then, even if the construction may have been falsified by the facts, he was not deceived.*"

*(e) Guilty knowledge*

467.    The basis for the issuer's liability for a misstatement in published information being fraud on the part of at least one PDMR,[82] the ascertainment of objective meaning, even if the statement is unambiguous, is only the beginning of the enquiry. As the Privy Council held in *Akerhielm v de Mare* [1959] AC 789:

> "*The question is not whether the defendants in any given case honestly believed the representation to be true in the sense assigned to it by the court on an objective consideration of its truth or falsity, but whether he honestly believed the representation to be true in the sense in which he understood it albeit erroneously when it was made.*"

468.    As in the common law of deceit, it must be proven that a PDMR (as it is accepted each Defendant was) *"knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading"*; or alternatively, that he knew that the omission of matters required to be included was the dishonest concealment of a material fact. For both s. 90A and Sch 10A, the language used shows that there is a requirement for actual knowledge.

469.    *Derry v Peek* also sheds light on what it means to know a statement to be true or misleading. In the case of a statement, it is not sufficient that a person knows the facts which render a statement untrue: he will only be liable if those facts were present to his mind at the moment when the statement is made, such that he appreciates that the statement is untrue.[83] In the case of an omission, the PDMR must have applied his mind to the omission at the time the information was published, and appreciated that a material fact was being concealed (i.e. that it was required to be included, but was being deliberately left out). Otherwise, it could not be said that he "*knew the omission to be a dishonest concealment of a material fact*". In the context of this case, the Defendants submitted that means that the Claimants would need to prove in respect of any

---

[82] Sch 10A §3(2) and 3(3). S. 90A contained a similar concept: see s. 90A(4) ("*person discharging managerial responsibilities within the issuer in relation to a publication*").

[83] See the discussion of *Derry v Peek* and *Armstrong v Strain* at paragraphs 549 and 550 below, in the context of the claim in deceit.

alleged omission that Dr Lynch knew there was a <u>requirement</u> to include the relevant fact.[84] Unless he knew there was such a requirement, there can be no liability for dishonest concealment.

470.    Liability also extends to recklessness: but it is common ground that recklessness bears the meaning laid down in *Derry v Peek* (1889) 14 App. Cas. 337, that is, not caring about the truth of the statement, such as to lack an honest belief in its truth.  Honest belief in the truth of a statement defeats a claim of recklessness, no matter how unreasonable the belief (though of course the more unreasonable the belief asserted the less likely the finder of fact is to accept that it was genuinely held).[85]

471.    For the purposes of paragraph 3(3) and deliberate concealment by omission, but not, it would seem, paragraph 3(2) and overt misrepresentation, dishonesty has a special definition under Sch 10A, (though s. 90A contained no such special definition).  Paragraph 6 provides that for the purposes of paragraphs 3(3) and 5(2) (re dishonest delay in publishing information) a person's conduct is regarded as dishonest only if:

> *"(a)  it is regarded as dishonest by persons who regularly trade on the securities market in question, and*
>
> *(b)     the person was aware (or must be taken to have been aware) that it was so regarded."*

472.    As is apparent from the Government's July 2008 consultation paper on what would become Sch 10A, this was intended to be a statutory codification of the common law test for dishonesty laid down in *R v Ghosh* [1982] 1 QB 1053.  As the Claimants noted, however, the Defendants have never relied on an argument based on the difference between that test and the revised and now applicable test in *Ivey v Genting Casinos (UK) Ltd* [2018] AC 391 which no longer requires that it be established that the defendant appreciated that his conduct was dishonest by the standards of ordinary decent people.  As explained in *Ivey* (at [74]):

> *"When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the*

---

[84] On that basis it would not be enough that Deloitte considered further disclosure might be preferable on a particular point.

[85] And see paragraph 472 below and the decision in *Ivey*.

> *defendant must appreciate that what he has done is, by those standards, dishonest."*

473. Cogent evidence is required to justify a finding of fraud or discreditable conduct, and the courts recognise that it is generally unlikely that people engage in such conduct. Where a claimant seeks to prove a case of dishonesty, its inherent improbability means that, even on the civil burden of proof, the evidence must be strong enough to overcome the general presumption that innocent incompetence is more frequent and more likely than dishonest design and fraud. The more serious the allegation the more cogent the evidence required to overcome the unlikelihood of what is alleged and thus to prove it. The more serious the consequences for the individual involved, the less likely he would be to run the risk of those consequences. See *In re D* [2008] UKHL 33, at §§23-28 (Lord Carswell) and §§40-42 (Lord Brown); and *Fiona Trust & Holding Corp v Privalov* [2010] EWHC 3199 (Comm) at §§1438-1439 (Andrew Smith J). See also *Jafari-Fini v Skillglass Ltd* [2007] EWCA Civ 261, where Carnwath LJ said this (at §40):

> *"Thus in civil proceedings, the "presumption of innocence" is not so much a legal rule, as a common sense guide to the assessment of evidence. It is relevant not only where the cause of action requires proof of dishonesty, but, wherever the court is faced with a choice between two rival explanations of any particular incident, one innocent and the other not. Unless it is dealing with known fraudsters, the court should start from a strong presumption that the innocent explanation is more likely to be correct."*

474. For both allegedly misleading statements and omissions, it is relevant to consider any advice given to the company and its directors from professionals. The relevance of that advice to a determination of dishonesty is likely to depend on (a) whether the issue to which the statement or omission related was one which fell within the professional expertise and remit of the person providing the advice; (b) whether and to what extent the form or content of the relevant statement was necessarily based on the advice given; and (c) whether by contrast, the person providing the advice would not be in a position to assess how the readership would construe what was said and/or what its true likely import and impact would be.

475. Thus, where a director understands, on the basis of guidance from the company's auditors on an issue as to the intended scope of an accountancy statement, that such accountancy statement and practice do not require the disclosure of a particular fact in the company's published information, the omission of that fact on the basis of that advice is unlikely to amount to a dishonest concealment of a material fact. Even if the Court takes the view that disclosure of the fact was required, the requirement for dishonesty is unlikely to be satisfied where the director was acting in accordance with the advice of reputable professionals in such a context. Similarly, if a PDMR has been advised by auditors that a particular statement included in the accounts was a

fair description of some aspect of the company's business required to be disclosed under the acts or accountancy standards or statements of practice, it may be unlikely that he knew the statement to be untrue or misleading, or that he was reckless as to its truth, unless the auditors did not have the full picture or were misled.

476. Particular care is necessary in this context in the present case. In respect of every one of the allegations made against him, Dr Lynch (in particular) relied on the fact that Deloitte, who it was largely common ground had detailed knowledge of Autonomy's business and the specific transactions giving rise to the claim, had approved not only the accounts but also the narrative 'front-end' reports and presentations of Autonomy's business activities. He relied on their approval, or at least their lack of objection, as the demonstration of the integrity and honesty of those reports and presentations. However, there are good reasons, both theoretical and practical, why auditors have an attenuated role in respect of such reports. As a theoretical matter, the purpose and objective of these 'front-end' reports are to reflect the directors' view of the business rather than the auditors', and to require directors to provide an accurate account according to their own conscience and understanding, neither of which can properly be delegated. As a practical matter, directors are likely to be, and should be, in a better position than an auditor to assess the likely impact on their shareholders of what is reported, and (for example) to assess what shareholders will make of possibly ambiguous statements. In short, on matters within the directors' proper province, the view of the company's auditors cannot be regarded as a litmus test nor a 'safe harbour': auditors may prompt but they cannot keep the directors' conscience.

477. Another issue which arose is as to the necessary nexus between an allegedly false statement, knowledge of its falsity, and the investment decision made by the claimant said to have given rise to loss. The Claimants referred in their written opening to "*the relatively limited scope of the knowledge that must be proved in order for a Schedule 10A claim to arise,*" arguing that "*It is sufficient if the Defendants knew enough to appreciate that there was at least one statement in the published information that was false.*" I do not accept that. I agree with the Defendants that it is clear from the language of the Schedule that a PDMR must have the relevant guilty knowledge in respect of each false statement or omission alleged to give rise to liability. Paragraph 3(2) states that "*The issuer is liable <u>in respect of an untrue or misleading statement</u> only if a person discharging managerial responsibilities within the issuer <u>knew the statement to be untrue</u> or misleading or was reckless as to whether it was untrue or misleading.*" Liability is only engaged in respect of statements known to be untrue.[86] If a company's annual report contains ten misstatements, each of them relied on by a person acquiring the company, but it can only be shown that a PDMR knew about one of those misstatements, the company will only be liable in respect of that one, not the other nine.

---

[86] The same argument applies in relation to omissions: Sch 10A §3(3).

*(f) Reliance*

478.    It will already be apparent that reasonable reliance is another necessary precondition to liability under s. 90A and Sch 10A.  It is expressly provided that the reliance must be reasonable at the time of the investment decision and in the circumstances as they were then; and that a loss is not to be regarded as suffered as a result of the statement or omission unless the person suffering loss acquired securities "*in reliance on the information in question, and … at a time when, and in circumstances in which, it was reasonable for him to rely on it.*"[87]

479.    As the Claimants noted in their written closing, Sch 10A does not define the requirement of reliance on published information.  They submitted that the concept of reliance is therefore to be informed by the position at common law.  The Defendants accepted this, but only insofar as the language of Sch 10A is unclear: and they submitted that the language of the section provides an answer on several of the points in issue.

480.    The Defendants identified four questions: (i) reliance by whom? (ii) reliance on what? (iii) what degree of reliance? and (iv) when is reliance reasonable?  I address each in turn, and in doing so (within question (i)) I address a particular issue which arose as to the position of Bidco ("the Bidco point") which is relevant not only in the context of the FSMA claim but also in the context of the Claimants' other 'direct' claims for deceit and/or misrepresentation.

*Reliance by whom?*

481.    As to the question of "reliance by whom?", s. 90A and Sch 10A both require reliance by the person who acquired the relevant securities, not some other person.  This is clear from the way the provisions are drafted: see in particular s. 90A(5) and Sch 10A §3(1)(a).[88]  The latter provides a remedy to "*a person who…acquires, continues to hold or disposes of the securities in reliance on published information*".

482.    The Defendants also submitted that this point is consistent with and made clear in the cases on misrepresentation and deceit.  In order to succeed on a claim in misrepresentation or deceit, the claimant must have relied on the misrepresentation.  This means that it must have been present to the claimant's mind at the time when it took the action on which the claim is founded; or put another way, the claimant must give some contemporaneous, conscious thought to the representation.  It is not enough that somebody else (not the claimant) applies his mind to the representation.  As to this, the Defendants relied especially on:

---

[87]Sch 10A §3(4) and, in similar but not identical terms, S. 90A(5).
[88]S. 90A(5): "*A loss is not regarded as suffered as a result of the statement or omission in the publication unless <u>the person suffering it acquired the relevant securities</u>– (a) <u>in reliance on the information</u> in the publication…*"; Sch 10A §3(1): "*An issuer of securities to which this Schedule applies is liable to pay compensation to <u>a person who</u>—(a) <u>acquires, continues to hold or disposes of the securities in reliance on published information</u> to which this Schedule applies…*".

(a) Cartwright, Misrepresentation, Mistake and Non-Disclosure
(4th Ed., 2017) at §3-50:

> *The requirement of a causal link between statement and
> loss. Whichever remedy is sought for misrepresentation,
> it will be necessary to establish an adequate link between
> the statement and the consequence from which the
> representee claims to be relieved. If the claim is for
> damages, the question is whether the statement caused
> the loss. If the claim is for rescission of a contract, the
> inquiry is as to the causal link between the statement and
> the claimant s entry into the contract. The language used
> in the different remedies, and the legal tests employed for
> them, will vary, but generally the issue is similar: it is an
> issue of the claimant s reliance on the statement, and
> whether the statement caused the harm in issue. A false
> statement, even one made fraudulently, will not be
> actionable as a misrepresentation by the person to whom
> it was addressed if it had no impact on his actions, nor
> otherwise caused him loss. This means that the statement
> must have been present to the claimant s mind at the time
> when he took the action on which he bases his claim, but
> the claimant need not prove that he believed that the
> statement was true: it is sufficient that, as a matter of
> fact, he was influenced by the misrepresentation."*

(b) Chitty on Contracts (33rd Ed, 2018) at §7-036:

> *Inducement*
>
> *It is essential if the misrepresentation is to have legal
> effect that it should have operated on the mind of the
> representee. It follows that if the misrepresentation did
> not affect the representee s mind, because he was
> unaware that it had been made or because he was not
> influenced by it, he has no remedy."*

(c) *Marme v Natwest Markets Plc* [2019] EWHC 366, at §§281-
288 (Picken J). This was a case dealing with an alleged
implied representation, to which the claimant had not
addressed its mind when entering into a contract. At
§286, the judge said:

> *In the circumstances, I agree with Mr Howe QC when
> he submitted that these authorities support the
> proposition that a claimant in the position of Marme in
> the present case should have given some*

> *contemporaneous conscious thought to the fact that some representations were being impliedly made, even if the precise formulation of those representations may not correspond with what the Court subsequently decides that those representations comprised. If the position were otherwise, then, I agree with Mr Howe QC that the consequence would be that there would be a substantial watering down of the reliance requirement."*

> (d) *Chagos Islanders v Attorney General* [2003] EWHC 2222, at §364. In that case, Ouseley J held that a person cannot sue in deceit

>> *in respect of representations which were not made to them directly or to an agent and in reliance upon which they did not act, being unaware of them. I regard that as obvious."*[89]

483. This gives rise to a point which only surfaced in its full form in the Defendants' written closing submissions: the *'Bidco point'.*

*The Bidco Point*

484. The acquirer in the present case was Bidco, not HP. It was only Bidco that acquired an "*interest in securities*" within the meaning of Sch 10A §8(3).[90] Bidco is the only party that claims to be entitled to damages from Autonomy under FSMA.[91] HP is not a party to these proceedings. Accordingly, in order to establish liability under s. 90A / Sch 10A, the Claimants must establish that <u>Bidco</u> relied on the published information in deciding whether to acquire the share capital of Autonomy. This is common ground: in their written closing the Claimants accepted that one of the components of the FSMA claim is that "*Bidco must have relied on the information in question when deciding to buy Autonomy shares, at a time when, and in circumstances in which, it was reasonable for Bidco so to rely.*"

485. The Claimants relied on two arguments in respect of the *'Bidco point'.* The first was that this was plainly an *"ambush"*, and that the point (a) should have been properly pleaded to alert the Claimants to it, and since it was not, (b) should not

---

[89]See also the Court of Appeal's comments on that conclusion: "*The judge may very well be right in his conclusion that, as a matter of law, no such cause of action exists as a matter of principle. But it is conceivable that in certain exceptional circumstances, for instance where the defendant, by the very making of the deceitful statement or for some other reason, had assumed liability to the claimant, a cause of action could exist.*" *Chagos Islanders v Attorney General* [2004] EWCA Civ 997, at §36.
[90]Sch 10A §8(3): "*References in this Schedule to the acquisition or disposal of securities include— (a) acquisition or disposal of any interest in securities, or (b) contracting to acquire or dispose of securities or of any interest in securities, except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.*"
[91]See RRAPoC §§97-201, under the heading "*Liability of Autonomy to Bidco under Sch 10A FSMA*".

now be available to the Defendants. The second was that in any event the point was a contrived and bad one, since the reality was that HP was the controlling mind of Bidco, and Bidco simply did as it was directed by HP. The Defendants, and in particular Dr Lynch, did not accept either of the Claimants' points. I address each in turn below.

486.    As to the pleading point and the "ambush", the Claimants had asserted in their RRAPoC that:

> *"Bidco acquired the share capital of Autonomy, including the shares held by Lynch and Hussain, in reliance on (i) the information contained in the Annual Reports and the Quarterly Reports (and as repeated and explained during earnings calls) and (ii) the misrepresentations made by Lynch and Hussain directly to HP (and thus to Bidco) as set out below."*

487.    The Defendants had (in each case) denied this. But they had not pleaded any positive case that only proof of Bidco's reliance would suffice, that reliance by HP would not constitute reliance by Bidco and that since no separate reliance by Bidco was demonstrated the claim must fail. They had asked questions as to the identity of those alleged to have relied on the representations but made nothing ostensibly of it: they had not explained or relied on the point in their opening submissions, and had it now seemed, carefully tucked them away for later deployment after the conclusion of evidence, in their written closing submissions. The Claimants denounced this, and submitted that the Defendants should be precluded from pursuing the *Bidco point* as insufficiently pleaded.

488.    In answer, Mr Miles took me through the relevant parts of Dr Lynch's defence to show that there was *"a flat denial, clear denial of reliance by Bidco"*, and that Dr Lynch had (a) made clear that the Defendants were unaware of Bidco's existence, and (b) expressly put the Claimants to strict proof and required them to provide information as to which individuals had relied on Autonomy's published information and the alleged misrepresentations, and (c) received the answer that they were Messrs Apotheker, Robison and Johnson, who had advised the HP Board whether to proceed. The Defendants denied having taken the Claimants by surprise. They contended that they had thus made clear and express their focus on the identity of the individuals who had allegedly relied on the information. Put shortly, the Defendants submitted that there was a clear issue on the pleadings and that in any event it was ultimately an issue of law.

489.    They added that any deficiency in the pleadings, if relevant, was on the Claimants' side: the Claimants had simply failed to plead or prove how it was that a representation made to HP and its bid team could be regarded as one made to and relied on by the Claimants (and in particular, Bidco). The answer contained in the Claimants' Reply did not identify anyone within the management of Bidco who was said to have relied on the published information. Bidco's directors at the time of the acquisition were Ms Lesjak, Paul Porrini and Sergio Letelier. The persons whom the Claimants had identified in answer were the bid team within HP itself:

> *"201.1. Mr Apotheker, Mr Robison and Mr Johnson relied on Autonomy's published information (or on the review by their subordinates or by HP's advisers of Autonomy's published information, who also so relied) when making recommendations to the board of directors of HP as to whether to proceed with the Autonomy Acquisition and at what price.*

> *201.2. The board of HP relied on those recommendations (and on the views of HP's advisers derived from Autonomy's published information) when determining whether Bidco should proceed with the Autonomy Acquisition and what price it should pay for Autonomy. Further, the board was given certain information taken directly from or derived from Autonomy's published information, and the board relied on the same."*

490.    There is, to my mind, some substance in the submissions of both sides. The Defendants did keep their point, as it were, "under wraps", pleading at best the bare minimum. The Claimants did not plead out, as they should I think have pleaded out, their case that although Bidco had its own directors, none of whom was a director of HP, nevertheless its investment decision was made by HP's bid team and directors in alleged reliance on the relevant information. But the question to be determined is whether these points are such as on grounds of pleading deficiencies either (a) to preclude the Defendants pursuing the Bidco point or, more drastically, (b) to result in the total failure of the Claimants' case in all its aspects.

491.    Neither is an inviting result; and inevitably perhaps, I have felt a great reluctance to countenance that these entire proceedings should be determined by a pleading point. I have concluded that:

(1)    The Defendants' pleadings were sparse but sufficient, and their tactic of keeping the point and its powder dry was forensically unyielding but not impermissible in the context of a hard-fought fraud case with the best of legal representation and so much at stake.

(2)    The Claimants' pleading was imperfect and technically incomplete, but the reality is that there has been no material prejudice to the Defendants, who were well aware of the point, had every opportunity to and did cross-examine the individuals said in fact to have relied on the relevant information (being the HP bid team and directors, rather than the *de jure* directors of Bidco, namely, Mr Porrini and Mr Letelier).

(3)    Ultimately, as Mr Miles himself submitted, the issue is really one of law.

492.    As to the issue which substantively arises, the question is whether reliance can be demonstrated in the absence of (a) any evidence to show that Bidco itself, which was not incorporated until 15 August 2011, almost at the end of the due diligence process, six days after KPMG's draft due diligence report, and a day

before the HP board meeting at which HP decided to carry out the acquisition[92] relied on, considered, or even aware of the alleged misstatements contained in the published information; and (b) any evidence from any of the directors of Bidco, apart from Ms Lesjak, who gave no evidence about what she did or thought in her capacity as a director of Bidco, gave no evidence of having relied on any of the published information, and as the CFO of HP, was actually opposed to the transaction.

493.    The Defendants submitted that the answer was "No". The Claimants had not adduced the required evidence: the statutory provision plainly required, and the Claimants had simply not sufficiently provided, proof that Bidco had itself considered and acted on the relevant information. Mr Miles also rejected the ancillary suggestion by the Claimants that the Defendants were applying an excessively restrictive interpretation of the statutory provision not required by the wording, and went on to submit:

> "…they say it would be construing the issuer liability regime under FSMA in an unduly restrictive way so as to exclude a remedy simply because of the quite standard way in which HP decided to structure its investment. And they say our interpretation isn t required by the language of the statute. They seem to be suggesting that our interpretation would thwart the statutory purpose.

> Now we don t agree with that, about the language of the statute. They have not put forward any real argument as to how the statute allows a separation between the person who relies on the information and the person who suffers the loss, or the separation between the acquirer and the decision-maker, perhaps more precisely…

> But we also don t agree with the idea that it s thwarting the purpose of the statute. The purpose of the statute is to protect investors who rely on financial statements and decide to purchase shares. This isn t, we would suggest, an ordinary situation. Investors don t normally incorporate SPVs for the purpose of acquiring shares…"

494.    The Defendants' forthright conclusion was that HP chose to buy Autonomy through Bidco for its own commercial reasons: if the benefits of doing so came at the cost of depriving HP of a claim under FSMA, that is the consequence of HP's choice, and that reliance by HP cannot be equated to reliance by Bidco.

495.     The answer the Claimants offered was that (quoting from Mr Rabinowitz's oral closing speech):

> "…Bidco was an acquisition vehicle created to acquire Autonomy on HP s behalf with HP s money. The decision that Bidco would make an offer for Autonomy and on what terms was made by HP s board based

---

[92]As to Bidco's incorporation, it is pleaded in the RRAPoC that: "*Hewlett-Packard Vision BV ("Bidco") was incorporated in the Netherlands on 15 August 2011*". For the draft due diligence report, and HP's board meeting, see paragraphs 265 and 294 above.

> *on recommendations by HP s management…The board members of Bidco, on whom so much focus is now placed, merely implemented the HP s board decision that Bidco should make the offer as the Board directed them to."*

Mr Rabinowitz added in his oral reply that:

> *We say that the people who took the decision that Bidco should purchase Autonomy were HP s board on the advice of HP s management and their reliance constitutes Bidco s reliance."*

496.    The Claimants sought to support their arguments:

(1)    By reference to an observation of my own in *SL Claimants v Tesco plc* [2019] EWHC 2858 (Ch) at [117] that in the context of FSMA:

> *"Unless the wording was without any semantic doubt entirely deficient to apply in such circumstances, ordinary principles of statutory construction require the court to ensure that the statutory purpose is not thwarted."*

(2)    By relying on the decision of the Court of Appeal in *Abu Dhabi Investment Co v H Clarkson and Co* [2008] EWCA Civ 699 in which it was held that the claimants (ADIC and two of its subsidiary companies, ASH and ASMIC), each of whom had different claims, could successfully claim against the defendants (the Norasia defendants) in respect of dishonest misrepresentations made by the Norasia defendants to ADIC. In paragraph 38 of the judgment, May LJ explained:

> *Certainly by the date of the Memorandum of Agreement…, the Norasia defendants knew quite well that the role of the special purpose vehicle was to be subscribed to the shares with money largely derived from a Paribas bridging loan. The underlying commercial thinking which led ADIC to adopt this structure is unimportant. What mattered was that the Norasia defendants knew that this was to be the structure, and that they plainly intended, by their dishonest misrepresentations, to deceive the controlling minds of the special purpose vehicle to induce them to give effect to the proposed investment by means of the proposed structure.  It is not necessary, for ASH and ASMIC to succeed, to conclude that the Norasia defendants intended their representation to be passed on to any person whom ADIC might wish to interest in the investment. It is only necessary to conclude, as I do, that the Norasia defendants, knowing as they did the structure by means of which ADIC intended to, and did in fact, effect the investment, plainly intended that their representations should be passed on to those parts of the structure, that is ASH and ASMIC, which effected the investment. In fact, of course, those who controlled the special purpose vehicle were the same people who controlled ADIC, so*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *that in reality the passing on of the representations is a lawyers' construct.""*

Mr Rabinowitz submitted that this was effectively the same as their case on reliance, substituting (as it were) HP in place of ADIC and Bidco in place of ASH and ASMIC.

497.    I turn to the Claimants' second point that it was sufficient for the purpose of the statute for them to demonstrate that Bidco was simply implementing the HP Board's decision made on the basis of the information provided to them that Bidco should make the offer as the Board of HP directed them to do.

498.    Mr Miles sought to side-line the *Abu Dhabi* case as concerned only with whether the Norasia defendants had the necessary intention to deceive for a deceit claim, and whether the second and third claimants (ASH and ASMIC, the two special vehicles) were within the contemplation of the Norasia defendants as likely, and therefore to have been intended to be deceived by the defendants, which Mr Miles stated *"wasn't an issue of reliance"*.

499.    Given the fundamental effect of the point raised by the Defendants it is convenient to explain now the basis on which I have determined that the *Bidco point* has not the conclusive effect which, late in the day, the Defendants contended it had. I accept the Claimants' argument that the fact that it was HP which claims to have been influenced by Autonomy's published information (and specific representations) and it was HP which undertook due diligence does not mean that Bidco cannot satisfy this part of the reliance test.

500.    In a little more detail:

(1)    The *Abu Dhabi* case, though relating to common law deceit and not a statutory provision, does support the conclusion urged by the Claimants that for the purpose of the acquisition, HP can be treated as the controlling mind of Bidco, and that HP's reliance is to be treated as Bidco's reliance.

(2)    There is no such separation on that basis between the person who relies on the information and the person who suffers the loss, nor between the acquirer and the decision-maker.

(3)    Such a conclusion is consistent with the intent of the statutory provisions and avoids what to my mind would be the counter-intuitive conclusion, that the use of an SPV which had no purpose or business nor any real part in the process except as a pocket in HP's trousers, should invalidate the claim.

*Reliance on what?*

501.    Sch 10A paragraph (1)(a) refers to the payment of compensation to a person who acquires, continues to hold or disposes of securities *"in reliance on published information to which this Schedule applies"*. (Its predecessor, s. 90A,

related only to acquisitions of shares and referred to compensation to a person who acquired shares *"in reliance on the information in the publication"*). The loss claimed must be caused by reliance on that statement or omission.

502.    The focus is on statements or omissions in published information on which reliance is demonstrated to have been placed. Paragraph 3(2) refers to the issuer being *"liable in respect of an untrue or misleading statement"*. Further, paragraph 3(1) states that compensation is only to be paid where the acquirer *"suffers loss in respect of the securities as a result of—(i) any untrue or misleading statement in that published information, or (ii) the omission from that published information of any matter required to be included in it.*"

503.    As Dr Lynch submitted in his written closing, it would not be enough for Bidco to show that it relied in some generalised sense on a piece of published information (e.g. the annual report for a given year): I accept the Defendants' submission that it cannot have been intended to give an acquirer of shares a cause of action based on a misstatement that he never even looked at, merely because it is contained in (say) an annual report, some other part of which he relied on. The requirement that loss be suffered as a result of the untrue or misleading statement can only be satisfied where the person acquiring securities applied his mind to the statement in question, and where that statement induced the acquisition or (more relevantly for this case) induced the acquirer to transact on the terms he did.

504.    This view gains support from the Davies Review on Issuer Liability. Discussing s. 90A, Professor Davies QC said this:[93]

> *"Section 90A ..., by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken."*

The same reasoning would apply in relation to Sch 10A.

505.    Similarly, the requirement for reliance cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all: again, see *Marme v Natwest Markets Plc* at §§281-288. The statement must *"have been present to the claimant's mind at the time when he took the action on which he bases his claim."*[94] Unless a document was reviewed, it cannot have been relied on. In this case, the Claimants have referred to alleged misstatements or omissions in a number of documents (for instance transcripts of earnings calls, and Quarterly Reports from long before the acquisition) which were not reviewed by or on behalf of any of the Claimants. These cannot found a claim, though they may be relevant evidence of intention.

---

[93] Davies Review of Issuer Liability: Discussion Paper (above).
[94] See *J Cartwright, 'Misrepresentation and Non-Disclosure'* (4th Ed.) at [3-50].

506.    That said, statements (or omissions) may in combination create an impression which no single one imparts. In my view, if the overall impression thus created is false it may found a claim, if the other conditions of liability are also met.

*What degree of reliance?*

507.    The Claimants argued, by analogy with the common law relevant to claims in deceit, that only a weak causal connection is required between the false statement and the acquisition: they contended that:

> *Although the claimant must have been induced to change his position (here, by buying the Autonomy shares), the representation need not have been the sole or dominant cause. If necessary, the Claimants will contend that, but for the representation, the claimant might" have acted otherwise".*

508.    They referred to *Reynell v Sprye* (1852) 42 EF 710 at 728 (where it was said that *"Once make out that there has been anything like deception…no contract resting in any degree on that foundation can stand"*); to *Barton v Armstrong* [1976] AC 104 at 118[F-H] (in the Privy Council, where it was stated that *"…in this field the court does not allow an examination into the relative importance of contributory causes"*); and to *Raiffeisen Zentralbank Osterreich AG v Royal Bank of Scotland Plc* [2011] 1 Lloyd's Rep 123 at [198]-[199] (where Christopher Clarke J stated *"There are sound reasons of policy why…those who set out to deceive should bear a liability even if it might well have been the case that, but for such behaviour, the contract might still have been made…"*). On this basis, inducement is made out if the representation had *"an impact on the mind"* or an *"influence on the judgement"* though the Claimants accepted that inducement is negated where the representation had *"no effect on the decision"* (*per* Lord Clarke in *Zurich Insurance Co plc v Hayward* [2017] AC 142 at [29]).

509.    The Claimants further contended, again citing *Zurich Insurance Co plc v Hayward* [*supra*], that if a representation was material, that is, of such a nature as to be likely to induce a person in the claimant's position to enter into the contract, it is a fair inference of fact (though not an inference of law) that he was influenced by the statement; and the inference is particularly strong where the misrepresentation was fraudulent. Lord Clarke cited at [35] Lord Mustill's statement in the *Pan Atlantic* case [1995] 1 AC 501, 551 that the representor

> *"will have an uphill task in persuading the court that the…misstatement…has made no difference…there is a presumption in favour of a causative effect."*

510.    The Defendants, however, did not accept that these cases applied in the context of a s. 90A or Schedule 10A FSMA claim. They pointed out that FSMA does not require that the issuer should have intended the claimant to rely on the relevant published information, whereas that is a requirement of the tort of deceit, and it is that requirement and proof of its fulfilment which informs the presumption of causative effect. Accordingly, they did not accept that there was any such presumption in the context of a claim under s. 90A/ Sch 10A. In any

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

event, they submitted, in its application to claims for misrepresentation/deceit such a presumption is one of fact, not law, and does not affect the burden of proof: see *per* Longmore LJ's analysis in *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc,* and his conclusion at [25] that:

> *The tribunal of fact has to make up its mind on the question whether the representee was induced by the representation on the basis of all the evidence available to it."*

511.    Further, they contended that it was not sufficient for the Claimants to show that HP/Bidco might have been induced; they had to show that they were induced, and that although the misrepresentation in question need not be the sole inducement, it must play a real and substantial part in inducing the representee to act.  They relied again on the analysis and conclusions in *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc.*

512.    Their analysis based on the wording of the statutory provisions was as follows:

(1)  A claimant under these provisions must, in the normal way, establish that the ingredients of the statutory cause of action are made out.

(2)  The burden of proof lies on the claimant.

(3)  The claimant must therefore establish (i) that he has "*acquire[d] ... the securities in reliance on published information ...*" and (ii) "*suffer[ed] loss in respect of the securities as a result of*" the untrue or misleading statement or omission.[95]

(4)  That requires proof that he would not have suffered loss but for the misleading statement.  For this purpose, he must therefore show that he would have acted differently but for the statement (thereby suffering a loss), not that he might have acted differently.  If he can only prove that he might have acted differently, all that can be said is that he might have suffered loss as a result of the statement – in which case the burden of proof has not been satisfied.

(5)  If the evidence shows that the acquirer would have acted in the same way had the published information not contained the false statement or omission, it cannot be said that any loss is suffered as a result of the false statement or omission.

513.    The Defendants submitted that given that the language of the section is clear, there is no need to look to the cases on misrepresentation or deceit in the context of the FSMA claims; but they went on to submit that in any event, those cases do not assist the Claimants, as follows:

(1)  The burden is on the claimant in a deceit claim to prove reliance.  See Clerk & Lindsell on Torts (22nd Ed, 2017) at §18-34:

---

[95]Sch 10A §3(1); and see to similar effect s. 90A(3).

> *"To entitle a claimant to succeed in an action in deceit, he must show that he acted (or in a suitable case refrained from acting) in reliance on the defendant's misrepresentation. If he would have done the same thing even in the absence of it, he will fail. What is relevant here is what the claimant would have done had no representation at all been made. In particular, if the making of the representation in fact influenced the claimant, it is not open to the defendant to argue that the claimant might have acted in the same way had the representation been true."* [96]

(2) It is not sufficient for a claimant to show that he <u>might</u> have been induced: he must show that he <u>was</u> induced: see *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc* [2019] 1 Lloyds Rep 491 (CA) at §34.

(3) The test for inducement has been expressed in different ways in claims for different types of misrepresentation. It is sufficient in a claim for fraudulent misrepresentation to show that the representation "was actively present to [the claimant's] mind", and whether "his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did".[97] While the misrepresentation need not be the sole inducement, it must play a "real and substantial part" in inducing the representee to act.[98]

514. The Defendants also submitted that in asking whether a claimant under the statutory provisions has relied on a false or misleading statement or omission, in the sense of being induced by that statement or omission to change his position, it is legitimate to ask whether the claimant would have acted differently had he known the truth. If he would have acted in the same way, even if he had known the truth, it cannot be said that he relied on or suffered loss as a result of the false or misleading statement or omission. The Defendants cited *Raiffeisen Zentralbank v RBS* [2010] EWHC 1392 (Comm) at §185 (Christopher Clarke J):

> *"... a claimant who says that even if he had been told the whole truth it would have made no difference to his readiness to enter into the contract will be likely to fail to establish that he was induced to enter into the contract by the misrepresentation in question. There is an inherent contradiction in someone saying that a representation was an inducing cause and accepting that,*

---

[96]The above passage shows that, once inducement has been established as a fact it is irrelevant to ask whether the Claimants would have acted in the same way had the statements made in the published information been true. However, as discussed below, it is relevant to ask the different question, whether the Claimants would have acted differently if accurate information had been published (assuming *arguendo* that the Claimants succeed in their case that there were inaccuracies in it).

[97]*Edgington v Fitzmaurice* (1885) 29 Ch. D. 459, at 483, followed in *BV Nederlandse Industrie van Eiproducten v Rembrandt Enterprises Inc* [2019] 1 Lloyds Rep 491, at §§28, 32 and 43 (Longmore LJ).

[98]*Dadourian v Simms* [2009] EWCA Civ 169 at §§99 and 101 (Arden LJ).

*if the truth had been told, he would have contracted on the same terms anyway."*

The Defendants referred also, to similar effect, to *Dadourian v Simms* at §107, and *JEB Fasteners* [1983] 1 All ER 583 (CA), at 588.

515.    As to these competing submissions on the question of what degree of reliance is required and whether the presumption of inducement applies in the context of the FSMA claims, in my judgment:

(1)    It is enough that a fraudulent representation has had *"an impact on the mind"* or an *"influence on the judgement"* of the claimant (see *per* Lord Goff of Chieveley in *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501, as quoted by Lord Clarke of Stone-cum-Ebony JSC in *Zurich Insurance Co plc v Hayward*). There is no "but for standard" in that context; and the fact that other considerations may have been predominant does not negate the deception if it did have some impact or influence, for (as Lord Cross of Chelsea said in *Barton v Armstrong* [1976] AC 104, 118-119) *"in this field the court does not allow an examination into the relative importance of contributory causes."*

(2)    I was originally minded to agree with the Defendants that the so-called 'presumption of inducement' should not be read into the FSMA test; and that it would be difficult to integrate with the test of reasonable reliance which is expressly introduced by FSMA. On reflection, I think this would be to treat the *"presumption of inducement"* as, in effect, one of law: and as Lord Clarke explained in the *Zurich Insurance* case, it is simply an inference of fact. I have ultimately concluded that the presumption applies in the context of a FSMA claim no less than in other cases of deceit. The reason is simple: it aphoristically expresses the reality that once it has been established that a representor fraudulently intended his words to be taken in a certain sense and that the representee understood them in that sense and entered into the contract, it is natural to suppose, unless the presumption is rebutted on the facts, that the representee was induced to make his investment decision on the faith of the representor's statement.[99]

(3)    It remains a question of fact to be determined on the balance of probabilities whether having regard to all the circumstances it did in fact have *"an impact on the mind"* or an *"influence on the judgment"* (as Lord Goff put it in the *Pan Atlantic* case) of the representee in making that investment decision. But the presumption is difficult to shift.

(4)    In *Hayward v Zurich Insurance Co plc*, Lord Clarke noted (at [36]) that the authorities are not entirely  consistent as to what is required to rebut the presumption of inducement: and in particular, *"whether what must*

---

[99] Lord Mustill put it this way in the *Pan Atlantic* case (at [551]): the representor
*"will have an uphill task in persuading the court that the…misstatement…has made no difference…there is a presumption in favour of causative effect."*

be proved is that the misrepresentation played *"no part at all"* or that it did not play a *"determinative part"*, or that it did not play a *"real and substantial part"*. It was not necessary to decide how the test should be worded in that case since it was found that the presumption was not rebutted in that case on any of the formulations; but Lord Clarke did go on to say that *"the authorities…support the conclusion that it is very difficult to rebut the presumption"*, citing Baroness Hale of Richmond DPSC's observation in *Sharland v Sharland* [2015] UKSC 60; [2016] AC 871 that a party who has practiced deception with a view to a particular end, which has been attained by it, cannot be allowed to deny its materiality or that it actually played a causative part in inducement.

(5) It seems to me that, it would be in accordance with the approach in the authorities cited above to avoid semantic debate and leave the issue to be determined according to a value judgment whether in all the circumstances the misrepresentation(s) should be taken as having influenced the decision, without entering into an assessment of its relevant importance amongst any other influences.

(6) Further, the additional requirement of FSMA that the reliance, if established, must also be shown by the claimant to have been reasonable does not remove, but does, in my view, mitigate the effect of the presumption. In my judgment, it introduces an additional test requiring consideration of whether it was reasonable for the representation so to have impacted on the mind and judgment of the representee; put another way, it seems to me that the claimant must show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it: and see further paragraphs [517*ff*] below.

(7) It is also important to keep in mind that the propensity of a statement to influence the mind only gives rise to the presumption (if applicable) if it is shown to have been read or heard and understood by the representee in its deceptive sense and/or the claimant would have entered into the contract even if the misrepresentation had not been made: see *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm) (Males J, at §§18, 19 and 171-172): if it did not influence the mind, or if the representee understood it in some different sense and it was by reference to that different meaning that he acted, the presumption does not arise: and see the discussion about ambivalent or ambiguous statements in the recent decision of Cockerill J in *Leeds City Council and others v Barclays Bank plc and another* [2021] 2 WLR 1180.

(8) I agree, therefore, with Mr Miles that the Court should not assume reliance by Bidco on every statement alleged by the Claimants to be potentially false or misleading, drawn from hundreds of pages of financial statements and transcripts going back months or years before the acquisition of Autonomy, merely because the Claimants allege that these statements were deliberately false or misleading.

516.    Once reliance/inducement has been established as a fact, it is (subject to the exception noted in *Raiffeisen Zentralbank v RBS*, where the representee accepts that he would have acted in the same way, even if he had known the truth) not legitimate or relevant for the defendant to enquire or suggest what the representee would have done had he been told the truth: for, as Hobhouse LJ said in *Downs v Chappell* [1997] 1 WLR 426 at 433, in fact the truth was never told. The question is whether the representee was induced by the false statement; not what the effect would have been if he had been told what he was not told.

*When is reliance reasonable?*

517.    As explained above, and in a departure from the common law, FSMA s. 90A / Sch 10A stipulate also that to establish liability the acquirer of securities must have acted reasonably in relying on the information at a time when, and in circumstances in which, it was reasonable for him to rely on it.  See Sch 10A §3(4):[100]

> *"A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities —*
>
> *(a)    in reliance on the information in question, and*
>
> *(b)    at a time when, and in circumstances in which, it was reasonable for him to rely on it."*

[Emphasis added]

518.    The Claimants relied on *Redgrave v Hurd* (1881) 20 Ch D 1, 13 in which Sir George Jessel MR said:

> *If a man is induced to enter into a contract by a false representation it is not a sufficient answer for him to say,  If you had used due diligence you would have found out that the statement was untrue. You had the means afforded you of discovering its falsity, and did not choose to avail yourself of them."*

519.    I did not understand this proposition, or its applicability in the context of FSMA as well as common law claims in deceit, to be contested: and although the Defendants pointed to various substantial deficiencies in due diligence they did not argue that on that account the Claimants could not complain they had been deceived. In any event, in my judgment, it is no defence to a FSMA or a fraud claim that the claimants had the means of discovering the truth; and no defence of contributory negligence or *"caveat emptor"* is available. The test of reasonableness relates to the form and timing of the misrepresentation and what

---

[100] S.90A(5) is in materially the same terms.

it is reasonable for the representee to make of what he is told: it is not addressed to hypothetical matters such as what else the representee might have done to assess the reliability of the statement.

520.    As mentioned above, the statutory provision requiring the claimant to show that at the time when and in the circumstances in which the relevant fraudulent misrepresentation was made his reliance on it was reasonable was regarded by Prof. Davies as a substitute for the common law requirement to show that the representor "intended reliance". [101] The test of reasonableness is not further defined, but it is plainly to be applied by reference to conditions at the time when the representee claimant relied on it. Circumstances, caveats or conditions which qualify the apparent reliability of the statement relied on by the claimant are all to be taken into account. The question of when reliance is reasonable is fact-sensitive.

521.    In the present case, the Defendants instanced the following considerations, amongst others:

(1) The status and purpose of the particular statement being relied on: thus, the Defendants contended that it is more likely to be reasonable to rely on an IFRS figure stated in the accounts than to rely on a general statement contained in the directors report (for instance, a statement such as "*we believe that our products are the best in the market*"), or a comment made in passing in the course of an earnings call;[102]

(2) Whether the statement is qualified: the Defendants suggested that where a piece of information is qualified by a statement that it is "*provided for background information and may include qualitative estimates*" (as with the supplementary non-IFRS metrics given by Autonomy), reliance will be reasonable for narrower purposes than where there is no such qualification.

(3) The time at which the statement is relied on: the Defendants suggested that it is more likely to be reasonable to rely on up-to-date information than to rely on a quarterly report that is several years out of date.

(4) The purpose for which the information is relied on: the Defendants submitted that it will be unreasonable to rely on information for a purpose for which it is not suited.  Thus, they suggested, in the case of a non-IFRS metric expressly stated to involve qualitative estimates, it is unlikely to be reasonable to rely on it by plugging it into a valuation model whose output is highly sensitive to small variations in input.

522.    I agree that the test is fact sensitive and that these factual matters do require consideration in assessing reasonableness. I address these matters at greater length after determining whether the Claimants have established the

---

[101] See *Davies Review of Issuer Liability: Final Report para.30 p18.*
[102] Assuming (*arguendo*) that the call in question constitutes published information.

misrepresentations alleged: see chapter titled Reliance and Loss Revisited. But I would summarise my conclusions in this regard as follows:

(1) Although HP/Bidco undoubtedly saw Autonomy as a *"transformational opportunity"* and Mr Apotheker envisaged that a combination of HP and Autonomy would realise synergy values in excess of Autonomy's stand-alone value, the basic building bricks which informed HP's approach, negotiation, bid and the eventual Acquisition were the historic revenue figures and description of Autonomy's five revenue streams as represented in Autonomy's published information.

(2) It was entirely reasonable for HP/Bidco to rely, as it did, on the accuracy and completeness of the figures and description thus given, unless and to the extent that through persons acting on its behalf, and having responsibility to pass on to HP/Bidco what they had found out, HP/Bidco actually became aware (whether in the context of due diligence or otherwise) of some particular inaccuracy or material qualification.

(3) HP/Bidco did not, prior to the Acquisition, and whether in the course of due diligence or otherwise, actually become aware of anything in the course of due diligence to warn it of some inaccuracy or material qualification such as to invalidate or cause it not reasonably to be entitled to place reliance on Autonomy's figures and representations in its published information. None of the matters relied on by the Defendants made HP/Bidco's reliance unreasonable.

(4) The reasonableness of HP's reliance at least in material part on Autonomy's published information was reinforced, and such reliance was further encouraged, by representations made by Mr Hussain and others and by presentations made in the January, February and March Slides described and assessed in the chapter on Deceit and Misrpresentation later in this judgment below.

(5) HP/Bidco have established reasonable reliance on what was stated in the published information in respect of all the aspects of Autonomy's business now said to have been misrepresented; and more particularly, HP/Bidco reasonably relied on that published information as having conveyed expressly or by necessary implication that:

(a) Autonomy was a *"pure software company"* and its revenue and revenue growth were generated almost exclusively from its software licence sales, demonstrating also the success and penetration of its signature product, IDOL;

(b) Autonomy's OEM business revenue was a particularly valuable source of recurring revenue derived at least predominantly from development licence sales and recurring revenue from royalties;

(c)     Autonomy's hosting business, which was accounted for as part of its IDOL Cloud business, was growing as a result of increased hosting revenue streams which by their nature were recurrent;

(d)     Sales by Autonomy from which revenue was recognized were genuine transactions of commercial substance, and properly accounted for accordingly.

523.    I turn to issues of principle which arise in respect of the measure of damages in the context of the Claimants' FSMA claims.

*(g) Loss in the context of FSMA claims*

524.    Neither s. 90A nor Sch 10A specifies the measure of damages that applies to a claim brought under them. Sch 10A §3(1) simply provides that an issuer *"is liable to pay compensation"* to a person who has acquired securities in reliance on published information, and who has *"suffer[ed] loss in respect of the securities as a result of"* any untrue or misleading statement, or the omission of any matter required to be included. It was not in dispute that damage is a separate component of the cause of action under s. 90A / Sch 10A; and must be proved separately from questions of inducement and reliance.[103] The burden of proving damage lies on the claimant, who must show on the balance of probabilities that he has suffered compensable loss.

525.    One of the questions raised by Professor Davies at the consultation stage was which measure of damages was appropriate, that for fraud (deceit) or that for negligence. He concluded that it would be difficult to formulate effective rules that would not tie the court's hands in an unsatisfactory way, and he recommended that the issue should be left to the courts to decide. In doing so, however, he thought it likely that the courts would apply the same course as it followed in the case of common law claims for deceit *"since the section is closely modelled on the common law tort"*. He noted also that the damages would be likely to be assessed by reference to the loss caused by reliance on the statement, and not the loss caused by its falsity.

526.    It was common ground that the starting point for the assessment of damages is the statement of Lord Blackburn in *Livingstone v The Rawyards Coal Company* (1880) 5 App. Cas. 25:

> *"I do not think there is any difference of opinion as to its being a general rule that, where any injury is to be compensated by damages, in settling the sum of money to be given for reparation of damages <u>you should as nearly as possible get at that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his</u>*

---

[103]As explained below, to the extent that analogies with the common law are relevant, loss and causation of loss is a separate element from inducement, and requires 'but for' causation.

> *compensation or reparation. That must be qualified by a great many things which may arise—such, for instance, as by the consideration whether the damage has been maliciously done, or whether it has been done with full knowledge that the person doing it was doing wrong. There could be no doubt that there you would say that everything would be taken into view that would go most against the wilful wrongdoer—many things which you would properly allow in favour of an innocent mistaken trespasser would be disallowed as against a wilful and intentional trespasser on the ground that he must not qualify his own wrong, and various things of that sort."* [Emphasis added]

527.   This is, as for all tort damages, a "but for" test of causation.[104] In a claim under these provisions of FSMA, the wrong for which the claimant is getting his compensation or reparation is the inclusion of a false or misleading statement in, or the omission of required information from, published information.

528.   In assessing the losses flowing from that wrong, it is necessary to ask what would have happened had the false statements or omissions not been made (i.e. to identify the right counterfactual). The answer which I also took to be common ground is that if the published information had not contained false statements or omitted matters required to be included, the published information would have contained true statements and included all matters required to be included. Autonomy was under an obligation to produce annual, half yearly and quarterly reports covering everything it was required by the Companies Act and Disclosure and Transparency Rules to cover, having regard also to all applicable accounting standards. But for the alleged wrong, it would have complied with its obligations properly. It is not therefore a case where, but for the false statement, there would have been nothing said on the topic covered by the statement.[105]

529.   It is indeed common ground that in assessing the FSMA Loss, the relevant counterfactual is that accurate information would have been published historically. Thus, I also take it not to be in dispute that in determining whether HP would have proceeded with the transaction, it is to be (and, for the purpose of calculating any loss, has been) assumed that accurate information would have informed the market and thus Autonomy's share price and its shareholders' expectations. This is the basis on which Mr Bezant was instructed: see §1.67 of his First Report:

---

[104]Again to the extent common law analogies are relevant, see the discussion of loss in relation to deceit below.

[105]Contrast the hypothetical example given by Christopher Clarke J in *RZB v RBS* where "*P buys a house from V. He had been considering several houses. He is minded to buy the one which he eventually buys because of its size, shape and character. Shortly before he makes his final decision V's agent tells him that a particular celebrity has the house next door, a circumstance which he regards as advantageous. ... In fact, as it turns out, there is no celebrity next door.*" In that example, if the agent had not chosen to tell a lie, nothing would have been said about whether there was a celebrity next door. There was no obligation on V or his agent to volunteer information about whether the neighbours were celebrities.

> *"In assessing the FSMA Loss, I am instructed to assume that, but for the breaches of duty alleged by the Claimants:*
>
> *(1) Autonomy's published financial information would not have been subject to the false accounting of which the Claimants complain; but*
>
> *(2) the impugned transactions would still have been entered into."*

530.   The next step in the counterfactual analysis is to ask what would have happened in those circumstances.  At §196A.1 of the RRAPoC, the Claimants state that:[106]

> *"But for the matters complained of, Bidco would have acquired Autonomy at a lower price. The Loss is therefore the difference between the price that Bidco actually paid for Autonomy (i.e. approximately US$11.1 billion) and the lower price that Bidco would have offered for Autonomy, had it known the true position (this being a price which the selling shareholders in Autonomy would certainly have accepted or which they would have been likely to accept had they, too, known the true position)."*

531.   Despite this being their primary pleaded case, the Claimants took a different approach in their written opening.  They argued that the prima facie measure of loss is that set out in *Smith New Court Securities v Scrimgeour Vickers* [1997] AC 254 – that is, the price paid by Bidco for Autonomy, less Autonomy's true value at the time of the acquisition.  As they note, this measure of loss "*may be conceived of as applying an assumption that absent the fraud the transaction would not have taken place.*"

532.   The Claimants also submitted that the primary pleaded measure discussed above, that is, the difference between the price paid and the lower price that would have been paid but for the wrong – should only apply to the extent that it gives them larger damages than the *Smith New Court* measure.  Thus, they said that "*while it is open to a victim of fraud to increase damages above the prima facie measure by claiming losses from not entering into an alternative transaction, it is not open to the fraudster to eliminate (or reduce) damages on that basis."*

533.   The Claimants sought to justify this on the basis of the Court of Appeal's decision in *Downs v Chappell* [1997] 1 WLR 426.  They contended that this precludes the Defendants from arguing that Bidco would have paid the same price even if it had known the truth.  Further, they say that their position is consistent with the policy considerations that apply to fraud claims, referring to

---

[106]Thus, the Claimants averred as their primary case that the bid would have proceeded, albeit at a lower price. By amendment the Claimants pleaded an alternative case that the bid would not have proceeded (see further below), in which case their loss would be the difference between the price that Bidco paid for Autonomy and Autonomy's true market value on the date that Bidco's offer became unconditional.

the following dictum of May J in *Slough Estates plc v Welwyn Hatfield DC*
[1996] 2 PLR 50, at 124:

> "*If, as I conceive, the policy of the law is to transfer the whole
> foreseeable risk of a transaction induced by fraud to the
> fraudulent defendant, and if, as I conceive, the court does not
> speculate what, if any, different transaction the plaintiff might
> have done if the fraudulent representation had not been made,
> damages on this basis are not to be regarded as a windfall, but
> the proper application of the policy of the law.*"

534.    The Defendants rejected this on the basis that:

(1)    First, whatever the position in relation to the tort of deceit, the
       Claimants' argument has no application in a claim under s. 90A / Sch
       10A FSMA.  The language of the statute contains no suggestion that
       the law on damages in deceit should be imported wholesale to claims under
       these provisions. [107]  Different policy considerations apply to claims
       under FSMA.  In a claim in fraud or deceit, "*the policy of the law is to
       transfer the whole foreseeable risk of a transaction induced by fraud to
       the fraudulent defendant*" (Slough Estates, above).[108]  But in a claim
       under s. 90A / Sch 10A, there is no "*fraudulent defendant*" since the
       fraudster (i.e. the PDMR) and the defendant (i.e. the issuer) are different
       persons.[109] Unlike a successful fraudster, an issuer does not in general
       benefit from the PDMR's wrong in putting out misleading annual or
       quarterly reports because, as already discussed, these are not "selling"
       documents. [110]  Transferring risks to the issuer penalises the general
       body of its shareholders, not the individual responsible for the
       misleading statement.  Far from seeking to transfer risk to the issuer, the
       policy underlying s. 90A and Sch 10A was to avoid an inappropriate
       transfer of risk to, and diversion of resources from, defendant companies
       and their shareholders, employees and creditors.

(2)    Secondly, and in any case, even in a claim in deceit or misrepresentation,
       the dice are not loaded in the way that the Claimants suggested.  When
       it comes to questions of damages it is for a claimant to prove his loss on
       a "but for" basis (see further below) and this requires the Court to
       examine what would have happened in the counterfactual world.  As
       explained above, the first element of the counterfactual is that accurate
       accounts would have been prepared; the second step is to ask what
       would have happened had that occurred? The Defendants submitted that
       the Court has to decide these questions and, as with all factual questions,
       there can in principle only be one answer.  The question is one of fact;

---

[107]Contrast the language used in s. 2(1) of the Misrepresentation Act 1967, discussed at paragraph 570
ff below.
[108]See also *Smith New Court* at 279-280
[109]As argued at paragraphs 17 and 18 above, in the present claim, the FSMA claim against the issuer is
being used as a stepping stone to the claim against the PDMRs; but that should not affect the court's
interpretation of s. 90A and Sch 10A.
[110]See paragraph 437 above – and contrast the position with a prospectus.

and it is not open to the claimant to elect or opt for an outcome which would happen to give it the larger recovery.

(3) Thirdly, the passage from *Downs v Chappell* which the Claimants cited was not dealing with the assessment of damages. As already discussed, it was dealing with an unnecessary (indeed illogical) intermediate question posed by the judge at first instance, after inducement had been established, but before turning to the question of damages.[111] *Downs v Chappell* does not assist on this point.

535.   The Defendants went on to contend on the basis set out above that the "no transaction" method of assessing loss discussed in *Smith New Court* will therefore be appropriate only if it is accepted or the Court concludes on the evidence that, absent the alleged misleading statements and omissions in the published information, Bidco would not have purchased Autonomy at all.

536.   I agree with the Claimants that the basis of what was termed the *Smith New Court* measure is the *"assumption that absent the fraud the transaction would not have taken place."* That assumption is likely to reflect the reality in many cases of a transaction induced by fraud. But not invariably so: and in particular, in other cases, although the transaction would not have gone ahead at the agreed price, it might have proceeded at a lower price. In *Smith New Court* itself, it had been found as a fact that the sale and purchase would not have taken place because the seller would not have agreed to sell at the best price which the purchaser would have considered paying: see [260F-H]. Likewise in *Downs v Chappell* the judge had decided on the facts that no transaction would have eventuated. However:

(1)   In this case, the Claimants averred that *"But for the matters complained of, Bidco would have acquired Autonomy at a lower price"* and pleaded the *"no transaction"* case only as an alternative. Dr Lynch admitted that *"as a matter of fact irrespective of the matters complained of, Bidco would have proceeded with its acquisition of Autonomy"*. In such circumstances it seems to me that the *Smith New Court* *"assumption"* is displaced.

(2)   It is to be noted that Mr Hussain denied the averment; but it still seems to me to be a question of fact whether or not an agreement at a lower price would have been agreed. In my judgment, this is a question of fact to be determined by the tribunal of fact, not an

---

[111]There is another passage in the judgment of Hobhouse LJ, in the section dealing with damages, which states that "*In general, it is irrelevant to inquire what the representee would have done if some different representation had been made to him or what other transactions he might have entered into if he had not entered into the transaction in question*": p 441 at B-C . However, the words need to be read in context: on the facts the judge had decided that it was a no transaction case; and in such cases it is indeed irrelevant to go on to ask whether other hypothetical deals might have occurred. That has no application in a case where the court concludes that in the counterfactual world the same transaction would have occurred in any event; the question then is whether the claimant can show that it would have occurred on the same or different terms. Furthermore, as Leggatt J noted at §217(1) of *Yam Seng*, the dictum of Hobhouse LJ cannot have been intended to state a proposition of law.

election to be made by the defrauded party; and see *Vald Nielsen Holdings A/S and anr v Baldorino and others* [2019] EWHC 1926 (Comm).

(3)     I shall review and finally determine the issue in a subsequent judgment on quantum of loss; but my provisional conclusion is that HP would have purchased Autonomy notwithstanding the diminished historical performance which would have on the Claimants' case been revealed had its transactions been fully and properly described and accounted for, but at a lower price and reduced premium reflecting what would have been its lower share price in the market. The fact is, as I see it, that (a) the value (both actual and prospective) of Autonomy's main product and business, IDOL, was substantially unimpaired (b) Autonomy still offered HP the prospect of transformational change and the creation of a data stack which had been the strategic purpose of the acquisition and (c) the synergy values expected would have been little affected. In my provisional view, this is not a 'No transaction' case.

537.    As I see the matter, I am further fortified in that view by the conceptual difficulties which would arise in adopting a 'No transaction' approach at the election of the Claimants but in circumstances such as these which do not justify it. For all the reasons given above, Autonomy was of special value to HP even in its deemed diminished state; to ignore that special value is to ignore the fact. The Claimants insistence that in a 'No transaction' context, no credit would be allowed for that special value would result in a windfall to HP. Though in a fraud case, the court is tender to the defrauded party, the calculation of loss remains an exercise of assessing proper compensation, not meting out punishment or conferring windfalls. If there is a doubt whether credit should be given for that windfall in a 'No transaction' context, that is another reason for adopting the 'transaction' approach which I have found to be appropriate and for denying the Claimants an opportunistic right of election.

538.    However, and in case I am wrong, and contrary to my view the Claimants are entitled to elect, I should address the issue raised as to the approach to be adopted in a 'No transaction' case, especially in relation to synergy value. If damages did fall to be assessed on that basis, the Defendants submitted that:

(1) As Lord Browne-Wilkinson said in *Smith New Court*, in assessing damages in such a case "*the plaintiff is entitled to recover by way of damages the full price paid by him, but he must give credit for any benefits which he has received as a* result of the transaction."[112]

(2) The aim in valuing the benefit received by Bidco must be to arrive at the figure "*that truly reflects the value of what the plaintiff has obtained.*"[113]

---

[112]*Smith New Court* at 266 C-D.
[113]*Smith New Court* at 267.

(3) There is no dispute about the date of valuation: the Claimants accept that it is appropriate in this case to value the property acquired as at the date of acquisition.

(4) It is ordinarily appropriate, in giving credit for the benefits received, to assess the market value of the asset to the claimant, which usually is determined by evidence of the price at which the stake could have been bought and sold between willing parties.

(5) The Claimants in this case submitted that this hypothetical purchase should not include special purchasers and (in accordance with the *IVS Framework of the International Valuation Standards Committee*) should not take into account synergies or any element of value available only to a specific buyer (and, in particular, any synergy value to HP).

(6) The Defendants accepted that market value is the measure of the credit to be given in a standard case, that is because that market value is a satisfactory measure of the benefits received; but where there are benefits to the purchaser of the thing acquired and then retained voluntarily it would be punitive and not compensatory to permit the purchaser to retain the value of what it has disavowed. That would not, echoing Lord Browne-Wilkinson's words, truly reflect the value of what the plaintiff has obtained. In a case such as this, the value to be ascertained for which credit is to be given is the value of the stake (the shares in Autonomy and the benefits to which they provide access, actual and potential) in the hands of the acquirer: and that must reflect the synergy values to the acquirer as well as any standalone value. A valuation ignoring synergies would not properly reflect the value of the asset obtained, and would result in a windfall to the Claimants.

(7) The Defendants also submitted that whereas in a deceit claim *"the policy of the law is to transfer the whole foreseeable risk of a transaction induced by fraud to the fraudulent defendant",* in claims under FSMA against the issuer there is no *"fraudulent defendant"* since the fraudster (the PDMR) and the defendant (the issuer) are different persons. Unlike a successful fraudster, an issuer does not in general benefit from the PDMR's wrong in putting out misleading annual or quarterly reports because they are not "selling" documents. Transferring risks to the issuer penalises the general body of its shareholders, not the individuals responsible for the misleading statement: and that is not consistent with the policy underlying s.90A/Sch 10A which was to avoid an inappropriate transfer of risk to, and diversion of resources from, defendant companies, and their shareholders, employees and creditors: and see paragraph 534(1) above. The fact that the issuer may then have a stepping-stone for a claim against the PDMR should not affect the interpretation of s.90A and Sch 10A of FSMA.

539. These are novel and difficult issues, which so far as I am aware have not previously been tested. I shall return to them when addressing issues of quantum. For the present suffice it to say that my provisional view is that credit

should be given for synergy value where that was the strategic purpose of the acquisition and the asset has been voluntarily retained.

## Knowledge of the Defendants

540.    If the Court concludes that Autonomy is liable to Bidco under s. 90A and/or Sch 10A, separate questions arise as to the Defendants' liability.  Are the Defendants liable for breach of duty owed to Autonomy for exposing Autonomy to the FSMA Loss? And if so, for what parts of the FSMA Loss are they liable to pay damages?

541.    In opening the case for the Claimants, Mr Rabinowitz appeared to accept that each of the Defendants would only be liable to pay damages to Autonomy to the extent that (i) he was legally responsible (i.e. in breach of duty to Autonomy) for any relevant wrongful statements in or omissions from the published information and (ii) those statements or omissions caused loss to Autonomy by becoming liable to Bidco. He expressly stated:

> "*I don't think there is anything between us because I certainly wasn't suggesting, and certainly wasn't intending to suggest, that if, for example, the accounts -- there were false and misleading statements and -- I'm using this as an example -- Mr Hussain was involved and knew and in breach of his duty but Dr Lynch didn't know, that because Mr Hussain knows, Autonomy has a claim against Dr Lynch.  It seems to me plain that we wouldn't.*"

No correction or refinement was suggested in the Claimants' written closing submissions.

542.    The Defendants took this to mean that it was common ground that it is necessary to consider the position of the two Defendants separately: Dr Lynch would not be liable save in respect of losses caused by his own breach of duty: he could only be liable for the consequences of the particular wrongful statements or omissions in respect of which he had the requisite guilty knowledge – not for the consequences of any other wrongful statements there may have been of which he was unaware, even if those statements give rise to a liability from Autonomy to Bidco (e.g. because another PDMR had the requisite guilty knowledge in relation to those other statements).  However, I have been reminded by the Claimants[114] that in his oral closing, Mr Rabinowitz sought to revisit this, and he explained that all he had intended to convey by his submission in opening was that the Claimants accepted that they "*could not rely against Lynch on Hussain's knowledge that the financial statements were untrue or misleading if Dr Lynch did not know about this and vice-versa…[they] could not rely on the knowledge of defendant 1 to bring a claim against defendant 2 if defendant 2 understood the financial statement to be true and not misleading and vice-versa.*" He submitted further that the way the Defendants had apparently interpreted what he had said would result in an inappropriate "*narrowing of the basis of the claim*". He suggested that the point was simple:

---

[114] After circulation of an earlier version of my judgment in draft.

> *"If Dr Lynch through his breach of duty caused Autonomy to be liable to Bidco under FSMA, then he will be liable for the whole loss caused to Autonomy…"*

543.    Whilst maintaining that the Claimants were thereby departing from common ground, Mr Miles submitted that in any event the position as summarised in paragraph 542 was correct. He suggested the following example. Assume for the sake of argument that Autonomy's published information contained two misstatements, misstatement *A* and misstatement *B*.  Dr Lynch was only aware of misstatement *A*; Mr Hussain was aware of misstatement *B*.  The price HP actually paid was *P*.  If HP had known the truth in respect of misstatements *A* and *B*, it would have paid a lower price (*X*) than the price it would have paid (*Y*) if it knew the truth only in respect of misstatement *A*.  As against Dr Lynch, the maximum claim would be the difference between *P* and *Y* – a lesser sum than the difference between *P* and *X*.  He cannot be liable for the additional losses caused by misstatement *B*, since that misstatement was known only to Mr Hussain.

544.    In the event, as will become apparent, the point is academic, since in respect of all the claims I have found that both Dr Lynch and Mr Hussain had what by way of shorthand I shall refer to as *"guilty knowledge"*.  However, in case it should become relevant, and because the point may have some general application, I should explain why (in addition to thinking that the Defendants were entitled to proceed on the basis of the matter being common ground) I consider Mr Miles's submissions to be correct. It seems to me that the essential point is that the claim against the Defendants is for breach of duty. It is not, as against them, a claim under the statute. The Claimants have not articulated their claim for breach of duty in any detail.  They stated that Dr Lynch owed duties under ss. 171, 172 and 175 of the Companies Act 2006 (duties to exercise powers for proper purpose, to act in good faith to promote the success of the company and to avoid conflicts of interest), and they refer to the duties owed to Autonomy with regard to the proper preparation of its individual and consolidated group accounts (ss. 393, 394, 399 and 415-418 CA 2006).  They also rely on duties owed under Dr Lynch's employment contract.  They argue that further elaboration is unnecessary, saying that if the Defendants caused Autonomy to put out information containing knowingly untrue statements or omissions, then they must have been in breach of those duties, and they say that "*If Autonomy is liable to Bidco in damages by virtue of a misstatement or omission in Autonomy's published information made with the knowledge of the Defendants', then it is inevitable that the Defendants' must in turn be liable to Autonomy for those damages, which were caused by their breach of duty.*"  But I agree with the Defendants that this is an oversimplification. A director may be liable for his own breach of duty and its consequences but (unless he has *"guilty knowledge"* of it) not for another director's breach. The Claimants did not address that possibility, and I agree that their generalized plea would have been insufficient, had the point not been academic (on my view of the facts).

**Claims in deceit and under the Misrepresentation Act 1967**

545.    The claims against Dr Lynch and Mr Hussain in deceit and/or under the
Misrepresentation Act 1967 do not assert any liability on the part of the issuer
(Autonomy). They are claims directly against the Defendants based on
misrepresentations allegedly made by them in the course of meetings with HP
or in written presentations provided to HP in the run-up to the bid for
Autonomy. The claims relate only to the loss allegedly suffered on the
acquisition of the shares in Autonomy held by the Defendants.

*Claims in deceit*

546.    The elements of the tort of deceit can be summarised as follows (per Jackson
LJ in *Eco 3 Capital Limited v Ludsin Overseas Limited* [2013] EWCA Civ 413
at §77):

> *"What the cases show is that the tort of deceit contains four
> ingredients, namely:*
>
> *i)     The defendant makes a false representation to the
> claimant.*
>
> *ii)   The defendant knows that the representation is false,
> alternatively he is reckless as to whether it is true or false.*
>
> *iii)   The defendant intends that the claimant should act in
> reliance on it.*
>
> *iv)   The claimant does act in reliance on the representation and
> in consequence suffers loss.*
>
> *Ingredient (i) describes what the defendant does. Ingredients (ii)
> and (iii) describe the defendant's state of mind. Ingredient (iv)
> describes what the claimant does."*

A number of these elements are considered below.

*Representation made to a claimant by a defendant*

547.    To succeed in the tort of deceit, a claimant must show that a misrepresentation
was made to him or his agent: *Chagos Islanders v Attorney General* [2003]
EWHC 222, at §364. Here, the Claimants allege that the misrepresentations
were made to HP, not Bidco.

548.    The representation must be one made by or on behalf of the defendant:[115]

> (1) In this case, the Claimants rely on some representations allegedly made
> by Dr Lynch and on others allegedly made by Mr Hussain. There is no
> allegation that misrepresentations were made by Mr Hussain on Dr
> Lynch's behalf; and Dr Lynch can have no liability in respect of

---

[115] Cartwright, <u>Misrepresentation, Mistake and Non-Disclosure</u> (4th Ed., 2017), §5-07.

statements made by Mr Hussain. The Defendants submitted, and I agree, that each defendant must therefore be considered separately.

(2) As I explain at greater length later, some of the representations allegedly made by Dr Lynch were not made by him directly, but by means of slides produced and sent by Qatalyst. Dr Lynch submitted, and again I agree, that it is necessary for the Claimants to establish that Qatalyst was acting as Dr Lynch's agent (not Autonomy's agent) in sending those slides.

*Defendant's state of mind*

549.    A claimant in deceit must establish that the representor was fraudulent, in that he did not honestly believe that his representation was true. See *Derry v Peek* (1889) 14 App. Cas. 337, (Lord Herschell):

> *"I think the authorities establish the following propositions: First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth. And this probably covers the whole ground, for one who knowingly alleges that which is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made."*

550.    In the same case, Lord Bramwell explained that a defendant would not be found to be fraudulent unless the truth was present to his mind at the moment when the false statement was made.[116]  Put another way, he must have been conscious of the truth, and thus the falsity of what is being said.  It is not sufficient to show

---

[116]*Derry v Peek*: "*Now, as to the evidence. The plaintiff's case is that the defendants made an untrue statement, which they knew to be untrue, and likely to influence persons reading it; therefore they were fraudulent. It is not necessary to consider whether a prima facie case was made out by the plaintiff. We have all the evidence before us, and must judge on the whole. The alleged untrue statement is that, "The company has the right to use steam or mechanical power instead of horses," and that a saving would be thereby effected. Now, this is certainly untrue, because it is stated as an absolute right, when in truth it was conditional on the approval of the Board of Trade, and the sanction or consent of two local boards; and a conditional right is not the same as an absolute right. It is also certain that the defendants knew what the truth was, and therefore knew that what they said was untrue. But it does not follow that the statement was fraudulently made. There are various kinds of untruth. There is an absolute untruth, an untruth in itself, that no addition or qualification can make true; as, if a man says a thing he saw was black, when it was white, as he remembers and knows. So, as to knowing the truth. A man may know it, and yet it may not be present to his mind at the moment of speaking; or, if the fact is present to his mind, it may not occur to him to be of any use to mention it. …*"

that the defendant has some knowledge stored away in his mind that, if it had been recalled would have, shown him that what he was saying was false.  See also *Armstrong v Strain* [1951] 1 TLR 856 (Devlin J, at p 253):[117]

> *"A man may be said to know a fact when once he has been told it and pigeon-holed it somewhere in his brain where it is more or less accessible in case of need. In another sense of the word a man knows a fact only when he is fully conscious of it. For an action of deceit there must be knowledge in the narrower sense; and conscious knowledge of falsity must always amount to wickedness and dishonesty. When Judges say, therefore, that wickedness and dishonesty must be present, they are not requiring a new ingredient for the tort of deceit so much as describing the sort of knowledge which is necessary."*

551.   Fraud is inherently improbable, and brings serious consequences, so evidence sufficient to overcome the starting point of improbability will be required to justify a finding of fraud, even on the civil standard: and see paragraph 473 above.

552.   In addition, a claimant in deceit must establish that the representor intended the representation to be acted upon by the claimant.[118]

*Reliance / inducement*

553.   In a claim for deceit, the claimant must establish that he relied on the statement, in the sense that the representation was an inducement to his action.

554.   As with the FSMA claim, it must be shown that the representation was relied on by the claimant, not by some other person: the representation must have been present to the claimant's mind at the time when he took the action on which he bases his claim. As noted in respect of the FSMA claim, the claim is by Bidco alone and the Claimants pleaded simply that:

> *"Bidco acquired the share capital of Autonomy, including the shares held by Lynch and Hussain, in reliance on (i) the information contained in the Annual Reports and the Quarterly Reports (and as repeated and explained during earnings calls) and (ii) the misrepresentations made by Lynch and Hussain <u>directly to HP (and thus to Bidco)".</u>* [my emphasis].

555.    The Claimants' pleading is at best sparse in this regard; and the Claimants did not elaborate their pleading in the evidence. However, for the reasons I have stated in paragraphs 499 to 500 above, I have concluded that I should accept

---

[117]Cited with approval by Rix LJ in *AIC Ltd v ITS Testing Services (UK) Ltd (The Kriti Palm)* [2007] 1 Lloyds Rep 555.

[118]Clerk and Lindsell on Torts (22nd Ed, 2017), §18-30, and see §77 in *Eco 3 Capital Limited v Ludsin Overseas Limited* [2013] EWCA Civ 413 (set out at paragraph 546 above).

that HP was Bidco's controlling mind, and that representations made to HP were thus made to Bidco.

556.    As to the degree of reliance that the Claimants must show, see paragraphs 507 to 515 above. It is not sufficient for them to show that they might have been induced: they must demonstrate that they were induced as a matter of fact.

557.    The legal burden is on the claimant to establish that he has been induced to act by the defendant's misrepresentation: *BV Nederlandse v Rembrandt Enterprises* at §25. However, and as explained in the context of the FSMA claims, once it has been established that a false statement has been made which is material, in the sense that it was likely to induce the contract, and which was intended to induce the representee's investment decision, the claimant/representee has the benefit of a fair inference or presumption of fact (though not an inference of law) that he was influenced by the statement.[119] This presumption is difficult to shift but can be so rebutted where it can be shown that the fraudulent statement or omission played no real or substantial part in the determination of the course of action adopted by the representee, whether because the representee did not hear or read it or because he chose entirely to ignore it, and/or the claimant would have entered into the contract even if the misrepresentation had not been made: see *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm) (Males J, at §§18, 19 and 171-172)[120], and paragraph 515 above.

*Loss*

558.    The only loss claimed in the direct claims is that sustained by Bidco in respect of the shares it contracted with the Defendants to buy. This loss has been carved out from the FSMA claim so that there is no double recovery.

559.    As Picken J noted in *Marme v Natwest Markets Plc* [2019] EWHC 366, at §296, the distinction is sometimes overlooked: but the question whether loss has been caused to the claimant as a result of a representation is a separate issue from inducement/reliance. There is a distinction between the questions (i) whether a misrepresentation has induced a claimant to act in a certain way and (ii) whether a loss has been caused to the claimant as a result of the misrepresentation. See also *Vald Nielsen v Baldorino* [2019] EWHC 1926, at §430.

560.    On the question of loss, the starting point is again Lord Blackburne's statement in *Livingstone v Rawyards Coal Co*, that damages should be assessed so as to "*as nearly as possible get at that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation.*"[121]

---

[119] *Zurich v Hayward* [2017] AC 142, at §34 (Lord Clarke); and *Rembrandt Enterprises* at §25.
[120] Males J found in that case that MOG had discharged the burden of shifting the presumption, even though, as he noted, amongst the problems for a defendants is that *"…it is not attractive, and will generally be unconvincing, for a fraudster…to assert that its fraud, which it may have gone to some lengths to perpetrate, has actually made no difference…"*
[121] *Livingstone v Rawyards Coal Company* (1880) 5 App. Cas. 25.

561. Even in a case of fraud, the quantification of damages is compensatory, not punitive: *Vald Nielsen v Baldorino* at §549, and, like other claims in tort for damages, requires "but for" causation. However, English law adopts *"a policy of imposing more extensive liability on intentional wrongdoers than on merely careless defendants"*: per Lord Steyn in *Smith New Court Securities Ltd v Citibank NA* [1997] AC 254, 279-285. In particular, the limitations that only damage which was (a) foreseeable and (b) within the scope of the duty owed which have been adopted in the context of claims in negligence (see *South Australia Asset Management Corporation v York Montage Ltd* [1997] AC 191) do not apply in the case of fraud, where *"the defendant is bound to make reparation for all the damage directly flowing from the transaction"*: *Doyle v Olby (ironmongers) Ltd [1969] 2 QB 158, 167* and *Smith New Court [supra]*. Thus, per Lord Briggs of Westbourne and Hamblen LJ in *UBS AG (London Branch) v Kommunale Wasserwerke Leipzig GmbH* [2017] 2 Lloyd's Rep 621 at [183]:

> *"...[t]he deceiver is liable, on the tortious basis of analysis, for all the loss directly caused to the representee by the fraudulent misrepresentation, without limits derived from the law as to foreseeability or scope of duty".*

562. The analysis is similar, but not identical, to that discussed above in the context of the FSMA claim. Damages, for the claims in deceit, are to compensate Bidco for the wrong suffered, and thus for having relied on the misrepresentations. So it is necessary to ask what would have happened if that wrong had not occurred, that is, if the misrepresentations had not been made.

563. The Claimants have instructed Mr Bezant to follow the counterfactual recorded as follows in his first report:

> *"In assessing the Misrepresentation Loss, I am instructed to assume that, but for the breaches of duty alleged by the Claimants, the misrepresentations alleged to have been made by the Defendants directly to HP would not have been made; but the impugned transactions would still have been entered into; and Autonomy's published financial information would have been the same as it was in fact."*

That counterfactual refers to "*the misrepresentations alleged to have been made by the Defendants*"; but Dr Lynch submitted, in my view correctly, that in considering the claim against him, only those misrepresentations found to have been made by him, or on his behalf, can be taken into account.

564. As already noted, the Claimants' primary case is that but for the matters which the Claimants complain, including the alleged misrepresentations, Bidco would still have acquired Autonomy. The Claimants will only prove their loss on their primary case to the extent that they can establish that there would have been an agreed bid at a lower price than that which Bidco in fact paid.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

565.    It is open to the Court, when considering the question of damages, to find that
the fraud has caused no loss.  Where the parties would have contracted on the
same terms even in the absence of the fraud, no losses will be recoverable.  See
*Vald Nielsen v Baldorino* [2019] EWHC 1926 (Comm) (Jacobs J):

> "*430.  As far as the law is concerned, it was common ground that
> the question of causation was a separate legal question from the
> issue of inducement.  Whilst there might be an overlap on the facts
> relevant to both questions, a favourable answer to the Claimants on
> inducement did not enable the Claimants to bypass the question of
> causation.  The Defendants referred to a number of authorities in
> support of that proposition, including the following passage
> in Chitty on Contracts 33rd edition, paragraph 7-039:*
>
> > "*It seems to be the normal rule that, <u>where a party has entered a
> > contract after a misrepresentation has been made to him, he will
> > not have a remedy unless he would not have entered the contract
> > (or at least not on the same terms) but for the misrepresentation</u>.
> > Certainly this is the case when the misrepresentee claims
> > damages in tort for negligent misstatement; and it seems also to
> > be required if damages are claimed for fraud.*"
>
> *431.  The Defendants also cited the analysis of Doyle CJ in an
> Australian case, Copping v ANZ McCaughan Ltd (1997) 67
> SASR 525, 539:*
>
> > "*It is sufficient if the relevant loss can be said to be caused by the
> > representation, and it is not necessary to show that the loss is
> > attributable to that which made the representation wrongful.  In
> > that sense the test is a relatively generous one, in that the
> > misrepresenting party may have thrown upon it risks unrelated
> > to the representation.  <u>But there is still the requirement that the
> > loss flows from the representation, and it seems to me impossible
> > to conclude that it does so flow if one concludes that quite apart
> > from the representation the appellant would have entered into a
> > transaction bringing with it the very risk which eventuated in the
> > relevant transaction and which can be seen as the cause of the
> > loss which the appellant seeks to recover.</u>  There may be an
> > element of impression in all this.*"
>
> *432.  In the light of these authorities, <u>it appeared to be common
> ground that one relevant factual question on causation was whether
> Updata Europe could prove that, but for the misrepresentation, it
> would not have entered into the contract with LMS on the same
> terms that it did</u>.  Where a question arose as to what Updata Europe
> would or would not have done, it was also common ground that the
> question was to be resolved on the balance of probabilities.*"

[Underlining added]

566.   The same case (§493) shows that the burden is on a claimant to establish loss.

567.   The exercise is again a counterfactual one to be determined on the balance of probabilities. Dr Lynch's case is that, but for the misrepresentations alleged against him, Bidco would still have acquired Autonomy on the same terms, so that no loss has been suffered. I address issues relating to this counterfactual question later.

568.   If it is established, despite the Claimants' pleaded case, that but for the Defendants' alleged misrepresentations, Bidco would not have acquired Autonomy, then damages fall to be assessed on the "No transaction" basis: see paragraph 531 above which is for the most part applicable in this context likewise.

569.   As explained in paragraph 534(2) above, the counterfactual issue (what would have happened but for the wrong) is like any question of fact (albeit an hypothetical one), to which there is a single answer; the Claimants cannot, as they contended in opening, plump for an outcome which would happen to give them a higher measure of loss at their election or option.

**Misrepresentation Act claims**

570.   In the alternative to their claim in deceit, the Claimants claim damages under s. 2(1) of the Misrepresentation Act 1967 ("s. 2(1)"). This provides:

> "*Where a person has entered into a contract after a misrepresentation has been made to him by another party thereto and*
> *as a result thereof he has suffered loss, then, if the person making the misrepresentation would be liable to damages in respect thereof had the misrepresentation been made fraudulently, that person shall be so liable notwithstanding that the misrepresentation was not made fraudulently, unless he proves that he had reasonable ground to believe and did believe up to the time the contract was made the facts represented were true.*"

571.   It is a requirement of the section that the representation be made to the person who enters the contract, in this case, Bidco. Damages are only available where a person has entered into a contract "*after a misrepresentation has been made to him by another party thereto*". This again raised the '*Bidco point*' which I have addressed above.

572.   There is no requirement for a claimant under s. 2(1) to prove fraud. But he must prove all of the other elements of the tort of deceit in respect of the defendant's statement except for the fraud. Thus, he must prove a false representation made

to the claimant, by or on behalf of the defendant, that the defendant intended the claimant to act on it,[122] and that the representation was an inducement to the claimant's action as a result of which he suffered the loss he claims.[123] The arguments above on these elements in the context of the claim in deceit accordingly apply equally in the context of the claim under s. 2(1).

573. In that connection, the Claimants relied on the "fiction of fraud" as importing the "presumption of inducement" into this context also.

574. Liability will not arise where the defendant "*proves that he had reasonable ground to believe and did believe up to the time the contract was made the facts represented were true*". If the Defendants were each dishonest, this would not avail them. A more difficult question is if one or both were not dishonest because they were not aware of the falsity of the representation in question. The Defendants submitted that if it is found that the published information was inaccurate on any point, but that the relevant defendant was unaware of and had no responsibility for the inaccuracy, then if that Defendant repeated the statement made in the published information, it will (in practice) likely follow that he will have had reasonable grounds for believing, and did believe what he was saying to be true. Dr Lynch, in particular, submitted that he was entitled to, and did, rely on the accuracy of Autonomy's published information, prepared by experienced accountants in the finance department and reviewed by Deloitte. I return later to this defence also.

575. As regards the measure of damages under s. 2(1), the Claimants relied on *Royscot Trust v Rogerson* [1991] 2 QB 297 (CA) as establishing that the fraud measure of loss applies. The decision in *Royscot Trust* has been much criticised. In *Smith New Court*, Lord Browne-Wilkinson said that he expressed no view on the correctness of the decision, as did Lord Steyn,[124] and it was also doubted by Leggatt J in *Yam Seng*.[125] Dr Lynch accepts that *Royscot Trust* is binding on this Court, and has the consequence which the Claimants state. However, he reserved the right to contend on appeal that the case was wrongly decided.

**Direct claims for breach of duty**

576. Independently of the claims relating to the acquisition, the second and third Claimants (Autonomy Inc and ASL) have brought direct claims to recover the

---

[122] As to this element, see *Raiffeisen Zentralbank v RBS* [2010] EWHC 1392 (Comm) at §221: "*The requirement that a representation must be made with the intention that it should be acted on by the other party applies equally under section 2(1) of the Misrepresentation Act as in a fraud case*".
[123] Cartwright, Misrepresentation, Mistake and Non-Disclosure (4th Ed., 2017), §7-17.
[124] *Smith New Court* at 267 and 283.
[125] *Yam Seng* at §206: "*The decision in the Royscot Trust case has been much criticised. As has been pointed out by academic writers, the policy considerations which justify a broad measure of damages where fraud has been demonstrated do not apply, or in nothing like the same degree, in cases of mere negligence. Nor does the language of s 2(1) seem to me to compel such a conclusion. It is possible to construe the words 'and as a result thereof ... has suffered loss' as requiring the claimant to show that he has suffered loss as a reasonably foreseeable result of a misrepresentation having been made to him, and to treat the following words as imposing an additional requirement (that the defendant would be liable to damages had the misrepresentation been made fraudulently) which must also be satisfied. Unless and until the Royscot Trust case is overruled, however, it represents the law; and I must therefore apply it.*"

direct loss that they and Zantaz suffered as a result of the Defendants' breach of duty in causing such company to enter into loss-making transactions for allegedly improper purposes giving rise to loss.

577.   The breach of duty claims relate to four categories of transaction: (i) loss-making "pure hardware" sales (and a claim in respect of a hardware-related bonus that was paid by Zantaz to Mr Sullivan); (ii) VAR transactions where a marketing assistance fee (MAF) (or similar payment) was paid to the VAR (or the relevant Autonomy entity forewent receipts); (iii) alleged reciprocal transactions and VAR transactions involving a reciprocal element; and (iv) Schedule 12D hosting transactions.

578.   Autonomy Inc was the contracting party for most of these transactions; Zantaz was the contracting party on the Schedule 12D hosting transactions (save for one transaction where Autonomy Inc was the contracting party). Nonetheless, the Claimants' primary claim is that damages are recoverable by ASL rather than Autonomy Inc or Zantaz, because of transfer pricing arrangements between Autonomy Inc / Zantaz / Verity Inc, and ASL, under which revenues and costs of the former were transferred to the latter. There is an issue in this regard; one of the points raised by Dr Lynch being that he had no detailed knowledge of the transfer pricing arrangements and no awareness of ASL having any exposure, nor that losses would be transferred from Autonomy Inc to ASL. To the extent the claim is alleged to be a breach of duty to ASL in entering the transfer pricing arrangements he contends no such claim could succeed against him. I deal with that contention later, but in summary I find that for the breach of duty claims to succeed the breach must have occurred in entering the impugned transactions, and not in the context of the transfer pricing arrangements. Thus his knowledge of those is not determinative of the direct claims.

579.   In addition, according to the RRAPoC before becoming absorbed into HP with effect from 1 November 2014, Zantaz assigned to Autonomy Inc all its rights, title to and interest in, amongst other matters, any claims, rights and causes of action that Zantaz had against third parties, and notice of such assignment was given to the Defendants on 27 March 2015.

580.   Mr Hussain was a director of all three entities alleged to have suffered loss (Autonomy Inc, ASL and Zantaz). Dr Lynch's case is that he was not a *de jure* director of any of them; the Claimants contended that he was President of Autonomy Inc (which he denied) and a *de facto* or shadow director of ASL (which also he denied), and that he owed fiduciary duties to each of those two entities accordingly.

581.   The issue whether Dr Lynch was a *de facto* or shadow director is one of fact, and the burden of proving it is on the Claimants. It was stated by Morgan J in *Instant Properties Ltd v Rosser* [2018] BCC 751 at [219], citing Lord Hope's review of authority in *Revenue and Customs Cmrs v Holland* [2010] 1 WLR 2793, that:

> "*if it is unclear whether the acts of the person in question are referable to an assumed capacity or some other capacity such as shareholder or*

> *consultant the person in question must be entitled to the benefit of the
> doubt."*

582.   The Claimants originally alleged that Dr Lynch was also a *de facto* director of
       Zantaz but when the conditions that would need to be satisfied to establish that
       under Californian law (Zantaz being an entity incorporated and existing under
       the law of the State of California) were explained they withdrew the claim
       against him by Zantaz: in the result, no claim on behalf or in right of Zantaz was
       properly entered against him.

583.   As to the substantive merits of the claims, the Defendants contended that the
       transactions impugned were all ones that could properly be undertaken, acting
       in the best interests of the contracting party and the group. These points are
       developed below.

**Interpretation of accounting standards and statements of practice**

584.   Except for its case relating to the representations made about IDOL OEM
       revenue, the Claimants' claims revolved around issues of accounting. The
       following paragraphs provide an overview of the accounting framework to be
       interpreted and applied. I return to particular aspects of these accounting issues
       in the context of the specific claims in which they arise.

585.   The statutory underpinning is provided by the Companies Act 2006. Section
       395 of the Companies Act 2006 requires that a company's accounts must present
       a "true and fair view" of its assets, liabilities, financial position and profit or
       loss. That standard is to be satisfied by preparing such accounts either under
       section 396 of the Companies Act 2006 ("section 396") and in accordance with
       Financial Reporting Standards issued by the Financial Reporting Council ("the
       FRC"), or under section 395 of the Companies Act 2006 ("section 395") and in
       accordance with international accounting standards as defined.

586.   Accounts properly prepared either in accordance with section 396 or in
       accordance with IAS are said to be prepared in accordance with generally
       accepted accounting practice ("GAAP"). There are, however, different versions
       of GAAP. In the United States there are different practices together
       compendiously known as "US GAAP": the US has not adopted IAS, and US
       GAAP departs from IAS in key areas. US GAAP principles were not applicable
       to Autonomy before its acquisition by HP, though (as I explain later) they were
       familiar to and may incorrectly have influenced the Claimants in bringing their
       claims.

587.   As a UK listed company, Autonomy was required to prepare its accounts in
       accordance with the international accounting standards customarily known in
       the accounting profession as "EU-adopted IFRS". IFRS are accounting
       standards issued since 2001 by the International Accounting Standards Board
       ("IASB"), and EU-adopted IFRS are those IFRS that have been adopted by the
       European Commission in accordance with EC Regulation No. 1606/2002.
       Between 1975 and 2001 accounting standards issued by the IASB's predecessor,
       the International Accounting Standards Committee ("IASC") were known as
       IAS, and they have for the most part continued in operation alongside newer

IFRS developed and introduced since 2001. In practice, the terms "IAS" and "IFRS" are used interchangeably.

588.   The aim of these standards is to harmonise regulations, accounting standards and procedures relating to the preparation and presentation of financial statements and to seek to ensure that financial statements achieve their purpose of providing the information about the financial position, performance and changes in the financial position of an entity which is likely to be necessary for the purposes of enabling their readership to make informed economic decisions. Application of the IAS/IFRS is presumed to achieve a fair presentation of the financial position, financial performance and cash flows of a company, though the EC Regulation and IAS 1 provide a saving where compliance would be so misleading as to conflict with the purpose of financial statements. The requirement that the accounts should *"fairly present"* the position and performance of the company is substantially the same as the requirement that they should present a *"true and fair view"* (which is the test long adopted in a sequence of English Companies Acts).

589.   After some debate and expression of concern amongst both accountants and the market as to whether in the case of entities adopting IAS accounting the presumption that compliance with IAS/IFRS accounting standards would, save in an exceptional case, result in a 'fair presentation', replaced the age-old requirement that accounts should present a true and fair view, the present version of section 393 of the 2006 Act gave renewed recognition to the older test: it re-confirms that the directors must not approve annual accounts which they are not satisfied give a "true and fair view". Although the mechanism for that test to be paramount is now provided within IAS and not the 2006 Act, the result is in my judgment that the test is ultimately the standard to be achieved and the accounting standards are to be interpreted as the means of complying with the underlying duty of directors to present a "true and fair view" of their company's financial position, performance and prospects. I would take it to be the test graven in the heart and mind of every director responsible for the accounting statements of a public listed company such as Autonomy.

590.   I stress that because it is worth emphasising that a company's accounts are ultimately the product and responsibility of the directors. Auditors, even auditors with free access to detailed records, are at one remove, and in the end cannot know what the Directors had in mind except by reference to what directors choose to reveal.

591.   In that connection, the Defendants placed great reliance and emphasis on the fact that Deloitte had free and open access to all Autonomy's books and records, considered in detail and reviewed with care the facts and accounting standards applicable to all the transactions which the Claimants have impugned, and approved Autonomy's financial statements and reports in every quarter and half and full year in the Relevant Period. The question whether that provides the Defendants with an answer to these claims depends not only on the facts and the extent of Deloitte's knowledge, and the interpretation of the variety of Accounting Standards and Statements of Practice which had to be satisfied in that context, but also on a determination of what in reality the directors regarded the economic effect as being or likely to be.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*Key accounting issues*

592.    The key accounting matters in issue in these proceedings relate to

(1) The recognition of revenue (which is relevant to most of the Claimants' allegations); and

(2) The accounting for and/or disclosure of hardware sales transactions in Autonomy's various financial statements.

593.    The standards bring necessary detail to the overall guidance provided by the '*Framework for the preparation and presentation of Financial Statements*' published in 1989 and subsequently partially revised by '*The Conceptual Framework for Financial Reporting*' issued in September 2010 (which contained new material on the objective of general-purpose financial reporting and on qualitative characteristics of useful financial information).

594.    Neither the '*Framework*' nor the '*Conceptual Framework*' has the status of an accounting standard; but they provide a framework for the development of more precise standards, a useful guide as to the meaning and intention of individual standards if unclear, and a reference point for the accounting treatment of transactions for which there are no specific rules. An example of the guidance given, and one which occasioned considerable debate in these proceedings, concerned the important concept of 'economic substance'. Both *Framework documents* and the relevant standards require that transactions and events must be accounted for *"in accordance with their substance and economic reality and not merely their legal form."*

595.    The experts agreed that the Accounting Standards ("IAS(s)") issued by the IASC and newer International Financial Reporting Standard(s) ("IFRS") issued by the IASB of particular relevance are:

(1) IAS 1 ('Presentation of financial statements')

(2) IAS 2 ('Inventories')

(3) IAS 18 ('Revenue')

(4) IAS 34 ('Interim financial reporting')

(5) IFRS 8 ('Operating segments').

596.    As I elaborate later, especially in the context of the application of the rules for revenue recognition contained in IAS 18.14 (which as I shall return to later, has since been replaced by IFRS 15), there was a dispute between the parties, and to a lesser extent between the experts, as to the proper approach to the interpretation of IFRS/IAS.

597.    In summary, the dispute was as to the extent to which the legal attributes of a transaction should be taken to determine its true nature from the point of view of IAS/IFRS standards. The most obvious and usual case where it would be relevant is in seeking to determine how to apply IAS where the legal content of

a transaction appears to differ from what circumstances reveal to be its intended or actual economic effect, and where if the legal effect is conclusive, revenue would fall to be recognised, but if a test of economic reality were to be applied, it would not be. (Thus, for example, Autonomy's VAR transactions plainly provided for ownership, managerial control and the significant risks and rewards of ownership to pass to the VAR, those being preconditions of revenue recognition; but at least arguably, the economic reality was that Autonomy retained the economic risk, effective managerial control and the real risks and rewards of ownership, raising acutely whether the preconditions were to be interpreted as imposing a legal test, or as imposing a test of their economic substance.)

598.    In *Ball UK Holdings Ltd v HMRC* [2018] UKUT 407 (TCC), the issue as to whether the interpretation of an accounting standard was a process of legal analysis or accountancy practice arose in acute form in relation to a dispute as to the meaning of "the functional currency" in FRS 23. FRS 23 is the standard prescriptive of the selection of a single currency in financial statements. The Upper Tribunal, whilst acknowledging (at [38]) that *"accountancy clearly does meet up with legal principles…in the Companies Act, and in particular in the requirement now in s 393(1) Companies Act 2006 that accounts must give a "true and fair view…"*, stated as follows (at [37] and [40] to [41]):

> *"37.    Accounting standards are not legal documents. They are not statutes or contracts. This is also not a case where public law concepts, such as the doctrine of legitimate expectation, are engaged in a way that means that the document in question may form the basis of a legal right. So it is not necessary to construe them to determine any legal effect to be given to them. They are documents written by accountants for accountants, and are intended to identify proper accounting practice, not law. No accountant would consider turning to a lawyer for assistance in their interpretation, nor should they.*
>
> *...*
>
> *40.    In our view, the question of what is generally accepted accounting practice, as well as the question whether a particular set of accounts are prepared in accordance with it, is a question of fact to be determined with the assistance of expert evidence. Professional accountants are best placed to understand accounting statements in their context, and in particular their "spirit and reasoning".*
>
> *41.    What is a matter for a court or tribunal, however, is the proper assessment of expert evidence. Clearly a judge may prefer the evidence of one expert to that of another, but this should be fully reasoned and the judge should not simply "develop his own theory" (see for example Devoran Joinery Co Ltd v Perkins (No 2) [2003] EWCA Civ 1241 at [24])."*

599.    I must admit, with all respect, to some reservations about the generality of the last two sentences of [37] in its application to accounting standards for company

accounts in general, and to IAS 18.14 in particular. I tend to think that it could be simplistic to regard such accounting standards as written by accountants for accountants, without recognising that such statements are issued after broad consultation and input, including from lawyers, and after regard has been had to the likely context of their application, which (at least in the case of IAS 18.14) will usually be a legal relationship. The law and the way lawyers apply and interpret the law, inform them and this is reflected in the drafting, even if the emphasis is on applying the standard in a way which reflects the economic reality of the entity's economic position and performance. Hence, for example, my understanding is that a lawyer was usually part of a panel of enquiry because law and accountancy were so closely enmeshed in determining the approach to and proper application of accounting standards with a view to achieving the statutory standard of a "true and fair view".

600.    In that latter context, it is also to be noted that when the issue arose in 1983 as to the interaction between the requirement that accounts must state a "true and fair view" and statements of accounting principles, the Accounting Standards Committee turned to two lawyers, Mr Leonard Hoffmann QC and Miss Mary Arden (as they then were),  for the answer; and the FRC turned to Mr Martin Moore QC when the question was revisited in the light of the European Directive and changes in the law in 2008.

601.    However, with that caveat, I agree with the conclusion reached in *Ball UK Holdings Ltd v HMRC*, in which the Upper Tax Tribunal followed Arnold J's decision in *Smith v HMRC* [2011] STC 1724, that accounting standards are not law, and their interpretation is therefore not a question of law. Further, in many, if not most cases, the question will not be as to what single approach is dictated: it will (in the event of dispute) be a question whether a given approach is within the range of possible proper applications of the standard according to the practice of accountants as revealed by expert evidence.

602.    The court or tribunal will ordinarily have to determine that question by reference to the expert evidence, although ultimately it is for the Court or tribunal to determine the correct principle of commercial accountancy to be applied, or the permissible range which would constitute compliance. Whilst Mr Peter Holgate ("Mr Holgate") considered that the range would usually be *"relatively narrow"* he accepted that its scope and the application of IAS/IFRS to a specific company would be a matter of judgement having regard to all the particular facts and circumstances.

603.    I also agree that the standard must be applied to the economic substance and real intended effect of the transaction and not merely its legal form and content; and whilst the contractual provisions are likely (as Mr Miles submitted) to define the relationship between the parties and their shared intent, they are the starting point and not the end-point in assessing the real substantive effect of the arrangements constituting and relating to the transaction.

604.    The assessment involves an analysis of the entire commercial package of rights and an assessment of how the arrangements the parties have made are in substance intended to affect their relationship in respect of the subject-matter of the contract. The assessment must also take into account indicia which the court

considers the evidence of accounting practice suggests should be taken into account as being relevant to that assessment.

605.    Further, and although the court must be wary, in determining the attributes of a transaction, about taking into account matters which the parties have expressly stipulated should not be taken into account, and equally wary of promoting an assurance as to likely future conduct of another person (here, Autonomy) into a defining element in the relationship between the parties, the court has to keep well in mind that though a legal prohibition may deprive legal effect to something done in breach of it, cannot erase it as a fact. If it has happened, it has happened, and the law can only regulate its consequences in law and not deny it and its operation between the parties in point of fact.

606.    Lastly on this issue, I agree with Mr Rabinowitz that the court must be careful in its approach to guard against viewing the matter though a legalistic prism. It must assess the substance in the round; and even where (as perhaps in the case of IAS 18.14), the examples given or rules expressed in explaining the standard appear to reflect legal principles) it must be guided in its reading and application of the standards by the approach of accountants as revealed by the expert evidence, and by the objective of IFRS accounting, being (in my view) to achieve a true and fair presentation and account of the substantive economic performance of the company, and to inform appraisals and investment decisions likely to be made in reliance on that account.

## Issues of nomenclature

607.    Throughout this judgment, unless stated to the contrary, I use the terms "the Claimants" as a shorthand to denote the Claimant making the particular claim. The Claimants do not in reality make any claims jointly. A summary of the individual claimant(s) making the various claims is provided in the next section.

608.    I should also clarify that in terms of describing the acquirer, I use the descriptions HP and Bidco interchangeably in light of my conclusions on the 'Bidco Point'.

609.    My references to 'Autonomy' in the context of the various impugned transactions are by way of shorthand convenience; but in the context of an impugned transaction the reference is intended to denote (unless otherwise stated) whichever of the Autonomy group companies was the contracting party.

610.    References to the 'Defendants' are to whichever of the two of them is alleged to have been implicated in wrongdoing. I have sought to identify them individually when issues arise as to that individual's knowledge or involvement. Mr Hussain adopted all Dr Lynch's submissions as regards matters other than knowledge.

## Structure of the judgment

611.    As explained in paragraph 33 above, the length of this judgment has necessitated its division into two parts. I deal with the claims in separate

chapters, in the following sequence, the first two chapters being in Part A and the remainder being in Part B:

(1) Hardware Claims and related issues (paragraphs 613 to 1854);

(2) Reseller/VAR Claims, including claims in relation to the VAR reciprocals, and related issues (paragraphs 1855 to 2336), in respect of which there is also a Schedule in a separately page- and paragraph-numbered document containing an analysis of each of the 37 impugned VAR transaction;

(3) Reciprocal Transactions (paragraphs 2337 to 2972B);

(4) OEM Claim (paragraphs 2973 to 3253);

(5) Hosting Claim, including Schedule 12D Hosting Direct Loss Claim (paragraphs 3254 to 3739);

(6) Other Transactions Claims (paragraphs 3740 to 3820);

(7) Deceit and Misrepresentation (paragraphs 3821 to 3993);

(8) Reliance and Loss Revisited (paragraphs 3994 to 4076);

(9) Direct Loss Claims (paragraphs 4077 to 4105);

(10)    Dr Lynch's Counterclaim (paragraphs 4106 to 4115);

(11)    Conclusion (paragraphs 4116 to 4135).

612.    I have latterly also included a Postscript to address various matters raised in the process of providing comments and corrections on the embargoed drafts of this judgment (see paragraphs 4136 to 4155).

## HARDWARE CLAIMS

### The Claimants' 'Hardware Case' in outline

613.    A flagship of the Claimants' case is their claim that although Autonomy was presented to the market (and in due course to HP) as deriving substantially all its revenue from the sale of high margin proprietary software, in fact from Q3 2009 onwards (and throughout the Relevant Period) a substantial (and certainly material) part of its revenue was derived from undisclosed sales of third-party hardware. In internal Autonomy emails, these hardware sales were often euphemistically referred to as *"low margin"* sales; but in fact they were almost invariably at a loss.[126]

614.    The Claimants divided Autonomy's hardware sales into three categories: (i) *'pure hardware'* sales, (ii) '*Appliance sales*' and (iii) *'other hardware sales'*. These categories, and the difficulties or obfuscation which they caused, are explained further, together with other issues of terminology in relation to the Claimants' hardware claims, in paragraphs 648 to 659 below.

615.    Of the three categories of hardware sales, by far the largest was *"pure hardware sales"*. Put shortly, *'pure hardware'* sales were sales of hardware where the hardware sold had no Autonomy software in it and the sale did not include any Autonomy software as part of the overall sale. The revenue generated by *'pure hardware'* sales was substantial: some \$200 million over the course of the Relevant Period (constituting some 11% of total reported revenues), including \$105 million in 2010 alone.

616.    According to the Claimants, the sales of *'pure hardware'* lacked any legitimate commercial rationale. Their only real purpose was to assist Autonomy to meet (and if possible, *"beat and raise"*) market expectations for overall revenue in the quarter or other longer period in question. The Claimants dismissed as a pretence the Defendants' justification of the *'pure hardware'* sales and all the hardware sales as being to assist software sales and promote the development of Autonomy's core software business.

617.    The Claimants contended further that to achieve the real purpose of what became a routine activity or programme ("the hardware reselling strategy"), it was necessary that the extent of the sales and their contribution to Autonomy's revenues should never be disclosed or visible to the market. The purpose being to present substantially all Autonomy's revenues as derived from sales of its own software, it would undermine that purpose if the market was told, or was able to discover, how much of Autonomy's revenues were in fact derived from loss-making hardware sales.

618.    The necessity to hide the hardware sales in turn necessitated the concoction of a narrative which would persuade what the Claimants described as a *"very reluctant"* Deloitte and the Audit Committee to accept that revenue from

---

[126] because Autonomy had to purchase hardware from third party suppliers, and the purchase price paid by Autonomy exceeded the amount received by Autonomy in respect of the onward re-sale.

hardware sales should be aggregated with revenue from software sales without differentiation, and that no disclosure of the separate source of part of the revenue was required in Autonomy's accounts or published information.

619.   In the result, although hardware sales were accounted for in that the revenue and costs of sales were brought into account, Autonomy's published information mentioned neither the *'pure hardware'* sales nor any other hardware sale, except the sale of a small quantity of 'appliances' at margins represented to be *"not dissimilar"* to software sales. The hardware reselling strategy was thus never mentioned to analysts and the market. The Claimants contended that the Defendants personally *"went out of their way to prevent the market knowing that this was happening"*.

620.   In the Claimants' words in their written closing submissions, Autonomy's *"hardware reselling strategy"* in which both Defendants were *"centrally involved"* and *"actively concealed"*:

> *"...was little more than a scheme whereby Autonomy in effect 'bought and paid for' recognisable revenue to inflate reported revenue in order to mislead the market."*

621.   The Claimants further contended that to mitigate and disguise the inevitably adverse effect which low margin/loss making hardware sales would have on Autonomy's gross margins[127] and gross profits, two further refinements of the scheme came to be adopted. Both further demonstrated that hardware sales had nothing to do with driving software growth (which, put broadly, was the Defendants' justification for it). The two refinements were:

(1)   if expected shortfalls in software sales did not eventuate, so that revenue from high-margin software transactions unexpectedly transpired to be sufficient to meet forecasts, revenue from hardware sales would be deferred to a subsequent quarter for later use; and

(2)   instead of accounting for all costs as Costs of Goods Sold ("COGS"), as much of such costs as ingenuity would allow and Deloitte could be persuaded to approve would be allocated as Sales and Marketing expenses, thereby diminishing the adverse effect of loss-making sales on Autonomy's gross profit margin and thus its apparent performance.

622.   The Claimants' primary case is that the financial position and performance, and thus the long-term value, of Autonomy was thereby fundamentally distorted and overstated.

623.   The gist of the FSMA claim against the Defendants is that they instigated all this, or at least had full knowledge of it, knew that this was wrong and repeatedly misled Autonomy's auditors, the Audit Committee, the market more generally,

---

[127] Gross margin is the margin on each incremental sale of a product; or, across a company, the average gross margin across all sales.

and during the pre-acquisition discussions and due diligence process, HP in particular. The Claimants contended that the contemporaneous documentary evidence makes all this plain.

624.   The Claimants' case on *'pure hardware'* was summarised in paragraph 54A of their RRAPoC as follows:

> *"There was no legitimate business reason for Autonomy Inc to enter into any pure hardware transactions. In fact, the pure hardware transactions were not entered into genuinely in furtherance of, or pursuant to, Autonomy Inc's business, but rather were entered into for the improper purpose of allowing Autonomy falsely to portray itself as a high-margin software company whose revenues were growing rapidly and meeting market expectations, when in reality a substantial portion of these revenues and the apparent rate of revenue growth were the result of undisclosed (and indeed, as pleaded further below, actively concealed) pure hardware sales."*

625.   The Claimants seek very large damages or compensation on the basis, in broad summary, that the fact that a material part of Autonomy's revenues was derived from loss-making or (at best) low margin hardware sales which were not disclosed meant that Autonomy was a very different company, and very much less valuable, than it was presented to be.

626.   In addition to their FSMA claims, the Claimants also pursued direct claims against the Defendants on the basis that the Defendants breached their duties to Autonomy Inc and/or ASL by causing those companies to conduct hardware transactions at a loss.

627.   Thus, the Claimants' causes of action in relation to their Hardware Case are:

(1)   Claims pursuant to FSMA, on the basis that in consequence of the failure to disclose the hardware sales Autonomy's published information was untrue or misleading, rendering Autonomy liable to Bidco (which liability Autonomy admitted and now seeks to recover against the Defendants);

(2)   Claims in deceit and under the Misrepresentation Act 1967 directly against both Defendants on the basis that they fraudulently made material misrepresentations as to the financial position, performance and prospects of Autonomy and thereby induced HP, and thus Bidco, to proceed with the acquisition of their shares in Autonomy at the offer price.

(3)   Claims for breach of duty against both Defendants on the basis that at their instigation Autonomy Inc entered into what they termed *"pure*

> *hardware"* transactions (as to which, see below) *"not for any legitimate business purpose, but for the improper purpose of generating the revenues that would enable Autonomy to portray itself, falsely, as a high margin software company".*

628.    Claims within category (3) above seek recovery of transactional losses. However, the losses from the hardware transactions themselves were relatively small (in the region of $20 million) and transactional losses are not the real focus of the Claimants' complaint. It is important to keep those much smaller claims separate in order to preserve focus on the far larger claims based on misrepresentation and non-disclosure: and I consider the claims for transactional losses in another part of the judgment.

**Defendants' case in summary and matters primarily in dispute in the FSMA Claim**

629.    The Defendants did not deny that Autonomy transacted substantial hardware sales in volume and value terms between Q2 2009 and Q2 2011. The Defendants' case was that reselling hardware at a discount to its customers was a carefully weighed strategy, the principal purpose of which was to protect, support and facilitate software sales and Autonomy's software business.

630.    As presented by the Defendants, the strategy had two primary prongs: one pointing towards Autonomy's hardware suppliers and the other pointing towards its software customers:

(1)    As regards hardware suppliers, its objects were to enhance Autonomy's relationships with those suppliers and increase the prospect of them (a) optimising their hardware products for use with IDOL software, (b) co-operating with Autonomy to develop a joint "appliance" if the market adopted what appeared to be a move towards appliances as the means of delivery of software and (c) generally, encouraging their hardware customers to buy Autonomy/IDOL software.  Autonomy also hoped and expected thereby to increase Autonomy's market presence and the market penetration of Autonomy's software offerings.

(2)    As regards Autonomy's customers, its objects were (a) to enhance its ability to offer one-stop shopping and bulk purchasing and thereby (b) to consolidate its position as a favoured IT supplier and achieve or retain "key supplier status" at a time when some of its customers were limiting the number of their IT customers in order to make procurement cheaper and more efficient. Further, many of its customers had procurement departments, whose performance was measured on the discounts they could obtain. Although the discounts offered by Autonomy caused most of its hardware reselling to be at a loss, the Defendants contended that the losses were small, especially in comparison to the very high margins on increased software sales encouraged by the strategy.

631.    Their principal answers to the question posed by Mr Rabinowitz, put summarily, were that:

(1) The sales of hardware were never an end in themselves, and Autonomy never undertook a separate business as a hardware seller or reseller: its hardware reselling strategy was part of its single segment software business and, in effect, a loss leader and/or a form of marketing to protect and promote that business;

(2) The hardware sales or re-sales were disclosed to and reviewed in great detail by Deloitte, who approved their accounting treatment;

(3) Every deferral of revenue was justified, and the allocation of costs of hardware sales in part to Sales and Marketing was discussed and agreed with Deloitte and approved by both Deloitte and the Audit Committee;

(4) It was for Deloitte to advise, and they did advise, what disclosure was required by accounting standards, and Autonomy never acted contrary to that advice; and that

(5) It was a management judgment whether further disclosure should be made voluntarily, but on rational and substantial grounds, management determined not to provide further disclosure, and their decision was supported by both Deloitte and the Audit Committee who signed off on Autonomy's published information throughout the Relevant Period.

632.   The Defendants relied principally on the evidence of the Claimants' own witnesses, and in particular, that of Mr Sullivan and Mr Egan, which (they submitted) confirmed that there was a valid commercial rationale for the hardware sales (including the *"pure hardware"* sales) as a means of driving software sales. The Defendants submitted that (since it is their own) the Claimants are bound by that evidence, which was also given support by another witness called by the Claimants, Mr Welham.

633.   The Defendants acknowledged that the sales of hardware did provide *"flexibility"* in terms of supplementing revenue and could be and were used to enable revenue to be supplemented where quarterly revenue slipped. However, that was a collateral advantage rather than the purpose, let alone the primary purpose, of such sales.

634.   In asserting that *"None of these claims bears scrutiny"* it was an important element of the Defendants' case that Deloitte reviewed all the published information now contended by the Claimants to have been fraudulently presented, and (as Mr Welham accepted) would not have allowed any statement or presentation to be made that they considered misleading.

635.   According to the Defendants, Deloitte were aware of Autonomy's hardware sales, right down to a granular deal by deal basis, their amounts, their loss-making nature (to the extent that they were so) and the identities of the counterparties. They knew that some of the hardware was sold without adding any software to it. Deloitte considered and discussed with Autonomy's finance department and the Audit Committee not only the inclusion of the revenues as

revenue, but also the disclosure, categorisation and explanation of Autonomy's various types of revenue.

636.    Dr Lynch also stressed that he was not an accountant; he was entitled to, and did, think that in preparing and scrutinising the accounts the finance department (made up of experienced accountants), Deloitte and the Audit Committee had properly done their job. Thus, if more disclosure was required, he expected them to say so; and if any of those people had thought the published information was misleading, he expected them to say so, explain why, and offer an alternative which would ensure its fairness and accuracy.

637.    In the round, Dr Lynch depicted the aggregate gross losses from the hardware reselling strategy as a small price to pay for what in effect was, as he saw it, a successful marketing strategy at a time of threatening market changes which was of considerable benefit to Autonomy.

**The Principal Issues**

638.    The Claimants identified and summarised the principal issues to be determined in relation to their case impugning the hardware transactions as follows:

(1) What was the Defendants' purpose in causing Autonomy to resell *"pure hardware"*?

(2) Was Autonomy's published information untrue or misleading by reason of the *'pure hardware'* sales, and did the Defendants appreciate this?

(3) Did Autonomy's treatment of the costs of the *'pure hardware'* sales render Autonomy's published information untrue or misleading, and did the Defendants appreciate this?

(4) Should Autonomy, at the least, have made clear in its published information what its accounting policy was with respect to hardware?

(5) Did Autonomy wrongly recognise revenue in Q2 2009 on a specific ($6 million) hardware transaction with Morgan Stanley?

639.    That summary of the issues, which as to (2) to (5) follows the structure of the first report of the Claimants' expert witness, Mr Peter Holgate, provides a useful overall structure for the analysis and determination of the hardware case. However, these headline issues need to be broken down further to understand the various strands of the Claimants' hardware case as it was ultimately put forward, and the Defendants' answer to it (especially their contention that they relied on Deloitte's approval).

640.    First, it is necessary to identify three different contexts in which the Claimants' case as to the purpose of the hardware reselling strategy (Issue (1) in paragraph 638 above), which was the central area of disputed fact, is relevant:

(1) Its principal context is the Claimants' contention that the overall purpose asserted by the Defendants was no more than a pretext falsely to justify describing and accounting for revenue from the hardware sales as if it were part of, or at least not to be distinguished from, revenue from software sales. That is a self-sufficient part of the Claimants' hardware case, in that they contended that if they established it, Autonomy's published information was plainly false and misleading, and can be determined to have been so without reference to the expert evidence. Mr Shelley, co-head of one of Autonomy's Corporate Brokers (UBS), had to concede in cross-examination that if the market had found out that Autonomy was selling hundreds of millions of dollars of hardware to inflate its apparent software revenues then that would have been fraud and the market would not have reacted well.

(2) A second context in which the identification of the purpose of the programme is relevant is the Defendants' defence that Deloitte approved all the published information relied on by the Claimants. The Claimants contended in that context that the defence is invalidated if it is established that the Defendants misrepresented to Deloitte the true purpose of the hardware reselling strategy.

(3) The third context in which a determination of the purpose of the hardware reselling strategy is relevant is in assessing the credibility of the Defendants, and in particular of their justification for their determination that the programme should not be disclosed to the market.

641. Secondly, it is necessary to distinguish between the two different limbs of the Claimants' case that Autonomy's published information was false and misleading:

(1) One limb relates to positive statements or representations in Autonomy's published information: this aspect ("the positive misrepresentations case") focuses especially on the way Autonomy chose to present its business and sources of revenue in the 'front-end' or 'narrative' part of its accounts.

(2) The other limb relates to alleged omissions from Autonomy's published information: this aspect ("the expert accountancy case") focuses especially on the Claimants' expert evidence that under IFRS rules hardware transactions should have been, but were not, separately disclosed.

642. The Claimants emphasised that their positive misrepresentations case is not dependent on expert evidence, since no expert evidence is needed for the proposition that a company's published information must not contain false or misleading statements. The issue is one of interpretation (and more particularly what meaning would have been given in the market to what was positively stated in Autonomy's published information about the nature of Autonomy's business and its sources of revenue). By contrast, the Claimants' expert accountancy case

is reliant on the view of their expert, Mr Holgate , that the IFRS rules and statements required disclosure, and that this was too plain to be a matter of fine judgement.

643.    Thirdly, it is important to understand the relationship between the Claimants' "purpose case" (see (1) in paragraph 638 above) and the other aspects of their hardware case (see (2) to (5) in paragraph 638 above). I have already explained that if the Claimants succeed in demonstrating that the avowed purpose was a pretence that also concludes Issue (2). The question now addressed is as to the effect if the Claimants do not succeed in that regard. As to that, in oral closing argument, Mr Rabinowitz emphasised that neither the Claimants' positive misrepresentations case nor their expert accountancy case is dependent on proof of pretence or even simply some improper purpose. As to the positive misrepresentations case, which became by the time of closing arguments, the Claimants' favoured route to success, Mr Rabinowitz submitted that:

> *"it really doesn't matter why Autonomy was selling this hardware, and whether, as we say, it was simply a revenue-pumping exercise or whether, as the Defendants say, it was part of some marketing strategy. Because either way this could not have justified misrepresenting the totality of its sources of revenue, which is what it did."*

644.    Fourthly, however, and the above submission seems to me to offer an example, the Claimants tended to glide over the need to establish in relation to Issues (2) and (3) (see paragraph 638 above) not only that Autonomy's published information was untrue or misleading, but also that the Defendants appreciated this. As I have already signalled, the Defendants relied on Deloitte's approval of their narrative description and accounting treatment of the hardware reselling strategy (and, in particular, its revenue) as both justification and a litmus test of the acceptability of describing and treating hardware sales all as part of IDOL Product business. If, to borrow the way Mr Rabinowitz put it in his oral closing submissions, *"the real question that arises",* is whether the Defendants had any legitimate basis for the way they presented their business and sources of revenue (which did not reveal the hardware reselling strategy), the Defendants' answer was both the purpose they asserted and the acceptance of that presentation by Deloitte. That is why identification of the 'purpose' of the programme is relevant also to the Claimants' positive misrepresentations case.

645.    I would add three further glosses to the Claimants' adumbration of the issues as set out in paragraph 638 above. The first is that the Defendants raised two preliminary issues as to the permissible extent of the Claimants' case in respect of the purpose of the hardware reselling transactions. In particular, the Defendants contested whether it was open to the Claimants (a) given the way they had pleaded and pursued the case prior to their closing submissions, to rely on an alternative claim that even if revenue pumping was not the only, it was the primary or preponderant, purpose of the hardware sales; and (b) given the evidence of their own witnesses, to contend that marketing and assisting software sales was not one of the substantive purposes of the hardware sales. I address those two issues as preliminary points in the course of my detailed discussion of the Claimant's 'purpose' case in paragraph 660 *et seq* below.

646.    The second gloss is that the Defendants also raised a further issue, which is whether HP knew about Autonomy's hardware sales pre-acquisition and continued them post-acquisition. I address that issue in paragraph 1802 *et seq* below.

647.    The third gloss is that there were also subsidiary, but important, disputes as to terminology, to which, to assist better understanding of the principal issues, I turn immediately.

## Issues of terminology

648.    Before turning to the substantive issues in more detail, it is convenient to identify and explain certain phrases deployed by the Claimants to define and confine their hardware reselling claims.

649.    Although ultimately the Claimants' FSMA claims extended to all hardware sold on the basis that (because the margin on hardware sales was so much lower) they all should have been disclosed, initially their challenge to the legitimacy of the transactions was confined to sales of *"pure hardware"* (though, on their definition over 99% of the hardware revenue was attributable to *"pure hardware"* and *"other hardware"* was a small residual category); and they reserved particular criticism of *"pure hardware sales"* on the basis that there was no good reason, as they saw it, why a software business should want to sell *"pure hardware"*.

650.    The expression *"pure hardware sales"* is not a term of art: it is a term of the Claimants' own devising. It is distinguished in their pleading from *"appliance sales"* and *"other hardware sales"*. Their case as pleaded is that *"pure hardware sales"* were any "*sales of third-party computer hardware (with or without third party software) without modification by Autonomy and unaccompanied by any Autonomy software"*. That last phrase engendered a further point of dispute, as to whether the sale of hardware with a view to later provision or use of Autonomy software was or was not a *"pure hardware sale"*.

651.    The Claimants defined *"other hardware sales"*, which they described as *"insignificant compared with pure hardware sales"* as *"sales of hardware (that were not appliance sales) that were in connection with sales of Autonomy software"* (for example, because a sale of software appears on the same order). Thus *"other hardware sales"* were, in the Claimants lexicon, a residual category, being neither *"pure hardware sales"* nor *"Appliance"* sales. Obviously, it is not a term of art either and it is a rather loose categorisation. The Defendants contended that all of Autonomy's hardware sales were in some sense *"in connection with"* sales of software: and for their own part, they characterised such sales as sales of an *"Appliance"* or an *"Appliance-type sale"*.

652.    The content to be given to the expression *"appliance"* is also of considerable importance and was a contested issue. Again, the phrase *"appliance sales"* is not a term of art with a fixed meaning. The Claimants used "*appliance sales"* to mean *"[sales of] hardware on which Autonomy software had been pre-installed and which was offered where the customer had an urgent need to deploy IDOL"*. But that was not how the Defendants understood the term, nor

how (they say) it was generally used at Autonomy.  Mr Miles described it as a
self-coined term of some elasticity. Dr Lynch emphasised, for example, that:

> "...the term "appliance" was used, in different contexts, to refer to a
> variety of things, including hardware pre-packaged with software,
> hardware generally and hardware to be used with software. There was
> no singular definition of the term. If, for logistical or budgetary
> reasons, a customer bought hardware, such as servers, separately from
> the archiving software that went with it, customers, Autonomy staff and
> the auditors would still call these "appliances". I should add that the
> term "appliance" was an industry term and, like many technical terms,
> its meaning has evolved over time."

653.    Dr Lynch elaborated on this in the course of his cross-examination:

> "...the fundamental essence of an appliance is that you have a
> standard block, usually of hardware but not always, with a standard
> block of software and the important point is that you put the two
> together and they do one thing. So a normal computer like your laptop,
> you can put lots of different programs on and it will do lots of things
> and you have to install those programs. In the enterprise world, when
> you sell a piece of software, someone then goes and gets some piece of
> hardware from many different possibilities, they then configure that
> hardware, they get the software, they then have to configure the
> software to match the hardware and that whole process, if you're a
> company, can take three or four months. If you're a government it
> seems to take years, but it's a big process.
> What an appliance is is something that is designed to do one thing, so
> you don't need to worry about all the other possibilities and to do that
> there's a standard block of hardware and a standard block of software
> and you put the two together and it does the standard task and it's
> much quicker and more reliable to get working. So "turnkey" is the
> phrase that's used in the industry for that. And that is the defining
> characteristic of an appliance. So, for example – I just used the
> example of a games appliance that people have in their homes, that's
> called an appliance because it's a standard thing that's designed to
> run games, it doesn't do anything else, you can put games in it and it
> will run games and that is an appliance.
> The term has been around for a while, it has changed its meaning over
> time, but the fundamental point is it's not a generic computing device,
> it's a standard block of hardware, standard block of software, standard
> function.
> ...
> I do not believe that it is deterministic of whether something is an
> appliance as to whether the hardware and software are ordered
> together...
>
> Q. For it to be an appliance, would it have to be standard Autonomy
> software?

> *A. Well, to be an Autonomy appliance, it would have to be one, yes.*
>
> *Q. All right, so when Autonomy talks of Autonomy selling appliances, what you are saying you sold or what you are saying you were talking about was the sale of hardware in order for Autonomy software to be loaded on it?*
>
> *A. Correct."*

654.    A further important point of disputed terminology is the meaning (both (a) as intended and (b) as received)[128] of the phrase *"pure software model/company"* as used by Autonomy in its published information (and especially in its 2009 Annual Report and 2010 Annual Report) [129] . In the 2009 Annual Report, Autonomy's financial model was stated to be *"one of the very rare examples of a pure software model"*. In the 2010 Annual Report it was described as *"a rare 'pure software' model"* and the Business Overview section elaborated as follows:

> *"Autonomy is one of the very rare examples of a pure software model. Many software companies have a large percentage of revenues that stem from professional services, because they have to do a lot of customisation work on the product of every single implementation. In contrast, Autonomy ships a standard product that requires little tailoring, with the necessary implementation work carried out by approved partners such as IBM Global Services, Accenture and others."*

655.    The Claimants also claimed that the same phrase had been used by the Defendants in pre-acquisition discussions, and that this was intended to deceive (see the Chapter in this judgment on *"Deceit and Misrepresentation"*).

656.    The Defendants contended that they intended the description to convey by the phrase that a distinguishing feature of Autonomy was that, unlike most software companies, it did not undertake or derive substantial revenues from any servicing work. They did not intend thereby to convey that Autonomy did not undertake or derive revenue from hardware sales, still less sales of hardware with no software content and/or entirely separately from any software sale. However, it is part of the Claimants' case in relation to hardware that by representing itself to be a "*pure software*" company, Autonomy not only sought to distinguish itself from a company that derived a significant proportion of revenue from services. Its description also, when combined with express

---

[128] The meaning which the Defendants insisted they intended was critically different from the meaning the Claimants insisted the phrase conveyed to the reasonable reader. This was the subject of extended dispute, both as to the facts and the law: this is summarised in paragraphs 1609 to 1632 below.

[129] It was not clear to me when it was first introduced in Autonomy's published information and other presentations. However, it is to my mind of some relevance to the dispute as to its intended meaning that it was in use by early 2008 and, for example, appeared in the *'Strategy Review'* in Autonomy's report for Q1 2008 [L/32/9] and thus before the hardware reselling programme commenced.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

references to appliance sales and the provision of categories of revenue which made up the total revenue of Autonomy in the Relevant Period, would either individually or cumulatively, lead a reasonable reader to conclude that:

(1) Autonomy was not engaging in any (or any material) sales of hardware apart from appliance sales, or in the very least was not engaging in any (or any material) pure hardware sales, and/or

(2) any revenue from hardware sales and/or pure hardware sales (apart from appliances) was lower than the revenue from appliance sales, and/or

(3) any revenue from hardware sales (apart from appliance sales) was lower than revenue from Services.

657. I have concluded that, at least in the way the statement was deployed after the commencement of volume hardware sales, the purpose of the statement was to convey a special selling point, the success and self-sufficiency of Autonomy's software business without the need for other revenue streams. A reader of the statement in its context would in such circumstances not have expected any substantial revenues from hardware sales to be as much as or more than its expressly disclosed activities, such as servicing. In the end, therefore, I have concluded in favour of the Claimants on the point.

658. There was also a dispute as to the meaning to be ascribed to the phrase *"organic growth"*. The Claimants pleaded and submitted that the inclusion within the metric of hardware sales improperly inflated it and gave a different and false picture. The Defendants disagreed: as Dr Lynch said, to exclude hardware from the calculations would be to produce a different metric, *"organic growth ex hardware"*.

659. These disputes are not merely semantic. They go to the root of the issue as to the interpretation to be given to certain statements in Autonomy's published information, and whether HP was misled, whether by Autonomy's published information or by what was said prior to the conclusion of the transaction. I shall return to each disputed phrase in context when dealing with the issues identified by the Claimants in paragraph 638 above. I turn now to the first of these.

### Issue (1): what was the Defendants purpose in causing Autonomy to resell "pure hardware"?

660. The Defendants' case as to the purpose of Autonomy's hardware reselling strategy was very largely based on (a) the evidence of Dr Lynch as to its initial rationale, (b) the evidence of the key employees charged with its implementation (and in particular, Mr Sullivan, Mr Egan and Mr Scott), and (c) Deloitte's acceptance of the rationale and the conclusion that hardware sales were incidental to the software business so as to require no separate disclosure.

661. The Claimants' case that the reselling of *"pure hardware"* was simply *"a device deployed by the Defendants to assist in meeting Autonomy's revenue targets, inflating both overall revenue growth and 'organic growth'"* was based largely on the documentary evidence, and especially on what that evidence revealed as to the

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

chronology and the way that hardware sales were in fact conducted. Their exegesis of the documents and chronology was very detailed, as indeed was the Defendants' response.

*Three notable features*

662.    Before turning to that considerable detail, three general features of or issues relating to the Claimants' contentions on the hardware purpose case may be noted:

(1)  First, as pleaded, the Claimants sought to impugn <u>all</u> *'pure hardware'* sales on the same basis of being in every case for the improper purpose of generating reportable revenue and presenting that revenue as if it were referable to software sales: the Claimants asserted a *"systematic policy"* in operation between Q2 2009 and Q2 2011, and did not make any distinction according to the context of the particular sale or the business of the purchaser. In his oral reply, Mr Rabinowitz accepted that there really was not the material to enable an informed assessment on a transaction-by-transaction basis. Thus, the Hardware Case concerned the propriety of a strategy of which the hallmarks were (almost invariably) loss-making sales of hardware, the revenue from which was recognised and then, without differentiation or disclosure, included as part of the overall revenues of Autonomy's software business.

(2)  Secondly, the case (as pleaded) asserts the improper purpose identified as the only purpose of the strategy. As Mr Miles put it in his oral closing submissions, *"It is not a case that involves, as it were, the weighing of purposes"*. However, over the course of the Trial the Claimants increasingly sought to treat it as being sufficient for their case if revenue generation to enhance the appearance of software sales growth was shown to be a substantial purpose, even if not the exclusive purpose. In their written closing submissions, the Claimants relied on *"the primary – if not the only – purpose"* which seemed to allow for the possibility of some subsidiary commercial rationale: but that was not pursued or pleaded by amendment, whether in the alternative or at all. Mr Miles submitted in his closing submissions that, having pleaded, and in their opening presented, their hardware case on the basis that the binary question was whether (their case) it was a device to pump revenue without revealing its source or (the Defendants' case) a rational strategy based on a business judgment that it would protect and promote Autonomy's software business, it is not open to the Claimants in closing to run a case based on primary or preponderant purpose. That gave rise to a pleading issue which it is convenient and necessary to deal with as one of two preliminary matters (see paragraphs 663 to 675 below).

(3)  Thirdly, and obviously related to (2) above, the witnesses called by the Claimants on the issue as to the purpose of the policy or strategy (and, in particular, Mr Egan and Mr Sullivan) had all accepted in earlier evidence they had given in the US criminal proceedings, and they again accepted in these proceedings, that part of the purpose was to drive

software sales and realise other benefits as explained below. It was submitted for the Defendants that the Claimants were bound by that evidence, and that this was fatal to their "binary" case. The Claimants did not accept this, their main submission being that there had *"been some cherry-picking of Mr Sullivan's evidence at Mr Hussain's criminal trial"*, and more generally, the evidence as a whole was more nuanced than the Defendants suggested, and in any event could not be read out of the context of the documentary evidence. That dispute gives rise to the second issue which it is also convenient and necessary to address as a preliminary matter.

*A pleading issue: Is it open to the Claimants to impugn the sales on the basis that 'revenue pumping' was the predominant , even if not the only purpose of them?*

663.    The Claimants' Particulars of Claim at paragraph 54A plead the Claimants' factual case for impugning the hardware sales as follows:

> *"54A. There was no legitimate business reason for Autonomy Inc to enter into pure hardware transactions. In fact, the pure hardware transactions were not entered into genuinely in furtherance of, or pursuant to, Autonomy Inc's business, but rather were entered into for the improper purpose of allowing Autonomy falsely to portray itself as a high-margin software company whose revenues were growing rapidly and meeting market expectations, when in reality a substantial portion of these revenues and the apparent rate of revenue growth were the result of undisclosed (and, indeed, as pleaded further below, actively concealed) pure hardware sales."*

664.    That pleading is, as to establish the FSMA claim it had to be, an allegation of dishonesty: the purpose pleaded is to achieve an objective (*"to portray itself as a high margin software company"* which undertook no substantial hardware sales) by deception. The Claimants' case as pleaded made no express allowance for any other purpose than to generate revenue from one source (hardware) and present it as derived from, and an expense of, another source (software sales). The allegation is that what was presented to be a commercial purpose was in fact a dishonest pretext contrived in order to present a false description of the true nature of its business.

665.    Paragraph 57A then pleads a claim for the direct loss sustained on the pure hardware claims on the basis that:

> *"The Defendants each knew (since, as particularised at paragraphs 133 and 135 below, it was they who instigated the practice of Autonomy Inc entering into pure hardware transactions) that the practice of entering into pure hardware transactions was not genuinely in furtherance of Autonomy Inc's business but was for the improper*

> *purpose pleaded at paragraph 54A above. The losses suffered by*
> *Autonomy Inc on such transactions are therefore losses occasioned by*
> *the Defendants' breaches of duty".*

666.  The direct claim also is based on dishonesty, even though in a claim for breach of duty it would ordinarily be sufficient to plead and establish that an improper purpose was in fact the predominant purpose.

667.  Until closing submissions, the Claimants had never put their case on the basis that there might be legitimate business reasons for the hardware reselling, but they were secondary to some other improper purpose.  Mr Miles, with a forensic side swipe that the change of tack was *"doubtless because of the difficulties they have with their own evidence"*, submitted that that would be a new, distinct and unpleaded case, and as such it was not open to the Claimants. His position was that having pleaded and opened the case on the basis that the entire purpose of the strategy was to generate revenue, even if at a loss, with a view to presenting that revenue as derived from Autonomy's software business without disclosure of its true extent and source, it was too late now for the Claimants to base their case on the weighting of preponderant purpose in respect of individual transactions.

668.  Mr Miles stressed that this was not *"an arid pleading point"*: had the Defendants understood there to be a case based on the primacy amongst mixed motives the case would have taken a different course. He submitted that, for example:

> (1)  He would have wished to cross-examine Mr Welham and explore what difference it would have made to the accounting treatment;
>
> (2)  The Defendants *"might very well…have taken the view…that…steps should be taken to ensure that [Mr Sullivan] gave evidence by video"* as a condition of his witness statement being admitted into evidence as hearsay (Mr Miles made clear he could put it no higher);
>
> (3)  They would certainly have wished to cross-examine Mr Holgate, and to explore with him how accountants would deal with the idea of mixed motives, and what if any guidance there is in accounting literature;
>
> (4)  They would have wished to assess the mixed purposes of each transaction, to weigh its preponderant purpose: and that was not possible, as Mr Rabinowitz had accepted; and
>
> (5)  Furthermore, even if such an enquiry had been possible, they would also have wished to question the experts as to the feasibility of such an enquiry in the course of an audit.

669.  Mr Rabinowitz sought to answer all this with the submission that the possibility of mixed purposes, necessitating a determination of the primary purpose, had *"always been in play"*.  He submitted that it was not a new case at all. He especially relied on (a) passages in Mr Hussain's Defence relying on the

primary, if not the sole, purpose being to drive high-margin software business, (b) passages in witness statements by the Claimants' witnesses referring to "primary" or "principal" reasons, (c) passages in the cross-examination of the Claimants' witnesses, and in particular Mr Egan, exploring whether driving software sales was or was not a principal or predominant reason, and (d) references in the experts' respective reports identifying the key area of judgement as being (to quote Mr MacGregor):

> *"whether management considered that the sale of hardware was the separate sale of a different product to the sale of Autonomy's core IDOL Product, or that it was incidental to sales of the core product, with its principal purpose being to facilitate further software sales."*

670.    I must confess that during the hearing I tended to follow and accept the argument that the question was whether the Claimants' pleading accommodated a weighing of purposes; and if that was the right question, I would agree with Mr Miles that it does not.

671.    On reflection, however, I think that is a mischaracterisation. The true gist of the Claimants' pleading is that the transaction was dishonest. The real question is not whether the hardware sales could be said to have been intended to have had, and in fact had, some potentially beneficial effects such as to suggest that that was their purpose, or part of it; it is whether a dishonest purpose underlay the transaction. In other words, the real answer lies in the plea of dishonesty.

672.    In my judgment, if a substantial part of the reason for a transaction is found to have been dishonest, the fact (even if established) that it may have been perceived that it would also have beneficial effects cannot save it. The dishonest purpose need not be exclusive or even predominant (though it is unlikely not to be so).

673.    In this case, dishonesty, not predominance of improper purpose, has always been the Claimants' case. According to their pleading, what caused Autonomy to enter into the hardware sales was not only improper (which might include a purpose beyond the powers of the directors) but dishonest: the false portrayal of Autonomy as a high-margin software company deriving all its revenues from software sales when in reality a substantial proportion of its revenues and its apparent revenue growth were the result of undisclosed, and indeed actively concealed, *'pure hardware'* sales. If that is proved, that is sufficient. No weighing of purpose or other effect is required.

674.    It follows that the pleading point raised is based on a false premise, perhaps encouraged by some of the language used, the focus on whether avowed purposes were real, and the dispute that developed as to whether revenue recognition or relationship development to facilitate software sales most weighed with the witnesses and in particular, Mr Sullivan and Mr Egan. The Claimants' hardware case has never been about competing purposes: it has always been that the objectives and purposes deployed by the Defendants to justify the hardware reselling strategy were pretexts: the real purpose of the

programme was to generate revenue which could dishonestly be presented in the accounts and Autonomy's published information as part of the revenue from Autonomy's main software business. In my judgment, that case, which requires proof of pretext and dishonest concealment but not the weighing of purposes, is sufficiently pleaded.

675.    Two other matters connected to this need also to be borne in mind:

(1)    First, an important part of the defence (of both Defendants) was their reliance on Deloitte's approval of Autonomy's accounts and published information even though Deloitte were well aware that the hardware sales generated revenue which was included in those accounts without differentiation from Autonomy's revenues from its software business. However, any such reliance would be negated if what Deloitte were told was the purpose of the hardware reselling (protecting and promoting software sales) was an anticipated incidental benefit of what was in truth a device to preserve the appearance of revenue growth by covering from hardware revenue a shortfall in software revenue. If the Claimants establish that those were incidental benefits to disguise the true purpose, and that the true purpose was never disclosed, then Deloitte will have been shown to have been misled. Put another way, although the Claimants' case did not allow for a weighing of competing commercial purposes, it did extend to demonstrating that the purpose asserted, though fulfilled, was (or became at some point in the implementation of the programme) no more than an incidental or ancillary benefit and not the real purpose.

(2)    Secondly, in the context of the expert accountancy case, Mr Holgate's evidence was that the purpose of the hardware sales did not ultimately matter, it being his opinion that any proper application of the accountancy rules required separate disclosure of the hardware reselling strategy in any event. By contrast, on Mr MacGregor's evidence as I understood it, only showing that revenue pumping was the sole real purpose would require such disclosure. On that basis, as to the expert evidence, a case based on primary purpose would not have been necessary for the one expert or sufficient for the other. (I shall address further the expert evidence in this regard in the context of the Claimants' alternative case.)

*An issue as to the evidence given by Mr Egan and Mr Sullivan in the US criminal trial*

676.    As to the proof of the Claimants' case that the real purpose of the hardware reselling strategy (what they described as *"this…bizarre and expensive programme"*) was to generate revenue from covert hardware sales to make good shortfalls in sales of software, and thus continue the depiction of Autonomy as a high margin software company which was (usually) meeting or beating market expectation, the Claimants placed primary reliance on the contemporary documentation.

677.    The Claimants observed that the Defendants tended to shy away from this documentary evidence, and especially the #correspondence between Mr Sullivan,

Mr Hussain and Dr Lynch, almost all of which, the Claimants pointed out, appeared to be directed towards the issue of revenue generation and what hardware deals would be needed to plug gaps in revenue.

678.  There is force in this, as will be clear later; but similarly, there is something in the Defendants' opposing contention that the Claimants have themselves sought to shy away from the evidence of their own witnesses on the issue as to the purpose of the hardware strategy, which is barely mentioned in the witness statements of Mr Egan and Mr Sullivan, but which is more substantially dealt with in their evidence in the US criminal proceedings. In those US criminal proceedings, evidence from many of the witnesses for the Claimants had already been examined on substantially the same issues.

679.  Both sides referred to and prayed in aid parts of the transcripts of that witness evidence (which in the case of Mr Sullivan, for example, was entered into evidence under a hearsay notice since he did not appear at the trial here). Before discussing its substance, the question I address now relates to the status of that evidence.

680.  At a pre-trial hearing, I directed the parties to side-line what parts of the transcripts of evidence given in the US criminal trial by witnesses who would not be called in this trial they respectively intended to refer me to or rely on. Evidence side-lined by one party was taken at trial to be the evidence of that party. During the trial, evidence was taken to be that of the party that had indicated that they wanted to refer to it, as if it was that party's evidence. However, in every case, the witness concerned was called in the US criminal proceedings in support of the case against Mr Hussain; and in assessing their evidence I have always taken that into account, and that each was in reality the Claimants' witness.

681.  However, and I did not understand any party to contend to the contrary, the side-lining did not preclude any party or the Court from referring to parts of the transcripts of evidence as necessary to obtain a proper understanding of the evidence as a whole. The whole of the relevant transcripts were before the court in agreed bundles (and see CPR PD32/27.2) and were admissible as to their contents, and although the Defendants in correspondence expressly stated that they did not thereby accept their treatment as evidence of the facts stated in them, it was nevertheless open to them, and in any event to the Court, to have regard to the whole in testing the true meaning, reliability and veracity of the side-lined parts.

682.  In addition, as it seems to me, and as was submitted by the Defendants, the party which has sought to rely on the witness as a witness of truth, cannot invite the Court to believe the parts identified by that party as helpful to its case and yet disbelieve other parts which go the other way. The whole is the evidence of that party's witness, for good and ill. As Brooke LJ said in *McPhilemy v Times Newspapers Ltd (No 2)* [2000] 1 W.L.R. 1732, at 1740:

> "*I know of no principle of the law of evidence by which a party may put in evidence a written statement of a witness knowing that his evidence conflicts to a substantial degree with the case he is*

> *seeking to place before the jury, on the basis that he will say
> straight away in the witness's absence that the jury should
> disbelieve as untrue a substantial part of that evidence."* [130]

683.    In any event, and as the Defendants also pointed out, the passages in the
        evidence of Mr Sullivan in the US criminal proceedings on which the Claimants
        have chosen to rely include evidence as to the existence and legitimacy of the
        hardware sales strategy: and there can be no doubt that that evidence must be
        taken to be part of the Claimants' own case. However, that does not, of course,
        preclude them from reliance on other evidence, such as that of Mr Camden on
        whose evidence in the US criminal proceedings, about three transactions with
        Zones Inc, the Claimants focused in considerable detail (and see paragraphs
        1159 to 1182 below).

684.    The position is less unusual in the case of Mr Egan. He did attend, albeit via
        video link. I did not take it to be disputed that the whole of his evidence,
        including that in the US criminal proceedings, needs to be weighed.

**The relationship between purpose and concealment**

685.    The Defendants' depiction of the purpose of the hardware sales as being to
        protect and promote Autonomy's software business is the basis on which they
        sought to justify both the loss-making sales themselves (Autonomy not having
        previously engaged in material sales of hardware) and their treatment as part
        and parcel of Autonomy's software business in Autonomy's accounts (both in
        the narrative 'front end' part and in the 'back end' accounts proper).

686.    For the purposes of analysis, two related questions need to be addressed. The
        first is what in truth was the real purpose of the hardware sales. The second is
        whether having regard to that purpose it was rational and permissible to treat
        and account for the hardware sales and the revenues from them as an integral
        part of Autonomy's software business and all its revenues, requiring no separate
        identification or explanation.

687.    That, on the Claimants' case, is the link to concealment. The Claimants' case is
        that the true purpose of the hardware reselling strategy is revealed by the
        Defendants' determination that the sales and the revenues they generated should
        never separately be identified: even if the 'purpose' case and the 'disclosure'
        case have for the purpose of analysis, to be separately examined, they are
        inseparable. Their true driving purpose was never, and could never, be
        disclosed: because that true purpose was to generate revenue in order covertly

---

[130] See also the following passage from the judgment of Holroyd J in *Ewer v Ambrose* (1825) 3 B. &
C. 746, at 750 (cited by Brooke LJ in *McPhilemy v Times Newspapers Ltd (No 2)* [2000] 1 W.L.R.
1732, at 1739F): "*if a witness proves a case against the party calling him, the latter may show the truth
by other witnesses. But it is undoubtedly true, that if a party calls a witness to prove a fact, he cannot,
when he finds the witness proves the contrary, give general evidence to show that the witness was not
to be believed on his oath, but he may show by other evidence that he is mistaken as to the fact which
he is called to prove.*"

to make good shortfalls in software business revenues by including hardware revenue without differentiation or disclosure in Autonomy's accounts and reports as if it had been generated by Autonomy's 'pure software' business.

688.    Thus, in his oral closing, Mr Rabinowitz melded, and in a sense reversed, the two related questions in submitting that ultimately what has to be determined is whether the Defendants have been able to identify any legitimate basis for having withheld from the market information which would have had a *"devastating impact on the picture that was painted of Autonomy in the published information"*.

## Structure of this chapter

689.    The Claimants' hardware case, as one of their lead cases (with their case on VARs), engendered a great deal of paper and gave rise to a plethora of issues and a considerable volume of evidence. That has resulted in this part of the judgment being of considerable length and factual density. There was a marked contrast in the way the two sides approached the issues.

690.    The Defendants based their main defence to the claim on (a) Dr Lynch's explanation of the rationality of the strategy (b) an analysis of the witness evidence, and especially the evidence in cross-examination of the Claimants' two principal witnesses on the Hardware Claims, Mr Sullivan and Mr Egan, and (c) Deloitte's approval of the accounting treatment which the Claimants now criticised.

691.    They also sought to rely on evidence which they suggested revealed that HP knew about the hardware reselling before the acquisition; and certainly did so after it; but until, in the context of serious investor criticism of the acquisition, blaming the Defendants became a commercial imperative, neither HP nor its accountancy advisers (Ernst & Young for these purposes) were concerned.

692.    The Claimants did not accept the Defendants' depiction of the evidence of Mr Sullivan and Mr Egan; but their main approach was to focus on the documentary evidence of the way the hardware reselling strategy was actually implemented, not only initially in Q3 2009, but over the course of the Relevant Period. In that context, they relied, not only on the documents that revealed the structure and nature of the transactions and contemporaneous exchanges within Autonomy as to their objectives, but also the lack of documentation to support the Defendants' suggestion that the programme was in the nature of a marketing exercise and was succeeding in its objective of driving software sales.

693.    Contending that the programme was simply a device for *"in effect, paying for, or buying, revenue that could be recognised"* without disclosing its real source and nature, the Claimants rejected as dishonest the reasons given for the hardware sales and for the inclusion of the revenues they generated as if they were part of, or at least not to be distinguished from, revenue from software sales.

694. In light of these differences in approach I have felt it necessary to deal in turn with each side's case in the round. That has further increased the length of this part of this judgment. But it was a centre-piece of the claims and invites and (to my mind) requires, detailed treatment.

695. In broad outline:

(1) I discuss first the dispute between and competing cases of the parties as to the origins of the hardware reselling strategy.

(2) I address next (somewhat unusually) the Defendants' case that its purpose was to protect and promote Autonomy's software business and that it was both properly accounted for and sufficiently disclosed. The Defendants' case focused on the approval of Deloitte and the evidence of certain key witnesses, especially Mr Sullivan and Mr Egan (both of whom were, of course, the Claimants' witnesses), as well as Dr Lynch himself.

(3) I then turn to the Claimants' case that the purpose asserted by the Defendants was or swiftly became a pretext for what in reality was a relentless drive to generate sales from hardware to cover shortfalls in sales in software licences, which had to be and was dishonestly disguised to maintain the appearance of continuing to maintain or increase revenues in line with market forecasts. The Claimants' case focused on the documentary evidence, a detailed assessment of the sequence of the hardware sales, of the correlation with the need to make good shortfalls in revenue from Autonomy's software business, and of what Deloitte were actually told from time to time.

(4) Lastly, I summarise my conclusions, and their relevance to other aspects of the overall case.

### (A)    *The first hardware sales and the origins of the hardware reselling strategy*

696. In seeking to demonstrate its true purpose, it was important to both the Defendants and the Claimants to explain and establish the origins of the hardware reselling strategy.

697. The Defendants' case centred in this respect on elaborating upon the risks to the software business which they perceived in mid-2009 and to which they contended the hardware reselling strategy was a strategic response, and upon the benefits to the software business which the programme was conceived and intended to secure, including closer associations with hardware suppliers and the ability to present itself as a one-stop shop to its customers.

698. It was common ground that Autonomy's first substantial sales of hardware commenced in the early summer of 2009. Until then, Autonomy had purchased substantial amounts of hardware for deployment in its datacentres (principally for hosting and archiving services), but its sales of hardware were minimal.

Reflecting their dispute as to the purpose of the programme, the parties disagreed as to what prompted the initial hardware sales.

699.    The Claimants placed the origin of these sales, and what became a programme of hardware reselling, in the sudden and urgent need to find revenue in order to meet forecasts after (a) what Mr Hussain described in an email to Mr Egan and Mr Mooney (cc Dr Menell) dated 10 June 2009 as a *"major disaster"* in the form of the sudden collapse of two OEM deals (one with Adobe and the other with Microsoft) that he had confidently expected to complete by the end of Q2 2009, and (b) more generally, Autonomy's uncharacteristic failure in Q2 2009 to achieve analysts' consensus expectations of revenue in the quarter.

700.    On the day before the email from Mr Hussain referred to in paragraph 699 above, which was subject-headed *"OEM disaster"*, Mr Hussain had notified Dr Lynch by email that the Adobe transaction was *"not happening"*, but he had cushioned that by stating that *"MS frank cook actively considering hardware – so hope to replace"*. In that email, Mr Hussain noted that *"50 IDOL reps in the US…are delivering very little"*; and he put forward *"MS hardware to have a total $10m"* as first amongst other things to be done to ensure recovery.

701.    On the terms of a one-off letter agreement reached on 30 June 2009 between Autonomy Inc and Morgan Stanley, Morgan Stanley agreed to purchase from Autonomy on or before 30 June 2010, $20m worth of Hitachi hardware (or other third-party hardware agreed between the parties) for a discounted price of $13.5m. At around the same time, Autonomy Inc entered into a *"One-Time Reseller Authorization Agreement"* with Hitachi, under which the latter authorised Autonomy Inc to resell Hitachi hardware to Morgan Stanley.

702.    The overall effect of these arrangements was that Morgan Stanley bought the hardware at a discount from Autonomy as reseller, and Autonomy funded the discount by buying from Hitachi at full price and selling on at the discounted price, thereby incurring a financial loss.

703.    The Claimants relied on these arrangements as demonstrating that Autonomy had resorted to the loss-making hardware sale to Morgan Stanley as an expedient to cover an unexpected shortfall in software revenue, and not to advance its software business. They also relied on an internal Autonomy email chain relating to the execution of the agreement with Hitachi which was copied to both Defendants to show that both were aware of these arrangements.

704.    They submitted that this loss-making agreement with Morgan Stanley became the start of and template for *"an extended and more ambitious programme of reselling pure hardware at a loss"* in which Autonomy's only involvement was its interposition as a seller into an existing deal for the supply of hardware by a hardware supplier to its customer, which might or might not be a customer of Autonomy. The benefit to the hardware supplier was that Autonomy paid it the full price whilst the end customer would purchase from Autonomy at a discounted price with Autonomy subsidising the difference or *'delta'*: a 'win' for the hardware supplier, and a 'win' for the end customer: the only 'loss' was to Autonomy.

705.    On the Claimants' case, Autonomy's only part in these sales to Morgan Stanley, and all that the hardware sales ever involved in terms of Autonomy's role, was Autonomy's interposition as a seller into an existing deal for the supply of hardware by a hardware manufacturer to its customer; and the *quid pro quo* was simply that Autonomy charged the customer substantially less for the hardware than the price that Autonomy paid to the hardware manufacturer (by itself taking the loss).

706.    According to the Claimants, once its potential had been established, the hardware reselling strategy developed quickly to become one of the principal *"levers"* (another was the VAR sales) deployed by Autonomy at the instance of the Defendants in the context of concerns about shortfalls in software sales. Hardware (like VAR) sales enabled Autonomy to supplement or accelerate and manage revenue in each quarter to enable Autonomy to meet, and if possible, to *"beat and raise"*, analysts' consensus expectations notwithstanding, and to cover, software sales shortfalls.

707.    The Claimants contended that the context of the instigation of the hardware reselling strategy, and the reason why it quickly became and remained such an important and addictive strategy, was the constant pressure of the market perception of Autonomy and its stock as being, to quote Mr Marc Geall ("Mr Geall"), who was Autonomy's head of Corporate Strategy and Investor Relations until May 2010, *"an expensive growth stock that needs to 'beat and raise'"*. The problem with such a reputation is, of course, the difficulty of consistent fulfilment of ever-increasing expectations without regard to market conditions.

708.    The Claimants illustrated this (and the volatility of market perception and in consequence Autonomy's share price) by reference to analysts' reaction to two announcements relating to Autonomy's revenue forecasts or forward guidance about revenue expectations:

     (1) An announcement by Autonomy on 7 July 2009, ahead of reporting its final figures, that it expected to report *"revenues in line with current consensus estimates"* [my emphasis]: so accustomed was the market to Autonomy exceeding analysts' consensus expectations that merely meeting those expectations was a disappointment, and Autonomy's share price immediately fell 8%.

     (2) Further forward guidance on 16 July 2009 (when the Q2 2009 figures were announced) estimating for Q3 2009 $180 million for revenue and EPS at 19 cents per share, compared to an earlier market consensus forecast for the quarter of $198-199 million and EPS at around 26 to 27 cents per share. Autonomy's share price fell again, so that by August 2009 its share price had fallen 18% since the pre-announcement of the Q2 2009 results.

709.    The Claimants also referred me to the analysis and prescription put forward by Mr Geall in the light of (a) a continuing aggressive fall in Autonomy's share price in mid-2009 and (b) a UBS note written by its house analyst, Mr Briest, dated 4 August 2009 suggesting that part of the reason for the decline was

*"disappointment at the level of Q3 guidance and the seeming loss of Autonomy's 'beat-and-raise' status".* Mr Geall observed that:

> *"...lack of beat and raise in Q2 and the weaker Q3 outlook which means that there is a lot to do in Q4 is going to continue to get some legs. Obviously delivering $190 – 200m in Q3 will help off-set this fear".*

710.    According to the Claimants, these circumstances show that the importance to Autonomy of shoring up its *'beat and raise'* status, and the fact that in Q3 2009 and following quarters this was not possible to achieve on the basis of software sales revenues, drove the Defendants to the hardware reselling strategy. What the Defendants advanced as the purpose of the expedient was a pretext contrived:

> (1)    to justify sales of third party hardware by a software company which touted itself as selling only its own proprietary software;

> (2)    to justify the fact that such sales were not only so out of character but also at a loss;

> (3)    to justify the description and treatment of revenue from sales of hardware as all being sufficiently part of Autonomy's software business to be included in software revenues without differentiation or explanation, and thus to obviate disclosure and prevent discovery.

711.    The Defendants, however, submitted that it is the Claimants' case which is contrived. Their case is that the hardware reselling strategy was not a response to the failure of any particular transaction, nor to concerns about diminishing or fluctuating results and the need to satisfy and exceed analysts' expectations of revenue or other performance: it was a commercial response in the interests of the software business in changing, and possibly threatening, market conditions, and a successful and cost-effective marketing strategy.

712.    As to contrivance, the Defendants dismissed the Claimants' notion that the programme was directed to the sale of *"pure hardware"* as misplaced and the Claimants concept of *"pure hardware"* sales, as if there were some category of sales which by nature were unconnected to Autonomy's software business as self-coined. Dr Lynch insisted consistently that Autonomy never did sell *"pure hardware"*: it was never interested or engaged in the sale of hardware as a separate line of business. For the Defendants, a mischaracterisation of the programme as almost a separate enterprise, and a *"bizarre and expensive programme"* to boost reportable revenue to cover any shortfall in software sales, rather than an extension of the way it needed to conduct its software business, lay at the heart of the Claimants' mistaken approach.

713.    An example, according to the Defendants, of the Claimants' misunderstanding and mis-presentation of the nature of the hardware sales was the transaction with Morgan Stanley which the Claimants relied on as marking the beginning of and

establishing the pattern for the hardware reselling strategy. The Defendants contended that the Morgan Stanley transaction should not be regarded as a sale of *"pure hardware"* even on the Claimants' definition of the term. They pointed out that:

(1)  It was concluded on the same day as, and should be considered in the context of, two software agreements with Morgan Stanley, which was a longstanding software customer of Autonomy.

(2)  In the contractual documentation the link between the software and hardware transactions was explicit; and it also made express provision for Morgan Stanley to deploy the equipment purchased not only in any of its own but also in Autonomy's (or any third-party service provider's) facilities, connoting that Morgan Stanley wanted the flexibility to use the hardware with Autonomy's software in Autonomy data centres.

(3)  The hardware transaction should be regarded, in effect, as a *"strategic package"* or *"appliance"* sale, in the broader sense which the Defendants supported: a sale of hardware for use with Autonomy software.

(4)  Mr Egan, who was involved in the transaction as the relationship manager with Morgan Stanley, accepted in evidence that the document made that link clear and obvious.

(5)  Furthermore, in an email chain in May 2010 involving Mr Scott, Mr Hussain and Mr Egan, which is not said to be pretextual by the Claimants, Mr Egan referred to the sales as part of *"a large solution sold to them which included HW, restructuring the safe, and the SW licences to cover ILM"* and Mr Scott responded on 10 May 2010, stating *inter alia:*

> *"...I don't know what TJs take is on this or whether he feels $2m is suitable but we obviously had to make major concessions across the board to get the Morgan business, including giving Morgan a very aggressive discount on their hardware purchase commitment in June 2009, the same time at which we set the $2m option for Morgan to purchase the ILM license".*

714.  The Defendants contended that, contrary to the Claimants' case that the Morgan Stanley hardware transactions had nothing to do with protecting and promoting software sales, the discount funded by Autonomy in respect of the hardware sale to Morgan Stanley was the price that Autonomy felt it had to pay to be sure of securing the high-margin software business and (as Dr Lynch put it) *"snuggling up"* to both hardware suppliers and the ultimate customer.

715.  Thus, the dispute as to the origins of the hardware reselling strategy reveals the main issue between the parties as to the purpose and objectives of the hardware reselling strategy.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

**(B)**      ***The Defendants  case as to the purpose of the hardware reselling strategy***

716.    I elaborate the Defendants' case under the following headings:

      (1)  The Loudham Hall meeting in July 2009 and Dr Lynch's evidence as to the development and rationale of the hardware reselling strategy.

      (2)  The Defendants' depiction of the evidence of Mr Egan and Mr Sullivan as to their understanding of the purpose of the programme as initially conceived and thereafter implemented, and of Mr Welham's evidence (which is said by the Defendants to be corroborative).

      (3)  Autonomy's relationship with EMC: the development of their relationship in Q3 2009 and the dispute as to the reasons for EMC bringing an end to its participation in the hardware reselling programme at the end of the same quarter.

      (4)  The replacement of EMC and the continuation and expansion of the hardware reselling strategy with Dell (after EMC withdrew) in every quarter from Q4 2009 to Q2 2011 and (on a more limited basis) with Hitachi.

      (5)  The further evidence relied on by the Defendants as showing the use and success of the hardware reselling strategy in protecting and promoting Autonomy's core software business.

      (6)  The Defendants' case that the Claimants' assertion of secrecy is unsustainable: and that the hardware reselling strategy was openly recorded in Autonomy's ledgers and discussed within Autonomy, fully explained to Deloitte and approved by them, and had become well known in the market;

      (7)  The Defendants' honest belief in the rationale of the purpose and the support given to that and the propriety of the way the programme was presented and accounted for by the approval of Deloitte and the Audit Committee with full knowledge of the facts.

### *(1) Dr Lynch's evidence as to the rationale of the hardware reselling strategy*

717.    Just as the transaction with Morgan Stanley was not, in the Defendants' presentation, an expedient to pump up revenue, but a strategy to promote a software sale, so too the Defendants presented the hardware reselling strategy as a carefully weighed strategy to safeguard its software business, which was presented and launched, and thereafter openly discussed, within Autonomy.

718.    There were two main limbs of the Defendants' justification of what they often referred to as *"strategic hardware sales"*, though the ultimate objective was the same: to drive software sales. One limb was essentially defensive: it was to meet the risk posed by two market changes which Dr Lynch considered

threatened Autonomy's software business. The other was more proactive: to use hardware sales as a marketing tool.

719.    At what the Defendants depicted as the formal presentation and official launch of the strategy in July 2009, at a management meeting which took place between 8 to 10 July 2009 at Dr Lynch's country house in Suffolk, Loudham Hall ("the Loudham Hall meeting"), the emphasis was on the marketing strategy.

720.    I was not shown any agenda for or contemporaneous record of the Loudham Hall meeting.[131] Dr Lynch told me that it was unlikely that there was any: *"We didn't take notes at the meetings"*. But he described it in his witness statement, as follows:

> *"In July 2009, at a management offsite meeting in Loudham, Messrs Hussain, Egan, Scott, Mike Sullivan and I discussed Autonomy's hardware strategy. I believe that around 20 people were present at the management offsite meeting, so there would have been several other people present during this discussion. Although I cannot recall precisely what we discussed, the gist was that we should sell hardware to the company's biggest customers in an effort to drive software sales. The commercial strategy was not to sell hardware at a loss in order to inflate revenue, it was to sell hardware to strategic customers, even if we made a loss on the hardware sales, for the dual purpose of servicing our strategic customers at a time of industry consolidation and to improve our position with hardware manufacturers with which we could develop appliances. We discussed the level of sales we would aim for in pursuit of these objectives. I cannot remember if we decided on $10M as HP claims, or some other figure. We agreed that Mr Sullivan would take the lead in this. In that context, HP claims that Mr Hussain or I joked that we would buy Mr Sullivan a Porsche if he succeeded in executing the strategy. He was not given a Porsche; his remuneration was based on a sales package, as I explain below."*

721.    That description of the presentation at the Loudham Hall meeting focused on what the Defendants often referred to as *"strategic hardware sales"* as a marketing strategy and does not mention the other more defensive rationale for the programme which was asserted by the Defendants. In his witness statement Dr Lynch explained those threats he considered were posed by *"a few key market changes"*. In more detail:

---

[131] Though the Defendant latterly relied on an email exchange between Dr Lynch and Mr Egan on 2 September 2009, which was subject headed *"key customer strategy"*, as evidence of the nature and purpose of the hardware reselling strategy said to have been discussed and agreed at the Loudham Hall meeting in July 2009. The Claimants contended that the email exchange was pretextual: see paragraphs 811 to 822 below.

(1) Dr Lynch perceived that in the wake of the financial crisis in 2008-2009 customers had started consolidating their vendor lists and limiting what suppliers they would use because they thought that it would make procurement cheaper. Dr Lynch described this when cross-examined as *"an industry trend at the time"*. He was concerned that some of Autonomy's key customers, in particular financial institutions, were reducing the number of approved suppliers or would be likely to do so, and that if Autonomy was removed from the list, Autonomy would likely be forced to sell via a third-party provider still on the list. This would make Autonomy reliant on another company (which could well also be a software competitor) for the sale of software and lead to an erosion in its margins because the third-party supplier would demand a margin on sale (typically 30%). He added:

> *"We held internal discussions as to what we should sell to increase overall volumes of sales to these customers. We concluded that we did not want to sell third-party software owned by our competitors and we did not want to sell services because that was against the ethos of the company and carried significant overhead. Hardware was a good option as all our customers were also hardware customers*[132]*, and it supported our software business."*

(2) Dr Lynch's objective was *"strategic package sales"* or *"one-stop shopping"* under which Autonomy would supply all customers' IT needs (hardware as well as software) as a means of tying such customers into Autonomy and reducing the risk of customers looking to mainstream hardware suppliers which might seek to introduce other software companies. In cross-examination, Dr Lynch elaborated that:

> *"So we were very, very keen to avoid that happening and we spoke to the banks and one of the things they said to us is: there's going to be an element in this of how much you are selling us. And it was actually a suggestion that came from the banks that hardware was something they would be happy to do this way.*
>
> *That was the customer-facing part of the strategy and it turned out to be very successful and unlike companies that were selling more than us, we did not get pushed into being a supplier through one of the majors and that saved us 30%. So the amount of business we're talking about here is about $150 million, so that saved us $50 million profit immediately, so it was a very good outcome."*

722.    As to the second threat Dr Lynch identified, which was the perception that the software industry appeared to be moving towards appliances as the means of packaging and selling its offering:

---

[132] Dr Lynch estimated that only about one percent of overall sales of hardware were to prospective rather than existing software customers.

HC-2015-001324

(1) Dr Lynch's assessment was that the way software was delivered was changing. At that time, the Cloud (which in fact ultimately became, to Autonomy's advantage, the predominant delivery mode) was in its early development: appliance sales appeared at the time to be the most likely platform and mode of delivery of software offerings.

(2) The threat was that companies focusing exclusively (or almost exclusively[133]) on software, and which could not offer any packaged solution, would find it difficult to compete with large companies that had the capability to provide both. Dr Lynch gave as an example, Google's development and production of an appliance that overlapped with some of Autonomy's products; he was concerned that some analysts, such as Mr Whit Andrews of Gartner (an influential industry analyst), had identified Google Search Appliances as one of the main competitive threats to Autonomy.

(3) Dr Lynch described the perceived likely industry move to appliance sales as *"an existential threat to our software business"*, unless Autonomy could establish a relationship with one or more hardware suppliers to develop an appliance or packaged solution which it would be to their joint benefit to market in a combined product or (as it was often referred to) *"solution"*. For that purpose, he considered, Autonomy needed to establish strong *"strategic relationships"* with hardware suppliers (what he described as a *"partnership that we could leverage and rely on if the market did aggressively move (as feared) to appliances"*) so as to be able to procure appropriate basic hardware (*"without unnecessary bells and whistles"*) at a competitive price. That hardware could efficiently and economically be configured with Autonomy software and then either sold and delivered as a package either with Autonomy software embedded or already configured for Autonomy software to be supplied later. (Either package was, as Dr Lynch used the term, capable of being an "appliance".)

(4) Dr Lynch's evidence was that his perception was that:

*"Autonomy's hardware sales helped us overcome that threat: they enabled us to partner with hardware suppliers to purchase appropriate hardware at a competitive price, develop an appliance and meet the perceived market demand."*

723.    When the *"existential threat"* subsided, as in the event it did with the increasing dominance of the Cloud as the means of both the delivery and the archiving of software, the assistance of a hardware supplier to develop an appliance became much less of a concern. Dr Lynch accepted that the weight given to the various objectives of the hardware reselling strategy shifted from about Q2 2010 onwards, and became more centred on what he called *"strategic package sales"* and the *"customer-facing aspect"*: or, in other words, positioning Autonomy to

---

[133] The Claimants accepted that Autonomy had always sold some hardware, and of course it had always had to purchase large amounts of hardware for its data centres and hosted and archiving businesses.

make software sales by becoming the customers' preferred supplier across the spectrum of its IT needs.

724.    Dr Lynch always emphasised, however, that it was never intended that Autonomy should become, and he insisted that it never did become, a generic reseller of hardware. In his witness statement his evidence was that:

> "...we did not seek to sell hardware into companies who were not in the market for our software and we did not support the hardware we sold with related services. We sold hardware to our actual or prospective software customers, for a variety of reasons connected to our core business, which I will explain…"

725.    That is consistent with what he said close to the time, for instance, in an email dated 23 October 2009 to Mr Barry Ariko, a member of Autonomy's Audit Committee:

> "Personally despite the benefits you cite I feel we would not want to become resellers of unrelated hardware which is not about furthering our software sales."[134]

726.    It is also consistent with Mr Sullivan's evidence that Dr Lynch explained from the outset that the aim of the hardware sales was to get a bigger share of the financial market and in particular, big banks' software business. (As Mr Sullivan told the US court, those banks and financial institutions were his largest customers: that marked him out as the logical person to drive forward the programme.)

727.    Dr Lynch also referred in his witness statement to a number of *"additional benefits to the hardware strategy"*, some anticipated, and some which emerged, including:

(1) Autonomy could leverage its buying power to negotiate discounts on hardware needed for its own data storage centres.

(2) Many of Autonomy's customers had procurement departments, the performance of which tended to be measured on the discounts they obtained. Autonomy found that, if it sold hardware at a loss, it could more easily maintain its margins on its software. If Autonomy failed to maintain its margins on its software with one customer, the company faced erosion of its margins with all of its other customers. Commercially, it was better for Autonomy to discount certain hardware sales to large customers with strong negotiating positions in order to maintain (typically very much more substantial) margins on its sales of software.

728.    Dr Lynch did not dispute or seek to disguise the fact that a further material but collateral advantage was that the hardware strategy gave *"a degree of flexibility"* and *"a little bit of a degree of freedom"* which enabled Autonomy

---

[134]  The benefits cited by Mr Ariko, in the email to which Dr Lynch was replying, were "*incremental revenue and margin contributions*".

*"on occasion"* to *"plug gaps in relation to other revenues"*. Dr Lynch confirmed further that he was sure that the freedom and flexibility had been used. However, he was adamant that this was not, and never became, the driving force or reason for the strategy.

729. He also contended that hardware sales would be a poor tool for inflating revenue, and that if that had been Autonomy's goal, it would have been easier and more efficient to sell third party software. He explained in cross-examination:

> *"...If the goal was to produce recognisable revenue, we would have just resold third party software, which would have been a far more efficient way of doing things. It would have not had the delivery issues. So one of the big problems with this as a strategy for trying to get revenue of course is that hardware has to be physically delivered. So you've got 30% of your business in the quarter is done in the last week and generally, although there can be other arrangements, that's too late to turn on a hardware tap. So if the goal of the exercise was to –- solely to get revenue, you would resell third party software, which you could do on exactly the same basis but obviously it wouldn't meet our strategic goals."*

730. On that point, Ms Harris also gave evidence about the relative complexity and timing problems inherent in hardware sales. Whereas with sales of software, delivery was effected by sending an email key, and revenue could be recognised straight away provided the other revenue recognition criteria were met (e.g. collectability), the process was much less simple for hardware, with no guarantee that the revenue would be recognisable in the quarter: again, it was suggested that this meant that hardware sales would not have been an effective tool to enable Autonomy to "plug gaps" in order to meet its targets.

731. In the round, Dr Lynch portrayed the hardware reselling strategy as "the right decision and a good insurance policy for the company". He was also adamant that at a net cost of no more than $20 million the hardware reselling strategy was good value for money in marketing terms. He submitted that when looking at the commercial sense of the strategy, it is not the size of the revenues that matters, but the cost to Autonomy. When cross-examined he expressed this as follows:

> *"So if we just look at this in context of what's actually going on here. Autonomy spends $500 million over this period on marketing. This strategy costs us about $20 million and we get back through the fact that the linked discounts come – meant that we don't have to discount software to get the procurement discount, so it costs us less than $20 million. We then get EMC, for example, bringing us into their extended deals where they replace EMC with us and that goes into multiple customers. Dell bring us into 40 customers. They all make appliances for us. We displace our main competitor FAST out of Hitachi so we*

> *actually become the software for Hitachi. And we protect losing the profit margin on about $160 million of software business. So what's going on here is the execution of what actually is probably the best $20 million I ever spent on marketing in terms of the return that we got for it."*

732.    He summarised what he saw as its advantages and successes in his witness statement, as follows:

>   (a) *"Autonomy maintained its strategic supplier status with its major customers.*
>
>   (b) *Autonomy demonstrated that it was not threatened by the move to appliances.*
>
>   (c) *Autonomy protected its software margins.*
>
>   (d) *Autonomy developed its appliances with Dell, and sold them to customers.*
>
>   (e) *Autonomy and Hitachi were developing an appliance as well.*
>
>   (f) *Autonomy and EMC agreed to develop an appliance[135].*
>
>   (g) *Autonomy and EMC entered into discussions for the purchase of Documentum[136] for $2.2bn (which did not ultimately proceed).*
>
>   (h) *EMC changed the code on its hardware to enable it to run Autonomy software, leading to sales.*
>
>   (i) *Autonomy obtained discounts worth several million dollars on its own hardware purchases."*

733.    Dr Lynch could not and did not shy away from the fact that the hardware sales were, on a stand-alone basis, almost invariably loss-making; but his case was that when the benefits (especially increased high-margin software sales, but also including discounts on hardware purchases for its own considerable needs in its archiving and hosting offerings) were weighed in the balance, the costs were outweighed by the advantages.

734.    In the round, the Defendants stressed especially the importance of putting the programme in proper perspective: when looking at the commercial sense of the strategy, it was not the size of the revenues that matters, but the cost to Autonomy; and even the gross cost was small in comparison to the very high margins that could be made on software sales, as Mr Welham agreed.

---

[135] After a reconciliation, by August 2010, according to Dr Lynch.
[136] EMC's content management and archiving division.

735.  There is no evidence of the hardware reselling strategy having been discussed by the board: the strategy was presented as having been discussed at the Loudham Hall meeting and developed thereafter.

## (2) Witness evidence which the Defendants contend supports their case

736.  As indicated previously, the Defendants reinforced their case as explained by Dr Lynch principally by reference to the evidence of the Claimants' own witnesses. They relied in particular on the evidence of Mr Sullivan and Mr Egan, which they contended supported their case as to the purpose of the hardware reselling strategy in all its aspects, and on the evidence of Mr Welham.

737.  Both Mr Egan and Mr Sullivan were directly involved in the hardware reselling strategy, which was almost exclusively centred in the US. Both had given evidence in the US criminal proceedings. Both appear from that evidence to have considered that there was a valid commercial rationale for the hardware sales, including sales of what the Claimants would characterise as "*pure hardware*". The omission from their respective witness statements of any substantial recognition or explanation of the outlook they expressed at the time has tended rather to emphasise the Defendants point that the Claimants' case now is not supported by their own witnesses.

*Mr Sullivan*

738.  In his witness statement, Mr Sullivan did not express any view as to the purpose of the strategy of hardware sales, which he considered began to be implemented in Q3 2009 after the meeting at Loudham Hall and his return to the US after that. He accepted that it was not unusual for software companies to sell hardware. However, the emphasis in his witness statement was on the fact that Autonomy's hardware sales were at a loss; and that although he was familiar with the process of reselling hardware, had engaged in it when at SteelPoint, and had a well-established network of large institutional customers to which hardware could be sold, he stressed that in his experience there the sales had been for a profit and never at a loss.

739.  Mr Sullivan explained that he was in regular contact with Mr Hussain, who regularly set revenue targets for hardware resales and frequently requested updates on the status of hardware sales (which, he added, were often referred to as "low margin" business). He acknowledged that he was offered and received bonuses if he achieved the targets. He identified EMC as the initial usual hardware provider; they were replaced by Dell after Q3 2009.

740.  His evidence was that after the HP acquisition Dr Lynch and Mr Hussain agreed that reselling hardware should cease except for committed deals, though he was asked to do some new deals after that; and that the programme finally came to an end in April 2012. He seemed to imply that termination post-acquisition signified some suspicion about propriety.

741.  The Defendants depicted Mr Sullivan's evidence in the US criminal proceedings as giving a fuller and fairer picture of his view of the hardware reselling strategy.

They relied on his evidence in that context as demonstrating that in his perception:

(1) There was nothing wrong or illegal in a software company selling hardware at a loss as part of a marketing programme: he considered that it was something that happened frequently in the software and hardware industries. He explained his own thought process as follows:

> *"Absolutely. I mean companies sell printers at a loss to sell ink. Companies sell razors to sell blades. You know, we were a software company. We gave away professional services for free to get software deals. We gave away training for free to get software deals. I mean, in the end what matters is you make more than you don't make when you add it all up and group it together. That's the way I looked at it."*

(2) Autonomy and its then preferred hardware provider, EMC, had mutual customers (in particular, large financial institutions) and it was with a view to mutual benefit that *"we specifically targeted, you know, our mutual customer list to provide this benefit too, yeah."*

(3) Autonomy wanted the hardware manufacturers to drive sales of Autonomy products, and there were opportunities for mutual benefits if they did. For example, if a manufacturer's introduction led to Autonomy selling Digital Safe to a customer, that in turn would increase Autonomy's or the customer's need for hardware, which would result in further hardware purchases from the manufacturer.

(4) After mid-2009, when he started selling the low-margin hardware, he only sold it to big software customers of Autonomy and such customers included Citigroup, Bank of New York, and Bloomberg. He explained that a lot of software was sold to a company called Insight which was Citi's purchasing agent for hardware so that when they were selling to Insight they were selling to Citi. He also confirmed that a company called SHI played the same function for Bank of America as Insight for Citi and so if they were selling to SHI they were selling to Bank of America. All of those financial institutions were software customers of Autonomy before the hardware program started.

(5) He agreed that the programme or strategy was *"a way to develop good relationships and to induce further business...an investment in the relationship..."*

(6) It was never suggested to him that he should, and he never did, try to conceal hardware sales, saying that he *"never thought there was a reason to. In fact, I tried to make it clear"*. He expressly told both EMC and Dell that the sales were part of a marketing programme, and never thought there was anything at all wrong in it.

(7) He saw nothing wrong in either the payment of bonuses, nor in the setting of targets measured by sales under the programme: he said he did not know *"why you would do it any other way"*.

(8) It was impressed on him by Mr Chamberlain and the legal department that to that end, it was essential for Autonomy (a) to take title and own the hardware before reselling it (as he put it *"We had to hold the receivables risk…"*) and (b) to ship the product before the end of the quarter for which revenue was to be recognised: if shipment was delayed, then revenue recognition would have to be deferred (which he said *"happened regularly"*).

742. The Defendants relied also on Mr Sullivan's evidence when asked in the US criminal proceedings in "direct" examination what in September 2010 he understood the purpose of the *"Dell resells"* to be:

> *"Well, clearly there was an element of wanting more revenue. That was one. But there was also the overarching purpose…The overarching purpose, again, as I asked multiple times, was to generate good will and marketing benefit…"*

743. However, Mr Sullivan's evidence in the US criminal proceedings also signalled that he was not himself verifying the rationale of the programme: he was explaining what he had been told by the Defendants and that that was the basis on which he had proceeded. Thus:

(1) When asked whether the explanation of the strategy in focusing on big financial institutions and selling them discounted hardware which he was given by Mr Hussain and Dr Lynch, which was that this would help to develop relationships with them with a view to getting a bigger share of their software business was plausible, he side-stepped, and simply answered that the big financial institutions were his *"largest customers for the portion of the business that I ran."*

(2) When asked whether he knew that the marketing aspects of discounted hardware sales were important to, for example, Mr Hussain and Dr Lynch he said he did *"because of their words and that's what they told me."*

(3) He was aware that it was important for Autonomy that the sales of hardware should be papered and structured to result in recognised revenue: he accepted that revenue recognition was part of the rationale.

744. It is clear from Mr Sullivan's evidence in the US criminal trial that he was personally unsure what was the purpose of the sales of hardware at a discount on the price which Autonomy had paid the supplier and thus at a loss to it. The fact that he repeatedly asked Mr Hussain and Dr Lynch for an explanation suggests that he remained unsure and needed reassurance from them. His evidence was replete with the variety of answers he was given, though all revolved around the central theme of fostering goodwill with suppliers and

software customers, and mining that to develop and extend relationships with them both.

745.    Of course it is dangerous to place too much reliance on nuance having not had the opportunity to watch and listen to him being cross-examined, but I also formed the impression from the transcripts of his evidence in the US criminal proceedings that he was ultimately unsure quite what the story was that he had been told and tended to grasp at different formulations according to whether he was being examined or cross-examined, being anxious to satisfy both and insulate himself.

746.    Further, although Mr Sullivan well understood and accepted the notion of a promotional deal and using discounting for marketing purposes (see, for example, paragraph 801(1) below), when confronted with particular transactions, he often had to accept that the reality was that the real driver was revenue generation albeit at a loss. Thus:

(1)    As elaborated below (see paragraph 773 *et seq*) in considering the nature of the relationship between Autonomy and its first major hardware supplier, EMC, Mr Sullivan confirmed that though he *"certainly characterised the deal as, you know, a marketing deal"* and had told them that he *"had marketing funds to use to spend on some of our mutual customers"* the reality was that:

> *"You know, really, the deal that I had with EMC was just to help us sell some hardware. It really didn't go much beyond that."*

(2)    In relation to Autonomy's dealings with a Dell customer called Zones Inc, which Dell introduced to Autonomy (and which I address in more detail later, see paragraph 1159 *et seq*) Autonomy was contractually precluded from revealing its involvement. Mr Sullivan duly confirmed that he never mentioned Autonomy's involvement in any transactions with Zones, or in other transactions with Dell customers such as Oracle where like prohibitions had been imposed.

(3)    Mr Sullivan had to accept, in relation to an email from Mr Hussain dated 25 March 2011 in which Mr Hussain had written that making further hardware sales was *"the last part of the low margin jigsaw"*, that this was being done to try to hit a revenue number, rather than for any marketing purposes.

747.    More generally, Mr Sullivan's role, as the person chosen to develop business with hardware suppliers (first, with EMC and subsequently with Dell), was defined exclusively by reference to revenue generated from hardware sales. He reported regularly to Mr Hussain as to (a) what *"low margin"* sales could realistically be achieved and (b) the value, purely in revenue terms, of hardware sales secured from time to time. In other words, the accent was almost exclusively on revenue, without a thought to the pursuit or accomplishment of any other benefit. In that connection, Mr Sullivan stated in his evidence in the US criminal proceedings that he did not know whether there was any effort at

all at head office in England to try to track or relate *"low-margin hardware deals with software sales"*.

748.    My overall impression was that Mr Sullivan had been carefully assisted as to the line to be followed for his own protection if and when questioned about the purpose of the hardware sales. He tried to repeat his lines (with some glitches in his recital of them), that he had been assured and had then persuaded himself that there was nothing improper in what was being done. However, although I should stress that the Claimants did not accuse Mr Sullivan of dishonesty, he knew that it was all about revenue, with any other benefits being uncertain and peripheral, and unproductive in terms of his take-home pay.

749.    Indeed, in a passage from his evidence which was not quoted in the Defendants' respective closing submissions, even though it was part of the same passage quoted at the end of paragraph 742 above which was especially relied on by Dr Lynch, Mr Sullivan appears to have accepted that where the deals were arranged at the very end of the quarter, their real purpose was simply to generate revenue. Thus, when giving his answer that *"the overarching purpose"* was to generate *"good will and marketing benefit"* he expressly differentiated what he referred to as *"the last second request"*. He was asked to explain what he meant by this:

> Q.  What do you mean by the last second request?
>
> A.  Well, in this case this is two days before the end of the quarter
>
> Q.  What significance do you attach to that?
>
> A.  To get more revenue for the quarter."

*Mr Egan*

750.    As mentioned above, Mr Egan (like Mr Sullivan) said very little in his witness statement about the rationale of the hardware sales, and he tended to minimise his own involvement. However, Mr Egan (unlike Mr Sullivan) did attend to be cross-examined via video-link in these proceedings; and when cross-examined he confirmed that he did not think there was anything wrong with Autonomy's strategy of selling hardware, even though it typically involved a loss on the resale.

751.    Mr Egan also confirmed that the evidence he had given in the US criminal proceedings was correct, and could be taken still to be his evidence. The gist of that evidence was captured in the following exchange:

> "Q. Did you believe that the sales to these banks of hardware had the extended benefit of enhancing the relationship with the banks?
>
> A.  I did believe that.
>
> Q. Who were big customers for software?
>
> A. Some, yes; some targets.

> *Q. Did you consider it a relationship builder to sell the hardware to these targets or customers for software?*
>
> *A. I did.*
>
> *Q. And did you see it as a benefit to future software purchases?*
>
> *A. Absolutely.*
>
> *Q. Did you believe that hardware and software were leveraged together with these big customers?*
>
> *A. Often, yes.*
>
> *Q. And did you believe it increased Autonomy's standing with the big financial institutions that bought their software?*
>
> *A. The hardware sales?*
>
> *Q. Yes.*
>
> *A.    Absolutely."*

752.    Mr Egan's evidence thus seemed directly to corroborate Dr Lynch's explanation of the purpose of the hardware reselling strategy, and (perhaps more importantly) that the purpose was pursued and seemed to him to be realised in its implementation. Again, the absence of any acknowledgement of this in his witness statement tended to support the Defendants' submission that the Claimants had provided no reason to suggest that the rationale was contrived or implausible.

753.    The Claimants pointed out, however, that Mr Egan was never once asked to identify the basis of his stated belief as to the purpose of the hardware sales. Apart from the so-called *"Linkage Analysis"* which I refer to later, no objective evidence such as to inform or validate the statements of belief was ever provided. They contended that it is clear from other parts of his evidence that his understanding was based on discussions with Dr Lynch and Mr Hussain, and cited in particular the following evidence in his witness statement:

> *"I understood from discussion with Mr Hussain and Dr Lynch that a reason for making these sales was to engender goodwill with customers that were also customers for Autonomy software; and that was always a stated reason for these money-losing sales."*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

754.    Further, Mr Egan, who (with Mr Sullivan) was present at the Loudham Hall
meeting in July 2009, but did not address it in his witness statement, implied
that the notion of hardware sales driving software sales might have informed the
strategy initially, but soon faded when the revenue-generating potential of
hardware sales was recognised. He stated in his witness statement that:

> *"...it was also clear to me over time that a principal reason for these
> money-losing sales was to generate revenue that could be recognised
> in the quarter in which the sale was made so that Autonomy could
> achieve its revenue target and meet market expectations. This benefit
> was discussed as a primary motivation for doing these deals amongst
> myself and others, including Mr Hussain and Dr Lynch."*

755.    Mr Egan agreed with Mr Miles in cross-examination that this was carefully
phrased, and that the use of *"a"* rather than *"the"* before *"principal reason"*
was deliberate and what he was *"comfortable with"*.   That was not least perhaps
because in his evidence in the US criminal proceedings Mr Egan (when cross-
examined in that context) had accepted that he had regarded hardware sales, and
in particular sales to large banks who were big customers for software, to be *"a
relationship builder"* so that *"hardware and software were leveraged together
with these big customers"*. He was careful to maintain the position that even if,
*"later in the process"*, such reasons *"became secondary in a couple of cases to
the absolute desire for revenue"*, they always, in his view, subsisted.

756.    Most importantly, at least from the Defendants' perspective, Mr Egan's
evidence was that he considered that it was genuinely always part of the purpose
of hardware reselling to turn Autonomy into a favoured seller to large customers
and particularly banks and other financial institutions,  and that engendering
goodwill with customers that were also customers for Autonomy software was
not only a stated but *"always a very big reason"* for the money-losing hardware
sales.

757.    Mr Egan made the point also that *"...you could have an argument in any one
transaction about whether something was secondary or primary to the other..."*
He accepted that the evidence he had given in his witness statement that revenue
generation had *"been discussed as a primary motivation for doing these deals
amongst myself and others, including Mr Hussain and Dr Lynch"* was not based
on any actual or specific conversation. He accepted as correct Mr Miles's
suggestion to him that the notion of a primary motivation for a deal:

> *"...sounds rather like the kind of thing a lawyer would say rather than
> what business people would say at the time..."*

758.    That is probably realistic. Different transactions may have differently weighted
purposes and objectives, and business decisions are usually multi-faceted; the
weighing of which is the primary or predominant purpose is beloved by lawyers,
looking at the matter after the event; but commercial men tend to take a more

holistic approach and weighting as between various commercially welcome effects is not the reality of commercial life. Mr Egan sought in this way to reconcile his evidence in the US criminal proceedings, his witness statement, his conscience and what increasingly also struck me as a desire so far as possible, not further to implicate Dr Lynch, or indeed himself[137].

759.   This difficult line was easier to follow where Mr Egan was involved in, or did know of a prior or contemporaneous hardware sale; and it is clear that in those instances, Mr Egan did try to leverage the hardware and software sales together.

760.   The Defendants made much in this regard of an email exchange between Mr Egan and Mr Hussain on 23 December 2009 which had as its subject heading *"A few additional points for your prep"*. This exchange (which Mr Egan had not mentioned in his witness statement) appeared to suggest that when 'prepping' Mr Hussain how best to present to Mr Christian Lucas of Morgan Stanley a large proposed deal with Morgan Stanley which also involved a 'loss leader' sale to Morgan Stanley of Dell hardware at a discounted price, Mr Egan had presented what was described as the *"Dell/reseller"* deal as a loss leader which promoted good relations with Dell and led to faster adoption of Autonomy software and *"grease[d] the process of lucrative OEM bundling of Autonomy software on Dell kit"* especially when Dell could see *"the level of usage of our software in a prestigious account like MS…"*

761.   The Defendants also relied on a passage of evidence from Mr Egan's re-examination in which Mr Rabinowitz had sought to elicit from him that the use of hardware sales to leverage software sales in the Morgan Stanley deal was a single exception, and that Mr Egan had not been involved in any other hardware sales which were linked to a sale of software. Mr Egan, contrary perhaps to the re-examiner's expectation, replied that he was sure he was, causing Mr Rabinowitz quickly to break away from that line of questioning.

762.   However, the surprise of the initial answer may have somewhat obscured Mr Egan's addition, which explained its limited scope:

> *"To be clear, I answered that question based on knowing that I've sold what I believe I referred to the other day as more occasional hardware in conjunction with software versus very large hardware deals."*

Earlier, in the course of his cross-examination, Mr Egan had referred to having

> *"sold some incidental hardware prior to the period that we're talking about and I don't think anyone has questioned, or that's not under scrutiny."*

763.   What in the round I took from Mr Egan's evidence was that:

(1)   Although he knew of money-losing hardware sales, and of their general justification as *"to engender goodwill with customers that were also*

---

[137] He also emphasised, for example, that though he was *"involved in making this type of hardware sale when Autonomy first began this practice in Q2 2009…[he] was involved only occasionally thereafter."*

customers for Autonomy software", he was *"more tasked with selling software"* and it was Mr Sullivan who *"was tasked by Dr Lynch and Mr Hussain with managing most of the hardware reselling."* In other words, the tasks were usually separately undertaken, and Mr Egan was only occasionally involved in hardware sales.

(2) *"As a general matter, [he] did not know which companies had purchased hardware from Autonomy or how much third-party hardware was being sold"*; and he was not, therefore, in a position to and did not *"use the fact of a prior or contemporaneous hardware sale to promote the software sale [he] was trying to make".*

(3) Even in some cases where there were long running negotiations for software sales he was simply not told or aware of the fact of a prior or contemporaneous hardware sale which might have assisted him in concluding a software sale. The example given in his witness statement of a software licensing and data hosting transaction eventually concluded with BofA was especially instructive because not only did he not know of a prior large hardware sale to BoA which might well have assisted him in his negotiations but also he *"never heard Dr Lynch or Mr Hussain…refer to these hardware sales during our extensive negotiations with Bank of America"* either).

(4) As to what he described in cross-examination as the *"small universe"* of large value end of quarter hardware sales, his evidence to me was that in his discussions with Dr Lynch about this *"I feel as though we had an understanding that they were needed from a revenue perspective…".*

(5) It was, inferentially, for that reason that he was not told and usually did not know any of the details of such sales, or (in particular) which companies had purchased hardware from Autonomy or what the sales involved.

764.  I accept that evidence. If Mr Egan, who was so often responsible for software sales, (a) in important instances where there were ongoing negotiations for software sales did not know and could not and did not use the fact of prior or contemporaneous hardware sales as a negotiating point , and (b) often did not know relevant details of end of quarter hardware sales and in any event understood them to be directed simply to revenue generation, that tends substantially to undermine the notion that the objective of such hardware sales was to benefit software sales and that *"hardware and software were leveraged together with these big customers".*

765.  This fed through into the main difficulty for the Defendants. This was that although Mr Egan sought to emphasise what he called (see paragraph 751 above) the *"extended benefit"* (of enhancing relationships with the banks), the overall impression persisted in his evidence that the *sine qua non* and driving force of the hardware sales was revenue generation to meet what he knew was the Defendants' desire and need to satisfy revenue forecasts.

766.  That impression was supported further by other parts of his witness statement which illuminated how little part any ancillary benefits for software sales

actually played in the planning and practical implementation of Autonomy's hardware sales. To exploit an advantage in terms of software sales that might be gained from a sale of hardware, the software salesman had to know of the hardware sale; but in his witness statement, he stated:

> *"As a general matter, I did not know which companies had purchased hardware from Autonomy or how much third-party hardware was being sold. When I was involved in selling software licences to end-users, I usually did not know whether hardware had been sold to that end-user and when I was not involved in, or aware of, a hardware sale I did not use the fact of a prior or contemporaneous hardware sale to promote the software sale I was trying to make."* [138]

767. It may also be noted that Mr Egan stated in re-examination that: (i) he was unaware that each quarter from Q3 2009 to Q2 2011 the Defendants set hardware revenue targets for Mr Sullivan; (ii) he was generally not aware of the dealings that took place between the Defendants and Mr Sullivan in relation to the generation of revenue through hardware sales; and (iii) he did not know that bonus payments were offered and paid to Mr Sullivan linked to the amount that he generated from hardware sales. All were factors tending further to undermine any belief that the hardware reselling strategy was intended to generate and increase software sales.

768. My overall assessment is that Mr Egan's evidence was more a recital of reasons he had been given as to the purpose of the hardware reselling strategy dressed in the language of belief, and that the real import of his evidence was that his own experience in practice was that the hardware reselling strategy had very little relevance to, and no measurable benefit for, the software business, and that it was the need to show revenue which was its true explanation.

*Dr Lynch*

769. Dr Lynch's evidence did not attempt to show any direct or causative link between hardware reselling and increased software sales. His justification was stated in general terms with little or no evidence-based examples:

(1) His overall justification was to depict the programme as similar in intended effect to an advertising campaign, but (at a net cost of about $20 million) cheaper.

(2) He offered the further justification that the discounts which Autonomy offered its software customers on hardware sales could be used to maintain prices for software products, because it meant *"that Autonomy did not have to discount software sales in the same amount"*.

---

[138] Mr Egan elaborated on this by reference to a large software licensing and data hosting transaction with Bank of America in which he was involved in Q1 2011: and I have quoted further from the same passage in his witness statement in examining that example at greater length in paragraph 1140 *et seq* below.

770.    He contended also that what he called the customer-facing part of the strategy
turned out to be very successful, and that the effect of promoting good
relationships with hardware suppliers was that:

> "*unlike companies that were selling more than us, we did not get pushed
> into being a supplier through one of the majors and that saved us 30%.
> So the amount of business we're talking about here is about $150
> million, so that saved us [$]50 million profit immediately, so it was a
> very good outcome.*"

771.    As will be seen later, these issues were reflected both in a *'Strategic Deals
Memorandum'*, which referred to the "*continuing rationalization of IT suppliers
to major financial institution customers*"; and also in Autonomy's Quarterly
Results for Q3 2009, which noted that "*During the quarter we saw some of our
large customers promote Autonomy to strategic supplier status.*"

772.    However, none of this could explain:

(1)    The frantic use of hardware reselling when gaps emerged in expected
revenue from software sales;

(2)    The determined efforts not to disclose the hardware reselling strategy, to
the point of accounting for the costs in such a way as to minimise the
risk of revelation as well as reducing the adverse effect of loss-making
sales on the 'bottom line';

(3)    The repeated efforts to paint a misleading picture of Autonomy's efforts
to establish a partnership with the first of its main hardware suppliers,
EMC (to which I now turn).

### (3) Autonomy's relationship with EMC and the dispute as to why it abruptly ended

773.    Mr Sullivan's evidence on Autonomy and his own relationship with EMC was:

(1)    Whilst at Zantaz (which had purchased servers and storage from EMC
for use in its hosting business) and then after the acquisition of Zantaz
by Autonomy, Mr Sullivan had established a good working relationship
with EMC's director of Global Sales and Marketing Operations, Mr Bill
Scannell ("Mr Scannell").

(2)    The potential for some collaboration with EMC preceded the Loudham
Hall meeting. Autonomy was, even before the adoption of the hardware
reselling strategy, one of the largest buyers of data storage in the world.
EMC was *"a very large hardware provider, really the leader in storage
systems...a top-notch company"*. There was advantage to both in
securing and increasing each other's business.

(3)    At the same time, Autonomy and EMC were in discussions about
building appliances. Also in June 2009, following a difficult negotiation,
Autonomy had convinced EMC to create a "*custom configuration for us*

*that will be useful for the Digital Safe*" during this period, and as also Mr Goodfellow accepted in cross-examination.

(4) On 18 June 2009, Mr Sullivan wrote to Mr Scannell of EMC to say that Autonomy would like "*a more strategic relationship with EMC,*" in view of the large investment Autonomy was making in purchases from EMC, in particular in relation to Digital Safe and Introspect. In his evidence, Mr Sullivan explained that what he meant was getting some of EMC's hardware customers to buy Autonomy software:

> "*Q. And what you wanted them to do in this more strategic relationship, you were buying a lot of hardware from them, you wanted them to drive some revenue to you; right?*
>
> *A. Absolutely.*
>
> *Q. And what did that mean? Did that mean get some of their hardware customers to buy Autonomy software?*
>
> *A. Yes.*"

(5) To encourage EMC further, Mr Sullivan had mentioned to Mr Scannell the possibility of an alternative tie-up of some kind between Autonomy and HDS (Hitachi). This was intended to and did excite some rivalry and interest from Mr Scannell. The exchange and its upshot seem to me to have some bearing on the dispute as to the nature of the subsequent arrangements between EMC and Autonomy:

(a) Mr Scannell's email to Mr Sullivan stated in relevant part:

> "*This is what I took from our discussion last night. Please clarify if I missed anything or misstated anything.*
> *HDS is looking to provide Autonomy a slick deal where they would provide you:*
> -   *a close configuration to what you have with EMC infrastructure already*
> -   *they will become a reseller of Autonomy hosting services*
> -   *Autonomy are now moving Digital Safe to HDS drives and away from the current vendor*
> *You would like to see EMC try to take a stab at the same type of deal where we would drive Autonomy Hosting Service deals and that would allow us to perhaps do a larger overall deal with you (grow from $2.9m to $5m)???*"

(b) Mr Sullivan's reply stated in relevant part:

> "*Correct. We would commit to the current deal (subject to some details) plus make an additional commitment for more hardware related to DS and/or Introspect (to be determined). Since we*

> *would be making a very large investment in EMC[139], we would*
> *like a more strategic relationship with EMC so that you could*
> *also drive revenue for us. We would also be looking for a*
> *commitment this QTR."*

(6) The upshot as reported by Mr Sullivan in an email dated 26 June 2009 to Mr Hussain and Dr Menell was a good deal on the purchase price for EMC hardware which Autonomy was proposing to lease through Bank of America for its own use[140], and also a commitment by EMC to refine its hardware for Digital Safe needs, as emails sent at the time demonstrated.[141]

(7) On 1 July 2009, Mr Sullivan emailed Dr Lynch and Ms Eagan, noting that:

> *"EMC would like to setup a day where we could get our respective*
> *product people together to discuss our respective offerings and see if*
> *there are more opportunities for us to work together. For example, they*
> *do not have a supervision product or a legal hold product. Not sure what*
> *is realistic given that we compete in other areas, but I think it is worth*
> *having the conversations."*

774. It was natural therefore that it was to EMC that, on his return to the US after the Loudham Hall meeting, Mr Sullivan immediately turned to take forward the hardware reselling strategy that had been agreed upon at Loudham Hall. Mr Sullivan elaborated on the relationship established between Autonomy and EMC, which was (as appears later) a point of dispute, as follows:

(1) After the Loudham Hall meeting, Autonomy worked for a relationship with EMC in the nature of a partnership: there was advantage for both in that Autonomy was on its own behalf a large purchaser of hardware from EMC for its data storage business (which Mr Sullivan explained was one of the largest in the world) at the time (before the end of Q3 2009), and EMC was a large and successful provider of hardware, and an OEM willing to embed IDOL into its hardware and thus increase market penetration of IDOL. There was a strong incentive for Autonomy to secure its supply chain for hardware and EMC's partnership for

---

[139] According to Mr Sullivan's evidence in the US criminal trial, this included what was known as the HULK, *"a big giant storage system that was supposed to store stuff...very, very cheap"* which EMC had just produced and Autonomy was thinking of trying out.

[140] Mr Hussain's email to Mr Sullivan, 30 June 2009 stated: "*I am very happy with the negotiations that you guys have carried out. My understanding is that you have managed to strike a very aggressive pricing on the existing hardware refresh ($3m) having taken formal pricing from Hitachi (the only alternative) and also pre bought digital safe storage capacity at the same attractive rates for $6m (all including 3 year maintenance). This hardware will save significant costs as our digital safe business is increasing at a very rapid rate.*"

[141] For example, in an email of 25 June 2009 to Dr Menell Mr Wang stated: *"we had a breakthrough with EMC today in having them agree to sell us essentially hard drives without their fancy software which is irrelevant for Digital Safe... Given that we will be using EMC only for storage, we also convinced them to removed [sic] the IU server that was bundled in the unit. so what we're essentially left with a cabinet with 360 hard drives, the price of which should be substantially better than the standard ATMOS unit"*.

software by purchasing EMC hardware using its negotiating power to secure material discounts[142].

(2) With the EMC hardware sales, Autonomy focused on mutual customers for hardware sales. As Mr Sullivan said, "*we specifically targeted ... our mutual customer list to provide this benefit.*" The way he saw the programme was set out in an email sent by Mr Sullivan to EMC on 15 September 2009:

> "*The purpose of the program is to strengthen our relationship with enterprise customers in the NYC region by offering them EMC information management products at attractive pricing. We will focus primarily on existing Autonomy Enterprise customers in the financial sector, but other companies may be added as we mutually agree.*"

(3) Mr Sullivan said that the goal was to get some of EMC's hardware customers to buy Autonomy software and to encourage EMC to push Autonomy products: "*We would have loved to have them, for example, push our Digital Safe project.*"

(4) Mr Sullivan also explained that he opened and pursued discussions with EMC in the latter half of 2009 about "*building an appliance, so something like potentially shipping a Digital Safe or actually e-Discovery on [sic] bundling it on their hardware and shipping it…*"

(5) Discussions about an appliance continued after that and on 5 October 2009 Mr Sullivan wrote to Mr Scannell to say: "*Per our previous conversations, I would like to get together to discuss the continuation of the programme to include development of an appliance bundle, mutual cross referrals, account introductions, reselling and other opportunities.*"

(6) Mr Sullivan explained that this referred to discussions he had been having with EMC about building an appliance to bundle Digital Safe or e-Discovery on EMC software and discussions from November 2009 onwards between technical teams evaluating EMC hardware that might be used in an appliance. These discussions continued through 2010.

*Contractual arrangements between Autonomy and EMC*

775. The Claimants could not dispute the fact of those discussions; and indeed Mr Goodfellow had to accept in cross-examination (after at least three obviously evasive answers) that EMC hardware was being refined for use with Digital Safe towards the end of 2009. Instead, the Claimants contended that in the event, EMC never made any enforceable commitment beyond those set out in a

---

[142] On the basis that increasing Autonomy's volumes of hardware further gave it serious negotiating power which could lower the price of its purchases. Dr Lynch gave unchallenged evidence that this led to a saving of $10m for Autonomy on hardware purchases – a saving equivalent to around half of the $21m of losses incurred (on the Claimants' case) on hardware transactions during the Relevant Period.

*"Purchase & Fulfillment Agreement"* executed on 10 September 2009, which they submitted was definitive of the relationship between Autonomy and EMC, and involved nothing more than *"a straightforward purchase by Autonomy of EMC hardware for resale (at a loss to Autonomy) to EMC's customers."* The Claimants submitted further that this was illustrative of the hardware reselling arrangements as a whole.

776.   The Claimants highlighted the following substantive provisions of that agreement:

>   (1)   Under clause 2, EMC would discuss with the end Customer its (the end customer's) needs and EMC and the Customer would agree the specification, which Autonomy could not change or amend. EMC would then issue a price quote to Autonomy based on that specification.

>   (2)   Under clause 3, Autonomy would issue a purchase order to EMC based on the quote, stating the name and address of the Customer, the specific products and/or services to be purchased by the Agent for resale to Customer and *"total fees payable to EMC by Fulfillment Agent."* EMC would then arrange for the hardware to be shipped directly by EMC to the customer.

>   (3)   Clause 9 (headed "*relationship of parties*") made clear that Autonomy was "*not a reseller (except as described herein), referral partner, joint venturer or any other sales agent or representative of EMC*". Instead, the parties' relationship was "*that of non-exclusive independent contractors*".

>   (4)   Clause 13 provided that the agreement constituted the entire agreement between EMC and Autonomy in relation to the hardware resales.[143]

777.   However, that summary gave no content to the first clause which envisaged that "the Customer" would be someone with whom Autonomy had an existing relationship, and who might be interested in the enhancement of the hardware in question by the provision of Autonomy software and other "enhancements". Its first clause, headed "Background", recited as follows:

>   *"A 'Customer' is a third party buyer located in the USA (excluding any United States federal government entity, agency or department) which desires to obtain one or more products or services offered by EMC, and with whom Agent may: (i) hold one or more relationships; and/or (ii) through its resources, other relationships, product offerings, or otherwise, be capable of enhancing Customer's purchase of such EMC*

---

[143]   It is to be noted also that there was nothing in the agreement that obliged EMC to use the money it received from Autonomy in any particular way. The potential significance of this is developed further later in the context of how the Defendants sought to justify the allocation of a substantial portion of the hardware costs as sales and marketing expenses.

> products or services. The term 'products' may include both hardware
> and software. This Agreement states the terms and conditions under
> which EMC agrees to (a) accept purchase orders and collect payment
> from Agent for purchases made hereunder, and (b) permit Agent to sell
> EMC products or services to Customers."

778.   That first clause seemed to me to support the Defendants' case that Autonomy
selected its own customers, or at least, supplied to companies which, even if
customers of EMC, were also customers of its as well. On that basis, the
arrangements did enable it to further the purpose it had identified by supplying
its customers with a packaged solution, whilst strengthening its relationship
with the hardware supplier. That case was further supported by the fact that
although selected by EMC, most (perhaps all, see below) of the "Customers"
(principally banks and other financial institutions, such as BofA, JPMC,
Deutsche Bank and Societe Generale), were also large customers of
Autonomy [144], with large software and archiving needs and an existing
relationship with Autonomy (such as the hosting of their archives in Digital Safe
at an Autonomy/Zantaz datacentre).

779.   However, as often transpired, the contractual wording did not in fact confine the
relationship as it developed. An example given by the Claimants to explain their
perception of the operation in practice of the hardware reselling arrangements
with EMC in Q3 2009 suggested that the chosen "Customer" was not always an
existing customer of Autonomy with software needs. The example given was as
follows:

   (1)   On 22 September 2009, the specification having previously been agreed
   between Bloomberg and EMC, Autonomy agreed to sell EMC hardware
   to Bloomberg for $8.663 million.

   (2)   On 24 September 2009, Autonomy issued a purchase order to EMC for
   that hardware in the sum of $10.089 million.  The shipping instruction
   was for hardware to be shipped directly by EMC to Bloomberg's offices
   in New York and New Jersey.

   (3)   The upshot was that Bloomberg received the hardware at a discount of
   almost 15%, but otherwise its position was identical to that which would
   have applied had it purchased the hardware directly from EMC.[145]

   (4)   The Claimants emphasised that Dr Lynch accepted when cross-
   examined, that Autonomy was effectively paying money to EMC to
   allow Autonomy to sell EMC hardware at a fairly substantial loss.

---

[144] This was a point Dr Lynch was especially quick to emphasise when cross-examined on the EMC
arrangements.

[145]As Mr Chamberlain noted in an email dated 25 September 2009: "*We are not taking on any
performance rights in respect of hardware, software, maintenance or services that remains with EMC.
Bloomberg owe us the full amount and the only thing we have to do is deliver the equipment*".

780.    As the Claimants pointed out (albeit in a different context), the documentary evidence suggests that Bloomberg made no software licence purchases during the period Q1 2009 to Q4 2010. It did not purchase software from Autonomy until 2011.  Although Dr Lynch suggested in cross-examination that it had made a large software purchase just before the hardware deal, it appears from the documentary evidence that it was not a purchaser of Autonomy software in 2009 or in 2010, and (except obviously for the hardware purchase) it does not appear to have been an Autonomy customer at all in that period.

781.    The "devil in the detail" of the evidence thus suggests that Autonomy was content to take a loss to generate income without either any existing relationship with the customer chosen by EMC, or any reason to suppose that it would service a software need or generate a software sale in the immediate future.

*Apparent success of the trading relationship with EMC*

782.    The Claimants further supported their case by reference to the immediate availability of as many hardware transactions as Mr Sullivan could handle. At the Loudham Hall meeting, Mr Sullivan had said that it would not be difficult to resell $5 million to $10 million of hardware, and Dr Lynch had joked that if he could do that, he would buy him a Porsche. As it was, within the week (on 15 July 2009) Mr Sullivan reported to Dr Lynch and Mr Hussain by email confirming that he was confident that he could:

> *"deliver all the revenue we need per our discussions at Loudham. I have verbal commitments for up to $20MM and could probably get twice that if you want it…My biggest concern is that 4 or 5 Porsches are not practical for me. Perhaps we need to discuss a small plane or yacht?"*

783.    The Claimants relied on that jocular confidence and the exclusive reference to "*the revenue we need*" as confirming their contention that all that was involved was agreeing with an established supplier a means of purchasing from the hardware manufacturer and then reselling on hardware to end-users at a discounted price, the discount in effect being funded by Autonomy. Both manufacturer/supplier and end-user gained, and it cannot have been difficult to interest them, if all that was sought by Autonomy was revenue without any further tie or commitment. The Claimants relied on that, and also on the almost immediate expansion of the programme well beyond what was envisioned at the Loudham Hall meeting, apparently without any re-assessment, as further indications that the programme had nothing substantively to do with business building and everything to do with revenue generation.

*EMC decide not to proceed with the programme*

784.    Nevertheless, what appeared to be a developing relationship with EMC on hardware reselling rather abruptly came to an end, just after the end of Q3 2009 in December 2009. The reasons for this too were disputed*:*

(1) The Claimants contended that EMC's sudden refusal to remain involved with the programme (a) suggested some sense on its part that there was something amiss and, in any event, (b) confirmed that there was nothing beyond the reselling arrangements to bind them, and that Autonomy's suggestion that EMC had committed to a strategic partnership and the development of a joint appliance was baseless. They cited an exchange of emails between Mr Sullivan and Mr Scannell at the beginning of December 2009, in which, in response to a request from Mr Sullivan asking "can you help us out at all in Q4?", Mr Scannell had emailed Mr Sullivan on 9 December 2009 that

> *"At this point we unfortunately are uncomfortable with these deals".*

(2) The Defendants, on the other hand, dismissed any suggestion that EMC had sensed anything untoward. They ascribed the change to EMC having bought one of Autonomy's competitors, a company called Kazeon. Employees of EMC working in the division that had bought Kazeon were lobbying against the Autonomy hardware reselling deals. Mr Sullivan told the US court:

> *"I think that the dynamic that I understood within EMC is that the software business within EMC would rather have EMC bringing them into the deals rather than – rather than us."*

(3) The Defendants suggested that this too was telling in that it appeared to reflect a concern that the hardware sales strategy did assist in driving software sales. (They suggested further that the fact that it was possible for a hardware manufacturer suddenly to cease supplying hardware without any prior notice confirmed the importance of having strong relationships with them.)

(4) The Defendants relied also on the fact that not long after, in March 2010, EMC indicated they would be prepared to consider exploring a different business relationship with Autonomy, suggesting that the reason for the break was not based in any suspicion of impropriety.

785. The evidence is incomplete, and of itself provides no certain explanation for the sudden decision of EMC to withdraw. However, Dr Lynch plainly regarded it as important to his case to demonstrate that there was nothing sinister in EMC's withdrawal, and that it did not indicate that what Deloitte and the Audit Committee had been told in Q3 2009 – that Autonomy and EMC were in a strategic partnership and were developing an appliance – was baseless. He developed a complex explanation which the Claimants denounced as a demonstrable lie.

786. The explanation Dr Lynch developed was that people within one of EMC's divisions, called Documentum, were lobbying against the pure hardware deals. He continued:

"*But then unbeknown to Mr Scannell or Mr Sullivan at this point, a conversation broke out with the senior people at EMC which was about buying a division of EMC which was called Documentum for about $2.2 billion and because of that everything got very sensitive about how it was handled from that point onwards*".

787.   The Claimants submitted that in fact, it is clear on the documents that the discussions with EMC about Autonomy potentially purchasing Documentum did not commence until <u>much later</u>, in April 2010. They relied on the following:

(1)   An internal Autonomy memorandum produced on 28 May 2010, which set out the background to a possible deal (under the name "*Project Dynamo*") . The memorandum stated as follows: "*Morgan Stanley have made the senior level introductions between the two companies and MRL met with Harry You (Executive Vice President, Office of the Chairman, reporting to Joe Tucci Chairman and CEO) in April 2010*" . Nowhere does the memorandum suggest, nor is it consistent with, discussions having taken place any earlier, and certainly not as early as August 2009 as Dr Lynch suggested in his evidence.

(2)   Other documents further demonstrate the inconsistency.  On 5 March 2010, Dr Lynch sought an update from Mr Sullivan about relations with EMC.  Mr Sullivan responded:

"*As for EMC, the tone on "working with us" is very positive in general. They still are not willing to do reselling deals but have said they are happy to explore other types of partnerships. Billy [Scannell] is always willing to consider creative ideas. Billy says the software group (Documentum / Kazeon etc.) is the only group where we might see resistance…*
*...*
*They are very interested in keeping us as a customer and we have discussed working on the appliances with them although it does not seem a great fit vs alternatives.*"

(3)   The Claimants submitted that the document indicated that (a) Documentum's anticipated "*resistance*" was to EMC exploring any type of collaboration with Autonomy in March 2010; and (b) no appliance was being developed with EMC by March 2010, nor was there any plan to do so in the future, given that Autonomy did not view EMC as "*a great fit vs alternatives*".  Even by August 2010, the possibility of EMC creating an archiving appliance utilising Autonomy software had not proceeded beyond tentative discussions between the parties: see the "*Discussion Paper re Strategic Relationship*" prepared by Autonomy for EMC in August 2010, which identified the creation of an appliance as no more than a possibility under "*Expansion of Existing Relationship*". The "*Existing Relationships*" section of the paper made no reference to appliances.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(4) The discussions with EMC about Autonomy purchasing Documentum did not, in the event, lead anywhere. Dr Lynch's evidence in cross-examination was that "*the deal [with EMC regarding Documentum] was all ready to go by the summer*". Again, that was not supported by the contemporaneous documents; these suggested that the discussions remained tentative by October and November 2010. Ultimately, as Dr Lynch accepted, no deal took place.

788. Even if (and I do not need to decide this) the analysis may not reveal a lie, I would accept that it supports the Claimants' suggestions that:

(1) The relationship with EMC never amounted to anything like a partnership: the essence was that EMC was content to sell hardware at a full price which it could offer at a discount subsidised by Autonomy until (as seems to me more likely than not) concerns were expressed higher up the management chain to the effect that it seemed too good to be true;

(2) Any suggestion that the EMC relationship demonstrated or offered the potential of a strong nexus with software sales and development was exaggerated;

(3) The nature of the EMC relationship was not in consequence properly represented to Deloitte.

### (4) Autonomy's relationships with Dell and Hitachi

789. EMC's withdrawal necessitated urgent action to find a replacement hardware provider. As I elaborate in paragraph 912 *et seq* below, there is no doubt that by now, Autonomy had become addicted to hardware reselling to cover any software revenue shortfall headaches. Mr Sullivan found Dell. Dell had already supplied *"thousands of servers"* for Autonomy's data centres and hosted offerings which (Mr Sullivan elaborated) included *"the world's largest archiving and discovery offerings, which we were at the time"*: The parties' very different depictions of the relationship between Autonomy and Dell provides one of the clearest illustrations of the clash between, on the one hand, what the Defendants extracted from the evidence of Mr Sullivan and Mr Egan, and, on the other hand, what the Claimants submitted the actual sequence of events and the documentation revealed. In this part of my judgment, I focus on what the Defendants made of the witnesses' evidence; but it must be borne in mind that a very different story emerges when I turn later to the Claimants' analysis.

790. The Defendants relied on Mr Sullivan's evidence in the US criminal proceedings as providing substantial support for the Defendants' case that as with EMC, there were sound reasons for extending Autonomy's co-operation with Dell:

(1) Dell was a natural choice: as well as being large in its own right, Dell was the largest EMC reseller in the world as well.

(2) Further, at the time, Dell was seeking to build its own intelligent storage product, and was evaluating IDOL technology for that purpose, in a project known as Project BlueJay.

(3) Project Bluejay (which Mr Sullivan sometimes referred to as 'Bluebird') was Dell's response to an industry move to build 'intelligent storage', which Mr Sullivan explained in his evidence in the US criminal proceedings meant *"systems that indexed everything and made it searchable and provided analytics and things like that"*. Dell was evaluating technology with a view to developing its own product for the market, including Autonomy's IDOL.

(4) Discussions on this had begun in February 2009, but moved into *"high-gear"* in November 2009 (about the time that Autonomy started reselling Dell hardware). In this context, Mr Sullivan explained that Autonomy was heavily engaged working with Dell's R&D team.

(5) In an email to Mr Hussain on 6 November 2009, Mr Sullivan outlined *"Potential components of Autonomy/Dell deal"*. Among other things, they included Autonomy launching archiving and e-Discovery appliances with Dell, Dell acting as an OEM for Autonomy's IDOL search platform, Dell reselling Autonomy appliances and software, and Autonomy using Dell equipment and storage for its archiving and discovery offerings. As Mr Sullivan explained,

> *"...we really wanted to win that because that would mean every time they sold this, we would get a little piece of it. It was an OEM project...That would have been a very large software deal if it closed...".*

791. Although Project Bluejay did not ultimately result in an OEM deal, the Defendants relied on it as exemplifying the sort of collaboration which Autonomy's reselling of Dell hardware was intended to support. They relied in this regard also on the following exchanges:

(1) An email dated 19 November 2009 from Mr Craig Irons of Dell to his colleague Mr Bob Barris, introducing him to Mr Sullivan. His email explained that Mr Barris was *"Dell's Vice President of Sales responsible for the Financial Services vertical in New York"*, and it emphasised the benefits both sides could obtain from collaboration:

> *"As you and I have discussed Dell Product Group is currently engaged in strategic partnership discussions with Autonomy (Zantaz' parent company). As those discussion continue I thought it might make sense for you and Mike to know each other as much of Autonomy/Zantaz's enterprise search, archiving, and ediscovery market leadership resides within the financial services community. As*

HC-2015-001324

> *such there may be great synergies available to both*
> *you and Mike if you were to begin collaborating*
> *within the finserv vertical."*

(2) In an email sent at the time, Mr Egan described some of the benefits of
the reselling arrangements with Dell as follows:

> *"Regarding the Dell/reseller deal:*
>
> *-   This is a purely commercial deal done on a lost*
> [sic., loss] *leader basis by Autonomy.*
>
> *-   We gain greatly by seeing faster adoption of our*
> *software and we view Morgan Stanley as one of the*
> *fastest innovators in the space.*
>
> *-   Dell appreciates the relationship and it greases*
> *the process of lucrative OEM bundling of Autonomy*
> *software on Dell kit. This is strategic and we pride*
> *ourselves at getting our OEMs to move fast and adopt*
> *IDOL as a standard. When they have front row seats*
> *to the level of usage of our software in a prestigious*
> *account like MS they move faster on OEM decisions."*

(3) Emails from March 2010 demonstrated that discussions continued
between Dell and Autonomy (run on Autonomy's side by Mr Sullivan
and Mr Matt DeLuca, not Dr Lynch) regarding a strategic partnership
between the two companies. Mr Mollo of Dell stated that "*The intent is
to get a strategic partnership arranged in several key areas short and
long term*" and referred to the intended relationship with Dell as a
"*strategic and important partnership.*"

792. Autonomy's collaboration with Dell continued until HP acquired Autonomy.
An email of 17 August 2011 summarising "*Dell recent activities*" dealt with
discussions about Autonomy as a "*GTM [go to market] partner*" for Dell with
respect to eDiscovery and Cloud, noting that the Dell Software Partner
Management Team was "*engaged at highest levels*", and that this was *"key
because insistence from Dell HQ we will be promoted by Dell sales will be very
helpful in our relationship building in the field."*

793. While the principal focus was on EMC and later Dell, Mr Sullivan explained in
his evidence in the US criminal proceedings that Autonomy also worked on a
strategic relationship with Hitachi/HDS:

> *"Q.    And you were working on a similar strategic*
> *relationship with Hitachi at that time, weren't you?*
>
> *A.    Yes. A little different but, yes."*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

794.    By way of example, in 2010, Autonomy partnered with HDS on a proof of concept for Morgan Stanley. The proof of concept involved running HDS's software – Hitachi Content Archive Platform – using IDOL, rather than Microsoft's FAST. The parties sought to showcase this product to Morgan Stanley, as a replacement for Morgan Stanley's existing third-party product:

> *"The purpose is to show Morgan Stanley an archive platform that has the strengths of Hitachi storage coupled to the advanced features of the IDOL index as well as the ability to plug this solution into Morgan's existing IDOL implementation. The instance of IDOL running on HCAP can be easily "connected" into other IDOL servers, providing an immediate link between the HCAP data and the existing Autonomy solution-set. This is a far cleaner solution than inserting an archive platform that runs a different index application (i.e. MSFT FAST)."*

795.    Throughout 2011, Autonomy continued to work with HDS, and its parent, Hitachi Data Systems, on promoting each other's products to customers. Autonomy secured an OEM agreement with Hitachi Data Systems just prior to the HP acquisition. The deal envisaged Hitachi OEM-ing Autonomy technology into its own enterprise search and storage solutions and reselling the solutions to customers.

796.    In summary, the Defendants depicted Autonomy's relationships with EMC, Dell and Hitachi as having been intended to enhance Autonomy's relationships with key suppliers, enable it to provide its own customers with a one-stop and complete solution, and protect it against the threat posed to it, given its focus on software, if appliances did become the preferred means of providing software. They urged that the programme should be regarded as a commercially rational way of protecting and promoting Autonomy's software business.

### *(5) The Defendants' further evidence as to the use and success of the programme*

797.    As to what the Defendants claimed was the networking effect of the hardware sales and the potential that offered of leveraging into far more valuable software deals, Mr Hussain's closing submissions focused especially on Autonomy's dealings with UBS.

798.    Mr Hussain provided the following chronology in support of this:

> (1) After unsuccessful attempts by Autonomy in December 2009 to sell a Legal Hold software product to UBS, Mr Egan approached Mr Dominic Lester (UBS's head of EMEA Technology) the next quarter with a proposal to resell to UBS $10 million of Dell hardware, fishing for an introduction to UBS senior IT people (with whom Autonomy had no existing relationship).

(2) Although the initial proposal came too late (UBS had already contracted directly with Dell) Mr Lester was sufficiently interested to arrange a meeting between Mr Hussain and Mr Sullivan for Autonomy and senior managers in UBS's procurement team (Mr Jaffrey and Mr Dille) which took place in February 2010.

(3) In Q2 2010, Autonomy as reseller sold $6.3 million of Dell hardware to UBS via another reseller, Metro (which is one of the 'pure hardware' transactions alleged to have been fraudulent). Until then Autonomy had not sold UBS either any hardware or any significant software.

(4) In May 2010, Dr Lynch met with Ms Michele Trogni (the UBS Group CIO) *"to discuss [Autonomy's] vendor relationship with UBS"*, following which two telephone conferences were arranged: (a) the first was *"to introduce [Autonomy] to Senior Management within our Compliance Group and for [Autonomy] to provide an overview of their compliance solutions and views on industry best practices"* and was to be attended by the senior technology officers from UBS's London and Zurich offices, including the Global Head of Compliance and the Group Chief CIO ; and (b) the second, which took place on 10 September 2010, was for Autonomy to present its offerings for archiving and e-Discovery, and was attended by even more senior UBS personnel, including the Global Heads of IT (Contracting and Shared Services), of Legal and Compliance IT and of Strategic Planning.

(5) In Q1 2011, Autonomy and UBS began negotiations in which Mr Jaffrey of UBS was closely involved for the software deal that Autonomy had (until now unsuccessfully) been trying to interest UBS in since Q4 2009; and on 20 July 2011, UBS entered into a master agreement with Autonomy and made a supply order pursuant to that agreement for a package of software including ACA, DS Mail Supervisor and Legal Hold. The licence fees totalled $13,585,860.

799. Mr Hussain submitted in his written closing submissions that:

> *"...the chronology shows that the hardware sales, and proposals for hardware sales, in 2010 were the means by which Autonomy was introduced to and built relationships with the bank's key technical and procurement officers. These were the individuals who would decide what software UBS would buy, and it was the hardware sales that put Autonomy on their radar. As a result of selling hardware at minimal cost, Autonomy was able to close a high margin US$13 million sale of its flagship software."*

800. Other evidence put forward by Mr Hussain of hardware sales being used to facilitate software sales or oil the wheels of a desired or difficult relationship included:

(1) An email from Mr Sullivan to Messrs Hussain, Menell and Egan dated 16 September 2009 sent after receiving a forwarded serious complaint from Citi about deficiencies in Autonomy's provision of support for e-Discovery software supplied to Citi's subsidiary, Primerica. The complainant had stated in an email to Mr Hussain and others that the deficiencies had caused him to question whether he was *"going down the correct path"* in proposing to buy software from Autonomy and that he could not recommend that course to *"Tony DiSanto CTI Head North America and the guy I have to convince we should be buying Autonomy products"*. Mr Sullivan wrote that *"Toni DiSanto is also at least in the loop on our EMC deal with Citi. Pete – I will call to share some thoughts and some history…"* It was submitted on behalf of Mr Hussain that this showed that (a) earlier hardware sales to Citi had the attention of the bank's key procurement officer and (b) Mr Sullivan considered, or at least hoped, that this would influence the general relationship for the better, and translate into software deals then under discussion[146].

(2) An internal Autonomy email dated 5 August 2009 (cc Mr Hussain) from which it appears that Autonomy sold discounted hardware to SJ Berwin Solicitors to facilitate the migration to Autonomy from Vivisimo, a competitor.

(3) Three discounted hardware sales to Citi in March 2010, August 2010 and December 2010: (a) the first to encourage Citi to proceed with a proposal in relation to email management; (b) the second, a discounted sale of storage cells to persuade Citi to persist with Digital Safe after "relationship problems"; and (c) the third, a discounted sale of storage cells to facilitate negotiations for the data migration to Digital Safe from Iron Mountain.

(4) An email dated 29 June 2011 from Mr Egan to Mr Mooney outlined the strategic advantages of Autonomy agreeing to act as a reseller for SGI in return for SGI embedding Autonomy software[147].

(5) An email dated 20 December 2010 from Mr Egan to Mr Dan Manners of Deutsche Bank from which it appears that Autonomy offered Deutsche Bank discounted hardware to encourage the bank to sign off on a deal for the IDOL-isation of its Digital Safe.

---

[146] It appears from an email dated 17 October 2009 from Mr Robert Mark to Mr Hussain that Autonomy was pursuing two software deals with Citi in Q4 2009, one for the migration of Citi data from Iron Mountain to Zantaz and the other an EAS deal. The same email also suggests that a 23% hardware discount was to (in effect) be compensated by a higher maintenance fee.

[147] Which Mr Egan depicted as not only initiating a *"strategic sale relationship into the Federal space where we have decided to invest heavily"* but also (and illustrating the dual purpose) *"to sell with SGI and work to add HW to our book of business and add SW to SGI in a lucrative quarter."*

801.    Mr Hussain contended that these were merely documented examples of the type of dealings between Autonomy and its customers and suppliers. He suggested that *"based on Mr Egan's and Mr Sullivan's evidence, [they] happened all the time in face-to-face meetings and by telephone…"* He supported this with the following:

(1) Mr Sullivan informed HP after the Acquisition that his *modus operandi* was to negotiate the initial discount with the hardware supplier and that, on at least some occasions, this would be followed by direct negotiations with the customer.

(2) Mr Hussain offered two examples from the evidence to support this. Thus, in March 2010, Mr Sullivan met representatives of Bank of New York Mellon to discuss the possibility of Autonomy supplying it with Dell hardware. On 10 June 2011, Mr Sullivan informed Mr Hussain that he was engaging directly with JPMC's procurement team to offer them direct incentives in relation to hardware sales.

802.    Such or similar conversations were relied on also by Dr Lynch, whose evidence in his supplemental witness statement was that in seeking to encourage BofA to enter into a software sale before the end of Q4 2010 he had had *"several private conversations"* with a senior director of BofA, Mr Simon Mackenzie-Smith (then head of BofA in London) when he:

> *"sought Mr MacKenzie-Smith's assistance in encouraging the bank's procurement team to prioritise the deal, [and] emphasised that Autonomy was a big supplier of software and hardware to the bank."*

803.    However, this was not accepted by the Claimants. They urged me to reject this on the footing that it was unsupported by documentation or by any witness evidence from Mr Mackenzie-Smith, had not been referred to in any communication in the period and had not been mentioned by Dr Lynch in his first witness statement. For reasons I have set out later in this Chapter (see paragraphs 1143 to 1155) when dealing specifically with the BofA transaction in question, I have concluded that whatever discussions there were, and even if Dr Lynch did in passing mention the previous discounted hardware sales, the mention of them had no immediate or discernible effect. The evidence of Mr Reagan Smith, who was negotiating the deal for BofA, was to the effect that he had never heard of any such discounted sales, and accordingly they had no influence on the negotiations at all.

804.    Another point made in Dr Lynch's written closing submissions in seeking to show that Autonomy was discriminating in its hardware sales was that Autonomy was not prepared to take hardware sales where they did not fit with the strategy explained above. There was some factual foundation for this. For example, the evidence appeared to show that Autonomy was not interested in the revenue that could have been obtained from providing services to EMC customers – even pass-through services where the obligation to provide services would be passed on by Autonomy. It refused to provide services despite some pressure from EMC: as Mr Hussain wrote at the time, "*I don't want us fronting*

*any of the services on behalf of EMC. If it means the deals disappear then I think we have to accept that*"; and he persisted in this position even after Mr Sullivan gave his view that a refusal to provide services "*will be a disaster. All the deals will go away and we will ruin our relationship.*"

805. Dr Lynch submitted that had the aim of the strategy been to drive revenue, Autonomy would not have taken this position; and that if it had been pursuing revenue as an end in itself, it would not have confined its hardware sales to its actual or potential software customers: it would have sold to any company that was prepared to buy discounted hardware. The Defendants relied in this regard on an analysis prepared for Deloitte in January 2011 which had shown that 75% of the hardware sales in the period Q3 2009 to Q4 2010 were made to software customers of Autonomy who entered into large software deals in 2009 and 2010.

806. Dr Lynch accepted that the sales gave Autonomy a small secondary source of revenue; but he was adamant that there is nothing improper in that. As mentioned previously (see paragraphs 633 and 728 above) he accepted that the hardware sales gave Mr Hussain a degree of flexibility that he would not otherwise have in meeting targets and plugging any gaps in revenue: but he presented that as a perfectly legitimate benefit. Autonomy's 2010 Annual Report made clear that one of the risks which the company faced was "*fluctuations in results due to quarterly reporting, and variability in results due [to] late-in-the-quarter purchasing cycles common in the software industry*" and that to mitigate that risk it engaged in "*Close management of sales pipelines on a quarterly basis to improve visibility in results expectations.*"

807. Dr Lynch added to this the consideration that not only were hardware sales logistically complex (as explained by Ms Harris, see paragraph 730 above), but also it would have been counterproductive for Autonomy to use loss making hardware sales as a tool in a scheme to inflate its revenues and to portray itself as a "*a high-margin software company whose revenues were growing rapidly*", as the Claimants allege. The strategy depressed rather than inflated Autonomy's margins, and other metrics that were important to investors and analysts. In short, whilst headline revenue was increased, profit margins were eroded, as also were critical valuation criteria such as earnings momentum, organic revenue growth and cash generation/flow. The point relied on by Dr Lynch was illustrated by calculations, which were put to Dr Lynch in re-examination. These showed that Autonomy's organic revenue growth would have been significantly higher if the hardware transactions were stripped out, both for Q2 2011 and H1 2011 (in each case, compared against the equivalent period the previous year).

808. Thus, the Core Business Organic Growth Rate Calculation in Autonomy's interim results up to 30 June 2011 gave growth rates of 15% (Q2 2011) and 17% (H1 2011). Adjusting these figures to remove the "pure hardware" sales listed by the Claimants in Schedule 1 of the RRAPoC, those figures are increased to 28% (Q2 2011) and 21% (H1 2011). Of course, according to the periods compared, different results going the other way may be obtained: and the Claimants cross-examined Dr Lynch on such different comparisons. But the Defendants contended that the point endured that, in the key period before the

acquisition, organic growth increased if hardware was stripped out; and that if hardware sales were a ruse, as the Claimants claimed, artificially to inflate the apparent value of Autonomy, then according to those valuation criteria, it backfired.

809. All relevant witnesses had to accept (though some were reluctant) that stripping out hardware would have increased profit margin and cash generation/flow, as did HP's investigating accountants Ernst & Young in 2012. Thus:

(1) Even one of Autonomy's then harshest critics, Mr Morland, accepted (eventually) when cross-examined that higher growth rates would have given a higher valuation (though he also stressed that the decrease in sales would have exerted downward pressure which he considered to be greater).

(2) Mr Apotheker, somewhat obstinately and ultimately unsuccessfully, cavilled against this conclusion in cross-examination; and in particular, he initially sought to maintain and defend a point that he had made in his witness statement that but for the hardware sales Autonomy would not only have been a smaller company in revenue terms (which is obviously true) but also that it would have had *"significantly lower profit margins"* (which almost equally obviously is incorrect in circumstances where, as was common ground, Autonomy's accounts did include all losses and costs of hardware sales, and the issue is whether the separate source should have been disclosed).

(3) Mr Giles made a similar point: "*Without hardware sales – which were loss-making – the Autonomy business may have lower revenues, but it would have generated more profits and more cash.*"

(4) Mr Pearson explained that "*because Autonomy's hardware sales were made at a loss, the sales actually depressed Autonomy's cash flow, profit and EPS. Given EPS was the key valuation driver, these sales would more likely have the effect of reducing Autonomy's value, not increasing it.*" In his view, a missed earnings target was more likely to have an adverse impact than a missed revenue target, and loss-making hardware sales would only make it more difficult for Autonomy to hit its earnings target.

(5) Ernst & Young reached a similar conclusion in December 2012, in its paper addressing "*our considerations of the allegations on the original valuation of Autonomy at Q4'11*":

**"*Gross treatment of hardware pass-through***

*The Autonomy standalone hardware sold in FY 10 and FY11 (prior to acquisition (January – September)) was roughly $105 million and $85 million respectively. Having evaluated ASC 605-45-15 – Principal Agent Considerations Management concluded that the majority of indicators support net accounting treatment.*

> *While this does impact the presentation of the income statement we do not believe these items have an impact on the "run-rate" cash flows of the business. <u>Since Autonomy sold the hardware at a loss, these transaction reduced cash flows</u>. Alternatively, HP may have considered different growth rate assumptions Therefore, it is unclear as the impact on HP's used DCF valuation model that was used to estimate a fair value of the Autonomy business."*

810. Pausing there briefly, the mathematical logic that loss-making sales will reduce gross margin seems clear. However, I shall return later to discuss whether that correlation was a disincentive to using hardware sales as a means of enabling Autonomy to generate revenue or an incentive to the Defendants devising ways in which to account for hardware sales so as to attenuate the adverse effect (in particular, as will be seen, by inventively accounting for the costs).

811. Returning to the Defendants' presentation, and lastly under this heading, and in relation to the Claimants' point that the Defendants' presentation of the rationale of the hardware reselling strategy lacked any documentary support, I should deal with a dispute about a document which was uploaded onto the trial Magnum system only after the conclusion of the evidence. The document comprises an email exchange on 2 September 2009 between Dr Lynch and Messrs Egan, Hussain and Dr Menell, with the subject heading *"key customer strategy"*.

812. The Defendants relied on this email exchange to underpin their case as to the challenges which Dr Lynch explained the hardware reselling strategy was meant to address, and to contradict the Claimants' point that the explanation had no documentary support. But what Mr Miles described in his oral closing submissions as *"an important document in the case"* the Claimants sought to dismiss as *"pretextual"* and in any event, in its singularity or egregiousness, simply demonstrative of the dearth of documentary evidence supporting the Defendants' case.

813. The exchange is thus of some relevance (a) for what it says, (b) as to whether it was indeed contrived or pretextual, but also (c) as another litmus test of the honesty of the Defendants and the reliability of the record they have put forward.

814. The first in the thread was an email from Dr Lynch to Mr Egan, Mr Hussain and Dr Menell which the Claimants depicted as pretextual:

> *"As we have achieved scale in a set of major accounts such as Bloomberg, Citi, jpmc etc and are dealing at CIO level let me make it clear I am happy to supply these firms with the full turnkey package in order to maintain key supplier status    sw hw services etc so we cement our vital key supplier status. This is so strategic and valuable in the long term that even if a sub component of this strategy is at a loss that is fine  overall keeping the strategic nature of the relationship will pay dividends."*

815.    Mr Egan responded as follow:

> *"Agreed, as evidenced by the continued orders from JPMC etc for extended areas of software that in part come from our status as large scale and strategic supplier."*

816.    The Defendants relied on this exchange as encapsulating and demonstrating the fundamental aspects of the rationale for the programme, that is (a) consolidating relationships with hardware suppliers and (b) consolidating and developing relationships with key customers such as Bloomberg, Citi, JPMC and the like, as the means of (c) protecting and promoting Autonomy's software business.

817.    The Claimants sought to interpret the reference to a *"full turnkey package"* as a reference to appliances; but Mr Miles in his closing submissions rejected this and insisted that it was a reference to *"the full series of suppliers: software, hardware, services, etc."*

818.    Of course, that interpretation was Mr Miles' gloss; and in that regard and more generally, the Claimants invited me to discount the document in any event on the ground that it had been put forward too late for any examination of witnesses about it. But Mr Miles pointed out that the document was in the Claimants' own disclosure, and although lately uploaded onto the Magnum trial bundle, it had always been part of the wider *'corpus'* of disclosed and available documents. He submitted that, on that basis, if they considered the emails in question to be, or wished to explore whether they were, pretextual they should have identified them and then cross-examined the respective authors of each email to give him the opportunity to deal with any doubt as to its meaning, any contention as to its authenticity, and any insinuation or allegation that it had been contrived to *'paper the record.'* They had not done so, and should not now be heard to make any such contention or allegation.

819.    Eventually, and as foreshadowed above, the Claimants' substantive response was that:

> (1) The simple fact that this is an example of only one or two documents that Dr Lynch has been able to find undermines rather than supports his contention as to the purpose of the hardware program being a marketing one;
>
> (2) Especially having not (as they put it) had the opportunity of cross-examining Dr Lynch, it cannot, in the context of $200m worth of hardware being sold in the Relevant Period, alter the conclusion to be drawn from many contemporaneous documents passing between them that the primary purpose of the programme was revenue generation rather than anything else;
>
> (3) Furthermore, the email was "pretextual", in that (so they alleged):
>
>> i.    it was sent "out of the blue" by Dr Lynch to his core management team but notably not Mr Sullivan: there was no need for Dr

Lynch to convey his thoughts in this way, unless the email was designed for some ulterior purpose;

ii. it is wholly uncharacteristically formal in content and style and it reads as if it is designed for the record;

iii. its factual basis is contrived: Autonomy was not dealing at CIO level in relation to these hardware sales, which were instead co-ordinated and brought to Autonomy by EMC. Nor is there any documentary support for any dealings taking place between Autonomy and the customers at CIO level in relation to these pure hardware sales;

iv. Autonomy finance department needed something to persuade Deloitte to allow Autonomy to account for these hardware sales how they wished, and the strong inference is that this email was part of that process and designed to put in place a paper trail.

820. In response to those submissions of the Claimants that both emails of 2 September 2009 were pretextual, Mr Miles submitted in his oral closing that:

(1) In order to accept that it was a pre-textual email, it would be necessary to *"postulate someone you're trying to fool"*: whilst the Claimants had contended that Deloitte was the intended audience, the email in question was not the sort that would ever go to Deloitte, nor is there anything to suggest that Deloitte would ever have asked or looked for emails of this kind; and there was no evidence that it had been shown to Deloitte;

(2) Contrary to the Claimants' suggestion, there is evidence of dealings at CIO level. Mr Miles cited an email chain from 17 July 2009 to 22 July 2009:

(3) This began with an email from Mr Sullivan to Mr Hussain, Mr Egan and Mr Mooney stating:

> *"We want to identify our mutual large customers where we can become their EMC reseller. This will be the easiest path. DB, Citi, & JPMC are very large customers. Who are our highest level contacts there? What other companies do we have at CIO level contacts with that we can leverage?"*

(4) Mr Egan's response stated:

> *"Updated*
>
> *Morgan Stanley-Not so good as we alreayd [sic] have Hitachi thing going and Morgan expressed their preference ot [sic] us so I would not involve EMC*
>
> *Eli Lilly-Perfect, My relationship is with Mike Heim, CIO GSK-Perfect, Ingo Elfering, VP IT Strategy at GlaxoSmithKline SOC Gen-*

> *BofA- I'm going to get you a name of a guy I haven't met yet*
> *but who knows us and of me well.*
> *Apple-Dounbt they buy EMC*
> *AT&T-Not mine*
> *Bloomberg-Tom Secunda, Co founder and chief of technology*
> *Bayer-William (Bill) Dodero, GC US*
> *MacAffee-Ron Wills, Associate General Council, and Dave*
> *Dewault CEO (former EMC) May be very tight with Billy or*
> *they may not get along??*
>> *1. JPMC- We are close to Larry Feinsmith, Paul*
>>    *McEwen, Fernando Castenheira, and Guy Chiarello*
>> *2. Deutsche Bank-Firstly, let Billy know we could team*
>>    *up on the Storage Buy Back RFP at DB coming from*
>>    *Rolf Riemenschnitter and Chares White. I know*
>>    *Charles White very well. Dan Manners is also a big*
>>    *champ and recently promoted…"*

All this was consistent with the emails in question.

(5) Although in other contexts, Mr Egan had accepted that he had concocted, and had accused others of, concocting pretextual documents[148], this was not such a context, and he accepted when cross-examined in these proceedings that he could not point to any evidence to support the assertion as against Dr Lynch and, furthermore, had not suggested any such thing to the US Grand Jury some time earlier than his witness statement.

(6) In fact, the emails are consistent more generally with the evidence of Mr Egan in these proceedings, to the effect that the hardware sales had benefitted the software selling by the company and that was their purpose: there was no reason to think that he was being pretextual in what he said.

(7) Mr Miles also submitted that, despite only being uploaded to the electronic repository of documents for this trial after Dr Lynch's evidence, the email was disclosed by the Claimants years ago and was part of the Claimants' disclosure so that they did have the opportunity to cross-examine him on this document. If the Claimants had wished to characterise the document as pretextual they should have said so and cross-examined Dr Lynch about it. It was not open to them now, having themselves disclosed the document and not tested Dr Lynch, to contend that the document was false and dishonest.

---

[148] In his evidence in these proceedings, and in the US criminal proceedings, Mr Egan accepted that he had, and he accused others of having, concocted pretextual documents in the context of (a) reciprocal transactions to give apparent credence to Autonomy's stated need for the product it was purchasing; and (b) a transaction with Capax to provide EDD services (as to which see paragraph 1963(2) of this judgment) to give the appearance that the services were actually being provided by Capax (though it is the Claimants' case that they were not).

821.    I accept that the email exchange was curiously and uncharacteristically formal. But I doubt that either Dr Lynch or Mr Egan would have thought to leave a confected exchange of emails in case of litigation, kept the exchange away from view and then contrived to pull it out of a hat in court late in the day. I have not been persuaded that the exchange was pretextual. As to its introduction into the trial bundle after cross-examination of Dr Lynch had concluded, both sides share the 'blame' (though the word is too strong for an oversight in respect of one document amongst 11 million or so). As a document in their own disclosure, the Claimants must be taken to have accepted its authenticity as a document; and though that does not, in my view, extend to accepting that its content was not pretextual, if they wished to allege that it was, they should have identified it and put it to Dr Lynch if they perceived he would rely on it.  However, even though it was in the Claimants' disclosure, if Dr Lynch wished to rely on it, it was for him and his advisers to see to it that it was included in the bundle in good time.

822.    In such circumstances, I will not exclude the exchange; but I will take into account in weighing its effect that it appears to me somewhat contrived; and having had no opportunity to see whether Dr Lynch would be able to dispel that prima facie impression I cannot attach to it such importance as Dr Lynch at a very late stage came to place on it.

### (6) The Defendants' case that the strategy was not secret nor the revenue disguised

823.    The Defendants also submitted that if there had been an illegitimate scheme to inflate revenue, it would have been carefully concealed: but they were adamant that it was not.

824.    The Defendants contended that, on the contrary, the sales were (a) widely discussed within the company and (b) fully disclosed to and reviewed by Deloitte and the Audit Committee.

*Discussion within Autonomy itself*

825.    The Defendants submitted that the strategy and the hardware sales were well known within the company, and that there is no evidence that Autonomy concealed or attempted to conceal either.

826.    Mr Sullivan explained that when the hardware reselling strategy was discussed and formally launched at the Loudham Hall meeting in July 2009, there were at least 10 people present; and he said that the sales were well known within the company. Dr Lynch's evidence in his first witness statement was that *"a wide group of people knew about Autonomy's hardware sales, including employees, customers and suppliers."*

827.    The hardware sales were recorded separately in Autonomy's ledgers, were open to analysis (including being made available to HP after the acquisition), and would inevitably have been discovered by a future purchaser.  In this regard, Ms Harris noted that:

> "*The ledger codings clearly separated hardware sales and costs from software. For example, 47000 referred to hardware revenue, 57000 referred to the cost of hardware, and there was also a specific marketing code for hardware costs attributable to sales and marketing.*"

828. Mr Sullivan said that he had "*never concealed [the fact that Autonomy was selling hardware] and never thought there was a reason to. In fact, I tried to make it clear.*" When asked whether he had been told to tell customers that Autonomy was reselling discounted hardware, he answered:

> "*Absolutely. In fact, it actually said that in the contracts and it said it in all the POs.[149] Or most of the POs I should say…*"

When asked whether as regards the EMC and Dell transactions he told the customers that the sales were part of a marketing programme, he unequivocally answered *Yes"*.

829. Mr Egan (who also had attended the Loudham Hall meeting) was aware of the hardware reselling strategy, though not its detail. So was Ms Gustafsson/Prentis. As I shall come back to in explaining the Audit Committee's understanding, Mr Bloomer did not regard the hardware sales as a secret: the topic was regularly and openly discussed during his tenure as Chairman of the Audit Committee, as also Mr Webb confirmed.

830. Understanding of the extent and purpose of the hardware sales programme, however, was, leaving aside the Defendants, Mr Sullivan and what I have termed the clique or cabal of three (see paragraph 833 below), much more limited. The lack of any minute or other record of the Loudham Hall meeting has made it difficult to determine exactly what was stated there to be the purpose, save as it has years later been presented to have been by Dr Lynch. However, given that at that meeting hardware sales of $5 million to $10 million were envisaged to be something of a stretch, I suspect that when the far greater potential had soon become clearer[150], the true purpose may have changed, and become understood only by the few in control of the strategy, and, in particular, the clique or 'cabal'.

831. For example, as will be apparent from my later discussion of Mr Egan's evidence in the context of the SHI/BofA transaction in Q1 2011 (see paragraphs 1140 to 1155 below) that by then at least he had lost touch with the programme, which was being conducted by Mr Sullivan; and his evidence in his witness statement, which on this point was not challenged or unsettled in cross-examination, was that as a general matter he "*did not know which companies had purchased hardware from Autonomy or how much third-party hardware was being sold…*" and usually did not know of hardware sales to his software

---

[149] Purchase Orders.
[150] This became clear by mid-July 2009 when, after approaching EMC, Mr Sullivan reported to Dr Lynch and Mr Hussain by email dated 15 July 2009 that he had already got verbal commitments for up to $20 million of hardware and could "*probably get twice that if you want*" (see paragraph 782 above also).

companies (so that he could not *"use the fact of a prior or contemporaneous hardware sale to promote the software sale that I was trying to make."*)

832.    Ms Gustafsson similarly made clear in her witness statement that her understanding was that *"Autonomy's hardware sales were fairly limited and made available only to key customers"* (though it may be noted that her understanding was that these sales were *"with the genuine commercial purpose of maintaining a customer relationship and generating further software sales"*).

833.    The overall impression I have formed was that though hardware reselling was not a secret, and nor were there any efforts to keep it so, the hardware reselling strategy had a very low profile within Autonomy. It was directed by the small group I have called the 'cabal' and Dr Lynch, and implemented almost entirely by Mr Sullivan, without any substantial discussion or coordination with Mr Egan or anyone else involved in software sales. The email exchanges concerning the details and targets of hardware sales appear to be almost entirely confined within that group. It does not appear from the evidence that, beyond that small group, it was a matter which aroused either interest or concern. That in itself may be indicative of the fact that the hardware reselling strategy had very little day to day nexus with the mainstream software business.

*Disclosure to and review by Deloitte and the Audit Committee*

834.    However, there is no dispute about the fact that the nature and extent of Autonomy's hardware sales were fully disclosed to Deloitte and scrutinised in detail. Deloitte had detailed knowledge of the sales and their avowed purpose; and the fact and avowed purpose of the hardware sales programme was also explained to the Audit Committee.

835.    I am aware that the successive lead partners, Mr Knights and Mr Mercer, have been severely criticised in a FRC Report in disciplinary proceedings, where it was determined that their approach was insufficiently sceptical, and their ultimate judgments were flawed. [151] But that does not signify that the audit process, as distinct from the judgements made by lead partners, was deficient. The evidence before me revealed a very careful and open audit process, with full cooperation in it by the finance department and all concerned within Autonomy.

836.    Mr Bloomer statement in his witness statement that he *"found Deloitte to be thorough and diligent in their audits"* was not challenged; and their reports struck him as *"detailed, open and direct"*.

837.    Ms Gustafsson stated in her witness statement that she considered that the process was thorough and robust. Subject to the caveat I mention below as to

---

[151] I should clarify that although tempted to do so, I have not read that report. At a virtual hearing in February 2021, submissions were made to me on behalf of the Claimants that I should do so; that was opposed by the Defendants. I was not asked to state a decision and did not do so. However, I determined privately that, notwithstanding the eminence of its authors and its status more generally, I should not take account of what was and is opinion evidence, even if akin to expert evidence, which I should not accept collaterally nor weigh with or against the expert evidence admitted and tested in these proceedings.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

whether Mr Knights and Mr Mercer lost objectivity and the requisite degree of scepticism[152], I would accept that.

838.   I also accept her unchallenged evidence that throughout the audit, Deloitte (who were often on-site at Autonomy) had unfettered access to all Autonomy's files and to the finance department functions and its sales and technical teams. It is a fair inference that the Defendants would have expected any accounting records relating to the hardware reselling to be carefully scrutinised.[153]

839.   In cross-examination before me, Mr Welham confirmed the truth of the following evidence he had given in the US criminal trial against Mr Hussain:

> "Q.   ...From 2009, 2010, and 2011, Deloitte knew that Autonomy was reselling EMC and Dell hardware; correct?
>
> A.   Correct.
>
> Q.   And Deloitte, the Deloitte audit team, knew how much hardware Autonomy was reselling; correct?
>
> A.   Yes.
>
> Q.   Probably down to the penny? I mean did you know exactly how much hardware was being sold?
>
> A.   We would test the majority of the hardware transactions. They would have good – good level of understanding, yes.
>
> Q.   And Deloitte knew that Autonomy was reselling the hardware at a loss; correct?
>
> A.   Yes, for the most part.
>
> Q.   And Deloitte also knew that some of the hardware that Autonomy was reselling was sold without adding any software to it?

---

[152] They may also have lost their way in their response to Mr Hogenson's letter and its aftermath.

[153] However, a gloss on that is important, especially since I understood the Defendants occasionally to take the inference as extending to an expectation that all Autonomy's correspondence would also be open for review. Such an extended inference would not be justified. There were various instances, of which the clearest was extended correspondence between Mr Sullivan and EMC (see paragraph 773 *et seq* below), in which it was clear that Deloitte had not seen or sought to see emails. The impression I have gathered is that, in terms of documentation, Deloitte confined itself to accounting records and neither they nor Autonomy expected Deloitte to be shown or seek out Autonomy's internal or third party emails unless Autonomy chose to copy them.

> A.    Correct.

> Q.    Deloitte knew that Autonomy was reselling hardware
>       through hardware resellers as well; correct?

> A.    Correct.

> Q.    And all of this was known to and discussed, not only with
>       the Deloitte audit team, but also the audit committee and
>       the board as well?

> A.    Correct."

840.    Mr Welham summarised what Deloitte understood the purpose of the
programme to be in cross-examination in the US criminal proceedings as
follows[154]:

> "Q.    Deloitte, the Deloitte audit team, understood
>        Autonomy's strategic rationale for selling this hardware
>        at a loss; correct?

> A.     Yes.

> Q.     And is it fair to say that in the third quarter of 2009,
>        management explained that Autonomy wanted to meet
>        existing and potential customers' demand for one-stop
>        shopping?

> A.     Yes.

> Q.     In other words, to be able to supply hardware along with
>        software?

> A.     Yes.

> Q.     To big customers?

> A.     Yes.

> Q.     Like the banks?

---

[154] This was in a sequence of questions and answers, the first part of which is quoted in paragraph 839 above. In cross-examination in these proceedings he confirmed the truth of what he had said.

> A.    Yes.
>
> Q.    And Autonomy also wanted to develop a relationship in
>       Q3/2009 with a particular hardware supplier, EMC;
>       correct?
>
> A.    Yes.
> ...
> Q.    And in sum, you understood that big picture, Autonomy
>       was selling hardware at a loss to increase its software
>       sales down the road; correct?
>
> A.    Correct.
>
> Q.    And the audit team, applying your professional
>       scepticism, you considered and you challenged
>       Autonomy on that rationale; right?
>
> A.    Yes.
>
> Q.    But in the end, you weren't aware of any evidence
>       contradicting management's explanation for the reason
>       for why they were doing these sales; right?
>
> A.    Correct."

841.    Mr Welham agreed with the following comments made by Mr Mercer in an
interview with the FRC about the use of hardware sales as a means of driving
software sales and in cross-examination, he confirmed that they accorded with
how he saw things at the time:

> "Yes, I think the most important background or context to make
> on hardware is that Autonomy had no desire just to sell
> hardware. This was not a different business. This was not
> something that they were doing as an end in itself. _The only
> reason they ever sold hardware was to sell more software.
> That's massively important_ to get that understanding for all the
> questions that you – the two or three questions that we need to
> concentrate on.
>
> We were – Richard was and I was completely aware that
> Autonomy did not want to sell hardware as an end in itself. They
> were conscious that some of their competitors were offering
> hardware and software and combinations thereof. They were
> conscious that the marketplace was becoming ever more

> competitive.   They didn't want to lose out on software sales
> because their offering was short of this area."

[My emphasis]

842.    Mr Welham also confirmed the statement in the Deloitte Defence in the FRC
Proceedings that Deloitte considered that the motivation for the hardware sales
as being to drive software sales appeared commercially plausible, and after
consideration was accepted as such by the Deloitte audit team.  He gave the
following evidence:

> *"Q.    But the audit team's position was that there was no
> problem as such with Autonomy selling hardware for
> strategic reasons and that also what is called their plain
> vanilla hardware sales are also okay?*
>
> *A.    Yes."*

843.    In the absence of evidence from any other of those involved in Deloitte, I take
and find that to be Deloitte's understanding, as well as Mr Welham's own, of
the purpose of the hardware reselling strategy. That is reinforced by what
Autonomy's management told Deloitte in discussions on the connected issue of
the allocation of the costs of hardware sales (see paragraph 1262 *et seq.* below).

844.    In summary, I consider and find that Deloitte understood from the material they
had:

(1)    The full extent of the hardware sales, the terms on which they were
contractually undertaken and the identities of all suppliers and end-
customers concerned;

(2)    That the strategy included, indeed largely comprised, the sale of
hardware without Autonomy software;

(3)    That the effectiveness of the strategy in marketing terms was largely a
matter of assertion without documented analysis (except the *"Linkage
Analysis"* as to which see below);

(4)    The typical structure of hardware sales, including the introduction of
Autonomy into existing transactions and the payment by Autonomy of
subsidies to end-users, resulting in a loss to Autonomy because the price
it paid to the hardware suppliers exceeded the net (of subsidy) price it
received from end customers;

(5)    That the finance department repeatedly demonstrated their
determination that no distinction be drawn between that revenue and
revenues from Autonomy's IDOL Product core business, and that the

revenues were combined when described in Autonomy's published information.

845.    In my judgment, Deloitte did not understand (or perhaps, through Mr Knights, chose not to understand) that the "strategy" was not to drive software sales, but to use hardware reselling as a flexible resource from which to make up for shortfalls in software sales. Deloitte (who, as I understand it, did not see Autonomy's internal emails) could not know or (for whatever reason) did not focus on what truly lay behind the hardware sales, nor the careful calculation of what hardware sales were necessary in light of the identification of any shortfall with growing precision as each quarter came to its end. If Deloitte were misled, or fed a line which they were prepared to swallow, it was not as to the basic facts: it was as to the real over-arching purpose of the hardware sales in the minds of the Defendants and the 'cabal'. The key part (which I have underlined) of what Mr Mercer told the FRC in the passage quoted in paragraph 841 above, and the part which he himself said was *"massively important"*, was the perception that *"The only reason they ever sold hardware was to sell more software"*. Led by Mr Knights and subsequently Mr Mercer in the Cambridge office, they allowed themselves to use the lens that Mr Hussain and the 'cabal' provided to them. If Deloitte were at fault, it was in accepting that justification and thereafter in continuing to accept it despite growing concern as to the lack of documentary support for it, and management's severe allergic reaction against any revelation of the strategy in any published information or public calls. How they came to accept it, and how Mr Knights came to abandon any scepticism, is at the heart of the hardware case, for the strategy depended on it.

846.    Turning to the Audit Committee, Mr Bloomer (who became Chairman of the Audit Committee in August 2010) made clear that he did not regard the hardware sales as a secret. His evidence in his witness statement was that the existence and disclosure of hardware was regularly and thoroughly considered by Deloitte and discussed at every meeting of the Audit Committee whilst he was its Chairman: it was *"always one of the key accounting issues we considered."*

847.    That the Audit Committee was fully kept informed is apparent from Deloitte's reports to the Audit Committee quarterly, half yearly and yearly on their review of Autonomy's accounts and notes prepared by Mr Hussain, with Mr Chamberlain, also quarterly (which were always circulated to Dr Lynch in advance).  By way of example:

(1) In their Q3 2009 Report, Deloitte, having set out that revenue from hardware sales for the quarter ($36 million) amounted to 19% of the total revenues for the period and that the sales (disclosed to be at a loss of some $9 million) did not include any IDOL software component, outlined the explanation they had themselves accepted: this was that the sales reflected *"early targeting of the merging market of appliance solutions"*. This was elaborated later in the Report as involving *"the provision of appliance related solutions to leading multi-national financial institutions"* and it was stated that to that end Autonomy had entered into a *"significant hardware and marketing purchase"* with EMC to provide (a) hardware for delivery to existing Autonomy

customers (b) ongoing *"joint sales and marketing support to promote further sales in this emerging market"* and to (c) *"begin to develop an appliance based hardware and software configuration whereby Autonomy software might be fully integrated into EMC hardware for products aimed at the appliance sector and major institutions"*.

(2) In their Q1 2010 Report, again under the heading *"Key Risks"*, Deloitte noted that included in revenues for the quarter was $12.2 million of hardware sales (mostly sales of Dell hardware to Morgan Stanley, SHI and Fanny Mae, but also sales to *"other blue-chip companies in order to become the preferred supplier for all archiving requirements, including both software and hardware"*) at an overall loss. In a further explanation which is of more particular relevance to the related issue as to the allocation of costs between COGS and Sales and Marketing expenses (see paragraphs 1412 to 1419 below) Deloitte stated that Autonomy had had to pay a price considerably higher than they would normally have to pay in order *"to gain a strategic partnership and become the preferred hardware reseller with EMC, Dell, SHI and HDS."*

(3) In their Q2 2010 Interim Report, Deloitte (again under *"Key Risks"*) reported hardware sales of $27.5 million at a loss of approximately $3.8 million. They explained management's rationale in entering into these loss-making contracts as being *"that Autonomy is seeking to develop a long term strategic relationship with the end-users in order to secure future profitable software sales."* Deloitte referred for the first time to a *Linkage Analysis* (see paragraphs 1477 to 1496 below) *"demonstrating strong linkage between the loss making hardware sales and highly profitable software sales"* and stated that having reviewed it they had accepted that the loss of $3.8 million should be allocated to Sales and Marketing.

(4) In their Q3 2010 Report, under the heading as ever of *"Key Risks",* Deloitte signalled loss-making hardware sales of $26 million (10% of total revenues). Deloitte again reported that they had reviewed and accepted *"management's analysis of the linkage between the loss making strategic sales and subsequent highly profitable software sales…"*;

(5) In their FY 2010 Report, (as always under *"Key [Audit] Risks"*) Deloitte noted (mostly loss-making) hardware sales of $29 million for Q4 2010, representing some 11% of Group revenues. The rationale for this was stated to be *"in order to procure future, profitable software sales."* Deloitte also notified a change in proposed accounting treatment of the associated costs of the sales. They explained that given that Autonomy had purchased and on-sold $110 million of hardware during 2010, *"management now considers that the level of sales being made is equivalent to that of a hardware reseller"* and proposed that as:

> *"an equivalent sized reseller would expect to make a modest profit on such sales…it would better reflect the nature and volume of the strategic hardware sales if Autonomy recognised an equivalent margin on these sales, estimated at 5%…[which] would then reflect the true sales and marketing expense incurred in making these sales in order to procure further, profitable software sales."*

(6) Deloitte added to this that the total amount thus proposed by management to be allocated to sales and marketing for the year would be $16.4 million, which would be lower than for 2009 ($37.8 million) because:

> *"those initial [2009] hardware purchases (mainly from EMC) including an amount paid for additional marketing services and future development costs as part of an effort to build strategic relationships with those suppliers…No equivalent marketing services or future development costs were purchased with the 2010 hardware, which is evidenced by the much smaller net loss made on these sales."*

(7) Deloitte stated its response to these proposals which was that (a) they would accept the allocation to sales and marketing expenses of a sum of $4 million equal to the loss on hardware sales in Q4 2010 but (b) this would be justified as a *"judgmental adjustment"* not as proposed by Autonomy's management because (c) management's proposal did not, in Deloitte's judgement, *"better reflect the nature of these transactions"* and was *"inconsistent with management's assessment that the group has just one Operating Segment, being sales of IDOL software."*

(8) In their Q1 2011 Report, Deloitte reported loss making hardware sales of $20.4 million for the quarter, again using the description *"strategic"* to connote that the sales were *"only made at a loss in order to procure further, profitable software sales"*. They also noted that *"Management has further extended its analysis determining the strong linkage between the loss making hardware sales and subsequent highly profitable software sales"* and responded to it only by stating that *"given the scale and consistency in allocation with the prior quarters, [we] accept the decision taken by management to allocate the loss of $2.0 million to sales and marketing expense in Q1."*

(9) In their Q2 2011 Report, Deloitte noted loss making hardware sales in the quarter of $20.9 million (some 8% of Group revenues, down from the previous quarter) and recorded the same rationale for those *"strategic sales"*.

848. Like Deloitte, and in reality following their lead, Mr Bloomer and the Audit Committee accepted that hardware sales were purely to promote and protect the software business. Satisfied of that, and satisfied in consequence that no separate business requiring segmental accounting was required, the Audit Committee was content.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

### (7) Defendants' support of and belief in the purpose asserted and its accounting treatment

849.    Two warning notes at the outset of this section are appropriate.

850.    First, not only did the Claimants reject the honesty of the Defendants in respect of the asserted purpose or rationale of the hardware reselling strategy, but they also relied, as a further manifestation of dishonesty, on what they regarded as the Defendants' deceptive presentation of the programme to Deloitte, especially to obtain the accounting treatment of its costs which they needed to perpetuate its disguise. I return to deal with those matters in greater detail later. This section addresses the Defendants' case that they honestly believed in the rationale of the hardware reselling strategy they avowed and were reassured in that by Deloitte's acceptance of it, and of Autonomy's accounting treatment of the sales revenue it generated (albeit at a stand-alone loss).

851.    Secondly, especially given the fact that the question of whether Deloitte properly understood the relevant requirements (which the Claimants submitted and Mr Holgate was definite they did not) was one of the matters in issue and determined against Mr Knights and Mr Mercer by the FRC's Disciplinary Tribunal, I should at the outset clarify that, in my view, what is of relevance in the present context is what Deloitte and the Audit Committee understood at the time the Standards to require, and their approval of the accounts and advice to Autonomy on the basis of their understanding. Whether they were right or wrong is a matter relevant to issues numbered (2) to (4) in the Claimants' summary of the main issues in the hardware case (as set out in paragraph 638 above), which I address in turn later; but it is not relevant in the present context. Even if Deloitte were wrong (and Mr Holgate is adamant that they were) the fact remains that they did give the approval and advice then; and if the Defendants really did rely on it then, they are entitled to rely on it now, unless of course they knew that Deloitte had given it no proper consideration, or that their conclusion was plainly and obviously wrong and/or based on a material misunderstanding of the underlying facts.

852.    The Defendants' case is that they honestly believed, in reliance on the approval of both Deloitte and the Audit Committee throughout the Relevant Period, that:

(1) having regard to the purpose of the programme, there was no requirement to distinguish hardware revenue from software revenue either in the narrative to the accounts (what the Claimants called the 'front-end') or in the accounts themselves (what the Claimants called the 'back-end');

(2) the disclosure provided was in accordance with the requirements set out in Accounting Standards devised to enable the presentation of a true and fair view of a company's financial position;

(3) the further disclosure they provided, in particular in '*Supplemental Information*' in the 'front-end'*,* was fair and approved by Deloitte; and

(4) the decision whether or not to give further voluntary disclosure either in accounting or narrative form was a commercial one taken for good commercial reasons and in good faith, after careful iterative exchanges with Deloitte.

853.    Deloitte considered the issue of disclosure from two angles:

(1) they considered whether or not the Accounting Standards mandatorily required disclosure of revenue from hardware sales separately from other revenues; and

(2) in their Reports to the Audit Committee, they identified for discussion anything they considered merited further disclosure and made recommendations in that regard.

854.    As to (1) in the preceding paragraph (paragraph 853(1)), there is a variety of contemporaneous documents which show that Deloitte considered the relevant Accounting Standards relating to the separate identification and disclosure of sources of revenue at the time:

(1) Their principal focus was on the issue of segmental accounting and the application of IFRS 8. Mr Welham said that the audit team considered IFRS 8 particularly carefully, because it was a new piece of guidance, introduced in 2009. Deloitte approved management's assessment that Autonomy had just one operating segment. Their analysis specifically considered the hardware sales, in order to assess whether they would meet the criteria to be classed as a separate operating segment under IFRS 8, and concluded that they would not. For the FY 2009 audit, this conclusion was reviewed by Mr Barden, in the context of a "*Consultation on difficult or contentious matters.*" The Financial Reporting Review Panel was also happy with the analysis. The Claimants accepted for the purpose of these proceedings that this determination was correct.

(2) As well as considering whether there was more than one operating segment, Deloitte's reports to the Audit Committee for FY 2009 and FY 2010 showed that Deloitte considered whether there was a need for entity-wide disclosures (under IFRS 8 §§32-34). [155] Those provisions apply even where a company has only one operating segment for the purposes of IFRS 8. This point was also considered in consultation with Mr Barden, who agreed with the audit team's determination that no analysis of revenues by product type was required for the purposes of §32.

---

[155] The FY 2010 Report to the Audit Committee stated "*Under IFRS 8, additional entity-wide disclosures are prescribed that are required even when an entity has only one reportable segment. These include information about each product and service or groups of products and services ... As part of our audit of the notes to the financial statements, we shall review the disclosure made in relation to operating segments and we shall ensure that this meets the requirements of IFRS 8.*"

(3) Deloitte considered the application of IAS 18 §35 and (as Mr Welham confirmed when cross-examined) determined that Autonomy was required to break out services, as that was mandatory (under IAS 18 §35), but that there was no mandatory requirement to disclose hardware separately in the accounts.

855.    In considering these matters, Deloitte were well aware of the extent and nature of the hardware sales (see above). Deloitte specifically addressed their attention to the <u>extent</u> of the sales: the working paper on operating segments for the FY 2010 audit stated that:

> "*The level of these sales has continued to increase on a quarterly basis and now contribute approximately 12% of the group's revenue in FY 2010. On the basis that it now represents a relatively significant proportion of Autonomy's business, we must consider whether it would meet the criteria to be classed as a separate Operating Segment under IFRS 8.*"

856.    In assessing whether or not entity-wide disclosure was required under IFRS 8 §§32-34, Deloitte were fully aware of all the various details identified by Mr Holgate as relevant to such an assessment as being liable to *"influence decisions that users make on the basis of financial information"*: absolute amounts of hardware sales, the amounts of hardware sales relative to total revenues, the significant effect that hardware sales had on growth percentages, the very different gross profit percentages on hardware and software, as well as the fact that Autonomy described itself as a *"pure software company"*. Deloitte also knew that Autonomy was rated in the market as a *"beat and raise"* stock with particular importance being attached to (and its share price being liable to fall in the event of any material decline in) its organic revenue growth and high gross margins.

857.    Mr Welham confirmed in cross-examination that his view (and Deloitte's) at the time was correctly summarised in the following passage of Deloitte's Defence in the FRC Proceedings:

> "*There was no need for Autonomy to disclose the hardware sales in the financial statements because Autonomy was a single segment business*";

> and further that:

> "*there are no mandatory disclosure requirements for the financial statements prescribed by IFRS (or other legislation) to disclose the 'existence, nature and extent of pure hardware sales'.*"

858.    In relation to FY 2009, the absence of disclosure in respect of hardware sales was a point specifically considered by Ms Lisa Bennett of Deloitte's professional standards review team.  Her note raised the question why there was no mention of the hardware sales in note 2(e) to the financial statements. The

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

response given (by, so it appears, the audit team) was "*Not material.*" Mr Welham confirmed that this assessment, founded it would seem on a numerical consideration, rather than on any broader consideration of what it might tell about Autonomy's quality of earnings, was a further reason for Deloitte's advice that there was no need to disclose hardware in the back-end of the accounts.

859.    Whether the Accounting Standards required separate disclosure of hardware revenue in the accounts was also a matter repeatedly considered with the Audit Committee (especially under Mr Bloomer's chairmanship from mid-2010 onwards):

(1)    According to Dr Lynch, careful consideration was given to advice from Mr Knights in Q3 2009 that disclosure of the hardware sales should be discussed since there was a prospect that it could be mandatory at year-end *"particularly if they became material to the numbers"*. His evidence in cross-examination was that although he had no specific memory of it, he thought that there had been a decision not to disclose at that time because *"we didn't expect the numbers to be material"*.

(2)    In 2010, shortly after joining the Audit Committee in mid-2010, Mr Bloomer had a long discussion with Mr Mercer, addressing the decision not to separate out hardware as a separate operating segment. Certainly during his tenure as Chairman of the Audit Committee, the Audit Committee discussed the level of hardware sales regularly with Deloitte, in considering whether further disclosure was required. Mr Bloomer stated in his witness statement that the hardware sales and their disclosure were regularly and thoroughly considered by Deloitte, and discussed at every Audit Committee he chaired: indeed, "*It was always one of the key accounting issues we considered.*"

860.    In cross-examination, Mr Bloomer explained that:

"*A.     ... it was a regular topic at the audit committee, not least because we were discussing, certainly at least two of the audit committees, whether there was a need under what was then a relatively recent accounting standard to split out separate segments of the business, and there was clearly a view for a range of reasons that are set out that there was no need to do that for hardware. We also considered it for a geographical split where there was some information given but again that wasn't felt to be an operating segment. It was quite clear in both Deloitte's mind, management's mind, Deloitte's and mine, that we had one operating segment.*

*Q.     Did Deloitte give any indication that you can recall as to the level of sales at which it would then become an issue?*"

> A.    *No. No. And as I say, the levels of -- the proportion of hardware sales started to fall anyway so it became less relevant."*

861.    Mr Bloomer, whom the Claimants described as *"a straightforward and reliable witness",* explained his view that, in circumstances where, as he emphasised his perception to be, *"hardware sales were not a strategic goal of the company (as opposed to a tool to further software sales)"* and the assessment had been made that hardware was not a separate operating segment, the decision not to disclose hardware sales separately naturally followed. Viewing the matter as an issue relating to segmental accounting and whether the hardware sales undermined the conclusion that Autonomy was a single segment (software) business, he was adamant that:

> *"The decision not to disclose hardware sales separately was not an attempt to hide anything. It just did not make sense to separate out hardware sales because we did not consider hardware sales a separate part of Autonomy's business. Had hardware been a higher portion of sales, say 25% or more, we would have considered whether hardware sales had become more important such that it was, in fact, a separate operating segment or, in any event, significant enough to warrant further disclosure."*

862.    What I take to be the Audit Committee's overall view was summarised by Mr Bloomer in his witness statement, in two passages which were not challenged, as follows:

> (1)    *"I really did not see the disclosure of hardware sales as a major concern at the time. I saw it as a tool Autonomy used to develop key relationships, get big sales over the line and maintain the headline price of its software. The purpose of hardware sales, as I understood it, was to drive Autonomy's software sales. This did not necessarily mean there was always a direct link between any particular sale of hardware and a sale of software. Sales of hardware and software were not necessarily simultaneous but, as I understood it, the underlying strategy behind hardware sales was always to further software sales."*

> (2)    *"Had hardware been a higher portion of sales, say 25% or more, we would have considered whether hardware sales had become more important such that it was, in fact, a separate operating segment or, in any event, significant enough to warrant further disclosure.*"

863.    In short, neither Deloitte nor the Audit Committee ever considered that further disclosure of the hardware reselling strategy was mandatorily required by the Accounting Standards; and both were content to approve Autonomy's published information in respect of its financial position in the Relevant Period accordingly. Mr Webb QC, Autonomy's Chairman, gave the following unchallenged evidence:

> *"I can remember occasionally discussing hardware sales and accounting for hardware. I was not a member of the Audit Committee, but I attended Audit Committee meetings once or twice and met with Deloitte from time to time. I do not recall the context of the conversation, but I remember someone explaining the sales of hardware using an analogy along the lines of "if you sell long playing records, sometimes you have to sell a few gramophones", which I thought was a light-hearted dig at my generation. I do not recall the discussions around the disclosure of hardware being particularly heated. There was a discussion and the conclusion was to account for hardware sales in whatever way Deloitte said the company was required to account for it.*
>
> *If Deloitte had any concerns, they could have contacted me easily. I feel confident they would have done so had any issues arisen. They never did."*

864.  Dr Lynch was equally clear that if Deloitte or the Audit Committee had said that the hardware sales had to be disclosed, they would have been disclosed.

865.  However, as the Defendants recognised and accepted, there is a distinction between these decisions as to whether a separation between revenue streams in the accounts was needed (and in particular that there was no need to account for hardware revenues separately), and whether nevertheless some narrative or other non-IFRS disclosure of the nature and extent of hardware sales was required in the front-end of the accounts, or at least advisable.

866.  The Defendants countered the two limbs of the Claimants' case in this regard, on the basis that:

    (1) Autonomy always carefully considered any recommendations or suggestions made by Deloitte as to whether further 'narrative' or 'front-end'/non-IFRS disclosure should be provided; but Deloitte always accepted that this was a matter of balance and commercial judgement, and thus ultimately a commercial decision for Autonomy's directors. The Defendants rejected as *"wrong"* the Claimants' argument that Autonomy ignored repeatedly advice from Deloitte to provide further narrative or other non-IFRS disclosure.

    (2) Autonomy provided *Supplemental Metrics* from Q3 2009 to Q2 2011 to assist a better understanding of its business. Nothing was kept from Deloitte. When Deloitte considered the form of disclosure to be potentially misleading, there were discussions between Autonomy and Deloitte which resulted in an amended presentation suggested originally by Deloitte themselves, which Deloitte and the Audit Committee approved.

867.  Further as to (1) above, the Defendants accepted that Deloitte did repeatedly press the Audit Committee and Autonomy's management to consider whether further disclosure was required. The following examples illustrate this pressure:

(1) On 14 October 2009, following receipt of the Strategic Deals Memorandum, Mr Knights wrote to the Defendants noting that there would be an issue at year-end as to whether the hardware sales needed to be disclosed and raised the possibility of disclosure in October 2009, as something that Autonomy might like to consider voluntarily, in case disclosure later became mandatory:

> *"One additional point to be considered at the year end will be whether under IFRS you could be required to disclose hardware sales- particularly if they became material to the numbers. Whilst this is a year end matter, if disclosure did become necessary and in the absence of any previous indication through the year, it would be the first time that this information would be made available to your investor and analyst community. This might be worthy of some consideration at Q3?"*

(2) Deloitte's report to the Audit Committee for Q3 2009 dated 16 October 2009 noted that hardware sales represented 19% of the total revenues for the quarter and that the Autonomy board:

> *"should consider how best to communicate this new opportunity to the shareholders as these revenues are not driven from the organic IDOL technology of the Group"*.

Deloitte added that, if hardware sales in the year were significant, there might be a requirement to disclose them in the year-end financial statements.

(3) Deloitte's report to the Audit Committee at Q2 2010 advised that:

> *"Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q2 2010 press release"*.

(4) Deloitte's report to the Audit Committee for Q3 2010 again advised that given the:

> *"increasing significance of the hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q3 2010 press release"*.

(5) Deloitte also suggested that it was likely that in light of questions raised at the Q2 2010 press conference:

> *"it would be helpful to include narrative regarding the nature of these revenues in the quarterly report."*

(6) Deloitte's report to the Audit Committee on the 2010 audit stated that "*Given that Autonomy has purchased and on-sold $110 million of hardware during 2010, management now considers that the level of sales being made is equivalent to that of a hardware reseller*". Deloitte expressed the view that:

> *"Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and full year results, we expect appropriate explanation to be given in the 2010 Annual Report"*.

868.    However, there was always iterative discussion and according to Dr Lynch, management would always seek to find wording that addressed the concern in discussion with Deloitte. The Defendants provided illustrations of what they presented as a typical iterative approach as follows.

869.    The first illustration related to Deloitte's Report to the Audit Committee in Q2 2010 (see paragraph 867 above) and their statement that given the increasing significance of hardware sales to the group's revenues, and the resultant impact on gross and operating margins "*we would expect appropriate explanation to be given in the Q2 2010 press release.*" As to this:

(1)    Following the Audit Committee meeting, at which management had agreed to give disclosure in respect of the impact of strategic hardware sales in the front end of the accounts (the narrative part), Mr Chamberlain prepared some proposed wording for Deloitte. Mr Chamberlain's proposal was to say that "*The fall in gross margins in Q2 2010 was in line with our expectations due to Arcpliance sales as discussed last quarter.*" Deloitte did not regard that first draft of the wording as adequate.

(2)    Further wording, with what Mr Chamberlain described as *"MRL's tweaks"* was accordingly suggested. The revised wording was that "*The small variation in gross margins in Q2 2010 was in line with our expectations due to the sales mix as discussed last quarter.*"

(3)    Discussions took place between Deloitte and management in which the wording was further revised, as shown in Mr Welham's email dated 21 July 2010 to Mr Robertson and Mr Lumb (each of Deloitte):

> *"Please find attached the final draft of the Autonomy press release. There have been a few tweaks but nothing substantial since the previous version you saw. The one significant point is the wording on the appliance/hardware sales. We have spent some time going through this with management and the proposed wording is as follows:*

> *The small variation in gross margins in Q2 2010 was in line with our expectations due to the sales mix including appliances as discussed last quarter.*
>
> *As an engagement team, we are comfortable with the wording because it makes reference to appliance sales and the resultant impact on gross margin. Chris Brough has also confirmed that he can accept this wording.*
>
> *Can you confirm by return that you are happy from a PSR perspective."*

(4) Mr Welham confirmed that the discussions with management referred to in this email were with Mr Hussain and Mr Chamberlain. The PSR (Mr Robertson, then the professional standards reviewer) provided the confirmation sought by Mr Welham and on 22 July, Deloitte signed off its independent review of the results, with an unqualified opinion.

(5) The results contained the phrase approved by Deloitte, which had added the words underlined:

> *"The small variation in gross margins in Q2 2010 was in line with our expectations due to the sales mix <u>including appliances as discussed last quarter.</u>"*

(6) In cross-examination, Dr Lynch was criticised about the sentence quoted above from the Q2 2010 results. His response was that Deloitte had a detailed knowledge of the nature of the hardware sold by Autonomy; they had pressed for further disclosure, which Autonomy agreed to give; and Deloitte had discussed various forms of wording with management (not with Dr Lynch), and arrived at a form of words with which they were comfortable, as Mr Welham confirmed they were in his oral evidence.

870. Another illustration suggested by the Defendants related to Deloitte's report to the Audit Committee for the Q3 2010 review, when they (Deloitte) again stated that given the increasing significance of the hardware sales to the Group's revenues, "*we would expect appropriate explanation to be given in the Q3 2010 press release.*" In this regard:

(1) A sentence was added by management, as noted in Mr Welham's email to Mr Brough dated 18 October 2010:

> *"Hardware — they have added in an explanatory sentence similar to that included in the Q2 release which states that the gross margin has once again being [sic] impacted by sales mix as highlighted in Q2. In Q2 they talked about the strategic appliance sales, so this is a direct reference to this."*

(2) Mr Welham confirmed that, having had a discussion with management, Deloitte was comfortable with the wording in the Q3 press release. Again, Deloitte issued an unqualified review opinion.

871. The third illustration the Defendants advanced concerned discussions on the wording of the Q4 2010 press release. As to this:

(1) Mr Welham had informed Mr Chamberlain by email on 30 January 2011 (cc Mr Mercer) that it would be "*necessary to have some comment on hardware sales in the year and the impact of these on GP margin.*" Interestingly, I think, he added *"At present, this section states that the principal reason is IDOL cloud but surely this would result in fewer hardware sales."*

(2) There were then discussions between management and Deloitte.

(3) In the final version of the press release, in a section discussing gross profits and gross margins, the press release approved by Deloitte noted:

"*During the year Autonomy has seen success in addressing the urgent needs of a small number of customers with package solutions, constructed of services, hardware and software, such as Arcpliance. The gross margin in these cases is lower than the normal business.*"

(4) Again, Dr Lynch was cross-examined about this, and it was put to him that the statement was only "*about Arcpliance*" and as such was misleading. Having pointed out that the words were actually *"such as Arcpliance"* (connoting a subset of *"hardware and software"*) his answers more broadly exemplified his defence:

*"Well, that's language that was worked out with Deloitte and I don't think Deloitte would have done anything that was misleading...*

*...*

*...we have some disagreement about which hardware is which type, which we haven't really addressed, so there is a difference between us. But, again, I just come back to the fact that Deloitte were completely alive to this issue. They consider it – it actually is not just the audit team, it's something that goes up to their technical experts and there's a conversation and we agree a form of words, and this is it, and you know, I'm relying on my finance department and I'm relying on the audit committee and most of all I'm relying on Deloitte and it looks like a reasonable sentence to me."*

872. The Defendants instanced the following evidence of ultimate consensus after constructive discussion:

(1) Mr Welham confirmed in cross-examination that Deloitte had discussions with Mr Hussain, Mr Chamberlain and the Audit Committee from time to time about potentially including further narrative concerning hardware sales, but that they never considered Autonomy's disclosure was false or misleading because it did not contain further detail on this point:

> "Q.… We've seen a couple of references so far to Deloitte from time to time discussing with management potentially putting further explanation into the published                                    information.
>
> A. That's correct, yes.
>
> Q. If we can just turn to that for a moment. Is it fair to summarise it this way, that Deloitte had discussions with management and the audit committee from time to time about potentially including further narrative concerning hardware sales because Deloitte thought it would be preferable to say more?
>
> A. That's a valid statement, yes.
>
> Q. But Deloitte never thought that the quarterly releases or the annual reports misrepresented things or were false or misleading because they didn't contain that further narrative?
>
> A. That's correct, yes.
>
> Q. And when you had those discussions with management, those were discussions with Mr Chamberlain and Mr Hussain?
>
> A. Yes, and with the audit committee as well."

(2) As to the Audit Committee's perception in 2010, Mr Bloomer emphasised again, with I think his focus on the issue of segmental accounting, that:

> "...from a Deloitte point of view, and clearly from the previous audit committee's point of view, hardware was not seen as a big topic actually to flag."

(3) In re-examination, Mr Bloomer added this:

HC-2015-001324

> *"As I said at the time, Deloitte were not – although they flagged that they'd like to see some mention of it, it wasn't a huge point for them. It was more of a point, the essence of it, that looking forward, if these get much bigger, then we're going to have to talk more about them. In practice, the volume of hardware sales certainly in the first two quarters of 2011, dropped somewhat and were starting to become a smaller percentage of total revenue and that was the way I interpreted it at the time. It was certainly not a big issue that this must be. If it had have been, Deloitte would have insisted more on it and they didn't and I didn't."*

873.  Dr Lynch also stressed that further voluntary disclosure was kept under review: he accepted that where hardware sales represented a substantial percentage of total revenue (say, 20%) disclosure was *"certainly something one needs to think about"* but *"it depends on the purpose";* and in circumstances where the Accounting Standards imposed no obligation to provide further disclosure, they contended that it was a matter of commercial judgement.

874.  What he presented as the *"judgement call for management"* was whether voluntarily to disclose (a) the amount and/or (b) a breakdown of the type of the hardware it sold and the nature of the sales. He regarded that, as any such judgement call, to require:

> *"balancing the market's desire to know as much as they can find out about the company's business with Autonomy's commercial interest in keeping confidential information away from its competitors and counterparties."*

875.  The Defendants supported the decision not to provide further narrative disclosure as commercially rational and justified in circumstances where (a) after careful investigation by Deloitte and its reviewers and by the Audit Committee it had been determined that hardware sales did not constitute a separate operating segment of Autonomy's business and accordingly that it did not have to break out hardware revenue separately in its accounts whatever proportion of revenue hardware sales comprised in any financial year and (b) though both (and especially Deloitte) favoured further disclosure, neither Deloitte nor the Audit Committee had ever suggested that it was required under the Accountancy Standards nor that determining against it would be improper.

876.  In a sense, the most surprising aspect of the issue of disclosure is the Defendants' consistent efforts to avoid or minimise it and Deloitte's passive acceptance of anodyne wording (see paragraphs 869 to 871) which obviously did more to obfuscate than to clarify and reeked of reluctance to give any real insight into a strategy justified as being of such benefit to Autonomy's overall business. Mr Knights and in his turn, Mr Mercer, seem to have been quite extraordinarily reluctant to stand back from the rules and the mantra of management judgement to ask themselves and press management really hard as to quite what was the reason for such reticence.

877. After all (as the FRC put it to Mr Mercer when they interviewed him), if the purpose of the hardware reselling strategy was as avowed and successful, it would be more natural to expect the Defendants to *"want to sort of shout this strategy explicitly from the rooftops."* Mr Mercer's response was that Autonomy's management would not necessarily *"from a competitive point of view, want to shout from the rooftops the way we are being successful at driving our software sales by selling them hardware. So there's a commercial sensitivity point, I suspect…"*. This was worse than lame: the hardware sellers were, on the Defendants' case, collaborating to that end. The fact remains, however, that both Deloitte and the Audit Committee were fully aware of what the analysts and the market were being told, or rather, not being told; and although they occasionally pressed for more disclosure, both clung to the belief that the hardware reselling was all part of the software business and in any event immaterial, and ultimately shrank from insisting on more than the opaque wording which Autonomy was persuaded upon from time to time to include.

878. Dr Lynch, in his witness statement and subsequently when cross-examined:

(1) Stressed what he regarded as the *"defensive nature"* of the strategy, and his concern that if Autonomy were to break down its revenue into hardware and software, *"let alone into different types of hardware"*, competitors would perceive Autonomy's concern about its weakness in the appliances sector and about its vulnerability to the risk of being removed from strategic supplier lists or to others copying its strategy from a position of greater strength;

(2) Explained that he was also concerned lest revelation of a special relationship with one hardware supplier could preclude Autonomy from working with another, and also lest if news of special deals were broadcast, everyone would be demanding the same;

(3) Stated his assessment that the *"more details we disclosed about our hardware sales, the more we would expose these commercial sensitivities"*;

(4) In cross-examination, added to the above (a) concern about *"most favoured nation situations that we have to be very careful about"* and (b) his understanding that *"EMC wanted to keep the arrangement confidential, as did the customers."*

(5) When it was suggested to him that the truth was that he did not want to disclose the programme because he preferred that the market should be misled about Autonomy's real source of revenue rather than being told the true position, he was adamant:

*"No, there was no intention to mislead the market."*

879. The Defendants maintained that this was also consistent with a comment made by Dr Lynch at the time: in his email to Mr Ariko dated 23 October 2009, after Mr Ariko voiced his concern and wish to review further hardware disclosure, Dr Lynch noted that it was "*also very commercially sensitive to our partner us and our customer and concerning new product developments.*"

880.    It is, of course, important to strip out the effect of hindsight. But even having done so, Dr Lynch's attempted justification appears to me paper-thin. Furthermore, Dr Lynch's reply to Mr Ariko dated 23 October 2009 (also wishing him well for an excellent retirement) sought to mollify him by assuring him that (a) *"the market is already aware we sell hardware, something we have done for 5 years or so…"* (b) Autonomy would be issuing *"a new press release next week on these matters relating to hardware"* and (c) that *"if this approach were to develop into a larger part of our business on an ongoing basis we would review the current master press release template."*

881.    The falsity of each point is elaborated later: the exchange with Mr Ariko is an important part of the story and provides very considerable support to the Claimants' case that the hardware reselling strategy was deliberately concealed: see paragraphs 1397 to 1403 below. A summary suffices for the present. Dr Lynch's email to Mr Ariko was false in every respect. The market did not know of the hardware sales. The press release did no such thing: it talked in general terms of Arcpliance. The reassurance provided was never fulfilled.

882.    Nevertheless, to return to focus on the Defendants' case, they rejected also the second part of the Claimants' allegations, which was an attack on the non-IFRS *Supplemental Metrics* included in Autonomy's Quarterly Reports from Q3 2009 to Q2 2011, and in the 2010 Annual Report, which (for the first time) broke down Autonomy's revenues into IDOL Product, IDOL OEM, Services and Deferred Revenue Release, and at a later point IDOL Cloud.

883.    Hardware revenue was included in these categories, but the Claimants argued that they were defined in a way that could not properly include hardware, and thereby both overstated software revenues and at least implicitly represented that there were no material revenues from hardware sales. In other words, the Claimants contended that the further disclosure the Defendants did decide to provide was in truth a further exercise in disguise: the non-IFRS *Supplemental Metrics* in what was called the "front-end of the Accounts" further disguised the fact of the hardware sales.

884.    The Defendants rejected these criticisms of the non-IFRS *Supplemental Metrics* and maintained that:

(1)    As the Quarterly Reports and 2010 Annual Report made clear, these were metrics "*provided for background information and may include qualitative estimates.*" They were not precisely defined.

(2)    Deloitte scrutinised the calculation of the non-IFRS metrics each quarter, and was well aware that Autonomy's hardware sales were included in the category "IDOL Product". Each quarter, they prepared a working paper, whose stated aim was "*To agree the metrics used in the quarterly press release to the supporting schedules and to test the validity of these schedules.*"[156] Mr Welham confirmed that, as part of the audit or review process, Deloitte would have reviewed the underlying contracts for at least some of the transactions included in those schedules – all that were over $1m in value, or that were part of the sampling

---

[156] Mr Welham confirmed that this process was carried out every quarter.

process. He said that Deloitte knew that certain deals included within IDOL Product were hardware deals: indeed, that is clear from the face of the working paper, and from Deloitte's tickmarks.[157]

(3) Deloitte were of course aware of how IDOL Product was described in the Annual Reports, as demonstrated by the ticked off versions, where the number is ticked next to the description in question.[158] They knew that some of the hardware sales did not include an IDOL software component. [159] They did not consider that this rendered Autonomy's Quarterly or Annual Reports misleading, as Mr Welham confirmed:

> "Q.    Then looking at what you did know, going back for example to IDOL Product, you knew that as part of the total amount that was being stated as IDOL Product, that included the hardware deals that we've looked at?
>
> A.    Yes.
>        ...
> Q.    ... So you knew those facts, you didn't think that the way that then Autonomy presented itself to the financial markets through its published information was misleading in any way, did you?
>
> A.    We did not, no."

885.    Thus, the Defendants presented the non-IFRS *Supplemental Metrics* as intended to assist in the understanding of Autonomy's core business by providing a breakdown of the main sources of IDOL revenue: they contended that they were not intended to mislead, and certainly did not suggest any such improper purpose and dishonesty as was alleged.

886.    In summary, the Defendants contended that they were entitled to rely on the fact that, knowing all the details of the hardware sales, and with the means and commercial acumen to test the commercial justification which the Defendants advanced in support of them, Deloitte and the Audit Committee:

(1) were persuaded, as according to the Defendants was the fact, that Autonomy's directors and management (and thus the Defendants) had conceived and were implementing the hardware reselling strategy for genuine commercial purposes;

---

[157] Mr Welham confirmed that the tickmarks were prepared by Deloitte, and that the whole spreadsheet, although based on a document provided by Autonomy, was a Deloitte working paper.
[158] The description is as follows: "*IDOL Product is normally delivered as licensed software paid for up-front with an ongoing support and maintenance stream. This model is becoming less significant with the rise of cloud computing. In 2010, IDOL Product revenue totalled $251 million*"; Deloitte has ticked off the number $251 million.
[159] See e.g. Deloitte's Report to the Audit Committee on the 2009 Audit: "*These hardware sales did not include any IDOL software component.*

(2) approved Autonomy's financial statements (sometimes known as the 'back-end' of the accounts, for which Deloitte had full auditing responsibilities) as compliant with all applicable Accounting Standards and as showing a true and fair view of its financial position;

(3) did not object to the content of the 'front-end' of the accounts (which Deloitte did not audit but had to review for fairness and consistency) and approved the Supplemental Metrics provided by Autonomy;

(4) accepted that what further disclosure to give was a commercial judgment;

(5) never required further disclosure in Autonomy's published information than was from time to time provided.

887.    The Defendants relied also on the fact that when KPMG spoke to Deloitte during the due diligence process on 17 August 2011, Deloitte confirmed that there were no disagreements with management regarding accounting policies and accounting conclusions.[160] They could not have given that confirmation if they considered that further disclosure was required which Autonomy was refusing to make.

**Summary of the Defendants' Hardware case**

888.    In conclusion on this section, therefore, the Defendants:

(1) Insisted that the purpose of the hardware reselling strategy was clearly elaborated, objectively plausible, intended in good faith to protect and promote the software business, and accepted as such by the Claimants' own principal witnesses on the hardware part of the case, Messrs Sullivan and Egan.

(2) Submitted that Autonomy would not have engaged in the programme simply for the revenue benefit, since (to quote from Dr Lynch's supplemental witness statement), *"hardware created a negative impact on metrics that were of greater importance to me and the market"* (and especially profitability and earnings per share).

(3) Maintained that the programme was successful in that regard, and that its costs (which Mr Mercer estimated[161] as in total less than 10% of the sales and marketing budget) were minimal compared to the value of the software business secured.

(4) Relied on the approval of Deloitte who had full information and knowledge of the nature, extent and costs of the hardware reselling strategy, in relation to both the narrative description and the accounting

---

[160]In cross-examination, Mr Welham confirmed that he remembered this conversation, and that to his knowledge, there never were any major disagreements with management regarding accounting policies or conclusions.

[161] In the course of his evidence to the FRC on 4 September 2013.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

treatment of the hardware sales, including the costs associated with them.

(5) Made (as they claimed Deloitte had advised they were entitled to make) a commercial judgement on the extent of any other disclosure, having established that no more detailed disclosure was required, and determined in that context that more disclosure could damage the company.

(6) Accepted that a collateral benefit of the programme was increased revenue which could be recognised in Autonomy's accounts, but pointed out that Autonomy would not have chosen the programme had revenue pumping been its purpose, given the availability of other means of achieving that purpose (including sales of third-party software) which would not have had the adverse effect of the programme in adversely reducing gross margin and gross profits, and which would have been considerably more flexible.

(7) In all the circumstances rejected the Claimants' case theory that the sales were intended to bring in extra revenue without disclosing its source.

## (C) *Elaboration of Claimants' case on the real purpose of the hardware reselling strategy*

889.    The Claimants' overall response to the Defendants' case was that even if the commercial rationale of the hardware reselling strategy, as articulated by Dr Lynch and echoed by Messrs Egan and Sullivan, was theoretically reasonable and sustainable, that rationale:

(1) was not in reality what informed, or at least quickly came to inform, the programme as in fact it came to be implemented; and

(2) could not explain, and indeed raised the question, why the Defendants actively sought to disguise and hide from the market what was presented as a commercially beneficial programme to promote and protect Autonomy's core business.

890.    To recapitulate the principal elements or limbs of the Claimants' case:

(1) What the hardware reselling strategy was directed towards and entailed was the sale of third-party hardware (at a loss) in order to generate revenue which would be presented and accounted for as derived from Autonomy's software business: its purpose was to cover and disguise shortfalls in software sales;

(2) The intended benefits asserted by the Defendants were never more than side-benefits used as a pretext to persuade Deloitte and the Audit Committee to include revenue from hardware sales as part of the

revenues of a single segment software business without disclosing their
true source;

(3) The Defendants were well aware that if the true source, nature and extent
of the hardware reselling strategy was disclosed or discovered, the
market (and in due course HP) would have considered it to be improper
and an erosion of the quality of Autonomy's earnings: and that this
would have adversely impacted Autonomy's share price and the value
placed on IDOL and Autonomy's software business as a whole;

(4) The extensive steps and representations taken and made by the
Defendants, and further steps and representations they were prepared to
take and make, to ensure that the hardware reselling strategy was neither
disclosed nor discovered, confirm its impropriety and their knowledge
that Autonomy's published information was false in this regard.

891.    The Claimants supported that case by reference to:

(1) The lack of any documentary support for Dr Lynch's explanation that
the hardware reselling strategy was conceived as a response to changes
in the market which posed real threats to Autonomy's core business;

(2) The almost immediate increase in Autonomy's appetite for hardware
reselling transactions between Autonomy and EMC well beyond
anything contemplated at the Loudham Hall meeting;

(3) The resort to hardware sales purely as a response (which became routine)
to shortfalls in software revenue which were identified at the end of a
quarter, and the use of, and accounting for, revenue from such sales as
if it were derived from software sales;

(4) The development of ways of using that source as a discretionary fund
without any discernible appraisal whether such expansion and use would
proportionately benefit Autonomy's core business, and if so, how;

(5) The Defendants' internal written communications between themselves
and others in their team[162], which focused, not on how hardware sales
might generate additional software sales, but on how much revenue
would be needed and raised from that source to 'plug the gap' as regards
Autonomy's aggregate revenue targets.

(6) EMC's sudden withdrawal as a supplier to Autonomy of hardware for
reselling, and Dr Lynch's misrepresentation of the nature of Autonomy's
relationship with EMC and the reasons for its severance;

(7) EMC's immediate replacement by Dell, and Dell's participation in the
programme on the terms of a hardware reselling agreement between
Autonomy and Dell which in name and substance provided for no more
than Autonomy being interposed as a reseller of Dell products to Dell's

---

[162] (Largely comprised of email exchanges between the individuals at Autonomy principally involved
and especially, in addition to the Defendants, Mr Kanter, Mr Chamberlain and Mr Sullivan).

own customers (albeit in the expectation that most if not all would also be customers of Autonomy) at a discount funded by Autonomy.

(8) A chronological summary, based on documentary evidence, of the dealings between Autonomy, Dell and Hitachi and their customers between Q1 2010 and Q2 2011, demonstrating in particular that:

    i. It became routine for Autonomy to rely on loss-making hardware reselling transactions as the means of achieving revenue forecasts calibrated to meet, and if possible *"beat and raise"*, market expectations.

    ii. In almost every such transaction Autonomy was simply interposed into a hardware sale originally intended to be between Dell and the end-user, with the end-user seldom (if ever) being made aware of the fact that Autonomy was funding the discounted price.

    iii. Recognition of revenue from hardware reselling was manipulated so as to minimise the adverse effect on Autonomy's 'bottom line' and thus reduce the visibility and the chances of the programme being revealed or discovered.

    iv. Autonomy developed and soon came to depend upon the practice of transacting sufficient loss-making hardware reselling to cover any anticipated shortfall in high margin software sales, but then deferring recognition of revenue arising from such hardware reselling transactions if at the end of the relevant quarter software sales (which, being high margin, maintained its gross margins and EPS) in the event proved sufficient to meet forecast.

(9) The way Mr Sullivan was incentivised solely by reference to hardware revenue generated and recognised, without any reference or regard to software sales resulting from discounted hardware sales nor to any other criteria relevant to the software business.

(10)    The absence of contemporaneous documentary evidence to suggest that:

    i. Autonomy's marketing department was in any way cognisant or involved in the hardware reselling strategy;

    ii. Autonomy's software sales team was instructed to use the loss-making hardware sales (with discounts funded by Autonomy) as a bargaining chip when negotiating sales of software to Autonomy's hardware customers or in any other way as part of any software sales pitch to customers of Autonomy (whether prospective or existing);

   iii. apart from the Linkage Analysis (see further in paragraphs 1477 to 1496 below and paragraphs 1034 to 1307 below), there was ever any internal discussion or assessment of any measurable impact or effect of the hardware reselling strategy as a marketing strategy.

  (11) The evidence that the Defendants, in conjunction with Mr Kanter and Mr Chamberlain, repeatedly sought to and often did mislead Deloitte and the Audit Committee, or circumvent their concerns and recommendations, and in particular, the steps they took:

   i. to persuade Deloitte and the Audit Committee (including by pressing Mr Sullivan to extract a false depiction from EMC of the nature of its relationship with Autonomy) to approve the allocation of costs and losses referable to the hardware reselling strategy as marketing expenses rather than COGS in order to reduce the adverse effect on Autonomy's apparent financial results and prevent revelation of the strategy;

   ii. to present to Deloitte and the Audit Committee information designed to show a *"strong linkage"* which did not exist between hardware sales and software sales especially to answer Deloitte's concerns in 2010 that the hardware reselling strategy had become *"business as usual"*;

   iii. to convince Deloitte and the Audit Committee, when the increase of marketing expenses itself began to invite scrutiny, that R&D and increased sales and marketing expenses were referable to the development and marketing of a new product, SPE.

  (12) Autonomy's management's determination not to make the full disclosure which the Claimants submitted it is obvious they would have actively wished to make had the purpose of the hardware reselling strategy been as the Defendants asserted it to be.

892. INTENTIONALLY LEFT BLANK.

893. These points are elaborated and assessed below.

### *(1) No documentary evidence of threats to Autonomy's software business*

894. The Claimants put to Dr Lynch that his oral evidence that Autonomy adopted its hardware strategy in response to two market shifts which seriously threatened Autonomy's core software business, being (as he summarised them in his supplemental witness statement) (a) vendor consolidation and (b) a perceived shift towards consuming software as an appliance, was not supported by any documentary evidence prior to October 2009.

895. When further pressed that there was *"not a single document…and you know it, that supports your suggestion that the sale of hardware at a loss was in response to the two trends in the market you identify"* Dr Lynch's response was

that he disagreed with that; and he told me that he thought there were (a) *"multiple emails"* (b) analysts reports (c) *"commentary inside the company"* and (d) information easily available on the internet (especially as to the perceived threat from Google's Search appliance), all of which should be *"very easy to find."* Mr Rabinowitz challenged the Defendants to identify them. None was, either during cross-examination or in re-examination.

896. Nor was there any record of any meeting or discussions within Autonomy about these market shifts or how to address and respond to them. Dr Lynch's explanation for this was that it was not the practice within Autonomy to record discussions in writing. For example, when it was put to him that there was no record of any discussion of any of this either before, at or after the Loudham Hall meeting[163], he accepted that this was "*unlikely. We didn't take notes at the meetings."*

897. The question is whether this lack of any documentary support indicates, as the Claimants contended, that the alleged risks were simply manufactured by Dr Lynch as an overall justification for the hardware reselling strategy (additional to the promotion of software sales) and had no real basis. That possibility is to some extent supported by the fact that (as I elaborate later when addressing the development of the Strategic Deals Memorandum) Mr Hussain did not make any reference to those risks when first seeking to explain and justify the relationship with EMC.

898. Nevertheless, I doubt that Dr Lynch would have cited repeatedly an entirely fanciful justification. A characteristic of the justifications for the various stratagems deployed by the Defendants was that they appeared outwardly or apparently reasonable and had enough substance to persuade Deloitte and the Audit Committee, and key employees such as Mr Sullivan and Mr Egan. It seems to me to be plausible and even likely that financial organisations would have wished to reduce the number of IT suppliers and, to the extent possible, to have all their IT requirements met from a single supplier; and likewise it seems plausible that, before development of the Cloud, appliances might have been seen as a necessary part of a software company's offering as the means of making available its software products.

899. To my mind, however, the real question is whether it was the alleged risks which really prompted the programme; or whether the risks were relied on as convenient context for what in reality was a response to concerns about shortfalls in software sales in Q2 2009, and the need to find other sources of revenue to maintain Autonomy's record as a "beat and raise" stock[164] and shore up its share price.

## (2) Expansion of and dependence on the programme with EMC in Q3 2009

---

[163] Of which the only detailed description was in Dr Lynch's own witness statement: see paragraph 720 above.
[164] See the explanation of this in paragraph 65 above.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

900.    Dr Lynch told me that no fixed amount of hardware transactions to be
undertaken had been agreed at the Loudham Hall meeting[165]. But Mr Sullivan's
evidence (which I accept) was that the figure he had suggested as easily
achievable in a quarter was $5 million to $10 million (which had elicited Dr
Lynch's joke that if he could do this, Dr Lynch would buy him a Porsche). It is
reasonably clear, and I find, that this was the range contemplated at Loudham
Hall; and it is to be inferred (and I find) that any assessment of the cost/benefit
of the hardware reselling strategy when incepted was by reference to that range.

901.    It quickly became apparent from Mr Sullivan's meetings with EMC after he
returned from the Loudham Hall meeting, and as by email dated 15 July 2009
Mr Sullivan reported to Dr Lynch and Mr Hussain, that there would be no
difficulty in arranging sufficient hardware transactions with EMC to deliver *"all
the revenue we need per our discussions at Loudham."* He said he already had
commitments for up to $20 million of hardware. He added that he *"could
probably get twice that if you want"*.[166]

902.    This apparently considerable source of revenue seems to have opened the
Defendants' eyes to the potential of hardware reselling as a more significant
resort; and the hardware reselling strategy with EMC soon increased very
considerably beyond what had been contemplated when it was incepted. The
Claimants cited an exchange of emails in early September 2009 between EMC's
Mr Joe Profeta and Mr Sullivan in this regard:

    (1)    In an email on 2 September 2009 Mr Profeta set out the deals that EMC
    was "*chasing for the quarter*" , listing the customers and the deal values
    as being (a) Bloomberg ($7-10m) (b) Citi ($8-12m) (c) Sony
    Corporation ($4-7m) (d) JPMC ($10-20m) (e) Deutsche Bank ($8-15m)
    and (f) DTCC ($4-6m). The customers appear to have been selected by
    EMC. Most, though probably not all, were existing customers of
    Autonomy. There is no reference to any identification of their software
    needs.

    (2)    Mr Sullivan forwarded this email to Mr Hussain, noting that there was a
    "*Big range from total $46MM to $80MM*".

    (3)    The following day, Mr Hussain forwarded Mr Sullivan's email to Dr
    Lynch[167] stating that he had "*listened in on a call with the head of sales
    at EMC and Sullivan yesterday*", that they (EMC) were "*committed
    internally, their selling style is v aggressive*", and that they (EMC)
    believed that "*$60m will be the eventual number (equates to around
    $73m cost)*".

---

[165] Dr Lynch told me in cross-examination that he did not think that a fixed amount had been fixed at
the Loudham meeting: *"As I recall the conversation, it was more people offering how much they could
do and what might be possible".* That answer itself points to the focus being on revenue maximisation
rather than on promoting the software business, though of course the Defendants contended that what
was good for one would be good for the other.
[166] Hence his reference to 4 or 5 Porsches instead of the one Dr Lynch had jokingly offered him: see
paragraph 782 above.
[167] Dr Lynch accepted in cross-examination that Mr Hussain kept him abreast of the position in relation
to these hardware deals.

(4) That was of course some six times the value of hardware sales which Mr Sullivan recollected had been canvassed at the Loudham Hall meeting. Although Dr Lynch was at pains to emphasise that this was a maximum potentially available, and not a target, the fact that such a considerably increased figure was in contemplation as a recourse seems to me to demonstrate how far the programme had extended from its originally conceived size without any re-assessment of its value as a marketing exercise (if that was what it was).

903.   The Claimants emphasised especially a number of aspects of this exchange:

(1) First, the focus of Mr Hussain was on the amount of revenue that could be obtained by Autonomy through this arrangement, coupled with the cost to Autonomy of participating.  Dr Lynch had to accept this when cross-examined.

(2) Second, Mr Hussain did not appear to mention or be concerned with the marketing potential of these sales, nor does he suggest that they were designed to achieve anything other than meeting Autonomy's revenue targets. Dr Lynch also accepted this, but sought to dismiss it on the basis that (a) discussion about marketing effect would have taken place in a different context and (b) this was just a discussion about *"salespeople getting the revenue"* and simply showed *"the sausage-making machine making sausages"*.  However, there was no record provided of any discussion about marketing effect in a different context; and the email did not relate to a discussion between *"salespeople"*: it was a communication between Dr Lynch and Mr Hussain solely focused on revenue generation.

(3) Third, it is plain that responsibility for securing the hardware deals was to lie with EMC alone, utilising their "*v aggressive*" selling style. Consistent with this, it was EMC, rather than Autonomy, that had visibility as to the level of hardware deals that could be secured. The hardware was almost invariably to be physically delivered directly by EMC to the customer, as Dr Lynch accepted[168].

(4) Taken together, the Claimants described Autonomy's role as therefore being "*limited to being slotted into the transaction to provide the customer with the discounted pricing.*"  In that context, the Claimants rejected a somewhat half-hearted suggestion made by Dr Lynch that EMC and Autonomy co-ordinated in determining the selection of customers.  When tested against particular transactions it was clear that the customers were simply selected by EMC and Autonomy was inserted into the transaction thereafter. Dr Lynch had to admit that the selection was not by reference to any marketing potential for Autonomy: it was, he said, *"the sausage machine making sausages"*.

---

[168] Though Dr Lynch understood (as did Mr Sullivan) that for legal purposes Autonomy did have the right to delivery.

904.   The Claimants submitted that all this, and the apparent absence of any evidence
       of any attempt to identify or monitor whether this expansion of the programme
       with a single supplier to the same pool of customers offered any or any
       commensurate incremental marketing benefit to Autonomy, or occasioned any
       review of the programme such as might be expected when a marketing
       programme potentially expands by a factor of six or seven times its originally
       conceived size and cost [169], strongly supported their case that "relationship
       building" and "marketing potential" and the benefits avowed by the Defendants
       were nothing more than a pretext, and that the real purpose was

           *"simply to, in effect, 'buy' (at a substantial cost) recognisable revenue
           that would be included in the revenue figures reported to the market
           without revealing the true source (or cost) of this additional revenue
           stream."*

905.   The Claimants added that *"It is inconceivable that Dr Lynch and Mr Hussain,
       intelligent individuals, could have considered that what they were doing was
       honest."* I return to the issue of "guilty knowledge" later.

### (3) Emails showing strategy's purpose and use as flexible source of revenue

906.   There is no doubt, and it was not disputed, that the Defendants were heavily
       focused on revenue growth as a key performance metric. Autonomy's share
       price was volatile, and as a *"beat and raise"* stock tended to experience sharp
       declines if in any quarter the Autonomy group failed to meet market
       expectations of revenue growth. The Claimants did not suggest that such
       promotion of revenue growth as an indicia or metric of performance was of itself
       improper; but they did contend that it became improper when it was not
       disclosed that in reality a material proportion of it was not generated by software
       sales, and overall revenue generation became an end in itself irrespective of its
       source.

907.   The Claimants relied especially on a sequence of emails on 10 August 2009
       between Dr Lynch and Mr Hussain under the subject heading *"revenue
       updates"* as revealing that hardware sales were simply part of a relentless drive
       for more revenue after disappointing Q2 2009 results, without so much as a
       whisper of any objective of consolidating and extending relationships with
       customers and suppliers with a view to enhanced software sales or co-operation
       towards a joint product and joint marketing. Thus:

       (1)   In an email at 09:14 Dr Lynch urged Mr Hussain *"are you doing sms
             today…you need to grab it revenue revenue revenue"*.

       (2)   Mr Hussain responded 30 minutes later that "*EMC is key to quarter*" and
             that he was "*tracking $190m with EMC*".

---

[169] Dr Lynch told me in cross-examination that this figure was *"the forecastable revenue that can be
obtained, not the theoretical maximum"* by which I took him to mean that not all the EMC deals would
proceed. Even if that is so, the excess over the figures in contemplation at the Loudham Hall meeting is
very considerable and in my view such as to invite reassessment of the alleged strategy.

(3) Dr Lynch's reply was: *"NOT ENOUGH"* (though in cross-examination Dr Lynch accepted that $190 million was the top end of the analysts' revenue forecast for the quarter).

(4) Later that day Mr Hussain sent Dr Lynch a further email (under the same subject heading) setting out expected and projected revenues and confirming that he was *"still targeting"* $20m to $25m of EMC and that including the MS-Hitachi order of *"$6m to $7m"* he was now at *"$196m so far but Iwov[170] is a bit week [sic]"*.

908.   Much the same obsessive focus on revenue generation is apparent from an exchange between them only a fortnight later, on 31 August 2009. This commenced with a query from Mr Hussain whether to spend some time on planning for two acquisition prospects (in fact, Coremetrics and Informatica[171]), and also demonstrates how even Mr Hussain as CFO felt obliged to obtain permission as to how best to use his time. Dr Lynch responded:

> *"Your call, I guess a day on acq is OK but in general revenue revenue revenue."*

909.   Dr Lynch sought in his witness statement to shrug this off as *"a fairly typical push on my part for progress from the salesforce"* and as not being *"addressed to hardware in particular"*. He likewise sought to shrug off his message on 31 August 2009 as *"One of my standard motivational emails…"*. His explanation in cross-examination, when pressed to accept that he had pushed Mr Hussain especially hard for more revenue following the disappointing Q2 2009 results, was that:

> *"It was the case every month, so until we had the quarter in, it was always revenue revenue revenue".*

910.   Dr Lynch emphasised that the focus evidenced by these emails was on revenue generally, and was not confined to hardware revenue. But the largest single component mentioned in the emails was the $20 million or more expected from sales of EMC hardware, and Dr Lynch accepted in cross-examination that he appreciated at the time that *"EMC was the key to the quarter"* in terms of achieving the overall revenue forecast.

911.   The Claimants contended that what was starkly confirmed by these emails was a consistent and obsessive focus, which had become an end in itself, unconnected to any marketing drive or perceived threat, and which was fuelled by the availability of far more revenue from the reselling of hardware than had been contemplated when the programme was incepted.

### *(4) Use of hardware sales as a flexible source to 'plug' shortfalls in software sales*

---

[170] Interwoven.
[171] Informatica was a large NASDAQ quoted company, Coremetrics a small one; Autonomy was considering acquiring both.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

912. The financially incentivised willingness of EMC to agree to the interposition of Autonomy into existing and prospective hardware sales transactions meant that hardware reselling offered a much more considerable source of revenue than had originally been contemplated at the Loudham Hall meeting.

913. Total revenue forecasts for Q3 2009 were fixed before the potential of the resource was apparent, and hardware revenues were used *ad hoc* to make good software revenue shortfalls. In quarters subsequent to Q3 2009, once the resource had become clearer, the potential for hardware sales revenue was also taken into account in the forecasting process. Overall forecasted revenue would take into account and include a targeted sum in respect of revenue from hardware sales: and the target developed for hardware reselling revenue would typically be whatever sum was needed over and above forecast software sales revenue to meet market expectations of likely overall revenue targets.

914. Thus, the practice within Autonomy became that, early in each quarter, Dr Lynch and Mr Hussain would agree goals for revenue to be achieved from what they called *"low margin"* or *"strategic sales",* meaning hardware reselling. Mr Hussain would then inform Mr Sullivan of these goals, which would also set the framework for Mr Sullivan's incentive payments (see further below). The hardware sales were a 'stop-gap' in the sense that the targeted revenue from them made good the gap between what Autonomy expected software revenues to be and the expectations in the market of total revenue for the quarter which Autonomy's *"beat and raise"* status had engendered.

915. However, *ad hoc* recourse continued to be made and in the course of every quarter, the target for hardware sales would often be adjusted in response to (a) indications from the hardware supplier (EMC or subsequently Dell, or less often Hitachi) as to their own expected sales and (b) Autonomy's progress towards achieving (also) pre-determined software sales targets: whilst high margin software sales would be primarily targeted, any shortfall might need to be made good or plugged by recourse to hardware sales. In other words, the hardware reselling strategy came to be used as an available resource not only to pump up quarterly forecasting but also as and when required to *"plug gaps"* in software revenues.[172]

916. This required careful balancing of the various sources of revenue. The need to strike this balance became a feature of Mr Hussain's exchanges with Dr Lynch in Q3 2009. As the quarter progressed – and as in all subsequent quarters – Mr Hussain closely monitored the level of revenue that had been secured or was anticipated from hardware sales and updated Dr Lynch accordingly.

---

[172] Dr Lynch sought to dismiss the argument that hardware sales were used as a "stop-gap" on the basis that such sales were themselves built into and part of the monthly overall targets, and had to be achieved accordingly. That would be an answer if hardware revenues did not exceed the target set for them: but it soon was evident and known to Dr Lynch that it would be possible to obtain significantly more revenue from sales of EMC hardware than had been contemplated at Loudham Hall or budgeted for thereafter.

*Efforts to mitigate the effect and visibility of loss-making hardware sales*

917. There was, however, a serious downside of the hardware reselling strategy: an inevitable consequence of its considerable expansion was a considerable increase in its costs (of purchases) and losses (since all, or almost all, the hardware resales were at a loss).

918. These costs and losses would barely have been significant at the levels of hardware purchases and resales which seem initially to have been contemplated at the Loudham Hall meeting. But as they grew, their effect on Autonomy's bottom line, and on the prime parameters of gross profit and gross margin (which Mr Morland explained was a calculation of sales minus costs of goods divided by sales, expressed as a percentage), was potentially very considerable.

919. A material effect and deterioration of gross margin would inevitably cause analyst concern and give rise to questions. A hallmark of software companies is a typically very high gross margin on software sales (80 to 95%) compared to hardware sales by hardware suppliers. This is largely because the direct cost of reproducing software for licence is extremely low. The high gross margins which software companies characteristically enjoy, together with high operating margins which are a key determinant of how much cash a company ultimately generates, are important reasons why software companies tend to command high valuation multiples. Autonomy itself tended to boast very high gross margins of in the region of 90%, and high operating margins of in the region of 40%.

920. Expanding costs of the hardware reselling strategy might have put that at risk; and any deterioration in gross margin not only meant that the hardware reselling would jeopardise a key value parameter, but it would also increase the risk of scrutiny which would expose its nature and extent. Although, as Dr Lynch acknowledged, Autonomy took steps to confine the use of hardware reselling strategy, with its easy but high-cost revenue, to that which was necessary to fulfil consensus revenue projections, the deterioration in software sales in Q3 2009 (and even more markedly in Q4 2009) made that straightforward solution insufficient. The balance between Autonomy's need to plug the gap and the risk it exposed was a tricky one.

921. In subsequent quarters (from Q1 2010 onwards) Mr Hussain and the finance department devised ways of treating revenue from such sales as a discretionary fund to which Autonomy could fine tune its recourse according to the figures for quarterly software revenue: see Q1 2010 (paragraphs 968 to 989), Q2 2010 (paragraphs 1022 to 1029 and 1033(1)) and Q1 2011 (paragraphs 1074 to 1100) below. But in Q3 2009 and Q4 2009, their efforts were directed towards attenuating the adverse effect of hardware sales on its 'bottom line.'

922. As to attenuating the adverse effect of loss making sales, as I shall elaborate later, what was required was some way of justifying accounting for the costs/losses not as costs of sales but rather as Sales and Marketing Expenses which would not affect gross margin.

923.    These, together with (so the Claimants alleged) the depiction of the increase in Sales and Marketing expenses as referable to the development and marketing of SPE are matters of principal importance in the context of assessing whether and how Autonomy misled its auditors, Audit Committee and the market, and I shall return to them each in that context.

*Developing use of hardware revenues*

924.    The Claimants illustrated the emerging use of the hardware reselling strategy as a flexible source of revenue whereby to meet market expectations notwithstanding software sale shortfalls by reference to email exchanges between Mr Hussain and Dr Lynch as Q3 2009 was coming to an end:

(1)    On 26 September 2009, Mr Hussain emailed Dr Lynch (under subject heading *"update"*) as follows:

> *Went thru deals with brent[173] and mooney this evening. Yesterday was v bad. Iwov[174]- $2m off and US idol $6m off. Covered with part jpmc/ emc. But now worried more will fall out. Am at $189m to $190m with $30.7m of EMC stuff. We have $41m so $10.3m left to recognise…"*

(2)    The Claimants made two points in relation to that email. First, the words "*Covered with part jpmc/emc*" showed that hardware deals were being used to plug gaps in software sales.  In other words, they submitted, the hardware deals were being treated as a source of income that assisted Autonomy in meeting or exceeding its revenue targets where a shortfall had arisen, or was likely, due to lost software sales.  Dr Lynch himself said in cross-examination that the EMC hardware sales provided "*a back-up plan*" if needed. Secondly, and relatedly, it appears from the words "*Am at $189m to $190m with $30.7m of EMC stuff. We have $41m so $10.3m left to recognise*" that Mr Hussain had yet to decide whether to recognise the $10.3 million of hardware revenue within the quarter, or to hold it over until the next quarter; and the approach apparently taken was that recognition would be dictated by the Defendants' wish to meet the market's revenue expectations: in other words, the amount of hardware revenue to be recognised would be set in order to achieve that end.

(3)    The next day, 27 September 2009, Mr Hussain emailed Dr Lynch with a further update. He said:

> "*So from Thursday collapse is heavy. Excluding kraft and including 30.7m from emc derived = $188.5m. Stouff says kraft is possible so with that and $26m from emc we are looking at 190m at this stage*".

---

[173] Mr Brent Hogenson (then Autonomy's CFO for the Americas) and Mr Michael Mooney (then Senior Vice President, Field Sales Operations at Autonomy).
[174] Interwoven.

(4) The Claimants submitted that again, this confirmed the approach suggested above: if the Kraft deal concluded, it would only be necessary to recognise $26 million of hardware revenue, rather than $30.7 million, that quarter: the extent of resort to hardware revenue again appears to be treated as (a) optional and (b) unrelated to protecting or driving Autonomy's software business, or any of Dr Lynch's stated purposes.

(5) On 28 September 2009, Mr Hussain provided Dr Lynch with a further update, stating "*With 41m from emc related I am at 200m plus but....*" . That tallied with the $41 million figure for EMC hardware revenue which appeared in Mr Hussain's email to Dr Lynch of a few days earlier (on 26 September 2009).

925.    There is once again no sign that these fluctuations in the amount of hardware which Mr Hussain asked for were referable to any specific software objective. More generally, there is no record relating to this quarter of any projections or analysis or even discussion as to whether hardware sales could benefit software sales. The *ad hoc* use of hardware reselling revenue as a discretionary recourse to the extent necessary if and to the extent of a shortfall in software sales was a third feature relied on by the Claimants as demonstrating that the hardware reselling strategy had nothing to do with promoting or protecting software business and everything to do with covering emerging deficiencies.

926.    Dr Lynch did not address any of these emails in his witness statement, though the Claimants pointed out that they had been identified and relied on expressly in the Claimants' responses to Requests for Information. When cross-examined, Dr Lynch sought to present the figures as estimates or projections, rather than actual sales; but he did have to accept that even if that were so, the fact remained that Mr Hussain was calibrating the amount required from hardware sales according to whether or not software sales eventuated within the quarter and thus according to revenue targets or software revenue shortfalls.

927.    It was in this context that he accepted (as mentioned in paragraph 728 above) that Mr Hussain had *"a degree of flexibility"* and that *"on occasion"* hardware revenue would be used to *"plug gaps in relation to other revenue which may not be achieved."* Further, when asked whether he told Mr Hussain not to seek to use the arrangement with EMC to raise further revenue at a loss once he was confident of hitting what Dr Lynch recollected as a target of $180 million, he said:

> *"If I knew we were about to do 196, then that would – if we were making a loss on that hardware, it's probably one of the first things we'd stop doing."*

*Importance of hardware sales revenues relative to total revenues in Q3 2009*

928.    In the event, Autonomy's total hardware purchases from EMC in Q3 2009 amounted to about $47.3 million, and its reselling receipts on resales to JP Morgan, Citi and Bloomberg amounted to about $37.6 million. It thus

apparently adventitiously resorted to some $7.6 million additional hardware sales revenue to cover the software sales shortfall. Total revenue reported in Q3 2009 was $191.6 million, of which hardware sales revenue comprised over 19%. That met, indeed just exceeded, best expectations. It was within a range of $190m to $200m which Mr Geall had advised would *"help set-off"* the fear of bears in the market if Autonomy once more failed to *"beat and raise"* (see paragraph 65 above).

929.    Without that hardware revenue, Autonomy would not have achieved top-end forecast, nor even the lower end forecast. The Claimants' case was that the use made of the hardware revenues to meet the need which emerged neatly demonstrated the true purpose.

### (5) EMC's withdrawal from the programme and its replacement by Dell in Q4 2009

930.    Mr Sullivan's intention had been to continue reselling EMC hardware in Q4 2009. However, as explained in paragraph 784 *et seq* above, at the beginning of December 2009 EMC suddenly withdrew from the programme. As foreshadowed in describing in those paragraphs the Defendants' case as to what the witness evidence revealed, the Claimants contended that the sequence of events and documentation belied the Defendants' presentation of the relationship as primarily or at least substantially driven by the objective of promoting software sales through an OEM relationship.

931.    It is clear that by the time of EMC's departure, Autonomy had become dependent on hardware reselling to maintain its revenue and meet its forecasts, and needed to replace EMC as the hardware supplier to enable the programme. Mr Hussain's emails in particular, show some considerable urgency to establish another reselling arrangement.

932.    On 17 November 2009, Mr Hussain sent an email to Mr Mooney and Mr Sullivan with the subject "*Dell*". He stated that he wanted a call that day as "*this is now critical*". He continued: "*We need oem ($10m) plus appliance resell (v large). This is a priority*". The Claimants contended that Mr Hussain's use of the expression "*appliance*", given the sums involved ("*v large*") and the reference to "*resell*", was code to refer to *"pure"* hardware sales. I accept that.

933.    On 20 November 2009, Mr Hussain reported to Dr Lynch on a conversation that Mr Sullivan was due to have with Dell. That conversation took place with Bob Barris, a Dell Vice President of Sales, who told Mr Sullivan that Dell had:

> "*a few pending deals in the $10m range that could potentially go through Autonomy ... The catch might be that these deals are going to happen rather quickly and if there are other contingencies we may miss the window*".

934.    As the Claimants noted, that would suggest that all Dell had to offer at that stage were deals already in the pipeline with existing or immediately prospective Dell

hardware customers, into which Autonomy would simply be injected as reseller: hence Mr Barris' reference to Dell already having pending deals that could be made to "*go through Autonomy*". The Claimants made the point that in such circumstances, if Dell's customer happened also to be an existing Autonomy customer (as in fact Mr Sullivan said in direct examination in the US criminal trial they happened to be) that was just a coincidence. The Claimants relied on this as undermining the suggestion by Dr Lynch about the 'marketing' purpose of these sales.

935.  Later that day (20 November 2009), Mr Sullivan reported back to Mr Hussain that there had been "*Great progress with Dell today on the reselling*" and that $10-15 million of potential revenue had been identified, though Autonomy would "*Need to move very fast on paperwork*".

936.  This development prompted Mr Hussain to start sketching out his thoughts on what Autonomy's reselling agreement with Dell should say. It is plain that Mr Hussain's objectives were to be able to point to provisions in the agreement which would reinforce Autonomy's presentation of it as constituting something more than a resellers' agreement, and as directed to enhancing software sales.

937.  On 23 November 2009, Mr Hussain set out these thoughts in an email to Mr Sullivan. In that email, he stated "*our ideal*" would be that the agreement should (a) provide for Autonomy to have the ability to set prices, (b) rehearse that Autonomy would take risk as principal in the transaction with the end customer, (c) provide for the purchase order from Autonomy to Dell to split the price between hardware and marketing, and (d) provide for the purchase order from the customer to Autonomy to contain wording such as "*includes software*". The Claimants submitted that, in other words, the idea was to use the form of the purchase orders to support the impression that these hardware resales were linked to sales of Autonomy software.

938.  The idea and its purpose were further reflected in internal email exchanges within Autonomy. Thus, for example, in an email from Mr Guiao to Mr Chamberlain and Mr Sullivan (cc Mr Scott) dated 2 December 2009 which attached a travelling draft of the proposed agreement with Dell, Mr Guiao referred to the draft as "*based off of the Dell-required VAR agreement*" but which would have additions to:

> "*contemplate both a "standard" VAR relationship, as well as one where pricing is based on Dell marketing efforts…Also I had a discussion with Mike, and mentioned that each PO we submit to Dell will have a line item for Dell marketing…*"

*The terms of the Value Added Reseller Agreement between Dell and Autonomy*

939.  On 22 December 2009, a "*Value Added Reseller Agreement*" was concluded between Dell and Autonomy. This authorised Autonomy Inc to re-sell Dell branded computer hardware and related products, including software, to Morgan Stanley and SHI International ("SHI"), a company that purchased

computer hardware and resold it to BofA. Thereafter, Autonomy used Dell as its primary source of pure hardware for resale.[175]

940.    The provisions of the agreement between Autonomy and Dell included:

(1) Clause 3.1: Dell appointed Autonomy to resell "*Products*" to "*Approved Accounts*". The "*Products*" were defined in clause 2 as "*Dell-branded computer hardware and related products, including Software*"[176]. The "*Approved Accounts*" were set out in "*Attachment A*", which named Morgan Stanley and SHI.

(2) Clause 4.6 dealt with "*Shipping and Handling Options*" and made clear that the products would be shipped by Dell to Dell's customer.

(3) Attachment B (which was referenced in clause 3.1) set out further terms regarding the obligations of the parties in relation to the reselling arrangements. Clause 2 made clear that Dell was to deal directly with its customer, following which Dell would issue a quote to Autonomy, which in turn would issue a corresponding quote to the customer "*based upon the agreed upon pricing between*" the Dell customer and Dell.

(4) Clause 7 of Attachment B contained a provision headed "*Joint Marketing Efforts*". This wording was included at the behest of Mr Hussain and Mr Chamberlain so as to facilitate the allocation of the hardware costs to sales and marketing expenses. However, whether or not Dell participated in any sales and marketing efforts was "*in its sole discretion*".

941.    The Claimants summarised these arrangements with Dell as in effect providing for Dell marketing its own hardware to its own customers, and then, when terms had been agreed, offering its customers the opportunity of a discount, funded by Autonomy, as a nominated reseller.

942.    On that basis, according to the Claimants, these arrangements were in substance broadly the same as the arrangements with EMC, with cosmetic changes to seek to improve Autonomy's arguments in relation to the allocation of a proportion of the costs of the hardware reselling strategy as sales and marketing expenses rather than entirely as COGS.

943.    As with EMC, the Defendants contended that Autonomy's relationship with Dell went far deeper and covered much more ground than was expressed in their agreement. They emphasised that:

(1) The Claimants' own witness, Mr Sullivan, had incepted the relationship: and he was its instigator and the person chiefly responsible

---

[175] A chronological summary of Autonomy's hardware reselling programme with Dell follows in section (6) starting at page 383 below.
[176] The Claimants submitted that this must be a reference to software provided by Dell on the basis that Autonomy would not need Dell's permission to sell its own software: but it is clear from e.g. clause 8 that it included third-party software and I do not agree that it did not include Autonomy software.

for its development. Mr Sullivan had told the court in the US criminal proceedings that Autonomy not only had used Dell for years, deployed its servers in all its data centres and was buying *"thousands of servers at the time"* , but also Dell were:

*"actually a customer as well. They were an e-Discovery customer, and we were just trying to get them to use more of our e-Discovery products."*

(2) Autonomy's many projects with Dell included working on development of an appliance with new Dell hardware running IDOL software, under code-name *"Project Blue Jay."* Discussions on this had begun in February 2009 and certainly by November 2009 had moved into *"high gear"*. Although Project Blue Jay eventually did not proceed, Mr Sullivan said *"That would have been a very large software deal if it closed, which it didn't"*.

944. However, the Claimants contended that these were no more than potential side benefits of association with Dell, and were not the purpose of the hardware reselling arrangements or the hardware sales.

945. Just as Autonomy had swiftly become dependent on EMC to interpose it in hardware sales of EMC hardware to EMC customers (most of which were also Autonomy customers too) so too it became dependent on Dell (albeit with occasional resort to Hitachi) to do likewise in respect of Dell deals.

946. The inter-company exchanges between Mr Sullivan and Mr Barris show Autonomy consistently seeking to boost revenue from hardware deals, and the disappointment and growing anxiety as quarter end approached on the part of Mr Hussain (in particular) when sales were delayed or failed. None of the exchanges mentioned or even hinted that the sales were intended to achieve a marketing objective for Autonomy. As in Q3 2009, so in this quarter, there is no record of any projections, analysis or even discussion as to whether hardware sales could benefit software. In his evidence in the US criminal proceedings, Mr Sullivan confirmed that none of the sales involved software, although he also confirmed that the end-users were existing customers of Autonomy.

947. The continued importance of hardware sales in terms of Autonomy's Q4 2009 revenue is apparent from a number of the contemporaneous documents:

(1) The market consensus for Autonomy's Q4 2009 revenue was between $223 million and $225 million;

(2) Consistent with that, on 15 December 2009, Mr Hussain sent an email to Dr Lynch, with the subject "*as requested*", attaching a document entitled "*ROUTE TO 225*". The attachment identified that one of the elements to achieving the $225 million upper end of market consensus was obtaining a further $5m of hardware sales through Dell/Hitachi, which "*could be ok with the MS deal*" (which was a reference to a

possible deal involving Autonomy buying hardware from Dell for $6.28 million and then selling it to Morgan Stanley for $5.712 million).

(3) A few days later, on 19 December 2009, Mr Hussain provided Dr Lynch with a further update. By this point, to achieve revenues of $224.5 million, further hardware sales of $6.8 million were being targeted. That $6.8 million was comprised of two Dell hardware deals: one with Morgan Stanley for $5.7 million (referred to in the previous sub-paragraph) and a deal for $1.1 million with SHI for the end customer BofA.

(4) Dr Lynch emailed Mr Sullivan on 21 December 2009 (copied to Mr Hussain) stating "*So its [sic] all down to you and 10m from Dell*". In cross-examination, Dr Lynch agreed that he was making it clear to Mr Sullivan that whether market expectations as to Autonomy's Q4 2009 revenue could be met depended on getting a hardware deal with Dell.

(5) Mr Hussain emailed Dr Lynch with further *"quick updates"* on 22 December 2009, which highlighted the possibility of a $20 million Dell hardware deal with Bank of New York, and also noted that EMC had (through Mr Scannell) contacted Mr Sullivan to express interest in this large deal.

(6) Further revenue updates were provided to Dr Lynch by Mr Hussain on 23 December 2009 ("*225m*"), 24 December 2009 ("*224*"), 28 December 2009, 29 December 2009, and then again later that same day.

(7) On the evening of 28 December 2009, Dr Lynch emailed Mr Hussain enquiring whether he had had "*any luck with mooney/sullivan?*" Mr Hussain's response again illustrated the importance of the hardware revenue: "*Was on call with Sullivan – nothing, though I urged him to keep trying*". Later on 28 December 2009, Mr Hussain emailed Dr Lynch: "*US – talked with mooney (dell oem said no), stouff and Sullivan. They are doing what we agreed though Sullivan has nothing*". The Claimants pointed out that this suggested close co-operation between Dr Lynch and Mr Hussain.

(8) In the event, Autonomy recognised $9.1 million of pure hardware revenue in Q4 2009, according to the figures in Autonomy Inc's general ledger. Revenue from impugned VAR and reciprocal transactions was $37.8 million.

(9) The total revenue which the Claimants contended was from an improper activity or source was $46.9 million.

(10)     Without that total Autonomy's revenue for the quarter would have been $158.4 million, a miss of 29% as against the analysts' consensus of $226.1 million, and that figure included add-back of revenue from previous quarters.

948.    From Q1 2010 onwards, Autonomy continued to purchase and resell Dell hardware and also Hitachi hardware, without there being any software included in the sale, nor any sale of software agreed at the same time.

### (6) What a chronological summary of the hardware reselling strategy with Dell by reference to the documentary evidence reveals

949.    In a long section of their written closing submissions, the Claimants set out, separately in respect of Q1 2010 to Q2 2011 (and for good measure, Q3 2011), the facts on which they primarily relied to establish the first limb of their case, to the effect that the hardware reselling strategy was simply a means of pumping revenue, and that the purpose asserted by the Defendants was just a pretext to justify treating the hardware sales revenues as part of the software business without separate identification and disclosure.

950.    They also included within that factual resume the second limb of their case, to the effect that in every quarter both Deloitte and the Audit Committee were materially misled in this regard. In this chapter I focus on the chronology revealed by the documentary evidence as to the first limb. I start with a chronological outline.

*Chronology of Autonomy's relationship with Dell from Q1 2010 to Q2 2011*

*Q1 2010*

951.    Towards the end of Q4 2009 there were, as had become the norm, discussions within Autonomy as to what level of Dell hardware resales should be targeted for Q1 2010:

   (1) On 30 December 2009, Mr Mooney sent Dr Lynch an email with the subject "*Dell* resale" . Mr Mooney asked, "*Should we target $20M for Q1?*", to which Dr Lynch replied, "*yep*" .

   (2) Mr Mooney passed this instruction on to Mr Sullivan within minutes of receiving it from Dr Lynch: "*We need to target $20M for next Q and get as much in January as we can*".

   (3) Mr Sullivan then emailed Dell's Mr Barris stating: "*Autonomy's goal is to do $20m in reselling business in Q1 with Dell. We would like to do as much as possible in January*" .

   (4) On 4 January 2010, Mr Barris informed Mr Sullivan of the hardware deals that Dell was "*tracking*", which he said "*should be able to get us to our desired targets each quarter*" .

952.    In none of these exchanges was there any discussion of which customers might be targeted, or of any marketing benefit that might flow from these deals.

953.    In cross-examination, in response to the suggestion that this was all directed towards generating revenue to fill any gap in software sales, Dr Lynch told me:

"*once we were selling the hardware, that had to go into the forecast and once it was in the forecast, it had to be hit*". He continued:

> "*So there will be a forecast -- from the point where we decided to do this, we would have our quarterly forecasts and those would be what analysts would try to coalesce around with consensus. Because we know we're going to be selling hardware, that hardware number has to be built into the forecast because we can't have it coming on top of it and so the forecast is actually constructed to take account of the expected amount of hardware business.*"

954. The Claimants submitted that Dr Lynch thus accepted, at least implicitly, that the purpose of the hardware sales was to generate the revenue necessary so as to meet Autonomy's forecasts, which drove in large part market expectations.

955. The chronology for Q1 2010 in this regard was as follows:

(1) As referred to above, Dr Lynch's confirmation that Autonomy should target $20 million of hardware sales was given on 30 December 2009.

(2) It was only subsequently, from 7 January 2010, that Mr Hussain and Dr Lynch started discussing the revenue targets for each quarter in 2010.

(3) On 7 January 2010, Mr Hussain provided Dr Lynch with details of the Bloomberg consensus for the year and how that might be achieved.

(4) On 11 January 2010, Dr Lynch responded as follows:

> "*go with 192*
>
> *map out the year*
>
> *work out the acceptable q1 eps*
>
> *map out the eps year*
>
> *report back*
>
> *maintian [sic] y o y margins*"

(5) On 15 January 2010, Mr Hussain provided Dr Lynch with a forecast breakdown for the year. He suggested that for Q1 2010 they should target $194 million of revenue, with 45% operating margin and 25 cents earnings per share. He continued: "*I have analysed how to get to $194m and can get the 25 cennts [sic] EPS with around $15m or so of appliance sales*". In other words, in order to generate $194 million of revenue in Q1 2010, with earnings per share of 25 cents, Mr Hussain estimated that they would need to include what he called "*appliance*" sales of $15 million or so. Dr Lynch confirmed in cross-examination that this was a

reference to building hardware sales into the forecast to achieve the target.

(6) Dr Lynch was content with Mr Hussain's proposals.

956. Pausing there, the Claimants submitted in their written closing submissions that this chronology demonstrated that it could not have been the 2010 targets that drove Dr Lynch's instructions to target $20 million through Dell for Q1 2010, for the *"Simple reason that that instruction was given before the setting of the 2010 targets."* But that submission seems to me to be based on a misunderstanding: Dr Lynch's point (as I understood it) was that because hardware sales were included in the forecast, they cannot have been there to plug shortfalls in software revenues if they emerged, and that point is substantiated by the chronology, rather than upset by it. How far that takes Dr Lynch is another matter: the Claimants' contention remains that Autonomy needed to show growth and the forecast Autonomy felt able to give was on one view "padded" with hardware sales to enable it to do so. Whether plug or padding seems to me to make little difference in the context.

957. To return to the factual résumé, throughout Q1 2010, as in previous quarters, Mr Hussain provided regular updates to Dr Lynch in relation to the achieved and projected hardware revenue. The Claimants submitted that every exchange supports their contention that the primary, if not sole, purpose of these sales was the production of recognisable revenue, rather than any 'marketing' objective:

(1) On 8 February 2010, Mr Hussain provided Dr Lynch with an update on projected revenue and earnings per share for Q1 2010. This forecasted revenue at $197 million and earnings per share of 26 cents. Mr Hussain made clear that in order to achieve $197 million, a number of hardware sales would need to be secured, including "*Hit[a]chi / MS + BofA $5m*" and "*Dell (Ubs) $10m (in negotiations)*". Mr Hussain concluded that he was "*happy that we have sufficient backup to hit the numbers at this stage*".

(2) On 11 February 2010, Mr Sullivan sent an email to Mr Hussain identifying "*the more probable deals for the qtr*". As can be seen from the attachment to that email, by that time, Mr Sullivan was anticipating the possibility of Dell hardware deals in Q1 2010 totalling $30.7 million.

(3) In Mr Sullivan's commentary on each of these deals there is no suggestion that any of these transactions involved the sale of an appliance or a package that included Autonomy software; nor that the sale of Autonomy software was of the remotest interest to Mr Sullivan, as Dr Lynch accepted in cross-examination.

(4) Further, as the Claimants especially drew to my attention, the entry in relation to a $10 million deal with Citibank indicated that Autonomy's involvement in the deal was unlikely to be known by Citibank. Dr Lynch recognised that is hardly consistent with these deals forming part of an Autonomy marketing strategy:

> *I wouldn t be happy with that, unless we could tell Citi. ... I wouldn t accept that order if I had known – if I knew that it was not possible to tell Citi, but I don t know how they would stop us telling citi".*

(5) On 23 February 2010, Dr Lynch sent an email to himself which included details of secured and anticipated revenue. By that time, $100 million of revenue had already been achieved in the quarter, of which $5.5 million was "*low margin*", i.e., loss-making hardware sales. The email appears to note that further hardware deals were projected for the quarter ("*3 dell/hiatachi [sic]*", "*10 HW \*\*\*\*\**"), with total revenue forecast totalling $200 million.

(6) By 1 March 2010, Dell deals of only approximately $5 million had actually closed. An email from Mr Sullivan to Autonomy's Mr Matt de Luca of that date, noted that by that point $50 million of deals had been talked about with Dell but that "*much of the $50m are bids that dell may not win or won't hit this qtr*". The concern appears to have been lest the revenue targets were not hit: and the Claimants made the point that had the purpose of these sales been 'marketing', then whether or not the deals would conclude that quarter would have been a matter of little moment for Mr Sullivan.

(7) On 12 March 2010, Dr Lynch sent himself a further email containing an update in relation to the revenue position as it stood at that time. Revenue from deals "*done*" at that time totalled $108 million, which included $9.3 million of "*low margin*" hardware sales. Further hardware sales were forecast at $8 million ("*8 HW \*\*\*\*\* (Silicon G, rita,,Dell 3, emc?, Hit[achi]/ms 4.5, dell5 2, Target)*") in order to arrive at a total revenue figure for the quarter of $195 million.

(8) A few days later, on 15 March 2010, Mr Hussain told Mr Sullivan that they would "*definitely need*" a further Hitachi deal and that he would also "*like*" a further Dell deal, which were two of the hardware deals included in Dr Lynch's 12 March update to himself. On the same day, Mr Hussain provided an update to Dr Lynch stating that revenue was "*currently at 195.5m*", but "*5-8 more*" was needed.

(9) The following day, 16 March 2010, Mr Hussain sought an update from Mr Sullivan on the status of hardware deals with Dell and Hitachi. Mr Sullivan responded as follows:

> *HDS will be about $2.1m – final orders coming in this week – I need to calc the final number based on final margin agreement with Morgan. Morgan is not willing to place the additional $4m order this qtr.*
>
> *-   should have another $500k to $1m from Dell/SHI. discussing some other orders as well – we could provide extra incentive to accelerate this.*

> - *also working on a deal to sell DB a dedicated safe. this could be about $300k to $400k and could be delivered this qtr. There is no rep involved as Dan Manners came directly to us (Roger, Rob and I). I am in Pleasanton and we are trying to cut a deal with him ASAP.*
>
> *other longer shots for Q1*
>
> - *Will get orders from UBS in March for up to $1m, but unlikely to ship. Calls later today on this should provide more info.*
>
> - *I am meeting Bank of NY in NYC on Thursday re: potential dell orders.*
>
> - *We will probably get an order from Citi through a reseller called insight in March. Around $1m. Shipping will likely make this a q2 deal."*

(10)    There is no mention of any sales of Autonomy software to those customers.  Mr Hussain's response was that he "*was counting on hds so need ubs and citi orders to be shipped"*. Mr Sullivan immediately actioned that.

(11)    Shortly after receiving Mr Sullivan's email, Mr Hussain updated Dr Lynch, informing him that it was "*getting more difficult, low margin is down for hds – confirmed* for *2.1m out of 4.5m (but with 2m from ubs and citi as possibles). have 1 m from bofa dell so need another c 1.5m from somewhere"*.

958.    In a pattern becoming familiar, as Q1 2010 came to an end, Mr Hussain became increasingly concerned about whether enough hardware reselling revenue would be raised, and the Defendants continued to monitor whether $20 million of hardware revenue would suffice to meet aggregate revenue expectations:

(1)    On 24 March 2010, Mr Hussain, in an email to Mr Sullivan, expressed concern that two hardware orders that Mr Sullivan had mentioned might not ship in time to enable revenue to be recognised in the quarter: "*… I need $1m to ship"*.

(2)    The next day, Mr Hussain told Mr Sullivan and Mr Egan, in connection with a contemplated hardware sale to Morgan Stanley, "I just want the revenue gents".

(3)    On 27 March 2010, Mr Hussain wrote to Dr Lynch, "Keeping you informed that I have increased the appliance sales to $19.215m (with another $1.7m possible)".

(4)    Dr Lynch disagreed that this was simply a false description for what were in truth pure hardware sales and suggested in cross-examination that some of these sales would have been appliance sales.

(5) However, in his evidence to the US court, Mr Sullivan stated that he did not consider any of the Dell sales in 2010 to have been sales of appliances; and there is no documentary evidence to suggest that any part of the $19.215 million of potential revenue related to appliances. Furthermore, the amount of appliance sales was stated to be very small. I accept Mr Sullivan's evidence.

959.    On 29 March 2010, Dr Lynch sent Mr Hussain an email attachment recording in short form the Q1 2010 aggregate revenue figure. This stated that $132 million had already been achieved "*INCL 20 Low margin*". Dr Lynch's email noted "*- 5 replace low margin in closed with hi*" which the Claimants maintained was a suggestion that $5 million of the loss-making hardware revenue should be replaced with "*hi*", i.e. revenue from high margin software sales, if such sales could be achieved.

960.    This was put to Dr Lynch in cross-examination. After patient but rigorous cross-examination, he said he was "*having trouble following this*" and subsequently that this was ten years ago, that it was one of 100 million pages in the case, that he did not know the context, and that the suggested interpretation "*might be on the right lines, or it may be something completely different, I don't know*". This reluctance to speak to selected documents from 10 years ago is understandable; but it was uncharacteristic of Dr Lynch; and his equivocation was likewise uncharacteristic and unconvincing. There is nothing of substance to contradict the Claimants' suggestion, which I thus accept: Dr Lynch's equivocation does not suffice.

961.    The following day, 30 March 2010, Dr Lynch sent Mr Hussain, in a format which had become habitual for Dr Lynch of a column of numbers and opposite each number an abbreviated reference to a counterparty (such as "*5: PMI Partner*") or description of type of business or activity (such as "*- 5: replace low margin in closed with hi*"), a revision of his suggested list of transactions to achieve forecast. The first entry was "*138: Done (INCL 20 Low margin)*". The list following now included two alternatives, the second catering for the possibility that no Vatican Library VAR transaction (discussed in paragraphs 280 to 397 of the Schedule of Impugned VAR Transactions) were to materialise; in that event, Dr Lynch envisaged "*22 Low margin*", i.e. $22 million of pure hardware revenue. When cross-examined on this, Dr Lynch accepted, that this anticipated the possibility of Autonomy including anywhere from $15 million of pure hardware revenue ($20 million less $5 million) to $22 million.

962.    Later that same day, 30 March 2010, Dr Lynch sent Mr Hussain a further revision of his earlier notes on sales, again containing two alternatives, stating as follows:

> *Ok heres my list*
>
> *note the without vat list*
>
> *good to hear vat looking fine but even if vat were compromised, even if you could get 5 from Valueteam it might just scrape it at 193."*

963.    On 31 March 2010, the last day of the quarter, Mr Hussain sent an email to Dr Lynch entitled "*route*". The attachment, entitled "*SH route to 25c*", identified that, if "*Low margin cost*" (i.e. if the cost to Autonomy of purchasing hardware sold in the quarter) were $20 million, total revenue of $200 million would be required in order to achieve earnings per share of 25 cents in Q1 2010. This reflected the fact that although the hardware sales boosted revenue, they were loss-making, and thus had a deleterious effect on earnings per share. As Ms Gustafsson had explained:

> "*Selling hardware ..., particularly hardware at a loss, involved a cost that hit Autonomy s earnings per share. ... While higher hardware sales may have led to a higher quarterly revenue figure, they led to a lower EPS figure given they resulted in a negative margin*".

964.    Dr Lynch responded to Mr Hussain later that day, attaching a revised version of the "*SH route to 25c*" document. Based on Dr Lynch's alternative calculations, earnings per share of 25 cents could be achieved with total revenue of $195 million ("*EPS 25c 195*"). Dr Lynch's apparent intention was to suggest that the target earnings per share could be achieved if less hardware revenue (and thus less cost) was recognised in the quarter. He appears to have reached this view having checked with Mr Goodman where market consensus was at for Q1 2010. Mr Goodman informed Dr Lynch that a "*more accurate reflection of where Q1 consensus really is, excluding the two clear outliers that are above $200m*" was revenues of $193.12 million with earnings per share of 25 cents. Dr Lynch forwarded this on to Mr Hussain.

965.    Numerous further versions of the "*SH route to 25c*" schedule were exchanged between Dr Lynch and Mr Hussain on 31 March 2010, which the Claimants suggested was a demonstration of the importance that they attached to ensuring that an appropriate balance was struck between achieving revenue through (loss-making) hardware sales and maintaining an adequate earnings per share.

966.    In the event, Autonomy reported revenues for Q1 2010 of $194.2 million and earnings per share of 25 cents in its Q1 2010 Quarterly Report. This was exactly the Reuters consensus figure. Reported revenues included $11.8 million of revenue (reduced from the original target of $20 million) from the hardware sales programme (as well as some $26.8 million which the Claimants alleged was improperly recognised in respect of five impugned VAR transactions, $8.5 million from reciprocal transactions which they also impugned, and a further $12.7 million from hosting arrangements which they alleged ought not to have

been recognised in Q1 2010). That left $149 million from sources not impugned by the Claimants.

967.   That $11.8 million of revenue for the hardware sales programme was less than the value of the hardware sales achieved and shipped in Q1 2010, which was just over $19.2 million. [177] In the days following the end of the quarter, Mr Chamberlain, at the instance of what he described as *"powers greater than me"*, directed *"adjustments to revenue"*. The Claimants alleged that this was improper and illustrated both the Autonomy management's attitude to hardware revenues and their propensity to mislead the market, Deloitte and the Audit Committee. I turn now to the issue of revenue manipulation.

*Q1 2010: alleged post-quarter end manipulation of the hardware revenues recognised*

968.   I have mentioned previously the problems to which an expansion in Autonomy's recourse to hardware sales to make good shortfalls in software sales gave rise in Q3 2009, and the 'solution' adopted at that time of persuading Deloitte to approve the allocation of a substantial proportion of the costs/losses as marketing costs (see paragraphs 917 to 922 above). The continued material recourse to such sales after EMC had withdrawn and Dell had replaced it as hardware supplier for the programme necessitated the development of other ways of minimising the adverse effect of the programme on Autonomy's 'bottom line' figures.

969.   That was, however, easier said than done; and the problem was exacerbated by two factors:

(1)   The problem of identifying final figures for quarterly software sales revenue. Delivery of software could be achieved instantaneously over the internet. A considerable proportion of software sales tended to be concluded at the very end (often on the last day) of the relevant quarter, and so software revenues could not accurately be measured until the last moment. Hardware sales, by contrast, required physical delivery and in any event, EMC (or subsequently, Dell and/or Hitachi), would typically wish to fulfil the sale contract in the ordinary course of the quarter.

(2)   In the case of both software and hardware, once delivery was effected unconditionally, revenue from the sale was mandated under IAS rules.

970.   The only 'solution' available to this mismatch was to find some way of justifying deferring recognition of hardware revenue which had proved to be, as it were, excess to requirements. The expedient developed by Mr Hussain was to find some basis on which to assert that the hardware sales had not been completed, usually by reference to some alleged delay or imperfection in delivery.

971.   According to the Claimants, Q1 2010 was the first quarter in which Autonomy deferred revenue recognition from hardware sales. The Claimants' case in

---

[177] And see further paragraph 980 below.

closing was to the effect that Autonomy, at the instigation of the Defendants, treated hardware sales revenue as a discretionary fund, recognising or deferring recognition of such revenue as they pleased in order to achieve (or appear to be achieving) targeted revenue growth whilst at the same time protecting Autonomy's bottom line and consequently key parameters including organic growth figure and EPS.

972.    The Claimants contended that this was not only improper in itself, but also was another powerful indication that the hardware programme had nothing to do with protecting and promoting Autonomy's software business and was never calibrated or pursued for the purposes avowed by Dr Lynch: it was always about *"revenue revenue revenue"* and the need for and use of it was a function of revenue targets.

973.    There was a dispute, however, not only as to whether this reduction in recognised hardware revenue was dishonest manipulation (rather than an appropriate decision against recognition), but also as to whether any such claim was open to the Claimants on their pleading. Before turning to the dispute in more detail, it is convenient to determine whether or not the allegation against the Defendants was sufficiently pleaded.

974.    The Defendants had to acknowledge that there was a reference in a different part of the RRAPoC (under the heading *"Involvement of Lynch and Hussain in the transactions themselves"*) but Mr Miles submitted that in the allegations of false accounting for hardware in the RRAPoC there was no express allegation that the deferral of revenue was illegitimate. Nor was it alleged that the matters referred to resulted in an inaccuracy in Autonomy's published information.

975.    The Claimants maintained that the plea was plain, that it was well understood by the Defendants to extend to an allegation of impropriety, and that the parties had as a matter of pleading and submission joined issue on it. The pleading on which they relied was expressed as follows:

> *"On occasion, Lynch and Hussain also discussed and (it is to be inferred) agreed to defer recognising revenue from pure hardware sales from one quarter to the next, and to reduce the level of pure hardware sales that could otherwise have been achieved (and thus to postpone or avoid recognising the associated costs of hardware) where they anticipated that they could meet market expectations with a lower level of hardware sales than had been, or could be, achieved."*

976.    The Claimants submitted that:

(1) Dr Lynch and his lawyers plainly understood the allegation that he (Dr Lynch) faced: when pleading to that paragraph, he stated that the email communications which the Claimants went on to refer to in PoC §135 *"did not relate to any improper deferral in recognising revenue from existing sales ..."*. Indeed, Dr Lynch sought further particulars of the allegation, which the Claimants provided;

(2) The same is true in relation to Mr Hussain, stating that "*[a]ll revenue was appropriately recognised in accordance with the relevant accounting standards*";

(3) Contrary to Mr Miles' assertion, this issue was in fact addressed by Mr Welham in his witness statement, in passages on which he was not cross-examined: It was also addressed by Dr Lynch's own witnesses.

(4) The point was also addressed in the Claimants' written opening submissions.

977. To my mind, there is force in Mr Miles's objection to the extent that such an allegation should have been pleaded so as expressly to state in the more relevant part of the pleading that impropriety was being asserted. However, I do not think the Defendants can realistically claim to have misunderstood what was being alleged, or to have been taken by surprise. The evidence engaged with the point. In my judgment, the allegation cannot be disposed of on the basis of a pleading point; and the allegation is relevant to probity in any event.

978. As to the substance of the allegation, the Defendants argued that (a) the decision was taken because additional information became available such that the finance department considered that part of the hardware resales revenue could not properly be recognised in that quarter; (b) late changes such as these were subjected to intense scrutiny by Deloitte and approved by them; and (c) Autonomy was in any event entitled to manage its sales pipeline carefully to ensure predictability of its results, and was open about doing so in its Annual Reports.

979. Dr Lynch contended further that there was no basis demonstrated for the Claimants' contention that he was involved in the decision. However, when cross-examined, although he could not speak to the actual facts, he justified the principle and practice of such changes as entirely normal: enquiries post-quarter end would often reveal some impediment to recognition such as late delivery or failure to deliver "*in good stead*". He insisted that "*There's nothing inappropriate about that happening past the quarter end*".

980. To demonstrate the contrary, the Claimants relied on the following demonstration of manipulation, in addition to the matters I have referred to above:

(1) On 31 March 2010, Mr Sullivan provided Mr Hussain with "*a preliminary estimate of how it will come down based on updates from Dell*". He set out the status and details of the Hitachi and Dell hardware sales that had been achieved in Q1 2010. He stated that he would not have the final "*shipping numbers*" until the end of the day "*so these numbers could change a little*", but that the preliminary estimate was that $18,583,976 of hardware had been shipped in Q1 2010 (with a further $7,043,598 falling into Q2 2010).

(2) Later that evening, Mr Sullivan provided updated numbers to Mr Hussain and Ms Cynthia Watkins (Autonomy's Corporate Controller). These showed that $19,224,547.76 of hardware had been shipped in Q1 2010, with a further $7,595,180.74 falling into Q2 2010.

(3) On that basis, just over $19.2 million of hardware sales had been achieved, and shipped, in Q1 2010.

(4) That, therefore, is the amount of hardware revenue that should have been recognised in Q1 2010: but it was not.

981.    As to the thinking behind the sudden reduction in hardware sales in the Q1 2010 Quarterly Report the Claimants contended that:

(1) On 8 April 2010, over a week after quarter end, Mr Chamberlain sent an email to Ms Watkins, copied to Mr Stephan and Ms Harris, subject "*Revenue adjustments*", stating as follows:

> "*Firstly, I apologise for the constant changing of your numbers. Powers greater than me are making these decisions and whilst I understand them I know they will be causing you a lot of pain. I will make sure this is remembered when it comes to sorting out Q1 bonuses.*
>
> *We need to make adjustments to revenue which affects hardware revenue and costs as well as normal licence.*
>
> *1) Defer Capax (FSA) - $4,285k*
>
> *2) Defer additional hardware deals as per attached – some ins and outs from last nights schedule*
>
> *Once processed can you resend TB, consol pack and revenue sheets.*
>
> *Thanks and apologies again*".

(2) The attachment to Mr Chamberlain's email was a schedule which showed the percentage of resold hardware which had been shipped in Q1 2010; and the totals after applying the percentages equate to those

which appeared in Mr Sullivan's email of 31 March 2010 referred to in paragraph 980(2) above.

(3) The Claimants submitted that it was to be inferred that what was under consideration was that revenue in relation to certain deals should be deferred for some reason other than delay in shipment.

982.   As to who was responsible for or involved in this revenue manipulation, the Claimants contended:

(1) It was plain from his covering email of 8 April 2010 that Mr Chamberlain was not deciding off his own back what revenue should or should not be recognised in Q1 2010.  He was being directed by "*powers greater than me*".

(2) At the very least must have included Mr Hussain. (Ms Harris thought it likely that it was Mr Hussain, but did not know the extent to which he would have discussed the matter with Dr Lynch).  Indeed, that is apparent from Mr Hussain's email to Mr Chamberlain of earlier that day (with the subject "*costs*"): "*If we can defer $4m from HDS (Morgan Stanley) then I believe we get there*".

(3) Mr Hussain would have wanted to check with Dr Lynch, and given the close interest that Dr Lynch clearly took in ensuring an appropriate balance between revenue and earnings per share (see paragraph 965 above), as well as his previous (and subsequent) input into how much hardware revenue to recognise, it is improbable that he would not have been involved on this occasion too.

983.   The Claimants contended that given the familiarity that each of them had with the revenue recognition rules (and this would have involved the most basic application of those rules), absent any good reason for such deferral, it would have been obvious to Mr Chamberlain, and also to Mr Hussain and Dr Lynch, that what was under consideration was wholly improper, but that this was not thought by them to be an impediment.

984.   The Claimants sought further to support this contention by reference to various crosses against hardware shipments made on a succession of versions of the schedule prepared by Mr Sullivan (see paragraph 980 above), which appeared to show changing plans in succeeding versions as to what hardware sales (marked with a cross) should be stripped out. They suggested, for example, that:

(1) As at 7 April 2010, the plan had been to defer the revenue (and corresponding costs) in relation to eight hardware sales with a total revenue of $4,472,575, meaning that $15,054,428.69 would be recognised in Q1 2010 (column G, row 38); whereas

(2) By 8 April 2010, only five crosses were included, but the 'crossed' deals now included a $5.6 million deal with Morgan Stanley showing a loss to Autonomy of 30% (much higher than the standard 10% and therefore a considerable negative in respect of EPS): this meant that $7,748,041.69

(column H, row 36) of hardware revenue would be deferred, with $11,779,144 being recognised in Q1 2010 (column H, row 38).

985.    A few days later the position had changed again. On 12 April 2010, Mr Chamberlain sent a further email to Ms Watkins, copied to Mr Stephan and Ms Harris, with the subject "Further changes":

> *We have had to make further changes to your numbers.*
>
> *Capax (FSA) – back in*
>
> *Hardware – have had to recognize more HW*
>
> *The revised hardware sheet is attached again with a column identifying the changes. We have manually updated the consol packs and TBs and processed the journals so you should tie in to these revised numbers."*

986.    The Claimants submitted that by 12 April 2010, it would have been entirely clear what hardware had been sold and delivered in Q1 2010: and that these latter changes cannot sensibly be explained by reference to changes emerging from 8 April onwards. They also pointed out that the one person – indeed perhaps the only person – who would have known exactly what hardware had been delivered was Mr Sullivan, but he was not copied in on any of the above exchanges and does not appear to have been involved in the discussions or decisions as to what hardware revenue to recognise.

987.    Furthermore, they pointed to later documentary evidence that Mr Hussain, at least, was concerned to ensure that Mr Sullivan was not involved or made aware of the late changes. Thus, on 26 April 2010, in an email with the subject "*Low margin business*", Mr Hussain instructed Mr Stephan that he (Mr Stephan) was responsible for "*keeping right on top of how much has been sold, how much is in deferred revenue, how much in the pipeline*", requesting that Mr Stephan provide him with "*daily updates*". In response, Mr Stephan enquired whether he could "*share with Sullivan the changes we made to what was recognised/deferred in Q1*". Mr Hussain's reply was categorical:

> "*No – you do not give this info to mike S – why would he need it? just get what he has sold on a daily basis – create a spreadsheet – I do not want any inventory at the end of this q*".

988.    The Claimants concluded with the point that in any event, it is clear from the delivery notes for the deferred deals that (a) the hardware was indeed shipped in Q1 2010 and, save for one, was delivered in Q1 2010 too; and (b) in respect of many of the deferred deals, Autonomy had actually received payment in Q1 2010, disproving (if it were otherwise contended) that these deferrals were

anything to do with collectability or issues as to whether the customer had accepted the goods. Payment had been received by Autonomy in Q1 2010.

989.   In my judgment, the decision to defer recognition of this hardware revenue was taken because the revenue was (a) not needed for that quarter to make good any shortfall in software revenue (they had already been covered in other ways); (b) 'expensive' in that the costs of it exceeded its sale price and thus had an adverse impact on gross margin, so that (in pursuit of the objectives of the strategy) it was best kept back for use when more necessary; (c) likely to prove useful in future quarters if and when shortfalls arose which had not been covered. That was improper, and the Defendants knew it.

*Q1 2010 – the inventory*

990.   A consequence of the decision was that the hardware of which the sale had not yet been recognised for accounting purposes needed to be shown as an asset on Autonomy's balance sheet as at 31 March 2010 until it was purportedly sold. This meant that there was a significant increase in Autonomy's inventory for Q1 2010:

(1)   The inventory appearing as a sub-heading *"Inventory"* under the heading *"Assets"* in Autonomy's balance sheet as at 31 March 2010 (and included in the Q1 2010 Quarterly Report) was $10.250 million. That represented an increase of over $9.75 million as compared to the previous quarter.

(2)   In cross-examination, Ms Harris did not dispute that the increase in inventory as at the end of Q1 2010 was referable to the revenue from certain of the hardware sales not having been recognised in that quarter.

(3)   That can also be seen from the contemporaneous documentation.

i.   On 16 April 2010, Ms Harris sent an email to Ms Watkins with the comment: "*We want to classify the 3 invoices at the bottom of the attached list (4,170,350; 4,666,928 & 1024,093) as inventory rather than prepayments*"). Those three entries – $4,170,350, $4,666,927.90 and $1,024,093.37 – totalled $9,861,371.27. In a further email to Ms Watkins later that same day, Ms Harris stated that the "*equipment was shipped directly to the customer which is stated on the invoices*".

ii.   On 17 April 2010, Ms Watkins responded: "*This is for the balance of 8.3M as an additional 1.5M was recognized. Helen will be sending to you. Its more like 15 invoices ☺*".

iii.   Following accounting revisions on 12 April 2010, $8,209,780.60 of costs relating to the four hardware deals was deferred (column M, row 36); with $1,508,340 of additional costs being recognised as a result of a further revision in the 8 April 2010 version of the spreadsheet. (column M, row 39).

iv.   The fact that the inventory related to these hardware deals can also be seen from an attachment to Mr Chamberlain's email to Mr Hussain of 16 April 2010.

991.   The Claimants contended, and I accept and find, that Deloitte were misled in relation to the inventory.

(1)   On 20 April 2010, Mr Chamberlain sent an email to Mr Stephan, which he copied to Mr Welham, referring to the hardware deals in respect of which revenue was not being recognised in Q1 2010 and stated:

"*to cut a long story short we were not able to prove delivery on these deals, each of them having problems and so we have deferred until Q2 2010. The future receipt of cash and satisfactory delivery notes will provide me with the evidence I need to recognize. They are currently deferred as goods in transit/inventory.*"

(2)   In response, Mr Welham stated:

"*The issue we have is ensuring that you have the asset at the balance sheet date. Can you prove delivery now, i.e. post period end to show that you had the hardware and delivered just after period end?*"

(3)   Mr Chamberlain responded:

"*We have many delivery notes that show delivery leaving in March but not reaching customer until early April.*"

(4)   This was false: as set out in paragraph 988 above, all bar one of the hardware deals had been delivered by quarter end (31 March 2010) and, in many cases, Autonomy had actually received payment for it by that date.

992.   However, the substantial increase in inventory therefore required some explanation to the market.

(1)   On 16 April 2010, five days before the results were released, Autonomy issued a trading statement, stating that it expected to:

"*report record first quarter 2010 results in line with analyst consensus estimates of revenues of approximately $193 million and fully diluted EPS (adjusted) of approximately $0.25*" .

(2)   The trading statement continued:

"*In Q1 the company <u>took advantage of discounted offers to purchase stock for the Arcpliance product in advance of Q2</u>*

> *sales, which affected the cash position. These sales have now been completed*" (emphasis added).

(3)     Dr Lynch and Mr Hussain were both involved in approving this wording prior to its release.

(4)     In a similar vein, the Q1 2010 Quarterly Report stated:

> "*Movements in cash flow during the first quarter of 2010 of note included: ... Purchasing of inventory of $10 million for Q2 2010 sales, most of which have now completed.*"

993.    However, as both Defendants knew:

(1)     The increased inventory in Q1 2010 was <u>not</u> due to stock having been purchased in Q1 2010 for sale in Q2 2010: as explained above, it was due to the decision not to recognise the revenue in Q1 2010.

(2)     Further, it was not "*stock for the Arcpliance product*".  Arcpliance was sometimes referred to as 'Digital Safe in a Box', as Mr Avila confirmed in cross-examination. It involved Autonomy pre-loading Digital Safe on to hardware and then pre-configuring it.[178]  In contrast, the inventory related to pure hardware which had already been sold and, as Ms Harris confirmed in her email to Ms Watkins on 16 April 2010, had been shipped directly by the manufacturer to the customer.

(3)     Nor was it stock that was purchased by Autonomy to take "*advantage of discounted offers*", but was instead hardware that Autonomy was selling (indeed, had sold) at a loss.

994.    The story was false: but once spun it had to be kept going. As I describe later, the false representation that the $10 million of inventory related to Arcpliance was subsequently reinforced by the Defendants on the Q1 2010 earnings call: see paragraphs 1573 to 1588 below.

*My assessment re Q1 2010*

995.    In my judgment, these facts and those set out in paragraphs 951 to 994 above demonstrate that:

---

[178] See also Yan 1 §28, which was unchallenged in cross-examination: "*Following Autonomy's acquisition of Zantaz, the Product Development team was encouraged, and at times, pressurized, into trying to package Digital Safe into a self-contained appliance for sale to on-premise customers. This led to the development of what was known amongst the software developers as "Safe in a Box" (subsequently marketed as "Arcpliance"), which was essentially a computer box with the capacity to archive a limited amount of data*".

(1) In Q1 2010 a pattern of manipulating recognition of revenues from the hardware reselling strategy to achieve the best balance between revenue growth and gross margin/EPS is clearly evident;

(2) The deferral of hardware revenue recognition gave rise to the problem that the amount of the deferral was (logically and properly) posted as an asset to Inventory: but the truth as to its source could not be told without revealing the hardware reselling strategy;

(3) At the Earnings Call for the quarter both Defendants provided an explanation for the Inventory which was patently false: see below.

*Q2 2010*

996.    The hardware reselling strategy continued in Q2 2010. A particular feature of this quarter, which served to increase Autonomy's reliance on hardware, was the dramatic reduction in VAR transactions.[179] There were no allegedly 'reciprocal' transactions in Q2 2010 either.  It was in this quarter that the Hogenson episode occurred, which placed the spotlight on the propriety of both.

997.    The Claimants contended that Q2 2010 provides a particularly striking illustration both of the Defendants' reliance on hardware sales and of the way the Defendants tailored their sales, or at least recognition of revenue arising from them, in order to meet market revenue expectations.

998.    On 16 April 2010, Mr Sullivan sent the Defendants a summary of where things stood regarding hardware sales for the quarter. He referred to an *"Additional Pipeline of approx. $67m"* with caveats that (a) some was *"low probability"* (b) about $17m was *"70% probability or greater"* and (c) *"Some will likely book or ship outside Q2 2010"*. He provided a schedule of prospective deals assigning to each a probability percentage. He said he was:

> "*Looking for any guidance on where to draw the line on new pipeline or target Q2 Low Margin Revenue range*".

999.    On 19 April 2010, Mr Hussain sent Dr Lynch an email referring to the "*consensus*" market expectation of aggregate revenue of $222 million and earnings per share of 30 cents for Q2 2010. Mr Hussain then set out a number of different models:

(1) Taking the cost base excluding hardware as $94.5 million, in order to hit earnings per share of 30 cents (sometimes referred to in shorthand as *"30c"*), software sales of $190.5 million would be required.

---

[179] Only one VAR transaction was concluded (VT15); and that did not involve any of Autonomy's usual VARs.

(2) If it was assumed that there would be $15 million of hardware sales and if various software deals could be concluded, revenue of $201.5 million for the quarter would be achieved with earnings per share of 28 cents.

(3) In order to hit aggregate revenue of $215 million with earnings per share of 30.6 cents, Autonomy would need "*$20m hardware*" along with various software sales; or, if aiming for aggregate revenue of $220 million with earnings per share of 30 cents, "*[we] will need either 5m more h/w and lower cost or more s/w*".

1000.   He suggested two alternative targets, explaining that the question was "*more of how much h/w to take…*"

(1) "*So could go for $215 m and 30c (most likely outcome) but 10% organic growth means share price likely off a lot*";

(2) "*Or could go for $220m and 30c (13% organic growth) – will need either 5m more h/w and lower cost or more s/w*".

1001.   Mr Rabinowitz asked Dr Lynch about this in cross-examination, and put to him that "*the consideration of how much hardware deals to do was all about what revenue figures you want to get to, correct?*" Dr Lynch answered this as follows:

"*Yes, I think that's reasonable. What's happening here is we're working out what the forecast is going to be, so, as we were discussing the other day, we lower and raise the forecast as we think prospects are. And, yes, we are using, or at least in one of his options, the option in the middle, he's using the possibility of 5 million of hardware flex to fit that forecast together.*"

1002.   Mr Rabinowitz followed this by asking him to accept that "*it's all about revenue figures…it was about producing revenue, albeit at a cost, that might be used to achieve particular revenue targets?*" Dr Lynch's calmly delivered answer encapsulates the essence of the defence:

"*There's no doubt that they come with revenue and there's no doubt that that does have the advantage of giving us a bit of flexibility. Not much because of the delivery issue. But that's not the primary reason why this was chosen as the strategy. If the primary reason was revenue, there would be better things to do.*"

1003.   The next day, 20 April 2010, Mr Hussain emailed Dr Lynch some further thoughts as to how to achieve the target. He explained how earnings per share of 30 cents could be achieved by reference to different overall revenue levels with differing levels of hardware sales:[180]

---

[180] The reference in Mr Hussain's email to "*bav*" was to the Vatican Library.

> *FURTHER THOUGHTS on outlook – tax rate in Q2 is higher:*
> 1. *Tax losses mean full year rate will be 24.4%, means Q2 rate will be 21.8% (catch up on Q1)*
> 2. *Costs exc. Hardware = $94.5m*
> 3. *To hit 30c in Q2 without h/w need $194.8m revenue. My current forecast (inc 15m from jpm and 13m from bav) is $186.5m so $8.3m short*
> 4. *To hit 30c with $215m of revs = $18.3m of hardware, means $10m short*
> 5. *To hit 30c with $220m of revs = $23.2m of hardware, means $10.5m short*
>
> *So overall we will need to find $10m or so if we forecast 195, 215 or 220*
>
> *How can I find it?*
>
> - *CA deal should yield $6m to $7m*
>
> - *Grow Safenet, BlueArc etc*
>
> *My suggestion is to go with 220m and 30c but we can discuss when you waken."*

1004. Later that day, Mr Hussain sent an email to Dr Lynch with the subject "*Interesting point on deals for hardware*", stating: "*Would be $40m to have no effect on gross margins – i.e. big visibility on q2*". It is unclear quite what Mr Hussain meant, but the Claimants suggested (and I accept) that the effect of what he was saying was that if $40 million of hardware sales were made in the quarter that would have no effect on gross margin, but that sales at that sort of level would be very visible to the market.

1005. It appears that, shortly thereafter, Dr Lynch and Mr Hussain agreed the amount of revenue required from hardware sales in Q2 2010. Thus, following a discussion he had had with Mr Hussain on 21 April 2010, Mr Sullivan emailed Mr Chamberlain (with subject heading "*Low Margin Revenue*") that the pure hardware sales revenue goal for Q2 2010 was now $30 million. When cross-examined, Dr Lynch said he assumed that the $30 million figure was one that they had agreed would be the objective.

1006. In an email to Dr Lynch dated 28 April 2010, Mr Hussain referred to the pure hardware sales revenue earned to date in Q2 2010 ("*Deferred was $15m New so far is $15.5m Expect $10m more minimum*") and stated "*I am slowing it down ok*?" Dr Lynch replied two minutes later, "*ok*".

1007. The Claimants suggested that all this once more confirmed that hardware revenue, or at least its recognition by Autonomy, was a tap which the Defendants turned on or off more or less at will, without regard to any business consideration other than meeting market expectations for aggregate revenue and earnings per share. The Claimants also relied on exchanges between Mr Hussain

and Mr Barris of Dell, which showed Mr Sullivan (a) seeking to control the hardware revenue and (b) suggesting deferral to the next quarter once the $10 million which he had mentioned to Dr Lynch seemed likely to be considerably exceeded.

1008. On 5 May 2010, Mr Hussain sent Dr Lynch a document entitled "*Getting to 220 SH.doc*". This was an updated routemap to achieving $220 million of aggregate revenue in Q2 2010. The document referred to $16.4 million of "*low margin*" revenue being needed that quarter, and noted (as Dr Lynch accepted) that $13.2 million of such revenue had not been recognised in, but had been deferred from, Q1 2010. This version of the routemap anticipated $13.5 million of revenue from "*BAV*", i.e. the Vatican Library.

1009. Dr Lynch reviewed and amended the routemap. On 12 May 2010, he sent a revised version to Mr Hussain. The following day, 13 May 2010, Mr Hussain sent Dr Lynch a further version of the routemap. In this 13 May version, the amount of $13.5 million previously shown for BAV was reduced to zero, recognising that no revenue could be achieved that quarter from a VAR transaction with the Vatican Library (discussed in paragraphs 280 to 397 of the Schedule of Impugned VAR Transactions). Instead, a new line-item "*Low margin (cover for BAV)*" of $13.5 million was added. As Dr Lynch accepted in cross-examination, Mr Hussain was proposing that, if the sale of software to Vatican Library (through a VAR) was not concluded in this quarter, it could be covered by an equivalent dollar amount of low margin hardware sales: as Dr Lynch put it "*that gives him his certainty of 220…*".

1010. On 25 May 2010, in a further version of the "*Getting to 220 SH.doc*" document sent by Mr Hussain to Dr Lynch, next to the line item "*Low margin (cover for BAV)*", the comment "*BP can cover this*" had been added. This was a reference to a hosting contract which Autonomy hoped to conclude with BP that quarter. The comment appears to signify that if the hosting contract materialised, the pure hardware sales would no longer be needed to meet Autonomy's revenue target for Q2 2010.

1011. On 2 June 2010, Mr Sullivan informed Mr Hussain that "*We have hit $30m in reselling for the qtr*", with "*Still more to come*".

1012. On 7 June 2010, Mr Hussain sent an email to Dr Lynch attaching a document entitled "*Getting to 220 SH 7th june 2010 (snap shot)*". Mr Hussain said in his covering email, "*Positive moves on Msft and deloitte allows lower low margin deals means 29c*". The Claimants suggested that this signified that if increased software sales were to be made, that would give room for lower hardware sales and thereby allow Autonomy to report higher earnings per share of 29 cents.

1013. In this context, Mr Hussain's attachment reduced the amount shown for "*Low margin (cover for BAV)*" from $13.5 million to $5.8 million, and annotated the change with the comment, "*Have closed 38m, recognising 23.1m*". That, as interpreted by the Claimants, suggests that, even though Autonomy had in fact closed 'pure' hardware transactions which would entitle it to recognise $38 million of revenue in Q2 2010, Mr Hussain was proposing that Autonomy should recognise only $23.1 million of that revenue within the quarter, leaving

an amount of further pure hardware revenue that Autonomy could recognise in a later quarter as and when required.

1014.  Dr Lynch did not agree with this interpretation and suggested that all that Mr Hussain meant was that *"he may have some discretion in terms of saying to the customer Can I deliver that to you in three weeks time…."* That was not convincing: and Mr Hussain did not suggest that his proposal had anything to do with what hardware had been delivered in the quarter, because he was plainly assuming that it would all be delivered before quarter end, which was still over three weeks away.

1015.  A few days later, on 11 June 2010, Mr Hussain sent Dr Lynch a further version of the routemap. As before, $38 million of low margin hardware deals had closed, with $23.1 million of the revenue to be recognised.

1016.  On 16 June 2010, Mr Hussain provided Dr Lynch with another update: by this point, with revenue for the quarter at $217 million, Mr Hussain planned to include low margin hardware sales of $23 million, meaning that earnings per share would be at 28.3 cents. As at 18 June 2010, the plan remained to recognise $23 million of hardware sales in Q2 2010. The same was true as at 21 June 2010.

1017.  On 29 June 2010, Mr Hussain sent Dr Lynch a further update tracking Autonomy's success in concluding large deals prior to the end of Q2 2010. The update gave a snapshot of the status of each deal as at five dates between 16 June 2010 and 29 June 2010 and also identified the amount of revenue proposed to be recognised in respect of *"Low margin"*, i.e. pure hardware sales. As stated above, at 16 June 2010, 18 June 2010 and 21 June 2010, the proposal was to recognise $23 million in respect of pure hardware sales. However, by 28 June 2010 it had become apparent that *"NO DEAL"* could be secured on three hoped-for software transactions. As a result, the figure for *"Low margin"* was increased to $30 million to compensate for the corresponding shortfall.

1018.  At the foot of the spreadsheet, Mr Hussain identified the effect on earnings per share of recognising more hardware revenue. He stated that if $30 million of hardware revenue was recognised, earnings per share would be 26 cents (row 38); whereas if only $23 million of hardware revenue was recognised, with a further $7 million of software sales instead (*"EPS (with $7m s/w)"*), earnings per share would be 28.7 cents (row 39). Dr Lynch accepted that this reflected the balancing act that he and Mr Hussain were having to perform:

> Q.    *And that really reflects the balancing act that you and Mr Hussain were having to perform with how much hardware sales should be included or recognised because, although it could help you get to a revenue figure, it had a knock-on deleterious effect*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *on your ability to hit the particular earnings per share figures,*
> *correct?*
>
> *A.      Yes, that s accurate.  We re having to balance not only the*
> *revenue, the EPS, but cash positions, a whole series of metrics*
> *that we ll be trying to optimise in the balancing.*
>
> *Q.      And that is why, if you could have a software deal which you*
> *could recognise, you would not recognise the hardware?*
>
> *A.      If that was an option, if we had the ability to not recognise the*
> *hardware, then in that situation where we had too much revenue*
> *then we wouldn t do the loss-making hardware transaction,*
> *that s correct."*

1019.   Mr Hussain provided Dr Lynch with a yet further update on the afternoon of 30 June 2010 (the last day of the quarter). As before, $30 million of hardware revenue was to be recognised in the quarter.

1020.   In the event, Autonomy recognised $31.1 million of pure hardware revenue in Q2 2010. That was one of the highest quarterly amounts in the Relevant Period and constituted over 14% of total revenues reported for the quarter ($221.1 million). It enabled Autonomy almost to hit the consensus projection of $223 million notwithstanding the restrictions on VAR sales and the continuing depression of software sales revenues.

1021.   I was not shown and am not aware of any document or exchange between Dr Lynch and Mr Hussain relating to these contemplated sales and Mr Hussain's projections and modelling, that suggests that any of this had anything to do with marketing.

*Q2 2010 – alleged post-quarter end manipulation of the hardware revenues recognised*

1022.   The revenue recognised for Q2 2010 was once again, however, not the full amount of revenue generated from the hardware reselling strategy. As in the previous quarter, management again determined not to recognise all the hardware revenues from hardware transactions that had taken place in Q2 2010.

1023.   On 7 July 2010, a week after the close of the quarter, Ms Cynthia Watkins sent an email to Mr Chamberlain with the subject "*H/W Cost*".  She stated that "*H/W cost is coming in @ 45M*", providing a breakdown of "*H/W Orders (Shipped)*". That included "*Q1 related 9,914,858 not accrued in Q1*" and "*Q1 Deferred 9,861,371*" which reflected the fact that certain hardware revenues and costs had been deferred, rather than being recognised, in Q1 2010. Mr Chamberlain forwarded Ms Watkins' email on to Mr Hussain with the comment: "*disaster*".

1024.   Mr Hussain's responded to Mr Chamberlain as follows:

> *You need to check this.*
>
> *We deferred $15m or so last q (cost $20m or so – including the expensive Morgan Stanley). We are recognizing $16m more ($17.5m or so) – unfortunately that gives $37.5m.*
>
> *If you can defer the more expensive ones then we hit the $34.2m I have."*

1025. The Claimants contended that, after the end of the quarter, Mr Hussain was thereby instructing Mr Chamberlain to defer the recognition of certain "*expensive*" hardware deals in Q2 2010. They submitted (and I accept) that it is plain that Mr Hussain's focus was solely on the amount of revenue that needed to be deferred to meet the targets he had set. That was why he had selected "*the more expensive ones*". The Claimants added that there is no suggestion of deferral being based on whether the revenue recognition criteria were met in respect of them, except what may conceivably be implicit in the words "*If you can…*" , though both Defendants knew that if the revenue recognition criteria were met, Autonomy had no discretion as to whether or not to recognise the revenue.

1026. It would appear that Mr Hussain's instruction was actioned.  Two days later, on 9 July 2010, he emailed Ms Harris, Mr Chamberlain and Mr Stephan, with the subject "*US costs for the low margin business*", stating as follows:

> *The US team has put in the complete costs but of course they don t know that we are deferring some revenues.*
>
> *I have the US pack giving us total costs (EXC. R&D, OPTIONS & BAD DEBTS) from Lisa of $72.9m*
>
> *If I take out the relevant costs from the latest forecast then we have $27.5m – the difference being $45.4m. I would like you to confirm that this relates to the low margin business and then we will put in the relevant $35.6m number.*
>
> *Please confirm and report back as the difference is quite large!!"*

1027. The Claimants emphasised especially, and described as "*striking*",  the comment that the "*US team*" (including, I assume, Mr Sullivan) did not know that some of the hardware was being deferred. The "*US team*" had operational control of the transactions. If there had been problems delivering some of the hardware sold in the quarter, then the "*US team*" would have known that the revenue in question would have to be deferred.  This email was not copied to Mr Sullivan; nor to Dr Lynch, who maintained that he was not involved in or aware of this aspect of the Q2 2010 hardware programme.

1028. The Defendants contended that there was nothing odd in the fact that Mr Sullivan was not involved. They cited their witness Ms Harris's explanation that revenue recognition was for the accountants to sort out, *"not the salesmen who conducted the sales."* Ms Harris told me she *"didn't have contact with the salespeople."* But after some equivocation as to whom she would approach for the basic facts about delivery and the like, and after suggesting that Mr Hussain might be the more likely contact as he was more senior and *"these are big strategic deals"*, she conceded in cross-examination that in fact she did not know: she would not have been the *"person having those conversations"* because she was not in the revenue recognition/revenue accounting team. In any event, the disconnect between the accounting function and the sales operation seems to emphasise the point that the deferrals were driven without reference to the facts.

1029. In terms of the facts, I was not shown any evidence of any factual reason for deferral of revenue recognition from the Q2 2010 hardware resales in question.

*Deloitte Report to the Audit Committee on the Q2 2010 Review*

1030. In its report to the Audit Committee for Q2 2010, Deloitte concluded:

> "*Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q2 2010 press release*".

1031. At the Audit Committee meeting on 20 July 2010, as reflected in Mr Welham's email of later that day, it was agreed that disclosure of the impact of the hardware sales should be included in the front-end of the press release for Q2 2010.

1032. I address the exchanges which followed, with Deloitte pressing for transparency and principally Dr Lynch pushing back hard, in paragraph 869 above. For the present I can summarise the result as being that Dr Lynch got his way. All that the market was told was:

> "*The small variation in gross margins in Q2 2010 was in line with our expectations due to the sales mix including appliances as discussed last quarter*".

*My assessment of Q2 2010*

1033. In my judgment:

> (1) The facts relating to Q2 2010 as set out above repeat and reinforce the pattern evident in Q1 2010 of covering shortfalls in software sales revenue compared to forecast, and of also manipulating recognition of

revenues from the hardware reselling strategy to achieve the best possible balance between revenue growth and gross margin/EPS;

(2) Dr Lynch resorted to (at best) half-truths to (as the Claimants put it):

> *put the market off the scent as to the existence of the pure hardware sales and their use as one of the means by which Autonomy was able to meet market expectations."*

*Linkage Analysis*

1034. Before turning to the hardware transactions in the next quarter (Q3 2010), I should mention in passing[181] the fact that it was from Q2 2010 that Autonomy started providing to Deloitte what were known as *"Linkage Analyses"*. This was its response to Deloitte's expression of concern about the accounting for hardware sales, and in particular their perception that what (according to Mr Welham's witness statement) they had perceived to be a one-off strategic initiative with EMC was becoming "business as usual".

1035. It was Mr Welham's evidence that Deloitte requested (it is not clear when) what he described as:

> *an analysis…setting out, on a customer-by-customer basis, what management said was the evidence of the linkage between the loss-making hardware sales and software sales and hosted revenue to the same customers".*

1036. A dispute developed as to what prompted this request, and whether what was provided by Autonomy properly addressed it. Again, I return to consider this in greater detail later. I mention it now primarily as a marker: (a) Deloitte's request and the concern that gave rise to it further demonstrates how the hardware sales were being presented to Deloitte as ancillary to the software business; (b) since there was no real linkage, any response was, necessarily, an exercise in disguising that fact; (c) linkage analysis for every quarter became routine from this time on, and became an important part of the way Autonomy presented the hardware sales to Deloitte; and (d) the Defendants were required to devise explanations of the hardware selling for Deloitte which were increasingly detached from reality.

1037. This was matched (indeed exceeded in terms of detachment from reality) by what Dr Lynch chose to tell analysts in the Earnings Call for Q2 2010 which took place on 22 July 2010. I address this further when assessing the evidence that the Defendants consciously sought to conceal the hardware reselling strategy and the inclusion of hardware revenues without differentiation in the revenues attributed to Autonomy's software businesses.

*Q3 2010*

---

[181] I address this at greater length later: see paragraph 1477 *et seq* below.

1038.  The hardware reselling strategy continued in Q3 2010. Mr Sullivan was set revenue goals which were calibrated, as before, simply by reference to the volume of recognised revenue and incentivised according to their achievement.

1039.  By now, Mr Hogenson's concerns had apparently been disposed of, and VAR transactions were accordingly restarted after the pause in Q2 2010 in light of his enquiries. This slightly reduced the requirement to make good shortfalls in software revenue out of revenues from hardware sales, since part of the shortfall could, once more, be covered by VAR sales. Thus, in Q3 2010, hardware revenues, though still considerable, reduced to $26.7 million from $31.1 million in Q2 2010, and VAR revenue increased from $2 million in Q2 2010 (having been $26.8 million in Q1 2010) to $23.3 million in Q3 2010. These correlations tell their own story.

1040.  An exchange of emails when Mr Sullivan canvassed Mr Barris at Dell as to the value of deals it would be prepared to transact in Q3 2010 revealed an interesting thread of earlier emails:

(1)  On 1 July 2010 Mr Sullivan asked Mr Barris to *"encourage your team to show us more deals"* to which Mr Barris replied the next day *"How much do you want?"*

(2)  Mr Sullivan responded "An additional $20 million." Mr Barris said that they would "do what we can here…"

(3)  The thread is all subject-headed "BofA SW". That reflects the fact that the first email in the chain was dated 10 June 2010. It was from Mr Thomas Carlisle, Global Account Manager at Dell, to Mr Sullivan. It read:

*I think we can pull off a large SW deal if you are interested. It seems everyone I've talked to agrees we can do this. Let me know. It would be 10-20M."*

(4)  Mr Sullivan expressed immediate interest. But after Mr Carlisle had emailed Mr Barris, the latter was less than enthusiastic in an email to Mr Sullivan the next day:

*Hello Mike*

*Thanks for your interest. However, I don't want a deal like this to lessen your interest in hardware transactions. This would be less strategic to me than hardware."*

(5)  Mr Sullivan did not respond: the next email in the print-out of the chain is that referred to in (1) above.

1041.  I should acknowledge that none of the parties made any point about those earlier emails in the chain. But, as it seems to me, they appear to indicate a clear focus on Mr Barris' part on hardware sales which is difficult to square with the

depiction of Dell assisting Autonomy to protect and promote its software sales and coordinating its choice of customers to that end; and Mr Barris was Mr Sullivan's main point of contact in this context.

1042. In any event, the familiar pattern of Mr Hussain asking for more or less *"low margin"* according to what he from time to time forecasted or feared he would require to meet forecast overall revenue is evident from email exchanges in this quarter, as in the last.

1043. Thus:

(1) On 30 August 2010, Mr Hussain sent an email to Mr Sullivan with the subject heading *"I'll need more margin-thought there were $4m in the pipe for q3?"*. There was no suggestion of any link to software sales nor of any advantage to Autonomy's software business.

(2) On 6 September 2010, Mr Hussain sent Dr Lynch an email entitled *"group revenue"* attaching a spreadsheet *"6th sept group revenue MRL format"*. Within the spreadsheet was a column stating:

|                    | 2nd sept | 3rd sept | 6th Sept | Commentary |
|--------------------|----------|----------|----------|------------|
| *Memo-low margin*  | *15*     | *15*     | *17*     | *$24m done* |

(3) It appears from that spreadsheet that at that time Mr Hussain was envisaging the recognition of $17 million of revenue from hardware sales in the quarter (column E, row 3), as compared to the $15 million included in the spreadsheet as at 2 and 3 September 2010 (columns C and D, row 3), though the spreadsheet also recorded $24m as *"done"*.

(4) On 28 September 2010, Mr Hussain emailed Mr Sullivan with the subject *"deals"* stating *"DB is fine So need EMC please And probably $2m more low margin*."

1044. In the event, Autonomy recognised about $26.7 million in revenue from hardware sales in Q3 2010, which amounted to about 12.7% of total revenue reported in the quarter ($211 million). Autonomy's Quarterly Report stated that this was *"the highest Q3 revenues in the company's history"* and also that *"IDOL business grew organically at 18% during the first nine months of 2010"*.

1045. No mention was made of hardware sales: in cross-examination Dr Lynch accepted that they were not disclosed to the market.

*Q4 2010*

1046. Autonomy's hardware sales increased again in Q4 2010. In a quarter where revenue had been forecast at about $236 million, which was a considerable increase, Mr Hussain's apparent need for the additional revenue from them

became especially marked, particularly in December (see paragraph 1054 below).

1047.   The pure hardware sales goal for the quarter was $30 million of revenue, as recorded in an email from Mr Hussain to Mr Sullivan dated 8 October 2010 headed "*low margin*". Mr Hussain wrote: "*Need 30m this q as it's a big q. Can you get EMC to do some?*".

1048.   On 15 October 2010, Mr Hussain sent Dr Lynch an email on 15 October 2010 entitled "*getting to 236*" which specified the targets that had been provided to each part of the business, including "*Strategic sales $30m*". The subtext is plain: in order to achieve aggregate revenues of $236 million in Q4 2010, Autonomy needed pure hardware sales of $30 million. There is no record of an objection from Dr Lynch.

1049.   At around the same time, Dr Lynch and Mr Hussain agreed that Mr Sullivan should be paid a bonus of $50,000 for Q3 2010 because of the "*good job for us*" he was doing. The "*good job*" was that "*last q he got us the emc deal plus the low margin strategic sales*". There is no suggestion of his job extending to any results in terms of building relationships or driving software sales.

1050.   Similarly, the group revenue updates sent by Mr Hussain to Dr Lynch (among others) on 31 October 2010, 7 November 2010, 18 November 2010 and 7 December 2010 identified, in the worksheet entitled "*MRL sheet*" intended for Dr Lynch, $30 million as the target set for "*Strategic*", "*low margin*" revenue.

1051.   An email dated 13 October 2010 from Dell's Mr Michael Faughnan to Mr Sullivan, subject headed "*Dell/Autonomy Top Line*" expressed Dell's perception of the purpose as being to drive revenue. Mr Faughnan:

> "….wanted to know if Autonomy is still looking to drive top line in Q4 – and if so, what conditions you have for the incentives being offered – we are putting end of year plays in front of JPMC & MS before month end and will bundle with your incentives if the appetite for top line on your side is still there."

1052.   Mr Sullivan did not dissent from this perception, replying on 18 October 2010 that Autonomy had a "*large appetite for Q4 deals*". In a similar vein, on 5 November 2010, Mr Sullivan told Dell's Mr Barris that Autonomy "*was very interest[ed] in doing more Q4 business with you.  Are there more things we can work on together?*"

1053.   Dr Lynch accepted that "*top line*" in the email quoted in paragraph 1051 above was a reference to revenue; but with a characteristic illustration of his point by an analogy, he shrugged it off as a conversation between people in the engine room being told to get the engine running and it is "*not the same as the reason as why the captain is taking the ship in a particular direction*". As to Mr Sullivan not having suggested any other reason in his response to Mr Faughnan, Dr Lynch said that this is "*the sales people executing on selling*", and that a sale

to JPMC and Morgan Stanley would be very much in line with a software business development strategy as asserted by the Defendants. Not unusually, Dr Lynch's explanation appeared to me worldly and reasonable; but my education in the case has made me more sceptical, and in my view, there was little more to it than *"appeared on the tin"*: Autonomy needed to sell hardware to *"drive top line"* and Dell were keen to sell it hardware for that purpose.

1054. The acuteness of this need was demonstrated by a despairing email sent on 10 December 2010 by Mr Hussain to Dr Lynch (under subject heading *"US idol"*):

> *"Really don't know what to do mike. As I guessed revenue fell away completely yet SMS report shows massive activity. But I speak with the vp's [sic] who are far more accurate. Also stouff, Joel and mike I think keep separate sheets and unless I am v wrong don't discuss the sheets hence plane crashes and they don't know. We've covered up with bofa and hopefully db and doi but if latter two don't happen it's totally bad. There are swathes of reps with nothing to do maybe chase imaginary deals.*
>
> *So radical action is required, really radical, we can't wait any more.*
>
> *Everywhere I look at us idol it s bad."*

1055. Dr Lynch accepted that he would have discussed this *cri de coeur* with Mr Hussain, but said that it had to be seen in the context of what he depicted as *"a sales management issue in the US, which is about 25% of our revenue, where forecasted deals are turning out to have a much lower probability of closing…"* and that Mr Hussain's unhappiness was *"about the forecasting"*.

1056. When cross-examined as to what he had thought Mr Hussain had in mind in suggesting the need for *"really radical"* action, Dr Lynch initially suggested that this was a call to *"basically reorganise the US IDOL sales management"*. That may also be so: but the underlying concern expressed is that software sales in the US have fallen away, and hardware sales have been and will be required to plug the difference.

1057. As it was, the action which in fact immediately followed was that Mr Hussain authorised Mr Sullivan to find more hardware deals even if this meant improving the incentives and so increasing the cost to Autonomy. When this was put to Dr Lynch, Dr Lynch said that he did not know whether that was the case *"but it may well be"*. On 13 December 2010, just three days after Mr Hussain's *"radical action"* email, Mr Sullivan informed SHI[182] that Autonomy would *"extend an additional 5% discount to SHI provided that SHI orders an additional $3m in Dell product prior to 12/29/2010"*.

1058. SHI's initial reaction was that *"3 million is an awful lot for us to bring in by the end of the year. Especially when it would sit in our warehouse for 3 months"* . As a result, they enquired whether any of the existing orders could count

---

[182] It may be recalled (and see paragraph 939 above) that SHI International was a company that purchased computer hardware (typically from Dell) and resold it to BofA.

towards the $3 million. Mr Sullivan responded that he was "*trying to incent for net new revenue so anything that is already in does not help*" . Following further discussion with SHI, Autonomy offered, with Mr Hussain's express approval, the additional 5% discount to SHI, provided that it placed hardware orders totalling $2.5 million before the end of the quarter. The goal of "*new net revenue*", even if it would cost more to bring in, appears clear.

1059. The revenue goal remained the same as of early December. On 3 December 2010, Mr Hussain sent Mr Sullivan an email headed "*what i need*": "*Low margin - $30m delivered*". Mr Sullivan then informed Dell of Autonomy's appetite for hardware deals that quarter, indicating that it had "*a goal to do $35m in Q4 deals with Dell*".

1060. The incentives appear to have worked. By 21 December 2010, Mr Sullivan was forecasting that he would secure "*low margin*" sales "*in the range of $28.5m*" and said that "*[o]rders from SHI will be coming in right until the last day of the year*". Within two days, Mr Sullivan's forecast had increased to $29 million, with $27.86 million already having been secured. On 29 December 2010, Mr Sullivan informed Mr Hussain that, with further "*SHI orders coming tomorrow*", hardware sales should be over $29 million.

1061. In the event, Autonomy recognised pure hardware revenue in Q4 2010 of $35.4 million, which constituted almost 14.5% of total revenue reported for that quarter ($244.5 million). The Claimants noted that a further $25 million of revenue came from impugned VAR transactions, and some $6 million from impugned reciprocal transactions, and some $15.2 million from impugned "*Other*" transactions, so that on their case, revenue from legitimate sources was $161.4 million, which would have been some 33% short of consensus estimates.

*Q1 2011*

1062. The pattern of hardware sales continued also in Q1 2011, for which the market consensus projected overall quarterly revenue of $215.9 million (a slight decrease from the previous quarter).

1063. On 10 January 2010, Mr Hussain emailed Dr Lynch with the subject "*Targets for 2011*" stating:

> "*Mike,*
> *Below shows achievement for 2010:*
> *EMEA (Perachio, Murray, Hutchinson) $102m*
> *ASIA (Aurora) $13m*
> *US IDOL (inc. OEM Latam) $114m*
> *Protect (Neil) $37m*
> *Promote (Rafiq) $44m*
> *Strategic low margin $101m*
> *Management sales (stouffer) $75.5m*
> *Maintenance, hosted etc $381m*
> *Totals $868.5m*

> *The target for 2011 I propose to be $978m (up 12.6%). I believe that the analyst consensus is $972m with UBS at $979m.*
>
> *EMEA (Perachio, Murray, Hutchinson) $125m (up 22.5%)*
> *ASIA (Aurora) $13m (up 92%)*
> *US IDOL (inc. OEM Latam) $105m*
> *US Latam $13m (up 50%)*
> *Protect (Neil) $45m (up 22%)*
> *Promote (Rafiq) $55m (up 22%)*
> *Strategic low margin $110m (up 9%)*
> *Management sales (stouffer, Mooney) $100m*
> *Maintenance, hosted etc $400m (up 5%)*
> *Totals $978m*
> *...I have told Mike S that the target is $25m minimum for Q1*
>
> *Please confirm you are ok with these targets for 2011."*

1064.  That set a *"Strategic low margin"* target for the (whole) year of over 11% of the aggregate revenue target of $978 million. Dr Lynch responded on 12 January 2011 stating, *"your call but build in some headroom".*

1065.  On 16 January 2011, Mr Hussain emailed both Dr Lynch and Mr Kanter suggesting a target of $977m but still with $110m of *"Strategic low margin".* He followed this with a further email to Dr Lynch dated 26 January 2011 under subject heading *"draft forecast"* also attaching a *"forecast for analysts".* The email set out the following, which included a comparison with 2010:

> *"$975m revenue (up 12%)*
> *125c fully diluted (up 12.5%)*
>
> *Gross margin 88% (vs 87% '10)*
> *Operating margin 46% (vs 43% '10)*
>
> *Strategic Sales $97m vs $100m '10*
>
> *Q1 '11 Revs $217m (up 12%), EPS 26 cents (vs 25 cents Q1 '10 – remember no dilutive effect in Q1 '10 from the convertible)"*

1066.  The Claimants invited me to note especially, as being *"difficult to square with the Defendants' contention as to the primary purpose of this activity",* that these targets were set without any analysis, or even mention, as to how they would be achieved, the identities of the parties to whom the hardware would be sold, or how the hardware sales would be used to drive software sales. I am not persuaded that to prove its substance or intent it was necessary for the Defendants to rehearse its purpose, or that whenever a target was mentioned, it would be expected to be accompanied by a statement of "how and to whom" in a forecast for analysts. But I accept that the overall impression given is of the measurement, balancing and use of strategic sales by reference to an objective of growing revenue whilst at the same time preserving gross margin and EPS.

1067. Also clear, to my mind, is that the pressure for hardware sales continued to fluctuate inversely according to the success of software selling, and that the calls over the course of the period to increase or find another source for hardware selling were prompted not by success in encouraging software sales, but on the contrary by any diminution in Mr Hussain's confidence in them eventuating, or simply and more immediately, if an anticipated hardware transaction fell away.

1068. As an example of the latter, on 25 March 2011, after Mr Sullivan had informed him that a sale to Morgan Stanley of Hitachi hardware which Mr Hussain had described to Mr Sullivan as *"the last part of the low margin jigsaw"* would not proceed, Mr Hussain emailed Mr Sullivan:

> *"Need a plan b*
> *Anything you can do on hitachi is good*
> *Aggressively pursue SHI, JPMC etc. Really need to hit $25m"*

1069. Mr Hussain's email the same day to Dr Lynch to report the position spoke only of missed revenue:

> *"We have done deals many times and were confidently expecting $3m this time round. Although I pressed we didn't get it and MS have given the orders ($4m) directly…*
>
> *V v v v frustrating as its $4m of revenue missed."*

1070. The exchanges thereafter also speak loudly of Mr Hussain's by now almost desperate focus on revenue, with blame and recrimination following any apparent failure to meet his expectations. Thus:

(1) Mr Hussain provided Dr Lynch with a further update early on 28 March 2011. In relation to further hardware revenue, the position remained as it was on 25 March 2011.

(2) Shortly thereafter, Mr Hussain enquired of Mr Sullivan *"how are you getting on with replacing MS / Hitachi. Need as much as we can get from SHI"*. Mr Sullivan responded that *"SHI can't do anything",* but that there was *"[p]ossibly another $1m from BNY, but not looking good to get to $25m"*.

(3) Mr Hussain was not impressed. On 29 March 2011, Mr Hussain sent an email to Dr Lynch stating that *"Sullivan's psychology is interesting. MS / Hitachi was a complete cock up yet he isn't trying to get a replacement for it as his life depended on it"*.

(4) Dr Lynch chose to send that email on to Mr Sullivan with the comment *"WOW Sushovan says you have interesting psychology................"* .

(5) Mr Sullivan replied to Dr Lynch saying:

> *"Sushovan is wrong. I have been burning up the phone lines trying to find more revenue. Was I suppose [sic] to lie and give him a more rosy outlook? He just doesn't like my forecast. It is hard to drum up $3.5m in revenue in just a few days. But In fact I have found more revenue and am pushing on the reps, Dell managers and resellers I know. Revenue is now up to $23m in to date. If you check with Chamberlain he will tell you that I was working a deal just yesterday in Ireland (It fell out of the qtr). I tried to pull in some JPMC business in Europe - no go. I have offered incentive to resellers (no takers). We processed about 300 orders this qtr so far. I am basically running a small side business and it takes a lot of time, networking, paperwork etc. I am not sitting on my ass."*

(6) On 30 March 2011, Mr Hussain sent further updates to Dr Lynch. By this stage, $152 million of revenue had closed, with Mr Hussain saying that it was unlikely that there would be more than $250,000 of further hardware revenue (row 18).

(7) Later that day, Mr Hussain's only response to an email from Mr Sullivan reporting on progress with a prospective $1.6 million software deal which he thought would not come in before the (imminent) end of the quarter was to ask Mr Sullivan whether he had found *"some more hardware revenue? I need it"*.

(8) Mr Sullivan responded (presumably sarcastically, as the Claimants said) *"I did not know that"*, and indicated that he was expecting *"another approx $100k tomorrow"*.

1071. The Claimants presented these exchanges as further demonstrating that (a) the hardware reselling was all about generating revenue, with no other objective discernible from any of the emails and being evident from Mr Hussain's almost panicked reaction to any sign of impending shortfalls, and (b) Mr Sullivan's perception of himself to be running a *"small side business"* was in substance accurate and revealed that there was no properly integrated sales approach, with the two sides of the business working together and utilising contacts and discounted hardware sales to sweeten and encourage software deals, such as surely would have been readily apparent if the strategy really had been to use hardware sales to drive software sales.

1072. In the event, and once again, Mr Hussain's panic was unwarranted. Autonomy beat the market consensus for Q1 2011 of $215.9 million with reported revenue for the quarter of $220 million, gross margins of 88% and adjusted earnings per share of 26 cents[183]. Of this, reported revenue of some $20.1 million represented what the Claimants described as 'pure' hardware sales in Q1 2011, which constituted just over 9% of total revenues of $220 million reported for the quarter.

---

[183] That is to say, adjusted for conversion of loan notes, as Mr Hussain had alluded to in his email of 16 January 2011 to Dr Lynch (see paragraph 1065 above) when comparing Q1 2011 and Q1 2010.

1073. There is, however, a story behind the figures as presented, and in particular, as to how the balance was so successfully struck between low margin hardware sales and the important metrics of gross margin and EPS.

*Q1 2011 and alleged revenue deferral*

1074. The story arose out of an incident at around this time which the Claimants contended was a further demonstration of dishonesty on the part of the Defendants in their approach to the question of revenue recognition and their use of hardware revenues as a discretionary fund.

1075. On 9 April 2011, over a week after the end of the quarter, Mr Hussain sent an email to Dr Lynch and Mr Kanter with the subject "*management meeting analysis*". He attached a spreadsheet – entitled "*revenue analysis SH MRL AK only*" – which he said could "*be used as the basis for data analysis at the management meeting*". That spreadsheet showed, in the "*Q1 actuals*" tab, that, as compared to his hardware revenue target for Q1 2011 of $25 million, Mr Sullivan had achieved $22.1 million. However, as in previous quarters, discussions took place as to whether all that hardware revenue should be recognised in Q1 2011.

1076. On 11 April 2011, Mr Hussain sent an email to Dr Lynch, with the subject "*Q/e*", stating:

> "*If we defer prisa[184] then we are at 218.1m but 24c and 85% [gross margin]. If we don't defer prisa but defer equiv low margin we are at same revs but now at 25c and 88%. To discuss when I land or you can discuss with steve.*"

1077. In short, the Claimants submitted that Mr Hussain was identifying various options that he considered might be adopted in relation to revenue recognition at this time: he was questioning whether to recognise revenue in Q1 2011 on the DiscoverTech transaction (which was, according to the Claimants, not entered into until early April 2011, but was backdated to 31 March 2011), or instead to recognise hardware revenue.

1078. The former course would have an advantageous effect on gross margin and earnings per share. If hardware sales were made and hardware delivered, the associated revenue had to be recognised. If a deal with or for Prisa had not been completed before the end of the quarter, there was no revenue to recognise.

1079. What, according to the Claimants, Mr Hussain was engaged on and seeking approval for was a 'pick-and-choose' approach to revenue recognition, reverse engineering their decision from the desired level of Q1 2011 aggregate revenue, gross margin and earnings per share, regardless of the underlying facts. Mr

---

[184] The Prisa deal was a VAR transaction entered into with DiscoverTech (as to which see paragraphs 591 to 707 of the Schedule of Impugned VAR Transactions) for which the licence fee payable was $3.6 million.

Welham had told the US criminal trial court that he was *"troubled"* by Mr Hussain's suggestion that, two weeks after the end of the quarter, there was an open choice whether to defer recognition of revenue from the Prisa transaction or defer recognition of a hardware sale.

1080. In cross-examination, Dr Lynch stated that he did not accept that Mr Hussain was "*saying that there's necessarily a choice in all of this*". He suggested that there might be issues and a judgment to be made, for example, as to the reseller's credit, or, in the case of the hardware, as to whether delivery had been accepted. However, this was not convincing: Mr Hussain certainly appeared to be offering a choice, making clear to Dr Lynch that they could do one thing ("*defer prisa*") or the other ("*defer equiv low margin*"). Dr Lynch said that he did not know whether he had a discussion with Mr Hussain following the email, but I accept that it is unlikely that, having raised the point with Dr Lynch, Mr Hussain would then have acted on his own.

1081. In any event, the Claimants submitted, the fact that Mr Hussain was presenting a choice for discussion is put beyond doubt by Mr Chamberlain's email to Mr Hussain the following day, 12 April 2011, with the subject "*Numbers*":

> "*Three options:*
>
> 1)      *recognize Prisa, defer $3.6m Hardware - $218.1m, 88%, 24.8c*
>
> 2)      *Defer Prisa, recognize $3.6m HW - $218.1m, 86%, 23.7c*
>
> 3)  *recognise BBC $1.6m, defer Prisa, recognize $2.0m HW - $218.1m, 87%, 24.2c*
>
> *Need to speak asap to lock this down. We announce in 9 days and if we don't stop moving I cannot deliver timetable.*"

1082. The Claimants interpreted the "*Three options*" that Mr Hussain and Mr Chamberlain presented as being the following:

(1) The first option was to recognise the Prisa VAR transaction and to defer the equivalent amount of hardware revenue ($3.6 million), which would result in total revenue for the quarter of $218.1 million, a gross margin of 88%, with earnings per share of 24.8 cents.

(2) The second option was to defer Prisa and instead recognise hardware revenue of $3.6 million, which would result in the same overall revenue ($216.1 million), but a lower gross margin (86%) and earnings per share (24.8 cents) due to the hardware deals being loss-making.

(3) The third option was to recognise a transaction with the BBC with revenue of $1.6 million, again defer Prisa, but recognise hardware revenue of $2 million, which would generate the same overall revenue, but mean that gross margin and earnings per share were at 87% and 24.2 cents respectively.

The need to decide between the options was emphasised by Mr Chamberlain's concluding paragraph, in which he said that he needed to speak to Mr Hussain as soon as possible so as "*to lock this down*".

1083. Shortly after sending his email to Mr Hussain, Mr Chamberlain forwarded it to Ms Gustafsson and Ms Harris, stating "*These are the options and the impacts if he calls again*" (emphasis added).

1084. Dr Lynch told me in cross-examination on Day 43 that this was not how he would interpret the "three options" email. As the BBC contract contained a services component where the customer had to inform Autonomy that milestones had been met, he thought it may well be that Mr Hussain and Mr Chamberlain were trying to get the milestone confirmation out of them. He added:

> "*What Mr Hussain I think is doing is saying: this is the minimum ways, but obviously we could end up in a situation where we get confirmation from the BBC, the VAR pay us some money and we can take that, in which case we have the upside.*
>
> *I don't think there's an idea that these things are completely moveable parts. Some are judgement, but some aren't.*"

1085. Dr Lynch was further cross-examined on this aspect a few days later (Day 52). By then, he seems to have felt able to be more certain and more specific, although he was a little unclear whether he was aware at the time and could now remember these matters from that time, or whether they were reconstructions from documentation he had seen, or whether he had gathered the information from emails or other such sources. He clarified that he did not have "*an explicit memory of it*" but the best he could do to explain his source was to refer to an email he thought he had seen "*where there was a discussion of the fact that there were multiple purchase orders and what they were going to do*" and "*some sort of email that was sent to me about which deal was going to be taken or not*".

1086. When further cross-examined on this issue, he asserted that "*The BBC was an acceptance issue*" and that Dr Menell was talking with someone called Chris Westmacott at the BBC "*to get them to sign off on and acceptance within the quarter*"; and as to the multiple purchase orders issue he now clarified that DiscoverTech had submitted three orders in the same quarter, and "*there was a judgment to be made about whether DiscoverTech's credit was worthy of having three or two or one, or which of the two, and that decision had to be made*". He added that at the same time there were issues about whether all the necessary

proof to meet acceptance criteria had been met and stressed that *"this is part of the normal process that happens past the quarter end where all the paperwork and the terms and the evidence is reviewed."*

1087. I do not consider that I should place any substantial weight on Dr Lynch's evidence as to particular factors which might have justified deferral of revenue recognitions. My impression was that his second, more detailed, version was a reconstruction worked out by Dr Lynch by reference to other witness statements and documents. There are echoes of (and it may be that Dr Lynch may have borrowed or half-remembered) Ms Gustafsson's witness statement, where she stated that the "*Three options*" "*email does not strike me as problematic*", and suggested that there may have been accounting judgements under consideration bearing upon what revenue could be recognised in the quarter.

1088. I do not consider Dr Lynch was knowingly misstating the position; but I do consider that he was trying to varnish his previous evidence on the same issue, and that the truth is that he had no reliable evidence to give of the actual events. In a way it is surprising that he even attempted to suggest otherwise: for his ultimate defence was that he was not involved in the deferral process, except as a recipient of and probably brief consultee on Mr Hussain's email of 11 April 2011 (see paragraphs 1076 to 1080 above), which (as explained below) he submitted was a report updating him as to different possible outcomes of deferral, rather than an invitation to choose between options.

1089. In general terms I accept that the final resolution of matters such as whether goods shipped have been duly delivered and accepted without objection, and whether revenue may properly be recognised accordingly, will take place in the days after the end of the quarter, and in the event of real doubt may take some time, as for example, Mr Bloomer confirmed, (and Mr Welham had, after much equivocation, and contrary to the impression he sought to give before me, also agreed when cross-examined in the US criminal proceedings). In my judgment, therefore, the Claimants' supposition that everything should have been determined by the end of the quarter is unrealistic, given the typical end of quarter flurry; and the Claimants' criticism of that process is misplaced. I also consider it likely that the decisions may be influenced in fact by the animus with which the issue is addressed: if more revenue is not required there may be, without real impropriety, a tendency to resolve any small doubt as regards the fundamentals such as time of actual acceptance in favour of the preferred result.

1090. Nevertheless, the question is whether in the particular context the exercise and delay were in fact occasioned by the need to check matters relevant to proper revenue recognition ("the fundamentals"), or whether the exercise was simply one of how best to manipulate the timing of revenue recognition without regard to those fundamentals, with the objective of improving Autonomy's figures, and especially EPS. It is not an issue as to the ordinary process; it is a question whether (a) there was any doubt as to the fundamentals and (b) whether the cabal ignored the fundamentals and simply chose the best solution from the point of view of EPS.

1091. There was no documentary evidence to suggest any real doubt as to the fundamentals. In addition to the "options" emails, the email exchanges suggest that the figures given for hardware revenue change according to the objective of increasing EPS whilst maintaining revenue growth, rather than by reference to any new emerging evidence or concerns. Thus, for example, the Claimants made the point that on 14 April 2011, Mr Hussain sent an email to Mr Chamberlain, Ms Gustaffson and Ms Harris, with the subject "*Q1*", in the following terms:

> "*Apologies upfront for this, i wouldn't be pushing if it wasn't important:*
> *Please could you look at:*

> - *Any more maintenance revs (maybe $250k)*

> - *Defer similar amount of low margin*

> - *R&d capitalisation / Depreciation / bad debt / accruals of $750k*

> - *Taxes - i wonder if you can hit 26.75% ($500k save?)*

> *Does this get 25.6c?"*

1092. There is no sign that any of this was being driven by any new evidence about fundamentals or revised accounting judgements: the plain focus is on getting to EPS of 25.6c.

1093. Perhaps a different slant might have been put on the matter had any of the three persons definitely and directly involved (Mr Hussain, Mr Kanter and Mr Chamberlain) appeared before me as witnesses; but none did. There was no documentation to support the theory, as Dr Lynch acknowledged. Mr Chamberlain did not mention any matters of accounting judgement in his email. Mr Sullivan, who would be the person most likely to know the operational details, was not copied in on the emails and was very definitely not invited to the "management meeting" (see paragraph 1075 above).

1094. I have concluded and find that the management meeting and the exchanges described, which smacked of decision-making by a clique or cabal of three (with Dr Lynch as the éminence grise) determined to and did choose between the options, not according to the fundamentals, but according to the objective of minimising any adverse financial effect of the loss-making hardware sales and maximising earnings per share.

1095. Had the issue been about 'fundamentals' it seems to me likely that the advice of Deloitte and approval of the Audit Committee might have been sought. It was not. None of the 'cabal' (or Dr Lynch) consulted or shared the issue or their decision with either Deloitte or the Audit Committee. I accept the evidence of Mr Welham and Mr Bloomer that neither was informed or aware that this had occurred.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*Defendants' involvement/knowledge*

1096. Mr Hussain did not dispute that he well understood that this was not a choice properly open: if delivery had been completed the revenue arising had to be recognised. He did not need Deloitte to tell him that; and he was in a better position than they were to determine the matter. In his written closing submissions, Mr Hussain appeared to rely on a defence that the revenue was properly deferred and that this was confirmed by Deloitte's approval. It was submitted that Deloitte checked every major sale as part of its quarterly and annual audit testing and had never identified any revenue which was improperly deferred. However, Deloitte were obviously not party to the cabal, or aware of it; and it is not clear what they were told from time to time about what I have called the fundamentals. I do not think any such defence avails Mr Hussain.

1097. Except for Mr Hussain's email of 11 April 2011 (see paragraph 1076 above) setting out the varying effects (Dr Lynch said *"possible outcomes"*) according to whether the Prisa transaction or the *"equiv low margin"* were to be deferred, none of the other emails was sent or copied to Dr Lynch, and he was not at the meeting of the cabal of three. He was adamant that he would have played no role in such decisions. He felt able to offer his understanding of the process in general terms, supplemented by his reading of the documents for the purpose of his evidence; but his evidence was that he was not involved in any of the details of such matters at the time.

1098. Ms Harris confirmed, when she was cross-examined, that Dr Lynch was not really involved in this level of detail; but this was a somewhat generalised statement, and, for example, she accepted that she had no way of knowing whether Dr Lynch and Mr Hussain had discussed the decision between options presented in Mr Hussain's email. Dr Lynch himself was less than certain in this regard: he told me that he did not know *"if [he] would have done or not"*.

1099. I have described Dr Lynch earlier as the éminence grise of the clique or cabal. It seems to me most unlikely that he did not discuss the options carefully with Mr Hussain, especially since Mr Hussain had expressly asked for such a discussion. In any event, this was not the sort of decision Mr Hussain would have made without Dr Lynch's approval. For reasons to which I turn and elaborate when discussing later all the instances of backdating and the issue of what Dr Lynch knew about them, I consider that Dr Lynch was aware that Mr Hussain would take steps necessary to ensure recognition of revenue or not according to the election made, and that this would depend on whether the revenue was needed in the previous quarter to make up a shortfall, or was better reserved for the subsequent quarter. It may be that Dr Lynch did not know how the election would be documented, and it is possible that Mr Hussain did not refer back to Dr Lynch before finalising that (the die having already been cast), but I cannot accept that Dr Lynch was not aware that the decision was going to be made on the basis not of chronological truth but revenue need, and that if the latter prevailed, any documentation of the decision would be false. I consider and find that Dr Lynch (a) discussed the matter with Mr Hussain (b) was party to and/or approved the decision ultimately made and (c) knew that the choice made involved dishonest backdating and the improper deferral of low margin

revenue in Q1 2011, falsifying Autonomy's accounts and published information.

1100.  In my view, that is the more likely pattern of the events in question; but it is reinforced by my general view that no decision of real substance regarding revenue recognition was done without Dr Lynch's approval.

*Q2 2011*

1101.  The hardware sales goal for the whole of 2011 set in early January 2011 was $110 million (as part of an aggregate target revenue of $978 million). This had been revised later in January: on 26 January 2011 Mr Hussain had sent Dr Lynch a further spreadsheet with revised targets for overall revenue of $975 million (a reduction of $3 million) and for hardware (described as *"strategic sales")* of $97 million (a reduction of $3 million also, so that the entire reduction was to come from reduced hardware sales). That same spreadsheet had targeted "strategic sales" of $30 million for Q2 2011.

1102.  The hardware sales goal was then revised down to $27.5 million at the beginning of Q2, as recorded in an email from Mr Hussain to Dr Lynch on 9 April 2011. At some point in May or early June it was further revised down to $25 million: it was a difficult quarter for hardware sales. That target too proved to be unattainable, and in the end, Autonomy recognised revenue from hardware reselling totalling $20.8 million for Q2 2011 (compared to $20.1 million in the previous quarter).

1103.  As before, most of the hardware business this quarter was done through Dell in the usual way, with Autonomy acting as reseller. The pattern was much the same as in previous quarters, but the following points were singled out by the Claimants as further demonstrating their case that the only true objective of these sales was revenue, and not the promotion of Autonomy's software business (which is not mentioned in the relevant correspondence).

1104.  First, the Claimants submitted that a good illustration of the typical way in which these deals worked can be seen from an email chain relating to a transaction involving Dell (as hardware supplier), Autonomy (as reseller) and an insurance company called Progressive (as end customer):

(1)  On 2 March 2011, Autonomy quoted for the supply of certain Dell hardware to Progressive.

(2)  Three months later, on 2 June 2011, Dell informed Autonomy that they had "*ended up losing this round*", but that:

> *"They have another potential purchase coming up later this month. Will you be able to participate? They told me we are close on your pricing. I would imagine that another $25 off will win the business. This order may be for approximately 2000 systems."*

(3) Thus, it was Dell rather than Autonomy that was dealing with Progressive; indeed, Autonomy had no knowledge of the deal. It was Dell that was seeking to make the sale. Dell invited Autonomy to participate in the deal, for its benefit: Autonomy was to be interposed into the deal and its involvement limited to funding the discount so as to make Dell's bid more attractive.

(4) Mr Jorge Salazar, an Autonomy Contracts Manager, responded the same day to say that he was sure that Autonomy could "*make ourselves available to participate on a new bid*", but that the decision lay with Mr Sullivan who he copied to his email.

(5) On 3 June 2011, Mr Sullivan enquired as to the total deal value and timing of the orders. He made clear that Autonomy's willingness to increase the discount depended on it being able to count this hardware sale as revenue in Q2 2011. Mr Sullivan concluded: "*We can only get more aggressive if the orders come by June 30*".

(6) There is nothing to suggest that Mr Sullivan displayed any interest in using the prospective hardware sale as a way of promoting a related software sale to Progressive: it would appear that he was entirely focused on what he had described as his "*small side business*".

1105. Secondly, the push to secure revenue in Q2 2011, with undisguised emphasis on the need for revenue without reference to any other objective, was directed from the top. So, for example, on 1 May 2011, Dr Lynch informed Mr Egan and Ms Eagan that they both "*must be focused on this Q revenue now and NOTHING else*".

1106. Thirdly, when Mr Sullivan, after being pressed by Mr Hussain by email dated 10 June 2011 whether it was "*still on for 25m?*", replied negatively, citing "*Way more moving parts than normal at this time of the qtr*", complaining that "*We were tied to a lot of deals, but Dell keeps losing them*", and stating that "*I don't see a way to get to $25 without absolutely everything coming in on time which is a longshot*", Mr Hussain the next day reported to Dr Lynch somewhat hysterically that Mr Sullivan was "*backtracking on his commitment of $25m*" and "*being slippery*". This arguably illustrated that Dr Lynch was very much involved, and that Mr Hussain (who had on 28 May 2011 told Dr Lynch that "*Low margin should hit $25m…*") was increasingly desperate both to please him and avoid blame.

1107. Fourthly, the Claimants cited also Mr Hussain's reaction which was to increase the target for pure hardware revenue. He directed Mr Sullivan to generate $29 million of pure hardware revenue: "*As you know this is a key quarter. So what we need from you is as follows: … Low margin $20.5m net new ($8.5m done already, you need to close Morgan Stanley and JPMC)*". In order to provide an additional incentive, he offered Mr Sullivan a $50,000 "*spiff*" (i.e. bonus) if he achieved this goal as well as a goal of $12 million of new licence revenue. Dr Lynch accepted that he and Mr Hussain offered Mr Sullivan this bonus in the

hope that he (Mr Sullivan) might be able to land further hardware deals so as to reach the increased revenue target.

1108. Fifthly, the email reports seem to indicate the compulsive focus, with ever changing forecasts, and collapses met with immediate offers of further incentives, despite the cost, and without any sign of any measurement against benefit in terms of anything other than revenue. Thus:

(1) On 16 June 2011, Mr Hussain informed Dr Lynch that the "*low margin*" deal with JP Morgan "*was strong again yesterday so 20m total should be achievable*".

(2) On the same day, Mr Hussain sent a spreadsheet to Ms Gustafsson asking that she "*have a look at the low margin and the management sheet and check closed deals*". The attached spreadsheet contained a tab labelled "*Sullivan*", which detailed hardware deals. Row 40 in that spreadsheet noted that Autonomy should "*consider throwing some incentive at JPMC to place $10m in orders before June 30 – an extra 1%...?*".

(3) Two days later, on 18 June 2011, Mr Hussain provided Dr Lynch with a further update, stating that the JP Morgan hardware deal was "*difficult again – likely $16m to $17m*". By this time, Mr Hussain was projecting $24 million of hardware revenue in the quarter of which $18 million was "*new*": see the fourth entry in the table.

(4) On 25 June 2011, Mr Hussain sought an update from Mr Sullivan, including in relation to "*Low margin*". Mr Sullivan's response set out the "*reselling*" deals that had been secured and the status of the deals that were still in the pipeline. He identified a likely deal with Morgan Stanley/Hitachi for $2 million, stating that it had "*[r]educed $ this week but is coming in*". He reported that he was trying to secure a hardware deal with BofA by "*[g]iving some extra incentive to get [it]*".

(5) On 29 June 2011, Mr Sullivan informed Mr Hussain that, "*Out of left field*", the Morgan Stanley deal had gone away. Mr Sullivan forwarded an email chain from Hitachi, which recorded that "*Morgan will not be doing the deal through Autonomy or Direct. They now want to trade in other equipment*". Mr Hussain's response to this news was "*Shit*".

(6) On 30 June 2011, Mr Hussain provided Dr Lynch with an update on the "*state of play*", listing out deals which it was hoped would still close before quarter end.

(7) As it was, as previously explained, Autonomy recognised revenue from pure hardware sales totalling $20.8 million, thus falling materially short of its target.

1109. In the round, the Claimants submitted that this pattern demonstrated that the objective was plainly to produce reportable revenue, with no sign or evidence

to support the Defendants' case that the purpose was a marketing one designed to drive software sales.

1110. In the event, for Q2 2011, Autonomy recognised revenue from what the Claimants categorised as *"pure"* hardware sales totalling $20.8 million out of a total reported revenue of $256.3 million, beating the market consensus estimate of $250.5 million.

1111. The Claimants' case was that if revenue from transactions impugned by them (i.e. from hardware sales, impugned VARs, improperly accelerated Hosting revenue and improper *"Other"* transactions) only some $190.5 million revenue was achieved (a miss of some 24% on consensus estimate).

*Q3 2011*

1112. Although their hardware claim relates to the period from Q3 2009 to Q2 2011, the Claimants referred also to the continued focus on hardware sales to achieve revenue forecasts and to evidence of exchanges in Q3 2011 and at the time of the HP acquisition as providing further support for their case.

1113. Thus:

(1) On 27 July 2011, Mr Hussain sent Mr Sullivan an email headed "*low margin sales*" asking "*What is your expected number for this q. As usual i will need $25m*". Mr Sullivan replied that he was "*on it*" and that there was "*Lots of good stuff in the works*".

(2) On 18 August 2011, the day that HP's acquisition of Autonomy was announced, Mr Sullivan forwarded an email to the Defendants saying:

"*Getting bombarded with calls from Dell and EMC. I have a lot lined up with Dell. Given the competitive situation, I will need guidance. <u>I have committed to a lot of Q3 reselling revenue</u>. I assume I keep going… There are deals lined up in future qtrs as well*" (emphasis added by the Claimants).

1114. There is no hint in any of this of any marketing purpose; the focus is entirely on the production of recognisable revenue.

1115. Following the completion of the Autonomy acquisition (on 3 October 2011), Mr Sullivan emailed Dr Lynch and Mr Hussain (on 11 October 2011) stating, "*I am still taking reselling orders from Dell. Do you have a reselling revenue goal for the quarter (through Jan)?*". On 7 February 2012, Mr Sullivan stated that the hardware deals were to continue for the time being as "*MRL still wants the revenue for now*". Again, these emails simply confirm what is already apparent from the material set out above, namely that the purpose of the pure hardware sales was to generate revenue.

1116. In a rather different vein, the Claimants referred to representations made by Dr Lynch before and at the time of the acquisition which they contended demonstrated the extent to which the hardware reselling strategy was kept quiet, and Autonomy was presented as being differentiated by its exclusive focus on software sales.

1117. In particular, they cited (a) a copy of a Q&A script posing and answering questions which might be put by the press on announcement of the acquisition, which Autonomy prepared and shared with HP on 17 August 2011 (which was the day before the acquisition) and (b) a rebuttal prepared by Dr Lynch to a negative description of the HP acquisition in an article in the *'eDiscovery Journal'* which was sent to him in draft. As to this:

> (1) In the Q&A script, Question 31 was "*What is the product fit between the businesses?*", to which the planned response was "*Perfect fit, no overlap. Barcelona [HP] is a hardware and IT Services business and Arsenal [Autonomy] is a pure software company*". Dr Lynch reviewed earlier drafts of the script that contained this planned answer. The Claimants cited this as demonstrating a contrast of what was to be stated then and the case now being advanced by the Defendants: then, the distinction was being drawn between HP as "*a hardware and IT Services business*" on the one hand and Autonomy as "*a pure software company*" on the other. The assertion that there was "*no overlap*" between the two companies was designed to reinforce the message that Autonomy was not a company engaged in the sales of hardware.

> (2) E-Discovery Journal was planning to publish a negative description of the HP acquisition, which it shared with Autonomy in draft prior to publication. Dr Lynch took umbrage in relation to the draft, describing it as "*a real mess of rumor [sic] innuendo and incorrect technical comments*". He produced what he called a "*rebuttal*", which he shared with others within HP and Autonomy. This contained a section headed "*Product rationalisation and overlap*", which stated as follows (emphasis added):

>> *The report poses the question:*

>> *What is the go-forward plan for product rationalization, both within the Autonomy portfolio and between the Autonomy and HP portfolios?*

>> *But none of this is analysed either in the report, which instead makes vague references to product overlap. In fact there is very little overlap which is why the acquisition makes so much sense. The eDiscoveryJournal seems to deliberately shy away from stating the obvious: that HP is primarily a hardware company and Autonomy is a pure software business.*"

### *(7) Incentivisation of Mr Sullivan purely by reference to hardware sales revenue*

1118. The Claimants also relied, as being consistent with and demonstrative of the Defendants focus on pumping revenue from loss-making hardware reselling, on the fact that in Q3 2009 and various subsequent quarters the Defendants pressed and incentivised Mr Sullivan to achieve revenue targets by offering bonuses calibrated by reference to revenue, without any suggestion of any regard being had to the identity of the customer, its IT needs or the volume of any sales of Autonomy software that might flow from hardware sales.

1119. These bonus targets and promises started from the first quarter of the programme, and continued throughout the Relevant Period. Thus, in respect of Q3 2009, Autonomy agreed to pay Mr Sullivan what was described by Mr Hussain in an email to Mr Sullivan dated 15 September 2009 as *"a special $200,000 bonus"* for delivering $30 million of recognisable revenue by 30 September 2009, with a promised supplement of another $100,000 *"should you manage to get to $50m of recognisable revenue"*.

1120. Similarly calibrated and very handsome bonus payments were promised and made to Mr Sullivan in subsequent quarters, with no stipulation or even mention on any occasion of any required correlation of hardware sales to software sales or contacts.

1121. The Claimants pointed out also that none of these bonus payments was revealed to Deloitte or the Audit Committee, nor was the fact that they were promising incentives calibrated by reference to hardware sales targets.

1122. In their written closing submissions, the Claimants contended that if the purpose of the hardware sales was as the Defendants contended:

> *"…it is incomprehensible that Mr Sullivan was promised bonuses – which were also concealed from Deloitte and the Audit Committee – by reference to one, and only one criterion: namely, the level of hardware revenue he generated, regardless of the identity of the hardware purchaser, the terms on which it transacted or the need for any software purchase to eventuate, let alone even be contemplated."*

1123. The Claimants suggested that it would have been perfectly straightforward and, on the Defendants' case, more logical – to tie Mr Sullivan's bonus payments to some other measurable standard, such as the volume of software purchases entered into by customers who also bought discounted hardware from Autonomy; and that the reason why it was tied to hardware sales only was because in reality that was the only target he or Autonomy ever had.

1124. Dr Lynch sought to counter this on the basis that the calibration by reference to revenue only was simply to ensure clarity. In cross-examination, Dr Lynch suggested that the bonus compensation[185] had necessarily to be set by reference to *"recognisable revenue"* so as to ensure that it was measurable by reference

---

[185] Or 'spiff'. Dr Lynch also made the point that Mr Sullivan was also rewarded for software sales.

to *"a clear target"*. In his written closing submissions, Dr Lynch submitted that any other criterion would have been unworkable, or likely to lead to dispute. [186] Dr Lynch added that it was in his view *"inherent"* that the revenue achieved would be referable to the protection and/or promotion of the software business because otherwise Autonomy would not have agreed to participate in the revenue-raising hardware transaction in the first place.

1125. Dr Lynch's explanation struck me initially as plausible; and Mr Sullivan's evidence in the US criminal proceedings was also in line with it. However, the fact remains that if protection and promotion of the software business was truly the underlying objective, the omission of any mention, still less provision, for Mr Sullivan to prioritise customer and hardware sales according to their propensity to engender software sales is notable; as is the complete absence from the correspondence of so much as a whisper of encouragement of such a priority.

1126. Dr Lynch's suggestion that it was *"inherent"* in Autonomy's ability to decline any Dell transaction that sales would be confined to existing or strongly prospective customers was untested since he could offer no concrete example of a transaction proposed by Dell having been declined; in any event, it simply amounted on analysis to an assumption that Mr Sullivan would put aside the temptation of greater sales and a larger bonus by reference to the unstated objective. Furthermore, Dr Lynch's suggestion of an *"inherent"* filter begged the question why it was not quite easily and clearly made express.

1127. Again in passing, since this too is more conveniently elaborated when I address later the question whether the Defendants misled Deloitte and the Audit Committee, it is to be noted that Mr Hussain's email dated 15 September 2009 promising Mr Sullivan bonuses for obtaining recognised revenue also promised a further:

> *"special bonus of $50,000 if you are able to extract an email that allows us to allocate the associated costs appropriately in my opinion"*.

1128. This was, the Claimants suggested, an extraordinary provision, which tied Mr Sullivan into trying to get some form of email from EMC sufficient to present their arrangements in such a way as to justify part of the sums paid to EMC as referable to marketing and expenses (and see further paragraphs 1272 to 1284 below). It is noteworthy also that the payments were to be made only after the auditors had signed off the Q3 results (then expected in the third week of October): demonstrating the concern that Deloitte had to be persuaded that the accounting allocation was correct.

---

[186] Dr Lynch did not elaborate what disputes he had in mind; but it seems to me that they could have included issues as to what time lag between one purchase and the other should be permitted, how pre-purchases of software in advance of hardware sales might be treated, or whether any account should be taken of customer retention by virtue of the other advantages to existing customers of dealing with a single supplier for all IT needs.

HC-2015-001324

1129. In the event, the conditions were satisfied (though Autonomy restricted the first part of the bonus to $200,000 and refused Mr Sullivan's request to pay a further *pro rata* amount to reflect the higher recognisable revenue in fact achieved). By email of 11 November 2009, which had been approved in draft by Dr Lynch, Mr Hussain confirmed the arrangements (though no Porsche) and put forward further bonus arrangements for Q4 2009, as follows:

> *"Hi Mike*
> *Apologies for the delay in my response. Whilst the email [earlier in the thread] was clear in that there were 2 distinct triggers for the EMC deals ($30m and $50m), given the out performance in Q3 here's what I would propose:*
>
> 1.  *You receive $200,000 for delivering $30m of recognizable revenue in Q3*
> 2.  *You receive $50,000 for extracting the necessary written confirmation for allocation of costs signed off by the auditors*
> 3.  *For Q4 for newly contracted and recognized <u>appliance related</u> revenue from EMC~~, and~~ HDS ~~and Dell~~ amounting to ~~$15m~~ $10m (excludes any HDS / MS revenues) you will receive ~~$150,000~~ $100,000 plus an additional linearly calculated commission from Q3 of $54,000 (see below for calculation). This will require the necessary confirmations for the allocation of costs and also inclusion of Autn software in the sale as we have already discussed.*
> 4.  *For additional Q4 contracted and recognized revenue from ~~EMC, HDS and~~ Dell <u>(excluding OEM related revenue)</u> amounting to a further ~~$15m~~ $10m you will receive an additional ~~$150,000~~ $100,000.*
>
> *The usual Autn ts and cs apply and good luck! I will get the cheque cut tomorrow on this basis*
>
> *Regards Sushovan."*

1130. That also serves to illustrate that the bonuses were by no means insubstantial: for Q3 2009, gross $250,000 ($200,000 for delivering recognisable revenue in excess of $30 million plus the 'special bonus' of $50,000); and a further $100,000 in Q4 2009 if revenue from hardware exceeded $10 million (excluding OEM-related revenue). (I was not provided with the details of every promise or payment, but note, for example, that for his *"good job"* including in relation to hardware sales in Q3 2010 he was promised $50,000 , and for Q2 2011 a further $50,000).

1131. The following evidence in Mr Welham's witness statement relating to the $50,000 'special bonus' was not challenged:

> *"I was not aware of the existence of this bonus at the time of our audit and review work. I have never known of a situation in which an*

> *employee of one of our audit clients has been offered a financial incentive to obtain documentation to support representations being made by management to the auditor as to what should be the appropriate accounting treatment. Had we been made aware of this bonus arrangement at the time, we would have asked questions of management in relation to the rationale for the bonus."*

1132. As a consequence, it would not have been raised by Deloitte with the Audit Committee and, accordingly, the Audit Committee would have been unaware too.

1133. In summary, the structure and calibration of Mr Sullivan's incentive arrangements were, at the least, entirely consistent with the Claimants' case, even if not in isolation probative of it. They add to the indications that the hardware reselling strategy was carried on without ostensible regard to any measured benefit to the software business. The fact (as I find it to be) that the incentive payments were never revealed to Deloitte or the Audit Committee reinforces that view.

### (8) No documentary evidence that discounted resales of hardware were used as a bargaining chip

1134. It may be recalled that an important element of the Defendants' justification for the hardware reselling strategy was the evidence of Mr Sullivan in the US criminal proceedings, and of Mr Egan in those proceedings and in this action, to the effect that they always understood that the principal purpose of the resale of discounted hardware was (as Mr Keker, Mr Hussain's counsel in the US criminal proceedings, put it when cross-examining Mr Sullivan) to build *"a bigger share of the financial market and use discounted hardware as a means to that end"* (see paragraphs 726 and 743(1) above).

1135. The Claimants relied on the documentary material in evidence to counter the Defendants' case based on that evidence (whilst, of course, maintaining the argument, which I have in the event accepted, that the understanding of both Mr Sullivan and Mr Egan was really based on what they were told by the Defendants). They submitted that there was nothing in the documentary evidence to suggest that either the marketing department or even those in Autonomy's sales team (apart from Mr Sullivan, and to some extent, Mr Egan) had any knowledge of the hardware sales; and that in any event, there is no contemporaneous documentary evidence to suggest that the discounted resales were ever used as leverage in promoting and negotiating the terms of software sales.

1136. Further, in at least some of the documented arrangements (see the Zones transactions below) the contractual arrangements were structured to seek to ensure that the end-user (a long-standing customer of Dell) did not and never could find out about Autonomy's subsidy and involvement.

1137.    The Claimants submitted that this made a mockery of the purported justification of the programme as a loss-leader for marketing purposes, as does the basic fact that (a) hardware reselling targets were fixed by reference to market expectations of overall quarterly revenues and (b) hardware reselling was, within the overall target, increased or decreased by reference to Autonomy's success or failure in selling software offerings in that quarter.

1138.    They elaborated on this in submitting that had sales of hardware really been designed to drive software sales, matters would have looked quite different, and there would have been (as Mr Rabinowitz put it in his oral closing) *"if not mountains of documents, at least some pile of documents, at least an anthill's worth of documents"* to show (for example) continuing cost/benefit analysis, consultation with the salesforce as to the impact of offering discounts, selection of customers according to likely requirement for hardware and software, and some form of input from the marketing department; but there was *"no such thing"*.

1139.    As the Claimants noted in their written closing submissions, there is not a single email or document in evidence passing either to or from Ms Nicole Eagan, Autonomy's Chief Marketing Officer, to suggest that either she or anyone else reporting to her had any knowledge of, or involvement in, this supposedly important and cost effective marketing strategy. Ms Eagan was not called as a witness either and the witness statement she had made (giving a London address) was withdrawn. [187] In the recitation of the chronology, I noted Ms Eagan's involvement only once in this context: this was that she was one of the two recipients (Mr Egan being the other) of Dr Lynch's email on 1 May 2011 stating:

> *"Folks, you two must be focused on this Q revenue now and NOTHING else"* (see also paragraph 1105 above).

1140.    Mr Egan's evidence in this context was that although he was aware of the hardware reselling strategy, even he generally did not know which companies had purchased hardware from Autonomy or how much third-party hardware was being sold. In a passage of his witness statement from which I have previously quoted in part in paragraph 766 above, he illustrated this by reference to a particular transaction with Bank of America, as follows:

> *"I was involved in making this type of hardware sale when Autonomy first began this practice in Q2 2009, but was involved only occasionally thereafter. To my knowledge, Mike Sullivan, the CEO of Autonomy Zantaz, was tasked by Dr Lynch and Mr Hussain with managing most of the hardware reselling. I was more tasked with selling software licences. As a general matter, I did not know which companies had purchased hardware from Autonomy or how much*

---

[187] Ms Eagan was one of those (with Mr Kanter and Dr Menell, and also Ms Orton) who joined Invoke Capital in May 2012 after leaving Autonomy. She was co-CEO (with Ms Gustafsson) of Darktrace prior to its IPO with particular responsibility for the marketing side of the business. She is now the Chief Strategy and AI Officer at Darktrace. She has always been based in the United States.

> *third-party hardware was being sold. When I was involved in selling software licences to end-users, I usually did not know whether hardware had been sold to that end-user and when I was not involved in, or aware of, a hardware sale I did not use the fact of a prior or contemporaneous hardware sale to promote the software sale that I was trying to make. For example, I discuss below a very large software licensing and data hosting transaction with Bank of America that I was closely involved in and which we eventually executed in Q1 2011. I did not know at the time, but have since been informed, that in 2010 Autonomy resold, at a loss, more than $30 million of Dell hardware to a reseller called SHI whom in turn, on-sold the hardware to Bank of America. Had I known about this at the time, it might well have been useful information in our discussions with Bank of America. However, I did not know about it, and I never heard Dr Lynch or Mr Hussain refer to these hardware sales during our extensive negotiations with Bank of America."*

### (9) Three illustrative transactions where marketing was no part of the purpose

1141.  The Claimants put forward three examples to illustrate and support their proposition that the hardware reselling strategy cannot really have been conceived of as a marketing programme because it is the essence of a loss leader marketing strategy that the purchaser should know who covered the loss, and Autonomy's salesmen did not have that knowledge, and certainly did not deploy it as a 'bargaining chip'.

1142.  The examples were (1) a transaction with BofA (2) a transaction with Citibank and (3) various transactions via Zones Inc (to H&R Block, Target and Oracle).

*BofA*

1143.  Mr Egan's evidence in relation to the Bank of America (which was not directly challenged in cross-examination) was corroborated by the evidence of Mr Reagan Smith, who ran BofA's procurement team for software purchases. Mr Reagan Smith did not give evidence before me, but his evidence in the US criminal proceedings was admitted into these proceedings by a hearsay notice issued by the Claimants. That evidence was to the effect that he was not aware of any hardware sales by Autonomy to BofA (or to SHI) and that, in the course of the negotiations with Autonomy, neither Mr Egan nor Mr Scott (who he said were the individuals principally involved for Autonomy) or Mr Hussain or Mr Krakoski (who had responsibility for sales to BofA) or anyone else raised the hardware sales as a selling point in any way.

1144.  More generally, the Claimants submitted that:

(1) The documentary record disclosed no evidence of a reference to a prior sale of hardware in any sales pitch made to any software company.

(2) If a marketing strategy had existed, senior management within Autonomy would have ensured that, if nothing else, the hardware deals were widely publicised within the software sales team so that they could be used to secure software sales.

1145. Against this, Dr Lynch told me in cross-examination that Mr Egan did in fact know that Autonomy *"had a history of selling hardware to Bank of America and that's covered in some documents"*, and referred in support to an email from Mr Egan to Mr Hussain dated 23 December 2009 in which Mr Egan expressly referred to the Morgan Stanley Dell reseller deal (for hardware) being done *"on a lost [sic] leader basis by Autonomy"*.

1146. Dr Lynch also relied on his own evidence (in his supplemental witness statement) to the effect that he had *"several private conversations"* with another more senior director of BofA, Mr Simon Mackenzie-Smith ("Mr Mackenzie-Smith", then head of BofA in London) when he:

> *"sought Mr MacKenzie-Smith's assistance in encouraging the bank's procurement team to prioritise the deal, [and] emphasised that Autonomy was a big supplier of software and hardware to the bank."*

1147. This issue developed some importance, both as a microcosm of the larger disparity in the context of the hardware sales between Dr Lynch's oral evidence and the documentation, and in terms of credibility.

1148. The Claimants urged me to reject Dr Lynch's evidence that he had sought to deploy the discounted hardware sales in support of the software sales: it was unsupported by documentation or by any witness evidence from Mr Mackenzie-Smith, had not been referred to in any communication in the period and had not been mentioned by Dr Lynch in his first witness statement. In his first witness statement, Dr Lynch had mentioned that he had spoken to Mr Mackenzie-Smith but had made no mention at all of any hardware deals, still less their use as leverage:

> "*In Q4 2010, I spoke with high-level contacts at Bank of America (namely Simon MacKenzie-Smith, who I believe was the head of Bank of America in London, and Mr Thomas Fakhouri) to seek their assistance in encouraging the bank s procurement team to prioritise the direct deal, in the hopes of closing the deal within the quarter*".

1149. In cross-examining Dr Lynch, Mr Rabinowitz deployed as his anvil the disparity between his first and second witness statements, and also (a) that Mr Egan had claimed that in late 2010, when he was negotiating the software deal with BofA's Mr Reagan Smith, neither he nor (as far as he was aware) Mr Reagan Smith had any awareness that Autonomy had sold discounted hardware to Bank of America[188], and so obviously he had never thought to use that as leverage,

---

[188] Autonomy had resold, at a loss, more than $30 million of Dell hardware to SHI (as reseller) who, in turn, on-sold to Bank of America.

and (b) more specifically, that not only did Mr Egan say that he did not know of the hardware sales to Bank of America, but also that he had *"never heard Dr Lynch or Mr Hussain…refer to these hardware sales during our extensive negotiations with Bank of America."*

1150.  Mr Rabinowitz took Dr Lynch through a series of emails between Dr Lynch and Mr Mackenzie-Smith at this time which demonstrated that Dr Lynch was trying to enlist Mr Mackenzie-Smith to cut through some bureaucratic impediments which were delaying the software transaction (which involved a hosting restructuring) but in which there was no mention or reference to any parallel telephone conversations. Mr Rabinowitz repeatedly put to Dr Lynch that if there had been parallel telephone conversations between them in which Dr Lynch had sought to use the hardware sales as further leverage, there would surely have been some reference to them in that chain of email correspondence.

1151.  Dr Lynch displayed uncharacteristic irritation in answering these questions, and sought to dismiss the suggestion that he had no such discussions as *"unrealistic",* on the basis that in a one-to-one conversation between people as senior as they were it was inherently likely that Dr Lynch would have sought to deploy such an argument, and correspondingly unlikely that either would have recorded the private discussion in any formal record or note.

1152.  In the absence of any evidence (oral or written) from Mr Mackenzie-Smith, I have had to reach a view on the basis of (a) my appreciation of Dr Lynch's oral evidence, (b) the points made by the Claimants about the lack of any reference to these conversations in the first round of evidence and (c) the content and tone of the email exchanges.

1153.  I have concluded that in the general way of things it is more likely than not that Dr Lynch made some passing remarks about the previous relationship and discounted sales; but not in a way that caused Mr Mackenzie-Smith to treat it as a sufficient consideration to influence the decision or mention the matter to BofA's negotiator Mr Reagan Smith.

1154.  In a sense, Dr Lynch's version of the discussions in his second witness statement tells against his case that the hardware sales were a potent and successful marketing tool. The fact is that whatever the conversations were, they do not appear to have accelerated the proposed software sales to BofA: no deal was concluded with BofA in Q4 2010 (which is what Dr Lynch had been pressing for) and Autonomy, desperate for the revenue, had instead to restructure the deal, split it into smaller parts, and parcel it out and effect a sale to two VARs (DiscoverTech and Capax Discovery) from which it purported to recognise revenue, as I explain in the Schedule to this judgment on the impugned VAR transactions. Dr Lynch's explanation did not answer the real point that the sales were negotiated by and between Mr Egan and Mr Reagan Smith, and the latter's evidence, which I accept, was that he did not even know of the hardware sales.

1155.  In all these circumstances, I accept the Claimants' submission and find that the hardware deals with BofA played no material part in relation to BofA's agreement to enter into the software deal. The Claimants further submitted, and

again I accept, that this seriously undermines any suggestion on the part of the Defendants that the purpose of those hardware sales was primarily marketing, to drive (in some way) separate sales of software.

*Citibank*

1156. In the case of the Insight/Citibank transaction, which was a $10 million transaction for the supply of Dell hardware, the Claimants drew particular attention to commentary in a spreadsheet, prepared by Mr Sullivan and attached to an email dated 11 February 2011 from him to Mr Hussain which notes:

> *"Dell in competitive bid for business to be awarded in Feb. Purchase in March. Dell is incumbant [sic] and gives themselves 60-70% chance to win. We would need to put this through an existing reseller (Insight) who inventories so Citi may not know we are involved. Not clear if this revenue would all hit in Q1."*

1157. The Claimants pointed out (and in cross-examination, Dr Lynch accepted) there is no indication anywhere in his comments or elsewhere that this was the sale of an appliance or a package that contained Autonomy software, or that Mr Sullivan had any interest in some related sale of software: his eyes appear firmly fixed on the revenue target and its timing.

1158. What the Claimants suggested was particularly telling was that it appears that Mr Sullivan anticipated that Citibank might not even know of Autonomy's involvement. Dr Lynch recognised this when cross-examined; and although he told me that he *"wouldn't be happy with that, unless we could tell Citi...I wouldn't accept the order if I had known..."*, the Claimants understandably pressed the point that whatever Dr Lynch might now choose to say, the fact remained that, at the time no-one, including Mr Hussain, suggested that the deal should not be accepted or concluded unless Autonomy's involvement was disclosed to Citibank. I accept that.

*Zones Inc*

1159. As to the various deals through Zones (a substantial Dell reseller and *"IT solutions provider"*), the Claimants' principal point was that, as they read it, each of the letter agreements which governed Autonomy's relationship with Zones provided that its terms should be confidential and that no party should *"disclose the terms hereof without the consent of the other party"*.

1160. Furthermore, the Claimants relied on each of the three deals with Zones as illustrating their case that Autonomy had no role apart from injecting or insinuating itself into arrangements between Zones and Dell so as to establish a contract from which it could derive recognised revenue. Thus, in each case and in the context of an existing relationship between Dell and Zones:

(1) The arrangement was that Zones would procure Dell hardware which Zones needed for supply to its own customers not (as would have been normal) from Dell but from Autonomy;

(2) The advantage offered to Zones for this process of what was described in an email dated 20 May 2010 from Mr Dean Bordeaux ("Mr Bordeaux", an account executive with Dell) to Zones (including Mr Camden, of whom see below) as *"injecting a new reseller between Dell and Zones"* was a discount on the cost to it of the hardware: the discount resulted from Autonomy purchasing Dell hardware from Dell at its undiscounted price and then selling it on to Zones at a discounted price;

(3) Autonomy would account for the purchase from Dell as a sale giving rise to recognised revenue, but its involvement would be minimal in that the hardware in question would not be delivered physically to Autonomy and then by Autonomy to Zones or Zones' customer, nor would it be loaded with Autonomy software: instead, it would be delivered by Dell to Zones or Zones' customer;

(4) The first of the three Zones deals was a large deal of over $7 million with a tax preparation services company called H&R Block. As Dr Lynch accepted, the hardware was not going to be loaded with any Autonomy software: it was *'pure hardware'* according to the Claimants' definition. The evidence principally relied on by the Claimants was in the form of a transcript of the evidence in the US criminal proceedings given by the head of Zones' sales organisation, Mr Dominic Camden ("Mr Camden"). This was introduced into evidence by hearsay notice served by the Claimants. The Claimants also relied on Mr Bordeaux's contemporaneous emails.

1161. Mr Camden, who did not provide evidence in these proceedings and whose hearsay evidence could not, therefore, be tested, stated in his evidence in the US criminal proceedings that whilst the discount was attractive, he had concerns about the introduction of Autonomy into this deal with a long-time customer (as was H&R Block), lest Zones should lose a client if the client found out that it could secure the solution it wanted for less money from Autonomy.

1162. He explained that it was for that reason that he insisted on there being both non-solicitation and confidentiality clauses in the contract with Autonomy. He regarded that as very important. A clause was negotiated to address this and was included, as follows:

> *"The terms of this Letter shall be confidential. No party hereto shall disclose the terms hereof without the consent of the other party. For a period of one (1) year from the date Autonomy receives the most recent Customer PO [i.e. Purchase Order] hereunder, Autonomy shall not actively solicit H&R for purposes of reselling the Products directly to H&R Block. For avoidance of doubt, nothing herein shall prelude*

> *Autonomy from selling to H&R Block any Autonomy products, in any manner whatsoever."*

1163. Mr Camden said in his evidence in the US criminal proceedings that he took from this that Autonomy would have no contact with H&R Block. This reflected and was reinforced by an assurance Mr Bordeaux had given in his email of 20 May 2010 quoted from earlier that:

> *"Autonomy has and will have no direct contact with Block but does need the attached simple agreement executed with Zones."*

1164. That "simple agreement" was substantively like the agreement eventually signed. In the event, it seems that the confidentiality of Autonomy's involvement was preserved: Mr John Meiers ("Mr Meiers"), who was in charge of H&R Block's software procurement team in 2010, gave a witness statement in these proceedings (which was not challenged) in which he said that when in September 2010 he negotiated a $2 million software deal with Autonomy, he was unaware that, just three months earlier, Autonomy had been involved in the resale transaction. Mr Meiers added that to the best of his knowledge, no-one else at H&R Block involved in the software purchase was aware of Autonomy's involvement either. The Defendants chose not to cross-examine Mr Meiers.

1165. The Claimants posed the question why in such circumstances Autonomy wanted to be involved at all. Understandably, the Zones management team was puzzled at being offered the opportunity to sell its own longstanding customer cheap hardware, subsidised by Autonomy, with the customer kept in the dark about Autonomy's role.

1166. In this context, Mr Camden sent an internal email to the Zones team on 7 July 2010 offering a theory as to why Autonomy should be prepared to act in that way. He speculated that "*Dell must be an Autonomy client*" which received preferential discounting and pricing for business driven through Autonomy. His Zones colleague replied the same day, observing that this "*will go in the books of unresolved mysteries*". The Claimants contended that:

> *"These contemporaneous exchanges merely confirm what is obvious; that it made no apparent commercial sense for Autonomy secretly to subsidise Dell's sale to a hardware reseller and the reseller's sale to its customer. These Zones' employees could not have known that the Defendants had a very good reason for having Autonomy engage in this activity, namely facilitating the ability of Autonomy to report the revenues thereby achieved, without disclosing their source; and in this way, misleading the market."*

1167. The same *modus operandi* was adopted to subsidise Dell's sales to Zones for other Zones customers. Thus, a quotation dated June 2010 issued by Zones for the sale of hardware to Oracle, the large software company, contained no

reference at all to Autonomy. The deal between Autonomy and Zones, again, was that Oracle should not be notified of Autonomy's involvement in the deal.

1168. The same was true of the third of the Zones deals, that in late 2010 for the sale of Dell hardware to Zones for resale to yet another Zones customer, Target Corporation ("Target"), a US chain of retail stores. The letter agreement between Autonomy and Zones dated 11 November 2010 contained, at clause 10, a confidentiality provision preventing disclosure of its terms to anyone, which would include Target itself.

1169. The Claimants described and relied on the third Zones transaction as follows:

(1) In an email exchange on 11 November 2010 (the same date as the letter agreement) between representatives of Dell, Zones and Autonomy (Mr Sullivan), Mr John Niemier of Zones sought clarification that the way things would work was that Autonomy would provide a quote to Zones, and Zones would in turn deliver the final quote to Target. On 12 November 2010, Dell's Mr Randall Johnsen responded agreeing that "*Zones is the only entity that should provide Target a quote for this transaction*": in other words, Autonomy was not to deal directly with Target.

(2) In parallel with this exchange of emails, there was an internal email discussion at Zones between Mr Niemier and Mr Camden. In an email dated 11 November 2010, Mr Niemier expressed confusion as to how the process would work. Mr Camden's response was clear: "*Zones places PO with Autonomy, yes. Autonomy places order with Dell. Autonomy and Target don't touch*".

(3) When Mr Niemier asked who would issue the quote to Target, Mr Camden's response was "*Zones*", in the same way as for H&R Block. He added, "*HRB [i.e. H&R Block] never knew about Autonomy and neither should Target*".

(4) Mr Camden confirmed during his testimony in the US criminal proceedings that this email reflected his understanding of how the deals with Autonomy were set up.

(5) On 22 November 2010, Dell's Mr Johnsen contacted Mr Camden about the Target deal. He reminded Mr Camden, "*not to use Autonomy name in messaging*", i.e. in the messaging Zones sent to Target about the hardware sale.

(6) Consistent with this, a Mr Tom Corley of Zones sent an email on 30 November 2010 to Mr Camden confirming that Autonomy had received the Zones purchase order for Target. Mr Corley noted that the delivery would be a

"*blind drop-ship from Dell directly to Target. So there should be* nothing *that says Autonomy on any packing slip*".

(7) Mr Camden testified in the US criminal proceedings that a "*blind drop-ship*" meant that the hardware would be shipped directly from Dell to Target, rather than coming via Zones.

(8) The Claimants submitted that the significance of the lack of any reference to Autonomy, even on the packing slip received by Target, is plain: Autonomy was to get revenue, but no customer relationship.

1170. The Claimants submitted that these Zones deals were an illustration of the true nature and purpose of the overall strategy: it was plain and obvious that there was no question of Autonomy using cheap hardware sales to H&R Block, Oracle or Target, as a means of driving software sales to those companies, in circumstances where the companies in question had no idea, and were contractually forbidden from knowing, that Autonomy was responsible for subsidising their purchases of hardware.

1171. They submitted more generally that:

> *at no time during the Relevant Period was any attempt whatsoever made to identify or monitor the extent to which these hardware sales produced any marketing benefit to Autonomy. That, again, is consistent with the real purpose of the hardware reselling strategy being simply to, in effect, buy (at a substantial cost) recognisable revenue that would be included in the revenue figures reported to the market without revealing the true source (or cost) of this additional revenue stream. It is inconceivable that Dr Lynch and Mr Hussain, intelligent individuals, could have considered that what they were doing was honest."*

1172. The Defendants, however, submitted that:

(1) Even in the three Zones deals the only restriction as a matter of construction of the letter agreement was that Autonomy was required to keep the terms of the letter agreement confidential and did not extend to prohibiting Autonomy from saying that it was involved as the party supplying hardware to Zones, or that this was part of a marketing programme;

(2) There was no evidence that either of the Defendants was made aware of the contractual restriction;

(3) Dr Lynch stressed that (a) he had no involvement in the Zones/H&R Block transaction, and he was not aware at the time of any contractual term preventing Autonomy from disclosing its role in the transaction (and it was not suggested to him in cross-examination that he did) and he *"wouldn't have been happy with the lawyers if I'd known about that"*; (b) the position was likewise as regards the sale via Zones to Target; and

(c) he was also unaware of any sales of hardware via Zones to Oracle, and thus was not aware of any such restriction: but he added that he did not see how a term could have been agreed with Zones precluding Autonomy from soliciting business from Oracle given that Oracle were an existing customer;

(4) The Zones sales, even if they did not assist to reinforce a customer relationship, achieved the other objective of the strategy as (according to Dr Lynch) formulated at the Loudham Hall meeting of reinforcing relationships with the hardware suppliers themselves, and in particular with Dell (see above).

1173. The Defendants also drew my attention to other parts of Mr Camden's testimony in the US criminal proceedings in which he accepted that (a) there was a customer demand for *"complete solutions"* (where a seller of software would act as a *"one-stop shop"* and also provide the hardware) and (b) if one of Autonomy's customers wanted a package or complete solution, it would make good sense to provide the hardware that those customers needed as well as the software. Mr Camden accepted also that Zones itself often planned, and it was perfectly standard business practice, to use a relationship (such as Zones' with Target) established initially by sales of hardware to sell them other products like software; and that it made sense likewise for Autonomy to sell hardware to a customer with a view to using that relationship to introduce their own software products.

1174. In any event, the Defendants submitted that the Claimants' focus on the Zones deals flagged that they were the exception not the rule, and that for the large majority of hardware transactions the customer was aware of Autonomy's involvement and sales were deployed to promote the customer relationship. Mr Sullivan acknowledged in his evidence in the US criminal proceedings that *"absolutely"* he was instructed to and did tell customers that the sales were *"part of a marketing programme"*, and he did not consider that to be wrong in any way.

1175. Further, even though I would accept the Claimants' more general point that most Autonomy software salesmen probably did not know of the hardware reselling strategy and did not therefore consciously use it as leverage for software sales (and see above as to my impression that the fact of the programme was known only to a small circle within Autonomy), the fact is that most of the hardware deals in question were undertaken by Mr Sullivan, who plainly did know all about the programme. It seems to me likely, consistently with Mr Sullivan's evidence, that he would have felt some need to explain, in deals where he had some contact with the purchaser, what the rationale for offering a discount was; but all he said was that it was *"part of a marketing programme"*. That seems to me to be little if anything more than a statement of the patently obvious. There was, however, no suggestion in his evidence or any other evidence (apart from Dr Lynch's discussions with Mr Mackenzie-Smith) that he ever said anything more.

1176. In any event, the Defendants' broader point was that there is evidence that both Mr Egan and Mr Sullivan did think that the hardware reselling strategy was a catalyst for software customer loyalty and software sales. Mr Egan's evidence is of particular interest in the broader context of the utility of the hardware reselling strategy as a marketing strategy.

1177. I have previously quoted his witness statement in relation to this (see paragraph 754 above). As usual in his case, Mr Egan's evidence was carefully modulated, seeking to find interstices as best he could in the heavily lawyered agreed evidence he had given in the US criminal proceedings (from which he could not depart on pain of imprisonment) when it appeared or was presented as at odds with other evidence. But subject to the caveat that in his perception *"a principal reason"* for the hardware sales *"was to generate income"*, he accepted that there were other substantial reasons for it, and in particular, agreed with his cross-examiner's recital of propositions dressed as questions and designed to elicit the answers that he gave that *"often"* hardware and software sales *"were leveraged together"* and the hardware reselling strategy *"increased Autonomy's standing with the big financial institutions that bought their software"* (and see also paragraph 751 above).

1178. The problem for the Defendants, as it seems to me, has always been that it is not sufficient for them to demonstrate that at least in some, perhaps many, cases, the fact that Autonomy was providing or subsidising the discount on hardware sold to customers, including software customers, encouraged goodwill and warm feelings about Autonomy which might in due course translate into future sales, including software sales. The case they have always had to meet is that even if that was a benefit it was never the real reason or driving purpose, as demonstrated by the fact that Autonomy made at least some substantial sales for which even that benefit would not be obtained, because the purchaser had no idea of Autonomy's involvement: the Zones deals being the clearest examples, it being obvious in those transactions that it was no part of their purpose to promote or protect the prospect of software sales to Zones.

1179. In Mr Hussain's written closing submissions, it was stated that the above three deals *"were the exception and not the rule."* The additional contention was advanced that *"in any event, these sales achieved the objective of building relationships with the hardware suppliers themselves"*.

1180. The latter argument was given greater prominence by both Defendants as the case developed. It was, to my mind, paper-thin, even taking into account the possibility that Autonomy may have got discounts on its purchases of hardware for its own use (for archive hosting and the like). There was little or no evidence of any special relationship being developed, nor that such a relationship promoted software sales. (It may have assisted OEM ventures, but that is a different matter and would not justify the accounting treatment of the costs.) Autonomy's supposed 'partnership' with EMC was extinguished with minimal notice. Dell was in it because it is not often that a third-party agrees to subsidise a company's sales. But I was not persuaded that opportunism metamorphosed into a relationship of such real benefit to the software business as to be a substantial purpose of Autonomy's hardware sales.

1181. As to whether the three sets of transactions addressed above were exceptions or outliers, the express contractual prohibition on Autonomy being involved or asserting involvement at all was unusual. But it seems to me that the question in relation to the Zones transactions (and the others singled out by the Claimants described above) is ultimately whether or to what extent there can be discerned or established from them what the driving purpose and objective of the hardware sales really was, and what credence can be given to the Defendants' assertions that the sales were driven by the interests of, and to enhance, Autonomy's software business.

1182. In my judgment:

> (1) The Zones transactions, and those with BofA and Citibank (another example being the transaction with Progressive), give substantial general support to the Claimants' case that the real purpose of the hardware reselling strategy was revenue generation: they demonstrate clearly that any marketing benefits in terms of Autonomy's software customers might be desirable by-products but were certainly dispensable, and were not what was driving hardware reselling.

> (2) It may be that Mr Egan's qualification in responding *"often, yes"* to the proposition put to him in cross-examination in the US criminal proceedings that *"hardware and software were leveraged together with these big customers"* was intended to accommodate cases such as Zones where no such leverage was possible at all. But neither Mr Egan nor anyone else ever provided any evidence, apart from their say-so, of any co-ordination, let alone leveraging, beyond some attempt to aim at mutual customers (and the evidence for even that is scanty). I suspect that Mr Egan satisfied himself, in his interstitial efforts, that he could agree to the proposition, and seek thereby to put the strategy and his own involvement in a kinder light, on the basis that in certain cases the discount might generally be supposed to have oiled the wheels of the relationship with software users. But Mr Egan had no reason to believe that there was any greater nexus than that; and it seems to me likely (and I find) that he knew that whilst any benefit which might loosely be termed marketing was readily dispensable, recognisable revenue, being the real objective, was not.

> (3) The real importance of the Zones and the other transactions, in which no marketing benefit was possible, was that they provided proof of what really mattered to Autonomy and the Defendants: revenue irrespective of benefit.

### (10)    The consistent pattern of concealing the hardware sales

1183. The second limb of the Claimants' hardware case (as pleaded in paragraph 54A of the RRAPoC) was that in its published information Autonomy actively concealed its 'pure' hardware sales. They relied on that not only as a facet of

the improper purpose but also as further proof of it: disclosure would have undermined the purpose as alleged by the Claimants (being to drive up revenue by hardware sales and to present it as all won as part of the business of a successful 'pure software company'); whereas if the purpose had been in any material part as the Defendants contended it was, there would have been no reason not to disclose it to the market.

1184.   As one of the Deloitte Reviewers (Mr Robertson) queried rhetorically when the issue of disclosure arose in respect of the Q3 2009 Report:

> *What s the sensitivity about being more transparent on this score? If it s a strong strategic move for them, why wouldn t they want to explain this?"*

1185.   There is no doubt, and the Defendants did not deny, that they and Autonomy's management consistently and insistently declined to disclose any more than they were advised by Deloitte was mandatory under the Accountancy Standards and thus a pre-condition of approval of the Defendants' accounts and financial statements.

1186.   I shall discuss later the Defendants' reasons (based on *"commercial sensitivities"*) for restricting disclosure and their defence that whilst they did no more, they did no less, than Deloitte advised was required and cannot be said to have been dishonest in following their advice. In this section, I summarise what (if any) disclosure relevant to hardware revenues was made in Autonomy's Yearly and Quarterly Results in the Relevant Period. (I also indicate the Defendants' explanations, as appropriate.)

*Annual Reports: overview*

1187.   As previously mentioned (see, for example, paragraph 654 above), Autonomy presented itself to the market generally, and to HP during the pre-acquisition discussions and due diligence, as a *"pure software company"*. The Defendants maintained that this was to distinguish itself from software companies deriving a significant part of their revenue from services and installation. The Claimants maintained that it was intended to and did connote a company whose revenues were almost exclusively derived from the sale of its IDOL software and related software (with some small amounts of 'appliance sales' as later described), and that is the basis on which they acquired it.

1188.   The Business Overview section of its 2009 Annual Report provides an example of the use of the phrase to distinguish Autonomy from other software companies. The following was stated under the heading *"Financial Model"*:

> *"Autonomy is one of the very rare examples of a pure software model. Many software companies have a large percentage of revenues that stem from professional services, because they have to do a lot of customisation work on the product for every single implementation. In contrast, Autonomy ships a standard product that requires little*

> *tailoring, with the necessary implementation work carried out by approved partners such as IBM Global Services, Accenture and others. This means that after the cost base has been covered, for every extra dollar of revenue that comes in significant benefits can fall straight through to the bottom line. What this offers is a business model with a proven record of strong operating leverage and that is expected to continue to deliver industry leading operating margins and revenue to cash conversion."*

1189.  Materially identical wording appeared in the 2010 Annual Report.

1190.  The Claimants accepted that it may be true that, in these passages, Autonomy was seeking to emphasise its distinctiveness from companies that made significant revenues from the provision of services. However, their case is that the reasonable reader – including HP – would also and more importantly have understood the phrase to distinguish Autonomy as being unusual in carrying on no other business, and thus in its financial position being based entirely on its software business and not on any significant revenues from sales of non-software products, particularly products, such as hardware, that were burdened with substantial associated costs. They submitted that this is what the Defendants must have known and intended in emphasising that aspect of Autonomy's business. The reason for such emphasis and its importance was the same as that which the Defendants expressly gave for emphasising how little of its revenue came from services: in the case of software, "*after the cost base has been covered, for every extra dollar of revenue that comes in significant benefits can fall straight through to the bottom line*", while services commanded much lower margins. The Claimants contended that that is an equally fundamental difference between software and hardware sales.

1191.  The 2009 and 2010 Annual Reports both referred to a hardware-based product described as an "*appliance*" in terms of hardware with Autonomy software pre-loaded on it. The explanation in the 2009 Annual Report was as follows:

> *"Appliance*
>
> *Currently a small part of the business focused on quick time-to-value and high return. Where customers have an urgent need to deploy IDOL, either for regulatory or commercial imperatives, we are able to provide a complete solution installable on a turnkey basis to be used in a discrete part of the customer's business. The value of these solutions is in the high end functions they offer in a complete package, and thus the margin profile is not dissimilar to our traditional license business."*

1192.  The equivalent wording in the 2010 Annual Report was more explicit about the fact that an appliance involved hardware:

> *"Appliance*

> *This is currently a small part of Autonomy's business, focused on quick time-to-value and high return. Where customers have an urgent need to deploy IDOL, either for regulatory or commercial imperatives, we are able to provide a pre-installed licence on appropriate hardware to start generating an immediate return. The value of these solutions is attributable almost entirely to the functions offered by the licence, so although there are some hardware costs involved, the margin profile is not widely dissimilar to our traditional licence business."*

1193. Beyond this, there was no mention in the Annual Reports issued in the Relevant Period of Autonomy earning revenues on sales of hardware. Thus, the Financial Review section in the 2009 Annual Report stated that the increase in revenues in 2009 "*is a combination of strong organic growth and the successful integration of Interwoven*" (a company Autonomy had acquired in early 2009). Similarly, the Financial Review section in the 2010 Annual Report ascribed Autonomy's reported revenue growth between 2009 and 2010 entirely to the deployment by customers of Autonomy software.

1194. Furthermore, the accumulated yearly costs of the hardware reselling strategy which might have revealed its extent, were not disclosed either, even though in 2009 there was an increase in the amounts allocated to Sales and Marketing Expenses of $35.6 million as compared to 2008, and the hardware sales were a major, if not the sole, cause of the increase.

1195. Instead, this increase was addressed in Autonomy's 2009 Annual Report as follows:

> *"**Sales and marketing expenses** totalled $170.8 million in 2009, up 26% from $135.2 million in 2008. The increase in sales and marketing expenses from 2008 to 2009 was primarily due to increased advertising, additional headcount and an increase in sales commissions due to an increase in sales and a change in the geographic and size-of-transaction mix, all of which also increased with the expansion of the group in 2009. As a percentage of revenues sales and marketing expense has fallen to 23% in 2009 from 27% in 2008."*

1196. When cross-examined about this, Dr Lynch nonetheless sought to defend the passage in the 2009 Annual Report as "*a reasonable explanation*". He identified especially the effect of Autonomy's acquisition of Interwoven which, he said, had been an increase not only in advertising spend, but also of the numbers employed in marketing from around 238 to around 510 people. This is difficult to square with the fact that in 2009, $35.8 million of the costs of purchasing pure hardware were treated as sales and marketing expenses, whereas the total reported increase in sales and marketing expenses was only $35.6 million, leaving no room for the suggested Interwoven factor. When pressed again, Dr Lynch added that:

> *"Again, this is signed off by Deloitte, they consider it reasonable, and that's good enough for me."*

1197.  In the 2010 Annual Report, the explanation given for the increase of some 20% in sales and marketing expenses made no mention anywhere of any loss-making hardware sales or the hardware reselling strategy. The explanation then given was that:

> "The increase in sales and marketing expenses from 2009 to 2010 was primarily due to increased advertising, additional headcount and an increase in sales commissions due to an increase in sales and a change in the geographic and size-of-transaction mix, all of which increased with the expansion of the group in 2010…[189]"

1198.  The Quarterly Reports followed suit and contained no disclosure of the hardware reselling strategy either. On the contrary, the Claimants contended, they revealed varying efforts to camouflage the source of revenue.

*Q3 2009 Quarterly Report*

1199.  Thus, although of course the hardware revenues were included in the total, the way the results were presented in the Q3 2009 Quarterly Report did not distinguish their source. This was not apparent and could not be ascertained.

1200.  Four categories of revenue were presented under the heading *"Supplemental Metrics"*[190]: *"Product including hosted and OEM"* ($125 million), *"Service revenues"* ($9 million) and *"Deferred revenue release"* ($58 million) which equated (after rounding) to the total revenue figure of $191.6 million as shown under *"Financial Highlights"* and under *"Revenues"*.

1201.  Furthermore, the Q3 2009 Quarterly Report noted a reduction in adjusted gross margin (86% compared to 92% in the previous year) and attributed it to the *"unexpected demand for our new product programs…We do not expect this to be a trend."*

1202.  The hardware reselling strategy, which was in fact the principal drag on gross margins since hardware sales were at a discount funded by Autonomy, throwing up a loss, was not mentioned in this Quarterly Report, just as it was not in the Annual Reports (see above), except that in one cryptic sentence later relied on by the Defendants the following statement (agreed with Deloitte) was made:

> During the quarter we saw some of our large customers promote Autonomy to strategic supplier status. This has led them to adopt a broader set of our solutions in a number of significant deals."

1203.  As Mr Knight of Deloitte pointed out at the time (and see further paragraphs 1360 to 1364 below as to the discussions between Autonomy and Deloitte which led to this formulation), this could quite naturally be read as a reference to more

---

[189] A reference to the Interwoven acquisition (as also is the reference to *"additional headcount"*).

[190] As will be seen, the way the sources of revenue were presented was changed in Q1 2010: broadly speaking, from the start of 2010, *"Product including hosted and OEM"* was reported as three separate categories: (i) IDOL Product, (ii) IDOL Cloud and (iii) IDOL OEM. The Claimants emphasised that whatever the breakdown, it always added up to 100% of Autonomy's total reported revenues.

IDOL sales: and it certainly did not constitute transparency about the hardware sales.

*Q4 2009 Quarterly Report*

1204. The Q4 2009 Quarterly Report did not mention hardware sales either. The following points may be noted:

(1) Autonomy boasted increased revenues in the quarter and for the year, ascribing its performance to *"a combination of strong organic growth and the successful integration of Interwoven"*.[191]

(2) Dr Lynch wrote: *"We continue to see our strongest growth in the new models of the software industry such as OEM and cloud computing…"*

(3) Gross margins were marginally down on Q4 2008 (89% compared to 92% adjusted, 83% compared to 89% on IFRS) but had improved since Q3 2009. The Report stated: *"As previously announced, the one-time additional costs in Q3 2009 from the IDOL SPE Quick Start program were not repeated in Q4."*

(4) The Report also stated:

"*Cost base returned to traditional model after Q3 2009 product launch costs, with fixed cost base modulated by seasonal market spend and revenue-tracking sales commission."*

(5) Amongst reported highlights were *"Successful launch of IDOL SPE, Arcpliance, ICE, IDOL Social Media and Interwoven product range built on IDOL"*.

(6) Increased R&D expenditure was ascribed to:

*"new R&D efforts associated with the acquisition of Interwoven and the one-off spend in relation to the development of new products"*.

(7) Autonomy again provided *"supplemental metrics to assist in understanding and analysis of Autonomy's business"*. As in the Q3 2009 Quarterly Report, hardware revenue was incorporated homogeneously into *"Product including hosted and OEM"* [192] and was effectively invisible as a separate source.

*Q1 2010 Quarterly Report*

---

[191] Autonomy acquired Interwoven Inc earlier in 2009 for approximately $800 million.

[192] A different format for *"Supplemental Metrics"* was adopted for the Q1 2010 Quarterly Report and thereafter, dividing Autonomy's business into IDOL Product; IDOL Cloud; Service revenues; Deferred revenue release (primarily maintenance); and OEM derived revenues.

1205. Autonomy's Q1 2010 Quarterly Report made no mention of hardware sales, and in the *"Supplemental Metrics"* revenues from such sales were now included amorphously within the category *'IDOL Product'*. The Claimants' specific criticisms in addition referred to the explanation of the sudden emergence of a figure for *"Inventory"*.

1206. As I have explained in paragraph 990 above, the decision to defer recognition of part of the revenues from hardware sales in the quarter brought with it the need to post the amount deferred as Inventory. Autonomy had not historically held noticeable amounts in Inventory; and the increase by some $9.75 million (to a total of $10.250 million) had to be explained in the Q1 2010 Quarterly Report.[193]

1207. In summary:

(1) A trading statement issued by Autonomy on 16 April 2010 (five days before the results were released) included an explanation of Inventory as follows:

> *In Q1 the company took advantage of discounted offers to purchase stock for the Arcpliance product in advance of Q2 sales, which affected the cash position. These sales have now been completed."*

(2) The Q1 2010 Quarterly Report explained the position as follows:

> *Movements in cash flow during the first quarter of 2010 of note included:…Purchasing of inventory of $10 million for Q2 2010 sales, most of which have now been completed."*

(3) The Inventory was thus presented as comprised of stock acquired with a view to sale as part of Arcpliance products.

1208. The Claimants' case was that this was all false: (a) the increased inventory was not due to stock purchases: it was the balance of goods sold and delivered but in respect of which revenue recognition had been deferred; (b) it was not *"stock for the Arcpliance product"*; and (c) it was not stock purchased to take *"advantage of discounted offers"*: it was as yet unrecognised revenue for hardware sold at a loss.

1209. The statement that the $10 million of inventory related to purchases of Arcpliance for sale to meet unexpected demand was tested by questioning in the Q1 2010 Earnings Call; as I explain below (see paragraphs 1573 to 1588 below, the Claimants contended and I have broadly accepted) that to maintain the story Dr Lynch had to lie.

---

[193] The Claimants alleged that what they presented as subterfuge was apparent in the Q&A scripts for the Earnings Call and in what was said at the Q1 2010 Earnings Call. Their case was that not only the market was misled: so too were Deloitte and the Audit Committee. Even with that explanation it triggered inquiry, as I elaborate on when dealing with the Earnings Call for that quarter.

1210. As previously, the figures for "*IDOL Product*" ($47 million), "*IDOL Cloud*" ($45 million), "*Service revenues*" ($11 million), "*Deferred revenue release*" ($62 million) and "*OEM derived revenues*" ($29 million) (presented in tabular form) amounted (after rounding) to the total revenues of $194.2 million appearing under "*Financial Highlights*" and under "*First quarter 2010 Highlights*".

1211. One further matter which I mention in passing to set it in its chronological context, but on which also I elaborate later, is that in their Report to the Audit Committee on the Q1 2010 Review, Deloitte did confront the issue of the presentation of costs associated with hardware sales, highlighting that:

(1) The revenues for the quarter included $12.2 million of hardware sales, most of which they observed had been made at an overall loss.

(2) Management's rationale for the hardware sales was noted as being that they were seeking "*to develop a strategic relationship with Dell. The intention is that both Autonomy and Dell will market Dell hardware that incorporates Autonomy search software.*"

(3) Autonomy had sought to allocate $3.8 million of the costs to Sales and Marketing expenses, as they had allocated the costs in the previous quarter, but Deloitte had made clear that this would not be acceptable. It was explained that they had sanctioned the previous allocation on the understanding that the deals in that earlier quarter had involved Autonomy "*purchasing hardware at a price which was considerably higher than they would normally have paid in order to become the preferred hardware reseller with EMC, Dell, SHI and HDS*" but they had "*expected these to be more one-off in nature*" and had concluded that for Q1 2010 "*it would be more appropriate to reflect all the costs of hardware sold in costs of goods sold*".

(4) Further, Deloitte noted that "*we have included the $3.8 million as a classification adjustment…and would not expect to see such amounts in sales and marketing in subsequent quarters.*"

(5) From Q2 2010 onwards, it was only the loss sustained on the hardware sales (normally about 10% of the costs of the hardware) which was allocated to Sales and Marketing expenses, with the balance being allocated to COGS.

*Q2 2010 Quarterly Report*

1212. Once again, revenue from hardware sales was not mentioned in the Q2 2010 Quarterly Report. All that was said to explain an erosion in gross margins was:

> *The small variation in gross margins in Q2 2010 was in line with our expectations due to the sales mix including appliances as discussed last quarter."*

1213. It is fair to point out, however, and the Defendants naturally emphasised, that that form of words was approved by Deloitte, after an extended negotiation with management, as described in greater detail in paragraph 869 above.

1214. The *Supplemental Metrics* as provided again presented all revenue as derived from IDOL (except, arguably, those described as *"OEM derived revenues"*), with no clue that any such revenues might be derived from sales other than software sales (save the reference to *"appliances"* in paragraph 1212 above).

1215. Contrary to a suggestion made by Dr Lynch when cross-examined (albeit in a different context of the Q&A scripts prepared for the quarter), there was no mention of *"strategic sales"* either: that shorthand (the Claimants would say euphemism) for hardware sales made its appearance in the Q4 2010 Quarterly Report, but not this one (or indeed any other Quarterly Report in the Relevant Period).

*Q3 2010 Quarterly Report, Earnings Call and Investor Bulletin*

1216. The Q3 2010 Quarterly Report did not mention hardware or *"Arcpliance", "Appliances"* or *"Strategic Packages"*. As an echo of the explanation given in the Q2 2010 Quarterly Report for the erosion of gross margins (see above) the recovery in gross margins was very briefly referred to as being *"due largely to changes in the sales mix."* There was no mention of Arcpliance, appliance sales, strategic sales, or hardware.

1217. Again, the *Supplemental Metrics* showed all revenue as IDOL-derived. The figures for *"IDOL Product"* ($59 million), *"IDOL Cloud"* ($47 million), *"Service revenues"* ($10 million), *"Deferred revenue release"* ($64 million) and *"OEM derived revenues"* ($31 million) (presented in a table) equated to the total revenues of $211 million appearing under *"Financial Highlights"* and the $210.6 million appearing under *"Revenues"*.

1218. A new Autonomy publication in this quarter (Q3 2010) was an Investor Relations Bulletin ("the Q3 2010 Bulletin").[194] In the Q3 2010 Bulletin, there was no express mention of appliance sales, and the only mention of Arcpliance was in explaining that deferred revenue declined because of *"the sell-through of the remaining hardware"*. Dr Lynch accepted in cross-examination that this was a reference to the sale of hardware as part of an appliance (Arcpliance) and not a sale of *'pure hardware'*.

---

[194] Mr Miles pointed out in his oral closing submissions that there is no evidence that any of the Claimants relied on either of the Investor Bulletins referred to by the Claimants, and they are not the basis of any claim (nor is any mention made of any such Bulletin in the RRAPoC). However, the Claimants relied on them as part of the evidence demonstrating how any hardware sales were depicted as "appliance" or "Arcpliance" sales, the fact of *"pure hardware"* was enveloped in that fog, and revenue from *"pure hardware"* sales of which recognition had been deferred tucked away as *"Inventory"* (and its source and nature was subsequently falsely described).

1219. The Q3 2010 Investor Relations Bulletin also represented that Autonomy's adjusted gross margin had:

> "*snapped back to 87.6% from 86.3% in Q2 10, as the one off effects experienced in Q2 subsided. So despite there being around $6m of hardware revenue in the mix in Q3 10, the gross margin is now back in the usual 88-90% range*".

1220. This, as written, gave the impression that Autonomy had recognised $6 million in hardware revenue in Q3 2010[195]. In truth, as already stated, Autonomy had recognised $26.7 million in pure hardware revenue that quarter Dr Lynch sought to explain this away as *"an error. It's referring to the inventory that's gone through and it shouldn't be saying – it should say hardware inventory revenue, not hardware revenue."* But on that basis the suggestion that the erosion in gross margins was simply due to inventory sales is incorrect, and the hardware sales of some $26.7 million in the quarter were not alluded to let alone disclosed.

1221. Dr Lynch sought to argue that he was not responsible for the inaccurate description because he had not reviewed the last draft of the Q3 2010 Bulletin because *"By the time it was available I was already in the television studios, so it went out without my review."* The Claimants provided a detailed examination of the contemporaneous documentation showing that this was, at best, mistaken memory and that Dr Lynch cannot have been in the TV studios at the time; and in any event, he had seen previous drafts with the same error. It seems reasonably clear, and I find, that this was another example of the efforts made to conceal the fact of substantial *"pure hardware"* sales.

1222. The Q3 2010 Earnings Call took place on 19 October 2010, after the publication of the Q3 2010 Bulletin and the Q3 2010 Quarterly Report. No mention was made of either appliances or Arcpliance or "strategic sales". Mr Khan asked a question about the impact of *"hardware sales"* on deferred revenue, plainly referring to the appliance sales referred to in Q2 2010: but Mr Hussain (who dealt with the question) made no attempt to clarify what sales there had been or what their effect was: still less did he reveal anything about any hardware reselling.

1223. As in respect of previous relevant quarters, I was not shown any document or exchange between Dr Lynch and Mr Hussain relating to these contemplated sales and Mr Hussain's projections and modelling, that suggests that any of this had anything to do with marketing.

1224. A further demonstration of not only the efforts made by the Defendants to conceal *'pure hardware'* sales but also their apparent success is apparent from an email sent by Autonomy's Mr Ganesh Vaidyanathan to Mr Yelland some time later in the story, on 22 March 2012, which referred to *"hardware orders which we source from [Dell] and <u>sell through</u> to our customers"* (emphasis

---

[195] The Claimants submitted that given the extensive inventory-related discussions on the Q1 and Q2 2010 earnings calls, a reader of the Bulletin would have understood this all to be appliance-related.

added). It was suggested to Mr Yelland in cross-examination that he must have known from the email that Autonomy was selling pure hardware. Mr Yelland explained that, even at that stage, he did not understand 'sell-through' in that way.

1225. Support for Mr Yelland's position can be derived from the Q3 2010 Bulletin, which, as Dr Lynch accepted, used the expression "sell through" to refer to the sale of hardware as part of an appliance, <u>not</u> as a sale of *'pure hardware'*: (emphasis added):

> There were two principle effects that led to a modest decline in the deferred revenue balance in Q3 10, which fell to $167.7m (from $175.5m in Q2 10). Firstly, <u>the sell-through of the remaining hardware related to Arcpliance</u>, which if excluded would mean that deferred revenue would actually have risen sequentially given the related revenue that the hardware supports."

1226. That explanation plainly assumes that analysts had no idea that Autonomy had sold substantial amounts of pure hardware in this (or any other) quarter. The explanation appears to have been accepted, strengthening that assumption. Had it been or been thought to be common knowledge it seems most unlikely that Dr Lynch should have remained so determined to conceal it from them.

1227. This is of relevance to a question which is bound to occur to observers of this long saga, and has troubled me: this is whether it was common knowledge in the sector, and amongst analysts and those paid to find out about this sort of thing, that Autonomy was buying and re-selling large amounts of hardware? I have concluded that although it was known to some (including, for example, Mr Morland and Mr Khan) that Autonomy was buying and selling hardware, the assumption, which it can be inferred was fuelled by the supposition that anything material would have been disclosed, was that these were immaterial.

*Q4 2010 Quarterly Report, Earnings Call and Investor Relations Bulletin*

1228. Once again, in the Q4 2010 Quarterly Report, the *Supplemental Metrics* made no mention of hardware revenues. They were amorphously included in the figures for "*IDOL Product*" ($84 million); and Autonomy's other revenues were included as "*IDOL Cloud*" ($51 million), "*IDOL OEM*" ($34 million), "*Deferred Revenue Release*" ($66 million) and "*Services revenue*" ($10-11 million) (now in narrative rather than tabular form). Total revenues thus comprised amounted (after rounding) to $244.5 million.

1229. The key point to emerge in the Q4 2010 Quarterly Report and that quarter's edition of the Investor Relations Bulletin ("the Q4 2010 Bulletin") was that hardware was mentioned, and so was "*Arcpliance*"; and the description *"package solution"* also figured for the first time. The Defendants' position as to whether this did or did not amount to disclosure of hardware sales was somewhat variable.

1230. It may be remembered that in the presentations in the preceding quarter (Q3 2010) no mention had been made of such sales, except for a fleeting reference to *"the sell-through of the remaining hardware"* purchased at a discount for future Arcpliance sales to explain a decline in deferred revenue. Dr Lynch was pressed in cross-examination to explain why no mention had been made of hardware sales which he had to accept amounted to some 14% of the total revenue in this quarter (Q4 2010). His response was that (a) it was not correct to say that no mention had been made, (b) on the contrary, language agreed with Deloitte had been added, at Deloitte's request and in a form they approved, to disclose such sales.

1231. As to (a) in paragraph 1230 above, when asked to identify where in the Q4 2010 Quarterly Report this was the case, Dr Lynch pointed to the following passage:

> *"During the year Autonomy has seen success in addressing the urgent needs of a small number of customers with package solutions, constructed of services, hardware and software, such as Arcpliance. The gross margin in these cases is lower than the normal business.*"

1232. As to (b) in paragraph 1230 above, and when the passage above was then criticised as inadequate and misleading, Dr Lynch remonstrated that it had been *"worked out with Deloitte"* who were *"completely alive to this issue"* and had thought it *"suitable to put in and we followed Deloitte's directions in these matters"*. He also insisted, when told by Mr Rabinowitz to *"Never mind that, let's just look at what you said…"*, that he did not himself think it misleading, though he did emphasise that Arcpliance was simply given as an example of a wider category.

*Q4 2010 Earnings Call*

1233. The Q4 2010 Earnings Call took place on 1 February 2011. Yet again, the focus of the Claimants' submissions was on the Q&A script. Indeed, they made no complaint about what in the event was said on the call about hardware.

*Q4 2010 Investor Relations Bulletin*

1234. A few days after the Earnings Call, Autonomy produced an Investor Relations Bulletin for Q4 2010, which was published on 7 February 2011 ("the Q4 2010 Bulletin"). The Claimants focused much attention on the drafting stages of this also; but the essential point is that in each succeeding draft, as in the Q4 2010 Bulletin as eventually published, the *"Organic Growth calculation"* was described as intended to be a measure of *"growth in the core IDOL business"*, but included revenue generated by hardware sales at a loss without any distinction or explanation.

1235. The Q4 2010 Bulletin contained references to *"package solution sales…such as Arcpliance"*, similar to those in the Q4 2010 Quarterly Report. If anything, greater emphasis was given to Arcpliance as the prime exemplar, though the

elaboration sought also to explain that any hardware sales with a software solution in prospect (as well as with software installed) were included.

1236.  The Q4 2010 Bulletin included the following explanation of the calculation of organic growth (the emphasis is as in the original):

> *This calculation arrives at growth in the core IDOL business, whether through up front license sales, on an appliance, in our private Cloud or through our IDOL OEM partners. We remain indifferent to the means by which a customer chooses to purchase the technology, because the share of the value in all of these models is so dramatically skewed towards the software component.*
> **The value is in the software:** *Arcpliance is a good example, whereby Autonomy delivers its software pre-loaded onto a suitable piece of hardware in order to dramatically cut the time to value for the customer, who is often responding to crisis situations (early case assessment in eDiscovery, for instance). Where Arcpliance is concerned, the value of the IDOL software solution and the complex processing it performs is many times higher than the cost of the hardware on it is installed.*
> *Therefore we do not think the approach of attempting to strip out the various components of a sale – e.g. Arcpliance internal hardware costs – makes sense. We would also point out that if one wanted to perform such a calculation one would also need to strip out the hardware element from the year ago period, in order to compare apples with apples, which in this case would actually increase the organic growth."*

1237.  In fact, on the Claimants' calculations, if hardware revenue had been excluded, organic "*growth*" would have been negative:

  (1)  The Q4 2010 Bulletin stated that Q4 2010 growth was 12%. Without hardware revenues, there would have been negative growth of 5%.

  (2)  Similarly, FY 2010 growth was stated to be 17% in the Q4 2010 Bulletin. Removing the hardware revenues would have reduced annual growth to 7%.

  (3)  Accordingly, on those figures, the last sentence of the passage quoted in paragraph 1236 above appeared to be untrue: in relation to this, Mr Rabinowitz accused Dr Lynch in cross-examination of a "*bare-faced lie*".

1238.  When cross-examined on these comparisons, Dr Lynch had to accept the calculations, but he made three points:

  (1)  For the purpose of their calculations the Claimants had stripped out what they considered to be more "*pure hardware sales*" whereas, as already well apparent, his position is that many such sales were properly

characterised as Arcpliance and/or *"appliance"* or *"appliance-type"* sales;

(2) More important than the organic growth figure for understanding the momentum of sales of IDOL was earnings growth which was not affected by the calculation (because, of course, the hardware sales were not profitable); and

(3) There had been *"a little bit of picking of periods here"* by the Claimants: he suggested that a comparison with the more relevant preacquisition period between H1 2010 and H1 2011 would yield a very different result.

1239. What Dr Lynch's answers in cross-examination in the context of the Q4 2010 Bulletin served to emphasise was the inextricable connection, on the Defendants' case (at least as it was developed by Dr Lynch), between the purpose of the sale and its characterisation as an appliance: and as the purpose of all the hardware sales, on the Defendants' case, was to drive software sales, substantially all, if not all, its hardware sales were *"Appliance"* or *"Appliance-type"* sales. Put another way, Dr Lynch's ultimate answer to Mr Rabinowitz's accusation that the last sentence of the passage quoted in paragraph 1236 above was a *"bare-faced lie"* depended on what was comprised in the phrase *"the hardware element"*.

1240. A problem for the Defendants in this way of developing their case is that at one and the same time they and management also represented that *'appliance sales'* comprised only a very small proportion of total sales, say 1%. The argument that the nature and extent of hardware sales were revealed by the disclosure of the fact of appliance sales was untenable; and the mere revelation of the fact of such sales took the Defendants next to nowhere.

1241. Mr Rabinowitz also suggested to Dr Lynch that the second of Dr Lynch's points summarised in paragraph 1238 above was inconsistent with a passage earlier in the Investor Bulletin itself stating that *"In analysing organic growth Autonomy considers organic IDOL growth to be the most meaningful performance metric for understanding the momentum in the business"*. Dr Lynch's answer to this was that the sentence was limited to stating that for the purpose of analysing organic growth the important factor was organic IDOL growth and did not affect the fact that, in his view, the most important metric in valuing Autonomy was not organic growth, but earnings growth (EPS) and/or free cash flow growth.

1242. I agree that the metrics are different. I also agree, of course, that it is a tenable view that the more important valuation metric is earnings growth, and EPS. Further, though Dr Lynch accepted that growth driven by the sale of 'pure' hardware was not a meaningful metric for understanding the momentum of IDOL sales, and it seems to me it would follow that its inclusion would thus have skewed the presentation of IDOL organic growth, he did not accept that any of the sales were 'pure' hardware sales. He argued that the Claimants' calculation, and its utility, depends on accepting their definitions. Again, at the heart of this was Dr Lynch's elastic definition of *"the hardware element"*. What was said entirely altered in significance according to the content of that phrase.

In my view, all this was an exercise in obfuscation on the part of Dr Lynch. What he needed to do, and what this part of the Investor Bulletin did, was to count all hardware revenue in for one purpose, but remove only part of it for another, in order to maintain the picture of growth without material past adverse effect, and the prospect of future improvement, in gross margin.

1243. Mr Miles took up in re-examination the last of Dr Lynch's points as summarised in paragraph 1238 above. Mr Miles put to Dr Lynch two different comparisons. These, as Dr Lynch had suggested in cross-examination, were based on information extracted from the interim results for the six months ended 30 June 2011.

1244. The comparisons Mr Miles put were (a) between Q2 2010 and Q2 2011 and (b) between H1 2010 and H1 2011. Those comparisons, as Dr Lynch happily agreed, showed that if what the Claimants termed *"pure hardware"* was stripped out from both, the effect was actually to increase the organic growth rate from one period to the other. But this did not take Dr Lynch very far: the exclusion of *"pure hardware"* in both periods might show comparative organic growth, but at the price of reducing the revenue growth and ruining the whole picture which hardware sales were intended to paint.

1245. In any event, even accepting (to test the argument) every part of Dr Lynch's three-part rebuttal summarised in paragraph 1238 above, the fact remains that if what was termed in the passage quoted *"the hardware element"* had been stripped out, Autonomy's revenue would have been materially reduced. That of itself would almost certainly have invited questions, which would have revealed the programme. Further, depending on exactly which sales were treated as the *"hardware element"* the comparison between the two periods selected by the Claimants would depend on the relative amounts of such sales in each period; but I suspect that, whatever the content given to the *"hardware element"* the claim that "organic growth" would have increased is a shaky one. And if, as at one moment in his cross-examination Dr Lynch suggested, all sales with a hardware content except Arcpliance sales were excluded, the statement made would have been false.

1246. More generally, I cannot avoid the conclusion that the part of the Investor Bulletin with reference to organic growth quoted in paragraph 1236 above omitted any reference to hardware sales, other than Arcpliance or appliance sales, not because of the difficulty of comparing apples with apples, but as part of the continuing determination of the Defendants not to disclose to the market that a material part of Autonomy's revenue and IDOL "organic growth" was derived from such sales.

1247. The Claimants' contentions in that respect are fortified by another passage in the same Bulletin which again presented the variability in gross margins as being due to appliance sales ("*pre-packaged, turnkey solutions*"), with no reference being made to the substantial 'pure' hardware sales that Autonomy had made both in this and previous quarters. Under the heading "*Profitability analysis*", the following passage appeared (emphasis added):

> *Other factors to consider: There are a number of other factors that affect the gross margin. During the year Autonomy has also succeeded in addressing the urgent needs of a small number of customers with pre-packaged, turnkey solutions, constructed of services, hardware and software, of which Arcpliance is an example. The gross margin for such solutions is lower than for pure software. As a result, over the last few years the gross margin has fluctuated anywhere between around 85-92% without an easily discernible pattern. Autonomy has indicated that it expects the gross margin to remain within the range of 85-90% for the foreseeable future."*

1248. Lastly in respect of Q4 2010, and to repeat my refrain from previous quarters: I was not shown any document or exchange between Dr Lynch and Mr Hussain relating to these contemplated sales and Mr Hussain's projections and modelling that suggests that any of this had anything to do with marketing.

## Q1 2011 Quarterly Report

1249. I did not understand the Claimants to take any specific point or make any specific criticism of the Q1 2011 Quarterly Report (released on 21 April 2011) (nor, for that matter, of the Q1 2011 Q&A or the Earnings Call for that quarter), apart of course from the criticism that the hardware reselling strategy was once again not properly disclosed.

1250. However, it is noticeable that the Q1 2011 Quarterly Report did not repeat the sentence which Dr Lynch stated Deloitte had insisted be included in the Q4 2010 Quarterly Report and (according to him) had regarded as sufficient disclosure of the hardware reselling strategy (see paragraph 1232 above), and (as in the Q3 2010 Quarterly Report) did not mention hardware or "*Arcpliance, Appliances or Strategic Package/Solutions".* By now, gross margins had recovered, and indeed were shown as having increased to 88%, with improvements forecasted. That, at least in part, reflected a reduction in loss-making hardware sales.

1251. The figures for "*IDOL Product"* ($54.4 million), "*IDOL Cloud"* ($52.7 million), "*IDOL OEM"* ($37.2 million) [196] and "*Services revenue"* ($9 million) in the narrative descriptions and "*Deferred Revenue Release"* ($66.5 million) amounted (after rounding) to the total revenues of $220 million as stated under "*Revenue*": the categories left no room for other sources of revenue.

## Q2 2011 Quarterly/Half yearly Report and Earnings Call

1252. There was no mention of hardware sales, or Arcpliance, or *"strategic Package/solutions"* in the Q2 2011 Quarterly Report either. The only reference was to 'appliances', and then only as follows:

---

[196] The "*Core IDOL reported revenues*" ($144.3 million) appearing in the table at the top of page 3 of the Report was – as stated in footnote 1 to the table – the sum of the IDOL Product ($54.4 million), IDOL Cloud ($52.7 million) and IDOL OEM ($37.2 million) categories.

> *Autonomy saw expected improvements in gross margins in Q2 2011*
> *compared to 2010 due to the sales mix including more appliances in*
> *prior years. Gross profits (IFRS) for H1 2011 were $388.3 million, up*
> *16% from $334.0 million in H1 2010."*

1253. Software sales had recovered well in Q2 2011, and with the increase in gross profit and gross margin, there was no longer any need for words to explain *"low margin"* sales. As elaborated later, it is clear from the Q&A scripts that had questions been asked about the reference to appliance sales in prior years, the answers would not have disclosed the fact of hardware sales, otherwise than as Arcpliance or *"strategic"* packages or solutions. In the event, no such question was asked.

1254. Once more, the figures for "*IDOL Product*" ($68.5 million), "*IDOL Cloud*" ($64.3 million), "*IDOL OEM*" ($47.2 million), "*Deferred revenue release*" ($67.5 million) and "*Services*" ($8.8 million) (this time in a table) amounted to the total revenue figure of $256.3 million appearing at the foot of that table, as well as under "*Highlights*".[197]

1255. No mention was made of hardware sales in either the Q2 2011 Quarterly Report or in the Q2 2011 Earnings Call, although Autonomy recognised some $20.8 million in respect of *'pure hardware'* in Q2 2011. Apart from that observation, no particular point needs to be noted in respect of either the report or the call: however, as I elaborate later, it is clear from the Q&A scripts prepared for the Q2 2011 Earnings Call that Dr Lynch and Mr Hussain remained determined that the market should not know about these *'pure hardware'* sales.

*Summary of the Claimants' case as to the disclosure made in Quarterly Reports*

1256. In my judgment, this review of the Annual and Quarterly Reports in the Relevant Period demonstrates that the hardware sales were almost entirely concealed. Concealment required considerable invention.

1257. When, as an inconvenient by-product of the deferment of revenue recognition, $10 million was required to be parked in 'Inventory', a story was invented that this was hardware inventory purchased in preparation for Arcpliance sales. The story was false. In subsequent quarters, any reference to 'hardware' was excused as being referable to appliance or Arcpliance sales: the fact and extent of what the Claimants have called *'pure hardware'* sales were to that extent disguised and as to the rest concealed.

1258. As will be examined in more detail later, the costs of hardware were allocated, not to *'Cost of Sales'* or *'COGS'* but as to large part as *'Sales and marketing expenses'*, serving a dual function of (a) disguising the true costs of the hardware purchases and loss-making sales and (b) reducing the adverse impact on gross margin.

---

[197] I was not referred to any Investor Relations Bulletin for this period.

1259.  It also appears that, in line with the Claimants' case:

(1)  When gross margins were not impacted, or not impacted materially, by loss-making hardware sales, so that the gross margin percentage remained stable or had improved, no reference was included to anything except sales of software: that was the case, for example, in Q4 2009, Q1 2011 and Q2 2011.

(2)  When gross margins were adversely impacted, a variety of explanations were put forward, none of which revealed the real reason (loss making hardware sales). Thus:

   i.  In Q3 2009 the reduction in gross margins was presented as being referable to *"unexpected demand for new [products]"* (SPE and Quick Start);

   ii.  In Q1 2010, the sudden increase in Inventory in consequence of the deferral of revenue from hardware sales was incorrectly ascribed to the purchase of hardware for Arcpliance;

   iii.  In Q2 2010, the deterioration in gross margins was ascribed to the quarter's *"sales mix including Appliances"* (appliance sales being at lower margins) without any reference to loss-making hardware sales;

   iv.  In Q3 2010, when gross profits were once more stable, the past was explained in terms of the *"sales mix"* in the previous quarter;

   v.  In Q4 2010, at Deloitte's insistence, words to capture low margin and loss-making sales were included, but in very opaque terms (*"package solutions, constructed of services, hardware and software, such as Arcpliance"*);

   vi.  In Q1 2011 and Q2 2011, by which time gross margins first stabilised and then increased in percentage terms, no reference was made to hardware, or even to some broad description such as *"package solutions, constructed of services, hardware and software, such as Arcpliance"*.

1260.  Overall, the impression given in every report was that all revenues were generated through IDOL software transactions, except those relating to services, which were separately accounted for. That further appeared to confirm the Claimants' case (as summarised above) that Autonomy presented itself to the market generally, and to HP during the pre-acquisition discussions and due diligence, as a *'pure software company'* whose revenues were almost exclusively derived from the sale of its IDOL software and related software (and a small amount of 'appliance sales').

1261.  What was said, or not said, about the sales in the quarterly earnings calls was correspondingly disingenuous at best. I have determined that what Dr Lynch

said at the Earnings Call for the quarter (Q1 2010) when both Defendants provided an explanation for the Inventory was patently false, and he elaborated on the falsity during the call which exacerbated the falsity. Allowing for his hearing problem, I was not persuaded that Dr Lynch was in some way at cross-purposes because volcanic ash had marooned him in California and he was on a mobile phone which he could not connect to his hearing aid: the transcript is clear and consistent and his responses did not seem to me to suggest that he misheard the relevant question.

### Is the Defendants' avowed reliance on Deloitte a "trump card"?

1262.   The fact remains that Deloitte approved the Quarterly Reports and Autonomy's quarterly, half-yearly and annual accounts throughout the Relevant Period, and so too did the Audit Committee. Furthermore, at least one representative of Deloitte (I think invariably Mr Welham) sat in on each of the Earnings Calls (see further paragraphs 123 above, 1437 and 1519(6) below) in the course of which it is clear, at least in retrospect, that (at best) incomplete and on various occasions fundamentally inaccurate information was provided about the hardware reselling revenue's contribution to overall revenues.

1263.   Neither Deloitte nor the Audit Committee expressed any material doubt as to the commercial propriety of the hardware reselling or the Defendants' explanation of its purpose: on the contrary, both accepted the purpose given as a valid basis for accounting for and treating hardware reselling revenue as part and parcel of Autonomy's core software business.

1264.   As was essential in order to achieve the true purpose of the hardware reselling strategy, both Deloitte and the Audit Committee were also persuaded, despite reservations they expressed, not to insist on separate disclosure of the hardware transactions, either in the 'back-end' of the accounts, or in any of Autonomy's published information.

1265.   The fact that Mr Welham and all those concerned at Deloitte, including the audit engagement partners in overall charge of the Autonomy audit in the Relevant Period, Mr Knights (from 2005 to 2010) and Mr Mercer (from May 2010), considered the hardware sales in great detail and were persuaded (a) that their purpose was to protect and promote software sales; (b) that some proportion of the costs were properly to be accounted for as marketing expenses; and (c) that the accounting treatment, the *Supplemental Metrics* and the cryptic and limited information given could properly be approved, is obviously much relied on by the Defendants.

1266.   The Defendants accepted that the responsibility for the accounting treatment was ultimately that of the Directors. Directors put forward their account of the performance of the company of which they have management control: auditors audit that account. However, they insisted that unless materially misled, Deloitte's acceptance of the accounting put forward by the directors, after careful audit, with full access to the accounting information, and with knowledge of the extent of the hardware reselling, demonstrates that, whatever else, they were not dishonest. Indeed, their case was that they believed the

hardware reselling and the way it was accounted for to be entirely proper, and were confirmed in that belief by Deloitte.

1267. However, if the Defendants did mislead Deloitte, that would of itself be powerful evidence, not only of the impropriety inherent in any deliberate misrepresentation, but also that they considered that disclosure would fatally undermine the programme (which could only be the case if its purpose was as the Claimants alleged).

1268. The Claimants' case is that the reason why Deloitte and the Audit Committee did not raise any red flags, accepted accounting treatment of the hardware reselling revenues and costs which undoubtedly obscured their nature and source, and never insisted on more transparency, was that both were fundamentally misled by an avowed purpose which was bogus and a false narrative which was developed by the Defendants with the assistance of (in particular) Mr Kanter and Mr Chamberlain and adjusted over time as events progressively raised more questions as to its legitimacy.

1269. The Claimants' case on the reasons for avoiding disclosure and the falsity of the Defendants' presentation of the purpose of the hardware sales come together and are mutually supportive at this point. The presentation of the purpose of the hardware sales as being to drive software sales was necessary to persuade Deloitte that the hardware revenues did not have to be differentiated in the accounts nor did their source need to be disclosed. If the true nature and extent of the sales were to be disclosed, the programme would be revealed for what it was: a means of covering up disappointing software sales, and there would have been no point in it.

1270. It was on that basis that Mr Rabinowitz submitted in his oral closing that:

> "Deloitte is not the trump card that Dr Lynch would like it to be."

*The development of the narrative presented to Deloitte and the Audit Committee*

1271. It seems to me that the most convenient way of addressing and determining this key aspect of the hardware case is to track the development of the narrative by reference to the phases in the programme marked by:

    (1) The background and development, and the presentation and effect, of the *Strategic Deals Memorandum,* which was principally focused on the arrangements between Autonomy and EMC but was formative of Deloitte's perception of the hardware reselling strategy even after Dell replaced EMC as Autonomy's hardware supplier for the programme.

    (2) The reinforcement and adjustment of the justification of the hardware reselling strategy and its costs after the replacement of EMC by Dell (and especially from early 2010 onwards), principally in Quarterly Notes prepared by Mr Hussain and Mr Chamberlain for the Audit Committee ("Mr Hussain's Quarterly Notes"). These Notes were always pre-circulated to Dr Lynch and Deloitte, and when presented to the Audit

Committee were accompanied by Deloitte's own quarterly reports on their reviews in each quarter of the accounts for that quarter ("Deloitte's Quarterly Reports"), and its effect.

(3) The development of the *"Linkage Analysis"* in successive editions from Q2 2010 to persuade Deloitte and the Audit Committee that the hardware reselling strategy had discernible effect on and was of benefit to software sales.

*Efforts to obtain "a helpful form of words" from EMC to "wave in front of Deloitte"*

1272. It will be recalled that in its original incarnation, when EMC was Autonomy's hardware supplier, the Defendants presented the hardware reselling strategy as involving a 'partnership' with EMC for the development jointly of an 'appliance' and for marketing and related arrangements to be undertaken by EMC, funded in part out of the purchase price for the hardware purchased by Autonomy. This was bound to raise Deloitte's expectation of confirmatory evidence from EMC.

1273. Autonomy's management spent much of September 2009 pressing Mr Sullivan to use his contacts in EMC to get them to agree to wording which would provide confirmation of the arrangements, and especially of some commitment on the part of EMC to begin the joint development of an appliance and to treat part of its receipts from the sale of its hardware as a *"marketing incentive"* (there being none in the relevant contracts).

1274. The Claimants' closing submissions contained a detailed chronological description, by reference to a number of email exchanges, of what they presented as the orchestration by Mr Hussain and Mr Chamberlain, in conjunction with Mr Sullivan, of efforts to extract from EMC *"a helpful form of words...that could be waved in front of Deloitte."*

1275. They also described how on 15 September 2009, Dr Lynch and Mr Hussain had agreed to pay Mr Sullivan a special bonus of $50,000 if he succeeded in this regard (I have quoted the email in question and the incentive arrangements in greater detail in paragraphs 1119 and 1127 above).

1276. I do not think it is necessary for me to rehearse in as much detail as the Claimants provided the numerous exchanges between Mr Sullivan and Mr Hussain and/or Mr Chamberlain, which were characterised by the latter two formulating, re-formulating and pressing for the wording to which they wanted EMC to agree, and Mr Sullivan consistently having to suggest modifications and to warn (in effect, even if not in so many words) that EMC would not agree wording which did not reasonably accurately reflect his actual discussions with them.

1277. It is, however, necessary to refer to the exchanges in summary to illustrate why it seems to me to be clear that what Dr Lynch in cross-examination sought to justify as the efforts of Mr Hussain and Mr Chamberlain to *"get the right accounting...the accounting... reflecting the reality of the situation"* (and see also paragraph 1342 below) ultimately exposed the fact that EMC did not regard

itself as committed in any way, and was not willing to provide more than anodyne enthusiasm for the reselling programme which provided it (EMC) with undoubted benefit (a discount for its customers at Autonomy's expense).

1278. In summary:

(1) Initially, what Mr Hussain and Mr Chamberlain wanted (as is clear from the email of 15 September 2009) and urged Mr Sullivan to *"extract"* was EMC's agreement (actual or tacit) to the presentation of the price paid by Autonomy for their hardware as comprised of three components, being *"hardware cost"*, *"commission for resale"* and a *"marketing fee"*, each with an allocated dollar amount. Mr Chamberlain gave as an illustrative example a $31 million hardware order, and the suggested description of $20 million as *"hardware cost"*, $6 million as a *"commission for resale"* and $5 million as a *"marketing fee"*. Mr Chamberlain explained to Mr Sullivan that this was *"the sort of thing we need from EMC for internal cost allocation"*. Mr Sullivan did not feel able to propose this since he did not think EMC would be *"that specific on their cost"*.

(2) Mr Sullivan's proposal for blander wording sparked a counter-proposal from Mr Chamberlain which he presented as a *"minor tweak"*, but which the Claimants (justifiably, in my view) presented as a substantive change designed *"to allow us to show $20m as COGS and $10m of marketing"*.

(3) When Mr Sullivan balked at seeking the proposed wording from EMC, there followed a further exchange culminating in agreement on revised wording to be put to EMC providing *"details of Autonomy's Q3 marketing program"* under which Autonomy would *"purchase products from EMC at a price consisting of"* (i) *"EMC's discounted price to Autonomy, which typically will represent a substantial discount off list price but will be determined on a deal by deal basis"* and (ii) *"plus a marketing incentive supplied to EMC to be determined on a deal by deal basis"*. Mr Sullivan put this version to EMC in an email dated 18 September 2009 ending his email *"I would appreciate it if you could confirm your understanding of the program."*

(4) Even though Mr Sullivan's email involved no suggestion that EMC had assumed any obligation to provide marketing assistance to Autonomy, still less any suggestion of the agreed development of an appliance, EMC's reply that afternoon was studiously non-committal, simply stating:

*"This looks like a great programme and we are excited to participate in it."*

(5) All that appears to have been sent to Deloitte (addressed to Mr Knight and Mr Welham) by Mr Chamberlain (and only at a later date, in early

October 2009) is the thread of (a) Mr Sullivan's email and (b) EMC's response on 18 September 2009. Mr Knight forwarded that thread to Mr Knights with the comment:

> *"Helpful but not enough to substantiate a $25m marketing element in my view. I have asked if EMC can quantify but I suspect that this is all we will get."*

(6) On 2 October 2009, by email to Mr Sullivan, copying Mr Hussain, Mr Chamberlain proposed new wording which invited EMC to confirm that (a) EMC would spend a material proportion of the difference between the Autonomy selling price and the EMC selling price, which was labelled *"the premium"*, together with a *"distributor premium"*, on *"development of the EMC cells and working on training the sales force and joint marketing with Autonomy to further develop the EMC-Autonomy partnership"*; and also (b) that *"the standard reseller margin is approximately 55%"*.

(7) Mr Sullivan could not support this tack either. His response (by email to Mr Hussain and Mr Chamberlain dated 2 October 2009) was that he was *"Not optimistic about this…"* [198]

(8) Mr Hussain immediately replied to both Mr Sullivan and Mr Chamberlain, *"Give me an idea of what you could get"*. The Claimants suggested also that Mr Hussain's reply showed that *"Mr Hussain simply wanted whatever form of words could be extracted from EMC to show Deloitte, whether or not it bore any relationship to the truth"*.

(9) Mr Sullivan was not, however, to be pushed too far. As he put it in his witness statement:

> *"On occasion, I was asked by Mr Hussain or Mr Chamberlain to extract certain language from EMC and when the suggested language was not accurate, I offered modified language that was accurate."*

(10)    Mr Sullivan's further email response of 2 October 2009 to Mr Hussain and Mr Chamberlain (but not, it seems, Dr Lynch) was unequivocal:

> *"…They will not OK anything that says that what we paid them was for something other than for the product we purchased in this period. Nor will they say the money will be spent on marketing etc. They are extremely sensitive to these kinds of letters.*

---

[198] The notion of a *"standard reseller margin"* of 55% was contradicted by Autonomy's references only days before to an allocation based on a 25% and then a 35% margin.

> *If I can get them to agree to anything it will need to be more general:*
>
> *1.  Maybe acknowledge that our marketing program is not limited to Q2. This would imply that we would do more of the same in Q4 and beyond.*
>
> *2.  They have already acknowledged that the fees paid were a marketing incentive…"*

(11)    Mr Sullivan could scarcely have been plainer; but still Mr Chamberlain persisted. On 5 October 2009 he emailed Mr Sullivan, copying Mr Hussain, stating:

> *"We have to get EMC to state that they will spend $'s over next few quarters on developing their cells…the key at this stage is to get something that will state that their [sic] will be a future investment by EMC".*

(12)    Mr Chamberlain proposed new and briefer language including:

> *"EMC plan to continue to invest in the relationship through continued development of our cells and similar joint marketing with other customers".*

(13)    Mr Sullivan could not accept this either. On 5 October 2009 he proposed and sent, with the reluctant but resigned approval of Mr Chamberlain and Mr Hussain, an email which thanked EMC for *"participating in our key customer marketing program"* and looked forward to the possibility of *"the continuation of the program to include: development of an appliance bundle, mutual cross referrals, account introductions, reselling and other opportunities"* (as also quoted in paragraph 774(5) above). As the Claimants pointed out, that wording contained no suggestion that such matter had been agreed with EMC: rather, these were to be discussed in the future.

(14)    Having received no reply, Mr Sullivan chased Mr Scannell by email dated 14 October 2009. The content of that email demonstrated that Mr Sullivan (a) recognised there was no prospect of the sort of confirmation that Mr Hussain and Mr Chamberlain had sought and (b) well understood that there never had been any commitment on the part of EMC either to spend money on marketing for Autonomy or to collaborate on a joint appliance. All that was left was to talk lamely of wanting:

> *"to follow up again to see if we could spend some time talking about other ways we could help each other. Amongst other things, we are going to launch some appliance products and will need hardware to bundle into the product."*

(15)     Mr Scannell again sent no reply.

1279.  It seems to me that it was plain by then to Mr Hussain and Mr Chamberlain, as illustrated by their reluctant retreat from seeking to persuade Mr Sullivan to try yet again to extract wording from EMC showing some definite commitment to apply the 'delta' in pre-agreed ways, that some other justification for the allocation of a proportion of the hardware costs to sales and marketing had to be found and substantiated.

1280.  From then on, as it seems to me, their focus was no longer on obtaining from EMC any acknowledgement of any commitment. Instead, management turned to seek through Mr Sullivan EMC's acknowledgement of some generally applicable but quantified parameter, whether a quantified *"hardware amount"* or *"the standard reseller margin"*, with a view to persuading Deloitte that the difference between the amount to be regarded as the selling price and the amount actually paid to EMC by Autonomy (the 'delta') should be treated as referable to marketing incentives or development funding. This was what became known as the *"residual approach."*

1281.  In the meantime, as the Claimants presented it, Mr Hussain had gone ahead with efforts to maximise the amount of hardware costs that could be allocated to sales and marketing expenses in Autonomy's accounts. This process too had gone through a number of stages:

(1)  On 29 September 2009, Mr Chamberlain sent Mr Hussain by email a summary of the Q3 hardware deals. He attached a spreadsheet showing that by that point Autonomy had purchased hardware from EMC for a total of $50.722 million and Autonomy had re-sold that hardware for $40.873 million, thereby incurring a loss of $9.859 million. Mr Chamberlain had proposed (as shown in the spreadsheet) to allocate $30.654 million of the $50.722 million spent to COGS and the remaining $20.068 million to sales and marketing.

(2)  Mr Hussain was not satisfied. On 30 September 2009 he told Mr Chamberlain in an email that he needed *"to get cogs down by at least $5 million so that it's 50:50"*. That necessitated decreasing the amount allocated to COGS by $5 million, and increasing the amount allocated to marketing by that amount, to achieve a roughly 50:50 split. No basis for the change in allocation was suggested. The Claimants therefore submitted that the allocation was driven simply by a desire to attribute as much as possible to marketing and reduce to a minimum the amount allocated to COGS.

(3)  In response, Mr Chamberlain duly amended the spreadsheet, though he had to adopt a slightly more complex method to achieve the result. The $50.722 million was now allocated as follows: $26.567 million to COGS and the remaining $24.155 million to sales and marketing. This was achieved by reducing (artificially, according to the Claimants) the so-called *"wholesale price"* of the hardware. Whereas in the original spreadsheet the wholesale price ($30.654 million) was shown as 75% of

the retail price ($40.873 million) showing a *"Normal margin to reseller"* of 25%, in the revised version, the wholesale price was reduced to $26.567 million (i.e. 65% of the retail price), with the "*Normal margin to reseller"* increasing to 35%.

(4) The Claimant labelled this as *"entirely artificial",* in that Autonomy was not at that stage aware of EMC's real *"wholesale price"*, and the reduction of that *"wholesale price"* enabling an increase of the *"Normal Margin to reseller"* was arrived at without any input from or discussion with EMC, and to achieve only one end, being to maximise the amount of hardware costs allocated to marketing so that the effect on the bottom line of the hardware reselling costs would commensurately be reduced. It is difficult to disagree with that label: and I accept it.

(5) The evidence did not disclose whether Deloitte knew of these alterations or their basis.

1282. Quite what Deloitte came to know of these unsuccessful efforts to extract serviceable wording from EMC to persuade them of a commitment on EMC's part to apply the 'delta' to marketing and/or development is not clear. It was not disputed that Deloitte always had access to all emails and other internal documents: Autonomy appears to have operated an 'open book' policy. There was, however, no documentary trail or evidence demonstrating that Deloitte were sent or saw the emails internal to Autonomy referred to above. Nor, apart from the email from EMC of 18 September 2009 which was sent to Deloitte on 9 October 2009 (see paragraph 1278(5) above), was there evidence of Deloitte having been shown the emails to EMC or Mr Sullivan's follow-up email dated 14 October 2009 when Mr Scannell did not reply, in which the best that Mr Sullivan felt able to achieve was an acknowledgment of some possibility of such an agreement in the future:

> *"I wanted to follow up again to see if we could spend some time talking about other ways we could help each other. Amongst other things, we are going to launch some appliance products and will need hardware to bundle into the product."*

1283. In such circumstances, I have concluded that it is unlikely that Deloitte were aware of the exchanges within Autonomy, or (except for the email of 18 September 2009) those (which were few) between Autonomy and EMC.

1284. As a result, it seems to me more likely than not, and I find, that, prior to the final drafts of the *Strategic Deals Memorandum,* Deloitte were (a) unaware that the metric central to the *"residual approach"* (EMC's real *"wholesale price"*) was a figure contrived by Autonomy and (b) still looking to Autonomy to supply the substantive evidential support of the collaboration and agreement with EMC which Autonomy's management continued to cite as justification for the accounting treatment which they proposed.

1285. Mr Welham's unchallenged evidence in his witness statement was that on 7 October 2009 Mr Hussain met with members of the Deloitte team to explain the background to the EMC hardware transactions. A review working paper with the subject heading *"EMC related revenue deals"*, (which is actually dated at its top 5 October, but which refers to later events and was described by Ms Anderson of Deloitte, who prepared it, as an extract from a full memorandum), recorded what Deloitte had been told of the commercial rationale at that stage. This included the following:

> (1) *"Autonomy has decided to apply, in the case of large ongoing projects, a package approach to the demand for strategic selling at major institutions."*

> (2) *"This will replace the existing situation where a customer has the choice of purchasing software from Autonomy or another software provider and purchasing hardware in a separate transaction from EMC or another hardware provider."*

> (3) *"Autonomy will encourage customers to purchase EMC hardware and the customer will get a better deal by purchasing through Autonomy than they would receive directly with EMC."*

> (4) *"The benefit will be seen in the long term with these and other customers as they purchase additional cells to replace or expand their existing storage cells. As Autonomy has aligned themselves strategically with EMC, customers will purchase their cells from EMC via Autonomy. EMC will have configured their cells to make them completely compatible with Digital Safe. Customers will be able to choose Autonomy as their strategic supplier for hardware and software."*

> (5) *"Autonomy has considered the cost to them in respect of these deals"* [the reference being to the deals with Citi, JPMC and Bloomberg] in three portions:
>
> *"Costs of goods sold: This is equal to the standard wholesale price...and is equal to 55% of the selling price*
> *Marketing: Autonomy has repaid the reseller margin back to EMC. The standard reseller margin is 45% of the selling price. Autonomy considers this is a marketing cost that they need to incur…*
> *Development: Autonomy has then paid an additional sum on top of the cost of goods and marketing cost which they consider to be a development cost…This amount represents a contribution to EMC's development costs and is being expensed over the period during which Autonomy is expected to benefit. EMC has confirmed that they expect to spend these $'s over the next few quarters and Autonomy is expecting to generate additional benefit through further sales in that period."*

> (6) A note from Mr Welham reads *"But is this really a marketing cost. Remember IAS 38 has been amended to clarify this point…"*

1286. Behind the scenes at Deloitte, the attitude in September, and up to mid-October 2009, was quite plainly one of considerable scepticism. Mr Welham had also put comments in the margin on Ms Anderson's Memo. These included:

    (1) A comment next to the statement in that Memo that the *"standard wholesale price of the goods"* was 55% of the selling price, the question *"How can we evidence this?"*;

    (2) Three exclamation marks and the comment *"That is a nice incentive"* next to Ms Anderson's note that Autonomy had *"repaid the reseller margin back to EMC"* and the standard reseller margin was 45% of the selling price;

    (3) A comment next to Ms Anderson's note that Autonomy had additionally paid what they were describing as a *"development cost",* which read *"This makes no sense. Why would Autonomy pay for EMC to develop their products, especially they are making no margin on such deals"*; and

    (4) Next to Ms Anderson's note that Autonomy accepted they could not capitalise what they asserted were development costs because they could not demonstrate probable future benefit, a comment *"...so we are expecting this to be taken as a cost".*

1287. On 7 October 2009 (and presumably after the meeting the same day referred to above), Mr Knight sent an email to Mr Hussain, Mr Chamberlain and Mr Knights and Mr Welham (and thus to the four finance persons principally involved). In addition to asking for further details of the three deals (with Citi, JPMC and Bloomberg), Deloitte requested documentation, and an explanatory memorandum, to be circulated to the Finance and "wider" audit team and also the Audit Committee, to justify what Autonomy proposed.

1288. Deloitte asked that this explanatory memorandum should include:

    (1) *"a clear explanation of the commercial rationale for selling at a loss. This needs to explain the exact nature of the benefit you are getting from this deal at a loss and how it alters your relationship with JPMC, Citi etc and also the relationship with EMC* [which] *will need input from those who negotiated the deal"*;

    (2) an explanation of *"your rationale for showing the costs associated with the hardware purchase below the line rather than as a cost of sale"* given that the contracts themselves *"appear to suggest we are buying on and selling equipment as a straight sell through."*

1289. Mr Knight also noted in the email that Mr Hussain had spoken *"of an appliance being developed by EMC which will have Autonomy embedded into it"* and he asked Autonomy to *"please provide the documentation around this"* and if to

be accounted for as an intangible asset (as I assume must have been suggested at the meeting), an explanation of how its value could be identified, and how it could meet the IAS 38 definition (see below).

*Development of the Strategic Deals Memorandum*

1290.  The Strategic Deals Memorandum was developed as a response to Deloitte's request for further information as above described. It was itself a development of a document originally file-named *"EMC transactions – Audit memo"*.

1291.  The first draft of the *"EMC transactions – Audit memo"* was prepared by Mr Hussain and the finance department on 1 October 2009. They amended it the same day, but not substantially. Its subject was presented as:

> *"a number of additional transactions with EMC whereby Autonomy and EMC sell to existing Autonomy customers product which is subsequently used with Autonomy software.*
>
> *These transactions represent the commencement of a significant new partnership between EMC and Autonomy to develop EMC data cells such that they are readily compatible with Autonomy software and in particular the Digital Safe. The initial transactions have revolved around common customers of both entities but the long term goal is that customers with EMC storage cells will be referred to Autonomy for data storage software needs…*
>
> *…*
>
> *In recognition of the investment that EMC needs to make to ensure marketing focus and further development of the cells, Autonomy has paid a premium to EMC. This premium has two parts:*
>
> > *1.  The normal reseller margin (35%) has been returned to EMC; and*
> > *2.  An additional premium of 20-25% has been paid.*
>
> *The purpose of the premium is to enable EMC to provide marketing dollars, encourage the EMC salesforce to jointly sell, develop EMC cells and provide joint marketing with Autonomy…*
>
> *…*
>
> *The cost to Autonomy is higher* [than the price on the onward sale]…*and comprises three elements: the cost of the goods and the two elements which make up the premium paid for marketing and development costs to be incurred by EMC.*
>
> *The standard reseller margin for EMC distribution channels – to which Autonomy is entitled – is 35% so the cost of goods sold represents $23,804,684 (65% of customer selling price)…As previously noted the*

> *reseller profit margin of $12,817,907, normally retained by Autonomy,*
> *has been passed to EMC and as an additional incentive to deepen and*
> *widen the relationship a further $8,789,662 has been paid to EMC."*

1292.   The Claimants highlighted numerous falsities in that draft, including:

> (1) In cross-examination, Dr Lynch accepted that the statement that the
> hardware sold was for use with Autonomy software was not accurate, at
> least in some circumstances, since the customer was under no obligation
> to use the hardware with Autonomy software and although in some
> instances the hardware would be used with Autonomy software, in
> others it would not.

> (2) As and in the respects previously explained, Autonomy's relationship
> with EMC was not as described.

> (3) The arrangements in relation to the amounts paid by Autonomy to EMC
> were falsely described.

> (4) So too were the statements as to the reasons for the *"premium"*.
> Autonomy had not agreed to pay EMC a "*premium*" in order for it to
> take any of the steps suggested in the draft memorandum, and EMC had
> not agreed to make any "*investment*", nor had there been any discussion
> between Autonomy and EMC about Autonomy paying a "*premium*" for
> product development or marketing efforts.

> (5) EMC had not agreed with Autonomy to incur any marketing and
> developments costs; nor had it provided any confirmation that it
> expected to expend $8.8 million over the period up to 30 June 2010.

1293.   On 2 October 2009, Mr Hussain circulated a draft to Dr Lynch's PA for him to
consider.  Dr Lynch did not seek to correct any of the inaccuracies referred to
above. Instead, he suggested a change of structure and a new introduction to
extend it to cover and explain transactions with other hardware sellers (such as,
at that time, Hitachi). The recast document (file-named *"EMC accounting memo
v3"*) was renamed *"Review of strategic transactions with very large
organisations – Audit memo (Q2 and Q3 2009)."*  It is not clear who drafted
the amendments. Mr Hussain sent a copy to Dr Lynch's PA later the same day
(2 October 2009).

1294.   That recast document (v3) opened with the following (after which the same
basic explanation as previously was given of the elements explaining the total
costs):

> *"During the current downturn, to reduce costs, Autonomy has seen a*
> *major shift taking place with companies seeking to reduce the number*
> *of IT suppliers to 6 or 7 strategic ones. A significant part of these*
> *customer's IT base is related to storage and archiving and, as part of*

> this process, _Autonomy has been asked to extend its role into becoming strategic suppliers to these companies._
>
> ...
>
> _Autonomy decided to apply a package approach to this demand for strategic selling at these major institutions which may mean that in certain instances Autonomy takes terms which may appear loss making initially but when considering the bigger picture are hugely profitable. Autonomy expects this approach to pay off in the longer term as it becomes a key part of the architecture for companies such as Citi, JPMC and Morgan Stanley..._
>
> ...
>
> _Autonomy approached EMC and Hitachi for a strategic partnership to deliver the requirements in Q2... EMC have proven quicker..._
>
> ...
>
> _In recognition of the investment that EMC needs to make to ensure marketing focus and further development of the cells, for certain transactions Autonomy has paid a premium to EMC. This premium has two parts – the normal reseller margin (45%) has been returned to EMC plus a premium of 20-25% has been agreed. The purpose of the premium is to enable EMC to provide marketing dollars, encourage the EMC salesforce to jointly sell, develop EMC cells and provide joint marketing with Autonomy."_ [My underlining for emphasis]

1295. The underlined phrases were new. The Claimants contended that each was inaccurate or false, for the following reasons:

(1) The first underlined phrase was false: there was no evidence that the hardware reselling strategy was a response to customer demand, and the presentation had previously been that it was an initiative by Autonomy.

(2) The second underlined phrase was inaccurate: (a) it was EMC, at Autonomy's request, that found and delivered up to Autonomy customers wishing to buy hardware; (b) there was no _"strategic partnership"_ between Autonomy and EMC; and (c) there was no _"strategic partnership"_ between Autonomy and Hitachi either: only a _"One-Time Reseller Authorisation Agreement"._

(3) As to the third underlined passage, the figure of 45% as the _"normal reseller margin"_ contrasted with the percentage given as _"the standard reseller margin"_ in the previous draft (of 35%). The Claimants submitted that (a) neither percentage was substantiated and (b) the change to the higher figure in the recast memorandum was designed simply to justify an increase in the amount of costs to be allocated to sales and marketing (Autonomy by now suggesting that only $20.1 million would be allocated to COGS, with $25.3 million to sales and marketing.)

1296. A yet further (fourth) version was worked on and sent to Dr Lynch by Mr Hussain in the evening of 2 October 2009. This version (which Mr Hussain had envisaged to be the last) contained two additional passages which the Claimants considered to be worth flagging:

(1) A revised opening sentence of the third paragraph was amended to read "*Autonomy has decided to* apply*, in the case of large ongoing projects, a package approach to this demand for strategic selling to these major institutions*" (new words underlined). The Claimants submitted that this was inaccurate because Autonomy was selling EMC hardware on a freestanding basis and not as any part of an "*ongoing project*" or on a "*package*" basis.

(2) A further sentence was added stating: "*EMC is banking on Autonomy's bid for strategic supplier in* return *for the promotion of their solution*". According to the Claimants, this again was fictitious: EMC had not agreed to promote any "*solution*" nor was EMC "*banking*" on anything.

1297. About half an hour later, Dr Lynch responded *"Very clear"*, having obviously read the re-revised draft.

1298. Another (supposedly) final version of that document marked v5 but still, contrary to Dr Lynch's express direction, subject headed *"EMC accounting memo"*, was circulated by Mr Hussain to Dr Lynch, Mr Chamberlain and Mr Stephan on 4 October 2009. This version was re-circulated at Dr Lynch's insistence under the revised subject-heading *"strategic deals and partnerships memo final"* with a covering email from Mr Hussain stating *"this is the final document for the files"*. However, further drafts followed and the latest draft was sent to Mr Knight and Ms Anderson on 7 October 2009.

1299. Prior to this, according to the Claimants, two things had happened:

(1) Some preliminary discussion had already taken place between Autonomy and Deloitte about the EMC relationship. This appears to be supported by an email that Deloitte's Mr Rob Knight (not to be confused with Mr Richard Knights, also of Deloitte) sent to Mr Hussain and Mr Chamberlain on 7 October 2009. It is plain from the third paragraph of the email that, by this point, Mr Hussain had told Deloitte that an appliance was "*being developed by EMC which will have Autonomy embedded in it*". But as already stated, this was exaggerated. EMC was plainly not committed and had repeatedly brushed off Autonomy's efforts to obtain some sort of confirmation of intent (see paragraphs 1272 to 1284 above).

(2) Relatedly, steps were being taken to produce further documentation that the Claimants suggested was to be provided to Deloitte to support Autonomy's accounting for these transactions. On 7 October 2009, Mr Hussain sent an email to Ms Julie Dolan (Autonomy Senior Corporate Counsel), copied to Mr Kanter, with the subject "*draft partnership agreement*", in the following terms:

> *"Can you draft up a one pager with the following:*
>
> - *between emc and autn*
>
> - *partnership to work on developing an appliance that combines Autonomy compliance software (digital safe, introspect) with EMC hardware*
> - *timescale 6 months*
> - *both parties to respect confidentiality of information*
> - *neither party has obligation to perform etc*
> *need it immediately"*

1300. The Claimants submitted that this was plainly an effort on the part of Mr Hussain (involving also Mr Kanter) to paper the record to support what he had told the auditors, who could be expected to wish to see some sort of written confirmation that EMC had committed to spend the significant profit that it was making from these deals – at Autonomy's expense – on a variety of marketing and development initiatives.

1301. The Claimants further submitted that it was plainly a contrivance given that (a) EMC had not entered into a partnership with Autonomy, and had not agreed to develop an appliance with Autonomy, (b) no such partnership agreement was even under active discussion (as is apparent from Mr Sullivan's email to Mr Scannell of 5 October 2009), (c) at most, this was all something that might be discussed in the future, and had no such urgency as was imported by the last sentence of the email, and (d) there is nothing to suggest that this draft partnership agreement was in fact ever shared with EMC: the Claimants suggested that this was because it was recognised that EMC would not sign even a non-binding statement of intent.

1302. However, there is no evidence either that any such draft Partnership Agreement was prepared; still less that such a draft was shown to Deloitte. Quite what its purpose was remains unclear, and though I accept that the Claimants' explanation of Mr Hussain's sudden call for a draft is probably the most likely one in all the circumstances, he seems to have thought better of it.

1303. No mention was made of it in the recast document, renamed and referred to from now on as the *Strategic Deals Memorandum* or *SDM*, the objective of which continued to be to overcome Deloitte's scepticism as to the justification for (a) reselling at a loss and (b) allocating a substantial proportion of the costs as Sales and Marketing expenses. The drafting process continued in tandem with the faltering and ultimately unsuccessful efforts by Autonomy's finance department (described above) to extract some confirmation from EMC which would satisfy Deloitte on both points and Autonomy's assertion as to the development of an EMC/Autonomy appliance. The document went through a number of drafts, usually being exchanged between Mr Hussain, Mr Chamberlain and Mr Sullivan, but not, until the final draft, with Dr Lynch.

1304. Exchanges evidencing the drafting process show, to my mind, (a) Deloitte's focus turning increasingly (as might be expected, since it was an accounting not merely a narrative matter) to the issue of cost allocation and whether there was any justification for a proportion being allocated as a sales and marketing expense or R&D costs; and in consequence (b) Mr Hussain continuing to try (i) to get from EMC (via Mr Sullivan) some details, especially as to the *"standard reseller margin"* to substantiate the figure of 45% given to Deloitte, and (ii) to plump up the description of the *"strategic supplier relationship"* with EMC in such a way as to persuade Deloitte that in surrendering to EMC the difference or *"non-reseller margin"* Autonomy was paying sales and marketing expenses or R&D costs.

1305. An example of the latter was Mr Hussain's email to Mr Chamberlain of 12 October 2009, which was forwarded to Deloitte later that day, and which included the following:

> *"The customer relationships are very hard to achieve and Autonomy has accepted that for its part paying for the marketing, sales and r&d effort of the h/w vendors is of major long term benefit. EMC and Autonomy are developing an appliance for the future ... In terms of the accounting we have provided evidence of the reseller margin, so the remainder of the cost is accounted as sales, marketing and r&d – we have allocated to sales and marketing. The non reseller margin monies are being used to incentivise the emc, hds, acs salesforce, provide discounts to the customer, provide funds for the development of the appliances, to hold marketing programs ... We would strongly argue that a large proportion of the monies are being used for the development of the appliance which has a significant future value but we have taken a very prudent view and have expensed the total amounts."*

1306. The problem continued to be, however, that there was nothing emanating from EMC to substantiate any of this, which is really what Deloitte had asked for in order to justify the accounting treatment Autonomy's finance department were pressing for. Later that day (12 October 2009), Mr Knight responded to Mr Hussain and Mr Chamberlain as follows:

> *"Can we get anything from EMC quantifying the hardware amount? Is there a set marketing programme or any further information available which can help us to quantify the marketing element – eg a joint marketing plan or similar? Evidence which helps us understand the marketing side in some more depth would be very helpful.*
>
> *Again on the appliance development, is there anything to further substantiate the amount of development you are funding as opposed to relying on this being a balancing figure."*[199]

---

[199] Shortly after receiving that email, Mr Chamberlain asked Mr Hussain whether he could forward on Deloitte's email to Mr Sullivan. The Claimants drew my attention to Mr Hussain's response, in which

1307. Thus, as at 12 October 2009, it was plain that Deloitte's attitude to the proposed accountancy treatment of the hardware sales costs/losses still remained sceptical. The email from Mr Scannell at EMC of 18 September 2009, which Mr Chamberlain had forwarded to Deloitte on 9 October 2009 (see paragraph 1278(5) above) had not changed this substantively. In particular, and as Mr Chamberlain had anticipated, as already recorded above, it was not regarded by Deloitte as *"enough to substantiate a $25m marketing element"*.

1308. Mr Hussain was well aware that Deloitte were, at that stage, unpersuaded. Knowing by now (that is, by 12 October) that evidence of any bilateral agreement would not eventuate, he pressed Mr Sullivan instead to get the basic information necessary to substantiate the figure for the *"standard reseller margin"* which was the foundation of the "residual approach":

(1) On 12 October 2009, in an email chain between Mr Hussain and Mr Sullivan, copying in Mr Chamberlain, Mr Hussain asked Mr Sullivan to contact EMC:

> *"Having issues with the auditors.*
>
> *Can you get someone to send us an email stating what their standard reseller margin (can be for s/w or appliance sales) is between 40% and 50%?"*

(2) Mr Sullivan responded on the same day with:

> *"I will try, but it is holiday today in Mass. So it will be tough. Also, I have learned that EMC guards the details of their reseller program closely. I believe the answer is that standard margins are lower than what you indicate, but on a one-off basis, EMC will approve deeper discounts for larger or more strategic accounts similar to those that we did in Q3."*

(3) Later, on 12 October 2009 at 9.38pm, Mr Hussain sent an email to Mr Chamberlain with the subject "strategic appliance sales" stating:

> *"Steve,*

---

he stated that Mr Sullivan could be emailed in relation to the first point only, namely obtaining evidence from EMC quantifying the hardware amount. As for the "*other points*" (i.e. Deloitte's requests relating to the asserted marketing programme and appliance development initiative), Mr Hussain refused Mr Chamberlain's request, describing these requests as "*more management stuff*". The Claimants contended that Mr Hussain's refusal must be seen against the backdrop of (a) Mr Sullivan having already made clear to Mr Hussain and Mr Chamberlain that none of these matters had been discussed with EMC and that EMC had not committed to anything, and (b) Deloitte having expressly suggested that when providing the clearer explanation of the rationale for the strategy they required, Autonomy would need to involve *"those who negotiated the deal"*, i.e. Mr Sullivan. They submitted that the reality is that Mr Hussain did not want Mr Sullivan to see how he (Mr Hussain) had described the arrangements with EMC to Deloitte, because Mr Sullivan would know that the description was untrue. I accept this.

> *Auditors already have our draft memo which explains the strategic supplier status we have established with the likes of Citi, jpmc, Morgan Stanley etc by selling both software and hardware for compliance application. In addition I have explained the nature of the relationship with the suppliers emc, hds and acs to the auditors. The driving force for the sales has come from our joint customers. The customer relationships are very hard to achieve and Autonomy has accepted that for its part paying for the marketing, sales and r&d effort of the h/w vendors is of major long term benefit. EMC and Autonomy are developing an appliance for the future and we are engaged in negotiations with HDS for installing our software on their hardware for our data centres.*
>
> *In terms of the accounting we have provided evidence of the reseller margin, so the remainder of the cost is accounted as sales, marketing and r&d-we have allocated to sales and marketing. The non reseller margin monies are being used to incentivise the emc, hds, acs salesforce, provide discounts to the customer, provide funds for the development of the appliances, to hold marketing programs (e.g. we attended a major EMC marketing event for JPMC last week which we would not have without the marketing dollars). We would strongly argue that a large proportion of the monies are being used for the development of the appliance which has significant future value but we have taken a very prudent view and have expensed the total amounts. The sales and marketing spend has resulted in new accounts being developed- for example more deals have been identified already.*
>
> *Please let me know what additional information the auditors need but we are being prudent in our accounting. Add what you need that is relevant otherwise feel free to share this email with Rob and Lee."*

(4)  Mr Chamberlain sent the above email on to Mr Knight and Mr Welham of Deloitte within 5 minutes of receiving the email from Mr Hussain under cover of an email stating:

> *"See below from Sushovan.*
>
> *I have provided an analysis of standard reseller rates as well as evidence from EMC regarding the fact that we are paying for hardware and marketing incentive. Below is further explanation of what we are getting for our marketing $'s. There is an argument that some of this is future development costs but we did not feel we met the IAS38 definitions and so have expensed those balances."*

(5) Mr Knight responded shortly thereafter copying in Mr Hussain stating:

> *"Steve/Sushovan,*
>
> *Can we get anything from EMC quantifying the hardware amount?*
>
> *Is there a set marketing programme or any further information which can help us quantify the marketing element-eg a joint marketing plan or similar? Evidence which helps us understand the marketing side in some more depth would be very helpful.*
>
> *Again on the appliance development, is there anything further to substantiate the amount of development you are funding as opposed to relying on this being a balancing figure…"*

(6) On 13 October 2009, at 9.31am, Mr Hussain sent an email to Mr Sullivan (which I have no reason to think was seen by Deloitte) in the following terms:

> *"This is what I'd like from emc*
>
> *Dear Mike*
>
> *I confirm that the standard reseller margin is around 35% but for large strategic deals this can go as high as 45%".*

(7) Mr Hussain then forwarded that email to Dr Lynch at the same time stating:

> *"We have spoken a number of times-this is in essence what he is trying to get."*

(8) Later on 13 October 2009, Mr Hussain informed Dr Lynch that Deloitte may wish to speak to him in relation to the matter. To prepare for this, Mr Hussain sent Dr Lynch an email (cc'd to Mr Chamberlain) timed at 1.24pm, which largely recited the themes that Mr Hussain had developed in his email of 12 October 2009 to Mr Chamberlain (see paragraph 1305 above). The Claimants contended that this email was not only *"replete with the same falsehoods"* but also that it was designed to give the impression that Dr Lynch had no knowledge of the strategy whilst nevertheless reminding him of the storyline:

> *"The auditors would like some more colour on the strategic relationships with EMC and HDS in order to understand the accounting for the costs associated with the strategic deals signed with Citi, MS, JPMC and Bloomberg this quarter. I have spoken to the auditors several times and have submitted a paper that described the background to the sales made.*

> *The relationship with EMC and HDS are very important to Autonomy. These are companies with multi billion dollar sales and with significant relationships with global companies. The trend with these global companies is to move towards limiting the number of strategic suppliers and Autonomy is positioning itself as the key vendor of choice for compliance and related software and appliances.*
>
> *Based on the success of the last six months, Autonomy is paying EMC and HDS for marketing and also for r&d in developing the next generation integrated appliance. The marketing is very targeted because there are relatively few companies both of us would want to market to. Already we have taken part in a large marketing event organised by EMC for JPMC-all the senior IT and business decision makers were at this event-and Autonomy took part in it. These marketing events are focussed and Autonomy's payment to EMC allows participation.*
>
> *Autonomy is also paying for EMC and Hitachi salesforce to be incentivised and to introduce Autonomy to the key identified accounts. Finally there is expenditure related to the development of the appliance. Already Autonomy uses EMC hardware with compliance software in its data centres and EMC have OEMed Autonomy into a number of its strategic products. The appliance is the next stage in the development of the relationship.*
>
> *So overall the payment to EMC and HDS consists of a refund of the reseller margin (COGS) and the remainder is funding sales and marketing (events, advertising, seminars, commissions and r&d (development of the appliance).*
>
> *The auditors may call you later today to discuss."*

(9)  Mr Hussain followed this up some 10 minutes later with the following email (also cc'd to Mr Chamberlain) under subject heading *"reseller margins for h/w"*:

> *"The auditors may ask you a question that reseller margins for h/w are not 45%. Points I have made are:*
>
> *1.  Its not pure hardware but part of an appliance sale*
> *2.  The level of sales were large and strategic so reseller margins would be higher.*
> *3.  The margins for pure h/w are actually much bigger."*

1309.  I am not persuaded by the Claimants' suggestion that the purpose of these emails was to give the impression that Dr Lynch had no knowledge of the strategy. In

my view, their purpose was to 'prep' Dr Lynch, and update him as to the then position. However, given Dr Lynch's previous involvement, the emails do seem to me to betray Mr Hussain's recognition and concern that the presentation to Deloitte had become so embellished that its detailed recitation was necessary to cover any changes from that previously agreed or understood. Even if its toes were in the truth, its exaggerations had become significant (to the point of falsity), and its full recitation was necessary lest Dr Lynch speak out of turn.

1310. So far as I am aware from the evidence, there was no record of the discussion between Deloitte and Dr Lynch for which it appears Mr Hussain was 'prepping' Dr Lynch; but it seems likely that there was one[200], and that it was the catalyst for a turn in events which to my mind substantially shaped Deloitte's move from scepticism to acceptance.

1311. That turn of events was that, on the evening of 13 October 2009, Mr Knights himself became involved in the re-drafting of the "*Strategic Deals Memorandum*", the document intended to answer questions raised by his own firm.

*Mr Knights' own involvement in drafting the Strategic Deals Memorandum*

1312. Although he was careful to direct that the final version as sent to Deloitte should come from Autonomy, and when sending it to others in Deloitte on 14 October 2009 described it as *"the client produced memo which I have been through with the CEO and CFO…"* , it was Mr Knights who was responsible for the penultimate (or possibly pre-penultimate) version of the *Strategic Deals Memorandum*, and for instigating the work which resulted in its finalised form the next day.

1313. It is apparent from an email dated 13 October 2009 (timed at 10.11pm) sent from the email address of Claire Knights to Mr Hussain (copied to Mr Chamberlain) with the subject *"draft of your EMC paper-from RK"* and attaching a file entitled *"Autonomy EMC transactions"*. The body of the email set out:

> *"S&S*
>
> *"After a glass or two of red wine and a plate ful [sic] of Mrs K medieval pasta I've had a stab at writing the Autonomy paper on EMC-*
>
> *This needs to come form [sic] you to us.*
>
> *I need it to square the position on COGS allocation-i've still not seen anything from EMC.*

---

[200] Mr Knights' annotations on the draft he prepared seem to confirm an earlier discussion with Dr Lynch and Mr Hussain: see paragraph 1314 below.

> *If it is useless please re-write but hopefully it points in the right direction. As per our discussion on Mike L's ideas the paper goes through this analysis - you need to beef it up - the one key area is setting out quite what "sales and marketing" type stuff or further product development stuff EMC might provide you.*
>
> *Please improve this and together with the EMC email I'm hoping this will move to where it needs to be.*
>
> *I do need to run through this with Mike as well tomorrow.*
>
> *As mentioned above this was rattled out pretty quickly and fortified with a few liveners so as a modest bookkeeper it would benefit from the cutting edge of you software gurus….!!*
>
> *R".*

1314. The basic structure of the arguments to get *"where it needs to be"* remained in the final version, but as the above email indicated, there were matters which, when drafting his late-night version, Mr Knights identified as needing further support or elaboration. In particular, there were five important parts relating to the allocation of the hardware costs (which Mr Knights in a later mail described as *"the nub of this"*) left uncompleted in Mr Knights' 13 October evening draft, which needed (and on which Mr Knights expressly invited) explanation and further detail:

   (1) After a reference to the potential *"value add opportunities"* that could arise from *"this relationship with EMC"*, a sentence followed which read *"It is possible that if successful it may be possible to move towards an "Intel Inside" type of arrangement with EMC hardware"*: Mr Knights has in square brackets noted: *["Sush this is probably simplistic…are there any other upsides??"].*

   (2) After a sentence which read *"The hardware component of this transaction was used to supply our customers [Bloomberg/Citi ???] with equipment for their existing data warehousing and storage functions"*, Mr Knights, has in addition to the words square bracketed above, put in square brackets: *"[Sush/Steve….please improve]".*

   (3) After a sentence which read *"The allocation of $45m between hardware and other marketing services is not established in the purchase order or invoice from EMC"*, Mr Knights has in square brackets asked: *"[can you comment here on how the $45 m was arrived at ???]".*

   (4) After a sentence which read *"The Autonomy rationale for this transaction was to combine the delivery of hardware to key customers (thereby beginning to develop the recognition of being an application player) together with making an investment in the growing relationship with EMC"*, Mr Knights has noted in square brackets: *"[I need help explaining what EMC and you think you will be getting. Trade*

*sales/customer meetings ??? This is the part that Mike Lynch was alluding to this morning – so can you put some ideas in here]"*.

(5) After a reference to *"...the standard reseller margins that [EMC] would expect to see in the sale of its hardware through a third party"* Mr Knights has in brackets noted: *(see appendix XX. Insert confirmation)*; and also he has interpolated the words in square brackets in the following: *"This demonstrates that in normal situations a range of [37.5% - 50%...check I've not seen this yet] is the standard reseller margin"*.

1315. It appears that first thing the next morning (14 October 2009), Mr Knights met with Mr Hussain to go through his draft and the questions raised. At 9.30am, Mr Knights emailed Dr Lynch and Mr Hussain (under subject heading "*EMC – can we have a brief chat today?*" and commencing *"Dear Mike"*) recounting that he and Mr Hussain had been going over the Q3 position. Remarking that he had *"a sense that the engine is running a little hot in certain areas of the Q3 numbers"*, he stated that he would appreciate Dr Lynch's thoughts on the EMC transactions and *"the strategic long term importance of the deal"* so as to assist in determining *"the nub of this"* which he identified as being *"how to appropriately reflect the costs of this transaction."*

1316. He identified three potential *"landing areas"*:

> *"-$45 million to be shown as a cost of sale (and therefore shown in the gross margin)*
>
> *-$36m to be shown as a cost of sale (on say assumed net margin of nil) with $9m classified as sales and marketing expense, or*
>
> *-A different split. If however this is arrived at it does need to be fully supported. To date we've only seen a purchase order for the $45m albeit I understand there has been some further correspondence with EMC to determine what was actually included in this transaction."*

1317. The further correspondence that Mr Knights was referring to comprised:

(1) An email dated 13 October 2009 from a Mr Mussulli at EMC (which was in due course appended to the *Strategic Deals Memorandum*) stating (and see also paragraph 1324 above):

> *"Mike, per your request, our typical pricing for entry level partners in our Velocity programme is 36% off Clarion and 56% off on DMX. If you have any additional questions please feel free to call me at the number below..."[201]*

---

[201] Clarion (a mid-range product) and DMX (a high-range product often called Symmetric) were different EMC product lines. According to an earlier email from Mr Mussulli to Mr Sullivan, the breakdown as regards the three end-purchasers in the Q3 2009 transactions was: JPMC = 100% DMX; Bloomberg = 100% Clarion; Citi = 35% Clarion, 65% DMX.

(2) An email from Mr Sullivan with the subject "Re pricing info" with an explanation (which I assume came from Mr Mussulli) explaining the split between Clarion and DMX stating:

> *"Fortunately-this breaks out along customer lines:*
>
> *JPMC =100% DMX*
> *Bloomberg =100% Clarion*
> *CS = 100% DMX*
> *Citi = approx.: 35% Clarion; 65% DMX..."*

1318.  Dr Lynch forwarded that email to Mr Hussain, who replied immediately to Dr Lynch by email:

> "…*We have firm evidence of the product cost of the hardware <u>so the residual is clearly marketing which we have explained to Richard</u> as being for:*
>
> - *Seminars*
> - *Meetings*
> - *Customer events*
> - *Incentives to the emc salesforce to bring us deals*
> - *Development of the appliance"*

[My emphasis]

1319.  It appears from Mr Welham's witness statement (which was in this respect not challenged) that at some point in the morning (I assume after the exchanges between Mr Hussain and Dr Lynch) Mr Welham and Mr Knights had a telephone call with Dr Lynch. The purpose of this (as described by Mr Welham) was to hear directly from Dr Lynch, as Autonomy's CEO,

> *"as to the rationale for what was a material transaction for the quarter involving a new strategy, that is reselling third party hardware at a loss in order, we understood, to support a broader marketing objective."*

Mr Welham went on to say that during the call, Dr Lynch confirmed to them that this was the rationale.

1320.  There is no suggestion in Mr Welham's evidence that he or Mr Knights discussed with Dr Lynch the other questions that Mr Knights had raised, which went to the proper accounting treatment and allocation of the costs of the purchase from EMC (as distinct from the narrative of the rationale for the hardware reselling strategy). However, the Claimants put to Dr Lynch in cross examination that Mr Knights (in particular, in an email to colleagues in Deloitte enclosing the final draft of the "*Strategic Deals Memorandum*" further described in paragraph 1324 below) stated that he had been through the memorandum with the CEO and CFO in relation to hardware sales.

1321.  Dr Lynch was asked repeatedly about this; and his invariable response was that he did not think he had done this. He sought to maintain throughout that his discussions with Deloitte were limited to dealing with questions as to *"why we wanted to do this"* and explaining *"what we were trying to achieve"* and that *"his role and recollection in dealing with Mr Knights was to talk about commercial rationale"*.

1322.  For reasons which I elaborate in paragraphs 1341 to 1348 below (when assessing what Dr Lynch knew of the decision to account for part of COGS as marketing expenses) I have concluded that it is more likely than not that Dr Lynch had been through all aspects of the memorandum, including the part relating to the costs allocation between COGS and sales and marketing.

1323.  After changes had been made in the draft memorandum to fill in the gaps left by Mr Knights in his draft the previous evening, and in particular to reflect the email exchanges with EMC (which were not forwarded to Mr Knights until after he had sent out his 13 October 2009 draft), the final version of the *"Strategic Deals Memorandum"* was sent to Deloitte on 14 October 2009 at 10.19am in an attachment *"Strategic deals memo 14th Oct"* (copied to Mr Hussain) stating *"here is our paper updated for additional items received from EMC last night"*.

1324.  Showing my own underlining of passages especially emphasised by the Claimants, the final version of the *Strategic Deals Memorandum*, which also included in its Appendix 1 all the email correspondence from EMC quoted in paragraphs 1278 and 1317 above, stated in full:

> *"Background*
>
> *As part of the Directors' continual assessment of the strategic opportunities for the business the Executive management recognized an opportunity to develop <u>an application based sales and marketing initiative</u>. The background to this position was the recognition that there was likely to be a continuing rationalization of IT suppliers to major financial institution customers resulting from both the impact of the global credit crisis and the continuing evolution of hardware/software applications to major multi-national organisations.*
>
> *In terms of specifics, after a meeting between Guy Chiarello (global CIO) of JPMC and Mike Lynch in Q2, Autonomy was asked to step into a strategic supplier role for JPMC. This has resulted in 2 deals-one in Q2 ($6m) and one in Q3 ($11m) following on from the $10m deal in Q4'08. There have also been a number of senior level conversations between Autonomy and Morgan Stanley again resulting in two sales in Q2 ($7m) and two more in Q3 ($4m) which followed the $18m deal in Q3'08. Similarly significant discussions have taken place between Citi and Autonomy resulting in multiple sales ($22m) in Q2 and Q3 following on from the $20m plus deals in 2008. Discussions have taken place between Sushovan Hussain and John Goaynes (CIO of Deutsche Bank) but a deal has yet to be consummated although a major $10m plus deal is expected in Q4. Finally major companies such as Eli Lilly,*

*Kellog Brown and Root (KBR) and Pfizer have chosen Autonomy as strategic vendor for compliance.*

*Autonomy has decided to apply, in the case of large ongoing projects, a package approach to this demand for strategic selling at these major institutions. This may mean that, for certain individual components, Autonomy takes terms which may appear less attractive initially but, when considering the bigger picture, are significantly profitable. Autonomy expects this approach to allow it to become a key part of the architecture for companies such as Citi, JPMC, Deutsche Bank, Eli Lilly and Morgan Stanley going forward.*

*It was noted that IBM, EMC, HP amongst others were increasingly going to market with a combined hardware/software application offerings in the compliance space. For example, EMC acquired a company called Kazeon solely for the purpose of creating an appliance for the compliance space. Another company Clearwell Systems has partnered with EMC and IBM to offer an appliance for the ediscovery space.*

*Autonomy recognized the importance of being able to demonstrate to substantial multi-national organisations that they could deliver a combined application solution. In order to put together such a solution it was necessary to find an appropriate hardware supplier that could provide:*

*-Global reach*
*-Highest quality product reputation*
*-Industry accepted product recognition*
*-A management team/culture that was similar to Autonomy and who could recognize the value in a trade association*
*-Networking and major customer relationships that could be exploited by Autonomy*
*-The need for reciprocal benefitting from Autonomy's relationships with existing major customer relationships.*

*Our management team had previously attempted to establish through a working relationship with Hitachi Data Systems on a basis set out above but found that the Hitachi business culture and speed/flexibility was not compatible with Autonomy. Through Mike Sullivan, worldwide head of Zantaz, our executive management team had a strong connection with EMC and we have begun to develop a relationship with this business to enhance the Autonomy presence in the application space. The strategic partnership with EMC has been led by Bill Scannell (head of worldwide sales at EMC) showing the level of importance afforded to the relationship. As part of the strategic relationship EMC extended the Autonomy OEM agreements by 3 years and extended to new products and Autonomy extended the use of EMC products within its data centres. In addition EMC is spending monies developing an appliance with Autonomy software pre loaded and*

*immediately operational on its hardware.* Hitachi have been slower but
are actively considering replacing Fast with Autonomy as an OEM as
part of the strategic relationship and also creating an appliance which
Autonomy would host in its data centres for Hitachi and Autonomy
customers. EMC have proven quicker in being able to deliver in the
timescale required by the customers (Citi, JPMC, Bloomberg) although
Hitachi have started (albeit more slowly) with Morgan Stanley.

Additionally, we consider that there will be further value add
opportunities that will arise from developing this relationship further
with EMC. We are working on the possibility to move toward an "Intel
Inside" type of arrangement with EMC hardware. i.e. the creation of
appliances whereby archiving, ediscovery and compliance solutions
are offered as a one stop solution to key strategic customers. The key
element of this strategy is that by investing significant dollars in the
relationship today, Autonomy will "own" the customer for many years
yielding multi-million dollars of revenue from each customer.

### Q3 Transaction

*During Q3 Autonomy entered into a $45m purchase of hardware and
additional sales and marketing support.* The hardware element
represents the purchase of hardware that was sold on to the above
mentioned customers. The sales and marketing incentive reflects the
payment of $'s for the investment in the relationship and future
development of cells as well as joint marketing initiatives.

This transaction was appropriately approved and authorized by
Executive management in accordance with the standard business
procedures. The hardware component of this transaction was used to
supply Autonomy's own customers (Citi, JPMC, Morgan Stanley and
Bloomberg) with equipment for their existing data warehousing and
storage functions. In addition Autonomy has sold software for the
applications over the past few quarters to Citi, JPMC and Morgan
Stanley. Our intention is to use this opportunity to aggressively further
exploit software opportunities with these types of organisations.

The revenue recognized on these hardware sales in the Q is $36m. The
transactions with each of these customers was appropriately structured
so that Autonomy acted as principal to these transactions. The key
accounting consideration is the recognition of the $45m of costs,
negotiated at arms length by the executive management teams of both
companies. [sic] with particular reference to the allocation of costs
between COGS and Sales and Marketing. The allocation of $45m
between product and other marketing services is not established in the
purchase order or invoice from EMC and HDS but has been identified
from confirmatory documentation from EMC (refer to email 1 in
Appendix 1).

*The Autonomy rationale for the transaction was to combine the delivery of hardware to key customers (thereby beginning to develop the recognition of being an application player) together with making an investment in the growing relationship with EMC.*

*Having established the product cost at between 63% and 43% directly from EMC (depending on product type), the residual cost is for sales, marketing and development efforts. There are significant sales and marketing activities and a series of plans including seminars, trade show stands, customer specific events, sponsorships and incentive payments to the EMC salesforce to market the Autonomy sales. The number of customers and type of customer is very targeted and does not require general advertising. In addition, EMC and Autonomy are obtaining joint meetings with customers and the payment by Autonomy to EMC incentivizes the EMC salesforce to obtain these meetings.*

*To determine the appropriate allocation of costs between COGS and Sales and marketing the executive management have received confirmation from EMC of the standard reseller margins that it would expect to see in the sale of hardware through a third party. This confirmation was received from Mike Mussulli-Regional Partner Manager (refer to email 2 in appendix 1). The standard reseller discount is 36% for Clarion and 57% for DMX. This has been applied to the sales made by Autonomy this quarter and is computed in the attached spreadsheet (EMC summary Q3 2009 Final.xls.)*

*The table below-extracted from the spreadsheet-shows the relevant cost of sales based on the standard discounts:*

| Customer | Product | Discount | | COGS |
|----------|---------|----------|----------------|------|
| Citi (65%) | DMX | 57% | 5,193,026.18 | |
| Citi | Clarion | 36% | 4,161,852.82 | |
| Bloomberg | DMX | 57% | 3,065,520.60 | |
| JPMC | DMX | 57% | 4,692,922.39 | |
| | | | 17,113,321.98 | |

*On this basis Autonomy has allocated $17.1m cost to COGS-representing the standard cost of hardware- with the remaining costs being split between sales and marketing expense and research and development. The sales and marketing amount represents the return of the Autonomy profit of the transaction which it has been agreed with EMC will be reinvested in the relationship in the manner set out above.*

*The additional payment relates to payment to EMC for the development of the appliance referred to above. Management did not*

*feel that this payment met the definitions of IAS 38 for capitalization and hence has expensed this payment during the quarter.*

*Final cost allocation*

| | |
|---|---|
| *COGS* | *17,113,322* |
| *Sales and marketing incentive* | *19,509,269* |
| *R&D costs* | *8,860,079* |
| | *45,482,670* |

*Having reviewed this allocation the directors have concluded that this represents the fair and appropriate split of the costs of this transaction with EMC."*

1325.   The alterations from the version sent by Mr Knights the previous evening (so far as not editorial or stylistic) have echoes of Mr Hussain's earlier briefing note to Dr Lynch (see paragraph 1308 above), and earlier memos he had sent Deloitte, re-ordered and re-formulated to fit into Mr Knights' revised structure.

*Did the Strategic Deals Memorandum spin a false narrative?*

1326.   The Claimants denounced the final version of the "*Strategic Deals Memorandum*" as "*replete with falsehoods*" (see above). By reference in particular to the underlined passages in the full quotation at paragraph 1324 above, the Claimants submitted that the main thrust of the memorandum was thus to frame Autonomy's supposed relationship with EMC to be all about the delivery of an appliance (or application solution), and that this was false. They encapsulated their case as to this falsity in their written closing submissions as follows:

> "*Whatever semantics Dr Lynch may wish to employ, the basic indisputable fact is that the EMC sales were of pure, standalone hardware – not appliances, not applications, not solutions, and not packages. The sales were of EMC hardware, sold unmodified to customers selected by EMC. Autonomy's sole contribution was to interpose itself into an existing relationship and to buy the hardware at one price and resell the same hardware to the EMC customer at a lower price.*"

1327.   In addition, the Claimants submitted that the final version of the memorandum repeated falsities that appeared in the previous versions, giving as an example, the statement in it, for which Dr Lynch had not been able to identify any documentary material in support, that there were:

> "*significant sales and marketing activities and series of plans including seminars, trade show stands, customer specific events, sponsorships and incentive payments to the EMC salesforce to market the Autonomy sales.*"

1328. In his oral closing submissions, Mr Rabinowitz dismissed as *"spin"* the submission in Dr Lynch's written closing submissions, that this:

> *"fairly reflected the twin drivers for the hardware sales, namely (i) the need for strategic package sales to major financial institutions and (ii) the need to find an appropriate hardware supplier with which Autonomy could work on an appliance."*

1329. Mr Rabinowitz submitted that this was not what the "*Strategic Deals Memorandum*" actually said:

> *"...rather what it said in the memo is that EMC was in fact developing an appliance with Autonomy software loaded on to it and that it was spending money on this. That....was completely untrue, because EMC had not agreed to develop such an appliance and nor was it spending any money doing so."*

1330. As so often in this case, this presentation of falsity is too black and white: even the passages in the "*Strategic Deals Memorandum*" highlighted by the Claimants which predominantly related to the accounting treatment might be said to have had a toe in the truth, and to be more in the nature of exaggerations rather than falsities. Thus, for example:

(1)  Both Mr Sullivan's evidence in the US criminal proceedings and (after much circumlocution) Mr Goodfellow's evidence [202] in cross-examination in these proceedings confirmed that EMC was (in the summer of 2009) refining its hardware product at the request of Autonomy in order to make it more suitable, efficient and cost effective for use with Digital Safe and with a view to Digital Safe being embedded in it. Dr Lynch told me in cross-examination that he too had understood and seen emails confirming *"that they were configuring hardware for us."*

(2)  Mr Sullivan expressly confirmed in cross-examination in the US criminal proceedings that he had further discussions later in 2009 about (a) *"building potentially an appliance, so something like potentially shipping a Digital Safe or actually e-Discovery [and] bundling it on their hardware and shipping it..."*; (b) a Digital Safe appliance using EMC hardware and *"split cell technology"*; and also about (c) getting into packaged servers, as well as *"bringing each other into each other's accounts, linking up our sales teams..."*

(3)  More generally, Mr Sullivan agreed that Autonomy's relationship with EMC *"was not just hardware reselling, it was more a strategic general discussion of possibilities to work together..."*

---

[202] Mr Goodfellow was, in my view, a partisan witness and sometimes a rather too strident advocate of the Claimants' case.

(4) He also regarded the purpose of the hardware purchases and the development of the relationship as being to *"drive some revenue to Autonomy",* which the Claimants seized on as showing that the driver was revenue by selling on the hardware at a loss, but which Mr Sullivan clarified in his evidence in the US criminal proceedings meant getting some of EMC's hardware customers to buy Autonomy software.

(5) There were also email exchanges, in June 2009, albeit internally within Autonomy, which referred to telephone calls between Autonomy and EMC which culminated in EMC agreeing to configure and provide hard drives which suited Digital Safe. For example, an email dated 26 June 2009 from Mr Wang to Dr Menell referred to Autonomy having:

> *"had a breakthrough with EMC today in having them agree to sell us essentially hard drives without their fancy software which is irrelevant for Digital Safe…"*

(6) This *"custom configuration"* was also referred to in emails from Mr Sullivan. This inevitably required investment by EMC: as Dr Lynch said when it was suggested that EMC had not agreed to spend money, *"…you can't do it without spending money".*

(7) Mr Hussain's written submissions also drew attention to the evidence in an email chain dated 23 to 25 November 2009 (under the subject heading *"Re: Appliance"*) of further technical discussions between Autonomy and EMC with the view to the harmonisation of EMC hardware with Autonomy products and the development of an Appliance.

(8) These later discussions involved the relevant departments of each company and continued in subsequent emails that year and the next, including an email chain in February 2010 in which Mr McLaughlin of EMC spoke encouragingly of the integration of Autonomy software into EMC products as a *"win-win".*

(9) In those circumstances, Mr Hussain made the further point that:

> *"the very worst that could be said of the Strategic Deals Memo is that it suggested that steps were being taken in October which were in fact taken the very next month…it is highly improbable that [Autonomy] manufactured the story of EMC's commitment to an appliance programme to achieve a spurious accounting treatment only for the lie to come true in the next quarter."*

1331. It might also be said that the "*Strategic Deals Memorandum*" was also in terms aspirational, casting the relationship with EMC as offering future opportunities. For example,

> (1) It stated:
>
>> "*Additionally, we consider that there will be further value add opportunities that will arise from developing this relationship further with EMC. We are working on the possibility to move towards an "Intel Inside" type arrangement with EMC hardware, i.e. the creation of appliances whereby archiving, ediscovery and compliance solutions are offered as a one stop solution to key strategic customers. The key element of this strategy is that by investing significant dollars in the relationship today, Autonomy will "own" the customer for many years yielding multi-million dollars of revenue from each customer.*"
>
> (2) Similarly, with specific reference to the Q3 2009 transactions themselves, the memorandum emphasised both the rationale of the immediate deal and the future prospects:
>
>> "*The Autonomy rationale for the transaction was to combine the delivery of hardware to key customers (thereby beginning to develop the recognition of being an application player) together with making an investment in the growing relationship with EMC.*"

1332. Further, and in contrast to earlier drafts, some of the limitations on the evidence available to substantiate the accounting treatment of part of the costs as marketing expenses, and capitalising a proportion, were expressly recognised (even if the positives may be said to have been accentuated). It was recorded:

> (1) As to allocating part of the costs to marketing, that:
>
>> "*The allocation of $45m between product and other marketing services is not established in the purchase order or invoice from EMC and HDS but has been identified from confirmatory documentation from EMC (refer to email 1 in Appendix 1)*" and
>
> (2) As to capitalisation of what Mr Hussain had wanted to characterise as development costs, that:
>
>> "*Management did not feel that this payment met the definitions of IAS 38 for capitalization and hence has expensed this payment during the quarter.*"

1333. Nevertheless, all this said, and though (like the hardware reselling strategy itself) some of its constituent elements appeared rational and could be justified, and others were expressly aspirational and not ostensibly false in being so, I have concluded that the "*Strategic Deals Memorandum*" was, in the round, seriously misleading.

1334. The fundamental realities which the *Strategic Deals Memorandum* disguised were that:

> (1)  As Mr Hussain acknowledged, Autonomy and EMC never did form a "strategic partnership".

> (2) There is no evidence that their discussions for the development of an appliance moved beyond the discussion stage. The *Strategic Deals Memorandum* papered over Autonomy's repeatedly unsuccessful efforts to obtain any actual agreement or commitment from EMC (beyond agreeing to sell its hardware through Autonomy to customers (largely) in common). Mr Sullivan's vague description of the relationship (see paragraph 1330(3) above) as comprising *"more a strategic general discussion of possibilities to work together…"* was really the extent of it, save of course for the purchase and reselling itself.

> (3) There was some evidence that EMC spent some money on reconfiguring its hardware to enable easier and more effective use of IDOL software, but no evidence of any definite programme or commitment on the part of EMC.

> (4) The extent of the sales, marketing and development activities in fact taking place at the time was (as I find) overstated considerably[203]; and any plans for the future were general in nature and not supported by documentary evidence or any confirmation of commitment by EMC.

> (5) The emails from EMC attached to the *Strategic Deals Memorandum* did not confirm the allocation of $45 million between product and other marketing services, nor even did they confirm that the sale price covered both hardware costs and marketing and support: the most EMC was prepared to do was speak in general terms which, especially in the context of previous exchanges (not referred to in or attached to the memorandum), demonstrated a refusal rather than agreement to give any such confirmation.

1335. More particularly, the "*Strategic Deals Memorandum*" covered up the lack of any evidence such as Deloitte had originally asked for *"to substantiate a $25m marketing element"* (see paragraphs 1278(5) and 1307 above). It advanced and relied on a proxy (the "residual method") to persuade Deloitte to approve an accounting treatment which perpetuated an impression of there being commitments on the part of EMC to spend the 'delta' on marketing for

---

[203] The only documentary evidence actually produced was an email dated 11 September 2009 from Mr Egan to Dr Lynch, copied to Mr Hussain, with subject heading *"JPMC NPower thing"*, recommending $35k level sponsorship of a JPMC evening, and stating that it would be *"an evening honouring Joe [T]ucci* [CEO of EMC] *and all the EMC deal people who are doing this quarter deal will be there. So will all the JPMC upper management of IT…"* Dr Lynch's response was *"ok"*. In fact, the event was not a joint marketing event with EMC, but an event organised by JPMC to which Autonomy agreed to make a charitable 'sponsorship' donation in a relatively small sum which Mr Egan (in the same email) said would be *"deductible at some level"*.

Autonomy and the joint development of an appliance for which management knew there was no substance, and when in fact EMC would have denied any, as Mr Sullivan had explicitly warned in his email of 2 October 2009 (also quoted in paragraph 1278(10) above):

> *"…They will not OK anything that says that what we paid them was for something other than for the product we purchased in this period. Nor will they say the money will be spent on marketing etc."*

1336. In my judgment, the picture presented in the *Strategic Deals Memorandum* of a *"strategic partnership"* with EMC involving joint marketing, joint development of an appliance and cost-sharing of both via a *"premium"* paid by Autonomy was false. EMC never committed to any of that. Had it done so, the document would almost certainly have been unnecessary.

1337. The Defendants argued that these were matters which principally, and certainly most directly, affected the issue of cost allocation, and that it was essentially an accounting judgement as to what part, if any, of the costs could be allocated as marketing expenses. However, for so long as the principal means of achieving the overall purpose could plausibly be presented as being the pursuit and formation of a partnership, Autonomy did not need to show any more measurable result to justify treating the programme as calculated to protect and promote its core software business: a partnership to develop an appliance in which to embed Autonomy software could fairly easily be (and was) presented as both a legitimate objective and a legitimate part of the software business. If Autonomy could only rely on the alleged benefits of the hardware reselling in terms of generating new software business to justify the programme, it was bound sooner rather than later to provide some evidence of real linkage.

1338. Furthermore, whilst the issue of cost allocation would usually be a matter of judgment, I do not accept that it was so in the particular context in which the allocation of the costs of the hardware purchases and loss-making sales was determined in this case. That allocation was part of the means of concealing the hardware reselling and attenuating, and thereby disguising, its real effect. Unexplained costs would be likely to be queried by analysts; and any material erosion in gross margin would be a concern to the market and undermine the success of the strategy. In this case, what was involved was not a judgement; it was a necessary part of the scheme.

1339. The false presentation was, in my judgment, driven by three complementary imperatives:

(1) One was that the programme should appear to be justified by the prospect or actuality of a partnership for the sale of Autonomy software without the need to show any other measurable benefit.

(2) A second was that the effect on key metrics of losses incurred in the hardware reselling strategy should be attenuated.

(3) The third was to hide or disguise the programme so as not to expose it to enquiry and/or undermine its utility as a surreptitious means of maintaining the appearance of continuing organic growth by including hardware revenues in forecasts and drawing on them as and when required.

1340.  In my judgment, this was not honest judgment but dishonest expedient.

*Dr Lynch s knowledge of falsity of the Strategic Deals Memorandum*

1341.  As will already be apparent, Dr Lynch did not dispute that he was aware and indeed involved in the presentation of the purpose of the hardware reselling strategy and EMC's participation in it. For the reasons given above, I have concluded that that presentation was misleading. But even if I am wrong about that there can be no real doubt that the presentation of the nature of the arrangement with EMC was misleading in any event.

1342.  Dr Lynch did dispute that he was involved in or aware of the efforts in exchanges with EMC to find some written acknowledgement to justify the allocation of a large proportion of the costs to marketing expenses; and he insisted that he was not aware of any impropriety in this context. As far as he was concerned, he told me, *"what Autonomy was trying to do was get the right accounting…the accounting…reflecting the reality of the situation"* (as quoted previously in paragraph 1277 above). He added, when further pressed in cross-examination (with particular reference to the emails sent to EMC):

> *"What is happening at this time – and I'm not involved but I've seen the emails – is that a combination of Mr Chamberlain, Mr Sullivan, EMC and ultimately Deloitte are trying to get the right answer. It is a complex situation and lots of people are involved in that and they work through it and they ultimately come up with an answer that they're all agreed on and that's what I'm relying on when I go forward."*

1343.  He emphasised also that, as CEO, he could not be involved in the details of this sort of matter. He relied on what he was told by his lieutenants (hence needing prepping by Mr Hussain before meeting Deloitte about the *Strategic Deals Memorandum*, for example). He said this in cross-examination:

> *"So just to keep some perspective here, I'm running a FTSE 100, I spend most of my time not dealing with this sort of thing. I'm not on top of it. I have a finance department which does all of this that has very good people in it…"*

1344.  Some support for Dr Lynch's oral evidence that though involved in the explanation of the genesis and rationale of the programme he was not involved in the issue as to the accounting allocation of its costs ("the COGS issue"), is provided by the emails from Mr Hussain prepping Dr Lynch as referred to in paragraph 1308 above. Thus, as recorded in paragraph 1318 above when Mr Knights emailed Dr Lynch asking to discuss the issue as to allocation of the

costs of the EMC purchases and resales on 14 October 2009, Dr Lynch immediately forwarded the email to Mr Hussain, which prompted Mr Hussain's second email of 14 October 2009 (referred to in paragraph 1318 above). That email was plainly intended feed Dr Lynch with what to say. As to its content, Dr Lynch was pressed in cross-examination to accept that he knew it was *"pure fiction"*; he rejected this and told me:

> *"A.    Well, at this time I am relying on emails and information from other people, but, no, I understand seminars, meetings and customer events were happening. The incentives to the sales force is sort of self-evident. And EMC – I'd seen emails that EMC confirmed that they were configuring hardware for us. So I'm reasonably confident that that is accurate.*
>
> *Q.    Had you attended any of these seminars, meetings, customer events?*
>
> *A.    No, they were in the US, because, if you remember, the arrangement was for New York; I m based in Cambridge in the UK."*

1345.  Nevertheless, though Dr Lynch's answers were persuasively delivered, I have concluded that I cannot accept that Dr Lynch was not involved in the discussions relating to the COGS issue. It seems to me that the issue as to the rationale of the programme and the issue of the accounting treatment of its costs were and are intertwined, despite Dr Lynch's efforts to cordon off the one from the other.

1346.  I have reached this conclusion principally on the following grounds:

(1)    Although undoubtedly Dr Lynch was busy, and he was not an accountant, he had time and accounting awareness enough to know that the loss-making hardware reselling strategy had a serious potential disadvantage in terms of its adverse effect on Autonomy's 'bottom line', which if it could properly be attenuated should be so.

(2)    As, on his own evidence, the hardware reselling strategy was his concept, I think it unlikely that he would not have been interested in its accounting treatment, even if its rationale was as he depicted: and if the rationale was a pretext, then all the more reason to be engaged to disguise it as much as possible.

(3)    Furthermore, it is not disputed that, unless advised that it was a requirement to disclose, Dr Lynch was very keen to ensure that the hardware reselling strategy was not disclosed: and it was always obvious that material increases in COGS would be likely to lead to inquiry which would in turn reveal the nature and extent of the programme. This was a concern which it seems to me would have been likely to have prompted his interest and involvement.

(4) Mr Knights seems to have thought that Dr Lynch was involved in devising ways to deal with the COGS issue: it will be recalled that in his email (using his wife's email address) of 13 October 2009 to Mr Hussain and Mr Chamberlain (see paragraph 1313 above) Mr Knights had referred to *"Mike L's ideas"* in relation to the *"key area"* of *"quite what 'sales and marketing' type of stuff or further development stuff EMC might provide you."*

(5) Albeit not quite contemporaneous, there is documentary evidence, in the form of an email dated 18 July 2010 from Mr Hussain to the Deloitte audit team (copied to Mr Chamberlain), recording Dr Lynch's *"strong views"* on the issue of COGS in the context of hardware sales; and although the evidence is from a later date, there is no reason to suppose that these strong views only crystallised in 2010, rather than when first relevant.

(6) More generally, the conclusion seems to me to follow from my conclusion that the allocation of costs to *'Sales and Marketing expenses'* was all part of the strategy; and Dr Lynch was well aware of that.

1347. My conclusion has been reinforced by my other conclusion that Dr Lynch was a knowing party to the exaggeration of the amounts properly referable to the launch and marketing of SPE, which were treated and accounted for as sales and marketing expenses as another stratagem to cover up the substantial costs in Q3 2009 of the hardware reselling strategy.

1348. In summary, therefore, I have concluded and find that both Defendants were involved, not only in elaborating the extent of the relationship with EMC, but also more particularly in the false presentation to Deloitte of the COGS issue in order to attenuate (by moving part of COGS to sales and marketing) the adverse effect on Autonomy's gross profit and gross margin figures resulting from a very considerable expansion of the hardware reselling strategy.

*Assessment of the effect of the "Strategic Deals Memorandum"*

1349. The question then is how Mr Knights came not only to accept, but also to help present, the accounting treatment based on the "residual approach" (see paragraph 1280 above), and later to require no clear disclosure.

1350. This is not easy to fathom, given that it seems to me to be clear that Mr Knight, Mr Knights and Mr Welham all fairly quickly identified that Mr Hussain and the finance department had exaggerated the extent of Autonomy's relationship with EMC. That is evident from Mr Knight's email of 9 October 2009 to Mr Knights and Mr Welham after receipt of what, by then, was the best that Autonomy appeared to be able to offer by way of substantiation, which was EMC's email of 18 September 2009 (and see paragraphs 1278 and 1282 above)[204]. Further, of course, the fact that neither Mr Knights nor any other

---

[204] *"This looks like a great program and we are excited to participate in it".*

person who was in the Deloitte audit team apart from Mr Welham, gave evidence in these proceedings, has made the task of unravelling why Mr Knights, and subsequently Mr Mercer, accepted the unacceptable even more difficult.

1351.   There may have been a combination of factors, including:

(1) Until tested sceptically against email exchanges demonstrating a very different objective, the overall rationale of the hardware reselling strategy appeared broadly credible. Except that he saw and considered the final emails between Autonomy and EMC as referred to above, there is no evidence that Mr Knights saw the emails from Mr Hussain and Dr Lynch focused entirely on *"revenue revenue revenue" (*see, for example, paragraphs 906 to 911 above) or other internal Autonomy emails conveying the same focus. He was thus not confronted with material to excite further scepticism; and it seems plain that his mindset was always to seek to assist his client to overcome apparent inconsistencies, rather than sceptically to test the reasons for them. That mindset appears to have distracted him from a more sceptical review of the true reasons for the resort to the "residual approach" [205] and management's disproportionate determination (relative to the comparatively small amount of costs to which the accounting treatment related) to mitigate the adverse effect of the programme and reduce its visibility.

(2) The process of collaborative engagement with Mr Hussain and Mr Chamberlain in working up a document which they were to present as their own caused him to become parti pris. Instead of testing Deloitte's objectives, Mr Knights had become too close to question them: in his own word, "wordsmithing" replaced sceptical review. Caught up in presenting on Autonomy's behalf the narrative of the overall purpose of the programme, he failed to assess objectively the significance of the continuing lack of any of the evidence of commitment on the part of EMC which his own audit team had required, and of Autonomy's resort to a proxy in the form of the residual approach. He convinced himself of what he had helped to write, and his auditing team followed suit.

(3) Last, but I suspect not least, it seems more than likely that Mr Knights felt considerable pressure to retain for Deloitte's office in Cambridge (of which he was head and which seems to have committed most of its resources to this one client) a valuable account in respect of a FTSE 100 company which was a leading light in a high-profile sector.

1352.   Whatever the reason, ultimately the more important point for the purposes of this case is the fact of his involvement, and the effect of it. In my judgment, there can be no real doubt that Mr Knights ceased to be a sceptical auditor and became an inventive wordsmith, who was even prepared to disguise his own

---

[205] which also had the effect of minimising the importance of justifying the various suggested categories of alleged allocation of the 'premium'.

contribution, which included using (a) his wife's email to send his draft; (b) emphasising in his covering email attaching it the need for it *"to come from you to us";* and (c) artfully describing the final version as *"the client produced memo"* when sending it to the Reviewers the next day.

1353. Although (as will be seen) in future quarters Deloitte would only accept a lower proportion of the costs of the programme being accounted for as Sales and Marketing expenses, Mr Knights' contribution to and support for the narrative in the *"Strategic Deals Memorandum"* had an important influence in overcoming Deloitte's original scepticism, and in leading them to treat the issue of cost allocation as purely one of accounting judgment, rather than as one which invited questions as to the use and propriety of the programme in the manner in which it came to be implemented.

1354. More generally, the *"Strategic Deals Memorandum",* reinforced by Mr Hussain's Quarterly Notes (see below), in substance shaped Deloitte's view of the hardware reselling strategy from then on until at least Q2 2010 when the arrival of Mr Mercer and the growing obviousness that the hardware sales had become *"business as usual"* prompted Autonomy to provide the further support of the *Linkage Analysis.*

1355. Mr Knights' conversion and support seems to me likely also to have had some influence on the attitude of the reviewing agencies ("the Reviewers") whose involvement was stipulated by Deloitte as part of its internal oversight and control of complex audits. The Reviewers were its Professional Standards Reviewer ("PSR", at that time in Q3 2009, Ms Lisa Bennett)[206], Engagement Quality Assurance Review ("EQAR", at that time, in 2009, Mr Stuart Henderson[207]), and Independent Review Partner ("IRP", in 2009 for Autonomy, Mr Robertson[208]). Deloitte's final approval depended on their sign off.

1356. Again, the determination of what persuaded them is compounded by the fact that like Mr Knights, none of the Reviewers gave evidence, and there seem to me to be gaps in the documentary evidence provided (despite its immensity). However, what is apparent is that:

   (1) Mr Knights gave them very limited time for review and response: after sending them the final version at 11:40 on 14 October 2009 he not only chased for a response that day but then chased again at 13:54.

   (2) Although Mr Knights stated that he was happy to discuss with each of them individually, or collectively and Mr Welham's evidence was that their practice was to perform a collective process together, there is no

---

[206] According to Mr Welham's witness statement, the PSR for H1 2009 was Ms Joanna Hacking, but Ms Bennett was the PSR for the remainder of 2009. The PSR in Q1 2010 was Ms Lisanne Fitzgerald; during the period Q2 2010 to Q2 2011 it was Mr Garrie Lumb.
[207] According to Mr Welham's witness statement, in Q1 2010, the EQAR was Mr Chris Brough, in H1 2010 and Q3 2010, Mr Chris Robertson, and thereafter until Q2 2011 Mr Jonathan Dodsworth.
[208] According to Mr Welham's witness statement, Mr Brough was the IRP for the Q1 to Q3 2010 reviews, followed by Mr Stuart Barnett until Q2 2011.

record of any such collective decision, perhaps because of time constraints.

(3) There was a one-line email (timed at 14:23 on 14 October 2009 and apparently in response to Mr Knights' chaser at 13:54) from the then PSR, Ms Bennett, stating "I am OK with it" (which supports the inference that there was no collective process).

(4) There is no record (or at least I have no record of having been shown one, and I have found none in the Trial Bundle), of any written response from the EQAR or the IRP.

(5) It seems that by 16:30 Mr Knights had received their response(s), since he emailed Dr Lynch and Mr Hussain at that time on 14 October 2009 stating that Deloitte had considered the *"cost analysis on the transactions we have been discussing"* and were *"satisfied that your paper appropriately sets out the accounting",* but subject to three caveats (which, since Mr Knights had not previously mentioned them, I assume reflected further consideration with the EQAR and/or the IRP).

1357. Again, the more important matter than trying to discern in their absence what persuaded them is that the Reviewers signed off on the basis of the three caveats and a further cautionary note that the board should consider what further disclosure might be appropriate.

1358. The caveats appear to me to signify that the approval was somewhat hesitant, and that the Reviewers and Deloitte would require more convincing detail about the allocation of costs in future transactions. Their central or common theme was to treat the Q3 transactions as something of a one-off and to leave open the prospect of more rigorous review in the event of further hardware deals. In detail they were that:

(1) The split between COGS and marketing expenses had been considered for this *"initial transaction"* and *"would not necessarily recur in subsequent deals"*;

(2) The allocation for further transactions *"would need to be assessed on its own merits"*;

(3) The expectation would be that any future deals *"would not necessarily include the same level of marketing costs"* and

> *"importantly it will be necessary to have a more itemised breakdown of component parts of any purchase between Hardware and other items."*

1359. Mr Knights set out these caveats when reporting back to Dr Lynch and Mr Hussain by email timed at 16:31 the same day (14 October 2009). He ended the email with the following, which I take also to have reflected part of the basis on which the Reviewers acquiesced:

> *"One additional point to be considered at the year end will be whether under IFRS you could be required to disclose hardware sales- particularly if they became material to the numbers. Whilst this is a year end matter, if disclosure did become necessary and in the absence of any previous indication through the year, it would be the first time that this information would be made available to your investor and analyst community. This might be worthy of some consideration at Q3?"*

*The issue of disclosure in Q3 2009*

1360. That leads on to the issue of disclosure, and the way that Mr Knights was persuaded, perhaps against his initial and better judgement, to agree to minimal disclosure and only tinkering changes in the Q3 2009 Accounts. This, like the *"Strategic Deals Memorandum",* seems to me to have set a pattern, with Deloitte repeatedly raising the issue of further disclosure but then either deferring to management as being a matter of commercial judgement, or settling for bland or cryptic sentences which were only decipherable by those in the know already and fell a very long way short of the transparency about the *"quantum and nature of these sales"* which Deloitte's Report has suggested should be *"considered"* for Q3 2009 and had warned could well be *"necessary"* in the full or half-year accounts.

1361. Although I have set out previously in chronological sequence what was said about hardware in the Yearly and Quarterly Reports throughout the Relevant Period (see paragraphs 1187 to 1261 above), an elaboration of the way Deloitte's initial concerns were dealt with in Q3 2009 seems to me to illustrate how Deloitte was led to agree to so little disclosure then and thereafter. Thus:

(1) When provided by Mr Kanter (on 15 October 2009) with his suggestion for the way the new *Supplemental Metrics* might be presented[209], Mr Knights' response expressed concerns including the absence of anything to show the hardware sales: he put this in the form of a question *"...I'm not sure where hardware sales would sit in your table?"*. But he softened his other concerns with a final sentence:

> *"It might be that with some word smithing it can be achieved."*

(2) He amplified his concerns in red type on a revised draft "Updated Press Release" which he circulated within Deloitte (to Messrs Welham and Knight and Ms Anderson) on 15 October 2009 which included the following:

---

[209] Mr Kanter produced a mock-up of a table of revenue sources which did not in any way differentiate software revenue from hardware sales as such. Instead, and in contrast to a proposed differentiation from *Interwoven-related revenues"*, it seemed to envisage hardware revenues being lumped into "*Core Autonomy IDOL revenues"* and included in the calculation a figure to be given for *IDOL Organic Growth"*.

    i. A comment next to a bullet point in the draft highlighting *"Strong organic IDOL growth of 15%"* which read *"check this calculation excludes impact of hardware sales"*;

    ii. Comments next to a description of revenues for the quarter having *"totalled $191.6 million, up 51% from $127.1 million for the third quarter of 2008 due to strong organic growth"* which (a) queried whether *"due to"* should be amended to *"including"* and (b) stated *"but hardware sales are not organic"*.

(3) In a follow-up email to Mr Hussain on 16 October 2009, setting out Deloitte's role and responsibility as regards the "front-end of the accounts",[210] Mr Knights noted at the end (the underlining is mine):

> *"Can we have a detailed breakdown on how the figures are compiled. <u>My biggest concern will be that hardware sales were neither IDOL based or organic !!</u>*
>
> *Let's see the analysis and work out how to sensibly disclose."*

(4) Yet none of these concerns was reflected in an updated draft press release sent to the Audit Committee prior to its meeting the next day (16 October 2009). That draft, which Mr Welham also sent to Mr Robertson and Mr Henderson (cc Ms Anderson) to consider in time before anticipated release on 19/20 October, set out under *"Supplemental Metrics (not reviewed)"* the following, none of which gave any hint that the source of a proportion of the revenue was hardware sales:

> *"**Supplemental Metrics (not reviewed)***
> *Autonomy is supplying supplemental metrics to assist in the understanding and analysis of Autonomy's business*
>
> *Software sales including hosted and OEM..................$125m*
> *Service and support revenues…...................................$9m*
> *Deferred revenue release (primarily maintenance)....$58m*
> *IDOL OEM derived revenues…...................................$24m*
> *IDOL Organic Growth ...............................................$15%"*

(5) In response, Mr Henderson (in an email to both Mr Welham and Mr Knights and copied to Mr Robertson, sent some 20 minutes after Mr

---

[210] Which he explained as follows:
*"In principle if these are to be included in the press release Deloitte have a responsibility to ensure that they are not inconsistent with our understanding of the numbers.*

*We do however need to ensure that the information is consistent with the approach applied in putting together the financial statements and does not invalidate the segmental or revenue analysis arguments that have previously been put forward."*

Welham's email) did not focus on the *Supplemental Metrics* but expressed considerable and more general disquiet:

> *"As anticipated I am deeply concerned by the total lack of reference to the fact that nearly 20% of their Q3 revenues representing a major strategic change in the nature of their business attracts no comment….They don't even seem to mention the customers to whom these highly material hardware sales have been made. I will take a fair amount of convincing this is appropriate."*

(6) Given the first phrase, it seems likely that Mr Henderson had voiced this concern earlier, or at any rate it would not have come as a surprise. Mr Knights replied immediately to say that the matter would be discussed at the Audit Committee Meeting later, and he would then revert. Mr Knights followed up again some 30 minutes later in an email to Mr Henderson, Mr Robertson and Mr Welham, it seems likely after a discussion with Dr Lynch or perhaps Mr Hussain and/or Mr Chamberlain, stating:

> *Wording being now put into Mike s quote….*
>
> *during the quarter we saw some of our customers promote Autonomy to strategic supplier status. This led them to adopt a broader set of our solutions in a number of significant deals.*
>
> *We should remember that the 36 is split into 3 deals of around 9-11m I think - Moving the battle ship [sic] slowly-this is bound to go round and change a few times…"*

(7) As Mr Knight pointed out after Mr Knights had forwarded the same email to him, a problem with the proposed wording was that it *"talks about the strategic supplier status but doesn't talk about the nature of the deals. It could be read as they have bought more IDOL"*. Mr Knight then suggested that:

> *"If they do not want to talk about hardware then the solution could be to get them to remove comments about organic growth and idol growth."*

(8) Later that day (at 17:03), Mr Robertson also replied by email to Messrs Welham, Henderson and Knights (cc Ms Anderson) making two points:

> i. With reference to the proposed statement in the gross margin section that *"The unexpected demand for our new product programme had a small depressing effect on gross margins",* he asked, *"Do we think this explains things sufficiently?"* and suggested that the drop in margin was considerable and not done justice by the description;

ii. In the same connection, he also posed the question at the heart of things:

> *"What's the sensitivity about being more transparent on this score? If it's a strong strategic move for them, why wouldn't they want to explain this? I'd have thought the analysts will be bound to ask a lot of questions about it given the results look quite different this Q (usual big increase in revenue but comparatively small increase in profit)";*

iii. With reference to the statement in the draft *"We do not expect this to be a trend"*, he made the point that he had the impression *"from our various conversations over the last few days that they were planning on doing more of this"* and posed the question also at the heart of things: *"Can they really make this statement?"*

iv. He ended with the comment that he would be interested to hear how the discussions at the Audit Committee *"have moved on the transparency around these transactions."*

1362. These comments went to the root of the issues which have arisen since. Yet apart from prompting further apparently inconclusive discussion at the Audit Committee about the description *"IDOL organic growth"* (which was not minuted) and the debate I have mentioned previously as to how that might be altered, there is nothing in the evidence before me to suggest that the full discussion about the need and rationale for greater transparency ever took place.

1363. It seems that the issue of transparency became subsumed, and indeed lost, in a discussion (without any evident further involvement of Deloitte's review partners) about the *Supplemental Metrics* and the description of organic growth.

(1) The nature of the discussion is illustrated by an email from Mr Chamberlain to Mr Hussain and Mr Kanter on 16 October 2009 stating that:

> *"The key issue with the auditors seems to be around the use of the word IDOL.*
>
> *Strong organic growth and strong organic IDOL growth - to them the former includes hardware sales and the latter does not Product including hosted and OEM and IDOL product including hosted and OEM-same point IDOL organic growth and organic growth*
>
> *Whilst we may find a way to get there on organic growth through allocations they are going to really struggle with*

> *including hardware within the description of IDOL product or IDOL organic growth.*
>
> *Battle lines have been drawn."*

(2) The "battle" was not fierce. Its upshot was that (a) Autonomy (with the intervention of Dr Lynch) agreed to remove the prefix *"IDOL"* when describing the various categories of revenue in the "*Supplemental Metrics"* (so that, for example, *"IDOL Organic growth"* became *"Organic growth"*) and (b) after further exchanges, Autonomy overcame Deloitte's concerns about including hardware revenues within *"Organic growth"* with the argument that all revenue growth should be treated as organic unless its source was an acquisition.

(3) Mr Welham stated in his witness statement (without further elaboration) that:

> *"Ultimately, we agreed that growth in hardware sales was organic, in that it did not derive from the acquisition by Autonomy of a pre-existing business."*

(4) In the final tie-through version of the Q3 press release checked by Deloitte on 19 October 2009 both the statement *"Strong organic growth of 15%"* and the statement *"Revenues for the third quarter of 2009 totalled $191.6 million, up 51% from $127.1 million for the third quarter of 2008 including strong organic growth"* which Mr Knights had expressed concerns about in his email of 16 October 2009 (see paragraph 1361 above) were ticked off by Deloitte.

(5) As previously noted in paragraph 1259(2)(i) above, and apparently heedless of Mr Robertson's query as quoted in paragraph 1361(8)(iii) above, in the final version of the Q3 2009 Report an erosion in gross margin was ascribed to unexpected demand for SPE and Quick Start, which was not expected to be *"a trend"* and did not mention the hardware reselling strategy, which was in fact the principal drag on gross margins and was expected to be a "trend"; and the only reference which the initiated might have recognised related to hardware was the cryptic sentence also already quoted that:

> *"During the quarter we saw some of our large customers promote Autonomy to strategic supplier status. This has led them to adopt a broader set of our solutions in a number of significant deals."*

(6) There is no sign of the concerns expressed by Mr Henderson and Mr Robertson having been addressed; as far as the evidence before me goes, they appear to have sunk without trace.

(7) Thus, Autonomy's management had got its way with Deloitte, overcoming Mr Knights' earlier concerns and the Reviewers' objections, for the price of a false explanation, a cryptic sentence and the removal of the prefix *"IDOL"* before the description of the categories of revenue. (Even that retreat was soon made good: in subsequent quarters and half and full year accounts, the prefix was restored.)

1364. As my earlier chronological review of the Annual and Quarterly Reports (see paragraphs 1187 to 1261 above) demonstrates, none contained any further disclosure of the hardware reselling strategy, except (and as only the initiated could have surmised) (a) an even more cryptic explanation for an erosion in gross margins in Q2 2010 as being *"due largely to changes in the sales mix"* and (b) a very opaque reference in Q4 2010 to "*package solutions, constructed of services, hardware and software, such as Arcpliance"*.

*Quarterly Notes prepared by Mr Hussain/Mr Chamberlain*

1365. Although Dr Lynch had been insistent that what became the *Strategic Deals Memorandum* should not be restricted to justifying the programme with EMC, its principal focus had been on the Autonomy/EMC relationship as at Q3 2009. As the hardware reselling strategy continued in subsequent quarters its results and justification required confirmation and refreshment. The Claimants contended that the false and misleading description of the hardware reselling strategy in the *Strategic Deals Memorandum* was perpetuated, reinforced and as necessary modified throughout the Relevant Period in Quarterly Notes (which were marked as having been *"Prepared by: Sushovan Hussain, Steve Chamberlain"*).

1366. These *"Quarterly Notes"* contained an analysis of the quarter's results which were circulated to the Audit Committee (and also to Deloitte), usually a day before their quarterly meeting, as part of the pack of material which included (a) such a memorandum (b) Deloitte's report on its review of the financial statements and (c) a draft press release for the quarter.

1367. The Claimants alleged that in these Quarterly Notes, Mr Hussain consistently misled Deloitte and the Audit Committee about the nature of Autonomy's relationships with its hardware suppliers, and the purpose and extent of the hardware reselling strategy; and that Dr Lynch, who in every quarter was sent a draft in advance, knew that Deloitte and the Audit Committee were being misled in this way, but said nothing.

1368. The Claimants alleged further that the fact that Mr Hussain and Dr Lynch perceived that they needed to mislead the Audit Committee and Deloitte in this way gives rise to the inference that they knew that (a) the accounting description and treatment of the hardware sales they had adopted could not be justified except on the basis of a false description of their context, nature and extent and (a) if the Audit Committee and/or Deloitte had been told the truth, they would have objected to the hardware reselling strategy and/or the accounting treatment of its costs, and required its disclosure to the market.

1369. In other words, the burden of the Claimants' case in this regard is that the Defendants' resort to the misrepresentation to Deloitte and the Audit Committee of the extent of the hardware sales and the nature of Autonomy's relationships with hardware suppliers and the hardware reselling strategy (a) betrays the real purpose and impropriety of the sales and the programme, (b) exposes as futile their claim to have relied on the approval of their published information by Deloitte and the Audit Committee, and (c) damns conclusively the Defendants' relentless efforts to ensure that the extent of the sales and the nature of the programme were never disclosed to the market.

1370. The Claimants' written closing submissions analysed in some detail both Mr Hussain's Quarterly Notes (referred to in the Claimants' RRAPoC as *"memoranda"*), and Deloitte's own quarterly reports which were likewise provided to the Audit Committee every quarter. They also cross-examined Dr Lynch on these documents, which he acknowledged he would usually review cursorily but not consider in detail. He made the point also that he did not attend meetings of the Audit Committee; and could not provide any evidence of any discussions.

1371. It will be necessary to consider various of Mr Hussain's Quarterly Notes and Deloitte's Quarterly Reviews in some detail. But as an overview, (a) the Quarterly Notes served to reinforce, elaborate and, as circumstances changed, refresh what had been said in the *Strategic Deals Memorandum* (b) Deloitte's own Reviews appear to have borrowed in relevant part from the Quarterly Notes but tended to be more restrained in their description of the purpose and effect of the hardware sales and (c) the Audit Committee were largely unquestioning of what they were told, and content to rely on Deloitte.

1372. As to (c), the evidence showed that the Audit Committee, having satisfied themselves that the segmental analysis confirmed that Autonomy had only one operating segment, being its IDOL-based software business, would have been troubled only if the hardware sales appeared to be of such nature, extent and materiality as to undermine that conclusion and amount to a separate business.

1373. As it was, that never became a real concern, and a flavour of their attitude emerges from the evidence of Mr Robert Webb, who was not a member of the Audit Committee but as Non-Executive Chairman of Autonomy from May 2009 until its acquisition by HP in 2011, occasionally attended its meetings. Although he could not recall the context, and it may not have been at the Audit Committee meeting to consider the Q3 2009 Reports itself[211], Mr Webb related in his witness statement, on which he was not cross-examined, that:

> *"I do not recall the discussions around the disclosure of hardware being particularly heated. There was a discussion and the conclusion*

---

[211] His attendance is not recorded in the Minutes for the Audit Committee meeting to consider the Q3 results held on 16 October 2009. The three members of the Committee were present. Messrs Hussain, Kanter (Secretary), and Chamberlain of Autonomy, and Messrs Knights, Knight, Welham and Ferguson of Deloitte were recorded as having been in attendance.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *was to account for hardware sales in whatever way Deloitte said the company was to account for it."*

*How the hardware reselling strategy was presented in the Quarterly Notes*

1374. The focus of the Quarterly Notes and Quarterly Reviews in dealing with the hardware reselling strategy altered over time. In my view, the following themes and changes of emphasis emerge:

> (1) In Q3 2009, the embellishment of the depiction in the *Strategic Deals Memorandum* of the relationship between Autonomy and EMC, principally with a view to justifying the accounting treatment of the costs of the hardware sales in Q3 2009.

> (2) From Q3 2010, and especially from Q1 2010 after EMC had withdrawn, the recasting of the justification of the hardware reselling strategy towards its "customer-facing" aspects, and *"strategic package sales"* to meet all their IT needs, with a view to justifying the treatment of hardware sales as an integral part of the software business and continuing to justify accounting for part of the costs of the sales as sales and marketing expenses.

> (3) The introduction in Q2 2010 of the notion that such *"strategic package sales"* had already been *"flagged"* to the market, in response to increasing concern from Deloitte about the absence of disclosure, with a view to deflecting any requirement for further disclosure.

> (4) In tandem with the *Linkage Analysis,* increasing focus from Q2 2010 onwards on the line that hardware sales had generated significant new software business for Autonomy, and that there was a *"strong linkage"* between hardware sales and *"highly profitable software sales"*, with a view to addressing increasing concern on the part of Deloitte that the hardware reselling strategy had become *"business as usual"*.

> (5) The disguise of the various stratagems which Autonomy came to adopt to reduce the effect of loss-making sales on accounting metrics, and thereby to support efforts to prevent discovery and disclosure of the extent and nature of the hardware reselling strategy.

1375. These themes are elaborated and illustrated below by reference to individual Quarterly Notes and Reviews.

*Mr Hussain's Q3 2009 Quarterly Note*

1376. The final version of Mr Hussain's Quarterly Note for Q3 2009 was sent by Mr Kanter to each of the members of the Audit Committee (namely, at that time, Mr Richard Perle, Mr John McMonigall and Mr Barry Ariko) late in the evening

(9:54 pm) on 15 October 2009 before the meeting next day. Those to whom Mr Hussain's Quarterly Note was circulated included Mr Hussain and Mr Chamberlain. (As I describe below an earlier draft, in a different form, was sent to Dr Lynch and Mr Hussain by Mr Chamberlain at 16:23 on the evening of 14 October 2009.)

1377. As became characteristic, Mr Hussain's Q3 2009 Quarterly Note embroidered on the "*Strategic Deals Memorandum*" in a rather expansive way. Four facets of this embroidery were particularly striking in this quarter.

1378. First, what had been described in the "*Strategic Deals Memorandum*" as "*continuing rationalisation of IT suppliers to financial institutions*" was embellished considerably into an assertion that:

> "... These organisations are restricting their key suppliers to 6 or 7 companies comprising the usual suspects, Cisco, Microsoft etc. Because of the strategic nature of Autonomy they have asked us to assume the last of these slots. In doing so, however, this has pushed EMC, a major supplier of storage, out. It should be noted EMC's business with these organisations is very large. In order to allow all parties to accept this outcome the companies have asked Autonomy and EMC to partner closely together. This close tie has given Autonomy the scale the banks require and has given EMC the security to acquiesce to the arrangement. Obtaining this strategic supplier status we believe will be very valuable to Autonomy in the coming years."

1379. As to this:

(1) The Claimants submitted that almost every part of this was false, and none of it was supported by the contemporaneous documentation.

(2) Thus, they said, it was not the case that EMC had been "*pushed out*" by Autonomy; nor was Autonomy appointed as a panel supplier to any of these organisations. On the contrary, the hardware sales, through EMC, had come about by Autonomy approaching EMC: it was EMC that was bringing the hardware deals to Autonomy, and it was EMC that was selling the hardware into its customer base.

(3) The passage was introduced after Dr Lynch had been provided with the proposed last draft (which did not include it). When cross-examined, Dr Lynch denied having had more than a "*quick look*" at the draft, but the Claimants submitted and I accept that the most likely explanation of the change is input from him, especially since the contribution reflects previous amendments he had suggested to pre-final versions of the *Strategic Deals Memorandum*.

(4) Dr Lynch sought to support Mr Hussain's description: but he had no documentary evidence to substantiate any of it. Dr Lynch maintained that the companies had indeed indicated that there was not room for both

EMC and Autonomy in their supplier lists, and encouraged them to collaborate. He instanced especially a conversation with a Mr Chiarello, whom he described as JPMC's CIO, and another person whom he described as Mr Chiarello's right-hand man, a Mr Feinstein, who he said *"were dealing with Autonomy and EMC, sometimes even together."* His evidence was that:

> *"...there was a discussion at the time that the way that it was played by JPMC was that we were both vying for the final place and that if we could put together this kind of an arrangement then it would be workable for both of us. That was what was presented."*

(5) There was no documentary record of this. Even though I would accept Dr Lynch's dismissal as *"just not realistic"* the suggestion that this sort of conversation would have been minuted (and it is also fair to note that the draft sent to him did not include this passage), he did indicate that he thought there would definitely be emails between him and *"people at JPMC"*; but none was ever produced.

1380.  Second, what had been described in the "*Strategic Deals Memorandum"* as *"a package approach to this demand for strategic selling"* and *"combined hardware/software application offerings in the compliance space"* was elaborated into *"large sales in Q3 (comprising software and hardware utilising the software in an appliance model)"* and sales of *"software and hardware as part of their compliance solution"*. The Claimants submitted that this reference to an *"appliance model"* was false. No such *"appliance model"* had been developed, and the sales were of *'pure hardware'*.

1381.  Third, what had been referred to in the "*Strategic Deals Memorandum"* as *"the strategic partnership with EMC... led by Bill Scannell"* was elaborated into:

> *"The partnership with EMC is allowing the development of joint products and marketing of EMC/Autonomy solutions to the customer. This has served to give EMC confidence despite no longer owning the relationship. These arrangements have been brokered at the highest level by the CTOs and we view these sales as part of a bigger strategic picture."*

1382.  As to this:

(1) The Claimants dismissed the passage as also untrue in every material particular, contending that (i) there was no partnership with EMC; (ii) there was no development of joint products with EMC; (iii) there was no joint marketing initiative between EMC and Autonomy; (iv) EMC still *"owned"* its relationship with the customers to whom the hardware was being sold; and (v) any arrangements between Autonomy and EMC had been made between Mr Sullivan and Mr Scannell, and no part had been played by Dr Menell.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(2) When cross-examined on it, Dr Lynch disagreed that there was no partnership with EMC and stuck to his line that the process of developing a joint product with EMC had *"already happened at one level by this time and we then go on to work on other things with them"*. He also defended the description of *"strategic package sales"* as extending to sales of hardware to established customers for Autonomy software with a view to supporting software already acquired, or further software to be supplied whether as part of the hardware sale or later. But all this was a semantic exercise, with Dr Lynch's justification amounting in reality to insistence on his own dictionary. The plain import of what was said was against him.

1383. Fourth, the explanation in the *"Strategic Deals Memorandum"* of the increase in *"Operating costs"* including costs of sales was expanded in Mr Hussain's Q3 2009 Note as follows:

> *There were 2 large movements. Firstly, in sales and marketing we spent around $20m on sharing marketing costs with EMC and extra marketing on our new product launch (Structured Probabilistic Engine). EMC are using the monies in highly targeted joint marketing programmes with companies such as JPMC and Citi and in also jointly developing further appliances for future sales. Secondly we capitalised $11m of R&D under IAS 38 as a direct result of significant development effort on the new product release (SPE)…"*

1384. The Claimants alleged that both aspects of these explanations were false. More particularly:

(1) The aspect relating to R&D and SPE has been dealt with separately.

(2) The aspect relating to statements as to there being a *"highly targeted joint marketing programme"* with EMC and as to joint development of further appliances for future sales was exaggerated: as previously explained, there was no such *"targeted joint marketing programme"*; EMC had not committed, and was not required, to use the money it received for the hardware in any particular way; and any development plans for joint Autonomy/EMC appliances were at best inchoate.

1385. In my judgment, the intended effect of Mr Hussain's Q3 2009 Quarterly Note was to confirm and amplify for the particular attention of the Audit Committee the message that the hardware sales did not indicate that Autonomy was engaged in a new and separate (and loss-making) business of hardware reselling: that they were part and parcel of the existing software business and could properly be accounted for as such.

*Deloitte s Q3 2009 Review*

1386. On 16 October 2009, Deloitte issued their Q3 2009 report to the Audit Committee. Prior to its finalisation, Deloitte had sent a copy in draft to Mr Hussain and Mr Chamberlain. Mr Hussain forwarded it on to Dr Lynch stating: "*See the positioning re emc – any comments?*"

1387. The wording of that report is a further refined version of the "*Strategic Deals Memorandum*" which may have borrowed also from Mr Hussain's Q3 2009 Quarterly Note. It displays the same misleading depiction of the extent of the relationship between Autonomy and EMC, with the same implicit suggestion of commitment on the part of EMC to invest the 'delta' in agreed ways (though Deloitte was more circumspect in avoiding any reference to a 'partnership' than Mr Hussain had been). Its references to the prospective development of an appliance described the cost/loss as "*Autonomy's upfront investment in working jointly with EMC to develop this proposition.*"

1388. The opening paragraph stated as follows:

> "*During the quarter, the executive management identified a new and significant longer term market opportunity for Autonomy to develop in the provision of appliance related solutions to leading multi-national financial institutions. In order to begin to establish the Group's presence in this space Autonomy management identified the need to develop a close working relationship with a major hardware company. EMC were approached by the executive management team and a significant hardware, marketing and development purchase entered into with this organisation. The purpose of this transaction with EMC was:*
>
> - *to provide hardware to Autonomy for it to deliver to its existing customers,*
>
> - *to provide ongoing joint sales and marketing support to promote further sales to this emerging market and*
>
> - *to begin to develop an appliance based hardware and software configuration whereby Autonomy software might be fully integrated into EMC hardware for products aimed at the appliance sector and major financial institutions.*"

1389. This was at best exaggerated: the arrangements made with EMC were not concerned with developing "*appliance related solutions*"; there was no "*hardware, marketing and development purchase*" entered into with EMC; EMC did not "*provide hardware to Autonomy for it to deliver to its existing customers*"; there was no "*joint sales and marketing*" arrangement with EMC; and there was no agreement, or even discussions, between EMC and Autonomy regarding the development of "*an appliance based hardware and software configuration*".

1390. Deloitte's draft report went on to state:

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *"The procurement of goods, marketing services and future
> development costs have been allocated between cost of goods (within
> gross margin) and sales and marketing costs (which fall to be treated
> as operating costs). ... The marketing cost is being used to incentivise
> the EMC salesforce; provide discounts to the customer; provide funds
> for the development of the appliances; and to attend marketing events.*
>
> *Management's rationale behind entering into these loss making
> contracts is that Autonomy is seeking to develop a strategic
> relationship with EMC whereby in future an appliance will be
> marketed which combines Autonomy's software with EMC's hardware.
> The $9 million cost over and above the $36 million recovered through
> the sales reflects Autonomy's upfront investment in working jointly
> with EMC to develop this proposition. Management has considered
> whether these costs should be capitalised but has concluded that they
> do not meet the necessary asset criteria and accordingly has expensed
> them as incurred."*

1391. Again, this was based on what Deloitte had been told by Dr Lynch and Mr
Hussain. Although Deloitte steered away more carefully than had Mr Hussain
from asserting a partnership or any commitment on the part of EMC, I accept
the Claimants' contentions that (a) the scope and extent of Autonomy's then
existing relationship with EMC was exaggerated, and (b) there was next to no
substance in the assertion that part of the amounts paid by Autonomy went
towards attendance at marketing events. Except for the emails attached to the
Strategic Deals Memorandum, these calculations were arrived at unilaterally by
Autonomy, without any input from or discussion with EMC. The only prices of
which Autonomy in fact had knowledge were (i) the price they had agreed to
pay EMC and (ii) the price at which it was on-selling to the customer.

1392. At that time, none of the members of the Audit Committee had any accountancy
qualification; and it is unsurprising that they accepted Deloitte's approval of the
Q3 2009 Report (subject to the caveats referred to above) without (so far as the
evidence goes) any question, except as to disclosure.

*How Dr Lynch dealt with the Audit Committee s questions about disclosure (Q3 2009)*

1393. Before resuming my description of how Mr Hussain's Quarterly Notes and
Deloitte's Quarterly Reviews shaped the attitude of the Audit Committee over
the course of the Relevant Period, it is convenient to interpose an episode which
arose immediately after the Q3 2009 Audit Committee meeting relating to the
issue of disclosure.

1394. An important detail in Deloitte's Q3 2009 review was a passage as follows:

> *"These hardware sales did not include any IDOL software component
> and reflect Autonomy's early targeting of the emerging market of
> appliance solutions. The Board should consider how best to*

> *communicate this new opportunity to the shareholders as these*
> *revenues are not driven from the IDOL technology of the Group."*

[Emphasis supplied by me]

1395. On 21 October 2009, and following up earlier emails from him and his colleagues about the lack of any mention in draft minutes (prepared by Mr Kanter) of discussions they all recollected having had at the Audit Committee meeting about (in Mr Ariko's words) *"how to best represent and incorporate the EMC servers we are reselling into our financial results",* Mr Ariko sent an email to Dr Lynch regarding *"the revenue we're putting on our books from the reselling of these storage servers".* He stated that he agreed that *"our Strategic position with many of our large customers is a good thing"* and noted also that *"because of that reselling another companies products does present us with incremental revenue and margin contributions."*

1396. Mr Ariko's only real concern was with disclosure. Perhaps prompted by a passage in Deloitte's Q3 2009 Review, he wanted to ensure that the effect of this new revenue stream, and the performance of Autonomy's software business (which he described as *"our most strategic products"*), were fairly presented both for internal purposes and also from the point of view of the market. He was explicit:

> *"...I think we have a potential problem with how we discuss the*
> *revenue we're putting on our books from the reselling of these storage*
> *services. We need to agree how best to present those numbers to the*
> *Street and how best to review the performance of the Company without*
> *those revenue/profit numbers included to best understand the state of*
> *our business regarding our most strategic products. I believe this*
> *needs to be an extensive discussion at the next Board meeting and I*
> *think we should review our [current] press release so that it*
> *adequately reflects the effects of this new business line."*

1397. This concern was shared by all his colleagues on the Audit Committee, and expressed clearly after it transpired that the Press Release was issued notwithstanding these concerns. All three members wrote expressing concern about the lack of discussion about and disclosure of the hardware reselling strategy in the Q3 Press announcement:

(1) On 19 October 2009 at 4.18pm, in response to having been sent for approval the draft minutes of the Audit Committee meeting held on 16 October 2009, which did not record any discussion about hardware sales and revenues, Mr McMonigall sent an email to his fellow Committee members, and also to Mr Kanter, copying Mr Hussain and others at Autonomy, which stated:

> *"Fine with me. But how did we deal with the hardware GM*
> *issue in the announcement?".*

(2) Mr Ariko sent an email less than an hour later stating:

> *"I think the minutes need to reflect that we had a discussion about how to best represent and incorporate the EMC servers we are reselling into our financial results".*

(3) The third member, Mr Perle, later that evening sent an email agreeing with Mr Ariko and stating that he:

> *"share[d] John's interest in knowing what the press release says".*

1398. As has already been seen, the Press Release had been issued earlier that day. It made no mention of the *"new business line"*. Although one of the functions of the Audit Committee was to approve the quarterly results and press release, it appears that they, and these concerns, were by-passed. The responsibility for this is not clear. There is no record of Mr Kanter having sent to Deloitte his draft minutes, which the members of the Audit Committee all thought missed out this vital discussion. I did not hear from any of those members; or from Mr Kanter; or from Mr Knights, who did attend the meeting. I have had no opportunity to assess properly what may be competing recollections.

1399. But, to my mind, who was responsible matters less than the undoubted confirmation that the episode provides of (a) the natural reaction at the time of informed but objective persons, asked to consider the rationale for the hardware sales, that in any event they should be disclosed; (b) the determination on the part of management that they should not be so; (c) the inevitable suspicion surrounding (i) the omission from the minutes of the discussion all three members of the Audit Committee recalled and (ii) the apparent failure (including by Mr Knights, if the discussion took place) to factor in the Audit Committee's views on a matter which was part of their remit. Both (a) and (b) above were further demonstrated by two further emails.

1400. Mr Hussain's reaction to Mr Ariko's email was to send an email to Mr Kanter (only) which provides an insight into his outlook on the issue of disclosure:

> *"We made a statement about the strategic sales in MRL's quote – we cannot give too much detail in the press release as it's commercially sensitive. In the press release we said "during the quarter we saw some of our large customers promote autonomy to strategic supplier status. This has led them to adopt a broader set of solutions in a number of significant sales.""*

1401. Dr Lynch responded directly to Mr Ariko on 23 October 2009. The Claimants fastened on his response as showing clearly that he was *"perfectly content to mislead Mr Ariko"*. His response was prefaced by an assurance of complete agreement that the matter needed to be monitored closely, and a reference to Mr Knights having *"explained his treatment of this to me and Andy and Sushovan*

*advised that they felt the positioning was correct but also added that like you something we needed to keep under review".* The remainder and the Claimants' basis for criticising particular parts of it are summarised below:

(1) Dr Lynch stated that:

> *"The market is already aware we sell hardware, something we have done for 5 years or so and indeed we mentioned it as being relevant to q3 on the conference call and in Q3 shareholder meetings and indeed that this had been more pronounced this quarter. This has been mentioned by financial analysts in their coverage of the quarter."*

(2) The Claimants contended that the market had not been informed that Autonomy was selling pure hardware, and that the transcript for the Q3 2009 earnings call does not contain a single reference to the hardware sales. They paraphrased Dr Lynch's references to the situation in Q3 being *"quite complex involving hardware, our software to customers and a partnership development"* and to *"the move ... towards an appliance model rather than usual hardware re-sell"* and a *"new strategic product offering"* as intended to maintain a fiction of a partnership with EMC for the development of an appliance which did not accurately reflect the reality of the position with EMC.

(3) Dr Lynch stated that Autonomy *"would not want to become resellers of unrelated hardware which is not about furthering our software sales"*.

The Claimants contended that was the reverse of the truth because according to the Claimants' case that was precisely the strategy that had been implemented and the hardware sales during Q3 2009 were a means of producing recognisable revenue, rather than having anything to do with *"furthering ... software sales"*.

(4) Dr Lynch assured Mr Ariko that Autonomy was *"issuing a new press release next week on these matters relating to hardware"*.

(5) According to the Claimants, this was incorrect. As Dr Lynch well knew, the press release in question had nothing to do with pure hardware sales: it concerned the launch of the Arcpliance appliance: and they cited a press release issued on 28 October 2009 (*"Autonomy Announces New Archiving Appliance"*).

(6) Dr Lynch concluded:

> *"I think its a good subject to discuss at the board meeting although perhaps we need to monitor the next couple of quarters to see if this is a one off or a trend before reacting".*

(7) The Claimants said that this was misleading because by that time, it was already clear that these hardware sales were not intended to be a one-off (as Dr Lynch acknowledged in his own witness statement by the words "*EMC was just one of the hardware providers we planned on working with as the hardware strategy developed*"). Rather, the Claimants continued, the sales had become an important means of generating revenue for Autonomy and indeed, as explained below, a matter of days later, Dr Lynch and Mr Hussain were setting an ambitious hardware revenue target for Q4 2009.

1402. I accept that Dr Lynch's email was misleading. Tracking the sub-paragraphs above:

(1) As to (1), Dr Lynch's assertion that the market was already aware that Autonomy sold hardware was true only in the most literal sense; it skated over the fact that the very considerable increase in the volume of sales had been kept from the market, and the sales were only ever mentioned in the context of sales of appliances or Arcpliance. Further, and more concretely, it is correct that there was no mention of hardware sales in the Q3 earnings call; and though Dr Lynch may have confused the call with his own public statement on the Q3 results, which did contain the Delphic reference to Autonomy having, in consequence of certain large customers having promoted it to *"strategic supplier status",* adopted *"a broader set of our solutions in a number of significant deals"*, the inaccuracy and evasiveness are very striking.

(2) As to (2), Dr Lynch's references to partnership coupled with references to a *"a new strategic product offering"* had no real grounding in the truth.

(3) As to (3), I have determined that whatever its purpose when first formulated, by the time of this exchange the hardware reselling strategy's purpose was the generation of revenue to make good shortfalls in software sales without disclosure of their extent or true source.

(4) As to (4) and (5), the Claimants were correct in their contention that Dr Lynch must have been referring to a press release dated 27 October 2009 which announced Autonomy's Arcpliance product, which had nothing to do with the hardware sales to which Mr Ariko was referring.

(5) As to (6) and Dr Lynch's concluding statement to the effect that board discussion of hardware sales might be better postponed because *"perhaps we need to monitor the next couple of quarters to see if this is a one off or a trend before reacting"* smacks of evasion and sits uneasily with Dr Lynch's presentation of the hardware reselling strategy as a continuing strategy, involving not only EMC but also other hardware sellers.

1403. Again, this is plainly at odds with the picture of open and constructive engagement painted by the Defendants as described above. The impression that

Dr Lynch interpreted Deloitte's advice that the Accounting Standards did not require separate disclosure of revenue from the hardware reselling strategy as justifying him taking active steps to disguise or distract attention from it is reinforced by what he said at the Earnings Call for Q3 2009 (which took place on 20 October 2009).

*Mr Hussain s Q4 2009 Quarterly Note*

1404. A draft of Mr Hussain's Q4 2009 Quarterly Note was, as usual, pre-circulated to Dr Lynch for his comments. The final version was dated 29 January 2010 and circulated to the Audit Committee in advance of its meeting on 1 February 2010. The Note did not mention EMC or appliance sales, but contained a passage on *"Strategic Sales"*, as follows:

> **"Strategic sales** – only one new strategic sale for $1m this quarter (Bank of America) and 2 were delivered from deals concluded last quarter (Morgan Stanley for $6m and Credit Suisse for $4m). The total is $11m and 4.9% of total sales. The Morgan Stanley sale is particularly strategic as we made a further $12m of software sales to Morgan Stanley in the quarter. The Bank of America sale is also strategic in that we are in the midst of a large 7-figure sale of software in Q1'10."*

1405. The Claimants submitted that this was misleading because:

(1) As Dr Lynch accepted, the "*$12m of software sales to Morgan Stanley*" was in fact the restructuring of the hosting arrangement with Morgan Stanley. That transaction was entirely unrelated to the hardware sales that had been made to Morgan Stanley. There was no linkage between the two. Thus, it was misleading to state that the hardware sale to Morgan Stanley was "*strategic*" to the software sale.

(2) The same was true in relation to the BofA hardware sale, which was made to the reseller SHI. Again, the hardware deal was not "*strategic*" to the software deal referenced, which was a hosting arrangement that was negotiated entirely independently.

1406. In cross-examination, Dr Lynch sought to justify their description on the basis that both were nevertheless *"part of our strategic solutions problem"*. He explained this as follows:

> Q. *How do you say there was a relationship between a restructuring of the hosting deals and a sale of hardware to Morgan Stanley which was going to go on site?*
>
> A. *Because they're being done under the Morgan Stanley arrangement from 30 June 2009 which is an arrangement that is to do with hardware and also mentions Digital Safe, and then the other aspect of this is that Morgan Stanley owns some of the hardware that we host, and then the last aspect of this is that Morgan Stanley also has some safes which we're not hosting.*

...

> Q. *I suggest to you that the way in which this has been presented to the audit committee, suggesting some kind of close link, or link between these transactions, was just misleading, wasn't it?*
>
> A. *No, that's incorrect. And Deloitte were well aware of the level of linkage in each deal and there are working papers that discuss their understanding of that in detail…"*

1407.   In relation to the BofA deal, he explained the linkage as being:

> *"..that they are part of our strategic program…which by selling these large banks the hardware, we are able to fulfil the strategic need. Now, there are other sales if you're correct about these ones, where actually the software is running on the hardware and there are other ones which are the appliance-type sales. So there's a mixture going on here but the basic principle is that we are doing one-stop shopping for the banks."*

1408.   The effect of this was to cover all situations. In his oral evidence before me Dr Lynch extended his asserted meaning of *"strategic sales"* to apply to any sale of hardware to a software customer of Autonomy, existing or prospective. As also appears from the passage quoted in paragraph 1406 above he told me that Deloitte were *"well aware"* of the *"level of linkage"*. However, what Deloitte had been told appears from a passage in Deloitte's own Report to the Audit Committee on the Q4 2009 Audit:

> *"These hardware sales did not include any IDOL software component and reflect Autonomy's continued targeting of the emerging market of appliance solutions. However, we do note that during Q4 2009, Autonomy sold and have also sold significant software to Bank of America (who are the end-user in the SHI deal) in recent quarters. As consistent with the hardware sales reported to the Audit Committee in our Q3 report, these sales have been made at an overall loss with the costs being allocated between costs of sales and marketing expenses. Management's rationale for entering into these loss-making contracts is that Autonomy is seeking to develop a strategic relationship with EMC whereby in future an appliance will be marketed which combines Autonomy's software with EMC's hardware. It should be noted that the sale to SHI international was not connected to this strategy with EMC and involved a sale of 1,000 laptops to Bank of America via SHI International which Autonomy had purchased from Dell. The intention here is that both Autonomy and Dell will market Dell hardware that incorporates Autonomy search software."*

1409.   There are a number of problems with Dr Lynch's evidence in this regard:

(1) In respect of each transaction, Deloitte appear to have proceeded on a much more specific basis than Dr Lynch's very broad extension of the concept of a strategic sale in cross-examination.

(2) But in neither could the basis on which they proceeded be supported.

(3) By the beginning of Q4 2009 EMC had withdrawn from the hardware reselling strategy. There was no *"strategic relationship"* or agreement for marketing of a joint appliance. Mr Welham's unchallenged evidence was that Deloitte had not been told this during the course of the 2009 year-end audit.[212] Nor had the Audit Committee.

(4) Any arrangements for the development of an appliance with Dell were inchoate and uncertain.

1410. I am persuaded and find that Deloitte were misled and the Audit Committee likewise.

1411. Mr Hussain's Q4 2009 Note was also misleading in stating as follows under *"Operating costs"*: *"... the costs associated with the strategic sales (joint marketing and cost of sales) were down ..."*. However, no *"joint marketing"* had been agreed, let alone undertaken, with any of the hardware manufacturers.

*Mr Hussain's Q1 2010 Quarterly Note*

1412. By Q1 2010, Deloitte knew that Dell had taken over from EMC as the primary hardware supplier. Some recasting of the justification for hardware sales was required. The Claimants' allegations in respect of Mr Hussain's Q1 2010 Quarterly Note (the Claimants called it a 'paper') related particularly to the alleged depiction of a sale of hardware to BofA as part of a *"package sale"* resulting in a software purchase by BofA from Autonomy, both in Q1 2010.

1413. These allegations were particularly directed against Dr Lynch, as having been responsible for changing a draft of Mr Hussain's Q1 2010 Note in the manner shown by the text and deletions below:

> ***"Strategic Package ie sales*** *– the total was $7m (3.5% of total sales) of lower margin business including a strategic sale to the Bank of America for $145m $9m of . This should be seen in the light of a separate $9m major strategic sale of compliance software and 5m of low margin business also in the quarter (we flagged this sale in the Q4 Audit Pack). We also sold $41m to Fannie Mae and at the same time sold $3m of compliance software and $1m low margin to Freddie Mae."*

1414. Thus, whereas the original draft had described the software and hardware sales as separate (indeed, that very word was used in the pre-circulation version in

---

[212] Dr Lynch told me in cross-examination that he did not know this.

relation to the BofA software sale), the effect of what I accept were changes made by Dr Lynch[213] was to suggest that they constituted part of the <u>same</u> "*package sale*". These changes, which recast the justification for the hardware reselling strategy in conjunction with Dell as a means of enabling Autonomy to deliver its software through "*package*" sales of both software and hardware, were all adopted by Mr Hussain in the final version.

1415. As amended, the wording conveyed an inaccurate impression of composite sales; but, read on its own, the justification was no longer based on the quest for a joint appliance solution. Yet it is clear that Deloitte understood the strategic rationale still to be to develop a strategic relationship with Dell, as can be seen from their own Report to the Audit Committee on the Q1 2010 Review dated 20 April 2010 in which, in the section on *"Hardware"*, it was stated that:

> "*Management's rationale for entering into these loss making contracts is that Autonomy is seeking to develop a strategic relationship with Dell. The intention is that both Autonomy and Dell will market Dell hardware that incorporates Autonomy search software*".

1416. It is not clear to me from the evidence what the source or basis was for this gloss on what was stated in Mr Hussain's Q1 2010 Note. The gloss was wrong: there was no strategic relationship between Autonomy and Dell, and any intention of marketing a joint appliance was vague and inchoate. Indeed, Mr Chamberlain expressly acknowledged this in an email to Mr Welham and Mr Knights (cc Ms Harris and Mr Hussain) dated 19 April 2010 seeking to justify the allocation of 62.4% of the costs of sales of Hitachi hardware to Sales and Marketing on the basis that *"HDS are developing appliances and providing similar levels of support to EMC"*, but an allocation of the reduced figure of 37.6% in the case of sales of Dell hardware because *"there is no development effort for Dell…"*

1417. In such circumstances, it does not seem to me that Deloitte was misled in this regard by Mr Hussain's Note; nor by Mr Chamberlain. That does not alter the fact, however, that Deloitte's gloss on the justification was put forward to the Audit Committee without correction by Mr Hussain or Mr Chamberlain (or anyone else at Autonomy). It seems to me that Autonomy was content not to correct a confusion which was to its advantage in offering the best prospect of securing the result it wanted, and more especially, the allocation of part of its costs to Sales and Marketing.

1418. That said, and as Deloitte's Report explained, even on the basis of part of the costs being referable to building a *"strategic relationship"* Deloitte was not

---

[213] Dr Lynch denied this, relying on the fact that he was in California (marooned there by the Icelandic volcano eruption which restricted international flights), and suggesting that *"I don't think these would be my changes. The words may be my changes but there's certainly something else going on here as well"*. However, it is clear, in my view, that Dr Lynch did make the changes. The changes were attached to an email from Dr Lynch to Mr Hussain in response to a request for comments, the message in that email being *some suggested edits you may want to check for accuracy"*.

prepared to agree to the allocation percentages presented by Autonomy[214]. This was reflected in their report:

> *Given the period that has elapsed since these initial deals were transacted and the fact that we expected these to be more one-off in nature, we conclude that it would be more appropriate to reflect all of the costs of hardware sold in cost of goods sold.*
>
> *We understand that management has allocated the $3.8 million to sales and marketing based on the previous analysis prepared for the EMC sales in Q3 2009 which demonstrated that Autonomy were purchasing hardware at a price which was considerably higher than they would normally pay in order to gain a strategic partnership and become the preferred hardware reseller with EMC, Dell, SHI and HDS.*
>
> *Based on the limited information available, we have included the $3.8 million as a classification adjustment in Appendix 1 and would not expect to see such amounts in sales and marketing in subsequent quarters."*

1419.   In summary, Mr Hussain's Q1 2010 Note:

(1) paved the way for a shift in the justification of the hardware reselling strategy away from the development of an appliance to the customer-facing justification of a *"one-stop shop"*;

(2) reinforced the presentation of the hardware reselling strategy as nevertheless intended to promote Autonomy's software core business;

(3) was interpreted by Deloitte, when taken together with other representations, to justify the accounting treatment of hardware revenues as part of the overall revenues of the group without differentiation.

*Mr Hussain's Q2 2010 Note*

1420.   The shift in the justification for hardware reselling which had been commenced in Q1 2010 was confirmed in Q2 2010. Dr Lynch accepted in cross-examination that there was a shift:

> *"Q.    It's right, isn't it, from Q2 2010 onwards, rather than trying to position the hardware sales as being part of some strategic*

---

[214] The discomfort within Deloitte was expressed by the PSR on the Autonomy account for Q1 2010, Ms Lisanne Fitzgerald, whose comments on 18 April 2010 on the draft Q1 2010 report to the Audit Committee were summarised to Mr Chamberlain by Mr Welham; she stated:

> *"I feel pretty uncomfortable about this – it seems that the magnitude of these hardware sales will grow and have been occurring over a period of months – how long can they really be deemed to be marketing and not cost of sales. It strikes me that this is a way of them preserving gross margin which I am not sure is right…".*

> *relationship with a hardware manufacturer, including the
> production of appliances, what one finds going forward is a
> somewhat different justification being advanced?*
>
> A.    *Yes, it changes. What we're doing changes. It starts to move
> away from the appliance-type situation more to the strategic
> package sales.*
>
> Q.    *....it's not about appliance sales any more, it's about how this
> positions Autonomy well in order to make valuable software
> sales not loaded on to the hardware but just separately to some
> of the customers, correct?*
>
> A.    *Yes, I think it s shifted."*

1421.    That was consistent also with an earlier passage in his cross-examination:

> *"I would say at the beginning of the strategy it was more heavily
> weighted towards the appliance than the hardware providers, but a few
> months later, probably around Q2 2010, we were seeing more of Cloud
> take-off rather than appliance and that became less important and at
> that point we had more interest in the customer-facing aspect of it…"*

1422.    In their submissions as to the alleged deception of Deloitte and the Audit
Committee in Q2 2010 the Claimants focused on three points in Mr Hussain's
Q2 2010 Note dated 20 July 2010 (a draft of which was, as usual, pre-circulated
to Dr Lynch):

> (1)    The first was the statement under the heading *"Strategic package sales"*
> that:
>
> > *"...these types of sales were flagged in the Q1 results presentation so
> > the market is aware of them".*
>
> (2)    The second was that:
>
> > "*These lower margin sales have generated significant new software
> > business for us (over $80m of sales have been associated with these sales
> > over the past few quarters).*"
>
> (3)    The third was the statement under a heading *"Gross margins"* that:
>
> > *"We have charged the cost of the lower margin sales to the cost of sales
> > line even though we had agreed with our suppliers that the 50% of the
> > cost could be used for marketing purposes."*

1423.    On the first point, the Claimants submitted that the statement that *"strategic
package sales"* had been *"flagged"* in the Q1 results presentation was not true.

There had been a reference in the Q1 2010 Earnings Call to having purchased hardware inventory to take *"advantage of discounted stock offers to purchase stock in advance of Q2 sales"* and the PowerPoint presentation used for that call referred to *"Pre-investment in inventory for Q2'10 sales".* But in ensuing discussion when asked what *"Arcpliance or appliance sales and hardware sales would have been in a normal quarter",* Dr Lynch had replied *"...It would be a fraction of that number".*

1424.    The Claimants placed the blame for the untrue statement on Dr Lynch because it did not appear in the draft that was sent to Dr Lynch and was inserted only after that. When asked about this, Dr Lynch told me that he did not know whether the addition had been made at his request; but he submitted that there was no basis for the Claimants' suggestion that the text was inserted at his suggestion, or even that he saw it. But no other explanation was suggested as to how the amendment to the pre-circulated draft came to be made.

1425.    Dr Lynch was obviously discomfited when confronted with this in cross-examination, both as regards the inclusion of the statement and as to what it stated. As to whether the false statement was his suggestion, I have been struck by how often Dr Lynch used the words "flag" or "flagged": 11 times in his first witness statement, for example. Taking account also the fact that the amendment was introduced sequentially following the draft having been sent to him for his consideration, and the lack of any other explanation for it, on balance, I think it more likely than not, and I find, that he did cause the insertion of those words, even if he cannot now remember that he did.

1426.    He admitted that the statement was *"not as clear as I would like it to be".* When pressed on whether it was misleading, he first suggested that the intended reference was probably to the Q3 2009 Earnings Call, but then added that there had been more information given in Q1 2010 as well in respect of *"the Arcpliance solutions"* which he described as a *"subset"* of *"strategic package sales".* But this was glib, and I formed the impression that Dr Lynch was grasping at straws. None of his efforts to explain really addressed the point: they did not justify the statement that volume sales of "strategic" hardware had been undertaken.

1427.    Mr Bloomer, asked about the same statement appearing in the Q3 2010 Audit Committee presentation, indicated that the text would not necessarily have concerned him, because "*at the time, hardware sales were not a particularly big issue in Deloitte's report*". He added when asked whether, if he had become aware that the strategic package sales which he was told had been flagged had not been so, that would have concerned him, that:

> *"It would have been interesting rather than concerning...hardware was not seen as a big topic actually to flag."*

1428.    This was, as I see it, because Mr Bloomer, and the other members of the Audit Committee took the view that unless the hardware sales were of such an amount as to (a) undermine, or potentially undermine, the judgement that Autonomy had a single operating segment (its core IDOL-based software business) and (b)

be material, hardware reselling was not a problem unless of course Deloitte said it was: and they never did.

1429. The statement in the Note (see (2) in paragraph 1422 above) that "*over $80m of sales have been associated with these sales over the past few quarters*", was based on Mr Stephan's analysis (see below), which became known as *"the Linkage Analysis".* This showed $78m of software sales to Autonomy's hardware customers in the period from Q2 2009 onwards. As I develop in the context of my analysis of the dispute relating to the "linkage analysis", 'linkage' between events or transactions is an elastic expression which could denote anything from temporal coincidence to causation; but the Defendants submitted that the wording "*associated with*" did not suggest a direct, close, causal link. While the version sent to Dr Lynch contained the text, the number it contained was different ($40m rather than $80m). In any event, as Dr Lynch said, the document would have gone to Deloitte, who would have checked it and flagged to the Audit Committee if it contained anything misleading; and they never did so.

1430. Behind the statement in Mr Hussain's Q2 2010 Note (see (3) in paragraph 1422 above) that Autonomy had *"charged the cost of the lower margin sales to the cost of sales line even though we had agreed with our suppliers that the 50% of the cost could be used for marketing purposes"* lay a debate between Autonomy's finance department (and, in particular, Mr Chamberlain) and Deloitte (with both Mr Knights and Mr Mercer involved) on the abiding issue of costs allocation.

1431. In the previous quarter (Q1 2010), Deloitte had pushed back and after much wrangling obtained an agreement to limit the allocation to Sales and Marketing to an immaterial $3.8 million, on the basis of *"a classification adjustment in Appendix 1"* (see paragraph 1418 above). It is clear, as also intimated previously, that Deloitte were very uncomfortable with any allocation at all; and the identification of the relatively small allocation permitted as a *"disclosure deficiency"* (which appears to have been Mr Welham's idea) was intended (in Mr Welham's words in his witness statement) *"to flag to management that we would not expect such classification going forward."* Deloitte gave the same explanation and admonition to the Audit Committee.

1432. Even so, Mr Chamberlain pressed in Q2 2010 for a 50% split between COGS and Sales and Marketing. In a Memo to 'The Files' cc Mr Hussain dated 16 July 2010 and headed *"Product – cost allocation"*, Mr Chamberlain sought to justify this as follows:

> *"During Q2 2010 Autonomy has continued its practice of procuring hardware at a perceived loss on behalf of its most strategic customers. As has been previously explained the purpose of these deals is to become the single source supplier for all of the major banks in relation to its data management activities…*
>
> *…*

> *...the total cost represents a "loss" on the hardware sales. However, these sales should not be considered in isolation. A proportion of the payment represents an investment in the customer relationship and has helped enormously in the procurement of significant software sales. In the last 4 quarters alone we have signed licence deals that have generated almost $80 million in revenues with a further $40-60 million in backlog of estimated hosting fees that will be generated for the initial term of the agreements.*
>
> *The cost allocation of 50% to COGS and 50% to sales and marketing is consistent with the quotations provided to the hardware vendors. The sales and marketing payment is effectively a commission payment to the hardware vendors for allowing us to secure the sole supplier relationship with the banks and has been a very successful enabler in closing the larger, much more valuable, software deals.*
>
> *Every purchase quotation provided to the vendors contains the following clause:*
>
> *"The purchase order amount above includes payment for the equipment/services listed in the attached quote, in addition to payments for the joint marketing support referenced in the Agreement. For Autonomy purposes, the value of these transactions has been apportioned as follows: equipment/services 50% and marketing support 50%".*
>
> *The allocation reflects two things. 1) normal cost allocation to COGS such that hardware margin is consistent with margins earned by large hardware vendors; 2) balance of payment being allocated to S&M."*

1433.   I would make the following observations on this:

(1)   In the teeth of Deloitte's obvious discomfort and express warning that they did not consider allocation of the costs of hardware sales to Sales and marketing rather than COGS to be justified as a proper expense, and were only prepared to permit the allocation of a much smaller amount ($3.8 million) than Autonomy had pressed for as an exceptional *"disclosure deficiency"* which they would not expect to sanction in future quarters, Mr Chamberlain's tenacity is notable and indicative of quite how important was the allocation of costs issue to the finance department for the very reason which Deloitte's PSR had identified in Q1 2010 – preserving gross margin.

(2)   Mr Chamberlain presented the *"commission payments"* as if the hardware suppliers had agreed that this is what they represented: whereas the purchase orders themselves simply indicated how Autonomy was intending internally to account for them (*"For Autonomy's purposes"*).

(3) Mr Chamberlain's assertion that Autonomy's funding of discounts on hardware had *"helped enormously in the procurement of significant software sales"*, with a further suggestion of the generation thereby of *"almost $80 million in revenues with a further $40-60 million in backlog of estimated hosting fees"*, had no support beyond the Linkage Analysis (which from now on became the principal basis of justifying the desired allocation of Hardware sales costs), but which the Defendants have had to accept amounted to little more than what its author Mr Stephan referred to as a *"matching up names"* exercise to show a correlation between buyers of hardware and buyers of software and sometimes a broad temporal correlation, which, since all purchasers were existing customers for Autonomy software, demonstrated little.

(4) The basis on which Mr Chamberlain felt able to determine and represent that the *"normal cost allocation to COGS such that hardware margin is consistent with margins earned by large hardware vendors"* is unclear, just as it had been in Q3 2009.

(5) Although Mr Hussain's Q2 2010 Note stated that Autonomy had agreed to forego the benefit in terms of cost allocation of what was presented as an agreement *"with our suppliers that the 50% of the cost could be used for marketing purposes"* (see paragraphs 1422 and 1430 above), adding that Deloitte concurred *"with this prudent approach"*, behind the scenes Mr Chamberlain and the Defendants continued their efforts to persuade Deloitte to agree to some allocation of costs to Sales and marketing. The importance of this to them all was again evident from an email dated 18 July 2010 from Mr Hussain to Mr Mercer, Mr Knights and Mr Welham, in which he made clear that *"The main issue to get across the line on is COGS. Steve will discuss with Lee"* and noted *"Also MRL has strong views on this in terms of the business rationale"*.

1434. In the event, Deloitte were not persuaded to accept the proportions proposed by Mr Chamberlain. However, rather extraordinarily in general terms, but by now characteristically in the context of the relationship that had developed between Autonomy and Deloitte, they were persuaded to permit the allocation of losses to sales and marketing on the basis of *"a solution"* devised by Mr Knights and recorded in an email from him to Mr Hussain, Mr Mercer, and Mr Welham (cc Mr Chamberlain) late in the evening on 18 July 2010.

1435. The email is quoted later as a further illustration of the extent to which Mr Knights had adopted the role as supportive and constructive adviser rather than questioning and sceptical auditor, and was quite prepared to "workaround" his own compliance people. It is sufficient to note for the present that the upshot was that once again Deloitte approved the allocation of some $4 million to Sales and Marketing, which enabled Autonomy to present its gross margin figure as 88% for the six months ended 30 June 2010 compared to 89% for the first six months of 2009, and the small variation in the comparative Q2 2009 and Q2 2010 quarterly gross margin (89% as compared with 86%) as (quoting from the Q2 2010 Quarterly Report released on 22 July 2010):

> *"...in line with our expectations due to the sales mix including appliances as discussed last quarter."*

1436. In summary, Mr Hussain's Q2 2010 Note, Deloitte's own Report to the Audit Committee on the Q2 2010 Review, and the work done behind the scenes for both:

> (1) completed and reinforced the 'shift' in the justification for the hardware reselling strategy;

> (2) reassured the Audit Committee that the hardware reselling strategy did not destabilise the previous analysis that Autonomy was a single segment business with revenue from sources which required no differentiation; but to do that;

> (3) contained a demonstrably false assertion that *"strategic"* hardware sales had previously been *"flagged"* to the market which I have concluded was inserted at the suggestion of Dr Lynch;

> (4) confirmed yet again the Defendants' determination to say as little as possible about the hardware reselling strategy, and nothing as to its nature and extent (apart from the falsity mentioned above);

> (5) demonstrated Mr Knights' role as presenter of 'solutions' even in the teeth of concern from his team and the Reviewers, and the warning from one of the latter that it appeared likely that Autonomy's objective in posting as much as Deloitte would endorse of the costs to 'Sales and Marketing' instead of COGS was to preserve gross margin.

1437. Whether Deloitte were actually deceived by the Q2 2010 Note, however, is a more problematic question. As previously noted, Deloitte had full and detailed information about the hardware sales, except perhaps what was revealed in email exchanges between Autonomy and hardware suppliers. It seems to me to be difficult to conclude that Mr Knights was misled by the representations adumbrated in paragraph 1422 above; and, for example, Mr Welham, who attended all the Earnings Calls, must surely have known that the hardware sales had not been *"flagged"* to the market.

1438. Obviously, it would have been helpful, in this context especially, to have had evidence which could be tested from one or more of Mr Knights, Mr Mercer, Mr Knight and the Reviewers. On what has been put before me, the uncomfortable truth appears to me to be that by this time, at least Mr Knights and thereafter, Mr Mercer, no longer had the sceptical approach required of an auditor: neither in his turn retained the detachment and independence of mind that was required to call out Autonomy. Instead, they were content to take at face value representations which sceptical reflection would have revealed to be inconsistent with what they or the market had been told in the recent past. Autonomy was an important client; and I should imagine (though I had no direct

evidence about this) of very great importance to the Cambridge office which Mr Knights had managed.

1439. That raises further questions as to (a) whether this undermines the Claimants' submission that had Deloitte and/or the Audit Committee been told the truth, they would have objected to the programme and/or its accounting treatment and required its disclosure to the market (see paragraph 1368 above) and (b) whether this establishes, or at least strongly supports, the Defendants' case that the propriety of what they were doing had been confirmed by Deloitte and the claim of dishonesty should fail accordingly.

1440. As to (a) above, in my view, even if Deloitte continued to rely on what they knew to be unreliable or false, it seems to me that it was the story spun by Autonomy which continued to be the basis on which Deloitte themselves reported to the Audit Committee and on which both Deloitte and the Audit Committee approved the accounts in Q2 2010, as before. Even if Deloitte had no proper basis for relying on what they were told in the respects identified above, these proceedings contain no claim against Deloitte, and in these proceedings, it is the fact that the misrepresentations were made, and not any issue as to Deloitte's reliance, which is in issue. In other words, the fact that Deloitte acted does not excuse the way the matter was presented to them in the Q2 2010 Note (see paragraph 1422 above) or justify an accounting treatment on a false basis.

1441. Further as to (b) in paragraph 1439 above, and in any event, although the Claimants have presented the question as being whether reliance on Deloitte is a trump card for the Defendants, the real question is whether the fact that Deloitte and the Audit Committee approved both the accounts and the narrative demonstrates honesty on the part of the Defendants: and the truth as I find it is that what was stated in the Q2 2010 Note was false to their knowledge.

*Mr Hussain's Q3 2010 Note*

1442. The Claimants' allegations in respect of statements made in Mr Hussain's Q3 2010 Note that the strategic package sales had been *"flagged"* in the Q1 and Q2 results presentations, mirrored those concerning his Q2 2010 Note and discussed above. The best Dr Lynch could offer to support the statement in Q3 2010 that the hardware sales had been *'flagged'* in Q2 2010 was to say that in the Q2 2010 Earnings Call *"we'd talked about Arcpliance, which is a type of strategic package sale"*.

1443. However, not only was there no record of any such reference to Arcpliance in the transcript of the Q2 2010 results presentation, but Dr Lynch had told one of the analysts, in response to a question as to the effect on gross margin of the sale of Arcpliance inventory, that what he described as *"the appliance model"* would *"account for about 1%..."* and was an *"exceptional situation"*. There was thus a fundamental inconsistency in Dr Lynch's position: even if *'appliance'* sales had been flagged, his minimisation of them destroyed any argument that thereby the very considerable hardware sales had been flagged also.

1444.  The Claimants relied on this as a further demonstration that Dr Lynch was determined not to disclose the extent and nature of the hardware reselling, and would resort to very incomplete answers if that is what he felt was required. I agree and find accordingly.

1445.  The Claimants alleged that Mr Hussain also misrepresented the position in his Q3 2010 Note in claiming that *"lower margin sales have generated significant new software business for us"*. They tied this in with statements in Deloitte's report that management's linkage analysis showed a *"strong linkage between the loss making hardware sales and subsequent highly profitable software sales."* They made the further point, which was not contradicted by the Defendants, that the Audit Committee was not provided with the *Linkage Analysis* in that quarter or any subsequent quarter, and were reliant on the summary provided by Deloitte and Mr Hussain. The Claimants alleged that Mr Bloomer and the Audit Committee had been misled into a misunderstanding that *"the linkage analysis showed that hardware sales to a particular customer had driven software sales to that customer"*.

1446.  The Claimants made two further allegations in respect of Mr Hussain's Q3 2010 Note. The first concerned the bonus payments to Mr Sullivan. Mr Bloomer told me in cross-examination that he was not aware either of the payments, or that they were calibrated according to the amount of revenue Mr Sullivan generated from hardware sales. But the Claimants did not suggest that this made any particular difference.

1447.  The second further allegation relating to the Q3 2010 Note concerned the costs allocation issue. The Note went on to state, under "*Gross margins*", that:

> "*We have charged the cost of the lower margin sales to the cost of sales line even though we had agreed with our suppliers that the 50% of the cost would be used for marketing purposes*".

1448.  The Claimants alleged that this too was false: no such agreement had been reached with any hardware supplier; and not all of the cost of the pure hardware sales was included in "*the cost of sales line*". Mr Bloomer stated that he thought that this passage may have "*related to prior periods*", but the Claimants alleged that it was not true in relation to earlier periods either.

1449.  I agree that the Q3 2010 Note misstated the position. As previously noted, Mr Hussain habitually and incorrectly presented the justification for allocating part of the costs of the hardware sales to Sales and Marketing expenses as lying in a bilateral agreement, rather than in the (obviously unilateral proxy) *"residual method"* which I have described previously as a proxy in the absence of any such agreement.

1450.  Deloitte's own report on their Q3 2010 review to the Audit Committee likewise re-hashed the false line that *"these types of sales were flagged in the Q1 and Q2 results presentation so the market is aware of them."* Deloitte also stated in their report that management's analysis showed a *"strong linkage between the loss making hardware sales and subsequent highly profitable software sales"*.

1451. I took from Mr Bloomer's evidence when cross-examined that, on what they were told, his mindset and that of his committee continued in this quarter to be that on the basis that (a) the hardware sales did not cause Autonomy to be a *"hardware seller"* in the sense of running a separate business not incidental to the IDOL software business so as to upset the segmental analysis, and had also been *"flagged"* and (b) the issue of costs allocation involved amounts that were *"tiny"*, *"just immaterial"*, there was no real issue or problem.

1452. More generally, in my view, both Deloitte and the Audit Committee settled into the view from Q2 2010 onwards that subject to (a) taking steps to restrict the allocation of costs to Sales and Marketing to amounts which were comparatively immaterial (b) requiring some paperwork to lend some general support to the notion of the hardware sales assisting the software business and (c) repeating in each quarter their advice to make disclosure, whilst accepting that ultimately this was a commercial decision for Autonomy's board, the hardware reselling was not a matter of concern.

1453. What would have awakened Mr Bloomer and the Audit Committee's concern was anything which suggested that the hardware reselling was in the nature of a separate business or otherwise than intended to drive software sales, or in any sense clandestine. Mr Bloomer made clear that:

(1) He never thought that hardware reselling was a *"secret"*; he assumed (including from what he described to me as *"meetings with at least one of the shareholders where the shareholder was aware of the hardware sales"*) and *"that there were a variety of things which to me seemed that the market knew about hardware"*; but he acknowledged later in his cross-examination that he was not suggesting that the market was aware that in 2010 Autonomy resold over $100 million of third party hardware *"without any Autonomy software"*;

(2) Had he appreciated that, contrary to what was stated in the Q3 2010 Note and Deloitte's Report, hardware sales had not been *"flagged"* to the market, he would have wanted to know why they had stated they had;

(3) He was not aware that every quarter management would set Mr Sullivan revenue targets and that Mr Sullivan was regularly asked by management to generate further revenue from hardware sales, particularly towards the end of the quarter, nor that bonus payments were offered and paid to Mr Sullivan linked to the amount of revenue that he generated from hardware sales;

(4) He was not made aware (and nor according to Mr Welham's witness statement was Mr Welham) that separate revenue targets were set for

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

hardware each quarter, nor that Dr Lynch received updates on the revenue from hardware sales as each quarter progressed.[215]

1454. What the Q3 2010 Note and Deloitte's report did in the round was confirm the Audit Committee's mindset that the hardware sales were part and parcel of the software business, and that the issue as to costs allocation was an immaterial detail which could be left to Deloitte. Nothing was said to unsettle the Audit Committee's preconceptions, or to suggest the need for discussion and review of the real issues raised by the continuation of the hardware reselling strategy, including (a) what more exactly the market had been told (b) what, if the market remained unaware of the nature and extent of the programme and its contribution to overall revenue the reaction of the market would be if it were to be revealed (c) why, if immaterial, the issue of cost allocation was of such apparent and abiding importance to management, (d) why a proper Linkage Analysis had not been provided, and whether any linkage demonstrated was sufficient to justify loss-making sales of non-IDOL goods[216] and more generally (e) whether the programme, as it had developed, could properly be said to be wholly focused on driving software sales.

*Mr Hussain's Q4 2010 Note*

1455. The Claimants' allegations in respect of Mr Hussain's Q4 2010 Note largely mirrored their allegations in respect of his previous Notes in the Relevant Period.

1456. As in previous quarters, in Q4 2010 the Audit Committee were led to believe that there was a strong linkage between hardware sales and software sales. Thus:

(1) Mr Hussain's Q4 2010 Note stated, under "*Gross margins*", that the "*lower margin sales have <u>generated</u> significant new software business for us*" (emphasis added). Deloitte stated in their report to the Audit Committee for Q4 2010 that management's analysis demonstrated a "<u>*strong*</u> *linkage between the loss making hardware sales and <u>subsequent</u> highly profitable software sales*" (emphasis added).

(2) Again, as in earlier quarters, the Note stated, in the "*Strategic sales*" section, that "*these types of sales were flagged in the previous quarters' results presentation so the market is aware of them*" .

(3) Mr Hussain's Q4 2010 Note went on to state:

---

[215] Mr Welham was not challenged on his witness statement in this regard. The point was of some importance to the segmental analysis; and in Mr Chamberlain's report sent to Deloitte on 18 January 2011 it was emphasised, entirely falsely, that *"No information is provided to MRL on hardware revenues".*

[216] Mr Bloomer confirmed that (a) he and his committee had relied on what they were told by Mr Hussain and Deloitte (b) they understood the linkage to show that hardware sales for a particular customer had driven subsequent software sales to that customer (though he subsequently said that *"...my understanding at the time was that there were a number of major customers who bought both hardware and software and that selling the hardware was an aid to selling the software....But there was no – in my mind at the time – there was no sort of chicken and egg debate about which came first. There was a series of big customers who bought both hardware and software.")*

> "*We sold to Bank of America following on from the software sales made this quarter and several deals in q1. ... Large deals in Q4 included a large sale to Bank of America (we won the Merrill Lynch legacy data migration to our hosted digital safe environment). This is a major win for Autonomy as we are now a major strategic supplier to the BofA worldwide*".

1457.  Notably, Mr Bloomer and the Audit Committee were given to understand that the analysis showed a strong linkage between the hardware sales and subsequent software sales.  He confirmed that the Audit Committee was not provided with the Q4 2010 linkage analysis prepared by Autonomy, which he understood had been reviewed by Deloitte.

1458.  That might have led to a train of enquiry which would have revealed, as was in my judgment the fact, that none of the statements summarised in paragraph 1456 above could be justified:

> (1)  There was no linkage between the hardware sales and software sales in any causative sense.[217]

> (2)  The market had no visibility in relation to the substantial pure hardware sales that Autonomy had undertaken: they were not "*flagged*" in Q1 or Q2 2010, nor does it appear from the transcript that they were disclosed during the Q3 2010 earnings call.  When faced with this in cross-examination, Dr Lynch suggested that the hardware sales were "*mentioned in Q3 2009*":

> > "*I think there was language added to the Q3 earnings call about something along the line of strategic sales*".

> No such language was identified.  There was no reference to hardware sales, whether "*strategic*" or otherwise, during the earnings call for Q3 2009 .  There were the following cryptic sentences in the Q3 2009 Quarterly Report:

> > "*During the quarter we saw some of our large customers promote Autonomy to strategic supplier status. This has led them to adopt a broader set of our solutions in a number of significant deals*".

---

[217] Shortly before written closing submissions were submitted, Dr Lynch uploaded an email that Mr Egan appears to have sent to Mr Hussain on 3 November 2010 concerning a Morgan Stanley deal.  In response to Mr Hussain's query ("*Software and hardware together?*"), Mr Egan responded: "*Separate but proposed in concert as it helps Morgan get arms around discounted hw as part of larger relations*" .  In fact, Autonomy's own linkage analysis does not suggest that Morgan Stanley entered into a software deal in Q4 2010 that was 'linked' to any hardware deal (see column U, row 12).  In any event, as is plain from the way in which the hardware sales were generated and concluded, Morgan Stanley's ability to get its "*arms around discounted hw*" was not in any way dependent upon or linked to its software purchases from Autonomy.

But without prior awareness it would be difficult to extract from those sentences that Autonomy was making hardware sales.

(3) As to (3) in paragraph 1456 above, no software deal was concluded with BofA in Q4 2010. As already mentioned in paragraphs 1154 to 1155 above, Autonomy had been pushing hard to close a deal with BofA. When a BofA deal could not be completed in the quarter, Autonomy instead entered into deals with two VARs, DiscoverTech and Capax Discovery, on the last day of the quarter, 31 December 2010. Dr Lynch attempted an argument that in conversations between him and Mr Mackenzie-Smith (head of BofA in London) he reminded Mr Mackenzie-Smith of the discounted hardware sales Autonomy had arranged for it: but I have determined that even if they took place, such conversations had no material effect, and more generally that the hardware sale to BofA in Q4 2010 played no part in the deals with DiscoverTech or Capax Discovery, nor in the subsequent direct deal between Autonomy and BofA.

1459. On the issue of cost allocation, and similarly to the previous quarter, Mr Hussain's Q4 2010 Note stated, under "*Gross margins*", that:

"*We have charged the majority of the cost of the strategic sales to the cost of sales line even though we had agreed with our suppliers that the 50% of the cost would be used for marketing purposes.*"

1460. However, no such agreement had been reached with any hardware supplier; nor were the sales "*strategic sales*"; they were sales of (adopting the Claimants' phrase) '*pure hardware*'.

1461. It follows that Mr Hussain's Q4 Note was misleading, intentionally so in my judgment. As in the case of his previous Notes, Mr Hussain's Q4 2010 Note and Deloitte's own report were calculated to reinforce the Audit Committee's preconceptions and the Defendants' justification of the hardware sales: the Note does not establish the falsity of that justification, but the justification being false, it once more perpetuated it.

1462. Before turning to Mr Hussain's Q1 2011 Note, a point of detail which arose at this time in relation to continuing review of the issue of segmental analysis (see paragraphs 854 to 863 above)[218] illustrates the disregard for the truth that had developed within the cabal whenever it was necessary to depart from it to achieve a desired accounting treatment or approval. On 18 January 2011, Mr

---

[218] The issue of segmental analysis was an abiding and important one. It may be recalled that Autonomy management's view was that the group had just one operating segment, being the sale of IDOL software. The importance of that is that if a company has more than one operating segment, each segment must be differentiated in the accounts. The importance of this is clear: segmental accounting would have destroyed the achievement of the purposes of the hardware reselling strategy. By the same token, however, it has seemed to me that it was Deloitte's approval of the view that Autonomy had a single operating segment which caused Mr Bloomer and the Audit Committee not to query the hardware sales further and to accept the allocation of costs from what was in reality a different business to the software business, without any differentiation or warning note.

Chamberlain provided a paper to Deloitte which was intended to support the conclusion that Autonomy had only one operating segment. One of the points made in the paper was that "*No information is provided to MRL on hardware revenues*". That was false. As set out in detail above, Dr Lynch discussed and agreed the hardware revenue targets in each quarter, and Mr Hussain provided Dr Lynch with regular updates on hardware revenue throughout each quarter. It is clear that Deloitte were misled in this regard: Mr Welham's unchallenged evidence is that he was not aware that separate revenue targets were set for hardware each quarter or that Dr Lynch received updates from Mr Hussain on the revenue from hardware sales as each quarter progressed.

*Mr Hussain's Q1 2011 Note*

1463. In addition to familiar complaints about references to "*strong linkage…and subsequent highly profitable software sales*", to which the answer was the same as in earlier quarters, the Claimants focused especially on words added in the final version circulated to the Audit Committee to the draft Note sent to Dr Lynch (which I have underlined below for the purpose of identification):

> "*strategic package sales that included approximately $20m (9% of total sales) of lower margin business included JPMC and Bank of New York. These sales are part of strategic sales to these companies — for example JPMC is one of our largest customers of compliance software.*"

1464. The Claimants took issue with the underlined words. They suggested that those words had been put in at Dr Lynch's request, and they alleged that the suggested strategic link was spurious, not least because no software deal had been entered into by Autonomy with JPMC in Q1 2011 (it had happened much earlier, in Q2 2010).

1465. In addition to their submission (which I accept) that careful consideration of the sequence of drafts shows that Dr Lynch was unlikely to be the person who inserted the words,[219] the Defendants submitted that in any event, the words are unobjectionable: contrary to the Claimants' suggestion, they did not say that there was a software sale to JPMC in Q1 2011, and any linkage which might be taken to be suggested was not inaccurate.

1466. That submission did not, however, negate the fact that it was the overall message which was received which counts; and that message perpetuated and reinforced the Audit Committee's mindset. Both message and mindset can be seen from Mr Bloomer's evidence in his witness statement. Mr Bloomer explained that in Q1 2011 he understood that:

---

[219] Mr Hussain sent Dr Lynch a draft for comment at 13:11 on 16 April 2011: that draft did not include the underlined words. Mr Hussain sent Dr Lynch a further draft half an hour later, including the underlined words; the covering email stated "*Please use this draft for review – updated with frrp and shareholder letters comments*". This suggests that Dr Lynch had not yet reviewed the earlier draft, and also that the changes between the two drafts were not proposed by him.

> *"As they had done in their previous reports, Deloitte reviewed Autonomy's strategic hardware sales and concluded that the linkage between the loss making strategic hardware sales and subsequent profit-making software sales justified the allocation of the loss to sales and marketing expense".*

1467. As before, the Audit Committee was not provided with the linkage analysis for that quarter. Mr Bloomer said that both he and the other members of the Audit Committee would have relied on what Deloitte and Mr Hussain had said in their respective reports regarding linkage.

*Mr Hussain's Q2 2011 Note*

1468. The position in relation to Q2 2011 was much the same. The pattern had been set, the message and the mindset established. In the usual way, Mr Hussain produced a Note for the Audit Committee meeting for Q2 2011, which he shared in draft in advance with Dr Lynch, seeking his comments. Both the draft (which Dr Lynch had reviewed) and the final version presented to the Audit Committee contained the following passage:

> *Strategic package sales – new strategic package sales in the quarter included approximately $16m (6% of total sales) of lower margin business (JPMC, Bank of America and Bank of New York). In addition, we had deferred lower margin business of $5m from previous quarter due to delivery. These sales are part of strategic sales to these companies – for example at JPMC we sold ediscovery software, continued archiving services and strategic package sales. And at Bank of America we have sold web content management software, archiving and is one of our largest customers of compliance software."*

1469. The Claimants advanced two specific allegations:

(1) First, that the statement that $5 million of hardware sales had been deferred from the previous quarter "*due to delivery*" was false. At least some $2 million of hardware revenue was not recognised in Q1 2011 because the Defendants chose instead to recognise the DiscoverTech/Prisa VAR transaction. The Claimants contended that this had nothing to do with the delivery of hardware, and was instead driven by the desire to achieve a particular level of revenue without unduly affecting gross margin and earnings per share. The Claimants relied on Mr Bloomer's acceptance that he had understood that $5 million of hardware sales revenue had not been recognised in Q1 2011 because the hardware had not been delivered in that quarter and contended that, therefore, the Audit Committee were misled in relation to this issue.

(2) Secondly, that the Note was misleading in stating that the sales to JP Morgan and BofA were strategic package sales and in giving the impression that the hardware sales were linked to software sales in the same quarter. The Claimants contended that in truth, Autonomy did not

enter into any software licences with BofA in Q2 2011: the only transaction between Autonomy and those companies in that quarter was a restructured hosting deal where JP Morgan were offered very substantial savings, and there is no evidence whatever to suggest that that restructuring of an existing hosting deal was in any way driven or impacted by any hardware deal that may have been done with JP Morgan during Q2 2011.

1470. I have concluded in a previous section of this judgment (see paragraphs 1074 to 1100 above) that revenue was improperly deferred in Q1 2011, at the instigation of what I have called the clique or cabal of three, including Mr Hussain, and (so I have found) to the knowledge of Dr Lynch as its éminence grise (see paragraphs 1094 and 1099 above). I accept also, therefore, that in stating that the reason for the deferral was a problem with delivery Mr Hussain's Note was misleading to the knowledge of both Defendants.

1471. In cross-examination, Mr Bloomer agreed that his understanding at the time was that deferral was in consequence of late delivery, and that if in fact it was not delivered late, obviously he would have wanted to understand what the reason was for the apparently unjustified deferral, and if an impermissible one it might have given rise to concern about the approach management was taking in relation to the recognition of revenue. He pointed out, however, that (a) he would have expected the issue as to the cut-off for the quarter (which he told me was always a point of debate which had to be sorted out) to have been carefully checked and verified by Deloitte and would have relied principally on that, and (b) an element which would have had to be considered was that of materiality: *"I mean, 250-odd million of sales in these quarters, 5 million is not that material one way or the other".*

1472. As to the depiction of the sales to JPMC and BofA as strategic package sales, I would accept that little more was claimed by Mr Hussain than that the hardware sales provided the context for, and may have helped in getting, the software sales. No causal connection was expressly claimed: indeed, the nexus asserted was that which might be claimed for any advertising campaign or customer-oriented effort to encourage sales or customer loyalty. I accept that the hosting restructurings offered sufficient incentive of themselves to make unnecessary any further incentive from discounted sales of hardware; but that does not necessarily mean that the context did not also include such hardware sales, nor that they did not provide a further incentive.

1473. But once more, as it seems to me, this parsing of the separate statements overlooks the fundamental message being conveyed in Q2 2011 as in previous quarters, to the effect that hardware resales were driving software sales, and the rest was anodyne and immaterial detail. Once more the message reinforced the Audit Committee's bedded-in perception of the purpose of the sales, and ensured passive acceptance, rather than quizzical discussion.

1474. The message as the Audit Committee received it is again apparent from the evidence of Mr Bloomer:

(1) Deloitte's report to the Audit Committee for Q2 2011 stated the following:

> "*Management has further extended its analysis determining the <u>strong</u> linkage between the loss making hardware sales and <u>subsequent</u> highly profitable software sales. This continues to show a <u>high degree of correlation</u> between hardware sales and much more profitable licence sales to the same companies*" (emphasis added).

(2) Mr Bloomer understood that Deloitte had reviewed the linkage analysis prepared by management for Q2 2011, and that linkage was established. Again, management's linkage analysis was not shared with the Audit Committee.

(3) Based on what the Audit Committee was told by Deloitte in their report, Mr Bloomer understood that the analysis showed a strong linkage and high degree of correlation between the hardware sales and subsequent software sales.

*Conclusions in respect of Mr Hussain s Quarterly Notes*

1475.  In the round, in my judgment:

(1) Mr Hussain's Quarterly Notes embellished and amplified the message that both Deloitte and the Audit Committee had already accepted from the time of Mr Knights' "conversion" (when he became a "wordsmith").

(2) Deloitte were largely tied into their initial acceptance of the presented purpose of the strategy (in Q3 2009), and the Audit Committee followed their lead.

(3) The Audit Committee were in a sense distracted by conceiving as the principal issue whether or not the newly introduced segmental accounting provisions in IFRS 8 were being properly applied. Mr Bloomer's witness statement, and to a great extent his oral evidence, appear to me to take as the litmus test of the propriety of the accounting and disclosure of the hardware sales whether by reason of their extent or otherwise such sales had come to constitute a separate segment of Autonomy's business, necessitating separate identification, accounting treatment and disclosure of its performance.

(4) The Audit Committee had no idea, for example, that Mr Sullivan considered himself to be, and in reality was, *"basically running a small side business".*

(5) Mr Hussain's Quarterly Notes do illustrate yet again that management and one or more of the Defendants were content to dissemble if that was necessary to ensure that there was no further disclosure of the hardware sales programme which would have revealed, or would be likely to lead

to a train of enquiry that probably would reveal, their true extent and contribution to Autonomy's revenues.

1476. It seems clear and I find that the predominant reason for dissembling, and for the false presentation repeatedly reinforced by Mr Hussain's Quarterly Notes, was that those involved were concerned that revelation of the programme would be perceived in the market to diminish the quality of Autonomy's earning record and prospects and would materially adversely affect analysts' and the market's rating of Autonomy.

*Linkage Analysis*

1477. I have repeatedly referred in the preceding analysis to the *Linkage Analysis* and the way in which it was deployed by Autonomy's management will by now already be apparent, as will be its purpose. In summary, it served as management's response to:

(1) The shift from placing primary emphasis on the avowed *"joint development programme"* (in collaboration with EMC) as the principal justification for the programme to placing emphasis in justifying the hardware sales (in conjunction with Dell) on their success as an investment in customer relationships and in enabling Autonomy to become a one-stop supplier of both software and hardware to its customers, and

(2) Deloitte's natural requirement for some demonstration of the nexus and growing concern that the hardware reselling strategy, which had initially been presented as a one-off initiative with EMC, was becoming *"business as usual"* (as Mr Welham put it in his witness statement).

1478. In this part of my judgment, I address certain issues in relation to the *Linkage Analysis* raised by the Claimants, and in particular the issue as to (a) what it was designed to show and (b) whether it demonstrated the *"strong linkage"* and *"high degree of correlation"* between hardware and software sales which management asserted in its deployment.

1479. The first is as to what Deloitte expected from it and its format. Although it seems clear that this exercise was in response to a request from Deloitte for an analysis of hardware revenues paid to customers to whom Autonomy also sold software, there was not in evidence any email or other document setting out the terms of the request, and there was a dispute as to what Deloitte gave Autonomy to understand was required.

1480. It was Mr Welham's evidence that Deloitte requested (it is not clear when) what he described as:

> an analysis…setting out, on a customer-by-customer basis, what management said was the evidence of the linkage between the loss-making hardware sales and software sales and hosted revenue to the same customers".

1481. Mr Welham was not cross-examined on this statement. However, in his oral closing argument, Mr Miles suggested that Mr Welham's description was not of the request but of what Deloitte received in answer; and that it accordingly amounted to no more than Mr Welham's own perception of the content and effect of the analysis: any request would have been in line with the simpler one already referred to (but made later in January 2011).

1482. That would tally with Mr Stephan's evidence in chief ("direct" evidence as described in the US) in the US criminal trial as to what he conceived his task in preparing the analysis to be. That evidence (which was adduced by the Claimants under a hearsay notice) was that the spreadsheet did not contain any real analysis of whether the hardware deal actually related to a software deal: it was simply (in Mr Stephan's words):

> *a mathematical exercise of matching names of customers…So if we sold a hardware to Customer A, we d be looking for Customer A through the historic revenue to try and find software sales to them."*

1483. Ms Gustafsson's evidence of her understanding of the analysis, in its original form but also as updated, was to the same effect.

1484. In conjunction with the dispute as to what Deloitte had asked for, there was also a dispute about what Deloitte really understood the analysis to show when they received it (and successive versions). The Claimants' case is that Deloitte were misled by the linkage analysis (which was updated quarterly) into thinking that there was a direct causal link between individual hardware sales and individual sales of software, and that then they and Mr Hussain together (unwittingly in the one case and dishonestly in the other) misled the Audit Committee into thinking there was *"strong linkage"*. The Claimants described it as *"yet another exercise designed to disguise the true nature of what Autonomy was doing."*

1485. Apart from what the spreadsheets themselves showed, the Claimants' case was very largely based on the evidence of Mr Welham. Mr Welham's evidence in his witness statement was that Deloitte understood that the linkage analysis prepared by management:

> "*provided directional evidence of a causal link between the hardware sales and subsequent software or hosted revenues*".

1486. Mr Welham was not cross-examined on this either; but in his oral closing submissions, Mr Miles emphasised the words *directional evidence"* in Mr Welham's statement and submitted that they made clear that Mr Welham cannot have been suggesting that the spreadsheets constituted an analysis of the causal link between particular sales of hardware and particular software sales.

1487. In the absence of cross-examination, it is not easy to determine quite what Mr Welham did mean. But I agree with Mr Miles that the two expressions Mr Welham used (*"directional evidence"* and *"causal link"*) cannot be taken together to denote *"causal link"*. I think that the nearest synthesis is probably

that the analysis suggested a correlation which might indicate, but did not establish, a causal link.

1488.   In any event, if Mr Welham was seeking to suggest that Deloitte understood that the linkage analysis provided evidence of something like a causal link, that is not what it appears others in Deloitte thought. In his oral closing submissions, Mr Miles referred me to notes of an FRC interview with Mr Mercer on 4 September 2013 in which Mr Mercer made clear that he and Deloitte appreciated the limitations of the spreadsheets. He plainly regarded the sales of hardware as being in large part a marketing exercise and emphasised more than once both the truism that *marketing is an art, not a science"* and the aphorism *half of marketing works"*: *You just don t know which half. So, so this is what they re doing and overall, we can see it is working."* When asked by the FRC representative *"…what was this analysis of the linkage that management did?"* Mr Mercer replied:

> *It s analysis of sales that they made of hardware and losses historically…So, it is,  We have made these sales of hardware and losses to these customers. We have made sales to these selfsame customers of software of (blank). It s the same customers we are selling…that we are making this marketing effort and incurring this marketing cost by selling software at losses that we are selling highly profitable software to…" So it s not…you are absolutely right. You can t…show a hardware sale on 30 June 2010 and have an analysis that it s…since they started doing this in a significant way, they ve tracked who they ve sold this stuff to and them who they ve made – how much of the software posted revenues they ve made to the same people."*

1489.   In other words, Mr Mercer and Deloitte did not treat the spreadsheets as intended to show a causative link, or even a clear correlation between a particular hardware sale and a subsequent software sale: they treated them as showing that, even if a direct nexus was not capable of being demonstrated in particular individual cases, in overall terms the loss-making hardware sales appeared to lead to more high-margin sales to the same group of customers: as in all marketing. Mr Mercer agreed *absolutely"* that it was not more than *sort of a reasonable correlation"* across the cohort of customers, adding:

> *It s by no means perfect and you can t see one following the other but you can see that the vast majority of these companies that they are selling hardware to, they are now selling significant amounts of software to…"*

1490.   That accords with Dr Lynch's understanding[220]:

> *"A.     … it was like when you do advertising, you don't know exactly which sale comes from the advertising but you*

---

[220] Dr Lynch was aware that a spreadsheet was prepared each quarter that showed the software bought by customers who bought hardware.  However, he did not see the spreadsheets at the time.

> *can do something like – you can look at the amount of advertising in a region and then see what sales you have in that region. It doesn't mean that there's a causality on a one-to-one deal basis.*
>
> *...*
>
> *I think they [i.e. Deloitte] considered there was a link but not on an individual basis, in the same way as there would be a link in advertising something in Northampton and then looking at the number of shoe sales in Northampton. That was my understanding."*

1491. More difficult to answer in those circumstances is the question why this broad correlation, as both Autonomy and Deloitte do seem to have perceived was what the linkage analysis was designed to show, came to be presented by Autonomy to Deloitte and by Deloitte to the Audit Committee as demonstrating a *strong linkage"* and their resort to it as a significant factor in justifying the allocation of costs to Sales and Marketing expenses.

1492. In that regard, it may be recalled that Mr Hussain's Q2 2010 Note for the Audit Committee asserted that the "*lower margin sales have generated significant new software business for us*"; and Deloitte's report to the Audit Committee for Q2 2010 stated:

> *These are further examples of a number of strategic hardware transactions [sic] completed by Autonomy to major international banks or other large blue chip companies completed in order to open up new market opportunities and to become the preferred supplier for all such clients' archiving requirements, including both software and hardware.*
>
> *... Management s rationale for entering into these loss making contracts is that Autonomy is seeking to develop a long term strategic relationship with the end-users in order to secure future profitable software sales.*
>
> *Management has prepared an analysis demonstrating the strong linkage between the loss making hardware sales and subsequent highly profitable software sales ..."*

1493. In my judgment, it is clear from the contemporaneous documentation, taken as a whole, that both Autonomy and Deloitte understood the limitations of the linkage analysis, but nevertheless deployed it to support the depiction of the nexus between hardware and software sales urged by Autonomy's management. This was to the effect that there was a sufficient correlation between hardware sales and subsequent software sales to the same customers not only to justify taking a loss on the hardware sales, but also to justify an accounting treatment which would allocate a proportion of the costs to Sales and Marketing expenses.

1494. For example, in an internal Deloitte email dated 14 October 2010, Ms Antonia Anderson said of the linkage analysis that Mr Stephan had sent her earlier that day that "*[t]he important thing on this tab is their analysis of the software and hosted sales they generate with customers that they sell this hardware to*". Similarly, in his email to Mr Stephan on 20 January 2011, Mr Leo He of Deloitte requested a copy of the linkage analysis in order to "*justify the rationale that the purpose of Autonomy selling hardware at a loss is to generate significantly more software revenue from these customers, and therefore it is reasonable to classify the hardware loss to be S&M expenses*" . Mr Welham went further in his witness statement and said that when Deloitte accepted that the loss suffered by Autonomy on the hardware sales could be allocated to sales and marketing expenses, with the balance of the cost of the hardware being allocated to COGS, they did so:

> "*on the basis of the linkage analysis provided to us by Autonomy each quarter, which, based on the representations Autonomy management had made to us about the business strategy, appeared to supply adequate support for the allocation of the loss on the hardware sales to sales and marketing expenses*".

1495. I consider and find that there were two main reasons why Deloitte in fact treated the linkage analysis as offering more support than it was designed to show and on its face it did:

(1) First, I agree with the Claimants that it is important to remember that Deloitte did not receive the linkage analysis in isolation. Autonomy had stressed to Deloitte that its strategy of reselling hardware at a loss was in order to become "*the single source supplier for all of the major banks in relation to [their] data management activities*" and that the net loss represented "*an investment in the customer relationship*" which had "*helped enormously in the procurement of significant software sales*". (emphasis added). That was Deloitte's mindset; and, read in that light, the Linkage Analysis complemented and reinforced it.

(2) Secondly, the truth is, as it appears to me, that Mr Knights was very open to persuasion: my impression is, as I have previously indicated, that by now he had changed from sceptical assessor to become an active participant in finding a way to justify the allocation of costs to sales and marketing expenses which would satisfy the Deloitte Reviewers. I have in mind particularly an email dated 18 July 2010, from Mr Knights to Mr Hussain, Mr Mercer and Mr Welham (copied to Mr Chamberlain). In that email, he explained that he, Mr Mercer and the Reviewers had had to draw the line when Autonomy's management had tried once more to get approval for 50% to be allocated as such expenses (which he described as "*not something our compliance people will get comfortable with…we only got comfortable with this in Q1 on immateriality grounds*"). Whilst that might have appeared to show (and both Mr Knights and Mr Mercer have since insisted that their refusal to accept the 50% split did show) the audit function properly working, he then immediately put forward what was in effect a "work-around" with the

same objective. Under a heading in bold type which read *"But there is a solution that makes sense – particularly as in the Q1 call you already highlighted the $10m of hardware in inventory which you highlighted was to be sold in Q2"* he laid out the following plan:

> *My solution would be:*
> - *Record the hardware sales at nil gross margin for IFRS reporting*
> - *Take the  loss" as selling expense – (around $4-5m I think)*
> - *The market already knows that you will be making Q2 hardware sales as you highlighted this at Q1 and had inventory on the b/s. So any IFRS gross margin one off drop is reasonable and can be explained as part of the strategy.*
> - *In the **adjusted gross margin** [original emphasis] strip back out the hardware element to a normalised" level and add an explanation –*
>
> *By the time you wrap up the $10m hardware b/f and the $4-5m that is in selling expense surely we are almost there??*
> *Just to be totally clear all of us fully get the strategic element to this and the opportunity to open up new markets. The evidence of follow through sales is apparent."*

> (Mr Welham's again unchallenged evidence (which I accept) was that the last sentence was a reference to the linkage analysis that had been supplied to Deloitte by Autonomy management.)

1496. In summary, therefore, it was not so much the linkage analysis itself as its context and presentation, together with Mr Knights' readiness to accept Mr Hussain's depiction of it as in some way (unexplained) showing *"strong linkage between the loss making hardware sales and subsequent highly profitable software sales"* (to quote from Deloitte's Q2 2010 Quarterly Review), which persuaded Deloitte to regard the linkage as sufficient for them to approve Autonomy's allocation of a significant proportion of the costs of the hardware sales to sales and marketing. That was vital, as I have emphasised before: it was that which ensured that the hardware reselling did not appear to have a concerning adverse effect on gross margin such as would be likely to excite further enquiry, and thus at one and the same time both ensured full realization of the true purpose of the hardware reselling and so much helped to disguise and attenuate the likelihood of inquiry about its true extent.

*Other examples showing the determination to avoid disclosure to the market*

1497. Finally, in assessing the purpose of the hardware reselling strategy I turn to discuss three aspects of the Defendants' conduct especially relied on by the Claimants as showing that both Defendants were prepared to resort to lies about the true extent and nature of the hardware sales in order to avoid their disclosure

or enquiry which would result in the market becoming aware of them and their improper purpose, and thereby Autonomy's dependence on hardware sales to maintain its image as an extraordinarily successful *pure software"* company.

*Q&A scripts*

1498. First, I address the scripts prepared by Autonomy and management in advance of every earnings call. These included draft "Qs and As" worked on after 'brainstorming' sessions to 'spot' topics of likely interest or concern to those attending the calls. Many of the questions 'spotted' were never asked, nor therefore were the draft answers given. Obviously, a scripted answer never in fact uttered and never made available cannot be the basis of any claim under FSMA or in misrepresentation. However, the Claimants relied on them nevertheless as evidence of what would have been said if the questions had been asked, and thus of the Defendants' state of mind and intentions.

1499. More particularly, the Claimants relied on individual scripted answers as evidence of (a) a willingness on the part of both Defendants to mislead the market and (b) the fact that neither of the Defendants had any honest belief that the hardware sales were known to the market, or that their purpose was legitimate, or that there was any proper basis for not disclosing them fully.

1500. The Defendants contended, to the contrary, that the scripts could not safely be relied on as evidence of what would have been said if the questions were asked. According to the Defendants, the answers relied on by the Claimants in the scripts were drafts, which went through many iterations and which were prepared by a large number of people, including Autonomy's brokers and investor relations. Scripted answers might or might not reflect input from the operational part of the company to which they related; might or might not have been checked by the Defendants; and might or might not be used. On this view, they were little more than placeholders.

1501. Dr Lynch's elaboration of the process was as follows:

(1) The process involved some 20 people (some junior or only "interns") "brainstorming" with a view to identifying any questions, and generated a mass of them which accumulated over time, many of which might remain on the script unless and until focused on at a second stage of review: *"some of the questions…hang around for years"* and the scripted misleading answer may have been a hangover from previous versions of the Q&A script which had not been reviewed or had simply been insufficiently checked and verified.

(2) Some questions were *"too sensitive"* for the large group and so a smaller group of people, who were privy to *"inside information"* would undertake a *"final phase"* where the *"actual"* answers would be developed, sometimes at a stage too late to be included in the printed version so that the final answers had to be inserted in handwriting. The scripted answer may in effect have been a placeholder (my word, not his), which would have been amended and changed, had it been focused

on, and would not have been used in anything like that form if the
question had been asked.

(3) Even after review of the drafts there was a further important stage:

> "*Then the last stage, which is the sensitive one, is those
> documents are taken and then the questions are
> amended for things that we know that the rest of the
> group don't know that are important.  And that would be
> any inside information or anything that we think is
> competitively very sensitive.  So that will not have been
> surfaced and taken out.  The answers that will have been
> put in in the drafts would have been ones just to move
> on to the next question, because obviously you can't
> highlight this to the brokers and the other people that
> are sitting there.  And then we come up with an actual
> set of answers that we would use. And that's why the
> answers in those documents are not the same as the
> answers you hear when the questions are asked
> sometimes on the call because there's actually a final
> version that's done.*"

1502.  The last amendments would not be made in the printed version, but in
manuscript. Thus, the Defendants submitted, the inclusion of a proposed
response on a particular draft cannot be relied on as showing anyone speaking
on the call intended to use the response in question: and, they concluded, the
only responses that can be relied on – and the only information of any possible
relevance to the claim before the Court – are those that were in fact given on the
calls. Furthermore, in the case of each of the scripted answers on which the
Claimants sought to rely, Dr Lynch's evidence was that the statement in
question was not in fact, and would not have been, used.

1503.  The Claimants submitted that Dr Lynch's repeated efforts to dismiss the scripts
as containing draft answers which were later revised and which in any event
would never have been (and in the event never were) used as an elaborate
concoction which Dr Lynch knew to be patently untrue.  They submitted further
that Dr Lynch's resort to lying about both the process of developing the answers
and the use to be made of them when cross-examined not only fortified their
main argument as to the insight shown into the mindset of both Defendants, but
also was fundamentally revealing of Dr Lynch's personal dishonesty and his
propensity to lie to the court as well as the market.

1504.  This aspect thus acquired more importance in a FSMA claim than might be
expected of representations never in fact uttered. Indeed, the Claimants spent
considerably more time on the Q&A scripts, which were not mentioned in the
pleadings, than on what was actually said at the Earnings Calls. They cross-
examined Dr Lynch at length on the process by which they came to be finalised
for use in each quarter in the Relevant Period, and on the content of the Q&A
drafts (with particular emphasis on the scripts prepared for the Q3 2009

Earnings Call and the Q2 2011 Earnings Call, marking the beginning and end of the sequence in the Relevant Period).

1505.  I do not think it is necessary to go through each script quarter by quarter. Instead, I examine first, the dispute as to the way the scripts were produced and my conclusion in that context, before discussing various illustrations of the questions and answers instanced by the Claimants as obviously false and misleading from the Q&A scripts prepared for Q3 2009, for Q1 2010 and for Q2 2011, and Dr Lynch's responses in respect of them. I then set out my conclusions as to the allegations made in respect of the Q&A scripts compositely.

1506.  The documentary evidence seems to me to reveal that:

(1)  The final printed version of the Q&A document typically went through a number of drafts: for example, that for Q3 2009 appears to have gone through at least 15 drafts;

(2)  Autonomy's Investor Relations (headed by Mr Geall, working with Mr Goodman) would typically "own" the document, with suggestions and amendments channelled through them;

(3)  Financial Dynamics (Autonomy's external financial PR advisers) would also be involved;

(4)  The evidence of larger meetings of 20 or so is sparse. Although in Q3 2009 at least one meeting seems to have taken place, where individuals not in core management may have been present to throw around questions and answers, there is no clear evidence of any such meetings in later quarters, and it is not easy to see when they would have fitted into the chronology;

(5)  Even if a group of 20 or so people did assist in "brainstorming" sessions to identify possible questions and answers at the inception of the process, it is plain from the little evidence that there is (confined to Q3 2009) that they took place very near the beginning of the process of developing the script;

(6)  The process was soon in the hands of a small group and the drafts were worked up over email, as opposed to in much larger meetings;

(7)  Further, in every quarter, the Defendants seem to have been engaged in the final drafts: and in Q1 2010, for example, the source of the questions and draft answers highlighted by the Claimants appears to have been them;

(8)  Certainly in Q1 2010, the source of the objectionable/ noxious questions and answers seems to be Dr Lynch and Mr Hussain. As late as 8.03pm the day before the Earnings Call, Dr Lynch was editing the document containing those answers and not correcting them. It seems implausible

that any meeting was going to take place after that time when any analysts or interns would see that document;

(9) There are no extant copies in evidence of Q&A scripts with manuscript amendments; and typically, the final printed version would have little room for the insertion of manuscript additions;

(10)    There does not appear to be any evidence that Deloitte saw the scripts or the Q&A drafts (or final version) prior to the quarterly earnings calls.

1507.  The following scripted questions and answers prepared for the Q3 2009 earnings call (numbered 27, 37 and 107 in the final printed draft) are examples particularly relied on by the Claimants as demonstrating that the Defendants intended to give seriously misleading answers to key questions on hardware sales which had been identified as likely to be asked:

| 27. How much h/w did you sell in the quarter? | We do sell a bit of H/W every quarter eg telephony cards as part of our call centre solution |
| --- | --- |
| 37. You used to give licence organic growth in the past. What is it and why don't you give it now? | All we sell is IDOL so that is the organic growth number. The reason for the old categories was when we had legacy things like ultraseek. That is no longer relevant. |
| 107. Do you include hardware revenues in Hosted? | There are some instances where we might sell an appliance solution. But this is rare and the quantum is low as a percentage of group revenues. |

1508.  The contemporaneous documents show that both Defendants were closely involved in the preparation of the final script. Dr Lynch had to accept that had the answers scripted been given, they would have been seriously misleading.

1509.  In addition to his explanation as to the process (see above) and his ultimate defence that the scripted answers would never have been used, Dr Lynch suggested that the Q&A scripts also tended to accumulate historic answers which were (as he described them) *"hangovers"* from previous quarters which were no longer to be used.  But he had to retract the suggestion when a further document was put to him later in his cross-examination.

1510.  In respect of the Q&As prepared for the Q1 2010 earnings call, the Claimants relied particularly on what they submitted were a series of misleading or diversionary answers to be given to hardware-related questions that had been picked out as likely to be asked. These included:

(1) Q&A 15 was *"How much was the hardware related sales incurred in Q1?"* to which the scripted answer was *"[$5]m went into the solutions."*

(2)        Q&A 16 was *"Hardware: Why?"* to which the scripted answer was *"Arcpliance. Up to customers strategic eca".*[221]

(3) Q&A 19 was *"HW: What was it in the past?"* to which the scripted answer was *"No idea".*

(4) Q&A 71 was *"You used to give licence organic growth in the past. What is it and why don't you give it now?"*, to which the scripted response was *"All we sell is IDOL so that is the organic growth number."*

(5) Q&A 85 was *"Why haven't you disclosed the hardware sales in the past?"*, to which the scripted response was *"Not a material part, normally pure software, sometime software and services or software and hardware…new move to arcplaince."*

(6) Q&A 108 was *"Inventory – have you done many hardware deals in the past"*, to which the scripted answer was *"Not usually a significant amount."*

1511.  Of these answers, all but (1) and (4) were exactly as drafted by Dr Lynch, except for the correction of typographical errors which were typical of his usually hurried emails. (1) and (4) also appear likely to have been largely drafted or suggested by him as they were inserted further to a final email on the Q&A script from him to Mr Hussain on the day before the Q1 2010 earnings call.

1512.  Turning to the Q&A script prepared for the Q2 2011 earnings call, the Claimants relied particularly on the following:

(1) Q&A 24 was *"Hardware sold in the quarter"*. The proposed response was as follows: *"Arcpliance sales were low well under their usual range of a couple of million. I would note that this is dissimilar of what they were a year ago"*.

(2) Q&A 25 read *"Do you sell hardware other than arcpliance"*, to which the scripted answer was: *"Yes occasionally for example we sell a tiny amount of memory cards for PCs that go into call centres"*.

(3) Q&A 66 posed the question *"Cost of sales – how much was hardware?"*, to which the scripted response was *"Arcpliance sales 2.5 to 3 [SH to confirm]"*.

---

[221] Early Case Assessment.

1513.  All of these Q&As were included in an attachment to an email from Mr Hussain to Dr Lynch, Mr Kanter, Mr Chamberlain and Mr Derek Brown (who was also in Autonomy's Investor Relations department) dated 26 July 2011.

1514.  Dr Lynch, with some surprising equivocation that it might depend on the context, had to accept in cross-examination that if those answers had been given, they would have been misleading. Plainly they would have been so: in Q2 2011, revenues from hardware sales amounted to about $20.8 million, compared to total revenues of some $256 million.

1515.  Dr Lynch sought to defuse this on the same basis as before: (a) the answers had not been used, and so could not have been misleading; and (b) the answers did not show what would have been said:

> *"You're asking me about an answer that may be generated by a 22 year old intern…This is a document which is produced and worked on by 20 people around a table, including in some cases even interns, 22 year olds, people throw in the questions, we write answers. In the answers we do not give inside information because it is – and it includes external people to the company as well. And then this is taken and the actual answers are done and the proof of that is very simple, which is the answers in this document are not the ones you see when questions are asked on a conference call. And that's true for the last, you know, whatever it is, 40 quarters."*

1516.  The Claimants submitted that these efforts were confounded by the documents: far from the scripted answers having been "*produced and worked on by 20 people around a table*", they were contained in a draft which Mr Hussain described as "*my latest*" and which he sent to Dr Lynch, Mr Kanter, Mr Chamberlain and Mr Brown only. Furthermore, and as noted above, the fact that Autonomy was selling large quantities of pure hardware in order to report what would appear to be higher levels of software revenue was not "*inside information*". Dr Lynch's answer that the scripted answers were never used missed the point, which was that the question was never asked.

1517.  When put to him that the position that was being taken in these responses was dishonest, Dr Lynch said as follows: "*If it had been dishonest, the answer would have been used. The answer was never used*". But, yet again, that misses the point: as it transpired, the question was never asked but the existence of the planned answer suggests, strongly to my mind, that Dr Lynch and Mr Hussain were prepared dishonestly to mislead the market.

1518.  Dr Lynch's broader point that the transcripts prove that questions which were asked were often answered differently than appeared on the prepared script is less easily dismissed and in fact was not addressed by the Claimants. Dr Lynch did tend to depart from the script: indeed, he almost invariably did so, providing much more detailed answers than had been suggested. For example, questions

in Q2 2011 about the growth of Cloud business and developments in Promote were dealt with by Dr Lynch in a far more detailed way than the scripted answers (and indeed some of the questions were left blank in the script).

1519.  I have concluded and find as follows:

(1)  Even if there were meetings of 20 or so people including "interns" to "spot" questions and suggest possible answers, such meetings had very little influence on the shape and content of the finalised scripts, which had gone through a number of drafts and reflected the input of Autonomy's Investor Relations department, Financial Dynamics and ultimately, and most significantly, Mr Hussain and Dr Lynch. I cannot accept that the scripted answers were the work of interns: they were the work of the Defendants.

(2)  There is nothing to support Dr Lynch's evidence that the scripts were or would have been amended in manuscript. The Defendants' revisions of the relevant scripts typically continued until the eve of the earnings call in question. There was no reason for such a process: and there was no space provided, nor any time for such an exercise.

(3)  I do not accept either the suggestion that placeholder answers were necessary to protect confidentiality or reflected the fact that those compiling them had no access to confidential information. There was nothing confidential in the answers; and they were in many instances drafted by Dr Lynch himself.

(4)  Dr Lynch appears to have paid particular attention to the answers to be given to questions 'spotted' relating to hardware. His contribution to the Q1 2010 scripts is especially clear. The answers he scripted in this context would have been misleading if given.

(5)  All that said, however, I doubt that the scripted answers show anything more than that Dr Lynch did not intend to disclose the truth about the hardware sales. I doubt that the answers Dr Lynch would have given would have followed the script had the question(s) been asked. Even where he had drafted the scripted response, I am doubtful that he would have used it: that was not his habit or style. As his performance in the witness box also showed, Dr Lynch is articulate and skilled at presentation. I think at most the scripted answers were aide-memoires, and sometimes I suspect little more than placeholders.

(6)  For example, the scripted answer to Q&A 27 in Q3 2009 was a clumsy lie and Dr Lynch is not clumsy; neither would either Defendant, or any of those speaking on behalf of Autonomy, have fixed on that answer as likely to pass unnoticed by, or without comment from, Deloitte and Mr Welham (who listened into the earnings calls). Dr Lynch may well have hoped that the question would not be asked, did not want to commit to any focused answer in advance, and trusted himself to equivocate or distract attention if and when the question came, with the comfort of

knowing that the practice was not to allow more than one follow-up question.

(7) Dr Lynch had taken the advice from Deloitte, as adopted by the Audit Committee, to be that *"the information did not have to be disclosed"* (as he stated when cross-examined): he would not simply have stated what the hardware sales were. Nor would Mr Hussain, who was very reluctant to say anything unscripted anyway: he would have referred the question to Dr Lynch, and said nothing more.

(8) The truth is that the Defendants were prepared to mislead to keep analysts and the market away from the nature and extent of the hardware sales.

(9) The Q&A scripts further undermined Dr Lynch's reliability and credibility in my eyes. They support the conclusion urged by the Claimants as summarised in paragraph 1503 above.

*Representations to disguise the hardware reselling strategy made in Earnings Calls*

1520. That conclusion is also supported by various representations actually made by the Defendants in the course of Earnings Calls in the Relevant Period. The Claimants' pleaded allegations in this regard related to the earnings calls for Q3 2009, Q1 2010 and Q2 2010: they did not advance allegations in their RRAPoC or in their opening in respect of the other Earnings Calls in the Relevant Period. Mr Rabinowitz did, however, cross-examine Dr Lynch on the other earnings calls in the Relevant Period in support of the general case of dishonesty against both Defendants.

1521. Whilst I have borne in mind the others, and have mentioned them in passing in the section on the chronology of Autonomy's relationship with Dell and hardware reselling, it is for present purposes sufficient to focus in this context on Q3 2009, Q1 2010 and Q2 2010. Each one illustrates a different set of what the Claimants contended were misrepresentations to conceal hardware reselling and examples of serious dishonesty on behalf of the Defendants. I address at some length the Q3 2009 Earnings Call, which was principally related to the costs attributable to a new product of Autonomy's called SPE. SPE was an issue of some importance in the Claimants' case[222] (though it was one which the Defendants tended to shy away from and seek to marginalise). The Claimants contended that (a) it demonstrated the lengths to which the Defendants would go to conceal hardware reselling and costs and (b) it reveals *"a willingness on the Defendants' part to tell lies to Autonomy's auditors, the market and to this Court."*

*Q3 2009 Earnings Call*

1522. In its Quarterly Report for Q3 2009, Autonomy had capitalised $11.7 million in R&D expenses. This figure was much higher than the R&D costs capitalised for

---

[222] About 100 pages were devoted to it in the Claimants' written closing submissions. Dr Lynch dealt with it in about 30 pages.

the equivalent quarter the previous year which amounted to only $3 million. The Q3 2009 R&D figure was stated in that report to be *"primarily due to the new IDOL SPE product reaching commercial exploitation phase."*

1523.  The principal focus of the Q3 2009 Earnings Call was Dr Lynch's announcement of the launch of SPE. He described SPE during the call as *"a complex piece of technology"*, a *"radical technology"*, which could *"clip on to pretty much any relational database"* and was *"probably the second most important product in the Company's history"*. He knew, he said, that it was *"geek stuff at the moment"* but it was soon, he hoped in 2010, *"going to open up markets in a very different way for us."* He talked of a *"very large addressable market"*, an *"$18 billion market"*.

1524.  On the Q3 2009 Earnings Call, Dr Lynch told the market that the sales and marketing expenditure incurred in Q3 2009 in relation to SPE was *"$18 million/$20 million, with about $4 million extra on the Quick Start program"*. In explaining the significant increase in Sales and Marketing expenses, Dr Lynch talked of[223]:

> (1)  the time spent on a BETA programme model necessary for such a complex piece of technology;
>
> (2)  the work done on *"advertising in the trades"* and working very closely with the (computer) analysts;
>
> (3)  the *'Quick Start initiative'* for which he said there had been *"over demand"*;
>
> (4)  tax breaks negotiated by Mr Hussain which had given *"a little bit of leeway… to increase the Quick Start program considerably above where we expected it to be"*;
>
> (5)  *"flying key customers from around the world to special selective seminars…small affairs…done for about 15 customers at a time….over two days…and that worked very well"*

1525.  Mr Kanter added that the IDOL SPE launch had been *"acclaimed by industry analysts"*.

1526.  Mr Hussain said in seeking to clarify (a) the reasons for the reduction in gross margin in the quarter to 86% compared to 92% in Q3 2009 (as stated in the Q3

---

[223]In summary, on the Q3 2009 earnings call, combined with the accompanying presentation, Dr Lynch attributed the SPE marketing spend figures to five steps:

> *(1)*  Advertising in the trades;
> *(2)*  Discussions with analysts;
> *(3)*  A Quick Start initiative;
> *(4)*  A Beta programme-which was already underway and released to several hundred Beta customers, and
> *(5)*  Specialist Seminars.

2009 Quarterly Report), and (b) the decline in Autonomy's operating margin in Q3 2009 (which fell to 34%, compared to 42% in Q3 2008 and 47% in Q2 2009), as follows:

(1) *"Moving on to gross margins. At 86% this quarter, we saw the effect of a couple of percentage points of the over-demand on the Quick Start program for the new product release"*; and

(2) *"Operating margins were at 34.5%. This was affected by seasonality and the additional spend on the new product release. Now excluding the effects of the new product release, i.e. the additional marketing spend, the lower gross margin effect of the over-demand, and adding back the net effect of the capitalised R&D, then operating margins would have been 43%, around that number".*

He also clarified, in answer to an analyst's question, that *"the spend on SPE in Q3 was a one-off in Q3 only."*

1527. The Claimants' case can simply be stated: the R&D capitalised costs of $11.7 million did not arise in respect of the development or launch of SPE or its related product 'Quick Start'[224]. They were a disguise to explain increases in marketing expenses and R&D costs, and decreases in gross margin, without any mention of the effect on these metrics of the rapidly developing and substantial, but loss-making, programme of hardware sales instigated further to the Loudham Hall meeting in July 2009.

1528. According to the Claimants, who relied principally on the evidence of Dr Blanchflower, behind all the fanfare, SPE was not a new standalone product at all. It did not involve writing any new code. It was simply a relatively straightforward repositioning of IDOL's existing meaning-based computing to structured data, and there were no additional statistical or probabilistic features in SPE which did not already exist in IDOL.

1529. The Claimants' case was that the real costs of SPE's development were small: Dr Blanchflower estimated them at around $50,000. Other costs might take the aggregate to $100,000; but no more. The Claimants' other main witness on the point, Mr Lucini, accepted a slightly higher total amount for development costs: $70,000, rather than $50,000, based on an industry charging rate.

1530. The Claimants contended that the documentary evidence revealed no significant SPE sales and marketing expenses in Q3 2009 and that it is impossible for anything approaching $18-20m to have been spent on sales and marketing for the launch of SPE and that the true figure was unlikely to exceed $100,000.

1531. They submitted that, with the exception of a small sum spent on advertising, there was no documentary support for there having been any expenditure on any of the specific categories mentioned by Dr Lynch in the Q3 2009 Earnings call.

---

[224] For accuracy: of the $11.7 million, $7.3 million was said to be referable to SPE.

According to the documents, and the evidence of Dr Blanchflower and Mr Lucini:

(1)     The total advertising spend was $78,342 and Dr Lynch personally limited such expenditure to no more than $80,000 in an email on 23 August 2009 to Ms Eagan.

(2)     There were very few documented discussions with analysts. The Claimants accepted that there was a video conference held with Ms Sue Feldman of IDC on 14 September 2009 but submitted in their written closing that there is no evidence of any payment made in respect of this and that if there was it is likely to have been immaterial. The Claimants accepted that briefings were held with Mr Muncaster on 15 September 2009: but on the documents, that appeared to be that.

(3)     There was no documentary evidence of any Beta program (being sample software testing) in existence in relation to SPE in Q3 2009, and the Claimants relied also on the evidence of Dr Blanchflower and Mr Lucini that there was none. They noted further that (a) when, following the press release on 16 September 2009, customers asked whether they could join the Beta program, they were told with Dr Lynch's knowledge and/or by his direction that the Beta program was closed due to over demand; and that Dr Lynch personally created the pretence of a Beta program when none existed; and (b) Dr Lynch, by email on 23 October 2009, had directed a response to be given to Mr Goodman of Fidelity who had registered to download the Beta version of SPE, which was to tell him it was closed due to overdemand. Lastly in relation to this point, they further relied on a prepared answer in a Q&A script prepared on 20 April 2010 for Autonomy's Q1 2010 earnings call stating the product had been sold so Beta was not relevant, which the Claimants submitted was a way of ducking the question because Dr Lynch knew the Beta program had not existed.

(4)     Contrary to what Dr Lynch told the market, and though it was stated to account for some $4 million of the sales and marketing costs, there was no Quick Start initiative or programme in existence. The evidence of Dr Blanchflower and Mr Lucini was to the effect that they were unaware of the existence of any such program in circumstances where they would be reasonably expected to if such a program existed. There was no documentation to substantiate systems engineers ("SEs") coordinating with customers in order to install SPE such as when to turn up, with what equipment, and identifying how SPE may be useful to such a customer, and a lack of witness evidence to the effect that SPE was installed at customer sites in Q3 2009.

1532.   Apart from a single seminar held at Cliveden House from 09 September 2009 to 10 September 2009, there were no such selective seminars in Q3 2009 which involved flying key customers from around the world. There was none of the supporting documentation which might be expected: no guest lists, invitations, flight bookings, hotel bookings, schedule of events, nor any agenda for the

seminars. The Claimants suggested that if such seminars had really occurred then they would have involved Mr Lucini; and he denied any involvement. Dr Lynch had not called a single witness who was claimed to have been a customer, though this had been a pleaded issue. Further, the Claimants relied on, as being obviously a concoction, Dr Lynch's suggested response to an email dated 14 September 2009 sent to Mr Hussain by an analyst called Mr Raimo Lenschow asking for an update on progress on the product:

> *"Premarketing well underway, ad starting to run, customer seminars with them being flown in from around the world already done and on going, demo appliances out, industry analyst briefed etc… …..sadly we missed off financial analysts as they have no budget…!"*

1533. The Claimants added to this barrage asserting, in effect, that the Q3 2009 Earnings Call had amounted to a pack of lies, that a memorandum prepared by Ms Gustafsson (of Autonomy's finance department) ("the R&D Memo"), which had been produced to justify to Deloitte the R&D figures in the accounts, was based on figures which had no factual foundation and were untrue. The figures had been provided to Ms Gustafsson by the cabal, and in particular, Dr Menell and Mr Chamberlain. Ms Gustafsson made clear that she had very largely relied on the information that had been thus supplied to her.

1534. There were two primary elements in the calculation of R&D capitalisation in the R&D memo:

(1)     $4.8 million was attributed to time spent by SEs and

(2)     $2.5 million was attributed to time spent by the development engineers.

1535. The Claimants detailed at considerable length their reasons for dismissing the amount of time attributed to SEs, which involved an extended account of the usual work they undertook and the calculation of the monetary value to be attributed to their time. For present purposes, the following should suffice:

(1)     The SEs were uncontroversially described in the R&D Memo as follows:

> *"Systems Engineers are a team of individuals traditionally associated with ensuring that software supplied by Autonomy meets the needs of the customers['] existing systems …*
>
> *Typically the work of an SE is the tailoring of Autonomy software, or providing 'proof of concept' to customers to demonstrate that the software meets their requirements".*

(2)     The basic approach was stated in the R&D memo as follows:

> *"From discussions with Pete Menell, a list was provided showing SEs who spent all of their technical time in Q3 09 developing SPE through trialling the software with real databases. 75% of Q3 SE costs have therefore been capitalised*

> *in line with the proportion measured and agreed with HMRC.''*[225]

(3)    Dr Menell simply provided a list, later expanded by Mr Chamberlain without apparent justification, of all Autonomy SEs, and the figure in the R&D Memo represented 100% of all their 'technical time' (being 75% of total time).

1536.    The Claimants submitted that it was plain and should be found that (i) <u>none</u> of the SEs in Mr Chamberlain's list spent <u>all</u> of their technical time in the first three quarters of 2009 developing SPE by trialling the software with real customer databases; on the contrary, there is no evidence that <u>any</u> of these SEs spent <u>any</u> of their time in the first three quarters of 2009 doing that, with one minor exception of one SE, who spent some time assisting Mr Lucini with the construction of the SPE demo in Q3 2009. They submitted further that that conclusion was further justified by the complete absence of any of the evidence that might be expected if the SEs had been trialling SPE with clients, such as feedback and customer comments.

1537.    The Claimants also submitted a shorter answer to the analysis in the R&D Memo based on Dr Blanchflower's evidence to the effect that SPE did not come into existence until midway through Q3 2009 itself. They pointed out that it was a logical impossibility for the SEs, at any earlier stage during Q3 2009, let alone in Q1 or Q2 2009, to have been trialling with customers a product that had not yet come into existence.

1538.    The amount ($2.5 million) allocated to development engineers (see paragraph 1534 above) for work described in the R&D Memo as having been a *"direct result of the new product, SPE"* was calculated from spreadsheets showing the time spent on R&D by each of the development teams within Autonomy. Each development engineer's salary as recorded for national insurance was extrapolated and then multiplied by the days recorded as having been spent by that engineer on R&D work. Ms Gustafsson told me in cross-examination that the attribution of $2.5 million to SPE, out of a total of $6.94 million capitalised for R&D work for development enquiries, was based on a *"sort of qualitative context around the development of SPE that you can't do in a spreadsheet."*

1539.    On that somewhat opaque basis, the R&D Memo asserted, for example, that it was likely that *"over half"* of the $62,589 of R&D time incurred by the Cambridge team was attributable to SPE, and a round figure of $400,000 was taken as the value of the time spent by that team on SPE. Ms Gustafsson told me, when asked what was the source of the assertion of the proportion of R&D time spent on SPE by the Cambridge team, that she could not remember specifically but *"I would speculate that it would have been Pete".* She confirmed that she had no recollection of having spoken to Dr Blanchflower, who was based in Cambridge and head of R&D, about how much time he and

---

[225] 75% was permitted by HMRC as qualifying 'technical' work for tax relief purposes; but as Ms Gustafsson agreed the further implicit suggestion that 75% was an accurate estimate of the time spent on SPE was obviously wrong. The notion that all the SEs had spent all their technical time on SPE was absurd: it would have crippled the Autonomy group, as Mr Lucini pointed out.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

his team had actually spent. I accept Dr Blanchflower's evidence and find that she had not done so. His evidence was that the value of time spent by the Cambridge team was a maximum of £24,000.

1540. The Claimants made the further point that on Dr Lynch's own case SPE predominantly involved reconfiguration of IDOL. The R&D Memo asserted that a number of other Autonomy development teams – Discovery Mining, iManage and Web Content Management ("WCM") – in total incurred $2 million worth of time in the development of SPE. But IDOL was the responsibility of the Cambridge development team led by Dr Blanchflower . His evidence was that other teams did not have access to the IDOL source code, which was only available to the Cambridge development team, and they played no part in the development of IDOL. Accordingly, it is inherently unlikely that they would have played any part in the development of SPE. When it was put to Dr Blanchflower that he was not in a position to know what work was being done by the WCM team in 2009 he answered firmly but fairly:

> "Was I aware of everything that the WCM team were doing? No. Were they working towards SPE? No. But I didn't know all of the details of what they were doing, correct."

1541. The Defendants' response to this barrage sought to re-address the origin, substance and worth of SPE:

(1) SPE was a real product which predated the hardware sales: it was *"not some kind of a blind for the hardware costs"*.

(2) Long before the Loudham Hall meeting, Dr Lynch had stated at the January 2009 earnings call that:

> "Now onto the really interesting one. Our probabilistic structured technology is new technology which we've been working on. We think that's going to be very powerful technology and that's going to lead to a large market. And so that's something that we will see revenue start to come in, in 2009."

(3) Contrary to the impression given in some of his evidence at trial, Dr Blanchflower had regarded this as a potentially huge new product line with *"the potential to open an entire new market"*. That view was shared within Autonomy.

1542. With particular reference to the issue of R&D capitalisation:

(1) Much had been made by the Claimants about the capitalisation of R&D costs in respect of SPE but this was a *"peripheral area of the case"*, with no relevance to any part of the Claimants' loss: the Claimants' criticism of lack of evidence and witnesses to speak to the matters was misplaced.

(2)     The Claimants' approach to the capitalisation of SEs' time was flawed. In particular, the SEs were in many ways and over a long period *"contributing to the development effort"* with regard to structured functionality.

(3)     Not only Ms Gustafsson and the finance department but also Deloitte were evidently satisfied as to the amount of SE time being capitalised, after careful testing.

(4)     None of the Claimants' witnesses could speak to what the true costs which should be capitalised were. Dr Blanchflower *"did not have the expertise to comment on which costs should or should not be capitalised"*. Mr Lucini could not comment on what was involved: *"He had a customer-facing role and was not usually involved in the development of products"* nor was he in any position *"to accurately quantify the exact time spent by SE's in relation to SPE."* Ms Gustafsson was the only person directly involved in the accounting.

1543.   The Defendants[226] dismissed as unsupported by the evidence and unwarranted the suggestion that the statements about the derivation of marketing costs in the Q3 2009 Earnings Call were false.

1544.   Dr Lynch pointed out that Mr Welham had listened to the call; Mr Welham confirmed that if he had heard anything misleading on that call, he would have raised it with his engagement partner, and that he did not have occasion to do that. Dr Lynch also maintained that none of the witnesses on whom the Claimants relied had been in a position to give reliable evidence on how much was spent on marketing costs. Dr Blanchflower was not part of the marketing department, and nor was Mr Lucini. Mr Lucini told Morgan Lewis in an interview in December 2012 that it would be difficult to quantify the marketing costs for SPE.[227]

1545.   Dr Lynch sought to downplay the role of Dr Blanchflower, describing him in written closing submissions as merely a *"titular head of research and development…largely involved in IDOL development"* to whom *"not everyone in R&D reported"* and who himself had *"very little interaction with members of senior management other than Dr Menell."* He *"did not have the expertise to comment on which costs should or should not be capitalised"*; he could only speak to work on coding and not as to work streams more generally: it was stated that *"he did not know what the SEs were doing on structured data, or to what extent that could properly be included in the R&D capitalisation."* More generally, his evidence on this aspect of the matter should be discounted: he *"had a propensity to make firm statements as to matters that he was not involved in and could not recall"*.

---

[226] Mr Hussain's submissions barely addressed this aspect of the matter; but I have taken him to support and adopt Dr Lynch's submissions.

[227] Mr Lucini was cross-examined in relation to this: he clarified that all he was seeking to say at that interview in 2012, and certainly as he saw the position now, was that he would not have known without finding out from Ms Harris.

1546. Mr Lucini, similarly, was said not to have *"handle[d] the area"*. In cross-examination he admitted being aware of a long list of people in Autonomy involved in marketing, with at least some working on SPE,[228] but acknowledged that he did not know precisely what they were doing:

> *"Q. You were not in the marketing department, so you would not have known in detail the breakdown of the marketing expenditure?*
>
> *A.     That is correct.*
>
> *...*
>
> *Q.     Or what all the people in the marketing department were doing?*
>
> *A.     No.*
>
> *Q.     You didn't have day-to-day responsibility for managing the marketing of SPE?*
>
> *A.     I did not."*

1547. Further, Dr Lynch contended that the documents in fact showed a number of activities being undertaken during the launch period, including (it was said) a *"focused"* advertising and briefing campaign for analysts and journalists and advertisements placed in trade publications. In addition, Autonomy spent considerable time and money briefing trade journalists and analysts about the product, which was said to have generated immediate interest amongst industry analysts and writers. Mr Lucini explained that there were also roadshows to what he described as *"quite a lot of people"*, specifically analysts, press and customers.

1548. Dr Lynch had been advised there was a soft launch of the product through the beta programme. Despite being subjected to a lengthy cross-examination regarding the roll-out of this programme, Dr Lynch did not have a detailed understanding of its delivery, and made it clear that his understanding derived from documents he had seen subsequently. He told me he could only *"speculate"* about these things that went on *"far below his level"*.

1549. He emphasised that in any event, at the time (i.e. October 2009), he believed SPE to be in the beta phase, and submitted that was a reasonable belief on the basis of the documents. His view was that a beta programme would typically involve two aspects: a process of gathering up interest and testing of the product. Such programmes were normally run through the Customer Liaison Support Program,[229] who were the experts in this area. He contended that the evidence showed this happening in the case of the SPE beta programme: participants

---

[228] The cross-examiner did not clarify in every instance whether the individual was working on SPE.
[229] Often referred to in the documents as "CLSP" or "CL+SP".

registered for the beta programme via Autonomy's website, [230] and the registrations were forwarded to telesales to take up with the customer.

1550. Though Dr Lynch said that this likewise was a process that took place "*way below*" his level as CEO, he told me he believed that the Quick Start programme was also ongoing as of October 2009 and referred to documents such as a request to approve the purchase of servers for the "*SPE Early Starter program*" in October 2009. He relied especially on Dr Blanchflower's acceptance that VMS participated in the Quick Start programme in early 2010. With his usual reverence for anything *"secret squirrel"* Dr Lynch told me that he believed that some of the first customers that received SPE through the beta/Quick Start programmes were likely to have been intelligence customers.

1551. Dr Lynch also maintained that, contrary to the Claimants' presentation, there was also expenditure on customer seminars, and customers had been flown to seminars, called "Customer Innovation Forums" or "CIFs", in (so he believed) Cliveden, Napa Valley and Mexico. There was some documentary material, not mentioned by the Claimants, demonstrating both that CIFs were taking place in Cliveden (for UK/EU customers) and Napa Valley (for North American customers) in October 2009, and that Autonomy was responsible for customers' air fares (though as I elaborate below, nothing in the document seemed to suggest that they were SPE-specific).

1552. Dr Lynch's written closing submissions also went into some detail about the marketing and use of SPE after its launch, instancing a number of case examples of it being presented (and more occasionally deployed by Autonomy in Interwoven products). Also instanced was an internal Autonomy email to (amongst others) Mr Lucini and Dr Blanchflower dated 3 February 2010 reporting that a demonstration of SPE to a VMS representative had gone very well: *"he was pleased with the results and sees great potential in SPE…[and]…took away from this both a very positive impression of SPE as well as a great concrete example of how it could solve problems for his own needs…"* .

1553. However, Dr Lynch's over-arching point was that he was not directly involved. He had understood that the finance department had determined properly R&D costs by reference to the proportion of SE and Development Engineers' time costs at the rate agreed by HMRC but he was not involved in the R&D capitalisation, did not know any detail in relation to it, gave no instructions in relation to it, and was not involved in the production of the R&D Memo or speaking to Deloitte about it.

1554. Similarly, he maintained that he depended on what he was told as to marketing costs. He said he was not involved in the beta or Quick Start programmes: he had been informed of the plan for the soft launch of the product via a document and was entitled to rely on its accuracy. He acknowledged having approved an item of spend for SPE, but that was all: as CEO, he was not involved in approving everything spent.

---

[230] The SPE page on Autonomy's website included a link for registration.

1555. Likewise, he asserted that he was entitled to rely on the documents given to him as the basis for his statements on the Q3 2009 Earnings call, including the figures he gave.

*Summary*

1556. After this rather lengthy digression into the detailed evidential dispute about SPE, I turn to my assessment as to whether, as the Claimants submitted in their written closing, (a) both Defendants *"knew that the statements in the Q3 2009 Quarterly Report and on the Q3 2009 earnings call about Autonomy's R&D capitalisation being primarily attributable to SPE were false"* and (b) in the Q3 2009 Earnings Call, knowing already from (and as set out in) the Strategic Deals Memorandum that Autonomy was intending to treat $19.5 million of hardware costs as sales and marketing expenses,

> *"Dr Lynch lied about the sales and marketing and COGS expenditure on SPE in Q3 2009...to enable Autonomy to cover up the very substantial costs it had incurred in the quarter on buying pure hardware and which it was treating as a sales and marketing expense."*

1557. It is reasonably clear, in my view, that the R&D Memo was to a considerable extent a concoction. The figures given for the time cost of SEs was greatly exaggerated (well beyond any acceptable margin). It was based on (a) a list of SEs initially provided by Dr Menell but then enlarged by Mr Chamberlain who (I accept and find) cannot have had any sufficient reason to suppose had done any work on SPE; (b) treating all those on this artificially enlarged list (as I find it to have been) as having spent 100% of their technical time on SPE, which was entirely unrealistic.

1558. My impression that the amount attributed to SE time costs, which was the most important element of the capitalisation costs, was contrived is fortified by: (a) the lack of any contemporaneous documentation showing any work done by the SEs in relation to SPE; (b) the lack of any witness evidence from SEs (including none from Mr Zanchini, all of whose technical time in Q1, Q2 and Q3 2009 was treated as having been spent on SPE, who works for Darktrace and must have been amenable to a witness summons); (c) Mr Chamberlain's response to an email from Deloitte sent also to Mr Hussain and dated 14 October 2009, in which he blamed Deloitte for not having raised the issue of timesheets for SEs until too late, assured them that *"the 75% is not a number picked out of the air"* (which deflected from the real issue as to what, if any, time that was properly to be applied to) and under the guise of dealing with the issue *"in a practical and sensible way"* studiously ignored the actual request which was for an opportunity *"to talk to 5 systems engineers to understand their role in the development"*.

1559. Similarly, in my view the time cost attributed in the R&D Memo to development engineers was simply the say-so of Dr Menell and Mr Chamberlain with no feet in the facts. Had there been any intention to base the figures on fact, it seems to me inconceivable that Dr Blanchflower would have been entirely ignored in the process.

1560. The attribution of a capitalised sum of $2 million to the work of other Autonomy development teams in the development of SPE lacked any evidential support; and I agree that it is inherently unlikely that any of those teams played any such role in the development of SPE, given that they had no access to the IDOL source code.

1561. My view that the R&D memo was concocted disposes also of the notion that the Defendants (and more especially Dr Lynch) were entitled to rely on Deloitte's approval of the R&D capitalisation figures. It was Mr Welham's unchallenged evidence, and it seems to me to be obvious (and I find), that Deloitte would not have accepted the $7.3 million capitalisation if they had known that the R&D memo had no real footing in fact. I accept and find also that the Audit Committee, who were dependent on what Deloitte reported to them, were thereby also misled.

1562. Focusing next on Dr Lynch's justification of what he said at the Q3 2009 Earnings Call about marketing costs and launch spend in the sum of *"I think nearer $18/20 million, with about $4 million extra on the Quick Start program"*:

(1) Dr Lynch's suggestion, not pleaded and unstated in his witness statement and skeleton argument, was that his reference needed to be read in the context of what he said at the Q2 2009 earnings call and in a website entry: it was, he said, a reference to Autonomy's aggregate marketing and launch spend for a couple of new products and was *"more than just SPE"*. I do to think it is necessary for me not to say more than that (a) having reviewed what he said in Q2 2009 there was nothing in it to support this construction, and indeed it appeared to reinforce that he was talking about SPE only; (b) the website similarly did not assist him. That was further reinforced by evidence of the drafts provided by Dr Lynch to direct Mr Hussain's responses in email exchanges with an analyst at Citibank called Mr Hoi Chuen Lam. In short, Dr Lynch's suggestion of some different meaning to what he said at the Q3 2009 Earnings Call in this regard was a false expedient for which the only apparent explanation is that he knew he had given inflated figures: and I find he did know that accordingly.

(2) As to the five categories of SPE expenditure he referred to:

    i. The Claimants always accepted that some $78,342 had been spent on trade advertising.

    ii. There was no evidence of material expenditure in relation to analysts.

    iii. I would accept that, contrary to the Claimants' case, there may have been some events or meetings which might be said to have been part of a *"soft launch"* but very little (if any) evidence of an established beta programme.

    iv. Similarly, there was little or no support for the suggestion that material sums, let alone $4 million, were referable to the Quick

Start initiative with strategic customers. As the Claimants observed, even Dr Lynch himself did not positively assert in his witness statement that the Quick Start initiative had taken place, and could not name a single site at which it was said to have taken place apart from vague reference to there being one *"within the UK intelligence community"*. None of his witnesses (including Ms Pereira, who did address SPE) provided any support either. No supporting evidence was provided. Dr Lynch relied on assertions by his Investor Relations team and in the draft *"Q&A script"* for which no more foundation was provided either.

v. The evidence that Autonomy had arranged and flown customers in for trade seminars seemed to me to illustrate how little support Dr Lynch had for his statements. None of it appeared to be SPE-specific; the seminars were concerned with Autonomy generally. It may be that SPE was to be mentioned at the seminar as one of the *"latest product developments"*: but the only material to which I was referred seemed focused principally on Autonomy's recent acquisition of Interwoven and *"Autonomy's iManage brand"*.

(3) Whilst the figure of only $100,000 suggested by the Claimants as all that had been demonstrated to be referable to marketing SPE may be too low, I am satisfied that what Dr Lynch said at the Q3 2009 Earnings Call about marketing costs and the Quick Start initiative had no foundation.

1563. The three questions which seem to me to remain are (a) what involvement Mr Hussain had; (b) Dr Lynch's overarching point that he himself relied on others to verify what he was to say, and he believed what he said to have been true; and (c) subject to that, whether the falsities were deliberately aimed at disguising the hardware sales and costs.

1564. As to (a) above, Mr Hussain was the CFO, in charge of the finance department. The question of capitalisation of R&D costs was a matter within his responsibilities. There are clear signs that he conceived the use of R&D capitalisation to disguise hardware costs. I have taken the following from the Claimants' analysis, which I accept and adopt:

(1) On 1 October 2009, Mr Hussain emailed Mr Chamberlain and Dr Menell suggesting that the R&D for Q3 2009 should be $9.5 million, and asserting (without any possible basis) that this was all "*to do with the enormous work pete and the team have been doing on the structured probabilistic engine*".

(2) Mr Hussain was the sole recipient of Mr Chamberlain's email of 7 October 2009 identifying a $2 million shortfall in R&D.

(3) He was copied on the email exchanges on 8 October 2009 regarding the identification of SEs to include in the capitalisation, and was kept

informed by Mr Chamberlain of the fact that Ms Gustafsson would be meeting Dr Menell to revise the R&D Memo.

(4)    Mr Hussain was also copied on Mr Chamberlain's exchanges with Deloitte on 14 October 2009.

(5)    In the context of justifying the R&D capitalisation, Mr Hussain also provided to Mr Chamberlain, for relaying to Deloitte, a forecast of the revenues that SPE was expected to bring in.

(6)    Deloitte's working paper dated 15 October 2009 duly recorded these figures as Mr Hussain's estimate of the revenues that SPE would bring in.

1565.  To my mind, this has all the hallmarks of the working of the cabal. There is no reason to suppose that Mr Chamberlain (Mr Hussain's trusted deputy) or Dr Menell would have constructed a dishonest fraudulent analysis to support the R&D capitalisation, without Mr Hussain's knowledge and approval. In my judgment, Mr Hussain knew that the R&D capitalisation was based on concocted figures. It seems more likely than not that he would also have known of the false 'marketing cost' figures.

1566.  The Claimants speculated that this perhaps may explain why, on 18 October 2009, shortly before the Q3 2009 earnings call, Mr Hussain wrote to Dr Lynch saying:

> "*I am burnt out...given my "anal" nature i am spending all my time (awake and asleep) worrying about the 10 minutes on Tuesday where i have to answer the analyst questions and i'm not doing anything else, i need you to take the questions this time round unless they are really easy, i don't want to deal with the analysts anymore.*"

1567.  As to (b) in paragraph 1563 and Dr Lynch's overarching point, far from being "*best placed*" to know as the Claimants asserted he was, Dr Lynch's case was that:

(1)    He was not involved in the R&D capitalisation, and there is no evidence at all that he knew any detail of it or, as the Claimants suggested, gave any instructions in relation to it.

(2)    He was not involved in the R&D Memo and there is no suggestion he spoke to Deloitte as part of the process.

(3)    Nor was he involved in the detail of the sales and marketing work. He was not involved in either of the beta or Quick Start programmes, both of which went on far below his level as CEO. He was told there was to be a soft launch of the SPE product in September, and that customer

seminars were ongoing. It was not put to him that anything in that document was inaccurate, or intended to mislead; on the contrary, it appeared to be accepted by the Claimants that this document accurately represented Autonomy's plan for the launch of SPE. Dr Lynch was, accordingly, entitled to rely on it.

(4)     The statements made by Dr Lynch on the Q3 2009 earnings call were based on information he had been given and he had no reason to doubt its veracity. As Dr Lynch explained, he was given drafts of the presentations in order to prepare for the calls. The documents, which show the Investor Relations team sending Dr Lynch the PowerPoint presentation and Q&A, stated that the beta and Quick Start programmes were underway, that the feedback had been positive, that $20m had been spent on the new product launch, and that c. $3-4m had been incurred due to overdemand on the Quick Start programme. This information came from others in the organisation. If the information was inaccurate, Dr Lynch was unaware of that.

(5)     The Claimants did not take issue with Dr Lynch's evidence that the figures conveyed to the market had been given to him and prepared by others: this was stated at §228 of his witness statement and was not challenged even when repeated in cross-examination.

(6)     In fact, very few documents involving Dr Lynch were put to him at all on this area of the case. This underlined how little involvement Dr Lynch had in any of the SPE development or launch process. For example, the Claimants could only point to one instance of Dr Lynch approving a marketing expense in relation to SPE. That email dealt only with one aspect of the marketing campaign, namely advertisements in printed trade magazines. The Claimants had produced no evidence that Dr Lynch was personally involved in approving any other spend in relation to SPE (in relation to its development or marketing).

1568.   I accept that the documents do not establish his personal involvement. However, in my judgment, Dr Lynch would have known (and for the avoidance of doubt I find that he did know) that:

(1)     There was no basis for the figures for marketing that he gave in the Q3 2009 Earnings call. No document has ever been identified in which anyone in Autonomy's finance department advised Dr Lynch that anything approaching $18 or $20 million had been spent on sales and marketing in relation to SPE in Q3 2009. Ms Gustafsson confirmed that she was not involved in collating or calculating any such figures and had no specific recollection that anyone else had done so either. Moreover, it is wholly implausible that Dr Lynch, whose written approval had to be sought for advertising spend of $144,830 (which he declined to give and reduced to $80,000) would, unblinking and without detailed backing, have accepted expenditure of $24 million.

(2)     The R&D capitalisation figures had been produced by the cabal and were similarly false. I cannot accept that all three would have kept from him

that the figures for SE and Development Engineers time costs and the capitalisation amounts were a concoction. In my view, it is more than likely that he was kept informed, and I find that he was so.

1569. The last issue to consider in the context of the Q3 2009 Earnings Call is whether the purpose of the falsehoods was indeed to disguise the hardware sales and costs (see (c) in paragraph 1563 above). The principal argument Dr Lynch advanced against this (in addition, obviously, to his case that he had no knowledge of any falsehood, which I have not accepted) was that *"the Claimants' arguments would have involved time travel"* because (as briefly mentioned above):

> *Autonomy had announced its development work on SPE by early 2009, before the strategic hardware sales had even commenced. SPE was plainly a real initiative, which predated the hardware sales by a considerable period. Further, Autonomy did not know until after the end of Q3 2009 that Deloitte would permit the allocation of any hardware costs to sales & marketing; it makes no sense to imagine that the development of SPE, and its launch in September 2009, was conceived as a ruse to hide the fact that Autonomy s sales and marketing expenses might include costs relating to hardware."*

1570. Of course, the question is not whether SPE and its development was a ruse. The question is whether what was said falsely about it was in order to justify the R&D capitalisation figures and the marketing and Quick Start costs which were presented.

1571. The answers provided by the Claimants, which I have done little to modify in my recitation of them below, seemed to me to expose the "time travel" argument as a bad point. The timing seems to me more to support the Claimants' case than undermine it. Thus:

(1) In fact, the figure of $10-15 million for sales and marketing expenses was announced, not in Q1 2009, but on the earnings call for Q2 2009.

(2) That earnings call was held on 16 July 2009, not "*back at the beginning of 2009*".

(3) By 16 July 2009, the meeting at Loudham Hall (on 8-10 July 2009), at which Dr Lynch accepts that a programme of reselling hardware was decided upon, had already taken place.

(4) Accordingly, the suggestion that Dr Lynch announced a figure for the sales and marketing expenses at a time when he could not have foreseen the hardware sales is simply wrong. The hardware reselling programme had already been decided upon.

(5) It is true that Dr Lynch would not necessarily have known, as at 16 July 2009, precisely how much of the hardware costs would end up being allocated to sales and marketing expenses. But that is a point against Dr Lynch, not in his favour, because the figure of $10-15 million that Dr

Lynch announced on the Q2 2009 earnings call ended up being out by a significant margin. As explained above, on the Q3 2009 earnings call, Dr Lynch identified higher sales and marketing figures of $18-20 million and an additional $4 million on the Quick Start programme.

(6) The reason for the increase was that by the time of the Q3 2009 earnings call, the actual hardware costs were now known to be $47.34 million of which $28.37 million was allocated to sales and marketing.

(7) Accordingly, the Claimants' case does not depend on the proposition that Dr Lynch had perfect foresight of the quantum of future hardware costs, let alone that he had the power of time travel.

1572.  I have concluded that both Defendants knew that the Q3 2009 Earnings Call so far as it related to SPE contained a series of falsehoods with the objective of concealing the hardware sales and costs.

*Q1 2010 Earnings Call*

1573.  The Q1 2010 Earnings Call took place on 21 April 2010 during the Icelandic volcano eruption which spewed ash into the atmosphere and into flight paths and caused flights to be cancelled throughout the Northern Hemisphere. Dr Lynch's evidence (which I accept) was that he participated on a mobile phone from California, having been unable to return to the UK.[231]

1574.  As it is clear from the Q&A scripts[232] prepared in advance to provide possible answers to questions that might be asked at the Q1 2010 Earnings Call, the Defendants anticipated that they would be asked about the large increase in Autonomy's inventory to $10 million at the end of Q1 2010; and so it transpired.

1575.  As they had planned, the Defendants answered these questions by saying that the inventory comprised $10 million of hardware purchased at the end of Q1 2010 to take *"advantage of discounted offers"* in anticipation of an increase in appliance sales in Q2 2010 and beyond. Mr Hussain was careful to explain that the margin for such sales of Autonomy's appliance product (Arcpliance) would still be *"dominated by the software element"*. Mr Daud Khan of JP Morgan took from this, reasonably in my view, that *"the value of the appliance product that Autonomy was selling was in the software, and that there would be no particular impact on gross margin when the application was sold."* That extrapolation from what Mr Hussain said was not challenged or contradicted.

1576.  The increase in Inventory and the explanation given for it generated a number of questions from analysts on the call:

(1) Michael Briest at UBS asked the following:

---

[231] The transcript of the Earnings Call refers to the poor line quality.
[232] I address the scripts in greater detail when considering the issue as to "guilty knowledge".

"*Could you talk a bit more about the Arcpliance product because clearly the level of hardware purchase, and I guess maybe the level of sales there, would be more than we're used to?*"

(2) In response, Dr Lynch explained that Arcpliance was *"a hardware box which has all the software loaded on it"* . He went on to state that the *"main driver for a sudden pick-up in Arcpliance purchases we think is early case assessment"* and continued:

*It must be said that this is just one of the forms in which customers can consume our technology. They can of course buy ECA, add software, set up their own servers and put the software on it, or indeed it can be done as a hosted offering as well. So really our approach is just to make the technology available in whatever form that customers want. We don t know whether this sudden burst of Arcpliance-type sales is a one-off because of a response to things the regulator is doing at the moment or whether it is part of a trend. I suspect it s probably more likely to be a one-off, but we ll see how that unfolds.*"

(3) Mr Briest asked a supplemental question: *"Could you say what the Arcpliance or appliance sales and hardware sales would have been in a normal quarter? It seems a large number for Q1, going into Q2"* .

(4) In response, Dr Lynch said: *"Yes. It would be a fraction of that kind of number"*.

1577. Dr Lynch was cross-examined especially closely on his answers. His flat and apparently unflustered delivery, sometimes so modulated as to become monotonous, could not disguise the fact that he was at a loss to explain his own answer. In his discomfort, he relied on external circumstances: his absence in California, the middle of the night, the poor line quality, his bad hearing, the possibility (which, as he went on, he promoted to a fact) that the transcript (one of two prepared each by different transcribers) was inaccurate (*"all rather questionable"*): but none was convincing, still less an answer. He was left asserting, without conviction, that in any event he was not sure, but he did not think, his statement on the call was misleading, and that in any case, *"I don't think the question as written makes a lot of sense to me in the context of the call."*

1578. The impression I formed that he was in this context left grasping at straws was consolidated by the further researches of the Claimants demonstrating that:

(1) The two transcripts, one by Bloomberg, the other by Thomson Reuters, were almost identical.

(2) Dr Lynch's suggestion that in that case both were wrong was not supported by the audio version which the Claimants uploaded onto Magnum (and which I have listened to at their request): the transcripts

seem to me accurately to record Mr Briest's question and Dr Lynch's response.

1579. Further, although it is a subjective assessment, I do not consider that the audio version supports the suggestion that the line was very bad. There was some distortion, and some echo and hiss from time to time: but the quality was fairly good, and even making allowance for Dr Lynch's hearing difficulties, I could not detect in the way or tone in which he responded any sign of uncertainty as to what the questions were. In particular, Mr Briest's question was clear in the version I listened to, as was Dr Lynch's response.

1580. Later during the call, Mr Khan asked a follow-up question to that asked by Mr Briest:

> "*Just a follow-up question to Michael's question on the Arcpliance. If I understand it right, the $10m that has gone into inventory, I'm just wondering what the revenue would be for that amount of inventory and when we are likely to see that. Are we going to see that in Q2 or is that going to be spread across Q2 and Q3?*"

1581. Dr Lynch's response (which appears in almost identical terms in the Bloomberg transcript which demonstrates that both the transcripts were accurately transcribed) was as follows:

> "*So the first question was on the Arcpliance. I'm afraid we are not going to give you an exact number, because that's rather commercially sensitive. What I would say is that the software component of the revenue is far higher than the hardware component. So the software is still the bit that dominates in terms of the cost of an Arcpliance. It's not the hardware; it's the software. Rather like on the Cloud side you may remember it's rather different from, for example, a normal hosting situation.*
>
> *In terms of the sale, most of that inventory has already been sold in Q2. There might be a little bit that goes over the end, but at the moment it looks like it may well all happen in Q2.*"

1582. Dr Lynch's answer was predicated on the fact that this hardware was to be used in connection with Arcpliance, in which the software element would dominate, and that most of the inventory had already been sold by that point in Q2 2010. The Claimants contended that the predicate and every part of his answer was false: the inventory related to pure hardware sales, the sales had occurred and the goods had been delivered in Q1 2010, but Autonomy had decided not to recognise the revenue in that quarter.

1583. Dr Lynch asserted, but provided no evidence to substantiate, his predicate that the inventory related to 'Arcpliance' or at least to a package sale of hardware and software from which the revenue related in substantially larger part to the software component. Even accepting for that purpose Dr Lynch's evidence that when referring to 'Arcpliance', he meant any *"regulatory appliance"* and that the term "appliance" could include not only hardware pre-packaged with

software but also hardware supplied to be used with Autonomy/IDOL software to be supplied later (see his first witness statement), an analysis of the Q1 2010 transactions which had given rise to revenue which Autonomy had deferred on the ground that, though shipped, delivery of the goods had not completed (as explained by Mr Chamberlain in an email to Mr Stephan (copied to Mr Welham dated 20 April 2010)) (see paragraphs 991 above) does not appear to support the predicate.

1584. Dr Lynch was asked by another analyst, Mr David Toms at Numis, to *"just clarify the $10m or so of hardware revenue"*. His answer, which was almost identically recorded in the two transcripts and for which the transcripts seemed to me consistent with the audio file, was as follows :

> *"David, I think you may have misunderstood what that revenue is. It's not hardware revenue. What it is is the selling of an appliance. ... We have very little interest in just selling hardware, and consequently the revenue that that goes for is not related to the hardware cost. It's solely a component of that sale. So what we are not doing here is acting as a generic company that resells hardware, like a Morse or something like that. Obviously those people do that business and we have no interest in it."*

1585. The Claimants rejected this answer as a lie. They submitted that Dr Lynch had no credible explanation when Mr Rabinowitz put to him in cross-examination that the hardware in question was not related to an appliance; and that acting as a hardware reseller was exactly what Autonomy was doing.

1586. However, although Dr Lynch may have been a little uneasy with his analogy with Morse, he seemed to me to be much more comfortable and consistent, and thus more convincing, in essentially repeating to me Autonomy's justification for the hardware reselling strategy, to the effect that the programme was not an end in itself, or a separate business; that its purpose was to protect and promote Autonomy's core software business; and that Autonomy was not acting as a hardware reseller because it had no interest in selling hardware except to promote its software business and what it did was all ancillary to that business, as demonstrated by the fact that it was doing so at a loss.

1587. The difficulty for Dr Lynch, as it seems to me, is not in the distinction; it is in the fact that it was not an explanation he uttered or even hinted at in the Q1 2010 Earnings Call (or in any of these Earnings Calls under review). Ultimately, what was not said at any of the Earnings Calls was the most important point of all.

1588. Unsurprisingly, therefore, Analyst reports published following the call stated that Autonomy's hardware inventory related to appliance sales. Thus, a KBC Peel Hunt report written by Mr Morland referred to what in truth was a balancing item for deferred revenue as the "*$10m Arcpliance stock*".

*Q2 2010 Earnings Call*

1589. The Q2 2010 Earnings Call took place on 22 July 2010. The only part of the call which the Claimants relied on in the context of their hardware claims related

once more to the $10 million inventory entry that had been discussed on the previous call.

1590. As usual, Q&A scripts had been prepared. As in the case of the Q&A scripts for Q1 2010 I address the content of the scripts earlier. In summary, the scripts show that it was anticipated that questions would focus on what was the hardware content in Arcpliance, and what would be the effect of sales of the Inventory on organic growth. Again, that was the focus of some of the questions in fact asked at the Earnings Call. An analyst, Mr Rajeev Bahl of Piper Jaffray, who prefaced his explanation saying that he *"wanted to dig into the gross margin question a little"*, asked whether this "*spike in appliance sales*" had affected gross margin.

1591. In answer, Dr Lynch described the impact of appliance sales on gross margin as an "*exceptional*" situation, with "*the appliance model [accounting] for about 1%*". He remained altogether silent about the hardware reselling strategy: he said nothing about the loss-making hardware sales or their effect on gross margin. Dr Lynch maintained that he was entitled to say nothing, since the question did not ask about hardware sales generally: it was confined to the effect of appliance sales.

1592. The problem with that line, in my view, is that Dr Lynch never admitted to any hardware sales except "appliance" and Arcpliance sales. Indeed, although he initially confined "appliance sales" to sales of hardware *"in order for Autonomy software to be loaded on it"*, by now Dr Lynch increasingly deployed the term "appliance" and Arcpliance sales to cover and disguise hardware sales. In such circumstances, I do not consider Dr Lynch's response to be complete and truthful.

**Conclusion on Hardware Sales Issue 1**

1593. In my judgment, this exploration of the contemporaneous documentation plainly supports the Claimants' case that, whatever its purpose at inception, the hardware reselling strategy soon and, increasingly, became an addictive means of meeting market expectations of revenue maintenance and growth. What the Defendants asserted to be the purpose of the programme either initially was, or as soon as the size of the potential revenue source was apparent became, a pretext to justify accounting for the hardware revenue as part of the software business revenues without separate identification. Neither the fact that the pretext appeared rational nor that Mr Sullivan and Mr Egan accepted it, alters that conclusion: the justifications and pretexts offered by the Defendants in their relentless search for revenue were invariably rational and believable but, in my judgment, they were pretexts nonetheless.

1594. As I mentioned earlier, although the 'purpose' case and the 'disclosure' case have for the purpose of analysis, been separately examined, they are inseparable.

1595. The real objection to the hardware sales was not that they were to raise revenue and were loss-making; it is the fashioning of the pretence, principally for the

consumption of Deloitte and the Audit Committee, that their purpose was 'marketing' or to bring more substance to that elastic term, to promote the software business by deepening relationships with hardware suppliers and leveraging discounted hardware sales to generate more high margin software sales. Their true driving purpose was never, and could never be disclosed: because that true purpose was to generate revenue in order covertly to make good shortfalls in software business revenues by including hardware revenue without differentiation or disclosure in Autonomy's accounts and reports as if it had been generated by Autonomy's 'pure software' business.

1596. Purpose, pretence and non-disclosure combine and support each other to expose and prove the impropriety. Had the true purpose of the hardware sales been 'marketing' (as that word is above elaborated) the Defendants would have wished to publicise it energetically. Had the pretence not been maintained, Deloitte and/or the Audit Committee would not have approved the accounting treatment. Both concealment of the sales, and in particular their cost in Autonomy's accounts and other published information, were necessary because revelation of Autonomy's use of hardware sales, and the erosion of gross margin would have nullified their true purpose and exposed that Autonomy's software business was not generating the accelerating revenue and profits which the market looked for and which sustained its share price.

1597. In my judgment:

(1) The hardware reselling programme was conceived, expanded and implemented in order to enable Autonomy to cover shortfalls in software revenue by selling hardware and including the revenue without differentiation in revenue shown in the accounts as generated by Autonomy's software business.

(2) To succeed the hardware reselling had to be concealed from the market, but sufficiently revealed to Autonomy's auditors and audit committee to secure their apparently fully informed approval of the company's accounts.

(3) The imperative that the reselling should be concealed from the market required a number/variety of accounting devices which had to be presented in such a way as to secure the approval of Deloitte and the Audit Committee. In particular, their approval had to be secured to treat the costs of the hardware reselling programme not as COGS which would have eroded gross margin and encouraged both analyst and market inquiry and concern, but instead as ordinary sales and marketing expenses which had no such adverse effect on key investment parameters.

(4) The means by which this difficult balancing act was achieved are set out in my judgment. Suffice it to say that Deloitte and the Audit Committee were persuaded to regard the purpose of all hardware sales as being to generate revenue and new orders for the software business, and to account for hardware costs accordingly.

(5) The strategy also required that the contribution of hardware reselling revenues to overall revenues should be disguised or concealed, and that again the auditors and Audit Committee nevertheless being satisfied that such disclosure as was given was sufficient. That balancing act also was successfully achieved.

(6) The true purpose of the hardware reselling strategy/programme lacked any commercial justification and was dishonest. The true purpose had to be camouflaged in the way it was presented to Deloitte and the Audit Committee in order to obtain their approval for an accounting treatment which concealed it.

(7) The Defendants were well aware of this.

(8) Although I presently have doubts that this justifies the quantum of loss in the amount claimed in respect of it, since Autonomy was still a valuable company with an *"almost magical"* signature product, in terms of liability the Claimants' hardware case has clearly been established.

## Issue 2: Was Autonomy's published information untrue or misleading by reason of the hardware sales, and did the Defendants appreciate this?

1598. Notwithstanding the fact that the Claimants spent the larger (or certainly the longest) part of their written submissions on the 'purpose' case (and I have followed suit), the Claimants did state that irrespective of the Defendants' purpose in relation to the hardware reselling strategy, Autonomy's published information was untrue or misleading by reason of the hardware sales and since the Defendants appreciated this, that was enough to establish liability, even though if the purpose was as alleged by the Claimants the position was *a fortiori*. Indeed, in his oral submissions and especially in reply, Mr Rabinowitz described this as the primary way in which the Claimants put their claim.

1599. My conclusion that the Claimants should succeed on their *a fortiori* case, if correct, renders Issue 2 superfluous. However, in case I am found to have been wrong, and in deference to the fact that, sometimes at least, the Claimants presented this as their primary case, I address the rather different foundations of this way of putting their case below.

1600. Before doing so, however, I should make clear that, contrary to what I took Mr Rabinowitz to be suggesting (especially in his Reply), I do not regard this alternative way of putting the Claimants' case (whether primary or not) to offer a simpler solution for them. As I have sought to explain, in my view, purpose and intention, pretence and concealment are all ultimately inter-related. It seems to me unrealistic in dealing with the third (concealment), which is what, in effect, the Claimants argued the statements in question amounted to or achieved, to be indifferent as to purpose. Further, it is unclear whether, in assessing whether the statements in question were misleading, the exercise to be undertaken in the 'primary' case is to be so on the basis that the purpose was as the Defendants asserted it to be. That is bound to affect the issues of intention

and honesty. This may all also help to explain why I have taken the 'purpose' case first.

*The Claimants' alternative case*

1601. There are four main strands to the Claimants' alternative case:

> (1) whether Autonomy <u>made statements</u> in its published information that were untrue or misleading in light of the fact of the hardware sales and, if so, whether the Defendants knew those statements to be false or were reckless as to whether such statements were true or misleading;

> (2) whether Autonomy's published information <u>omitted matters</u> relating to the hardware reselling strategy which were "required" to be stated, and, if so, whether the Defendants knew the omission to be (quoting s. 90A (3) of FSMA) *"dishonest concealment of a material fact".*

> (3) whether the accounting <u>treatment of the costs</u> of the hardware reselling of itself caused the accounts and Autonomy's published information to be untrue or misleading, and, if so, whether the Defendants appreciated this; and

> (4) whether Autonomy was in any event required to <u>make clear in</u> its published information what <u>its accounting policy</u> was with respect to hardware reselling and its costs, and if so, whether the Defendants appreciated this or knew the omission to be (quoting s. 90A (3) of FSMA) *"dishonest concealment of a material fact".*

*Statements made in Autonomy's published information*

1602. The Claimants described this first strand, relating to positive statements made in Autonomy's published information, as involving *"the simple exercise of comparing what Autonomy chose to say to the market with the true facts…"*. It did not depend on expert evidence: the experts agreed, and it might have gone without saying, that Autonomy was not free under any applicable accounting statements to make untrue or misleading statements. The arresting fact that provides the context for this strand of the Claimants' case is that Autonomy's published information did not, anywhere, make clear that it was selling material amounts of hardware otherwise than as part of a sale of Autonomy software (what the Claimants called *"pure hardware"*). Even Autonomy's corporate broker (UBS) was unaware of that.

1603. The Claimants relied on the following statements by Autonomy as having been untrue or misleading:

> (1) The description of itself as a *"pure software company"*, combined with references to *"appliance"* sales as comprising only a *"small part"* of Autonomy's business;

(2) The description it chose to give in the narrative or 'front end' of each of its Quarterly Reports from Q3 2009 onwards and in its 2010 Annual Report of the categories comprising its revenue, particularly in *"Supplemental Metrics"* purporting to give a breakdown of its total reported revenues which made no mention of hardware sales and instead treated them as sales of "IDOL Product";

(3) The description in its 2009 Annual Report in the *"Revenue Recognition"* section within the *"Significant Accounting Policies"* of the nature of the transactions entered into by the Autonomy group during 2009 as *"the same as in 2008 in all respects"*, which disguised the fact that whereas in 2008 Autonomy had not carried out any material pure hardware sales in 2009 it sold $53.6 million of it;

(4) Its inclusion within the metric *"organic growth"* (connoting, so the Claimants contended, growth attributable to sales of IDOL software) revenues from loss-making hardware sales, which were not sales of IDOL software at all.

*The relevance of what the Defendants intended the representations to mean*

1604. It is important to have in mind at the outset the relevant legal tests to be applied in the context of determining whether (as the Claimants submitted) the positive statements they identified falsified Autonomy's published information and give rise to liability on the part of the Defendants in respect of that published information under FSMA or in the tort of deceit.

1605. The Claimants pleaded and tended to present this as a matter of determining what the words used would have conveyed to a *"reasonable reader."* Thus, for example, their pleading as regards the statements, said by the Claimants to have been false and misleading and to have misled them, was (in relevant part) as follows:

> *"In describing itself as a "pure software" company, Autonomy was, in part, seeking to distinguish itself from companies which derived a significant portion of revenue from the provision of services. However, the description of Autonomy as a "pure software" company in Autonomy's published information, the express reference in that published information to appliance sales, and the provision (as pleaded in paragraph 61.5 below) in the published information of a breakdown of revenue categories which together added up to total reported revenue for the period in question and yet made no reference to hardware, would, individually or cumulatively, have conveyed to the reasonable reader:*

> *53A.1. that Autonomy was not engaging in any (or any material) sales of hardware apart from appliance sales or, at the very least, was not engaging in any (or any material) pure hardware sales; and/or*

*53A.2 that any revenue from hardware sales (apart from appliance sales) and/or from pure hardware sales was lower than the revenue from appliance sales (which were stated to be a small part of Autonomy's business); and/or*

*53A.3 that any revenue from hardware sales (apart from appliance sales) and/or from pure hardware sales was lower than the reported revenue from Services."*

1606. However, though what the *"reasonable reader"* would have understood is a necessary question to be answered, the answer is not sufficient where the gist of the claim is an allegation of dishonesty and deceit.

1607. As the Defendants contended and, as a matter of law, ultimately the question is not what the objectively ascertained 'best' interpretation of the statements is, but what the Defendants understood and intended the statements in question to convey. As Mr Miles observed, this is not a contractual dispute in which the search is for the meaning most likely to accord with the intention of the parties as objectively derived from the words they used and the context in which they used them, set in the context of the factual matrix. This is a claim of dishonesty; and a man is not dishonest simply because he uses words which are misunderstood: he must be shown to have had an intention to mislead, or at the very least, to take advantage of a misunderstanding.

1608. I have analysed the case law as to the proper approach in the Introduction to this judgment at paragraph 460 *et seq* above. Put shortly, it seems to me to be well established that:

(1) The claimant must prove what his/her own understanding of the statement in question was.

(2) Where the words used are entirely unambiguous, plainly misleading and admit no other understanding of them, and the claimant's understanding accords with the only available meaning, it will be difficult, if not impossible, for the defendant to show that he/she intended some other meaning. The Claimants ultimately (in Mr Rabinowitz's oral reply) submitted that to be the position in this case.

(3) Where, however, two or more interpretations are possible, the search is not for the most likely objective meaning of the statement in question, but for the intention behind its use.

(4) It is then for the defendant to make clear that he/she intended the statement to have some meaning other than that understood by the claimant; and in practice it will be incumbent on him/her to assert clearly

which of two or more available meanings he/she intended, and the basis of that assertion. That is a factual matter.

(5) Theoretically, a defendant could have had in mind a meaning which the court considers not to be available on the words of the statement: and that could theoretically suffice. But in such a case, the difficulty of demonstrating such an extravagant or unlikely meaning may be insuperable as a matter of evidence, especially given that there would then be a question of whether the defendant was aware of the obvious meaning, and thus reckless as to how it would be likely to be understood, even if he/she did not intend that meaning.

*The representation that Autonomy was a 'pure software company'*

1609. As already explained in the context of the first issue, focused on the purpose of the hardware reselling and its concealment, the Claimants submitted that the statements in Autonomy's Annual Reports that Autonomy was a *"pure software company"*, especially when combined with references to the fact that *"appliance"* sales represented but a *"small part"* of Autonomy's business, were untrue or misleading in view of the nature and extent of the 'pure' hardware sales actually being transacted. The Claimants' alternative case was that even if the purpose of the *"pure hardware"* sales was as asserted by the Defendants, the phrase was nevertheless intentionally misleading.

1610. It may be helpful to reiterate why that was said to be so. According to the Claimants, the phrase would have conveyed to the reasonable reader that:

(1) Autonomy was not engaging in any (or any material) sales of hardware apart from appliance sales, or in the very least was not engaging in any (or any material) pure hardware sales, and/or

(2) any revenue from hardware sales and/or pure hardware sales (apart from appliances) was lower than the revenue from appliance sales, and/or

(3) any revenue from hardware sales (apart from appliance sales) was lower than revenue from Services.

1611. The Claimants submitted that a *"reasonable reader"* of these statements could not have understood that, although Autonomy did not depend on any significant income from the provision of services, its business model did, by contrast, depend on material income from what they described as "other non-pure software activities", such as conducting a significant hardware reselling business.

1612. In that regard, the Claimants submitted that by carefully identifying very limited occasions or cases when it sold appliance hardware, Autonomy further strengthened the impression given that those were the only exceptions to its *"pure software model"*.

1613. As to the comparison with the true facts, the Claimants contended, the total revenue generated by hardware sales over the Relevant Period amounted to approximately $200,000,000 and constituted approximately 11% of the total reported revenue from Q3 2009 to Q2 2011. These amounts dwarfed both appliance sales and the revenue from Services. Accordingly, the Claimants contended, each of the representations which they submitted were conveyed by the statement was false.

1614. Against this, however, the Defendants denied that any such representations were conveyed by the statements made. They submitted that the Claimants' case is based not on what was actually said, but on their interpretation of the phrase's broader message, which the Defendants did not accept.

1615. In any event, the Defendants objected that that was not the meaning the Defendants understood to be conveyed by the phrase, nor did they anticipate that it might be so construed.

1616. The Defendants did not accept the Claimants' contention that the statement was unambiguous. Mr Miles submitted that even if the statements in question could be read as connoting that Autonomy made no or no substantial hardware sales, the words certainly did not unambiguously convey that meaning. I agree with Mr Miles:

    (1) In their pleading, the Claimants accepted that the description of Autonomy as a *"pure software company"* was intended to mean *"in part"* that it did not derive *"a significant portion of revenue from the provision of services"*. The possibility that the phrase could have meant only that appears to be countenanced even by the Claimants.

    (2) The fact that the representations could be read and understood as simply distinguishing Autonomy from software companies which had a substantial servicing business is plain from the fact that they appear so to have been understood by Deloitte and the Audit Committee.

    (3) Similarly, it seems to me an available meaning was that Autonomy carried on a one segment software business (in line with the segmental analysis) and no separate or self-standing hardware business.

    (4) In other words, what the Defendants contended they meant was well within the range of possible meanings to be attributed to the phrase: it could mean that, or it could mean more.

1617. I also agree with Mr Miles that in such circumstances, what the Claimants had to prove was both they and that, contrary to their evidence, either the Defendants understood and intended the words to denote that Autonomy made no substantial hardware sales, or they were aware that the words were ambiguous and intentionally used the ambiguity for the purposes of deception.

1618. As to their own understanding, the Defendants maintained that what they thought the statement that Autonomy was a *"pure software model"* or a *"pure*

*software company"* meant was that Autonomy did not have a substantial percentage of revenues deriving from professional services.

1619. That, Dr Lynch told me, was worth stating because it was rare amongst software companies at the time because generally software sellers in the enterprise sector had to do a lot of customisation work on the product for every implementation. By contrast, he said, standard IDOL required little customisation and Autonomy's business model was to contract out implementation work to be done by approved partners. This was an important point of difference marking out Autonomy's business modelling: and there was good reason to bring it out in its published information.

1620. The Defendants' case was that they thought that this was clear from the context in which the phrase appeared, and from the Reports in which the statements appeared read as a whole.

1621. Thus, the 2009 and 2010 Annual Reports stated that:

> "*Autonomy is one of the very rare examples of a pure software model. Many software companies have a large percentage of revenues that stems from professional services, because they have to do a lot of customisation work on the product for every single implementation. In contrast, Autonomy ships a standard product that requires little tailoring, with the necessary implementation work carried out by approved partners such as IBM Global Services, Accenture and others.*"

Read in context, they submitted that the phrase says nothing about whether Autonomy sold hardware, or how much it sold.

1622. The Defendants relied also on the explanation in its 2010 accounts, as follows:

> "*Many software companies have a large percentage of revenues that stem from professional services, because they have to do a lot of customisation work on the product for every single implementation. In contrast, Autonomy ships a standard product that requires little tailoring, with the necessary implementation work carried out by approved partners such as IBM Global Services, Accenture and others.*"

1623. The point was repeated at page 18 of the document, where Autonomy set out the proportion of its revenues derived from services, as it had to under IAS 18:

> "*Services. Services revenues relate to third party and internal implementation consultants and training. Services revenues remained flat in 2010 at approximately 5% of revenues (or $10 million to $11 million per quarter) (2009: $9 million to $11 million per quarter). Autonomy operates a rare "pure software" model under which our goal is that most implementation work is carried out by approved partners.*"

> *This optimises Autonomy's ability to address its horizontal technology to multiple vertical markets and regions in the most efficient way."*

1624. The Defendants added to their own insistence that the statements could not be taken to mean that Autonomy did not sell hardware[233] the contention that in point of fact that was not how the statements were understood either by Autonomy's auditors, or by the Claimants' own witnesses; nor indeed by HP and those acting for it, until later when the exigencies of formulating a claim made it expedient for them to contend otherwise.

1625. As to Deloitte, who had a detailed knowledge of the volume and nature of the hardware sales:

(1) Mr Welham stated in his evidence when cross-examined in the US criminal proceedings that he understood the reference to "*pure software model*" as distinguishing Autonomy from software companies that have a large percentage of revenues that stem from professional work[234]: and that he did not understand the phrase to mean that Autonomy only sold software. He expressly confirmed that evidence when cross-examined in these proceedings. Further, he told me that he did not think that the reference to the "*pure software model*" in the 2010 Annual Report, *"in the context it was placed in"*, was in any way inconsistent with the fact that Autonomy had made hardware sales of around $100 million in 2010.

(2) Taylor Wessing made this point on behalf of Deloitte in their January 2015 letter to the Claimants' Solicitors[235] :

> *"Contrary to your letter of claim the hardware sales were not inconsistent with Autonomy's description of itself as a 'pure software' company. It is quite clear from the Business Overview sections of Autonomy's financial statements on which you rely that the company was not representing that it only sold software. The words on which you rely appear immediately after a paragraph addressing Autonomy's sales of appliances and states: "Autonomy is one of the very rare examples of a pure software model. Many software companies have a large percentage of revenues that stems from professional services, because they have to do a lot of customisation work on the product for every single implementation. In contrast Autonomy has a standard product that requires little tailoring ... ". It is clear that Autonomy uses the term 'pure software company' to*

---

[233] For comprehensiveness it may be noted, as Mr Holgate did note, that the Q1 2010 Annual Report did (fleetingly) refer to hardware (at p51) in "*Costs of revenues: Costs of license revenues includes the cost of royalties due to third party licenses, costs of product media, product duplication, hardware and manuals".* But I do not think it is realistic to read that as a disclosure of volume hardware reselling.
[234] Mr Apotheker gave the examples of TIBCO and Software AG when cross-examined in these proceedings.
[235] In reply to a pre-action letter of claim.

> *distinguish itself from other software companies which derive significant revenues from selling services alongside software."*

(3) Similarly, the Deloitte Defence in the FRC proceedings noted that:

> *"The words 'pure software model' were not inconsistent with any assertion in the financial statements. The audit team reasonably understood these words to draw a distinction between Autonomy's business model and those of rivals who derived a substantial proportion of their revenues and profits from professional services. ... There is no assertion in the financial statements that hardware was or was not sold and a statement that Autonomy followed a "pure software model" was entirely consistent with the assertions in the financial statements."*

1626. In support of their submission that the Claimants and their witnesses themselves understood that the statements that Autonomy was a *'pure software company'* were simply differentiating Autonomy from the norm of a company deriving substantial revenue from services the Defendants contended that:

(1) Mr Apotheker had a similar understanding of the phrase:

> *"Q.    ... Go back to page 15 {K15/369/15}. It's making it quite clear, isn't it, what it means by this?  "Financial model": "[...] very rare examples of a pure software model. Many software companies have a large percentage of revenues that stem from professional services [...] In contrast, Autonomy ships a standard product that requires little tailoring [...]"*
>
> *A.    Yes.*
>
> *Q.    That's the point they're making, that they're not providing lots of services?*
>
> *A.    I agree.*
>
> *Q.    That's all they mean by this phrase "pure software model"; that's how you understood it?*
>
> *A.    Yes, I understood that this company was in the business of providing excellent software with as little services as possible.*
>
> *Q.    Right.*

> A.    *That's how I understood it."*

(2)    Similarly, Mr Khan and Mr Gersh both understood that the phrase was being used to distinguish Autonomy from a company that sells services.

(3)    When cross-examined, Mr Holgate was constrained to accept that in context, the phrase was used to denote that Autonomy was not a service company.  He agreed also that Autonomy was saying *"we're not like those other companies that sell lots of services".*  However, he qualified this by saying that he *"would not infer from that description that they sell hardware on an undisclosed basis…"* though I do not think that had been suggested by any party, and certainly not by the Defendants, the issue raised being whether a positive statement was made that Autonomy did not sell hardware.

1627.    Nor, the Defendants submitted,  could the Claimants get any assistance from the reference to appliance sales being a small part of Autonomy's business:  the paragraphs dealing with appliance sales in the 2009 Annual Report said nothing about whether Autonomy sold any non-appliance hardware, either expressly or by implication.  Further, and contrary to the Claimants' argument, they cannot somehow be combined with the reference in a different part of the Annual Reports to the "*pure software model*" to convey the impression that Autonomy was not engaging in sales of non-appliance hardware.

1628.    The Defendants also contended that:

> *"the market could not assume, nor is there evidence suggesting it did assume, that the term "pure software company" denoted that the company sold no hardware, given that, even on the Claimants' case, it was public knowledge that Autonomy sold some hardware appliances. Although Mr Gersh, when cross-examined, sought to depict a sale of an appliance as a sale of software, and the hardware on which such software was loaded, not as hardware but as "the form of the delivery of the software" or a "software solution", he eventually had to concede that it nonetheless constituted in part at least, a sale of hardware."*

1629.    This was not a complete and accurate presentation of Mr Gersh's evidence, as I shall explain when addressing later the issue of HP's pre-acquisition knowledge (see paragraphs 1799 to 1813 below). But the Defendants maintained that in any event, this was not the only evidence suggesting that HP itself did not really understand the statement (*"pure software company"*) to connote that Autonomy sold no hardware (other than limited appliance sales, using that phrase in the limited sense the Claimants insisted upon), and that in truth  HP knew before the acquisition that Autonomy engaged in hardware sales, from which it is to be inferred that it would not have interpreted the statement to connote otherwise.

1630.    Accordingly, the Defendants rejected any suggestion that the reference to Autonomy being a *"pure software"* model or company was false or misleading

in light of the hardware reselling. That was not in fact how it was understood or liable to be understood, as both Deloitte and the Audit Committee must also have been satisfied. In any event, the Defendants said that they did not intend that it be taken to mean that Autonomy made no hardware sales, nor did they calculate that it was likely (or, at least, liable) to be taken to mean that either.

1631. In my judgment:

(1)     As I have previously concluded, the purpose of the statement was to convey a special selling point, the success and self-sufficiency of its software business without the need for other revenue streams.

(2)     That is how it was understood by the Claimants. The Defendants' quotations from Mr Apotheker's evidence were too selective. What I understood him to be telling me (and I accept the truth of this evidence) was that he was pleased to note that Autonomy provided very little servicing because that made him *"believe that Autonomy provided brilliant software because it didn't need a lot of services"*, but he also thought that the statement meant that Autonomy regarded itself as different from other companies that produced software because, as he put it, Autonomy was

> *a software company that only does software, so it makes total sense that they are trying to do as little as possible services. But they basically do two things in this annual report: they sell software and they provide some services."*

(3)     A determination of what the Defendants themselves intended to be conveyed by the phrase is inevitably informed by my conclusion that the real purpose of the hardware reselling strategy was to generate recognised revenue from hardware sales but (a) account for them without differentiation as if they had been generated by software sales and (b) attenuate and disguise the adverse effect of almost invariable losses on the hardware sales by accounting for them as sales and marketing expenses.

(4)     Having reached that conclusion, it seems to me that it would be odd to conclude that nevertheless the Defendants did not mean to further the concealment by the use of an ambiguous phrase.

(5)     In other words, in light of my other conclusions, I have further concluded that the phrase was intended by the Defendants to conceal hardware sales.

(6)     But that is primarily because of my conclusion that the hardware strategy and its potentially adverse effect if properly accounted for, needed to be concealed to succeed. The question now posed is what the position would be had I concluded that the hardware reselling programme was genuinely in furtherance of its software business and there were good commercial reasons for not disclosing it or its effect such as to justify it not being disclosed.

(7)     It is not easy to recast my approach, but it seems to me to follow that had that been my conclusion, I would also have concluded that the Defendants might well honestly have intended the phrase to convey in 2010 as it did at the beginning of 2008 (before the hardware reselling programme began) that unlike many other software companies, services were not a material part of its business or revenues. There are certainly examples of that being spelt out. For example, at the Q3 2010 Earnings Call, Mr Kanter (speaking with and at the invitation of Dr Lynch) stated:

> "...there's a continuous debate on whether the Autonomy business model should be pure software or whether there should be a shift towards more professional services in the revenue mix. To date, the model has been maintained at the pure software end of the spectrum, i.e., little services revenue in the mix."

1632.   That brings the question back again to purpose, pretence and concealment. In my judgment, without proof of those three, the alternative way of putting the case might have failed.

*That the disclosed revenue categories comprised all sources of Autonomy's revenue*

1633.   Secondly, the Claimants contended that the revenue stated in Autonomy's disclosed revenue categories in its Annual and Quarterly Reports was equal in aggregate amount (across the categories) to Autonomy's total reported revenue. This, they contended, gave the same false impression, and would have conveyed to the reasonable reader, that there were no other material sources of revenue, and thus that there was no (or no material) revenue from hardware sales or indeed any other sources. In addition, the inclusion of revenues from hardware sales within the IDOL Product category, without any disclosure or explanation that this was so, also falsely inflated the revenue falling within IDOL Product. They submitted that all of this must have been apparent to the Defendants.

1634.   The Defendants did not accept this either. They countered the Claimants' argument that the non-IFRS *"supplemental metrics"* included in Autonomy's Quarterly Reports from Q3 2009 to Q2 2011, and in the 2010 Annual Report, which broke down Autonomy's revenues into IDOL Product, IDOL OEM, Services and Deferred Revenue Release, and at a later point IDOL Cloud, were defined in a way that could not properly include hardware and further, left no headroom for hardware revenue, as follows:

(1)     As the Quarterly Reports and 2010 Annual Report made clear, these were metrics "*provided for background information and may include qualitative estimates.*" The metrics were not precisely defined.

(2)     Deloitte scrutinised the calculation of the non-IFRS metrics each quarter. They were well aware that Autonomy's hardware sales were included in the category "IDOL Product". Each quarter, they prepared a working paper, the stated aim of which was "*To agree the metrics used in the quarterly press release to the supporting schedules and to test the*

*validity of these schedules.*" Mr Welham confirmed that, as part of the audit or review process, Deloitte would have reviewed the underlying contracts for at least some of the transactions included in those schedules, all those that were over $1 million in value, and those that were part of the sampling process. He said that Deloitte knew that certain deals included within IDOL Product were hardware deals: indeed, that is clear from the face of the working paper, and from Deloitte's tickmarks in their working papers.

(3) Deloitte were aware of how IDOL Product was described and what its category comprised in the Annual Reports, as demonstrated by the ticked off versions, where the number is ticked next to the description in question.[236] They knew that some of the hardware sales did not include an IDOL software component. [237] They did not consider that this rendered Autonomy's Quarterly or Annual Reports misleading, as Mr Welham (unsurprisingly) confirmed under cross-examination:

"*Q.  Then looking at what you did know, going back for example to IDOL Product, you knew that as part of the total amount that was being stated as IDOL Product, that included the hardware deals that we've looked at?*

*A.  Yes.*
...
*Q.  ... So you knew those facts, you didn't think that the way that then Autonomy presented itself to the financial markets through its published information was misleading in any way, did you?*

*A.  We did not, no.*"

1635.  The Defendants also maintained that, contrary to an important premise of the Claimants' argument, the market was also aware that IDOL Product could include hardware revenue. Thus, for example, they cited Mr Morland's evidence in cross-examination as demonstrating this:

"*MR SHIVJI:  Mr Morland, you knew at the time at the time, this is 2009 to 2011, that Autonomy included some sales of hardware in its revenue figures?*

*A. Yes.*

---

[236]  The description is as follows: "*IDOL Product is normally delivered as licensed software paid for up-front with an ongoing support and maintenance stream. This model is becoming less significant with the rise of cloud computing. In 2010, IDOL Product revenue totalled $251 million*"; Deloitte has ticked off the number $251 million.

[237] See e.g. Deloitte's Report to the Audit Committee on the 2009 Audit: "*These hardware sales did not include any IDOL software component*".

> *Q. And you must have realised that they would be included in its IDOL product category?*
>
> *A. Yes."*

1636. However, that citation of Mr Morland's evidence, which would on its own be highly material, was incomplete. A little later in his cross-examination, when Mr Shivji came back to the point, Mr Morland clarified what he had meant:

> *"Q. But you understood that within licences there was a hardware element?*
>
> *A. An immaterial element, yes."*

1637. In any event, Dr Lynch emphasised that he had no involvement in the compilation of the *"supplemental metrics"*; and Mr Welham agreed that Deloitte dealt with the finance team and the Audit Committee in the course of the audit process and Dr Lynch really had no substantive involvement with Deloitte, or certainly none with him.

1638. If set in the context of the conclusions I have reached as to the true purpose and concealment of the hardware reselling strategy, none of the Defendants' arguments is attractive or indeed tenable. Set in that context, I would regard the *"supplemental metrics"* as having been intentionally calculated, as part of the imperative to conceal the hardware sales to present Autonomy's business as comprised only of the elements identified, and as not involving any other material activities. I would not regard reliance on Deloitte as a viable argument in circumstances where Deloitte had been unaware of the true purpose of the strategy and its concomitant, the imperative to conceal it. And I would not accept that Dr Lynch was not involved in this furtherance of the strategy by these additional means.

1639. However, if the building bricks of purpose and its concealment are removed, the position is much less clear. If accepted that the hardware sales were truly driven by the protection and promotion of the software sales, so as in effect to be a cost of it (as indeed Dr Lynch sought to depict the strategy) the *"supplemental metrics",* with the warning to which they were subject, would not appear to me necessarily to have been calculated to mislead. Nor would I accept subjective intention to mislead would have been demonstrated. I would not accept, even then, the defence that Dr Lynch was not involved; but that would not save the plea.

1640. Once again, in my judgment, without proof of purpose, pretence and concealment, the alternative way of putting the case might have failed.

*The representation that transactions in 2009 were the same in nature as those in 2008*

1641. Thirdly, the Claimants contended that the statement in the 2009 Annual Report under *"Revenue Recognition"* section within *"Significant Accounting Policies"* that *"The nature of the transactions that the group has entered into during 2009 is the same as in 2008 in all respects"* was untrue or misleading because Autonomy had not carried out any 'pure hardware' sales in 2008 and its resales of $56 million in 2009 constituted a clear change.

1642. The Defendants dismissed this as *"not a valid complaint"*. They submitted:

(1) This statement should be seen in context. It does not appear in a section describing Autonomy's business, but instead in a note dealing with significant policies. The paragraph in which it appears reads as follows:

> *"The group discloses revenue within two categories, namely sale of goods and rendering of services, as required by IAS 18. During 2009 there has been no change to the group's revenue recognition policies in any respect. The nature of the transactions that the group has entered into during 2009 is the same as in 2008 in all respects. To assist the reader in understanding the group's business the accounting policy set forth below has been reviewed and clarified, but does not represent any change in the group's accounting policy for the recognition or measurement of revenue."*

(2) Thus, the phrase is dealing with the nature of the transactions seen from the narrow perspective of revenue recognition. The reader would not expect to see the types of goods sold by Autonomy enumerated in that context, or any change in the types of goods identified.

(3) The Defendants did not accept that there was any relevant change. As stated previously, Autonomy had always sold some hardware.

(4) There was no suggestion in cross-examination that Dr Lynch was aware of, or responsible for, this alleged misstatement.

(5) Nor was there any evidence that HP had noticed or placed any reliance on the statement. It would be surprising if it was a point of any importance at the time of the acquisition over 18 months later.

1643. I would not accept the contextual point in paragraph 1642(1) in any event; and in my view, there plainly was a change. The sales of hardware were of a different order in 2009 when compared to 2008. Nor, again, would I accept that Dr Lynch was not relevantly involved, though I could see an argument that he may not have focused on the presentation, and though that would be careless and a breach of duty it might not be sufficient to establish dishonesty or recklessness for the purposes of a FSMA claim. However, I need not finally determine the point: because, in my judgment, once again without proof of purpose, pretence and concealment, the alternative way of putting the case, would have failed. Deloitte and the Audit Committee were satisfied, on what they understood of

the hardware sales and assumed to be their genuine purpose, that they were not material.

*Falsity of inclusion of hardware sales in "Organic Growth"*

1644. Fourthly, the Claimants contended that the inclusion of revenue from *'pure'* hardware sales within the revenue figures given for *"organic IDOL growth"*, without any note or warning, was obviously and materially false and misleading.

1645. They highlighted especially the Financial Review section in the 2009 Annual Report, which stated that the increase in revenues in 2009 "*is a combination of strong organic growth and the successful integration of Interwoven*" (a company Autonomy had acquired in early 2009) .

1646. This was, according to the Claimants, untrue or misleading, since *'pure hardware'* sales were responsible for $53 million of Autonomy's revenue growth in 2009. Similarly, the Financial Review section in the 2010 Annual Report ascribed Autonomy's reported revenue growth between 2009 and 2010 entirely to the deployment by customers of Autonomy software. Autonomy reported an increase in revenues of $130.7 million in 2010: $52 million of this growth (some 40%) arose from sales of *'pure hardware'*.

1647. The Claimants relied especially on the evidence of one of Dr Lynch's own witnesses, Mr Shelley (Co-Head of Corporate Broking first at UBS, one of Autonomy's corporate brokers, from 2004-2010, and then at Goldman Sachs, who joined UBS and Citi as a corporate broker for Autonomy, in around May/June 2011). This evidence was to the effect that he understood that *"organic IDOL growth"* was a measure of growth in Autonomy's core software business. Autonomy's 2010 Annual Report described *"organic IDOL growth"* as the *"most meaningful organic performance metric for understanding the momentum within the business."*

1648. One of the Claimants' witnesses, Mr Morland, concurred in that, and stated in his witness statement that as far as he was concerned,

> *"the key valuation metric is organic software growth because, in indicating underlying, repeatable growth, it provides the best measure of how successful and competitive a software company's products are in the market(s) in which it operates."*

1649. When it was put to him in cross-examination that Autonomy did not publish any figures for *"organic software growth"*, Mr Morland explained that when Autonomy said *"organic growth"* that, to him, had the same meaning, even though he accepted that it included an *"immaterial"* hardware element.

1650. The Claimants prepared calculations by reference to figures given in Autonomy's Investor Relations Bulletin ("the Bulletin") to show that if the *'pure hardware'* revenue had been excluded from *"organic growth"*, as they contended it should have been, such *"growth"* would have been negative:

(1) Whereas Q4 2010 growth was stated in the Bulletin as 12%, without pure hardware revenues, there would have been negative growth of 5%;

(2) Similarly, whereas FY 2010 growth was stated in the Bulletin to be 17%, without pure hardware revenues that would have reduced to 7%.

1651.  Further, when cross-examined about a draft of the Q1 2011 Quarterly Report that Derek Brown had sent him on 20 April 2011, Mr Shelley (see paragraph 1647 above) stated:

"Q.    In the last couple of lines [of {K17/356.2/2}] it says that reported IDOL Product revenue was 54.4 million up from 46.5 million for quarter 1 2010 and that's the 17% increase they've reported, yes?

A.    Yes.

Q.    Now, I'd like you to assume for a moment that the 46.5% figure for quarter 1 2010 included 6 million of revenues from pure hardware sales, yes?

A.    Right.

Q.    So that's 40.5 million if you take out the hardware?

A.    Yes.

Q.    And assume that the 54.4 million for quarter 1 2011 included 18 million of revenues from pure hardware sales, making it 36.4 million, yes?

A.    Yes.

Q.    And if those assumptions are right, what it would mean is that instead of going up by 17%, the software part of IDOL Product had actually declined by more than 10%, yes?

A.    Mm-hm.

Q.    Can we flick back to page 1, please {K17/356.2/1}. Do you see at the bottom of the page there's a section called "Chief Executive's Review"?

A.    Yes.

Q.    And this is a statement from Dr Lynch, yes?

A.    Yes.

Q.    He says at the beginning: "Q1 was a strong quarter for Autonomy in which we continued to execute well with good

> *growth in revenue, profits and other key metrics." Do you see that?*
>
> A.    *Yes.*
>
> Q.    *In the fourth line he says: "In Q1 2011 IDOL Product, driven by licence growth, increased by 17%." Do you see that?*
>
> A.    *Yes.*
> Q.    *What he's saying there is that IDOL Product revenues are because the licence revenue was up, yes?*
>
> A.    *Yes.*
>
> Q.    *If what I just told you about the hardware revenues is correct, then the claim that growth in reported IDOL Product revenue was driven by licence growth would be completely wrong, wouldn't it?*
>
> A.    *If what you've just told me is correct, then potentially, yes."*

1652.    The Claimants pointed out that this apparently significant evidence was not addressed by the Defendants, neither of whom made any mention of Mr Shelley in any of their submissions.

1653.    Again, the Defendants denied that Autonomy's published information contained any false representation in this regard.

1654.    As to the Claimants' argument that Autonomy's statements about "*organic growth*" and "*organic IDOL growth*" were misleading in light of the hardware sales, the Defendants submitted that:

(1)    Once it is accepted (as is common ground) that the hardware revenues were correctly included in total revenues, there can be no objection to the inclusion of hardware revenues in a calculation of organic growth. In ordinary parlance, organic growth means growth generated organically by a company rather than through acquisitions. This is how Autonomy used the term: as stated in the Financial Review in the 2010 Annual Report, organic growth "*excludes the contribution from acquisitions, foreign exchange impact, services revenue (not a goal of the business) and deferred revenue release (primarily maintenance income).*" There was no indication, or implication, that hardware revenue was being excluded. As Dr Lynch put it, to exclude hardware from the calculations would be to produce a different metric, "*organic growth ex hardware*".

(2)    Deloitte were ultimately content to approve the inclusion of hardware sales within organic growth. It is true that they were initially doubtful, especially about Autonomy's inclusion of them under the heading "*IDOL organic growth*": the hardware sales were obviously not sales of

IDOL, and Deloitte wanted to understand and be persuaded why they were organic.

(3) Mr Knights expressed this concern directly in his email to Mr Hussain and Mr Chamberlain dated 16 October 2009 (which Mr Hussain forwarded to Dr Lynch):

> *"Can we have a detailed breakdown on how the figures are compiled. My biggest concern will be that the hardware sales were neither IDOL based nor organic!!"*

(4) In an email to Mr Chamberlain and Mr Knights (cc Mr Welham) two days later (18 October 2009) Mr Knight of Deloitte focused on the *"organic growth issue"* as almost the sole issue of remaining concern, elaborating that:

> *"We currently still have an issue with organic growth, all we have seen to date is a summary calculation which has "assumed interwoven sales" and no account taken for the hardware sales. The reader will probably assume this is therefore all organic software growth."*

(5) Deloitte (through Mr Knights) ultimately concluded that it was appropriate to include the hardware sales on the basis that (as Mr Welham accepted in his witness statement):

> *"Ultimately we agreed that growth in hardware sales was organic, in that it did not derive from the acquisition by Autonomy of a pre-existing business"*.

(6) Deloitte signed off on Autonomy's organic growth figures in the non-IFRS metrics knowing that they incorporated hardware, so long as the entry was captioned *"organic growth"* (as Deloitte themselves suggested) and not as *"organic IDOL growth"* nor as *"organic software growth"*.

1655. The Defendants also contended that the criticisms made by the Claimants about the description of growth in the 2009 and 2010 Annual Reports could not withstand scrutiny.

(1) The statement in the 2009 Annual Report that the increase in revenues in 2009 "*is a combination of strong organic growth and the successful integration of Interwoven*" was, they said, correct. Although the growth in hardware revenues was one component of the increase, that was properly included in the organic growth figures. They submitted, therefore, that the Claimants were wrong to suggest that it was misleading.

(2) This statement could be of no further assistance to the Claimants than that relating to the inclusion of hardware revenue in the figures given as

"*supplemental metrics*": once the hardware revenue was included within those metrics, the difference between organic and non-organic growth did come down to the difference between revenues generated by the business without taking into account acquisitions and revenues generated by the business taking into account acquisitions.

(3) The Claimants' suggestion that in the 2010 Annual Report, "*the Financial Review section (page 15) ascribed Autonomy's reported revenue growth between 2009 and 2010 entirely to the deployment by customers of Autonomy software*" is incorrect: there is no such statement in the Financial Review.

(4) Their criticism as put to Dr Lynch in cross-examination that he must have spotted, and ought, in all honesty, to have corrected, an inaccurate description by Mr Briest of UBS (one of Autonomy's corporate brokers) in his analyst's note in late 2009, referring to Autonomy's organic growth as organic <u>software</u> growth was unfair: the statement was buried towards the end of a 57-page document. Dr Lynch's evidence was that, although he had read earlier parts of the note, and corrected certain aspects of the description in it of IDOL technology which Dr Lynch considered Mr Briest "*had got very wrong*", he would not have noticed the point in a different section tucked away at the end. In any case, the Defendants contended that this is miles away from being any representation by Dr Lynch, or any part of Autonomy's published information that can be relied on for the purposes of the claims before the Court.[238]

(5) Dr Lynch added that in any event, he was quite removed from the process. Mr Miles submitted in his oral closing:

> "*He is not involved in the production of the accounts, he's less involved in the review of the accounts even than other directors such as Mr Bloomer and Mr Webb, and he knows that these things are being carefully considered by Deloitte, who are considering them to ensure that nothing misleading is being said.*"

(6) Finally on this point, the Defendants countered the Claimants' contention that "*if the pure hardware revenue had been excluded from organic growth, as it should have been, organic 'growth' would have been <u>negative</u>*" [their underlining] with comparative tables of their own demonstrating the reverse. According to the Defendants' calculations (which Mr Miles put to Dr Lynch in re-examination), if the hardware transactions were stripped out then both for Q2 2011 and H1 2011 organic revenue growth would have been significantly higher (in each case, compared against the equivalent period the previous year). Further, again according to the Defendants' calculations, the Core Business

---

[238]Further, the Defendants submitted that Mr Briest's analysis is plainly not "published information" of Autonomy; and nor is it suggested that his report is a representation made by Dr Lynch.

Organic Growth Rate Calculation in Autonomy's interim results up to 30 June 2011 gave growth rates of 15% (Q2 2011) and 17% (H1 2011). Adjusting these figures to remove the "pure hardware" sales listed by the Claimants in Schedule 1 of the RRAPoC, those figures would have increased to 28% (Q2 2011) and 21% (H1 2011). The Defendants submitted that these were the key periods for comparison since the key comparator at the time of the Autonomy acquisition would have been Q2 2011 v Q2 2010, as Mr Apotheker had confirmed when cross-examined: judged at that time, growth rates as at Q4 2010 were out of date, so the Claimants' figures based on Q4 2010 results *"addressed the wrong period"*.

1656. Once again, it would seem to me that the claim would be well founded in the context of my primary conclusions, as being a further manifestation of the disguised purpose and the imperative to conceal it. However, I must seek to assess the claim on the hypothesis previously explained.

1657. I have found the issue more finely balanced in relation to this representation, principally because Autonomy was expressly warned by Deloitte, in an email from Mr Knight to Mr Chamberlain dated 18 October 2009, which was plainly relayed to both Defendants (and which I have quoted more fully in paragraph 1654(4) above), that *"The reader will probably assume this is therefore all organic growth"*.

1658. Although Deloitte had eventually accepted Mr Chamberlain's counter-argument that all that *"organic growth"* connoted was that the growth was not from acquisitions, that does not diminish the propensity of the phrase to mislead, nor negate the fact that the Defendants were warned and aware of that propensity and its attendant risk that *"organic growth"* of a *"pure software company"* would be read as *"organic software growth",* as indeed it was (including by Autonomy's own broker, Mr Shelley, as described in paragraphs 1647 and 1651 above). It is a short step from knowledge that a statement may be liable to mislead to a conclusion of recklessness or dishonest intention to mislead if it is used.

1659. Even so, I have concluded that, on the premise which I have taken to be applicable, the mindset of those concerned at Autonomy, including the Defendants, would have been that sales as loss leaders for the software business generated revenues to be treated as all part of the single software enterprise in a single segment entity, and the inclusion of revenue from hardware sales within organic growth was a corollary.

*Overall conclusion on the claims in respect of statements made in the accounts*

1660. There can be no real doubt, and I do not understand it to have been disputed, that the Defendants wished to avoid disclosure of the nature and extent of the hardware sales. The Claimants' case was that it was part and parcel of the true objectives of the hardware reselling strategy and the imperative to conceal it. The Defendants rejected that but prayed in aid (in summary) commercial sensitivities. Although that is the backdrop, and is to be borne in mind in assessing intention, for the present, my focus is on what Autonomy chose to say, rather than on what they

Approved Judgment                                                      HC-2015-001324
Mr Justice Hildyard

chose not to say. The question now is whether the Defendants not only sought to avoid disclosure, but also included in Autonomy's published information statements designed, or which the Defendants knew would or might be taken, to signify that no material part of its business comprised the sale or reselling of hardware to third-party customers.

1661. For the reasons I have given in respect of each of the positive statements relied on by the Claimants, on the hypothesis that (contrary to my primary conclusions) the purpose of the hardware reselling and the reasons for not separately disclosing it are taken to be as the Defendants asserted they were, I would have not been persuaded that the Claimants had established their claims that the statements made were untrue or misleading and that the Defendants appreciated this so as to render them liable under FSMA.

1662. I confirm that I have also considered the statements in the round as well as individually. Although in the context of my actual conclusions, the picture is then darker still, on the hypothesis I have been implicitly directed to take, my conclusion would be no different than in relation to the representations singly. I have concluded that even together the statements cannot be aggregated to produce a false and intentionally misleading positive representation that Autonomy was not reselling hardware.

1663. However, the overall presentation certainly did not disclose hardware reselling: and I turn to the second way in which the Claimants put their case on the hypothesis that the purpose of the hardware reselling was as asserted by the Defendants.

*Did the Annual Reports/ Autonomy's published information omit information about hardware sales which was required to be disclosed?*

1664. With the reservation that if their case on what Autonomy had positively stated in its published information succeeded, their case that there were also omissions might be unnecessary, the Claimants also contended that Autonomy's published information *"was defective because it did not disclose the fact, nature and extent of its hardware sales in its Annual Reports for 2009 and 2010."*[239]

1665. They submitted that:

> "*the relevant accounting standards and other rules required fair disclosure and explanation of the nature and extent of Autonomy's hardware sales, including sales of pure hardware and other hardware in the Annual Reports*."

---

[239] Originally, the Claimants contended that Autonomy also had a duty of disclosure in its Quarterly Reports; but in its written closing submissions it was clarified that, in light of Mr Holgate's evidence that *"the case for disclosure of hardware sales in quarterly reports is not as strong as in interim reports"*, they were no longer pursuing that contention, although Mr Holgate's view was that it would have been *"good practice"* for Autonomy to have disclosed its hardware sales in these reports.

1666. Their pleaded case in this regard as set out in the RRAPoC is summarised there as follows:

> *"In short, the absence of any disclosure in the Annual Reports…of the existence or extent of hardware sales (other than the unquantified reference to appliance sales being a small part of Autonomy's business) meant that the statements* [identified above] *were untrue and/or misleading , those reports gave a misleading impression of the revenue and revenue growth of Autonomy's software business and/or the Annual Reports omitted a material fact (namely that Autonomy was engaged in the business of selling significant amounts of pure hardware at a substantial loss) that was required to have been included in Autonomy's published information."*

1667. Leaving aside positive misstatements, only the omission of *"any matter required to be included"* can be relied on as the basis for liability under FSMA Schedule 10A. Further, an issuer is liable only if the PDMR (here, each Defendant) *"knew the omission to be a dishonest concealment of a material fact."*

1668. Thus, to establish liability for an omission, the onus is on the Claimants to demonstrate on the balance of probabilities that:

(1) Disclosure of the omitted matter was *"required to be included"* (that is, mandated by applicable legislation or accounting standards)[240] in the relevant published information;

(2) The relevant Defendant, being a PDMR, had actual knowledge, at the time of the omission of the published information in question, of (a) a material fact which (b) he also knew was required (in the sense explained above) to be disclosed but which instead (c) was being *"concealed"* (that is, deliberately being left out).

1669. The issues as to the materiality of a fact which had not been disclosed and as to whether disclosure was *"required"* turn on Accounting Standards and Practice, on which there was detailed opposing expert evidence. The issues of what might be termed *"guilty knowledge"* and dishonest concealment are issues of fact. I address first the accountancy issues and thereafter the factual issues.

*Did Autonomy s published information omit a material fact required to be disclosed?*

1670. In arguing that such disclosure was *"required"* the Claimants relied in particular on IAS 18, §35; IAS 1 §29; and IFRS 8, §32. Alternatively, even if disclosure was not required under specific IFRSs, they contended that additional disclosures were necessary under IAS 1, §17(c) in order to achieve a fair

---

[240] which is not the same as commercially sensible or advisable.

presentation in the Annual Reports.[241] I shall address those provisions in turn by reference to the expert evidence as to the application of these provisions and in the order that Mr Holgate dealt with them in his expert report.

1671. Before doing so, however, the confines of the issue seem to me best observed by recording that the following matters were and remain common ground:

(1) As previously noted, the revenues from hardware sales were properly included within the overall revenues of Autonomy in compliance with IFRS;

(2) There was no requirement on Autonomy to disclose hardware revenues in its quarterly or interim reports;

(3) None of the Companies Act 2006, the Combined Code or the Disclosure and Transparency Rules required disclosure;

(4) Autonomy properly reported that it had a single operating segment for the purposes of IFRS 8 and this was not gainsaid by the Claimants;

(5) The accounts were prepared or scrutinised by the finance department (made up of a number of experienced accountants), Deloitte and the Audit Committee, and all three groups considered and decided on the appropriate accounting treatment.

*IAS 18.35*

1672. Mr Holgate cited the requirement in IAS 18.35 to disclose:

*"the amount of each significant category of revenue recognised during the period, including revenue arising from: (i) the sale of goods; (ii) the rendering of services ..."*

1673. There is no dispute between the experts that IAS 18.35 was mandatory (*"An entity shall disclose…"*). The issue is whether the requirement to disclose *"each significant category of revenue"* extends to providing a further breakdown of the goods sold or services rendered within those categories.

1674. Mr Holgate's opinion, as given in his evidence, was that hardware sales (a) were very different in their nature and economic effect from the (disclosed) software sales, with radically different profit margins, so as to comprise a *"category of revenue"* and (b) the quantum of the hardware sales was such as to render them *"significant"*.

1675. When cross-examined, Mr Holgate elaborated on his view as follows:

---

[241] In the RRAPoC, the Claimants also relied on various provisions of the Companies Act 2006, the Combined Code on Corporate Governance and the Disclosure and Transparency Rules, but as explained below, it appears that these points are no longer pursued.

> *"... in many circumstances which are straightforward, then this disclosure requirement [in IAS 18 §35] would be met by saying sale of goods X, rendering of services Y, interest separately and so on. But the circumstances here, as I've outlined, are very unusual in terms of the growth of hardware, the impact on growth percentages and the vastly different gross profit percentages involved. So we're not in a normal situation, I don't believe. So it is important to read the requirements which is the amount of each significant category of revenue recognised in the period and then including this and that. But, to me, the hardware revenue is a significant category of revenue because, if you don't know about it as a separate component, then you are easily misled about the growth, where the growth has come from, where the profitability has come from, the effect on gross margins and the overall picture of what is described as a pure software company, if there's hardware within there with very different characteristics, economic characteristics from the main software business. To not disclose that, I think has various problems including true and fair view and fair presentation and, more specifically here, it is in my view a significant category of revenue for the reasons I've given."*

1676. However, Mr Holgate accepted that there was no definition of what counted as a "category". There is nothing in the wording of the rule that requires a further breakdown into sub-categories. Nor was Mr Holgate able to point to any literature which suggested that a breakdown within the listed categories was required.

1677. Mr Holgate appeared at one point to argue that the interpretation of the rule should be conditioned by such matters as growth rates, margins, and the scale of the relevant sales; in other words that these things should affect the interpretation of the rule in some way. However, he did not explain how these factors could affect the interpretation of the mandatory rule.

1678. Mr Holgate also raised the spectre of an argument, echoing that of the Claimants, that the reference to Autonomy as a "*pure software company"* was somehow relevant to this rule. But he then accepted that, in context, that was used to point out the differences between Autonomy's business and that of a service provider. Again, he did not offer any real explanation as to how that could affect the interpretation of IAS 18.35 or cause it to be read as requiring a further breakdown below the level of "categories" of revenue.

1679. Mr MacGregor accepted that the hardware sales were indeed *"significant"* and that they were different in nature from sales of software. However, he took a different view about the application of IAS 18.35, focused on the words *"category of revenue".*

1680. Mr MacGregor's view was that the categories of revenue described in this standard are general categories of sale of goods, rendering of services, royalties, *et cetera*. Mr MacGregor relied upon IAS 18.1, which sets out the scope of the standard and explains that it covers revenue in five categories. These are then replicated in IAS 18.35. He explained that the purpose of IAS 18.35 is to require the separate statement and disclosure of revenue in these categories, if it is

significant. In his view, no further sub-categorisation or breakdown of the revenues within these categories is required.

1681. Accordingly, Mr MacGregor's evidence supported the approach in fact taken by Autonomy, which was audited by Deloitte. The accounts divide the revenues into the categories of (i) sales of goods and (ii) rendering of services but do not provide a further breakdown of those categories.

1682. Furthermore, and although sometimes rather didactic in his approach, Mr Holgate accepted that in relation to this specific issue the view taken by Deloitte, that no sub-categorisation was required by the rule, was not outside the range of a reasonable accountant's views.

1683. Mr Rabinowitz pressed Mr MacGregor in cross-examination on what meaning he thus gave to the words *"including revenue arising…"* [my emphasis] which might appear to suggest that the list which followed was not exhaustive; but Mr MacGregor at least three times repeated his view that in its context the list was indeed intended to be exhaustive.

1684. Further, Mr MacGregor rejected Mr Holgate's suggestion that the rule may depend on variable metrics of performance of the kind he ventilated. He depicted that approach as importing a sort of segmental analysis: and he was adamant that *"This is not an attempt by the standard setters to come up with a segmental analysis"*.

1685. Mr MacGregor considered that Mr Holgate's approach would inject excessive uncertainty and subjectivity into what is stated as a simple and straightforward rule. Further, the Defendants argued that IAS 18.35 is only one of many applicable provisions: it is not the only means of bringing home the objective of IFRS. The suggestion that the Claimants' interpretation was necessary to safeguard the objectives of IFRS ignored this.

1686. To test his view, I suggested to Mr MacGregor in the course of his cross-examination an extreme example, of a company (I gave Siemens purely as an illustrative example) which made and sold both (say) mobile telephones and fridges, products with vastly different profit margins: I asked him whether he would nevertheless contend that they should be lumped together in one category as both being sales of goods. He said he would. Mr Rabinowitz took this up with him as follows:

> *"Q. And just to be clear, Mr MacGregor, …you take the view that you don't have to disclose those separate categories, however different they may be, however important they may be to understanding how the company is working, you don't have to disclose them separately, however material they may be for the ability of the investor to understand the financial position of the company; is that your view?*
>
> *A. This is what the Standard requires…this is not the role of the Standard, to sort out segmental disclosures. If in Siemens, the mobile phone department is organised as a separate segment from the…white goods department, and…they're managed separately and*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*they're reported on separately, then in the segmental information, which is required under IFRS 8, if that's the way Siemens organises itself, then that information would be disclosed there.*

*On the other hand, if there was just one department dealing with all electrical goods, which includes mobile telephones and fridges, it wouldn't. It comes down to the way management has organized itself, certainly under IFRS 8.*

*Q. So doesn't that in your view, however material it would be for investors to know about it, they wouldn't have to be disclosed under this Standard, the fact that the company was doing that?*

*A. This is the disclosure requirement…*

*…what was in the conceptual Standard doesn't mean you disclose whatever somebody out there might think is interesting, material or significant. The disclosure requirements are set out in the IFRSs…*

*…*

*You're trying to read into [IAS 18] something which seems to me to be along the lines of, because there is information someone out there might find reasonably useful, you need to disclose it. That is not the requirement."*

1687. In his oral reply, Mr Rabinowitz disparaged this interpretation of *"including"* and the application of IAS 18.35 as *"confused"* and *"plainly wrong"*. In the Claimants' written closing, it was submitted that the difficulty and flaw in Mr MacGregor's approach was that it:

*"produces an outcome that is entirely inconsistent with the general objective of IFRS, namely to ensure a fair presentation of a company's financial position and its financial performance in a way that enables readers of its financial information to make economic decisions."*

1688. The Claimants also cited in support two letters written to Autonomy by the Financial Reporting Review Panel ("FRRP") on 9 September 2009 and 30 November 2009, in the latter of which the FRRP stated:

*"The Panel further notes that it regards the categories listed in paragraph 35(b) of IAS 18 as a minimum disclosure only and would generally expect more disclosure from all but companies with relatively simple operations"*.[242]

---

[242] It should be noted that the FRRP's comments were in relation to a company's general disclosure requirements.  They were not directed at the hardware issue, which was not on their radar at the dates of those letters.

1689. As to the Defendants' interpretation, they submitted that whether the word "including" before a list is intended to be exemplary or exhaustive is a matter of interpretation having regard to the context. Further, the Defendants submitted, while there is room for debate about whether there could, in principle, be further categories of revenue, the question here is not whether the hardware sales should have been disclosed as another category. The Defendants' position was that the hardware revenues represent revenues from the sale of goods, which is one of the express categories contained in the rule. The issue is whether the rule required further breakdown within that category; not whether there might be some other category of revenue beyond those listed. Hence, they submitted, the contention whether the rule is non-exhaustive is nothing to the point.

1690. In such circumstances, it is necessary to consider the other provisions on which Mr Holgate relied: for it was the Claimants' case that it is not just IAS 18.35 that would have compelled disclosure. The starting point is IAS 1.

*IAS 1*

1691. IAS 1 is a general standard about the presentation of financial statements. It is not concerned specifically with revenue reporting, there being (as already apparent) specific standards prescribed in IAS 18 (revenue) and IFRS 8 (segmental reporting).

*IAS 1.1*

1692. IAS 1.1 explains that the standard prescribes the basis for presentation of general purpose financial statements to ensure comparability both with the entity's financial statements of previous periods and with the financial statements of other entities. It sets out overall requirements for the presentation of financial statements, guidelines for their structure, and minimum requirements for their content. For present purposes, the provisions specifically relied on (as well as IAS 1.1) are 1.15, 1.17, 1.29, and 1.30. Mr MacGregor also relied on IFRS 8.

*IAS 1.15*

1693. IAS 1.15 is concerned with the general requirement that financial statements "*shall present fairly the financial position, financial performance and cash flows of an entity.*" It makes clear that:

> "*Fair presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework.*"

1694. The final sentence of IAS 1.15 states that "*the application of IFRSs, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.*" It continues that "*in virtually all circumstances, an entity achieves a fair presentation by compliance with*

*applicable IFRSs*" [my underlining] although the paragraph then states that there may be some circumstances where fair presentation requires further disclosures (see IAS 1.17(C)).

*IAS 1.17*

1695. IAS 1.17 similarly states that *"In virtually all circumstances, an entity achieves a fair presentation by compliance with applicable IFRSs".* But it too, in sub-paragraph (c) repeated that a *"fair presentation"* also requires an entity:

> *"to provide additional disclosures when compliance with the specific requirements in IFRSs is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance."*

1696. The real dispute between the experts was, in the end, as to when *"additional disclosures"* would become necessary, and whether they did so in the circumstances of the hardware sales in this case.

1697. Mr Holgate considered the *"fair presentation"* requirement in IAS 1 to be analogous to the *"true and fair view"* standard in the Companies Act. I would interpolate that this appears to me to be consistent with the approach of the FRC, and with the view expressed in an Opinion of Mr Martin Moore QC that the two are *"synonymous"* and *"simply different articulations of the same concept."* [243]

1698. In that regard, Mr MacGregor's opinion was that where all applicable IFRSs have been complied with, the threshold for further disclosure is a very high one and further disclosure will only be required rarely.

1699. Mr Holgate accepted that the question whether further disclosure is needed under that rule notwithstanding compliance with the detailed specific provisions of IFRS is a matter of accounting judgement.

*IAS 1.29*

1700. Mr Holgate placed special reliance on IAS 1.29, which provides as follows:

> *"An entity shall present separately each material class of similar items. An entity shall present separately items of a dissimilar nature or function unless they are immaterial."*

1701. In Mr Holgate's view, IAS 1.29 was a further standard that applied so as to require Autonomy separately to disclose its hardware sales because, both in relation to 2009 and 2010, those hardware sales were material and, further, those hardware sales were of a dissimilar nature to the other sales Autonomy was making (i.e. software sales). The test for materiality, in this context, is whether

---

[243] See Opinion of Martin Moore QC, *'The True and Fair Requirement Revisited'* dated 21 April 2008 and published by the FRC on its website.

the information could influence the economic decisions that users make on the basis of the financial statements.

1702.  The Claimants contended that there are any number of factors that would highlight the dissimilar nature of hardware and software sales by Autonomy, including the very different profit margins that each type of sale would attract; software involves the sale of a licence, whereas hardware is a tangible product; software was created by Autonomy, but hardware was bought and resold with no added value. They also suggested that it is clear that Autonomy itself regarded selling hardware as wholly dissimilar to selling software, and indeed that Mr MacGregor did not in fact dispute that the products and their sale were dissimilar.

1703.  In terms of materiality, Mr Holgate in his report developed in some detail his reasons for concluding that hardware sales could not be considered immaterial. Thus:

> (1)  Mr Holgate identified, in this context, the volume of sales of hardware compared with total reported sales. His Table A was put forward as illustrating the fact that, for FY 2009, total hardware revenue constituted <u>7.3%</u> of total reported revenue, and that, for FY 2010 total hardware revenue constituted <u>12.1%</u> of total reported revenue. Mr MacGregor did not suggest that the revenue from hardware, for example in FY 2010 when it was over 12.1%, was immaterial in the context of the overall revenue reported by Autonomy for those periods.

> (2)  Mr Holgate further referred, in this context, to the effect of "*pure hardware sales*" on Autonomy's revenue growth from 2008 to 2009 and also from 2009 to 2010. His Table B was put forward to show that, if the contribution made to revenue by hardware in each of those years was stripped out, so as to identify what growth there had been in Autonomy's revenue from its software sales (across the board, including hosting):

>> i.  rather than growth of 47% from 2008 to 2009, the figure would be 36.5% – a reduction in growth of some 22%;

>> ii.  rather than growth of 17.7% from 2009 to 2010, the figure would be 11.5% – a reduction in growth of 35%.

1704.  Mr Holgate was not challenged on this analysis in cross-examination. Nor was he challenged on his evidence that "*growth in revenue is a major performance indicator for listed companies and one that Autonomy frequently cited*" and that such a difference in these growth figures of software was "*highly significant*". Mr MacGregor accepted that it was material, though he caveated that "*It's a smaller part than played by other parts of revenue*".

1705.  Mr Holgate further set out figures intended to illustrate both the very different gross margins that applied to sales of hardware and sales of software and the extent to which the gross margin applicable to sales of hardware affected the overall gross profit margin. Mr Holgate, in this context, also noted that it would have been important, in "*seeking to interpret an overall gross profit of 79%, ...*

*to know that the majority of sales are at a 90% margin and that a minority of sales are at a gross loss*". Mr Holgate was not challenged on this in cross-examination.

1706. Again, Mr MacGregor did not express disagreement about this, nor did he deny that being able to identify what gross margin applies to what products that an entity is selling was information that could be important for investors. Rather, and as foreshadowed in paragraph 1698 above, Mr MacGregor's position was that on the basis of his understanding of Autonomy's business, IAS 1.29 (indeed the whole of IAS 1) could not add anything to any disclosure obligation on the part of Autonomy in relation to hardware.

1707. Mr MacGregor made the following principal points:

(1) First, in his view, disclosure of revenue was expressly covered by IAS 18.35 and no further disclosure obligation could, or perhaps should, be added by IAS 1 or IAS 1.29, which were more general in application, rather than being applicable specifically to revenue. Except in very unusual circumstances, compliance with the specific provision qualified as compliance with the general guidance as regards the specific accounting item.

(2) Secondly, Mr Holgate appeared to assume, but did not explain the basis for the assumption, that (in relation to the requirement of IAS 1.29 that *"An entity shall present separately items of a dissimilar nature or function unless they are immaterial"*) hardware sales were to be treated as a separate and material *"class"* of *"items"* from software sales. The Defendants added to this that Mr Holgate had accepted in cross-examination that there was no definition of what is meant by *"similar"* or *"dissimilar"*, nor of *"nature"* or *"function"*; nor is there anything in the wording of the provision (at least nothing specific) that required a breakdown of revenue into sub-categories. Further, he had not suggested or provided any support in the literature for the view that the rule requires a breakdown of revenues into sub-categories and (the Defendants submitted) the wording of the rule does not support it.

(3) Thirdly, and as a further matter relevant to the interpretation of IAS 1.29 and (the Defendants submitted) supportive of Mr MacGregor's view, IAS 1.30 appears to show that the reference to *"items"* in a set of financial statements is a reference to a *"line item"*. Hence revenue for sales of goods could be such a line item, revenue from services another line item, etc. Similarly, costs of goods sold are a different line item from administrative expenses. The rule says that each class of similar line items must be presented separately. It also says that if a line item (say sales and marketing expenses) is not material it need not be separately disclosed. These rules say nothing about the need to present a breakdown within a line item.

(4) Fourthly, and in any event, IAS 1, as a general presentation standard, had to be read together with IFRS 8.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

1708. Mr MacGregor made clear, however, at least when cross-examined, that his approach was informed by his understanding (on the basis of his instructions) that (as he put it):

> *Autonomy considered it was essentially selling one overall product, and everything connected with the sale of that product was considered to be [the same] revenue."*

1709. Mr MacGregor appeared to accept in cross-examination that if the sale of hardware had no connection with or relationship to the sale of software, *"nothing to do with the sale of software"*, then IAS 1.29 could apply and require disclosure:

> *"Q.   So you accept that IAS 1.29 could apply? You're just saying you don't think it does if Autonomy – if Dr Lynch's version of the facts is right and hardware was simply sold as a way of selling software?*
>
> *A.    That's correct. I mean, if the reason for selling the hardware was not to sell the software but was for another reason, for example to pump up revenues, then clearly that is something which is material to an understanding of the business. In those circumstances. But in the circumstances where it's incidental, connected with the sale of the software, then no. I appreciate there is a dispute over that.*
>
> *Q.   So just to be clear, I think you're accepting that if the primary reason was actually to drive revenue rather than to drive software sales, there would have had to have been disclosure, including under IAS 1.29 –*
>
> *A.    That's correct. Just to be clear, if what's being suggested is that they are implying that what was in fact the sale of IDOL was in fact the sale not of that at all but it was basically being used to pump up revenues, then I would agree, that is something which the accounts should have disclosed. Those are the two – that seems to me the boundary or the bounds of the dispute and the effect on the presentation."*

1710. That leads on to a further issue as to the application and effect of IFRS 8, and in particular IFRS 8.32.

*IFRS 8*

1711.  IFRS 8 is generally concerned with segmental reporting. The standard applied to Autonomy for the first time in respect of the full year accounts for 2009. It was then a new standard, adopted as part of an attempt to converge IFRS and US GAAP, and (although Mr Holgate disagreed) Mr MacGregor considered that there were uncertainties about its application.

1712.  Mr MacGregor gave as an example a debate as to the extent to which it replicated or overlapped with the requirements of IAS 18.35; and he also referred to a paper (*"Post-Implementation Review of IFRS 8 Operating Segments"* dated July 2013) which the International Accounting Standards Board (the "IASB") had issued to consider and report on various uncertainties which had caused debate and difficulty. These difficulties and uncertainties included the issue as to the meaning of *"similar economic characteristics"* and when operating segments fell to be aggregated[244].

1713.  As explained in Dr Lynch's closing submissions, and put broadly, whether an entity should be accounted for as having one or more *"Operating Segments"* so as to distinguish the performance of each depends on the way the entity is managed, on the information flows within the company, and on identifying the "chief operating decision maker". Speaking generally, where there is more than one line of business, it will be expected that there is more than one operating segment.

1714.  In the case of Autonomy, the finance department and Deloitte concluded in both 2009 and 2010 that there was a single operating segment and (as already explained) that conclusion has not been questioned in these proceedings.

*IFRS 8.1*

1715.  IFRS 8.1 identifies the "*core*" principle of IFRS 8 as follows:

> *"An entity shall disclose information to enable users of its financial statements to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates."*

1716.  One of the curiosities of IFRS 8 is that although at first blush it might be taken that it applies only to determine whether an entity should adopt segmental accounting, and if it does, to provide for its more detailed application, it is common ground that at least one of its provisions can also apply to an entity with a single Operating Segment, such as Autonomy. The particular provision in issue is IFRS 8.32.

*IFRS 8.32*

1717.  IFRS 8.32 provides as follows:

> "*An entity shall report the revenues from external customers for each product and service, or each group of similar products and services,*

---

[244] The IASB noted that *"the empirical evidence identified in the academic review shows that the number of reported segments has increased and the number of single-segment entities has decreased."*

> *unless the necessary information is not available and the cost to develop it would be excessive, in which case that fact shall be disclosed. The amounts of revenues reported shall be based on the financial information used to produce the entity's financial statements."*

1718. It is not in dispute that IFRS 8.32 in effect obliges an entity to report the revenues for *"each product or service"* that it provides to customers – or each "*group of similar products or services*" – unless the information is not available and cannot be made available without excessive expense. It is not suggested that this information was not available within Autonomy.

1719. As already noted above, Mr Holgate saw no difficulty or uncertainty in the application of the standard in the case of Autonomy. He was of the view that the sale of hardware was indeed dissimilar to Autonomy's software sales: hardware and software had to be regarded as different products or different groups of products; and that, since the volume of hardware sales was material, IFRS 8.32 clearly obliged Autonomy to make separate disclosure of its hardware sales.

1720. Against that, and as in relation to the other potentially applicable standards, Mr MacGregor noted that the standard did not define "*similar products*", which was therefore something in relation to which judgement was required. He also noted that materiality was, again, a matter in relation to which judgement was required. In each case the judgement would be fact-sensitive and nuanced. In his opinion, the question turned on the nature of the business being carried on by Autonomy; and I took Mr MacGregor to justify this approach in part by reference to the need to give some different content to IAS 8.32, ascribing to IAS 8 overall the objective of requiring proper disclosure of substantially separate and independently run businesses. Mr MacGregor stressed also that in his opinion, *"judgment was (and is) the foundation when considering the application of IFRS 8.32"*; and he emphasised that when stating his overall view in respect of IAS 8.32:

> *"...judgement is required when determining whether an entity's sales of products and services require separate disclosure. On the basis that Autonomy's hardware sales were incidental to the sales of the core software product, I agree with the conclusions reached by Deloitte that separate disclosure was not required."*

1721. Mr MacGregor told me that this was consistent with the way that other accountants and other companies (including those which, like Autonomy, had a single operating segment for the purposes of IAS 8) had looked at the matter, as had Deloitte in this case after careful consideration of IAS 8.32 and review also by its National Accounting and Auditing Team ("NAA").

1722. Applying that approach, and as in relation to IAS 1.29, Mr MacGregor explained his view that Autonomy was not required to make separate disclosure under IFRS 8.32 of its hardware revenues, on the basis that Autonomy undertook no separate or segregated business of hardware selling: the hardware sales were 'incidental' to Autonomy's IDOL software sales.

1723. Mr MacGregor's view was that on the basis that Autonomy had only one overall product (IDOL) and the sales of such product were supported by the hardware sales no disclosure was necessary: on that basis, Autonomy was a seller of software and the other sales were, like everything else the company did, made in order to sell IDOL. As Mr MacGregor put it in cross-examination:

> "…there is one overall product and that product is supported by essentially the hardware sales. That is the important thing. That is their business model.
>
> …
>
> My understanding is that Autonomy isn't interested in hardware, it doesn't consider itself to be a seller of hardware per se. What it considers itself to be is a seller of certain types of software and everything else it does is designed to support those sales."[245]

1724. Mr MacGregor's general position was encapsulated as follows:

> "Q.    That [i.e growth figures] is plainly information of the sort that could affect the decision of users of the financial accounts, correct?
>
> A.    Well, it may do but if you're not required to disclose it, then you're not required to disclose it. I mean, Autonomy could have taken the view they would disclose it elsewhere but you're not required to disclose it in a set of financial statements…
>
>     …
>
> Q.    …you do not dispute, do you, Mr MacGregor, that being able to identify what gross margin applied to what products an entity was selling is indeed something that could influence the economic decisions of users of accounts?
>
> A.    But it's not – the breakdown of the gross margin is not something that is required by accounting standards. If you're going to do it, then it's done on a…voluntary basis.
>
> Q.    What's the answer to my question? Do you accept that it is something that could affect the economic decisions of users of the accounts?

---

[245] Mr MacGregor accepted that if the hardware sales were a separate sale of a different product to the sale of Autonomy's core IDOL product, then they would have to be disclosed unless hardware sales could reasonably be considered by management to be 'incidental' to the sales of the core product, with their principal purpose being to 'drive' or 'facilitate' software sales. Mr MacGregor appeared to accept, therefore, that if Dr Lynch's case that Autonomy entered into the hardware sales to drive software sales is not accepted, the hardware sales should have been disclosed.

> A. It might do. It might do…it might do but there's all sorts of things that companies do that could affect the economic decisions of people out there who might invest or who might not. They're not required to disclose them in the annual financial statements if it's not required by the accounting standards.
>
> Q. Just in terms of whether hardware and software sales were dissimilar in nature or indeed function to other items that Autonomy was selling, just standing back, there's a fairly obvious distinction between the nature of hardware and the nature of software?
>
> A. Yes, there is. If you step back and look at those two things, but my understanding is within the context of the business that Autonomy considered it was essentially selling one overall product, and that everything connected with the sale of that product was considered to be the sale of revenue.
>
> The way I think about this when I think about one-segment companies of which there are some, you're allowed to have one-segment companies, IFRS 8 allows you to do that, is this: the principal thing you're selling, the other things which are sold you wouldn't sell but for the principal thing you are selling. That is the distinction which I make in terms of trying to understand why you have a one-segment company."

1725. This was consistent with the approach in Deloitte's report in relation to IFRS 8.32 in 2009 (which was approved and signed off by the NAA, as was their report in 2010) which read as follows:

> "All of the software solutions provided by Autonomy to its clients are underpinned by the single core IDOL technology. On that basis, management has provided the following analysis of the revenue balance for the group's single operating segment (Note 4):
>
> (1) Sale of goods
>
> (2) Rendering of services; and
>
> (3) Interest Receivable
>
> We note that sale of goods included all items of software and strategic hardware sold during the year. Rendering of services is the release of the support and maintenance revenue and the provision of professional services to clients.
>
> As outlined above, management tracks all licence and strategic hardware sales as a single body of sales, being the sale of goods. This is consistent with the financial information presented to Mike Lynch and it is the basis on which he makes his resource allocation decisions. Likewise, the deferred revenue release and the professional services rendered are also reported to Mike as a single line item.

> *On that basis, we deem that management has appropriately disclosed a breakdown of revenue that is consistent with the information presented to the Chief Operating Decision Maker and is that used to produce the group's financial statements.*
>
> *It is worth noting that in their Q4 2010 press release, management did provide some representative revenue figures for the following virtual product categories:*
>
> > *-IDOL Product;*
> > *-IDOL Cloud;*
> > *-IDOL OEM;*
> > *-Deferred revenue release; and*
> > *-Services.*
>
> *We note that whilst this information was able to be produced following some detailed analysis performed by management, these are not amounts extracted from the financial information that underpins the preparation of the financial statements. It was derived from a separate analysis purely* [performed] *for providing some information to analysts on the performance of each virtual product category. It does not represent the way that revenues are analysed out on a regular basis for presentation to Mike Lynch.*
>
> *We also note that this is just one of several virtual buckets that management use to badge their different product offering to analysts, another being the Protect, Promote and Power families. Again, no separate financial information is maintained on a regular basis to evidence the results for any of those virtual brands.*
>
> *On that basis we note that the disclosure provided by management is in line with the requirements of IFRS 8."*

1726. Mr Holgate considered that IAS 8 clearly required separate disclosure of revenues from hardware sales (assuming the information was available and material). He accepted that it was a new standard at the time and there had been *"some uncertainty as regards the disclosure of operating segments because it was based on a new idea of what was reported internally to the chief operating decision-maker"* but he disagreed that IAS 8.32 was a source of difficulty, and described it as *"quite straightforward."* He countered the suggestion put to him in cross-examination that the provision lacked a definition of *"the idea of products or groups of similar products and services"* by the response that *"they just have their natural meaning".*

1727. He disagreed with Mr MacGregor's approach (and thus also with that of Deloitte and the NAA), and considered it (a) to rely on a gloss which was not justified by the words of IAS 8.32, (b) to be extreme and implausible in treating hardware and software as similar products, and (c) to be a view and approach which would

not have been taken either by him and his firm or *"the vast majority of auditors and the ones I've come across and worked with"*.

1728. However, Mr Holgate was nevertheless reluctant, when cross-examined directly whether nevertheless a range of views might encompass the decision made by Autonomy and Deloitte, to say that he considered it to be *"completely outside the range of what a reasonable accountant could think."* As in the context of IAS 1, his response was that clearly that is not the way he would have accounted for hardware, and he thought that not only his own firm, but many other firms also, would have considered that disclosure was required; but he could not say that it was *"outside the range of what a reasonable accountant could think."* That was the same answer as he had given in relation to IAS 1.

*Materiality*

1729. The two experts had different views as to the materiality test, which seem to me also to reflect their different approaches to the provisions discussed above. These differences can be summarised as being:

(1) In Mr MacGregor's view, *"if you're not required to disclose it, then you're not required to disclose it"*. Materiality is only a consideration in determining whether what would otherwise be a requirement of disclosure is material or not sufficiently material to warrant it. To sever materiality from the anchor of the specific disclosure requirements would lead to what Mr MacGregor called a "*free for all*": what is in fact required is to comply with the standards.

(2) In Mr Holgate's view, this was a surprising and extreme position, which could not be consistent with IAS 1, which is directed towards a fair presentation of the company's financial position, and could not be right. Material information as to the company's performance and financial position should be disclosed, if not under specific IFRS provisions then under IAS 1, to achieve fair presentation.

(3) The essential question is the relationship between the general requirement of IAS 1 (which expressly *"sets out overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content"*) and the specific provisions presumed in *"virtually all circumstances"* (quoting IAS 1.17) to implement those general requirements (albeit with the override that in what Mr MacGregor called *"the very, very rarest cases"* "*additional disclosure*" might remain necessary (despite the presumption) to *"result in financial statements that achieve a fair presentation.*")

(4) Mr Holgate considered that this is a *"rarest case"*. Mr MacGregor did not, at least if (as he put it in cross-examination) *"all the sales…are being designed to do one thing which is to sell IDOL software."*

*My assessment*

1730. I agree that the essential dispute requires review of the relationship between the general requirement of IAS 1 and the specific provisions presumed in *"virtually*

*all circumstances"* (quoting IAS 1.17) to implement those general requirements, and the application of the "override".

1731. I agree with Mr MacGregor that the starting point, and in ordinary circumstances, also the end-point, is what is specifically mandated by the Accounting Standards. Full compliance, mitigated by exception for immateriality, should ordinarily ensure fairness. I agree also with the Defendants that it does not follow from the fact that something might be considered *"reasonably useful"* that it must be disclosed. There are many aspects of a company's financial position and financial performance which some investors might wish to know about but of which disclosure is not mandated. The Accounting Standards are intended to determine what is to be disclosed and how disclosure is to be effected: and the ordinary presumption will be that if the information is not required to be disclosed under specific Standards, then even if *"reasonably useful"* it need not be disclosed.

1732. On the other hand, I agree that there are rare circumstances where the materiality of the matter in question is such that disclosure is required notwithstanding that there are no specific Standards unequivocally mandating it. If the Standards do not appear to require disclosure of a matter which, measured by its likely effect on their assessment of the company if readers of the published information were to be made aware of it, is of plain and obvious materiality, the "override" may apply. In my judgment, information may just as much be *"required"* to be disclosed for the purposes of s. 90A(3)(b) and (when it came into force in October 2010) Schedule 10A paragraph 3(1) of FSMA to give, overall, a true and fair view of a company's position and performance as when specific accounting principles or statements of practice expressly require it.

1733. It is, in other words, ultimately a question of degree, to be answered taking into account (a) any judgement as to why specific requirements, which are themselves a useful litmus test of materiality, do not apply, (b) any reasons why disclosure is thought to be unnecessary or commercially unwise, and (c) whether having regard to (a) and (b), disclosure is nonetheless required in order to provide, in the round, a true and fair view.

1734. Sometimes, I would surmise often, there will be a nice balance; in those cases it would to my mind be surprising to conclude that nevertheless disclosure was *"required".* I agree with the Defendants' submission that where there is a range of permissible views on whether a matter is *"required to be included",* an issuer will not be held liable for the omission of that matter: and in any event, if there was doubt that would be fatal to a fraud case. In my view, that is especially so where the Standards do not appear specifically to be applicable and the question of any exceptional "override" is being considered.

1735. In the limited category of cases, where the real reason for non-disclosure is a dishonest intention to conceal, the two limbs of this analysis come together. Consciousness of a high degree of materiality in combination with a conscious determination to conceal the relevant facts and matters from published information precisely because of their materiality from the point of view of the

reader will likely result in there being (a) a *"requirement"* by virtue of the "override" and (b) dishonest concealment such as to establish liability.

1736.  As to the first hurdle for the Claimants of establishing a disclosure "requirement" under the Standards, Mr Holgate tended initially to give the impression of a rather black and white approach. In the end, however, notwithstanding his own unequivocal views as to the correct interpretation of the Standards, he accepted that neither in the context of IAS 8 nor in the context of IAS 1 was he willing to say that the judgement made was *"outside the range of what a reasonable accountant could think"* (see paragraph 1728 above). I have considered whether this simply reflects polite unwillingness to express views entailing the conclusion that a respected firm had unanswerably been negligent. I have concluded that although that may have been part of it, his reluctance was primarily based on a realistic appreciation that the points made were arguable.

1737.  The lesson suggested by the expert evidence is that there was a range of permissible views on the application of the specific provisions in the Accounting Standards; that would suffice for the Defendants since a statement is not to be regarded as false or misleading where it can be justified by reference to that range of views.

1738.  In those circumstances, and in light of Mr Holgate's concession that the case that no disclosure was required by the Standards was arguable, I agree with the Defendants that this is not the occasion to determine which of the competing views on the application of the various Standards is best as if it were a binary matter and then conclusive; for it must always be borne in mind that this is a case based on the alleged dishonesty of the Defendants. No claim is made in these proceedings against Deloitte, and there is no suggestion that Deloitte were aware of, still less colluded in, any dishonesty. In such a context, even a conclusion that in each case the applicable Accounting Standards were not properly applied, and that correctly construed the separate disclosure of hardware sales was mandated, would not be enough for the Claimants. They still have to prove that (a) the Defendants knew that disclosure of the hardware sales was required and (b) the non-disclosure was the dishonest concealment of a material fact, notwithstanding that in every case Deloitte did approve the accounting treatment and did not advise that disclosure was required.

1739.  In other words, the ultimate question in determining whether there has been a failure to disclose a matter required to be disclosed by the Standards is not the meaning of the specific provisions but whether the Defendants knew there was a requirement to include the relevant fact and determined to and did conceal it. If they honestly believed that the views taken and judgements made in relation to each relevant bit of published information was one within the range of acceptable views, having regard to the facts as known at the time, and that therefore disclosure was not required, that establishes a good defence so far as the "requirements" of the Standards are concerned. That is so even if the relevant but undisclosed fact was highly material, though the greater the materiality, the more likely it is that its non-disclosure was deliberate. However, that is not the end of the matter: the question remains whether the non-disclosure (or the form of any disclosure made) amounts to dishonest concealment because the directors

knew that disclosure (or a different form of disclosure) was required in order, in the round, to present a true and fair view.

*Did the Defendants determine dishonestly to conceal matters they knew to be material?*

1740.  I turn to address the issue whether, if the Claimants were able to prove one or more omissions of a *"matter required to be included"* in the published information, the Defendants *"knew the omission to be dishonest concealment of a material fact"*. I do so on the premise (contrary to my finding) that the purpose given for the hardware reselling was as it was stated to have been by the Defendants. I am aware (and wary) of piling hypothesis on hypothesis.

1741.  The Defendants relied in this context on Deloitte's advice to the effect that there was no *"requirement"* mandating disclosure, so that disclosure was a commercial judgement for the board of Autonomy, and contended that in such circumstances they honestly believed that there was no relevant concealment. It was stressed on their behalf that:

(1) As noted previously, only proof of actual 'guilty' knowledge at the time of a requirement to include the relevant fact would suffice: absent actual knowledge of such a requirement there can be no liability for dishonest concealment.

(2) Dishonesty is the gist of the claim against the Defendants and must be proved, and although in civil proceedings the standard of proof always is that of a balance of probabilities, the seriousness of the allegation means that in the ordinary course, cogent evidence is required in order to overcome the inherent unlikelihood of what is alleged and thus to prove it. Experience shows that in the ordinary course, a benign though curious explanation is often more reliable than a malign though initially plausible one; and furthermore, the seriousness of the consequences of a finding of dishonesty militates against the likelihood that the person implicated took the risk of it.[246]

(3) It is relevant to consider the advice given to the company and its directors: and where, on the basis of advice, a director is given to understand that it is not requisite to disclose a particular fact in the company's published information, the omission of that fact is unlikely to amount to a dishonest concealment of it, unless the giver of the advice was materially misled by or to the knowledge of the recipient of it or that recipient knows full well in some way that the advice is wrong.

---

[246] Against this, I have reason to recall that the Court of Appeal has stated recently that *"…in commercial cases, there will be a wide spectrum of probabilities as to the occurrence of reprehensible conduct",* and once a propensity for dishonesty in and around the same matter has been demonstrated *it is faintly absurd to elevate the principle that it is inherently improbable that a party would do something dishonest into a relevant benchmark for the determination of the issues":* see *Bank St Petersburg PJSC & Anor v Arkhangelsky & Anor* [2020] EWCA Civ 408 at [47].

(4) It is clear from the language of the Schedule that a PDMR must have the relevant guilty knowledge in respect of each false statement or omission alleged to give rise to liability. Paragraph 3(2) states that "*The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.*" Liability is only engaged in respect of statements known to be untrue.[247] If a company's annual report contains ten misstatements, each of them relied on by a person acquiring the company, but it can only be shown that a PDMR knew about one of those misstatements, the company will only be liable in respect of that one, not the other nine.

1742. The Claimants submitted that nevertheless:

(1) The Defendants' assertion of an honest belief based on Deloitte's advice as to the permissibility of not disclosing the hardware sales must also be tested against the background that the Defendants were prepared to tell deliberate lies to the market to ensure that the hardware sales were not detected.

(2) In that regard, the Defendants' Q&A scripts for the earnings calls contained numerous deceptive answers to questions about Autonomy's hardware revenues, many of which Dr Lynch now accepts were misleading (or were, at least, capable of being so).

(3) Further, what the Defendants actually said on the Q1 2010 and Q2 2010 earnings calls was flatly untrue: Dr Lynch's attempt to deny, and put the market off the scent of, Autonomy's pure hardware sales sits very uneasily with the contention that he genuinely believed on the basis of Deloitte's advice that it was permissible for Autonomy to remain silent about its hardware sales.

(4) In addition, the Defendants well knew that Deloitte by no means readily blessed the non-disclosure of the hardware sales, even on the false basis as to the purpose of those transactions presented to Deloitte. On the contrary, Deloitte repeatedly advised Autonomy to make such disclosure. That advice was ignored. Gathering this together:

i. On 14 October 2009, following receipt of the Strategic Deals Memorandum, Mr Knights wrote to the Defendants noting that there would be an issue at year-end as to whether the hardware sales needed to be disclosed and that, "*if disclosure did become necessary and in the absence of any previous indication through the year, it would be the first time that this information would be made available to your investor and analyst community. This might be worthy of some consideration at Q3?*"

---

[247] The same argument applies in relation to omissions: Sch 10A §3(3).

ii.   Deloitte's report to the Audit Committee for Q3 2009 dated 16 October 2009 noted that hardware sales represented 19% of the total revenues for the quarter and that the Autonomy board "*should consider how best to communicate this new opportunity to the shareholders as these revenues are not driven from the organic IDOL technology of the Group*". Deloitte added that, if hardware sales in the year were significant, there might be a requirement to disclose them in the year-end financial statements.

iii.  Deloitte's report to the Audit Committee at Q2 2010 advised that "*Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q2 2010 press release*". None was given.

iv.   Deloitte's report to the Audit Committee for Q3 2010 again advised that given the "*increasing significance of the hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and half year results we would expect appropriate explanation to be given in the Q3 2010 press release*". Again, none was given.

v.    Deloitte's report to the Audit Committee on the 2010 audit stated that "*Given that Autonomy has purchased and on-sold $110 million of hardware during 2010, management now considers that the level of sales being made is equivalent to that of a hardware reseller*". Deloitte expressed the view that, "*Given the increasing significance of hardware sales to the Group's revenues, and the resultant impact on the gross and operating margin in the quarter and full year results, we expect appropriate explanation to be given in the 2010 Annual Report*". None was given.

vi.   The Claimants posed the rhetorical question: why were the Defendants so concerned that the market should be kept ignorant of these hardware sales, even if this meant ignoring the views of their own auditors, if there was nothing to hide?

1743.  For these reasons, the Claimants contended that the Court should find that the Defendants lacked any honest belief that it was proper for Autonomy to withhold disclosure of the fact, nature and extent of its hardware sales.

*Conclusion*

1744.  My starting and ending point is a strong caveat that my assessment of these opposing contentions is artificial, since I am proceeding on a premise which I have earlier rejected, and building hypothesis on hypothesis leads to a suspect structure.

1745. However, on the hypothetical premises, I would not have been persuaded that the Defendants knew that Deloitte were wrong in their interpretation of the Accounting Standards and their application. The Defendants would have been entitled to rely on Deloitte's interpretation of the particular provisions of those Standards, except in one regard: the exception in my judgment, relates to what I have called "the override".

1746. As to the exception, in my view, the "override", which reflects or echoes the long-established company law requirement that a company's accounts must present a *"true and fair view"*, can be taken to be engraved on the heart of every company director (and especially the CEO and CFO of a public listed company). Though it may be informed by the views of accountants, the assessment whether a company's accounts, in the round, achieve this objective is a judgment for its board of directors by reference to overall fairness, which cannot exclusively be defined or confined by statements of accounting principle, and the assessment of which cannot be delegated. A question as to whether disclosure should be made, and in what form, is a paradigm example of one which cannot exclusively be determined by statements of accounting principle, or by a company's accountants and auditors: it is ultimately a matter for the judgment of the directors, acting in good faith with a view to providing the information necessary to provide a true and fair view of the company's position and performance.

1747. In my judgment, the nature and extent of the hardware reselling strategy was information of sufficient materiality that its non-disclosure resulted in Autonomy's published information in the round being false and misleading: and the Defendants knew that, and were dishonest therefore in concealing it.

1748. The question posed by one of the Reviewers (Mr Robertson) in Q3 2009 (see paragraph 1361(8)(ii) above) rings in the ears:

> *"What's the sensitivity about being more transparent on this score? If it's a strong strategic move for them, why wouldn't they want to explain this?"*

1749. No satisfactory answer was ever provided. As indicated in paragraphs 878 to 888 above, Dr Lynch's justification for it was stated in his first witness statement as follows:

> *"HP complains that Autonomy should have provided further disclosure about the nature and extent of its "pure hardware sales". Autonomy was under no obligation so far as I was aware at the time, to break down its revenue into hardware and software, let alone into different types of hardware. Given the defensive nature of the hardware strategy, we did not particularly want to volunteer this information to the market. We did not want competitors to know that we felt vulnerable by the move to appliances or that we perceived a risk of being removed from strategic supplier lists (and copy our strategy of selling increased volumes to*

> *these companies). In addition, we did not want our relationships with one hardware supplier to preclude us from working with another or news of favourable deal terms getting out and being demanded from everyone. The more details we disclosed about our hardware sales, the more we exposed these commercial sensitivities."*

1750. As with most, if not all, of Dr Lynch's explanations, this carried an initial semblance of reason and reliability: and no doubt non-disclosure did have the advantages identified, especially in Q3 2009. However:

(1) Dr Lynch's own evidence was that in Q3 2009, the market perceived appliances to be a likely preferred means in the immediate future of delivering software. That was no secret, and nor was it a secret, or otherwise than obvious to anyone interested, that Autonomy had no appliance offering. Why keeping quiet Autonomy's avowed efforts to develop an appliance jointly with the largest hardware suppliers in the world to remedy this apparent gap in its offering in those circumstances was necessary or appropriate is extremely difficult to explain.

(2) The Defendants could never quite make up their mind whether their case was that the market did know or that it did not know of the hardware sales. Mr Bloomer thought it did, and said that there was no attempt to keep from the market the fact that Autonomy sold hardware at a loss, and he himself discussed this with an institutional investor (Hermes): in which case the commercial sensitivity argument seems further eroded.

(3) The "shift" in the rationale for the hardware reselling strategy in Q1 2010 or Q2 2010, away from appliances or establishing Autonomy as a preferred supplier, and towards a *"customer-facing"* or *"one-stop shop"* justification, left much of Dr Lynch's justification outmoded.

(4) Furthermore, the relevant customers were, according to the Defendants' own case, existing volume customers of Autonomy in the financial field, further calling into question why there should have been sensitivity in revealing details lest customers use it against Autonomy. There is no evidence or sign to suggest that Autonomy would not have wished to offer the same terms to all valued software customers to incentivise software sales.

1751. Overall, and even (a) on the premise that the purpose of the hardware sales was to drive software sales and (b) accepting that the Court will be very hesitant in second-guessing genuine business judgments made in good faith by those entrusted to make them, the proportion of the revenues derived from hardware seems to me so to have cried out for disclosure as to outweigh any contrary commercial sensitivity in determining the issue of disclosure. It may be remembered that this is broadly what Mr Ariko thought: and he was only deflected by the series of falsities in Dr Lynch's response to his request for a review of disclosure (see paragraphs 879 to 881 and paragraphs 1395 to 1403 above), including that the market was already aware of hardware sales from what they had been told on earnings calls.

1752. I have taken into account, in deciding that the decision not to disclose was not within the generous ambit of discretion afforded by the court in matters of commercial judgement, the counter-indication that neither the Audit Committee nor Mr Webb considered that disclosure was required either, and there is no suggestion of lack of impropriety on their part in this regard. I have explained Mr Bloomer's outlook in paragraphs 859 to 862 above, and Mr Webb's in paragraph 863 above.

1753. In my view, the Audit Committee's curious indifference or at least passivity in this regard under the chairmanship of Mr Bloomer, and in particular his and their approach in considering the measure of materiality for these purposes to be in the region of 25% of total revenues, appears to me to reflect a mistaken approach. They treated materiality according to whether the programme was of such a size or nature as to upset the segmental analysis (see paragraph 1372 above). But though related that was a different issue. In four of the ten quarters in the Relevant Period more than 10% of revenue comprised loss-making hardware sales. In Q3 2009, 22.8% of revenue was so comprised, and though this dropped in Q4 2009 and Q1 2010 (to 4.1% and 6.1% respectively) after the cessation of Autonomy's relationship with EMC, it rose again to 14.1% in Q2 2010, 12.7% in Q3 2010 and 12.0% in Q4 2010, before dropping back again to 9.1% in Q1 2011 and 8.1% in Q2 2011. This was, in my judgment, clearly material, and whilst the Audit Committee and Mr Webb appear to have been disoriented by the segmental issue, there is nothing in the evidence to suggest that the Defendants were in the same way.

1754. In any event, even if Mr Bloomer and his colleagues, and it also seems Mr Webb, considered that the hardware reselling strategy was well known to the market, the Defendants knew that it was not. The Defendants' perspective was different.

1755. At this point the accumulation of hypotheses becomes almost impossible to accommodate. But on the footing that whilst I am to assume a proper purpose for the hardware sales, and no imperative to conceal the purpose, I am not required to accept the commercial reasons given by Dr Lynch, which seem to me to be contrived. No substantial or satisfactory answer to the pertinent question posed by Mr Robertson in Q3 2009 as to what could possibly be the sensitivity about transparency of a strong strategic move having been given, and in light of the Defendants' consistent and egregious efforts to find reasons or Delphic language to avoid it, I would have been inclined to the conclusion that the Defendants simply had no good reason not to disclose. That would leave a judgment based on a covert and dishonest objective as the only available explanation.

1756. Fortunately, however, I need not and do not base my decision on that ground. On my actual conclusions, the ultimate relevance of the exegesis and assessment is in its confirmation of my judgment that the Defendants lacked any honest belief that it was proper for Autonomy to withhold disclosure of the fact, nature and extent of its hardware sales.

**Issue (3): Did Autonomy's treatment of the costs of the hardware render Autonomy's published information untrue or misleading and did the Defendants appreciate this?**

1757. Obviously, if the true purpose of the hardware reselling strategy was to pump up revenue and the purpose put forward to Deloitte of driving software sales was a pretext, the allocation of part of the costs or losses of the programme to sales and marketing expenses, rather than as COGS, was both a further indication and a further instance of impropriety. The experts were agreed on this also. But what if the purpose was as put forward by the Defendants?

1758. The Claimants contended that even then it is plain that the Defendants

> *"did not genuinely believe that it was proper to treat part of the costs of the hardware that was sold as a sales and marketing expense…that treatment was driven, not by any genuine attempt to apply the accounting standards correctly, but by reverse-engineering to get to a desired gross margin figure."*

1759. The Claimants' expert, Mr Holgate, accepted that there was no IFRS guidance on what a company should include in COGS or Sales and marketing but that was because it was so obvious that it does not require explanation. He considered and opined that it was obvious that it is:

> *"clearly contrary to IFRS and wrong in a wider sense to account for part of COGS as sales and marketing expense…*
>
> *…*
>
> *Making sales at low margins, or even at losses, has no impact on the simple principle that the costs of goods sold is shown as COGS and the costs of sales and marketing activities are shown as sales and marketing expenses. The effect of a reduction in sales price is exactly that: revenues are reduced."*

1760. Thus, according to the Claimants, it was plain and obvious that Autonomy was wrongly and misleadingly treating all the revenue from 'pure' hardware sales as revenue, but less than all of the costs of the product that it sold as a cost of that revenue. Autonomy's published information was untrue or misleading for the further reason that the allocation to sales and marketing of any part of the costs of the hardware reselling strategy resulted in the figures for COGS, gross profit, gross margin, and sales and marketing expenses in the Annual Reports and the Quarterly Reports from Q3 2009 to Q2 2011 all being false.

1761. The Defendants did not accept this. They contended that within the price paid for the hardware was an element of marketing expense; and there was nothing in the IFRS or otherwise to prevent that element being allocated in accordance

with what they presented to be its true nature. Further, all of the various allocations of costs to sales and marketing were closely monitored by Deloitte (including review by the Reviewers), who signed off on them in every quarter in the Relevant Period as representing a reasonable allocation having regard to the marketing purpose.

1762. The Audit Committee likewise were content with the final figures agreed. Mr Bloomer explained in his witness statement:

> *My view was that it was not unreasonable for losses on hardware sales to be categorised to sales and marketing when the benefit generated from having incurred these losses would arrive over time through further sales."*

1763. Mr MacGregor supported this line, elaborating when cross-examined that he could see nothing wrong with treating as a sales and marketing expense *"the loss which has been taken because it's an incentive to sell the overall software product…"*

1764. Given my previous conclusions, it is sufficient to state my views on this area of the dispute in more summary form:

(1) Mr Holgate's approach tended to overlook the Defendants' basic argument that part of the amounts paid by Autonomy to the hardware supplier concerned were referable to, and properly treated as, a premium to fund marketing.

(2) To the extent that the payment of such a premium could be shown on the facts, I am not persuaded (on the hypothesis that the hardware reselling was for the purposes asserted by the Defendants) that it would be wrong to account for it, or some part of it, as a marketing expense.

(3) Whether that was sufficiently demonstrated by Autonomy in every or any case is a question of fact.

(4) In point of fact, I have concluded previously (see paragraphs 1335 to 1340 above) that the *"residual method"* was adopted in respect of the amounts paid to EMC in Q3 2009 as an expedient proxy because EMC was not prepared to acknowledge that any part of the purchase price paid by Autonomy for the hardware it resold was referable to development or marketing costs. This was not an appropriate basis on which to allocate to Sales and marketing a sizeable proportion of the costs.

(5) Similarly, and notwithstanding the provisions unilaterally inserted into the purchase orders by Autonomy to bolster an argument that part of the purchase price of hardware supplied by Dell was referable to marketing or development (see paragraphs 940 to 941 above), neither Dell nor, for that matter, Hitachi, ever agreed to part of the purchase price being committed in that way, and there was no sufficient basis in fact for allocating any substantial part of the costs to Sales and marketing. Indeed, that was the decision of Deloitte, subject to a concession in

respect of losses (10%) and to Mr Knights' "solution" (see paragraph 1495(2) above).

(6) I accept the Claimants' contention that the amount of costs which Autonomy proposed should be allocated to Sales and marketing was dictated by (a) management's need to reduce the impact of the loss making hardware reselling strategy on gross margins (and thereby, in effect, manipulate the figures) and (b) what Deloitte could be persuaded to accept. Internal emails demonstrated this: the examples given by the Claimants being (a) an email from Mr Hussain to Mr Chamberlain dated 11 October 2009, asking Mr Chamberlain to *"see if you can allocate $4m from cogs to opex"* because *"need GM [i.e. gross margin] to be at the minimum 86%"* and (b) an email dated 18 April 2010 from Mr Hussain to Dr Lynch telling him *"need to relocate some costs from cogs to opex"*.

(7) After Deloitte had confined the sales and marketing expenses allocation to losses (and thus some 10% of costs) the amounts became relatively immaterial: certainly, that was the view taken by Mr Bloomer and his colleagues on the Audit Committee.

1765. With reference to (7) above, Mr Miles submitted in his oral closing submissions that even if in Q3 2009 the amount allocated was (a) not properly substantiated (b) disproportionate in any event and (c) calculated by the process of reverse engineering suggested by the Claimants, the Claimants did not make their decision by reference to Q3 2009, and by 2010 the impact on the accounts had been much reduced because Deloitte had insisted that only losses could be allocated, with the effect that 90% of the costs were allocated to COGS. The impact on gross margin of about 1% was immaterial. According to the argument, therefore, Autonomy's accounts in 2010 and 2011 were not rendered materially untrue or misleading even if the losses from hardware sales were wrongly allocated to sales and marketing: there was no material deficiency in disclosure.

1766. This argument, which was not in Dr Lynch's written closing submissions, was not specifically addressed by Mr Rabinowitz in his oral reply. Had it been decisive, I would have required additional assistance, since I have not found it an easy point. The difficulty, as I see it, revolves around the separate but associated issues of inducement and causation, and the difficulty of determining what the effect would have been on subsequent accounts if in the Q3 2009 and the 2009 Year-end accounts substantially all the costs of the hardware reselling strategy had been allocated to COGS as I have concluded they should have been. I am disposed to think that the presentation would have altered and that Mr Miles' argument would not be conclusive against the Claimants' case. That seems to me to be supported by the evidence of Mr Gersh in cross-examination to the effect that had HP appreciated prior to the acquisition that part of the costs of hardware or appliance sales had been allocated to sales and marketing expenses, it would have been in a better position to assess the volume of such sales. But I prefer not finally to determine the point.

1767. Lastly under this heading, and in case the matter were to become relevant in the future, I confirm my view that contrary to the Defendants' case, Dr Lynch was involved from the outset (Q3 2009) in the issue of cost allocation.

***Issue (4): Should Autonomy, at the least, have made clear in its published information what its accounting policy was with respect to hardware costs?***

1768. I can also be relatively brief in summarising my view in respect of the further issue about the extent to which (if any) it was necessary for Autonomy to make clear in its published information what its accounting policies were with respect to its hardware cost accounting.

1769. Mr Holgate pointed out in his first report that the only disclosure given by Autonomy in its 2009 and 2010 consolidated financial statements (note 2(h)) was:

> *"sales and marketing costs comprise the costs of the sales force, commissions and costs of promoting new products and entering into new markets."*

1770. He noted that this policy for sales and marketing costs did not refer to hardware or hardware reselling, though in 2010 (only) the policy for cost of revenue did refer to hardware in passing:

> *"Cost of revenues: Cost of licence revenues include the cost of royalties due to third party licenses, costs of product media, product duplication, hardware and manuals."*

1771. Mr Holgate suggested that this clearly gave the incorrect impression that all hardware costs were included in costs of revenue and none was included in sales and marketing expenses.

1772. He cited various IFRS requirements in relation to disclosure of accounting policies as follows:

(1) IAS 1's requirement that:

> *"An entity shall disclose in the summary of significant accounting policies: (a) the measurement basis (or bases) used in preparing the financial statements; and (b) the other accounting policies used that are <u>relevant to an understanding of the financial statements"</u>* [Mr Holgate's underlining]

(2) A further requirement in IAS 1 with specific reference to judgements made that:

> *"An entity shall disclose, in the summary of significant accounting policies or other notes, the <u>judgements</u>, apart from those involving estimations…<u>that management has made</u> in the process of applying the entity's accounting policies and that have the most significant effect on the amount recognised in the financial statements."* [Again, Mr Holgate's underlining]

1773.   In Mr Holgate's opinion:

> *"These requirements clearly point to a need for Autonomy to have disclosed that part of COGS (i.e. the costs of the hardware) had been accounted for as sales and marketing expenses. It would have been 'relevant to an understanding of the financial statements' for a user to have known that gross profit had been increased by moving part of COGS to a heading (sales and marketing expenses) that was presented below gross profit. Likewise, 'disclosure would have assisted users in understanding' the accounting treatment and the underlying business undertaken and margins achieved. In addition, disclosure of the accounting policy would assist users in understanding the 'judgement' that 'management [had] made…Indeed, adding wording dealing with the inclusion of part of COGS in sales and marketing expenses would have been much more important than the disclosure that Autonomy actually gave. This is because the sales and marketing policy wording in the notes to the 2009 and 2010 annual financial statements…was both compliant and reasonably obvious (and therefore arguably unnecessary); whereas the inclusion of part of the hardware costs in sales and marketing expenses was both non-compliant and unexpected, and therefore disclosure was necessary."*

1774.   Mr MacGregor did not agree with this, and explained that the requirement was to disclose the principal policies and that it was not necessary to present policies in the granular way implicit in Mr Holgate's approach. Just as the general presentation of information in financial statements requires the application of judgement and selection, so too does the statement of relevant accounting policies.

1775.   I would agree with Mr MacGregor's general approach that it is not necessary to set out at great length every element of the revenues and costs of the company and its assets and liabilities that have been accounted for: some judgement is required. However, I would agree with Mr Holgate that in this case the allocation at least in 2009 was sufficiently significant in its effect that I would have expected it to have been explained.

1776.   The question whether it was dishonest not to have done so is more difficult. Deloitte were content and so were the Audit Committee. That was necessary but not sufficient; but it seems to me that there would be real difficulty in establishing dishonesty if there was no improper purpose driving the decision.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

**Issue (5): Did Autonomy wrongly recognise revenue in Q2 2009 on a specific ($6 million) hardware transaction with Morgan Stanley?**

1777.   A discrete 'hardware' claim also advanced by the Claimants was that Autonomy wrongly recognised revenues of $6 million on a sale of hardware by Autonomy Inc to Morgan Stanley under an agreement entered into on 30 June 2009.

1778.   The nub of the claim is that the hardware was recognised on the premise that it was sold to Morgan Stanley and dispatched by EMC in Q2 2009 whereas, according to the Claimants, it was in fact dispatched by Hitachi pursuant to Autonomy's one-time reseller agreement with HDS entered into with Autonomy on 27 June 2009 with delivery not occurring until inside Q3 2009.

1779.   The Claimants' case is that this revenue was wrongly recognised in Q2 2009, *"to the knowledge of at least Mr Hussain"*, because to satisfy the requirements of IAS 18.14 for the recognition of revenue the hardware had to have been delivered by 30 June 2009 and was not, though Mr Hussain pretended to Deloitte that it had been, and Autonomy's management made a like (false) representation in a management representation letter dated 15 July 2009 signed by Mr Hussain.

1780.   The formula *"to the knowledge of at least Mr Hussain"* was an opaque way of saying, as was the fact, that Dr Lynch was not alleged to have played any part and was not cross-examined on the matter. Mr Rabinowitz expressly confirmed in his oral closing submissions that no claim could be made against Dr Lynch accordingly.

1781.   The Claimants acknowledged that *"this episode might be said to be a comparatively minor one in pure revenue terms"*, but submitted that *"it speaks volumes about the willingness of Autonomy management, and in particular Mr Hussain, to lie to Deloitte to achieve their ends."*

1782.   They relied on the issue also in support of a contention that Mr MacGregor was less than objective in his support for the Defendants' analysis, and produced an *"exotic thesis…dependent on a number of hypothetical facts"* none of which the Defendants even attempted to prove at trial.

1783.   The Defendants sought to dismiss this claim as a *'cul-de-sac'*, on the basis that it is not possible to see how the revenue recognition occurring a quarter earlier has any bearing on HP's acquisition of Autonomy.

1784.   Further, Dr Lynch submitted (and Mr Hussain adopted this) that the recognition was correct on the basis that it was possible for title to pass without delivery under the contract for the reasons given by Mr MacGregor in his supplemental report.

1785.   The full factual detail is complex and convoluted; but in summary, the underlying facts can be distilled as follows:

(1) On 30 June 2009 Morgan Stanley agreed that it would purchase Hitachi hardware from Autonomy unless the parties agreed that Autonomy could supply hardware from a different manufacturer.

(2) Pursuant to that agreement, Autonomy entered into a contract with Hitachi for the purchase of hardware for supply to Morgan Stanley.

(3) Autonomy did indeed acquire $6 million of hardware from Hitachi which was, in fact, supplied to Morgan Stanley in or after August 2009, i.e., in Q3 2009. Title to the hardware that Hitachi sold to Autonomy for onward sale to Morgan Stanley did not pass even to Autonomy (still less from Autonomy to Morgan Stanley) any earlier than August 2009, after the end of Q2 2009.

(4) Autonomy management told Deloitte that once it was clear that Hitachi could not deliver the hardware on or before 30 June 2009, Autonomy had entered into an agreement with EMC dated 29 June 2009 under which EMC was to provide and deliver $5 million worth of hardware for delivery to Morgan Stanley by 30 June 2009 and Autonomy itself agreed to supply $1 million worth of hardware from its own reserves of new hardware stock.

(5) Deloitte asked Autonomy management for evidence that the EMC hardware had indeed been delivered by 30 June 2009.

(6) On 13 July 2009, Mr Chamberlain, copying Mr Hussain, told Deloitte that Autonomy was trying to get the relevant invoices from EMC, which should show the delivery date. Later, Mr Hussain and Mr Chamberlain told Deloitte that EMC had been unable to supply any documentation. Deloitte then agreed to rely on a written representation from Autonomy management to the effect that the hardware had been physically despatched by 30 June 2009.

(7) That representation was contained in a management representation letter dated 15 July 2009 signed by Mr Hussain, for and on behalf of Autonomy, which stated as follows:

> "We are satisfied that the acquisition of $9.0 million of hardware from EMC Corporation was an arms length commercial transaction. Additionally, we confirm that the despatch of hardware with a purchase price of $5.0 million was made from EMC Corporation on the 30 June 2009."

(8) There were EMC invoices dated 30 June 2009 for the hardware that EMC had sold Autonomy. However, they were headed "*PROFORMA INVOICE*" and stated "*Invoices will be revised once order is shipped*". Thus, those invoices made clear on their face that the hardware had not yet been shipped as at 30 June 2009, the last possible day for delivery within Q2 2009.

(9) On 13 July 2009, Mr Hussain pointed out to Mr Chamberlain and Mr Sullivan that the invoices were "*clearly proforma*" and asked them to "*work out what you need at a minimum for the auditors tonight*".

(10)      Mr Chamberlain responded the same day saying that he needed an email from EMC confirming that the hardware had been shipped to Autonomy on 30 June 2009. He asked whether this was "*something we can get*".

Mr Sullivan responded, "*No. Give me a call now please ...*" . Mr Sullivan explained in his testimony at Mr Hussain's criminal trial:

> "*... the reason I said "no" is because I knew that the – or I thought that the product had not shipped only because we signed the product – we signed the contract on, you know, the last hours of the quarter. So I don't believe EMC would have even had time to ship it.*"

(11)      On 13 July 2009, Mr Sullivan asked EMC to remove the language "*Invoices will be revised once order has shipped*" from the EMC invoices. EMC did so and, on 14 July 2009, Mr Sullivan provided Mr Hussain and Mr Chamberlain with the revised form of invoices. The revised invoices obscured the fact that the EMC hardware was not delivered by 30 June 2009, but they did not provide positive evidence that delivery had taken place by that date. It is unclear whether the revised invoices were provided to Deloitte. At all events, the absence of positive evidence of delivery by 30 June 2009 resulted in Deloitte requiring the management representation mentioned above.

(12)      The truth is that, as Mr Hussain well knew, the EMC hardware was only despatched by EMC to Autonomy in July 2009, and so after the end of the quarter. The as-despatched invoices show, with one minor exception (an invoice for $414,578 plus tax), this to be the case. They also show that the EMC hardware was delivered to Zantaz locations, not Morgan Stanley.

(13)      The fact that the EMC hardware was to be utilised by Zantaz, not Morgan Stanley, can also be seen from other contemporaneous documents.

(14)      In his evidence to the US court, Mr Sullivan confirmed that he never intended the EMC hardware to be sold to Morgan Stanley and nor would it have made sense to do so; nor did he ever discuss with EMC the prospect of selling its hardware to Morgan Stanley, which could not have been done without EMC's permission; nor had he discussed with Mr Hussain the prospect of selling EMC hardware to Morgan Stanley.

(15)      On 30 June 2009, Mr Mooney informed Dr Lynch and Mr Hussain that the "*final docs*" had been received from EMC for signature. Later that day, Dr Lynch approved the purchase order, Mr Hussain having already done so.  The "*Purchase Order Request*" recorded that it related to "*EMC Storage Solution order for WW Hosted Introspect & Digital Safe platforms*" at a cost of $9 million.

(16)     The hardware that was actually delivered to Morgan Stanley was not EMC hardware at all, but Hitachi hardware. This accorded with the Morgan Stanley purchase order dated 1 July 2009 which expressly specified delivery of Hitachi hardware.

(17)     The Hitachi hardware was not delivered to Morgan Stanley until August/September 2009.

(18)     On 24 September 2009, Hitachi confirmed to Autonomy that the Morgan Stanley hardware orders had been shipped and delivered.

1786.  Mr Welham's unchallenged evidence was that if the hardware, which was Hitachi rather than EMC hardware, was despatched and delivered to Morgan Stanley after 30 June 2009, that is, in Q3 2009 rather than Q2 2009, then it is highly unlikely that Deloitte would have agreed with the recognition by Autonomy of $6 million of revenue in Q2 2009. He further explained that these facts, if discovered by Deloitte, would also have given rise to broader concerns regarding management's honesty and integrity.

1787.  Mr Holgate's opinion was that, if the Hitachi hardware was despatched to Morgan Stanley in August/September 2009, then it is "*clear*" that revenue on the transaction should not have been recognised in Q2 2009.

1788.  Mr MacGregor accepted that ordinarily the date of delivery of goods is, absent particular factors that point against it, a strong indication of the date on which revenue should be recognised. He made two caveats: (a) first, he emphasised that under *"International GAAP it's perfectly possible for the risks and rewards to pass without delivery taking place…and the key issue is whether title has passed"*; and (b) secondly, that this was only a general rule and was subject to unusual complications or features, and *"this did have some unusual features"*.

1789.  In this case, Mr MacGregor suggested, the first unusual feature was that, in his view, the Morgan Stanley sale may have qualified as a *'bill and hold'* sale under which it is presumed that delivery is delayed at the buyer's request but the buyer nevertheless accepts or takes title and accepts the billing, and risk and title passes even though the goods are not yet shipped. He drew attention (in his supplemental report) to IAS 18 Appendix, which gives various illustrative examples of risk and rewards of ownership passing at different times, depending on the circumstances; and he particularly highlighted the first example, being of

a 'bill and hold' sale. IAS 18 Appendix 1E §1 notes as regards such a sale that revenue is to be recognised when the buyer takes title, provided:

    (1) it is probable that delivery will be made;

    (2) the item is on hand, identified and ready for delivery to the buyer at the time that the sale is recognised;

    (3) the buyer specifically acknowledges the deferred delivery instructions; and

    (4) the usual payment terms apply.

1790.  Mr MacGregor then put forward a complex set of assumptions leading to the possibility that Morgan Stanley – by way of a possible 'bill and hold' arrangement or something analogous – effectively took title to the hardware that Autonomy purchased from EMC for its (Autonomy's) own use, even though (as he conceded) the EMC hardware was not physically delivered to Autonomy until Q3 2009 (and was never delivered to Morgan Stanley). These assumptions were principally that (i) notwithstanding that Morgan Stanley contracted with Autonomy to purchase Hitachi hardware, an agreement was reached that Autonomy would instead supply them with EMC hardware, and (ii) Morgan Stanley had agreed to take title to the EMC hardware in Q2 2009 so as to give rise to the 'bill and hold' arrangement which Mr MacGregor posited.

1791.  As the Claimants pointed out, however, the Defendants did not even attempt to prove the factual assumptions made by Mr MacGregor; and I accept the Claimants' submission that the contemporaneous documents, and Mr Sullivan's testimony to the US court, did not support them.

1792.  Without descending further into the convoluted detail, I accept that the documents show that Morgan Stanley agreed to make payment to Autonomy on 2 July 2009 in circumstances where they had been told by Autonomy's Cynthia Watkins (i) that Autonomy had *"received the PO"*, which was Morgan Stanley's purchase order which expressly specified delivery of Hitachi hardware (see paragraph 1785 above), and (ii) that Morgan Stanley's *"order is assembled in our Pleasanton facility"*. It was on these two bases that Ms Watkins said that *"payment can be issued as we have fulfilled the order"* and Morgan Stanley's Kathy Macedonio confirmed that *"The order has been received in so payment can be released"*.

1793.  It is thus plain that Morgan Stanley only agreed on 2 July 2009 (i.e. in Q3 2009) to make payment because they understood (wrongly, but through no fault of their own) that the hardware that they had ordered – i.e. Hitachi hardware – had

been delivered to Autonomy's Pleasanton facility; not because they had agreed to take title to the EMC hardware by way of some 'bill and hold' arrangement.

1794. I also accept the Claimants' submission that IAS 18 Appendix IE §1 only relates to 'bill and hold' sales *"in which delivery is delayed at the buyer's request but the buyer takes title and accepts billing"*. It is plain that Morgan Stanley did not request that delivery be delayed. Mr MacGregor seems to suggest that the same principles should apply "by analogy" where delivery is not delayed at the request of the buyer, but is instead prompted by the seller. That is not what happened in this case. But even were the principles in IAS 18 Appendix IE §1 to stretch that far – and I agree with the Claimants that it is illogical to imagine that a seller could still recognise revenue even though it was not in a position to effect delivery to the buyer – it would still need to be shown that Morgan Stanley (a) agreed to take and (b) did take title to the EMC hardware. Again, there is no factual basis to support such a conclusion.

1795. In any event, and as the Claimants also emphasised, Mr MacGregor's analysis is wholly removed from what Deloitte understood to be the position. It is plain that the view Deloitte took at the time was that, in order for revenue to be recognised in Q2 2009, they (Deloitte) needed to be satisfied that the hardware had actually been physically delivered to Morgan Stanley by 30 June 2009 – see (i) Mr Welham's unchallenged evidence (see paragraph 1786 above); (ii) Mr Welham's email dated 15 July 2009: "*I have talked to Steve [Chamberlain] re the EMC delivery point*"; and (iii) Deloitte's file note: "*We have also examined correspondence between Autonomy and Morgan Stanley over the completion of the order and Morgan Stanley's acceptance and beginning of the payment process as evidence of delivery of the hardware (and hence that shipment from EMC has taken place)*". As can be seen from Mr Chamberlain's email to Deloitte of 13 July 2009, Autonomy understood that Deloitte's focus was on delivery: "*we are trying to get invoices from EMC which should come in overnight. These should show delivery date*".

1796. In short: Mr MacGregor's analysis was ingenious but unsupported by the facts, and inconsistent with Deloitte's approach at the time. Regrettably it seems to me that his efforts went beyond what was appropriate and became in this context, unrealistic and partisan. I agree with the Claimants' conclusion that the simpler truth is that the revenue was wrongly recognised by Autonomy in Q2 2009.

1797. There was no dispute as to Mr Hussain's involvement: I find that he knew that there was no proper basis for recognising revenue from the transaction in Q2 2009.

1798. As to the position of Dr Lynch, having fairly recognised and accepted that the Claimants could not, in those circumstances, allege 'guilty knowledge' on his part, Mr Rabinowitz submitted only that the episode was a further example of Autonomy not being the *"bright, cleaner than clean company that did everything by the book"* that Dr Lynch had depicted. That is so.

**Issue (6): Did HP know about the hardware sales pre-acquisition and continue them after it?**

1799.  The Claimants' case is that prior to the acquisition, the only hardware sales that HP knew about were appliance sales, and it did not know about the loss making "pure hardware" sales. HP's 20 November 2012 announcement of the write-down stated that the hardware sales were a recent discovery, allegedly identified after a whistle-blower came forward after the departure of Dr Lynch. That was also the position adopted by Ms Lesjak in her witness statement: she said that it was not until after Dr Lynch had left and Mr Scott had come forward with his allegations that she came to learn that Autonomy had been reselling third party hardware at a loss.

1800.  The Defendants' case, which is of course primarily relevant to the issues of inducement (and, in the misrepresentation claim, reliance) and loss is that in truth, HP knew before the acquisition that Autonomy engaged in substantial hardware sales. Further, HP was certainly aware of the nature and amount of the hardware sales from shortly after the acquisition, but expressed no surprise, and did nothing about it, suggesting (according to the Defendants) that at the time Autonomy's hardware sales were not a real concern for HP, contrary to the picture that is now being painted, and that it would have made no material difference to the acquisition or its terms if HP had had detailed knowledge of the hardware sales in advance.

1801.  The Claimants rejected this. They contended that there was nothing in the Defendants' assertion that HP knew about Autonomy's hardware sales (apart from appliance sales) pre-acquisition, and nor did HP become aware of the sales prior to May 2012.

*Pre-acquisition knowledge and due diligence*

1802.  The Defendants submitted that even before the acquisition was announced, HP must have known that Autonomy sold hardware; and that certainly "*it knew enough before the acquisition to make further inquiries and chose not to*", suggesting lack of concern. The Defendants' punchline, for this as for their case that HP were certainly aware of Autonomy's hardware reselling after the acquisition (see below), was that "*Nobody thought they were buying a different company.*" The issue is of most relevance to reliance (and quantum).

1803.  The Defendants supported these submissions principally on the basis of: (a) what they asserted was an industry understanding that most enterprise software companies do sell hardware ; (b) the fact that HP itself sold substantial quantities of hardware to Autonomy; (c) express references to "*hardware sales, including appliances*" in the course of due diligence  and (d) emails sent by Mr Gersh of KPMG (acting for HP in the due diligence exercise) from which it was said by the Defendants to be clear that "*he was aware that Autonomy was selling self-standing hardware*" and yet "*KPMG never asked Autonomy how much hardware it was selling*".

1804.  There was support for the suggestion that hardware sales by software companies
were commonplace in the evidence of Mr Apotheker and also in the evidence
of Mr Sullivan:

> (1)  Mr Apotheker, who had long experience in the industry, appreciated
> that hardware sales of 5 to 7% of a software company's business "*could
> be quite normal for somebody who doesn't do appliances*." (For one
> that produced appliances, the figure would be higher.) Thus, he
> recognised that software companies would usually sell some <u>non</u>-
> appliance hardware, that is, in the Claimants' terms, "pure hardware".
> Moreover, the implication is that for a software company which also sold
> appliances, hardware sales would be greater than 5 to 7%. He also
> recognised that hardware sales would often be loss making, and that this
> was the reason why software companies sought to avoid selling 'pure'
> hardware:
>
>> "*If only because, for obvious reasons, hardware, in particular
>> when you resell it, you will probably make a loss. At least you
>> won't make a profit. Or the best situation, even if you make a
>> profit, you will significantly dilute your margins*".
>
> (2)  Mr Sullivan gave evidence at the US trial against Mr Hussain that
> hardware sales were common in the software industry, and that he had
> sold hardware to customers both at Zantaz, and also at Steelpoint, the
> software company at which he had previously worked. He also stated
> that Autonomy had made substantial sales of hardware at a profit, to
> Citigroup and Paribas.

1805.  There was other evidence to like effect. Mr Philip Pearson ("Mr Pearson")
"*assumed that <u>as with any enterprise software business,</u> [Autonomy's] business
included additional revenue streams which typically consisted of support,
services and hardware*" (emphasis added); and he believed that this was
common knowledge. He explained that most enterprise software firms would
take on some hardware, services and support work. He was not challenged on
this evidence. Furthermore, HP sold not only to Autonomy but to a wide range
of enterprise software companies.

1806.  Obviously, I would accept that many enterprise software companies sell
hardware; and that this would be generally expected within the limits broadly
indicated by Mr Apotheker. But neither side explored, and certainly it was not
clear to me, how other enterprise software companies accounted for these sales,
nor what disclosure they made in their accounts; or whether they were single or
multi-segmental businesses. If other hardware selling enterprise software
companies generally accounted separately for such sales, or made disclosure of
them, that might have rebounded on the Defendants. I do not make assumptions
either way; but I do not extract much assistance from the point.

1807.  The fact that HP sold substantial quantities of hardware to Autonomy and yet
did not focus on it is, at first blush, surprising. But it seems to me to be more a
forensic point than one of real substance. HP was an enormous organisation,

which on the Defendants' own case was very disorganised, and divided into 'silos' with very poor communication between them. It should not be assumed that one department had the knowledge of another, or even ready access to it. I agree that in an £11 billion acquisition one might have expected the deal team to have made enquiries; and that this is particularly so where, as here, the buyer and the target were operating in closely related sectors, and the buyer was hoping to achieve synergies from operating as a combined business. But the question is whether those making the decision to proceed with the acquisition actually knew; and there is no evidence that they did so. The Defendants' written closing submissions noted that it was *"unclear what checks HP actually carried out in its initial records of sales to Autonomy."*

1808. In my judgment, the Defendants overplayed the facts said to support the submission that there was discussion of Autonomy's hardware sales in the course of due diligence and that the fact that neither HP nor KPMG displayed much interest or asked any questions in relation to them suggests that the sales were not of significance for HP in the deal. As to that:

(1) Mr Sarin recalled an exchange with Mr Hussain in relation to appliance sales; and the Defendants relied on the fact that he did not seek to find out how large those sales were, or even to apply his mind to that question: he said that he did not think about what the number for such sales might be. However, that does not reflect that Mr Sarin's evidence was that what he had been told, he *"would think"* by Mr Hussain, was that (a) *"sometimes customer wanted the software on an appliance or a box"* and that would be shipped by Autonomy to the customer and (b) although in that way *"appliances were sometimes sold to customers....it was a small part of their business".* Further, when asked *"what level of appliance sales"* he thought Autonomy was making, his reply was *"a very small number".* He was asked to quantify that in numerical terms; but reiterated that he was *"comfortable that it was a very small number"* and that the demand was from *"a small handful of customers"* adding when pressed again that he thought it *"very minimal".* Whilst more generally I formed reservations about Mr Sarin's evidence, I found his answers credible on this point.

(2) The Defendants also placed reliance on a list of questions prepared by KPMG which Mr Sarin received on 8 August 2011. The Defendants submitted that the contracts referred to in the list *"included contracts in part for the sale of hardware, as the list of questions made clear."* However, all that was included was (a) a contract for *"hardware and software development"* (as regards which the question was how revenue was recognised, whether on completion or as and when delivered); (b) a contract which was stated to include *"implementation of networking, hardware and infrastructure procurements and deploying hardware set up and configuration"* (as regards which the question was how services, including professional services, were recorded). In my view, only (if at all) with hindsight does that appear to suggest separate sales of hardware.

(3) The Defendants suggested that Mr Gersh was very reluctant in cross-examination to accept that he had been aware that Autonomy sold any hardware, even in the context of appliance sales: they described as *"close to nit-picking"* his position that appliance sales did not amount to sales of hardware, but rather to sales of software, the method of delivery for which was hardware. They went on to suggest that he ultimately accepted that he had known that Autonomy was selling some hardware, though they accepted that he continued to insist this was only as a component of, or at least in conjunction with, a software sale. But my understanding is that Mr Gersh was explaining that as matter of accounting:

> *"...the appliance is a software sale. It's just the appliance refers to the method of delivery of the software and because it's a sale, the cost of the sale is the hardware, which we understood to be in the cost of sales line."*

(4) His later answers, when pressed again, seem to me to show how very different was KPMG's understanding than it is now suggested by the Defendants they had (and, indeed, to illustrate how effective was the disguise that Autonomy devised):

> *"The client is buying...the client is buying software...because it's buying the product which Autonomy makes, which is IDOL. It's not buying – or at the time when we were doing due diligence, Autonomy is presented as a software company and it sells software. And so what are customers buying from Autonomy? We understood they're buying software and in this case Autonomy is – in some cases it is selling its software already pre-loaded to a server, which they refer to as an "appliance"."*

(5) Mr Gersh added later that:

> *"the commentary around the appliance sales was that it was insignificant and didn't change the margin profile, which to us meant that there was an immaterial amount of hardware being sold as part of the appliance product. So it was more material items in the revenue that we discussed at length".*

(6) The Defendants then contended that in fact, Mr Gersh and his team must have known from their review of contracts that Autonomy sold hardware, and that this was not restricted to appliances as HP uses the term in these proceedings. Mr Gersh confirmed that he read all of the contracts in the data room. These included a contract providing that the customer would be *"entitled at any time during the term of this Schedule to order Hardware set out in the Hardware Annex"*; and another contract

to which was annexed a purchase order for 48 storage cells together with maintenance and support. In each case, Mr Gersh claimed that he had assumed these were references to "*a solution involving Autonomy's product*" or to an appliance. He gave the following evidence:

> "A.   I saw contracts which had -- three contracts which described hardware which we assumed were appliances.
>
> Q.   So you assumed that they were appliances, but they didn't say on the contracts that they were appliances? It was your assumption, correct?
>
> A.   That's correct."

(7)   The Defendants claimed that there was no basis for such an assumption in the documents, and KPMG, as a firm carrying out due diligence, should not have contented itself with assumptions: its job was to probe and ask questions, and to consider critically the documents it reviewed. They contended further that it is likely that he did appreciate from these documents that Autonomy sold some non-appliance hardware, and likely also that he did not think it would be a matter that would have caused concerns for HP, since if he had regarded it as an important point, he would have asked further questions. However, that seems to me to overlook Mr Gersh's evidence in his witness statement (which was not challenged, and which I accept) about the subject-matter and nature of the (redacted) contracts which Mr Gersh saw in the Data Room:

> "*I recall that of the three redacted contracts referencing hardware that we saw in the Data Room, two seemed to me to meet Autonomy's description of an appliance. The third, which I surmised was a contract with UBS, contemplated a large package solution[248] providing software, services and hardware for storage, with the core element being Autonomy software. The commercial components of this contract were difficult to break down. Although it appeared that hardware might be delivered separately and at different times from the software, we presumed it had been purchased from a hardware distributor (or, less likely, a manufacturer) and "passed through" to the customer as part of an overall solution being provided to UBS.*"

---

[248] These were direct sales by Autonomy to UBS (VT28 and VT34) after "dummy" VAR sales to Capax Discovery addressed in the chapter of this judgment on the impugned VAR transactions. Looking ahead, it will be seen that I have concluded that "VT28 and VT34 were exemplars of the pattern. The sale to the VARs were illusory and effected no change in control or transfer of risk; no revenue should have been recognised in respect of them."

(8) Nevertheless, the Defendants then submitted that it is clear from an email sent by Mr Gersh on 8 August 2011 that he was aware that Autonomy was selling self-standing hardware. Commenting on analysis performed by one of his colleagues at KPMG on the contracts in the data room he said the work needed to be reviewed, amongst other things because "*as far as I can tell they have not captured free software or hardware pass-through.*" As apparent from the quotation in the preceding sub-paragraph, Mr Gersh told me that (on the contrary) "*hardware pass-through*" was a reference to appliance sales. The Defendants submitted that this cannot be right because of the way Mr Gersh used the phrase in another context. In his witness statement, he discussed the discovery in October 2011 of a $41m payable to Dell, which he considered too large to relate to just appliance sales. He said that "*I remember that what we collectively had heard from Mr. Chamberlain was that the payables to Dell related to pass-through hardware sales Autonomy had made and that the sales had been recorded on a "gross" basis*". (They referred me also to how one of Mr Gersh's colleagues used the term "*pass-through hardware*", submitting that it was plainly not a reference to appliances as the Claimants have used the term in these proceedings.) In my view, this exercise in semantic comparison was misplaced. It is plain that the phrase was used in different senses in different contexts; for example, the Claimants referred to its use by Mr Briest (an analyst) in a research note dated 23 July 2010 in a context which plainly was intended to signify appliance sales, and was understood in that sense by, for example, Mr Shelley. The question is whether Mr Gersh's evidence of what he meant by it in the particular context is to be rejected: and I do not consider it should be. It is entirely consistent with his explanations as described above.

1809. In summary, I have concluded, and find, that neither Mr Sarin nor Mr Gersh knew, or on the evidence before me, had reason to know or further enquire about the pure hardware sales.

1810. Dr Lynch's evidence was that after the acquisition had been announced, but before it had been completed, he discussed Autonomy's hardware sales with Mr Robison, and that they specifically considered together whether Autonomy should continue to sell Dell and EMC hardware in the run-up to the acquisition. Dr Lynch also said that it was that conversation that enabled him to give an affirmative answer when Mr Sullivan had asked him whether or not he should proceed with the Dell hardware sales after the acquisition. All this was, however, hotly disputed by the Claimants, who noted also that the alleged conversation went beyond Dr Lynch's pleaded case of a discussion about "*the synergies that might be achieved in respect of hardware*". In his witness statement on behalf of the Claimants, Mr Robison denied any such discussion about hardware and emphasised that he was "*not aware of their possible existence until I heard that HP was making that contention in connection with its write-down, long after I retired from HP.*" He added:

> "*Moreover, if Dr Lynch had informed me that Autonomy was reselling a substantial amount of third-party hardware and reported it as revenue,*

> *I absolutely would remember because that information would have immediately raised serious questions about Autonomy's reported margins…"*

1811. Unfortunately, Mr Robison had a medical condition resulting in it being agreed that he was unfit to attend for cross-examination. Dr Lynch was cross-examined and it was put to him that he had made up the conversation. In the course of that cross-examination, Dr Lynch was shown emails that suggested that Mr Sullivan had been given approval to continue the Dell hardware sales in August 2011 and not in late September 2011. Dr Lynch reacted to this by suggesting that perhaps he had had more than one discussion with Mr Robison, including also one on the very day of the acquisition (18 August 2011):

> *"I think, although I'm not sure, that actually what happened, Mr Sullivan's email[249] comes in while I'm standing next to Mr Robison. That's why I'm able to give him an answer. And then the subject of these things come up on more than one occasion between that point and the 21st.*

> *What we're doing is, as a courtesy, every time there's something that "We need to know what will happen if the deal closes", we're asking Shane [Robison] what he wants to do.*

> *And you can see in there there's communications and Shane sends some of them on to Leo [Apotheker] as well."*

1812. The Claimants emphasised that no conversation of that kind on the day of the announcement had ever been suggested and it was not corroborated by the documents or supported by any other evidence; they dismissed this as *"simply made up…in the witness box in the hope that he could salvage his position."*

1813. In the round, in my judgment, there is no sufficient evidence to demonstrate pre-acquisition knowledge on the part of HP of any material hardware sales (other than a small number of appliance sales); nor is there sufficient evidence that the due diligence team were put on inquiry in that regard.

*Post-acquisition knowledge and discussion of hardware*

1814. The Defendants contended that whatever HP had known before the acquisition, it is clear that HP's accountants and management had a detailed understanding of Autonomy's hardware sales from very shortly afterwards.

1815. They relied principally on HP's reaction to what it would depict as a "discovery": no complaint was made or surprise expressed, and the sales were permitted to continue, because, so the Defendants suggested, none of this came as a surprise because HP already knew.

1816. Although they became co-mingled in the Defendants' closing submissions, there were two strands to the Defendants' resulting case: the first strand related

---

[249] Dated 18 August 2011  asking whether he should proceed with the Dell hardware sales.

to the pre-acquisition period, and in summary was that the lack of surprise shown by persons such as Mr Sarin confirmed that the deal team was aware even before the deal was finalised that Autonomy was selling substantial amounts of hardware. That point goes to both reliance and loss. The second strand related to HP's conduct in announcing in November 2012 that it had found out about the hardware sales only after Dr Lynch's departure, which was false and showed that HP had misled the markets, casting doubt on their corporate integrity and confirming the trumped-up nature of all the claims.

1817. The Claimants disputed both the factual basis of this aspect of the Defence and its relevance. Ms Whitman stated in her witness statement that she did not know of any 'pure' hardware sales until Dr Lynch told her about them in 2012 and she instructed him to discontinue the practice (and was not cross-examined about that). Ms Lesjak and Mr David Duckworth ("Mr Duckworth", who had the title of HP's Mergers, Acquisitions, Divestitures and Outsourcing, Finance Integration Project Manager) all lined up to say (in effect) that the sale of hardware (or at least non-appliance hardware) did not become a point "in focus" for them until the *"whistle-blower"* (Mr Scott) *"came forward"* in May 2012. In any event, the Claimants added, Bidco's cause of action was complete at the time of the acquisition, and *"it is difficult to see what turns on when precisely after the acquisition HP learned of the earlier hardware sales."*

1818. Turning to the chronology, it is clear that KPMG (who were in the course of preparing a closing balance sheet report) discovered the volume of hardware sales after a question had been raised about a large amount payable to Dell, and that then KPMG and E&Y (who, as HP's auditors, were reviewing the report) each informed HP about the hardware sales in late October or early November 2011:

(1) On 24 October 2011, KPMG wrote a draft report addressed to Meeta Sunderwala in HP's finance department, dealing with Autonomy's closing balance sheet. It stated that:

> "*There is approximately $41 million owed to Dell as of Close ($22 million in payables and $19 million in accruals). We believe these payable* [sic] *are related to pass-through hardware sales to customers which Autonomy records on a gross basis*" [Emphasis supplied]

(2) Later in the report they added that:

> "*The remaining accounts payable balance mainly relate to data center server costs, or hardware Autonomy sells on a pass-through basis*".

(3) By early November 2011, E&Y had a detailed understanding of Autonomy's hardware sales. On 4 November 2011, Ms Rebecca Norris of E&Y sent an email to others on the E&Y team, stating that *"We have finished our review of Deloitte's workpapers for the 2010 audit of Autonomy"*; and the email noted that:

> *"The company had about $100 million in hardware revenue. This is not mentioned in the financial statements or KPMG reports. Long story short, they have VAR arrangements with some of the large hardware providers and th [sic] $100 million of hardware revenue is primarily just pass through revenue for laptops and servers. This hardware is normally sold at a loss to 4 or 5 large customers in advance of software sales. Some of these costs are allocated to sales and marketing. Their software is normally not on the hardware. We can further discuss commercial reasons and accounting on our call."*

(4) On 7 November 2011, Mr Kirk Parish of E&Y wrote to Rachel Scott, head of HP's revenue recognition team, stating that it:

> *"Looks like there may be as much as $100 million in hardware sales on an annual basis, but it was not mentioned in the due diligence report."*

(5) On 9 November 2011, Brian Outland of E&Y raised the same point in an email to Ms Betsy Branch of HP, noting that some of the hardware was sold at a loss and the loss allocated to sales and marketing; and he said that he was going to discuss the point with Ms Sunderwala.[250]

1819. It is also clear that on 11 November 2011, Mr Welham and Mr Murray of Deloitte discussed the hardware sales and accounting at a meeting with E&Y. E&Y's note of the meeting shows that they were told the amount of the sales, the amount of the loss incurred, the commercial rationale and the accounting treatment:[251]

> *"Hardware sales*
>
> *During FY1O we observed that Autonomy purchased hardware from third parties (e.g. Dell) of $115m and sold this to customers for $105m as part of its goal to become the end to end supplier of archiving services for its customers. The associated cost of this hardware was split between cost of sales ($94m) and sales & marketing ($21m) which results in an 11% margin recognised on the hardware sales. The recognition of a margin was considered appropriate by management. However, Deloitte recorded an audit adjustment in relation to this margin. In addition, we observed that Autonomy concluded that it was appropriate to account for these pass through sales on a gross basis. HP will be required to assess*

---

[250] I should note that in HP's written closing submissions it was asserted that "*There is no evidence of the EY memorandum [of a review of Deloitte's working papers] ever having been sent to anyone at HP*". That may be so: but the email referred to shows that the only "surprise" (hardware sales in the amount of $100 million pa) was reported to HP.

[251] Mr Welham did not recollect the detail of the discussion, but said it is likely that he did discuss these matters with E&Y.

> *the appropriate accounting and policies for hardware sales under*
> *US GAAP and HP policy."*

When shown this document in cross-examination, Mr Yelland accepted that
E&Y were fully aware of the hardware sales being carried out by Autonomy.

1820. The first strand of the Defendants' case was focused on the reaction of KPMG
and Mr Gersh, and then of Mr Sarin. I consider first the reaction of KPMG.

1821. Mr Gersh and his team were (in Mr Gersh's words in his witness statement)
*"shocked and concerned to see such large payables to a hardware*
*manufacturer."* Mr Gersh added (in his witness statement):

> *"The existence of significant payables to a hardware manufacturer was*
> *inconsistent with what we understood to be Autonomy's business from*
> *the information we received during pre-acquisition due diligence.*
> *Margins (and profitability) on hardware sales are typically much lower*
> *than margins on software sales, which could mean that HP had*
> *overvalued Autonomy. Mr Boggs [252] and I immediately began asking*
> *Autonomy management about Dell payables."*

1822. Mr Gersh described in some detail in his witness statement the extent and results
of those investigations of Autonomy's management, and in particular
conversations and exchanges with Mr Chamberlain. It is not necessary to repeat
this detail: the flavour of the exchanges and their result can I think be captured
in the following examples of Mr Chamberlain's responses:

(1) After further enquiries over November and December had prompted no
response from Mr Chamberlain, and his sudden cancellation of a
meeting to discuss the matter, on 24 January 2012, Mr Chamberlain
wrote in an email in purported answer to the details requested of the
*"Dell payable"* as follows:

> *"...for certain strategic accounts we also procure hardware as*
> *well as software. This will all be sourced via HP in future but the*
> *process of setting up procurement via HP is painfully slow."*

(2) In response to an email dated 6 March 2012 from Ms Sunderwala[253]
(after HP's EFR team had, through her, been told of the continuing
inquiries) asking him *"What percentage of [Autonomy's] total annual*
*revenues is related to hardware revenue (this can be historical revenues*
*related to Dell purchases vs a go forward view)"*, Mr Chamberlain sent
an email two weeks later, on 21 March 2012, informing her that this was
his last day at Autonomy and in relation to the hardware question:

---

[252] Jamie Boggs, was described by Mr Gersh as his colleague and *"a director [of KPMG] who was*
*heavily involved in both the pre- and post-acquisition engagements for HP related to the Autonomy*
*acquisition"*.
[253] Senior Director, Accounting Policies and M&A Reporting in HP's EFR team.

*"confirmed, less than 10%"*

1823.  KPMG referred to the hardware sales in a draft report on Autonomy's closing balance sheet, dated 26 January 2012.  The report stated that:

> "*The remaining accounts payable balance mainly relate to data center server costs, or hardware Autonomy sells on a pass-through basis. Management stated these hardware sales are recorded on a gross basis.*" [Emphasis supplied]

1824.  Mr Gersh explained in his witness statement that by March 2012 HP's October 2011 financial reporting deadline that KPMG's closing balance sheet engagement had been intended to support had long since passed, and EFR in effect took over the outstanding inquiries. He completed his witness statement as follows:

> "*At the time KPMG's involvement ended, I was not aware of any satisfactory explanation for the Dell payables having been provided by Autonomy, and my team and I still did not understand what hardware Autonomy had been selling, in what arrangements, and with what associated revenue recognition.*"

1825.  I consider that Mr Gersh's reaction of surprise was genuine, confirming my previous assessment that he had not become consciously aware of the pure hardware sales in the course of due diligence.

1826.  Turning next to Mr Sarin:

(1)  On 15 November 2011, Ms Kathryn Harvey ("Ms Harvey") of HP's EFR M&A Policies and Reporting team wrote to Mr Sarin about Autonomy's hardware sales:

> "*There was one other item that we just learned which I wanted to ask about/bring to your attention. During discussions with Autonomy folks in conjunction with our valuations, we learned that they have had approx $100M/ year in revenue coming from the sale of Dell HW products. Was just curious if you were aware of this when you put the model together? It doesn't have any impact on our valuations, but it likely won't be part of Autonomy's future revenue stream and didn't know whether it was included in their revenue forecasts/targets.*"

(2)  Mr Sarin responded by email on the same day as follows:

> "*The Dell-based revenue you reference is from which Autonomy products? They are predominantly a software company with little or no services or hardware. I am guessing they are trying to grow their "appliance" business i.e. Autonomy software*

> *bundled on industry-standard Dell hardware. I suspect this is sell-through revenue where they are getting a margin as they sell Dell appliances. Again, I am just conjecturing and don't know for sure.*
>
> *I don't believe Autonomy breaks out this Dell-based revenue in their financials and we haven't either…"*

    (3) But after that response, Mr Sarin did nothing to discuss the matter further or follow it up in any way.

1827.  In cross-examination, Mr Sarin struck me as uncomfortable:

    (1)  He could not explain why he had never spoken to Ms Harvey about what, on the Claimants' case that nothing was known about hardware sales except for *de minimis* appliance sales, was a startling revelation.

    (2)  He told me that he *"suspected at this time or my guess at this time was that what she was telling me was probably not right"*, but he offered no explanation why he did not seek to find out how it could have occurred and correct it: he accepted that he had done nothing to follow up on the matter in any way.

    (3)  He resorted to suggesting that he thought it must be appliance sales: but that was hardly consistent with the notion of such sales being minimal in amount.

    (4)  He then resorted to seeking to pass off the matter as simply an issue for accounting; he told me:

> *"Again, she is just doing whatever she's doing in the accounting department. I don't have to go and correct everybody."*

    (5)  Finally, he resorted to saying that he *"wasn't tasked with that assignment and…left HP a few months after this acquisition."*

1828.  Mr Sarin's evidence was unimpressively given and offered no answers. The question why he had responded to Ms Harvey so impassively and then done nothing to follow up remained unanswered. I do not accept that he thought that Ms Harvey was simply mistaken; nor that the explanation for $100 million was that the sales were appliance sales. In retrospect, his conduct looks strange: and I suspect his discomfort in the witness box was because he could see that.

1829.  But ultimately the question is whether Mr Sarin turned a blind eye because he knew all along what would be revealed; or whether there is some other explanation: perhaps that he was simply, by that stage unconcerned, especially since Ms Harvey had expressly stated that it did not impact the valuation; or perhaps because he put his head in the sand and hoped that something would

turn up which did not demonstrate inadequacies in the due diligence exercise for which he might be blamed in circumstances where much blame was being thrown around. In my judgment, one of the latter two is the more likely, because I remain persuaded (and have so found) that he did not know of significant hardware sales. Furthermore, had he known, the obvious course, given he was told that it would not impact the valuations, was to explain it away, not leave it for others to answer.

1830. In my judgment, the evidence does not establish that HP knew of the substantial pure hardware sales prior to the acquisition: and I find that they did not.

1831. The second strand focused especially on the position of Ms Lesjak and when it was that she came to know of the hardware sales. I did not understand it to be suggested she had any such knowledge before the acquisition. It is most unlikely that she did: she was an opponent of the deal and it seems to me very likely that she would have deployed against it anything she knew about as showing there to be a problem.

1832. As to the investigations which revealed the sales, she repeatedly asserted in her oral evidence that none of these matters had been brought to her attention at the time. She asserted in her oral evidence that she did not know of the work being done *"several layers down in my organization"*. Further, she told me that she did not recall either Ms Sunderwala or Mr Murrin speaking to her about these matters at the time. She said she was:

> *"not informed about it until after the whistle-blower came forward, except for some documents that I'm sure we'll get to, that were presented to the audit committee and me later."*

1833. The Defendants made the point that if that were right it would suggest that they were not considered to be important news. But they submitted that in fact, it appears that the hardware sales must have been drawn to Ms Lesjak's attention at about that time.

1834. On 11 November 2011, Ms Lesjak had one of what she told me were her regular CFO update meetings with E&Y. A short slide deck was produced by E&Y as an agenda for the meeting (2 pages plus a cover sheet). One of the agenda points in relation to the Autonomy acquisition was a statement that "*Revenue includes $115M of hardware.*" The same day, Ms Lesjak approved an E&Y slide deck for HP's Audit Committee meeting the following week, saying "*Looks good.*" The slide dealing with Autonomy (one of the Q4 areas of audit focus) identified that 11% of Autonomy's revenue was from hardware.

1835. The Defendants submitted (and had put to Ms Lesjak) that it is highly likely the point was discussed with her, given that it was on the agenda, and given that E&Y had been flagging it in emails over the previous days sent to people in Ms

Lesjak's department. She said that she did not recall a discussion on the point, but reluctantly accepted that it was possible there was. The Defendants submitted that the truth was that she did not remember either way, but was trying to avoid accepting that she had in fact known about the hardware sales long before HP says, and said to the world in November 2012, it had discovered them. If she did not raise it with anyone else at the time, the Defendants contended that is because she did not think it remarkable that Autonomy had $115m of hardware revenues.

1836. This was obviously a point Ms Lesjak had anticipated being raised, and her evidence had plainly been mulled over in advance. Her position in cross-examination was, in summary, that she simply did not focus on what was set out. Unsurprisingly, since she plainly valued her reputation as a safe pair of hands and may well have felt she would be supposed to have dropped the ball, her evidence came across as rather defensive. She refused to accept that it was obvious that the point referencing hardware revenue would have been discussed; she resorted to the position that it was possible that it had been, but as she could not remember, she could not accept that it was probable. I accept the Defendants' submission that it is more likely than not that she would have read and understood the reference to revenue from hardware sales: and I find that she did so. It is less clear whether there was any discussion of the point: her evidence was that she *"did not recall ever seeing or focusing on or having a discussion about hardware."* On balance, I accept that; but the question remains why it did not register with her as a concern. In one of her many denials that she had understood the true position, and the fact that she did not react with surprise demonstrated that she had known about it long before then, she said this:

> *"...I don't actually know what happened. I've no recollection of a discussion around the hardware. In fact when, during an internal investigation after the whistle-blower, they showed me the decks, I was quite surprised because I did not recall ever seeing or focusing on or having a discussion about hardware."*

1837. She suggested that this may have been because she would have assumed that any such sales were (a) properly accounted for and (b) appliances: but she accepted this was hypothesis, rather than recollection. However, she went on to make a further point to explain why the point would not have concerned her, which was considerably relied on by the Claimants: she and her team were only focusing on the accounting. As a matter of pure accounting, there was nothing wrong with *"sell-through sales", "as long as it was accounted for correctly and disclosed…"* She told me in cross-examination:

> *"...I also think what's really important to understand is, even if I focused on it, the most that I could hypothesise is that I thought it was appliance, and that the deal team that put the business case together also understood that there was hardware and that was captured in the business case that they put together.*
>
> *...*

> *My team, from top to bottom, did not know what was in the business case. So from their perspective, as long as this was accounted for correctly, and ultimately disclosed appropriately and the deal team knew about it and it was captured in the business case, there isn't an issue. The issue arises if the due diligence team never understood there was hardware, never understood in what product category that hardware is being reported and disclosed to them, and it's in that failure that the issue arises."*

1838.  Mr Yelland was also aware of Autonomy's loss-making hardware sales, long before the investigation preceding the write-down. On 22 March 2012, he received an email from Mr Ganesh Vaidyanathan, Autonomy's Director of Accounting, asking him to approve a payment to Dell of $942,072.33. The email explained that "*This is for the hardware orders that we source from them and sell through to our customers at a loss of approximately 10%.*" Mr Yelland accepted that he read the email, although he had not by then taken up his post as CFO. Once in post, on 17 April 2012, he received and approved a similar request, this time for $478,734.43; again, this explained that it was "*sell through to our customers*" at a 10% loss. He said that he did not know the business rationale for the sales, but he raised no objection to the payment; and he accepted that he had access to all the financial information to tell him precisely the extent of the hardware sales. Indeed, he continued to approve payments to Dell as late as Q3 2012.

1839.  Ms Harris's evidence was also that HP had detailed knowledge of the hardware sales from an early stage. She explained that Mr Duckworth was already aware of the hardware sales when she first met him in Pleasanton (in or around November 2011), and that he knew the details of all the accounting codings. Indeed, she said that it was "*entirely impossible that [HP] weren't aware of*" the hardware sales and hardware cost of sale*s* given the conversations she had had with Mr Duckworth. It was clear from her cross-examination that she was outraged when she first learned, via Mr Hussain, that HP was contending that it was unaware of the sales until a later date. If the matter had been a shock or surprise to HP, queries would have been raised, but Ms Harris never received any information requests from HP about hardware or hardware customers.

1840.  Mr Duckworth himself expressly denied in cross-examination when it was put to him that he was aware of Autonomy's hardware revenues and hardware costs when he conducted what was referred to as "the mapping exercise". He explained:

> *"I was not. That was not my focus. There was lots of different accounts, lots of different cash accounts, lots of different, you know, accounts across the balance sheet. My structure – my focus area was not on the type of activity that Autonomy was doing. It was just to make sure that whatever they had in their general ledger had an appropriate mapping to the HP account. I actually did not remember this being in the chart of accounts mapping until after Lisa Harris had referenced me in the suit and said that we had this conversation, I actually had to go back into*

> *the chart of accounts to find on this account that there was indeed a mapping exercise, because I had no recollection of this. I also searched 3,000 emails that I had on Autonomy, and I saw no reference to any hardware revenue or hardware reference whatsoever."*

1841. Ms Harris also gave evidence that in early April 2012, Mr Yelland had asked her "*why aren't you selling HP hardware?*"; and she also said that she believed that he would have known the commercial rationale for the sales. She was not challenged on either of these points.

1842. Lastly, the Defendants relied also on the open (that is, not in any way covert or disguised) continuation of Autonomy's hardware transactions post-acquisition. After the acquisition, Autonomy sought hardware from HP to supply to its customers. In April 2012, in the wake of the supply chain problems caused by flooding in Thailand, Autonomy was having difficulty obtaining hard drives from HP, to be supplied to Citibank as part of an appliance deal (as Dr Lynch accepted in cross-examination). Dr Lynch raised the issue directly with Ms Whitman, who would have been aware then that Autonomy was selling hardware, but expressed no surprise. She was not cross-examined about this. Further, in his evidence in the US trial, Mr Sullivan stated that hardware sales continued post acquisition, and no one suggested hardware should be hidden.

1843. Indeed, it was only in June 2012 that a decision was taken to stop hardware sales. An email dated 13 June 2012 from Mr Yelland to Mr Veghte records a number of decisions from a call the previous day. These included various "*Decision*[s] *regarding the business we do*", the first of which was as follows: "*We are no longer reselling hardware unless an appliance or key enable* [sic] *of software sale.*"

1844. The Defendants concluded on this aspect of the matter that:

> "*This history belies HP's claim that knowledge of the full details of the hardware sales would have been significant to it. It knew enough before the acquisition to make further inquiries and chose not to. It knew everything after the acquisition and was relaxed. Nobody thought they had bought a different company. The history also shows that HP misled the markets in November 2012 when it claimed that it had found out about the hardware sales only after Dr Lynch's departure.*"

*My assessment*

1845. There is no doubt (and I find) that by November 2011, relevant persons within HP and its investigating accountants (E&Y and KPMG) knew that Autonomy had been undertaking hardware sales to the value of in excess of $100 million per year through the Relevant Period.

1846. However, HP was a huge company with 325,000 employees, and organizationally both bureaucratic and fragmented. It is important to be careful to distinguish between (a) what was known prior to the acquisition by the 'deal team', (b) what was known prior to the acquisition by Ms Lesjak and the finance department, (c) who came to know of those sales after the acquisition, and (d) what the reaction of each group to the information provided by E&Y and KPMG was and what (if anything) it reveals about their then state of knowledge or understanding. It is convenient to approach the matter in reverse chronological sequence, starting in consequence with post-acquisition knowledge.

1847. There is no doubt (and I find) that Ms Sunderwala, and thus the accounting side of HP's EFR team, knew of the volume hardware sales as from late October 2011, both from KPMG and from E&Y. So too did Ms Betsy Branch who was also in the EFR team. However, I do not consider that they or the tone or content of the investigations made by KPMG and HP's EFR department through Ms Sunderwala suggest that they were already aware of the nature and extent of the hardware reselling strategy. On the contrary, they seem to me to suggest genuine surprise and concern.

1848. The position in relation to Ms Lesjak is curious. She had built her career on caution and carefulness, the "safe pair of hands in a crisis". Yet her response to the suggestion that in a two-page briefing note and slide stack she had been told expressly that *"Revenue includes $115 million of hardware"*, now said to constitute serious dishonesty, is that she simply did not focus on any of it before approving the slide deck for submission to HP's Audit Committee saying *"Looks good"*.

1849. The Defendants invited me to find that (a) the inference from Ms Lesjak's approval of the slide deck was that she had read it, (b) she had known long before HP now says, and said to the world in November 2012, it had discovered them but (c) the reason she did not take any action upon finding out was that it was neither a surprise nor a concern that Autonomy had this source of revenue from hardware sales.

1850. In my judgment, it is more likely than not, and accordingly I find, that Ms Lesjak did read the slide deck and covering note, and also that she attended a discussion about the hardware revenue (though I accept she did not recall it). The question then is what conclusions should follow from that.

1851. Contrary to the Defendants contentions as summarised in paragraph 1849 above, Mr Rabinowitz submitted (in his oral reply) that Ms Lesjak's lack of focus and concern was of no material significance: the reference to hardware sales would only have been of concern to Ms Lesjak had she thought it was something missed by the 'deal team' in constructing and presenting *"their business case"* (for the transaction); and she did not think that. Mr Rabinowitz referred me to her evidence in cross-examination to the effect that it did not register with her as of significance until after the whistle-blower had come forward and detailed the nature of the hardware sales, their use and how they were accounted for. In other words, although she did know from then on of the

hardware sales, she did not focus on what they might signify was not something she grasped properly until later.

1852. It seems to me that the point that ultimately I have to determine is whether Ms Lesjak's defensiveness and/or her lack of surprise and concern, supports the Defendants' case that HP was well aware all along, and certainly before the Acquisition went unconditional, that Autonomy was generating revenues from third party hardware sales. In the end, I have concluded that her discomfort was because, having been told of the hardware sales, she felt that it might be thought that she had dropped the ball in neither appreciating their significance nor digging deeper at the time, and not because she was dissembling in this regard. I had no sense from her evidence, her defensiveness or her demeanour, and I do not consider, that she had any appreciation then, or until the whistle-blower caused her to investigate further, of the true use, purpose and vice of third-party hardware sales to disguise and provide a stop-gap for shortfalls in software revenues.

## Conclusion as to when HP became aware of "pure hardware sales"

1853. As the Claimants noted in identifying the issues to be determined in relation to their Hardware case, the Defendants raised but did not fully explain the relevance of post-acquisition knowledge of the hardware sales; but pre-acquisition knowledge would be relevant to the question of reliance.

1854. I have concluded that neither Mr Sarin nor Mr Gersh, nor anyone else whose knowledge could be imputed to HP/Bidco, knew that Autonomy was routinely selling material amounts of third party hardware separately from any software sales, still less did they know that (as I have determined) their purpose was to cover shortfalls in software revenues and perpetuate the appearance of meeting revenue forecasts, and that to that end their true nature was being concealed and their effect on Autonomy's trading performance was being disguised.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

## THE CLAIMANTS' 'VAR CASE': THE 37 IMPUGNED VAR TRANSACTIONS

### Overview of the parties' respective cases on Autonomy's VAR sales

*The Claimants case*

1855. The Claimants' claims in respect of Autonomy's resort to the use of intermediaries known as Value Added Resellers ("VARs" or "resellers") vied with their claims in relation to Autonomy's sales of 'pure' hardware in the importance the Claimants attached to them.

1856. Although they accepted that Autonomy also entered into a large (but unspecified) number of unobjectionable VAR transactions in the Relevant Period[254], the Claimants identified and impugned 37 high-value VAR licence sales ("the impugned VAR sales") as being contrivances to which Autonomy resorted when an intended sale by Autonomy to an end-user of the same subject-matter as the impugned VAR sale was unexpectedly delayed (or in some cases aborted), leaving a revenue shortfall. Almost all of them were with one of a small cohort of 'friendly' VARs.

1857. According to the Claimants' case, the context of every one of the impugned VAR sales was Mr Hussain's urgent need, at the end of a given quarter, to find revenue which could be presented as satisfying accounting rules for the recognition of revenue, in order to enable Autonomy to meet revenue forecasts.

1858. The purpose of every impugned VAR sale, according to the Claimants, was simply to establish a contract with a VAR, in place of the proposed end-user, from which recognised revenue in the amount of the VAR sale would appear to be generated even though in reality, revenue would only ever be received when the contemplated (but delayed) sale to the proposed end-user actually took place. In some instances, no sale to an end-user ever eventuated. In such cases, the Claimants' case was that other contrived transactions (referred to as *Reciprocal VAR Transactions* ) were entered into in order to enable Autonomy, in effect, to fund the VAR to enable it to appear to discharge its obligations. In a smaller group of cases, the VAR's obligations were, if no end-user sale eventuated, written off altogether; but that was not a solution favoured; it ran the risk of exposing the lack of substance in the VAR sales.

1859. This use of VAR sales took advantage of the fact that under IFRS, unlike under US GAAP, there is no requirement for there to be "sell-through" to an end-user before revenue is recognised. Under US GAAP, the use of VAR sales to generate recognised revenue where no end-user sale had yet been put in place would not have been feasible.

---

[254] Sales to VARs were described as *"Autonomy's primary revenue channel"* in its Annual Reports for both 2009 and 2010. It is of some note that the resellers listed in such Annual Reports were big name companies such as Accenture, IBM Global Services, Cap Gemini, Wipro and HP. MicroLink LLC ("MicroLink") was mentioned in the context of its purchase by Autonomy in the first half of 2010 but there was no other mention of any of the 'friendly' VARs with whom Autonomy conducted the impugned VAR sales.

1860.   Three special characteristics of software also enabled this use of VARs in such a way at the last moment at the end of a quarter:

> (1) Software can be delivered electronically and more or less instantaneously at the last minute.

> (2) Acting as a VAR carries transactional risk in respect of its outlay; but that will eventuate only if no onward sale can be arranged; and whilst the commissions are generous, a VAR need carry no inventory and its overheads may be relatively small.

> (3) Typically, what the VAR acquires is a licence to software: the seller retains the rights, and the ability to sell the licence (an intangible asset that can be infinitely and cheaply reproduced) to an infinite number of other users. A producer/seller (such as Autonomy) is in a position to fulfil with ease a licence sale to the end-user, notwithstanding an earlier licence sale to the VAR, if that is what it chose to do.

1861.   The acceleration of the recognition of revenue apparently generated by the impugned VAR sales (and in some cases the recognition of revenue which should never have been recognised at all) enabled Autonomy to cover a sudden or unexpected shortfall and meet quarterly and periodic revenue forecasts. The Claimants' case was that the objective was thus very similar to, and could be deployed to complement, the objective of Autonomy's 'pure' hardware sales, and both expedients were improper. Unlike the 'pure' hardware sales, however, the VAR sales were fully disclosed and their ostensible purpose was never in dispute.

1862.   The Claimants contended that Autonomy's use of VAR transactions in this way started in earnest in Q4 2009, immediately after what they described as the Defendants' "*lever of choice*" in Q3 2009 and its favoured strategy of reselling pure hardware to plug any shortfalls in revenue came briefly unstuck in Q4 2009, when Autonomy's main hardware supplier, EMC, withdrew from any involvement in *Autonomy's hardware reselling strategy.*" On this analysis, the use of VARs was another lever or device to which Autonomy resorted, with the Defendants' knowledge and authorisation,

> *to bridge the gap between [Autonomy's actual revenue for the quarter] – which was invariably far short of [analysts' and market] consensus – and Autonomy's reported figure, which was generally in line with or ahead of consensus."*

1863.   The Claimants depicted the VARs which Autonomy engaged for its VAR sales as friendly 'placeholders' which were willing to go along with a nominal role accepting nominal risk which involved no real effort or exposure in return for commissions in the form of "Marketing Assistance Fees" or "MAFs".

1864.   The Claimants sought to demonstrate a tell-tale pattern of a VAR sale at the very last moment of a quarter. The VAR would nominally accept a payment obligation and thus risk, but would know that Autonomy would be entirely

responsible for negotiating an end-user sale, and would never call on the VAR to pay the amounts due under the sale transaction out of its own resources. The shared understanding, of which they were in every case assured by Mr Egan, was that Autonomy would wait until either payment eventuated from an onward sale to an end-user, or the VAR could be put in funds by some ancillary transaction orchestrated and funded by Autonomy.

1865. The Claimants accepted that the 37 impugned VAR sales had contractual effect, and nominally transferred to the VAR risk and reward, and managerial control, of the software licence sold. However, the Claimants contended that the impugned VAR sales, all in amounts very considerably greater than any of Autonomy's other transactions with VARs, were not in economic substance sales at all, but arrangements for Autonomy to recognise revenue in advance of the true sale to an end-user.

1866. The Claimants acknowledged that Deloitte had in every case approved the accounting treatment of the impugned VAR sales. Their position was that this, though much relied on by the Defendants, did not provide either a justification or a defence because Deloitte did not and could not know the full picture. In particular, Deloitte were invariably told, and saw in the contract, that there was an express prohibition against any side agreement which might undermine the main VAR contract; but they were never told of the shared understanding between the VARs and Autonomy that, one way or another, Autonomy would see to it that the VAR was insulated from the nominal legal risk.

1867. Normally, as indicated above that would be achieved either by Autonomy crediting the VAR (directly or indirectly) with the proceeds from an end-user sale or by Autonomy funding the VAR through a reciprocal transaction. But the Claimants relied also on what they presented as a 'clean up' operation engaged in by Autonomy personnel in what the Claimants referred to as *the Dark Period*. This was the period after the acquisition by HP of Autonomy but before its integration, and whilst Autonomy's pre-acquisition management was still in control of its affairs. The Claimants alleged that during the *'Dark Period'*, past VAR and 'reciprocal' transactions which had not been paid for or completed were in various ways reversed or expunged. They relied on this as further demonstrating both the impropriety of the entire programme of impugned VAR sales and the knowledge and recognition of their impropriety.

*Overview of the Defendants case*

1868. The Defendants depicted the Claimants' case as based on assumptions which presumed impropriety where none existed, and on evidence in chief which was not reliable, and which, after cross-examination, was revealed not to be supportive of the Claimants' case.

1869. Although VAR is an acronym for "Value Added Reseller", and the paradigm would be a VAR providing additional value to a software company's products by providing services to the end-user, resellers commonly undertake different and very varied roles. The Defendants emphasised that there is nothing *per se* objectionable in the use of VARs as a channel through which software sales are

made, sometimes simply as a 'fulfilment partner' with no active role: indeed, it is common in the software business.

1870. According to the Defendants, the Claimants had sought to portray as suggestive of lack of substance and impropriety features which were commonplace in the market, and entirely *neutral"*. They suggested that the impugned VAR sales were, except for their unusual value, not materially different from Autonomy's many other sales to VARs: as being part of the ordinary course of business of a software seller and entirely unobjectionable.

1871. Thus, they insisted that it was not unusual or improper to use resellers (as the Defendants preferred to refer to VARs) merely as sales channels, or simply as 'fulfilment partners' assisting the supplier with the paperwork required to fulfil a sale to the end-user through the VAR sales channel; or, as in most of the VAR sales in this case, simply to enable the supplier to secure a sale (to the VAR) from which the supplier (Autonomy in this case) could book and recognise revenue in a targeted quarter if a contemplated sale to an end-user was delayed.

1872. Accordingly, they presented the 37 impugned VAR sales as higher value examples of a commonplace sales strategy involving what in Dr Lynch's estimation were *thousands"* of other unobjectionable VAR transactions with *hundreds of resellers"* in the same period. They maintained that there was nothing improper, illusory or wrong about Autonomy's VAR sales, just as there was nothing wrong with selling hardware to boost software sales, in effect as a promotional gambit.

1873. Mr Welham confirmed in cross-examination that Deloitte, for example, understood and accepted as unobjectionable the use of VARs simply to "de-risk" a delayed transaction and book revenue from it (subject to compliance with specified criteria in IAS 18.14 as discussed below). The Defendants submitted that, in the sector, it was not unusual for the reseller to act (in effect) as a guarantor. The effect of smoothing revenue to minimise peaks and troughs was not objectionable; and nor was a VAR transaction with that in mind if it satisfied the legal criteria of IAS 18.14.

1874. The Defendants relied especially on the detailed contracts which in each case established the impugned VAR transactions. The terms of these contracts were clear. They provided for an unconditional sale, an unqualified payment obligation (regardless of whether or not an end-user sale eventuated), allowed the VAR to determine the price of any onward sale and included in every case an unqualified "entire agreement" clause. The Claimants, who (the Defendants repeatedly emphasised) expressly disavowed any suggestion of legal sham, accepted that they were valid and enforceable in accordance with those terms. In such circumstances, the Defendants contended that there was no basis for characterising the substance of the transactions as anything other than in law what the parties had defined them to be: the substance was the contract.

1875. Mr Egan for Autonomy and both Mr Baiocco and Mr Szukalski on behalf of 'friendly' VARs, confirmed that such a VAR sale was not unusual, and was a useful way of ensuring that a supplier such as Autonomy would not be pressurised to sell to a procrastinating or opportunistic end-user at a discounted

price at the end of a quarter (as he also confirmed was a common end-user tactic). Amongst other advantages in the use of the VAR sales channel claimed by the Defendants were that (a) in theory at any rate, it permitted the supplier to reduce the costs of its sales function (as Mr Apotheker agreed in cross-examination) and (b) using resellers potentially gave Autonomy access to more customers (as Mr Egan agreed).

1876.    Mr Egan also confirmed that from the VAR's perspective, there was an incentive (in addition to any commission) for doing such a deal in that it would help the VAR's market presence and help build its own relationship with the end-user.

1877.    For the Defendants, the underlying flaw in the Claimants' approach was that it lost sight of both the contract (which the Defendants suggested was also the best evidence of the parties' intentions) and the point that, for the purposes of IFRS accounting and IAS 18.14, the VAR was the customer, and the status and prospects of any future deal did not impact upon recognition of revenue from the sale to the VAR. The Defendants suggested that the latter mistake originated in a different approach taken in US GAAP with which, of course, HP and its management were more familiar.

1878.    The Defendants relied also on the fact that the VAR transactions and their salient features were well-known to Deloitte, who gave each of the impugned VAR sales a clean bill of health. Thus, for example, Mr Welham confirmed that Deloitte were aware that Autonomy would regularly resort to a VAR sale, so that it could recognise revenue from that sale, at the very last moment before the end of a quarter, since it might only be then that it would become clear that the end-user sale would be delayed. He also confirmed in cross-examination that it would not be unusual for the VAR to have had no contact with the end-user, nor any familiarity with the software to be on-sold under licence.

1879.    The Defendants rejected any suggestion of improper reversals or other impropriety in their treatment of uncompleted VAR transactions in the *Dark Period"*. They insisted that everything that was done was typical of the usual reconciliation and clearing up process following an acquisition. They relied also on the evidence of Ms Harris in her second witness evidence in support of this[255].

---

[255] The Defendants have invited me to re-consider Ms Harris's evidence in this regard. She described what was done as an *"exercise, pre-acquisition, of trying to work out how HP would want to deal with provisions and bad debts under HP's own policies"* and insisted that there *"was nothing improper about any of this"*. She explained also that after the acquisition she and her team *"learned that HP was more conservative than we had predicted, so we had to make more provisions."* She emphasised that a note recording an interview she gave PwC in November 2012 (which she did not see until August/September 2019) had been *"spun"* and she sought to shrug off as *"muddled at this point"* a description in that note of her having said, as regards the pre- and post-acquisition write-offs, that she *"would have said something earlier if I had been allowed to talk about it or correct it, but Hussain prevented me"* and that she *"eventually presented little lists of these practices to come clean".* Her evidence at trial on which the Defendants relied was that *"It was a housekeeping exercise. There was nothing to "come clean" about and I was not prevented from discussing what we had done with HP."* I shall return to assess this evidence later: see paragraphs [2153] *et seq.*

*Number and value, and the two categories, of impugned VAR sales*

1880.  The 37 impugned VAR sales are listed and briefly described in Schedule 3 to the RRAPoC, which is headed *Contrived VAR Transactions"*.  Schedule 3 is 65 pages long and contains a brief summary of the Claimants' allegations in respect of each of the 37 transactions listed.

1881.  Of the 37 allegedly *Contrived VAR Transactions"* (which in the Claimants' written submissions were referred to as "the impugned VAR transactions"), 30 were transactions in respect of which the Claimants alleged there was a side agreement or understanding which negated their economic substance, which resulted in the VARs[256] being in every case no more than a 'placeholder' and precluded the recognition of revenue from them.

1882.  5 of the remaining 7 transactions (VT9, VT17, VT19, VT22 and VT29) were *Collectability VARs* . In those cases, no such side agreement or understanding was alleged. The basis of the Claimants' claim was the allegation that there was never any realistic prospect of the VAR in question actually meeting its payment obligation, and it was never in truth envisaged that any debt owing by the VAR would be called in. Although there was no side agreement asserted, both motive and effect were similar: to generate revenue from what was in effect a contrivance. I deal in more detail with the Collectability VARs in the Schedule of Impugned VAR Transactions that accompanies this judgment. The 2 remaining transactions (VT5 and VT14) are dealt with on their own particular facts in that same Schedule.

1883.  The Claimants calculated that the impugned VAR sales accounted for 88% by value of Autonomy's VAR transactions above $1 million in the Relevant Period. As to their chronological spread, it is not disputed that:

(1)  In Q4 2009, Autonomy made seven impugned VAR transactions each in excess of $1 million and which collectively accounted for $27.6 million in revenue;

(2)  In Q1 2010, Autonomy made a total of five impugned VAR sales which collectively accounted for $28.4 million in revenue;

(3)  After a lull in Q2 2010 when there was only one impugned VAR sale accounting for revenue of nearly $2 million, occasioned (the Claimants suggested) by Mr Hogenson's enquiries, Autonomy made four impugned VAR sales in Q3 2010 accounting for revenue of over $23 million (and two 'reciprocal' transactions yielding over $7 million);

(4)  Seven impugned VAR transactions followed in Q4 2010 accounting for revenue of $25.4 million;

(5)  In Q1 2011, Autonomy made seven impugned VAR sales accounting for revenue of $22.9 million; and

---

[256] All but two of the 30 were transactions with 'friendly' VARs. Only two (VT15 and VT26) were with other VARs (Realise Limited and Tikit respectively).

(6) In Q2 2011 (the last reported quarter before HP's acquisition of Autonomy was announced in August 2011), it made a further four such sales, which accounted for revenue of some $28.6 million.

1884. The amount of revenue recognised in respect of the impugned VAR sales in each quarter was alleged to be sufficient materially to distort Autonomy's quarterly report. That was so even though what is in issue, where (as in 19 out of 37 cases) an end-user sale eventuated, is a timing difference, because when the end-user sale was completed, revenue actually was received in most cases, albeit some time after it had been booked.

1885. It was not suggested that the 37 impugned VAR sales were indicative or exemplars of some wider misuse of VAR sales by Autonomy. In other words, the Claimants confined their claims to the 37 impugned VAR sales, and did not challenge Dr Lynch's estimation in his first witness statement that Autonomy entered into thousands of transactions with resellers in the Relevant Period. I infer that the other VAR sales which were not counted were unobjectionable.

1886. As previously indicated, the Defendants did not adduce evidence in respect of any such VAR sales to demonstrate similar but apparently unexceptional features. I did not therefore have the opportunity to assess whether the mass of VAR transactions which were not impugned shared features said by the Claimants to be objectionable in the context of the 37 impugned transactions, which might have confirmed the Defendants' case that the features relied on by the Claimants (such as the fact that VAR sales were entered into on the eve of quarter-end, and that VARs were excluded from any involvement in the end-user negotiations, as elaborated later) were unexceptional.

*Reciprocal VARs*

1887. Linked with both varieties of impugned VAR transactions were certain transactions, referred to by the Claimants as *Reciprocal VAR transactions",* which (somewhat confusingly) the Claimants lumped together with what the Claimants termed *Reciprocal Transactions"* (as listed in Schedule 5 to the RRAPoC).

1888. So-called Reciprocal VAR transactions were not really "reciprocal transactions" at all, since they did not involve any linked sale to and purchase from a counterparty. But what they were said to have in common was that they involved a purchase or purchases of a product (or services) which Autonomy allegedly did not *need"* and were of *no discernible value".* In other words, both varieties were put in place because of, and achieved, the same purpose.

1889. In the case of *Reciprocal VAR transactions* , all of which were with 'friendly ' VARs, the Claimants' case was that the purchase from the VAR was alleged to have been a device to put the VAR in funds to enable it to repay what it owed in respect of an earlier purchase by it of a product from Autonomy under an impugned VAR transaction. The Claimants relied on these transactions as evidence that the VAR was not in reality on risk in respect of earlier sales giving rise to the debts, thereby showing that the earlier sales lacked substance. I deal with these *Reciprocal VAR transactions* later in this Chapter.

*The Claimants legal causes of action in respect of the impugned VAR transactions*

1890. The Claimants' primary and largest claim in this context was that because they were wrongly treated as real sales generating revenue which could be recognised at the point of sale, the way the impugned VAR sales were accounted for was improper and resulted in a false picture in Autonomy's accounts and published information (on which they maintained they had relied). This is thus in the nature of a claim for false accounting and untrue or misleading published information brought under FSMA, the relevant accounting standard said to have been wrongly applied being IAS 18.

1891. The Claimants also made a claim for alleged "transaction-based losses"; the losses consisting of fees paid to VARs in the context of the impugned VAR transactions and what the Claimants described as *foregone receipts on improper transactions."* These claims for compensation for the Defendants' breaches of duty seek recovery of amounts which are relatively small, with a value amounting to some US$8.8 million.

*The two hurdles for the Claimants in their FSMA claims in respect of impugned VAR sales*

1892. To succeed in their VAR claims under FSMA, the Claimants had to demonstrate (in addition to reliance and loss) both (a) that the recognition of revenue from the impugned VAR sales lacked economic substance and/or did not satisfy the criteria for recognition of revenue prescribed by applicable Accounting Standards, and that therefore Autonomy's published information showing it as recognised revenue was untrue or misleading, and (b) that the Defendants knew that (or were reckless in that regard).

1893. As to (a), the Claimants put their case on two complementary bases. One basis was that in substance the impugned VAR transactions were not sales at all, and thus could not give rise to recognised revenue. The second basis was that the impugned VAR transactions did not satisfy one or more of the criteria stipulated by IAS 18.14 for the recognition of revenue from a sale of goods.

1894. As the case progressed, the Claimants seemed to me increasingly to emphasise the first limb of their case in this regard (that the transactions were not in reality transactions of sale at all, and that this was conclusive without further need to consider the detailed application of the specific wording or interpretation of IAS 18.14). This had the advantage, from the Claimants' point of view, of reorienting the points in issue away from any dispute as to the proper interpretation and application of IAS 18 and towards a fact-based assessment, and also thereby minimising the role of Deloitte.

1895. Although this latterly adopted approach is in some ways the more straightforward, it seems to me that it is important to understand the detailed provisions of IAS 18, both because that is the way the case was originally put, and because that was the apparent approach both of Autonomy and Deloitte.

1896. In any event, both ways of putting the Claimants' case ultimately depend on a careful factual analysis of the actual conduct of the parties to the impugned VAR

transactions. The Claimants maintained that this revealed a clear pattern consistent only with the conclusion that, though contractually enforceable, the VAR sales were not intended to have any real economic effect (save for the payment of commission to the benefit of the VAR as the price of its compliance in what the Claimants presented as (though not a sham in the legal sense)[257] a charade).

1897. In a nutshell, the Claimants' case is that this pattern, especially when repeated over a series of transactions with 'friendly' VARs, made clear that in every case, the VAR was and was always intended to be both insulated from risk and side-lined from any participation. That, the Claimants submitted, belied any true sale and demonstrated the VAR's purely nominal role.

1898. As to (b) and the second hurdle, S.90A and Sch 10A of FSMA require proof of what I have referred to as (see the Introduction to this judgment at paragraphs 467 to 477) "guilty knowledge". The Claimants thus had also to prove that the Defendants knew that the accounting treatment adopted by Autonomy, and sanctioned by Deloitte, in recognising revenue as arising from the impugned VAR transactions, was wrong and rendered Autonomy's financial statements untrue or misleading.[258]

1899. That essentially depended on (i) what, if anything, the Defendants knew about the assurances given by Mr Egan and/or the way the VAR transactions were routinely acted upon, (ii) what basis the Defendants were satisfied that the criteria of IAS 18.14 were fulfilled in each case, and (iii) what comfort they legitimately drew from the fact that Deloitte reviewed and approved the accounting treatment of every one of the impugned VAR transactions. The latter was much relied on by the Defendants, on the basis that even if Deloitte were in error, it is difficult to ascribe greater and guilty knowledge to the Defendants, unless they knew something (including their own intentions or the undisclosed intentions of the parties) that Deloitte did not, and/or misled Deloitte into giving their approval of the presentation and accounts on a factually incomplete or misleading basis.

**Structure of more detailed analysis of the claims based on false accounting**

1900. In light of the introductory preview above of a very detailed claim expounded by both the Claimants and the Defendants over the course of many hundreds of

---

[257] *Snook v London and West Riding Investments* [1967] 2 QB 786. A 'sham' in a legal sense is a contractual arrangement dressed up and misdescribed as having one legal effect and in reality having another legal effect; as Diplock LJ (as he then was) put it at p802C-E: *"...it is, I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create....for acts or documents to be a "sham"...all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating."*

[258] Or were reckless as to whether the relevant presentation was untrue or misleading.

pages of submissions and many days of cross-examination of a variety of witnesses, I turn to address the following in more detail:

(1) the usual provisions of the contracts relating to the impugned VAR sales;

(2) the terms of and the proper approach to the interpretation of Accounting Standards, and in particular, IAS 18 para. 14 ("IAS 18.14"), which at the relevant time[259] governed the recognition of revenue from sales of goods (including software);

(3) how the expert evidence as to the application of IAS 18.14 affects the analysis;

(4) how the parties to the VAR sales actually conducted themselves, and in the light of that, whether in the case of the impugned VAR transactions the overall relationship between the contracting parties satisfied the criteria stipulated by IAS 18.14 for the recognition of revenue; and/or

(5) whether (as the Claimants submit) those transactions were enforceable but never really intended to be enforced or acted upon so as not in real economic terms to be sales of goods at all;

(6) what the Defendants knew and whether it amounted to "guilty knowledge".

### *(1)    Usual provisions of VAR sales contracts*

1901. Taking as an example the master agreement made between Autonomy Inc and Capax Discovery LLC dated 30 June 2009,  it was provided that:

> a) *"…Once the Autonomy products on a purchase order have been shipped by Autonomy[260], VAR may not cancel or amend the purchase order without the prior written consent of Autonomy."*

> b) *"…VAR shall not be relieved of its obligations to pay fees owed to Autonomy hereunder by the non-payment of fees by an End-User."*

> c) *"…VAR shall: (a) use commercially reasonable efforts to promote, market and sell Autonomy Products and Services to End-Users…(b) maintain a sufficient number of VAR s personnel…trained in the features and functions of the current version of the Autonomy Products to (i) solicit orders for the Autonomy Products from End-Users; (ii) properly inform and demonstrate to End-Users the features and capabilities of the Autonomy Products…"*

---

[259] As explained below, the difficulties in its application were recognised and IAS 18.14 has since been superseded by IFRS 15.
[260] Usually by FTP or on Autonomy's Automater system, which was the platform through which Autonomy made software available for download to customers who had licensed it.

> d) Except as otherwise provided in this Agreement, VAR shall assume all responsibility and liability to End-
>
> e) Users with respect to the Autonomy Products…"
>
> f) "…VAR is free to determine its own prices and per copy fees to end-Users. Autonomy may from time to time publish suggested wholesale or retail prices and per copy fees, provided, however, that such prices and fees are suggestions only and VAR is and shall be free to determine the actual prices and per copy fees at which the Autonomy Product will be licensed to its End-Users"
>
> g) "**_ENTIRE AGREEMENT: AMENDMENT_**. This Agreement sets forth the complete and exclusive agreement between the parties with respect to its subject matter and supersedes any and all other written or oral agreements previously existing between the parties with respect to such subject matter. No alterations, modifications or additions to this Agreement shall be valid unless made in writing and signed by a Director or Officer of each party. The terms of any purchase orders or the like submitted by the VAR which conflict with any terms in this Agreement whether or not countersigned as accepted by Autonomy shall not be binding on Autonomy, regardless of Autonomy s failure to object to such terms."

1902. It is also of some interest, that in the definitions clause it was provided:

> a) End-User shall mean third party entities to whom VAR provides Services in respect of Autonomy Products"; and
>
> b) Services shall mean services provided to an End-User by which VAR may include demonstration, pre-sales support, installation, customisation, training, maintenance and support services, and other consulting or integration of the Autonomy Products."

1903. I set out the terms of Autonomy's VAR agreements with the other 'friendly' VARs (especially, MicroLink, MicroTech, and DiscoverTech) [261], when addressing impugned VAR transactions with each of them. The master agreements with MicroLink and MicroTech (each described as a *Government reseller*) were in similar form and materially the same as the agreement with Capax Discovery. The individual agreements with DiscoverTech were shorter but in each case they contained at least (a) a provision binding the reseller irrevocably to the purchase upon delivery and making clear the unconditional nature of the payment obligation and (b) a similar entire agreement clause.

---

[261] In the case of DiscoverTech, each reseller transaction was governed by an individual VAR agreement. In the case of the other 'friendly' VARs there was a master agreement governing all their respective reseller transactions.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

1904. Under all of Autonomy's agreements with 'friendly' VARs, the reseller was also required to sign debtor confirmation letters in respect of the debt arising under the impugned deals. The debtor confirmations are identified further below by reference to the individual transactions. An example (which related to deals with Capax including Amgen) stated:

> *The items listed above were properly charged to our account and were unpaid as of 30th September 2010 and there are no side letters or other agreements in respect of the subject matter of this request, except as noted below:*

> *[Nothing was noted.]*

> *We acknowledge that Autonomy Corporation plc retains no continuing managerial involvement in the delivery of this product or service, other than stipulated in the licence agreement."*

## (2) Terms and interpretation of IAS 18

1905. There is no dispute that Autonomy was subject, throughout the Relevant Period, to the requirements of IAS 18, and in particular IAS 18.14, and that revenue could not properly be recognised on sales of software (or hardware) unless its requirements were met. It was common ground also that if those requirements were met, recognition of revenue was mandatory, not discretionary: in other words, if all the criteria were satisfied, the revenue not only could be, but was required to be, recognised.

*Terms of IAS 18*

1906. IAS 18 prescribed criteria intended to adumbrate the qualities of a true and unconditional sale of goods (including software and software licences) from which revenue arising must[262] properly be recognised. Their application is not always easy, especially in the software context, where the goods are intangible assets that can be infinitely reproduced. It is of some note that IAS 18.14 has been replaced to clarify revenue recognition rules, especially for more complex transactions: IFRS 15 (which was first issued in April 2016) superseded it with effect for accounting periods beginning on or after 1 January 2018.

1907. IAS 18.14 provided as follows:

> *Revenue from the sale of goods shall be recognised when all the following conditions have been satisfied:*

---

[262] If the criteria are satisfied, recognition is mandatory.

> *(a) the entity has transferred to the buyer the significant risks and rewards of ownership of the goods;*

> *(b) the entity retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold;*

> *(c) the amount of revenue can be measured reliably;*

> *(d) it is probable that the economic benefits associated with the transaction will flow to the entity; and*

> *(e) the costs incurred or to be incurred in respect of the transaction can be measured reliably."*

1908.  IAS 18.15 elaborated on the test in IAS 18.14(a) as follows:

> *The assessment of when an entity has transferred the significant risks and rewards of ownership to the buyer requires an examination of the circumstances of the transaction. In most cases, the transfer of the risks and rewards of ownership coincides with the transfer of the legal title or the passing of possession to the buyer. This is the case for most retail sales. In other cases, the transfer of risks and rewards of ownership occurs at a different time from the transfer of legal title or the passing of possession. …"*

1909.  IAS 18.16 explained that the seller may retain *a significant risk of ownership"* in a number of ways and provides examples of various well-recognised situations where that may be so, as follows:

> (1)  *"when the entity retains an obligation for unsatisfactory performance not  covered by normal warranty provisions";*

> (2)  *"when the receipt of revenue is contingent on the derivation of revenue by the buyer from its sale of the goods";*

> (3)  *"when the goods are shipped subject to installation, and the installation is a significant part of the contract which has not yet been completed by the entity";*

> (4)  *"when the buyer has the right to rescind the purchase for a reason specified in the sales contract and the entity is uncertain about the probability of return."*

1910.  IAS 18.17 contained a saving provision as follows:

> *If an entity retains only an insignificant risk of ownership, the transaction is a sale and revenue is recognised. For example, a seller may retain the legal title to the goods solely to protect the collectability of the amount due. In such a case, if the entity has transferred the significant risks and rewards of ownership, the transaction is a sale and the revenue is recognised. Another example of an entity retaining only an insignificant risk of ownership may be a retail sale when a refund is offered if the customer is not satisfied. Revenue in such cases is recognised at the time of sale provided the seller can reliably estimate future returns and recognises a liability for returns based on previous experience and other factors."*

*Dispute as to interpretation of the Accounting Standards*

1911. These provisions resonate with, and indeed seem to me likely to have been informed by, legal tests for determining the transfer of risk, reward and managerial control in the ordinary context of a sale of goods. They identify legal characteristics of an unconditional sale. They provide examples to delineate when risk is assumed to pass (and when not) which appear to be borrowed from legal concepts and devices (such as warranties which in effect introduce conditionality, contingent payment provisions and terms enabling rescission which are usually referred to as *Romalpa* clauses). The way these matters are dealt with appears to encourage, especially in a lawyer, a legalistic approach and primary focus on any contract governing the transaction in determining the nature and extent of the bargain. My own initial tendency to adopt such an approach fuelled a dispute between the parties as to the extent to which the VAR contracts were properly treated as determinative of the true relationship between the parties to them (Autonomy and the relevant VAR).

1912. Mr Miles, supported by Mr Casey, embraced and encouraged an approach which put the contract at the centre of the enquiry as to the substance of the impugned VAR sales and focused on the legal relationship between the parties as defined there and in any legally enforceable arrangements ancillary to it. Although they accepted that *revenue recognition, like other accounting requirements, involves consideration of substance over form",* Mr Miles submitted that *the substance of the relationship is to be found in the entirety of the parties obligations".* He included in this *the entire commercial package of rights"* (some of which might be collateral to the main contract) but not *arrangements of some kind which are not of legal effect".* He submitted that the *guidance does not involve a quest for a nebulous  understanding" separate from the legal rights and obligations which, taken as a whole, comprise the parties  deal".*

1913. In the present case, the Defendants submitted that where, as in every one of the impugned VAR transactions in this case, being contracts for the sale of goods and not in the nature of complicated contracts such as a finance lease, the contract expressly provided that the entire agreement of the parties was to be found within the four walls of the contract, and nowhere else, the substance of

the transaction was to be (in most cases at least) determined from the contract itself.[263] He submitted that:

> *in practical terms, once you ve accepted that the transactions are real and not shams, then you can see what the substance is. It s the same thing as their legal form".*

1914.    He explained this further as follows:

> *generally speaking, commercial contracts are very good evidence indeed of the intentions of the parties, indeed of the economic transaction between them, and suppose that an accountant were to want to understand what the transaction between two parties consists of, the contract generally provides the answer."*

1915.    Mr Miles submitted accordingly that the Claimants' concession that the VAR agreements were in every case binding contracts *carries with it an acceptance that the contracts embodied the true intentions of the parties."* He elaborated on this in his oral submissions in closing as follows:

> *So what did those contracts do? Although there were some differences, there were also common features. The contracts were licences of goods for relicensing to an end-user. As I said earlier on, they contain unconditional obligations to pay, stating in terms that the reseller could not avoid payment by reason of a non-payment by the end-user. They governed the question of when title passed. It passed on delivery and that was by the software being made available electronically. It wasn t necessary for the reseller actually to download the goods. Title passes on it being made available.*

> *The contracts also said that the contract is the whole contract that supersedes all agreements with respect to it and that no changes would be valid unless signed in writing. That is very strong evidence, we suggest, of the substance of the transactions for accounting purposes, put at its lowest.*

> *Now, it is also worth noting that the Claimants accepted that nothing they could rely on would have amounted to a deferment of the debt in law or estoppel. They said that on day 84 at pages 136 to 137 [TS84/136-137]. Again, that is an important concession and not, we suggest, the way that the case was pleaded. Whether it was or not does not matter. It is an important point that, in law, the contract has the effect that it has."*

1916.    Thus, Mr Miles concluded, it follows that the VAR agreements are to be interpreted as both binding in accordance with their terms and demonstrative of

---

[263] In Dr Lynch's closings and in oral submissions this was less absolute: it was contended  that the terms of the contract are highly important in determining the substance, contrasting a simple sale of goods contract from a lease finance where in substance the lessee owns that which is leased.

the true intentions of the parties, including the intention that the obligations specified by their agreement should not be modified or re-characterised by reference to ancillary arrangements that they had agreed should not be made. There was a true sale established by an enforceable contract, and the VAR would have no defence in law to enforcement of its terms (including the payment obligation it contained). Even if assurances were given as to the likelihood that Autonomy would never look to its legal rights, and would do all that it could to see that the VAR was not left *on the hook"*, the fact remained that the VAR <u>was</u> in every case on the legal hook, and the assurances provided no defence or answer. They amounted to no more than *warm words"* intended to encourage the VAR to participate, but not intended to constitute any part of the substantive deal or (in particular) remove from the VAR the risk it had contractually assumed.

1917. Mr Miles also warned against the use of hindsight. He submitted that revenue recognition needed to be assessed at the date of the accounts, and hindsight should be avoided. Mr Welham accepted this when he was cross-examined as *probably a fair statement to make"*, and both experts appeared to agree that it was not permissible.  On that basis, Mr Miles submitted that post-transaction events, including (for example) a decision by the end-user to deal and contract directly with Autonomy and Autonomy's decision in those circumstances to forgive the VAR's debt, should not affect the analysis if the VAR was on risk at the time of the contract between itself and Autonomy.  The Defendants pointed out that this was indeed Deloitte's approach.

1918. Mr Rabinowitz rejected that approach and cautioned me against what he was concerned might be the natural inclination of a lawyer to adopt it. His case was that the focus of IAS 18.14, and of the practice of accountants in applying it, is on the economic reality of the transaction in the round, and whether the arrangement is one from which the revenue intended to be recognised can actually be expected. The audience is not a court applying the law: it is the market, seeking to assess how the company is performing.

1919. The Claimants' position was that the standard requires consideration of whether the factual circumstances demonstrate any different economic reality than is revealed by legal analysis of the contractual relationship said to constitute an unconditional sale. As it seems to me, the essence of their position was that it is the economic substance which must determine the accounting treatment: economic reality trumps (as it were) any legal interpretation of the effect of the contractual arrangements agreed by the parties. Accounting for transactions by reference only to legally enforceable commitments will not provide a true and fair view if in fact the parties' shared intention is to ignore the contractual elements and proceed on the basis of a different understanding.

1920. Contrary to the Defendants' submission, the Claimants submitted that this is not inconsistent with their disavowal of any plea of sham. They accepted the validity of the contract, and that each of the transactions was valid and had legal effect and could be enforced by the parties against each other in accordance with their terms. Their point was that the shared understanding and intention of the parties was that neither party would ever seek to rely on or enforce its legal rights against the other, and insofar as obligations such as the payment obligation had

to be seen to be performed, such assistance as became necessary (for example, by providing funds via a reciprocal transaction) would be arranged.

1921.  The Claimants' position was to the effect that the VAR transaction was, in economic reality, a side-show: the VAR was interposed as a placeholder for the end-user, and the economically significant sale in every case where a sale resulted was the sale to the end-user. It was that transaction on which in reality Autonomy was focused, and which it regarded as the real sale which would result in actual payment and in due course receipt of revenue. The accounting significance and revenue recognition accorded to the VAR transaction was contrived and misleading accordingly.

1922.  This dispute as to the interpretation of IAS 18.14 and its application to the facts clearly raises issues about the interplay between legal concepts and the Accountancy Standards, including:

(1)  Whether the substance of a transaction is to be assessed according to its legally enforceable incidents: or put another way, whether the contract is definitive of the parties' intentions and relationship; and

(2)  More particularly, whether the criteria specified by IAS 18.14, for example as to the transfer of *significant risk and rewards of ownership"*, or as to what constitutes *continuing managerial involvement"*, or as to what is meant in IAS 18.16 by the receipt of revenue being *contingent"* on the derivation of revenue by a reseller of revenue from an onward sale, are to be answered according to the terms of the contract between the parties, or are to be tested and applied according to any different economic reality that the circumstances and conduct of the parties may reveal.

1923.  I have addressed the first of these issues in the Introduction to this judgment in paragraphs 592 to 606 above. As there explained, in my judgment:

(1)  The objectives of IAS/IFRS accounting, being to achieve by adherence to carefully developed accounting statements a true and fair presentation and account of the substantive economic performance of the company, and to inform appraisals and investment decisions likely to be made in reliance on that account, require that the substance of a transaction be assessed by reference to its intended economic effect. This cannot safely be determined only by reference to its legal aspects. I cannot therefore accept the Defendant's argument in its purest form to the effect that a contract which is accepted to be valid and enforceable in accordance with its terms, and which is expressed to be the parties' entire agreement, must be treated as definitive of their intended relationship in respect of the subject matter of the contract. Regard must always be had to the shared intentions of the parties and, in the light of that, the real intended effect of the transaction in question.

(2)  As the Claimants contended, the attenuated or narrower form of the Defendants' argument, to the effect that in this case the contractual provisions of each VAR transaction, and especially the entire agreement

clause, render it unlikely that the parties had any intention which differed from that set out in such agreements, and the Court should be slow to find that they supplemented the written document by any further agreement or understanding, implicitly accepts that the totality of the evidence must be considered. Even if there is a presumption that the parties intended to set out their intention in the contract they signed, the presumption must yield to the evidence as a whole.

(3)     The inclusion in the contractual provisions of an entire agreement clause may preclude the parties asserting any other agreement or understanding in vindication of or answer to a legal claim; but it cannot negate the facts or preclude enquiry as to the underlying realities in order to reach an accounting treatment of the transaction which provides a true and fair view of its true economic substance and effect. Indeed, the inclusion of an entire agreement clause may be revealed to be simply part of an intention to deflect attention from arrangements parallel to the contract which changed its economic effect.

1924.   As to the second issue, and with particular reference to IAS 18.14, in my judgment:

(1)     The criteria for revenue recognition, though informed by legal precepts derived from the law on the Sale of Goods, are to be satisfied, not only in terms of the contractual effect, but also in economic reality: they require that the significant risks of ownership should actually, as well as nominally, be transferred, and that the seller should not in fact retain any continuing involvement to a degree usually associated with ownership, nor effective control of the goods sold;

(2)     Thus, IAS 18.14 requires an assessment of the true intended effect of all the arrangements and understandings between the parties to the relevant VAR transaction; all the facts and circumstances which bear on that assessment must be taken into account in determining the real economic substance of the relevant transaction and in accounting for it so as to provide a true and fair view of it.

1925.   I accept that facts which emerge after the transaction are not to be taken into account because hindsight is not to be used. But in my judgment, the preclusion of the use of hindsight relates to after-discovered facts and circumstances, rather than to the proof of facts and circumstances already present at the time of the transaction. The true intentions and understandings of the parties at the time of the transaction are known to them at that time; and the proof of them to establish the real substance of the transaction by recourse to what occurs later is not prohibited.

### (3) Expert evidence as to accountancy practice in applying IAS 18

1926.   In my view, the conclusions above expressed are consistent with accountancy practice as expounded by both experts (Mr Holgate for the Claimants, and Mr MacGregor for the Defendants), despite serious differences between them on various aspects of accountancy practice relating to IAS 18.

1927. The experts agreed that as regards Accounting Standards in general:

(1)     IAS/IFRS is less prescriptive than US GAAP in respect of all the matters in issue;

(2)     The application of Accounting Standards to a specific company is a matter of judgement, and where the application of principles calls for judgement, there may be a range of possible views that a reasonable accountant may reach;

(3)     Accounting decisions depend on the substance of the transaction and not merely its form; where the parties have agreed contractual terms they are highly material to, and likely to be strong evidence (or what Mr MacGregor referred to as *the driving force"*) of, the substance of the transaction, but they are not conclusive;

(4)     Accounting judgements fall to be made on the basis of the facts and circumstances as they were at the accounting date and hindsight cannot legitimately be used.

1928. In the context of the impugned VAR transactions, and as indicated above, the experts agreed that:

(1)     The relevant contract to examine for the purposes of revenue recognition was that between Autonomy and the VAR: under both IAS and IFRS, unlike under US GAAP, there is no requirement for there to be sell-through to an end-user before revenue is recognised;

(2)     It is not permissible to assume that all VAR transactions can be treated generically; the individual commercial facts relating to a given transaction at the time that it was effected are highly relevant to its accounting treatment;

(3)     The revenue recognition principles in IAS 18 could be difficult to apply other than in simple transactions: the notion of the transfer of risk and reward was regarded as especially problematic, and IFRS 15 (which superseded IAS 18.14) replaced it with the question whether it is the supplier or the purchaser who in fact controls the goods or services in question;

(4)     All of the IAS 18.14 criteria need to be satisfied in order for revenue to be recognised: but that once the criteria are satisfied, recognition of the revenue is mandatory;

(5)     As to the criterion in 18.14(a), as expressly stated in 18.15, *in most cases the transfer of risks and rewards of ownership coincides with the transfer of legal title or the passing of possession to the buyer"* and that will generally be determined by the contractual terms;

(6)     The criterion in 18.14(a) does not require all the risks and rewards to have passed: the test is whether substantially all of them have, and IAS 18.16 sets out various well-recognised situations where, under the

contractual arrangements, the seller may retain the significant risk and rewards of ownership;

(7)    Generally (and though each situation should be considered individually), the criterion in 18.14(b) (relating to the need for transfer of managerial control) goes hand in hand with the risks and rewards of ownership, and it would be unusual for an entity to retain managerial involvement to the degree usually associated with ownership or effective control where risks and rewards of ownership have passed: it is hard not to satisfy (b) where (a) is satisfied;

(8)    The third criterion (IAS 18.14(c)), which requires that the revenue can be measured reliably, is a matter of fact which is usually determined by the agreement, and in the case of a software sale is usually the sale price;

(9)    The fourth criterion (IAS 18.14(d)), which is that it must be probable that the economic benefit associated with the transaction will flow to the entity, requires a judgement as to the probabilities of whether it is more likely than not;

(10)   The fifth criterion (IAS 18.14(e)), which is that the costs incurred or to be incurred in respect of the transaction can be measured reliably, is a question of fact and is not disputed in this case.

1929.  Inevitably perhaps, given the difficulties inherent in the application of IAS 18.14, especially in the context of software transactions, there were in other contexts fundamental differences both in the approach of the two experts and in their evidence as to accountancy practice.

*Mr Holgates approach on VARs in his reports*

1930.  Mr Holgate's views on the accountancy issues raised by the VAR claims were built around 13 Assumptions of fact that he was instructed to make in his report. These Assumptions reflected the Claimants' pleaded case, and it is worth reciting them since they demonstrate both his approach and analysis and also what the Claimants sought to prove. As set out in Mr Holgate's first report , they were as follows:

(1)     *Assumption 1: There had been no communication between Autonomy and the VAR relating to a transaction involving the identified end-user until immediately prior to the end of the relevant quarter;*

(2)    *Assumption 2: There was no price negotiation between the VAR and Autonomy;*

(3)    *Assumption 3: The VAR had made no prior efforts to sell such a licence to, and had no prior relationship or contact with, the identified end-user;*

(4)    *Assumption 4: The VAR did not undertake or propose to provide any added value, or any service, to the end-user;*

(5)  *Assumption 5: For VAR transactions involving the sale of a licence to use Digital Safe software (and software to be used with Digital Safe), the Digital Safe software could only be implemented and thereafter operated by Autonomy (and not by the VAR);*

(6)  *Assumption 6: The VAR did not have the means to pay the Autonomy group company in the absence of an onward sale of the relevant licence to the identified end-user;*

(7)  *Assumption 7: For sales to Capax Discovery as VAR: Capax Discovery was a newly incorporated company in March 2009 and therefore had no financial history at that time. Capax Discovery wrote to Autonomy in March 2009, providing financial information for Capax Global  on the express understanding that Capax Global is a separate and distinct entity from Capax Discovery. All contractual obligations will be between Capax Discovery and Autonomy only";*

(8)  *Assumption 8: The VAR did not, after the agreement between Autonomy and the VAR had been entered into, make any effort to sell a licence for the relevant software to the end-user. Instead, the Autonomy group company continued its own efforts to achieve a sale of the licence directly with the end-user (and without consultation with the VAR);*

(9)  *Assumption 9: The purchase orders or sales agreements for the transactions between Autonomy and the VAR specified that the software was for onward licensing to the particular end-user;*

(10)  *Assumption 10: There was an agreement or understanding (whether or not legally enforceable) between the Autonomy group company and the VAR, which was not apparent on the face of the written contractual documentation between the Autonomy group company and the VAR, to the effect that the VAR would not be required to satisfy any liability to Autonomy from its own resources;*

(11)  *Assumption 11: The VAR was relieved of its ostensible liability to pay the price for Autonomy software licence it had purchased by one or more of the following means: (a) the purported sales agreement between Autonomy and the VAR being cancelled, (b) a credit note being issued to the VAR discharging its ostensible liability to pay the price, or (c) the VAR s debt being written off."*

(12)  *Assumption 12: Where the Autonomy group company subsequently achieved a direct sale to the end-user, the Autonomy group company arranged for the end-user to pay the VAR so that the VAR could then pay the relevant Autonomy group company;*

(13)  *Assumption 13: An Autonomy group company was caused to make a payment to the VAR to purchase rights, goods or services that the Autonomy group company did not need (and which had no discernible value to it), but which had the purpose and effect of putting the VAR in funds which it then used to pay for the Autonomy software licence."*

1931. Mr Holgate accepted that none of the 37 transactions featured all 13 Assumptions. However, he considered it clear that:

(1)    A VAR sale to which Assumptions 1 to 4 (relating to the substance of the transaction) and 9 (which he described as showing that *"…the sale to the VAR was not the end of the story as far as Autonomy was concerned; indeed it suggests that the sale to the VAR is not an important part of the story at all"*) were factually established to be applicable was *not genuine and lacked substance";*

(2)    If Assumption 8 was shown also to apply, the VAR transaction would have been demonstrated not to *affect the role and responsibility of Autonomy"* and thus would *fail to meet IAS 18 paragraphs 14(a) (risks and rewards) and 14(b) (managerial control)";* he added that it would also show lack of substance; and

(3)    If a side agreement (whether legally enforceable or not) making clear that in practice there would be no need for the VAR to pay Autonomy from its own resources so that Assumption 10 applied, that of itself would demonstrate that at best the sale was conditional, and in any event that the transaction lacked substance, so as to disqualify revenue recognition. He concluded that *the 30 transactions that feature assumption 10…lacked substance and so revenue should not have been recognised in respect of them"* and that such transactions would also fail to satisfy each of paragraphs 14(a), (b) and (d) of IAS 18. Assumption 10 was thus the only one which was conclusive if it applied.

1932. In Mr Holgate's assessment, Assumption 10 applied to all 30 of the impugned VAR sales where there was some form of side agreement; and in 26 out of 30 Assumptions 1 to 4 and 8 and 9 applied also. He considered the conclusion that those impugned VAR sales lacked substance and failed to meet the criteria was further reinforced when account was taken to what happened after the 'sale', principally because:

(1)    None proceeded to a sale by the VAR to the end-user;

(2)    In none was the VAR required to pay from its own resources, the VAR being held harmless in each in various ways;

(3)    19 of the 30 impugned VAR sales were ultimately concluded between Autonomy directly with the end-user after negotiations between them in which the VAR played no part;

(4)    11 of the 30 impugned VAR sales never proceeded to any sale to an end-user, but the VAR was in these transactions also held harmless from loss in a variety of ways.

1933. Furthermore, as regards Assumptions 5, 6, 7 and 11 to 13, all of which related directly to the revenue recognition criteria in IAS 18, Mr Holgate's approach and assessment were in summary to the effect that:

(1)     If, as he was instructed to assume by Assumption 5, Digital Safe software was of no value to the end-user absent Autonomy's implementation and operational services, any VAR transaction which involved the licence sale of Digital Safe software without such services failed the criteria in paragraphs 14(a) and (b) of IAS 18 because Autonomy necessarily had to and did retain both significant managerial involvement/control and the risks and rewards of ownership. The relevant transaction also thereby lacked any real substance.

(2)     If, as he was instructed to assume by Assumption 6, the VAR did not have the means to pay in the absence of an onward sale, then in a situation where the VAR was not in reality ever intended or intending itself to sell to an end-user, it could not be said that payment by the VAR was "probable", so that the transaction failed to meet IAS paragraph 18.14(d). Mr Holgate's view was that this rendered revenue recognition improper in the case of 19 of the 36 impugned VAR sales.

(3)     Likewise, if, as he was instructed to assume by Assumption 7, Capax Discovery was a newly incorporated company with no trading history, Mr Holgate considered that payment could not be said to be "probable" so that again, the criteria in IAS 18.14(d) was not satisfied.

(4)     If, as he was instructed to assume by Assumption 11, the VAR was relieved of any liability to pay by dint of (a) cancellation of the sale or (b) the issue of a credit note or (c) the debt simply being written off in each case at the instance of Autonomy, Mr Holgate considered that this similarly resulted in failure to satisfy IAS 18.14(d), and also IAS 18.14(a). It would also reinforce the point about lack of substance.

(5)     If, as he was instructed to assume by Assumption 12, where the Autonomy group company achieved a direct sale to the end-user, it would arrange for the end-user to pay the VAR so that the VAR could then pay the Autonomy group company, Mr Holgate considered that the VAR transaction would fail to meet the criteria in IAS 18.14(a), (b) and (d) and the test of substance.

(6)     If, as he was instructed to assume by Assumption 13, the Autonomy group company was caused to make payments to the VAR to purchase goods or services that the Autonomy group company did not need and which had no discernible value, the payments would be in the nature of disguised gifts and, taking the two transactions together the Autonomy company would have made no net gain, and Mr Holgate considered that the transaction failed to meet IAS 18.14 (a) and (d).

(7)     Assumptions 11, 12 and 13 could, in Mr Holgate's view as stated in his first expert report, be regarded as *different ways of putting assumption 10 into effect"*: Mr Holgate considered that one or more of those three Assumptions applied to 36 (that is, all but one) of the impugned VAR sales. He accepted that all three related to events that occurred after the VAR sale date but considered that it was permissible and appropriate to take them into account as evidence of the understanding referred to in Assumption 10. In any event, after the first few such transactions the

pattern would not any longer be hindsight: it would be plain to see before the sale date.

1934. Mr Holgate did not come through unscathed from cross-examination. Mr Holgate's evidence in cross-examination was notably more equivocal than his views as expressed in his first report; and it seemed to me that this was principally because, when cross-examined, he had to take into account nuances, and the actual documentation, for which the Assumptions allowed no room. Indeed, he accepted that *in the real world, [the auditor] would find out additional information, of course"* and that the conclusions he had reached in relation to particular transactions were the product of his Assumptions:

> *If I was working with actual facts and seeking to establish what they were, then I agree I would need to look at the master agreement and as many other pieces of information as I could find. But if I m working with assumed facts as given to me, then that s the basis on which I ve been asked to provide my opinion".*

1935. Thus, when asked to consider factual variations or practical nuances not comprehended in the Assumptions he frequently had to resort to the explanation that he had simply answered on the basis of the assumptions he had been instructed to make, taking each to have been established. He contrasted this with *the real world",* and accepted that in reality, the scope for (a) questioning, resulting in further information giving a more complete picture and revealing nuances not catered for in the assumptions, (b) valid commercial justification of which he was not aware in a field of which he had no experience[264], and (c) the fairly broad margins within which a proper judgment might be made, all could well result in a different and perfectly proper answer.

1936. For example as regards Assumptions 1 to 9:

    (1)    Mr Holgate accepted that Assumptions 1 and 2 at most would have led to further enquiry, and even together did not undermine revenue recognition;

    (2)    He struggled to explain any rationale for thinking that Assumption 3 supported an unequivocal conclusion, and retreated into a weak and unconvincing assertion of gut feeling, which seemed contrary to the "sell in rather than sell through" approach of IAS 18, that:

> *"...the real customer is the end-user and not the VAR. The end-user is the party who needs the goods, who wants to buy them and use them...And that therefore feels like, to me, in terms of substance, feels like the real transaction rather than the sale to the intermediate party."*

    (3)    He sought to rely in the same context and more generally on the premise that the fact that the VAR may in certain cases have had no knowledge

---

[264] Mr Holgate accepted that he did not have any prior experience in relation to the reseller industry for information technology in the US.

of and no relationship with the prospective end-user was *a very unusual situation"*. But when asked on what basis of comparison he felt able to say this, he had to accept that he had provided no evidence of whether this was unusual by reference to Autonomy or the market but instead inferred it to be unusual because:

> *if all transactions were like these impugned transactions, such that Autonomy sells to the reseller but then the reseller doesn t sell in any case on to the end-user, that s no business – that s no foundation for a business."*

(4) Mr Holgate regarded Assumption 4 (that the VAR did not undertake or propose to provide any added value or service to the end-user) as signifying either *irrational commercial behaviour"* or simply a means for Autonomy to buy revenue recognition at the cost of margin which otherwise it could have retained for its own benefit; but he was constrained to accept that taken together, Assumptions 1 to 4, if established on the facts, would not have caused Deloitte's decision to approve revenue recognition to have been such that no reasonable accountant could have reached it (even if he himself might not have taken the same view).

(5) Similarly, in his first report, Mr Holgate stated that Assumption 9 (that the VAR agreement specified that the software licence sold to the VAR was for onward licencing only to a particular end-user), though on its own not strongly indicative of a lack of substance, strengthened his conclusion that he had already reached on the first four Assumptions that the VAR sales lacked substance and were artificial. But under cross-examination he accepted that *in the real world"* (which he added *is different from an exercise based on assumptions given to me"*) this was simply another factor which would prompt the auditor to ask further questions, and he did not exclude the possibility that the outcome would substantiate the VAR transaction.

(6) Mr Holgate came to accept that Assumption 5 (concerning VAR transactions involving the sale of a licence to use Digital Safe software for operation by Autonomy and not the VAR, as to which see further below) would have no real significance for the purposes of revenue recognition.

(7) Even in respect of Assumption 6, relating to the VAR not having the means to pay in the absence of an end-user sale, Mr Holgate accepted that the issue was "fact-sensitive" and that it could be quite permissible to take into account the contract receivable ultimately due from the end-user, though he sought to attenuate this response by suggesting (rather unconvincingly, to my mind) that if the VAR had very little to do with the end-user sale, the receivable might in some way (unexplained) be devalued. His evidence on this was as follows:

> *Q. Would you agree that it would also, in making that assessment, be permissible to take into account the likelihood of the VAR deal closing with the end-user as a way of generating*

> *funds to pay Autonomy? I m not saying it would necessarily be the only source but do you accept that that s something that could permissibly be taken into account in reaching an overall assessment?*
>
> *A. Yes, you can take that into account. Clearly if the VAR has pre-sold to the end-user, then that s very definitely helpful of course because it s a contractual receivable for them. If they – but if that s not the case, then the question is how certain is the sale by the VAR to the end-user and that s – well you find out as much as you can about that. But if, for example, Autonomy is pursuing the sale and the VAR isn t, then that will count against it, but if the VAR were very active in making the sale and pursuing the deal, then that would count towards it.*
>
> *Q. So again it s quite fact-sensitive, is that fair?*
>
> *A. Yes.''*

(8) Similarly with Assumption 7, in relation to Capax Discovery's status as a newly formed entity with no financial history and which Mr Baiocco had expressly stressed was distinct and separate from Capax Global, Mr Holgate accepted that the extent to which Autonomy would properly be able to take comfort from the position of that company within the Capax Group was a matter of fact, prompting further enquiry and then a conclusion.

(9) As to Assumption 8, that the VAR did not, after its agreement with Autonomy, make any effort to sell on to the end-user and left that to Autonomy, Mr Holgate opined in his first report that it was:

> *strong evidence that* [Autonomy] *had not transferred to the reseller the risks and rewards with respect to licences that the reseller purported to purchase''*

and also that:

> *a vendor who continued the sales effort would clearly have retained managerial involvement in and control over the goods in question.''*

Under cross-examination, however, Mr Holgate had to accept that the Assumption may well have introduced inadmissible hindsight and that in any event, and albeit *a strange thing to do''*, which would raise questions an accountant might wish to explore and take into account, it would not necessarily prevent revenue recognition, if, for example, it was explicable on the basis of Autonomy having the better relationship with the end-user, and thus the far stronger prospect of sealing the deal.

(10) Assumptions 11, 12 and 13 were similarly relied on by Mr Holgate in his first report as both reinforcing his conclusion as to lack of substance and also as demonstrating that the #impugned VAR deals failed to meet

IAS 18.14 (a) and (b) and probably also (c). However, under cross-examination, Mr Holgate accepted that all three Assumptions 11, 12 and 13 concerned later events and described an outcome which could not have been known to the accountants at the time and therefore could not have affected the accounting judgment. He sought to rationalise these as in effect supporting Assumption 10:

> I think all of those, to my mind, are methods of dealing with or implementing assumption 10, which we've discussed, is a point for the time of the transaction; 11, 12 and 13 are the playing out of that subsequently…
>
> …
>
> …all of them, as I say, are the playing out of assumption 10 which was a feature at the time."

1937. Mr Holgate seemed ultimately to consider the force of the above Assumptions as being in their cumulative effect, and the picture it built up, even if (as eventually he accepted) none individually were conclusive. Further, his acceptance, under cross-examination, that Assumptions 1 to 4 and 9 did not, even taken together, necessarily cause the decision in this case to recognise revenue to be outside the ambit of what may constitute a reasonable judgement means that their proof cannot of itself avail the Claimants, though of course all must be weighed together in the balance. His concessions in cross-examination had the like consequence as regards Assumptions 6 to 8 and 11 to 13.

1938. Even in relation to Assumption 10, which he regarded as the most important and the only potentially conclusive one of the 13 Assumptions (if established on the evidence), he was eventually driven to accept that the clash between the contractual stipulation against any side agreement, buttressed by the confirmation letters promising that there was none (neither of which, either the contracts or the letters, he had read at the time of his first report, which was most surprising), resulted in what he called *an ambiguous situation"*. In the course of his cross-examination, I asked him to clarify this for me:

> *MR JUSTICE HILDYARD: If the salesman said, I don't think you'll have to pay for this if everything goes wrong but I want you to understand that whatever I say can never be enforced, you would be out on the whims of the law, what would the accountant, the auditor, say?*
>
> *A. My Lord, it's a tricky one. If the salesman is saying both sides of those things, I want you to understand you won't have to pay but that's not a legal…' then the understanding that the customer gets is – well, is less –*
>
> *MR JUSTICE HILDYARD: The understanding he gets is he's on a wing and a prayer.*
>
> *A. Yes*

*MR JUSTICE HILDYARD: But the wing and the prayer will do, will it, to undo the transaction?*

*A. I think in practice you would look at other transactions and see what happened in the past, see how these things have turned out, that s what you would do in practice. But, yes, it s an ambiguous situation…*

*MR MILES: But in those circumstances, on the scenario that the judge has just posed, then although you said it s tricky, actually the truth is that the revenue would be recognised, wouldn t it?*

*A. No.*

*Q. Do you accept that there s a range of possible views on that?*

*A. I accept that an accountant dealing with this in practice would do some digging to find out more surrounding facts, would look at past transactions to see if there had been similar circumstances to see what can be learned from that. Now, this might be a case where there is really quite a borderline difficult judgement and there may be different judgements reached reasonably by different accountants because I said earlier that, speaking in general terms about IFRS, there s a range of judgements that could be made and it s relatively narrow and not broad, it s not anything goes . But what we re describing here I think is quite a narrow – it s quite a fine point. You could read it either way. It s quite difficult, it s somewhere in the middle. So in this case I would agree with you that you could view that either way and still be…a reasonable judgement."*

1939. This was obviously a significant concession, which also demonstrated a weakness in Mr Holgate's approach in his reports resulting from the reliance he was instructed to place on summary Assumptions, and the fact that in consequence he had not considered the actual facts (or even, as mentioned previously, the contracts or Deloitte's working papers). The Assumptions he was instructed to make were inevitably in synoptic form, which could not provide an accurate proxy for the complex and nuanced actual circumstances which both experts had agreed had to be considered in respect of individual transactions. Further problems include that such assumptions, especially when used to create a substitute or proxy universe, may box the expert in, or lead him or her, when asked to consider alternative factual hypotheses, to tend to struggle if they are in conflict with the assumptions given, and either retreat into them or seek to defend them as reasonable, which undermines their purpose. Also, for the same reason, or because they may also be couched in terms or even a particular sequence, they may encourage "confirmation bias" and tend to suggest the conclusions sought by the party calling the evidence, which again may undermine the value and reliability of the opinion given.

1940. In the end, although Mr Holgate had initially appeared to suggest that the criteria provided bright lines which could be applied to the Assumptions to provide a clear, almost scientific, judgement on whether revenue should have been recognised in respect of the impugned VAR sales, he accepted that he had not the information, and it was not really the function of an expert, to make such a binary assessment. Mr Holgate was led by the Assumptions into expressing conclusions of fact (which is not the province of an expert) by reference to contractual arrangements he had not studied and on information he accepted to be incomplete and insufficient.

1941. It took him ultimately to accept that the issue came down to a judgement call as to whether, applying the criteria to the actual facts but also standing back to consider its true intended economic effect, the transaction had any real substance separate from any ultimate sale to an end-user. That would depend principally on (a) who was *the real customer"* in the sense of turning the goods sold to use or account; (b) whether there was ever any intention for the reseller to negotiate and contract a sale to the end-user; (c) whether the parties truly intended the VAR to pay Autonomy from its own resources if no end-user deal eventuated, or whether instead they intended the end-user sale to be the source of funds to enable payment, failing which some alternative arrangement to remove or satisfy the VAR's outstanding legal obligation would have to be made. Put shortly: was the VAR intended to be a real or a nominal purchaser?

1942. Despite the appearance of differences between them, it seemed to me that this chimed with Mr MacGregor's approach, to which I now turn.

*Mr MacGregor s approach on VARs in his reports*

1943. Mr MacGregor (who was instructed by the First Defendant) had more practical experience of actual auditing (though latterly his experience was not field work but forensic accounting) than Mr Holgate, but his evidence had less analytical coherence. Especially in his answers when cross-examined, he was not always consistent. He often found the varying assumptions he was asked to make somewhat confusing, especially (as is understandable) when complex and cumulative, and he tended to complain in general terms or express confusion, rather than gather his thoughts and ask for clarification. Mr Miles interceded when absolutely necessary; but there were nevertheless times when it was not altogether clear to me what the emerging evidence was. Both in his appreciation of the question asked, and in his answers, Mr MacGregor tended to lack precision. He also occasionally appeared to lose his footing, and gave the impression of trying to remember what he had said in his report, rather than focusing on his answer to the question asked.

1944. Mr MacGregor had, however, the advantage of having read the VAR agreements, and Deloitte's working papers. His approach was thus much closer to replicating how Deloitte did in fact approach the matter: it was closer also to what Mr Holgate accepted was the *real world"* (distinguishing that from the exercise he was instructed to undertake himself). He was careful to distinguish between, on the one hand, matters of accountancy practice and approach, and on the other hand, issues of fact or legal interpretation or effect, which he left to the court to decide.

1945. He considered that the effect of an entire agreement clause was a matter of law, and that *such a clause suggests that there would be no validity to any agreement which was not contained in the contractual documentation itself"* . He appeared to accept that the law might altogether resolve the question, and he also acknowledged that in any event:

> *while it is important to consider the substance of a transaction as well as its legal form, the contract terms can drive the accounting treatment and should not be ignored in determining the point at which revenue should be recognised and the measurement of revenue".*

1946. However, Mr MacGregor did not suggest that there was any settled approach to the issue as to the interplay between contract and informal assurances in accountancy practice; and subject to the law having preclusive and conclusive effect (which he left open), he appeared to consider that assurances given outside the contract could and should be taken into account in reaching a view as to the true substance of the transaction, at least as to whether there had been any true sale (which he regarded as the real question, the provisions of IAS 18.14 being the means of reaching an answer), and that this was the case even if such assurances would be unenforceable in law.

1947. Subject to his caveat as to whether in law the entire agreement clause was conclusive, Mr MacGregor appeared to accept that the recognition of revenue from the impugned VAR transactions was improper if, notwithstanding what the contract appeared to provide, there was no true sale in economic terms because neither party intended the fundamental aspects of a true sale (payment of the purchase price and transfer of management and control of the goods sold) actually to take place. In such circumstances, assuming that the true intent was that Autonomy should close a direct deal with the end-user and obtain actual payment from the end-user only at the point of that sale, Mr MacGregor regarded the only true sale in economic terms as being to the end-user, and revenue should only be recognised on completion of the sale to the end-user.

1948. Mr MacGregor regarded the specific criteria set out in IAS 18.14 as indicia of an unconditional sale: a purported sale which did not satisfy those criteria could not be treated as a sale from which revenue could be recognised. But for him the specified criteria were not the only means of determining the question: if the economic reality was that the parties never intended the 'sale' to have any economic consequences and was simply a nominal arrangement put in place pending a true sale to an end-user which the parties intended to be (a) negotiated by the original seller (Autonomy) and (b) the true source of payment for the goods, there was no need to look further. This echoed Mr Holgate's point that a condition of recognising revenue was that the transaction said to generate it should have economic substance. But Mr MacGregor's test of substance was more obviously based on the intention of the parties: if the parties did not intend to fulfil the obligations of a real sale, no revenue recognition could be permitted.

1949. That focus on the real intentions of the parties was, as I understood his evidence, Mr MacGregor's central point. He did not regard this as conclusively determined by their contract, although what they had contractually agreed would be a very

important factor in determining their overall intentions (for substantially the obvious reasons accepted by Mr Holgate). The following passage from Mr MacGregor's cross-examination seems to me to capture his approach (and a flavour of the way he explained it):

> Q. Well, let s take a situation, Mr Welham in his evidence has told my Lord that even if it isn t legally enforceable, if in fact there is an oral agreement which stands next to the contract, you take that into account and Mr Holgate has said the same thing. You don t disagree with that, do you?

> A. You would think about it and you would take it into account. Whether it has ultimately any relevance to the accounting is always going to be a matter – potentially a matter of judgement but potentially not a matter of judgement.

> Q. You would think about it and it may well form part of the substance, regardless of whether it is legally enforceable?

> A. If it s not legally enforceable, it is probably going to have – it s probably going to have limited use. I mean, as far as the oral side of it is concerned, I mean in the hierarchy that auditors, for example, use when trying to assess evidence, it s well known: information from the parties is more reliable. It s well known: information that is written rather than oral is much more reliable.

> Q. If in fact there is an understanding and an agreement, it may not be legally enforceable but it exists and both parties know it exists and both parties intend actually to give effect to it in any event, regardless of whether it s legally enforceable, you would not disregard that when you re looking at the substance of the transaction?

> A. Well, I think the keyword there is intention" and if at the time a contract is entered into and there is an intention to do one or more things and that intention is carried out, such that it overrides the terms of the agreement, then I can well see that that would be the case. In fact, I do say that in my report. The intention at the time of the contract has to be thought of as relevant there.

> Q. And that is so, regardless of whether that is legally binding, that is to say you can come to a court and enforce that?

> A. If one has a debt that one doesn t intend to collect, doesn t intend to collect, forget I m going to give somebody time to pay", just doesn t intend to collect, then that fails the definition of an asset because there is no future economic benefit going to come as a result of that debt. So that fails - that would fail at the first hurdle."

1950. Likewise, as regards the effect of all negotiations for the end-user sale being undertaken by Autonomy, without any involvement on the part of the VAR nor any suggestion of agency, Mr MacGregor stated in an Appendix to his first report:

> *"...if at the time of the sale to the reseller, Autonomy intended to continue to attempt to sell direct to the end-user, and if it intended to cancel the sale to the reseller (or otherwise relieve the reseller of the debt) on a subsequent successful direct sale (or no sale) then no revenue should be recognised in the income statement until such time as, for example, a sale to the end-user made probable the flow of economic benefits to Autonomy."*

1951. He clarified in oral evidence that it was not sufficient for revenue recognition to be impermissible that ultimately Autonomy did deal and contract with the end-user: what did *invalidate the original sale"* was *the intention to deal with the end-user, come what may…".* In a later passage in answer to a question from me he elaborated:

> *"...if it s the intention at the time of the sale to the VAR takes place, the VAR is going to do nothing, the VAR is just going to sit there and Autonomy is going to do as it was always doing and go in there, you know, continue to negotiate the price and the amount of software and all those sorts of things, then there s no sale. That s not a sale that Autonomy would be entitled to recognise.*
>
> *However, if it s not the intention, if it s something less than that, then one would need to look at all the facts and that would be a consideration, possibly a material consideration…It s clear cut to me when there is a definite and clear intention; it becomes less clear when it s just an understanding."*

1952. The distinction which Mr MacGregor appeared to draw between a settled intent never to require payment (leading to the conclusion that in substance there was no sale) and some understanding about deferral, falling short of a contingent contract, which Mr MacGregor considered to be consistent with a sale in substance and, therefore, to be *fine"* , was also clear from a later passage of his cross-examination when Mr Rabinowitz pressed him as follows:

> *Q. If the side agreement or understanding and intention at the time of the contract, again to ensure that the VAR would not have to make a payment out of its own resources, was simply that if the VAR could not achieve a sale to a specified end-user, Autonomy would find and facilitate a sale by the VAR to some alternative end-user enabling the VAR to use the money so obtained to pay Autonomy, again you would say that transaction, when arranged or understood or agreed, simply lacked economic substance, correct?*
>
> *A. No, I don t agree with that. I don t agree with that.*

> *Q. Why not? Because?*
>
> *A. For this simple reason. If I sell something to somebody and they don t currently have the means to pay but expect to have the means to pay in the future, I can recognise a sale. In this case, if I sell something to somebody with the intention that they sell on to the end-user and thereby will have the money to pay for the purchase, then that s fine. And if they fail to make that first purchase but Autonomy then arranges, manages to find a further, a second end-user they can sell to, I don t see what the problem is with that being a sale.*
>
> *Q. I think you may have misunderstood the assumption. The assumption is that the nature of the arrangement made is that Autonomy says to the VAR,  All right, here s software to sell to that end-user but don t worry about it if you can t sell to that end-user, you won t have to pay us until – we will find you another end-user with whom there is a contract to sell, sell to that other end-user and then you can use the money from that other sale to pay us for the first sale"?*
>
> *A. No, I did understand that one and I think that seems to me to be fine.*
>
> *Q. Fine?*
>
> *A. Yes.*
>
> *Q. How is that not the same as a situation in which the parties have effectively understood and intended that the reseller would not have to satisfy any liability to Autonomy from its own resources?*
>
> *A. Because you didn t preface that example with the side arrangement that there is no intention to – on the seller to collect…"*

1953.   What I took from all this was that neither forbearance after the event in pressing for payment, nor intervention to facilitate a sale to the end-user which was not premeditated, would undo the substance of the sale; but intention from the beginning to the same effect would. As it seemed to me, on Mr MacGregor's approach, two primary questions had to be raised and answered by reference to the detailed facts:

   (1)     which was, in reality, the transaction which at the time of the VAR 'sale' Autonomy intended should generate its actual receipt of revenue: was it the VAR sale or the sale to the end-user?

   (2)     who, at the time of the VAR sale, did Autonomy intend should in fact negotiate and conclude the end-user sale?

1954.   If the answer to these questions was that Autonomy intended that any money it received would come from the end-user sale, rather than the VAR sale, and/or if Autonomy intended that it, rather than the VAR, would be the entity which would in fact negotiate and conclude the end-user sale, the conclusion would follow that the VAR sale lacked substance and the criteria in IAS 18.14 were

not satisfied, so that no revenue could permissibly be recognised from the VAR sale.

1955. In my view, these tests are in substance the same as the tests which Mr Holgate considered should be adopted; and the experts, albeit in different language and with different emphases, and with Mr MacGregor preferring the test of intention to that of objective substance, reached the same conclusion that (a) there would be no true 'sale' and (b) the criteria in IAS 18.14 would not be fulfilled if those committing the parties to the transaction as a matter law intended at that time that:

(1)     the VAR would not play any part in negotiations with the end-user;

(2)     Autonomy was to negotiate and close a direct deal between itself and the end-user with a view to the VAR transaction being dissolved if that eventuated, subject to payment of a fee (a MAF) to the VAR for its trouble;

(3)     the VAR would never be required actually to make any payment to Autonomy for the software 'sold' whatever the contract might say unless and until funded by the proceeds of a sale to the end-user or credited by Autonomy in the same amount, or somehow put in funds by Autonomy itself.

### (4) *Factual analysis*

1956. As summarised earlier, the Claimants contended that the court should find that the arrangements between Autonomy and the VARs in all the impugned transactions followed a tell-tale 'pattern', which demonstrated the true intentions of the parties and the real economic substance and intended effect of the transactions.

1957. According to the Claimants, this 'pattern' involved one or more of the following features which (they submitted) caused the economic substance and intended effect of the transaction to be very different than appeared from the unconditional sale (and transfer to the VAR of risks, rewards and managerial control) legally provided for by contract:

(1)     the VAR made no real attempt to sell the software license on to the end-user, such efforts being a matter exclusively for Autonomy;

(2)     the VAR was never required or pressed to pay for the software license from the VAR's own resources.

1958. These two matters were presented by the Claimants as complementary. As it was put in their written closing submissions:

> "...if the Court finds...that it was intended at the time of the VAR transaction that the VAR would do nothing, *that fact is – in itself – a reason to infer that the VAR was also not intended to be required to pay Autonomy from its own resources.*

> *The reason is simple. If the VAR was genuinely expected to pay
> Autonomy from its own resources, the most obvious way for the VAR to
> put itself in funds would be by working hard to secure an end-user sale.*
>
> *Contrariwise, it would be most <u>unnatural</u> for a VAR – which knows
> that it is going to be compelled to make payment for a software licence
> imminently – to do absolutely nothing to sell that software licence on to
> the intended end-user and thereby obtain the funds with which to pay
> Autonomy…"*

1959. As to proof of the pattern and the intention of the parties thereby revealed, amongst the features characteristic of the impugned sales were the following:

    (1)    The sale to the VAR took place on the last day of a quarter.

    (2)    The VAR had had no previous contact with the contemplated end-user nor any information or knowledge about its intentions or its financial position and reliability from which it could gauge the prospect of an onward sale.

    (3)    The VAR never had any contact, still less undertook any process of negotiation, with the end-user.

    (4)    There was never any sale by the VAR to an end-user, and instead

    (5)    Either Autonomy eventually sold directly the same software (plus or minus extensions) to the end-user, or there was no end-user sale at all; and then (one way or another).

    (6)    Autonomy (whether expressly or implicitly) released the VAR from any further obligation or some way of funding it to take the VAR off the legal hook.

    (7)    Although there was nothing in any of the written contracts entered into between Autonomy and the VAR which conferred any entitlement or expectation of a MAF (or any fee) Autonomy paid a MAF in every case in which an end-user deal eventuated, illustrating again that the parties paid only lip service (at most) to the provisions in the written agreement prohibiting side agreements and providing that the written contract should comprise the extent and entirety of their agreement.

1960. On the basis of my view of the expert evidence and the proper approach to the Accounting Standards, these features and the pattern they reveal, if proven and shown to demonstrate the true intentions of the parties to the impugned VAR sale in question, would disqualify from revenue recognition any impugned VAR sales to which they apply.

*The Claimants case that in reality the VARs were never at risk and Autonomy retained managerial control*

1961. I turn then to analyse and assess, grouped by reference to particular resellers or VARs, in respect of each of the impugned VAR transactions, (i) the evidence of

the persons who negotiated the impugned VAR transactions and thereafter (ii) how the Defendants depicted the individual transactions to Deloitte and thereafter to the FRRP and finally, (iii) the allegations that each of the Defendants had 'guilty knowledge' of the impropriety of recognising revenue from the impugned VAR transactions.

1962. Before addressing the factual evidence relied on by the Claimants in respect of each of the impugned 30 VAR sales (in respect of which the Claimants alleged there was a side agreement or understanding which negated their economic substance), it may assist to provide a brief overview and rough chronology of the arrangements concerned, the parties to them and the personalities involved.

*The counterparties to the impugned VAR sales*

1963. Autonomy's principal counterparties in those impugned VAR transactions were as follows:

(1) <u>MicroLink</u>, which had been a reseller for Autonomy for many years prior to the beginning of the "Relevant Period" in Q1 2009, and had entered into many VAR transactions with Autonomy prior to 2009, none of which are impugned. MicroLink had US Federal Government security clearance and by December 2008 had become Autonomy's primary reseller to the US Federal Government. MicroLink was the VAR in a series of reseller transactions in 2008 and 2009, of which the Claimants have impugned 11, with a variety of prospective end-users, including IBM-Ameriprise and the NSA (part of the US Federal Government). The Claimants referred to this series of transactions together as "VT1". MicroLink was acquired by Autonomy at the end of 2009. The Claimants alleged that Autonomy's purpose in making this acquisition was to enable MicroLink's indebtedness *to be reclassified as inter-company debt and effectively washed away."* After that acquisition, Autonomy used MicroTech, which it had also used as a VAR since 2006, in its place: see paragraph 1963(3) below.

(2) <u>Capax Discovery LLC</u>, usually referred to as "Capax Discovery", which Autonomy used as a VAR for 10 of the impugned VAR sales (and also another transaction said to be an improper linked or "reciprocal" transaction, a category to which I return later). Capax Discovery LLC was established in early 2009, as a subsidiary of Capax Global LLC when Mr Stephen Williams, who had joined Capax Discovery in 2008 from Autonomy's e-Discovery division, persuaded Capax Global's management to expand into e-Discovery or electronic data discovery ("EDD") business. Both companies were usually referred to simply as "Capax". Capax Discovery LLC was also party to the EDD transaction which was impugned by the Claimants to which I also return later. The Capax Group was, by 2009, the largest professional service provider to Autonomy, and one of the largest professional service providers to Microsoft. Its business had largely been built around Microsoft, but Autonomy was its second largest partner. The 10 impugned VAR transactions involving Capax Discovery in the Relevant Period (Q1 2009

to Q2 2011), each of which took place under a VAR agreement between Autonomy and Capax Discovery dated 30 June 2009,  were:

   i.  VT2, in Q2 2009, in respect of which the prospective end-user was a Texan electricity supplier called TXU Energy Retail ("TXU"), and for which the software licence fee was $783,086 (plus $78,309 for one year's support) payable in three instalments.  This was followed by a further transaction for a fee of $61,652 plus additional fees of $6,165 for support and maintenance and $395,023 for hardware.

   ii.  VT3, in Q3 2009, in respect of which the prospective end-user was Kraft (a well-known US grocery manufacturing and processing conglomerate, and by then a long-standing customer of Autonomy) and for which the VAR sale price was $4,000,000 and a further support and maintenance fee of $200,000.

   iii.  VT4, in Q4 2009, in respect of which the prospective end-user was Eli Lilly & Co (a large pharmaceutical company) and for which the VAR sale price was $5,986,827 and a further $299,342 support fee.

   iv.  VT10, in Q1 2010, in respect of which the prospective end-user was the UK Financial Services Authority ("the FSA") and for which the VAR sale price was $4,285,714 plus a support and maintenance fee of $214,286.

   v.  VT16, in Q3 2010, in respect of which the prospective end-user was Amgen Inc ("Amgen"), a pharmaceutical company and for which the VAR sale price was $9 million and a further one-year support fee of $450,000.

   vi.  VT20, in Q4 2010, in respect of which the prospective end-user was Defense Knowledge Online ("DKO") for the US Department of the Army, and for which the VAR sale price was $1,950,197, plus a support and maintenance fee of $292,530, payable in three equal instalments (in March, June and September 2011).

   vii.  VT21, in Q4 2010, in respect of which the prospective end-user was Merrill Lynch, by then a subsidiary of Bank of America and for which the VAR sale price was $1,830,600, including two years' support and maintenance, payable in two equal instalments of $915,300, one within 90 days and the other within 180 days.

   viii.  VT27, in Q1 2011, in respect of which the prospective end-user was McAfee, and for which the VAR sale price was $5,000,000 plus a support and maintenance fee of $250,000, payable in two equal instalments (in July and September 2011).

    ix.  VT28, in Q1 2011, in respect of which the prospective end-user was UBS, the well-known bank and for which the VAR sale price was $8,000,000, plus an annual support and maintenance fee of $400,000, payable in two equal instalments (in July and end of July 2011).

    x.  VT34, in Q2 2011 (though allegedly not signed until 1 July 2011, the first day of the next quarter) in respect of which the prospective end-user was again UBS, and for which the VAR sale price was $7,664,132, plus an annual support and maintenance fee of $383,207.

(3) <u>MicroTech</u>, which Autonomy used as a VAR in eight of the 30 impugned VAR sales (in respect of which the Claimants' alleged that there was a side agreement or understanding) and in one further impugned VAR transaction (VT5) where no side agreement or understanding is alleged, was (like MicroLink) used by Autonomy long before the Relevant Period. Also like MicroLink, MicroTech was a US Federal Government-approved "8A" reseller. The nine impugned MicroTech VAR transactions (including VT5 where no side agreement or understanding is alleged), all governed by a June 2006 MicroTech Master Agreement, were:

    i.  VT5, in Q4 2009, in respect of which the end-user was DiscoverTech, and for which the VAR sale price was $9,523,810 plus a first-year support fee of $476,190. However, it is to be noted that no side agreement or understanding was asserted, and the impropriety alleged turns on what the Claimants termed *"its own peculiar facts"* relating to (a) the connection between VAR and end-user since MicroTech and DiscoverTech (and MicroLink) were *"Truitt-related companies"* and (b) a suggestion that VT5 was simply a means of returning to Autonomy $10 million of the purchase price of MicroLink.

    ii.  VT6, in Q4 2009, in respect of which the prospective end-user was Honeywell Aerospace ("Honeywell") and the VAR sale price was $1,800,000 plus a first-year support fee of $90,000. Ultimately Honeywell did not conclude any end-user sale with either MicroTech or Autonomy.

    iii.  VT7, also in Q4 2009, in respect of which the prospective end-user was Manufacturers Life Insurance company ("ManuLife") and the VAR sale price was $1,080,000 plus a first-year support fee of $104,000. Autonomy issued a credit note for those amounts and paid a MAF to MicroTech when, shortly afterwards (in March 2010), it entered into a larger, direct deal with ManuLife.

iv.  VT8, also in Q4 2009, in respect of which the prospective end-user was Morgan Stanley and the VAR sale price was $4,888,800 ($4,656,000 plus a fee of $232,200 for support and maintenance). As in VT7, Autonomy issued a credit note to MicroTech and paid a MAF when subsequently (in March 2010) it entered into a direct agreement with Morgan Stanley for a higher amount.

v.  VT13, in Q1 2010, in respect of which the prospective end-user was the Vatican Library and the (initial) VAR sale price was $11,000,000 plus a fee of $550,000 for support and maintenance. The end-user was planning to use IDOL to digitise the Vatican Library's manuscript collection of over 80,000 manuscripts and over 40 million pages of documents, and this was a very prestigious and enormous project, which would (to quote Dr Lynch) *"certainly have been a contender for"* the biggest single deal ever done by Autonomy.

vi.  VT25, in Q4 2010, in respect of which the prospective end-user was the US Department of Interior ("DoI") and the VAR sale price was $4,000,000 plus $200,000 for support and maintenance. No end-user deal was ultimately achieved, nor did MicroTech make any payment either.

vii.  VT32, in Q1 2011, in respect of which the end-user was Bank of Montreal and the VAR sale price was $2,880,000 plus $144,000 for annual maintenance and $50,000 for annual premium support. In June 2011, Autonomy closed a direct deal with Bank of Montreal for a licence fee of $2,800,000 and in August 2011 it issued a credit note to MicroTech for the amounts it owed under the VAR transaction.

viii.  VT33, also in Q1 2011, in respect of which the prospective end-user was Xerox, and the VAR sale price was $1,170,000 plus $58,500 for support and maintenance. Ultimately, on 29 July 2011, an Autonomy group company called Verity Inc entered into a direct deal with Xerox for an amount of $1,300,000 including support and maintenance and a further fee of $14,175 for an additional Spanish module. The end-user direct deal with Xerox provided for payment to MicroTech as Autonomy's designated payee and MicroTech then paid on to Autonomy but having deducted $85,675 as a fee.

ix.  VT37, in Q2 2011, in respect of which the prospective end-user was HP (which hoped to provide the technology services to the United States Postal Service "USPS") and the VAR sale price was $7,000,000 plus $350,000 for one year's maintenance. In the event, no end-user deal was closed. MicroTech paid the full amount due under the VAR transaction in August 2011.

(4) <u>DiscoverTech</u>, which Autonomy used as a VAR in eight of the impugned VAR transactions, was newly formed by Mr David Truitt (Mr Steve Truitt's brother) in 2009 as a vehicle to carry on the software business comprising an advanced information discovery and social networking product which was spun out of MicroLink just before Autonomy acquired MicroLink. (That acquisition and the prior spin-off are both also matters impugned by the Claimants and dealt with elsewhere in this judgment: my present focus is on DiscoverTech's two subsequent VAR transactions with Autonomy which are also impugned.) The eight impugned VAR transactions between it and Autonomy were each governed by an individual reseller agreement, but the agreements were in materially the same terms with, in every instance, wide 'entire agreement' clauses. The transactions were:

   i.  VT11, in Q1 2010, in respect of which the prospective end-user was Citigroup ("Citi", which was one of Autonomy's large, long-standing clients), and the VAR sale price was $5,500,000, plus a first-year support fee of $275,000. The VAR sale comprised software only, DiscoverTech paid Autonomy 20% (over $2,000,000) upfront. It was intended that DiscoverTech should on-sell to Citi; but there were difficulties and delays in getting on to Citi's approved vendor list. Ultimately, a tri-partite agreement was made, under which Autonomy was deemed to be receiving payment in respect of the software from Citi as agent for DiscoverTech (to which Autonomy also paid a MAF). However, a further wrinkle was that the direct sale was in fact of storage cells (Zantaz Digital Safe Smart Cells with uploaded IDOL software) rather than software alone: I address this in greater detail later.[265]

  ii.  VT12, in Q1 2010, in respect of which the prospective end-user was Philip Morris International ("PMI"), the tobacco company, and the VAR sale price was $4,185,000, plus a first-year support fee of $209,250. Initially, PMI wanted to use its partner SHI for the deal and Discover Tech expected a purchase order from SHI. But PMI then changed their mind; and ultimately, a direct deal was made between Autonomy and PMI, following which Autonomy issued a credit note to DiscoverTech and paid it a MAF reflecting the margin DiscoverTech would have got had the end-user signed with them.

 iii.  VT23, in Q4 2010, in respect of which the prospective end-user was Bank of America ("BofA"), and for which the licence fee was $3,500,000 plus a support and maintenance of $175,000. The deal ran in parallel with VT24 (see paragraph 1963(4)(iv) below). Both were part of a larger overall deal for end-users BofA/Amgen/Merrill Lynch (the last two being BofA group companies), with a total licence value of $21,330,600 which was

---

[265] Mr Goodfellow's evidence was that Autonomy delivered the storage cells directly to Citi and, furthermore, delivered a number of them in advance of the direct agreement being signed.

parcelled out to various resellers (MicroTech, Capax Discovery and DiscoverTech) in impugned transactions VT16, 21, 23 and 24). Ultimately, Autonomy made a direct deal with the end-user for a total licence fee of $19,500,000 in respect of all four transactions, with MicroTech as designated payee, and arrangements for MicroTech to account to Discover Tech and Capax Discovery for their relevant parts.

iv.  VT24, in Q4 2010, in respect of which the prospective end-user was also BofA, and for which the license fee was $7,000,000, plus a support and maintenance fee of $350,000 (which was part of the larger overall deals referred to at paragraph 1963(4)(iii) above).

v.  VT30, in Q1 2011, in respect of which the prospective end-user was Prisa, a Spanish and Portuguese language media group and an existing Autonomy customer before the VAR transaction. The VAR transaction was for a licence fee of $3,600,000 plus a first-year support fee of $200,000. Ultimately, no end-user deal was concluded with Prisa, either by DiscoverTech or Autonomy. The Claimants accepted that DiscoverTech satisfied its obligations but allege that this was only because it was enabled to do so by a purchase from DiscoverTech by Autonomy of a product called DiscoverEngine. This product was, amongst other things, a connector to Microsoft's SharePoint product (which is a content management system in wide usage in enterprise environments) and had been developed to support and enhance Autonomy's IDOL software for IDOL customers who were also SharePoint users. The Claimants make no claim that the transaction was reciprocal or linked, and no FSMA breach or misrepresentation is asserted, nor is it suggested that the transaction resulted in losses. However, the Claimants suggested that Autonomy had another similar product already and that it had no use for DiscoverEngine: the Defendants rejected that.

vi.  VT31, in Q1 2011, in respect of which the prospective end-user was ThinkTech Inc. ("ThinkTech"), an associate of the brokerage firm TD Ameritrade, and the VAR licence fee (for an amendment to ThinkTech's existing Digital Safe hosting arrangement) was $1,800,000 plus a first-year support fee of $180,000. No end-user sale eventuated, as the Claimants maintained was inevitable since TD Ameritrade had even before the VAR transaction indicated that it had no intention of proceeding; and the way in which the VAR deal was (to quote the Claimants) *"unravelled"* is also contentious.

vii.  VT35, in Q2 2011, in respect of which the prospective end-user was Abbott Laboratories ("Abbott"), a healthcare company, and the VAR licence fee was $8,611,011.07, plus $388,988.93 in respect of hosting and a first-year support and maintenance fee. A small direct deal was concluded between Autonomy and

Abbott in July 2011 for a fee of $600,000; but the large end-user deal never eventuated. The Claimants alleged that Abbott's General Counsel had vetoed the transaction and that there was never any real prospect of an end-user sale.

viii.   VT36, in Q2 2011, in respect of which the prospective end-user was Hyatt and the licence fee was $5,333,914 plus a first-year support fee of $266,696. Under the deal, DiscoverTech was to sub-licence to Dell, which in turn would sub-licence to Hyatt. Again, no end-user deal was concluded; again, the Claimants claimed that this was all but inevitable, since before the VAR transaction Dell/Hyatt had *"said no"*, VT 36 was also one of the deals which the Claimants claimed was *"unravelled"* and the debt written off to protect DiscoverTech and honour the alleged side agreement or understanding.

(5) FileTek, which specialized in the archiving of structured data, was the developer of the StorHouse and Trusted Edge software. It entered into a single VAR transaction with Autonomy (VT18). The VAR licence fee was $10,000,000, plus a first-year support fee of $500,000, and the prospective end-user was the United States Department of Veterans Administration Authority ("USDVA"). USDVA were a repeat customer of Autonomy's and had been working with Autonomy on an email archiving system. In the event, no end-user deal was concluded with USDVA by either FileTek or Autonomy. FileTek paid Autonomy in tranches, including $500,000 on the same date that the VAR transaction was concluded, with further payments of $1.5m in March 2011, $1m in April 2011 $1.5m, in June 2011 and the remaining $6m in August 2011. However, the Claimants alleged that these payments were funded out of the funds paid by Autonomy to acquire StorHouse, which they further alleged was a 'reciprocal' transaction for which Autonomy had no need, as I elaborate later.

1964.   The Claimants provided a useful summary of the quarterly distribution of the impugned VAR transactions in the "Relevant Period" (Q1 2009 to Q2 2011) and the licence revenue attributed to those transactions in aggregate in each quarter: I append that as Appendix 3.

*Summary of the Claimants' overall approach in presenting the factual evidence*

1965.   There were six principal elements in the Claimants presentation of the factual evidence:

(1)   Witness evidence (what the Claimants called *direct evidence"*) on the key points as to (a) the alleged understanding or intention that the VAR should not be involved in any way in the end-user sale envisaged by the VAR transaction and (b) the alleged understanding that the VAR should not be required to pay from its own resources;

(2)   Circumstantial evidence of a characteristic 'pattern' in the case of the impugned VAR transactions (other than the *Collectability VARs* ),

alleged to be commercially and rationally explicable only by reference to a shared understanding or intention that (a) only the seller (Autonomy) and not the VAR was to be involved in any way in the end-user sale envisaged by the VAR transaction and (b) the VAR should not be required to pay from its own resources, and only pay if and when paid by the end-user;

(3)     Evidence as to the payment of MAFs in circumstances where (a) the VAR had had no involvement in marketing and (b) the VAR agreements made no contractual provision for the payment of MAFs;

(4)     Evidence of efforts to suppress the truth as to the 'pattern', what the VARs had been given to understand, and the basis for the payment of MAFs, including alleged efforts to mislead both (a) Deloitte and (b) the the FRRP/FRC;

(5)     Alleged inconsistencies in Dr Lynch's attempts to resist such inferences; and

(6)     Evidence of the involvement and true objectives of both Mr Hussain and Dr Lynch and their guilty knowledge'.

1966.    I turn to discuss in turn each of these elements, and the Defendants' case in relation to them, in general terms.

### Direct evidence" of the alleged side agreements or understandings

1967.    As to (1) in paragraph 1965 above, the Claimants relied on "direct" or witness evidence in relation to the central allegation that there were consensual side agreements in respect of each of the impugned VAR transactions (except the *pure collectability VARs* ) which were such as to undermine *the legal obligation to cough up"* (to adopt Mr Miles' phrase in his opening) and to reserve to Autonomy the exclusive role in negotiating and closing an end-user deal which would in fact be its real source of revenue.

### Direct evidence": the relevant witnesses

1968.    The Claimants relied primarily on what they depicted in the case of each of the impugned VAR transactions (other than the *pure Collectability VARs* , (VT9, VT17, VT19, VT22 and VT29 where the issue is only as to the credit-worthiness of the VAR) as:

> a wealth of direct evidence to the effect that, at the time the VAR transaction was entered into, no-one – Autonomy included – intended that the VAR should be involved in any attempt to on-sell the software licence to the end-user."

1969.    The Claimants submitted that much of the witness evidence (and particularly that of Mr Egan and Mr Baiocco) to the effect that the VAR was often, indeed usually, told that it was not expected and not encouraged to participate in, or have anything at all to do with, Autonomy's sales efforts was unchallenged.

1970. The Claimants sought to rely on this also, as well as direct oral evidence, to support what they presented as the second limb of their case, which was that it was orally agreed or understood, and in any event undoubtedly intended between Autonomy and the VAR, that Autonomy would not require the VAR to pay the licence fee from its own resources if no end-user deal eventuated.

1971. The order of these points is noteworthy. Both experts regarded the primary question in relation to revenue recognition under IAS 18.14 as being whether the seller (Autonomy) had transferred to the buyer (the relevant VAR) *the significant risks and rewards of ownership of the goods"* (IAS 18.14(a)). They regarded the further criterion in IAS 18.14(b), that the seller should have retained *neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods sold",* as being a subsidiary matter which was almost invariably determined by the answer to the first question. However, the Claimants reversed that sequence in their presentation of the evidence. The Claimants also submitted that a finding that it was never intended that the VAR, but only Autonomy, should make any attempt to on-sell the goods to the end-user, would *by itself be sufficient to make good the Claimants case that no revenue should have been recognised at the point of sale to the VAR."*

1972. The Claimants described the further finding that they sought, that it was orally agreed between Autonomy and the VAR that Autonomy would not require the VAR to pay the licence fee from its own resources, as *more controversial as between the parties".* But they submitted that the direct evidence was in this context also *compelling".*

*Overview of the witness evidence put forward by the Claimants*

1973. The witnesses who gave oral evidence in relation to one or more of the impugned VAR sales were:

(1)    As the person said to have reached on behalf of Autonomy the side agreements or understandings with the VARs: Mr Egan (Autonomy), who gave evidence by witness statement, on which he was cross-examined by video-link;

(2)    On behalf of various VARs: Mr Baiocco (Capax Discovery) and Mr Szukalski (FileTek), both of whom were cross-examined at the hearing on their respective witness statements; and

(3)    As regards the information provided to and the understanding of Deloitte: Mr Welham of Deloitte (no one else from Deloitte gave evidence at this trial).

1974. In addition, the Claimants relied on:

(1)    The evidence of Mr Loomis of FileTek in the US criminal trial, introduced by the Claimants under a hearsay notice;

(2)    The evidence of Mr Steve Truitt of MicroTech in the US criminal trial and in civil proceedings brought by MicroTech against Autonomy in the

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

US (the "MicroTech litigation") introduced by the Claimants under a hearsay notice;

(3)    The evidence of Mr Tomas Esterrich (MicroTech's CFO) in the MicroTech litigation in the US, also introduced by the Claimants by hearsay notice; and

(4)    The evidence of Mr David Truitt of DiscoverTech and MicroLink in the US criminal trial, and in the MicroTech litigation, likewise introduced by the Claimants by hearsay notice in the same way.

1975.  Both the Claimants and the Defendants in their written closings submissions provided first, a general overview of the witness evidence (both oral and hearsay), before thereafter describing in more detail the series of impugned VAR transactions and the evidence of the actors in relation to them. I adopt the same approach below.

*Overview of Mr Egan s evidence as to what he told the VARs in every impugned VAR transaction*

1976.  Mr Egan was presented as the Claimants' main witness on this aspect of their case and his evidence covered most of the impugned VAR transactions.

1977.  I have made an assessment above (see paragraph 426(5) to 426(7) above) of Mr Egan's reliability as a witness, and explained why I consider that he was in a difficult predicament: having entered into a Deferred Prosecution Agreement ("DPA") with the US DoJ) which committed him to prescribed evidence, honed after numerous interviews with the US DoJ, HP's lawyers and his own, his freedom depended on adherence to it; he was now being cross-examined in these proceedings, contrary to his expectation, but on video-link since he refused to attend in person; and he could not be required to attend in person, being "beyond the seas". No doubt his oath weighed with him; but whilst it was at least unlikely that he could be subjected to proceedings here for perjury, departure from his script brought the real prospect of losing his freedom in the USA.

1978.  In his closing argument, Mr Miles remarked of his evidence:

> *"... The impression one gets – because he was reasonably candid a good deal of the time in cross examination –... is that this statement has been lawyered up and put in front of him and he was prepared to sign it because he was under the impression that he would not have to give evidence."*

1979.  I broadly agree with this assessment. Thus, for example, although Mr Egan gave the impression in his witness statement made in September 2018 that he could remember quite clearly what had happened in the reseller deals in which he was principally involved, a rather different picture emerged from his oral testimony given by video link. Under cross-examination it emerged that he could remember very little about the details of individual deals. Similarly, in the case of the MicroTech deals and the ATIC deal, it became clear that his witness

statement was comprised of an orderly recollection of events carefully crafted by his lawyers which he could not in reality support from his own recollection.

1980.  Further, whereas in his witness statement the impression given was of frequent contact both with Dr Lynch and Mr Hussain at Autonomy and Messrs Steve and Dave Truitt, when cross-examined he had to accept that at least as regards Dr Lynch and Mr Steve Truitt his contacts were minimal:

(1)    Mr Egan specifically corroborated Mr Steve Truitt's testimony to the effect that they had had only very occasional contact. He thought that one of the possible occasions was in the course of the Vatican deal, but even then Mr Egan did not feel *comfortable saying that absolutely"*.

(2)    He also confirmed that he mostly spoke to Mr David Truitt. However, Mr David Truitt was not the decision-maker: he was passing on information to Mr Steve Truitt and Mr Jimenez.

(3)    As regards Dr Lynch, the impression he gave in his witness statement was of a line of direct report, with the natural inference that he had told Dr Lynch the various things that he knew; in cross examination he withdrew the very serious allegations he had made against Dr Lynch in that context and, for example, was unable to offer any real recollection or evidence at all against him in relation to the repeated allegations of "pre-textual emails". (Mr Miles made the inevitable submission in this connection that all this raised *a real question mark over what on earth they were doing in his witness statement in the first place. It looks, I m afraid to say this, very much like something that was inserted by lawyers."*)

1981.  Nevertheless, in cross-examination, and as Mr Miles acknowledged, Mr Egan appeared to me to do his best to tell the truth, even if warily in respect of matters referred to in the statement he had agreed with the DoJ on which depended his freedom; and his depiction of the way he conducted Autonomy's VAR business in general terms struck me as reliable.

1982.  In that regard, Mr Egan confirmed that he had said substantially the same thing to the relevant VAR in each transaction, in accordance with instructions given to him by Mr Hussain, whom he described as *a very detail-oriented, hands-on manager"* who *often tracked deals in great detail [and]… kept in touch with members of the sales force, directing which deals to pursue and what prices to negotiate"*. Thus, he repeatedly cross-referred to what he described as *the guidance that Mr Hussain gave me as described in paragraphs 28 and 29 above"* (of his witness statement) as a shorthand for describing what he had said.

1983.  In his witness statement, Mr Egan summarised in the following terms what he said Mr Hussain, as the person he identified as the architect of the impugned VAR transactions from whom he took his instructions (which was not challenged) , had told him he (Mr Egan) should tell the VARs:

> *Mr Hussain defined the parameters of the practice; I implemented it.*
> *Mr Hussain ultimately determined which deals, and in what amounts,*

*would be taken to a VAR, and which VAR to approach. In view of the significant financial cost of these deals (i.e. the fees paid to the VAR for taking them on), no one else (apart from Dr Lynch) had the authority to make that decision. Mr Hussain described the VAR deals to me as  acceleration deals"…*

*Mr Hussain gave me specific instructions to follow so that these deals would be accepted by Autonomy s auditors (Deloitte)…*

*Mr Hussain provided guidance to me regarding what was, and was not, acceptable to communicate in my conversations with VARs. He laid out explicit rules about what could be offered as incentive to the VARs, what was required of the VARs, and what could not be part of any deal. He instructed me to tell the VAR that in order for Autonomy to be able to recognise revenue, the VAR would have to sign a document that stated a binding obligation to pay for the software, that Autonomy would deliver the software to the VAR before the end of the quarter, and that there had to be sufficient evidence that the VAR could pay for the software regardless of whether a sale was made to the end-user. He also emphasized that it was vital that the VAR confirm to Deloitte that the VAR owed the money to Autonomy and intended to pay. I was also instructed by Mr Hussain to say, and did say, to the VAR orally that Autonomy would continue its efforts to sell to the end-user; often that the VAR was not expected to participate in those sale efforts; and, importantly, that Autonomy would do everything in its power to help ensure that the VAR would not be left  holding the bag". On some occasions, Autonomy completed the sale to the end-user and caused the end-user to pay the VAR, which, in turn, allowed the VAR to pay Autonomy. On other occasions, if the end-user paid Autonomy directly, the VAR was relieved of its payment obligation.*

*…*

*At Mr Hussain s direction, I assured the VARs that if Autonomy was ultimately unable to close a deal with an end-user, there were various options that Autonomy had to  fix" the situation for the VAR so that it would not end up having to pay for the software from its own resources. Over time, this happened and Mr Hussain came up with a number of different ways of handling this, including buying products that Autonomy did not need from the VARs to offset losses from deals that we did not manage to sell through to the end-users. Mr Hussain made it clear that our assurances about the VAR not being left holding the bag could not be put in writing. We realized, of course, that if we left the VAR  holding the bag," we would be unable to do future transactions with that VAR as it would probably ruin the relationship."*

1984.  However, Mr Egan gave little or no detail of any actual occasion, or exchange with the VARs, at which he allegedly communicated the assurances referred to above in accordance with Mr Hussain's instructions. He simply asserted that these were the assurances always given; and in the case of each transaction, he

referred back to the general description as his evidence of the side agreement relied on.

1985.   As to the nature, rationale and perceived disruption of these arrangements, Mr Egan's evidence in his witness statement was as follows:

> The incentive for the VAR to take the license [sic] in order to help Autonomy reach its revenue goal for the quarter was that the VAR would be paid a margin" or fee on the deal, which, typically, was 10% of the deal price. For its part the VAR had to sign a purchase order relating to individual deals and, if asked, to confirm to Deloitte that the VAR remained responsible to Autonomy to pay for the deal, and that there were no side letters or other agreements in place between Autonomy and the VAR. Therefore, although referred to as at risk" deals (because no deal had yet been concluded with the end-user), the VAR was not truly at risk of incurring any loss on the transaction given our pledge that Autonomy would do everything in its power to help ensure that the VAR would not be left holding the bag. I felt very personally obligated to make sure that the VAR would be made whole on the purchase. Any concern the VAR might have had at the outset about the possibility of Autonomy reneging on its pledge would have been dispelled over time by our actual practice of never in fact allowing a VAR to suffer a loss.

> On several occasions, no sale was able to be made to the prospective end-user. I believe that each time this occurred, we found a fix" for the deal so that the VAR did not have to pay for the software with its own funds…

> The deals with the VARs were almost always entered into right at the end of each quarter, after Mr Hussain had determined that a sale to a particular end-user could not be completed in that quarter and when he was able to determine the size of the gap between that quarter s revenue target and the sales that had been made, or would be made to non-VAR customers before the end of the quarter. In my opinion, the practical effect of VAR deals of this type was to accelerate into the current quarter revenue that would otherwise have been recognised in a later quarter, assuming that a sale to the end-user could be made in a later quarter. This helped Autonomy to meet its revenue target for the current quarter. However, the problem this created for me was that, in the following quarter, I had to spend time and effort attempting to close the end-user transaction so that the VAR would be protected. I also had to make all of the sales in the following quarter that we otherwise needed in order to meet the following quarter s sales goal. In concept, we were borrowing revenue from a future quarter to achieve the revenue goal in the current quarter. However, in the following quarter, we had to close end-user deals just to enable the VAR to pay back" the debt" incurred in the prior quarter.

> This practice started on a relatively small scale involving a small number of end-user deals that were very likely to close in the near

> *future. Over time, the number and size of the deals increased, and, in certain cases, the probability that the end-user deal would be completed decreased. The hole in which we started each new quarter – the implied obligation to find a way to complete the old end-user deals (or find some other solution) – grew larger and larger. At the same time, the revenue targets that had to be satisfied with new deals continued to increase. The ever-increasing revenue targets, in turn, created the need for yet more transactions of the type that I have just described and other revenue-generating tactics that I will describe…In my view, this pattern ultimately became unsustainable."*

1986. Mr Rabinowitz submitted that important parts of Mr Egan's witness statement were not challenged in cross-examination. He instanced especially Mr Egan's evidence that, at Mr Hussain's direction, he often told the VAR that the VAR was not expected to participate in Autonomy's sales efforts. He also referred to and relied on Mr Egan's elaboration of his evidence in relation to particular VAR deals with favoured VARs following the prescribed 'pattern', including especially:

(1) Mr Egan's reference to a series of impugned VAR transactions with MicroLink which Mr Egan described as in each case being a "paper transaction", in which MicroLink was simply required to submit a purchase order and only Autonomy was to be involved in pursuing and closing a sale to the end-user, whom Mr Egan described as Autonomy's "true customer";

(2) Mr Egan's evidence that in a VAR deal with Capax Discovery in anticipation of an end-user deal with Kraft (VT3), again all Capax Discovery had to do in return for a MAF of 10% was to issue a purchase order, sit back whilst Autonomy continued its efforts to close a deal with Kraft, and then charge a 10% fee;

(3) Mr Egan's evidence that at the end of Q4 2009 he entered into a number of supposedly "at risk" deals with MicroTech (VT5, VT6, VT7 and VT8) *to get the revenue associated with the corresponding prospective end-user deals into the fourth quarter of 2009"* in which MicroTech would be paid a fee for playing no active part in any negotiations with the end-user;

(4) Mr Egan's evidence that the like 'pattern' was followed in the deal on 31 December 2010 with DiscoverTech in respect of a proposed end-user deal with BofA (VT23/24), in which again DiscoverTech was simply required, for its fee, to sit back whilst Autonomy sought to close the deal directly.

1987. The basis for Mr Rabinowitz's submission that much of Mr Egan's evidence was not challenged is that he was not separately cross-examined on each of these transactions. However, Mr Egan confirmed in cross-examination that he said the same kind of thing to each of the VARs with whom he negotiated deals, though of course there would be different amounts of money, differences in

software and license or other user terms, and different information as to the state of play with the prospective end-user, according to the particular facts.

1988. I was therefore invited by Mr Miles to treat his explanation as applicable to all the impugned VAR deals (with appropriate variation according to the circumstances) and his references to specific VAR transactions as exemplars. On that basis, Mr Miles submitted that his cross-examination of Mr Egan was therefore appropriately confined to testing the assertion in respect of one transaction and treating that as a challenge to all other transactions where the same basic allegation was made that the impugned VAR transaction in question was (a) a paper exercise in which the VAR would (b) subscribe to an agreement for the sake of form but (c) take no part in the negotiation or closing of any end-user transaction and would (d) notionally, but not actually, take on risk. I accept that: Mr Egan had confirmed that he had given like assurances in every case, and a challenge to one was a challenge to all.

1989. The focus of that cross-examination was on whether any of the assurances, if given, were intended to affect the legal obligation and indebtedness of the VAR. As to that, as Mr Miles emphasised in his closing submissions, Mr Egan considered that in every case the VAR in question was fully on risk, and nothing he said to individual VARs affected this. But this was addressing the legal position, which the Claimants did not dispute. It did not address what the parties intended would actually be their economic relationship, which was the focus of the Claimants' case.

1990. In that context, Mr Egan's evidence was to the effect that he did indeed give assurances to the VAR that Autonomy would do its best to rescue them if the anticipated end-user deal failed, and indicated that Autonomy would forbear from enforcing the payment obligation in the meantime. In making clear that their legal risk remained, and that there was no binding commitment on Autonomy's part except as set out in the contract, the impression of the sub-text was unmistakeably that whilst the legal position had to be emphasised, of course, and lip-service must be seen to be paid, the reality was that Autonomy needed the deal and the VAR wanted the immediate business and the prospect of more. As the saying goes, 'a nod's as good as a wink to a blind horse'. It seems to me to be clear that all those concerned understood, and the VARs proceeded on the basis, that the economic realities would have little to do with the definition of their nominal legal relationship, and Autonomy would not leave the VAR to shoulder any uncovered liability for acting in its nominal role.

1991. Thus, when cross-examined, Mr Egan elaborated on what he meant with particular reference to the FileTek/USDVA transaction (VT18) in Q3 2010 , as follows:

> *Q. Is this the position: that you made clear to FileTek that they would be on risk but that Autonomy would do what it could to make sure that in the end they would get paid?*
>
> *A. They would be fully at risk but that we would use every effort to backfill that deal if for some reason that deal did not happen and not leave them holding the bag effectively.*

> *Q. That idea of not leaving them holding the bag, that didn t affect, as you understood it from your discussion, the legal obligation on FileTek to pay even if the end-user deal was not done?*
>
> *A. No, 100% not. You know, there s more detail to that in that I would let them know that they were signing up to buy this software, that they were buying it non-refundably, no recourse to not pay, and Autonomy was not bound to do what it would intend to do if it went poorly, but that it would be our intent and that we would use every effort to backfill. Nobody wants to just burn a partner and leave them in the dust. The point of this was to create channels of revenue that were forward-looking, that they would be incentivised and go out and sell the software other times.*
>
> *Q. And they always understood that although you were giving that statement of intention, that wasn t in any way legally binding?*
>
> *A. I made it clear that it was intent but that if, you know, Mike or Sushovan decided that they didn t want to do that, they would absolutely be nothing I could do about it and I was telling them that if we were acquired or if there was any other change, I describe the fact that it was our intent if they think the relationship will work that way then that s something that they d consider.*
>
> *Q. The whole idea behind this was that risk had to pass in order to get revenue recognition, wasn t it?*
>
> *A. I actually didn t understand that, that that was required for revenue recognition, but I understood that it was an absolute requirement of Sushovan s that I impart the risk and that it be absolute."*

1992. I understood that this was intended as an exemplar and an explanation of the position across the impugned VAR transactions as Mr Egan perceived it: and I consider the challenge to the exemplar to have been a challenge to all. So I do not consider that the challenge failed for want of being put in respect of every transaction; it failed because Mr Egan's answers made clear the formulaic nature of the emphasis on the legal position.

1993. Mr Miles also relied especially on two passages of evidence given in the course of Mr Egan's re-examination by Mr Rabinowitz as being *really crucial evidence"*:

    (1)    The first was this:

> *Q. Mr Egan, can I ask you to explain further what you meant by backfilling" and ensuring that the VAR was not left holding the bag"?*
>
> *A. When I used the term backfilling" what I was referring to was if the deal that the reseller had taken at risk somehow were not to be able to be closed, and Autonomy needed to make sure that the reseller wasn t – not receiving any revenue and making those payments to Autonomy, I was going to take other deals from*

> *Autonomy s forward-looking pipeline and then give them to that*
> *reseller to backfill that amount, in other words basically substitute*
> *another deal for it."*

(2)    The second was this: when asked whether Mr Egan had discussed with the VAR whether, if the specified end-user dealer failed to eventuate, the VAR would be expected to make payment to Autonomy during the period before Autonomy had found a way to backfill the deal, Mr Egan answered:

> *"Effectively, yes, they had to make their payments in line with payment*
> *terms they d committed to, independent of the time it took to decide*
> *whether to backfill, the time it took to partially backfill,*
> *independently".*

1994.    Mr Miles relied on this evidence for two points. First, he submitted that what Mr Egan had said amounted simply to an assurance that he would see what Autonomy could do to find another end-user in the event that the first end-user dropped out. Secondly, and a point which Mr Miles submitted was critical, Mr Egan made clear that in the meantime the VAR would still be *on the hook"* to pay, or in another expression Mr Egan often used, left *holding the bag"* pending identification and substitution of a 'backfill" deal. Mr Miles submitted that this evidence:

> *undermines their contention that there was any arrangement that the*
> *resellers would not have to pay or would not have to pay until they*
> *were paid. On the contrary, this is Egan saying that it was expressly*
> *discussed that they would have to pay even while they were looking for*
> *another end-user".*

1995.    Mr Miles also made the more general point that although this passage referred to the VAR deal between Autonomy and FileTek, Mr Egan had earlier confirmed that both the assurances he gave and his perception of their intent and consequences were the same in each of the other deals also. As Mr Miles summarised it (after a forensic swipe that *the Claimants themselves are guilty here of ignoring the substance"*) this evidence was that:

> *what Mr Egan was emphasising to them was that the reseller was*
> *indebted to Autonomy whatever happened with the end-user."*

1996.    Mr Miles went on to suggest that this not merely challenged, but disposed of, any notion of some unilateral intention on the part of Autonomy that neither risk nor managerial control should effectively pass, since Mr Egan was the only person supposed to have generated that intention.

1997.    The Claimants sought to reply to these points by presenting Mr Egan's answers as simply reiterating the distinction, on which they relied, between the legal

position (in respect of which the Claimants accept legal enforceability) and the practical reality, which they alleged to be what they described as his:

> *unchallenged evidence that he assured the VARs that Autonomy s intention was not to leave the VAR holding the bag."*

1998. I am entirely persuaded that Mr Egan gave these assurances, and that he did so with the sanction, and indeed on the instructions, of Mr Hussain. I cannot accept Mr Miles' submission that Mr Egan's oral evidence critically affected his presentation of this in his witness statement. In my view, nothing that Mr Egan said in cross-examination or re-examination substantially qualified or undid the evidence in his witness statement that I have quoted at some length in paragraphs 1983 to 1985 above. Taken in the round, the gist of his oral evidence was to reiterate that the relationship with the VAR operated at two levels: what the contract provided and how the parties in fact intended to and did in fact conduct their relationship. For as much as Mr Egan stressed to the VAR that it was on the legal hook, as Mr Hussain had insisted he should, he also made clear that Autonomy would do *everything in its power to help ensure that the VAR would not be left holding the bag."* Nothing that Mr Egan said contradicted the reality that neither party expected the VAR to have any role, or to carry any real risk, or to gain any reward from any resale (except a MAF which the contract made no provision for).

*Overview of Mr David Truitt s evidence as to MicroLink s role in impugned VAR deals*

1999. As explained in paragraph 1963(1) above, none of the many VAR deals between Autonomy and MicroLink entered into prior to the Relevant Period has been impugned in these proceedings. At one time (in October 2018), the Claimants confirmed that they were abandoning their allegation that there was a side-agreement in relation to the MicroLink transactions in the Relevant Period. That concession was then withdrawn a month later; yet Mr Welham's witness statement records that he was asked to assume that in only one of the six MicroLink VAR deals with Autonomy in Q2 2009 was there a side-agreement; and of the three impugned MicroLink deals in Q3 2009, Mr Welham was again asked to assume a side-agreement in relation to only one of them. That is the basis of the Defendants' submission that the Claimants' case in relation to MicroLink has been in flux as regards the basis on which they seek to impugn the MicroLink VAR transactions.

2000. Mr David Truitt, a practiced prosecution witness who gave evidence at the US criminal trial, as well as in the MicroTech litigation, accepted in his deposition in the MicroTech proceedings that Autonomy's objective in its VAR sales to MicroLink was to *take on these end-of-quarter deals so that Autonomy could recognize revenue on those deals in whatever was the then current quarter, the quarter that was about to end."* However, he consistently made clear in both sets of proceedings that MicroLink acquired full ownership and full control of the software under the VAR transactions and was unequivocally *at risk".* He

denied that there was any side-agreement or understanding such as to undermine revenue recognition.

2001. Though cautioning as to his reliability, the Defendants cited the following three passages in support of their contention that Mr David Truitt's evidence in earlier US proceedings undermined rather than supported the Claimants' case:

(1)     In his examination-in-chief in the US criminal proceedings, Mr David Truitt confirmed that MicroLink's relationship with Autonomy was an *at risk scenario"* such that he wanted to make sure that the deal with the end-user would close quickly:

> Q.     *What did you mean by "end-of-quarter scenarios"?*
>
> A.     *"End of quarter" for me would mean deals that Autonomy had been working on their own, that they would -- they'd be similar, you know, to the one I just described in the sense that they were supposed to be far down the line in the sales process, and they would ask whether we would be interested in issuing orders for those -- for those scenarios.*
> *So they would present a -- you know, a particular opportunity, they would talk to us about what it was, where it was in the sales cycle, and then we would decide whether to issue an order or not.*
>
> Q.     *The $200,000 order that you described that started this end-of-quarter scenario, why did you call the customer about that?*
>
> A.     *I wanted to make sure that it was going to indeed close quickly and that, you know, the agreement with Autonomy on those deals was -- you know, once you issue the order, it's your order. So there was, you know, an at-risk scenario. So, you know, I didn t know Mr. Cronin very long at that point and wanted to make sure that what he was telling me was correct. I didn t want to be out 200,000."*

(2)     Mr David Truitt gave similar evidence in relation to MicroLink in the US MicroTech litigation.  This was marked up as hearsay by the Claimants and (as the Defendants pointed out) must be taken to represent their evidence:

> Q.     *And were there occasions when you did not collect from the customer?*
>
> A.     *Yes.*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> Q.    Okay. What happened on those occasions?
>
> A.    On the occasions where the customer did not buy the
>       software, we would try to take that software and sell
>       it to another customer, and sometimes we were
>       effective at doing that. You know, we had -- we had
>       to figure out a way effectively to cover -- we would
>       call these transactions at-risk transactions, which
>       meant to us that we took them and we had to figure
>       out if it went badly, you know, what to do."

(3)    In another passage from his evidence in the US criminal proceedings,
this time taken from his cross-examination, Mr David Truitt gave similar
evidence against Mr Hussain, explaining what he meant by an "at risk"
transaction (albeit in relation to DiscoverTech). He confirmed that
DiscoverTech was at risk if the end-user deal did not close.

2002.    The difficulty with this evidence is that (a) according to Mr Egan, whose
evidence on this point was not challenged, it was Autonomy, and not MicroLink,
which in the transactions in the Relevant Period to which it was a party
invariably and exclusively dealt with the end-user to seek to conclude the
indicated end-user transaction; (b) no instance was provided of MicroLink
seeking to sell on the software it had acquired under license; and (c) no evidence
was provided of MicroLink ever suffering a loss on any of these deals: on the
contrary, the evidence adduced showed that its indebtedness (which it had no
substantial resources to enable it to meet) was always resolved by some form of
transaction with Autonomy [266], and ultimately by Autonomy acquiring
MicroLink itself and its debts being 'forgiven' (with the result that MicroLink's
principal relevance is in the context of the Claimants' claims in respect of the
alleged 'reciprocal' VAR transactions)[267].

2003.    Mr David Truitt did not give evidence before me. I have only the transcripts of
his evidence in the US in this regard. However, Mr David Truitt's depiction of
MicroLink being substantially at risk in respect of its legal indebtedness, and of
taking control and active steps in respect of the licensed software it had

---

[266] The Claimants' case being that *"the only money ever paid by MicroLink in respect of the 11
[impugned VAR] transactions was money that Autonomy had channelled to MicroLink for that
purpose."* These alleged 'reciprocal' VAR transactions included the purchase by Autonomy of
MicroLink's 'Search Analysis Tool' ("SAT") and AIS software for the sum of $9.3 million, for which
the Claimants alleged Autonomy had no need.

[267] The Defendants have referred me to evidence that, prior to being acquired by Autonomy (on 4
January 2010), (a) MicroLink was a large reseller of Autonomy products and indeed was its "Global
Partner of the Year" in 2007; (b) MicroLink's Q3 2009 purchase (VT1) was an addendum to an earlier
software licence agreement it had entered into with Autonomy in March 2007; and (c) MicroLink's
extensive work with both Autonomy and Microsoft products and customers made it well placed to
develop its own software tools to enhance Microsoft's Sharepoint customers' use of Autonomy
products using its AIS (Autonomy Integration Suite for SharePoint) product. That seems to me,
however, to make more remarkable the fact that in the impugned VAR transactions MicroLink played a
'placeholder' role.

acquired, does not fit with the evidence before me. He spoke of MicroLink's risk and managerial control: but there is no evidence that he thought of this as defining the parties' understanding of their true commercial relationship.

2004. Furthermore, Mr Matt Stephan testified at the US criminal trial that, following Autonomy's acquisition of MicroLink, he was asked to look at MicroLink's financial records and found that the VAR transactions between Autonomy and MicroLink were not recorded in MicroLink's own books: they were "*just not in the books at all*":

> *Q. When you looked at the financial records at MicroLink, was there anything that caused you concern?*
>
> *A. Yeah. They did not have on their books an equal and opposite amount of accounts payable due to Autonomy that Autonomy had in their books as owed to them, if that makes sense.*
>
> *Q. All right. Can you describe that for us? I mean, what were you seeing and what were your concerns?*
>
> *A. I think —— I can t recall the figures, but Autonomy was owed over $10 million by MicroLink at that point and MicroLink had a much, much smaller balance on their books as owing to Autonomy.*
>
> *Q. Was that because they were listing smaller figures for the deals?*
>
> *A. No. The deals —— the deals were just not on the books.*
>
> *Q. So debts ——*
>
> *A. A number of the deals — sorry. A number of the big deals that we d signed in recent quarters were just not in the books at all.*
>
> *Q. So debts to Autonomy by MicroLink were not reflected in MicroLink s books?*
>
> *A. That s correct.*
>
> *Q. So why did this cause you concern?*
>
> *A. It indicated to me that despite signing audit confirmation letters and different things about not having any side agreements in place, it suggested that from MicroLink s perspective, they were never going to have to pay that money if they didn t get paid or if they didn t close the deal with the end-user."*

*Overview of Mr Baiocco s evidence as to Capax Discovery s role in impugned VAR deals*

2005. Mr Egan's opposite number in the 10 impugned VAR transactions between Autonomy and Capax Discovery (see paragraph 1963(2) above) was Mr Baiocco. Mr Baiocco was managing partner of both Capax Global and Capax Discovery and the central figure in the impugned VAR transactions in which the latter was a party.

2006.  I have made an assessment above (see paragraphs 426(7) and footnote 55 above) of Mr Baiocco's reliability. He was another practised witness, having met with HP's lawyers three or four times in 2013 and with US prosecutors six or so times before the Grand Jury proceedings prior to the US criminal trial. He also gave evidence to the Grand Jury and in the US criminal trial. He has had throughout the benefit of his own lawyer, paid for by HP.  Parts of his evidence relating to the impugned VAR transactions struck me as the product of careful forensic lawyering: when cross-examined, some parts of his witness statement appeared unfamiliar to him; and his voice in cross-examination was a contrast with the words on the pages of his witness statement.

2007.  Like Mr Egan's evidence, the format of Mr Baiocco's witness statement was to set out matters of general application and then deal more particularly with the various transactions individually. I address general matters at this stage.

2008.  The Claimants portrayed Mr Baiocco's evidence as being to similar effect as, and thus complementary to, Mr Egan's, but looked at from the other side of the bargain between Autonomy and the VAR.

2009.  Again, like Mr Egan, Mr Baiocco paid lip service to the legal content of the VAR agreements made with Autonomy on behalf of Capax Discovery, and accepted that the VAR agreements were legally enforceable. But he sought to portray the risk of actual enforcement as attenuated, if not extinguished, by assurances he stated he had received from Mr Egan, and the 'pattern 'which Mr Baiocco expected or came to expect the transactions to follow. Mr Baiocco sought to capture this outlook in stating that the real risk, as he thought of it, was that *Autonomy might not follow through on my handshake agreement with Mr Egan."*

2010.  There was a marked contrast between the honed fluency and consistency of Mr Baiocco's witness statement and the contradictory and sometimes evasive evidence he gave when cross-examined.

2011.  The gist and (to my mind) manufactured message and contrived tone of Mr Baiocco's witness statement is apparent from the following passages in it, which the Claimants, somewhat unrealistically, submitted were unchallenged:

> *29. In around May or June 2009, Mr Egan asked me whether Capax would become a reseller for Autonomy. A value-added reseller, as that term is usually used, is a company that purchases a product from a manufacturer or supplier to which it adds features or services and then resells the package (usually to an end-user)as an integrated or completed solution. However, that was not the nature of the relationship we had with Autonomy. Instead, Mr Egan told me that Autonomy often faced the situation where it was very close to completing a sale to an end-user, which it was not able to conclude by the end of the quarter. Rather than Autonomy lowering the price to get the end-user to sign a contract for quarter end, Autonomy wished instead (a) to enter into an agreement with us at quarter end supposedly for on sale by us of the software in question to the end-user, and then (b) to continue to negotiate with the end-user and to close the*

*deal with the end-user in the following quarter. Capax Discovery
would receive a 10% fee.*

*30. There were a number of significant features to these transactions:*

*(a) First, I was usually approached by Autonomy (almost always Mr
Egan) to enter into these VAR transactions right at the end of a quarter.
As I understood it, Autonomy s primary objective was to close its deal
with the end-user before the end of the quarter, thereby avoiding the
10% profit commission that it would pay us if we were involved. Thus, it
appears that our participation was only requested where Autonomy
failed to conclude a deal with the end-user. As a result, we were often
approached by Autonomy at the very end of the quarter and the
paperwork had to be rushed through before quarter end. All of the
transactions that I describe in this statement, without exception, were
entered into on the very last day of a quarter. I would only agree to
enter into the transaction if I was assured that Autonomy was very close
to concluding the deal with the end-user, as reflected in my email dated
June 24, 2009 to Mr Sass, which made it plain that we would only
consider taking transactions which Autonomy was  fairly confident"
would close.*

*(b) Second, although on paper Capax Discovery licensed the software
from Autonomy, we did not pay for it upfront. The agreement with Mr
Egan - again by way of a  handshake"- was that Capax Discovery
would not be required to pay Autonomy until Autonomy closed the deal
with the end-user and the end-user (i) paid Capax Discovery or (ii)
Autonomy (in which case our debt under the VAR agreement would be
forgiven), or (iii) Autonomy had otherwise put Capax Discovery in
funds to make the payment. In actuality, in most cases, Autonomy either
caused the end-user to pay Capax Discovery and we in turn then paid
Autonomy, or if Autonomy failed to conclude a deal with the end-user
or the end-user made its payment to Autonomy directly, Autonomy
forgave Capax Discovery s payment obligations. As with the EDD
arrangement, there was always a risk that Autonomy might not follow
through on my handshake agreement with Mr Egan. Again, our use of
Capax Discovery as the vehicle for these VAR transactions was
designed to protect the rest of the Capax group from this risk.*

*(c) Third, there was never any price negotiation between Capax
Discovery and Autonomy: instead, in each case, Autonomy prepared a
purchase order for submission by Capax Discovery in a specified
amount, for specific software that was, on paper, to be resold by Capax
Discovery to an identified end-user. We then executed the purchase
order as requested and returned it to Autonomy.*

*(d) Fourth, while Autonomy provided us with a key which could be used
to access the licensed software from an Autonomy website, as far as I
am aware we never actually retrieved the software because we had no
need for it. We never were asked to deliver the software to the end-user.*

> *(e) Fifth, the end-users were presented to us by Autonomy and we played no part in selecting or identifying them. The negotiation of the sale to the end-user (before we submitted our purchase order and after we submitted our purchase order) was handled exclusively by Autonomy, without any assistance or participation by us. In fact, Autonomy did not allow Capax Discovery to get involved in the discussions with the end-user. When an agreement was ultimately reached between Autonomy and the end-user, Capax Discovery played no part in bringing it about, or in negotiating or approving its terms. In most (but not all) cases, payment was made directly by the end-user to Autonomy rather than to Capax Discovery. Capax Discovery did not actually resell" the product to the end-user."*

2012. Like Mr Egan's, his witness statement presented an overall picture of the VAR agreements to which Capax Discovery was a party as being a paper record to show Autonomy's auditors *"which did not reflect our actual relationship with Autonomy",* which was in reality defined by a *"handshake"* and characterised as a matter of substance by the *"significant features"* identified.

2013. It was unclear from Mr Baiocco's witness statement how many of these *"significant features"* it was being suggested Mr Baiocco and Mr Egan had agreed by such a *"handshake"* in advance. The impression sought to be created, I think, was that the features identified did reflect what had been agreed between them; or at least, that the substance of what the parties had in mind was reflected in the pattern of the transactions concerned. However, the carefully assembled *"significant features"* seemed to me to be far too precisely engineered and detailed to be comprehended in an informal exchange; and I am in little doubt that they reflected lawyers' analysis, honed over many years, after the event and after many interviews and two substantial trials, and not Mr Baiocco's recollection of anything agreed at the time. Indeed, in cross-examination Mr Baiocco accepted that the scope of any handshake agreement or assurances was far more limited, as I elaborate later.

2014. Another carefully constructed passage in Mr Baiocco's witness statement addressed the fact that Mr Baiocco signed a series of audit confirmation letters which (he confirmed) he knew were sent to Deloitte. Both in his witness statement and under cross-examination, Mr Baiocco sought to portray these, at least in his understanding, as simply confirming *Capax Discovery s existing payment obligations to Autonomy."* He said that he had been told by Mr Egan that Capax Discovery had to sign them to *let the auditors know that we owed them, that the bill – the receivables on there were proper"* (as he elaborated when cross-examined). This was an obvious effort to confine the effect of the signed confirmation letters to an acknowledgement of legal indebtedness under the VAR agreements, which Mr Baiocco always accepted. However, the audit confirmation letters were not so confined. In addition, as previously noted, each such letter formally represented that there were *no side letters or other agreements in respect of the subject matter of this request"* and later versions included a further representation that Autonomy *retains no continuing managerial involvement in the delivery of this product or service, other than stipulated in the licence agreement."* As I also elaborate later, even Mr Baiocco,

who was not a man to appear abashed, looked uncomfortable in resorting to saying that he had not spotted or understood this at the time.

2015. Mr Baiocco did not mention in his witness statement the *entire agreement"* provisions which were contained in every version of the Capax Discovery VAR agreements. When cross examined, he initially accepted both that such a provision was included in the VAR agreements and, more generally, that such a provision was standard in software agreements. Indeed, he was taken to Capax Discovery's own standard terms in its own contracts which contained a similar provision, which did not surprise him. However, when later in his cross-examination, Mr Baiocco was asked whether he accepted that the reason for such terms was that there was *always a risk that a salesman might try to say something to get a deal",* he said that he could not really answer that because he did not *understand this language enough to speak anything to it".*

2016. His evidence under cross-examination when shown the numerous audit confirmation letters he had signed and pressed on their apparent inconsistency with the side agreements he asserted is exemplified by the following passage:

> *Q.    What you were doing was confirming that these amounts were due and owing, that there were no side agreements and that Autonomy retains no continued managerial involvement in the delivery of the product?*
>
> *A.    What I was confirming when I signed those was that I owed the money, because they told me that these were about owing the money, so I signed that knowing I owed the money. I never looked or saw the side letter agreement and as far as the continuing managerial involvement, that was not on the first couple of them, I believe that was something that was added down the road. So I did not knowingly sign those knowing that there was a –*
>
> *Q.    How do you know those words were added down the road?*
>
> *A.    Pardon?*
>
> *Q.    How do you know those words were added down the road?*
>
> *A.    Nine years of lawyers.*
>
> *Q.    Right, sitting with too many lawyers?*
>
> *A.    Yes.*
>
> *Q.    So they pointed it out to you.*
>
> *You were signing this, it s on the very page that you were signing and it said that there were no side letters or other agreements in respect of the subject matter, and that was true as you understood it, wasn t it?*

A.      *It was true to me that we owed the money. I did not recognise that sentence when I signed these.*

Q.      *Right. Did you think there were side letters or other agreements?*

A.      *I mean, it depends how you define  side agreement", but –*

Q.      *All right, how do you – I m just asking you your understanding –*

A.      *I personally do not*

Q.      *You do not and you did not at the time?*

A.      *I did not at the time but it s irrelevant because I did not see that at the time.*

Q.      *Well, that s your evidence. It s on the same page, I suggest you did see it, but that s what you say.*

A.      *You don t know that.*

Q.      *But I m asking you now about what you believed at the time. You didn t think there were any side agreements or other agreements that affected the debt, did you?*

A.      *If you consider they were going to swap out the deals, a side agreement, then there was a side agreement, I didn t sign that with that in mind because I didn t see it.*

Q.      *When you say, if you consider they were going to swap out the deals, that s going back to what you said before, that Mr Egan said to you,  We ll do what we can to try and get you another deal"?*

A.      *Correct.*

Q.      *Nothing more than that? That s all he said?*

A.      *If it fell through, we ll get another deal, yes, we ll swap out the deal, correct?*

Q.      *But you never thought that what he was saying was legally binding, did you? You never thought that what he was saying about swapping out the deal was legally binding?*

A.       *Correct.*

        *I mean, I guess unless oral promises are legally binding. I m not a lawyer.*

> Q.      *Well, let me ask you about that. Did you or did you not think that whatever he said about swapping out the deal was legally binding?*
>
> A.      *I can t really answer that with knowledge. I don t know if –*
>
> Q,      *What did you believe?*
>
> A.      *I believed probably not."*

2017. The contrast between this evidence under cross-examination and the bald assertion in his witness statement, crafted after *nine years of lawyers"*, that the *confirmations were false"* is stark. Mr Rabinowitz interceded in the course of cross-examination to suggest that the assertion as to the confirmations' falsity related only to the part relating to management involvement in the delivery of the goods; but had quickly to withdraw the suggestion and accept that the reference was to both aspects of the confirmations provided.

2018. As to Capax Discovery's obligation to pay, Mr Baiocco's evidence as I understood him was that:

(1)      The deals were usually made right at the end of a quarter; this was not unusual in the sector but amongst its consequences was that there was never any price negotiation between Capax Discovery and Autonomy: the price was that which Autonomy had established for the sale to its proposed end-user;

(2)      Capax Discovery was, in terms of the law, 'on the hook' to make payment in full; but neither party ever intended or expected payment by Capax Discovery unless and until the end-user deal was closed, whereupon the amounts paid would be applied in discharge of the VAR.

(3)      If no end-user deal eventuated Autonomy would devise some way of extracting Capax Discovery from the 'hook': at one and the same time as emphasising Capax Discovery's legal obligation, Mr Egan always assured Mr Baiocco that Autonomy would do everything it could to ensure that Capax Discovery was not left exposed.

(4)      A particular way of negating this exposure was specifically discussed: this was that Autonomy would do its best to *swap out"* any deal which failed to result in an end-user transaction which would provide the funds to satisfy the obligation. But Mr Baiocco's evidence left me in no doubt that the assurance was general and the intention clear.

2019. As to the other legal and economic effects of the VAR transactions as between Autonomy and Capax Discovery, and in particular, as to how it was intended the parties to the VAR sales should conduct themselves after the date of sale, Mr Baiocco's evidence was:

(1) He believed that delivery of the software licensed was always made electronically on execution of the VAR sale: this was effective delivery;

(2) However, he was never involved in that process, and (so far as he was aware) no-one at Capax Discovery ever actually retrieved the software, *because we had no need for it. We never were asked to deliver the software to the end-user.*"

(3) Although the contract did not reserve to Autonomy any contractual right to do so, in practice the parties intended that Autonomy should be in actual and exclusive control of the onward sales process. The following passage from Mr Baiocco's cross-examination demonstrates this:

> *Q. Then the next point is about the identification of the end-users. Now, you say that Autonomy didn t allow Capax to get involved in discussions with the end-user. Who do you say said that? Mr Egan?*
>
> *A. Yes.*
>
> *Q. Now, can we just consider that for a minute. He didn t actually say you couldn t, did he? He wasn t telling you, you couldn t?*
>
> *A. I think on occasions I asked -- because we may have had some people we knew at the end-user clients, maybe not in this specific area, and they were like, basically, No, stay out of it".*
>
> *Q. Okay, so that s Mr Egan saying that?*
>
> *A. Yes."*

(4) If the end-user sale proceeded, Autonomy would pay Capax Discovery a 10% fee (a MAF). Mr Egan regarded this as a fee for taking on risk, analogous to a guarantee fee. The letters relating to the MAFs stated that the products would be sold to Capax Discovery at a 10% discount and that Capax Discovery would get its 'fee' from the full price on onward sale. But in fact Capax Discovery never did actually "resell" to the end-user. Autonomy simply paid Capax Discovery the 10%. Mr Baiocco was not interested in and never read the letters relating to the MAFs: he was only interested in getting the fee.

(5) Capax Discovery never had dealings with the end-user prior to the sale. Part of the commercial rationale from its point of view was that it would have the opportunity to offer the end-user professional services thereafter: but this happened in only two sales (the TXU and FSA deals).

*The Goldberg Segalla letter*

2020.   In addressing Mr Baiocco's evidence, and in seeking to contradict the Claimants' contention that it demonstrated that in economic substance, Capax Discovery took on neither any real risk nor any managerial responsibility as regards the software it had contractually acquired, Mr Miles drew repeatedly from a letter dated 1st November 2013 ("the Goldberg Segalla letter"). This letter was written on behalf of Capax Discovery's holding company, Capax Global LLC by its

lawyers, Goldberg Segalla LLP to the US Department of the Air Force ("USDAF").

2021. The Goldberg Segalla letter was signed by Mr Baiocco's present lawyer, Mr Christopher Belter ("Mr Belter"), who was paid by HP and accompanied him at the hearing. The letter was stated to be *in response to the show cause letter dated September 6, 2013 inviting Capax Global LLC ( Capax") to respond to allegations concerning accounting improprieties involving Autonomy"* in respect (in particular) of a *government end-user business opportunity…brought to Capax in late December 2010"*.

2022. The avowed purpose of the Goldberg Segalla letter was stated to be *to show that at all relevant times Capax and its subsidiaries have been responsible contractors and should not be proposed for debarment from Government contracting."* To that end, the letter described first *the nature of Capax s business and the relationship between it and Autonomy, including the current relationship with [HP]"* and then set out reasons why Capax Discovery should be regarded as a *responsible contractor with particular emphasis on its ethics, integrity, compliance with laws, and ability to perform adequately."*

2023. Mr Baiocco told me that he had read and approved the Goldberg Segalla letter at the time, and had also had an opportunity to look at the letter recently. He confirmed his belief that the statements made in the letter were true: he told me he believed it to be *an honest letter"*, and he acknowledged that he was well aware at the time that there were serious potential consequences (including criminal consequences) of not giving an accurate and comprehensive account in reply to the USDAF. Of course, it was not realistic to expect him to say or suggest otherwise.

2024. Dr Lynch attached very considerable importance to the Goldberg Segalla letter. Key points in it relied on and emphasised by the Defendants as contemporaneous support for its description of the nature and effect of the VAR sales were as follows:

(1) Capax Global and Capax Discovery were treated as one company ("Capax"), and Capax was presented as a sizeable entity which had been in operation since 1999 and as an

*information technology company that provided technology services, and solutions concerning cloud hosting, software application and development, systems integration and technical support."*

(2) The letter explained Capax Discovery's position in the market, the breadth and depth of its customer base (including 250 Fortune 500 companies) and its role as a professional services provider and reseller for Autonomy's products and especially its core software product, IDOL, from May 2009. That presentation (which reflected the position of Capax Global but not its subsidiary Capax Discovery, which was not established until early 2009) went on to state (again in a passage which did not apply to Capax Discovery) that:

> *A mainstay of Capax s solution offering is the deployment and configuration of Enterprise Search and the incorporation of Enterprise Search into a customer s applications to achieve business value."*

(3)    The letter addressed two impugned VAR sales, one (referred to in the letter as *The Government End-User Transaction"*) in Q4 2010 (VT20) for which the VAR was Capax Discovery and the end-user was Defence Knowledge Online ("DKO", part of the US military) and the other (referred to in the letter as *The Entity B Transaction"*) in Q1 and Q2 2011 was a two-stage impugned VAR sale (VT28 and VT34) for which the VAR was Capax Discovery and the end-user was UBS.

(4)    The letter gave an explanation of the way the reseller and supplier relationship worked in the market, explaining *inter alia* how reseller risk included revenue loss caused by the inability to collect payables.

(5)    The letter also explained the role of a VAR in general and Capax Discovery's specific role as a VAR for Autonomy:

> *In the computer industry, a VAR may add value to a product by customizing or implementing software and/or being a guarantor. As a VAR for Autonomy, Capax was a guarantor <u>as well as a provider of services and support that allowed Autonomy s software to function effectively in its clients environments.</u>"*
> [Emphasis supplied]

(6)    It stated that Capax Discovery viewed being a reseller for Autonomy as a way to *potentially create direct and valuable relationships with new clients in order to sell them additional products and services".*

(7)    It emphasised that Capax Discovery took substantial risk in every reseller transaction with Autonomy. It stated unequivocally that:

> *At no time did Capax ever think that it was not at substantial risk. Indeed, in all VAR transactions with Autonomy, if the deal with the end-user did not materialise, Capax would ultimately still be responsible to Autonomy for the payment of the software licences.*
>
> *Although Autonomy would possibly assist Capax in finding a new client in a joint selling arrangement or Capax would itself be able to sell the licences to another client, there was no guarantee that Capax would ultimately find a different end-user. Ultimately, weighing the risks and reward potential, Capax decided to proceed with these VAR deals. Capax had additional confidence with respect to the risks involved in these deals because Capax was, and remains, a major service and support provider to Autonomy s clients. Over the years, Capax has*

Approved Judgment                                                         HC-2015-001324
Mr Justice Hildyard

> *provided, and continues to supply, substantial and effective*
> *services and/or support for over 1,000 Autonomy clients."*

(8)     It stated that Mr Baiocco and Capax Discovery considered that they had
        no reason to believe that any Autonomy revenue was being improperly
        recognised.

(9)     It confirmed that Capax Discovery had reviewed the audit confirmation
        letters which confirmed that Capax Discovery was on risk and that there
        were no side-agreements and believed them to be accurate; and in cross-
        examination, Mr Baiocco told me that when he signed the audit
        confirmation letters he "*absolutely believed what I was saying was true*".

(10)    Capax Discovery also confirmed that it was on risk in relation to the
        specific reseller deals addressed in the letter.

2025.   The Defendants placed considerable reliance on the Goldberg Segalla letter: for
        Dr Lynch it was submitted that:

> *the Claimants case on the Capax transactions is unsustainable in the*
> *light of this letter and Mr Baiocco s confirmation of its accuracy".*

2026.   In essence, the Defendants' case was that the Goldberg Segalla letter represented
        a reliable and more contemporaneous record of Capax Discovery's role and
        acceptance of risk in the impugned VAR transactions which was consistent with
        Mr Baiocco's statement that he never believed at the time that there was any
        side-agreement; and that the description given in the letter of the VAR
        arrangements should be preferred to the evidence in his witness statement in
        these proceedings. The letter was presented as reflecting the true relationship
        between the parties; his witness statement, and in particular his evidence about
        "side agreements", as reflecting Mr Baiocco's business imperative to remain on
        good terms with HP[268], his many meetings with HP's lawyers and prosecution
        lawyers in the US, and lawyers' input: it was the result of *what had been*
        *suggested to him repeatedly over the years."*

2027.   However, the Goldberg Segalla letter must be set in context, and read with an
        appreciation of its objectives. It is true that the letter made no mention of any
        side-agreement, and focused only on legal commitments and their presented
        rationale. But the Goldberg Segalla letter was quite obviously heavily lawyered
        and carefully crafted to seek to maintain Capax Discovery's valuable status as a
        Government Reseller, and I do not think it realistic to treat the letter as an
        authentic and complete depiction of the relationship between Capax Discovery
        and Autonomy.  Indeed, the Goldberg Segalla letter has unsettling features, and
        in particular:

(1)     The misleading elision of the two Capax Discovery companies to give
        the impression of far greater financial solidity and a much wider

---

[268] By 2013 Capax Discovery was making some $15 million per year in revenue from contracts with
HP and it wanted to be (and at about that time in fact became) a preferred HP partner.

customer base than could be said of the VAR in each case, which was Capax Discovery, not Capax Global;

(2)    The rolled-up presentation of the usual activities or contribution of a VAR in general, and "Capax Discovery's" contribution in particular, which gave an impression that "Capax Discovery" did far more to "add value" than was the truth;

(3)    The exaggeration of the risk borne by Capax Discovery, given that there was no real doubt that Mr Egan had given assurances of assistance with a view to doing all that was possible to ensure that Capax Discovery would not be left exposed, the real issue and dispute being not whether any assurances had been given, but whether they amounted to a proscribed "side-agreement";

(4)    Clear examples of half-truths in the depiction of the nature of the risk and Capax Discovery's role in its VAR deals. The risk depicted was the legal risk: but not the reality; and as to Capax Discovery's role, the suggestion, for example, that Capax Discovery *viewed being a VAR as a way to potentially create direct and valuable relationships with new clients in order to sell them additional products and services"* may not have been untrue at one level: but in the context of Capax Discovery's impugned VAR transactions with Autonomy it is, at another level, either inapposite or misleading, given that in none did Capax Discovery deal directly with the end-user (Autonomy having itself (alone) negotiated directly).

2028.    In short, whilst I would accept that Mr Baiocco's evidence was influenced by the input and (I suspect) insistence of HP's lawyers and the prosecuting authorities that he should (as it were) label the assurances he was given as, and confess to, a 'side-agreement', that was really a matter of legal labelling: the Goldberg Segalla letter does not disprove or even tell against Mr Baiocco's consistent and, to my mind, entirely credible position that Mr Egan gave the assurances that both he and Mr Egan described. The truth is that in both the letter and Mr Baiocco's witness statements, his own voice is for the most part barely audible: his lawyers' voice is what prevailed in both contexts and too often it followed what they perceived to be, or was made clear to them to be, the required legal line.

2029.    In summary, I agree with the Claimants that the picture revealed by Mr Baiocco on the other side of the impugned VAR sales is in substance the same as that painted by Mr Egan; and (in my own words) that:

(1)    Mr Egan emphasised to him, and Mr Baiocco understood, that Capax Discovery was legally obliged to pay Autonomy in accordance with the terms of the VAR sales contract. There was no doubt as to the VAR's legal indebtedness as a matter of law.

(2)    Mr Baiocco understood the letters of confirmation simply to confirm that legal indebtedness, principally for the benefit of Autonomy's auditors. He did not understand those letters to have anything to do with his handshake deals with Mr Egan, which he did not understand to be legally

enforceable, but which he did consider to be reliable as a matter of reality, both parties' interests being aligned.

(3)   The residual risk was that contrary to the intentions and expectations of both parties, and notwithstanding the best efforts of Autonomy to hold Capax Discovery harmless or release it from liability, something would happen which caused Autonomy to resort to its legal right to enforce payment: absent some change or control in Autonomy, or some cataclysmic collapse in its fortunes of the marketability of IDOL, this was most unlikely; and Mr Baiocco considered that this risk (which in point of fact never eventuated) was covered by the upside to Capax Discovery of enabling it to sell services to the end-user (as Mr Baiocco told me in cross-examination did happen) and in payment to it of a MAF, which Mr Baiocco accepted was payment for the nominal or residual risk assumed (which Mr Baiocco described as acting as a 'guarantor').

(4)   Neither party to the VAR transactions between Autonomy and Capax Discovery ever expected Capax Discovery to play any material role in negotiating the end-user sale of which the VAR sale was in contemplation: Autonomy carried on such negotiations after the 'sale' in every case as if nothing had happened: even offers of assistance volunteered on the part of Capax Discovery were roundly rebuffed by Autonomy.

(5)   The much-emphasised benefit to Capax Discovery, used to justify the nominal risk, of an introduction to end-users was greatly exaggerated. Any contact with end-users was after the conclusion of the end-user contract, and was not in consequence of any involvement in or risk taken as a VAR, but in consequence of an end-user's need for service support which Autonomy usually outsourced anyway and for which Capax (usually Capax Global) was a preferred provider.

*Evidence in relation to FileTek's single impugned VAR transaction*

2030.   FileTek's single VAR transaction with Autonomy in September 2010 (VT18, for end-user USDVA) was in a sense an outlier. FileTek was not in business as a VAR and had no real wish to be so. Its President and Chief Marketing Officer from 2009 to 2013, Mr Szukalski, did not wish to do the deal and was not involved in any direct negotiations with Mr Egan.

2031.   However, he reported to Mr Loomis, FileTek's CEO and CFO during the Relevant Period. Mr Loomis confirmed that he had never done a VAR deal with Autonomy before: it was *"something new"* for FileTek; it was Mr Loomis who directly dealt on behalf of FileTek with Mr Egan in respect of VT18, and who also reported directly on the deal to FileTek's ultimate owner (Mr Bill Thompson).

2032.   The "direct" evidence relating to FileTek's perception of its role comprised the oral testimony of Mr Szukalski (in person) and of Mr Loomis (given in the US criminal trial and admitted under a hearsay notice into these proceedings). Mr

Szukalski previously worked for Verity Inc ("Verity"), another software
company which was acquired by Autonomy in 2005.[269]

2033.  Their evidence was also directed to two transactions with FileTek which the
Claimants alleged were, and sought to impugn as, "reciprocal" transactions in
Q4 2009 and again in Q1 2010 (under which Autonomy purchased StorHouse
software from FileTek), and to a further succession of three purchases of
StorHouse licences by Autonomy from FileTek in March, June and August
2011. I deal with the two "reciprocals" in detail in the section of this judgment
in which I address the Claimants' claims relating to *Reciprocals"* and other
purchases by Autonomy from its own customers. As the 2011 transactions were
alleged to have been contrived to put FileTek in funds to pay down its debt under
FileTek's single VAR deal with Autonomy, I address them when dealing with
this VAR transaction (VT18) (end-user USDVA).

2034.  There was no mention in the evidence of Mr Loomis in the US criminal
proceedings that there was any side agreement or understanding qualifying the
terms of the VAR transaction. Indeed, as was pointed out in Dr Lynch's written
closing submissions, the prosecution did not suggest there was any prior
agreement, but instead focused on an allegation that, while FileTek's debt was
real and substantive, the later StorHouse purchases in 2011 were made primarily
to assist FileTek meet its obligations, rather than because Autonomy had any
need for further StorHouse licences.

2035.  I address the effect of the evidence given by Mr Szukalski and Mr Loomis in
respect of VT18 at greater length when addressing that transaction later in this
judgment. For present purposes a broad summary should suffice. In my view,
the evidence of Mr Loomis and Mr Szukalski is again largely consistent with
Mr Egan's account to the effect (in brief summary) that the legal risk was clear,
but FileTek, like Capax Discovery, well knew that there was no real economic
risk of the legal obligation being enforced, since some means would be found
by Autonomy to avoid that. However, neither Mr Loomis' nor Mr Szukalski's
evidence provides any support for the suggestion made by Mr Egan that pending
the end-user sale the VAR might be made to pay: Mr Loomis made quite clear
that this was never on the cards, and in the event, he felt no difficulty in
withholding any payment accordingly.

*Overview of Mr Steve Truitt s evidence on the impugned MicroTech VAR transactions*

2036.  MicroTech was a fast-growing, and by 2011, already substantial reseller. By
then, it had some 350 employees, having had no more than 12 or 13 in 2006. It
acted as a VAR for a number of large US companies. As well as being a reseller
for Autonomy, MicroTech was a Cisco Gold Partner, an HP Elite Partner, a
Symantec Managed Services Partner and an Oracle Silver Partner, all

---

[269] Mr Szukalski now works for Darktrace, and reports to Ms Nicole Eagan, who had previously (and
whilst Mr Szukalski was there) headed Autonomy's marketing department: he started there at the end of
August or early September 2014.

corporations of very substantial size. Its COO was Mr Steve Truitt. Its CEO was a Mr Jimenez, who had decision-making power, and whose approval Mr Steve Truitt needed for each deal.

2037.   The Claimants sought to impugn nine VAR transactions between Autonomy and MicroTech on the basis that in consequence of side agreements or understandings risk did not pass to the VAR, and nor did managerial control of the goods (save for VT5, which turns on its own peculiar facts). The Claimants submitted that the transactions were designed simply to enable Autonomy to recognise revenue at the point of the VAR agreement, but in substance none constituted any real economic sale.

2038.   The relevant impugned VAR transactions with MicroTech, which took place between Q4 2009 and Q2 2011, are VT5 (end-user DiscoverTech), VT6 (end-user Honeywell), VT7 (end-user ManuLife), VT8 (end-user Morgan Stanley), VT13 (end-user Vatican Library), VT25 (end-user US Department of the Interior) ("DoI"), VT32 (end-user Bank of Montreal), VT33 (end-user Xerox), and VT37 (end-user HP).

2039.   Although Mr Steve Truitt's evidence was that the deals with Autonomy were originally introduced by his brother, Mr David Truitt, and a Mr John Cronin (a Consultant to MicroTech, who appears to have been paid a commission by MicroTech for each such deal) the VAR deals with Autonomy were operationally controlled by Mr Steve Truitt. On the Claimants' case, therefore, any discussion giving rise to a side agreement or understanding would have had to be between Mr Steve Truitt and Mr Egan.

2040.   In respect of their claims that the nine impugned VAR transactions between Autonomy and MicroTech had involved no real economic sale the Claimants relied principally on Mr Steve Truitt's evidence given in a deposition dated 7 September 2018, which was made in the course of proceedings in the US between MicroTech and Autonomy and admitted into these proceedings under a hearsay notice.

2041.   The Claimants placed particular reliance on the following passage:

> Q. Did you – was it your understanding that on these deals that Autonomy had the relationship with the customer and Autonomy could continue the sales effort with respect to the ultimate – the true customer?
>
> A. Yes.
>
> Q. Okay.
>
> A. As it says here, these – these are deals that were ostensibly very close to closing. It certainly wouldn t make sense to – to hand over, you know, to bring in the second team offense when you re on the 5- yard line.
>
> Q. Okay.
>
> A. They re supposed to score the touchdown and we get the extra point.

*Q. Okay. So – so the – and was there – withdrawn. Who – who controlled the negotiation of the price with the end customer?*

*A. I don t know.*

*Q. Not MicroTech, though?*

*A. Not MicroTech.*

*Q. Okay. Somebody at Autonomy?*

*A. Somebody at Autonomy.*

*Q. Okay. And so was the concept at the beginning that you would take the deal, Autonomy would continue to sell to the end-user and – and, hopefully, there would be a sale to the end-user?*

*A. Well, I would – I would say that s correct, except that at this point in time, it was more than hopefully. I was – what I was looking at was the – was an attempt to duplicate the experience that my brother [David Truitt], who s my brother, said that he had had.*

*Q. Okay.*

*A. So it was more than hopefully.*

*Q. Okay. And – and it s correct, is it not, that you understood that Autonomy would be not only attempting to sell to the customer, but negotiating the price with the customer?*

*A. Yes."*

2042. Mr Steve Truitt gave similar evidence when asked about specific purchase orders. For example, as regards the purchase order that MicroTech submitted in Q4 2009 for end-user Morgan Stanley (VT8), Mr Steve Truitt testified in the same deposition as follows:

> *Q. Who did you understand would be dealing with Morgan Stanley about the purchase of a license to use the software identified on page 3 of Exhibit 37?*
>
> *A. A salesperson who worked for Autonomy."*

2043. Another example relied on by the Claimants was the Vatican Library purchase order (VT13). When asked about this, Mr Steve Truitt testified in his oral evidence in chief in the US criminal trial (also admitted into these proceedings under a hearsay notice):

> *Q. In terms of the Vatican, was MicroTech making any effort to sell to the Vatican?*
>
> *A. No.*
>
> *Q. Who was going to sell the software to the Vatican?*

HC-2015-001324

> *A. Autonomy."*

2044.  However, in a passage in his cross-examination in the US criminal proceedings
marked by the Claimants as evidence on which they intended to rely, Mr Steve
Truitt explained the rationale, from MicroTech's perspective, for entering into the
reseller deals, and also confirmed that he understood that MicroTech were fully
on risk:

> Q.    *And these -- these deals you saw as a way to get the company to grow; right?*
>
> A.    *Yes.*
>
> Q.    *Meet new customers, you've talked about?*
>
> A.    *Right.*
>
> Q.    *And you knew that your brother had been very successful in doing similar kind of work when he'd been at MicroLink?*
>
> A.    *That's right.*
>
> Q.    *And you wanted to try to repeat that for MicroTech?*
>
> A.    *Yes.*
>
> Q.    *You had, as I understand it, three objectives for MicroTech being a reseller. The first one was -- and the primary reason was to get service business from the people that would buy the Autonomy software?*
>
> A.    *Yes. That's correct.*
>
> Q.    *And then another reason was to meet people -- meet customers and grow your business, hire more technical people?*
>
> A.    *Yes. Particularly commercial customers.*
>
> Q.    *And then a third reason was to get this -- you buy the software at a discount so you would get a 10 percent premium; right?*
>
> A.    *Right.*
>
> Q.    *But you wouldn't have done these deals just for the 10 percent premium. It was these other reasons that predominated, didn't it?*
>
> A.    *Yes. Those were the reasons that mattered to me.*
>
> Q.    *And the deals that you did, you knew that MicroTech was at risk when it agreed to buy Autonomy software, didn't you?*
>
> A.    *The first set of deals in particular as I testified earlier, yes, I considered us to be at risk.*
>
> Q.    *You considered -- and I think you used the words that MicroTech was on the hook for the debt?*

> *A.    Yes."*

2045.    In his deposition evidence in the MicroTech US litigation, Mr Steve Truitt was at pains to emphasise that, contrary to what was suggested to him, he regarded the indebtedness to Autonomy as *100 percent real": we owed it not just on paper. We owed it for real"*; and that when the end-user deal did not close in a *timely fashion"* he was *a hundred percent freaked out".* He added, however, that there came a time (which he could not specify) when he felt less concerned

> *because Autonomy was going to work with us to make arrangements to pay these debts with money that we didn t have to go make elsewhere."*

2046.    His evidence suggested that this was in part something which he came to appreciate from experience: but he also stated (in his deposition evidence in the MicroTech litigation) that his approach was informed by his brother Mr David Truitt's earlier experience at MicroLink in 2009 (see paragraph 2041 above); and Mr David Truitt was clear in his own deposition evidence in those proceedings that it was understood that MicroTech would not pay Autonomy for the VAR deals unless it had first received the money from someone with which to make such a payment.

2047.    Pulling these strands together, it seems to me that, though with perhaps a little more equivocation, Mr Steve Truitt's evidence also substantially endorsed Mr Egan's presentation and that in summary:

(1)    Even if he was more concerned initially, it was not long before he well understood that the legal risk would be most unlikely to eventuate, that Autonomy had no intention of relying on its legal rights and on the contrary, that it fully intended to ensure that MicroTech was not left "on the hook".

(2)    He did not regard this as a side-letter or side deal at the time because, as he put it, there was *never a literal side letter".* But he was clear that, whether or not labelled a side deal (as he said in his deposition evidence he was only later persuaded by HP's lawyers and the US prosecution counsel to call it), it was made plain to him by Autonomy that they would see to it that they would, if necessary, arrange *to do business… separate from those deals so that we could somehow get the money to pay those debts off".* As to the label he was later persuaded to put on it, he said (to quote again from his deposition evidence):

> *"…look, I didn t think of it this way at the time. There was never a written side deal, but if you want to call that a side deal, call it a side deal. I will acknowledge that this situation existed."*

(3)    At no stage was MicroTech involved in any negotiations for or the closing of end-user deals; and it should be noted that the customer contact which Mr Steve Truitt anticipated and placed value on was not

to eventuate until after the end-user sale, for the simple reason that only Autonomy would be involved in the negotiations for it; and if none eventuated, that benefit would evaporate. As he explained in his direct evidence in the US criminal proceedings:

> *"...the way it was going to work was that when the [end-user] deal closed, we would be introduced to the key people and the customer and the technical contacts, and we would then go actually install and configure the software and start building relationships with the customer. And as they started learning what the software could and couldn t do, we would – we would extend and modify and reconfigure the software, sell them additional packages to complement what they already bought. I mean, we would put a relationship in place."*

(4)    He accepted that in such circumstances, Autonomy retained managerial involvement. When asked directly in the MicroTech litigation whether the additional sentence in the audit confirmation letters confirming on behalf of MicroTech that Autonomy retained *no continuing managerial involvement in the delivery of this product or service, other than stipulated in the license agreement"* was true, he accepted that it was not true. He offered only that *to my discredit, I didn t* even *notice that language…".*

(5)    A point of detail not mentioned above remained unexplained but nevertheless supportive of the point that MicroTech did not regard the notional debt as an economic reality: MicroTech's accounts did not reflect its exposure to Autonomy at anything like its face amount[270]. Thus:

  i.    As at 31 December 2009, MicroTech owed more than $18 million to Autonomy on VAR transactions: $10 million on the DiscoverTech purchase order (VT5), almost $1.9 million on the Honeywell purchase order (VT6), about $1.1 million on the ManuLife purchase order (VT7) and over $4.8 million on the Morgan Stanley purchase order (VT8).

  ii.    However, MicroTech's own audited financial statements showed current liabilities of only $17.2 million as at 31 December 2009, of which $3.5 million related to a bank line of credit. Plainly, therefore, MicroTech's accounts cannot have accounted for the full amount of the $18 million debt owed to Autonomy.

  iii.    MicroTech's 2009 financial statements also contained no indication that Autonomy software was being held on its balance sheet as inventory, as at 31 December 2009.

---

[270] MicroLink provided a similar, in fact more stark, example of a VAR not recording its 'indebtedness' in its accounts as a liability; according to evidence in the US criminal trial, its larger deals with Autonomy were *"just not in the books at all".*

    iv.  Steve Truitt offered no explanation of these discrepancies during his deposition:

> *Q. Is it correct that you do not see either the debt owed to Autonomy or the associated asset owned by MicroTech at year end on this balance sheet?*
>
> *MR RINGER: Objection.*
>
> *THE WITNESS: I think that s a reasonable statement, looking at these numbers.*
>
> *BY MR FRANK: Q. Okay.*
>
> *A. But it doesn t mean that some – some part of it isn t here. I don t know exactly what these numbers do represent."*

(6)    The position a year later was no different. MicroTech's audited financial statements for 2010 do not appear to show, on the balance sheet as at 31 December 2010, the debt of over $10.7 million which MicroTech owed Autonomy at that time. Again, Steve Truitt was asked about this in his deposition:

> *Q. Do you see on the balance sheet anything that you believe corresponds to that more than $10 million debt?*
>
> *MR RINGER: Objection.*
>
> *THE WITNESS: It s difficult to say exactly what these liabilities are, but there aren t enough of them to correspond to this amount.*
>
> *BY MR FRANK: Q. Okay. Do you know why that debt does not appear on MicroTech s audited financial statements?*
>
> *MR RINGER: Objection.*
>
> *THE WITNESS: No, I don t."*

2048.  It is not difficult to see why he did not wish to hazard an explanation; but it seems to me to be a fair inference that there was no debt recognised because in commercial terms it was perceived that it would unbalance the accounts: the debt was to be covered by the understanding with Autonomy that any debt would be funded by another (contrived) deal if necessary (see above).

*Mr David Truitt s evidence on the impugned DiscoverTech VAR transactions*

2049.  As mentioned in paragraph 1963(4) above, DiscoverTech was a newly incorporated entity in 2009. It was formed by Mr David Truitt, who was

DiscoverTech's CEO from its inception, and in effect was MicroLink's successor as a favoured VAR after MicroLink was acquired by Autonomy (in circumstances and for purposes which the Claimants also seek to impugn, as I explain later).

2050.  Mr David Truitt, who continued as CEO of MicroLink after its acquisition by Autonomy, accepted in the US criminal trial that DiscoverTech's financial position as a start-up was not such that it could fund VAR purchases out of its own resources, at least without *recapitalising the company"*. Even though theoretically it could, of course, take into account receivables from any onward sale to an end-user it is of some note, therefore, that DiscoverTech took on so many high-value VAR transactions (BofA was a *big deal"* as Dr Lynch put it, even for Autonomy), especially since it cannot have been confident of receipts from an end-user sale in which it was not to be involved.

2051.  Mr David Truitt also confirmed in his evidence in the US criminal proceedings that DiscoverTech never made any effort to resell the software it had acquired from Autonomy under licence. Like Messrs Egan, Baiocco and Szukalski, and like his brother Mr Steve Truitt, he accepted that in none of the impugned VAR sales was the VAR involved in any way after the VAR transaction, and that in reality Autonomy controlled what to sell, to whom to sell and at what price.

2052.  A corollary was that in none of the impugned VAR transactions to which DiscoverTech was a party was an end-user sale by it ever effected. DiscoverTech was reliant on Autonomy either procuring payment to it out of the proceeds of a direct deal, or cancelling the initial VAR transaction (which, in the same testimony, was something that he had never had to do in any MicroLink or other VAR deals prior to the impugned VAR deals in question).

2053.  Even so, the Defendants much relied on Mr David Truitt's evidence (in the US criminal trial and/or the MicroTech litigation) asserting that DiscoverTech was *at risk"* and could be *stuck with it"* even if the end-user deal failed to materialise and further asserting that DiscoverTech *had control of the software and [was] fully the owner"*. In the latter context, they also relied on his evidence in the US criminal trial on the issue of managerial control:

> *Q. And then some questions about -- you keep asking about control, who controlled what. And your answers were, "The documents we signed were the terms of the agreement. The terms are stated in the agreement." Do you remember that testimony?*
>
> *A. Yes.*
>
> *Q. And is what you meant is that once you made the agreement, you, be it DiscoverTech, MicroTech, whoever made the agreement, owned the software? It was your software?*
>
> *A. Yes.*
>
> *Q. And was -- if it didn't close, it's still your software and you owed money; right?*

> *A. Yes.*
>
> *Q. If you sold it to the end-user, the terms were already set. It was there in the agreement; right?*
>
> *A. Correct.*
>
> *Q. So you had control of the software, you owed the money, and you were fully the owner; right?*
>
> *A. Yes."*

2054. This evidence mirrored his evidence in respect of MicroLink VAR sales in the MicroTech litigation (see paragraph 2001 above). The Defendants made the point that such evidence had been adduced by the Claimants themselves (pursuant to hearsay notices). Once again, however, it seems to me that the only way that this evidence can be treated as consistent with his other evidence (as relied on by the Claimants) and with what in fact transpired is to treat it as reciting (somewhat ritualistically) the legal position only.

2055. Whatever the legal position, I take it and find that Mr David Truitt accepted that in reality, and like MicroLink before it, DiscoverTech never had the means to pay Autonomy out of its own resources, never did so, and never participated in any negotiations with end-users after the VAR sale to it: and that was entirely as both he and Mr Egan expected and intended.

*Dispute as to the effect of any assurances given*

2056. Both Defendants submitted that the oral testimony of Mr Egan and Mr Baiocco, and the hearsay evidence from Messrs Steve Truitt, David Truitt and Loomis in the US criminal trial and in the MicroTech litigation, suffered from its genesis in numerous meetings with the US authorities playing on the self-interest of the actors. They submitted that the evidence had *been contaminated by the forensic process"*, was unreliable and inconsistent, and could not provide any secure basis for a plea of fraud. Nevertheless, they added that, read as a whole, and contrary to its purpose, such evidence served on balance to support their case, rather than the Claimants, since it demonstrated that all the witnesses well understood that nothing that Mr Egan said could or would dissolve their legal obligations.

2057. The Defendants' position was thus that whatever assurances were given, none could reasonably have been or were taken by the VAR to release, qualify or modify the VAR's right to the software which (it was common ground) was in each case electronically transferred to the VAR when the VAR agreement completed and was then available for use, nor the VAR's obligation to pay within the stipulated time. The Defendants emphasised the unanimity amongst the witnesses that they were acting legitimately in VAR transactions, which were not out of the usual, that they had confirmed their belief in the accuracy of the audit confirmation letters when they signed them, and their understanding throughout that the VAR they represented remained in substance and in law fully at risk to pay Autonomy on demand.

HC-2015-001324

2058.  In his oral closing submissions, Mr Miles summarised the Defendants' position
as follows:

> "*Now, the next point is to turn to the witness evidence and make some
> observations on that. There are several factual witnesses. There were
> three live witnesses, Mr Egan, Mr Baiocco and Mr Szukalski, and then
> the worthier hearsay statements. Now, as regards both Mr Egan and
> Mr Baiocco, we do suggest that you have got to be quite careful about
> the evidential status of certainly much of their witness statements. But
> even if you do… exercise caution, as we suggest you should, what we
> suggest the evidence as a whole shows is that, even taking the position
> most favourable to the Claimants there s nothing in the discussions that
> Mr Egan had with the resellers which would impact on revenue
> recognition.*
>
> *The evidence of Mr Egan and indeed the others was that the resellers
> understood that they were fully on risk. When they explained in their
> evidence that they thought they were on risk, what they meant, we
> suggest, is that they would have to pay from their own resources.*
>
> *If you were to think the evidence came to anything at all… It was just
> that Mr Egan would do what he could to find another end-user or
> possibly that he would try and do what he could to help. But the
> evidence was that the resellers knew that any assurance or words of
> comfort he gave them was just that, non-binding words of comfort. But
> more than that, even if you accept their evidence, the resellers knew
> that their relationship was governed by the contract, that they were
> bound to pay in accordance with the contract, that if things did not go
> right Mr Egan would try and help them out, that they also knew that
> was just a hope and not something that was binding on Autonomy in
> any way.*"

2059.  This summary correctly, in my view, identified the nub of the factual issue
revealed by the direct evidence: whether the assurances given were "warm
words" or "soft soap", or whether they were intended to be and were acted on as
the basis of the parties' relationship.

2060.  Mr Rabinowitz, rejecting the suggestion that the assurances given were simply
"warm words" or "soft soap", summarised the Claimants' position in his oral
reply as follows:

> "*…the expression… also has pejorative connotations of the kind of
> thing an unscrupulous salesman might say to get the deal done. But
> here no one is suggesting that the expressions of intent communicated
> by Mr Egan were anything other than his honest intention backed by
> the express authority of Mr Hussain and, we say, in turn backed by Dr
> Lynch. Mr Egan was not duping the VAR into thinking that Autonomy
> would avoid leaving the VAR  holding the bag". That actually was the
> intention.*
>
> *My lord, the best evidence of that is what actually happened. Your
> lordship will recall that I described the pattern where Autonomy never*

> *did require the VAR to pay in full from its own resources, leaving aside a few modest part payments. That is evidence of Autonomy s intention at the outset. I would note that Mr Miles did not seek to answer my patterns point.*
>
> *... The proof of the seriousness with which the VARs treated these assurances, despite their non-binding character, lies in the VAR s willingness to assume the enormous risk that would arise if they nevertheless ended up being held to their contractual obligations. From Autonomy s point of view, as Mr Egan explained, any failure to honour the assurances would have made it harder to get a VAR to take on a deal in the future. For your Lordship's note, that is what he said at Egan 1, paragraph 29, last sentence {C/5/9}. From a repeat VAR s point of view, the fact that the intention was always honoured would have added more weight to the assurances as time went by."*

*Assessment of the effect of the direct/witness evidence*

2061. Supported by the details of the way each VAR sale was implemented which I describe in the next section, it is to my mind clear, and I find, that in every one of the impugned VAR sales except the five Collectability VARs and the two VAR transactions (VT5 and VT14) which turned on their own facts, Mr Egan both (a) emphasised, as he had been instructed by Mr Hussain he must emphasise, that legally the VAR was unconditionally obliged to pay and became upon delivery the owner of and responsible for the licensed software with a view to its resale, but at the same time also (b) assured the VAR that it would not be expected to be involved in negotiating and closing an end-user sale, and that if no end-user sale eventuated, Autonomy would not leave it *on the hook"* or require payment in the meantime, and would one way or another ensure, whether by *backfilling"* or some arrangement which realised funds sufficient to discharge the legal indebtedness, that it would not be left *holding the bag".*

2062. I think it clear also, and I find, that even if Mr Egan did not make any formal representation that he was able to bind Autonomy[271], he made it clear, as was the fact, that he was acting in conformity with the wishes and suggestions, and probably on the actual instructions, of Mr Hussain, both in emphasising the legal position and in giving the assurances as to the real intentions of Autonomy.

2063. Reading between the lines of their incantations (with varying degrees of insistence) about their legal exposure, the direct evidence of all the VAR witnesses confirmed, and I find, that but for these assurances, and the shared intention (on the part of Autonomy) and expectation and belief (on behalf of the VARs) that they would be fulfilled, none of the VARs could rationally have agreed to take on the role in the circumstances in which it was almost invariably obtained; these being that (a) the VAR deal would be put forward at the end of a quarter, sometimes on the very last day, (b) for completion before the end of

---

[271] There is no evidence of any express representation of authority, perhaps because such a representation would not have fitted with the essentially non-binding nature of the assurances as a matter of law, and his repeated emphasis that nothing he said would or could modify the contractual terms set out in the relevant VAR agreement.

the quarter, with (c) little if anything being known by the VAR of the state of Autonomy's negotiations, nor of the real prospect of a deal eventuating, with the prospective end-user; and (d) the VAR would usually not be able to cover the legal obligation out of its own resources, and in any event the risk/reward balance being plainly and obviously commercially unacceptable.

2064.    In my view, it is also clear, and I find, that in every one of these cases the VARs expected, and were content, that Autonomy would carry on negotiations with the end-user as being the best or most likely way of concluding a sale to the end-user, and that the VAR would play no part. Some might have expected an introduction to the end-user after conclusion of an end-user sale, and commercial advantage after that from it; but the most reliable source of reward would be payment to them of a MAF, of which they were assured by Mr Egan, although the VAR sales agreements made no legal provision in that regard.

2065.    The question then is as to how IFRS accounting principles are to be applied in circumstances where the parties accept that the contract is binding, and provides (amongst other things) for their agreement to be entirely expressed within it and that there are no side agreements (or the like) to qualify their bargain, but their evidence casts an entirely different light as to their real intentions and expectations and the real substance of their relationship. In short, whilst it will depend on the circumstances it is almost invariably the case the real substance must prevail.

2066.    Before considering the application of IFRS accounting principles and answering that conundrum, I turn to consider in more detail the Claimants' case that the impugned VAR sales and the way they were implemented followed a "pattern", which the Claimants relied on as the best proof of the parties intentions and the true substance of their arrangements.

### (5) The alleged pattern" and the Defendants response that it reveals neutral features"

2067.    In parallel with their case based on the direct evidence of the VARs as to their understanding of the real substance of their engagement with Autonomy, Mr Rabinowitz described as *striking beyond belief"* the *'pattern'* evident in every one of the impugned VAR sales indicating behaviour and its inconsistency with the ostensible contractual arrangements. He submitted that this *'pattern* could only be explained by reference to shared understandings between the parties as to the true economic substance and nature of the arrangements which were very different from those expressed in or apparent from their contract.

2068.    In this way of putting their case, the Claimants sought to focus on what the parties actually did (and did not do) as the litmus test of the true economic substance of the transactions and the existence of the shared intentions which in truth explained their true nature. This was a facet or development of Mr Holgate's description of economic substance as *"the commercial effect in practice and things like that"* and *a common sense point of view [of] what is really happening in a transaction"*. In their written closing, the Claimants described this as *a further string to their bow"*; but in his oral reply Mr

Rabinowitz appeared to give primacy to this aspect of the Claimants' case on VARs.

2069. As in the context of the witness evidence, the Claimants submitted that the conclusion should be that the impugned VAR transactions, though effective in law on the terms of the VAR agreements made in respect of them, did not reveal their true substance because they did not reflect how in fact the parties proposed to act. Once the way in which the parties acted was examined, it was contended that it was quite clear that nothing really changed after the VAR transaction: Autonomy continued its negotiations with the end-user, and the VAR did nothing to signify either a change of ownership, nor make any payment. This demonstrated that (a) it was Autonomy, and not the VAR, which in fact had 'managerial control' of the goods in question; and (b) the VAR had neither any role nor any real interest in an end-user sale, because in reality it was just a *placeholder"* and would never be required to pay since Autonomy's true source of payment was always intended to be the end-user.

2070. The Claimants suggested that a further advantage of this way of putting their case, in addition to the fact that, although complementary to, it does not depend on the evidence of witnesses who may be considered self-interested or *parti pris*, is that (so they submitted) if the facts do indeed show that the parties' actual intentions and conduct differed from the ostensible effect of the written sale contract, then neither the entire agreement clause in each of the VAR agreements, nor the auditor confirmation letters, could *insulate the transactions from an accounting treatment which reflects the true facts."*

2071. The Claimants contended that the plain inference from the 'pattern' revealed was that:

(1) in none of the impugned VAR sales did or was the VAR ever intended or even permitted to negotiate or close a direct deal with an end-user; and

(2) in none of the impugned VAR sales was the VAR ever intended and / or ever expected to pay out of its own resources.

*Was there demonstrated to be a pattern showing that VARs did not, and were not intended to, negotiate or effect an end-user sale?*

2072. The circumstantial facts the Claimants relied on as establishing a *'pattern'* demonstrating that at the time the VAR transaction was entered into, no-one intended that the VAR should be involved in any attempt to on-sell the software licensed to the end-user, and that the true intention was that Autonomy should contract directly with the end-user, can be summarised as follows.

2073. First, in all of the impugned transactions it was Autonomy, rather than the VAR, which was negotiating with the end-user at the time of the VAR transaction; and it was Autonomy, and not the VAR, which had the relationship with the end-user, often one of long-standing and involving repeat business. The Claimants' submission was that it is inherently unlikely that Autonomy would have wanted

to cede the conduct of that commercial relationship to the VAR. Further, they suggested that it was equally unlikely that the end-user would want to deal with an unknown (and in some cases, newly incorporated) VAR in those circumstances either. Both considerations pointed to the conclusion that the VAR was not expected to do anything beyond acting as a "placeholder", the true arrangement both existing and prospective was between Autonomy and the end-user, and the VAR agreement in each case lacked any real substance as a sale.

2074.  Secondly, and as already noted from the unchallenged witness evidence, in none of the impugned VAR sales was there any sign of any effort being made to give the VAR the introduction and information necessary to enable the VAR to intervene and take over the pre-existing negotiations. That again supports the conclusion that no such involvement was ever in reality intended of the VAR.

2075.  Thirdly, there is no evidence of Autonomy ever asking the VAR why it had failed to make any effort to on-sell to the end-user. The Claimants suggested in this context that if Autonomy had really expected the VAR to attempt to sell the deal to the end-user, it would surely have expressed its disappointment at the VAR's lack of effort and regarded the VAR as the author of its own misfortune in missing out on an onward sale.

2076.  Fourthly, there is no evidence that in any of the impugned transactions did the VAR actually make any effort, after the VAR transaction, to achieve an onward sale of the Autonomy software license to the end-user; which once more supported the same conclusion that the VAR was intended to be entirely passive.

2077.  Fifthly, and perhaps most strikingly, Mr Rabinowitz emphasised especially that in none of the impugned VAR transactions (except perhaps VT20, see footnote 273 below) did Autonomy's negotiations ever actually bring about a contract between the VAR and the end-user. The end-user contract, if one eventuated at all, was invariably on terms (including as to price) negotiated and determined, not by the VAR, but by Autonomy, and in every case where a contract eventuated, Autonomy and not the VAR was the party to it.[272]

2078.  The Claimants submitted that such direct deals shed light on the true intention at the date of the VAR transaction: they gave rise to the inference that the reason why the VAR never ended up concluding a deal with the end-user was because the VAR was never expected to do that, and/or that Autonomy in reality retained managerial control throughout, with the VAR being a purely passive placeholder and any purported purchase and sale to it being illusory. As Mr Rabinowitz put it in his oral reply:

---

[272] The only apparent exceptions in evidence were, on analysis, not exceptions at all. There were one or two sales to which Autonomy was not party; but that was only because Autonomy, having negotiated the sale, directed that a VAR (but not the VAR to which it had initially sold the software) be inserted. Thus, in VT20 Capax Discovery/DKO the direct sale was negotiated between Autonomy and DKO, without any involvement by Capax Discovery; at the last minute, Autonomy arranged for MicroTech (not Capax Discovery) to step in so that the agreement took the form of a sale from MicroTech (rather than Autonomy) to DKO. VT1 may provide a similar example: RRAPoC Schedule 3 VT1 states that in Q4 2009 MicroLink sold the software it had acquired for the intended end-user US Federal Government to a second VAR called Computer Security Solutions. But that too seems to have followed negotiations exclusively by Autonomy with the end-user US Federal Government and to have been at the direction of Autonomy. I have found no other 'exceptions' in the evidence.

> *we say that that pattern makes it very unrealistic to suppose that Autonomy s intention was solely to negotiate a contract between the VAR and the end-user. At times Autonomy tried to achieve that, but always failed. At other times it did not even try. It simply negotiated a direct deal between Autonomy and the end-user."*

2079. The Claimants submitted in conclusion on this aspect that this *'pattern'* demonstrated that Autonomy must from the outset have been intended to have, and did in every case in fact have, exclusive control of negotiations with the end-user, and that the VAR had no say or involvement in the process; and that this in turn demonstrated, to use the wording of IAS 18.14(b), the retention by Autonomy of *managerial involvement to the degree usually associated with ownership"* and *effective control"* in each case *over the goods sold."*

2080. As to the second aspect of the 'pattern', which the Claimants alleged also gave rise to the inference that there was no true 'sale', was that the facts demonstrated that the VAR was also not intended to be required to pay Autonomy from its own resources if no end-user sale eventuated, and that in reality Autonomy's true source of revenue was never intended to be the VAR but the end-user. Failing an end-user sale, Autonomy would have to take some step, whether by way of "round-trip"/reciprocal transaction, debt forgiveness or some other expedient to protect the VAR whilst preserving the fiction of revenue generation. The Claimants relied on the following.

2081. First, the Claimants submitted that if it is found that it was intended at the time of the VAR transaction that the VAR would do nothing, that fact, of itself, was also a reason to infer that the VAR was also not intended to be required to pay Autonomy from its own resources. The rationale was this: if the VAR was genuinely expected to pay Autonomy from its own resources, it would be vitally interested in the end-user sale: the most obvious way for the VAR to put itself in funds would be by working hard to secure an end-user sale. To step back altogether, and leave further negotiation and completion of the end-user sale entirely to the seller, would be most unnatural, to the point of being commercially inexplicable, if the VAR was really on the hook.

2082. Secondly, the Claimants relied on the fact that the VAR was first approached by Autonomy regarding a transaction involving an identified end-user at the very end of the quarter, and usually concluded the VAR transaction within a matter of hours thereafter, with no chance being given to the VAR to scope and assess the end-user deal. The Claimants rejected Dr Lynch's suggestion (which I examine further below) that this was entirely usual, on the basis that it was exceptional for such deals to be struck at the very end of the quarter without the VAR negotiating any of its terms. Further, having had no prior contact with the end-user, the VAR had no insight of its own as to the prospects of an end-user deal being concluded, whether at all or within a reasonable time, beyond whatever Autonomy may have told it. The Claimants referred in this regard to the evidence of Mr Welham when asked about this in re-examination:

> *Q. In your experience as an auditor of software companies, would you consider it usual or unusual for a VAR to be first approached about doing a deal right at the end of or on the last day of the quarter?*
>
> *A. Probably unusual."*

2083. The Claimants suggested further that if it was genuinely intended that the VAR would pay from its own resources, the VAR would have had, and been keen, to carry out elementary due diligence: it was not realistic and not to be assumed that astute businessmen would ever act so recklessly.

2084. Thirdly, the absence of any effort at all, given that in every case the impugned VAR sale was right at the end of the quarter, to even make time for price negotiation with Autonomy before executing the VAR transaction, made no commercial sense if it was intended that the VAR would have to pay Autonomy from its own resources; and all the more so given that the amounts involved would have presented an existential threat to the VAR in many instances had it truly been at risk.

2085. In short, the continuing responsibility of Autonomy and the abdication of responsibility by the VAR demonstrated that Autonomy regarded its source of recourse and reward as being from the end-user, and the VAR, relying on Mr Egan's assurances, did not regard itself as being at substantive risk in the meantime.

2086. Fourthly, the Claimants maintained that in many cases the VAR did not appear to have the means to pay Autonomy, in the absence of payment further to an end-user sale. They submitted that the fact that Autonomy must have understood at the time of the VAR transaction that the VAR could not pay supports an inference that it was not intended to do so, at least unless and until the end-user sale had been completed.

2087. Fifthly, the Claimants relied on the fact that, leaving aside any modest deposit, Autonomy never did require any 'friendly' VAR, in any of the impugned transactions, to pay Autonomy out of its own resources prior to receipt of funds from the end-user or (in effect) from Autonomy itself in a 'reciprocal transaction.' Instead, and as I describe and discuss at greater length later, Autonomy either caused the end-user to pay the VAR, so that the VAR in turn could pay Autonomy, or Autonomy found another means to excuse the VAR, whether by issuing a credit note, and cancelling the VAR's legal obligation; or by buying something from the VAR in order to put the VAR in funds; or by simply writing off the VAR's debt.

*The Defendants' position as regards the alleged 'pattern'*

2088. The Defendants resisted all of this, and both limbs of the Claimants' case as to the VAR agreements' lack of economic substance, primarily on the basis that the Claimants' reasoning was flawed because it was based on false *a priori* assumptions. They contended that the Claimants placed undue reliance on features of some of the impugned transactions on the assumption that they revealed impropriety, whereas in reality they were entirely usual features of

VAR transactions in the software field and were "neutral" in terms of the criteria for revenue recognition.

2089. In Dr Lynch's written closing submissions, the Defendants identified and sought to justify as entirely "neutral" the following features of the impugned VAR transactions on which the Claimants had placed undue reliance:

(1)     Deals being reached at the quarter end;

(2)     Bringing in a reseller to enable revenue recognition in that quarter when an end-user deal could not be closed at a quarter-end;

(3)     The status or prospects of the deal between the reseller and the end-user;

(4)     The extent of price negotiations between Autonomy and the reseller;

(5)     No "added value" by the reseller;

(6)     Autonomy continuing to be involved with the end-user after the VAR sale;

(7)     Sales to VARs of hosted products;

(8)     Closing a sale directly between Autonomy and the end-user;

(9)     Arrangements for the VAR to be paid by the end-user notwithstanding a direct contract between the end-user and Autonomy (which Dr Lynch referred to as "Designated payee situations");

(10)    Cancellations of a VAR's obligations after a direct deal had been closed between the end-user and Autonomy;

(11)    Occasional write-offs of debts owed to Autonomy by resellers;

(12)    Absence of any occasions on which Autonomy demanded payment from the VAR and sued when none was received;

(13)    A VAR's unwillingness to pay; and

(14)    The payment of MAFs notwithstanding that the VAR had added no value nor taken any part in the negotiations for and conclusion of the end-user sale.

2090. Put broadly, the Defendants' case was that there is nothing unusual, let alone improper, in a VAR taking software on its books and committing in law to pay the purchase price, with a view to assisting Autonomy (for a fee and other commercial advantages) both (a) to recognise revenue on the immediate sale to the VAR and (b) to achieve a subsequent sale of that software to an end-user. In other words, a VAR may be, and in ordinary commercial dealings often is, nothing more than a guarantor (as, for example, Capax Discovery described itself in the Goldberg Segalla letter), or in other cases, a "fulfilment partner"; and a sale to a VAR for that purpose is nonetheless a sale in economic substance as well as law.

2091. The "neutral features" as they were identified and described in Dr Lynch's written closing submissions are differently organised and differently expressed ways of putting the converse to the Claimants' case that the 'pattern' reveals lack of substance and impropriety. The easiest, and for the present the most convenient, course is to explain how Dr Lynch elaborated his case in this regard, and then to assess together the two opposing perspectives in reaching my determination on this aspect of the case.

*Quarter-end timing*

2092. First, the Defendants sought to dispel the suspicion that the Claimants tried to create with respect to the timing of the VAR deals. They contended that, contrary to the Claimants' case, quarter-end deals with VARs were and are common-place in the software industry. Their timing is not of itself indicative of impropriety; and that is so even if, as a corollary, there may well have been no discussions with the reseller previously, nor any time for the reseller to assess the prospects of an end-user deal, or the reliability of the end-user if the deal was done.

*Recourse to a VAR simply to recognise revenue if the end-user deal was delayed*

2093. Secondly, the Defendants submitted that there was nothing improper or indicative of impropriety in Autonomy bringing in a reseller at a quarter end simply because a deal with an end-user could not be closed in time to enable recognition of the income to be derived from a sale of that software in the preferred quarter. Deloitte knew that Autonomy closed deals with resellers in these circumstances and there was no suggestion that this affected revenue recognition. Dr Lynch under cross-examination described this as "de-risking": Autonomy was getting the commitment to pay from the VAR, constituting a "bird in the hand". As Mr Miles put it in his oral closing:

> "*it meant that Autonomy could actually get a commitment to the revenue on the deal without further delay or pressure on prices.*"

2094. Mr Welham confirmed in his oral evidence that Deloitte had no problem with Autonomy selling to a reseller for the purposes of recognising revenue. He accepted that the fact that Autonomy was unable to close the deal for the quarter might be a good reason for selling to the reseller.

*No assessment of status or prospects of end-user deal by VAR*

2095. Thirdly, the Defendants submitted that the Claimants' focus on the status and prospects of an end-user deal was misplaced. Dr Lynch relied on the following passage from Taylor Wessing's letter of January 2015 on behalf of Deloitte in order to rebut HP's letter before action under the Professional Negligence Pre-Action Protocol:

> *The relevant agreement for revenue recognition purposes is that between Autonomy and the VAR. It is not relevant for the purposes of revenue recognition whether the party with whom Autonomy has contracted is a VAR or an end-user. It is not necessary to identify an end-user (other than for licence control purposes.*"

2096. The Defendants pointed out that Mr Welham had agreed also that it was not necessary for revenue recognition purposes for Autonomy even to identify the end-user, still less for the VAR to have considered the prospect or commercial terms and rationale of any onward sale by the reseller to the end-user. The Defendants surmised that the Claimants, in suggesting otherwise, may have been influenced, and indeed misled, by the more familiar (at least to them, as for the most part, US entities) but different, rules of US GAAP which (putting the point broadly) preclude revenue recognition until the end-user sale. The Defendants repeated once more that under IFRS accounting, the test is a "sell in" test: provided the IAS 18.14 criteria are met in the case of the immediate sale to the VAR, revenue is required to be recognised. Under US GAAP, the test is a "sell through" test: revenue may only be recognised once the end-user sale is closed. Influenced by the US approach, the Claimants tended not to recognise or accept the reality and the consequence of the fact that even though the reseller would not be expected to do anything, it was for the purposes of both the law and the IAS (unlike US GAAP) Autonomy's customer.

*No price negotiation for VAR sale*

2097. The Defendants argued that a lack of negotiation on price between Autonomy and the reseller may be a neutral factor, and is so on the particular facts of this case.

2098. The Defendants submitted that it is clear on the evidence that, as a matter of law at least, all the resellers were genuinely on risk in respect of their purchases, and took the risk in anticipation of advantage to themselves. Autonomy was coming to them with a purchase opportunity which they were happy to accept on the terms that were offered, as Mr Baiocco made clear in his evidence.

*VAR sale but no added value*

2099. Dr Lynch's fifth point was that although the appellation "Value Added Reseller" may encourage the contrary supposition, a VAR sale is not improper or lacking in substance so as not to merit recognition of its revenue just because the reseller was not to add value to the sale in the sense of enhancing the goods sold or providing services to the end-user.

2100. According to Dr Lynch a VAR transaction would nonetheless qualify as a proper sale even if it was not intended that the VAR should fulfil any role at all beyond purchasing the goods on the terms of the VAR agreement, going on risk for that purchase by accepting thereby the unqualified commitment to pay, and thereafter fulfilling the end-user's purchase order.

2101. Deloitte accepted that it would be a legitimate and normal reseller transaction if the only role of the VAR was to purchase from Autonomy, going on risk in the process and thereafter to sell to the end-user. Thus, for example, Deloitte's Defence in the FRC proceedings states as follows:

> *Contrary to the impression given in the Formal Complaint, this is not to say that a VAR has to perform additional services or add value" in every sale insofar as that is intended to mean  provide additional*

services"; it can and often does simply re-sell software licences to customers, acting as a reseller."

2102. In his evidence under cross-examination, Mr Welham accepted that this was Deloitte's actual perception at the time:

> Q. ...The VAR could simply act as a reseller, it didn t have to provide any additional services?
>
> A. Yes.
>
> Q. And Deloitte understood that at the time, that was part of your understanding at the time of the audit?
>
> A. That could happen, yes."

2103. Thus, the Defendants submitted that although the Claimants spent some time in argument and cross-examination questioning what services or added value a VAR would be likely to bring to the relevant transaction, that was based on a false premise: it is neither unusual nor improper in the business for a VAR to be what Mr Szukalski called a "fulfilment partner" with its role being simply to enter the contract for the purchase of the goods, go on risk for the purchase, leave Autonomy alone to negotiate with the end-user and thereafter fulfil the end-user's purchase order. In effect, only the "paperwork" would go through the VAR.

2104. In the same context, the Defendants also relied on Mr Szukalski's evidence that all this was *very common practice"*. However, as I elaborate later, FileTek's only deal with Autonomy was not really a true VAR deal; FileTek was not really a VAR in any usual sense; and Mr Szukalski did not really operate in that business at all.

*Autonomy's involvement with the end-user after the VAR sale*

2105. Dr Lynch's sixth point was his contention that it did not undermine revenue recognition for Autonomy to continue to negotiate or be involved with the end-user after the reseller sale.

2106. Issues with regard to managerial control could potentially arise if Autonomy had been contractually obliged to exercise managerial duties with respect to the goods, since that obligation would connote that managerial responsibility and effective control of the goods had not been transferred under the contractual terms; but this was not in fact ever the case, and would have been inconsistent with the provisions of the contract, which made it clear the risk passed in all respects to the purchaser, and did not impose any relevant continuing obligations on Autonomy.

2107. Further, in circumstances where the VAR was simply fulfilling that role, it is not surprising or undermining of the VAR's purchase that, with the VAR's

consent, and without obligation on the part of Autonomy, Autonomy should be conducting the subsequent discussions with the end-user.

2108. Dr Lynch, supported by Mr Hussain, presented this as the unobjectionable provision of voluntary assistance by Autonomy, with a plain and obvious and entirely proper commercial rationale; as he put it in his first witness statement:

> *Many of the end-users were repeat customers with whom Autonomy had other business, customers often buying the same product over and over again. It would make no commercial sense for Autonomy not to continue discussions with the end-user. If a customer bought millions of dollars worth of products from the company every year, the company would not stop talking to them because a particular sale for a couple of hundred thousand dollars had been made to the reseller who was going to on-sell it to that customer. The reseller was on risk and owned the relevant product. In order for the sale to be recognised, Autonomy was not required to step out of the picture altogether. In fact, Autonomy s continued involvement in the deal could increase the collectability of the debt from the reseller, I understand, based on my discussions with Autonomy s Finance Department, and the auditors at the time, that there was no issue from an accounting perspective with Autonomy voluntarily providing assistance to the reseller in closing an end-user deal, or leaving the reseller to complete the sale alone. That made perfect sense to me."*

2109. However, in all this the impression given by the Defendants was that the objective and expectation was that the ultimate sale to the end-user would still be expected to be made by the reseller fulfilling the purchase order from the end-user, and that Autonomy's involvement was to facilitate that result. The Claimants' point, to which I shall return, was that (apart from the two 'exceptions' identified and discussed above which, on analysis, were not really exceptions at all) in not a single case was that the result: any end-user deal which eventuated was not only entirely negotiated by Autonomy but also a direct deal with Autonomy.

### Sales to VARs of hosted products

2110. Dr Lynch contended that the fact that some of the impugned VAR sales (such as the deal with Capax Discovery for end-user Kraft, "VT3") involved sales of licences of products likely to be (and arguably only capable of being) used in the hosted environment, and in particular, Digital Safe, indicated no difficulty either: the licence remained a valuable asset and its sale was substantive and legitimate, so that revenue could be recognised from it accordingly whether or not it could be brought on site by the end-user.

2111. Further, Deloitte were aware that some of the reseller deals were of licences in connection with hosting arrangements and do not appear to have objected to the recognition of revenue in respect of them.

### Transactions going direct

2112. The Defendants submitted that the Claimants had no basis for calling into question, or seeking to draw adverse inferences from, the recognition of revenue at the point of the VAR sale in certain cases where thereafter a direct deal was made between Autonomy and the end-user, and the revenue received on the end-user sale would either be remitted to the VAR or the VAR would be treated as released. They presented this as an occasional occurrence, and never Autonomy's objective in continuing to be involved with the end-user (see above). According to the Defendants, only

> *very few transactions became direct deals; based on a historical average of 2009/2010, fewer than one transaction per quarter".*

2113. The Defendants also made the point that the occasional replacement or reversal deal of that sort was not objectionable, either generally or in the view of Deloitte. That is illustrated by Deloitte's approval of the introduction into certain VAR purchase orders in Q4 2010 of a clause expressly contemplating, permitting and providing for direct end-user sales.

2114. Dr Lynch additionally drew attention to Deloitte's own Defence document in the proceedings against it brought by the FRC, where as regards the new clause, it was stated as follows:

> *The clause therefore envisaged that on occasion Autonomy might enter into a transaction with a VAR, but subsequently deal directly with the end-user. In those circumstances, once Autonomy had received payment from the end-user, it would pay a fee to the VAR.*
>
> *The audit team concluded that this new clause did not affect revenue recognition. Upon the VAR entering into the agreement, it had accepted the risks and rewards of ownership. It had possession of the licence, and the ability to sell it to the end-user without requiring the involvement of Autonomy. It was legally required to pay Autonomy. The existence of the new clause did not change the analysis in respect of IAS 18 paragraphs 14(a) and (b) as the risk remained with the VAR, unless a direct deal was concluded with the end-user, a risk the VAR could not control."*

2115. However, the Defendants acknowledged that, by reference to two VAR deals with MicroTech in Q4 2009 where there was a direct sale to end-user (ManuLife and Morgan Stanley), Deloitte highlighted a concern about "revenue reversals" in its Audit Committee reports for Q1 2010 and Q2 2010. Deloitte had warned that *significant evidence of such further revenue reversals may jeopardise management's ability to recognise revenue at the point of sale to the reseller*".

2116. As again I return to later, the problem for the Defendants is that the truth is that direct deals and revenue reversal were or became characteristics of end of quarter deals transacted for revenue purposes, rather than occasional unexpected

expedients. Their contention that *very few transactions became direct deals; based on a historical average of 2009/2010, fewer than one transaction per quarter"* (which was based not, of course, on an analysis of impugned VAR transactions but on a comparison with the entire corpus of VAR deals) did not really address the point that 19 out of 30 of the relevant deals went direct, and in the rest, no end-user deal eventuated at all: see paragraph 2152 below.[273]

*VARs as 'designated payees' in respect of direct deal between Autonomy and end-user*

2117.   Another post-transaction event referred to by the Claimants with suspicion, but which the Defendants contended was unobjectionable and certainly not such as to upset earlier revenue recognition, is where there was a "designated payee". That is to say, transactions where the end-user was either asked *ad hoc* for, or (from 2010 onwards) a contractual term in the end-user sale between it and Autonomy required, payment of the purchase price to the reseller as Autonomy's designated payee.

2118.   A variant was in the VAR transaction with DiscoverTech for end-user Citigroup, in the context of which the end-user wished to deal directly with Autonomy and Deloitte noted:

> *Autonomy resolved the issue with the VAR by entering into a tri-party agreement, whereby Citigroup paid Autonomy in full and Autonomy then paid the VAR their margin based in the amounts due [i]n the original PO".*

2119.   I have considered whether Deloitte's approval of that sort of mechanism suggests acceptance by them, or apparent acceptance by them so as to falsely reassure the Defendants, of a more common-place practice of 'direct deals', so as to invalidate or neutralise the professed concern about direct deals which became an issue in 2010. I have concluded that it does not.

2120.   It appears to me that Deloitte always regarded a direct deal as the exception and the designated payee provision as designed to cater for the exceptional case where notwithstanding negotiation and conclusion of an end-user deal by the VAR, the end-user nevertheless insisted on completing with the software producer/supplier (namely, Autonomy). That was never so in any of the direct deals following impugned VAR sales.

2121.   Autonomy occasionally cancelled a reseller's obligations by providing a credit note. Again this was a post-transaction event, which the Defendants maintained could not have affected the original recognition of revenue. In circumstances where the end-user had chosen to deal directly with Autonomy so that Autonomy received payment for the software from the end-user it was a sensible business decision to cancel the reseller deal.  The alternative would have been

---

[273] The Defendants made the point that the impugned VAR deals were selected by the Claimants as showing this characteristic and were not a representative sample of the universe of VAR deals entered into by Autonomy. That is so: but that does not address the point that the selection included the large end of quarter transactions entered into to generate revenue to make good shortfalls from other sources.

to leave the reseller on the hook despite Autonomy having taken the customer opportunity. This would have been damaging to the relationship.

2122.  Of course, where an end-user contracted with Autonomy, the revenue was not recognised twice. Revenue was not recognised again on the end-user sale: Deloitte understood this and was satisfied. The Defendants adopted substantially the same approach and argument in the limited number of cases where the end-user was told to make payment to the reseller to permit the reseller to make payment to Autonomy.

2123.  Dr Lynch summarised the position as he saw it in his first witness statement:

> *From my vantage point, Autonomy's reseller relationships operated without any major difficulties. I had a general understanding that, on occasion, reseller deals departed from the conventional pattern of "Autonomy sells to reseller/reseller sells to end-user", for example, where an end-user decided to purchase from Autonomy directly. HP has cherry picked 37 transactions to try to identify deals of this nature. In those circumstances, Autonomy had a couple of options. We could say to the end-user that we would not supply them and direct them to the reseller, but we would avoid doing this if it was likely to cause problems in our relationship with the end-user, particularly if the end-user was a repeat customer. I had a general awareness that Autonomy could take the commercial decision to supply to the end-user and unwind the reseller deal or designate the reseller as Autonomy's payee, although I would not have been the person at Autonomy to make that decision. In those circumstances, Autonomy would generally pay the reseller a MAF for their lost margin on the end-user deal. I now know that this happened in a handful of cases, a very small percentage of the overall total of sales to resellers. Autonomy could also have held the reseller's feet to the fire and demanded payment from the reseller, even though Autonomy had sold directly to the end-user and received payment from the end-user. The consequence would be that Autonomy would have double the cash and double the revenue on the sale of the same software, which would seem inappropriate. That rarely made commercial sense. Either way, it was a commercial decision for Autonomy at its discretion. Despite these complications, it was my understanding, then and now, that Autonomy's products were almost always sold to and used by the end-users, and that cash was received against the revenue recognised (whether from the reseller or the end-user)."*

2124.  In the Taylor Wessing/Deloitte letter of January 2015 it was stated:

> *Deloitte did in fact carefully consider and review each of the situations in which a contract with a VAR was cancelled and the deal was completed directly with the end-user, in order to understand the reasons for the cancellation and entry into a*

> *direct contract with the end-user. This included ensuring that the sale had not been double counted. With the exception of the Capax / Kraft transaction, which had no impact on the 2009 year end results, and which was the first time Deloitte had seen such a cancellation, these transactions were also all raised with the Audit Committee.*
>
> *The fact that the earlier transaction with the VAR was ultimately cancelled does not however change the fact that in each case it had been appropriate to recognise revenue on the original contract between Autonomy and the VAR. In each case, as <u>at the time of considering the original transaction with the VAR</u>, there was a binding and non-cancellable agreement in place between Autonomy and the respective VAR, and under that contract the risks and rewards had passed to the VAR.*
>
> *It is not appropriate in such circumstances to reverse the earlier recognition of revenue. The revenue was properly recognised. Circumstances then changed. As Deloitte was ultimately satisfied with the circumstances of the cancellation of the original contract with the VAR, there was no need to consider the need for Autonomy to adjust and re-issue the previous quarter results."*

[Underlining was in the original]

2125. The Defendants also relied on Mr Welham's confirmation in cross-examination that the fact that Autonomy cancelled a deal with a reseller did not impact on the original revenue recognition, because at the time of the reseller deal there was a binding and non-cancellable obligation on the reseller to pay. It is of some note, however, (and I shall return to this) that Mr Welham added the following caveat, which though a reference to it was provided in a footnote, was given less prominence in Dr Lynch's closing submissions, and sought to be minimised by a statement which I do not accept (and see paragraph 2153 below) that *in the event the instances of direct deals were rare"*:

> *"...it is important to highlight though what we did highlight to the audit committee at the time, which is that clearly if you have a continuing trend of that, then you build up a bank of evidence that would suggest that you wouldn t recognise revenue on the full 100%...."*

*Write-offs*

2126. The Defendants eleventh example of a *neutral feature"* which did not call into question revenue recognition was what they described as the occasional need to

write off debts owed by resellers. They ascribed this need to the occasional vicissitudes of business ( *Bad debts arise in business''*), and such an event long after the VAR deal in question could not sensibly affect the accounting analysis.

2127. This is another matter to which I shall have to return, not least because (a) Mr Welham made clear that credit notes and write offs would sound a warning note if they were other than occasional; (b) most of the write-offs were not "occasional" but done in the *Dark Period'';* and (c) bad debt write-offs and credit notes resulted in $107.9 million of sums accounted for as owed to Autonomy and counted as recognised revenue being removed from its balance sheet.

*Not suing debtors*

2128. The Claimants alleged that the reseller was not "pursued" for outstanding debts. The Defendants maintained that the documentary record in fact shows that resellers were chased up frequently; and that in any event, it is not commercially surprising if Autonomy did not race to court when there was an outstanding debt from its partners. Deloitte monitored debtors and recognised that resellers' repayments were being delayed in circumstances where the end-user deal had not closed, or amounts had not been received (see below).

*Reseller unwillingness to pay*

2129. Nor, the Defendants submitted, was there anything in the Claimants' complaint that there were instances when Autonomy did not pursue the VAR for the outstanding debts in the meantime (and there were cases, which the Defendants depicted as occasional, in which it had made clear that it would not pursue the debt).

2130. Whereas the Claimants relied on this as referable, not to unexpected commercial exigencies, but to the understanding between Mr Egan and the relevant VAR that there was no intention or expectation of the VAR ever being required to pay out of its own resources, the Defendants characterised this as ordinary commercial positioning and behaviour, which did not signify that the VARs were not on risk. They also relied on the fact that Deloitte monitored debtors and aged debt: and did not make any objection on that score.

2131. Almost as a throw-away additional point, the Defendants suggested that *in point of fact the documentary record show that VARS were chased up frequently''*: but although there were a few examples showing this, chasing letters were sent by members of the Finance Department who were unaware of the arrangement in place, and who were told to desist by those in the know (and see paragraph 2153(4) below).

*MAFs*

2132. I have referred above to the payment of MAFs but it is convenient to bring together the strands of the Claimants' case in this regard before addressing the Defendants' case that they were a yet further example of *neutral features''* distorted and incorrectly criticised by the Claimants.

2133. The Claimants' case on the payment of MAFs was not that they were intrinsically abnormal or inherently objectionable, but that none of the VARs did anything substantial to merit their payment. The Claimants focused especially on the following aspects:

(1) The absence of any contractual provision for, and yet the expectation on the part of VARs of, payment of a MAF, which the Claimants submitted illustrated how such arrangements between Autonomy and its VARs were established informally, outside the "four walls of the contract", and despite express contractual provisions precluding side arrangements. This, they submitted, demonstrated a readiness on the part of both Autonomy and the VARs to keep important parts of their agreement out of the written contract. They also made the more general submission that the fact that this important element of the overall arrangements was not expressed in the VAR agreements demonstrated that it would be wrong to assume that there is anything improbable about the notion that the parties might have agreed upon important matters that were not recorded in the written contract.

(2) Secondly, the Claimants also criticised some of the payments of MAFs to resellers when in the event a direct deal was done and the VAR deal was, in effect, replaced. They contended that in such circumstances, the VAR had in reality done nothing to warrant reward (still less provided any marketing assistance), had been released from any risk or obligation, and deserved no reward. They submitted that this was a concrete illustration of *Autonomy…buying revenue again"*.

(3) Thirdly, the Claimants relied on instances where (as was for example the case in the Capax Discovery/Eli Lilly transaction) the VAR's entitlement to a MAF was recorded in writing in terms which (they submitted) did not fairly and honestly represent the true reason for the payment, thus further demonstrating Autonomy's propensity dishonestly to misrepresent the true nature of its payments and inducements. The Claimants provided as an example a letter drafted by Mr Kanter in the course of the Capax Discovery/Eli Lilly transaction which they contended was typical and stated as follows:

> *To formalize our prior discussion, Autonomy Systems Limited ( Autonomy") and Capax LLC ( Referral Partner") agree to the terms and conditions of this letter agreement ( Agreement") as follows:*
>
> *Referral Partner will: (1) introduce Autonomy into the deals with Eli Lily ( End-user"); (2) obtain quotes from Autonomy on behalf of the End-user; and (3) work with the End-user to assist in executing purchase orders and contracts with Autonomy.*
>
> *Autonomy will: (1) pay Referral Partner commissions in the amount of US$629,000, as a result of Referral Partner s direct and proximate participation in the account; (2) deliver products directly to End-user; and (3) use reasonable efforts to provide mutually agreed upon sales assistance. …"*

2134.    The Claimants submitted that the letter was plainly designed to give the impression that it was formalising prior discussions as to what role the VAR would perform – and that, in return for the performance of that role, Autonomy would pay the commission; and that was so although by the date of the MAF letter quoted above (30 September 2010), it was perfectly clear that Capax Discovery had not done any of the things the letter said it had agreed to do.  The Claimants gave another example of an email from Mr Kanter approving a MAF on the Capax Discovery/FSA transaction, in which Mr Kanter stated that he had been impressed by Capax's contribution whilst in fact knowing there had been none.

2135.    The latter point posed two rhetorical questions, one bearing on impropriety and the second bearing on the Defendants' knowledge of it:

(1)    First, why, if Autonomy had nothing to hide in relation to the reasons for this payment, Mr Kanter chose to resort to relying on a fictitious basis for the payment and the documents under which they were made. In connection with the payment of MAFs the Claimants also contended that the indications of what they characterised as pre-textual emails seeking to describe why a MAF was being paid indicated the substantive impropriety of the payment.

(2)    Secondly, whether it is likely that they were intending to mislead Dr Lynch, or whether it is more likely that there was a discussion in which Dr Lynch knew and understood the real reason why the VARs were being paid and that it was better dressed up.

2136.    The Defendants submitted that the Claimants' premise, and the assumptions they had made and required their experts to make, was that (a) any impugned VAR transaction was improper and thus (b) any MAF that was paid, being (on that assumption) a fee paid in return for some improper revenue recognition, was another facet or demonstration of impropriety; but there was no basis for these assumptions, and nor was the inference justified.

2137.    The Defendants submitted that, contrary to the Claimants *circular"* approach, the starting point should be, and the evidence was, that the VAR did take on risk, for which it expected reward; and that in those circumstances, the payment of a MAF was a sensible and appropriate course where for one reason or another the reseller which had gone on risk could not otherwise make its margin (for example, where Autonomy and the reseller eventually made a direct deal, and the VAR lost its customer).

2138.    It was not disputed that MAFs were common in the software industry, usually in the range of 10% to as much as 30% of the deal price and something HP itself employed. The Defendants reminded me especially that Deloitte were aware that Autonomy paid MAFs, including in situations (such as the Kraft deal addressed in more detail below) where the deal went direct and the reseller was being compensated for lost margin.

2139.    Mr Welham confirmed that he did not think that the fact that fees were paid to VARs for their agreeing to become fully on risk for VAR deals was improper ;

and he confirmed in his evidence that if a deal had gone direct and Autonomy thereafter agreed to pay the reseller a commission or payment fee notwithstanding that the risk they had undertaken would no longer eventuate since they had been released, this was essentially a commercial decision for Autonomy and did not affect revenue recognition.

2140.   The Defendants also drew my attention particularly to the following passage from the Deloitte memo on changes to Autonomy's VAR agreements:

> *In 2009, four deals with Morgan Stanley ($4.6m), Eli Lilly for ($6.1m), Kraft ($4.3m) and Manufacturers Life Insurance ($1.1m) that were initially sold through VARs Microtech (Morgan Stanley and MLI) and Capax (Kraft and Eli Lilly) were eventually done through Autonomy, Kraft was signed with Autonomy in Q4 2009 and the remainder were signed in 2010. In 2010 two deals initially sold through Discover Technologies (Phillip Morris International $2.9m, Citigroup $5.5m) were eventually done direct with Autonomy.*
>
> *In a normal deal, the VAR signs with Autonomy, then signs a (slightly higher value) deal with the end-user, making a margin on the way. However, when the end-user decides to sign direct with Autonomy, then there is a contract between the VAR and Autonomy, a contract between the end-user and Autonomy, but no contract between the VAR and the end-user. In this situation, per the explicit terms of the VAR agreement, the VAR would owe Autonomy for the deal signed; without having a customer.*
>
> *The issues were resolved in a way that ensured the VAR retained the margin they would have got, had the end-user actually signed with them. In the example of Citigroup, Autonomy resolved the issue with the VAR by entering into a tri-party agreement, whereby Citigroup paid Autonomy in full and Autonomy then paid the VAR their margin based on the amounts due on the original PO.*
>
> *These events highlighted the issue of risk for the VAR s – relying only on the goodwill of Autonomy towards its resellers rather than formal legal recourse was deemed to be too high, and hence the clause was agreed."*

2141.   Mr Egan's evidence was that MAFs were justified in either context, and that he saw nothing wrong with paying them. In cross-examination he said this:

> *Q. Now, from time to time Autonomy paid what was called a marketing assistance fee to a VAR, do you remember that?*
>
> *A. I do*
>
> *Q. And that was a way of compensating the VAR for its agreement to take on the liability to pay?*
>
> *A. Correct."*

2142. From Mr Baiocco's and other VARs stated perspective, there was nothing untoward, unusual, or still less improper, in being paid for taking on the risk which the VAR agreements unequivocally imposed on the VAR. Mr Baiocco saw it as a fee for the risk undertaken, sometimes in effect as a guarantor (as it was put in the Goldberg Segalla letter) (and see paragraph 2024 above). If he was released because a direct deal was substituted that position was historic, but nonetheless real; and the VAR should properly be compensated for lost margin. He never read or cared about the various letters that referred to MAFs.

2143. The Defendants' answer to the second point in paragraph 2133(2) above was thus that the MAF was in each case in effect a fee for standing as guarantor, and thereby enabling Autonomy to recognise revenue at a time that was commercially advantageous to it; and that there was nothing wrong with that. But the converse of the Claimants' argument against a MAF was circular insofar as it depended on establishing impropriety but likewise the Defendants' argument was premised on the VAR actually being at real as distinct from nominal risk (which, of course, the Claimants submitted was never the case).

2144. The Defendants did not substantively address the Claimants' first point (see paragraph 2133(1) above) as to the absence of any contractual provision for payment of a MAF and what that demonstrated as to the parties' real attitude to the "entire agreement" clause and the prohibition of any side agreement or understanding. I recognise that neither such a clause nor such a prohibition precludes uncovenanted payment; but the convention of payment of a MAF does resonate with the alleged convention that the VAR would never be called on to fulfil its obligations.

2145. As to the two questions raised in paragraph 2135 above, the Defendants sought to dismiss as *an overblown forensic point"* the Claimants' criticism of the various 'MAF letters' and the suggestion that, by referring to the VAR as a *Referral Partner"* and stating that the payments were for *direct and proximate participation in the account",* they were apt and designed to mislead. Dr Lynch contended that the letters were in standard form for a MAF and not bespoke; each contained language which was properly usable, even if not entirely suited to the particular case, and also contained language imposing a restriction on competition from the reseller, which was of value to Autonomy, supporting their substance.

2146. In other words, the Defendants' answer was that there was no intent to disguise: the explanation (use of a standard form) was more prosaic. But that does not answer the email referred to in paragraph 2134 above; nor to my mind, what

HC-2015-001324

happened in various of the transactions, including the impugned VAR sale for
end-user FSA. Thus:

(1) In his email (sent to Mr Hussain and Mr Egan, dated 6 October 2010
subject *Capax"*) Mr Kanter stated:

> *Having been impressed with Capax s contribution to the FSA
> transaction, I am comfortable that they have earned a marketing
> assistance fee in line with our standard terms. I have prepared
> the attached to document properly the transaction. Please can I
> have your views."*

Mr Egan responded *Agreed"* and Mr Hussain responded *ok".*

(2) The impression given was of a specially produced draft recording the
particular transaction and of a payment in exchange for a contribution to
the end-user transaction with the FSA.

(3) Dr Lynch told me in cross-examination that although he was not
involved in the transaction, he did know that Capax Discovery *were
doing a lot of the work to actually show the technology and use it for
FSA and that would be a very helpful contribution".* However, there is
no record in the evidence of Capax Discovery having done such work in
2010 and Dr Lynch accepted that if there was none, his assertion would
fall.

(4) The letter sent to Mr Baiocco by Mr Kanter dated 6 October 2010 which
was in similar terms to one sent in respect of the Eli Lilly sale (see
paragraph 2133(3)), described Capax Discovery as Autonomy's
*Referral Partner"* and recorded that Capax Discovery was to introduce
Autonomy into deals with the FSA; obtain quotes from Autonomy on
behalf of the FSA and assist in executing purchase orders and contracts.

(5) Mr Baiocco's evidence (which was not challenged, and which I accept)
was that Capax Discovery *did none of these things; and I never
discussed any of this with Autonomy".* In further unchallenged evidence,
which I also accept, he stated:

> *In actual fact, we did not make any attempt to license Autonomy
> software to the FSA or participate in setting the terms of the
> license that I understand Autonomy sold to the FSA".*

2147. The Claimants made the further point that in opening they had especially sign-
posted that they wished to cross-examine Mr Kanter about the MAF letters
(amongst other things), and were deprived of the opportunity to do so because
Dr Lynch then decided not to call him. They invited the inference that Mr Kanter
was not called because (a) he could give no honest explanation of the misleading
way in which the MAF letter agreements were drafted and (b) he would have
implicated Dr Lynch. As to (a), I prefer to approach the matter on the simple
basis that I have been left to determine the matter on the basis of the balance of
probabilities without the benefit of any contrary evidence from Mr Kanter, or

any verification of an innocent explanation. On the evidence available, and in all the circumstances, I consider that it is more likely than not that the letter was in crafted (and not template) terms, and was intentionally misleading. I return to (b) later.

2148.  As will appear from my assessment of individual impugned VAR transactions later in this judgment, the FSA example was typical of the payments of MAFs made to "friendly" VARs, with variations as to the manner of payment according to whether or not any end-user eventuated. As will be seen, their payment was a pattern; the justification set out in the letters sent to VARs to document their payment was invariably included as a pretence to the reasons for their payment; and that pretence was kept up to both the Audit Committee and Deloitte.

*Summary of Defendants position*

2149.  In the round, the Defendants sought to present a position that even if in many instances of impugned VAR sales Autonomy was involved in negotiations with the prospective end-user, Autonomy's objective was always voluntarily to assist the VAR to obtain and close a contract between the VAR and that end-user; and that even though there were occasions on which the culmination of the negotiations was that the end-user preferred to contract directly with Autonomy, none of this revealed anything such as to indicate that for the purposes of IAS 18.14, *the risks and rewards of ownership of the goods"* had not transferred to the VAR, nor signified that Autonomy retained *managerial involvement or effective control over the goods sold"* to *the degree usually associated with ownership."*

2150.  They ascribed the various ways in which VARs were released from liability as part of the ordinary course of commercial dealings necessitated by unexpected commercial exigencies.

2151.  Dr Lynch also noted that for the vast majority of the impugned VAR transactions Autonomy did receive the cash. As stated in his written closing submissions, of the $176,400,000 of revenue which the Claimants allege in Schedule 3 of their Statement of Case was reported by Autonomy on those deals, Autonomy received approximately three-quarters in cash. The dispute, of course, was as to how such payments had been funded, though the Defendants rejected the Claimants' allegation that in no case had the VAR provided funds which did not originate from some transaction with Autonomy such as a 'reciprocal' or 'circular' transaction.

2152.  As part of this presentation, the Defendants also sought to depict the direct contracts between Autonomy and an end-user, and the *neutral features"* identified above, as occasional, and not part of any invariable or even standard 'pattern'. The Defendants did not really offer an answer if those features presented in a 'pattern', as was the Claimants' case that they did; and they offered nothing except assertion to the contrary, and reference without any evidence to it being atypical of an unidentified mass of VAR transactions which were not impugned, to contradict the evidence which emerged that in not a single one of

the impugned VAR sales was the VAR actively involved in negotiating with the end-user, and in not a single one did a contract between the VAR and the end-user result. In every instance, any end-user contract was between Autonomy and the end-user, and in 11 out of 30 no contract eventuated at all.[274]

2153. Thus, and as in some instances already observed in the course of examining what the Defendants averred to be  *neutral features"*,

(1)    Although the Defendants submitted that it would not prevent revenue recognition if materially all the interaction post-sale was between the end-user and Autonomy, they steered away from the reality that time and again, Autonomy was not assisting the VAR: it was excluding the VAR, and dealing exclusively with the end-user as if no VAR transaction had occurred.

(2)    Linked to that, whilst the Defendants submitted, and Mr Welham agreed, that the prospect (or in the case of deals subject to the revised contract wording, express contemplation) that there might be a direct deal between the end-user and Autonomy did not prevent the risk being transferred to the reseller at the time of the deal, and nor did the occasional decision to deal directly at the insistence of the end-user, Deloitte warned the Audit Committee, and the Defendants appear to have appreciated, that the opposite conclusion would follow if in truth a direct deal was the intention and a routine or repeated result.

(3)    The Defendants' assertion that the fact that in most cases a transaction between Autonomy and the end-user resulted made clear their awareness of the importance of the result in terms of the propriety of revenue recognition: the actual position, which was that no such transaction ever eventuated in the case of any impugned VAR transaction tells its own story against them.

(4)    Dr Lynch's suggestion that *in point of fact the documentary record shows that VARS were chased up frequently"* was obviously directed to buttressing the notion that Autonomy's behaviour did not depart from an ordinary commercial norm, with Autonomy doing what might be expected in the case of a reluctant payer. However, in the limited number of cases in which Autonomy did chase payment, the efforts were unsuccessful and not pursued; and, for example, when, in respect of the Eli Lilly transaction (VT4), Mr Baiocco complained on behalf of Capax Discovery that, contrary to his understanding of the basis of the VAR transaction, he was being pressed for payment before receiving any payment from Eli Lilly, Mr Egan interceded and the calls pursuing payment were stopped.[275]

(5)    Whilst the Defendants submitted that the occasional cancellation of a VAR deal, and the issue of a credit-note and payment of a MAF to a

---

[274] Though the Defendants made the same point as I have recorded in footnote 274 to paragraph 2116 above.

[275] See also my discussion of VT4 in the Schedule of Impugned VAR transactions attached to this judgment.

VAR, did not necessarily impact on the original revenue recognition, Deloitte warned, and the Defendants appeared to accept, that if that became the norm or routine, again the assessment could well change. Their attempt to depict the issue of credit notes and very substantial write-offs on the basis that *bad debts arise in business"* and to pass off the write-off and credit notes issued in the short *Dark Period"* as a *normal housekeeping exercise"*, reveals an acute consciousness of this; and the like applies to the cancellations.

(6)  With particular reference to the write-offs made and the credit notes issued in the *"Dark Period"*, debts written off (as shown in Autonomy's main general ledger ("*DDS*") (included $2.3 million owed by MicroTech (VT13) and some $2 million owed by Realise (VT15) as well as £1.6 million owed by Sales Consulting (VT9) and £1.8 million owed by Red Ventures (VT19)) – the first two being transactions impugned by reference to a side agreement, and the latter two being "Collectability VARs). Ms Harris originally tried to claim that all of these debts had already been fully provisioned, so that the write-offs made "*no difference to profit and loss, it's just a balance sheet tidy-up exercise.*" However, when she was shown an analysis that made clear there had been no provision for Red Ventures or MicroTech, and only a partial provision for Sales Consulting, she had to accept that these were substantive write-offs, and no mere "*tidy-up*".[276] Other impugned VAR transactions that led to write-offs in the Dark Period, as shown in the same analysis included VT14 (£2.7 million net write off shown), VT17 ($1.7 million net write off shown), and VT22 ($1.1 million net write off shown). The list of credit notes included several credits to VARs, including Capax Discovery (through its parent company Capax Global), DiscoverTech and MicroTech, including (for example) $4 million in respect of VT25.[277]

## My conclusion as to whether a pattern emerges and what is revealed

2154.  The Defendants accepted that the transactions did, for the most part, consistently evince the features identified by the Claimants. The real dispute was whether those features were *"neutral"*.

2155.  Perhaps unsurprisingly, the Defendants could point to features which were not, in themselves, unusual. I accept that it is not unusual or objectionable, of itself:

---

[276] As noted by the Claimants in their written closing submissions, she fell back on saying that the provisions in issue had been made in Q3 2011, and included in the $45.6 million of bad debt expenses recorded for the quarter. As she admitted, where provision is made in the quarter that does result in a charge to the P&L.

[277] The exact quantification of the amounts written off or the subject of credit notes in relation to VAR transactions was disputed. The Claimants gave a figure of $130 million for the total amount of the revenue *"clean up"* but accepted that only a proportion related to impugned VAR transactions. The Defendants appeared to accept that write-offs relating to impugned VAR transactions exceeded $15 million, and credit notes issued in respect of VARs impugned by reference to a 'side agreement' exceeded $18 million (in addition to credit notes of some $23.2 million in respect of transactions where Autonomy had cut out the VAR, dealt directly with the end user and was compensating the VAR).

(1)     For a software seller to effect a genuine sale to a VAR at the very end of a quarter in order, for example, to avoid being squeezed on price by a prospective end-user hopeful of exploiting (entirely legitimately) quarter, half or year-end pressures on the software seller to get a better deal;

(2)     For a software seller to effect a genuine sale to a VAR after failing to conclude a transaction with the end-user before the end of the relevant accounting period (as the Claimants conceded in their Reply and Mr Welham accepted);

(3)     For the VAR, in the context of such a deal late in the quarter, to have no time to assess the status or prospects of an end-user sale, or even the identity of the end-user, otherwise;

(4)     For there to be no negotiation on the VAR sale price where there was no real issue as to the prospective onward sale price (typically because of a standard price or price range for the software sold);

(5)     For the VAR in certain instances to act merely as a fulfilment partner (usually when acting, as FileTek did, as an approved intermediary for end-sales to US government institutions such as USDVA) and not to add any real value beyond processing the paperwork;

(6)     For the software seller to be involved with the VAR in negotiating an end-user sale (for example in the case of an established customer of the software supplier);

(7)     For there to be occasions, though they would be rare, where the end-user decided it would only deal directly with the software supplier and some arrangement would have to be made with the VAR to ensure that it was not out of pocket and that Autonomy was not paid twice;

(8)     For there to be occasions (again rare) where the end-user might be instructed by Autonomy to pay the VAR instead of Autonomy again to avoid double exposure or double recovery;

(9)     For the VAR to be issued a credit note for similar reasons (though again this would be rare);

(10)    For the VAR to be paid a MAF either as reward for its assistance or compensation (if a deal went direct) for lost margin.

2156.   However, it is unusual, and both revealing and potentially objectionable:

(1) For the VAR to have no expectation at any time of any involvement at all in any discussions or dealings with the prospective end-user or any other potential end-user;

(2)     For the VAR in fact to be entirely passive and cede entirely to the software seller all negotiations with the prospective or other end-user and to take no part in them;

(3)    For the VAR not to expect to be consulted about the terms or even told of them (until after the event), or be party to any contract concluded by Autonomy with an end-user, or be involved in the delivery of software to such end-user;

(4)    For the VAR routinely to agree to payment instalment dates for which it routinely made no apparent provision and failed to pay in time, as if they were never intended to have any actual effect[278];

(5)    For the VAR not to be pressed or even reminded by the software seller about failures to pay on instalment payment dates;

(6)    For the VAR to take on legal risk in an amount well beyond its ability as a practical matter to pay on the instalment dates;

(7)    For the VAR to be dependent on the software seller to remit to it or credit it with the proceeds of the end-user sale, and, if no end-user sale eventuated, simply to await some other form of rescue by Autonomy;

(8)    For a combination of the above to be typical of its largest VAR purchases from the software seller time and time again.

2157.  Further, the Defendants efforts to validate the impugned transactions require careful scrutiny. In many instances, those submissions were premised on fact patterns which at first blush appeared similar to what in fact occurred but which were on analysis subtly but materially different. In other instances, the factual matters relied on by the Defendants were not established, or they were revealed to be either incorrect or confined to special situations.

2158.  For example, it was submitted in Dr Lynch's written closing that the Claimants were mistaken in repeatedly questioning what services or value a reseller was likely to bring to the transaction, and that *"it would not matter if the reseller was not going to fulfil any role at all, other than purchasing the goods, going on risk for that purchase, and thereafter fulfilling the end-user's purchase order."* They placed reliance on the FileTek 'fulfilment only' transaction in Q3 2010 (VT18) as an exemplar of a standard form of VAR relationship in the industry. In this regard, the Defendants relied especially on Mr Szukalski's evidence in cross-examination to this effect, and his assertion that an agreement under which the VAR was required to do nothing at all after the VAR sale to it except 'fulfil' any end-user sale negotiated and contracted for by Autonomy was *"very common practice"*. But this carried no weight: Mr Szukalski was in no position to make such an assertion. FileTek carried on no business as a VAR[279], and (though he had worked for several software companies) Mr Szukalski had

---

[278] Mr Rabinowitz made the point in his reply that in only three of the 37 impugned VAR transactions did the VAR pay the licence fee by the due date, and in each of those three cases (VT5, VT23 and VT37) Autonomy had put the VAR in funds.

[279] Mr Szukalski told me in cross-examination that he had never wanted to do the deal because reselling was not part of FileTek's business at all, and he confirmed that FileTek had never resold Autonomy software. He had wanted Autonomy to use another company owned by the same person as FileTek called Centennial; but Autonomy had insisted on FileTek.

no evidenced experience of practices in reselling such as to give any credence to his view.

2159.  Further, even in the FileTek transaction in Q3 2010 (VT18), which the Defendants promoted as the VAR deal which took the Claimants furthest,[280] there was no evidence that FileTek was intended to fulfil the end-user's purchase order except possibly in a nominal or mechanical sense and at Autonomy's direction. Mr Szukalski confirmed that FileTek's role was simply *"holding the paperwork for those 45 days* (i.e. pending closure of the USDVA end-user deal) *and in exchange we'd earn a certain margin on the deal…So that's what we were asked to do."*

2160.  Neither in the FileTek transaction nor in any other of the impugned VAR transactions was the VAR to play an active role or do anything on its own behalf at all. Even the residual task suggested of fulfilling the end-user's purchase order was of no substance. If, in any instances, the VAR was left or required to 'fulfil' the purchase order (presumably by making available its access code) that would simply be at Autonomy's direction in fulfilment of Autonomy's contract and not its own, and all that was required to 'fulfil' the purchase order was delivery of the software; and that could be, and I would assume was, achieved electronically on Automater.

2161.  Similarly, the Defendants again sought to illustrate their case by promoting the FileTek transaction as showing that even in this transaction the VAR always undertook real risk. They conceded that email exchanges between Mr Szukalski and Mr Loomis made clear that Mr Szukalski was given to understand by Mr Egan that there would be no real risk for FileTek.  But they sought to make a virtue of the concession by also contending that even in that context, Mr Egan had made clear that any indication of his did not bind Autonomy and that FileTek's legal risk was unaffected. Further, they depicted what Mr Egan had said as soft-soap: all that Mr Egan had said was that (as Mr Egan put it in cross-examination) *"If, for some reason, the [USDVA] deal was not completed, Autonomy would use all efforts to find another end-user for the same software or some other way to make sure that FileTek would get paid and could then pay Autonomy."* This was referred to as "backfilling" and the Defendants sought to present it merely as in the nature of an assurance of co-operation to substitute a new end-user. "Backfilling" was simply a euphemism for Autonomy trying to establish a direct deal with another party; the question is whether Autonomy would have pursued FileTek (or any other VAR in the impugned VAR transactions) for the purchase price it had agreed to pay, and the answer is, in my judgment, plainly 'no'.

2162.  What shone through the evidence, in my judgment, was that FileTek was given assurances which satisfied Mr Szukalski and Mr Loomis that FileTek would never in fact be called for the purchase price. That was, as it were, the "bottom line".  Mr Szukalski admitted in cross-examination that but for those assurances,

---

[280] Dr Lynch's written closing submissions stated that the evidence in respect of the FileTek transaction for end-user USDVA *"of all the reseller transactions...in fact takes the Claimants' case the furthest"*. That was a fairly transparent 'Aunt Sally'.

FileTek could not have proceeded: the amount of the deal was far above its ability to pay, and any real risk would have posed an existential threat.

2163.  Thus, in important respects the impugned VAR transactions did not satisfy even the Defendants' formulation in paragraph 2155 above. On the contrary, the analysis that the argument necessarily occasioned demonstrated that the VARs did not expect to be nor were further involved with either the end-user or any onward sale, or indeed to do anything at all except co-operate with any arrangements that Autonomy might make to ensure that the VARs were not left *"on the hook",* and receive payment of a MAF which in most cases was the only real reason that the VARs were prepared to accept the legal risk.

2164.  In my judgment, (a) the impugned VAR transactions manifest both aspects of the pattern which the Claimants have alleged and (b) the pattern provides further confirmation that in reality (i) the VAR sale did not impose any obligation on a VAR of any intended economic consequence (ii) the only real sale was where one eventuated pursuant to Autonomy's negotiations with an end-user, and (iii) the only source from which Autonomy ever expected any actual payment (otherwise than out of its own funds) would be an end-user sale.

**Relevance of Deloitte's approval of revenue recognition**

2165.  In this context, as in all others, the Defendants relied on the approval given by Deloitte and the Audit Committee as showing that the transactions were within the margins of propriety and that, even if they were not, the Defendants were entitled to assume that they were.

2166.  The Defendants instanced paragraphs 82 to 84 of a letter from Taylor Wessing LLP on behalf of Deloitte to Travers Smith LLP, written in response to a letter of claim setting out the basis for a claim in negligence by Autonomy (now controlled by HP) against Deloitte, where it was stated as follows:

> *"Deloitte did in fact carefully consider and review each of the situations in which a contract with a VAR was cancelled and the deal was completed directly with the end-user, in order to understand the reasons for the cancellation and entry into a direct contract with the end-user. This included ensuring that the sale had not been double counted. With the exception of the Capax / Kraft transaction, which had no impact on the 2009 year-end results, and which was the first time Deloitte had seen such a cancellation, these transactions were also all raised with the Audit Committee.*
>
> *The fact that the earlier transaction with the VAR was ultimately cancelled does not however change the fact that in each case it had been appropriate to recognise revenue on the original contract between Autonomy and the VAR.*
>
> *In each case, as <u>at the time of considering the original transaction with the VAR</u>, there was a binding and non-cancellable agreement in place*

> between Autonomy and the respective VAR, and under that contract the
> risks and rewards had passed to the VAR.
>
> It is not appropriate in such circumstances to reverse the earlier
> recognition of revenue. The revenue was properly recognised.
> Circumstances then changed. As Deloitte was ultimately satisfied with
> the circumstances of the cancellation of the original contract with the
> VAR, there was no need to consider the need for Autonomy to adjust and
> re-issue the previous quarter results."

[Underlining as in the original]

2167. As foreshadowed above, however, what the Defendants' submissions did not
grapple with was what was missing from the information available to Deloitte,
and what they were not told, even when they raised concerns. This included,
most importantly:

(1)     Deloitte were never told or aware that it was never intended by either
Autonomy or the VAR that the VAR would have any role or say in the
negotiations with the end-user;

(2)     Deloitte were never told or aware that in the negotiations between
Autonomy and the end-user after each impugned VAR sale Autonomy
was at best indifferent as to whether any sale to the end-user should be
by the VAR or by Autonomy. Deloitte were left with the impression that
'direct' deals were exceptional rather than the planned norm, and were
unaware, since Autonomy did not mention the VAR sale and appeared
to be acting as principal, that the end-user would always be most likely
to contract (if at all) with Autonomy as the person it had always dealt
with and the supplier of the software;

(3)     Thus, for example in the Kraft deal (see paragraphs 106 to 121 of the
Schedule of Impugned VAR Transactions), Deloitte were never told or
aware that the VAR had never been involved in any negotiations and a
direct deal had always been envisaged; on the contrary, the purchase
order which was the source of the information given to Deloitte stated in
terms that (a) the end-user and VAR were anticipating entering into a
license transaction with one another and that (b) any direct deal, though
possible, was an unlikely event".

(4)     Autonomy's response to Deloitte's expression of concern (in its Q1 and
Q2 2010 reports to the Audit Committee) about a possible pattern of
direct deals, and their warning that this might jeopardise Autonomy's
ability to recognise revenue at the point of sale to the VAR, was to
represent in Q3 2010 (as was in Deloitte's Q3 2010 report) that there had
been no further such direct deals; whereas in fact Autonomy had entered
into a direct deal that very quarter (Q3 2010) with the FSA (VT10) which
it concealed from Deloitte until much later.

(5)     Deloitte were repeatedly misled by Autonomy as to the ability of
'friendly' VARs to meet out of their own resources the legal obligations

they assumed, and they were unaware that such VARs were reliant upon the assurances given by Mr Egan that Autonomy would never require such payment and would engineer another means of funding the obligation.

(6)     Finally, and in summary, Deloitte were never told, and certainly were not given any full or proper understanding, of the assurances given to the relevant VARs by Mr Egan, nor therefore of the shared understandings between the parties which rendered every impugned VAR sale artificial and/or merely a device to give the appearance of a transaction which would give rise to revenue whereas in reality it would never do so.

### *(6) The Defendants  knowledge of improper accounting*

2168.   That brings me to the issue of the Defendants' knowledge: in other words, whether the Defendants knew that the VAR transactions lacked substance, that the only real sale would be if and when one eventuated between Autonomy and an end-user, and that the recognition of revenue at the amount and time of the VAR sale was improper.

2169.   Obviously, Mr Hussain was more directly and routinely involved than was Dr Lynch; and it is appropriate to deal with them each in turn.

*Mr Hussain s knowledge*

2170.   The Claimants summarised in six points their case that Mr Hussain was well aware of the true nature of the impugned VAR transactions and their improper accounting treatment and presentation.

2171.   First, Mr Egan's evidence was that it was Mr Hussain who was the architect and *defined the parameters"* of the practice of using VARs for  *at risk deals"* or (as Mr Hussain called them)  *acceleration deals"* to accelerate revenue recognition[281]; and it was Mr Hussain who selected which deals, and in what amounts would be taken to a VAR, and which VAR to approach and who directed Mr Egan to give the assurances to the VARs that they would not be left *on the hook"* or  *holding the bag".*

2172.   Mr Egan added that Mr Hussain:

(1) gave him *"specific instructions to follow so that these deals would be accepted by Autonomy's auditors (Deloitte)"*;

---

[281] *"At risk deals"* were (in Mr Egan's terminology) sales to the VAR where the VAR had not yet agreed a sale with the end-user. Mr Egan explained in his witness statement that prior to 2008/9 Autonomy had frequently sold its software through resellers, but none was an *"at risk deal"*: Autonomy had always required the VAR *"to first obtain a purchase commitment from its customer, the end-user. Then, and only then, would we accept an order from the VAR for the relevant software."* The Defendants' case was that Mr Egan had confused the chronology and that Autonomy had routinely undertaken *"at risk deals"* once it had changed from US GAAP to IFRS accounting which permitted revenue recognition before "sell-through".

(2) *"provided guidance to [him] regarding what was, and was not, acceptable to communicate in my conversations with VARs"*,

(3) *"laid out explicit rules about what could be offered as incentives to the VARs, what was required of the VARs, and what could not be part of any deal"*,

(4) instructed him to say that it would be Autonomy which *"would continue its efforts to sell to the end-user"* and that "*the VAR was not expected to participate in these sales efforts",* and

(5) directed him to assure the VARs that, though nothing could be put in writing, *"if Autonomy was ultimately unable to close a deal with an end-user, there were various options that Autonomy had to "fix" the situation for the VAR so that it would not end up having to pay for the software from its own resources"*.

2173. According to Mr Egan's evidence, Mr Hussain was thus well aware of the assurances given. Mr Egan accepted in cross-examination that, as far as he was aware, Mr Hussain was not involved in negotiations or discussions with VARs prior to any impugned VAR sales. However, when it was suggested to Mr Egan (by reference to one of the Capax Discovery sales) that it was *"just an arrangement between you and Mr Baiocco and it wasn't something that Mr Hussain knew about"* he was very clear and adamant in his insistence that he knew *"first-hand that Mr Hussain knew about it"*. Furthermore, he told me that Mr Hussain:

> had much more interaction with the VAR after a deal, particularly if a deal required some form of unconventional conclusion; like if a deal ultimately had to be cancelled and dealt with in a different way, in those circumstances Mr Hussain was often more involved."

2174. As indicated in the Introduction, Mr Egan's witness statement appeared to me to be over-lawyered; and he was, as also noted previously (see paragraph 1977 above), restricted in what he could say without peril, having agreed with the DoJ not to offer any contradictory evidence or arguments on pain of immediate prosecution without defence for breach. But when he gave his oral evidence (over a video-link, which was adequate) he struck me as substantially reliable in what he said about the institution and development of the *at risk"* VAR selling programme and Mr Hussain's part in it.

2175. His cross-examination elicited answers supportive of the defence based on the notion that the arrangements with the VARs did not affect their legal liability to pay, and the transactions fell to be accounted for in accordance with their contractual definition. He agreed repeatedly and with enthusiasm that (a) his understanding was that what happened was legal because the assurances given to and understandings established with the VARs were not legally enforceable, did not in any way affect the VAR's legal obligation to pay and thus were not, as he understood it, "side agreements" in a legal sense, and (b) he saw nothing

wrong in paying the MAFs as compensation for the VAR's agreement to take on the legal liability to pay. But his cross-examination did not, in my judgment, unsettle materially his account of the derivation, development and implementation of the post-2008 VAR *at risk"* sales strategy.

2176. Secondly, it was the unchallenged evidence of Mr Welham that Deloitte was never told of the existence of any side agreements. As an accountant, Mr Hussain well knew that information about any side agreements or understandings needed to be provided to Deloitte. Indeed, Mr Hussain signed management representation letters to Deloitte confirming the absence of any side agreements. Given Mr Hussain's actual knowledge of Mr Egan's assurances to the VARs, it follows that Mr Hussain deliberately misled Deloitte.

2177. Thirdly, Mr Hussain knew, from his own close involvement in the transactions, that Autonomy did not intend the VAR to do anything to achieve an onward sale or to make payment from its own resources. Mr Hussain knew that Autonomy would continue to try to achieve a direct end-user deal, as though the VAR transaction had not happened.

2178. Fourthly, Mr Hussain was intimately involved in the steps taken to unwind the VAR transactions in accordance with the fundamental understanding that the VAR would never be left *on the hook"* or *holding the bag"*, as was his deputy, Mr Chamberlain.

2179. Fifthly, Mr Hussain was a qualified accountant. He can be taken to have understood that the effect of the oral agreements or understandings between Autonomy and the VARs and the parties' intentions in respect of the same was that which has been explained by Mr Welham, Mr Holgate and Mr MacGregor. There was no evidence from Mr Hussain to suggest that he made an innocent mistake about this.

2180. Sixthly, Mr Hussain's knowledge of the improper accounting for the VAR transactions is reinforced by his involvement in misleading Deloitte about the relevant facts. An example emphasised especially by the Claimants was his conduct after Deloitte had warned Autonomy management and the Audit Committee in its Audit Committee reports for Q1 2010 and Q2 2010 that a pattern of VAR agreements being replaced by direct sales to end-users might jeopardise Autonomy's ability to recognise revenue at the point of sale to the VAR.[282] Mr Hussain assured Deloitte, and Deloitte's Audit Committee report for Q3 2010 noted that there had been no further reversals of VAR transactions in the form of direct deals between Autonomy and end-users, thus supporting Autonomy management's policy of continuing to recognise revenue at the point of sale to the VAR. Yet Mr Hussain knew, but concealed from Deloitte and the

---

[282] Deloitte came to learn in the first half of 2010 of a small number of transactions that had been concluded between Autonomy and three VARs, which were later replaced by a direct deal between Autonomy and the end-users. The transactions where Deloitte knew that this had occurred were VT3 (Capax Discovery/Kraft), VT7 (MicroTech/Manulife), VT8 (MicroTech/Morgan Stanley), VT4 (Capax Discovery/Eli Lilly) and VT12 (DiscoverTech/PMI).

Audit Committee, that in that very quarter (Q3 2010), another VAR transaction (namely VT10, Capax Discovery/FSA) had in fact been replaced by a direct agreement between Autonomy and the end-user. Mr Hussain plainly did this in order to avoid the consequences of which Deloitte had previously warned, namely that Autonomy's ability to recognise revenue at the point of sale to the VAR would be imperiled. This same phenomenon recurred in later quarters, right up until Autonomy's acquisition by HP, but Mr Hussain continued to conceal this from Deloitte.

2181.  Further, Mr Hussain's knowledge of the falsity of the accounting treatment can be inferred from the numerous other respects and occasions in which Mr Hussain misled Deloitte about relevant facts, including as to the rationale for the reciprocal purchases that were made to put the VARs in funds to pay down their debt to Autonomy.

2182.  I accept these points, which are in my judgment, amply illustrated and supported by a review of the individual impugned VAR transactions to which I turn below. In my judgment, Mr Hussain had 'guilty knowledge' of the artificiality of the impugned VAR transactions and their improper accounting treatment and presentation.

*Dr Lynch s knowledge*

2183.  Mr Egan said Dr Lynch was not involved in dealings with VARs. He told me that he was not suggesting that he could give evidence about what Dr Lynch thought or knew. There was not the transaction-specific or direct evidence against Dr Lynch that there was against Mr Hussain.

2184.  Nevertheless, the Claimants' case is that the body of evidence as a whole establishes Dr Lynch's knowledge of the artificiality and improper accounting of the impugned VAR transactions.

2185.  First, they submitted that it is clear on the evidence that Dr Lynch had personal knowledge of many of the end-user negotiations and was well aware from the inception that, where no end-user deal had been executed by quarter-end, Autonomy used a VAR to recognise the revenue instead.

2186.  Thus, for example, in relation to one of the very first impugned VAR transactions, Capax Discovery/Kraft (VT3), Mr Hussain emailed Dr Lynch on 25 September 2009, just before quarter-end, saying "*I have an idea on kraft*". Dr Lynch's omission to address this email, which was expressly pleaded, in his witness statement was characteristic of a notable evasiveness on all questions on the issue of his knowledge. His oral evidence in cross-examination was as follows:

> "*Q. Mr Hussain would have spoken to you to tell you what the idea was, yes?*
>
> *A. Well, there would have been some communication I assume, yes.*

> *Q. That idea, I suggest, which was the second line there, that idea, his idea on Kraft, was to use a value added reseller to take over the Kraft deal and so enable revenue to be recognised in Q3 2009, correct?*
>
> *A. I suspect so, yes."*

2187. He at first sought to deny any specific knowledge and asserted that he was *generally not involved".* He then accepted that he would usually come to know, but that he would only *find out what had happened once the dust had settled"*. The following passage from his cross-examination captures this:

> *"Q. So you would have known, I think you're saying, at the latest very shortly after quarter end that there had been a deal with a reseller?*
>
> *A. Yes, I would probably have known -- again I don't know but I would probably have known shortly after quarter end. That's the most likely."*

2188. My impression was, however, that Dr Lynch was seeking, by this formulation by reference to a time by which he would have known of the transactions, to avoid accepting that he knew of their progress well before they were executed as VAR sales. I note also, for example, that on occasion, such as in Q1 2010, it was Dr Lynch who added the VAR's name to the revenue route-map for that quarter. I have concluded that Dr Lynch kept a careful eye on the transactions and was well aware of their progress, even if he may not always have recalled more than the headline amount involved. The principal factors that have led to my conclusion are summarised below.

2189. Email evidence confirms that Dr Lynch had a keen interest in the typically large VAR deals which became necessary to fill the gaps, and I do not accept that he only came to know of such matters after the end of the quarter. A comparison between revenue achieved and revenue forecasted was supplied regularly by Mr Hussain to Dr Lynch in schedule form; and the need for recognised revenue would not have been lost on him. I do not accept his evidence that the situation was so frantic and *dynamic"* that he had no time to keep track.

2190. The size of the deals, and their importance in the achievement of revenue forecasts, also would have been likely to capture his attention. It is highly unlikely that Mr Hussain would not have kept Dr Lynch carefully and continuously informed. In this regard:

2191. Many of the impugned VAR transactions were amongst the largest, by revenue, in a given quarter.

(1)   As illustrated in the relevant slide, in each of Q4 2009, Q1 2010, Q3 2010, Q4 2010, Q1 2011 and Q2 2011, the disputed VAR transactions accounted, in aggregate, for over $20 million of reported revenue in that

quarter, and they were key to Autonomy meeting its revenue and earnings per share targets.

(2)    The pattern as regards the principal 'friendly' VARs in the Relevant Period is also striking and would surely have measured with Dr Lynch:

     i.    Capax Discovery entered into 10 impugned VAR transactions generating licence revenue of over $48 million. It did not enter into any other VAR transactions with Autonomy above $1 million.

     ii.    MicroTech entered into 9 impugned VAR transactions generating licence revenue of over $43 million. MicroTech entered into only one VAR transaction with Autonomy above $1 million (in an amount of $1.1 million), which is not impugned.

     iii.    DiscoverTech entered into 8 impugned VAR transactions generating licence revenue of over $39.5 million. It did not enter into any other VAR transactions with Autonomy above $1 million.

     iv.    FileTek's sole VAR transaction was for $10 million.

(3)    The impugned VAR transactions accounted for 88% by value of Autonomy's VAR transactions above $1 million in the Relevant Period generally.

2192.    Secondly, the Claimants submitted that though he professed to be unaware of the detail, Dr Lynch knew that it was not intended that the VAR would participate in the end-user negotiations.

2193.    Again, Dr Lynch's evidence in cross-examination on this aspect struck me as contrived. Ultimately, he appeared to be taking a legalistic position that because the VAR had purchased the goods, and thereby acquired control of them, Autonomy could do nothing to stop it being involved in negotiations with an end-user for onward sale, and that it followed that anything done by Autonomy was at the behest of and in conjunction with the VAR and not unilateral or exclusive of the VAR. But all this was theory and not reality, as I think Dr Lynch well knew.

2194.    The reality, I have concluded, is that Dr Lynch would never have expected or tolerated a VAR taking over control of negotiations commenced by Autonomy with one of Autonomy's customers, and would have operated on the (correct) understanding that none of the VARs had the slightest intention or inclination to do so (being content to receive a large MAF for saying and doing nothing).

2195.    I agree with the Claimants' contention that it would have been quite contrary to Dr Lynch's controlling nature to suppose that he expected a VAR to be involved in negotiations, which hitherto had been conducted by Autonomy alone and which in truth Autonomy expected to result in a direct deal (or no deal). That is supported by, for example, an internal email from Dr Lynch dated 7 August 2010 in the context of the USDVA end-user deal, which illustrates his

own conception of the negotiations being entirely a matter for Autonomy and of vital interest to it. He reminded all concerned that this was *"the biggest deal in the quarter"*, that *"ALL of you own this"* and the responsibility was theirs to bring the end-user transaction to a successful conclusion. He required to be told about any problem in securing an end-user deal "*IN A F\*\*\*ING MILLISECOND*" . I agree with the Claimants' point that the idea that Dr Lynch expected FileTek – a small company which had never previously acted as a VAR (whether for Autonomy software or otherwise), never spoken to the USDVA before, and knew nothing about the negotiations hitherto – to take over or participate in those negotiations is simply not credible.[283]

2196. Thirdly, the Claimants submitted that once it is concluded that Mr Hussain knew of, and indeed authorised, the giving of assurances to the VARs by Mr Egan, the natural inference is that Mr Hussain shared what he knew with Dr Lynch. Dr Lynch did not contend that Mr Hussain concealed material facts from him. I agree, and the inference is further supported by a more general consideration of the way Autonomy was controlled and directed, as I have described in the introduction.

2197. In my judgment, it is likely that Dr Lynch would have worked out for himself, if he was not the architect of the strategy, the basis on which the VARs were contracting with Autonomy, taking on apparently unconditional liabilities for millions of dollars on or around the last day of the quarter, with no insight into the end-user's requirements, and with no intention of themselves seeking any onward sale to the end-user. The balance of probabilities is, in any event, firmly in favour of Mr Hussain having told Dr Lynch of the reality that the VARs had proceeded only on the basis that they would never be left *"holding the bag"*.

2198. I consider and find that Dr Lynch was aware that it was not intended or expected that the VAR would ever be called upon to pay out of its own resources, and that instead, the understanding was that if and when no end-user sale eventuated, Autonomy would either arrange some form of funding or credit note, or failing that, simply write off the apparent debt. That is what happened: and I would expect Dr Lynch to have been aware of that, either as part of his general supervision or because it would have been reported to him by Mr Hussain or another in the cabal.

2199. I accept in that regard the Claimants' submission that it is improbable (the Claimants said *"inconceivable"*) that Autonomy released its legal entitlement to be paid millions of dollars by the VAR without first obtaining Dr Lynch's authorisation, or, at the least, being entirely confident of his approval, if not on a transaction-specific basis, then at least on the basis of Dr Lynch's approval of a general policy. In this context, the Claimants pointed to the fact that neither of the individuals whom Dr Lynch supposed were involved in the decision, namely Mr Hussain or Mr Kanter, had been called to give evidence, and nor was Mr Chamberlain (who became increasingly closely involved); they invited the court

---

[283] It is fair to point out, as the Defendants have reminded me was the case, that as at 7 August 2010 there was no VAR yet involved in this deal: and see my discussion of VT18 in the Schedule of Impugned VAR transactions. The point, however, is that made in the last sentence of paragraph [2195].

to infer that they could not have given truthful evidence to support Dr Lynch's case.

2200. The Claimants also submitted that Dr Lynch was personally involved in many of the steps taken to ensure that no VAR would be left "holding the bag", and, for example, that he:

(1)    Personally gave approval for Autonomy to make purchases from the VARs in order to put them in funds to pay down their debt to Autonomy, such as the purchase of the ATIC licence and the Federal Cloud Platform from MicroTech, the DiscoverEngine purchases from DiscoverTech and the further StorHouse purchases from FileTek; and

(2)    Knew of and authorised the further steps taken by Mr Hussain in Q3 2011 to make the VARs whole prior to HP's takeover of Autonomy by means of very considerable write-offs and credit notes to forgive or set off their indebtedness.

2201. I deal in more detail with Dr Lynch's personal involvement in the impugned VAR and reciprocal transactions which I address in the next main section of this judgment.

2202. As to (2), in cross-examination, Dr Lynch sought to distance himself from these steps by asserting that they were a frolic on the part of Mr Joel Scott[284], without authorisation from the UK team. He was adamant when cross-examined that he:

*"…was not involved at all in any programme to make VARs whole, and [he] was not involved in any of the write-down or reversal decisions…[and] in fact…didn't know about them at the time."*

2203. Dr Lynch contended that Mr Scott's contrary evidence in the US criminal proceedings, which was in evidence before me under a hearsay notice, should be given no weight. He made the point that Mr Scott had been granted immunity by the US authorities (for which he implied suitably supportive evidence for the prosecution was the price) and had not provided a witness statement or attended to be cross-examined in these proceedings. Further, he suggested that contemporaneous emails did not support Mr Scott's position that he had been directed to do what he had done by Mr Hussain, directly or through Mr Chamberlain.

2204. I have not felt able to accept Dr Lynch' argument. The documents make clear that the exercise of writing off debts was overseen from England by Mr Chamberlain, Mr Hussain's deputy, and a member of the small group or cabal

---

[284] The "whistleblower" who had been Autonomy Inc's Chief Operating Officer and *"came forward"* in May 2012.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

of managers with and through whom Dr Lynch managed and directed the Autonomy group (see paragraphs 1093 to 1094 above). Ms Harris agreed that she would have expected Mr Chamberlain to have discussed write-offs with Mr Hussain. I consider it much more likely than not that Mr Hussain was involved; and I agree with the Claimants that Dr Lynch would have been kept informed, and such large write-offs probably needed his approval.

2205. Fourthly, as to Dr Lynch's knowledge that the accounting treatment of the VAR transactions was incorrect and improper, the Claimants submitted that Dr Lynch had approved payment of MAFs on the terms of MAF letters which sought to justify the payments by reference to the purported performance by the VAR of services which Dr Lynch must have known the VAR was never intended to or never did provide. The Claimants cited as typical the MAF letter (dated 30 September 2010) for the Capax Discovery/Eli Lilly transaction, which included the following:

> *"To formalize our prior discussion, Autonomy Systems Limited ("Autonomy") and Capax LLC ("Referral Partner") agree to the terms and conditions of this letter agreement ("Agreement") as follows:*
>
> *Referral Partner will: (1) introduce Autonomy into the deals with Eli Lily ("End-User"); (2) obtain quotes from Autonomy on behalf of the End-User; and (3) work with the End-User to assist in executing purchase orders and contracts with Autonomy.*
>
> *Autonomy will: (1) pay Referral Partner commissions in the amount of US$629,000, as a result of Referral Partner's direct and proximate participation in the account; (2) deliver products directly to End-User; and (3) use reasonable efforts to provide mutually agreed upon sales assistance. ..."*

2206. The Claimants invited me to read this and other similar MAF letters as plainly designed to give the impression that it was formalising prior discussions as to what role the VAR would perform, and that, in return for the performance of that role, Autonomy would pay the commission. They described this as simply a false paper trail.

2207. Dr Lynch told me in cross-examination that he did not know whether he approved this letter; but to address the obvious difficulty that it was a characteristic of Autonomy's true relationship with the VARs in the impugned VAR transactions that they certainly were not intended to and never did have any *"direct and proximate participation in the account"*, it was contended in his written closing that this was *"standard form language and was capable of being used"* and also that the *"agreement also had forward-looking obligations including a restriction on competition from the reseller."* His closing submissions dismissed the Claimants' point as *"a forensic rather than real one."*

2208.  The Claimants also relied on the fact that the MAF letter agreements were drafted and signed by Mr Kanter, a member of Dr Lynch's inner circle. During the oral opening, the Claimants signaled that this would be a matter for Mr Kanter's cross-examination: "*We will have to ask Mr Kanter when he comes to give evidence on whose instructions he does this.*" In the event, Mr Kanter did not give evidence. The Claimants were thereby deprived of the opportunity to cross-examine Mr Kanter. The Claimants submitted that it should be inferred that Mr Kanter was not called because (i) he could give no honest explanation for the misleading way in which the MAF agreements were drafted and (ii) he would have implicated Dr Lynch.

2209.  Plainly it would have been interesting to hear any explanation from Mr Kanter. However, it seems to me likely that he would simply have reiterated Dr Lynch's explanations of the MAF letters and their content. As explained in paragraph 2147 above, I prefer to determine the issue without relying on the inferences contended for by the Claimants and simply on the basis of the balance of probabilities revealed by the evidence available to me.

2210.  I consider it plain that the MAF letters did not reflect the reality: the reality was that the VARs were not expected to do anything, and the MAFs were the reward for their co-operation and assumption of a risk which, though in my view not intended to be enforced, was nevertheless legally enforceable.

2211.  I accept and find that the MAF letters were contrived in order to give the paper impression, especially to Deloitte, that the payments were not for the VARs' co-operation in accepting legal risk and in signing confirmation letters that this legal risk was not subject to any side agreement, but for their contribution to the onward sales.

2212.  The Claimants' sixth point was in two parts: (a) that Dr Lynch worked closely with Mr Hussain, a qualified accountant, and must have understood from him that Autonomy's accounting was wrong, which is why Dr Lynch *"supported the steps taken by Autonomy's management to mislead Deloitte and the Audit Committee about the true facts";* and (b) that Dr Lynch himself had a sufficient grasp of accounting and the accounting standards to know that recognising revenue on the impugned VAR transactions was wrong. Both parts relate to and invite a determination of the question whether in the case of the impugned VAR transactions Mr Hussain and Dr Lynch did know that, on the true facts, revenue recognition was improper.

2213.  I address that question by reference to the individual impugned VAR transactions in the Schedule of Impugned VAR Transactions that accompanies this judgment. However, it is convenient to mention now four points advanced by the Claimants in support of their case as to Dr Lynch's own understanding of the accounting standards which are not fact-specific and are of general

application, and which raise an important question as to what really was Dr Lynch's subjective understanding by which of course he must be judged:

(1)    The first is that Dr Lynch accepted in cross-examination that he knew that the correct question to ask was whether Autonomy had transferred to the buyer the significant risks and rewards of ownership of the goods.

(2)    The second is that Dr Lynch accepted that, if the reseller/VAR only had to pay for the product if the end-user bought the product, the transaction did not qualify for revenue recognition, and that *"the way [he] would interpret it"* the reason was that in that scenario the reseller had not taken on the unconditional risk of having to pay for the goods it had bought.

(3)    Although Dr Lynch asserted in his oral evidence that he understood that any assurance had to be legally enforceable in order to affect revenue recognition, that assertion should be rejected. Dr Lynch accepted that Deloitte never told him that everything turned on what the written contract said. Dr Lynch also accepted that he was familiar with the concept of substance over form.

(4)    Dr Lynch accepted in cross-examination that he knew that there was *"some sort of managerial control test to do with having control of the goods"* and *"that the customer had to have control of the goods".*

2214.    In my view, it is fair to add that in giving those answers Dr Lynch had made clear that he was not an expert and could only speak to his *"limited understanding"*. It is also fair to add that in his answers Dr Lynch never stated expressly (as the Claimants stated he had) that his understanding was that *"any assurance had to be legally enforceable in order to affect revenue recognition".* It was the Claimants who (both in their questioning and in their written closing submissions) repeatedly added the word "legally" before the word "enforceable" in restating Dr Lynch's answers. Dr Lynch in his answers seemed to me to shy away from expressly asserting that only legal enforceability sufficed. He preferred to instance examples of what would not suffice to constitute an impermissible side agreement or assurance. The following answer exemplifies how he sought to explain his approach:

> *"A. ...if someone gives someone general industry patter about, you know,* "We look after our partners", *but that is not enforceable, then I don't think that's a problem.*
>
> *Q. What if it goes beyond that and it's an assurance that that will not happen, in other words you will not be left –*
>
> *A. That's my point. If it's enforceable then I would be in agreement with you, if it's not enforceable then I'm not."*

2215. It is of fundamental importance to distinguish, as sometimes to my mind the Claimants failed to distinguish, between on the one hand, Dr Lynch's own genuine but subjective understanding of the applicable accounting principles and standards and, on the other hand, an objective determination of their meaning (though the latter is also necessary). It is therefore necessary to establish what he meant on this important point.

2216. In my judgment, Dr Lynch was aware that something less than a legally enforceable agreement would ordinarily suffice. His point was that he thought that the provisions of every one of the VAR agreements expressly stating that no side agreement would be legally enforceable did effectively negate any purported side agreement or assurance. The following exchange later in his cross-examination, focusing on the difference between substance and form, seems to me to illustrate this:

> "Q.  Are you familiar with the concept of substance over form?
>
> A.  Yes.
>
> Q.  And so if the substance of the transaction reflects the fact that there is an arrangement, regardless of what form is, regardless of what the legal term says, if the substance is there is an arrangement under which the VAR is not at risk, you would have known that revenue couldn't be recognised?
> ...
> A. If obviously the whole thing was a sham, then I agree, but if it's a real situation, surely one has to look to the contract to see what it actually is.
>
> Q.  I think you're accepting you don't just look at the contract, you look at substance over form. The contract may suggest the form, but if in commercial substance there is a wider arrangement, then that's what you look at, correct?
>
> A.  Again, I feel like we – you know, I m in a room full of lawyers, you're asking me what legal terms are, and then there's a roomful of accountants. I agree with you that if you had a contract but the reality was the whole thing was cooked up and was a complete sham, then obviously. But in any practical situation, when there's a real contract and it's clear, then surely that is the commercial reality.
>
> Q.  I'm asking you for your understanding at the time?
>
> A.  I think that's my understanding at the time that I'm giving you.
>
> Q.  You say if you had a contract but the reality was the whole thing was cooked up and it was a complete sham. That's not what I'm suggesting. I'm suggesting you had a contract and a side arrangement attached to that contract which makes it clear that the VA R is not on risk, so that the substance –

> *A. Yes, but then you have to look at the legal agreement and if it says that whatever you're calling a side agreement is worthless and therefore not enforceable, then the legal term is showing that you have a real deal."*

2217. That was the nearest that Dr Lynch came to asserting that only a legally enforceable side agreement would alter the substance of the transaction in accounting terms. It is of obvious importance to the VAR case more generally to determine whether that was truly his understanding and belief (as is his case) or whether in truth he appreciated that the substance of the arrangements had to be viewed as a whole, had to be determined according to the real intentions and expectations of the parties, and that determination would, in turn, be determinative of its proper (and mandatory) accounting treatment. That is to my mind, indeed, the single most important question to be answered on this part of the case.

2218. It seems to me that Dr Lynch persuaded himself that the contractual wording gave sufficient protection for what he and Mr Hussain had decided needed to be done in order to preserve Autonomy's reputation as a company which set and met growing revenue forecasts, but did appreciate that words on the page of a contract could not change reality. He knew that a transaction had to be accounted for on the basis of its substance rather than its form, and that substance had to be measured according to the true intentions and expectations of the parties. If, as I find, he knew that the VARs were proceeding on the basis that whilst the contract would be enforceable it would never in reality be enforced, he must have appreciated, as a highly intelligent and experienced CEO, that the substance of the transaction was different from its legal form.

2219. In short, in my judgment, Dr Lynch knew that the contractual wording did not define the contracting parties' relationship but rather obscured the substantive reality that the VARs were placeholders taking on a commercially illusory legal liability in expectation (though there was no contractual provision for one)[285] of a substantial fee.

2220. The seventh and last of the points relied on as establishing the fact and extent of Dr Lynch's knowledge was again in two parts: (a) that Mr Hogenson had specifically raised concerns with Dr Lynch about Autonomy's accounting for VAR transactions, which Dr Lynch had purported to have fully investigated but in fact had succeeded in smothering; and (b) Dr Lynch contributed to and approved Autonomy's letters to the FRRP, following and prompted by the Hogenson episode, which were highly misleading, as he must have known.

2221. In relation to (a) in the preceding paragraph 2220 it is the Claimants' case [addressed further in paragraphs 2232 to 2289 below] that rather than investigate dispassionately the concerns expressed by Mr Hogenson, Dr Lynch's reaction was to push them into the long grass, and then find a reason to eject him from the company at the earliest possible opportunity. The Claimants contended that

---

[285] Further undermining any argument that the relationship between the contracting parties was exclusively defined by the contract.

this is not how an honest CEO would have reacted, and that his conduct betrayed his appreciation that Mr Hogenson's concerns, if not smothered early, would reveal the truth. I address Mr Hogenson's concerns and how they were dealt with in greater detail later.

2222. It is sufficient for present purposes to note that those concerns were, for the most part, well-founded; that the way they were dealt with was contrived to ensure their dismissal without proper investigation; that Dr Lynch was closely involved in that process; and that the "Hogenson episode" further demonstrated that the accounting treatment of the VAR deals might not survive scrutiny of what Mr Hogenson set out.

2223. Similarly, the Claimants contended that Dr Lynch approved Autonomy's response (dated 3 March 2011) to the FRRP's letter dated 2 February 2011 seeking information about a number of the VAR transactions, particularly Capax Discovery/Kraft (VT3) and Capax Discovery / Eli Lilly (VT4), and that the response was materially misleading in a number of respects. They submitted that Dr Lynch can only have sought to mislead the FRRP if he appreciated that stating the truth would have caused them concern and/or undermined the presentation and accounting treatment of the transactions under review.

2224. As to (b) in paragraph 2220 above, Dr Lynch accepted in cross-examination that he appreciated that Autonomy's response to the FRRP needed to be accurate and complete. It was apparent from Mr Kanter's email of 2 March 2011 attaching a draft that he had looked at Autonomy's draft response and was content with it in final form, as he ultimately accepted in cross-examination. It is, as I find later in this judgment, equally clear that the responses given to the FRRP were fundamentally misleading.

2225. I address in more detail the FRRP's requests and Autonomy's answers at paragraphs 2290 to 2336 below. It is sufficient for present purposes to note that a central theme of Autonomy's responses was that it was unusual (indeed *"almost unique"*) for Autonomy, having sold a licence to a VAR for ostensible on-sale to an end-user, to enter into a direct agreement with the end-user. As the Claimants contended that was highly misleading, as Dr Lynch (as well as Mr Hussain who was also involved) must have known.

2226. As at 3 March 2011, this had happened 13 times. Far from being *"almost unique"* it was an invariable characteristic of every one of the impugned VAR transactions which resulted in any end-user deal at all. Deloitte, believing there had been only isolated incidents, and in ignorance of the extent of the practice or pattern, had warned in their Q2 2010 Report to the Audit Committee that *"significant evidence of such further revenue reversals may jeopardise management's ability to recognise revenue at the point of sale to the reseller."* The Defendants knew full well that the practice was incompatible with revenue recognition.

2227. For the reasons elaborated later, I accept the Claimants' case that if Dr Lynch (and indeed Mr Hussain) had honestly believed that Autonomy's accounting treatment of the impugned VAR transactions was proper, they would have had

no reason to withhold the true facts from the FRRP, let alone actively mislead the FRRP through false statements and implications. That the Defendants were prepared to draft and approve letters to the FRRP (part of the FRC, and in effect its Regulator) in these terms reinforces the conclusion that they appreciated that Autonomy's accounting treatment of the impugned VAR transactions was improper.

### *Summary of my conclusions on the VAR case*

2228.  It may be helpful to summarise now the overall conclusions I have reached on the Claimants' VAR case. I confirm that these conclusions, though stated now to assist digestion of my analysis of the individual VAR transactions that follows in the Schedule of Impugned VAR Transactions that accompanies this judgment, have been reached after my assessment of each of the 37 impugned VAR transactions.

2229.  In summary, in my judgment:

(1)     The impugned VAR transactions follow a pattern, of which the characteristics were that (a) they were all undertaken right at the end of a quarter (b) they were all directed and/or encouraged by Mr Hussain with the objective of making good shortfalls (compared with quarterly forecasts) on the recognised revenue from other activities; (c) their value of course varied, but all were of considerable size; (d) almost all were negotiated by Mr Egan; (e) in every case, an enforceable VAR sale contract was made or treated as made before the end of the quarter so that the revenue from it could be recognised in the accounts for that quarter; (f) in every case, the reseller confirmed that there was no side agreement or understanding such as to qualify their contract; and (g) in every case the relevant software was delivered electronically on Automater; but equally, (h) in every case and however transmitted between the reseller and Mr Egan (or whoever was arranging the VAR sale on behalf of Autonomy) the shared intention and expectation of the contracting parties was that the contractual terms, though they had to be seen to be agreed and confirmed, would not ever be enforced, so that the reseller would not seek to use, or negotiate with the prospective end-user to sell, the software (unless and until so directed by Autonomy) nor would Autonomy require payment of outstanding payment obligations until the VAR could pay either out of the proceeds of an end-user sale negotiated by Autonomy or funds from a transaction arranged to generate funds for the reseller to use to pay it and that instead and in the meantime, (i) the VAR's role would be to accept a nominal legal risk (sometimes called *"holding the papers"*) but otherwise do nothing further (save if and as required by Autonomy), in return for which (j) the reseller would be paid a MAF, purportedly for its services as a reseller but in fact as a *quid pro quo* for its passive role. No reseller was to be left *"on the hook"* or *"holding the bag"* (as the understanding and intention that all should be insulated against their legal liability was variously described).

(2)    Deloitte did not see the pattern; alternatively Deloitte preferred to accept reassurances that ostensibly negated its true purpose. In any event, neither the approval of Deloitte nor that of the Audit Committee was fully and properly informed, and the fact of it does not avail the Defendants, who knew that.

(3)    The strategy which the pattern was designed to implement was to ensure that Autonomy continued to appear to be a company which met its forecasts out of the sales of IDOL and related software, and thus maintain Autonomy's market following and share price in difficult trading conditions after the financial crisis in late 2008 and early 2009. The VAR strategy became of additional importance (and increased in volume) after the supplier of hardware originally relied on by Autonomy, EMC drew back from its association with Autonomy. VAR sales, like hardware sales, were increased or decreased according to the revenue shortfall at the end of each quarter. There is a correlation between the throttling back of revenue from hardware sales and the acceleration of revenue from VAR sales in and after Q3 2009 (and most markedly in Q4 2009 and Q1 2010) which speaks to the objectives of both.

(4)    I see no reason to doubt Mr Egan's evidence that the strategy was first conceived by Mr Hussain; and it also seems clear from that evidence and other documentary evidence that it was directed by Mr Hussain and encouraged and presided over by Dr Lynch, both of whom knew that the transactions were not being accounted for according to their true substance, and both of whom knew that the recognition of revenue on the sale to the VAR was improper, and that the accounts were thus false.

(5)    Both Defendants thus had "guilty knowledge" of untrue or misleading statements in Autonomy's published information for the purpose of FSMA and are liable accordingly. The Claimants' VAR case succeeds.

2230.    That conclusion, and the strategy informing and the pattern revealing the impropriety of the impugned VAR transactions, is supported and illustrated in the Schedule of Impugned VAR Transactions that accompanies this judgment in which I address each of the 37 impugned VAR transactions in turn. (I have incorporated these in a Schedule to try to make this judgment a little more manageable. But I should stress that the findings there should be taken to have the same intended status as if in the main judgment itself.)

2231.    The variations illustrate the adaptability and incremental development of the pattern. The growing number of impugned VAR transactions which were never followed by any end-user sale at all, and where Autonomy had, in effect, to make good the money it had paid to the VAR whilst leaving the VAR with the benefit of the MAF, provided the most lurid illustrations of the use of the strategy to generate recognised revenue at very considerable ultimate cost.

**The 'Hogenson episode'**

2232. I have mentioned the *'Hogenson episode'* briefly in various places above. It follows incidentally from my conclusion on the VAR case and the individual impugned transactions (including all those which caused Mr Hogenson concern and prompted his inquiries) that Mr Hogenson's questions and concerns about the way Autonomy accounted for VAR transactions were justified.

2233. Before addressing each of the impugned VAR transactions to illustrate further the pattern identified by the Claimants and which I have accepted, I turn to consider in more detail the 'Hogenson episode'. Partly this is in deference to the detailed submissions made by the parties. Partly it is because an understanding of the way Mr Hogenson's concerns were dealt with assists an understanding of the questions raised by the regulators after the episode. And partly it is because the way Dr Lynch dealt with the concerns (which, as will appear, included the sacking of Mr Hogenson) seems to me to fortify my conclusions on the issue of Dr Lynch's knowledge.

2234. Although the Hogenson episode gave rise to no claim, it was treated by the Claimants as the most telling demonstration of the fundamental dishonesty of the Defendants and their knowing participation in the improper transactions and accounting which had led to the Claimants' losses. They concluded the separate chapter they devoted to the episode in their written closing submissions as follows:

> *"The Court should find that the explanation for the Defendants' conduct is that they knew that Mr Hogenson was on the scent of fraud and were determined to get rid of him, come what may."*

2235. An earlier passage identifies who was involved:

> *"Dr Lynch's reaction, in concert with Mr Hussain, Mr Kanter and Mr Chamberlain, was to take all steps necessary to undermine, discredit, retaliate against and ultimately eject Mr Hogenson from the company. This is compelling evidence that Dr Lynch felt threatened by Hogenson's allegations, because he knew them to be well-founded."*

2236. The Claimants also and more generally relied on the spotlight shed on them by the Hogenson episode as having provoked Autonomy suddenly to shift away from VAR transactions and the impugned 'reciprocal transactions' and to resort to other different (but so the Claimants contended, equally objectionable and surreptitious) means of enabling it to appear to generate recognised revenue and cover shortfalls in actual software sales.

2237. In particular, the Claimants pointed to a sudden decline in VAR transactions after Mr Hogenson had raised his concerns, accompanied by a sudden increase in *"pure hardware"* sales (from $11.8 million in Q1 2010 to US $31.1 million in Q2 2010), together also with an acceleration of hosting revenues through the sale of licences (which rose to $32.5m in Q2 2010).

2238. Mr Hogenson had been well regarded in Autonomy. He had been Vice-President, Finance at Interwoven Inc before its acquisition by Autonomy in 2009 and had made rapid progress in Autonomy. Although Dr Lynch said his title of 'CFO in the Americas' was overblown and that he was really an

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

operational manager, he was described by Mr Anthony Bettencourt (as he was then) (in June 2009) as *"spot on in the details, digs into the revenue and takes this all very seriously"* and by Mr Hussain as *"Definitely worth keeping, trustworthy and revenue driven".*

2239.  In Q2 2010, Mr Hogenson emailed Dr Lynch (dated 23 June 2010 but in fact sent on 22 June according to West Coast/Pacific time) stating that he had become concerned that Autonomy might have engaged in a number of VAR transactions, and at least one of what the Claimants label reciprocal transactions, which had been wrongly accounted for, leading to a material misstatement of revenue in Autonomy's published information.

2240.  The introduction to the email carefully set the context: explaining that the concerns it expressed followed on from a review of financial accounts and account reconciliations across all business units in the Americas which Mr Hogenson had instructed the newly consolidated Autonomy Americas finance team to undertake in Q2 2010.

2241.  Mr Hogenson expressed these concerns as follows:

> *"During this review I became concerned that Autonomy may have engaged in multiple material transactions with resellers of our software where the available information suggests that we may have materially misstated revenue and income within our reported financial statements in 2008, 2009 and Q1 2010. <u>The evidence that I have gathered suggests that members of your senior management team and other employees may have been engaging in seven and eight figure transactions with resellers where 1) there was no end-user and the reseller does not have the ability to make the payments under the agreement; 2) there appear to be resellers with related party relationships on revenue transactions; and 3) there appear to be barter transactions where the economic benefit on both sides of the transaction appears to be materially overstated."</u>*

> [Underlining, for emphasis, supplied by me]

2242.  Mr Hogenson went on to say that he considered this to be *"a qualifying disclosure made in good faith based upon the evidence currently available to me"* (which was no doubt important to him because that categorisation of the disclosures insulated him under California law from adverse employment repercussions). He requested:

> *"a meeting with the audit committee prior to the release of Autonomy's Q2 2010 financial statements to review these matters and ensure that material misstatements, if any, are corrected prior to releasing future financial statements".*

2243. That initial email gave no particulars or examples: it mentioned no specific deals, counterparties, dates or transactions. However, Dr Lynch might be expected to have appreciated the seriousness of a concern about potential wrongdoing by senior management, especially when expressed by a senior employee with finance management responsibilities. It was also clear that Mr Hogenson wanted a meeting with the Audit Committee.

2244. Dr Lynch accepted in cross-examination that he understood that Mr Hogenson was expressing concern about potential wrongdoing by management and (from the request to meet with the Audit Committee) that Mr Hogenson wanted to escalate those matters above Dr Lynch's head. He accepted also that this was *"a very serious allegation."*

2245. Dr Lynch's first answer to the concerns raised, however, was that, far from being a genuine whistleblower, raising concerns in good faith to ensure that Autonomy's financial statements did not include inaccuracies capable of misleading the market, Mr Hogenson's letter *"out of the blue"* was prompted by another objective: to deflect attention away from serious process problems with Autonomy's payroll systems, which had resulted in a substantial fraud, in his own department, which he feared could put his future at Autonomy in jeopardy.

2246. The Defendants based this suggestion principally on the fact, revealed by email exchanges shortly before Mr Hogenson's email to Dr Lynch late on 22 June 2010, that an issue had arisen, which should have been caught during the reconciliation process which Mr Hogenson had directed upon becoming CFO in the Americas, about certain discrepancies in relation to Autonomy's US payroll systems (which it was part of Mr Hogenson's job to oversee). The Defendants contended that what Mr Vaidyanathan described in an email to Mr Hogenson and Mr Chamberlain dated 22 June 2010 as *"more payroll stuff crawling out of the woodwork!"* (which Mr Vaidyanathan reported he was going to investigate in detail in San Francisco the next day) was the catalyst for Mr Hogenson's sudden late email to Dr Lynch.

2247. I do not accept this. By 22 June 2010, the problem was identified and needed review; but contrary to the Defendants' case no serious process problem had yet been revealed. Furthermore, Mr Hogenson's concerns as expressed in his 22 June email to Dr Lynch were of longer standing, and I was not persuaded that they were not honestly held. I am satisfied that when he raised them with Dr Lynch, he did so in good faith and not for any collateral purpose. I am satisfied also that, whether or not there had been a payroll fraud in Mr Hogenson's department (in which it was not suggested Mr Hogenson was at all involved), that was not a basis for not treating his concerns properly.

2248. I am satisfied, however, that Dr Lynch instead determined to do his best to push Mr Hogenson and his concerns into "the long grass"; and instead of seeking to facilitate access to Autonomy's Audit Committee he sought to put obstacles in the way.

2249. A considerable amount of evidence was put forward to show a very detailed sequence of events, and factual intricacies on which the Claimants made repeated submissions that Dr Lynch was lying about the substance of the matter

and lying about matters of fact in the process he adopted after receipt of the letter. There were curiosities and instances when I cannot accept Dr Lynch's account.

2250. For example, Dr Lynch said that after receipt of Mr Hogenson's initial email, he contacted Mr Kanter and subsequently tried to get in contact with Mr McMonigall, then the senior member of the Audit Committee, before finally having a phone call with Mr Hogenson himself. Dr Lynch said that, during this conversation with Mr Hogenson, "*I asked him which members of management he was referring to and he told me Mr Hussain and Mr Egan*". He had not mentioned this in his witness statements and I doubt that this is accurate. In fact, the documentary evidence suggests that Dr Lynch consistently warned Mr Hogenson against identifying specific wrongdoers. It would be inconsistent with Dr Lynch's own email dated 24 June 2010 to Mr John McMonigall, in which Dr Lynch had reported that Mr Hogenson "*refuses to name*" the wrongdoers. Dr Lynch's subsequent suggestion, to seek to explain the email, to the effect that he had relayed the two names to Mr McMonigall in advance of sending this email, and that he had refrained from stating the names in the email itself for fear of leaks, was not persuasive. It might, I suppose, have been given credence if Mr McMonigall had confirmed it; but Mr McMonigall could not attend for undisclosed medical reasons; and no witness statement was provided under hearsay notice.

2251. However, since it is not necessary or possible to delve deeper, I shall assume that either there were factual details which resolved the explanation or that this was a failure of recollection. Even in a judgment of this length, it would be disproportionate to rehearse all the details of this and other instances put forward by the Claimants; and it is not necessary, since even on the assumption that the inconsistency was apparent but not real for whatever reason, the conclusion I have reached on the substantive issue is that the Hogenson episode as a whole further demonstrates that the Defendants did know that the VAR transactions impugned in these proceedings were concocted means of revenue acceleration. I can summarise the salient events and features as follows.

2252. It is apparent that Dr Lynch forwarded Mr Hogenson's email of 22/23 June 2010 to Mr Kanter soon after its receipt, without any explanatory message (which may suggest an earlier telephonic explanation), but attaching a draft response, replete with spelling mistakes characteristic of Dr Lynch.

2253. It seems that Dr Lynch also tried to get hold of the senior member of the Audit Committee, Mr McMonigall, initially without success because Mr McMonigall was offshore sailing. Dr Lynch could not recall exactly when he had first managed to speak to Mr McMonigall; but it seems that he had done so by 24 June 2010 (and see paragraph [2269] below). Dr Lynch's evidence was that he also spoke to Mr Knights at Deloitte; and an email dated 28 June 2010[286] from Mr Knights to Mr Hogenson, Mr Knight and Mr Mercer, promising to respond to Mr Hogenson's concerns "*directly to the Audit committee…when we have finalized our review*", supported that.

---

[286] (which was not referred to in any closing submissions but which was drawn to my attention by the Defendants in commenting on an earlier draft of this judgment).

2254. At 5pm on 23 June 2010, and after some small amendments to the draft he had attached in his email of that morning to Mr Kanter (presumably reflecting their conversations after that), Dr Lynch sent an email, with the finalised draft letter attached, to Mr Hogenson, copying in Mr Kanter.

2255. The letter expressed surprise about the concerns Mr Hogenson had generally identified, and asked that *"as a first step"* more information, identifying particular transactions of concern, should be provided. Whilst confirming that *"it is clear that in any case you are acting in good faith and I appreciate your efforts"* (thus affording Mr Hogenson the "whistleblower" protection under California law that he had wanted), Dr Lynch also raised an issue as to whether the concerns might be based on a misunderstanding of differences between US GAAP and IFRS, or partial information, stating:

> *"In order to provide an accurate statement of the questions as any part of any review, it is important to quickly ascertain whether your concerns have arise [sic] due to:*
>
> a) *Misunderstanding of IFRS tests versus US GAAP tests;*
>
> b) *The fact that (as you correctly state) you have access to only half of the jigsaw puzzle and whether other pieces have already been given to the auditors and Audit Committee (which, as you state, you have not been a part of) and they have taken them into account and already made suitable decisions;*
>
> c) *An accounting policy weakness;*
>
> d) *False information being provided to Autonomy or you have information Autonomy does not have which changes its current view; or*
>
> e) *The fact that matters you raise have already been identified and considered as a failing by the Audit Committee and have been addressed."*

2256. Dr Lynch also identified particular areas which he suggested required further elaboration and evidence, and in particular Mr Hogenson's apparent concerns (as stated in Mr Hogenson's initial email) about (a) there being *"no evidence of sell-through by a reseller"*; (b) the use of VARs with *"an inability to pay"*; (c) what Mr Hogenson had called *"Related Party Transactions"*; and (d) *"Overstated barter deals."* Of course, on the conclusions I have reached, Dr Lynch knew the answers already, as did Mr Kanter and Mr Hussain.

2257. However, Dr Lynch warned against:

> *"involving Sushovan and the rest of the finance team to preserve the integrity of the review. Thus please do not discuss this matter with them."*

2258.  He also emphasised the need for speed and invited a response by close of play, stating:

> "*in order to quickly get a prima facie analysis of the situation I suggest we start with Q1 2010 as the large transactions in that quarter are fresh in the minds of those involved. Please by return can you list the deals you have concerns with along with the reasons and Andy and I as a first step will investigate what information was known and considered already but [sic] the auditors and share this with you*"...

2259.  Lastly, Dr Lynch sought to reassure Mr Hogenson that he was *"maintaining an open mind"* and that *"[i]f once we have compared the missing pieces we still have issues we will rapidly take this to the next level"*; but he also sounded a warning:

> *I would ask that until we have performed the next step that the language you use is a little more moderate as until we confirm your concerns are valid and not just an artefact of partial information I would not want to inadvertently run the risk of accusing the innocent as emails have been known to escape. I would suggest you use the usual encryption.*"

2260.  It is now clear that within minutes of sending the email attaching that letter, Dr Lynch also telephoned Mr Hogenson from his mobile telephone. Dr Lynch had not mentioned the call in his witness statements, and there was no evidence of it in the trial bundles. When he was first cross-examined about that telephone call, the Claimants questioned him with evident scepticism as to whether it had taken place at all. However, Dr Lynch's recollection of there being a recording of it in disclosure proved to be correct: a recording was found showing that the call had commenced at 17:06.

2261.  In summary, Dr Lynch:

(1)  Reiterated the point made in his letter that the concerns might reflect a misunderstanding of the important differences between US GAAP and IFRS;

(2)  Warned against the danger of making an accusation of dishonesty against anyone without very careful checking, especially under English law, to which Mr Hogenson responded that he had worded his email very carefully *"not to accuse anybody, just suggest that the evidence provides information around"*;

(3)  Suggested that the most important thing was to *"make sure that we've understood all the things and dealt with all the possibilities"*, and asked Mr Hogenson to provide a few examples *"to start with"* and to determine whether they showed any real problem;

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(4) Asked Mr Hogenson whether he was *"happy with this as an approach"* to which Mr Hogenson replied that he thought *"it's a fair approach, absolutely."*

2262. With hindsight it seems to me to be clear that in fact the approach was not intended to be "fair": it was intended to promote Dr Lynch and Mr Kanter's strategy of keeping control of the process and what the Audit Committee was told.

2263. Late in the evening on 23 June 2010, and in compliance with Dr Lynch's rather peremptory request, Mr Hogenson sent a letter responding to Dr Lynch's email earlier that day and giving more factual detail about, and examples to illustrate, his concerns in each of the areas identified by Dr Lynch. He sought to tie these examples in to the provisions of IAS 18.14. He also reiterated at the commencement of his letter his *"desire to speak directly with the Audit Committee prior to the release of the Q2 2010 financial statements."*

2264. Mr Hogenson identified the following concerns, each of which I have found to be justified in this judgment:

(1) The Capax Discovery / Eli Lilly deal ($6.3 million), on the basis that there was apparently no end-user and the reseller not having the ability to make the payments under the agreement;

(2) The MicroLink acquisition, as being between related parties without a proper valuation; and

(3) Purchases from FileTek, on the basis that they appeared to be barter transactions where the economic benefit on both sides of the transaction appeared to be materially overstated.

2265. There followed a telephone conversation in which Dr Lynch probed for more details and emphasised that *"sell through"* (that is an end-user deal) was not required under IFRS accounting (unlike US GAAP with which Dr Lynch supposed Mr Hogenson was more familiar). Dr Lynch also promised to provide more detail on the FileTek fair value point. The call concluded with Dr Lynch saying:

> *"Alright, well look, I really appreciate the effort. I hope you've found this useful. We'll send you the document now if you need any more let us know. And, you know, I think once you've done the work you know, I'm very happy to set up a meeting with you, for the audit committee and let me know what you want to do. Obviously, if you've only got one barter and one related party given that those are very easy because we can look up the audit committee notes to see whether the tests were done we can knock those ones out very quickly. Alright, and Brent, I know this a lot of work and I really appreciate the work you've put in."*[287]

---

[287] The transcript repeatedly includes the word "umm" in the above passage. This has been deleted in the quotation because it hinders the plain meaning of what was said.

2266. A sourer note was struck by Mr Kanter when emailing Mr Hogenson after that telephone call under the subject heading *"Follow up"* and attaching documents going over the matters discussed: in explaining the attachments, he added this:

> *"One thought that did occur to me. We know of a couple of rather dishonest characters who are fronting hedge funds, and by coincidence a couple of phrases you used were reminiscent of them. Please can I ask that if you are getting outside IFRS advice please be very mindful of the need for discretion and please be careful who you consult with. We are happy to arrange any independent training courses you may wish to take on IFRS.*
>
> *Please note that all of this information, especially the board minute and audit pack extracts, are highly confidential and must not be shown to a third party without our written permission, but I hope you will find them useful.*
>
> *I look forward to speaking again soon. Please call me any time with any questions…"*

2267. The call was followed by a joint letter to Mr Hogenson from Dr Lynch and Mr Kanter, sent as an attachment to an email dated 24 June 2010, setting out again Autonomy's position on VAR transactions. The letter, signed by *"Mike and Andy",* described Mr Hogenson's original email in its second paragraph as having *"made some potentially serious accusations against members of the senior management team"* and in one of its closing paragraphs as containing *"some very strong accusations against members of the management team".* It gave the impression, however, that nevertheless his concerns would be dealt with in a measured and detailed way, with a view (it stated) to enable him to understand more fully matters *"to which you have not been privy, regarding revenue recognition and audit decisions."* The basic message was that (a) it was understandable that Mr Hogenson might have *"jumped to some of the concerns you have expressed"* but (b) there was so far no new evidence or insight to undermine or change the decisions made by the auditors and the Audit Committee at the time. The letter added:

> *"Obviously whilst I hope you agree that these particular points, although we may learn good policy lessons from them, once all the information is available do not seem to fit with the original accusations. I am course open to continue investigating any other issues you may have as an open, ongoing process. Consequently as we have now been through this exercise on Q 1 and you can now see the effect of the missing information I think it would be fruitful for you to look at 2008. If you could please classify any issues under your concern headings (bulleted below), I will be happy to continue with this exercise in collaboration with you."*

2268. The letter concluded stating that if Mr Hogenson should find wrongdoing by members of the management team this should be referred to the Audit

Committee; but warned that *"as under such circumstances it would be required for you to name those at fault"* it would be *"negligent for us to have not considered all the information rather than just half of it before presenting it, especially under UK law."* Its last paragraph plainly emphasised the real message which was that Mr Hogenson should assemble and share whatever information he had, not with the Audit Committee but with Mr Kanter:

> *"Lastly, we have contacted the senior member of the audit committee who has suggested that we continue the process of merging each others information to see what we find. He has asked to be keep updated on progress, which will be done by Andy, as part of the standard process."*

2269. On the evening of 24 June at 8.46pm, Dr Lynch emailed Mr McMonigall with what he described as a *"quick update on the current status"*. As previously explained, it seems to me that Dr Lynch had already had a brief discussion with Mr McMonigall, having tracked him to Nice; but this was the first occasion on which Dr Lynch went into any detail.

2270. The Claimants emphasised various questionable features of what Dr Lynch told Mr McMonigall in that email[288], a draft of which Dr Lynch accepted in cross examination he had "*run past*" Mr Kanter (to whom the email was also copied), and in particular:

   (1)   The description of Mr Hogenson as *"a US financial employee of Interwoven…who had access to the US PO books but is lacking the other rev rec information"*: which undoubtedly minimised his status and although not inaccurate did not reflect fairly that he was CFO of Autonomy in the Americas as well as President of Interwoven, and the highest ranking finance person in Autonomy based in the US (Autonomy's largest market by far);

   (2)   The assertion that Mr Hogenson was refusing to name the senior members of Autonomy's management team he thought might be responsible for accounting impropriety: which was inconsistent with (a) Dr Lynch's oft-repeated assertion that Mr Hogenson had named Mr Hussain and Mr Egan, (b) Dr Lynch's recollection of having told Mr McMonigall their identities also, and (c) Dr Lynch's strict admonition to Mr Hogenson not to name them formally or in writing unless and until his concerns were fully researched, and furthermore, was calculated to give the impression that Mr Hogenson had not the conviction to name names;

   (3)   The conclusory tone and substance of the report, including the dismissive and patronising conclusion *"At this stage nothing seems amiss and the guy is learning a lot but somewhat confused"*; which may have reflected Dr Lynch's own assessment but was also calculated to

---

[288] Which started with a pun *"hope Nice is nice"*.

trivialise the issues raised and condition Mr McMonigall's mind on his first learning of the nature of the concerns.

(4)  The final assessment that *"He appears to be somewhat backing off his original statement but we shall see…"*: which the Defendants breezily dismissed as *"a fair comment in light of the conversation which Mr Kanter and Dr Lynch had had earlier that day with Mr Hogenson"* but which was far from a complete and accurate depiction of the way the matter was left with Mr Hogenson (and was certainly not borne out by immediately subsequent events).

2271.  On 25 June 2010 at 9.43am, Mr Hogenson responded to Dr Lynch's and Mr Kanter's letter of the previous day. The letter said that he was "*confused by a few of your statements in the return mail*" and that this was probably due to the fact that they were "*not both accountants speaking with a history of dealing with phrases such as Fixed and Determinable*". The letter continued:

> "*As the CFO of Americas, with responsibility for a large portion of the consolidated financial statements as Americas makes up approximately 70% of total revenue, it may make sense that I have a direct conversation with Richard Knights our D&T Audit Partner*"

2272.  Dr Lynch forwarded that letter to Mr Kanter and in the early hours they worked on a response, which went through at least two drafts, the first of which was exchanged at 01.34am on 26 June, with further exchanges of minor details early in the morning before 9am. Dr Lynch sent the final response to Mr Hogenson at 08.39am on Saturday 26 June 2010, copying in Mr Kanter.

2273.  The response stated that Dr Lynch had contacted the senior member of the Audit Committee running the process and that the mandate from him was clear:

> "*He wants you and I to work together to look at these specific examples that have given you concern and add the half of the information that you are missing. We then need to understand from you whether (on the basis of this full information) you are still concerned, and whether these concerns support your original statement about certain individuals, and once we have done this to then look at the overall materiality of these potential issues of concern over the periods you cite. I must stress the issue at hand is to investigate your original statement. I am also interested where you believe you have more information than was given to the company's auditors at the time of them considering these transactions*".

2274.  The letter continued, "*To provide the senior director the information he needs there are a series of actions*". Dr Lynch then set out a series of action points including:

> "*1: Please can you send any evidence you have of information that the auditors should have seen during the periods covered by their*

> *past audit operations that they did not see, i.e. matters arising pre-April 20, 2010.*

> *2: Please can you provide this direct language from the master IFRS definition that requires the examination of the end-user contract between the reseller and its customer.*

> *3: From what I understand, Interwoven, which you have managed the finances of for years, has always done a lot of its business through resellers, for example via the ishop purchasing process. In these cases I believe that no end-user contract is viewed or obtained from these resellers yet the revenue is recognised. Can you help me to understand why is this case a different one to the above?*

> *4: Please send the other examples you said you have from 2008."*

2275. The letter concluded:

> *"Brent, I really appreciate your effort in this process, and although we must remain focused on your original assertion, as a separate process the two of us seem to be learning useful things that we should keep note of for future improvements in policy. I think it is important that whilst there may be many options open to the senior member of the audit committee for different things to do, at this stage I obviously must follow the mandate and our official policy for dealing with these matters. I look forward to continuing this discussion".*

2276. Although the letter referred to Dr Lynch having *"touched base with the senior member of the Audit Committee",* and the request for information is couched in terms of being what that person has specified to be required, there is no evidence of any conversation between Dr Lynch and Mr McMonigall between 24 June and 26 June 2020. It may be that they had a conversation after Mr McMonigall's receipt of Dr Lynch's 24 June email; or it may be that the reference was simply to the first conversation where Mr McMonigall asked Dr Lynch to gather information.

2277. Either way, I consider it more likely than not that the reality of the matter was that Dr Lynch (with Mr Kanter) were in truth operating with little, and most probably no, specific directions from Mr McMonigall, and the presentation to Mr Hogenson of the requests for information being driven by the senior member of the Audit Committee was not correct. It may be that this impression might have been corrected if Mr McMonigall had given evidence, but he was not called. The Claimants invited me to infer that Mr McMonigall could not have given truthful evidence to support Dr Lynch; I need not go further than to note that the impression I formed was in the circumstances not corrected.

2278. Whether Mr Hogenson sensed any of this, or had other motivations, is a matter to which I return later. In any event, Mr Hogenson did not respond to Dr Lynch's letter, which was the last substantive communication between them on the accounting issues.  In the evening of 26 June 2010 (at 19.36 BST) Mr Hogenson sent an email to Deloitte headed *"IMPORTANT AUDIT RELATED QUESTIONS"* detailing his concerns to Deloitte and also noting that he had identified questions to Dr Lynch and had further conversations with him and Mr Kanter over the past week beginning 22 June 2010, but that despite his requests he had not been able to have any direct contact with the Audit Committee.

2279. Mr Hogenson's decision to write directly to Deloitte  put paid to any idea that he was becoming persuaded of Dr Lynch's explanations and preparing to back down. Dr Lynch's response was not satisfactory.

2280. Again, much detailed evidence was submitted by both sides which it would be disproportionate to recite at length. Suffice it to say, that having carefully considered it, I am satisfied on a balance of probabilities that the objective of Dr Lynch and Mr Kanter after Mr Hogenson had sent his email to Deloitte (which obviously brought an end to the efforts to kick his concerns into the long grass) became (a) to ensure that they were the persons in contact with Deloitte and that the Audit Committee were largely kept out of the loop; (b) to present to Deloitte the attitude of the Audit Committee (which had in reality not been involved substantively at all) as being that whilst of course an investigation would be needed, it should be confined to what was necessary to answer Mr Hogenson's questions from an accountancy point of view, (c) to keep Deloitte well clear of any investigation of the other aspects of Mr Hogenson's concerns, which in a nutshell were that the transactions might involve conscious impropriety on the part of some of those involved in the VAR sales in the USA (such as Mr Egan) and (d) thereby to procure that any investigation became an exercise for Deloitte of double-checking their previous auditing approach, and duly repeating it.

2281. Thus, for example, Dr Lynch continued to be the person dealing with Deloitte on the part of Autonomy, and continued to relay the message that the Audit Committee considered the issue to be a dry issue of accounting; in the evening of 27 June 2010, Dr Lynch wrote to Mr Knights, copying Mr Kanter and Mr McMonigall:

> *"I spoke to John [McMonigall] who is sailing.*
>
> *Due to his difficulty in communication he asked me to pass the following request to you. I understand when possible he will be intouch [sic] directly.*
>
> *He would like D&T to consider the questions sent by Brent and rapidly revert back to him. He would only like to focus on material matters."*

2282. The Defendants were assisted in this by the fact that Mr Hogenson did not include in his correspondence with Deloitte the references he had initially made to concerns about potential wrongdoing, and he framed his email in terms of

questions rather than concerns: his correspondence was in terms that plainly reflected the warnings Dr Lynch had issued. In the event, Deloitte treated the letter as raising issues of accountancy judgement; they did not treat it as raising issues of potential wrongdoing, and did not regard Mr Hogenson as a "whistleblower" in that sense.

2283. Deloitte's own perception of its role and approach was summarised in the Deloitte Defence in the FRC proceedings (which was endorsed by Mr Welham in his evidence):

> *"307. The audit team (reasonably) did not regard Mr Hogenson's questions to be "whistleblowing" properly so-called (that is, implicitly confidential allegations as to management wrongdoing or fraud made by an anonymous whistleblower) or as raising any allegation of wrongdoing on the part of the audit team. On that basis Mr Hogenson's questions did not require an independent corporate investigation as might be required into a fraud and there was no need for ethical walls to be erected between the investigating team and the 2009 audit team.*
>
> *308. It is averred that Mr Hogenson's questions (which were addressed to Mr Knights and Mr Knight) could quite properly have been investigated by them alone as no allegation was made of wrongdoing on the part of the audit team.*
>
> *309. That said, it was apparent that Mr Hogenson had raised potentially important questions as to, for instance, Autonomy's approach to revenue recognition and he had done so outside the usual internal Autonomy channels. Given that the audit team had accepted those judgements, there was an obvious benefit in involving personnel in the investigation who were not a party to those audit judgements. It was therefore decided in consultation with Deloitte's Head of Audit Risk, Simon Letts, that the judgements on the conclusions of the investigation would be made by senior members of the firm who had not been involved in the relevant audits. These were the new audit engagement partner, IRP and PSR director.*
>
> *310. In consequence the Deloitte team which investigated Mr Hogenson's questions was different from the historical audit team. The historical audit team (that is, the team which conducted the 2009 year-end audit) comprised Mr Knights (engagement partner), Mr Henderson (EQAR), Mr Robertson (IRP) and Ms Bennett (PSR). Other team members included Mr Welham (Senior Manager), Ms Anderson (Manager) and Mr Murray (Assistant Manager).*
>
> *311. The Deloitte team which investigated Mr Hogenson's questions comprised Mr Mercer (engagement partner) who led the investigation, Mr Brough (IRP), Mr Robertson (EQAR) and Mr Lumb (PSR director). Other team members who investigated or assisted included Mr Knights, Mr Knight (Director), Mr Welham (Senior Manager), Mr Milburn-Smith (Senior Manager), Ms Anderson (Manager) and Mr Murray (Assistant Manager)."*

2284. I discuss later the Regulator's subsequent concerns in this regard. It is clear, however, that Dr Lynch and Mr Kanter had succeeded to a large extent in their objectives.

2285. Two important disputed factual matters also deserve brief mention. Once more I shall not recite the factual detail of the extended dispute but I am satisfied that (a) as Mr Welham stated in his witness statement, Deloitte were not provided at the time with Mr Hogenson's initial emails to Dr Lynch mentioning potential management wrongdoing and (b) nor was Mr McMonigall or the Audit Committee: or if they were, no one appears to have focused on them (see below).[289]

2286. As regards the latter point, the email which Dr Lynch had earlier sent to the Audit Committee (cc Mr Kanter) forwarding Mr Hogenson's email to Deloitte, which also was belittling of Mr Hogenson's standing and dismissive of his concerns, seems to me to confirm that the Audit Committee had been told next to nothing and had either not been shown or had not focused on Mr Hogenson's initial email:

> *"John*
> *FYI*
> *There is some background on this which we can discuss when you ring. The guy (US finance person from Interwoven) has played no role in the audit process and is missing a lot of the information he would need to understand all this. He seems to confuse USGAAP and IFRS.*
>
> *Our current analysis: We just received this but a quick read's conclusions:*
> *Sushovan has seen the questions and believes there are no issues here. A few of the facts are just wrong or have perfectly good commercial explanations which were considered already by the AC, his understanding of IFRS differs from Deloitte's (we believe Deloitte is correct) and all of the things he asks if Deloitte (and in most cases the audit committee) have considered and seen were indeed considered. We do not believe there is any new information here relating to any of the past auditing decisions".*

2287. I acknowledge that, subsequently, Mr McMonigall stated in an email dated 8 July 2010 to Mr Hogenson (in fact Mr McMonigall's first direct contact with him) that he had *"seen all of your correspondence on this matter, going back to the first email to Dr Lynch, Autonomy's CEO."* Naturally the Defendants much emphasised this. But Mr McMonigall was in reality detached from the process.

---

[289] It appears from an email dated 22 July 2010 from Mr Kanter to Mr Webb QC's PA (Ms Sandra Daley), which had not been referred to at trial but to which the Defendants referred me as part of their comments on an earlier draft of this judgment, that what was described as the *"Brent correspondence.piz"* was sent to Ms Daley at the request of Mr Webb in two *"zipped files of all correspondence"* apparently attached to the email. The attached zipped files were not in evidence and it is unclear what they comprised. Mr Kanter might have been able to tell me: but he declined to appear and his witness statement was withdrawn. Mr Webb's evidence in his witness statement was that he *"did not deal substantively with the issues raised by Mr Hogenson nor the response to these issues by the Audit Committee and auditors."*

The email was drafted for him by Mr Kanter and sent out without apparent review.

2288. The subsequent review by Deloitte, the issues arising as to its independence and the inquiries on the part of the FRRP/FRC that followed are separate matters which I need not discuss here. Apart from mentioning that the result of all this from the point of view of Mr Hogenson was that he was sacked, purportedly by reference to the payroll fraud and *"other irregularities",* made a settlement to forestall claims against Autonomy for alleged breach of statutory whistle-blower protections, and in exchange for $750,000 provided an affidavit calculated to give the impression that he had recanted and ensured that the matter could not be aired publicly, I need go no further.

2289. The point in summary is that, in my judgment, the 'Hogenson Episode' provides further support for the conclusion I have reached that both Defendants knew that the VAR sales were illusory and improper, and were determined to avoid investigation that would reveal this.

### The FSA and FRRP correspondence

2290. I have been fortified further in my conclusions by the lack of candour, and in some instances dishonesty, of the way the VAR sales were presented to the FSA and the FRRP (to which I shall refer as "the FRRP", since only the FRRP had jurisdiction)  in response to their letters seeking clarification of their nature and purpose after Mr Hogenson and others (including Mr Tejada) had raised serious concerns about their impropriety (and see paragraphs 2232 to 2289 above as to the *"Hogenson episode"*).

2291. I have concluded that these responses were misleading in circumstances where candour and truth would have exposed the impropriety of their accounting treatment.

2292. Although my focus in this section is intended to be on the falsity of what the FRRP were told, and whether the Defendants had knowledge of such falsity, it is necessary first to explain the genesis and content of the exchanges in question.

*Mr Hogenson s concerns about Autonomy s accounting treatment of VAR sales*

2293. On 26 July 2010 Mr Hogenson had emailed the FSA to alert them to various questions and concerns he had raised with Autonomy about certain of its  VAR sales and, in particular, their accounting treatment and what he thought might be associated  barter sales". Mr Hogenson had presented his purpose as being:

>  to provide assistance in ensuring that the Autonomy financial statements provided to investors are materially correct and are not misleading current or potential investors."

2294. Mr Hogenson had justified his direct approach to the FSA on the basis of the *nature and lack of response"* to his questions when raised with the Audit Committee and with Mr Kanter (as its COO)  and the appearance to him that his

> *questions were closed by Autonomy without a serious review or even discussion with me."[290]*

2295.  Mr Hogenson had copied his email to Mr Robert Webb QC, who had become Autonomy's (non-Executive) Chairman in mid-2009. Receipt of the email appears to have prompted Autonomy to *reach out"* to the FSA by letter dated 30 July 2010 *in the interests of open communication"* (as Mr Kanter explained it in an email to the Audit Committee[291] dated 2 August 2010)[292]. The Claimants took a different view of its purpose: in effect (though the words are mine), being to spike Mr Hogenson's guns and introduce doubt as to his reliability.

2296.  Autonomy's 30 July 2010 letter, which was signed by Mr Kanter on behalf of Autonomy (and given its nature, and the unlikelihood that Mr Kanter would have signed such a letter without their approval, must in my judgment be taken to have been approved by both Defendants) was presented as providing *background which may assist you in the matter"* and included the following passages:

> *In summary, Mr Hogenson raised a series of questions to Autonomy's governance bodies. The questions were thoroughly and independently investigated, and the matter concluded. It appears to us that Mr Hogenson is not accepting the conclusions on these matters, and is thus asking the same questions despite the answers being independently confirmed.*

> <u>Investigation</u>

> *Mr Hogenson served as Autonomy's CFO of the Americas for the last year or so. In late June Mr Hogenson raised unspecified accounting questions. The Autonomy directors took the questions raised by Mr Hogenson extremely seriously, and significant time and cost was expended to reach a satisfactory conclusion that the accounts are accurate. The matter was passed to Autonomy's Audit Committee and independent auditors for their review. In working with him via Autonomy's Audit Committee, the deal issues were defined and he was provided group-level information he would not have had access to in a regional role. Mr Hogenson was given the opportunity to deliver any additional information but declined.*

> *Autonomy's independent auditors Deloitte, after an investigation of the points using an independent Deloitte team, reported to the Audit Committee there was no new information in Mr*

---

[290] This email was the first time that Mr Hogenson had taken his concerns outside the four walls of the company and its advisers.

[291] Then comprised of Messrs McMonigall, Perle and Ariko (of whom none was an accountant). Mr Bloomer had not yet become its chairman.

[292] That email also explained that the FSA only regulated financial services firms and so this was a matter outside the FSA's jurisdiction, but that *"in the interests of open communication we will proactively work with them should this be of interest".*

> *Hogenson's queries, and there are no areas that require change or would have been material in relation to prior periods. Because there was no new information provided by Mr Hogenson, ultimately the questions involved different levels of understanding of IFRS by Deloitte and Mr Hogenson (Mr Hogenson is experienced in US GAAP, not IFRS).*
>
> *...*
> <u>*Conclusions*</u>
>
> *In short, a full and proper procedure has been followed to investigate Mr Hogenson's concerns, which involved an independent investigation by a team separate to our normal audit team at Deloitte. The investigation found no issues relating to the points raised and confirmed that Mr Hogenson provided Deloitte with no new information they did not already have in making their original decisions. Despite the questions being thoroughly independently reviewed Mr Hogenson continues to seek to keep the matter alive."*

2297.  The 30 July 2010 letter also contained a section entitled *Other Issues"*. This, with elaborate but contrived moderation and obvious intent, made reference to a *payroll fraud"* and other *unauthorised third party payments"* which *coincidentally, at virtually the same time…began to be uncovered in Mr Hogenson s department."* It left hanging whether Mr Hogenson was implicated personally (which he was not, though a question was raised whether he should have spotted earlier shortcomings in controls which enabled the unauthorized payments to be made).[293] It did not mention that Mr Hogenson had already been dismissed, purportedly for gross misconduct. A little later, on 2 August 2010, Mr Kanter sent the Audit Committee an update, asserting that an independent investigation had confirmed over half a million dollars of unauthorised payments by Mr Hogenson *"and other irregularities"*, as a result of which Mr Hogenson had been "*let go*".

2298.  After some equivocation, and only after being shown email exchanges confirming it, Dr Lynch had to accept in cross-examination that he had received and commented upon drafts of the 30 July 2010 letter.

2299.  Although its involvement in the process of investigation of Mr Hogenson's questions and concerns was an important element, Deloitte was not shown the letter before it was sent. According to Mr Welham, they did not see it until many months later.[294]

2300.  It was the Claimants' case that this omission was inexplicable, except on the basis that    Mr Kanter and those who approved the letter knew that the

---

[293] Mr Welham's evidence in his witness statement was *The impression conveyed to us by Autonomy s management was that Mr Hogenson had raised the accounting question in order to distract attention from his own responsibility for the payroll fraud."*

[294] By email dated 14 February 2011, Mr Welham asked Mr Hussain, Mr Chamberlain and Mr Kanter, "*Can we see the letter from 30 July 2010*". On 16 February 2011, Mr Welham emailed Mr Kanter again asking for "*a copy of the letter sent to the FSA in July 2010*".

presentation of the Deloitte investigation as having been by *"an independent Deloitte team"* and that it was an "*independent investigation by a team separate to our normal audit team at Deloitte*" were deliberately misleading. The Claimants contended that if Deloitte had been asked to approve the letter, Deloitte would have pointed out that it was untrue to say that, given the central involvement of Mr Knights, along with Mr Knight and Mr Welham. Their concern in that regard and generally would have also considerably been increased had they seen the letter dated 24 June 2010 from Dr Lynch and Mr Kanter to Mr Hogenson which I have referred to above and of which, according to Mr Welham's evidence neither he nor his Deloitte colleagues were aware.

2301. That is, of course, relevant to (a) the honesty of all those involved in the letter and (b) the integrity of the process to investigate Mr Hogenson's concerns. In the present context, however, and as previously explained, my focus is on the specific misrepresentations made to the regulators after receipt of this letter and Mr Hogenson's email with reference to the VAR sales.

2302. To revert, therefore, to the correspondence with the Regulator, the matter was not pursued by the FSA, given the jurisdictional issue which Mr Kanter had identified, but it was referred to the FRRP[295].

2303. On 2 February 2011, the FRRP sent a letter ("the February 2011 FRRP letter") addressed to Mr Webb, and copied to Mr Hussain, asking for a further explanation of the issues raised in order to help it determine whether to open a formal enquiry. In the February 2011 FRRP letter, the FRRP posed (amongst others) the following questions regarding the Capax Discovery/Kraft transaction:

> *"Kraft*
>
> *9. It has been alleged to the Panel that, in the quarter ended 30 September 2009, Capax gave an order to Autonomy worth some $4m in respect of the supply of licences to Kraft, an end-user, which was recorded in the revenue of one of the company's US subsidiaries for that quarter. Subsequently, in December 2009, Kraft executed a licence agreement directly with Autonomy for a similar amount. It is understood that, in December 2009, the group relieved Capax of its obligations under the order given to the company and itself paid Capax a fee of some $400,000. The Panel would be grateful for the company's comments on the truth or otherwise of this account.*
>
> *10. To the extent that the above sequence of events has been confirmed by the company, the Panel would then be grateful for information enabling it to understand why the company appears to have contracted with both Capax and Kraft for the same licences.*

---

[295] The Financial Reporting Review Panel had responsibility for oversight of public and large private company accounts and directors' reports, and periodic reports by issuers of listed securities.

> *11. The Panel would also like to know when the revenues concerned were recorded in the group's consolidated accounts. If the revenues were recorded in the consolidated accounts for the quarter ended 30 September 2009, the Panel would then like to know how the group determined that it was in a position to recognise revenue relating to the sale of licences to Kraft in that quarter if the agreement concerned was not executed until December 2009.*
>
> *12. Finally, the Panel would be grateful for information enabling it to understand why the group paid Capax a fee in respect of these transactions."*

2304.   Autonomy's response dated 3 March 2011 ("the 3 March 2011 letter") stated the following:

> *"In an almost unique series of events, Kraft sought to enter into a different agreement directly with Autonomy in a subsequent quarter. The latter agreement provided for direct payment to Autonomy, so even though the VAR was already paying Autonomy for its order the original transaction was cancelled ...*
>
> *... For the original order Capax would earn a normal software resale margin of approximately 30% under the terms of its VAR agreement, and in fact could have blocked the cancellation of the binding original order. Given Capax's involvement in the original transaction, Capax was entitled under written agreements to a Marketing Assistance Fee of approximately 10%. Capax earned less from this revised arrangement than the original transaction."*

2305.   These statements to the FRRP in the 3 March 2011 letter were materially misleading in a number of respects:

(1)   Far from being "*almost unique*", by the time of this letter in March 2011, the pattern of Autonomy contracting directly with the end-user was well-established and highly recurrent. As stated in paragraph 2226 above, by 3 March 2011, this had happened 13 times. [296] The falsity of the representation was especially arresting given that at the time of the June letter to the FRRP, Autonomy had just entered into another sizeable direct deal (further to the Tikit/KPMG transaction, VT26).

(2)   The attempt to justify the $400,000 payment on the theory that Capax Discovery could have blocked a direct sale by Autonomy to Kraft was false also. In fact, Capax Discovery was a complete stranger so far as Kraft was concerned. It had provided no "*marketing assistance*," and it had no contractual or other right to block the direct sale.

---

[296]In Microlink/Ameriprise (VT1), Capax Discovery/TXU (VT2), Capax Discovery/Kraft (VT3), Capax Discovery/Eli Lilly (VT4), MicroTech/ManuLife (VT7), MicroTech/Morgan Stanley (VT8), Capax Discovery/FSA (VT10), DiscoverTech/Citi (VT11), DiscoverTech/PMI (VT12), Capax Discovery/Amgen (VT16), Capax Discovery/Merrill Lynch (VT21), DiscoverTech /BofA (VT23) and DiscoverTech/BofA (VT24).

(3)     Moreover, Capax Discovery had not missed out on any "*resale margin*". Capax Discovery never even tried to sell anything to Kraft. Capax Discovery's VAR agreement did not provide for a "*normal software resale margin of approximately 30%*".

(4)     In any event, this transaction could never have involved any actual resale margin. Capax Discovery "*bought*" its licence for the same price that Autonomy was trying to sell a licence to Kraft.

(5)     There was no written agreement, at the time of the Capax Discovery purchase order, which entitled Capax Discovery to a Marketing Assistance Fee of "*approximately 10%*" or to any fee.

2306.   The falsity of this answer was later compounded in a further letter from Autonomy dated 8 June 2011 to the FRRP responding to a request from the FRRP (in a letter dated 5 April 2011) for clarification as to what was meant by "*an almost unique series of events*" in the explanation they had been given as to why the Kraft transaction had culminated in a direct deal between Autonomy and Kraft. Autonomy gave the following explanation:

> "*This is a series of events that virtually never happens; in fact management struggles to recall any prior time that this happened, but hesitates out of prudence to give an absolute answer one way or the other. Thus the events were described as "almost unique ..."*

2307.   This response was even more misleading as at 8 June 2011, the Tikit/KPMG transaction had also been followed by a direct end-user deal (VT26). Autonomy had also, in the meantime, entered into three further VAR transactions (Capax Discovery/UBS (VT28), MicroTech/Bank of Montreal (VT32) and MicroTech/Xerox (VT33)) which would in due course end up being followed by direct deals between Autonomy and the end-user in a subsequent quarter.

2308.   Dr Lynch tried to justify the statement in Autonomy's 8 June letter by suggesting that the words "*any prior time*" in the second line of the paragraph may have meant "*before Kraft*" rather than "*before the date of the letter*". As the Claimants observed, if that really was the basis on which Autonomy gave this answer to the FRRP, it was pure sophistry.

2309.   Dr Lynch's alternative explanation was an assertion that there were "*10,000 reseller deals*" and the transactions at hand were "*still a very rare event out of 10,000*". No evidential support beyond this somewhat airy statement was ever provided. I would accept that there was a considerable number of VAR deals: but that must include many of trivial value. Further, Dr Lynch's submission in his written closing that the *Kraft situation, described as almost unique, was a rare one*" was simply wrong: it was not the exception but the rule.

2310.   In any event, I do not accept the explanation offered. It was, to my mind, obviously misleading to present as *almost unique*" a sequence of events

characteristic of so many of the deals of the same value and type as those to which the request for clarification related, and which taken together made up at least 88% by value of all VAR transactions above $1 million entered into by Autonomy during the Relevant Period.

2311. Similarly, and also to my mind confirmatory of my approach, the easy and correct answer to another question from the FRRP about whether there were other contracts as at 30 December 2009 in respect of which revenue had been recognised on a VAR transaction, where the VAR had yet to conclude a transaction with an end-user, was not given. There were seven such contracts. But Autonomy's response did not say this. Instead, Autonomy's answer was an exercise in obfuscation and gave a false impression:

> "All agreements between Autonomy and its resellers represent binding contracts whereby the reseller's obligation to pay Autonomy is independent of whether or not the reseller gets paid by its customers. Moreover the software sold to the VAR is only licensed for a named end-user and thus can not be used for stock. Ultimately provided the reseller is creditworthy and all other revenue recognition criteria are met (e.g delivery, fixed price, etc.) then revenue is recognised upon receipt of the binding contract.

> We do not require the reseller to provide us with confirmation that they have contracted with their end-users, as is normal in the software industry for standard product; rather resellers are required to identify the end-user for licensing purposes. It would be impractical in reality for us to confirm each contract with the final end-user. Under this approach Microsoft, for example, would have to visit offices to prove Word was sold-through by its OEMs and resellers. As end-users require ongoing support and maintenance it is not possible for a reseller to supply licensed software to another party without that transaction becoming known. Thus, whilst we may not have the details of when arrangements are signed between a reseller and their customer, the process works smoothly. This is the normal practice in the software industry for standard product."

The implication of this response was that the VAR would attempt to contract with the end-user but that, for reasons of practicality, Autonomy did not seek confirmation of this fact. This was highly misleading: Autonomy did not intend that the VAR should make any attempt to contract with the end-user.

2312. To add to this litany is Autonomy's response to a further enquiry by the FRRP about the Kraft deal, the enquiry being the following:

> "The Panel would also be grateful for confirmation or otherwise as to whether the "binding original order" between Capax and Kraft referred to in your letter had been signed by the two parties as at 30 September 2009."

2313. It seems from this that the FRRP had assumed that Kraft had placed a binding order with Capax Discovery but later decided to contract directly with

Autonomy instead. Autonomy management, including the Defendants, knew that this was a misapprehension and that Kraft had never placed any order, or had any prior dealings, with Capax Discovery.

2314.  Autonomy nevertheless responded to the FRRP's query as follows :

> *"The binding original order between Capax and Autonomy was signed by both parties as at 30 September 2009. For the reasons set out above we would not necessarily be aware of when Capax and Kraft signed their agreement."*

2315.  This failed to correct the FRRP's misapprehension. On the contrary, it strongly implied that Autonomy management believed that Capax Discovery and Kraft had indeed "*signed their agreement*", but that the date of that agreement was not known to Autonomy. In reality, Autonomy management knew that no such agreement would ever have existed.

2316.  Furthermore, in its letter of 5 April 2011, the FRRP had also raised the following:

> *"On page 19 of the Deloitte report, the management response refers to management's consideration of the ability of Capax to stand by its obligation to Autonomy, irrespective of its ability to onward sell the Autonomy product supplied. The Panel would be grateful for information enabling it to understand what factors the company took into account in its consideration of the ability of Capax to stand by the obligation concerned. The Panel would also be grateful for copies of any financial information available to the company at that time concerning Capax. A recent set of accounts would be particularly helpful if available."*

2317.  In its 8 June letter, Autonomy responded to that as follows:

> *"Autonomy started to do business with Capax in early 2009. At that time we obtained financial statements from Capax (Attachment 1). These financial statements showed the company at that time to be profitable and able to support the payment stream required by purchase for Eli Lilly, part of the company's revenue recognition criteria.*
>
> *Capax have had an excellent payment record since that date. As a result there has not been a need to obtain more recent financial statements since their history of cash collection has shown no concerns regarding recoverability. These judgements were considered by our auditors at that time."*

2318.  The financial statements at Attachment 1 to Autonomy's 8 June 2011 letter were those of Capax Global. Autonomy's letter referred throughout to "*Capax*". It did not explain that Capax Global was not, in fact, the relevant contracting party. Nor did Autonomy tell the FRRP of Mr Baiocco's letter disclaiming Capax Global's responsibility for Capax Discovery's debts.

2319. The assertions in Autonomy's letter about Capax's *"excellent payment record"* were also misleading. The FRRP was not told that this payment record was the result of monies channelled by Autonomy to Capax Discovery for non-existent services.

*Defendants' knowledge but alleged reliance on Deloitte*

2320. Mr Hussain signed both the 3 March 2011 letter and the 8 June 2011 letter. But Mr Casey said nothing at all about the FRRP letters or Autonomy's responses in his written closing submissions on Mr Hussain's behalf, nor in his oral submissions on Day 92 of the trial. On this issue as to the misrepresentations in the letters to the FRRP there was a tension or conflict between Dr Lynch and Mr Hussain. Mr Hussain was also of course operating within the finance department, which Dr Lynch portrayed as having had carriage of the correspondence.

2321. Dr Lynch maintained that he himself had no material involvement in the drafting process. According to Dr Lynch, the drafting was done by Autonomy's finance department and Mr Kanter working with Deloitte. When cross-examined in relation to the March 2011 letter:

> *Q. You were involved in the drafting of this; that's obviously what's going –*
>
> *A. I wasn't involved in the drafting of it. Mr Kanter and Deloitte were involved in the drafting of it and then I look at it when it's finished and I say "Looks fine"."*

2322. There was a similar dispute as to whether Dr Lynch approved the June 2011 letter. He initially denied having done so, although this was not really plausible: there were emails from Mr Kanter sending earlier drafts and referring to *Mike…having a look",* and on 25 May 2011, Mr Kanter had sent Dr Lynch a further draft and asked him to "*Ring me when you have a moment*". It seemed to me unlikely that having engaged him in the process, and apparently awaited his replies on each occasion, Mr Kanter would have gone ahead without Dr Lynch's approval.

2323. Dr Lynch eventually refined his position a little, and told me in cross-examination that he did not know if he had seen the final version, but did not think he had; and if he had, he had not checked or verified it, citing pressures on his time, the necessity to delegate and the reasonableness of relying on the finance department and Deloitte:

> *"…if we just come back to reality here…I m running a company, I m doing all the things that have to be done. This is a matter for the legal, accounting and Deloitte departments to deal with. If I saw the letter, I may well have read it, but I would certainly let them get on with answering it and that s what happened and legal, finance and Deloitte all worked together in a large amount of back and forth and came up with what they think is the correct answer."*

2324. Ultimately, the main plank of his defence was to the effect that Deloitte had done it. This was the point emphasised in the closing submissions on his behalf. The point was made that Deloitte had undoubtedly been closely involved and had had many chances to comment on the drafting and made points both on the structure and style as well as on points of detail.

2325. Thus, for instance, in relation to the 3 March 2011 letter, Mr Welham had emailed Mr Kanter on 17 February 2011, saying:

> *From talking through your draft response with our internal specialist in this area, our overall thinking is that you should transform the letter somewhat from its current state, to a format which is much shorter and concentrates on the specific facts required by the letter from the FRRP.*
>
> *...*
> *We suggest that you keep your responses concise and concentrate on answering the questions asked and do not give additional information or include emotive language. Where it is appropriate, you should simply cross refer to the Appendix to our Audit Committee report, which helpfully includes detailed management responses from you, to avoid repeating information included in this report. This will assist in making your response to the FRRP shorter."*

2326. The letter then went through various internal reviews at Deloitte with further comments provided before it was finalised. Deloitte were content with the final version, a copy of which was sent to them. Mr Welham confirmed that Deloitte did not consider that there was anything misleading in the letter.

2327. A similar process appears from exchanges of drafts by email to have been undertaken by the relevant departments at Autonomy and by Deloitte for the June 2011 letter. Indeed it appears that Mr Welham referred both the FRRP's letter and Autonomy's proposed response to Ms Isobel Sharp, one of the Deloitte review team described by Mr Welham as *our internal specialist in this area"*, who also (according to the email from Mr Welham requesting her input) had assisted on the previous response as well.[297]

2328. The Claimants presented a short three-part answer to this line of defence: Deloitte did not know about Mr Baiocco's letter, Deloitte did not know that Autonomy was paying for non-existent services and Deloitte did not know that Capax Discovery had had no dealings with Kraft.

2329. As to the last of the three points, there was considerable dispute as to what Mr Welham and/or Deloitte did actually know. Dr Lynch emphasised that Deloitte reviewed the Kraft transaction, and were well aware of its context and that (a) Capax Discovery was only introduced because the end-user deal could not

---

[297] There were two cautionary notes in Ms Sharp's response: (a) *"not all of the Panel's questions have been answered"* and (b) *"there are a few dangerous points"*; and she added *"We need to close down the enquiry now before it gets more serious"*. But she was not a witness; and the parties did not make anything of these.

formally be completed in Q3 2009 (b) Autonomy undertook the negotiations with the end-user (Kraft) before and after the VAR agreement with Capax Discovery and (c) ultimately, Kraft (as end-user) insisted on contracting directly with and paying Autonomy (with Autonomy thereafter crediting Capax Discovery to avoid double recovery, and paying a MAF).

2330. Dr Lynch's closing submissions also sought to draw support from a summary of the position in Deloitte's Defence in the FRC proceedings, which Mr Welham confirmed was accurate, which read as follows:

> "...it is admitted that Deloitte and Mr Knights were aware (a) that Capax s principal role was to allow Autonomy to complete a sale and for revenue to be recognised in the quarter in which the Kraft deal was negotiated because it could not be formally completed with Kraft in that quarter, and (b) that Autonomy were negotiating directly with Kraft."

2331. In his cross-examination of Mr Welham on this point, Mr Miles sought to elicit from Mr Welham confirmation that the relevant issue in determining revenue recognition was not whether Autonomy, having sold the software to the VAR, was or was not negotiating with the end-user notwithstanding the VAR sale, nor even whether or not the seller (here, Autonomy) was the principal or even only person negotiating with the end-user after the sale to the VAR; it was whether the seller/Autonomy was under an effective obligation (which did not have to be a legally enforceable obligation) to negotiate with the end-user. Only in the latter case (of the seller being under some form of obligation), Mr Miles suggested (and eventually submitted to me), did the fact of it negotiating impact on revenue recognition, because only then would the fact of the seller negotiating suggest that it/they retained control or risk in the goods. He submitted that the explanation accords with Deloitte's report to the Audit Committee on the 2010 interim review :

> We note that management has responded to the concerns raised in Q1 2010 where for the first time we noted instances where deals had been credited and re-sold directly to end-users. If Autonomy is _required_ to maintain ongoing managerial duties in respect of reseller deals or if the reseller cannot demonstrate its ability to pay for goods received then it would not be appropriate to recognise revenue on delivery of the product." [My emphasis, reflective of the Defendants]

2332. Mr Welham would not be drawn that far. He agreed that if there was such a requirement or an obligation on the seller then that would be a clear and different case; in other cases, where the seller as a matter of its own choice, was simply _assisting the sales process and the close process"_ the decision was more nuanced, and would be a matter of judgement as to the extent of the  _assisting"._ However, he also made clear that if what the seller did went beyond assistance, and its involvement was  _extensive"_ or (_a fortiori_) exclusive that would be _problematic."_ Indeed, my understanding of his evidence was that had Deloitte known that Autonomy had  _more than an assisting role"_ and been in reality  _the primary business closing the deal"_ it would not have approved revenue

recognition. Another way of putting this, as it seems to me, is whether Autonomy had *de facto* control of the negotiations. In every one of the impugned VAR transactions, it did.

2333.   Accordingly, although perhaps a little glibly stated, the third part of the Claimants' rebuttal of the Defendants' reliance on Deloitte's approval was also, in my judgment, sustained. As I have already determined previously that the first two parts of the rebuttal were proven, in my judgment Dr Lynch's reliance on Deloitte, which (apart from his plea that he was not involved, which I confirm I have rejected) was his only resort in seeking to neutralise the fact that Autonomy's letters to the FRRP were fundamentally misleading, could not be sustained because Deloitte themselves had been misled.

2334.   The admission in Deloitte's Defence in the FRC proceedings, which Mr Welham had confirmed was accurate and on which Dr Lynch had relied, does not assist the Defendants either on that analysis (if ever it could have been much help anyway). The admission that *Autonomy were negotiating directly with Kraft"* does not touch on the point whether Capax Discovery were involved with them, or (put another way to reflect Mr Welham's evidence) whether Autonomy was in an *assisting role"* or by itself and in exclusive control.

*Summary in respect of the letters to the FRRP*

2335.   In summary, in my judgment, Autonomy's letters to the FRRP did contain fundamental misrepresentations for which the Defendants were responsible. They are not absolved by the involvement of Deloitte, since Deloitte did not know the full facts and had indeed also been misled. The misrepresentations were intentional: they were necessary to prevent the VAR strategy being exposed and revenue recognition being disapproved. The position is the more telling in light of the fact that Deloitte, knowing only half the story, had expressly warned in its Audit Committee Reports for Q1 2010 and Q2 2010 that (as its warning was refined in the Q2 2010 Report):

> In Q1 2020...two deals sold to MicroTech in Q4 2009 were credited and resold directly to the two end-users. In our Q1 2020 report we highlighted that significant evidence of such further revenue reversals may jeopardise management s ability to recognise revenue at the point of sale to the reseller. Only one deal has been signed with the reseller MicroTech during Q2 2010 for $270k and the overall level of software deals done this quarter through resellers is significantly reduced.

> During Q2 2010, a $6m licence deal originally with the reseller Capax Global from Q4 2009 was signed directly with the end-user, Eli Lilly and a Q1 2010 $4.2 million deal with Discover Technologies LLC was signed directly with the end-user Philip Morris....

> We note that management has responded to the concerns raised in Q1 2010 where for the first time we noted instances where deals had been credited and re-sold directly to end-users. If Autonomy is required to maintain ongoing managerial duties in respect of reseller deals or if the reseller cannot demonstrate its ability to pay for goods received then it would not be appropriate to recognise revenue on delivery of the

> *product. Management acknowledges this position and further highlights that there have been no significant software sales to resellers in Q2 2010…"*

2336.  Of course, these matters do not give rise to a claim; but, with the Hogenson episode, they have confirmed me in my assessment of the impugned VAR transactions and the "guilty knowledge" of the Defendants, as summarised in paragraph 2229 above.

# PART B

| PART B CONTENTS | |
|---|---|
| *Headings* | *Paragraphs* |
| **RECIPROCAL  TRANSACTIONS** | |
| Summary of the Claimants' claims re 'reciprocal' transactions | 2337-2344 |
| Summary of the Defendants' case re 'reciprocal' transactions | 2345-2348 |
| Defendants' knowledge and participation | 2349-2351 |
| The Schedule 5 and Schedule 12B transactions | 2352-2353 |
| General points on accounting issues | 2354 |
| The accounting framework | 2355-2363 |
| The parties' approaches to the nature of the linkage required and its identification | 2364-2398 |
| Factual evidence as to real rationale: Claimants' case | 2399-2408 |
| Factual evidence as to the real rationale: Defendants' case | 2409-2421 |
| My assessment of the witness evidence on 'reciprocals' in general terms | 2422-2428 |
| The Expert Evidence relating to the impugned reciprocal transactions | 2429-2443A |
| RT 1: Capax Discovery/EDD (Sch 5/1 and Sch 12B) | 2444-2458 |
| The first Capax Discovery/EDD sale in Q1 2009 | 2459-2467 |
| The Claimants' evidence of a handshake deal and the Defendants' criticisms of it | 2468-2488 |
| Evidence of an agreement after the London Hotel meeting but before 31 March? | 2489-2502 |
| Further defences if there was a pre-contract understanding | 2503-2506 |
| Autonomy's purchase orders and payments to Capax Discovery Q2 2009 to Q4 2009 | 2507-2514 |
| No documentary support for purported outsourcing of eDiscovery services | 2515-2523 |
| Deloitte's consideration of the first Capax Discovery/EDD sale | 2524-2530 |
| Conclusion on first Capax Discovery/EDD sale | 2531 |
| The second Capax Discovery/EDD sale (Q4 2009) | 2532-2544 |
| Deloitte's consideration of the second Capax Discovery/EDD sale | 2545-2549 |
| Conclusion on second Capax Discovery/EDD sale | 2550 |
| The third Capax Discovery/EDD sale (Q1 2011) | 2551-2564 |
| Deloitte's consideration of the third Capax Discovery/EDD sale | 2565-2571 |
| Did the Defendants have guilty knowledge of false accounting in respect of RT 1? | 2572 |
| Mr Hussain's knowledge | 2573-2574 |
| Dr Lynch's knowledge | 2575-2588 |
| RT 2: the VMS transactions | 2589-2594 |
| The first VMS transaction (Q2 2009) | 2595 |
| Background | 2596-2602 |

| Negotiations for sale and purchase | 2603-2615 |

| | |
|---|---|
| VMS and Autonomy reach agreement in principle (29 June 2009) | 2616-2621 |
| Justification of the transactions | 2622-2627 |
| "Project Shockwave" business plan | 2628-2632 |
| The revenue recognition memorandum | 2633-2650 |
| Deloitte's consideration of the first VMS transaction | 2651-2661 |
| Autonomy's use of the VMS data feed Q3 2009 to Q3 2010 | 2662-2670 |
| Conclusion on first VMS transaction | 2671-2672 |
| The accounting treatment of the VMS reciprocal transactions | 2673-2674 |
| Defendants' knowledge | 2675-2679 |
| The second VMS transaction - Q4 2010 (RT 2) | 2680-2714 |
| Deloitte's consideration of the second VMS transaction | 2715-2721 |
| Payments made in respect of the second VMS transaction and VMS's bankruptcy | 2722-2729 |
| Conclusions on second VMS transaction | 2730-2731 |
| Knowledge of the Defendants | |
| Mr Hussain's knowledge | 2732 |
| Dr Lynch's knowledge | 2733-2734 |
| RT 3: purchases of StorHouse from FileTek (Q4 2009/Q2 2010) | 2735-2738 |
| FileTek's business | 2739-2749 |
| Genesis of the proposal for the allegedly reciprocal transactions | 2750-2762 |
| Negotiation of the price to be paid for StorHouse | 2763-2790 |
| Had Autonomy (coincidentally) any identified need for StorHouse? | 2791-2805 |
| Price Autonomy agreed to pay FileTek for purchase of StorHouse | 2806-2815 |
| Price FileTek agreed to pay Autonomy for Autonomy software | 2816-2819 |
| Autonomy's technical analyses of StorHouse | 2820-2825 |
| Execution of the two agreements | 2826-2829 |
| How the first StorHouse purchase was presented to Deloitte | 2830-2840 |
| Mutual payments in respect of the first FileTek transaction | 2841-2844 |
| Defendants' knowledge | 2845 |
| The second of the FileTek transactions comprised in RT 3: Q1 to Q2 2010 | 2846-2860 |
| My conclusion in relation to the second set of RT 3 transactions | 2861-2862 |
| Deloitte's approval was given on a false basis | 2863-2869 |
| The FRRP were also misled | 2870-2872 |
| Defendants' knowledge | 2873 |
| Mr Hussain | 2874-2875 |
| Dr Lynch | 2876 |
| Overall conclusion in respect of RT 3 | 2877 |
| RT 4: Vidient Systems Inc (Q4 2009/Q3 2010) | 2878-2884 |
| The first Vidient transaction Q4 2009/Q1 2010 | 2885-2903 |

| | |
|---|---|
| Separation of the OEM agreements by quarter | 2904-2913 |
| Deloitte's consideration of the first Vidient transaction | 2914-2920 |
| Conclusions on first Vidient transaction | 2921-2923 |
| The second Vidient transaction – Q3 2010/Q4 2010 | 2924-2926 |
| Accounting treatment of the Vidient transactions | 2927-2928 |
| The Defendants' knowledge of improper accounting of the Vidient transactions | 2929-2935 |
| RT 5: EMC Corporation - Q3 2010 | 2936-2939 |
| My assessment | 2940-2944 |
| The Defendants' knowledge of improper accounting of the EMC reciprocal transaction | |
| Mr Hussain's knowledge | 2945-2948 |
| Dr Lynch's knowledge | 2949-2952 |
| Purchase and sale transactions with MicroTech comprising RT 6 in Q1 2011 | 2953-2966 |
| Defendants' knowledge | 2967 |
| Mr Hussain | 2968-2969 |
| Dr Lynch | 2970-2972A |
| Overall Conclusion on Reciprocal transactions | 2972B |
| **IDOL OEM** | |
| Summary of the Claimants' claims in relation to OEM | 2973-2986 |
| Summary of the Defendants' defence in relation to OEM | 2987-3001 |
| The Claimants' various causes of action in respect of OEM business | |
| Summary of FSMA claim in relation to statements made about the OEM business | 3002-3005 |
| Summary of the Claimants' misrepresentation claims in relation to OEM | 3006-3008 |
| Two points of clarification with respect to the ambit of the dispute in respect of OEM claim | 3009-3029 |
| FSMA claim in more detail | 3030 |
| The legal ingredients of the FSMA Claim in relation to OEM | 3031 |
| The statements on which the Claimants claim to have been entitled to rely in this context | 3032-3035 |
| Determining whether a statement is (a) untrue or misleading and (b) known to be so | 3036-3051 |
| What was stated in Autonomy's published information about the OEM metric? | 3052-3058 |
| The Defendants' response on the scope of IDOL OEM conveyed by the published information | 3059-3081 |
| My assessment of what was conveyed by the published information itself | 3082-3090 |
| Should regard be had to evidence that various Analysts considered the market understood OEM Metric to be broad in scope? | 3091-3097 |
| Analyst/other evidence and market understanding | 3098-3100 |
| Mr Khan | 3101-3110 |
| Mr Morland | 3111-3114 |
| Mr Pearson | 3115-3121 |
| Mr Shelley | 3122-3127 |

| | |
|---|---|
| Assessment of that evidence and comparison with analysts notes relied on by the Claimants | 3128-3137 |
| (e) Was the published information false and misleading? | 3138-3145 |
| The Defendants' response | 3146-3153 |
| Did the Defendants know of the inclusion within the OEM metric of revenue outside what investors were likely to understand to be within its scope? | 3154-3165 |
| Deloitte and OEM revenues | 3166 |
| Nature and extent of Deloitte's involvement | 3167-3178 |
| What reliance can the Defendants place on Deloitte in this context? | 3179-3188 |
| A further issue as to upfront prepaid licensing deals or "buy-outs" | 3189-3194 |
| The Lone Pine episode | 3195-3207 |
| Allegation of concealment of transactions in published information | 3208-3219 |
| Alleged pre-announcement concealment: Top 10 List | 3220-3235 |
| The "Joe Bloggs" correspondence and post-announcement concealment | 3235A-3235C |
| The issue of reasonable reliance: did Bidco acquire Autonomy in reasonable reliance on the information given about Autonomy's OEM business in the published information? | 3236-3247 |
| Misrepresentation Claims relating to OEM business | 3248-3252 |
| Conclusion on OEM | 3253 |
| **HOSTING** | |
| General overview of the Claimants' hosting case | 3254-3258 |
| Autonomy's hosting business and the introduction of the Hybrid Model in more detail | 3259-3267 |
| PART A: FSMA Claims | 3268-3275 |
| (1)Brief description of Digital Safe | 3276-3289 |
| (2)Brief description of Autonomy's e-Discovery offering | 3290-3292 |
| (3)A detailed analysis of the Digital Safe claim | 3293-3301 |
| Outline of the dispute as to the purpose and effect of the restructurings | 3302-3314 |
| Applicable accounting principles | 3315-3323 |
| The differences between the experts in their approach to applying these Standards | 3324-3355 |
| The practicalities of (a) installation and (b) monitoring | 3356-3357 |
| The manner in which hybrid deals were sold | 3358-3363 |
| Defendants' reliance on Deloitte and Audit Committee | 3364-3380 |
| The Defendants' knowledge in relation to Digital Safe | 3381-3388 |
| Conclusion as to accountancy treatment of hybrid hosting licence as separable | 3389-3395 |
| IAS 18.14 (a) and (b) | 3396-3399 |
| (4)A detailed analysis of the e-Discovery claim | 3400-3409 |
| Accounting principles | 3410-3422 |
| Did the EDD licences have or lack substance? | 3423-3429 |
| My assessment and conclusion | 3430-3448 |

| | |
|---|---|
| (5) Defendants' knowledge | 3449 |
| Mr Hussain's knowledge of true purpose of the licences and accounting impropriety | 3450-3455 |
| Dr Lynch's knowledge of Autonomy's improper accounting | 3456-3475 |
| (6) IDOL Cloud metric | 3476-3481 |
| PART B : THE SCHEDULE 12D TRANSACTIONS | |
| The nature of the claims and how they differ from the Schedule 6 claims | 3482-3485 |
| Overview of the Schedule 12D transaction and claims | 3486-3493 |
| Problems of standing and loss outlined | 3494-3499 |
| The Defences in outline | 3500-3507 |
| Structure of this Chapter | 3508-3511 |
| Did Dr Lynch owe any duties to ASL? | 3512-3526 |
| The extent of Dr Lynch's duties acting as a de facto or shadow director of ASL | 3527-3542 |
| The individual Schedule 12D Transactions | |
| General observations on the factual circumstances of the Schedule 12D Transactions | 3543-3547 |
| The Q4 2009 Morgan Stanley Schedule 12D transaction | 3548-3562 |
| The dispute whether the inclusion of SPE was a contrivance | 3563-3577 |
| My assessment of the commerciality of the transaction and Deloitte's apparent approval | 3578-3595 |
| The second Morgan Stanley Schedule 12D transaction: Q1 2011 | |
| Outline of the Claimants' case | 3596-3603 |
| Instigation of the transaction | 3604-3631 |
| Were Deloitte misled? | 3632-3634 |
| Conclusions | 3635 |
| Deutsche Bank Q1 2011 re-restructuring | 3636-3646 |
| The Second DB Amendment Agreement: the restructuring negotiations | 3647-3651 |
| Claimants' case | 3652-3659 |
| Defendants' answers to Claimants' case | 3660-3669 |
| My assessment | 3670-3683 |
| The Claimants' allegations that Deloitte and the Audit Committee were misled | 3684-3687 |
| Metropolitan Life | 3688-3702 |
| Claimants' case | 3703-3715 |
| Relevance of Deloitte's review and approval? | 3716-3719 |
| Defendants' knowledge of impropriety | 3720-3721 |
| Overall conclusion | 3722-3723 |
| **OTHER TRANSACTIONS** | 3724-3739 |
| Tottenham Hotspur: the two sets of transactions | |
| First set: Q2 2010 | 3740-3744 |

| | |
|---|---|
| The second transaction | 3745-3754 |
| Were Deloitte misled? | 3755-3758 |
| My assessment whether Tottenham 2010 Sale should have been accounted for as a 'solution' | 3759-3761 |
| The second Tottenham Hotspur transaction | 3762-3762A |
| Prisa (Q4 2010) | 3763-3768 |
| Appropriate accounting treatment | 3769-3776 |
| Were Deloitte misled? | 3777-3778 |
| My assessment whether the Prisa Sale should have been accounted for as a 'solution' | 3779-3785 |
| Amgen (Q4 2010) | 3786-3794 |
| How Hosting Addendum (a) was and (b) should have been accounted for on pleaded case | 3795-3798 |
| Were Deloitte misled? | 3799-3802 |
| My assessment | 3803-3805 |
| Iron Mountain (Q2 2011) | 3806-3815 |
| My assessment | 3816-3818 |
| Overall conclusion on the "Other Transactions" | 3819-3820 |
| **DECEIT AND MISREPRESENTATION CLAIMS** | |
| The pre-acquisition misrepresentations alleged | 3821-3824 |
| Summary of the representations and the claims made in respect of them | 3825-3830 |
| The January and February Slides | 3831-3841 |
| Substance of representations in the January and February Slides and their alleged falsity | 3842-3845 |
| Did HP rely on the January and February Slides? What effect had the Disclaimer? | 3846-3851 |
| Summary of my assessment re the alleged falsity January and February Slides | 3852-3855 |
| The March Slides | 3856-3862 |
| Representations in the March Slides | 3863-3864 |
| Summary of my assessment re alleged falsity of the March Slides | 3865 |
| The Defendants' involvement in and responsibility for the representations in the March Slides | 3866-3867 |
| Did the Claimants rely on the March Slides? | 3868-3872 |
| 29 June 2011 meeting: the fourth set of alleged misrepresentations | 3873-3889 |
| 29 July 2011 meeting and its background: the fifth set of alleged misrepresentations | 3890-3920 |
| Alleged misrepresentations in the course of due diligence 1 August 2011 to 18 August 2011 | |
| Overview | 3921-3923 |
| 1 August 2011 due diligence call: the sixth set of alleged misrepresentations | 3924-3937 |
| 2 August 2011 due diligence call | 3938-3955 |
| 4 August 2011 due diligence call | 3956-3966 |
| Dr Lynch's involvement in the due diligence process | 3967-3978 |

| | |
|---|---|
| Whether HP relied on the Defendants' misrepresentations | 3979-3986 |
| My overall assessment of the due diligence process and its relevance | 3987-3988 |
| The Non-Disclosure Agreement | 3989-3992 |
| Conclusion on the claims in deceit and misrepresentation | 3993 |
| **RELIANCE AND LOSS REVISITED** | |
| Ambit of this Chapter | 3994-3998 |
| Summary of Claimants' case on reasonable reliance | 3999-4002 |
| Summary of the Defendants' contrary case | 4003-4005 |
| The issues requiring analysis | 4006 |
| (1)What were the principal factors and metrics by reference to which HP/Bidco pitched its bid price and eventually concluded the Acquisition? | 4007 |
| Mr Apotheker | 4008-4019 |
| Mr Robison | 4020-4021 |
| Mr Sarin | 4022-4027 |
| Mr Johnson | 4028-4032 |
| (2)The Deal Model and its bases | 4033-4036 |
| (3)How ultimately did HP's Board make its decision? | 4037-4043 |
| (4)What is the relevance of HP/Bidco's reliance on other sources of information and advice? | 4044-4048 |
| (5)Was HP/Bidco actually aware of any matters falsifying the published information? | 4049-4050 |
| Conclusion on reliance (FSMA Claims) | 4051-4055 |
| Introduction to issues of quantum | 4056-4065 |
| Issues relating to the Deceit/Misrepresentation Claims | 4066-4076 |
| **DIRECT LOSSES** | 4077-4087 |
| Hardware | 4088-4092 |
| MAF Payments to VARs | 4093-4098 |
| Reciprocal Transactions | 4099-4105 |
| **COUNTERCLAIM** | 4106-4115 |
| **CONCLUSION** | 4116-4135 |
| **POSTSCRIPT** | 4136 |
| The position of Mr Chamberlain | 4137-4152 |
| Differences between the Summary of Conclusions and this judgment | 4153-4155 |

## RECIPROCAL TRANSACTIONS

### Summary of the Claimants' claims re 'reciprocal' transactions

2337. The Claimants alleged that another way in which Autonomy created the appearance of increased revenue in its published information was through a number of what they labelled variously as *"Reciprocals", "barter", "quid pro quo", "round-trip" or "circular"* deals.

2338. The Claimants advanced two types of challenge:

(1) The first type of challenge concerned purchase transactions listed in RRAPoC Schedule 5 ("Schedule 5 transactions") which were said to be purchases of products which (a) Autonomy allegedly did not "need", (b) were of "no discernible value", and (c) were "linked" to sale transactions in an accounting sense.

(2) The second type of challenge concerned purchase transactions which were not said to be "reciprocal" with sale transactions, but which were alleged to have put VARs in funds so to enable them to repay their debts on earlier sales identified at RRAPoC Schedule 3. These purchases were also said to have been of products which Autonomy did not "need" and which were of no value to Autonomy. The Claimants relied on these types of transactions detailed in Schedule 3 of the RRAPoC as evidence that the VAR was not on risk in respect of earlier sales giving rise to the debts (the revenue for which sales the Claimants have stripped out for the purpose of their FSMA and misrepresentation claims).

2339. I have already addressed, in the section of this judgment dealing with the impugned VAR transactions, purchase transactions which are said to have put those counterparties in funds to enable them to repay their debts under VAR purchase orders. I shall return later to these 'type 2 reciprocals'. For the present, my focus is on the first type, the Schedule 5 transactions.

2340. The Claimants challenged the Schedule 5 transactions as typically involving:

(1) Autonomy <u>selling</u> a software licence and/or hardware to the relevant counterparty and, at the same time, or shortly thereafter, Autonomy <u>purchasing</u> products or services from that counterparty the sale and the purchase having been negotiated at the same time and concluded in circumstances where (allegedly) the sale would not have happened, either at all, or on the terms it did, but for the purchase; and then

(2) Autonomy preparing and implementing separate contractual documentation for the sale and purchase, and presenting and accounting for the sale and the purchase as if they were independent, arm's length transactions;

(3) Autonomy recognising revenue from the <u>sale</u> immediately, and capitalising and amortising the costs of the <u>purchase</u> over the purported useful life of the product or service in question, thereby deferring the related costs.

2341. The Claimants further alleged that, to ensure that this accounting treatment passed muster with Deloitte, Autonomy devised a false commercial rationale to explain Autonomy's purchase of the counterparty's product or service. The Claimants alleged that, with one exception (a purchase of hardware, software and services ("RT 5") from EMC Corporation ("EMC") which was impugned only on the basis that the purchase was in excess of fair value), the only real purpose of Autonomy's purchase from the counterparty was to incentivise the counterparty's reciprocal purchase of a software licence or hardware from Autonomy from which Autonomy could recognise revenue and, in most cases, to provide the counterparty with the necessary funds for the counterparty's purchase.

2342. The Claimants' case was that this is apparent from, amongst many other things: (i) the absence of evidence that Autonomy's decision to purchase the product or service was made on the basis of a genuine commercial rationale, as opposed to a desire to generate revenue from a reciprocal sale, (ii) the evidence that Autonomy would <u>not</u> have made the purchase had the counterparty not entered into the sale, and (iii) the evidence that the counterparty would not and, in many cases, could not, have purchased the software licence and/or hardware from Autonomy on the terms it did but for Autonomy's purchase.

2343. The Claimants' punchline was that in the case of Schedule 5 transactions Autonomy should not have recognised any revenue from its sale to the counterparty, and should have accounted for the sale and the purchase on a net basis, recording the net amount that Autonomy paid to the counterparty as an expense. The Claimants contended that the total adjustments required in respect of improper recognition of revenue from the reciprocal transactions in the Relevant Period total some $65.2 million. The Claimants' main claim in respect of the Schedule 5 transactions is brought under FSMA and/or for misrepresentation to recover loss in respect of the resulting falsity of statements made in Autonomy's published information.

2344. In addition, with the exception of the EMC transaction (RT 5) and the MicroTech transaction ("RT 6") at Schedule 5/5 and 5/6 respectively, these transactions are also said to have resulted in transactional losses claimed by the relevant Autonomy counterparty (ASL and Zantaz) against each of Mr Hussain and Dr Lynch on the basis of an alleged breach of duty. The Schedule 5 transactions in respect of which transactional losses are claimed were set out in RRAPoC Schedule 12B ("Schedule 12B"). In each case, the Claimants quantified their loss as the excess of the total cash paid by Autonomy group companies for the purchase side of the transaction over the total cash received by Autonomy group companies from the sale side.

**Summary of the Defendants' case re 'reciprocal' transactions**

2345. The Defendants rejected this characterisation of the Schedule 5 transactions. They submitted that the Claimants' case in relation to the Schedule 5 'reciprocal' transactions was without any foundation: the sets of transactions identified in Schedule 5 were all accounted for properly, and since each transaction was independent, had its own commercial rationale, and was to be regarded and accounted for separately, it was wrong to lump it in with another or other transactions to conjure a 'loss'. The Defendants preferred to refer to the transactions in question as *"purchases from customers"*.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

2346. The Defendants emphasised, in particular, that in all the impugned transactions the "reciprocal" transactions concerned sales of dissimilar goods (which, as will be seen is important in the context of IAS 18.12). They submitted that the existence of a commercial rationale for various purchases was confirmed extensively by the Claimants' own witnesses.

2347. More generally, (though the Claimants dismissed these points as *"straw men"*) the Defendants stressed that (a) there is nothing wrong with purchasing something from a customer, (b) there is nothing improper *per se* about linked transactions, (c) there is no requirement to show that Autonomy 'needed' the products or services, and (d) there is no basis for substituting Autonomy's stated rationale for the purchases with another rationale after the event.

2348. The Defendants also noted that for many of the impugned purchase transactions, the Claimants did not even challenge the fair value assessment during the trial. In any event, fair value was assessed at the time, often with objective third party evidence, and Deloitte, who were well aware of the factual connections between the transactions, were satisfied and concluded that revenue on Autonomy's sales transactions should be recognised gross.

**Defendants' knowledge and participation**

2349. As to the issue of the Defendants' knowledge of improper accounting, the Claimants' case was that:

(1) Mr Hussain's knowledge was *"beyond argument"*: he was

*"front and centre of the reciprocal transactions. He often came up with the idea for the transactions and he was either directly involved in their negotiation or he oversaw and directed their negotiation by others within Autonomy."*

(2) Dr Lynch was aware of each of the relevant sales by Autonomy and he approved most of Autonomy's related purchases. Even where there is no documentary record of him approving a purchase he must, at the very least, have been aware of it: it is inconceivable that Mr Hussain, who knew of both transactions, would only have told Dr Lynch about the Autonomy sale and not the related multi-million-dollar Autonomy purchase.

2350. In his closing submissions, Mr Hussain attacked the evidence of Mr Egan and Mr Baiocco to the effect that he had planned and directed the sales and purchases with Capax Discovery ("RT 1"), on which the Claimants based their claims, as contrived, co-ordinated and untrue. He contended, as to both this and the other impugned transactions, that there was no reliable evidence suggesting that he conceived the arrangements to be in any way improper. Mr Hussain otherwise adopted the submissions on behalf of Dr Lynch.

2351. Dr Lynch maintained that each of the impugned transactions appeared to him to have a commercial rationale and to be at fair value. He did not think that any of them was improper. His closing submissions noted that for many of the transactions the Claimants did not even challenge him as to his understanding at the time in relation to one or both of the commercial rationale and fair value issues.

**The Schedule 5 and Schedule 12B transactions**

2352.  The impugned 'reciprocals' which were not connected with VAR transactions (see paragraph 2338 above) were described in Schedule 5 of the RRAPoC in groups referred to as "RT 1" through "RT 6". In the Claimants' written closing submissions, the groups were addressed according to the counterparty. "RT 1" (with Capax Discovery), "RT 3" (with FileTek), and "RT 6" (with MicroTech) were transactions with favoured or 'friendly' VARs. The others, "RT 2", "RT 4" and "RT 5", were described as "Miscellaneous Reciprocal Transactions" and were with various software companies: RT 2 was with VMS Inc ("VMS"), RT 4 with Vidient Systems Inc ("Vidient") and RT 5 with EMC. In this judgment, I shall revert to the sequence as set out in Schedule 5 of the RRAPoC, which is chronological by reference to the first transaction in the set.[286]

2353.  In addition to their claims under FSMA and/or misrepresentation, the Claimants also claimed transactional losses in respect of some, but not all, of the Schedule 5 transactions impugned as 'reciprocal'. Those transactions in respect of which the Claimants made claims for transactional losses were listed in Schedule 12B of the RRAPoC: the transactions comprised in RT 1, RT 2, RT 3 and RT 4 were all also "Schedule 12B transactions" in respect of which claims for transactional losses were made. No claims for transactional losses were made in respect of RT 5 and RT 6.

**General points on accounting issues**

2354.  The accounting question and the Claimants' allegations must be decided in respect of each of the impugned transactions individually and on its own particular facts. However, it is convenient to consider first the overarching accounting questions raised by the Claimants and the accounting framework by reference to which they arise, and also certain points suggested in Dr Lynch's written closing submissions to be of general application.

*The accounting framework*

2355.  Although the Claimants sometimes described the sets of transactions which they sought to impugn as *"barter"* transactions, those transactions were not suggested to involve an *"exchange"* or swap of goods such as to bring the transaction within IAS 18.12[287]: they were transactions for monetary consideration. However, the Claimants' case was that

---

[286] It should be noted, however, that I have already dealt with transactions connected with VAR transactions (and which were the subject of the second type of challenge identified in paragraph 2338(2) above and set out in Schedule 3 of the RRAPoC) in the Schedule of Impugned VAR Transactions.  Accordingly, I have addressed the 2011 FileTek/StorHouse transactions, which were, as Schedule 3 transactions, examples of the second type of challenge referred to in paragraph 2338(2) above, together with the impugned VAR transaction to which they relate (VT18).

[287]  IAS 18.12 provides in relevant part as follows:

*"When goods are sold or services are rendered in exchange for dissimilar goods or services, the exchange is regarded as a transaction which generates revenue. The revenue is measured at the fair value of the goods or services received, adjusted by the amount of any cash or cash equivalents transferred. When the fair value of the goods or services received cannot be measured reliably, the revenue is measured at the fair value of the goods or services given up, adjusted by the amount of any cash or cash equivalents transferred."*

they were so inextricably 'linked' that their only fair presentation in the accounts would have been to account for them together.

2356. The Claimants accepted that simultaneous transactions of sale and purchase between the same counterparties are common, and that usually, they are accounted for as separate transactions. The Claimants' point was that in certain circumstances that may not reflect their true substance: although in form separate, their true substance may only be revealed and reflected by treating and accounting for them together. The Claimants contended that this was the position in the case of each of the sets of impugned 'reciprocal' transactions they identified in Schedule 5.

2357. Thus, the Claimants presented the principal accounting question underlying their case on the Schedule 5 transactions as being whether Autonomy should have accounted for the relevant sale and purchase impugned:

> (1) as separate transactions, in accordance with the accounting principles applicable to each; or (as the Claimants submitted was correct)
>
> (2) on a net basis, that is, recognising any net payment by Autonomy as an expense and any net receipt by Autonomy as other income.

2358. The Claimants adopted two approaches in support of their submission that (2) (the net basis) was the correct accounting treatment.

2359. The first, and what they presented as the simplest, approach involved a reiteration and application of their fundamental point in the context of the impugned VAR transactions, which is that transactions are to be accounted for in accordance with their substance and not merely their legal form. The Claimants' case is that in each case the overall reciprocal arrangement lacked substance because it lacked any commercial rationale other than to put the counterparty in funds for some other purchase, or to satisfy some other obligation, and that it was wrong to recognise revenue from it accordingly. The Claimants' first approach was not dependent on IAS 18.13, and indeed made it unnecessary to look at that rule. Furthermore, the experts were agreed with that approach: if the transactions lacked independent rationale and substance, that sufficed to disqualify revenue recognition without further regard to the more specific and detailed journey through IAS 18.13.

2360. The Claimants' alternative approach was based on IAS 18.13 itself. IAS 18.13, which is headed *'Identification of the transaction'*, prescribes the test and accounting treatment of 'linked' transactions. In the course of his oral closing submissions, however, Mr Rabinowitz clarified that although the routes offered were different they would always lead to the same conclusion: there would never be a case where one route was satisfied and the other not: as he put it *"you get to exactly the same point"*.

2361. IAS 18.13 confirms that transactions are *"usually"* accounted for separately. However, and in addition to a case where transactions are by way of barter or exchange (for which the test and accounting treatment is prescribed in IAS 18.12) there is a possible exception where two or more transactions, though they may take the form of separate agreements, they:

> *"are linked in such a way that the commercial effect cannot be understood without reference to the series of transactions as a whole."*

2362. IAS 18.13 also stipulates how, in such a case, revenue recognition criteria are to be applied to:

> *"separately identifiable components of a single transaction in order to reflect the substance of the transaction."*

2363. As the Defendants emphasised, and the Claimants accepted, the test under IAS 18.13 is not factual linkage *per se:* it is not sufficient for there to be a factual connection, or even for there to be a situation where one transaction would not have occurred without the other. Mere reciprocity does not lead to net accounting. Moreover, and as was common ground between the accounting experts and the parties, the fact that transactions may be linked does not prevent recognition of the sale transaction at gross fair value. The joint statement of Mr MacGregor and Mr Holgate stated under their "Agreed view":

> *"Even if the alleged reciprocal transactions are determined to be linked, this does not necessarily preclude separate recognition of each limb of any such transaction i.e. the recognition of the gross fair value of the sale and purchase."*

*The parties' approaches to the nature of the linkage required and its identification*

2364. The Claimants put forward the following approach:

(1) The initial step is to identify the transactions that might be linked in such a way that their commercial effect cannot be understood without reference to the series of transactions as a whole. This may be established by what the Claimants described as a *"prima facie linkage"*. The Claimants stressed that such a *"prima facie linkage"* would not of itself mean that the transactions must be accounted for together, and that it would only mean (as Mr Holgate explained it) that the transactions:

> *"should be considered together but that then may lead to accounting for them separately or on some net basis. That's not the end of the story, in other words".*

(2) The next step, according to the Claimants' approach, is to consider whether it is possible to understand the commercial effect of each of the transactions without regard to the other. That is a fact-specific enquiry. Relevant considerations would include (a) whether each transaction has a genuine commercial rationale, (b) whether there is any contractual interdependence between the transactions, and (c) whether the transactions are at fair value.

(3) The Claimants stressed, however, that these considerations are (i) not exhaustive, and they instanced a further potentially relevant matter as being whether one transaction would have happened without the other; (ii) not mutually exclusive, and they instanced the payment significantly in excess of fair value such as might call into question the commercial rationale for the purchase; and (iii) not necessarily deserving of equal weight, and they quoted Mr Holgate's view in particular that if there is a lack of commercial rationale for one part of a linked transaction *"you're three-quarters of the way there."*

2365. The Defendants, on the other hand, advocated the three-stage approach in fact adopted by Deloitte:

(1) First, it is necessary to examine the contracts to determine whether there is a contractual linkage between the purchase and any sale transaction which impacted on the revenue recognition for the sale. The Defendants submitted that there was no such linkage for any of the transactions which are impugned in this case.

(2) Secondly, it is necessary to ensure that there was a commercial rationale for the purchase.

(3) Thirdly, it is necessary to determine whether the transactions were at fair value.

2366. In his closing submissions on behalf of Dr Lynch, Mr Hill addressed the Claimants' suggestion that it was relevant to consider whether one transaction would have occurred without the other. Noting that Mr Holgate had accepted in cross-examination that this was not conclusive, Mr Hill submitted that it was no more than *"part of the factual picture"* since it did not answer the question he posed as being at the heart of the matter:

> *"...can I understand the commercial effect of these transactions separately?"*

2367. Mr Hill suggested that, in the case of each of the Schedule 5 transactions, if there was a commercial rationale other than solely to generate, by means of a purchase, revenue for a sale, that commercial rationale provided the requisite understanding. He stressed that the Claimants' case for impugning the transactions had been pleaded and argued on the basis of the sole purpose of Autonomy's purchase being to incentivise and fund the counterparty to enable Autonomy's sale. It would not suffice if that was only part of the purpose. In this connection, Dr Lynch's written closing submissions quoted Mr Welham's agreement that, having ascertained that the goods were dissimilar items, the essential questions were whether there was a commercial rationale, and whether there was fair value; and provided that was the case then revenue would be recognised gross:

> *"Q.    ... So one of the questions is whether the goods in question are similar, correct?*
>
> *A.    It is, yes.*
>
> *Q.    Once that's out of the way, then essentially the two elements are commercial rationale for the deal and fair value?*
>
> *A.    Yes."*

2368. It was common ground that in each set of Schedule 5 transactions the goods, the subject of Autonomy's purchase transaction and the goods, the subject of Autonomy's sale transaction were not "similar".

2369. The principal focus of the parties' submissions was therefore on the commercial rationale, and in particular, the issue as to whether what the Defendants asserted was the rationale for the Schedule 5 transactions was genuine, or whether it was a pretext to cover what the Claimants submitted was the real purpose, being to incentivise and fund Autonomy's counterparty to purchase software from Autonomy so that Autonomy could recognise revenue on its sale transaction. There were a number of disputed issues in

this connection, some of which melted away as being largely semantic or what the Claimants described as *"strawmen"*.

2370. In that context, the issues can be summarised as:

> (1) The relationship between the commercial rationale of the transactions and their commercial effect;
>
> (2) Whether the Claimants had to demonstrate that the only rationale for the transactions was for Autonomy to fund by the purchase transaction the revenue-generating sale transaction and thus in effect purchase its own revenue;
>
> (3) The relevance of whether or not Autonomy needed and used the goods it purchased;
>
> (4) The relevance of the pre-purchase assessment of the goods the subject of Autonomy's purchase transactions;
>
> (5) The relevance of Deloitte's assessment and approval of each of the transactions;
>
> (6) The import of the factual evidence given by those involved in the transactions;
>
> (7) The import and reliability of the expert evidence.

2371. As to (1) in the preceding paragraph 2370, the Claimants sought to apply IAS 18.13 according to whether or not one transaction in a series had any commercial rationale without the other(s). They contended that where one of the transactions in a set of two makes, on its own, no commercial sense, and has no substantial business rationale or commercial purpose at the time of the transaction except to fund the other transaction, then the one is obviously dependent on, and cannot sensibly be understood without regard to the other; and that in such circumstances both must be accounted for according to their net effect together. Mr Rabinowitz summarised this in his oral closing submissions as *"...the inability to understand a commercial rationale for one without having regard to the other as well."*

2372. The Defendants, though they too addressed the issue of the commercial rationale of each transaction, pointed out, correctly, that the test prescribed by IAS 18.13 for applying the recognition criteria for two or more transactions together is not expressed in terms of the *"commercial rationale"* of one transaction in a set of two (or perhaps more) transactions, but rather in terms of whether an understanding of the *"commercial effect"* of the relevant set or series of transactions may only be had by *"reference to the series of transactions as a whole"*.

2373. The paradigm is where the series of transactions all concern the same goods going round in a circle or *"round-trip"*. Hence the example given in IAS 18.13 of a transaction of sale of goods on one date and a transaction for the repurchase of the same goods at a later date: a proper understanding of each transaction is only to be found by reference to their composite result, and it is right that the revenue recognition criteria should be applied, not to the components, but to the composite, as in the case of an exchange or swap of the same goods (see IAS 18.12).

2374. Where, on the other hand, the various transactions in a sequence relate to dissimilar goods, and the analogy with an exchange or swap is lacking, the fact that the transactions are performed in a sequence does not ordinarily deprive each transaction of commercial

effect: neither the sale nor the acquisition of the goods is substantially negated or in commercial terms reversed, and the application of the revenue recognition criteria to each transaction in the sequence is appropriate and indeed required. Perhaps another way of looking at this is that where the effect of one transaction is fundamentally altered by the effect of another the question is whether each can be understood on its own terms without reference to the other, or whether in reality the two (or more) can only properly and rationally be understood by reference to their combined effect.

2375. In each of the allegedly reciprocal transactions impugned in this case, the transactions related to dissimilar goods: they were not (contrary to the terminology sometimes deployed by the Claimants and even by Mr Holgate) exchange, barter or "round-trip" transactions; and where the goods the subject of each of the two transactions are dissimilar, *prima facie* at least each transaction would appear to be independent and the subject-matter of the contracts suggests no reason to depart from the "usual" approach of separate accounting of each.

2376. The question is whether, nevertheless, any of the transactions in an identified sequence was in reality simply a way of funnelling money to the counterparty to fund another transaction in that sequence, having no real substance or independent rationale at all. Mr MacGregor put the point this way in his oral evidence:

> *"...So to make this real, in these situations, I think the suggestion is that Autonomy was buying software which it didn't -- had no point – there was no purpose in it buying it, it was done solely as a way of funnelling money back to the counterparty. So it's that leg of purchase which on its own doesn't make any sense.*

> *...if the overall substance of the transaction is solely as a way of Autonomy paying money to – for no other reason, paying money to a counterparty so that it can buy its software, then that commercial – the overall transaction has no commercial substance. And one would deal with the accounting for that on a net basis, i.e. whatever the net payment is...would be simply treated as an expense with no recognition of revenue."*

2377. On that approach, the relevance of assessing the commercial rationale of a transaction in such a sequence is to determine whether that transaction has any independent substance, or whether it is in reality only understandable by reference to the commercial effect of all the transactions in that sequence. In particular, where a purchase transaction has no rationale except to fund a sale transaction, so that the purchase cannot really be understood except by having regard to the sale, it may well be that the two transactions need to be taken as one, and only any surplus of the sale proceeds over the purchase proceeds accounted for and recognised as revenue.

2378. This analysis seems to me to bear on a point I raised with Mr Rabinowitz in the course of his oral closing submissions, intended to be reflected in the question identified in (2) in paragraph 2370 above. This was whether it suffices to justify treating transactions in a sequence compositely when applying revenue recognition criteria that (to take the example as above of a purchase transaction and a sale transaction) the predominant purpose for the purchase was to fund the sale, and the one would not (or probably not) have taken place without the other, but it was not the sole purpose.

2379. Mr Rabinowitz initially submitted that *"predominant reason suffices"*. I do not accept that this is the correct approach. It would, at least potentially, require the court to weigh an entity's competing proper purposes, which (outside possibly the context of unfair prejudice issues) is very rarely appropriate when the judgment has lawfully been left to that entity's management.

2380. Similarly, a related test Mr Rabinowitz proposed, which was to ask whether the one would have taken place but for the other, does not seem to me to be what IAS 18.13 has in mind: thus, the rationale of a purchase by Autonomy may include the fact that thereby the counterparty will have funds which it intends to use to purchase dissimilar goods from Autonomy, and yet also have its own commercial rationale and substance viewed as an independent transaction so that its commercial effect can readily be understood.

2381. Mr Rabinowitz's last iteration of the argument was to pose the question: *"why was this being done?"*. He elaborated this (modifying it a little to suit the particular context of related transactions) as follows: accepting factual linkage is a necessary but not a sufficient characteristic, having identified it:

> *"...you ask yourself a question: can I actually understand this, properly understand the one, genuinely understand the one without having regard to the other? If you can't you have to account for them together. It's only in that way that you get a genuine commercial rationale being reflected in your accounts."*

2382. Although that may seem to restate the issue, it does seem to me to point the way. The question in my view is whether the rationale of the one is only in reality supplied by the other. The answer may not depend exclusively on whether one or the other lacks substance: it may be apparent from other considerations that the real reason for one is the other. If in the case of factually linked transactions, one transaction appears to be so lacking in commercial rationale that it begs the question what the real reason can be, and the reason is apparent from the other, the two must be accounted for together for the purposes of applying the revenue recognition criteria. Here, if it is established that the one cannot realistically be explained except as a funding mechanism for the other, that would, in my view, suffice. The test also seems to me to be close to what Mr MacGregor may have had in mind, though that must be qualified by the gloss that the commercial rationale of a transaction is to be distinguished from its incidental side effects and from pretended objectives which at the time plainly carried no real weight in the decision to undertake it.

2383. The next question is how the fact or lack of any genuine commercial rationale for and substance of the (in this case) purchase transaction is to be determined. The Claimants relied especially on two tests, reflected in (3) in paragraph 2370 above: whether Autonomy had in fact any need for the goods and whether it in fact made any use of the goods when purchased. In this regard, the Claimants had pleaded in each case that Autonomy had *"no independent need"* for the goods purchased; and they contended that this could be demonstrated by evidence as to the use made, or the lack of any use being made, of the goods after the purchase.

2384. This led to the Defendants contending that (a) a test of necessity was too strict and misplaced, and that any genuine commercial rationale should suffice, and (b) to assess the commercial rationale by reference to the subsequent use of the goods purchased was flawed in principle since it relied on hindsight, did not address the commercial rationale

at the time of purchase and was a particularly unsuitable evaluative approach for a fast-moving company in a fast-developing sector, where technologies change and priorities shift with great speed and it is not unusual for products to be unsuccessful or to be moved aside.

2385.  I agree with the Claimants that this dispute was largely semantic (a dispute about "need"); and indeed, the Claimants accepted in their oral closing that the test is *"genuine commercial rationale at the time of the purchase"*. A demonstrated lack of any real intention at the time of the purchase to use the goods purchased is obviously relevant. Conversely, evidence of subsequent use might be relevant in testing whether the rationale was genuine or (as Mr Rabinowitz put it) *"one drummed up after the event."* I accept the Claimants' submission that adventitious use after the event is unlikely to provide any commercial rationale, and indeed may suggest that the need for the product has been confected and the rationale contrived.

2386.  That said, I accept the Defendants' submission that the Claimants adopted too confined an approach to the assessment of commercial rationale. I agree that:

(1)  There could be a number of types of commercial rationale. Immediate need is not a valid test of commercial rationale. Autonomy could have a potential use for the product, or could want it in its inventory, or could be accumulating useful stock (in the case of hardware servers, for example).

(2)  Nor, related to that, is the subsequent use of the product purchased a reliable test either; and although it may have some relevance to the intention at the date of the purchase (as acknowledged above) the Claimants' approach of assessing commercial rationale according to the lack of any subsequent use runs the risk of impermissible and misleading hindsight. A product considered worth acquiring may be overtaken, or have been proved unreliable. As head of R&D, Dr Blanchflower was well placed to comment on this industry reality:

> "Q.    It's also right, isn't it, that tech companies quite often work on projects that end up not being successful, yes?
>
> A.    Correct.
>
> Q.    It's an industry where one hit can make up for a number of misses, isn't it?
>
> A.    Yes.
>
> Q.    And when a project starts, it can be pushed aside by something more important sometimes, yes?
>
> A.    Yes, yes.
>
> Q.    Or a better opportunity might come along which is more worth spending the development management time?

> A.   *Yes, I agree.*
>
> Q.   *Or perhaps sometimes a competitor's product might come along which makes the project no longer so viable or interesting to take forward?*
>
> A.   *Yes, yes.*
>
> Q.   *And it's not that rare, is it, for a company to invest in a project and for it then to get delayed, or sometimes not even get to market?*
>
> A.   *That happens, yes.*
>
> Q.   *And Autonomy had projects like that just like any other tech company, didn't it?*
>
> A.   *I would like to think we had a greater hit rate than most, but that is still the case, yes."*

(3) Conversely, however, I accept the Defendants' submission that whilst evidence of non-use may or may not be significant, proven actual use may have what Mr Hill termed *"asymmetrical significance"* as a good indicator of commercial rationale.

2387.   As to (4) in paragraph 2370 above, the Claimants placed considerable emphasis on what they depicted as the lack or paucity of evidence of any proper pre-purchase process of assessment by Autonomy of the goods it was to purchase. This is obviously, in my view, potentially a relevant factor to consider in respect of each of the impugned reciprocal transactions in assessing whether Autonomy really wanted to purchase the goods, or whether its driving purpose was to get money into the hands of its counterparty to enable the counterparty to purchase Autonomy products. However, I agree with the Defendants that it is necessary to consider whether Autonomy's approach was uncharacteristic compared to its ordinary process of decision-making, or whether the Claimants' criticisms are in part a manifestation of a different and more bureaucratic management style of a company such as HP. It is also necessary to take into account whether management were already familiar with the product, such that extended assessment and a written record may have been considered pointless or unnecessary.

2388.   As will be seen when considering the various impugned reciprocal transactions in turn, the Defendants contended that the Claimants had taken an unrealistic approach to the process that one would expect to see for Autonomy to decide on a purchase which overlooked Autonomy's characteristic entrepreneurial approach to decision-making, and that their criticisms of the written material justifying or recommending the purchase were exaggerated. The Defendants contended that members of management were well abreast of other products in their market and often already had prior knowledge of a product, and knew they were interested in buying it. It was not unusual or sinister for the written document to have no more than a confirmatory role.

2389. As to (5) in paragraph 2370 above, the Defendants contended that the Claimants had ignored or understated the role of Deloitte. The Defendants placed considerable reliance on Deloitte's review and approval of each of the impugned reciprocal transactions, in the course of which Deloitte had full access and spoke to Autonomy personnel, including Dr Menell and others on the technical side (such as Mr Lucini). Deloitte also consulted their own technical specialist, Mr Johnstone, who reviewed the products.

2390. Deloitte's approach was summarised in a summary prepared by Mr Knights, in which Deloitte considered the first VMS purchase and sale, having also discussed the matter with Mr Barden, from Deloitte's NAA department:

> *"I have talked through the "VMS" matter with Phil Barden.*
>
> ### *Background Summary*
>
> - *Autonomy have sold $9m of software to 3rd party VMS*
> - *VMS have separately sold to Autonomy $13m of services/license for a 3 year provision of their services to Autonomy*
> - *We have reviewed the commercial substance of both deals*
> - *We are satisfied that these are not similar items of exchange*
> - *We have reviewed the contractual terms of both transactions*
> - *It is clearly demonstrable that what Autonomy has bought from VMS is entirely different from what it has sold to VMS.*
> - *We are satisfied that there are no related party matters.*
>
> ### *Accounting principles*
>
> *Phil has agreed that the accounting principles are around revenue recognition and are directly tied into the audit judgements around:*
>
> - *Establishment of fair value of both transactions.[288]*
>
> - *The determination that these transactions are or are not for similar items*
> - *The judgement for business rationale for these transactions - to underline the separate nature of both transactions.*
>
> *On the basis that the audit team can conclude satisfactorily on these areas of judgement then revenue recognition and the separate recording of revenues and costs is appropriate.*
> *Revenue and costs would be recognised at fair value."*

2391. Deloitte's view that a preliminary matter to be addressed was whether the two transactions within the set (one for Autonomy to purchase goods and the other for

---

[288] In the case of the sale transaction, there was no reason to measure the fair value as distinct from the sale revenue. In the case of a purchase, where the measurement is highly fact-specific, the Defendants' case is that the finance department and Deloitte considered the evidence of fair value of the goods purchased in each case and were satisfied that the amount paid was the fair value. The Claimants contended, however, that Deloitte were misled. The issues as to the measurement of fair value, Deloitte's assessment and the Claimants' case that Deloitte approached the matter on the basis of a number of misunderstandings fed by Mr Hussain and Mr Chamberlain, are elaborated below.

Autonomy to sell goods to the same counterparty) concerned similar goods was explained in an email dated 6 July 2009 from Mr Barden of Deloitte's national accounting and auditing team when considering the VMS deal (see below) to Mr Knights, Mr Knight and Mr Welham (and others in Deloitte), where he stated in response to an email from Mr Knights setting out his report as follows:

> *"Even in a barter transaction, revenue will be recognised at fair value unless the items exchanged are 'similar'. If we are happy that each sale could have taken place without the other, and that the items exchanged are not 'similar', then I would expect revenue to be recognised at fair value."*

2392. Mr Welham agreed and explained that having ascertained that the goods were dissimilar items, the essential questions were whether there was a commercial rationale, and whether there was fair value. Provided that was the case then revenue would be recognised gross:

> *"Q.  ... So one of the questions is whether the goods in question are similar, correct?*
>
> *A.    It is, yes.*
>
> *Q.    Once that's out of the way, then essentially the two elements are commercial rationale for the deal and fair value?*
>
> *A.    Yes."*

2393. Deloitte also reviewed and approved the assessment of fair value in the case of each of the impugned reciprocal transactions. Mr Welham confirmed that Deloitte in every case scrutinised the evidence available at the time the audit judgement was made, which included evidence which came into existence after the accounts stage but before the audit judgement.

2394. The Defendants suggested that the Claimants paid hardly any attention to the assessments of fair value which were carried out at the time, and that the cross-examination of Dr Lynch was striking for the absence, in general, of any challenge in relation to this material and the fair value assessment that was made. They went on to submit that if (as they suggested the Claimants' own witnesses had confirmed) Autonomy was purchasing a product that was or would be useful, and which was purchased at fair value, the Claimants attempts to impugn the transaction and the accounting cannot get off the ground.

2395. It is to be noted, however, that in the case, for example, of the Vidient transaction (RT4) addressed in greater detail below (see paragraphs 2878ff), where the purchase and sale transactions by Vidient were put into different quarters (see paragraphs 2904 to 2913), Mr Welham's evidence (which is supported by the documentary evidence and which I accept) was that Deloitte did not become aware of the Vidient sale transaction until too late to consider the two together (and see paragraph 2914 below). Similarly in the case of the purchase and sale transactions with MicroTech comprising RT6 in Q1 2011, which were also put into different quarters, Deloitte were unaware of the second

transaction when they reviewed the first (see paragraph 2964(1) below). Mr Welham also confirmed that Deloitte knew that there was factual linkage in the sense that they were transactions between the same parties at about the same time. The question is whether they <u>could</u> each have taken place without the other, not whether they <u>would</u> each have taken place without the other.

2396.   As to (6) in paragraph 2370 above, the parties drew rather different conclusions from the "direct" evidence as to the rationale for Autonomy's purchases. The Claimants relied especially on Mr Egan's evidence as to the real rationale for some of Autonomy's purchases in his witness statement (in paragraphs 36 to 38) as follows (the underlining is mine):

> *"36. ...One of the ways in which Autonomy met the larger goals was to do round trip transactions with customers who had a product Autonomy could buy. <u>Mr Hussain directed me to find "quid pro quo" deals – deals in which Autonomy could buy goods or services from another company, and in turn, that company would use the funds from the sale to purchase software from Autonomy.</u> The point of these deals was effectively to find revenue for Autonomy that was easier to get than a conventional sale because the buyer was getting something good for its own business in return.*
>
> *37. In the deals that I understand from the Claimants' lawyers are challenged in this case, Mr Hussain or I identified another company's product or service that Autonomy could purchase, <u>even though Autonomy otherwise had no intent or plan to purchase that product or service, which was unwanted, unused or overpriced</u>. I would then approach the other company and propose what I called a "quid pro quo" or "round trip" deal. Autonomy would offer to purchase the other company's product or service if, in return, that company would agree to license identified software from Autonomy. In most cases, the money that Autonomy paid to the other company to buy its product or service gave the other company the funds with which to purchase the license from Autonomy. An incentive for the other company was that Autonomy would pay more for the other company's product or service than the other company was asked to pay Autonomy for the license to use Autonomy's software...*
>
> *38. Mr Hussain principally set the price to be charged for the Autonomy software and directed the negotiation of the spread. Again, he instructed me as to how to ensure that those deals were to be structured so as to be acceptable to Deloitte. To make the case that the revenue from the sale element of these deals could be recognized, I wrote emails explaining how Autonomy would get value from the products that it purchased. But, in reality, I knew that Autonomy would not have purchased the products without the related purchase by the third party."*

2397.   When cross-examined Mr Egan confirmed that his evidence in these paragraphs should be read as relating only to the reciprocal transactions with Capax Discovery (RT1) and FileTek (RT3). However, the Claimants submitted that many of the other reciprocal transactions had strikingly similar features to the FileTek and Capax Discovery round-trip deals; that this was unlikely to have been a coincidence, particularly in circumstances where Mr Hussain was involved in all of them; and that the Court should

therefore infer that Mr Egan's general comments in his witness statement about the rationale behind the reciprocal transactions apply across the board.

2398.  The Claimants submitted that it is clear from Mr Egan's evidence that:

(1)  The reciprocal transactions were conceived of by Mr Hussain or Mr Egan, neither of whom had technical expertise.

(2)  The transactions were conceived of as a means of generating revenue to meet market expectations.

(3)  The transactions were an expensive means of generating revenue because Autonomy had to purchase a product in order to induce the revenue-generating sale.

(4)  Autonomy would not have purchased the products without the related purchase by the counterparty.

**Factual evidence as to the real rationale: Claimants' case**

2399.  The Claimants went on to submit that this evidence and the inferences they invited the court to make were supported by what they described as a *"wealth of material"* from which they submitted it is to be inferred that this was the real rationale for Autonomy's purchases. They described this material in five headline points.

2400.  First, they submitted that the purchases were difficult to square with Autonomy's general approach of <u>not</u> purchasing third party software and using Autonomy's own software or open source software where at all possible. That general approach was Autonomy's publicly stated position at the time, and was confirmed by a number of witnesses, including Dr Blanchflower, Mr Lucini, Mr Humphrey, Mr Wang, Mr Kalbag, Mr Greenwood, and Dr Lynch's witness, Mr Avila. Their evidence, in short, was that Autonomy did not generally purchase third party software. There were, of course, exceptions, but this was usually where the software in question was highly specialised and Autonomy had no equivalent offering. A review of Autonomy's financial statements for the years ended 31 December 2009 and 31 December 2010 reveals that over 99% of Autonomy's capitalised software purchases during those years related to transactions that are impugned in these proceedings, which the Claimants relied on as belying any suggestion by the Defendants that it was commonplace for Autonomy to purchase third party software.

2401.  Secondly, the Claimants contended that Autonomy did not conduct the sort of due diligence which would be expected from a company purchasing a product for many millions of dollars with the genuine intention of using it in its business. Autonomy's approach was more consistent with what might be expected from a company that did not care what it was purchasing and whether it could use what it purchased but was searching for something to say to justify it. Thus, the Claimants contended that prior to purchasing the products in question:

(1)  Autonomy did not obtain any test licence or prepare any proof of concept.

(2)  Nor did Autonomy perform a detailed technical evaluation to determine: (i) whether Autonomy could build an equivalent product for less, i.e. a buy versus

build analysis, and (ii) whether the product was capable of being used alongside or integrated with Autonomy's software.

(3) Nor did Autonomy conduct any detailed commercial or cost benefit analysis to determine the likely value of the product to Autonomy in terms of future sales or saved expense.

(4) Nor, contrary to Dr Lynch's assertion, did Autonomy obtain alternative quotes from third-party suppliers "*in most cases*". Autonomy obtained competing quotes in just <u>two</u> instances – RT2(1) and RT3(1) (the first reciprocal transaction with VMS and the first reciprocal transaction with FileTek, respectively) – and even then only <u>after</u> the purchase in question had taken place, suggesting that the quotes did not, therefore, form any part of Autonomy's decision-making process, and instead, were obtained in an attempt to justify to Deloitte the fair value of a purchase that had already happened.

2402. The Claimants rejected the arguments (outlined above) deployed by the Defendants to the effect that Autonomy did not need to conduct any detailed technical analysis because it was already familiar with the product or the product was well known in the industry, and as an agile company in a fast-moving industry that made decisions quickly did not habitually produce long reports on why it did things. The Claimants contended that these points do not withstand scrutiny, because:

(1) There was no evidence that Autonomy had any first-hand experience of the relevant products prior to purchasing them. The material that Autonomy did obtain was marketing information or information obtained from cursory internet searches and was often obtained <u>after</u> Autonomy had already made the decision to purchase the product.

(2) Autonomy <u>did</u> produce reports, certainly for the larger purchases, but these were often misleading and produced <u>after</u> the event, not for the purpose of determining whether Autonomy should purchase the product, but, rather, to generate a paper trail which Autonomy could use to justify the purchase to its auditors.

2403. The Claimants submitted that the only credible explanation for Autonomy's approach is not that Autonomy was acting normally; but rather that the purpose of Autonomy's purchase was not to obtain the benefit of the products or services, but to generate a related revenue-generating sale.

2404. Thirdly, the Claimants submitted that there is clear evidence that the purchases were an exercise not just in generating, but in <u>maximising</u>, Autonomy's revenue, and that this was achieved by Autonomy channelling funds to the counterparties under the guise of the purchases to enable them to enter into sales that would otherwise have been beyond their financial means. In addition to the direct evidence from Mr Egan in re-examination on the FileTek reciprocal transactions (RT3) that Mr Hussain's objectives included making the deal as large as possible, the Claimants pointed to accounting evidence that Autonomy's purchases were out of all proportion to the sales made by the counterparty of the same products in their ordinary course of business. They submitted that this strongly supports the inference that the purpose of Autonomy's purchase was simply to induce the counterparty's purchase at a price that would assist Autonomy in reaching its revenue goals and to channel the necessary funds to the counterparty. For example:

(1) For RT1, the counterparty, Capax Discovery, was, in 2009, a newly-formed entity with no business to speak of. Nevertheless, Autonomy paid in excess of $14 million for services which Capax Discovery was not even in a position to provide and never in fact provided.

(2) For RT2, the counterparty, VMS, had total annual revenues of $50 to $75 million, and yet Autonomy purchased VMS's products for $13 million and $8.4 million.

(3) For RT3, the price that Autonomy paid for its first purchase of FileTek's StorHouse software represented more than 20 times FileTek's total licence revenues for StorHouse in all of 2008, and more than 10 times its total licence revenues for StorHouse in the first three quarters of 2009.

(4) For RT4, the price that Autonomy paid for its first purchase of Vidient's 'SmartCatch' software represented more than 13 times Vidient's total licensing revenue from sales of SmartCatch in 2009 and was the largest transaction in the company's history.

2405. The Claimants also sought to rely on evidence from the counterparties that, without Autonomy's purchase, they would not – and, in many cases, could not – have made their reciprocal purchase from Autonomy on the terms they did. This is addressed in more detail in the transaction-specific parts of this section below.

2406. Fourthly, the Claimants placed reliance on the following common features of the reciprocal transactions:

(1) Autonomy paid the amounts due in respect of Autonomy's purchase <u>before</u> the counterparty paid the amounts due in respect of Autonomy's sale, with the exception of RT4, where the counterparty made a small advance payment to Autonomy in response to concerns expressed by Deloitte as to the counterparty's financial standing, and RT5, where the relevant debts were netted off against each other; and

(2) Autonomy paid significantly <u>more</u> to the counterparty than the counterparty paid to Autonomy, with the exception of RT6, where this would have happened but, in the event, the outstanding balance was cancelled <u>after</u> HP's acquisition of Autonomy was announced and there was no net payment.

2407. The Claimants submitted that these features are consistent with the purpose of Autonomy's purchase being: (i) to incentivise the counterparty to enter into the reciprocal sale, which Autonomy achieved by agreeing to make a net payment to the counterparty, and (ii) in most cases, to fund the reciprocal sale, which Autonomy achieved by paying the counterparty <u>before</u> it was required to make any payments to Autonomy. The Claimants put this as high as being:

> "*not just the inexorable inference to be drawn from these common features of the reciprocal transactions, it is also borne out by the transaction-specific evidence of the negotiations of the reciprocal transactions, many of which involved negotiation of the "spread", i.e. the net amount that Autonomy would pay to the counterparty and/or the timing of Autonomy's payments to the counterparty so that they preceded any payment by the counterparty.*"

2408. Fifth, the Claimants submitted that an examination of whether Autonomy actually received and used the services and products that it purchased from the counterparties reveals that:

(1) For RT1 (Capax Discovery) and RT6 (MicroTech), Autonomy never received any of the services it purportedly purchased for in excess of $17 million and $4.5 million, respectively.

(2) For RT2 (VMS), Autonomy made no material use or sales of the VMS data feed for which it paid a total of $17 million.

(3) For RT3 (FileTek), Autonomy did not achieve any code integration of the 'StorHouse' software on which it spent more than $21 million, nor was the software actually used by or for a single Autonomy customer.

(4) For RT4 (Vidient), there is no evidence that Autonomy ever tried to combine Vidient's 'SmartCatch' with any Autonomy product or otherwise used or sold the 'SmartCatch' software which it purchased from Vidient for more than $5 million.

(5) For RT5 (EMC), EMC did not use the software licensed to it by Autonomy and Autonomy knowingly overpaid for the EMC hardware it purchased.

(6) Four of the reciprocal transactions involved multiple purchases by Autonomy of rights to the same products or services from the same counterparty over a period of time (RT1, RT2, RT3 and RT4). As Mr Holgate put it in re-examination:

> "*Well, it would certainly, as the phrase goes, put one on enquiry because if the first licence to use software hasn't been used, then why is one paying further money to acquire further rights to the same thing? That doesn't make commercial sense. So at the very least one would need to find further facts and circumstances to understand why such a thing had been done*".

**Factual evidence as to the real rationale: Defendants' case**

2409. The Defendants rejected the Claimants' analysis and contended that much of it was based on unreliable witness statements, and that the principal person on whom they had relied, Mr Egan, had in effect recanted when (as they postulated came as a surprise to him) he was cross-examined. Further, whilst in fact Autonomy had made every one of its purchases because of its perceived utility at the time, they submitted that (i) what happened after the reciprocal transactions is irrelevant to their accounting treatment, (ii) the "*vast majority*" of Autonomy's purchases were used, albeit not always immediately, and (iii) Autonomy sometimes got it wrong or abandoned projects.

2410. The Defendants submitted that insofar as the Claimants' witnesses had first-hand evidence to give in relation to the purchase transactions, when they came to be cross-examined, they generally confirmed that there was indeed a commercial rationale for the purchase.

2411.  In their written closing submissions, the Defendants gave two examples from Mr Egan's witness statement:

(1) Mr Egan's witness statement included the general statement that he had identified products for Autonomy to purchase which were unwanted, unused or overpriced. Mr Egan accepted that he only had any real recollection of three deals, VMS, StorHouse and EDD, and agreed that these were the only deals he was really able to give any evidence about.  As explained below, Mr Egan was taken to the StorHouse and VMS purchases, and his evidence under cross-examination was very different from his witness statement.  He confirmed that, as far as he was concerned, there was a good commercial rationale for each of the purchases, and that though it was not his judgement, he understood them to have been at fair value.

(2) Mr Egan suggested that Dr Lynch was involved in generating pretextual emails about Autonomy's purchases.  Although he believed he would have had a better recollection at the date that he made his witness statement, he acknowledged that he retained no memory of any emails from Dr Lynch that were pretextual, and he acknowledged that he had not suggested any such thing in his evidence to the US Grand Jury given some time before his witness statement. He could point to no evidence to support the assertion as regards Dr Lynch; and in the end he accepted that from his own memory he was not able to give any evidence of Dr Lynch's involvement in generating emails to create the appearance that Autonomy had a genuine need for a product or service.

2412.  In short, the Defendants depicted the "direct" evidence (and especially Mr Egan's evidence) as undermining rather than supportive of the Claimants' case when tested and then clarified in cross-examination.

2413.  The Defendants contended that it was also a recurring feature of the Claimants' witness statements (in particular from the technical witnesses) that they included commentary on various purchase decisions made by Autonomy and the merits of those decisions. The Defendants dismissed this evidence as *"not useful"*:

(1) It became clear from cross-examination that so far as the technical witnesses were concerned, the witnesses in question were not involved in those business decisions and did not have any evidence as to the actual commercial motivation of management at the time.  Moreover, those witnesses were generally not involved in <u>any</u> of Autonomy's decision making as to whether and when to make purchases, and on what terms.  Nor were they involved in the sales side, in ascertaining the market demand for particular products, or in considering Autonomy's market positioning, and the product portfolio that Autonomy wanted to present. These all involved commercial questions which were not dealt with at the time by these technical staff, and which were handled by other (often more senior) people in management and/or on the commercial side.[289]

---

[289] The Defendants instanced Mr Lucini's comments on the StorHouse purchase.  Mr Lucini was not involved in strategic discussions generally, and not involved in any of the strategic discussions with regard to Autonomy's development in the structured market.  Mr Wang agreed in cross-examination that essentially, the pricing decisions, commercial decision, and the ultimate decision-making was made by people on the commercial side, not on the technical side (as he was, and to a large extent, so also Mr Lucini).

(2) Even on the technical aspects, the technical witnesses were frequently asked to comment in their witness statements on products that they had not been involved in at the time, and on the basis of a recent review of limited documentation, rather than the product itself. Unsurprisingly, it emerged that the witnesses had little understanding of the product or its functionalities.

(3) Non-technical witnesses also volunteered comments on technical areas which were not their expertise, and on which they would at the time have deferred to Dr Menell and his technical team.[290]

2414. The Defendants similarly sought to undermine the other evidential material relied on by the Claimants.

2415. As to the first point relied on by the Claimants in support for the proposition that Autonomy could not have had genuine commercial reasons for the various impugned purchase transactions (see paragraph 2400 above), the Defendants noted that a number of the statements of the Claimants' technical witnesses included a section regarding Autonomy's propensity (or otherwise) to buy third party software, which the Defendants described as amounting to a refrain that it was against Autonomy's philosophy to purchase third party software, and it did not do so.

2416. However, according to the Defendants, the Claimants and their witness statements painted an extreme picture, the true position being more nuanced; fully understood, it did not yield any support for the Claimants' case: the reality was that while, all things being equal, Autonomy did have a philosophy of developing its own software and it did use and purchase third party products where this made business sense. Whether, in any particular situation, it was preferable to "buy" or to "build" was, of course, a multi-faceted commercial decision; Autonomy did both.

2417. Despite the terms of some of the witness statements, the Defendants relied on the following examples from cross-examination in support of their point that this was broadly accepted by the Claimants' witnesses:

(1) Dr Blanchflower's evidence, including the following passage:

"Q. And the management would need to take a number of factors into account in the buy or build decision, including the opportunity cost of devoting a number of their engineering staff, yes?

A. Yes.

Q. As well as the time it would take, if you were building rather than buying, to get the product to market, yes?

A. Yes.

Q. And, depending on the situation, it can be better to buy a product that's already been tested rather than have to go

---

[290] The Defendants cited Mr Egan as an example.

> *through elaborate testing processes?*
>
>     *A.    There were certainly situations where that was not the case.*
>
>     *Q.    But it all depends, doesn't it?*
>
>     *A.    Yes."*

(2) Mr Lucini gave evidence to similar effect.

(3) Mr Martin explained in his witness statement that Autonomy did purchase software from third parties.[291] He explained about the documents (which showed examples of such purchases) being:

> "*consistent with my understanding of Autonomy's philosophy of wanting to develop its own products where feasible and commercially reasonable, but making a business judgment to purchase software where it made more sense to acquire it from third parties*".

He was not challenged on that evidence.[292]

2418. The Defendants sought to rebut the Claimants' contention that Autonomy did not conduct the sort of due diligence one would have expected from a company purchasing a product for many millions of dollars with the genuine intention of using it in its business (see paragraph 2401 above) on the basis that (already mentioned previously) having regard to its nature as a nimble and bureaucracy-free entrepreneurial company, speedy management decisions based on personal prior knowledge and experience with little written material recording an assessment were not egregious, and did not suggest anything sinister or any improper purpose.

2419. The Defendants relied also on the wide variety of commercial reasons that might justify a purchase, the fact that the Claimants' technical witnesses had little or no first-hand involvement in the decision-making process nor any knowledge of or insight into the actual commercial motivation of management or of perceived market demand, Autonomy's market positioning, or management's plans for the development of Autonomy's product portfolio. They sought to sweep away witness evidence, particularly from witnesses with technical rather than commercial roles purporting to address the commercial merits of a purchase, as just *"not useful"*.

2420. As to the Claimants' contention that Autonomy in effect tried to maximise the size of its purchases simply as a means of funnelling more funds to its counterparty to enable the counterparty to make purchases well beyond its means, (see paragraphs 2376 and 2404 above), the Defendants relied on the fact that in every case Deloitte had confirmed

---

[291] A witness called by Dr Lynch.

[292] It was put to Mr Avila in cross-examination that as a general rule or philosophy Autonomy did not purchase third party software. Mr Avila agreed but acknowledged that *"it wasn't entirely the case"* and that there were several exceptions. Mr Avila's evidence was that there were a number of reasons that made it not only possible but likely that Autonomy or any other software company would consider third party software. He also explained that he had a lot of experience with customers which required Autonomy in some cases to go out and explore whether "*we could build them in-house or find the best of breed from outside of Autonomy*".

that fair value was paid, and there was nothing inherently wrong with a purchase from a counterparty, nor in the use by the counterparty of the proceeds to purchase from Autonomy. It is normal practice for software companies to buy and sell each other's products: the ultimate question is whether there was a commercial rationale and fair value for the product on each side.

2421. As regards the Claimants' reliance on seemingly suspicious *"common features"* of the transactions (see paragraph 2406 above) the Defendants depicted the Claimants' submissions as placing excessive weight on the instances where Autonomy paid a customer for a purchase immediately before the customer paid Autonomy for the sale, and/or situations where Autonomy made prompt or early payment to the customer. They contended that there is no significance in this:

(1) If Autonomy was paying its customer it was unsurprising (and good business practice) that it expected its customer to meet its obligations to Autonomy. It was generally in Autonomy's interests to pay its customers promptly and receive prompt payment from the customer, as this would reduce Autonomy's "days sales outstanding" ("DSO"). Autonomy published its DSO figures. Thus, for example:

> *"In Q1 2011 DSOs were 102 days [...] above the top end of the company's target 80-90 day range."*

(2) As Dr Lynch explained, the lower the DSO, the better:

> *"A. They told the reader how quickly our customers were paying us and it would be -- if customers were taking a long, long time to pay, then people might interpret that as meaning there was an issue with the product or that the economic environment was deteriorating, so it was a number that people looked at to try and make inferences."*

**My assessment of the witness evidence on 'reciprocals' in general terms**

2422. I shall return to address particular aspects of this evidence in addressing each of the impugned reciprocal transactions specifically. However, my overall assessment as to whether, as the Defendants submitted, cross-examination exposed and undermined the Claimants' evidence to the extent of showing the Claimants' characterisation of the purchases from customers as improper 'reciprocal', '*quid pro quo'* or *'round-trip'* transactions to be without remaining foundation can be summarised as follows.

2423. The centre-piece of the Defendants' case that the purchases were properly rationalised transactions for sound commercial purposes at fair value was their assault on Mr Egan's evidence. It did seem to me that Mr Egan's witness statement, which was shown to be narrowly focused on StorHouse and EDD, gave a much more comprehensive and assertive condemnation of the purchases (*"unwanted, unused or overpriced"*) than his much more understated and carefully confined evidence when cross-examined. This was one of the many contexts in which I felt that even if Mr Egan had carefully considered the evidence as he assured me he had, he had subscribed to lawyerly drafting that had more impact and assertiveness than when confronted specifically he was content to defend or convey.

2424. Nevertheless, whilst the message was modified, it seems to me that it was to the same ultimate effect summarised in (1) to (4) of paragraph 2398 above: even if by happenstance some use could be found for what was purchased and the price was not shown to be above fair value, the conception, purpose and effect of the three sets of purchases by Autonomy on which he could give direct evidence was to induce and fund a reciprocal purchase from Autonomy of a software licence so that Autonomy could recognise revenue from the latter.

2425. Thus, for example, after his cross-examination, from a question to Mr Egan (in fact by reference to the second FileTek deal) to explain further an answer he had given in re-examination as to the principal driver of the deals the following exchange developed:

> "*MR JUSTICE HILDYARD: ...Another question arising out of your re-examination today and this time referable to the second quid pro quo deal with FileTek where Mr Rabinowitz asked you what the primary driver for the deal was, was it revenue, and I think your answer was that you did regard the primary driver as being revenue. Was that a matter of concern to you then as to the propriety of what was being proposed?*
>
> *A. No.*
>
> *MR JUSTICE HILDYARD: Why not? Can you answer reasonably shortly?*
>
> *A. Yes, I viewed it that if Sushovan wanted to take out what was very expensive revenue, then that was fine because he was going to take the expense as well as the revenue.*
>
> *MR RABINOWITZ: Can I just ask you, Mr Egan, in answering my Lord's question, you said that if Sushovan wanted to do a deal for expensive revenue, then you were happy to do a deal for expensive revenue. Can you just explain what you meant by "expensive revenue"?*
>
> *A. Meaning that there was a large cost to Autonomy. Autonomy was buying something else, so it was not therefore the same as if I went and sold a similar software deal to a company where there was no expense side of the equation.*
>
> *MR RABINOWITZ: Thank you very much.*
>
> *MR JUSTICE HILDYARD: Yes. Was the expense side, the fact that it was expensive in financial terms to Autonomy, made up in your mind by some other advantage and, if not, how could the transaction in your perception then be a proper one?*
>
> *A. Value -- software revenue was always the priority and it was very highly valued. It was just implicit to me that that had high value.*"

2426. Perhaps inevitably, given the constraints under which he had to give his evidence, it was not always clear quite what the overall effect was of Mr Egan's answers. The Defendants sought to take from this evidence that Mr Egan considered the transactions to raise no concern as to their propriety. But I took from it a different message that Mr Egan accepted that the real purpose of the purchase by Autonomy from the counterparty was to fund a purchase by the same counterparty from Autonomy from which Autonomy

could recognise revenue. It was revenue which came at a cost; the outlay was justified only by the value to Autonomy of securing such a software sale. No value other than revenue recognition was suggested. That, of course, chimes with the Claimants' case that the reciprocal transaction was in the nature of a 'round-trip'. Further, as will be seen, any other explanation or 'spin' on what Mr Egan meant cannot stand with the contemporaneous documentation explored below.

2427. Further, and in addition to the disputed issue as to whether its purchases were ever really of any utility to Autonomy, which is more conveniently elaborated later in discussing the specific impugned transactions, the point summarised in paragraph 2408(6) above that four of the reciprocal transactions involved multiple purchases by Autonomy of rights to the same products or services from the same counterparty over a period of time (RT1, RT2, RT3 and RT4) was never satisfactorily rebutted.

2428. My last general comment relates to Mr Egan's evidence on the issue of pre-textual documents. The Defendants presented this as in effect amounting to a retreat from the evidence he had given. I did not take that to be the effect of what Mr Egan was saying. I took it that Mr Egan candidly accepted that this was no longer a matter that he could remember; but he believed that at the time of his witness statement what he had stated was something he could recall and truthfully state. He rejected the suggestion put to him that he had included it *"because that's the evidence that HP wanted"* and he had never thought he would be cross-examined on it. He told me that he had taken a *"very careful approach"* to his statement, had edited it significantly and *"removed names very frequently"*. As I have explained previously, I have been wary of Mr Egan's evidence in his witness statement, parts of which seem to me plainly to have been formulated for him by US lawyers with a certain view of the facts, and which he reconciled himself to saying at the time. But his own evidence in cross-examination tended to be more reliable; and I was persuaded in this context by what he told me.

**The Expert Evidence relating to the impugned reciprocal transactions**

2429. The last of the general issues identified in paragraph 2370 above is the import and reliability of the expert evidence relating to the impugned reciprocal transactions (see paragraph 2370(7)).

2430. Ultimately, there was little substantive dispute between the experts as to the meaning and effect of the relevant provisions of IAS 18; and they were agreed that in the application of the revenue recognition criteria in particular it was necessary to identify clearly (a) the transaction to which the criteria were to be applied (be it a separate transaction or a linked one) and (b) its substance and commercial effect, and not merely its legal form.

2431. Both experts also agreed that a transaction having no real and understandable commercial effect except by reference to another linked transaction should not be accorded accounting recognition. That is so either because the overall reciprocal arrangement lacked substance or because, in terms of IAS 18.13 and/or IAS 18.14 the revenue recognition criteria should be applied to the transactions so linked together and the separate purported effect of each individual but linked transaction should be ignored.

2432. Moreover, the experts did not differ materially on a number of matters relating to the otherwise contentious issue as to the degree and nature of the linkage required to

mandate the application of revenue recognition criteria to the linked transactions as a whole. Thus:

(1) Although certain parts of Mr Holgate's evidence at first blush appeared to suggest otherwise, he did not disagree with Mr MacGregor that mere reciprocity does not lead to net accounting, and nor does factual linkage, such as negotiation at the same time, without more.

(2) Mr Holgate accepted that the fact that one transaction would not have occurred without the other is not conclusive: it is a part of the factual picture.

(3) Mr MacGregor stressed, and Mr Holgate also accepted, that part of the analysis in determining whether two or more transactions should be accounted for separately or together under IAS 18.13 is to look at the relevant contracts and see if there is any linkage provided for or implicit.

(4) Both experts agreed that questions of commercial rationale depended very much on the facts; that a company like Autonomy might have a number of reasons for purchasing goods and services; that it was not the accountant's job to substitute his own views on commercial matters for those of the entity; and that the accountant would discuss things with management.

2433. Where the experts materially differed was in (a) the approach each took to his task and (b) the application of the agreed principles to the facts or assumed facts.

2434. As in his assessment of the impugned VAR transactions, Mr Holgate assessed the accounting treatment of the reciprocal transactions on the basis of the assumptions he had been instructed to adopt. Again as in the case of the impugned VAR transactions, he had not considered the actual facts; and since he had not even been provided with the relevant contracts, he had not considered the contractual documentation governing the legal relationship between the parties in the various transactions concerned.

2435. These matters were heavily criticised by the Defendants, especially since both experts were in agreement that (a) the analysis of transactions thought to be linked, their commercial rationale, and the determination of their proper accounting treatment depended on the particular (often nuanced) facts and (b) in the real world an accountant would always have regard to the terms of the contracts in determining whether the sets of transactions identified fell to be accounted for separately.

2436. Further, according to the Defendants, the assumptions Mr Holgate was given were truncated and extreme, lacking in nuance and presented in a vacuum, and couched in such a way as to suggest the answer to the ultimate question. Although slightly different assumptions were given for each impugned transaction, so that it is necessary for me to rehearse those applicable when discussing the particular impugned transaction, the following examples common across the impugned transactions were instanced by the Defendants to illustrate their point:

(1) In each case, Mr Holgate was instructed to assume that the Autonomy group company directly contracting *"had no independent need"* for the goods and/or services that it purchased from the counterparty, connoting (as the Claimants themselves put it) that there was no *"commercial rationale for buying it"*.

(2) Likewise, the assumptions described the impugned transaction as a *"nominal purchase"*, connoting (as Mr Holgate accepted) contrivance or artificiality (though any suggestion of sham was disavowed by the Claimants).

2437. Mr Holgate also accepted that another potential problem in proceeding on the basis of assumptions was the danger that in an *"assumed facts case"* some assumptions could implicitly rely in whole or in part on matters not yet known at the date of the accounting judgement called for in *"a real case"*. He confirmed in the course of his cross-examination, albeit in the context of the accounting treatment of the impugned VAR transactions, that it is not legitimate to take into account events after the date of drawing up the accounts.

2438. I would add that my understanding of the agreed view of the expert accounting evidence and of IAS 8 is that information coming to light between the reporting date and the signing date (after audit approval and signature) cannot be taken into account except (and the exception is an important one) insofar as it sheds light on circumstances prevailing at the reporting date; and information coming to light in that period must be disregarded insofar as it describes or reveals transactions and other events that arise after the reporting date. Information that comes to light after the signing date can be taken into account only at the next reporting date.

2439. Mr Holgate protested that even if (as he did accept) the assumptions were framed in a way that rather determined the answer, he was *"not going to be led by the nose so easily…"*. However, the Defendants made the point that confirmation bias is by its nature difficult to recognise and thus avoid, and submitted that there were signs that Mr Holgate was (as Dr Lynch put it) *"channelled"* by his assumptions and this resulted in him (a) failing properly to consider the possibility of nuanced variations or qualifications and the differences introduced by hindsight and (b) failing to ask for obviously relevant material (most strikingly, the contractual documentation). I was surprised by the last point; but I have not been persuaded that in the end it skewed his approach.

2440. Mr MacGregor regarded his approach as being *"somewhat different to Mr Holgate's"*. He was not asked to make assumptions, save as to the basic facts. He described his approach as follows:

> *"I have looked at each of the transactions and identified the accounting treatment based on the available evidence including identifying elements of disputed factual evidence which, if so determined (i.e. if the Claimants' allegations are confirmed) would mean the transactions did not have substance."*

2441. Mr MacGregor emphasised that in his opinion:

> *"a key point in considering the alleged reciprocal transactions is that, even if they are considered 'linked' by reference to IAS 18.3, this does not necessarily invalidate the revenue recognised by Autonomy."*

2442. As to the first five of the six impugned transactions, he stated that:

> *"…in my opinion, it appears that the sales and transactions in each case may have been "linked", but not necessarily in such a way that they could not be*

> *understood without reference to the series of transactions as a whole. I say this because, based on the evidence I have seen, there appears to be a commercial rationale for both the sales and the purchases, and each can be understood on its own terms. It appears that the linkage could have been, in substance, the exchange of dissimilar goods or services that should be accounted for by reference to IAS 18.12, which requires that the revenue is measured at the fair value of the goods or services received, adjusted by the amount of any cash or cash equivalent transferred."*

2443. With the obvious but important caveat as to the need in every case for detailed consideration of the facts and contractual documents, I think the overall gist of his evidence in relation to IAS 18.13 is captured by the following exchange in the course of his cross-examination:

> *"Q. ...If the facts are that Autonomy was purchasing something for which it had no need and which had no discernible value to Autonomy, and it was entering into that transaction simply as a means to channel funds to the potential purchase of its own software, then because the one transaction at least lacked a commercial rationale, you would look at the transactions together and you wouldn't account for any revenue from that transaction, correct?*
>
> *A. The way it works is if the overall commercial – if the overall substance of the transaction is solely as a way of Autonomy paying money to – for no other reason, paying money to a counterparty so that it can buy its software, then it has no commercial – the overall transaction has no commercial substance. And one would deal with the accounting for that on a net basis, i.e. whatever the net payment is, in this case it's Autonomy paying the counterparty, would be simply treated as an expense with no recognition of revenue."*

2443A. I turn from these general matters to consider the impugned reciprocal transactions individually to assess whether the Claimants' case that each was a means of Autonomy buying recognised and reportable revenue at substantial cost has been established and whether, as they submitted, the linked sale and purchase in each case lacked substance. If so, I agree that each pair of purchase and sale should have been accounted for on a net basis, and no revenue should have been recognised from the sale.

## RT 1: Capax Discovery/EDD (Sch 5/1 and Sch 12B)

2444. The Claimants contended that revenue on three sales to Capax Discovery of Electronic Data Discovery ("EDD" or "e-Discovery") software was recognised incorrectly, on the basis that the payments in respect of the sales were "reciprocal" with payments from Autonomy for EDD services that Autonomy did not need and which in any event Capax Discovery could not and did not provide.

2445. These three transactions were referred to compendiously as RT 1 and comprised individually:

(1) A March 2009 sale of a licence for $7.5m and 2 years support and maintenance for $750,000. This is referred to below individually as "the first Capax Discovery/EDD sale".

(2) A December 2009 agreement licensing additional software and extending the term from 5 to 6 years, for a licence fee of $4 million and $200k support and maintenance. This is referred to below individually as "the second Capax Discovery/EDD sale."

(3) A further agreement dated March 2011 providing Capax Discovery with the right to install the software at its UK Data Centre, for a licence fee of $1.6m and $80k support and maintenance. This is referred to below individually as the "third Capax Discovery/EDD sale".

2446. The Claimants' pleaded case in relation to RT 1 in RRAPoC Schedule 5/1 is that Capax Discovery agreed to purchase the EDD licences initially on the understanding that the Autonomy group companies would direct EDD support service business to it; and that when that support business was not provided, Autonomy made payments to Capax Discovery and Capax Global which were intended to be and were, used to fund the instalment payments due under the EDD software licences. These payments were made ostensibly for *"specialized EDD processing"*, *"additional EDD processing"* and *"Supplemental EAS support"*: but in fact, Capax Discovery and Capax Global were never required to provide such services or support (or what was provided was of no discernible value to the Autonomy group).

2447. As was noted in Dr Lynch's written closing submissions, the version of events pleaded in RRAPoC Schedule 5/1 refers only to a promise of future business rather than funding, and does not *ipso facto* call into question revenue recognition. However, the Claimants' factual presentation went further. Mr Baiocco asserted in his witness statement that even before that first sale, Mr Egan had agreed that Autonomy would provide funds to Capax Discovery to meet its instalment payments and indeed make a profit. That sat uneasily with the pleading that initially the only promise was that Autonomy would direct lucrative business to Capax Discovery. However, the cross-examination focused on the alleged side-agreement and tested the proposition that it was made before the first sale; and I consider that notwithstanding the departure from the pleading I must resolve the factual case as presented and cross-examined, not least since undoubtedly the Claimants have always sought to impugn all three of the sales comprising RT 1, and it is important in any event to determine when (if ever) there was an agreement to the effect that Autonomy would funnel funds (as distinct from business) to Capax Discovery to enable it to make the instalment payments as they became due.

2448. Thus, the Claimants' primary case is or became that the recognition of revenue from each of the sales comprising RT 1 was improper because the sales were only achieved by the preceding promise that Autonomy would somehow channel funds to Capax Discovery to put Capax Discovery in funds to pay the instalments due and to enable it also to show a profit. In that way, Autonomy funded and incentivised Capax Discovery to purchase Autonomy software so that Autonomy could recognise revenue from the sales.

2449. Whilst the Defendants contended that any arrangements made for Autonomy to purchase services were reached after the initial purchase and were not pre-agreed, the Claimants

contended that it is clear from the evidence, and that it is a matter of obvious and necessary inference, that the arrangement was reached <u>before</u> the relevant licence sales were entered into, and that it is simply not credible for the Defendants to suggest that this was a "*private arrangement*" between Mr Baiocco and Mr Egan, not least in circumstances where Autonomy paid $17 million pursuant to the arrangement over a period of more than two years, a substantial proportion of which was approved by the Defendants. On that basis, the Claimants submitted, the overall arrangement with Capax Discovery lacked economic substance, there was no net revenue realised and no revenue should have been recognised on the sales.

2450.   The Claimants submitted that the Defendants both knew this. They contended further that Deloitte were misled by the form in ignorance of the substance, and did not appreciate that in substance and reality, Autonomy was buying revenue through a reciprocal transaction of illusory substance.

2451.   Further, and more generally, the Claimants submitted that the means Autonomy adopted of funding Capax Discovery, by the issue of a series of purchase orders followed by payments for e-Discovery services which Capax Discovery could not and did not provide and for supplemental EAS support which Capax Global was never required to provide, plainly demonstrate fraud.

2452.   The amounts involved were considerable. The revenue recognised by Autonomy in the Relevant Period in respect of the three transactions comprising RT 1 amounted to some $14,130,000. The Claimants' case is that Autonomy should not have recognised any of that as revenue but should instead have recorded the difference between the cost of the purchases and the amounts that it invoiced in respect of those sales, amounting to $1,507,281, as an expense. Under Schedule 12B of the RRAPoC, the Claimants also sought recovery of transaction losses in respect of RT 1 in the net amount of $3,215,000.

2453.   As to the Defendants' position, Dr Lynch himself came to have concerns about RT 1. At the outset of his cross-examination, Mr Rabinowitz asked Dr Lynch whether, having listened to the evidence given in the case for the Claimants, it was really his position that not a single example of wrongdoing at Autonomy had been shown. Dr Lynch said that this was not his position; and he identified the evidence of Mr Egan and Mr Baiocco in respect of the transactions comprising RT 1 as having convinced him that Autonomy had been paying for EDD services that Capax Discovery was not in a position to provide, and that Mr Egan knew this and yet was reporting that the services were being provided. Later in the course of his cross-examination, Dr Lynch confirmed his acceptance that:

> "*What I know of the matter is that Capax was not able to deliver the services it said it was able to deliver.*"

2454.   When then asked whether in such circumstances it was inappropriate for Autonomy to have recognised revenue from the sale of software to Capax Discovery, Dr Lynch was more guarded; but he did accept that revenue recognition would indeed have been inappropriate *"if that arrangement was made at the time of the sale of software to Capax."*

2455.   In other words, Dr Lynch distinguished between (a) the general impropriety inherent in paying for non-existent or fictional services (which he accepted) and (b) the different question whether that affected revenue recognition in respect of the transaction

preceding the payments (which he contended depended on whether any arrangement for payment for such services was made before or after the transaction). As to the latter, the Defendants' case was that if there was any agreement to pay for non-existent or fictional services, it was put in place after and not before the transaction, and only to make up for the failure to funnel business Capax Discovery's way. That, after all, was consistent with the Claimants' pleading. Thus, notwithstanding Dr Lynch's acceptance, on the basis of the evidence given by Mr Egan and Mr Baiocco, of the apparent impropriety of the arrangements as between them, the Defendants did not accept that the recognition of revenue from the sale of the three licences was improper.

2456. The Claimants sought to dismiss the timing issue as a *"red herring"*. They argued that had Deloitte been told at any point that payments had been made on fictitious invoices and then used to pay instalments under the original sales transactions, Deloitte's whole approach would have been unsettled and it would have revisited very sceptically indeed all related revenue recognition; and management's credibility would be shot. However, it seems to me that though relevant to any reliance sought to be placed by the Defendants on the approval of Deloitte, and also of course to my overall assessment of the Defendants' intentions, knowledge and honest belief, for present purposes the point cannot be dismissed as a red herring, even if in the event sums were paid for fictional services. From the point of view of the accountancy rules, the relevant time for assessment is the date of the transaction from which revenue is said to have been derived. A dishonest expedient adopted afterwards as the means of funding it would not necessarily affect revenue recognition of a precedent transaction at the transaction date[293]. Accordingly, Dr Lynch's caveat as to the timing of whatever arrangement was made must be assessed.

2457. Further, both of the Defendants maintained that they were not aware of any improper arrangement at the time, and were certainly not aware that there was anything wrong in recognising revenue from Autonomy's EDD licence sales. Dr Lynch's position was that he had very little involvement in any of the three transactions; and generally, that he was not involved in any software sales. He signed off some of the purchases for services, but he did so on the basis of the proper approvals of others, without any reason to think that the purchases were not genuine. For his part, in his written closing submissions, Mr Hussain described the attempt to implicate him in whatever arrangements that may have been agreed between Mr Egan and Mr Baiocco as *"ex post facto reconstructions which bear no relation to reality"*.

2458. Accordingly, and as the Claimants had themselves highlighted, the principal factual issues for determination in respect of RT 1 are:

(1) Whether there was an understanding between Mr Egan and Mr Baiocco and/or in the case of the March 2011 agreement between Mr Hussain and Mr Baiocco prior to the sales from which revenue was recognised that Autonomy would ensure that Capax Discovery would be provided by Autonomy with the means

---

[293] Mr Welham was asked whether he considered this would have affected the original revenue recognition. His response was a little under-stated:

*"A.      I think when you use the word "fictitious" auditors' ears start to prick up. So anything where we're assuming there is something fictitious going on, I feel slightly uncomfortable to be honest. So I can't comment on that because I think you're saying if something happened to do with fictitious invoices after the event, would that impact revenue recognition? And I just can't speculate at all because we're in the world of fictitious invoices which as I say, would trouble me."*

of paying instalments due under the sales agreement, and if so what was its nature and timing?

(2) Whether, having regard to its nature and timing, the effect of any such arrangement and what was known of it rendered Autonomy's decision to recognise revenue on its software sales improper; and if so

(3) Whether the Defendants knew that the recognition of revenue from Autonomy's sales of EDD licences was improper.

*The first Capax Discovery/EDD sale in Q1 2009*

2459. The software licensed to Capax Discovery by Autonomy under the first Capax Discovery/EDD sale (dated 31 March 2009) included Autonomy's e-Discovery software, called "Introspect" and a product called Enterprise Archive Solution ("EAS"):

(1) E-Discovery or EDD is, in summary, the process through which electronic data is ingested and maintained, searched and analysed, typically in the context of litigation or investigations. The provision of e-Discovery/EDD business requires a platform of e-Discovery software and appropriately trained personnel. Autonomy's e-Discovery/EDD software was called 'Introspect'.

(2) EAS was a digital archiving product that had been developed and sold by Zantaz to a significant number of smaller customers. After Autonomy acquired Zantaz in 2007, Autonomy made the decision not to continue to develop EAS; but it still had to provide support services for customers to whom the product had been sold. In this respect, EAS differed significantly from e-Discovery/EDD, the software for which Autonomy continued to develop and sell, together with related e-Discovery services.

2460. It is common ground that EDD was a lucrative line of business which Mr Baiocco (and, in particular, Mr Stephen Williams who had been recruited by Capax Global in late 2008 and who had been an Autonomy e-Discovery consultant at his previous employers) was particularly keen to develop. Mr Baiocco explained that his goal was to offer a hosted e-Discovery solution to customers: that is to say, that eventually Capax Discovery[294] would host the relevant e-Discovery software and the customer's data in its own data centres. For that purpose, Capax Discovery would eventually need to acquire a data centre and the necessary hardware, and suitably trained personnel; but it needed also a licence to the relevant e-Discovery software.

2461. The license granted to Capax Discovery by Autonomy by the first Capax Discovery/EDD license agreement was to (a) use this software for the benefit of customers, either in connection with Capax Discovery's distribution of services provided by Autonomy, or in connection with Capax Discovery's own provision of services, and (b) install, operate and host the software, solely for the purposes of making the software available to customers as a Software as a Service ("SaaS") subscription-based offering, provided such hosted offering was housed on, managed by, and offered through access to servers owned and/or leased and controlled solely by Capax

---

[294] Capax Discovery was not incorporated until mid-March 2009, after the meeting at the London Hotel discussed below (see paragraph [2468(2)]). References to 'Capax Discovery' for the purpose of this section denote the Capax entity to carry on e-Discovery business.

Discovery. The agreement also granted Capax Discovery a licence to market, sell and distribute Autonomy's services to customers. No source code license was granted.

2462. The amounts payable under the first Capax Discovery/EDD sale were to be paid in instalments over 2 years in accordance with the Schedule to the licence, with the first instalment of $500,000 falling due on 30 April 2009. There were then eight instalments of $968,750 which were due at three-monthly intervals thereafter, until 31 March 2011. Autonomy was entitled to a royalty of 20% on all "Net Revenues" (as defined) over a threshold of $25 million.

2463. Capax Discovery assumed unequivocal obligations to pay the fees under the agreement (see Article 6). At Article 13, the agreement contained an entire agreement clause, which Mr Egan agreed was completely standard in software licences at that time, and which provided, amongst other things:

> "This Agreement together with all Order Forms, contains the full and complete understanding of the parties as to the subject matter hereof and may not be altered or modified, except by written amendment which expressly refers to this Agreement and which is executed by both Autonomy and Capax. The parties expressly agree that this Agreement supersedes all prior or contemporaneous proposals and all other oral or written understandings, representations, conditions, and other communications between the parties relating to such subject matter, as well as the terms of all contemporaneous or future purchase orders. Unless the parties expressly agree otherwise in writing, in the event of a conflict or ambiguity between or among the provisions of this Agreement and an Order Form, the following shall be the order of precedence: first this Agreement; second, the Order Form. Any terms and conditions contained in any purchase order or other ancillary purchase documents issued by Capax and/or Customer shall be of no force or effect."

2464. Autonomy recognised the $7,500,000 license fee as revenue in Q1 2009. The Claimants have stressed that the first Capax Discovery/EDD sale was important to Autonomy in enabling it to hit its quarterly revenue targets. On the day it was struck, Mr Sass sent an email to Mr Hussain and Mr Egan (among others) marked 'high importance' and announcing in capital letters: "CAPAX IS IN (SIGNED COPY IN HAND)". A few hours later, Mr Hussain replied, copying Dr Lynch, saying "Very well done both of you – I like $7.5m deals". There is no dispute that Dr Lynch was also thus aware of the sale.

2465. More contentious, however, is the detail of what was said in the lead-up to the agreement. The Claimants' case was that a "handshake" agreement was made, and deliberately not reduced to writing, which in substance obliged Autonomy to provide funds to Capax Discovery in order to enable it to fund its obligations under the Capax Discovery/EDD agreement. The Claimants supported their case on the basis that Capax Discovery was newly incorporated and such funding was absolutely necessary: and in any event Capax Discovery was not in a position itself to provide EDD services until much later, and was reliant on Autonomy to fund it.

2466. The Defendants, on the other hand, contended that even if an arrangement was at some time made between Mr Egan and Mr Baiocco for Autonomy to assist Capax Discovery

by paying it for services before it could actually provide them, it was after and not before the first Capax Discovery/EDD sale agreement. Further, if and when made, the agreement was informal and personal to Mr Egan and Mr Baiocco, and did not bind Autonomy or alter or remove the unconditional obligations entered into by Capax Discovery under that agreement. They dismissed the version of events put forward by the Claimants as not credible, nor realistically supported by the evidence.

2467. Dr Lynch relied in his closing submissions on four key points in addressing the alleged understanding between Mr Egan and Mr Baiocco. He submitted:

(1) First, the version of events put forward by the Claimants through their witness statements was manifestly incorrect.

(2) Secondly, the timing of any arrangement (whether by handshake or otherwise) was not as suggested, and post-dated the Capax Discovery/EDD agreement.

(3) Thirdly, the only party to any such discussions or understanding from the Autonomy side was Mr Egan, and any agreement he made with Mr Baiocco in defiance of standing instructions and the terms of the first Capax Discovery/EDD license agreement was personal to them and not binding upon Autonomy as a legal entity.

(4) Fourthly, any understanding or arrangement reached was informal, did not amount to an enforceable arrangement, did not alter the fact that Capax Discovery was on risk, and did not affect revenue recognition under the first Capax Discovery/EDD sale agreement.

*The Claimants' evidence of a handshake deal and the Defendants' criticisms of it*

2468. The Claimants' evidence was directed towards establishing not only the content of the alleged *"handshake"* agreement (see paragraph 2465 above) but also its timing, it being crucial to their case (as it had developed) on revenue recognition in respect of the first Capax Discovery/EDD sale agreement that it should be shown to have preceded 31 March 2009. There were three strands:

(1) The background to the alleged agreement, which the Claimants depicted as demonstrating that the initiative came from Autonomy (or at least, Mr Egan) which was desperate to make up a revenue shortfall, that Capax Discovery (or at least, Mr Baiocco) was equivocal, and that Capax Discovery's agreement had in effect to be bought;

(2) The events relating to the only actual meeting firmly identified as having taken place in the relevant time period between Mr Egan and Mr Baiocco, at a hotel in New York, on 11 March 2009;

(3) The exchanges after that meeting, which were predominantly between Mr Baiocco and Mr Sass, but which the Claimants maintained were directed by Mr Egan.

2469. Each of these strands was disputed by the Defendants. They maintained that:

(1) The initiative was welcomed by Autonomy but initially came from Mr Baiocco, who had identified e-Discovery as a lucrative area and incorporated Capax

Discovery to pursue it, but who needed not only an EDD licence but (in effect) some sort of collaboration with Autonomy to build this new area of business.

(2) At the meeting between Mr Egan and Mr Baiocco at the London Hotel in New York on 11 March 2009, the discussion was general and involved nothing which could have been described or thought to amount to a handshake agreement.

(3) No such agreement was reached in the period after that meeting: the exchanges and finalisation of the details which culminated in the first Capax Discovery/EDD sales agreement were dealt with by Mr Sass without substantial involvement on the part of Mr Egan.

2470. As to (1) in these opposing positions, an important detail of the Claimants' evidence is that Mr Baiocco stated in his witness statement that in early 2009, after Capax Discovery had decided to explore licencing EDD from Autonomy with a view to then offering e-Discovery services to its own clients, Capax Discovery requested quotes from Autonomy, but *"the amount Autonomy was asking for ($4 - $4.5 million) was more than we were willing to pay"* and Capax Discovery told Autonomy that it *"would not be able to proceed at a price in that range"*. Mr Baiocco had given the same evidence when examined in chief in the US criminal trial. The point is important because it was deployed by the Claimants as part of their overall case that Mr Baiocco's agreement to a very considerably higher quote a month or two later can only realistically be explained on the basis of Autonomy having agreed some sweetener or other.

2471. Another detail not mentioned in the witness evidence, but which is important for the same reason, is an email dated 13 March 2009 from an Autonomy salesperson called Jeff Cornelius ("Mr Cornelius") which he sent after hearing that Capax Discovery had *"reached out"* to Autonomy, advising Mr Egan and Mr Sass that he had already made a proposal to licence EDD software to Capax Global for as little as $1.6 million. Although Mr Sass quickly replied to the effect that the offer was nonsense *("This is bs. Must tell you guys")* the discrepancy is arresting, and was cited by the Claimants in closing as reinforcing the Claimants' position that later discussions:

> *"were driven by Autonomy's desire to recognise as much revenue as possible in Q1 2009, and were not constrained by the value of the software or what Capax was willing to pay, because Autonomy was itself going to fund the licence purchase in full."*

2472. Thus, the Claimants relied on the antecedent history as an important indication that Autonomy engineered the transaction to plug a gap in its software revenues, and then in effect talked Mr Baiocco into a larger deal than otherwise Capax Discovery could have reasonably been expected to undertake by the promise of funding.

2473. In my view, the documentary evidence points to the original enquiry having come from Mr Baiocco, and that it met with an enthusiastic response. That was my impression of the email exchanges and the oral evidence did not cause me to alter it. Thus:

(1) An email from Mr TJ Lepore (an Autonomy sales person covering the New York area) to Mr Robert Sass (Vice-President of US Sales) dated 4 March 2009 records (as an update on "new opportunities") that *"Capax Global wants to build an eDiscovery practice – EDD, Review, maybe ECA. John can talk to you*

*whenever"*, and Mr Sass's reply (within 10 minutes) encouraged immediate discussion, asking also *"do you have a feel for dollars – what do you think we can get this q?"*

(2) After Mr Lepore had spoken with Mr Baiocco that day to discuss Mr Baiocco's plans for this new venture, and what assistance Autonomy could provide, a later email from Mr Lepore to Mr Sass also dated 4 March 2009 recorded the fact of the discussion and the following:

> *"I did speak with John @4.30 as planned.*
> *I told him…that this is in the 7-figures range, depending on how much of a platform he wants to build. He didn't flinch; he's just looking for help on the best deal possible.*
> *Actually, in addition to ECA etc., they'd want to be able to show up to Company X with a portable system and collect from specific repositories. So they want to do the on-site ingestion/collection ala EnCase.*
> *With regard to timing, he has to sell it to his partners but he recognises this is huge business, the direction they want to go, AND he has all the idle servers released by Voxant. He wishes he had a deal to tie this to, but I explained that eDiscovery hosting is "here's the data – I need it processed and ready in two days" kinda thing, and if you've made the law firm happy it's more of an annuity than a huge up-front deal. He's hearing that from his new guy Steve Williams as well (Steve is from the eDiscovery space)."*

2474. In my view, the emails above attest also to the preliminary nature of the enquiry: it is a prospective project rather than a present proposal, and at that stage, Mr Baiocco had no settled or certain idea quite what he wanted in terms of software in order to achieve its new objective. But the impetus came from him.

2475. Turning to (2) in paragraphs 2468 and 2469 above and the dispute as to what transpired at the only documented meeting between Mr Egan and Mr Baiocco on the matter, on 6 March 2009 Mr Sass emailed Mr Baiocco, saying that Mr Egan and Mr Mooney were keen to put something together that worked for all parties. He *"reiterated the fact that we can be creative to ensure flexibility"* but emphasised that March was a key driver for Autonomy. Mr Baiocco was very enthusiastic about doing the e-Discovery project,[295] but at this stage it was still up in the air, and Capax Discovery had not even sorted out what the software might be. Mr Sass's email encouraged further discussion *"to get more clarity on what is needed"* and suggested a further meeting thereafter with Mr Egan who was in New York at the time (his email of 6 March 2009 proposed that they *"see if we can get together when Stouffer is in town to kick around ideas."*)

2476. It is common ground that a breakfast meeting was then arranged to be held at The London Hotel in New York City ("the London Hotel"). This was to be attended inter alios by Mr Egan, Mr Sass and Mr Baiocco on 11 March 2009. The evidence of that

---

[295] Mr Baiocco: "*We really want to do this. Just need to make sure we have everything in order.*"

meeting, and who in the event attended it, is disputed and equivocal and the Claimants' case was modified over time. No consistent version was provided by the witnesses.

2477. In his evidence in the US criminal proceedings, Mr Baiocco had (in examination in chief) given a detailed account of proposals put forward by Mr Egan at the London Hotel meeting. He described this in answer to Mr Frentzen (US prosecuting counsel, with whom Mr Baiocco had had many previous meetings) as follows:

> "*Q. What did Mr Egan propose to you?*
>
> *A. He proposed that they would give us the software and – well, give us the software for a price and that then they would make sure on the back end that we got taken care of to pay it until we were up and running and able to do the actual work ourselves.*
>
> *Q. So what was the price that you were – that Capax was supposed to pay?*
>
> *A. Seven and a half million plus support and maintenance.*
>
> *Q. So it was more than the original quote?*
>
> *A. Yes.*
>
> *Q. All right. And so in what way was it that Mr Egan was proposing that you could now do this deal for more money than you were – that you had already not been able to do?*
>
> *A. Well, he was proposing it because we weren't going to have to write a check for it. They were going to actually, you know, give us the EDD sort of processing money to give us the ability to make the payments to them for the software.*
>
> *Q. So was the proposed deal that Autonomy would give you the money to pay to them for the licencing of the software?*
>
> *A. Yes.*
>
> *Q. What were you going to do with the software once you received it at Capax?*
>
> *A. Well, we were going to set it up and build the business that we wanted to build around it.*
>
> *Q. Was there an understanding of – or was there an agreement about it if you were able to do the eDiscovery work, how that would proceed in terms of the relationship between Capax and Autonomy?*
>
> *A. Yeah. Well, once we were going to be up and running, they were going to feed us overflow and then there was like a royalty on the back end…after we hit a certain threshold, that they would collect X amount of any eDiscovery that we would do going forward for the term of that license.*
>
> *Q. Was part of this discussion or did part of this discussion involve the potential that Capax would actually get EDD work sent their way by Autonomy?*
>
> *A. Yes. When we were ready.*

HC-2015-001324

> *Q. And that was my question. At this time in early 2009, was Capax prepared to do any EDD work?*
>
> *A. No. We couldn't have been until we had the software. We didn't even own the software prior to that, so, no.*
>
> *...*
>
> *Q. What was it that gave you reassurances that you could enter into this agreement even if you couldn't make that payment schedule?*
>
> *A. I had a handshake agreement from Stouffer that they were going to make sure that we got the money to us to be able to make the payments to them.*
>
> *Q. To be clear, the money for these payments was going to come from who?*
>
> *A. From Autonomy.*
>
> *Q. With that understanding, did you agree to this?*
>
> *A. Yes."*

2478. This evidence was largely repeated, but with less detail, in Mr Baiocco's witness statement in the present proceedings. Mr Baiocco gave an account of the meeting, and of a deal, which Mr Egan stipulated must be made and signed by the quarter end (31 March 2009), for Capax Discovery to licence an EDD software package from Autonomy for an initial fee of $7.5 million. The assertion that a specific fee was mentioned acquired some importance and was disputed. It became clear in evidence that a fee of $7.5 million had not in fact been mentioned: the most initially floated was a fee of $5 million. However, even at that lower level, such a fee was, according to Mr Baiocco, significantly higher than a fee quoted previously by Autonomy (in January or early February) of some $4 to 4.5 million which he had rejected; but this time, Mr Baiocco said, the proposal was for *"a more robust EDD software package"* and came with a collateral assurance that Autonomy would:

> *"get money to [Capax] so that we could make the licence fee payments as they became due and in return Autonomy would receive the royalty on EDD fees earned by Capax. In addition, Mr Egan said that Autonomy would make sure that Capax would make a profit on the relationship".*

2479. In addition, Mr Baiocco stated:

> *"...once we acquired a data center and all of the necessary hardware, installed the EDD software on it, and trained the necessary EDD personnel, we would provide EDD services to our own customers and Autonomy would send any overflow EDD business from its customers to us. We would pay a 20% royalty to Autonomy on EDD fees earned in excess of $25 million."*

2480. According to Mr Baiocco, he was only willing to contemplate an even higher fee (of $7.5 million) and:

> *"willing to go forward with these terms because the software would effectively cost Capax nothing, we would be able to build an e-Discovery business, and we were promised a profit."*

2481. It was this rather detailed and specific set of arrangements that Mr Baiocco described as a *"'handshake' agreement with Mr Egan on behalf of Autonomy."* His description of its terms varied; and Mr Baiocco accepted that his recollection was imperfect. However, the gist of what Mr Baiocco said Mr Egan proposed remained the same: Autonomy would take care of Capax Discovery, or as Mr Baiocco put it:

> *"the concept was clearly on the table that they [Autonomy] were going to somehow give me the money to pay the thing".*

2482. Whereas, initially at least[296], Mr Baiocco placed all this as having been agreed at the London Hotel meeting, Mr Egan's witness statement did not expressly mention the London Hotel, nor did he specify when else the proposal was made. However, he gave a similar account in his witness statement of the proposals some time exchanged, emphasising the nature of the arrangements made as a *quid pro quo*. He stated their content in a conspicuously legalistic way, with a confessional flavour, as follows:

> *"I proposed that Capax license EDD software for a term of five years for $7.5 million (plus $750,000 for two years of support and maintenance). In return, and with Mr Hussain's approval, I told Mr Baiocco that Autonomy would agree to underwrite Capax's purchase by paying Capax a monthly fee that would fund its license purchase in full. I told Mr Baiocco that the license to use EDD software and Capax's corresponding payment obligations would be recorded in a contract that would state that Capax would be obligated to pay the full amount. I described the payments from Autonomy as monthly and at will, but said that it was Autonomy's intention to pay them until the license was fully underwritten or Capax was generating sufficient revenue from use of the licenses to pay the license off early. This was an oral side agreement. At Mr Hussain's direction, this oral agreement was not to be documented. I also told Mr Baiocco that Autonomy would do everything in its power to help Capax ultimately earn a profit on the transaction. Mr Baiocco agreed to proceed on that basis."*

2483. One of the difficulties with over-lawyered evidence, as was this passage (and others) in Mr Egan's witness statement, is that the impression is given of focus on details of legal significance and the orderly exchange of information and mutual promises, whereas any conversation or series of conversations (particularly perhaps one in the lobby area of a busy hotel apparently taken over at that time by a trade show[297]) is likely to have been more amorphous, fragmented and (often) legally incomplete. Mr Egan's detailed and orderly presentation of the alleged agreement in his witness statement did not survive cross-examination; and the time and place of the agreement became increasingly vague

---

[296] In cross-examination, he acknowledged that he did not in fact remember the meeting at the London Hotel at all though he could recall Mr Egan being there, and on the basis of an email referring to Mr Sass having been there, probably Mr Sass also
[297] According to Mr Egan in his cross-examination.

and unclear from the answers given by Mr Baiocco and Mr Egan when required to depart from their carefully polished scripts.

2484. Another difficulty of using witness statements as a vehicle for a statement of events crafted to achieve a legal result is that even if not untrue, the words placed in the mouth of the witness may reflect matters thought to complete the legal depiction of which he or she has or retains no direct knowledge. In this case, it seemed clear to me that neither Mr Baiocco nor Mr Egan could any longer accurately distinguish between what they actually could remember and what had become their perceived recollection, though to be fair to both, when cross-examined and left to their own devices, they did each do their best in that regard.

2485. Varnish stripped away by the process of cross-examination, the uncertainty even as to who was there revealed the frailty of the recollection of the principal witnesses, Mr Egan and Mr Baiocco. Mr Baiocco expressed himself *"1,000%"* confident that he had walked with Mr Lepore to the London Hotel and was originally insistent that Mr Lepore was at the meeting. However, this is not supported by the email evidence put to Mr Baiocco; Mr Lepore was not on the email convening the meeting and is not named as a "required attendee". There is no reason to suppose that Mr Lepore is likely to have attended the meeting; and eventually Mr Baiocco accepted that his recollection may have been faulty[298]. Mr Egan thought Mr Lepore was there too; but by his own admission his memory was hazy. The unreliability of their recollection is emphasised by the fact that Mr Baiocco could not remember Mr Sass being there, and nor could Mr Egan; but the email evidence clearly suggests that he was. I accept and find that the meeting at the London Hotel was attended by Mr Baiocco, Mr Egan and Mr Sass, but not Mr Lepore.

2486. Mr Baiocco accepted when cross-examined that he had no real recollection of the details of the discussion at the breakfast meeting in the London Hotel. Under cross-examination, he portrayed it instead as a discussion about *"e-discovery software in general"*, possibly with some discussion of Autonomy investing a little in Capax Discovery as an EDD partner, but with no specific discussion about "a dollar value on the deal" or any side agreement. He no longer could support his previous stance of the London Hotel meeting having been the occasion of the alleged *"handshake"* agreement. He could no longer remember *"exactly when the money piece came in…"* He added:

> *"I remember Stouffer talking about having 8 or $9 million of free money somewhere above or below – I'm not an accountant – the line they could use to invest in a partner, that's what I remember but not specifically talking about a dollar value on the deal at that meeting, I don't recall that."*

2487. Mr Egan, having first told me in the course of his cross-examination that he could remember a meeting with Mr Baiocco at the London Hotel at which he *"started talking to him about his interest in buying EDD software"* but little else of detail, and certainly no specific discussion about the *"7.5 million"*, then clarified that actually he had no recollection of discussing EDD at that meeting at all, and that what he had said about having had such a meeting at the London Hotel where they had discussed EDD was *"wrong"*; he added:

---

[298]Mr Baiocco suggested that Mr Lepore might not have been at the meeting, but that he had met him before the meeting for coffee. But in his earlier evidence, he had been unequivocal that Mr Lepore was at the meeting with Mr Egan. Mr Baiocco plainly had no real recollection; his evidence was entirely reconstructed.

*"I've corrected it, I do not recall that we discussed EDD."*

2488.  In light of the answers given under cross-examination, I consider it clear that whatever discussions there were at the London Hotel on 11ᵗʰ March 2009 they were more general and informal than the impression created in the witness statements. However, I think it likely (and this is borne out by later correspondence referred to in paragraph 2492 below) that, recognising the delay likely before it could be ready and able to do serving work, the possibility of Capax Discovery licencing e-Discovery software with the assistance of funding from Autonomy was floated, reflecting in this context the same general pattern which came to be established in the impugned VAR deals.

*Evidence of an agreement after the London Hotel meeting but before 31 March?*

2489.  Mr Baiocco's evidence was that the meeting at the London Hotel was the only occasion on which he met Mr Egan prior to the deal; and though in re-examination Mr Egan was prompted by various emails (referred to at greater length in paragraph 2492 below) to state his belief that he *"did have discussions with Mr Baiocco after the London Hotel"* he had earlier stated when cross-examined that he had no reason to disagree with Mr Baiocco's evidence that the London Hotel meeting was their only meeting.

2490.  In this curious position, of an alleged agreement on which the representatives of both of those said to have been parties to it insisted but neither of whom was ever able to date or place, the Claimants' case to the effect that the surrounding documentary and circumstantial evidence is such that it must have taken place ranged over a long time period and many events, as did (inevitably) the Defendants' response. The Claimants' written submissions well exceeded 100 pages in seeking to establish the inference, and the Defendants were almost as detailed in their rebuttal.

2491.  I propose to consider the matters and events relied on by the Claimants as follows:

(1) the email exchanges immediately after the first Capax Discovery/EDD sale agreement;

(2) whether those involved were aware that Capax Discovery could not itself provide EDD servicing;

(3) other evidence of arrangements after 31 March 2009 suggesting prior agreement;

(4) any documentary evidence of arrangements thereafter made for Autonomy to support Capax Discovery;

(5) payments actually made by Autonomy to Capax Discovery under purchase orders issued by Capax Discovery for EDD services.

2492.  The email exchanges following the London Hotel meeting seem to me to support my conclusion that the discussions there were preliminary, and did not focus on price or any settled *quid pro quo,* but did float the idea of a deal for Capax Discovery to purchase the EDD licence with money to pay for it being provided by Autonomy in some form:

(1) Mr Egan must have reported back to Mr Hussain after the breakfast meeting because on 12 March 2009 (the day following) Mr Hussain emailed Dr Lynch with the subject *"Capex [sic] deal"* and informing him that Mr Egan *"had a*

*bite at a $5m deal"*. The day following that, in the context of updating Mr Hussain on a number of prospective deals, Mr Egan confirmed to Mr Hussain that *"John [Baiocco] called Rob [Sass] and said he was very interested in the pitch we presented at breakfast. Time to start to let him know it could be possible".* Mr Hussain forwarded the email to Dr Lynch and Dr Menell.

(2)    On the same day, Mr Lepore reported on a meeting with Mr Williams of Capax Discovery. Capax Discovery was evidently still exploring what kind of EDD project it wanted to do, and decided it would be necessary to produce a demo for Mr Jerry Hawk (Mr Baiocco's partner in Capax Discovery).  Mr Lepore noted excitement on the part of Capax Discovery; and also that they had *"ideas about also not only developing eDiscovery software for those we sell to, but running it for them as well. I bet Wilmer would have interest in that kind of arrangement".*

(3)    Later on 13 March 2009 Mr Sass reported to Mr Egan on a call with Mr Baiocco.  He wanted to move forward for a deal in Q1.  He was proposing a meeting in Parsippany, New Jersey on 23 March 2009, and was still considering a broad range of possible deals (described as *"flavors on a proposal"*) of $5m, $10m, or possibly a lower entry point.

(4)    On 18 March 2009, Mr Hussain sent Dr Lynch one of his many spreadsheets: on it was listed a $5 million deal with Capax Global, with a comment by the entry *"Indicated would like to do"*.

(5)    No deal fee had been settled on even by 24 March 2009, as is evident from the documents below.

(6)    The negotiations appear from the email evidence to have been carried on between Mr Baiocco and Mr Sass, though (contrary to what the Defendants suggested) with substantial background involvement on the part of Mr Egan.

(7)    The parties' revenue expectations could be seen from the spreadsheet sent from Mr Sass to Mr Williams on 24 March 2009, in the revenue generation models. At that stage, a straight $5m fee was being proposed by Autonomy (see the "E-discovery proposal" tab).

(8)    On 26 March 2009 Mr Sass sent a deal model with two options, one being a $7.5m option and the other a $5m option.  This was the first evidence of a $7.5m option being suggested. There was evidence that a deal at that higher amount was promoted by Mr Egan to cover a gap in expected revenue for the quarter opened up by the collapse of a deal with Morgan Stanley which had been expected to close in the quarter.  Mr Hussain's instant reaction as recorded in an email to Mr Egan responding to the news of the collapse of the Morgan Stanley deal was *"s\*\*t – another piece of revenue gone. You definitely need $7.5m from capax."*

(9)    The *quid pro quo* offered for the larger commitment of $7.5m on the part of Capax Discovery was a lower rate of royalty payable to Autonomy, suggesting (according to a 5-year model) a greater long-term return to Capax Discovery under the $7.5m option. Mr Baiocco had set his sights on revenues of the order

of a net $44m over 5 years, and naturally considered it an exciting prospect.[299] However, despite this, Mr Baiocco seems to have remained cautious, and it should be remembered that this was before the first of the VAR deals when the understanding that Capax Discovery would not be left exposed became part of the pattern.

(10) By 27 March 2009 no deal had yet been completed; and it is clear from email evidence that Mr Egan remained concerned that Mr Baiocco had or would develop *"cold feet again"*. Mr Sass confirmed by email in response that:

> *"...he is looking for some sweetners [Sic]. he mentioned meeting with the partners and wanting to lay it all out. essentially he sent tom[300]on a mission and tom came back empty handed. He sounded a bit concerned, so I want to nip asap. You may want to call him or reply all to my emails and assuage concerns."*

2493. No specific occasion when the idea floated at the London Hotel meeting was discussed is identifiable in that chronology, and it is a fair point against the Claimants and the credibility of Mr Baiocco's evidence that he never did pinpoint any place or time when that idea became an understanding on which he was prepared to rely. Mr Hussain's closing submissions sought to quash any notion that "Tom's mission" had anything to do with any handshake agreement, on the grounds that (a) on the Claimants' case any agreement had already been made some time earlier and (b) as head of sales Mr Leonard ("Tom") would not have been engaged in that sort of thing, but in *"sweetners [sic]"* which got the EDD operations up and running and securing new business. There is something in the latter point, reinforced by the likelihood that Mr Baiocco would have wanted to seek any confirmation of a handshake agreement himself, rather than through a messenger.

2494. Mr Baiocco's inconsistencies, and his failure to identify when the understanding eventually crystallised, were understandably much relied on by the Defendants in support of their case that (a) no settled formulation had ever been provided of what the alleged understanding was, even to the point that the Claimants' pleaded case varied from the case eventually put at trial; and (b) if there was any workable understanding reached between Mr Egan and Mr Baiocco in respect of the EDD transaction it was, at most, an *ad hoc*, reactive arrangement reached after the event in light of unexpected difficulties, and not such as in any event to affect revenue recognition at the (relevant) point of sale.

2495. As to (a) in the preceding paragraph 2494, I have had especially in mind that initially Mr Baiocco described the arrangement as being that Mr Egan would provide Capax Discovery with business that would provide it with the means to make its instalment payments (and see paragraphs 2446 to 2448 above). However, and although the Defendants dismissed Mr Baiocco's attempt to explain this as *"incoherent"*, I consider that the explanation he gave is understandable. His central point was that by 'business' he meant and understood 'provision of funds'; and I consider that the explanation probably lies in the fact that even at an early stage the mechanism for funds being passed

---

[299] As he confirmed in cross-examination.
[300] Mr Tom Leonard, who (according to Mr Hussain's closing submissions) acted as Capax Discovery's head of sales.

by Autonomy to Capax Discovery involved the placing of purchase orders for 'business'. That is how I understood the following exchange in Mr Baiocco's cross-examination, when he was asked to confirm whether his account that the handshake agreement was that *"Autonomy would provide enough EDD business to Capax to cover Capax's quarterly payments on the purchase of software…"* was true:

> *" Q. Is that what you told your lawyers at the time? I mean, it's a very different story from the one you're now giving to this court.*
>
> *A. It's one word difference. There's no chance they could have given me business in the beginning because we weren't set up or able to do the business.[301]*
>
> *Q. This is a completely different story. What this is talking about is the level of business that Autonomy would provide to give you enough to cover the payments plus a profit. That is a completely different story from the one you're now telling this court, isn't it?*
>
> *A. No, then the word "business" is wrong in there*
>
> *Q. Well did you-*
>
> *A. I don't know if I said "business"*
>
> *Q. Were you misleading the lawyers when you told them this?*
>
> *A. No, I was not trying to mislead anybody, I was there of my own volition so, no, I was not trying to mislead anybody. Ever."*

2496.  In support of their alternative argument as to the timing of any understanding, and in addition to there being no identified time or place for when it was crystallised, the Defendants placed much reliance on what they depicted as a sudden dawning on Mr Baiocco that his enthusiasm had overlooked the extent of the task that confronted Capax Discovery in building an EDD business, followed by a rather desperate lunge for some support from Autonomy. This was presented as inconsistent with there having been, prior to then, any settled understanding. Dr Lynch highlighted the following in particular:

(1)  A few days after the agreement, Capax Discovery received a proposal for a lucrative proposed deal with a company called Iovate Health Sciences Inc ("Iovate") for the provision of litigation search facilities in pending Canadian litigation with an estimated data corpus of 2.5TB and a contract price of around $400,000 to $450,000. That would have covered the first instalment due under the agreement with Autonomy. Preliminary assessment of the viability of the possibility of Capax Discovery becoming involved, perhaps using Autonomy's facilities, revealed quite how far Capax Discovery really was from being able

---

[301] I considered at one point that the explanation might be that at the time, Mr Baiocco was not distinguishing between Capax Global (which was already undertaking profitable business) and Capax Discovery (which was not), and that his main point that the word "business" was misplaced because Capax Discovery was incapable of undertaking any was an afterthought. But the fact that the understanding was for the provision of EDD business disposed of that to my mind.

to assist, and brought home to Mr Baiocco quite how long it would take to get his new project up and running.

(2) Dr Lynch suggested that it was this dawning which drove Mr Baiocco to enlist, after the deal, Autonomy's financial help via a rather frantic email from Mr Baiocco to Mr Sass very early (03:14 hours) in the morning of 6 April 2009 in the following terms:

> "*I really need to speak to you in the morning. As I said from the beginning of this deal, there are things we didn't know we didn't know. We rushed the process to get this done for you in Q1. We are feeling the pain of all that now. My understanding of the Keys to the kingdom was that we would have everything we needed to do e discovery etal. Steven [Williams] is saying that the contract is missing key elements. Can we please talk in the AM as early as possible? I pushed this thru against all the partners wishes to push it into q2 so we didn't make mistakes. I need help. Sorry to sound so dire, however my reputation is on the line here.*"

(3) Dr Lynch pointed out that Mr Baiocco's email of 6 April does not mention or even hint at any prior agreement that Autonomy would be passing money to Capax Discovery in some way. Mr Baiocco sought to explain the omission on the basis that this had nothing to do with financial support and that what he was pressing for was software which had not been provided; but this did not carry conviction.

(4) Furthermore, when Autonomy responded, its answer came, (by email also dated 6 April 2009) not from Mr Sass (though he and Mr Sullivan were copied) but from Mr Egan, and it made no mention whatever of software but simply stated:

> "*Sushovan, Mike Sullivan and I identified $250k of business we would like Capax to handle for us last week. That would be a first job. Mike Sullivan should be in touch tomorrow.*"

(5) Also consistent with the 6 April email having been intended by Mr Baiocco, and understood by Mr Egan, to be a cry for financial help rather than for software or a software fix is the activity which the email prompted. The focus is not on the provision of fixes for software, but on what was ostensibly a "first job" which was intended in reality as the promise of initial funding.

2497. Nevertheless, despite my scepticism and concerns about the lawyer-varnished witness evidence, the inconsistencies in Mr Baiocco's evidence (exacerbated no doubt by the push and pull of multiple meetings with lawyers) and the Claimants' inability to pin-point any particular occasion when any agreement was made, I am satisfied that at some point prior to the end of Q1 2009 and the signing of the deal, the parties became *ad idem*.

2498. In particular, I have concluded and find:

(1) Mr Baiocco and Mr Egan agreed to proceed on the basis that Autonomy would find a way or ways of getting money to Capax Discovery to enable it to pay instalments under the licence proposed and earn a profit as well and (as Mr Baiocco put it in his evidence in the US criminal proceedings) "*make sure on*

*the back end that we got taken care of to pay it until we were up and running and able to do the work ourselves"*.

(2) That understanding crystallised at some time prior to the agreement on 31 March 2009. I do not accept the argument that the risk belatedly dawned on Mr Baiocco. I do not accept the Defendants' argument that Mr Baiocco was simply carried away by enthusiasm, and may also have underestimated the length of time required to get an EDD platform up and running. Mr Baiocco was undoubtedly exuberantly entrepreneurial; but in the particular context he was markedly more hesitant and deliberate, and needed to carry his partners with him; and he is not a fool. I reject the defence that if there was any such understanding, it post-dated the first Capax Discovery/EDD sale and (as Dr Lynch's closing submissions put it) *"amounted to no more than an ad hoc solution with a salesman to assist Capax with its instalment payments, by putting business Capax's way, as a stop-gap, until Capax were up and running."*

2499. In the end, it is a point that comes down to whether or not to believe Mr Baiocco. For all the doubts I had and have retained about his witness statement, his rejection in the course of cross-examination of the suggestion that he left it until after he had signed a $7.5 million deal to make arrangements to cover his exposure was authentic and convincing:

> *"Q. Can I suggest that if you reached any kind of arrangement with Mr Egan, it was after the licence agreement and all that he was doing was saying, "look, I'll find a way of getting you the money until you get set up and running"?*
>
> *A. Let me just be clear. Are you suggesting that I signed the $7.5 million deal and then made a deal to get paid on the backside of that after I signed the 7.5 million, is that what you're saying?*
>
> *Q. Well, I'll ask the question again. What I suggest is that, if you reached any kind of arrangement with Egan, it was after the licence agreement had been entered into?*
>
> *A. That would be false. I knew flat out when I signed it that we were going to get the money on the handshake deal."* [Emphasis intended to reflect inflection in Mr Baiocco's answers]

2500. I accept that evidence. It had the ring of truth and logic. It seems to me to be also consistent with the circumstantial evidence, and in particular the following:

(1) Mr Baiocco's consistent evidence was that there was no prospect of Capax Discovery being ready to do e-Discovery business for, at the very least, 6 months; and I consider it unlikely that Mr Baiocco and his partners would have committed to paying instalments in June without some reassurance such as is alleged. As Mr Baiocco himself put it in an email dated 4 March 2010 (see paragraph 2544(6) above), without some such assurance, *"we were nowhere near ready to do a deal like this."*

(2) Autonomy needed the deal; and for that it needed to provide a *"sweetener"* and reassurance. I have been persuaded that something, beyond optimism and greed, must have encouraged Mr Baiocco at this early stage in the Autonomy/Capax Discovery collaboration to go, at Autonomy's request, for the considerably larger deal.

(3) At some point in the last week of March, the decision was made and implemented by Mr Baiocco and his partners to form the new LLC, Capax Discovery. Whilst of course Mr Baiocco's ultimate purpose was for Capax Discovery to be the vehicle for what was a new venture distinct from Capax Global's business, he made it quite clear that it also was *"a way to mitigate risk. It was a way to say: if you don't pay, then we're going to mitigate how we may have to pay if you don't live up to your bargain."* What has struck me is not so much the suggestion that Capax Discovery's formation was a means of holding Autonomy to an understanding already established, but that Autonomy accepted both the introduction of this new, untested vehicle with no trade or financial history, and the blaring message it sent. Dr Lynch accepted that even if he did not personally know, it was well known within Autonomy that Capax Discovery was a new entity set up for the purpose, as contemporaneous emails made clear.

2501. Autonomy's pressing need to overcome Mr Baiocco's hesitancy about so large a commitment in order to fulfil its revenue forecast for Q1 2009, and its acceptance of the last-minute introduction of a newly formed entity without any financial ability to meet its obligations under the deal, seem to me to add considerable support to the Claimants' case. Mr Baiocco could not proceed without support; Autonomy could not achieve forecast if his reluctance was not overcome; Mr Egan could not legally bind Autonomy, but the agreed introduction of Capax Discovery meant that as a matter of fact Autonomy would have to abide by the understanding to preserve the credibility of the arrangement. These realities must have been recognised and accepted by both parties: in a sense, the assurances and the incentive to abide by them were inherent.

2502. I am also satisfied that but for these assurances, and the additional comfort provided that they would be honoured because Autonomy agreed to contract with the newly-formed Capax Discovery without right or legitimate expectation of recourse to Capax Global, Mr Baiocco would not have proceeded. On 31 March 2009 (the last day of Q1 2009), Autonomy Inc entered into a licence and distribution agreement with the newly-formed Capax Discovery, signed by Mr Egan on behalf of Autonomy Inc and Mr Baiocco on behalf of Capax Discovery.

*Further defences if there was a pre-contract understanding*

2503. In case of such a conclusion, the Defendants contended that, even if there was a collateral understanding between Mr Egan and Mr Baiocco, it was personal to them and did not bind Autonomy or implicate the Defendants.

2504. Dr Lynch maintained that he had very little involvement in any of these transactions and that he certainly had no knowledge of any such understanding. Mr Baiocco only met Dr Lynch briefly once at a conference and did not discuss with him any of the transactions referred to in his witness statement. Mr Egan did not suggest that he had any discussions with Dr Lynch in relation to the EDD arrangements and he accepted in cross-

examination that there was no interaction with Dr Lynch of which he could give evidence.

2505.  He did not accept that other members of Autonomy's management knew of it either:

(1)  He pointed out that neither Mr Baiocco nor Mr Egan had suggested that any other Autonomy staff member was party to the relevant conversations.

(2)  He contended that individuals far closer to the underlying business than he was did not know; and he relied especially on the evidence of Mr Sullivan, who was the Claimants' witness, the CEO of Zantaz (which was the umbrella company for e-Discovery business) and the person subsequently involved in giving and requesting approval on a number of purchase orders for services from Capax Discovery (which became the vehicle for payments to Capax Discovery used to fund instalments, as explained below) that he was not aware of it. He stressed that the Claimants had expressly disavowed any allegation that Mr Sullivan was implicated in any wrongdoing.

(3)  As to Mr Egan's evidence that Mr Hussain did know and approved the arrangements, Dr Lynch drew my attention to the fact that this was a story told in the statement of facts attached to Mr Egan's deferred prosecution agreement with the US prosecuting authorities, and his own liberty depended on sticking to that script. Dr Lynch submitted that the evidence as a whole is far more consistent with Mr Hussain not being aware of the arrangements.

(4)  He submitted that there was no basis for thinking that Mr Scott, Mr Smolek, or Ms Watkins knew of the arrangements at the time, or that any of them appreciated that no e-Discovery work was, or was capable of being, done by Capax Discovery.

2506.  This defence gives rise to a number of questions, not least how the reality that Capax Discovery was incapable of providing EDD servicing can possibly have been kept so secret for so long, from so many who were undoubtedly involved in the process of Autonomy placing orders for it and paying accordingly. I shall return to the question of the Defendants' personal knowledge later. For the present I focus on three aspects of the issue as to the state of awareness within Autonomy of (a) the purchase orders for EDD servicing and the pattern of payments by Autonomy to Capax Discovery in the period Q2 2009 to Q4 2009; (b) the capacity of Capax Discovery to undertake EDD servicing and other work; and (c) the omission of Mr Kanter from Dr Lynch's roll-call.

*Autonomy's purchase orders and payments to Capax Discovery Q2 2009 to Q4 2009*

2507.  In the months that followed the first Capax Discovery/EDD sale, Capax Discovery's largest, perhaps exclusive, source of funds was payments made to it by Autonomy under purchase orders for *"outsourced specialised EDD services"* which I am satisfied and find Capax Discovery was not able to provide. The process was elaborated by Mr Egan as follows:

> *"Autonomy submitted a series of purchase orders to Capax Discovery for EDD services to be rendered; Capax then billed, and Autonomy paid, for services that were not actually performed and that, for a substantial period of time,*

> *Capax Discovery was not capable of performing…Mr Hussain and Dr Lynch approved these payments…*
>
> *…*
>
> *I generated emails that created the appearance that Capax was actually providing overflow EDD services for Autonomy. In those emails I referenced Autonomy's true bandwidth constraints with respect to its EDD processing and used those constraints as a stated reason for paying Capax for EDD services that were not performed…I knew that Mr Kanter and Mr Hussain had made similar pre-textual statements. Mr Kanter confirmed: "I'm OK with the subcontracting on the EDD side as we have volume issues" and Mr Hussain stated: "We have been subcontracting EDD services to Capax". In fact, the payments to Capax Discovery were designed to allow Capax Discovery to pay for the license that we sold to it so that Autonomy could recognise $7.5 million of revenue in Q1 2009."*

2508. This needs a little unbundling. The first point to explain is my finding that Capax Discovery was simply unable to and never did provide the services for which it was paid by Autonomy pursuant to the series of purchase orders.

2509. In making that finding, I have considered Dr Lynch's evidence, which was not challenged, that *"Capax could have performed the service work anywhere it could access Introspect software, whether at its own facilities, at the customer's facility if the customer had Introspect or at Autonomy's Boston office where Introspect was run."* I also note that from the time that the deal was signed Capax Discovery was sending employees to Autonomy's Boston EDD centre for training and by July 2009 Capax Discovery was being held out in promotional material as providing EDD services and hosted archive services, which may have influenced some Autonomy personnel (see below). The Defendants also sought to contend, both (in the case of Mr Hussain) in the US criminal proceedings and in these proceedings, that although it was some time before it could establish its own data centre, Capax Discovery did almost immediately develop an EDD service capability which it did make available to Autonomy and for which it was properly paid.

2510. However, it is important to note the limit of Dr Lynch's evidence on the point. Dr Lynch did not say that Capax Discovery actually did provide such services; just as it never did provide the services referred to in the promotional material. Nor was Mr Baiocco's evidence challenged that Capax Discovery was unable itself to provide e-Discovery services to customers until 2011, and probably did not actually start doing so until December 2011. In particular, the evidence was, and I find, that Capax Discovery could not and did not provide the services ordered from it by Autonomy in a sequence of purchase orders over the course of two years which nevertheless Autonomy paid in full. The pattern which emerges is clear: Autonomy was repeatedly paying for non-existent services. Not only does that support the Claimants' case that there was an understanding, and the conclusion I have reached, since it is difficult to posit such a pattern unless there was some such understanding[302], it also invites the question how it can be that only Mr Egan knew about this extraordinary state of affairs, notwithstanding the involvement of

---

[302] Its timing is a different matter, I accept.

a number of Autonomy personnel in the implementation and approval of the purchase orders.

2511.  The Claimants relied on the following train of events:

(1)  The pretence commenced, almost immediately after the first Capax Discovery/EDD deal was signed, with Mr Egan's email of 6 April 2009 which I have already cited in paragraph 2496(4) above, in which Mr Egan, in response to a cry for help from Mr Baiocco, wrote that Mr Hussain, Mr Sullivan and he had:

> "...identified $250k of business we would like Capax to handle for us last week. That would be a first job. Mike Sullivan should be in touch tomorrow."

(2)  It is apparent from email exchanges that the request came from Mr Hussain and that Mr Smolek consulted Mr Scott (COO and General Counsel of Autonomy Inc) and Ms Cynthia Watkins (Autonomy's Corporate Controller) about Mr Hussain's "*request in correctly quantifying the $250k PO requests service for Capax & MicroLink LLC with Joel [Scott] & Cynthia [Watkins]*". Mr Smolek then reported to Mr Hussain that Mr Scott had:

> "*resolved that Stouffer [Egan] would be best to establish that mechanism, as he determined that it wouldn't fall under existing contract terms*".

(3)  In his response the same day (16 April), Mr Hussain expressed impatience with the fact that a purchase order had not yet been given to Capax Discovery, saying that he had:

> "…*no idea why this is so complex Create a PO for outsourcing edd processing as we did last year. Send details of PO (gb [gigabytes], price) to stouff Egan], pete [Menell], Sullivan and me. We'll approve*".

(4)  Later that day, Mr Smolek sought authorisation from Mr Hussain and Dr Menell to issue a purchase order to Capax Global for "*Outsourced Services*" described as "*Specialized EDD Services*" in the amount of $250,000. Mr Hussain provided his approval. Dr Menell indicated that Mr Sullivan should be "*second approval for these*". In Mr Sullivan's witness statement he said he was "*puzzled by this since I was not aware that Capax was doing any EDD processing work for Autonomy*". He said that he raised the matter with both Mr Hussain and Mr Kanter who referred him to Mr Egan. His recollection was that Mr Egan's explanation had "*a certain vagueness*" but the gist was that:

> "*there was a commercial arrangement between Autonomy and Capax for Capax to undertake e-Discovery projects for which it would be paid by Autonomy. Mr Egan assured me that the work was being performed and I should therefore sign-off on the purchase order.*"

(5)  Mr Sullivan then emailed simply "*ok*" that afternoon. Autonomy sent the purchase order to Mr Baiocco the next day (17 April). Initially, the purchase

order was incorrectly issued to Capax Global, and it was reissued by Autonomy on 22 April 2009 to Capax Discovery. The following day, 23 April 2009, Capax Discovery invoiced Autonomy in the amount of $250,000 for "*Specialized EDD Processing*", corresponding to the purchase order.

(6) In the meantime, Mr Baiocco was pressing for more help in view of the impending payment instalment date at the end of the month, when Capax Discovery would owe $500,000. Mr Baiocco emailed Mr Sass on 21 April 2009 asking if there was "*Any movement*".

(7) When Mr Sass replied that Mr Egan was tied up in a meeting, Mr Baiocco replied immediately:

> "*Im running out of time for today. I have a MS thing I need to be at from 4pm on. Can you talk to him? The deal is that Autonomy will stay ahead of us (champagne smacking)! We have 500k due in ten days and a PO for 250k. we also talked about front loading the PO's. We have no ability to help ourselves yet. We should be getting enough po [purchase order] monies to get us ahead by the end of April. I am sure I didn't misunderstand the deal? Correct? Don't mean to sound like a whiner, but I guess I am at this point.*
>
> *PLEASE HELP !*"

(8) The message appears to have reached Mr Egan because, on 23 April 2009, Mr Sullivan emailed Mr Smolek saying that Mr Egan had "*asked that we issue another PO to Capax. $270k is the amount. Could you get this in process?*". Together with the earlier purchase order for $250,000, this would bring the total amount that Autonomy was proposing to pay to Capax Discovery for non-existent "*Outsourced Specialized EDD services*" to $520,000.

(9) Mr Smolek sought authorisation from Mr Hussain and Mr Sullivan to issue this second purchase order on 24 April 2009, and Mr Egan asked Mr Sass to let Mr Baiocco know to expect another purchase order within 24 hours. As before, the purchase order was for "*Outsourced Services*" described as "*Specialized EDD Processing*". Mr Sullivan and Mr Hussain gave their approvals. The next day, 28 April 2009, Capax Discovery invoiced Autonomy for $270,000.

(10) Notwithstanding that the purchase orders had been approved by Mr Hussain and Mr Sullivan, by May 2009, Autonomy had not paid anything to Capax Discovery. Capax Discovery had also not paid Autonomy, which the Claimants suggested was consistent with the arrangement that Autonomy would put Capax Discovery in funds before it paid Autonomy.

(11) In the meantime, on 15 April 2009, and again on 11 May 2009, Mr Baiocco sent Mr Egan a list of the hardware that he needed to set up Capax Discovery's e-Discovery platform. Mr Egan then forwarded the list to Dr Menell and Mr Hussain, saying "*This is the HW [hardware] that Capax is looking at for starting their EDD processing facility. Can you have someone comment on whether the specs look right?*". From Mr Egan's email, it was clear that Capax Discovery did not yet have a facility for e-Discovery processing. This did not apparently prompt any questions from Mr Hussain or Dr Menell as to why

Autonomy had issued purchase orders in purportedly outsourcing e-Discovery processing services. The Claimants submitted that this is consistent with Mr Egan's evidence that Mr Hussain and Dr Menell were aware that this was the case: by analogy with the Sherlock Holmes story, they were the dogs that did not bark.

(12) The delay in receiving funds from Autonomy and assistance with the hardware order led to Mr Baiocco emailing Mr Sass again for help. His first email of 11 May 2009 simply said "*HELP !!!!!!!*". Mr Sass asked Mr Baiocco to send an email as he was travelling. In response, Mr Baiocco wrote:

> "*Getting nowhere with a bunch of promises that were made. I just need to have a schedule of what's going to happen when. Don't want to come off as a complainer, but things are [not] happening in the timeframes that were promised.*
>
> *I.E*
>
> *Champagne smacking profit (edd invoicing) FRONT LOADED*
>
> *Hardware order (crippled without it)*
>
> *Buyout datacenter hardware (promised EASY to do)*
>
> *EU business*
>
> *Please don't share this email. I know how this might sound outside of you and I, but there wasn't a second that anyone wasn't available when they needed me to sign the deal. Now I need to stalk to get the bare minimum.*
>
> *I want this to be perfect for a million reasons, first and foremost, so we can do this AGAIN when you really need it!*
>
> *Let me know your thoughts.*"

(13) Mr Sass asked Mr Baiocco to leave it with him for 48 hours and noted that Mr Egan was "*getting you some stuff as I write this (meaning he is paying attention)*".

(14) At the end of May 2009, Mr Chamberlain emailed Ms Watkins, copying Mr Hussain, in relation to the e-Discovery purchase orders. Mr Chamberlain noted that they should have been approved by both Mr Hussain and Dr Lynch given the amounts involved.

(15) The following week, on 8 June 2009, Mr Smolek sought Dr Lynch's approval:

> "*Hi Mike,*
>
> *Steve Chamberlain has directed that we obtain (ex post) your authorization to the following four PO Requests (in addition to the below listed standard authorizations previously granted per Corp Policy). If similar such requests arise in the future, per Steve C., we will seek to obtain your authorization within the standard process framework, by obtaining an AND [sic] authorization for both yourself*

> *& Sushovan at the highest listed level policy prior to issuing a PO (vs. the OR currently dictated per policy under which these were processed). ]*
>
> *Please at your earliest convenience - review & reply with your authorization to the following below listed four purchase requests.*
>
> *All below listed individual approvals are also attached.*
>
> *#1 [Tracking #04072009-7] PO Request*
>
> *REQUESTOR: Stouffer Egan*
>
> *VENDOR: Capax Discovery LLC*
>
> *PO LINE DESCRIPTION: Outsourced Specialized EDD Services [1,250 GB @ $200.00/GB] TOTAL COST: $250,000.00*
>
> *APPROVED BY: Sushovan Hussain Apr 17, 2009; Mike sullivan Apr 17, 2009*
>
> ...
>
> *#3 [Tracking #04242009-1] PO Request*
>
> *REQUESTOR: Stouffer Egan*
>
> *VENDOR: Capax Discovery LLC*
>
> *PO LINE DESCRIPTION: Outsourced Specialized EDD Services [1,350 GB@ $200.00/GB]*
>
> *TOTAL COST: $270,000.00*
>
> *APPROVED BY: Sushovan Hussain Apr 27, 2009; Mike sullivan Apr 27, 2009"*

Dr Lynch wrote: *"ok".* He did not ask any questions.

(16) On 8 June 2009 Ms Watkins asked Mr Sullivan (by email) to sign off and inform her that work had been completed on EDD invoices from Capax Discovery in order that Autonomy could process them. Mr Sullivan signed off: "*Yes – work has been completed.*" Again, Mr Sullivan's conduct is not impugned and Mr Egan does not suggest that he was aware of any arrangement. Mr Sullivan must have been given that impression by Mr Egan, whose evidence was that he "*wrote emails that gave the impression that work was being done*".

(17) On 22 June 2009, a few weeks after Dr Lynch's approval of the purchase orders, Autonomy paid Capax Discovery $520,000.

(18) The following day, 23 June 2009, Capax Discovery paid Autonomy $500,000 in respect of the first instalment under the first Capax Discovery/EDD sale. This was almost two months after the instalment had fallen due. Mr Baiocco's unchallenged evidence was that Capax Discovery had not paid earlier because it had not been given the funds by Autonomy to do so.

(19) At around this time, Mr Egan had agreed to purchase hardware to the value of approximately $800,000 for Capax Discovery to use with its EDD system, half of which was sent to Dr Lynch for approval by Mr Smolek in July 2009 and half of which was sent to Dr Lynch for approval in October 2009. Capax Discovery had first asked for this in April 2009, and repeated the request in May 2009. There was no criticism by the Claimants of the hardware purchase as such; but the Claimants cited an email from Mr Egan to Dr Menell and Mr Hussain (dated 11 May 2009) describing the hardware order as what *"Capax is looking at for starting their EDD processing facility"* as making clear that by that time Capax Discovery did not yet have a facility of its own for e-Discovery processing. The hardware request sent by Mr Smolek to Dr Lynch on 8 June 2009 identified Mr Egan as the requestor and confirmed Mr Sullivan and Mr Hussain as having already given their approval. Mr Sullivan was first approver. Dr Lynch wrote simply, *"ok"*.

2512. The next instalment under the first Capax Discovery/EDD sale was $968,750 and was due on 31 July 2009. That brought forward once more the urgent need to find funds to enable Capax Discovery to pay.

(1) On 7 July 2009, when Mr Smolek contacted Mr Egan saying that he had sent the hardware purchase order to Dr Menell for approval, he also explained that he had spoken with Mr Baiocco, who was expecting "*multiple more POs to be issued in the very near term*" and wanted early commitments on dates/amounts so he did not need to "*keep hounding Autonomy to meet his expectations*". Mr Egan responded:

> "*We have a large volume of EDD processing at the moment and will be sub-ing quite a bit to them. I am with Mike Sullivan and Pete [Menell] this evening and we will get you details quickly*".

Mr Egan told me in cross-examination that this email too was pretextual, and was intended to provide a record consistent with what he and Mr Hussain had agreed would be the stated reason for the payments to Capax Discovery. When it was put to him by Mr Miles that *"this was something cooked up with Mr Baiocco"* Mr Egan responded that this was not so; rather, he and Mr Hussain had "*cooked it up*" together and then *"proposed it to Mr Baiocco"*. In light of the antecedent history described above, I accept that evidence.

(2) On 9 July 2009, Mr Sullivan asked Mr Smolek to prepare another $250,000 purchase order for eDiscovery work for Mr Sullivan's approval. Mr Sullivan approved the purchase order on the same day (9 July 2009), following which Mr Smolek sought Mr Hussain's approval. Mr Hussain provided his "*ok*" the same day. Mr Hussain also approved the first part of the hardware purchase he had asked Mr Egan to split in two a few weeks earlier, as did Dr Menell.

(3) Next in the approval chain was Dr Lynch. Mr Smolek emailed him on 10 July 2009, saying:

> "*Hi Mike,*

*Please at your earliest convenience - review & reply with your authorization to the below listed two purchase requests (requiring CEO authorization per Steve Chamberlain).*

*All below listed individual approvals are attached.*

*#1 [Tracking# 07092009-1] PO Req*

*REQUESTOR: Stouffer Egan*

*VENDOR: Capax Discovery LLC*

*WHAT: Outsourced Specialized EDD Services 1,250 GB@ $200.00/GB*

*COST: $250,000.00*

*APPROVED BY: Mike Sullivan July 9, 2009, Sushovan Hussain July 10, 2009 [attached]*

*#2 [Tracking # 07092009-2] PO Req*

*REQUESTOR: Stouffer Egan*

*VENDOR: Capax Discovery LLC*

*WHAT: Reimbursement of Hardware & Software (procured from vendor Dell) needed to drive partnership acceleration efforts. Full Dell quote support attached approval on partial listing as detailed here: Sub-Total Cost Part# Description*

*$30,562.32 493005440 Software Licensing*

*$682.75 493007331 VMWare Workstation*

*$25,197.89 493024437 (VMWare Server Vl3) Latest Version vSphere 4 Enterprise*

*$179,290.97 493052754 CX4 Storage*

*$75,240.77 493053552 Brocade Switches*

*$105,396.17 483285873 M1 OOOe/Biade M600 Chassis 1*

*COST: $416,370.87*

*APPROVED BY: Pete Menell & Sushovan Hussain July 9, 2009 [attached]"*

(4) Dr Lynch provided his usual "*ok*" later that day. Dr Lynch's evidence when cross examined, was that the payment was in respect of "*capacity which could be called on at short notice in order to deal with peak processing*". Dr Lynch told me that his understanding that "*that's what I thought we were buying*" came from information "*that would have come up, presumably ultimately, from Mr Egan… since he was the person that told that into the system*", but that he had not spoken specifically to anyone within the management team. He added:

> *"What I didn't know was whether it was being used or not, but I would have expected the person requesting the POs to have made sure that there was a reasonable level of usage."*

(5) A few weeks later, on the morning of 31 July 2009, Mr Baiocco emailed Mr Egan, noting "*Today's the 31st. can you please update me on the PO's*". That morning, Mr Baiocco also called Mr Sass. Mr Sass relayed this:

> "*I received a call from John Biaocco [sic]. He indicated that he is waiting for 4 po's [purchase orders] at 250k each and asked that I reach out for status as he has an invoice due. Please advise*".

It is clear that Mr Baiocco was expecting purchase orders totalling $1 million from Autonomy because Capax Discovery's second instalment (in the amount of $968,750) fell due that day. Mr Sass made no attempt to disguise that fact in his email. Mr Sass forwarded his email to a wider group, including Mr Hussain and Mr Chamberlain, saying that he was re-sending it because Mr Smolek and Mr Hussain had limited access to email.

(6) Later on 31 July 2009, Mr Egan forwarded this exchange to Mr Kanter, Mr Sass and Mr Smolek, copying Mr Sullivan, saying:

> *"Andy,*
>
> *I think we discussed in UK. Can your group pick this up? Mike Sullivan can provide the what, but it needs you to then get the approvals done and manage the pos out on time."*

(7) Mr Egan and Mr Kanter appear to have had a discussion in the UK about the e-Discovery purchase orders. Shortly after Mr Egan sent this email, he replied to Mr Baiocco's email earlier that day, apologising for the delay and saying "*Sushovan is on vacation so we've routed through Andy Kanter our COO. Should be forthcoming*". Mr Kanter eventually took over the purchase order process, which the Claimants relied on as further undermining the suggestion that the arrangement between Autonomy and Capax Discovery was a secret confined to Mr Baiocco and Mr Egan.

(8) Mr Smolek prepared a purchase order for $1,000,000 for "*Outsourced Specialized EDD Services*", which was approved by Mr Sullivan on 3 August 2009 and by Dr Lynch and Mr Hussain on 6 August 2009. Dr Lynch told me that he did not feel the need to question anyone about it, and did not do so, in light of the prior approval of it by numerous people and the fact that it was a repeat purchase.

(9) The Claimants noted that by this point, Dr Lynch had approved payments to Capax Discovery totalling $1.77 million ($520,000 + $250,000 + $1,000,000) without questioning anyone specifically about the payments. They submitted that either Dr Lynch questioned the outsourcing arrangement and was informed of the true position, it being no part of Dr Lynch's pleaded case that he was

misled by, for example, Mr Hussain and Dr Menell – who, in addition to Mr Egan, knew the true position – or he did not ask any questions because he was already aware of the arrangement.

(10)     Although the purchase orders had been approved, it took Autonomy until 30 September 2009 to pay Capax Discovery. During this time, Capax Discovery made no payment to Autonomy, even though payment was nominally due at the end of July 2009. However, Capax Discovery then paid the second instalment due under the first Capax Discovery/EDD sale the very same day that it received $1 million from Autonomy.

2513. In my judgment, the sequence of these events, the correlation between the imminence of Capax Discovery's need to meet payment obligations under the first Capax Discovery/EDD sale agreement with purchase orders in amounts sufficient to enable that, and the apparent automaticity of the approval process for each of the purchase orders raised, all support the case that there was some sort of arrangement for Autonomy to subsidise Capax Discovery irrespective of whether at the date of payment Capax Discovery had any capability of providing the services purchased, and indeed notwithstanding that it did not.

2514. In addition to the points already noted, of particular significance to my mind are:

(1) Mr Egan's email to Mr Baiocco dated 6 April 2009, which I have concluded was pre-textual, was circulated to both Mr Sass and Mr Sullivan: neither contradicted its account that it was Mr Hussain, Mr Sullivan and Mr Egan who had identified "$250k of business" which none of them had any grounds to suppose Capax Discovery could handle as the basis for a purchase order.

(2) It is clear that Mr Hussain was at the centre of the purchase order process, and the procurement and payment for services which he had no reason to think could be provided so shortly after the first deal and Capax Discovery's formation. Further, Mr Hussain knew that Capax Discovery was a fledgling company, that it had no business of its own and that Mr Baiocco had made plain that it could not rely for help from Capax Global.

(3) The subsequent emails referred to in (2), (3) and (4) in paragraph 2511 above confirm that Mr Smolek, Mr Scott, and Ms Watkins were involved as well as Mr Hussain.

(4) Mr Baiocco did not confine to Mr Egan his references to the arrangement between them. He was open about Capax Discovery's inability, initially at the least, to pay out of its own resources; his email stating *"We have no ability to help ourselves yet"* and its obvious further reference to a funding plus profit arrangement to get Capax Discovery *"ahead"* by the time the first instalment became due at the end of April was, it will have been seen, written to Mr Sass when Mr Egan was not available; see (7) in paragraph 2511 above.

(5) Mr Kanter was also involved from the outset: see (4) in paragraph 2511 above.

(6) Mr Sullivan appears to have known at the time, or at least suspected, that Capax Discovery was not yet capable of doing processing work (see (4) in paragraph 2511 above).

(7) It would have been obvious to them all that Mr Baiocco's pressure on Autonomy was tied to impending instalment dates, and payments by Autonomy depended upon and correlated with payments by Capax Discovery.

(8) Autonomy's and Capax Discovery's need and appetite for mutual assistance is apparent: for example, and as the Claimants submitted, the references to Autonomy's need to sign the deal and to doing this *"AGAIN when you really need it"* (see (12) of paragraph 2511 above) reinforce their case that the arrangement was driven by Autonomy's revenue recognition requirement, which might well recur.

(9) Mr Kanter became central to the operation, and the fact that he took over the e-Discovery purchase orders seems to me to confirm the direction of the process by the core management.

(10)    The automatic unenquiring approvals sought from and provided by both Dr Lynch and Dr Menell are difficult to explain unless they too were complicit.

### *No documentary support for purported outsourcing of eDiscovery services*

2515. The Claimants' case was that the notion that e-Discovery services were being provided to Autonomy by Capax Discovery was a pretence. I do not think that is entirely justified:

(1) There is evidence, for example, that by August 2009, Capax Discovery employees, who had been sent to Autonomy's Boston data centre for training, were also providing *ad hoc* consultancy services. An email from Mr Scott to Mr Smolek dated 3 August 2009 noted this and recorded also that Mr Sullivan was expecting *"that they would be billing us for their services and wanted to be sure that we track any amounts we are paying them for those services and include them in tally of payments made out to Capax."* Mr Smolek's reply stated *"Yes – makes sense. Accordingly, going forward I will amend PO Requests to reflect tally of payments made to Capax."*

(2) Further, by October 2009, Capax Discovery was apparently confident that it had trained human resources for EDD processing. Thus, for example, on 20 October 2009, Mr Cox of Capax Discovery emailed Mr Loughran of Autonomy asking whether they might be deployed:

> *"Have resources on the bench for I6,* [a reference to Introspect EDD projects] *and would very much like to get them on a I6 project. Do you have anything in the works that we could jump on?"*

2516. That said, however, there is nothing to suggest that there was any basis at all for the initial pre-August purchase orders. Further, there is nothing to quantify the work done in August and later, or the charge for it; nor is there any evidence to suggest that in the event any charges were included in any EDD purchase orders, which were invariably in round figure amounts, and certainly did not give any appearance of incorporating labour charges.[303] There is a conspicuous lack of any documentation of the kind which would be expected in such a context. There was no statement of work, no order form, no

---

[303] Conceivably, such charges may have been swept up into what was described as a *"catch-all"* category described in paragraph 2541 below.

procurement or ordering document, no agreement to evidence the outsourcing except the purchase order and nothing to record the place, time and value of the outsourcing said to be taking place. Dr Lynch accepted in cross-examination that he would have expected there to be *"more paperwork than that"*.

2517. This contrasted starkly with the position relating to the EAS support services that (it is common ground) were actually being provided by Capax Global. In that context, the documentary record was substantially complete, undermining also any suggestion of some systemic aberration or neglect.

2518. A similar contrast was provided by a comparison between the approval process for EAS support services properly provided by Capax Global and the EDD purchase orders which were simply the machinery for payments for non-existent services. Thus, for example, in an email dated 12 November 2009 from Mr Hussain to Mr Egan and Mr Smolek (copying Dr Menell and Mr Kanter) Mr Hussain carefully adumbrated six questions to be answered before approval of *"the EAS part"* (including as to whether Capax Global had enough capacity to provide support) whereas all Mr Hussain noted in relation to the second part was: *"Regarding the EDD – I would like Andy to approve."* In an email later in the same thread, Mr Crumbacher noted that he had *"NO INSIGHT into the EDD."*

2519. That, and a request from Mr Scott asking for a table showing the amount of revenue Autonomy received from Capax (both entities) and the amount Autonomy paid to Capax Discovery in respect of the e-Discovery and EAS then prompted Mr Crumbacher to ask Mr Smolek for some *"help with the EDD numbers…"*. When Mr Crumbacher reported back to Mr Scott (the same day) he stated:

> *"I talked to Phil [Smolek] about the EDD subcontracting "process". Long story short, there really isn't one. Sullivan and Stouffer approve sending EDD processing work to Capax at a processing rate of $200/GB. There is no statement of work, order form, contract, or other ordering document or agreement to evidence the outsourcing of these services, other than a PO. Further, there is no specific outsourcing agreement under which we would outsource the EDD processing work in this manner; the EDD License Agreement contemplates them paying us for EDD processing work, not the other way around.*
>
> *So far, we've paid $1,770,000 for these outsourced EDD services. An additional PO is open (not finally approved/issued) for an additional $250,000.00, making the grand total of our EDD processing services $2,020,000.00 to date. Going forward, Andy Kanter is to be involved in approving the EDD outsourcing POs…"*

2520. Moreover, in his witness statement in these proceedings, Mr Sullivan (whose honesty was not impugned) stated that, though as CEO of Zantaz he *"had detailed oversight of its EDD business"*, he did *"not believe that Autonomy needed standby EDD support services"*. He added that he:

> *"knew of no instance of EDD work being outsourced to Capax or any other third party. When capacity constraints did arise, as in the case of our extremely large EDD contract with BP, Autonomy scaled up its operations by adding hardware and hiring additional staff to handle the extra workload."*

2521. Whilst I have harboured some reservations about this evidence (which, of course, could not be tested by cross examination), and its consistency with the evidence Mr Sullivan had given in the US criminal proceedings (which was so tested) in this regard its central point chimes with what Mr Crumbacher and Mr Smolek had observed: that there was no support beyond the purchase order and their approval for what by December 2009 amounted to payments by Autonomy to Capax Discovery of a total of $2,520,000 (all of which was used by Capax Discovery to pay instalments due under the first Capax Discovery/EDD agreement by that time totalling $2,437,500).

2522. I have concluded and find that, in addition to Mr Hussain, Dr Menell and Mr Kanter knew that:

> (1) Capax Discovery had not the means to undertake substantial (if any) e-Discovery processing work as envisaged by the series of purchase orders.

> (2) The purchase orders had been devised principally by Mr Egan and Mr Hussain, as a means of getting funds to Capax Discovery to enable it to pay instalments due under the first Capax Discovery/EDD sale, as was necessary to maintain the presentation of the sale to auditors and in the accounts as one from which revenue should be recognised.

> (3) The way the purchase orders were (a) commandeered by Mr Hussain and/or in anticipation of instalment dates under the first Capax Discovery/EDD sale then (b) processed on demand for the round figure required to pay such instalments without demur, further consideration or request for background supporting documentation, and lastly, (c) followed by invoices which were automatically approved without enquiry or any actual evidence, and simply on the basis that another person in the rung of approvers had given their approval,[304] seems to me consistent only with them being the pretence asserted by the Claimants. They were in reality payment orders made out to Capax Discovery.

> (4) The various emails suggesting that Autonomy actually needed and expected the work to be done by Capax Discovery because of excess demand for which it required overflow capacity were contrived.

> (5) None of this could, of course, be revealed to Deloitte.

2523. I need make no finding about what Mr Sass and/or Mr Sullivan knew. I shall return to Dr Lynch's involvement and knowledge in paragraphs 2575 to 2588 below. I turn to considering the reliance placed by the Defendants on Deloitte's approval of revenue recognition.

*Deloitte's consideration of the first Capax Discovery/EDD sale*

2524. The Defendants placed reliance on Deloitte's review and approval of the revenue recognition on the sale agreement. It seems to me to be clear that this purported reliance was unjustified. It is worth exploring briefly the principal reasons why that is so, because

---

[304] The exchange of emails between Mr Sullivan and Ms Watkins on 8 June and 10 June 2009 illustrates this. Ms Watkins stated: *"I spoke with Stouffer on Thursday last week in regards to the EDD invoices from Microlink and CAPAX and he believes that you will be able to sign off and confirm work has been completed in order for us to process. Please review the attached invoices and provided [sic] your approval and confirmation…"* All Mr Sullivan was prepared to state in response was: *"Yes – approved as I understand MRL has already approved as well."*

as well as showing that if they had known the true position, Deloitte would never have approved revenue recognition, it provides a broader insight into how Autonomy dealt with Deloitte to secure its revenue aims.

2525. First, Deloitte was not told about a letter from Mr Baiocco dated 31 March 2009 stating in terms that Capax Global LLC was *"a separate and distinct entity from Capax Discovery LLC. All contractual obligations will be between Capax Discovery LLC and Autonomy only"*. Secondly, Deloitte were never informed that there was a *"handshake"* agreement between Mr Egan, acting on behalf of Autonomy and with Mr Hussain's authority, and Mr Baiocco, acting on behalf of Capax Discovery, pursuant to which Autonomy had agreed to fund Capax Discovery's payments to Autonomy by channelling funds to Capax Discovery for fictitious services. Both provided clear grounds for refusing revenue recognition.

2526. Mr Baiocco's letter was no doubt intended to negate any expectation that Capax Global would stand behind its fledgling subsidiary, and drove home the point that a reason (the Claimants suggested the principal reason) for forming the new entity and making it the sole contracting party with Autonomy was to insulate Capax Global. As it happened it also left Autonomy in effect committed to funding Capax Discovery's commitments until it developed the EDD business (since otherwise artificiality would be revealed anyway). Mr Sass forwarded Mr Baiocco's letter to Mr Egan, Ms Watkins and Mr Crumbacher. It seems to me to be most unlikely that Mr Hussain was not told about it: and I infer that he was. Yet Deloitte were not told. At the very least the letter would have raised serious, probably unanswerable, questions about collectability, which I infer was the reason that it was not shown.

2527. As it was, Deloitte's working papers make clear that Deloitte approved revenue recognition on the assumption that parent would stand behind subsidiary, and Capax Global had proved reliable and was financially strong. Both experts were agreed that if recourse was only against Capax Discovery it would not have been appropriate to recognise revenue; and that, as it seems to me, was the significance of Mr Baiocco's letter, which plainly should have been disclosed to Deloitte.

2528. Secondly, even on the Defendants' case that any agreement or understanding post-dated the first Capax Discovery/EDD deal, it was in place before Deloitte approved the quarterly statements. Mr Egan's evidence was that Mr Hussain knew and approved of the handshake agreement and yet Mr Hussain did not disclose its existence to Deloitte. The Claimants invited me to find that this was because Mr Hussain knew that it would have precluded Autonomy from recognising revenue from the first Capax Discovery/EDD sale. Mr Welham explained in his witness statement at Welham 1 §120:

> *"If Autonomy had indeed agreed to make payments to Capax Discovery for fictitious EDD services in order to fund the EDD licence fee instalment payments due to Autonomy, I do not believe that we would have concluded that the revenue on the 31 March 2009 sale could be recognised. A side agreement of this kind would have been inconsistent with our understanding that the risks of ownership had truly passed to Capax Discovery or that economic benefits would flow to Autonomy from the transaction, and would have been contrary to the audit confirmation received from Capax Discovery."*

2529. The obvious problem with that passage of evidence is that it appears to be premised on Deloitte being told that the payments were for fictitious EDD services and does not in terms address the position if there had simply been (before or after the deal) a side agreement for Autonomy to fund Capax Discovery's instalment obligations in whatever way was available. It should go without saying that an auditor would not approve revenue from a contract for purported services known to be a fiction. However, it seems to me that Deloitte could not reasonably have approved revenue recognition had they known that Autonomy was somehow to fund Capax Discovery's instalment payments either, for the reason given by Mr Welham: it would have been inconsistent with risks of ownership truly passing to Capax Discovery, and the economic benefits associated with the transaction would have been funded by the purported recipient (Autonomy).

2530. In any event, it is clear that Deloitte's approval of revenue recognition was on the basis of an incomplete, and in fact fundamentally erroneous, understanding. Had Deloitte been properly informed, revenue recognition would not have been approved. I infer that that was the reason why Deloitte was kept in the dark.

*Conclusion on first Capax Discovery/EDD sale*

2531. In short, in my judgment, the reason for the first Capax Discovery/EDD sale was that it was needed in order to generate recognised revenue to cover an unexpected shortfall; Capax Discovery had no ability to pay the first year's instalments, and Autonomy agreed to fund them. Autonomy was paying for its own revenue. No revenue should have been recognised.

*The second Capax Discovery/EDD sale (Q4 2009)*

2532. By the end of 2009, and even though its advertising material in July had (prematurely) held out its capability of undertaking EDD business, Mr Baiocco was still trying to get Capax Discovery's e-Discovery platform up and running.

2533. At the end of December 2009, Autonomy and Capax Discovery entered into the second Capax Discovery/EDD sale which extended the term of the first Capax Discovery EDD sale by one year, and also enlarged the licence to include additional software, including ControlPoint, additional EDD software and IDOL SPE.

2534. The licence fee of $4,000,000, plus an annual support fee equal to 5% of the licence fee, was payable in four equal instalments of $1,050,000, with the first instalment due on 31 March 2010, and the remaining instalments at three-month intervals. Autonomy recognised the $4,000,000 licence fee in full as revenue in Q4 2009.

2535. The evidence of both Mr Baiocco and Mr Egan was that Mr Egan had promised, again on a handshake basis, that the fee instalments due from Capax Discovery would be covered one way or another by Autonomy, as under the first Capax Discovery/EDD sale. That meant that, in addition to ensuring that Capax Discovery was able to meet its quarterly payments of $968,750 under the first Capax Discovery/ EDD sale, Autonomy now had to ensure that Capax Discovery was able to pay the additional quarterly payments of $1,050,000 due under the second Capax Discovery/EDD sale.

2536. It is plain that Mr Egan both appreciated this and understood that something more had to be done to help Capax Discovery. In January 2010, Mr Egan emailed Mr Kanter, copying Mr Hussain, saying:

> *"Sushovan [Hussain] has approved Capax Jan support, can you be sure it has gone out? Capax has not received.*
>
> *Also, can you update on the process of outsourcing more EDD <u>and</u> the greater sum on <u>support</u> per month given higher client load than we had accounted for originally? If you could raise that paperwork for approvals it would be great."*
> [Emphasis supplied]

2537. The Claimants contended that Mr Egan's requests in the second paragraph of his email were designed to implement the handshake agreement that Autonomy would fund the instalments due under the second Capax Discovery/EDD sale by increasing the monthly amounts Autonomy was paying to Capax Discovery. This was partly achieved by an increase of $225,000 per month in the payments to Capax Discovery purportedly for e-Discovery services, from $250,000 to $475,000. This increase was attributed to so-called "*Additional EDD Processing*". As explained above, Capax Discovery simply was not yet in a position to provide such services, and the invoicing process was a fiction.

2538. However, even this substantial increase fell short of the quarterly payments that were due from Capax Discovery at this stage, which totalled $2,018,750 ($968,750 + $1,050,000). As Mr Egan suggested in his email to Mr Kanter, on top of the increase in payments for supposed e-Discovery services, Autonomy was going to increase the sum paid to Capax Discovery in respect of EAS support, making additional monthly payments of $125,000 under the guise of "*Supplemental EAS Support*".

2539. Although the Claimants accepted that Capax Global was providing EAS support to Autonomy's customers, they did not accept that the payments in respect of "*Supplemental EAS Support*" were for any genuine services. On the contrary, they contended that, as reflected in Mr Egan's email above, the "*Supplemental EAS Support*" payments were simply another means of getting funds to Capax Discovery to enable Capax Discovery to pay for the first and second Capax Discovery/EDD sales.

2540. The Defendants sought to counter this by presenting "*Supplemental EAS Support*" as part of the provision of EAS support services which was "*work that Autonomy did not want to do and Capax was happy to do it*" (as Mr Baiocco confirmed in cross-examination). However, this was not accurate: although the Defendants deployed the description "Capax", it was not Capax Discovery which did EAS work: it was Capax Global.

2541. It was suggested to Mr Baiocco in cross-examination that these supplemental EAS payments were supposed to compensate Capax Global for professional services it had provided but was unable to bill for. It was put to him that according to the notes of an interview he had with Morgan Lewis in February 2013, his version of events then was that "*truth be told*" the description "*Supplemental EAS Services*" was used as a "*catch-all*", and payments made under or by reference to the Capax EAS agreement included an element of uplift to compensate Capax Global[305] for "*thousands of unbillable hours and write-offs related to the product implementation services Capax performed for Autonomy*". Mr Baiocco had not mentioned this in his witness statement; and in his

---

[305] Although in the note "Capax" was the definition used for Capax Discovery, it is clear from the context that it was used to describe both Capax companies. It struck me that the unbilled hours were more likely to be referable to work done by employees of Capax Global than of Capax Discovery.

answers in cross-examination he seemed to me to be trying to marginalise what he had said to Morgan Lewis, though accepting that it was *"partially true"*.

2542. My impression was, and I find, that what Mr Baiocco really meant by the category being a "catch-all" was that it was a useful and sufficiently amorphous description to cover payments which were not referable to any documented or identified service, and which could be and was used as the vehicle for the additional payments that became necessary to enable Capax Discovery to cover its increased commitments. That was both the catalyst for and the principal purpose of the payments made by reference to the category, as the close relationship between payments made in and payments made out by Capax Discovery illustrates. It may well be that Capax Global had a justified claim to be compensated for unbilled hours; but that was not the purpose of the payments.

2543. Put shortly, it seems to me clear that the increased payments to Capax Discovery and Capax Global, whether described as for *"Additional EDD Processing"* or as *"Supplemental EAS Support"*, were driven by the need to find more money for Capax Discovery in light of the increased instalment payments due under the second Capax Discovery/EDD sale and continuing obligations under the first Capax Discovery/EDD sale and were made for that reason.

2544. I have been fortified in that conclusion by the following evidential matters:

(1) Apart from those directly involved in the Purchase Order process, no-one within Autonomy appears to have had any experience of Capax Discovery ever providing any services: if any question arose it was invariably referred on to "Cambridge", connoting the finance department.

(2) There was never any documentary evidence provided to support the suggestion that Capax Discovery did any EDD processing or EAS work: unsurprisingly, since it was incapable of doing the first, and EAS work was usually done by Capax Global.

(3) It is clear that in early 2010 Mr Kanter took over supervision and control of all the purchase order process in relation to Capax and Autonomy's purported EDD and EAS activities, confirming its direction from "Cambridge" without regard to what, if anything, was happening where Capax Discovery was based and operated, and without any evidence of work done or required. As the Claimants submitted, Mr Hussain's decision (and his decision it was) to put Mr Kanter in charge of the e-Discovery and supplemental EAS purchase orders only made sense if they both knew that this was simply a financial exercise that involved getting sufficient funds to Mr Baiocco.

(4) The pattern of the issue of a purchase order by Autonomy to cover instalments due from Capax Discovery is to my mind further confirmed, and the correlation between payments made by Autonomy pursuant to purchase orders purportedly for e-Discovery processing or Supplemental EAS support is, as before, revealingly exact. Purchase orders were churned out according to funding need, and enhanced immediately when additional amounts became due in consequence of the second Capax Discovery/EDD sale.

(5) In this regard, the Claimants cited various spreadsheets prepared at the time by Mr Baiocco which clearly show him attributing payments received from Autonomy in respect of purported e-Discovery services and supplemental EAS

support to instalments due under the first and second Capax Discovery/EDD sales, and only paying those instalments once he had received sufficient funds from Autonomy to do so. Notably, no deductions were made for the costs of providing the purported services: for none were being provided. Any excess of the monies paid to Capax Discovery over the amounts paid out represented the agreed profit. Although in cross-examination Dr Lynch suggested that each spreadsheet was *"more like a standard balance of trade journal which you see quite regularly where people keep track of the cash and the trade between two parties"* the spreadsheets did not allow for any of the usual deductions or variations that would be expected in a record of a trading relationship; and the correlation mentioned above was a clear sign also of the purchase orders simply being the mechanism for payment of funds as and when required for payment of instalments.

(6) Further, after sending the first of these spreadsheets to Mr Kanter in March 2010, Mr Baiocco sent Mr Kanter a follow-up email which, as well as confirming Mr Kanter's direct involvement, makes even plainer that the payments manifest, not a trading relationship, but the subsidy arrangements provided for in the handshake agreement:

> *"...sorry to hit you again here. Just wanted to reiterate. That we were promised more than a dollar for this. We were promised a profit as well. Trying not to sound ungrateful in any way, just that we were nowhere near ready to do a deal like this."*

(7) Another illustration is provided by an e-mail exchange between Mr Baiocco and Mr Kanter on 6 December 2010. In the first Mr Baiocco asked: "*anything today?*" Mr Kanter asked what the number was on "*DD1*", i.e. direct deal 1. This was a reference to the first Capax Discovery/EDD sale. Mr Baiocco later responded that the number was "*750 k for dd1 in turn. I pay 968,500 asap for oct 31 due that will get me thru dec for heat*". Mr Kanter must have been aware of the arrangement with Capax Discovery. Even Dr Lynch accepted that Mr Baiocco was saying that he needed another $750,000 from Autonomy in order to pay the instalment under the first Capax Discovery/EDD sale which had fallen due on 31 October 2010. (Dr Lynch subsequently approved this payment without making any enquiry; and see paragraph 2578 below in my discussion of the Defendants' knowledge).

*Deloitte's consideration of the second Capax Discovery/EDD sale*

2545. Deloitte's working paper setting out its consideration of the second Capax Discovery/EDD sale included the following:

> *"...The Capax Discovery arm of the group specialises in eDiscovery solutions for businesses and in order to do that they need the Autonomy software listed above...*
>
> *...given the success Capax has had with its previous Autonomy purchases, we conclude that there is clear commercial rationale for this purchase...*

> *In considering the ability of Capax Discovery LLC to meet their contractual commitments to Autonomy, we have reviewed their payments made in Q4 2009 and their overall payment history…*
>
> *Given that Capax are up to date with their significant payment obligations (i.e. more than $1.0m paid in each of the last two quarters) and given the information obtained with regards to their status with Microsoft, we conclude that this deal is recoverable…"*

2546. As is apparent from this working paper, and from Mr Welham's unchallenged evidence, Deloitte was not aware that the only reason Capax Discovery was up to date with its payment obligations under the first Capax Discovery/EDD sale was because, pursuant to the handshake agreement, Autonomy had funnelled money to Capax Discovery for non-existent e-Discovery services. Mr Welham's evidence was that, if Deloitte had known that Autonomy needed to put Capax Discovery in funds to pay for the Autonomy e-Discovery software by making payments for services that Autonomy knew to be fictitious, Deloitte would not have regarded Capax Discovery's payment history as supporting the recognition of revenue on this or other Capax Discovery deals, which was not challenged and is obvious if its premise is correct. There can, therefore, be no dispute that the information which was withheld from Deloitte was highly relevant to Deloitte's conclusion on revenue recognition.

2547. Equally obvious and *a fortiori* would be the position if Deloitte had also been aware that what lay behind Mr Baiocco's call for and expectation of help, and Autonomy's urgent reaction to assist, was the same understanding as had underpinned the first transaction (and indeed all of the impugned transactions with Capax). As before, Mr Egan's evidence was that Mr Hussain knew and approved of the understanding and the expectation which was its corollary. As before, Mr Hussain did not disclose its existence to Deloitte because he knew that it would have precluded Autonomy from recognising revenue from the second Capax Discovery/EDD sale.

2548. Deloitte was not aware either that Capax Discovery had in fact had no success with its previous Autonomy purchases, i.e. with the software licensed pursuant to the first Capax Discovery/EDD sale, because (as explained above) Capax Discovery was not even in a position to provide e-Discovery services to customers by 31 December 2009.

2549. I find that Deloitte were misled; their approval cannot avail the Defendants, and the Defendants' purported reliance on it tends further to endorse the dishonest nature of their (the Defendants') approach and of the transactions concerned.

*Conclusion on second Capax Discovery/EDD sale*

2550. For similar reasons as in the case of the first Capax Discovery/EDD sale I have concluded that no revenue should have been recognised from the second Capax Discovery/EDD sale.

*The third Capax Discovery/EDD sale (Q1 2011)*

2551. By the end of March 2011, Capax Discovery was ready and looking to undertake e-Discovery processing work in the UK. To that end, it had rented premises in London and set up a data centre at a considerable cost. The team at Capax Discovery was

working closely with individuals from Autonomy, including Mr Lucini and Dr Menell, to ensure that everything was in place to provide actual services, and, in particular, a prospective part in providing services in the context of BP Deepwater Horizon oil-spill litigation then at the disclosure stage.

2552. As part of the process, and also to discuss with Autonomy a structured service contract which a Capax Discovery-related entity called Autonomix had won from the US government and in which it hoped to enlist Autonomy, Capax Discovery's Mr Baiocco, Mr Steve Williams and a Mr Allen Gurney, travelled to the UK for a meeting in Cambridge, which in the event was followed by two short meetings between Mr Baiocco and Mr Hussain.

2553. The Claimants presented the meetings between Mr Baiocco and Mr Hussain (the first occasions on which they had met in person) as curious affairs, at which:

(1) First, Mr Hussain seemed principally concerned initially to try to persuade Mr Baiocco to take in another VAR deal which he explained Mr Egan had forgotten to mention, and of which Mr Baiocco had been given no notice at all. That was odd in itself; but more remarkable still was that according to Mr Baiocco's evidence, Mr Hussain wanted the new VAR deal booked as a Q1 2011 deal, even though by this point it was late in the first week of Q2 2011.

(2) When Mr Baiocco declined, not (it appears) so much because of the backdating proposed, but because he had just entered into a VAR transaction for end-user UBS and did not want so soon to take another one, Mr Hussain almost immediately followed this up by telling Mr Baiocco that Capax Discovery's existing licence did not enable use in Europe and that in order to provide e-Discovery services from its London data centre it would have to extend its licence for a fee.

(3) There was a dispute as to whether this came as a surprise to Mr Baiocco, as he had claimed in his witness statement. There was contrary evidence relied on by the Defendants that the possibility of this had earlier been raised internally within Capax Discovery by Mr Williams. Even so, the impression I got from Mr Baiocco was that he was taken aback: both because Autonomy itself had not previously raised it despite exchanges of emails as to the setting up of and prospective work for the London office, and because of the apparent correlation between his refusal of the VAR deal and what was effectively a demand for a further licence fee. The correlation is added colour by the fact that the VAR deal and the fee sought by Autonomy were almost the same: $1.6 million, payable in two equal instalments on 30 May and 29 June 2011.

(4) According to Mr Baiocco, who had made clear in emails that he had over-spent on the London office to prepare for licensing work he had understood to be imminent, the feeling of being, in effect, confronted with little option was compounded by the fact that within hours after his first meeting with Mr Hussain at which this had been mentioned, and before any further discussion of the terms, he was sent documentation for a licence extension. This was already complete with the relevant terms of licence extension, first in draft and then almost immediately after that, in execution form with the date entered in as 31 March 2011 (nearly a week earlier than the draft, echoing the VAR proposal which Mr Hussain had initially proposed).

(5) At the second meeting (on 7 April 2011) between Mr Hussain and Mr Baiocco there was discussion about the Autonomix proposal, and a very short exchange, so short as barely to amount to a discussion, also about the licence extension (what became the third Capax Discovery/EDD sale). There was no substantial dispute about the words comprising the exchange; but much debate as to its true content and significance. Mr Baiocco's evidence was that he asked Mr Hussain *"straight up, 'We're good on this no matter what?' and he [Mr Hussain] said 'Yes'"*. Mr Baiocco read a lot into this, however; in cross-examination he said that this was:

> "*the gist of it. I don't know if there were more words but the answer was I needed assurance that, if I was buying this, even if --- we were assuming we were going to get the BP data which would make anything else moot, but if for some reason they didn't give us the BP data that I wasn't going to be left holding the bag for $1.6 million*".

2554. Mr Baiocco accepted in cross-examination that he had never discussed the so-called *"handshake arrangement"* with Mr Hussain ever before. Mr Hussain's closing submissions described the idea that this exchange of some five words in about two seconds amounted to a confirmation of a supposed handshake deal made years before as *"unreal"*. Viewed in a vacuum that is plainly right. But the discussion did not stand alone. In particular:

(1) Mr Baiocco set the short exchange in the context of *"all the payments that came my way over the course of time leading up to that"* and his *"assumption that [Mr Hussain] was fully aware of the handshake deal at that point"*.

(2) Before the meeting Mr Baiocco had repeatedly sought assurances from Mr Lucini that substantial work would be provided by Autonomy to Capax Discovery, and emphasised that Mr Baiocco had scaled up in London on that basis. Mr Lucini had been variable in his responses and it was natural for Mr Baiocco to seek reassurance. He supposed that Mr Hussain would be aware of that.

(3) Both Mr Baiocco and Mr Hussain must also have known full well that the licence extension was backdated. That did not benefit Mr Baiocco but it did benefit Autonomy, which on the basis of the false date recognised revenue from the sale in Q1 2011. That backdating was not explained or denied. In complicity there was mutual need and understanding.

2555. I have reached the conclusion that, notwithstanding how short and apparently perfunctory the exchange, each man knew what the other was meant to understand. I accept and find that Mr Hussain was well aware of and had approved the previous agreements with Mr Egan. The exchanges signified that nothing would change: the same understandings as before remained in place. If for some reason Autonomy did not give Capax Discovery the BP Deepwater Horizon work, then it would be provided with funds in another way and *"no matter what"* it would not be left *"holding the bag"*.

2556. That this is what was intended by the two of them is reinforced by subsequent events. When Autonomy did not pass on to Capax Discovery any of the processing work related to the BP Deepwater Horizon case and instead up-scaled its own operations by adding

hardware and hiring additional staff, Capax Discovery was not left holding the bag. Autonomy subsequently made additional payments, purportedly for EDD processing services which Mr Baiocco said in his witness statement Capax Discovery *"did not actually provide"* but which enabled Capax Discovery to discharge its indebtedness under the third Capax Discovery/EDD sale, as well as the payments previously promised in respect of the two earlier EDD agreements.

2557. Reflecting the previous arrangements:

(1) Mr Baiocco's main point of contact continued to be Mr Kanter, whom he continued to email regarding payment of the purchase orders.

(2) Towards the middle of June 2011, Mr Kanter suggested that he, Mr Baiocco and Mr Hussain should speak, and he proposed a call on 14 June 2011. Ahead of the call the following day, Mr Baiocco replied to Mr Kanter, "*Hey, if you get me the July 475k for edd today, I will pay off the entire 968,750 today as well, I already wired half to Helen Ku. That way we have that off the table for tomorrow?*".

(3) Mr Kanter could not have understood anything other than that Mr Baiocco intended to use the payment of $475,000, purportedly in respect of e-Discovery services, to pay the final part of the instalment due under the first Capax Discovery/EDD sale.

(4) By the end of June 2011, Capax Discovery – entirely with money provided to it by Autonomy – had paid Autonomy the instalments under the first and second Capax Discovery/EDD sales. All that remained were the instalments due under the third Capax Discovery/EDD sale. Although these had fallen due in May and June 2011, respectively, they remained unpaid when HP's bid for Autonomy was announced on 18 August 2011 because Capax Discovery had not yet been put in funds by Autonomy.

(5) On 20 September 2011, Mr Richard Eads emailed Mr Chamberlain with the subject "*Capax*", noting that there had been a "*Tremendous amount of clean up recently. We have 2 invoices remaining as shown below. These appear to be for internal Capax systems since no end-user is specified…I'm going to start calling on these unless instructed otherwise*". Mr Eads must have been instructed otherwise, because the two invoices for the instalments due under the third Capax Discovery/EDD sale were not paid until more than two months later, in December 2011.

(6) The last purchase order in respect of supplemental EAS support was issued on 13 September 2011, and the last e-Discovery purchase order was issued on 3 October 2011, the day that HP's acquisition of Autonomy completed. Since Mr Hussain was the person who discussed the third Capax Discovery/EDD sale with Mr Baiocco, the funds required to pay the instalments under this deal could not plausibly have made their way to Capax Discovery unless, as Mr Baiocco said, Mr Hussain was aware of the handshake agreement and agreed that a

similar arrangement would apply to the third Capax Discovery/EDD sale – as in fact it did. [306]

2558. Mr Baiocco's evidence was that these payments were made using funds Capax Discovery received from Autonomy in respect of eDiscovery and/or supplemental EAS support services that Capax Discovery never actually provided. His position was that Capax Discovery was simply unable to do the work for which purchase orders were drawn and honoured. This is inconsistent with its promotional material asserting the contrary, which he first explained at the US trial on the brusque basis that this material *"wasn't true"*, *"selling ahead of capability, so – we do it all the time"*, but softened by elaborating to say, in answer to a question from his cross-examiner querying whether he did routinely tell people that they had capability that they did not have:

> *"No. But it takes sometimes six months to a year to close a deal like that, so we felt like we were close enough that we could advertise and get a deal, and we always have the back up of Autonomy doing the work for us if we weren't ready."*

2559. Mr Baiocco's evidence was supported by Mr Sullivan, whose evidence in his witness statement was that he *"knew of no instance of EDD work being outsourced to Capax or any other party"* and that he did not believe that Autonomy needed standby EDD support services, explaining that *"when capacity constraints did arise, as in the case of our extremely large EDD contract with BP, Autonomy scaled up its operations by adding hardware and hiring additional staff to handle the extra workload."*

2560. Mr Sullivan sought to explain the fact that he had approved a sequence of purchase orders without demur, and in at least one he not only approved but certified that *"Yes – work has been completed"* on the basis that though he had been *"puzzled"* initially (in April 2009), he had thereafter relied on Mr Egan's assurance and the apparent assent of Mr Hussain and Dr Lynch that the work was being performed.

2561. I have mentioned previously my wariness of relying on witness statements clearly honed by US lawyers, and though Mr Baiocco and Mr Sullivan both also testified in the US proceedings and relevant parts of the transcript were in the evidence in these proceedings, of course Dr Lynch had no opportunity to cross-examine them (nor, of course, did I have any opportunity to see that done).

2562. Dr Lynch, who (the Claimants did not dispute) had no involvement in any of the above discussions or events, and who denied any knowledge of them (see further below), did not accept either Mr Baiocco's or Mr Sullivan's evidence as above summarised. By this time, he suggested, Capax Discovery was on any view performing EDD work for Autonomy. They had personnel who had been trained for eDiscovery work and were operating in Boston on Autonomy's platform: and those staff could also have performed EDD services at the customer centre, or on Capax Discovery's platform to the extent it

---

[306] The table in RRAPoC Schedule 5, Transaction 1 showed: (i) the payments by Autonomy group companies to Capax Discovery and Capax Global which the Claimants contend were made in respect of non-existent eDiscovery services and supplemental EAS support in the period June 2009 to December 2011, and (ii) the payments received by Autonomy Inc from Capax Discovery in the same period, which the Claimants contend were made using the payments in sub-paragraph (i). To support this further, the Claimants compared the table in RRAPoC Schedule 5, Transaction 1 with the last known version of Mr Baiocco's Capax Aging Report. As shown in Annex B of the Claimants' Closing Submissions, the payments and receipts in the RRAPoC table tallied with Mr Baiocco's Capax Aging Report, save in the minor respects outlined in Annex B.

was up and running. As he had stated in his witness statement, his understanding was that Capax Discovery could perform the work wherever it could access Introspect software, whether at its own facilities, at the customer's facility, or at Autonomy's Boston office.

2563. This is one of many contexts in which it would have been helpful to hear from Mr Sullivan; and for that matter to have more reason to have confidence in the witness statements as evidence. However, there was no evidence either that Capax Discovery was in fact called on to provide or in fact providing any EDD outsourced services of any materiality, nor that Autonomy ever in fact had need of them. Furthermore, the circumstantial evidence is against Dr Lynch's efforts to sanitise this transaction. Its timing (in response to Mr Baiocco's need for help); its genesis; its amount; its backdating demonstrating clearly that revenue recognition was the imperative that drove it; and the simple fact that the amounts remitted by Autonomy were needed and (albeit after some unusual delay) used to pay Autonomy: all support generally the evidence given that Capax Discovery had no capacity and that the invoices from Autonomy were fictitious: and that is my finding.

2564. Dr Lynch repeated his case that this was not how it appeared at the time. Sitting in the UK and busy as a CEO with his many and various functions, and with evidence by this time of Capax Discovery's EDD capabilities, he had no reason to suppose that Capax Discovery was not doing anything for the payments it received. For reasons given later in discussing the issue of knowledge, I cannot accept this.

*Deloitte's consideration of the third Capax Discovery/EDD sale*

2565. When Deloitte reviewed the third Capax Discovery/EDD sale, it did so as part of its Q1 2011 review, given that it had been backdated to 31 March 2011. The rationale for the deal was explained to Deloitte by Mr Chamberlain as allowing Capax Discovery's UK data centre to connect to the software licensed under the previous sales. Deloitte concluded that "*it represents additional rights to Capex [sic] and therefore can be recognised as revenue*".

2566. As before, Deloitte was unaware that Autonomy was channelling funds to Capax Discovery under the guise of purchase orders for e-Discovery processing and supplemental EAS support which Capax Discovery was not providing.

2567. Although Dr Lynch suggested that Deloitte was "*sampling the payments, they were able to look at them, nothing was hidden from them*", it is clear that Deloitte was in the dark about the scale and nature of the payments being made in respect of e-Discovery processing. Mr Murray of Deloitte emailed Mr Welham on 18 April 2011 with the subject "*Capax – payments going back to them for services performed*", saying:

> "*Pete is still waiting on information about the level of Capax purchases during Q1 2011, but I note that in our post Q-end unrecorded liabilities work we have picked up on $1.5 million of invoices alone paid to Capax.*
>
> *Going to be too late to comment on in the audit committee but we should consider putting further 'context' around the relationship with this reseller for Q2. Might not look so rosy if revenue from Capax to date is (for example) $50*

> *million, cash received is $30 million, balance outstanding is $20 million,*
> *services purchased from Capax by Autonomy are $60 million..."*

2568. Mr Welham initially put the amounts paid to Capax Discovery down to Capax Discovery doing *"all of the legacy eas [Enterprise Archive Solution] maintenance"*. He suggested that Deloitte should find out what the figure was for the previous year, noting that he would expect it to fall given EAS was no longer a product being sold by Autonomy. But, as Mr Murray pointed out in his response, *"The one invoice details I have seen to date is for EDD processing – that doesn't sound like maintenance – sounds more like data analysis/input type services"*.

2569. This was less than a year after Mr Hogenson and Mr Tejeda had raised concerns about the payments to Capax Discovery in respect of e-Discovery processing and supplemental EAS support. Had Deloitte conducted a full investigation into these payments at the time of the Hogenson episode, or otherwise been informed of them on a regular basis, as Dr Lynch wrongly suggested was the case, this is not the sort of exchange one would expect to see between Mr Murray and Mr Welham. The exchange makes plain that Deloitte had little idea of the scale of these payments or what these payments were supposedly for. Still less did Deloitte appreciate that no e-Discovery processing had actually been outsourced to or performed by Capax Discovery or that Capax Discovery was just using the funds it received from Autonomy to pay the instalments under the first, second and third Capax Discovery/EDD sales in a circular flow of funds, and keeping the excess as profit. Dr Lynch accepted that these were matters Deloitte would have needed to know about in order to assess whether it was appropriate to recognise revenue on the three Capax Discovery sales. Deloitte was not aware of them.

2570. Deloitte was similarly unaware that the third Capax Discovery/EDD sale had been backdated. Mr Welham's unchallenged evidence was that, had Deloitte known of the backdating, it would not have approved recognition of the revenue in Q1 2011 and, had it known of the arrangement between Capax Discovery and Autonomy, it would not have approved of any revenue recognition.

2571. Again, given Mr Hussain's involvement in the third Capax Discovery/EDD sale, and his awareness of the true nature of the arrangement with Capax Discovery, the withholding of this highly relevant information from Deloitte cannot have happened without his knowledge.

*Did the Defendants have guilty knowledge of false accounting in respect of RT 1?*

2572. Dr Lynch accepted in his oral evidence that if the nature of the arrangements in relation to the first, second and third Capax Discovery/EDD sales was as the Claimants contended, and Autonomy was in effect channelling money to Capax Discovery for fictitious services, then *"absolutely"* it would have been improper for Autonomy to recognise revenue on the sales. As the Claimants put it, the position is *a fortiori* as regards Mr Hussain's knowledge and position. That leaves as the only question whether the Defendants were aware of the fictitious nature of the arrangement.

*Mr Hussain's knowledge*

2573. I have already made and reconfirm my central finding that Mr Hussain was well aware of and approved the assurances and intentions which underpinned all Capax Discovery's

VAR and reciprocal dealings with Autonomy. I have found more particularly that Mr Hussain understood what Mr Baiocco was signalling in the short exchange at their second meeting discussed above, and conveyed the confirmatory signal that the same arrangements would continue as before.

2574. I find that Mr Hussain also knew that (a) Capax Discovery did not have any capability to undertake e-Discovery processing until 2011 and (b) payments made by Autonomy for EDD services and supplemental EAS support were fictitious.

*Dr Lynch's knowledge*

2575. As I have noted to the same effect previously, Dr Lynch was not the sort of person, and Autonomy was not the sort of company, where the CFO acted autonomously. Mr Hussain reported to Dr Lynch routinely and regularly, and there would have been no question, and there was as far as I am aware no example, of Mr Hussain acting otherwise than in implementation of a course discussed with, and ultimately determined by, Dr Lynch. In idiomatic language, Dr Lynch was a control freak, and he regarded Autonomy very much as both his creation and his creature.

2576. I have already concluded that Mr Hussain was well aware of, and had indeed fashioned, the use of purchase orders for services which he knew that Capax Discovery would not and could not yet provide as a covert means of funding Capax Discovery to enable it to pay instalments under the first Capax Discovery/EDD sale in accordance with an arrangement with Mr Baiocco of which he was also well aware. It would have been entirely out of character, and contrary to Dr Lynch's expectations of those he regarded as serving him, for Mr Hussain to have kept this from Dr Lynch. That is particularly so given that this was a new venture with a new company. Furthermore, there is no dispute that the recognition of the revenue concerned had become a focus of both Mr Hussain and Dr Lynch as Q1 2009 drew to a close.

2577. At the operational level, it is clear that:

(1) An email dated 12 March 2009 from Mr Hussain to Dr Lynch and headed *"capex deal" [sic]* evidenced that Mr Hussain told him of Capax Discovery's possible interest in what was then a $5 million deal the day after the London Hotel meeting, albeit in brief terms (*"Stouff's had a bite at a $5m deal"*).

(2) Also, (and illustrating how Mr Hussain kept Dr Lynch in almost constant touch) Mr Hussain forwarded to Dr Lynch an email from Mr Egan dated 13 March 2009 noting (amongst other deals) that *"John called Rob and said he was very interested in the pitch we presented at breakfast. Time to let him know it could be possible"* (see paragraph 2492(1) above).

(3) Five days later, on 18 March 2009, Mr Hussain emailed Dr Lynch, Dr Menell and Mr Kanter identifying *"capexglobal"* as one of the *"Big deals"* prospective but outstanding.

(4) The fact of this prospective deal was listed in the very regular update spreadsheets schedules provided by Mr Hussain to Dr Lynch in this as in every quarter.

(5) Dr Lynch knew about the formation of Capax Discovery and its introduction as a counterparty. There is no documentary record that he was shown Mr

Baiocco's letters stressing that it was *"brand new"* and separate legally and contractually from Capax Global; but I think it more likely than not that Mr Hussain would have told him.

(6) On the last day of the quarter, Mr Hussain emailed Mr Sass and Mr Egan, copying Dr Lynch and Dr Menell, noting from their earlier email to him that (as summarised in the subject line) *"capax is in (signed copy in hand)"* and to send congratulations: *"Very well done to the both of you – I like $7.5m deals!"*

(7) Thereafter, Dr Lynch was asked to and did approve a first purchase order of $250,000 for *"outsourced specialised ED services"* which on 8 June 2009 Dr Lynch approved unquestioningly *"ok"*. This was the pattern of future purchase orders likewise.

2578. In the round, it seems clear that Dr Lynch knew of the first transaction in broad terms, knew its value and knew that it had become a vital constituent element of Mr Hussain's plans for the quarter in terms of revenue recognition. I have explained that I think it likely that Mr Hussain discussed and agreed with him the use of the purchase order mechanism I have described to fund the fledgling Capax Discovery in accordance with the understandings that had enabled Mr Baiocco to commit it to the transaction. That knowledge informed his understanding of the second and third transactions also.

2579. In the end, Dr Lynch relied on the vital gap in his knowledge as having been that he did not appreciate, and had no reason to suppose, that Autonomy was paying something for nothing. There were three strings to his argument:

(1) First, *"Since Mr Hussain was not aware of anything improper, there is no basis for suggesting that Dr Lynch would be"*. Dr Lynch maintained the position that Mr Hussain had never suggested to him, and (contrary to Mr Egan's evidence) he did not think Mr Hussain or Dr Menell knew at that time, that in fact no services were being or could be provided. Dr Lynch added to this that he was in a more distant position than was Mr Sullivan, who as CEO of Zantaz was in a position to know; and he was entitled to and did rely on the fact that Mr Sullivan had given his approval.

(2) Secondly, Dr Lynch appeared to suggest that his own understanding, even at that time, was that (a) though it had not yet got facilities or requisite hardware to do its own processing, Capax Discovery had the services of Mr Williams and what he described as *"experienced EDD people"* well able to assist using someone like Autonomy's own systems, and it was doing e-Discovery work at Autonomy's premises, and (b) any payments presumably related to this work.

(3) Third, his understanding at the time, according to his first witness statement, was that what Autonomy was paying did not depend upon the actual provision of services, but on the guarantee of their availability. He explained this in his first witness statement as *"akin to an insurance policy"* to ensure availability of overflow services to meet exceptional demand, and elaborated on this as follows:

> *"Whilst I was not involved in the specific case with Capax, the general rationale behind partnering with an EDD service provider…was that [it] would be able to provide back-up services, that could be used when Autonomy alone was unable to meet customers' EDD needs.*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> *Essentially, Autonomy purchased overflow capacity from Capax on a monthly basis, akin to an insurance policy.*
>
> *...*
>
> *If I had known at the time that an EDD provider did not perform any overflow work in a particular month, I still would have been happy paying the provider for EDD overflow capacity because the nature of an insurance policy is that you are not going to call upon it every month...*
>
> *...*
>
> *My understanding was that [Capax] was capable of processing that content and was on standby to do so..."*

2580. This three-string defence was repeated by him in respect not only of this, but also the second and third Capax Discovery/EDD sales addressed below.

2581. As to the first string, and as will already be apparent, I do not accept the lynchpin of Dr Lynch's argument that Mr Hussain did not know that no services were being or could be provided. I have held that Mr Hussain not only knew but had orchestrated a chorus of pretextual emails to give colour to the pretence (see above). Mr Kanter also was well aware, and his positioning to be in charge of the purchase order process is significant: an insider in the core management team needed to be in charge, even if this was not ordinarily part of his role. Of course, Mr Kanter might have persuaded me otherwise had he given live evidence: but he did not. It seems to me very unlikely that either of them would have kept this from Dr Lynch. Dr Lynch's retort that they did so because they knew they had no alternative but to keep quiet since he would have sacked them is circular.

2582. In relation to the second string, as I have indicated in paragraph 2515 above, there is some evidence that in the later part of 2009, Capax Discovery was building the expertise and employee base to offer EDD service capability. Dr Lynch was quick to seize on this in cross-examination as giving some substance to his alleged belief that work was being done by Capax Discovery under the various purchase orders. For example, when it was put to him that *"it would have been obvious to anyone within the company that Capax was not actually providing Autonomy with these services",* Dr Lynch enveloped his responses with a recourse to what had become a stock reference to *"Capax staff working on EDD"*, telling me that:

> *"...there's a big complication in all this, which is there are significant numbers of Capax staff working on EDD on projects for Autonomy, but they're doing it on Autonomy's own system, not on the Capax system, and although it's very difficult to unpick the jigsaw puzzle at this stage, the question is how were those people paid for?"*

2583. I do not accept that this was any part of Dr Lynch's thinking at the time. This struck me as an opportunistic recourse to matters that, as I read his evidence, he did not suggest he was aware of, and which for reasons I have previously explained are unlikely to have been the basis of the purchase orders in any event.

2584. What really stands out is the lack of any supporting evidence such as Dr Lynch himself accepted he would have expected (see paragraph 2516 above) but which he never called for. What also stands out is that in his witness statement, he was quite clear what he considered the purchase orders to relate to, and it does not suggest that any part of the justification was occasional services by Capax Discovery employees training at Autonomy's Boston data-centre:

> *"The process of purchasing EDD overflow capacity was handled primarily by Mr Egan and Mr Scott in Autonomy's US subsidiary. They would request a purchase order <u>for a certain amount of data overflow capacity, priced by volume on a monthly basis</u>, and would seek approval before issuing the purchase order. The payments to Capax for the EDD <u>overflow capacity</u> were approved at times by Messrs Sullivan, Kanter, Hussain and others. I also approved some of these payments. I did so on the basis that the US management team considered that <u>the overflow capacity was a necessary insurance policy. I was also informed that Capax were performing the work.</u> It did not seem unreasonable at the time."* [My underlining for emphasis]

2585. That brings me to the third part of Dr Lynch's argument – that even if no actual work could be demonstrated, the purchase orders were akin to payments for insurance cover. I have reached the conclusion that Dr Lynch was simply casting about for some justification to cover the reality that he knew that no EDD processing work was being done. In my judgment, he knew also that Capax Discovery was a new company, new into the field, which (to quote Dr Lynch himself) *"wanted to break into the EDD business"*; he knew it was lacking infrastructure, and that it was experiencing software problems and further delays; he knew the product and the business and he knew accordingly that it was entirely unrealistic to suppose that Capax Discovery was immediately ready to provide the cover he suggested was needed. He cannot really have believed that Capax Discovery was in a position to provide, still less had actually provided, e-Discovery services with an invoiced value of $520,000 by June 2009 when he approved the purchase orders in June 2009.

2586. In my judgment, none of these lines of defence is persuasive. I have concluded that the most likely rational explanation is that Dr Lynch and his core management knew that the purchase orders and following invoices were indeed a funding mechanism, in accordance with the need to enable Capax Discovery to pay the instalments in accordance with the handshake agreement and to maintain the appearance of a real sale.

2587. In short: even if he was not involved in and did not know the details of individual transactions, I consider it more likely than not, and I also find, that Dr Lynch was aware from Mr Hussain and Mr Kanter and Mr Egan of (a) the handshake agreement and (b) the purchase order scheme.

2588. In my judgment, Dr Lynch, like Mr Hussain, had *"guilty knowledge"* of the false accounting of each of the transactions comprised in RT 1.

**RT 2: the VMS transactions**

2589. I next address two sets of transactions between Autonomy and Video Monitoring Services of America, Inc ("VMS") in Q2 2009 and Q4 2010. VMS provided a data

service, together with analytics of the data. The data included television, radio and podcast content, internet content for the top 200 print publications and video commercials. VMS was a longstanding Autonomy customer and used Autonomy software extensively in their products. Its CIO, Mr Gerry Louw, had built a close working relationship with Mr Egan.

2590. The transactions comprised (a) the purchase by Autonomy of rights (under licence) to use and display VMS's data feed and (b) the sale by Autonomy of software licences and hardware to VMS.

2591. It is the Claimants' case that there was no genuine commercial rationale for either of Autonomy's purchases of the VMS data feed, that neither was an independent arm's length transaction and that both were linked to, and in truth the reason for them was to incentivise and fund, the sales by Autonomy to VMS of Autonomy software on terms VMS would not otherwise have agreed so that Autonomy could recognise additional revenue in Q2 2009 and Q4 2010. Mr Egan negotiated both the sale and the purchase elements of both transactions.

2592. The Claimants contended, with the support of expert evidence from Mr Holgate, that Autonomy's purchases, and the linked sales to VMS, therefore lacked economic substance and further, that IAS 18.14(d) was not satisfied because in substance no economic benefits flowed to Autonomy.

2593. Accordingly, the Claimants submitted that Autonomy should not have recorded revenue on the sales to VMS. Autonomy should instead have: (i) recorded the net cost in relation to the first VMS sale and purchase, totalling $4,000,000, as an expense in Q2 2009, and (ii) recorded the net cost in relation to the second VMS purchase and the VMS hardware and software sale, totalling $261,633, as an expense in Q4 2010.

2594. The Defendants rejected these allegations as having no merit. In Mr Hussain's closing submissions, they were described as *"utterly misconceived"*. The Defendants contended that:

(1) The purchases were for fair value, and the Claimants had not challenged the fair value assessment during this trial. The purchases involved valuable data rights which could be, and were, compared to offerings of other third party providers at the time.

(2) There was a commercial rationale for the purchase. VMS provided data that Autonomy could and did offer to its customers and embed in its products.

(3) Mr Egan considered that both the sale and purchase transactions were well-rationalised, sensible, logical and proper transactions, with a good commercial rationale.

(4) Dr Lynch approved the purchases but had limited involvement in them: so far as he was aware, they had an acceptable commercial rationale, were at fair value, and had been or would be scrutinized by Deloitte.

(5) The accounting of the purchase transactions and the sales to VMS was handled by the finance department, was scrutinised by Deloitte and was correct. Such factual "linkage" as there was did not undermine the revenue recognition for the sales.

(6) Dr Lynch was not involved at all in the accounting, he was entitled to rely on the finance team and Deloitte, and there was no basis on which he should have concluded that the accounting was incorrect, let alone fraudulent.

*The first VMS transaction (Q2 2009)*

2595. In deciding between these two opposing positions it is convenient to address the following issues:

(1) The background to the transactions and the genesis of the sale by Autonomy to VMS;

(2) The genesis and suggested commercial purpose of Autonomy's purchase by Autonomy of the VMS data feed licence;

(3) Whether there was any analysis of the utility to Autonomy of the VMS data feed;

(4) The terms of (a) the purchase by Autonomy and (b) the sale by Autonomy;

(5) What use was made by Autonomy of the VMS data feed;

(6) Whether the price paid by VMS for Autonomy software was fair;

(7) On what basis Deloitte and the Audit Committee considered the sales and purchases.

*Background*

2596. The first mention of any deal with VMS in Q2 2009 was in Mr Hussain's email to Mr Egan on 10 June 2009, in which Mr Hussain asked "*how about VMS for extra revenue? They are private.*" Mr Hussain's email did not suggest that there was any reason for approaching VMS, apart from generating extra revenue. The email did not identify what Autonomy was looking to sell to VMS; it simply identified VMS as a potential source of additional revenue. Nor is it clear what the relevance of VMS being private was, though the Claimants surmised that it would likely be subject to less scrutiny than a public company. Dr Lynch accepted that the idea of a sale came from Mr Hussain, not Mr Egan.

2597. Mr Hussain emailed Mr Egan again on 15 June 2009, saying "*call to vms for a deal?*". Again, there was no mention of any particular reason for approaching VMS.

2598. A few days later, on 19 June 2009, Mr Hussain emailed Dr Lynch, telling him that "*US commercial call was poor…I believe we need emc and vms…*". This suggests that Dr Lynch was already aware of a potential deal with VMS. Dr Lynch accepted that Mr Hussain might have mentioned it to him before this email. He was, however, reluctant to accept that Mr Hussain was saying that Autonomy needed revenue from EMC and VMS to make up for the poor commercial deals in the US, suggesting that "*there was always stuff on the left and right*" and that deals "*come and go within a quarter*". But this was, in Dr Lynch's words, "*very late in the quarter*", and Mr Hussain was not sending Dr Lynch a spreadsheet with deals on the left and deals on the right; he was sending him an email specifically about needing deals with VMS and EMC, for no apparent reason other than because the "*US commercial call was poor*". The Claimants suggested that Dr Lynch could not have been in any doubt that Autonomy needed extra

revenue from deals with VMS and EMC in order to hit Autonomy's Q2 2009 revenue target.

2599. That was also the message Mr Hussain was communicating to Mr Egan. On 22 June 2009, he told Mr Egan *"we need big VMS – more commercial just disappeared"*. So urgent did Mr Hussain apparently regard the possible deal that he even offered to fly to New York to meet VMS's CEO, Mr Peter Wengryn, in order to close out a deal that was *"favourable to both parties"*.

2600. At around the same time, also on 22 June 2009, an unconnected event occurred[307]. Up until then, a company called Moreover Technologies, Inc ("Moreover"), a news and social media aggregator, had supplied Autonomy a data feed of news articles, free of charge. Out of the blue, Mr Ian Black, Autonomy's Head of Global Operations, informed Dr Lynch, Mr Hussain, Mr Kanter and Dr Menell by email that he had just learned that Moreover had switched off the data feed. Apparently, its new owners had decided to use a rival provider's software, rather than Autonomy's. This was the first time that anyone at Autonomy, including Dr Lynch, learned that the feed had been switched off. Mr Black informed the recipients of his email that he had persuaded Moreover to switch the feed on pending discussions after the end of Q2 2009, and that he would seek a replacement in the event he was unable to keep the feed free of charge.

2601. Dr Lynch's witness statement sought to present the approach to and purchase of a data feed from VMS as prompted and made necessary by the requirement for Autonomy to replace Moreover's services. Although Autonomy sought in the meantime to "work-around" the resulting loss of data feed by *"spidering"* a small selection of news sites to continue demonstrating Autonomy's software to customers, Dr Lynch said this was a necessarily temporary, inadequate and expensive expedient.

2602. The Claimants, however, insisted that the rationale and impetus for the deal with VMS <u>cannot</u>, have been the temporary cessation of the Moreover data feed. Nor can it have been the fact that Moreover subsequently indicated that it wanted to charge Autonomy £50,000 per annum to continue using the data feed in its demonstrations, because this offer was not made until <u>after</u> Autonomy had entered into the deal with VMS. They submitted that Dr Lynch's witness statement was misleading in suggesting that either of these factors formed part of the background to the VMS deal, and that it is clear from the terms and the timing of Mr Hussain's emails that the rationale for the deal with VMS on Autonomy's side was the need to generate extra revenue in Q2 2009.

*Negotiations for sale and purchase*

2603. In late June 2009, Autonomy entered into negotiations with VMS to buy their data feed, in parallel with the negotiations for the sale to VMS of Autonomy software. These continued in tandem between 23 June 2009 (when Mr Egan sent VMS a draft set of terms for both sale and purchase) and 29 June 2009, when Mr Egan forwarded the terms to Mr Hussain and Mr Chamberlain on 25 June 2009, asking them how they wanted to structure the deals. Mr Chamberlain's response noted:

---

[307] By this point, Mr Hussain had <u>already</u> emailed Dr Lynch and Mr Egan about a deal with VMS and offered to fly to New York to close out a deal that was favourable to both parties. Dr Lynch accepted that none of Mr Hussain's emails had anything to do with the Moreover data feed being switched off.

> "The tricky bit on this from a rev rec perspective will be demonstrating fair value.
>
> e.g. this is currently priced as us paying them $9m and them paying us $7m for the licence – i.e. net flow $2m. We need to prove that this is fair value and that the net $2m is not appropriate at $3m to licence to them and $1m to us. All the support we can get on that will be helpful."

2604.  Mr Chamberlain's focus on revenue recognition is notable. His further commentary also implicitly recognised the importance to Autonomy of the headline figures, as distinct from the net position. Autonomy needed the headline sale price to be high to maximise recognised revenue, even though of course that would entail greater outlay.

2605.  The Claimants also called my attention to the timing of the email setting out proposed terms, which was just hours after Autonomy found out about the Moreover data feed having been switched off, suggesting that the proposal to purchase VMS data feed was independent, and not prompted by the position with Moreover. The Defendants, on the other hand, tended to depict the need for replacement as the catalyst. I return to this later.

2606.  However, it is apparent from the draft terms, and from Mr Chamberlain's response, that both sides of the round-trip arrangement were already in play by this point: a $9 million purchase by Autonomy and a $7 million purchase by VMS. Mr Egan sent these proposed terms to VMS on the morning of 23 June 2009, a matter of hours after Autonomy first found out that the Moreover data feed had been switched off. That suggests that what appeared then to be the temporary interruption to the Moreover data feed formed no part of Autonomy's decision to purchase the VMS data feed.

2607.  In the meantime, the need for the VMS transaction to make up a revenue shortfall became even more definite and so did the quantum of the amount needed for that purpose. The day after Mr Egan sent the draft terms to VMS for the sale and purchase transactions, Mr Hussain informed Dr Lynch that VMS was *"in process at between 7-9m"*. Later that day, Mr Hussain told Mr Egan *"Hitachi – unlikely and JPMC $1m lower so I am $2m short – therefore need VMS at $8m or $9m"*.

2608.  This suggests that Mr Hussain was dictating the size of Autonomy's sale to VMS by reference to Autonomy's revenue needs for the quarter. Dr Lynch initially resisted this suggestion, referring to a *"whole series of variables: what can be offered, what discounts can be offered, how much you throw in for a particular amount"*, but none of those considerations was even hinted at in Mr Hussain's email. Dr Lynch was willing to accept, however, that Mr Hussain *"would certainly like to have a VMS deal of 8-9 million, so I guess what he's telling Mr Egan is to try and aim for that, whatever package is put together"*.[308] He also had to accept that he may well have been aware that Autonomy was planning to purchase something from VMS for $9 million.

2609.  This is most likely to have been the case. He would not have been able to provide any meaningful input or make any informed decision if he only knew of the proposed sale to VMS. Furthermore, that sum made this a large deal: around 10% of VMS's entire projected revenues for 2007. Yet there was no evidence of VMS's ability to afford such

---

[308] At that amount, the size of the purchase contemplated by Mr Hussain was around 10% of VMS's entire projected revenues for 2007, as shown in an Information Memorandum which Autonomy had received when Dr Lynch was considering acquiring VMS in that year.

a commitment, which in itself seems to me to suggest that Autonomy never intended that the purchase price of what VMS was to get from Autonomy would be self-funded.

2610. Mr Egan emailed Dr Lynch and Mr Hussain on 25 June 2009 with updates on a number of deals, asking for *"a decision/input from you first thing in my AM (6AM-ish)"*. The last deal in Mr Egan's email was VMS, in relation to which he said:

> *"We [Autonomy and VMS] meet at 9.30 am to go over products etc. Then I meet Peter [Wengryn] on Friday at 11:00 AM to finalize numbers. He has cancelled 2 of 3 customer meetings on Friday to do this with me. He also confirmed that he can do the deal if it is a good one for VMS without additional board input."*

2611. According to Dr Lynch, whether it was a good deal for VMS depended on what VMS was getting from Autonomy and what it was having to give to Autonomy. Mr Hussain was involved in deciding this too. When Mr Egan sent him a copy of the draft agreement licensing certain Autonomy software to VMS on 28 June 2009, he suggested reducing the software licenced to Autonomy, Virage and Softsound and to *"give future pricing for the rest"*.

2612. The same day, Mr Hussain emailed Dr Lynch, copying Mr Egan, Dr Menell and Mr Kanter, with the subject *"VMS sale"*, saying:

> *"Mike*
>
> *As you know VMS have bought IDOL multiple times and are an excellent reference for us. Gerry Louwe and Pete Wengryn of VMS have often expressed a desire to extend the relationship and we have come close in the past in selling more software to them.*
>
> *We have been in discussions to extend the relationship and it appears there is significant interest in our rich media software and the Interwoven products. Stouffer has the detail but it looks like we could have a large sale of $5m to $9m based on the amount of software they want to buy. I have talked to Pete Wengryn over the weekend and he is v interested in buying this quarter.*
>
> *Following the Iwov acquisition we also been considering integrating the VMS services (news and ads) as part of our wcm [web content management] offering. I believe this could be a significant advantage in future sales. We will draft up a business plan for the wcm offering featuring vms for your approval."*

2613. As the Claimants noted, Mr Hussain's email read as though it was the first contact he had made with Dr Lynch about a potential deal with VMS in Q2 2009 even though, by this point, Mr Hussain had already informed Dr Lynch of a potential deal with VMS on two separate occasions (explaining that it was *"in process at between 7-9m"* ), and Mr Egan had asked for Dr Lynch and Mr Hussain's decision/input on a number of deals, including VMS. Dr Lynch suggested that the email was laying out *"the fact that we're going to be doing a purchase, which I may or may not have heard of before this point"*. But I agree with the Claimants that it is improbable that Dr Lynch had been told that Autonomy was attempting to make a large sale to VMS but not that Autonomy was also proposing to make a $9 million purchase from VMS.

2614. That said, the focus of Mr Hussain's email was on Autonomy's sale to VMS. Mr Hussain said *"it looks like we could have a large sale of $5m to $9m based on the amount of software to buy…Pete Wengryn…is v interested in buying this quarter"*. This, the Claimants suggested, was a considerable understatement of the size of the deal, and an odd turn of phrase for Mr Hussain to use in circumstances where, four days earlier, he had told Dr Lynch that a deal was in process between $7 and $9 million, and where he had seen Mr Egan tell Dr Lynch that Mr Wengryn was willing to do the deal that quarter if it was a good one for VMS.

2615. The Claimants submitted that Mr Hussain's email only makes sense as a pre-textual document setting out the party line on the VMS deal to Autonomy's senior management. Likewise, Dr Lynch's response that this made "*sense especially given the moreover issues*" depicted the purchase side (Autonomy's purchase of data feed) as a response to the Moreover issue, which the Claimants submitted was likewise pre-textual. That is of course a serious allegation. However, given the clear evidence that Mr Hussain had been keeping Dr Lynch informed of the intention to use revenue from the VMS deal to cover shortfalls (see above), my assessment that it is likely that Dr Lynch knew of the direct link between the purchase and sale transactions, and the likelihood (as I find it to be) that Dr Lynch was well aware of the two transactions and their inter-dependence I have concluded that it is more likely than not that both emails were indeed pre-textual.

*VMS and Autonomy reach agreement in principle (29 June 2009)*

2616. Over the next few days, Mr Hussain and Mr Egan finalised the terms of the sale to VMS. On 29 June 2009, Mr Hussain told Mr Egan to take out certain software (Introspect EDD, ECA and Digital Safe) from the proposed list of software to be licensed to VMS *"since these are hosted and would be subject to a hosting fee"*. The same day, Mr Egan instructed the Autonomy lawyer who had put the agreement together to make the changes Mr Hussain had directed and to increase the licence fee from $7 million to $9 million. Mr Hussain was also copied to this email.

2617. Thus, Mr Hussain was instructing software to be removed from the draft agreement and yet the price was going up from $7 million to $9 million, the range that Mr Hussain had previously given to Dr Lynch on 24 June 2009. It is hard to see why Mr Hussain had told Dr Lynch the day before that Autonomy's sale to VMS would be between $5 and $9 million depending on the amount of software VMS bought when that was clearly not the case.

2618. Meanwhile, Mr Scott and Mr Crumbacher were tasked with reviewing Autonomy's proposed purchase of VMS's data feed. Mr Crumbacher asked Mr Scott on 29 June 2009: "*What do we intend to do with this data? Not being flippant…more for ensuring scope of license*". Mr Scott responded: "*Push it through our software to show end-users how the software works and/or to make available as a value added service. Need to confirm though as have not been given any detail*".

2619. By the end of the day on 29 June 2009, Autonomy and VMS had reached agreement on the terms of the deal. Mr Hussain emailed Mr Egan and Mr Wengryn, copying Mr Scott, saying:[309]

---

[309] Emphasis added.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> "Stouffer and peter
>
> *My understanding of where we have ended up:*
>
> - *$9m software purchase*
>
> - *$0 maintenance in year 1*
>
> - *5% maintenance in year 2 onwards*
>
> - *Existing maintenance (assumed at around $400k but tbc) superceded [sic] by the new deal*
>
> - *$13m valuation on the VMS services – 3 year term*
>
> *I'll leave it to you to finalise the documentation."*

2620.  Both agreements were executed on 30 June 2009, the last day of Q2 2009:

(1)  Autonomy's purchase took the form of a data licensing agreement, pursuant to which VMS granted Autonomy Inc a licence to use and display the licensed data and agreed to provide Autonomy with access to the data so that its end-users could access and view the data in connection with their use of Autonomy's software products (the "first VMS purchase"). Autonomy was not entitled to sell or transfer the licensed data in any manner to any other party. The term of the licence was three years commencing on 30 June 2009, to renew automatically unless terminated by either party. The licensed data included broadcast content, i.e. television, radio and podcast content, internet content of approximately 30,000 websites, web print content and advertising content, i.e. all the video commercials and associated metadata captured by VMS. The fee for the provision of the licensed data during the term of the agreement was $4,333,333.33 per year, payable in one lump sum of $13 million within 30 days of the effective date of the agreement.

(2)  VMS's purchase from Autonomy took the form of a fifth product schedule to a software licence agreement that Autonomy and VMS had entered into in December 2002 (the "first VMS sale"). Subject to the terms and conditions of that prior agreement, Autonomy Inc granted VMS a licence to use an extensive suite of Autonomy software for the purpose of indexing audio and video content from various news feeds and other audio/video sources. The licence fee of $9 million, which included a support and maintenance fee of $428,571 for the first year, was to be invoiced immediately and was payable within 30 days from the date of invoice.

2621.  Mr Egan emailed Mr Hussain and Dr Lynch at the close of Q2 2009, telling them that the "*Big ones* are *done*", including VMS. Autonomy recognised $8,571,429 as revenue in Q2 2009 and recognised the support and maintenance fee of $428,571 as revenue over the following year.

*Justification of the transactions*

2622.  Autonomy had not conducted any technical analysis of VMS's data feed before agreeing to purchase rights to it for $13 million. When cross-examined about this, Dr Lynch said

that he did not see why there was any need for a technical analysis of a data feed, and did not know *"quite what that would be for a data feed"*.

2623.  Similarly, it was suggested to Mr Lucini that he would not have expected Autonomy to carry out a technical analysis because Autonomy was purchasing information rather than technology. Mr Lucini explained that he would have expected a different type of analysis in those circumstances, aimed at whether the content of the information met the requisite specification: *"…what is this data? Is it what we want it to be or is it purported to be --- so there would be some checking"*.

2624.  The lack of any effort, before spending $13 million on a data feed, to assess its suitability, quality and content, and overall utility in terms of whether it could be integrated or used with Autonomy's products, is certainly noteworthy. So is the lack of any sign that any consideration was given to whether Autonomy could produce its own data feed for itself, particularly in light of Autonomy's general philosophy not to license third party products.

2625.  No assessment of the commercial utility of the licence to Autonomy had been undertaken either. In his contrived email dated 28 June 2009 (already very late in the day) Mr Hussain had told Dr Lynch that a business plan setting out the rationale for purchasing the VMS data feed would be drafted for his approval; but none had been prior to the purchase.

2626.  Dr Lynch sought in cross-examination to wave this away, telling me (I felt somewhat glibly) that the commercial analysis *"would be down to, after everyone else has approved it, whether it makes sense to me and it did"*, and adding simply that he was "*very happy with the commercial terms because of what we were getting for that money"*. When pressed whether any comparative evaluation had been undertaken to see what other suppliers could provide in terms of a data feed and on what price, he told me that *"…we did have good knowledge of that and…then we got competitive quotes from multiple players that all came in at the same level"*; but these were obtained after the event and cannot have formed part of the decision-making process.

2627.  It was only on 1 July 2009, after the transaction had been agreed, that a business plan and other supporting documentation, including a revenue recognition memorandum, was hastily commissioned by Mr Hussain. The Claimants characterised this suite of documents as a paper trail contrived to give the false impression of careful assessment of the VMS transaction after a survey of alternative solutions prior to the VMS transaction.

*"Project Shockwave" business plan*

2628.  The business plan which emerged, which was produced initially by Mr Egan and Dr Menell, but then substantially amended by Mr Hussain, was entitled *"Project Shockwave: Autonomy Integration of VMS Data Q1 – Q2 2009"*. It was plainly intended to present this as a proposal which had been under consideration for some time and for which a business case appeared clear; and in its final form as handed to Deloitte the document was drafted as if the VMS transaction were a prospective opportunity, rather than already executed. In its conclusion it stated *"We are asking for approval to engage in negotiations with VMS to buy a 3 year exclusive unlimited access to its data set for a price of up to $13m…."*

2629. The Claimants pointed out, however, that the document (which was passed on to Deloitte), though clearly dated 21 March 2009 on its front page is shown by its metadata to have been created on 3 July 2009. I was told that the earliest version which the Claimants' researches unearthed was created on 30 June 2009.[310] By the time the document was first circulated by Mr Hussain, Autonomy had already entered into the first VMS purchase transaction with VMS. Dr Lynch suggested that there *"may have been an earlier version"* but accepted that *"...if you're telling me that this is edited in July, then no, this is after the purchase was done"*.

2630. I accept the Claimants' case that the business plan was misleading in other ways too:

(1) It stated that Autonomy had approached both VMS and another company in the same business called Newsedge (renamed Acquire Media) for quotes and described the differences (including that the Newsedge proposal though cheaper was for news and text only). It referred in addition to other indications of interest (including from a company called PRN Newswire). It stated that it had *"considered all indications of interest and...decide to recommend VMS..."*. But Autonomy had not obtained quotes from other potential suppliers; it had entered into the VMS transaction at Mr Hussain's direction without any such process and it was only on 3 July 2009 that the first approaches were made by Mr Hussain and Mr Black. Any competitive quotes were elicited only after the transaction had been agreed, and Mr Hussain was still somewhat haphazardly updating the draft with indications of interest later received on 3 July 2009.

(2) The document represented that compared to continuing use of the Moreover data feed, a cost saving of approximately $1 million over three years could be expected if the VMS data feed were used instead. But Moreover had previously provided the data feed for free; and they had not yet had any discussions with Moreover about whether that would continue and, if not, what charge it would make. As noted previously, in his evidence Dr Lynch had suggested a likely cost of about £50,000 pa and told me that this was his expectation because *"a news feed costs that sort of money"*.

(3) Dr Lynch had no explanation for the suggestion (in the business plan) that Moreover would charge in the region of $300,000 pa saying only in cross-examination that he assumed that Mr Black had given the estimate and that there were *"many emails that you're not showing us around this whole process."* None was identified in re-examination or at all.

2631. The version of the business plan that was sent to Deloitte was materially identical to the version sent by Mr Hussain to Dr Lynch on 3 July 2009 and contained all these misleading passages.

2632. However, as elaborated later, Deloitte was aware that one of the competitive quotes referred to (that from Newsedge) post-dated the transaction, but in its own memorandum accepted it anyway as *"still persuasive evidence that the purchase price from VMS of*

---

[310] The Defendants contended, however, that the dating of the document was automated, and *"was clearly a hangover of some kind resulting from the inclusion of material from various sources in the document. The content of the document referred clearly to the cancellation of the feed in June...It was obvious to the reader that the document post-dated the cancellation of the Moreover feed and was not a March 2009 document"*. I should record that the Claimants, having previously pleaded the document was backdated, then deleted that allegation, and I have proceeded on the basis that the document was wrongly dated, but not intentionally back-dated.

*$13 million is not unreasonable"*. Further, the Defendants contended, the description of the transactions as prospective had not misled Deloitte: it was obvious to Deloitte that the transactions had already been entered into when the document was provided to them.

*The revenue recognition memorandum*

2633. As well as the business plan, Autonomy's finance department also produced a revenue recognition memorandum dealing with various accounting issues, including collectability and fair value in relation to the purchase by Autonomy. Mr Chamberlain had noted in his notebook that the $9 million VMS sale by Autonomy was *one* of the key revenue items for Q2 2009 and a memo was needed *"to support fair value"* for the transactions. The same notes stressed the importance of a number of other considerations, including the need to show that (though he described them as *"swap transactions"* in his notes and as *"circular"* in discussions with Dr Lynch) there was (a) *"clear water between the two…payment of $13 m & timing"* and (b) *"evidence of negotiation - $13m"*.

2634. Mr Chamberlain prepared and sent to Mr Hussain what he described as a *"very draft…skeleton for me to work with tomorrow"* of the revenue recognition memorandum on 29 June 2009.

2635. On 3 July 2009, Mr Hussain sent a substantially revised draft of the memorandum to Mr Chamberlain and Dr Lynch. Dr Lynch understood that this document was going to be provided to Deloitte, and he accepted that it is likely that he read it.

2636. The Claimants' criticism that the revenue recognition memo, like the 'Project Shockwave' business plan, was written as if the VMS transactions were in contemplation rather than already entered into seemed to me, of itself, overblown: but the Claimants' more substantial point, which I accept, was that the impression that was conveyed was that Autonomy had satisfied itself as to 'fair value' and had proceeded with a purchase from VMS only after having (a) considered and obtained quotes from other news aggregators and (b) conducted *"detailed market research"*, neither of which was true. There had been no detailed market research, and Mr Hussain and Mr Black had sought quotes from a handful of other news aggregators after Autonomy entered into the first VMS purchase.

2637. In relation to the first VMS purchase, Mr Hussain's amended revenue recognition memo carefully portrayed the acquisition of the data feed by Autonomy as complementary to the purchase of Interwoven in March 2009. This was on the basis that since Interwoven products *"manage the data repositories for publishing to websites and allow companies to automatically tune their marketing campaigns"* the addition of the data feed would give a further competitive advantage.

2638. The purchase price payable by Autonomy of $13 million was said to be justified not only by *"detailed market research",* but also by reference to an offer which (Mr Hussain's memo recorded) VMS had received from a company called Neilson in 2006, for the purchase of lesser rights for $7.5 million for three years, with an option to extend for three further years for $12 million. The memo stated also that:

> *"Value in use calculations based on a combination of the revenue opportunities and the costs savings that will result from the acquisition of the licence show a value of $23m. This represents a margin of 43% which is consistent with the margins within the Autonomy business."*

2639. The memo did not bring out the exceptionality of the sale from VMS's point of view. A schedule of VMS representative sales prepared by VMS's CFO, Ms Sayad, showed that VMS had not entered into any sales in excess of $1 million.

2640. As regards the first VMS sale the memo acknowledged that HP had acquired from Autonomy a similar internal use licence in 2006 for the considerably smaller sum of $3.7 million, but stated that the VMS licence *"includes much more technology due to the inclusion of the Interwoven product suite."* Further, it was said that VMS anticipated it would save some $2.7 million annually by substituting the technology in place of manual functions, and at the same time get better and more accurate content *"as well as getting new customers attracted to the superior offering."* The memo acknowledged also that VMS's *"Annual capex spend in 2006 was some $4.5m so this purchase is higher than normal but represents a significant business opportunity for VMS…".* Like the sale side, the deal was exceptional from VMS's point of view.

2641. As to affordability and collectability, it was stated in the memo that collectability was not an issue:

> *"Collectability*
>
> *We need to consider the collectability of the $9m licence fee due to Autonomy independently of the purchase of Autonomy software.*
>
> *Autonomy considered acquiring VMS in early 2007. The information gathered at that time showed that <u>VMS was generating revenues of $75m</u> and producing EBITDA margins of 20% and above. Whilst we have not been able to obtain more recent information from management they have confirmed that the company has shown over 5% growth per annum since then.*
>
> *The company has annual revenues in excess of $75m and over 900 employees. Annual capex spend in 2006 was some $4.5m so this purchase of $9.0m is higher than normal but represents a significant business opportunity for <u>VMS and they have represented that they could finance this transaction without the need for external finance even if Autonomy paid nil for the VMS licence."</u>*
>
> [My emphasis]

2642. However, the actual hard detail about VMS's financial position was sparse. VMS was a private company and produced only short-form accounts, and its CFO, Ms Sayad, explained in an email of 2 July 2009 that:

> *"VMS is a private company therefore we do not disclose any such information. I can share with you that our revenue falls within the $50M to $75M range."*

2643. The Claimants submitted that having regard to the available financial information:

> *"it is hard to see how VMS could have purchased Autonomy software for $9 million, still less why it would have wanted to do so. Taking the figures at their highest, a transaction of this size was more than 10% of VMS's entire annual revenues and it was not something that VMS could finance from its available cash reserves. The only explanation for why VMS was able and willing to pay*

> *$9 million was because Autonomy had agreed to pay more for the VMS data feed."*

2644. Albeit some time later, VMS's CEO Mr Wengryn later acknowledged (in an article in the *Wall Street Journal* in 2012) that VMS could not have contemplated a purchase of that magnitude but for the sale.

2645. Further, this was clear at the time to all concerned at Autonomy. In an email exchange on 6 July 2009 between Mr Hussain, Dr Lynch, Dr Menell and Mr Scott it was decided (at Mr Hussain's suggestion, but with the immediate approval of Dr Lynch) to pay VMS's sales invoice early *"to ensure their goodwill"*.

2646. It is difficult to see how goodwill would have been ensured from payment a day early, as in effect was proposed. Autonomy already had the right to use the VMS data feed; and, as Dr Lynch accepted, if the transactions between VMS and Autonomy were looked at together Autonomy was making a net payment of a 'delta' of some $4 million. As Dr Lynch also accepted, VMS had already had quite a lot of "goodwill". Dr Lynch eventually said he did not know what Mr Hussain had meant.

2647. It was suggested, however, that it would have been obvious to him what the reason for the rush to early payment was: it was to assist VMS by providing the funds it needed to meet the first instalment (which was due imminently) of the purchase price for the software licence it had purchased from Autonomy.

2648. Dr Lynch resisted this suggestion when put to him in cross-examination on the basis that Mr Hussain could simply have netted the debts and paid the difference. But it is of some note that this was not the approach that Autonomy took. As Dr Lynch himself explained, *"for cash transparency reasons to make our accounting more straightforward"*, Autonomy preferred not to net the payments. To avoid doing so in this case, Autonomy needed to put VMS in funds, which is what it did. Autonomy paid VMS $13 million on 29 July 2009, a day before the payment was due. The next day, VMS paid the $9 million due to Autonomy under the first VMS sale.

2649. That Dr Lynch was well aware of the nature of the transaction, seems to me to be supported by the fact that he asked for no details; and I infer that is because he already knew of the transactions. I agree with the Claimants that that is the most obvious explanation for why Dr Lynch would approve making an early payment on the basis of an email that he professed not to understand.

2650. Dr Lynch contented himself with:

> *"ok and lets put moreover on the to be destroyed list"*

*Deloitte's consideration of the first VMS transaction*

2651. Autonomy provided Deloitte with the business plan and the revenue recognition memorandum as part of its review of the first VMS sale and purchase at the beginning of July 2009.

2652. Additionally:

    (a)    Ms Sayad of VMS signed an auditor debtor confirmation letter confirming that the first VMS sale was a "*separate transaction completed on an arms-length basis*"; and

(b)      Mr Hussain and Mr Egan spoke with Deloitte about "*the commercials*".

2653. On 6 July 2009, Mr Hussain briefed Mr Egan in advance of a planned evening call with Mr Knights (of Deloitte) as follows:

> "*Last piece of the jigsaw, they want to talk what were the commercials*
>
> *YOU Should only talk about the sale of autonomy software as I ran the purchase side*
>
> *VMS have sent us a written confrmation about the independence of the 2 transactions so that's fine*".

2654. Dr Lynch disagreed when it was put to him that the reason why Mr Hussain was telling Mr Egan only to talk about the sale is because he wanted it to appear to Deloitte that the sale and purchase were negotiated separately. He suggested that the reason was that Mr Hussain "*would understand the strategic rationale for the purchase. Mr Egan is just a sales guy.*"

2655. However, the Claimants submitted that Mr Hussain plainly ran both the sale and the purchase. They put to Dr Lynch that Mr Hussain had told Mr Egan to reach out to VMS for a deal to generate extra revenue which he needed for the purpose of achieving forecast; he had told Mr Egan what size the sale needed to be to satisfy Autonomy's revenue targets; he had told Mr Egan how to structure the deal; and he had told Mr Egan what software to sell to VMS. Dr Lynch sought to deny each element, and queried what each proposition put meant; but beyond repeating his point that Mr Egan would have little knowledge of the purchase side and was simply involved in sales, and emphasising that "*if you were trying to create a distance, you wouldn't be putting a document to them that mentions that we've done both together at the same time*", he eventually resorted to saying that he "*wasn't involved in this deal, so I don't know the ins and outs of who did what, when and detail*".

2656. The working paper that Mr Welham produced, dated 6 July 2009, provides an indication of what Deloitte had been given to understand about these transactions by Autonomy. I accept the Claimants' submission that the paper reveals a number of misunderstandings on Deloitte's part:

(1) Deloitte's understanding was that the purchase by Autonomy was prompted in March 2009 as part of Autonomy management's programme of developing the Interwoven content management products following its acquisition of Interwoven.[311] The paper recorded that:

> "*it became clear that the revised IWOV web content management products could be used to provide other services to the customer through the use of software supplied by VMS, who have been a customer of Autonomy since 2002.*"

---

[311] Dr Lynch told me the same when he was cross-examined: "*The reason that it was investing in this way was that it had just spent three-quarters of a billion dollars on Interwoven which is a company where half of its business is aimed at marketers and what it wanted to do was give them products that would be able to combine the power of real time news analysis.*"

In fact, though Deloitte were unaware of this, the first mention of any deal with VMS in Q2 2009 was Mr Hussain's email to Mr Egan on 10 June 2009 (see also paragraph 2596 above) in which Mr Hussain asked *"how about VMS for extra revenue? They are private"*.

(2) Secondly, and relatedly, Deloitte understood from Mr Hussain that there "*has been ongoing negotiations since the development of the Project Shockwave plan in March 2009*". This was untrue for reasons set out above. It was suggested to Mr Welham in cross-examination that the date was an obvious error and that Mr Welham understood that at the time. But it is clear from Mr Welham's working paper that this was not the case. Further, Mr Welham confirmed in re-examination that, per this document, his understanding was that the Project Shockwave plan had been developed in March 2009.

(3) Thirdly, and again relatedly, Deloitte was led to believe from discussions with Mr Egan that the negotiations on the price of the first VMS sale had been ongoing for "*several months*". Dr Lynch tried to defend this statement in cross-examination by vague references to Autonomy having had dealings with VMS since 2002 and there being ongoing interactions between the parties. That is not what the working paper recorded Mr Egan as having told Deloitte. Dr Lynch was eventually forced to accept that "*the deal only became a firm option in June*".

(4) Deloitte were not aware that (a) Moreover was prepared to continue its data feed for a relatively modest annual fee (£50,000 per annum) nor that (b) Autonomy's Dr Blanchflower had started work on improvements to its own data feed immediately after the interruption to the Moreover feed in June 2009 and was expecting to 'go live' by the end of July 2009 (see paragraph 2665(6) below); so that (c) Autonomy's need for the VMS data feed was very uncertain.

(5) Deloitte were not aware either that Autonomy had not conducted any technical analysis or assessment of VMS's data feed before agreeing to purchase rights to it.

2657. Autonomy provided Deloitte with further documentation intended to support its accounting treatment of the transactions with VMS, including: (i) a management representation letter, dated 15 July 2009 and signed by Mr Hussain, stating that the first VMS purchase was an arm's length commercial transaction and that the cost should be amortised over the useful economic life of the data feed, which was estimated to be three years, and (ii) the financial information on VMS that Mr Chamberlain had collated. Mr Hussain instructed Mr Chamberlain to send this financial information to Deloitte together with some further points Mr Hussain had drafted in an attempt to support recoverability of revenue from VMS. Mr Chamberlain did so, emailing Mr Murray of Deloitte on 7 July 2009 as follows:

> "Tom – this is the latest financial information I have and was generated when we were looking at acquiring VMS.
>
> Couple of additional points:

> - *Old company, been around for 25 years, run like a partnership with cash taken out by the shareholders. They run a revolver with the bank which we assume they will use. They are a conservatively run company who have always paid us on time - $1m licence plus $250k maintenance*
>
> - *$85m retained earnings so a good strong company, but like a partnership like deloitte they take money out of the business and run an overdraft. They also have an $11m revolver. So I am comfortable that for such a strategic deal as the purchase of Autn software they will use the revolver to allocate the cash."*

2658. The Claimants dismissed the suggestion that VMS was going to use more than 80% of its revolver to pay for the Autonomy software as just a ruse to satisfy Deloitte that collectability was probable. In particular, they provided evidence that Mr Hussain had already suggested paying VMS the $13 million in respect of the first VMS purchase before it was contractually due. The funds to pay for the Autonomy software were therefore going to come from Autonomy, and not from any revolver.

2659. As it was, and despite the fact that as Mr Murray of Deloitte noted in an email to Mr Welham the "*financial info for the year ended March 2007 is mildly useful but nowhere near enough to support our audit work...*", Deloitte ultimately appears to have received sufficient comfort on collectability to concur with Autonomy's accounting treatment.

2660. Deloitte's Q2 2009 Report to the Audit Committee simply stated that:

> *"This is a $9 million deal to supply VMS with a perpetual licence for a suite of Autonomy software products including TeamSite, LiveSite, Qfiniti and IDOL. Also in the quarter, Autonomy has separately purchased $13 million of software and associated services from VMS. Given that there is clear commercial rationale for the separate transactions, separate contractual arrangements and evidence that both transactions have been made at fair value, management has confirmed and concluded that there are no links between the contracts that would impact the accounting. Licence revenue of $8.5 million has been recognised with $0.5 million being deferred as fair value on support and maintenance. The cost of the software purchased by Autonomy has been capitalised on the balance sheet as an intangible asset and is to be amortised to the income statement over its useful economic life of 3 years."*

2661. What Deloitte did not know, and what the Audit Committee were thus not told, was that the transactions had been conceived by Mr Hussain as a means of generating extra revenue in Q2 2009, had been negotiated together, and would not have happened independently of the other.

*Autonomy's use of the VMS data feed Q3 2009 to Q3 2010*

2662. The Claimants relied finally in this context on evidence that (a) Autonomy did not use the VMS data feed for some 8 months after its acquisition and (b) Autonomy developed its own enhanced data feed which left little room for or appetite to adopt the VMS version. The Claimants prayed this in aid first, on the ground that lack of subsequent use was relevant in assessing what was the real rationale in purchasing the product in the first place, and secondly, in assessing the substance of a subsequent purchase by

Autonomy of further rights in respect of the VMS data feed. (I elaborate on the second of these points in the context of the second VMS transaction, see paragraphs 2680 to 2714 below).

2663. The Defendants responded to this that (i) contrary to the Claimants' case, Autonomy did use the VMS feed for demonstration purposes and furthermore (ii) in any event, the Claimants had misunderstood and overlooked Autonomy's use and sale of the VMS feed as an integrated element in its product portfolio (and especially Autonomy's "Explore" offering) which they submitted was the central purpose for which it was purchased. The Defendants also submitted that the crucial question which the line of argument tended to obscure was not whether the data feed was in fact used but was whether there was a commercial rationale at the time of the sale.

2664. The dispute engendered a detailed exegesis in the parties' respective written closing submissions. I consider that the most salient points can be summarised under three headings as follows:

(a) Autonomy's immediate response to the cessation of the Moreover feed;

(b) Autonomy's efforts to find a use for the VMS data feed after it was provided with sample data from it 6 months later;

(c) Autonomy's attempt to integrate the VMS data feed and sell it as part of Autonomy's software product.

2665. As to (a) in the preceding paragraph:

(1) In the Business Plan produced by Mr Hussain it was stated that as Moreover had cancelled its feed and restored it only temporarily, *"a replacement news feed is required urgently"*.

(2) Nevertheless, although the Defendants sought to present the purchase of the VMS feed as the solution adopted in light of this urgent need, contemporaneous documents make clear, and it did not seem to be disputed, that after the purchase of the relevant rights to that feed its evaluation was not a priority for Autonomy, and still less was its deployment. The contemporaneous documentation barely referred to it, the focus being almost exclusively on assisting VMS in relation to its purchase and adoption of Autonomy software.

(3) Instead, when on 20 July 2009 Mr Hussain asked Dr Menell *"what to do"* when Mr Black advised that Moreover would be switching off its feed on 31 July 2009 Dr Menell suggested that Autonomy should create its own feed:

*"Moreover is a good clean and reliable feed. However, like the rest of the world (remember Bloomberg) technology wise its built on our stuff and other simple 3rd party bit and pieces that we have our own and frankly superior version off…So renewing Moreover would be something we would do if a) we were lazy and have been lazy and b) we ever listened to humans calling themselves "product managers". Thus*

> *time to bite that bullet and package our own that given our technology will utterly obliterate the likes of Moreover…"*

(4) Then, on 20 July 2009, Dr Menell instructed Dr Blanchflower, Mr Goodfellow and Mr Lucini to create an alternative news feed by 31 July 2009, when the Moreover feed was due to be switched off:

> *"You know what to do – it is time to eat our own dog food. We have until 31st and I want something we can use AND sell to our customer as a clean pre classified plug and play tagged feed package. Fern [Lucini] lead the charge."*

(5) There was no mention in any of these emails of the VMS data feed that Autonomy had licensed a few weeks earlier for $13 million.

(6) As it happened, Dr Blanchflower had been working on an alternative feed since the interruption to the Moreover feed in June 2009. Dr Blanchflower told Dr Menell, Mr Lucini and Mr Goodfellow that there was an "*rss fetch on 200 news sites*" and that it would be ready to go live before 31 July 2009. Dr Blanchflower's unchallenged evidence was that it was a relatively straightforward task: it took him a morning to find as many news sites as possible, an afternoon to connect them using a rich site summary (RSS) connector, and a further two weeks for the feed to fill up with news items. Similarly unchallenged was Dr Blanchflower's evidence that the news feed was able to pick up breaking news stories quickly and effectively, and worked well in Autonomy's demonstration environment.

(7) The only challenge to Dr Blanchflower's evidence on this issue was the suggestion that he could not have gone out and replicated the content of the VMS data feed, at least not without negotiating and paying for rights to access and sublicense content. As Dr Blanchflower explained, he had, to some extent, replicated the VMS data feed, because "*we had a demonstration on the sales environment and products that we shipped to customers that were able to obtain the transcriptions of broadcast news feed and social media posts and obviously web content as well*". To the extent that further rights were required, he considered that they could be obtained without great expense, either by the customer or by Autonomy.

(8) Dr Lynch sought to discredit the data feed that Dr Blanchflower created on two fronts: technical and legal.

   (a)   Dr Lynch suggested that the feed was a "*temporary workaround*", which was expensive, slow, required a large amount of bandwidth and was often blocked by websites. But the Autonomy news feed used a RSS connector to extract news from as many websites as possible. RSS is a format specifically used for delivering regularly changing web content, such as news headlines. The RSS connector only extracted the text from news articles, which required very little bandwidth, and it did so quickly and inexpensively. Dr Blanchflower, who created the news feed, did not recall any issue with the speed at which it operated. Nor, since RSS is how news sites expect their

articles to be consumed, did he recall any websites blocking Autonomy's news feed. This evidence was not challenged.

(b) Dr Lynch also suggested at various points in his oral evidence that Autonomy would not be able to create its own data feed without infringing copyright. However he accepted that though a *"grey area"* this should not affect use for demonstration.

(9) The news feed that Dr Blanchflower created is <u>still</u> used to this day by MicroFocus in the same form as it was in 2009, which appears be contrary to any suggestion that it contravened copyright laws or had any deficiencies of note.

The 'Blanchflower' data feed must also have been used within Autonomy because, as explained below, Autonomy was not even using the VMS data feed some six months after purchasing it.

2666. As to (b) in paragraph 2664 above:

(1) It seems clear, though Dr Lynch did not accept this, that it was not until the beginning of December 2009, some 6 months after the first VMS purchase, that VMS provided Autonomy with some sample data from the VMS data feed. Mr Avila had no knowledge of any sample data having been provided prior to this point. There is no other evidence of VMS delivering the data feed to Autonomy, save to enable VMS to recognise revenue from the first VMS purchase.

(2) Perhaps both because it had not been scoped before purchase, nor its details and sample data provided until so long after it, Autonomy still seems to have been unclear what use they could make of the data feed. On 3 December 2009, Mr Avila sent a link to the sample of the VMS data to Mr Lucini, Mr Gallagher and Dr Blanchflower, noting that Autonomy needed to "*provide some specification/requirements document for the data feed. Beyond putting this into our demos, if we intend to pair it with our WCM [Web Content Management]/Optimost stack we need some doc that outlines what we want*".

(3) That *"doc that outlines what we want"* was necessary in order to provide VMS with some information to enable it to determine what application programming interfaces ("APIs") Autonomy needed to enable the VMS data feed to communicate and interact with Autonomy's software, as Mr Avila accepted.

(4) VMS had been asking for this specification since July 2009, but, as at December 2009, none had been provided by Autonomy's technical team. Mr Avila could not remember when work on the technical specification had started, nor even whether it had done so prior to his email of 3 December 2009. There is no evidence, and it is not likely in those circumstances, that any use could have been made of the data feed in the meantime. This is difficult to reconcile with the claims made in the Project Shockwave business plan.

(5) When the sample of data was provided, Mr Avila asked his colleagues to look at it or let him know who to work with. The email exchanges that ensued show that there was still no clear idea as to whether and, if so, how, the VMS data feed was going to be used by Autonomy. The email exchanges suggested also

that some of the content was unsuitable for use in Autonomy's demonstration environment, and that there was a considerable degree of overlap between the VMS data feed and the Moreover data feed that Autonomy could have licensed for demonstration purposes for £50,000 per annum.

(6) The response of Mr Gallagher, Head of Development at Autonomy, appears to confirm that the provision of the data sample was Autonomy's first practical engagement with the application of the VMS feed. In an email dated 7 December 2009 he asked: "*What is this feed? What sort of content does it contain? Why did we licence it?*". As far as Mr Avila was aware, and as is plain from the terms of Mr Gallagher's email, Mr Gallagher was not familiar with the VMS data feed before Mr Avila's email. In response:

(a) Mr Avila replied with a summary of the VMS data feed and explained that "*It was part of the last deal we did with them as far as I know, we can integrate this "feed" within our demos or products and upsell customers into full VMS features…*".

(b) Mr Gallagher appears to have reviewed the data feed and then asked Mr Avila: "*Have you looked at the demo data?...From what I've seen the quality and content is pretty poor…not at all sure how it could be used in our demo network*". Mr Gallagher copied and pasted an example from the data feed in his email to Mr Avila.

(c) Mr Avila responded that he had "*not looked at it closely*" but "*for most of them the quality seemed ok*".

(d) But, for Dr Blanchflower at least,

"*the "okay" was never what we were aiming for. The demo system was our showcase and designed to be as high quality as we could obtain. If there was anything that wasn't okay, we would remove it and try to do better. This was to replace our own iteration of the Moreover feed and unless it was tangibly better, there would be no reason to*".

(7) In further exchanges, Mr Avila went on to say: "*We don't have to use all of it, or any of it. If we do want to use it somehow we need to give them a spec [specification] of what we want though*". Mr Avila confirmed in his oral evidence that (a) if a specification was to be provided he needed someone to work with him to determine how to filter the data, which he accepted Autonomy needed to produce and provide to VMS if it wanted to use the data; but (b) he could not remember what he knew about it at the time, but he accepted that Autonomy probably did not need the data feed, because the data feed Dr Blanchflower had devised was satisfactory.

(8) Sometime later, Mr Lucini participated in the discussion, expressing uncertainty as to whether Autonomy got much value from "*a raw feed of unprocessed info*". Mr Lucini thought "*it would be funny if we end up getting moreover again but coming from vms! but this is a numbers game. Eloy, how much data do they process? How much would come our way? If it's meaningful we can put it through maindemo beta [sic] and see if it plays well…*". Mr Lucini was

essentially saying that, if Autonomy took the print and internet content, then it would be getting the Moreover data feed, but via VMS.[312] His suggestion that the VMS data feed be run in the main demo environment to see how it played out, indicates that the feed had not been tested in this environment, still less used. Mr Avila told Mr Lucini that he would get the numbers. Noting that Autonomy had *"seemingly paid for this"*, he expressed hope that Autonomy could "*use it somehow, even if just moreover*". But $13 million was a lot to pay to <u>continue</u> to receive <u>Moreover's</u> data feed <u>via VMS</u> and other unprocessed, low quality news feeds that Autonomy did not want to use for its product demonstrations.

(9) Mr Gallagher's further investigations were not positive. As regards the only additional content that VMS offered over and above Moreover, namely, the broadcast content, Mr Gallagher advised Mr Avila that he should "*take a look*", because Mr Gallagher's random sampling of the files that VMS had transferred showed them "*all to be crappy local news broadcasts…we don't want these in the demo*". The Defendants took issue with this, on the basis that Mr Lucini, for one, appeared to consider the local data feeds *"a good thing"*. Mr Avila considered that *"for most of them the quality seemed ok"* and thought that Mr Gallagher, in comparing the feed to Moreover and viewing it solely in terms of its use in demonstrations had rather missed the point that the use of the VMS feed was not so confined. Indeed, the Defendants pointed out that Mr Avila had stressed that the ability to use VMS data for demonstrations was simply an ancillary benefit; its main purpose was to permit Autonomy to embed the feed into its WCM (Web Content Management) product line and Mr Avila had asked for thoughts about use in any other products also.

(10) That point had its dangers for the Defendants: Mr Avila's requests in finding and defining for VMS a use specification other than demonstration strengthened the impression that some use had had to be identified because none had been the reason for the purchase. As the Claimants noted, had the reason for the purchase been to integrate with Autonomy's product sets (as Autonomy represented to Deloitte in the Project Shockwave business plan) that exercise would have been unnecessary: Autonomy's engineers would have been told to start work on integrating it.

2667. As to (c) in paragraph 2664 above:

(1) Even by January 2010, Autonomy had still not provided VMS with the specification for the data feed without which VMS could not tailor it to Autonomy's requirements. It was not provided until 11 February 2010.

(2) Towards the end of March 2010, some nine months after Autonomy had acquired the VMS data feed, Autonomy incorporated it into its media aggregation service ("MAS") which in turn fed into a product known as Autonomy Explore. As Dr Blanchflower explained, and Mr Avila agreed, Autonomy Explore was an interface that formed part of Autonomy's Promote

---

[312] This was also the view of Mr Andrew Joiner, CEO of Autonomy eTalk, who told his colleagues in May 2010: "*VMS doesn't care about the feed. It's basically forked to us without being cleansed. They get it through a subscription to Moreover etc. What they want is for us to sell their data*".

business unit, which included the Web Content Management suite of products. At a high level, Autonomy Explore indexed documents of use to people interested in media and marketing and performed analytics on that data.

(3) On 23 March 2010, Mr Joiner notified Dr Lynch and Dr Menell of the integration, saying:

> *"Good news is that we are receiving and ingesting the daily feeds from VMS into explore.*
>
> *Eloy [Avila] and Nathan [Anderson] have spearheaded the effort and produced a sizing. The issue is that we fill up the current demo idol server in a few days*
>
> *Would you be okay with adding a few servers per their recommendation? It is key element of deals and demos."*

(4) Dr Lynch recalled seeing this integration at the time, and acknowledged that it took place nine months after the first VMS purchase. Attempts were made during the cross-examination of the Claimants' witnesses to establish that the VMS data feed was incorporated into Autonomy Explore and sold to customers. Mr Goodfellow was unable to comment on whether Autonomy Explore incorporating VMS was sold to customers. Mr Lucini recalled that Autonomy tried to use the VMS data feed in Autonomy Explore, but that it did not work and was stopped. He also recalled a number of proofs of concept and demonstrations, but he did not recall any sales. Nor was he taken to any signed sales contracts in his cross-examination.

(5) Mr Avila referred in his witness statement to a number of documents shown to him by Dr Lynch's legal team and suggested that the VMS feed was "*incorporated into many of our Promote products, such as Optimost and Autonomy Explore, and sold to various key customers*". Mr Avila amended this paragraph before giving evidence so that it read "*VMS's feed was incorporated into and made compatible with many of our Promote products, such as Optimost and Autonomy Explore, which were sold or proposed to various key customers*" (emphasis added). The examples given were explored in detail in cross-examination. It emerged that Mr Avila had no personal involvement in four of the five examples he referred to in his witness statement. None of the documents he referred to were a signed sales contract showing the sale of the VMS data feed to a customer. Nor did any of the documents involve a sale or a proposed sale of Optimost incorporating the VMS feed. The most that Mr Avila was able to point to was an email chain relating to a customer called Herbalife, which started with Mr Anderson noting that Autonomy had sold a media aggregation service to Herbalife which it had not yet built. Mr Avila was not taken to any others in re-examination, nor was Dr Lynch.[313]

---

[313] After the close of evidence, the Defendants uploaded a number of additional documents to the trial bundle on this issue. Many of the documents post-date the second VMS reciprocal transaction and most of them are to the same effect as the documents exhibited to Mr Avila's witness statement, i.e. proofs of concept, statements of work, draft agreements, emails and the like, as opposed to evidence of material sales of Autonomy Explore / MAS incorporating the VMS data feed.

(6) In November 2010, Mr Avila asked Mr Joiner: "*how we are packaging the VMS data feed into Explore nowadays and if we are selling it?*". Mr Avila also asked whether it would make sense for VMS to host the data and provide access to Autonomy. Mr Joiner responded that this was not really practical and that:

> "*...For a variety of reasons, it doesn't make much sense for VMS to host the data. Firstly, we have already paid for the data and we are better with IDOL. Secondly, they don't add much value. They aren't collecting data themselves just forwarding the feeds. If they were to index the data, they don't have an automated way to extract and export data like we do with Automation Server. I could go on and on obviously (we would be totally dependent on them for support, they would know our customers etc etc). Happy to discuss further.*"

(7) Mr Avila confirmed in cross-examination that this reflected his understanding at the time and explained that he handed over evolution of the data specification to Mr Anderson, who worked closely with Mr Andrew Joiner and Mr David Joiner, heads of the business unit for Autonomy Explore and Optimost.

(8) Mr Avila then asked Mr Joiner, who was involved with the VMS data feed and its potential use within Autonomy's Explore and Optimost products, about the possibility of upselling or reselling the VMS data feed, suggesting that part of a new offering to VMS "*may be a more collaborative reseller agreement of their feed/service*". Mr Joiner's response was again negative, ending:

> "*...there just isn't a ton of value in their feed, especially if there are royalties. It's a commodity market — though putting it into IDOL isn't...*".

2668. As at Q4 2010, therefore, Autonomy had not done what it represented to Deloitte it would do with the feed in its Project Shockwave business plan. There is no evidence that the feed had been integrated with Autonomy's Interwoven or Optimost product sets, still less sold to customers as part of these products.[314] As elaborated in the context of the second VMS transaction, it appears that Autonomy had not even acquired the rights to use the VMS data feed as part of its Optimost products, despite representing to Deloitte that this was part of the rationale for acquiring the data feed in Q2 2009.

2669. Mr Hill sought in his oral closing to maintain the line that the VMS data feed "*was used and was used for the purposes for which it was bought.*" He submitted that it was successfully incorporated into the 'Explore' product, which was part of the WCM product line, which in turn was part of the 'Promote' part of Autonomy's business. He added that even if this was not the Optimost product mentioned in the Project Shockwave Business plan, it was another Interwoven product and thus "*very much in line with the commercial rationale that was explained to Deloitte*" so that "*the product was used and was used for the purpose for which it was bought*".

---

[314] After the close of evidence, the Defendants uploaded two documents on this issue. These do not advance their case. The first in time shows that the Managing Director of Optimost, Mark Wachen, asked in August 2009 whether the terms of the first VMS purchase entitled Autonomy to use the data feed in new Optimost products. As will be seen, it did not. The second in time shows that, by Q1 2011, there had not been any VMS-Optimost integration.

2670. However, Mr Rabinowitz countered in his oral reply that this overlooked how long it had taken even for Autonomy to start work on the specification for the data feed, having as a matter of some urgency paid $13 million for it; it overlooked the fact that what Deloitte had been told to justify the purchase was that it would be integrated for demonstration use immediately, and into TeamSite, LiveSite and Optimost in Q3 2009, none of which was done; and that even overlooking the fact that it was the Optimost product, and not the Explore product, which Autonomy had identified, there was (as stated above) no evidence of actual integration with Interwoven or Optimost products, and the evidence of any sales was *"very thin indeed"*. There were in evidence no signed sales documents nor any documents of the kind that would be expected if there had been material sales. Mr Rabinowitz also reminded me that attempts were made during the cross-examination of the Claimants' witnesses to establish that the VMS data feed was both incorporated and sold to customers: but all these attempts failed. I accept the Claimants' case and find that any sales were negligible.

*Conclusions on the first VMS transaction*

2671. In summary, in my judgment:

(1) Mr Hussain proposed a sale of software by Autonomy to VMS as the means of generating extra revenue in a quarter when the *"US commercial call was poor"* and Autonomy needed some $9 million in extra revenue in order to hit Autonomy's Q2 2009 revenue target. It was Autonomy which approached VMS and prompted and promoted the sale.

(2) VMS was undoubtedly interested and became keen to purchase software which it considered offered it a potential for positive change: but a purchase of that magnitude was disproportionately large having regard to its available resources and was not one it could have contemplated but for Autonomy's offer to purchase from it a licence to its data feed.

(3) Autonomy's purchase of a licence to VMS's data feed was thus the means of enabling VMS to effect its proposed large ($9 million) purchase of Autonomy software.

(4) Mr Hussain was in direct control of both Autonomy's sale and its purchase. He dictated the price and the amount of software sold, as well as the price to be paid by Autonomy to VMS for the data feed licence. The presentation of the transactions to Deloitte and the Audit Committee as separate was false.

(5) Autonomy did not conduct any technical analysis of VMS's data feed before agreeing to purchase rights to it for $13 million. The commercial assessment presented to Deloitte was prepared after the deal had been agreed and did not in reality guide or indicate the reasons for the decision either to sell or to purchase.

(6) The further memorandum on revenue recognition prepared to persuade Deloitte of the desired revenue recognition was also contrived and misleading.

(7) Autonomy did not need the data feed licence it acquired and did not seek to assess, still less deploy, it for many months after its purchase of it on the last day of Q2 2009. Instead, Autonomy pursued two alternative options of either

(a) striking a deal for its previous data feed provider, Moreover, to continue providing such a data feed at a cost negotiated at £50,000 per year or (b) developing its own data feed.

(8) Given its past disappointment with Moreover, the fact that its data feed was limited to demonstration and did not permit sale, and Autonomy's corporate preference to develop its own software, Autonomy favoured and adopted the course of developing its own data feed.

(9) Although there were or might have been copyright problems for Autonomy in developing its own data feed for sale, those problems did not, or were not thought to, affect the development and deployment of its own data feed for demonstration purposes. Dr Blanchflower, Mr Lucini and their teams quickly developed such a data feed which is still in use by MicroFocus in substantially the same form as it was in 2009.

2672.  I have concluded in these circumstances that the reason for Autonomy's purchase of the VMS feed was to fund a purchase from it by VMS in order to generate recognised revenue in order to seek to cover a shortfall on quarterly revenue targets; and that, since that was the reason for both transactions, they should have been accounted for together, and no revenue should have been recognised in respect of the sale to VMS.

*The accounting treatment of the VMS reciprocal transactions*

2673.  It is convenient to set out the accounting consequences in respect of both the first and the second VMS transactions. There is no real dispute as to the application of the accounting principles on the basis of my conclusions that in each set of transactions the reason for the purchases by Autonomy was to fund the purchases from it in order for Autonomy to generate recognised revenue and in each set the purchase by Autonomy and the purchase by VMS from Autonomy must be taken together:

(1)    There is no dispute that Autonomy's purchases of the VMS data feed were linked to Autonomy's software and hardware sales to VMS. The linked sale and purchase transactions ought, therefore, to have been considered together in order to determine their substance and appropriate accounting treatment.

(2)    From the matters set out above, it is clear that, in each case, the linked sale and purchase were not independent, arm's length transactions, and it was not possible to understand the substance and commercial effect of one agreement without regard to the other. That is because there was no genuine commercial rationale for either of Autonomy's purchases of the VMS data feed. Rather, the real purpose of Autonomy's purchases was to incentivise VMS and to fund VMS to purchase Autonomy software on terms VMS would not otherwise have agreed so that Autonomy could recognise additional revenue in Q2 2009 and Q4 2010. Autonomy's purchases, and the linked sales to VMS, therefore lacked economic substance.

(3)    Further, IAS 18 §14(d) was not satisfied because no economic benefits flowed to Autonomy.

2674. It follows that Autonomy should not have recorded revenue on the sales to VMS. Autonomy should instead have: (i) recorded the net cost in relation to the first VMS sale and purchase, totalling $4,000,000, as an expense in Q2 2009, and (ii) recorded the net cost in relation to the second VMS purchase and the VMS hardware and software sale, totalling $261,633, as an expense in Q4 2010.

*Defendants' knowledge*

2675. There is no doubt about Mr Hussain's involvement and knowledge. I accept the Claimants' submissions that:

(1) Mr Hussain conceived of the first VMS reciprocal transaction as a means of generating extra revenue in Q4 2009 and he dictated the size of the deal to Mr Egan by reference to Autonomy's revenue needs.

(2) Based on the financial information he had relating to VMS and the size of VMS's business, he must have appreciated that VMS would not have entered into the first VMS sale on the terms it did unless Autonomy had incentivised it and funded it to do so through the first VMS purchase.

(3) He contributed to the misleading Project Shockwave business plan and was content for the equally misleading revenue recognition memorandum to be provided to Deloitte. He can only have understood that it was necessary to mislead Deloitte because there was no genuine commercial rationale for the first VMS purchase and that Deloitte would not have concurred with Autonomy's accounting treatment of the first VMS sale had it known that was the case.

2676. As ever, the position against Dr Lynch is less clear. His general position, as he asserted in his witness statement, and resorted to in cross-examination occasionally (see above) was that he had little involvement in the VMS reciprocal transactions.

2677. However:

(1) Dr Lynch was aware (as he had been informed by Mr Hussain by email of 19 June 2009) that the context in which Mr Hussain was pursuing a deal with VMS was that the *"US commercial call was poor"* and he needed extra revenue (naming VMS in that regard): see paragraph 2598 above. The inference from the way the email was drafted was that Dr Lynch was already aware of the proposed deal by then.

(2) Dr Lynch was kept updated of the progress of the transaction, including the proposed sale price *"at between 7-9m"* (see paragraphs 2607 and 2615 above), and accepted that he may well have been aware of the proposal for Autonomy to purchase something from VMS for a like price. He was also party to what I have determined were pre-textual exchanges setting out the line to be adopted on the purchase side.

**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

(3) He was provided with a copy of the Project Shockwave Business Plan and the Revenue Recognition memo. He suggested that he might not have read the Business Plan: but I would doubt that. I think it more likely than not that he would have read it, even if only rapidly.

(4) He discussed the twin transactions with Mr Chamberlain, including a discussion about the first VMS reciprocal transaction being one of a number of "*circular transactions*".

(5) He eventually had to accept in cross-examination that the proposed deal only became a firm option in June 2009, and I infer that he was aware accordingly that the statements made to Deloitte that the purchase proposals had been commenced in March 2009 were false.

(6) He was kept informed of Mr Chamberlain's concerns about persuading Deloitte about the values paid.

(7) He was aware at the time that the purchase by VMS and the sale by VMS were being discussed at the same time.

(8) Mr Hussain sought his approval to pay VMS early. Dr Lynch asked no questions and I infer he knew, as did Mr Hussain, that this was needed to enable VMS to fund the instalment for its own purchase the next day.

(9) Dr Lynch was aware of the efforts to find some use for the VMS feed, and of the work being done to create Autonomy's own data feed. He was aware that the VMS data feed was not incorporated with any Autonomy product until the end of Q1 2010, almost a year after Autonomy had bought it for $13 million.

(10) Over the course of his cross-examination, I formed the impression that Dr Lynch did know that the pressing and preponderant reason for the purchase by Autonomy from VMS was to fund a corresponding purchase by VMS of software. I agree with the Claimants, and find that Dr Lynch cannot have believed that it was appropriate to recognise revenue from the sale to VMS in those circumstances.

2678. That is consistent with my overall view that Mr Hussain always kept Dr Lynch informed of the purpose and progress of the various transactions to bolster revenue to reach target.

2679. In my judgment, in all the circumstances, Mr Hussain plainly had 'guilty knowledge' of the improper recognition of revenue from the sale side. I have concluded on a balance of probabilities that so also did Dr Lynch.

*The second VMS transaction - Q4 2010 (RT 2)*

2680. As in Q2 2009, in Q4 2010 Mr Hussain was looking for ways to generate revenue to achieve revenue targets. As was his habit for every quarter, Mr Hussain had prepared a revenue forecast spreadsheet divided into closed deals, large deals and *"deals on the right"*. In Dr Lynch's words, there was a sort of route map, with *"his deals on the left, and then as things come out of the left, you put things in from the right"*. In other words, the deals on the right were brought in to cover any revenue shortfall in the event that any of the deals on the left fell away.

2681. At the beginning of November 2010, Mr Hussain circulated to Mr Egan, Ms Eagan and Dr Lynch, among others a table setting out the status of various large deals. The table included a $5 million deal with VMS 'on the right'. Mr Hussain, who had by then taken

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

up Mr Egan's suggestion of the possibility of striking new arrangements with VMS through its new CEO (Mr David Stephens), told Ms Eagan in his covering email that the VMS ideas needed to be put into a proposal as soon as possible.

2682. A few days later, on 14 November 2010, Mr Hussain updated Dr Lynch on various deals that quarter and told him to *"Add VMS at say $5m – Nicole running, meeting wed"*. Each of Mr Hussain's updates to Dr Lynch over the following week identified VMS as key to the quarter. Over the course of the next few weeks, Mr Hussain, Ms Eagan and Mr Egan's focus was on what Autonomy could buy from VMS and sell to it, and how Autonomy could maximise revenue from the deal.

2683. It is clear that Dr Lynch was aware of a possible deal with VMS and that Mr Hussain was counting on it in his revenue forecasts. Dr Lynch was also kept informed of the progress of the discussions with VMS. Mr Hussain forwarded him Ms Eagan's summary of a meeting with VMS, in which Ms Eagan said that it *was "looking very good but still not sure on the new CEO's spend level. Beth Ladd has lunch with Gerry [Louw] today and I'll ask her to try to get a feel for how large we can go"*. Obviously, and as Dr Lynch accepted, the larger the deal, the more revenue for Autonomy.

2684. As is also clear from Ms Eagan's email, this was not a case of Autonomy having identified further rights from VMS that it needed or wanted and then entering into negotiations with VMS to acquire those further rights, as one would expect to see if there was a genuine commercial rationale for the purchase.

2685. Mr Hussain's primary concern, unsurprisingly, was how much revenue Autonomy could generate from a deal with VMS.

2686. At the beginning of December 2010, Mr Hussain told Dr Lynch that VMS needed some connectors and that a deal could be done, but probably for no more than $1 million. Mr Hussain suggested to Dr Lynch that a meeting needed to take place with the CEO of VMS, Mr Stephens. Mr Hussain later offered to Ms Eagan to meet with Mr Stephens when he was in New York.

2687. The first exercise was conducted primarily by Ms Eagan, not by reference to any apparent need or want on the part of Autonomy for further rights to VMS's products, but simply by reference to what was outside the scope of the first VMS reciprocal transaction:

(a) Ms Eagan asked Mr Scott and Mr Egan on 15 November 2010 for the terms of the first VMS reciprocal transaction, that is, what Autonomy licensed to VMS and what VMS licensed from Autonomy, saying that she needed them "*in order to think through the new deals structure*". Having considered the agreements, she then emailed Mr Scott and Mr Egan with some queries.

(b) On 19 November 2010, Mr Scott set out his answers underneath Ms Eagan's queries (his answers being identified in bold):
    *"Products such as Explore, Social Media Governance, Concept Stream (a new News Monitoring function) as well as the Twitter hash tag analysis we are just developing now did not exist. I assume these would therefore not be covered under the agreement as they did not exist at the time of the agreement. Is that correct?*

> *Anything new that was not in existence at the time would not be covered.*
>
> *What were the limitations on our license of VMS data? Apparently, Andrew Joiner said we are using the feeds but not the other information. We need Gerry@ VMS to wrap it in a web API. I'm trying to find out more about that aspect but may need to know if that would be covered under the agreement. VMS new CEO would also like us to display the VMS brand in our demonstration with VMS data. Was that contemplated in the original agreement?*
>
> ***We are authorized to use and display the Data to End-Users by embedding an API designed to access the Data into Autonomy software. We have no right to sell or distribute the Data, itself, in any manner or via any method to end-users. Autonomy is restricted from providing functionality to the End-User to download or reproduce Data for its own use, for sale or distribution. I did not see anything that authorizes, requires or prohibits us from displaying their logo in our demos.***
>
> *Were there any resell/upsell terms? For example, does our salesforce have the right to resell or upsell VMS services to our clients? If so, what are the terms? Or are we to refer clients to VMS sales organization?*
>
> ***I don't see a right to sell/upsell VMS products (presumable the data in question) to customers. In fact, the contract states "All sales of Data or media to Autonomy End-Users, whether in tape, DVD, or other digital format, shall be made by VMS at prices to be established by VMS. VMS shall bill each End-User directly for such sales. VMS shall pay Autonomy a commission of 10% of all such sales exclusive of taxes, shipping, and handling charges, and/or royalty charges, if any." Commissions are paid quarterly in arrears."***

2688. Dr Lynch asserted that Ms Eagan's email was the "*sales part of an interaction with VMS, not the purchase part*", and that Ms Eagan was trying to find out what VMS already owned so that she could "*work out what she can go and pitch to sell them*". The Claimants contended, and I accept, that that was not the case. Only the first paragraph of Ms Eagan's email related to the software that Autonomy had already licensed to VMS and what further software Autonomy might be able to pitch. The remainder of Ms Eagan's email related to the scope of the first VMS purchase.

2689. On 19 November 2010, Ms Eagan sent Mr Hussain a proposal, which envisaged VMS licensing Autonomy software outside the scope of the first VMS sale and Autonomy reselling / upselling the VMS data feed.

2690. Initially, it seemed unlikely that a deal in excess of about $1 million was realistic. By 7 December 2010, Mr Stephens had had several meetings with Ms Eagan. He summarised the outcome of those meetings in an email to Ms Eagan and Mr Egan, noting that:

> *"VMS is not yet fully utilizing the software it already has under license – I guess like Autonomy is not yet fully utilizing the content it has licensed from VMS"*

2691. The following week, Ms Eagan met with Mr Hussain to discuss the deal structure. The goal, by this point, was *"$2m revenue VMS pays Autonomy"*. Mr Hussain told Mr Egan, Ms Eagan, Dr Menell and Mr Scott on 14 December 2010 that he had spoken with Dr Lynch and *"he was fine"*. Mr Hussain summarised the deal structure as follows:

> *"We sell $2m of software (connectors that Pete [Menell] has to deliver please)*
>
> *We buy: $0.5m services provided, $0.5m for the VMS service plus for non cash (but valuable to VMS) – we put their logo on our AVRO product and also we give them PR via our PR of the product"*

2692. Dr Lynch accepted in cross-examination that it was obvious the two deals with Autonomy buying and selling software were being discussed at the same time, and that he had had a discussion with Mr Hussain about the proposed deal reflecting the terms of Mr Hussain's email.

2693. The next day, 15 December 2010, Mr Hussain told Dr Lynch and Dr Menell that the CEO of VMS wanted to do a deal, that the terms were yet to be agreed and that he and Mr Egan would negotiate the deal. Mr Hussain later told Dr Lynch that the VMS deal was *"a replacement for kpmg"*, another potential Q4 2010 deal, which Mr Hussain had flagged earlier as being at risk. Dr Lynch accepted in cross-examination that Mr Hussain meant a replacement from a revenue point of view; in other words, the revenue from the VMS deal was going to replace the revenue that Autonomy was looking to earn from a deal with KPMG.

2694. Mr Hussain then attempted to identify ways of increasing the size of the deal and hence the revenue that Autonomy could recognise. The same day, he emailed Mr Egan and Ms Eagan with the subject *"about buying vms"*, saying:

> *"Thought I'd throw that in to make it bigger*
>
> *We could take shares as part consideration to help them*
>
> *The problem is of course time but at these levels we could do it without much dd."*

2695. Dr Lynch acknowledged that Mr Hussain was trying to make the deal bigger in order to increase the revenue Autonomy could recognise, and that he was suggesting Autonomy consider taking shares in VMS as payment to facilitate that.

2696. Mr Hussain sent Mr Egan and Ms Eagan further ideas for increasing the size of the deal later that day:

> *"Ideas: We sell hardware for $5m. We provide financing – say 1 year to pay. This has value*
>
> *We sell the connectors, extensions etc for $5m inc 5% maintenance*

*We prebuy their servies [sic] at list etc for $4m*

*There has to be a strong branding of vms and cross selling opportunities".*

2697. *[Paragraph intentionally left blank]*

2698. Dr Lynch suggested that Mr Hussain was simply trying to sell more to VMS, and that there was nothing wrong with that; but Mr Hussain was plainly aware that VMS was not in a position to finance a larger deal from its own resources and was trying to find ways of overcoming this by providing financing or accepting alternative consideration so as to increase the revenue that Autonomy could look to recognise.

2699. Mr Hussain's idea of adding a sale of hardware enabled a considerable increase in the size of the proposed transaction. After negotiations between Mr Egan and Ms Eagan with VMS on 16 December 2010 Mr Egan reported that "*There is a $10M deal here*", assuming that Autonomy could supply "*approx. $5 to $6M in HW through bonded warehouse*" and software to a value of between $2m to $4m, and would purchase from VMS "*enhanced and increased rights for current period*" and also an extension of aggregate rights for a term of 5 years, which Mr Egan wrote in his email reporting on the meeting was "*vital for Nicole [Eagan]*" Mr Egan noted further that VMS "*also requested longer than 2 year payment on the HW*".

2700. The following day, 17 December 2010, Mr Hussain updated Dr Lynch and Dr Menell on Autonomy's progress towards its revenue targets, saying "*Currently tracking between 250 and 258 depending on kpmg*". That figure included "*Vms agreed at 9.5m*".

2701. By 22 December 2010, the discussions between VMS and Autonomy had come down to the delta, that is, the net cash VMS was going to receive from the deal. The Claimants contended that this reflected the reality that the deal for Autonomy was about how much it had to pay to VMS to secure the revenue it needed for the quarter.

2702. This reality, and the fact that all concerned in Autonomy understood that the sale values for which Autonomy would seek to achieve would depend on revenue needs, was further emphasised in the email exchanges in evidence. Thus on 22 December 2010, Mr Egan received an email from Mr Stephens with the subject "*best effort*", which Mr Egan forwarded to Mr Hussain.[315] Rather than having protracted negotiations, Mr Stephens indicated he wanted to "*cut to the chase and put a deal on the table that works for all*".

2703. Mr Stephens summarised the deal as follows:

> "*...Please see attached. It achieves*
>
> -   *A $13m sale for AU in 2010*
>
> -   *The net payment is in the range you discussed*
>
> -   *VMS gets the HW and SW it needs*

---

[315] The suggestion was made that Mr Stephens' email might not be the email referred to, but it is clear that the attachments to the email were sent to Mr Hussain by Mr Egan.

> - *AU has access to data to help build your business*
>
> - *I believe I can get our shareholders to agree in time*
>
> - *Most importantly it builds an even stronger relationship between our 2 companies*
>
> - *We have discussions underway for further relationship enhancement in 2011"*

2704. A spreadsheet which (though at one time this was queried) appears to have been attached to Mr Stephen's email set out in tabular form a series of linked transactions between Autonomy and VMS, comprising a sale by VMS of further rights to the VMS data feed for $8.1 million, and sales by Autonomy of (a) hardware (acquired by Autonomy from a third party supplier) for $8 million and (b) further Autonomy software for $5 million.

2705. On 23 December 2010, Mr Egan sought Mr Hussain's advice on how to proceed, suggesting that they "*counter slightly more softly at like 3.25 delta or at least put language in that opens the door for David to be in touch with you today to discuss/make a case etc.*". Mr Egan summarised the position for Mr Hussain in more detail later that day in response to an earlier email from Mr Hussain:

> "*Not sure when you are getting out of your meeting. I'm not sure I follow this. Our offer to them was:*
>
> *They buy approx 8-10M in HW, amount doesn't matter really as it nets out of analysis. (however, it does actually matter a bit as I'm sure we will source it for at least 10% less than we sell it for.)*
>
> *They pay $5M for the SW*
>
> *We buy $7.5 M in VMS Information Services*
>
> *That would leave a real delta of $2.5M. One way to think about it is that $1M of that is against the AU staffing services obligation both past and future. The remaining 1.5 is either: a pure delta or recovered in HW sourcing prowess.*
>
> *With that said. They countered moving that $2.5 to $4.6. and penciling 8M in HW so it would be 13M in rev to AU.*
>
> *A few thoughts:*
>
> - *I think we can counter again*
>
> - *I don't think they have the ability to do too much better than that. (they aren't actually going to buy the HW in the absence of help like this , they just have to go on and run their business and hope they can self fund those aspirations over 4 years. So it's not like we are relieving them of planned expense.*
>
> - *What we do next depends heavily on what you need. It would be best to know more on BofA.*

> - *We could just work to optimize and keep the option to do this deal. If we break out of the range of economics they can even consider we will not be able to reconvene them if we regret it upon collapse of other stuff.*
>
> - *Thoughts???"*

2706.  The Claimants highlighted a number of points of note in Mr Egan's email:

(1)  The hardware purchase netted out of the calculation of the delta because, as Dr Lynch put it, it was a zero-margin transaction. The relevant delta was therefore between the proposed sale by Autonomy of software and the proposed purchase by Autonomy of further rights to the VMS data feed. In other words, the delta was the cost to Autonomy of selling its software.

(2)  Autonomy's response to the terms proposed by Mr Stephens expressly depended on what Mr Hussain said he *"needed"*; and given the subsequent reference to the status of the proposed deal with BofA, that can only have meant what Mr Hussain needed from a revenue perspective.

(3)  Mr Egan regarded the deal as otherwise optional: he appeared to think that in reality, Autonomy only needed to make the purchase to generate the sale.

2707.  In the result, the parties compromised on what Mr Stephens described as *"the $3.3m net cash payment"*. Only after that was attention turned to ironing out exactly what would be the software rights to be sold by Autonomy to VMS and the data feed licence rights it was to purchase from VMS, as well as to providing a recorded justification for Autonomy's purchase of such rights for $8.4 million.

2708.  In the latter context, no effort was made by either Mr Hussain or Dr Lynch, both of whom ultimately approved the transactions, to establish whether the first VMS purchase had been a success, financially or otherwise, before investing further substantial sums (including a very handsome 'delta') in another VMS data feed licence. Mr Crumbacher simply prepared a table setting out the main features of Autonomy's further purchase from VMS and asked Ms Eagan and Mr Egan to add the reasoning behind the purchase and the amount allocated to each component of it. Mr Hussain put in an additional request that Ms Eagan and Mr Egan *"add colour"* and Mr Chamberlain *"work on valuations"*. Mr Hussain indicated that he was *"ok"* with the purchase *"given the commercial success of the previous acquisition of data"*, any such success being negligible, if measurable at all.

2709.  The three components of the second VMS reciprocal transaction were executed on 31 December 2010:

(1)  Autonomy's purchase from VMS took the form of an amendment to the first VMS purchase (the "second VMS purchase"). The second VMS purchase extended the term of the first VMS purchase from three years to five years and expanded the scope of the data licensed under the first VMS purchase so as to include social media content and vertical market content. The agreement also licensed additional rights to Autonomy, including: (i) the right to sublicense and

distribute the licensed VMS data to Autonomy customers, end-users, prospects, resellers and partners, and (ii) the right to use, manipulate, access, review, compile and automatically act on the VMS data solely through operation of and in conjunction with Autonomy's hosted, web-based, online marketing optimisation and analytics product currently marketed under the trademark "Optimost" for itself and for the benefit of customers and users of the Optimost service. The fee payable by Autonomy under the second VMS purchase was $8.4 million, which was due in five (unequal) instalments. The first three instalments were for $2 million each and were due in February, April and July 2011.

(2) Autonomy's sale of further software licences to VMS took the form of a further product schedule to the existing software licence agreement (the "VMS software sale"). Under the VMS software sale, Autonomy licensed certain software to VMS for the uses authorised therein. The agreement provided for a licence fee of $5 million, which included a fee in respect of the first year of support services in the amount of $250,000. The licence fee and the support fee were payable in three instalments. The first two instalments were for $1,500,000 and were due within 90 and 120 days of invoice, respectively.

(3) Autonomy also sold hardware and other equipment to VMS pursuant to a second amendment to an earlier software licence agreement between the parties (the "VMS hardware sale"). Under the VMS hardware sale, VMS agreed to purchase from Autonomy the hardware and equipment specified in the schedule to the agreement for a purchase price of $6,004,066.90. This amount was payable in four instalments of $1,501,016 or thereabouts. The first instalment was not payable for almost an entire year, and the final instalment was not due until almost two years after the effective date of the agreement. Dr Lynch acknowledged that these were unusually generous payment terms.

2710. Autonomy recognised the licence fee from the VMS software sale and the amount payable under the VMS hardware sale, totalling $10,754,067, in Q4 2010, and the support fee as revenue over the following year.

2711. Three further points were stressed by the Claimants:

(1) First, much was made by the Defendants in the cross-examination of the Claimants' witnesses and in Mr Avila's witness statement of the second VMS purchase giving Autonomy the right to resell the VMS data feed; indeed, Mr Avila's witness statement rehearsed that Dr Lynch's legal team had told him that this right was a "*fundamental factor*" in Autonomy entering into that agreement. The basis for those instructions is entirely unclear. As noted above, when Mr Avila asked Mr Andrew Joiner in November 2010 about the possibility of reselling or upselling the VMS data feed, Mr Joiner was less than enthused and said that there "*isn't a ton of value*" in the feed.

(2) Secondly, as outlined above, the second VMS purchase granted Autonomy the right to use the VMS data feed in Autonomy's Optimost product set. Yet Autonomy had represented in the Project Shockwave business plan that part of the reason for the <u>first</u> VMS purchase was to incorporate the VMS data feed

with its Optimost suite of products. The fact that Autonomy had to license <u>additional</u> rights in order to be able to use the VMS data feed in this way indicates that: (i) this cannot have been part of the rationale for the first VMS purchase, contrary to what was stated in the Project Shockwave business plan, and (ii) Autonomy cannot, at least lawfully, have incorporated the VMS data into its Optimost product set by Q4 2010. This would explain why there is no evidence of Autonomy having done so prior to the second VMS purchase.[316]

(3) Thirdly, the payment terms were structured so that: (i) VMS did not have to pay anything in respect of the hardware for almost a year after the sale, an unusually long period of time, and (ii) with one exception which, as will be seen, VMS regarded as an oversight, VMS did not have to pay anything to Autonomy under the VMS software sale until Autonomy had provided VMS with the funds by making payments under the second VMS purchase. These payment terms reinforce the suggestion that the second VMS purchase was simply a means of channelling funds to VMS.

2712. As in the case of the first VMS purchase, the Claimants' case is that the purpose of the second VMS purchase was to incentivise and fund VMS to make a reciprocal purchase from Autonomy from which Autonomy could recognise revenue in Q4 2010, not because Autonomy had any genuine need or want for further rights to the VMS data feed.

2713. Dr Lynch's written closing submissions complained that much of the material put to him was comprised of documents to which he was not a party. It was noted, however, that none suggested that the purchase from Autonomy was not going to be at fair value or that it would not involve purchasing rights that Autonomy genuinely wanted.

2714. However, the VMS data feed was no more useful than it had been previously; and the reason for the linked transactions was, as before, revenue recognition with the transactions fixed at a price to ensure the achievement of the revenue required by Mr Hussain to meet the quarterly target.

*Deloitte's consideration of the second VMS transaction*

2715. On 18 January 2011, a few weeks after Autonomy entered into the second VMS reciprocal transaction, Mr Chamberlain asked Ms Eagan to "*pull together a memo that shows what we have purchased and why. This memo should give some consideration to why we have paid $8.4m for it. May be linked to price lists, quotes etc or may be cheaper than costs for us to replicate etc etc*". No such consideration had taken place within Autonomy prior to it entering into the second VMS purchase, as one would expect if the purchase had a genuine commercial rationale.

2716. Mr Chamberlain repeated his request the following day, saying he was "*going to need something over the next few days on this to provide to the auditors*". He said that the summary Ms Eagan had produced a few days earlier was very useful and "*should be repeated in the paper with a little bit more meat on the bones highlighting why we would pay $8.4m for this i.e. some evidence of possible future sales/markets that this will help us get into*". Ms Eagan responded, noting that she was "*not at all involved with pricing*".

---

[316] As noted above (footnote 314), from a document uploaded to the trial bundle by the Defendants after the close of evidence, it is clear that there had not been any VMS-Optimost integration by Q1 2011.

As set out above, that is because the pricing was negotiated by Mr Egan and Mr Hussain by reference to the delta between the second VMS purchase and the VMS software sale.

2717. No paper appears to have been produced because, the same day, 19 January 2011, Mr Chamberlain forwarded an inconclusive earlier summary by Ms Eagan of the second VMS purchase to Mr Welham. Mr Chamberlain subsequently emailed Mr Welham on 25 January 2011 asking what he needed, saying that he had *"provided the commercial rationale from Nicole"* and that the pricing was *"consistent with the previous deal we did with them at which time we obtained many third party quotes etc."*. Subject to the next paragraph, these emails appear to have been the only documented rationale put forward to Deloitte to justify the second VMS purchase.

2718. From Deloitte's working paper, it appears that Deloitte was given to understand that the second VMS purchase provided Autonomy with access to VMS's main data feed and permitted Autonomy to include the VMS analysis tools in its own products. Deloitte also appears to have spoken with Dr Menell about the supposed rationale for the deal, and been provided with a short demonstration to prove that *"the VMS feed [Autonomy] claimed [it] had was real"*. Presumably because the information was insufficient, Deloitte had to consult its own in house IT specialist. Deloitte's working paper records that:

> *"Per our conversation with…our in house IT specialist, the value gained from this purchase is considerable and has a defined market opportunity. As a result, the amount to be paid of approximately $8.4 million is deemed to be reasonable and at fair value for the purposes of our assessment of the two transactions made with VMS during the quarter."*

2719. As regards the VMS software and hardware sales, Deloitte was provided with: (i) an auditor debtor confirmation letter signed by the CFO of VMS confirming that the instalments under the VMS software and hardware sales were proper and unpaid as of 31 December 2010, (ii) confirmation that the hardware supposedly being supplied from Autonomy's existing stock was bonded, and (iii) documents indicating that the hardware Autonomy purchased from the hardware reseller, Insight, had been approved by Dr Lynch and was bonded and ready for shipment.

2720. None of the material provided to Deloitte by Autonomy disclosed that:

(1) Moreover had offered to continue to provide its data feed to Autonomy for use in its demonstration environment for £50,000 per annum in mid-July 2009;

(2) Autonomy had created its own data feed, which it started to build in June 2009, and which it used for demonstration purposes in place of Moreover;

(3) Autonomy had not achieved any real commercial success from the VMS data feed it purchased for $13 million under the first VMS purchase and did not have any real reason for purchasing additional data streams and rights in Q4 2010;

(4) The second VMS purchase and the VMS software sale were linked and their negotiation was conducted by reference to the 'delta' payable to VMS; and

(5) Contrary to what Deloitte were told, Autonomy had to buy in hardware for resale and did not deliver $4 million of hardware from its own stock under the VMS hardware sale.

2721. Mr Welham's unchallenged evidence was that, had Deloitte been aware of these matters, this would have prevented revenue recognition in respect of the sum relating to the hardware supposed to be supplied from Autonomy stock, and would have caused Deloitte to give further consideration to whether it was appropriate to recognise any revenue from the VMS software sale.

*Payments made in respect of the second VMS transaction and VMS's bankruptcy*

2722. The payments made in respect of the second VMS transaction were as follows:

(1) Autonomy paid VMS $2 million on 17 February 2011 for the first instalment under the second VMS purchase.

(2) A few weeks later, on 31 March 2011, VMS paid Autonomy the first instalment of $1.5 million under the VMS software sale.

(3) The next day, 1 April 2011, Autonomy paid VMS a further $2 million under the second VMS purchase.

(4) On 29 April 2011, Autonomy received $1.5 million from VMS in respect of the VMS software sale.

2723. At the beginning of June 2011, Mr Stephens asked Mr Egan for help regarding the next payments. As Mr Stephens explained, "*we have $2m to go in either direction 2 days apart. Our intent in the December deal was to have dates that were exactly synchronous. In the rush to get revisions done the gap arose. We want & need to avoid sending you $2m to only get it back 2 days later…Unless I hear otherwise I will assume you are ok for the amounts to net out on 6/30*". Mr Chamberlain raised Mr Stephens' request with Mr Hussain. Although Mr Hussain asked Mr Chamberlain to try to get the cash in, in the event, Autonomy agreed to net off the final instalment payable by VMS under the VMS software sale against the $2 million instalment payable by Autonomy under the second VMS purchase, leaving Autonomy owing $2.4 million in respect of the second VMS purchase.

2724. At around this time, June 2011, Mr Louw of VMS contacted Mr Goodfellow to see if Autonomy would consider buying back some of the hardware that VMS had purchased under the VMS hardware sale. Mr Louw told Mr Goodfellow that VMS had a "*very nice overhang of servers that I need to get rid of quickly to fund another immediate opportunity here at VMS. We are estimating that we can reduce the HP DL360 count by 40, and the HP ML150 count by 600. The above has not been shipped yet / received yet, so guaranteed brand new and in box*". Mr Louw offered to sell this hardware to Autonomy or one of its clients at a lower price than VMS had paid for it.

2725. This proposal appears to have been discussed within Autonomy. Before Autonomy had made a decision, VMS filed for bankruptcy at the end of August 2011. The imminence of VMS's bankruptcy must have been apparent to Mr Hussain because an instruction was given in mid-August 2011, two weeks before VMS filed for bankruptcy, to put a

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

payment hold on so that no payments were made to VMS without Mr Hussain's approval.

2726. Autonomy did not pay the final instalments under the second VMS purchase, which were not due until October 2011 and July 2012.

2727. Nor did Autonomy receive any cash in respect of the VMS hardware sale. The full amount was ultimately written off in September 2012. Mr Goodfellow's unchallenged evidence was that no repurposed Autonomy hardware was ever delivered to VMS. It is unclear if Autonomy ever sought to recover the HP hardware that had been supplied to VMS for which it was never paid.

2728. As a result of VMS's bankruptcy, Autonomy had to find another source for ingesting social media content into its media aggregation service.

2729. The reactions within Autonomy varied from suggesting that Autonomy should consider acquiring the material assets of VMS to suggesting that VMS's bankruptcy was not a surprise and that Autonomy had better alternatives. Dr Lynch seemed to think that the reference to Autonomy acquiring VMS's assets showed that the VMS data feed was valuable to Autonomy, in fact, it showed the opposite. Had the data feed been as significant as the Defendants had sought to make it out to be, one would have expected Autonomy to have explored that option. But it did not do so. That supports the inference that it did not do so because Autonomy purchased the data feed not for its intrinsic value to Autonomy but to fund reciprocal purchases by VMS of Autonomy software, from which Autonomy could recognise revenue.

*Conclusions on second VMS transaction*

2730. In summary, I have concluded in respect of the second VMS transaction, as in the case of the first VMS transaction, that:

(1) Mr Hussain proposed a further sale of software by Autonomy to VMS because he needed additional recognised revenue to make up for deals *"on the left"* which had not materialised (and in particular a proposed deal with KPMG).

(2) His need was such that a sale of software alone was insufficient. A sale of hardware was added to bring up the total apparent recognised revenue.

(3) VMS wanted both the software and the hardware (though later it offered some of the latter for sale back to Autonomy because its financial position became so weak). But to fund its purchases it needed Autonomy to make further purchases to cover the outlay.

(4) Mr Hussain was in direct control of both Autonomy's sale and its purchase. He dictated the price and the amount of software sold, as well as the price to be paid by Autonomy to VMS for the data feed licence. The presentation of the transactions to Deloitte and the Audit Committee as separate was false.

(5) Autonomy did not conduct any technical analysis of the commercial and more general success of the VMS data feed which it had purchased in the first VMS transaction before committing to purchase extended rights for $8.4 million.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(6) No memorandum to explain the justification for the further purchase was ever drafted: one could not even be put together. The information provided to Deloitte and reflected in their working paper was misleading. The commercial assessment presented to Deloitte was prepared after the deal had been agreed and did not in reality guide or indicate the reasons for the decision either to sell or to purchase.

(7) Autonomy purchased the data feed <u>not</u> for its intrinsic value to Autonomy but to fund reciprocal purchases by VMS of Autonomy software, from which Autonomy could recognise revenue.

(8) Even so, Autonomy had to pay a considerable 'delta' to VMS for its participation.

(9) When VMS went into liquidation, as the final demonstration of its financial precariousness, Autonomy made no effort to acquire any further rights. They were not of any real utility or commercial value to it.

2731. As in the first VMS transaction, it follows that Autonomy should not have recorded revenue on the sales to VMS. Autonomy should instead have: (i) recorded the net cost in relation to the first VMS sale and purchase, totalling $4,000,000, as an expense in Q2 2009, and (ii) recorded the net cost in relation to the second VMS purchase and the VMS hardware and software sale, totalling $261,633, as an expense in Q4 2010.

*Knowledge of the Defendants*

*Mr Hussain's knowledge*

2732. Mr Hussain orchestrated both sides of the second VMS transaction. His knowledge is clear. I accept the Claimants' submission that as an experienced CFO it is more likely than not that he did not honestly believe that the requirements for revenue recognition were satisfied.

*Dr Lynch's knowledge*

2733. I accept the Claimants' contentions and find that:

(1) It is more likely than not that Dr Lynch was aware that the VMS data feed was not incorporated into any Autonomy product until the end of Q1 2010, almost a year after Autonomy had bought a licence to it in the first VMS transaction for $13 million.

(2) He cannot genuinely have believed that Autonomy had made sufficient commercial use of the data feed to warrant spending another $8.4 million on it in Q4 2010 without any further assessment.

(3) The most likely explanation why he proceeded without any assessment was that he appreciated that the real rationale for the second VMS purchase was to fund another purchase by VMS of Autonomy software and in addition hardware from

which Autonomy could, at a price, recognise revenue. It is of note, and confirmatory of this explanation, that when subsequently he was told that VMS looked at the deal as a financial transaction, only he expressed no surprise.

2734. For similar reasons as in the context of the first VMS transaction, I have concluded that Dr Lynch, like Mr Hussain, had 'guilty knowledge'.

### RT 3: purchases of StorHouse from FileTek (Q4 2009/Q2 2010)

2735. Two further sets of transactions between Autonomy and FileTek were alleged by the Claimants to be (in each case) a means of enabling Autonomy to obtain recognisable revenue from FileTek by making purchases from FileTek to put it in funds to purchase Autonomy software. The allegedly reciprocal transactions occurred in Q4 2009 and again in Q1 2010/Q2 2010.[317] The Claimants' case is that no revenue should have been recognised on Autonomy's sales of IDOL licences to FileTek, since these transactions lacked any genuine commercial rationale and thus lacked economic substance, and that the Defendants knew this.

2736. The Claimants contended that the central facts in relation to the FileTek reciprocal and VAR transactions were largely established by the unchallenged evidence of Mr Egan and concessions made in cross-examination by Mr Szukalski.

2737. The Defendants, on the other hand, maintained that the purchases by Autonomy in each case had a commercial rationale, on the basis that the 'StorHouse' software acquired offered valuable functionality of utility to Autonomy and its customers and was at fair value.

2738. I address first the principal dispute, which was as to whether the commercial rationale for the 'StorHouse' purchases which was asserted at the time, and presented to Deloitte and the Audit Committee, was genuine (as asserted by the Defendants) or contrived (as alleged by the Claimants). This requires an assessment of:

(a) FileTek's business in broad overview;

(b) the genesis of the first pair of transactions, and in particular how the decision to buy the StorHouse product came to be made;

(c) the extent of the technical analysis conducted by Autonomy prior to the purchase;

---

[317] See also footnote 286 above as to the reciprocal VAR transaction with FileTek: FileTek was used by Autonomy as a VAR for a large ($10.5 million) one-off transaction in respect of the end-user US Department of Veterans Affairs ("USDVA") (VT18). Subsequently, in March, June and August 2011, Autonomy entered into a succession of further purchases of StorHouse licences from FileTek. The Claimants' case is that these were intended to, and did, put FileTek in funds to pay down its debt on the USDVA VAR transaction. The last and by far the largest of the purchases took place the day before the announcement of HP's acquisition of Autonomy and was alleged to be part of an attempt by Autonomy management to clean up the books before the new owners took over. The Claimants' case is that no revenue should have been recognised on the VAR transaction and that the Defendants knew this.

(d) the coincidence in timing between each of the StorHouse purchases and FileTek's need for funds;

(e) FileTek's own internal accounting analysis regarding the true value of the software being bought and sold.

*FileTek's business*

2739. FileTek had two main products:

(1) Trusted Edge was a classification and e-Discovery tool that dealt with unstructured data and was aimed at the e-Discovery market. Mr Szukalski described it in cross-examination as a product that:

> *"was able to classify and index content that was at the edge, the trusted edge, of companies' networks, so it would go on to laptops and desktops and see what was on those desktops and laptops, to be able to index them, categorise them, classify those so that if there was a legal hold or anything, the company would be sure that they got all the materials in terms of being able to identify those materials underneath."*

(2) StorHouse was, as Mr Szukalski accepted, a different product altogether. It was not at all directed at the e-Discovery market. Rather, it was directed at the IT industry and at data storage vendors. At its simplest, StorHouse was a database archiving product that allowed customers to archive databases and conduct searches across them. It had two main components: (i) StorHouse Relational File System ("RFS"), which was essentially a file system that was hosted in the cloud; and (ii) StorHouse Relational Manager ("RM"), which was a means by which a customer could offload its database to the cloud and conduct searches across the database.

2740. Filetek's CEO and CFO during the Relevant Period was Mr William ("Bill") Loomis. He testified at Mr Hussain's criminal trial that, in 2008, FileTek had revenues of about $15 million. This is reflected in FileTek's profit and loss statement for 2008. Mr Loomis further testified that part of the company was then spun out, as a result of which revenues fell to between $7 to 8 million per annum. FileTek's profit and loss account for 2008 attributes about $6.6 million of revenue to a segment of the business known as Healthcare Information Systems. Mr Szukalski confirmed that he believed that this was the segment of the business that had been spun out before he re-joined FileTek in January 2009.

2741. As at the end of 2008, FileTek's sales were not flourishing. FileTek made licence sales of StorHouse of only $331,000 in 2008. Mr Szukalski agreed that, at the time he re-joined FileTek "*there was very little sales going on*". Instead of making new sales of StorHouse licences, FileTek was "*living off the maintenance revenues*" of sales of StorHouse that had been made in the mid-to-late-1990s.

2742. Similarly, as regards Trusted Edge, FileTek made licence sales of only $81,000 in 2008. Mr Szukalski explained that Trusted Edge was "*the start-up component of FileTek*" and was "*just pretty much being launched as a new product*" at the time he re-joined FileTek

(on 1 January 2009). Mr Szukalski readily agreed that sales of Trusted Edge were "*low*" and that Trusted Edge was a "*small player in the e-discovery market at best*".

2743.  Overall, therefore, FileTek was incurring a loss on its operations.

2744.  As at the end of 2008, FileTek had cash and cash equivalents of just under $5 million. There was no significant improvement in FileTek's business during the first half of 2009. On the contrary, sales of StorHouse declined year-on-year from $283,000 in the first six months of 2008 to $162,000 in the first six months of 2009. As regards Trusted Edge, during the same six month period there was a slight increase in licence sales from $27,000 to $93,000. But Mr Szukalski accepted that Trusted Edge remained a "*very small*" player nonetheless. FileTek incurred a loss on its operations of slightly over $1 million in the first half of 2009.

2745.  Realistically, therefore, Mr Szukalski accepted that FileTek was very much a business in need of a turn-around. Although Mr Szukalski pointed to the company's history in the late 1990s and early 2000s as a basis for thinking that the company's turn-around could succeed, he accepted that the technology industry was one where things could change very quickly.

2746.  FileTek had an OEM agreement with Autonomy in respect of its Trusted Edge product. By an agreement dated 21 February 2008, FileTek had taken a licence of certain "*Development Software*" and "*Run-Time Software*" from Autonomy in relation to FileTek's Trusted Edge product (defined as the "*Application*"). This had not proved a success either: as at the third quarter of 2009, it appears that FileTek had yet to incorporate IDOL Server into Trusted Edge so as to make use of the Run-Time licence.

2747.  Mr Szukalski's evidence was that there had been no sales of Trusted Edge that incorporated the IDOL Server software as at 30 October 2009. In an email dated 17 November 2009, Mr Loomis estimated that FileTek was likely to make only 15 sales of Trusted Edge, incorporating IDOL Server, between then and 30 June 2010. Mr Szukalski accepted that this was Mr Loomis' best estimate of the likely sales.

2748.  Under its OEM arrangements with Autonomy, FileTek had negotiated that most of its payments should be as commission on sales. But it also was required to make a prepayment of $150,000. Not long before the disputed transactions, FileTek had determined that it would have to write down the value of FileTek's $150,000 prepayment. Mr Loomis had calculated that the value to FileTek of its prepayment was only $37,500[318], resulting in an impairment of $112,500. This amount was written down in FileTek's accounts.

2749.  In short, by the third quarter of 2009, FileTek was in some considerable financial difficulty.

*Genesis of the proposal for the allegedly reciprocal transactions*

2750.  Mr Egan's evidence was that it was he who conceived of what the Claimants presented as a round trip transaction: the purchase by Autonomy of StorHouse software in order

---

[318] $2,500 multiplied by 15.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

to fund the purchase by FileTek of Autonomy software. This was not challenged in cross-examination.

2751.  Mr Egan's evidence, which was in effect what the Claimants principally relied on, was as follows in respect of the first FileTek reciprocal transaction:

> *"In late December 2009, I conceived of, and Mr. Hussain approved, a round trip deal that would generate immediate and substantial ($8 million) recognizable revenue. The entire transaction was arranged over the course of two or three days. FileTek's Chief Operating Officer was Gary Szukalski, a former Autonomy employee. I knew from prior conversations with Mr. Szukalski that FileTek was interested in licensing IDOL but did not have the means to pay for a substantial license. My idea was that, in return for FileTek agreeing to pay a large sum to license IDOL, Autonomy would agree to license FileTek's StorHouse software for integration with Autonomy's Digital Safe software. Digital Safe software is primarily used to store and manage unstructured data -- for example, emails. My idea was that it might be possible for StorHouse to be used with Digital Safe to enhance Autonomy's structured data capabilities.*

> *85.    Autonomy's technical staff had not, to my knowledge, previously evaluated FileTek's StorHouse software or determined whether it was practical to combine it with our existing Digital Safe software. However, I now had a reason for a purchase from FileTek that would give FileTek both the money to purchase a license from Autonomy and, as I explain below, the incentive to license software from Autonomy. I presented my idea to Mr. Hussain. He approved it, but he made it clear that, if the deal were made, the documentation for each deal had to be entirely independent of each other."*

2752.  Mr Egan's evidence regarding Mr Hussain's approval was not challenged. Dr Lynch confirmed in cross-examination that he had no basis for disputing the fact of Mr Hussain's approval. When Counsel for Mr Hussain cross-examined Mr Egan, he invited Mr Egan to agree with the narrow point that Mr Hussain *"did not meet anyone from FileTek"* but did not challenge Mr Egan's evidence about Mr Hussain's approval of the transaction.

2753.  On Monday, 28 December 2009, Mr Egan emailed Mr Szukalski, subject *"Hello and idea"*, asking Mr Szukalski to ring because *"I have an idea I want to run by you"*. When Mr Szukalski received the email, he did not know what Mr Egan wanted to speak about, as he confirmed in cross-examination and as also appears from his message in an email under which, on the same day, he forwarded the email to Mr Mark Seamans, FileTek's CTO, asking *"Hmmm ... what do you think this is all about?"*. Mr Seamans speculated that Mr Egan might seek to *"pitch you on an extension"*, that is, an extension to FileTek's existing OEM agreement which was due to expire on 30 June 2010.

2754.  It is now common ground that the telephone call took place at 10.30am on the morning of Tuesday, 29 December 2009. Mr Egan's evidence about the telephone call in his witness statement, which Mr Szukalski considered to be accurate, was:

> *"I proposed a deal to FileTek. I said that Autonomy had money in its budget to make a purchase from FileTek and suggested that Autonomy would buy a*

> *license to use FileTek's StorHouse software if FileTek were willing to buy a
> license to use Autonomy's IDOL software. I told Mr. Szukalski that my proposal
> would do two things for FileTek: it would give FileTek the money it needed to
> license IDOL and the deal would be profitable for FileTek because Autonomy
> would pay FileTek more than FileTek would have to pay Autonomy. FileTek
> would keep the difference. Mr Szukalski expressed interest and agreed to talk to
> his colleagues at FileTek. I told him that any deal had to be completed in the
> next two days, i.e. by December 31."*

2755. In cross-examination, Mr Szukalski volunteered that Mr Egan asked "*more questions
about what StorHouse was and what it did and could it benefit Autonomy in some way*".
This reinforced the conclusion that, when Mr Egan spoke to Mr Szukalski, Mr Egan
was unaware of any technical analysis within Autonomy as to how StorHouse might be said
to benefit Autonomy.

2756. Mr Szukalski also explained that, during his initial call with Mr Egan, Mr Szukalski had
questions for Mr Egan about Autonomy's storage requirements for StorHouse, such as
"*how many clients, how many instances, what the storage requirement was*". Mr Egan
did not have answers to what Autonomy actually needed, but Mr Szukalski thought he
recalled that Mr Egan had said that he would go and speak to the technical people at
Autonomy, find out what those requirements were, and revert to Mr Szukalski.

2757. Mr Egan did revert to Mr Szukalski by email later that day, setting out what Autonomy's
*"needs would look like".* The email asked also whether that was enough to enable Mr
Szukalski to *"get…going on a price and fair value support?"* signifying (as Mr
Szukalski confirmed) that there had been some prior discussion about price:

> "*Q.    Now, so far as the price is concerned, that had already been discussed
> on the call that you had had with him in the morning, hadn't it?*
>
> *A.    He had discussed a range, that is correct. Without knowing any details he
> had discussed a range. So I was kind of reverse engineering, if you will,
> leveraging our existing price book, how to get to those numbers that he was
> suggesting.*
>
> *Q.    So he'd given you the range for the price, both for the Autonomy sale and
> the FileTek purchase?*
>
> *A.    In ranges, yes.*
>
> *Q.    And he'd indicated the range of the delta between those two?*
>
> *A.    That is correct.*
>
> *Q.    And now he was giving you the technical information so that you could
> reverse engineer justifying a price for StorHouse within that range?*
>
> *A.    Yes, correct.*"

2758. Quite what Mr Szukalski meant by *"kind of reverse engineering"* was much disputed. I elaborate on that later. But to return to the sequence of events, Mr Egan's proposal was "*exciting*" for Mr Szukalski and his colleagues. Mr Szukalski described it as a "*no brainer*". Mr Egan's witness statement continued:

> *"Mr. Szukalski responded promptly. He said that FileTek was prepared to discuss my proposal further. We talked numbers. After some back and forth, I proposed that Autonomy would license StorHouse software and support for $10,367,280 and that FileTek would license IDOL for $8,480,000 (of which $480,000 was for one year of support and maintenance). The difference, $1,887,280, would be FileTek's profit on the deal. I told Mr Szukalski that the documentation of the two deals would have to be separate. I said that the documentation would say that each company was to pay for its licence 30 days after signing, but that Autonomy would pay a few days early."*

2759. Again, Mr Szukalski in cross-examination endorsed this account, subject to two qualifications. First, he said that the discussion concerned a spread of around $2 million, Mr Szukalski having initially proposed a spread of $2.5 million, which eventually came down to $1.89 million "*which again we were very happy with*". Secondly, he did not *"necessarily recall"* Mr Egan saying that the documentation for the two deals would have to be separate.

2760. Mr Szukalski was reluctant to accept that the two transactions – the sale to FileTek and the purchase from FileTek – were linked. He presented the main driver as *"the ticking time bomb of renegotiating the Trusted Edge KeyView/IDOL software that we had to renegotiate"*. He told me in cross-examination that the proposed transaction, and the delta it offered, was *"the one way we could figure it out pretty quickly"*. However, he accepted that the numbers agreed for the two transactions were linked, because the price for one was dictated by the spread over the price for the other.

2761. The timing indicated by Mr Egan meant that there were only two calendar days for the deal to be done. Mr Szukalski, a former Autonomy employee, assumed (and thought it obvious) that the urgency and the year-end deadline imposed by Mr Egan meant that it was driven by Autonomy's need to recognise revenue within the quarter, though he also stated that *"Most software companies are always looking for opportunities to find new transactions if they can at the last end of the quarter…"*.

2762. As regards the final sentence of the passage from Mr Egan's evidence quoted in paragraph 2758 above, (that Autonomy would pay early), Mr Szukalski said that Mr Egan's offer was a "*great offer because part of the negotiation was they paid us early, we had the cash to pay them on time*". Mr Szukalski agreed that the written contracts would not say anything about Mr Egan's agreement to pay early, and said that to that extent FileTek was taking a risk. However, Mr Szukalski went on to say:

> *"Q. But when Mr Egan told you that Autonomy would pay early, you relied on what he said as being true?*
>
> *A. Yes, absolutely we did. We said we'll trust you on that for sure.*
>
> *Q. So although it wasn't going to be put down in writing, you proceeded on the basis that Mr Egan would be as good as his word?*

> *A. Trust, yes.*
>
> *Q. And that Autonomy would perform in accordance with what he had said?*
>
> *A. That is correct."*

*Negotiation of the price to be paid for StorHouse*

2763. Mr Egan's evidence was that he and Mr Szukalski reached agreement in principle on either Tuesday 29 December 2009 or Wednesday 30 December 2009. Mr Szukalski accepted this in cross-examination.

2764. Also on 29 December 2009 (and thus on the same day as the initial call between Mr Egan and Mr Szukalski) Mr Egan informed Mr Szukalski that "*Steve Chamberlain our comptroller will call Bill [Loomis] shortly*".

2765. Mr Chamberlain's subsequent email identified two things he needed for revenue recognition purposes:

(1) On pricing of the StorHouse software to be purchased by Autonomy from FileTek, Mr Chamberlain needed "*a copy of your price list together with confirmation that discounting on this deal is consistent with your other discount levels for your larger transactions*". Mr Szukalski understood that this was relevant to justifying the price Autonomy paid FileTek as being at fair value.

(2) On the price to be paid by FileTek for its purchase of software from Autonomy, Mr Chamberlain's immediate concern was collectability: Mr Chamberlain needed to "*demonstrate that FileTek have the ability to pay Autonomy in the absence of the cash receipt from Autonomy from the sale of your software.*" Mr Szukalski understood that Autonomy's auditors would need to see evidence that FileTek could pay Autonomy even if FileTek was not paid by Autonomy.

2766. Thus, although (on the Claimants' case) Autonomy's objective was to maximise recognised revenue and to that end, extract as high a price as possible for the purchase by FileTek of Autonomy software without exceeding 'fair value', the purchase price of the Autonomy software to be purchased by FileTek could not exceed what could be presented, even then at a 'stretch', as being collectable from FileTek. Equally, what Autonomy could pay for StorHouse to provide the actual cash for FileTek's purchase had not to exceed what could be presented as the fair value of the StorHouse software.

2767. On the afternoon of 29 December 2009, Mr Chamberlain wrote to Mr Hussain, copying Mr Egan, saying that he (Mr Chamberlain) had spoken to Mr Loomis. Mr Loomis told Mr Chamberlain that FileTek was waiting on information from Mr Egan to be able to price and show how this was consistent with FileTek's pricing. Mr Chamberlain noted that "*Current models are based on volumes for licence and our volumes and multiple customers should enable us to construct an argument*".

2768. On collectability, Mr Chamberlain referred to FileTek as having $5.3 million of cash and a $1.1 million net receivable loan which could be converted. He suggested that "*$6.5m is ok, $8m is a stretch*".

2769. Dr Lynch initially told me in cross-examination that he did not think that he knew at this time about Mr Chamberlain's view that $8 million was a stretch in relation to collectability. However, having been shown an email which Mr Hussain had sent to him, subject "*End of day*", which stated, "*FileTek – collectability will be issue for $8m but getting more info*", he had to accept that the collectability issue in relation to FileTek plainly was brought to his attention.

2770. The same day (29 December 2009) Mr Egan sent an email, to Mr Szukalski and Mr Loomis, in which Mr Egan said, "*Our needs would look like the following*" and set out the technical parameters for StorHouse that had been given by Dr Menell. Mr Egan asked Mr Szukalski, "*Gary can that get you going on a price and fair value support?*"

2771. Dr Lynch accepted that Mr Egan's list of the technical parameters would *"ultimately"* have come from Dr Menell or someone in Autonomy's technical department. There were, however, no documents or other evidence to suggest that Autonomy's technical department had given a moment's thought to the technical parameters for a StorHouse licence prior to the evening of 29 December 2009.

2772. Although Mr Egan's email requested that FileTek provide a price based on the technical requirements that had been provided, Mr Szukalski candidly accepted in cross-examination that a price range had already been discussed on the initial Szukalski/Egan call that morning, without knowing any of the technical details. Mr Szukalski confirmed in cross-examination that he understood that Autonomy wanted him to demonstrate that the price Autonomy was paying for StorHouse was consistent with FileTek's general pricing.

2773. On Wednesday 30 December 2009, Mr Crumbacher sent FileTek draft documentation for the transaction. In an internal FileTek email later that day, Mr Loomis set out a number of comments on the draft documentation, including the following:

> "*1. Deal is for $8.8M (vs. $8M). As I understand the initial conversation Gary had with Stouffer, the spread was to be $2M. Therefore, the STHS [StorHouse] deal s/b [should be] $10.8m?*
>
> *2. Payment terms are 50% net 30 + 50% net 90. We'll need their cash to pay any portion, and I understand that our payment terms for the STHS s/w is net 30. … Perhaps it should be net 20? Also, an item for the final exec call.*"

2774. The Claimants made the following points in this context:

(1) As regards item 1, they submitted that Mr Loomis' comment meant that, in order to derive the price that Autonomy would pay FileTek for a StorHouse licence, it was necessary to add the spread of $2 million to the licence fee that FileTek would pay Autonomy. They submitted that this demonstrated that the purchase price was reverse engineered, as Mr Szukalski had acknowledged. Dr Lynch, though emphasising his position that he had not seen this at the time, attempted to sever the apparent link and suggested that it was *"the other way round"* and that the purchase price had already been fixed and all this signified was that *"Stouffer is trying to drum up an 8.8 million sale"*. I do not accept Dr Lynch's

suggested gloss; in any event, Mr Szukalski (the recipient of the email) agreed that the Claimants had correctly identified what Mr Loomis had meant.

(2) As regards item 2, Mr Szukalski confirmed that his understanding was that FileTek needed Autonomy's payment for the StorHouse licence, in order for FileTek to pay any portion of the price on FileTek's licence of IDOL Server. That was the reality, as further demonstrated when, later that day, Mr Loomis sent Mr Chamberlain FileTek's financial statements as at Q3 2009. Licence sales of StorHouse for the first three quarters of 2009 were $546,000 and of Trusted Edge were $105,000. Mr Szukalski accepted that FileTek was still "*burning cash*" and making an operating loss.

(3) As regards Mr Loomis' suggestion that the payment terms for the StorHouse licence should be "*net 20*", Mr Szukalski confirmed that Mr Loomis was suggesting that the written contract should reflect what Mr Egan had already said Autonomy would do, namely pay FileTek before FileTek had to pay Autonomy.

2775. Further, as at the end of Q3 2009, FileTek had yet to make any sales of Trusted Edge that incorporated within it the IDOL Server software. Accordingly, the low sales of Trusted Edge did not, at that stage, have anything to do with the Sublicense Fee payable under FileTek's 2008 OEM agreement with Autonomy, as Mr Szukalski rightly accepted.

2776. In the early hours of 30 December 2009, Mr Szukalski sent Messrs Egan and Scott a proposed price for StorHouse. The proposed licence fee of $7,405,200 and maintenance fee of $2,962,080 came to a total payment in the first year of $10,367,280. Mr Szukalski confirmed in cross-examination that, in arriving at this figure, he made sure that it achieved the agreed spread of about $2 million over the price that FileTek was to pay Autonomy for the IDOL Server licence.

2777. As already noted, the scale of the price to be paid by Autonomy for StorHouse is striking. It represented more than <u>20 times</u> the total licence revenues for StorHouse in the whole of 2008. It also represented more than <u>10 times</u> the total licence revenues for StorHouse in the first three quarters of 2009. Mr Szukalski accepted both these points. He claimed that he and Mr Loomis had not felt *"uncomfortable with this dollar figure because we had…done transactions of this size previously…in the late 1990s…"* This was not persuasive: whatever may have been the position in the 1990s, the disproportionality of the transaction relative to FileTek's sales in 2009 was obvious. The explanation lay in the assurances given and the prospect of the delta offered.

2778. The price that Autonomy was willing to pay for StorHouse is all the more remarkable given Mr Szukalski's evidence that, having regard to the flagging nature of FileTek's business at the time he re-joined FileTek, "*it was all about just find customers, transact, kind of turn the crank back up by not giving software away by any stretch of the imagination, but being a little more, you know, conducive to the needs of the budgets of the customers that we're selling to*". As Mr Szukalski acknowledged in cross-examination, there was therefore the potential for deep discounts to be offered against the list price, all the more so for a very large transaction.

2779. On the morning of 31 December 2009, Mr Howard Patrick, FileTek's General Counsel, wrote to Mr Szukalski, stating, "*You were going to forward revised pricing to Autonomy*

*and copy me?*". Mr Patrick then wrote to all recipients stating, "*I have just been told by Gary, that there are to be no changes to FileTek's pricing*".

2780. Mr Szukalski did not have a good recollection of these exchanges; but he accepted the possibility that Autonomy simply did not want FileTek to offer a lower price. If FileTek offered a lower price, the price to be paid by FileTek for the IDOL licence would also need to come down, if the agreed spread was to be maintained; Autonomy did not, however, want the price for the IDOL licence to come down, because that would reduce the revenue that Autonomy would recognise in Q4 2009.

2781. Still on 31 December 2009, Mr Szukalski emailed Mr Egan FileTek's proposal. Although the proposal was dated 29 December 2009, Mr Szukalski explained that he produced it on 31 December 2009, having had to type it at the reception for his father-in-law's funeral. Mr Szukalski accepted that it was a "*rushed*" piece of work and that some of it would have come from boilerplate marketing materials. The reason why it had to be rushed was because to satisfy Autonomy's objectives, it needed to be provided to, and accepted by, Autonomy by the end of the day, being the last day of the quarter.

2782. That afternoon a call took place between Mr Egan, Mr Loomis and Mr Szukalski. In advance of the call, Mr Loomis circulated internally within FileTek a checklist of points to cover on the call, including:

> "*2. Timing of payments*
>
> *3. Confirm that there's no way of being burned. No contemplated change in control or management prior to transfer of money.*"

2783. Mr Szukalski confirmed in cross-examination that item 2 was a reference to the fact that FileTek was going to get paid by Autonomy, before FileTek had to pay Autonomy. He agreed that this was a point that was important to FileTek. It was important because FileTek would not have bought IDOL at the price that it did, but for the fact that Autonomy was going to buy StorHouse and thereby channel funds to FileTek to pay for IDOL.

2784. Mr Szukalski explained that item 3 was a reference to a concern that, were there to be a change of management or an acquisition of Autonomy, after the execution of the deal but prior to the transfer of money from Autonomy to FileTek, any new management of Autonomy might fail to honour the assurances that Mr Egan had given. Mr Loomis was going to seek confirmation that there was no way of FileTek being burned in that way and thus, as Mr Szukalski put it, "*establish trust*".

2785. Mr Loomis' testimony in the US criminal proceedings was to similar effect:

> "*Q. Are you familiar with this email, Mr. Loomis? Do you remember it?*
>
> *A. Yes, generally.*
>
> *Q. Okay. Point No. 3 here says, "Confirm there's no way of being burned." Do you see that?*
>
> *A. Yes.*
>
> *Q. What did you mean by that?*

> *A. Well, my concern, given this was a barter transaction, I was viewing it as a barter transaction, that we would not have a situation where we were obligated to pay 8 or $9 million and all of a sudden there was a cancellation of the StorHouse side of the barter transaction.*
>
> *Q. Okay. How dependent were you on the StorHouse side of the transaction to go forward with the purchase of the Autonomy software?*
>
> *A. We were dependent on it."*

2786. Following the call, Mr Loomis sent an email to himself and Mr Szukalski entitled "*Autonomy Memo to File*" summarising the key outcomes from the call. Mr Szukalski confirmed that he regarded the email as an accurate record of the discussion. It included the following items:

> *"1. We should be paid 4-5 days before net 30 due date.*
>
> *2. ...*
>
> *3. No change in control or change in leadership is contemplated prior to exchange of money.*
>
> *4. No one to be burned on this deal."*

2787. I accept that these points were a reflection of the assurance that had been provided, and which was the basis of the deal, that (a) Autonomy would pay FileTek 4-5 days before the date when Autonomy was contractually required to pay (namely 30 days after invoice) (item 1); (b) that FileTek was not going to be left having to pay for the IDOL licence without getting paid by Autonomy for the StorHouse licence (Item 4); and (c) that no change of control of Autonomy was in the offing which might result in new management not observing these extra-contractual assurances (item 3).

2788. Also on 31 December 2009, Mr Loomis wrote to FileTek's Chairman, Bill Thompson, regarding "*a year end transaction*". Mr Loomis said (item 1), that "*Driven by Autonomy's need to make certain numbers ...[319] they approached Gary*". Mr Loomis went on to summarise the key terms of the transaction, including the net profit to FileTek of around $1.88 million (item 4). Mr Szukalski confirmed in cross-examination that this figure reflected the spread that he had agreed with Mr Egan. Mr Loomis also noted (item 5), "*Must be signed today*".

2789. That assessment – that the deal was driven by Autonomy's "*need to make up the numbers*" seems to me to have been correct. The conclusion is further supported by the fact that although it was put to Mr Egan that Dr Menell or other members of Autonomy's technical team may have known about the technical properties of StorHouse, Mr Egan was not challenged on his evidence that he himself was unaware of any such evaluation.

2790. The Claimants submitted, and I accept and find, that it follows that (i) the idea of selling an IDOL licence to FileTek originated with Mr Egan, (ii) so too did the idea of purchasing StorHouse, (iii) Mr Egan's reason for suggesting a purchase of StorHouse was to bring about the sale of the IDOL licence by providing FileTek with the

---

[319] Points of ellipsis appear in the original.

wherewithal, (iv) Mr Hussain knew and approved of this proposal, and (v) Mr Egan conceived of this idea in circumstances where he did not know of any technical evaluation by Autonomy of StorHouse or the practicality of combining it with Digital Safe, and as a means of generating recognisable revenue from the sale of Autonomy software to FileTek. Mr Hussain knew that.

*Had Autonomy (coincidentally) any identified need for StorHouse?*

2791. There were two strands to the Defendants' argument that even if revenue generation was a desirable product of the purchase by FileTek of Autonomy software, and even if that purchase was facilitated by Autonomy's purchase of StorHouse from FileTek, the primary purpose of Autonomy's purchase was that it considered StorHouse to be (a) a useful adjunct for incorporation into its (Autonomy's) product offering and (b) part of what Dr Lynch stated in his witness statement to be a *"strategy to move aggressively into the structured data market…"*. The Defendants also contended that both the purchase from FileTek of StorHouse and the purchase by FileTek of Autonomy software were at fair value.

2792. The Claimants accepted that Mr Egan did not have the final say on whether Autonomy should buy StorHouse; approvals from his superiors, including Dr Lynch, would be needed. But they submitted that it would be a remarkable coincidence if, Mr Egan having come up with the idea of the purchase for one reason (a reason known to Mr Hussain), others within Autonomy's senior management nevertheless ended up approving the purchase for an entirely different reason.

2793. Dr Lynch, in his witness statement, presented the decision to make "*an investment in StorHouse, in the tens of millions of dollars range*" as part of a "*strategy to move aggressively into the structured data market ...*". He claimed that Autonomy *"had familiarity with the product by virtue of our experience in the market, File Tek's OEM and our negotiations with Informatica."* He maintained that:

> "*Autonomy decided to buy StorHouse rather than try to develop the software itself to save time, money and engineering resources. The software needed to be tested with live customer databases, which was a tedious and very time intensive process that had a tendency to irritate the customers whose databases were being used. Autonomy had prospects lined up that needed the software and had been asked to provide a solution for a highly classified intelligence application, which involved handling structured data. For these reasons, it was necessary to acquire the software reasonably quickly. Purchasing StorHouse had the added advantage of signalling to Informatica that Autonomy was not desperate to acquire their company and had other options, which might encourage Informatica to accept Autonomy's prior offer. For Autonomy, buying StorHouse was the equivalent of parking a tank on Informatica's lawn.*"

2794. In cross-examination, Dr Lynch also stated that, in the context of the potential acquisition of Informatica, Dr Menell had compared Informatica's technology to third-party offerings on the market, including FileTek's, and so Autonomy was familiar with the StorHouse product and had assessed its technology.

2795. However, when pressed to identify any documentation to support his depiction of the strategy, and the assessment of StorHouse which he claimed in cross-examination had been undertaken by Dr Menell (which was not mentioned in his witness statement), Dr

Lynch initially told me that he did not know whether there was documentation or not, but revised this later to justify its apparent absence on the basis that Autonomy was *"a very different company to a Hewlett-Packard. We move very fast. We understand our products, we understand the market and we make decisions and we don't spend a lot of time producing long reports."* He thought there might have been a short 5 or 6 page document recording *"basic technical checks"* but qualified that by saying that *"to be blunt, the decision had been made before that document was done usually."* He could offer no explanation why the strategy alleged had not been explained to Deloitte: he said he did not deal with Deloitte and did not know what they had been told.

2796. Dr Lynch also suggested in cross-examination that Mr Egan was aware, when approaching Mr Szukalski, of the Informatica strategy. This had not been put to Mr Egan, whose evidence was not consistent with the suggestion. But, more importantly, the suggestion was also inconsistent with Dr Lynch's own earlier evidence in his second witness statement that "*Mr Egan was wholly unaware*" of the potential Informatica transaction.

2797. In the circumstances, I cannot accept Dr Lynch's depiction of the genesis and rationale of the purchase of StorHouse from FileTek as being part of some overall strategy for Autonomy's entry into the structured data market and persuading Informatica to accept its overtures. Dr Menell did not give evidence; there was no documentary support for Dr Lynch's presentation; and the suggestion that Mr Egan was aware of such a strategy seemed to me implausible and contradicted by Dr Lynch's own evidence, as well as Mr Egan's unchallenged evidence to the contrary.

2798. Nor can I accept the second strand of the Defendants' response, to the effect that Autonomy had undertaken a technical analysis of StorHouse prior to late December 2009 which had prompted its interest. It seems to me clear from the pattern of events described above, and from the unchallenged evidence of both Mr Egan and Mr Szukalski in that regard, that when Mr Egan approached Mr Szukalski, he had next to no knowledge of StorHouse as a product. I am satisfied and hold that identified need for the product did not prompt Mr Egan's approach or inform the negotiations which followed.

2799. I am fortified in that conclusion by the efforts subsequently made, including by Mr Egan, to develop a technical justification for the acquisition after the event.

2800. On 29 December 2009, and after his initial call with Mr Szukalski, Mr Egan wrote to Dr Menell as follows:

> "Pete,
>
> In response to all your investigations into tech to support the right way to deliver on the Kraft style RDBS archiving demand a company called Filetek has come forward with a pitch about their Storhouse product as well as a module called "Relational Manager".
>
> It sounds like they may have a very good solution to the things you have been looking at build/buy on.
>
> I may recall that you had already shortlisted them but their president called me this AM to pitch as they are quite keen and he knows Autonomy ..."

2801. Mr Egan's email was a contrivance:

(1) There is no evidence that, as at 29 December 2009, Dr Menell had been conducting the "*investigations*" mentioned in Mr Egan's email. Certainly, as already noted, Mr Szukalski's evidence was that neither Dr Menell nor anyone else in Autonomy's technical department had previously contacted him about the potential use of StorHouse by Autonomy.

(2) Mr Egan's own evidence in cross-examination was that his email was pretextual and misleading because it did not accurately express the fact "*that this was my idea to pitch this quid pro quo relationship*" and he (Mr Egan) was not aware of Dr Menell looking to "*build/buy*" as stated in the email.

(3) It was not true that FileTek had "*come forward with a pitch*" or that Mr Szukalski "*called me this AM to pitch*". As the documents make clear, and Mr Szukalski and Mr Egan readily confirmed in cross-examination, it was the other way round: Mr Egan had contacted Mr Szukalski.

2802. Dr Lynch had to accept in cross-examination that it did appear that Mr Egan's email was pretextual in giving the impression that FileTek had come forward with a pitch.

2803. Mr Egan was asked whether he was "*trying to mislead Dr Menell*" by this email, to which he answered "*No*". But that was because Dr Menell already knew that the email was pretextual.

2804. Dr Menell responded to Mr Egan 30 minutes later stating, "*Come across this lot before. Very strong on lifecycle and trans[p]arent back off to teirsh [sic] storage. Will have sean et al pull more of the White papers to validate the assumptions*". As the Claimants noted, this email exchange is hardly indicative of Dr Menell having come up with the decision to invest tens of millions of dollars into StorHouse.

2805. On 30 December 2009, Mr Chamberlain asked Mr Egan and Dr Menell, in an email copied to Mr Hussain, for a "*technical paper explaining why both bits of technology are needed*":

> "*1)    why does Autonomy need the Filetek solution and what benefits will that bring. Need to try and justify the $10m cost and show that benefits of at least that amount will be generated. E.g cost savings of $2m per annum for 7 years discounted to give a NPV of greater than $10m*
>
> *2)    why does FileTek need Autonomy and how will the technology be used?*"

*Price Autonomy agreed to pay FileTek for purchase of StorHouse*

2806. As to 1) in the preceding paragraph and the purchase by Autonomy of *"the Filetek solution"* (StorHouse), the Defendants sought to counter the notion that the price was "reverse-engineered" according to the price that Autonomy was wishing to achieve from

its sale to FileTek of software on the basis that in fact the price was "fair value" and in fact represented a 45% discount on FileTek's list price. They relied also on (a) Mr Szukalski's assertion in his witness statement that *"The contract pricing was not inflated; it was set at a level that FileTek considered to be appropriate"* and (b) Mr Egan's somewhat reluctant evidence in cross-examination, after stating that he *"didn't care too much about that"* that *"it was at fair value effectively".*

2807. The issue relating to the quantum of the purchase price which Autonomy agreed to pay FileTek was much disputed and the evidence in respect of it was confusing. In particular, the evidence given in the US criminal proceedings by Mr Loomis of the way FileTek internally analysed and accounted for the value of the software it sold contradicted its depiction as representing a fair price, and, in accounting terms, "fair value".

2808. Mr Loomis' accounting memorandum, which addressed the question whether it was proper for FileTek to recognise revenue in respect of its receipt is a telling document. Amongst its observations in explaining the conclusions that under US GAAP, and in particular, its requirement for VSOE[320], immediate revenue recognition of the sales revenue from the purchase of FileTek software to Autonomy would not be proper were the following:

(1) *"This transaction was completely unique to [sic: for] FileTek and was an outlier transaction for our normal business strategy and projections and there were no very similar transactions that would provide a good faith comparison for the pricing and fair values."*

(2) *"This was our first customer who had plans to use our software in a hosted environment with large hosted customers, so it doesn't fit into our Reseller model or the End-User model for pricing."*

(3) *"The 5-year term for the StorHouse maintenance with prepaid maintenance collected is also highly unusual for our customer base and therefore assigning appropriate fair value to maintenance for a 5-year duration would be very subjective."*

(4) *"without any similar transactions in past (nor any expected in near future) there is no context in which to determine the VSOE of Fair value of the maintenance contract."*

(5) *"Due to the unusual nature of the two contracts being executed at close duration and the fact that FileTek might not have entered into the contract to purchase the Autonomy licences without the StorHouse licence being executed, the contract prices are clearly not fair value and therefore, accounting treatment "a"... without any fair value adjustments would be inconsistent with GAAP."*

2809. Mr Szukalski, when cross-examined, was not asked to comment on the GAAP accounting issues but he was invited to and did confirm that:

---

[320] Vendor-Specific Objective Evidence is required under US GAAP: this requires evidence of the fair value of a contract's components if any part of the value of and revenue from individual items is to be recognized before the last element in the contract is delivered

(1) It is unlikely that FileTek would have contracted to purchase Autonomy software *"at that price point"* without the StorHouse sale contract.

(2) The StorHouse contract was highly unusual, as in particular was its provision for pre-payment of 5-years maintenance.

(3) If the StorHouse sale contract had been self-standing (that is, but for the contract for FileTek's purchase of Autonomy software at the same time) the price that Mr Szukalski and Mr Loomis would have expected to get in an arm's length transaction for the sale of the StorHouse software was much closer to $2 million than $10 million. A figure of $2 million for a transaction of this size, had it been the only thing under negotiation, and *"where there wasn't a barter deal"*, would have been, according to Mr Szukalski's evidence, a:

> *"Good deal. We would have taken that deal for sure, yes."*

(4) In stating, in his witness statement, that the *"contract pricing was not inflated: it was set at a level that FileTek considered to be appropriate"* he had intended to convey no more than that the sale was at a discount on the list price in the *"standard price book"*.

(5) He told me that he *"reverse-engineered to get in Mr Egan's range of the differential [the range that Mr Egan had given in their first call] but I still used the standard price list to come up with the pricing how it was. So I didn't pull it out of thin air. I came up with the pricing based on something that had already been around for a while."*

(6) He could not opine on *"fair value"*, which he regarded as an accounting concept and *"a Bill Loomis issue."*

2810. Furthermore, Mr Szukalski's evidence was that in the absence of the IDOL licence, he would have been prepared to offer Autonomy a discount as high as 74% on its StorHouse licence, if that meant transacting the business. Mr Szukalski, who was responsible for sales of StorHouse, said he would still have regarded a much lower price of only $2 million for a StorHouse licence of this size as a "*Good deal. We would have taken that deal for sure.*"

2811. Further, Mr Egan's evidence in cross-examination was more equivocal than its description in Dr Lynch's written closing submissions. When it was put to Mr Egan that the price paid to FileTek by Autonomy was a "*fair and proper price*". Mr Egan answered as follows:

> *"I didn't care too much about that, I was more going through what Sushovan's objectives were for the financials of the deal. It could have been significantly smaller, it could have been significantly larger; it was the three factors I mentioned."*

2812. The "*three factors*" were identified by Mr Egan in a previous answer as, "*the absolute dollar amounts, fair value, and that the volumes going in each direction were acceptable and relevant to each party*".

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

2813. Mr Egan expanded in re-examination on what he meant by "*Sushovan's objectives*":

> "*Pretty much exactly what I was just referring to, in other words he had a set of objectives and a bit of a puzzle to solve. He had to consider wanting the deal to be as large as it could be properly rationalised to be on fair value; it had to have enough delta to incentivise FileTek for doing this very rushed transaction; it had to involve software that both parties valued and got in the volumes that were meaningful.*"

2814. The Claimants contended that Mr Egan's reference to the price being "*rationalised to be on fair value*" echoed Mr Szukalski's evidence about "*reverse-engineering*", i.e. starting with the price for StorHouse that he and Mr Egan had discussed and then creating a proposal that would be said to justify that price. Mr Egan also explained that his understanding was that:

> "*Fair value provides for a very large range. It was my understanding at the time that both prices from each company to the other met fair value criteria.*"

2815. In my view, what both Mr Egan and Mr Szukalski were trying to do was explain that they had not consciously broken any rules or adopted a pricing structure which, having regard to both transactions in the round, they felt could not be rationalised by reference to some objective criteria; but the objective was for both FileTek and Autonomy to achieve as high a price as could plausibly be presented as being within the "very large range" of fair value and not wholly disconnected in terms of percentage variation from FileTek's list price.

*Price FileTek agreed to pay Autonomy for Autonomy software*

2816. Turning to 2) in paragraph 2805 above, Mr Chamberlain's question *"why does FileTek need Autonomy and how will the technology be used?"* reflected his concern about the dramatic increase in the price to be paid by FileTek for its IDOL licence, which he would have anticipated would have to be explained to Deloitte. The figures were startling: in 2008, FileTek was required to make a $150,000 license prepayment and had paid nothing else since then. Now it was going to pay a licence fee of $8 million. On 30 December 2009, Mr Chamberlain followed up his initial query with a further email to Mr Egan and Dr Menell, again copying Mr Hussain (who recognised the issue as "*vv important*"):

> "*The technical paper should also address the different economics of their previous deal compared to this one. In Q1 2008 they signed an OEM agreement with term until 30 June 2010. They got similar software for the Trusted Edge Application. The cost was $150,000 plus 10% S&M, giving a total of $165,000. This agreement adds SPE but otherwise looks same from software perspective and allows them to also use on their Storhouse application. Now the fee is $8,000,000.*
>
> *Pete- need a compelling technical argument to support the pricing differential.*
>
> *Stouff- need to add a compelling commercial argument as to why pricing is like this. Needs significant additional revenues to justify their expense.*"

2817. Again, I prefer the insight provided by Mr Loomis's accounting memorandum to the self-justifying and ultimately circular evidence provided by Mr Egan and Mr Szukalski. The memorandum explained what truly was the proposed use of the Autonomy software envisaged by FileTek and what its anticipated value to FileTek would be. It attributed a fair value to FileTek of the Autonomy IDOL licence of $455,000. That was about 5% of the price actually agreed to be paid. The reason for that very low value to FileTek in comparison to the price being paid was that FileTek only had plans to sell the software with Trusted Edge licences and Trusted Edge's sales projections were very low (40 sales a year).

2818. In this context:

(1) Although an amendment to the agreement for the purchase of Autonomy software gave FileTek the right to incorporate IDOL into StorHouse (whereas the 2008 OEM agreement was limited to Trusted Edge), the truth was that FileTek's intention at the time, as Mr Szukalski confirmed, was to bundle IDOL only with Trusted Edge software licences.

(2) The accounting memorandum recorded that FileTek "*does not have on its development road map to incorporate Autonomy licences into StorHouse software*", a fact which Mr Szukalski confirmed was correct.

(3) The estimate of 40 Trusted Edge sales incorporating IDOL yearly was Mr Loomis's estimate taking into account that (as the memorandum recorded) FileTek had a "*poor track record*" of hitting its projected figures for sales of Trusted Edge, as Mr Szukalski confirmed. Mr Loomis therefore did not feel comfortable relying on FileTek's sales projections for Trusted Edge when calculating the value to FileTek of the extension of its IDOL licence. The assumption which Mr Loomis regarded as reasonable was a sale of an average of 40 units of Trusted Edge per year over 5 years. Mr Szukalski did not regard the estimate of just 40 unit sales per year as an unrealistic estimate at the time. Indeed, even that estimate turned out to be optimistic, since in the event "*Trusted Edge failed as a business*".

2819. In the circumstances it is clear that the price for one transaction was dictated by the other, and it was calculated not by reference to the value of what was being sold but by reference to the generation of as much recognised revenue for Autonomy as it was thought possible to present to Deloitte, with a large reward for FileTek for its assistance. I accept the Claimants' submission and find that the reason why FileTek was willing to pay such a vastly higher price for IDOL was because Autonomy was going to give FileTek the funds to pay for it.

*Autonomy's technical analyses of StorHouse*

2820. Mr Chamberlain's email of 30 December 2009 referred to in paragraph 2805 above had also asked for some assessment of "*why…Autonomy need[ed] the Filetek solution and what benefits will that bring.*" When it was put to Dr Lynch that this looked as if Dr Menell was being asked by Mr Chamberlain to come up with an *ex post facto* technical argument to support a price that Mr Egan had already agreed, he acknowledged this, and

HC-2015-001324

queried also how a technical argument would support the price agreed. But, as the Claimants submitted and I accept, Mr Chamberlain would have understood, as I consider Dr Lynch did also, that Autonomy needed something to give credence to the case for there being a genuine commercial rationale for acquiring StorHouse.

2821. The requests from Mr Hussain and Mr Chamberlain prompted a cursory and superficial technical assessment by Autonomy of the StorHouse software. Mr Egan acknowledged in his witness statement that, as the chronology also demonstrates, the purpose of this technical analysis was not to decide whether Autonomy should purchase the software or what it should pay, but *"to justify the value of the deal to Deloitte"*.

2822. Dr Blanchflower's unchallenged evidence was that, on 30 December 2009, Dr Menell, without explaining the reason for his request, asked Dr Blanchflower and Mr Gallagher (neither of whom were part of the Digital Safe team) to provide a description of FileTek's software, along with examples of how it could be used in conjunction with Autonomy's products. Dr Blanchflower gave the following unchallenged evidence:

> *"To the best of my recollection, the only thing we had to go on when conducting our analysis was the name "FileTek". Our starting point, therefore, was to conduct an internet search to find information on the company and its software. We looked at FileTek's own website, and may also have run additional Google searches to look for relevant news stories or other information about FileTek and its technology. We did not have a copy of FileTek's software or any detailed installation guides or user manuals. Our report took us no more than a few hours to produce."*

2823. Based on those internet searches, Dr Blanchflower and Mr Gallagher prepared an email which Mr Gallagher sent to Dr Menell later on 30 December 2009. The first half of the email, which was drafted by Dr Blanchflower, set out *"Initial thoughts"* on how FileTek's software might overlap with or complement Autonomy's software. At a high level, Dr Blanchflower could see that FileTek's software could be valuable to Autonomy, but he said that he had to *"fish for possible uses"* and included anything that was potentially plausible: he made clear that he was *"stretching some of the use cases, but I was asked to think of as many as I could"*. The second half of the email, which was drafted by Mr Gallagher, was evidently based on a review of FileTek's own website, as the links to the website made clear.

2824. It was the unchallenged evidence of Dr Blanchflower that Dr Menell did not follow up with Dr Blanchflower and Mr Gallagher in relation to the email. All that Dr Menell did was to send a hyperbolic summary in praise of StorHouse stating that its capabilities *"represent a game changing play when combined with Autonomy's SPE powered DigitalSafe"*. This was untrue and there was no basis for it: no prior work had been done to explore the possible integration of StorHouse with SPE, nor had any work been done to determine the feasibility of combining StorHouse with Digital Safe.

2825. I accept the Claimants' submission, supported also by the evidence of Mr Wang and Mr Goodfellow, that this is hardly the sort of technical evaluation one would expect Autonomy to conduct if it was seriously considering licensing StorHouse for in excess

of $10 million in order to integrate it with Autonomy's products[321]; and that the technical analysis was just an *ex post facto* justification in order to provide a paper trail for Deloitte.

*Execution of the two agreements*

2826. Less than half an hour after receiving Dr Menell's paper, Dr Lynch replied "*ok*", signifying his approval for the StorHouse purchase. Shortly thereafter, Mr Hussain also replied, "*This is good – I am fine*".

2827. On the evening of 31 December 2009, Mr Loomis wrote to Mr Thompson, subject "*autonomy agreements have been mutually signed*". Mr Szukalski accepted that, on that day, FileTek would not have signed the IDOL licence, unless Autonomy had mutually signed the agreement for a StorHouse licence. Mr Loomis' email again recorded that "*CEO [Mr Egan] said that we should be paid 4-5 days early via wire*", a reference to Mr Egan's assurance on the call earlier that afternoon. Also that evening, Mr Szukalski sent a note to his FileTek colleagues expressing appreciation for their help and hard work. He said, "*I would have never guessed one week ago that we would be closing a financial transaction of this size to close out 2009. It has been quite a challenging and remarkable 48+ hours …*". Mr Szukalski accepted that his email reflects the fact that the transaction only came onto the horizon at all when Mr Szukalski heard from Mr Egan on 28 December 2009. Mr Seamans' one-word reply to Mr Szukalski's email, "*Unbelievable*", was a fair reflection of Mr Szukalski's own reaction to getting the deal done within only three days and to the scale of the deal.

2828. The two agreements mutually executed on 31 December 2009 were:

(1) A software licensing and maintenance services agreement under which FileTek granted Autonomy Inc a licence to install, implement, access, use and copy StorHouse for a period of five years for its internal business purposes and/or for the benefit of its hosted customers. The total fee for the software licence and maintenance support was $10,367,280, based on 60 users and specific data limits (including 1 petabyte of primary relational data, i.e. <u>structured</u> data), which was payable by Autonomy Inc within 30 days from receipt of invoice.

(2) An amendment of the 2008 OEM agreement under which Autonomy Inc licensed certain software, including Autonomy IDOL with SPE Basic, to FileTek for use with FileTek's StorHouse application. The agreement provided for the payment by FileTek of a licence fee of $8,000,000 and a fee of $480,000 for the first year of support. The licence fee and support fee were to be invoiced immediately and payable in two equal instalments of $4,240,000 within 30 and 90 days, respectively, from the date of invoice.

---

[321] Mr Wang's evidence was that a proper product evaluation would have involved speaking to the technical team (including himself) and having engineers run a proof of concept to ensure there were no significant integration issues, which in this case would have involved trying to integrate StorHouse with Digital Safe. This never happened. Indeed, on the evidence, no attempt was made to check, for example, whether StorHouse was capable of searching structured data on the scale required by large customers, such as banks. Mr Wang's evidence was that repeated stress tests using large volumes of structured data should have been run, and that this would have taken weeks.

2829. Autonomy recognised the $8,000,000 licence fee under the first FileTek sale as revenue as at 31 December 2009 and the support fee as revenue over the following year.

*How the first StorHouse purchase was presented to Deloitte*

2830. The Defendants placed reliance in this context also, as in almost all others, on Deloitte's approval of the transactions. They emphasised that Deloitte's review involved a demonstration of the StorHouse product attended by Deloitte's technical expert Mr Johnstone. Mr Gallagher presented the demonstration and Mr Goodfellow had worked on it. Deloitte were seeking to *"ensure from an audit perspective that the two transactions are appropriately valued and can be separated and that they make commercial sense."*

2831. Deloitte focused on the two key questions of whether there was a commercial rationale, and whether the transactions were at fair value. With regard to the technical evaluation Mr Welham confirmed in cross-examination that Mr Johnstone was able to ask all the questions he wanted about the software. Mr Johnstone produced his own technical evaluation.

2832. Then, on 11 January 2010, Deloitte produced their working paper with a view to assessing whether the two deals could be recognised separately. This involved ascertaining whether there was a linkage such as to impact the accounting treatment. Deloitte's view was that these were dissimilar goods, and the transactions could be recognised independently. Deloitte concluded that:

> (1) There was a clear commercial rationale behind the purchase; and

> (2) The purchase was at fair value. In this context Deloitte took into account that competitive quotations had been obtained by management from a number of companies with regard to potential software applications for use with SPE for structured data analysis, including HP, Informatica and CommVault. Mr Welham confirmed that Deloitte had no problem with a quotation being obtained after the year end.

2833. Mr Welham agreed that reaching these conclusions involved the process previously described of confirming the transactions did not relate to similar goods, and then identifying both commercial rationale and fair value for the transactions:

> *"Q. So you decide they're not similar, then you ask yourself the question, is there a commercial rationale for both limbs?*
>
> *A. Yes.*
>
> *Q. Then you ask yourself, has fair value of the two transactions been established?*
>
> *A. Yes, correct."*

2834. In addition to the demonstration and a management paper provided to them by Autonomy on 12 January 2010, Deloitte was also provided with: (i) a management representation letter dated 22 February 2010, signed by Mr Hussain, confirming that Autonomy's purchase of StorHouse was on an arm's length basis, (ii) a confirmation

letter signed by Mr Loomis in respect of the first FileTek sale confirming the outstanding debt owed to Autonomy and that there were no side agreements, (iii) evidence of Dr Lynch's approval of the first FileTek purchase and internal correspondence between Autonomy management outlining the supposed commercial rationale for the purchase, and (iv) a copy of an email from Mr Szukalski to Mr Egan on 21 January 2010, in which Mr Szukalski purported to set out FileTek's commercial rationale for licensing additional Autonomy software as follows:

> "...the FileTek Trusted Edge platform utilizes the Autonomy Keyview filters and IDOL platform. Our current contract with Autonomy was set to expire in June 2010...we projected that a royalty arrangement with the same terms would have cost us an annual average of approximately $3-5 million in royalties due to Autonomy and possibly even more. Further, the prior royalty formula caused less than optimal pricing structures for FileTek in order to minimize the per copy royalty. These conditions drove the commercial desire to negotiate a license with a fixed up front cost (and no royalties.) Otherwise, we would have been forced to find alternatives to the Autonomy products. This new arrangement not only allows us to renew our commitment to Autonomy but allows us to further expand our use of Keyview and IDOL within Trusted Edge and allows us to integrate the Autonomy IDOL SPE software in support of our STH storage virtualization platform offering."

2835. Deloitte concluded, on the basis of this material, that the first FileTek sale and purchase were separate transactions conducted at arm's length. This process appeared to be careful and comprehensive and reliable accordingly.

2836. However, the Claimants' case was that Deloitte was misled. The Claimants relied particularly on the evidence of Mr Welham. According to his evidence in his witness statement, Deloitte were unaware that:

(1) Autonomy had not undertaken any detailed technical analysis or due diligence in relation to the StorHouse software but, the day before the first FileTek purchase, had only briefly reviewed FileTek's website and the information about its software on the internet.

(2) FileTek would not have bought the IDOL licence at the price it did had it not been for Autonomy's purchase of StorHouse, and FileTek was dependent on receipt of funds from Autonomy under the StorHouse purchase to make payments under the IDOL licence.

(3) The negotiations had been conducted by reference to the "*spread*", i.e. the delta or net payment that would fall to be made after setting the two payments off against each other.

(4) FileTek had been assured by Autonomy that it would not be "*burned*" on the transaction.

(5) Had Deloitte been aware of these matters, they would have been of "*concern*" as they would have called into question whether the transactions were independent, arm's length and commercially reasonable transactions, all of

which were essential planks of Deloitte's analysis of the appropriate accounting treatment.

2837. According to the Claimants, the true position was also withheld from the Audit Committee. On 28 January 2010, Mr Hussain sent Dr Lynch and Mr Kanter the final version of his management note for the Audit Committee. Mr Hussain's covering email noted that he had included "*More on filetek*" and requested "*Any final comments before we send?*". Dr Lynch accepted that he had at least reviewed the draft "*at the level of the non-financial stuff*". The version of the note sent to the Audit Committee, which included what was described in Dr Lynch's written closing submissions as having *"added positioning",* was seriously misleading:

(1) The note described the purchase of the StorHouse licence as a "*completely separate transaction*" from the IDOL sale to FileTek. This was an untenable description in light of the chronology set out above. In fact, as already noted, the two transactions had been conceived by Mr Egan, and approved by Mr Hussain, as a package, and negotiated with FileTek by reference to the spread between the two prices.

(2) The note also misrepresented the commercial rationale and background to the purchase of StorHouse:

> "*We carried out a detailed evaluation process over several months to identify technology that would allow us to do this "out-of-the box" and evaluated products from HP, Informatica and CommVault. The evaluation process was carried out independently by our CTO and technical team. We eventually selected the Filetek product because the technology was judged to be the most appropriate and best of breed ...*"

(3) But there had been no "*detailed evaluation process over several months*" nor is the adverb "*eventually*" apt to describe the decision to buy StorHouse; and there was no evaluation at any time of HP's or CommVault's products as an alternative to purchasing StorHouse. As explained previously, Autonomy's technical department spent a few hours browsing material about FileTek on the internet, only a couple of days before the StorHouse licence was purchased.

(4) The suggestion that the evaluation of StorHouse was carried out "*independently*" by Dr Menell, was also false: Dr Menell was only asked to consider the StorHouse purchase <u>after</u> Mr Egan had already approached Mr Szukalski about a round-trip transaction.

2838. The note also went on, as part of supporting the existence of a genuine commercial rationale, to assert that StorHouse had been "*fully integrated and is available for commercial sale*". Dr Lynch asserted in cross-examination that this was "*a perfectly reasonable statement*" on the basis that because FileTek "*was an NAS,[322] once it was set up in a network environment, then it was integrated and available for sale*". Dr Lynch's position therefore appeared to be that the statement was true if StorHouse had merely been installed in a network environment. However:

---

[322] This appears to stand for Network Attached Storage.

(1) Although there was a dispute about what *"fully integrated"* meant, the Claimants submitted, and I accept, that the phrase *"fully integrated"* of itself was intended to convey more than the installation of the software on the network. That is reinforced by the claim that it was *"available for commercial sale"*.

(2) The Claimants also submitted that in any event, there was no evidence that StorHouse had even been installed in a network environment within Autonomy as at late January 2010. Against this, the Defendants relied on (a) exchanges with Mr Gallagher which appeared to demonstrate that the StorHouse software had been downloaded in January 2010 and (b) the fact that there had been a demonstration in January to explain to Deloitte the purpose of the StorHouse software and a use case for combining it with IDOL, which suggested that the StorHouse software would have been installed for that purpose and to show off its functionalities. However, when cross-examined about this, Mr Goodfellow explained that the demonstration material had been compiled by him and two others in his team, and he was adamant that they had not installed StorHouse by then or for that purpose. There was nothing to contradict this.

2839. Despite Mr Goodfellow's adamant insistence, I remained puzzled by why or how a use case would have been sought to be presented without installation of the software concerned. Nevertheless, even if a prototype was installed by then (12 January 2010) I consider and find that the note, especially with the additions made by Dr Lynch, was materially misleading: I accept that the depiction of a fully integrated "oven-ready" product was greatly exaggerated with a view to justifying to Deloitte (and, in turn, the Audit Committee) the purchase of StorHouse as a self-standing transaction which was justified on its own merits notwithstanding its very considerable purchase price.

2840. In short, I am satisfied that the way the transaction was presented to Deloitte was distorted to the point of falsity. In my judgment, Deloitte's conclusion that the first FileTek sale and purchase were separate transactions conducted at arm's length was based on a false presentation to them.

*Mutual payments in respect of the first FileTek transaction*

2841. The inter-dependence of the transactions, and the side arrangements to ensure that FileTek would be put in funds before ever being required to pay was again illustrated by the payment process:

(1) On 26 January 2010, a number of days before Autonomy's payment for the StorHouse licence fell due, Mr Egan wrote to Mr Scott asking him to *"raise the payment"* to FileTek that day. Mr Egan explained that, *"Sushovan is aware and is expecting a request for approval as early as this evening or at latest tomorrow AM. He will then approve and can you be sure we either wire or send check overnight?"*

(2) The same day, Cynthia Watkins, in Autonomy's finance department, sought Mr Hussain's approval for the payment, noting that payment was due on 30 January 2010. In the early hours of 27 January 2010, Mr Hussain gave his *"ok"*, and so did Dr Lynch.

(3) Autonomy paid FileTek $10.367 million on 27 January 2010, in advance of the contractual due date for payment, in accordance with the assurance given by Mr Egan to Mr Szukalski.

(4) Two days later, on 29 January 2010, FileTek paid the first instalment of $4.24 million to Autonomy. Mr Szukalski confirmed that FileTek used the cash it had received from Autonomy to pay Autonomy.

2842. In cross-examination, Dr Lynch did not seek to argue that the timing of these payments was a mere coincidence; but he sought to explain and justify the sequence on the basis that, before the payment was made by Autonomy, he would have expected someone to have had a phone call with FileTek saying, "*If I send you what I owe you, you'd better send it back straightaway*". Dr Lynch said that getting prompt cash payment from FileTek was helpful for Autonomy's Days Sales Outstanding ("DSO") metrics, which he explained in re-examination was a measure of how quickly debts owed to Autonomy were paid. This did not, however, address the real issue: as the Claimants put it,

> "*the issue here is not one of the timing of cash flow: the Claimants' case does not involve a complaint that Autonomy made a legitimate purchase but paid for it sooner than it could have done; the Claimants' case is that Autonomy's reason for purchasing the StorHouse licence and paying in advance of the due date was to put FileTek in funds first to enable it to purchase Autonomy software at a high price and then to pay down its debt to Autonomy.*"

2843. On 31 March 2010, FileTek paid the remaining instalment of $4.24 million to Autonomy. Again, Mr Szukalski's evidence was that FileTek used the money it had received from Autonomy to pay Autonomy.

2844. I accept the Claimants' case in relation to the first of the transactions comprising RT 3.

*Defendants' knowledge*

2845. The knowledge of both Defendants of the reciprocal nature of the first of the RT 3 transactions, and the consequent impropriety of accounting for them as if they were independent, seems to me to be apparent from the description above. I give further reasons for this conclusion after my consideration of the second of the RT 3 transactions which follows.

*The second of the FileTek transactions comprised in RT 3: Q1 to Q2 2010*

2846. Whereas the Claimants described the second FileTek purchase transaction as once again driven by Autonomy's need for more recognised revenue, the Defendants described it as being for proper commercial purposes and to meet a genuine desire on Autonomy's part to extend the data limits of the first purchase (including a 1 PB limit for relational

data) so as to enhance its capacity to deploy StorHouse and enable it to meet identified customer demand. Both sides relied on the evidence of Mr Egan in this context; and there was a dispute as to whether a number of emails were genuine or pre-textual.

2847. The Claimants relied on the following description in Mr Egan's witness statement of what promoted the transaction, and its salient features:

> "In Q1 2010 Mr Hussain told me that we were short on revenue again. I therefore looked to do another quid pro quo deal. Mr Hussain and I agreed that I would present a second round trip deal to FileTek. The rationale for the deal, which I laid out in an email to Mr Hussain dated March 30, 2010, was that Autonomy expected an increase in its data hosting business because of its recent (separate) agreement to host Merrill Lynch data, and that as a result, Autonomy could license additional rights relating to the volume of data that could be hosted by Autonomy using FileTek's StorHouse software. The rationale was a pretext, as both Mr Hussain and I knew. Autonomy did not "need" the right to use StorHouse.
>
> On March 29, 2010, I spoke with FileTek's Mr Szukalski, with whom I had made the quid pro quo deal at the end of 2009. I proposed that FileTek licence additional Autonomy software before March 31. In return, I said that Autonomy would purchase additional rights to use FileTek's StorHouse software in the following quarter for a purchase price that would substantially exceed the amount of FileTek's purchase from Autonomy. The separation in time was a requirement established by Mr Hussain. Its purpose was to introduce two separate time periods as another fact establishing the deals as independent transactions. Most of my discussion with Mr Szukalski and FileTek's CEO, Bill Loomis, was about the spread - the dollar amount by which Autonomy's purchase from FileTek would exceed the amount of FileTek's purchase from Autonomy. The spread was a principal incentive to FileTek to do this quid pro quo deal.
>
> I agreed with Mr Szukalski and Mr Loomis that FileTek would license software from Autonomy in Q1 2010 for $8.5 million, plus one year of maintenance for $510,000, a total obligation of $9,010,000. In return, I agreed that Autonomy would purchase additional rights to use FileTek's StorHouse software and related support for about $11.5 million in Q2 2010. We agreed that the spread would be approximately $2.5 million. Mr Hussain established the amount of the licence fee for the Autonomy software and directed the negotiation of the amount of the spread; I conducted that negotiation. Both halves of the agreement were reached orally at the end of March 2010. FileTek's purchase from Autonomy was documented on March 31, 2010. Autonomy's agreement to purchase additional rights to use StorHouse remained entirely oral at that point. Mr Hussain told me that it should not be in writing."

2848. The Claimants relied also on internal Autonomy email exchanges with Dr Lynch which appeared to support the presentation of the transaction as a device to raise recognised revenue to cover shortfalls, and thereby also Dr Lynch's involvement and knowledge;

(1) On 29 March 2010, Dr Lynch sent an email to Mr Hussain and Mr Egan, attaching a revenue route map which included $12 million of revenue referable to "*gary/clutch/bluearc/safenet/cronin*". Dr Lynch accepted that "*gary*" might have been a reference to Gary Szukalski.

(2) The next day, 30 March 2010, Dr Lynch sent Mr Hussain an update, which now included $10 million of revenue referable to "*gary*". Again, Dr Lynch accepted

it was possible that this was a reference to Mr Szukalski. No alternative explanation has been advanced.

(3) Later on 30 March 2010, Dr Lynch sent an email to Mr Hussain, attaching what Dr Lynch called "*my list*". The list again included $10 million of revenue in relation to "*Gary*", which Dr Lynch accepted might, at the very least, be a reference to a deal with Mr Szukalski.

(4) On 31 March 2010, Dr Lynch sent Mr Hussain a further revenue routemap, which now included $8 million of revenue for "FILETEK". Dr Lynch confirmed in cross-examination that it was he who had added the reference to FileTek. This strongly supports the conclusion that the references to "*Gary*" in Dr Lynch's earlier route maps had also been to FileTek.

2849. The Claimants contended that it is perfectly clear, therefore, that late in Q1 2010, Dr Lynch knew that a revenue transaction with FileTek was part of Autonomy's plan to achieve its revenue target for Q1 2010; and further, that it is very unlikely that whoever told Dr Lynch about this (either Mr Hussain or, since Dr Lynch was on the west coast of the United States at the time, Mr Egan) failed to tell Dr Lynch about the intended quid-pro-quo purchase of StorHouse.

2850. On 30 March 2010, Mr Egan sent Mr Hussain an email, subject "*filetek*", in which he said, "*BofA has granted us the Merrill business. We will have to buy more FileTek to satisfy that contract at lower HW costs. We may wish to pitch a deal at FileTek on last day of Q to get best pricing*". Mr Hussain responded enthusiastically, copying Mr Kanter and Dr Menell.

2851. Mr Egan's evidence was that both he (Mr Egan) and Mr Hussain knew that the commercial rationale set out in this email was a pretext. Although it was suggested to Mr Egan in cross-examination that his email was an "*honest email*", Mr Egan maintained that it was:

> "*a bit misleading because I wanted to buy more FileTek to enable another quid pro quo deal. It also happened to be that we had great increases in volume and therefore had perfect rationale and business case for buying more.*"

2852. The Claimants contended also that the pretextual nature of the rationale is apparent from the fact that, as at 30 March 2010, Autonomy had not yet installed, let alone used StorHouse and, therefore, had not used any of the data capacity made available under the first StorHouse licence. They added that until an email from Mr Chamberlain to Mr Hussain dated 30 March 2010 referred in a single phrase to a limit on what Autonomy had acquired under the first transaction there was no document in which anyone in Autonomy's senior management had ever referred to the capacity limitation in the first transaction, or to any need to revise it.

2853. The Defendants, on the other hand, relied on Mr Egan's evidence to support their case that the need for extra capacity was not contrived but real, and that the rationale for the purchase was genuine. They instanced especially the following:

(1) On 30 April 2010 Mr Egan emailed Mr Goodfellow and Dr Menell stating:

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

> "This is FileTek's first proposal for the additional volume we asked about as a result of our winning the Merrill Lynch, Met Life and Newedge deals. They don't know about Lily volume, BNPP, The new larger JPMC volumes and the rate at which volumes are growing."

(2) Mr Egan confirmed that the rationale for this purchase was genuine:[323]

> "Q. Right.  The business about needing extra capacity, that was true, wasn't it, as you saw it at the time?
>
> A.  I believe so, yes.
>
> …
>
> Q. But in relation to the rationale for this further deal, what you say there represents what you honestly believed at the time?
>
> A.  Yes, I believed that the additional -- I knew that we had one capacity and that we had growing volumes and additional customers that rationalised making additional purchases."

2854. They relied also on Mr Szukalski's evidence in cross-examination that there was a genuine negotiation for something that Autonomy genuinely wanted in the course of which he wanted to "fence" the deal to limit the amount of software that Autonomy received for the $10 million that Autonomy had proposed, but that Dr Menell had negotiated *"very cleverly"* by introducing the idea that Autonomy would require in return that the StorHouse licence should be extended to grant unlimited capacity. This was Mr Szukalski's answer also to the fact that it was Mr Egan's evidence in his witness statement that the price had in fact been agreed in March 2010 at $11.5 million (see above), and indeed to his own evidence that Mr Egan had "coached" FileTek to put forward a price that could be beaten down by procurement. The following exchange in the course of Mr Szukalski's cross-examination illustrates the point:

> "Q.  So this negotiation was a bit of a show really, wasn't it?
>
> A.  No, continue on, there should be more negotiation that happens –
>
> Q.  Yes.  There are a number of further emails between you and Mr Scott.  Those are emails you've seen recently, are they?
>
> A.  No, not at all.  But there's further, I think, negotiation as well relative to the capacity licences of the software that we sold.

---

[323]In this passage of his cross-examination Mr Egan did say that he had more of a "symbiotic agreement" with Mr Szukalski than the email reflected.  Although the Defendants submitted that this went only to the negotiation process and did not affect the substance, which was that Autonomy did want the extra capacity (and paid fair value for it), I consider that Mr Egan was making the broader point about his business relationship and understandings with Mr Szukalski

> *Q. Insofar as the price is concerned, where you land up is that the figure precisely of $11.5 million that you had agreed with Mr Egan at the end of March?*

> *A. Correct, but the value that we provide to Autonomy becomes significantly higher based on a negotiation of the software that we're licensing to them which changes dramatically during this negotiation phase."*

2855.  Mr Szukalski presented the licence for unlimited capacity as a *"big deal"*:

> *"Q. And Autonomy didn't seek to negotiate you to a lower price than that?*

> *A. No, but higher value.*

> *Q. Removing the constraints on capacity?*

> *A. Big deal. It's a big deal in terms of what we're offering here in terms of unlimited capacity. The technology was completely based on per terabyte pricing. When you remove that, you've removed all limitations. So in essence what we were offering to Autonomy was -- a Zantaz Digital Safe was a complete enterprise licence for the technology. It's a big deal. It's high value."*

2856.  Mr Szukalski expanded on this in the course of his re-examination as follows:

> *"Q. ... again, can you just expand a little on that answer when you talk  about the negotiation of the software that you were licencing to him, what are you talking about there?*

> *A. Again, there is two components here. There is the price negotiation and then the software negotiation. In this case it was very interesting. So the price negotiation ended up about $11.5 million which was kind of the target value that we, in terms of price or budget that Autonomy was willing to spend. But what Autonomy negotiated very cleverly, and this is the involvement of Dr Pete Menell, the CTO of Autonomy at the time, was, you know, the original proposal included our standard structure of so many terabytes of licensed storage for storing this and Dr Pete came back and basically said, "We'd like to negotiate a little harder and get an unlimited capacity for Digital Safe" which was pretty clever and that's the improved value that Autonomy got as a result of that negotiation. They got an unlimited capacity."*

2857. However, although it does seem likely that there was growing demand for archiving and searching database records, and in that context there was a theoretical or potential use case for StorHouse which (in Mr Wang's words) Autonomy *"definitely tried to push and offer"*, the fact which was never contradicted was that at the time of the second StorHouse purchase, (a) Autonomy had not yet started using StorHouse for any customers (b) in the case of neither BofA/Merill Lynch nor Kraft, nor any other Autonomy customer was StorHouse ever actually used, as Mr Wang confirmed in his re-examination. There was no evidence to support the Defendants' line of argument that Autonomy needed to extend the first StorHouse licence because it had exceeded its 1 PB limit.

2858. So far as concerns FileTek's purchase from Autonomy, Mr Szukalski told me (again in re-examination) that FileTek came to the negotiation with its own "wants list" of software that it wanted to acquire in the purchase – a list a Mr Seamans of FileTek was said to have compiled as a *"running list"* before Mr Egan made an approach to FileTek. However, as the Claimants emphasised, Mr Szukalski had earlier accepted in cross-examination that FileTek had not approached Autonomy about wanting to licence any new IDOL functionality before Mr Egan's approach to him.

2859. Further, Mr Loomis' evidence in the US criminal trial was that FileTek would not have paid anywhere close to $9,010,000 if Autonomy had not agreed to license additional StorHouse software for the same amount or more:

> *"Q. ...Now, would you, on behalf of FileTek, have bought the $8.5 million license from Autonomy in March 2010 if Autonomy had not agreed to a barter transaction in which it bought even more StorHouse from FileTek, you know, eventually in the period that was discussed -- would you have bought that license from Autonomy if there had not been the other side of the equation?*
>
> *A. We would have bought the license, but not at that dollar amount. We needed the extra capability. And we would have bought the license if the StorHouse sale was the same exact dollar amount [as FileTek's purchase from Autonomy] also. We didn't need that extra dollar amount to do it, but it was, of course, attractive.*
>
> *...*
>
> *Q. What amount of money do you think you would have been comfortable with if there had been no reciprocal barter transaction? How much are we talking about?*
>
> *A. I don't know. It would be significantly less.*
>
> *Q. How much significantly less?*
>
> *A. Well, it would be less than a million, put it that way, and could be substantially less than that. I don't -- I would have to review all my sales forecasts back in those days."*

2860. That was, of course, less than one-tenth of the price FileTek in fact agreed to pay. For his part, Mr Szukalski sought to quibble about what FileTek would have agreed to pay; but he said he "*absolutely*" agreed that, if Autonomy had not been offering to buy more StorHouse licences, FileTek would not have been prepared to pay anything like $8 or

$9 million for this further IDOL licence. He later confirmed that he had no reason to disagree with Mr Loomis' testimony about what FileTek might have been prepared to pay, as set out above.

*My conclusion in relation to the second set of RT 3 transactions*

2861. In my judgment, the second FileTek purchase and sale transactions comprised in RT 3, like the first, were plainly "reciprocal" or "barter" transactions; they should have been accounted for accordingly. That is so whether or not Autonomy found some use for the StorHouse software and customer demand for the structured data analyses it facilitated.

2862. In particular:

(1) The evidence that Mr Egan's overture to Mr Szukalski was driven by a need to generate recognised revenue was clear; and the suggestion that the impetus really came from a need for greater capacity was very thin and undermined by the fact that even if later demand increased, at the time Autonomy had done little to use up the initial capacity it had purchased under the first agreement.

(2) Mr Szukalski's evidence of a real negotiation was unpersuasive; and the notion of Dr Menell having *"very cleverly"* pulled off an unexpectedly *"big deal"* of *"high value"* was not in the least bit credible. Even Dr Lynch had to accept that the whole negotiation appeared to be, as it was, a charade.

(3) The division of the two transactions across two quarters was artificial, as confirmed by Mr Egan's evidence that Mr Hussain directed that Autonomy's commitment in March 2010 to purchase additional rights to use StorHouse in the following quarter *"should not be in writing"*, which was not challenged.

(4) The purchase price for Autonomy's software was out of all proportion to its real value to Filetek.

*Deloitte's approval was given on a false basis*

2863. As usual, the Defendants sought to rely on the fact that Deloitte approved the accounting treatment of both sides of the second RT 3 transaction, after a review of the purchase transaction to ascertain whether it had any impact on the revenue recognition for the licence deal in the previous quarter. Mr Welham confirmed that essentially the same tests were applied as if both transactions had taken place in the same quarter.

2864. It appears that Deloitte discussed the commercial rationale for the transaction with Mr Gallagher and Dr Menell. There was a further demonstration attended by Mr Johnstone, Mr Welham and Mr Murray and Deloitte were able to test the rationale and make any enquiries they wanted to. Deloitte's conclusion was:

> *"Given the above demonstration (and the input from Ben Johnstone) and the discussion with Pete Menell, there appears to be a clear commercial rationale behind this purchase."*

2865. Deloitte also concluded that the transaction was at fair value. Their memorandum on the "Purchase of additional StorHouse tech from FileTek Q2" (prepared by Mr Murray) dated 18 July 2010 noted that the:

*"extension to make this an unlimited licence would add significant value. Note that Mike Lynch talks about the potential for a £35m licence deal alone that could come out of this purchase…*

*Per Pete Menell we note that management considers this to be a worthwhile purchase and the fact that it was approved by the CEO, CTO and CFO adds weight behind it being an arms length transaction made at fair value."*

2866. It is apparent that Deloitte were unaware that the 'use case' for StorHouse within DigitalSafe was purely theoretical, and that the talk about potential deals was simply that: talk.

2867. It is also clear that Dr Menell provided Deloitte with information designed to justify the licence extension which was misleading. Thus:

(1) Dr Menell told Deloitte that the second StorHouse purchase was necessary because the 1 PB limit for structured data under the existing StorHouse licence "*was reached by Kraft alone*". This was false. In fact, as at the time of the second StorHouse purchase, Autonomy's technical team had not even attempted to use StorHouse for Kraft, still less used up the 1 PB limit. Indeed, it was the unchallenged evidence of Mr Wang that the total volume of data (structured <u>and</u> unstructured) held by Kraft in its Digital Safe as late as September, October, November and December 2010 was considerably <u>less</u> than 1 PB. The position was no different in July 2010, when Deloitte came to review the second StorHouse purchase. Dr Lynch suggested in his cross-examination that Dr Menell had meant that "*Kraft had the legal right to turn on that tap and to do that we had to have capacity of 1 petabyte in order to take whatever they sent us and that had to be up and running there and then*". But, as the Claimants pointed out, this is not what Dr Menell told Deloitte, and it was not suggested to Mr Welham in cross-examination that it was what Deloitte understood. In any event, I accept the Claimants' submission that, even if there were any basis for Dr Lynch's attempt to rationalise what Dr Menell told Deloitte, it fails to meet the point that StorHouse was not in fact being used for Kraft as at the time of the second StorHouse purchase and, indeed, was never used for Kraft.

(2) Dr Menell told Deloitte that the capacity constraint in the first StorHouse licence required Autonomy to monitor the volumes of data being archived and that "*customers had expressed concern over that fact*". This was also misleading: Autonomy had not yet started using StorHouse for any customers. No contemporaneous documentation supports the suggestion that customers had expressed concern over monitoring of their data volumes.

(3) Dr Menell told Deloitte that "*any sale of SPE contains an element of this FileTek software*". This was untrue. As Dr Blanchflower explained, SPE never contained any element of StorHouse software. Dr Menell, as CTO, must have known this.

2868. In the round, I am satisfied, and find, that Deloitte were not aware of the true nature of the transaction. Mr Welham confirmed in his witness statement that he and his team were not aware, in particular, that Autonomy had orally agreed with FileTek at the time

of the sale of Autonomy software in Q1 2010 that in the subsequent quarter (and after the Q1 2010 earnings announcement had been made), Autonomy would make a further purchase of FileTek's StorHouse software product in order to put FileTek in funds to pay the amount due to Autonomy in respect of the Q1 2010 sale. Nor were they aware of the disparity in the values paid on each side of the transaction compared to the price that would, but for the reciprocal transactions, have been a realistically achievable price. Whether more sceptical review might have led to a line of inquiry which would have put the transaction into a more realistic perspective is not in issue in these proceedings.

2869. In my judgment, Deloitte approved the transaction on a false basis, and so did the Audit Committee.

*The FRRP were also misled*

2870. As discussed in the course of my assessment more generally of Mr Hogenson's concerns and the questions which followed from the FRRP (see paragraph *2232ff* above) Mr Hogenson had questioned the purchases from FileTek, on the basis that they appeared to be barter transactions where the economic benefit on both sides of the transaction appeared to be materially overstated, and the FRRP in due course also queried the transactions.

2871. The responses provided by Autonomy in a letter to the FRRP dated 3 March 2011 included misleading statements about the transactions now under consideration:

(1) Autonomy presented the purchase/sales in the two sets of transactions as unconnected, which plainly they were not.

(2) Autonomy told the FRRP that *"FileTek was selected by Autonomy following receipt of multiple quotations as part of Autonomy's due diligence process"*: but quotations from competing suppliers were sought and obtained only after the purchase of the first StorHouse licence.

(3) The letter went on to claim that "*FileTek products are incorporated into Autonomy software, for which sales have been strong*". This was not correct: as already explained, StorHouse was not incorporated into any Autonomy software. Sales of Autonomy software incorporating StorHouse were not "*strong*"; they were non-existent.

2872. Autonomy's perceived need to mislead has further confirmed me in my conclusion that the transactions were not properly accounted for.

*Defendants' knowledge*

2873. I am satisfied that both Defendants knew and conceived the real driving purpose of the transactions comprising RT 3 to be the generation of recognised revenue by funding FileTek to make a purchase of Autonomy software that otherwise it would not have made, and that their accounting treatment was not proper having regard to their true nature as reciprocal transactions.

*Mr Hussain*

2874. Furthermore, Mr Egan's evidence in his witness statement was that it was Mr Hussain who:

(1) authorised both sets of *quid pro quo* transactions.

(2) devised the idea adopted in the second set of FileTek transactions of the purchase from Autonomy and the sale by FileTek being artificially split to take place in sequential quarters and directed Mr Egan that the sales and purchases should never be linked in any paperwork;

(3) encouraged Dr Menell and the technical departments to come up with bogus technical reasons to justify them; and

(4) acquiesced in, and may have sanctioned, the provision by Dr Menell of false information to Deloitte; and contributed to the drafting of the misleading memoranda to Deloitte.

2875.  I accept that evidence: Mr Hussain had guilty knowledge of the true nature of the RT 3 transactions and that they were improperly accounted for accordingly.

*Dr Lynch*

2876.  Dr Lynch had such 'guilty knowledge' also. I consider and find that:

(1) It is unlikely that Dr Lynch was asked to approve the transactions without an explanation of their true nature. That was not how Mr Hussain and the cabal operated.

(2) That is further supported by the fact that in an email dated 29 December 2009 Mr Hussain undoubtedly did raise collectability as an issue in the context of the first RT 3 transaction, and (as the Claimants submitted) it is inherently likely that Mr Hussain would have explained to Dr Lynch how the issue was resolved through the StorHouse purchase as a means of funding FileTek.

(3) The technical evaluation was an exercise in trying to find *ex post facto* justification for the purchase and some use case. Especially given that it involved the acquisition of third party software, contrary to Dr Lynch's preference and policy, for Autonomy to develop its own solutions, it is inherently unlikely that Dr Menell, Mr Hussain and the cabal would have kept back from Dr Lynch the bogus nature of the exercise.

(4) Dr Lynch was personally involved in adding *"positioning"* to the memorandum for Deloitte and also to the letter to the FRRP which was misleading, as he must have known.

(5) Dr Lynch's depiction of the StorHouse transactions being part of a broader strategy to acquire Informatica (putting *"tanks on Informatica's lawn")* lacked any supporting documentation and any real credibility, and the creation of a false story is further evidence of his knowledge of the truth.

*Overall conclusion in respect of RT 3*

2877.  In my judgment, both sets of transactions comprising RT 3 are plainly illustrative and confirmatory of Autonomy's use of reciprocal transactions as a further means of making

good shortfalls in quarterly revenue; and both Defendants knew that, and that the objective required false accounting. The linked sales and purchases were not independent, arm's length transactions, and it was not possible to understand the substance and commercial effect of one agreement without regard to the other: they should have been considered together in order to determine their substance and appropriate accounting treatment. I agree with the Claimants that Autonomy should not, therefore, have recorded revenue from the FileTek sales, but instead should have recorded the net cost, totalling $4,395,494, as an expense.

### RT 4: Vidient Systems Inc (Q4 2009/Q3 2010)

2878. The Claimants impugned as "reciprocal" and improperly accounted for two transactions with Vidient Systems Inc ("Vidient"). Each involved a purchase by Autonomy from Vidient of a product for which it was alleged Autonomy had no need in order to fund a purchase by Vidient of Autonomy software which enabled Autonomy purportedly to recognise revenue from its sale.

2879. Autonomy's <u>purchases from Vidient</u> were:

    (1) A purchase in Q1 2010 of a 3-year software licence for video analytics software manufactured by Vidient and called *"SmartCatch"* for $3 million plus $150k in respect of support and maintenance for one year.

    (2) A purchase in Q4 2010 of further rights under a distribution and system integration agreement in respect of SmartCatch software for a total consideration of $2.31 million.

2880. Autonomy's <u>sales to Vidient</u> were of:

    (1) A licence to certain Autonomy software for use as an embedded component of SmartCatch under an OEM agreement in Q4 2009 for which the consideration was $2.5 million plus $125,000 for one year of second-line support. Payment was due 15 days after payment was due from Autonomy under its agreement to purchase a licence for SmartCatch.

    (2) An extension in Q3 2010 of the term of the Autonomy OEM agreement of Q4 2009 by one year, and the licensing of additional software and IDOL functionalities for a fee of $2 million, plus $100,000 for one year of second-line support.

2884. I address each in turn. However, I do not think it necessary to do so in the same detail as my discussion of the VMS transactions, since it seems to me that the pattern is similar, and the use of 'reciprocals' as another lever to generate revenue when needed to cover shortfalls on forecast revenue was already established both by the VMS transactions and by the FileTek transactions. Instead, I highlight the points emerging which seem to me to be of greatest significance in confirming that the Vidient transactions fell into the same pattern.

*The first Vidient transaction Q4 2009/Q1 2010*

2885. Autonomy's first transaction with Vidient was pursued by Autonomy at the same time as the FileTek transaction. The sale side (the sale by Autonomy of a licence to embed Autonomy software under an OEM agreement) was entered into at the end of Q4 2009, the purchase side (the purchase by Autonomy of the SmartCatch licence) was entered into in Q1 2010.

2886. SmartCatch was Vidient's only substantial product. Put in simple terms, SmartCatch monitored video feeds from closed circuit television systems ("CCTV") and identified suspicious activity, such as a person loitering in a particular area or walking the wrong way at an airport. SmartCatch was predominantly marketed and sold to transportation entities in the US, such as railways, airports and metros.

2887. Vidient was a heavily loss-making business. During the first nine months of 2009, it incurred a loss of $2.7 million. Vidient's total revenues in the same period were just $456,902, of which $228,569 was from sales of SmartCatch. As at 30 September 2009, it had cash and cash equivalents of just over $3 million. Mr Frank Pao ("Pao"), who had worked at Autonomy for four years before then (including as COO) was Vidient's fourth CEO in a 12-month period, described 2009 as a "*horrible*" year and acknowledged that the numbers for the first three quarters were "*ridiculously low*". Vidient's status as a struggling restart is worth underlining, if only to set in context the statements by Dr Lynch and Mr Frank Pao (who gave evidence on behalf of Dr Lynch) regarding the supposed success of, and market demand for, SmartCatch, and to put into context the scale of the transactions, from Vidient's perspective, that Vidient entered into with Autonomy.

2888. Mr Pao agreed when cross-examined that prior to his discussions with Mr Egan, he had no firm intention to purchase Autonomy software in Q4 2009. In view of Vidient's financial position and the rapid rate of spend, he had no money to license Autonomy software on a large scale.

2889. Although Mr Pao kept in touch with a number of his colleagues after leaving Autonomy, he most commonly contacted Mr Kanter, with whom he had worked closely at Autonomy. Mr Pao therefore had no reason to approach Mr Egan at the end of Q4 2009. Mr Egan, however, was looking for ways to generate more immediately recognisable revenue for Autonomy in Q4 2009. This is plain from the first FileTek reciprocal transaction which Mr Egan was pursuing at the same time. It was thus Mr Egan who approached Mr Pao.

2890. Mr Pao undoubtedly welcomed the opportunity to sell a licence to Autonomy for Autonomy to embed SmartCatch in its own products for sale, and for Vidient to embed Autonomy in its products likewise. On the Vidient sale side, the upside was obvious and substantial from Vidient's point of view. First, the sale price was full, and profitable for Vidient as a major sale on its own. The price being paid by Autonomy was more than 13 times the total licensing revenue that Vidient had received from sales of SmartCatch in 2009 to that point, and it was the largest transaction in Vidient's history. Secondly, Vidient's own sales had been badly affected by the 2008/2009 market crash: and it had little market penetration, having for example only two salespeople in the USA. Partnership through an OEM agreement with a large company with a successful product and a large customer base was plainly an enticing prospect to Vidient. As Mr Pao put it:

> *"This is for a partner to embed our software within their product and then to sell that product out to hopefully hundreds of customers because Autonomy had a tonne of customers."*

Mr Pao told me in cross-examination that he was expecting to make *"maybe $30 million out of this deal"* by way of royalty payments on Autonomy's sales.

2891. Furthermore, the sale by Vidient was to be coupled with a purchase by it of Autonomy software for Vidient to 'OEM' it (embed it in its own product) which was to be funded by the purchase price payable by Autonomy. The net effect of both transactions together would leave Vidient with a profit or 'delta' of some $525,000. The purchase by Vidient was in effect to be funded by the sale to Autonomy. Although Mr Pao equivocated (to the point of confused bluster) when asked whether Vidient could have afforded to make the purchase out of its own resources, and settled on the formulation that he *"would have found ways to still buy the software but at a much cheaper price that's in line with my cash reserves and what I'm expecting to get in Q4"*, this was either mere puff or (which seems to me more likely) demonstrative that the price to be paid to Autonomy was considerably higher than what Mr Pao would ordinarily have been expected to pay for it. It was plain that with cash reserves of $3.1 million which were being eroded by difficult trading conditions a purchase of anything like the magnitude discussed was otherwise out of the question. Mr Pao was more candid in accepting that he:

> *"fully expected to be paid by Autonomy on one transaction first and then I would pay them this amount."*

2892. Furthermore, after further circumlocution, Mr Pao eventually had to admit in cross-examination that in fact Vidient never did 'OEM' Autonomy software into SmartCatch. He told me that he:

> *"ended up having deals that did not necessarily require Autonomy technology, so there was no need for me to dedicate engineering resources to do that over dedicating engineering resources to sell my own product which had much higher margins."*

2893. This too was difficult to accept given Vidient's lamentable trading history[324] and the opportunities Mr Pao had earlier told me about; but I think it reveals the truth: that from Vidient's point of view the real benefit of the deal, in addition to the benefit of association with Autonomy in general terms, was the cash 'delta'.

2894. Looking then at the matter from the point of view of Autonomy, Autonomy's management cannot realistically have expected much from the sale of Autonomy software to Vidient, except, of course, the revenue it generated, which could be and was booked in its quarterly accounts. The prospect of large OEM sales through Vidient was small. What then of Autonomy's purchase of SmartCatch?

2895. The Defendants maintained that Autonomy wished to partner with Vidient because SmartCatch had (to quote Mr Hussain's written closing submissions) *"a good*

---

[324] Though in fairness I should note that Mr Pao told me that it improved considerably in 2010 and thereafter

*reputation and market penetration in the critical US markets"*[325] whereas Autonomy's own similar product in the video analytics segment of the market, Virage, *"had failed to penetrate US markets, and its products had been poorly received".* They also cited positive industry press support to the effect that the deal made sense since (in the words of one commentator) *"while there's no doubt, Autonomy is a global leader in the broader search market, their approach never translated to meaningful success in the video surveillance market"* whereas *"Vidient can provide them a solid solution".* The Defendants' case was thus that SmartCatch was a superior product to Virage, recognised to be so in the market, and Vidient had thereby achieved success in the US market despite its small size which would be of considerable benefit to Autonomy if in an OEM partnership with it.

2896. The Claimants disputed this, and emphasised especially that:

(1) As in respect of VMS, Autonomy undertook no analysis of SmartCatch, technical or otherwise, prior to 30 December 2009, the point when the deal was agreed.

(2) Dr Blanchflower and Mr Gallagher (then Autonomy's Head of Development) were asked by Dr Menell to analyse the SmartCatch software on 30 December 2009 only after the deal had been struck, and their analysis was constricted by the fact that Autonomy did not have a licence to test SmartCatch and they simply had to review Vidient's website. That of itself is noteworthy: as Mr David Humphrey ("Mr Humphrey", who was Chief Technology Officer ("CTO") of Micro Focus International plc at the time of his witness statement, but at the time CTO of Virage, Inc ("Virage", the Autonomy group company that developed and sold Autonomy's video analytics products) stated in his witness statement on behalf of the Claimants:

> *"...it does not make any sense to me to purchase a licence to a third party product based only on the information available on the company's website".*

(3) Dr Blanchflower provided his thoughts and comments to Mr Gallagher, who then wrote an email to Dr Menell the same day. Mr Gallagher's email noted that Vidient's website was "*very low on technical detail, so no detail at all on how they do it*" and that Vidient seemed to have "*one product called SmartCatch which has 2 main applications: Security and Surveillance or (Video Intrusion Detection) as they call it [and] Business Intelligence*".

(4) With regard to Video Intrusion Detection, Mr Gallagher told Dr Menell that there was "*Lots of overlap with existing Virage products lines here*",[326] but that SmartCatch had two additional features which "*Virage has never claimed much in that they do*", namely, "*…Remote control of surveillance cameras – auto control and zoom – automatic following of suspect*". Mr Gallagher's email is

---

[325] In particular, Vidient had won a $500,000 contract from the US Department of Homeland Security for San Francisco Airport and had a number of high profile users in the transport sector, including Montreal Metro.
[326] Virage was an Autonomy group company that, amongst other things, developed and sold Autonomy's video analytics products.

the only written record of any analysis of SmartCatch by Autonomy in, or prior to, December 2009.

(5) Dr Blanchflower confirmed in cross-examination that the exercise with which he and Mr Gallagher were tasked: (i) did not involve any assessment of the relative performance of SmartCatch and Autonomy's existing offerings, because that would have required access to the SmartCatch software, which they did not have, (ii) did not involve any consideration of the respective market penetration of the products, (iii) did not involve any consideration of which product was better perceived in the market, and (iv) did not involve any assessment of the value to Autonomy of purchasing a product with better market penetration and/or perception.

2897. There remained considerable disagreement as to the relative advantages of the two systems. However, I do not think it necessary to say more than that it seemed to me that the balance of the evidence, which was limited as to its substantive content as distinct from the disagreement it encouraged, was that SmartCatch probably was a superior and more complete system, and it had a more positive reputation in the relevant market segment and some track record of exploiting it, though Vidient itself was struggling to convert this into durable success.

2898. But such an exercise in comparing the two products, to my mind, misses the point. What did not come out of the evidence, in my judgment, was that this perception was the real reason that Autonomy entered into the twin arrangements. Neither the results of the limited *ex post facto* assessment undertaken, nor the way Autonomy approached the decision whether or not to enter into the arrangements, suggests that the advantages of the product were the reason for Autonomy's purchase.

2899. Moreover, not only did Vidient not deploy the Autonomy software it had licensed (see above) but there is no evidence that Autonomy made any effort to pursue a 'strategic partnership' with Vidient after it executed the OEM agreements, or that it integrated SmartCatch into its Command and Control application (a security infrastructure platform which assisted with the retrieval of relevant intelligence in real time), despite paying $3.15 million for the right to do so.

2900. Mr Pao confirmed in cross-examination that he could not recollect ever being told of any sales by Autonomy of Vidient's software; and that he never received any royalties from sales, still less the $30 million he had hoped for.

2901. Indeed, Mr Humphrey and his security and surveillance division did not even download SmartCatch until some 18 months after the Vidient OEM agreement was executed and then only because Dr Menell asked Mr Humphrey to take a look at the software. This evidence was not challenged. Rather, it was put to Mr Humphrey that he was not open to the supposed commercial opportunity presented by the partnership with Vidient and took no steps to develop it. As Mr Humphrey pointed out in his oral evidence, he "*had no clue what was going on [with Vidient] other than what was in the press release, which didn't make sense*" to him. Mr Humphrey's evidence was consistent with his reaction at the time. The Claimants relied on the following in particular:

(1) The Vidient press release referred to by Mr Humprey announced a 'strategic partnership' between Autonomy and Vidient and was issued in January 2010. The day after it was issued, Marc Geall (then Head of Corporate Strategy and Investor Relations at Autonomy) asked Mr Humphrey "…*what is the story with the vidient announcement?*". Mr Humphrey responded: "*Thought you could tell me!*". Mr Humphrey was clearly confused by the announcement and, as he made clear in cross-examination, "*didn't know what was going on at this point*". As Mr Humphrey explained in his first witness statement, he only became aware of the OEM agreements after they had been entered into.

(2) On 2 February 2010, Mr Humphrey emailed Mr Egan, copying Mr Murray (the CEO of Virage), asking Mr Egan to:

> "*...explain...our positioning with regards to Vidient and that press release last week? I fully understand them wanting IDOL, having spoken a few times to Frank [Pao] about this at shows…What I do not understand is the statement referring to redistributing their product. They have a very similar product set to Virage S&S so there is a direct conflict of interest. Also even if there are potential areas of collaboration, policy has always been to remove third party product. We have therefore placed confusion in the market with regards to our product capabilities and also generated conflict against our statement that we own all our own technology?*"

(3) A few days later, on 4 February 2010, Mr Humphrey emailed Mr Egan and Ms Eagan, again copying Mr Murray, setting out the quote attributed to Mr Egan in the press release and adding:

> "*Another colleague has sent links to their website ask [sic] what is going on. As I said below the following quote really makes it difficult, what should I be saying?*".

(4) Having received no reply from Mr Egan or Ms Eagan, Mr Humphrey asked Mr Murray to "*try and chase this*". Mr Murray said "*Absolutely – nothing from either party suggest [they are] not proud of this deal*".

(5) Mr Humphrey never received a response from Mr Egan or Ms Eagan. The inference suggested is that there was no coherent story to tell.

2902. Put shortly, in all the circumstances, I have concluded and find that the real reason for Autonomy's purchase of SmartCatch was to incentivise and fund Vidient's purchase of Autonomy software and enable Autonomy to recognise the revenue thus (apparently) generated.

2903. This conclusion is fortified by the fact that no coherent explanation was ever provided to me for why Autonomy suddenly needed to acquire OEM rights to SmartCatch in the dying days and hours of Q4 2009. The best that Dr Lynch could offer, apart from emphasising that he did not really know the reason since he was not involved in the negotiation at the time, was to suggest that the hypothesis that it was all done in a rush to ensure recognition of revenue was fundamentally flawed because if that had been the aim it would have been far more straightforward to sell to a VAR. A discount would be

necessary, but (on his view of IFRS) the sale to the VAR would trigger the revenue recognition and

> *"that would be perfectly fine. And then you would have that revenue, they would then sell the stock later, you'd have taken a discount hit to get them to do it, but there would be nothing improper about that. You don't need to go to these elaborate levels of buying things unless you actually want the thing."*

In my judgment, however, that does not reveal a flaw, but simply another lever; and as I have found in the context of the impugned VAR transactions a flawed lever likewise.

*Separation of the OEM agreements by quarter*

2904.   The focus on the requirement to generate recognised revenue within Q4 2009 to meet Autonomy's revenue target was the context of, and I have concluded the reason for, a particular feature of the first Vidient transaction. This feature is that, although both agreements were negotiated and then signed together on the evening of 31 December 2009, and were in similar terms, it was agreed between the parties to treat the sale by Autonomy (from which revenue was needed in Q4 2009) as completed on that day, but the effective date of Vidient's sale of a licence was (on 31 December 2009) moved into the next quarter (Q1 2010).

2905.   After Mr Hussain had asked him, by email dated 30 December 2009, to spend time with him on the paperwork, the next day (31 December 2009) Mr Chamberlain emailed Mr Mooney, Mr Guiao, Mr Scott, Mr Egan, Mr Kanter, Dr Menell and Mr Hussain expressing his concerns about the agreements that were to be signed later that day with Vidient:

> *"…General – don't like the fact that we have prepared both of these. They are two separate transactions and they should look and feel like that. Need to work with Frank [Pao] to get the license of their software on their paper. Also, the licensed software needs to reflect the quote we have received (attached)."*

2906.   Mr Scott replied at 6.46am PT time (2.46pm UTC time):

> *"We've already received comments back on both docs (attached). We can look to move to a different [sic] for Vidient's license to Autonomy but my concern is that this will extend the process with limited time left. Is it truly necessary?*
>
> *Separately they have asked us to commit to issuance of a press release issued through "standard" channels and would like the draft attached to both contracts. I received from MDM [Mr Mooney] a copy of UK-approved press release yesterday. OK to agree to commitment below with UK-approved press release attached?"*

2907.   The second sentence of Mr Scott's email appears to have been missing a word. It is likely that it was intended to read "*We can look to move to a different [quarter] for Vidient's license to Autonomy*" or similar because: (i) that is, in fact, what happened, (ii)

that would be consistent with Mr Chamberlain's prior email referencing a need for the transactions to appear to be separate, and (iii) that would make sense in the context of Mr Scott's own email, in which he expressed concern about the shortness of time before the end of the quarter.

2908. Mr Chamberlain then responded at 4.38pm UTC time, saying:

> "...*Priority 1 – make deal recognizable [i.e. for revenue purposes] ...Priority 2 – get deal in.... To help one [i.e. Priority 1] the more different these look the better. Just spoke to Livius [Guiao] on this point*".

2909. At 11.46am PT (7.46pm UTC time), Mr Pao sent Mr Guiao an email, copied to Mr Scott, attaching a revised draft of the Vidient OEM agreement. Mr Pao's covering email said:

> "*Here are David's changes, plus two that I discussed separately with you [Mr Guiao] and Joel [Scott] today, specifically for the agreement where we sell to you: (a) the date changed to 1/1/10; and (b) change internal fee waiver to inclusion as part of second-line support fee...*"

2910. From this email, it is clear that Mr Pao spoke with Mr Guiao and Mr Scott that day and agreed to change the effective date of the Vidient OEM agreement to Autonomy from 28 December 2009 to 1 January 2010 and to make a change in relation to the second-line support fee.

2911. When cross-examined on the point, Mr Pao said he could not recall who had proposed the change to the effective date, and whether it was his suggestion or whether it had been suggested by Mr Scott and Mr Guiao. He said that it was possible, *"maybe even likely"* that the change came from him, because the other change "*almost certainly*" came from his accountant, Katerina Jeanneau. Mr Pao suggested that he might have wanted to roll the deal into 2010 because 2009 had been *"a horrible year for the company"* and, as he was *"not going to hit my number so I don't want to waste any revenue that I can recognise...I would rather take it in 2010 and make 2010 look fantastic"*. But he acknowledged that this was *"kind of my guess at what happened here"*. In re-examination, when he was again asked about the point, he told me that *"...Again I don't have a specific recollection but that's probably the case, that I would have asked for it"*. I was not persuaded that Mr Pao could remember the sequence, and his evidence smacked to me of him looking back and recreating what would, as he thought, be the canny thing to have done. Given the sequence I have described, I think it unlikely that the idea came from Vidient, even though I would accept that his rationalisation may explain why he was prepared to go along with it. Mr Pao struck me as commercially obliging even when he might have been unsure of the reasons for what he was being asked to do.

2912. For his part, Dr Lynch (who was not copied on Mr Chamberlain's email of 31 December 2009 which I consider was the catalyst of the change) attempted to explain the change as being down to Autonomy wanting to maximise its various financial metrics for that quarter. He disagreed with the suggestion that the OEM agreements were put into different quarters by Autonomy in an attempt to make them look like separate transactions, thereby facilitating revenue recognition on the Autonomy OEM agreement. He suggested that:

> *"...in terms of the reality of the situation, one day is not going to make any difference in terms of what the process was. So I suspect it's to do with that we wanted the cost of this to come into this quarter rather than the previous quarter."*

2913. But that ignores the context, and in particular the fact that Mr Chamberlain had in effect spelt out why the change was necessary. I accept the Claimants' submission that I should find (as I do) that the sequence and substance of the exchanges was as follows:

> (1) Mr Chamberlain expressed concern that the agreements should look like separate transactions.

> (2) Mr Scott suggested that they could move the Vidient OEM agreement to a different quarter but was worried that this might delay the process.

> (3) Mr Chamberlain advised that making the transactions look more different would help make revenue from the deal recognisable, and spoke with Mr Guiao about this point.

> (4) Mr Scott and Mr Guiao then spoke with Mr Pao and suggested changing the effective date of the Vidient OEM agreement to 1 January 2010.

> (5) Mr Pao obliged and circulated a revised draft of the Vidient OEM agreement which changed the effective date of the agreement to 1 January 2010 and showed the other changes that they had discussed on their call.

*Deloitte's consideration of the first Vidient transaction*

2914. There was another important facet or consequence of the artificial separation of the two sides of the first Vidient transaction. This is that, despite Dr Lynch's suggestion that it would in reality make no difference (see above), Mr Welham's unchallenged evidence was that, because the Vidient OEM agreement was in a subsequent quarter, it was <u>not</u> considered as part of Deloitte's analysis of Autonomy's sale of its licence to Vidient. Deloitte therefore reviewed Autonomy's accounting treatment of the Autonomy (sale) OEM agreement without regard to the Vidient (sale) OEM agreement. They did not review the Vidient OEM Agreement until April 2010, as part of their Q1 2010 review.

2915. The Claimants described the Vidient OEM agreement as having been withheld from Deloitte and submitted that this cannot have been inadvertent. In support of this the Claimants submitted that it is inconceivable that it would have escaped Autonomy's finance department, and Mr Hussain and Mr Chamberlain in particular, to bring to Deloitte's attention an agreement that was executed by the same party on the same day. They also relied on the fact that when Deloitte reviewed the Autonomy OEM agreement in January 2010, they immediately identified an issue with Vidient's financial condition, causing Mr Murray of Deloitte to email Mr Chamberlain on 12 January 2010 to say that Deloitte needed evidence to support recoverability in the context of various revenue deals. Amongst the list of revenue deals was the transaction with Vidient, in relation to which Mr Murray noted:

> *"...although we have been provided with a balance sheet – they are a loss-making company, albeit with $3m of cash at 30 September 2009, with a net asset position that is only supported by that cash balance. Based on their cash burn I am not sure they would have enough to pay this deal as at 31/12/09. Certainly not without using all cash reserves, which I would expect they would be reluctant to do. Unless they obtain further funding I cannot see how they can pay within the 45 days. Can you please provide the rationale for the recoverability of this deal."*

2916. Mr Pao agreed that Deloitte's summary was fair. As noted previously, he also agreed that the answer to Deloitte's question regarding how Vidient was going to pay within the 45 days was that Vidient was going to use the funds it received from Autonomy under the Vidient OEM agreement and from any other sales it made (although he did not identify any such 'other sales'). Yet even then Autonomy said nothing, and the Autonomy OEM agreement was included in Deloitte's schedule of proposed misstatements, pending evidence that the revenue from Vidient was recoverable.

2917. Mr Welham informed Mr Chamberlain that Deloitte would "*need some cash on Vidient given heavily loss making business which we have evidence is burning cash quickly in order to remove this from misstatements schedule*". By 26 January 2010, someone from Autonomy had spoken with Mr Pao about making an early payment in respect of the Autonomy software. Mr Pao could not recall with whom he spoke, but he accepted that he agreed to make an early payment as a favour to Autonomy so as to strengthen the business relationship. Mr Chamberlain relayed the message to the Deloitte team, telling them that Vidient would pay "*all or a large proportion over the next day or so,*" without mentioning that Autonomy was to pay Vidient a far larger sum within days.

2918. The Claimants contended that had Autonomy considered that the OEM agreements were genuine arms' length transactions, the finance department would surely have disclosed the Vidient OEM agreement as an answer to Deloitte's concerns about collectability, and ensured that the transaction was removed from what was called *"the misstatement list"*. Dr Lynch could provide no answer, stressing that he thought it unlikely that he knew of the misstatement list, still less Vidient's appearance on it. Mr Hussain, Mr Kanter, Mr Chamberlain and/or Dr Menell might have dispelled the suggestion: but not one of them gave evidence before me.

2919. Mr Rabinowitz submitted in his oral reply the obvious inference is that Autonomy withheld the information deliberately. With some hesitation, since disclosure was inevitable sooner or later (and was indeed made for the Q1 2010 review, as has been mentioned) I have concluded that that is the only explanation. The alternative that there was a complete failure within the finance department to grapple with Deloitte's enquiry seems to me to be too unlikely.

2920. Thus, I agree with the Claimants that, far from providing comfort and endorsement from the Defendants' point of view, the evidence relating to Deloitte's consideration of the first Vidient transaction further supports the Claimants' case.

*Conclusions on first Vidient transaction*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

2921. In my judgment, the first Vidient transaction reinforces, and indeed highlights, the
pattern of the reciprocal transactions by now set, with the refinement of splitting the two
agreements over two quarters. In particular:

(1) The sale and purchase were reciprocal transactions for which the principal
driver was revenue recognition to cover a shortfall in revenue compared to
forecast.

(2) They were orchestrated by Autonomy, and in particular by Mr Hussain and Mr
Egan.

(3) No assessment of SmartCatch was made before Autonomy agreed to purchase
rights under the Vidient OEM Agreement. The only assessment made was after
the event and was equivocal. In reality, Autonomy had no pressing need to
acquire SmartCatch on the last day of Q4 2009.

(4) There was no evidence that Autonomy ever did integrate SmartCatch into its
Command and Control application, despite paying $3.15 million for the right to
do so. The Defendants disparaged the evidence of Mr Humphrey that he would
have expected to have been aware of any sales of the SmartCatch software and
was not so. They stated that *"this was an exaggeration of his role"* and (as he
acknowledged) *"although he was part of the Virage business in Cambridge,
there were other parts of the business in the US in which he was not involved."*
But it seems to me more likely than not that had there been sales, he would, at
(in effect) headquarters have come to hear at least something about it; and he
did not.[327]

(5) Nor was there any evidence that Vidient ever deployed the Autonomy software
it licensed under the Autonomy OEM agreement. The reality was that what was
in the transaction for Vidient was the $525,000 'delta', and what was in it for
Autonomy on its sale was revenue recognition.

(6) The separation of the two agreements constituting the first Vidient transaction
was at the suggestion of Autonomy, and its purpose was to give the appearance
of separate transactions to protect revenue recognition and Deloitte's approval.

(7) The decision not to tell Deloitte about the Vidient OEM agreement during
Deloitte's review of Q4 2009 was in order to safeguard revenue recognition,
even at the cost of the transaction appearing on the *"misstatements list"*. The
evidence relating to the involvement of Deloitte in this regard further
undermines the Defendants' case.

2922. The accounting treatment of the first Vidient transaction was improper. As in the case
of the first and second VMS transactions, it follows, in my judgment, that Autonomy
should not have recorded revenue on the sales to Vidient. Autonomy should instead

---

[327] Mr Humphrey was obviously proud of Virage's own product, and his evidence was that SmartCatch offered
no more and was no better than Virage's existing product, though in cross-examination Dr Lynch branded the
latter *"useless"*. Dr Blanchflower agreed that SmartCatch was better. I have taken into account Mr Humphrey's
antagonism to the purchase and to being undermined but nevertheless regard his evidence as reliable
confirmation, in the absence of contrary evidence, that in the event no sales were effected.

have: recorded the net cost in relation to the first Vidient sale and purchase, totalling $525,000, as an expense in Q1 2010.

2923. I deal with the issue as to the Defendants' knowledge of both Vidient transactions after briefly addressing the second Vidient transaction.

*The second Vidient transaction – Q3 2010/Q4 2010*

2924. The second Vidient transaction took place in Q3 2010/Q4 2010 and was, similarly to the first, comprised of:

(1) a sale by Autonomy to Vidient of additional Autonomy software and IDOL functionalities, and also a one-year extension of the term of the existing Autonomy OEM agreement, for which the licence fee was $2 million plus $100,000 for one year of second-line support; and

(2) the purchase by Autonomy from Vidient of further rights in respect of SmartCatch under a software distributor agreement, for which Autonomy agreed to pay a non-refundable prepayment of $2.31 million.

2925. Thus, again much as in the first Vidient transaction, Vidient was to be paid by Autonomy more than it was to pay Autonomy, the 'delta' this time being $210,000; and, again as in the first Vidient transaction, Autonomy's payment to Vidient was due before Vidient's payment to Autonomy was due.

2926. I need not spend as long on this second Vidient agreement. Suffice it to say that I am satisfied that:

(1) The sale by Autonomy was driven by Autonomy's imperative to generate further revenue for Q3 2010 to meet targets. On the last day of the quarter, Mr Hussain directed Mr Egan and Mr Mooney to:

"*...pull out all the stops on vidient and the other 2 deals we talked about. If you can hit $5m it would be great but $4m is fine*".

(2) Mr Pao was not planning to purchase further software from Autonomy until he was approached by Mr Mooney of Autonomy close to the end of Q3 2010, and as far as Mr Pao could recall, no one from Autonomy had contacted him about purchasing further rights to SmartCatch.

(3) As of mid-2010, Vidient was still a loss-making business and its cash reserves had dwindled to a little over $1 million. Mr Pao explained in re-examination that he knew he would eventually run out of money and had to try to line up potential buyers of Vidient.

(4) The fees of $2.1 million payable under the OEM amendment were twice Vidient's available cash as at June 2010. Mr Pao admitted in cross-examination that he "*really needed their [Autonomy's] money to be able to finance this*" and that he would not have entered into the amendment if he did not know that Autonomy was going to purchase further rights to SmartCatch. It goes beyond that, in my view, because such an agreement would not have been proportionate or realistic otherwise, as well as it being inconceivable that Mr Pao would have

entered into an agreement to pay more than twice Vidient's available cash reserves without a sufficient assurance – whether (in Mr Pao's words) in the nature of "*a handshake and a discussion with Mike (Mooney)*" or otherwise – that Autonomy was going to put it in funds in time to pay the instalments. Mr Pao repeatedly asserted that Autonomy did not know he was dependent on Autonomy purchasing further rights to SmartCatch to enter into the OEM amendment. I do not accept this. It is plain that the reason Mr Mooney and Mr Pao did not agree equal payment terms, as recorded in the exchanges of 30 September 2010, was to ensure that Vidient was paid first.

(5) The two sales agreements were reciprocal. As in the case of the first Vidient agreement, the coupled agreements were deliberately put into different quarters by Autonomy to give the appearance that they were independent, arm's length transactions in order to assist with revenue recognition.

(6) Save for Autonomy's desire to generate further revenue in Q3 2010, neither party therefore had any apparent reason to enter into a further deal.

(7) The second Vidient transaction was improperly accounted for. Deloitte's approval was on a false basis and in ignorance of the true reciprocal nature of the agreements and Vidient's inability to fund its purchase without the sale proceeds from Autonomy.

*Accounting treatment of the Vidient transactions*

2927.  I agree with the Claimants that:

(1) The linked sale and purchase transactions ought to have been considered together in order to determine their substance and appropriate accounting treatment.

(2) From the matters set out above, it is clear that, in each case, the linked sale and purchase were not independent, arm's length transactions, and it was not possible to understand the substance and commercial effect of one agreement without regard to the other.

(3) Further, IAS 18 §14(d) was not satisfied because no economic benefits flowed to Autonomy.

2928.  It follows that Autonomy should not have recognised any revenue on its sales to Vidient and should instead have recorded the net cost in relation to the second Vidient sale and purchase, a total of $237,909, as an expense in Q4 2010.

*The Defendants' knowledge of improper accounting of the Vidient transactions*

2929.  In the circumstances described above, I am satisfied that Mr Hussain had "guilty knowledge" in respect of both Vidient transactions. The position in respect of Dr Lynch requires more analysis.  Dr Lynch maintained that his involvement in both Vidient transactions was peripheral, and that he was not involved in negotiating or accounting for the purchase or sales. He drew particular support from an email dated 22 October

2010 which he sent to Mr Ganesh Vaidyanathan of Autonomy in response to a request for his approval of payments to Vidient, in which he had stated:

> *"I know nothing about this and so can't comment let me find out from the relevant people. I'm sure it's fine I have just been out of the loop."*

2930.    He was adamant, however, that there was nothing wrong with the transactions. His evidence in his witness statement was:

> *"To my knowledge, the purchase made good commercial sense.*
>
> *...*
>
> *At the time, I would have expected Deloitte to review the purchases and sales as part of their quarterly audit review, and to agree an appropriate accounting treatment with the Finance Department. I had no reason to suspect that there were any material issues with the accounting. I now know that Deloitte were satisfied with the accounting treatment for both purchases and sales."*

2931.    Further, Mr Hill submitted in his oral closing submissions on behalf of Dr Lynch that the Claimants had not challenged Dr Lynch's evidence that this was his understanding at the time and had instead focused on what the relevance to the decision making process of his commercial understanding can have been if he had not been involved at all in that process. This point was developed into the submission on his behalf that having cross-examined Dr Lynch on the premise that since he had not been involved his commercial view was irrelevant, they could not now turn back and rest their case on an allegation that in fact he was involved. It was submitted for him that it was *"impossible to understand"* how in such circumstances a fraud case could be pursued against him in respect of these transactions.

2932.    This was bold but, in my judgment, not accurate. Although sometimes perhaps too apt to ask Dr Lynch about his views on emails to which he was not party, Mr Rabinowitz did cross-examine Dr Lynch on his involvement, and the fact that he also asked questions on the alternative hypothesis that he was not involved does not detract from that.

2933.    Amongst the points that emerged from that cross-examination were that:

> (1)    The email of 22 October 2010 referred to in paragraph 2929 above can only have referred to the second Vidient transaction, and not the first.
>
> (2)    Dr Lynch accepted that he may have been aware from one of Mr Hussain's *"prospect lists"* that Autonomy was looking to recognise revenue from a sale to Vidient at the end of Q4 2009, and probably also from an email and schedule sent to him by Mr Hussain on 29 December 2009 stating *"Frank Pao's [company] said yes $1.5m".*
>
> (3)    On 29 December 2009 Mr Pao requested assistance from Mr Mooney and Mr Egan (in the absence of the *"PR person"*) on a press release to be issued concurrently with the OEM agreement, and Mr Mooney sent a *"first stab"* to

Dr Lynch, who responded with some changes (pruning the draft considerably) on 31 December 2009 stating:

> *"something like this would be acceptable…pls do not forward directly from me".*

(4) Dr Lynch explained that the reason he did not want to have drafts forwarded directly from him was simply because he did not want Mr Pao to know that he was *"the one that's nobbling his press release".*

(5) When it was put to him that he was thus aware of the simultaneous negotiation and agreement of the sale of Autonomy software and the purchase of SmartCatch, and that he had been able to and did review the press release (twice) in the light of that and his knowledge of their basic content, he resorted to repetition that, except for the press release, he had *"very little to do with the deal".* I formed the impression that he baulked at a denial because what was put to him was true.

(6) Dr Lynch said he would not *"explicitly"* have known that Autonomy was paying Vidient a 'delta', but it may be that he could have worked it out from email exchanges he saw. Again, I formed the impression that he was aware of the broad structure, including the payment of some form of 'delta', even if not of the precise details.

(7) He felt able to tell me categorically that *"the contracts were not dependent on each other…they were independently executed contracts".* He was also content, after the usual introduction that he *"wasn't particularly involved at this level"*, that the reason for the purchase was that *"we wanted to have some technology that the market respected that worked".* He also told me that he was able to judge this because he *"had significant knowledge of this market and the technology",* having himself written the original video analytics code for the system. I accept that; but his certainty as to the reasons for the separation was based on his reading of the contracts, and his conclusion that as *"there was no clause that says, "I'm buying this because you're buying that", they were independently executed contracts"* was neither within his expertise nor correct; and the evidence was plainly self-serving.

(8) When pressed to accept that he must have known, at least when he made his first witness statement, that Deloitte had not been provided with and did not consider the Autonomy purchase agreement as part of their Q4 2009 review, Dr Lynch told me that his understanding was (it was not clear when this was formed) *"that they reviewed it – anything that was within two quarters",* and that non-disclosure would have been *"a futile approach".* But he had to accept that there was nothing to suggest that they had done.

(9) He told me that it was *"highly unlikely"* that he knew that Deloitte had put the first Vidient transaction on the list of potential misstatements, and doubted he even knew what such a list was at the time; but when shown that Mr Hussain had sent an email on 28 January 2010 (attaching the Q4 2009 Audit Committee pack) to Dr Lynch and Mr Kanter expressly alerting them to the fact that Vidient was in a list of *"judgemental errors"* and that *"we can get it down to $1m or so*

*from the current $4m – Vidient cash plus the Italian deal is being worked on to remove"* his response was to the effect that all he had been asked about was a list of misstatements not judgemental errors and that he was not very familiar with these things. (This lacked conviction and credibility. Mr Hussain would not have been emailing Dr Lynch in these terms unless Dr Lynch was familiar with, and involved in, these sorts of matters.)

(10)    A few days later, Dr Lynch approved the payment of $3.15 million to Vidient; he must have understood that the payment was going to fund Vidient's multi-million-dollar linked purchase of Autonomy software.

(11)    When it was put to him that there was no evidence that Autonomy had either used or sold SmartCatch by September 2010 he said his understanding, based on Dr Menell having (apparently) told him was that it had been used *"in some covert surveillance applications",[328]* was that it had been.

2934.    My strong impression overall was that, although he was not involved in the day to day details, Dr Lynch was well aware of the salient aspects of and true reason for both sets of Vidient transactions. Knowledge on his part of the fact and purpose of the transactions was taken as read by Mr Hussain. He knew they were proposed as part of the route to meeting revenue forecasts; that they had been negotiated and concluded together; that they had then been presented to Deloitte as separate transactions; that their presentation as separate transactions was fundamental to revenue recognition; that Deloitte had expressed concern in that regard; that the proposed solution was to ensure payment by Vidient; that Vidient was a small company and that Deloitte considered collectability an issue; that the payments by Autonomy to Vidient he approved was the means of funding repayment; that insofar as there was any evidence at all of sale or use before the second Vidient transaction it was limited to a reference by Dr Menell about a single classified sale. He had no explanation why none of this was set out in his witness statements, except to suggest that the Claimants had been critical of the length of his witness statement as it was.

2935.    The question then is whether, with that knowledge, he also knew that revenue recognition was not justified. In my judgment, he did, despite his insistence in cross-examination that if the contract did not contain express language of direct linkage they were not so in accounting terms. He knew the transactions were linked in the sense that they were not independent but inter-dependent; and that this was fatal to revenue recognition. In my judgment, he had 'guilty knowledge.'

## RT 5: EMC Corporation - Q3 2010

2936.    Towards the middle of August 2010, Mr Hussain provided Dr Lynch with a revenue update indicating that, in order to reach its revenue targets for Q3 2010, Autonomy needed to close another large deal *"plus one at $5m and we should be ok"*.

---

[328] Dr Lynch referred in his first witness statement to a sale *"as part of a classified solution for use in Afghanistan"*.

2937.  The Claimants contended that Autonomy entered into reciprocal transactions with EMC to generate the required recognised revenue. In bare outline:

> (1)  In Q3 2010, Autonomy purchased computer software and hardware from EMC under an order letter dated 29 September 2010 which provided for the shipment of hardware and software to Las Vegas, Sacramento, Boston and London. The London order was subsequently cancelled, and the claim relates only to the US hardware purchase which totalled $8,947,386 plus sales tax ($9,627,894 in total). Payment was due on 30 October 2010.

> (2)  At the same time (on 30 September 2010) there were two sales by Autonomy of software to EMC. One such sale was pursuant to a fifth amendment of an agreement dated 26 February 2004 between an Autonomy group company, Verity Inc ("Verity") and a subsidiary of EMC called RSA Security LLC. This was referred to as the RSA amendment. The RSA amendment was not impugned. The impugned transaction comprised a sale of OEM rights made by Autonomy's subsidiary, Verity, to EMC. The agreement was comprised in a Sixth Amendment to a Verity OEM agreement entered into on 14 February 2002[329], and was referred to as "the Sixth Amendment". The effect of the Sixth Amendment was to extend licences EMC had acquired from Autonomy from June 2012 to June 2015. The fee was $5,007,000 plus a support fee of $250,350.

> (3)  The net effect of the US hardware purchase and the Sixth Amendment was that Autonomy was to pay EMC $8,947,386 (before tax) and EMC was to pay Autonomy $5,257,350. Autonomy netted off the amounts due to Verity Inc (in respect of the Sixth Amendment and the separate RSA amendment) against the amounts due to Autonomy Inc for the US hardware purchase. Autonomy paid EMC the difference of $3,627,954 in November 2010.

2938.  The Claimants' case is that:

> (1)  As regards the sale to EMC: the only reason EMC agreed to purchase more software and extend the term of its licence at that time was because Autonomy agreed to overpay for its purchase of hardware (and related software and services) from EMC. No extension of the term of its licence was yet necessary in circumstances where (a) under the Fifth Amendment to the OEM Agreement (in June 2009) its existing licence still had two years of the term remaining and in any event, (b) in June 2010 Mr Di Silvestro of EMC had told Autonomy that EMC had *"not used or distributed the software covered under"* the Fifth Amendment. This was confirmed in summer 2011 when Autonomy's maintenance renewal department asked EMC to renew the support services under the Sixth Amendment. Mr Di Silvestro of EMC responded by email dated 9 August 2011 that EMC had no plans to do so because the Sixth Amendment *"was a component of the swap transaction last year, and we do not use the software."* The sale pursuant to the Sixth Amendment lacked a genuine commercial rationale and therefore lacked economic substance.

---

[329] The Verity OEM agreement granted EMC rights to use certain Verity software for the development of EMC's software application programmes and to distribute the software as an embedded component of those programmes. As implicit, the OEM agreement had been subject to a number of successive amendments.

(2) As regards the purchase from EMC: although RT5 differed from the other impugned reciprocal transactions in that the Claimants did not contend that Autonomy's purchase from EMC was of goods that Autonomy did not need and accepted that the hardware and related software was for use in its data centre, that purchase was at significantly more than fair value. The Claimants submitted that this is obvious from the contemporaneous material:

(a) Mr Sullivan expressed concern about the price EMC was proposing to charge Autonomy in an email to Mr Hussain on 28 September 2010. He told Mr Hussain that EMC was "*trying to charge a very heavy premium to our normal prices. Still the overall price is 20% below list but much higher than what we would normally pay. Will fill you in in the AM*".

(b) Dr Lynch suggested that this was just part of a negotiation, but the price of $10 million that Mr Hussain had mentioned on 24 September 2010 to EMC's Mr Harry You was more or less the price set out in Mr Sullivan's email to Dr Menell and Mr Hussain seeking their approval to place the order.

(c) Dr Lynch then suggested that Autonomy had still managed a "*good reduction on the list price*". That was clearly not the case in circumstances where, as Mr Sullivan noted in his email, the price was <u>much</u> higher than Autonomy would normally pay. There is no obvious explanation for why Autonomy would pay so much more than normal, other than to incentivise a reciprocal purchase by EMC.

(3) Further, in view of the fact that Autonomy received no cash (on a net basis) from the round-trip transaction with EMC, no economic benefits flowed to Autonomy, thus precluding the satisfaction of the revenue recognition criteria under IAS 18 §14(d).

(4) It follows that Autonomy should not have recognised the revenue on the Sixth Amendment.

2939. The Defendants' case is that there was a commercial rationale for both EMC's purchase from Autonomy and its sale to Autonomy, they were genuine sales at fair value, and they were not 'reciprocal' at all:

(1) As regards the sale to EMC: EMC was a sophisticated and reputable purchaser. The Claimants did not suggest any impropriety on EMC's part. The Claimants had provided no reason or evidence at all why EMC would have been prepared to be involved in doubtful and uncommercial dealings, as was the unstated but inevitable implication of the Claimants' case. As Dr Lynch put it in the course of his cross-examination:

"*Let's just work this through. So your theory – so remember hardware isn't profitable at the same level as software. So in order – so the margin that EMC would have made on the hardware would have been perhaps $1 million of profit, so it's not – it doesn't make any sense.*

> *They would have sold us the hardware but only made $1 million, and then they'd have to send 5 million on software. So, again, when you actually think about it, putting aside the fact that EMC is a large, perfectly respectable company, it just doesn't make any sense."*

(2) A demonstration that the purchase was genuine was provided by the fact that on 31 July 2012 EMC opted to renew the licence for a further 6 years until 30 September 2018. There are no proper grounds for impugning the sale of software licences by Autonomy to EMC.

(3) As regards Autonomy's purchase from EMC: the computer equipment purchased by Autonomy was for equipment it needed for use in its own data centres (and indeed the Claimants did not suggest otherwise, see below) and the price Autonomy negotiated to pay was at a 22% discount to list price, and thus (*per* Dr Lynch) at *"better than fair value because it's at a discount to the list price"*.

*My assessment*

2940. I accept that the Claimants' case implicitly implicates EMC. No one who had worked for EMC gave evidence. I do not think it appropriate, and it is not necessary, to make final findings in such circumstances.

2941. Nevertheless:

(1) It is by no means easy to understand what reason EMC had to purchase an extension of a licence which it did not need for software it twice confirmed it did not use.

(2) It does seem clear that the price paid by Autonomy for hardware, even though at a discount to list price, was much higher than Autonomy, as a valued repeat customer, would normally have expected to pay.

2942. Further, it seems clear that the impetus for the transactions at the time they were made was Mr Hussain's need at the end of Q3 2010 for recognised revenue to achieve forecast, and that was the reason for the twin transactions. In that regard:

(1) On 26 September 2010, Mr Hussain circulated a revenue summary to Dr Lynch, Mr Kanter and a number of others. The spreadsheet included a tab entitled "*forecast mrl*", which was a revenue forecast spreadsheet that Mr Hussain had prepared for Dr Lynch. The spreadsheet was divided into closed deals, large deals and deals on the right. Dr Lynch explained that Mr Hussain put together a "*sort of route which is his deals on the left, and then as things come out of the left, you put things in from the right*"; in other words, the deals on the right were brought in to cover any revenue shortfall in the event that any of the deals on the left fell away. Mr Hussain had included in the list of deals on the right a $10 million deal with EMC.

(2) The next day, 27 September 2010, Mr Hussain told Mr Egan that he "*really need[ed] db, bofa, va and one other (emc)!!*". Mr Hussain then asked Mr Sullivan and Mr Mooney if they had "*sent the sales contracts to emc*", to which

Mr Sullivan replied "*Already discussed with Joel [Scott] and Mike [Mooney] separately. Contracts are being prepared but depend on what we sell etc…*".

(3) As is clear from these emails: (i) Autonomy needed a deal with EMC, among others, in order to meet its Q3 2010 revenue target, and (ii) as late as 27 September 2010, Autonomy had no clear understanding of what it was going to sell to EMC.

(4) Dr Lynch seemed reluctant to accept this in his oral evidence. He suggested that Mr Hussain was just 'overshooting' with Mr Egan and probably did not need all the deals he had listed. But Mr Hussain's email was only 4 days from the end of the quarter. By that point, it is likely that Mr Hussain would have known how much revenue was needed in order to meet Autonomy's targets; in any event, Mr Hussain reiterated to Mr Sullivan the next day, 28 September 2010, that he "*need[ed] EMC please And probably $2m more low margin*".

(5) Also on 28 September 2010, Mr Hussain emailed Mr Mooney, Mr Sullivan and Mr Scott setting out five different purchases that EMC was apparently looking at. There was no mention in the list of what became the Sixth Amendment. Mr Hussain asked Mr Mooney and Mr Scott to send Mr Sullivan the purchase orders that they had already sent to EMC and said "*…MS [Mike Sullivan] – as agreed Billy's [Bill Scannell of EMC] team picks those that make up $6m but I want to identify deals that I can take to Harry [You]. Need that information tonight please*" (emphasis added). From Mr Hussain's email, it appears that an agreement had been reached whereby EMC would pick deals totalling $6 million, and that Mr Hussain was looking to pitch further deals to Mr You. That, at least, is what happened.

(6) The email from Mr Di Silvestro in the summer of 2011 stating that the Sixth Amendment was a component of the swap transaction and that EMC did not use the software is not easy to explain away and appears to confirm the Claimants' case.

(7) The Claimants' contention that it is further confirmed by last-minute efforts made by Mr Hussain to expand the deal that had already been agreed by adding three further purchases from EMC in return for EMC purchasing something from Autonomy, and Mr You of EMC's initial response that "*At this late stage, I think the only thing we can do is expand both sides of the current, basic deal*"[330] also seemed to me at least to invite serious questions of Mr You, and probably Mr Di Silvestro.

2943. As I say, these are not questions on which I consider it is necessary, appropriate or fair to provide a final answer on less than complete evidence and in the absence of a non-party from which no evidence has been provided. However, it does seem to me, on the evidence before me, that:

---

[330] Though it is to be noted that later that day Mr Harry You appears to have had misgivings, saying "*I think we are fine with the current deal*" after Mr Hussain spelt out what he had in mind ("*Harry – I was thinking that I can find need for hardware for data centres at list price (expand the current purchase) if you were to find the need for the web content management software for your websites*")

(1) The EMC transaction had attributes echoing, and followed the pattern which emerged from, the other reciprocal transactions I have addressed above.

(2) At the least, the high price paid by Autonomy, well in excess of what it would ordinarily have expected to pay, seems likely to have been what EMC required as an incentive to effect a transaction in such a rush simply to assist Autonomy to book revenue from it in Q3 2010 so as to meet its forecast. That, rather than any proper commercial rationale, is what appears to have driven the transaction.

(3) On the view expressed by Mr Di Silvestre that the Sixth Amendment was a component of a *"swap transaction"*, the Sixth Amendment and the US hardware purchase were linked and should have been assessed together to determine their substance and proper accounting treatment, with the result that no revenue would have been recognised.

2944. I do not think the fact that Deloitte approved the revenue recognition assists the Defendants. As the Claimants submitted, Autonomy did not inform Deloitte that the Sixth Amendment was a component of a reciprocal transaction and that EMC did not use the software to which it related. Nor did Autonomy tell Deloitte that the US hardware purchase was significantly overpriced in comparison to the price it would ordinarily expect to pay. Mr Welham's unchallenged evidence was that these matters would have been highly relevant to Deloitte's assessment of revenue recognition criteria in relation to the Sixth Amendment. Dr Lynch had no explanation for why "*highly relevant*" matters were withheld from Deloitte. The inference is that Mr Hussain's finance department deliberately withheld these matters because Mr Hussain appreciated that, if they were disclosed, Deloitte would not have concurred with Autonomy's accounting treatment of the Sixth Amendment.

*The Defendants' knowledge of improper accounting of the EMC reciprocal transaction*

*Mr Hussain's knowledge*

2945. Mr Hussain was at the centre of the EMC reciprocal transaction. He closely monitored Autonomy's revenues in Q3 2010. He identified the need for another revenue-generating transaction at $5 million in the middle of August 2010 and, as the end of the quarter approached, he stressed the need for the deal with EMC in order to meet Autonomy's revenue targets.

2946. He knew that the price Autonomy was paying for the EMC hardware (and related software and services) was a *"very heavy premium to our normal prices…much higher than we would normally pay"* (see paragraph 2938(2)(a) above). He nevertheless approved the US Purchases as described in an email to him and Dr Menell of 29 September 2010. It appears from an email from Mr Chamberlain to Mr Stephan circulated to both Mr Hussain and Dr Lynch that they gave their approval orally with 13 minutes to spare before the deadline.

2947. Mr Hussain then led a further effort to encourage EMC to enter into deals to buy <u>further</u> software from Autonomy in exchange for Autonomy making an <u>additional</u> purchase of hardware that Autonomy did not then need at a price that he knew to be significantly higher than the price Autonomy ordinarily paid EMC for comparable hardware.

2948. Mr Hussain must have appreciated in those circumstances that EMC entered into the Sixth Amendment, not because it had any genuine reason for extending the Fifth Amendment, but because Autonomy had agreed to pay over the odds for the US hardware purchase, and that the Sixth Amendment could not, therefore, give rise to any recognisable revenue because it lacked economic substance. I find that he did have 'guilty knowledge'.

*Dr Lynch's knowledge*

2949. Dr Lynch veered in his evidence between his desire to put forward observations which would rehabilitate the transaction and its approval by Deloitte and his main defence that he was not involved and any comment was conjecture or the product of analysis long after the event. Also, and this is a point of more general application, the diligence of his review of the documentation and his ability to recollect its content made it even more than usually difficult to determine what he had come to know and believe from what he knew and believed at the time. Not infrequently, his observations offered a glimpse of more contemporaneous knowledge than he was prepared to admit he had.

2950. As was often, indeed almost invariably, the case in my experience, Dr Lynch delivered his evidence in a calm, unruffled and articulate way which was impressive, and when set apart from the documentary evidence, convincingly delivered. For example, in this context, he was able to dismiss the suggestion that the fact that the transaction was done at the very end of the quarter was not in the least unusual: he assured me that nearly all Autonomy purchases were at the end of the quarter, because, so he told me, *"it's a negotiating point"* and further, *"the only time you know how much fire power you've got in the quarter is when you see whether the quarter is coming in…so…you'll have your spare capacity to buy things…."*. But that was an attempt to extrapolate from a normal transaction and its timing as justification for a very different sort of transaction. It does not, in my view, explain the coincidence of the need for revenue and the urgency of the two transactions. I do not accept Dr Lynch' s suggested explanation.

2951. My overall assessment is:

(1) I would accept that Dr Lynch was not involved in the transaction day to day.

(2) He seemed to me reasonably clearly to be underplaying the extent of his involvement. For instance, he seemed reluctant to accept that he was aware of Autonomy's purchase from EMC, notwithstanding that Mr Hussain had forwarded him an email referring to an offer by EMC "*to sell $10m of hardware for our data centres for q3*", and that he approved the purchase by telephone on the last day of the quarter. He also questioned whether an email from Mr Hussain saying "*Need to talk to you about q3 emc deal and db*" referred to the deal with EMC in Q3 2010, suggesting that it might have been about Project Dynamo, even though Dr Lynch knew the parties were aiming for a Q4 close for Project Dynamo because that is what he had discussed with the CEO of EMC and told Mr Hussain.

(3) The contemporaneous documents show that Dr Lynch was aware of both sides of the reciprocal arrangement with EMC and that he was aware Mr Hussain was trying to find ways of incentivising EMC to enter into deals from which Autonomy could recognise revenue in Q3 2010.

HC-2015-001324

(4) Moreover, it is improbable that Mr Hussain kept Dr Lynch informed of the Q3 2010 deal with EMC and his efforts to expand both sides of the existing deal, but concealed from Dr Lynch the fact that the Sixth Amendment – which formed part of the existing deal – had only come about because Mr Hussain had agreed to make overpriced purchases from EMC that Dr Lynch was going to be asked to approve, and did approve.

(5) Overall, I had the impression that Dr Lynch knew the general shape and purpose of the transactions at the time, and when giving his approval: and that he appreciated that the reason for both and their linkage was in reality the urgent need to show revenue.

2952. According to Dr Lynch's own evidence about the sorts of transactions he would have considered problematic, he cannot have regarded such an arrangement as in any way proper. Nor, as an intelligent CEO with more than a basic grasp of accounting, can he genuinely have believed that it was appropriate for Autonomy to recognise in full revenue on a sale of Autonomy software which was induced by, and would not otherwise have taken place but for, an overpriced purchase by Autonomy.

**Purchase and sale transactions with MicroTech comprising RT 6 in Q1 2011**

2953. Another set of transactions which the Claimants alleged to have been reciprocal and driven by the need, late in the quarter, for recognised revenue to cover a shortfall on market forecast, took place some time later, in Q1 2011. Autonomy's counterparty was MicroTech, which Autonomy had by then used as a 'friendly VAR' in a number of impugned VAR transactions.

2954. The allegedly reciprocal transactions with MicroTech involved:

(1) Autonomy granting MicroTech the right to collect 98% of Autonomy's maintenance and support fees from Autonomy's end-user customer, Bank of America, in return for MicroTech purportedly providing 'backline' maintenance and support services[331] directly to, or for the benefit of, Bank of America (the "MicroTech Services Agreement"); and

(2) Autonomy selling MicroTech a licence to use the Autonomy software that ostensibly would allow MicroTech to provide these services (the "Autonomy Software Licence Agreement").

2955. The Claimants contended that there was no genuine intention on Autonomy's part to outsource the 'backline' maintenance and support services for Bank of America to MicroTech, and that this was a reciprocal transaction conceived by Mr Hussain, and implemented with the knowledge and approval of Dr Lynch, as a means of improperly generating revenue to ensure that Autonomy met its Q1 2011 revenue targets.

2956. As it was, Autonomy recognised the licence fee of $3,860,468 as revenue in Q1 2011. MicroTech was rewarded with a 'delta' of $450,389, representing the difference

---

[331] 'Backline support services' were defined in the *"Maintenance & Support Services Agreement"* between Autonomy Inc and MicroTech as including *"troubleshooting in conjunction with Bank of America in order to assist Bank of America with its support requests, coordinating with Autonomy to respond thereto, and timely responding to Bank of America's requests for telephone, email, or web-based support Services."*

between what MicroTech was to receive under the MicroTech Services Agreement ($4,503,880) and what, in aggregate, MicroTech was to pay for the licence under the Autonomy Software Licence Agreement ($4,053,491, comprising the licence fee of $3,860,468 and an annual support fee of $193,023).

2957. The Claimants identified and relied on the following features in support of their claim:

(1) the absence of any contemporaneous documents demonstrating a bona fide reason for, or plan by, Autonomy to outsource 'backline' maintenance and support services to MicroTech;

(2) the absence of any explanation as to why, if Autonomy genuinely intended to outsource these services to MicroTech, the relevant paperwork was only produced and sent to MicroTech within the last 24 hours of Q1 2011;

(3) the fact that Autonomy never asked MicroTech to provide, and MicroTech never provided, any 'backline' maintenance and support services for Bank of America; and

(4) the fact that the reciprocal transaction was unwound shortly after the announcement of HP's acquisition of Autonomy.

2958. Dr Lynch claimed to have had *"no material involvement in this transaction."* His written closing submissions noted that the Claimants' pleadings and Further Information did not include any specific allegation of knowledge or involvement on the part of Dr Lynch; and that no basis for the allegation of knowledge was identified in his cross-examination either.

2959. However, Dr Lynch also asserted that he could see nothing in the arrangements on their face which would have alerted him to any impropriety: he would have considered it to be a straightforward commercial transaction in line with Autonomy's practice of delegating services work to its partners. In his view, the sale to MicroTech of the licence was to enable it to perform the support services; and there was nothing wrong in assigning to MicroTech the right to invoice customers directly for such services. He relied also on the evidence of Mr Steve Truitt adduced as hearsay evidence by the Claimants themselves as confirming that both the assignment agreement and the purchase of software from Autonomy were genuine commercial transactions.

2960. Dr Lynch dismissed the pattern of events after the transaction as simply showing that *"the arrangements did not operate as they were intended. Dr Lynch was not involved in this aspect."* Likewise, he depicted the arrangements made in September 2011, under which Autonomy and MicroTech executed agreements effectively cancelling the parties' obligations to each other, as *"not surprising where the arrangements had not worked out as originally intended, and BoA were continuing to pay Autonomy directly."* He noted that the Claimants made no claim for any transactional loss in respect of the transaction: it is relevant only to the FSMA and misrepresentation claims.

2961. Mr Hussain adopted Dr Lynch's position, noting in addition only that *"RT 6 is a peripheral claim, being modest in amount and it was unwound with no material impact on [Autonomy's] financial position."*

2962. In the circumstances, I consider it is sufficient for me to state my conclusions on the first limb (the allegedly reciprocal nature of the transactions) in summary form.

2963. As to the genesis and main driver of the transactions:

(1) I am satisfied that the sequence of schedules provided by Mr Hussain to Dr Lynch from 26 March 2011 demonstrated that (a) the revenue-generating side of the overall transaction was first referenced in a spreadsheet dated 25 March 2011 sent to Dr Lynch on 26 March 2011; (b) the deal was initially posted on the right of the schedule, signifying it was held in reserve and was not immediately envisaged for completion if deals on the left hand-side of the schedule proceeded as hoped; (c) the deal was only moved to the left of the schedule when deals on the left failed to eventuate; (d) only when moved to the left of the spreadsheet did the deal move (quoting the Claimants) *"from being a contingency plan to a necessity for Autonomy to satisfy its Q1 2011 revenue goals";* (e) the deal was conceived a few days before the end of the quarter.

(2) On 30 March 2011, Mr Hussain emailed Mr Scott, copying Mr Chamberlain, with the subject "*bofa*" saying "*MT [MicroTech] assignment. Let's chat when you're up, need to get the MT obligation to support sorted*".

(3) Mr Scott testified at Mr Hussain's criminal trial that either Mr Hussain or Mr Chamberlain had asked him to prepare two agreements with MicroTech: (i) an agreement appointing MicroTech to provide 'backline' maintenance and support services for the benefit of Bank of America (the MicroTech Services Agreement), and (ii) an agreement licensing to MicroTech the software that was ostensibly needed to provide those services (the Autonomy Software Licence Agreement).[332] Although I have reservations about Mr Scott's evidence generally, I see no reason not to accept this part of it.

(4) Not until 30 March 2011 did Autonomy propose the arrangements to MicroTech: it seems that Mr Scott talked to Mr Steve Truitt sometime on the same day before sending him a draft of the proposed MicroTech Services Agreement as an attachment to an email timed at 20:44 on 30 March 2011. Even allowing for timing differences (it was some 8 hours earlier in California, which is where I take it that Mr Steve Truitt received the email) that gave MicroTech only hours to consider the agreement and the proposed purchase of the licence.

(5) The circumstances in which and the haste with which the agreement was concluded casts real doubt on its substance. Further, the MicroTech Services Agreement obliged MicroTech to have sufficient personnel trained in the features and functions of the relevant Autonomy software and to have procured office space and facilities for such personnel, ostensibly to allow MicroTech to be in a position to provide 'backline' maintenance and support services from the moment it entered into the agreement. I agree with the Claimants that it is difficult to see how MicroTech could have been in such a position in circumstances where it received the agreement stating these obligations a matter

---

[332] From Mr Hussain's email to Mr Scott on 30 March 2011, copied to Mr Chamberlain, in which Mr Hussain asked to speak with Mr Scott, the Claimants submitted, and I accept and find, that it is more likely that the direction came from Mr Hussain.

of hours before the agreement was due to be signed and MicroTech's supposed service obligation was theoretically to be fully functioning. MicroTech did not even have access to the relevant Autonomy software until 31 March 2011.

2964. I also agree with the Claimants that the conclusion that the real rationale for the transactions was not for Autonomy to outsource 'backline' maintenance and support services, but to enable an apparent purchase by MicroTech of Autonomy software in respect of which Autonomy could (as it did) recognise revenue on Q1 2011, is reinforced by events after the agreements were concluded. In particular:

(1) Autonomy did not disclose the MicroTech Services Agreement to Deloitte. Mr Welham's unchallenged evidence, which I accept, was that Deloitte were not aware of the MicroTech Services Agreement when they reviewed Autonomy's revenue recognition of the Autonomy Software Licence Agreement.

(2) MicroTech never provided any 'backline' maintenance and support services for the benefit of, or directly to, Bank of America. There is also no evidence that Autonomy ever asked MicroTech to provide such services; and no evidence that MicroTech even set up the infrastructure needed to provide those services. Even so, Autonomy paid MicroTech $714,082 on 10 June 2011, notwithstanding that MicroTech had provided no 'backline' maintenance and support services to that point, and never provided such services thereafter.

(3) Shortly after HP's acquisition of Autonomy was announced on 18 August 2011, Autonomy and MicroTech unwound the reciprocal transaction. Thus:

(a) On 1 September 2011, MicroTech paid Autonomy, not the amount due under the Autonomy Software Licence Agreement ($642,674.59), the amount it had received from Autonomy in June 2011 ($714,082) in a circular flow of funds.

(b) Then, on 7 September 2011, Mr Scott sent letter agreements to Mr Steve Truitt terminating the entire arrangement and relieving MicroTech of any obligation to pay the outstanding fees under the Autonomy Software Licence Agreement. MicroTech was also relieved of any obligation to provide 'backline' maintenance and support services under the MicroTech Services Agreement and its right thereunder to invoice and/or collect fees was revoked.

(c) Autonomy then raised credit notes to MicroTech totalling $3,339,410, the amount of the fees MicroTech was due to collect from Bank of America pursuant to the MicroTech Services Agreement ($4,053,492) less the amount paid by MicroTech in September 2011 ($714,082).

2965. I have concluded that the MicroTech Services Agreement was the means of funding the Autonomy Software Licence Agreement: the two transactions comprising RT 6 were reciprocal and the objective of both was in the last hours of Q1 2011 to enable Autonomy to recognise revenue to cover a shortfall on forecast revenues that had become apparent at the end of 25 March 2011.

2966. It follows that Autonomy should not have recognised any revenue from the Autonomy Software Licence Agreement.

*Defendants' knowledge*

2967. As to the second limb, and the knowledge of the Defendants:

*Mr Hussain*

2968. Mr Hussain maintained the revenue spreadsheets I have referred to above. I am satisfied that he conceived and managed the process by which the MicroTech reciprocal transaction was put in place and directed Mr Scott to draft the two agreements.

2969. I accept the Claimants' submission that as an accountant, Mr Hussain cannot have been in any doubt that these agreements should have been considered together to understand their substance and to determine their appropriate accounting treatment. The fact that nevertheless, he signed a representation letter to Deloitte confirming Autonomy's accounting treatment of the Autonomy Software Licence Agreement without making any mention of the MicroTech Services Agreement supports my conclusion that he knew the two, if properly considered together, would be revealed to be linked in such a way as to cause Deloitte to characterise them as reciprocal. That would have undermined their real purpose.

*Dr Lynch*

2970. Dr Lynch, for his part, attempted to distance himself from the MicroTech reciprocal transaction in his witness statement and his oral evidence. However:

(1) Although initially during cross-examination he appeared reluctant to acknowledge that he was aware of a possible deal in Q1 2011 with MicroTech involving Bank of America, Dr Lynch eventually accepted that he was "*aware that something with Bank of America was happening with MicroTech*" and that Autonomy was proposing to sell something to MicroTech for around $3 million and to recognise revenue on that sale.

(2) It must have been obvious to Dr Lynch from the sequence of spreadsheets he received from Mr Hussain as briefly described above that the transactions were conceived and came to be relied on by Mr Hussain as the means of making good a shortfall on revenue forecasts.

(3) The Autonomy Software Licence Agreement and the MicroTech Services Agreement were, in Dr Lynch's words, "*obviously linked*" even if (as he maintained) "*not in the accounting sense*". Dr Lynch offered no credible explanation for why Mr Hussain would have informed him about only one side of the arrangement with MicroTech and concealed the other.

(4) I accept the Claimants' submission that it is also unlikely that Mr Hussain would have agreed to Autonomy relinquishing some $4.5 million in fees from Bank of America without alerting Dr Lynch. Dr Lynch cannot maintain he was unaware of the MicroTech Services Agreement without insinuating that he was misled by Mr Hussain, but it is no part of Dr Lynch's case that Mr Hussain actually did mislead him.

2971. I have concluded on a balance of probabilities that Dr Lynch would have been informed by Mr Hussain or by Mr Chamberlain of the linked agreement with MicroTech, and its objective of funding MicroTech so that it could pay for the Autonomy software and earn a profit.

2972. I am satisfied that Dr Lynch would have appreciated that it was improper to recognise revenue on such an artificial reciprocal arrangement.

2972A. Accordingly, I have concluded that Dr Lynch, like Mr Hussain, had "guilty knowledge" of the improper accounting treatment of RT 6.

### Overall Conclusion on Reciprocal transactions

2972B. My overall conclusion is that the Claimants have established their claims in respect of each of the impugned Reciprocal Transactions.


## IDOL OEM

### Summary of the Claimants' claims in relation to OEM

2973. The Claimants have brought claims against both Defendants under FSMA, under the Misrepresentation Act 1967 and in deceit, in relation to allegedly untrue or misleading statements in Autonomy's published information and representations made to HP in respect of a line of Autonomy's business called its *"Original Equipment Manufacturer"* or *"OEM"* business. Revenues from that business were variously described in Autonomy's published information, and it is the meaning perceived by the market and intended by Autonomy to be conveyed by the various descriptions which is at the nub of this aspect of the dispute.

2974. The classic characteristics of this line of business were that Autonomy sold licenses to Original Equipment Manufacturers or "OEMs", who then on-sold their products with Autonomy software embedded to third-party customers. Under the licences sold, OEMs were obliged to make payments to Autonomy in the nature of commission or royalty payments on each sale of equipment embedded with licensed Autonomy software. This generated a growing, reliable and recurrent revenue stream, which was in addition an especially high margin business because after the sale of the licence it required no further input from Autonomy.

2975. During the Relevant Period, Autonomy reported revenue arising from its OEM business using various terms: "*IDOL OEM*", "*OEM derived revenues*" and "*IDOL OEM derived revenues*" (collectively "IDOL OEM revenue"). In total, reported IDOL OEM revenue in this period amounted to $316.5 million.

2976. In cross-examination, Mr Apotheker told me that he:

> *"really liked this notion of the OEMs because much more than the resellers themselves, this was a highly scalable model. In particular, the way it was explained to me and the way I think it worked was that it was a multi-year, layered effort where you could generate more and more income from a given*

> OEM over time with hardly any additional cost of sale. So I thought it was a
> very, very important part of the business model and a very smart one."

2977.  The Claimants submitted that:

(1) A reasonable reader of Autonomy's published information would have understood an OEM to be a software company, which then embedded IDOL into its own software products, and licensed those combined products to the OEMs' third party customers. A reader would not have supposed that a hardware supplier would be considered to be an OEM.

(2) Autonomy's presentation of OEM derived revenue in its published information gave the impression that it comprised (a) upfront development fees paid by OEMs for the right to embed Autonomy's IDOL technology into their own software products for subsequent licensing of those combined products to third parties or (b) ongoing royalty or other recurring payments from OEM partners to Autonomy in respect of the OEM's sales of their own software products, with IDOL embedded under licence, to their own customers[333].

(3) Accordingly, the understanding conveyed by the OEM metric was of (a) a (normally) recurring and predictable high-margin revenue stream which would grow over time as other software companies licensed their own software containing IDOL; and (b) broad acceptance of IDOL across the software industry.

(4) Dr Lynch's own comments about IDOL OEM revenue in Autonomy's published information reinforced the impression that IDOL OEM sales were sales of IDOL to be embedded in other software companies' products.

2978.  According to the Claimants, the truth was very different, in that:

(1) a large proportion of revenues represented as OEM revenues arose from sales to *"companies which could not embed Autonomy software in their own software products"* and were thus generated from sales to persons not properly characterised as OEMs[334].

(2) The constituents of what was reported within what I shall refer to as "the OEM Metric" comprising IDOL OEM revenue as variously described[335] comprised, in addition to royalties (i) revenue from one-off sales of Autonomy software licences to customers that did not sell software and were not OEMs, (ii) revenue from one-off license sales for the purchaser's internal use only; and/or (iii)

---

[333] The usual royalty rate was presented as amounting to about 3% of the revenue from OEM partners' sales of their own product with embedded IDOL.
[334] The Claimants pleaded that *"In theory, OEMs were software companies (i.e. companies that licence software to third parties) that embedded Autonomy's IDOL software in their own software products"* and thus sales to "non-software companies" could not fall within the OEM metric
[335] As explained above, I use this expression to cover the various expressions used over time to denote the same revenue stream (*"OEM derived revenues", "IDOL OEM derived revenues"* and later simply (and revealingly) *"IDOL OEM"*).

revenue from VAR sales, none of which therefore had any of the classic characteristics of OEM business.

(3) Such sales did not generate royalties or produce a reliable and recurring revenue stream, and they did not signify broad acceptance of IDOL across the software industry.

(4) Of the total of $316.5 million included within the OEM metric over the Relevant Period, around 80% of it (over $250 million) did not conform to Autonomy's description of it as OEM business because it lacked an essential quality of that business. The revenue was not generated by commission or royalty payment and thus lacked its reliable recurring nature, generated without any further effort required of Autonomy, which made it especially attractive to investors in assessing Autonomy's business. Furthermore, the amount of revenues truly of that nature and properly classifiable as *"OEM"* business were in decline.

2979. The Claimants accepted, and it is common ground, that neither *"OEM"* nor *"OEM derived revenues"* (or cognate expressions) is a term of art; each is an expression that, in isolation, is capable of bearing different meanings. It was also common ground that Autonomy's reporting of the OEM metric was not covered by IFRS. However, the Claimants contended that by the same token, the market's understanding of the precise nature and scope of a given company's "OEM" business and revenue derived from it must be gained, not from a dictionary or financial lexicon, but from the way that the company chose to describe this aspect of its business in its published information.

2980. The Claimants relied in this regard on various express statements in Autonomy's published information which, contrary to the Defendants' case now, appeared invariably to describe OEMs as software companies. Thus, in its 2010 Annual Report, and Quarterly Reports for Q4 2010, Q1 2011 and Q2 2011 Autonomy described IDOL OEM as follows:

> *"IDOL OEM. IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets. This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences."*

2981. In Schedule 8 to the RRAPoC, the Claimants provided details relating to 68 transactions which they contended generated revenues wrongly included within the OEM metric. They did not ultimately pursue their case in respect of one of these[336]; and in an Appendix (Appendix 3) to their written closing submissions they provided short summaries of the 67 such transactions in respect of which they maintained their claims. They had provided a broadly similar appendix as part of their written opening submissions.

2982. They identified three broad categories or aspects of revenue which did not conform to the understanding (as described above) of the OEM metric which the Claimants

---

[336] A transaction in Q2 2011 with Bloomberg.

HC-2015-001324

contended was conveyed by Autonomy's published information, and which accounted for some $250 million out of total revenues of some $316.5 million described as "*IDOL OEM*", "*OEM derived revenues*" or "*IDOL OEM derived revenues*":

(1) Sales to non-software companies, including (a) a sale to Tottenham Hotspur of a solution to provide own-use functionality, and in particular "*functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design*" and (b) government agencies who "*by definition*" would "*not sell anything to anyone*";

(2) Sales that limited the purchaser's right to use Autonomy's software to internal use by the purchaser only, so that the purchaser would have neither the apparent intention nor the capability of embedding IDOL software for resale in their own products;

(3) Sales which could not properly be classified as giving rise to IDOL OEM revenue, because (a) the licence sale was associated with hosting transactions; or constituted (b) VAR sales where neither the VAR nor the end-user was a software company intending and licensed to embed IDOL technology into its own for onward sale, or (c) reciprocal transactions (for the same reasons) or (d) hardware sales, in each case being instances where (on the Claimants' case) the purchaser was not a software company with the ability and intention of embedding IDOL technology into its own technology for onward licensing to third parties.

2983. The Claimants contended that the Defendants were well aware of what the Claimants described as the "*striking mismatch between Autonomy's presentation and the truth*". They contended that it must have been obvious to them both that the inclusion in the "*OEM metric*" of revenue which did not conform to the description, and did not have the valuable characteristics of 'true' OEM revenue, resulted in the metric being untrue and misleading and made this aspect of Autonomy's business (and since it was a significant business line, Autonomy as a whole) seem more valuable than it was.

2984. Further, although their FSMA claim in this context was based on untrue or misleading statements, rather than omissions and deliberate concealment, the Claimants relied on what they presented as Autonomy's repeated concealment from HP of details relating to the largest transactions allocated to the OEM business as confirming the Defendants' guilty knowledge of the misleading or untrue presentation of IDOL OEM revenue.

2985. According to the Claimants, Autonomy's Quarterly Reports throughout the Relevant Period would cite only transactions with software companies as giving rise to OEM derived revenues, and (conversely) did not identify any transactions as giving rise to such revenue which did not conform to the Claimants' narrow definitions of the disputed expressions, even where such transactions were of substantially greater value or prestige

than the transactions that Autonomy did choose to highlight.[337] The Claimants provided the following illustrative examples:[338]

(1) In Q1 2009, Autonomy allocated to IDOL OEM revenue $3,251,000 from a deal with the Ministry of Defence (OEM2). This was a much larger deal than two of the three named deals: Symantec (no revenue allocated to IDOL OEM revenue) and Proof Point ($230,000).

(2) In Q1 2010, Autonomy allocated to IDOL OEM revenue $8,915,000 from a deal with Bank of America (OEM21). This was a far larger deal than all of the named deals combined: Adobe ($750,000), McAfee ($500,000 and $248,000) and Siemens ($72,000).

(3) In Q1 2011, Autonomy allocated to IDOL OEM revenue $6,448,000 from a deal with Tottenham Hotspur Football Club (OEM48). This deal was almost four times larger than one of the named deals: Symantec[339] ($1,400,000).

2986. The Claimants acknowledged that Deloitte had reviewed these passages and indeed the constitution of the OEM metric in every quarter (though, as elaborated in paragraphs 3168 to 3170 below, the Claimants did not accept that Deloitte's advice on the classification of that revenue as IDOL OEM revenue was sought or given). However, they were keen to stress that in both their FSMA and their misrepresentations claims the *"fraud that has been alleged is not at its heart an accounting fraud"*. They presented each as a claim *"where the fraud involved was straightforward"*, and not one which involved the assessment of accounting standards or matters of accounting judgement. The Claimants submitted that the Defendants could not, therefore, *"hide behind anything said or done by Deloitte."*

### *Summary of the Defendants' defence in relation to OEM*

2987. The Defendants disputed the Claimants' claims root and branch. They submitted that there was no basis for the Claimants' *"artificially narrow definition"* of what constituted an OEM, nor for their *"unsustainably restrictive"* limitation of the scope of revenues which could properly be included within the description in Autonomy's published information of the *"OEM Metric"*.

2988. In particular their position was that:

(1) The Claimants had adopted an unduly restrictive approach to what constituted an *"OEM"*. According to the Defendants, there was no basis for confining the expression *'OEM'* to a company whose business included licensing software to third parties and which has the intention and capability of embedding IDOL

---

[337] The Claimants also contended that the Defendants were involved directly in the choices: and see as to their involvement and knowledge paragraphs 3208 to 3219 below.

[338] Revenue figures are taken from Mr Hussain's spreadsheets. The size of the transactions was not reported in the Quarterly Reports – just the customer names.

[339] This is an impugned OEM transaction (OEM55). The Claimants contended that its mention in the relevant Quarterly Report, along with the mentions of the Q2 2009 deal with VMS (OEM4) and the Q2 2011 deals with Rand (OEM60), McAfee (OEM58) and OpenText (OEM59) in the relevant Quarterly Reports, would not have given rise to suspicion in the same way as mention of the concealed transactions mentioned in the main text above as the relevant named customers were very obviously software companies.

software into its own software products for licensing to those third parties, as the Claimants have sought to do.

(2) Nor was there any basis for restricting the revenues properly included within the OEM metric to upfront fees and royalties paid to Autonomy by the OEM itself, as the Claimants have also sought to do.

2989. According to the Defendants, such restrictions were not justified by anything said in published information by Autonomy, and the market to which such published information was addressed would not have perceived the OEM metric to be so restricted. In particular:

(1) Dr Lynch's view was that any organisation that develops a software solution for its industry and then sells it on to others in the industry could reasonably be considered an OEM, and the Claimants' attempts to restrict OEMs to software companies was *"an artificial exercise"*. Dr Lynch accepted that *"obviously the vast majority of software in the world is done by software companies"*, and agreed that OEMs in the sector of interest to Autonomy would predominantly be software companies: but the Defendants' position[340] was thus that the category was not exclusive. The essential quality as he presented it, was the "*right to reprint*": the OEM is being given the right to produce or sell multiple copies of the software it acquires from Autonomy. In the context of Autonomy's business, Dr Lynch described an OEM as being:

> "*one that takes Autonomy's technology and builds it into something that it sells or gives to its customers, as opposed to a one-off sale*".

(2) As to the requisite quality required for revenues to be included within the OEM metric, Dr Lynch contended that commission/royalty payments from an OEM, albeit the paradigm, were not the only qualifying revenues: revenues from direct sales[341] to customers of Autonomy's OEMs for which the opportunity arose in consequence of the initial licence sales to the OEMs concerned (or to put it another way, for which the original OEM transaction was the springboard) were also properly classified as indirectly derived from the OEM relationship and could be and was properly described as *"OEM derived"* revenue within the 'OEM metric'.

2990. Dr Lynch, whose submissions were (as ever) adopted by Mr Hussain, did not shy away from the consequence that (as he put it in his first witness statement):

> "*Working out whether a sale was OEM-derived or not involved a qualitative judgment.*"

---

[340] In his closing submissions, Mr Hussain fully endorsed Dr Lynch's position and did not address the matter further, save for summarising his overall case in consequence as being that: *"'OEM' is not an accounting term and the approach taken by AU to categorising revenue as 'OEM' revenue was reasonable. Deloitte vetted the revenue that AU categorised as OEM to ensure that it was not presented misleadingly, and there is no basis for alleging fraud against Mr Hussain."*

[341] Especially *"upsells"* and *"PODS"* as to which see footnote 343 below.

2991. Further, the Defendants stressed that just as the meaning accorded to "OEM" was not unnatural and indeed fell within the ordinary usage of the term[342], so too the more extensive scope of their interpretation of *"OEM derived revenues"* was not contrary to any accountancy rule, and gave content and their ordinary meaning to the words used: and there was no basis for restricting the meaning of *"OEM derived revenue"* so as, in effect, to give no meaningful content to the word *"derived"*.

2992. They contended that the very purpose of the introduction of the word was to ensure inclusion of revenue *"derived"* from OEM business (including sales to a third-party customer of an OEM) as well as revenue from a direct sale to an OEM: the inclusion of the word "derived", which remained in the published information until Q3 2010, and (according to the Defendants) continued to inform market understanding after that date, necessarily connoted a wider category of revenues than merely those received from the OEM itself as an upfront licence payment or ongoing royalty stream and captured further sales made possible (*"driven"*) by the initial OEM sale. Dr Lynch explained this in cross-examination as follows:

> "*The metric that we give as a management metric which is OEM-derived includes that revenue but also includes revenue which has been made possible by our OEM programme, but that may – well, it does include sales where the purchaser is not an OEM. So, for example, an upsell.*"[343]

2993. The Defendants also drew attention to the fact that types of OEM described by Dr Lynch were similar to the types of OEM included in HP's own OEM business, and suggested that this reflected the ordinary usage of the expression. Thus HP's "*OEM Partnership*" brochure from March 2014 identified:

> "*...three types of OEM branding options to align with your go-to-market (GTM) requirements:*
> •      **Embedded** *– Encapsulate HP-branded hardware components within your own branded product.*
> •      **Integrated** *– Use HP hardware systems as the platform for an appliance or a vertically integrated solution loaded with your intellectual property, and you can brand the turnkey solution with your brand or ours.*
> •      **Private label** *– Simply rebrand and sell an HP component "as-is" to your own customers.*"

---

[342] The OED defines OEM as an *"organisation that makes devices from component parts bought from other organisations"*. By contrast, Investopedia states that an OEM is *"traditionally defined as a company whose goods are used as components in the products of another company which then sells the finished item to users"*. In their Re-Amended Reply, the Claimants accepted the OED definition to be the usual one; but then also conceded that *"as a matter of general usage, the expression "OEM" is capable of referring to a transaction where a company makes a component or part-system that is used in another's product"*.

[343] In this context, an *"upsell"* is a sale of additional functionality or capacity, either to the OEM itself to sell on to its customers or a direct sale of additional functionality or capacity to the OEM's customers (an "end-user" in the Claimants' terminology, which I shall adopt). Another type of sale direct to the OEM's customers were *"PODS"* (short for product oriented drop-in solutions): these were sales of additional software direct to an OEM's customer.

2994. Thus, in the Defendants' terminology at trial (though it is to be noted it was not deployed in the published information itself) *"Core"* or *"straight"* OEM business involved sales to an OEM with the "*right to reprint*": the OEM is being given the right to produce or sell multiple copies of the software it acquires from Autonomy. *"Derived"* OEM business extended to sales of Autonomy software generated or which were judged to have been made possible by that original OEM sale. The latter, so the Defendants contended, included both *"upsells"* and *"PODS"*. These comprised most of the so-called *"derived"* business.

2995. In Dr Lynch's Re-Amended Defence (at paragraph 160.3) it was pleaded that:

> *"Autonomy provided information as to its OEM derived revenues in its quarterly accounts. The relevant revenues included both transactions directly with OEMs, sales of additional functionality to the end- user ("upsell") either directly or through the OEM as a reseller, and (in particular where BEA, IBM or SAP[344] were the relevant OEM) sales of drop in solutions ("PODS") which end-users would buy to function with the Autonomy /OEM product."*

2996. In practical and numerical terms, the dispute between the parties in respect of all the various claims brought by the Claimants in respect of the presentation of Autonomy's OEM business focused on whether those categories could or could not properly be classified as falling within the OEM metric as generating OEM derived revenues; and then on whether the Defendants believed in the accuracy of the published information about the OEM revenues.

2997. As to the latter point, Dr Lynch emphasised that, in any event, he had not personally been involved in the classification or calculation of OEM revenues and had relied on the finance department and Deloitte. His avowed understanding was that the OEM metrics were fair and accurate and the revenues included within them were understood by the market; and he was reassured in that belief and in his approach to Deloitte's careful review, and the fact that at no time had they ever suggested that the descriptions or figures were wrong or misleading. Dr Lynch submitted that Deloitte's close involvement and their approval of the categorisation of the transactions confirmed him in his belief that the OEM metric and the figures given in Autonomy's published information were not misleading in any way.

2998. Further as to this:

> (1) Deloitte were familiar with the transactions themselves, having tested all of Autonomy's large revenue deals as part of their quarterly audit review. This involved testing all transactions over $1m, and a sample of smaller ones. According to the Claimants, most of the impugned OEM transactions (51 out of 67) fell into the $1m plus category; thus, the vast majority were tested by Deloitte.[345]

---

[344] BEA Systems, SAP and IBM were/are all large software companies.

[345] An example of a working paper testing one of the impugned OEM transactions, with Tottenham Hotspur Plc, though it does not address the classification as OEM (that was the subject of a separate exercise), was relied on to demonstrate Deloitte's awareness of the terms of the relevant transaction.

(2) Deloitte reviewed and approved each quarterly press release and Annual Report. Similarly, Mr Welham explained that somebody from Deloitte (usually Mr Welham himself) listened in to each of the earnings calls in the Relevant Period. Thus, Deloitte was aware of all of the material from which the Claimants contended their restrictive definition of OEM derived revenues had been taken.

(3) There was a quarterly testing process to agree the metrics used in the earnings release. Deloitte took the spreadsheets classifying revenue prepared by Autonomy's finance department, and incorporated them into one of its own working papers.[346] Illustrating Deloitte's approval of the classifications, in one such paper, a Deloitte tick-mark appears against the heading for the column "OEM upsell", directing the reader to a note drafted by Deloitte stating that:

> "*The OEM Upsell category includes hosted license deals that are hosted on OEM customer data-centers. This is considered reasonable for including as OEM driven revenues.*"

(4) Deloitte understood that the IDOL OEM category published by Autonomy included upsells and PODS, as Mr Welham confirmed. Mr Welham gave the following evidence on this point:

> "*Q. ... So someone within Deloitte has specifically considered this particular category, the "OEM upsell" category in relation to hosted licence deals, hosted on OEM customer data centres and concluded that this is considered reasonable, correct?*
>
> *A.    Well, the preparer of this spreadsheet has, yes.*"

He went on to explain that the preparer of the spreadsheet, including the tickmarks, was Deloitte.

(5) On a related note, Mr Welham said that if he had heard anything he thought was misleading on an earnings call, he would have raised the matter, in the first instance with the audit partner. Mr Welham did not raise any such issue for any of the calls he listened to; nor, as far as he was aware, did anyone else at Deloitte.

2999. In any event, the Defendants concluded, the Claimants' case *"has the whiff of hindsight"*. Although now keen to stress the importance of the OEM metric, the Claimants had not attached such importance at the time:

(1) It was not an IFRS figure, and did not form part of the financial statements. As Autonomy's published information made clear, it was a voluntary supplemental metric provided for background information, to assist in understanding the company's business. Autonomy explicitly stated that the categorisation involved qualitative estimates.

---

[346]Mr Welham confirmed that the whole of the document was a Deloitte working paper.

(2) The effect of any misclassification, if established, would be hard to gauge, since any reduction in the OEM metric would be offset by an increase in some other metric that might be equally attractive for investors. As Dr Lynch put it,

> "*there's no dispute that these are actual sales. So if you take them out of OEM revenues and you put them into cloud, then investors would get excited that cloud was growing even faster.*"

(3) It was attractive to HP to know that Autonomy's technology had been adopted in some large OEMs, but Mr Apotheker agreed that "*the absolute number wasn't of big interest.*"

3000. In further support of their position that the Claimants' approach was manufactured, the Defendants also pointed out that the transactions the Claimants now complain were misdescribed as "OEM" include contracts that were in the data room during due diligence. They contended that HP's advisers analysed these contracts, knew that they were categorised as OEM, but raised no complaint about misclassification. Further, this gave rise to the question whether the Claimants could show that they had reasonably relied on the OEM business having a narrow scope such as to exclude from it transactions of the sort that were actually made available to them as being within it.

3001. The Defendants dismissed the misrepresentation claims as similarly contrived, and in answer to the Claimants' central claim stressed especially that Autonomy's OEM derived revenues were indeed *"highly likely"* to be recurring and no false depiction had been given at any stage.

## The Claimants' various causes of action in respect of OEM business

*Summary of FSMA claim in relation to statements made about the OEM business*

3002. The Claimants' FSMA claim is based necessarily on statements made in Autonomy's published information. In its published information, Autonomy described revenues from this line of business initially as *"OEM derived revenues"[347]*, later as *"IDOL OEM derived revenues"[348]* and lastly as *"IDOL OEM"*. (I shall refer to them uniformly as *"OEM derived revenues"*).

3003. The Claimants' FSMA case in this regard is that HP (and through it, Bidco) (a) reasonably relied on the presentation of OEM derived revenues in its published information when purchasing Autonomy[349] (b) was thereby misled and (c) has suffered loss as a result.

3004. Mr Rabinowitz summarised the essential elements of the OEM claim under FSMA in his oral closing submissions as follows:

---

[347] In four Quarterly Reports from Q3 2009 to Q2 2010.

[348] In the Q3 2010 Quarterly Report.

[349] This claim has, as in the case of all the FSMA claims, a dog-leg nature: to establish liability the Claimants must first show that Autonomy was liable to Bidco and was right to accept liability in full, and then secondly, that the Defendants are liable to Autonomy for their respective breaches of duty in thus exposing Autonomy. See also paragraphs 17 to 18 and 432 to 434 above.

> *"So what matters is to identify what it was that Autonomy told the market about its IDOL OEM revenue, to consider whether that reflected the reality about what was being included by Autonomy in that category and to consider also, if this is the case, whether the Defendants knew that what was being said by Autonomy in its published information did not reflect the reality of what Autonomy was in fact including in this category."*

3005. I address these FSMA claims in respect of Autonomy's presentation of its OEM business in more detail in paragraphs 3030 to 3247 below.

*Summary of the Claimants' direct misrepresentation claims in relation to OEM*

3006. In addition to their FSMA claim, the Claimants also brought claims in deceit and/or under s. 2(1) of the Misrepresentation Act 1967. However, the Claimants only claimed losses under these claims in respect of the shares and share options which each of the Defendants sold to Bidco. In connection with Autonomy's OEM business, the Claimants alleged that direct misrepresentations about the OEM derived revenue category had been made by Dr Lynch and Mr Hussain to HP in the run up to the acquisition, on which HP and through it, Bidco, had also relied.

3007. The Claimants grouped eight sets of misrepresentations they alleged in respect of Autonomy's OEM business and divided them chronologically according to certain presentations made during the course of the acquisition process:

(1) The initial approach to HP by Qatalyst and introductory meetings in January to March 2011, at which HP was shown two slide decks ("the January and February Slides") depicting Autonomy's *"Attractive Revenue Mix"* of which some 15% was shown in a pie-chart to be comprised of *"OEM Ongoing"* (some 13%) and *"OEM Dev"* (some 2%), and later, in March 2011 some further slides ("the March Slides") to the same effect;

(2) The more detailed discussions in London in June and July 2011, in the course of which (according to the Claimants) Dr Lynch (in addition to describing Autonomy as a *"pure software"* company) stated that (i) the costs of Autonomy's IDOL OEM revenues were very low, being royalty based, with gross margins approaching 100% and (ii) the sales channel to OEMs gave rise to a *"network effect"*; and

(3) The due diligence process in August 2011, in the course of which HP asked specific questions of Autonomy and also asked for Autonomy's *"Top 10 OEM customers by revenue for FY 2010"*, and received (allegedly) misleading responses.

3008. I address these claims in deceit and/or misrepresentation claims, which are direct claims by HP against the Defendants, in paragraphs 3248 to 3252 below.

*Two points of clarification with respect to the ambit of the dispute in respect of OEM claim*

3009. Before addressing the issues in respect of the OEM claim at greater length, it is convenient to address two points which serve to define and confine the ambit of the dispute.

3010. The first, raised by the Defendants, has two facets. One is as to the sufficiency and status of the details provided by the Claimants in respect of the 67 transactions they relied on as generating revenue which could not properly have been classified as "OEM derived revenue".

3011. The other is as to the consequences of the fact that the Claimants sought to advance their OEM case on the general basis that none fell within what the Defendants described as the Claimants' own *"self-chosen, inaccurate definition"*, and apparently on that basis did not go through the details of the transactions referred to in Schedule 8 of their RRAPoC with Dr Lynch or any other witness or ask about their classification as giving rise to OEM revenues.

3012. Dr Lynch contended that the Claimants' approach, and especially their suggested conclusion that the three categories they had identified (see paragraph 2982 above) comprised some 80% of the OEM derived category, was so insufficient and unsatisfactory that the claim should simply be regarded as not open to them to pursue as against him. Mr Hussain could not complain that the case had not been put to him; but he could and did complain that the case was inadequately supported by the evidence that the Claimants had chosen to put forward.

3013. The Defendants relied especially on the following:

(1) The Claimants did not go through the 67 transactions (otherwise than in submissions) even on a sample basis; they did not ask Dr Lynch (or any other witness) about any specific positive features which on their case had apparently justified a judgement that revenue from it qualified for inclusion within the OEM metric. Instead, the case on misclassification was put to Dr Lynch "*at a very high level of generality*". Dr Lynch was simply asked about the Claimants' general theory, and then confronted with certain conclusions based on that theory with which he inevitably disagreed.

(2) The cross-examination of him thus proceeded on the basis of the Claimants' narrow definition, which he considered wrong, but did not condescend to the detail of why each impugned OEM transaction was, on the basis of that narrow definition, said to be lacking qualifying characteristics. The complaint was that he was never given the chance to explain how, by reference to the characteristics of each transaction, the broader definition he advanced would have justified the classification of revenue within the OEM metric in each particular case or why the characterisation suggested by the Claimants was wrong in the context of each specific transaction.

(3) Having not been given the opportunity to justify the classification of each individual transaction by reference to his own understanding of the scope of the metric, Dr Lynch was also not given the opportunity to explain the (avowedly very limited) extent of his knowledge in respect of each of them, nor what part (if any) he played in assigning them to the OEM metric as being OEM-derived.

(4) Further, the summary descriptions of the nature of the transactions provided by the Claimants were (according to the Defendants) not adequate for the purpose of testing the Claimants' complaints as to classification. In a number of cases, the Claimants' reasons for saying that transactions were wrongly classified as

OEM was that the same transactions were challenged in some other part of the Claimants' case, whether as alleged 'reciprocal transactions', or impugned VAR or Hosting transactions[350]. The Defendants' more general point was that this was not a proper or sufficient basis on which to challenge the classification: a separate analysis was needed to sustain a case that the revenues were wrongly categorised as OEM.

(5) In particular, the Defendants submitted that the 80% figure asserted by the Claimants to represent the proportion of revenue included in the OEM metric which (according to their 'narrow' definition) did not match Autonomy's own description of OEM derived revenue was *"not anchored to anything, not even kinds of deals, never mind actual deals".*

3014. Mr Rabinowitz submitted in his oral closing that, having set out in his pleading and in his written opening what characteristics of the 67 impugned transactions the Claimants relied on as disqualifying them from inclusion within the OEM metric, (a) it would have been disproportionate and would have *"got very short shrift"* from me had Dr Lynch been cross-examined on such features in each or even a sample of those transactions; (b) Dr Lynch had had every opportunity to raise, and should have raised, any points he had if he disagreed; and (c) the suggestion that the impugned transactions were properly included within the OEM metric because the market understood a broader category to be indicated by the introduction of the prefix "derived" in Q1, Q2 and Q3 2010 was the case relied on by the Defendants and for them to demonstrate.[351]

3015. The Claimants' decision is forensically understandable, especially given constraints of time, but raises a difficult issue. As to whether a trawl through the 67 impugned OEM transactions with Dr Lynch (who denied any detailed involvement but was the only person giving evidence for the Defendants who was suggested to have been involved) might have got short shrift from me, there was no need for such reticence, even if mercifully meant. But I agree that it is unlikely that I would have been persuaded that a trawl in cross-examination through 67 listed transactions, with a witness who professed not to know anything about the details of them and could only, if anything, offer a commentary which he might have provided more efficiently in submissions would have been necessary or proportionate. Some process of illustration by example might have been fashioned, but none was suggested.

3016. In any event, the question is whether having made the choice and taken that course, it was sufficient for the Claimants to base their OEM case on their general theory, and an explanation in submissions (but not evidence) why none of the features of the 67 transactions identified (but not proved) conformed with it.

3017. It is obviously important to consider what the Defendants pleaded. Neither of them admitted the contents of Schedule 8. However, the point that each made was that they were not knowingly improperly accounted for because they were considered to be "OEM-derived revenues". Dr Lynch also pleaded that if their inclusion as such was in

---

[350] The examples given by Dr Lynch were OEM13, 15, 16, 23, 34 and 35.
[351] As Mr Rabinowitz put it: *"It's the defendants who say – it's not us who say this – it's the defendants who say the expression "OEM derived"…everyone knew….meant something wider than development fee and ongoing royalty…They're relying on OEM derived as producing some wider category but that's their case, not our case."*

error it was not an error of which he was aware of or involved in. I set out Dr Lynch's pleading in this regard below:

> *"It is further denied that the transactions identified in Schedule 8 were incorrectly characterised. The characterization of those transactions involved a qualitative assessment by members of the Finance Department (and not by Dr Lynch), which was reviewed and concurred in by Deloitte and was fair. If, which is denied, any of those transactions could not fairly have been characterised as OEM-derived revenues, this was not an error that Dr Lynch was aware of or involved in."*

3018. In that latter context, and as recorded in his written closing submissions, Dr Lynch's evidence on the general point was that he knew and regarded it as entirely appropriate, and consistent with the broad scope of OEM revenues that he understood was conveyed (especially by the use of the prefix *"derived"*), that during the Relevant Period, the revenues classified as *OEM-derived* revenues were not limited to those generated by sales to customers who purchased the right to embed IDOL software into their own software for onward licensing to third parties; and that he knew that Autonomy was including within the OEM metric other revenues, including one-off upsells and PODS directly to service providers which had purchased the IDOL software content from an OEM, and sales to a VAR merely for resale. The justification he avowed for the inclusion of revenue from the 67 impugned transactions in the "OEM metric" was that OEM business was not limited to sales to an OEM and sales such as upsells and PODS to service providers to update and upgrade Autonomy software on equipment supplied to them by an OEM was "OEM derived".

3019. At times during the dispute it seemed to me that the issues were being obscured, and their determination made more difficult, by treating the disagreement as being whether the semantic description "OEM derived" offered a safe haven (as Dr Lynch insisted it did). As it seems to me, the issue cannot be determined by labels.

3020. The issue is whether the Defendants genuinely thought that transactions with the characteristics of the 67 transactions impugned (and described as OEM derived) would have been considered in the market to be such as to justify regarding them as having special value by reference to the nature of the revenue they generated such as to justify their special description.

3021. I am not persuaded that anything more was needed than to determine (a) why special value was generally accorded in the market to OEM business (b) what were the salient characteristics of the 67 transactions relied on by the Defendants as justifying their implicit invitation to the market (by their special description in Autonomy's published information) to treat them as having special value; and (c) whether the Defendants had any honest belief in that justification or were simply deploying the special description as a false excuse for according special treatment and value to a cohort of transactions having in fact (and to their knowledge) no special qualities or characteristics.

3022. The Claimants' case was set out clearly in their Opening Submissions, identifying the characteristics of the 67 impugned OEM transactions which they submitted were not such as would be perceived to have the especially valuable characteristics associated

with OEM business. If Dr Lynch wanted to argue that they contained other characteristics or that the characteristics had been misdescribed he had the opportunity to do so. I am not persuaded that this required him to be cross-examined to elicit his comments in that respect.

3023. As to the honesty of his belief in the characteristics it seems to me that enough was put forward and Dr Lynch was, in all the circumstances, sufficiently cross-examined.

3024. I return later to consider the Claimants' submissions on the *"general theory"* and the basis on which they submitted it excluded each of the 67 impugned OEM transactions.

3025. A second point of detail concerns whether the Claimants' "general theory" dictates that only a recurring revenue stream was properly included within the OEM metric: if so, that would have excluded single licence or upfront payments and revenue from the sale of PODS.

3026. There was some confusion in this regard, introduced by the contention in Dr Lynch's Re-Amended Defence that the Claimants' clarification (in paragraph 185.1 of their Reply) that they were not contending that revenue was "*precluded from being classified as IDOL OEM revenue merely on the ground that it did not, in a given case, result in an ongoing revenue stream*" carried with it acceptance that such single licence or upfront payments were not improperly included within the metric.

3027. I do not think that the Claimants' clarification went further than to accept that it was not a necessary quality of all revenue allocated to the OEM metric that it should be recurring in nature provided it was generated by further sales to the OEM made almost inevitable by the original sale to that OEM. The Claimants maintained their position that revenue from a sale to an end-user and PODS would not be perceived as either sufficiently certain or as having the other qualities associated with OEM business.

3028. The upshot is that it remained the Claimants' case that (a) it was misleading of Autonomy to have included within the OEM metric in its published information sales to an end-user simply on the basis that the end-user had originally acquired the IDOL software to which it wished to add functionality from an OEM; and (b) it was misleading to include in the OEM metric revenue a type of revenue that might be expected to be but was not a sale to an OEM and was not an incidental but almost inevitable product of and within the original OEM relationship. I consider later whether the admitted extension to incremental sales nevertheless introduces an element of subjective judgement in any event.

3029. I turn to identify and then address the issues to which the disputes concerning Autonomy's OEM business give rise by reference to the Claimants' pleaded causes of action.

### *FSMA claim in more detail*

3030. The following issues arise in the context of the FSMA claim in respect of the OEM metric:

> (1) What did the Claimants have to prove to establish their FSMA claim in relation to the OEM metric?

(2) What was the "published information" on which the Claimants claim to have been entitled to rely in this context? Are they right that it included transcripts of earnings calls at least from Q4 2010 onwards?

(3) What were the statements made of OEM derived revenue in that published information, and what, in the round, was the depiction of the scope of IDOL OEM revenue in that published information?

(4) Should the depiction of the scope of IDOL OEM revenues in the published information be taken as exhaustive and exclusive? Or is that depiction to be read subject to an established market understanding that revenues described as IDOL OEM would include also revenues which did not arise directly from, but could be said to have been made possible by, sales to OEMs?

(5) Did revenue streams in fact included in the OEM metric fall outside a reader's likely understanding of the OEM metric so as to make the published information false and misleading?

(6) What involvement did the Defendants each have in the presentation of that published information? If the statements were false and misleading, did they know that?

(7) How did HP/Bidco understand the published information? What is the test of reliance in a FSMA claim and can HP demonstrate such reliance?

*The legal ingredients of the FSMA Claim in relation to OEM*

3031. In the Introduction to this judgment, I have sought to explain the requisite conditions of liability applicable in any FSMA claim, whether under s. 90A or its replacement, Schedule 10A (as and from 1 October 2010): see paragraphs 432 to 544 above. Certain particular legal issues arise in the context of the OEM claim which require further elaboration. These relate to:

(1) Whether the statements made in earnings calls and transcripts of earnings calls after 1 October 2010, on which the Claimants placed reliance, fell within the scope of the definition of *"published information"* in Schedule 10A, paragraph 2(1) FSMA (which came into force on 1 October 2010);

(2) The test for determining whether a statement is *"untrue or misleading"*; and

(3) The test of whether a PDMR within the Issuer knew it to be so, or was *"reckless whether it was untrue or misleading"* (what I have termed "guilty knowledge" in paragraph 448 above).

*The statements on which the Claimants claim to have been entitled to rely in this context*

3032. In the context of the OEM claim, the Claimants referred to and contended they relied on Autonomy's Annual and Quarterly Reports for the Relevant Period (that is to say, the Quarterly Reports for Q1 2009 to Q2 2011 and the Annual Reports for FY 2009 and

2010). It is common ground that these constituted *"publications"* or *"published information"* within the meaning of those expressions in s. 90A and its replacement (with effect from 1 October 2010) in Schedule 10A of FSMA respectively.

3033. However, the Claimants also referred extensively to calls and transcriptions of earnings calls in the same period, including the Q4 2010 earnings call, the Q1 2011 earnings call and the Q2 2011 earnings call, and appeared to rely on statements made in that context as also constituting *"published information"* to which Schedule 10A FSMA applied.

3034. I have explained, in the Introduction, my reasons for concluding that the calls and the transcripts of them did not constitute published information. It follows that, in my judgment, statements made in the earnings calls cannot found a claim under Schedule 10A of FSMA. However, as also noted in the Introduction, that does not mean that they are inadmissible or irrelevant: they may well be relevant to other conditions of liability, such as the state of mind of relevant PDMRs in making the statements now impugned, and the actual state of market knowledge.

3035. In the context of the OEM claim in particular, they may be of direct relevance to the fundamental questions of (a) whether the scope of OEM-derived revenues was explained to the market so as to become, in effect, market knowledge and (b) the Defendants' own understanding of the meaning of IDOL OEM and their perception of what the market would take the category to comprise and understand from the metrics given. Some may also be relevant to the question of what analysts and the investment community actually knew, or were told, though of course individual conversations should not be taken to import knowledge across a broader constituency.

*Determining whether a statement is (a) untrue or misleading and (b) known to be so*

3036. Obviously, whether a statement is knowingly false or recklessly made depends upon what its maker understood it to state about the matters to which it refers, and whether according to that understanding, what was stated was in fact true. In a case based on alleged deceit, the test is whether the statement was untrue, tested according to what the defendant considered to be, or envisaged would be understood to be, its meaning, though it will suffice also if the defendant was reckless in the sense of knowing that a statement might well be understood in a way which would render it (on that understanding of it) untrue or misleading.

3037. In many cases, there is no dispute as to the meaning of a given statement, and the questions then are whether it was untrue or misleading in its description of the matters to which it refers, and if so, whether the PDMR deemed responsible for the published information in which it appears knew it to be untrue or misleading, or was reckless as to whether it was or not.

3038. In such a case, the clear objective meaning of the statement, though not determinative, may itself be a relevant factor in determining whether the maker had any real belief in the meaning he now asserts. Thus:

(1) If the objective meaning of a statement is clear, and by reference to that meaning would be false, a defendant's claim to having thought and intended it to have some other meaning may be difficult to sustain. In such circumstances, the defendant will be forced to resort to some personal definition, or some

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

eccentric meaning, which may strain credulity. As the Privy Council said in *Akerhielm v de Mare* [1959] AC 789:

> *"For instance, the meaning placed by the defendant on the representation made may be so far removed from the sense in which it would be understood by any reasonable person as to make it impossible to hold that the defendant honestly understood the representation to bear the meaning claimed by him and honestly believed it in that sense to be true."*

(2) By contrast, as Males J (as he then was) noted in *Leni Gas & Oil Investments Limited and another v Malta Oil Pty and another* [2014] EHC 893 (Comm) at [7] to [9]:

> *"if a reasonable person in the claimant's position would not have understood that the statement in question was being made, that may make it unlikely that the defendant intended his words to be understood as making such a statement. As Mr Kitchener acknowledged, if the court is of the view that no reasonable representee could have inferred the representation contended for, it is highly unlikely that it will find either that this is what Dr Higgs intended or that this is what Mr Ritson in fact understood."*

3039. In other cases, however, what a reasonable person would have taken the statement to mean is not clear, and is disputed. The potential for such dispute is obviously far greater in a case such as the present, in the context of statements which (a) have no standardised or defined meaning, (b) have been given none by the maker, (c) have been the subject of a variety of explanations to different audiences at different times, and (d) in the case of the voluntarily provided OEM metrics, were expressly stated to be subject to *"qualitative"* assessment. Any search for what the posited reasonable person would have understood the statement to mean is further complicated in a case such as this (and possibly in any case where information is published generally), where the audience is disparate and comprised of persons in very different circumstances, with varying degrees of background knowledge and expertise, a few of whom may also be aware of other published information issued by the same issuer at about the same time though most others may not.

3040. The search for a single objective meaning in such circumstances is in reality something of a conceit; and it may be unnecessary and even unwise. Unnecessary, because, as Mr Miles submitted, the search in the context of a deceit claim is not for the single 'best' objective interpretation, as it would be in the context of disputed contractual interpretation: for the PDMR cannot be guilty of deceit simply because the court considers that on its interpretation of it, the statement was untrue: his knowledge of its falsity is ultimately the only test of dishonesty. Unwise, because the selected preferred meaning may skew the assessment of subjectively intended meaning, at least unless it is kept firmly in mind that at most it is relevant as a test of the credibility of the defendant's own interpretation or of the likelihood that the defendant fell upon the phrase precisely because of its ambiguity (and see paragraph 3047 below).

3041. Mr Miles went on to submit that if the court is persuaded that a statement alleged to be false or misleading is genuinely open to various meanings, and that asserted by the defendant is one of them (even if not the most likely or obvious one), the determination of the matter is, in effect, removed to the second stage of enquiry, and to an assessment of the defendant's actual state of mind. As Mr Miles put it:

> "If there is a range of possible meanings, then in order to say someone has acted fraudulently, it is necessary to show that they either understood the term in the narrow sense contended for by the claimants or deliberately used the ambiguity for the purpose of deception."

3042. That accords with the following extract from *Clerk & Lindsell on Torts* (22nd ed) at 18-25:

> "Where a statement is capable of being understood in more than one sense, it is essential to liability in deceit that the party making the statement should have intended it to be understood in its untrue sense, or at the very least that he should have deliberately used the ambiguity for the purpose of deceiving the claimant."

3043. Thus, for example, in the *Akerhielm* case itself, a buyer of shares who had relied on an ambiguous statement in a company prospectus (that shares had been "subscribed", begging a question whether the shares were paid up in cash or in some other way, or unpaid) failed in his action in deceit once it was shown that the defendants had honestly believed the statement to be true in the sense in which they had intended it to be read.

3044. Mr Miles submitted that there was just such ambiguity in the present case. The meaning the Defendants maintain they had intended was an available one, and (so they said) shared by many in the market, so that at worst the statements were unintentionally ambiguous: and according to that intended meaning, or one of two or more legitimate meanings resulting in ambiguity, the statement was neither untrue nor misleading.

3045. However, that submission, and Mr Miles's invitation to move straight to limb two, is premised on an initial conclusion that true ambiguity has been revealed by the dispute. The Claimants did not accept that. They contended that on proper analysis, the meaning conveyed by the OEM metric and the disputed expressions (OEM and OEM derived revenues) was clear, and as conveyed, was untrue. Although the expressions might, short of context, be open to different interpretations, the description of the OEM metric and the meaning attributed to the disputed expressions in the published information, resolved any ambiguity otherwise inherent in the expressions 'OEM' and 'OEM derived revenue' and left no room for any alternative interpretation. The Defendants had, in effect, supplied their own definition of the expressions in the published information.

3046. On this view, the Defendants were seeking to rely, not on ambiguity in the statements made, but on a private dictionary which the Defendants claimed to have built up in the market, in which the impugned expressions had or had acquired, on the basis of a special dictionary thus created, a broader meaning than the meaning apparently ascribed to them in the document taken as a whole. In other words, any ambiguity was introduced by some special meaning vouchsafed to the market, or more likely, a section of the market, which was not apparent from a process of interpreting the published information itself.

3047. It followed, on the Claimants' argument, that Mr Miles's approach of going straight to the question of what the Defendant intended assumed ambiguity where in fact there was none, and could result in an important factor being left out of consideration. Resort to an eccentric 'private dictionary' meaning would be difficult to sustain and itself cast dispositive doubt on the defendant's honesty in making statements in a form which relied on it; and indeed the question of guilty knowledge might also be determined by plain inconsistency between an arguable interpretation asserted by the defendant, and the other words the defendant has used in the presentation taken as a whole.

3048. I have concluded that, in this case, I am required to adopt the two-stage approach by the Claimants' assertion that any ambiguity in the meaning of the expressions used has been resolved by definitive language in the published information taken as a whole. In any event, I have concluded that the ambiguity is not so evident that I can safely take the shortcut to the question of the Defendants' subjective intention.

3049. In the circumstances it seems to me that there is no available shortcut such as Mr Miles in effect suggested; and to determine the OEM claim, I must assess:

(1) whether the market would have understood the expression *"OEM Derived"* materially to extend the nature of the business included in the OEM metric.

(2) What, at that time, the Defendants honestly intended readers of Autonomy's published information to understand to be conveyed by the OEM metrics they provided, the expressions *OEM* and *OEM derived revenue* they deployed, and the statements they made as to the scope and nature of Autonomy's OEM business;

(3) Whether, in the light of the answers to (1) and (2) above, the statements made and the metrics provided were true or untrue, or misleading, to the knowledge of the Defendants.[352]

3050. Incidental to these principal questions are the following further sub-issues:

(a) What, if any, account should be taken of the evidence of Analysts relied on by the Defendants in support of their position that there was an established market understanding that Autonomy's OEM business was broader in scope than the Claimants have depicted it to be and extended, for example, to upsells and PODS;

(b) Whether the Defendants were aware that those expressions would be likely to be interpreted by many as the Claimants maintain they did interpret them and deployed them (i) knowing that, so interpreted,  they were untrue or misleading, or (ii) lacking any honest belief in their truth (so as to be reckless according to the meaning of recklessness laid down in *Derry v Peek* (1889) 14 App. Cas 337)) if so interpreted; and/or (iii) because they knew the expressions were ambiguous and consciously deployed the ambiguity to deceive the Claimants.

---

[352] It would suffice for the Claimants if, although the Defendants did not actually know the statements to be untrue or misleading, they were reckless as to whether they were untrue or misleading.

3051. I turn first to the way the OEM metric was put forward in Autonomy's published information.

*What was stated in Autonomy's published information about the OEM metric?*

3052. What was said about the OEM metric and OEM derived revenues in Autonomy's Quarterly Reports and Annual Reports can be summarised as follows:

(1) Initially, in the Q1 2009 and Q2 2009 Quarterly Reports, little more was conveyed about this category of business than that Autonomy was developing an *"OEM Program"* which involved sales of Autonomy software to key companies which would each *"OEM Autonomy technology",* that is to say, embed Autonomy software in their own products for onward sale.

The OEM Program was said to be growing, but little more information was provided, and nothing was said about the content or form of the OEM agreements.

(2) The Q3 2009 Quarterly Report was the first to provide *"Supplemental Metrics"* which referred to and measured *"OEM derived revenues".* It cautioned that these metrics were *"provided for background information"* and *"may include qualitative estimates".*

It was stated that *"More than 400 companies OEM Autonomy technology, including Symantec, Citrix, HP, Novell, Oracle, Sybase and TIBCO";* but no definition was provided of OEM derived business, nor was the form or content of the deals described.

(3) The 2009 Annual Report described OEM relationships (as well as cloud computing) as one of *"the new models of the software industry"* and as the vehicle to enable Autonomy's technology (especially in unstructured data analysis) to be applied to every area of IT, even areas in which Autonomy did not itself compete.

There was no discrete definition of OEM business; and the rubric *"OEM derived"* was not used.

However, it was stated that Autonomy had over 400 *"OEM relationships with other major software vendors that build our technology into their products"*; and that Autonomy was relied on by OEMs *"from virtually every major software sector"* to *"address the problem of unstructured information, provide unique next-generation functionality and deliver unparalleled performance"* by *"[embedding] Autonomy's award-winning technology into their software solutions".*

It was stated also that:

*"Autonomy's OEM customers bring Autonomy technology to vertical markets by embedding it in their own solutions. Autonomy benefits from the expertise of*

*a community of systems integrators and consultants who engage with customers to expand and sustain use of Autonomy products in a wide variety of industries".*

For the first time, there was mention of the fee structure, which was said *"typically"* to provide for royalty fees based on the amount of sales by the OEM: it was stated that *"OEM and reseller arrangements…typically provide for fees payable to the group based on licensing of the group's software to third party customers".* These royalties or royalty-type payments were said to be around three percent of the value of product sales.

Supplemental Metrics were provided, with a warning about qualitative estimates; but though these gave figures for key parameters, and in particular organic growth and cash conversion rates, they did not identify or distinguish OEM or any other business lines.

(4) The Q1 2010 Quarterly Report referred to and quantified *"OEM derived revenues"* and introduced more detailed *"supplemental metrics"* which separated out two constituent parts of OEM derived revenue, *"OEM Dev"* and *"OEM Ongoing"* and portrayed the OEM Program as growing strongly.

Still there was no overall definition of the types of revenue comprising OEM derived business nor any description of the form or content of OEM deals. The Supplemental Metrics were given as before, with the same warning about qualitative estimates.

(5) The Q2 2010 Quarterly Report expressly stated the OEM business to be Autonomy's *"fastest growing revenue stream"*, with a quote from Dr Lynch referring to *"a powerful networking effect underway as IDOL further penetrates the entire spectrum of enterprise software applications".*

Supplemental Metrics were provided in a form which distinguished various business lines, including *"OEM derived revenues"* (which was sub-divided into *"OEM Dev"* and *"OEM Ongoing"*). There was no further definition of OEM derived business or the form or content of OEM deals. Again a warning was given about the supplemental metrics only being provided *"for background information and may include qualitative estimates."*

(6) The Q3 2010 Quarterly Report described strong (30% year on year) growth in "IDOL OEM revenues" as *"both a further endorsement of the unique capabilities of IDOL and reflects a growing network effect as more software companies choose to design their products with Autonomy inside."*

Supplemental Metrics were again provided, substantially in the same (revised) format, but prefacing the word "*IDOL*" before *"OEM derived revenues"* and quantifying each of the sub-components identified (*"IDOL OEM Dev"* and *"IDOL OEM Ongoing"*). As before, there was no definition of IDOL OEM or IDOL OEM derived, and no description of the form or content of OEM deals. The same warning about qualitative estimates was given.

(7) The Q4 2010 Quarterly Report described IDOL OEM as *"where Autonomy's IDOL is embedded inside other software companies' products…addressing most software vertical markets."* It added that:

> *"This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences."*

Autonomy continued to depict IDOL OEM, with IDOL Cloud, as fast growing, high margin, highly attractive *"as they turn one-off sales into multi-year committed annuity streams",* replacing *"one off sales"*, and one of the *"key drivers of our business".*

The Report drew attention to there being a short-term effect of this as appearing to depress growth, since one-off sales were recognised in full and immediately, but emphasised the advantage over the longer term of *"more valuable annuity streams".* The impression conveyed was of the OEM business promoting the wide use and acceptance of Autonomy's software within the software industry.

Supplemental Metrics were provided in a slightly altered and truncated format but to the same effect: these indicated that in Q4 2010 IDOL OEM revenues totalled some 14% of all revenues. The previously invariable warning of "qualitative estimates" was no longer expressly stated.

(8) The 2010 Annual Report elaborated on the presentation in the Q4 2010 Quarterly Report, adopting the same description of IDOL OEM. Again, OEMs were described as software companies wishing to embed IDOL, and a warning was included in Dr Lynch's report as CEO of *"some seasonality in IDOL OEM sales as they are predicated on the rest of the software industry sales, and the period over which those vendors report their sales to us".*

IDOL OEM growth was stated to have been 32%, and broadly similar statements as in the immediately preceding Quarterly Reports were deployed to expand on the value of turning *"one-off sales into multi-year committed annuity streams"*, and to emphasise that *"numerous world-leading software companies embed Autonomy's award-winning technology into their software solutions".*

The fee structure was described as generating royalties, giving rise to higher margins than IDOL Cloud business. However, no breakdown between *"OEM Dev"* and *"OEM Ongoing"* was provided, and no mention was made of *"OEM derived"*: those terms appear to have dropped out of the description of the metric.

(9) The Q1 2011 Quarterly Report conveyed basically the same message, emphasising again IDOL OEM's importance as a revenue stream *"as it generates ongoing business across the broadest product set possible, in addition to up-front development licences".*

However, this report did not include the information provided in the Q4 2010 Quarterly Report and the 2010 Annual Report which expressly depicted the

IDOL OEM category as comprising, in addition to up-front licence payments (which were mentioned), ongoing royalty payments paid by software companies which had chosen to embed IDOL in their own software for onward sale. No split between *"Dev"* and *"Ongoing"* was provided.

(10)    The Q2 2011 Quarterly Report was in similar form to the Q1 2011 Quarterly Report, again emphasising the importance of IDOL OEM as a driver of Autonomy's business, providing strong growth and (like Cloud) a recurring and particularly important revenue stream *"as it generates ongoing business across the broadest product set possible"*.

The description of IDOL OEM as being *"where Autonomy's IDOL is embedded inside other software companies' products"* was repeated.

Again, no split between "*Dev"* and *"Ongoing"* was provided: again, those sub-categories were not mentioned, though reference was made to revenue from sales by OEM *"in addition to up-front development licences"*. OEM business was (like Cloud business) presented as a *"recurring model"*, deriving *"recurring revenues with long-term contracts."*

3053.    In none of these Reports was there any express mention of either *"upsell"* or *"PODS"* revenue. Nor was there any other express reference to sales of functionality to end-users (as distinct from to the OEMs). The Defendants' contention was, as it had to be, that the reference to *"ongoing business across the broadest product set possible in addition to up-front development licences"* was easily broad enough to extend to such sales, and certainly did not exclude them.

3054.    The Claimants relied strongly on breakdowns of OEM derived revenue provided in certain quarters (Q1 2010, Q2 2010 and Q3 2010). These divided *"OEM derived revenues"* into two sub-categories (*"OEM Dev"* and *"OEM Ongoing"*). The Claimants pointed out that according to those breakdowns, the lion's share of IDOL OEM revenue consisted of ongoing royalty revenue (see paragraph 3056(4) to (5) below). Thus, in each of the three quarters (Q1 2010, Q2 2010 and Q3 2010) in which this breakdown was provided, the sum of *"OEM Dev"* and *"OEM Ongoing"* was equal to total reported *"OEM derived revenues"*, with the vast majority (at least 90%) being attributed to *"OEM Ongoing"* revenue.

3055.    The Claimants' latter point was simple but important: in addition to emphasising the preponderance of royalty revenues, the two stated categories left no arithmetical or other room for any other sources of OEM revenue. Thus, if, as the Defendants contended, the expression "*OEM derived revenues*" communicated the inclusion of upsell and PODS revenue within IDOL OEM revenue, this could only be because upsell and PODS revenue could properly be regarded as coming within one or both of the sub-categories: "*OEM Dev*" and "*OEM Ongoing*".

3056.    The Claimants' case is, as I would summarise it, that taken together, a reasonable reader of all these various Reports would have understood them to be demonstrating the rapid growth of what in early 2009 was a relatively new line of business and as representing that:

(1) Autonomy's OEM business was based on sales to (or at least predominantly to) some 400 of the largest software companies, each with a very large customer base and considerable market presence and penetration: this was a means of introducing IDOL software to a very broad market.

(2) Those software companies (a) produced their own software (b) embedded IDOL software into their own software products under a licence purchased from Autonomy and (c) licenced or sold their products with IDOL embedded on to their own customers.

(3) Sales of software embedded with IDOL through the OEM channel (a) endorsed the unique capabilities of IDOL and reflected its penetration of the software market, and its wide acceptance and use in the software industry, and (b) promoted wider acceptance and use of Autonomy's software in the software industry, furthering the objective of IDOL OEM becoming the software of choice for anyone with unstructured data analysis needs.

(4) Revenue from IDOL OEM business (whether described as *"IDOL OEM"*, *"IDOL OEM derived revenues"* or *"OEM derived revenue")* came from two sources, that is (a) upfront fees for the purchase of a development licence (sub-categorised in the Reports for Q1 2010, Q2 2010 and Q3 2010 as *"OEM Dev")* giving the right to embed the software into an OEM's own products and (b) royalties which normally became payable on the licensing by the OEM's own customer of the combined product (sub-categorised by way of further information in the Reports for Q1 2010, Q2 2010 and Q3 2010 as "*OEM Ongoing"* and referred to as *"OEM royalties"* in Q4 2010, the 2010 Annual Report and as *"ongoing business"* in Q1 2010 and Q2 2010 ).

(5) The predominant component of OEM derived revenue in every quarter was the ongoing element. Breakdowns of these revenues, provided in Q1 2010, Q2 2010 and Q3 2010, allocating total OEM Derived revenues between each of those two categories, appeared to show that (a) some 90% or more of the total revenue came from *"OEM Ongoing"* payments and (b) the two categories accounted for all revenues, and there was no room for any other source of revenue.

(6) *"OEM Ongoing"* revenues were presented (in Q1, Q2 and Q3 2010) as derived from payments by OEMs to Autonomy calculated as a percentage (usually about 3%) of revenues received by the OEM from the sale of its own products with embedded IDOL, and as likely to expand over time as OEM partners embedded more IDOL software functionality in product releases.

(7) Such payments represented a rapidly growing, committed (by contractual obligation imposed on the OEM) and multi-year, recurring revenue stream of greater value than one-off payments, notwithstanding some adverse impact on short-term growth because revenues classified as "royalties" for accounting purposes could only be recognised in the accounts over time.

(8) Another hallmark of the ongoing revenue stream was that it was generated without any ongoing effort by and at no additional cost to Autonomy, resulting in nearly 100% gross margin.

(9) The strong organic growth of IDOL OEM revenue had by 2010 (when such growth was stated to be 32%) become a driving force, with IDOL Cloud, of Autonomy's business and could be regarded as an important measure both of Autonomy's current success and its future prospects.

3057. HP did not read all the published information. Mr Sarin read the most: but he considered only the 2010 Annual Report and the quarterly reports for Q1 2011 and Q2 2011. The Defendants pointed out that most of the OEM transactions sought to be impugned were from Q3 2010 or earlier. I accept the Defendants' point that it was not until Q4 2010 that anything was given resembling a definitive description of IDOL OEM in terms of being *"where Autonomy's IDOL is embedded inside other software companies' products...addressing most software vertical markets"*. However, it being common ground that the scope of IDOL OEM was intended to be constant over the entire Relevant Period, it seems to me that the Claimants were entitled to rely on the description as applicable across the Relevant Period; and, in any event, HP was entitled to rely on the way IDOL OEM was described in Autonomy's published information in the Annual Report for 2010.

3058. In summary, the Claimants' case was that the reasonable reader of Autonomy's published information (including the reasonable reader who had only read the annual report for 2010 and the quarterly reports for Q1 2011 and Q2 2011) would have expected and the market would have understood:

(1) Most, if not all, of Autonomy's OEM business to be generated through transactions with large software companies.

(2) The revenues of that OEM business to come exclusively from development licences sold to such OEM partners and recurring payments due from those OEM partners to Autonomy by way of royalties in respect of their onward sales to third parties of software products with IDOL embedded under licence.

They would not have expected any material part of the revenue included in the OEM metric to be derived from sales to third parties, and would not have regarded the prospect of multiple sales to third parties involving sales effort and cost on the part of Autonomy as being the same as recurring revenue from an OEM partnership at no further cost to Autonomy and thus near 100% margin.

*The Defendants' response on the scope of IDOL OEM conveyed by the published information*

3059. As indicated in my summary of their case, the Defendants contended that (a) in standard parlance and in the market, it was not only companies in the business of developing their own software which could properly be regarded as OEMs: the category was not generally understood to be so limited and hardware companies could be OEMs as well; (b) the Claimants' approach rendered redundant the word "derived" and had given no or no sufficient content to the description of the OEM metric as expressly including all revenue derived from the OEM relationships, as well as revenues generated from an OEM directly.

3060. As to (a), the Defendants drew support from the evidence of Mr Daud Khan ("Mr Khan"): when cross-examined, he accepted that OEMs are not limited to software

companies. They contended that there was no reason why OEM relationships with customers in hardware or other sectors would have been less attractive than software OEMs, and that the same rationale which commended OEM partnerships with other software companies would also apply to a partnership with large hardware companies. They reasoned that the important issue was the market penetration and low costs upsells that an initial sale of a licence to an OEM could achieve; and it mattered not in terms of that objective whether the OEM developed its own software, or was a manufacturer of hardware which embedded IDOL onto its hardware.

3061. Dr Lynch suggested that market penetration across a broad range of industries is in itself desirable. Dr Lynch said that he would be keen to publicise an OEM where "*someone was OEM-ing our software on to a piece of hardware*", or an OEM in the healthcare sector, since it would be a very positive thing to show Autonomy's involvement in broader sectors.

3062. The breadth of the expression "OEM" contended for by Dr Lynch is well illustrated by the example of the transaction with Tottenham Hotspur Football Club in March 2011 (OEM48). Tottenham Hotspur is obviously neither a software nor a hardware company. In cross-examination, it was put to Dr Lynch (in effect) that a football club could surely not reasonably be considered to be an OEM, with an expectation of embedding the Autonomy software it acquired and then onward licencing the product to its own customers. Dr Lynch responded that, on the contrary, Tottenham Hotspur might well decide to sell its website solution on to another football club and it would thereby be an OEM, and the revenues would be OEM derived revenue (see below).

3063. As to (b), the Defendants maintained that they had themselves coined the description of the revenues from the OEM business as *"OEM derived"* to make clear that the category was not confined to a transaction with an OEM yielding revenue from the OEM itself by way of upfront licence fee or royalty payments. This was a lynch-pin of their case. Accepting (as the Defendants did accept) that none of the phrases in contention was or is a term of art or has any established accountancy definition, in ordinary English usage the word *"derived"* connotes something received or obtained from a source or origin and it was apt to cover a wider category of revenues than merely those received from the OEM itself as an upfront payment or royalty: it could include revenue arising from sales of IDOL transactions made possible by, or for which the need arose in consequence of, the embedding and licensing of IDOL software further to the original OEM sale.

3064. According to the Defendants, that would obviously include sales of enhanced functionality (an *"upsell"*) to the OEM itself (which the Claimants accepted to be the case only if the OEM would embed that additional functionality into its software product for on-sale to its own customers); but it would include also the sale of enhanced functionality to an end-user which had come to use IDOL software and need or want that functionality as a result of purchasing from an OEM software with IDOL embedded in it (which the Claimants did not accept).

3065. Both the Defendants positively asserted this. Mr Hussain's pleaded case was to that effect. Dr Lynch's Re-Amended Defence and Counterclaim pleaded as follows in this regard:

> "160.1. Given the nature of Autonomy's core IDOL software, third party
>          OEMs frequently sought to embed Autonomy's technology in their own

> *products through a variety of contractual arrangements. OEM customers would typically license a small subset of the many functions in IDOL – perhaps four or five of the 500 available – which could be further restricted by the permissible amount of data that could be used with the software.*
>
> *160.2. Following these sales, Autonomy would have the opportunity to "up-sell" additional functionality or capacity either to the original OEM purchaser or directly to an entity that had purchased the product from an Autonomy OEM customer. Autonomy considered and accounted for any follow-on license-sale – whether to the original OEM customer or to an OEM customer's customer – as OEM-derived revenue, because the follow-on sale occurred as a consequence of the initial OEM sale.*
>
> *…*
>
> *161.4 When referring to transaction types falling within OEM-derived revenues, Autonomy's published information also made it clear that contracts and situations varied and did not purport to describe all transactions as holding identical characteristics. The OEM model and its characteristic of having derived revenues from follow-on licence sales or upsell transactions had been discussed extensively in analysts' reports since the earliest days of the OEM business and it was clear that the market knew and understood Autonomy's OEM model."*

3066.   Dr Lynch himself described it in cross-examination as follows:

> "*The metric that we give as a management metric which is OEM-derived includes that revenue but also includes revenue which has been made possible by our OEM programme, but that may – well, it does include sales where the purchaser is not an OEM. So, for example, an upsell.*"

3067.   Thus, sales to OEMs with a view to IDOL software being embedded into and re-sold by that OEM as part of its own software of that type could, he suggested, conveniently be described as *"core"* OEM transactions, and the revenue derived from them as *"core OEM revenue"* to distinguish it from the wider category of OEM derived revenues discussed above. The wider category would extend to sales of further functionality to persons which had acquired the original IDOL software embedded in a bundle of software sold by an OEM: though not "core" sales generating core revenue in that sense, these were nevertheless sales parasitic on, made possible and in that sense "derived" from, the original core sale, and generated OEM-derived revenue accordingly.

3068.   To my mind the clearest explanation of the distinction between OEM and OEM-derived, and what the Defendants said they intended to be the considerably wider scope of the latter, was provided by Dr Lynch in the course of his cross-examination about a list of the ten largest OEMs which Autonomy provided to HP at Mr Sarin's request in the late stages of HP's due diligence exercise in August 2011. I must return later to the dispute about the *Top 10 list*, but I quote now and at some length from that cross-examination for the illumination it offers of Dr Lynch's case on OEM and OEM derived:

> "*Q.     We've been through this before. Mr Sarin asked you for total – the ten largest OEM.*

> *A.      OEMs, yes.*
>
> *Q.      No, I think what he asked you for was the top ten OEM customers by revenue?*
>
> *A.      That's right. So an OEM-derived contributor might not be an OEM customer.*
>
> *Q.      Well, with respect, it's still an OEM customer –*
>
> *A.      No, it's not. An OEM customer is someone who takes our software and builds it into their product, and there is – and then they sell that to other people, and that is an OEM. Okay? And our OEM business is about those OEMs. The metric that we give as a management metric which is OEM-derived includes that revenue but also includes revenue which has been made possible by our OEM programme, but that may – well, it does include sales where the purchaser is not an OEM. So, for example, an upsell. So, just to go through this, for the sake of argument, Oracle sells something to Ford, we'll get revenue from Oracle because they are an OEM, and then, if Ford buys something to clip on to that piece of Oracle which uses…the connection to Oracle [quaere Autonomy], then that is a sale that has been enabled and driven by that network effect that we were talking about and that is an OEM-derived sale. But the sale to Oracle is a core OEM deal, the sale to Ford contributed to derived, but Ford is not an OEM.*
> *…*
> *I don't think there's any dispute between us that, if you sell an upsell to Ford, then Ford is not an OEM, yet that still goes into OEM-derived."*

3069.    The Defendants contended that there was nothing in the published information sufficient to displace the broader meaning which they said was intended by the word *"derived"*. They submitted that the Claimants had based their narrow definition of the term from a selective reading of certain parts of the published information, whereas in fact no such definition could fairly be spelt out of the metric as described in the published information.

3070.    They added that the express warning that the figures were provided as background information and might include *"qualitative estimates"* reflected the fact and connoted that the category was descriptive and not definitive, and that the inclusion of particular amounts within the category was a matter of judgment and estimation, rather than a rigid rule. Thus, for example, a judgement might be required and made as to whether the link between source and sale was sufficient to warrant the sale being categorised as derived from (and made possible or driven by) the original sale to an OEM.

3071.    The Defendants relied especially on the following:

(1) Throughout the Relevant Period up to and including Q3 2010, there was nothing in Autonomy's published information that stated in terms either (a) that Autonomy's OEMs were all software companies or (b) that the revenues within the OEM metric were restricted to payments direct from the OEM.

(2) The Business Review section in the 2009 Annual Report stated that "*As part of our comprehensive OEM Program, numerous world-leading software companies embed Autonomy's award-winning technology into their software solutions*" (emphasis added). It did not purport to give an exclusive definition and nor did it say that the programme was restricted to such arrangements: on the contrary, it indicated that was only a part of the programme.

(3) The Claimants' suggestion that a comment in the Q2 2010 press release that "*IDOL further penetrates the entire spectrum of enterprise software applications*", and in the Q3 2010 press release that the growth in IDOL OEM revenues "*reflects a growing network effect as more software companies choose to design their products with Autonomy inside*" demonstrated that it was made clear that the idea that all the OEMs were software companies was an incorrect gloss. While these comments (correctly) highlighted the success of the OEM programme in the software sector, there was no suggestion that the only OEMs were software companies.

(4) The 2010 Annual Report retained the statement from the 2009 Annual Report that "*As part of our comprehensive OEM Program, numerous world-leading software companies embed Autonomy's award-winning technology into their software solutions.*" It also contained the following words, on which the Claimants placed particular reliance:

> "*IDOL OEM. IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products. IDOL is now embedded in most major software companies' products addressing most software vertical markets. This is a particularly important revenue stream as it generates ongoing business across the broadest product set possible, in addition to up-front development licences. In 2010 IDOL OEM revenue totalled $132 million, up 32% from 2009. 42 new agreements were signed during 2010 with 10 new agreements signed during Q4 2010, including deals with Nuance, HP and Vericept.*"

(5) But there was no suggestion in that extract that OEM revenues were limited to revenues received directly from the OEM. On the contrary, this passage stressed the breadth of the business generated by the OEM programme: "*it generates ongoing business across the broadest product set possible*". Nor did it purport to give a comprehensive definition of what is categorised as IDOL OEM revenue; at most, it is a general description, qualified by the words appearing above the passage quoted, that "*the trends are provided for background information and may include qualitative estimates.*" In any event, these words should not be read in isolation: given what was said five pages earlier ("*As part of our comprehensive OEM program…*"), the reader would

understand that the embedding of IDOL in software companies' products did not represent the totality of Autonomy's OEM business.

(6) The Q1 and Q2 2011 press releases contained the passage saying that "*IDOL OEM is where Autonomy's IDOL is embedded inside other software companies' products*", but without the indication given in the Annual Reports that this was only a part of Autonomy's OEM business. However, readers interested in Autonomy would not have read the quarterly press releases alone: they would read them together with the fuller account in the Annual Reports. In this case, HP read the 2010 Annual Report, and it would not have been led by the Q1 and Q2 2011 press releases into thinking that IDOL OEM revenues were more narrowly drawn than in the Annual Report.

3072. The Defendants contended also that the warnings about *"qualitative estimates"* would not have been necessary if the category was confined to "straight" OEM transactions: whereas there was obviously some measure of qualitative assessment or estimate in determining whether to include a later transaction as derived from the original transaction.

3073. The Defendants brought their points on the scope of OEM derived revenues and OEM Ongoing together in the submission that once it is understood that OEM derived revenues included sales direct to customers of OEMs, it is unsurprising that they included revenues from companies other than software companies: even if the OEM itself was in the software sector, its customers could well be operating in different fields.

3074. The Defendants relied on the same point in relation to sales where there was a restriction requiring the customer to use Autonomy software for internal purposes only: where a sale is made direct to an OEM's customer, that customer would be using the software for its own purposes, rather than acting as an OEM itself, so an "internal use" restriction would cause no problems.

3075. As to the Claimants' point that (a) the further breakdown of *OEM derived revenues* into the two sub-categories of *"OEM dev"* and *"OEM Ongoing"* which Autonomy provided in Q1 2010, Q2 2010 and Q3 2010 appeared to allow no room for the inclusion of revenue from any other source (see paragraphs 3054 to 3055 above) and (b) Mr Hussain had adopted the same sub-categories as representing all such revenues, the Defendants' answer was to the effect that this depended on rigidly confining the description *"OEM Ongoing"* to royalties, and (for example) altogether excluding upsells and PODS, for which there was no warrant. Again in the context of questions related to the *Top 10 List*, Dr Lynch put the Defendants' position forcefully and clearly in cross-examination (the underlining is mine):

> "...what we did with our OEM business was we <u>created a definition which was well communicated to the market over a very long period,</u> at least ten years, on multiple occasions, and our numbers were done on that basis. Yes, there are some judgements in those numbers, and it was made clear that situations varied and that there were qualitative estimates. That was actually the wording in the annual report. You [the Claimants] have come up with a different definition of these terms and you've recalculated things on your own basis which bears

> *no relation to our terms, and also, I would venture, bears no relation
> to the commercial reality of what was going on."*

3076. The Defendants also submitted that the words *"OEM Ongoing"*, according to their definition, included not only royalties, but also revenues (a) made possible by the original OEM sale and (b) which could be expected to be ongoing from reliable repeat business. Their rationale was that OEM customers, having embedded Autonomy's software in their own products, were in practical terms tied in: they would be almost bound to renew their contracts and purchase updates and add-ons from Autonomy on a regular basis. Phrases such as *"multi-year committed annuity streams"* (as used in Autonomy's published information, see paragraph 3052(7) above) and Mr Hussain's references to *"ongoing royalties"* should be interpreted similarly, as extending to what Dr Lynch described in his first witness statement as *"follow-on sales…made possible by the initial OEM sale"*. Dr Lynch explained in cross-examination that even if not legally committed to renew, an OEM would in practical terms have to do so if its product had succeeded, because:

> "*people don't make and launch software products that are going to be sold for a year. They're generally the lifetime of a software product, probably 10/15 years. So once an OEM puts our technology in, remember you have to re-engineer the thing to take technology out usually, so it's a big job. So once you're in, you're in a situation that you're going to make money out of that situation for multiple years.*"

3077. Dr Lynch went on:

> "*Autonomy's OEM business generated substantial ongoing revenue. Once the technology was incorporated in a product, the product was likely to continue being shipped and a renewal was likely to be generated at the end of the original licence. It was not uncommon for an OEM customer to enter into six renewal contracts with Autonomy. For example, EMC entered into a sixth amendment to its OEM Agreement with Autonomy in 2010."*

3078. The Defendants concluding in their written closing submissions that:

> "*Far from limiting the scope of the revenues derived from the OEM set, this phrase emphasised the breadth of those revenues. The OEM business model was a way of generating on-going revenues as it tied in OEMs and required them to continue doing business with Autonomy. Ongoing business need not necessarily be recurrent royalties. As well as royalties, periodic renewals and ad hoc upsells derived from the original OEM relationship provide a revenue stream from ongoing business."*

3079. In summary, the Defendants' case was that:

(1) There was nothing in the wording of the published information denoting that Autonomy's OEM business and its OEM partnerships were exclusively with software companies.

(2) Nor was there anything in that wording sufficient to displace the meaning of "OEM derived": on the contrary, the introduction of the prefix "derived" was intended to denote the inclusion of any revenue judged to have been made possible by an initial OEM sale: they had cultivated that meaning in the market, and by Q4 2010 it had become notorious that OEM business included "OEM derived".

(3) The rationale of OEM derived revenue applied whether the OEM was a software or a hardware company.

(4) Repeat sales to third parties who had been sold a product embedded with IDOL and thus became not only aware of Autonomy and its software offering but often dependent on Autonomy for any enhancements or functionality needs were both referable to the original sale of a licence to the OEM in question and likely to lead to repeat or recurring sales;

(5) The revenue stream from upsells and PODS to end-users could be expected to endure and increase, as could repeat purchases by OEMs who, having embedded IDOL would almost inevitably require upgrades, add-ons and renewal or extension of licences; and prospective revenue from all that business was properly regarded as offering similar added commercial value as repeat revenue even if it was not automatically recurring like a royalty.

3080. Dr Lynch had to accept, however, that in not a single one of the Quarterly Reports, Annual Reports or even Earnings Calls in the Relevant Period was there anything expressed which either (a) distinguished between "straight" or "core" OEM (or just OEM) and "OEM-derived" sales or (b) referred to the word *"upsell"* or the expression *"PODS".* Although Dr Lynch insisted nevertheless that by that time the extended scope of the transactions and revenues categorised as OEM sales and revenues had become common knowledge in the investment community and the market, he had to resort to the evidence from analysts reports and explanations said to have been given to a section of the market[353] which I have determined do not establish any market understanding to be taken into account in determining the meaning which reasonable readers would have attributed to the published information.

3081. I turn to my assessment of the competing arguments as to that meaning.

*My assessment of what was conveyed by the published information itself*

3082. I have already noted that the Claimants acknowledged (and I think this was accepted by the Defendants) that neither *"OEM"* nor *"OEM derived revenue"* were expressions with any settled or standard meaning: both were capable of different meanings, and the latter was, of course, self-coined. Subject to the issue as to some cultivated general understanding in the market (which I address further later), an understanding as to the

---

[353] *"Upsells and PODS were discussed frequently between 2002 and 2009, multiple times, and not only was it done on earnings calls, but it was in analysts reports, communications with fund managers and analysts and their writings as well."*

scope of Autonomy's OEM business and the nature of the revenues it generated had to be formed from what Autonomy said about them in its published information.

3083. The Defendants' contention that the introduction of the prefix *"derived"* clearly signalled a widening of the scope of business allocated to the OEM metric beyond the ordinary scope of OEM business, and that transactions and revenues which might not have constituted "core" OEM business and revenue nevertheless were counted as being part of that OEM metric, supposed that the market would have recognised some extension from a usual meaning: but there was no usual meaning, and readers were left to cull the meaning from Autonomy's published information read carefully in context. Put another way, the notion of an "expanded" meaning going beyond the ordinary assumes an established ordinary meaning; here there was none and a reader would not have been alerted to a broader than usual scope of business, because there was no "usual" scope of business.

3084. I consider that what must be assessed at this first stage is what impression was given in the published information of the nature and scope of Autonomy's OEM business and revenues in the relevant statements, taking into account that the statements usually included warnings about qualitative estimates. It is in a sense in the nature of a jury question rather than one of legal definition.[354]

3085. In my view, the reasonable reader would have read the published information starting from the premise (expressly stated in the annual and each quarterly report in 2010 and in Q1 and Q2 2011) that OEM business generated *"a particularly important revenue stream"* and had special characteristics which materially distinguished it from other lines of Autonomy's business. In identifying those special characteristics, the careful reader would have particularly noted:

(1) The references to the OEMs as *"other major software vendors"* or as being within *"the software sector"*, the emphasis placed on the number and standing of the 400 software companies with whom Autonomy had established software partnerships, and the references to OEM partners *"leveraging Autonomy's award-winning technology into their software solutions"* and to IDOL being embedded in *"other software companies' products"*;

(2) Dr Lynch's own special commendation of the OEM business in his review in the 2010 Annual Report as being based on partnerships with *"numerous world-leading software companies [which] embed Autonomy's award-winning technology into their software solutions"* which were *"highly attractive to us as they turn one-off sales into multi-year committed annuity streams"*;

(3) There was no mention of revenue from OEM business other than from development licence fees and royalty payments, no room allowed in the Supplemental metrics for any different source of revenue, and no mention either

---

[354] However, it would be permissible to answer that the impression given is equivocal, or to use the more familiar word, ambiguous: so that if the statement were true by reference to any of the meanings, that would conclude the matter against the Claimants, unless in fact the Defendants intended a meaning which would make the statement untrue.

of what the Defendants now present as having been a major source of revenue, namely upsells and PODS.

3086. I cannot accept the Defendants' submissions that the published information, without reference to what they insisted was general market understanding, depicted OEM business in terms which allowed for a broader category of revenues than from development licence fees and royalty payments by OEMs to Autonomy. I do not accept that what the Defendants referred to as *"the narrow categories"* put forward by the Claimants were simply pulled together from *"various snippets from the Annual Reports and the quarterly press releases and earnings calls to come up with an unsustainably restrictive definition"* (as the Defendants suggested they were).

3087. I do not accept the Defendants' alternative submission that the presentation was ambiguous. The attraction offered was clearly depicted: a growing line of business generating, at little or no expense to Autonomy and thus a near 100% margin, recurring royalties from large 'captive' partners using their size, reputation and market presence to sell products with IDOL embedded under licence, as the Claimants submitted.

3088. In any event, I cannot accept that a reasonable reader would have understood from Autonomy's published information that a substantial proportion of revenue categorised as OEM derived revenue included (a) revenues from one-off licences sales for the purchaser's internal use only or (b) revenue from VAR sales.

3089. In my judgment, taking the published information as a whole, but without regard to anything said at Earnings Calls or any views expressed by Analysts, the impression conveyed by Autonomy's published information was that:

(1) Substantially all Autonomy's OEM relationships were with software companies, and in value terms most were with the 400 or so software companies expressly referred to.

(2) Substantially all revenue was derived from OEMs in the form of (a) development licence sales proceeds and (b) royalties paid by the OEM to Autonomy.

3090. Further, in my judgment, the same impression would have been given to a reader who read only the 2010 quarterly reports and the 2010 annual report and the quarterly reports for Q1 2011 and Q2 2011.

*Should regard be had to evidence that various Analysts considered the market understood OEM Metric to be broad in scope?*

3091. In further or alternative support of their submission that the expression was known to have extended the scope of OEM business, however, the Defendants contended that the OEM metric and the disputed expressions (*"OEM"* and *"OEM derived revenues"*) were (as the Defendants submitted) to be understood by reference to what the Defendants described as *"the understandings that had built up in the market over time as a result of explanations given by Autonomy"*. They sought to rely in this regard on evidence of the views of various Analysts who covered Autonomy and wrote advisory notes on its business and prospects for the benefit of their clients.

3092. This evidence was disputed, both as to its relevance and as to its message. The principal focus was on (a) the evidence of two analysts, Mr Khan (two of whose analyst notes, one in 2002 and the other in 2004 were relied on also), and Mr Morland; (b) the evidence of one of Autonomy's corporate brokers, Mr Shelley, and the evidence of the manager of a hedge fund that invested in Autonomy, Mr Pearson; and on (c) what the Defendants sought to dismiss as *"a small selection of analyst notes"* especially identified by the Claimants.

3093. The Claimants also objected to Dr Lynch's attempt to rely upon what he argued was the market understanding concerning IDOL OEM on the broader basis that (a) it resembled expert evidence of some general market approach and understanding; but it was not adduced and could not be relied on as such; (b) such evidence could in any event lead nowhere, since *"the possibility that an analyst or investor might have been privy to additional information, not found in the published information, is neither here nor there"*. On that basis, the Claimants dismissed Dr Lynch's recourse to what he argued was the market understanding as a *"red herring"*.

3094. I accept the Claimants' broader objection in substantial part. I would add by way of both explanation and gloss that in my view:

(1) As emphasised previously, the question in this case is not one of contractual interpretation: nevertheless, at this first stage of identifying what the disputed statements would have been taken to mean by the reasonable reader, the principles established in the context of contractual interpretation provide a guide more generally in any context of linguistic analysis. The fact that the statement is unilateral does not alter that: see *Kyle Bay Limited t/a Astons Nightclub v Underwriters subscribing under Policy No. [019057/08/01]* [2007] EWCA Civ 57 at [31] citing *Mannai Investment Co Ltd v Eagle Star Assurance Ltd* [1997] AC 749 as putting to rest any doubt in that regard.

(2) It is well established that (even in the absence of apparent ambiguity) words must always be read in context to ascertain their intended meaning, and their context includes (in the oft-quoted words of Lord Hoffmann in *Investors Compensation Scheme v West Bromwich Building Society* [1998] 1 WLR 896):

> *"absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man"*

However, this is subject to the requirement that it should have been *"reasonably available to the parties"* and to the exclusion for the purpose of establishing objective intention of evidence of negotiations and declarations or other evidence of subjective intentions.

(3) That said, the concept of what is *"reasonably available to the parties"* must be kept within sensible limits, especially where the words spoken are addressed not as between the parties, but are published generally to a mixed audience, as in the context of published information. In such a context, if words are to be given a special "private dictionary" meaning the special private dictionary must be shown to have been available to all those to whom the words were addressed.

(4) In the context of words published generally, as by (inexact) analogy with words in a standard form contract, resort to background information or knowledge should be sparing, and probably only used where it is clearly established that it was shared generally within the market or audience to which it was addressed. At this first stage, the search is for a meaning that would have been generally ascribed to the disputed statement(s), if one can be identified.

(5) Proof of a generally accepted market dictionary or understanding is difficult. It will ordinarily require expert evidence. Such proof is not supplied by evidence that the Defendants vouchsafed to particular persons a key to understanding not provided to the market as a whole: for example, in Earnings Calls which I have determined do not constitute published information.

(6) Similarly, evidence (such as was relied on by the Defendants in this case, as elaborated later) from particular analysts of what they themselves understood, or considered to be understood in the market more generally, will only carry weight if it is accepted as a reliable proxy for the market as a whole. I agree with the Claimants that the evidence of what analysts thought is not expert evidence and was not adduced as such. Unless I were to accept the evidence of what the analysts told me as a reliable proxy for the views of the market, I do not think it would rise above evidence of a particular point of view, possibly informed by essentially non-public information. Analysts' notes and views may inform, but they do not demonstrate or represent, a general investor outlook.

(7) Proof that a significant body of analysts or others in the market or audience held a different view of the meaning of the statements made will obviously tell against any assertion of general market understanding; and especially strongly so where (as arguably again in this case) market understanding is being used to establish a private dictionary meaning inconsistent with what the words otherwise appear to connote.

3095. I do not accept that the evidence of the views of various analysts relied on by the Defendants provides a reliable proxy, not least because of the contrary evidence (analyst notes) which the Claimants also sought to rely on. I am not persuaded that there was reliable evidence on which the Defendants could rely to establish an understanding shared by those to whom the published information was addressed of a different or modified meaning of the disputed expressions in that published information relating to the OEM metric.

3096. It follows from this conclusion that, in my view, I should assess what the published information conveyed to its audience about the OEM business and the OEM metric without regard, at the first 'objective' stage, to evidence of the market understanding alleged by the Defendants (though that does not exclude the possibility of a mixed or ambiguous message and does not mean that the evidence of market analysts is irrelevant, since it may be relevant at the second stage of assessing what, subjectively, the Defendants themselves intended to convey).

3097. However, lest I am wrong in my conclusion that there was no reliable evidence of a general accepted market understanding, I turn to address in more detail the Analyst

evidence and any further evidence in relation to the Defendants' case that (a) the Claimants had adopted an excessively restricted and self-serving approach and had failed to take into account that (b) Autonomy had cultivated over the course of time an appreciation and understanding in the market of the phrase "OEM derived" (and cognate expressions) and that (c) it had become accepted and notorious that the OEM metric extended to business generated by reference to an original OEM sale.

*Analyst/other evidence and market understanding*

3098.  The Defendants' case that the Claimants' restrictive definition of IDOL OEM revenues (limiting them to revenues from sales of software to companies (i) whose businesses included licensing that software to third parties and (ii) who had the intention and capability of embedding IDOL software into their own software products for onward licensing to those third parties) was inconsistent with the evidence of two of the Claimants' own witnesses, Mr Daud Khan ("Mr Khan") and Mr Paul Morland ("Mr Morland"), who had covered the company on-and-off for many years, and with *"the understanding that had built up in the market over time as a result of explanations given by Autonomy."* The Defendants relied also on the evidence of their own witnesses, Mr Pearson and Mr Shelley.

3099.  The Claimants' submissions engaged at some length with the content of analyst reports, including in a detailed Appendix devoted to "*Evidence concerning market understanding*", in support of their case that, if relevant, what in fact the analyst notes showed was a widespread understanding that the analyst community in general understood the OEMs involved to be software companies embedding IDOL technology in their own software products and IDOL OEM revenues to consist entirely of development fees and ongoing royalties.

3100.  To determine this aspect of the dispute I address the evidence of Messrs Khan, Morland, Pearson and Shelley in turn, before turning to the evidence of other analysts relied on by the Claimants.

*Mr Khan*

3101.  Mr Khan said that he understood the term "OEM" as used by Autonomy in its published information by reference to:

> *"the standard use of the word and the commentary they provided around their use of the word."*

3102.  Mr Khan had covered Autonomy intermittently since 2001 (first for Merrill Lynch and then, after 2006, for Cazenove) and had become a "negative analyst" in the sense that (a) as he accepted, from January 2008 onwards, he consistently recommended selling Autonomy stock and (b) many, if not most, of his clients had short positions in Autonomy stock.

3103.  In his witness statement, he stated that it was not his *"understanding of the substance of IDOL OEM revenue"* that it included revenues derived from direct sales to customers of OEM customers. However, he accepted that he recollected having been told:

*"by someone from Autonomy management mentioning, I believe off-line, after an earnings call, that OEM revenues included direct sales to customers that had purchased software from an Autonomy customer"* and

*"assumed that such a sale would be related to the original OEM purchase, allowing the customer to increase the functionality of the embedded software."*

3104. He reconciled what otherwise might appear to be inconsistent positions by explaining that:

(a) *"given the focus of the published disclosure on sales to software companies, a royalty model and recurring revenue, making no mention of the inclusion of sales to the customers of OEM customers, I assumed that this was a minor part of Autonomy's overall revenues"*; and further that he

(b) *"did not believe that the inclusion of such revenues was common knowledge amongst analysts. It was not a standard interpretation of OEM"*; and he added that

(c) *"If such sales had been material, this would have been significant from a valuation perspective as they would have involved costs that would not arise in a royalty model, and hence would not command as high a valuation in the same way as OEM revenue…"*[355]

3105. When cross-examined, he largely reiterated this evidence but introduced the refinement that he thought there were *"probably two definitions of upsell"*, one an upsell to the OEM customer and the other an upsell directly from Autonomy to the OEM customer's customer to add functionality to IDOL acquired as part of software purchased from an OEM. He explained that the latter was the species of upsell he had not understood before the "off-line" conversation and had considered not to be a material part of the OEM business. The former was the sense he may have had in mind when describing upsell fees as one of three types of revenue from OEMs in a note dated 26 April 2002 which he had written on Autonomy when at Merrill Lynch (though he did not mention it in his witness statement).

3106. It was not clear whether he had this in mind also in a second analyst note he had written for Clear Capital Markets[356] in January 2004, which he had not mentioned in his witness statement either, and which included the following passage suggestive that whatever upsells were:

*"What we have seen is that up-sell OEM revenues have started to be a significant contributor albeit as volatile as royalties or up-front payments."*

3107. This was, again, a little at odds with his witness statement, in which he stated that he had:

---

[355] Mr Khan and Mr Morland agreed that IDOL OEM revenue commanded a higher market valuation than other revenue streams by virtue of its predominantly recurring nature. Mr Shelley and Mr Pearson concurred.
[356] A UK based stockbroker and wealth manager

> *"... assumed that this was a minor part of Autonomy's overall OEM revenues...If such sales had been material, this would have been significant from a valuation perspective as they would have involved costs which would not arise in a royalty model, and hence would not command as high a valuation in the same way as OEM revenue…"*

3108. He also stated that he did not believe that *"the inclusion of such revenues was common knowledge amongst analysts. It was not a standard interpretation of OEM."* Mr Khan agreed, however, that deciding whether or not a particular contract should be categorised as upsell would be a matter of judgment.

3109. When cross-examined, Mr Khan sought to explain inconsistencies between what he had written in his notes for Merrill Lynch and Clear Capital (and also a note for Cazenove) and his evidence in his witness statement as lapses in memory; but in a passage of his cross-examination which seemed to me to cast some doubt on the status of his evidence in his witness statement, and some concern as to the way it had been assembled, he also accepted that:

> *"My witness statement was drafted by the claimants' lawyers using my testimony from the US and then we had dialogue around the various paragraphs which I then authored and asked for changes."*

3110. Mr Khan could not recall whether he knew that PODS were also included in OEM revenue (*"I honestly can't remember. Maybe they were"*). He was referred to an earnings call in Q4 2002 in the course of which, in response to a question about the contribution of the *"PODS technology"* to sales, Dr Lynch had estimated that it was then running at around $2 million a quarter, noting also that it was a *"different route to market"* and a useful way of getting IDOL into the relevant organisation, and Mr Hussain had added that *"...in terms of the POD sales in Q4, it's included within the $1.5m of up sells for the OEMs"*. These references did not trigger any recollection: and Mr Khan made the point that this was more than 17 years ago.

*Mr Morland*

3111. Mr Morland's evidence in cross-examination was that the market understood that both PODS and upsells were included in Autonomy's OEM revenues:

> *"Q.  Let's quickly deal with OEM. Autonomy reported its OEM revenues using a number of different terms over the years: OEM, OEM-derived, IDOL OEM-derived, IDOL OEM. You understood them to mean the same thing, didn't you?*
>
> *A.    Yes.*
>
> *Q.    And the market understood that OEM-derived included pods and upsells didn't it?*
>
> *A.    Yes."*

3112. However, in re-examination, Mr Morland qualified this by saying that:

> *"at the time I was unfamiliar with the term 'pod' but I understood it was to do with connectors and so I understood an upsell to be a sale of an additional connector to the OEM partner at the time. I never really understood it…I wasn't familiar with the term 'pod' at the time."*

3113. The Claimants pointed out that the difficulty with the question to Mr Morland in cross-examination was that the expression "upsell" is ambiguous: some take it to include only sales of additional licence or functionality to an OEM, some take it to extend to sales to an end-user. I agree with the Claimants that Mr Morland appears to have assumed the limited meaning; and he was simply unclear what PODS were.

3114. More generally, Mr Morland's evidence was rather unclear. The impression I formed overall was that he regarded the OEM metric in much the same way as Mr Khan, and would have expected it to be substantially comprised of revenue derived from sales to OEMs for embedding and onward sale.

*Mr Pearson*

3115. Mr Pearson was one of the witnesses called by Dr Lynch. His evidence was that the category was understood differently by different investors. In his witness statement he stated that:

> *"To my knowledge, there was no 'standard interpretation' of OEM-derived revenue at the time…The definition varied company to company. Therefore, I knew that a company's OEM-derived revenue figure could have a range of revenue streams included in it, such as licences, royalties, and upsells. Quite clearly, Autonomy's OEM revenue included both recurring and non-recurring revenue streams, as was stated by Autonomy in multiple conference calls from 2002 – 2004…"*

3116. The results presentation for Q1 2008 similarly noted that *"OEM breakdown includes some licence and is almost all IDOL"*. The Defendants appeared to latch on to this as denoting that the scope and nature of OEM derived revenues was as they had suggested, and thus included non-recurring revenue; and they emphasised Mr Pearson's evidence in cross-examination that this was a point that had been well understood in the market for some time. But this was, to my mind, a misunderstanding or mistaken assertion: all that the presentation seems to me to have signified was that OEM business generated revenue from the sale of development licences to OEMs (*"OEM Dev"*) as well as recurring payments from OEMs for onward sales of products with IDOL embedded (*"OEM Ongoing"*). That was of course well known and plainly stated to the market: but that is of no assistance in the present context of considering how *"OEM Ongoing"* and thus *"OEM derived"* were constituted.

3117. Mr Pearson's own assertion that he *"knew"* from the fact that the term was not defined and had different meanings *"company to company"* that therefore the *"OEM-derived revenue figure"* could include upsells was either a *non-sequitur,* or simply a general statement as to the potential, but not necessarily the actual, meaning of the term. Either way, it was of little assistance; and Mr Pearson also had difficulty in pointing to any support for including upsells in any published information or recorded commentary after 2004.

3118. The only post-2004 analyst research note which Mr Pearson was able to pray in aid (when drawn to his attention in re-examination) was one dated 6 January 2010 and written by Mr Briest at UBS. That note did, in a table highlighting that implied growth in *"royalty/upsell sales" "might be more like 50-60%"* and a chart tracking the acceleration in sign-up rates against an acceleration in what were described as *"OEM upsell/royalties"*, thus contain a reference to *"upsell"* in the context of IDOL OEM revenue. The same Note, in its analysis of *"The OEM opportunity"*, also spoke of *"a high pedigree of software relationships within its OEM list"* and identified the significance and value of OEM relationships as being *"perhaps the best visible evidence of IDOL's differentiation and competitive advantage"* and the high operating margin on all such sales "*given the related R&D costs are absorbed in the core business and the costs of sales will be relatively modest for incremental royalty streams."*

3119. However, nothing in the Note, as I read it, demonstrated an understanding that upsells to customers of the OEM partner were also included and I agree with the Claimants that the references to upsells were to sales of additional software or functionality to the OEM partner itself: the presentation being of upsell revenues having a similar nature and the same source as royalties. On that reading, Mr Briest's Note does not take the matter further for the Defendants, and tended rather to support the Claimants' case both as to OEMs typically, perhaps invariably, being software companies and as to there not being included in OEM derived revenues revenue from dealings with a third-party customer.

3120. The Claimants also noted that the 6 January Note was the last report written by Mr Briest that mentioned upsells. In subsequent notes, Mr Briest only mentioned development fees and ongoing royalties.

3121. In any event, I accept the Claimants' contention that the value of Mr Pearson's evidence was diminished by (a) his claim, which he had to draw back from in cross-examination, that by 2009 the OEM category had become relatively less valuable because IDOL was by then so well known to and well regarded in the market that the market penetration offered by OEM sales was no longer of the value it had previously had; (b) his difficulty in pointing to any specific examples of explanations by Autonomy, after 2004, that justified the conclusion that the category included revenue from direct sales to end-users; as well as (c) his continuing close connection with Mr Hussain and his continuing investment in Dr Lynch's business interests, which may explain a somewhat partisan approach considered that the market also understood that OEM included some licence revenues.

*Mr Shelley*

3122. Mr Shelley (who, like Mr Pearson, was called as a witness by Dr Lynch, but who is not relied on or even referred to at all in the Defendants' closing submissions, as the Claimants noted with some glee) gave evidence in his witness statement that he did:

> *"not recall there being a discussion between Autonomy and the analyst community regarding the composition of reported OEM sales. If this had been an area of interest for analysts and investors, I would have raised the issue with Autonomy."*

3123. This was difficult to square with his own requests, of which he was reminded in cross-examination, for a breakdown of the composition of reported IDOL OEM, and in

particular, what the split was between new deals and royalties from previous deals. Autonomy's response further indicated a perception that it was understood that those were indeed (substantially at least) the constituent revenue sources. Mr Kanter responded to Mr Shelley as follows:

> *"A very small proportion of OEM revenue relates to upfront development fees for new transactions, typically $200k per transaction. Royalties for OEM contracts vary, depending on what IDOL functionality is being used by the OEM. Four percent is an example of a typical OEM, and are reported on gross sales of the OEM's product. Royalties are normally paid quarterly in arrears."*

3124.  The same emerged from further exploration with Mr Shelley in the course of his cross-examination, of various documents, including a variety of analysts' notes with a view to showing that in fact analysts were clear as to the substantial composition of OEM revenue, and there was no sign in any of them of it being contemplated that it might include a substantial proportion of non-royalty one-off sales to end-users.

3125.  He was taken to a draft of the Q4 2010 Quarterly Report containing his comments as well as those of a colleague of his at Goldman Sachs (just after Mr Shelley had moved there in late 2010). The draft Report noted that IDOL OEM revenues:

> *"comprise two elements: up-front development licences as third party software vendors develop new products built on IDOL; royalty payments earned from sales of those products when they come to market…".*

3126.  He was then also taken to a note published by Credit Suisse on 18 March 2010 entitled *"The Autonomy OEM Opportunity"*.  In addition to describing the OEM partnerships as being with *"software vendors"*, the Credit Suisse Note explained OEM derived revenues as being comprised of development licence fees and *"royalties paid to Autonomy for ongoing sales made by OEMs once they are up and running"* as Mr Shelley had to accept (and see further as to this note, paragraph 3129(1) below).

3127.  The following exchange during Mr Shelley's cross-examination seemed to me to confirm his acceptance that, more generally, the high margins attributed to OEM revenues, were characteristic of, and only really explained if OEM ongoing was largely, even if not exclusively, comprised of, royalty payments rather than one-off direct sales:

> *"Q. So when Credit Suisse is talking about gross margins of over 95% and operating margins of around 75%, they're talking about margins on royalty payments, not direct sales by Autonomy, aren't they?*
>
> *A. It would appear so, yes.*
>
> *Q. So the understanding that Autonomy's reported ongoing OEM payments are royalty payments, which we've seen is an understanding they had, rather than revenues on direct sales, that is critical to Credit Suisse's valuation of the OEM business in this note isn't it?*
>
> *A. It would appear so, yes.*

...

> *Q. The exercise here is based on the understanding that the OEM ongoing revenues are royalty revenues, isn't it?*
>
> *A. Yes, that's right."*

*Assessment of that evidence and comparison with analysts notes relied on by the Claimants*

3128. Looked at in the round, I consider that this evidence suggests that it was recognised by some analysts that Autonomy might have some leeway in terms of including revenue generated by sales to an end-user even if (as would be usual) they were one-off sales for which the opportunity was provided by the embedding of IDOL in software licensed to that end-user by an OEM: but it does not signify any appreciation in the market that revenue of that sort would represent any material part of the total IDOL OEM revenue. Nor, to my mind, does it establish any general market understanding that the prefix 'derived' materially increased the scope of the OEM classification.

3129. The impression that the market continued to regard the OEM metric as substantially confined to licence and royalty-type payments is confirmed by evidence of the understanding of other analysts relied on by the Claimants. The Claimants relied on the following:

(1) A detailed 17-page note about Autonomy's OEM business issued by Credit Suisse on 18 March 2010, entitled "*The Autonomy OEM Opportunity*", and authored by Mr Frederick Grieb ("Mr Grieb")[357]. The note recorded Mr Grieb's understanding of the meaning of "*OEM Dev*" and "*OEM Ongoing*":

> **"OEM Development**: *OEM Development fees are the upfront fees of $200k that are paid to Autonomy, upfront, upon the signing of an OEM agreement.*
>
> **OEM Ongoing**: *These are the royalties paid to Autonomy for ongoing sales made by OEMs once they are up and running."*

There was no mention of upsell or PODS sales anywhere in this note. The entirety of Autonomy's "*OEM derived revenues*" appears to have been understood by Credit Suisse, a sophisticated evaluator of Autonomy's published information, to be made up of development fees and ongoing royalties from licence sales by an OEM of products in which Autonomy software was embedded under licence from Autonomy.[358]

---

[357] As well as Chandramouli Sriraman.

[358] Indeed, when analysing why IDOL OEM revenues were a "*high-growth, high margin opportunity*", Credit Suisse referred only to the "*initial $200,000 fee to begin work with Autonomy*", and the "*~3% of OEM license revenues as a royalty payment on average*". Credit Suisse's analysis of Autonomy's historic IDOL OEM revenues, and its projection of Autonomy's future OEM revenues, was broken down entirely into these "*OEM Development*" and "*OEM Ongoing*" categories.

(2) A Morgan Stanley analyst note dated 30 June 2008 describing Autonomy's OEM business as essentially comprising *"an upfront fee and then a 3% royalty on its product sales that embed IDOL on a going forward basis"*;

(3) A Nataxis analyst note dated 11 March 2011 describing OEM revenues as comprised of (a) a non-refundable upfront fee and (b) royalties on the sale of the software;

(4) A Nomura analyst note dated 22 April 2010 (by an analyst also regarded by Autonomy as "sound" according to the assessment referred to in paragraph 3130(1) below) breaking down all reported IDOL OEM revenue into *"OEM Dev"* and *"OEM Ongoing"* and describing the latter as *"royalties"*;

(5) An initiating note[359] by Standard & Poor's ("S&P") dated 27 August 2010 to the same effect;

(6) A Societe Generale ("Soc Gen") initiating note dated 23 March 2010 (by an analyst described by Autonomy as a "drifter") stating that *"OEM sales are extremely profitable as they carry a 100% gross margin"* which Mr Shelley accepted suggests that Soc Gen shared Credit Suisse's understanding since such high gross margins are consistent with royalty payments, and not direct sales by Autonomy.

3130. In short, these analyst notes suggest that a number of influential market analysts understood from what they were being told that Autonomy's OEM business was confined to what Dr Lynch described later as "Core" OEM. Dr Lynch was notably discomfited by the Credit Suisse note[360], and offered uncharacteristic bluster when confronted with it:

(1) It was first suggested to Dr Lynch that Credit Suisse did not understand that upsells were included in reported OEM revenue, and he responded that he would be "*very surprised*" if Credit Suisse had got this wrong. Having then been shown that Credit Suisse's understanding did not support his case, Dr Lynch then said that he did not know who Mr Grieb was: "*obviously Credit Suisse didn't understand it, whoever this person is*" and queried whether he (Mr Grieb) had actually been *"present in the calls where this was all explained"*. Yet Mr Grieb was an analyst who was both known to, and well regarded by, Autonomy's executive management and investor relations team. Indeed, Mr Grieb was an analyst considered by Autonomy or its advisers to be "*Sound*" (as opposed to "*Corrupt*", or "*Feeble-minded*" or a "*Drifter*").[361]

(2) Dr Lynch then sought to paint Credit Suisse as an exception in not knowing about the inclusion of upsell and PODS revenue. He went so far as to tell me

---

[359] That is to say, that firm's first note on Autonomy.

[360] In which it may be noted that Mr Grieb described OEM business as being where *"Autonomy allows software vendors to use the company's IDOL technology via OEM agreements"*

[361] This was the view expressed in the slide-deck sent by Mr Brown to Dr Lynch and Mr Hussain on 3 December 2010. Furthermore, the Claimants contended that contrary to the impression given by Dr Lynch in cross-examination, Dr Lynch knew *"perfectly well"* who Mr Grieb was, having met him in September 2010 at a meeting in Autonomy's Piccadilly offices.

that *"everyone knew, with the possible exception of the one analyst"* (Mr Grieb).

3131.  The Defendants broadened this to submit that this evidence of other views suggested only that the primary focus of a *"a small number of analysts"* was on core OEM revenue: it did not establish that those analysts perceived the OEM metric to include no other revenues at all; and if they did, and if they took to be excluded from the OEM metric any revenue which was not recurring, and all upsells (even of additional functionality to an OEM customer) it was altogether more restrictive than even the Claimants had put forward. As mentioned above, even the Claimants came to accept that "upsells" did at least include sales of:

> *"additional functionality to the original OEM purchaser…provided the revenues arose from licences that permitted the licensee to embed additional IDOL software in the OEM's own software product for onward licensing to the OEM's customers."*

3132.  However, I do not think it ultimately assists the Defendants on this aspect of the case. What these notes suggest to me is that the focus of a not insignificant number of analysts from well-regarded firms, and (I take it) of their readership and addressees as a whole, was on the particular value to be ascribed to (a) the typically recurring nature of IDOL OEM revenues (b) the especially low cost and high margins of sales effected through an OEM and (c) the prospect of ever greater penetration into the unstructured data market, bringing the potential for IDOL increasingly to become the solution of choice embedded within a broader software package sold by large OEMs with a corresponding presence and reputation in the market. Revenue which did not have any of those characteristics or qualities, and could only be distinguished from IDOL Product revenue by reference to some antecedent sale to an OEM, would not have been anticipated to form any substantial part of the revenues included in the OEM metric.

3133.  It seems to me to be clear from the analyst notes collated by the Claimants that many analysts, and it is to be inferred, many addressees, would not have expected revenues from one-off sales, or sales direct to an end-user rather than an OEM, which generated no ongoing and recurring revenue stream, to represent any material proportion of the revenue comprised in the OEM metric. If they expected any such revenues at all, they would not have expected the amounts to be such as to upset the description of the OEM metric as predominantly, even if not exclusively, made up of a recurring royalty revenue stream derived from OEMs producing software themselves which embedded IDOL in that software and licensed the combined product to end-users.

3134.  Indeed, on that basis, I am not persuaded that there was such a division of understanding between the analysts relied on by the Defendants and those relied on by the Claimants.

3135.  In any event, I consider that it is possible to identify revenue which, having none of the qualities associated with OEM revenue, addressees of Autonomy's published information and market analysts would <u>not</u> have expected to form any material part of the amounts included in the OEM metric. As to that:

(1)  It seems to me that the touchstone for analysts and investors was that the revenue included in the (straight or core) OEM metric was derived from either

development licences sold to an OEM (whether or not a software company) for the OEM to embed IDOL into its products for sale to an end-user, in which case they fell within the description *"OEM Dev"* or from royalty payments on revenues earned by the OEM on onward sale to an end-user, in which case they fell within the description *"OEM Ongoing"*.

(2) Revenue from sales which, but for an antecedent transaction between the purchaser and an OEM, was not in any other sense "OEM-derived", and which had none of the characteristics that made OEM revenues particularly valuable (their recurring nature, especially low costs and high margins and the market penetration amongst (to use a phrase which will place this judgment in its historical context in the time of Covid-19) "super-spreaders" of the software (as were the large OEMs)), would not have been considered by addressees to be any material part of the OEM/OEM-derived metric.

(3) In my view, these included upsells and PODS directly to end-users which cannot comfortably be described as "upsells" because (a) they were not sales to the same person as had originally purchased the goods for which additional functionality was required; (b) they were not sales of OEM products; (c) they did not give the purchaser any right to embed IDOL into products for onward sale; (d) they did not enhance the royalty rate or generate any new multi-year royalty stream (or in some cases an upfront payment in lieu of it); and (e) the costs of the sales were not absorbed by an OEM, so that the marginal profit was unlikely to be either recurring or different from ordinary IDOL Product sales.

(4) Likewise, revenue from sales of IDOL to OEMs which were not calculated to result in IDOL being embedded because the OEM was not a software company and/or because the license granted was restricted to the internal use of the IDOL software, and sales which were not structured and/or intended to generate a recurring royalty revenue stream (or in some cases, a lump sum in advance in lieu if it), also fell outside what I have found Autonomy presented in its published information and addressees of that information understood the scope of the OEM metric to be.

(5) Sales of hardware, and other sales which were not of IDOL software, would not have been understood to be included in the IDOL OEM metric either: the fact that the purchaser had in some anterior transaction acquired an Autonomy product from an OEM, or was purchasing non-IDOL goods to supplement or add to the functionality of a previous purchase of IDOL software embedded in an OEM product, would not, in my view, have been understood to fall within that metric.

(6) Another debated category was revenue from repeat renewals of development licenses. Dr Lynch insisted (quoting from his second witness statement) that *"Even OEMs that did not include ongoing royalties provided ongoing revenue streams, as it was extremely common for OEMs to be renewed."* He gave as an example that EMC renewed its OEM six times prior to HP's acquisition, and again even thereafter. I accept the commercial sense of this, which Dr Lynch explained clearly when cross-examined as follows:

> *"... people don't make and launch software products that are going to be sold for a year. They're generally the lifetime of a software product, probably 10/15 years. So once an OEM puts our technology in, remember you have to re-engineer the thing to take technology out usually, so it's a big job. So once you're in, you're in a situation that you're going to make money out of that situation for multiple years."*

(7) But whilst I accept the commercial logic, I am not persuaded that it is of much assistance to Dr Lynch. The renewal posited is with an OEM for continued embedding of Autonomy software yielding a royalty-like payment (or sometimes a payment in advance to cover the term, which Dr Lynch explained would be called an *"upfront royalty"*). In that event, the revenue upon renewal would either be recurrent or its equivalent upfront; but whilst any renewal might be likely it could not be said to be recurrent. Dr Lynch sought to rely in this context on the evidence of Mr Collet when it was put to him that the renewal would *"lead to recurrent revenues",* to which Mr Collet replied *"It might lead to renewal upon the end of the agreement. If that is what you call recurring revenues."* But I did not understand Mr Collet to be indicating that that is what <u>he</u> would have called recurrent revenues; and I have concluded that there is nothing to support the suggestion that either analysts or the market more generally would have considered revenue from repeat business to be like or analogous to a *"multi-year committed annuity stream"* (as Dr Lynch described the characteristic which made the OEM business so *"highly attractive to us"* in his statement in the 2010 Annual Report).

3136. In the result, I have concluded (and see paragraphs 3086 to 3089 above) that the narrow "objective" view of the meaning of the metrics provided was that which probably prevailed amongst both the analysts and in the market, with some leeway for the occasional borderline case permitted by the warnings Autonomy expressly stated (to the effect that the metric was for background information and that the decision to include revenues within it would involve some *"qualitative estimates"*) which I consider would have been taken to connote some flexibility and room for subjective judgement.[362]

3137. In any event, I consider that a more detailed review of the views expressed by analysts at the time confirms me in my view that there is not any sufficient evidence of there having been any general market understanding that the OEM metric extended to business judged by Autonomy to have been made possible (IDOL OEM *"derived"*) by some earlier sale to an OEM as well as the OEM sale itself.

*(e) Was the published information false and misleading?*

3138. In the RRAPoC, the Claimants identified a total number of (initially) 68 (but subsequently amended to 67) transactions of over $1 million in the period Q1 2009 to Q2 2011 which they alleged were incorrectly characterised as giving rise to IDOL OEM revenue during the Relevant Period. Their total value was $254,964,000. This compared

---

[362] Even though that express warning was not included in the reports for Q1 2011 and Q2 2011 (where the figures appeared in the *"Financial Review"* section which was described as representing a *"a commentary on key trends in the quarter"*) I am prepared to assume that a reader of the run of financial statements would have had the warning in mind.

to a total value of all such deals worth $1million or more during the Relevant Period of $293,500,000.

3139. Thus, the Claimants pleaded that approximately 87% by value of the OEM transactions they had analysed had characteristics which did not match the description of IDOL OEM revenue in the published information so as to render the statements in it false.[363]

3140. As previously explained, the Claimants did not at trial pursue a case in relation to a transaction with Bloomberg in Q2 2011 (the last one listed in the above Schedule 8), so that the Claimants ultimately identified and relied on 67 OEM transactions not having characteristics which were necessary for revenue from the transaction to be allocated to the IDOL OEM metric. The Claimants calculated that these transactions in total accounted for some 80% of the revenue included in the OEM metric, though the Defendants disputed this figure and did not accept that there was any demonstrated basis for it.

3141. The Claimants divided the revenues (allegedly comprising about 80% of the whole) which they submitted were wrongly included in the metric into three principal (but sometimes overlapping) categories:

(1) Revenues from sales of IDOL to non-software companies, which did not license software to their own customers, and so had neither the intention nor the capability to embed Autonomy's software into their own software products. In most, if not all, cases of this type, the reality was that the purchaser simply intended to deploy the software acquired from Autonomy for its own internal use. The principal examples given by the Claimants were:

(a) various sales to government agencies[364], which by definition are not in the business of selling anything to anyone, let alone their own software products with embedded IDOL software;

(b) a sale to Tottenham Hotspur football club of a solution *"intended to enable a system to provide the following functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design"*.

This category included sales to companies which plainly intended to deploy the software on hardware supplied to them for internal use: these companies included Bloomberg (OEM10), MetLife (OEM27), JP Morgan (OEM28), as well as revenue from non-software companies who could not embed the software in their own product;

(2) Revenues from sales of software licences that expressly limited the purchaser's right to use the Autonomy software, and prevented the purchaser from

---

[363] See the Notes at Schedule 8 to the RRAPoC, which explained that *"The analysed transactions represent approximately $293.5 million (93%) of the $315.9 million of revenue categorised as IDOL OEM in the Relevant Period. Of the transactions analysed, approximately 87% were found not to be IDOL OEM ($255.0 million of $293.5 million)...If all of the non-analysed transactions are assumed to have been properly characterized as IDOL OEM, approximately 81% of the value categorised as IDOL OEM...(or 86% in the period from Q3 2009 to Q2 2011) did not arise from IDOL OEM transactions."*

[364] As end-user, whether through a direct purchase or purchase from a VAR.

embedding the software into its own products for onward sale or licensing to third parties.

(3) Revenues from transactions that by virtue of the nature of the contract, or because the revenue was not properly recognisable under IAS, could not properly be classified as a sale giving rise to IDOL OEM revenue. These included:[365]

    (a) Licence sales associated with hosting contracts which enabled those customers to archive digital information in an environment hosted by Autonomy but were not sales to software companies which embedded IDOL technology into their own software products for onward licensing to third parties, and where in any event restrictions on the use of the licenced software for such purposes was prohibited (including six impugned hosting transactions, worth a total of $31.1 million, where the Claimants alleged that the data continued to be hosted by Autonomy on Autonomy's facilities using Autonomy software and (according to the Claimants) the revenue should not have been recognised at all);

    (b) Hardware sales, including (i) a transaction under which Autonomy agreed to sell to Bloomberg *"hardware, software and services"* for a total sum (all classified as OEM revenue) of $7,129,000 of which the hardware element was $5,718,010 and (ii) a transaction with Rand covering hardware which involved a sale of Arcpliance and a licence to use DS Mail (but not IDOL software), under a contract which limited use of the licensed software, prohibited the making of any copies, sublicensing and distribution, and made clear that its use was to be to provide a hosted email archiving service to end-users;

    (c) Ten impugned VAR transactions, totalling $59.9 million of revenue, under which neither the VAR nor the end-user was permitted or intended to embed IDOL into its own products, and where the revenue should not have been recognised, and seven of which (involving $40.1 million of revenue) were not followed by any sale to an end-user during the Relevant Period;

    (d) Ten components of impugned reciprocal transactions involving $55.9 million of revenue; and

    (e) Five transactions totalling $11.6 million of revenue from the sale of consultancy services by MicroLink, a subsidiary of Autonomy.

---

[365] It may be noted that the Claimants contended that *"Where an impugned OEM transaction…is also impugned elsewhere in the case, such that the revenue should not have been recognised at all, the fact that this revenue was classified as IDOL OEM revenue served to exacerbate the misleading nature of reported IDOL OEM revenue. That follows from the fact that IDOL OEM revenue, a particularly valuable revenue stream, was also fraudulently inflated. Further, VAR, hosting or hardware transactions are, by definition, incompatible with Autonomy's description or definition of IDOL OEM revenue."*

3142. The Claimants' analysis was that from Q3 2009 to Q2 2011 inclusive, that estimate of 80% of the revenue included in the OEM metric had one or more characteristics of (a)-(e) below:[366]

>      (a) Revenue from licences sold by Autonomy where the terms of the licence restricted the licensee to internal use of the software only;
>
>      (b) Revenue derived from hardware;
>
>      (c) Revenue derived from contrived VAR, reciprocal or hosting transactions;
>
>      (d) Revenue derived from transactions generating only a single up-front payment and no royalties (the Claimants' case being that none of the 67 in fact gave rise to royalties, even if provision was made in the contract for them)[367];
>
>      (e) Revenue derived from sales which were not IDOL sales by Autonomy.

3143. The Claimants submitted that in none of the 67 transactions above described, which they estimated to represent 80% of the revenues classified as OEM derived, were any of the revenues derived from royalty or other payments of a recurring nature.

3144. Furthermore, the Claimants contended that even in relation to the remaining 20% or so of revenues allocated to the IDOL OEM metric which they accepted was such as to generate high margin royalty income from OEMs, most were restructured in favour of accelerated upfront one-off payments, which (because discounted for early payment) yielded in aggregate less in total revenue over the course of the transaction. Many OEMs accepted this since the lump sum was smaller and relatively good value for them (the only advantage to Autonomy being immediate receipt of revenue which could immediately be recognised in its accounts).

3145. The effect of the one-off prepayments, according to the Claimants, was to reduce still further the amount of revenue in the IDOL OEM metric which consisted of ongoing royalties, and still more to reduce the amount representing royalty payments at a level of 3%, thus aggravating the untrue and misleading nature of the statements made by Autonomy in its published information.

*The Defendants' response*

3146. The Defendants' response on this aspect of the dispute concerning these analyses and numbers had four primary limbs:

---

[366] The OEMs are numbered according to their position in the table provided at Schedule 8 to the RRAPoC. The same name and value are ascribed to them as in Mr Hussain's quarterly revenue spreadsheets that were provided to Deloitte, with footnotes provided in the Claimants' further tables in their written submissions suggesting explanations of any discrepancies.

[367] In respect of some there was a royalty clause [OEM1,6,11,15,18,31,34,35,44,52,60] but either none resulted (sometimes because of a commutation to a single up-front payment) or none should have been recognised because it was a reciprocal or other impugned transaction [OEM1,11,13,15,18,23,31,34,35,44,52] or there is no sufficient evidence to warrant treating revenue as royalty [OEM20,29,30,39,47,57,67]

(1) The Defendants rejected as being artificially and incorrectly restrictive the basis on which the Claimants alleged the 67 OEM transactions in question to have been wrongly classified. They denied that the characterisation of the impugned transactions was untrue or misleading. In accordance with the Defendants' more flexible and broader interpretation, their case was that revenues classified as IDOL OEM reflected a qualitative estimate of all IDOL business in the period in question generated through the OEM channel/network which Autonomy would not otherwise have been able to generate. In his Defence, Dr Lynch had pleaded, for example, that a non-software company could be an OEM and revenue from sales to an OEM would be classed as OEM derived[368], as also should sales to end-users of added functionality or PODs. According to the Defendants, these transactions had not been shown to be incorrectly classified.

(2) The numbers had been compiled by Autonomy's Finance Department in close consultation with Deloitte and listed on spreadsheets provided to and carefully ticked-off by Deloitte: Deloitte had thereby reviewed and verified Autonomy's classification of transactions as OEM transactions for the purpose of testing the OEM revenue figures.

(3) The summary reasons given in the Claimants' written closing were not adequate for the purpose of testing the Claimants' complaints as to classification, and these had not been put to Dr Lynch.

(4) The Claimants' assertion that 80% of the revenue characterised as IDOL OEM was misallocated was just that, an assertion, and it had not been supported by evidence.

(5) Further, in a number of cases, the Claimants' reasons for saying that revenues were wrongly classified within OEM was that the transaction from which the revenue was generated was challenged in some other part of the case, as an alleged reciprocal transaction, or impugned VAR transaction or (in at least one case) a hardware transaction, and that was not a proper basis of challenge without a separate analysis as to why they were not properly characterised as OEM-derived.

3147. As to (1) in the preceding paragraph, it follows that on the Defendants' own case, considerable amounts of revenue were allocated as OEM-derived which did not have what I have concluded would have been taken by addressees of the published information to be the special characteristics of that metric. It further follows from that conclusion that whilst I consider that such addressees would have expected there to be scope for *"qualitative estimate"* or subjective judgement as to whether in particular instances the link between the transaction to which revenue was referable and a prior OEM transaction was sufficient to warrant differentiating it from, for example, income referable to IDOL Product transactions, they would not have expected the inclusion of substantial amounts of revenue from categories of transaction which had not the special characteristics associated with the metric to be within that scope. Both Defendants knew

---

[368] In his Defence, and in his witness statement, the example given was that *"a delivery company may develop a smartphone application for tracking parcels which they sell to other parcel delivery companies. If, in developing that app, they use Autonomy and then they sell the app to others, they will be acting as an OEM."*

that, on the contrary, there were substantial amounts included in the OEM metric which were neither licence fees paid by an OEM nor ongoing payments payable by an OEM in respect of onward sales under licence of products embedded with IDOL. (That does not necessarily mean that the Defendants were dishonest: it is a matter for consideration at the next stage of the analysis whether at the time (a) they honestly intended the broader meaning they now assert and (b) whether they honestly considered the revenue to have been entirely properly allocated in accordance with their own understanding of the metric; but it does mean (if the amounts of revenue in question were substantial) that the published information was misleading.)

3148. Similarly as to (2) in paragraph 3146 above, although the involvement of Deloitte is a matter to which I must return (see paragraphs 3166 to 3185 below), the fact (if shown) that Deloitte did accept Autonomy's finance department's categorisation of revenue as IDOL OEM which had not the characteristics which I have concluded an addressee of the published information would have associated with the metric, can only go ultimately to the issue whether the Defendants were acting dishonestly. Any comfort or confirmation they may have obtained from Deloitte's approval would not alter the fact that the published information was, on the basis of my conclusions, misleading.

3149. The question raised by (3) in paragraph 3146 above relates back to the first of the two issues that I addressed in the introduction to this chapter as to whether what the Claimants had done was sufficient for the purpose of identifying the characteristics of the 67 impugned transactions without further evidence of their own or cross-examination of Dr Lynch. My judgment is that it was: see paragraphs 3010 to 3023 above.

3150. More specifically as to (4) above, in his oral reply, Mr Rabinowitz relied on (i) the *"underlying contracts"* alleged to have generated revenues which could not properly be classified as OEM derived revenue (which were in the trial bundles and were identified in the Schedules provided as part of the Claimants' Opening Submissions, and, as slightly modified, as part of the Claimants' Closing Submissions also) , and (ii) Mr Bezant's Fourth Report, which Mr Rabinowitz submitted verified the content of Schedules 8 and 9 of the RRAPoC and the 80% figure as having been *"correctly quantified from Mr Hussain's revenue spreadsheets."* Mr Bezant (who was not, of course, a witness of fact but an expert) only checked and confirmed the consistency between the Schedules and what was stated in Mr Hussain's spreadsheets: he expressly stated that he was not instructed to consider *"the Claimants' assessment of whether transactions were or were not IDOL OEM…"* But he could calculate the sum assuming that none of the transactions went beyond the scope of the market view of OEM business.

3151. I have taken into account in that context, and with regard to (5) in paragraph 3146 above, the Defendants' argument that some of the 67 transactions revenues were alleged to have been wrongly classified as OEM derived on the ground that the transactions in question were impugned on some other basis (VARs and reciprocal arrangements in particular), and that this did not suffice to establish a case that the revenues had been wrongly categorised as OEM derived. Of course, I accept that there could arise an obvious element of double-counting; and, for example, the mere fact that revenues have been recognised too early would not of itself entail that they had been wrongly categorised as OEM derived.

3152. However, in the case of almost every one of the VAR transactions and Reciprocal transactions, there was at least one further material basis alleged for the Claimants' case that the revenues generated were not properly classified as OEM, rather than (as in fact they were classified by Autonomy) 'OEM-derived'. Thus:

(1) Of the 10 VAR transactions identified as giving rise to revenue which was not properly categorised:

(a) OEM7 (with a VAR for end-user IBM/Ameriprise) involved the licencing of software for use of 20,000 Mailboxes only with Ameriprise and was part of a hosting services arrangement, so that no OEM was involved and no ongoing royalty arrangement could or did result;

(b) OEM12 (with MicroTech for end-user DiscoverTech) did not involve an OEM embedding IDOL into its own software and no ongoing royalty payment could or did result;

(c) OEM16 (with MicroLink for end-user DiscoverTech) did not involve an OEM embedding IDOL into its own software and no ongoing royalty payment could or did result;

(d) OEM36 (with Capax Discovery for end-user Amgen) was a licence sale for internal use (hosting), and that use was restricted accordingly;

(e) OEM45 (with DiscoverTech as VAR for end-user BofA) was a licence sale for use only for internal purposes, and no ongoing royalty payment could or did result;

(f) OEM50 (with Capax Discovery for end-user McAfee Inc) was a licence sale for McAfee's sole internal use, no OEM which wished to embed IDOL software in its own products was involved, and no ongoing royalty payment could or did result;

(g) OEM53 (with DiscoverTech for end-user Prisa) was a licence sale for use only for internal purposes, no OEM which wished to embed IDOL software in its own products was involved, and no ongoing royalty payment could or did result;

(h) OEM62 (with DiscoverTech on-licensing to Dell for end-user Hyatt) was a licence solely for the purpose of a sub-licence to Hyatt for its internal use, and no ongoing royalty payment could or did result;

(i) OEM64 (for JP Morgan) was a licence for its internal use only, no OEM was involved and no ongoing royalty payment could or did result;

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(j) OEM65 (with Capax Discovery for end-user UBS) was a licence for UBS's internal use only, no OEM was involved and no ongoing royalty payment could or did result.

(2) Of the 10 reciprocal transactions identified as giving rise to revenue which was not properly categorised:

(a) OEM1 (with Capax Discovery) was a licence which did not permit Capax Discovery (which was not an OEM) to embed Autonomy software in its own software for onward licensing to third parties and even though the contract contained a royalty clause this related only to the provision of services;

(b) OEM4 (with VMS) was a sale of a licence which prohibited VMS embedding Autonomy software into its own, and resulted in no ongoing royalties;

(c) OEM11 (with Capax Discovery for Eli Lilly) gave rise to no royalty payments or obligations;

(d) OEM13 (with FileTek) gave rise to no royalty payments or obligations;

(e) OEM15 (with Vidient) was one of three exceptions in that the contract did contain a royalty clause and Vidient might be classified as an OEM;

(f) OEM23 (with Filetek) gave rise to no royalty payments or obligations;

(g) OEM34 (with Vidient) was another of three exceptions in that the contract did contain a royalty clause and Vidient might be classified as an OEM;

(h) OEM35 (EMC) was the third such exception;

(i) OEM46 (with VMS) the transaction was not with an OEM nor did it give rise to any royalty payments;

(j) OEM52 (with Capax Discovery) was a licence for restricted internal use and though the contract contained a royalty clause it was never triggered.

3153. As to the substance of those complaints, I find that (with the possible exception of OEM15, 34 and 35, where the Claimants specified no reason other than that the transactions were "impugned reciprocal transactions" and which involved an aggregate of some $9,507,000) revenues from the 67 transactions identified were misclassified, amounting to nearly 80% of the revenues in the OEM metric. This misclassification of what I accept was regarded in the market as an important metric rendered untrue or

misleading (i) Autonomy's definition or description of IDOL OEM/OEM derived revenue in its published information, (ii) each amount of IDOL OEM/OEM derived revenue stated during the Relevant Period, and thereby (iii) Autonomy's published information, including its Quarterly, Half-Yearly and Yearly Reports in 2010 and 2011.

*Did the Defendants know of the inclusion within the OEM metric of revenue outside what investors were likely to understand to be within its scope?*

3154. Nevertheless, and as the Claimants appreciated, it is not enough for them to establish (as in my judgment they have established) that Autonomy included within the OEM metric revenues that reasonable readers would not have expected to be categorised as such (in the sense that readers would not have expected the OEM metric to comprise such revenues). They must also prove that the Defendants (to quote the test in FSMA, but interpolating my own words to make clear its application in the present case) each *"knew the statement* [of OEM and OEM-derived revenues] *to be untrue or misleading or was reckless as to whether it was untrue or misleading".*

3155. Put another way it is not sufficient to show that the Defendants knew that the metric included revenue which falls outside what I have determined, looking after the event at the language in the published information, its context and evidence of the way it was in fact understood in the market, readers would have expected to be included within the metric. What they had to show was that the Defendants knew at the time that revenue was being misclassified, and thus of a mismatch between reality and expectation, so as to displace the Defendants' case that they knew no such thing.

3156. It is the Defendants' subjective understandings and intentions which are in issue at this second stage, and which are not revealed as fraudulent simply because of a mismatch between what they thought at the time was proper to include and what, years later, the court has determined the readership expected to be included.

3157. As earlier foreshadowed, Dr Lynch submitted that (a) so far as he was aware, all revenues allocated to the OEM metric fell within its scope as he understood and intended the scope of the OEM metric to be; and (b) he was not involved in the process of characterisation of revenues nor in the allocation of revenues to the OEM metric, and he relied on the finance department and Deloitte in that regard. The first point (that is, (a) above) was available to and adopted by Mr Hussain as applicable to him also, *mutatis mutandis*. The second point was not available to him.

3158. Before turning to the facts especially relevant to this second stage, however, I must return (see also paragraph 3013 above) to Mr Miles's objection on behalf of Dr Lynch that this part of the Claimants' case was never properly put to him (despite indications that it would be in his long cross-examination), nor was he ever challenged on material parts of his witness statement in this regard. Mr Miles submitted that Dr Lynch was "*not given the opportunity either to justify the classification of the individual transactions, or to explain the extent of his knowledge in respect of each of them"* and that in combination the result should be to preclude the Claimants from pursuing the allegation of fraudulent knowledge against Dr Lynch. (Of course, although in all other respects Mr Hussain adopted all that Dr Lynch said, no such objection was open to or pursued by Mr Hussain.)

3159.  I cannot accept this submission. In my judgment, Dr Lynch made clear his understanding at the time that Autonomy was including revenues within the OEM metric on the basis of an alleged market understanding that its scope extended not only to revenue from the OEM transaction but to revenue generated from transactions with end-users *"made possible by the initial OEM sale"* (as he put it in his first witness statement). He knew that included within the OEM metric was licence revenue from sales to service providers who were using IDOL to provide services; licence revenue from sales to a reseller for resale; sales to non-software companies; direct sales to customers of OEM partners; sales involving licences limited to internal use; and revenues from upsells and PODS. It was his case that he believed that the scope was understood to be so extended[369]; the Claimants challenged him on that case and put their opposing and primary contention that it was not, and he did not have any honest belief that it was. If Dr Lynch considered that any of the 67 impugned transactions individually fell within the narrower scope, he could and should have said so. In short, I consider that the Claimants did sufficiently challenge Dr Lynch on the salient points in his evidence, and in particular on his fundamental point that it was made plain to the market, and should have been obvious from the use in 2010 of the phrase "OEM-derived", that the IDOL OEM/OEM derived metric extended to all sales of IDOL software generated or facilitated by what he called the *"OEM route to market"* (including direct sales to the end-user).

3160.  I cannot accept either that any different understanding would have resulted from a more detailed exegesis of the contracts nor that any material unfairness was caused to Dr Lynch by the course adopted by the Claimants of challenging Dr Lynch on his understanding of the phrase, its use in the relevant published material, and how he understood it would be interpreted by the market, rather than on the details of the 67 individual transactions impugned as falling outside the metric.

3161.  In summary, what was necessary was for the Claimants to challenge and undermine Dr Lynch's evidence as to his own understanding and put to him their case that he was aware of and involved in the mischaracterisation of revenue which resulted in a mismatch between the description of OEM-derived revenue and what in fact was included under that category or metric. In my judgment, they did put to Dr Lynch their case, and the basis on which they sought to challenge his.

3162.  The Claimants focused especially in this context on what Mr Hussain and Dr Lynch had said at the time, especially in the course of Earnings Calls and in the Q3 2010 Investor Bulletin. Although I have determined that the transcripts of these Earnings Calls did not constitute "published information" within the FSMA test, and (as the Defendants emphasised) there is no evidence that anyone at HP looked at or listened to any of them at the time, they are nevertheless relevant at this second stage to an assessment of the Defendants' true understanding and intentions.

3163.  The Claimants relied, for example, on the fact that:

(1)  On the Q3 2009 earnings call, when asked to comment on the *"slight deceleration"* that had occurred in that quarter in the *"OEM situation"*, Dr Lynch had replied that *"The simple reason is that we get the returns from what*

---

[369] For example, he told me in cross-examination that although not involved in the transactional detail, *"...everyone understood that the definition of "OEM-derived" included business that was being generated by our OEM programme even if it was not revenue directly from the OEMs."*

*400 of the world's software companies have sold, and there's very little ability to work out exactly where that number's going"*. The Claimants contended that this suggested that OEM derived revenue was, in the main at least, revenue *"from what…software companies have sold"* and that this equated to royalty revenue.

(2) On the Q1 2010 earnings call, Dr Lynch explicitly stated :

> *"On the OEM side of the business, <u>we sell to virtually all of the major names in the software industry through a royalty based model</u>. As we've mentioned before, that business acts like a tracker fund of the software industry. So as wider software sales increase and the number of products coming to market increase, so you would expect OEM revenues to increase."* [Emphasis supplied]

(3) In the course of the earnings call for Q1 2010,[370] Mr Hussain explained the breakdown of that quarter's reported $29 million of "*OEM derived revenues*" in terms which characterised "*OEM derived revenues*" as being comprised entirely of development licence fees, and ongoing royalties received in that quarter, leaving no scope for the inclusion of upsell or PODS revenue. He said this:

> *"OEM development licenses of $3m give us some visibility about future royalty streams into the OEM business. OEM ongoing royalties in the quarter amounted to some $26m."*

3164. When, in cross-examination, Dr Lynch was confronted with this apparently exclusive characterisation of "*OEM Ongoing*" as "*OEM ongoing royalties*" both in statements he himself made, and in statements made by Mr Hussain, he offered the following explanations, which the Claimants answered, and which I assess, as summarised below:

(1) First, as to his own statements, Dr Lynch contended that the phrase *"royalty based model"* does not necessarily mean, and he did not intend it to mean, that the only OEM business conducted by Autonomy was done on such a model, nor that each relevant transaction had an ongoing royalty stream. He gave as an example a buyout deal or bulk royalty deal that could fairly be described as *"royalty based"* where the amount the customer was required to pay was calculated by reference to a notional royalty rate. Mr Pearson (who, it will be remembered, was called by the Defendants) also sought to emphasise in re-examination that *"there were generalisations about description…generalisations were commonly used by analysts and investors throughout this period to describe the general trend of what's going on"* by which I took him to mean that words would often be deployed in a generic but not exclusive sense to signify a broad general category but not to denote an exclusive meaning. However, even Mr Pearson volunteered (in the same

---

[370] The first of the three quarters in which this breakdown was reported.

passage of his re-examination) that *"People understood that in general they were royalty driven in some form or another…"*

This did not carry the Defendants very far. The typical characteristic of OEM revenue (after payment of the original licence fee) was a payment by the OEM to Autonomy calculated by reference to the value of its onward sales of product including Autonomy software: in other words, a royalty-type basis of calculation.

(2) Secondly, Dr Lynch told the Court that Mr Hussain simply made a mistake in his choice of words – "*there's an occasion when talking in realtime on a call, he has used a word he shouldn't*".

However, Mr Hussain was reading from a script. He said exactly what he was scripted to say:

- *"OEM development licenses of $3m give us some visibility about future royalty streams from the OEM business.*

- *OEM ongoing royalties in the quarter amounted to some $26m."*

Further, the script: (i) contained edits by Dr Lynch to the management presentation part of the script; and (ii) contained no edits to the 'question and answer' section. While Dr Lynch made changes to other parts of the management scripts, he made no changes to Mr Hussain's description of "*OEM Ongoing*" as "*OEM ongoing royalties*".

In any event, even if Dr Lynch's review had been limited to the questions as he suggested it was, the same representation of the contents of IDOL OEM revenue was contained in the 'question and answer' section. Question 59 was "*New revenues classification*" and the answer, so far as it concerned IDOL OEM revenue, said "*OEM Dev 3.0*" and "*OEM Royalty 26*" – entirely in accordance with Mr Hussain's representation that $26 million of OEM Ongoing comprised only royalty revenue. Dr Lynch could not identify any steps taken by anyone at Autonomy, including Dr Lynch himself, to correct Mr Hussain's characterisation of "*OEM Ongoing*" as "*OEM ongoing royalties*", whether on this call or at all.

(3) Thirdly, Dr Lynch asserted during cross-examination that an explanation of the sub-categories "*OEM Dev*" and "*OEM Ongoing*" had been given to the market two quarters before the Q1 2010 earnings call, in the context of the Q3 2009 results, and that the actual definition of these metrics would be found there.

However, there appeared to be nothing to support this, either in the transcript of the Q3 2009 Earnings Call, or in the Results presentation for that quarter: on the contrary, both appeared to convey that Autonomy's IDOL OEM revenue comprised (i) a development fee and, (ii) payments when OEMs' products are sold i.e. ongoing royalties, and there was no mention of upsells or PODS in the

Q3 2009 earnings call materials, let alone a description or explanation of such revenue sources.

Indeed, the way Dr Lynch explained to the market what OEM business Autonomy was doing is perhaps the most striking demonstration that he (and Mr Hussain) knew what the market perceived OEM business to comprise. Thus, for example:

(a) On Autonomy's Q1 2008 earnings call Dr Lynch said:

> "*we license our technology to other software players who then use the technology to enable their own products to understand structured information ... They do this on a model where they will sign up a deal with us. There may be an upfront payment which would typically be around $200,000, and then they ... write ... their product ... The back period is now, on average, two years between for them to write whatever their product is ... Then that product ships and we would receive a royalty stream ... What we see in Q1 is 12 OEM deals signed, so we would expect to see revenue from them on average in two years' time.*"

(b) Autonomy's 2009 Annual Report stated:

> "*An OEM pays an upfront non-refundable fee and then writes its new product which can take up to two years depending on its product roadmap and release cycle. Once the product is launched they make license payments of around three percent of product sales to Autonomy*".

(c) Autonomy's 2010 Annual Report stated:

> "*Contracts and situations vary, but by way of example an OEM could pay an upfront non-refundable fee and then take two years to launch its product. Once that product is launched they may make license payments of around three percent of product sales to Autonomy.*"

(d) An "Introduction to Autonomy" prepared for investors in 2010 read:

> "*An OEM pays an upfront development fee and then writes its new product which can take up to two years depending on its product roadmap and release cycle. Once the product is launched OEMs pay a royalty stream of around 3 per cent of product sales to Autonomy.*"

(4) Fourthly, Dr Lynch referred to what he presented as being the universal understanding in the market (except for an errant Credit Suisse or *"unless they had arrived from another planet"*). But as explained previously, (see paragraphs 3098 to 3137 above) I do not accept that that was so; and certainly no general market understanding such as the Defendants asserted was proven: the evidence showed that many analysts had the same or a similar understanding as Mr Grieb and Credit Suisse.

(5) Fifthly, Dr Lynch also relied on his understanding that both Deloitte and Autonomy's Audit Committee, as well as its finance department, were closely involved, had reviewed Autonomy's policies for disclosure of and accounting for the OEM revenues, and had satisfied themselves that they were appropriate. He assumed that Deloitte understood the nature of the transactions and the identity of the counterparty in each case. He knew that Deloitte checked Autonomy's earnings releases and ensured that the figures reported were accurate. As Mr Miles put it in his oral closing argument, *"they understood more about the detail than Dr Lynch"* and appeared content with both *"the numbers and the way the language was used"*. Dr Lynch's case was that he felt entitled to and did assume that if Deloitte had had any concerns that the information provided about OEMs was misleading, they would have made that clear: but nothing of that kind ever happened.

3165. The last of these points, and the dispute which resulted as to the significance of the fact that Deloitte never objected to either the enumeration and presentation of the OEM metric, was a principal focus of the defence and needs elaboration.

*Deloitte and OEM revenues*

3166. I turn to consider, therefore, (1) the nature and extent of Deloitte's involvement and of its responsibilities in respect of the OEM metrics, and (2) what relevance Deloitte's involvement has to the assessment of whether the Defendants believed the OEM metric to be properly described and constituted (or whether, instead, they knew it be untrue or misleading, or took a reckless risk of it being misunderstood).

*Nature and extent of Deloitte's involvement*

3167. The Defendants' case was that although the initial preparation and presentation was for the finance department of Autonomy, Deloitte (a) reviewed the way in which the OEM metric was presented in the Quarterly and Annual Reports and in what was termed *"the front end of the accounts",* (b) checked the constituent elements of the deals going into the OEM metric, and (c) "*ticked off"* the numbers. Deloitte was thus closely involved in considering the categorisation of the transactions and the amount of revenue which could be included in the metric as OEM derived revenue. Dr Lynch had no role in the process.

3168. The Claimants, on the other hand, submitted that *"the misclassification of transactions within the IDOL OEM revenue was not an accounting matter"* and Deloitte's involvement was *"of very limited relevance indeed"* to the determination of the OEM issue. Deloitte's advice, they stated, *"was neither sought nor given"*. They added that *"in circumstances where the Defendants knew that the definition or description of IDOL*

> *OEM revenue in the published information was misleading, it is simply irrelevant that Deloitte failed to detect the Defendants' wrongdoing."* They submitted that the Defendants could not *"hide behind Deloitte in relation to their fraud."*

3169. The Claimants accepted that, as appeared from their working papers, Deloitte had undertaken a process of going through the final draft of the relevant Reports and had ticked off every number, next to the relevant label or description of the metric. However, they contended that it was no part of Deloitte's remit to check the composition and presentation of the IDOL OEM metrics and figures in the "front-end" or narrative part of the reports, which the Defendants themselves accepted were not IFRS figures subject to audit and were provided voluntarily by Autonomy. The Claimants cited in this regard Accounting Standard *ISA 720A (2004)*, which states that *"...the auditor has no specific responsibility for determining whether or not other information is properly stated"*, and *"ISA 720B (2009)"*, which requires the auditor only to *"read the other information to identify material inconsistencies with the audited financial statements".*

3170. As to the actual process in this case, they relied on Mr Welham's evidence as confirming that this ticking off process simply involved checking the totals presented in the *"front end"* against the audited figures in the *"back end"* (as put to Dr Lynch) and that Deloitte never had to consider, and did not consider, the reasonableness of the categorisation of revenue within IDOL OEM revenue. It was, as it were, a merely mechanical process of ensuring consistency of numerical quantification between the two parts of the Reports.

3171. They relied particularly on the following passage of Mr Welham's evidence when he was cross-examined by Mr Miles on a spreadsheet which Deloitte had marked up with tickmarks, the objective of which was stated to be *"To agree the metrics used in the quarterly press release to supporting schedules and to test the validity of these schedules"*:

> *"So the tickmarks will just be what the person who prepares the spreadsheet writes. So just to clarify what we're doing here, because this relates to what we call front end information, then we have no - - our responsibilities around that are to read it and ensure consistency with the financial statements... So when the team have gone through this, they're essentially looking at what's included to make sure we can tie back - - so that the totals tie back to the financial statements and what makes up those totals ties back to what we have audited or reviewed. So while someone may have written "Appears reasonable", we're not really considering the reasonableness of where things are categorised because that's not within our remit.[371]"*

3172. In addition, and although not stressed by the Claimants, the following further passage seemed to me to illuminate that evidence:

> *"So we're not opining on the categorisation here, we're essentially making sure that revenue deals included here are ones that we've tested and therefore that essentially there aren't incorrect deals or bogus deals included in these metrics which are not part of the reviewed revenue or the audited revenue."*

---

[371] Mr Welham made a similar point in relation to IDOL Cloud revenue, which, like IDOL OEM revenue, was not an IFRS metric.

3173. However, that is difficult to reconcile with what the evidence demonstrates as to what Deloitte actually did, as revealed by extracts from one of Deloitte's working papers showing their comments on spreadsheets provided by Autonomy's finance department classifying revenue. The example relied on by the Defendants was a spreadsheet with various schedules, of which the stated objective was *"To agree the metrics used in the quarterly press release to supporting schedules and to test the validity of these schedules"*. Its conclusion was *"Satisfactory."*

3174. It does seem from the paper itself that as part of the audit testing process, Deloitte would have reviewed at least some of the underlying contracts, if their value was over $1 million, as part of the sampling process. Mr Welham was taken to the Q2 2011 tab within the document. It was clear that he could not remember much about it. His answers were really simply acknowledgements of what was stated: thus, he agreed that columns AB to AE were headed "OEM Royalty", "OEM upsell", "OEM POD", and "OEM Prepay", and that it looked as if the "IDOL OEM" category which was published by Autonomy had included upsells and PODS.

3175. He was then taken to columns S and Y headed "Deloitte Added Columns" with column S containing deals over 1 million which had a reference to a testing sheet and on to column AC row 4, which contained a reference to "tick mark e", and then on again to the "Tickmarks tab" where a note stated:

> *"The OEM upsell category includes hosted licence deals that are hosted on OEM customer data-centres. This is considered reasonable for including as OEM driven revenues."*

3176. It was put to Mr Welham that someone within Deloitte had specifically considered the OEM upsell category in respect of hosted licence deals hosted on OEM customer data centres and concluded it was reasonable: he agreed that the preparer of the spreadsheet had, and confirmed that this was someone in Deloitte.

3177. Further, in cross-examination, Mr Welham was taken to guidance issued by the Auditing Practices Board (the predecessor in this context of the FRC) as to an auditor's responsibility in respect of *"Other information in documents containing audited financial statements"* (which essentially covered the 'front-end' narrative part of the Annual Report). That guidance provided, for example, that:

> *"The auditor should read the other information to identify material inconsistencies with the audited financial statements. If as a result of reading the other information, the auditor becomes aware of any apparent misstatements therein, or identifies any material inconsistencies with the audited financial statements, the auditor should seek to resolve them."*

3178. Mr Welham acknowledged[372] that, in the light of this guidance, Deloitte did check for material inconsistencies and misleading statements in the 'front-end', as the Schedule exemplified, and they had identified none.

*What reliance can the Defendants place on Deloitte in this context?*

3179. In his written closing submissions, Dr Lynch placed considerable emphasis and reliance on Deloitte's review and apparent acceptance of the accuracy of the schedule in this context, as in effect, endorsing and even justifying both his avowed belief in the accuracy of the published information about the OEM derived revenues and the reasonableness of that belief. Mr Miles added in his oral closing that:

> *"Deloitte read the description...in the front end of the accounts and they read the descriptions in the quarterly reports, did the same thing every quarter and never identified anything misleading. As I say, they had a fuller and closer understanding than Dr Lynch did of the deals that actually went into the numbers given for the metric. We say that's very important because, if they didn't think there was a problem, it makes it very improbable to suggest that Dr Lynch should have done."*

3180. The Claimants, on the other hand, dismissed any reliance on Deloitte's checks as unfounded: even if Deloitte's remit extended to opining on the reasonableness and consistency of the information provided in the front-end of the various Reports (whether as a matter of obligation or simply as a matter of what in fact they chose to do), which the Claimants did not accept, they submitted that:

> *"In circumstances where the Defendants knew that the definition or description of IDOL OEM revenue in the published information was misleading, it is simply irrelevant that Deloitte failed to detect the Defendants' wrongdoing."* [Claimants' emphasis]

3181. That submission is premised on knowledge (or at least recklessness) on the part of the Defendants. Ultimately, as will be seen, I agree with its conclusion, but there is a prior question, as it seems to me, whether the Defendants' case that they relied on Deloitte as support for treating OEM business as being broad enough in scope to cover the scheduled transactions. That requires brief analysis of what Deloitte's role was and what their approval signified.

3182. As to that, in my view, all that really Deloitte's process of checking and approval signified was that they were satisfied that the transactions were accurately described and that transactions as so described fell within what the Defendants told Deloitte was a broader category of OEM business. In other words, Deloitte saw no basis to contradict what they were given to understand by Autonomy was the scope of the OEM metric as extending to any revenue which, according to a subjective judgment, could be said to have been driven or made possible by an original licence sale to an OEM. They read the metric and interpreted the disputed phrases using the criteria that the Defendants

---

[372] As he had also agreed in his evidence in the US criminal proceedings.

supplied them. Deloitte did no more than check that the transactions conformed to the description of the metric that Autonomy had supplied.

3183. Deloitte might have probed further; but they were not required, as regards this narrative description voluntarily provided, to assess separately or second-guess the directors whether a transaction fell fairly within the scope of what the market understood to be OEM business. They had to do little more than satisfy themselves that the approach and figures were consistent. Having, for whatever reason, accepted management's interpretation, approval followed, but that provides little or no validation of the Defendants' avowed belief. Autonomy and its management were in a far better position to assess what the market considered to be comprised in OEM business.

3184. I have concluded that the fact that Deloitte accepted, or at least did not raise any objection to, the inclusion of the 67 impugned transactions within the OEM metric is of little, if indeed any, relevance or assistance in determining whether the Defendants knew that the inclusion of revenues from *"follow-on sales"* gave an untrue or misleading depiction of the extent and success of the OEM line of business. I do not accept that Deloitte were or can be regarded as a litmus test either of market perception of the scope of the OEM metric or of the Defendants' honesty.

3185. In my judgment, Deloitte did not know what the Defendants, in my judgment, did know, or at least knew to be a real risk: that the category they had devised extended to transactions which the market would not have regarded as having the characteristics associated with OEM business.

3186. As to the Defendants' individual positions, I do not accept that Dr Lynch was ignorant of this. As previously noted, Dr Lynch emphasised that he personally had no involvement in or knowledge of individual OEM transactions, and was not involved in determining how deals should be classified. He could not recall ever reviewing the spreadsheets in any detail, if he saw them at all. But he did know, as he has acknowledged, that there were many transactions that did not constitute "core" OEM transactions: and I have concluded that the metric was misleading, and he knew it. Mr Hussain was in no better position. He offered nothing to absolve himself except the "definitional issue".

3187. On the basis of the matters referred to above, (and I should acknowledge, fortified also by my findings summarised in paragraphs 3207 and 3235 below),[373] it is reasonably clear, and I find, that:

(1) Both Defendants knew or recklessly took the risk that readers in the market of Autonomy's published information were not aware that such a preponderance of the revenues included in the OEM metric were not "core" OEM revenues;

---

[373] Relating to my findings in respect of the *"Lone Pine episode"* and the *"Top 10 List"* provided to HP in the course of the due diligence process

(2) Both Defendants well understood the enhanced value attributed to OEM business and wanted to take advantage of it, including (if necessary) by 'pumping up' the OEM metric and including within it revenues which had only a vestigial subjective basis (if any) for classifying as especially valuable.

(3) The fact that Deloitte undertook the checking exercise described above does not affect the conclusion.

3188. The evidence has satisfied me, and I find, that a substantial (likely to be almost 80%, though I shall confirm the figure in my judgment on quantum) of the revenues allocated to the OEM metric was outside what the market perceived to be its scope, as the Defendants knew or understood to be a real risk.

*A further issue as to upfront prepaid licensing deals or "buy-outs"*

3189. A further aspect of the dispute concerns the evidence of Mr Harald Collet ("Mr Collet")[374], Autonomy's head of OEM sales in North America from Q3 2008 to Q1 2010 and as such the *"real head of OEM"*, to the effect that even in the case of "core" OEM transactions which might have generated ongoing royalty revenue, in the *"great majority"* Autonomy had agreed instead to smaller, accelerated, upfront non-royalty payments. This, the Claimants submitted, made matters even worse.

3190. Mr Collet's evidence made two principal points:

(1) the upfront prepaid licensing deals or "buy outs" were presented as giving rise to recurring revenue in the form of royalty, and that was untrue or misleading;

(2) the discount for prepayment or buyout reduced the likely aggregate payment obligation: contrary to the impression given by Autonomy's published information, Autonomy was sacrificing ongoing royalty income in order to accelerate future revenue into current reporting periods to be recognised immediately.

3191. The Claimants invited me to find that:

*"...even as regards OEM deals with OEM partners that were legitimately included within IDOL OEM revenue and might otherwise have generated royalty payments...this in the main did not happen"*, and that this

*"...further reinforces the untrue and misleading nature of the statements made by Autonomy in its published information to the effect that IDOL OEM revenue consisted mainly of ongoing royalties, still less that royalty payments at a level of 3% of the OEM's sales to end-users were typical. Few, if any, IDOL OEM transactions generated, or could reasonably be expected to generate, a recurring royalty stream of around 3% of license sales."*

---

[374] Mr Collet also co-authored the "Joe Bloggs" communications: see paragraphs 312 to 313 in the Introduction and 3235A and 3235C below.

3192. Dr Lynch accepted in the course of his cross-examination that *"there would be a significant number of upfront royalties on that sort of structure, yes"*, and that he knew at the time that this was happening.

3193. I have not been persuaded that this materially would have affected the market, or that it was wrongful, even if it was (as the Claimants contended) with a view to accelerating recognition of revenue, and despite a loss thereby to Autonomy in terms of total ultimate revenue. It seems to me that a prepaid royalty is a capitalised payment in lieu of a recurring royalty. I decline to make the finding sought.

3194. However, Mr Collet's evidence also referred to an incident in relation to upfront royalties which I should mention since it was relied on as revealing Dr Lynch's *"willingness to lie to the Court, in order to cover up lies he had told to investors during the Relevant Period",* and in this case to maintain the depiction of the OEM business he wished to present. This was referred to at trial as *"The Lone Pine episode"*.

*The Lone Pine episode*

3195. Lone Pine Capital (HK) Limited ("Lone Pine") was a hedge fund (based in Hong Kong) at which a Ms Leonie Foong ("Ms Foong") worked. According to Dr Lynch's evidence in cross-examination, Lone Pine, through Ms Foong, had been probing for material in support of a negative story in the market that Autonomy had a balance of pre-paid royalties that had been improperly recognised up-front, although the royalties would need to be paid back if the sales on which they were based did not occur. When Ms Foong approached Autonomy with regard to the story, Dr Lynch sent an email dated 21 July 2009 referring her to Mr Collet whom he described to her as *"the real head of OEM for Autonomy".*

3196. A call was set up with Mr Collet on 21 July 2009. Mr Collet was not trained in investor relations, and was not permitted, save in limited circumstances, to speak to analysts or investors, but Autonomy was happy for him to have a one-off, general conversation about the market. In an email Dr Lynch encouraged him to keep the call short.

3197. Mr Collet claimed that in advance of the call, ("*Dr Lynch emailed me a script setting out what I should say to Lone Pine*." He said that the script contained a number of assertions that he was uncomfortable with, because (he said) they mischaracterised Autonomy's OEM business *"as principally involving deals for ongoing royalty revenue streams when, in my experience… the great majority of my team's OEM sales were being structured as up-front, pre-paid licensing deals"*; however, because of the "*culture of fear*" at Autonomy, he followed the script as best he could.

3198. The Defendants objected that none of this was true, and the Court should find that the notion of a script – and the instruction to say anything misleading – was an invention by Mr Collet. Dr Lynch was adamant that there had been no script. His written closing submissions elaborated on this as follows:

> (1) The script was, according to Mr Collet, sent by email (as it must have been since Mr Collet was located in the US and Dr Lynch in the UK). No trace or copy of any such script has been found, despite extensive searches.

(2) When this was pointed out to him in cross-examination, he said – for the first time – that he had deleted it, claiming that he did so as "*it felt like it was best for [him] not to have a copy of that*", because he "*was concerned that [he] got direct instructions on how to speak to the investor and what to say to the investor and it was emailed direct from Mike Lynch to [him]*." This was inconsistent with his witness statement, which simply stated that he did not have a copy of the script and that he understood from the Claimants' lawyers that they had been unable to locate it on Autonomy's systems. In any event, the Defendants contended that a copy would have existed in Dr Lynch's email account and no such email exists.

(3) Mr Collet maintained that the script was a narrative document, setting out in some detail what he was meant to say. However, the call took 45 minutes, and he remembered the "script" to be only half a page long.

(4) Mr Collet said that he was uncomfortable with what he had to say on the call, but he did not raise that either with his boss, Mr Mooney, or with Dr Lynch.

(5) The suggestion that there was a script was inconsistent with the other emails that were sent at around the time of the conversation, for the reasons explored in cross-examination with Mr Collet.

3199. Following the call, on 23 July 2009 Ms Foong sent some follow up questions to Mr Collet, focussing on prepaid royalty fees, and Mr Collet passed them on to Dr Lynch. Dr Lynch replied with a proposed response for him, copying Mr Mooney and Mr Bettencourt. Dr Lynch then provided Mr Collet with a Word document containing the text of proposed responses to each of Ms Foong's questions, which focused especially on whether there was any "*hosted component to some OEM deals which requires either pre-payment of licences or ongoing licence fees*". Dr Lynch instructed Mr Collet (who it will be remembered was head of OEM in North America) to "*Pls take attached doc, read it and CUT AND PASTE JUST the text into a text email reply to them.*" In cross-examination, Dr Lynch sought to explain this peremptory instruction on the basis that (a) Mr Collet was not trained in investor relations and (b) "*under the DTR regulations[375], only certain people...are allowed...to have correspondence in anything other than general terms with investment managers.*" In any event, Mr Collet followed the instruction to the letter.

3200. Lone Pine's questions and Dr Lynch's answers were as follows:

(1) "*Is there any "hosted" component to some OEM deals which requires either pre-payment of licences or ongoing licence fees?*

*No this would not be normal (can't think of one), there may be deals like this in the EDD and hosted archiving group but not the OEM business.....but I guess we would consider it if it arose.*

(2) *What are pre-paid royalty fees if such a thing exists?*

---

[375] The FCA's "*Disclosure Guidance and Transparency Rules sourcebook*" issued in compliance with the FCA's obligations under the *Market Abuse Regulation*.

*The 200k upfront payment that customers make covers the first quarter of royalties when they start shipping (typically 2 years later). It is not normal for customers to pay upfront royalties. I believe Verity did this kind of thing before the acquisition by Autonomy but it is not our model. (I think insistence on this old verity model was one of the reasons Chad was let go) <u>We aim to maximize the royalty stream not the upfront.</u>* [My emphasis]

(3) *Using an example, could a customer choose to prepay upfront a portion of his future expected royalty payments, and subsequently pay less royalty payments in the future (when his products get shipped). You mentioned some royalty rates go as high as 30%; I'm wondering whether there is any structuring a customer might do to lower that royalty rate, but pre pay a portion upfront*

*Prepaying would not reduce the royalty rate even if we did it, although I guess we are always open to considering any deal (not my call that would be the CEO) this is not how we work, as I said our goal is maximum ongoing royalty not upfront.*

*There is one area that might cause confusion. An OEM customer enters a deal with us for specific of the 500 functions we sell (typically 4 or 5 of them) ships them inside each time their software is sold and pays the royalty on each one sold. Sometimes although their product has these 4 or 5 functions one specific of their end customers might need another function not in the OEM agreement in which case for this one end-user the OEM can resell the extra function as a one off licence solely for that end-user (i.e. for this one sale the OEM is acting as a reseller as well as an OEM). There can also be deals where the OEM is only licensed to a certain amount of data/speed per end-user and in the event of them selling to an end-user with bigger needs they can pay a one off royalty kicker for that end-user.*

*Remember a company like Sybase may be an:*

*1 OEM paying a royalty to us on their shipping product;*

*2 may also be a reseller of licences for other functions to augment the OEM product in specific end customers;*

*3 resell Autonomy non OEM licences, and*

*4 may also be doing systems integration work using Autonomy software.*

*The OEM group would only see the first 2 cases, the rest is non OEM but to the same company."*

3201.  There is a dispute between the parties both as to what question Ms Foong was really asking in question 2, and whether the answers proposed by Dr Lynch were accurate and reasonable:

(1)  Dr Lynch maintained in cross-examination that the question was "*about whether we have a balance of pre-paid royalties that have to be given back if the sales don't occur, which was the hedge fund story at the time*". He submitted that his answer on that basis was correct: particularly in the context of the questions regarding returnable up-front royalties that Lone Pine had been asking, and bearing in mind the need to avoid making improper selective disclosures to a hedge fund. Autonomy did not engage in transactions involving the pre-payment of royalties which were returnable, and which could only properly be recognised on sell-through.

(2)  The Claimants dismissed this as a tactical gloss on a straightforward question about what prepaid royalties were, and whether Autonomy used them, and that Dr Lynch had to gloss the question because he knew that, if the question bore its obvious meaning, then his draft answer to that question was a lie.

3202.  There was also a dispute in relation to Dr Lynch's scripted response to Ms Foong's third question. The Claimants submitted it to be obvious that the statement that *"Prepaying would not reduce the royalty rate, even if we did it"* was intended to reinforce the answer to question 2, and to reiterate the false assertion that Autonomy had not received (or bargained to receive) pre-paid royalties, that being no part of its model. Dr Lynch suggested in cross-examination that all the response meant was that the royalty rate would not be lowered, and that this was true: *"We did take pre-paid royalties, yes, but we didn't reduce the royalty rate."*

3203.  On the basis of their interpretation of the questions and answers, the Claimants submitted that:

(1)  Dr Lynch's *"lies to Lone Pine were glaring"*. He had instructed Mr Collet to tell Lone Pine that prepaying royalties did not take place, when he knew it was entirely ordinary for Autonomy to receive prepaid royalty payments from OEM partners.

(2)  To cover these lies *"Dr Lynch gave blatantly dishonest evidence to the Court."* The Claimants elaborated this as follows:

> "*His tactics included: (i) attributing a false meaning to what Lone Pine had asked and the answers he drafted; (ii) inventing a justification – the risk of inside information- that was irreconcilable with is written evidence about the market's understanding; and (iii) providing evasive answers when faced with these difficulties".*

3204.  Against this, the Defendants insisted that:

(1)  Mr Collet was an unreliable witness who had concocted a story about a script which never existed to cover up his own misdescription of the OEM business to Ms Foong at their first meeting which led to the further questions.

(2)  Restrictions under the DTR regulations made it imperative for Dr Lynch to dictate the response to Ms Foong to avoid inadvertent release of inside information by Mr Collet who had no relevant training in investor relations, and

especially so since Ms Foong had (according to Dr Lynch) been fishing before, and he was concerned that Lone Pine was attempting to solicit inside information. His concerns are apparent from an email he felt he had to write to Ms Foong on 23 July 2009 (after her discussion with Mr Collet) warning her off such soliciting.

(3) Both the questions and the prescribed responses had to be interpreted in the context of earlier questions regarding returnable up-front royalties that Lone Pine had been asking, and bearing in mind the need to avoid making improper selective disclosures to a hedge fund. The questions were properly regarded as attempts to establish whether market gossip that Autonomy was engaged in transactions for prepaid royalties which would be recognised as revenue immediately but then returned was true: and the answers were intended to provide a firm refutation of that, and make clear (as was the fact) that Autonomy did not engage in transactions involving the pre-payment of royalties which were returnable, and which could only properly be recognised on sell-through.

(4) Thus, the interactions with Lone Pine give no grounds to criticise Dr Lynch, and provide no support for the allegation that he was involved in or knew of any false reporting of OEM revenues. Mr Collet's evidence should be rejected as unreliable.

3205. Although in a sense something of a side-show, the Lone Pine episode does cast light on a central issue of Dr Lynch's reliability and in particular his true intentions in relation to the depiction to the market of Autonomy's OEM business.

3206. In my judgment:

(1) Mr Collet's antipathy to the Defendants was obvious. His reliability was also shaken by:

(a) The discrepancies between his witness evidence and his evidence when cross-examined, especially those arising from his sudden mention in cross-examination of matters entirely absent from his written evidence (for example, that he had destroyed the script he said Dr Lynch had sent him);

(b) The lack of any documentary support for certain of his factual assertions (in addition to the obvious example of the lack of any trace of the script he said had been provided by Dr Lynch);

(c) His apparent willingness to fling accusations without a shred of support (so that the Claimants had to withdraw a paragraph of his witness statement containing a serious accusation that the Defendants had manipulated the number of OEM deals reported)[376];

(d) His acceptance in cross-examination, contrary to the impression given in his written evidence, that (i) he had never been specifically directed to do a buy-out (ii) there was no policy on the part of the Defendants

---

[376] Mr Collet himself sought to persist with this allegation even after accepting he could not substantiate it

that buy-outs should be preferred[377] and (iii) the point of the exercise was to try to do the best deal possible for Autonomy;

    (e) The overall impression I had was that he was no longer able to distinguish between the case theory and his actual recollection.

(2) However, Dr Lynch's evidence on the Lone Pine episode did not appear to me to be reliable either. In particular:

    (a) His effort to recharacterize the questions put by Ms Foong in order to explain his answers was ingenious but unconvincing;

    (b) His answer to the second of Lone Pine's questions (quoted in paragraph 3200(2) above) was almost the reverse of the truth and was in any event misleading; and

    (c) His evidence in relation to his answer to Lone Pine's third question was not convincing either. Dr Lynch is prone to careless spelling but seldom to careless language. I find that in stating *"Prepaying would not reduce the royalty rate, even if we did it"* (and see paragraph 3202 above) he was stating and intended to confirm that Autonomy did not "do" prepayment deals.

3207. Overall, the Lone Pine episode does seem to me to provide an example, and confirm my more general impression, of Dr Lynch using language by which he intended to convey or support the depiction of a business line generating a reliable recurring revenue stream (or, to use a phrase from Dr Lynch's statement in the 2010 Annual Report, *"multi-year committed annuity streams"*), knowing that the depiction given was at best inaccurate.

*Allegation of concealment of transactions in published information*

3208. The Claimants submitted that further support for the conclusion that the Defendants were aware that an untrue or misleading presentation was being given of IDOL OEM revenues was also to be derived from what they described in their written closing submissions as *"the manner in which Autonomy repeatedly concealed the identities of the counterparties to the largest transactions that had been allocated to IDOL OEM revenue."*

3209. In particular, they submitted that it cannot have been a coincidence, especially given the prolonged period over which the contrast is apparent, that:

(1) Throughout the Relevant Period, Autonomy's Quarterly Reports would cite only a handful of deals giving rise to IDOL OEM revenue, all with counterparties who were software companies fulfilling the restrictive view of a standard OEM; whereas

---

[377] Though Autonomy's sales commission system did provide salesmen (including Mr Collet) with a financial incentive to strike deals with a larger 'headline' figure, as Mr Collet himself explained in his first witness statement.

(2) By contrast, Autonomy never identified counterparties to transactions included within the OEM metric which were not software companies even where (as they put it) *"such transactions were of substantially greater value or prestige than the transactions that Autonomy did choose to highlight."*

3210.   The Claimants offered the following suggested examples:

(1) In Q1 2009, Autonomy allocated to IDOL OEM revenue $3,251,000 from a deal with the UK Ministry of Defence ("the MoD") (OEM2). This deal (which was not mentioned in the Q1 2009 Quarterly Report) was a much larger deal than two of the three named deals: Symantec (a software company) which raised no allocated OEM revenue, and ProofPoint (another software company) from which the revenues were just $230,000.

(2) In Q1 2010, Autonomy allocated to IDOL OEM revenue $8,915,000 from a deal with BofA (OEM21). This was a far larger deal than all of the named deals combined: Adobe ($750,000), McAfee ($500,000 and $248,000) and Siemens ($72,000).

(3) In Q1 2011, Autonomy allocated to IDOL OEM revenue $6,448,000 from a deal with Tottenham Hotspur Football Club (OEM48), which was almost four times larger than one of the named deals (with Symantec, from which the revenues were $1,400,000).

3211.   The Claimants' point was if the Defendants honestly believed that there was nothing wrong with the inclusion in IDOL OEM revenue of revenue from large-value deals with such well-known counterparties as, for example, the Ministry of Defence, Bank of America, and Tottenham Hotspur, then it is difficult to understand why they were omitted from the published information. The Claimants suggested that the reason was that had such counterparties been mentioned, this would have invited questions as to how some of the counterparties could possibly have been embedding IDOL into their software products for on-sale to end-users.

3212.   They went on to submit that had Mr Hussain attended for cross-examination he would have been asked about his involvement in the process and what led to some transactions being selected for inclusion in the published information when other much larger transactions with high profile counterparties were omitted. He would not, answering truthfully, have disputed that he and Dr Lynch were both involved in the selection process and, further, that it was no coincidence that transactions which would have alerted the market to an inconsistency between what Autonomy's published information represented as IDOL OEM revenue and what was in fact included were deliberately omitted.

3213.   In the same context, Dr Lynch was taken in cross-examination to the passage in his first witness statement where he had stated that Autonomy "*commonly reported selected new OEM relationships to the market*" (emphasis added). The Claimants portrayed that as an acknowledgement that a deliberate choice was made as to which deals were references in Autonomy's published information. Dr Lynch did not dispute this, but he said that he, personally, "*would not have been involved in that level*".

3214. Against this, the Defendants contended that it is wrong to say that the transactions that were highlighted systematically referred only to customers operating in the software sector. Dr Lynch made four principal points in this regard:

(1) First, that the whole argument was predicated upon an artificially narrow view of what could properly be categorised as an OEM and OEM revenue. On the broader interpretation which the Defendants say they intended there was no reason to select only software companies: the choice of which deals to mention was not informed or influenced by the narrow view at all.

(2) Secondly, unless perhaps it was something *"strategically important"*, the selection would have been done by the Investor Relations or Marketing department, and Dr Lynch would only be minimally and exceptionally involved.

(3) Thirdly, there was no suggestion in Autonomy's quarterly reports that it was the largest examples that were chosen. He explained that the selection was not based on size, and the selected deals were not described as the largest OEM-related transactions. He stated in his witness statement that:

> *"Autonomy highlighted those transactions that were innovative, to show the calibre and breadth of OEMs, to reference up-and-coming companies or those whose reputation would enhance Autonomy's reputation."*

(4) Fourthly, it is wrong to say that the transactions that were highlighted systematically referred only to customers operating in the software sector. He also specifically disagreed that there was any intention to present only software companies. Dr Lynch told me in cross-examination that he had *"gone through the press releases of Autonomy"* and in fact, Autonomy's published information in the Relevant Period included companies that would fairly be regarded as operating both outside and inside the software sector; he named companies such as GE, Siemens, Xerox and HP. He added that the boundary between a software company and a non-software company is a vague one. Dr Lynch explained in cross-examination that *"every so often companies whose primary business is something else still do something with software."* Although he accepted that since Autonomy dealt most with software companies those highlighted would *"obviously…more likely…be software companies"* he did not understand that they were selected for that reason. He added that, on the contrary:

> *"If we'd had the chance to announce that someone was OEM-ing our software onto a piece of hardware, we would have been extremely keen to publicise that. You know, being able to show, for example, that Autonomy is being used in health care was a very positive thing, given that we didn't do a lot of health care business ourselves…"*

3215. The first of the points raises in a modified form the question at the heart of this aspect of the case as to the meaning of the disputed phrases in fact intended by the Defendants. My determination that the Defendants knew that they were allocating to the OEM Metric transactions which would not have fallen within the market perception of OEM business (with permissible but small exceptions as I have explained above) largely disposes of the point, though of course my determination would further be supported if the Claimants establish that the selection of OEM deals was for the reasons they suggested.

3216. As to the second point, Dr Lynch's position as regards his knowledge of the process of selection was somewhat inconsistent. As the Claimants pointed out, in his first witness statement, Dr Lynch gave detailed evidence explaining the thought process behind the selection of which OEM deals to highlight and the basis on which Autonomy *"commonly reported selected new OEM relationships to the market."* There was no suggestion or acknowledgment in that witness statement that this was not a matter within Dr Lynch's direct knowledge. The Claimants submitted that if it were true that Dr Lynch had no involvement in, or direct knowledge of, the selection process, one might have expected him to have said precisely that, not least because Autonomy's reporting of selected OEM partners to the market is specifically pleaded by the Claimants as a basis for inferring Dr Lynch's knowledge of Autonomy's wrongdoing. No such statement appears in either of Dr Lynch's witness statements either. I consider that Dr Lynch and Mr Hussain would have been involved: I hold that they were so.

3217. As to the third point, I accept that the selection was not by reference to the size of the transaction, though I should have thought it might also have some bearing. But that is not, as I see it, a point entirely in Dr Lynch's favour. For example, if selection was made (as Dr Lynch contended) to enhance Autonomy's reputation, I accept that it is striking that no mention was made of the Ministry of Defence or the SFO or Tottenham Hotspur.

3218. As to the fourth point, the fact is that the selections made were of entities unlikely to cause surprise or excite enquiry as to the basis of their inclusion does support the Claimants' position. Again, the 'dual' status of some companies as both hardware and software companies is a point which is in some ways against Dr Lynch: the choice of such an ambivalent entity is consistent with the Claimants' position.

3219. In light of my earlier conclusions effectively accepting the Claimants' case that Autonomy's published information contained untrue or misleading statements in respect of its OEM line of business, I do not think I need make a determination whether in addition the selection of OEM counterparties in the published information actually concealed the identities of the counterparties to the largest transactions that had been allocated to the OEM metric. I make no finding of deliberate concealment, which in any event would only be a basis of claim under FSMA if the concealment resulted in *"the omission from…published information of any matter required to be included in it"* within the meaning of FSMA. However, I consider that the selection of OEM transactions for presentation in the Quarterly Reports is consistent with and supportive of the findings I have earlier made.

*Alleged pre-announcement concealment: Top 10 List*

3220. I am further fortified in my conclusions by the efforts made in the course of HP's pre-acquisition due diligence to avoid disclosing the existence of transactions included within the IDOL OEM category when providing a list of 'top 10' OEM customers by

revenue which Mr Sarin requested. The Claimants relied on this in the context of the FSMA claim as providing a further demonstration of what they presented as the Defendants' willingness to mislead HP regarding the true nature of its IDOL OEM revenue and business. In brief, the facts relating to the *Top 10 List* were as follows.

3221. On 9 August 2011, Mr Sarin sent Mr Kanter a list of information requests, which sought amongst other things "*Top 10 OEM customers by revenue for FY10 (and IBM, Oracle, EMC, [Computer Associates] and [Symantec] if not in top 10 list)*". A list was provided by Mr Kanter in an email on 10 August 2011. The email described what was being provided: "*The top ten <u>core OEM licence customers</u> in FY 2010 break down as follows*". Mr Kanter then proceeded to list three companies "*[b]etween \$3m and \$12m*" and seven companies "*[b]etween \$1m and \$3m*".

3222. Mr Kanter thus did not describe what was being provided as a list of the top contributors to Autonomy's OEM metric: it simply listed the largest "core" OEMs. The Defendants contended, in essence, that Mr Sarin got what they understood him to have asked for, and that Mr Kanter had made clear what they were providing by describing the list as being of the top 10 "*core customers*". Dr Lynch's Defence clearly summarised their position:

> "*The customers listed were Autonomy's top 10 customers who were OEMs, which corresponded to HP's request for the top 10 OEM customers. HP's request also made it clear from the reference to IBM, Oracle, EMC, CA and SYMC that HP were looking for information as to actual OEMs, rather than transaction counterparties to other OEM derived revenue…*"

3223. Mr Sarin stated in his witness statement, however, that he "*understood this to mean that the 10 customers listed were the 10 largest sources of IDOL OEM revenue in the year ended 31 December 2010.*" Dr Lynch, who was involved with Mr Hussain in the process of compiling the list, and had been consulted by Mr Hussain in drawing up the list sent by Mr Kanter, explained the difference:[378]

> "*A…. the simple fact is you can go through our contracts, you can find the top OEM customers and that will give you a list, but that's not the same as the top contributors to OEM-derived, because those are not OEMs and we're being asked for OEMs.*"

3224. Dr Lynch's evidence in his witness statement was that at no stage did he believe that HP was being provided with anything different from what Mr Sarin had requested; he was adamant when cross-examined that what he took Mr Sarin to be asking for was a list of the largest OEMs, and not the largest OEM-derived customers. His rationale was explained in an exchange in cross-examination which I have already quoted at length in paragraph 3068 above. I would refer again to that passage and add the following further extract:

---

[378] It was also Dr Lynch who had suggested that it was better to give bands of values, rather than the exact revenue from each OEM.

> *"Q.    What I suggest has happened, Dr Lynch, is you get a request
> from Mr Sarin for top ten customers. You and Mr Hussain work
> through a list of OEM customers that…Mr Hussain has put together on
> a schedule, and what you send him includes only those customers, only
> the OEM customers or transactions which fall within a narrow ambit
> of the definition of OEM, rather than you identifying –*
>
> *A.    Because they're OEMs*
>
> *Q.    Well –*
>
> *A.    The others aren't OEMs. I don't think there's any dispute
> between us that, if you sell an upsell to Ford, then Ford is not an
> OEM, yet that still goes to OEM-derived.*
>
> *Q.    I suggest that what you did was to exclude transactions from
> the list that you knew didn't accord with Autonomy's description to the
> market of OEM revenue?*
>
> *A.    I completely disagree. What they're wanting is to see the
> contracts – it's not even a list they want, it's the contracts – relating to
> OEM customers so they can see the terms of those contracts…"*

3225. In the result, the list that Mr Kanter provided omitted many of the entities that were the
counterparties to the 10 largest transactions by revenue that had been included in IDOL
OEM revenue in FY 2010. For example, there was no reference to the deals with JP
Morgan (worth $8,700,000 (OEM28)), MetLife (worth $7,025,000 (OEM27)), Bank of
America (worth $8,915,000, $2,726,000 and $7,000,000 - OEM21, OEM37 and
OEM45[379] respectively) or Amgen (worth $4,467,000 and $9,000,000 - OEM24 and
OEM36[380] respectively). Each of these transactions was included within the $132
million of IDOL OEM revenue stated in Autonomy's published information for FY
2010. Taken together, they accounted for 36.2% of reported IDOL OEM revenue in that
year.

3226. The Claimants contended that it is no coincidence that none of the excluded entities is a
software company; and that, furthermore, the spreadsheet prepared by Mr Hussain
which formed the basis of the list ultimately provided to Mr Sarin did not identify
customers to HP where the relevant contract (a) was restricted to the purchaser's internal
use; (b) constituted an upsell transaction or (c) was a hosting transaction. The Claimants
submitted that it was plain that, before sending the list to Mr Sarin, the Defendants had
carefully selected only those customer names where they believed that the related
transactions accorded by nature with the narrower interpretation of the OEM metric,
inviting or supporting the inference that the Defendants knew that the market would
perceive the metric to have that narrower scope.

3227. They added that Dr Lynch's responses in cross-examination were *"not at all to his
credit. He made a series of assertions that lacked any credibility."* They instanced his

---

[379] As end-user in an impugned VAR transaction.
[380] As end-user in an impugned VAR transaction.

suggestion, quoted in paragraph 3224 above, that Mr Sarin was really asking for the relevant contracts not the names of customers, which was plainly not the case. More generally, they dismissed Dr Lynch's main point that there was a distinction between *"core"* and *"derived"* as a *"tactic"*, and his claim to the effect that this distinction had previously been explained to HP as *"completely untrue"*. They added that the explanation of the distinction to HP was not mentioned in his Defence, nor in his written evidence (including in his response in his second witness statement to Mr Sarin's witness statement): nor was it to be found in any quarterly report, earnings call or annual report during the Relevant Period. They stated that *"There was no such mention because Dr Lynch's live evidence was simply made up."*

3228. Dr Lynch sought to rely on a Power Point display at a meeting in which (he said) the distinction was made and asserted that in any event it was also *"well understood in the market and covered in many analysts reports and market conference calls before that period"*. There was little or no evidence for either.

3229. However, the Defendants referred me to a document which was provided to Mr Sarin by Autonomy a little later in the due diligence process. This was a further list of top OEM customers, headed *"OEM analysis. Top customers by name and revenue category 2006-2010"*, which Mr Sarin accepted when cross-examined, that he had probably seen. Immediately below that description there appeared a note in the following form:

> *"Note: Excludes…upsells, maintenance, pros serve etc, and excludes companies which were formerly OEMs but subsequently acquired by Arsenal (eg IWOV, Meridio, etc). Estimates of contributions below."*

3230. The further list then set out the customers in question under two categories (Over $10m and Under $10m) as follows:

> *"Over $10m category*
> - *EMC*
> - *HP*
> - *IBM*
> - *Iron Mountain*
> - *Video Monitoring Services*
>
> *Under $10m category*
> - *Adobe*
> - *Bloomberg*
> - *Computer Associates*
> - *Dassault Systems*
> - *Deloitte*
> - *Energy Solutions*
> - *Huron*
> - *Hyland*
> - *KPMG*
> - *Rand*
> - *Opentext*
> - *Oracle*
> - *Symantec*

- *Verdasys*
- *Xerox"*

3231. The Defendants submitted that this list made clear to HP both that Autonomy's OEM business included upsells, and also that upsell revenue was being excluded in drawing up the list. If still uncertain, for example about the scope of the expression "upsells" (which when cross-examined he told me he had understood to be restricted to *"selling more functionality to the OEM itself"*) Mr Sarin had the opportunity to ask further questions, but had chosen not to do so.

3232. Further, on 10 August 2011, various OEM contracts were uploaded to the data room. Mr Gersh confirmed that he read all of them. Those contracts include contracts which HP now impugn, saying that they cannot properly be classified as OEM. But the Defendants contended that HP would have known that Autonomy was treating those contracts as OEM contracts from their inclusion amongst the OEM contracts in the data room; and as explained below, those reviewing the contracts for HP during the due diligence process identified the very clauses about which the Claimants now complain in a document headed "*Project Tesla OEM Contract Reviews*" prepared on 11 August 2011. However, that is a matter going, as I see it, to inducement and reliance rather than the intentions behind the provision of the *Top 10 List.*

3233. Despite some equivocation on the part of Dr Lynch when he was cross-examined on the matter, there was no real dispute about the Defendants' involvement in the preparation of the *Top 10 List.* Dr Lynch accepted that he had been consulted by Mr Hussain in drawing up the list sent by Mr Kanter, and had, for example, suggested that it was better to give bands of value rather than the exact revenue from each OEM. He accepted also (and there are emails demonstrating) that he had thereafter been kept up-to-date by Messrs Hussain and Kanter as the response to Mr Sarin was finalised. Mr Hussain was aware and involved likewise.

3234. The question whether the *Top 10 List* was contrived to perpetuate a false impression is a facet of the more general question as to whether the IDOL metric was intentionally misleading. My conclusion that it was accordingly not only informs but to some extent dictates my assessment.

3235. I have concluded on a balance of probabilities that:

(1)   Although it may well be that, over time, Dr Lynch has convinced himself, such that he now does believe, that the distinction between OEM and OEM derived on which his position is based was current in the market's understanding at the time, it was not.

(2)   At the time, the Defendants did wish and intend to ensure that the fact that they had included in the OEM metric a very substantial amount of revenue from sources other than what the market understood to be comprised in it was not exposed.

(3)   The Defendants (and Mr Kanter) well appreciated that Mr Sarin's request for a list of *"Top 10 OEM customers"* required an answer which did not expose that fact.

(4)    Like the self-coined expression "OEM derived", the notion of "core" OEM customers was the means they devised of providing a list which was apparently responsive, but which confined the listed customers to software companies engaged in business which plainly did properly fall within the metric, and did not expose the "derived" element which by now comprised by far the greater part.

(5)    There was no evidence that the expression "core OEM" had been used before, or that the Defendants had some substantial basis for thinking that it would be understood by Mr Sarin as differentiating "derived" business. I have seen no evidence that either he or the market understood, or had even been introduced to, the notion of "core" OEM as denoting a small sub-set of business included in the OEM metric.

(6)    The notable absence of any attempt at an explanation, and the deletion of words in an early draft list which did at least explain that upsells and maintenance had been excluded, further support the impression I have formed that the *Top 10 List* was carefully contrived to continue the pretence that the OEM metric was substantially comprised of revenue from (a) development licences and (b) royalty-type payments by the OEM concerned on its onward sales of product embedded with Autonomy software.

(7)    In this, as in general, the due diligence undertaken was feeble: its aim in reality was to find support for Mr Apotheker's project and the sale price, rather than to ferret out inconsistencies: but that is matter going to the issue of inducement and reliance, to which I turn in paragraph 3236 below, after brief consideration of one further episode which the Claimants submitted, and I agree, reinforces the conclusion that Dr Lynch was at the time intent on concealing from HP the true variety of revenues included in what Autonomy presented as its OEM business. The episode in question relates to the *"Joe Bloggs"* correspondence, which I mentioned in paragraphs 312 to 313 of the Introduction to this judgment.

*The "Joe Bloggs" correspondence and post-announcement concealment*

3235A.  It may be recalled that in late August 2011, and some 14 months after he had left Autonomy, Mr Collet co-authored (with a former Autonomy colleague of his called Mr Marshall) an anonymous communication (of which there were several iterations) to industry and financial analysts suggesting a number of questions that HP should be asking about Autonomy's OEM business. The Defendants portrayed this (in Dr Lynch's written closing submissions) as *"[r]ather than being a disinterested attempt by him to pass on his concerns, this was a sustained campaign to generate negative market sentiment, apparently for the benefit of investors holding short positions in Autonomy stock…"* More pertinent in this context than Mr Collet's motives, however, is the insight that Dr Lynch's responses provides into how he intended HP to understand Autonomy's OEM business.

3235B. Of particular relevance in that context is a document dated 13 September 2011 entitled *"Autonomy – examining the intentional misinformation"* sent by Dr Lynch to Mr Robison under cover of an email of the same date, and described by Dr Lynch as *"a simple rebuttal to the 4 main attacks from the short hedgies over the years"* which had been prepared by *"Our IR people"*. One of the four areas addressed was *"IDOL OEM, how it works and the revenue profile"*. What stands out from the description given of the *"IDOL OEM"* business is that no inkling was given of any revenue source other than development fees and (predominantly) recurring royalty revenue: thus there was no mention or suggestion at all of other sources of revenue, such as upsells and PODS revenue, and no mention of some subset of *"OEM- derived revenue"* though the totals given in the document were the same in the document as in Autonomy's published information.

3235C. Dr Lynch sought, especially in his second witness statement, to distance himself from the preparation of the 13 September 2011 document. But it is clear from background documentation, and I find, that he was personally involved in its preparation and aware of its contents before it was sent to HP. He must have been aware, and I find that he intended, to perpetuate the impression given in the published information of the *"IDOL OEM"* business being entirely comprised of upfront development fees and (predominantly) recurring royalty revenues because of the special value given in the market to revenues of that sort. I would not base my conclusion as to what the category was intended to convey on this document: but it does seem to me to be supportive of the conclusion that I have reached.

*The issue of reasonable reliance: did Bidco acquire Autonomy in reasonable reliance on the information given about Autonomy's OEM business in the published information?*

3236. The Claimants' case that HP's understanding of the IDOL OEM revenue stream as particularly valuable was based on Autonomy's published information (and in the context of its deceit and Misrepresentation Act claims, on the pre-acquisition representations made to it) and their case that HP reasonably relied on what was said in that published information accordingly was based on the evidence of Mr Sarin and Mr Apotheker, little of which was challenged on the point, and also of Mr Robison and Mr Gersh (whose description of OEM revenues as comprising *"an upfront licensing fee, PCS [post contract support] and royalties that are paid on a quarterly basis…"* in KPMG's due diligence report was plainly based on that information).

3237. Mr Sarin's evidence was that:

(1) He reviewed the 2010 Annual Report, and "*relied on the accuracy of the 2010 Annual Report when forming a view as to whether Autonomy could be a good acquisition target for HP*".

(2) He also reviewed Autonomy's Q1 2011 Quarterly Report, which "*indicated that all of [Autonomy's] product lines were achieving double digit growth*", and that "*Autonomy's OEM business was said to be growing at 28% annually*".

(3) He read Autonomy's Q2 2011 Quarterly Report "*and was impressed by Autonomy's apparent performance*", which included 27% growth in the IDOL OEM business.

(4) When building the Deal Model, HP used the five categories of reported revenue identified in Autonomy's published information. One of these was IDOL OEM, which Mr Sarin understood to be "*licensing Autonomy software to other software companies who embedded it in their own products*".

(5) In the Deal Model, a high gross margin (98%) was projected for OEM:

> "*because we understood OEM revenue to consist of royalties paid to Autonomy by other software companies, with very little attendant cost to Autonomy, and it seemed that Autonomy had few competitors in the space*".

(6) At the time of the Q2 2011 results, the published information appeared to convey, and HP understood it to convey, that:

> "*Cloud and OEM now represented more than half of Autonomy's core software business was significant from HP's perspective. We <u>considered the Cloud and OEM revenue streams to be particularly valuable because of their (apparent) recurring nature... once an OEM customer embedded Autonomy software in its own software product, that product would usually (we understood) be sold for a period of years. We viewed the OEM business as very valuable</u> because we believed the revenues were recurring in nature, increasing rapidly, and highly profitable to Autonomy because all selling was done by the third party software companies*".[381]

(7) The following excerpt, from a document headed "*Autonomy – calculating organic growth*" sent to Mr Sarin by Derek Brown (Autonomy Investor Relations), copied to Dr Lynch and Mr Hussain[382], on 23 August 2011, shortly after the offer was announced, accorded with Mr Sarin's understanding of the attractiveness of Autonomy's IDOL OEM business:[383]

> "*Autonomy has consistently signed 10 to 15 OEM agreements per quarter for many years. These lead to royalty revenues which begin to flow around 2 years later as 3rd party products with IDOL embedded come to market. Thus there is a **layering effect** as more and more products begin paying royalties each quarter.*
>
> *Another key driver for OEM is the **royalty rate**, which averages around 4% but is ticking up as more functionality is licensed. IDOL OEM revenues grew by 27% in Q2'11 which is pure organic expansion. IDOL OEM is currently 26% of core IDOL sales.*"

---

[381] Emphasis added.
[382] The Defendants saw the document in draft form before it was sent to Mr Sarin.
[383] Emphasis in the original.

3238. The Claimants also relied on the following unchallenged parts of Mr Apotheker's evidence:

> (1) His statement in his witness statement that he reviewed the 2010 Annual Report "*very carefully*" in May 2011. (He confirmed this when cross-examined.)

> (2) His understanding that the manner in which IDOL OEM revenue was described or defined in that report:
>
>> "*indicated that Autonomy's IDOL software had been widely accepted by other software companies and was becoming the industry standard for managing and analyzing unstructured data. This aspect of Autonomy's business also appeared to be very profitable because other software companies were selling Autonomy's software in the course of selling their own software (at no cost to Autonomy). OEM revenues were attractive for the further reason that they are typically recurring in nature. Once software is embedded in another software company's product, sales of that company's product tend to be made over a period of several years*". [384]

> (3) Dr Lynch's remark in the 2010 Annual Report that the "*IDOL OEM and IDOL Cloud routes*" were "*highly attractive*" as they "*turn one-off sales into multi-year committed annuity streams*" was consistent with Mr Apotheker's understanding of the value of the IDOL OEM revenue stream.

> (4) Mr Apotheker stated that:
>> "*Similarly, if Autonomy had fully disclosed that its IDOL OEM revenues were far lower than had been shown in the Annual Report I reviewed... it would have made a significant difference to my thinking about the company. Lower IDOL OEM growth would have meant that Autonomy's software was not as successful in the marketplace as I had otherwise thought...lower IDOL OEM revenues and slower growth would have made Autonomy, as a whole, less attractive to HP, because Autonomy would not have as readily helped HP to achieve its strategic goals of becoming a higher margin, higher growth company.*"

3239. When cross-examined, Mr Apotheker told me that he:

> "*really liked this notion of OEMs because much more than the resellers themselves this was a highly scalable model. In particular, the way it was explained to me and the way I think it worked was that it was a multi-year, layered effort where you would generate more and more income from a given OEM over time with hardly any additional cost of sales. So I thought that was a very, very important part of the business model and a very smart one.*"

---

[384] Emphasis added.



3240. He confirmed that it was this which made the OEM line such an attractive part of Autonomy's business model: *"the absolute number wasn't of big interest".*

3241. Mr Robison, who did not attend to give evidence (citing medical reasons) also stated in his witness statement that his understanding was that:

> *"Strong IDOL OEM revenues and revenue growth were important to HP. The stated growth of Autonomy's IDOL OEM sales was an indicator that other companies valued Autonomy's technology. We therefore considered IDOL OEM to be a highly profitable, growing revenue stream that was recurring in nature and an indicator of the quality of the business."*

3242. I agree with the Claimants' summary in their closing submissions that:

    (a) HP based its understanding of Autonomy's IDOL OEM business, in substantial part, on the 2010 Annual Report, and the Q1 and Q2 2011 Quarterly Reports.[385]

    (b) HP's understanding of IDOL OEM revenue accorded with Autonomy's description or definition of this revenue as arising where Autonomy licensed its software to other software companies who embedded it in their own products.

    (c) HP understood the business to be fast-growing.

    (d) HP forecast future IDOL OEM revenue by reference to the size and growth of the IDOL OEM revenue amounts reported by Autonomy.

    (e) HP understood this business to be particularly valuable, because it consisted of a stream of recurring, high-margin, royalty income, paid by OEM partners over many years.

3243. Further to my analysis of the instances given by the Defendants where reliance might not be reasonable (see the Introduction to this judgment at paragraph 521) I have considered the following in the particular context of the question whether HP's reliance on the above was reasonable:

    (1) Whether the fact that there was a general warning in the 2010 Annual Report that *"delivery of Autonomy's core technology is via a number of methods, depending on the demands of the customers, trends within these delivery methods are not segments and are provided for background information and may include qualitative estimates"* was a sufficient warning to make any reliance without further investigation and verification unreasonable;

    (2) Whether the fact that Mr Apotheker accepted when cross-examined that he did not read any more up to date quarterly reports and the 2010 Annual Report which he did read was by then some seven months' out of date (though he told

me he was told by others within HP that the quarterly reports *"were in line with*

---

[385] As noted above, its understanding was also formed by the misrepresentations made to HP directly, upon which HP also relied. These misrepresentations are addressed more fully below.

*expectations more or less"*) made any reliance unreasonable in the context of such a large transaction;

(3) Whether in the course of due diligence HP reviewed documents which made plain the true position, and if so whether (as was submitted in Dr Lynch's written closing) the Claimants *"cannot say that they were misled about the content of Autonomy's OEM business, when these things were clear from documents provided to them and reviewed at the time."*

3244. Suffice it to say that none of the matters in (1) and (2) above persuaded me that reliance was not reasonable.

3245. As to (3), the Defendants relied on the following as demonstrating that the Claimants' claim is artificial and *"founded on matters that they (or their advisers) knew about at the time, and were not concerned about"*:

(1) that a number of the OEM contracts that the Claimants sought to complain about were included in the data room during due diligence and HP's advisers (Freshfields), working with an HP in-house lawyer (Ms Walton) had analysed these contracts, and collated a document headed "*OEM Contracts Reviews*";

(2) the "*OEM Contracts Reviews*" document identified key features of contracts in the data room inconsistent with what the Claimants have alleged to be their understanding of the scope of the metric; yet

(3) neither HP nor its advisers raised any complaint or suggested that any contracts had been improperly categorised as OEM;

(4) one example given by the Defendants was the transaction OEM 61 in the list of OEM transactions impugned by the Claimants. This covered two contracts with Iron Mountain, both of which were uploaded to the data room on 10 August 2011. Although the documents were redacted, the redactions did not cover the text which the Claimants relied on as showing these contracts could not properly be classified as OEM. The basis which the Claimants give for the complaint that the agreements were wrongly classified is that "*The transaction related to a reseller agreement and a second agreement restricted to internal use*". Dealing with the two contracts in turn:

(a) The contract the Claimants challenged as a reseller agreement was the very first contract described in the "*OEM Contract Reviews*" document.[386] In the "*Type of Document/Contract*" box the reviewer wrote "*Value added reseller agreement*"; so there was no secret about that. The Claimants' written opening quotes one clause to allege that the contract was wrongly classified. The

---

[386] The Defendants identified the document being discussed as "*Iron Mountain - IM partnership (redacted)*", a redacted version of the VAR Agreement dated May 2011.

same clause is quoted in the "*OEM Contract Reviews*" document.[387]

(b)   The Claimants alleged that the second contract described in "*OEM Contract Reviews*" contained an internal use restriction such that its categorisation as OEM was improper. But the Defendants suggested that the reviewers must have read it, since it is the first clause on the first page, and they have quoted from other parts of the contract.

(5)   It was also clear from those contracts in the data room that Autonomy's OEM business covered some VAR agreements: the example of OEM 61 (relating to two contracts with Iron Mountain) appears above; and OEM 55 covered a contract with Symantec also relied on by the Claimants as wrongly classified on two bases clear from the wording of the contract itself, both noted in the *OEM Contract Reviews.*".

(6)   The contracts in the data room also included contracts which would not generate royalties (such as an agreement with Verity for lump sum payments and no royalty, OEM54).

3246.   However, although the Defendants contended in their closing submissions (both written and oral) that the Claimants *"cannot say that they were misled about the content of Autonomy's OEM business, when these things were clear from documents provided to them and reviewed at the time"*, I do not accept this apparent assertion of actual knowledge and understanding. It may be that the Claimants should have appreciated that the OEM business was broader in scope, and/or their advisers should have so advised them; but I am far from convinced that they did so. As discussed previously, it was not open to the Defendants to contend that HP should somehow have worked out the truth for itself. Further, none of this was put to Mr Sarin or Mr Apotheker (or Mr Gersh); it was not suggested to any of them that HP had in fact ascertained the true composition of IDOL OEM revenue from its due diligence exercise.

3247.   In short, I consider that HP (and thus Bidco) reasonably relied on and was induced by what was stated in the published information as to the particularly valuable nature of the OEM revenue stream.

### The misrepresentation of Autonomy's OEM business in other materials

3248.   I address in a separate chapter of this judgment the various claims made by the Claimants in respect of pre-acquisition representations, which the Claimants allege they relied on as having induced them to purchase the Defendants' own shares in Autonomy at the price they agreed to pay: see the chapter headed Deceit and Misrepresentation Claims. Although I also address various representations made about Autonomy's OEM business in that chapter, it is convenient to deal here with a sub-set of those representations now, because in my view they cast further light on the dispute as to what the Defendants intended to convey about that business, and in my view reinforce my conclusion as to

---

[387] In the box headed "*Product*": "*Tesla, Inc. grants Iron Mountain, during the term of this agreement, a limited non-exclusive, non-transferable right and license to distribute copies of the Products to Iron Mountain's customers, and to resell the Service Products and Support to End-users.*"

what the Defendants intended the published information to convey about Autonomy's OEM business.

3249. The material I have in mind, all of which I return to later, can for present purposes be summarised as follows:

(1) In initial meetings in January and February 2011, Mr Quattrone of Qatalyst took HP through two slide decks. There is an issue whether he did so as agent of Autonomy, but for the present that is not of importance since the focus presently is on what HP were told. The Slides included representations concerning (i) the level of IDOL OEM revenue; (ii) the growth of IDOL OEM revenue; and (iii) the nature of the business as "*Royalty-based ~3%*".

(2) On 4 March 2011, a further slide deck ("the March Slides") was used which included what the Claimants alleged were misrepresentations as to (i) the level of IDOL OEM revenue; (ii) the growth of IDOL OEM revenue; (iii) the royalty-based nature of IDOL OEM revenue; (iv) that IDOL OEM revenue was revenue from transactions with software companies; and (v) that reported IDOL OEM revenue related to deals signed two years ago.

(3) The Defendants contended that the slides shown in March should not be considered in isolation; and Dr Lynch told me in cross-examination that although not mentioned in the Slides themselves, the inclusion of revenues from upsells and PODs was expressly mentioned; but there was no other evidence of this, and Dr Lynch made no mention of any such broader discussion in his witness statements, nor in his pleadings.

(4) On 29 June 2011, Dr Lynch made misrepresentations at a meeting held between HP and Autonomy representatives in London. These included that Autonomy's OEM business was fast-growing and involved many other software companies incorporating IDOL into their own software products.

(5) Further representations about IDOL OEM revenue were made to HP on due diligence calls in August 2011, including on calls held on 1, 2 and 4 August 2011. These reinforced the depiction of Autonomy's OEM business as being rapidly and exponentially growing, very high margin and generating recurring revenue, as in Autonomy's published information.

3250. The Defendants addressed the statements made in the March slides in relation to OEM as follows:

(1) First, they said that the Claimants' argument that the Slides represented that IDOL OEM revenue constituted 15% of Autonomy's reported revenue in 2010, when the true figure was only 3.2%, was founded on the Claimants' narrow and erroneous definition of the relevant revenues. The Defendants' case was that Autonomy's IDOL OEM revenues for 2010 were not, and were never represented to be, confined to core OEM revenue received directly from OEMs, rather than the broader OEM derived revenues described above.

(2) Secondly, they rejected the Claimants' allegation that by selection of companies whose logos were shown on slide 19, Dr Lynch represented that Autonomy's OEM revenue "*was exclusively derived from transactions with companies operating in the software industry or with a large software business*." They contended that no such representation was made: the relevant slide, which appeared in a section describing Autonomy's business models rather than defining the scope of its different revenue categories, merely identified a selection of Autonomy's core OEM customers.[388] The Defendants contended, therefore, that the selection was not misleading: as already discussed, Autonomy's core OEM customers are primarily software companies, even if its OEM derived revenues come from a wider range of counterparties.

(3) Thirdly, as to Dr Lynch's alleged representation through the Slides that the business operated mainly or typically on a royalty model, with annual royalties of 3 or 4%, the Defendants' case was that no such representation was made, and that, at most, an example was given with an indication of a 4% royalty, which HP would have known from reading Autonomy's 2010 Annual Report was only an example, and that "*contracts and situations vary.*"[389] Further, they submitted that HP was aware from its own OEM arrangements with Autonomy that some of Autonomy's contracts provided for prepaid fees.

(4) Fourthly, the Defendants insisted that they had not given a false impression of OEM revenues in respect of recurrent revenues and that there was no misrepresentation, since Autonomy's core OEM revenues were highly likely to recur since, even where the OEM paid a bulk or prepaid royalty, there was a strong incentive to renew at the expiry of the contracts with Autonomy. In any event, the Defendants contended that many of Autonomy's OEM contracts were royalty bearing and that the Claimants had not established otherwise.

(5) Finally, they maintained that the Claimants' argument that the growth rate for Autonomy's OEM revenues were misstated, showing that the business was growing at the rate of 35% from 2009 to 2010, rather than (as the Claimants argued) shrinking at 28.5%, was again predicated on the Claimants' misconception about the true scope of the OEM metric: see above.

3251. Given that I have found in favour of the Claimants on their case that a significant proportion of the revenues included in the OEM metric were not structured to generate recurring revenue and on their case that only revenue from development licences and royalty revenues should have been included in the OEM metric. I accept the Claimants' case that the March Slides were misleading in relation to Autonomy's OEM business.

3252. I consider the extent of the Defendants' involvement in and responsibility for them in paragraphs 3866 to 3867 below in a separate chapter in which I address the Claimants' deceit and misrepresentation claims. Suffice it to say for the present that I think both must accept responsibility for the representations made from March 2011 onwards.

*Conclusion on OEM*

---

[388] Not all of the companies whose logos were shown were "software companies", though Dr Lynch accepted that they had software businesses.
[389] See paragraph 3164(3)(c) above.

**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

3253. In my judgment:

   (1)  the Defendants gave a false and misleading picture of Autonomy's OEM business.

   (2)  They knew they were doing so. They did so because they also knew that it would be, and had been, regarded as generating a particularly valuable revenue stream.

   (3)  HP relied on that picture, and it was reasonable for it to have done so.

   (4)  The direct representations made to HP confirmed the depiction given in Autonomy's published information.

   (5)  HP was the controlling mind of Bidco; and its reliance is to be attributed to Bidco.

   (6)  The Claimants' case in respect of the OEM business has been established.

## HOSTING

### General overview of the Claimants' hosting case

3254. An important part of the Autonomy group's business was the provision of data hosting services to customers which enabled them to archive and preserve, access and navigate their data and digital information in an environment that was hosted and managed by the Autonomy group at its own data centres using Autonomy software.

3255. Hosting business customers tended to be 'sticky' in the sense that once having settled on a provider, they rarely switched to another, because of the effort and substantial expense of doing so. Further, since the standard model was that customers would pay a subscription for the services provided, hosting businesses tended to generate recurring and predictable revenue. This made its hosting business (sometimes called *"IDOL Cloud"*), which Autonomy primarily carried on through Zantaz, a part of the group's business which analysts and other investors valued especially highly. Dr Lynch was well aware of this: he noted in the Q2 2011 earnings call that:

> *"Obviously we'd be very happy if everything went to the Cloud because it's a much nicer model in terms of valuation."*

3256. The particular importance ascribed by analysts and investors to Autonomy's hosting business as an important source of reliable and growing revenue seems to have encouraged Autonomy to provide metrics to show its success. From 2010 onwards, Autonomy's published information referred to the hosting business as *"IDOL Cloud"* and included an IDOL Cloud metric in the "front-end" of its quarterly and annual accounts. Revenue included within that IDOL Cloud metric was an indicator of the growth and success of the hosting business. It was an especially valued revenue stream.

3257. The Claimants' case in relation to Autonomy's hosting business ("the hosting case") is, in a nutshell, that Autonomy resorted to stratagems intended artificially to accelerate the rate at which Autonomy recognised revenue from hosting customers to boost the appearance of substantial growth of this revenue stream whilst at the same time failing to disclose the true nature of the arrangements and the fact that this inevitably reduced future recurring revenues.

3258. The alleged stratagem was Autonomy's introduction of what was called a "hybrid model" for its two main hosted offerings in the Relevant Period, which were Digital Safe and e-Discovery. The Claimants' complaints relate both to the model and to its presentation.

### Autonomy's hosting business and the introduction of the Hybrid Model in more detail

3259. Both these products (Digital Safe and e-Discovery) had originally been developed by Zantaz, a specialist in cloud archiving. Zantaz also had another archiving solution called Enterprise Archive Solution ("EAS"), which was typically the solution sold to smaller

customers who wanted to manage their own archive on-premises (that is to say in their own office or site).[390]

3260. Autonomy had acquired Zantaz in July 2007, and Zantaz continued to be the operating company for Autonomy's hosting business thereafter[391]. Both before and after the acquisition the CEO of Zantaz was Mr Sullivan. He remained as CEO of Zantaz throughout the Relevant Period.

3261. Prior to its acquisition, Zantaz had generally charged its customers fees for hosting services (priced as an agreed sum per megabyte of storage) usually on a pay-as-you-go basis. This was an industry standard way of charging and was known as "Software-as-a-Service" ("the SaaS model"). In its own financial statements prior to its acquisition, Zantaz recognised revenue from its SaaS business over the course of the hosting contract as and when the services were provided. That was the accounting treatment prescribed by US GAAP.

3262. Following its acquisition, and at Autonomy's instigation, Zantaz began to promote, both to new and existing customers, an alternative contract model, known as the *"hybrid model"* or *"hybrid structure"*. This involved structuring or restructuring its hosting arrangements so that customers paid (i) a significant upfront sum for a licence to use Autonomy's software, (ii) fees for standard maintenance and support services of the kind typically provided with software licences, and (iii) considerably reduced fees for hosting and related ongoing services. Typically, around one-third of the overall revenue from a hybrid deal was recognised upfront[392]. References in this part of this judgment to "licence fee" or "licence fee element" are to that proportion of the revenue from a hybrid deal which was recognised upfront.

3263. In cases where the hybrid model was agreed, Autonomy treated the sale of such a licence like the sale of goods and would recognise the sizeable licence fee element as revenue immediately upon delivery of the software. The remaining revenue was recognised over the period of the arrangement.

3264. The Claimants' overall "Hosting case" is that the licence issued in the hybrid model had no real substance and was not in any real sense a separate and severable component of the overall transaction for the provision of hosting, monitoring and maintenance services, so that it was wrong to account for it as if its sale was analogous to the sale of goods. The rights apparently conferred on a grantee under the licence had no practical utility and were of no material benefit to the grantee except as the means of obtaining discounted hosting fees. It was a device used to justify accounting for part of the hosting

---

[390] After acquiring Zantaz, Autonomy made the decision not to continue to develop EAS, though it still had to provide support services for EAS customers which Autonomy largely outsourced to Capax Global. Autonomy/Zantaz focused development efforts on e-Discovery and Digital Safe.

[391] However, and in line with my general impression that little heed was taken to separate corporate identity within the Autonomy group and all group business was in reality directed by Autonomy's management, Dr Lynch, when asked in cross-examination to confirm that hosting business was *"mostly carried on by or through Zantaz",* said *"We didn't really operate as companies in that way…so, for example, the employees in Zantaz would have been Autonomy employees…".*

[392] As Dr Lynch explained, in the hybrid model, there was a licence element or component, for which a fee was charged, as well as hosting and service elements. The licence fee element would typically comprise about one-third of the whole. After carving out somewhere between 5% and 15% for the invariable maintenance part of the licence fee the remaining part of the licence fee would be recognised 'upfront' (i.e. immediately), provided that the auditors (Deloitte) were satisfied that the split between licence fee and maintenance fee was at *"fair value".*

fees as realised revenue at the point of the licence sale, whereas in reality the issue of a licence did not alter the fact that all that was to be provided was hosting and related services[393]. Further, the Claimants argued that such were the discounts offered in return for payment of the upfront licence fee that the hybrid model resulted in Autonomy receiving a considerably diminished overall return.

3265. In the particular context of eDiscovery, the Claimants also advanced an alternative case, that it was not possible to ascribe a "fair value" to the licence component of the hybrid deal and therefore recognise the licence revenue upfront.

3266. The Claimants' hosting case had five strands:

(1) Their principal claim was a FSMA Claim which related to 51 of the hosting transactions identified in Schedule 6 of the RRAPoC each involving the sale by Autonomy of a licence to use Digital Safe and/or related software as part of a hosted Digital Safe arrangement which in many cases could only be used with Digital Safe ("Related Software"). These Digital Safe transactions were referred to as "Schedule 6DS (D(igital) S(afe)) transactions". The Claimants' complaint in relation to the Schedule 6DS transactions is that Autonomy ought to have recognised the licence fee as revenue over the term of the contract and not upfront, and that the recognition in its accounts of all revenue from the licence fee at the time of the sale caused Autonomy's published information to be misleading.

(2) The Claimants also claimed under FSMA in respect of seven more of the transactions listed in Schedule 6, which related to Hybrid Model e-Discovery arrangements ("the Schedule 6 e-Discovery transactions"). As with the Schedule 6DS transactions, the Claimants contended that Autonomy ought to have recognised the revenue rateably over the term of the contracts, rather than upfront, and the recognition in its accounts of all revenue from the licence fee at the time of the sale caused Autonomy's published information to be misleading.

(3) A further complaint raised by the Claimants related to the inclusion of the licence fee revenue within the IDOL Cloud metric in Autonomy's published information[394]. The principal issue is whether Autonomy's descriptions of the IDOL Cloud category of revenue were untrue and/or misleading to the knowledge of the Defendants. According to the Claimants, Autonomy represented the IDOL Cloud metric as comprising revenue which was recurring in nature, and the allocation of licence fee revenue (which was a one-off fee and thus not recurring) was never disclosed, and (the Claimants noted) the Defendants did not contend that they were ignorant of the allocation of licence

---

[393] For Digital Safe, this comprised (a) hosting the software and the data on Autonomy's own hardware or the Autonomy cloud, and (b) monitoring and managing the performance of the system. For e-Discovery, this comprised the same plus related e-Discovery services, and the use of the term 'hosting' or 'storage' in a context where it applies to e-Discovery should be understood to include both.

[394] From 2010 onwards, Autonomy's accounts (at their "front-end") and published information referred to the hosting business as *"IDOL Cloud"* and all or nearly all hosted transactions and the revenue arising were allocated to IDOL Cloud. IDOL Cloud revenues grew considerably during the Relevant Period, increasing from $45 million in Q1 2010 to $64.3 million in Q2 2011. The Schedule 6 transactions comprised some 10% in Q1 2010, 44.4% in Q2 2010, 10% in Q3 2010, 13% in Q4 2010, 29.2% in Q1 2011 and 24.7% in Q2 2011.

fees to IDOL Cloud. The Claimants contended that the purpose and effect of this was to give the market the false impression that Autonomy's recurring revenue from its hosting business was higher and of a different quality than actually it was. However, Mr Rabinowitz clarified that the Claimants did not assert any free-standing claim in this regard, but relied on it as evidence of (a) general dishonesty on the part of both Defendants and (b) their willingness to present Autonomy's hosting business to the market (and HP) in a misleading manner.

(4) The fourth strand of the Claimants' hosting case was a direct personal claim for breach of duty against both Defendants to recover transactional losses in relation to a numerically small, but in money terms substantial, subgroup of the 51 Schedule 6DS transactions. Originally, the Claimants sought to claim damages against the Defendants in respect of all the Schedule 6DS transactions. However, by the time of trial (and further to amendments at a contested hearing in 2017 and at the PTR in February 2019) the Claimants confined their claim for damages against the Defendants to just four of the 51 DS transactions ("Schedule 12D transactions"). Though residually maintaining that all 51 identified DS transactions were improperly accounted for, the Claimants adduced no evidence relating to any specific hosting transactions other than in respect of those four Schedule 12D transactions. The four Schedule 12D transactions all involved what were claimed to have been contrived re-structuring (and in one case, re-re-structuring) of hosting contracts which had already been restructured, which were of no benefit to either of the parties to them, except in enabling Autonomy to claim further revenue recognition and the customer to achieve cost savings. The four Schedule 12D transactions accounted collectively for almost 25% of the total licence fees from the Schedule 6DS transactions. They were made between Zantaz and Morgan Stanley (two transactions, one in Q4 2009 and the other in Q1 2011), Zantaz and Deutsche Bank (in Q1 2011), and Autonomy Inc (though Zantaz continued to be the entity recording revenue)[395] and MetLife (in Q2 2011). The issue is whether the Schedule 12D transactions were entered into for the improper purpose of artificially accelerating revenue, without regard for and contrary to the commercial interests of Zantaz and/or ASL.

(5) The fifth strand of the Claimants' case was defensive: they refuted any suggestion that HP was aware that the upfront recognition of licence revenue from Autonomy's hybrid hosting deals contravened the applicable accounting principles, or that the hybrid model was implemented in such a way as to result in the reduction of overall hosting revenues and profits, or that licence revenue was included in IDOL Cloud, or (more generally) any suggestion that HP was not deceived.

3267. Part A of this chapter of this judgment addresses both limbs of the FSMA/Schedule 6 claims and also the Claimants' contentions in respect of the IDOL Cloud metric. Part B addresses the Schedule 12D personal claims for transactional losses.

## PART A: FSMA Claims

---

[395]  According to Schedule 12D.

3268. The crux of the Claimants' Hosting claim under FSMA is a dispute whether it was proper for Autonomy to recognise revenue from the sale of the licence as at the date of that sale as if the licence was separate from the hosting services element for which customers continued to be obliged to pay, or whether the licence fee was properly to be treated as a prepayment of the hosting services to be provided by Autonomy and thus recognised over the period during which those services were provided.

3269. The characterisation of the sale of the licence as a separate component of a composite sale giving rise immediately to recognised revenue depended on the licence being treated and regarded as conferring a real and realisable right in respect of the software to which it related and thus as having a real and independent value to the grantee separate from the services also to be provided.

3270. At heart, the issue is as to the application of accounting principles; but the dispute as to the substance of the licence engendered a detailed analysis of what in practice the grant of a licence meant in terms of the use the grantee could in practice make of the licenced software. The Claimants argued that in all of the Schedule 6 hosting transactions the licence lacked any practical utility. The Defendants argued that, on the contrary, its utility was to enable the customer to use the software separately from any hosting services, and in its own premises if it so wished; and that whilst not all customers who subscribed into the restructured package would use the right, the right was nonetheless in the nature of a separate asset available for use and good against its issuer.

3271. In that regard, the analysis of utility was slightly different according to whether the licence related to the 51 Schedule 6DS transactions or to the seven e-Discovery transactions. In both cases the Claimants contended that (a) the customer continued to receive substantially the same service regardless of whether it had acquired a licence (that is, the same service as a customer who contracted on a SaaS basis) and (b) only the legal/payment structure changed, which did not justify the accounting treatment accorded. However, whereas the e-Discovery software was capable of being used independently of an Autonomy hosted arrangement, the Claimants contended that Digital Safe was too big and too complex for it to be used by the customer independently from the hosting and related service components of a Digital Safe arrangement.

3272. In the context of the e-Discovery claims, the Claimants argued that even though a customer could take e-Discovery in-house and operate it itself, it would not have been practicable for customers to do so. The argument was primarily based on the difficulty and expense of seeking to use e-Discovery "on-premises".

3273. Subject to those differences, however, it can be seen that the broader issues as to the practical effect of the purchase and grant of a licence, and as to viability and utility of the options said to be available to the licenced customer, were common to both.[396]

3274. Although the competing cases can thus fairly shortly be summarised, their elaboration by the parties both in submission and in the evidence was considerable. The Claimants' written submissions devoted over 320 pages and some 650 footnotes to their Hosting Case, after days of evidence. The Defendants also dealt with the matter at length though

---

[396] Mr Holgate put the essential point differently as being whether the services (of capturing, indexing and archiving) were, as he was asked to assume they were, unaffected by the sale of a licence to the customer, and *"the sale of a licence to Digital Safe had no commercial effect in practice and therefore no substance"*.

they managed to confine themselves to less than 200 pages in their written closing submissions, with only 400 footnotes.

3275.   I turn to address the following matters:

> (1)  Brief description of Digital Safe;
> (2)  Brief description of Autonomy's e-Discovery offering;
> (3)  A detailed analysis of the Digital Safe claim;
> (4)  A detailed analysis of the e-Discovery claim;
> (5)  Defendants' knowledge; and
> (6)  IDOL Cloud metric.

*(1)     Brief description of Digital Safe*

3276.   Digital Safe was Autonomy's leading archiving product. It performed a "capture and index" function, which enabled customers to store, search and retrieve their data. The software, together with the hardware (servers) onto which it was loaded, formed the Digital Safe system or (as a combined software and hardware offering was often referred to in the parlance of the sector) "solution".

3277.   Mr Samuel Yan ("Mr Yan") who had been Systems Architect and Director of Development for Digital Safe at Zantaz, and continued in a similar role at Autonomy after its acquisition of Zantaz[397] described its *"most recognisable attribute"* as being *"its ability to scale"* which (in broad terms) meant that it could keep accommodating increasing demand for data for archiving with the addition of more storage cells.[398]

3278.   Digital Safe was originally developed by Zantaz, which Autonomy acquired in July 2007. Zantaz had a number of archiving and related offerings, increasingly cloud-based, which it had either developed itself internally or acquired from other entities. These included, as well as Digital Safe and e-Discovery, Enterprise Archive Solution ("EAS") which was typically sold to customers who wanted to manage their own archive at their own customer site ("on-premise"), and Digital Supervisor, a surveillance product.

3279.   Reflecting its Zantaz history and its acquisition by Autonomy, there were two types of Digital Safe: the original type was a Lucene-powered Digital Safe (sometimes referred to as a "Lucene Safe") developed by Zantaz and an IDOL-powered Digital Safe (sometimes referred to as an "IDOL Safe").

3280.   Broadly speaking, the IDOL Safe consumed more storage and memory than a Lucene Safe, but it had other compensating advantages. Autonomy's drive was to get IDOL, its proprietary product, into everything. Nevertheless, whilst new Digital Safe customers would be provided with IDOL safes, large legacy customers of Zantaz generally remained on Lucene Safes because, though possible, there were difficulties in moving between the variants.

---

[397] On its acquisition of Zantaz, Autonomy appointed Mr Yan Chief Architect in the Product Development team for Digital Safe. After the spin-off of Hewlett Packard Enterprise's software business, he became a senior member of the Digital Safe Product Development team at MicroFocus, the buyer.
[398] Digital Safe operated by having identical storage cells. Additional storage could be obtained with additional identical cells.

3281. To bridge the gap, in a few cases an additional, smaller IDOL index, known as *"IDOL Cache"*, was added to a Lucene Safe, which enabled new IDOL-based applications (such as DS Mail, which is like Gmail for DS users, and Supervisor S6) to be used on a Lucene safe. (It may be noted that even IDOL Safes needed an IDOL Cache to use DS Mail.)

3282. As Mr Sullivan explained in his witness statement, in the case of both variants, multiple services were wrapped around a Digital Safe ("DS") archive, including data migration into the archive, data returns and destruction, monitoring, technical support, systems administration and security. The solution could store, search and retrieve from multiple petabytes of data to accommodate the vast exponential growth in data in recent history. In a hosted environment it was often used in conjunction with other pieces of related Autonomy software, including Supervisor S6 and DS Mail.

3283. Of particular utility, Digital Safe offered regulated entities (such as banks) the ability to store their data in accordance with Rule 17a-4 issued by the US Securities and Exchange Commission ("SEC") regarding electronic data storage, which has specific requirements relating to length, format, quality, accessibility etc. of record retention. As mentioned before, a particular characteristic and strength was its scalability.

3284. Digital Safe was, however, a complex and sophisticated product, with what Mr Sullivan described as *"a huge footprint."* The indexing and archiving functions were performed automatically by the software, but the complexity of the solution was such that it needed close monitoring, and problems frequently arose, which (especially given the nature of the customer base and their reliance on the solution) had to be fixed very quickly.

3285. Autonomy needed teams of specialized technicians (who, according to Mr Yan, typically received around 6 months of intensive training to even understand its operation) to monitor its hosted customers' DS archives on a 24/7 basis. Mr Sullivan's evidence was that at any one time, there would be at least five network and software operations people on duty simply monitoring the software.

3286. Digital Safe was thus not designed for use by an unassisted customer: it was designed to be (primarily at least) a hosted solution to be run at scale by Autonomy from its own or third-party data centres. Its designers did not expect it to be used "on-premises" except perhaps by very large entities with their own data centres and trained personnel.

3287. Accordingly, the vast majority of Digital Safe customers (Mr Yan estimated 90%) were hosted by Autonomy, storing their data in a Digital Safe at an Autonomy data centre. Mr Yan said (and he was not contradicted) that only a handful of customers had an on-premises Digital Safe solution. Even the small number of "on-premises" customers almost invariably needed a remote management system so that their Digital Safe and data could be monitored and managed by personnel with the requisite Autonomy expertise.

3288. Mr Yan could remember only two attempts by companies (CDC and Rand) to use Digital Safe and make its capabilities available to their own customers without Autonomy's assistance; and in those two situations, CDC was supplied with a more self-sufficient variant which did enable it to carry on, but Rand was forced to stop.

3289. Mr Sullivan's evidence in his witness statement was that even with a good remote management link, on-premises Digital Safe was more burdensome for Autonomy than hosted Digital Safe since it was dependent on the customer for a number of things in an on-premise context. It was better and easier for Autonomy to have the control of everything in its own data centres. Because of this, Mr Sullivan said, Autonomy *"always tried to sell DS on the hosted basis…"*.

*(2)    Brief description of Autonomy's e-Discovery offering*

3290. Often as part of its hosted business Autonomy also offered e-Discovery services to assist customers with the review and disclosure of material in litigation. The software at the heart of this process was called 'Introspect' and 'Early Case Assessment' ("ECA").

3291. Like Digital Safe, Introspect had been developed by Zantaz before its acquisition by Autonomy. ECA was developed by Autonomy before that acquisition. Introspect was used in connection with the processing of data; ECA was effectively a data-culling tool, allowing customers to reduce the population of material to be loaded into Introspect for review by identifying a subset of data falling within specified parameters.

3292. As indicated earlier, e-Discovery software could form part of a hosted arrangement or an on-premises solution. In a hosted arrangement, the software was used in connection with the ingestion, processing, storage, analysis and production of data by Autonomy in Autonomy-run data centres. In an on-premises arrangement, the software was sold on a standalone basis to the customer to be used in-house (or at a third-party centre), where the required services would be performed by the customer (or a third party).

*(3)    A detailed analysis of the Digital Safe claim*

3293. Under the SaaS model, Zantaz/Autonomy stored the customer's data on the Digital Safe system as a service to the customer. The Digital Safe system and the customer data loaded onto it were hosted and managed by Zantaz in data centres controlled by Zantaz or, in some cases, by third parties such as IBM.[399] The hardware and software that made up the Digital Safe system were owned by Zantaz/Autonomy and maintained by its employees, according to the unchallenged evidence of Mr Egan and Mr Yan, and the evidence of Mr Sullivan.

3294. Before its acquisition and the introduction by Autonomy of the hybrid model, Zantaz usually provided its data hosting service under a multi-year contract, with customers paying for the service on a per megabyte basis and uploading data to the Digital Safe system over the duration of the contract. Zantaz was paid by customers either in

---

[399] Some of the so-called "on-premise" Digital Safe customers used a third party's data centre. The distinction between these customers and the hosted customers who nevertheless used an IBM data centre was as follows. In the hosted scenario, the customer would contract with a third party, for example IBM, for the provision of a hosted archiving solution. The third party would then subcontract Zantaz to provide the solution; there would be no contractual relationship between Zantaz and the customer, and the customer was fundamentally purchasing a hosted service provided through an intermediary. It would not own the hardware or the software on which it was installed. By contrast, in the on-premise scenario, the customer would purchase Digital Safe in the form of an appliance from Zantaz, and then Zantaz would be engaged to run and monitor the appliance, which would be located at the third party's data centre. In this scenario, there was a contractual relationship between Zantaz and the customer, and the customer was fundamentally purchasing an appliance, such that it would own the hardware and the software installed on it.

advance[400] or, increasingly from 2008, on a 'pay-as-you-go' basis. In both cases, Zantaz recognised revenue in the quarter in which the service was provided.

3295. Regardless of whether the customer was on a pre-paid or a pay-as-you-go contract, neither the Defendants nor Mr MacGregor, Dr Lynch's accounting expert, dispute that the substance of the SaaS arrangements was a <u>data hosting service</u>, or that Zantaz appropriately accounted for those arrangements by recognising the revenue derived from them over the term of the arrangements as the service was provided.

3296. Under the hybrid Digital Safe arrangements, Autonomy provided the same data hosting service, but the customer also purchased a licence to use either Digital Safe software or Related Software.

3297. The way that Autonomy structured the hybrid arrangement involved the customer paying: (i) a substantial fee in respect of the software licence, which was usually paid upfront; (ii) a fee in respect of software maintenance and support services; and (iii) significantly reduced hosting / storage fees on a per megabyte basis. The key differences between these arrangements and the SaaS arrangements were thus: (i) the change in payment structure, and (ii) the introduction of a software licence.

3298. The Claimants emphasised, however, that the payment structure does not determine the pattern, or timing, of revenue recognition. IAS 18 §24 provides that "*[p]rogress payments and advances received from customers often do not reflect the services performed*". The fact that the customer pays in full upfront, in full in arrears, or in instalments on a monthly basis, does not alter the fact that if or to the extent that the contract is, in substance, for the provision of services, then, whatever the <u>cash</u> position the <u>revenue</u> should, in accordance with IAS 18 §20, be recognised over the period as the services are provided.

3299. For so long as the hosting arrangement continued, the introduction into the structure of a licence enabling the customer to move on-premises did not materially alter the nature of the services provided by Autonomy, which continued to provide the same data hosting service under the hybrid arrangement as it would have done or, in the case of existing customers, did under a SaaS arrangement. In particular, regardless of the fact that the customer had purchased a software licence:

(1) Autonomy still hosted the customer's data and the Digital Safe system – including the Digital Safe software licensed to the customer – on hardware owned by Autonomy and located in Autonomy's data centres.

(2) Autonomy still used the Digital Safe software to perform the capture and index processes mentioned above on the customer's data, which the customer provided to Autonomy over the duration of the arrangement and which Autonomy uploaded to the system.

(3) Autonomy still monitored the customer's Digital Safe system round the clock, detecting and fixing problems as they arose.

---

[400] Dr Lynch disputed the extent to which this took place.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

3300. From the customer's perspective, the position was also the same. In particular, the customer was contracting for a <u>hosted</u> Digital Safe arrangement; it intended for Autonomy to host its data, it paid Autonomy to host its data, and that is what Autonomy did. The customer received substantially the same service as it would have received had it contracted, or re-contracted, on a SaaS basis with Autonomy.

3301. The Claimants emphasised that Autonomy repeatedly assured customers – particularly those who found the concept of a licence in a hosted arrangement confusing – that everything would remain exactly the same and that the licence was just a formality. Thus, for example, in an email dated 23 December 2009 to Mr Christian Lucas of Morgan Stanley (which had apparently thought the new structure *"problematic"* and queried *"what would be the upfront payment that you're looking for before y/end in order for the savings programme to kick in?"*) Mr Hussain wrote:

> *"Hi Christian – to clarify, we require no payment at all. The savings start the moment MS signs an amendment to the existing agreement that simply puts lower rates into effect coupled with a software licence fee. In this sense it is not even an offer that requires a legal review as <u>it is purely financial and causes savings. It's quite simply "sign and save"</u>…"* [My emphasis]

*Outline of the dispute as to the purpose and effect of the restructurings*

3302. In those circumstances, according to the Claimants, it is clear that the reason, and the vice, of Autonomy's introduction of a hybrid model for hosted business, and the sale of a licence to the hosted software in exchange for an upfront payment, was to enable Autonomy successfully to avoid the usual revenue recognition treatment of a prepayment for services and to accelerate the recognition of revenue in respect of the licence element improperly, and to present a false impression of its business. They described it as little more than a *"naked attempt to find a way to produce an accounting effect…namely the acceleration of recognised revenue"*.

3303. The Claimants' case was that the net effect of the introduction and adoption of the hybrid model was substantially to reduce the total contract value to Autonomy and to accelerate the rate at which Autonomy recognised revenue from hosting customers at the expense of recurring revenue. They claimed that over $125m of revenue was "accelerated" in this manner.

3304. The Claimants depicted the adoption of the 'hybrid' model as part of Autonomy's relentless search for ways of giving the impression of meeting ambitious revenue targets and market expectations. According to this depiction, though in the case of the impugned hardware, VAR and reciprocal transactions Autonomy in effect purchased its own revenue, whereas hybrid hosting deals involved Autonomy foregoing some part of its future revenue stream in favour of an upfront payment which they treated as immediately recognisable revenue, the same objective of meeting and beating market revenue forecasts was common to all.

3305. The Defendants, on the other hand, insisted there was nothing intrinsically wrong, let alone improper, about the hybrid hosting model, or the issue of licences in order to secure for Autonomy immediate revenue and tie in its customer at a time of sharply declining storage rates and considerable customer volatility. That being the case,

accounting for the sale of a licence was a matter of fine judgement, and the decision to treat the sale of the bundle of legal rights which a licence comprised as analogous to sale of goods revenue stream was well within the ambit of propriety. Enquiry about what use of the rights was made thereafter by individual licensees was (since it was the application of hindsight) illegitimate on ordinary accounting principles.

3306. The Defendants pointed out that after the Acquisition, HP itself had accepted the propriety, and explored how it could continue the practice, of the hybrid hosting model and the sale of licences linked to lower storage and service charges even though the requirement under US GAAP to undertake a VSOE assessment[401] was expensive. They suggested that HP had only abandoned the model because of a strong market movement back towards the SaaS model and a concern that establishing VSOE under US GAAP would constrain Autonomy's ability to be flexible with pricing. Those were matters of business judgement, not indicative of any doubt as to propriety.

3307. In that regard, the Defendants contended that the 'hybrid' model was beneficial both to Autonomy (in ensuring longer term customer commitment) and the customer (which acquired a legal right to software it could deploy outside the hosted environment and a beneficial aggregate subscription rate). They defended it as a commercially driven business decision well within the range of the proper exercise of directors' business discretion. They stressed especially that hosting was a profitable and valuable business line but highly competitive. The commercial effect of selling a licence deal was to lock in the customer which had made an upfront investment that it would not wish to lose.

3308. Ultimately, the Claimants did not go as far as to suggest that the restructurings had no commercial benefits for Autonomy. Zantaz's CEO, Mr Sullivan, who was in charge of its hosting business, and who gave evidence for the Claimants both in the US and in these proceedings, did subscribe to the Claimants' line that the *"main commercial reason for the restructurings, from Autonomy's perspective, was to generate large upfront licence fee revenues"*. But he did not suggest that he considered the sales or restructurings to have been improper. In his witness statement, he explained the advantages as follows:

> *"There were, however, other incidental commercial benefits flowing from the license model, principally enhanced customer lock-in and upsell opportunities.*
>
> *…*
>
> *30. Customers did, though, sometimes threaten to switch to a new provider for new data, often by issuing RFPs in an effort to get lower prices from Zantaz/Autonomy. Although we occasionally lost customers, these customers were generally smaller customers. We could afford to lose smaller customers because they did not significantly affect our revenues. We had to be careful with larger customers and, where data center costs had fallen, we passed some of our cost savings to them to make sure we did not lose them. The relationship was sticky, but retention was not guaranteed and concessions on rates were often offered.*

---

[401] Vendor-specific objective evidence, a requirement under US GAAP for the recognition of revenue.

> *31. One effect of restructuring to a license model was to remove this tension dynamic from the relationship with customers. They paid a great deal upfront and, in exchange, secured very low ongoing storage rates. This meant that there were, for the term of the service arrangement, no discussions around reductions in storage rates (save where instigated by Autonomy) or threats from customers to go elsewhere. Customer retention was virtually guaranteed.*

> *32. The license model also had the theoretical benefit for the customer that it now owned a license to the DS software. A few customers did express some interest in having the ability to bring their DS archives in-house in the future, if, for example, Autonomy were to go bankrupt – and may have believed that the purchase of a license gave them that ability."*

3309. Mr Sullivan also made clear that Autonomy had to remain competitive in light of the falling rates in the market. Customers did threaten to leave. Autonomy did have to pass on some of the costs savings of falling storage costs to customers, to ensure they did not lose them. Customer retention was not guaranteed. (This was said by the Defendants to undermine the Claimants' counterfactual assumption that in the absence of the restructured deals Autonomy could have continued to store the same amount of data at higher historical rates.[402])

3310. Mr Egan also thought there was nothing wrong with the restructuring of the hosted deals. He considered that the hybrid arrangements incentivised customers both to stay and to store additional amounts of data:

> *"My view was that it gave them incentive to stay longer and it gave them incentive to give us more of their overall volumes and change their policies to retain and collect more."*

3311. Other witnesses called by the Claimants, including Mr Goodfellow, also confirmed the business common sense in the hybrid deals when they were cross-examined about them, especially at a time (which it was not disputed it was) of precipitously falling storage prices.

3312. It should also be noted that the practice of selling the hybrid model continued after the acquisition, until at least the end of May 2012. HP had a project to establish VSOE under US GAAP for the hybrid deals. In May 2012 the model was abandoned for

---

[402]In a nutshell: the Defendants submitted that the Claimants' arguments as to the financial implications of the hybrid model were unrealistic. They assumed that, absent a restructuring, customers would have continued to pay historic rates for the duration of the restructured contract, when in reality customers would have responded to the changing commercial environment by demanding competitive rates. The Claimants also ignore the fact that, by offering competitive storage rates, Autonomy was encouraging customers to store more data. The Defendants contended that the assumption that, in a counterfactual world, the same amount of data would have been stored under uncompetitive rates as was stored under lower, competitive rates, is a false one. However, that might be a reason for offering a discount for the "bird in the hand"; but not for artificial devices to enable accounting for it as recognised revenue.

business reasons (including the fact that the market was moving away from a licence model to a SaaS model).

3313. However, the Defendants' answers on the issue as to the commercial rationale of a licence and the financial advantages it offered (which I shall come on to assess later) must be distinguished from the accountancy issue to be addressed in respect of the 51 Schedule 6DS transactions in the context of the FSMA claims. This is whether the accounting treatment of the sale of a licence separately from the provision of services for an upfront fee was justified (in the sense of being a not unreasonable application of the relevant accounting standards).[403]

3314. That question, which is the principal focus of this section of this judgment, is whether or not the sale of a licence to an Autonomy customer, as part of a hybrid contract under which it was also entitled to receive and bound to pay for hosting and related services, could properly be treated and accounted for as a separate component of the hybrid transaction, and the licence fee booked as recognised revenue at the point of sale.

*Applicable accounting principles*

3315. There is no dispute that in accruals accounting, unlike cash accounting, a prepayment for goods or services falls to be recognised over the period in which the goods and services are provided, and not upfront.

3316. The dispute, in a nutshell, is whether the licence fee was merely a disguise for, and in substance no different from, the prepayment for hosting services; or whether the licence conferred rights of substance and real practical utility to the customer in respect of the use of Digital Safe, such as to justify the licence and the fee for it being treated as a separate component of the hybrid contract analogous to an immediate payment on the sale of goods.

3317. As foreshadowed above, the Claimants, though not alleging that the licence was a sham, nor disputing that it comprised and conferred a bundle of legal rights, contended that it had no real utility to the customer or effect on the hosting services and its substance and value were illusory: the hybrid model (as they put their case to Dr Lynch) *"made no difference to the substance of the arrangement and the service the customer received"* and was *"simply a pretext devised by Autonomy to accelerate revenue"*. In other words, the Claimants sought to depict the licence simply as a construct, the only value of which was that it provided a passport to discounted service costs, at the expense to Autonomy of a reduced aggregate revenue stream.

3318. The Defendants submitted that it was sufficient that the licence granted under the hybrid model conferred enforceable legal rights which gave the customer the option to continue using Autonomy's hosting services, or to use the hosting services of a third-party for the licensed Autonomy software, or to operate the software themselves by moving Digital Safe and their data on premise.

---

[403] The Claimants confirmed, with emphasis, in their closing submissions that their complaints in their Hosting case were ranged exclusively at Autonomy's sales of a licence to Digital Safe and/or related software in a hosted Digital Safe arrangement and not an on-premise arrangement so that none of their Schedule 6DS transactions involved an on-premise Digital Safe.

3319. They contended also that the Claimants' case that the rights were illusory was false, and that it was entirely possible to deploy Digital Safe on premise and quite practicable to move from a hosted solution to an on-premise solution, lifting and shifting Digital Safe and the Customer's data from Autonomy's data centre to its own (or another) data centre. According to the Defendants, that was a real and separate right of practical utility, justifying treating the sale of the licence as analogous to a sale of goods and to be accounted for accordingly.

3320. Except as noted below, the two experts (Mr Holgate for the Claimants, and Mr MacGregor for the Defendants[404]) agreed on the relevant accounting principles, which can be summarised as follows:

(1) The IASB[405] *'Conceptual Framework for Financial Reporting'* makes clear that a transaction must be accounted for in accordance with its substance and economic reality and not merely its legal form.

(2) The revenue recognition criteria in IAS 18 are usually applied to each transaction as a whole. However, as IAS 18 §13 provides, where a single transaction consists of multiple components, consideration should be given as to whether they are separately identifiable components to which it is necessary to apply the revenue recognition criteria separately <u>in order to reflect the substance of the transaction</u>, or, alternatively, whether the revenue recognition criteria should be applied to the transaction as a whole in accordance with its overall substance.

(3) Where the substance of the transaction, or a separately identifiable component thereof, is the <u>rendering of services</u>, the criteria governing both if and when revenue can be recognised are set out in IAS 18 §§20 and 25. These provide, inter alia, that:

> *"When the outcome of a transaction involving the rendering of services can be estimated reliably, revenue associated with the transaction shall be recognised by reference to the stage of completion of the transaction at the end of the reporting period… [IAS 18 §20][406]*
>
> *For practical purposes, when services are performed by an indeterminate number of acts over a specified period of time, revenue is recognised on a straight-line basis over the specified period unless there is evidence that some other method better represents the stage of completion…" [IAS 18 §25]*

---

[404] Mr MacGregor was instructed by Dr Lynch; but Mr Hussain "*fully endorsed*" Dr Lynch's position and adopted that evidence.

[405] The International Accounting Standards Board.

[406] The rest of IAS 18 §20 provides that the outcome of a transaction can be estimated reliably when all the following conditions are satisfied: (a) the amount of revenue can be measured reliably; (b) it is probable that the economic benefits associated with the transaction will flow to the entity; (c) the stage of completion of the transaction at the end of the reporting period can be measured reliably; and (d) the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

(4) Where the substance of the transaction, or a separately identifiable component thereof, is the sale of a good, the relevant revenue recognition criteria are those set out in IAS 18 §14. These criteria include that the amount of revenue can be measured reliably.

(5) Mr Holgate accepted that it was *"entirely possible"* for there to be a hybrid contract with a licence element and then a service element *"if the facts point to that"* and in particular, if on the facts the licence was *"validly a separate good or service"* separable from the service provision as a whole; and that a software licence is in general treated as a sale of goods.

(6) However, Mr Holgate did not consider this was or could be answered by reference to what legal rights the licence conferred; he considered that in order to establish the correct accounting treatment for the hybrid transaction, it is necessary to identify the genuine economic substance of the transaction and to consider whether the components of the transaction should be accounted for separately, so as to reflect the substance of the transaction.

3321. In cross-examination Mr Holgate put the test as follows:

> *"...we have to ask if the licence is indeed validly a separate good or service...If it is separate from the provision of subsequent services, then fine, you recognise the licence upfront on day one as revenue and the services gradually over the period.*
>
> *On the other hand, if it's not separable from the service provision as a whole, then the whole thing falls to be accounted for as service provision over a period."*

3322. I did not understand Mr MacGregor to dispute the test. As he expressed his position in this regard in his and Mr Holgate's Joint Statement:

> *"If there were separately identifiable components, providing the criteria of IAS 18.14 and/or IAS 18.20 were applicable, Autonomy was entitled to recognise the IAS 18.14 revenue generated on the licence component of the hosting arrangements at the date of the sale agreement, and the separate IAS 18.20 storage services revenue over the term of the agreement (by reference further to IAS 18.25)."*

3323. The differences in approach between him and Mr Holgate were as to (a) the relevance of the definition of the attributes of the licence in the contract defining it and (b) if the contract was not conclusive, whether in fact the licence did confer rights of substance and utility.

*The differences between the experts in their approach to applying these Standards*

3324. The differences between the experts as to their ultimate conclusions were in consequence of:

(1) Mr Holgate's more expansive view of the principle that accountants look to the substance and not the form (which Mr MacGregor readily accepted as a

principle but considered was not to be stretched as far as Mr Holgate suggested); and

(2) Eight assumptions which the Claimants instructed Mr Holgate to make. One of these assumptions foreclosed the issue, in that Mr Holgate was instructed to assume that the licence had *"no independent value"*. Others were conclusory and it was suggested that they "*dragooned*" the answer. Subject to that, which was objected to and on any view objectionable, the assumptions were factual matters, which were in every case disputed.

3325.  As to (1) in the preceding paragraph, Mr Holgate gave the accountancy principle (which I have discussed earlier when addressing the VAR transactions) that a transaction must be accounted for in accordance with its substance rather than in accordance with its form such pre-eminence that he did not see or call for the licence agreements themselves and consequently did not consider the terms of the licences.

3326.  When cross-examined on the legal differences between a SaaS contract and a hybrid contract, and challenged as to whether he was *"unduly dismissive of the legal differences between a SaaS contract and a hybrid one"*, Mr Holgate (who had not read any of the underlying contracts) answered:

> *"No. My Lord, it's inevitable that accountants and lawyers see this issue of substance over form differently. Substance over form is very much an accounting principle that essentially overrides contractual and legal form of arrangements. It's not surprising that lawyers have difficulty with that…"*

3327.  Consistently with this approach, Mr Holgate seemed to consider that he was entitled to ignore the fact that the licence agreements conferred legal rights, which would (by way of illustration) be enforceable in bankruptcy; and then, having dismissed their form, to assess their substance according to whether there was any difference between the services a customer received (a) before and (b) after the sale and purchase of the licence.

3328.  His conclusion, without regard to any of the licence agreements, that because the service provided was essentially the same, the rights provided to the customer had no practical substance (or, as he put it, were *"trumped by the fact that the service continues as before"*), was the main plank of his case that recognition of revenue was wrong.

3329.  Mr MacGregor agreed, of course, that the accounting principles require accountants to identify and assess the commercial, or *"genuine economic"* substance of the transaction over the form. However, he ascribed importance to the contractual option and rights conferred by the licence to *"take the storage system in-house to archive data itself at any time during the licence term."*

3330.  Like Mr Holgate, Mr MacGregor wished to be satisfied, in light of the Claimants' claims to the contrary, that the legal option and rights conferred were not illusory. In that context, he recognised the need to be satisfied that the rights were capable of being exercised by the customer, and that from the customer's perspective, there was an independent value to owning a Digital Safe licence separate to the value of the data storage service provide by Autonomy: or, in other words, that the licence agreement was not all form and no substance. Mr MacGregor appeared to accept that if a customer had

in fact no intention of moving Digital Safe on premise or otherwise away from
Autonomy then in that particular case the licence could not be considered to have
separate value; but he appeared to suggest that then revenue recognition would be denied
by reference to the individual case, and he became convoluted and indeed confused
when pressed on whether that provided the basis of extrapolating any more generic test,
sometimes suggesting that each individual case had to be assessed but then at other times
suggesting that the matter had to be looked at generically. I think the following
exchange is illustrative:

> "Q.      ...You say in a number of places in your report that, when
> considering whether the licence to Digital Safe or eDiscovery software
> should be treated separately from the service and indeed whether it
> has value, what is most important to consider is the view of the
> customer, correct?
>
> A.  Well, one looks at it from the perspective of the customer, ie what is the
> customer getting?
>
> Q.  So what is most important is to consider it from the point of view of the
> customer, yes?
>
> A.  In this respect, yes.
>
> Q.  And it would follow…in relation to customers that did not consider the
> licence to be important or of value, indeed customers who didn't even
> want to download the licence, that you would not consider any revenue
> from those licences could be recognised…?
>
> A.  Well, I think where – I don't think that's correct. Because if you have a
> whole series of licences being sold, you're looking at the position of
> customers generically in terms of what it is they're getting.
>
> Q.  What if more customers take the view that they don't really want the
> software and they're only doing this for reducing the costs, in other
> words you say you're looking at it generically, what if the bulk of
> customers do not consider the licence to be important or of value? Do
> you extrapolate from that and say I shouldn't therefore recognise it for
> anyone?
>
> A.  I suppose it depends on the negotiations and what the customers think
> they're getting when they're going through the negotiations and what
> their future intentions are…
>
> …
>
> If the situation is – and we clearly have the situation where some
> customers are taking this stuff on premise, other customers are having
> it at the Autonomy data centre, if there is a position between those
> customers and some of those customers are in the position I just said
> and others are not like that, then you probably do two different things.
>
> Q.  Two different things, what in relation to customers who are like that
> you don't recognise the revenue?

> *A. Possibly but I think you've got to – you know, looking at the generic, what is it that the customer is getting? Well, it's getting a licence and then it's getting some services afterwards. If when you actually drill down to that you're going to a particular customer who says, well, no, I was never interested in any of that, what I wanted was just – I was offered something cheaper, then that would be a different situation…*
>
> *…*
>
> *You've got to look at these things on a detailed [contract] by contract basis…"*

3331. Ultimately, it seemed to me that Mr MacGregor built in an implicit assumption that the bulk of customers did genuinely want to have at least the possibility of moving on premise, but accepted that a different accounting treatment might be necessary in the case of what he took to be, or persuaded himself was, the exception. He assumed, in other words, that the exemplar was a customer which had in mind the possibility of making use of the legal right.

3332. On that basis, and unlike Mr Holgate, Mr MacGregor's view that "*the Digital Safe licences were capable of being separated from the hosting services provided by Autonomy*" was based on his review of the evidence as to the nature of the legal rights and obligations conferred and imposed, and the use that was or could be made of the licence by exemplar customers, and on Deloitte's working papers. Mr MacGregor especially stressed that (a) the licence conferred ownership of the software; (b) even if none of the hosted customers had brought Digital Safe and their data on premise, their entitlement to do so was valuable and sufficient, and not illusory since it appeared that there was a number of customers which had started off and run Digital Safe on premise (albeit with the assistance of Autonomy).

3333. Neither expert provided me with what I regard as a settled and satisfactory test:

(1) In my judgment, Mr Holgate went too far in suggesting that the "*accounting principle essentially overrides contractual and legal form of arrangements.*" The accounting principle reflects that what must be determined is what in substance is the effect of the transaction; but that will be informed by its legal form. A valid legal contract confers enforceable legal rights and imposes enforceable obligations. As Mr MacGregor pointed out, Mr Holgate's arguments missed the point that under the licencing agreement part of the hybrid arrangements, the customer became (for the term of the licence) the owner of the software, which it could 'mine' using another hosting provider or at home, and had an option as to its use enforceable against Autonomy, including in the event of its bankruptcy.

(2) But whilst I agree with Mr MacGregor that those contractual rights and obligations cannot be ignored, or said to be "*trumped*", the assessment of them for accounting purposes required is of their intended commercial effect on the relationship between the parties. The rights and obligations may be commercially illusory (as I have held them to have been in the impugned VAR transactions); or the rights and obligations, even if given full effect, do not conform with their overall description: the classic example is a lease dressed as

a licence. Here, if in reality the customer either had no intention or no practical prospect or capability of utilising and enjoying any benefit from the licence and the reality was that it entered the arrangement to secure the discount, that may determine what the true commercial effect was to be. The problem of the question of revenue recognition being so fact-specific and requiring individual assessment of the intentions and capabilities of the specific customer is a difficult one to deal with, and is liable to pose immense problems for any auditor.

3334. As to the factual assessment, and as regards (2) in paragraph 3324 above, Mr Holgate was required by his instructions to make eight far-reaching Assumptions of fact. His conclusions were necessarily entirely and exclusively by reference to the constructed universe to which he was confined by his instructions.

3335. The eight Assumptions which thus defined and confined Mr Holgate's task require more detailed assessment. They were stated as follows:

(1) Once a customer had purchased a licence to Digital Safe software, it received substantively the same service that it would have done had it contracted on a SaaS basis. The Digital Safe system (comprising the Digital Safe software-which performed the capture and index function-and the hardware) was at all times installed only at Autonomy's data centres.

(2) A Digital Safe licence was of no independent value to a hosted customer because a hosted customer could not customise, configure or implement the Digital Safe system (including the software) for use in its own premises as it could only be performed by Autonomy using Autonomy's proprietary knowledge and resources. The implementation process for use on a customer's own premises was complex and took several weeks minimum to complete. Unless and until that process was undertaken, it was incapable of operation. Provision of the necessary Autonomy customisation, configuration and implementation services for Digital Safe on a customer's premises did not generally form part of the contracts with hosted customers.[407]

(3) Digital Safe required ongoing managed services without which it would malfunction and ultimately stop working. In practice, only Autonomy could provide such services and the provision of them for use of Digital Safe on a customer's premises did not form part of the contracts with hosted customers.

(4) There were no user-manuals regarding either the implementation or ongoing support and management of Digital Safe, and no third parties (let alone customers) who could provide such services.

(5) Where hosted Digital Safe involved the sale of software other than Digital Safe software then such software could only be used, or was sold for use, with Digital Safe.

---

[407] RRAPoC §110.1 additional support did not form part of the licensing or hosting arrangements that Autonomy provided to the customer.

(6) Negotiations between Autonomy and existing hosted customers were largely instigated by Autonomy and not the customer. For both new and existing customers the hybrid model was proposed by Autonomy and negotiations largely centred on the customer's savings over the lifetime of the contract. Autonomy's primary purpose in hybrid deals was so as to generate upfront recognition of revenue through the licence.

(7) The intention and understanding of both Autonomy and the customer was that after the sale of the licence, the Digital Safe system and the customers' data would remain hosted, and all associated services would be performed by Autonomy at its data centres.

(8) None of the hosted customers brought the Digital Safe system (comprising the Digital Safe software and accompanying hardware) in house.

3336. Mr Holgate opined that these eight factors relating to the hybrid Digital Safe contracts compelled the conclusion that (to quote his report) *"the substance of the arrangement was…the services of capturing, indexing and archiving data"* and that the *"sale of a licence to Digital Safe had no commercial effect in practice and therefore no substance".*

3337. In other words, Mr Holgate considered that, taking the assumptions together, there was, in substance, no sale of a good since on the basis of the assumptions collectively, the licence had no independent value separate from the data storage services: the sale was of services and had to be accounted for as such. On that basis, the approach taken of recognising revenue from the licence sale immediately at the point of sale was improper.

3338. On Mr Holgate's approach, there was no room for the application of the criteria prescribed by IAS18.14: that had no application to, what on that approach, was simply in what he termed *"overall substance"* a structured sale of services over time for which the relevant IAS 18 paragraphs are IAS18.20 (and 18.25 in the case of storage or other services).

3339. Furthermore, Mr Holgate did not look at the work Deloitte undertook concerning the hybrid licences. All he knew about the licences was what was said about them in the Assumptions he was given, all of which (in accordance with his instructions) he took to be the basis on which he was required to report.

3340. Mr Holgate had not been invited, and had not attempted, to try to assess what the effect of stripping out one or more of the assumptions might be: indeed, perhaps a little too easily, he accepted when cross-examined that it was *"all or nothing."* Nor did he assess other possibilities which might ensure the value to the customer of the licence (such as the possibility of purchasing implementation and monitoring services, or the possibility of the customer favouring a hybrid structure because it might enable it to allocate the cost against its capital budget, or obtain some tax advantage). He accepted that this was an important point; when asked to explain why, then, it was not mentioned in his reports he explained that this was because he had proceeded *"on the basis of the assumptions in front of us."*

3341. In his first report, Mr Holgate placed special reliance on Assumptions (2), (3) and (4) as numbered in paragraph 3335 above. All these related to the implementation and

management of Digital Safe on premise, which he assumed, and the Claimants insisted, could not be achieved successfully without Autonomy's assistance on premise.

3342. He agreed when cross-examined in that connection that the fact (as it was put to him to be) that customers could buy implementation and monitoring services from Autonomy for a separate fee was important. He was a little evasive as to the effect of that in terms of Assumptions (2), (3) and (4). Instead, he moved swiftly on to say that even more important was the first part of the first Assumption (see paragraph 3335(1) above), that a hybrid customer received substantially the same service that it would have done had it continued to contract on a SaaS basis. He confirmed that he considered that point, and its elaboration in Assumptions (6), (7) and (8), to be the most important: in effect, a trump card (and see paragraph 3328 above). In his first report he explained why:

> *"The substance of the arrangements was (for new customers) and continued to be (for existing customers) the service of capturing, indexing and archiving data throughout the contract period. These services were unaffected by the sale of a licence to the customer. The licence fee, when properly considered, was therefore payment towards these services."*

3343. Consistently with that, Mr Holgate confirmed that the Claimants:

> *"do not take issue for the purpose of these proceedings with the accounting treatment for 'on premise' deals, i.e. where Digital Safe was implemented at the customer's own site."*

3344. Mr MacGregor rehearsed these assumptions in his supplemental report. In his conclusions, Mr MacGregor summarised in his own words in more compressed form his understanding of the assumptions that Mr Holgate had been instructed to make as being that (a) a Digital Safe licence was of no independent value to a customer (b) the software could not work on a customer's premises without Autonomy (and no one else's) ongoing support, (c) there were no user manuals, (d) the intention and understanding was that the customer data would be hosted by Autonomy and (e) all associated services would be performed by Autonomy at Autonomy's own data centres. He dealt, however, with all eight.

3345. Mr MacGregor accepted that the eight assumptions taken collectively, including the conclusory introductory sentence to the (second) "assumption" that the licence had *"no independent value to a hosted customer"*, led inexorably to the accounting treatment outcome or conclusion reached by Mr Holgate. However, noting that all the assumptions were matters of fact disputed by the Defendants, he made clear that, as regards Digital Safe, only the *"no independent value"* assumption was of itself conclusive.[408] "

3346. In Mr MacGregor's opinion, unless it was factually impossible (as distinct from expensive or difficult) to use the rights whether at that time or in the future, the licence would be a thing having some value independently and separately from the supply of

---

[408] As regards e-Discovery he went further, stating in his Supplemental Report that *"if for example, it was possible for customers to perform the services themselves, contrary to just the single assumption that it was not practicable for a customer to perform the service itself, then [he] would not agree in the same way."*

services. He suggested that, at least, it would offer *"a protection element…which you get when you purchase something which isn't there when you're just renting something"*. He considered also that the eighth assumption impermissibly introduced hindsight to an accounting assessment.

3347. When questioned further whether he would accept that on the basis of the first, sixth, seventh and eighth assumptions (which in effect elaborated on the "trump" point Mr Holgate had described as of particular importance in reaching his conclusion) it would follow that the licence had no substance, he declined:

> (1) As to the first assumption (same service with or without and before or after sale and purchase of a licence) he opined that what was missed out, not even mentioned, was the fact that the licence conferred a proprietary right of significance;

> (2) He did not consider the sixth assumption (as to the licence purchase being instigated by Autonomy) *"matters one bit"*;

> (3) In his opinion, the seventh assumption (the intention and understanding that after the sale the hosting would continue) did not *"deal with the optionality that the customer has"*;

> (4) He considered the eighth assumption (none of the customers brought Digital Safe in house) to be both a *"hindsight point"* and one which missed the point that a number of customers had started with and retained Digital Safe on premise without undue difficulty.

3348. After that, Mr Rabinowitz returned to cross-examine Mr MacGregor further on the second, third and fourth assumptions, on which Mr Holgate had relied particularly in reaching the conclusion that the licence could not be used by a customer *"independently from the hosting and related service components of a Digital Safe arrangement"* nor was it *"feasible, from a commercial or technical perspective, for the licence to be sold as a separable good"*.

3349. Again, Mr MacGregor's opinion was that none of the factual assumptions compelled or even justified the conclusion that the licence had no independent value; and the conclusory first sentence in assumption (2) (which he considered, correctly) to be in reality a self-standing judgment, not a matter of fact, of itself took the matter no further for that very reason: all it signified was that *"if that's the assumption, then that's the conclusion you reach"*.

3350. In my judgment, Mr MacGregor was correct to this limited extent: the assumptions took no account of the basic legal fact that the licence gave contractual rights to the customer and imposed contractual obligations on Autonomy which introduced, potentially, a new and separate facet of the relationship between them beyond the provision of services.

3351. But none of this answered the real question in the case, on which Mr MacGregor floundered: how it was that those contractual rights could be said to have any real substance if (a) in most or many cases those rights were commercially illusory and/or never likely to be useful or used, and/or (b) the real intention of a hybrid customer was

to continue using hosted services, without regard or recourse to the licence rights, with the sole real benefit of the licence being as a passport to lower data storage rates.

3352. Again and again, the only answer provided by Mr MacGregor and the Defendants was (to quote from a passage in Dr Lynch's written closing submissions which seems to me eloquently and neatly to summarise the nub of his argument and of Mr MacGregor's response to Mr Holgate) that Mr Holgate's and the Claimants' approach gave:

> *"negligible, if any, weight to the contractual rights and obligations of the parties. It sets at nought the option given to the customer, in law, to take the software in-house (at which point it would be in the same position as the on-site licensee) and discounts the fact that the buyer owns an asset which would, for example, be effective in any bankruptcy of Autonomy. There may also be other good commercial reasons why the buyer would wish to have those rights, such as an ability to allocate them against a capital budget in its own business.*
> …
>
> *As Mr MacGregor pointed out, Mr Holgate's emphasis on the practical position of the customer misses the point that under the hybrid agreement, it <u>owns</u> the software and that the customer has an <u>option.</u>"*

[Emphasis as in original]

3353. Dr Lynch also submitted that Mr Holgate's approach entirely ignored the fact that the licence conferred a bundle of legal rights; and it led to the proposition, which Dr Lynch labelled *"bizarre"* in his closing submissions, that when selling the licence to one customer (the on-site customer), Autonomy could recognise the revenue, but when selling the same asset to another customer (the hosted customer) Autonomy could not.

3354. Pausing there, in a sense the Defendants' position was, by implication at least, that if the hybrid hosting agreements were valid in accordance with their terms (which was not disputed), and the rights were capable of having some economic value for example in the event of the bankruptcy of Autonomy, or in the licensee's accounts, or (as Dr Lynch also posited, simply as an option which the licensees could flourish when the time came for renegotiation of hosting terms) that was definitive. Before considering whether (or to what extent) a factual exegesis is necessary or whether there is, as it were, such an overall or generic answer, I would summarise my view as to the relevant test or tests as follows:

(1) As already indicated, I consider the fact that the licence comprised legally enforceable contractual rights to be highly important but, in the application of accounting principles, far from definitive in the determination of the substance of the transaction.

(2) I agree also with the observation in the written closing submissions on behalf of Dr Lynch that Mr Holgate tended to talk about the use of the software, rather than the acquisition of it (or a right to it) by the customer, and that this led to the flawed assumption that if *"in practice"* the customer remained on Autonomy's hosting system it necessarily followed that the licence had no separate value.

(3) I do not think it is realistic to require of the company and its auditors to enquire of and determine the motives of an individual customer in purchasing a licence[409], or whether that customer actually intends and/or has or is likely to have the capability to utilise the rights it confers.

(4) However, I do not think it unrealistic, and I do think it necessary (as indeed must follow from my conclusion at (1) above) that an overall or generic assessment be made as to (a) whether across the cohort of customers there was ever any practical likelihood that the contractual rights would be utilised, (b) whether in reality the use of the licence ever played any substantial part in the promotion and negotiation of a hybrid deal or a further re-restructuring of its terms, and (c) whether there was ever any real expectation on the part of Autonomy or intention on the part of the customer, in any but the most exceptional case, to move the customer's software and data away from Autonomy's data centres onto its own premises (or even a third party provider's) during the currency of its hybrid hosting arrangement.

(5) If that assessment reveals no such practical likelihood; or no such usual intention; or that the difficulties and expense of moving and/or running Digital Safe on premise would in all but an exceptional case or cases be prohibitive or at least disproportionate to the likely benefit and/or that the process of promotion and negotiation of a licence or a restructuring placed no real focus on the benefit of moving on premise (as distinct from the financial benefit of reduced ongoing data storage charges or, a less obvious but potentially equally important financial advantage such as amortisation of the costs over the licence term) then the licence should be accounted for as in effect a prepayment, rather than a sale of goods.

3355. I turn therefore to that factual question whether the licence for which the licence fee was charged had any real substance and utility (whether actual or prospective) to the customer separate and apart from the hosting services which the customer also contracted to have and pay for as part of the 'hybrid' transaction looked at as a whole, and which in fact all customers continued with after acquiring a hybrid hosting licence.

*The practicalities of (a) installation and (b) monitoring*

3356. The evidence in this regard was very detailed. In my judgment, it established that:

(1) Digital Safe was designed to be primarily a hosted solution, and the majority of Autonomy's Digital Safe customers were hosted (as Mr Yan put it, *"located at an Autonomy data center and managed by Autonomy personnel"*).

(2) On-premise installation and implementation was not impossible. Digital Safe was available and actively offered as an on-premise solution. However, it involved considerable infrastructure costs. There were *"not many"* (to quote Mr

---

[409] Which Ms Gustafsson emphasised she did not in any event regard as relevant. In cross-examination she told me: *"…their motivation for undertaking that transaction is irrelevant to me as an accountant when looking at that deal…Their motivation was not part of an accounting standard that would have changed the accounting treatment"*.

Yan) existing hosted customers who moved Digital Safe on-premise. The Claimants acknowledged that some 17 customers were said to have had Digital Safe on-premise.

(3) Most Digital Safe customers were banks and large financial institutions with considerable resources, often running (and having employees with suitable training and experience to run) complex IT systems. Smaller entities would be unlikely to want or need to run the full Digital Safe solution; Arcpliance, a simpler product with a more limited capacity known among Autonomy's software developers as "Safe in a Box", could possibly provide a more suitable solution as it was simpler and much more easily installed, implemented and managed, though for smaller customers other simpler alternatives were available such as CAMM.

(4) Installation, configuration and customisation or implementation of Digital Safe on-premise were complex tasks, almost inevitably requiring Autonomy's assistance. The evidence (which I accept) was that no customer ever carried out this process by itself successfully (or at all).

(5) The complexity and duration of the implementation process for an on premise Digital Safe established from inception (and thus not involving the further complexities of data segregation and "lift and shift" involved in a move from an existing hosted service) depended on the size and resources of the customer, its data requirements and its particular needs. A minimum of at least three weeks would have been required: and Dr Lynch accepted in cross-examination that in many cases it would have taken *"at least months."*

(6) Autonomy never encouraged on-premise deployment of Digital Safe without Autonomy managed services. The Defendants' reliance on the fact that Autonomy produced instruction manuals as signifying encouragement to move on-premise was mistaken: and I accept that such manuals as were produced were far from being sufficiently detailed to enable a customer to do without managed services.

(7) Some customers that moved Digital Safe on-premise initially did not want ongoing services (which were usually provided by remote access through a VPN link) because they did not want anyone to have access to or visibility of their data (Apple, Axa and BNP Paribas were examples). Not all customers initially opted for full management services. However, after initial difficulties all Digital Safe customers who were sold a system without managed services (except Apple which never completed implementation) resorted to Autonomy to provide management services, or moved into another less complex solution (such as Arcpliance, and latterly, a new umbrella product called Autonomy Consolidated Archive or ACA, as in the case of Rand and a company called Air Liquide). Autonomy encouraged this. Dr Lynch's suggestion that Digital Safe could be managed without assistance was not borne out by their experience; it was (as described by Mr Young in an email to Dr Lynch dated 16 April 2010) *"a complicated beast with a lot of delicate moving parts"*.

HC-2015-001324

(8) In some cases, customers chose to instal Digital Safe from inception in a third party data centre. For example, ManuLife had its Digital Safe on-premise in an IBM or IBM-controlled data centre in Canada because Canadian law required data to be hosted within its jurisdiction and Autonomy had no data centre there at the time.

(9) A customer with a licence also had the option to keep its existing data in a data centre hosted by Autonomy, whilst using that licence to have any new data on-site or at a third-party data centre: and that was a feasible and practicable alternative to full migration (which, for example, was adopted by Morgan Stanley which used hosted services for most of its Digital Safe data but had an on-premise Digital Safe in Switzerland for Swiss secrecy law reasons).

(10) Migration of hosted data on premise was not completely impossible, at least if the migration was to another Digital Safe (or as Mr Yan put it more technically, *"if the solution source and the solution destination were Digital Safe"*). However, the process was, as described by Mr Yan, *"laborious"*, time-consuming and expensive. The only example in the evidence of a company which initially had its data stored under a hosting contract with Autonomy but which, after purchasing a licence, successfully migrated its data and *"lifted and shifted"* its hardware from Autonomy's data centres on to its own premises was Citibank.[410] (In fact, there is no evidence that Citibank ever purchased a hybrid deal: it appears that Citibank's transition was agreed in December 2007, pre-dating the adoption of the hybrid model in mid-2008). That was, it seems, the exception that proved the rule. Citigroup's move on-premise was very complex (involving over 2 petabytes), and took about a year, even with Autonomy's help. The actual costs of the migration of data and any *"lift and shift"* were not explored in detail. It seems likely they were a very considerable disincentive for others contemplating the same thing. Mr Yan was cross-examined as to the practical difficulties of data migration. He told me that some 30 people were involved and that though he did not have the exact figures, it was:

> *"safe to say that it would have costed them a lot of money, a lot of materials and lot of staff and certainly a lot more time…"*

(11) During the period of a transition from hosted to on-premise a customer would still need to adhere to any applicable regulations on data storage: this was put forward by the Claimants as another reason why a move was impractical. But Dr Lynch explained, and I accept, that during the transition period the obvious solution would have been (at least in theory) for the customer to carry on its hosted service arrangements until its on-premise Digital Safe was built.

(12) Schedule 6DS licence contracts did not include any provision for Autonomy to provide managed services if a customer decided to move its archive on premise. The Claimants initially suggested that the requirement for Autonomy's assistance rendered the process unviable in the absence of any contractual

---

[410] Mr Yan explained that *"lift and shift"* involved powering down the hosted Safe, loading it up onto trucks for transportation, reassembling it at the customer site, and re-powering it up. As Digital Safe was compatible with most hardware, installing new hardware and programming Digital Safe onto it was likely to be the easier option.

provision for such assistance in the licence. That was an exaggeration. There was no impediment to Autonomy pricing and charging separately for its assistance and managed services, and that is indeed how customers (such as Merck) which did not initially contract for managed service but did subsequently require it, were charged. Autonomy's charges for such services, whether as part of the original purchase price or as a separate and subsequent addition, were modest. Thus, for example, BNP Paribas paid $80,000 per annum for remote monitoring and administration services (though this was in addition to $160,000 per annum for support and maintenance); Manulife paid $123,500 for implementation at its third-party on-premise centre and $14,583.33 per month for the entire suite of managed services; and AXA paid $60,000 for implementation.

(13) There was nothing to suggest that the same options would not have been available where Digital Safe had been moved on-premise from a hosted environment. However, Mr Goodfellow felt sure, when cross-examined, that *"Autonomy would have been willing to sell them those services as an additional service from Autonomy"*. Citibank's purchase of maintenance and monitoring services when it bought a licence demonstrates, as I find, that they were available. It appears from the lack of any evidence to the contrary, Mr Yan's evidence in cross-examination, and the inherent likelihood, that such services would have been provided by Autonomy at fair value and without differentiation according to whether the customer had always had Digital Safe on-premise or had moved on-premise. In all cases, according to Mr Goodfellow, monitoring and management charges, like implementation charges, were historically comparatively small.

(14) In all cases, however, the customer was dependent on Autonomy. No VAR or third party provider was in a position, either legally (since only Autonomy had the requisite proprietary rights) or practically (since none was trained or had experience on Digital Safe) to provide the assistance that any on-site Digital Safe customer would inevitably and routinely require.

3357.  As it seems to me this evidence also confirms, and I find, that:

(1)  Although (as was not disputed) Digital Safe was capable of being and was operated on premise, it realistically only ever was so by large institutions, multinational companies or large organisations with quasi-governmental roles such as the SFO and VA Vaco with commensurate resources.[411]

(2) Even the largest institutions with considerable resources either never attempted, or having attempted, found it impossible[412], to instal and/or manage Digital Safe without Autonomy's assistance and for example, all on-premise customers found they needed to establish VPN access for Autonomy to monitor and

---

[411] Thus, only one of the 17 on-premise Digital Safe users identified by the Defendants was not either a financial institution (BNP Paribas, AXA, Manufacturers Life, Morgan Stanley, UBS) or a large multinational
[412] For example, Air Liquide (a large French multinational corporation) had to be moved to EAS/CAMM which were designed for on premise use because it was as a practical matter impossible to run Digital Safe unmanaged or by "self-service".

manage the system and provide the near constant support required for Digital Safe.

(3) In short, it was not a practical proposition to implement or keep Digital Safe going without considerable and consistent support from Autonomy. I accept the Claimants' submission and find that a customer who had bought a licence had no real chance of implementing and thereafter using the Digital Safe on a standalone basis, because of its intrinsic complexity, the lack of customer-facing manuals, and the lack of third parties in a position to assist them.

*The manner in which hybrid deals were sold*

3358. The Claimants also relied on the pattern of Autonomy's approaches to existing hosted customers and the subsequent negotiations if and when they ensued as demonstrating that (a) Autonomy presented the hybrid model licence simply as a means to obtain the data storage savings it offered, and never expected any hybrid customer actually to exercise its contractual rights or "option" and (b) very rarely, if ever, did any customer manifest any intention of using the licence independently of its hosting arrangements with Autonomy.

3359. The Claimants took as an exemplar Autonomy's approach (through Mr Krakoski, a Digital Safe sales executive at Zantaz)[413] to Charles Schwab Corporation (a US multinational financial services company, "Charles Schwab"), and the latter's reaction and the ensuing course of negotiations. They illustrated these matters by reference to contemporaneous emails as follows:

(1) On 19 October 2009, Mr Krakoski emailed Mr Andy Uffelman (of Charles Schwab) encouraging a restructure:

> *"Great thing about the license structure for Schwab is long term it reduces storage [i.e. storage rates] dramatically... It will absolutely be imperative that we are both on the same page for making this happen in the quarter. Autonomy exec's are hyper-focused on quarterly results..."*

(2) The focus of Mr Krakoski's sales pitch was thus on the potential savings that Charles Schwab stood to make, not on the licence.

(3) Although at one point, Charles Schwab's legal group expressed "*...concerns with the licensing language*", the subsequent exchanges make clear that the real focus was not on the extent of the licence rights (in which there was no apparent interest) but on the balance of the real underlying deal as between (a) what Charles Schwab would be prepared to pay for the licence and (b) what level of reduction or discount Autonomy would be prepared to accept in return on (i) storage rates (ii) maintenance and service charges.

---

[413] Mr Krakoski had been slated as a witness for the Claimants, but he was withdrawn

HC-2015-001324

(4) The true focus of the negotiation and Charles Schwab's lack of interest in the licence is plain from the contemporaneous documents. For example:

(1) On 18 November 2009 Mr Krakoski proposed revised terms for a licence fee of $3.8 million, in return for a very low management and services charge of *"M/S: 5% annually!"* with *"all services currently being provided"* and in addition a licence of both ControlPoint and a Digital Safe Connector, as well as an option to increase ControlPoint capacity *"in the form of a perpetual licence"*. Mr Krakoski calculated this resulted in 26% savings over the current method of charging, $2.8 million in savings over the term, reduced maintenance and services fees, as well as allowing Charles Schwab *"to leverage ControlPoint"*, which he summarised as *"Overall increases savings and allows for more upside archival"*.

(2) On 7 December 2009, Mr Uffelman emailed Mr Krakoski saying that (a) Charles Schwab had *"no appetite"* for so large a licence fee; (b) but they would be prepared to pay $2.25 million; provided that (c) since they *"did not intend to take the software"*, Autonomy agreed to the 5% maintenance fee and the same reduced storage rates continued as part of the arrangement.

(3) After the deal closed on 28 December 2009, Autonomy sent Charles Schwab a software delivery email letting it know that the licensed software was ready for download.

(4) When Charles Schwab received this email, Mr Uffelman contacted Mr Krakoski saying:

"*Jim, let's talk about what this means. <u>We don't want to download the software</u>, nor do we want the risk of any of our technical partners doing so in error. What controls can we have in place to ensure this doesn't happen?*" [414]

(5) Eventually, Charles Schwab agreed to restructure its arrangement and to contract on the hybrid model. But, as the Claimants contended, it appears clear from the email exchanges that the reason Charles Schwab agreed to the new model was simply because it made considerable savings; it had no interest at all in owning the licence or moving on-premise.[415]

3360. More generally, it does not appear that any of the hybrid Digital Safe customers were expected by Autonomy or themselves intended even to download the licensed software. The Claimants relied in support of this on the evidence of Mr Avila who had noted in an email to Autonomy's Mr Mohit Mutreja in relation to a hybrid e-Discovery deal (subject headed *"Papering JPMC"*):

---

[414] Emphasis added.

[415] In his first witness statement, Dr Lynch suggested that Charles Schwab ran Digital Safe on premise. This was not so: Charles Schwab was always a hosted Digital Safe customer, as Mr Avila confirmed in cross-examination, and as also appeared from an internal Autonomy email from Mr Rizwan Khan of 15 September 2011

> "*since we are selling a license, we will have to deliver [it to the customer] – even if we host it. Similar in concept to deals where we sell the DS software but host it in any case. The customer is never expected to install it themselves.*"

3361. When Mr Avila was shown this document in cross-examination, he initially tried to pass it off as an "*exaggeration*", but ultimately he accepted that it was fundamentally correct:

> "*Q. … That was true, in cases where Autonomy sold Digital Safe licences to customers, it was true that the customer was never expected to install the software themselves, yes?*
>
> *A. That was perhaps an exaggeration on my part, but I think we all assumed that in any hosted deal where there was a licence component, it was unlikely that the customer would go off and try to install it themselves while they had the service being hosted for them.*
>
> *Q. You didn't expect them to do that?*
>
> *A. Right.*
>
> *Q. And so far as you know, no customer did go and install Digital Safe software themselves?*
>
> *A. Or any hosted licence software as far as I know.*"

3362. The Claimants gave other examples from which this appears to have been a widespread understanding amongst Autonomy staff at the time. Thus:

(1) In the context of a Schedule 6 transaction in Q2 2009 during which Morgan Stanley purchased a licence to Digital Safe Universal Access, Mr Goodfellow sent an email to Mr Wang and Mr Loren Wheale (an Autonomy technician) asking them to "*build … a package we can put on Automater for delivery to MS*". Mr Wheale asked Mr Wang what the point of the exercise was, with Mr Wang explaining in reply: "*Revenue recognition, we need to ship something to Morgan. We shipped them Digital Safe software before even though they probably won't do anything with it*".[416] The Claimants noted that Mr Wang was not challenged on this evidence.

(2) In the context of another Schedule 6 transaction with Energy Solutions LLC in Q1 2010, Ms Cynthia Watkins noted that the deal was "*hosted but we still need to ship the software in order to recognize the license*". The Claimants' point was that this suggested that shipment was irrelevant to the customer, and only needed for Autonomy's own purpose of revenue recognition.

3363. Of course, these are simply examples; but the fact that, in the Relevant Period, not one hosted customer successfully used the hybrid licence to move on premise strongly supports the suggestion that the licence element was simply regarded on both sides of

---

[416] As Mr Wang explained, he was referring to a Schedule 6 transaction with Morgan Stanley in Q2 2008.

the transaction as something that would never be used by the licensee, except as the required fee to access the lowest data storage charges.

*Defendants' reliance on Deloitte and Audit Committee*

3364. A principal plank of the Defendants' defence, in this context as similarly (as has been seen) in others was that, whatever may now be the case, years later and with the potentially insidious overlay of hindsight, at the time they drew comfort from the approval of the accounting treatment of the hybrid hosting transactions throughout the Relevant Period by a well-trained and experienced finance department, and by respected auditors Deloitte, and also the Audit Committee headed (from 2010) by Mr Bloomer, himself a respected Chartered Accountant with a wealth of financial and commercial experience.

3365. The Defendants pointed out that Deloitte had access to a wide group of personnel at Autonomy and Zantaz to assist in their understanding of Digital Safe, and hosting and hybrid deals.[417] Deloitte also had access to their own technical expert, Mr Johnstone. The Audit Committee had its own fund of expertise.

3366. In summary, the Defendants' case was (in respect of both Digital Safe and also e-Discovery which I shall deal with later) that:

(1) Deloitte audited and the Audit Committee approved a considerable number of these deals over the course of the Relevant Period. They carefully scrutinised the hybrid model and its accounting treatment proposed by the finance department; and they considered it sound and approved it. In every audit, Deloitte concluded that the licence revenue was correctly recognised.

(2) More specifically, Deloitte understood the salient features of the hybrid deals and approved Autonomy's approach in:

(1) treating the sale of the software licence and the provision of hosting and related services as separately identifiable components of a single transaction;

(2) accounting for the licence revenue upon sale to the customer and recognising revenue on that date and thus upfront; whilst

(3) accounting for hosting, support and maintenance and other services rateably over the period in which they were provided;

---

[417] Both Zantaz and Autonomy made available a number of people, including from its technical staff, to assist Deloitte in its process of review and auditing. They included Mr Lucini, Mr Goodfellow and Mr Smolek (who were not suggested to have been in any way dishonest), as well as Ms Gustafsson (whom the Claimants depicted as having *"personal interests…closely aligned with the Defendants"* and as occasionally unreliable or implausible in her evidence but not dishonest) and Dr Menell and Mr Chamberlain (both of whom the Claimants did allege were implicated).

(4) following a "residual method" of valuing other services in order to determine the appropriate amount of revenue for the licence (which Mr Holgate also accepted was reasonable and normal).

(3) Deloitte reviewed the accounting to ensure it complied with the provisions of IAS 18. Mr Welham confirmed in his oral evidence that on the basis of the information provided to them Deloitte considered that the sale of a licence was a sale of goods, that IAS 18.14 fell therefore to be applied to that element, and that its criteria were satisfied.

3367. The Defendants submitted that they were entitled to and did rely on this as corroboration of the appropriateness of their approach; and Mr Rabinowitz accepted that if Deloitte understood the factual position and were not misled then:

> "...it's very hard to say that Dr Lynch and Mr Hussain should not have thought it was okay."

3368. The question on that basis is whether the finance department were compromised, or Deloitte and the Audit Committee were misled, as to their assessment of the true nature of the hybrid arrangements and the expectations of the parties in respect of them. In particular, it is necessary to consider what they knew or were told as to the viability of installing and running Digital Safe and its software on premise without specialist assistance from Autonomy; and as to the practicality of a hosted customer moving on premise its data and software to which it was entitled under the terms of the licence.

3369. The Claimants' case was that the finance department was headed by, and ultimately its assessments reflected the views and requirements of, Mr Hussain and Mr Chamberlain; and that Deloitte, and in consequence the Audit Committee, were fundamentally misled. According to Mr Welham's witness statement, they were given to understand by Autonomy's core management that:

(1) There was no reason why hybrid model customers should not exercise their contractual right under the licence, just as Citigroup had done, to bring the Digital Safe system, including the software, onto their own premises, that this was a developing market trend[418], and that, at least in some cases, customers intended to do so in short order.

(2) There was no reason why customers could not (a) instal the Digital Safe system, their data and the software, onto their own servers, either themselves or with the assistance of third party service providers and then (b) implement and use the Digital Safe system and software themselves or with the support of third parties, without the need for material input from Autonomy.

---

[418] According to Mr Welham, Deloitte was told in 2008 that there was a *"current trend in the market place"* of customers "*bringing services in house*". There was no relevant evidence of such a trend: whilst Deutsche Bank and Morgan Stanley did express an interest in (and Morgan Stanley did implement in Switzerland) on premise solutions in jurisdictions that imposed restrictions on data exports (such as Switzerland and Japan) that was a specific response to a specific difficulty and was exceptional. The real trend was towards the cloud, and in particular cloud-based hosting, which was a particular Autonomy strength and which made hosting cheaper and even more attractive.

3370. According to Mr Welham's witness statement, Deloitte were not told, and did not understand, that customers were motivated by the substantial savings offered by Autonomy, rather than by a desire to own a licence to the Digital Safe software. Nor, according to Mr Welham, did Deloitte understand that the hybrid model was generally proposed by Autonomy to the customer, and that the negotiations with hybrid customers were mainly about price.

3371. In an echo of the assumptions which Mr Holgate was instructed to make, the Claimants also asked Mr Welham to make six assumptions of fact, which he confirmed were directly contrary to Deloitte's understanding at the time. This served to (a) emphasise how different Deloitte's understanding was from what was said by the Claimants to be the reality and (b) to enable Mr Welham to state his view as to Deloitte's likely approach had they been aware of that reality. Those six assumptions were in substance[419]:

(1) Hybrid customers received substantially the same service as SaaS customers, the only substantive difference being the payment structure.

(2) A Digital Safe system could only be customised, configured and implemented for use on premises by Autonomy as part of a complex and lengthy process using Autonomy's proprietary knowledge and resources unavailable to third parties: a Digital Safe licence was thus of no independent value to a hosted customer.

(3) The Digital Safe system required continuously available managed services, which only Autonomy (and no third party) could provide, to keep it going.

(4) Negotiations to restructure a hosting contract were largely instigated by Autonomy, and not the customer, and such negotiations largely centred on price and the amount that the customer would save over the lifetime of the contract.

(5) The intention and understanding of both Autonomy and the customers was that, after the licence sale, the customer's data would be hosted, and all associated services would be performed, by Autonomy at its data centres.

(6) None of the hosted customers referred to in Schedule 6 to the RRAPoC ever did bring a Digital Safe system (including the software) on premise.

3372. Mr Welham's expressed view was that:

(1) Each of these assumptions was contrary to Deloitte's understanding at the time, and would have been relevant to Deloitte's overall consideration of the issue whether the licence was analogous to a product sale or should be treated as a prepayment, which was the nub of the decision about revenue recognition.

(2) The matters he was asked to assume suggested that there was no standalone value in the Digital Safe licence.

(3) The likely conclusion would have been against revenue recognition; further, Deloitte (and presumably also the Audit Committee whose understandings were

---

[419] I have slightly altered their expression, but not materially so.

based on Deloitte's reports to them) would have drawn serious adverse conclusions from management's provision of what, on that basis, would have been false or misleading information.

3373. Neither this forensic approach nor the responses it elicited was accepted by the Defendants. They depicted the Claimants as having *"used hindsight to construct an argument against revenue recognition which is contentious and highly technical (and indeed wrong)"*, and stressed that *"the people who were operating diligently and in good faith at the time thought that the licences could be recognised as separate components and that the accounting was correct."* The Defendants sought to challenge the six assumptions and Mr Welham's evidence as to how Deloitte would have accounted for the hybrid deals on the basis of them.

3374. The Defendants were adamant that Deloitte had not been misled, and that the Claimants had overlooked the fact that Deloitte were involved in a detailed consideration of the hosting arrangements such that they cannot have approached the matter in such a simplistic way. They were supported in this by the following aspects of Mr Welham's evidence in cross-examination:

(1) Mr Welham accepted when cross-examined that Deloitte were aware that the expectation for many customers who had purchased a licence as part of a hybrid deal was that they *"might well"* not migrate but continue to remain with Autonomy and continue to enjoy essentially the same services as any hosted customer.

(2) Mr Welham also accepted that what mattered for accounting purposes was that the customer <u>could</u> take their licence elsewhere and not whether they <u>did</u> take their licence elsewhere (which did not quite address whether they ever <u>would</u> do so).

(3) Although the Claimants presented his evidence as having been that Deloitte were misled into thinking that there was a customer trend towards an on-premise solution, Mr Welham was more circumspect in his witness statement, claiming no more than he had *"derived"* an understanding from Autonomy management that *"consistent with the then current trend in the market, customers wanted to be able to archive their data in-house and to reduce the cost of storage"*. He also clarified when cross-examined that their understanding was that there was a move amongst customers to *"cloud services or hosted services in-house"* (which was not inaccurate).

(4) Mr Welham accepted that Deloitte had understood that running a data centre on the customer's own premises *"required specialist expertise"*, though he reiterated that he did not think they had understood it would require *"very specialist implementation"*. He also accepted that a customer would always be able to buy separate implementation and support services from Autonomy: but he emphasised that Deloitte had understood that these might be purchased also from "*another provider"*.

(5) Further, he accepted that Deloitte knew that when Citi had taken Digital Safe in-house the *"lift and shift"* of its servers from Autonomy's data centres to its

own had proved a serious undertaking, but had been achieved; and they took from this also that other customers would have the ability to do the same if they chose.

(6) Mr Welham confirmed also that if it was assumed that customers could migrate their data to their own data centre or a third-party data centre with specialist assistance separately charged, that could impact on the question whether the licence had standalone value and possibly lead to a conclusion *"the other way"* (that is, that it did have standalone value).

(7) Similarly, Mr Welham confirmed that Deloitte understood that Digital Safe would be likely to need monitoring and management by specialists, and as long as the services were provided to the customer at fair value that would not tell against revenue recognition and indeed would tend to support the licence having separate value.

(8) He accepted that it really did not matter whether it was Autonomy which approached the customer to initiate negotiations about restructuring, or *vice-versa*. What mattered was the final contract which they agreed. However, Mr Welham suggested that he considered the issue as to who had initiated the contract had influenced Deloitte's *"slightly different"* understanding as to whether there was *"a move to move cloud services or hosted services in-house"* though he again confirmed that in isolation the point did not impact revenue recognition.

(9) When asked about the fifth assumption he had been told to make (which mirrored Mr Holgate's seventh assumption), that the intention of both Autonomy and the customers was in fact that notwithstanding their acquisition of a licence entitling them to *"lift and shift"* they would stay put as hosted customers, he agreed that this was really a repeat of the first assumption; and it was likewise answered by the point, which Mr Welham had accepted (albeit with a barely audible but potentially important reservation *"to an extent, yes"*), that what mattered for accountancy revenue recognition purposes was the rights and obligations of the parties, and not whether they were in fact exercised (unless practically incapable of being so): he made clear, however, that what he meant by this was that what mattered was having *"the ability to do it."*

(10) Similarly, when asked whether, if it were assumed that a customer which chose to move Digital Safe on-premise could only obtain the maintenance and other services required in order to run the system from Autonomy, but also that Autonomy would have been willing to provide such services at fair value, he intimated that then that too *"might well"* militate in favour of the accounting treatment adopted.[420]

3375. Mr Welham correctly cautioned, however, that he was not, in giving this evidence, intending either to verify or disprove these assumptions: they were prescribed assumptions, not verified assertions. Before turning to assess whether Deloitte were

---

[420] Mr Welham was notably reluctant to concede this, and prevaricated what effect this would have before ultimately all but conceding that it would support and not undermine the accounting treatment which Autonomy had adopted and Deloitte had approved.

misled it is necessary to address the underlying questions of fact as to the viability of on premise Digital Safe and as to what truly were the objectives of the contracting parties in respectively agreeing to sell and purchase hybrid licences.

3376. As detailed in paragraph 3356 above, with one notable outlier, the witness evidence broadly confirmed that:

(1) Digital Safe was a highly sophisticated product (it may be remembered that Mr Young had described it in an email to Dr Lynch dated 16 April 2010 as *"a complicated beast with a lot of delicate moving parts"*), and it could not be moved on premise or managed and kept in working order there without continuous expert assistance. All efforts to make do without such assistance, and without a VPN connection, failed. That was so even in such cases as Merck (one the world's largest pharmaceutical companies), Citibank and AXA (both amongst the world's largest financial institutions): as the Claimants noted in their written closing submissions if those three companies did not have the technical expertise and resources to operate Digital Safe without Autonomy's managed services, it is difficult to imagine that any could. According to Mr Yan's unchallenged evidence, Autonomy even had to second an employee to Citibank's New Jersey offices to supervise the system.

(2) Mr Wang, Mr Yan and Mr Goodfellow all confirmed in their witness statement evidence that Digital Safe required near constant support, for which a VPN link on a dedicated network line was essential. Mr Avila was constrained to accept that he could not disagree.

(3) That was no criticism of the product: it was simply not designed or suitable for on premise deployment without such assistance. Mr Sullivan, as the CEO of Zantaz which had devised it, described it (see also paragraph 3284 above) as *"a massive product with a huge footprint"*, and the systems required to run it as being *"complex and proprietary"*. His evidence was that it *"was not designed to operate at a customers' premises, or without the Autonomy services necessary, first to implement it and thereafter to maintain it."* There was a raft of contemporaneous documentation to that effect, in which Dr Lynch's witness, Mr Avila, repeatedly expressed his agreement. Mr Young agreed entirely with Mr Robert Desroches[421] that it should not be put onsite at all except perhaps in *"extraordinary circumstances",* and then only with full monitoring and maintenance. Indeed, Mr Desroches considered it should not be offered at all: EAS or CAMM[422], or sometimes perhaps Arcpliance, should be offered instead.

(4) The option offered by a hybrid licence to move and run Digital Safe on premise was more theoretical than real: the logistical support required, even if put in place, was a clear disincentive against any move from a hosted solution.

(5) Further, assistance was only available from Autonomy. Mr Sullivan's evidence was that the relevant information to enable assistance was not provided to non-Autonomy personnel, and he was not aware of any VAR that could or did

---

[421] Who, according to Mr Yan, was in charge of Digital Safe operations at the time.
[422] Enterprise Archive Solution and CA Message Manager ("CAMM") were software solutions which could *readily* be installed onto a computer and easily managed.

implement or maintain Digital Safe in the Relevant Period. Even Mr Martin, a witness for Dr Lynch who tended to be an enthusiastic advocate for him (though, to my mind, too enthusiastic to be a reliable one), appeared to accept that Autonomy had not trained partners like Capax Discovery and MicroTech to assist, and no other third party providers, who would not in any event be given the requisite proprietary evidence, were in a position to provide assistance either.

3377. The notable outlier was Dr Lynch. He was to some extent committed to confirming its viability because he accepted that he was involved in the decision to offer the hybrid hosting model and thought it a *"sensible business decision",* thought he emphasised he was *"not…involved in the execution of this strategy"*. If anything, he went further in seeking to support its viability and deny impracticability when cross-examined (after the evidence of Mr Wang and Mr Yan to the contrary). He told me:

(1) When asked to agree that Digital Safe was designed to be a hosted system, not an on-premise system, he replied *"not at all"*. He sought to recharacterize Mr Yan's evidence to the contrary as limited to the case of a *"very large Digital Safe"* with thousands of cells. That was more difficult but would only be likely to be required by large institutions with the resource to handle the most complex IT systems.

(2) In that context, he asserted that in fact *"Digital Safe was not particularly advanced"*. It was written in industry-standard language and protocol. There was *"no problem using Digital Safe unhosted."* He reasoned that it shared a code with Arcpliance and, he said, *"they both ran on premise"*.

(3) He accepted that there were no specific manuals to assist migration or management of Digital Safe. He did not agree this posed any problem; again he referred to Arcpliance as if it were much the same thing: *"Arcpliance is Digital Safe in a box and that had its manuals."*

(4) He contradicted the evidence of Mr Yan and Mr Goodfellow that only the most skilled staff at Autonomy dealt with Digital Safe pre-configuration and other similarly complex tasks: he told me that they *"just dealt with their little area"* and *"actually the Digital Safe group were actually not particularly highly skilled"*.

(5) He sought also to contradict the evidence of his own witness, Mr Martin, that Autonomy did not train partners to assist with Digital Safe; he told me that Capax Discovery and MicroTech *"did for ACA[423] and may have done for Arcpliance as well"* and that since *"ACA is Digital Safe but under a different brand"* he *"would totally have believed Capax was capable of implementing Digital Safe for a customer."*

3378. Dr Lynch's expertise in the software field is undoubted; for a man who had devised IDOL, its adaptation for and incorporation into Digital Safe (which was a Zantaz product) no doubt appeared relatively simple. But the balance of the contemporaneous evidence seems to me to be very firmly against his rear guard attempt, alone, to depict

---

[423] Autonomy Consolidated Archive.

Digital Safe as a common or garden variety bit of software which could be implemented and managed with ease. His efforts to confuse and equate Digital Safe with other products which could more easily be deployed on premise were fairly obvious, and discreditable. His suggestion that Digital Safe could be managed without assistance was not borne out by the experience of anyone involved. I have no real hesitation in rejecting his evidence in this regard.

3379. Furthermore, the regrettable inference which I make is that Dr Lynch devised this line to try to bolster both (a) the semblance of the licence offering a viable option and (b) Deloitte's approach and acceptance of that. That obviously is of relevance more generally, and more specifically see also paragraphs 3383 and 3384 below as to what he supposed Deloitte to understand. I next deal with my assessment whether Deloitte were misled.

3380. In my judgment:

(1) As his cross-examination confirmed, Mr Welham's witness statement over-egged the extent of Deloitte's misunderstanding;

(2) I do not accept that Deloitte understood Digital Safe to be *"standard software that customers were capable of installing onto their own servers themselves or with the assistance of third party service providers";* nor that Deloitte ever had any basis for an understanding that Digital Safe could be supported *"without the need for material input from Autonomy"* (as Mr Welham had rather extraordinarily claimed in his witness statement, from which he had to retreat in cross-examination).

(3) Similarly, I do not accept either that Deloitte, which also audited Citibank, did not appreciate that the process of bringing Digital Safe and related software and its data on premise had been complex and expensive for Citibank. By the same token, Deloitte knew that a move on premise, though expensive and difficult, was an option and could be achieved: and that therefore the licence did appear to grant some optionality.

(4) Deloitte also understood that notwithstanding that optionality, many customers might not exercise their rights under the licence, and would continue with Autonomy so as to benefit from the cheap hosting services for which they had also contracted.

(5) Nevertheless, cross-examination also confirmed that there were fundamental gaps in Deloitte's understanding. They were not provided with and did not have anything like a full understanding of what a move in-house would involve. Perhaps the most important was that they do not appear to have understood quite how much continuing and constant support was needed for Digital Safe, or quite how highly specialist was the support required, or that an on premise customer would in consequence be wholly dependent on Autonomy. In that regard, Mr Welham emphasised that Deloitte understood, and indeed Mr Miles in questioning him confirmed that he should assume, that implementation and support services could be provided by *"another provider"* (see also paragraph 3374(4) above). But the evidence was that no third party provider could assist: it was a proprietary product as well as being hugely complex and only

Autonomy could assist. The fact that the evidence also was that Autonomy charged fair value did not undo the point that Deloitte had not understood that the optionality depended on continued and extensive co-operation from Autonomy.

(6) Further, and in consequence, Deloitte had not understood the degree of even the most sophisticated on-site customer's likely dependence on Autonomy, and the almost inevitable disincentive to any move on premise that this presented.

(7) In addition to the gaps in their understanding of the product and its viability in practical and commercial terms of its on premise use, Deloitte did not have a full or accurate understanding of the market. Mr Welham repeated (see paragraph 3374(8) above) that Deloitte had what he described as *"slightly different"* understanding as to whether there was *"a move to move cloud services or hosted services in-house"*: Deloitte do seem to have been under the impression that the optionality which the licence was said to provide was a response to a perceived market desire for flexibility, rather than simply a restructuring of pricing. This clouded their view as to the true objectives of the contracting parties and whether any had any real expectation (on the part of Autonomy) or intention (on the part of the customer) that the optionality apparently granted should ever be exercised. That in turn encouraged a flawed perspective as to the separate utility and purpose of the licence.

(8) It was a noticeable feature of the cross-examination that, despite its thoroughness otherwise, Mr Welham was never asked whether Deloitte had any, and if so what, understanding of the negotiations leading to the transactions and/or of the objectives of the customers concerned. Although Mr Welham was cross-examined about whether the assumption he was asked to make that Autonomy had instigated the negotiations was significant (see above) he was not asked about the evidence linked to it which Mr Welham had given in his witness statement: he was not questioned about the linked assumption that the ensuing negotiations *"largely centred on price."* I infer that this was not explored because, as the Claimants illustrated by reference to the transaction with Charles Schwab described in paragraph 3359 above, that was indeed (often, perhaps usually) the only focus of negotiations.

(9) In short, Deloitte did not have a proper understanding of the product, or the viability of on premise deployment of Digital Safe, or the true objectives of the contracting parties, or, therefore, of the real purpose of the licence.

(10) With a fuller understanding, it is more likely than not that Deloitte would not have been persuaded that the licence had substantive stand-alone value, and would not have approved revenue recognition; and neither would the Audit Committee.

*The Defendants' knowledge in relation to Digital Safe*

3381. The question then is whether Autonomy's management, and more particularly, the Defendants, actively misled Deloitte, or alternatively knew that there were those fundamental gaps in Deloitte's understanding so that their audit opinion could not properly be relied on.

3382. Dr Lynch emphasised that the task of accounting for the hybrid deals was in the province of the finance department and Deloitte and he had not been involved in the audit process; but he insisted he had no reason to believe that they had been misled or had misunderstood the circumstances to which their accounting judgments were to be applied. He made clear that his understanding was that *"this is all seen completely transparently by Deloitte who go through it in great detail";* and that he had assumed that they had the information they required, that they were doing their job properly and that he could rely on their view and approval, and that of the Audit Committee.

3383. However, I take it from his own evidence that the understanding he asserted he had, and must be taken to have assumed that Deloitte would form or share, was that Digital Safe was easily implemented, managed and maintained. He would have assumed that that was the basis on which Deloitte provided their audit opinion; and on which the Audit Committee gave their approval. However, I have found that he knew that this presentation of Digital Safe as a straightforward, easily managed product was contrived: in fact, he knew it to be false. In such circumstances, he knew likewise that Deloitte were proceeding on a false basis; and in any event, he cannot have relied on their approval.

3384. Furthermore, he would have known, as an experienced CEO that the judgement as to the viability of the optionality said to be conferred by the hybrid licence depended on matters unlikely to be, and in fact not, in their experience or knowledge. The judgement was ultimately dependent on facts, not fine assessment of audit principles. It may be that Deloitte were naive; or led by the nose; it is unnecessary and inappropriate for me to say more than that Dr Lynch cannot legitimately maintain that he relied on their approval.

3385. Mr Hussain, a trained accountant, CFO and head of the finance department, had direct involvement in a number of the deals, including in reviewing the savings models[424]. Quite how many is uncertain. In her witness statement, Ms Gustafsson suggested that she could *"only remember [Mr Hussain] looking at the models once or twice."* In cross-examination she was taken to four such examples, and referred to three more; and she revised her evidence to say that he would only have seen a *"single digit [percentage]"* of the *"hundreds of models"* she produced. But it was not the numbers that mattered: he saw quite enough for him to know what the purpose was and that the licences were sold simply on the basis of the savings they would yield to the customer and the revenue they would realise for Autonomy.

3386. This is clear also from one of his own contemporaneous emails (dated 23 December 2009) recording that he himself sold the hybrid model by reference to the savings that it would yield for customers, noting in relation to a deal with Morgan Stanley that the deal was "*purely financial and causes savings. It's quite simply sign and save*".

3387. Both his involvement and the objective was confirmed by other email exchanges urging Autonomy staff to complete hybrid deals and emphasising how important they were. The extent to which he expected to be involved is apparent from an email he sent when it emerged, in relation to a restructuring of a Digital Safe hosting deal with Pioneer

---

[424] These were detailed spreadsheets produced by Autonomy's sales representatives/Finance team which were designed to illustrate to the customer the savings that could be achieved if they chose to contract on a hybrid, rather than a SaaS, basis.

Investments in Q3 2010 that there would be a lower licence fee than he had been expecting or been told about:

> *"on Pioneer <u>we gave away licence value</u> without my knowledge or approval. I was expecting $1.2m but now it's a lot lot less. Do not let that happen again"*[425]

In point of fact, this seems to have been rather unfair on the part of Mr Hussain, betraying perhaps a desperation for revenue in the quarter. Again illustrating Mr Hussain's close involvement, Mr Stephan and Mr Sullivan had kept him well informed and warned him of the particular difficulties in the transaction which Mr Stephan described to Mr Sullivan made *"recognising licence revenue upfront very problematic."*

3388. There can be no real doubt, in my judgment, that Mr Hussain was well aware that a Digital Safe hybrid hosting licence was a device to provide a basis for recognising revenue at the point of sale. In my judgment, he cannot legitimately assert that he relied on Deloitte in this respect either.

*Conclusion as to accountancy treatment of hybrid hosting licence as separable*

3389. In my judgment, the accounting treatment of revenue from the sale of hybrid hosting licences was improper.

3390. Customers agreed to purchase such licences and pay the considerable fee in exchange for deep discounted storage rates and service charges, and without any or any real intention of downloading software, moving their data, or otherwise exercising the rights conferred by such licences.

3391. Autonomy expected and customers who purchased such a licence (in every instance save one (Citi, whose transaction pre-dated the hybrid model) intended to continue as hosted customers. The economic and factual reality was that the licence fee was not paid as the purchase price for the acquisition of valuable rights but as the negotiated prepayment for future services to be provided at discounted rates. It was not analogous to a sale of goods.

3392. The suggestion of its utility in giving customers an option to move their data and software was a pretence. The option was legally defined and no doubt enforceable: but what it enabled was, in all but theory or in such an exceptional case as to be unrepresentative, in practical terms unusable. The licence was a device to obtain accelerated recognition of revenue, for which the customer paid a fee but for which it was Autonomy which ultimately paid the price by so heavily discounting future revenue streams.

3393. Both Dr Lynch and Mr Hussain were aware that the licence was an accounting contrivance: both were aware of its purpose.

3394. The finance department were not independent; and Deloitte and the Audit Committee were misled.

---

[425] Emphasis added.

3395. The Claimants have established their case.

*IAS 18.14 (a) and (b)*

3396. In light of that conclusion, and for two further reasons, I do not think it is necessary or appropriate for me to consider in this context the Claimants' argument, put forward in their written closing submissions (as they had in their written opening) that in relation to software licences sold as part of hybrid contracts, the condition of neither IAS 18.14(a) nor IAS 18.14(b) were met.

3397. One of the further reasons is that the Defendants correctly pointed out that this had not been pleaded: in the context of their case in respect of the Digital Safe licences (Schedule 6DS) the Claimants' pleaded case in the RRAPoC relied only on IAS 18.13 as the basis for their claim that recognition of revenue was improper. Especially in a case alleging fraud, it is imperative that the case sought to be advanced should properly be pleaded. In the context of the Digital Safe hybrid hosting arrangements, the Claimants should not be permitted to rely on IAS18.14 to upset revenue recognition.

3398. The second reason is that in the context of e-Discovery the Claimants did plead reliance on IAS 18.14 as a further basis for their contention that revenue recognition was improper in the context of the e-Discovery hosting arrangements. It is pleaded there as an alternative case. It seems to me that it only arises in that context, as in this, if it is necessary to deal with the alternative case. I return to that when addressing the e-Discovery position.

3399. It is to the e-Discovery aspect of the Claimants' hosting claim that I next turn.

### (4)    A detailed analysis of the e-Discovery claim

3400. Autonomy's e-Discovery offering provided customers with the software, and usually the services, necessary to collate, review and disclose material in the context of litigation.

3401. Autonomy's e-Discovery software included: (i) Introspect, which was used in connection with the processing and hosting of data, and enabled data to be searched and reviewed before being disclosed, and (ii) ECA[426], which allowed customers to limit the material to be uploaded to the review platform by identifying data falling within specific parameters.

3402. This e-Discovery software usually formed part of a hosted arrangement, where Autonomy used the software in its data centres in connection with its performance of ongoing e-Discovery services. These services were multiple and varied, ranging far beyond simply storing customer data to, amongst other things, ingestion, processing (and resolving data processing issues), data culling, analysis and producing reports, performing quality control checks, and production of documents in disclosure.[427]

---

[426] Early Case Assessment: see paragraph 3290 above.

[427] In the *context* of e-Discovery, the term "hosting" should be understood to include not just storage services, but also related e-Discovery services.

3403. According to the unchallenged evidence of Mr Kalbag, Autonomy personnel were heavily involved in providing these services, which were not automatically performed by the software, but required action or intervention at each stage of the e-Discovery process. The combination and extent of these services was difficult to predict in advance, and differed from customer to customer.

3404. As with the hosted Digital Safe arrangements, prior to its acquisition by Autonomy Zantaz sold e-Discovery to hosted customers on a SaaS basis. Zantaz offered customers a menu of different services, including data ingestion, processing, storage and production, and charged customers a unit price for each of the various services provided. Zantaz accounted for these hosted arrangements as a service, recognising the revenue as the service was provided.

3405. Following Autonomy's acquisition of Zantaz, Autonomy structured and, occasionally, restructured, hosted e-Discovery arrangements so that customers purchased a licence to use the e-Discovery software as well as storage and other e-Discovery services. These hybrid arrangements were offered as an alternative to a SaaS basis, and offered the customer lower overall cost: the upfront fee for the licence being less than the saving achieved by reduced ongoing charges for related e-Discovery services.

3406. As in relation to the Schedule 6 Digital Safe transactions, the Claimants' overall case in relation to the seven Schedule 6 e-Discovery transactions was that the only real benefit from the customer's point of view was the heavy discount on storage and service charges thus obtained, and the only real purpose of the e-Discovery licences from Autonomy's point of view was the acceleration of revenue recognition to assist or enable it to meet revenue targets. The Claimants cited an email dated 20 June 2011 from Mr Mark Daoust (VP e-Discovery) to Mr David Wilner (who had just joined after the Iron Mountain acquisition) explaining the purpose of the licence:

> *"I would be sure to look at existing revenue for existing clients. If we are getting great rates, then I wouldn't try to convert to licence. I would only use on net new clients or new cases with existing clients.*
>
> *For instance, we had a J&J case that was going approaching contract expiration so we converted them to license. However, if they had a long time before contract expiration we would have left them as is.*
>
> *Of course, if we need revenue for the quarter we may chose [sic] to sacrifice some recurring revenue for a license deal to hit our numbers."*

3407. The Claimants pointed out also that the conclusion that Autonomy was motivated by a desire to accelerate revenue recognition is reinforced by a consideration of the targets and generous commissions that Autonomy set for its sales representatives for concluding hybrid deals. Whereas SaaS deals attracted commission of around 2% to 6% of the revenue recognised during the first 12 months of the arrangement, hybrid deals, at least to begin with, attracted commission ranging from 5% to as much as 18% of the upfront licence fee. Unsurprisingly, this had a substantial effect on the behaviour of Autonomy's sales representatives. As Mr Bock explained in an email to Mr Hussain in March 2009 (which in point of fact related to a DS transaction, to which the same applied), he had "*negotiated with [Deutsche Bank] for months to structure [a] deal in a way that allowed us to front-load the revenue*", and therefore expected to

be paid commission on the licence immediately, at the higher rate applicable to licence fee revenue.

3408. The seven e-Discovery transactions impugned by the Claimants were entered into with five customers and can briefly be summarised as follows:

(1)     two of the transactions were with Johnson & Johnson (one in Q2 2009 granting for a fee of $1,446,104 a two-year licence for Introspect software, with user limitations, and (for a further $695,000) storage and eDiscovery services or a term of two years, the other in Q1 2011 granting for a single fee of $2,659,176 a two-year licence, again with user limitations, for Introspect software and storage and other eDiscovery services, together with support and maintenance);

(2)     two were with BP (one in Q2 2010 granting for a fee of $13,534,000 a perpetual licence, with user limitations, to Introspect and ECA software together with a three-year application services term with a separate charge , the other in Q2 2010 granting for a fee of $1,350,000 a perpetual licence, limited to 200 named users and 10TB of customer data, for Introspect software including EDD (but with only limited functionality) together with separately charged application and support and maintenance services for a three-year service term);

(3)     one was with Philip Morris International AG ("PMI") in Q4 2010 granting for a fee of $964,176 a three-year licence , with use and user limitations,for Introspect EDD, I6 and ECA software, together with separately charged hosting and support and maintenance services);

(4)      one was with United States Postal Service ("USPS") in Q2 2011 granting for an upfront fee of $5,531,553 a two-year licence, with use and user limitations, for Introspect and ECA software and for a further spread fee, storage (hosted) eDiscovery services and support and maintenance;

(5)     one was with JPMC in Q2 2011 granting for a fee of $3,237,600 a two and a half-year licence, with use and user limitations, for SLD software and (for a further deferred and spread fee) hosting services and support and maintenance.

3409. The Claimants' case on the Schedule 6 e-Discovery deals has two aspects:

(1) First, as with Digital Safe, they complained that the transactions in question were hosted deals structured as hybrid arrangements comprising (a) the sale of a licence to use the e-Discovery software and (b) the sale of storage and other e-Discovery services simply so that Autonomy could present the licence sale as a sale of goods justifying the application of IAS 18.14 and the recognition of revenue at the time of that sale, whilst recognising revenue from the sale of services rateably over the term of the arrangement. The purpose of this, according to the Claimants was to accelerate revenue recognition improperly. The claim was that the licence was not a separately identifiable component of the impugned transactions, and that it should have been treated as a prepayment for services, with the revenue being deferred and recognised rateably over the terms of the arrangements as in the case of other payments for services.

(2) Secondly, the Claimants claimed that no reliable fair value could be attributed to the e-Discovery software licence, and thus even if IAS 18.14 applied to the licence element separately, its criteria for revenue recognition (and sub-paragraphs 14(a) to (c) in particular) could not be satisfied. The Claimants contended that in approving Autonomy's determination that fair value could be attributed to the software licence, Deloitte were misled about and/or failed to understand certain facts about the provision of e-Discovery services.

*Accounting principles*

3410. As to (1) in the preceding paragraph, the relevant accounting principles were agreed to be broadly the same as applied in the context of the Digital Safe claim. In both contexts, the question is whether the value attributed to the licence should have been recognised upfront as revenue generated by the sale of goods, or whether it should have been treated as a prepayment for services and spread rateably over the term of the relevant contract.

3411. In determining the propriety of their accounting treatment, the most important difference between Digital Safe and e-Discovery transactions is that in the case of e-Discovery, it was not in dispute, and indeed one of six bespoke Assumptions[428] numbered (4) which Mr Holgate was instructed to make in relation to the substance of e-Discovery licences was, that the software was capable of operating independently of Autonomy.

3412. However, the Claimants maintained, and Mr Holgate was (as part of the same Assumption (4) referred to in the preceding sentence) instructed that:

> *"Generally, it would not have been practicable for the hosted customers to take the software and the data in-house to perform the services themselves."*

3413. The other Assumptions Mr Holgate was instructed to make in respect of the question whether the e-Discovery licences had any real substance mirrored those in respect of the same question in respect of the Digital Safe transactions. Adopting the same numbering as in Mr Holgate's report, they were as follows:

> (1) *"Autonomy performed a variety of services as part of its hosted e-Discovery offering, many of which (e.g. performing quality control checks, resolution of data imaging/ processing issues, e.g. from password protected, encrypted or corrupted documents, data culling, batching, report production, format conversion and load file creation) were not performed automatically by the software, but rather required action or intervention by Autonomy personnel. This process was akin to a production line requiring a significant level of involvement from Autonomy staff at each stage of the e-Discovery process."*

> (2) *"With the exception of the deals with BP, the term of each of the hosted e-Discovery licences was relatively short (two to three years) and Autonomy was contracted to provide services for the duration of the term. BP had a perpetual licence with a limited capacity and Autonomy was contracted to provide*

---

[428] The Claimants instructed him to make 12 Assumptions in all in respect of the Claimants' case on eDiscovery. The first six (referred to above) related to the issue as to the substance of the licence and whether it was a separately identifiable component of the hosting arrangement (which they contended it was not); the other six (see later) related to the Claimants' argument that even if it was, the licence fee should still not have been recognised upfront, because none of IAS 18.14(a), (b) or (c) was satisfied.

> *services for an initial term of three years. During the initial three year period BP was to pay a monthly Application Service Fee of $4/ GB/ month, following which the Application Service Fee increased to $10/ GB/ month."*

(3) *"Each hosted e-Discovery customer received substantially the same service regardless of whether it had acquired a licence, i.e. the same service as a customer who contracted on a SaaS basis; only the legal/payment structure varied. Existing hosted customers who had originally contracted on a SaaS basis received substantially the same service as they had previously."*

(4) As summarised or quoted in paragraphs 3411 and 3412 above, but also adding:

> *"Unlike the Digital Safe software, the e-Discovery software was capable of being used independently of an Autonomy hosted arrangement, but was either sold as standalone software (which the customer would use itself, without Autonomy providing e-Discovery services) or as part of a hosted arrangement. If a hosted customer decided to take the e-Discovery software on premise during the term of the licence, Autonomy would not have provided the services that the customer expected to receive and for which it had effectively prepaid through payment of the upfront licence fee."*

(5) *"The intention and understanding of both Autonomy and the customers was that the software and data would be hosted and maintained by Autonomy in its data centres, and the associated e-Discovery services would be performed by Autonomy, for at least the contractually agreed period. This is what happened in practice."*

(6) *"The negotiations between Autonomy and the customers were focused on price. Autonomy typically introduced the option of an upfront licence fee and highlighted the significant discounts it offered the customer as compared to the price on a SaaS basis. From the perspective of the customers, the transactions involved the purchase of hosted e-Discovery services with an upfront prepayment in the form of a licence fee. Autonomy's primary purpose in structuring the deals to include a licence was the upfront recognition of revenue."*

3414. On the basis of this set of six Assumptions, Mr Holgate considered that (a) *"it was not generally practicable for customers to take the software and their data in-house to perform the e-Discovery services themselves"*; (b) in any event, *"it did not happen in practice in the transactions under consideration"*; and so (c) *"there was no substance to the grant of the licence"*.

3415. He concluded that:

> *"the revenue recognition criteria should therefore be applied to the transaction as a whole in order to reflect the combined substance of the two*

> *elements of the transaction taken together, which was....the provision of eDiscovery services over a period of time.*"

3416. Mr Holgate considered Assumptions (3) and (5) as set out in paragraph 3413 above to be the most important in reaching his conclusion that the e-Discovery hybrid hosting licences had no real substance.

3417. As to the second aspect of the Claimants e-Discovery case (see (2) in paragraph 3409 above), Mr Holgate considered that even if he was wrong about the e-Discovery licences lacking substance, on the basis of the same Assumptions, none of the first three criteria in IAS 18.14 was met.

3418. This was because (a) it was impracticable for hosted customers to take the software and data in-house and so in substance they never had transferred to them the risks and rewards of ownership, (b) for the same reason, Autonomy and not the customers retained managerial involvement and control usually associated with ownership, and (c) the prices charged for the e-Discovery software and related services were so variable, and there was such a lack of what he called *"sufficiently disaggregated and relevant management information relating to costs",* that it was not possible to measure reliably the revenue attributable to the software licence, whether by the "residual method" (explained later) or at all.

3419. Mr MacGregor considered, as to the first aspect of the Claimants' e-Discovery case (see (1) in paragraph 3409 above), that on the basis of the specific Assumptions dictated to Mr Holgate, the conclusions he reached dictated the result (as had his assumptions in respect of the Claimants' Digital Safe case). He stated: *"there is again not another credible way to analyse the Schedule 6 transactions for the sale of e-Discovery licences."* In other words, as with the Digital Safe case, Mr MacGregor accepted that if all the Assumptions which Mr Holgate was instructed to make were established on the evidence as matters of fact, the e-Discovery licences lacked substance and the accounting treatment adopted was incorrect and improper.

3420. However, he did not accept that it sufficed for the Claimants to establish in fact the Assumptions that Mr Holgate identified as appearing to him to be the most important. He declined to accept Mr Holgate's view that Assumptions (3) and (5) were the most important to the analysis and might of themselves invalidate the accounting treatment adopted by Autonomy. He maintained that in his view *"all of them together are part of his overall picture"* and that they all stood or fell together; he said that if even just one of the Assumptions was incorrect (he instanced Assumption (4) in particular: if it was practicable for a customer to perform the service itself, contrary to Assumption (4)) then he *"would not agree in the same way."* When cross-examined he clarified that by this he meant that *"I think if you just vary that one, then you will be taking into account revenue at the point of sale."*

3421. Overall, his refrain was that the licence did have separate substance because:

> *"...there is a right there, you own the software, it's your data on it and that of itself has value."*

3422. As to the second aspect of this part of the case (see (2) in paragraph 3409 above), Mr MacGregor's view, contrary to that of Mr Holgate, was that the rights conferred by the

licence were plainly transferred to, and enjoyed, managed and controlled by the customer (so that (a) and (b) of IAS 18.14 were satisfied); and that as to IAS 18.14(c), it appeared to be confirmed by Deloitte's review that it had been possible and practicable to capture the costs of the hosting portion of the transaction (often using standard rates for data storage) and on that basis there was no reason for not establishing the fair value of the licence calculated based on the residual value of the complete contract. Mr MacGregor also emphasised that *"the assessment of fair value does not require precision and IFRS confirms this"*. He found it:

> *"difficult to believe that the range of possible costs for these services was so wide that a reasonable estimate of the cost, and therefore of the value (on a cost plus margin basis), could not be determined or that Autonomy had no idea of the costs associated with the various parts of the business."*

*Did the EDD licences have or lack substance?*

3423. Although the experts appeared at first blush to be divided by this battery of assumptions, there was no real dispute as to the factual position as regards Assumptions (1), (2), (3) and (5). It seems to me that Mr MacGregor's focus on Assumption (4) reflected this; and that the real question to be decided in relation to the Claimants' e-Discovery claim is whether the Claimants showed, on the evidence, and as a matter of fact, that even accepting that, unlike the Digital Safe software, the e-Discovery software was capable of being used independently of an Autonomy hosted arrangement, that was not something any hosted e-Discovery customer would ever in fact have intended to do. The Claimants maintained that this was so because once a customer had elected for a hosted solution, if subsequently during the term of the licence a hosted customer decided to take the e-Discovery software on premise, Autonomy would not have provided the services that the customer expected to receive and for which it had effectively prepaid through payment of the upfront licence fee.

3424. The Claimants insisted that in such circumstances, the admitted right given to a hybrid e-Discovery customer to move on premise during the currency of a hosted e-Discovery arrangement was no more than theoretical and it was highly unlikely that any customer would ever actually exercise it. In reality, they contended, the licences simply offered financial advantages to both parties to the arrangement but otherwise were never expected or intended to alter in any way the hosting arrangements between the parties to such licences, or the use made of them. The Claimants especially noted in that regard that the term of the licence was usually coterminous with the term of the services, and/or the relevant agreement provided for Autonomy to host the licence, supporting their case that the customer had no desire to host the e-Discovery software and its data, or to perform the e-Discovery itself, and intended to rely on hosted services throughout the term.

3425. Furthermore, the Claimants contended that in each of those transactions:

> (1) The hybrid e-Discovery deal was sold on the basis of the savings that the customer would make, and not on the basis of the rights a licence would confer. This was perhaps most clearly illustrated in Autonomy's detailed licence proposal for JPMC stating:

> *"Licence Deal: JPMC gets significant discount in exchange for revenue commitment and immediate payment"*

The discounts proposed were between 20% and 30% depending on the projected volumes of data, and were set out in a table of *"Proposed Discounts in exchange for License Commitments"*.

(2) What each of the customers was interested in purchasing and retaining was a hosted arrangement; and some of them demonstrated confusion (and in one case concern) as to why a software licence was being introduced into the arrangements. Thus, for example, PMI could not really understand, and therefore queried, the purpose of a licence when all it wanted was *"pure hosting"*; and USPS's comments on a draft hybrid e-Discovery arrangement circulated to it included that *"it is strongly suggested that [USPS] removes/deletes any license for which it has no interests/needs"*.

3426. As proof of the real expectations and intentions of the contracting parties, the Claimants relied also on the fact that in the case of the seven impugned e-Discovery transactions, none of the five hybrid e-Discovery customers involved did in fact operate the software independently of Autonomy.

3427. The Defendants, on the other hand, rejected the Claimants' suggestion that the licence was merely a mechanism for Autonomy to offer savings, and contended that the Claimants' case is flawed as a matter of accounting principle and baseless in fact. Autonomy marketed its e-Discovery offering on the basis that it was able to "*seamlessly provide both hosted/licensed products*" and this set it apart from its competitors. It was accepted by Mr Kalbag that Autonomy faced competition from other e-Discovery offerings, some of which offered licences that permitted a customer to use the software on-site. Not only was on premise deployment of e-Discovery entirely possible: but offering the option of it was a commercially motivated response to other products in the market, attract new customers and keep existing hosted customers happy.

3428. The Defendants emphasised both the advertised and actual commercial practicability of on premise deployment, and of a move from a hosted to an on premise environment:

(1) Autonomy made e-Discovery software available to licensees because they legally owned the software, and it did so by putting it on Automater, as Mr Lucini accepted. It was available for customers to download it if they wished to bring it on site. Customers who did not own the licence did not have access to the software.

(2) Downloading of the material was straightforward and no different than for other licenced software products. The software was made available on Automater to customers in the usual way.

(3) The evidence also was that the cost of transitioning to on-premise was close to being, by comparison to the other costs, insignificant: for example, Mr Kalbag accepted that in the case of USPS the estimate was $30,000.

HC-2015-001324

3429. The Defendants also contended that, contrary to the Claimants' case, the evidence demonstrated that customers <u>were</u> interested in having the option of bringing the software on-site:

(1) The example the Defendants most relied on was BP which (as Dr Lynch correctly recalled) had been especially concerned about owning a licence, one of Autonomy's in-house lawyers (Ms Dolan) having noted following a meeting with BP, that:

> "One commercial issue came up on Friday regarding their longer term plans. They will use the hosted software for their immediate need but they want to bring it in house. They do not want any limitations on the software. They want an unlimited BP license key and then they wanted to true up (number of instances, users, data amount, etc) after an agreed period."

(2) Another client, USPS, far from indicating a wish not to have a licence, confirmed that they too were interested in the option of bringing e-Discovery on-site (which was not their immediate intention but which gave them flexibility to do so in due course). Thus, USPS requested pricing for four different e-Discovery options as part of its RFP[429] in September 2010, three of which involved USPS taking the software in-house. Two of the four options involved USPS starting out as a hosted customer, and then bringing the software in-house at a later date; and the option of bringing the software in-house continued to feature in discussions with USPS throughout much of the negotiations. Mr Kalbag confirmed that the option of taking the software in-house was never "*taken off the table*".

*My assessment and conclusion*

3430. It does seem clear, and I accept, that e-Discovery could be deployed on premise with considerably greater ease and far less expense than could Digital Safe, though (as I have found) it was not impossible to run Digital Safe on premise either. Although the evidence as to the particular point was sparse, it did not appear that e-Discovery needed the constant availability of Autonomy back-up and expertise that I have accepted Digital Safe did. Furthermore, it was not suggested by the Claimants that there were no third party providers with the ability to assist a customer to use and maintain e-Discovery in-house. Dr Lynch was adamant that use of e-Discovery in-house was common place (he told me in cross-examination that his *"understanding was that there were more on-premise e-Discovery implementations than those that were hosted"*).

3431. The real issue is whether a customer which had selected and entered into a hosted e-Discovery arrangement with Autonomy would ever have seriously wanted the option of moving on premise.

3432. Dr Lynch also maintained, though with less conviction, that moving e-Discovery software and data from a hosted Autonomy data centre on premise/in-house was not at all difficult or expensive:

---

[429] Request for Proposal.

> "Q. ...I suggest to you not a lot of the customers who were using eDiscovery hosted services could or wanted to take on the burden of performing the eDiscovery services themselves?
>
> A. I disagree. I don't know about people moving but, you know, without looking it up, my understand was there were more on-premise eDiscovery implementations than there were those that were hosted.
>
> Q. But the point I'm trying to make to you, Dr Lynch, is that where you have a hosted customer, they are unlikely to want to move to do themselves?
>
> A. I disagree. Unlike Digital Safe, where you could have very large amounts of data to be moved, it was relatively, then all these things are relative – relatively easy to set up an eDiscovery system, and so if a customer wanted to move, it actually wasn't very difficult at all. In fact you even had – it was even easier than you might think because you often had hybrid situations, and I don't mean that in terms of the deal, but the customer is processing their own eDiscovery system, and then they have overflow and they send it to a hosted eDiscovery system or vice-versa, so there really wasn't very much  - it's a very different situation to Digital Safe.
>
> Q. The reality is that customers were interested in relation to eDiscovery as well in the savings offered on the hybrid deals, not on moving on premise, correct?
>
> A. No, I disagree with that completely. EDiscovery was a slightly different business model in that it was generally to deal with litigations. So if someone is getting sued and processed, so what would happen, for example, if they had a high volume of processing, so I think Morgan Stanley used to do this, so if they're in the middle of a big case, then they would like hosted stuff, but for the general run of the mill , they would be happy to have it run on premise, so it was basically about load balancing."

3433. As I have outlined above, Dr Lynch offered two examples of customers who did want that flexibility and the legal rights conferred by the licence which secured it for them: BP and USPS. However, the evidence is far less clear than the Defendants suggested.

3434. As to USPS, although the Defendants relied on Mr Kalbag's evidence, it does not seem to me that it supported the proposition that USPS wanted to have and for that reason contracted for flexibility to move on premise during the currency of their hosting contract. Mr Kalbag, though tenaciously cross-examined, doggedly maintained the general thrust of his evidence that in the case of USPS (at least) their real requirement was for hosted services: although they had started off by exploring all options including on-premise software deployment (as was clear from the RFP), by the end they regarded the licence as something that Autonomy wanted more than they did, and they regarded the licence in reality simply as a sort of *"insurance policy"* affording them some *"price protections."*

3435. Mr Kalbag, who enhanced his credibility by acknowledging that his objective was to get as much commission as soon as possible[430] summarised his position as continuing to be, notwithstanding 40 pages of cross-examination on the point, that all USPS really wanted was to continue the hosting arrangements with some protection against price increases but never intended to move on premise. The protections could have been (and it seems in fact were) obtained by provisions within the hosting arrangement; and as Mr Kalbag continued to insist notwithstanding 40 pages of cross-examination on the point:

> "…Yes, I think I've said this several times: … The licence was a mechanism to protect them from cost overruns and predictability of price. Once we gave them options that didn't require it, it was clear that bringing it in-house was not their preference or what they desired, it was just their way of protecting themselves from cost overruns. And if you look at the final licence that they signed, we inserted the licensing not because that was the best way to give them the licences [sic, but must have meant to say protections], it was because it would allow us to recognise the revenue upfront. So it was definitely an insertion from our part, it wasn't something they specifically said, that "Hey, while you're hosting it, give me licences at the same time.""

3436. BP was an exceptional case at least in one particular and important respect: BP was the only one of the five customers identified above which negotiated for and agreed a perpetual licence[431], suggesting that it did want to reserve some ability and right to move on premise after the end of the hosting services term. But as in the case of USPS there is nothing to suggest that BP ever intended to move on premise during the currency of the agreed hosting term. Mr Sullivan recorded in a contemporaneous email (dated 16 May 2010) to Mr Hussain and Dr Lynch (and others) that, in looking for a platform for the vast documentation in the well-known Horizon well oil-spill litigation, BP explained that they would "*not even think about trying to do this themselves*". It is clear from the context, in my view, that this signified that for the term of the hosting deal (three years) they wanted a hosted and not an on premise arrangement, and the issue for them at the time was to choose a suitable hosting provider (being concerned about their then provider's *"weaknesses including throughput rates, and ability to reuse content in multi matter cases"*).

3437. More generally, Dr Lynch's own witness, Mr Avila, confirmed that Autonomy did not expect customers to install the e-Discovery software whilst it was being hosted for them. As he had explained in an email to Mr Mutreja in June 2011 in response to a query whether in hosted e-Discovery contracts the software had to be uploaded on Automater:

> "*since we are selling a license, we will have to deliver [it to the customer] – even if we host it. Similar in concept to deals where we sell the DS software but host it in any case. The customer is never expected to install it themselves.*"

---

[430] Due to the terms of their compensation plans, sales representatives could make significantly more in commission by structuring new or restructuring existing hosting arrangements to include an upfront licence fee than they could from SaaS deals.

[431] The others negotiated licences coterminous with their hosting arrangements, usually 2 or 3 years.

3438. None of the five e-Discovery customers in Schedule 6 did in fact ever bring the e-Discovery solution in-house during the term of the hosting transaction (or at all, so far as disclosed in the evidence before me).

3439. In my judgment:

(1) It is clear from the evidence that in the context of e-Discovery the licence was perceived by customers as something that Autonomy were keen, indeed anxious, to persuade them to agree, and which put them in a good position to negotiate sharply reduced storage and service rates.

(2) Some may have perceived the licence as also conferring protection against price rises; but there is no evidence that any placed any real value or practical utility on the option conferred under the licence to move on premise, at least during the hosting term which in all cases except BP was coterminous with the licence granted.

(3) Hybrid hosting was devised and deployed by Autonomy as the means of introducing a thing (technically, and in legal terminology, a chose in action) which could be sold apparently as something separate and apart from the storage and services which the customer really wanted and intended to use.

(4) The reality of the matter was that in most cases the licence had no real commercial purpose otherwise.

(5) Certainly in those cases, the licence was thus not a separable part of the hosted arrangements. The sale of a licence was not analogous to a sale of goods. It should have been accounted for as a prepayment for services.

(6) I must admit to more uncertainty in the case of the perpetual licence granted to BP. When Deloitte themselves expressed some concern about the licence being in the nature of a prepayment, the fact of the licence being perpetual was certainly emphasised by Mr Hussain to Deloitte, as recorded in Deloitte's working paper. But even in that case, Mr Hussain was clear, in contemporaneous emails not apparently shown to Deloitte, that BP had no intention of moving on premise: when a question from Mr Tim Young of Autonomy asking whether that might be BP's aim was forwarded to him, he responded unequivocally *"Nope – this is all hosted"*. Further, it seems clear from that contemporaneous record that BP's objective was the usual one of securing the price reductions Autonomy was offering for licensed customers.

3440. In reaching my overall assessment I have been mindful, of course, that Deloitte took a different view: they accepted that the licence component was separate, and approved the way Autonomy did account for licence sales. I accept that Deloitte considered the arrangements in considerable detail and in doing so had access to Autonomy's finance department and its own internal technical expertise.

3441. However, it is clear to me that, whether because they were misled or because they overlooked the realities, Deloitte swallowed the line they were given that the *"key feature"* in every transaction was that the customer wanted to own, and by the licence

acquired ownership, of the licence. I have concluded that, save possibly in the case of BP, the evidence simply does not bear out that this was any real part of the customer's objective; and even in the case of BP, it seems that Deloitte's doubts were assuaged by Mr Hussain telling them (as recorded in Deloitte's working papers) that:

> *"if BP thought that the licence fee was in any way paying for future services to be performed by Autonomy, then they would have requested deferred payment terms over the life of the agreement. Instead, they have paid the full amount upfront within several days of signing the agreement."*

3442. That disguised the point that what the payment obtained was the deeply discounted storage and service rates. It is not for me to determine whether Deloitte should have seen through this: the fact appears to be that they did not.

3443. In any event, I do not accept that Deloitte's approval was in fact relied on by the Defendants. For reasons that I elaborate later in addressing the issue of the Defendants' 'guilty knowledge' (see paragraphs 3449 and 3475 below) I have concluded that both the Defendants knew that the licence was a contrivance and that it was not properly accounted for, negating their pleas of reliance on Deloitte.

3444. I consider briefly later their approach to the more detailed tests prescribed by IAS 18 in assessing the e-Discovery hybrid hosting transactions and the question whether, even if the licence could be regarded as a separate component or element, it was possible to ascribe that component *"fair value"* (which was another precondition for revenue recognition).

3445. As foreshadowed in the context of my discussion of the Digital Safe hybrid transactions in paragraphs 3396 to 3398 above, the Claimants submitted that even if the Schedule 6 e-Discovery transactions were in substance transactions with separable components, such that it was *prima facie* necessary to recognise the revenue from the licence fee upfront, the criteria in IAS 18.14 also needed to be satisfied before Autonomy could do so: and that IAS 18.14(a) to (c) were not met. As I have accepted their primary argument, this alternative is (on the view I have formed) redundant in this context as I found it to be in the context of the Digital Safe transactions.

3446. In paragraph 3398 above I indicated that in this context, in which it was expressly pleaded (it was not in the context of Digital Safe), I would consider further the basis for the Claimants' alternative reliance on IAS 18.14 as an alternative if it was appropriate.

3447. In the event, having concluded in both contexts that, in line with the principle that a transaction must be accounted for in accordance with its true substance, a conclusion that in commercial reality the licence had none except as a ticket to cheaper storage rates appears to mandate its treatment in that same way for the purpose of the specific accountancy standards. In that event it would be very odd if some different conclusion were reached by applying the specific provisions of IAS 18.14.

3448. On the other hand, if the hypothesis to be adopted is that the licence was genuinely a valuable thing apart and conferred real rights the problem remains, albeit in a slightly different form: the problem being how the tests prescribed by IAS 18.14 are to be applied where the rights, even if real, cannot as a practical matter be exercised and there is in

truth no wish or intention to exercise them. In short, I have concluded that ultimately this leads to a *cul de sac* because whatever the analysis, the question always has to be asked what the substance of the "real rights" was: and in substantive terms there was none. Accordingly I do not think it useful to consider further the alternative case.

*(5)    Defendants' knowledge*

3449. Lastly in this section, I return to the case on accountancy impropriety, and the second limb of the case, as to whether the Defendants had "guilty knowledge". I do so in relation to both the Digital Safe and the e-Discovery Schedule 6 claims.

*Mr Hussain's knowledge of true purpose of the licences and accounting impropriety*

3450. In my judgment, the evidence confirmed, as was inherently probable, that Mr Hussain, Autonomy's CFO and a chartered accountant, was involved in a number of hybrid hosting arrangements (both Digital Safe and e-Discovery) and aware of the true purpose and objective of the licence as a device to enable the acceleration of revenue and its improper early recognition.

3451. With Dr Lynch (as to whose involvement and knowledge see below), he was responsible for developing and overseeing the implementation of the strategy of selling software licences as part of hosted arrangements, knowing that the licence was a pretext for accelerating revenue recognition. (That is particularly clear from their involvement in the Schedule 12D re-restructuring transactions as to which see further below.)

3452. The evidence showed that Mr Hussain was often the most senior direct point of contact between Autonomy and Deloitte during the process of explaining to Deloitte the nature of the individual hosting transactions. There was never any question that he had direct engagement in and knowledge of the basis of the hybrid hosting programme.

3453. I have concluded that Mr Hussain was aware of:

(1) Autonomy's true motivations for selling hybrid deals;

(2) The nature of the negotiations with hybrid customers;

(3) The fact that there was no change in the substance of the services provided to customers before and after the relevant transactions;

(4) The fact that Digital Safe was as a practical matter incapable of being used on-premise without Autonomy's assistance in implementation and the ongoing operation of the system;

(5) The fact that (save the transactions with BP) each of the Schedule 6 e-Discovery transactions involved the sale of a licence that was coterminous with the provision of e-Discovery services, and that there was no real likelihood of a customer which had elected to acquire a hosting licence and paid a large sum in advance for the benefit of obtaining reduced hosting rates and services moving on premise within the term.

3454. The Claimants drew my attention to a particular example of Mr Hussain's direct involvement in misrepresenting the true nature of the hybrid hosting transactions. In

relation to one of the two BP e-Discovery transactions, he stated in an email dated 14 July 2010 to Mr Welham (copied to Mr Mercer of Deloitte and also Mr Chamberlain) that he would prefer that (a) they should *"clear"* with him *"the technical person you speak to since otherwise you will get incomplete information"* and (b) in the particular BP transaction at least that the *"future obligation is covered by the fee per gb per month."* As Mr Hussain knew, that presentation of the (future) hosting data storage fees and services as wholly separate and funded by the charges was materially misleading: the licence fee secured the reduced rates and was in reality a prepayment.

3455.  In my judgment, Mr Hussain had "guilty knowledge" that the accountancy treatment of the hybrid hosting transactions was (as to the immediate recognition of revenue from licence sales) improper and Autonomy's published information contained untrue and misleading statements in this respect accordingly.

*Dr Lynch's knowledge of Autonomy's improper accounting*

3456.  As regards Dr Lynch, it is inherently improbable, given the nature of the relationship between him and Mr Hussain, that Mr Hussain would have been aware of the impropriety of Autonomy's accounting, but not Dr Lynch. It is difficult to see what motivation Mr Hussain would have had to keep these matters from Dr Lynch, given that relationship. Notably, it was no part of Dr Lynch's case that he was misled by Mr Hussain.

3457.  In any event, Dr Lynch acknowledged that he was *"involved with Autonomy management about developing creative solutions to offer our hosted customers, including the hybrid hosting model."* He implicitly acknowledged also that, as CEO, he was required to assess the commercial sense of the hybrid hosting arrangements, his evidence in that context being that they *"provided numerous benefits to Autonomy"*. He identified the following in particular:

(1)  allowing Autonomy to remain competitive in the hosting market and to avoid a feared *"exodus of clients"*;

(2)  committing the customer "*to longer terms for hosting services and greater data volumes than they had under prior agreements"* because customers *"were incurring a large "sunk cost" upfront in the form of the licence payment, with much lower costs occurring over the term of the licence"*;

(3)  increasing the prospect of upsells of a *"whole host of IDOL-compatible products, which generated new business"* to customers (who would then own hosting software integrated with IDOL and (he said) thus be "*far more likely to buy other licences from Autonomy, rather than competitors, to perform related tasks"* than would SaaS customers);

(4)  providing cash immediately, which was in itself beneficial to Autonomy and lastly;

(5)  encouraging customers to move to newer versions of the hosting software, enabling Autonomy *"to free up space and power in its data centre, which saved on internal costs"*.

3458. I return to his commercial assessment later when discussing the Claimants' claims to recover transactional losses in respect of Schedule 12D transactions (see paragraphs 3482 to 3723 below). It is relevant for present purposes in (a) demonstrating that, even if not at the implementation level, Dr Lynch was closely involved in the development, assessment and justification of the model; and in (b) revealing inconsistencies which in my view support the conclusion that Dr Lynch was quite aware that the licence rights were never intended or expected to be exercised.

3459. As to (b) above, it seems to me that the premise of Dr Lynch's assessment was not that customers would be likely to exercise their apparent legal right to move on premise, but that they would be tied closer to remaining as hosted customers and using more data storage, because of low hosting rates in consequence of, and as a reward for, upfront subscription and because, in his own words, of the large upfront "sunk cost" in the form of the licence payment. In my judgment, it is obvious from the basic premise that he assumed that the licence rights were never in fact to be exercised: and the commerciality of the model from the point of view of both Autonomy and the customer was premised on them not being exercised. That, in my view, undermined, to the point of substantially disposing of, his central theme that the licence was valuable in itself. He was well aware that it was not.

3460. Dr Lynch submitted that the Claimants' cross-examination on the issue of IAS 18.13 and e-Discovery "*fell far short of what was necessary to maintain an allegation of fraud against him*". He emphasised that very few documents relating to e-Discovery were put to him, none directly involving him, and that his cross-examination was limited to two main points:

   (1) First, a suggestion that customers were told by Autonomy they would get the "*same thing*", whether it was a licence or SaaS. Dr Lynch stated this was based on a single document, which, as Dr Lynch explained it, was making the point that customers who bought a licence but still paid for hosting services received the same service from Autonomy as a SaaS customer. Dr Lynch accepted that this is what it stated; but he submitted that this did not upset his case: the fact that customers also paid for and received hosted services simply reflected the nature of the hybrid model and did not alter the fact that they paid for and received an asset – a valuable software licence.

   (2) Secondly, a suggestion that customers were "*unlikely*" to want to move from a hosted service to on-premise. He rejected this and maintained that the suggestion was undermined by documents which he maintained demonstrated that customers were interested in the option of bringing the software on site.

3461. He added to this that the Claimants accepted that there were on-premise customers and that it followed (he maintained) that however "*complex*" the process of implementation, the licence in those cases had independent value; there is no justification for why a different approach should be adopted for hosted customers.

3462. However, as it seems to me, the cross-examination focused sufficiently and put to Dr Lynch the fundamental points in issue; and it also seems to me that it demonstrated that he had no satisfactory answer on either. His resort to the twin assertion that the legal rights conferred by the software licence were valuable was (I agree with the Claimants) trite; and his claim that customers were interested in the options it conferred was undone

by the premise described above, and by the fact that it was implicit in his approach that he knew that:

(1) a customer with a hosted arrangement had no need for a software licence, particularly where: (i) the customer had no intention of using the licence on-premise independently of Autonomy's hosting services, (ii) the term of the licence was coterminous with the term of the hosting services, as was almost invariably the case in the Schedule 6 e-Discovery transactions, or (iii) the licence was to software that did not exist or was not asked for nor needed by the customer, as was often the case in the Schedule 12D transactions, or could not be used without Autonomy's assistance, as was the case for all the Schedule 6 Digital Safe transactions; and that

(2) there was no material difference between the SaaS offering and the hybrid offering; both were, in essence, service offerings under which customers received substantially the same services, regardless of whether they owned a licence to the software or not.

3463. I have concluded, and find, that Dr Lynch can only have understood and intended that the purpose of introducing a licence sale in a hosted arrangement was to provide a pretext for the improper acceleration of revenue, and that there was, in truth, no justification for adopting a wholly different revenue recognition approach to the hybrid deals than the approach that had been adopted in relation to the SaaS arrangements.

3464. My conclusion is also reinforced by Dr Lynch's explanation of the hybrid model in exchanges with analysts. Two examples of such exchanges were explored with Dr Lynch in cross-examination.

3465. At the end of May 2009, Ed Meier of Schroder Investment Management emailed Mr Hussain saying "*It's come to my attention from a couple of your customers recently that there may have been some change to contract structures (both in Zantaz). We have been told that on some occasions rather than pro-rating a 5-year contract equally over quarters as used to be done, a large proportion of it has been paid up front with the remainder (maybe 20-25%) pro-rated*". Mr Meier asked if this was prevalent in more than a few contracts. Mr Hussain forwarded Mr Meier's email to Dr Lynch. Dr Lynch responded to Mr Hussain with a draft email (replete with typographical errors) to be sent to Mr Meier saying:[432]

> "*the number amount and sources exploded so this model no longer worked, so it was necessary to terminate the old approaches and move to the new hybrid model with software on site to do the gathering and apply meaning based policies for what to then send tot he [sic] digital safe...*
>
> *...on once [sic] sense what you write is true, ratably recognized solutions for 3 suppliers were rolled into one with a 1/3 upfront. However the points to bear in mind is that the new contracts were much larger (~10 times) and for different functionality that subsumed the need for the old ones. Only a 1/3 of the new larger contracts moved up front. <u>So in fact the effect of the change was still a massive increase eint he [sic] ongoing...ie the argument Autonomy some how swapped up front licence for ratably when the whole thing is viewed is the</u>*

---

[432] Emphasis added.

> *opposite of the total outcome...THe [sic] outcome is actually much more*
> *longeterm [sic] revenue, not a short term boost at the expense of the future*
> *(unless you only consider a small fraction of the roll up rather than the total*
> *size).”*

3466.   The Claimants branded Dr Lynch's response as a complete fiction: and I must agree, for
the reason they gave, which was simply that the position he was attempting to disavow
was precisely what had happened and what the Defendants had intended from
restructuring the hosted arrangements. I agree also with the Claimants that Dr Lynch's
defence of this email in cross-examination was unimpressive. He stood by his suggestion
that hybrid customers would pay "*a lot, lot more*" as a result of the restructuring, a
suggestion that was patently incorrect, as explained in more detail in the context of the
Schedule 12D transactions below. For present purposes, it suffices to note that the
evidence of Mr Sullivan, Zantaz's CEO, is that the hybrid model led "*to reductions in*
*longer term revenue and, thus, to a reduction in the total revenue which would be earned*
*on those customers' accounts over the lifetime of the relationship*".

3467.   Moreover, the Claimants observed (again to my mind, correctly) that having accepted
that he was intending thereby to give Mr Meier the impression that the licensed software
was used by the customer onsite to ingest and index the data that needed to be archived,
Dr Lynch steadfastly refused to accept that this was false, maintaining that "*the licence*
*is also used on site for part of the system as well*", even when it was pointed out to him
that Mr Yan had given contrary evidence. The Claimants' witnesses, Mr Goodfellow
and Mr Yan, gave unchallenged evidence that, when Digital Safe was hosted, regardless
of whether the customer had a licence or not, the entirety of the Digital Safe system
resided on Autonomy's systems, and not the customer's. None of Dr Lynch's witnesses
gave evidence to the contrary. Dr Lynch sought to defend the accuracy of his statements
to Mr Meier in May 2009 by suggesting that Autonomy did not start selling licences to
the Digital Safe software itself until the <u>end</u> of 2009. But that was belied by the
documentary record, as set out in Annex C of the Claimants' written closing submissions
and Schedule 6 of the Particulars of Claim, that Autonomy had entered five hybrid deals
<u>before May 2009</u> that involved the sale of a Digital Safe licence (numbered in Annex C
as 1, 2, 3, 4, 9).[433]

3468.   The second example put to Dr Lynch related to similar suggestions in an email that he
sent to Mr Goodman on 20 September 2009 for passing on to Mr Michael Briest, an
analyst at UBS. The email appears to have been intended as a response to a note written
by Mr Morland.[434] Dr Lynch wrote:

> *"2/ [Mr Morland's] statement that: Autonomy has changed the revenue*
> *recognition policy at Zantaz and now recognizes a third of hosted deals up*
> *front ... The statement that Autonomy recognizes a 1/3 of hosted deals up*
> *front is completely untrue, all hosted operations are recognized ratably as*
> *the service is delivered. A typical mega deal is made up of 2 parts, <u>a set of</u>*
> *<u>software that is bought by the banks and installed inside it and on this</u>*

---

[433] There were many more Schedule 6 transactions in this period, which either concerned Related Software or
eDiscovery.

[434] Two days earlier, Mr Morland had published a note in which he wrote: "*Autonomy has changed the revenue*
*recognition policy at Zantaz which used to recognise its hosted revenues evenly over the period of the contract.*
*Autonomy has changed this such that one third of hosted revenues are now taken up front (as if they were a*
*license) with the rest spread as before*". This statement was addressed by Dr Lynch in the quoted text above.

*hardware to sort data by policy (ie it is not hosted), this is in the example case given as a third of the total size. This is recognized as a normal software licence sale. 2/3 is the service of hosting a different set of software on our servers, eg archiving and discovery. [This] is recognized ratably as the service is delivered. ON NO account is a third of hosted sales recognized up front. This has been covered in earnings calls ... This error is key to the note as it is the central tenant of the hypothesis by which revenues were aggressively recognized ..... [it's] just not correct and arises solely from forgetting that <u>mega deals are only part hosted and part licence software the customer runs un hosted by us</u>...”[435]*

3469. When it was suggested to Dr Lynch that he was proposing to tell Mr Briest that the software licensed in hybrid deals was not hosted and was run on the customer's system, he echoed his remarks regarding his draft email to Mr Meier: "*Again, we're early in this process, in September 20 2009. More of the licences -- the licences tend to move -- become hosted by us more for the larger deals later*". The Claimants submitted, and again I agree, that when it was pointed out to Dr Lynch that there were sales of Digital Safe <u>in 2008</u>, he was unable to offer any meaningful explanation of his remarks:

> "*Q. Wasn't Morgan Stanley first licensed Digital Safe in 2008?*
>
> *A. Yes.*
>
> *Q. Well, I suggest to you from the very beginning, the way in which your hybrid system worked, was intended to work, was that Autonomy continued to host both the software and the customer's data and that what you were saying here was false?*
>
> *A. No, I think this is a reasonable explanation of what is going on. <u>And by the way, it has to be taken in the context of everything else that's been said at the time</u>.*
>
> *Q. You say everything else that's being said at the time, Dr Lynch, but if what you were saying here was untrue, then it was untrue?*
>
> *A. It's not untrue. It's absolutely correct, what it's saying.*"

It was not clear what the relevant "*context*" to which Dr Lynch referred was. The point was not explored in re-examination.

3470. Dr Lynch then sought to rely on the fact that customers were occasionally licensed some software that ran onsite in hybrid deals:

> "*A. Just on the last point, just to be clear, there's a series of things that can be licensed that are part of this cloud system which run on premise as well as the licence itself being hosted off premise. Just so we've got that clear. My apologies for interrupting you.*
>
> *Q. Well, let's just be very clear. I understand there are a series of things that can be licensed and hosted, and there's no dispute, for example, that a*

---

[435] Emphasis added.

> *connector could have been put in the customer's premises, but what we're talking about here is that for which you're being paid one-third of the fee, which is the whole Digital Safe licence –*
>
> *A. No, the one-third would include those licence elements because those are going in -- all of that is going into the cloud part of the business.*
>
> ...
>
> *Q. ... that's the scenario you paint: that the customer is using the software that you've licensed, let's say Digital Safe on premise.*
>
> *A. It is using some of the software it's licensed on premise –*
>
> *Q. Some of the software?*
>
> *A. -- and some of the software, <u>its licence is hosted by us at their discretion rather than being on premise or somewhere else.</u>"*

3471. But Dr Lynch's draft email to Mr Briest did not make this clear at all. In stating that a hybrid deal was "*part hosted and part licence software the customer runs un hosted by us*", it suggested that <u>all</u> the software that was sold by way of a licence would be run by the customer onsite. It did not suggest that Autonomy was licensing software that was <u>not</u> installed on the customer's systems and was instead hosted by Autonomy; but this is precisely what Autonomy did when it licensed Digital Safe and e-Discovery software (and indeed much of the Related Software that was sold as part of Schedule 6DS transactions).

3472. When later pressed on this, Dr Lynch returned to the suggestion that hybrid customers ran Digital Safe on-premise:

> "*Q. What parts of the software do you say that they were hosting themselves?*
>
> *A. Things like parts of the Supervisor software, parts of the ControlPoint-type software, parts of the gathering software so things that were actually getting the data, sucking it up. IDOL caches would be run on site, so where there were IDOL caches being run, those would be run on site. There would quite often be quite a small satellite Digital Safe system on site depending on what the bank needed as well, where that was a short-term archive. So under the regulatory requirements, some data had to be kept for seven years, some data had to be kept for three years, but some of it had to be kept for seven days, and that was better done on site.*"

3473. This gave the misleading impression of some usage of licence rights by hosted customers; and it was inconsistent with the unchallenged evidence of Mr Yan that in a hosted Digital Safe arrangement, the Supervisor software would sit with the Digital Safe software in Autonomy's data centres. The Claimants submitted and I agree that it is also difficult to square Dr Lynch's comments about a "*small satellite Digital Safe system on site*" for short-term archiving with the fact that there was no evidence to suggest that any of the hybrid Digital Safe customers with existing hosting agreements ever ran

Digital Safe on-premise (save for Morgan Stanley which ran an on-premise Digital Safe in Switzerland, which appears to have been for regulatory reasons and not for short-term archiving)[436].

3474. The Claimants concluded that the obvious inference from Dr Lynch's recourse to misleading statements, or at best partial truths, as to the nature and use of the hybrid hosting model is that he was aware that, if the market realised the true nature of these transactions, Autonomy's improper revenue acceleration scheme would be discovered. I accept that.

3475. I have concluded that Dr Lynch was well aware that:

(1) The hybrid hosting structure was a response, not to customer interest, but to his and Mr Hussain's obsession with ensuring that Autonomy achieved, or came as close as possible to meeting, revenue forecast;

(2) The licence was a device calculated to justify revenue recognition which conferred legal rights which neither side intended or expected would ever be deployed and which in the context of Digital Safe were in reality of no practical utility, and in the context of e-Discovery would have nullified the original choice made by the customer in favour of hosting and caused the upfront payment to be wasted;

(3) The introduction of a formal legal right of no intended commercial consequence would not in any material way alter the hosting arrangements between the contracting parties, which both parties intended and expected to carry on as before.

*(6)    IDOL Cloud metric*

3476. I should mention, but not dwell long, on the Claimants' contentions in respect of the use of the IDOL Cloud metric in Autonomy's published quarterly and annual accounts from 2010 onwards.

3477. The gist of these complaints was that in what were described as *"supplemental metrics"* provided in the narrative or *"front end"* of Autonomy's accounts from 2010 onwards a false impression was given by the inclusion of revenue from the sale of licences that Autonomy's recurring revenue from its hosting business was higher than it was. In particular, it was said, the market was given to understand that the metric was comprised (or at least largely comprised) of recurring revenues and thus a reliable and valuable revenue stream whereas in fact it included a substantial proportion (of around 20%) of revenue from one-off licence sales which was not recurring in nature (and see paragraph 3266(3) above).

3478. The Claimants made clear in their closing submissions that these allegedly misleading presentations did not give rise to any standalone claim. The Claimants relied on them as constituting *"powerful evidence"* of the Defendants' (i) *"general dishonesty"* and (ii) *"willingness to present Autonomy's hosting business to the market (and HP) in a misleading manner."* In his oral submissions, Mr Rabinowitz confirmed that the Claimants' complaint in relation to the IDOL Cloud metric was *"not part of the reason why we say the published information was wrong"* and did not *"feed into the loss*

---

[436] See Annex D of the Claimants' written closing submissions for further detail.

HC-2015-001324

*claim"*. After I had queried this, Mr Rabinowitz explained that this was because *"of the way the model works, the DCF model worked here"*.

3479.    The length of the Claimants' submissions on this issue of credit suggests to me that at one point this was intended as a substantive plea but was never in the event advanced. The Defendants objected to the deployment of such matters at such length on an issue of credit. In objecting to its elaboration, Dr Lynch summarised this objection as follows in his written closing submissions:

> *"In summary, the complaint appeared to have morphed from one in the pleading where it was said that it was false accounting to allocate cloud licence revenue to IDOL Cloud to one where it was said to have been a fraudulent misrepresentation on the market to include any licences in IDOL Cloud because the latter was a category of "recurring revenue". The morphed complaint is contingent on an unstated (and unpleaded) but implied assumption that IDOL Cloud was exclusively a category of "recurring revenue".*

3480.    I consider that the matter was pleaded. In their RRAPoC, the Claimants had alleged that an untrue and/or misleading impression had been given that:

> *"IDOL Cloud revenue was increasing rapidly and was a source of recurring revenue at the level suggested by the then-current reported IDOL Cloud revenue when, in fact, a significant component of IDOL Cloud revenue was attributable to purported licence fees which were non-recurring in nature. The aforementioned practice meant that the revenues were not representative of the actual performance of IDOL Cloud or its future prospects."*

3481.    But it was not pursued as a claim. I do not propose to delve further into it; and I have not taken account of it in my assessment of the Defendants accordingly.

## PART B

### The Schedule 12D Transactions

*The nature of the claims and how they differ from the Schedule 6 claims*

3482.  In addition to their claims pursuant to FSMA that the transactions listed in Schedule 6 of the RRAPoC were falsely accounted for, the Claimants identified a sub-set of those transactions as commercially entirely unjustifiable, and as having been entered into only for the improper purpose of accelerating revenue, at considerable cost, and thereby loss, to the Autonomy group company concerned[437].

3483.  The Claimants referred to this sub-set of Schedule 6 transactions as Schedule 12D transactions, the latter being the Schedule to the RRAPoC where the relevant transactions were listed. The Schedule 12D claims made were direct claims against the Defendants for breach of duty.

3484.  Although both sets of claims related to Autonomy's hybrid hosting business, it is important to distinguish the different ingredients of the two types of claim:

   (1)   As previously explained, but as I repeat to accentuate the differences, the Schedule 6 claims pursuant to FSMA required proof that it was wrong to treat the licence sold in a hybrid hosting transaction as a separate component of real substance justifying an accounting treatment analogous to a sale of goods, and that the Defendants knew it was wrong and that Autonomy's published information was false accordingly.

   (2)   The Schedule 12D claims were not dependent on proof of accounting impropriety; nor was proof required of knowledge of the impropriety of the recognition of revenue. The proof required was that, viewed as a whole, the impugned transaction lacked any commercial rationale, and that no reasonable director could have approved and/or directed it, so as to be in breach of duty as a director and/or employee or by virtue of exercise of fiduciary discretion and power.

3485.  Accordingly, the Claimants' position was that their Schedule 12D claims could be made good even if their larger Schedule 6 accounting claims failed. Conversely, and as was implicit in the limitation of their direct claims to only a small sub-set of the Schedule 6 transactions, the Claimants appeared to accept that to make good their Schedule 12D claims it was not sufficient to establish their case that the accounting for these transactions was improper; they had also to establish that the transactions themselves were not commercially justifiable. I have some doubt about that implicit concession. The basis of their Schedule 6 claims was the contrived nature of the licence; and it is difficult to justify the sale of a contrivance, and the impropriety of the objective and intended accounting treatment may infect the whole and outweigh any other claimed commercial benefit. I return to that below.

---

[437] As I elaborate below, the Schedule 12D claims also give rise to difficult, but (in the case of the claims against Dr Lynch) potentially dispositive, issues as to which Autonomy entity was the legal person to which the duty alleged was broken and which such entity had suffered the alleged loss and damage.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*Overview of the Schedule 12D transactions and claims*

3486. Originally, the Claimants had asserted that all the hosting transactions which are the subject of the false accounting claims (that is all the Schedule 6 transactions) were improper and caused transactional losses which they sought to recover as damages in personal claims against each of the Defendants.

3487. However, by amendments made in early 2017, the Claimants confined their claims to losses resulting to ASL and Zantaz from only four such transactions. Those four transactions (all of which are also the subject of Schedule 6 claims) were entered into with three leading financial institutions, namely, Morgan Stanley, Deutsche Bank and MetLife by Zantaz (in the case of the Morgan Stanley and Deutsche Bank transactions) and Autonomy Inc (in the case of the MetLife transaction).

3488. The distinguishing feature of these transactions ("the Schedule 12D transactions"), and the basis of their selection, was that they were restructurings of hosting contracts which had already been restructured from the SaaS model to hybrid contracts with a licence fee; except that in the case of Morgan Stanley, the impugned transaction was a re-re-restructuring which included a further licence fee (by then the third such payment).

3489. The Claimants contended that, therefore, if there were any benefits to be gained from bringing a customer onto the hybrid model, they had already been realised.

3490. Further, the Claimants contended that the customers concerned were offered substantial reductions to their ongoing data storage rates in circumstances where they had not approached Autonomy seeking any price reductions, and where there was no discernible risk of them leaving Autonomy in favour of another archiving provider.

3491. The Claimants also maintained that in each case, Autonomy licensed software that did not exist, was of no use to the customer, had been added into the description of software to be licenced under the agreement at the last minute without any request for it by the customer and/or had already previously been promised to the customer separately from the re-restructuring. The Claimants contended that the addition in the description of the software to be licensed was contrived to give the impression (especially to Deloitte who would be scrutinising the transactions) of some further commercial basis for the transaction which was in truth illusory.

3492. The Claimants' case in such circumstances was that it was not only the accounting for these transactions which was improper: the transactions themselves were not commercially justifiable and they resulted in overall loss. Their purpose was to establish a further licence sale from which Autonomy could immediately recognise all the revenue except for the fair value of the maintenance element. Their price was the discount which had to be offered to customers, and the resulting loss was the reduction in the overall fees paid over the course of the relevant transaction.

3493. The total losses allegedly sustained were stated in the Claimants' written closing submissions to amount to $24,835,156. The entity which actually booked the reduced revenue was Zantaz. Of this the Claimants claimed $6,912,011 had been suffered by

Zantaz and the remainder, $17,923,145 was loss claimed by ASL as transferee of losses under intra-group transfer pricing arrangements (see further below)[438].

*Problems of standing and loss outlined*

3494.  The cause of action indicated would be a claim by the corporate entity alleged to have suffered loss against the directors responsible for that alleged loss for breach of a duty owed to that company in causing it to enter the loss-making transaction(s) and/or compensation for the abuse of their powers. I make that statement of what may seem obvious because it gives rise to two fundamental difficulties for the Claimants. Both difficulties emanate from the fact that the only Autonomy entities which were parties to the four impugned transactions were Zantaz and Autonomy Inc, and Zantaz was the only entity which booked revenue from those transactions.

3495.  The first difficulty is that though Zantaz was the party which booked the allegedly reduced revenue within the Autonomy group[439] and is thus the entity which the Claimants contend "*forewent revenue as a result of the improper restructuring of four hosting arrangements*", the claim is primarily advanced by ASL. ASL claims losses of some $17,923,145 compared to a claim advanced by Zantaz of $6,912,011 (the total losses claimed in respect of the Schedule 12D transactions being just under $25 million[440]).

3496.  The Claimants have put forward this as their primary case on the basis that most of Zantaz's profits and losses were, transferred to ASL under transfer pricing agreements between (inter alios) ASL and Zantaz which provided for the allocation of profits and losses from group companies to ASL.[441] However, in recognition of the potential difficulty in relying on the transfer pricing agreements as the basis of loss claims and also given the complex calculations necessary in that context, the Claimants put forward an alternative case which they presented as reflecting the position before the transfer pricing arrangements are taken into account. On that alternative case the entirety of the alleged loss is claimed by Zantaz.

3497.  That, however, accentuates the second difficulty. Dr Lynch was never *de jure* a director of Zantaz. Nor was he a *de jure* director of ASL, though Mr Hussain was a *de jure* director of both.

3498.  The Claimants sought to overcome this impediment by establishing that though not *de jure*, Dr Lynch was a *de facto* or (by virtue of being President of Autonomy Inc and/or what the Claimants described in their RRAPoC as "*the chief decision-maker within the Autonomy group*") a shadow director of ASL, and that ASL was entitled to recover from

---

[438] The Claimants advanced an alternative case, reflecting the position before the transfer pricing arrangements, under which all loss is allocated to Zantaz as the entity that recorded the revenues.

[439] More precisely, the entity which contracted with the customer, raised the invoice and originally recorded the licence revenue in its general ledger, except in the case of the MetLife transaction where the contracting and invoicing party was Autonomy Inc but the revenue was recorded in Zantaz's books.

[440] More exactly (as calculated by Mr Bezant) $24,835,156.

[441] The transfer pricing arrangements and the transfer pricing calculations carried out for the year ended 31 December 2010, and which in summary amongst other things involved amounts equal to 96.5% of revenues recorded in Autonomy Inc and Zantaz, with arrangements for a percentage to be paid back to Zantaz in respect of profit-sharing arrangements between Zantaz and ASL, were of some complexity. However, Mr Bezant checked the allocation of the Schedule 12 losses by reference to these arrangements and calculations and did not identify any inaccuracies. Mr Bezant was not challenged on this in cross-examination.

him by way of damages or equitable compensation losses passed to it in consequence of the transfer pricing arrangements referred to in paragraph 3496 above.

3499.  These are, as against Dr Lynch at least, convoluted claims. For the present, suffice it to say that:

(1) The Claimants abandoned their original allegation that Dr Lynch was a *de facto* director of Zantaz when it became clear that since Zantaz was incorporated in California the question whether he would be treated as a *de facto* director of it would be governed by the laws of California;

(2) The Claimants have ultimately not pursued any claims on behalf of Zantaz against Dr Lynch and thus, Zantaz's claims are now brought only against Mr Hussain;

(3) It follows that, on the basis of the Claimants' alternative case, reflecting a mathematical model of the position before the transfer pricing arrangements, no monetary claim is left against Dr Lynch;

(4) The Claimants' claims against Dr Lynch on behalf of ASL depend on establishing either (a) that Dr Lynch was a *de facto* or alternatively a shadow director of ASL or (b) that the transfer pricing arrangements somehow gave rise (now quoting from the RRAPoC) *"to a relationship of trust and confidence such that Lynch assumed the obligations of a fiduciary towards ASL…"* and that (c) he acted in breach of duty to ASL even though the impugned transactions were entered into, not by ASL, but by Zantaz and Autonomy Inc; and

(5) There is also an issue as to whether ASL suffered any loss, given that it was not the party that entered into the allegedly loss-making transactions, and that any losses were allocated to it pursuant to the transfer pricing arrangements.

I shall return to deal at greater length later with (4) and (5) above: they are, of course, fundamental to the Hosting 'improper transactions' claims against Dr Lynch, as they are to the other claims for transactional losses.

*The Defences in outline*

3500.  In addition to these 'gateway' issues, the Defendants also accused the Claimants of having in effect presented a new case in closing which (as Mr Hill who dealt with this aspect of the case on behalf of the Defendants submitted) was *"not visible in their pleading".* Put shortly, the Defendants' point was that in opening the Claimants had presented the claim as based on alleged false accounting and its adverse effects, whereas in closing they impugned the Schedule 12D claims as commercially improper irrespective of the accounting because a re-restructuring (and *a fortiori*) a re-re-restructuring, could not be proper because the customer was already locked in: the bird was already in the hand.

3501.  Dr Lynch, in particular, submitted that this change of tack, albeit relating to a more restricted cohort of transactions, went back on a concession made by the Claimants in opening as to the scope of the improper transactions claim, was not pleaded, and was unfair. Mr Hill submitted that the Defendants would have wanted to know, and were entitled to know, that the Claimants were seeking to run this new case before cross-

examination; and that had they known, they might well have *"wanted to put more focus in our cross-examination specifically on the issue of whether, from a commercial perspective, a re-restructuring was distinct from a restructuring and whether a re-restructuring was considered to be commercially sound."* He submitted that the Claimants should be held to the position they set out in opening and be restricted to the accounting issues they had raised.

3502.    I accept that the Claimants did refine and recast their case, as is obvious from the whittling down of the Schedule 12D transactions to re-restructuring transactions; but I do not accept that they ever made the concession asserted that they would restrict their complaints to the accountancy issues, nor do I accept that the Defendants were truly taken by surprise or caught unprepared. Seeking to strait-jacket the Claimants' claims in this way was always part of the Defendants' strategy; and I agree with Mr Rabinowitz's observation in his oral reply that this was a forensic point on their part. I do not consider that the Defendants' cross-examination of the Claimants' witnesses was unfairly affected or would have been substantially different. In my judgment, the Claimants were entitled to pursue the claim, and there is no unfairness to the Defendants thereby.

3503.    Turning to the Defendants' substantive positions, in addition to those 'gateway' matters, their case was that the transactions impugned all had a sound business rationale. They promoted customer loyalty. They encouraged increased use of hosting facilities. They locked in new revenue streams which were otherwise uncertain in a falling market. They also secured an immediate payment of cash. Mr Hill referred to this in his oral closing submissions as *"the bird in the hand approach"*. The greater customer retention they secured increased the prospect of upsales, and by demonstrating customer loyalty, enhanced Autonomy's profile and credibility in the market-place.

3504.    Furthermore, the Defendants presented the transactions as profitable and not loss-making. According to the Defendants, the rates payable under the re-restructured deals remained competitive without excessively squeezing margin. There was no basis on which any of this fell outside the proper exercise by the directors of their business judgement or constituted any improper exercise of their powers.

3505.    The Defendants also relied on the fact that a number of people at Autonomy were involved in selling hybrid deals, including restructured hybrid deals, and none had apparently thought any of the transactions to involve impropriety: these included Mr Sullivan, Mr Collet, Mr Yan, Mr Wang and Mr Goodfellow (none of whom is suspected of dishonesty) as well as Mr Egan.

3506.    The Defendants rejected the suggestion that in the case of each of the Schedule 12D transactions, Autonomy inserted into the description of the software licensed items which did not exist, which the customer had not asked for and did not need in order to mislead Deloitte into treating the newly licensed software package as different and more extensive than that previously licenced. They insisted that additional software was included in every case; and in every case it existed, was capable of being used, and was of practical use and value to the customer.

3507.    The Defendants made the further point that it was not disputed that the software was put onto the delivery mechanism by Autonomy's technical team, none of whom was implicated in any wrongdoing, and none of whom considered that he/she was doing

anything improper. They dismissed as unsubstantiated, unsupported and implausible the Claimants' case that (as Mr Hussain portrayed it) "*AU's technical team decided to upload fake software*".

*Structure of this Part*

3508. Once again, these allegations and their rebuttal led to considerable cross-examination and occupied the parties in a very substantial exegesis: in their respective written closing submissions, the Claimants devoted some 110 pages, the First Defendant, just over 100 pages and the Second Defendant added a further 50 pages, all with copious footnotes with references to passages in the transcript.[442]

3509. Although my treatment must be more condensed, bearing in mind that the losses claimed are, in the circumstances of this case relatively small (totalling a maximum of some $25 million spread in each case over several years), it is nevertheless necessary to travel into some of the details of each of the four transactions to do justice to the parties' rival contentions. That is especially so since the Claimants relied on the details as further illustration of their case that all the Schedule 6 transactions were accounted for improperly.

3510. I address first the question whether, and if so on what basis and to what extent, Dr Lynch owed duties to ASL in respect of the Schedule 12D claims.

3511. I then turn to consider each of the four transactions in turn, and especially in each case

    (1) Whether the Schedule 12D transactions had any proper commercial rationale;

    (2) Whether Autonomy included as part of the transactions (and purported to supply) software which did not in fact exist but which gave (false) support to Autonomy's justification of the transactions to Deloitte.

*Did Dr Lynch owe any duties to ASL?*

3512. The primary basis on which the Claimants sought to establish that, though not *de jure* a director of ASL, Dr Lynch owed fiduciary and statutory duties to ASL, was their contention that he was a *de facto*, alternatively a shadow, director of ASL.

3513. The Claimants relied in this context on the recent decision of Morgan J in *Instant Access Properties Ltd v Rosser & others* [2018] BCC 751, especially at paragraphs 213 to 228. Morgan J explained in that case that:

    (1) "*...the question whether a person is a de facto director or a shadow director depends upon the specific facts of each case*" (see para. 217)

    (2) "*There does not appear to be a clear legal test to help one decide whether a person is or is not a de facto or shadow director. For the purpose of deciding that question, it is necessary to focus on what the person actually did in relation to the company.*" (ibid.)

---

[442] Some 261 footnotes in the case of the Claimants in this part alone.

3514. Morgan J also drew on and quoted extensively from the decision of the Supreme Court in *Revenue and Customs Comrs v Holland* [2010] 1 WLR 2793, where the earlier authorities were reviewed and by a majority (3-2) it was decided (dismissing the appeal) that the director of a corporate director of a company was not a *de facto* director of that company, even though he was the guiding mind behind the sole corporate director and was the natural person who decided that the underlying company should pay the dividends which were impugned. That was because (according to the majority) he never assumed the duties of a director, and all that he did was *"in the course of directing the corporate director, not by acting or purporting to act as a director of the [underlying company]"*.

3515. As confirmed by Lord Hope JSC in *Holland* (at [26]):

> *"if it is unclear whether the acts of the person in question are referable to an assumed directorship or to some other capacity such as shareholder or, as here, consultant, the person in question must be entitled to the benefit of the doubt".*

3516. Further, as Lord Collins (also, with Lord Hope and Lord Saville, one of the majority) made clear:

(1) It is not sufficient, if it is sought to establish that a person was a *de facto* director for the purpose of making that person liable for some act or omission of the company, to show that that person was *"the guiding mind"* in making that company's decision.

(2) In such a context, it must be shown that the person assumed the responsibility for a directorial decision; and that decision must be one reserved under the company's governance structure (that is, the system by which companies are directed and controlled) to a director or board of directors, and not one capable of being performed by a manager or other employee, or actually being performed by the person in question by virtue of some other role or authority.

(3) Thus, the question is whether the person in question (a) was as a fact *"part of the governing structure"* [93] and (b) had been demonstrated to have *"assumed a role in the company sufficient to impose on him a fiduciary duty to the company and to make him responsible for the misuse of its assets"*.

(4) Now that the concept of a *de facto* director has been extended to cover not only (as originally) a person whose appointment was defective or who without lawful authority claimed to hold office, there can be no hard and fast distinction between the concept of a *de facto* director and that of a shadow director (see [91]) though, as noted by Morgan J in *Instant Access* [at 216]:

> *"If they were de facto directors, they owed the same duties to the company as would a de jure director. If they were shadow directors, there is a separate question as to whether they owed fiduciary duties to the company, and, if so, which duties."*

3517. Morgan J also referred to cases on *de facto* directors after the *Holland* case, and especially *Smithton Ltd v Naggar* [2015] 1 WLR 189 in the Court of Appeal, where

Arden LJ said that *"The question is whether he has assumed responsibility to act as a director"* and added (*inter alia*) that:

(1) That *"is to be determined objectively and irrespective of the defendant's motivation or belief"*;

(2) *"The court is required to look at what the [defendant] actually did and not any job title actually given to him"*;

(3) *"The court must look at the cumulative effect of the activities relied on"* and all the circumstances in the round; but

(4) *"It is also important to look at the acts in their context. A single act might lead to liability in an exceptional case"*;

(5) *"Relevant factors include*: (i) *whether the company considered him to be a director and held him out as such; (ii) whether third parties considered that he was a director"*;

(6) *"The fact that a person is consulted about directorial decisions or his approval does not in general make him a director because he is not making the decision."*

3518. Lastly in his analysis of the law in *Instant Access*, on the question of what makes a person a shadow director Morgan J referred to *Secretary of State for Trade v Deverell* [2001] Ch 340 and *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) where it was clarified that:

(1) *per* Morritt LJ (as he then was) in *Deverell*, *"Whether any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence"*;

(2) again *per* Morritt LJ in *Deverell*, *"such directions or instructions do not have to extend over all or most of the corporate activities of the company; nor is it necessary to demonstrate a degree of compulsion in excess of that implicit in the fact that the board are accustomed to act in accordance with them"*, and nor furthermore is it *"necessary to the recognition of a shadow director that he should lurk in the shadows"*;

(3) *per* Lewison J in *Ultraframe*, *" a position of influence (even a position of strong influence) is not necessarily a fiduciary position"*: the test is effective control since *"the policy underlying the definition is that a person who effectively controls the activities of a company is to be subject to the same statutory liabilities and disabilities as a person who is a de jure director"*; and

(4) also *per* Lewison J in *Ultraframe*, and by the same logic, it is not necessary that the person in question should be able to influence every member of a board: *"a person at whose direction a governing majority of the board is accustomed to act is capable of being a shadow director"*.

3519. In the present case, the Claimants relied on the following facts as demonstrating that Dr Lynch was a *de facto* director of ASL (ASL being a company incorporated in England, the *de jure* directors of which were Mr Hussain and Mr Kanter):

(1) The Claimants' general case about Dr Lynch's role in relation to the Autonomy group companies, including (a) Deloitte's conclusion in its memo of January 2011 that Dr Lynch exercised *"a very unusual level of control for a FTSE 100 CEO"*; (b) the evidence of corporate decisions in all operating companies being made by a "core management team" comprising Dr Lynch (at its head), Mr Hussain, Mr Chamberlain and Mr Kanter, and also (though less consistently) Dr Menell and Ms Eagan; (c) Deloitte's further conclusion that all *"purchases over $30,000 must be approved by the CEO"* such that *"very few transactions are processed within the group without direct authorisation from Mike Lynch being required"*;

(2) The lack of any evidence that ASL acted on the basis of resolutions passed by its board of directors, and the appearance that instead, important decisions regarding its affairs were taken by executives at the Autonomy group level, including Dr Lynch. The Claimants gave as an example ASL's $9.6 million purchase of a three-year licence of the ATIC in Q4 2010 in connection with the MicroTech/Vatican VAR transaction (VT13) which Dr Lynch approved, as he accepted. The invoice was initially issued to Autonomy Inc, following which it had to be re-issued to ASL. Nevertheless, Dr Lynch refused to accept in cross-examination that he had given his approval on behalf of ASL. He said that he was "*able to do the approval as part of my role, but I don't know how that relates to the legal entities*". The Claimants contended that it is obvious that, in point of fact, Dr Lynch was acting as though he were a director of ASL. Dr Lynch had no knowledge of an ASL board resolution approving the purchase, and there is no evidence that one exists.

(3) Dr Lynch's approval was required for purchases made by ASL. Thus, for example, in the allegedly reciprocal transaction with Vidient Systems in Q3 2010 (being the second Vidient transaction in RT4), which included ASL making purchases from Vidient totalling $2.31 million, Mr Chamberlain sought Dr Lynch's approval for this "*given size of amount*". In cross-examination, Dr Lynch accepted he gave the required approvals. When it was put to Dr Lynch that these approvals were given on behalf of ASL, Dr Lynch said "*I wouldn't necessarily have known who it was getting contracted through*". This reflected Dr Lynch's earlier evidence that: "*I wouldn't know which contracting company was being used, unless I went and looked at the paperwork, which I didn't usually*".[443] The practice was clearly for Dr Lynch to provide purchase approvals where ASL was the Autonomy company that entered into substantial transactions.

(4) Dr Lynch also approved MAF payments on behalf of ASL. He accepted that he approved the payment of a $1.1 million MAF by ASL to DiscoverTech in Q1 2011.

3520. Alternatively, the Claimants asserted that Dr Lynch was a shadow director of ASL, on the alleged basis that Mr Hussain and Mr Kanter, ASL's directors, were accustomed to act in relation to the transactions entered into by ASL in accordance with Dr Lynch's instructions. Very little additional evidence in support was provided by the Claimants, save as relevant to their contention that he was a *de facto* director. I think the reality is

---

[443] In the context of his cross-examination concerning RT3, where the relevant Autonomy subsidiary was Autonomy Inc.

that if they fail to establish that he was a *de facto* director, they cannot succeed in the alternative plea that he was a shadow director.

3521. In the further alternative, the Claimants contended that Dr Lynch owed a fiduciary duty of loyalty to ASL on the basis that he undertook to act for it or on its behalf in relation to the transactions which had a financial impact on it by virtue of the transfer pricing arrangements discussed above. The Claimants relied on *Bristol and West Building Society v Mothew* [1998] Ch 1, 18 and submitted that that undertaking is implicit in the fact that:

> *"all significant transactions and decisions, including those affecting ASL, took place at his direction or with his knowledge, consent and/or involvement. These circumstances gave rise to a legitimate expectation on the part of ASL, which equity will recognise, that Dr Lynch would not utilise his position in a manner adverse to the interests of ASL and, accordingly, gave rise to the relationship of trust and confidence between him and ASL."*

3522. On the issue whether he was a *de facto* or shadow director of ASL, Dr Lynch raised little dispute on the law, not least because (as explained above) the law is clear that ultimately the issue in every case is one of fact. The facts, however, were much disputed.

3523. Dr Lynch's position on the facts was:

(1) He was adamant in his oral evidence that he was never a *de facto* director of ASL;

(2) The Claimants did not identify any instance of him being held out as a director of ASL;

(3) The main focus of his cross-examination in relation to this issue was on the fact that it was thought necessary for transactions by ASL to be approved by him, and he did, on various occasions, approve transactions that were, in the event, entered into by ASL. However, although he did not deny the fact that he was asked for and gave approval, Dr Lynch contended that (a) he would not *"have known which subsidiary the purchase was going through at the time"* and (b) his approval of transactions undertaken by subsidiaries of Autonomy Corporation Plc does not mean that he was acting on behalf of, let alone acting as a director of, those subsidiaries: he was acting as CEO of Autonomy, or as "Group CEO" (as he was described, for example, in Autonomy's Trading Update for Q1 2011).

3524. Dr Lynch contended that the Claimants' further alternative contention that if he was not a *de facto* or shadow director of ASL, then he owed a fiduciary duty to ASL because he implicitly undertook, under or by virtue of the transfer pricing arrangements, that he

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

would consider its interests and not utilise any power or position (whether as CEO or otherwise) in a manner adverse to ASL (in accordance with the *Mothew* case cited above), failed on the facts. Dr Lynch contended that the fundamental premise of this basis of claim was that he knew that ASL would end up bearing the consequences of the transactions he approved because of the transfer pricing arrangements: but there was no evidence, and he denied, that he knew of those arrangements and that losses would be transferred to ASL.

3525.  In my judgment, Dr Lynch plainly did act as a *de facto* or shadow director of ASL and owed duties in acting as such:

(1)  His own denials in that regard are not legally dispositive: the question is to be *"determined objectively and irrespective of the defendant's motivation or belief"*: see paragraph 3517(1) above;

(2)  The governance structure of the Autonomy Group as a whole was such that (a) decisions at subsidiary level were taken without the perceived need for formal board consideration by the senior management group comprised of Dr Lynch, Mr Hussain, Mr Chamberlain and/or Mr Kanter, (b) Dr Lynch was in a position to and did influence the others to the extent that his was the decisive decision on all material matters referred to him. As explained in paragraph 3518(2) above,

> *"such directions or instructions do not have to extend over all or most of the corporate activities of the company; nor is it necessary to demonstrate a degree of compulsion in excess of that implicit in the fact that the board are accustomed to act in accordance with them".*

(3)  Dr Lynch's answer in the course of his cross-examination that *"I wouldn't know which contracting company was being used, unless I went and looked at the paperwork which I didn't normally"* illustrates how subsidiaries within the Autonomy Group were "used" as contracting parties without regard to their separate interests and at the direction of senior management with Dr Lynch at its apex.

(4)  Although the mere fact that his approval was sought for large transactions by subsidiary companies would not of itself support the conclusion that he was a *de facto* or shadow director of the transacting subsidiary, the reality was that (a) the absence of any evidence that any of the subsidiaries had a functioning board of directors which actually made any decision confirms that the power of management in fact resided elsewhere than the board; (b) Dr Lynch was at least on a par with the *de jure* directors, and (c) the need for his final approval connoted that Dr Lynch had the ultimate decision-making power and was in fact first among them.

3526.  That makes it unnecessary to consider the alternative case based on *Mothew*, though I should say that I was not convinced by it, and would accept the arguments against its application which Dr Lynch put forward.

*The extent of Dr Lynch's duties acting as a de facto or shadow director of ASL*

3527.  However, establishing that Dr Lynch acted as a *de facto* director of ASL does not entail that he owed a duty to take steps in other capacities to protect it from harm: and in this case, the sources of alleged harm to ASL were (a) transactions entered into, not by ASL but by Zantaz/Autonomy Inc and (b) the transfer pricing arrangements.

3528.  Dr Lynch submitted that even if he was a *de facto* director of ASL (as I have found he was) and if he did owe such a duty, there was no basis in law for any claim for its breach in the context of the four Schedule 12D transactions, because:

(1) ASL was not a party to any of them and nothing Dr Lynch did in relation to them was done on its behalf;

(2) If ASL suffered any loss, that loss was caused, not by the transactions or their effect, but by the transfer pricing arrangements: Dr Lynch was not aware of or involved in those arrangements and had not exercised *de facto* or shadow directorial power in respect of them; and in any event

(3) The Claimants have not alleged that the decision by ASL to enter into those arrangements involved any breach of duty.

3529. The Claimants accepted that if only Zantaz (as the contracting party, or in the case of the MetLife transaction, the entity which recorded the revenues) was the proper claimant in respect of all the relevant losses, then only Mr Hussain could be liable, and not Dr Lynch. The basis on which the Claimants asserted that Dr Lynch as a *de facto* or shadow director of ASL could be liable for transactions entered into not by ASL was never made clear or even broadly explained:

(1) In the RRAPoC, the Claimants pleaded the duties that Dr Lynch owed to ASL, but there was no satisfactory explanation as to how those duties were engaged or breached in the case of a transaction entered into by another entity. The pleaded duties were alleged to include *"to act for and on behalf of ASL in relation to transactions which had a financial impact on ASL pursuant to the transfer pricing and profit sharing arrangements…".* But the basis of this broad (and, in my view, novel) duty was not explained.

(2) In their written closing submissions, the Claimants variously asserted that Dr Lynch and Mr Hussain owed duties either as a director of ASL or in equity *"not to utilise his position in a manner adverse to the interests of ASL"* and were in breach of duty:

> (a) *"in procuring Zantaz's entry into them [the Schedule 12D transactions]"*

> (b) *"in causing the relevant subsidiary to act to its detriment…"*

in circumstances where (the Claimant submitted) *"all significant transactions and decisions, including those affecting ASL, took place at his direction or with his knowledge, consent and/or involvement."* But again there was no explanation of the basis of these broad formulations which cut across ordinary principles of separate corporate personality.

3530. In Dr Lynch's closing submissions the Defendants took it to be the Claimants' case in this regard that Dr Lynch owed a duty to ASL in respect of transactions carried out by other companies likely to cause it loss and was in breach of that duty by causing Zantaz/Autonomy Inc to enter into the Schedule 12D transactions knowing that they would cause loss which ASL would eventually bear because of the transfer pricing arrangements. It was not for Dr Lynch to postulate the basis of such a duty and he did not do so; but he submitted that even if such a duty was assumed for the sake of argument, the claim failed on the facts anyway, since Dr Lynch had not known the details of the transfer pricing arrangements and he was not aware losses would be transferred from Zantaz to ASL.

3531. Addressing first the legal basis of the claims, in my judgment:

(1) The Schedule 12D transactions involved no decision by ASL at the time they were made: they were entered into by Zantaz (or, in the case of the MetLife transaction, by Autonomy Inc), not by ASL: no duties were owed to ASL in respect of transactions undertaken (as they were) by different entities, namely, Autonomy Inc and Zantaz;

(2) The decision of ASL which has allegedly been causative of ASL's own loss (the decision to enter into the transfer pricing arrangements) has not been impugned and cannot be the basis of loss;

(3) No basis of claim against Dr Lynch for ASL's loss has been explained, still less established;

(4) If as public filings suggested but Dr Lynch denied, he was President of Autonomy Inc, he might have been liable for loss in respect of the MetLife transaction to which Autonomy Inc was a party: but the Claimants' case is that *"Autonomy Inc…typically transferred 100% of the costs it incurred and 96.5% of the revenues, to ASL",* leaving Autonomy Inc no worse off for having entered into the transactions and thus having sustained no loss.

3532. My findings set out in the previous paragraph address the primary case advanced by the Claimants, as I understand it (and there were convolutions in it), in respect of the four hosting contracts.

3533. As my fourth finding indicates I consider that whilst any claim for breach of duty arising from transfer pricing arrangements must fail for the reasons given, it does not follow that the company suffering the original loss which it might have sustained from a breach of duty cannot bring a claim. Thus, the claim which Zantaz has brought against Mr Hussain (brought in the name of the 4th claimant to whom it has been validly assigned) can be validly brought because it involves a breach of duty by him owed to Zantaz. Whether it succeeds depends on the facts which I discuss below.

3534. No question arises in respect of Zantaz of the losses having been transferred to ASL. But in principle I do not consider that the transfer pricing arrangements with ASL affect the potential claims which a subsidiary which in fact has suffered the original loss could make. Those transfer pricing arrangements, as explained in the Claimants' submissions, do not purport to assign the claims.

3535. In my view, the fact that the subsidiary has chosen to transfer its loss to another company in the group does not mean that subsidiary has not suffered the loss. It does not put the Defendants at risk of double recovery because there has been no assignment and therefore no claim can be brought by ASL (unless as is the case in other direct claims under different heads (in particular, in respect of (a) reciprocal transactions (both VAR and non-VAR) on which it incurred losses as set out in Schedule 12B and (b) MAF and similar payments or foregone receipts on improper transactions identified in Schedule 12C) ASL has suffered the original loss). The company which suffered the loss can enter into an arrangement to transfer the loss to someone else. As long as it does not assign the claim it does not lose the right to sue, and the fact it has by an inter-company arrangement agreed the loss shall sit on another subsidiary's books does not mean it has suffered no loss. The Claimants have put their claim in the alternative on the basis of

claims by the subsidiaries (or their assignee) for the loss they sustained as a result of a relevant breach of duty. Those are the companies which appear to me to have the claim.

3536. However, in my view, what has to be established is that the company which has the claim for the breach of duty has in fact suffered a loss as a result of that breach of duty. The original hosting arrangements of the Schedule 12D customers, prior to any restructurings, were with Zantaz. Further, Zantaz was the contracting party in three out of four of the amending contracts which reduced the amount of payments it received in the future. Autonomy Inc was the party to the fourth amending contract (the MetLife contract) which reduced the amounts to be received by Zantaz.

3537. Autonomy Inc suffered no loss as a result of this fourth contract, because it was never going to receive the income stream which has now been reduced. It was Zantaz which suffered the loss, and Dr Lynch, for the reasons advanced, owed Zantaz no duty. It follows, in my judgment, that, not because of the transfer pricing arrangements but because it has suffered no loss, Autonomy Inc has no claim.

3538. Thus, though there is nothing sufficient to displace the public filings showing him to have been President of Autonomy Inc, and I find that he was, for the reason given above Autonomy Inc suffered no loss. No claim lies by Autonomy Inc, the 4th claimant, against Dr Lynch in respect of the MetLife contract.

3539. As to what Dr Lynch knew of the transfer pricing arrangements and their effect, when the Claimants put to him in cross-examination that he was aware of the transfer pricing arrangements, his initial answer was *"Not really. I wouldn't be surprised to hear there were…but, no, I wouldn't have had any detailed* knowledge *of it"*. Later he clarified that he *"understood they existed"* but he did not *"know the details"*. However, I do not understand the transfer pricing arrangements themselves to have been impugned. Accordingly, I am not persuaded that Dr Lynch's knowledge or the lack of it affects the position in respect of the Schedule 12D hosting direct claims, or in respect of the other Schedule 12 direct claims (in respect of hardware, VAR, and reciprocal transactions).

3540. In my judgment, as to the Schedule 12D hosting contracts:

(1) Notwithstanding his overall strategic control of the Autonomy group and the broad remit of his role and activities in that respect, as a matter of law Dr Lynch, though a *de facto* director of ASL, did not breach any duty to ASL.

(2) The only claim there might be for breach of duty owed to ASL would be if ASL suffered the original loss in respect of the breach of duty arising out of making the four impugned hosting contracts; and that is not alleged. No claim, therefore, lies by ASL against Dr Lynch for breach of duty in respect of these four hosting contracts.

3541. In relation to direct claims made in Schedule 12 by ASL in respect of the payment of commission to friendly VARs and entering into unfavourable reciprocal arrangements to boost revenue, a claim does lie by ASL against Dr Lynch because ASL was the original contracting or paying party who sustained some of those losses claimed, not because of the transfer pricing arrangements. I deal with this in the section of my judgment dealing with the other direct loss claims.

3542. However, I must turn to consider the substance of the Schedule 12D transactions, both in case I am wrong, and also because in any event, although he did not admit this in his pleading, it is clear from public filings and I find that Mr Hussain was a director of all three implicated companies (Zantaz, ASL and Autonomy Inc) and thus claims do theoretically lie against him in respect of the Schedule 12D transactions.

*General observations on the factual circumstances of the Schedule 12D Transactions*

3543. Turning to the facts relating to the Schedule 12D transactions, the following points of general application were stressed, particularly by Mr Hussain, and do seem to me to be either common ground or to have been established:

(1) According to Dr Lynch's undisputed evidence, the cost to the hosting industry of storing data fell from $1 million for 1 GB in the 1980s to around $10 in the early 2000s and to $0.10 by 2010; the amount that a hosting provider could charge per unit of data consequentially dropped substantially over the Relevant Period, inevitably prompting customers to expect and often demand savings.

(2) Zantaz SaaS contracts were typically terminable at short notice and prescribed no commitment by the customer to store a minimum level of data.

(3) The hybrid model gave Autonomy an immediate injection of cash.

(4) From the customer's perspective, the hybrid model delivered a more competitive rate, greater certainty as to future rates, and any benefits of owning the software licence (albeit the Claimants disputed there were any at all).

3544. Both Defendants also stressed that none of the number of people at Autonomy who was involved in selling hybrid deals, including the restructured deals in Schedule 12D, thought there was any impropriety involved in them. The Claimants' own witnesses such as Mr Sullivan, Mr Goodfellow and Mr Egan considered that there was a commercial rationale for them, in particular in enhanced customer retention and upsell opportunities.

3545. In addition, and as Mr Hussain again stressed, the hybrid model was known to the market, and known to HP from the diligence process. Further, HP studied the hybrid model in detail as part of the "re-basing" project to restate Autonomy's accounting applying US GAAP. There is nothing in the evidence to suggest that HP's decision to discontinue the model was anything other than a business and/or US GAAP accounting judgement, nor that the internal HP accountants involved in the project considered the model or its accounting treatment was inappropriate.

3546. The problem with these general points is that although they do appear to provide commercial justification for hybrid deals sold to existing SaaS customers, that justification is much more thin and tenuous in the context of the Schedule 12D transactions themselves which involved a re-restructuring or in one case, re-re-restructuring of existing hybrid arrangements.

3547. That focuses attention on the commercial justification of the individual Schedule 12D transactions, to which I now turn in chronological sequence.

*The Q4 2009 Morgan Stanley Schedule 12D transaction*

3548.  Morgan Stanley had originally contracted with Zantaz on a SaaS basis pursuant to an agreement dated 21 June 2001 ("the Original MS Agreement"). Zantaz first sold a hybrid deal (using the Claimants' terminology, "the First MS Amendment Agreement") to Morgan Stanley in Q2 2008. The First MS Amendment Agreement moved Morgan Stanley off the SaaS model and secured substantial savings for Morgan Stanley. The Claimants' complaints relate to two subsequent re-restructurings of that hybrid deal in Q4 2009 (in the Claimants' terminology "the Second MS Amendment Agreement" but which I shall call "the Q4 2009 MS Agreement") and then again in Q1 2011 ("the Q1 2011 MS Agreement").

3549.  To understand the purpose and effect of the Q4 2009 MS Agreement, which the Claimants preferred to regard as a re-restructuring, it is necessary to set it in the context of the First MS Amendment Agreement in Q2 2008.

3550.  Under the First MS Amendment Agreement in Q2 2008:

(1)  Morgan Stanley agreed to pay a fee of US$18.5 million for a licence of a package of software including Digital Safe version 7.1 (a Lucene version) and Digital Safe version 8 (an IDOL version);[444]

(2)  The agreement was for a term of two years from 1 July 2008 subject to Morgan Stanley having an option to extend for up to six consecutive one-year term;

(3)  The storage rate for year one was $0.00798 per MB, reducing to $0.00312 per MB for year five.

3551.  The Claimants contended that the First MS Amendment Agreement was an example of the use of the hybrid hosting model improperly to accelerate revenue recognition, at a substantial cost in terms of the deep discount that had to be provided to the customer to persuade it to pay an upfront licence fee.

3552.  The Q4 2009 MS Agreement followed less than two years later. By the time it was concluded on 31 December 2009, there were still at least[445] six months left to run before the initial term of the First MS Amendment Agreement expired.

3553.  The revisions introduced by the Q4 2009 MS Agreement included the following:

(1)  Morgan Stanley agreed to pay a fee of $12 million to licence the same software (albeit with updates), but with the addition of a product called *"SPE Basic"*;

---

[444] In an argument which presaged a more substantial dispute as to the existence of IDOL Digital Safe version 9 when purportedly supplied as part of the Q1 2011 MS Agreement (see paragraph 3618 below), Mr Yan and others of the Claimants' witnesses suggested that Digital Safe version 8 did not exist at the time it was sold to Morgan Stanley. It was asserted in the RRAPoC that it was not released until December 2010. Mr Yan also suggested that version 8 could not have been used by Morgan Stanley, which had a Lucene safe and not an IDOL safe. However, it became clear that there was confusion about the appellation/designation "version 8": it sometimes being referred to internally as *"DS Onsite"*. I did not understand the Claimants to have sought ultimately to pursue the point. In any event, I was persuaded that it was not well-founded. I was persuaded, and find, that Autonomy was in a position to sell IDOL Digital Safe version 8 to Morgan Stanley as at the date of the First MS Amendment Agreement.

[445] Although the term commenced on 1 July 2008 (*"the SOW Effective Date"*) the initial term was to continue for 24 months from the *"Livestream Activation Date"* which appears to be uncertain but to have occurred at some point between 1 July 2008 and 3 March 2009.

    (2) The storage rate was amended so that Morgan Stanley would pay $0.00312 per MB from year two rather than year five, with a view to projected savings for Morgan Stanley of some $13 million over seven years.

3554. The Defendants presented the immediate commercial context of the Q4 2009 MS Agreement as follows:

    (1) Morgan Stanley had pointedly made clear to Dr Lynch, at a meeting between him and the bank's head of enterprise infrastructure in November 2009 and in a presentation the bank thereafter provided to Dr Lynch that the bank was looking to cut costs across the board.

    (2) The same presentation stated another of Morgan Stanley's objectives to be to manage its costs by working with strategic suppliers: Autonomy/Zantaz had ambitions to fulfil that role, and Morgan Stanley seemed eager to explore possibilities to broaden its use of Autonomy/Zantaz products.

    (3) Thus, whereas until 2009 Morgan Stanley had very largely used its Digital Safe simply to store emails, in an email to Mr Lepore of Autonomy dated 16 October 2009, Mr David Bhola of Morgan Stanley stated that the bank was interested in both SharePoint and a document-tracking dashboard proposal, and, more generally, *"would be interested in hearing from Autonomy what is going on in the search space, new product offerings, new functionality etc. Areas of interest include rich media, spe, new functionality to be introduced into the IDOL product set."*

    (4) Another, separate, deal concluded in November 2009, under which Zantaz was to supply, and Morgan Stanley's Digital Safe system would be accepting, data from MS Office, SharePoint and Documentum, seemed to offer the prospect of likely increased demand on the part of Morgan Stanley for additional data archiving in Digital Safe from 2010 onwards.

    (5) Autonomy had in the circumstances seen encouraging signs of there being a substantial opportunity to increase Morgan Stanley's data needs and usage, but with the implicit costs that Morgan Stanley would be looking for lower data storage costs.

    (6) Further, Autonomy/Zantaz was promoting the use of newly developed *"Ironman cells"* which allowed more data to be stored per cell than traditional IDOL cells. This new development was also thought likely to facilitate the conversion of a Lucene Digital Safe to an IDOL Digital Safe. This was a further factor suggesting enhanced prospects of Morgan Stanley increasing its data storage requirement. As Mr Egan stated in a briefing note to Mr Hussain dated 23 December 2009 if Morgan Stanley could be persuaded to upgrade to Ironman cells *"Autonomy gets a showcase account on the latest safe cells and that is good for Autonomy"*. Moreover, as Mr Egan also noted:

        *"The economics work out better for Morgan Stanley over time and in the case where MS wishes to send any additional volumes to the safe.*

        *The last point is important in that Autonomy wishes to constantly provide MS with incentive to store more volume in the safe. By capping software expense and lowering the rates MS is incentivized to migrate*

> *other types of data to the safe. An example would be the legacy migration project that is going on right now. Or for instance, Autonomy can take retired application data into the safe etc.*
>
> *Overall, this license proposition and rate reduction commercially underpins constant innovation to lower costs to Morgan Stanley on a per unit basis so that the Autonomy Digital Safe becomes an increasingly attractive and cost efficient archive platform for greater volumes and breadth of data."*

(7) Mr Egan added to this, when cross-examined about the reference to *"retired application data"*, that this would be likely to include data from financial applications, which would in turn include relational structured data which would be a use case for SPE.

(8) In the meantime, Autonomy's costs of storage had fallen since the First MS Amendment Agreement, and Autonomy could afford to offer a reduced hosting rate whilst still making the same margin.

(9) Thus, Autonomy saw its opportunity to obtain more data and data storage fees from Morgan Stanley, as well as a potential shopfront for both Ironman cells and SPE, and at the same time to lock the bank in for a new upfront commitment. In return, it was offering a package which it could present as attractive to Morgan Stanley whilst not eroding its previous margins.

(10)    When it was suggested to Mr Goodfellow in cross-examination that the end of 2009 was a good time to lock Morgan Stanley in with a new upfront commitment, the gist of Mr Goodfellow's answer was:

(a) first, that it was <u>always</u> a good idea to try to renegotiate and secure a further upfront commitment and revenue; any time was a good time to improve lock-in with customers; and

(b) secondly, that all customers would be seeking to get the best deal they could. This was true also in the case of Morgan Stanley.

3555. Against that commercial background, the Defendants submitted that the Q4 2009 MS Agreement achieved a number of objectives for both parties, made obvious business sense, and was a good commercial deal. Not least, as the Defendants emphasised, it locked in $12 million of licence revenue, which, whether or not relied on to meet quarterly targets was a valuable accretion to funds.

3556. The Claimants presented the position very differently. Their case is that the deal entirely lacked *"any legitimate rationale…"* and was driven (with the active involvement and encouragement, it was contended, of both Mr Hussain and Dr Lynch) by the need on Autonomy's side for any deal that provided apparently recognisable revenue in a large amount.

3557. The Claimants contended that this was demonstrated by the negotiations leading up to the deal. According to the Claimants:

(1) Autonomy's opening pitch for this restructure was made by reference to the savings that Morgan Stanley stood to gain from it; only later was anyone concerned to identify what software might be licensed to Morgan Stanley to give the transaction some semblance of a rationale. Had the purpose of this transaction been to license Morgan Stanley new software that it genuinely wanted or needed, one would have expected the discussions about the software to precede negotiations over price. That was not the case.

(2) According to Mr Egan's unchallenged evidence, the deal was a point of "*focus of Dr Lynch and Mr. Hussain's attention*". In cross-examination, Dr Lynch appeared to accept it was an important deal for the quarter. Mr Egan informed both of them on 21 December 2009 that the numbers supported "*doing a large deal*", and Mr Hussain responded saying "*good luck! Need it!*".

(3) When on 22 December 2009, Mr Egan opened the negotiations over the deal, he sent Mr Frank Cooke and Mr Troy Huber of Morgan Stanley a spreadsheet demonstrating the potential savings, noting:

> "*-Proposed lowering of overall cost structure for Digital Safe to Morgan Stanley to create savings of $6.3M over next 5 years or $13m over 7 years…*
>
> *-This deal can be accomplished with no changes to contracts other than to amend existing agreements with new software table and new rate table…*
>
> *Mike [Lynch] and Sushovan [Hussain] asked that I keep the offer very simple and show Morgan Stanley <u>a pure savings option based upon a restructure that yields license revenue for savings</u>. I know they described this in broad strokes to people like Christian in the UK which you and I discussed.*"[446]

(4) That encapsulated the deal in the eyes of Mr Egan: it was to make a further licence sale to serve as a pretext for upfront revenue recognition, in return for which Morgan Stanley would receive further substantial savings. Mr Egan forwarded this email to Mr Hussain, saying "*FYI in case you talk to [Christian Lucas of Morgan Stanley] in am*".

> (a) When Mr Hussain chased Mr Lucas again the next day, 23 December 2009, Mr Lucas replied, asking:
>
> > "*what would be the upfront payment that you're looking for before y/end in order for the savings programme to kick in?*".
>
> (b) In response Mr Hussain clarified that:
>
> > "*The savings start the moment MS signs an amendment to the existing agreement that simply puts lower rates into effect coupled with a software licence fee. In this sense it is not even*

---

[446] Emphasis added.

*an offer that requires a legal review as it is purely financial and causes savings. It's quite simply "sign and save".*

3558. The Claimants contended that whilst it is clear that the purpose of the deal from Morgan Stanley's perspective was to achieve savings, it is equally clear that the real driver for Autonomy was revenue that it could (albeit improperly) recognise immediately. They referred in this regard both (a) to Mr Hussain's determined efforts to get a deal before the end of the quarter, and (b) also to his re-jigging of the transaction to maximise recognised revenue return.

3559. As to (a) in paragraph 3558 above:

(1) Mr Hussain pushed for the deal to be completed before the end of the quarter, emailing Morgan Stanley on 23 December 2009 to say: "*Realize this is a big ask but anything you can do would be highly appreciated*".

(2) Likewise, Dr Lynch was keen to ensure that the Morgan Stanley deal closed in Q4 2009 given its importance to Autonomy's revenue targets. On 26 December 2009, he told Mr Hussain and Mr Egan, among others, that:

"*Given the criticality to the quarter and the short amount of time left should: [Mr Egan] and [Mr Joel Scott] be in NY for 7am Monday for MS? what do we think?*"

(3) To push the matter forward, Mr Hussain approached an employee of Morgan Stanley called Mr Lucas (an investment banker who advised Autonomy from time to time but who was not part of Morgan Stanley's IT procurement function) in an attempt, as Dr Lynch acknowledged, (in his words) "*to leverage the relationship with the investment bank*". Mr Hussain suggested to Mr Lucas in an email dated 22 December 2009 that, "*if we have a deal with MS that gets us there on the q[uarter]*" it was "*very likely*" that he would be minded to pursue a convertible bond issue with Morgan Stanley acting as Autonomy's advisors.[447]

3560. As to (b) (in paragraph 3558 above):

(1) The problem arose because the rates Autonomy had offered and contracted for with Morgan Stanley in the First MS Amendment Agreement were already so low that under VSOE rules[448] if any lower rates were offered Autonomy would have had to carve out an amount from the licence fee and attribute it to storage, so as not to undervalue the storage component of the transaction.

---

[447] This is apparent from: Mr Hussain's earlier requests for advice about the effect of a convertible bond issue; his later reference to organising a call with "*John and Mark… re converts*"; a later email from Mr Lucas referring to a "*convertible financing*"; and the fact that Autonomy issued convertible bonds worth around £497 million in early 2010, with Morgan Stanley acting as "*Global Coordinator and Sole Bookrunner*".

[448] VSOE is technically a US GAAP concept, but the term was also used by Autonomy during the Relevant Period to refer to its IFRS estimates of fair value for software and services. In essence, VSOE refers to the evidence required in order to attribute a reliable fair value to individual components of a transaction.

(2) The consequence of carving out an amount from the licence fee would, of course, have been a reduction in the immediately recognised licence fee revenue.

(3) To avoid this, Mr Hussain was content to reduce Autonomy's fair value for Digital Safe storage to the new, lower rate proposed in the further amendment, as recorded in Mr Philip Smolek's email of 23 December 2009:

> *"I did discuss w/ Stouffer [i.e. Mr Egan] – this Morgan restructure if successful will likely [mean] we'd need to establish a new VSOE rate on storage in order to not require a carve on this license… Stouffer indicated to me that Sushovan is 100% in support of this deal & assured him that he'd handle any Accounting/VSOE adjustment that need to happen to make this Q4 license deal stick. Quick background (in case your minds are getting old like mine)… We re-pegged Dig Safe Storage VSOE to $0.00672/MB/yr (equiv) in Q2'09 [which equated to Morgan Stanley's then current second contract year contracted rate] (the lowest client rates in existence). Stouffer's proposal today proposes to peg Morgan's new storage rate effective with this deal to become $0.00312/MB/yr (equiv)…"*

3561. The Claimants rejected any suggestion that Autonomy's motive for entering the deal related to any real concerns about customer retention. As Mr Hussain noted in an email to Dr Lynch in November 2009, Morgan Stanley were Autonomy's "*best client, v happy*"; which is perhaps unsurprising, since they were on the "*the lowest client rates in existence*".

3562. Likewise, the Claimants dismissed Dr Lynch's suggestion that Morgan Stanley were exerting pressure for a new deal. They accepted that it was true that Morgan Stanley had issued a generic document that showed they were attempting to cut the costs of their enterprise infrastructure software in 2009. However, this document was a nonspecific strategy presentation, which did not even mention Autonomy. The Claimants submitted that it:

> *"would be a stretch to conclude, on the basis of that presentation, that Morgan Stanley would have moved to a competitor if Autonomy was unwilling to cut prices."*

*The dispute whether the inclusion of SPE was a contrivance*

3563. Last but not least, the Claimants contended that the last-minute[449] addition of SPE Basic to the definition of the software to be provided to Morgan Stanley under the Q4 2009 MS Agreement was a fiction devised to persuade Deloitte that there was substance in the sale of a new licence as well as a broader commercial justification for the transaction as a whole.

---

[449] According to Mr Egan's evidence in his witness statement, a draft version of what became the Q4 2009 MS Agreement which was sent to Mr Crumbacher by Morgan Stanley's external lawyers on 30 December 2009, just one day before the transaction was concluded, contained no reference to SPE; SPE was only added to the draft in the early hours of 31 December 2009.

3564. The position with respect to SPE, which the Claimants emphasised was (apart from updates) the only or additional software included in the Q4 2009 MS Agreement, is factually convoluted and disputed. The dispute engendered a considerable amount of evidence as to the nature of SPE, its utility generally and in particular to a Lucene safe operator such as Morgan Stanley, what Deloitte had been told and whether they were misled, and the veracity of Dr Lynch's claim during the Q4 earnings call on 3 February 2010, that *"although the deal was many other things, [SPE] was one of the key differentiators"* and his evidence to me when cross-examined that the addition of SPE was *"the basis on which Morgan Stanley were happy to commit to us for a long time"*. These issues are relevant not only to the matters under discussion in this section of this judgment, but also as a test of my conclusions about the accounting treatment accorded to the hybrid hosting model which I addressed in the preceding section.

3565. In broad summary, the Claimants contended that SPE Basic[450]:

(1) was in its infancy at that time, and in the event was never integrated with Digital Safe;

(2) according to Dr Blanchflower, would need to have changed considerably to enable it to be harnessed with Digital Safe to access and search structured data;

(3) in any event would not have been capable of use on a Lucene safe without further work by Autonomy which, according to the Claimants, was never done; and in any event;

(4) was not asked for, discussed or required by Morgan Stanley: its inclusion in the Q4 2009 MS Agreement was in consequence of a directive from Mr Hussain at the end of December 2009 that it should be included (whether or not requested, and for free) in all IDOL deals worth more than $250,000;

(5) Morgan Stanley itself did not focus on, or even appreciate, the addition: thus, for example, Morgan Stanley's Mr Furman, who was head of archiving at Morgan Stanley at the time, sent two chasing emails in January 2010, after the Q4 2009 MS Agreement had been concluded, asking for information about SPE after reading about it in the Financial Times, and apparently unaware that it had been supplied to Morgan Stanley already.

3566. The Claimants submitted in the round that in the particular context of the Q4 2009 MS Agreement, SPE was included to give the semblance of a more extensive licence and as the means of persuading Deloitte that the new licence had independent value.

3567. The Claimants relied especially on the evidence in the witness statement of Mr Egan, who was directly involved in the negotiations with Morgan Stanley. He stated:

> *"SPE was included in the deal at a very late stage. The reason for this was that, for the revenue to be recognized, it was necessary to distinguish the software package under the restructured deal from that under the prior arrangement. I discussed this issue with Mr. Hussain, including what would satisfy the appropriate level of distinction in order to enable revenue recognition. I understood that we either had to add software or include a different version of the software to that previously provided. Therefore, I understood that if we had not included SPE in the deal, and the deal had been restructured as it had*

---

[450] Structured Probabilistic Engine.

> *originally been negotiated (without SPE), it would have threatened revenue*
> *recognition. To my knowledge, based on my involvement in the negotiation with*
> *Morgan Stanley, SPE was not part of the commercial justification for Morgan*
> *Stanley's decision to restructure their existing arrangement. Indeed, I believe*
> *that Morgan Stanley would have done the deal without SPE."*

3568. The Claimants observed, and I accept, that much of this evidence was not challenged in cross-examination:

> (1) Mr Egan's evidence that he and Mr Hussain discussed the need to differentiate the software licensed to Morgan Stanley from that which had already been licensed to them under the First MS Amendment Agreement, and that Mr Egan was left with the understanding that some software needed to be added to the agreement in order to enable revenue recognition was not challenged.

> (2) Nor was there any challenge to Mr Egan's evidence that he did not discuss SPE with Morgan Stanley and that he believed that Morgan Stanley would have done the deal without SPE.

3569. The Claimants also pointed out, and I also accept, that Mr Egan's explanation was supported by the contemporaneous documents:

> (1) When Autonomy pitched the restructuring to Morgan Stanley, it never made any mention of SPE. This was true of the pitches made by Mr Hussain and Mr Egan to Mr Lucas, Mr Cooke, and Mr Huber.

> (2) Dr Lynch attempted to explain away Mr Hussain and Mr Egan's exchanges with Morgan Stanley on the basis that Mr Lucas was an investment banker with little understanding of the bank's IT functions, and that Mr Cooke and Mr Huber were "*just interested in getting a good deal*" and "*making sure the system runs*", respectively. They were later dismissed as "*low-level operational people*". However, Mr Cooke was head of procurement at Morgan Stanley, and Mr Huber was an executive Director who appears to have been Mr Furman's boss, in charge there of Archiving and Digital Safe, and of sufficient corporate weight to have been suggested as a contact for Dr Lynch. In other words, Mr Huber and Mr Cooke were senior and important individuals within Morgan Stanley's IT function; and the contemporaneous documents show that they knew nothing at all of SPE.

> (3) It is also consistent with Mr Egan's evidence that the draft restructuring agreement sent to Mr Crumbacher by Morgan Stanley's external lawyers, Sidley Austin, on 30 December 2009, just one day before the transaction was concluded, contained no reference to SPE and that SPE was only added to the draft agreement in the early hours of 31 December 2009, after Mr Hussain and Dr Menell had issued their directive to include it (for no charge) in all IDOL deals worth more than $250,000.

3570. Further in relation to paragraph 3566 above and the suggestion that the inclusion of SPE was a means of persuading Deloitte to accept that the new licence was materially different, the Claimants supported their case by reference to Deloitte's working paper, which stated that:

*"SPE is a new Autonomy product, launched in Q3 2009. SPE gives additional functionality to IDOL, which allows it to search structured information, such as databases. Combining this software with DS allows customers to sort and archive data directly from their third party databases.*

*In order to understand the commercial rationale for this purchase by MS and to establish how significant the addition of SPE is (in order to justify the $12m price tag) we have held discussions with Pete Menell (CTO). Pete noted that under the original DS deal, MS was only able to sort and archive its undstructured [sic] data, such as e-mails and other documents produced by standard desktop applications (Microsoft Office etc.). What the addition of SPE allows MS to do is to sort and archive all of their structured data from their transactional databases i.e. the databases that the bank uses to manage its customer accounts, value its numerous financial products and manage its finances. Given the volume of structured data held by MS globally, by purchasing DS with SPE, MS has significantly increased the amount of its data that can be archived in accordance with regulatory requirements. In Pete's opinion, from MS's point of view, when compared to other options for archiving all of their global structured data, a price of $12m is tiny.*

*…*

*Now that we have identified the commercial rationale and the technical reasons for the transaction, we must consider whether the licence fee of $12.0m represents fair value or whether an element of the upfront fee relates to the provision of future services. To do this, we must consider the exact nature of the additional software provided to MS and the other elements in the deal, such as the future support and maintenance fees and the ongoing storage rates. These are considered in turn below…*

*…*

*Note from the above that the storage rates have now been reduced significantly, so that the ongoing storage charge from year two onwards is at the rate previously reserved for year five onwards under the original agreement. Per discussion with the CFO we noted that the reason why the storage rates have now been reduced is due to the commercial pressure to keep MS as a customer."*

3571. The Claimants contended that the information provided to Deloitte by Dr Menell was misleading, because (a) SPE could not be used with Digital Safe because it was never successfully integrated into it; (b) even if it had been integrated, Morgan Stanley would not have been able to use it unless Autonomy created a new IDOL cache specifically to enable SPE to work with a Lucene Digital Safe, or Morgan Stanley converted to an IDOL Digital Safe, neither of which happened. Indeed, the Claimants suggested that even on the Defendants' evidence, further configuration of Morgan Stanley's Safe would have been needed before it could use SPE, and there is no credible evidence that this ever occurred. Dr Menell's explanation was also, according to the Claimants, misleading by omission. He neglected to mention that he and Mr Hussain had issued a directive that SPE should be included in all IDOL deals with a licence fee greater than $250,000 "*at no additional cost*". In those circumstances, they suggested that it is *"surprising"* that he was willing to tell Deloitte that the $12 million that Morgan Stanley paid for its licence to SPE was "*tiny*".

3572.  The Defendants sought to rebut each of these contentions, insisting that SPE was:

> (1)  Compatible with Morgan Stanley's Lucene safe and usable through an IDOL 'cache': according to the Defendants, the Claimants' submissions failed to take into account that by at latest November 2009[451], Morgan Stanley had commenced (and were some way in the process of) *"IDOL-ising"* its safe by (in Morgan Stanley's case, given its huge structured data archive) installing extensive parallel IDOL architecture in the form of an IDOL cache;

> (2)  From, at latest, November 2009, part of what Dr Lynch called the *"roadmap"* for the development of Morgan Stanley's use of IDOL for both unstructured and structured data: the Defendants maintained that structured databases of customers such as Morgan Stanley could be searched using a combination of IDOL, Digital Safe and SPE. Indeed, as both Dr Blanchflower and Mr Wang (though with some caveats) accepted when cross-examined, such a use of SPE was being considered for another institution, BofA, at around this time;

> (3)  Of considerable value to Morgan Stanley, given its vast structured data archives: the Defendants emphasised that Morgan Stanley certainly had a use for SPE, as Mr Goodfellow eventually conceded, and Dr Lynch referenced in that context both correspondence in October 2009 mentioning Morgan Stanley's interest in SPE (amongst other products and functionalities) and also meetings which he told me he had personally had with senior executives of Morgan Stanley (including Mr David Riley, Morgan Stanley's CIO of enterprise infrastructure) in Q4 2009, as well as a breakfast and town hall meeting at the Morgan Stanley Investor Conference on 10 November 2009[452]. Dr Lynch also told me in the course of his cross examination that he recalled discussing SPE further with Mr Rosenthal, Morgan Stanley's CTO and Mr Traverso, and that these discussions had concerned Morgan Stanley's interest in Autonomy's roadmap of its technology and the extent to which Autonomy would be able to handle other types of data (which would increasingly become available for archiving following the November 2009 deal).

3573.  In the latter context, Dr Lynch insisted, when pressed to explain why SPE was only included at the last minute, that this was a misunderstanding: according to his evidence, in fact SPE capability was already included in IDOL 7.5, and the decision to *"break out"* SPE was *"so that we could actually use that from a marketing point of view"*, that is to say, *"for branding purposes"*.

3574.  He insisted also that, contrary to the Claimants' suggestion, SPE was an important factor in persuading Morgan Stanley at the highest approval level to commit to a five-year engagement: Dr Lynch told me that he had met with Mr David Riley, Morgan Stanley's CIO of enterprise infrastructure, amongst others. It seems clear from the documents (and

---

[451] In paragraph 8 of his third witness statement, Mr Yan suggested that Morgan Stanley *"only had an IDOL cache installed in its production safe in the first half of 2011"*. However, that was contradicted by the documentation, from which it is clear that (as the Defendants submitted) the process was well underway by November 2009.
[452] The evidence of his diary extracts also supports Dr Lynch's recollection of meetings with Morgan Stanley's CTO and other senior IT employees on 28 September 2009, and his attendance at a breakfast and town hall meeting at the Morgan Stanley Investor Conference on 10 November 2009.

HC-2015-001324

especially an email from Mr Scott Coleman of Morgan Stanley to Dr Lynch dated 2 November 2009) that this discussion included email archiving.

3575. The Defendants denied that Deloitte had been misled by them or Dr Menell or anyone else. Dr Lynch repeated once again that *"No one was trying to mislead Deloitte and Deloitte could easily check anything they needed to know."* When it was put to him that he would surely have appreciated that *"the acceleration of revenue was improper given that the so-called licence contained in this agreement was artificial"* he added further:

> *"I disagree that it was improper to do that structure and it's one that Deloitte and the market knew and understood. The market was well aware that we were doing that and it's one that HP well understood and there was nothing improper about it. The commercial strategy here was actually a highly successful one for the business which led to us being one of the largest cloud providers, if not the largest, at the time."*

3576. As to Dr Menell's failure to mention that no separate charge was made for SPE, Dr Lynch gave the following answer in cross-examination:

> *"Q. Do you see that Dr Menell told Deloitte that from Morgan Stanley's perspective $12 million would be a tiny price for SPE?*
>
> *A. Yes.*
>
> *Q. He doesn't mention that he had instructed Mr Crumbacher to include it in all licence deals over $250,000 for free, does he?*
>
> *A. Yes, but this is tied into the archiving pricing of the per megabyte. So what's happening is they take in SPE, they take in unstructured data -- sorry, structured data, they then still have to pay on the per megabyte basis, so we're going to make a lot of money out of it.*
>
> *Q. Dr Lynch, Dr Menell tells Deloitte that, from Morgan Stanley's perspective, $12 million would be a tiny price for SPE in circumstances where, as he knew and you knew, an instruction had been given to include it in all licence deals over $250,000 for free?*
>
> *A. On the basis of the licence deal. So, remember, it's part of IDOL so that IDOL transaction that's being added to will have a limit on it. So here the limit is very large because this is a large deal. So the equate you're making is not apples to apples. So if I license IDOL to a customer they then get SPE Basic, you're calling it for free, but the point is they're only getting that for what they've licensed IDOL for. So if they've licensed IDOL for a certain amount of data or a certain amount of users -- remember we talked about instances and users and things like that -- that's all they're getting SPE for. The reason why this is so much more expensive is this is a massive system.*
>
> *Q. They already had a licence for IDOL, correct?*
>
> *A. They already had a licence for one level of IDOL, yes.*
>
> *Q. And they were restructuring in a way where the only additional software was SPE, correct?*

> *A.  SPE for a large amount of data, yes.*
>
> *Q.  I suggest Dr Menell was misleading Deloitte, correct?*
>
> *A.  Completely disagree."*

3577. In the round, Dr Lynch remained adamant that (a) for the reasons explained above, the size of the fee was justified by the size of Morgan Stanley's structured data and the value to it of using the software in such circumstances, adding *"what you are buying is the rights for the size of what you are doing. Morgan Stanley here is buying a very big version of IDOL, if you like to think of it that way"*; (b) there was no reason why Morgan Stanley couldn't use SPE to process new structured data; and (c) there was nothing misleading about telling Deloitte that there was a risk that Morgan Stanley would leave: as Dr Lynch put it, *"obviously, if something is 10 times more expensive than the competition, you're going to move."*

*My assessment of the commerciality of the transaction and Deloitte's apparent approval*

3578. There is no doubt that Mr Hussain came to place reliance on the deal as a source of revenue to enable Autonomy to meet its quarterly target. That was the obvious driver for Autonomy's need to strike the deal before the end of the quarter. The rush betrayed the purpose. In assessing the commerciality of the transaction, the question is whether there was any other purpose; and, if so, whether that is sufficient to justify the transaction as the product of a reasonable commercial decision, rather than a costly expedient to ramp up revenue in a hurry in respect of which any side benefit was just that and not the driver.

3579. The Defendants asserted that the deal was commercially a good one for Autonomy. Dr Lynch's written closing submissions emphasised that:

(1) Autonomy locked in $12m of licence revenue.

(2) From a commercial perspective this was a good moment to renegotiate with Morgan Stanley and lock in a new commitment. They were coming towards the end of the contractual period anyway, and had the right to terminate at will. There were also very substantial amounts of new data in prospect.

(3) Locking in Morgan Stanley was a justified objective; they were known to be cost-sensitive and an internal document showed that their "*top priority*" was in controlling and reducing costs, including by strategic sourcing.

3580. Mr Egan's briefing note to Mr Hussain explained the commercial proposition (in the second paragraph, starting "*Regarding the Digital Safe rate reduction deal*"):

(1) It referred to the value proposition of the migration to Ironman IDOL cells offered by the new arrangements. It also made the following point:

> *"Autonomy wishes to constantly provide MS with incentive to store more volume in the safe. By capping software expense and lowering the rates MS is incentivized to migrate other types of data to the safe. An example would be the legacy migration project that is going on right now. Or for instance, Autonomy can take retired application data into the safe etc."*

(2) This showed that Autonomy was envisaging Morgan Stanley migrating other types of data into the Digital Safe. This included "*retired application data*", which would be structured data: a use case for SPE. Mr Goodfellow accepted this:

> "*Q.   And this is dealing with incentivising them to deal with other types of data including a legacy migration project, yes?*
>
> *A.   That's correct, yes.*
>
> *Q.   There's also a reference to Autonomy taking retired application data into the safe, do you see that?*
>
> *A.   There is there, yes, correct.*
>
> *Q.   And retired application data is likely to include data from financial applications, isn't it?*
>
> *A.   That is correct.*
>
> *Q.   Which is likely to include relational structured data, yes?*
>
> *A.   That is correct.*
>
> *Q.   And that is a use case for SPE, isn't it?*
>
> *A.   It's a potential use case for SPE as we've already covered.*"

(3) The final paragraph of Mr Egan's email stated:

> "*Overall, this license proposition and rate reduction commercially underpins constant innovation to lower costs to Morgan Stanley on a per unit basis so that the Autonomy Digital Safe becomes an increasingly attractive and cost efficient archive platform for greater volumes and breadth of data.*"

(4) The Claimants' witness, Mr Goodfellow, who had stated in his witness statement that he could not see "*any commercial justification beyond revenue recognition for re-restructuring*", was unable to adhere to that when cross-examined, as the following extract shows:

> "*Q.   ... So overall the message to Morgan Stanley is it's being offered incentives to put greater amounts of data into archiving, yes?*

> A.    *That's correct, yes.*
>
> Q.    *And that fits with Morgan Stanley's commercial programme which it's told Autonomy about of trying to lower its costs and achieve economies of scale, yes?*
>
> A.    *That seems a perfectly -- reducing costs seems a perfectly reasonable goal for Morgan Stanley.*
>
> Q.    *And at the same time Autonomy stands to benefit from getting more data?*
>
> A.    *Potentially, yes."*

3581.  When cross-examined, Dr Lynch, with characteristic fluency, elaborated his case as to the commercial rationale of the transaction as follows:

> "Q.    *...You appreciated that this transaction was not in the commercial interests of Zantaz, correct?*
>
> A.    *I think it was an extremely commercial deal for Zantaz in that you managed to tie in one of the marked customers for another five years, you managed to set rates in a market where they were falling, you managed to get them to become a reference for your new technology, you got the possibility of opening up much more data than you already had because you now had the argument of going into Morgan Stanley and saying, "You've already got the SPE licence, turn on structured archiving for us". So, no, I think it was a very, very good deal. And of course because we lowered the rates, they sent us more data.*
>
> Q.    *I suggest that substantial savings were being offered to Morgan Stanley in circumstances where there was in fact no risk of them leaving and as a result of that, Zantaz actually received substantially less revenue as a result of the restructuring; correct?*
>
> A.    *That's wrong on so many levels. So, first of all, your assumption is that although their contract ended in six months' time, they would continue for the next five years at the rate at that point despite the fact that storage costs were falling and had continued to fall very, very aggressively. So that's the assumption that you've made there. Secondly, you haven't included any concept of pricing having an effect on demand so the fact that the rate was lower meant that they put more data in. And, in terms of moving, Morgan Stanley could have decided to completely change their archive over, I agree that*

> *that would have been a very large amount of work and probably not necessary, but all they had to do to switch to a competitor was take the pipe that was bringing new data and switch it over to their competitor. And in fact the other possibility was when there were banking transactions. So one of the things that happens here; because of this deal, we win a deal for a joint venture that Morgan Stanley does and we wouldn't have been able to win that if we hadn't got this new basis for doing the business. So the reality is it was an extremely good commercial situation where we got more data and we got more types of data, we got a long-term commitment, we fixed a price in a falling market, we kept out competition who couldn't match us and we became Morgan Stanley's choice where they did have completely green field situations such as their joint venture with Citigroup."*

3582. The additional commercial factors referred to by Dr Lynch illustrate that commercial decisions may have many strands. Where there are competing commercial arguments, the Court is most reluctant to second-guess the balance between them struck by directors; nor even, in most cases, which was the predominant consideration; that is a matter for their business judgment. The question is whether that is the situation in this case.

3583. In my judgment, this is not really a case of competing commercial arguments as to how best to serve and advance the interests of the company: it is a case where the operative reason for what was done could not be relied on as being in the interests of the company at all.

3584. Even accepting that the transaction offered the various benefits identified and emphasised by Dr Lynch, what drove the transaction was Mr Hussain's requirement for recognised revenue to try to achieve the target for Q4 2009. Whilst I suspect that Morgan Stanley would have proceeded with the transaction even had it not been supplied with the structured data functionality, and on balance could in any event have made use of that functionality on its Lucene safe with further work by Autonomy, in my judgment (and I find) Autonomy would not have proceeded but for its management's need for, and perception that the transaction could be structured so as to generate, revenue which could immediately be recognised in its quarterly accounts and presented to auditors (and by them to the Audit Committee) in such a way as to secure their approval.

3585. It seems to me likely, and I find, that part of the reason for Autonomy's adoption of this strategy was that the hosted hybrid transactions, and in particular the issue of a licence, could be presented as having commercial benefits for both contracting parties. The fact that the licence could reasonably plausibly be presented as the means of securing continuing loyalty and the "bird in the hand", and the appearance of there being commercial benefits for both contracting parties from the transaction, were essential if the payment for the licence was not to appear too obviously to be what it really was: a prepayment of hosting costs and charges.

3586. That is not to say that those other benefits were all illusory; but I do not consider that any was the real reason for Autonomy's adoption and espousal of the model. In particular (but without elevating it into some sort of litmus test, since I have considered all the alleged benefits both individually and cumulatively) I cannot accept that the late

addition of SPE (in the early hours of 31 December 2009) was anything more than cosmetic: it was made for the reasons given by Mr Egan as recorded in paragraph 3567 above. I cannot accept Dr Lynch's evidence in this regard. His claim in cross-examination that the reason that SPE was added was *"because that was the basis on which Morgan Stanley were happy to commit to us for a long time"* (and see paragraph 3564 above) was not credible; and his attempt to justify what he had said in the earnings call for Q4 2009 that SPE was *"the key winning differentiator"* in securing that commitment was likewise unconvincing: what he had said in the earnings call was false, and its falsity has confirmed in my view that the addition of SPE was a device. The other benefits were potentially real; but they were ancillary.

3587. In such circumstances, in my judgment, what ultimately drove the transaction was not a commercial assessment of the interests of the company, but the perceived imperative of generating revenue which could be presented as recognised revenue in its accounts to seek to meet revenue targets. That may have sustained the share price; but it is well established that the proper business of the company does not extend to pursuing such an objective.

3588. I consider that the Q4 2009 Morgan Stanley transaction provides a further illustration and confirmation that treating the sale of a licence as a separate component of a hybrid hosting restructuring was without foundation and led to improper accounting and misstatement of recognised revenue. There was barely more than a residual recourse to the licence as making any real difference, let alone an identified and separate difference. The arguments highlighted that even on the Defendants' case, save only for the extension of the licence to SPE which I have determined was contrived at the last minute and was provided to others free of charge, the real commercial rationale was the *quid pro quo* offer of reduced data storage rates and service and maintenance charges in return for an upfront prepayment. As briefly mentioned in paragraph 3583 above, I doubt whether in such circumstances the pursuit of that objective could ever be justified as a proper exercise of business judgment or management powers.

3589. I have concluded that the driver for the transaction was the need for recognised revenue, that this was not a commercial decision weighing the interests of the company but one borne of the Defendants' objective of maintaining Autonomy's reputation of meeting revenue forecasts which underpinned its share price, and that it was a breach of duty giving rise to loss.

3590. I confirm that I do not consider that the fact that Deloitte considered and approved the transaction provides any defence. On the contrary, it seems to me that Deloitte were materially misled, that what they were told to address concerns they expressed about SPE was false and that the perceived need to dress the transaction up for them is further proof of its impropriety. The position is particularly stark because Deloitte were misled so directly in response to a concern they had specifically raised.

3591. Deloitte were plainly concerned about the transaction, and in particular that SPE was the only additional software to that which had been licensed to Morgan Stanley under the First MS Amendment Agreement. In January 2010, Mr Welham had asked Mr Chamberlain whether Autonomy was *"saying that Morgan Stanley have paid $12 million for SPE Basic?"*

3592. More generally, Deloitte was dubious as to "*what caused the agreement to be renegotiated*", noting that, "*from Autonomy's point of view, they had MS tied in to a*

*lucrative S&M and storage contract...*" prior to the restructuring. Unsurprisingly, given that the storage rates under the agreement were lower than Autonomy's previous estimates of fair value,[453] Deloitte wanted to consider the "*substance of the [Q4 2009 MS Agreement] to establish if the relevant elements have been determined at fair value*".

3593.  In paragraph 3570 above, I have already quoted Deloitte's working paper recording Autonomy's explanation of the transaction, and the inclusion of SPE. I have previously also addressed the dispute whether SPE could be used on Morgan Stanley's Lucene safe (and concluded that it could, but only with further work by Autonomy). Even leaving those aside, the reply recorded in the working paper as having been given by Dr Menell to Deloitte on the specific concern and resulting question they had raised is, in my view, sufficient to undermine any purported reliance on their approval. Deloitte were not in a position to know what SPE comprised or what its true value was. Dr Menell's statement, as recorded in the working paper, that the price of $12 million *"when compared to other options for archiving all of their global structured data" was "tiny"* was thoroughly misleading without being in the context of the undisputed fact that (as previously mentioned in paragraph 3571 above) he and Mr Hussain had issued a directive that SPE should be included for free. In my judgment, this was more than *"surprising"* (again see paragraph 3571 above): it was false. I do not consider that Dr Lynch's attempt to explain it away in the passage of his cross-examination I have quoted in paragraphs 3576 and 3577 above, though characteristically ingenious, was credible.

3594.  Further, it appears from the final paragraph of the quoted text from Deloitte's working paper above, that Mr Hussain himself misled Mr Welham into believing that Morgan Stanley had applied commercial pressure to reduce storage rates, and that Autonomy had been concerned that, if it did not reduce the storage rates, Morgan Stanley might terminate the First MS Amendment Agreement. There is nothing to suggest that this was in fact true. This depiction of Morgan Stanley as a flighty customer contemplating a move was at odds with Mr Hussain's own evidence earlier that Morgan Stanley were Autonomy's *"best client, v happy"* (see paragraph 3561 above) and with Dr Lynch's description of them as *"reasonably happy"* (see paragraph 3600 above). Further, the Claimants pointed out that:

(1)  Mr Hussain did not merely suggest that Morgan Stanley might use a new provider for new data; he suggested to Mr Welham that Morgan Stanley might terminate the existing arrangement, which would require it to move its existing data to a new provider. Dr Lynch himself accepted that a customer would be very unlikely to do that.

(2)  In fact, as explained above, Autonomy could not have had any cause for concern regarding Morgan Stanley's continuing use of Digital Safe, given the extremely low rates that Morgan Stanley was already benefiting from, and the difficulties, mentioned above, with any customer switching hosting provider.

---

[453] Mr Smolek had remarked that if the transaction went ahead, Autonomy would "*need to establish a new VSOE rate* on *storage in order to not require a carve on this license*" but that "*Sushovan is 100% in support of this deal & assured [Mr Egan] that he'd handle any Accounting/VSOE adjustment that need to happen to make this Q4 license deal stick*".

3595. In the round, therefore, in my judgment, the Claimants' factual case in relation to the Q4 2009 MS Agreement is well-founded and a breach of duty and improper use of power has been established. I shall consider later what loss was thereby caused.

*The second Morgan Stanley Schedule 12D transaction: Q1 2011*

*Outline of the Claimants' case*

3596. The Claimants' case with respect to the third amendment to the original agreement in Q1 2011 (which I shall refer to as "the Q1 2011 MS Agreement", and which was a re-re-restructuring in the Claimants' parlance), echoed their case in respect of the re-restructuring in Q4 2009 discussed above.

3597. At the time of the Q1 2011 MS Agreement, Morgan Stanley's existing arrangements entitled them to renew for up to six years on consecutive one-year terms. Morgan Stanley had already exercised its option to extend its existing arrangements.

3598. The licence fee under the Q1 2011 MS Agreement was $5 million. The new licence covered (a) the software already licenced under the hosting agreement, with the addition of (amongst other things) Digital Safe version 9, StorHouse/RFS and StorHouse/RM, Autonomy Investigator and Early Case Assessment, and (b) a separate package of software to be supplied by Autonomy pursuant to an 11th Amendment to the Software License Agreement dated 31 March 2011.

3599. Under the Q1 2011 MS Agreement, which was concluded on the last day of the quarter, 31 March 2011:

(1) Morgan Stanley agreed to pay a licence fee of $5 million;

(2) Autonomy agreed to reduce the data storage charge from an already extremely low rate of $0.00312 MB per annum to a rate of $0.0023 per MB per annum for the year beginning April 2011, and then to reduce yet further at various intervals thereafter to $0.0016767 per MB per annum;[454]

(3) Otherwise, the terms of the agreement and the options to extend remained substantially unchanged.

3600. The Claimants sought to impugn the Q1 2011 MS Agreement as a contrived and commercially indefensible deal. They dismissed as unsustainable the Defendants' presentation of the rationale of the deal, on the basis that (put shortly):

(1) Dr Lynch's claim that *"the old hosting rates were no longer competitive"* and that a further reduction was needed to ensure Morgan Stanley's continued loyalty ignored (a) the fact that by virtue of the Q4 2009 MS Agreement, Morgan Stanley already enjoyed extremely (and artificially) low storage rates, (b) his own evidence in cross-examination that Morgan Stanley was already *"reasonably happy"* and also (c) the fact that at the time that what became the Q1 2011 MS Agreement was being negotiated, Morgan Stanley had already shown its satisfaction in exercising its option to extend the existing agreement;

(2) Dr Lynch's argument that under the Q1 2011 MS Agreement Autonomy supplied additional software which was both a benefit to Morgan Stanley and a

---

[454] The Agreement itself reads "$0016767/MB". This appears to be a typographical error.

prospective source of further profit for Autonomy from its use and maintenance was contrived: Morgan Stanley had not requested the additional software and the principal addition as put forward by Dr Lynch (Digital Safe version 9) did not even exist.

3601. The Claimants invited me to reach the conclusion that the only real purpose of the transaction from Autonomy's point of view was revealed to be accelerated revenue recognition, for which it paid the price of having to agree even more deeply discounted storage rates. Once more, according to the Claimants, Autonomy was, in effect, purchasing its own revenue and swallowing the cost.

3602. The Claimants sought to elaborate and fortify these points by reference, in particular, to:

(1) the difficulties which Autonomy apparently had in finding any plausible justification for a re-re-restructuring;

(2) what on the Claimants' case was Autonomy's contrived resort to the inclusion of what was described as Digital Safe version 9 (which the Claimants claimed simply and starkly, did not exist) and the reference to structured data load capabilities as provided by FileTek Storhouse RFS and StorHouse RM software simply as expedients to differentiate the Q1 2011 deal from the Q4 2009 deal;

(3) Mr Welham's evidence that Deloitte was not made aware of fundamental aspects of the transaction and would not have considered revenue recognition appropriate had they known about them.

3603. I address these points in turn, with some additional elaboration of the convoluted and confused issue relating to whether or not Digital Safe version 9 was in existence, which is relevant also to another transaction which the Claimants impugned as improper and loss-making between Zantaz and Deutsche Bank.

*Instigation of the transaction*

3604. Dealing first with the instigation of the transaction by Mr Hussain and his team, it seems that in around the middle of February 2011, Mr Hussain identified Morgan Stanley as one of a number of *"deals possible this [quarter]"* and encouraged his team to set about trying to identify what else they could offer to Morgan Stanley to justify another transaction and another upfront licence fee which would generate recognised revenue.

3605. The twin problems which emerged were that (a) Mr Crumbacher's hurried review of the existing contractual arrangements did not suggest any restrictions or deficiencies in Morgan Stanley's existing contractual entitlements which might have offered an easy opening for a further sale, and (b) when Mr Hussain tasked Ms Gustafsson with checking *"the model, [updating] it and [sending] it to [Mr Egan] and me with any possibility of restructure. Urgent"* Ms Gustafsson replied the same day, highlighting that Morgan Stanley storage rates were already at what Autonomy had set as "fair value": *"we are already at VSOE…".*

3606. Notwithstanding these difficulties, on 15 March 2011, Ms Gustafsson sent a draft proposal to Mr Egan, copying Mr Hussain, presenting Morgan Stanley with *"an opportunity to save your company in excess of $9m in five years"* in return for an upfront licence fee of $5m for software that was yet to be identified. The suggested savings were later revised down to approximately $5.9 million over five years assuming a flat storage

rate of $0.00312 per MB per annum, thus not taking into account further decreases in the storage rate at various intervals that featured in the final version of the contract.

3607.  On 16 March 2011, Mr Egan explained to Mr Furman and Mr Cooke of Morgan Stanley that *"through a restructure of your license the Digital Safe we can reduce for storage cost per MB by 26.2%, saving Morgan Stanley a total of $5.9m (37%) over a five-year period… In exchange for a $5m Digital Safe license, we would be able to reduce the storage rate…"*. Again, there was no mention of the software that Autonomy was proposing to licence to Morgan Stanley. The Claimants contended that this demonstrated that:

> *"the approach appears to have been to identify how much of the ongoing storage fees could be moved into the upfront licence fee in order to create substantial revenue for Autonomy for the quarter, and the savings that Autonomy would need to offer to Morgan Stanley to persuade it to pay the license fee, and then to work out what software Autonomy could licence to Morgan Stanley to justify the licence fee."*

3608.  The Claimants referred to two emails from Mr Hussain to Mr Egan as illustrating the pressures he felt he was under and the pressures he put on those below him in the hierarchy: on 16 March 2011, he emailed Mr Egan saying *"2 weeks for MS is an eternity!! We definitely need the deal"* and on 21 March 2011 his email subject line read *"no pressure but need MS!"*.

3609.  Meanwhile, the software to be licensed to Morgan Stanley had still not been identified. Mr Egan emailed Dr Menell, Mr Hussain, Mr Crumbacher and Mr Scott on 24 March 2011, saying:

> *"As discussed with Sush, I need a list of new software that would be additive to Morgan Contract but related to IDOL, DS, audit center and S6 that can be added to the contract to support their accounting position for keeping old and new package amortizing simultaneously. Need urgently."*

3610.  Mr Hussain forwarded this email to Mr Chamberlain, who responded: *"Just met with Pete [Menell] and Poppy [Gustafsson]. She is drafting an email. Plenty of extra we can give them"*. Around 15 minutes later, Ms Gustafsson sent Mr Egan a *"PROPOSED SOFTWARE OFFERING"* which included *"Digital Safe v9.0 Digital Archive System with FileTek structured data-load capabilities"*. Mr Egan then asked her to "*line item the idol functions*". Ms Gustafsson duly did so by lifting a list from another customer's Digital Safe contract. Mr Chamberlain forwarded this list to Mr Crumbacher, copying Mr Egan, saying:

> *"THIS NEEDS TO BE VERIFIED BY THE TECHNICAL TEAM AS BEING RELEVANT AND DELIVERABLE".*

3611.  When cross-examined, Ms Gustafsson acknowledged that she had little idea of what the software set out in her emails actually was. She told me:

> *"…I was very rarely, if ever, involved in what was actually licensing, I was agnostic to it, It certainly didn't change the metrics that I was putting in…*

> *What I can see here is that there's a long list of technical things that then I would have had no idea what any of those are, now I have no idea what any of them is - - what's a kick-start metadata? I have literally no idea. What this looks like to me is a copy and paste from a similar or equivalent agreement…"*

3612. The Claimants submitted that this demonstrated that she had simply put together a description of varieties of software offering, culled from previous agreements without discrimination in terms of customer suitability, from which others could select what would be appropriate, not for the customer's needs, but to ensure that the revenue from the licence fee could be recognised upfront.

3613. When it was put to her that it was clear that she had been called upon to put together the software offering to ensure that the revenue from the licence fee could be recognised upfront she told me:

> *"Q. You would have been concerned from a revenue recognition perspective to ensure that the software that was licensed was something new from that which had previously been licensed, correct?*
>
> *A. It would have been important, yes, to be able to demonstrate it was separable.*
>
> *Q. That's why you're involved in the discussion as to what software is going to be licensed, to make sure there's something new in there which can justify recognising the revenue, correct?*
>
> *A. I don't think that's correct."*

3614. Ms Gustafsson's explanation for the fact that she was tasked with putting together the first formulation of the software licence was that she had:

> *"a lot of visibility of the other contracts readily at my disposal and [she could] copy and paste them from another legal agreement, if that's possibly helpful"* and she was *"bringing up things that could be used as a frame of reference … to sort of start drafting the legal agreements"*.

3615. The Claimants submitted that this was not credible evidence: it was improbable that Mr Crumbacher, one of Autonomy's lawyers, would have needed Ms Gustafsson's help in sourcing a suitable precedent for a Digital Safe licence. Moreover, if the software licence were being put together with Morgan Stanley's commercial and technical needs in mind, one would expect to see the person negotiating with Morgan Stanley passing information back to Autonomy's technical department, which would identify the products that met the customer's technical needs, and would in turn pass the list of products to Autonomy's Legal and Finance departments to ensure that the proposal was documented correctly. But Ms Gustafsson, on her own admission, was *"not involved in conversations that are happening there with the customer"*. The Claimants invited me to conclude that the only rational explanation for Ms Gustafsson being tasked with putting together the software offering was that it was primarily driven by accounting considerations.

3616. I have concluded that this is indeed the most rational explanation. Ms Gustafsson struck me as uncomfortable in telling me *"I don't think that's correct"* and her attempt to explain her role was not convincing. Her evidence revealed clearly that though she had little, if any, idea what the software comprised, she knew what she was tasked to do and the target she was required to hit:

> *"...from my perspective, and I stand by my statement, that what we are licensing is not really relevant. What's important here is that the licence is a separable element to that bundle of contracts that we are doing. Whether it's IDOL licence 7.0 or 6.0, whatever it is, it could be anything. What matters to me is that this is a separable component of the bundled agreement."*

3617. The second limb of the Claimants' contentions was the claim that some of the software included in order to appear to differentiate the Q1 2011 MS Agreement from the previous agreements did not even exist in March 2011, and was only made available to customers some three and a half years later, in November 2014.

3618. A considerable body of evidence was put forward on the dispute as to the existence or not at the time of version 9 of Digital Safe (an issue which, as will be seen is relevant also to another of the impugned Schedule 12D transactions, that between Zantaz and Deutsche Bank). By way of overall summary:

(1) The Claimants relied primarily on (i) Mr Langford's searches of the records of Autonomy software releases, (ii) Mr Langford's evidence that the listing of Digital Safe software on Automater with a suffix *"WIN"* demonstrated that Automater was not an accurate guide, still less proof of 'version 9', because Digital Safe was a 'Linux' system which was not compatible with Windows, and (iii) the recollections of Messrs Yan, Wang, Langford and Goodfellow as to when Digital Safe version 9 was released.

(2) Dr Lynch's position was that this was no more than a "*dispute over semantics*": and that there was a version of Digital Safe called 'version 9' prior to 2014 and "*it is irrelevant that a 2016 version of Digital Safe may also been called Digital Safe version 9*". Further, Mr Langford's evidence as to the incompatibility of Digital Safe and Windows was wrong: Digital Safe could be adapted to be compatible with Windows, as shown by a number of documentary references to Windows compatible versions of Digital Safe and, for example, the supply of a Windows compatible version to Manulife.

(3) Mr Hussain's case was that he understood that version 9 was placed on Automater in March 2011.

3619. It is clear that there was some uncertainty within Autonomy at the time as to the availability of version 9, and considerable confusion as to what was in the event placed on Automater for downloading. After receiving Ms Gustafsson's list on 24 March 2011, Mr Crumbacher asked Dr Menell and Mr Avila to confirm that the additional software could be delivered by the end of Q1 2011:

(1) Dr Menell and Mr Avila replied in the affirmative the following day, but Mr Crumbacher was clearly not satisfied with their answers, because he asked Mr McCarthy to confirm that the products were deliverable a few days later.

(2) Mr McCarthy explained in an email to Mr Crumbacher dated 28 March 2011 that he did not have a version 9 of Digital Safe as a "deliverable": but he noted that he had *"heard rumours that Roger may have a copy but it isn't on Automater".*

(3) Mr Crumbacher relayed to Mr Goodfellow and Mr Lucini:

> *"Chris, Fer, is there a version 9 of the Safe? Need it for Morgan Stanley (8.0 won't work), and Michael's telling me there's no v.9 on Automater. If Ver 9.0 exists, can we get it up on Automater for delivery?"*

(4) Mr Lucini responded saying "*...we will put [version 9] up there*" but he stated in his witness statement that he could not recall what was uploaded; "*It may have been a copy of an earlier version of Digital Safe, or possibly just an empty zip file*". Indeed, Mr Lucini's evidence, which he confirmed in cross-examination, was that somebody – he thought possibly Dr Menell – told him that it didn't matter what software was uploaded.

(5) The software that was eventually uploaded was sent by Mr Wang to Mr Goodfellow, who passed it to Mr Booth for uploading onto Automater. Mr Wang could not be sure what he sent to Mr Goodfellow, but suggested that it was most likely to have been Digital Safe version 8.

(6) Mr Goodfellow too believed that it was most likely to have been a predecessor to Digital Safe version 9, albeit he thought it was more likely to have been Digital Safe 7.4.

3620. This evidence on the part of the Claimants' witnesses was at best confused. But the Defendants' evidence, largely provided by Dr Lynch himself despite his position that he was barely involved, did not clarify the matter either. It was less than convincing, partly because it was based on supposition, but also because it turned on the assertion that the evidence of Mr Wang, Mr Yan, Mr Goodfellow and Mr Langford could be disregarded on the simple basis that *"It's not for the engineers to name the products"* and that "engineers" would not be either involved in or (apparently) even aware of the name allocated by marketing.

3621. In greater detail, what Dr Lynch asserted in his evidence was that the marketing department had taken the decision to brand the combination of Digital Safe version 8, StorHouse, and dense cells as "Digital safe version 9" sometime around the time of the conclusion of the First MS Amendment Agreement. Dr Lynch went on to suggest that the software engineers would have continued to refer to this combination as a *"dot release"* on version 8 (viz. as Digital Safe version 8.1 or version 8.2 or similar), while the rest of the company, particularly customer-facing departments and the lawyers, referred to it as Digital Safe version 9.

3622. The Claimants neatly pointed out a number of difficulties with this explanation, and in particular, that:

(1) Mr Goodfellow did interact occasionally with customers, as also (less often) did Mr Wang and Mr Yan; and it is hard to imagine how they were meant to talk to customers about the products for which they were responsible without the

naming conventions that the sales and marketing departments, and therefore the customers, were using;

(2) It is hard to see how Autonomy could have run an effective business if its legal and sales departments were using different naming conventions from the engineers, with neither of them aware of the different terminology being used by the other;

(3) There is no evidence beyond the fact of the entries on Automater of any decision to rebrand Digital Safe version 8 with StorHouse and dense cells as Digital Safe version 9;

(4) Dr Lynch's suggestion that Autonomy's marketing function would have renamed the relevant iteration of Digital Safe as version 9 *"some time…around the Morgan Stanley first deal"* cannot be right: the First MS Amendment Agreement was signed in June 2008, some 18 months before Autonomy purchased the StorHouse software that Dr Lynch claimed was a critical feature of version 9.

3623. Dr Lynch's explanation, though characteristically ingenious and delivered with assurance, is not credible. The Defendants' other witness on the issue was Mr Martin. His evidence on version 9 was speculative and no more persuasive than Dr Lynch's.

3624. The Defendants' stronger point was that the records in evidence showed that by May 2011 at least Automater did list a product called version 9 as a shippable/deliverable. Furthermore:

(1) On 31 March 2011 Mr Adam Booth (who oversaw the Automater system) wrote to Ms Dolan (an in-house lawyer) and Mr Martin in relation to the version of Digital Safe software to be provided to Philip Morris, which had just signed a Digital Safe software purchase contract. Mr Booth wrote: "*We put "Zantaz Digital Safe v9" on Automater earlier this week. I can't see a list of products as such, shall I just ship that?*"

(2) In May 2011, Mr McCarthy was providing Mr Young with a list of "*Automater shippable*". This included Digital Safe version 9.

(3) On 16 June 2011, Mr Booth provided Mr Goodfellow with a list of Digital Safe software potentially shippable to a customer (Compliant Phones), asking which software was to be shipped. The list included Digital Safe version 9.

(4) An email from Mr Nick Ng to Mr Avila dated 7 December 2011 attached a list of "*shippables from michael*". The document lists all the products which were put up on Automater and shippable to customers as at 28 October 2011. Digital Safe version 9 was included on the list.

3625. However, to my mind, this shows nothing more than that software named Digital Safe version 9 appeared on Automater, in line with what Morgan Stanley were told they were being provided with.

3626. I have concluded that in a sense Digital Safe version 9 did exist, and the issue was a semantic one, as Dr Lynch insisted: but it was a new name for an old lamp, or more accurately a collection of old products, bestowed in order to give the impression of something new and novel because that was what was needed to distinguish the new

licence from the old one. It was obviously necessary to ensure that the software as described should appear as a deliverable on Automater; but as Mr Langford explained, that presented no real difficulty, at least in part because Automater was simply a delivery platform. I accept:

    (1) Mr Wang's evidence in cross-examination that:

> "...we sometimes put up just a binary and name it something that matches the name of the contract. That's why when we went through the list that you had pulled up for Automater, the files may be there by name but essentially you could put any file and name it, which we have done for previous contract fulfilments of software delivery."[455]

    (2) Mr Langford's similar evidence in cross-examination that: one "*could put something in Automater that purported to be a version of the software*" even though "*it wouldn't be the version you could actually deploy*" and that "*there was never any check or balance on Automater to ensure that actually what was being uploaded would have resulted in something that actually worked*" the effect of which was that "*you could list anything you want in Automater and it wouldn't matter*". He added that all the emails that he was shown by the Defendants could prove was that:

> "... there was an entry in Automater that said Digital Safe version 9. That doesn't mean there was an actual functioning installation media under that."[456]

3627.  My conclusion that "Digital Safe version 9" was simply a name chosen to convey novelty does not mean, however, that the new licence contained no more software than the old. Although the Claimants did also challenge the inclusion of 'StorHouse' in the definition of software to be provided, the Defendants pointed out also that none of the other new or additional or upgraded software to be supplied pursuant to the Q1 2011 MS Agreement (which included Autonomy Investigator and Early Case Assessment, Autonomy Consolidated Archive ("ACA") Server, Autonomy Social Media Connect DS Mail and Supervisor S6) was alleged to be superfluous, unusable or otherwise not of value and benefit to Morgan Stanley, and in terms of charges for additional ongoing support and maintenance fees and prospective add-ons to Autonomy as well.

3628.  The dispute about the value of StorHouse[457] centred on whether it could be successfully integrated with Digital Safe. The Claimants contended that it never had been: certainly,

---

[455] Indeed Mr Wang suggested that this happened once in relation to Digital Safe version 8.

[456] Mr Langford also said that he had conducted his own checks through SIDCAP, which according to his evidence was a significantly more robust record of when software was released than Automater, to establish when various versions of the Digital Safe software were released. Those searches apparently showed that Digital Safe version 9 was not certified as being fit for installation in customer safes until November 2014.

[457] StorHouse, it may be recalled from the section of this judgment in which I addressed the transaction between Autonomy and FileTek in Q4 2009 which was impugned as reciprocal (RT 3), was one of FileTek's two main products (the other being "Trusted Edge"). StorHouse was a database archiving product that allowed customers to archive databases and conduct searches across them. It had two main components: (i) StorHouse Relational File System ("RFS"), which essentially was a file system hosted in the cloud and (ii) StorHouse Relational

they said, not at the level of code-integration. The Defendants contended that, on the contrary, StorHouse was substantial and valuable software even if not properly integrated at the code-level, as Mr Goodfellow explained. Ultimately, the Claimants' other witnesses did not gainsay this:

(1) Mr Yan, whose evidence in his witness statement was that StorHouse had never been successfully integrated into Digital Safe because *"it did not make sense to integrate"* the two (since Digital Safe *"does not interrogate structured data"*), conceded in cross-examination that he *"would not know"* whether nevertheless it would have been useful to Morgan Stanley in non-integrated form and that Mr Wang would know more.

(2) Mr Wang had suggested in his witness statement that Morgan Stanley "*would not have been able to make any use of StorHouse's capabilities in a Digital Safe context*". However, when cross-examined, he eventually accepted that StorHouse was a useful product for customers without a deep code integration; and when asked more specifically about its utility to Morgan Stanley he stated:

> *"If Morgan Stanley's requirement was directly what StorHouse provided for nearline database offloading, then that would have been useful. I just don't know what Morgan Stanley's requirements were."*

3629. The issue whether what was provided did justify both the further substantial fee and its treatment as a separate component for the purpose of revenue recognition ultimately became reduced, as regards these other software additions, to whether the addition was to meet the customer's requirement or need, or simply contrived to achieve that purpose.

3630. When it was suggested to Dr Lynch that this software was not being included at the request of the customer and was added for revenue recognition purposes, he demurred, insisting that Morgan Stanley's needs would have played a role in the selection of the software, and that "*the customer won't be requesting a carburettor, but they will expect a system that actually works like a car*".

3631. The Claimants contended that the reality was that Morgan Stanley had not requested version 9 of Digital Safe, or StorHouse; nor had they requested the functionality provided by either piece of software.[458] Dr Lynch's analogy with a carburettor provided no answer: on the Defendants' case, the addition was not simply of a part necessary to make the car already provided work: it was a new piece of equipment. I have concluded that the inclusion was directed without regard to the customer's need: it was included to support the accountancy case.

*Were Deloitte misled?*

3632. As in the case of the Q4 2009 MS Agreement, the Defendants relied on Deloitte's approval of the Q1 2011 MS Agreement, although it is fair to note that in both contexts

---

Manager ("RM"), which was a means by which a customer could offload its database to the cloud and conduct searches across the database.

[458] Not only is there no evidence of this in the contemporaneous documents, it is also unlikely to have been true given the *nature* of Morgan Stanley's archived data. Mr Yan's unchallenged evidence was that Morgan Stanley never put meaningful amounts of structured data (the type of data that StorHouse was designed to handle) into its Safe.

Deloitte's focus was on revenue recognition, rather than on testing commercial purpose and propriety (which in the ordinary course would be matters for management). Neither Deloitte (according to Mr Welham) nor the Audit Committee (according to Mr Bloomer) were provided with detailed material which would have enabled them to test how the transaction had arisen and its objectives and purposes.

3633. The Claimants elaborated on what they presented as deficiencies in what Deloitte and the Audit Committee were told and the information provided to them, relying especially on Mr Welham's evidence (which was not directly challenged and was confirmed by Mr Bloomer from the point of view of the Audit Committee) premised on the assumptions he was asked to make that:

> (1) Deloitte was not told that Morgan Stanley had not requested Digital Safe version 9 or StorHouse. Similarly, the Audit Committee did not know whether Morgan Stanley had requested this software or could use it.

> (2) Nor was Deloitte told that version 9 of Digital Safe did not exist at the time and that StorHouse had not been successfully integrated with Digital Safe.

> (3) Further, neither was provided with Autonomy's internal exchanges, or its communications with Morgan Stanley.

3634. Subject to the modified approach I have taken, and the qualified answer I have given on the question whether or not Digital Safe version 9 existed at the time, and whether the inclusion of StorHouse differentiated the new licence from the old, I accept that the approval of Deloitte and the Audit Committee was based on a misappreciation of the facts. That in turn was based on what Deloitte was told by Autonomy. I think it unlikely that the Defendants were unaware of what Deloitte were being told. Mr Welham confirmed in cross-examination that obviously any audit view would depend on the actual facts. The fact that it is surprising that Deloitte, who must have appreciated that it was a re-re-restructuring inviting especially sceptical review, asked no more questions does not avail the Defendants.

*Conclusions*

3635. In my judgment:

> (1) Autonomy did conceive and press for the Q1 2011 MS Agreement as a means of generating recognised revenue to enable it to achieve revenue forecasts. It is more likely than not that it was that perceived advantage which prompted Mr Hussain to suggest the re-re-restructuring to Morgan Stanley; and it is clear that it was the need to achieve forecast for the quarter which explained its urgency. Revenue recognition was the objective which drove the transaction.

> (2) There were ancillary benefits, including the value Mr Hill repeatedly emphasised of the *"bird in the hand"* especially at a time (and it was accepted that this was a time) of swiftly softening rates. But that did not alter the reality that the transaction was promoted, structured and eventually concluded for the overriding purpose of securing immediately recognised revenue from the sale of a licence which in reality conferred no new rights or benefits of any utility.

(3) The real essence of the transaction was that Autonomy had to offer and agree a deep discount on future storage charges as the price of an immediate licence fee of $5 million.

(4) In my judgment, therefore, the Claimants have established the factual premises of their case in respect of both of the two MS Amendment Agreements and a breach of duty and improper use of power has thereby been established.

*Deutsche Bank Q1 2011 re-restructuring*

3636. The third of the four Schedule 12D transactions impugned by the Claimants took place in the same quarter as the Q1 2011 MS Agreement and was made between Zantaz and Deutsche Bank.

3637. Deutsche Bank was a long-standing customer of Zantaz. On 4 October 2005, the New York branch of Deutsche Bank had entered into a three-year contract with Zantaz for email restoration services ("the Original DB Agreement"). Pursuant to the Original DB Agreement, Zantaz had agreed to provide digital archiving services on an SaaS basis for an initial storage rate of $0.105 to $0.10 per MB per annum subject to a clause which obliged Zantaz to share with Deutsche Bank the benefit of any savings resulting from a decrease in the cost of providing the services.

3638. In May 2008, shortly before the Original DB Agreement was due for renewal, the parties entered into a 17th amendment, which restructured the arrangements into a hybrid hosting contract. The Claimants referred to this as "the First DB Amendment Agreement".

3639. The core terms of the First DB Amendment Agreement, which was dated 21 May 2008, were as follows:

(1) Deutsche Bank agreed to purchase a Digital Safe licence with certain functionalities for a fee of $5.227 million;

(2) The term of the amended contract and the software license was from 1 June 2008 to 31 May 2013, subject to Deutsche Bank's rights (a) to terminate the agreement on six months' notice; and (b) to extend the arrangements for a maximum of three years from 31 May 2013, a fee of $1,045,000 being payable for each consecutive annual extension;

(3) Deutsche Bank agreed to pay storage fees of $0.0092 per MB per annum.

3640. The Claimants impugned the First DB Amendment Agreement as a Schedule 6 transaction, alleging that the immediate recognition of revenue from the sale of the Digital Safe licence was improper on the basis that the licence had no separable substance or value, did not confer any usable right or benefit on Deutsche Bank which had no intention of taking its data on-premise and its treatment as a separate component of the overall transaction was a pretence: their case was that it was merely a device to seek to justify accelerated revenue recognition.

3641. The Claimants emphasised in their written closing submissions that Dr Lynch and Mr Hussain were aware of the restructuring from the outset and appear from the contemporaneous documents to have been in no doubt as to its importance to Autonomy's quarterly revenue targets. The Claimants pointed out that:

(1) On 7 February 2008, Mr Hussain told Mr Egan, among others, that "*DB are "hot" right now – so which ones are Q1 opps (and which can be made into licence)?*".

(2) The same day, Mr Jim Still, VP for North American Field Sales, informed Mr Hussain and Dr Lynch that Zantaz was looking to see if the arrangement with Deutsche Bank could "*be turned into a licence*".

(3) At the beginning of April 2008, Mr Hussain emailed Dr Lynch letting him know that Autonomy should hit its revenue target of $117m by the end of Q2 2008 if three "*large deals*" were concluded, including the deal with Deutsche Bank.

(4) In an email copied to Dr Lynch, Mr Hussain later stressed the importance of doing the "*Digital Safe restructuring*" for Deutsche Bank "*asap*"; he explained that "*they want to buy and I am telling them they have to buy now*".

3642. The Claimants also brought to my attention documentation which they submitted appeared to suggest that, in the Defendants' own perception and from Deutsche Bank's perspective, the purpose of the deal was to achieve cost savings. Thus:

(1) In an email to Mr Hussain on 7 April 2008, an Autonomy sales representative categorised the restructure as "*cost savings / license revenue*".

(2) Later in April 2008, Mr Egan emailed Mr Hussain, copying in Dr Lynch, saying that they could now "*push Dan Marovitz much more directly on the cost savings proposition*".

(3) A few weeks later, on 8 May 2008, Mr Egan provided Deutsche Bank with an overview of the proposed restructure, referring to "*$8.2M nominal savings figure over 5 years*" and "*$5.3M real savings over 5 years or an 18% savings as compared to the current structure*" without any mention of the licence element at all.

(4) Mr Egan also attached an illustrative table of the savings that could be achieved, saying that this helped to "*communicate the kind of savings that can be realised through restructure*".

(5) Mr Hussain forwarded Mr Egan's email to Dr Lynch the same day. Mr Egan sent another email the same day to Deutsche Bank, copying in Mr Hussain, telling them that "*in the case of the Digital Safe restructure the software is currently live and yielding significant value. The restructure would create savings vs expense for Deutsche Bank*", which Mr Hussain forwarded to Dr Lynch shortly after. This, the Claimants contended, demonstrated, and was evidently Autonomy's attempt to reassure Deutsche Bank, that the restructure was only about finances and that, in substance, everything would stay the same.

(6) As with the Morgan Stanley restructures above, the software appears to have been an afterthought. On 14 May 2008, only a week before the restructure, and many weeks after negotiations began, Mr Scott emailed Dr Menell, copying in Mr Egan, asking for "*...a clear list of software to be licensed to DB as part of the current deal which contemplates a licensed Digital Safe. Please give me a call asap as we are trying to get an amendment out to DB very quickly...*".

(7) The effect of the First DB Amendment Agreement was that Deutsche Bank obtained a significant reduction in storage rates in return for paying an upfront

fee to license Digital Safe, a result which was described by Mr Egan to Deutsche Bank as a "*win/win*".

3643. In addition, the Claimants identified features, said to be indicative of Deutsche Bank having no intention to take Digital Safe on-premise, so that the licence was of no utility to it. These included the fact that the term of the Digital Safe licence was coterminous with the term of the First DB Amendment Agreement, so that if it had wished to move on-premise, Deutsche Bank would have had to terminate the First DB Amendment Agreement and forfeit the sums it had paid thereunder.

3644. For reasons I have sought to set out in the preceding section of this judgment, I have accepted the Claimants' case that Autonomy, to the knowledge of the Defendants, improperly accounted for the Schedule 6 transactions. For comprehensiveness, I confirm that the features of the First DB Amendment Agreement which the Claimants brought to my attention to indicate particular grounds for considering immediate revenue recognition in respect of the licence sale to have been improper, appear to me to be consistent with, and to confirm, the general conclusion I reached in that part of this judgment.

3645. In particular, I consider of particular significance that (a) the terms of the licence and the hosting agreement were coterminous, (b) Autonomy's clear objective was immediate revenue recognition, and (c) the evidence indicated that Deutsche Bank had no intention of moving on-premise and would have forfeited sums it had paid under the First DB Amendment Agreement if it did so. These facts support the conclusion that the licence was a contrivance, and could not realistically be characterised as a separate component of the hybrid model so as to justify immediate recognition of the sale revenue in Autonomy's accounts.

3646. The Claimants did not, however, seek to impugn or claim any loss in respect of the First DB Amendment Agreement as an improper loss-making Schedule 12D transaction, though they noted that it secured for Deutsche Bank savings (and thus in a sense a concomitant reduction in overall revenue for Autonomy) of some $8.1 million (representing a saving compared to what it had to pay under the Original DB Agreement of approximately 37%). The Claimants did not claim any direct loss in respect of the First DB Amendment Agreement: it was not one of the Schedule 12D transactions. I need say no more about it and now revert to the further restructuring in respect of Autonomy's hosting agreement with Deutsche Bank which was the subject matter of the Schedule 12D claim. I refer to this as the Second DB Amendment Agreement which as mentioned in paragraph 3636 above, was, after long negotiation, finally executed in Q1 2011.

*The Second DB Amendment Agreement: the restructuring negotiations*

3647. The re-restructuring negotiations commenced some time earlier, in April 2010. The Claimants spent some time in chronicling what they presented as Autonomy's *"multiple (failed) attempts to push the deal through each quarter, until it was finally executed in Q1 2011".*

3648. Much time was spent in the parties' respective closing submissions on the exchanges of correspondence, both internal within Autonomy and between Autonomy and Deutsche Bank:

(1) The Claimants' aim was to show that the process was initiated by Autonomy and that substantially the whole focus was on Autonomy trying to get Deutsche Bank to enter into a new licence and pay a fee in return for offering Deutsche Bank considerable data storage savings, and on Autonomy trying to find ways of justifying a new licence as conferring substantive rights different from those that Deutsche Bank already had under the First DB Amendment Agreement.

(2) The Defendants' aim, on the other hand, was to show that (a) it was Deutsche Bank which approached Autonomy to try to negotiate downward its storage charges on the basis (as it stated in an email from Mr Dan Manners of Deutsche Bank to Mr Sullivan of 12 April 2010) that it was *"looking to dramatically increase [its] data volumes in the UK as [it was] moving to a capture all scenario"* and wished to discuss how pricing might be *"extrapolate[d] to the larger scope"*; (b) Deutsche Bank needed and wanted further software and software rights and that there was real substance therefore in its corresponding need for a new and more extensive licence, and (c) what Autonomy might theoretically stand to lose in consequence of reducing its data storage charges it would in reality gain from retaining Deutsche Bank as a customer and storing considerably increased amounts of data for it.

3649. In my view, all these strands are evident from the documentary evidence. I can summarise the position as having been that Deutsche Bank, appreciating that Autonomy was certainly keen, and indeed in something of a hurry, to strike a further agreement, deployed both carrot and stick. Deutsche Bank made clear that its corporate plans included a substantial migration of its data, but (hinting at moving to a competitor) that it was not going to increase the usage of its UK Digital Safe unless it negotiated a substantial overall fee reduction, and obtained also a discount on an IDOL-isation project for its Lucene Safe which it considered it required to enable full migration into Digital Safe. It pressed, in particular, for free installation of an IDOL index and full IDOL functionality.

3650. When the Second DB Amendment Agreement was eventually concluded on 31 March 2011 its provisions included the following:

(1) Deutsche Bank agreed a fee of $7.1 million to license a package as before, but now including Digital Safe version 9 together with IDOL dense-cell (sometimes known as "Ironman") implementation;

(2) The term of the agreement was extended to 31 March 2016, (and thus a three-year extension on the First DB Amendment Agreement);

(3) Storage rates were reduced to $0.00445 per MB per annum;

(4) Deutsche Bank would be given a credit if it increased the data in its UK Digital Safe from 0.34 TB to 2.37 TB.

3651. It should be noted that Deutsche Bank was previously a Lucene user and had not licensed an IDOL version of Digital Safe (e.g. version 8).

*Claimants' case*

3652. The Claimants alleged that:

(1) Deutsche Bank had no need or use for and had not requested IDOL dense-cell implementation, because it operated a Lucene–powered safe which used only Lucene dense-cells; and

(2) Digital Safe version 9 did not exist as of 31 March 2011, and Deutsche Bank had never requested a licence for it. This was substantially the same allegation (*mutatis mutandis*) as was made in respect of the Q1 2011 MS Agreement (see above).

3653. In paragraph 106Y of its RRAPoC, the Claimants invited the conclusion that:

> *"It is to be inferred… that Autonomy included these licences in the software definition in the Second DB Amendment Agreement in order, in part, to deliberately mislead Deloitte into believing that the licence fee of US$7.1 million had been paid in return for new software that DB had requested, and intended to use, and thus to support the case for recognising the revenue from the licence fee upfront, when in reality no new software had been requested by, or was (in the case of Digital Safe version 9) to be made available, or (in the case of IDOL dense cell capability) of any use, to DB."*

3654. As to (1) in paragraph 3652 above, according to the Claimants:

(1) IDOL dense cells were not a licensable piece of software at all; they were part of the architecture for the Digital Safe system, and it therefore made no sense at all to include them in a software license that was apparently to be delivered electronically;[459] and

(2) In any event, IDOL dense-cells were of no use to Deutsche Bank since Deutsche Bank had a Lucene Safe and such dense cells were incompatible with Lucene-powered safes, for which there were Lucene-dedicated dense cells.

3655. Further, and in anticipation of the argument that it was a substantive thing of value provided under the agreement which would also facilitate the conversion of Deutsche Bank to an IDOL safe with greater data usage, the Claimants also ran an argument in their closing oral submissions that the provision in the agreement for dense cell installation and implementation (described as merely *"included within the software"*) simply confirmed a commitment made by Autonomy (through Mr Egan) for a free upgrade under the First DB Amendment Agreement. They argued that this could not itself substantiate the licence arrangements under the Second DB Amendment Agreement.

3656. On the basis of those propositions, the Claimants contended that the only real substance of the Second DB Amendment Agreement, and the true *quid pro quo* for the licence fee, lay in its provisions for data storage fee reductions, resulting in losses to Zantaz/Autonomy. They accordingly denounced the licence element as a dishonest contrivance, which purported to give rights which were illusory to software which DB

---

[459] Mr Goodfellow stated in his witness statement that *"[b]uying and implementing dense cells was an Autonomy overhead – the benefits derived from dense cells were only felt by Autonomy (through a reduction of its internal costs). It was not a piece of software that was licensed to clients."* Mr Yan said a dense cell was a piece of *"storage architecture"*. Mr Sullivan stated in an internal Autonomy email in August 2012 that *"Cells can be considered appliances because they are hardware with software pre-installed."*

did not want and could not use, and in the case of Digital Safe version 9 did not exist, simply in order to enable Autonomy to present it as sale of goods generating revenue which could be recognised "upfront" but which should have been spread over the term of the Second DB Amendment Agreement.

3657. That argument primarily goes to the accountancy issue of revenue recognition. But the Claimants relied on it to show that the transaction lacked any proper commercial purpose, and caused loss. As to loss, they submitted that the savings to Deutsche Bank from lower data storage fees (estimated internally at $8.6 million over five years) were considerably in excess of the licence fee ($7.1 million); and that any suggestion that the lower rate would be balanced or exceeded by greater ingested volume (as Dr Lynch did quite strenuously suggest in cross-examination) was false. They submitted that in fact, modelling at the time suggested that ingested volumes were expected to decrease, not increase, following the transaction.

3658. The Claimants concluded that not only was the licence a contrivance, and the transaction was simply an example of Autonomy resorting to the purchase of its own revenue at considerable cost. They submitted that the Defendants cannot have believed that the Second DB Amendment Agreement, which resulted in reduced revenues and profits, was in the commercial interests of ASL, nor can Mr Hussain have believed that it was in the commercial interests of Zantaz. On that basis, the transaction was improper, and the Defendants were in breach of their duties to ASL and, in the case of Mr Hussain, to Zantaz, in bringing about the transaction. The company which had suffered the loss should be compensated accordingly.

3659. The Claimants calculated that the loss arising from the Second DB Amendment Agreement was $6,368,357.[460] The loss has been calculated in the same way as the Q4 2009 and Q1 2011 MS Agreements. This was set out at length by Mr Bezant in his Supplemental Report.

*Defendants' answers to Claimants' case*

3660. The Defendants refuted this case in its entirety. They mounted a sustained attack on the evidence of each of the Claimants' witnesses, both as to its apparent but suspicious consistency and as to its revealed and revealing inconsistency. As indicated above, the witnesses marshalled a great deal of detail, but it can fairly be summarised by reference to the principal propositions in the Claimants' case as I have summarised those above.

3661. The nub of the Defendants' answer to the Claimants' proposition that Deutsche Bank had no need for IDOL dense cell implementation, supposedly because it operated a Lucene–powered safe which used only Lucene dense cells, was that the documentary evidence contradicts this. The Defendants contended that it shows that, on the contrary, Deutsche Bank (a) had, for some time before the re-restructure, wanted to IDOL-ise its Lucene Safe, and to utilise IDOL functionality and search on its archived data; (b)

---

[460] In the RRAPoC, Schedule 12D, the loss is stated to be $6,724,420. This difference is the result of three errors, which are summarised in Table A13-12-2 of Mr Bezant's Fourth Report. The first is explained in Mr Bezant's instructions, and arose from an error in calculating the application of various volume-based archiving credits, which results in an adjustment of $381,816 in the Defendants' favour. Mr Bezant has confirmed that this adjustment is correct. The second arises from a failure to include certain actual data volumes, and results in an adjustment of $14,363 in the Claimants' favour. The third arises from a formula inconsistency, and results in an adjustment of $11,390 in the Claimants' favour.

initially sought to brow-beat Autonomy into providing it for free (which Mr Sullivan dismissed in an internal email dated 9 December 2009 as *"an absurd position"* for them to take *"without a deal"*) but (c) eventually negotiated the provision of IDOL Digital Safe and IDOL dense cell implementation as part of the Second DB Amendment Agreement, as the final wording of that agreement confirmed.

3662. The Defendants pointed to a number of what they depicted as unsatisfactory features of the evidence given by the Claimants' witnesses, and in particular:

(1) Mr Yan had said in his witness statement that he did not even understand what was meant by *"IDOL dense cell implementation"*; but he was reminded in the course of his cross-examination that he was personally involved from 2011 in the project to convert Deutsche Bank's Lucene-powered Digital Safe into an IDOL-powered safe. Once taken through some contemporaneous email exchanges (and especially an email dated 31 May 2011 from Mr Goodfellow) he accepted that this phrase probably referred to the use of ironman/dense cells for the project to IDOL-ise Deutsche Bank's safe.

(2) Mr Wang said in his witness statement that he had not heard of *"IDOL dense cell implementation"* before. He too omitted to mention the project to IDOL-ise Deutsche Bank's Digital Safe, notwithstanding his own involvement in it. With some initial reluctance, he eventually conceded in cross-examination that active steps were indeed taken to move all of Deutsche Bank's data to an IDOL-powered Digital Safe and that he *"would not disagree with Mr Yan…if that is what Mr Yan had attested to"* that the phrase from the contract most likely referred to the use of ironman/dense cells for this purpose.

(3) Mr Goodfellow did remember the project to IDOL-ise the Deutsche Bank safes but he could offer no explanation to explain the omission from his witness statement of any mention of it other than to say that he did not intend to give a misleading impression.

3663. The Defendants relied on the above also to counter what Mr Hussain described in his written closing submissions as the Claimants' *"fall-back position"*, which was advanced via the evidence of Mr Goodfellow. This was to the effect that even if Deutsche Bank did require the ironman/dense cells, that could only be to enable the IDOL-isation of its Digital Safe, and Mr Egan had already given Deutsche Bank a separate undertaking, outside the contract, to IDOL-ise the Digital Safes for free. That was suggested by the Claimants to provide another reason for doubting the commerciality of the Second DB Amendment Agreement and for presenting it as in substance simply an agreement to pre-pay data storage charges as the means of obtaining an unusually deep discount.

3664. The Defendants objected to this *"fall-back position"* on the basis that it was a new line of argument that had not been pleaded[461]. They also dismissed it as *"another bad point"* They stressed that it was quite plain that the discussions for IDOL-isation took place within the context of the discussions for the restructuring, and the obligation to provide Deutsche Bank with IDOL dense cell implementation was contained in the Second DB

---

[461] As succinctly summarised by Mr Hill QC in his oral closing, *"… It's a new case. It is contrary to the pleadings and their own witness statement. The pleaded case is that Deutsche Bank couldn't use this software, not that it could."*

Amendment Agreement itself and not elsewhere, and was in terms stipulated by Deutsche Bank by amendment to the travelling draft.

3665.   The Defendants further emphasised that:

(1)   Although (as Mr Hussain put it) *"Cs may not like it, the legal position is that [Autonomy] and Deutsche Bank contractually agreed that the licence would include Digital safe version 9 with IDOL dense cell implementation."*

(2)   There was no suggestion that the contract was some sort of a sham; and furthermore, Deutsche Bank took the trouble of amending the draft of the Second DB Amendment Agreement (by email dated 11 March 2011) to tighten Autonomy's obligations from the provision of *"IDOL dense cell capability"* to *"IDOL dense cell implementation"*.

(3)   The contract is the only place where the agreement to provide the dense cell implementation is formally recorded;

(4)   Mr Goodfellow ultimately accepted in cross-examination that Deutsche Bank did need to establish a contractual entitlement to the IDOL Digital Safe software, and that could only be found in the Second DB Amendment Agreement.

(5)   He also eventually agreed that, contrary to the message given in his witness statement, Deutsche Bank did have a use for IDOL dense cell implementation, specifically wanted it and had contracted for it.

3666.   As regards the Claimants' second proposition (that Digital Safe version 9 simply did not exist as of 31 March 2011, see paragraph 3656 above), the Defendants' case was that (a) version 9 was put up on Automater, (b) it was an IDOL version of Digital Safe; (c) it was put up with the active involvement of Mr Wang, Mr Lucini and Mr Goodfellow, (d) it was available for delivery, and was delivered, to Deutsche Bank, and (e) none of the witnesses suggested that he thought he was involved in anything improper. Furthermore, and as I return to below, Dr Lynch contends that he was not involved in any way.

3667.   I have addressed this issue as to whether Digital Safe version 9 was in existence at the time in the context of the Q1 2011 MS Agreement. I add only that in the context of the Second DB Amendment Agreement the Defendants submitted that the Claimants' witness statements were once again seriously misleading and unaccountably failed to disclose the witnesses' role in providing version 9 of Digital Safe to Deutsche Bank via Automater. In particular:

(1)   Although Mr Wang had stated in his witness statement that *"a customer bought version 9 of Digital Safe at a time it did not exist"*, he neglected to mention that he had been the person responsible for providing Mr Goodfellow, and indirectly Mr Booth, with the version of Digital Safe that was put on Automater as version 9 for delivery to customers. Under cross-examination, Mr Wang (a little equivocally) accepted that the file that he provided to Mr Goodfellow to put on Automater was *"eventually put on Automater as version 9"*. He accepted that the file that he provided would have been likely to be Digital Safe software. He also accepted that, if it was going to satisfy Deutsche Bank's requirements, it needed to be an IDOL version of the software. Mr Wang could give no reason

why his own involvement in getting version 9 onto Automater was not dealt with in his witness statement.

(2) Similarly, Mr Lucini had stated in his witness statement that he could not recall what was uploaded: *"it may have been a copy of an earlier version of Digital Safe, or possibly just an empty zip file."* Mr Lucini had added in the same paragraph of his witness statement that he recalled *"someone, possibly Dr Menell, telling me that it did not matter"* what was uploaded. As also mentioned in the context of the Q1 2011 MS Agreement, the Defendants submitted that both were fabrications. They dismissed Mr Lucini's evidence as an incoherent invention, falsified by Mr Wang's evidence, and demonstrating that he was an untruthful witness. It was, they said, obviously inconsistent with the sequence of events apparent from the documents which do not suggest any involvement on the part of Dr Menell or anyone other than Mr Lucini, Mr Goodfellow, Mr Wang and Mr Booth;

(3) Mr Goodfellow's witness statement also grossly understated his role in the event, referring only to an email from Mr Lucini stating *"okay, we will put it up there"* and not to his own actions in implementing that. Under cross examination, Mr Goodfellow had to accept that he was the person who actually uploaded version 9 onto Automater, that although he was now trying to suggest that he thought version 9 and version 7.4 were the same, he did not say so or suggest that at the time, that that would have been unlikely since version 7.4 was a Lucene version, and that he knew that the fact that version 9 was for IDOL-isation purposes and was being supplied was important for revenue recognition purposes. The Defendants characterised Mr Goodfellow's evidence as contrived and dishonest with a constant but irrelevant refrain, which appeared to be a peddled script and was little more than a distraction, that IDOL-isation was not provided under the Second DB Amendment Agreement but by a prior commitment made by Mr Egan (see above).

3668. The Defendants also relied on the further evidence showing the inclusion of Digital Safe version 9 in the Automater record of shippables/deliverables, and its compatibility with Windows, which I have previously addressed in the context of the Claimants' like contentions in respect of the Q1 2011 MS Agreement: see paragraphs 3624 to 3631 above.

3669. More generally, the Defendants stressed the overall commerciality of the transaction:

(1) Contrary to some parts of the Claimants' submission, Deutsche Bank did need a licence: as noted above, it had not previously had any licence to operate IDOL-based software[462] on its Lucene Safe.

---

[462] The Claimants were inconsistent in this regard. They appeared in parts of their written closing submission to persist with an argument that Deutsche Bank did not need a licence because none was needed for initial installation of an IDOL Digital Safe. However, on page 1956 of their written closing submissions, the Claimants did concede that *"Admittedly, if Deutsche Bank's hosted Safe was being converted to IDOL, and it wanted a licence to the Digital Safe software deployed on that Safe, it would need a licence to the IDOL version of the Digital Safe software, as Mr Wang accepted in cross-examination…"* That is what was provided for: what Deutsche Bank wanted and was getting was (a) Ironman/dense cells and implementation and (b) version 8 or 9 of IDOL Digital Safe software to use IDOL functionality paired with its Lucene safe.

(2) It is true that both parties had an agenda in wishing to include software in the new licence which would clearly differentiate the new licence from the old: it was important to Deutsche Bank that the new licence should be in addition to, and not terminate, the old licence, because it wished to amortise the old licence in its accounts, which required its continuation; and it was important to Autonomy that the new licence should be a substantive sale of goods, for all the reasons discussed previously.

(3) It is true also that both parties recognised that the differentiation was in part driven by accountancy objectives. But what was eventually agreed to be licenced was materially different, and was useful to Deutsche Bank, as well as to Autonomy (not least in terms of the value of market penetration).

(4) Further, the Defendants contended that from Autonomy's point of view, the Second DB Amendment Agreement:

    (a) turned the speculative prospect of Deutsche Bank extending (at its option) the remaining term of the First DB Amendment Agreement beyond 2013 into a contractually certain term until 2016, in circumstances where rapidly falling data storage rates (and costs) meant that customers were naturally looking to improve their 'deal' rather than simply roll over;

    (b) locked in revenue and greatly increased the likelihood of retaining Deutsche Bank as a customer both in this context and in other business contexts then being pursued: that was a positive in itself, and was the means of avoiding the very considerable negative in the market place of a large multinational bank leaving Autonomy;

    (c) brought Deutsche Bank into the IDOL ecosystem and that would have provided perceived upsell opportunities, as envisaged in Mr Egan's email of 20 December 2010 where he explicitly stated (in respect of the IDOL-isation) that:

        "*this would ready the safe for additional use of Autonomy software that uses advanced IDOL function like DSMail or ECA or other but those products would still need to be licensed by DB for usage and hardware expense can scale depending upon the scale of the DB usage*"

    (d) generated an incentive for Deutsche Bank to store more data in due course with Autonomy in circumstances where the migration of its data was on the cards; and

    (e) strengthened the ties between Autonomy and Deutsche Bank and the prospect of future collaboration, it being recorded in an email from Mr Hussain to Dr Lynch dated 30 November 2011 written to brief Dr Lynch before a lunch engagement with Mr Dan Marovitz of Deutsche Bank that, in addition to Digital Safe UK and US there were existing relationships between the Bank and Autonomy in Supervision US and UK, ECA in the UK, Search Global Internet and an "Electronic commerce project in London"; and Mr Hussain

wrote that Deutsche *"want to use us in more areas: IDOLise the DS, Supervision in Asia and DS in Japan"*.

*My assessment*

3670. I turn first in my assessment to the dispute as to whether Deutsche Bank had any use for ironman/dense cells, and whether the inclusion of ironman/dense cells in the software covered by the licence granted as part of the Second DB Amendment Agreement was (as the Claimants in effect seemed to me to be contending) window-dressing to give credence to the presentation of the new licence as more extensive than the first.

3671. It seems to me that the key to the dispute in this regard is to determine quite what ironman/dense cells actually were, and what their use actually was.

3672. A premise of the Defendants' case was that ironman/dense cells comprised software, properly included as such in the Second DB Amendment Agreement and appropriately treated as valuable software items. This, on that case, demonstrated that the licence relating to the Second DB Amendment Agreement was materially more extensive than that relating to the first.

3673. As mentioned previously (see paragraph 3654 above)[463], the Claimants depicted the dense cells differently, as hardware, and not a licensable piece of software at all so that the licence to *"IDOL dense cell implementation"* was a *"mirage"*. As Mr Goodfellow explained in his witness statement:

> *"Over time, as technology improved, Autonomy updated its hardware and storage cells. When this happened, cells usually became "denser" and this reduced the cost to Autonomy of storing data. Buying and implementing dense cells was an Autonomy overhead – the benefits derived from dense cells were only felt by Autonomy (through a reduction of its internal costs). It was not a piece of software that was licensed to clients…"*

3674. This explanation, and its designation of dense cells as part of the hardware architecture, was echoed and supported by both Mr Yan and by Mr Sullivan. Although the Defendants criticised Mr Goodfellow sharply for not acknowledging, and as they saw it, seeking to obscure, both (a) his knowledge of and involvement in the project for IDOL-isation of Deutsche Bank's Lucene safe in his witness statement, and (b) that ironman/dense cells were proposed to be deployed to enable it, neither his evidence nor that of Mr Yan and Mr Sullivan that such dense cells were hardware and not a piece of software that was licenced to clients was challenged. I accept that evidence: ironman/dense cells were hardware and not software and were not licensable as software.

3675. Two points made by Mr Goodfellow then fall into place. First, the omission from his witness statement of any reference to the fact that dense cells were proposed to be

---

[463] And the footnote to the paragraph which I repeat here for convenience: Mr Goodfellow stated in his witness statement that *"[b]uying and implementing dense cells was an Autonomy overhead – the benefits derived from dense cells were only felt by Autonomy (through a reduction of its internal costs). It was not a piece of software that was licensed to clients."* Mr Yan said a dense cell was a piece of *"storage architecture"*. Mr Sullivan stated in an internal Autonomy email in August 2012 that *"Cells can be considered appliances because they are hardware with software pre-installed."*

deployed in the project to IDOL-ise Deutsche Bank's Lucene safe was by no means as open to criticism as the Defendants suggested it was. Once it is understood that the dense cells were only to be deployed by Autonomy, the Defendants' contention that Mr Goodfellow, Mr Yan and Mr Sullivan were all disguising their utility to Deutsche Bank carries little force. Secondly, his point that another reason why the inclusion of the dense cells in the licence was window dressing, was that Autonomy had already agreed to provide them as part of its project to IDOL-ise Deutsche Bank's safe also is clarified and compelling. It was his evidence, elicited in cross-examination, that Autonomy had indeed committed to the project and more particularly, had agreed to do it, and thus incidentally provided the means of doing so including the ironman cells, for free.

3676. The pleading point then seems to me to fall away also. None of this was new. It was not a *"fall back position"* as it was described in Mr Hussain's written closing submissions, nor a *"rear guard response"* as described in Dr Lynch's. It was all part of the Claimants' original case that the extension of the licence purportedly to cover dense cells was window dressing, as indeed I find it to have been.

3677. The only other respect in which the licence granted in the context of the Second DB Amendment Agreement was said to give more extensive rights to software than did the earlier licence was the purported provision of "Version 9".

3678. I have set out in my discussion of the same point in the context of the Morgan Stanley Q1 2011 transaction the reasons for my conclusion that this too was window dressing, and I need not repeat them.

3679. In my judgment, and in agreement with the submission to that effect made by the Claimants, the Defendants' reliance on the "software" that was licensed to Deutsche Bank as the mainstay of their argument that the licence had true substance is misconceived. I endorse and adopt the Claimants' conclusion that the true position is that Deutsche Bank paid the $7.1 million licence fee in exchange for savings; the addition of what purported to be software was an afterthought. In the case of what was described as "version 9" it was not new; in the case of the dense cells it was not software at all; and in neither case did the licence provide anything of utility which Deutsche Bank had not been provided with or already promised or available for free.

3680. As in the case of the Morgan Stanley transactions I would accept that the transaction did offer some benefits. Dr Lynch described the deal as *"a very elegant solution to protect the value in Zantaz's future relationship with Deutsche Bank"*. I would not discount the value in customer retention, especially since (as I have already noted in paragraph 3649 above) Deutsche Bank's wont was to strike a hard bargain using carrot and stick, and it had (for example) already expressly threatened *"to move our email platform…to a hosted Microsoft solution"*.

3681. But none of this was what drove the transaction. The essential characteristic of the deal was (as described in the Claimants' written closing submissions) *"savings for Deutsche Bank in return for upfront revenue for Autonomy"*. What drove the transaction, and its timing, was Mr Hussain's desperate need for more revenue: in the words of an email dated 3 December 2010 from Mr Hussain to Mr Sullivan subject- headed *"what i need"*, the transaction was an *"absolute must"*.

3682. That imperative, and the objective of the transaction, were well known to Dr Lynch, and I infer from all the circumstances, shared and approved by him. He could have been in

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

no doubt about the driver. On 10 December 2010, Mr Hussain had sent him an email containing the following:

> "*Really don't know what to do mike. As I guessed revenue fell away completely yet SMS report shows massive activity. But I speak with the vp's who are far more accurate. Also stouff, Joel and mike I think keep separate sheets and unless I am v wrong don't discuss the sheets hence plane crashes and they don't know.* <u>*We've covered up with bofa and hopefully db and Doi but if latter 2 don't happen it's totally bad.*</u>"[464]

3683. I can deal much more briefly with the Claimants' allegation that Deloitte were misled.

*The Claimants' allegations that Deloitte and the Audit Committee were misled*

3684. I accept the Claimants' case that Deloitte were misled about the true nature of the transaction with Deutsche Bank, and in particular, were not told that the new software licensed to Deutsche Bank was inserted only at the last minute or that version 9 only existed in the sense explained in paragraphs 3626 and 3627 above.

3685. I see no reason to doubt Mr Welham's evidence in his witness statement that if:

> "*the inclusion of additional software in the contractual documentation was made only at the last minute…simply to support an argument that the licence was of new software, then that would undermine the supposed commercial rationale for the deal and call into question the recognition of the revenue, as well as suggesting that the documentation had been drafted in a manner to mislead Deloitte. It would also be a matter of real concern if, as I am asked to assume, the additional software that was purportedly being sold included software that did not in fact exist or which could not have been used by Deutsche Bank.*"

3686. The Claimants supplemented this with an allegation that Autonomy's Audit Committee had not been provided with Autonomy's internal exchanges, or its communications with Deutsche Bank, and did not know whether Deutsche Bank had requested the licensed software, whether they could use it, or whether it had already been promised to Deutsche Bank separately to the restructure. More particularly, it was said, the Audit Committee did not know that Deutsche Bank was motivated to enter the transaction on the basis of the savings that it was offered, rather than any interest in the software that was ultimately licensed; nor that Autonomy entered into the transaction so as to accelerate revenue recognition.

3687. The fact that, as it was, both Deloitte and the Audit Committee approved the transaction is, in my judgment, of no assistance to the Defendants. In my judgment, the Claimants' allegation that the Q1 2011 Deutsche Bank re-restructuring was commercially unjustified and a breach of duty and improper use of power has been established. I shall consider later what loss was thereby caused.

*Metropolitan Life*

---

[464] Emphasis added.

3688. Chronologically the last of the impugned Schedule 12D transactions was a further restructuring in Q2 2011 of a hybrid hosting contract between Autonomy Inc and Metropolitan Life Insurance Company ("MetLife") which had been concluded in June 2010.

3689. Like Deutsche Bank, MetLife had been a long-standing customer of Zantaz. Until the end of Q2 2010 it had contracted with Zantaz on a SaaS basis, on the terms of an agreement dated as of 15 March 2002. At the end of Q2 2010, MetLife and Autonomy Inc agreed an amendment and restructuring of their existing SaaS arrangement to a hybrid arrangement ("the First MLIC Amendment Agreement"), made as of 30 June 2010.

3690. Under the First MLIC Amendment Agreement:

(1) MetLife agreed to license Digital Safe and Related Software for a licence fee of $7.025 million; and

(2) MetLife agreed to pay storage rates starting at $0.001313 per MB per month ($0.015756 per MB per annum) and reducing to $0.001125 per MB per month ($0.0135 per MB per annum) in the fourth year of the contract;

(3) The agreement was for a five-year term ending on 30 June 2015, and MetLife had options to extend for additional one-year periods.

3691. In conformity with the usual pattern, (a) Mr Hussain had needed and pressed for the deal to achieve quarterly forecasts (he described it in an email to Mr Chamberlain and Ms Gustafsson as *"a key deal for the quarter"*) and (b) in its negotiations, Autonomy's sales pitch focused on the potential savings from the restructure over time, while ensuring that Autonomy secured an upfront licence fee on which it could rely for revenue recognition. Autonomy made no secret of this: and in an email to Mr Hussain, Mr Sass said "*I shared that rev rec will guide what we can do".*

3692. According to a spreadsheet prepared by Autonomy for MetLife, MetLife stood to save $10.6 million over five years from entering into the First MLIC Amendment Agreement. Even so, MetLife initially balked at the licence fee, and Autonomy eventually agreed slightly extended payment terms, which became terms of the deal.

3693. Barely a year later, in May 2011, Autonomy approached MetLife about the possibility of a further restructuring with the inducement that it would lower storage rates again. Dr Lynch did not dispute that it was Autonomy that made the first approach.

3694. The initial term of the First MLIC Amendment Agreement then still had around four years left to run. Mr Hussain's written closing submissions noted, however, that under the First MLIC Amendment Agreement MetLife was paying more ($0.015756 per MB per annum) than Morgan Stanley had paid in 2008 ($0.0092 per MB per annum) and that MetLife's rates were plainly uncompetitive in light of the rapid fall in the costs of hosting.

3695. Nevertheless, Autonomy initially proposed only a reduction in maintenance and support fees. On 2 June 2011, Mr Sass sent Mr Egan a draft of his proposal to MetLife, setting out three different options, each involving the abolition of the maintenance fee. Mr Sass noted that Autonomy was "*proposing a licence "refresh" of the Digital Safe/Audit Center/Supervisor/Investigator Software (aka 2010 License software). This refreshed*

*licence grant will include all the software licensed under the June 2010 agreement*"; in respect of two options, it would also extend the expiration date of the licence.

3696. The Claimants drew my attention to Mr Egan's response and its aftermath: "*I would change word "refresh" to "increase" for both reve rec purposes and so that they can continue to amortize the license they have*". Mr Sass proposed "*update*" instead of "*refresh*" or "*increase*", noting a concern, at least with one scenario, "*that we are not adding anything per se*". Mr Egan agreed, indicating that Mr Sass would have to "*figure out how to [add] something*" to the agreement. Mr Sass sent the proposal to Mr Kelly the same day (2 June 2011).

3697. MetLife were not interested in paying upfront simply for a reduction in maintenance. When that became clear, Mr Sass proposed a generous reduction of 60% in storage rates in return for an upfront licence fee of $5.8 million. Having made the offer, Mr Sass reported to Ms Gustafsson that he had what he called "*sellers remorse*" that it was too generous to MetLife. Ms Gustafsson reassured him:

> "*Don't worry! It is a five year deal, and they are only getting 25% discount on NPV – I have seen many higher than that! We are close to Q end so if we want a deal then we have to get them focussed straight away*".

3698. MetLife again balked at the licence fee, prolonging the negotiation. Mr Sass sent an email to Ms Gustafsson on 16 June 2011 requesting "*immediate help*" and reporting that though MetLife "*like the deal*" they were "*fishing for a better deal*" and were asking (a) to extend by a further year from five to six year to enable them to amortise the cost of the licence over that longer period, (b) to reduce the licence fee and (c) to reduce the storage cost. He asked Ms Gustafsson to "*do some analysis (and magic)."* The upshot was a re-engineering of the proposal to (i) reduce the licence fee to $5.5 million, (ii) increase the term to 63 months and (iii) further reduce storage charges to $0.0004888 per MB per month.

3699. As that summary of the exchanges demonstrates, there was no focus or even mention in the negotiating process on what software was to be licensed to MetLife to attempt to justify the sizeable upfront licence fee. As at 13 June 2011, nothing had been "*figure[d] out*" (see paragraph 3696 above). Mr Crumbacher reminded Mr Sass on that date that he needed to identify some software to license: "*you didn't state what software your licensing [sic]. Is this a termination of the old license (Digital Safe) and then a relicense of the same/most recent version of the Digital Safe software with a lower maintenance rate?*". Mr Sass told him that it was a "*relicense with lower maintenance and lower reduced storage*". Not until 17 June 2011 was any alteration made to the software to be provided; even then, according to the Claimants, it was only because Mr Hussain decided that a DiscoverEngine SharePoint connector should be included. There is nothing in the evidence to suggest that the addition was requested by MetLife, or that the additional functionality was actually required. I elaborate on this in paragraph 3711 to 3714 below.

3700. A deal was agreed just before the end of the quarter. Mr Hussain was plainly involved in the negotiations and the ultimate transaction; and he was, for example, fully aware of and involved in the unilateral addition of software to the solution provided.

3701. Dr Lynch denied having had anything more than an awareness *"at a high level, very high level"* that a deal was being negotiated. However, he acknowledged in cross-examination that he had been informed that Autonomy was negotiating a further deal with MetLife, and he did not dispute that he would have known from one of Mr Hussain's many revenue target lists that the deal would be important in terms of meeting Autonomy's quarterly revenue targets. Further, he implied that he knew enough about it to try to justify the transaction (in fact, incorrectly) on the basis that MetLife was *"an unhappy customer"* (as further elaborated in paragraph 3704 below). This evidence was typical of Dr Lynch's attempts to offer explanations of a transaction which were to his advantage whilst protesting he had next to no knowledge of the transactions themselves. The Claimants submitted that *"it is to be inferred"* that Mr Hussain *"kept [Dr Lynch] informed"* of the matters complained of. In all the circumstances and in light of the instances and pattern of Dr Lynch's involvement and the way Dr Lynch and Mr Hussain worked together as chronicled in this judgment, the inference is justified. I have been left in little doubt that he knew what was going on, at least sufficiently to know what was Autonomy's true objective (revenue acceleration to help plug gaps in achieving forecast).

3702. Under the Q2 2011 deal ("the Q2 2011 MetLife restructuring"):

(1) MetLife agreed to licence Digital Safe and Related Software, and the five year term under the Q2 2010 hybrid hosting agreement was extended for 15 months to September 2016, for an aggregate fee of $5.5 million;

(2) DiscoverEngine was added to MetLife's licensed software package;

(3) MetLife's monthly storage fees were substantially reduced.

*Claimants' case*

3703. The essential factual elements of the Claimants' claim in respect of the Q2 2011 MetLife restructuring were the Claimants' propositions that:

(1) The Q2 2011 MetLife restructuring was conceived and instigated by Autonomy as a pretext to enable Autonomy to generate immediately recognised revenue from a licence sale at the cost to Autonomy of discounted data storage rates and thus a reduced future revenue stream;

(2) Its true substance was simply a payment by MetLife of the licence fee in return for a considerable reduction in data storage charges (under which MetLife stood to save in excess of $10 million over the term, almost double the licence fee);

(3) The only difference in terms of the software licensed to MetLife under the Q2 2011 restructure compared to its previous agreement was a licence to a connector called DiscoverEngine that enabled the extraction of data from a Microsoft Office document management and storage system, known as SharePoint;

(4) DiscoverEngine was introduced into the Q2 2011 MetLife restructuring by Autonomy at the very last minute, without any demonstration to, or discussion with, MetLife or any assessment of its suitability for MetLife;

(5) Initially, Autonomy proposed to provide DiscoverEngine for free; the true reasons why DiscoverEngine was included in the Q2 2011 MetLife

restructuring had nothing to do with any requirement of MetLife and everything to do with (a) seeking to mislead Deloitte into believing that MetLife wanted and intended to use DiscoverEngine and the licence fee had been paid for this new software, and so as to justify to Deloitte another licence and another upfront licence fee and (b) assisting Autonomy in persuading Deloitte that there was a genuine demand for DiscoverEngine from Autonomy's customers;

(6)  In terms of the interests of Autonomy as a corporate entity, there was no justification or commercial rationale for the Q2 2011 MetLife restructuring, especially during the currency of the earlier hybrid deal and so soon after it: there was no basis for any suggestion that the restructuring was prompted by any real concern about customer retention; and

(7)  Both the Defendants knew all this.

I address these points, and the Defendants' responses to them, in greater detail below.

3704.  Dr Lynch suggested when he was cross-examined about this deal that his memory of the background of the Q2 2011 restructuring was that MetLife were *"an unhappy customer…it had been a bit of a bumpy relationship with MetLife."* He suggested this was another matter that could be clarified from the *"corpus"* of documents. He also said that he did not think they were thinking of leaving, but *"had had issues with us"*; and that he did not know who had approached whom. He accepted that he had not mentioned this in either of his witness statements.

3705.  No documents were found by the Claimants in the *"corpus"* supporting Dr Lynch's memory; and none was suggested to Dr Lynch when he was re-examined. The Claimants instead relied on and put to Dr Lynch an email dated 16 June 2011 from Mr Sass to Ms Prentis (now Ms Gustafsson) stating (as they put to Dr Lynch) *"We are in good shape…they like working with us"*; but that was after the proposal for restructuring had been floated: the missing words after *"We are in good shape"* were *"(meaning they like the deal)…"*; so the email does not support either side.

3706.  Points of general application in the context of hosted restructurings made in Mr Casey's oral closing submissions on behalf of Mr Hussain were that (a) hosted customers were well aware that storage rates were going down fast, could transfer or reduce data storage needs at any time, were *"hard-nosed"* and could be expected to be on constant watch for a better deal; (b) although the Claimants had emphasised that once committed to data storage with one host, there were difficulties in moving and customers tended to "stick", that was *"overstated"* and there were at least two documented examples of very large movements of data during the Relevant Period and a number of threats by other customers to do the same; (c) it was *"far-fetched to suggest that what Zantaz/Autonomy should have done was to sit back and expect customers to pay whatever happened to be the current rate for hosting"*; and (d) a post-acquisition email referred to MetLife as being *"very sensitive to pricing"*.

3707.  I would, of course, accept that pro-active engagement with a customer to retain its goodwill would be understandable and indeed expected in what Mr Casey described as a business *"which was far more dynamic than the Claimants acknowledge, the customers were more hard-nosed"* and *"it's far-fetched to suggest that what Zantaz should have done was to sit back and expect customers to pay whatever happened to be the current rate for hosting"*. He added that the Claimants' suggestion of customer reluctance to move was overstated: *"We know that there were two very large movements*

*of data during the relevant period: Citi's from hosted archive to on-premises and JPMC's move to IBM. Other customers…threatened to do the same."*

3708. However, it was in this case a very short time since the previous substantial restructuring. There was no real evidence, beyond the say-so of Dr Lynch for which he claimed support which never materialised, of customer dissatisfaction or restlessness. It seems reasonably clear, and I find, that the impetus for the transaction came from Autonomy, and that but for Mr Hussain's need to find more revenue, no restructuring would have been proposed.

3709. The Claimants' characterisation of the true substance of the restructuring as being the payment of an upfront licence fee in return for deeply discounted data storage rates seems to me to be accurate. That does not exclude the likelihood that as in other contexts, such as the Deutsche Bank restructurings, there were other potential commercial benefits; but it encourages sceptical review of them.

3710. The real issue, to my mind, is whether, notwithstanding the rational commercial justifications advanced for the Q2 2011 MetLife restructuring, the imperative of somehow finding revenue which could be recognised in its accounts to *"cover up"* what Mr Hussain had described in his email to Dr Lynch of 10 December 2010 as the complete falling away of US IDOL revenue at the end of 2010 (see also paragraph 3682 above) was in reality the only, or at least plainly the predominant, driving force, and if so whether that invalidates the decision or renders it or Mr Hussain's conduct improper. The adventitious addition of DiscoverEngine as the sole extra software licensed is of particular interest in this context.

3711. As to the commercial features of the transaction, the extension of the term was always part of the package. It is clear, however, that the addition of DiscoverEngine software came late in the day, after the contours of the deal for Autonomy to reduce data storage charges in return for MetLife committing to a licence fee for an extended term: although there is email correspondence suggesting that Autonomy had identified in May 2011 a sales opportunity for *"Connectors for the capture and archive of documents (SharePoint, JIVE collaboration)"* the addition of DiscoverEngine was made on the initiative of Autonomy, rather than of MetLife.

3712. As submitted by the Claimants, the process leading up to that decision is revealing:

(1) When on 13 June 2011, Mr Crumbacher pointed out to Mr Sass that he needed to identify some software to license: "*you didn't state what software your licensing [sic]. Is this a termination of the old license (Digital Safe) and then a relicense of the same/most recent version of the Digital Safe software with a lower maintenance rate?*", Mr Sass told him that it was a "*relicense with lower maintenance and lower reduced storage*". There was no suggestion of including a SharePoint connector.

(2) A few days later, on 15 June 2011, Mr Scott emailed Mr Hussain identifying "*several customer opportunities where we may want to offer the Sharepoint connector as part of our overall solution*", including MetLife. Mr Scott had been asked to compile the list by Mr Hussain.

(3) The message about offering DiscoverEngine to customers including MetLife had reached Mr Rothman, an Autonomy lawyer, who was involved in

documenting the MetLife deal. On 17 June 2011, Mr Rothman emailed Mr Sass to say that he understood "*we now need to add Share Point Connector to ... this document ... correct?*".

(4) But the message had not reached Mr Sass, who had been leading the negotiations with MetLife. He was entirely unaware of a reason for adding a SharePoint connector to MetLife's contract. He replied: "*sorry. no clue what you are talking about*". Mr Rothman explained: "*My understanding is that Sush has decided we should give this connector to MetLife ... (for free) as a way to promote this product. Hence, I was asked by [Mr Crumbacher] to include a reference in both documents. Do you have any objection ...?*"[465]. Mr Sass responded "*Let me call Sush*". A few hours later, Mr Sass reverted to Mr Rothman indicating that he was content to include DiscoverEngine in the agreement.

(5) When on the evening of 17 June 2011, Mr Sass forwarded the draft produced by Mr Rothman to Mr Kelly, he made no mention of the fact that DiscoverEngine had been newly inserted into the agreement,[466] as shown by the "*redline*" he attached. Mr Sass's failure to mention the new software belies any suggestion that MetLife had requested it or the functionality it provided.

(6) The reality, to my mind, and I find, was that DiscoverEngine, though intended to be a promotional offer to others for free, was added in this case as if it justified a considerable fee as the available means of satisfying what Mr Egan had described as the need to "*figure out how to [add] something*".

(7) MetLife itself barely noticed the addition. The Claimants drew my attention to an email dated 1 September 2011 from MetLife to Ms Beth Ladd at Autonomy expressing interest in "*the strategy for SharePoint and capturing data that is traditionally maintained in an application or structured environment as opposed to just documents and emails*", suggesting (so they contended) that MetLife was not even aware that it had purchased a SharePoint connector as part of that agreement.

3713. Even though it is worth remembering that (as I have determined in the chapter of this judgment dealing with "VARs") Autonomy had purchased DiscoverEngine to put DiscoverTech in funds, I am prepared to accept in this context Dr Lynch's evidence that DiscoverEngine was superior to Autonomy's own product and did offer real benefits to MetLife; and that this was in turn of benefit to Autonomy. I accept also that it was in Autonomy's interests to improve its relationship with MetLife, address its complaints (which especially concerned cumbersome processes and service deficiencies), and pave the way for more business (including building an IDOL Index on its entire safe with 120 TB data requirements). This is apparent from the notes of a QBR (Quarterly Business Review) meeting between Autonomy and MetLife at operational level in May 2011. There were commercial considerations which also supported the transaction.

3714. But that was not the rationale of its addition of DiscoverEngine or more generally of the sale of a new licence. I accept the Claimants' contention that the operative reason for

---

[465] Emphasis added.
[466] A previous draft of the agreement that was sent to MetLife did not include DiscoverEngine.

the late addition of DiscoverEngine, reminiscently of the late addition of IDOL dense cells in the Deutsche Bank deal, was to support the misleading impression that MetLife was getting something for its $5.5 million which could be seen to be separate and apart from the benefit of reduced storage charges.

3715. Reverting to the transaction itself, the negotiations around the upfront licence fee for Autonomy and the overall savings for MetLife continued. After some last minute re-negotiation which resulted in a reduction in the licence fee to $5.5 million, coupled with reduced storage rates, which created an additional saving to MetLife of over $1 million, on 29 June 2011, Mr Sass informed Mr Hussain that the deal with MetLife should complete that quarter, which it did. The following day, 30 June 2011, Mr Sass told Mr Hussain "*MetLife ($5.5M) IN*". Mr Hussain's response again reveals Autonomy's true motivation for entering into the transaction: "*Any possibility of recognising $5.8m?*". First and last, that was, in my view, Autonomy's and the Defendants' real focus.

*Relevance of Deloitte's review and approval?*

3716. In this context, as in all others where an accounting treatment was questioned, the Defendants sought to draw support from the approval of Deloitte. But in this context, as in all others, Deloitte saw only what was presented to them. Whether those involved in Deloitte should have adopted and pursued a more sceptical approach is not for me to determine: Deloitte's conduct is not on trial, and they are not parties. What is relevant for present purposes is whether their approval was given on a basis which reflected reality.

3717. The basis of their decision is evident from their internal working papers detailing their approach to the accounting treatment of the Q2 2011 MetLife restructuring. In particular:

(1) Although the overall description of the deal is stated as involving "*an extension of term, a renegotiation of fees for both storage and go-forward maintenance, and the addition of the 'DiscoverEngine' connector for Digital Safe*" that is the only mention of DiscoverEngine in the assessment;

(2) The key terms are described as follows: –

"*The licence term is extended out to 30/09/16*

*Monthly storage fee reduced to $0.00048888 per MB per month for remainder of terms (reduced from $0.001313) -62.8%*

*Annual S&M fee reduced to $275,000 for remainder of term (reduced from $351,250)*"

(3) Immediately after that, Deloitte recorded:

"*we note that such deals are reasonably common with large customers – as the cost of storage for Autonomy falls, large customers are able to renegotiate their storage fees lower in exchange for a non-refundable upfront licence payment…*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*We have reviewed the original agreement and the amendment and
noted no terms that would restrict the upfront recognition of revenue.
As such recognition of revenue upfront is deemed appropriate."*

(4) Having reviewed the maintenance element, and Autonomy's management assessment concluding that it complied with the VSOE, Deloitte concurred that the established rates were reasonable.

(5) After noting that MetLife were one of the largest listed insurers in the US so that collectability should not be an issue, in formally approving revenue recognition, Deloitte recorded that:

> *"(a) The risks and rewards of ownership passed to the customer when the items were delivered. As all of Autonomy's obligations have been fulfilled the risks and rewards have been transferred.*
>
> (1) *Autonomy has not retained any managerial control.*
>
> (2) *The revenue can be measured effectively as it is stated on both invoice and in the contract*
>
> (3) *it is probable that economic benefits will flow to autonomy*
>
> (4) *there are no costs incurred in this transaction."*

3718. There was no consideration given to what any broader objectives of the transaction might be; there was no focus or sceptical review of the by now fairly evident pattern of transactions of many varieties late in the quarter which as a fact bolstered revenue otherwise than by what might be termed plain vanilla sales.

3719. I do not see any sufficient reason not to accept:

(1) Mr Welham's evidence that, had Deloitte known that DiscoverEngine had not been requested by MetLife, and was included in the deal to give the impression that MetLife was getting something for its $5.5 million licence fee, Deloitte would not have considered it appropriate for Autonomy to have recognised the licence fee as revenue in Q2 2011; and

(2) Mr Bloomer's evidence that, if it were the case that DiscoverEngine had been inserted into the agreement without any suggestion that the customer wanted it, it would have been "*contrary to [his] understanding at the time*" and he would have wanted to understand the "*conflict between*" what Deloitte was told and the true state of affairs.

*Defendants' knowledge of impropriety*

3720. I have already found that both Defendants knew what was the driving purpose of the transaction. For comprehensiveness I confirm that, in my judgment, they appreciated that all the other claimed benefits were peripheral, even if necessary in presentational terms, and that the transaction would not have been pursued but for the objective of accelerated revenue recognition, which would come at a substantial net cost and loss.

3721. In my judgment, the decision made was not one simply of commercial judgement in which the Court should not usually intervene. Its driver was a transaction based on a contrivance. That infected the decision and rendered it, to their knowledge (since they were aware of the contrivance), improper.

*Overall conclusion*

3722. In my judgment, the Claimants' allegation that the Q2 2011 MetLife restructuring was

commercially unjustified and a breach of duty and improper use of power has been established.

3723. I shall consider later what loss was thereby caused.

## OTHER TRANSACTIONS

3724. The Claimants sought to impugn a sixth (and final) category of transactions, described in both the RRAPoC Schedule 7 ("Schedule 7") and in its closing submissions as *"Other Transactions"*[467]. This amorphous collection related to another set or sets of transactions that allegedly had, and were designed to have, the effect of enabling Autonomy to recognise or accelerate the recognition of revenue for the purpose of achieving revenue forecasts in a given quarter.

3725. The four individual sets of transactions which were the subject of Schedule 7 are:

(1) A series of agreements with Tottenham Hotspur plc ("Tottenham Hotspur"): (a) a software licence agreement between ASL and Tottenham Hotspur pursuant to a purchase order dated 30 June 2010 ("the 2010 Tottenham Sale") but not actually signed until 5 July 2010, (b) a Shirt Sponsorship Agreement dated 5 July 2010 ("the 2010 Tottenham Purchase") between the same parties and also Tottenham Hotspur Football & Athletic Co Limited (together with Tottenham Hotspur "the Club") under which Autonomy committed to pay shirt sponsorship fees of an aggregate of £63 million payable over five seasons, and also a MAF calculated as 30% of "Total Net Qualifying Revenues" being revenues from customers referred by the Club to ASL as sponsor; (c) a further agreement between ASL and Tottenham Hotspur dated 31 March 2011 for the sale to Tottenham Hotspur of additional software licences and "managed services"; and (d) an amendment to the Short Sponsorship Agreement also dated 31 March 2011 altering the amounts payable in the subsequent seasons and also changing the definition of "Qualifying Revenues" with the effect of a further MAF being payable to the Club;

(2) An amendment dated 10 December 2010 ("the Prisa First Amendment") to a software licence agreement dated 31 March 2010 between ASL and a Spanish company in the Prisa group called Ediciones El Pais SL ("EEP"), (Q4 2010);

(3) A Hosting Services and Licence Addendum ("the Hosting Addendum") entered into between Autonomy Inc and Amgen Inc ("Amgen") on 21 December 2010, which was part of a wider project for the provision by Autonomy of hosting and related e-Discovery services (Q4 2010); and

(4) An agreement dated 3 June 2011 under which Autonomy Inc sold Iron Mountain Information Management Inc ("Iron Mountain") a perpetual licence and associated maintenance and support services, which was concluded on the same day that Autonomy Inc acquired the Iron Mountain digital business from Iron Mountain Inc (Q2 2011).

3726. The Claimants did not, apparently *"due to time constraints",* cross-examine Dr Lynch

in relation to any of these four transactions. Therefore, the Claimants accepted that they

cannot allege that Dr Lynch had knowledge of their false accounting.

327 However, they submitted that the Other Transactions remain relevant given that:

---

[467] Each described in Schedule 7 of the RRAPoC.

(1) the Claimants maintained that there was false accounting in relation to each of the transactions and they continued to allege that Mr Hussain knew of that false accounting; and

(2) if (as the Claimants alleged) there was false reporting in relation to the Other Transactions, they fell to be taken into account when assessing loss.

3728. The Claimants addressed the Other Transactions at considerable length in their written opening, and again in their closing submissions. They impugned the Other Transactions on various grounds, including the apparent linkage between ASL's sales to and purchases from Tottenham Hotspur, and the alleged failure in the case of all the transactions to satisfy the revenue recognition criteria in IAS 18.14. However, the focus of this aspect of the Claimants' case as regards the first three transactions (Tottenham Hotspur, Prisa and Amgen) was their allegation that the sale of licences in each case involved (as a substantial part of the overall sale) the provision of services after the sale to initiate and enable the use of the software supplied.

3729. The Claimants' case in respect of those three transactions is that what was sold was not simply a piece of software purchased together with separately charged additional services, but a composite 'solution' of which the provision of services was an integral part[468]. Since nothing of immediate value was transferred until the integral services were provided, it was wrong to recognise revenue at the point of sale (as Autonomy had done) and revenue recognition was required to be deferred until the delivery of a fully functioning product had been concluded, or at least until some subsequent stage in the installation of the software for the customer had occurred enabling its use as a working solution.

3730. The Claimants' case in respect of the fourth 'other' transaction (Iron Mountain) was of a different nature. It raised a separate and different issue about whether the revenue from an IDOL licence sold to Iron Mountain after its acquisition by Autonomy was booked at fair value; and in particular, whether there was any proper basis for Autonomy having increased the revenue recognised in respect of a software licence sold to Iron Mountain in Q2 2011 by way of what purported to be a 'fair value adjustment' of $5.5 million.

3731. The Claimants also contended that in the case of all four Other Transactions, the true position in respect of the relevant transaction was concealed from Deloitte.

3732. The Defendants rejected all these claims. Dr Lynch, in addition to the point agreed that having not been examined, it could not be suggested that he had dishonest knowledge of false accounting, dealt with the claims in relation to Other Transactions inside three pages. He dismissed each, at least as against him, as never having made any sense at all, and more generally, as based on *"nuanced matters of detailed accounting, and accounting judgement"* in respect of which Autonomy had taken, and Deloitte had approved, a perfectly permissible view.

3733. Mr Hussain's closing submissions dealt with the Other Transactions in more detail than in his opening submissions; but he too sought to dismiss the claims as turning on matters

---

[468] "Solution" is not a term of art, nor even a well-defined accountancy or business term. It was used by the Claimants to connote an agreement for the provision of both software (in this case invariably under licence) and implementation services where the provision of both is, as a matter of substance, so intertwined that it would be unrealistic and inappropriate to recognise separately the two elements of the sale.

of nuance and accountancy judgement, maintaining that the approach taken by Autonomy when accounting for them had been entirely legitimate, and Deloitte had concurred with it.

3734. The competing accounting views were argued out by the parties' respective experts. Each adopted the approach typical of his report. Mr Holgate relied on a series of assumptions of fact ("the Assumptions") given to him in his instructions. The Defendants criticised the Assumptions as framed in a way which funnelled him to a conclusion favourable to the Claimants. As noted in all other contexts in which he provided his expert opinion, Mr Holgate did not see, or call for, the relevant contracts. Nor did he consider Deloitte's working papers or any of the work Deloitte had undertaken in reaching their views about the accounting for these transactions. Mr Holgate agreed (as did Mr MacGregor) that in the real world an accountant would have had to be familiar with the contractual terms and all other available evidence about each individual transaction and reach a decision on revenue recognition case by case.

3735. On the basis of the Assumptions he was instructed to make, Mr Holgate's conclusions in respect of the first three transactions, put summarily, were that (a) Autonomy was in each case providing not simply a piece of software but also services as an integral part of the whole 'solution' sold, so that (b) revenue from the whole 'solution' could not be recognised unless and until it had been provided in full and (c) on the basis of the second of the Assumptions (in respect of Tottenham Hotspur and Prisa), as there was no clear statement of work for the project, nor were the deliverables or acceptance criteria defined, it was not possible to measure the costs reliably, as was required by IAS 18.20 before revenue from services could be recognised.

3736. Mr MacGregor's report was more open-textured. He concurred with the applicable tests but took a different view of the shape of the overall transaction in each case. In his first report, he identified as the main claim, and thus the main area of disagreement, in respect of the first three transactions as being whether the economic substance of the transactions was the provision of a "solution" to which the provision of services was integral, or (in the words of his report) "*whether or not the transaction could be split into separately identifiable components by reference to IAS 18.13, and whether the costs to complete the project or the outcome of the transaction could be estimated reliably by reference to IAS 18.26.*"

3737. With reference to the relevant agreements, and to Autonomy's general policy as set out in Autonomy's Consolidated Financial Statements for revenue associated with professional services, Mr MacGregor concluded that it was a legitimate approach, and in line with that general policy, to regard each of the first three transactions as comprised of separate components in accordance with IAS 18.13, and the costs of completing the project or the outcome of the project as susceptible to reliable estimation by reference to IAS 18.26.

3738. Although they reached different conclusions, Mr Holgate agreed in cross-examination that:

>   (1) the essential question for these deals was whether the sales in question were to be regarded as a sale of a licence or an agreement to provide a solution;

>   (2) that is a matter of judgement to be determined on the basis of the facts known to the accountant;

(3) it is possible for one agreement to include a licence and other services as long as they are separately identifiable;

(4) the question whether the costs of any service element can be measured is a matter of accounting judgement to be assessed against the factual evidence available at the time.

3739. A brief factual analysis of the first three transactions is necessary to understand the application of these questions to the facts.

## Tottenham Hotspur: the two sets of transactions

### First set: Q2 2010

3740. The transaction with Tottenham Hotspur was one of the "*big deals*" of Q2 2010, as described by Mr Hussain in the revenue summary spreadsheet he provided to Dr Lynch on 30 June 2010.

3741. Autonomy's sale of a software licence to Tottenham Hotspur ("the 2010 Tottenham Sale") was established pursuant to a purchase order dated 30 June 2010 ("the 2010 Tottenham Purchase Order"). The licence fee under the 2010 Tottenham Sale was a total of £3.9 million plus VAT, and professional services were contracted to be provided in order to provide Tottenham Hotspur with "*a fully implemented system*" with a view to the football club becoming "*the most technically advanced club amongst its peers*". The 2010 Purchase Order was signed by Mr Kanter on behalf of ASL following its approval by Mr Hussain.

3742. Although the 2010 Tottenham Purchase Order was dated 30 June 2010, i.e. right at the end of Q2 2010, the contemporaneous documents show that the 2010 Purchase Order was backdated; it was not signed by the parties until 5 July 2010. Given it appears that Mr Hussain gave his approval for the 2010 Purchase Order on 1 July 2010 (the final draft only having been produced that day), he must have been aware that it was going to be executed after the quarter end, even though it was dated 30 June 2010.

3743. The Shirt Sponsorship Agreement was established at the same time as the 2010 Tottenham Sale following discussions between Dr Lynch and Mr Daniel Levy (the Chairman of Tottenham Hotspur). The Shirt Sponsorship Agreement between ASL and Autonomy and Tottenham Hotspur was correctly dated 5 July 2010. The Shirt Sponsorship Agreement, which was signed by Mr Hussain on behalf of each of ASL and Autonomy, was for five seasons with fees totalling £63 million. The sponsorship fee payable to Tottenham Hotspur for the first season (2010/11) was £9 million, which rose to £12 million for the 2011/12 season (save that the fee would be reduced to £9 million if Tottenham Hotspur failed to generate 'Qualifying Revenues' of £4 million). Qualifying Revenues were revenues from sales by Autonomy to third party customers introduced by Tottenham Hotspur, with Tottenham Hotspur being entitled to a marketing assistance fee (MAF) equal to 30% of the Qualifying Revenues.

3744. The following points are to be noted in relation to this first Tottenham transaction:

(1) The 2010 Tottenham Purchase Order and Sale and the Shirt Sponsorship Agreement were negotiated alongside each other and (though dated differently) were entered into at or around the same time. The 2010 Purchase Order recorded – in language expressly approved by Mr Hussain – that there would be no annual

support fee payable by Tottenham Hotspur provided that it continued "*to maintain a strategic relationship with Autonomy*", which was plainly a reference to the Shirt Sponsorship Agreement.

(2) It was recited in the 2010 Tottenham Purchase Order, at the request of Mr Levy that the goal be identified, that the licence was intended *"to enable a system to provide the following functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design. It is the goal of the parties for Licensee to represent the most technically advanced club amongst its peers"*. The Claimants submitted that thereby Tottenham Hotspur contracted to receive a 'solution' to which the provision of services was integral: it required a bespoke solution to its website needs, a project involving not just the provision of software and support, but also services to conclude the delivery of a fully functioning website that would meet Tottenham Hotspur's requirements. They added that the software purchased under the 2010 Tottenham Sale was not of any use to Tottenham Hotspur until that solution had been delivered. The only witness who gave evidence in relation to the deal was Alastair Martin, but he accepted that he was not involved in its negotiation and, thus, had no knowledge of the discussions that had taken place between the parties prior to them entering into the 2010 Purchase Order.

(3) The 2010 Purchase Order provided no defined scope of work for the project; it did not define the deliverables or key milestones against which delivery could be measured, nor did it contain any defined acceptance criteria.

(4) The documents show that the project stalled and delays resulted, as Mr Martin accepted. As at 18 October 2010, nothing had happened on the project. At the end of October 2010, the parties had another "*Project Kick Off*" meeting, at which a further presentation was given by Autonomy, from which the embryonic nature of the project is clear: see, for example, the "*Work package summary*", including the "*Solution design*" workstream. Matters continued to stall thereafter and no professional services were provided following that meeting. Thus;

(a) By late April 2011, i.e., more than six months later, the solution design had still not been agreed between Autonomy and Tottenham Hotspur.

(b) Indeed, as late as early June 2011, Mr Martin raised with Dr Lynch and Mr Kanter the fact that Tottenham Hotspur was "*not overly happy with our responsiveness and attention*" to their website "*refresh project*", due to Autonomy's failure to apply adequate resources to it. Mr Martin acknowledged that the "*project is still in the design phases*". Dr Lynch replied on 6 June 2011 that the account was "*another one for a remedial plan*" and should be fixed, and asked that Mr Martin report back in a week.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*The second transaction*

3745. On 31 March 2011, ASL entered into a further agreement with Tottenham Hotspur to provide additional software licences and "*managed services*" for a period of three years. The agreement was recorded in a purchase order dated 31 March 2011, which was signed by Mr Kanter on behalf of ASL ("the 2011 Tottenham Purchase Order"). The licence fee was £4 million (plus VAT), with a 5% support fee for the first year (£200,000 plus VAT). On the same date, the Shirt Sponsorship Agreement was also amended, (i) increasing the sponsorship fee payable for the 2011/12 season from £9 million to £11 million, and (ii) altering the definition of 'Qualifying Revenues' so as to include licence revenues paid not just by third party customers, but also by Tottenham Hotspur to ASL, such that the £3.9 million payable under the 2010 Purchase Order and the £4 million due under the 2011 Purchase Order qualified ("the Amendment Agreement"). Mr Hussain signed the Amendment Agreement on behalf of ASL and Autonomy.

3746. A number of points should be noted in relation to this set of transactions:

(1) The 2011 Purchase Order and the Amendment Agreement were plainly linked transactions: they were negotiated together and the parties operated on the basis that the two agreements would "*complete*" at the same time.

(2) Indeed, it is notable that the 2011 Purchase Order and the Amendment Agreement were broadly for the same value: £4.2 million was payable by Tottenham Hotspur under the former; with £4.37 million payable to it under the latter, being the total of (i) the £2 million increase in the sponsorship fee for the 2011/12 season, and (ii) a MAF of £2.37 million, resulting from the combined total of £7.9 million payable under the 2010 Purchase Order and the 2011 Purchase Order now constituting 'Qualifying Revenues' (the MAF amounting to 30% thereof).

(3) The 2011 Purchase Order did not deliver any significant incremental value to Tottenham Hotspur. It stated that the licensed software was for use in relation to Tottenham Hotspur's web services and social media, indicating that it formed part of the overall project to provide the club with its website requirements under the 2010 Purchase Order. In other words, this sale formed part of the wider commitment by ASL to deliver to Tottenham Hotspur a functioning website. Thus, the software licensed under the 2011 Purchase Order was of no use to Tottenham Hotspur until the solution contemplated by the 2010 Purchase Order had been delivered.

(4) Again, as with the 2010 Purchase Order, the 2011 Purchase Order contained no defined statement of work for the project, key delivery milestones, defined deliverables, or defined acceptance criteria.

3747. Autonomy accounted for the Autonomy licence sale side of the first two transactions as follows:

(1) Licence revenue of £3.9 million less £30,000 under the 2010 Purchase Order was recognised immediately by Autonomy on 30 June 2010, that £30,000 representing a total of 6 months' services at £5,000 per month which Autonomy

Page 1129

carved out of the upfront licence fee as the value of future services to be provided over time[469];

(2) Licence revenue of £4 million under the 2011 Purchase Order was recognised immediately by Autonomy on 31 March 2011.

3748. As I explain below, the focus of the submissions on all sides was on the first set of transactions, which Deloitte considered were not reciprocal and so the 2010 sale and the 2010 purchase should be accounted for separately. I did not understand that to be challenged. In particular my focus is on Autonomy's accounting treatment of the 2010 sale, in which Deloitte concurred, as comprising separately identifiable components. The Claimants submitted that this accounting was wrong.

3749. Addressing the fundamental question and applying the criteria agreed between the experts as adumbrated in paragraph 3738 above, what is to be determined is whether the sales were of a licence, with separate arrangements at a separate price for servicing, or whether in reality the agreement should be characterised as providing for the sale of a 'solution'.

3750. There is no dispute of principle between the experts on this point. The issue that requires resolution is one of fact, not accounting principle, and turns on whether the substance of the deliverable to be provided to Tottenham Hotspur was a working solution.

3751. The Claimants submitted that plainly, it was. The terms of the 2010 Tottenham Purchase Order itself, which provided that the software licences that were the subject of the contract were "*intended to enable a system to provide the following functions at the level found in a Premiership football club's ordinary operations: CRM, ticketing, player analysis, retail, internet and web design*" (see paragraph 3744(2) above) reflected that Tottenham Hotspur were contracting to receive "*a fully implemented system*". According to the Claimants' characterisation:

(1) The objective that Tottenham Hotspur sought to achieve by entering into the 2010 Tottenham Purchase Order is plain on its face: they wanted a "*system*" which would provide the various specified "*functions at the level found in a Premiership football club's ordinary operations*", but the detail of what that involved was left to be discussed and agreed between the parties subsequently;

(2) The software licences the subject of the 2010 Tottenham Purchase Order were of no use to Tottenham Hotspur in and of themselves: they required Autonomy to provide the professional services in order to put in place the yet to be defined "*fully implemented system*" and the 2010 Tottenham Purchase Order simply included an exhaustive list of the software "*required in relation to management of a typical peer website*".

3752. Accordingly, the Claimants' case is that the substance of the deliverable to be provided to Tottenham Hotspur was a working solution (i.e. "*a fully implemented system*"), not simply a piece of software, and the provision of services was integral to that solution. Thus, nothing of immediate value was transferred to Tottenham Hotspur at the time of entry into the 2010 Purchase Order and, therefore, no revenue should have been

---

[469] Deloitte's working papers show that Deloitte considered that the carve-out should have been $90,000 but that no adjustment was proposed because the difference was "*clearly trivial*"

recognised by Autonomy in relation to the 2010 Purchase Order at 30 June 2010. It was not suggested to Mr Holgate in cross-examination that his conclusion was wrong if the substance of the deliverable was a working solution.

3753. For the Defendants, Mr MacGregor agrees that, if the contract – when assessed from the perspective of the customer – was for the provision of a working solution, then revenue should not have been recognised when it was. He put it as follows:

> "A.    ... Look, at the end of the day, on each of these things, again this is going to come down to a reading of what the contract information says about whether there was a sale of a licence or whether it's not as simple as that and what was being provided was the sale of a licence only in the context of something which was then had to have substantial amounts of work done on it so that it could be operated by the purchaser –
>
> Q.    Again –
>
> A.    – in the manner it wanted.
>
> ...
>
> ...as I say, it's at paragraph 20, goods and services were integral to the delivery of the project and that that project was for Autonomy to deliver. If that's not the case, then you're going to recognise the revenue upfront. If it is the case, you're not. That is the – I think in many respects there's probably not a disagreement between Mr Holgate and myself. It's more a disagreement as far as the facts are concerned which, as I've said, is not for me to opine on."

3754. However, subject to that caveat, Mr MacGregor expressed the view in his first written report that:

(1) He had seen nothing on the 2010 Tottenham Purchase Order to suggest that the goods were sold subject to installation, or (whether expressly or implicitly) that payment was subject to the services being provided.

(2) Based on the email confirmation of delivery and the revenue confirmation letter he had seen, he agreed with the view taken by Deloitte that the contemporaneous evidence supported the conclusion that revenue could be recognised from the sale of the licence before the services were delivered.

(3) He agreed with Deloitte that the 2010 Tottenham Sale could fairly be regarded as comprising separately identifiable components of a single sale to which the revenue recognition criteria could properly be applied separately.

*Were Deloitte misled?*

3755. The Claimants submitted that, as between the experts, the view of Mr Holgate on the characterisation of the 2010 Tottenham Sale as a 'solution' was to be preferred, and that the Defendants' reliance on Deloitte was misplaced because the true position in relation to the Tottenham Hotspur transactions was concealed from Deloitte.

3756. They relied in this respect on Mr Welham's evidence in his witness statement that:

(1) Contrary to the assumptions the Claimants asked him to make, he had not understood that (a) *"the parties understood at the date of the agreement that what was required was the delivery of a solution, namely a fully-functioning and much enhanced website"*, (b) *"delivery of the solution required the provision of significant services, but in the absence of a defined scope of work or key delivery milestones, there was no means reliably to measure the outcome of the transaction or the costs to complete the project"*.

(2) While he could not determine now how precisely the revenue would have been recognised over the lifetime of the contract, had Deloitte appreciated that *"the agreement was intended to deliver a solution"*, then *"it is likely that it would not have been appropriate to recognise software licence revenue at the outset of the transaction."*

3757. They relied also on the fact that Mr Bloomer confirmed in cross-examination that the Audit Committee was not told the full picture. The Audit Committee was informed of the 2011 Tottenham Purchase Order, but not the (linked) Amendment Agreement. He stated that if the two transactions were linked, that would have been an important point for him to consider in relation to revenue recognition. The Audit Committee understood that the deal was the sale of a software licence, rather than the sale of a solution which required the provision of significant but unquantifiable services.

3758. Dr Lynch did not address these further points, but Mr Hussain's written closing submissions did, and the allegation that Deloitte were misled was there described as *"utterly spurious"*. Those submissions emphasised that *"the parties made the contract they made, Deloitte reviewed a copy of it, and came to the view that AU's approach was acceptable."*

*My assessment whether Tottenham 2010 Sale should have been accounted for as a 'solution'*

3759. I accept and would agree with the view of the experts that the essential question can be characterised as whether the sale should be characterised as a sale of a licence or an agreement to provide a 'solution'.

3760. I do not, however, agree with the Claimants that the factual position was clear and necessarily demanded characterisation of the 2010 Tottenham Sale as a 'solution' and could not be treated as comprised of two elements (the sale of a licence and the provision of services at a price). I do not consider that in reaching their view Deloitte were misled. Deloitte's working papers confirm that Deloitte were well aware of the recital on which the Claimants placed such reliance and the provisions of the contract in relation to the provision of future services. They concluded that the provision of future services was a separate element for which an appropriate deduction could and should be made. In fact they considered to be inadequate the amount that Autonomy carved out of the upfront licence fee and had agreed should be deferred over the period: they would have required a carve-out of $90,000 equalling almost double the amount of £5,000 per month adopted

by Autonomy. However, they concluded the difference to be *"clearly trivial and as such, no adjustment has been proposed."* Mr Welham was simply stating what Deloitte's view might have been on the basis of Assumptions he was required to make. Likewise, Mr Holgate's opinion was the product of Assumptions which did mandate an answer, and he had never considered the contract.

3761.   I do not therefore accept the Claimants' conclusion that the 2010 Tottenham Sale was on the face of the 2010 Tottenham Purchase Order and in fact a contract under which the deliverable was a 'solution', namely a fully implemented system for which Autonomy had contracted to provide 200 hours of service, and from which it was wrong to recognise revenue before the implementation process had been completed. It seems to me that it is an available and respectable view that in form and substance the 2010 Tottenham Purchase Order established a contract for a licence and the separate provision of services, with the licence and the services to be paid for separately. It does not seem to me that Tottenham Hotspur's obligation to pay was contingent on either the provision of the services or the outcome of implementation. I do not accept that Deloitte were relevantly misled in this context; and I do not consider the facts clear enough to overturn the contemporaneous judgement call made of the contract and the facts.

*The second Tottenham Hotspur transaction*

3762.   As mentioned briefly above, there was no dispute between the experts that in the case of the second set of purchases and sales, the Tottenham Hotspur 2011 Purchase Order and the Amendment Agreement were linked transactions which needed to be considered together to understand their substance and to determine the appropriate revenue recognition under IAS 18.13. Nor was there any dispute between the experts that looking at the two agreements together, revenue under the 2011 Purchase Order should have been net accounted with the cost of the Amendment Agreement. As Mr MacGregor put it, the *"net effect of [the sale] is nil, when considered with the MAF and additional sponsorship payment that became due as a result of [the Amendment Agreement]"*.

3762A.  The second Tottenham Hotspur transaction was largely subsumed in point of analysis into the first by all parties. Noting that the experts had agreed that the 2011 Tottenham Hotspur transaction had been incorrectly accounted for, Mr Hussain did not address the position any further in his written closing submissions, and nor did Mr Casey in his closing speech (although he did address the first of the Tottenham transactions). Mr Hussain's pleaded defence was to the effect that the accounting judgment made at the time was not unreasonable, and had been approved by Deloitte. Mr Welham acknowledged this in his witness statement, but made clear that this was on the basis that *"Autonomy management told us that the new software included in the second deal provided significantly enhanced functionality for Tottenham Hotspur."* Any defence to the claim relating to the second transactions on the part of Mr Hussain amounted to piggy-backing on the defence to the first of the transactions. With some considerable hesitation, I have concluded that though the defence in the context of the 2011 transaction is (at best) stretched, I have not the degree of conviction, even on a balance of probabilities, required to make a finding of "guilty knowledge" and fraud. In any event, I doubt that the single transaction will make any material difference to the computation of damages.

*Prisa (Q4 2010)*

3763. The second transaction gives rise to broadly the same issues as the Tottenham Hotspur transactions.

3764. On 31 March 2010, ASL entered into an End-User Software Licence Agreement with a Spanish company called Ediciones El Pais SL ("EEP"). EEP was part of the Prisa group of companies, which, at the time ASL entered into the agreement, was "*a global media conglomerate that had four main business units: newspaper and editorial content (El Páis was its largest newspaper); television and satellite (the largest pay TV operation in Spain); an education-based unit (the largest publisher of textbooks in Spanish and Portuguese-speaking markets); and radio (with between 13,000 and 14,000 radio stations globally)*".

3765. Following negotiations involving Mr Hussain, a First Amendment to that Agreement ("the Prisa First Amendment") was entered into on 10 December 2010 between Autonomy Spain SL ("Autonomy SL") and EEP acting for itself and on behalf of its subsidiary company, Prisa Digital SL ("Prisa"). The Prisa First Amendment involved the provision by Autonomy SL of software licences, three years support and maintenance, 2,640 days of professional services and training for use on EEP and Prisa's website, audio, video and other digital products. The Claimants relied on the 2,640 days of services and training as demonstrating the importance of the services aspect of the contract, suggesting that the licensed software was of no use without these services and the two were indivisible.

3766. The agreement provided for fees totalling about €9.6 million (plus VAT), including €6.8 million in respect of software licences. It is clear from an email dated 15 October 2010 from Mr Hussain to Dr Lynch subject *"getting to 236"* that the entry into the Prisa First Amendment was recognised by the Defendants as forming a critical part of Autonomy meeting the market consensus for Q4 2010. The documentary evidence shows that Mr Hussain provided regular updates to Dr Lynch in relation to its progress.

3767. The background to the Prisa First Amendment was described in the Claimants' closing submissions as follows:

(1) At the time it was concluded, Mr Rahul Puri ("Mr Puri") was Managing Director of Innovation and Chief Software Architect at Prisa. Mr Puri joined Prisa in May 2010 with the remit to transform the company's technology, moving it from a traditional analogue media organisation to a digital centric organisation. In his witness statement, Mr Puri elaborated as follows:

> *"To do that, we had to change Prisa's entire technology platform. As part of the exercise, we wanted to build Prisa's online brand and maximize the revenue streams from our website. We therefore needed to implement web content management systems, data management systems and recommendation systems to enable the use of our apps that we also were building. It was a full top-down technology transformation."*

(2) In its pitch in the tender process that took place, Autonomy made clear that it could provide all the technology, tools and services that Prisa needed to transition into a digital media organisation within a three-year transformation process. Autonomy made a number of presentations to Prisa prior to contracting:

(a) The first was in Madrid in August 2010. The presentation given by Autonomy on that occasion recorded Prisa's objectives, and the "*solution*" that Autonomy was able to provide. Mr Puri was challenged during his cross-examination that Prisa "*hadn't defined your objectives and goals*", but this presentation shows that is wrong. As Mr Puri noted, Autonomy's solution, as referenced in the presentation, was "*its organisation bringing their technology, their people to bear to help us realise our strategy and our vision*".

(b) There was a follow up presentation in October 2010, which again reflected the custom built "*solution*" that Autonomy could provide to meet Prisa's objectives.

(3) As a result, Prisa decided to retain Autonomy. It is clear that the ability of Autonomy to tailor its core products to Prisa's needs was the key reason why Prisa elected to contract with Autonomy.

(4) That resulted in the parties entering into the Prisa First Amendment, pursuant to which Prisa purchased the software which was required in order for the digitalization project to be implemented.

(5) However, as Mr Puri explained, (i) successful implementation of the project required Autonomy's software to be tailored in order for the solution sought by Prisa to be delivered, and (ii) Prisa had no use for the software it had purchased beyond the scope of the project, and it could not use any of the software for the project without the involvement and support of Autonomy personnel. As Mr Puri explained in cross-examination:

(a) "*the intent was to have a comprehensive solution. So we could not execute on the technology without executing on the professional services, so they went hand in hand rather than just splitting up into two different components*"; and

(b) as a standalone product, the Autonomy software was of no use to Prisa: "*As a stand-alone we would not have been able to use that software; we required Autonomy's expertise to implement that software*".

(6) It can be seen from the contemporaneous documentation that Prisa made clear to Autonomy that the contract would need to include "*every product and functionality for the project*" as Autonomy understood the requirements at that time.[470] As Mr Puri put it in cross-examination, "*We were looking for an entire solution that we could implement to realise our strategy and vision for Grupo Prisa. ... when we looked at the contract, we looked at it as a full comprehensive*

---

[470] See also Alvaro Etcheverry of Autonomy's email to Mr Hussain dated 18 August 2010, in which he referred to the fact that "*we had a very successful POC meeting with the some of the top directors of Prisa in Madrid. Not only did we fully cover all their expectations and objectives we also demonstrated the added value of the Autonomy solution*".

*solution to meet our objectives and goals as an organisation*".[471]  He noted that "*the reason we had Autonomy do the services, they knew their technology best and would be able to provide an integrated solution for us to meet our overall objectives and goals from a strategy and vision perspective*".

(7)  In his witness statement, Mr Avant suggested that "*the license component of the deal was more significant than the services component*" and that "*the agreement was primarily for the purchase of software*".  However, Mr Avant accepted in cross-examination that he was not involved in the negotiation of the deal (which took place before he joined Autonomy), and as he accepted, the statements in his witness statement were based simply upon a review of the agreement after the event.  In any event, he is wrong: the agreement was for Autonomy's software licences and services together because the two elements were indivisible.  Similarly, Mr Martin purported to give evidence about the nature of the deal with Prisa, but he was not present at the pre-contract presentations, nor was he involved in negotiating the contract with Prisa.

(8)  Although the Prisa First Amendment was entered into on 10 December 2010, no statement of work had been agreed by that time; indeed, it could not be agreed until further discussions about Prisa's requirements and testing on its systems had taken place.  As a result, as is not disputed by Dr Lynch's witnesses, the scope of the project was not agreed as at 31 December 2010 and work on the project had not begun by that date.  Indeed, on 31 December 2010, Dr Lynch and Mr Hussain received a status update which indicated that there was no project plan in place at that time.

(9)  In fact, the scope of the project in relation to the flagship phase (Prisa Radio), which required the bulk of Autonomy's services and software, was not agreed until about a year later, in a statement of work dated 19 December 2011,[472] which was signed by Autonomy on 26 December 2011 and Prisa on 27 December 2011.  It outlined a project schedule that indicated the project initiation had started in February 2011 and set a "*target go live date*" for the new website of February 2012.  In the event, however, the project was never completed, according to the Claimants because Autonomy could not get its technology to work, and was cancelled.

3768.  Thus, as with the Tottenham Hotspur transactions, the Prisa First Amendment did not provide any defined scope of work for the project, nor did it define the deliverables or key milestones against which delivery could be measured, nor did it contain any defined acceptance criteria.  The Claimants made the point that this is unsurprising in

---

[471] "*The reason we had Autonomy do the services, they knew their technology best and would be able to provide an integrated solution for us to meet our overall objectives and goals from a strategy and vision perspective*".

[472] In his witness statement, Mr Martin said that the 19 December 2011 statement of work only concerned Prisa Radio, which was one of many projects with Prisa. It is right that statements of work for other parts of the overall project were envisaged and negotiated, but only one other was signed by Prisa.  However, that was dated 12 July 2011, so it cannot account for revenue having been recognised by Autonomy on 31 December 2010; indeed, it expressly related to services to be performed between 18 July and 30 September 2011.  In any event, due to the problems that arose in relation to the flagship phase (Prisa Radio), all other initiatives were put on hold.

circumstances where the parties recognised at the time of contracting that a statement of work addressing these issues would need to be agreed subsequently.

*Appropriate accounting treatment*

3769. On 31 December 2010, licence revenue totalling about €6.8 million[473] (out of a total consideration of €9.6 million) was recognised in full in respect of Prisa in Autonomy's accounts.

3770. For the same reasons as in relation to the Tottenham Hotspur transactions, the Claimants submitted that this accounting was wrong. In particular, they contended that:

(1) The substance of the deliverable to be provided to Prisa – when assessed from their perspective, which Mr MacGregor accepted is the correct approach[474] – was a solution, to which the provision of services by Autonomy was integral.

(2) Nothing of immediate value was transferred to Prisa at the time of entry into the Prisa First Amendment (31 December 2010), and therefore, no revenue should have been recognised by Autonomy in relation to the Prisa First Amendment at 31 December 2010.

(3) The deliverable under the Prisa First Amendment was not well defined, and in the absence of an agreed statement of work it was not possible to measure with any reliability important measures such as the stage of completion or costs to complete the transaction as was required in order to recognise revenue from services under IAS 18 §20.[475]

(4) In any event, as at 31 December 2010, no services had been provided to Prisa, and thus no costs had been incurred, so there was no revenue and no costs to account for in the FY 2010 accounts.

3771. In his expert reports, Mr MacGregor asserted that the Prisa First Amendment was not a 'solution'. The Claimants objected that it is unclear how he is able to opine on that issue as he accepted it is a question of fact. They noted that in cross-examination, Mr

---

[473] The licence revenue recognised was €6,820,208, being (i) the €6,745,000 licence fee appearing in the Prisa First Amendment, and (ii) a further amount of €75,208 carved out from the "*One Off Fee*" in the Prisa First Amendment (of €243,208) for a one month extension and support.

[474] PwC's guidance stated in this regard as follows: "*The substance will not only be based on the transactions' visible effect; it will also have to be analysed based on all the transactions' contractual terms, or the combination of the contractual terms of linked transactions….in assessing the transactions' substance, the transaction should be viewed from the perspective of the customer and not the seller; that is, what does the customer believe they are purchasing? If the customer views the purchase as one product, then it is likely that the recognition criteria should be applied to the transaction as a whole. Conversely, if the customer perceives there to be a number of elements to the transaction, then the revenue recognition should be applied to each element separately.*"

[475] Indeed, this appears to have been recognised within Autonomy. On 19 May 2011, Mr Lucini sent an email to Mr Hussain in which he stated: "*As I get the facts it becomes clear that we are about to embark on a complicated project without the appropriate measures to actually positively deliver and get acceptance from the customer. what's more I think that in the present conditions we can never succeed as the customers perception and reality of what they are going to receive is simple that…a perception …There is no objective acceptance criteria…we are hoping the client likes it at this point*".

MacGregor accepted that, as with the Tottenham Hotspur transaction, if the transaction is properly characterised as the provision of a solution, the revenue should not have been recognised in full as at 31 December 2010.

3772. However, what I consider Mr MacGregor meant was that the determination of the substance of the transaction depends on the facts and is ultimately a matter of accountancy judgement. In any event, the matters he put forward to explain his conclusion that on the basis of his understanding of the position are of relevance, though the Claimants did not trouble to address them.

3773. In particular, he drew attention to Mr Puri's own description in his witness statement of the scope and nature of the Prisa transactions, as suggesting that the customer perceived it was purchasing the underlying technology and, separately, additionally priced services for the implementation of the software products. The passage read as follows (emphasis as supplied by Mr MacGregor):

> "[PRISA] entered into an agreement with [Autonomy] involving the purchase by Prisa of certain _Autonomy software licences, three year's support and maintenance and 2,640 days of professional services and training_, for use on El Pais and Prisa's website, audio, video and other digital products. The agreement provided for fess totalling approximately €9.6m, _including €6.8m in respect of software licences. Autonomy was to provide the underlying technology for many of the components required for the project, as well as provide services for the implementation of those products for Prisa._"

3774. Mr MacGregor also emphasised that the contract itself expressly stipulated a separate and defined rate for the services to be provided, and provided as well for further incremental increases in the service rates after the exhaustion of the contractual number of man day services contractually agreed.

3775. Furthermore, he made the point that the Claimants had _"not explained how they believe the professional services revenue should be accounted for if the components of the transaction were not considered separable, given that these services were invoiced as and when such services were performed, and are therefore (it must be assumed) matched to the cost of the service being performed."_

3776. Mr MacGregor's conclusion was that on the facts as he understood them, as reflected in the above discussion, it was within a range of proper accounting judgement to account for the Prisa transactions as Autonomy had accounted for them; and if his understanding of the facts was wrong, he did not believe that the professional services under the contract should have been accounted for other than in line with the called for provision of those services, leading in effect to the same conclusion that the accounting treatment in fact according to the transactions was probably correct and at least was proper.

_Were Deloitte misled?_

3777. As in the case of the Tottenham Hotspur transactions, Deloitte's working papers confirm that Deloitte were well aware of the terms of the agreement, and thus of the provisions for a licence fee, a support fee and professional services and managed services thereafter. They were satisfied with the "carve-out rate" of 7% and concluded that the accounting treatment proposed was satisfactory.

3778. As in the context of the Tottenham Hotspur transactions, the Claimants relied on the evidence of Mr Welham in his witness statement that the true position was withheld from Deloitte, in respect of the Prisa First Amendment. But his evidence was premised upon the conclusory assumption he was instructed to make that the *"parties understood at the date of the contract that what was required was the delivery of a solution (to transform Prisa from a traditional media group to a predominantly digital media group…)"* and that there was *"no way to reliably measure the outcome of the transaction or the costs to complete the project"*. The assumptions commanded the conclusion sought by the Claimants.

*My assessment whether the Prisa Sale should have been accounted for as a 'solution'*

3779. Again (as in the context of the Tottenham Hotspur transactions) I accept and would agree with the view of the experts that the essential question can be characterised as whether the sale should be characterised as a sale of a licence or an agreement to provide a 'solution'.

3780. I do not, however, agree with the Claimants that the factual position was clear and necessarily demanded characterisation of the Prisa First Amendment as a 'solution' and could not be treated as comprised of two elements (the sale of a licence and the provision of services at a price).

3781. I accept the points made by Mr MacGregor as described above. I particularly agree with his analysis, as articulated also on behalf of Mr Hussain, that at least in its form, the Prisa First Amendment was, unequivocally, an agreement for the licencing of software and separately for the provision of services. Mr Puri agreed in cross-examination that this was indeed *"the way the contract is structured"*. The question then is whether what Mr Puri told me, in a following passage of his cross-examination, that *"the intent was to have a comprehensive solution"* and *"we could not execute on the technology without executing on the professional services, so they went hand in hand rather than just splitting up into two different components"* is sufficient to require a different reading of its effect as a matter of substance.

3782. In my view, it is not. Although in other contexts (especially in the context of the numerous impugned VAR transactions) I have accepted that it is substance rather than form which controls the accounting treatment of transaction, I have also made clear that the contractual form is usually the best guide to intention. The position is no different in this context. The following summary of the effect of the contractual provisions was put forward in the closing submissions on behalf of Mr Hussain, and I adopt it:

(1) It was for Prisa to determine on an as needed basis whether and in what quantity to deploy the (defined) Software (by putting it into operational use for access by its users) during the defined Deployment Period (Clause 4).

(2) Even if Prisa decided not to deploy the Software during the Deployment Period, it was nonetheless liable to pay the annual Support Service Fee (as defined) in full.

(3) At the end of the Deployment Period, it was for Prisa to provide an inventory of its use of the Software during the deployment Period. At that stage, the parties would consider the quantities of licences that Prisa would need in the future.

(4) The licence fee for the Software was payable up front and was non-refundable. The parties could have agreed, but did not agree, that the fee would be staggered or that Prisa's obligation to pay would be contingent upon the deployment/implementation of the Software or upon the Software achieving a particular outcome.

(5) If the parties mutually agreed a statement of works ("SOW"), Prisa would be entitled to call upon Autonomy to provide 2,640 man days professional services at the agreed bulk rate and thereafter at a rate of €900 per day.

3783. Mr Puri did agree that the arrangement was (as it was put to him in cross-examination):

> *"to have the software which gives you the building blocks and to have professional services and for you mutually to agree on the statement of works."*

3784. I also agree that the totality of what the parties agreed and promised each other can be understood from the written agreement itself. Unlike the position as I have found it to be in the case of the impugned VAR transactions, no assurances were given that the contractual agreement would in practice not be enforced. It was not suggested that there was any side understanding. What Prisa apparently hoped might be the benefits of collaboration and their confidence that Autonomy shared and would help it achieve its rather vaguely expressed objectives cannot subvert their stated and agreed understanding. In short, and again adopting Mr Casey's closing submissions on behalf of Mr Hussain:

(1) Prisa's obligation to pay the licence fee and software support services in full was unconditional and the fees were non-refundable. Its liability was not contingent upon its use of the Software for its intended or any other purpose.

(2) At the date of the Prisa Agreement, Prisa had no concrete ideas of what it wanted to do with the Software, other than a generalised aspiration to achieve the digital transformation of its business. Furthermore, the professional services work could only begin once the SOW had been mutually agreed with Autonomy.

(3) At its highest, Autonomy had agreed that Prisa could call upon it to provide professional services (subject to the terms of the agreement) but it had not agreed to perform any specific services (that being a matter for consensus in the SOW) nor had it agreed that it would achieve any specific outcome or result. It is common in business for contractors to be paid in phased stages of time or on the achievement of performance milestones. Autonomy and Prisa could have agreed that the licence fee would be paid in either of these ways, but did not do so.

(4) Thus, Prisa assumed the risks, among others, that on analysis the project would be far smaller in scale than anticipated in December 2010; that in the event it would choose not to pursue the project at all; that the SOW that it wanted could not be agreed with Autonomy in full; and that some or even the majority of the Software would prove to be superfluous to the project once Prisa properly defined it. Even if these circumstances materialised, Prisa had no right to, or expectation of, a refund of any part of the Software licence fee.

(5) In short, there is no warrant for the suggestion that the economic substance of the Prisa First Amendment was any different to its form.

3785. In all the circumstances, I do not accept that Deloitte were relevantly misled in this context; and I do not consider the facts clear enough to overturn the contemporaneous judgement call made of the contract and the facts they made.

*Amgen (Q4 2010)*

3786. Autonomy Inc entered into a Hosting Services and License Addendum (the "Hosting Addendum") with Amgen Inc ("Amgen") on 21 December 2010. This enabled Amgen to archive and access electronic communications in a hosted online electronic communications archiving and management system. It formed part of a wider project for the provision by Autonomy of hosting and related e-Discovery services, in relation to which there had been three prior agreements. The software and services to be provided under the Hosting Addendum related to Digital Safe technology[476].

3787. The Claimants made three points in respect of the Hosting Addendum in support of their case of improper accounting.

3788. First, they submitted that what, in substance, Amgen purchased was a 'solution', namely the "*Digital Safe System*". This comprised: (i) Digital Safe and related software (namely, DS Mail and Anywhere Archive), which was to be "*hosted and used for archiving*"; and (ii) hardware. The Digital Safe System was to be implemented for the provision of "*Hosted Services*", which consisted of "*DS Mail and Digital Safe Archiving services, which are a hosted online electronic communications archiving and management solution that enables [Amgen] to archive its electronic communications and enables Users to access such communications*". The services also included the purchase of a "*Dedicated Digital Safe*", which meant that all required servers (i.e. hardware) and software components were isolated for exclusive use by Amgen.

3789. Secondly, the Claimants invited me to note that the fees charged to Amgen by Autonomy, which were in two categories, were for a license and services (including infrastructure) which were not separately identifiable components of the overall 'solution' but rather were an integral part of the provision of the Digital Safe hosting services that Amgen had purchased. The Service fees of $11,382,076 which were charged comprised (i) an "*Infrastructure and Support Fee*" of $6,379,363 and (ii) an "*Archiving Fee*" of $5,002,713 (for volumes of data to be "*ingested into the Digital Safe*"). The Claimants submitted that these elements, along with the license to Anywhere Archive Software, were an integral part of the hosting product and neither was a separately identifiable component of the overall solution.

3790. Thirdly, the Claimants submitted that the licence element was artificially structured into the Hosting Addendum so that Autonomy could recognise as much revenue upfront as possible. It will be recalled (and see my consideration of the "Hosting claim") that such was the complexity of Digital Safe that generally (as here) it was provided as part of a hosted arrangement, whereby the Digital Safe system (on which the customer's data was stored) was: (i) located in Autonomy's data centres; and (ii) run by Autonomy on the customer's behalf. Part of the Claimants' complaint relating to the Amgen Hosting

---

[476] By way of brief reminder, Digital Safe was an archiving solution that allowed customers to store, search and retrieve their data.

Addendum was that it provided for the restructuring of Amgen's hosting arrangements so that as the *quid pro quo* of greatly reduced hosting fees in the future, Amgen would pay a licence fee for an "Anywhere Archive" software licence entitling it (it was said merely notionally) to bring Digital Safe in-house.

3791. The Claimants' case impugning the Hosting Addendum appears to have two aspects.

3792. One aspect of the Claimants' case, which may not be advanced separately from the second (see below), is the Claimants' contention that the restructuring and the "Anywhere Archive" licence comprised a device. The burden of the complaint in this respect was it is clear that Amgen did not desire an "Anywhere Archive" software licence: it had no commercial effect in practice since as a practical matter, moving in-house was not feasible, Amgen had no wish to attempt it, and the services provided to Amgen were wholly unaffected by the sale of the licence. The purpose of the "Anywhere Archive" licence, it was said, was simply to enable Autonomy to accelerate and recognise revenue from its sale. This part of the Claimants' case reflects or expounds the same arguments as its "Hosting Case", though the Claimants had by trial limited their Schedule 12D "Hosting Case" (asserting direct claims for transactional losses for breaches of duty) to re-restructurings of existing hosting arrangements. However, although not confirmed by the Claimants in their submissions, my understanding of their case as pleaded in their RRAPoC, is that the alleged artificiality of the licence is not separately relied on to establish the claim. The claim as pleaded is that no revenue should have been recognised, not because of any alleged artificiality, but because the 'solution' had not yet been provided. The pleading was:

> *"The Digital Safe system had not been successfully implemented as at 31 December 2010 or by the end of the Relevant Period (30 June 2011), and no hosting services had been provided to Amgen prior to this date. Accordingly, no revenue should have been recognised in relation to this transaction at 30 June 2011."*

3793. In the circumstances, I have assumed that the Hosting Addendum was not intended to be an unexplained and unpleaded extension of the Claimants' Hosting Case; and in accordance with the pleadings, I take it that the claim must stand or fall according to the second part of it.[477]

3794. The second, and on the basis of that approach the gist, of the Claimants' case impugning the Hosting Addendum is that the Claimants' contention that the licence to "Anywhere Archive" software was not a separately identifiable component of the overall arrangement (under IAS 18 §13) and that the artificiality of the licence serves to underline that the intention and understanding of Autonomy and Amgen was that both the Digital Safe System and Amgen's data would be hosted, and all associated services would be performed, by Autonomy at its data centres. That was the substance of the transaction. Nothing was transferred to Amgen that was of independent value as the Anywhere Archive software could not be used separately from the Digital Safe System,

---

[477] That is so even though I note that in Mr Hussain's written closing submissions it was accepted that the first part would *"clearly follow"* the outcome of the "Hosting Case" and (as will be seen) the Claimants' expert dealt with what I shall call the 'artificiality point' substantively.

which itself could not be used independently of Autonomy's support services. As events transpired, the purchased Digital Safe System was not implemented by the conclusion of the Relevant Period. The Hosting Addendum contained agreed milestones for the completion of the project with an expected completion date of 30 June 2011. This expected completion date was not met and formed part of a complaint by Amgen against Autonomy on 5 November 2012. In short, until all the constituent elements of the 'solution' were provided no revenue should have been recognised.

*How Hosting Addendum (a) was and (b) should have been accounted for on pleaded case*

3795.  Before the agreement of the Hosting Addendum on 21 December 2010, there was internal discussion within Autonomy about the amount of revenue that could be recognised. On 10 December 2010, in an email from Mr Mooney to Mr Chamberlain, copying in Mr Hussain, the view was expressed that Autonomy would be able to recognise the licence element (of $3.5 million) and the first two years of fees. When the deal eventually closed, Mr Mooney sent Mr Hussain an email stating "*Should be able to recognize very close to what's been committed. ($7.4M)*".

3796.  Ultimately, Autonomy recognised revenue for Q4 2010 of: (i) $3.5 million in respect of the "Anywhere Archive" licence on 29 December 2010; and (ii) $2,201,745 in respect of accrued infrastructure fees on 31 December 2010.[478]

3797.  The Claimants' case is that this was improper: by reference to all these considerations, no revenue should have been recognised in relation to the Hosting Addendum when it was or indeed at any time before the end of the Relevant Period (30 June 2011).

(1)  Nothing was transferred to Amgen that was of independent value as the Anywhere Archive software could not be used separately from the Digital Safe System, which itself could not be used independently of Autonomy's support services. Thus, the software licence should not have been accounted for separately from the overall Digital Safe hosting arrangement.

(2)  In the case of the infrastructure fees, again, the lack of separability of the infrastructure element from the overall Digital Safe hosting arrangement (see above) meant that it was not appropriate to account for it separately.

(3)  Accordingly, in both cases, the revenue recognition criteria should have been applied to the transaction as a whole in accordance with its overall substance, namely the provision of a service over time. Revenue should, therefore, have been recognised over the period that any hosting services were actually provided, in accordance with the recognition criteria for the provision of services under IAS 18 §20. These include the requirement that "*the stage of completion of the transaction at the end of the reporting period can be measured reliably*".

(4)  The Digital Safe System was not implemented, and the provision of hosting services did not commence, by the end of the Relevant Period, as explained above. Therefore, no infrastructure or licence revenue should have been recognised (even rateably) at all. Indeed, it was inherently unlikely that the Digital Safe project would even have commenced, let alone completed, at the

---

[478] Mr Hussain was involved in discussions about the appropriate accounting treatment of this transaction.

time revenue was recognised within just 10 days of the Hosting Addendum being signed.[479] It was, therefore, inappropriate to recognise any revenue by the end of Q4 2010.[480]

3798. Mr MacGregor cautioned that the evidential record was sparse. But on the available evidence, and especially having regard to the terms and provisions of the Hosting Addendum, (which Mr Holgate had not read) he took a different view from Mr Holgate. In particular:

(1) He did not agree that it was necessarily the case that the "infrastructure" and support fees could not be separately identified. He did not accept Mr Holgate's conclusion, based on the Assumptions he was told to make, that the "infrastructure" could not be regarded as in any way independent or operate independently from the Digital Safe services.

(2) Whilst accepting that it would not have been possible for Autonomy to provide the archiving services prior to Amgen putting any data into the Digital Safe, it appeared to him, based on his review of Deloitte's working papers (which Mr Holgate did not consider) that it was possible for Autonomy to set up the systems and infrastructure to hold such data at the outset of the contract. Also, it made sense to him that, if (as appeared) Autonomy was designating servers for Autonomy's use of a term of five years, Autonomy should be entitled to charge Amgen for these dedicated servers from the beginning of the contractual use term (of five years) regardless of whether Amgen made use of the servers or not.

(3) Further, in the absence of any evidence from Amgen as to its expectation and intentions, those could only be ascertained from the contractual documentation. The Hosting Addendum itself undoubtedly treated them separately, and provided for payment in any event on or before 12 February 2011. Mr MacGregor made the point that if, as suggested by Mr Holgate, the licence was in substance part of the provision of an overall service and was considered to be so, it was open to Amgen, and he would have expected it, to have protected its interests by specifying that it would only be obliged to pay once the services had been provided, or would be entitled to a refund if in the event they were not. As it was, Autonomy contracted for and received payment from Amgen of the licence fee and the infrastructure and support fee on 11 February 2011.

(4) Generally, he concluded that there was *"insufficient information to impugn the accounting treatment as recorded by Autonomy and detailed on Deloitte's files."*

*Were Deloitte misled?*

---

[479] The milestones for the project envisaged a draft of the project plan being produced at a later point in time, namely 10 January 2011. Thus, revenue was recognised before the project had been planned, let alone implemented.

[480] Mr Holgate also expressed the view that, even if the criteria for sale of goods applied to the transaction (which they do not), the fact that the Digital Safe System had not been implemented shows that criteria (a) and (b) of IAS §14 had not been met.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

3799.    The Claimants contended that had Deloitte been aware of the true facts in relation to the Amgen transaction, it would not have considered it appropriate to recognise revenue up-front.

3800.    As to this, according to the Claimants:

(1)    The Deloitte report for Q4 2010 shows that Deloitte considered the transaction based on a false understanding. It stated that the deal "*had been structured to split the licence fee into a licence fee payable upfront and an infrastructure fee payable over the term of the licence*" and that "*Both elements have been recognised in revenue as there are no further obligations on Autonomy's part now that the software has been delivered*". However, as shown above, in substance the transaction was for the delivery of a solution and that solution was, in fact, not delivered at all during the Relevant Period. Autonomy had many further obligations at the time the software was delivered.

(2)    In cross-examination, Mr Welham explained that Deloitte's view of the Amgen transaction was "*based on what we knew at the time*", in response to which the cross-examiner said, "*I'm not going to debate the assumptions you've been asked to make*". It was not suggested to Mr Welham that Deloitte would still have considered it appropriate to recognise revenue if those assumptions were, in fact, true - as indeed they are.

3801.    The Claimants also relied on Mr Bloomer's confirmation in cross-examination that the Audit Committee was not told the full picture. As to this, it was led to understand that: (i) the Amgen sale was the sale of a Digital Safe software licence and storage – rather than, according to the Claimants, the sale of a solution absent the implementation of which the software could not be used; and (ii) there were no further obligations on Autonomy's part as the software had been delivered – even though the solution had not been implemented at the time revenue was recognised. The Claimants contended that the Audit Committee were thus deprived of relevant considerations. As Mr Bloomer confirmed, it would "*certainly have been relevant for Deloitte at the time to ensure that the revenue split was right between whatever had been delivered by the end of this quarter and whatever remained to be delivered as ongoing services*" (emphasis added).

3802.    However, and although the Claimants in their oral closing argument submitted that there had been no challenge to this evidence (Mr Miles having stated he did not intend to "*debate the assumptions*" and Mr Casey not having cross-examined on the issue at all) as I read the evidence of Mr Welham he was simply expressing the conclusions already implicit (and even sometimes explicit) in the Assumptions he was required to make. As in other contexts, the evidence did not seem to me to carry the analysis any further.

*My assessment*

3803.    On the basis that the Claimants have not pleaded or advanced this claim as an extension

**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

of their "Hosting Case" (see above), the gist and basis of the claim is the recognition of revenue before delivery of the 'solution'. Although there appear to me to be a number of unanswered questions as to the basis for splitting off part of what in the round appears may well have been acquired as an indivisible whole, the evidence in this context was relatively sparse.

3804. Against that, the terms and provisions of the Hosting Addendum did separate out the various elements of what Autonomy engaged to provide and the amounts payable at each contractually agreed stage.

3805. I have concluded that in the particular context, and taking into account the nature of the claim as part of a fraud case where, as to this part of it, I have heard from neither of the two Defendants, there is insufficient factual basis to overturn the express provisions of the contract and the contemporaneous judgement call made of the contract and the facts made by Autonomy and approved by Deloitte.

*Iron Mountain (Q2 2011)*

3806. The fourth and last of the "Other Transactions" impugned by the Claimants was a sale of a perpetual licence to IDOL and associated maintenance and support services by Autonomy to Iron Mountain Information Management Inc ("Iron Mountain") for a licence fee of $1.5 million, with an additional $75,000 support and maintenance fee. As mentioned earlier, the transaction was concluded on the same day that Autonomy acquired the Iron Mountain Digital business from Iron Mountain Inc (a related group company). It is also worth noting that this is one of the impugned OEM transactions (OEM61).

3807. In the written closing submissions on behalf of Mr Hussain, the Iron Mountain transaction is described as *"a one-off in the case"*; and it is correct that the transaction is unlike any of the three "Other Transactions" addressed above, and the basis of impugning the transaction is specific and particular.

3808. The Claimants' essential complaint can be summarised as follows:

(1) As was common ground between the parties' respective experts was the correct approach, Deloitte determined that the perpetual licence sale to Iron Mountain and Autonomy's acquisition of the Iron Mountain Digital business were linked transactions and that in consequence it was necessary, in determining how much revenue from the sale could be recognised, to establish the *"fair value"* of the licence sold under IAS 18. That was more difficult than might appear since (as previously noted) IDOL had no standard price or value, with much turning on the particularities of different customers.

(2) Autonomy calculated the fair value of the licence by identifying what it considered to be eleven comparable sales with seven different customers. Details of these were set out in a table which Autonomy sent to Deloitte. Autonomy then calculated the average price (adjusting to the same 5-year term as the Iron Mountain licence[481] if the allegedly comparable licence term was

---

[481] Management took a 5-year term to be what in reality is equivalent to a 'perpetual' licence in the software industry as after that point it is likely that the technology will be outdated. Deloitte's working paper noted this as follows: *"As the Iron Mountain licence is a perpetual licence, management has assumed that in reality perpetual in the software industry only means around 5 years, as after that point the technology is largely redundant and a new licence would need to be purchased – on that basis, management has extrapolated the value of any licence with a term <5 years up to 5 years, to represent the value of the licence if it had been sold as a perpetual licence"*.

different) before excluding three of the comparables on grounds of a material difference undermining comparability[482].

(3) The comparables left gave rise to an average value of just over $11 million. In an email dated 20 July 2011 to Messrs Murray and Welham and copied to Mr Hussain, Mr Chamberlain stated that:

> *"This supports a fair value of $10-11m. Given the subjectivity we have gone for a slightly lower value - $7m – as we believe this to be a prudent and strongly supportable position."*

3809. The Claimants contended that the way that Autonomy assessed and determined the *"fair value"* was unjustifiable for two main reasons:

(1) First, the notion of determining "*fair value*" by comparison to other deals was misconceived because there was no standard pricing for Autonomy software, including IDOL:

(a) On 12 April 2011, Mr Welham sent an email to Mr Mercer (copying in Mr Hussain) expressing concern with the revenue treatment for two deals signed with Discover Tech. One was for end-user FINRA, and the other was for end-user Prisa. Both concerned e-Discovery software, into which IDOL was incorporated.[483] Mr Welham said: "*These are identical, i.e. products sold, number of users etc but the purchase price is $1.1m vs. $3.8m. We need help understanding how this works from a fair value and arms' length perspective*".

(b) The next day, Mr Chamberlain sent the following explanation to Mr Welham (again, copying in Mr Hussain): "*it is not uncommon for the same software to be sold to different customers for very different prices. The buying decision is all around ROI and different organisations can achieve different returns with the same software. The negotiations are complex and lead to very different answers from time to time*".[484]

(c) Accordingly, the same piece of Autonomy software could be sold on identical terms to two different customers at two very different prices from a fair value perspective. Prices were determined by the

---

[482] Three were excluded on the ground that *"Autonomy is a fundamental part of the customer offering"* which, based on Deloitte's working paper, the Claimants took to mean that it was not possible *"to split out the IDOL search related value"*

[483] Mr Welham's email concerns impugned VT30. As is apparent from the relevant letter agreement dated 31 March 2011, the software licensed to Prisa was e-Discovery software. IDOL was incorporated into such software by the time of this deal. Given that the deal with FINRA was "*identical*", the same must have been true for the software licensed to FINRA too.

[484] Dr Lynch confirmed in cross-examination that what Mr Chamberlain told Mr Welham was true. When it was put to him that there was no standard market price for Autonomy software, Dr Lynch said this would depend on the software – but he did not specify particular software that did have a standard market price. Nor was Dr Lynch's qualification expanded upon in re-examination.

idiosyncrasies of the particular customer and the complex process of contractual negotiation.

(2) Secondly, even if it were possible to compare prices, the particular transactions selected for comparison in Autonomy's spreadsheet were inappropriate. In their written closing submissions, the Claimants included a detailed table explaining their contentions in this regard by reference to each "comparable", concluding that none of the selected transactions was an appropriate comparable, for reasons which included variously (a) the licence covered different software and/or a different number of functionalities covered by the licence (b) the licence restricted the number or type of permitted users or the nature of permitted use (whereas the Iron Mountain licence was for an unlimited number and type of users and did not restrict use) (c) the licence was restricted to English, whereas the Iron Mountain licence included all languages supported by Autonomy (d) in four cases (a licence sold to Capax Discovery (RT 1), a licence sold to VMS (RT 2), a licence sold to Filetek (RT 3) and a licence sold to EMC (RT 5)) the sale was part of a transaction alleged (and which I have found) to be reciprocal.

3810. These criticisms were well put together and persuasive in demonstrating that the exercise was imperfect. But the difficulty is in fashioning any less imperfect alternatives.

3811. Mr Holgate suggested none, and acknowledged that it was not possible to be definitive about an alternative figure. In plumping (as he did) for the transaction price of $1.5 million, on the residual approach that he considered that *"no other number suggests itself as being preferable to $1.5 million"* Mr Holgate undermined the whole rationale for requiring (as IAS 18 did and does) the assessment of fair value in the first place (that is, that in a linked transaction the purchase price paid might well not be the 'right' price).

3812. Mr MacGregor made the point that *"Simply because arriving at a fair value is difficult does not mean that it should not be done; in fact international accounting standards require it must be done in certain circumstances."* Even accepting that *"views may (and…often do) differ as to what constitutes a "comparable" transaction, as there are so many different characteristics to be considered as well as the relative weight given to each"* there may be little alternative. Mr MacGregor considered that:

(1) Absent any indication of "standard price" or price list, such an approach, i.e. by reference to comparable transactions, was reasonable.

(2) Deloitte had carefully considered Autonomy management's fair value exercise (as recorded in its working paper, which show that Deloitte undertook a full review) and reached the conclusion that *"management has used a representative sample of deals and that the average used (excluding the one outlier) provides a prudent estimate of fair value".* He noted that Deloitte had also brought the matter to the attention of the Audit Committee (though it is to be noted that Mr Bloomer confirmed that they were not provided with details of the 'comparable' transactions). Overall, Mr MacGregor saw no reason to second-guess that assessment.

3813. The Claimants were critical of Mr MacGregor's answers about these matters in cross-examination. In particular, and although more circuitously expressed, I took the effect of their criticism to be that he had (a) appeared to downplay the extent to which

transactions even needed to be comparable and (b) done nothing to defend the management's assessment of fair value and appeared to accept that the comparators relied on by Autonomy did not establish anything more than that the default figure of $1.5 million might not be correct and (at most) that a higher figure might be justified. There was some substance in this: and I was left wondering whether he had himself lost confidence in the comparability of the transactions identified, though he refrained from any such admission.

3814.  The Claimants submitted that the description of the fair value adjustment exercise to the Audit Committee was highly misleading. The Deloitte report dated 30 June 2011 stated that management had "*determined fair value with reference to seven similar sized licence deals*" although that sample did include "*one significant outlier*".[485] Mr Bloomer confirmed that the Audit Committee was not provided with any details of the comparator deals. Thus, the Audit Committee's understanding was that the fair value exercise was undertaken by reference to seven other deals, and that the deals used were "*relatively similar*". The Claimants submitted that neither of these factors was true: the sample of transactions actually utilised in the calculation consisted of just four transactions from three customers, and the deals used were not similar at all.

3815.  They suggested further that the comparables had been specially selected by Autonomy to justify a figure Autonomy already had in mind and needed to achieve. They relied in that respect both on what they described as the inappropriateness of the transactions they considered and on an email exchange between Mr Chamberlain and Mr Hussain on 15 July 2011 (and thus before the analysis was undertaken) in which Mr Chamberlain first requested from Mr Hussain "*a summary of comparable transactions so we can justify the fair value adjustment*".

*My assessment*

3816.  I was left with a feeling of unease about the exercise adopted and the choice of comparables. Nevertheless, the fact remains that, as emphasised in Mr Hussain's closing submissions, the exercise was fully examined by Deloitte and Mr Welham did not suggest in his witness statement that Deloitte was in any way misled about this transaction: and they could assess the comparables for themselves.

3817.  The Claimants made much of Mr Bloomer's evidence that the Audit Committee was not provided with any details of the "comparator deals" (see paragraph 3814 above). But it was for Deloitte to determine what detail to provide in their report and the balance of Mr Bloomer's evidence was that the approach which had been taken "*seemed a reasonable approach*", and he and the Audit Committee well understood that "similarity" was a relative concept. The following exchange in his cross-examination seems to me to illustrate this:

> Q.  *And you would have understood that the comparator deals used for the fair value exercise were similar to the Iron Mountain transaction, yes?*
>
> A.  *As I say, <u>relatively similar</u> given the variability in the licence and the deals that Autonomy did, it – you know, there's an element of art rather than*

---

[485] The outlier referred to is Eli Lilly. As recorded by Deloitte, this transaction was excluded because: (i) of the different sizes of Eli Lilly and Iron Mountain; and (ii) because the value of IDOL had declined since 2008 (see Deloitte workbook tickmark (a)).

*science in trying to do this exercise <u>but they would have been similar enough to do it in this way.</u>"* [My emphasis]

3818.  In the round, and again having heard from neither of the Defendants, I have concluded that I was not shown a sufficient evidential basis for disturbing the assessment made by Autonomy and approved by Deloitte.

*Overall conclusion on the "Other Transactions"*

3819.  Accordingly, I do not consider that the Claimants' case for impugning the Other Transactions was made good in any of them. I consider them, for a number of reasons, to be distinguishable from the other claims in this case, which may explain their bundling together, and possibly even why Dr Lynch was not cross-examined on them.

3820.  As a general observation, the question, which I would have found difficult, as to the effect on the calculation of loss when a claim has been made good against one Defendant but not the other, does not arise in the context of the Other Transactions, or in relation to any of the claims in this case.

## DECEIT AND MISREPRESENTATION CLAIMS

### The pre-acquisition misrepresentations alleged

3821. The Claimants have also pleaded claims against the Defendants in common law deceit and/or under the Misrepresentation Act 1967 ("the 1967 Act" or "s.2(1)"). The Claimants' case is that in the course of the acquisition process the Defendants made a series of misrepresentations to HP on which HP/Bidco[486] relied in deciding to purchase Autonomy, and the price it was willing to pay. Subject to the 'wrinkle' that the claims are brought by Bidco, these claims are 'direct' claims: that is to say, they rely on what was allegedly represented to HP itself by Dr Lynch and/or Mr Hussain, rather than on what Autonomy represented to the market in its published information.

3822. In paragraph 207 of its RRAPoC, Bidco limited its direct claims against the Defendants in deceit and/or misrepresentation to loss attributable to the acquisition from them of the shares and share options that they each sold to Bidco in aggregate amounting to some US$420 million (being the dollar equivalent on the date these claims were issued (30 March 2015) of £284 million, the shares having been denominated in sterling)[487].

3823. Its claim (through Bidco) in deceit required HP to establish that:

    (a) the Defendants made representations of fact that were untrue;

    (b) they made those representations, directly or indirectly, to HP;

    (c) they did so knowingly, without belief in their truth, or reckless as to their truth;

    (d) they intended HP to rely on those representations; and

    (e) HP did so rely, and thereby suffered loss.

3824. Bidco's alternative claims in misrepresentation under s.2(1) do not require proof of the third element (that the false representations were made fraudulently, that is, without belief in their truth or reckless as to their truth). Rather, if the other elements adumbrated above are established, the claims are made out unless the Defendants prove that they had reasonable grounds to believe, and did believe up to the time they sold their shares and share options to Bidco, that the facts represented were true.

*Summary of the representations and the claims made in respect of them*

3825. The eight sets of pre-acquisition representations which the Claimants alleged were made to HP were grouped by the Claimants into three stages of the acquisition process:

---

[486] Again, the *Bidco point* arises: see paragraphs 484 to 500 above. References in this part of this judgment to HP should be taken to it as the controlling mind of Bidco and/or on the basis that representations to HP were intended to be relied on by HP and any acquisition vehicle that HP might use to acquire Autonomy.

[487] Bidco's case is that HP generally operated in US dollars at all relevant times, that it had to purchase sterling to effect the acquisition, and that Bidco, as the corporate vehicle that HP used to purchase Autonomy, foreseeably bore loss in US dollars: see paragraph 196C of the RRAPoC. I will address further in a judgment on quantum issues as to the currency of account and the currency of calculation of loss.

(1) the initial approach to HP by Qatalyst and introductory meetings in January to March 2011;

(2) the more detailed discussions in London in June and July 2011; and

(3) the due diligence process in August 2011.

3826.  In summary, the Claimants based their claims on:

(a) Representations made in January and February 2011 in slide decks ("the January and February Slides") sent by Mr Quattrone of Qatalyst ;

(b) A further slide deck presented at a meeting in March 2011 ("the March Slides");

(c) Representations allegedly made by Dr Lynch at a meeting attended by representatives of HP and Autonomy in London on 29 June 2011 ("the June meeting");

(d) Further representations allegedly made at another meeting on 29 July 2011 ("the July meeting");

(e) Representations allegedly made in the course of due diligence calls in August 2011, on 1, 2 and 4 August 2011.

3827.  The representations on which HP based its case in general reflected Autonomy's published information. The Claimants acknowledged that their case on the falsity of the representations, and on the Defendants' knowledge of (or recklessness as to) that falsity, generally followed from their case on the alleged false accounting. If the Defendants succeeded in defending the allegations about false accounting, many of the misrepresentation claims would have fallen away: but they have not done so.

3828.  The Defendants denied fraud and deceit. Their over-arching defences were that:

(1) Qatalyst was not acting as their or even as Autonomy's agent, and the Defendants cannot be liable for any misrepresentation made by Qatalyst, but not by them or on their behalf.

(2) The Claimants relied on some representations made by Dr Lynch and on others allegedly made by Mr Hussain, and (for example) in their counterfactual submissions as to loss, they did not distinguish in respect of each alleged misrepresentation which, if either, was responsible; but each Defendant had to be considered separately, and in considering a claim against one, only those misrepresentations found to have been made by him, or on his behalf, can be taken into account. Neither was alleged to have nor had any liability in respect of statements made by the other (save insofar as the Claimants allege that Dr Lynch, by his silence, acquiesced in a misrepresentation made by Mr Hussain; I deal with this below in the context of the 29 July 2011 meeting).

(3) Neither had conscious knowledge at the time that they had made any representation which was false.

(4) The Claimants had not proved inducement/reliance.

(5) The Claimants had not proved loss.

3829.  In addition, Mr Hussain contended in his Defence that even if, contrary to his primary case, he knew that statements made in Autonomy's reported financial results and its other public statements were false (or had no honest belief that they were true):

(a) Mr Hussain always made it clear to HP, and it was understood by all parties to the negotiations, that it was for HP to carry out its own due diligence in relation to the Autonomy acquisition.

(b) In repeating those statements to HP, or referring HP to Autonomy's published information, he was "*at its highest*" representing that those sources <u>contained</u> the statements in issue, and was neither making such statements himself, nor representing that they were accurate, or even that he reasonably believed them to be accurate.

3830.  In his closing submissions this contention, which was not advanced by Dr Lynch and which the Claimants dismissed as unrealistic, was not repeated in the context of the January and February Slides[488] but it was in relation to the 1 August 2011 due diligence call, and I take it to have remained part of his case in both contexts. [489]

 *The January and February Slides*

3831.  The first two sets of misrepresentations relied on by the Claimants were made in the January and February Slides.

3832.  The Defendants' position was that:

(1) Neither of these slide stacks or presentations was prepared by either Dr Lynch nor Mr Hussain, nor were they sent by them to HP, or used by either of them on a call or meeting. According to the Defendants, these were not representations by either Dr Lynch or Mr Hussain, nor were they made to Bidco. Instead:

(a) The January Slides were emailed by Mr Quattrone to Mr Lane of HP on 26 January 2011.

(b) The February Slides were emailed by Mr Quattrone to Mr Robison on 3 February 2011.

---

[488] *"At its highest, any representation by Mr Hussain would have been to the effect that he believed that AU's financial information was accurate and not misleading. Any such representation would have been true"*
[489] In that context, Mr Hussain's pleaded defence was that *"Mr Hussain was simply repeating information from the Q2 2011 Quarterly Financial Report and investor presentation…As a matter of English law, Mr Hussain's repetition of such information amounted, at most, to a representation that those sources contained the relevant figures, but not that those figures were accurate."*

    (c) Both sets of Slides were prepared by Qatalyst on its own accord, as an investment bank's tool to drum up a transaction from which it could profit: neither set was prepared by either of the Defendants.

    (d) Like the Slides sent by Qatalyst to Oracle at around the same time, they were sent "*for the purpose of our* [i.e. Qatalyst's] *independently pitching Autonomy as an idea*".[490]

    (e) Neither of the Defendants was even aware that the slide stacks were being prepared.

(2) The January and February Slides preceded the acquisition by more than six months, at a time when no transaction was in prospect, and when HP and Autonomy were at an early stage of getting to know each other.[491] They played no part in HP's decision in August to proceed with the acquisition of Autonomy.

(3) The January and February Slides were prepared on the basis of and reflected Autonomy's published information, which was accurate.

(4) Even if (contrary to the Defendants' case) the published information was in some respect not accurate, Dr Lynch's case in particular was that he believed it was, and reasonably so: accordingly, even if these documents are treated as containing misrepresentations by Dr Lynch, there would be no fraud, and Dr Lynch would have a defence to a claim under s.2(1).

(5) In any case, at that stage, neither of the Defendants was intending to promote or bring about a sale. At that stage, according to the Defendants, Qatalyst was simply (quoting Dr Lynch's written closing), "*arranging meetings with several companies on a low-key basis, preparing for the possibility of an unsolicited bid defence.*"

3833. The Claimants did not accept any of this. Their position was that Dr Lynch and/or Mr Hussain made these representations, or caused them to be made, as part of the strategy of enticing a bidder and inducing a sale:

(1) Mr Quattrone was shopping Autonomy to a set of potential purchasers that he had discussed with Dr Lynch. This "*potential acquiror universe*" included HP. Qatalyst produced and provided the January and February Slides to HP as part of that process and on behalf of Autonomy.

(2) The January and February Slides included information taken from a slide deck with the file name "*corpoverview2010*" sent by Dr Lynch to Mr Quattrone by two emails in advance of their video conference on 6 December 2010, and shortly before Mr Quattrone began approaching potential purchasers. The Claimants contended (and put to Dr Lynch) that the material was provided to

---

[490] Email from Mr Quattrone of Qatalyst to Dr Lynch, 29 September 2011.
[491] See Mr Johnson's evidence in the US criminal proceedings that the video-conference on 3 February was a "*typical first meeting with the company to learn a little bit more about what they do, a little bit about their products, but fairly high level, from what I remember*", and that "*you start at a very high level because we're talking to a lot of companies all the time*".

Qatalyst with the intention that Qatalyst should use the material to pitch Autonomy to potential buyers. As to this:

(a) I was told that the attachments to these two emails have been lost; and the Claimants had therefore referred to the slides sent by Dr Lynch to Mr Quattrone as the *"Lost Slides"*.

(b) However, two other Autonomy presentations from around this time – one with the file name "*Corporate overview November 2010*" (the "November 2010 Slides"); and another with the file name "*Company Overview – December 2010*" (the "December 2010 Slides") have been located. Dr Lynch accepted that Autonomy used standard slides, which it updated as needed, and that he along with others would work on them: "*one deck is used as the starting point for another*".

(c) A comparison of the November 2010 and December 2010 Slides with the January and February Slides (and indeed the March Slides, discussed below) shows significant overlaps, as was shown in detail in cross-examination. Materially:

(i) The representations as to <u>overall</u> <u>revenue, gross margin and net profit</u> in the January and February Slides were contained in the "*Autonomy Overview*" slide in each deck. Those Slides extensively reproduced material (including but not limited to materially identical representations) contained in four separate slides in the November 2010 Slides: "*Introduction to Autonomy*"; "*Autonomy's Power of Three*"; "*Financial Overview*"; and a slide containing bar charts. Those slides from the November 2010 Slides were later reproduced and updated in the March Slides.

(ii) The representations as to <u>organic IDOL growth</u> in the January and February Slides were contained in bar charts in the "*Key Financial Metrics*" slide in each deck, which reproduced and updated an otherwise substantively identical bar chart labelled "*Quarterly Organic Growth*" in the November 2010 Slides.

(iii) The representations as to <u>revenues by category</u> in the January and February Slides were contained in the pie charts reproduced at paragraph 3842(4) below, which substantively reproduced and updated a table of the same data in the November 2010 Slides. The same table was itself reproduced and updated in the March Slides.

(iv) The representations as to <u>IDOL OEM</u> in the January and February Slides were contained in the "*IDOL Software Business Model*" slide in the January and February Slides. Those slides extensively reproduced material (including but not limited to materially identical representations) from the December 2010 Slides.

(d) The Claimants submitted that it is clear that the January and February Slides were heavily based on the Lost Slides (updated appropriately), including the representations in issue.

3834. In cross-examination, Dr Lynch (in answers that struck me as having been thought about in anticipation of this line of questioning) admitted that the January and February Slides "*may*" have been based on the Lost Slides, but (i) initially claimed that the Lost Slides were publicly available on Autonomy's website; and (ii) pointed out that many of the representations concerned publicly reported figures. He also insisted that none of this was done, nor was Qatalyst's involvement with a view, to pitch Autonomy to potential purchasers. He told me:

> "*We were interested in the idea of having the ability to, if we got an irresistible bid, to have more than one bidder and the possibility of having a better home for the company that we could carry on with our vision and also we were very happy to take up these introductions to the most senior people in the technology sector in the world*".

3835. I am not persuaded that the derivation of the content of the January and February Slides has as much significance in determining whether the Slides amounted to representations by the Defendants as the Claimants suggested it did. It seems to me to be obvious that Qatalyst would have asked for information, and that Autonomy would have wished to, and in the event did, supply it. As the Claimants pointed out, if the compilation in the Lost Slides was available on and easily mined from Autonomy's website, there would have been no need to go to the effort of dividing the deck up into two parts and sending them to Mr Quattrone by email, as Dr Lynch did; he could simply have sent a link for Mr Quattrone to download. The coincidence of timing between the sending of the January and February Slides, and Mr Quattrone's approaches also suggests some connection between the two.

3836. All in all, it seems to me plain that the derivation or source of the information was the slides prepared by Autonomy: and there would have been no point in Qatalyst re-inventing the wheel from publicly available information. However, in my view, the form and content of the January and February Slides, and the fact that both were presented on their face as being Qatalyst documents, suggests (and I find) that, whatever their derivation, they were put forward by Qatalyst as its own documents.

3837. The more pertinent and difficult question is whether the documents were put forward at the meeting with HP on 3 February 2011 in the presence of the Defendants and without objection or correction from either of them. The Claimants contended that the February Slides were indeed shared with HP <u>during</u> the 3 February 2011 video-conference with HP that both Defendants attended (and there is no suggestion that they demurred from the representations made in them). They relied in this regard on Dr Lynch's own evidence in his first witness statement, where he said (<u>emphasis added</u>):

> "*HP claims that there were misrepresentations about the amount of revenue recognisable from OEM relationships, the growth of Autonomy's OEM business and the existence of royalties from OEMs in three PowerPoint slides shared or shown to HP in January, February and March 2011. <u>The February and March slides were shared with HP during video-conferences that I attended.</u>*

> *The January and February slides were prepared by Mr Frank Quattrone and Qatalyst…"*

3838.  However, in the course of cross-examination, Dr Lynch claimed for the first time that the February Slides had <u>not</u> been shared during the video-conference, and rather that some <u>other</u>, previously unidentified and (he seemed to suggest) no longer extant, presentation deck was shared instead. The Claimants urged that this evidence should be rejected, given that:

(1)  The passage cited from Dr Lynch's first witness statement is unambiguous and cannot sensibly be construed in the context of what immediately precedes and follows it as referring to some slide deck other than the February Slides.

(2)  No correction was made to that paragraph between 14 September 2018, when that evidence was served, and the moment when Dr Lynch made his new claim in the course of cross-examination.

(3)  Dr Lynch has not identified an alternative set of slides, nor have the Claimants been able to locate one.

3839.  In the circumstances, I do not feel able to accept Dr Lynch's evidence in cross-examination contradicting what he had said in his witness statement. He himself retreated to saying that *"Yes, there's been a lot of confusion about these slides"* and he oscillated between denial that the slides had been put forward at all and general assertion that *"…these would not be slides that I would do for a presentation because they're all about things that I don't know about"*. In short, the best that can be said about his evidence in this regard was that it was confused.

3840.  I find that the February Slides were based on material provided for the purpose of such a presentation and were put forward under the name of Qatalyst at the 3 February 2011 meeting in the presence of Dr Lynch and Mr Hussain, neither of whom dissociated himself in any way from their content.

3841.  Furthermore, even if Dr Lynch's claim that the February Slides were not shared with HP during the video-conference were correct, there is no dispute that they were provided to HP around the same time. I agree with the Claimants that the points made above in respect of both the January and February Slides would still apply, and that Dr Lynch and Mr Hussain both in effect adopted their presentation, and implicitly vouched for their accuracy.

*Substance of representations in the January and February Slides and their alleged falsity*

3842.  The Claimants' case (the elaboration of which I have taken very largely from their written closing submissions) is that the January and February Slides included the following false representations (set out here following the order of the slide decks, which is identical in each case)[492]:

---

[492]The analysis which follows reflects an exercise undertaken by the Claimants and their valuation expert to contrast certain financial metrics reported to the market by Autonomy with what, on the Claimants' case, it should have reported. In accordance with the shorthand used by the Claimants' valuation expert, Mr Bezant: "**Represented**" denotes figures actually reported by Autonomy, while "**True**" refers to the restated figures

(1) The Autonomy group's total revenues were said to be $740 million in 2009. The Claimants' case is that True total revenues were $646.8 million; or $593.8 million excluding the undisclosed pure hardware sales; and $870 million in 2010, when True total revenues were $722.3 million; or $623.3 million excluding the undisclosed pure hardware sales.[493]

(2) The Autonomy group's adjusted gross margin was said to be 88% in 2009, when in fact the True adjusted gross margin (correcting only for the treatment of hardware costs) was 83.3%. Its adjusted gross margin was held out as 87% in 2010; the True adjusted gross margin (on the same basis) was 83.6%.[494]

(3) The Autonomy group's net income (corresponding to "net profit (adjusted)" in the Quarterly Reports) was said to be $233 million in 2009, when in fact the True net income of the software business (excluding hardware costs and revenues) was $179.2 million; and $292 million in 2010, when in fact the True net income (on the same basis) was $199.8 million. As the hardware sales were loss-making, True figures including the hardware business were lower still.[495]

(4) Autonomy's purportedly "*Attractive Revenue Mix*" was represented as follows:

---

advanced by the Claimants as "corrected" (only) for the effects of the false accounting of which they complain. Mr Bezant and the Claimants accepted that, given the disconnect between Autonomy's underlying accounting records on the one hand, and Autonomy's reported revenues by product category on the other, there is no perfect way of correcting the latter to reflect the Claimants' case. The Claimants used two approaches: (a) they prepared what they called the **Restated Revenue Schedule** (which was built up from the underlying accounting records); and (b) they also undertook what they called the **Cross-check** (based on manually identifying transactions in the Hussain Revenue Spreadsheets from which the reported revenue figures by category were taken). In the former, "True total revenues" denoted what the Claimants contended were Autonomy's actual revenues excluding "pure" hardware sales, and "True adjusted gross margin" similarly was a calculation of gross margin with a "correction" for hardware costs. Mr Giles criticised the Restated Revenue Schedule but agreed with the Cross-check, and accepted that "*the two methodologies come up with something quite close*". In this part of this judgment, for ease of reference, True figures are taken from the Restated Revenue Schedule, in line with Mr Bezant's main analysis (in the slightly updated form exhibited to Mr Bezant's 4th Report to accurately reflect the Claimants' case). Figures based on the Cross-check are provided in footnotes for completeness.

[493] 2009 figures in January Slides, 2009 and 2010 figures in February Slides.

[494] 2009 figures in January Slides. 2009 and 2010 figures in February Slides. True figures *per* Schedule 2 PoC were confirmed by Mr Bezant, which was not challenged.

[495] 2009 figures in January Slides, 2009 and 2010 figures in February Slides. True figures calculated as follows: (i) Effective tax rate on adjusted basis calculated by dividing reported provision for tax by reported profit before tax (adj), in each case as set out in the 2010 Annual Report. Thus 2009 effective tax rate = $90{,}268 \div 323{,}066 = 27.9\%$; 2010 effective tax rate = $86{,}705 \div 378{,}921 = 22.9\%$. (ii) Tax at calculated effective tax rate deducted from True cash pre-tax income, as set out in Adjusted Deal Model: "Target IS" tab (cells S31:T31), with scenarios set to "Original" ("MB assumptions" tab) and "True Position" ("Accounting assumptions" tab). Thus 2009 True adjusted net income = $\$248.6$ million $\times (1 - 27.9\%) = \$179.2$ million; 2010 True adjusted net income = $\$259.1$ million $\times (1 - 22.9\%) = \$199.8$ million.

*January Slides*                    *February Slides*

(5) The slides did not specify the periods to which these pie charts were said to relate, but the January Slides appear to correspond to the reported figures for the 12 months ending in Q3 2010, and the February Slides appear to correspond to the reported figures for FY 2010. The Claimants contended that these pie charts made the following false representations:

(a) They portrayed Autonomy's revenues as being made up entirely of the categories shown: software licensing, and related services (including software as a service).[496] In fact, for the 12 months ending in Q3 2010, True hardware revenues were $83.6 million (12% of the True total), while for 2010 that figure was $100.7 million (13.9% of the True total).[497]

(b) As the total revenues shown in the pie charts included substantial hardware revenues, it follows that the revenue figures shown for one or more of the categories were significantly overstated.

(c) IDOL OEM revenues were substantially overstated. In the 12 months ending in Q3 2010, True IDOL OEM revenues were only $21.7 million (3.1% of the True total), rather than the $126 million or 15% as stated.[498] In FY 2010, True IDOL OEM revenues were only $22.8 million (3.2% of the True total), rather than the $132 million or 15% stated.[499]

(d) IDOL Cloud revenues were also significantly overstated. In the 12 months ending in Q3 2010, True IDOL Cloud revenues (i.e., in particular, absent the wrongful acceleration of revenue recognition) were $119.3 million (17.1% of the True total), rather than $184 million or 22%. In FY 2010, True IDOL Cloud revenues were

---

[496] Autonomy said that the "deferred revenue release" category "*[stemmed] principally from support and maintenance contracts recognized in arrears*".

[497] True figures: see footnote 499 above. Cross-check hardware revenues – 12 months to Q3 2010: $82.1 million, representing 11.7% of the total. FY 2010: $99.8 million, representing 13.8% of the total.

[498] These numbers are arrived at by adding "OEM Ongoing" and "OEM Dev" together. The same applies to the stated IDOL OEM revenues for FY 2010 in the February Slides.

[499] True figures: see footnote 499 above. Cross-check IDOL OEM revenues – 12 months to Q3 2010: $22.7 million, representing 3.2% of the total. FY 2010: $23.8 million, representing 3.3% of the total.

$119.2 million (16.5% of the True total), rather than $190 million or 22%.[500]

(6) The slides also included charts that purported to show year-on-year organic IDOL revenue growth consistently between 10% and 20% per quarter for 2009 and 2010.[501] In fact, True organic IDOL revenue (as defined, excluding loss-making pure hardware sales and improperly recognised revenue) declined by 5% from 2008 to 2009, and was flat from 2009 to 2010.[502]

(7) IDOL OEM revenue was said to be:

(a) growing significantly year-on-year (35% in the January Slides and 32% in the February Slides) when in fact True IDOL OEM revenue declined year-on-year at comparable rates (between 20.9% and 59.3% for each of the first three quarters of 2010, and 29.5% for FY 2010);[503] and

(b) "*Royalty-based ~3%*", when in fact, few if any true IDOL OEM transactions generated, or could reasonably be expected to generate, a recurring royalty stream of around 3% of licence sales.

3843. Dr Lynch accepted in cross-examination that he knew that Autonomy's reported revenue figures included hardware revenues, revenues from VAR transactions and revenues from what on the Claimants' case were improper reciprocal transactions.[504] Dr Lynch also accepted in cross examination that he knew that the IDOL OEM revenue figures included revenue from transactions that, on the Claimants' case, did not come within Autonomy's own description or definition of its IDOL OEM revenue. Further, he accepted that he was aware that the IDOL Cloud revenue figures included some non-recurring licence fee revenue (which, on the Claimants' case, did not come within Autonomy's own description of its IDOL Cloud business or revenue). Mr Hussain accepted that he knew all this too. What the Defendants did not accept was that the representations were false, or that they knew they were false.

3844. In my judgment:

(1) The Defendants were content for Qatalyst to make the representations conveyed by the January and February Slides as detailed in the preceding paragraphs. I accept and find that Qatalyst was, as the Claimants put it in their written closing submissions:

> "*shopping Autonomy to a set of potential purchasers that he [Mr Quattrone] had discussed with Dr Lynch. This 'potential acquiror universe' included HP. Qatalyst produced and provided the January and February Slides to HP as part of that process.*"

---

[500] True figures: see §0. Cross-check IDOL Cloud revenues – 12 months to Q3 2010: $126.9 million, representing 18.1% of the total. FY 2010: $129.1 million, representing 17.9% of the total.
[501] February Slides; the January Slides included an identical graph, save that it did not include Q4 2010
[502] True figures *per* the Claimants' Restated Organic Growth Schedule.
[503] True figures: see footnote 499 above.
[504] Dr Lynch also accepted that the (adjusted) gross margin figures stated in the slides would have been lower if all of the hardware costs had been accounted for in COGS.

(2) Strictly, the company (Autonomy) as a legal entity had no corporate interest in any auction which might be in contemplation or developing for its shares. The persons interested are the company's shareholders (the shares being their personal property), and the directors act in respect of inviting, promoting and developing any bid in effect as (a) potential and then actual auctioneers and (b) communicators of matters relevant for the shareholders to know in making their decision on any eventuating bid. It seems to me that representations made by Qatalyst on the basis of what they were told, or information supplied by the Defendants, were in effect made on their behalf.

(3) Although the Defendants maintained that they did not know that any of those representations was false, in light of my conclusions and findings in relation to the Claimants' cases on Hardware, VARs, Reciprocal Transactions, Hosting and OEM, that is not sustainable.

(4) It follows that the representations were in material ways false; and

(5) both Defendants knew the representations were false, or were at least, reckless as to their truth or falsity.

3845. For the avoidance of doubt, in the light of my previous findings, I do not accept that it avails the Defendants that Autonomy's published information had been prepared by Autonomy's finance department and scrutinised and approved by Deloitte. The finance department was controlled by the clique; and Deloitte were repeatedly misled. Neither Defendant can rely on assumptions as to the accuracy of their work or avoid liability by reference to what Deloitte did or did not know or do.

*Did HP rely on the January and February Slides? What effect had the Disclaimer?*

3846. The Defendants' final answer was to deny reliance.

3847. As to reliance, HP maintained that the January and February Slides prompted HP's interest and led to the March meeting (see below) so that there was a continuum of reliance which concluded with HP deciding to offer, and offering, £25.50 per share for Autonomy, including the shares owned by the Defendants. They presented the misrepresentations in issue as *"fundamental parts of"* (i) the initial approach to HP concerning the possible sale of Autonomy (of which the January and February Slides were part); (ii) the Defendants pitching Autonomy to HP directly (including by the February Slides); and (iii) the Defendants' responses to HP's due diligence requests.

3848. With particular reference to the January and February Slides they contended that:

(1) The January Slides, sent as part of Mr Quattrone's initial approach to HP, led to the 3 February 2011 video conference, which with the related February Slides, led in turn to the 4 March 2011 meeting at which the March Slides were presented; and

(2) The representations in the February Slides were of *"particular interest"* to Mr Robison (who was HP's Chief Strategy Officer and Head of SCD) and his

colleagues in the SCD group, and they relied on them when considering whether Autonomy would be a suitable fit for HP.

3849. The Defendants, on the other hand, contended that the January and February Slides had no material impact on HP in deciding to make the bid:

(1) They were not the cause of HP's interest, since HP was already aware of Autonomy as a potential target from late 2010.

(2) In January and February 2010, HP was not thinking of acquiring Autonomy: its focus was instead on Tibco.

(3) Mr Apotheker did not remember reading and/or looking at the Slides, still less focusing on them; and though Mr Robison's witness statement made claims about features in the slides that were interesting to him, and posited questions he would have wished to ask if gross margins had been presented as lower, he did not attend at trial, and since it was not possible to test his evidence they submitted that little weight should be placed on his account.

(4) There was no evidence provided that any of these Slides were shown to HP's board. The documents did not feature at all in the subsequent documentation showing HP's consideration of the acquisition (for which HP relied on analysis by its own corporate analysts, and third party advice from Perella Weinberg and BarCap).

(5) In any case, it was unrealistic to suppose that these Slides had any operative effect at all at the time of the bid many months later.

3850. The Defendants also relied in their defence on a boilerplate disclaimer at the end of the two slide decks in support of an argument that HP did not rely on the representations contained in them, or that any such reliance was unreasonable. They suggested that the disclaimer estops Bidco from contending that it relied on the representations. These contentions were not, however, elaborated or even put forward in their submissions, and I have not been persuaded that, of themselves, the warnings in small print provide a defence or found an estoppel.

3851. As to reliance, the Defendants concluded that it was not realistic to think (and the Claimants had not sought to argue) that either set of slides had any impact on their thinking by the time Bidco came to make an offer for Autonomy. They contended, in effect, that it is unrealistic to think that the January and February Slides still operated on the minds of those concerned on behalf of the Claimants  months later and after so much other information had been provided.

*Summary of my assessment re the alleged falsity January and February Slides*

3852. I agree with the Defendants that it is unlikely that HP called to mind the January and February slides when it came to determining to bid, nor were the slides any real influence by then in their determination of the price.

3853. Further, in my view, even if retained in the mind, the facts and impression so retained would be subject to further information provided and especially the due diligence exercise. The representations made would not independently be actionable as such.

3854. However, I accept HP's argument that the January and February Slides whetted HP's appetite. In a vacuum, I would not accept that this, nor the fact that the slides encouraged their further interest, would be sufficient. But the slides do need to be seen as part of a continuum, over the course of which the information provided and the representations made by Autonomy gave HP a picture of a company capable of enabling HP to achieve Mr Apotheker's target of moving HP into the mainstream of the advanced software sector, and thereby transformational change.

3855. In particular they need to be taken into account in conjunction with the March slides, to which I now turn.

*The March Slides*

3856. On 3 March 2011, HP and Autonomy entered into a Mutual Non-Disclosure Agreement. On 4 March 2011, Autonomy and HP spoke again via video conference. HP participants included Mr Robison, Mr Johnson, Mr Levadoux and Ms Marge Breya. The meeting took place in HP's offices in Palo Alto, California. Mr Hussain attended in person, with Mr Quattrone; and Dr Lynch joined by videolink. The third set of misrepresentations as alleged by the Claimants was made in a further stack of slides presented at that meeting ("the March Slides").

3857. Dr Lynch maintained that the March Slides were prepared by Autonomy using publicly available information. Dr Lynch said that he believed that he had delegated the preparation of the slides to various team members, and that he instructed Mr Kanter to include some additional background information about Autonomy to respond to particular questions that HP had raised (via Mr Quattrone) in advance of that meeting; but that otherwise he had little involvement.

3858. In cross-examination, Dr Lynch claimed that he had, in fact, refused to address many of HP's requested topics:

> *"All I'm prepared to do is give them an introduction to the company which is a public document and then some slides on other information that's already public, which is functions, geographies, head count and org explanation. What that doesn't say is: please prepare slides with the P&L for the next three years, with cloud Saas business model, with balance sheet overview, with market share over time, with historical revenue growth. So there's lots and lots of things here which are not going to be given in this meeting but you can't blame them for asking."*

3859. This was not entirely accurate. It is right to say the final deck did not include P&L projections for the next three years. Mr Quattrone had recognised that Autonomy would not want to give them precise forecasts at this stage", and suggested instead "*giv[ing] them orally some directional input*"; and in any event, Autonomy always maintained it did not have such projections, hence the 4 August 2011 due diligence call (addressed below) to discuss the reasonableness of the assumptions and projections contained in parts of HP's Deal Model. But all of the other items referred to by Dr Lynch were covered in the final version of the March Slides: the IDOL Cloud business model; an overview of the balance sheet; market share over time (OEM market share was said to be "*almost total*" in any event); and historical revenue growth.

3860. The Claimants submitted that Dr Lynch's claim that he had not been prepared to give HP such information, when in fact the slides included it, was a misguided attempt to obfuscate his evident enthusiasm for interesting HP in a potential purchase of Autonomy. When pressed, Dr Lynch accepted that he saw HP as a potential purchaser but insisted that a purchase by HP

> *"would not be a probability at this stage. This is a first meeting. There has been no discussion of anything to do with financials or price or anything like that. Remember, this is one of the largest technology businesses in the world. It's a big customer of Autonomy's and we're getting to meet the CTO and we' re getting to explain the way our business is wonderful. Yes, that could end up in an acquisition, yes, they're probably interested in learning as much as they can; but from our point of view it would be a very gentle process, and…you'll see in the emails that's very much how we view it. "*

3861. I accept that although these were early days, nevertheless by this time, Dr Lynch did have in mind HP as a potential suitor, and the information provided, which was impressively packaged, was no doubt designed further to whet the appetite. But the Claimants' suggestion to the effect that Dr Lynch's efforts to downplay its content was an effort to camouflage an established determination to achieve a sale is, to my mind, exaggerated.

3862. Three hours were allocated to the video presentation; but according to Dr Lynch's account, at the meeting on 4 March 2011, he presented the technology and positioning slides; other people dealt with the other slides. Dr Lynch attended throughout. Mr Johnson explained in his evidence in the US criminal proceedings that the meeting was primarily about the technology, but with a *"little bit of financial information"* at the very end of the meeting, presented by Mr Hussain rather than Dr Lynch. I accept that Dr Lynch may largely have left matters of general presentation to others, though that would have been atypical of him, judging from his contributions in Earnings Calls. But that does not serve to disassociate him from the content: see further in paragraphs 3866 to 3867 below.

*Representations in the March Slides*

3863. The Claimants' case was that the March Slides contained material misrepresentations which they sought both to summarise and quantify as follows:

(1) The slides made a series of claims about financial metrics, which were untrue because they reflected the false accounting addressed in earlier parts of this judgment. They included those set out, with what the Claimants presented to be the corresponding True metrics, in the following table (which with the underlying derivations I have taken from the Claimants' written closing submissions with very little alteration, but which it should be remembered will require amendment in assessing loss and damage since it includes adjustments which I do not consider to be justified in respect of amounts reflecting (a) the Claimants' claims in respect of the Realise/Credit Suisse VAR transaction (VT15) and the Schedule 7 "Other Transactions" which, in the event, I have rejected, and (b) overstatements of Autonomy's revenues for Q2 2011 in

consequence of what the Claimants asserted (but never pleaded) was misaccounting for a Q2 2011 Schedule 6 Iron Mountain transaction[505]):

| Metric | Stated figure | True figure |
|---|---|---|
| 2010 total revenue | $870 million<br>*slides 4, 58, 59* | $722 million ($623 million excl pure hardware) |
| 2009 total revenue | $740 million<br>*slide 58* | $646.8 million ($593.8 million excl pure hardware) |
| 2010 IDOL Product revenue | $251 million<br>*slide 59* | $222.7 million[506] |
| 2010 IDOL Cloud revenue | $190 million<br>*slide 59* | $119.2 million[507] |
| 2010 IDOL OEM revenue | $132 million<br>*slide 59* | $22.8 million[508] |
| 2010 IDOL OEM revenue as % of total | 15%<br>*slides 18, 20* | 3.2%[509] |
| IDOL OEM growth year-on-year | 30–35%<br>*slides 17, 18, 19* | (56.1%) (i.e. decline) in 2009[510]<br>(29.5%) (i.e. decline) in 2010[511] |
| 2010 operating profit (adjusted) | $377 million<br>*slide 58* | $246.3 million[512] |

---

[505] For the avoidance of doubt, I confirm that I have accepted the Defendants' submission that this allegation, which the Claimants did not assert to be based on fraud, and which was not mentioned in their RRAPoC except as a footnote to Annex 6, nor ever properly pleaded nor put to Dr Lynch, should be ignored.
[506] FY 2010 Cross-check IDOL Product revenue of $204.4 million.
[507] FY 2010 Cross-check IDOL Cloud revenue of $129.1 million.
[508] FY 2010 Cross-check IDOL OEM revenue of $23.8 million.
[509] FY 2010 Cross-check IDOL OEM revenue represents 3.3% of the total.
[510] This represents the decline in IDOL OEM revenue between 2008 Represented revenue and 2009 True revenue.
[511] Cross-check IDOL OEM growth – 2010: (26.4%) i.e. decline. 2009 not calculated because the 2008 revenues are not adjusted.
[512] Restated Profit Schedule: "Restated profit measures" tab (cell R39). Includes hardware.

| Metric | Stated figure | True figure |
|---|---|---|
| 2009 operating profit (adjusted) | $329 million *slide 58* | $239.2 million[513] |

(2) Slide 17 described Autonomy as having a "*Pure Software Model*". The same slide repeated the representations made in each of the January and February Slides as to the alleged "*Royalty-based ~ 3%*" nature of Autonomy's IDOL OEM revenue. On the Claimants' case and interpretation of the phrase, that was false, for the reasons previously discussed.

(3) Slide 18 repeated the misrepresentation made in each of the January and February Slides as to the alleged "royalty"-based nature of Autonomy's IDOL OEM revenue, save that the percentage "royalty" was now said to be "*~4%*". That was, again, false for the reasons previously discussed.

(4) Slide 19, headed "*IDOL OEM*":

(a) included the logos of 17 purported OEM customers. All of those companies were in the business of licensing software.[514] The obvious implication was that Autonomy's IDOL OEM revenue was obtained from those (and similar) companies. In fact, much of the revenue reported as "IDOL OEM" arose from transactions with companies or entities that did not license software, and so could not embed Autonomy software in any software product of their own; and

(b) claimed that "*Revenues today relate to deals signed two years ago*". This was a reference to (and so impliedly repeated) the Defendants' regular claim that IDOL OEM revenues consisted substantially of royalty payments on OEM partners' products, with such products typically released around two years after the OEMs' contracts with Autonomy were signed. The Claimants alleged that this was false, on the basis that much reported IDOL OEM revenue (around 80%) was neither (i) an upfront fee paid to an OEM partner; nor (ii) an ongoing royalty payment.

---

[513] Restated Profit Schedule: "Restated profit measures" tab (cell M39). Includes hardware.
[514] This does not appear to be in dispute.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

(5) Slide 20 purported to show that Autonomy's OEM business had a "*[p]owerful
cumulative effect*" on revenues "*as multiple new products reach market each
quarter*", via the following graph, which compared, on a quarterly basis, the
number of new OEM customers (blue bars) and "*OEM Revenue*" (red line).



(6) This slide was said to merit attention in light of and by way of rebuttal of the
Defendants' case that, in Dr Lynch's words, the reference to "*~4% royalties*"
(like that to "*~3% royalties*" in the February slides) was "*an example*", and "*did
not represent that all of Autonomy's OEM sales generated annual royalties of
4%*":

    (a) The red line showed the total quarterly IDOL OEM revenue reported
by Autonomy, which had risen to $38 million in Q2 2010, the last
quarter shown.

    (b) The dotted yellow line was said to illustrate a "*two year lag between
sign up and first royalties*" (emphasis added). It drew a link from the
number of new OEM customers (shown by a blue bar) in Q2 2008
to the red line in Q2 2010. The Claimants contended that the
reasonable reader would thereby understand that the red line – and
hence Autonomy's total reported IDOL OEM revenue – consisted
materially of royalty revenues.

    (c) Further, the slide claimed that "*Quarterly royalty run rate implies
end-user sales of IDOL powered software > $1bn.*" This was alleged
by the Claimants to be false given that: (i) the only revenue figures
shown on the slide were those plotted by the red line; and (ii) if the
3–4% figures cited by Autonomy and Dr Lynch were remotely
accurate indications of the level of IDOL OEM royalty payments,
then $38 million of IDOL OEM revenue could only imply more than

$1 billion in quarterly end-user sales by Autonomy's OEM customers if the great majority of the former indeed consisted of royalty payments, the clear implication was thus that the "*quarterly royalty run rate*" approximated total reported IDOL OEM revenue.[515]

(d) The slide thus represented that IDOL had been widely adopted by other software companies in their own products (as Dr Lynch accepted it did), and that ongoing, recurring revenues from those companies' sales would be substantial. However, on the Claimants' case, those representations were false: ongoing royalty payments from OEM customers in fact made up only a small part of reported IDOL OEM revenue.

(e) In cross-examination, Dr Lynch claimed for the first time that when the slides were presented to HP, Autonomy would have explained that IDOL OEM revenue in fact included revenue from upsells and PODs. However, there was never any public explanation of that point by Autonomy in the Relevant Period.[516]

(f) Dr Lynch also claimed that the slide was "*not discussing revenues*", on the basis that it was in a section of the deck entitled "*Business Models*". That appeared to be contradicted by a slide entitled "*Cumulative Revenue Effect*", which includes a graph of "*OEM Revenue*".

(7) Slides 55 and 58 repeated what the Claimants contended were the false claims about Autonomy's gross margin made in the January and February Slides, described earlier.

(8) Slide 59 set out a table of 2010 reported revenues by category, with year-on-year growth rates for Q4 revenues. This table:

(a) made no reference to hardware sales, but included revenue from such sales in some or all of the five categories of revenue listed, so

---

[515] In cross-examination Dr Lynch disputed this interpretation, claiming: "*there's a bit more information given away here than really should be because, if you take 3% – if you take 1 billion and you apply 3% and you gross down, it's in effect giving you the non-derived part of the OEM. Because if it was – if what you were saying was true, that number would be about 6 billion*". However, $1 billion of quarterly IDOL OEM sales, at a 3–4% royalty rate, would imply \$30–40 million (\$1 billion × 3–4%) in royalty revenues per quarter – so the claim of "*>\$1 billion*" in IDOL OEM sales is exactly in line with the most recent quarterly IDOL OEM revenues (\$38 million in Q2 2010) shown on the slide. By contrast, \$6 billion of quarterly IDOL OEM sales at the same royalty rate would imply \$180–240 million in royalty payments per quarter – several times the IDOL OEM revenue that Autonomy reported. It may be that Dr Lynch was trying to suggest that "*end-user sales … of >\$1 billion*" should be construed as referring to annual sales, but: (i) that is not what the slide says on its face; (ii) the reasonable reader would not read a sentence that refers in terms to a quarterly metric and understand that the other metric cited is intended to apply to a quite different time period; and (iii) even the highest quarterly IDOL OEM revenue shown (\$38 million in Q2 2010), using the 3% rate cited by Dr Lynch, does not imply \$6 billion in IDOL OEM sales annually in any event.

[516] The Claimants suggested that the implausibility of the suggestion is reinforced by the fact that the "intentional misinformation" document that Dr Lynch sent to HP's Mr Robison on 13 September 2011 (addressed in more detail in the OEM section of the judgment), which purported to provide (among other things) an explanation of the "revenue profile" of IDOL OEM, made no mention of the fact that IDOL OEM revenue included revenue from upsells and PODs.

making the same misrepresentation described in paragraph 3842(5)(a) above; and

(b) claimed that these figures "*implied*" IDOL OEM revenue for 2011 of $167 million, which claim the Claimants contended was neither honest nor reasonable as it would have represented more than 600% growth over the True 2010 IDOL OEM revenue of $22.8 million.

(9) The slide also claimed that Autonomy had the "*advantage of growth in annuity streams*". This too was said by the Claimants to be false: True IDOL OEM revenue was declining (see paragraph 3842(7)(a) above).

3864. The Defendants' answer to these claims was in summary as follows:

(1) Overall, the claims that the various statements as to Autonomy's revenues (overall and by category), profit and revenue growth, which according to the Claimants were "*untrue because they reflected the false accounting*" were groundless because there was no false accounting, for reasons already given.

(2) The slide headed "*Pure Software Model*" was not a representation that Autonomy sold only software: indeed, the same slide made reference to Autonomy's appliance sales. More generally, these slides would not have been considered in isolation from Autonomy's accounts, and those accounts made clear that the reference to "*Pure Software Model*" was intended to distinguish Autonomy from companies deriving significant revenues from services (and see paragraphs 654 to 657 in the part of this judgment dealing with the Claimants' "hardware" claims).

(3) The slide setting out revenue and growth by category, together with implied figures for 2011, accurately stated revenue and growth rates. As discussed in the "OEM" part of this judgment, the Defendants contended that the reference to "*advantage of growth in annuity streams*" was a fair comment.

(4) The remainder of the alleged misrepresentations related to Autonomy's OEM business. These representations have already been dealt with in the OEM section above.

(5) Further, Dr Lynch claimed for the first time in cross-examination that Autonomy's hardware sales were discussed at the 4 March 2011 meeting, relying on a slide in the March Slides that described "*Drag Along Third Party Revenues*". Although, as Mr Rabinowitz put to him in cross-examination, it had been part of the Claimants' case since April 2015 that the March presentation contained misrepresentations because nothing was said to HP about or to explain the hardware sales, this suggestion that there had been discussion about hardware sales as an example of "*drag along revenues*" was not pleaded in Dr Lynch's defence and was not mentioned in his witness statements. Dr Lynch suggested that it had been mentioned before, but without going through all the documents he could not be more specific; and when challenged again, he responded with studied calm and said he "*would have to disagree*" with the suggestion made to him that this was "*just another one of your opportunistic inventions*". No mention was made of the point in Dr Lynch's closing submissions. I have attached no weight to it.

*Summary of my assessment re alleged falsity of the March Slides*

3865. My assessment of the Claimants' allegations in respect of the falsity of the March Slides and the Defendants' answers to those claims can be summarised as follows:

(1) In light of my conclusions and findings in relation to the Claimants' cases on Hardware, VARs, Reciprocal Transactions, Hosting and OEM, I have concluded that it follows, and I find accordingly, that (a) the March Slides reflected false accounting in respect of those important aspects of Autonomy's business, so that (b) the representations in the March Slides based on that false accounting were in material ways false.

(2) I also consider that the representation made that Autonomy was a *"pure software company"* or *"pure software model"* was intended to convey a special selling point, the success and self-sufficiency of its software business without the need for other revenue streams, whilst in fact disguising volume third-party hardware sales.

*The Defendants' involvement in and responsibility for the representations in the March Slides*

3866. There is no real dispute that the representations in the March Slides were made by the Defendants to HP:

(1) Dr Lynch and Mr Hussain were both involved in preparing the slides. Mr Hussain admitted as much and Dr Lynch did not deny it. The evidence of his involvement is summarised above.

(2) Dr Lynch's name appears on the front of the deck.

(3) The Defendants admit that they presented the slides to HP.

(4) In cross-examination, Dr Lynch admitted to presenting the "*technology and positioning slides*". He claimed that "*other people did the other slides*", which was not consistent with his pleaded admission that there were two presenters - himself and Mr Hussain. In any event, he admitted that he listened to the whole presentation, and there is no suggestion that he disavowed any of the representations made in the deck under his name.

(5) Likewise, through presenting part of the deck, and his acquiescence during the rest, Mr Hussain adopted those representations he did not directly make.

3867. In my judgment, both Defendants had "guilty knowledge" of the false accounting and therefore knew the representations were false, especially in giving no inkling of substantial sales of *"pure hardware"*; or they were, at least, reckless as to their truth or falsity.

*Did the Claimants rely on the March Slides?*

3868. The Claimants dismissed as *"fanciful"* the Defendants' argument that these representations did not induce Bidco to acquire their share and share options in Autonomy.

3869. They contended that:

(1) Mr Robison "*relied on*" the March Slides, which gave an "*impressive picture of Autonomy's financial performance and business*".

(2) The "*pure software model*" they described was, according to Mr Robison:

> "*a very attractive model for HP, a predominantly hardware company that was looking to acquire an asset that would enable it to expand in the software market. The fact that Autonomy's business model was focused almost exclusively on software, with only a small amount of services as disclosed in its public filings and presentations to HP, was important to HP and affected the price that HP was ultimately willing to pay, and did pay, for Autonomy.*"

(3) According to Mr Robison's witness statement, the size and growth of IDOL Cloud as described in the March Slides was "*important to HP because of the relative predictability and recurring nature of the revenue stream*".

(4) The presentation of "*strong*" IDOL OEM revenues and revenue growth was also "*important to HP*", indicating "*that other companies valued Autonomy's technology*". HP therefore considered IDOL OEM to be "*a highly profitable, growing revenue stream that was recurring in nature and an indicator of the quality of the technology*".

(5) Mr Robison described the overall "*message conveyed during the March 4 meeting was that Autonomy was a high-growth, pure software company*". Mr Robison described the presentation Dr Lynch gave of the March Slides as "*pretty compelling stuff*".

(6) Mr Sarin, who did not attend the 4 March meeting but who reviewed the March Slides shortly thereafter, also thought that the March Slides described "*a very compelling business*", given its apparent scale and growth.

3870. However, the Claimants did not mention Mr Apotheker in this connection. The Defendants presented him as the lynch-pin, and as the only one of the witnesses relied on by the Claimants in this context who could be cross-examined. Their argument was that:

(1) In March 2011, Mr Apotheker was not yet focussed on Autonomy as a possible

acquisition target and the March Slides (which he did not refer to either in his witness statement or in cross-examination) played no part in his decision-making.

(2) On 19 March 2011 Mr Robison sent Mr Apotheker some slides showing a comparison between Tibco and Autonomy. Even by this stage Mr Apotheker was not personally considering Autonomy as a possible acquisition target. In his witness statement Mr Apotheker said that the first time he recalled

Autonomy appearing on the list of companies that were part of HP's Finance and Investment Committee's "M&A Pipeline" was at a meeting some time later, on 25 May 2011.

(3) Mr Robison's account of his reliance on the slides was general and could not be tested in cross-examination. The Defendants acknowledged that Mr Robison's witness statement made various very specific claims about what he thought in relation to particular slides, and how he relied on them; but it is hard to believe that these were genuine recollections when his witness statement said that "*I do not recall now whether I received a copy of the presentation at the time.*" The Defendants submitted that this has all the hallmarks of forensic reconstruction; a concern heightened by the fact that so many of the witness statements for the Claimants were palpably over-lawyered. This is a matter that Dr Lynch would have wished to test in cross-examination; and given that Mr Robison did not attend to give evidence, they submitted that no weight should be placed on what he says on this topic.

(4) In any event, none of the Claimants' witnesses suggested that the March Slides continued to have any impact on their, or HP's thinking by the time that HP's board decided to proceed with the acquisition in August. It is implausible that the March Slides played any real part in that decision, so long later, and after further investigation and negotiations must in all likelihood have relegated the March Slides far to the background, if ever they had any real prominence at all.

3871. As in the context of the January and February Slides (see paragraphs 3852 and 3853 above), I have concluded on the issue of reliance that:

(1) Subject to (3) below and to paragraph 3872, it is unlikely that HP specifically focused on or called to mind any of the January and February and March Slides when it came to determining to bid;

(2) The representations made would not independently be actionable as such;

(3) The March Slides, and what Mr Robison described as the *"impressive picture of Autonomy's financial performance and business"* conveyed by them and Dr Lynch's *"compelling"* presentation of them, were nevertheless intended to influence and were in fact influential in reinforcing HP's overall impression of Autonomy as (a) a *"pure software model"* which, as such, was particularly attractive to HP and ultimately (to quote Mr Robison's evidence, which I accept in this regard) *"was important to HP and affected the price that HP was ultimately willing to pay, and did pay, for Autonomy"*; and (b) having two sizeable and growing revenue streams, IDOL Cloud and IDOL OEM, which were relatively predictable and recurring in nature and (especially in the case of IDOL OEM, a good indicator of the quality of Autonomy's technology).

3872. I accept HP's argument that the March Slides, like the January and February Slides, whetted HP's appetite and informed its approach (including the development of its Deal Model): they need to be seen as part of a continuum, over the course of which the information provided and the representations made by Autonomy gave HP a picture of a company and business with strong revenue streams and quality technology capable of

enabling HP to achieve Mr Apotheker's target of moving HP into the mainstream of the advanced software sector, and thereby transformational change.

*29 June 2011 meeting: the fourth set of alleged misrepresentations*

3873. A meeting on 29 June 2011 between HP and Autonomy representatives was held in London. This followed two earlier meetings, one between Dr Lynch and Mr Robison at the beginning of June and another a lunch meeting between Dr Lynch and Mr Apotheker in Paris in mid-June.

3874. At the earlier meeting on 2 June 2011, the focus had been largely on HP and in particular Mr Apotheker's and Mr Robison's vision of making what Dr Lynch stated in his first witness statement he was given to understand was *"a key strategic shift away from its existing low-margin, commoditised hardware business, towards high-margin software"*. Dr Lynch described that he left the 2 June meeting *"excited about* [Mr Robison's] *ideas"* and went on that this was:

> *"the first meeting where I believed it was possible that HP would make an offer for Autonomy. After the meeting, I reported to Mr Quattrone that the meeting had been productive, but I expected it would be a slow partnership."*

3875. Dr Lynch described his lunch meeting with Mr Apotheker in Paris on 16 June 2011 notably briefly in his first witness statement:

> *"We discussed at a high level whether there might be any possibility of combining the two companies. While it was a serious discussion, it was brief."*

3876. According to Dr Lynch in his first witness statement, the purpose of the meeting on 29 June 2011 was to meet with HP's corporate development, software and cloud services team to discuss how HP and Autonomy might be able to work together. HP's participants included Mr Robison, Mr Sarin, Mr Levadoux and Ms Breya, while Autonomy was represented by Dr Lynch, Mr Hussain, Mr Kanter and Dr Menell.

3877. Mr Robison sent lists of discussion topics and detailed questions to Dr Lynch in advance of the meeting. Mr Sarin and Mr Levadoux both made notes of the meeting, which Mr Sarin stated in his witness statement was characterised as a "partnership discussion" to minimise the chances of rumour or speculation about a purchase transaction.

3878. The Claimants contended that Dr Lynch made the following misrepresentations at the 29 June 2011 meeting:

> (1) According to Mr Sarin's evidence in his witness statement, Dr Lynch again described Autonomy as a "*pure software*" company. This was challenged in cross-examination, but Mr Sarin maintained that he distinctly recalled the phrase being used multiple times. It does not appear to have struck him at the time that this was of significance though: his notes made no mention of the phrase; and although in their written closing the Claimants suggested that Dr Lynch *"ultimately accepted that he had used the term"*, I understood his evidence rather to be that he explained Autonomy's model as a software business which was unusual in doing no material services.

(2) Dr Lynch said that Autonomy's OEM business was growing, and that it involved many other software companies incorporating IDOL into their own products, which made the IDOL platform ubiquitous. Mr Sarin's evidence to this end was not challenged, and Dr Lynch accepted that it was possible that he might have made the statements that Mr Sarin says he made. The Claimants reiterated their contention that what was stated about Autonomy's OEM business was false, because True IDOL OEM revenue was a fraction of that reported, and in decline.

(3) According to Mr Sarin's witness statement evidence, Dr Lynch also represented that:

> (a) Being royalty-based, the costs of Autonomy's IDOL OEM revenues were very low, so that the gross margins of Autonomy's IDOL OEM business were close to 100%; and

> (b) IDOL OEM produced a "*reliable income stream*", because the use of IDOL in other companies' software gave rise to a "*network effect*", which Mr Sarin explained in his witness statement:

>> "*refers to the increased value that a good or service has as its user base increases – the telephone, for example (like, say, PayPal or Facebook) became much more valuable to its users as the number of those users increased.*"

> (c) Mr Sarin added:

>> "*Autonomy described their OEM business as the glue in many companies' products; it was very 'sticky', in the sense that once a company started to use IDOL as a component of its own products, it became very difficult for the company to cease doing so.*"

3879. Mr Levadoux's notes (which he summarised in an email dated 1 July 2011 to Mr Robison and others, copying (amongst others) Mr Andy Johnson) echoed this:

(1) They suggested that Dr Lynch had represented that Autonomy's technology was

> "*very sticky, and even if many competitors OEM their technology, it would be very difficult for them (i.e. IBM/Lotus/Oracle, Adobe) to switch vendor*"; and

(2) They noted that the impression given was that:

> "*A core element of [Autonomy's] strategy is to scale by allowing others to build vertical apps on this platform (i.e. through OEMs). Focusing on being a platform business is also what allows them to be so profitable*".

3880. The Defendants suggested that Mr Sarin's witness statement "*was affected by the forensic process, rather than reliable recall*", that Mr Sarin's reference to Dr Lynch

having described Autonomy as a *"pure software company"* looked like a *"forensic afterthought"* and that he was especially *"muddled"* as to what truly had been discussed about the OEM line of business, and had perhaps forgotten that in reality there had only been discussions about the broad pattern of OEM business and not about gross margins or other detailed facets of it.

3881. It was put to Mr Sarin that his contemporaneous notes of the meeting showed that the discussion at the meeting was "*all in the context of barriers to entry. It wasn't a general discussion about OEM or the OEM business model*" and "*when you suggest there was specific discussion about OEMs, gross margins and that sort of thing*", it was "*a muddle on your part.*" This part of the cross-examination of Mr Sarin was uncharacteristically convoluted; and I was not persuaded that it achieved what I took to be its purpose of suggesting and showing that nothing of any materiality or specificity had been said about the OEM business. I agree with the Claimants that the Defendants' suggestion that the discussion centred only on *"barriers to entry"* was a distraction, because the (alleged) fact that competitors could not easily enter the market was precisely one of the things that was said to make IDOL OEM a "*reliable income stream*".

3882. Further, the suggestion that a discussion about barriers to entry was not also a discussion about the reliability or profitability of IDOL OEM revenue is belied by the way Dr Lynch explained the concept in other contexts. For example, Dr Lynch explained on the Q1 2008 earnings call that:

> "*The OEMs market is very important for us because it allows penetration of the IDOL technology into many different areas without us having to write those applications, and it produces a very strong network effect*";

and in the Q3 2010 Quarterly Report, Dr Lynch said:

> "*The continued strong growth in our IDOL OEM revenues is both a further endorsement of the unique capabilities of IDOL and reflects a growing network effect as more software companies choose to design their products with Autonomy inside*".

3883. Moreover, the specific point about high gross margins recalled by Mr Sarin is also echoed in Mr Levadoux's notes:

> "*A core element of [Autonomy's] strategy is to scale <u>by allowing others to build vertical apps on this platform (i.e. through OEMs). Focusing on being a platform business is also what allows them to be so profitable</u>*" (emphasis added).

3884. In any event, as Mr Sarin pointed out in cross-examination, what he described Dr Lynch as saying about Autonomy's OEM business during the 29 June meeting was consistent with how Autonomy described its OEM business in the Q1 Quarterly Report, "*which we had read by this time*", and later in the Q2 2011 Quarterly Report. Indeed, the claim about near-100% gross margins on royalties was in the March Slides.

3885. Bringing this together:

(1) I consider it more likely than not, and therefore find, that Dr Lynch did refer to Autonomy as a *"pure software company"*, that the meaning that Mr Apotheker and others at HP (including Mr Robison) took from the phrase was the meaning adumbrated in paragraph 3865(2) above, and that this did encourage HP because it was through acquisition of a strong specialised *"pure software company"* having no need for or dependence on other revenue streams that Mr Apotheker planned to effect "transformational change" for HP.

(2) The main focus of the meeting appears to have been on the special value and attraction of Autonomy's (a) IDOL technology and (b) OEM business as a reliable income stream with incremental prospects because of a *"network effect"*.

(3) The overall effect was to reinforce the message that Autonomy was a strong software-focused business with ground-breaking technology, as indeed Mr Sarin stated in his witness statement. There is no dispute about the enthusiasm it engendered in HP: Mr Robison wrote that evening to Mr Apotheker referring to a *"REALLY good meeting today"* and Mr Apotheker confirmed his and Mr Robison's considerable enthusiasm for the potential deal by that stage.

3886. The Claimants did not allege that the ground-breaking potential of Autonomy's IDOL technology was exaggerated; however, I have concluded in the context of the OEM Claim that the nature of Autonomy's OEM business was misrepresented and its success and growth was inflated in its accounts, to the knowledge of both Defendants.

3887. Once again, I doubt that anything said at the 29 June 2011 meeting can plausibly be said to have induced the acquisition, other than in the general sense of encouraging HP's continuing interest and enthusiasm. The influence the meeting had was more general than specific: a purchase was not by then yet a real prospect and I doubt that the representations made were specifically called to the mind of those who eventually directed HP/Bidco to make a bid. However, (and like the January, February and (most especially) the March Slides), they were intended to and did encourage and inform HP as it worked towards the decision to bid, and in its work in developing and refining the Deal Model which eventually provided the parameters for agreement of a bid price.

3888. In other words, like the earlier slides, the representations made at the 29 June 2011 meeting were an important element of the continuum which eventually informed the bid and ultimately induced HP to purchase Autonomy at a considerable premium.

3889. I return to the issue of reliance in the context of these deceit/misrepresentation claims in paragraphs 3979 to 3988 below.

*29 July 2011 meeting and its background: the fifth set of alleged misrepresentations*

3890. On Friday, 29 July 2011, what HP described as the second set-piece meeting between HP and Autonomy took place at the Berkeley Hotel in London. No NDA was yet in place. HP was represented by Mr Robison, Mr Sarin, Ms Breya and Mr Levadoux. Autonomy was again represented by Dr Lynch, Mr Hussain, Mr Kanter and Dr Menell. The primary purpose of the meeting was to discuss the approach to and intended process

of due diligence. In cross-examination Mr Sarin accepted that it was agreed at the meeting that Autonomy would not be providing substantive information: it would be about process, the process by which information would be provided.

3891.  The immediate background to the 29 July 2011 meeting was a meeting the previous day between Mr Apotheker, Mr Robison and Dr Lynch in Deauville. It was at that meeting on 28 July 2011 that a bid price was discussed for the first time although the Claimants had begun developing an early version of a discounted cash flow ("DCF") model (which became "the Deal Model") to try to determine the standalone value of Autonomy some time earlier (in early February 2011).

3892.  Dr Lynch told me in cross-examination that until then he had thought a bid possible but not probable; but as from 29 July 2011 Autonomy was clearly *"in play"*. HP had even pencilled in and was targeting an announcement of acquisition on 18 August 2011 (leaving a short time for due diligence)[517].

3893.  Dr Lynch had been pressing for £27 per share. He, Mr Apotheker and Mr Robison had agreed that if HP was to acquire Autonomy, HP would need to offer a price in an agreed range. Dr Lynch's initial recollection was that this range was between £25.50 and £26.50 per share, but it now appears to be common ground that the range in fact agreed was between £24.94 (which was precisely a 45% premium over the previous end-day closing price of £17.20) and £26.94 per share (representing a premium of 57% over the previous evening's closing price). Those latter figures were as stated in a draft indicative offer letter sent by HP to Autonomy the next day (29 July 2011). Having reached agreement on range of price, HP and Autonomy agreed to proceed to due diligence.

3894.  The 29 July 2011 meeting was thus a new stage: a bid was by then on the cards, and it is plausible to assume (and intend) that the final decision and negotiations to fix on a final bid price would be influenced by subsequent details provided, and the due diligence process which had been agreed.

3895.  The Claimants alleged that two representations were made at or arose from the 29 July 2011 meeting: one in the course of the meeting itself, and the other in a table that the Defendants agreed at the meeting to provide:

(1)  Mr Sarin's evidence was that at the meeting, Mr Hussain *"told us that HP should rely on Autonomy's publicly available financial information"*. Both what was actually said and what was intended to be and understood to be conveyed by this was disputed.

(2)  Second, it is common ground that following discussions at the meeting, Mr Hussain, with the assistance of Mr Kanter, prepared a table in response to item III(A)(3) on the Tesla Question List, which was uploaded to the Data Room. The table set out quarterly revenue figures by product category for the period Q1 2009 to Q2 2011. Those figures matched, and were expressly said to derive from, Autonomy's quarterly earnings releases.

---

[517] Dr Lynch told me in cross-examination that he did not think *"anyone in their right mind expected to do the deal on 18 August."* He added: *"I now know why they had to do it on the 18th, but I didn't at the time…I've never seen a deal done at this speed."*

3896. As to (1) above, the Claimants alleged that what Mr Hussain said *"constituted an implied representation by Lynch and Hussain that Autonomy's published information was accurate and not misleading."*

3897. The Claimants' case is that by telling HP to rely on Autonomy's publicly available financial information, and by uploading the table to the data room in response to HP's due diligence question, Mr Hussain – and Dr Lynch, through his acquiescence – represented that in each case that information was complete, accurate, and not misleading.

3898. The Defendants did not accept this, and contended that this was not what was said or intended:

(1) Mr Sarin had a list of due diligence questions, and there was a discussion about how the answers would be provided, or where they could be found. In relation to some of those questions, he wrote "Doc" on his list. He explained what that meant in cross-examination:

> *"Q. It was being explained to you, wasn't it, by -- it was Mr Hussain who was talking at that point and he was explaining to you, wasn't he, that much of the information about these things was in the published material?*
>
> *A. Much of the basic financial information was in the published material, yes."*

The Defendants submitted that in this passage, "*these things*" is a reference to the points where he had written "Doc" on his list and that it was not some general statement by Mr Hussain that HP should rely on Autonomy's published information, nor would it have been taken as such by any reasonable person hearing what Mr Hussain said.[518]

(2) Secondly, Mr Hussain submitted that all that he had said, and was understood to have said, and certainly all he had meant, was that much of the information that HP had requested was available from the published material. In other words, he was not doing, or not intending to do, more than directing HP to where information would be available, without confirming its accuracy, still less warranting it. In any event, if (contrary to this) any representation was to be implied, his alternative position was that it would have been limited to Mr Hussain's belief that Autonomy's published information was accurate and not misleading: and, he maintained, any such representation would have been true.

(3) Thirdly, for his part, Dr Lynch emphasised that he made no such statement, nor should such a statement be attributed to him., and that Mr Hussain was not acting as his agent. HP argued that Dr Lynch through his silence demonstrated acquiescence and adopted Mr Hussain's statement. But Dr Lynch countered that

---

[518] See *Property Alliance Group Ltd v Royal Bank of Scotland plc* [2018] 1 WLR 329 (CA) citing Toulson J (as he then was) in *IFE Fund SA v Goldman Sachs International* [2007] 1 Lloyd's Rep 264 , para 50, (quoted in paragraph 3907 below).

silence does not ordinarily give rise to liability in deceit or misrepresentation;[519] that HP did not identify any legal obligation on Dr Lynch to correct or qualify anything said by Mr Hussain; and that Dr Lynch was not subject to any duty of disclosure.

(4) Fourthly, Dr Lynch contended that the Claimants did not in fact rely on the fact that he said nothing at this point. If they had wanted any assurance from Dr Lynch about the content of Autonomy's published information, they could have asked him directly: indeed, they could have requested a warranty from him as to the accuracy of Autonomy's accounts (something they never did). While Mr Sarin stated in his witness statement that Dr Lynch did not disagree with Mr Hussain's comment about the published information, he did not say that he paid any attention to – let alone relied on – Dr Lynch's silence. And as already noted, Mr Sarin played no part in the decision making process.

(5) Fifthly, Dr Lynch submitted that there was no actionable representation by him (and there was certainly no representation made to Bidco or its agent), but that even if there had been, the representation could have been no more than that he believed the published information to be accurate, which he did. He also had reasonable grounds to do so. Accordingly, the alleged representation would not give rise to liability, either in deceit or under s. 2(1).

3899. Although an issue of law may arise, which I discuss below, the primary question is one of fact, as to what was actually said and what was meant. Neither HP nor the Defendants were very clear on important details: for example, although Mr Sarin's evidence was that *"Dr Lynch did not disagree"* with Mr Hussain's statement, he did not actually state that Dr Lynch was there, or what the context was from which it was said to be apparent that Dr Lynch *"did not disagree"*. Further, the statement which Mr Sarin attributed to Mr Hussain that *"HP should rely on Autonomy's publicly available information"* was imprecise, as the present dispute as to its meaning shows: a direct quotation might have given more of an insight as to whether Mr Hussain was simply informing HP about a useful source, or indicating that what was stated was true and correct and need not further be assessed. Mr Sarin did not even in his witness statement confirm exactly what he understood Mr Hussain to mean, nor did he give any explanation as to why he had concluded that Dr Lynch understood what was said to have meant that Mr Hussain was verifying the published information (rather than identifying a source of information to be verified by HP).

3900. Indeed, although the Claimants' written closing submissions stated that Mr Hussain had made the relevant statement to HP *"in Dr Lynch's presence"* and cited Mr Sarin's witness statement in support, Mr Sarin did not actually say that, although there is some basis for an inference that Dr Lynch was present from Mr Sarin's evidence that the statement was made when going through with Dr Lynch and Messrs Hussain and Kanter and Dr Menell for that purpose what was called the *"Tesla Question List"*.

---

[519] <u>Clerk & Lindsell on Torts</u> (22nd Ed, 2017), §18-06. And bearing in mind that this is alleged to have been an *implied* representation, see *Marme Inversiones v NatWest* at §123: "*a number of principles can be distilled from these authorities: (1) First, it is possible for a representation to be made expressly or impliedly through words or conduct. <u>For a representation to be implied, silence or mere assumption is not usually enough as there is no general duty of disclosure</u>.*"

3901. As so often in this hugely detailed case, the finer details are nevertheless lacking or elusive. Once again, the difficulty in determining what was said, and more especially its nuances, is made very difficult by the absence of Mr Hussain, who therefore could not be tested on either. Mr Kanter might have assisted me: but he withdrew and was not cross-examined: and the same applies in respect of Dr Menell.

3902. Dr Lynch himself did not expressly deny that the statement had been made. He did not assert that he did not hear it being made. He was, as it struck me, uncharacteristically wary when he was cross-examined. The following passages serves to illustrate this:

> "Q.   So where information could be found in publicly available documents, you wanted HP to rely on that information, correct?
>
> A.   As I recall, Mr Robison was the person who first decided that a lot of the work could be done off of public documents, but we were happy for that to be a starting point.
>
> ...
>
> Q.   Now, Mr Sarin's evidence is that in the meeting Mr Hussain said that HP should rely on Autonomy's published information. You don't deny that in your pleadings. Is that because you don't remember it or you have no recollection of it?
>
> A.   I think it was a generally accepted term, but, as I say, I remember Mr Robison bringing it up and I wasn't in all the meetings anyway.
>
> Q.   You didn't disagree with what Mr Hussain said when he said that HP should rely on Autonomy's published information?
>
> A.   I don't know about the technicalities of "rely" from a legal sense but obviously I would expect HP to read all the public information.
>
> Q.   But you didn't disagree with what Mr Hussain said when he said to you...
>
> A.   I wouldn't disagree that it was a good idea to go and read all the public information, along with all the analyst reports, everything you could get your hands on.
>
> Q.   It would have been obvious to you, Dr Lynch, that when HP was told to rely on that information, HP would understand that it was being told that that information was accurate and not misleading?
>
> A.   A couple of things here. So first of all, I do believe that information was accurate, not misleading, but secondly, it's not for us to tell HP how to do its due diligence. Under the UK system they can request whatever information they want to request. We then decide whether to give that

> *information. We can't tell HP how it needs to arrive at its decision or what process it needs to do, it must make those decisions itself.*
>
> Q.    *When you tell them or when Mr Hussain says to them "You should rely on Autonomy's published information", you would have understood that HP would have understood from that that they were also being told that the published information was accurate and not misleading?*
>
> A.    *I believe that the public information was accurate."*

3903.   In addition to the questions of fact raised, it is necessary to consider certain authorities referred to by the Claimants as to the effect of a person making reference in this way to public information as the answer to enquiries. These can conveniently be dealt with now.

3904.   The Claimants cited *Webster v Liddington* [2015] 1 All ER (Comm) 427 in the Court of Appeal at [46][520], where Jackson LJ (with whom Briggs LJ and Christopher Clarke LJ both agreed) gave examples of possible "scenarios" in which, absent a contractual warranty, a person had passed on information produced by someone else, and how these might variously be regarded as him having (i) adopted the information as his own; (ii) represented that he has reasonable grounds to believe the information; or (iii) simply passed on information about which he has no personal knowledge or belief. The Claimants submitted that this is not a case that can plausibly fall into the third category: Dr Lynch and Mr Hussain were, respectively, the CEO and CFO of Autonomy, and had personally approved Autonomy's published financial results. Indeed, this was not information produced by someone else at all: it was their information and in passing it on they endorsed its truth and accuracy.

3905.   The Claimants argued further that implicit in any representations Mr Hussain made about figures or statements made in the accounts was that so far as he was aware those figures and statements could be relied on as giving a true and fair view: and see *MAN v Freightliner* [2005] EWHC 2347 (Comm).

3906.   Mr Hussain's case was that all he said, and was understood to have said, was that much of the information that HP had requested was available from the published material; in his RRAD he pleaded that he merely "passed on" information and that his references to information being in Autonomy's financial reports *"amounted, at most, to a representation that those sources contained the relevant figures* [or statement]*, but not that those figures* [or statement] *were accurate"*. His statement was in the nature of giving directions as to whereabouts, and not any warranty of the accuracy of what was then found. In any event, Mr Hussain contended that any representation would have been limited to his belief that Autonomy's published financial information was accurate and not misleading: and that each was true.

---

[520] In *Webster v Liddington* [2015] 1 All ER (Comm) 427 the defendants/appellants were qualified clinicians who handed a lay patient a brochure prepared by another which described the treatment which the clinician was offering to carry out. It was held at trial and confirmed by the Court of Appeal that the defendant clinicians, in handing over the brochure, adopted its contents and impliedly represented them to be accurate, even though the brochure was not, as it were, his document.

3907. As Jackson LJ acknowledged in *Webster v Liddington,* those scenarios are not a complete statement of the range of possibilities and there are other intermediate positions. They are simply illustrations of the more general proposition explained by Toulson J (as he then was) in *IFE Fund SA v Goldman Sachs International* [2006] EWHC 2887 (Comm), [2007] 1 Lloyd's Rep 264[521] at [50] and approved by Jackson LJ in *Webster v Liddington* that:

> "*In determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used. In determining what, if any, implied representation has been made, the court has to perform a similar task, except that it has to consider what a reasonable person would have inferred was being implicitly represented by the representor's words and conduct in their context.*"[522]

3908. What is required, therefore, at the first stage is not an assessment of which of the scenarios identified in *Webster v Liddington* most nearly equates to the position (as the Claimants appeared to suggest) but what in all the circumstances a reasonable person would have been likely to infer from Mr Hussain's references to the information sought by HP being available in Autonomy's published information, which it may be added, so far as it concerned financial information about Autonomy, was prepared by or under the aegis of Mr Hussain himself. I say "the first stage" because it seems to me that, having determined what the statement was taken to mean by the addressee, it is then necessary to determine whether that is the meaning which was intended by the addressor (and see *Arkwright v Newbold* and paragraph 466 of the Introduction).

3909. I turn to my assessment of the factual issue as to the received and intended meaning and effect of Mr Hussain's disputed statement referring HP to Autonomy's published information.

3910. I accept that a major part of the meeting was simply an exercise in assisting HP to understand where information might be found; and I note that Mr Sarin himself accepted in cross-examination that:

> (1) As mentioned in paragraph 3890 above, the 29 July meeting was about the process by which information would be provided, and Autonomy would not be providing any substantive information (not least because no Non-Disclosure Agreement was yet in place).

---

[521] An appeal from that decision was dismissed by the Court of Appeal [2007] EWCA Civ 811, [2007] 2 Lloyd's Rep 449

[522] In *IFE Fund SA v Goldman Sachs International*, Goldman Sachs had sent on a Syndicate Information Memorandum ("SIM") to IFE which IFE stated it had relied on in proceeding with an acquisition and which turned out to be false. The SIM was not prepared by Goldman Sachs but by a third party, and it contained express written disclaimers including that Goldman Sachs had not independently verified the information in the SIM. Toulson J did not accept IFE's case that Goldman Sachs was making an implied representation that it was unaware of any facts showing that the information was or might be materially incorrect (even though in fact Goldman Sachs had been advised by Arthur Andersen of some inaccuracies).

(2) At the meeting, those concerned simply went through the *"Tesla Question List"*[523] together and annotated the list to identify where the information requested might be found and/or its source.

(3) The answer in many cases was "the published information"; but all that was expressly said was to the effect that *"much of the information about these things was in the published information."*

3911. It is unsatisfactory to have to determine the first factual question, as to what Mr Hussain actually said, without having the benefit of any evidence from him. I take it that he would have denied having said, or having intended to be understood as saying, anything more than that for many of the questions which would arise in the course of the due diligence process HP should look first for the answer in the published information. I shall proceed on the factual premise that this was all that he did say or intended to say. I doubt that Mr Hussain would have intentionally expressed himself in such a way as to appear to be confirming, still less warranting, the accuracy of what was set out in the material. After all, the published information carried its own warranty of truth and accuracy, to the best of the issuer's knowledge and belief.

3912. The next question is what was conveyed by what I have determined he said. I consider that HP would have assumed that he was not aware at that time of anything material that he knew was not in that material and undermined its reliability.

3913. Then the question is whether Mr Hussain would have intended that to be what was conveyed. In my judgment, Mr Hussain, with what he knew of the quick time table and the constraints it imposed on the due diligence process, must have expected and intended that in referring HP to the published information as its first source (see above) he was conveying to them that he did not himself know of financial and other information which was material and undermined the reliability of that primary source.

3914. I have concluded, despite the lack of direct evidence, that Dr Lynch was present and aware of whatever it was that Mr Hussain said. He did not say he was not, despite being given every opportunity to do so when cross-examined: it seemed to me that in his cross-examination he deliberately stepped away from suggesting that he was not. Having the same appreciation as Mr Hussain of the constraints on the due diligence process, and with the knowledge he had, Dr Lynch would have expected HP to take what was being conveyed as being that Mr Hussain was not aware at that time of anything material that he knew was not in that material and undermined its reliability; and that he would have shared Mr Hussain's intention that HP should do so (as I find he did).

3915. On the basis of my previous conclusions that Mr Hussain and Dr Lynch had "guilty knowledge" that (a) the accounting treatment of important aspects of Autonomy's business was improper and gave a false impression of the true position and performance of Autonomy and (b) the nature and amount of an important part of the revenue attributed to the software sales had been generated over the course of the Relevant Period by hardware reselling, and that this and a significant proportion of the costs of it had been concealed or disguised, both would have known that HP were being directed to an unreliable source.

---

[523] Tesla being the code name for Autonomy at that time

3916. Whilst of course I accept that ordinarily there is no duty to speak, in the particular circumstances, Dr Lynch was there to represent Autonomy as its CEO in assisting HP in proceeding with the process of due diligence, and Mr Hussain was there as CFO to assist HP; Dr Lynch shares responsibility with Mr Hussain for the latter having led them to what I have determined he knew was a misleading source and implicitly encouraged them to rely on it.

3917. At least in the case of Mr Hussain, I consider that I am reinforced in this assessment by the table which, after the discussions at the 29 July 2011 meeting, Mr Hussain prepared with the assistance of Mr Kanter (and see paragraph 3895(2) above). This table, which was in response to part of the *"Tesla Question List"*, set out quarterly revenue figures by product category for the period Q1 2009 to Q2 2011 (and was uploaded to the Data Room). Those figures matched, and were expressly stated to derive from, Autonomy's quarterly earnings releases. Of particular note is that no mention was made of hardware sales. Neither of the Defendants addressed this point.

3918. In my view, and I find, Mr Hussain, in presenting this material and causing it to be uploaded to the Data Room for the purpose of the due diligence exercise, would have been taken to and did represent that he believed, as CFO, that the information given was complete, accurate and not misleading; and the table gave a misleading impression by omitting any reference to hardware sales.

3919. I have also concluded that Mr Hussain knew that he was representing that the information to which he directed HP, and that which he provided in the table he produced after the meeting with the assistance of Mr Kanter, was true and accurate to the best of his belief.

3920. However, no evidence was provided sufficient to establish that Dr Lynch was involved in either the compilation or presentation of the table: and I find that he was not involved in either. That does not, however, cause me to change my overall conclusion that he knew and intended that what was represented by Mr Hussain was done so with his endorsement.

**Alleged misrepresentations in the course of due diligence 1 August 2011 to 18 August 2011**

*Overview*

3921. I have described in the Introduction to this judgment the process of due diligence which took place between 1 August 2011 and 18 August 2011. It may be recalled that Dr Lynch, for his part, sought to impugn HP's conduct of due diligence as rushed, and suggested that HP cut corners, failing to obtain information – most strikingly, Deloitte's work papers – that would have been provided had HP not gone ahead and announced the acquisition on 18 August 2011, and revealed some of the matters that the Claimants complain about. By contrast, the Claimants submitted that those claims were not only factually wrong but also irrelevant as a matter of law, since it is trite law that it is no defence to a fraud claim that the victim should have discovered the truth, or even that he was careless in not doing so.

3922. I return to the process of due diligence now to address the Claimants' separate contention that Mr Hussain made a number of misrepresentations in the course of certain due

diligence calls on which HP also relied in proceeding with the Acquisition, in particular, in the course of telephone calls as part of the process on 1, 2 and 4 August 2011.

3923. In addressing the three sets of misrepresentations (the sixth, seventh and eighth sets) alleged to have been made in the course of due diligence calls on 1, 2 and 4 August 2011, I focus first on whether there was any misrepresentation in each case. I address the issue of reliance compositely at the end of this section since it seems to me to be artificial not to look at them together and in the round.

*1 August 2011 due diligence call: the sixth set of alleged misrepresentations*

3924. On a "finance overview" due diligence call held on 1 August 2011, Mr Hussain gave an overview of the business and presented Autonomy's Q2 2011 results. The Claimants alleged that in doing so he made a series of misrepresentations, all of which were recorded in a contemporaneous note of the meeting made by Rob Binns ("Mr Binns") of HP, and were also described by Mr Sarin to the same effect in his witness statement (which was not challenged in this regard).

3925. Mr Binns noted that Mr Hussain made the following representations in his overview of Autonomy's business:

(1) Autonomy's gross margin range was 87%–90%, and its operating margin range was 42%-50%.

(2) Although Autonomy's accounts were drawn up in compliance with *"IFRS not US GAAP"*, revenue-recognition policy was *"closely aligned to US GAAP"* (though I note that this may refer only to Interwoven since it was explained as being *"due to prior US listing"*).

(3) Autonomy's COGS included support costs, managed service data centre hosting costs, and *"very little 3P [third-party] royalty costs"*.

(4) The market consensus forecast for Autonomy's 2011 revenue was $1.06 billion.

3926. The Claimants alleged that each of these representations was false. According to the Claimants:

(1) If all hardware costs were allocated to COGS as the Claimants contended they should have been, and none to sales and marketing, Autonomy's reported gross margin (on the adjusted basis reported by Autonomy) would have been 83.3% in 2009, 83.6% in 2010 and 86.7% in H1 2011. (The unadjusted IFRS measures were substantially lower.)

(2) According to the Claimants, Autonomy's revenue recognition policy and practice did not meet even the less prescriptive IFRS standards.

(3) Mr Hussain's statement as to COGS made no mention of hardware costs, which even after Autonomy's wrongful inclusion of large parts of those costs in sales and marketing expenses still represented very large proportions of Autonomy's reported COGS: 37.7% of COGS in 2009 ($33.1 million of $87.7 million reported); 73.2% in 2010 ($81.7 million of $111.5 million reported); and 69% in H1 2011 ($40.4 million out of $58.6 million reported).

(4) Mr Hussain's statement as to the market consensus forecast for 2011 of revenues of $1.06 billion amounted to an implied representation that there were reasonable grounds for that consensus, which was false because that consensus was based on false and misleading historical financial statements.

3927. The Claimants also alleged that in presenting Autonomy's Q2 2011 results, Mr Hussain further impliedly represented that they were complete, accurate and not misleading, but that he well knew that they were not. According to the Claimants:

(1) As a result of false accounting, the Q2 2011 Quarterly Report included numerous incorrect and misleading metrics. They included those set out, with what the Claimants presented as the corresponding True metrics, in the following table (though it is to be noted that when I assess quantum the figures will have to be further adjusted to strip out claims in which the Claimants have not succeeded as identified for like purposes in paragraph 3863(1) above).

| Metric | Stated figure | True figure |
|---|---|---|
| Q2 2011 total revenue | $256.3 million *pages 1, 3, 9, 16* | $211.3 million ($190.5 million excl. pure hardware) [524] |
| Q2 2011 IDOL Cloud revenue | $64.3 million *page 3* | $49.1 million[525] |
| Q2 2011 IDOL OEM revenue | $47.2 million *page 3* | $3.8 million[526] |
| Q2 2011 IDOL OEM year-on-year growth | 26% *page 3* | (60%) from $9.6 million to $3.8 million[527] |
| H1 2011 total revenue | $476 million *pages 2, 3, 9, 16* | $388.9 million ($348 million excl pure hardware)[528] |
| H1 2011 IDOL Cloud revenue | $117 million *page 3* | $78.2 million[529] |
| H1 2011 IDOL OEM revenue | $84.3 million *page 3* | $7.5 million[530] |

---

[524] Cross-check Q2 2011 revenue is the same as the True Position revenue to the nearest $0.1 million.
[525] Cross-check Q2 2011 IDOL Cloud revenue is $43.6 million.
[526] Cross-check Q2 2011 IDOL OEM revenue is the same as the True Position revenue.
[527] Cross-check Q2 2011 IDOL OEM year-on-year growth of (64%) i.e. a 64% decline ($10.6 million to $3.8 million).
[528] Cross-check H1 2011 total revenue of the same.
[529] Cross-check H1 2011 IDOL Cloud revenue of $75.6 million.
[530] Cross-check H1 2011 IDOL Cloud revenue of $75.6 million.

| Metric | Stated figure | True figure |
|---|---|---|
| H1 2011 IDOL OEM year-on-year growth | 27% *page 3* | (44%) from $13.5 million to $7.5 million[531] |

(2) The Autonomy group's adjusted gross margin was said to be 88% in H1 2011 and 87% in Q2 2011. The True figures (correcting only for the treatment of hardware costs) were 86.7% and 86.2% respectively.

(3) The Q2 2011 Quarterly Report also repeated, on pages 3 and 4, the claim that Autonomy operated a "*pure software*" model, which the Claimants alleged was false as previously explained and addressed above.

3928. As previously mentioned, Mr Hussain pleaded and contended as a general matter that all that he was doing in "presenting" the Q2 2011 Quarterly Report and results was telling HP that there was information available in the public domain, on which HP could take its own view: his presentation added nothing, and no-one on the call could have thought that he was making any kind of personal representation. I have not accepted that general defence in the context of the 29 July 2011 meeting, and the position is in my view clearer in the present context, after due diligence had started, and matters had progressed from the preparatory stage to the substantive stage.

3929. In my view, and I find, when making statements in the course of the due diligence exercise about Autonomy's financial information, or in repeating or paraphrasing what was said about Autonomy's financial position and performance in published information for which he had, or shared, responsibility, he was not only passing on information: I consider it would have been naturally supposed by his audience, as he must have been aware and intended, that, as CFO with responsibility in that context, he believed and was satisfied that the information thus conveyed was accurate, and not untrue or misleading.

3930. I also agree with the Claimants that implicit in any representations he made about figures or statements made in the accounts was that he believed that those figures and statements could be relied on as giving a true and fair view: and see *MAN v Freightliner*.

3931. As to the particular misrepresentations alleged, Mr Hussain responded:

(1) The gross margin percentage range he had referred to accurately reflected Autonomy's published information, which he believed had been prepared in accordance with IFRS and vetted by Deloitte (including in relation to the allocation of part of the costs of hardware reselling to sales and marketing rather than COGS). Furthermore, it was the evidence of Mr Bloomer, as the chairman of the Audit Committee, that fluctuations in Autonomy's margins within a handful of percentage points would not have had a significant effect on

---

[531] Cross-check H1 2011 IDOL OEM year-on-year growth of (48%) i.e. a 48% decline ($14.5 million to $7.5 million).

investors' perception of Autonomy or its market valuation.[532] In the quarter in question (Q2 2011), even on the Claimants' case the adjustment required to correct the alleged misallocation of hardware costs in the quarter was immaterial (Autonomy reported adjusted gross margin of 88% in H1 2011 and 87% in Q2 2011, whereas the Claimants' 'correction' resulted in figures of 87.6% and 86.2% respectively).

(2) Anything that Mr Hussain had said about Autonomy's revenue recognition being closely aligned to US GAAP was (at most) a comment on Autonomy's accounting policies. It was not on its face any kind of representation about the accounting treatment of individual transactions.

(3) As to the impression alleged to have been created by the omission from the description of COGS of any significant hardware costs that there were none, Mr Hussain contended that:

(a) The description given was not, on its face, concerned with the proportionate monetary contribution of the various types of costs included in COGS;

(b) HP knew of at least Autonomy's sales of appliances and therefore that its COGS did include some hardware costs;

(c) It was open to Mr Sarin to ask questions to explore the costs of appliance sales or other sales but he did not do so because he had not taken what was said as a representation as alleged.

(4) Mr Hussain's reference to the market consensus forecast for Autonomy's 2011 revenue of $1.06 billion was not a representation that there were reasonable grounds for such consensus, nor any additional warranty of the accuracy of the published information: he was simply pointing out the availability of the public information and he believed that Autonomy's published information was accurate.

(5) In any event, no reliance had been demonstrated, in particular because:

(a) No evidence had been led to show that Mr Sarin, who was not a decision-maker, had reported this alleged representation to anyone who was; and

(b) Mr Sarin accepted without equivocation in his cross-examination that no buyer would ever rely on the target's evaluations.

3932. As to (1) above, even if (as I would accept is likely) the gross margin percentage range Mr Hussain gave did accurately reflect Autonomy's published information, and even if (as I would accept) Mr Hussain was aware that Deloitte had vetted the accounts, Mr Hussain knew there to be material information which falsified the figures given and nullified the fact of apparent approval by Deloitte.

---

[532] Mr Bloomer explained: *"If you compare Autonomy to a company that operates on very tight margins, such as a supermarket, the impact of reported margins is very different. A supermarket...might have margins of 2-3%. In a business like that, a 1-2% fall is very significant. For a company with margins around 80% or 90% that fluctuated by a few percentage points up and down every quarter, movements in margin are less relevant"*

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

3933. As to (2), Mr Hussain's reference to Autonomy's revenue recognition being closely aligned to US GAAP, even if ostensibly only a comment on Autonomy's accounting policies, would have been known by him to be untrue, in that the way Autonomy accounted for VAR sales was radically different than that required under US GAAP: and indeed it was only the difference which enabled the use of VAR sales as an improper means of accelerated revenue recognition. That strategy would have been impossible under US GAAP.

3934. As to (3) in paragraph 3931 above, I consider and find, that Mr Hussain's continued adoption by reference of Autonomy's treatment of COGS in its financial statements and published information, was or amounted to a misrepresentation as to there being no material hardware sales, which was false.

3935. I cannot accept Mr Hussain's point in 3931(4) above either. On the basis of my previous findings, Mr Hussain knew that market consensus figures were derived from incorrect figures in Autonomy's financial statements.

3936. As explained above, I address paragraph 3931(5) above later, taking together all the allegations in respect of alleged misrepresentations in the course of due diligence. I also address later the dispute as to the extent of any involvement by and knowledge of Dr Lynch in the due diligence process as a whole, after considering the seventh and eight set of alleged misrepresentations and the due diligence calls on 2 August 2011 and 4 August 2011 during the course of which the Claimants contended they were made.

3937. Thus, in my judgment, Mr Hussain misled HP during the 1 August 2011 due diligence call in each of the respects alleged.

*2 August 2011 due diligence call*

3938. The seventh set of alleged misrepresentations was made during the second financial due diligence call, held on 2 August 2011. This call addressed Autonomy's business model, revenue streams, revenue recognition practices and tax policies.

3939. HP had sent questions to Autonomy in advance. Mr Johnson, Mr Sarin and others attended for HP, together with representatives of BarCap, Perella and KPMG (including Mr Gersh). Notes were taken by Mr Sarin (on his copy of HP's questions) and by Mr Murali of BarCap. Mr Sarin's unchallenged evidence was that it was Mr Hussain who addressed most of HP's questions. The Claimants alleged that Mr Hussain made two misrepresentations in the course of the call.

3940. The first alleged misrepresentation arose from Mr Hussain's response to the first of the questions provided in advance by HP:

> *"1. Describe your sales model by product or vertical (i.e., hosted vs. SaaS vs. on-premise license vs. OEM vs. appliance). For each, describe the standard elements in each arrangement by sales model and how revenue is recognized with each.*

>    *a. Do all or only certain arrangements include license, maintenance, professional services or hosting/subscription?*
>
>    *b. Include discussion of how each element in the agreement is priced (i.e., % of license, users, cost per seat/node etc.)"*

3941.  Mr Sarin explained his thinking and objective in asking this question as follows:

>    *"In short, we were asking Mr Hussain to describe Autonomy's business by product, so that we could understand the revenue streams associated with each of these products. The request was intended to be broad. We were looking to elicit information from Autonomy, and Mr Hussain in particular, about everything that Autonomy sold (whether referred to in Autonomy's public filings or not) and wanted to know how revenue was recognized in relation to each revenue stream. We wanted to understand the full picture around Autonomy's revenues."*

3942.  Mr Gersh (who had been involved with KPMG in putting the question list together) explained his thinking behind the questions as follows:

>    *"The question [list] was intentionally broad ... [It] did not exclude (and was not intended to exclude) any particular product or type of sale or any element of Autonomy's business. We wanted to gain a broad understanding of Autonomy's sales model and how different types of revenue were recognized because revenue recognition differences between IFRS (which Autonomy used) and US GAAP (which HP used) might impact the business after an acquisition."*

3943.  Both Mr Sarin and Mr Gersh gave evidence that Mr Hussain's answer to HP's question made no reference to the pure hardware sales that had made up more than 10% of all Autonomy's reported revenues (and a larger percentage of what the Claimants recalculated and presented as being its "True revenues") over the preceding eight quarters. Thus:

    (1)  Mr Sarin stated:

>    *"We knew about Autonomy's appliance sales, which Autonomy described as a small part of its business, where customers had an urgent need to deploy IDOL, involving a pre-installed license on appropriate hardware, and which was said to be conducted at a margin not widely dissimilar to Autonomy's license business. However, we knew, and were told, nothing about any sales by Autonomy of third-party hardware without any Autonomy software ..."*

    (2)  Mr Gersh's evidence on this aspect was as follows:

>    *"I recall that Question 1 was asked on the August 2 call. As I explained to the jury in Mr. Hussain's criminal trial, if Autonomy was reselling any significant amount of hardware as an element of its contracts (with pre-loaded software or as standalone hardware), I would have expected Mr. Hussain or others in*

> *Autonomy management on the call to disclose and discuss any such*
> *arrangements in response to Question 1. They did not."*

3944. During the US criminal trial Mr Gersh was asked whether he recalled that "*as a part of the response to Question 1 ... Mr Hussain said that Autonomy sold hardware as a matter of convenience* <u>*when Autonomy software was needed to work with hardware*</u>" (emphasis added). Mr Gersh said that he did recall this, later making clear (as the original question put to him by Mr Hussain's US attorney did) that he thought Mr Hussain was talking about appliances. Mr Gersh then further emphasised this in his witness statement in these proceedings by way of response (and in rebuttal) to Dr Lynch's suggestion that Mr Hussain had in fact described Autonomy's pure hardware sales on the call.

3945. Both Mr Sarin and Mr Gersh were cross-examined on behalf of Dr Lynch about Mr Hussain's comments; but their evidence that Mr Hussain made no reference to Autonomy's pure hardware sales on the 2 August call was not itself challenged. Indeed, in his pleading, Mr Hussain did not deny that his answer to Question 1 omitted any reference to Autonomy's pure hardware sales.

3946. The Claimants contended that by omitting any reference to Autonomy's pure hardware sales from his answer to Question 1, Mr Hussain gave the false impression on the 2 August call that Autonomy's revenues were derived entirely from software, and related services (including software as a service), except only for the "*very small*" appliance business conducted at returns comparable to the rest of its pure software business that Autonomy had disclosed and represented as effectively software sales.

3947. Mr Hussain denied making any misrepresentation, and counter-attacked that Mr Gersh, in particular, was well aware that Autonomy sold hardware otherwise than as an appliance. More specifically, Mr Hussain contended that although the notes taken by Mr Sarin and Mr Murali both seem to make clear that all of those other revenue streams were discussed in terms on the call and only hardware went unmentioned, his defence pleaded that no false impression was given by Mr Hussain's answer because:

> *"Mr Hussain's notes exclude references to a number of revenue streams,*
> *including support and maintenance, professional services and eDiscovery*
> *services ... HP would have been aware that any response by Mr Hussain based*
> *on such notes would not have been an exhaustive description of Autonomy's*
> *revenue."[533]*

3948. In addition to his contention that he expressly mentioned hardware sales for the convenience of customers, Mr Hussain contended in his written closing submissions that Mr Gersh's knowledge of substantial hardware sales should be inferred from:

(1) Mr Gersh's evidence in cross-examination that he had read all the contracts that Autonomy placed in the due diligence data room: these included at least two contracts for the sale of hardware;

---

[533] This point was not pursued in Mr Hussain's Closing Submissions.

(2) The lack of any apparent foundation for Mr Gersh's explanation, which appeared to confirm that he had read the contracts, but assumed that they were all part of a *"solution involving Autonomy's product"* or an appliance;

(3) An internal KPMG email from Mr Gersh dated 7 August 2011 which expressly stated that he was not sure that the 40 contracts in the data room *"captured everything…since as far as I can tell they have not captured free software or hardware pass-through"*;

(4) The (alleged) falsity of Mr Gersh's suggestion in cross-examination that *"that's a reference to the hardware component of appliances and where they're selling a solution"*, it being submitted that such falsity was shown by Mr Gersh's use of the expression pass-through sales to denote hardware and distinguish hardware sales from appliance sales: the context being Mr Gersh's discovery (post-acquisition) of a $41 million purchase from Dell which he considered too large to relate to an appliance sale and Mr Gersh's approach then in distinguishing appliance sales from pass-through hardware sales; and

(5) The frailty (as Mr Hussain presented it) of Mr Gersh's explanation that:

> *"We use the term generally, sort of "pass-through hardware" in a software sense because software companies aren't making hardware, they're purchasing it from somebody, they're putting their software on it and they're selling the product with the hardware delivery mechanism, so as it's described as an appliance…"*

(6) Other evidence suggesting that (contrary to what Mr Gersh maintained he had understood) "pass-through hardware" was not used in "a software sense" included both (i) KPMG in their post-acquisition report and (ii) E&Y in their memorandum of December 2012 (addressing HP's write-down of $8.8 billion) used the term *"hardware pass-through"* to denote what they described as *"standalone hardware sales"*.

3949. It is necessary to separate out three strands in these competing presentations:

(1) Whether what Mr Hussain said on the 2 August 2011 telephone call gave the false impression that Autonomy's revenues were derived entirely from software;

(2) Whether Mr Sarin and/or Mr Gersh became aware that Autonomy sold hardware, and more particularly, hardware otherwise than as an appliance ('standalone' hardware);

(3) Whether the issue of hardware sales was, or if properly understood, would have been, a matter of importance to KPMG, Messrs Sarin and/or Gersh, and HP.

3950. I have addressed the last two points, which, as it seems to me, go to the issue of reliance, rather than whether or not there was any misrepresentation, in the context of the Hardware claim. I have concluded that neither Mr Gersh (or KPMG) nor Mr Sarin appreciated, prior to the Acquisition, that Autonomy had been reselling, in substantial

quantities, hardware other than with Autonomy software built into or embedded in it, or as part and parcel of an identified software sale.

3951.  Focusing for present purposes on point (1) above:

> (a)  Whether or not evident from other sources read or available to HP that Autonomy had engaged in substantial "pure" or "standalone" hardware sales, the fact remains that Autonomy's published information did not contain any reference to such sales;

> (b)  In those circumstances, in my judgment, in directing HP to that published information without any warning, Mr Hussain perpetuated and reinforced the impression that Autonomy did not sell material amounts of non-appliance (i.e. standalone) hardware;

> (c)  Further, in my judgment, this was intentional in that Mr Hussain did not wish HP to know that Autonomy had (a) undertaken hardware sales as an expedient to make good any shortfall in software sales and to ensure that Autonomy either did meet or came close to meeting quarterly revenue forecasts, and (b) disguised its use of that expedient by accounting for costs and losses of sales as sales and marketing expenses: and see my assessment of and conclusion on the Hardware claims.

3952.  The <u>second</u> misrepresentation concerned Autonomy's IDOL OEM revenue. As Mr Sarin's notes recorded, HP was told that such revenue generally consisted of an upfront payment by the OEM partner followed by royalty payments based on the OEM partner's sales, as the following excerpt from Mr Sarin's notes showed:



3953.  Mr Murali (of BarCap) also made notes which recorded in relevant part:

> *"Rev rec around OEMs – Upfront fee + royalty (from a licence perspective),"*

though he did also note after that: *"did not understand 100% Need to clarify".*

3954.  The Claimants alleged that this representation was false, because as discussed in the part of this judgment dealing with the OEM claims, only a small fraction of the IDOL OEM revenue reported by Autonomy was derived from ongoing royalties.

3955.  For reasons set out in some detail in the part of this judgment in which I consider the OEM claims, I have concluded that the depiction of Autonomy's OEM business as

generating from OEMs an especially valuable royalty revenue stream was incomplete, inaccurate and false, to the knowledge of both Defendants; and that Mr Hussain's representation was likewise false, and known by him to be so.

*4 August 2011 due diligence call*

3956. The eighth set of alleged misrepresentations were made on a due diligence call held on 4 August 2011. The call was attended for HP by Mr Johnson, Mr Sarin, Ms Hsiao and others, as well as representatives of BarCap. Mr Hussain, Mr Kanter and Mr Chamberlain participated for Autonomy, as (it appears) did Brian Cayne of Qatalyst: none of them gave evidence.

3957. During the 29 July 2011 meeting, HP had asked (not for the first time) for internal three-year financial projections. Dr Lynch and Mr Hussain had said that no such projections existed. It had therefore been agreed that HP would show Mr Hussain parts of its Deal Model, and that Mr Hussain would comment on the reasonableness of the assumptions and projections it contained. The Claimants relied on the fact that this agreement was recorded in Mr Sarin's notes of the 29 July 2011 meeting, where against HP's questions concerning Autonomy's three year projections Mr Sarin noted: "*walk thru HP model*"; and on Mr Sarin's email to his team following the meeting:

> "*They do not have a 3 year financial plan … As such, I have offered to Sushovan (CFO) that we can walk him through our stand-alone model (just the income statement and associated assumptions) to get his perspective*".

3958. In cross-examination Mr Sarin told me:

> "*The purpose of the August 4 call was really because we didn't have access to management's own long-term forecast. The idea was for us to really run at a high level some of the assumptions that were driving our projections for the valuation of Autonomy and so, as we have discussed before, looking at growth rates and margins was particularly important. So we were showing a subset of the model that was only looking at Autonomy, to Autonomy CFO and we were walking through that just to make sure we got comfort that some of those numbers were indeed correct, and we weren't really missing anything in the process …*
>
> *So the idea of talking to executive management really is they are more involved in running the business, they have more insight on their own business than anybody sitting from the outside would glean over a two to three-week period. So the idea was to elicit from management: here is how we're looking at the business, here is how we're evaluating the business, here is how we're looking at the projections of the business; looking at your historical numbers, do you believe this makes sense?*"

3959. Mr Sarin made contemporaneous handwritten notes of the call and gave evidence by reference to them. The notes were a few lines long; but Mr Sarin told me that the meeting lasted about an hour.

3960. During the call, Ms Hsiao (a member of Mr Sarin's team) shared her computer screen with the other attendees and Mr Sarin *"walked them through"* parts of the Deal Model. As Mr Sarin explained, "*it was limited to inputs*[534] *that would be needed to figure out top line and other elements of P&L until 2016, but no assumptions that would be relevant for a valuation*", because "*I wouldn't want to share with the target if the valuation that I'm coming up with is higher than the market value, because at this time the deal hasn't really been, you know, signed and so you don't want to tip your hand in terms of value.*" Mr Chamberlain took screenshots, which he emailed to Mr Hussain. There was a dispute, which I need not decide, whether those screenshots provide a complete or partial record of what was shown. Revenue projections were shown by product line, but only up until 2016.

3961. According to the Claimants, Mr Hussain *"largely confirmed the assumptions and projections that he was shown, but suggested some tweaks, which HP largely adopted."* The *"tweaks"* which the Claimants suggested were made at Mr Hussain's suggestion related to two aspects of the Deal Model which the Claimants said were adjusted in the course of the conversation: (a) the forecast growth of IDOL Product revenues (as to which, according to Mr Sarin's contemporaneous notes, Mr Hussain stated that the original 5% annual growth projection was "*very low*" and his suggestion was to use 10% instead), and (b) the formula used to project maintenance fees (which according to the same notes suggest that Mr Hussain placed the renewal rate at 90%). The result, as can be seen by comparing the first and second of Mr Chamberlain's screenshots, was slightly to reduce total projected revenue for 2011 (from $1.08 billion to $1.06 billion) and 2012 (from $1.27 billion to $1.25 billion).

3962. The Defendants gave a rather different depiction, and in particular, submitted that any changes that were made to HP's model following the call were not made in reliance on any comment of Mr Hussain, but rather on HP's own assumptions, and that in any case, Mr Hussain was not seeking to push up the numbers: on the contrary, he suggested that some of HP's proposed figures be reduced. Further, substantial changes were made to the model at a later stage between 4 and 18 August 2011, as Mr Sarin accepted. The Defendants relied on Mr Sarin's own evidence in cross-examination:

> "Q    ... Now, you, of course, understood that you were here looking at your own projections, and that projections like this are always a matter of opinion, aren't they?
>
> A.    Yes, there is an element of subjectivity involved.
>
> Q.    No buyer would ever rely on the target's own evaluation of these things; these were your own projections, correct?
>
> A.    Correct."

3963. The dispute in this regard is relevant to, and in assessing, the Claimants' allegation that, Mr Hussain made the following misrepresentations in the course of the call:[535]

---

[534] The transcript says "imports", which is an obvious error.

[535] Mr Sarin also explained that during the call Mr Hussain said that HP's assumptions about the various gross margins that applied to Autonomy's different product categories were "*right*". It was suggested to Mr Sarin in cross-examination that he had only asked about Autonomy's overall gross margin, rather than the margins on individual components; however, he explained later in his oral evidence that that was, and indeed he told Ms

(1) That the consensus analyst estimate for Autonomy's 2011 revenues was $1.05 billion, but that UBS's forecast of $1.06 billion was more accurate. The Claimants cited Mr Sarin's notes recording a statement there attributed to Mr Hussain that the consensus was "*a little behind*", so that actual revenue "*could be a little higher*", before he cited the UBS figure. The Claimants contended that this statement was false because, like the consensus figure, UBS's forecast reflected the false accounting underpinning Autonomy's published financial results.

(2) That the projections in the Deal Model for licence (i.e., IDOL Product), IDOL Cloud and IDOL OEM revenue were "*reasonable*". Again, the Claimants contended that this was false because Autonomy's 'True' revenues in those categories were inconsistent with such projections.

(3) That the consensus forecast for Autonomy's 2012 revenues was $1.25 billion. As described above, this corresponded to the revised projection in the Deal Model that resulted from the adjustments which the Claimants contended were made during the call. The Claimants submitted that this amounted to an implied representation that there were reasonable grounds for the market consensus, but that in fact the consensus simply reflected the false accounting. Mr Sarin told me:

> "*when somebody is looking at the revenue elements that comprise the full Autonomy revenue, he's looking at the disaggregated gross margins by those five elements. To the extent there is a significant piece of information that is missing, which would have a material impact on the valuation and our understanding of the business, that would have been an appropriate time to flag it.*"

3964. Mr Hussain dismissed the call as "*wholly insignificant*". He submitted:

(1) In fact, he had pointed Mr Sarin to lower projected revenue figures (of $1.05 billion) and the effect of his suggestions, as Mr Sarin had accepted in his evidence and confirmed in cross-examination, was to reduce projected revenues compared to those in HP's suggested model (which had projected revenues for 2011 of $1.076 billion).

(2) All that he was doing was referring to analyst estimates which were publicly and easily available to HP. He denied having said that HP's figures were "reasonable" and although the Claimants again cited Mr Sarin's contemporaneous notes as recording just such a comment, he said that all he was doing was explaining the assumptions and the comment was Mr Sarin's own gloss.

---

Harvey of HP in an email dated 10 November 2011 that "*The gross margin split was not officially provided by Autonomy. We had made assumptions based on our understanding, public comparables etc. During one of the diligence sessions we vetted the assumptions, at a high level, with their CFO*". The suggestion put to Mr Sarin is inconsistent with the comment recorded in Mr Sarin's contemporaneous note: "*gross margins right*" (emphasis added). Further, if all HP were asking were whether the weighted average of its individual gross margin assumptions was in line with Autonomy's reported overall gross margins, it could have done the necessary, simple sums itself.

(3) In any event, as Mr Sarin confirmed in cross-examination the further and substantial changes later made to the model between 4 and 18 August 2011 were made unilaterally by HP without any reliance on any statement made or allegedly made by him.

3965. Insofar as the Claimants were seeking to rely on the exchanges during the 4 August 2011 call as amounting to Mr Hussain confirming the validity of HP's Deal Model and its assumptions, and as going beyond or providing a basis for a claim independent of their allegations as to the falsity of Autonomy's accounting information I do not accept that. Nor do I accept that HP would have been entitled to or did treat what was said as validating their Deal Model, or as the basis on which they made alterations to it. At most, in my judgment, Mr Hussain was refining representations already made, and by inferential repetition, reinforcing them. If relevant at all, that is really relevant principally to reliance. Whilst the call was not wholly insignificant, what happened was not such as to found any separate claim for misrepresentation.

3966. That leaves for consideration two matters that I reserved until after dealing with the representations made during the process of due diligence: (a) the involvement of Dr Lynch in the due diligence process and (b) the issue of reliance.

*Dr Lynch's involvement in the due diligence process*

3967. Dr Lynch has sought to portray himself as having played very little part in the due diligence process. He says that he did not attend any of the calls between the senior leaders on both sides to which he was invited. But Mr Sarin's evidence was that he did, noting that Mr Robison for HP "*sat through every call*", and would not have joined in if "*his counterpart*" (Dr Lynch) did not. Indeed, Dr Lynch claimed not to remember speaking to Mr Sarin <u>at all</u> after 1 August 2011, but the evidence shows that he did.

3968. More generally, although it is true that Dr Lynch's name is on very few due diligence emails or documents, that does not mean he was not involved in drafting them. Rather, consistently with his general practice, Dr Lynch repeatedly commented on other people's emails in draft, and indeed himself drafted or redrafted emails for other people to send.

3969. Dr Lynch claimed in cross-examination that he did so because "*there was an explicit request from Andy [Kanter] that all emails should go through him for purposes of the recording for the UK takeover process*", but plainly Dr Lynch could simply have copied Mr Kanter on any emails sent by him. Indeed, Dr Lynch was happy to email HP directly about due diligence issues when it suited him. (Dr Lynch's claim is certainly not supported by Mr Kanter's email of 1 August 2011 asking him and others to avoid emailing <u>documents</u> on the basis that they had to go through the data room.)

3970. What is more, his involvement went beyond drafting or commenting on emails. He had conversations with Mr Hussain about how best to respond to HP requests. As described in the OEM section of the judgment, Dr Lynch was involved in putting together a list for HP of Autonomy's "*Top 10 OEM customers by revenue for FY 2010*". Despite attempting in his first witness statement to distance himself from this episode, it is clear

from the contemporaneous materials that he discussed the list with Mr Hussain on at least two calls.

3971. Dr Lynch continued to deny these allegations generally. He claimed that he did not participate in any of the financial or legal due diligence calls, though he did join a few technical calls to discuss Autonomy's products. He sought to maintain this in cross-examination:

> "So if you look at the calls I'm on, they're all about product, technology and positioning. I don't attend the finance and legal calls."

3972. His written closing submissions suggested also that this was broadly confirmed by Mr Sarin when he was cross-examined, relying on the following passage:

> "Q.... if we just consider the due diligence process from 1 August onwards, okay, and just define it as that for a moment, during the period after 1 August, you can't recall Dr Lynch providing any information to you, can you?
>
> A. So just to make sure I understand the question, when confirmatory diligence begins with the first call on August 1, your question is do I recall Dr Lynch providing me specifically any information?
>
> Q. Yes. During any call that you were involved with or any email that you received?
>
> A. My calls were largely with Mr Hussain, Mr Kanter. I probably did speak with Dr Lynch occasionally about some things, for example the call with Deloitte that happened in -- later on down the road. I don't believe he and I were spending time going through diligence materials.
>
> Q. Right. Just on that call involving Deloitte, you're not suggesting that he was actually part of the Deloitte call? Are you talking about process again?
>
> A. Process again.
>
> Q. Right, and he again says that he wasn't actually part of that conversation and that's something you've just misremembered?
>
> A. I think there is an email to that effect, which says, "This is what Dr Lynch and I have agreed in a prior conversation and therefore we will -- instead of getting the auditor work papers, we will go ahead and have a call with Deloitte".
>
> Q. We can look at that in due course –

> *A. Sure.*
>
> *Q. -- but he cannot recall any discussion with you during the period after 1 August?*
>
> *A. I don't recall any substantive diligence-related call. There might have been process-related calls."*

3973. Dr Lynch's closing submissions acknowledged that later in his cross-examination, Mr Sarin suggested that he had a conversation with Dr Lynch in relation to OEMs, sometime between 16 and 18 August 2011; but it was pointed out that this was not something which Mr Sarin dealt with in his witness statement, and when cross-examined he sought to justify the omission on the basis that this was because "*it wasn't really any diligence-related item per se*", and that "*There wasn't anything material that I ought to have then written out in the witness statement*". In the circumstances, Dr Lynch submitted that no weight should be placed on this supposed incident.

3974. Dr Lynch also said that he did not attend any of the calls between the senior leaders on both sides that he was invited to; and he pointed out that his name is on very few financial due diligence emails.

3975. However, with reference to that last point, the Claimants marshalled examples which they submitted demonstrated that, although not apparently involved, Dr Lynch was actually (as Mr Rabinowitz put it to him in cross-examination) "*directing what HP is and is not told in the background…*". In particular:

(1) They referred to a response, apparently from Mr Kanter, to an email from Mr Levadoux listing certain key things which HP wanted to be dealt with as due diligence entered its second week (including "*Top Tesla OEM arrangements")*, and relied on an email chain to show that in fact it was Dr Lynch who had drafted the response and simply told Mr Kanter to send it to Mr Levadoux.

(2) They put forward another example, of an email from Dr Lynch directly instructing the addressee, Mr Kanter, as to the content of a response to an email from Mr Sarin.

(3) Another email, dated 12 August 2011, from Mr Kanter to Dr Lynch concerning information sought by Mr Sarin, including relating to OEM business, received the response "*Could you draft answers for us to review*", suggesting a supervisory role on the part of Dr Lynch.

(4) A fourth example was an email dated 10 August 2011 from Dr Lynch to Mr Kanter with Dr Lynch's editorial changes of a draft email to Mr Sarin which Mr Kanter had prepared or caused to be prepared and obviously sent to Dr Lynch for comments. Dr Lynch stated that he had "*edited a lot*". Mr Sarin had asked various questions, focusing especially on Autonomy's hosting business, and had requested "*...off the shelf/regularly produced management reports (monthly/quarterly) that you use to manage the $300 million business…*"

3976. Dr Lynch sought to dismiss the suggestion that he was directing what HP was told and not told *"in the background"* as a *"bit of kite-flying"* forming no part of the Claimants' pleaded case and which, in any event, was not true. However, as it seemed to me:

(1) His explanation of the examples above of his involvement behind the scenes in responses to Mr Sarin, which was that "*there was an explicit request from Andy [Kanter] that all emails should go through him for purposes of the recording for the UK takeover process*", and *"emails are supposed to go through Mr Kanter…"*, seemed to confirm rather than disprove the fact of his involvement.[536]

(2) There were also instances suggesting that Dr Lynch was happy to email HP directly about due diligence issues when it suited him.

(3) There are indications also that his involvement went beyond drafting or commenting on emails. He had conversations with Mr Hussain about how best to respond to HP requests. For example, he was involved in putting together a list for HP of Autonomy's "*Top 10 OEM customers by revenue for FY 2010*", and it is clear from the contemporaneous materials that he discussed the list with Mr Hussain on at least two calls.

3977. The impression which I formed generally was that Dr Lynch was simply indisposed towards permitting an important part of Autonomy's business being run by others, indeed perhaps personally incapable of doing that. As in other contexts, which I have addressed, even if he was not involved routinely, or in day-to-day details, Dr Lynch never relinquished a general supervisory role in any sphere of importance to Autonomy's business. Where not ostensibly involved, he was in any matter of importance involved behind the scenes. He would almost invariably involve himself at a more micro-level, sometimes sporadically but often more routinely, according to his concern and interest. In my view, this is illustrated in the present context of the due diligence.

3978. In my judgment, Dr Lynch shared with Mr Hussain knowledge of the impropriety of the way aspects of Autonomy's actual business activities had been accounted for and disclosed (or rather disguised, concealed, or misleadingly presented). For the proposed Acquisition to proceed at the price agreed, both knew that the false presentation had to be maintained. I consider it much more likely than not that Mr Hussain would have kept him informed of the progress of the process on a regular basis. Dr Lynch was involved in this, as in all other important matters relating to the company. He did not need to know and I doubt he did know the details of every stage; but I am satisfied that in the due diligence process overall he was, as I have described him elsewhere, the éminence grise and well aware of what the message to HP had to be, and intended that it should be, and knew that it was being, delivered in the form of the information provided in answer to HP's questions and in the representations made. He knew that thereby HP were being deceived. In my judgment, Dr Lynch was responsible accordingly and liable with Mr Hussain as if he also had been the actual representor.

---

[536] Dr Lynch's claim is also difficult to reconcile with Mr Kanter's email of 1 August 2011 asking him and others to avoid emailing documents on the basis that they had to go through the data room.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*Whether HP relied on the Defendants' misrepresentations*

3979. It is common ground that in order to make good their claims in deceit HP had to show not only that the Defendants made representations of fact to HP which they knew to be untrue, and did so knowingly, without belief in, or reckless as to, their truth[537], but also that they intended HP (or, where the representations were made indirectly, recipients in a class including HP) to rely on those representations and HP did so rely.

3980. The Defendants contended that even if found to be such, none of the misrepresentations set out above were intended to or did induce Bidco to buy the Autonomy shares and share options they agreed to sell.

3981. The Claimants dismissed this as *"fanciful"*. They submitted that the misrepresentations in issue were fundamental parts of: (i) the initial approach to HP concerning the possible sale of Autonomy; (ii) the Defendants pitching Autonomy to HP directly; and (iii) the Defendants' responses to HP's due diligence requests. That process concluded with HP deciding to offer, and offering, £25.50 per share for Autonomy, including the shares owned by the Defendants. They contended *"non-exhaustively"* that the evidence shows that HP was induced by the representations in the following ways.

3982. The Claimants' case as to the January, February and March Slides is as follows:

(1) The January Slides, sent as part of Mr Quattrone's initial approach to HP, led to the 3 February 2011 video conference which, with the related February Slides, led in turn to the 4 March 2011 meeting at which the March Slides were presented.

(2) The representations in the February Slides were of "*particular interest*" to Mr Robison and his colleagues in the SCD group. Mr Robison, who was HP's Chief Strategy Officer and Head of SCD, relied on them when considering whether Autonomy would be a suitable fit for HP.

(3) Mr Robison "*relied on*" the March Slides, which gave an "*impressive picture of Autonomy's financial performance and business*". The "*pure software model*" they described was, as Mr Robison explained in his witness statement:

> *"a very attractive model for HP, a predominantly hardware company that was looking to acquire an asset that would enable it to expand in the software market. The fact that Autonomy's business model was focused almost exclusively on software, with only a small amount of services as disclosed in its public filings and presentations to HP, was important to HP and affected the price that HP was ultimately willing to pay, and did pay, for Autonomy."*

---

[537] Bidco's alternative claims under s.2(1) Misrepresentation Act 1967 do not require proof of the third element – that the false representations were made fraudulently, i.e. without belief in their truth or reckless as to their truth. If the other elements are established, the claims will be made out unless the Defendants prove that they had reasonable grounds to believe, and did believe up to the time they sold their shares and share options to Bidco, that the facts represented were true.

(4) The size and growth of IDOL Cloud as described in the March Slides was "*important to HP because of the relative predictability and recurring nature of the revenue stream*".

(5) The presentation of "*strong*" IDOL OEM revenues and revenue growth was also "*important to HP*", indicating "*that other companies valued Autonomy's technology*". HP therefore considered IDOL OEM to be "*a highly profitable, growing revenue stream that was recurring in nature and an indicator of the quality of the technology*".

(6) The overall "*message conveyed during the March 4 meeting was that Autonomy was a high-growth, pure software company*". The presentation Dr Lynch gave of the March Slides was "*pretty compelling stuff*".

(7) Mr Sarin, who did not attend the 4 March meeting but who reviewed the March Slides shortly thereafter, also thought that the March Slides described "*a very compelling business*", given its apparent scale and growth.

3983. As to the representations made in June and July 2011 the Claimants submitted that:

(1) The representations made at the 29 June 2011 meeting, including in respect of IDOL OEM, led Mr Sarin to conclude that Autonomy was "*a strong business*".

(2) HP also relied on the Defendants' repeated representations that Autonomy was a "*pure software*" business. Had HP known about Autonomy's hardware sales, and their contribution to Autonomy's reported rate of revenue growth, it would have viewed them as a significant negative, which would have affected how much (if anything) HP was willing to pay for Autonomy. Likewise, had Mr Sarin's team been aware of the hardware sales it would have asked detailed questions for the purpose of valuing Autonomy.

(3) HP relied, as the Defendants told it to rely at the 29 July 2011 meeting, on Autonomy's publicly available financial information, including the H1/Q2 2011 results presented to them directly by Mr Hussain.

(4) Most importantly, HP relied on that information also when building the Deal Model, the bedrock of which was Autonomy's reported historic revenues and costs.

(5) BarCap, acting for HP, also checked the historic revenue numbers in the model against the table provided by Mr Hussain described in paragraph 3895(2) above. Had the table been accurate, there would have been major discrepancies, and the falsity of the published numbers would have been discovered.

3984. As to the representations made during due diligence:

(1) Mr Sarin's evidence was that he and his team relied, in developing the Deal Model, on the information provided in due diligence. That included the comments on the Deal Model provided by Mr Hussain on 4 August 2011. According to Mr Sarin's witness statement:

> "*Confirmation from Autonomy's CFO that the key assumptions and projections in our valuation analysis were consistent with his knowledge*

> *of Autonomy's business was very important to us. I recall after that call feeling very comfortable that the projections in the model were reasonable. Of course, I recognized that Mr Hussain would probably be motivated to be upbeat about the projections so as [to] get a good price, and I weighed his feedback to reflect this potential bias, as well as the fact that people's views can differ. Thus, when he said that he thought our 5% year-on-year IDOL Product growth rates were too low and could be doubled to 10%, I took account of his views but did not fully adopt them. Ultimately, however, I believed that as the CFO of a large, publicly-listed company, Mr Hussain would be truthful in his statements to me and the public market."*

(2) Likewise, on 8 August 2011, Mr Johnson told Mr Robison that there were three areas in which HP hoped to "dig deeper" on due diligence: Deloitte's work papers, an open-source code scan, and:

(3) "*One click deeper on financial projections – While they do not have a 3-year plan, they probably have a financial model that they will use with Qatalyst for fairness purposes. Our financial diligence to date has been predominantly Q&A with Sushovan*" (emphasis added). HP never obtained Qatalyst's model, and Mr Hussain's answers on the 4 August 2011 call were what it principally relied on for confidence that its key forecasts and assumptions for Autonomy were in line with Autonomy management's views.

(4) Mr Apotheker and the SCD group in turn focused on the analysis in the Deal Model when considering the value that Autonomy presented to HP, which, in turn, informed the price that HP was willing to pay for it.

(5) It was suggested to Mr Sarin that HP did not rely on what Mr Hussain said in the 4 August 2011 meeting; Mr Sarin strongly disagreed. The Claimants dismissed this suggestion as *"hopeless"* and submitted that the whole purpose of the call was for Mr Hussain, the CFO of Autonomy, to provide HP with guidance on its forecasts and assumptions in the absence of any internal projections by Autonomy (which HP had repeatedly sought). They emphasised their point that there would have been no point in HP asking Mr Hussain to comment on its forecasts and assumptions if HP did not intend to rely on what he said.

3985. More generally, as set out above, the Claimants insisted that most of the representations in issue were responding to specific questions from HP. Thus:

(1) in the case of the March Slides, HP's questions covered topics including Autonomy's historical revenue growth and the size of the OEM and Cloud businesses;

(2) in the case of the 29 June 2011 meeting, HP asked about Autonomy's product categories and historical and projected sales; in the case of the 29 July meeting, HP's detailed questions gave rise to both the representation that it should rely on Autonomy's published information for many answers, and the specific table of revenues by product category complained of; and

(3) in all of the due diligence calls (1 August 2011: overview of Autonomy's financials requested by Mr Sarin; 2 August 2011: HP sent detailed lists of questions; 4 August 2011: Mr Hussain was asked to comment on specific forecasts and assumptions in the Deal Model), Mr Hussain was likewise responding to specific questions.

3986. The Claimants suggested that if, rather than either misrepresenting the truth or staying silent, the Defendants had told the truth, then the discrepancy between that truth, and the claims in Autonomy's published financial information, would have become apparent. In such circumstances, as Mr Apotheker described:[538]

> "I would have been highly suspicious and demanded answers ... The facts that I have been asked to assume would have raised material and serious questions about the accuracy of Autonomy's public description of its business and its success, and perhaps more importantly, raise[d] significant doubts about the integrity of Autonomy's management, whose names and signatures appeared in descriptions of the business contained in the Annual Report. Matters such as substantial sales of third-party hardware by a software company, round-trip transactions, overstatement of IDOL OEM revenues, inflated revenue growth figures, and other inaccuracies or misstatements would have suggested that Autonomy's management was engaged in a systematic effort to portray Autonomy's business as stronger, better-managed, more vibrant and more successful than was truly the case ...

> If such information had come to my attention prior to announcing the deal, I nevertheless think it possible that I would have given Autonomy and its leadership an opportunity to explain the discrepancies. If, as seems most likely, the explanation I heard was not satisfactory, I have no doubt that I would have recommended to HP's Board that it should abandon the deal, because I would have had no interest in bringing into HP a team that I could not trust and whose judgement I doubted, and a company significantly less relevant to HP's strategy and successful than initially thought. I am confident the Board would have shared my concerns."

*My overall assessment of the due diligence process and its relevance*

3987. In summary, in my judgment, the cumulative effect of the Slides and the representations made were to depict Autonomy as having a special selling point as a pure software company with especially valuable and dependable revenue streams (especially from its IDOL Cloud and IDOL OEM) accurately and reliably described and quantified in its published information. Due diligence on a tight timetable was undertaken on that premise, and the answers to the questions raised by HP in the course of the due diligence process reinforced the representations made and further encouraged and induced HP to rely on Autonomy's financial reports and the public statements therein of its business,

---

[538] Mr Apotheker was asked in various ways whether he would have been reassured to learn that Deloitte knew some of the underlying facts and had approved the accounts. He made clear that he would still have asked questions. But those questions, as premised, are not relevant here. If the Defendants had told Mr Apotheker that Deloitte was satisfied, that would obviously have amounted to an implied representation that Deloitte was correctly satisfied – and if the alleged fraud took place at all, that implied representation would have been equally false.

the sources and nature of its revenue streams, its software revenue growth, and its overall financial position and performance.

3988. HP/Bidco relied on these representations in the round, together with the published information they appeared to refresh and validate, in pursuing a potential bid, negotiating the price and ultimately entering into the Acquisition (including the purchase of the Defendants' respective shares and share options) at the price finally agreed. The suggestion that HP/Bidco did not rely on the representations as well as the published information is incorrect: they were complementary and reliance was placed on both in that all these matters impacted the mind and affected the judgement of HP/Bidco in determining to proceed and eventually conclude the Acquisition, including the purchase of the Defendants' respective shares and share options, at the agreed bid price.

*The Non-Disclosure Agreement*

3989. Finally, Dr Lynch (but not Mr Hussain, despite a passing mention in his Defence) sought in his RADC to invoke the provisions of the Non-Disclosure Agreement ("the NDA") entered into by HP and Autonomy on 3 March 2011 in an attempt to defeat the Claimants' misrepresentation claims. The plea relied on the effect of the NDA as a matter of Delaware law: but no evidence of Delaware law was provided. Dr Lynch did not mention the NDA in his closing submissions, and I take him to have abandoned the point.

3990. Further, if I am wrong and the point is sought to be maintained, I do not consider that, taking Delaware law to be the same as English law, as I must in default of any evidence of Delaware law, the NDA would avail Dr Lynch as a defence to a claim for fraud. Dr Lynch cannot rely on a contractual term to exclude his own liability for fraud, as a matter of public policy: *HIH Casualty and General Insurance Ltd and others v Chase Manhattan Bank* [2003] 1 All ER (Comm) 349, *per* Lord Bingham at §16 and Lord Hoffmann at §76.

3991. As to Bidco's claims under s.2(1) Misrepresentation Act 1967, pursuant to s.3 of that Act, contractual terms cannot exclude or restrict liability save insofar as they satisfy the requirement of reasonableness under s.11(1) Unfair Contract Terms Act 1977. That was for Dr Lynch to prove, and he has not even alleged that the terms of the NDA satisfy the statutory requirement. It is in any event doubtful that a contractual term that purports to exclude or restrict liability for fraud can be regarded as reasonable, especially in the circumstances of the present dispute.

3992. Further, and in any event, I agree with HP that the provisions invoked by Dr Lynch have no such effect even on their own terms:

(1) First, Dr Lynch sought to rely on clause 5 of the NDA as estopping Bidco from "*advancing any claim by reference to confidential information defined therein*". As to this:

(a) "*Confidential Information*" was defined in clause 1. The definition excluded, among other things, information that "*prior to or after the time of disclosure becomes part of the public knowledge or literature*", save by the fault of the receiving party.

(b) It was unclear which, if any, of the misrepresentations set out above were being said by Dr Lynch to relate to "*Confidential Information*"

within the meaning of the NDA – particularly given his case that the representations in issue "*generally reflected Autonomy's [public] financial statements*". The burden was on Dr Lynch to plead and prove those matters: and he did not do either.

(2) Second, Dr Lynch relied in his pleading on clause 13, which provided:

> "*This Agreement constitutes the entire agreement among the parties hereto and supersedes all other prior agreements and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof and thereof. All modifications of, waivers of and amendments to this letter agreement [sic] must be in writing and signed by both parties hereto.*"

(3) However,

(a) That is, in terms, an entire-agreement clause, providing that the Non-Disclosure Agreement supersedes "*prior agreements and understandings*". Entire-agreement clauses do not ordinarily exclude liability for (non-negligent) misrepresentations; if that is what is intended, then it must be expressly stated: *Mears Ltd v Shoreline Housing Partnership Ltd* [2013] CP Rep 39 §16.

(b) The clause is only concerned with agreements and understandings "*with respect to the subject matter*" of the NDA– that is to say, the use of Confidential Information. Even if "*understandings*" did mean "*representations*", the clause would have no effect on representations that did not concern the use of Confidential Information.

(c) Clause 13 defines the agreement "*among the parties hereto*", i.e., HP and Autonomy. Neither Bidco nor Dr Lynch is a party to the Non-Disclosure Agreement, and neither is mentioned in clause 13 (whether directly or by any reference to "*Associates*"). Dr Lynch had no right to enforce clause 13 against Bidco, nor is Bidco bound by it.

(4) In any event, even on Dr Lynch's case, he could only have invoked clause 13 in respect of representations made before the date of the Non-Disclosure Agreement, i.e. 3 March 2011: i.e., those in the January and February Slides.

*Conclusion on the claims in deceit and misrepresentation*

3993. In my judgment, the Claimants have established their claims in deceit and misrepresentation against each of the Defendants in respect of each of the misrepresentations addressed above.

## RELIANCE AND LOSS REVISITED

### Ambit of this Chapter

3994. Before turning to the Direct Loss claimed, I return to address in more fact-related detail, and as regards all the various FSMA claims, the issues of "reasonable reliance" and loss. I also address some associated issues in respect of the Deceit and Misrepresentation Claims.

3995. I have dealt in the Introduction with the law applicable in this context as I perceive it. I have also identified the persons within HP/Bidco primarily engaged in the process which ultimately led to the Acquisition (see paragraphs 158 to 178); and I have chronicled (a) how HP came to identify Autonomy as a target (see paragraphs 153 to 157); (b) the development of HP's interest and the preparation and refinement of HP's detailed analysis; (c) the exploratory and then more detailed negotiations about price (see paragraphs 222 to 233); (d) the process of due diligence (see paragraphs 234 to 278); and (e) the negotiations and their final conclusion with agreement on price, the approval and announcement of the bid on 18 August 2011 and the declaration of it becoming unconditional as to acceptances on 3 October 2011 (see paragraphs 279 to 304 and 321).

3996. Further, in paragraphs 3236 to 3247 I have addressed in some detail the question as to whether Autonomy's published information induced a false understanding of Autonomy's OEM business (and concluded that it did, and that HP/Bidco reasonably relied on a depiction of the extent and nature of that business which was false). I have focused especially on the presentation of OEM in Autonomy's published information for a number of reasons. First, in that context (OEM) there was a more pronounced issue in light of the dispute as to the meaning and extent of the OEM metrics voluntarily provided. Secondly, there was especially focused dispute between the parties as to whether any reliance had been placed by HP/Bidco on any particular understanding of what Autonomy's OEM business comprised. Thirdly, it is clear that HP/Bidco regarded the OEM business as (quoting from Mr Apotheker's cross-examination) a *"very, very important part of the business model, and a very smart one"* for which in its DCF analysis (see below) it projected gross margins of 98%: it is clear, and I find, that HP/Bidco placed particular reliance on their understanding derived from Autonomy's published information about the nature of IDOL OEM revenue, its rapid growth (for example, 27% growth was recorded in Autonomy's Q2 2011 Quarterly Report) and its high gross margins on what appeared to be recurring revenue.

3997. However, the matters I referred to in paragraph 3242 in reaching my conclusion that HP/Bidco reasonably relied on the depiction of the nature and scope of OEM's business in proceeding with the Acquisition at the bid price also exemplify the false and misleading exaggeration of key elements of Autonomy's business which led HP/Bidco to conclude that its revenue streams were more reliable and valuable than was in truth the case.

3998. My purpose now is to gather together strands already apparent as regards Autonomy's other business lines, and to confirm and clarify my conclusions as to the fact, extent and reasonableness of HP/Bidco's reliance on Autonomy's published information. This is necessary both for comprehensiveness and so as to enable determination of the related but separate issue of compensable loss in respect of the FSMA claims and the relevant counterfactual by reference to which to assess it. In doing so, I also consider the interplay between the FSMA claims and the personal claims in deceit and misrepresentation.

*Summary of Claimants' case on reasonable reliance*

3999. The Claimants submitted that in the context of their FSMA claims, as in the context of deceit, they had established that the Defendants were each responsible for untrue and misleading statements or omissions made dishonestly, and that the "presumption of inducement" applied and had not been rebutted. However, they also described at some length the process leading up to the negotiations which eventually culminated in the agreed bid, the construction of a DCF analysis[539] ("the Deal Model"), the formulation and agreement of a bid price, and the eventual Acquisition.

4000. The Claimants' overall factual case on reliance was that HP/Bidco's decision to proceed with and conclude the Acquisition at the bid price was materially informed and influenced by the untrue and misleading depiction of Autonomy as a *"pure software"* model achieving high margin sales with consistent organic software revenue growth based on the sale of IDOL (what Autonomy regularly referred to as *"IDOL organic growth"*) and an attractive mix of business in the amounts and having the characteristics described in Autonomy's accounts, including "annuity-like" flows of business and profits from rapidly growing OEM business.

4001. According to the Claimants, HP's approach and its Deal Model used to establish standalone and 'with synergies' valuations of Autonomy were falsified by the undisclosed reality that in what the Claimants' valuation expert, Mr Bezant, took to be the 'True Position',[540] Autonomy was (a) a much smaller business (at both revenue and profit levels); (b) not a pure software business but one that had a material and increasing proportion of sales of third-party hardware; (c) growing less rapidly than represented; and (d) based on a less attractive mix of business.

4002. As to the requirement of showing that their reliance was reasonable, the Claimants' position was that:

> *"there is no sensible basis on which it could be argued that it was unreasonable of HP and Bidco to rely on the accuracy of Autonomy's published information."*

*Summary of the Defendants' contrary case*

4003. The Defendants, in addition to denying reliance on the basis of their *"Bidco point"*, also did not accept that the "presumption of inducement" has any application in the context of a claim under s. 90A/Schedule 10A of FSMA, and submitted further that even where the presumption is applicable the burden lies on the investor (here, HP/Bidco) to identify precisely what misrepresentations they relied on, to establish that but for those misrepresentations they <u>would</u> have acted differently (it being insufficient to show that they <u>might</u> have acted differently) and that in all the circumstances any such reliance was reasonable.

---

[539] As described by Mr Apotheker in his witness statement, *"A DCF model estimates the future performance of a business, and assesses the present value of the cashflows that it is expected to generate."*

[540] The 'True Position' represented the position had accurate information been published historically. Mr Bezant recorded in this regard that the basis on which he had been instructed was that, in assessing the FSMA Loss, he was instructed *"to assume that, but for the breaches of duty alleged by the Claimants: (1) Autonomy's published financial information would not have been subject to the false accounting of which the Claimants complain; but (2) the impugned transactions would still have been entered into."*

4004. The Defendants appeared to accept that the misrepresentation need not be the sole inducement, and that it is sufficient in a claim under FSMA to show that the claimant's *"mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did"*; but they emphasised that the misrepresentation must play a *"real and substantial part in inducing the representee to act"* and that it must be shown to have been *"actively present to* [the claimant's] *mind"*. In this regard, on the facts, they contended that HP/Bidco (a) had relied on a variety of sources, and especially its own corporate analysts and third party advice from Perella Weinberg (on broad strategy issues) and Barclays Capital ("BarCap"), (on the specifics of the Acquisition) in determining whether to bid for Autonomy and at what price; (b) did not have in mind the published information or the Slides when it made the formal bid, even if those matters had encouraged and influenced its initial approaches; and (c) would have proceeded with the Acquisition on the same terms even in the absence of the alleged fraud, and so could not prove either the relevant degree of reliance or loss.

4005. In the latter context, the Defendants contended that in reality, Mr Apotheker drove the bid forward and his focus was at all times not on the published information or the financial state of Autonomy as there portrayed, but rather on the synergies that could be created by the Acquisition. They relied especially on an email from Mr Apotheker to Mr Lane dated 5 September 2011, in which, in seeking to defend the bid, he emphasised the importance of the envisaged synergies that the combined companies could generate, more than the stand-alone value of Autonomy (and see the footnote to paragraph 201 and paragraph 311).

*The issues requiring analysis*

4006. It seems to me that, in the light of those competing contentions, the following principal issues require analysis:

(1) What were the principal metrics and factors by reference to which HP/Bidco pitched its bid price and eventually concluded the Acquisition?

(2) More particularly, what were the principal metrics and factors underpinning the Deal Model?

(3) How ultimately did HP/Bidco make its decision at board level?

(4) Does the fact that HP/Bidco took into account the views of analysts and specialist advisers, especially in assessing Autonomy's likely future performance, suggest that it did not rely sufficiently on Autonomy's published information to establish its claims and substantial loss?

(5) Was anyone whose knowledge is to be attributed to HP/Bidco aware, before the Acquisition, of any material matters which falsified the depiction of Autonomy in its published information?

(1) *What were the principal factors and metrics by reference to which HP/Bidco pitched its bid price and eventually concluded the Acquisition?*

4007. With Mr Apotheker (as CEO) the persons primarily charged with the identification of suitable targets to enable HP to realise Mr Apotheker's vision of *"evolve[ing] the Enterprise Business from low-margin products and services to become a full services*

*and solutions partner for businesses, providing the essential/strategic parts of the technology 'stack'*[541]*"* were the members of the SCD Group and its Corporate Development sub-team particularly aligned with software business.[542] In the case of Autonomy, they were, principally, Mr Apotheker, Mr Robison (head of the SCD Group), Mr Sarin, and (though less engaged because diverted by a serious family illness) Mr Johnson. It was ultimately their assessments, together with the Deal Model and the assessments of HP/Bidco's advisers (Perella Weinberg and BarCap) that went to the Board of HP and informed the final decision.

*Mr Apotheker*

4008.  Mr Apotheker accepted that the only financial report he personally read relating to Autonomy was its 2010 Annual Report and Accounts. He did not read anything earlier, nor the Q1 or Q2 2011 Quarterly Reports. But he told me, and I accept and find, that he read the 2010 Report and Accounts *"very carefully"*. As well as the formal status, Responsibility Statement and the fact that the accounts were audited by Deloitte, Mr Apotheker's evidence (which I accept) was that he noted in particular that the Annual Report stated that:

> (1)  Autonomy's revenues in 2010 were $870 million, and that this was an increase of 18% from 2009;

> (2)  IDOL organic growth (revenue growth not attributable to acquisitions) was 17%;

> (3)  Autonomy's IDOL OEM business generated $132 million in 2010, up 32% from 2009; and

> (4)  IDOL Cloud growth was *"strong"*, with 2010 Cloud revenues of $190 million.

4009.  Mr Apotheker noticed also that the Annual Report referred in various places to Autonomy as being a rare example of a *"pure software model"*. Subject to the caveat that he accepted in cross-examination (as I have noted in paragraph 1626(1) above) that he took this to mean also that Autonomy *"was in the business of providing excellent software with as little services as possible"*, his evidence was that he *"understood this to mean that Autonomy made virtually all of its revenues and profits from the development, use, marketing and sales of software"* and that this was very important to him.

4010.  In my judgment, the more general impressions he formed, on the basis of his reading, that Autonomy appeared to be "*a very successful, high-growth, high margin"* enterprise encouraged his interest in pursuing negotiations, and encouraged him also to anticipate having to pay a significant premium over its then share trading price, which he took into account during the negotiations which followed, but such generalised impressions were not such as Mr Apotheker did rely or could reasonably have relied on without much more detailed analysis and support. However, I am satisfied, and find, that the untrue representation that Autonomy was a *"pure software model"* generating substantially all its revenue and growth from high margin software sales, and the concealment

---

[541] See paragraph 144 above as to what this meant and comprised.
[542] See footnote 24 in paragraph 141 above.

accordingly of the substantial pure hardware sales undertaken to disguise shortfalls in software revenues and the true performance of Autonomy's software business, impacted on his mind and informed his judgement (and that of the SCD Group) at every stage of the process, including the final decision to make a bid at the price eventually agreed, and ultimately to conclude the Acquisition.

4011. Further, Mr Apotheker and the SCD Group also placed reliance on the fact that the 2010 Annual Report (as in fact did subsequent Reports) (a) segmented Autonomy's revenues into five categories of (i) IDOL Product, (ii) IDOL Cloud, (iii) IDOL OEM, (iv) Deferred Revenue Release (broadly signifying maintenance) and (v) Services, (b) did not suggest that there was any other revenue category and (c) stated that Services accounted for only about 5% of total revenues. That apparently exclusive description of the sources of Autonomy's revenues made no mention of sales of third-party hardware. Mr Apotheker took all of this to be consistent with and confirmatory of Autonomy's representation as a *"pure software model"*, with the exception he noted of a small amount of "appliance" sales, which was presented and he read as a sensible strategy, being (as he understood it) confined to sales of hardware with Autonomy software preloaded into it, and thus to what he called *"a delivery channel for software sales"* generating (as the Annual Report expressly stated) a *"margin profile…not widely dissimilar to our traditional licence business."*

4012. In the mind of Mr Apotheker (as also in the minds of others in the SCD group, see below) that (false) depiction of Autonomy as a company deriving substantially all its revenues and meeting its forecasts from software sales in the apparently exclusive five categories of revenues listed in paragraph 4011 above was an important distinguishing characteristic of Autonomy; and it provided a litmus test of the success of its signature product (IDOL). That depiction was an important factor in assessing Autonomy and in the construction of the Deal Model (especially in projecting likely revenue forward) and reliance on it was, in my judgment, plainly reasonable.

4013. Mr Apotheker also focused on, and was especially attracted by, Autonomy's Cloud business, which was presented as largely comprised of delivery of IDOL on a 'Software-as-a-Service' (SaaS) model. As this business line was represented, he considered it would be of particular value in meeting HP's *"specific need to develop and grow its cloud business"*, as well as providing immediately, and apparently into the future, a source of recurring revenue, complementing Autonomy's fast growing IDOL OEM business (which was especially attractive for all the reasons previously explained). As with the representation of Autonomy as a *"pure software model"*, these were characteristics and qualities of Autonomy's business as depicted which I have been persuaded impacted on his mind and influenced his judgement, and that of the SCD Group, throughout the process, including the eventual Acquisition.

4014. However, Mr Apotheker made clear, both in his witness statement and when cross-examined, that HP obviously did not rely simply on his reading of the 2010 Annual Report, and more generally, would not have made a formal bid or proceeded with the Acquisition without having undertaken a full and careful financial analysis of its own, nor without a process of due diligence. The centrepiece of HP's assessment was its DCF analysis and Deal Model.

4015. The following evidence in Mr Apotheker's witness statement was not substantially or effectively challenged:

> *"When considering the value that Autonomy actually presented to HP, however, the SCD Group and I focused on HP's DCF analysis. That analysis, based on Autonomy's public financial statements, analyst reports, etc., sought to estimate Autonomy's standalone value by estimating the cash it could produce in the future, and also to take account of the synergies we hoped that HP could achieve from the deal. In considering a price that would be appropriate to pay for Autonomy and to recommend to the HP Board, I focused on ensuring that the price paid by HP was justified by the value we believed it would receive (including Autonomy's cash), that HP would pay as little as possible above Autonomy's share price, and on retaining for HP's shareholders as much as possible of the value of the synergies that we hoped to achieve from the transaction. I also recognized that Dr. Lynch would seek to obtain as much value as possible for his shareholders."*

4016.  As to the suggestion that Mr Apotheker and HP had in reality proceeded on the basis of the synergies and *"transformational opportunity"* to be realised by the Acquisition, rather than on the basis of Autonomy's stand-alone value, I accept the explanation and answers provided by Mr Apotheker himself in his second witness statement and then in the course of his cross-examination as to the relative importance of stand-alone value and prospective synergy values:

(1)  As he explained in cross-examination:

> *"there is a sequence here that is very important. It had to be a sound asset...The acquisition was based on the intrinsic value, stand-alone value of Autonomy plus the synergies...the actual value of the company was the foundation".*

(2)  When asked to confirm that nevertheless he was *"looking at the time at the long-term benefits of owning Autonomy"*, he said:

> *"A.    Well, I'm looking at two things essentially to form an idea. I'm first of all looking at the present value of Autonomy as a stand-alone business, because that's where you start, that's what you pay for essentially. Anything else, the synergies, if you take an objective look, objective view of this, clearly the risk on the synergies is on the HP shareholders, not on the Autonomy shareholders. So when you negotiate these things you want to be in a position where it's the HP shareholders who get the maximum benefit out of these synergies, so the price point has to take that into account."*[543]

(3)  This corresponded with his evidence in his second witness statement:

> *"in evaluating whether a software company's product is effective and successful, it is essential also to evaluate its financial performance, because that performance reflects whether customers who use the technology perceive it as valuable and worth the associated costs. The fact that Autonomy's reported financial results gave the impression that it had achieved significant*

---

[543] On HP's analysis, at the price it paid for Autonomy, it retained 90% of the synergy value that it hoped to create through the Acquisition, and yielded 10% to Autonomy's shareholders, which Mr Apotheker thought *"a fair compromise"*.

> *and fast-growing shares of the markets in which it operated was an important part of our assessment that its technology would be valuable to those markets in the future. It would have made no sense to look only at the technology without also putting significant focus on Autonomy's financial information."*

4017. When cross-examined, Mr Apotheker reiterated the importance of the underlying finances of a target company, and just as much so where the proposed acquisition was a *"strategic"* one with anticipated synergies: as he put it, *the actual value of the company was the foundation."* It was put to him that (a) he *"[wasn't] particularly interested in the metrics* [because he was really] *interested in buying a transformative business"*; (b) he *"never looked in any detail at the DCF valuation produced by HP…"*; and (c) what really prompted him was that Autonomy offered *"essentially a unique opportunity"* hinging on the synergies anticipated. His answers in summary were:

(1) He wanted a transformative business; but *"good financials"* were essential:

> *"I wanted both…I wanted to buy a good company with good financials and for me the financials were actually a proof point of the success of the business."*

(2) He did not study the spreadsheet nor did he look at every number, but he was adamant that he looked at the DCF valuations in detail, and *"of course"* he considered the assumptions used to satisfy himself of their reliability.

(3) Although he accepted both that Autonomy was unique in offering IDOL and the route into the unstructured data space and that the anticipated synergies were also very important in differentiating Autonomy and justifying a substantial premium on the then market price of its shares, he insisted that the underlying financial position of the company as it appeared in its Reports was the bedrock, as was apparent from the following exchanges:

> *"Q. What you say is that you presented to the board your business case hinging more on the synergies than on the stand-alone capabilities and that's what actually happened, isn't it?*
> ...
> *A. It is impossible to achieve the synergies without the actual company and therefore one needs to pay for the company and then add to it the synergies. The price of the company was determined by the actual value of the business and some of the synergies. We came to the conclusion in the conversation of this trial that it was about 10/11% of the synergies. That's how the maths works.*
>
> *Q. You never did that maths, the board never said, "I'll tell you what, you can go up to 10% of the synergies", that's just where you ended up, isn't it?*
>
> *A. But the board had all the information. These are smart people, they can do a simple arithmetic calculation.*
>
> *Q. The truth is that what this deal was driven by was your vision about the synergies that HP could make out of acquiring the software, wasn't it?*

> A. But it is clear that HP wasn't going to buy the company and not integrate it and therefore not extract synergies. The whole idea of this deal was to extract these synergies. That is absolutely right and that's the only reason that they really wanted to do any acquisition, be it Software AG or any other company. So in this case as well, the real reason of course that any company would want to acquire another company, we are not - as we said yesterday, we are not a private equity investor or a stand-alone investor, this is an industrial IT company who wants to buy a company in order to extract the value and the synergies out of it, obviously. <u>But the price calculation and therefore what it is that you end up paying for this business is based on the value of the business first of all.</u>" [My emphasis]

4018. Mr Apotheker was unequivocal in his evidence in his witness statement not only that he had no knowledge or awareness prior to the Acquisition of third party hardware sales except appliances sold as *"a delivery channel for software sales"*, but also that he had no knowledge or awareness of *"the round-trip transactions that created the false appearance of revenue and profit"*; or that *"Autonomy converted a significant portion of its Cloud revenue into license revenues…enhancing current reported revenue and reported revenue growth and reducing the long-term value of this part of the business"*; or that *"Autonomy greatly overstated the amount of its IDOL OEM revenues, and revenue growth"*; or (though he did *"of course"* understand the widespread use of resellers by software companies) that in this case, VARs were being *"used to enable Autonomy to recognize revenue or to accelerate the recognition of revenue in a manner inconsistent with relevant standards."* These matters resulted in a difference between what was reported and what properly should have been recorded of some $145 million: a roughly 17% reduction. He considered that these inaccuracies and misstatements suggested to him *"a systematic effort to portray Autonomy's business as stronger, better-managed, more vibrant and more successful than was truly the case"* and he found it *"hard for me to conceive of an innocent explanation for the fact that no such information was apparent from my careful study of the Annual Report."* The discrepancy between the represented position and what was *"truly the case"* was plainly such as in his view to alter materially and substantially the attractions and value of Autonomy to HP.

4019. I accept Mr Apotheker's evidence as above summarised.

*Mr Robison*

4020. Although in places over-lawyered, and also untested since he did not attend at Trial (see paragraph 166 above), Mr Robison's witness statement appeared to me to be credible and convincing as regards:

> (1) his specific consideration of both Autonomy's IDOL OEM revenues (which he understood to be derived from sales *"when Autonomy software was embedded in other companies' products"* and which he especially identified as *"important to HP"* because their stated growth *"was an indicator that other companies valued Autonomy's technology"*) and its IDOL Cloud revenues as reported in Autonomy's published information and confirmed in the Slides (showing nearly 20% growth year-on-year and representing some 22% of total revenue recognised), and the perception encouraged that

these were particularly attractive and high-margin sources of recurring revenue;

(2) his perception that the emphasis in both Autonomy's published information and in its management's repeated presentations that Autonomy was a *"pure software model/company"* with *"a compelling software product in IDOL"* demonstrated that its reported revenue growth was based almost exclusively on high-margin software sales (with a very small amount of appliance sales which were also high-margin); and that this powerfully endorsed the market success of Autonomy's software and its signature product, IDOL;

(3) his perception also that Autonomy's pure software model (as it was represented to be) was highly complementary to HP's plan to develop its business in high-growth, high-margin software markets and not in lower-margin hardware sales (HP already being one of the world's largest hardware manufacturers);

(4) his focus on the particular attraction and value of Autonomy's IDOL OEM business as represented in Autonomy's published information and purportedly confirmed in other presentations;

(5) his emphasis on the importance of the historic performance as presented in Autonomy's published information in assembling the DCF/Deal Model and in particular in forecasting future cashflows and growth, and his confirmation that both would have been markedly lower but for the material overstatement and false depictions of Autonomy's historic revenue streams; and

(6) the continuation of his understanding of and reliance on those matters up to and including the Acquisition.

4021. In my judgment, that evidence further supports the Claimants' case that Autonomy's published information, and in particular the statements of its revenues and their growth and its assertions that Autonomy was a *"pure software company"*, continued to have an impact on the mind and influence on the judgement of those within HP involved in the analysis of the merits of the proposed Acquisition and its eventual conclusion.

*Mr Sarin*

4022. As previously explained, Mr Sarin was a key member of the Corporate Development sub-team of the SCD Group, and reported to Mr Johnson (HP's Head of Corporate Development, who in turn reported to Mr Robison who reported to Mr Apotheker). He and his team had line responsibility both for the preparation of HP's Deal Model and (with KPMG) for the due diligence undertaken by HP. In the process leading up to the Acquisition, Mr Johnson relied unusually heavily on Mr Sarin especially in relation to the due diligence exercise since he himself was having to deal with serious illness in his close family and (as he told the US court in the criminal proceedings there) he was unable to travel.

4023. Mr Sarin stated in his witness statement that:

*"We were heavily reliant on Autonomy's published information and on analysts' projections for Autonomy, which were, in turn, reliant on Autonomy's published information."*

4024.  It was common ground that Mr Sarin carefully read Autonomy's 2010 Annual Report
and its Q1 and Q2 2011 Quarterly Reports (but not the 2009 Annual Report nor the 2009
Quarterly Reports). He also appears to have read some (unspecified parts) of the 2010
Quarterly Reports, and the transcripts of the Q1 and Q2 2011 Earnings Calls.

4025.  Amongst the matters which according to his evidence (which I accept in this regard) Mr
Sarin derived from those reports and documents were:

(1)  The accounting information, and in particular, Autonomy's historic revenue
figures split amongst the five categories (see paragraph [] above) which (as
I elaborate later) were fed into and provided the bedrock of the Deal Model;

(2)  The statements and explanations in the 2010 Annual Report as to
Autonomy's strategy, products and the size and performance of its five
revenue streams;

(3)  The statements in the Q1 2011 Quarterly Report, in particular those
indicating that (a) all of Autonomy's product lines were achieving double-
digit growth, (b) organic growth of Autonomy's IDOL Product and IDOL
Cloud businesses purportedly at an annual rate of 17%, (c) 28% annual
growth in Autonomy's OEM business, and (d) gross margins (which in its
2010 Annual Report Autonomy identified as a *"key performance measure"*
and an *"[i]ndicator of success of the company's business model"*)[544] of
88% and operating margins of 43%;

(4)  The results reported in Autonomy's Q2 2011 Report, in particular showing
(a) consistency with Autonomy's previously-reported financial
performance, (b) consistency with HP's own estimates (reported revenues
of $256.3 million compared to HP's estimate of $245.7 million), (c)
continuing strong organic growth of IDOL business year on year in H1
2011, with represented organic growth figures for H1 2011 in IDOL OEM,
IDOL Cloud and IDOL Product of 27%, 17% and 13% respectively leading
to the summary that (d) *"Cloud and OEM, both recurring models, account
for 62% of IDOL software sales, reaching an inflection point"* (all such
figures in fact being materially false for all the reasons addressed in this
judgment)[545].

4026.  Mr Sarin made clear that neither he nor (so far as he was aware anyone else at) HP was
aware pre-Acquisition that Autonomy was improperly accelerating hosting revenues
and profit and including non-recurring revenue in IDOL Cloud and IDOL OEM. This
was not substantively or successfully challenged in cross-examination. He was likewise

---

[544] Autonomy reported gross margin on an *"adjusted basis"* which excluded certain specific, non-recurring and
non-cash charges, thereby enabling investors, and Autonomy management, to assess the performance of
Autonomy's operations.

[545] The 'True Position' (being the financial position which would have been presented to the market on the
assumptions which the Claimants' valuation expert, Mr Bezant, was instructed to make and in effect were
intended to enable the correction of the false accounting and descriptions of Autonomy's business as alleged by
the Claimants), will be re-examined and tested as part of my quantum judgment: but, according to Mr Bezant's
analysis, *"In the True Position, Autonomy's historical revenue growth over the period 2009 to H1 2011 was less
than half that in the Represented Position"* with true organic growth even worse, and a materially less attractive
product mix (with True IDOL Cloud effectively flat from Q2 2009 through Q1 2011, but with an uptick in Q2
2011) and True IDOL OEM revenues having in truth diminished over the Relevant Period, so as to represent
only 2.5% of 'True software revenues' in the final twelve months.

adamant that he was not aware that a significant part of Autonomy's reported revenues in the period before the Acquisition resulted from the sale of hardware that included no Autonomy software; and he added that he *"would certainly have expected any such hardware resales to be described"* when, in the course of the due diligence exercise and in order *"to better understand each of Autonomy's existing and foreseeable revenue streams"*, he asked Autonomy's management to describe all of the products sold by Autonomy and *"major product categories and new products under development"*.

4027. Mr Sarin's evidence was for the most part supported by contemporaneous evidence. His cross-examination focused on an attempt to get him to accept that HP's forecasts of Autonomy's financial results had little to do with its reported financial results, and that HP did not rely on those results, or on what it was told in the process of due diligence. Mr Sarin rejected this and I consider that this attempt failed. I accept his evidence in his witness statement quoted above as to their reliance on Autonomy's published information and on analysts' projections for Autonomy *"which were, in turn, reliant on Autonomy's published information."*

*Mr Johnson*

4028. Mr Johnson, to whom Mr Sarin reported, was principally engaged in planning and overseeing the process of due diligence. Although not a member, he also attended (with Mr Apotheker, Ms Lesjak and Mr Robison) some meetings of HP's Finance and Investment Committee of HP's Board (including those on 25 May 2011 and 18 August 2011), which was also involved in the continued financial assessment of potential acquisitions. However, and as previously mentioned, because of a family illness he arranged for Mr Sarin to take a larger role in that. Mr Johnson did not provide a witness statement in these proceedings; but he did give evidence in the US criminal trial against Mr Hussain, which was admitted into these proceedings by a hearsay notice on behalf of the Claimants.

4029. Mr Johnson's evidence in the US criminal proceedings very largely related to the process of due diligence, the public announcement of the bid, and the post-Acquisition denouement and especially a dispute as to whether Mr Johnson had told Ms Lesjak that more than $5 billion of the eventual write-down was attributable to accounting improprieties. When asked in re-examination in those proceedings whether he had relied on Autonomy's financial statements, he answered *"very much so."* But he was not invited to condescend to more detail and did not do so.

4030. Mr Johnson confirmed, however, that the warranties as to the truth and accuracy of Autonomy's financial reports given by the Defendants to Bidco when irrevocably undertaking to assent their respective shares in Autonomy into HP/Bidco's offer had further encouraged and resulted in such reliance on Autonomy's public statements as to its financial position.

4031. As I elaborate later, the decisions at board level were predominantly based on the reports made by Mr Apotheker and Mr Robison, the reports of the SCD and of the Finance and Investment Committee, and the Deal Model (as to which see below), as well as the perceived absence of any "red flags".

4032. In my judgment, the statements and figures in the published information identified above undoubtedly influenced, through Mr Apotheker, Mr Robison, Mr Johnson and Mr Sarin not only HP's initial approach, but also its Board's decision to proceed with a bid for Autonomy in preference to any other, and more particularly, in preference to a bid it had

contemplated for another software company, Software AG (code-named "Singapore" within HP). Most important of all, however, was that the historical revenue figures underpinned the DCF analysis and Deal Model, to which I next turn.

## (2) *The Deal Model and its bases*

4033. There is no real doubt, and I also find, that HP's Deal Model that produced HP's standalone valuation of Autonomy, which was revised and updated throughout the acquisition process, was predominantly based on Autonomy's published information.

4034. That is so notwithstanding the Defendants' energetically pursued point that Mr Apotheker only read the 2010 Annual Report, and Mr Sarin read the 2010 Annual Report and the Q1 and Q2 2011 Quarterly Reports but not the 2008 or 2009 Annual Reports, nor the Q1 and Q2 2009 Quarterly Reports. The main 2009 results were reproduced in the 2010 Annual Report, and the main Q1 and Q2 2010 results were reproduced in the Q1 and Q2 2011 Quarterly Reports; and in any event, the fact remains that (subject to caveats mentioned by Mr Sarin and addressed below) the historical results in the Deal Model were taken from the published information.

4035. It is apparent from the various iterations of the Deal Model, and Mr Sarin's evidence was, that he and his team used the historic revenue and costs figures for 2008, 2009, 2010 and the first half of 2011 in Autonomy's published information in constructing their DCF analysis and Deal Model. Even in exercising judgements about other inputs, including assumptions underpinning future revenue growth and margins, those historic revenue and costs continued to provide the bedrock. Mr Sarin's evidence in his witness statement, which I accept in this respect, unequivocally supported this. Thus:

(1) The Deal Model was based on a DCF analysis, using an analysis of the historic performance of the target to estimate its future performance and the present value of the cashflows that it could be expected to generate as the means of establishing standalone value (that is, value of the target in its own right without regard to potential synergies to be obtained from the combination of businesses and resources pursuant to the acquisition). That analysis was necessarily based on historic figures provided by Autonomy in published information.

(2) The DCF analysis set out within the Deal Model focused on (a) *"Rev Buildup"*, which set out historical and forecast revenues and gross profits; (b) *"Target IS"*, which set out historical and forecast operating costs, profits and cash flows; and (c) *"Stdaln DCF"* which set out the calculation of the net present value ("NPV") of forecast cash flows during the explicit forecast period of H2 2011 to 2021, and the terminal value of Autonomy (being the value of Autonomy into perpetuity as at the end of a forecast period of ten years, assuming continuation forever having reached a steady state).

(3) The calculations set out in the *"Rev Buildup"* tab of the Deal Model were based on HP's analysis and forecasts of future revenues in five revenue categories, being (a) *"IDOL Product Licence"*, corresponding to the IDOL Product revenue category in Autonomy's financial reports; (b) *"IDOL Cloud"*, corresponding to the IDOL Cloud revenue category in Autonomy's financial reports; (c) *"OEM"*, corresponding to the IDOL OEM revenue category in Autonomy's financial reports; (d) *"Maintenance"*, corresponding to the Deferred Revenue Release revenue category in Autonomy's financial reports

(which was said to stem *"principally from support and maintenance contracts recognized in arrears"*); and (e) *"Services"*, corresponding to the Services revenue category in Autonomy's financial reports.

(4) The *"Rev Buildup"* tab set out historical revenues between 2008 and H1 2011 adjacent to HP's projections of Autonomy's future revenues over the explicit forecast period (H2 2011 to 2021). Mr Sarin explained in his witness statement that *"the historic revenue and costs were derived from Autonomy's annual audited accounts, its quarterly reports, and quarterly earnings calls that Autonomy had with analysts."* He added that *"we considered, and relied on, Autonomy's historic revenue figures for 2008, 2009, 2010 and the first half of 2011, as Autonomy had provided them to the market."*

(5) I accept that evidence, though with two caveats that Mr Sarin accepted in cross-examination. One caveat was that Autonomy did not report IDOL Cloud separately until Q4 2009, but rather provided one combined figure for what was later split into IDOL Product and IDOL Cloud, so the split between Product and Cloud revenues applied in the Deal Model for 2008 and 2009 reflected estimates provided by Goldman Sachs. The second caveat was that the historic revenue figures could only provide a starting point and future growth could not simply be extrapolated from past growth[546], though Mr Sarin also made clear that *"Where we used our own projections (in particular for later years), we paid particular regard to Autonomy's publicly reported organic growth to date…"*

(6) Mr Sarin's evidence, which I also accept, was that while HP obviously did not unthinkingly "carry forward" prior years' growth, historical revenue growth, and particularly historical organic growth, played a central part in HP's forecasts for the period through 2021: it was put to Mr Sarin in cross-examination, and he was asked to agree, that HP did not base its 2014-2021 revenue growth forecasts on historical organic growth rates up to 2011, and had in reality relied more on market growth projections than on Autonomy's reported results; but he did not agree and reiterated that whilst the projection of growth rates naturally took account of various sources and market projections, it remained *"based on what was prior growth and prior revenue."* He emphasised: *"Where we used our own projections (in particular for later years), we paid particular regard to Autonomy's publicly reported organic growth to date…"* When asked in re-examination whether reported historic revenues had any effect on the DCF analysis, he answered:

> *"They do…the model is very sensitive to margins, growth rates and a whole host of other factors. If the reported numbers are different or historic numbers are different, then the model would be very different."*

(7) Similarly, the three categories of operating expenses (research and development, sales and marketing, and general administrative costs) which were also reflected in the Deal Model to build up a projection of gross margins

---

[546] Mr Sarin explained in cross-examination that he thought a simple extrapolation would be inaccurate because *"…given a business like Autonomy with various revenue segments, there are different growth rates, different capital investment assumptions, all of that factors into a much more thoughtful free cash flow number than just trying to take history and grow it at a certain rate."*

were also grounded in the historical reported numbers. The three categories were projected as a percentage of revenue, based on their reported historical relationships, though for the purpose of the Deal Model HP held the relevant percentages constant from 2013 to the end of the forecast period because (as Mr Sarin explained) that was a conservative assumption to make given the significant revenue growth projected. Forecast costs were then deducted from the forecast revenues to produce forecast operating profits.

(8) In turn, and demonstrating once again the continuing bedrock influence of Autonomy's published historical figures, (a) HP's forecast of free cash flows through 2021 in the *"Target IS"* tab of the Deal Model was based on adjustments to those forecast operating profits to account for taxes, capital expenditures and working capital needs[547] and (b) the calculation of standalone value was based on the sum of (i) the free cash flow forecast through 2021, and (ii) the *"terminal value"* of Autonomy, that is to say, the value of its free cash flows after 2021 calculated on the assumption that the free cash flows projected for 2021 would grow at a *"terminal growth rate"* for which HP's central estimate was 4% *per annum.*

(9) Then, to establish enterprise value[548], each of the above components was discounted to present value by reference to HP's estimate of Autonomy's weighted average cost of capital ("WACC"), which was 10%. This resulted in an estimate of Autonomy's enterprise value of some $9.5 billion. Adding Autonomy's net cash reserve of $705 million produced an equity value of $10.207 billion.

(10)       The Deal Model then also included an estimate of the synergies that HP hoped to realise by combining its resources with those of Autonomy, which (after deducting certain "dis-synergies" in respect of the likely discontinuance of some of Autonomy's OEM relationships where the OEM was a competitor with HP), amounted to $7.6 billion, leading to a combined standalone and synergistic value of $17.1 billion. Mr Sarin explained that the quantification of likely synergies was a rather different exercise, which relied principally on a *"thorough understanding of HP's own business"* and was undertaken principally by Ms Breya and Mr Levadoux (leaving Mr Sarin and his team to focus on constructing the financial model). Mr Sarin explained, and I accept and find, that *"Standalone value is given more weight in pricing decisions than any estimated synergy value because standalone value is based on an existing*

---

[547] As Mr Bezant explained in his expert's report, HP calculated future free cash flows as it forecasts:
    (1) Operating profits (as above derived), plus
    (2) Amortisation expenses (assumed to be nil from 2011 onwards), less
    (3) Tax (assumed at a rate of 28%), plus
    (4) Depreciation (calculated as the product of forecast revenues and its expectations of depreciation as a percentage of total revenue), less
    (5) Increase in working capital (calculated as trade receivables less trade payables informed by their historical values) plus
    (6) Increase in deferred revenue (on assumptions informed by the historical relationship between deferred revenue and revenues in 2008, 2009 and 2010) less
    (7) Capital expenditures (calculated as a percentage of forecast revenues).
[548] *"Enterprise value"* represents the standalone value of Autonomy as calculated in accordance with the discounted cash flow analysis in the Deal Model; Mr Sarin explained in his witness statement that *"Enterprise value ignores cash and debt, and adjusting for these items produces the equity value of Autonomy. The focus of our valuation exercise was on enterprise value."*

*performance history"*; once more underlining the importance and impact of the historic figures derived from Autonomy's published information.

4036.   In short, although (inevitably) HP had regard to other sources of information and other analyses in building the Deal Model, the fundamental importance and influence in the building of the Deal Model of the historical figures in Autonomy's published information is obvious. For the avoidance of any doubt, it was in my judgment clearly established.

## (3) *How ultimately did HP's Board make its decision?*

4037.   The Deal Model could not and did not dictate the price: that was inevitably the product of negotiation and then consideration and approval (or not) by HP's Board. However, the Deal Model did provide, in effect, the lower and upper boundaries of a suitable bid price, in the form (respectively) of its figures for the standalone value of Autonomy and the valuation incorporating synergies. It was ultimately common ground, and in any event it seems to me to be clear, that the standalone value generally formed a lower bound to the price, above which the buyer will seek to pay over as little as possible of what it might obtain from potential synergies. A bid price within that range then had to be fixed by reference (principally) to (a) the standalone value (b) Autonomy's then current share price and (c) what premium HP was persuaded would be necessary (and thus what proportion of the synergy value which HP hoped would result would have to be surrendered to Autonomy's shareholders) to achieve the objective of an agreed bid.

4038.   The Deal Model was not, of course, the only analysis put before the HP Board. Before finally agreeing the bid price and approving the Acquisition, HP's board was also presented with what the SCD Group called the *"IRB Shell"* in the form of a deck of slides and information built up over the course of the bid process. An important function of the *IRB Shell* was to show and explain the SCD's working valuation of the target. Mr Sarin explained that the *"...purpose of the IRB Shell was to deliver all the key information in relation to an acquisition to HP's senior executives and the relevant Board committees in a format that was familiar to, and could easily be followed by, those executives and committees."* Perella Weinberg and BarCap supplemented this with presentations of their own (including valuation analyses).

4039.   The *IRB Shell* produced to HP's Board on 5 August 2011 incorporated a valuation section that included most of the key types of analysis that would typically inform a board's deliberations in determining whether to proceed with a large acquisition, most importantly, DCF valuations on both standalone and synergistic bases, but also trading and transaction multiples, together with analyses of earnings accretion/dilution and a range of potential bid premia. In this case, the deck included a chart summarising the key analyses graphically in a format referred to as *"football field"* chart.

4040.   In parallel with the continuing process of due diligence in the following two weeks after 5 August 2011, HP's board and relevant committees continued detailed assessment of the proposed deal. The Deal Model continued to be fine-tuned. Negotiations also continued to agree finally the bid price, taking into account a more than 10% decline in Autonomy's share price since the original range (of £24.94 to £26.94 per share) had been agreed between Dr Lynch and Mr Apotheker and Mr Robison in Deauville on 28 July 2011. The bid price of £25.50 per share (which was thus further toward the bottom of the range agreed at Deauville) was finally agreed (subject to Board approval by both

HP and Autonomy) on 15 August 2011. That was then considered by the SCD, Perella Weinberg and BarCap, and then also the Finance and Investment Committee, and the matter then went forward to the Board of HP with their recommendations and supporting material.

4041. When the question whether finally to approve the Acquisition at the bid price agreed came before HP's board for the final time on 18 August 2011, the deck and the presentations by the SCD and by Perella Weinberg and BarCap also included investment appraisal metrics, by way in effect of cross-checking the DCF-based valuations, and comprising:

(1) historical bid premia: the range of premia over the share price paid in comparable transactions can be used both to sense-check a proposed bid and to gauge the likelihood that it will be accepted by shareholders. These were provided by Perella Weinberg and BarCap;

(2) internal rate of return ("IRR"): the discount rate that, when applied to forecast cash flows, results in a net present value of zero. This can be compared to a predetermined "hurdle rate" that defines the minimum rate of return required by the investor. BarCap calculated the internal rate of return implied by SCD's DCF estimate of total synergistic value at the offer price; and

(3) earnings accretion/dilution: analysis of whether, and when, a proposed transaction will increase the return to shareholders of the acquiring company. Such analysis was provided by SCD, Perella Weinberg and BarCap.

4042. Perella Weinberg and BarCap's presentations included materially similar standalone DCF valuations to those presented by SCD, both of which were based on HP's forecasts.

4043. All the various presentations and the *"football fields"* showed that HP's board considered and approved the bid price by reference to (a) a standalone valuation of Autonomy and (b) a valuation including both standalone value and synergies. All the assessments were underpinned by the historical figures and metrics in Autonomy's published information. The bid price was at a premium to the standalone valuation, but significantly less than the valuation combining standalone value and synergy value: the bid price did not require HP to cede more than about 10% of its anticipated synergy benefits, which the Board was satisfied was reasonable, and by reference to analyses of historical acquisition premia paid for UK listed technology companies was so. The Board unanimously resolved to authorise HP to proceed with the transaction, and the bid proceeded through its subsidiary, Bidco.

(4) *What is the relevance of HP/Bidco's reliance on other sources of information and advice?*

4044. It will already be apparent and it was not in dispute that HP/Bidco took into account the views of analysts and specialist advisers, especially in assessing Autonomy's likely future performance (including, for example and as already noted above, relying on Goldman Sachs estimates in splitting annual IDOL Product and IDOL Cloud revenue figures for 2008 and 2009 which Autonomy had not provided).

4045. Also, HP used other valuation techniques, including trading and transactions multiples analyses, historical bid premia comparisons, calculations of Internal Rate of Return and earnings accretion/dilution analyses produced by BarCap and Perella Weinberg, as well

as Perella Weinberg and BarCap's own materially similar standalone valuations, to inform its deliberations.

4046. It seems to me unlikely that in any large transaction of this nature a bidder would proceed exclusively by reference to the target's published information even if tested by rigorous due diligence.

4047. However, in my judgment, none of this undermines my conclusion that the foundation of HP's assessment and ultimate decision was the description of historical revenue performance, organic software revenue growth, gross margins and the description of its business and five revenue streams put forward in Autonomy's published information and providing the bedrock for the Deal Model.

4048. Autonomy's published information also, of course, influenced the market, the share price, the anticipation of a bid premium and the expectations of shareholders in gauging the sufficiency of any bid offer price. That in turn had to be taken into account by HP in determining what bid price to agree and offer; and as already mentioned, one of HP's cross-checks was an analysis of bid premia in similar acquisitions. However, in my judgment, that does not militate against HP/Bidco having relied on the published information: on the contrary, it is a further manifestation of the fact that Autonomy's published information inevitably informed not only its analysis but its eventual decision.

*(5) Was HP/Bidco actually aware of any matters falsifying the published information?*

4049. I have concluded in earlier parts of this judgment that no one involved in due diligence on the part of HP, or in the negotiation and ultimately approval of the bid and Acquisition, whose knowledge would be attributed to HP/Bidco, was aware, before the Acquisition, of any material matters which falsified the depiction of Autonomy in its published information.

4050. As also previously explained, a defendant found guilty of deceit cannot establish a defence based on contributory negligence or the principle of *"caveat emptor"* (and see paragraph 519 above).

**Conclusion on reliance (FSMA Claims)**

4051. I am entirely satisfied that the Claimants have established reliance on Autonomy's published information and that such reliance was reasonable.

4052. If, as I consider to be the case, the presumption of inducement applies, it has not been rebutted; but even if I am wrong and it does not apply in the context of FSMA claims, as Mr Miles rather tentatively argued, inducement is established in any event in the case of each one of the claims that HP/Bidco based their assessment, constructed their Deal Model and proceeded on the basis of representations and statements in Autonomy's published information which have been demonstrated by the Claimants to have been untrue and/or misleading.

4053. As summarised in paragraph 522 above:

(1) HP/Bidco have established reasonable reliance on what was stated in the published information in respect of all the aspects of Autonomy's business now said to have been misrepresented; and more particularly, HP/Bidco reasonably relied on that published information as having conveyed that:

(a)    Autonomy was a *"pure software company"* having no need to rely on any sources of revenue other than those from its software licence sales;

(b)    All revenue recognized in its accounts was generated by substantive transactions which had been properly accounted for;

(c)    Autonomy's OEM business revenue was a particularly valuable source of recurring revenue derived at least predominantly from development licence sales and recurring revenue from royalties;

(d)    Autonomy's hosting business, which was accounted for as part of its IDOL Cloud business, was growing as a result of increased hosting revenue streams which by their nature were recurrent;

(e)    Sales by Autonomy from which revenue was recognized were genuine transactions of commercial substance, and properly accounted for accordingly.

4054.  In the circumstances it was reasonable for HP/Bidco to rely on Autonomy's published information and they did so; but in the respects I have sought to set out, that published information was untrue or misleading to the knowledge of both of the Defendants; and there were matters omitted from Autonomy's published information which were required to be included in it, both Defendants knowing that the omissions constituted dishonest concealment of material facts.

4055.  In reality, Autonomy was a smaller company with a materially less attractive revenue mix, with lower growth and less success in the market and (overall) lower profit margins than it was represented and appeared from its published information to be.

*Introduction to issues of quantum*

4056.  In my judgment, absent the fraud, HP would not have proceeded with the transaction at the bid price. The question then is whether HP would have proceeded with the transaction at all, and if so, at what price. However, I have reached the provisional view, in the context of the FSMA Claims, that even if accurate information had been given and Autonomy's financial position and performance had been properly and accurately disclosed, HP/Bidco would nevertheless have wished to proceed to a bid and to conclude the Acquisition, but at a significantly reduced bid price.

4057.  Although serious, in my judgment the misrepresentations did not negate the value of the core product IDOL nor the potential for the Acquisition of Autonomy's software business to provide the platform and catalyst for the transformational change in HP's focus away from its low-margin hardware business towards enterprise software, and the better use of its vast resources and market presence in that area and in the developing field of unstructured data analysis.

4058.  The question then is whether Autonomy's shareholders would have accepted a lower bid price. The Claimants pleaded that they would have done so (or at least would have been likely to do so): see the quotation from the RRAPoC in paragraph 530 above.

4059.  The premise of this is that Autonomy's published information should be assumed to have been corrected and that the shareholders would have been properly informed by accurate information, but would not have known of the fraud. As noted in paragraph

529, and expressly stated in Dr Lynch's closing submissions, it was common ground that in assessing the FSMA Loss, the relevant counterfactual is that accurate information would have been published historically, since loss falls to be calculated on the assumption that Defendants did not cause Autonomy to breach its obligations under FSMA, so that Autonomy's published information would have reflected the correct accounting in respect of the impugned transactions. I have taken it also thereby to be common ground that this accurate information would have informed the market, and thus Autonomy's share price and its shareholders' expectations. Accordingly, my understanding is that, on the case as argued I need not be troubled by a question that had at one time concerned me about whether the transaction would inevitably have been abandoned because whilst the position would have been corrected as between HP and Autonomy, the shareholders (whose agreement to sell was necessary) would still have had the perception of value and expectations of premium informed by the (inaccurate) published information.

4060.   On the assumptions explained above, my provisional view is that it is more likely than not that shareholders would have accepted a lower bid price, even a considerably lower bid price.

4061.   The assessment of what bid price, on that basis, would have been recommended and agreeable is a difficult one. As Mr Bezant acknowledged, it is not possible to provide a scientific determination and there is inevitably subjective judgement involved. The reality, as it seems to me, is that though valuation techniques provide a floor and ceiling, ultimately the price to be paid depends upon what is to be taken to be the then current share price and what premium is necessary to win the likely support of a strong majority (probably 90% of the shareholders). Autonomy's share price would have been lower, and shareholders' expectation of premium moderated; and HP's DCF modelling and other valuation cross-checks would only have justified a lower price and lesser premium to ensure an agreed bid. As Dr Lynch himself recognised, a bid becomes irresistible if at a premium which most shareholders are likely to find irresistible; and the Defendants could not have resisted or vetoed such a bid.

4062.   What that price would have been remains to be assessed in a later judgment on quantum, which will need to take into account the recalibration of the Deal Model and other cross-checks in light of my findings as part of an overall enquiry to assess what in Autonomy's 'True Position' its share price would be likely to have been, what premium would reasonably have been required to be paid, and whether a bid at the resulting price would have been within acceptable parameters having regard to HP's (properly recalibrated) Deal Model (including its revised assessment of synergy value) and other cross-checks.

4063.   In doing so I shall also wish to consider further the Defendants' expert, Mr Giles's, central themes that Mr Bezant had adopted a flawed approach both to the assessment of remaining synergy value and to the effect of the required adjustments on a DCF valuation, it being Mr Giles's view that *"Overall the Accounting Adjustments [would] very likely have no impact or very little impact on cash"* and that in consequence a DCF valuation would *"not be materially affected by the Allegations"*.

4064.   I am also likely to need further guidance on (if it becomes relevant) the *"No-Transaction scenario"* (the quantification of which would depend, amongst other things on whether synergy value of Autonomy in the hands of HP is to be included) and the differences in the *"FSMA Counterfactual"* and the *"Misrepresentation Counterfactual"* (as to which see further below).

4065. For the present, I do not feel it appropriate or possible to express any final view; but I presently and provisionally consider that the Claimants' FSMA loss will be established to be, though substantial, substantially less than the amounts claimed.

*Issues relating to the Deceit/Misrepresentation Claims*

4066. As previously explained, the FSMA claims did not seek to recover loss relating to the acquisition of shares and share options held by Dr Lynch and Mr Hussain. Conversely, the claims for common law deceit and under the Misrepresentation Act 1967 against the Defendants were confined to loss attributable to the purchase of their shares and share options (the amount claimed being approximately $420 million). A further complexity relates to the different considerations which the parties agreed were applicable in relation to the counterfactual to be assumed for the Deceit and Misrepresentation Act claims.

4067. Whilst I have taken the claims to be complementary, and to have been established in both cases, it is of course important to keep in mind that whereas the basis of the FSMA claims against the Defendants is the recovery from the Defendants (by way of breach of duty claims) of Autonomy's loss in consequence of it having accepted liability to HP/Bidco for the untrue or misleading statements and omissions dishonestly concealing material facts in published information for which the Defendants were responsible as PDMRs, what the Claimants described as the *"conceptually simpler"* claims in deceit/misrepresentation were direct claims against the Defendants, based on their personal deceit/misrepresentation. I have had to be (and have been) satisfied in the one (the FSMA claims) that HP/Bidco reasonably relied on Autonomy's published information in proceeding with the Acquisition at the bid price; and in the other (deceit and misrepresentation) that HP relied on the representations in purchasing the Defendants' respective shares and share options.

4068. The Claimants also stressed an important difference between the two sets of claims in respect of the measure and calculation of loss they asserted. As explained above, in the FSMA claim, and for the purpose of assessing the FSMA Loss, the counterfactual (*"the FSMA Counterfactual"*) presented is one in which the Defendants did not cause Autonomy to breach its obligations under FSMA, so that Autonomy's published information would have been compliant with FSMA and reflected the correct accounting in respect of the impugned transactions throughout. In the FSMA Counterfactual, therefore, HP would never have been aware that the published information was inaccurate or misleading, still less that the misrepresentations were the product of dishonesty. In the deceit/misrepresentation claims, however, the counterfactual is different. Unlike the FSMA Counterfactual, the *"Misrepresentation Counterfactual"* which the Claimants presented does not assume any correction to Autonomy's published information until the negotiation stage, and so HP would have at some stage become aware that the published information had been materially inaccurate or misleading, although it would after that disclosure or discovery then have proceeded on the corrected information.

4069. Quite when and in what terms it is to be assumed that the disclosure or discovery would have been made is likely materially, perhaps determinatively, to affect whether, in the context of the direct misrepresentation claims, the transaction would have proceeded at all.

4070. Thus, the Claimants contended (though Mr Bezant was not entirely consistent in this regard) that the correction would have revealed or required the revelation of dishonesty; and that in those circumstances it may then seem implausible that HP would have pursued an acquisition of Autonomy at all. In that context, Mr Bezant was instructed by HP to assume, in constructing the Misrepresentation Counterfactual that:

(1) but for the breaches of duty alleged by the Claimants, the misrepresentations alleged to have been made by the Defendants directly to HP would not have been made; but the impugned transactions would still have been entered into, and Autonomy's published financial information would have been the same as it was in fact; and

(2) insofar as HP continued to pursue an acquisition at all, price negotiations on both sides, and the decisions of the selling shareholders, would have been informed by the same information about Autonomy's "True" historical performance that would have been available to the market in the FSMA Counterfactual.

4071. Mr Bezant stated in his first report that he read this as in effect requiring him to

> *"assume that, during the course of negotiations, Autonomy would have informed HP of the True Position and thereby that its published information was false and misleading. In that scenario, I anticipate that, HP may well have terminated negotiations. If HP did not do so, I would not expect HP to have proceeded with negotiations until Autonomy had fulfilled its obligation to disclose the True Position to the market. In any event, consistent with my instructions, disclosure by Autonomy would be required in order for negotiations to proceed with the selling shareholders and Convertible Bond holders aware of the True Position."*

4072. The Defendants, on the other hand, contended that no such revelation of dishonesty would have been necessary and in the construction of the Misrepresentation Counterfactual none should be assumed. According to the Defendants, it would have been (as it was stated in their written closing submissions) sufficient for Autonomy to *"say that it had learned that the accounting ought to be different and then provided HP with the correct accounting treatment"* and accordingly the Misrepresentation Counterfactual should simply be based on the assumption that *"HP would have had a full view of the transactions in question."* In short, and as Dr Lynch's valuation expert Mr Giles approached the matter, neither the issue whether the transaction would have proceeded nor the counterfactual value of Autonomy should be discounted by reference to the *"stain"* of accounting issues.

4073. Further, if it is assumed for the purpose of the Misrepresentation Counterfactual that the transaction would have proceeded, the question arises as to what information revealing the need for correction would have been known when, and by whom, and what, even if no disclosure of dishonesty is to be assumed, what (if any) other repercussions of revelation should be assumed.

4074. In that context, Mr Bezant's approach was that:

> *"... disclosure of the True Position would cause the market to reassess the value of Autonomy for:*
>
> (1) *the business' prospects in the True Position; and*

**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

(2) *additional uncertainty arising from knowledge that Autonomy had misrepresented its operations and results in public filings and its communications with the market.*

*...*

*This uncertainty a buyer would have faced would adversely affect both the Actual Value of Autonomy and the Revised Price. I am unable to quantify with certainty the discount to value that would result from taking such matters into account."*

4075.  The Defendants again disagreed. Consistently with their position that the Misrepresentation Counterfactual should not involve any assumption that Autonomy's historical conduct was in any way improper (but also they contended, in any event), they and Mr Giles rejected any suggestion that any correction required would have any lasting effect on *"the long-term expectations for revenues, profits and cash flow that determine value".* They contended further that *"by the time that HP was provided with the information about the transactions, it would also know that the matter had been looked into and this is what had been identified. Any further discount for the stain would be double-counting."*

4076.  I consider that these points, which I have only sought briefly to introduce, raise challenging difficulties both in terms of legal principle and in their effect on the ultimate decision whether the transaction would have proceeded, and according to that, the construction of the appropriate Counterfactual and the quantification of loss. For these reasons, and also because the figures so far produced seem likely to be affected by my findings, I have considered it appropriate both to express only a provisional view as to whether (a) in the FSMA context and (b) in the deceit/misrepresentation context HP would have proceeded with the transaction, and more generally to defer my determination of quantum to enable further submissions. I shall need particular assistance in seeking to resolve, and if possible, reconcile the two different approaches: I would find it difficult to accept that it would be a satisfactory result for there to be a material difference in the quantification of loss according to whether the context and counterfactual relates to (a) the acquisition of shares and share options from Dr Lynch and Mr Hussain and (b) the acquisition of shares from all other shareholders.

## DIRECT LOSSES

4077. This Chapter addresses the Claimants' claims against each of the Defendants for breaching their duties as directors and/or employees of three companies within the Autonomy Group, namely, Zantaz, Autonomy Inc (the 4th Claimant), and ASL (the 3rd Claimant) (and/or in the case of ASL, for breach of Dr Lynch's fiduciary duty of loyalty, see paragraph 3521 above).

4078. The claims are for direct losses[549] suffered by particular Autonomy subsidiaries (including the 3rd Claimant and 4th Claimant, which bring the claims) as a result of the Defendants' breach of duty in causing the relevant subsidiary to act to its detriment, essentially by spending, or foregoing, money which it was not in the subsidiary's best interests to spend or forego, and which the Defendants did not believe to be in the subsidiary's best interests.

4079. In these further claims, the 4th Claimant (Autonomy Inc) sues (a) in its own right, but also (b) as the legal assignee of Zantaz's direct claims under this head, there having been a valid assignment to it of all of Zantaz's claims.

4080. I have already addressed such of the direct loss claims as relate to Autonomy's "Hosting" business. In relation to the direct claims made in respect of the four hosting transactions, I have set out in detail in the hosting section, my conclusion is that all four of the impugned contracts were not commercially in the relevant company's best interests, and the Defendants both knew that, because the contracts were entered for the purpose of falsely inflating Autonomy's apparent revenue.

4081. In the course of my analysis in that context, I have reached a number of conclusions of relevance to the matters addressed in this Chapter, which for convenience I summarise below.

4082. As to the dispute whether Dr Lynch had any directorial role in the three companies concerned, I have found that:

(1) both Defendants owed duties as *de jure* directors to Autonomy Inc;

(2) Mr Hussain was *de jure* a director of ASL and Zantaz;

(3) Dr Lynch was not *de jure* or *de facto* a director of Zantaz, but he was a *de facto* or shadow director of ASL.

4083. I have concluded that the only proper claimant for any of these direct claims is (a) the company to which either of the Defendants owed and breached a duty as director or employee (or, in the case of ASL, fiduciary in the sense described in (paragraph 3521 above) or (b) a valid legal assignee of such a claim. More particularly, I have determined that the existence of the transfer pricing arrangements where losses are transferred from one subsidiary to another within the group does not give a right to the transferee to sue for those losses.

---

[549] Described in the RRAPoC as "transaction-based losses".

4084. I have also found (again when dealing with the direct claims in respect of the hosting transactions) that no relevant duties were broken by either of the Defendants in their roles as directors of ASL in relation to the transfer pricing arrangements whereby losses incurred by Autonomy Inc, Verity Inc and Zantaz were transferred (but not assigned) to ASL. In my view, on the evidence put forward, those transfer pricing arrangements did not affect the right of the Autonomy company to which a duty was owed and broken by one or both of the Defendants in respect of the impugned transactions to make a claim. An agreement to transfer losses (as distinct from an assignment of the underlying rights) does not carry with it the conclusion that no loss has been sustained by the original claimant, nor that the right to claim has been lost or transferred. How the claimant which has suffered the loss has sought in the past or in the future seeks to deal with the loss which has been sustained has no bearing on its right to sue, or the quantum it may claim.

4085. I concluded in respect of the Hosting claims that because Dr Lynch was not a director of any sort or employee of Zantaz, he owed no duty in respect of the three Zantaz contracts impugned in these direct claims under hosting, and the claim against him in respect of those contracts fails accordingly. It succeeds against Mr Hussain. In relation to the fourth contract, namely between Autonomy Inc and MetLife, the loser was Zantaz, because it was Zantaz which was the original contracting party with MetLife, whose payments were reduced by the later contract with Autonomy Inc. Although Dr Lynch was a director of Autonomy Inc, because Autonomy Inc suffered no loss there is no valid claim against Dr Lynch in respect of this fourth impugned hosting contract. I emphasise that the reason the claim fails against Dr Lynch in relation to this fourth contract is not because of the transfer pricing arrangements, but because Autonomy Inc suffered no loss in the first place.

4086. In my judgment, the same approach as regards the status of Dr Lynch and the identification of the proper claimant and what if any loss was sustained applies to the remaining transaction-based/direct loss claims under the three remaining heads (Hardware, MAF payments to VARs, and reciprocal transactions (VAR and non-VAR)). The breach of a duty owed by the Defendants to the company which sustains the loss, must be established. Such a claim is not affected by loss transfers which fall short of assignment, nor do such matters result in the company suffering no loss. Further, the transfer pricing arrangements made by ASL cannot form the basis of a claim because the entering into of the transfer pricing arrangements cannot successfully be impugned as a breach of duty.

4087. Turning to the factual basis of the claims under these remaining heads, the parties dealt with these three heads of claim relatively shortly in their submissions. So will I.

*Hardware*

4088. The only difference on the threshold issues in respect of the hardware transactions is that unlike the hosting contracts Autonomy Inc did suffer the losses because they were the buyer and seller of the relevant hardware.

4089. The Third and Fourth Claimants put their case as follows:

(1) The relevant purchases and sales were made for the improper purpose of inflating Autonomy's reported revenue rather than for any genuine commercial purpose.

(2) Both Defendants (a) were directors of Autonomy Inc and (b) actively, albeit in different ways, promoted these hardware sales.

(3) The losses on the hardware sales related to and resulted from a breach by the Defendants of their duties to Autonomy Inc as the relevant company that sustained them.

4090. The Defendants' principal defence of course was that the hardware transactions were legitimate. Otherwise, they were left with arguments as to the effect of the transfer pricing arrangements and questions as to the extent of Dr Lynch's duty and knowledge. I have already dealt with these, as explained above.

4091. I have concluded that the Claimants must succeed on this aspect of their claims. That includes their claim for recovery of $250,000 paid as bonuses in respect of the hardware transactions.

4092. The Defendants have points on the quantum of these claims, which I will deal with in my quantum judgment.

*MAF Payments to VARs*

4093. The Claimants put their claim under this head as follows:

(1) All three subsidiaries paid so-called marketing assistance fees (MAFs) to VARs. The VARs did not assist in any marketing efforts, notwithstanding the paper trail in relation to various of the MAFs suggesting the contrary.

(2) These were inducements for the relevant VAR to participate, and a reward for having participated, in a transaction that would enable Autonomy to report revenue improperly, and were thus paid in breach of the Defendants' duty to the relevant subsidiary. That would in principle include foregone receipts on certain transactions, including in respect of Verity Inc, where amounts were paid to a VAR by an end user, as a designated payee on a transaction between Autonomy and the end user, which exceeded the amounts paid by Autonomy to the VAR, being in effect another mechanism for payment of a MAF.

4094. Again in principle, I have found the factual basis alleged by the Claimants made out in my detailed consideration of the VAR claims. I also find that procuring the companies to make MAF payments or forego receipts was a breach of duty as a director.

4095. It was not altogether easy or even possible to unravel from the schedules the extent to which ASL or Autonomy Inc was the original payer (and not simply a party to which a cost was subsequently transferred under transfer pricing arrangements). If either was the original payer, a claim lies against both Defendants. To the extent the original MAF payer was Zantaz the claim will only be against Mr Hussain.

4096. The schedules of MAF payments identify all three companies as payers depending on the relevant MAF payment. In principle I find both Defendants are liable for the

Autonomy Inc payments or foregone receipts. I find only Mr Hussain is liable for the Zantaz payments (or foregone receipts).

4097. In relation to the ASL payments, although the evidence is unclear, it appears in respect of a limited number of the MAF payments that ASL was the original payer. Both Defendants were responsible for those payments being made, and in those circumstances both Defendants are liable for the ASL MAF payments.

4098. Again, I will consider precise quantum in my quantum judgement. However, I note that the Defendants did not raise any positive points against the quantification of this head of loss advanced by the Claimants (and amounting to $8,883,221), and did not challenge at trial Mr Bezant's verification work in respect of those figures as set out in Schedule 12C of the RRAPoC.

*Reciprocal Transactions*

4099. The Claimants put their claim under this head as follows:

(1) All three subsidiaries were involved in either: (i) the impugned reciprocal transactions; and/or (ii) improper reciprocal transactions used to unravel VAR transactions (i.e. where the relevant subsidiary bought something it did not need in order to put the VAR in funds to settle its proposed debt).

(2) The losses incurred similarly represent damages for the Defendants breaches of duty.

4100. For the reasons I have set out at length in my consideration of the VAR Claims, and Reciprocal Claims made under FSMA I find the premise of this head of claim made out, namely there was no commercial justification for these reciprocal transactions and this was known to both Defendants because their purpose was falsely to inflate Autonomy's apparent income. In my judgment, both Defendants authorised these transactions.

4101. As with each of the four separate claims for breach of duty owed by the Defendants to Autonomy companies, against which Defendant the claim can be made depends on which subsidiary entered the impugned transaction. In their closing submissions the Claimants identify which entity has suffered the loss in respect of the reciprocal transactions as follows:

> *"Of this total amount, [around $20m] $739,450 was suffered by Zantaz and the remainder resulted in a loss to ASL by virtue of the aforementioned transfer pricing arrangements."*

4102. They added in a footnote:

> *"The Claimants advance an alternative case, which reflects the position before the transfer pricing arrangements. Under this case, the net loss is recorded in the entity that recorded the purchase transaction. This approach results in losses of $2,980,444 to ASL, losses of $14,469,910 to Autonomy Inc and losses of $3,215,000 to Zantaz: PoC Schedule 12, Table 12B."*

4103.  They also asserted that Mr Bezant had confirmed that he had not identified any inaccuracies in PoC Schedule 12, Table 12B. Mr Bezant's evidence on this point was not challenged in cross-examination.

4104.  I did not understand the Defendants to take any points on quantum on this head of claim if liability were to be established. However, although no points were raised, I will leave the assessment of these losses to my quantum judgment.

4105.  In those circumstances I find that the subsidiary which suffered the losses were as identified in the alternative claim, set out in the footnote. The amounts of that claim have not been challenged but will finally be determined in my separate judgment on quantum.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

## COUNTERCLAIM

4106. Lastly, I should briefly address Dr Lynch's Counterclaim against the First Claimant (Autonomy), though ultimately only to confirm that it seems to me to follow from my findings in the main claim that it falls to be dismissed.

4107. In summary, the gist of the Counterclaim was that HP's public announcement on 20 November 2012 of the $8.8 billion write-down of Autonomy, and the various briefings on that day, contained statements seriously impugning the conduct and damaging the reputation of Dr Lynch which (according to the Counterclaim) were untrue, that Autonomy authorised the false statements made, and that in doing so it was in breach of a duty of trust and confidence, alternatively duties in tort and under the Data Protection Act 1998 ("the DPA"), which it owed to Dr Lynch.

4108. The Counterclaim identified a series of eleven specific statements made in the course of the announcements and calls referred to above, including serious allegations against *"former members of Autonomy's management team"* accusing them of a *"wilful effort to mislead investors and potential buyers",* and alleged each to be false. Most of the eleven statements impugned the way the business of Autonomy had been conducted and accounted for on broadly the same grounds as have been put forward by the Claimants in the main proceedings and alleged that those *"former members of Autonomy's management team"* had *"used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP".* Three of the statements referred, misleadingly it was claimed, to the circumstances in which the alleged improprieties came to light, one to the impact of the alleged improprieties and misrepresentations in causing HP to pay too much for the acquisition of Autonomy. A further statement related to the role of Deloitte and HP's alleged reliance on them.

4109. The claims were not brought in defamation: it does not seem to have been disputed that any defamation claims were statute-barred. Nor did Dr Lynch seek to recover damages for reputational damage. Rather, the claims asserted that the allegedly false statements caused such reputational damage to him that it caused two very substantial prospective investors in his company, Invoke Capital, to withdraw. The sums claimed in the Counterclaim were considerable: Dr Lynch claimed that if the investments had been made, he would have earned considerable equity gains and fees through Invoke Capital of at least $160 million.

4110. The claims depended upon Dr Lynch demonstrating (on the usual balance of probabilities) that (a) the identified statements were false, (b) Autonomy authorised the making of the statements and thereby assumed responsibility for them, and (c) Autonomy owed Dr Lynch duties of which it was in breach. There was also a dispute about causation, and about quantum.

4111. As may be apparent from my description in the Introduction to this judgment, and especially in paragraphs 384 to 414, I have never been convinced that at the time of the Announcement of Impairment in November 2012 HP had yet established the facts necessary to justify the very serious allegations which the Announcement contained. The references in the Announcement to *"intense internal investigation"*, which were relied on as underpinning and justifying the representations and allegations made, had

not been completed and, so far as the evidence went, were largely undocumented (though the Claimants suggested that a claim made to privilege might in part at least explain that).

4112.  Still less had there been any exercise to correlate the irregularities alleged to the amount of the write-down sought to be explained and justified, as internal emails make clear (see paragraph 396(2) above). Indeed (as may also be relevant to the question of quantum), any correlation between the amount of the write-down and the improprieties alleged to have justified is difficult to discern, and appears to be belied by the way it was calculated at the time. Of the total write-down of $8.8 billion, $3.6 billion was the result of increasing the discount rate from the 9.5% used in August 2012 (when no impairment was thought necessary) to 16% (an extra percentage point having been added at the very last minute). According to an HP infographic circulated on 19 November 2012, the remaining $5.2 billion was attributable to (a) $2.9 billion for lower margins, (b) £1.8 billion for lower growth rates and (c) $1.3 billion for the effect of re-baselining revenue to reconcile the accounts. No mention was made of the alleged accounting improprieties (though they may be compendiously taken into account in those calculations without express identification).

4113.  There are grounds for supposing (and see paragraphs 409 to 413 above) that HP had hurried to inform the market before it had completed the necessary investigations because it urgently needed to revalue the component parts of its business following a reduction in its market capitalisation in 2012 and to satisfy the requirement of US accounting rules that the sum of the parts of a business plus 30% control premium could not exceed its market capitalisation. The huge write-off neatly resolved this problem. Writing down the value of Autonomy ensured that no write-down was required of HP's own Software division (which, as explained in paragraph 411) HP wanted to avoid. The signs are that HP proceeded before it was really ready in light of market and accounting exigencies, and the write-down was in an amount which satisfied both. That may also explain why the allegations were not even put to Dr Lynch before they were vigorously publicised.

4114.  However, whilst these matters did encourage in me original scepticism about the claims and their quantum, I do not consider it necessary to consider them in any greater detail. Nor do I need to explore and determine the various and considerable difficulties in Dr Lynch's way (including the difficulty of demonstrating that Autonomy assumed an obligation in respect of HP's Announcement), which would have confronted him even had he succeeded in the main claim. For the fact is, as pleaded by the Claimants, and whether or not sufficiently underpinned and documented at the time that they were made, the statements as to the conduct of the business and its accounts which Dr Lynch identified were, in my judgment, true. The fundamental premise of the Counterclaim was that the statements were untrue, and the premise having been falsified, the claim must fall away. That is so even if the representations as to the basis of the statements were untrue, incomplete or inaccurate: there would be no realistic prospect of establishing loss.

4115.  Accordingly, as I indicated would be the result in my Summary of Conclusions (in Appendix 6), I dismiss the Counterclaim.

## CONCLUSION

4116. I approached the Claimants' case with considerable scepticism. This was not a case like Theranos, which raised more than $700 million to develop and support a product which never had any substance. Autonomy was a successful cash-generating enterprise, audited by Deloitte, with substantial cash reserves at the close of 2010, and a world-beating software product, which had opened up for analysis the then uncharted but vast area of unstructured data (IDOL) and which Ms Whitman herself had apparently described as *"almost magical technology"*.

4117. However, I have been satisfied and concluded that the evidence reveals a clear pattern of Autonomy's central management resorting, under the direction of the Defendants, to a variety of what the Claimants had termed *"levers"*, which (quoting from the Claimants' written closing submissions) *"the Defendants could pull, as and when desired, to achieve their overall goal of misrepresenting Autonomy's financial condition so as to make it appear that the business was operating in line with market expectations"*.

4118. Although the Defendants advanced the semblance of commercial justification for hardware sales, VAR transactions, reciprocal sales, "hybrid hosting" and the inclusion within the "OEM" category of subsequent sales said to have been generated by OEM transactions, those justifications lacked substance.

4119. Further, the extent to which the Defendants had consistently and successfully sought to conceal the true substance and purpose of material parts of Autonomy's business and to disguise their adverse effect has become clear. No good or sufficient reason was ever provided, for example, for the failure properly to disclose the hardware sales and the treatment of their associated costs which made them loss-making.

4120. Both individually and together the effect of the deployment of these "levers" was to portray Autonomy as a much larger and more successful company than it really was, with a history of meeting and beating market expectations which was sustained only by resort to undisclosed or incorrectly described sources other than proper software licence sales.

4121. I have determined that the Defendants were responsible for a strategy of sales of third-party hardware which were not appliances or in any meaningful way a *"delivery channel for software sales"*, and the purpose of which was to plug shortfalls in software licence sales and thus to disguise the true performance of Autonomy's software business.

4122. I have accepted the Claimants' case that the series of VAR sales which I have described lacked any real substance and the apparent revenue they purportedly generated should not have been recognised: in every case (with one exception where the allegation was not established) the sale to the VAR was put in place to make good revenue lost when a sale to a genuine end-user failed: the reseller was never intended to, nor ever did, play any part in the resale of the software purportedly sold to it; nor was it intended to pay Autonomy from its own resources if an end-user sale eventuated; nor did it have any part to play in any sale to the proposed or a substitute end-user, which Autonomy alone would seek to negotiate and conclude, without regard to or any participation by the reseller.

4123. I have accepted also the Claimants' case that by a variety of reciprocal transactions Autonomy put its customers in funds to buy Autonomy products, by buying products from the customer despite having no or no real commercial rationale for doing so.

4124. Both the pure hardware sales (which Autonomy subsidised by buying the hardware and then reselling it at a loss) and the reciprocal transactions (where in effect Autonomy was paying a customer to buy Autonomy products) amounted to Autonomy buying its own revenue.

4125. Moreover, I have accepted that the Defendants well knew that Autonomy had repeatedly misrepresented the nature and scale of its IDOL OEM revenues, which they knew would be and were especially highly regarded by HP, and had materially exaggerated its hosting revenues.

4126. In reaching these conclusions, I have borne in mind throughout that Autonomy had well-known and reputable auditors, and through much of the Relevant Period, an Audit Committee chaired by a well-regarded and very experienced accountant, and an equally well regarded and experienced non-executive Chairman, all of whom had access to the accounting records without restraint. For reasons I have sought to explain, the Defendants' reliance on them as denoting that the accounting treatment of the impugned transactions may sometimes have 'pushed the envelope', but was within the parameters of reasonable judgements and propriety, justifies or provides a conclusive litmus test. The fact is, as I have concluded, that the evidence (including, especially, emails of which Deloitte, Mr Bloomer and Mr Webb QC were not aware) shows that the Defendants knew that the true purpose of the various 'levers' they deployed was dishonest, as further demonstrated by the efforts the Defendants made to conceal or misdescribe the true nature and scope of the business undertaken.

4127. In the result, I have determined that the Claimants have succeeded in substantially all their claims, except in respect of one impugned VAR transaction and in their claims relating to the *"Other Transactions."* They have established, on the civil standard of the balance of probabilities, that the Defendants dishonestly misrepresented the financial position and performance of Autonomy during the Relevant Period. I consider that HP/Bidco bought a smaller and less successful company than it was represented to be and that HP was led to and did believe that it was acquiring.

4128. One of the tragedies of the case is clear: an innovative and ground-breaking product, its architect and the company will probably always be associated with fraud.

4129. The length of this judgment may well be unparalleled. I have sought to set out the detail I have thought appropriate having regard to the gravity of the claims and the enormity of the consequences for the parties (and especially the Defendants). If there is excuse for its length it is that this has been a most unusual case.

4130. Ordinarily, even the most complex cases tend to be resolved ultimately by reference to a small collection of documents which become dog-eared with repeated citation during the course of the trial, and discrete passages of oral evidence likewise cited so often as to verge upon becoming leitmotifs. In this case, however, the allegations travelled over all the major aspects of the way Autonomy generated revenue, over (in all) more than 100 transactions each with supporting documents. The pattern which I have concluded emerges in the round had to be tested against each one, not least in case some differences

emerged which falsified the general description. The number and variety of transactions, documents and extracts from witness evidence referred to in this judgment may demonstrate the unusual nature of the case, as may also the volume of transcripts which exceed some 18,000 pages and the hundreds of pages of evidence from the US criminal proceedings admitted into evidence in these proceedings as hearsay.

4131. Another unusual facet of the case which necessitated particularly detailed focus on the extensive documentary record has been, conversely, the absence of not only, and most obviously, one of the only two Defendants (Mr Hussain) but also (as already recorded) of a number of key individuals who might have assisted me, and in particular, Mr Knights and Mr Mercer (the lead partners for Deloitte over the course of the Relevant Period), Mr Sullivan, Mr Johnson and Mr Scott (who gave evidence in the US criminal proceedings but not before me) and (on the Defendants' side) Mr Chamberlain, Ms Eagan, Mr Kanter, Dr Menell (all of whom I have concluded were part of a clique responsible with the Defendants for the operation of the impugned 'levers').

4132. The length and complexity of the judgment, my delay in completing my assessment, the need for an extended period to enable the parties' legal representatives to consider, correct and comment upon the draft and my concern about the difficulty of maintaining strict confidentiality pending final formal handing down of the finalised version, caused me to follow an unorthodox course in delivering my conclusions and reasoning. First, I took the unusual step of setting out a Summary of my conclusions and their basis at a public hearing on 28 January 2022[550] (see Appendix 6). Shortly thereafter I provided my draft judgment (first circulated on 31 January 2022, and supplemented in stages thereafter) to nominated individuals for correction and appropriate comment under conditions of the strictest confidence.

4133. As it transpired, rather longer was required for the process of correction and comments, and their consideration, than originally estimated; but the corrections and comments provided by all parties have been extremely useful, and I am grateful to all concerned. I am grateful too for the confirmation provided by all to whom any previous drafts were provided to enable the process of correction and comment, which remain embargoed that any such drafts, will (to ensure confidentiality) be delivered up and destroyed.

4134. More generally, I reiterate my thanks to the parties and their representatives for their patience and unstinting assistance throughout the long process of pre-trial hearings, the Trial itself and the regrettably long period of this judgment's gestation. The advocacy on all sides was of the highest quality, and the support on which it rested was equally exemplary.

4135. I shall need the same assistance in respect of the issues of quantum, which (as I have indicated) will be the subject of a separate judgment in due course after further submissions (in respect of which I shall give directions at a subsequent hearing which is to be arranged).

## Postscript

---

[550] The Summary I provided on 28 January 2022 is, for convenience, attached as Appendix 6 to this judgment. Where there is any inconsistency with this judgment, this judgment prevails.

4136. This postscript addresses three points which have arisen in the process of providing corrections of and comments on the embargoed original draft of this judgment.

*The position of Mr Chamberlain*

4137. First, on 6 April 2022, Clifford Chance sought my permission "*to notify Mr Chamberlain's US and UK counsel that the judgment includes findings of wrongdoing against Mr Chamberlain, so that he can (if so advised) apply to come inside the embargo or take whatever other steps he is advised to take.*" In that regard, they noted that "*the draft judgment contains a number of findings against Mr Chamberlain, who is facing prosecution in the United States alongside our client. The judgment makes findings against a number of other individuals, but Mr Chamberlain is the only one of these individuals facing prosecution. Mr Chamberlain is, of course, not aware of the fact that the judgment will include findings against him and will not have any opportunity to take legal advice on the implications of the civil judgment before it becomes public.*"

4138. When I declined to give permission, but invited further explanation of the basis of the request, Clifford Chance by further email dated 20 April 2022 helpfully referred me to the decision in *MRH Solicitors v Manchester County Court* [2015] EWHC 1795 at [24], [32] to [39] as being what they had had in mind, though they stated also that it was "*not an issue that affects our client directly.*"

4139. *MRH Solicitors v Manchester County Court* concerned findings made in an *ex tempore* judgment by a Recorder, after a four-day trial, dismissing a claim for personal injury and consequential losses on the basis that the underlying motor accident was staged and the claims were fraudulent. In the course of his judgment, the Recorder found that the solicitors for the claimant driver in that action (MRH Solicitors) were party to the fraud, as also (he held) were two companies which had provided and charged for hire cars provided to the claimant. A passenger was separately represented: but neither the solicitors nor either of the two car hire companies were party to the proceedings. The Recorder subsequently approved a transcript of his judgment which included those findings. MRH Solicitors and the two car hire companies brought proceedings for judicial review to seek to undo what they submitted was a breach of natural justice which had resulted in their integrity being impugned unfairly. They sought and obtained interim relief to prevent the circulation of the approved judgment and as their substantive relief they sought an order quashing parts of the approved judgment.

4140. It was submitted on the applicants' behalf in the judicial review proceedings in the Administrative Court that:

(1) The Recorder had behaved unfairly in expressing final conclusions that the Solicitors and car hire firms had behaved fraudulently, especially since (i) none of the three had been heard or had an opportunity to be heard; (i) no claim of fraud had been pleaded, (iii) there was no evidence for the findings of fraud made.

(2) Judicial review was the appropriate route and remedy since there was no route of appeal by non-parties.

4141. The Divisional Court declined to grant the order sought, since "*no more than on appeal can we re-write the judgment of [the] Recorder...*" They also declined to make

declaratory relief; but that was because they considered that it was unnecessary in light of the unequivocal determination in their judgment, where they stated that:

> "...the Recorder was not entitled to make a conclusive finding of dishonesty or fraud against MRH [or the two hire companies] and they should be treated as not having such a finding made against them."

4142. The Divisional Court also provided general guidance, stating that in

> "the unlikely event that something similar to this should happen in the future, in our view the right course would be for the third party who believes they have been unfairly criticised in a judgment to apply to be joined as a party."

The person concerned could then appeal (or seek permission to do so). At the same time, however, the Court stressed that the decision was a discretionary one, and emphasised that:

> "... we are not saying that a third party who is criticised will necessarily be entitled to be joined as a party. There are many cases heard in the civil courts (and also family and criminal courts) where the conduct of an absent person falls to be considered. For example, in a conspiracy case not all the alleged conspirators may be before the court as parties or witnesses. In complex commercial frauds it may well be part of the case there's an absent personal institution was party to dishonest conduct somewhere in the chain. Everything will depend on the facts of the individual case."

4143. It seems to me that two questions thus need to be considered: (a) whether, prior to public circulation of the judgment, the court should pre-circulate any person(s) in respect of whom it has made serious findings to enable them to make representations for the judgment in some way to be anonymised or even altered; and (b) whether at that stage or thereafter the court should, on application by the person concerned (or indeed on its own motion), order their joinder as a party to enable an appeal.

4144. In determining not to give the permission requested by Clifford Chance to make available this judgment to Mr Chamberlain and his advisers before its final handing-down, I have had in mind particularly the following considerations:

(1) Although Mr Chamberlain's decision not to provide evidence or attend is understandable in light of his indictment in the US, and his right of silence in the criminal proceedings there, that was his decision: he nevertheless had the opportunity to give evidence in these proceedings and declined it.

(2) As mentioned previously, he was not alone in declining that opportunity; and even if his reasons may be stronger than theirs, there would be a variety of persons in the same position as he, the common denominator being that in each case I considered it essential to consider his or her role in what was done as part of the process of determining the claims against the two Defendants. Mr Chamberlain must have appreciated, as must all the others, that their conduct would be reviewed; and it was on the cards that it might be criticised.

(3) This is, in my judgment, just the sort of case which the Divisional Court had in mind in emphasising that such findings might be necessary.

Furthermore, I do not consider that there was any means of successfully anonymising some part(s) of the judgment; nor that any good would come of any process which enabled Mr Chamberlain or others in a similar position to, as it were, offer their commentary and evidence on the findings I have made, without being bound by evidence or exposed to the scrutiny of cross-examination. I have been acutely aware throughout of the obvious imperative that judges should be extremely cautious before impugning the honesty of persons who have not had an opportunity to defend themselves, and I have taken every care accordingly, even though in this case, they did have an opportunity but declined it.

(4) I emphasise nevertheless that nothing in this judgment constitutes a finding of liability or formal finding of guilt against anyone other than the two Defendants. My findings against others are ancillary to my findings against the Defendants.

4145. In those circumstances, and given that (as the Court noted in *MRH Solicitors v Manchester County Court*) *"it is axiomatic that appeals are brought against orders, not the reasons for orders"*, I would not of my own motion consider it appropriate to join Mr Chamberlain or any other of the persons I have found to have been involved in the frauds on the basis of which I have held both Defendants to be liable.

4146. I very much doubt that an application to be joined would be appropriate or serve any purpose, since I have not been asked, do not intend to and could not properly make any order against Mr Chamberlain or any non-party I have criticised. However, since no application has been made, and theoretically, I suppose, could be so, I do not finally decide that now, but certainly do not encourage any such step.

*Extant copies of embargoed draft judgment and related documents*

4147. The content and copies of all drafts of my judgment circulated to the parties after I had delivered a summary of my conclusions on 28 January 2022 in open court were strictly embargoed. In the unusual circumstances of this case, I attached express conditions, including that all copies should be returned and destroyed once the process of finalising and handing down final judgment had been completed. The purpose of the embargo and of these conditions was to assist, safeguard the confidentiality of, the necessary process of enlisting the assistance of the parties in identifying and correcting suggested errors and omissions (including any parts of the draft(s) which might require clarification or amplification) before finalising the judgment and (by hand-down) putting it in the public domain. I had understood that the conditions I stipulated in relation to drafts of earlier and superseded versions of this judgment and associated documents proposing corrections were accepted, and certainly nothing to the contrary was intimated until 10 May 2022.

4148. However, Clifford Chance on behalf of Dr Lynch have now asked to be permitted to retain copies and the parties' proposed corrections for the purposes of pursuing any application for permission to appeal, and if permission is granted, any appeal itself. After I had indicated that I was not persuaded that this was appropriate, and very shortly before this judgment was finalised for publication, they have indicated that they may wish to put forward further arguments in support of this. I shall consider this further and make

directions to the parties accordingly. In the meantime, I should explain briefly why (subject to consideration of any further arguments and (possibly) interim arrangements for safe custody) I consider that earlier drafts should remain strictly embargoed and be returned or destroyed.

4149. I fully recognise that the process has been more extended and complex than usual, and the corrections proposed considerably more numerous. The parties have all assisted me greatly in identifying typographical errors and in reconstructing paragraph references. They have also, especially in the case of the Claimants, identified other errors both of expression or detailed fact, including some where I had overlooked documents or submissions which I was invited to (and did) revisit with a view to their correction. Dr Lynch, in particular, objected to various of the corrections suggested by the Claimants on the basis that the *"Claimants' comments cross[ed] the line from corrections to submissions on findings in the draft judgment"*.

4150. I have considered every such objection carefully by reference to any source material or submissions cited or repeated. Where I have made corrections, I have done so because it seemed to me necessary either to clarify the language I had used or to reflect my own review of some particular aspect of the record or submissions to which I had been directed and which I felt, with the perspective offered by a little distance from the original drafting process, I had not sufficiently accurately recorded or taken into account. In light of the same process of review, I have also included additional sections to address matters which I considered required further explanation of my conclusions. (These include, in particular, an additional chapter on Reliance which I considered both clarificatory and a necessary introduction to the issue of quantum, on which I shall require further submissions.)

4151. In no case were any corrections suggested or made by reference to evidence or submissions which had not been before me. In no case was any correction suggested or made which altered my overall approach or substantive conclusions as summarised in my Summary (subject only to the caveat below). I am satisfied that the corrections made were appropriate and necessary to ensure both clarity of expression and detailed accuracy in explaining those conclusions in this my final judgment .

4152. As should perhaps go without saying, this version of my judgment, as handed down, is the only version and record to be made public of my final conclusions and reasoning in this case.

*Differences between the Summary of Conclusions and this judgment*

4153. As to the caveat mentioned above, Simmons & Simmons have suggested to me that in certain instances there are differences between the wording in this judgment and the wording of my Summary of Conclusions. Of the differences to which they drew attention the following remain:

(1) Paragraph 42 of the Summary should be taken to be replaced by paragraph 524 of this judgment which is more nuanced.

(2) Paragraph 48 of the Summary does not reflect that ASL as well as Autonomy Inc have claimed for direct losses.

   (3) Paragraph 50.1 of the Summary states that the quantity of pure hardware sales was $100 million whereas in this judgment the total aggregate over the Relevant Period has been corrected to $200 million.

   (4) Paragraph 50.4 of the Summary describes the Claimants' case as the foregoing of future recurring revenue in exchange for a "one off and heavily discounted capital sum for a licence", which has been amended to remove the words "and heavily discounted" in paragraph 16(4) of this judgment, though in fact the capital sum provided a discount compared to licence fees otherwise payable over time.

   (5) Paragraphs 50.5 and 80 of the Summary describe OEM as Autonomy software being embedded in an OEM's hardware: the judgment has corrected this to an OEM's software at paragraph 16(5), consistently with other parts of the judgment.

4154. Simmons & Simmons have accepted that these corrections are minor. But they have suggested that in light of them, the Summary should now be removed from the Courts and Tribunals website, and not included as an Appendix to this judgment. I do not consider that either course is required. It seems to me that such minor differences are inevitable and had been anticipated in my Summary, where I expressly anticipated differences and stated that in the event of any conflict my judgment would prevail.

4155. Nevertheless, I shall give instructions for the version of the Summary publicised at the end of January to be re-issued with an endorsement in bold, referring readers to this judgment (which will by then have been handed down) and reiterating that in the event of any differences between the Summary of Conclusions and this judgment, this judgment prevails. It may also be possible to include in the Summary an electronic link to this judgment.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

**APPENDIX 1**

**DRAMATIS PERSONAE**

[Names in **BOLD CAPITALS** are parties. Names in CAPITALS were principal witnesses who gave oral evidence; names in *italics* were other witnesses, including in parenthesis those whose evidence in the US was admitted into these proceedings under hearsay notice; names in capitalised *ITALICS* were individuals of principal importance who did not give evidence]

| Name | Description of role |
|---|---|
| | *The roles of Autonomy individuals (and associated third parties) relate to the Relevant Period (Q1 2009 to Q2 2011) unless otherwise specified*<br><br>*The roles of HP individuals relate to the date of HP's acquisition of Autonomy unless otherwise specified* |
| Anderson, Antonia | Autonomy Group Financial Accountant and Revenue Director (from 2011; previously Manager at Deloitte). |
| APOTHEKER, LÉO | HP President and CEO (November 2010 to September 2011). *Witness for the Claimants.* |
| Araujo, Neil | CEO Protect, Professional Markets at Autonomy (from August 2009). |
| Ariko, Barry | Member of Autonomy's Audit Committee. |
| *Avant, Donald "Don"* | Group Head of Operations at Autonomy (from July 2011). At the time of trial, VP, Customer Experience at Darktrace, an investee company of Invoke Capital (founded by Dr Lynch and Mr Hussain). *Witness for Dr Lynch.* |
| *Avila, Eloy* | Held various technical roles at Autonomy, including Chief Technology Officer (from November 2010). At the time of trial, Chief Technology Officer, Americas at Darktrace. *Witness for Dr Lynch.* |

| | |
|---|---|
| BAIOCCO, JOHN | Managing Partner at Capax Discovery. *Witness for the Claimants.* |
| Barris, Bob | Vice President of Sales, Dell. |
| *Bettencourt, Michele (formerly Anthony)* | CEO of Verity Inc (acquired by Autonomy in December 2005). Thereafter headed up Autonomy's integration of Zantaz and Interwoven (left Autonomy in December 2009). *Witness for Dr Lynch (but not cross-examined).* |
| Bhagat, Varoon | Member of the Corporate Development sub-team within HP's Strategy and Corporate Development group (**"SCD"**). |
| Binns, Robert | Member of the worldwide Field Operations team, who worked within HP's Software & Solutions team. |
| Black, Ian | Autonomy Head of Global Operations. |
| BLANCHFLOWER, SEAN | Autonomy Head of R&D. *Witness for the Claimants.* |
| Blank, John | Member of HP's Enterprise Financial Reporting (**"EFR"**) group, focused on M&A Technical Accounting. |
| BLOOMER, JONATHAN | Chairman of Autonomy's Audit Committee (from 2010). *Witness for Dr Lynch.* |
| Bordeaux, Dean | Account Executive, Dell. |
| Broli, Corrado | Autonomy sales executive (covering Italy). At the time of trial, Country Manager, Italy at Darktrace. |
| Brossard, Gerard | Vice President for Planning, Strategy and Operations (HP Software); led the Project Management office focused on the Autonomy integration. |

| Brown, Derek | Investor Relations, Autonomy. |
|---|---|
| Breya, Marge | Senior member of HP's software marketing team. |
| Brunnick, Michael | Autonomy Vice President of Federal Sales. |
| *(Camden, Dominic)* | Responsible for sales at Zones Inc, an IT solutions provider and hardware reseller. *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| *CHAMBERLAIN, STEPHEN* | VP, Finance at Autonomy (until March 2012). Chief Operations Officer at Darktrace (until 2018). Part of the 'Clique' or 'Cabal'. |
| Chan, Otto | Managing Director, Global Technology Operations, Citibank. |
| Chang, Hung | Lawyer at Autonomy. |
| *(Channing, Roger)* | Chief Technology Officer and Senior Vice President at MicroTech. *Evidence in US admitted as hearsay (Claimants and Defendants).* |
| COLLET, HARALD | Autonomy Vice President of Business Development (October 2007 to May 2008); Autonomy Head of OEM Sales in North America (May 2008 to June 2010). Co-author of Joe Bloggs correspondence. *Witness for the Claimants.* |
| *Colomar, Vanessa* | Autonomy Head of Communications (August 2011 to September 2012). At the time of trial, Head of Communications and Investor Relations at Invoke Capital. *Witness for Dr Lynch.* |
| *Cooke, Stephen* | Partner at Slaughter and May (Mergers and Acquisitions practice). *Witness for Dr Lynch (but not cross-examined).* |
| Corado, Ray | Financial Analyst, Autonomy. |

| | |
|---|---|
| Corley, Tom | Sales Account Manager, Zones Inc. |
| Crumbacher, James "Jim" | Associate General Counsel of Autonomy Inc. |
| Daoust, Mark | Vice-President of e-Discovery, Autonomy. |
| Debban, Vince | Senior Vice President, End User Computing / Desktop and Electronic Communications, Bank of America. |
| Desroches, Robert | Vice-President of Digital Safe Operations, Autonomy. |
| Dolan, Julie | Autonomy Senior Corporate Counsel. At the time of trial, Senior Legal Counsel at Darktrace. |
| *Duckworth, David* | HP's Mergers, Acquisitions, Divestitures and Outsourcing Finance Integration Project Manager (until March 2012). *Witness for the Claimants.* |
| Eads, Richard | Global Procurement Officer and Director of Credit and Collections, Autonomy. |
| *EAGAN, NICOLE* | Autonomy Chief Marketing Officer. At the time of trial, co-CEO of Darktrace. *Withdrawn as witness for Dr Lynch.* |
| EGAN, CHRISTOPHER "STOUFFER" | CEO of Autonomy Inc. *Witness for the Claimants.* |
| *(Esterrich, Tomas)* | CFO at MicroTech. *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| Faughnan, Michael | Global Account Manager, Dell. |
| Fitzgerald, Lisanne | Senior Manager and Professional Standards Reviewer, audit, Deloitte. |

| Flanagan, Tom | Chief Information Officer, Amgen. |
|---|---|
| Frischknecht, Dominic | Member of the Supply Management team, Credit Suisse. |
| Furman, Al | Chief Technology Officer, Morgan Stanley. |
| Gallagher, Darren | Autonomy Head of Development. |
| Geall, Marc | Autonomy Head of Corporate Strategy and Investor Relations (until May 2010). |
| *Gersh, Andrew* | Managing Director at KPMG. Led the KPMG financial due diligence team retained by HP in respect of the Autonomy acquisition and the KPMG team engaged by HP in October 2011 to assist HP in understanding Autonomy's closing balance sheet. *Witness for the Claimants.* |
| Goldfarb, Neil | Latin America Sales, Autonomy. |
| GOODFELLOW, CHRISTOPHER | Chief Technology Officer of Infrastructure at Autonomy. *Witness for the Claimants.* |
| Goodman, Peter | Investor Relations, Autonomy. |
| GREENWOOD, PHILIP | Autonomy Head of Connectors. *Witness for the Claimants.* |
| Guiao, Livius | Autonomy Associate General Counsel. |
| GUSTAFSSON (NÉE PRENTIS), POPPY | Autonomy European Financial Controller (from June 2009) and later Autonomy Corporate Controller. At the time of trial, co-CEO of Darktrace. *Witness for Dr Lynch.* |
| *Harris, Elizabeth "Lisa"* | Autonomy's Financial Controller. Joined an Invoke Capital company as a Finance Manager in 2013. At the time of trial, a Director of Darktrace. *Witness for Dr Lynch.* |

| Haverfield, Rachel | Senior legal counsel at Autonomy. Joined Invoke Capital as General Counsel in December 2013. |
|---|---|
| *HOGENSON, BRENT* | CFO for Autonomy in the Americas (whistleblower whose employment was terminated in late July 2010). |
| *Humphrey, David* | Chief Technology Officer of Virage Inc. *Witness for the Claimants.* |
| Humphries, Brian | Head of HP's Corporate Development sub-team within the SCD group (until March 2011). |
| **HUSSAIN, SUSHOVAN** | Second Defendant and Autonomy's CFO (who did not give evidence). |
| Hyson, Malcolm | Chief Technology Officer, DiscoverTech. |
| Hsiao, Emily | Member of HP's Corporate Development sub-team within the SCD group. |
| Jackson, Alex | Member of the Deloitte audit team. |
| Jimenez, Antony | CEO of MicroTech. |
| *(Johnson, Andrew)* | Head of HP's Corporate Development sub-team within the SCD group. *Evidence in the US admitted as hearsay (Claimants and First Defendant).* |
| Johnstone, Ben | IT specialist, Deloitte. |
| KALBAG, SAMEER | Chief Technology Officer of Autonomy's Federal group. *Witness for the Claimants.* |
| *KANTER, ANDREW* | Autonomy Chief Operating Officer and General Counsel. At the time of trial, non-executive Partner at Invoke Capital. Part of the |

| | |
|---|---|
| | 'Clique' or 'Cabal'. *Withdrawn as witness for Dr Lynch.* |
| Kelly, Brian | Director, Global Procurement, MetLife. |
| Kelly, Frank | Member of Autonomy's Audit Committee. |
| *Khan, Hafeez "Daud"* | Financial analyst who covered Autonomy for Merrill Lynch (2001 to 2003) and for Cazenove (2006 onwards). *Witness for the Claimants.* |
| *King, Martina* | Head of Aurasma UK (May 2011 to May 2012). At the time of trial, was working at Featurespace, an Invoke Capital investee company. *Witness for Dr Lynch.* |
| *KNIGHT, ROB* | Member of the Deloitte audit team. |
| *KNIGHTS, RICHARD* | Deloitte audit engagement partner for Autonomy (2005 to 2010). |
| Krakoski, James (or Jim) | Autonomy sales executive selling Digital Safe. |
| Ku, Helen | Autonomy Revenue Manager. |
| Ladd, Beth | VP, Customer Marketing at Autonomy. |
| Lafreniere, Joanne | Planning & Strategy Manager, Bank of Montreal. |
| Lamond, Andy | Director, Realise. |
| Lane, Raymond | HP's Chairman. |
| LANGFORD, JONATHAN | Autonomy Development Support Engineer (from July 2010). At the time of trial, Service Management Director at Micro Focus. *Witness for the Claimants.* |
| Lee, Mickie | Autonomy Senior Counsel. |

| | |
|---|---|
| Lenschow, Raimo | Analyst, Merrill Lynch. |
| LESJAK, CATHERINE "CATHIE" | Executive Vice President and CFO of HP. *Witness for the Claimants.* |
| Letelier, Sergio | Director of HP's Corporate, Securities and M&A Operations team and in-house lawyer. |
| Levadoux, Jerome | Vice President in HP's Products, Information Management and Analytics group; involved in the Autonomy integration. |
| Levine, Marc | HP's Corporate Controller (from May 2012). |
| Livermore, Ann | Member of HP's Board of Directors. |
| *(Loomis, William "Bill")* | CEO and CFO of FileTek. *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| Louw, Gerry | Chief Information Officer, VMS. |
| Lucas, Christian | Managing Director, Morgan Stanley. |
| LUCINI, FERNANDO | Autonomy Head of Pre-sales and Chief Architect. *Witness for the Claimants.* |
| Lynch, Christopher | CEO of Vertica. |
| **LYNCH, MICHAEL** | First Defendant and CEO and Managing Director of Autonomy. |
| Lytle, Charles | Managing Director, Citibank. |
| Mackenzie-Smith, Simon | Chairman of Bank of America Merrill Lynch, UK. |
| Manners, Daniel | Director, Global PMO Manager, Deutsche Bank. |

| Mark, Robert | Autonomy Global Accounts Director. |
|---|---|
| Marovitz, Daniel | Managing Director, Deutsche Bank. |
| *Martin, Alastair "Al"* | Group Head of Autonomy's Technical and Customer Operations, EMEA & APAC. At the time of trial, VP, Technical Operations at Darktrace. *Witness for Dr Lynch.* |
| McCarthy, Michael | Autonomy Contracts Manager. |
| McMonigall, John | Senior member of Autonomy's Audit Committee. |
| Meier, Ed | Equity Analyst, Schroder Investment Management. |
| *Meiers, John* | Sourcing Leader in H&R Block's procurement department. *Witness for the Claimants (but not cross-examined).* |
| *MENELL, PETER* | Autonomy Chief Technology Officer. Currently head of R&D Technology at Invoke Capital. Member of the 'Clique' or 'Cabal'. |
| *MERCER, NIGEL* | Deloitte audit engagement partner for Autonomy (from May 2010). |
| Mohammadi, Rafiq | Chief Technology Officer of Interwoven; Group Chief Technology Officer of Autonomy following its acquisition of Interwoven. |
| Mooney, Michael | Senior Vice President, Field Sales Operations at Autonomy. |
| *Morland, Paul* | Financial analyst at brokerage firm Astaire Securities (July 2008 to June 2010) and at Peel Hunt (from June 2010). *Witness for the Claimants.* |
| Murali, Shailesh | Vice President, Technology Mergers & Acquisitions, Barclays Capital. |

| | |
|---|---|
| Murphy, Tony | CEO, Realise. |
| Murray, Tom | Assistant Manager, audit, Deloitte. |
| Niemier, John | Business Development Manager, Zones Inc. |
| *Orton, Emily* | Member of Autonomy's marketing department (2009 to 2010); Assistant to Dr Lynch (2010 to 2011). At the time of trial, Chief Marketing Officer at Darktrace. *Witness for Dr Lynch.* |
| *Pao, Frank* | CEO & President of Vidient Systems, Inc (and previously an Autonomy employee). *Witness for Dr Lynch.* |
| Pasini, Cesare | Prefect of the Vatican Library. |
| Patel, Dipan | Autonomy sales executive. |
| *Pearson, Philip* | Fund Manager at GLG Partners who invested in and traded Autonomy stock. At the time of trial, a Partner at Invoke Capital. *Witness for Dr Lynch.* |
| Perachio, Glenn | Senior Vice President of Protect, EMEA Autonomy. |
| *Pereira, Mariana* | Held roles in the marketing, R&D and sales teams at Autonomy; Director of Rich Media at Autonomy (until August 2011). At the time of trial, in the marketing department at Darktrace. *Witness for Dr Lynch.* |
| Perle, Richard | Member of Autonomy's Audit Committee. |
| Prasad, Reena | Autonomy Director, Americas Credit & Collections. |
| *Puri, Rahul* | Managing Director of Innovation and Chief Software Architect, Prisa. *Witness for the Claimants.* |

| | |
|---|---|
| Quattrone, Frank | CEO of Qatalyst Partners. |
| Robertson, Chris | Deloitte audit partner who oversaw the Autonomy Q1 2010 review. |
| *Robins, Harry* | Partner at Morgan, Lewis & Bockius LLP who advised Autonomy on merger control filing requirements in relation to its acquisition by HP. *Witness for the Claimants (but not cross-examined).* |
| *Robison, Shan*e | Chief Strategy & Technology Officer of HP and Head of HP's SCD group. *Witness statement on behalf of the Claimants admitted as hearsay.* |
| Rothman, Ivan | Autonomy Senior Corporate Counsel. |
| Ryan, Patrick | Autonomy AVP Sales. |
| SARIN, MANISH | Senior Director in the Corporate Development sub-team of HP's SCD group. *Witness for the Claimants.* |
| Sass, Robert | Senior Vice President, North America Sales at Autonomy. At the time of trial, Managing Director, North America at Darktrace. |
| Sayad, Laila | CFO, VMS. |
| Scannell, Bill | Global Sales and Customer Operations, EMC. |
| Schultz, John | HP General Counsel (from 2012). |
| *(Scott, Joel)* | Chief Operating Officer and General Counsel, Autonomy US. *Evidence in US admitted as hearsay (Claimants and Defendants).* |
| *Shelley, Philip* | Co-head of Corporate Broking and UK ECM team at Goldman Sachs. *Witness for Dr Lynch.* |

| | |
|---|---|
| *(Smith, Reagan)* | Head of Bank of America's procurement team for software purchases. *Evidence in the US admitted as hearsay (Claimants).* |
| Smolek, Phil | Autonomy Senior Financial Analyst (until December 2009). |
| *(Stephan, Matthew)* | Autonomy Senior Finance Manager (2009 until early 2011). *Evidence in the US admitted as hearsay (Claimants and Defendants).* |
| Sullivan, Michael | CEO of Zantaz (July 2007 to 2009); CEO of Autonomy Protect (the archiving and litigation discovery division of Autonomy) (from 2009). *Witness Statement on behalf of the Claimants and evidence in the US admitted as hearsay (Claimants and Defendants). He gave oral evidence in the US criminal trial but not in these proceedings.* |
| Sunderwala, Meeta | Senior Director, Accounting Policies and M&A Reporting, in HP's EFR team. |
| SZUKALSKI, GARY | COO and Chief Marketing Officer of FileTek. At the time of trial, Chief Channel Management Officer at Darktrace. *Witness for Dr Lynch.* |
| Tejeda, Percy | Autonomy Director of Revenue in the Americas. |
| Truitt, Dan (brother of David and Steve Truitt) | Federal District Sales Manager, Autonomy. |
| *(Truitt, David)* (brother of Dan and Steve Truitt) | Founder and CEO of Microlink. Co-founder of MicroTech. Co-founder of DiscoverTech. *Evidence in the US admitted as hearsay (Claimants and First Defendant).* |
| *(Truitt, Steve)* (brother of Dan and David Truitt) | Chief Operating Officer of MicroTech. *Evidence in US admitted as hearsay (Claimants and Defendants).* |

| | |
|---|---|
| Uffelman, Andy | Managing Director, Operational Services Control, Charles Schwab. |
| Veghte, Bill | Executive Vice President, HP Software; temporarily oversaw the management of Autonomy from May to September 2012. |
| Walton, Charles "Woody" | Vice President of Technology, Federal at Autonomy. |
| WANG, ROGER | Vice President of Product Development for Digital Safe at Autonomy. *Witness for the Claimants.* |
| Watkins, Cynthia | Autonomy's Corporate Controller. |
| *Webb QC, Robert* | Non-Executive Chairman of Autonomy. At the time of trial, Chair of Luminance (another Invoke Capital investee company) and Darktrace. *Witness for Dr Lynch (but not cross-examined).* |
| WELHAM, LEE | Member of the Deloitte audit team for Autonomy (2005 to 2008); Deloitte Senior Manager on the Autonomy audit team (2008 to August 2011). *Witness for the Claimants: the only one from Deloitte.* |
| Wengryn, Peter | CEO, VMS. |
| Wharton, Tim | Co-founder of MicroTech. Co-founder of DiscoverTech (and owned a 20% stake in Microlink, out of which DiscoverTech was spun). |
| WHITMAN, MARGARET "MEG" | Member of HP's Board of Directors (January 2011 to September 2011); President and CEO of HP (September 2011 to November 2015); CEO of Hewlett Packard Enterprise (November 2015 to January 2018). *Witness for the Claimants.* |
| YELLAND, CHRISTOPHER | Autonomy CFO (April 2012 to February 2013). Autonomy Financial Controller (February 2013 to September 2017). *Witness for the Claimants.* |

| YAN, SAMUEL | Chief Architect in the Product Development team for Digital Safe at Autonomy. *Witness for the Claimants.* |
|---|---|
| You, Harry | EMC Executive. |
| *Youngjohns, Robert* | Senior Vice President and General Manager of HP's Autonomy / Information Management business unit (from September 2012). *Witness for the Claimants.* |
| Zanchini, Marco | Systems engineer in Autonomy's Milan office. At the time of trial, Cyber Defence Education Specialist at Darktrace. |

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

## APPENDIX 2

### SCHEDULE OF BRIEF BIOGRAPHICAL DETAILS OF FACTUAL WITNESSES (OTHER THAN PARTIES) AND OF VARIOUS OTHER KEY PERSONS WHO DID NOT GIVE EVIDENCE

**The Claimants' witnesses (listed alphabetically)**

*Mr Léo Apotheker*

1.    Mr Apotheker started working in the software business not long after he graduated from university in 1976. In 1988 he joined SAP, which has become one of the largest software companies in the world. He started as the managing director of a small SAP subsidiary, and worked his way up, eventually becoming sole CEO of SAP in May 2009.

2.    Mr Apotheker was approached by HP in August 2010.  At that stage HP had recently fired its CEO, Mr Hurd, in connection with allegations about expenses.  Ms Lesjak, a longstanding HP executive, had been appointed as interim CEO.

3.    After he was head-hunted, Mr Apotheker wrote a paper for the Search Committee (an HP committee charged with selecting the next HP CEO) to support the hypothesis that HP needed to transform its business towards enterprise software; and it was not disputed that he was selected with that in mind. He was not a Silicon Valley insider, but SAP had a substantial presence in Silicon Valley and so he was not a stranger to it.

4.    He was appointed President and CEO of HP on 30 September 2010 (to take effect from 1 November 2010). He had initially been offered the position of Chairman as well as CEO, but turned down the chairmanship. In conformity with European norms and best practice, he considered it was preferable to segregate the positions.

5.    At the time of Mr Apotheker's appointment, HP was a low margin traditional hardware company employing some 300,000 people with an annual turnover of about $125 billion. His view was that it needed to evolve to provide a full technology "stack" which he described as comprising *"the hardware, software and network layers that stand between the basic infrastructure of data creation, storage and distribution and the end user of information."*

6.    Mr Apotheker perceived there to be special potential value in the integration of structured and unstructured data. He recognised Autonomy as one of the market leaders in unstructured data analysis. He led HP's acquisition of Autonomy.

7.    His appointment was terminated by the Board on 22 September 2011, just over a month after the acquisition had been announced.

8.    Mr Apotheker was the first witness called by HP and he was cross-examined for two days. His evidence primarily concerned his perception and perspective in relation to the acquisition of Autonomy.

*Mr John Francis Baiocco*

9.     Mr Baiocco was during the Relevant Period, and remains, the Managing Partner of Capax Discovery LLC, perhaps Autonomy's most favoured of its stable of 'friendly' VARs.  Capax Discovery was a subsidiary of Capax Global LLC, of which Mr Baiocco was (and remains) also effective CEO.

10.    Mr Baiocco gave evidence to the Grand Jury and in the US criminal proceedings against Mr Hussain. He had his own lawyer, paid for by HP.

11.    Mr Baiocco retained close links with HP after the Acquisition: for example, he was appointed to the partner advisory board of HP in 2013 and Capax Discovery became a "preferred partner" of HP at about the same time. When Mr Baiocco was first interviewed by HP's lawyers in 2013 Capax Discovery was making about $15 million a year from contracts with HP.

12.    He was cross-examined in these proceedings for one day. His evidence addressed the impugned VAR and reciprocal transactions to which Capax Discovery was a counterparty, including VT2, VT3, VT4, VT10, VT16, VT20, VT21, VT27, VT28 and VT34.

*Dr Sean Mark Blanchflower*

13.    Dr Blanchflower joined Autonomy in 2000 as a Research and Development Engineer in Cambridge after a PhD in applied mathematics and then a year of research at Trinity College, Cambridge.  From the end of 2004, his job title was Head of Research and Development. He was the leader of IDOL development, though not everyone in R&D reported to him (for example, the R&D teams in the US and in the web content management division did not report to him). He reported to Dr Menell.

14.    After the Acquisition he continued working first for Autonomy and then for HP. At the time of giving evidence, he was Vice President of Engineering for IDOL at Micro Focus (which had acquired the software business of Hewlett Packard Enterprise ("HPE") in 2017).

15.    Dr Blanchflower attended the trial pursuant to a witness summons. His evidence predominantly addressed technical issues, and especially (a) the development of SPE; (b) Autonomy's approach to purchasing third-party software; (c) the purchase of SAT from MicroLink (though he was not aware of the purchase at the time); (d) the purchase of StorHouse from FileTek and its use thereafter; (e) the VMS transaction; and (f) the Vidient transaction. He was cross-examined for one and a half days.

*Mr Harald Peter Ferdinand Collet*

16.    After a brief interlude at a marketing and media services company, Mr Collet (who graduated from Yale University in 2000) joined Oracle. He was there for seven years, holding the positions of Director of Global Sales Support from October 2005 to July 2006, and Senior Director of Governance Risk and Compliance from July 2006 to October 2007.

17.     In October 2007, he joined Autonomy in its New York office, as Vice President of Business Development. In around May 2008, he became Head of OEM Sales in North America.

18.     In June 2010, Mr Collett left Autonomy and joined Bloomberg LP and held the position of Global Business Manager for Governance and Compliance Products from July 2010 to August 2016 at which point he left Bloomberg and began a consulting practice. In January 2017, he founded a start-up company in the financial tech sector called Alkymi of which he was CEO at the time of giving evidence.

19.     Mr Collet was the author of the 'Joe Bloggs' communications (see paragraphs 312 to 313 and 3235A to 3235C in the main body of my judgment) sent to various industry and financial analysts at the end of August 2011 in which he (and a colleague when at Autonomy, an engineer called Mr Alex Marshall who left Autonomy shortly after Mr Collet to join him at Bloomberg) sought to express concerns about the way in which Autonomy's OEM business was reported to the market, raising a number of questions that they felt HP should ask about its OEM revenues.

20.     Mr Collet was cross-examined for a full day. His evidence primarily concerned (a) his assessment of the true nature of Autonomy's "OEM" business; (b) the basis of his concerns as communicated in the 'Joe Bloggs' communications; and (c) his account of Dr Lynch's involvement in providing misleading information to a company called Lone Pine (see paragraphs 3195 to 3207 in the main body of my judgment).

*Mr David John Duckworth*

21.     Mr Duckworth worked for HP for more than 22 years. His job title in 2011 was Mergers, Acquisitions, Divestitures and Outsourcing ("MADO") Finance Integration Project Manager.

22.     He had responsibility for the integration of Autonomy's financial systems and processes into HP's financial accounting structure following the Acquisition. That involved the "mapping" of Autonomy's financial information on a spreadsheet showing key parameters such as (a) Autonomy's various legal entities to HP's company codes, (b) Autonomy's organisational structure compared to HP's, (c) Autonomy's product lines to HP's business areas and (d) Autonomy's various general ledger accounts to HP's general ledger accounts.

23.     His evidence addressed whether in that process he came to know of Autonomy's *"pure hardware"* sales, and he was cross-examined on that for about two hours: he denied any such knowledge.

*Mr Christopher "Stouffer" Bradley Egan*

24.     After graduating with a BA in Economics from Trinity College in Hartford Connecticut in 1991, Mr Egan worked in a sales capacity for Glaxo Pharmaceuticals. In 1995 he joined Dataware Technologies, again in a sales capacity, before moving to Autonomy.

25.     Mr Egan initially joined Autonomy Inc in March 2001 as a salesperson based in Boston and was given responsibility for managing sales on the U.S. east coast within

approximately six months. He was promoted to the position of Head of Sales for the entire USA within a year.

26.     In 2003, he moved to San Francisco in California and from 2004 until 2012, Mr Egan was the CEO of Autonomy Inc responsible for Autonomy's sales activities in North and South America.

27.     Mr Egan was principally involved in almost all of the impugned VAR transactions. Towards the end of November 2017, Mr Egan entered into a Deferred Prosecution Agreement ("DPA") with the US DoJ, in which he admitted that he was part of a fraudulent scheme to deceive purchasers and sellers of Autonomy's securities about the true performance of Autonomy's business, and that this scheme involved artificially inflating Autonomy's revenues using many of the means complained about by the Claimants. The DPA obliged Mr Egan to pay $923,391 in disgorgement and interest to resolve an action brought against him by the Securities and Exchange Commission. Under the DPA Mr Egan also admitted all facts as set out in a Statement of Facts attached to it, and promised full co-operation with the US DoJ. Any departure from the Statement of Facts or other breach of the DPA would expose him to being charged for all the conduct the subject of the DPA and any other conduct. Mr Egan testified in Mr Hussain's criminal trial as part of his agreement in the DPA to co-operate with the DoJ.

28.     Mr Egan gave evidence in these proceedings via video-link from New York pursuant to a 28 U.S.C. §1782 order directing him to do so. His evidence addressed the general sales management process at Autonomy, as well as four categories of impugned transactions, namely, the VAR transactions, the reciprocal transactions, the pure hardware sales and the hybrid hosting arrangements. Mr Egan spoke to these transactions in general terms; he also spoke to a number of the specific transactions in which he had direct involvement. He was cross-examined over a video-link for three shortened days.

*Mr Andrew Keir Markham Gersh*

29.     At the time of the Acquisition, Mr Gersh was a Managing Director at KPMG LLP, the US member firm of the KPMG network. He had been working for KPMG since 1992, first in the UK and, since 1999, in the United States. He is a qualified Scottish chartered accountant, a US Certified Public Accountant, and a licensed accountant in Massachusetts and California. As already stated, at the time of the Autonomy acquisition he was a Managing Director in KPMG; he became a Partner in October 2012. Between 2004 and 2011, Mr Gersh worked on at least 50 financial due diligence engagements for HP, all of them associated with HP's M&A activity, as well as dozens for other clients. He was familiar with both US GAAP (which was his primary expertise) and IFRS.

30.     He was cross-examined for about three-quarters of a day in these proceedings. His evidence primarily related to the allegation that HP knew of Autonomy's pure hardware sales before the Acquisition, which he denied.

*Mr Christopher James Robin Goodfellow*

31.     Mr Goodfellow joined Autonomy in October 2004 as a sales engineer and became the Europe Middle East and Africa pre-sales manager. He subsequently was in the Global

Accounts department: he claimed to be its Director, but this was disputed and unclear. He worked in Global Accounts until 2008.

32.    Between 2009 and 2013, he was Chief Technology Officer of Infrastructure at Autonomy. During the Relevant Period, he worked with the Digital Safe Sales Team, Digital Safe Product Development Team, the Digital Safe Operations Team and the post-sales support team for Digital Safe customers. Organisational diagrams showed him as reporting to Mr Alastair Martin (then Group Head of Technical and Customer Operations); but he insisted that in practice he reported to Dr Menell. He was senior on the technical side, but not one of Autonomy's leaders.

33.    Following the Acquisition, Mr Goodfellow became the Chief Technology Officer of HP HAVEn OnDemand and moved to Micro Focus when it acquired HPE's software business. He subsequently left Micro Focus on 28 February 2018.

34.    A witness summons was issued on behalf of the Claimants to ensure his attendance at trial. He was cross-examined for two days. His evidence related primarily to Autonomy's hosting business, some of the reciprocal transactions and one of the VAR transactions.

*Mr Phillip Howard Greenwood*

35.    Mr Greenwood graduated from the University of St Andrews in 2000 with a degree in physics and joined Autonomy as a software developer in Autonomy's Research and Development team based in Cambridge. While in that team, he initially worked on "fetches" also referred to as connectors which extract data from one system to another.

36.    In 2002 he moved to another software development team within Autonomy before returning in 2005 to the connectors team to become the Head of Connectors. His main report was Mr Gallagher, who in turn reported to Dr Menell. At the time of the trial, Mr Greenwood was the Connector Team Lead at Micro Focus.

37.    Mr Greenwood attended the trial pursuant to a witness summons and he was cross-examined for part of a morning. His evidence related to (a) the development of Autonomy's own *"SharePoint connector"* which enabled the extraction of data from 'SharePoint' (which is a Microsoft Office document management and storage system) and its input into another system such as IDOL, and (b) the acquisition of another 'SharePoint' connector from MicroLink. He also addressed the merits of DiscoverEngine (another SharePoint connector) which Autonomy acquired from DiscoverTech.

*Mr David Humphrey*

38.    At the time of the trial, Mr Humphrey was CTO of Rich Media at Micro Focus. From 2005 until September 2017 (when HPE sold its software division to Micro Focus) he had been CTO of Virage, Inc ("Virage"), an Autonomy group company. Virage developed and sold Autonomy group video analytics products. Until Dr Lynch left Autonomy, Mr Humphrey in theory reported to him; but in practice he reported to Dr Menell and Mr Hussain.

39.     His witness statement addressed a series of allegedly reciprocal transactions in Q4 2009-Q1 2010 (RT4 and OEM15) and Q3 2010-Q4 2010 (RT 4 and OEM 34) which are discussed in my main judgment and which related to the purchase by Vidient from Autonomy of IDOL and Virage software with funds provided by a purchase from Vidient by Autonomy of Vidient's SmartCatch software.

40.     He was compelled to attend trial by witness summons and was cross-examined for about one and a half hours.

*Mr Sameer Sadanand Kalbag*

41.     After graduating from Cornell University with a degree in Computer Science, Mr Kalbag worked at Intel Corporation, followed by Convera Corporation, the primary focus of which was on search technology.

42.     Mr Kalbag joined Autonomy in August 2007 as the Vice President of Technology of the Federal Group. Towards the end of 2009, he was appointed as Account Executive of the Federal Sales Team within Autonomy, which was responsible for sales to government agencies.

43.     In mid-2010, he became Director of Federal Sales, responsible for managing a small team in Federal Sales and then in around January 2011 he became interim Vice President of Federal Sales. In around June 2011, he was appointed Chief Technology Officer within Federal responsible for providing assistance to Federal Sales team members.

44.     Following the Acquisition, he continued to work for Autonomy and then for Micro Focus following its acquisition of HPE's software business in September 2017. He left Micro Focus in April 2018 and at the time of giving evidence worked as the President and Chief Executive Officer of Trenzai LLC, a data analytics company.

45.     Mr Kalbag was cross-examined in one day. His evidence primarily related to the Claimants' case on hosting (and in particular the aspect of it relating to e-Discovery, see paragraphs 3400 to 3448 in the main body of my judgment) and impugned VAR transactions.

*Mr Hafeez Bux Daud Khan*

46.     Mr Khan graduated from the University of Cambridge and qualified as a chartered accountant with PwC, becoming a technology analyst, initially for Merrill Lynch and then, from 2006 to 2011, Cazenove, which was acquired by JP Morgan in 2010. From September 2011 to December 2015 he worked at Berenberg, and from 2016 to early 2018, Cannacord Genuity. At the time of this trial, Mr Khan was a Vice President of Corporate Development at WANdisco, a technology company specialising in distributed computing.

47.     Having initially been bullish about Autonomy he became progressively bearish, having concluded that Autonomy was not able to sustain organic growth and was increasingly dependent on growth by acquisition. He cast doubt on the way Autonomy presented and accounted for its organic growth. His relationship with Dr Lynch and Mr Hussain, originally cordial, deteriorated and he was accused of

regulatory breaches and excluded from Autonomy Earnings Calls. Autonomy sought
to portray him as ill-informed and even (when he changed his Autonomy share
recommendation to "sell") "corrupt".

48.   He was cross-examined about this and related matters for nearly a day. It was
suggested that he had used *"non-public information"* and had tried to drive
Autonomy's share price down in order to please unspecified clients with short
positions by seeking to manipulate consensus, because according to one set of
forecasts for Q1 2011 he had the highest revenue forecast and one of the lowest target
prices. He denied this.

*Mr Jonathan Paul Langford*

49.   After graduating from the University of Cambridge with an M.A. and an MSci in
Biochemistry in 2007, Mr Langford joined Autonomy as a Development Support
Engineer in July 2010.

50.    After the Acquisition, between November 2011 to June 2013, he became a Technical
Support Team Lead and then between June 2013 to September 2015 was Applications
Support Manager. From September 2015 to the date of his evidence he held the
position of Service Management Director, with a focus on the Digital Safe product
set.

51.   Mr Langford was cross-examined for part of one day. His evidence related to the
Claimants' case on hosting.

*Ms Catherine Anne Lesjak*

52.   Ms Lesjak worked at HP for over thirty years and at the time of the Acquisition she
was Executive Vice President and Chief Financial Officer. Pending Mr Apotheker's
appointment, between August and November 2010 she had served as Interim CEO.
She was, as it were, HP born and bred and was very much committed to the company.

53.   In November 2015, she became CFO of HP Inc. (when HP split into HPE and HP Inc)
and at the time of giving evidence had stepped down from that role to become Interim
COO.

54.   Ms Lesjak was cross-examined over two days. The primary focus of her evidence was
the impairment charge that HP announced in November 2012 after the Acquisition,
and when she came to know of Autonomy's sales of hardware.

*Mr Fernando Lucini Gonzalez-Pardo*

55.   After graduating with a degree in electrical engineering from the University of Kent
in 1998, Mr Lucini joined an IT consultancy firm called Dataware Technologies
where he held the position of Solutions Center Manager. Dataware changed its name
to Leading Side and Mr Lucini remained at Leading Side until around 1999.

56.   In 2000, Mr Lucini joined Autonomy working in pre-sales, Autonomy's technology
selling arm whose members were known as Systems/Sales Engineers. His precise title
and position within the organisation in the Relevant Period was a point of contention
between the parties; but it is not disputed #that during the Relevant Period, he worked

in pre-sales at Autonomy and on the technical side. It was common ground that he was of relatively high seniority amongst the technical individuals, though in describing himself as "Chief Architect" the Defendants contended that he inflated his position; he was not one of the leaders of the organisation.

57.    Mr Lucini remained with Autonomy following the Acquisition and left HPE in 2016. At the time of his evidence he was the Managing Director of Artificial Intelligence at Accenture, a global professional services company.

58.    He was compelled to attend trial by a witness summons and was cross-examined for two and a half days. His evidence covered principally (apart from extended questioning of his own role): (a) SPE, (b) Autonomy's approach to purchasing third party software, (c) the purchase of StorHouse from FileTek and subsequent integration work, (d) the VMS transaction, (e) the DiscoverEngine purchases from DiscoverTech, (f) the MicroTech/Vatican Library VAR transaction, (g) the Prisa "*other*" transaction and the DiscoverTech/Prisa VAR transaction and (h) the Morgan Stanley Q1 2011 hosting transaction.

*Mr John Meiers*

59.    Mr Meiers was employed by H&R Block, a tax preparation services company, between August 2007 and January 2015. He had previously worked for DST Output, a subsidiary of DST Systems, Inc, where his role included managing complex IT and manufacturing systems.

60.    When he joined H&R Block he was employed as an IT Contracts Project Manager. In March 2008, he became Sourcing Leader in H&R Block's procurement department, and in that role he was responsible for negotiating all of H&R Block's in-bound software licensing agreements.

61.    Mr Meiers provided a witness statement on behalf of the Claimants, but the Defendants decided not to cross-examine him. His evidence, which was thus unchallenged, principally concerned his negotiation of a $2 million software deal with Autonomy, and in particular the fact that when negotiating that deal, he was not told and was unaware that just three months earlier, Autonomy had been involved in the resale of hardware by Zones Inc to H&R Block. This (unchallenged) evidence was relied on by the Claimants as further support for their case that there was no real linkage between Autonomy's hardware reselling and its software sales: see paragraphs 1159 to 1182 in the main body of this judgment.

*Mr Paul Gilmer Morland*

62.    Mr Morland started working as an analyst in 1994, and began focusing on technology stocks when technology emerged as an independent sector from 1998 onwards. He started covering Autonomy in 2005 when working at Société Générale. He covered Autonomy throughout the Relevant Period as an analyst first at Astaire Securities, and then (from June 2010) at Peel Hunt. Thereafter, he was self- employed, before moving to Arden Partners in October 2014. He joined Canaccord Genuity in February 2016 where he remained at the time of the trial.

63.    Like Mr Khan he was initially bullish about Autonomy but after mid-2009 he increasingly began to question Autonomy's results and accounts, resulting in Autonomy accusing him of making a *"knowingly false accusation"* that Autonomy was *"misaccounting"*, and (falsely) suggesting he was in possession of inside information. Mr Kanter escalated this into a complaint to the FSA.

64.    Mr Morland's evidence in his witness statement was directed to explaining why he came to doubt Autonomy's accounting and especially (a) its *"organic growth"* figures, (b) its change to the way it structured its hosting contracts which *"flattered"* its true performance and accelerated receipts at the expense of longer term revenue and (c) its overly aggressive revenue recognition and its poor cash conversion rate. Mr Morland was fiercely attacked in his cross-examination over the course of a full day and it was alleged (for example) that, in bad faith, he tailored his reports to assist clients holding short positions.

*Mr Rahul Puri*

65.    Between May 2010 and September 2013, Mr Puri was the Managing Director of Innovation and Chief Software Architect at Promotora de Informaciones S.A., a Spanish media conglomerate known in these proceedings as Prisa, which was presented as the proposed end-user in the context of a VAR sale by Autonomy to DiscoverTech (see VT30 and paragraphs 591 to 707 of the Schedule of Impugned VAR Transactions).

66.    Mr Puri gave evidence about one of the "other transactions" impugned by the Claimants, a transaction between Prisa and Autonomy in Q4 2010. He also gave evidence in respect of impugned VAR transaction VT30, to the effect that (a) he had not even heard of DiscoverTech and DiscoverTech had not at any time contacted Prisa, until 2018 when he was testifying in the US criminal proceedings and (b) the software which was the subject of the VAR sale (e-Discovery software) would not have been of any interest to Prisa. Mr Puri was cross-examined in these proceedings for about one hour.

*Mr Harry T. Robins*

67.    Mr Robins was at the time of the trial (and I assume still is) a partner in the New York office of Morgan, Lewis & Bockius LLP ("Morgan Lewis"), which has acted in the US for HP in connection with HP's investigation into Autonomy and the subsequent US criminal proceedings, but also advised Autonomy on US merger control filing requirements relating to its acquisition by HP/Bidco.

68.    Mr Robins provided a witness statement in which he addressed a suggestion made by Dr Lynch that on 16 and 17 August 2011 (very shortly before the acquisition was announced) Mr Kanter and Mr Chamberlain sent Morgan Lewis spreadsheets detailing Autonomy's revenue breakdown for 2009 and 2010, including hardware revenue, and that the information thus provided to Morgan Lewis is attributable to HP. Mr Robins made clear that Morgan Lewis was at that time and for that purpose acting for Autonomy and not HP, and that the spreadsheets were not forwarded to HP's antitrust advisers, Freshfields. The Defendants did not require Mr Robins to attend to be cross-examined and his evidence was not challenged.

*Mr Shane V Robison*

69. Mr Apotheker was assisted by Mr Robison, the Chief Strategy & Technology Officer and Head of HP's Strategy and Corporate Development Group ("SCD"). Mr Robison was in favour of the strategy to move further into enterprise software.

70. Mr Robison had worked as a staff engineer at Evans & Sutherland, a computer graphics company before moving to Schlumberger to work on artificial intelligence in 1984. He later worked at the Advanced Technology Group at Apple, where he became the Vice President and General Manager of the Personal Interactive Electronics Division. In 1995 he joined Cadence Design Systems which produces software to design integrated circuits and chips before joining AT&T Labs as President of Internet Technology and Development.

71. In 2000, he joined Compaq as the Chief Technology Officer and Head of Corporate Strategy. In May 2002, Compaq was acquired by Hewlett-Packard Company and he became the Chief Strategy & Technology Officer of Hewlett-Packard Company and Head of HP's SCD from mid 2002 until 20 October 2011.

72. Mr Robison made a witness statement which was adduced into evidence under a hearsay notice. He did not attend at trial for medical reasons.

*Mr Manish Sarin*

73. Before joining HP, Mr Sarin had been a Director in Merrill Lynch & Co's Technology Investment Banking Group. He has an MBA from Columbia Business School.

74. He joined HP in the SCD team and became a Senior Director in February 2010. He reported to Mr Andy Johnson (HP's Head of Corporate Development) who in turn reported to Mr Robison. (Mr Robison reported to Mr Apotheker.)

75. At the time of giving his evidence, Mr Sarin had left HP and was Vice President of Proofpoint Inc, an enterprise security company in California.

76. Mr Sarin was cross-examined over two days. His evidence principally concerned his role in the due diligence process and in the SCD's assessment of Autonomy's results and in assessing and valuing Autonomy for the purpose of assisting HP's leadership.

*Mr Michael Sullivan*

77. Mr Sullivan co-founded SteelPoint Technologies Inc ("SteelPoint") which specialised in the management of unstructured information and litigation support services. SteelPoint was founded in 1993 and was acquired by Zantaz Inc in 2004. Mr Sullivan was made Senior Vice President of Operations and Services of Zantaz, responsible for the delivery of all software and services to customers. In 2009, following the acquisition of Zantaz by Autonomy in 2007, he became and remained CEO of Autonomy Protect, the archiving and litigation discovery division of Autonomy.

78.    After the acquisition of Autonomy by HP in October 2011, he held the position of Senior Vice President of Information Management and Governance, responsible for Autonomy's SaaS business.

79.    From 1 September 2017, upon HPE's software business being spun out and merged with Micro Focus, he oversaw the information management and governance product portfolio at Micro Focus, reporting directly to the CEO. In November 2017, he left Micro Focus to become CEO of a different company.

80.    Mr Sullivan gave evidence in the US criminal proceedings but (being resident outside the jurisdiction) he was not willing to, and did not, appear before me. His witness statement was adduced as hearsay evidence. No order was sought for video-link evidence.

*Mr Roger Wang*

81.    Mr Wang began working as a program manager for Verity Inc, a search technology development company, in 2002. In 2008, following the acquisition of Verity Inc by Autonomy in 2005, he was promoted to Vice President of Product Development for Digital Safe, reporting to Dr Menell.

82.    He left Autonomy in or around January 2013. At the time of this trial Mr Wang worked as a Senior Product Manager at BitGo Inc.

83.    Mr Wang was cross-examined for two days. His evidence related principally to the Claimants' case in relation to hosting and the impugned reciprocal transactions with FileTek.

*Mr Lee Peter Welham*

84.    Mr Welham joined Deloitte in 2002 and qualified as a chartered accountant in 2005. From late 2005 to 2011, he was a member of the Deloitte audit team for Autonomy. Through the period of 2008 to August 2011, he was a Senior Manager on the Autonomy audit team. He was made a Partner at Deloitte in 2016.

85.    Mr Welham was the only person from Deloitte who gave evidence in these proceedings. He was cross-examined for a full three days in relation to all Deloitte's audit work in the Relevant Period.

*Ms Margaret ('Meg') Cushing Whitman*

86.    Ms Whitman is a graduate of Princeton and Harvard Business School. She had held executive roles at a number of large companies including Walt Disney and Proctor & Gamble. She also served as CEO of eBay from 1998 to 2008. Between 2009 and 2010 she ran unsuccessfully for Governor of California.

87.    In January 2011, she joined the Board of Directors of Hewlett-Packard Company before succeeding Mr Apotheker as President and CEO in September 2011.

88.    Following Hewlett-Packard dividing into Hewlett-Packard Enterprise Company and HP Inc in November 2015, she became CEO of HPE, stepping down on 31 January

2018. She also served as Chair of the Board for HP Inc from November 2015 to July 2017.

89. Ms Whitman was cross-examined over two days. Her evidence was directed towards Dr Lynch's criticisms of the way HP handled the integration of Autonomy after the Acquisition and the Defendants' case that when the write-down was announced HP had no basis for its amount, and the exercise was one of the new board abdicating its responsibility and seeking to shift any blame on HP's side to Messrs Apotheker and Robison.

*Mr Samuel Hald Yan*

90. Mr Yan joined Zantaz Inc in October 1998 as a Systems Architect and Director of Development for Digital Safe. Following Autonomy's acquisition of Zantaz in July 2007, he was appointed Chief Architect of the Product Development Team for Digital Safe. In the Relevant Period, Mr Yan was one of the lead engineers in the Digital Safe Product Development team, reporting to Mr Wang.

91. Following the spin-off of HPE's software business to Micro Focus in September 2017, he remained in the Product Development team.

92. Mr Yan was cross-examined over two days, principally in respect of the Claimants' allegations relating to Autonomy's hosting business, and the theoretical and practical viability of moving Digital Safe on-premise.

*Mr Christopher Henry Yelland*

93. Mr Yelland was Autonomy's CFO from April 2012 until February 2013. After graduating from the University of Warwick he joined Arthur Andersen and qualified as a Chartered Accountant. He worked there for three and a half years before becoming a tutor at the Financial Training Company training people to become accountants. In 1995, he joined the Rover Group. He moved to Compaq in January 2000. In April 2004, after Compaq's merger with HP, he was appointed Finance Manager of HP's UK software and enterprise[551] storage and servers business. In 2007 he became the Finance Director of HP's Personal Systems group in the UK and Ireland. In September 2010, he was promoted to Finance Director of HP's EMEA Software business, and in April 2012, after the Acquisition, he was promoted to be CFO in Autonomy. From February 2013 to September 2017, he was Autonomy's Financial Controller. After Micro Focus had acquired HPE's software business (effective on 1 September 2017), he became Vice-President of Finance at Micro Focus, with responsibility for group Financial Planning and Analysis.

94. Mr Yelland's witness statement primarily related to his experience as CFO of Autonomy from April 2012, including the "rebasing" exercise conducted in June- July 2012 and its enquiry into Autonomy's historical financial performance, preparing various revised business forecasts, and preparing ASL's 2011 statutory accounts and restated 2010 financial results.

---

[551] HP's "enterprise" business focused on the provision of hardware (such as servers, network infrastructures and storage devices), software, and services to large commercial businesses.

95.     Mr Yelland was cross-examined for more than a day. His cross-examination focused principally on his perceptions of the "rebasing" exercise.

*Mr Robert Harold Youngjohns*

96.     After graduating from the University of Oxford, Mr Youngjohns worked for IBM for 17 years before working at Sun Microsystems Inc as Executive Vice-President of Global Sales and later Executive Vice-President of Strategy. Mr Youngjohns then held the position of President and CEO of Callidus Software before joining Microsoft Corporation in 2007 as President of Microsoft North America.

97.     On 17 September 2012, he joined Autonomy as Senior Vice President and General Manager of HP's Autonomy/ Information Management business unit. In May 2014, he was promoted to Executive Vice President and General Manager of HP Software.

98.     In December 2016, Mr Youngjohns left HP Software and has since founded his own investment and advisory firm with a focus on software and services industries.

99.     Mr Youngjohns' evidence was directed towards Dr Lynch's allegations that HP mismanaged the integration of Autonomy. He was cross-examined for about half a day.

**The First Defendant's witnesses (listed alphabetically)[552]**

*Mr Donald Leonard Avant, Jr*

100.    Mr Avant only joined Autonomy in mid-July 2011, less than a month before the Acquisition was announced. His title when he joined was Group Head of Operations and his evidence was that, as such, he oversaw a group of 400 to 450 people which had *"responsibility for all Autonomy functions in the post-sales space, including professional services, training, and technical support services."* He continued to work for Autonomy for five years thereafter. Since November 2017, he has been employed by Darktrace, in which he is a shareholder.

101.    His witness statement discussed (a) Autonomy's provision of services using third party partners; (b) the utility of a licence to use and run Digital Safe on-premise; (c) what he called *"HP Autonomy Culture",* and what he perceived to be the *"dysfunction [which] grew during the time of HP's ownership"*; and (d) his *"observations"* on Autonomy's agreement with Prisa. However, and unsurprisingly given that he had not been working for Autonomy at the time and had had no active role, his 'evidence' was largely interpretation and surmise.

102.    Mr Avant was cross-examined for just over an hour. There was no reference to or reliance placed on Mr Avant's evidence in the Defendants' closing submissions.

---

[552] Of these, none provided a witness statement in the first round of evidence.

*Mr Eloy Avila*

103.    Mr Avila joined Autonomy in January 2004 as a sales engineer. He became Chief Corporate Architect in September 2009, before being promoted to Chief Technology Officer (Americas) in May 2010, and subsequently became the worldwide CTO in November 2010, a position he held until June 2013, when he became the Vice President of Worldwide Pre-Sales for Big Data, a division within HP software. He held this role until he left HP in September 2015. He is currently employed by Darktrace as its CTO for the Americas, a position he has held since April 2018.

104.    After being promoted to worldwide CTO, Mr Avila reported directly (and regularly) to Dr Lynch. Before then he reported to Mr Lucini and Dr Menell (more often, the latter). His witness statement covered (a) Autonomy's general rule or philosophy of preferring to develop its own software rather than buying in third party software; (b) SharePoint connectors; (c) the practical feasibility of moving Digital Safe on-premise; (d) SPE; (e) Filetek Storhouse; (f) VMS; and (g) post-acquisition and corporate culture.

105.    Mr Avila was cross-examined on all these issues and gave evidence over the course of two days.


*Ms Michele (previously Anthony) Bettencourt*

106.    Ms Bettencourt (who before and when working for Autonomy was known as Anthony) joined Verity Inc in 1995 as a Vice President in its sales department, was promoted to the position of President and ultimately served as its CEO from 2003 to December 2005 (when Verity Inc was acquired by Autonomy). Ms Bettencourt worked within the Autonomy group from January 2006 until October 2009, focusing first on the integration of Verity Inc and thereafter on various acquisitions and potential acquisitions. Ms Bettencourt headed up the integration process of (a) Zantaz Inc when Autonomy bought Zantaz Inc in July 2007, and (b) Interwoven Inc after its purchase by Autonomy in March 2009, before leaving Autonomy in December 2009.

107.    Ms Bettencourt provided a witness statement on behalf of Dr Lynch. Its main object was to address the doubts raised in the witness statements for the Claimants casting doubt on the development costs and substance of SPE: her evidence set out her awareness of and involvement in Autonomy's plans to grow its structured data capability, SPE having been developed for that purpose. However, Ms Bettencourt accepted that she was not personally involved in the development of SPE or the acquisition of other technology to develop Autonomy's move into structured data.

108.    Ms Bettencourt also explained that she had been involved in preliminary approaches to two potential targets for Autonomy, namely TIBCO and Informatica, and before she left Autonomy had been *"working to improve relations between the companies with a view towards a possible merger or acquisition."* The Claimants chose not to cross-examine her.


*Mr Jonathan William Bloomer*

109.    Mr Bloomer was formerly CEO and CFO at Prudential Plc, having trained and qualified as an accountant and auditor at Arthur Andersen where he became a partner

in 1987 and remained for 20 years. Whilst at Prudential Plc, he was appointed the Chairman of the Practitioner Panel at the Financial Services Authority. He then became a partner at Cerberus European Capital Advisors and founder and CEO of Lucida Plc from 2006 to 2012. He had served on the audit committee at both RT Group plc and Hargreaves Lansdown plc. He became a non-executive director of Autonomy in August 2010.

110.    In September 2010, Mr Bloomer became the first permanent chair of Autonomy's Audit Committee. Prior to Mr Bloomer's appointment: (i) there had not been a permanent chair of the Committee, but its members had instead served as chair on an *ad hoc* basis; and (ii) none of the members of the Committee was an accountant or had any formal accountancy training,[553] which was unusual: Mr Bloomer said that the majority of Audit Committee chairs in listed companies would be qualified chartered accountants.

111.    Between his appointment and the acquisition of Autonomy by HP, Mr Bloomer chaired four meetings of the Committee held on the following dates: (i) 18 October 2010, in relation to Q3 2010; (ii) 28 January 2011, in relation to FY/Q4 2010; (iii) 19 April 2011, in relation to Q1 2011; and (iv) 25 July 2011, in relation to Q2 2011. The other members of the Audit Committee over this period were Mr Frank Kelly and Mr John McMonigall.

112.    During his tenure as chair, meetings of the Audit Committee were also attended by Mr Hussain, Mr Kanter, Mr Chamberlain, Deloitte and occasionally Mr Webb QC. In his witness statement, Mr Bloomer stated that Mr Mercer "*and occasionally more junior members of the Deloitte team*" attended the Audit Committee meetings but, in fact, the minutes show that Mr Welham attended three of the four meetings chaired by Mr Bloomer.

113.    In his evidence about the Audit Committee meetings, Mr Bloomer addressed hardware sales and revenue recognition, VARs, Reciprocals, COGs, account receivables and provisioning. He was cross-examined for three-quarters of a day.

*Ms Vanessa E. Colomar*

114.    Ms Colomar joined Autonomy as Head of Communications in August 2011. She thus had no relevant evidence to give in respect of the pre-Acquisition period. The focus of her evidence was thus on HP's statements to the market in November 2012.

115.    Ms Colomar resigned from Autonomy in late May 2012 and shortly thereafter joined Invoke Capital as a Partner and its Head of Communications and Investor Relations. Invoke Capital's website described her as a "founding partner" but she denied that she was, insisting that she *"joined Invoke in September when it was fully formed"* and was not involved in setting it up. She also sits on the boards of Darktrace and Luminance. Throughout the course of the trial, she was responsible, along with the Brunswick Group, for Dr Lynch's PR in relation to these proceedings.

---

[553]    In addition to Mr McMonigall, the previous members of the Committee were Mr Barry Ariko and Mr Richard Perle. Mr Ariko was a former executive of several computer and software companies. Mr Perle was former US Assistant Secretary of Defense.

116.    Ms Colomar was cross-examined for one hour. Her evidence concerned Dr Lynch's Counterclaim, and is of very limited relevance since in light of my conclusions on the main claim the Counterclaim has fallen away.

117.    Of suggested relevance to the main claim, she was taken to documents to show that, in the lead up to the 20 November 2012 announcement by HP, Dr Lynch was making preparations "*in case we really get blamed*", and he requested that Ms Colomar prepare a "*red secret list*" for that eventuality. Ms Colomar told me that she had no idea what Dr Lynch had meant by "*red secret list*", but nor could she recall whether she had sought clarification from Dr Lynch as to what he was referring. The Claimants submitted that this is implausible: Dr Lynch had instructed her to produce the list and she would have acted on that instruction, either producing the list or, if she had been under any uncertainty, seeking his clarification. That seems to me to be credible: but I need make no finding. Ms Colomar was almost invariably in court during the trial; but she was a peripheral witness.

*Mr Stephen John Cooke*

118.    Mr Cooke joined Slaughter and May in 1982, became a partner in 1991, headed its Merger & Acquisitions practice from 2001 to 2016 and at the time of the Trial was its Senior Partner. Slaughter and May was approached by Autonomy in October 2010 (on the introduction of Mr Webb QC) and Autonomy confirmed its intention to appoint the firm as defence counsel in the event of a potential takeover. Autonomy engaged Slaughter and May to advise on the HP acquisition in July 2011. Mr Cooke led the team.

119.    In his witness statement on behalf of Dr Lynch, Mr Cooke confirmed that (a) if Autonomy was seeking a buyer for the company in late 2010 and early 2011, he was not aware of that; (b) he was not aware of Autonomy seeking to prevent specific information going to HP; (c) he was not personally involved in the drafting of either a non-disclosure agreement (dated 3 March 2011) or a draft exclusivity agreement (signed by HP on 29 July 2011), but he was aware that Slaughter and May advised the removal of terms sought by HP to impose a requirement for Autonomy to provide all information requested by HP, so that in the result Autonomy never agreed to grant such unrestricted access (which he confirmed also would *"as well as being completely unacceptable to nearly all sellers, be highly unusual in a UK takeover bid").* He also confirmed that he was not directly involved in the due diligence process.

120.    The Claimants did not require Mr Cooke to attend for cross-examination, and so his witness statement was not challenged.

*Ms Poppy Gustafsson (whose maiden name was Prentis)*

121.    Ms Gustafsson began working at Deloitte in September 2004 and was assigned to the Autonomy audit soon after she joined. She left Deloitte in April 2008. She joined Autonomy's finance department in June 2009, working on the costs side of the business, before transitioning to work on the revenue side at the end of 2009. She left Autonomy shortly after its acquisition by HP in 2011, and co-founded Darktrace in June 2013. At the time of her evidence she was co-CEO of Darktrace with Ms Eagan.

She was also a substantial shareholder in Invoke, with shares worth around $15 million.

122. Ms Gustafsson accepted that she remains a "*good friend*" of Mr Hussain's, whom she regards as a "*mentor*". She suggested that she had "*no personal loyalty*" to Dr Lynch; but she accepted that he was "*the founding money behind*" Darktrace, a company she set up and of which she was, at the time of her evidence, co-CEO. Indeed, she maintained that she was motivated to "*come and tell [her] side of the story*" because she did not think that Dr Lynch's "*perspective has always been fairly represented*". She was sometimes too obviously an advocate for the Defendants.

123. She gave evidence in relation to (a) the conduct of Deloitte's audits and relationship with Autonomy; (b) her perception of the purpose and strategic rationale of hardware sales, and the reasons why no separate disclosure was considered necessary; (c) her understanding of Autonomy's transactions with VARs, and the issues raised about revenue recognition; (d) her understanding of SPE (she was not involved in its technical development, but her evidence was that she recalled it being talked about and celebrated) and its shipment to VMS; (e) her involvement in accounting for Autonomy's hosting transactions, Autonomy's purpose in adopting the so-called "hybrid model" and her emails, on which she was cross-examined, suggesting that her view was that Autonomy should *"steer clear of upfront payment"* unless it achieved accelerated revenue recognition; and (f) her experience of processes within Autonomy for the collation and monitoring of time sheets and labour costs.

124. Ms Gustafsson was cross-examined for a little less than one and a half days.


*Ms Elizabeth "Lisa" Jane Harris*

125. Ms Harris qualified as a chartered accountant with KPMG in 1987. She commenced employment with Autonomy on 1 April 2005, working on costs accounting in the finance team. From August 2005, when Mr Steve Chamberlain joined Autonomy, she reported to him. She was made Group Financial Controller in 2009. She worked for Autonomy in the same role after the Acquisition but left in February 2013. After three months gardening leave she left to work for an Invoke Capital company.

126. Her evidence covered (a) Autonomy's finance department functions and structure; (b) Deloitte's role and the audit process as she perceived it, and her impression of their work; (c) her awareness of Deloitte's investigation of the allocation to 'Sales and Marketing' of the costs of loss-making hardware sales (in which she was not herself involved); (d) her awareness of but separation from VAR sales notwithstanding having to approve payments of MAF; (e) her involvement with the sales team in paying staff expenses, commissions and salaries; (f) her perception of work post-Acquisition and on the various exercises to integrate Autonomy's accounting systems and processes into HP's and (in the case of the *"rebasing exercise"*) to find any errors and (as Ms Harris put it) *"prove things were incorrect"* and (driven by Mr Yelland) *"to look for any, and every, little mistake";* and (g) her view that a number of people within HP (including Mr Yelland and Mr Duckworth) were aware of hardware sales from the ledger codes.

127.    She was cross-examined for (in all) about one day. Her cross-examination also covered an allegation against her that after she had determined to leave, but whilst still employed by Autonomy, she copied on to a USB drive/ pen drive copies of Autonomy's and HP's confidential documents. She shared this with Mr Hussain because she considered that the documents held on the pen drive showed that HP knew of the hardware sales. She was also cross-examined on an attendance note of an interview of her by HP's lawyers which she claimed was inaccurate (which she addressed in a second witness statement also).

*Ms Martina Ann King*

128.    Ms Martina King had worked at Yahoo and then pursued a *"plural career"* until she joined Aurasma UK (an Autonomy group company) in May 2011 as its Head. She resigned in May 2012 and subsequently joined Invoke Capital.

129.    Her witness statement addressed: (a) her experience of working with Dr Lynch (about whom she spoke very highly) and in the work environment he cultivated and (b) HP's interaction with Aurasma (which she maintained HP did not understand or seek to foster and support, and with which HP struggled).

130.    Ms King was cross-examined for a little less than one hour.

*Mr Alastair James Martin*

131.    Mr Martin joined Autonomy in September 2004 as a sales engineer, having graduated from the University of Sheffield with a 1st class degree in Computer Science. His role became increasingly managerial, and by the time of Autonomy's acquisition by HP/Bidco his title was Group Head of Technical and Customer Operations, EMEA & APAC which in practice meant that he oversaw Autonomy's sales engineers in EMEA and Asia. He described this role as *"technical customer facing",* which he intended to mean that he *"worked a lot on the support side, helping customers with their technical issues."* He was not in product development but asserted familiarity with *"the technical language"* such that he *"could liaise between Autonomy's developers and our customers."* After leaving his role at HP in 2015, he joined Darktrace. He gave evidence for Dr Lynch.

132.    Mr Martin's witness statement addressed a broad variety of the claims against Autonomy. His evidence was in summary that, contrary to the Claimants' case (a) it was not accurate to say that Autonomy never bought software from third parties (and he provided examples of such purchases to the contrary) (see paragraph 2417(3) of the main body of my judgment); (b) there were good reasons why there was customer demand for a connector made by MicroLink which Autonomy acquired from it, and for a product called DiscoverPoint Engine which Autonomy acquired from DiscoverTech; (c) it was not the case that software sold by Autonomy to Tottenham Hotspur plc was of no use to it until Autonomy provided a full 'solution' (cf paragraph 3744 in the main body of my judgment); (d) Prisa made full and substantive use of software it acquired from Autonomy (see paragraph 3767(7) and footnote 473 in the main body of my judgment); (e) SPE was a real and valuable product for which there was real customer demand and which was incorporated as a module of the IDOL platform (see paragraphs 3623 to 3624 of the main body of my

judgment); and (f) Digital Safe was capable of being used by a customer on-premise and there was no difficulty in training Sales Engineers to assist customers to do so (though see paragraph 3377(5) in the main body of my judgment). He also described the differences in the working ethos of Autonomy compared to that of HP.

133.    There was considerable overlap and some repetition between Mr Martin's evidence and that of Mr Avila (to the point that certain passages were identical).  The Claimants submitted that in cross-examination (over the course of just over an hour) Mr Martin *"was frequently willing to speculate on matters beyond his ken, but was unwilling to accept the obvious (for example, that either he or Mr Avila had copied the other's witness statement)."*

*Ms Emily Orton*

134.    After graduating from Cambridge University in 2009, Ms Orton started working at Autonomy in September 2009 as a graduate European Marketing Executive in the marketing department in London. From early 2010, for around 18 months, she worked as Dr Lynch's assistant, before returning to the marketing department in various roles. By the time she left Autonomy in the summer of 2012, she had become the European Marketing Manager. She then joined Invoke Capital as a Senior Associate. She later became Head of Marketing at Darktrace, and then Darktrace's Chief Marketing Officer. She has been rewarded by around 1.5% of the equity in Invoke Capital, and shares and options in Darktrace in *"life changing"* amounts.

135.    Ms Orton's witness statement addressed (a) her perception of Autonomy's workplace culture and contradicted Mr Youngjohns' witness statement disparaging it; (b) her experience of working for Dr Lynch, and her perception of Mr Hussain (though she did not work directly for him); (c) her understanding more generally of Dr Lynch's role and activities, which she described as involving him spending some 50% on *"public facing matters",* leaving little time to deal with internal operational matters, and his relationship with line managers such as Mr Lucini. She mentioned that *"Operationally, while in the office, Dr Lynch was more inclined to be involved with marketing strategy…particularly ensuring the messaging was correct."* She also offered her evidence that *"After the acquisition, to my knowledge there were no tangible steps to integrate the companies."*

136.    She was cross-examined for part of an afternoon predominantly on (a) the extent of Dr Lynch's control of expenses and day to day matters and his way of working, and (b) her perception that HP's senior management barely involved themselves in Autonomy after the Acquisition.

*Mr Frank Pao*

137.    Mr Pao, who had formerly been employed by Autonomy, joined Virage as its CEO (see also the short description of Virage's CTO, Mr Humphrey, above) before it was purchased by Autonomy in 2003, remained there for a little over four years, and then left to become Chief Executive Officer and President of Vidient Systems, Inc ("Vidient"). He held that role for approximately three years. Vidient (which designed and developed search and surveillance products) went out of business in  November 2010.

138.  Mr Pao's evidence was in response to Mr Humphrey's evidence and addressed a series of transactions which the Claimants impugned as reciprocal and which Mr Pao had made on behalf of Vidient.

139.  Mr Pao was cross-examined over the course of one morning. The Claimants accepted his evidence on the negotiations that led to the allegedly reciprocal transactions (where consistent with the contemporaneous documents), whilst rejecting and inviting the Court to disregard what they described as his *"speculation and attempts to insulate the Defendants."*


*Mr Philip Michael Pearson*

140.  Mr Pearson, a good personal friend of Mr Hussain, initially worked at UBS and then managed a technology hedge fund at GLG Partners ("GLG") (one of the largest hedge funds in Europe at the time), where he worked from late 2001 to the summer of 2015. He began following Autonomy in 1999 (while still at UBS) and continued to do so at GLG. GLG invested in Autonomy and made at least £20 million from HP's acquisition. He became a partner at Invoke in May 2017, and at the time of giving evidence sat on the board of two of its investments: Darktrace (a company in which he also has a personal shareholding) and Featurespace.

141.  His witness statement addressed: (a) how Autonomy was perceived by analysts and the market; (b) methods of valuation (and EPS v DCF models); (c) the relevance of organic growth and the valuation of Autonomy; (d) how disclosure of hardware sales would have affected the perception and valuation of Autonomy; (e) his understanding of "OEM derived revenues" and the value placed on them (his thesis being, contrary to the rest of the evidence, that OEM revenue was a less valuable stream, though when cross-examined he conceded this was his personal and not a market view); and (f) market perception of the constitution of Autonomy's IDOL Cloud revenue. Some of his evidence appeared to be in the nature of opinion evidence, often without reference to supporting evidence or documents.

142.  He was cross-examined over the course of a morning.


*Ms Mariana Mato Machado de Paiva Pereira*

143.  Ms Pereira joined Autonomy in September 2008 as a Marketing Executive, an entry level role in the marketing department. In her short (4-page) witness statement she described her primary role as having been product marketing, including supporting the demo team by producing short marketing videos. She worked with the research and development team and the sales team during the period 2008 to October 2009. She then moved to San Francisco as the director of 'Rich Media'.

144.  She resigned from Autonomy in September 2011 and moved to Brazil, freelancing for a time until she was hired by HP Brazil in 2012 for a few months, before she left to study for an MBA. After obtaining her MBA degree she worked at Heinz and then started her own company. She then joined Darktrace's marketing department in September 2017 at the request of Ms Eagan (Autonomy's Chief Marketing Officer), with whom she had worked when at Autonomy.

145. The purpose of her evidence was to respond to the evidence of Dr Blanchflower and Mr Lucini concerning the development of SPE and to explain her role in that respect. This came down to having produced a video to demonstrate the product's capabilities and also having worked (indirectly) on its launch. She felt able to say that IDOL SPE *"was a genuine product which followed the normal path of development…"*. She was cross-examined for less than 30 minutes. The cross-examination confirmed that she had little direct involvement (even, for example, in the press releases) in SPE, and none at all before September 2009. She was a peripheral witness; the Claimants submitted that the decision to call her simply highlighted the failure to call Ms Eagan.

*Mr Philip John Shelley*

146. Mr Shelley was the co-head of Corporate Broking at UBS for several years prior to September 2010, and then joined Goldman Sachs in December 2010 as co-head of their combined Corporate Broking and UK ECM[554] team. Whilst at UBS he covered a range of clients as corporate broker, including Autonomy. UBS continued in its role as Autonomy's corporate broker (sharing that role with Citibank) after Mr Shelley left; but in around May/June 2011, Goldman Sachs was appointed as Autonomy's third corporate broker. Mr Shelley left Goldman Sachs in May 2015 and joined Barclays in June 2015 as Vice Chairman of European Banking. He left Barclays in February 2018 and founded his own company, Arlington Capital Markets, Ltd., which (he explained) *"advises companies on how best to communicate their strategy and proposition to potential investors."* Mr Shelley has no ongoing business connections with Dr Lynch.

147. Mr Shelley's witness statement contained a useful analysis of Autonomy's shareholding constituency (and he noted especially that some 60% of its shares were held by its top 20 shareholders) and addressed (a) his view of how the market regarded Autonomy (largely positive with a belief in the potential of IDOL for sustained market penetration, but with a particularly vocal negative constituency too); (b) his perception of Autonomy's approach to reporting (which he regarded as generally transparent); (c) his views on the 'negative analysts' (especially Mr Morland and Mr Khan); (d) his reaction on learning subsequently of the extent of Autonomy's hardware sales (he said he was not *"shocked or astonished"*); (e) his view that the constitution of Autonomy's OEM sales was not a particular area of interest for analysts and investors; and (f) his lack of any recollection of any market questions or discussions regarding the composition of revenues from hosting deals included in IDOL Cloud.

148. He was cross-examined for just over half a day. I have dealt with points emerging in my judgment. The Claimants pointed out that the Defendants did not refer to Mr Shelley's evidence at all in their closing submissions.

---

[554] European Capital Markets.

*Mr Gary Gerard Szukalski*

149.    Mr Szukalski worked for FileTek from January 1986 until August 2000, then for Verity (where he continued after its acquisition by Autonomy at the end of 2005) until 1 January 2009 when he re-joined FileTek as its President.

150.    His witness statement addressed allegedly reciprocal transactions with Autonomy whereby FileTek purchased Autonomy software and Autonomy purchased FileTek's StorHouse software. He also addressed a reciprocal VAR transaction with Autonomy for end-user USDVA.

151.    The Claimants made a number of points in support of their contention that *"Mr Szukalski's witness statement was not entirely satisfactory."* Although Mr Szukalski stated in his witness statement that he had *"read the witness statement of Stouffer Egan"* and purported to comment on certain paragraphs in Mr Egan's statement, it emerged in cross-examination, however, that Mr Szukalski had not been provided with a copy of Mr Egan's witness statement prior to signing his own witness statement, and therefore had not read it. Although Mr Szukalski initially appeared to say that he was given excerpts from Mr Egan's witness statement to comment on, he later clarified that he had not read the witness statement *"until fairly recently"* and so *"didn't read these witness statements prior to putting together my witness statement"*. Rather, someone from Dr Lynch's legal team had sought to give Mr Szukalski the gist of what was stated in Mr Egan's witness statement. Mr Szukalski also was not shown the transcript of the testimony of Mr Loomis (FileTek's CEO and CFO) in the US criminal proceedings before signing his witness statement, even though Mr Szukalski's statement was presented as part of Dr Lynch's reply evidence (served in the supplemental round), by which time the Claimants had already put in a hearsay notice in respect of Mr Loomis' testimony. Furthermore, it emerged during cross-examination that, prior to signing his witness statement, Mr Szukalski was not shown any contemporaneous documents to refresh his memory, apart from the single email cited in the statement itself. The Claimants submitted that the unsurprising result was a witness statement that was inaccurate in material respects, and needed to be corrected during examination-in-chief. It failed faithfully to convey the reality of Mr Szukalski's recollection of events, as it emerged during his oral evidence.

152.    Mr Szukalski was cross-examined for just short of a day and a half. His depiction in the course of cross-examination of FileTek's role as being that of a *"fulfilment partner"* with no real role or intended participation in any onward sale to an end-user was relied on by the Claimants. Indeed, although Mr Szukalski was called by Dr Lynch, the Claimants invited me to attach *"very significant weight to the oral evidence of Mr Szukalski."*


*Mr Robert Stopford Webb QC*

153.    After a successful career as a barrister, Mr Robert Webb QC was General Counsel at British Airways Plc (1998 to 2009) and Rolls Royce Plc (2012 to 2015). He also held non-executive directorships and chairman positions with various British companies, including The London Stock Exchange (2001 to 2015), the BBC (2007 to 2012) and Argent Ltd (2009 to 2012). He became non-executive Chairman of Autonomy in mid-2009 and continued in that position until the Acquisition. At the time of the trial he was Chairman of Darktrace and Luminance (amongst other roles).

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

154. Mr Webb's witness statement responded to (and contradicted) Mr Robison's evidence that in 2011 Autonomy's management was trying to find a buyer for the company, and also provided (a) his perception of the culture at Autonomy; (b) his impression of the way Mr Hogenson's concerns were addressed (his impression being that *"Mr Hogenson was being given the opportunity to say everything he had to say…"*); (c) his understanding of the extent and purpose of Autonomy's sales of hardware; and (d) his assessment of the views of analysts and how Autonomy addressed their questions.

155. The Claimants chose not to cross-examine Mr Webb.

**The following individuals did not provide any evidence but played key roles**

*Mr Stephen Chamberlain*

156. Mr Chamberlain was an ex-Deloitte Chartered Accountant. He joined Autonomy as the Vice President of Finance in August 2005. He was based in Cambridge, where the main group finance function was based. Ms Anderson (ex-Deloitte), Ms Gustafsson (ex-Deloitte), Ms Harris (ex-KPMG) and Mr Stephan (ex-Deloitte) all worked in the finance department and reported to Mr Chamberlain. All finance teams in group companies elsewhere also reported to him. He reported to Mr Hussain.

157. Mr Chamberlain was described by Mr Welham in his witness statement as his *"main point of contact throughout the audit and review processes"* and the *"first point of contact for many requests from the Deloitte audit team for information."* In his first witness statement, Dr Lynch described the Finance Department as being *"headed by Stephen Chamberlain"*, though when cross-examined Dr Lynch suggested that Mr Hussain (as CFO) headed the department and Mr Chamberlain *"would be the number two."* It seemed to me that Mr Chamberlain had day to day control of the department, whilst Mr Hussain oversaw Autonomy's operations, with Dr Lynch: Mr Chamberlain was the energetic *aide de camp* to the general staff. He was (with Mr Hussain and Mr Kanter) directly and closely involved in the due diligence process.

158. He left Autonomy in March 2012. Following his departure, he was appointed as the COO of Darktrace. Dr Lynch has maintained personal contact with him and is paying his legal fees in the ongoing US criminal proceedings.

159. The Claimants described Mr Chamberlain as being *"all over the documents"*. He was part of the core management team and what I have called the "clique" or "cabal". I would have been interested in and greatly assisted by his evidence. He did not provide any.

160. The explanation offered was that he had been indicted by the US DoJ and also charged by the FRC in this country with acting dishonestly and/or recklessly (as well as failing to act with competence and due care). Neither had happened in September 2018 when the first round of witness evidence was served. Dr Lynch told me he did not know whether there was any reason why Mr Chamberlain could not have given a statement.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

*Ms Nicole Eagan*

161.　Ms Eagan was Chief Marketing Officer at Autonomy and (as Dr Lynch acknowledged) a member of Autonomy's core management team. She was one of the individuals from Autonomy who helped Dr Lynch set up Invoke Capital. She was, at the time of her witness statement, co-CEO (with Ms Gustafsson) of Darktrace and on its board.

162.　She had direct knowledge concerning the sales and marketing of SPE whereas the individual called to speak to that (Ms Pereira) did not.

163.　I would have expected her to be called as a witness; and, as in the case of Mr Kanter, she provided a witness statement and was included as a witness in every version of the trial timetable prior to late August 2019, slated to be cross-examined for one day. Not until a letter from Clifford Chance dated 22 August 2019 was it indicated that Ms Eagan (again like Mr Kanter) would not be giving evidence at trial. Dr Lynch suggested that (like Mr Kanter) Ms Eagan declined to appear in light of the continuing investigations being made of them by the US DoJ.

*Mr Brent Hogenson*

164.　At the time of Autonomy's acquisition of a company called Interwoven in 2009, Mr Hogenson was its Vice-President of Finance. Following that acquisition, Mr Hogenson became CFO for Autonomy in the Americas and was based in Autonomy's office in San Jose.

165.　Mr Hogenson did not give evidence in these proceedings. However, his contemporaneous expressions of concern especially about the way Autonomy accounted for its sales to VARs (and in particular, Capax Discovery) were well documented, as was how Dr Lynch dealt with them. The *'Hogenson Episode'*, as the Claimants referred to this aspect of the matter (see paragraphs 2232 to 2289 in the main body of this judgment, also led to revealing exchanges with the FRRP/FSA (see paragraphs 2290 to 2336 *ibid.*).

166.　Autonomy and Mr Hogenson concluded a settlement agreement (executed on 19 November 2010) pursuant to which Mr Hogenson was paid $750,000. One of the terms of the settlement required Mr Hogenson to deliver an affidavit, which he did. The affidavit was calculated to give the impression that Mr Hogenson had recanted.

167.　Read closely, however, Mr Hogenson preserved his position: the most he stated was that he did not consider himself an "*expert*" in IFRS, as distinct from US GAAP, that he "*would not have had access to the complete books and records of the company*" and that, as a result, he "*would not have been in a position to reach conclusions on all of the matters that I raised*" and understood that "*some of the matters I raised may have been wrong or immaterial*" (emphasis added).

*Mr Andrew Kanter*

168.　Mr Kanter is admitted to practice law in California and in his early career was an associate at US law firms in California and London.

169.    He was employed by Autonomy Systems Limited a wholly owned subsidiary of Autonomy Corporation Plc from July 2000 to May 2012. From 2001, he served as Autonomy's Chief Operating Officer and General Counsel and in 2012 as Chief Operating Officer only. He was closely involved in many of the impugned transactions. I have described him as one of the members of the 'clique' or 'cabal' through whom Dr Lynch and Mr Hussain effectively ran the Autonomy group.

170.    Mr Kanter formally resigned from Autonomy in May 2012 and helped to form Invoke Capital as a founding partner in July 2012. He remains employed by Invoke Capital.

171.    Mr Kanter provided a witness statement on behalf of Dr Lynch and it was envisaged that his cross-examination might take four days. I would have been assisted by his evidence. As it was, following Dr Lynch's evidence, Dr Lynch's solicitors gave notice that Mr Kanter's lawyers had informed them that he would not be testifying and they had decided not to seek to compel his attendance (though his address was given as being a residential address in London in his witness statement).

172.    Reports in the press suggested that Dr Lynch's team had made the decision not to call Mr Kanter (or Ms Eagan). On the other hand, Dr Lynch suggested that Mr Kanter (like Ms Eagan) declined to appear in light of the continuing investigations being made of them by the US DoJ. In any event, he was not called and his witness statement was withdrawn without further explanation.

*Mr Richard Knights*

173.    Mr Richard Knights was the Deloitte audit engagement partner in respect of the 2008 and 2009 financial statements for Autonomy as well as for the quarterly review work during that period. He shared partner responsibility for the first quarter 2010 work with Chris Robertson. He was involved in all the auditing decisions and discussions in that period.

174.    However, Mr Knights gave no evidence in these proceedings, even though a Settlement Agreement the Claimants entered with Deloitte in April 2016 gave the Claimants unusual control over him as a potential witness: cl.6 gave them the right (inter alia) to require Mr Knights to prepare for and attend interviews, sign statements and attend voluntarily as a witness at this trial. I would have been assisted by his evidence. The Claimants' explanation for not calling him is that he was involved in the disciplinary proceedings brought against him by the FRC, which included allegations that Mr Knights breached the fundamental principle of integrity.

*Dr Peter Menell*

175.    Dr Menell worked as Autonomy's Chief Technology Officer from 2004 to 2010. He became Autonomy's Chief Research Officer ("CRO") in November 2010. He was based in Cambridge.

176.    Dr Menell was one of the members of what I have called "the clique" or "the cabal". He signed off technological justifications for a number of Autonomy's reciprocal purchases (which I have determined were largely spurious).

177.    At the time of trial Dr Menell worked for Invoke Capital. He was one of those involved in the setting up of Invoke Capital.

178.    Dr Menell did not give evidence during the trial. I would have been assisted by his evidence. When Dr Lynch was asked if there was a good reason for the failure to call Dr Menell as a witness, he alluded to a "*personal*" matter which should not be referred to in open Court and then said, "*I guess you would call it a medical issue*". This was never further explained or substantiated.

*Mr Nigel Mercer*

179.    Mr Mercer worked for Deloitte and took over responsibility as audit engagement partner on the Autonomy account in around May 2010 and was responsible for Q2 2010 through to Q2 2011.

180.    Mr Mercer was as such involved in the audit decisions in that period. His name again appeared on many documents and he was referred to repeatedly in the course of the evidence; and he was involved in all the important accounting decisions at the time. Mr Bloomer gave evidence about his discussions with Mr Mercer before and at Audit Committee meetings. Mr Mercer too was required by the Settlement Agreement to co-operate with the Claimants and, if they wished, to provide them with a statement and appear voluntarily at the trial.

181.    However, he gave no evidence in these proceedings: the Claimants cited the same reason that the FRC had brought disciplinary proceedings against him, though the allegations against him did not include any breach of the fundamental principle of integrity.

## APPENDIX 3



## **APPENDIX 4**

### *Chart 1: Reported Revenue in each Quarter of the Relevant Period*



**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

### *Chart 2: Impact of undisclosed pure hardware revenue and revenue claimed to have been recognised improperly*



## *Chart 3: Revenue performance relative to market expectations*



**Approved Judgment**
**Mr Justice Hildyard**

HC-2015-001324

## *Chart 4: Overview of yearly revenues in the Relevant Period*



**Approved Judgment**
**Mr Justice Hildyard**

## APPENDIX 5



Page 1291

**APPENDIX 6**

<span style="color:red">**THE APPROVED FINAL JUDGMENT [2022] EWHC 1178 (Ch) WAS HANDED DOWN ON 17 MAY 2022 . IN THE CASE OF ANY CONFLICT BETWEEN THAT APPROVED JUDGMENT AND THE SUMMARY OF CONCLUSIONS SET OUT BELOW AND PROVIDED ON 28 JANUARY 2022, THE APPROVED JUDGMENT PREVAILS.**</span>

(1) **ACL NETHERLANDS B.V. (AS SUCCESSOR TO AUTONOMY CORPORATION LIMITED)**
(2) **HEWLETT-PACKARD THE HAGUE BV (AS SUCCESSOR TO HEWLETT-PACKARD VISION BV)**
(3) **AUTONOMY SYSTEMS LIMITED**
(4) **HEWLETT-PACKARD ENTERPRISE NEW JERSEY, INC**

-v-

**MICHAEL RICHARD LYNCH AND SUSHOVAN TAREQUE HUSSAIN**

**SUMMARY OF CONCLUSIONS OF MR JUSTICE HILDYARD - 28TH JANUARY 2022**

*This summary*

1.    I will summarise my key findings in the statement I am about to make.  This is a public statement.  However, I will also deliver by 8pm today to the parties' legal representatives, but only to them, a copy of my draft judgment setting out much more fully the reasons for my conclusions. **That draft will remain at all times strictly embargoed.**

2.    Neither that draft, nor any part of its contents, is to be made available to persons other than those on the lists notified by the parties' legal representatives to me, and agreed by me.  **Any breach of the embargo would be a contempt of court**. My final judgment will be handed down after the usual process of checking and correction is completed.  As the judgment is of considerable length, that will take longer than usual.  That is the principal reason for this summary of my conclusions today.  As with any summary, it

may not entirely capture what the much longer document is intended to convey.  If there is any conflict between this summary and my judgment as finally delivered, my judgment will prevail.

3.    Even this summary of the draft is not short. Copies can be made available.  But I do not wish to cause unnecessary suspense.  I will start by saying that the Claimants have substantially succeeded in their claims in these proceedings.  Quantum will be determined in a later judgment, but I would anticipate that, although substantial, it will be considerably less than claimed.

***The proceedings***

4.    These proceedings relate to acquisition ("the Acquisition") for approximately $11.1 billion in cash of the entire issued share capital of Autonomy Corporation Limited ("Autonomy") by a special purpose vehicle called Hewlett Packard Vision BV, which was incorporated in the  Netherlands for the purpose of the Acquisition . I will refer to the acquisition vehicle as "Bidco".  By a merger in 2018, all of the assets and liabilities of Bidco were transferred to the Second Claimant.

5.    The Acquisition was declared wholly unconditional on 3 October 2011, and completed on 5 January 2012.

6.    The fallout from the Acquisition has spawned not only these proceedings, but also at least two sets of criminal proceedings in the Northern District of California, USA.  One has led to the conviction of the Second Defendant (hereafter "Mr Hussain"), for wire fraud under US legislation, and he has been imprisoned.  He could not attend this trial.  The First Defendant, (hereafter, "Dr Lynch") has been indicted in a further set of criminal proceedings in Northern California, in respect of which the US authorities now seek to extradite him to face trial there.

7.    All of the assets and liabilities of Autonomy, including all claims it has against the Defendants, were transferred to the First Claimant in 2017.

HC-2015-001324

8.     The real bidder and acquirer, through Bidco, was Hewlett Packard Company ("HP").  HP
       was the ultimate holding company in the Hewlett Packard group, one of the first
       companies to set up in Silicon Valley and since then a household name.

9.     Autonomy was and is an English company.  Autonomy acted as a holding company for
       a group of companies, all in the business of infrastructure software ("the Autonomy
       group").

10.    Autonomy was founded in 1996.  It was spun out of a company called Cambridge
       Neurodynamics, which was an early venture into using "machine learning" to develop
       software techniques which Dr Lynch had explored in his PhD thesis at Cambridge
       University and his subsequent research fellowship in "adaptive pattern recognition".

11.    Autonomy, and in particular its core product called IDOL, was the creation of Dr Lynch.
       IDOL is an acronym for Intelligent Data Operating Layer.  IDOL was the core technology
       at the heart of nearly all of Autonomy's software.  IDOL technology was focused on the
       analysis of unstructured data.

12.    Put shortly, using IDOL technology, computers could make sense of unstructured data.
       There are two types of data: structured and unstructured.  Structured data is found in
       spreadsheets or in prescribed fields in a database.  When data is entered into a database
       it is easily searchable.  Unstructured data is data that is not contained in the prescribed
       fields.  Most data is unstructured.  Books, newspaper articles, websites, voice recordings,
       videos and indeed, most forms of communication comprise unstructured data.
       Unstructured data is obviously much more difficult for computers to interpret and
       analyse.  In 2009, the vast majority of computer software could only process structured
       information.  It was Autonomy's ability, using IDOL technology, to handle unstructured
       information that set it apart.  HP chose barely to acknowledge this in the course of the
       proceedings, but IDOL was, in words attributed to Meg Whitman, who became CEO of
       HP, "almost magical"

13.    In consequence, by the beginning of the period to which the contested accounting
       information related, Autonomy had grown from a small start-up into a market leader in

enterprise technology, especially in the field of unstructured data analysis. It went public in 1998, with an initial listing on the EASDAQ. It was admitted to the official list of the LSE in November 2000. It joined the FTSE 100 in 2008.

14.    The Autonomy group was highly profitable. It generated annual revenue of about $900 million, collected all the cash it reported, and (as an illustration) held cash reserves of $1.1 billion at the close of 2010. Its customers included blue-chip companies in every sector. In 2011, based on market capitalisation, it was the largest British software company.

15.    On the other side of the Atlantic, HP was a giant company, with an annual turnover of $130 billion, but it was in the doldrums. Its focus and reputation had remained in hardware, where margins are very tight. A new CEO, Mr Apotheker, wished to change this. He was wanting to effect what he called "transformational change" by the acquisition of a software company to drive a reorientation of HP towards high margin software. Software margins can be well over 60%.

16.    However, when, together with other changes in HP's business, the Acquisition was announced, the markets reacted badly. Just over a month later Mr Apotheker was removed. The Defendants' case is that the claim was "manufactured" to cover and justify a change of corporate mind, and to cast the Defendants as scapegoats for what in reality is buyer's remorse coupled with management failings. The Claimants' case is that they were fundamentally misled.

***Brief summary of the basis of each Claimant's claim***

17.    Before giving a brief summary of the various claims, I would note some matters of terminology:

17.1.    Throughout this summary, unless stated to the contrary, I use the term "the Claimants" as a shorthand to denote the Claimant making the particular claim. The Claimants do not in reality make any claims jointly. I should also clarify that in terms of describing the acquirer, I use the descriptions HP and Bidco

interchangeably.  I shall explain why later by reference to an issue in the case which was called the *'Bidco point'*.

**17.2.**    My references to "Autonomy" in the context of the various impugned transactions are by way of short-hand.  In the context of an impugned transaction the reference is intended to denote (unless otherwise stated) whichever of the Autonomy group companies was the contracting party.

**17.3.**    References to the "Defendants" are to whichever of the two of them is alleged to have been implicated in wrongdoing.  I have sought to identify them individually when issues arise as to that individual's knowledge or involvement.  On almost all other matters, Mr Hussain adopted Dr Lynch's arguments.

18.    I shall now very briefly summarise the claims.  The Claimants' essential complaint in respect of the Acquisition is that they were induced into making the Acquisition by dishonest statements and omissions in Autonomy's published information, and other representations made personally by the Defendants.  The Claimants have in these proceedings accused both Defendants of fraud.

19.    There are also other claims which do not relate to the Acquisition, but to alleged breaches of duty on the part of the Defendants whilst directors or shadow directors of Autonomy group companies.

*The First Claimant's claim*

20.    By far the largest of the claims is brought under Schedule 10A of the Financial Services and Markets Act 2000 ("the FSMA claim").  The gist of the FSMA claim is fraud on the part of the issuer (Autonomy) in respect of statements or omissions in its published information on which the Claimant relied in making an investment decision.  It is claimed that "*persons discharging managerial responsibilities within the issuers*" ("PDMRs") knew those statements or omissions to be untrue or misleading, or to amount to the dishonest concealment of a material facts.  (An issuer's "published information" is specially defined but for present purposes the ordinary meaning it conveys will suffice.)

21. The FSMA claim depends on establishing first that Autonomy was liable (as issuer) to Bidco, and second, accordingly (as explained below) that the Defendants were liable to Autonomy.

22. It is not disputed that both Defendants were, for the purposes of the FSMA claim, PDMRs within the meaning of Schedule 10 A of FSMA (and previously section 90 A (4) before it's amendment). The basis for the issuer's liability is fraud on the part of at least one PDMR.

23. It may at first blush seem surprising that the claimant in the FSMA claim is the First Claimant, ACL Netherlands BV, which is the successor to Autonomy. Autonomy might appear to be suing in respect of its own fraud. The explanation is that its claim is in the nature of what is sometimes called a "dog leg claim". It is to recover from the Defendants the loss that Autonomy suffered by having (voluntarily) accepted liability for a claim brought by Bidco against it to recover its losses in having been induced to enter into the Acquisition.

24. The amount of accepted liability by Autonomy to Bidco is the sum of $4.55 Billion USD. That is therefore the principal sum which the First Claimant claims from the Defendants.

25. The reason for the "dog leg" structure of the claim is that under Schedule 10A of FSMA, only the issuer of published information is liable to persons induced to make investment decisions in reliance on dishonest statements or omissions in that published information. The position was the same under the equivalent provision of FSMA, section 90 A (3) which applied until 30 September 2010 and which Schedule 10A replaced. But a claim by HP against Autonomy would be of no benefit to HP since HP owned Autonomy. What HP/Bidco needed was recourse against the Defendants. Crucially under FSMA, an issuer can seek to lay off its own liability by suing key management persons called PDMRs on the basis that they were responsible for, or at least had knowledge of, the falsities.

26. To enable HP/Bidco to sue the Defendants, the following steps were taken.

    **26.1.** HP/Bidco notified its claim to Autonomy.

26.2.    Controlled by HP, Autonomy (whose assets and liabilities are now held by the First Claimant) has admitted liability to Bidco (whose assets and liabilities are now held by the Second Claimant).  The Claimants have accepted that this admission does not bind the Court.  That liability has to be determined.

26.3.    Autonomy then blamed and sued the two Defendants, who are both admitted to be PDMRs, for the loss.

27.    No objection in principle was made by the Defendants to the 'dog-leg 'nature of the claim, although every part of its substance is contested.  The Defendants 'case is that Autonomy had no liability to Bidco and should not have submitted to its claims.

28.    Bidco's FSMA claim was thus founded upon allegations that, when proceeding with the Acquisition, HP and therefore Bidco reasonably relied on Autonomy's published information, which contained untrue and/or misleading statements and/or dishonestly concealed material facts which were wrongly omitted from the published information.

## *The Second Claimant's claim*

29.    The Second Claimant claims an aggregate principal amount of $420 million against Dr Lynch and Mr Hussain for false representations which it claims were made by them to HP/Bidco knowingly and/or recklessly and/or without reasonable belief in the truth thereof, and which they claim induced the Second Claimant to purchase shares in Autonomy from the First and Second Defendants. Those false representations include reaffirmations of the false statements within the published information.

30.    The damages are claimed pursuant section 2(1) of the Misrepresentation Act 1967 and/or the tort of deceit.

## *The Third and Fourth Claimants' claim*

31.    The Third and Fourth Claimants claim against the Defendants for direct losses suffered by them in loss-making transactions which they claim Dr Lynch and Mr Hussain caused them to enter into in breach of their fiduciary duties or employment contracts.

32.    These claims do not arise out of the Acquisition, but out of the Defendants' management conduct. The losses occasioned by those transactions are estimated by the Third and Fourth Claimant to amount to $76.1 million:

33.    In the case of Dr Lynch, the claim is pursued against him as shadow director or assumed fiduciary of Autonomy Systems Limited (hereafter "ASL") and as an officer of Autonomy Inc, pursuant to the Companies Act 2006.

34.    In the case of Mr Hussain, the claim is pursued against him as director of ASL under the Companies Act 2006 and under his contractual and fiduciary duties as an employee of ASL in respect of the Fourth Claimant. Those losses include those of another group subsidiary Zantaz Inc ("Zantaz"), the cause of action to which was assigned to Autonomy Inc on 31 October 2014. This is pursued against Mr Hussain on the basis of breach of his fiduciary duties as a director and officer of Zantaz.

### The Defendants

35.    Dr Lynch was the Director of Autonomy from the time of its incorporation in 1996 up until 30 November 2011. Throughout the period with which this litigation is concerned, he was the driving force and leading figure within Autonomy.

36.    Mr Hussain was the Autonomy Group's Chief Financial Officer from June 2001 until 30 November 2011 and was a director of Autonomy from 1 June 2003 until 30 November 2011.

### The fraud alleged

37.    The fraud alleged, which underlies the legal heads of claim arising out of the Acquisition (the FSMA claim, the direct fraud and/or Misrepresentation Act claims, as distinct from the breach of duty claims for transactional losses) consisted of the publication of information to the market which was known by the Defendants to be false.

38.    The allegation was based on (a) the allegedly dishonest description of Autonomy as being a "*pure software company*" when in fact it undertook and had  become accustomed to

inflating what appeared to be the revenues of its software business by undertaking substantial hardware sales and (b) the allegedly dishonest presentation of its financial performance, which did not disclose (and instead disguised) improper practices which Autonomy adopted to boost and accelerate revenue.

39.    The Claimants contended that all this resulted in Autonomy being in fact a considerably less valuable enterprise than it appeared on the basis of its published information.

40.    These alleged improper practices included:

**40.1.**    artificially inflating and accelerating Autonomy's revenues;

**40.2.**    understating Autonomy's costs of goods sold by characterizing such costs as sales and marketing expenses so as to protect gross margins;

**40.3.**    misrepresenting Autonomy's rate of organic growth; and

**40.4.**    misrepresenting the nature and quality of Autonomy's revenues as well as overstating its gross and net profits.

*Financial Services and Markets Act claims*

41.    In the FSMA claims, it is common ground that the Claimants need to make good their case at each stage, ie the liability of Autonomy, and the fraud by the PDMRs .

42.    They have accepted also that each of Dr Lynch and Mr Hussain will not be liable except in respect of misstatements or omissions by the issuer about which he himself knew. It is not sufficient for the Claimants to demonstrate that the transactions or the way that they were accounted for was improper (the first limb).  They need also to prove personal knowledge and dishonesty in respect of the false accounting on the part of the Defendants as PDMRs (the second limb).

43.    As far as Bidco is concerned, the Defendants contended that no liability was owed to it because no representations were made to it, and it placed no reliance on any statements made.  This is the *Bidco point* to which I have referred earlier.  I have found that, if the

necessary elements are made out, Bidco (and therefore the Second Claimant) have a valid claim (both under FSMA and in respect of direct fraud and Misrepresentation Act 1967 claims against the Defendants).

44. I have accepted the Claimants' argument that the fact that it was HP which claims to have been influenced by Autonomy's published information (and specific representations) and that it was HP which undertook due diligence, does not mean that Bidco cannot satisfy this part of the reliance test. For the purpose of the acquisition, HP can be treated as the controlling mind of Bidco, and HP's reliance can be treated as Bidco's reliance.

### Direct Fraud and/or Misrepresentation Act 1967 claims against the Defendants

45. The claims for fraudulent misrepresentation and/or under section 2(1) of the Misrepresentation Act 1967 are direct claims against the Defendants: they are based on personal liability, not on the liability of the issuer.

46. Specific representations are averred against the Defendants which in many cases traverse the same territory as the FSMA claims. The quantum of those claims is much lower than the FSMA claims: the damages sought relate only to loss attributable to the shares and share options which the Defendants themselves each held and sold to Bidco. The pleaded quantum of this loss is $420 million. Any sum recovered under this head of claim will be in the alternative to the FSMA claim. There cannot be double recovery.

47. A point which may be of general interest is that it is no defence to a FSMA or a fraud claim that the claimants had the means of discovering the truth. No defence of contributory negligence is available. Thus, even if (though I have made no finding that it was) HP's due diligence were considered to be rushed and deficient, and HP might have been expected to unearth and probe further into matters about which complaint is now made, that would not be a defence. It would be beguiling but wrong to think that the answer could be "caveat emptor". Of course, had I found that HP was in fact aware, before the Acquisition, of the matters of which complaint is now made, that would be different, for in those circumstances it could not say that it had reasonably relied on what

it saw and read.  But I have found that it was not actually aware and that its reliance was reasonable.

## *Breach of Duty Claims brought By Autonomy Companies Against the Defendants*

48.  The claims for transactional losses based on breaches of fiduciary and employee duties stand on a different footing.  They do not arise in consequence of the Acquisition (except in the sense that they would almost certainly not have been brought if the Defendants still directed Autonomy).  They are claims for direct losses suffered by Autonomy Inc, Autonomy's main operating company in the US, incorporated in 1996 (now the Fourth Claimant) and another group subsidiary called Zantaz as a result of the Defendants' breaches of duty in causing the relevant subsidiary to enter into the impugned transactions without regard to the interests of that subsidiary.

49.  The Claimants accept that in the ultimate quantification of loss, they must give credit for a recovery of $45 million made in a settlement of related claims (against Autonomy's auditors), after deducting the cost of such claims and any tax payable in respect of the settlement sum.

## *Factual basis: the FSMA and direct fraud and / or Misrepresentation Act claims*

50.  In relation to the first two of the three legal heads of claim that I refer to above (that is to say, in relation to the FSMA and direct fraud and Misrepresentation Act claims), the factual basis of the claims relate to six areas of Autonomy's business and accounting.  These claims, each of which is substantial, are very briefly described below.

50.1.  The "**hardware case**" relates to the purchase and resale by Autonomy (usually at a loss) of "pure" hardware (in broad terms, hardware unaccompanied by any Autonomy software) in quantities (of over $100 million).  The Claimants allege that these transactions were never disclosed to the market that by boosting apparent revenue, they gave a false impression of the performance of Autonomy's business.  The Claimants say that they belied its presentation in its published information as a *pure software company*.  The hardware case also raises issues as to (a) whether a proportion of the cost of the sales were

improperly accounted for as marketing expenses so as artificially to increase gross margins, and (b) whether Deloitte, who approved Autonomy's accounting treatment of the sales, were misled as to the true purpose of the hardware sales.

50.2.    The "**reseller case**" or "**VAR case**" relates to 37 transactions between Autonomy (or in some cases, Autonomy Inc or Zantaz) and a small group of value-added resellers. The Defendant treated these transactions as sales giving rise to revenue which could be and was recognised immediately in Autonomy's accounts. The Claimants contended that this simply interposed a reseller between Autonomy and a true customer, and that these were not in substance true sales at all. The only true sale was to an end-user, if one eventuated. In many instances no end-user sale did eventuate, giving rise to a difficulty which I explain later. The Claimants' case is that in each VAR sale, the VAR was only a passive placeholder with no further participation expected or permitted of it after the VAR sale. Thus, the VAR sales were, in effect, devices to accelerate recognition of revenue in Autonomy's accounts, with the intended effect of misrepresenting its performance.

50.3.    The "**reciprocal transactions case**" relates to certain transactions with the VARs which are described below, and what the Claimants alleged were back-to-back transactions with friendly counterparties. It is claimed that Autonomy purchased from the counterparty software or other goods or services that Autonomy did not need, in order to fund the purchase by that counter party of high margin software from Autonomy. The Claimants contend that these reciprocal, or round-trip transactions, also were contrived with the dishonest purpose of artificially boosting apparent high margin software sales. It is said that this had the effect of giving an exaggerated depiction of the success of Autonomy's core business.

50.4.    The "**hosted case**" relates to transactions between Autonomy (or Zantaz) and existing customers. Under these transactions, Autonomy agreed to forego future recurring revenue from the provision of hosted archiving services (which was a substantial and lucrative part of Autonomy's business) for monthly (or other periodic) fees in return for the customer paying a one-off and heavily discounted capital sum for a licence to use Autonomy software outside the hosted

environment. The licence was alleged to be illusory, and its issue and sale was said to be for the dishonest purpose of treating it as akin to sale of goods so as to justify the immediate (that is at the transaction date) recognition of the sale proceeds as revenue. Again, it was alleged that the intended effect was artificially to boost apparent revenue in the period in question.

50.5.    The **"OEM case"** relates to the presentation in the narrative part of Autonomy's accounts of information about the revenue from its OEM business, variously described as "*OEM*", "*OEM derived*" and latterly "*IDOL OEM*". The Claimants' case is that revenue so presented would be taken in the market to have been generated by a transaction with an Original Equipment Manufacturer ("OEM") for Autonomy software to be embedded in the OEM's hardware. Autonomy would in return receive royalty payments on all their sales of such hardware (and thus a recurring revenue stream). The Claimants say that in fact Autonomy included in what was compendiously described as the *"OEM Metric",* revenues from one-off sales of software licences to customers which were not OEMs under contracts which did not provide for royalties or any other recurring revenue. The Claimants did not impugn the transactions themselves but contended that it was misleading and dishonest to include the latter revenues within the OEM metric. The Claimants claim that this gave the false impression of a valuable recurring category of revenues, and thereby dishonestly misrepresented the quality and reliability of Autonomy's revenue and earnings.

50.6.    The "**Other Transactions case**" relates to an amorphous collection of four sets of transactions entered into in late 2010 and early 2011 by ASL, Autonomy Spain SL and Autonomy Inc (and which I refer to as the "Other Transactions"). The Claimants' case in respect of three of those transactions is that what was sold was not simply a piece of software purchased together with separately charged additional services. They say that it was in fact a composite 'solution' of which the provision of services was an integral part. The Claimants alleged that it was wrong to recognise revenue at the point of sale (as Autonomy had done) and that revenue recognition was required to be deferred until the delivery of a fully functioning product had been concluded, or at least until some subsequent stage in the installation of the software for the customer had

occurred, enabling its use as a working solution. The fourth transaction raised an entirely separate and singular issue about whether the calculation of the *"fair value"* of the licence sold (to a company called Iron Mountain) was correct, which also determined whether revenue from the transaction had been correctly stated or overstated by Autonomy.

### *Factual basis: the breach of duty claim for transactional losses*

51.    The third legal head of claim was the breach of duty claim for transactional losses. This relates to four categories of transaction: (i) loss-making "pure hardware" sales; (ii) VAR transactions where a marketing assistance fee ("MAF") was paid to the VAR; (iii) alleged reciprocal; transactions and VAR transactions involving a reciprocal element and (iv) Schedule D hosting transactions.

52.    In Schedule 12 of the Re-Re-Amended Points of Claim ("Schedule 12"), the Claimants identified a number of the hosting lump sum transactions (set out specifically in Schedule 12D).  Autonomy Inc, the Fourth Claimant, was the contracting party for most of these transactions.  Zantaz was the contracting party on three out of four of the Schedule 12D hosting transactions, and also for some of the MAF payments, and reciprocal transactions. ASL, as well as being the company within the group to which losses arising from these transactions were transferred (but not assigned),  was also the original contracting or paying party in respect of some of the MAF payments and reciprocal transactions. Zantaz assigned to Autonomy Inc all of its rights, title to and interest in, amongst other matters, any claims, rights and causes of action that Zantaz had against third parties, and notice of such assignment was given to the Defendants on 27 March 2015.

### *Findings*

53.    In summary, my findings in relation to each of the heads of claim are as follows:

### *Findings: the FSMA and direct fraud and / or Misrepresentation Act claims*

#### The hardware case

54.   The purpose of the hardware selling strategy was to meet market expectations of revenue maintenance and growth, by misleading the market as to the true market position of Autonomy. These loss-making transactions were not commercially justified on any basis. The justifications advanced by the Defendants were no more than pretexts to increase stated revenue in the accounts. The strategy was not for the purpose of raising software revenue sales. That justification was a pretence, fashioned principally for the audit committee and Deloitte, who would not have approved the accounting treatment without the pretence.

55.   Both concealment of the hardware sales and their true cost in Autonomy's accounts and other published information were necessary because revelation of the Autonomy's use of hardware sales, and the erosion of gross margin would have nullified their true purpose. This would have exposed that Autonomy's software business was not generating the accelerating revenue and profits which the market thought it was, and which heavily influenced its price.

56.   In my judgment:

   **56.1.**   The hardware reselling programme was conceived, expanded and implemented in order to enable Autonomy to cover shortfalls in software revenue by selling hardware and including the revenue without differentiation in revenue shown in the accounts as generated by Autonomy's software business.

   **56.2.**   To succeed, the hardware reselling had to be concealed from the market, but sufficiently revealed to Autonomy's auditors and audit committee to secure their apparently fully informed approval of the company's accounts.

   **56.3.**   The imperative that the reselling should be concealed from the market required a variety of accounting devices which had to be presented in such a way as to secure the approval of the auditors and the audit committee. In particular, their approval had to be secured to treat the costs of the hardware reselling programme, not as Costs of Goods Sold ("COGS"), which would have eroded gross margin and encouraged both analyst and market inquiry and concern, but

instead as Sales and Marketing expenses which had no such adverse effect on key investment parameters.

**56.4.** The means by which this difficult balancing act was achieved are set out in my judgment. Suffice it to say that the auditors and audit committee were persuaded to regard the purpose of all hardware sales as being to generate revenue and new orders for the software business, and to account for hardware costs accordingly.

**56.5.** The strategy also required that the contribution of hardware reselling revenues to overall revenues should be disguised or concealed, and that again the auditors and audit committee nevertheless being satisfied that such disclosure as was given was sufficient. That balancing act also was successfully achieved.

**56.6.** The purpose of the hardware reselling strategy/programme was dishonest, and the way it was accounted for depended on its dishonest presentation.

**56.7.** The Defendants were well aware of this.

**56.8.** Although I doubt that this justifies the quantum of loss in the amount claimed in respect of it, in terms of liability the Claimants' hardware case has been established.

57. The Claimants reasonably relied on the truth of what was said about the revenue in the accounting material and were induced to buy Autonomy for $11.1b.

58. These facts satisfy both limbs of the FSMA claim and also give rise to liability on the part of both Defendants to the Claimants in respect of the direct fraud and/or Misrepresentation Act claims, and for breach of duty as employee and/or directors owed to the Autonomy companies in embarking on the hardware selling strategy.

**The reseller or VAR case**

59. Sales to VARs enabled Autonomy to recognize income before any sale to an end user. This enabled Autonomy to make good shortfalls in software business revenues relative to market forecasts. Dr Lynch and Mr Hussain kept a very careful watch over revenues, especially towards the end of a quarter when Autonomy would have to post its results.

If such a shortfall became apparent, a VAR sale would be arranged, usually on the same day, to cover it, with no questions asked. Almost all the impugned VAR sales were to a small group of "friendly" VARs.

60.    Although the "VAR buyers" accepted they were legally bound by the terms of the contracts, the impugned VAR transactions had no commercial substance. They were a means by which Autonomy could maintain the appearance of meeting revenue targets at the end of a quarter.

61.    In truth there was a pattern which emerged very clearly from all of the impugned VAR transactions. They were all large, entered into at the very end of the quarter, after no investigation by the VAR of the liability they were legally undertaking. The VAR would often not have the financial ability to meet the stated payment obligation out of its own resource, and in reality there was never any expectation or intention that it should do so, there never being any expectation on the part of either Autonomy or the VAR that the contractual terms would ever be enforced. There was a clear understanding, and it was invariably the fact, that the VAR would play no part in seeking to procure any contract with the end-user. If payment were ever required from a VAR, it would come either from the end-user, or if no contract were made with the end-user, payment would be waived or another transaction would be generated. This would involve Autonomy providing the VAR with the means to meet any obligation it owed under the VAR transaction. No VAR was ever to be left "on the hook" or "carrying the bag".

62.    The purpose of the strategy was to ensure that Autonomy continued to appear to be a company which met its forecasts out of the sales of IDOL and related software and thereby maintained its share price. The VAR strategy became of additional importance and increased in volume when the hardware selling strategy underwent difficulties when Autonomy's main hardware supplier suddenly drew back from its association with Autonomy. VAR sales and hardware sales were turned on and off by Autonomy at the end of each quarter depending on the levels of revenue required to be shown in the accounts.

63.    The VAR strategy was directed by Mr Hussain and encouraged and presided over by Dr Lynch. Both knew that the VAR transactions were not being accounted for according to

their true substance. Both knew that the recognition of revenue on the sale to the VAR was improper, and that the accounts were thus false.

64.  Deloitte did not see the full picture, or alternatively preferred to accept reassurance that ostensibly negated the true purpose of the VAR transactions. In any event neither the approval of Deloitte nor that of the audit committee was fully and properly informed, and the fact of it does not avail the Defendants, who knew that.

65.  The Claimants reasonably relied on the truth of the financial information provided by Autonomy (both numerical and narrative), including what was said about the revenue in the accounting material, and were induced to buy Autonomy for $11.1billion.

66.  These facts satisfy both limbs of the FSMA claim and also give rise to liability on the part of both Defendants to the Claimants in respect of the direct fraud and/or Misrepresentation Act claims, and for breach of duty as employees and/or directors owed to Autonomy companies in embarking on the VAR strategy.

**The reciprocal transactions case**

67.  There were two types of, so called, "reciprocals".

68.  In the case of the VAR reciprocals (related to the VAR case above), which involved the purchase by Autonomy of a product from a VAR, I am satisfied that in each case Autonomy purchased from the VAR a product for which it had little or no identified need or use. It was done in order to funnel funds to the VAR to enable it to appear to discharge its indebtedness to Autonomy under a VAR agreement. The purchase by Autonomy was the means of getting the VAR "off the hook" of the legal obligation to pay, which it was never expected or intended it would in fact be required to meet out of its own resources. No revenue should have been recognized. The Defendants were in each case aware of the contrived nature of Autonomy's purchase and its true purpose. They had guilty knowledge accordingly.

69.  In the case of reciprocal transactions, Autonomy would identify a counterparty with an interest in purchasing Autonomy software, but which would in all probability not make

any purchase at the price set by Autonomy unless it could sell Autonomy its own products and use the sale proceeds to fund its own purchase. The strategy was assisted by the fact that Autonomy had no list price for IDOL and could in effect choose its price. This would be a matter of indifference to the reciprocal purchaser, since it would be receiving funds from Autonomy under its reciprocal sale to Autonomy. By increasing the price, Autonomy could maximise its apparent revenue.

70.    I am satisfied that in the case of each of the transactions impugned on this ground, the reason for Autonomy's purchase was to enable the counterparty to purchase a licence for Autonomy software. This would generate recognized revenue which Autonomy could show in its accounts to cover shortfalls in revenue for the relevant quarter. Thus, Autonomy's purchase was another means of Autonomy buying recognised and reportable revenue at substantial cost. The purchase and sale should have been accounted for on a net basis. I am satisfied that both Defendants knew that these reciprocal or round-trip transactions also were contrived with the dishonest purpose of artificially boosting apparent high margin software sales, with the effect of giving an exaggerated depiction of the success of Autonomy's core business.

71.    As with the VAR, and Hardware cases, I find reasonable reliance on the part of the Claimants, and liability established on the FSMA claim.

72.    There are also direct fraud and Misrepresentation Act claims made out in respect of these reciprocal claims. I also find the case made out in respect of those direct claims.

**The hosted case**

73.    The impugned hosted transactions all involved a lump sum payment being made by the existing Autonomy customer who was already making periodic payments for Autonomy hosting its archive, for what on the face of it appeared to be a software licence. An example would be the right to transfer Autonomy software from Autonomy's hardware to the customer's in-house hardware, or to a third-party's directed hardware. These

transactions inevitably also involved substantially reduced periodic payments going forward. All of the lump sum would be recognised immediately as income by Autonomy. This was a true way of accounting for that income, if it was truly a payment for software rights. If it was no more than the price paid for the reduction in the later periodic payments for hosting services, then it was misleading to treat what was compensation for a later reduction in revenue as an immediately realized sum.

74. The lump sum arrangements I have just described were in reality almost invariably a response not to customer interest, but to the Defendants' obsession with ensuring Autonomy achieved or came as close as possible to meeting revenue forecasts. The licence was a device calculated to justify revenue recognition which conferred legal rights which neither side intended or expected would ever be deployed.

75. The introduction of a formal legal right of no intended commercial consequence would not in any material way alter the hosting arrangements between the contracting parties, which both parties intended to carry on as before.

76. Both Defendants were aware of the true nature of these lump sum arrangements and that they were driven by income recognition. Any software rights bestowed were never expected to be exercised. They knew it gave a false impression to recognise the income immediately.

77. The Claimants relied on the figures given as to revenue including the lump sum payments and it was reasonable for them to do so.

78. I have concluded that both limbs of the FSMA claim are established.

79. In Schedule 12, the Claimants identified a number of the hosting lump sum transactions (set out specifically in Schedule 12D) which involved significant reductions in periodic payments. The Claimants contended these contracts were commercially unjustifiable. Because they were only motivated by the desire for income recognition, the deals were commercially unfavourable to Autonomy and they had no purpose beyond income

recognition, I find the breach of duty established in respect of each of the Schedule 12D transactions.

**The OEM case**

80.    I have concluded that the perception and attraction of the OEM Metric as presented to the market was that it comprised a distinctive revenue stream, which was recurring and reliable because it derived from royalty payments made by or through the OEMs in whose hardware the Autonomy software was embedded. That revenue stream also included incremental revenue from sales to the OEM of updates and upgrades for that software. It was a stream of income which involved little or no further cost of sales. OEMs also usually had established market reputations; and the embedding of Autonomy software in their hardware assisted Autonomy in terms of market penetration. There was evidence that the market placed special value on OEM business for all these reasons.

81.    However, a substantial proportion of the sales categorized as OEM sales in the accounting documents, and in the representations made by the Defendants from March 2011 onwards, did not have this recurring nature, nor were they to OEMs. Instead, they were one-off sales to buyers. They would not offer the same advantages, did not yield a recurring royalty or royalty type payment, and they would not ensure the same certainty of incremental purchases of updates and upgrades to protect and enhance the OEM's own product and reputation.

82.    I have found that both Defendants knew that the accounts and the representations they made in this regard gave a misleading picture of Autonomy's OEM business. They did so because they knew revenues were included from transactions lacking the characteristics associated with OEM business. They knew that such revenues were considered in the market to generate a particularly dependable and valuable revenue stream.

83.    The direct representations which the Defendants made confirmed the depiction of Autonomy's OEM business and the revenue it generated which was given in Autonomy's published information.

Approved Judgment
Mr Justice Hildyard

HC-2015-001324

84.  This was another matter on which HP reasonably relied on in proceeding with its Acquisition for $11.1 billion.

85.  Both the FSMA claim and the direct fraud and/or Misrepresentation Act claims are made out against the Defendants.

86.  There are no breach of duty claims under this head

**The Other Transactions case**

87.  The Other Transactions allegedly had, and were designed to have, the effect of enabling Autonomy to recognise or accelerate the recognition of revenue for the purpose of achieving revenue forecasts in a given quarter.

88.  The Claimants did not, apparently *"due to time constraints",* cross-examine Dr Lynch in relation to any these four transactions.  Therefore, the Claimants accepted that they could not pursue an allegation that Dr Lynch had knowledge of their false accounting.

89.  However, they submitted that the Other Transactions remain relevant given that:

   **89.1.**    the Claimants maintained that there was false accounting in relation to each of the transactions and they continued to allege that Mr Hussain knew of that false accounting; and

   **89.2.**    if (as the Claimants alleged) there was false reporting in relation to the Other Transactions, it fell to be taken into account when assessing loss.

90.  In my draft judgment I have considered each of these four Other Transactions in detail. I have concluded in respect of each of them, that the Claimants have failed to establish that the accounting treatment adopted with the approval of Deloitte was wrong rather than a matter of accountancy judgement on which views might properly differ.  In those circumstances, the question of Mr Hussain's guilty knowledge does not arise, and this head of claim makes no contribution to any loss calculation.

*Findings: the breach of duty claim for transactional losses*

91.     In relation to the claim for transactional losses, Dr Lynch was the President of Autonomy Inc, and he owed legal duties to that company as a director. He was a de facto director of ASL and owed duties to it. I find that Mr Hussain was a de jure director of all three relevant subsidiaries, Autonomy Inc, Zantaz and ASL,- and owed duties to all three.

92.     I find that the transfer pricing arrangements which gave rise to the losses from transactions being transferred to ASL do not allow ASL to sue for those losses, and nor is there any legal basis for impugning the conduct of the Defendants in entering into those arrangements. But nor do they cause the subsidiaries who suffered the original losses to be treated as though they had suffered no loss, nor deprive them of the right to claim in respect of the losses. How they deal with the losses subsequently for example by price shifting arrangements does not effect the claims.

93.     In respect of each of the transactions impugned under the four heads identified in this claim, as being of no commercial benefit to Autonomy Inc, ASL and Zantaz I find that case made out. I find that both Defendants breached their duties in causing or allowing these transactions to take place in respect of ASL and Autonomy Inc.

94.     I emphasise that the breach of duty in respect of ASL is not the transfer pricing arrangements, but the original involvement in the Schedule 12 identified MAF payments, and reciprocal transactions.

95.     I find Mr Hussain liable in respect of each one of the Zantaz impugned transactions in Schedule 12, and their claim may validly be made as assignee by ASL. Dr Lynch was neither a de jure nor de facto director of Zantaz, and no direct claim succeeds against him in respect of any of Zantaz transactions.

96.     The pleaded quantum of the loss for the direct claims is $76.1 million. Whether that is the correct figure, I will determine in the quantum judgment.

97.   That concludes a summary of my findings.  I now deal with a number of other matters.

## *Quantum*

98.   I have not included in my embargoed draft judgment to be delivered to the parties today detailed findings or conclusions on quantum.  The parties have called evidence and addressed full argument on quantum.  I considered it inappropriate to delay my judgment on liability when it could have an effect on other proceedings, in particular the extradition proceedings, to allow completion of the quantum section. I have however provisionally determined that even if adjusted to take account of the fraud, HP would still have considered Autonomy, with its signature product, IDOL, a suitable acquisition whereby to effect transformational change.  I would expect the quantum to be substantially less than is claimed.

99.   The evidence on the quantum part of the case was dense and voluminous.  There was extended cross-examination.  I will now proceed to consider that aspect of the case.  That section will take some time to complete and further submissions may be necessary.

## *Counterclaim*

100.  Dr Lynch also brought a Counterclaim.  Dr Lynch contended that HP's public and much- publicised announcement of a claim against the Defendants of $5 billion was precipitate and had no properly formulated basis.  I need say nothing about this.  My findings in the main claim undermine his counterclaim.  I have not therefore addressed it in my draft judgment.  If there remains anything of substance, I am sure I will be told of it.

## *Final matters*

101.  This has been an unusually complex trial, 93 days long.  Dr Lynch was cross-examined for 20 days.  There was a database of many millions of documents from which there was extracted a trial bundle containing more than 28,000 documents. These documents have been the most reliable source of evidence.  But there were also hundreds of pages of

hearsay evidence, largely comprised of transcripts from previous proceedings in the United States, both civil and criminal. The determination of this matter in its plainly natural forum has been made the more difficult by the concerns I have had about the reliability of some of the Claimants' witness and hearsay evidence, which bore signs of having been fashioned, rehearsed and repeated in the course of multiple previous proceedings in the US and the preparatory stages for them, and in some cases, of the constraints (such as the terms of promised immunity) under which it had been given.

102. Nevertheless, I have reached clear conclusions in these proceedings on the civil liability of Dr Lynch and Mr Hussain for fraud under FSMA, common law, and the Misrepresentation Act 1967, applying, of course, the civil standard of proof of the balance of probabilities.

### The Parties' representatives

103. Finally, the legal representation and assistance provided to me in this case have been of the very highest standard. The longer my labours have continued the more I have understood and appreciated theirs and quite how much work has been put into these proceedings. I have been shown patience and understanding throughout. I wish to express my profound and genuine appreciation to them all for the quality of their work, and in particular the enormous help they have provided to me in what has been for everyone involved an exceptionally onerous case.

End.



**Trinity Term**
**[2023] UKSC 28**
*On appeal from: [2021] EWCA Civ 299*

# JUDGMENT

# R (on the application of PACCAR Inc and others) (Appellants) *v* Competition Appeal Tribunal and others (Respondents)

before

**Lord Reed, President**
**Lord Sales**
**Lord Leggatt**
**Lord Stephens**
**Lady Rose**

**JUDGMENT GIVEN ON**
**26 July 2023**

**Heard on 16 February 2023**

*Appellants*
Bankim Thanki KC
Rob Williams KC
David Gregory
Ian Simester
(Instructed by Travers Smith LLP)


*2nd Respondent – UK Trucks Claim Ltd*
Rhodri Thompson KC
Judith Ayling KC
(Instructed by Weightmans (London))


*3rd Respondent – Road Haulage Association Ltd*
P J Kirby KC
David    Went
Charlotte Wilk
(Instructed by Backhouse Jones Ltd (Clitheroe))


*Intervener – Association of Litigation Funders of England & Wales (written submissions only)*
(Pallas Partners LLP – no counsel instructed)




**Appellants**
(1) PACCAR INC
(2) DAF Trucks N.V.
(3) DAF Trucks Deutschland GmbH


**Respondents**
[(1) Competition Appeal Tribunal]
(2) UK Trucks Claim Ltd
(3) Road Haulage Association Ltd

**Intervener**
Association of Litigation Funders of England and Wales

**LORD SALES (with whom Lord Reed, Lord Leggatt and Lord Stephens agree):**

**1. Introduction**

1.      The question which arises on this appeal is whether a form of arrangement for the financing of litigation by third party funders is lawful and effective. This depends on the interpretation of an express definition of a term as set out in a statute. The case concerns the proper interpretation of a definition first used in one statutory context and then adopted and used in another context.

2.      It is necessary to consider the meaning of the definition in the first context. Lord Neuberger of Abbotsbury explained the proper approach in *Williams v Central Bank of Nigeria* [2014] AC 1189, at para 50:

> "Where a term in a later statute is defined by reference to a definition in an earlier statute, it seems to me self-evident that the meaning of the definition in the later statute must be the same as the meaning of the definition in the earlier statute. Hence, the meaning of the term in the later statute is determined by the definition in the earlier statute. Further, the adoption of the definition in the later statute cannot somehow alter the meaning of the definition in the earlier statute. It accordingly follows that one has to determine the meaning of the term in the later statute simply by construing the definition in the earlier statute."

We also have to consider whether later legislation throws any light on the proper interpretation of the earlier legislation.

3.      The specific issue for determination is whether litigation funding agreements ("LFAs") pursuant to which the funder is entitled to recover a percentage of any damages recovered constitute "damages-based agreements" ("DBAs") within the meaning of the relevant statutory scheme of regulation ("the DBA issue"). This depends on whether litigation funding falls within an express definition of "claims management services" in the applicable legislation, which includes "the provision of financial services or assistance". If the LFAs at issue in these proceedings are DBAs within the meaning of the relevant legislation, they are unenforceable and unlawful since they did not comply with the formal requirements for such agreements.

4.      The DBA issue arises in the context of applications to bring collective proceedings for breaches of competition law under section 49B of the Competition Act 1998. The second respondent ("UKTC") and the third respondent ("the RHA") each sought an order from the Competition Appeal Tribunal ("the Tribunal") to enable them to bring collective proceedings on behalf of persons who acquired trucks from the appellants (collectively, "DAF") and other truck manufacturers. The proposed proceedings take the form of follow-on proceedings in which compensation is sought for loss caused by an unlawful arrangement between DAF and other manufacturers in breach of European competition law, as found in an infringement decision by the European Commission dated 19 July 2016 (*Case AT.39824 – Trucks*). It is alleged that the prices paid for trucks were inflated as a result of the infringement.

5.      The RHA's application was for "opt-in" collective proceedings, whereby persons wishing to participate in any award would have to opt in to the class represented by the RHA. UKTC's application was for "opt-out" proceedings, whereby an order would be made for it to represent a specified class of persons who would have the ability to opt out if they did not wish to be represented. UKTC made an application for opt-in proceedings in the alternative.

6.      In order to obtain a collective proceedings order from the Tribunal, each of UKTC and the RHA needed to be able to show that it had adequate funding arrangements in place to meet its own costs and any adverse costs order made against it. For this purpose the RHA relied on an opt-in LFA and UKTC relied on an opt-in LFA and an opt-out LFA. The funders under the RHA LFA are entities which together I will call "Therium". The funder under the UKTC LFAs is Yarcombe Ltd ("Yarcombe"). Under each LFA the funder's maximum remuneration is calculated with reference to a percentage of the damages ultimately recovered in the litigation. UKTC and the RHA maintain that these LFAs do not constitute DBAs within the meaning of the relevant legislative provision, section 58AA of the Courts and Legal Services Act 1990 as amended in 2013 ("section 58AA" and "the CLSA 1990", respectively), and accordingly are lawful and effective funding agreements.

7.      The appellants, truck manufacturers who are defendants in the proceedings in the Tribunal, maintain that the LFAs in this case constitute DBAs within the meaning of section 58AA. On that basis, the appellants say the LFAs are unenforceable by virtue of section 58AA because they did not comply with formality requirements made applicable by that provision. If this is right, the practical consequence would be that there is no proper basis on which a collective proceedings order could be made by the Tribunal in favour of UKTC or the RHA. The arrangements which have to be in place to support the making of a collective proceedings order include provision for payment of any costs order made in favour of the defendants in the proposed proceedings, and it

would not be fair to authorise collective proceedings against them without proper and enforceable funding in that regard. More fundamentally, if the funding arrangements are not enforceable there is no effective agreement in place pursuant to which the funders will provide the financing necessary for the claims to be brought at all.

8.      The Tribunal (Roth J, Dr William Bishop and Professor Stephen Wilks) ordered that the DBA issue be determined as a preliminary issue to be heard together in both sets of proceedings. In determining that preliminary issue, the Tribunal ruled that the LFAs at issue are not DBAs within the meaning of section 58AA, and consequently found that they are lawful and enforceable funding arrangements such as could justify the making of collective proceedings orders in favour of UKTC and the RHA: [2019] CAT 26.

9.      The appellants sought to appeal to the Court of Appeal, but also challenged the Tribunal's ruling by way of judicial review in case the Court of Appeal did not have jurisdiction to entertain an appeal. A constitution of the Court of Appeal was convened (Henderson, Singh and Carr LJJ) which could also sit as a Divisional Court to hear the judicial review claim if necessary. The court decided that it had no jurisdiction to entertain an appeal: this is not an issue which arises in the present appeal to this court. Instead, they proceeded as a Divisional Court to grant permission for the appellants' judicial review claim in relation to the DBA issue, which it then dismissed: [2021] EWCA Civ 299; [2021] 1 WLR 3648. The Divisional Court agreed with the Tribunal's interpretation of section 58AA. Henderson LJ gave the sole substantive judgment, with which Singh and Carr LJJ agreed.

10.      The appellants now appeal directly to this court against that determination of their judicial review claim under the leap-frog procedure set out in section 13 of the Administration of Justice Act 1969. The Association of Litigation Funders of England & Wales has intervened, with permission granted by this court, to make written submissions.

11.      The common law was historically hostile to arrangements for third parties to finance litigation between others. According to the doctrines of champerty and maintenance, such arrangements were generally regarded as unenforceable as being contrary to public policy according to the test identified in *British Cash and Parcel Conveyors Ltd v Lamson Store Service Co Ltd* [1908] 1 KB 1006: see the discussion in *Giles v Thompson* [1994] 1 AC 142 and *R (Factortame Ltd) v Secretary of State for Transport, Local Government and the Regions (No 8)* [2003] QB 381 ("*Factortame (No 8)*"). But over the last 30 years there have been substantial changes to litigation funding in England and Wales. Legislation has been passed which has affected the courts' assessment of the extent to which public policy supports the conclusion that

particular funding arrangements are unenforceable: see *Factortame (No 8)*. As Henderson LJ observed, funding of litigation by third parties is now a substantial industry which, although driven by commercial motives, is widely acknowledged to play a valuable role in furthering access to justice. The old common law restrictions on the enforceability of third party funding arrangements have been relaxed in various ways, with the result that this industry has developed.

12.    In particular, the effectiveness of group litigation may depend on the use of third party funding, since such litigation often involves high numbers of claimants who have individually suffered only a small amount of loss, where the pursuit of claims on any other basis would be uncommercial. Third party funding arrangements based on the right of the funder to take a share of any compensation recovered in the proceedings have proved to be an attractive and effective model in other jurisdictions and claimants and third party funders have sought to adopt that model in proceedings in the United Kingdom.

13.    Against this background, the implications of the issue in the appeal are significant. Section 58AA provides that where a third party litigation financing arrangement takes the form of a DBA it will be unenforceable unless certain conditions are complied with. Such conditions have not been complied with in relation to the arrangements entered into by UKTC and the RHA, nor is it usual for them to be met in relation to other cases where the third party funding arrangements are based on the funders sharing in the compensation which might be awarded. The assumption has been made that third party funding arrangements such as those in issue in these proceedings, which assign a passive role to the funders in relation to the conduct of the litigation, are not DBAs within the meaning of section 58AA, are not contrary to public policy, and so are enforceable as ordinary binding contractual arrangements. The court was told that if LFAs of this kind, whereby the third party funders play no active part in the conduct of the litigation but are remunerated by receiving a share of any compensation recovered by their client, are DBAs within the meaning of section 58AA, the likely consequence in practice would be that most third party litigation funding agreements would by virtue of that provision be unenforceable as the law currently stands.

## 2. The Relevant Statutory Provisions

### (a) The Compensation Act 2006

14.    Although the appeal is concerned with section 58AA, it is necessary to go back to an earlier provision in the Compensation Act 2006 ("the 2006 Act") which set out

the definition of a DBA which section 58AA later incorporated and utilised. The 2006 Act received Royal Assent on 25 July 2006. As stated in its long title, the 2006 Act is an Act to make provision, among other things, for the regulation of claims management services. This it does in Part 2, which begins with section 4.

15.     The relevant provisions in Part 2 were brought into force by orders made by the Secretary of State pursuant to section 16(1). Section 4(2), (3), (5) and (6) was brought into force on 1 December 2006 by the Compensation Act 2006 (Commencement No 1) Order 2006 (SI 2006/3005) and section 4(1) and (4) was brought into force on 23 April 2007 by the Compensation Act 2006 (Commencement No 3) Order 2007 (SI 2007/922).

16.     Section 4(1) provides:

> "***4 Provision of regulated claims management services***
>
> (1) A person may not provide regulated claims management services unless –
>
>> (a) he is an authorised person,
>>
>> (b) he is an exempt person,
>>
>> (c) the requirement for authorisation has been waived in relation to him in accordance with regulations under section 9, or
>>
>> (d) he is an individual acting otherwise than in the course of a business."

17.     A claims management service is defined in section 4(2)(b) of the 2006 Act to mean "advice or other services in relation to the making of a claim".

18.     Section 4(3) of the 2006 Act provides:

> "(3) For the purposes of this section-

> (a) a reference to the provision of services includes, in particular, a reference to-
>
>> (i) the provision of financial services or assistance,
>>
>> (ii) the provision of services by way of or in relation to legal representation,
>>
>> (iii) referring or introducing one person to another, and
>>
>> (iv) making inquiries, and
>
> (b) a person does not provide claims management services by reason only of giving, or preparing to give, evidence (whether or not expert evidence)."

19.     As is clear from section 4(1), the mere fact that a claims management service is provided does not attract the regulatory restrictions set out in that provision. They only apply in relation to *regulated* claims management services. Section 4(2)(e) provides that:

> "services are regulated if they are-
>
> (i) of a kind prescribed by order of the Secretary of State, or
> (ii) provided in cases or circumstances of a kind prescribed by order of the Secretary of State."

It is an important feature of the legislative scheme in the 2006 Act that it gives the Secretary of State power to choose which claims management services should be subject to regulation.

20.     Section 6 of the 2006 Act also gives the Secretary of State power to exempt persons from the scope of regulation even if they provide regulated claims management services:

"**6 Exemptions**

(1) The Secretary of State may by order provide that section 4(1) shall not prevent the provision of regulated claims management services by a person who is a member of a specified body.

(2) The Secretary of State may by order provide that section 4(1) shall not prevent the provision of regulated claims management services-

(a) by a specified person or class of person,

(b) in specified circumstances, or

(c) by a specified person or class of person in specified circumstances…"

21.     By virtue of section 15 of the 2006 Act, before making an order for the purposes of section 4(2)(e) the Secretary of State is subject to a duty of consultation with the Competition and Markets Authority (or previously, until amendment in 2013, with the Office of Fair Trading) and such other persons as he thinks appropriate, and such an order has to be approved by each House of Parliament according to the positive resolution procedure. Also, the first order made under section 6 and any order thereafter which removes or restricts an exemption from section 4(1) have to be approved according to the same procedure; any other order under section 6 is subject to the negative resolution procedure.

22.     Pursuant to sections 4(2)(e) and 15, on 12 December 2006 the Secretary of State made the Compensation (Regulated Claims Management Services) Order 2006 (SI 2006/3319) ("the Scope Order"). Article 4(1) provided that for the purposes of Part 2 of the 2006 Act services of a kind specified in article 4(2) are prescribed (so as to be regulated) if rendered in relation to claims described in article 4(3), including for example claims for personal injuries and claims in relation to employment. Article 4(2) specified the following kinds of service:

"(a) advertising for, or otherwise seeking out (for example, by canvassing or direct marketing), persons who may have a cause of action;

(b) advising a claimant or potential claimant in relation to his claim or cause of action;

(c) subject to paragraph (4), referring details of a claim or claimant, or a cause of action or potential claimant, to another person, including a person having the right to conduct litigation;

(d) investigating, or commissioning the investigation of, the circumstances, merits or foundation of a claim, with a view to the use of the results in pursuing the claim;

(e) representation of a claimant (whether in writing or orally, and regardless of the tribunal, body or person to or before which or whom the representation is made)."

Article 4(4) provided that, despite article 4(2)(c), "the service of referring a claim's or a claimant's details to another person is not a regulated claims management service if it is not undertaken for or in expectation of a fee, gain or reward."

**(b) The Financial Services and Markets Act 2000**

23.    As of 1 April 2019 responsibility for the regulation of claims management services was transferred from the Ministry of Justice to the Financial Conduct Authority pursuant to amendments to the Financial Services and Markets Act 2000 ("FSMA"), and the relevant provisions of the 2006 Act were repealed. Section 419A of FSMA defines claims management services in materially the same terms, as follows:

**"419A Claims management services**

(1) In this Act 'claims management services' means advice or other services in relation to the making of a claim.

(2) In subsection (1) 'other services' includes –

(a) financial services or assistance,

(b) legal representation,

(c) referring or introducing one person to another, and

(d) making inquiries,

but giving, or preparing to give, evidence (whether or not expert evidence) is not, by itself, a claims management service."

24.    As under the 2006 Act, provision of a claims management service is only a regulated activity if specified in an order made by the Treasury: section 22(1B) and (5) of FSMA. Where the effect of such an order is that "an activity which is not a regulated activity would become a regulated activity", the approval of each House of Parliament is required under the positive resolution procedure: para 26 in Part III of Schedule 2 to FSMA. However, this power to regulate financial services or assistance in relation to the making of a claim has not been exercised.

**(c) The Courts and Legal Services Act 1990**

25.    Section 58 of the CLSA 1990 introduced conditional fee agreements ("CFAs") under which lawyers were permitted in certain circumstances to charge success fees for their litigation and advocacy services. These are distinct from DBAs (sometimes called contingency fee agreements) of the kind in issue in this appeal, under which those providing litigation and other services charge a fee in the form of a share of the compensation recovered by the client.

26.    Section 28 of the Access to Justice Act 1999 ("the AJA 1999") made provision for a new section 58B to be inserted into the CLSA 1990 to make enforceable certain litigation funding agreements which were otherwise thought to be unenforceable at common law ("section 58B"). Section 108 of the AJA 1999 provided that section 28 should be brought into force on a date appointed by the relevant Minister, but no commencement order has been made. Section 58B provides in relevant part as follows:

**"58B Litigation funding agreements**

(1) A litigation funding agreement which satisfies all of the conditions applicable to it by virtue of this section shall not be unenforceable by reason only of its being a litigation funding agreement.

(2) For the purposes of this section a litigation funding agreement is an agreement under which—

(a) a person ('the funder') agrees to fund (in whole or in part) the provision of advocacy or litigation services (by someone other than the funder) to another person ('the litigant'); and

(b) the litigant agrees to pay a sum to the funder in specified circumstances.

(3) The following conditions are applicable to a litigation funding agreement—

(a) the funder must be a person, or person of a description, prescribed by the Secretary of State;

(b) the agreement must be in writing;

(c) the agreement must not relate to proceedings which by virtue of section 58A(1) and (2) cannot be the subject of an enforceable conditional fee agreement or to proceedings of any such description as may be prescribed by the Secretary of State;

(d) the agreement must comply with such requirements (if any) as may be so prescribed;

(e) the sum to be paid by the litigant must consist of any costs payable to him in respect of the proceedings to which the agreement relates together with an amount calculated by

Page 11

reference to the funder's anticipated expenditure in funding the provision of the services; and

(f) that amount must not exceed such percentage of that anticipated expenditure as may be prescribed by the Secretary of State in relation to proceedings of the description to which the agreement relates.

(4) Regulations under subsection (3)(a) may require a person to be approved by the Secretary of State or by a prescribed person.

(5) The requirements which the Secretary of State may prescribe under subsection (3)(d)—

(a) include requirements for the funder to have provided prescribed information to the litigant before the agreement is made; and

(b) may be different for different descriptions of litigation funding agreements.

(6) In this section (and in the definitions of 'advocacy services' and 'litigation services' as they apply for its purposes) 'proceedings' includes any sort of proceedings for resolving disputes (and not just proceedings in a court), whether commenced or contemplated. …"

27.    A new section 58AA was inserted into the CLSA 1990 by section 154 of the Coroners and Justice Act 2009 ("the CJA 2009") to introduce DBAs and make them enforceable subject to the satisfaction of certain conditions. As originally introduced section 58AA was limited to employment claims. However, that limitation was removed by section 45 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012 ("LASPO") with effect from 19 January 2013. For discussion of these changes, see *Lexlaw Ltd v Zuberi* [2021] EWCA Civ 16; [2021] 1 WLR 2729. As so amended, and so far as is material, section 58AA provides as follows:

**"58AA Damages-based agreements**

(1) A damages-based agreement which satisfies the conditions in subsection (4) is not unenforceable by reason only of its being a damages-based agreement.

(2) But … a damages-based agreement which does not satisfy those conditions is unenforceable.

(3) For the purposes of this section—

(a) a damages-based agreement is an agreement between a person providing advocacy services, litigation services or claims management services and the recipient of those services which provides that—

(i) the recipient is to make a payment to the person providing the services if the recipient obtains a specified financial benefit in connection with the matter in relation to which the services are provided, and

(ii) the amount of that payment is to be determined by reference to the amount of the financial benefit obtained.

(4) The agreement—

(a) must be in writing;

(aa) must not relate to proceedings which by virtue of section 58A(1) and (2) cannot be the subject of an enforceable conditional fee agreement or to proceedings of a description prescribed by the Lord Chancellor;

(b) if regulations so provide, must not provide for a payment above a prescribed amount or for a payment above an amount calculated in a prescribed manner;

(c) must comply with such other requirements as to its terms and conditions as are prescribed; and

(d) must be made only after the person providing services under the agreement has complied with such requirements (if any) as may be prescribed as to the provision of information.

(5) Regulations under subsection (4) are to be made by the Lord Chancellor and may make different provision in relation to different descriptions of agreements.

…

(7) In this section—

…

'claims management services' has the same meaning as in Part 2 of the Compensation Act 2006 (see section 4(2) of that Act)."

28.    The latter cross-reference to the 2006 Act has now been replaced by amendment in 2018 (by article 90 of the Financial Services and Markets Act 2000 (Claims Management Activity) Order 2018 (SI 2018/1253)) to say that "'claims management services' has the same meaning as in the Financial Services and Markets Act 2000 (see section 419A of that Act)".

29.    Shortly after section 58AA was given general effect in January 2013, on 1 April 2013 the Damages-Based Agreements Regulations 2013 (SI 2013/609) ("the DBA Regulations 2013") came into force. These Regulations set out additional detailed requirements which must be satisfied if a DBA is to be enforceable pursuant to section 58AA. It is common ground that the LFAs at issue in this case do not satisfy the requirements in the Regulations. Therefore, if the agreements are DBAs, by virtue of section 58AA(2) they are unenforceable.

30.    Regulation 1(2) of the DBA Regulations 2013, as amended to reflect the change in the cross-reference in section 58AA(7), defines "client" to mean "the person who has instructed the representative to provide advocacy services, litigation services … or claims management services (within the meaning of section 419A of the Financial

Services and Markets Act 2000) and is liable to make a payment for those services" and defines "representative" to mean "the person providing the advocacy services, litigation services or claims management services to which the damages-based agreement relates". Regulation 3 requires that the terms of a DBA must specify, among other things, the circumstances in which the representative's payment is payable.

## 3. The issues in the appeal

31.     The appellants submit that under the LFAs with UKTC and the RHA, respectively, (hereafter, "the LFAs") Yarcombe and Therium provide "claims management services" within the meaning of section 4 of the 2006 Act and section 419A of FSMA by virtue of providing "other services in relation to the making of a claim" in the form of "the provision of financial services or assistance".

32.     The respondents dispute this. They submit that the provision of "financial services or assistance" (section 4(3)(a) of the 2006 Act; section 419A(2)(a) of FSMA) "in relation to the making of a claim" (section 4(2)(b) of the 2006 Act; section 419A(1) of FSMA) is to be interpreted as applying in the context of the management of a claim, and under the LFAs Yarcombe and Therium have no role in the management of the claims against the appellants. The LFAs are therefore not DBAs within the statutory meaning and section 58AA(2) does not render them unenforceable. This was the submission accepted by the Tribunal and the Divisional Court.

33.     The Divisional Court noted that none of the parties submitted that anything turns on the differences in wording between section 4 of the 2006 Act and section 419A of FSMA, so the critical issue before it was the meaning of the phrase "claims management services" as defined in the 2006 Act, when that definition was first incorporated into section 58AA by the CJA 2009. That remains the principal issue on this appeal.

34.     The LFA between the RHA and Therium was entered into prior to the change in the reference in section 58AA(7) from section 4 of the 2006 Act to section 419A of FSMA. The LFAs between UKTC and Yarcombe were entered into after that change to section 58AA(7). In this court, again, there was no suggestion that this change had any significance and counsel for all parties focused their submissions on the meaning of "claims management services" as defined in the 2006 Act.

35.     However, the respondents argued that it is relevant to have regard to later legislation, particularly the DBA Regulations 2013, as an aid to the interpretation of

section 4 of the 2006 Act and section 58AA. This is on the basis that, according to the argument, "claims management services" is an ambiguous expression, even having regard to the statutory definition, so that it is legitimate to have regard to later legislation to resolve that ambiguity; also, the DBA Regulations 2013 form part of an integrated legislative scheme with section 58AA and may be used as an aid to the interpretation of the parent Act, the CLSA 1990. They emphasised that the DBA Regulations 2013 use the term "representative" to denote the party who contracts with a client by way of the DBA.

36.     As a subsidiary issue, UKTC submitted that even if its opt-out LFA with Yarcombe provides for a claims management service as defined, it still does not fall within the definition of a DBA in section 58AA(3). UKTC raised this argument by way of a Respondent's Notice in the Divisional Court and the appellants responded to it in their skeleton argument before that court. It was not addressed in the Divisional Court's judgment. UKTC pursued this alternative argument before this court. Both sides dealt with it primarily by way of written submissions.

## 4. The judgment of the Divisional Court

37.     Henderson LJ summarised (paras 65-68) the principles of statutory construction to be applied, referring in particular to the speech of Lord Nicholls of Birkenhead in *R v Secretary of State for the Environment, Transport and the Regions, ex p Spath Holme Ltd* [2001] 2 AC 349 ("*Spath Holme*"), 396-397, and *Pollen Estate Trustee Co Ltd v Revenue and Customs Comrs* [2013] 1 WLR 3785, para 24 (Lewison LJ). Henderson LJ emphasised (para 68) that the presumption against absurdity is an important tool in determining the meaning which Parliament intended a statutory provision to have.

38.     At paras 69-79 Henderson LJ reviewed the legal, social and historical context of section 4 of the 2006 Act. In order to identify the particular mischief which that provision was intended to remedy, that is, its purpose, he referred to the Explanatory Notes which accompanied the 2006 Act and the Explanatory Memorandum for the Scope Order. He also reviewed the case-law which indicated that certain forms of litigation funding by third parties had by 2006 become established and were recognised by the courts as not being champertous as contrary to public policy: *Factortame (No 8)* and *Arkin v Borchard Lines Ltd (Nos 2 and 3)* [2005] 1 WLR 3055 ("*Arkin*"). He concluded (para 78) that the purpose of introducing statutory regulation of claims management services in section 4 of the 2006 Act and the Scope Order "was to enhance consumer protection in areas where the activities of 'claims intermediaries' had been causing widespread public concern", and that conversely (para 79) there was no suggestion "that regulation of non-champertous funding of litigation by professional third-party funders in return for a reasonable share of the client's

recoveries", of the kind exemplified in *Factortame (No 8)* and *Arkin*, formed any part of the mischief which section 4 of the 2006 Act sought to remedy. In that regard, he referred to section 58B and drew the inference from the fact that it had not been brought into force that immediate regulation of the third-party funding sector was not considered necessary.

39.     Having regard to the context in which section 4 of the 2006 Act had been passed, the Divisional Court concluded that the Tribunal had been right to construe the relevant words in section 4(2) of the 2006 Act as applying "in the context of the management of a claim" (para 87). Henderson LJ gave two main reasons for this. First, Parliament had already enacted a comprehensive scheme for the regulation of litigation funding agreements by way of section 58B, even though it had not been brought into force, and it was most improbable that Parliament would have intended to bring such agreements within the ambit of the regulation of claims management services by a side-wind: paras 88-90. Secondly, the structure of the definition of "claims management services" in section 4(2) and (3) of the 2006 Act, with a primary limb in section 4(2)(b) ("advice or other services in relation to the making of a claim", broadly defined) which was extended by subsection (3)(a) in various ways, meant that it was appropriate to have regard to "the potency of the term defined", meaning that the definition should itself be coloured by the reference to "claims management" in the phrase being defined: paras 91-95. Henderson LJ also relied (para 96) on the presumption against absurdity, saying:

> "The result of the construction for which DAF contends is in my judgment both anomalous and unreasonable, because it would bring any form of the provision of financial assistance for the making of a claim within the ambit of the 2006 Act, without regard to the fact that pure litigation funding was not then perceived to be a problem which required fresh legislative intervention, and if its regulation were to be considered necessary in the future, the provisions of section 58B of CLSA 1990 could be brought into force for that very purpose. I also respectfully agree with the Tribunal that the example of a bank lending money to a customer to fund litigation is telling in this context, because there is nothing to indicate that Parliament intended to bring such activities within the purview of the 2006 legislation, but a literal reading of section 4(3)(a)(i) would admittedly have that effect. A degree of legislative 'overkill' is sometimes the price to be paid for countering abuse, but if that were the position in the present case, it is inconceivable that the Explanatory Notes would have said nothing on the subject. If, however,

> the phrase 'claims management services' is interpreted with
> due regard to the central concept of the management (as
> opposed to the pure funding) of claims, the problem
> disappears."

## 5. The interpretation of Part 2 of the 2006 Act: its language and scheme and the context in which it was passed

### (a) The relevant interpretative principles

40.    The basic task for the court in interpreting a statutory provision is clear. As Lord Nicholls put it in *Spath Holme*, at p 396, "Statutory interpretation is an exercise which requires the court to identify the meaning borne by the words in question in the particular context."

41.    As was pointed out by this court in *Rossendale Borough Council v Hurstwood Properties (A) Ltd* [2021] UKSC 16; [2022] AC 690, para 10 (Lord Briggs and Lord Leggatt), there are numerous authoritative statements in modern case law which emphasise the central importance in interpreting any legislation of identifying its purpose. The examples given there are *R (Quintavalle) v Secretary of State for Health* [2003] UKHL 13, [2003] 2 AC 687 and *Bloomsbury International Ltd v Department for the Environment, Food and Rural Affairs* [2011] UKSC 25, [2011] 1 WLR 1546. In the first, Lord Bingham of Cornhill said (para 8):

> "Every statute other than a pure consolidating statute is,
> after all, enacted to make some change, or address some
> problem, or remove some blemish, or effect some
> improvement in the national life. The court's task, within the
> permissible bounds of interpretation, is to give effect to
> Parliament's purpose. So the controversial provisions should
> be read in the context of the statute as a whole, and the
> statute as a whole should be read in the historical context of
> the situation which led to its enactment."

In the second, Lord Mance said (para 10):

> "In matters of statutory construction, the statutory purpose
> and the general scheme by which it is to be put into effect
> are of central importance … In this area as in the area of

> contractual construction, 'the notion of words having a natural meaning' is not always very helpful (*Charter Reinsurance Co Ltd v Fagan* [1997] AC 313, 391C, per Lord Hoffmann), and certainly not as a starting point, before identifying the legislative purpose and scheme."

The purpose and scheme of an Act of Parliament provide the basic frame of orientation for the use of the language employed in it.

42.    It is legitimate to refer to explanatory notes which accompanied a Bill in its passage through Parliament and which, under current practice, are reproduced for ease of reference when the Act is promulgated; but external aids to interpretation such as these play a secondary role, as it is the words of the provision itself read in the context of the section as a whole and in the wider context of a group of sections of which it forms part and of the statute as a whole which are the primary means by which Parliament's meaning is to be ascertained: *R (Project for the Registration of Children as British Citizens) v Secretary of State for the Home Department* [2022] UKSC 3; [2023] AC 255, paras 29-30 (Lord Hodge). Reference to the explanatory notes may inform the assessment of the overall purpose of the legislation and may also provide assistance to resolve any specific ambiguity in the words used in a provision in that legislation. Whether and to what extent they do so very much depends on the circumstances and the nature of the issue of interpretation which has arisen.

43.    The courts will not interpret a statute so as to produce an absurd result, unless clearly constrained to do so by the words Parliament has used: see *R v McCool* [2018] UKSC 23, [2018] 1 WLR 2431, paras 23-25 (Lord Kerr of Tonaghmore), citing a passage in *Bennion on Statutory Interpretation*, 6th ed (2013), p 1753. See now *Bennion, Bailey and Norbury on Statutory Interpretation*, 8th ed (2020), section 13.1(1): "The court seeks to avoid a construction that produces an absurd result, since this is unlikely to have been intended by the legislature". As the authors of *Bennion, Bailey and Norbury* say, the courts give a wide meaning to absurdity in this context, "using it to include virtually any result which is impossible, unworkable or impracticable, inconvenient, anomalous or illogical, futile or pointless, artificial, or productive of a disproportionate counter-mischief". The width of the concept is acceptable, since the presumption against absurdity does not apply mechanistically but rather, as they point out in section 13.1(2), "[t]he strength of the presumption … depends on the degree to which a particular construction produces an unreasonable result". I would add that the courts have to be careful to ensure that they do not rely on the presumption against absurdity in order to substitute their view of what is reasonable for the policy chosen by the legislature, which may be reasonable in its own estimation. The constitutional position that legislative choice is for Parliament cannot be undermined under the guise

of the presumption against absurdity. There is an issue between the parties whether the presumption against absurdity provides relevant guidance in the circumstances of this case.

44.    In certain circumstances, subordinate legislation made pursuant to powers in a statute can be an aid to interpretation of the statute. There is an issue as to how far this principle extends. The parties are agreed that the Scope Order is an admissible aid to interpretation of the 2006 Act. It was promulgated at a time roughly contemporaneous with the 2006 Act itself, and in *Deposit Protection Board v Dalia* [1994] 2 AC 367 the House of Lords held that it is permissible to refer to such contemporaneous subordinate legislation as an aid to interpretation: p 397 per Lord Browne-Wilkinson. In my view, on this basis and in line with the position for explanatory notes, the Scope Order is admissible as an aid to interpretation both for such light as it might throw on an assessment of the purpose of the primary legislation and to assist in resolving any identified ambiguity in a provision in that legislation.

45.    Further, Part 2 of the 2006 Act specifically contemplated that, for its operation, the Secretary of State would define its scope by an order. Given the broadly contemporaneous nature of the Scope Order, it can fairly be regarded as being, in combination with the 2006 Act, part of a single scheme to introduce the new statutory regime in Part 2 in a way that justifies reference to the Scope Order "to take account of indications of consistency between them" on the basis explained in *R v McCool* [2018] UKSC 23, [2018] 1 WLR 2431, para 105 (Lord Hughes, for the majority); cited as authoritative in *Bennion, Bailey and Norbury*, 8th ed, above, section 24.18. To similar effect, in *R (A) v Director of Establishments of the Security Service* [2009] UKSC 12; [2010] 2 AC 1, Lord Hope of Craighead said that where a statute which received Royal Assent on 28 July 2000 and subordinate legislation was made under it on 28 September 2000 and laid before Parliament the next day, "[t]he interval was so short that, taken together, they can be regarded as all part of the same legislative exercise" (para 42), albeit in that case it was not in the event necessary to refer to the subordinate legislation because the scheme of the primary legislation was clear. Where the primary legislation and the subordinate legislation are drafted by or on the instructions of the same government department at about the same time, as would be normal in this type of case, it is reasonable to suppose that they are inspired by the same underlying objective and are intended to reflect a coherent position as understood at the time the primary legislation is presented to Parliament. In that situation, it has been observed that the subordinate legislation made under a power in the primary legislation can be regarded as a form of parliamentary or administrative contemporanea expositio (exposition of contemporary understanding) in relation to the primary legislation which may provide some evidence of how Parliament understood the words it used in the primary legislation, even though this does not decide or control their meaning: *Hanlon v The Law Society* [1981] AC 124, 193-194

(Lord Lowry, with whom Lord Edmund-Davies, Lord Fraser of Tullybelton and Lord Scarman agreed). This point is strengthened where, as here, the subordinate legislation is broadly contemporaneous with the Act and is subject to review by the same elected Parliament which passed the Act according to the positive or the negative resolution procedure. This can provide grounds to infer that the Parliament which passed the Act regarded the subordinate legislation as in accordance with it and a fair reflection of it.

46.    Since the Scope Order is a permissible aid to interpretation of the statute, for similar reasons the Explanatory Memorandum which accompanied it to explain its effect to Parliament is also a permissible aid to interpretation of the statute.

47.    The respondents contend that some assistance in interpreting the 2006 Act is also to be derived from the DBA Regulations 2013. In my opinion this contention is not sustainable. In the *Dalia* case regulations made four years after the Act in question were held not to be a permissible aid to interpretation. The DBA Regulations 2013 were not introduced broadly contemporaneously in combination with the 2006 Act as part of a single coherent scheme. They were not subject to review by the same Parliament which had enacted the 2006 Act. The reasoning which justifies treating subordinate legislation as a permissible aid to interpretation of primary legislation in limited circumstances is not applicable.

48.    In an appropriate case "the potency of the term defined" may provide some guidance as to the meaning for that term as set out in a statutory definition. As it is put in *Bennion, Bailey and Norbury*, op. cit., section 18.6: "In the case of a statutory definition the defined term may itself colour the meaning of the definition". Lord Hoffmann explained in *MacDonald v Dextra Accessories Ltd* [2005] 4 All ER 107, para 18, "a definition may give the words a meaning different from their ordinary meaning. But that does not mean that the choice of words adopted by Parliament must be wholly ignored. If the terms of the definition are ambiguous, the choice of the term to be defined may throw some light on what they mean". I agree with Henderson LJ, paras 92-93 (citing *Birmingham City Council v Walker* [2007] 2 AC 262, para 11, per Lord Hoffmann, and *Oxfordshire County Council v Oxford City Council* [2006] 2 AC 674, para 38, per Lord Hoffmann, and para 82, per Lord Scott of Foscote), that this principle is not confined to cases where there is an ambiguity in the terms of the definition, but means that when the definition is read as a whole the ordinary meaning of the word or phrase being defined forms part of the material which might potentially be used to throw light on the meaning of the definition. Whether and to what extent it does so depends on the circumstances and in particular on the terms of the legislation and the nature of the concept referred to by the word or phrase being defined.

49.    The difficulty in trying to use this sensible principle of interpretation in the present case is that it was agreed, and the Divisional Court accepted, that the phrase "claims management services" defined in section 4(2) of the 2006 Act did not have any established legal meaning. Nor, as explained below, did it have any clear or generally accepted meaning in ordinary parlance which was capable of exerting any significant "potency" in terms of qualifying the ordinary words used by Parliament in section 4(2) and (3) of the 2006 Act to define that term. Where an express definition of a term is given in statute then even if there is consensus as to its core content, in the absence of general consensus as to the limits of the term no significant potency can be attached to the term so as to colour or qualify the meaning of the definition: *Phillips v News Group Newspapers Ltd* [2013] 1 AC 1, para 20 (Lord Walker of Gestingthorpe, with whom the other members of the court agreed). Still less will the term defined have potency to colour the meaning of the definition if there is no general consensus as to the core meaning of the term, which is the case here. Rather, Parliament deliberately used wide words of definition in the 2006 Act precisely because of the nebulousness of the notion of "claims management services" at the time and in order to ensure that the general policy objective of Part 2 of the 2006 Act would not be undermined. That objective was to confer a general power on the Secretary of State appropriate for the regulation in the public interest of this developing area of activity, involving the creation of new commercial models to facilitate litigation and access to justice. The fact that Parliament provides a statutory definition of a term means that it is not satisfied that the term itself is sufficiently clear on its own. Where Parliament has taken the trouble to provide a definition, it is the words of the definition which are the primary guide to the meaning of the term defined. The weaker the inherent or established meaning of the term defined, the weaker must be its ability to throw light on Parliament's meaning when setting out the express words of the definition which falls to be construed.

## (b) The wording of section 4 of the 2006 Act

50.    The words used in section 4(2) and (3) to define "claims management services", read according to their natural meaning, are apt to cover the LFAs in this case, as the respondents and the Divisional Court accepted. Subsection (2)(b) defines "claims management services" to mean advice "or other services in relation to the making of a claim". Subsection (3)(a)(i) states in terms that for the purposes of section 4 "a reference to the provision of services includes … [a reference to] the provision of financial services or assistance." Under the LFAs Therium and Yarcombe are to provide financial services or assistance to their respective counterparties, the RHA and UKTC, in relation to the making of the claims they wish to bring. Of course, that would also be true of an ordinary bank which lent money to its customer for the purpose of assisting the customer to bring a claim. I return to this point when considering the presumption against absurdity, below.

51.     The words used to define "claims management services" also provide an important indication of Parliament's purpose in legislating as it did in Part 2 of the 2006 Act, to which I now turn.


**(c) The context in which Part 2 of the 2006 Act was enacted and its legislative purpose**


52.     The context in which Part 2 of the 2006 Act was enacted was one in which there had been a progressive expansion of the ways in which litigants could gain access to varieties of financial support to bring and defend claims. This was motivated in part by the need to promote new ways of assisting people to have access to justice in circumstances where public support for this in the form of legal aid was being reduced.


53.     Section 58 of the CLSA 1990 allowed agreements for conditional fees (that is, fees paid to persons providing advocacy or litigation services conditional on success of the claim) to be used in cases to be specified by order made by the Lord Chancellor. Where such agreements provided for an additional success element above the basic fees, that element was not to be recoverable from the opposing party. The Conditional Fee Agreements Order 1995 (SI 1995/1674) allowed such conditional fee agreements for the first time, by specifying a limited range of proceedings in which such agreements would be permitted. The AJA 1999, as brought into force on 1 April 2000, replaced section 58 with a new section 58 and section 58A of the CLSA 1990 which expanded the range of cases in which conditional fee agreements could be used and provided that the success element could be recovered from the opposing party. Section 58B was also enacted, but was not brought into effect.


54.     The decision of the Court of Appeal in *Factortame (No 8)* in 2002 considered the implications of these legislative changes as regards the public policy which underlies the law of champerty in the context of a contract whereby services were provided by accountants to assist in the bringing of a claim in return for a percentage of the final compensation awarded in respect of that claim. The claim was successful and the accountants were paid that percentage of the sum received as compensation. The claimants sought to recoup that amount as costs from the opposing party. The Court of Appeal held that they could. The original and the extant provisions of the CLSA 1990 provided guidance as to the limits of public policy taken to control the enforceability of such a contract. Section 58 of that Act did not apply to the form of contingent fee arrangement in issue and did not implicitly render it unenforceable. Assessing the effect of the contract in the light of the particular facts, and bearing in mind the importance which public policy now attached to access to justice, the contract did not conflict with public policy directed to protecting the due administration of justice. The

contract was therefore enforceable and the costs payable under it were recoverable from the opposing party.

55.    In the *Arkin* decision in 2005 the Court of Appeal confirmed that an arrangement whereby a third party funder who financed a claim in the expectation of receiving a share of any recovery, under an arrangement which left the claimant in control of the litigation, was non-champertous and hence was enforceable. If the claim failed, the funder could be ordered to pay the costs of the successful party, but found that the funder in that case should be liable only up to the extent of the funding provided. The effect of *Factortame (No 8)* and *Arkin* was to encourage third party funders to provide financing for claims on the basis that they would assume a passive role in relation to the conduct of the litigation itself.

56.    In May 2004 the Better Regulation Task Force ("the BRTF" - an independent group set up to advise the government) produced a report entitled "Better Routes to Redress" to consider what regulation would be appropriate in relation to various services to assist people to bring claims, focusing on personal injury claims. The report addressed the perception in the media that the United Kingdom was in the grip of a "compensation culture", but concluded that this was a myth. It considered how that damaging perception could be addressed and how people with genuine grievances could have better access to justice and made recommendations about how the process could be improved. It highlighted how the introduction of "no win, no fee" arrangements and the emergence of claims management companies had increased access to justice; but also how claims management companies, especially The Accident Group and Claims Direct which had dominated the market but had by then collapsed, had fed the perception that litigants were now being encouraged to bring unmeritorious claims in the hope of obtaining compensation. The report did not provide a definition of a claims management company nor analyse in detail what services might be provided by such a company, other than to say that they take advantage of the new "no win, no fee" arrangements "by gathering accident cases by advertising or direct marketing, administering the cases, and then farming them out to solicitors up and down the country", earning money "by non-transparent and complex systems of referral fees and charges". It noted that nearly everyone consulted for the purposes of the report called for the government to regulate the sector, "however few could suggest a model for the regulation of the sector"; instead, "self-regulation with a statutory underpinning" should be tried first, involving a new professional organisation, the Claims Standards Federation, which should apply to the Office of Fair Trading for approval of a code of practice to be developed by it. The BRTF advised that the government should keep the need for regulation under close review and a regulatory model should be developed "that could incorporate claims management companies should the need arise in future". If progress had not been made by December 2005, the government "should step in and regulate the sector" (para 4.1).

57.    The government responded to the BRTF's report in November 2004, accepting the recommendation that regulation of claims intermediaries should be considered if self-regulation failed. Part 2 of the 2006 Act laid the legislative foundation for such regulation.

58.    The government published Explanatory Notes which accompanied Part 2 of the 2006 Act. These referred to the BRFT's report and the government's response, by way of background. The Explanatory Notes stated (para 31):

> "The legislative framework [in the 2006 Act] is flexible and allows the Secretary of State to designate a body to regulate claims management services, to establish a body to regulate (where he thinks that no existing body is suitable for designation) or to regulate himself. The Act provides the outline regulatory framework to authorise providers who would be required to comply with rules and codes of practice. The Act also includes power for the Regulator to investigate unauthorised activities and to prosecute those who try to evade regulation."

The Explanatory Notes explained (para 34) that "[o]nly those claims management services that the Secretary of State prescribes by order under section 4(2)(e) will be subject to regulation. The Secretary of State can therefore target regulation in areas where he considers there to be a particularly high risk to consumers".

59.    At para 35 the Explanatory Notes explained that section 4(3) "gives examples of activities which constitute the provision of services (where they are connected with a claim)" and continued:

> "The list, which is not exhaustive, includes financial services (for example assisting with the purchase of insurance or loans); legal representation (for example acting on a [claimant's] behalf in pursuing a claim); referring or introducing one person to another (for example referring a claim to a solicitor); and making inquiries (for example contacting witnesses in the course of investigating a claim). The provision of advice does not extend to the preparation or giving of evidence. For example, if a person were asked to give evidence in a personal injury claim (whether or not

expert evidence) this would not amount to providing claims management services."

60.     The 2006 Act does not prohibit or limit the provision of claims management services generally. Instead, section 4(1) provides that a person may not provide *regulated* claims management services unless certain conditions are fulfilled. Services are regulated only if they are of a kind, or are provided in cases or circumstances of a kind, prescribed by an order made by the Secretary of State: section 4(2)(e). To make such an order, the Secretary of State has to comply with the procedural requirements laid down in the Act, which stipulates for parliamentary oversight by the positive resolution procedure. Parliament thus reserved to itself close control of the making of an order to subject particular services to regulatory control pursuant to the Act.

61.     In this way, in my view, the scheme of Part 2 of the 2006 Act bears out what was explained in the Explanatory Notes, that the purpose of Part 2 was to create a broadly framed power for the Secretary of State to regulate in this area, leaving it to him (subject to close supervision by Parliament itself) to target the regulation, and the statutory effects which regulation carries with it under section 4, according to his own assessment of where a need of regulation was shown to exist at any particular time on the evidence which had then become available.

62.     The fact that the making of an order was to be subject to the positive resolution procedure indicates that Parliament intended the control on the Secretary of State's power to be primarily procedural, rather than by way of closely delimiting the ambit of the power by the statutory definition of the area in which it might be exercised. Further, Parliament clearly intended that the Secretary of State should be able to regulate effectively in future in a new and fast developing area in which, as at the time of enactment, the financing and business models being used were not fully understood. Effective regulation would be liable to be undermined if the powers conferred were narrow or unclear, so that an order which the Secretary of State might consider to be justified in the public interest to regulate some feature in the general area of providing funding and other assistance to potential litigants could be made subject to a vires attack. In the context of the power of regulation created by section 4, and the general purpose it is supposed to promote, there is no good reason to look for implied limitations which do not appear from the wide language used for the definition.

63.     The language of the main part of the definition of "claims management services" in section 4(2)(b) is wide and is not tied to any concept of active management of a claim. The provision says that such services mean "advice or other services in relation to the making of a claim". Advice in relation to a claim does not carry any

connotation of management of the claim. In the area of litigation the connotation of "advice" in relation to a claim is advice (typically legal, though it might take other forms) given to a client who then makes their own decision about how to manage their claim. In the definition, the words "other services" are juxtaposed with and take their colour from "advice", so it is not plausible to say that they should be read as qualified to mean services in the management of a claim. Further, according to the definition the "other services" have to be "in relation to the making of a claim". That is wide express language and in my view it is not possible to read it to mean in relation to the management of the making of a claim; yet this is what the respondents' proposed interpretation amounts to.

64.    These basic points are strongly reinforced by the wide language of section 4(3)(a), which stipulates that "the provision of services" includes a non-exhaustive list of four items stated in very broad terms, none of which has the connotation of or involves a power of management of a claim. Provision of services "by way of or in relation to legal representation" (sub-paragraph (ii)) is, according to the normal understanding of the role of a legal representative, to assist a client in presenting a claim, not to manage or have the power of management of a claim. "[R]eferring or introducing one person to another" (sub-paragraph (iii)) clearly does not involve management of a claim as a matter of the ordinary use of language. The same is true of making inquiries (sub-paragraph (iv)): in the context of litigation, inquiries are made to find evidence to support a claim being brought by others. The same point applies in relation to the provision of financial services or assistance (sub-paragraph (i)): in the context of litigation, as a matter of ordinary language, such services or assistance are provided to help someone to bring a claim, not to secure a power of management over it.

65.    Consideration of section 4(3)(b) leads to the same conclusion. It is obvious, and does not require to be stated, that a witness giving or preparing to give evidence is not managing the claim to which that evidence relates, nor providing a service in order to manage that claim. The only point of section 4(3)(b) is to carve out from the wide definition of "claims management services" a category of case to which the Secretary of State's power of regulation does not extend. This provision therefore constitutes a further specific indication that the definition of "claims management services" in section 4(2)(b) is indeed intended to be very wide, in line with its own express language and that of section 4(3)(a), and that it is not limited to services involving the management of a claim.

66.    It is also significant that the manner in which section 4 operates is by focusing on a particular type of activity rather than by focusing on a particular actor (say, a claims intermediary as opposed to a reputable or regulated bank). If it is possible that

one of the activities referred to could be conducted in a way which is prejudicial to consumer protection in this area, it is plausible to infer that Parliament intended the activity to be covered by the wide regulatory power created by section 4 even if some actors in the field may not behave in a prejudicial way. The reverse logic, according to which if there are some reputable actors it should be inferred that the intention was not to provide a power to regulate the activity at all, is not at all persuasive.

67.     The textual and contextual indicators from the 2006 Act itself clearly lead to the conclusion that the definition of "claims management services" is meant to be wide and is not intended to be coloured by the notion of "claims management", which is simply inapt to qualify the various aspects of the express definition of the phrase which Parliament has used in section 4(2) and (3). I do not regard this as a case where there is any ambiguity about this.

68.     With respect to Henderson LJ, his assessment of the context and purpose of Part 2 of the 2006 Act is not sustainable. He infers there was an intention to regulate "claims intermediaries" and no one else, but that was not a concept used in the Act itself, nor is it a clear concept, nor was it used or defined in any precise way in the BRTF report or the Explanatory Notes. The scheme of Part 2 of the 2006 Act is to regulate activities, not persons of a particular description. The language used in section 4 and in the Scope Order to describe the services which may be or are regulated is not appropriate to describe what a claims intermediary (whatever that may be) does.

69.     Henderson LJ said that he saw no reason why Parliament would have wished to regulate non-champertous third party funding in return for a reasonable share of the sum recovered. But the scheme of the legislation was that the Secretary of State was given a discretion as to what services would be made subject to regulation, and Parliament was to exercise close supervision of that choice, and there was no reason to think that the Secretary of State would seek to regulate services which did not jeopardise consumers' interests. However, evidence might emerge of third party funders extracting more than a reasonable share of the recovery, in which case regulation would plainly be fairly and squarely within the purpose of the power in section 4 of the 2006 Act, to protect consumers of such services. Moreover, there might be an element of bundling financial services together with other services as part of an overall package offered to a potential litigant, or the funding provided might be used to pay the fees of other service providers, or the person providing the financial assistance might pay a referral fee to a person promoting the litigation, any of which might require the regulatory power under section 4 to be exercised.

70.     I do not consider that the existence of section 58B on the statute book has the significance which Henderson LJ accorded it. Section 58B is a comparatively blunt

instrument which is focused on regulating particular persons identified as funders, whereas the power to regulate under section 4 of the 2006 Act is focused on regulation of service activities and is intended to be wide and highly flexible, allowing the Secretary of State to target regulation more precisely as and when particular needs are identified. Section 4 allows for regulation of the provision of financial services or assistance to be integrated, if appropriate, into a coherent package of regulation covering also other forms of service provision with which they may be associated. If brought into effect, section 58B would impose a limitation which is not applicable where the Secretary of State regulates pursuant to section 4: see section 58B(3)(c). Section 58B was put on the statute book in 1999 (albeit not brought into effect) as a means of permitting litigation funding by exempting it from the common law rules against champerty on a very limited basis, where damages-based remuneration would not be permitted, but only remuneration calculated with reference to the funder's costs: section 58B(3)(e). That limitation was bypassed by development of the common law in *Factortame (No 8)* and *Arkin*, which confirmed that third party funding arrangements of the kind at issue in these proceedings were not champertous and hence were enforceable. Section 58B was not designed to regulate third party funding arrangements based on taking a share of the sum recovered of the kind which have been developed in the wake of those decisions, nor is it appropriate for that purpose. By the time of the enactment of the 2006 Act it was clear that, contrary to the view of the Divisional Court, section 58B did not provide a comprehensive scheme of regulation for litigation funders.

71.     Accordingly, it can be seen that section 4 of the 2006 Act and section 58B do not operate in the same way. Section 4 was designed to address a world of third party funding which had developed in significant ways beyond that for which section 58B had been devised. Section 4 has a different purpose and function. Furthermore, even to the extent that the provisions overlap in terms of their coverage, there is nothing inherently untoward in this. The statute book is not neat and tidy and there is no particular reason why statutory powers contained in different enactments should be regarded as mutually exclusive. Parliament included the reference to "financial services or assistance" in section 4 simply as one type of services within the purview of the general regulatory power conferred by that provision, where it might be found to make sense in future to regulate them from the perspective of section 4 (potentially alongside other services) without reference to section 58B.

72.     To sum up, therefore, I conclude that the statutory purpose of Part 2 of the 2006 Act was to provide a broad power to allow the Secretary of State to decide what targeted regulatory response might be required from time to time as information emerged about what was then a new and developing field of service provision to encourage or facilitate litigation, where the business structures were opaque and poorly understood at the time of enactment. The wide language used in section 4, and

the degree of parliamentary control for the future exercise of the section 4 power, which is a feature of the scheme of Part 2, are strong indications of this. The Explanatory Notes also indicate that this was the purpose of the provision. Viewed in this light, there is good reason to think that Parliament used wide language in section 4 deliberately and with the intention that the words of the definition of "claims management services" should be given their natural meaning.

**(d) The Scope Order**

73.    Reference to the Scope Order and the Explanatory Memorandum provide further support for the appellants' case on the interpretation of this provision in the Act.

74.    The Explanatory Memorandum for the Scope Order explained the policy background at para 7.1:

> "Claims management businesses gather cases either by advertising or direct approach. They then act either directly for the client in pursuing the claim, or as an intermediary between the claimant and a legal professional or insurer. Claims management businesses make money from several sources—from referral fees from solicitors; from commission on auxiliary services; from the sale of after-the-event insurance; and sometimes from loans to their clients. Concerns have grown over the unprofessional conduct by those who are providing the service for commercial gain— particularly as the activities of claims management businesses have extended into many areas of litigation, well beyond personal injury, and even into claims for certain kinds of benefits even though no litigation is involved."

75.    At para 7.6 the Explanatory Memorandum explained what the Scope Order was intended to achieve:

> "The definition of claims management services in the Act is wide to allow new areas to be brought within the scope of regulation where problems arise, and for areas to be removed from scope where problems subside. The intention is that the regulation be applied initially in the areas where

there is the greatest potential for consumer detriment. The Scope Order specifies the activities that will be regulated. The activities are those characteristically provided by claims management companies and have been described in such a way as to ensure that similar services provided outside the area of the claims management industry are not inadvertently regulated as claims management services. In particular, services provided to a defendant are outside the intended scope, and are not regarded as being within the definition of "claims management services" in the Act—see section 4(2)(b). The kinds of claim can generally be described as claims for injury, damage or loss that have resulted in consumer detriment. The consultation provided unanimous consensus that it was appropriate to include the sectors proposed in the draft Order."

76.    Two points in particular emerge from the Explanatory Memorandum. It supports the interpretation of section 4 of the 2006 Act as conferring a wide power to regulate on the Secretary of State, which was to be targeted on particular areas of activity giving rise to concern as and when they might emerge. It also shows that it was appreciated that one area of concern might be the making of loans, ie the provision of financial assistance. It is again relevant that the statutory scheme is framed in terms of a power to regulate types of activity rather than particular actors.

77.    The Scope Order provided for a range of kinds of services to be specified as regulated claims management services: para 22 above. These were services which the Secretary of State considered, on the basis of the information available to him at the time of making the Order, required to be regulated in the public interest pursuant to section 4 of the 2006 Act. Each of the services specified in the Scope Order is described in language which carries no connotation of management of, or of having the power to manage, a claim. They are far removed from any such concept. Advertising or seeking out persons who may have a cause of action (sub-para (a) of article 4(2)) can on no view be said to involve management of a claim. Nor can referring details of a claim or claimant, or a cause of action or potential claimant, to another person (sub-para (c)). Nor "investigating, or commissioning the investigation of, the circumstances, merits or foundation of a claim …" (sub-para (d)). The same point made above about "advice" in relation to a claim applies in respect of "advising a claimant or potential claimant in relation to his claim or cause of action" (sub-para (b)). Similarly, in ordinary language and in the context of litigation, "representation of a claimant" (sub-para (e)) means to act according to their instructions, without any power to manage how they seek to have their claim argued or litigated. In none of these cases is the management of a claim an apt concept to apply. For example, it cannot sensibly be said that a person

who advertises (it may be, unsuccessfully) to try to find a person who might have a claim is in any sense managing any claim at all. Accordingly, the Scope Order provides strong support for the appellant's submission as to the wide meaning of the definition in section 4 of the 2006 Act.

### (e) The potency of the term defined

78.     In my view there are three basic reasons why the notion of the potency of the term defined cannot be taken to have relevant application in this case to qualify or provide colour for the interpretation of the language used in section 4(2) and (3) of the 2006 Act to define "claims management services". First, as explained above, the terms explicitly used in the definition in the primary legislation and also in the Scope Order cannot be read as involving the management of claims nor as having claims management as a unifying core of meaning. It is therefore difficult to say that they should be read as the respondents suggest.

79.     Secondly, "claims management services" had no established and generally accepted meaning which could lead a reader of the text of section 4 to suppose that the express language of the definition was to be treated as qualified or coloured by that meaning. Section 4 of the 2006 Act is thus to be contrasted with those statutory contexts where the term defined does have this effect.

80.     *Delaney v Staples (trading as De Montfort Recruitment)* [1992] 1 AC 687 concerned the interpretation of a statutory provision which conferred exclusive jurisdiction on industrial tribunals in respect of the lawfulness of deductions from wages, where "wages" was defined in wide terms to mean "any sums payable to the worker by his employer in connection with his employment", with a series of items said to be included within this. The question was whether a tribunal had jurisdiction under this provision to adjudicate on the lawfulness of a failure to make a payment in lieu of notice to an employee who was summarily dismissed. The House of Lords held that since "wages" were payments in respect of the rendering of services during employment, the term did not cover payments in respect of the termination of a contract of employment. The main reasons for this conclusion were that the procedural provisions of the statute were not compatible with such an interpretation and it would have an unjustified effect on the employer's rights of set-off under the general law. However, a failure to pay some sums after termination of the employment would be covered according to the definition, and in order to draw the necessary dividing line Lord Browne-Wilkinson, who gave the sole substantive speech, said (p 697) that "one is thrown back to the basic concept of wages as being payments in respect of the rendering of services during the employment, so as to exclude all payments in respect of the termination of the contract save to the extent that such …

payments are expressly included" in the relevant statutory definition. This reasoning depended upon the concept of "wages" having a well understood basic meaning.

81.    The same point can be made in relation to the terms defined in the other cases referred to in para 48 above (in the *Oxfordshire County Council* case Lord Hoffmann, with whom the majority agreed, after acknowledging the potential relevance of the term being defined - "town or village green" - set out reasons why in the particular statutory context it would not be appropriate to colour the statutory definition by introducing elements of the traditional village green into it: paras 38-39). Such a clear accepted meaning is absent in respect of "case management services". The result, as the appellants contend, is that the interpretation urged by the respondents and adopted by the Divisional Court suffers from being vague and circular.

82.    I also agree with the appellants that the construction proposed by the respondents in substance involves the illegitimate addition or substitution of words in the definition in section 4 of the 2006 Act, either by interpreting section 4(2) to say "other services in relation to the management [rather than 'making'] of a claim" or by interpreting section 4(3)(a)(i) to say "the provision of financial services or assistance in relation to the management of a claim". Interpretation of section 4 in this way would also tend to undermine the object of having a definition of the term "claims management services", since the words used to define the term would then be treated as essentially illustrative and so would be redundant as a definition, since a service provided in the context of claims management will necessarily be a claims management service.

83.    Thirdly, to read the definition in section 4 in this way would be counter to the scheme and purpose of Part 2 of the 2006 Act as analysed above.

**(f) Section 58B and the presumption against absurdity**

84.    I do not consider that it can be said that the interpretation of section 4 of the 2006 Act for which the appellants contend produces any absurdity so far as the juxtaposition of that provision and section 58B is concerned: see paras 70-71 above. Looking at matters from the perspective of Parliament when legislating in 2006, there were understandable reasons why it would wish to include within the scope of the regime in Part 2 of the 2006 Act the possibility of regulation of funding to encourage or facilitate litigation.

85.     Indeed, one might think that this was bound to be a matter of concern, because on any view the provision of some form of credit in relation to the provision of services against the possibility of recovery in the litigation would be central to any arrangements whereby litigation was to be promoted in the absence of legal aid provided by the state and where a litigant did not have sufficient financial resources of their own to be able to go to law. Since provision of legal advice and representation on credit is at the heart of conditional fee CFAs and other similar arrangements, it is not surprising that Parliament would wish to include other forms of provision of credit within the scope of the regulatory regime in Part 2. Also, there is clearly scope for a connection between legal services being provided and provision of third party funding in terms of distribution of risk of the underlying risk. If a third party funder lends money to allow some or all of the legal fees to be paid in advance of recovery in the litigation, it takes on that element of the credit risk in place of the lawyers and there seems little reason to differentiate between the two as regards the coverage of the regulatory powers provided for in Part 2. It could reasonably be inferred that this is why the provision of financial services or assistance is the first item in the list in section 4(3) of the 2006 Act. The regime in Part 2 had to allow for the possibility that the person providing financial services or assistance might be willing to behave in exploitative ways or that they might be helping to fund others who are.

86.     Nor do I think that it can be said to be absurd that the power to regulate conferred by section 4 happens to cover normal lending by reputable banks if provided in relation to the making of a claim. Another example given was that of the services provided by a barrister's clerk. Parliament recognised that the power conferred was likely to be wider than the set of situations in which it might need to be used. That is why, instead of simply enacting regulatory rules in primary legislation, it provided for the Secretary of State to have a wide discretion as to what services should be made subject to regulation by including them in any order he would make and why the exercise of that discretion was to be made subject to the positive resolution procedure as a further safeguard. It is also the reason why Parliament did not seek to subject the Secretary of State's regulatory power to tight control by stipulating narrow and precisely formulated parameters in the primary legislation. Parliament's purpose in enacting the power in the wide terms it chose was to allow the Secretary of State to tailor its use according to need as more information became available and problems were identified. In my view, it is not for the court to limit the ambit of the power or to qualify the wide language used in the definition of "claims management services" by imagining situations in which use of the power might be unreasonable, but where it is very unlikely to be used and where there are controls in place to police and prevent such use.

**(g) Events after 2006**

Page 34

87.    Focusing on the meaning of the definition of "claims management services" in the context of Part 2 of the 2006 Act, as the parties are agreed is the appropriate approach, leads me to conclude that the appellants' submission as to its proper interpretation is correct. The problem in this case has arisen not from the effect of the definition in that context, but because the same definition was used in section 58AA with effect from 2009/2010 to define DBAs in relation to employment matters and then more generally from 19 January 2013 pursuant to the amendments to that provision introduced by LASPO. Section 58AA(2) directly declares that a DBA which does not satisfy the conditions in subsection (4) is unenforceable. Unlike in Part 2 of the 2006 Act, the effect of section 58AA is general and immediate and is not predicated on any further exercise of discretion by the Secretary of State or further supervision by Parliament. The use of the same definition in section 419A of FSMA means that this problem continues and that provision has the same effect as section 58AA.

88.    The respondents emphasised that Sir Rupert Jackson, in his preliminary report on Review of Civil Litigation Costs (May 2009) and in his final report (January 2010), identified improving access to justice as a regulatory objective and endorsed the use of third party funding based on receipt of a percentage of the sums recovered in the action. In chapter 15 of his preliminary report Sir Rupert noted that there had been a sea change in the common law of champerty to allow such arrangements to be enforceable, at least so long as the funders did not have control over the conduct or settlement of the litigation, and asked for views on whether regulation should be extended to cover them. In chapter 11 of his final report Sir Rupert recommended that a satisfactory voluntary code, to which all litigation funders should subscribe, should be drawn up and the question whether there should be statutory regulation of third party funders by the Financial Services Authority ought to be re-visited if and when the third party funding market expanded.

89.    In 2011 the Association of Litigation Funders of England and Wales issued a Code of Conduct in line with the recommendations in Sir Rupert Jackson's final report. The latest form of that code came into effect in 2018. The respondents emphasise that the LFAs comply with the requirements in the Code of Conduct.

90.    However, in my view neither of Sir Rupert Jackson's reports nor the Code of Conduct assist in answering the question of statutory interpretation which arises in this case. They post-date the enactment of the statutory definition in section 4 of the 2006 Act by several years and do not provide guidance regarding the policy context in which it was enacted or its purpose. Even if it might be said that it is desirable in public policy terms that third party funding arrangements of the kind in issue in this case should be available to support claimants to have access to justice (as to which I express

no view), this is not a reason why there should be any departure from the conventional approach to statutory interpretation. It may also be noted that section 58AA in its original form (cross-referring to the 2006 Act) and in its amended form (cross-referring now to section 419A of FSMA) provides that, even if the LFAs are to be classified as DBAs, such third party funding arrangements will be enforceable provided that the various stipulated requirements in respect of them are satisfied.

91.    Participants in the third party funding market may have made the assumption that such arrangements are not DBAs and hence are not made unenforceable by section 58AA(2). But this would not justify the court in changing or distorting the meaning of "claims management services" as it is defined in the 2006 Act and in section 419A of FSMA.

92.    Mr Rhodri Thompson KC, for the respondents, submitted that later legislation, in particular section 58AA, may be referred to as an aid to interpretation of the 2006 Act in order to resolve an ambiguity in that earlier legislation. He contended that the interpretation of section 4 of the 2006 Act proposed by the appellants produces absurd effects in relation to the application of the later legislation and that this supports the interpretation preferred by the Divisional Court. I am not persuaded by this. It is not clear to me that section 58AA would provide helpful guidance even if the statutory definition of "claims management services" in section 4 of the 2006 Act or section 419A of FSMA were ambiguous. However, it is not necessary to examine this submission in detail, because I do not consider that there is any ambiguity in that definition.

93.    Mr Thompson also submitted that it is legitimate to refer to the DBA Regulations 2013 as an aid to interpretation of the 2006 Act. I do not agree. There is authority to the effect that if a statute is ambiguous a later Act of Parliament might be relied on as persuasive authority as to its meaning: *Kirkness (Inspector of Taxes) v John Hudson & Co Ltd* [1955] AC 696; *Finch v Inland Revenue Comrs* [1985] Ch 1, 15, per Oliver LJ; and see the discussion in *Bennion, Bailey and Norbury*, op. cit., in section 24.19, pp 769-770. However, the inference to be drawn from a later Act as to the meaning earlier legislation was intended to have is comparatively weak and the principle comes into play only where there are two potential interpretations of the earlier legislation which are "both equally tenable" (in the words of Oliver LJ in the *Finch* case at p 15). The principle functions as a tie-breaker in that limited class of case, being justified by a background concern to maintain the overall coherence of the law as expressed in primary legislation. There is no ambiguity of this kind in the present case.

94.    In any event, in my judgment this principle does not apply where the later legislation sought to be relied on is subordinate legislation made by the executive rather than an Act of Parliament. Therefore it does not authorise use of the DBA Regulations 2013 as an aid to interpretation of the 2006 Act. If the position were otherwise, it would undermine the emphasis given in the authorities to the importance of subordinate legislation being broadly contemporaneous with the primary legislation which falls to be interpreted: paras 44-47 above. It would also confer an unjustified power on the executive to take action later on which might modify the meaning which is given to words used in earlier primary legislation. See also the discussion in *Bennion, Bailey and Norbury*, op. cit., pp 770-771.

### 6. UKTC's separate argument regarding its opt-out funding agreement

95.    Section 47C(8) of the Competition Act 1998, as added by amendment in 2015, provides that "[a] damages-based agreement is unenforceable if it relates to opt-out collective proceedings". Subsection (9)(c) states that "damages-based agreement" has the meaning given in section 58AA(3). Accordingly section 47C(8) creates an additional reason why UKTC's opt-out LFA with Yarcombe is not enforceable. Unlike a DBA in relation to opt-in collective proceedings, there is no scope for a DBA in relation to opt-out collective proceedings to be made enforceable by compliance with the conditions stipulated in section 58AA.

96.    UKTC seeks to meet this problem in relation to its opt-out LFA by submitting that even if Yarcombe is to be classified as a provider of "claims management services" (as I consider they should be), the LFA is not a DBA caught by the terms of subsection 58AA(3) as a matter of substance because (1) unlike a standard opt-in DBA, Yarcombe's recovery is subject to (a) prior payment to members of the opt-out class of their full share of damages and (b) the discretion of the Tribunal pursuant to section 47C(6) of the Competition Act 1998 (which provides that the Tribunal "may order that all or part of any damages not claimed by the represented persons within a specified period is instead to be paid to the representative in respect of all or part of the costs or expenses incurred by the representative in connection with the proceedings"); and (2) there is no reason to stretch the concept of a DBA under section 47C(8) to render unenforceable a commercial agreement between UKTC and Yarcombe that (a) involves a very significant sharing of risk by the funder; (b) is subject to judicial control by the Tribunal; and (c) provides for full recovery by individual claimants in the event that their claim for an aggregate award of damages is successful.

97.    I do not accept UKTC's submissions on this point. The appellants provide a convincing answer.

98.     Under the opt-out LFA Yarcombe's funder's fee is expressed to include a percentage of the proceeds of the litigation. As the appellants point out, according to the procedural rules in the Tribunal and by virtue of the Competition Act 1998 the funder of opt-out proceedings always takes the risk that all of the damages recovered will be distributed to members of the class with the result that there will be nothing left to pay its fee and also takes the risk that the Tribunal might decline to exercise its discretion to order a payment in favour of the funder. UKTC is the proposed representative in the opt-out proceedings and, if those proceedings succeed, will obtain an award of damages on behalf of the class represented. Distribution of the damages is governed by rule 93 of the Tribunal Rules. Members of the class who claim their share of the damages in time are to be paid; but it is in the nature of opt-out proceedings brought on behalf of a wide class of people, many of whom may be unaware of or uninterested in the proceedings, that there may be a substantial amount which is not collected. Rule 93(4) enables the Tribunal to order payments out of undistributed damages in respect of the representative's costs, fees and disbursements and it has been established that this also permits payment of a funder's fee: *Merricks v Mastercard Inc* [2017] CAT 16; [2017] 5 CMLR 16, paras 117 and 127. The terms of the opt-out LFA between UKTC and Yarcombe are structured to take this mechanism into account. Clause 10.1 imposes an obligation on UKTC to pay the funder's fee (including the stipulated percentage share of the damages) save to the extent that the aggregate amount ordered by the Tribunal to be paid to UKTC in respect of that obligation falls below the funder's fee, and by clause 3.1.4 UKTC warrants that it will use its best endeavours to obtain such an award.

99.     None of this affects the application of section 58AA(3). The LFA provides that payment of the funder's fee is conditional on UKTC receiving a "specified financial benefit" in the litigation. The payment to be made is obviously a success fee. As the appellants submit, the fact that a claims management service provider enters into an agreement which adds a further condition which must be met before a payment is due does not deprive the remuneration being of the character of a specified financial benefit within the meaning of section 58AA(3)(a)(i). This is a general point which has particular force when, as here, the additional condition simply reflects the mechanism in the Tribunal Rules which allows such a payment to be made. It also remains the case that the amount of the payment due to Yarcombe "is to be determined by reference to the amount of the financial benefit obtained", so as to satisfy the condition in section 58AA(3)(a)(ii) as well, even though the structure of the opt-out regime according to the Competition Act 1998 and the Tribunal Rules means that this is treated as capable of being departed from in certain circumstances. Yarcombe's primary contractual entitlement is to payment of an amount determined as stated in that subparagraph, even if there may be a departure from that in certain identified circumstances. As a matter of substance, the LFA retains the character of a DBA as defined. It is inherent in any DBA that risk is shared by the funder, so the fact that under the opt-out LFA

Yarcombe as funder shares the financial risks associated with the litigation provides no basis to say that this LFA falls outside the statutory definition of a DBA.

## 7. Conclusion

100.    For the reasons given above, I would allow the appeal.

**LADY ROSE (dissenting):**

**(1) Introduction**

101.    The issue before the court on this appeal is whether section 58AA of the Courts and Legal Services Act 1990, as inserted by the Coroners and Justice Act 2009, together with the regulations made under section 58AA(4), render unenforceable agreements between claimants and litigation funders in which the funder agrees to loan money to pay for the litigation in return for receiving a share of any damages recovered for the claimant in the proceedings. The appeal arises in the context of claims brought in the Competition Appeal Tribunal ("the CAT") pursuant to the statutory procedure for bringing collective actions. This is set out in sections 47B onwards of the Competition Act 1998. The issue arises acutely in this context because this kind of litigation funding agreement underpins many if not all of the proceedings brought under that statutory procedure. However, these funding agreements are by no means limited to collective actions in the CAT, as the cases I consider in this judgment show.

102.    Section 58AA of the Courts and Legal Services Act 1990 ("CLSA" or "CLSA 1990") as amended currently provides as follows:

> **"58AA Damages-based agreements**
>
> (1) A damages-based agreement which satisfies the conditions in subsection (4) is not unenforceable by reason only of its being a damages-based agreement.
>
> (2) But (subject to subsection (9)) a damages-based agreement which does not satisfy those conditions is unenforceable.

(3) For the purposes of this section—

(a) a damages-based agreement is an agreement between a person providing advocacy services, litigation services or claims management services and the recipient of those services which provides that—

(i) the recipient is to make a payment to the person providing the services if the recipient obtains a specified financial benefit in connection with the matter in relation to which the services are provided, and

(ii) the amount of that payment is to be determined by reference to the amount of the financial benefit obtained.

(4) The agreement—

(a) must be in writing;

(aa) must not relate to proceedings which by virtue of section 58A(1) and (2) cannot be the subject of an enforceable conditional fee agreement or to proceedings of a description prescribed by the Lord Chancellor;

(b) if regulations so provide, must not provide for a payment above a prescribed amount or for a payment above an amount calculated in a prescribed manner;

(c) must comply with such other requirements as to its terms and conditions as are prescribed; and

(d) must be made only after the person providing services under the agreement has complied with such requirements (if any) as may be prescribed as to the provision of information.

(5) Regulations under subsection (4) are to be made by the Lord Chancellor and may make different provision in relation to different descriptions of agreements.

(6) Before making regulations under subsection (4) the Lord Chancellor must consult—

(a) the designated judges,

(b) the General Council of the Bar,

(c) the Law Society, and

(d) such other bodies as the Lord Chancellor considers appropriate.

(6A) Rules of court may make provision with respect to the assessment of costs in proceedings where a party in whose favour a costs order is made has entered into a damages-based agreement in connection with the proceedings.

(7) In this section—

'payment' includes a transfer of assets and any other transfer of money's worth (and the reference in subsection (4)(b) to a payment above a prescribed amount, or above an amount calculated in a prescribed manner, is to be construed accordingly);

'claims management services' has the same meaning as in the Financial Services and Markets Act 2000 (see section 419A of that Act).

(7A) In this section (and in the definitions of 'advocacy services' and 'litigation services' as they apply for the purposes of this section) 'proceedings' includes any sort of

proceedings for resolving disputes (and not just proceedings in a court), whether commenced or contemplated.

(8) Nothing in this section applies to an agreement entered into before the coming into force of the first regulations made under subsection (4).

(9) Where section 57 of the Solicitors Act 1974 (non-contentious business agreements between solicitor and client) applies to a damages-based agreement other than one relating to an employment matter, subsections (1) and (2) of this section do not make it unenforceable.

(10) For the purposes of subsection (9) a damages-based agreement relates to an employment matter if the matter in relation to which the services are provided is a matter that is, or could become, the subject of proceedings before an employment tribunal.

(11) Subsection (1) is subject to section 47C(8) of the Competition Act 1998."

103.    The appeal turns on whether litigation funding agreements of the kind at issue in this appeal fall within the definition of "damages-based agreements" for the purposes of section 58AA. That in turn depends on whether the funders of these claims are providing "claims management services" within the meaning of the section. The reference in section 58AA(7) to the meaning given to "claims management services" in section 419A of the Financial Services and Markets Act 2000 ("FSMA 2000") is a reference to the following provision:

"**419A Claims management services**

(1) In this Act 'claims management services' means advice or other services in relation to the making of a claim.

(2) In subsection (1) 'other services' includes—

(a) financial services or assistance,

(b) legal representation,

(c) referring or introducing one person to another, and

(d) making inquiries,

but giving, or preparing to give, evidence (whether or not expert evidence) is not, by itself, a claims management service.

(3) In this section 'claim' means a claim for compensation, restitution, repayment or any other remedy or relief in respect of loss or damage or in respect of an obligation, whether the claim is made or could be made—

(a) by way of legal proceedings,

(b) in accordance with a scheme of regulation (whether voluntary or compulsory), or

(c) in pursuance of a voluntary undertaking.

(4) The Treasury may by order provide that a claim for a specified benefit is to be treated as a claim for the purposes of this section.

(5) The Treasury may specify a benefit under subsection (4) only if it appears to the Treasury to be a social security benefit, payable under the law of any part of the United Kingdom, designed to provide compensation for industrial injury."

104.    Before tackling the difficult question of the proper construction of these two provisions that is posed by this case, I describe the role that the litigation funders play and how their role in litigation has been addressed in the case law and in the legislation with which we are concerned.

**(2) Litigation funding**

*(a) What is litigation funding?*

105.    Attitudes to litigation funding by commercial third parties have turned round completely over the last few decades, particularly as a result of the substantial reduction in the availability of legal aid in most civil court proceedings. Funding agreements that used to give rise to criminal liability are now regarded as making an important contribution to providing access to justice. The background to litigation funding and current practice was described in the evidence before the court from Ms Susan Dunn who is the Chair of the Association of Litigation Funders of England & Wales ("the ALF"). She says that the basic model for litigation funding is a simple one. For many claimants the financial risks of commercial litigation can be prohibitive. Claimants may neither be able to afford to pay for their legal costs, nor to face the risks of an adverse costs order if their case fails. Even if they can afford it, they may prefer not to risk their assets and instead seek to manage these risks by obtaining litigation funding.

106.    One particularly important characteristic of litigation funding is that it is invariably a non-recourse investment. That means that the funder commits at an early stage in the proceedings to fund the costs and expenses of the client pursuing the claim. If the case is lost, then it is the funder who loses its money, the claimant does not have to pay back the money that the funder has provided. Because of the risk of losing the money lent, the funder has to investigate and assess the merits of the claim. After that, Ms Dunn says, the funder is essentially passive in the litigation process. The funder does not run the case or provide instructions as a client would. It merely monitors its investment in the case. Most notably, the funder does not control settlement of the case; this decision remains the decision of the client. The litigation remains the claimant's claim with the funder simply providing the means by which that claimant is able to use the civil justice process.

107.    Ms Dunn states that the vast majority of litigation funding in England & Wales is carried out by members of the ALF. They are obliged to adhere to the terms of a Code of Conduct promulgated by the Association and generally contract with the funded party on relatively standard terms. The current version of the Code of Conduct adopted in 2018 provides, for example, that the funder must take reasonable steps to ensure that the funded party has received independent advice on the terms of the agreement prior to its execution (para 9.1); it must not seek to influence the funded party's solicitor or barrister to cede control or conduct of the dispute (para 9.3) and must maintain adequate financial resources to meet its funding obligations (para 9.4). It also provides (para 18) that nothing in the Code prevents the funder "from

Page 44

conducting appropriate due diligence, both before offering funding and during the course of the litigation procedures that are being funded, including but not limited to analysis of the law, facts, witnesses and costs relating to a claim, and including regularly reviewing the progress of the litigation."

*(b) Litigation funding in the courts*

108.    It is important to understand the changing approach to litigation funding in the courts in order properly to construe section 419A FSMA and section 58AA CLSA. As Lord Wilberforce said in *Royal College of Nursing of the United Kingdom v Department of Health and Social Security* [1981] AC 800, 822:

> "In interpreting an Act of Parliament it is proper, and indeed necessary, to have regard to the state of affairs existing, and known by Parliament to be existing, at the time. It is a fair presumption that Parliament's policy or intention is directed to that state of affairs."

109.    Litigation funding was historically prohibited by the rules on maintenance and champerty. It was decriminalised by section 14 of the Criminal Law Act 1967. The history of this evolution leading to the enactment of section 58 CLSA 1990 has been recounted by Steyn LJ in *Giles v Thompson* [1993] WL 963259, [1993] 3 All ER 321, 328, and I need not repeat it here. That case upheld the ability of car hire companies to recover the charges for lending cars to claimants whose own cars had been seriously damaged in road accidents. The car hire agreement provided that the company should have a right to pursue the defendant responsible for the accident in the claimant's name to recover the car hire charges as special damage. The defendants' insurers asserted that such agreements were unenforceable because they were champertous and contrary to public policy.

110.    When the case reached the House of Lords ([1994] 1 AC 142, 164A) Lord Mustill in his leading speech noted that the law on maintenance and champerty has not stood still, but has accommodated itself to changing times, "as indeed it must if it is to retain any useful purpose". The law, he said, "can best be kept in forward motion by looking to its origins as a principle of public policy designed to protect the purity of justice and the interests of vulnerable litigants."

111.    Damages-based litigation funding agreements have come before the courts in a variety of contexts. First, where the claim has failed and the impecunious claimant is

unable to satisfy the adverse costs order made against him, the defendant may seek an order that the funder pay the costs. Cases in this category include *Arkin v Borchard Lines Ltd* [2005] EWCA Civ 655, [2005] 1 WLR 3055 discussed later and *Excalibur Ventures LLC v Texas Keystone Inc (No 2)* [2016] EWCA Civ 1144, [2017] 1 WLR 2221. Secondly, where the claim has succeeded and the claimant has received damages from which the lawyers seek to recover their share in accordance with the agreement, the client may refuse to share the damages, alleging that the agreement under which he or she agreed to do so was unenforceable. Cases in this category include *Lexlaw Ltd v Zuberi* [2021] EWCA Civ 16, [2021] 1 WLR 2729. Thirdly, the claim may succeed and the claimant may be happy to share the damages in accordance with the agreement. But the defendant against whom an adverse costs order is made then argues that it is not liable to pay the costs because of the indemnity principle: *R (Factortame Ltd) v Secretary of State for Transport, Local Government and the Regions (No 8)* [2002] EWCA Civ 932, [2003] QB 381 ("*Factortame (No 8)*") falls within this category.

112.    Of these authorities, the case on which the Respondents rely to show "the state of affairs" before the relevant legislation was enacted is *Factortame (No 8)*. This judgment of the Court of Appeal marked one of many chapters in the long running challenge by Anglo-Spanish fishermen to the legislation which banned them from fishing in UK territorial waters. After many years of litigation, in much of which they were successful, the fishermen entered into an agreement with a firm of chartered accountants, Grant Thornton ("GT"), to whom they already owed substantial fees. GT's task was to obtain the expert evidence needed to establish the appropriate quantum of damages – something that would require a major forensic accountancy exercise. GT appointed and funded an independent fisheries expert and an independent expert accountant with whom they worked to create a computer model for calculating the losses claimed.

113.    The parties settled the case with the Government paying the fishermen compensation. GT were paid 8% of the damages paid in accordance with their agreement with the fishermen, the money to cover both their own fees and the fees of the two expert witnesses. The issue arose whether the fishermen could recover that 8% from the Secretary of State under the costs order made against the Government or whether the agreement between the claimants and GT was champertous. If the agreement was champertous that would mean that the claimants had not been legally liable to pay GT that sum and, applying the indemnity principle whereby the receiving party can only claim costs to cover fees it is liable to pay, the Secretary of State would thereby avoid an adverse costs order in respect of GT's work.

114.    Lord Phillips of Worth Matravers MR giving the judgment of the court (with Robert Walker and Clarke LJJ) rejected the argument that the damages-based litigation

funding agreement was contrary to public policy and upheld the enforceability of the agreement.

115.    The Court of Appeal first considered the nature of the services provided by GT: paras 23 onwards. Solicitors had been instructed by the claimant fishermen and GT's services had at all times been ancillary to the conduct of litigation by those solicitors. Lord Phillips then considered the history of champerty and concluded that the test to be applied in any individual case was to see if the agreement tended to conflict with existing public policy directed at protecting the due administration of justice, with particular regard to the interests of the defendant: para 44. The Court held, first, that the agreement was not caught by section 58 CLSA 1990 which regulated conditional fee agreements (as I will describe later). Section 58 only covered agreements for litigation and advocacy services and GT was not providing those services.

116.    The fact that the agreement was not rendered unenforceable by statute was not, however, the end of the inquiry. As Lord Phillips put it, at para 61, the scope of the legislation may reflect "Parliament's assessment of the present state of public policy in this area" even for agreements not expressly caught by the provision. The Court considered that the policy behind section 58 in fact militated against a finding that public policy would condemn GT's agreement as champertous. That section evidenced a "radical shift" in attitude towards conducting litigation on terms that the obligation to pay fees will be contingent upon success:

> "62 … Conditional fees are now permitted in order to give
> effect to another facet of public policy – the desirability of
> access to justice. Conditional fees are designed to ensure that
> those who do not have the resources to fund advocacy or
> litigation services should none the less be able to obtain
> these in support claims which appear to have merit."

117.    Lord Phillips then applied a two-fold test to determine whether the agreement with GT put at risk the purity of justice first, because it gave GT an interest in the outcome of the litigation and secondly, because it entitled GT to a percentage of the compensation recovered. As to the first, the Court noted (para 79) that the parlous position of the claimants meant in reality that, regardless of the terms of any agreement with them, anyone who provided services to them was only going to be paid out of recovered damages. As to whether the damages-based nature of the agreement carried with it "any tendency to sully the purity of justice" (para 84), the Court held that it did not. GT were not likely to yield to the temptation to inflame the damages in order to increase their own payment. GT were reputable members of a respectable profession whose members are subject to regulation. No reasonable

onlooker would seriously have suspected that the fact that they were to receive 8% of the recoveries would tempt GT to deviate from performing their duties in an honest manner. The Court concluded at (para 91):

> "The claimants had been brought low by the initial wrong done to them and by the costs and stress of prolonged litigation in which no quarter was given. They were faced with an extraordinarily complicated task in proving the damage that they had suffered and there was a real risk that lack of funds might result in their losing the fruits of their litigation. The 1998 agreements ensured that they continued to enjoy access to justice. They did this without putting justice in jeopardy. The 1998 agreements were not champertous."

118.    Litigation funding was again considered by the Court of Appeal and Lord Phillips MR in *Arkin v Borchard Lines Ltd* [2005] 1 WLR 3055 ("*Arkin*"). *Arkin* concerned a claim for damages brought by the claimant against four members of a shipping conference. He alleged that they had destroyed his shipping business through anti-competitive activities contrary to the competition provisions of the EC Treaty. He entered into a conditional fee agreement with his lawyers and a funding agreement with a professional funding company. The funders agreed to fund the cost of expert evidence for a contingent fee of 25% for the first £5 million of damages recovered and 23% thereafter. The cost to the funder was £1.3 million. The claim was ultimately dismissed and a costs order was made against the claimant. The issue was whether, the claimant being unable to pay those costs, the defendants could claim the costs from the funders.

119.    The important point for our purposes is the emphasis that the Court of Appeal placed on the role of the funders in the litigation and the distinction they drew between champertous agreements and litigation funding agreements of the kind with which we are concerned. The judgment of the court (Lord Phillips of Worth Matravers MR, Brooke and Dyson LJJ) described the evolution of the rules against champerty during the 1990s in the context of costs orders being sought and made against those who had funded unsuccessful litigation. They referred to the important case of *Hamilton v Al Fayed (No 2)* [2003] QB 1175 where the successful defendant failed in his attempt to claim his costs from "pure funders", that is to say people who supported the litigation without any view to profit but simply from a more or less altruistic desire to assist the claimant. The Court of Appeal in *Arkin* recognised the need to balance the importance of ensuring access to justice with the principle that costs should normally follow the event. It was unjust that a funder who purchases a stake in an action for

commercial motives should be protected from all liability for the costs of the opposing party: para 38

> "Somehow or other a just solution must be devised whereby on the one hand a successful opponent is not denied all his costs while on the other hand commercial funders who provide help to those seeking access to justice which they could not otherwise afford are not deterred by the fear of disproportionate costs consequences if the litigation they are supporting does not succeed."

120.    The Court of Appeal devised a solution which was practicable, just and which reflected the policy considerations that they had considered. The solution for the non-champertous funder was that they should be potentially liable for the costs but only to the extent of the funding provided. The Court then considered the likely effect of such a ruling on the operation of the litigation funding market. One likely consequence was that professional funders would cap the funds that they provided in order to limit their exposure under an adverse costs order to a reasonable amount: para 42. This, Lord Phillips said, should have a salutary effect in keeping costs proportionate. Professional funders would also have to consider with even greater care whether the prospects of the litigation were sufficiently good to justify the support that they were asked to give. This would also be in the public interest.

121.    This case led to what has been referred to as the "*Arkin* cap", namely the principle that the liability of the claimant's funders to pay the costs of a successful defendant will normally be limited to the value of their funding: see for example the discussion in *Chapelgate Credit Opportunity Master Fund Ltd v Money* [2020] EWCA Civ 246, [2020] 1 WLR 1751 and the cases referred to in that judgment. In that case the judge at first instance had declined to apply the "*Arkin* cap" and the Court of Appeal upheld the exercise of his discretion, given the unusual nature of the funding arrangement in that case. As Newey LJ (with whom Moylan and Patten LJJ agreed) noted at para 36, litigation funding and after the event (ATE) insurance had moved on since *Arkin* and was now prevalent in litigation: (para 36)

> "It is also relevant that *Arkin* was decided when third party funding of litigation was still 'nascent' and conditional fee agreements and ATE insurance relatively new. Such matters will have highlighted the desirability of ensuring that commercial funders were 'not deterred by the fear of disproportionate costs consequences if the litigation they are supporting does not succeed' (to quote from the judgment in

*Arkin*). Nowadays, however, commercial funders, conditional fee agreements and ATE insurance are all much more established. The risk of someone with a claim which has good prospects of achieving success without disproportionate cost being unable to pursue it unless the extent to which a funder could be ordered to meet the other side's costs is curtailed will have diminished in consequence. Apart from anything else, a funder should now be able to protect its position by ensuring that either it or the claimant has ATE cover."

*(c) The collective proceedings in this appeal*

122.    The Appellants in this case were parties to an unlawful agreement which operated in the truck manufacturing sector. On 19 July 2016 the European Commission issued a decision finding that they had engaged in anti-competitive collusion for 14 years between 1997 and 2011 throughout the European Economic Area: see the decision in Case AT.39824 *Trucks* adopted on 19 July 2016. The Respondents are customers who bought trucks from the manufacturers during the operation of that agreement. They claim compensation on the basis that the price they paid for those trucks was artificially inflated as a result of the covert agreement of the Appellants and the other parties to the agreement.

123.    The Appellants have used the collective action procedure in the CAT to bring these claims pursuant to section 47B of the Competition Act 1998. The proceedings are governed by sections 47B to 49E of that Act, by the Competition Appeal Tribunal Rules (SI 2015/1648) and by Section 6 of the Competition Appeal Tribunal Guide to Proceedings issued in 2015 on the conduct of this kind of complex litigation. Broadly, collective proceedings can be brought either on an "opt-in" or an "opt-out" basis. In "opt-in" claims, the members of the class of claimants in the action are identified because they expressly choose to join in the action. In "opt-out" proceedings, the claimants are described as a class and everyone within the jurisdiction who falls within that class is joined as a party in the proceedings unless they opt out.

124.    In either case, the bringing of collective proceedings must be approved by the CAT before they can proceed. This approval involves two aspects. First, the person who wishes to represent the class of claimants must be authorised and secondly the claims must be certified by the CAT as being eligible for inclusion in collective proceedings. If the CAT approves the claim, it will appoint the class representative and issue a collective proceedings order ("CPO"): see section 47B(4).

125.    The collective proceedings which the Respondents wish to bring against the truck manufacturers were the subject of two applications before the CAT for CPOs. The first application has been brought by the Second Respondent, UK Trucks Claim Ltd, which is a special purpose vehicle set up to pursue these claims. That claim was filed on 18 May 2018. The second claim is brought by the Third Respondent, the Road Haulage Association Ltd, which is a trade association of road hauliers. The Road Haulage Association Ltd seeks to bring "opt-in" proceedings, whereas the UK Trucks Claim Ltd's application is primarily to bring "opt-out" proceedings with "opt-in" proceedings in the alternative.

126.    The Appellants who are defendants to these claims objected to the grant of the CPOs on a variety of grounds. The issue of the enforceability of the litigation funding agreements that the claimants have entered into was raised as one of several reasons why the truck manufacturers argued the CAT should not certify the proceedings and should not therefore allow them to go forward. The Appellants were not all the addressees of the European Commission's infringement decision in 2016. Other truck manufacturers have been allowed to join in the objection to the grant of the CPOs on the basis that they are likely to be subject to claims from the named defendants for contribution or indemnity.

127.    At the time the claims were commenced, the decision of the European Commission was binding on the CAT as to the existence of the unlawful agreement – the truck manufacturers cannot challenge in these proceedings the fact that they were parties to an unlawful agreement as found by the Commission in the decision. But the decision does not establish whether or how much loss had been caused to purchasers of trucks. The issues in the claims brought therefore include whether the infringing agreement in fact led to any overcharge for trucks bought by the members of the proposed class; if so, what was the level of the overcharge and what was the duration of any "run-off period" that is to say, the period after the termination of the agreement before prices returned to a competitive level. Establishing the existence and extent of any loss is likely to be an expensive and protracted process involving expert evidence, the processing of a great deal of data and the creation and refinement of computer modelling – an exercise similar to that described by Lord Phillips in *Factortame (No 8)*.

128.    The collective proceedings regime in the CAT was described by this court in *Merricks v Mastercard Inc* [2020] UKSC 51, [2021] Bus LR 25 ("*Merricks*"). That appeal concerned the proposed opt-out claim lodged by Mr Merricks against Mastercard arising out of the anti-competitive conduct of Mastercard in setting the intra-EEA multilateral interchange fee. The CAT refused to certify the proceedings but that decision was overturned by the Court of Appeal. This court, by a majority (Lord Briggs

and Lord Kerr of Tonaghmore JJSC and Lord Thomas of Cwmgiedd), upheld the Court of Appeal's decision. Lord Briggs in his opening paragraph noted that in such claims:

> "Proof of breach, causation and loss is likely to involve very difficult and expensive forensic work, both in terms of the assembly of evidence and the analysis of its economic effect. Viewed from the perspective of an individual consumer, the likely disparity between the cost and effort involved in bringing such a claim and the monetary amount of the consumer's individual loss, coupled with the much greater litigation resources likely to be available to the alleged wrongdoer, means that it will rarely, if ever, be a wise or proportionate use of limited resources for the consumer to litigate alone."

129.    Lord Sales and Lord Leggatt JJSC in their dissenting judgment (para 84) put the matter somewhat more forcefully, quoting Judge Posner in *Carnegie v Household International Inc* (2004) 376 F 3d 656 at 661, a decision of the US Seventh Circuit Court of Appeals:

> "The realistic alternative to a class action is not 17m individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."

130.    It has long been recognised that the collective proceedings procedure has the potential to be misused by people bringing speculative actions claiming large amounts of damages where the size of the claims and the heavy costs of defending the action may be used as a threat to induce defendants to settle: see for example the concerns of Lord Sales and Lord Leggatt in *Merricks*: para 86. The CAT's judgment in the present case illustrates how the safeguards introduced have operated for the benefit of the Appellants in this appeal.

131.    One of the requirements set by the CAT's Rule 78 is to show that the class representative will be able to pay the defendant's recoverable costs if ordered to do so (r. 78(2)(d)). In addition to addressing the enforceability of the litigation funding agreements (as I describe further below), the CAT dealt with a number of criticisms that the Appellants made about the adequacy of the funding agreements and the extent to which they, and the ATE insurance that would be in place, protected the Appellants in the event that they defeat the claims.

132.    In paras 46 to 109 of its judgment in this case, the CAT summarised the arrangements. First, the CAT analysed the funding agreement between the Road Haulage Association and the Therium Group. The funding provided by Therium in this claim amounts to £27 million to be provided in various tranches. The judgment records that during the course of the hearing and prompted by questions raised by the CAT, the agreement was amended to meet the Appellants' concerns, for example by restricting the ability of Therium to terminate funding after the first tranche or to assign its rights under the agreement. As to the funding agreement between Yarcombe and UK Trucks Claim, that provides for funding of £24 million of which £4 million was reserved for insurance premiums. Again, during the course of the hearing before the CAT and in response to points raised by the CAT, some features of the agreement were changed, for example, that the balance of the £24 million not yet spent would be placed in an escrow account in certain circumstances: para 63.

133.    The CAT also considered in detail the Appellants' concerns about the class representative's potential liability in costs. Issues raised by the truck manufacturers included the restrictions on the insurers' ability to avoid the policy for non-disclosure: see paras 80 – 83 of the CAT's judgment; whether the liability of the individual insurers who had joined together to underwrite the policies should be joint and several or only several: para 85; whether the insured should be the funder or the class representative: paras 87 – 89 and the level of cover, paras 103 - 109. At the conclusion of the judgment the CAT held that the funding arrangements proposed between the Road Haulage Association and Therium did not provide a ground for refusing to authorise the Association as a class representative pursuant to section 47B of the Competition Act and that the same applied to UK Trucks Claim and Yarcombe if certain conditions set out in the judgment were met.

**(3) The evolution of statutory controls on funding of legal proceedings**

*(a) Part 2 of the Courts and Legal Services Act 1990*

134.    The provisions with which we are concerned are found in Part II of the CLSA 1990, which comprises sections 17 to 70. Section 17 sets out the statutory objective for this Part:

> "(1) The general objective of this Part is the development of legal services in England and Wales (and in particular the development of advocacy, litigation, conveyancing and probate services) by making provision for new or better ways of providing such services and a wider choice of persons

providing them, while maintaining the proper and efficient administration of justice."

135.    Section 58 CLSA 1990 as originally enacted dealt with conditional fee agreements. These were defined as agreements for the provision of litigation or advocacy services (as defined) under which the provider's fees and expenses were to be payable only in certain circumstances. If such an agreement complied with the requirements imposed by or under that section, then it was not unenforceable "by reason only of its being a conditional fee agreement". Thus, the section did not provide that an agreement complying with the conditions set was enforceable, only that it was not unenforceable for that reason. Various requirements were set out in section 58 itself and the section empowered the Lord Chancellor to prescribe further requirements by order, following consultation with designated judges, the General Council of the Bar, the Law Society and other appropriate authorised bodies.

136.    Section 58(10) listed the kinds of proceedings in which conditional fee agreements could not be made, primarily criminal and family proceedings. Section 58(2) dealt with a term in the agreement whereby additional fees could be charged in certain circumstances (in practice where the claimant was successful) over and above the amount that would ordinarily be payable. The percentage of the uplift over the normal fees had to be specified in the agreement and, further, the Lord Chancellor could prescribe the maximum percentage permitted in relation to different kinds of proceedings. According to section 58(8) as originally enacted, although clients could be required under the agreement to pay the success fee to their lawyers, they could not recover that success fee from the opposing party as part of the costs order against the unsuccessful defendant.

137.    The Lord Chancellor exercised the power to prescribe the kinds of proceedings in which conditional fee agreements were to be allowed. The Conditional Fee Agreements Order 1995 (SI 1995/1674) specified a limited range of proceedings, primarily those relating to personal injuries, insolvency and cases before the European Commission and the European Court of Human Rights.

138.    Although the change in the law brought about by section 58 CLSA 1990 was modest, it set the structure which still pertains in respect of the control of conditional fee agreements namely:

(i)      it was limited to agreements between a person providing advocacy or litigation services and his or her client;

(ii)     it provided for such agreements to be permitted in respect of some kinds of proceedings but not others;

(iii)     it provided for requirements to be prescribed by the Lord Chancellor after consultation with the Bar Council, the Law Society and other authorised bodies; and

(iv)     it dealt with the extent to which the costs payable by the client under the agreement could be recovered from the opposing party under a costs order made in the proceedings.

139.    This change to the law was expanded by amendments made to the CLSA 1990 by the Access to Justice Act 1999 ("AJA 1999"). Section 27 of the AJA 1999 replaced the original section 58 with two new sections, section 58 and section 58A. Section 58 in this version was still limited to conditional fee agreements under which (a) fees were only payable in specified circumstances; and (b) a success fee was charged above the amount of the fees for the time spent working on the case.

140.    Section 58A dealt with the kinds of proceedings which could not be the subject of an enforceable conditional fee agreement (namely criminal proceedings and family proceedings as defined). It also dealt in more detail with some of the elements that had been covered by the original section 58, such as the kinds of conditions the Lord Chancellor could prescribe. Section 58A(6) reversed the effect of the original section 58(8) by providing that a costs order against the opposing party could now include the success fee that the client had to pay to his lawyer.

141.    As well as amending the statutory provision in relation to conditional fee agreements, the AJA 1999 inserted a new section 58B into the CLSA headed "Litigation funding agreements": see section 28 of the AJA 1999. This provided that a litigation funding agreement would not be unenforceable by reason only of being such an agreement, provided that it met certain prescribed conditions, including such requirements as the Lord Chancellor may set out in regulations. Section 58B defined a litigation funding agreement as an agreement under which the funder agreed "to fund (in whole or in part) the provision of advocacy or litigation services (by someone other than the funder) to another person ('the litigant')" and "the litigant agrees to pay a sum to the funder in specified circumstances": section 58B(2). It was thus clearly aimed at catching someone who was involved in the litigation in a different capacity from the person contemplated by sections 58 and 58A. The section did not itself define the "funder" who could enter into a litigation funding agreement; rather, section 58B(3)(a)

provided that the funder "must be a person, or a person of a description, prescribed by the Secretary of State".

142.    Section 58B mirrored the preceding sections in some ways. For example, a litigation funding agreement could not relate to proceedings of a kind to which a conditional fee agreement could not relate (section 58B(3)(c)); there was to be similar consultation with the professional regulators before the Lord Chancellor made regulations prescribing conditions (section 58B(7)); and an adverse costs order could order the opposing party to reimburse the payment due from the litigant to the funder under the agreement (section 58B(8)).

143.    I note here that neither section 58 and 58A nor section 58B as inserted by the AJA 1999 covered damages-based agreements. The scheme was only concerned with agreements under which the liability of the client to pay arose only in specified circumstances but, if it did arise, then the payment to be made could include an additional amount. In conditional fee agreements, the additional payment, described in section 58(2)(b) as a "success fee", was defined as an increase above the amount that would be payable if the fees were not conditional upon success. In litigation funding agreements in section 58B(3)(e), the additional payment was described as "an amount calculated by reference to the funder's anticipated expenditure in funding the provision of the services", in other words the uplift was a percentage of the amount expended in funding rather than an amount of fees charged.

144.    Section 27 of the AJA 1999 (and hence the new sections 58 and 58A inserted into CLSA 1990) was brought into force on 1 April 2000 by the Access to Justice Act 1999 (Commencement No 3, Transitional Provisions and Savings) Order 2000 (SI 2000/774). But section 28 AJA 1999 and hence the new section 58B CLSA 1990 has never been brought into force though it has not been repealed.

145.    There were further amendments to the CLSA 1990 provisions by the Coroners and Justice Act 2009, section 154. Section 154 falls within Part 6 of that Act dealing with legal aid and other payments for legal services. This introduced section 58AA into the CLSA 1990 dealing with damages-based agreements. The original section 58AA came into force on 12 November 2009. Again, the initial scope of the change introduced by this original version of section 58AA CLSA 1990 was modest. It applied only to a damages-based agreement relating to an employment matter, that is to say a matter which could be the subject of proceedings before an employment tribunal. In this original version of section 58AA:

(i)      Subsections (1) and (2) provided that a damages-based agreement which related to an employment matter and which satisfied the conditions set out in the section or prescribed by the Lord Chancellor was "not unenforceable by reason only of its being a damages-based agreement" but that if it related to an employment matter and did not satisfy those conditions then it was unenforceable;

(ii)     A damages-based agreement was defined as an agreement with a person providing advocacy services, litigation services or claims management services, under which the recipient of the services pays the service provider if the recipient obtains a financial benefit from the matter and the amount of the payment is determined by reference to the amount of that benefit;

(iii)    Subsection (4) provided for the Lord Chancellor to prescribe conditions additional to those set out in the section itself;

(iv)     Subsection (8) provided that it did not apply to any agreement that predated the making of the first regulations made by the Lord Chancellor under subsection (4).

146.    The Lord Chancellor made the Damages-Based Agreements Regulations 2010 (SI 2010/1206) pursuant to section 58AA(4) CLSA ("the 2010 DBA Regulations"). These came into force on 8 April 2010. At this stage, the 2010 DBA Regulations, like section 58AA itself, only applied to damages-based agreements in employment matters.

147.    Section 58AA CLSA as inserted by the Coroners and Justice Act 2009 was further extensively revised by section 45 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012 ("LASPO 2012"). Section 45 amended section 58AA by removing the limitation of the provision to employment matters and applying instead the restriction on the kinds of proceedings that already applied to conditional fee agreements under section 58A. Section 58AA in its current form, following the amendments made by LASPO 2012, has already been set out in para 102 above. LASPO 2012 also inserted section 58C into CLSA 1990. This dealt with the conditions that must be met before a costs order made in favour of a party to proceedings could include the premium for a costs insurance policy insuring against the risk of a party incurring a liability in those proceedings.

148.    The amendments to section 58AA by LASPO 2012 were wholly brought into force by 1 April 2013. On the same date the Damages-Based Agreements Regulations

2013 (SI 2013/609) ("the 2013 DBA Regulations") came into force replacing the 2010 DBA Regulations.

### (b) Case law on section 58AA CLSA 1990

149.    The parties drew our attention to two recent cases considering the application of section 58AA. They illustrate, in my view, the courts' awareness that provisions enacted to enable "new or better ways" for legal services to be provided should not be used either by the client to avoid paying their own lawyers for successful work done pursuant to the retainer or by the opponent to disrupt the proceedings and avoid the adverse costs consequences that normally follow from having fought and lost.

150.    In *Lexlaw Ltd v Zuberi* [2021] EWCA Civ 16, [2021] 1 WLR 2729 Ms Zuberi brought a claim against a bank alleging that she had been mis-sold certain financial products. Her solicitors agreed to work on her claims in exchange for 12% of the damages recovered, payable if the litigation was successful. She accepted an offer of settlement from the bank but then refused to pay her lawyers, contending that the agreement was unenforceable pursuant to section 58AA CLSA. She asserted that the agreement did not comply with the 2013 DBA Regulations because it provided that if the client terminated the retainer prematurely, (which she had not) she would be liable to pay the solicitor's time costs up to the date of termination. Ms Zuberi said that this was contrary to a regulation which prohibited any term which required an amount to be paid by the client other than the percentage share.

151.    Lewison LJ and Newey LJ followed different routes to uphold the entitlement of Ms Zuberi's solicitors to the share of her compensation they had earned. Lewison LJ held that the term of the agreement dealing with what would happen on early termination was not part of the damages-based agreement at all and so was not subject to the 2013 DBA Regulations. Newey LJ held that the 2013 DBA Regulations did not regulate and were not intended to regulate fees payable to legal representatives in the event of early termination of the agreement. Coulson LJ agreed with the reasoning of both Lewison and Newey LJJ.

152.    Lewison LJ quoted at para 41 of his judgment from the Explanatory Memorandum accompanying the 2013 DBA Regulations. This addressed how much regulation of damages-based agreements was appropriate where the agreement was entered into by qualified legal representatives. The Government had concluded that the conduct of such representatives was subject to regulation by their professional bodies so no further regulation of termination fees was required. In this regard, the

Memorandum noted the draconian consequences of a failure to comply with the 2013 DBA Regulations:

> "7.5 … Moreover, the consequence of failing to comply with these Regulations is that the DBA will not be enforceable and, in those circumstances, the representative will receive no payment. There is a concern that this could lead to attempts to avoid payment, by suggesting that the legal representative had failed to comply with one or more of the additional regulations (as happened when CFAs were subject to greater regulation), leading to satellite litigation."

153.    An example of satellite litigation instigated by the opposing party is *Akhmedova v Akhmedov* [2020] Costs LR 901. In that case a litigation funding agreement was entered into by a wife to fund her attempts to enforce an award of over £450 million made in her favour in financial relief proceedings on her divorce. Her son was a defendant to her claim as it was alleged that he held assets transferred to him by his father to put them beyond her reach. The son challenged the funding agreement as unlawful and champertous. He applied for an injunction to prevent the wife from instructing solicitors funded by the litigation funders and sought disclosure of the terms of the funding arrangements.

154.    Knowles J referred to the funding being provided to the wife by a well-known and London listed professional third party funder: para 18. The funder was a founding member of the ALF and committed to the Code of Conduct which had been endorsed by the Civil Justice Council. The precise terms of the arrangement were not known. The son argued that family proceedings were among the kinds of proceedings in which conditional fee agreements were not permitted by section 58 CLSA 1990. By analogy, he argued, litigation funding should not be permitted because many of the same concerns which prompted the exclusion of family proceedings from section 58 also applied to LFAs. Knowles J rejected the analogy between conditional fee agreements and litigation funders (para 70). She stressed the importance of litigation funding in enabling claimants in family proceedings to enforce their rights:

> "71. Absent any evidence for the improper conduct of the Wife and her legal advisors in these proceedings or any statutory barrier to her funding arrangements, Mr Owen QC's [the son's counsel's] contentions came perilously close to a submission that there was an issue of principle as to whether third-party funding was per se permissible in family proceedings. Those submissions are misplaced, in my view, in

circumstances where third-party funding has been accepted in this jurisdiction to be desirable to facilitate access to justice and where first-instance decisions in the Family Division have concluded that (a) it is "a necessary and invaluable service in the right case" (per Francis J at para 53 in *Weisz v Weisz* [2019] EWHC 3101 (Fam)) and (b) that nothing should be said "that makes it even more difficult for litigants to obtain litigation funding in the future, particularly given that there is no legal aid available in this area anymore" (per Moor J at para 9 of *Young v Young* [2013] EWHC 3637 (Fam))."

155.    She declined to investigate the terms of the Wife's arrangements with the funder:

"73. … Litigation funding practised by a funder adhering to the Code of Conduct has been endorsed by the senior courts in robust terms. Funding is being provided post-judgment to enable the Wife to secure the recovery of sums already awarded to her in the face of the Husband's contumelious conduct (assisted by others) in evading and frustrating the enforcement of the judgment debt. Without such funding, the Wife would lose access to justice and the chance of recovering the monies awarded to her in December 2016."

**(4) Claims management services**

156.    Section 58AA(7) provides that "claims management services" has the same meaning as in section 419A of FSMA 2000 which I set out at the start of this judgment. That definition, the Appellants say, gives a very broad meaning to claims management services which covers the funding that Therium and Yarcombe provide here. That means, they submit,

(i)      that the Respondent funders are persons "providing … claims management services" within section 58AA(3)(a); which in turn means that

(ii)     the agreement is a damages-based agreement within section 58AA(1); which in turn means that

(iii)    because the agreement does not satisfy the requirement in section 58AA(4)(c) that it comply with the prescribed terms and conditions it is unenforceable because of section 58AA(1).

157.    In order to decide if there is any merit in this submission it is necessary to back track a little to consider what "claims management services" as defined in section 419A FSMA are.

158.    Section 419A of FSMA is part of a regime which is not concerned with the enforceability or unenforceability of agreements but with the authorisation and regulation of people who, broadly speaking, act for clients who wish to pursue a legal dispute. Section 419A was inserted into FSMA 2000 by section 27 of the Financial Guidance and Claims Act 2018 ("FGCA 2018") in order to enable the provision of claims management services to be made a regulated activity within the meaning of FSMA. The FGCA 2018 was not the first occasion on which people who provide claims management services were required to be authorised. Section 419A of FSMA derived from section 4(2) of the Compensation Act 2006.

159.    Part 2 of the Compensation Act 2006 provided for the regulation of claims management services in the following terms:

> "**4 Provision of regulated claims management services**
>
> (1) A person may not provide regulated claims management services unless—
>
> (a) he is an authorised person,
>
> (b) he is an exempt person,
>
> (c) the requirement for authorisation has been waived in relation to him in accordance with regulations under section 9, or
>
> (d) he is an individual acting otherwise than in the course of a business.

(2) In this Part—

(a) 'authorised person' means a person authorised by the Regulator under section 5(1)(a),

(b) 'claims management services' means advice or other services in relation to the making of a claim,

(c) 'claim' means a claim for compensation, restitution, repayment or any other remedy or relief in respect of loss or damage or in respect of an obligation, whether the claim is made or could be made—

(i) by way of legal proceedings,

(ii) in accordance with a scheme of regulation (whether voluntary or compulsory), or

(iii) in pursuance of a voluntary undertaking,

(d) 'exempt person' has the meaning given by section 6(5), and

(e) services are regulated if they are—

(i) of a kind prescribed by order of the Secretary of State, or

(ii) provided in cases or circumstances of a kind prescribed by order of the Secretary of State.

(3) For the purposes of this section—

(a) a reference to the provision of services includes, in particular, a reference to—

(i) the provision of financial services or assistance,

(ii) the provision of services by way of or in relation to legal representation,

(iii) referring or introducing one person to another, and

(iv) making inquiries, and

(b) a person does not provide claims management services by reason only of giving, or preparing to give, evidence (whether or not expert evidence)."

160.    Other sections in Part 2 of the Compensation Act 2006 provided:

(i)    for the Secretary of State to designate by order who was going to be the Regulator for the purposes of section 4 (section 5);

(ii)    for the Secretary of State by order to provide for exemptions from the authorisation requirement for people who were regulated by specified bodies or in specified circumstances (section 6);

(iii)    that it was a criminal offence for a person to provide regulated claims management services unless he is authorised or exempt (section 7); and

(iv)    that an order under section 4(2)(e), that is to say, an order specifying which claims management services are to be regulated, could not be made until the Secretary of State had consulted the Office of Fair Trading and other appropriate persons and unless a draft had been laid before and approved by both Houses of Parliament (section 15).

161.    To implement section 4 of the Compensation Act 2006, an order was made under section 4(2)(a) and section 15: the Compensation (Regulated Claims Management Services) Order 2006 (SI 2006/3319) ("the Scope Order"). That order specified the kinds of claims management services which were brought into regulation if they were rendered in relation to the making of a claim of a kind described in that order. The kinds of services to be regulated were listed in article 4(2) of the Scope

Order. They included advertising for persons who may have a cause of action, referring clients to solicitors, investigating the merits of the claim or representing a claimant. The kinds of claims covered included personal injury claims, housing disrepair claims and claims relating to financial services or products. The Order did not refer to providing financial services or assistance or to claims relating to loss suffered from unlawful anti-competitive agreements.

162.    The role of the Regulator appointed under section 4 of the 2006 Act to authorise and set standards for people carrying on regulated claims management services was undertaken by the Claims Management Regulator Unit in the Ministry of Justice. The Regulator issued rules governing the conduct of regulated claims management services and the Compensation (Claims Management Services) Regulations 2006 (SI 2006/3322) set up the regime whereby providers could apply for authorisation.

163.    Subsequently it was decided to transfer regulation of providers of regulated claims management services from the Ministry of Justice to the Financial Conduct Authority ("the FCA") by incorporating the separate regulatory regime under the Compensation Act 2006 into the existing FSMA 2000 regime. Part 2 of the FGCA 2018 achieved that transfer of function making the substantial amendment to FSMA that was needed in order to effect this change.

164.    The fundamental provision in FSMA, section 22, describes the kinds of activity which can be specified by the Treasury as a regulated activity and thereby brought within the regulatory regime established by the Act. Section 22 was amended by the insertion of subsection (1B) by the FGCA 2018. That new subsection provided that an activity could be specified as a regulated activity if it was carried on by way of business in Great Britain and "is, or relates to, claims management services". So the potential for claims management services to be made regulated activities under FSMA was thereby created. The phrase was inserted into many other sections of FSMA by the FGCA 2018. The Financial Services and Markets Act 2000 (Claims Management Activity) Order 2018 (SI 2018/1253) ("the FSMA Claims Management Activity Order") made substantial amendments to the secondary legislation under FSMA in order to effect this change.

165.    Article 4 of the FSMA Claims Management Activity Order amended the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 (SI 2001/544) so that the potential for regulation created by the insertion of subsection (1B) into section 22 of FSMA was realised. The FSMA Claims Management Activity Order then inserted a new Part 3B (headed "Claims Management Activities in Great Britain") into the FSMA Regulated Activities Order. Part 3B comprised articles 89F – 89W. It specified the kinds

of claim in respect of which claims management activity was to be regulated as personal injuries claims, housing disrepair claims, some social security benefits claims, employment related claims and claims made under section 75 of the Consumer Credit Act 1974 or under the Criminal Injuries Compensation Scheme. Part 3B then specified which activities were regulated in relation to each of those kinds of claims. The provision of financial services or assistance are not mentioned.

166.    When it was originally inserted into the CLSA 1990 by the Coroners and Justice Act 2009 section 154, section 58AA defined "claims management services" as having the same meaning as in section 4(2) of the Compensation Act 2006. The reference to section 419A of FSMA was substituted by article 90 of the FSMA (Claims Management Activity) Order 2018.

167.    It is common ground that the two definitions cover the same services although the wording of section 4(2) and of section 419A are rather different. I shall refer to the two sections as "sections 4/419A".

168.    No one has suggested that the funding services provided by Therium and Yarcombe in these proceedings were specified as regulated activity either under the Compensation Act 2006 or under FSMA 2000 or that they need to be authorised under either of those regimes in order lawfully to operate the business that they are operating. I note here that Mr Leslie Perrin, Chairman of Calunius Capital LLP, states in his evidence that Calunius (the funding group of which Yarcombe is part) has in fact been authorised by the FCA since 2007 because it offers investment advice to its funds. The regulatory regime under the Compensation Act 2006 was not therefore the only means by which some control on the content of the agreements between funders and their customers could be exercised.

169.    There is limited case law on the meaning of the term "claims management services". The Divisional Court at paras 27 and 103 of the judgment now under appeal referred to the decision in *Meadowside Building Developments Ltd v 12-18 Hill Street Management Co Ltd* [2020] Bus LR 917 ("*Meadowside*"). The Divisional Court agreed with the conclusion of the CAT that the funding agreement in *Meadowside* was very different from the kind of third party litigation funding agreement that we are concerned with here. That case involved a damages-based agreement in adjudication proceedings on behalf of the liquidator of an insolvent company which had undertaken building work for which it had not been paid. The firm, Pythagoras, was appointed to "take all steps to ascertain and recover amounts due" to the insolvent company. The adjudication found that a balance was due to the insolvent company from the owners of the building. As part of the arrangement between the liquidator and Pythagoras, Pythagoras guaranteed payment of, amongst other things, any costs award made in

favour of the building owner. The Deputy High Court Judge considered the application of the 2013 DBA Regulations to the arrangement at paras 91 onwards. At para 97 he held that Pythagoras may have been providing all of the "other services" within the definition of claims management services. It could not sensibly be disputed that it was providing financial assistance since that was "at the very heart" of its services. In reality it was also providing advice and other services to ascertain and recover the debt. He, rightly in my view, rejected a submission that section 58AA should be read as limited to *regulated* claims management services. Having concluded that the arrangement was a damages-based agreement falling within section 58AA the judge held that it did not comply with the 2013 DBA Regulations, because the percentage of damages to which Pythagoras was entitled exceeded the maximum of 50%. The agreement was therefore unenforceable.

170.    I do not find *Meadowside* assists in resolving the present issue. Pythagoras was clearly managing the claim on behalf of the liquidator and providing a bundle of services that were properly described as claims management services. Those services included the services listed in section 419A(3). That does not help in deciding whether each such service amounts to providing claims management services if that is the only service which is provided.

**(5) The decisions in the CAT and the Divisional Court in this case**

171.    As I have mentioned, the issue of the enforceability of the damages-based litigation funding agreements supporting the Respondents' proposed collective proceedings was considered by the CAT as one of a number of issues raised by the Appellants objecting to the certification of the proceedings under section 47B of the Competition Act 1998. The CAT ordered the hearing of a preliminary issue, namely the question whether there were any aspects of the funding arrangements which should result in the Respondents not being authorised to act as class representatives. Not all the defendants to the proceedings advanced the argument that the agreements were unenforceable. The argument was put forward primarily by DAF, supported by MAN and Iveco.

172.    The CAT (Roth J, Dr William Bishop and Professor Stephen Wilks) handed down its ruling on that preliminary issue on 28 October 2019 ([2019] CAT 26). The CAT set out the legislative history of the statutory provisions and the orders made under them. They described the background to the enactment of section 58AA originally in the Coroners and Justice Act 2009. They referred to Sir Rupert Jackson's comprehensive review of litigation costs, the Preliminary Report dated in May 2009 and the Final Report dated in December 2009. The Reports discussed third party funding and addressed the question whether it should be regulated. Sir Rupert had recommended

that full regulation of litigation funding was not required and that a voluntary code to which all litigation funders subscribe should be drawn up: see para 31 of the CAT's judgment. That led to the founding of the ALF in November 2011 and the publication of the first Code of Conduct for Litigation Funders.

173.    The CAT relied on a number of principles of statutory construction; the importance of context, the relevance of Explanatory Notes as an aid to construction, the presumption against absurdity and the relevance of secondary legislation as an aid to the construction of the primary legislation under which it is made: para 38.

174.    The CAT held, in para 41, that the Respondents were correct that the reference in section 4(2) read with section 4(3)(a) of the Compensation Act 2006 to "the provision of financial services or assistance" "in relation to the making of a claim" is to be interpreted as applying "in the context of the management of a claim". I take that to mean, in the context of the management of a claim by the same person who is providing the financial assistance. Litigation funders, the CAT said, were engaged in the funding of a claim and not in the management of the making of the claim. On that basis they were not providing "claims management services" and so did not come within the definition of a damages-based agreement in section 58AA.

175.    The CAT also considered that viewed in its context, section 58AA was never intended to apply to litigation funding agreements. Those were intended to be covered by section 58B CLSA. This view was supported by the wording of the 2013 DBA Regulations which were not apt to describe the relationship between a funder and the recipient of financial assistance. This was further supported by the Jackson Costs Review material: "it would have been flying in the face" of those conclusions if Parliament had, by amending section 58AA rendered unenforceable agreements which complied with the ALF's Code of Conduct (para 44). They then turned to consider the nature and adequacy of the funding arrangements as I have described.

176.    The Appellants sought to challenge the CAT's decision on this point on appeal. There was a procedural issue to be resolved as to whether that challenge could be by way of appeal under section 49(1A)(a) of the Competition Act 1998 or whether it should be brought by way of judicial review. The Appellants brought an application for permission to appeal or alternatively for permission to bring proceedings for judicial review, (for which purpose the Court would sit as a Divisional Court of the Queen's Bench Division) with the substantive hearing to follow in either case if permission were granted. The Court (Henderson, Singh and Carr LJJ) held that the correct route was the judicial review route and that the Court of Appeal would have no jurisdiction to hear the substantive issue on appeal from the CAT: see para 60 of the judgment at [2021]

EWCA Civ 299, [2021] 1 WLR 3648. I shall therefore refer to that judgment as the judgment of the Divisional Court.

177.    Henderson LJ's judgment proceeded on the basis that the relevant search must be for the meaning of the phrase "claims management services" on its first enactment in section 4(2) of the Compensation Act 2006: para 64. He referred to principles of statutory construction, in particular the presumption against absurdity. Having set out the legal, social and historical context of section 4, including *Factortame (No 8)*, *Arkin* and the enactment of section 58B CLSA, he asked what was the particular mischief that section 4 was intended to remedy. He concluded at para 78 that there was nothing to suggest that non-champertous funding of litigation by professional third-party funders in return for a reasonable share of the client's recoveries formed any part of the explicit mischief that section 4 sought to remedy. He concluded at para 87 that:

> "Although on a literal, acontextual, reading of the extended definition, the words 'the provision of financial services or assistance' 'in relation to the making of a claim' could be read as including the provision of litigation funding by a third party which plays no part in the management of the claim, I consider that the Tribunal was correct to accept the submission of Mr Kirby for the RHA that those words are 'to be interpreted as applying in the context of the management of a claim'…"

178.    His conclusion was based in particular on the presence of section 58B CLSA even though it had not been brought into force. The second reason was the structure and wording of the definition itself (para 91). He referred to the principle of construction known as "the potency of the term defined" which I discuss below. He said that: (para 94).

> "it seems to me entirely natural to read the words of the definition as both coloured and conditioned by the reference to 'claims management' in the phrase which is being defined, so that the 'advice or other services in relation to the making of a claim' must be understood as referring to advice or other services of a claims management nature, or having to do with the management of a claim, and the reference in subsection (3)(a)(i) to the provision of financial services or assistance should likewise be read as referring to the provision of such services or assistance in the context of claims management."

179.    He held, at para 95, that the fact that the concept of claims management services had no standard or accepted legal meaning in 2006 shows that Parliament was content to leave its precise meaning to be developed by the courts in the light of the purpose of the statutory scheme and the guidance which could be obtained from the relatively open-textured terms of the definition. One must not, however, "ignore the relevance of the concept of 'claims management' as a central factor in delimiting the general nature and extent of the activities which Parliament intended to be subject to the regulatory scheme of the 2006 Act." He therefore granted permission to the Appellants to apply for judicial review but dismissed the claim on the merits. Singh and Carr LJJ agreed with his judgment.

## (6) Construing section 4/419a

180.    If section 58AA CLSA had been enacted without subsection (7), I doubt it would have occurred to anyone that litigation funding agreements of the kind supporting the truck purchasers' claims were caught by the term "claims management services". Litigation funders are not offering to manage their clients' claims, they are not lawyers and they do not represent their customers in any kind of proceedings, however informal. There is always one or more other firms or individuals providing litigation services or advocacy services to the funded person. Those other firms work for months or years, charging an hourly rate for preparing the case, liaising with the court or tribunal, liaising with the opposing side or with other claimants. The litigation funders lend a large capital sum for which they would, normally, be paid by the repayment in due course of that capital together with interest, set at a rate which covers whatever administrative costs are incurred in the initial negotiation of the loan together with the cost of money.

181.    The Appellants' submissions as to why nonetheless the Respondents are providing claims management services for the purpose of section 58AA can be summarised as follows. The definition of "claims management services" in section 4(2) of the Compensation Act 2006 and now in section 419A FSMA was cast very wide because it was simply delineating the pool of activities from which the activities to be regulated could be drawn. There were no consequences arising for a firm providing claims management services from the fact that its business now fell within that wide definition, unless or until the particular service it was providing was specified by an order made under those regimes. There was no reason therefore for Parliament not to include the activity of litigation funding in the definition of "claims management services" even if litigation funding could not be described as such by any normal meaning of those words. That, they say, is what Parliament meant in section 4(3)(a)/419A(3) by stipulating that the reference to the provision of services "includes, in particular," (in section 4(3)(a))or just "includes" (in section 419A(2)) a reference to

the provision of financial assistance. In other words, they submit that because a reference to claims management services "includes" a reference to the provision of financial assistance, that means that the provision of financial assistance becomes a claims management service, even if carried out separately. It does not have to be provided as part of an overall service that could properly be described as the service of managing a claim in order to be caught by the definition.

182.    The Appellants then make the jump from section 4/section 419A FSMA to section 58AA CLSA by submitting that the effect of section 58AA, now read together with section 419A FSMA, is that any person who provides one of the "other services" listed in section 419A(2)(a) to (d) of FSMA must be "a person providing … claims management services" within the meaning of section 58AA(3)(a) so that the agreement between that person and the recipient of the services is a damages-based agreement within section 58AA(1).

*(a) The relevant principles of statutory construction*

183.    Before construing section 4(3) and section 419A(2) I must first marshal the canons of statutory construction which will help determine whether what the Appellants contend is correct. First, I consider which interpretative criteria are relevant to the construction of section 4/section 419A. These are the general purposive approach to construction, the presumption against absurdity and the "potency of the term defined" or, as I find more relevant in the current dispute, what is meant by "including" something as part of the definition in this case. In construing section 58AA CLSA, additional tools can be deployed, namely the terms of the secondary legislation implementing the primary legislation, the relevance of a statutory provision which has not been brought into force, the effect of incorporating definitions from other enactments and reliance on the likely consequences of adopting either of the two rival constructions.

184.    I address first the interpretative criteria relevant for interpreting section 4/419A.

185.    **The purposive approach to construction** There are many passages in recent case law which set out how the courts should construe legislation. In *R (Project for the Registration of Children as British Citizens) v Secretary of State for the Home Department* [2022] UKSC 3, [2023] AC 255 Lord Hodge DPSC referred to some of the earlier authorities when describing the task: (paras 29 to 31)

"29 … Words and passages in a statute derive their meaning from their context. A phrase or passage must be read in the context of the section as a whole and in the wider context of a relevant group of sections. Other provisions in a statute and the statute as a whole may provide the relevant context. They are the words which Parliament has chosen to enact as an expression of the purpose of the legislation and are therefore the primary source by which meaning is ascertained.

"31 Statutory interpretation involves an objective assessment of the meaning which a reasonable legislature as a body would be seeking to convey in using the statutory words which are being considered."

186.    The court is often faced with legislative wording which appears to run counter to the purpose at which the provisions were directed. There is plenty of guidance in the case law as to how to approach such a problem. *Littlewoods Ltd v Revenue and Customs Comrs* [2017] UKSC 70, [2018] AC 869, was a judgment delivered in the long-running dispute over whether the interest to be paid by HMRC to a taxpayer when refunding overpaid tax should be calculated on a compound or simple basis. One issue was whether the statutory provisions conferring a right to interest for taxpayers who had overpaid VAT was intended to exclude the possibility of a common law claim to such interest.

187.    In their joint judgment, Lord Reed and Lord Hodge JJSC (with whom the other Justices agreed) accepted that read literally, the statutory provision did not exclude common law claims. On the contrary, the statutory entitlement to interest was expressly stated to arise if and to the extent that HMRC would not be liable to pay interest apart from that section. Further, there were other sections in the same enactment which did expressly exclude common law claims. They considered whether it was possible, nevertheless, to construe the critical words more narrowly than their literal sense so that they referred only to preserving the entitlement to interest under other statutory provisions but excluded a right under the common law. They noted that limitations had been placed by Parliament on claims to interest under the statute and these would be defeated if it were possible for the taxpayer to bring a common law claim instead. Parliament could not have intended the special regime to be capable of circumvention in that way. They therefore upheld that narrower construction, at para 39:

"It is not a literal construction, but a departure from a literal construction is justified where it is necessary to enable the provision to have the effect which Parliament must have intended."

188.    In *Littlewoods*, Lord Reed and Lord Hodge cited the well-known passage from the speech of Lord Bingham of Cornhill in *R (Quintavalle) v Secretary of State for Health* [2003] 2 AC 687, para 8. Lord Bingham stated that the court's attention should not be confined to a literal interpretation of the particular provision giving rise to difficulty. A literal interpretation has its dangers in, for example, encouraging prolixity in drafting:

"... It may also (under the banner of loyalty to the will of Parliament) lead to the frustration of that will, because undue concentration on the minutiae of the enactment may lead the court to neglect the purpose which Parliament intended to achieve when it enacted the statute. Every statute other than a pure consolidating statute is, after all, enacted to make some change, or address some problem, or remove some blemish, or effect some improvement in the national life. The court's task, within the permissible bounds of interpretation, is to give effect to Parliament's purpose. So the controversial provisions should be read in the context of the statute as a whole, and the statute as a whole should be read in the historical context of the situation which led to its enactment."

189.    **The presumption against absurdity** In *Shahid v Scottish Ministers* [2015] UKSC 58, [2016] AC 429, para 20 Lord Reed observed that purposive construction can only go so far: "No amount of purposive interpretation can however entitle the court to disregard the plain and unambiguous terms of the legislation." But he went on to observe that there are more powerful tools available:

"21 The only principle of statutory interpretation which might enable the plain meaning of legislation to be circumvented is that it can be given a strained interpretation where that is necessary to avoid absurd or perverse consequences: see, for example, *Inland Revenue Comrs v Hinchy* [1960] AC 748, 768 (Lord Reid), and *R (Edison First Power Ltd) v Central Valuation Officer* [2003] 4 All ER 209, paras 25 (Lord Hoffmann) and 116 (Lord Millett). Indeed, even greater violence can be done to statutory language where it is plain that there has been a

drafting mistake: *R v Federal Steam Navigation Co Ltd* [1974] 1 WLR 505, 509 (Lord Reid), and *Inco Europe Ltd v First Choice Distribution* [2000] 1 WLR 586, 592 (Lord Nicholls of Birkenhead)."

190. *Bennion, Bailey and Norbury on Statutory Interpretation,* 8th ed (2020) ("*Bennion*") states the presumption that an absurd result is not intended in the following terms, at section 13.1:

> "(1) The court seeks to avoid a construction that produces an absurd result, since this is unlikely to have been intended by the legislature. Here, the courts give a very wide meaning to the concept of 'absurdity', using it to include virtually any result which is impossible, unworkable or impracticable, inconvenient, anomalous or illogical, futile or pointless, artificial, or productive of a disproportionate counter-mischief.
>
> (2) The strength of the presumption against absurdity depends on the degree to which a particular construction produces an unreasonable result.
>
> (3) The presumption may of course be displaced, as the ultimate objective is to ascertain the legislative intention."

191. Earlier formulations of that principle in *Bennion* have been approved by this court, see for example *R v McCool* [2018] 1 WLR 2431, paras 23 – 25 (Lord Kerr of Tonaghmore JSC) and the observations of Lord Millett in *R (Edison First Power Ltd) v Central Valuation Officer* [2003] 4 All ER 209, paras 116-117.

192. **The potency of the term defined** The Respondents rely on the principle sometimes referred to as "the potency of the term defined". They submit that the other services listed in section 4(3)(a)/419A(2) only fall within the scope of the term "claims management services" to the extent that they are part and parcel of services involving the managing of claims. The principle, if such it is, has been used in a number of cases involving difficult points of statutory construction. In *MacDonald (Inspector of Taxes) v Dextra Accessories* [2005] UKHL 47, [2005] 4 All ER 107, ("*Dextra*") the House of Lords was considering the meaning of the words "potential emoluments" in a tax

context. Lord Hoffmann, with whom the other members of the House agreed, said at para 18:

> "In the ordinary use of language, the whole of the funds were potential emoluments. They could be used to pay emoluments. It is true that, as Charles J pointed out, 'potential emoluments' is a defined expression and a definition may give the words a meaning different from their ordinary meaning. But that does not mean that the choice of words adopted by Parliament must be wholly ignored. If the terms of the definition are ambiguous, the choice of the term to be defined may throw some light on what they mean."

193.   Lord Hoffmann made a similar point in *Oxfordshire County Council v Oxford City Council* [2006] UKHL 25, [2006] 2 AC 674 ("*Oxfordshire*"). That case concerned the definition of a village or town green and whether an area of scrub land much of which was described as "impenetrable by the hardiest walker" fell within the statutory definition of a village or town green. Under the heading "What is a village green?" Lord Hoffmann referred to a "visceral unease" some might feel at the lack of resemblance between the land sought to be registered in the case before the House and the "traditional" village green:

> "37 … Perhaps, one might feel, the concept could be narrowed by importing into the definition some of the qualities which are associated with the ordinary use of the term defined - what might be called an 'Auburn test', not expressly stated in the definition but implied from the choice of the words 'town or village green'.
>
> 38 My Lords, it is true that in construing a definition, one does not ignore the ordinary meaning of the word which Parliament has chosen to define. It is all part of the material available for use in the interpretative process. But there are several reasons why I think that it would be unwise for your Lordships, at any rate without full argument, to embark upon the process of introducing some elements of the traditional village green into the statutory definition."

194.   The reference to the "Auburn test" was to the green at Auburn described in wistful terms in Goldsmith's poem *The Deserted Village* (1770) from which Lord

Hoffmann had quoted at para 3 of his speech. Lord Rodger of Earlsferry at para 115 agreed with Lord Hoffmann that it should not be so limited. Lord Walker of Gestingthorpe noted at para 128 that Parliament had deliberately chosen not to adopt a narrower definition that had been proposed by the Royal Commission on Common Land 1955–1958 (1958) (Cmnd 462). Lord Scott of Foscote at paras 81 – 83 placed greater reliance on the potency of the term defined. He held that the ordinary meaning of the term did affect its scope, though he agreed with the outcome of the appeal on other grounds. He said:

> 82 In Bennion, *Statutory Interpretation*, 4th ed (2002), p 480, under the side-heading 'Potency of the term defined', the author says:
>
> 'Whatever meaning may be expressly attached to a term, it is important to realise that its dictionary meaning is likely to exercise some influence over the way the definition will be understood by the court. It is impossible to cancel the ingrained emotion of a word merely by an announcement.'
>
> The author gives a number of examples from decided cases which illustrate, convincingly in my opinion, his point. …
>
> 83 My Lords, I would apply the same approach to construction of the definition of 'town or village green' in section 22(1) of the 1965 Act, or, for that matter, to construction of 'town or village green' in the Victorian statutes to which I have referred. I do not believe it can be correct to insist on a literal application of the section 22(1) definition so as to apply it to land that no one would recognise as a town or village green."

195.    Lady Hale asked the question "Is there some essence of the very expression 'town or village green' which would preclude or at least militate strongly against the registration of such land as a green?": para 145. She said that she had considerable sympathy for the views expressed by Lord Foscote and noted that the powerful points expressed by Lord Hoffmann depended to a large extent on how the term had been construed since the 1965 Act was passed. She preferred to leave the issue for another day.

196.    The Appellants in this appeal argue that a term defined only has "potency" for this purpose if it has a settled meaning. They rely for this proposition on *Phillips v News Group Newspapers Ltd and another* [2012] UKSC 28, [2013] 1 AC 1 ("*Phillips*"). The issue there was whether information left by people in voicemail messages recorded on their friends' phones was "technical or commercial information" falling within the definition of "intellectual property" in section 72(5) of the Senior Courts Act 1981. Section 72(2)(a) referred to "proceedings for infringement of rights pertaining to … intellectual property" for the purpose of removing the privilege against self-incrimination. "Intellectual property" was then defined as including technical or commercial information.

197.    It was accepted by the parties in *Phillips* that there was no universal definition of "intellectual property" and that Parliament had adopted a variety of definitions for different situations. Lord Walker referred at para 19 to Lord Hoffmann's dictum in *Dextra* as to the potency of the defined term. But he concluded, at para 20, that there was no particular potency about the expression because although there was general consensus as to its core content, there was no general consensus as to its limits. For present purposes, he said, the essential point was that the definition contained the words "technical or commercial information" so that Parliament had made plain that information within that description was to be regarded as intellectual property for this purpose whether or not it would otherwise be so regarded.

198.    Lord Walker, however, acknowledged that there was some "limited potency" in the expression and more generally in the legislative purpose of section 72 in enhancing protection against unlawful trade competition. Further, that might be of assistance in determining the meaning of the phrase "technical or commercial information".

*(b) Applying those principles to the construction of section 4(2) and (3)/419A(2)*

199.    As regards a purposive construction of the provision, the CAT and the Divisional Court referred extensively to the history and context of the provisions in Part 2 of the CLSA 1990 and the regulation of claims management services in the Compensation Act 2006: see paras 22 to 35 of the CAT judgment and paras 69 to 79 of the Divisional Court judgment. The Divisional Court considered the mischief which section 4 was intended to remedy at paras 73 onwards. They referred to the Explanatory Notes to the Act which in turn referred to the Better Regulation Task Force report "Better Routes to Redress" (2004) and to the Government consultation paper, and the responses paper. They also quoted from the Explanatory Memorandum to the 2006 Scope Order. Henderson LJ concluded:

"78 Taking stock at this point, it seems reasonably clear to me that the purpose of introducing statutory regulation of claims management services in section 4 of the 2006 Act and its associated Scope Order was to enhance consumer protection in areas where the activities of "claims intermediaries" had been causing widespread public concern. Typical activities of the kind causing such concern might be broadly described as proactive "claims farming" or the formation of books of potential claimants to pursue legal claims, followed by assistance in the formulation and bringing of those claims, in relation to matters such as personal injuries, employment, housing, and financial products or services, in all of which consumer protection is likely to be much needed: compare article 4(2) and (3) of the Scope Order, set out in the Tribunal's judgment at para 28.

79 Conversely, there is no suggestion in any of the material I have reviewed which indicates that regulation of non-champertous funding of litigation by professional third-party funders in return for a reasonable share of the client's recoveries, of the kind exemplified in *Factortame (No 8)* [2003] QB 381 and *Arkin* [2005] 1 WLR 3055, formed any part of the explicit mischief that section 4 of the 2006 Act sought to remedy."

200.    Neither party before this court sought to rely on anything that was said in Parliament during the debates on the Bill which became the Compensation Act 2006. The debates at Second Reading in the House of Commons appear to have focused on whether trade unions would be caught and should be exempted.

201.    In my judgment, a purposive construction does not point clearly either in favour of or against a particular construction. The high point for the Appellants is a comment in the Explanatory Notes to the 2006 Act to the effect that the Act "provides the outline regulatory framework to authorise providers who would be required to comply with rules and codes of practice": see the passage quoted by the Divisional Court at para 75. The Respondents on the other hand point to the undoubted fact that litigation funders were not and never have been brought within the regulatory regime created by the Act. Further, the Respondents argue that the 2006 Act was enacted shortly after the Court of Appeal had stated very clearly in *Factortame (No 8)* and *Arkin* that the courts at least did not regard litigation funding as problematic. On the contrary, as I have described earlier, the Court of Appeal stressed the importance of litigation

funding as providing access to justice. The "state of affairs", to adopt Lord Wilberforce's phrase (see para 108 above), did not suggest that the purpose of the legislation was to bring litigation funding with the scope of potentially regulated activity.

202.    Turning to the presumption against absurdity, the Respondents rely on this presumption to submit that section 4(2) and (3)/419A(2) should not be read as meaning that everything listed amounts to a claims management service, subject only to the qualification that it is provided "in relation to the making of a claim". They give examples of absurdity that would result from treating every service listed, even if provided just by itself, as providing claims management services. The service of "making inquiries" in relation to the making of a claim in section 419A(2)(d) is, without more, entirely unbounded. There is no limit on the kind of inquiries that are covered. Similarly, if referring or introducing one person to another in relation to the making of a claim is a claims management service, a barrister's clerk would be caught by the definition since he or she clearly refers or introduces members of chambers to solicitors in relation to the making of claims. If the litigation funders in this case are caught, then so would an ordinary bank giving a loan, if they were aware that the loan was to fund the making of a claim.

203.    The Appellants accept, as they must, that their interpretation stretches the term claims management services beyond anything that could properly be described by the ordinary sense of those words. Their answer to the absurdity point was that it does not matter that all these services are caught by the definition. Parliament assumed that the Lord Chancellor would use the power reasonably when deciding which claims management services to regulate. They point to the additional control exercised because the making of an order under section 4 was subject to the affirmative resolution procedure: see section 15 of the Compensation Act 2006 and section 26 of FSMA.

204.    I do not accept that that is a sufficient answer to the undoubted absurdity problem thrown up by the Appellants' submission. The role of the legislature is to set the boundaries for the exercise of executive powers to make subordinate legislation. Those boundaries are defined by Parliament so that the later exercise of those powers can be examined by the courts to determine whether the resulting instrument made by the executive is within the vires of the power or not. The courts are frequently called upon to decide whether secondary legislation which the executive contends is authorised by the power conferred goes beyond the remit that Parliament delegated by the grant of that power. To argue, as the Appellants argue here, that it does not matter how broadly the power to regulate was drawn by the statute because one can

always trust the executive only to use the power reasonably upsets that balance between the legislature and the executive.

205.    Furthermore, the decision of Parliament to include a degree of control over the making of subordinate legislation through the affirmative resolution procedure does not help to save or justify the broad interpretation for which the Appellants contend. The court's power to determine the legality of subordinate legislation is well established; even where a provision has been approved by Parliament, this does not prevent it from being challenged. In *Hoffmann-La Roche & Co AG v Secretary of State for Trade and Industry* [1975] AC 295, 365, Lord Diplock stated:

> "even though [subordinate legislation] is contained in an order made by statutory instrument approved by resolutions of both Houses of Parliament … I entertain no doubt that the courts have jurisdiction to declare it to be invalid if they are satisfied that in making it the Minister who did so acted outwith the legislative powers conferred upon him by the … Act of Parliament under which the order [was] purported to be made …"

206.    The Appellants' argument that the formal parliamentary approval procedure is the control that saves the enabling provision from being too wide also runs counter to the legitimacy of the court's jurisdiction to review subordinate legislation. The parliamentary approval process does not in this case shed any light on the correct construction of the provisions and is no answer to the absurdity problem.

207.    If the Lord Chancellor had decided to prescribe ordinary lending by banks as a regulated claims management service or to require barristers' clerks to be authorised under the regime, I have no doubt that there would have been a powerful case mounted that the order was ultra vires the power conferred by section 4, or by section 419A. That would be on the basis that the service that a bank or a barristers' clerk provides is not a claims management service. The qualifying words "in relation to the making of a claim" do not narrow the scope sufficiently to mitigate the absurdity. The term "claim" is itself defined very broadly in section 419A(3). This presumption therefore points firmly in favour of a narrower construction of the term "claims management services" in section 4/419A.

208.    How then should one construe section 4/419A to avoid the absurdity that arises from an argument that because the reference to the provision of services "includes" a reference to providing financial assistance, making inquiries, referring one person to

another, that means that all those activities, taken by themselves, are also claims management services? The choice is, in my judgment, between two alternative constructions:

> (i)    The first construction is that because the term "claims management services" is said to "include" the provision of financial services, that means that any provision of financial services or assistance is to be treated as the provision of claims management services even if the provider is doing nothing else which would naturally fall within that term.

> (ii)    The second is that because the term "claims management services" is said to "include" the provision of financial services, a person who provides claims management services within the normal meaning of that phrase can be regulated in relation to the financial services or assistance they offer to their clients – and in relation to all the other ancillary activities listed in subsection 4(3)(a)/419A(2) — even if one would not otherwise describe those elements of the package, looked at independently, as "managing claims".

209.    The case law on the "potency of the term defined" is useful here. The *Phillips* case on which the Appellants rely is, in my view, of limited assistance on this point. The term "intellectual property" is clearly a term of art because it is not using the word "intellectual" in its normal sense, nor does it cover things that are "property" in any normal sense either in common parlance or as a legal concept. A non-lawyer coming across the term "intellectual property" for the first time would have no idea what it means. In those circumstances clearly there must be some settled meaning to the term, divorced from the actual words used, in order for the term to have some potency of the kind described by Lord Hoffmann. That is not the position with the term "claims management services". Each of those words has an ordinary meaning and the words bear that ordinary meaning here. The potency of that meaning is not destroyed by the fact that the precise boundary of the term is unclear. This point was made by Lewison LJ in *R (Sisangia) v Director of Legal Aid Casework* [2016] EWCA Civ 24, [2016] 1 WLR 1373 ("*Sisangia*"), referred to in *Bennion* section 18.3. That case concerned the meaning of the term "abuse of position or power" in a provision of LASPO 2012 which set out the kinds of claims for which legal aid could be granted. The judge at first instance had construed the term broadly on the basis that there was no generally recognised definition of "abuse of position or power" to be derived from the case law. Lewison LJ (with whom Elias and Christopher Clarke LJJ agreed) rejected that approach because it ignored the potency of the term defined: para 11. After referring to *Dextra*, he said:

> "14 In my judgment the fact that a definition of 'abuse of position or power' of universal application cannot be extracted from the authorities does not mean that the term defined can be ignored. It is equally possible, indeed probable, that Parliament's intention was that it should be left to the courts to develop what the phrase means.
>
> …
>
> 17 The fact that 'abuse of position or power' cannot be given a hard-edged definition does not mean that the concept itself is meaningless."

210.    I respectfully agree. Almost all English words have imprecise boundaries. If one were to limit the principle of the "potency of the term defined" to ordinary words that have a single accepted core meaning and no fuzzy penumbra, almost no English word would have any potency at all. Case law is full of instances where the courts have had to grapple with the uncertain boundaries of an ordinary word.

211.    The fact that litigation funding would not be regarded as "claims management services" in the normal meaning of those words is an important pointer in favour of a construction which treats the listed services as included in the term when they are provided as part of an overall claims management service but not when they are provided by themselves, not as part and parcel of managing a claim.

212.    A similar point about the inclusion of a range of disparate items in a defined term arose in *Winfield v Secretary of State for Communities and Local Government* [2012] EWCA Civ 1415, [2013] 1 WLR 948, a case cited in the passages from *Bennion,* section 12.2 to which the parties referred us. That appeal concerned the statutory definition of the word "advertisement" for the purposes of a provision in class 13 of the Town and Country Planning (Control of Advertisements) (England) Regulations 2007 (SI 2007/783) which gave deemed planning consent to an advertisement displayed on a site continually for ten years. For that purpose, the word "advertisement" was defined by reference to the meaning given to it in section 336(1) of the Town and Country Planning Act 1990. That definition is very broad and expressly "includes" any hoarding or similar structure used or designed for the display of advertisements. The claimant had installed wooden posts and a wooden structure on the land for ten years and had sometimes displayed placards and notices on them. He argued that the unbroken presence on the land of the wooden posts and the wooden structure for more than ten years gave rise to deemed consent because, even during

the periods when nothing was attached to them, they were expressly included in the definition of "advertisement" and so continued to be advertisements for that purpose.

213.    The Court of Appeal disagreed. Maurice Kay LJ (with whom Sir Stephen Sedley agreed) said:

> "14.    This is difficult drafting, … In *Butler v Derby City Council* [2006] 1 WLR 1346, para 18 Sullivan J said:
>
> 'There is a degree of circularity in this definition … if one asks, what is an advertisement, the answer is, at least in part, something that is "in the nature of, and employed wholly or partly for the purposes of, advertisements". In this respect the definition of an advertisement is like the definition of the proverbial elephant. One knows an elephant (or advertisement) when one sees it because it is in the nature of an elephant (or advertisement).'
>
> 15.    The submission on behalf of Mr Winfield is that the latter part of the definition, beginning with the word 'includes', brings within the meaning of 'advertisement' a 'hoarding or similar structure used or designed, or adapted for use, for the display of advertisements'. The structure need never have had upon it anything recognisable as an advertisement. It would be sufficient, if, for example, it had merely been designed or adapted for use for the display of advertisements."

214.    The Court of Appeal noted that a purposive construction of the provision pointed in favour of a very broad meaning for the word "advertisement" as Mr Winfield contended. The provision was aimed at facilitating the control of advertising and was drawn broadly as an anti-avoidance measure to prevent loopholes. It was intended to enable the local authority to control not just a sign or placard but the structure to which it is attached. But, the Court of Appeal asked, did that necessarily mean that a bare unadorned structure remained an advertisement? It did not. Maurice Kay LJ said, at para 19:

> "I am satisfied that common sense can be accommodated within the cumbersome wording of the definition. During the

period of cessation, the unadorned structure is no longer "in the nature of, and employed wholly or partly for the purposes of, advertisement" and it cannot feed the continuance required by class 13. I accept that this interpretation is at or near the limits of the permissible, but it seems to me to serve the purpose of the legislation and to chime with common sense. If it were not correct, it would mean that a landowner who erects a structure with the sole intention of eventual use for advertising, but who does not adorn it for ten years, would immediately obtain the benefit of class 13 if he were to commence active advertising at the commencement of the eleventh year. I do not believe that the legislation was intended to benefit advertisers (including advertising companies) in that way."

215.    Just as the fact that an advertisement is expressly defined as including the hoarding on which it is fixed does not mean that the hoarding alone is an advertisement, in our case, the fact that claims management services include providing financial assistance, does not mean that all financial assistance is a claims management service whenever it relates to a claim. I recognise that "claims management services" are perhaps less readily identifiable than elephants or advertisements. But the Appellants fairly accepted that litigation funding of the kind with which we are concerned did not naturally fall within the scope of the term – the litigation funders here are not managing claims but are funding the litigation and advocacy services or claims management services provided to the claimants by others.

216.    I am fortified in this conclusion by three further considerations. The first is that the drafting of the "services" which are said to become claims management services by the combination of section 4(2)(b) and (3)(a)(i) – (iv) is so broad as to be almost meaningless. How broad are the services "by way of or in relation to legal representation" or "making inquiries"? It cannot have been intended that everything falling within those terms is capable of being made a regulated activity even if the person does not also "manage claims" in any recognisable way. I agree, therefore with what Henderson LJ said at para 95 of the Divisional Court's judgment. The imprecision in the drafting of section 4:

> "shows that Parliament was content to leave its precise meaning to be developed by the courts in the light of the purpose of the statutory scheme and the guidance which could be obtained from the relatively open-textured terms of the definition."

217.    This appears to be the first time that the courts have been called upon to develop that meaning, and I agree with the way in which the CAT and the Divisional Court carried out that task.

218.    Secondly, it is important to consider the purpose for which claims management services are defined in section 4 of the Compensation Act 2006 and the subsequent section 419A FSMA. The prescription of some claims management services as regulated activities is not an end in itself but a means of empowering the Regulator to set standards for and control the conduct of persons carrying on regulated claims management services. The role of the Regulator designated by the Secretary of State under section 5 of the Compensation Act 2006 and now of the FCA is to regulate the conduct of authorised persons by for example investigating complaints. One can readily see that the inclusion of the ancillary services in section 4(3)/419A(2) within the scope of claims management services makes clear that standard setting and other regulation such as the capping of fees may extend to those aspects of the authorised person's business even if those aspects might not strictly speaking be described as claims management services themselves. It forestalls an argument by claims management service providers that the aspects of their business listed are not strictly speaking claims management services and so should not be the subject of regulation.

219.    Thirdly, a similar argument to that put forward by the Appellants was considered and rejected by the Court of Appeal in *Factortame (No 8)*. The Secretary of State argued in that appeal that because the services that GT were providing were in large measure the type of services that solicitors customarily provide in the course of "the conduct of litigation", the principles that applied to solicitors should apply to them. Lord Phillips analysed the services that GT were providing. He noted that given that it was a criminal offence to conduct litigation without being a solicitor, the term must be given a narrow meaning: "It cannot embrace all the activities that are ancillary to litigation and which are sometimes carried on by a solicitor and sometimes by a person who has no right to conduct litigation": para 25. He cited Potter J in *Piper Double Glazing v DC Contracts* [1994] 1 WLR 777, 783 who said that "An unqualified person does not act as a solicitor … merely by doing acts of a kind commonly done by solicitors. To fall within that phrase, the act in question must be an act which it is lawful only for a qualified solicitor to do and/or any other act in relation to which the unqualified person purports to act as a solicitor". Lord Phillips said that GT's services had at all times been ancillary to the conduct of litigation by those solicitors.

220.    The Appellants' argument in this appeal suffers from the same flaw as the Secretary of State's argument in *Factortame (No 8)*. It relies on a syllogism: claims management service providers often provide financial assistance - Therium provides financial assistance - Therium must therefore be a claims management service

provider. That ignores the point made in *Factortame (No 8)* that the people who provide advocacy services, litigation services and claims management services provide a bundle of services some of which are ancillary to the core service. A person who provides that ancillary service by itself is not within that class.

221.    Mr Thanki relied on the express exclusion from claims management services in section 4(3)/419A(2) of the services of witnesses, whether or not expert witnesses. He submitted that the definition of claims management services must be casting the net very wide if Parliament considered it necessary to exclude expert evidence. There are two answers to that point. First, the exclusion of a specific item does not necessarily mean that it would have been included had it not been expressly excluded: see *Sisangia* para 30. Secondly, it is more likely, in my view, that the explanation for this exclusion lies in *Factortame (No 8)*, decided shortly before the Compensation Act 2006, and the nature of the services that GT provided to the fishermen. In his judgment, Lord Phillips addressed at some length the question whether expert witnesses could provide their services on a contingency fee basis. The Court of Appeal concluded at para 73 that it would be a very rare case indeed where the court would consider that appropriate. As I have said, the Court of Appeal, by contrast, saw nothing contrary to public policy in pure funding being offered under a damages-based contingent arrangement. So the Court of Appeal saw evidence and expert evidence falling on the wrong side of the champerty line but litigation funding falling on the right side. The legislature in section 4(3)(b)/419A(2) made clear that giving evidence and expert evidence falls on the right side of the line being drawn here. It would not make sense to suggest, from that provision, that the legislature was moving pure funding to the wrong side of the line, at least without making it clear that that was the intention.

222.    I would therefore hold that section 4(3)/419A(2) properly construed means that claims management services include the ancillary services commonly provided by claims managers listed so that those ancillary services may also be regulated activities and subject to the supervision and standard setting role of the Regulator. It was not intended to elevate those ancillary services into claims management services in and of themselves, when they are undertaken outside the context of a claims management business. That is all that the section needed to achieve and that is, in my judgment, what it achieved both in its original version in section 4 of the 2006 Act and in its new version in section 419A of FSMA.

## (7) Construing section 58AA CLSA

223.    If I am wrong as to the scope of the definition in section 4/419A, there is still the question of how to define "a person providing advocacy services, litigation services or

claims management services" for the purpose of section 58AA(3)(a). For this task, four further interpretative criteria are relevant:

(i)      The relevance of contemporaneous statutory instruments implementing the statutory provision in issue;

(ii)     The relevance of a statutory provision which has not been brought into force;

(iii)    The effect of incorporating definitions from other enactments; and

(iv)     Reliance on the likely consequences of adopting each construction.

*(a) The relevance of the 2010 and 2013 DBA Regulations*

224.    It is fairly accepted by the Appellants in this appeal that the terms on which the 2010 and 2013 DBA Regulations were drafted can be used as an aid to construe the provisions of section 58AA: see *Factortame (No 8),* para 57. It is apparent from the way the 2010 DBA Regulations are drafted that they were not directed at agreements with litigation funders. For example:

(i)      The 2010 DBA Regulations use the term "client" to refer to the party who is described in section 58AA as the "recipient of the services" and define the word "client" to mean the person "who has instructed the representative" to provide advocacy services, litigation services or claims management services and who is liable to pay for those services.

(ii)     They use the term "representative" to refer to the party who is described in section 58AA as the "person providing advocacy services, litigation services or claims management services".

(iii)    They stipulate that the agreement must specify the circumstances in which the representative's payment, costs and expenses are payable. They then define "costs" as the total of the representative's time reasonably spent multiplied by a reasonable hourly rate, and define "expense" as disbursements including counsel's fees and the expenses of obtaining an expert's report.

225.    The 2010 DBA Regulations therefore assumed that the person providing the services was a "representative" of the recipient of the services. A litigation funder of the kind described in *Factortame (No 8)* or *Arkin* does not "represent" the claimant in any normal sense of that word. Those Regulations, further, assumed that the representative was providing the kind of service which involves ongoing work typically charged for at an hourly rate. Again, that is entirely inapt to apply to a litigation funder who does not charge an hourly rate for work done but rather recovers sums advanced to finance the litigation plus an additional fee. That distinction is reflected in the different description of the uplift to which I have referred in section 58B (dealing with litigation funders) and sections 58 and 58A (dealing with legal representatives). Litigation funders do not charge a success fee expressed as an amount of fees charged because they do not charge fees like legal representatives do.

226.    The 2013 DBA Regulations were similar to the earlier Regulations in that they referred to the recipient of the services as the client "who has instructed the representative" to provide advocacy services, litigation services or claims management services; they assume that the party providing the services is a "representative" who typically charges an hourly rate for time spent on the claim or proceedings. The use of these terms is not accidental. In fact, the Explanatory Memorandum laid before Parliament by the Ministry of Justice refers to the person providing the services as "the lawyer", apparently regarding that as interchangeable with "the representative". The DBA principles are described as "based on the lawyer not being able to recover any more than the DBA fee" (para 4.5).

227.    Damages-based agreements entered into by litigation funders cannot realistically comply with either the 2010 or 2013 DBA Regulations because those Regulations are not drafted in a way which applies to their business. The issue in this case is whether Parliament and the Lord Chancellor by enacting section 58AA and prescribing conditions with which damages-based litigation funding agreements could not comply intended thereby to render unenforceable the damages-based litigation funding agreements currently underpinning claims in the CAT and in other courts and tribunals.

*(b) The presence of section 58B CLSA 1990*

228.    I explained earlier that the AJA 1990 inserted section 58B about litigation funders into the CLSA 1990 as well as replacing the original section 58 with revised sections 58 and 58A. Section 58B has not been brought into force or amended since then. The Divisional Court placed considerable reliance on the existence of section 58B. Henderson LJ said at para 88 that one of the main reasons why he agreed with the

CAT's decision was the presence of section 58B. The fact that the section had never been brought into force was, he said, beside the point: (para 88)

> "… As I have explained, section 58B remained unrepealed on the statute book in 2006 (as it still does today), and the executive (in the form of the Lord Chancellor or the Secretary of State) is under a continuing duty to consider whether it should be brought into force: see para 81 above, and the decision of the House of Lords in the *Fire Brigades Union* case [1995] 2 AC 513. Furthermore, if section 58B were in force, there cannot be any doubt that the funding agreements in the present case would fall within its ambit. In terms of the definition in section 58B(2), set out at para 70 above, each such agreement is one under which the funder agrees to fund (in whole or in part) the provision of advocacy or litigation services by someone other than the funder to the litigant (i e the representative and/or the individual claimants), and the litigant agrees to pay a sum to the funder in specified circumstances."

229.    Henderson LJ, at para 89, said that it was "most improbable" that Parliament would have intended, by a sidewind, to bring litigation funding agreements which were potentially liable to regulation under section 58B within the ambit of the scheme for regulation of claims management services under the 2006 Act.

230.    The case to which Henderson LJ referred, *R v Secretary of State for the Home Department, Ex p Fire Brigades Union* [1995] 2 AC 513 concerned a statutory scheme set out in the Criminal Justice Act 1988 for compensating victims for criminal injuries. The quantum was to be calculated on the same basis as common law damages. The scheme was never brought into force by the Secretary of State. In 1994, a new non-statutory scheme was established that calculated compensation according to a tariff no longer based on common law principles and was substantially less generous. The House of Lords rejected the submission that the Minister was under a statutory duty to bring the provisions into force. That did not mean, however, that the Secretary of State had an absolute and unfettered discretion whether or not to do so. Lord Browne-Wilkinson said, at p 551:

> "So to hold would lead to the conclusion that both Houses of Parliament had passed the Bill through all its stages and the Act received the Royal Assent merely to confer an enabling power on the executive to decide at will whether or not to

make the parliamentary provisions a part of the law. Such a conclusion, drawn from a section to which the sidenote is 'Commencement,' is not only constitutionally dangerous but flies in the face of common sense. … In the absence of express provisions to the contrary in the Act, the plain intention of Parliament in conferring on the Secretary of State the power to bring certain sections into force is that such power is to be exercised so as to bring those sections into force when it is appropriate and unless there is a subsequent change of circumstances which would render it inappropriate to do so."

231.    The result of this was, the House of Lords held, that the Secretary of State came under a clear duty to keep under consideration from time to time the question whether or not to bring the sections into force. The introduction of the new tariff scheme was therefore unlawful because Parliament had expressed its will that there should be a scheme based on the tortious measure of damages. That expression of Parliament's will had not been repealed, nor had Parliament been invited to repeal it.

232.    Lord Lloyd of Berwick also held that although the legislative provisions did not have statutory force that "does not mean that they are writ in water": p 570H. They contain a statement of parliamentary intention even though they create no enforceable rights. Lord Nicholls said that although the Secretary of State is not under a legal *duty to appoint* a commencement day, he or she "is under a legal *duty to consider* whether or not to exercise the power and appoint a day" (emphasis in original): p 575F. That obligation would cease only when the power was exercised or Parliament repealed the legislation. Until then the duty to keep under review continued.

233.    The Appellants in this case say that that section 58B is not relevant because it does not empower the prescribing of a complete code for regulating litigation funding and in particular it could not be used to control damages-based litigation funding agreements. Henderson LJ was wrong to say that the funding agreements in the instant case would fall within section 58B if that section were brought into force. That is because litigation funding agreements within its scope are those where the uplift agreed is calculated by reference to the money spent by the funder and not by reference to the damages received: see section 58B(3)(e).

234.    I accept that correction but I do not consider that that detracts from the force of the point made by Henderson LJ. The structure of this series of statutory provisions shows that agreements entered into by funders who agree to fund the provision of

advocacy and litigation services by someone else were dealt with separately from agreements entered into by those providing the advocacy and litigation services. The former were intended to be dealt with, if at all, by section 58B CLSA. That would be brought into force if needed and would, one assumes, be accompanied by a further set of regulations. Those regulations would need to define who is a "funder" for this purpose because section 58B(3)(a) does not enact a definition of funder but envisages that the definition will need to be contained in regulations. In enacting section 58B in the terms set out, Parliament no doubt intended that the requirements would be prescribed in a way which enable at least some litigation funding agreements to comply with them and so be enforceable.

235.   If and when section 58B needs to be activated, Parliament may also have to consider whether that section itself needs amendment to reflect how matters have moved on since the AJA 1999 — whether, for example, it should apply to the funding of claims management services provided by someone else as well as to the funding of the advocacy or litigation services to which it is currently limited and whether it should apply to damages-based litigation funding agreements as well as agreements which provide for an uplift on the amount lent.

236.   It seems to me, as it seemed to the Divisional Court, most improbable that Parliament intended that damages-based litigation funding agreements would all be rendered unenforceable by section 58AA without any mention of this fact. Given the Secretary of State's duty to consider whether to bring section 58B into force, one would expect the Appellants to be able to point to some explanation given by the Government as to why the 2010 and 2013 DBA Regulations were drafted so as to be the mechanism by which all damages-based litigation funding agreements were rendered unenforceable, rather than revising and implementing the mechanism for regulation of such agreements that Parliament had enacted in section 58B.

## (c) Incorporation of a definition from another statute

237.   The Appellants place weight on authorities that make clear that where a definition is incorporated into another statute it must bear the same meaning in both places. The leading case on this point is *Williams v Central Bank of Nigeria* [2014] AC 1189 ("*Williams*"). That case concerned the word "trustee" in section 21(1)(a) of the Limitation Act 1980. Section 38(1) of that Act defined the terms "trust" and "trustee" as having the same meanings as in section 68(17) of the Trustee Act 1925. That earlier definition extended the expressions to implied and constructive trusts and to the duties incident to the office of a personal representative. The issue before the court was whether the term "trustee" in the 1980 Act included as well a stranger to a trust who was liable to account (as the defendant bank was alleged to be) on the footing of

dishonest assistance or knowing receipt of trust assets. If such a stranger was not a
"trustee" then the claim would be time barred.

238.    Lord Sumption (with whom Lord Hughes JSC agreed) dealt at para 27 with the
submission that Parliament must have intended to abolish for limitation purposes the
distinction between true trustees and those on whom equity imposed a liability to
account as if they were trustees. This was because the legislation was designed to
adopt the recommendations of the Wright Committee (see Law Revision Committee,
Fifth Interim Report, *Statutes of Limitation*, (1936) (Cmd 5334)) and that is what they
recommended. Lord Sumption rejected that submission for a number of reasons. First,
he rejected the submission that the Wright Committee had made such a proposal.
Further, if Parliament had understood the Wright Committee to have made that
recommendation, they would not have implemented it by adopting the definition in
the Trustee Act 1925 since that Act was also not concerned with ancillary liability. Lord
Sumption then went on: para 27

> "The latter point raises an altogether more fundamental
> objection to using the Committee's report to elucidate not
> the rules of limitation as such but the categories of 'trustee'
> to which they were intended to apply. By adopting not just
> the language but the meaning of the ready-made definition
> in the Trustee Act 1925, Parliament directed the courts to
> discover its meaning in the latter Act. On that question, the
> intentions of a Committee reporting 11 years later cannot be
> of the slightest assistance."

239.    Lord Neuberger (with whom Lord Hughes also agreed) made the same point in
*Williams*:

> "50 Where a term in a later statute is defined by reference to
> a definition in an earlier statute, it seems to me self-evident
> that the meaning of the definition in the later statute must
> be the same as the meaning of the definition in the earlier
> statute. Hence, the meaning of the term in the later statute is
> determined by the definition in the earlier statute. Further,
> the adoption of the definition in the later statute cannot
> somehow alter the meaning of the definition in the earlier
> statute. It accordingly follows that one has to determine the
> meaning of the term in the later statute simply by construing
> the definition in the earlier statute. … In the light of Lord
> Mance JSC's judgment, it is, I think, important to emphasise

> that the way in which the definition of 'trustee' in section
> 68(1)(17) is incorporated into the 1980 Act appears to leave
> no scope for contending that the meaning of the expression
> in the 1980 Act can somehow be different from that which it
> bears in the 1925 Act."

240.    He rejected any suggestion that the words in the Limitation Act 1980 could bear any different meaning, because of the mischief being addressed by the later Act. When performing its interpretative role, the court cannot take "a free-wheeling view of the intention of Parliament" treating the words used as merely one item of admissible material: para 72.

241.    That principle of construction, expressed in such uncompromising terms by Lord Neuberger, is in tension here with another principle referred to by *Bennion* at section 11.6. That section is headed "Regard to be had to consequences" and states the principle in the following terms:

> "When considering, in relation to the facts of the instant
> case, which of the opposing constructions of the enactment
> corresponds to its legal meaning, the court should assess the
> likely consequences of adopting each construction, both to
> the parties in the case and (where similar facts arise in future
> cases) for the law generally. If on balance the consequences
> of a particular construction are more likely to be adverse
> than beneficent this is a factor telling against that
> construction."

242.    The Appellants did not demur from the Respondents' description of the very adverse consequences of the choice between the two constructions I have set out at para 208, above. As I have already explained, the Appellants' primary argument in support of the breadth of the term "claims management services" for the purposes of section 4/419A is that Parliament included all sorts of ancillary services in the definition because the breadth of the term had no immediate effect on anyone unless or until the services were prescribed in an order of the Lord Chancellor. Transplanted into its new context in section 58AA, however, the Appellants contend that the breadth of the definition certainly does have adverse consequences for a person providing unregulated claims management services and for their customer. Those consequences are that the funders cannot enforce their agreement for the repayment of the millions of pounds they have spent.

243.    Ms Dunn, the current Chair of the Association of Litigation Funders, described the consequences beyond the present proceedings in her witness statement:

> "These consequences will extend to all or most litigation funding agreements that have been agreed since litigation funding began in England and Wales. This would be massively damaging both for the administration of justice in relation to the existing cases which involve funding by litigation funders, and the future access to justice of parties who would otherwise have employed litigation funding agreements to fund their cases. It would bring to an abrupt end hundreds of funded claims with potentially catastrophic financial consequences for all involved in the case. It would have a major impact on the development of group litigations before the English Courts (including but not limited to Collective Proceedings Orders before the Competition Appeals Tribunal), given the inter-relationship between that group litigation and the litigation funding industry. This would have enormous financial consequences: there is estimated to be over £500 million of costs incurred annually by litigation funders in the UK alone. It would also have huge policy implications for the litigation funding industry, which ALF is best-placed to address."

244.    Mr Leslie Perrin, Chairman of Calunius, also describes the importance of the issue:

> "… if the proposed LFAs with [UK Trucks Claim] were found to be DBAs, that finding would invalidate most if not all LFAs that have been agreed since litigation funding began. For example, it would invalidate the *Merricks* LFA (so far as I understand its terms from the judgments of the CAT) and would be likely to mean that no [collective proceedings order] could ever be pursued, given the reliance that has been placed on litigation funding in the development of this aspect of the work of the CAT. At the least, it would require a radical review not only of these LFAs but of the entire litigation funding sector as it has developed in the United Kingdom."

245.    As regards the consequences of the Appellants' submission, there is the additional point arising from section 58AA(11) which cross refers to section 47C(8) of the Competition Act 1998 (inserted by the Consumer Rights Act 2015). That provides that a damages-based agreement is unenforceable if it relates to opt-out collective proceedings even if it complies with the requirements set in section 58AA.

246.    Given that I have decided that the importation of the term "claims management services" from section 4(2)(b)/419A(1) into section 58AA does not lead to the outcome for which the Appellants contend, I do not have to address what would be the position if the term might be broad enough to do that. The Appellants were not able to point to anything that has happened in terms of orders made by the Lord Chancellor or standards set by the Regulator or FCA which would be disrupted by adopting the narrower of the two possible constructions set out in para 208, above. Litigation funding as an independent activity has never been treated as "claims management services" for any purpose either under section 4/419A or under section 58AA CLSA.

247.    In my judgment, therefore, the highest that the Appellants can fairly put their case is that section 4/419A is ambiguous as to whether it is intended to catch "financial assistance", "making inquiries" or "introducing one person to another" in relation to a making of a claim even where that activity is unconnected with what one might naturally describe as managing claims. If there is that ambiguity, one must then address whether the incorporation of the term in the later legislation casts any light on whether it was really ever intended to be that wide. This principle is included in *Bennion* section 24.19. It is important not to overstate this principle because as Lord Radcliffe said in *Inland Revenue Comrs v Dowdall, O'Mahoney & Co Ltd* [1952] AC 401, 426 cited in *Bennion* "The beliefs or assumptions of those who frame Acts of Parliament cannot make the law". But where the provision in the earlier statute is ambiguous and capable of two meanings, a later statute can assist in resolving that ambiguity if it is clear that it assumes that the earlier provision bore one of two possible meanings.

248.    This problem was considered in *R (ZYN) v Walsall Metropolitan Borough Council* [2014] EWHC 1918 (Admin), [2014] PTSR 1356, a case that was raised during the hearing before the court. In that case the difficulty was construing a reference in regulations made in 1987 to the "Court of Protection". The Court of Protection that had existed at the time those regulations were made had been abolished under legislation enacted in 2005 and replaced as from October 2007 with a new Court of Protection. Although transitional provision was made in the 2005 legislation dealing with various matters, there was nothing which stated that references in subsisting legislation to the old Court of Protection were to be treated as referring to the new Court. The question was whether the reference in the 1987 regulations was now

redundant or whether it should be read as referring to the new Court. Leggatt J compared the historical approach to interpreting legislation with the updating, or "always speaking" approach. He preferred the updating approach so that the term should be interpreted as referring to the body in existence at the time when the regulations are being applied: para 51. Leggatt J then went on to consider whether there are circumstances in which later legislation can change the meaning of earlier legislation. This can, of course, be done expressly but:

> "55 Even without explicitly requiring the courts to give a term in existing legislation a particular meaning, or to apply a specified rule when interpreting the term, Parliament may act in a way which treats the term as having a particular meaning and signals its approval of that meaning. A line of cases illustrates that this is a matter to which a court may properly have regard to resolve an ambiguity in the statutory language."

249.    Having considered a number of authorities on the point, Leggatt J concluded:

> "59 This approach seems to me to respect the constitutional principle of parliamentary sovereignty. Bennion, at p 801, quotes a statement of Thomas Hobbes in *Leviathan* (1651), ch 26 that 'the legislator is not he, by whose authority the laws were first made, but by whose authority they now continue to be laws'. If Parliament has proceeded on the basis that an existing law has a particular meaning at a time when, if Parliament had understood the law to have a different meaning, it is reasonable to infer that it would have acted differently, that may properly be treated as an implied directive as to how a previously ambiguous law should be interpreted."

250.    The term "Court of Protection" was capable of bearing either of two meanings. It was inconceivable that Parliament would have failed to update the 1987 regulations if they had thought that they referred solely to the body which had ceased to exist.

251.    Leggatt J also addressed a point that underlies much of the debate in the present appeal, namely that Parliament simply overlooked or misunderstood the effect of the combination of the earlier provision and the abolition of the Court of Protection. That was not a permissible conclusion:

> "65 That suggestion might have force if ascertaining the intention of Parliament involved a sociological inquiry into what was actually in the minds of individual legislators. However, that would be to mistake the nature of the interpreter's task. When courts identify the intention of Parliament, they do so assuming Parliament to be a rational and informed body pursuing the identifiable purposes of the legislation it enacts in a coherent and principled manner. That assumption shows appropriate respect for Parliament, enables Parliament most effectively to achieve its purposes and promotes the integrity of the law. In essence, the courts interpret the language of a statute or statutory instrument as having the meaning which best explains why a rational and informed legislature would have acted as Parliament has. Attributing to Parliament an error or oversight is therefore an interpretation to be adopted only as a last resort."

252.    I respectfully agree with that analysis. One of the cases to which Leggatt J referred was *Cape Brandy Syndicate v Inland Revenue Comrs* [1921] 2 KB 403. That concerned legislation taxing excess profits introduced by the Finance Act (No 2) 1915 during the First World War and raised the issue whether a business that was started after the War could be caught. The problem was that the Finance Act (No 2) 1915, when specifying the comparison to be made in order to decide whether profits were "excessive", appeared to contemplate that the comparison needed to be with profits earned in pre-war accounting periods. The Finance Act 1916 extended the operation of the taxing provision in the 1915 Act to later accounting periods but did not itself impose a new taxing provision. Lord Sterndale MR concluded that the framers of the Finance Act 1916 "were of the opinion" that the 1915 Act did catch businesses which started after the War commenced. He said: (p 414)

> "I think it is clearly established in *Attorney General v Clarkson* [1900] 1 QB 156 that subsequent legislation on the same subject may be looked to in order to see what is the proper construction to be put upon an earlier Act where that earlier Act is ambiguous. I quite agree that subsequent legislation, if it proceed upon an erroneous construction of previous legislation, cannot alter that previous legislation; but if there be any ambiguity in the earlier legislation then the subsequent legislation may fix the proper interpretation which is to be put upon the earlier. ... I think those are two possible constructions. It is perfectly obvious that the Act of 1916 and the Act of 1920 both assume that the Act of 1915

> was so framed as to include post-war businesses, and
> therefore it seems to me to assume and really to direct that
> the second construction, which does not exclude post-war
> businesses, is the right construction of Part II of the fourth
> schedule to the Act of 1915."

253.    The ambiguity, if it exists, in section 4/419A can in my judgment be resolved in this way. Everything in the scheme of Part II of CLSA 1990 as amended over the years, in the pre-legislative materials, the 2010 and 2013 DBA Regulations and in the case law which Parliament is assumed to know shows that Parliament did not intend by enacting section 58AA suddenly to render unenforceable damages-based litigation funding agreements. Parliament must have read section 4/419A as having the second meaning I have suggested and so as not covering the litigation funding agreements at issue in these proceedings. There is no need, therefore, to frustrate the will of Parliament in that regard, under the banner (to adopt Lord Bingham's phrase) of loyalty to the will of Parliament.

254.    I therefore conclude that the Divisional Court was right to agree with the reasoning of the CAT that the giving of financial assistance is only included in the term claims management services if it is given by someone who is providing claims management services within the ordinary meaning of that term.

255.    I would therefore dismiss the appeal.